1          **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

**VIP Products, LLC, an Arizona** )
5    **limited liability company,**  )    No. **CV 14-2057-PHX-SMM**
                                )
6      Plaintiff/Counterdefendant, )
                                )
7            vs.                )    Phoenix, Arizona
                                )    August 31, 2015
8    **Jack Daniel's Properties,**   )    2:57 p.m.
     **Inc., a Delaware corporation,** )
9                                )
       Defendant/Counterclaimant. )
10   _____ )

11

12          **BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE**

13            <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14              (*Telephonic Discovery Dispute*)

15

16

17

18

19

20

Official Court Reporter:
21   Laurie A. Adams, RMR, CRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, Spc 43
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

25

1    APPEARANCES:

2
     For the Plaintiff/Counterdefendant:

3
             DICKINSON WRIGHT PLLC
4            By:  **Frank G. Long, Esq.**
             1850 N. Central Avenue
5            Suite 1400
             Phoenix, AZ 85004

6
     For the Defendant/Counterclaimant:

7
             QUARLES & BRADY LLP - Phoenix
8            By:  **Isaac S. Crum, Esq.**
             One Renaissance Square
9            2 N. Central Avenue
             Phoenix, AZ 85004

10
             SEYFARTH SHAW LLP - Los Angeles
11           By:  **Christopher C. Larkin, Esq.**
             2029 Century Park E.
12           Suite 3500
             Los Angeles, CA 90067

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Civil Case 14-2057, VIP

 3     Products versus Jack Daniel's Properties.  This is time the set

 4     for telephonic discovery dispute.

 5                Please announce your presence for the record.        14:56:58

 6            MR. LONG:  Frank Long with Dickinson Wright for VIP

 7     Products, LLC.

 8            MR. CRUM:  Isaac Crum with Quarles & Brady for Jack

 9     Daniel's Properties, Incorporated.

10            MR. LARKIN:  Christopher Larkin of Seyfarth Shaw for      14:57:12

11     Jack Daniel's Properties, Incorporated.

12            THE COURT:  Okay.  Thank you again for making the

13     adjustments to be here this afternoon.  We're here with a court

14     reporter.  So I would appreciate it when you speak to identify

15     yourself so that she can make sure we get the right party        14:57:27

16     addressed to the right language.

17                So if you can help me out here and tell me what's

18     going on here today, I would appreciate it.

19            MR. LONG:  Sure, Your Honor.  This is Frank Long.

20     We're having two issues here:  One is a request by VIP for       14:57:47

21     documents and information that Jack Daniel's Properties is

22     objecting to providing; and second is VIP's disclosure of

23     documents and that Jack Daniel's Properties is also objecting

24     to.  I don't know which one the Court would want to take first.

25     But those are the two issues arising.                           14:58:22
```

1      THE COURT:  Okay.  Now, let me see if I can

2   understand.  I did pull up a couple of the documents from the

3   record, and it appears as though the deadlines were extended by

4   stipulation in Judge Campbell's Case Management Order, Document

5   25.  And, of course, keeping in mind you were going to have a        14:58:44

6   settlement conference and everything like that.

7      But in Paragraph 9, Judge Campbell said that the

8   document -- the deadlines are real.  The parties are advised

9   that the Court intends to enforce the deadlines set forth in

10   this order and should plan their litigation activities              14:59:02

11   accordingly.  The parties are specifically informed the Court

12   will not, absent truly unusual circumstances, extend the

13   schedule in this case to accommodate settlement talks, or

14   anything else as far as I'm concerned.

15      But anyway, so somebody who wants to lead this off and       14:59:18

16   you can take them in any order that you want to.

17      MR. CRUM:  Your Honor, this Isaac Crum for Jack

18   Daniel's.  I'd like to address that particular point.

19      So it's the two discovery disputes.  The first dispute

20   from Jack Daniel's perspective is VIP's untimely production of      14:59:34

21   what amounts to now almost 900 pages of additional documents.

22   Jack Daniel's certainly took to heart that language in Judge

23   Campbell's case management order, and the only reason we're

24   bringing this to the Court's attention is because all these

25   documents were produced after the close of fact discovery.  So     14:59:55

1    it would have been impossible for Jack Daniel's to bring this

2    to the Court's attention prior to the close of discovery.

3        With respect to the other issues, the VIP attempting

4    to compel additional production by Jack Daniel's, we think

5    again, Your Honor, that Judge Campbell's order governs and    15:00:14

6    there's no exceptional circumstances in this case for the Court

7    to entertain this Motion to Compel that, frankly, could have

8    been brought any time during fact discovery.

9        THE COURT:  Okay.  Now, just a minute.  Let me ask a

10    quick question here.  From Mr. Crum, if you would, from your    15:00:35

11    perspective, are any of these documents that they seek to

12    disclose to you, the 900 pages of documents, were those readily

13    available at some time prior to this date from your

14    perspective?

15        MR. CRUM:  Yes, Your Honor.  It's our perspective all    15:00:54

16    of them were readily available.  The bulk of them, almost 850

17    pages, either consist of charts, which appears to be prepared

18    by counsel for VIP, which they could have prepared and produced

19    at any time, or publicly available trademark registration

20    files, basically the prosecution histories for those trademarks    15:01:15

21    which VIP could have gone on line and downloaded at any time.

22        The remainder of the production was also available to

23    VIP at any time.  They were two pages of what appears to be

24    their marketing materials, an additional 38 pages of what look

25    like internet searches, t-shirts that bear a similarity to the    15:01:35

1    Jack Daniel's mark.  And actually just this morning, Your

2    Honor, they produced an additional four pages which appear to

3    be pictures of Jack Daniel's boxes and other shipping boxes.

4    So it's certainly Jack Daniel's position that all of this could

5    have been produced during fact discovery.                          15:01:56

6          THE COURT:  All right.  Mr. Long, what's your

7    position?

8          MR. LONG:  Well, our position is that, on this issue,

9    would be the discovery cutoff is not a disclosure cutoff.  And

10   what we're doing is providing information that has become      15:02:11

11   available to us since the discovery cutoff.  And it's either

12   part of our supplemental -- our obligations to supplement our

13   prior discovery responses, it's also information that is, even

14   though it's public record, we're not going to stand on the

15   position that it's equally available to the other side.  It's  15:02:34

16   just an order to have full and complete disclosure.  We're just

17   providing that information in order to make sure that there's

18   no possible argument that the other side wasn't aware of it.

19   And I think we could speak -- and it really falls into five

20   categories of documents that we have produced in order.  The   15:02:52

21   first one are two pages of VIP marketing information that

22   didn't exist prior to the close of discovery.  It was only

23   obtained shortly before we disclosed it.  We looked at the

24   discovery request and felt it fell within it so it was our duty

25   to supplement it so we sent over the two pages.  Another one -- 15:03:12

1              THE COURT:  Wait.  Wait.  Wait.  If it's marketing

2    material of your corporation and you represent them, they know

3    that they have to turn this over.  How is this suddenly newly

4    discovered marketing material that should have been disclosed

5    and wasn't?                                                    15:03:32

6              MR. LONG:  Because it was a display that didn't exist

7    at the time.  They had a new display for displaying this

8    particular product, and the client sent it and said here's a

9    new display that we have.  We said okay, it's a new display.

10   They want information on our marketing.  Arguably it falls      15:03:48

11   within it.  Give it to them.  It wasn't a display that existed

12   at the time.  In the interest of full and complete disclosure

13   and also in order to fulfill our duties to supplement

14   information that was pertinent to a request that was acquired

15   subsequent, we thought that we would give it to them.  It was   15:04:10

16   just appropriate to do that.  Frankly, we're surprised it's

17   objectionable.  It's information about us that they didn't have

18   but we thought they were legitimately entitled to receive.

19              THE COURT:  Okay.

20              MR. LONG:  And the second category are documents we    15:04:30

21   received on subpoena from a third party after the close of

22   discovery.  There were six pages.  They were disclosed to both

23   sides by the third party at the time of disclosure.  We both

24   had an e-mail.  We looked at them, considered them, thought we

25   would want to use them, marked them and just produced them so   15:04:45

1    they would have a proper Bates to them.  That was the second

2    category.

3          There are three more categories.  The third category

4    are the PTO file records, the bulk of them, and that is that

5    these are PTO records, registrations that were able to be          15:05:03

6    identified only through a very laborious process of searching

7    for graphical information.  It's not an easy search in PTO

8    records, but through that process, came up with this chart,

9    wanted to provide the chart and also all the information that

10   was used to create the chart so that the other side would have    15:05:21

11   that well in advance of any kind of Motion for Summary Judgment

12   or trial.  That was the third category.

13         The fourth category are websites that related to

14   products that were identified in requests for admission that

15   had previously been sent to Jack Daniel's and Jack Daniel's had    15:05:41

16   responded to, and were provided as backup for authentication of

17   the actual products and where they came from.  That was the

18   fourth category.

19         And the last one is a fifth category of documents that

20   did come this morning.  They are pictures taken by a person who    15:05:59

21   has been identified as an expert.  He produced an expert

22   report.  Hes' been deposed by the other side in an expert and

23   in the process of a deposition was asked questions about his

24   process of inspection and his assessments.  He notified us on

25   Friday that he had additional information.  He gave it to us on    15:06:17

```
1   Friday and we produced it today.
2           THE COURT:  Of course, he was under a subpoena, I take
3   it, or an agreement that when he testified he would disclose
4   everything at that time.  And, of course, Rule 26 requires him
5   in his report to produce all that in the very first instance,          15:06:36
6   right?
7           MR. LONG:  Yes, Your Honor, and he was asked about it.
8   He said I don't have any information on that point when he was
9   deposed.  Later on he said, you know, on that point, I have
10  done a test, and I have these results, and here they are.  And          15:06:51
11  so we produced them.
12          THE COURT:  But he didn't have it at the time of his
13  deposition, right?
14          MR. LONG:  Yes, Your Honor.  He did not have it at
15  that time.                                                              15:07:05
16          THE COURT:  So later on he says, whoops, maybe I
17  shouldn't have overlooked that.  Maybe I should find that and
18  come up with this, right.
19          MR. LONG:  He was asked, well, did you ever consider
20  doing X, and he said no.  He said I did, but I ran out of time,         15:07:16
21  I think was his exact testimony.  That was the day of the
22  deposition.
23          THE COURT:  Well, that -- you paid for the expert, and
24  you are paying for his time.  If he ran out of it that's what
25  you bought and paid for.  Why should the other side be burdened         15:07:30
```

1    with that when he keeps coming up with things he thinks of in

2    response to a question on this issue?  I don't get it.

3         MR. LONG:  Well, Your Honor, I thought this situation

4    could happen.  He could be asked in cross-examination, but you

5    never did these measurements.  He would say, yes, I did.  They          15:07:49

6    would say, when?  Well, I did them in August.  And I wouldn't

7    want -- I didn't think it was fair for the opposing party to be

8    asked that question or given an answer without being given the

9    information about the measurements that he did take.  That's

10   why we disclosed that.                                                  15:08:08

11        THE COURT:  What he was doing is -- the rule is very

12   clear.  State your opinions and be very proud of your opinions

13   and give all the underlying data that supports your opinion.

14   If you make a mistake or you didn't assume things and things

15   like that, that's legitimate cross-examination.  But when asked        15:08:23

16   and pinned down on it and the value of that is he didn't do his

17   job from the defense point of view, and you say, well, now that

18   you did ask me, I did go back and do all that anyway, then they

19   have to come back and live with that answer and they don't have

20   the time to further cross-examination him on that particular          15:08:40

21   issue because the deposition is closed.  That's not right.

22        MR. LONG:  Well, Your Honor, after they received this,

23   if they feel they needed to do any further discovery on that,

24   it's always a possibility.  I thought it was better to disclose

25   it rather than having a situation where he said, yes, I have           15:09:01

1    done the measurements and they didn't have the results of those

2    measurements.

3          THE COURT:  Let me go back over to the other side and

4    see what they have to say.

5          MR. CRUM:  So, Your Honor, I have got a list here.  So    15:09:12

6    if it's true that the two page which appear to be a stand that

7    VIP created after the close of discovery, if those two images

8    were really not in existence before the close of discovery,

9    Jack Daniel's will withdraw its objection to those documents.

10          The same thing -- so we had a conference on these    15:09:34

11    issues prior to alerting the Court, and there were six pages

12    that Frank alluded to which were produced by a third party.

13    And we told Frank and his colleague, David Bray, that given

14    that they had no control over when the third party produced

15    those documents we're going to withdraw our objection to those    15:09:56

16    as well.

17          THE COURT:  Before you move on to that point.

18          MR. CRUM:  Yes, Your Honor.

19          THE COURT:  I'm concerned about your position that

20    they didn't have control over what the third party did.  They    15:10:07

21    did, in fact, have that option.  The rules provide that if you

22    serve a subpoena and it's a subpoena duces tecum and you go to

23    take their deposition and they don't produce it, you have a

24    right to come to the Court and ask for an order of enforcement.

25    Isn't that correct?    15:10:26

```
 1          MR. CRUM:  Yes, Your Honor.  That's absolutely
 2   correct.
 3          THE COURT:  Parties don't do that a lot, but that's
 4   the remedy.  So to come in and say they don't have control over
 5   it, I don't find that to be exactly correct as an application      15:10:35
 6   of the rules.  So --
 7          MR. CRUM:  You are absolutely correct, Your Honor.  I
 8   agree with that statement.
 9          MR. LONG:  Your Honor, this is Frank Long.
10          What happened in that particular situation, Your           15:10:47
11   Honor, is that we subpoenaed the information.  They hired local
12   counsel, said they were objecting to it, but they invited us to
13   contact them and discuss with them the specific document
14   requests that we had, which we did.  And they responded to
15   those, said give us time to provide that information and we        15:11:04
16   did.  And those documents came on the date they did and we
17   produced them to both sides.
18          THE COURT:  I appreciate that.  And they --
19          MR. LONG:  And rather than --
20          THE COURT:  Go ahead.                                       15:11:16
21          MR. LONG:  The only alternative would have been to
22   tell them, I don't care that you're producing it.  It's not
23   happening quick enough.  We're going to call you into court
24   when they were acting in good faith and collecting the
25   information.                                                       15:11:28
```

1        THE COURT:  Well, your position is they were acting in

2   good faith.  I have been doing this for a long time and I find

3   more often than not third parties find a way to try -- they

4   don't care about your discovery deadlines and they drag things

5   out.  They can say well, we're still looking at it, we're        15:11:41

6   trying to do this, we've got other problems, but meanwhile you

7   are the ones that are at risk over it.

8        So, Mr. Crum, tell me what you want to do about these

9   third party's six pages.

10       MR. CRUM:  Well, Your Honor, we have only objected to     15:11:56

11   the six pages.  I mean, this is not a formal opinion.  We would

12   object to these six pages.

13       THE COURT:  But you were about to tell me, did you

14   wish to continue with your objection?

15       MR. CRUM:  Yes, Your Honor.  Want I would also -- so     15:12:14

16   there were three other categories that Frank identified that I

17   would like to also briefly respond to.

18       THE COURT:  I just want to make sure we finish the six

19   pages as to what your position was before we move on to the

20   other topics.  That's all.                                    15:12:30

21       MR. CRUM:  Yes.  So, Your Honor, the late production

22   of these six pages, we would object to that as coming after the

23   close of fact discovery and untimely, on that basis.

24       THE COURT:  Go ahead.  What's the next one?

25       MR. CRUM:  So the next topic, I think, is the one       15:12:51

1    Frank discussed last, which was today's production of four

2    additional images which appear to be now from their expert.

3    It's Jack Daniel's position 100 percent with what the Court

4    said.  We had an opportunity to review this expert's report.

5    We deposed him on this report, and now it appears that VIP is        15:13:10

6    attempting to supplement its report with these images.  Expert

7    discovery, Your Honor, is closed at this point in addition to

8    the fact discovery being closed.  So Jack Daniel's vehemently

9    objects to the inclusion of these documents and any additional

10   supplementation of his report.  And specifically during the        15:13:30

11   deposition, I have a copy of the rough transcript in front of

12   me, he was asked if he measured these certain -- these boxes,

13   which are now shown in the images and he said flatly that he

14   did not perform those measurements, Your Honor.  And it's Jack

15   Daniel's position that it's completely entitled to rely on the      15:13:52

16   testimony of the expert in cross-examining that expert

17   ultimately at trial.

18           Moving back to the 850-plus pages of PTO records, Mr.

19   Long indicated that it was a laborious process to obtain these

20   records.  What he didn't do is ever explain why they weren't       15:14:15

21   obtained earlier during fact discovery, yet he had six months

22   to run his searches and to produce this documentation.  He

23   didn't explain why they didn't do it, why they didn't do this

24   search earlier on in the process.  And the same is true with

25   these documents that Mr. Long characterized as images of           15:14:35

1    products which appear to be internet searches as far as I can

2    tell.  There's no indication why these exact same internet

3    searches couldn't have been run three months ago, four months

4    ago, six months ago.

5            THE COURT:  Now, what about these other documents that    15:14:55

6    they want you to produce?

7            MR. CRUM:  With respect to that, Your Honor, would you

8    like Jack Daniel's to start, Your Honor?

9            THE COURT:  Well, no.  Okay.  These all relate to

10   VIP's issues that they want addressed by the Court and to allow    15:15:11

11   these to come in.  Is that correct?

12           MR. LONG:  Yes, Your Honor.  Those are all the issues

13   related to the disclosure documents by VIP.

14           THE COURT:  Okay.  Then --

15           MR. LONG:  All we have done is just disclosed them.    15:15:27

16   We received this contact from Jack Daniel's raising objections

17   to that, and that's why we're bringing it up now.

18           THE COURT:  Right.  And, of course, what comes after

19   that, even if you produce them, that doesn't always mean that

20   they are necessarily admissible.  And --    15:15:42

21           MR. LONG:  Exactly.

22           THE COURT:  I will address some of that a little later

23   on.

24           But anyway, go ahead.  Now, the next section is the

25   documents, I take it, that the VIP would like the defendant to    15:15:54

1    produce, correct?

2              MR. LONG:  Yes, Your Honor.  This is Frank Long.  Yes,

3    Your Honor.  This is Frank Long for VIP Products.

4              Jack Daniel's has based its claim, counterclaim in

5    this case on the position it uses its mark not only for whiskey    15:16:12

6    but also for a wide variety of consumer products.  And in the

7    course of discovery, they identified some PTO registrations

8    that cover about 83 different consumer products.

9              In the course of discovery, VIP asked for information

10   and documentation related to and identifying the products that    15:16:32

11   are actually in use in commerce.  And when discovery responses

12   were initially received, Jack Daniel's produced, in part, the

13   PTO registrations themselves, and VIP responded and indicated

14   that they needed additional documentation, expected more

15   information on the actual products in use.                         15:16:55

16              Through that process, we received additional

17   documentations but so far have only received documentation or

18   information on 20 of the 83 products.  Approximately 63

19   products we have received no evidence or other documentation of

20   actual use of the Jack Daniel's mark on those products.  We       15:17:11

21   have identified those 63 products specifically and asked that

22   information to be produced.  There was a process back and forth

23   of requesting supplementation, getting the supplementation,

24   evaluating supplemental production and making this

25   determination.                                                    15:17:28

1          Finally, by August 14th, we were told that Jack

2     Daniel's -- Jack Daniel's pronounced that it would not produce

3     any additional evidence related to the use of the marks that

4     are identified as Patent and Trademark Office registrations.

5     And that there was further meet and confer after that, and now        15:17:42

6     Jack Daniel's has said, we don't have any additional documents

7     to produce, but we reserve the right to rely on other evidence.

8     And it's VIP's position that this is a very fundamental issue

9     as to the scope of the Jack Daniel's trademark rights, that

10    those rights are based on actual use in commerce, not just          15:18:04

11    merely because registration exists.  And this fundamental

12    critical information related to the scope of their rights

13    should be produced.

14          THE COURT:  Okay.  Mr. Crum, what's your position?

15          MR. CRUM:  Thank you, Your Honor.  To start off, I             15:18:22

16    just want to go over the history here.  So as you are aware,

17    the Court's Case Management Order was clear that the deadlines

18    in this case are real, and that fact discovery closed on July

19    17th of this year.  The very first letter we received from VIP

20    identifying this issue we didn't receive until July 22nd,           15:18:43

21    almost five days after the close of fact discovery.

22          In response to that letter, contrary to what Mr. Long

23    said, we didn't say that we wouldn't produce anything.  There's

24    some e-mail correspondence where we said we do not believe to

25    date our document production has been deficient at all, but we       15:19:03

1    agreed to go back and look for documents that were relevant to

2    this issue and to supplement our production, which we did.

3         Your Honor, it's -- so from the very basis, this issue

4    is untimely and untimely brought to the Court.  But even

5    assuming that the Court entertained this untimely request,          15:19:23

6    there are no requests for production in this case which ask for

7    these documents.  The first time we knew that VIP was asking

8    for these particular documents was in that July 22nd letter.

9    Up until that point, there was no request for what Mr. Long now

10   seeks, which is apparently documents showing the current use of    15:19:44

11   every product for every trademark registration that Jack

12   Daniel's has alleged or asserted was infringed in this case.

13        Furthermore, if you look at the request that Mr. Long

14   has pointed Jack Daniel's to, all of those requests do not

15   relate to the trademark registration, they relate separately to   15:20:07

16   the trade dress which has been asserted in this case.  Jack

17   Daniel's is asserting trade dress infringement in addition to

18   the trademark infringement of these registrations.

19        And with respect to the trade dress, the trade dress

20   is a square bottle with a ribbed neck, a black cap.  It's all     15:20:23

21   spelled out in Jack Daniel's Answer and Counterclaim.  And that

22   was incorporated by VIP into its request for production.  So

23   now for the first time on the 22nd of July, Mr. Long's letter

24   informed us that despite what is said in their discovery

25   request where they specifically incorporated that definition of   15:20:45

trade dress to be limited to the square bottle, we were first

informed that they also wanted, you know, all these documents

of these ancillary products, pictures of lighters and key

chains and other things which may include parts of that trade

dress, the Jack Daniel's label mark.  So from the beginning we

have taken the position that these documents are not responsive

to any request, and in order to be helpful, we did supplement

initially in our response.

So that's our position, is that they are not

responsive to any request.  This request is untimely.  And

then, Your Honor, even if you are inclined to compel this

production, we have gone back to the client and the client does

not believe that it has in its possession any additional

documents which would show the current use for every product

and every good specified on the trademark registration.

THE COURT:  Let me ask you this, Mr. Crum, the

ancillary products that we're talking about here, are they at

issue in this case, or are we primarily talking about the mark,

the trade dress of the bottle, whether it's included on a

T-shirt, whether it's a -- this image of the bottle with some

other -- the dog on it or whatever it is.  Hypothetically, if

you made a disposable lighter, is that at issue?  I mean, what

kind of products do you think we're talking about here other

than what you told me, and that is, we're concerned primarily

with the trade dress of that bottle and how it's used on a

15:21:05

15:21:22

15:21:43

15:22:04

15:22:27

1  variety of different products, which is different from I'm

2  trying to protect these products.  I have had a case like this

3  before where it was the trade dress issue and the trademark

4  issues had to deal with the mark itself and how it was being

5  used versus each individual supplemental product.  Because we          15:22:48

6  had gotten into luggage and T-Shirts and golf bags and all

7  sorts of things.

8        MR. CRUM:  Absolutely, Your Honor.  So both are really

9  at issue in this case.  So Jack Daniel's has asserted

10 infringement of its trade dress which it described in its          15:23:10

11 complaint.  Jack Daniel's also asserted infringement of --

12 there are, I think there are, nine of these trademarks that

13 Jack Daniel's owns in regards to various classes of goods.

14 Some are directed to posters, using a particular label mark.

15 Some are directed to things like key chains, cell phone cases,          15:23:31

16 that sort of thing.

17        So, Your Honor, at the end of the day both issues are

18 at play, both the trade dress which is directed toward the

19 bottle itself and the, you know, the accouterments described in

20 our complaint as well as the use of the label marks on          15:23:50

21 ancillary marketing materials.

22        THE COURT:  Now, with regard to those issues, did you

23 make the disclosures that are necessary at that point, or did

24 you have to disclose other additional information from your

25 perspective that he wants?          15:24:14

```
 1          MR. CRUM:  Your Honor, we're confident that we

 2  disclosed everything we need to make our case.  Certainly if

 3  VIP believes that we are obligated to produce evidence of use

 4  on every single product, they are certainly welcome to file

 5  their summary judgment motion arguing that we haven't met that    15:24:34

 6  burden because we haven't produced those documents.  From Jack

 7  Daniels' perspective, we're confident that the law is that once

 8  a registration has been acquired that registration is prima

 9  facie -- obviously it's rebuttable, but it's evidence in

10  support that those marks are being used for that class of        15:24:58

11  goods, Your Honor.  So in terms of making our case at trial

12  Jack Daniel's believes it has produced everything required of

13  it.

14          THE COURT:  Okay.  Anything else from you before I go

15  back to Mr. Long?                                                15:25:12

16          MR. CRUM:  No, Your Honor, unless my co-counsel, Mr.

17  Larkin, would like to add anything on that point.

18          MR. LARKIN:  Just very briefly, Your Honor.  As Mr.

19  Crum indicated, although we did not believe that the additional

20  evidence of use on these particular products that Mr. Long       15:25:29

21  asked us to provide was responsive either to our disclosure

22  obligations or to discovery requests, we did go back to the

23  client and we did give Mr. Long photographs of all of the

24  licensed and promotional goods bearing the label marks in the

25  case as opposed to the overall bottle trade dress.  And when     15:25:50
```

1    Mr. Long came back and said there are still ones that, in his

2    view, were missing, we went back to the client again.  And as

3    Mr. Crum indicated, we don't have photographs of those products

4    or samples of those products at this particular snapshot in

5    time.                                                          15:26:10

6          So there is, as a practical matter, to our best

7    understanding, there is nothing else to give VIP in response to

8    the request that Mr. Long first made of us in late July.

9          THE COURT:  Okay.  Mr. Long?

10          MR. LONG:  Yes, Your Honor.  I'd like to address the    15:26:37

11    three points that were made by Jack Daniel's.  The first is to

12    whether this request was untimely, and that they only learned

13    of a need for this information and the request for it until

14    after the close of discovery on mid-July.  The record would

15    show that the first letter they received objecting to their    15:26:51

16    discovery request was on June 9th.  After a response was

17    received it was followed up by another one on June 17th.  After

18    a response was received, another one on June 26th.  A response

19    to the June 26th letter was on July 1st that came from Jack

20    Daniel's in which they specifically referred in one of their    15:27:12

21    requests saying that documents regarding the use of the trade

22    dress and elements of the trade dress on licensed products were

23    responsive.  And to that they received -- after we evaluated an

24    additional 50 pages of documents that came we responded to them

25    on July 22nd, after the close of discovery on July 17th saying    15:27:33

1    this is still inadequate.

2            So it's not -- and we have continued that dialog to

3    try and narrow down the issues and get a resolution of it ever

4    since.  It's not accurate to say that this issue was first

5    raised in an untimely manner after the close of discovery.      15:27:49

6            Second, the idea that there's no requests for

7    documents, there's two interrogatories and three requests for

8    production, all of which relate to these issues, the

9    fundamental issue being the scope of the actual use of

10   these Jack Daniel's labels and designs on the consumed products 15:28:08

11   that they alleged in Paragraph 12 of their complaint that they

12   are using.  And they are a part of their overall claim bridging

13   the gap between whiskey on the one hand and a dog toy on the

14   other saying what we have is all this other use.  And what

15   we're providing you is the copy of the PTO registration.  And   15:28:28

16   it's fundamental that -- and registration is not evidence of

17   use, but it's also fundamental that the information related to

18   this use is in the hands of Jack Daniel's.  In order to

19   determine whether or not the scope of their use is as broad as

20   they say it is, the Patent Trademark Office requires them to    15:28:48

21   produce the information to do that.

22            The third thing is as to whether or not there's a

23   request for trade dress and that's distinguished by the

24   trademark.  I think Jack Daniel's admitted both issues, both

25   trademarks and trade dress are at issue by their election.  But 15:29:05

1   also I would like to make the point that their definition of

2   trade dress and in their pleading incorporates some of their

3   registered trademarks, particularly those having to do with the

4   label design that we are focused on, now we're focused on the

5   critical issues and saying, provide us with the evidence of          15:29:20

6   use.

7           Now, if we're at a point where they are saying they

8   have nothing to address this, then at the very least we should

9   be able to get a declaration from them saying that no such

10  evidence exists rather than come to the Court and indicate          15:29:34

11  that -- well, it's our supposition based on our deduction from

12  subtraction of the information they provided that they have no

13  evidence.  It seems incumbent upon them to say there is no

14  evidence.

15          And that's where we are today, dealing with the Motion     15:29:49

16  to Compel, produce the evidence we asked for so we have a

17  complete summary.  We have licensed agreements.  They have

18  reports from their licensees.  It's easy for them to produce

19  something that they haven't done yet, and information they have

20  in their possession is critical and we just ask that they          15:30:06

21  provide it.

22          THE COURT:  Okay.  Mr. Crum and Mr. Larkin, if you

23  would, just the last two points.  One is if your opinion about

24  this whole discovery about these ancillary products, trademark,

25  trade dress, et cetera, was that, in fact, started from your       15:30:28

position prior to the disclosure deadline?  Was the ball sort

of in your court when they kept asking for more and more and

more information?  And the second part of that is, if your

position is that you don't have any more information, what's

the problem of saying so?                                    15:30:45

        MR. CRUM:  Your Honor, this is Isaac Crum.  I will

take a first swing at those.

        First, we absolutely disagree this issue was raised

before the close of discovery.  I'm looking back at the letter

cited by Mr. Long, and nowhere in that do they identify this    15:31:04

particular issue.  Instead, what VIP did in those letters was

they said -- they have language to the effect that upon

reviewing Jack Daniel's responses, VIP has identified sort of a

non-exclusive list of deficiencies.  And that this was not one

of the items on their list of deficiencies that they identified  15:31:26

in our discovery responses.  Now it appears that they are

trying to cite back to this open-ended language that we have

other disputes over what Jack Daniel's has or has not produced.

The fact is they never identified this issue until after the

close of discovery, and Jack Daniel's had no way of knowing    15:31:46

that this was and issue based on this language that says

basically there might be other issues but we're not going to

tell you about them at this time.

        And then moving on to the second point, I think Mr.

Long was slightly incorrect where he said that if there's no    15:32:06

| | |
|---|---|
| 1 | evidence Jack Daniel's should sign the declaration saying that |
| 2 | there's no evidence.  There was evidence, and my colleague, Mr. |
| 3 | Larkin, was asked on multiple occasions and we produced a |
| 4 | number of documents responsive to those requests.  It just |
| 5 | turns out that at this point in time the well has run dry. |
| 6 | Your Honor, and that's certainly the case with response to |
| 7 | every single request for production.  The understanding is that |
| 8 | the responding party has produced all of the documents that are |
| 9 | responsive to that request for production.  The Court and the |
| 10 | parties don't force the other parties to sign a declaration |
| 11 | that responses and relevant documents have been produced. |
| 12 | That's not routinely done, and Jack Daniel's doesn't understand |
| 13 | why it needs to be done in this particular case. |
| 14 | Mr. Larkin, do you have anything else? |
| 15 | MR. LARKIN:  Your Honor, if there were -- if in our |
| 16 | judgment there were specific interrogatories and specific |
| 17 | requests for production that these documents were responsive |
| 18 | to, it would be appropriate, I think, to serve a supplemental |
| 19 | or you ruling to serve a supplemental response to this specific |
| 20 | request indicating that we had produced everything we had.  But |
| 21 | because, as Mr. Crum indicated, it's our position that the |
| 22 | documents currently sought were not responsive on the face of |
| 23 | the requests that were made but were simply ones that, in |
| 24 | revisiting those requests and reinterpreting those requests, |
| 25 | VIP seems to think that they were responsive, again, if we had |

15:32:26

15:32:44

15:33:02

15:33:29

15:33:51

1    a specific set of requests that these were responsive to, then

2    we could serve a supplemental response saying we have given you

3    everything that we have in our possession, custody, or control.

4    But our position is that this was not responsive to any

5    particular request.  Mr. Long mentioned an interrogatory, there    15:34:11

6    is one interrogatory directed to this and it requests a listing

7    of products on which the marks have been used and we provided a

8    list, you know.  But we did not offer to produce documents

9    under Rule 33(d) or provide anything else there.

10           So, you know, the practical matter, there is nothing.    15:34:30

11    We have gone back twice, even though I don't believe we're

12    obligated to do so, and we have provided to VIP again, even

13    though I don't believe we're obligated to do so, what we have

14    showing current use at this snapshot in time on whatever the

15    number of products in those nine registrations is, 80 or 90.  I    15:34:51

16    don't have the specific number in front of me.  And our

17    understanding is there are no additional photographs or

18    physical products at this snapshot in time to give VIP.

19           MR. LONG:  Your Honor, this is Frank Long.  If I could

20    speak to those two points.  I think there's two things that    15:35:07

21    need to be corrected.

22           THE COURT:  Okay.

23           MR. LONG:  I will take them in reverse order.

24           The first one I would like to address is the last

25    point that there's no specific request in the interrogatories    15:35:16

1  that seeks current use information.  And that's patently

2  untrue, because Interrogatory Number 11 requests Jack Daniel's

3  identify every product manufactured, used, sold, offered to

4  sale, or exported to the United States that Jack Daniel's

5  believes it uses or may use in its protected design.  So there          15:35:37

6  is an actual request that asks for current use and it's on the

7  face of the interrogatory.

8          As to this other point, as to whether or not this

9  issue and they had any understanding before the close of

10  discovery as to whether this was a request, I have their own          15:35:52

11  letter of July 1st.  Remember the close of discovery was on

12  July 17th, in which they respond in their own words that

13  Request Number 7 requesting production of documents regarding

14  distinctiveness of trade dress, they provide a response and

15  they say:  As explained, our counterclaims are based upon          15:36:12

16  longstanding use of the advertising and consumer exposure to,

17  in recognition of the trade dress.  And Jack Daniel's has

18  produced, and they mention documents regarding the use of the

19  trade dress and elements of trade dress on licensed goods.

20          And what exactly happened was those documents came in,          15:36:34

21  we looked at that, those must be the information that justify

22  or validate the claims in the Patent Trademark Office

23  registrations and in the process of examining those documents

24  identified that was not the case.

25          So it is critical to this case that the scope of Jack          15:36:50

1    Daniel's trademark rights, trade dress claims, and that scope

2    is based on the trademark office registrations of over 80 goods

3    of which we only have evidence of 20.

4         MR. LARKIN:  Your Honor, may I address those last two

5    points very, very quickly?                                    15:37:09

6         Interrogatory 11, Mr. Long is correct but we gave them

7    an answer.  We told -- we gave them a very lengthy two-page

8    list of the products.  And the second point is that most of the

9    requests that were served were directed to our trade dress.

10   And one of the things we did in response to that, particularly  15:37:28

11   asking about the fame of our trade dress, list the variety of

12   ways in which we think all of our trade dress became famous and

13   one of them was collateral licensing.  We identified the

14   products and we produced a very large number of representative

15   examples of that.                                             15:37:45

16        So I think, again, we're mixing the trademark and

17   trade dress requests here.  But at the end of the day we don't

18   have anything else to respond to the specific current request

19   at this snapshot in time with respect to these collateral goods

20   and registrations.                                            15:38:04

21        THE COURT:  Okay.  Now, let me go back to one issue on

22   the first one.  The six pages produced by the third parties,

23   and the defense have objected that they were late no matter

24   what, is there any prejudice to you if those are produced?  Do

25   they produce any prejudicial activity to the defendant?       15:38:27

1          MR. CRUM:  No, we don't believe so, Your Honor.  We

2     will withdraw our objection as to those six pages.

3          THE COURT:  All right.  Now, I have heard from

4     everyone.  Here's my ruling:  With regard to the two pages of

5     the images, there's been a withdrawal of the objection by the          15:38:52

6     defendants, that the plaintiffs want to get this.  With regard

7     to the plaintiffs' request that the six pages produced by the

8     third parties they are withdrawn.  The defense are now

9     withdrawing their objection to any argument whether they were

10    late or should have been produced earlier because they were          15:39:08

11    controlled by a third party.

12          With regard to the four images produced by the

13    experts, they will not be admissible.  They will not be used.

14    It's a clear violation by the expert of his duties under Rule

15    26.  And I know Judge Campbell covers this and I cover it ad          15:39:25

16    nauseam in my Rule 16 hearings that experts have to be told to

17    comply with the rules.  And if they get caught in a

18    cross-examination they didn't do something, they can't now say,

19    oops, let me go back and do this all over again.  That's not

20    right.  He had a duty to learn and understand what the          15:39:45

21    parameters were in this case.  If he's a true expert and if it

22    goes to his detriment, so be it.  But they will not be

23    available.  The defendants will be prejudiced by these

24    additional pieces of information, and I find that opening up

25    discovery again to re-depose the expert, even at imposing the          15:40:05

 1   cost on the plaintiffs, would not be fair to the defendants and

 2   therefore, I find that they are not -- those are too late, too

 3   bad, and so sad.

 4        Next thing is --

 5        MR. LARKIN:  Your Honor, may I just interrupt?  It's          15:40:24

 6   actually five pages not four.

 7        THE COURT:  Five pages.  Okay.

 8        MR. LARKIN:  Mr. Larkin here.  Thank you.

 9        THE COURT:  Okay.  Thank you.

10        Next is the request for all these PTOs that were          15:40:35

11   produced.  There's been adequate time to produce all these

12   things along the way.  And if the plaintiffs had information

13   they should have disclosed, they had the adequate opportunity

14   to say, well, gee, it was too tough.  You expanded the

15   deadlines by stipulation once.  The discovery deadlines were          15:41:04

16   clear and now to come back and say it was too laborious for the

17   plaintiffs to produce these, it rings hollow.  In like fashion,

18   with regard to the ones that are now being demanded of the

19   defendants, setting aside the issue of whether they were or

20   were not timely, the defendants have stated unequivocally they          15:41:22

21   have adequately responded.

22        And I see this a lot in my discovery challenges.

23   Well, Your Honor, there must be more.  They just haven't

24   produced enough.  And the other side says, I have produced it.

25   And I can't go back and look at all documents.  That's not my          15:41:40

1    job.  But what my job will be at the time of the trial and/or

2    Motions for Summary Judgment, if things surface that I believe

3    were responsive to the requests and weren't, then that cuts

4    against the party now seeking to use them and they won't be

5    used.  It's that simple.                              15:41:59

6          So the defendants have said, we have produced

7    everything that's responsive, and that's response to it.  The

8    plaintiffs have shown nothing other than speculation that there

9    must be something more and to go into these other areas.  And

10   again, I go back to some cases I have had before on these      15:42:15

11   trademarks and trade dresses, where the marks get mixed up with

12   the dress and the dress gets mixed up with the marks, and it's

13   pretty clear what is being or is not being infringed upon at

14   the end of the day.

15         So I would -- that's my ruling.  And I think that        15:42:36

16   takes care of that with regard to the discovery which was

17   requested.  Letters went back and forth including the July 1st

18   order.  But the response of the defendants is we have responded

19   adequately and properly and sufficiently to the requests that

20   have been made.  And if it comes up later that that's not       15:43:01

21   accurate, well, the defendants have to live with that.  If

22   that's a correct statement then the plaintiffs have to live

23   with what has been produced in these cases.

24         But when someone brings a lawsuit over trademarks and

25   trade dresses, you know you are in for an enormous contest over  15:43:17

```
 1    these things and they are not inexpensive.  So like I say, I

 2    have had a lot of these over the years, and that's what it is,

 3    so we judge them on the facts.  But that's my ruling today.

 4            Is there anything else that I have not ruled on that

 5    has been left open somewhere?                          15:43:42

 6            MR. CRUM:  Not from Jack Daniels' perspective, Your

 7    Honor.

 8            THE COURT:  Mr. Long?

 9            MR. LONG:  No, Your Honor.

10            THE COURT:  All right.  Now where are we going from    15:43:54

11    here?

12            MR. LONG:  Summary judgment.

13            THE COURT:  Who said that?  Who said what?  Go back

14    and say it again.

15            MR. LONG:  Frank Long, Your Honor, for VIP.  I said    15:44:02

16    summary judgment.

17            THE COURT:  Okay.  And then do you agree with that on

18    the defense side?

19            MR. CRUM:  Yes, Your Honor.  Expert discovery is

20    closed.  We have completed all expert depositions.  The next  15:44:21

21    step will be summary judgment.

22            THE COURT:  Okay.

23            MR. LARKIN:  Excuse me.  I'm sorry.

24            THE COURT:  Go ahead.

25            MR. LARKIN:  I will be quiet.  Go ahead, Your Honor.   15:44:34
```

1   I'm sorry.

2          THE COURT:  I can assure you that we'll try and get to

3   this.  We'll get the summary judgments done.  Again, I doubt

4   that you will ever be able to settle this issue.  But it sounds

5   like there's -- the battle lines are drawn particularly        15:44:51

6   brightly in this particular case, and so we'll wait for the

7   summary judgment motions to come up and we'll see where our

8   journey takes us.

9          If there's nothing else, we'll stand at recess.  Thank

10  you.                                                           15:45:11

11         MR. LONG:  Thank you very much, Your Honor.

12  Appreciate the Court's time.

13         (Proceeding concluded at 3:45 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5                    C E R T I F I C A T E

 6

 7         I, LAURIE A. ADAMS, do hereby certify that I am duly

 8   appointed and qualified to act as Official Court Reporter for

 9   the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 15th day of September,

16   2015.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25
```