Firm E-Mail: courtdocs@dickinsonwright.com

David G. Bray (#014346)
dbray@dickinsonwright.com
Frank G. Long (#012245)
flong@dickinsonwright.com
Jonathan S. Batchelor (#026882)
jbatchelor@dickinsonwright.com
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (602) 285-5100

*Attorneys for Plaintiff and Counterdefendant VIP Products, L.L.C.*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, L.L.C., an Arizona limited liability company,<br><br>  Plaintiff and Counterdefendant,<br><br>  v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation<br><br>  Defendant and Counterclaimant. | No. 2:14-cv-02057-SMM<br><br>**PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT ITAMAR SIMONSON**<br><br>**(Oral Argument Requested)** |

Plaintiff/Counter-defendant VIP Products, L.L.C. ("Plaintiff" or "VIP"), by and though its undersigned counsel, hereby moves the Court pursuant to Rules 403 and 702 of the Federal Rules of Evidence ("Rule 403" and "Rule 702," respectively) and LRCiv 7.2, to exclude the testimony of Defendant's expert Itamar Simonson. This Motion is supported by the following Memorandum of Points and Authorities and the exhibits thereto.

-1-

**DATED** this 24th day of September, 2015.

**DICKINSON WRIGHT PLLC**

By: s/ David G. Bray
David G. Bray
Frank G. Long
Jonathan S. Batchelor
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
*Attorneys for VIP Products, L.L.C.*

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

This case presents the question of whether Plaintiff's product (a dog toy) infringes on and/or dilutes the trademark of Defendant's product (Jack Daniel's whiskey). Defendant's proposed expert Dr. Itamar Simonson purports to opine on the issue of alleged trademark dilution by tarnishment: *i.e.*, whether, and how, consumers associate Plaintiff's product with Defendant's and whether that association dilutes Defendant's mark by harming its reputation.

Plaintiff seeks an order excluding the Simonson opinion. Simonson failed to perform any of the available surveys, focus groups, studies or other real world tests to form a well-grounded opinion as to how consumers react to the product at issue in this case. Rather, and as his report and deposition make clear, his opinion is only his own personal reaction to the product at issue, purportedly informed by his academic credentials and his familiarity with literature in the area of consumer psychology. Without more, the opinion set forth in his report is lacking in even the most rudimentary methodology or conceptual support that would permit his opinion to be admissible as a scientific expert opinion.

Simonson also does not qualify as an "experience based" expert. Simonson made clear in his deposition that he has no relevant life or work experience that would qualify him to speculate about what consumers would think about the products in this particular case. Thus his opinions would not constitute useful, admissible testimony to the factfinder.

The point of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny is that court time should not be wasted with "junk science" propounded by "experts," even those with (like Dr. Simonson) extensive academic credentials. An "experience based" expert is someone with relevant real world experience – not someone who fails to follow scientific methodology but wishes to testify anyway. *Daubert* requires a hard look at proposed expert testimony to ensure it qualifies as well-founded expert testimony pursuant to Fed. R. Evid. 702. Dr. Simonson's report and opinion manifestly do not.

## The Relevant Statute

The Lanham Act provides that "'dilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Whether Defendant's mark is "famous" within the meaning of the statute is not covered by the Simonson opinion and is, therefore, not at issue in this motion. This motion challenges whether Simonson's opinion as to an alleged "association arising from the similarity" between the parties' marks "that harms the reputation" of Defendant's mark is an opinion that reflects scientific or technical knowledge, or real world "skill" or "specialized knowledge," that "fits" the central issue in this case. *Daubert*, 509 U.S. at 591.

## Summary of Simonson Report and Deposition Testimony

In the "Summary of Conclusions" set forth in his Rule 26 expert report, Simonson stated as follows:

- Simonson performed "[a]n analysis based on principles of consumer psychology" and brand association, concluding that Plaintiff's product was likely to tarnish Defendant's product. Rule 26 Expert Report of Dr. Itamar Simonson ("Report") (Exh. A) at ¶ 11.  No test or analysis is cited in this paragraph, or elsewhere in the Report, to support the conclusion that Simonson reached based on his own private "analysis." *Id.*; *see also generally id.*

- Simonson mentions and briefly explains the "associative network memory model." *Id.* at ¶ 12. Simonson does not claim in this paragraph, or elsewhere in his Report, that the associative network memory model has ever been applied to the products at issue in this case. *Id.*; *see also generally id.*

- Simonson states, "Although Mr. Sacra [Plaintiff's CEO] may not be an expert on consumer psychology and he has not tested his assumptions regarding the impact of his Old No. 2 product on consumers, his testimony suggests that changing how consumers think about Jack Daniel's brands was his intention." *Id.* at ¶ 13.  While Simonson faults Plaintiff's CEO for not "test[ing] his assumptions," he makes no claim in his report that he tested his own assumptions. *Id.*; *see also generally id.*

- Simonson claims that Plaintiff's product "adds an unfavorable mental association" in the minds of consumers with regard to Defendant's product. *Id.* at ¶ 14.  Simonson does not cite, in this paragraph or elsewhere in his Report, any survey, test, interview or other procedure to confirm his hypothesis about "an unfavorable mental association" involving the products at issue in this case.

At p. 11, n. 10 of his Report, Simonson cites, as an authoritative source with regard to brand association,  Jacob Jacoby, *The Psychological Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion and Dilution*, 91 Trademark Rep. 994,

1013-70 (2001) ("Jacoby") (Exh. B).  That source, in turn, expressly recognizes the availability of testing for tarnishment.  Jacoby states: "[T]arnishment needs to be tested using defendant's mark.  The wrinkle is that, that defendant's use of its mark must be shown to cause not just any association, but a negative association.  The author has employed the rationale outlined above in various surveys proffered as evidence in litigated matters." *Id.* at 1053-54.  Jacoby then proceeds to discuss in detail a test the author designed and implemented in a tarnishment case involving Michelob beer. *Id.* at 1059-62.

In his deposition, Simonson confirmed that he was asked to evaluate whether Plaintiff's product diluted Defendant's product through tarnishment.  He explained that that inquiry involved "[h]ow people respond, whether they like it more or less, whether they are inclined to buy it or not, whether when viewing people drinking it, whether that elicits more or less favorable response."  Simonson Deposition dated June 18, 2015 ("Simonson Deposition") (Exh. C) at 49:18-50:6.  His conclusion was that the Plaintiff's product is likely to create dilution of Defendant's tarnishment, as so defined. *Id.* at 50:9-16.

Simonson testified that he has done "probably hundreds" of surveys related to consumer confusion, mostly for litigation purposes, and "perhaps ten" surveys in connection with trademark dilution. *Id.* at 19:23-20:14.  He has done "probably well over a few thousand" marketing research studies, mostly for academic purposes. *Id.* at 22:14-24.  Simonson acknowledged that it would be possible to do research to "find out how people perceive" the VIP Product. *Id.* at 92:15-19.  Indeed, he faulted Plaintiff's CEO Mr. Sacra for not doing so, saying that he "should have conducted some research, maybe even just qualitative research, find out how people perceive it.  Does that affect the way they think about the brand[?].  They could conduct some studies." *Id.*  Simonson testified that, "if he [Sacra] ran a survey and he showed the image of this product, using an online survey these days, it's fairly quick and not that expensive," and, if such a survey had shown a lack of

dilution, "I certainly would pay attention to that, and it may certainly affect my opinions." *Id.* at 101:24-102:10.   He further testified that focus groups "could provide some useful information, yes." *Id*. at 102:11-17.

Simonson further explained that, in gathering information about how actual consumers respond to the Plaintiff's product, Plaintiff's CEO Sacra "could have just shown this product and say what comes to mind.  I mean, try to ask questions that are non-leading as possible and see what he gets.  Maybe he can get them to rate it on a funny/not funny scale, disgusting/not disgusting scale.  Maybe he can do the same thing for other products as controls." *Id*. at 101:15-21.

Simonson's approach in preparing his opinion for purposes of this litigation, however, did not involve any such methodology – or any scientific or technical methodology at all. Simonson did not use an online survey, or focus groups, or interviews, or any other interface with actual consumers to reach his opinion is expressed in his report offered in this litigation. Rather, Simonson explained his approach as follows:  After establishing that one product brings the other to mind, "then you have someone who knows the literature, knows perhaps hundreds of studies that are relevant to that question, someone who has information about particular products at issue, and on that basis, that person, like me, an expert, reaching conclusions about the likelihood of dilution." *Id.* at 78:9-79:7. Simonson described his "testing process" as "evaluation based on your understanding of how response to brands takes place." *Id*. at 140:23-141:11.

Simonson further testified:

> "Q.  What evidence or facts did you rely upon as it relates to how purchasers of alcoholic beverages make their purchasing decisions in reaching your conclusions expressed in Deposition Exhibit 3 [the Report]?

> A. Just my general knowledge of how consumers form impressions and evaluate brands. It's not dependent on this or that category.
>
> Q. So nothing specific about –
>
> A. Nothing specific." *Id*. at 167:19-168:2.

With regard to his real world experience, Simonson acknowledged: "I am not an expert on whiskey." *Id*. at 230:13. He testified that: "I think I've done some studies for wineries. . . . I vaguely recall doing one or two studies in relation to tequila. Maybe at some point there was something related to rum." *Id*. at 24:10-17. With regard to pet products, Simonson stated that he had one consulting engagement related to dog food. *Id*. at 25:1-19. Simonson presumes that Jack Daniel's customers are also owners of dogs who "might" purchase toys for their dogs, but he has "nothing specific" to back up his presumption. *Id*. at 175:6-20. Simonson does not claim that he has any real world experience that would allow him to testify as to the actual reactions of consumers to the products at issue in this case.

With regard to the critical question of whether Plaintiff's product would be perceived by consumers as being "fun" (which is directly related to Plaintiff's defense that its product is a parody product that is exempt from a dilution claim), Simonson testified:

> "Q: What is to say that the consumer is not going to see it as fun?
>
> A: I don't know. I don't find it funny, but that doesn't matter." *Id*. at 91:25-92:3.

Simonson's approach, then, consists of Simonson himself looking at the products at issue, reporting his own subjective reaction, and describing his reaction using certain terms found in the literature. That is not science. It is hardly even junk science. It is not based on any special "skill" or real world "knowledge or experience." It does not qualify for admission under Fed. R. Evid. 702.

**Argument**

1. <u>The Simonson Opinion is Inadmissible as a "Scientific" or "Technical" Expert Opinion.</u>

Defendant may argue that Simonson used some "technique" or "procedure" that passes muster under *Daubert*, and that any critique of Simonson's "procedure" merely goes to the weight of his evidence. It is important to recognize at the outset that Simonson ***does not claim to have performed any tests or procedures to determine how actual consumers think about the parties' products***. Report at ¶¶ 11-14.  Rather, Simonson is clear that he did not perform a single test, survey, focus group, or any other procedure to confirm his alleged "knowledge of how consumers form impressions and evaluate brands." Simonson Deposition, Exh. C, at 167:19-168:2.

The experts involved in *Daubert* possessed "impressive credentials," 509 U.S. at 583, as Simonson, a Ph.D in marketing and a Stanford professor, admittedly does.  The *Daubert* experts even based their conclusions on live and in vitro animal studies; pharmacological studies of the chemical structure of Bendectin; and "reanalysis" of previously published statistical studies. *Id*. Their methodology, far more extensive and scientific than anything Simonson claims to have done, was still deemed to be insufficient for Fed. R. Evid. 702 admissibility, by the Ninth Circuit on remand from the Supreme Court.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995).

The Ninth Circuit's critique of the Bendectin/limb reduction defect experts in *Daubert* is equally, if not more, applicable to Dr. Simonson in this case:

- "[T]he experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced

- by (at least) a recognized minority of scientists in their field," *id.* at 1319;

- The challenged experts "neither explain[ed] the methodology the experts followed to reach their conclusions nor point to any external source to validate that methodology. We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert,* that's not enough," *id.*;

- "This is especially true of Dr. Palmer . . . . '[N]o understandable scientific basis is stated. Personal opinion, not science, is testifying here.'" *Id.* (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)).

Both the Supreme Court's and the Ninth Circuit's *Daubert* opinions stress the importance of "fit" between the proffered testimony and an issue in the case. *Id.* at 1320. In *Daubert*, the pertinent inquiry was causation. Here, the pertinent inquiry is consequence: whether Plaintiff's product dilutes, via tarnishment, Defendant's reputation in its products. Expert testimony, in order to be admissible in this case under Fed. R. Evid. 702, must "fit" that issue.

Simonson outlines, in his report, how he believes consumers, in general, associate one product with another. He states that "one accepted and useful way to think about brand knowledge and organization is based on the 'associative network memory model.'" Report, Exh. A, at ¶ 27. The Simonson report cites literature explaining that theory in general, but the Simonson report provides no data applying that theory to the products in this case. The report likewise cites no literature suggesting that merely obtaining the personal opinion of one familiar with the "associative network memory model" (which is what Simonson is offering

1 here) is a reliable method of gauging the reactions of actual customers. Thus, there is a lack
2 of "fit" between Simonson's opinions and the issue to be determined in this case.

3 The Ninth Circuit noted that a crucial inquiry in applying Fed. R. Evid. 702 is whether
4 an expert is using an approach that was developed exclusively for litigation purposes.
5 *Daubert*, 43 F.3d at 1317 ("That an expert testifies based on research he has conducted
6 independent of the litigation provides important, objective proof that the research comports
7 with the dictates of good science."). Simonson purports to be able to look at a product or
8 advertisement and discern whether it dilutes a company's trademark, based on no more than
9 his knowledge of certain literature and his familiarity with the "associative network memory
10 model." Report, Exh. A, at ¶¶ 12, 17, 27. It turns out, however, that Simonson's application
11 of that approach, in practice, is heavily dependent on the identity of the party responsible for
12 the advertisement or product in question -- a consideration that would occur only to a
13 litigation-oriented expert. In his deposition, Simonson was showed one of Jack Daniels' own
14 advertisements containing the phrase, "Questionable Joints," Simonson Deposition at Exh. 33
15 (Exh. D to this memorandum), and was asked whether the Jack Daniel's ad would create
16 "negative associations that would dilute brand equity" of the Jack Daniel's brand. Simonson
17 testified that "it might" create a negative association, but stated that in order to be sure, "I
18 need to know who advertised it." Simonson Deposition, Exh. C, at 184:14-185:23.
19 Simonson was shown another Jack Daniel's advertisement, Simonson Deposition at Exh. 35
20 (Exh. D to this memorandum), and was asked: "Do you associate any message with this
21 advertisement?" In response, Simonson stated that in order to opine he would need to know:
22 "[W]here did that come from? Who put it wherever it appeared? . . . I need to know who put
23 it, why, where it is." Simonson Deposition, Exh. C, at 191:3-192:10. In practice, then,
24 Simonson's approach is heavily dependent on whether a particular advertisement or product
25 was created by the party that hired him for litigation purposes. That comment is
26
27

characteristic of an expert whose approach was developed exclusively for litigation purposes, and is precisely the sort of approach unacceptable in the Ninth Circuit. *Daubert*, 43 F.3d at 1317.

Federal district courts routinely exclude expert testimony where basic scientific methodology has not been followed. *See, e.g.*, *Cummins v. Lyle Indus.*, 93 F.3d 362, 367 (7th Cir. 1996) ("The district court was justified in concluding that Dr. Carpenter's testimony, predicated on his own untested observations, was not admissible."); *generally Soldo v. Sandoz Pharm. Corp.*, 244 F.Supp. 2d 434 (W.D. Pa. 2003) (excluding expert opinions in light of absence of studies reliably demonstrating a relationship between defendant's product and postpartum intracerebral hemorrhage); *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (reversing district court for erroneous admission of plaintiff's expert's testimony; "It is undisputed that Petry did not conduct any scientific tests or experiments in order to arrive at his conclusions. Petry never produced any studies, tests or experiments to justify or verify his conclusions."). That is the result that should obtain here.

This Court's decision in *Elliot v. Google Inc.*, 45 F.Supp. 3d 1156 (D. Ariz. 2014), *appeal filed*, No. 15-15809 (9th Cir. Apr. 22, 2015), is consistent with the above principles. In that dispute, this Court admitted the testimony of that defendant's expert linguist, Dr. Geoffrey Nunberg, over objections that he was a "hired gun" and that his opinions were "conclusions on the ultimate issues." *Id.* at 1165. Neither objection is made in this case. Also, this Court admitted the testimony of that defendant's survey expert, Dr. Gerald Ford, who, unlike Simonson, performed a scientific survey directly aimed at the product at issue in that dispute: the Google search engine. *Id*. at 1166-67. Likewise, the Court admitted and considered the testimony of that plaintiff's consumer survey expert Berger, even though his survey "pushe[d] the boundaries of reliability." *Id*. at 1170. But, the Court excluded a survey

conducted by that plaintiff's counsel, finding that it lacked the requisite scientific reliability. *Id*. at 1167-68.

The *Elliot* decision strongly supports exclusion of Simonson's testimony, because (1) the issue in this case is whether there is an association arising from the similarity between the parties' marks that "harms the reputation" of Defendant's mark; (2) admissible scientific evidence in this case must "fit" that particular issue, *Daubert*, 509 U.S. at 591; (3) Simonson's Report and the sources cited therein, and his deposition, acknowledge that consumer research can be done to measure the likelihood of dilution by tarnishment; (4) Simonson admits that he has not done any survey, focus group, interview or other consumer research that would test that particular issue concerning the product and marks at issue in this case; and (5) Simonson cites no scientific literature that would permit a conclusion of dilution by tarnishment to be based on the personal opinion of a single expert familiar with the literature of brands and brand associations.

    2.    <u>Simonson Lacks (and Does Not Even Claim) Sufficient Real Word "Knowledge and Experience" to Allow Him to Testify on the Issue Presented Here</u>.

Fed. R. Evid. 702 provides that an expert testimony may be admissible based on the expert's "skill," or "specialized knowledge," but *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and its progeny make it clear that the gatekeeping function assigned by *Daubert* to District Court judges applies to "specialized knowledge" experts as well. In *U.S. v. Hankey*, 203 F.3d 1160 (9th Cir. 2000), the Ninth Circuit considered the admissibility of a "specialized knowledge" expert, specifically a DEA agent who testified about various aspects of gang culture and gang affiliations. The agent based his testimony on his extensive real world experience, including "working under cover with gang members in the thousands," teaching classes about gangs, and "extensive personal knowledge regarding the two affiliated

gangs" involved in the case. *Hankey*, 203 F.3d at 1168-69. The Court concluded that the proffered testimony was admissible.

Here, Simonson does not claim that he has any real world experience that would permit him to opine on the issues in this case. Simonson testified in his deposition that he is "not an expert on whiskey," Simonson Deposition, Exh. C, at 230:13, and "vaguely recall[ed] doing one or two studies in relation to tequila" and "[m]aybe at some point there was something related to rum." *Id.* at 24:10-17. Simonson did not claim in his report or deposition that he had real life experience in liquor marketing, bartending, pet toy sales or marketing, or any other field that might conceivably be a basis for Fed. R. Evid. 702 "specialized knowledge" expertise in this dispute.

Simonson's failure to qualify as a scientific expert cannot be cured by concocting a new identity as a "specialized knowledge" expert under Fed. R. Evid. 702. That aspect of the rule does not provide a convenient "catchall" for academics without actual relevant skills or specialized knowledge. In the absence of sufficient relevant real life experience, purported "specialized knowledge" testimony will not be helpful to the trier of fact and should be excluded. *See, e.g.*, *Amin-Akbari v. City of Austin, Tex.*, 52 F.Supp. 3d 830 (W.D. Tex. 2014) (proposed testimony by expert in law enforcement training that cab driver had option to stop driving and call police if he did not want to give ride to intoxicated individual was outside his expertise in law enforcement training, and was properly excluded because it would not be helpful to the fact finder)*; E.E.O.C. v. W. Customer Mgmt. Grp., LLC*, 899 F. Supp. 2d 1241 (N.D. Fla. 2012) (testimony of speech pathologist that job applicant's speech and Jamaican accent posed no barrier to his ability to communicate effectively was excluded).

3. <u>Where an Expert Does Not Meet the Threshold for Admissibility Under Rule 702, Allowing His Testimony Would be an Undue Waste of Judicial Time and Resources</u>.

Underlying *Daubert* and its progeny is the notion that "junk science" is not only unreliable, it is a waste of the court's time. *See, e.g.*, Fed. R. Evid. 403 (courts may exclude evidence that would lead to undue delay or wasting time); *Hankey*, 203 F.3d at 1168; *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1256 (E.D.N.Y. 1985) (excluding expert testimony; "In complex and protracted litigation, waste of the trier's time is a particularly telling factor"; " 'the speculation and unfounded assumptions underlying [the] testimony [of Doctors Singer and Epstein] decrease [ ] its probative value, perhaps to the level of the gossamer,'" citing *American Bearing Co., Inc. v. Litton Industries, Inc.*, 729 F.2d 943, 950 n. 14 (3d Cir. 1984)).

Simonson's testimony lacks any reliable foundation, whether a scientific basis or any specialized knowledge relevant to the status of this dispute. In the circumstances, admitting the proposed Simonson testimony would be a waste of time at trial and therefore inconsistent with Rule 702 and *Daubert* principles, and it should be excluded now. Fed. R. Evid. 403.

### Conclusion

Even in a bench trial such as this one, where there is no issue of jury prejudice, Plaintiff is entitled to have its trial preparation and presentation limited to admissible evidence that "fits" the issues in the case. *Daubert*, 509 U.S. at 591. Simonson's Report and deposition make clear that his testimony lacks any scientific basis whatsoever, and lacks any basis in real-world "specialized knowledge." Therefore, Dr. Simonson's testimony and Report should be excluded in their entirety.

      **DATED** this 24th day of September, 2015.

                                 **DICKINSON WRIGHT PLLC**

                                 By: s/ David G. Bray
                                      David G. Bray
                                      Frank G. Long
                                      Jonathan S. Batchelor
                                      1850 North Central Avenue, Suite 1400
                                      Phoenix, Arizona  85004
                                      *Attorneys for VIP Products, L.L.C.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2015, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

s/ Kristi Arendt

PHOENIX 53913-11 246569v3A