# Exhibit B

# THE PSYCHOLOGICAL FOUNDATIONS OF TRADEMARK LAW: SECONDARY MEANING, GENERICISM, FAME, CONFUSION AND DILUTION

### *By Jacob Jacoby*\*

## I. INTRODUCTION

Several years prior to enactment of the Lanham Act, Supreme Court Justice Felix Frankfurter wrote: "The protection of trademarks is the law's recognition of the *psychological function* of symbols."[1] Fifteen years earlier, Frank I. Schechter, defined dilution in his famous Harvard Law Review article as "the gradual whittling away or dispersion of the identity and hold upon *the public mind* of the mark or name by its use upon non-competing goods."[2] No less an authority than Professor J. Thomas McCarthy has asserted: "However, secondary meaning is a fact *only* in the sense that *the state of a buyer's mind* is a fact."[3] In like fashion, Richard Kirkpatrick has written: "trademarks are intellectual or psychological in nature. It follows that the question of trademark infringement is primarily one of the psychology — cognitive and behavioral — of consumers. A mark infringes when it is likely to cause a mental state of confusion in an appreciable number of consumers."[4]

---

* President, Jacob Jacoby Research, Inc., Associate Member of the International Trademark Association; member of the Editorial Board of The Trademark Reporter®; Ph.D, Psychology, Merchants Council Professor of Consumer Behavior and Retail Management, Leonard N. Stern School of Business, New York University. An earlier version of this paper was delivered as an address at the Gottlieb, Rackman & Riesman Seminar in Intellectual Property, School of Law, New York University. November 3, 1998. The author was retained and testified for the plaintiff in the following cases: Mead Data Central Inc. v. Toyota Motor Sales, U.S.A., Inc., 702 F Supp 1031, 9 USPQ2d 1442 (SDNY 1988), revd 875 F2d 1026, 10 USPQ2d 1961 (CA 2 1989); Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club, 31 USPQ2d 1801 (SD Ind 1994); Hershey Foods Corp. v. Mars, Inc., 998 F Supp 500 (MD Pa 1998); NFL Properties v. ProStyle, 57 F Supp2d 665, 49 USPQ2d 1374 (ED Wis 1999); Conopco, Inc. v. May Department Stores Co., 46 F3d 1556, 32 USPQ2d 1225 (CAFC 1994); Pebble Beach Co. v. Tour 18 I, Ltd., 942 F Supp 1513 (SD Tex 1996), affd as modified 155 F3d 526, 48 USPQ2d 1065 (CA 5 1998); Anheuser-Busch, Inc. v. Balducci Publications, 28 F3d 769, 31 USPQ2d 1296 (CA 8 1994), revg 814 F Supp 791, 26 USPQ2d 1180 (ED Mo 1993), cert denied 513 US 1112 (1995). Copyright © 2001 Jacob Jacoby.

1. Mishawaka Rubber and Woolen Mfg. Co. v. S.S. Kresge Co., 316 US 203, 86 L Ed 1381, 1385, 62 S Ct 1022, 1024, 53 USPQ 323, 324-25 (1942) (emphasis added).

2. The Rational Basis of Trademark Protection, 40 Harvard Law Review 813 (1927), 22 TM Bull 139 (1927), reprinted in 60 TMR 334, 342 (1970) (emphasis added).

3. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §15:29 at 15-46 (4th 3d 2001) (emphasis added).

4. Richard L. Kirkpatrick, Likelihood of Confusion in Trademark Law xx. (PLI 2000) (citing In re Beaunit Mills, Inc., 274 F2d 436, 437, 124 USPQ 370 (CCPA 1960)).

Without question, United States trademark law focuses upon consumer psychological states of mind and processes. Specifically, the Lanham Act prohibits any marketplace entity from engaging in an act that "is likely to cause confusion, or to cause mistake" or cause "deception" or "dilution" *in the minds* of the relevant consuming public. Similarly, trademark concepts such as "acquired distinctiveness" ("secondary meaning"), "fame" and "genericide" are based on the meanings and associations residing in the minds of the relevant public.

Though United States trademark law focuses on mental states and processes, those who provide counsel, litigate or adjudicate cases in this area of law, for the most part, have little or no formal training in the social sciences, particularly in psychology and its most relevant sub-disciplines, cognitive and consumer psychology. The scholarly literature in these disciplines has, for the greater part, remained unexamined. Yet, despite being "esoteric," this literature has much to offer those interested in trademark law and is directly in keeping with views expressed on the first page of the Federal Judicial Center's Reference Manual on Scientific Evidence:

> Increasingly, . . . the issues coming before the courts are more esoteric and complex. As a result, the resolution of such issues has become more dependent on the help of experts. No longer can judges and jurors rely on their common sense and experience in evaluating the testimony of many experts. . . . The challenge the justice system faces is to adapt . . . to deal with this kind of evidence fairly and efficiently and to render informed decisions."[5]

In line with these views, this article is designed to provide those in the legal profession with a basic understanding of pertinent thought and findings from cognitive and consumer psychology and to explain their impact on the application of United States trademark law. The second part of this article adumbrates the psychological foundations underlying much of trademark law. The third part applies these foundations to the concepts of acquired distinctiveness and fame, while the fourth part does the same for the concepts of confusion and dilution. As a point of departure, consider the following questions:

1. Regardless of how much and what a person knows, how is everything that is known (which includes knowledge regarding products, brands, and companies) stored in memory?

---

5. Federal Judicial Center, Reference Manual on Scientific Evidence 1 (1994).

2.  Only a minute fraction of everything known is consciously available to a person at any given moment in time. What is the process by which the known things are retrieved from memory?

3.  What is the relationship between the information stored in our memory and the process by which information from the outside world is perceived, interpreted and given meaning?

## II. PSYCHOLOGICAL FOUNDATIONS: THE INDIVIDUAL'S "COGNITIVE SYSTEM"

The trademark law concepts of acquired distinctiveness (secondary meaning), genericide, fame, confusion, and dilution may be better understood in light of the following psychological concepts and summary statements:

### A. Immediate Consciousness versus Memory

At the outset, it is important to distinguish between *consciousness of the moment* (sometimes referred to as the "cognitive workspace") and *memory*. Individuals have an incredible amount of information regarding an equally vast number of topics crammed into their minds. These include thoughts regarding, for example, their childhood, clients, thoughts about sofa fabrics, wall colors and styles for summer suits, vacations taken in the past, and dreams about vacations to be taken in the future, certain people (our spouse, family doctor, clergyman, boss, a particular federal judge), television shows and celebrities, animals (such as the family pet and the sharks we know dwell in the deep blue sea), sports teams (the Green Bay Packers) and hotels (the Four Seasons). The list of what an individual knows is endless.

Yet, only a very small fraction of a person's knowledge and past experience is present in "consciousness of the moment." All the other information[6] that we each have but are not thinking about at that particular moment (for example, our mother's maiden name — something generally not "uppermost" in our mind), is stored in "memory." Memory is fundamental and essential. As Hunt and Ellis have observed:

> Memory is the heart of human intellectual functioning and, consequently, is involved in all processes from perception to reasoning . . . [I]magine life without memory. . . . Without

---

6.  "Information" includes not only alphanumeric or semantic information (such as our mother's maiden name and the year in which Christopher Columbus discovered the Americas), but also visual images, sounds, aromas, experiences and feelings.

memory, you would be completely incapacitated in the working world, unable to function in even the simplest situation and unable to communicate coherently with you colleagues ... your social life would be non-existent ... because you would not be able to recall a person or anything about that person from one encounter to the next. Most devastating would be the lack of personal identity or self concept. With no memory for prior personal experience. ... You literally would confront a stranger in the mirror.[7]

The fact that we are able to are able to store information in memory does not mean that it is readily available or accessible. Some information can be easily retrieved on an instant's notice, while retrieving other information (the name of a particular person we knew in high school, the name of a movie we saw years ago) may be accomplished only after considerable effort. Yet other information (the name of a particular teacher we had in grade school) may be completely inaccessible. In other words, the information in memory ranges from the "virtually always available to be accessed into consciousness" to the deepest recesses of "virtually unavailable to be accessed into consciousness."[8]

---

7. R. R. Hunt and H.C.Ellis, Fundamentals of Cognitive Psychology 30 (6th ed 1999).

8. Parenthetically, this "accessibility of stored information" continuum has important implications when seeking to measure mental contents. Readily accessible stored information may be retrieved via open-ended (unaided recall) questions. However, retrieving less readily accessible stored information generally requires using either "focused" open-ended (aided recall) questions or closed-ended (recognition) questions. Despite the mistaken impressions of some courts, properly worded closed-ended questions are not inherently leading. As examination of the most rigorous peer reviewed scholarly journals across the social and behavioral sciences reveals, more so than open-ended questions, closed-ended questions provide a fundamental methodological cornerstone for scientific research in political science, psychology, sociology, organizational behavior, management, marketing, communications, to mention but a few. Moreover, closed-ended questions are used routinely and in vast numbers in government and industry to gather information and as a basis for reaching decisions of great consequence. For example, closed-ended questions constitute the vast majority of the questions asked in the United States Census. Exceptionally influential in Federal Reserve deliberations and other government planning, the Index of Consumer Sentiment is based entirely on the answers to closed-ended questions (eg, "We are interested in how people are getting along financially these days. Would you say that you are better off or worse off financially than you were a year ago?"). Despite the fact that these questions necessarily "plant" ideas in the minds of respondents, the question remains whether these closed-ended questions are necessarily leading or suggestive? As they do not indicate which of the answers is the "desired" answer, it is submitted they are not. The physician who relies solely on the information gathered from asking "How do you feel?," without following this up with pertinent closed-ended questions, likely would be considered a poor diagnostician and irresponsible physician. One is led to wonder whether those courts indicting closed-ended questions had ever completed medical inquiry forms, forms to purchase life insurance, a car or a home or taken a multiple-choice exam, including the LSAT ("The Law School Admission Test is a half-day-long standardized exam that is required for admission to all law schools approved by the American Bar Association. ... It consists of six separately timed sections, five of which use multiple choice questions." T. M. Martinson, Everything You Need to Score High on the LSAT ARCO, p 5 (2000 ed). The

Various analogies exemplify these concepts. For example, a person's immediate consciousness (or "cognitive workspace") can be likened to a desk, whereas memory can be likened to an extensive bank of file cabinets, drawers and bookshelves that grow in number as life is experienced. When working on a project, the individual cannot possibly place all the contents of these drawers, file cabinets and bookshelves onto her desk at the same time. Instead, she goes to those cabinets, drawers and shelves she thinks contain the pertinent materials, retrieving and placing onto her desk those items she thinks are germane. Similarly, a person's consciousness of the moment is like a desktop that can only accommodate a very limited amount of the information available in all her storage bins.

An even more popular analogy likens the operation of the human mind to that of a computer.[9] Like the neuro-electric biochemical structure of the mind, even the simplest computer has the capacity to store a considerable amount of information on its magnetic, electro-mechanical hard drive. The hard drive is the computer's memory store. These days, the capacity of this memory system is measured in ever-increasing units called gigabytes, which represent one billion separate "bits" (zero/one binary digits) of information.

Despite blazing speeds that permit information to be called forth virtually instantaneously and the significant restrictions imposed by the hardware upon the ability to open window upon window of information, it is impossible to provide all the information contained on the hard drive in the computer's memory at the same time. One restriction is imposed by the capacity of the computer's Random Access Memory ("RAM"). RAM may be likened to the neck of a soft-drink bottle. Just as the "bottleneck" permits only a limited surface area of the fluid to be exposed and limits the flow at any given moment, RAM limits the amount of information that can be retrieved from the computer's hard drive memory at any point in time.

---

bottom line is that, in their normal course of business—a concept important enough to be incorporated in Federal Rule of Evidence 703—industry, governments, educators, consumer and market researchers, and pollsters primarily rely on closed-ended questions when assessing the contents of respondents' minds. The accessibility of memory contents continuum requires the use of closed-ended questions. Thus, it is submitted that those who inveigh against properly constructed closed-ended questions have no scientifically legitimate basis for rendering such opinions.

9. For example, in introducing the term cognitive science, The New York Times said: "In the last few decades, scientists in a variety of fields, including psychology, have harnessed concepts from computer science to understand how people take in information, process it and use it to solve problems." Erica Goode, Human Nature: Born or Made? F1, The New York Times, March 14, 2000.

The limitations imposed by the video monitor display are even greater because, at any given instant, no more than a minute fraction of the vast amount of information stored in the computer may be displayed. This limitation is a boon rather than a bane, because the human mind cannot absorb all the information in the computer at the same time. Our mental (or "cognitive") systems would "blow a fuse" from a severe case of information overload.[10] Thus, if the hard drive may be likened to the memory store, then the video monitor may be likened to the cognitive workspace.

To summarize the points covered so far:

(1) Everything we know is stored somewhere in our memory;

(2) It is useful to think of memory as consisting of two components—a cognitive workspace (our consciousness of the moment) and long term memory (the storehouse of our past experiences and knowledge); and

(3) At any given instant, because of the limitations inherent in our cognitive systems, we can only be conscious of an exceedingly small proportion of what we know.

### B. Cognitive Networks:
### The Filing Systems of the Mind

Computers store information as a binary series of code activated via magnetic charges. For example, according to the American Standard Code for Information Exchange ("ASCII"), the letter "Y" is represented by the eight-bit sequence 10111001. But how is information stored in human memory? Since the mid-1970s,[11] the most widely accepted view among scholars[12] is that information is stored via a vast array of interlocked "cognitive networks," each consisting of "nodes" and "links." Nodes are

---

10. The individual's consciousness of the moment is overloaded by too much information retrieved from memory. Later, strategies that the consumer employs to avoid being overloaded by information coming into the cognitive workspace from the outside world will be discussed.

11. J.R. Anderson and G.H. Bower, Human Associative Memory (1973); J.R. Anderson and R. Hastie, Individuation and Reference in Memory: Proper Names and Definite Descriptions, 6 Cognitive Psychology 495 (1974); A.M. Collins and E.F. Loftus, A Spreading Activation Theory of Semantic Processing, 82 Psychological Review 407 (1975); J.R. Anderson, A Spreading Activation Theory of Memory, 22 Journal of Verbal Learning and Verbal Behavior 261 (1983).

12. Summaries of published empirical studies may be found in J.D. Bransford, Human Cognition: Learning, Understanding, Remembering (1979); D.E. Carlston and E.R. Smith, Principles of Mental Representation, in E.T. Higgins and A.W. Kruglanski, Social Psychology: Handbook of Basic Principles (1998); W.K. Estes, Cognitive Architectures from the Standpoint of an Experimental Psychologist, 41 Annual Review of Psychology 1 (1991); Hunt and Ellis, supra note 7; M.M. Smyth, P.E. Morris, P. Levy and A.W. Ellis, Cognition in Action (1987), among others.

meanings (either semantic, pictorial and auditory)[13] or feelings;
"links" represent the routes by which these meanings intercon-
nect. Links are the mental associations or connections between
different items of information (nodes) stored in the mind. Links
vary in strength. When depicted in visual form, stronger links are
usually indicated by thicker lines.

To the three points summarized above, we now add:

4.  Information and experiences are stored in memory as
    "cognitive networks" consisting of nodes (elements of
    information) and links (mental associations) between
    nodes.

Assume for now that each cognitive network can be visualized
as an interconnected Tinker-Toy® consisting of a large number of
wheels connected by spokes, with some wheels having more
connecting spokes than others. To illustrate, suppose someone was
asked to think about his family. He might begin by thinking of his
mother (a node) and then to thinking of his mother's two brothers,
first Bill (a second node), then Hal (a third node), then, maybe, his
mother's and two brother's mother, also his grandmother (another
node). This process is called "spreading activation."

Thus, an additional summary statement is as follows:

5.  Though psychological and neurological research reveals a
    certain amount of "parallel processing" (i.e., bunches of
    nodes lighting up all at once), most thinking, including the
    process of retrieving knowledge from memory, is essen-
    tially a sequential phenomenon. Through the process
    known as "spreading activation," one thought (node) leads
    to and activates the next thought (node).

Thinking is multi-linked and multi-directional. In other words,
there are many ways to get from here (thinking of your mother) to
there (thinking of your grandmother). Spreading activation forms
the basis of inference making.[14] (Sometimes, the inference drawn
may be incorrect,[15] as occurs, for example, in the context of false
advertising claims.) Thinking does not always proceed in a formal
linear fashion, but, rather, more often proceeds in an informal,
psychological process. Hoyer and MacInnis[16] provided the follow-

---

13. To appreciate that meanings may be stored visually or acoustically, the reader only has to call to mind the appearance of his office or desk, or the first four notes of Beethoven's Fifth Symphony.

14. A. Ortony, Remembering, Understanding and Representation, Cognitive Science 53 (1978).

15. R.J. Harris and G.E. Monaco, The Psychology of Pragmatic Implication: Information Processing Between the Lines, 107 Journal of Experimental Psychology: General 1 (1977).

16. W.D. Hoyer and D.J. MacInnis, Consumer Behavior 174 (1997).

ing easy-to-understand description of activation and spreading activation:

> We can think about activation [of a node] as a light going on. Whether a light goes on or not depends on whether sufficient electricity is delivered to it. Likewise, whether a node in memory is activated depends on how much prompting it receives, or its level of activation.
>
> The basic principle of spreading activation . . . is that when a particular node is activated, some of this activation (energy) will spread to adjacent nodes. If the activation level is sufficient, the other nodes may be retrieved [i.e., brought forth into memory] as well.

Advances in neuroscience have confirmed the validity of the notion of spreading activation. More than two decades ago, Mountcastle discovered that the neurons of the cerebral cortex are arranged so that the output from one neuron is transmitted simultaneously to numerous other neurons, as opposed to from one neuron to another.[17] More recently, a committee of the National Research Council reported:

> Positron emission tomography (PET) and functional magnetic resonance imagery (MRI) literally show that the mind does not follow a single "train of thought," but rather that thinking happens in neural networks, or sets of coordinated but simultaneous neural events in relatively small, sometimes widely separated areas of the brain (Druckman & Lacey, 1989; Posner & Raichle, 1994). We can see in the brain that the mind is not a passive receptacle for ideas, but an active constructor of sensations, patterns and meanings.[18]

Several of these concepts lie at the heart of determining whether a likelihood of confusion exists—the critical issue in trademark litigation. Testimony regarding cognitive networks and spreading activation assisted the district court in finding for plaintiff in Mead Data Central Inc. v. Toyota Motor Sales, U.S.A., Inc.,[19] a finding which was reversed on other grounds by the Second Circuit. More recently, in a lawsuit involving the "Baltimore Colts" mark, Judge McKinney took note of the process of spread-

---

17. V.B. Mountcastle, An Organizing Principle for Cerebral Function, in F.O. Schmitt (Ed) The Neurosciences: Fourth Study Program (1979).

18. Board of Behavioral, Cognitive and Sensory Sciences; Commission on Behavioral and Social Sciences and Education of the National Research Council, 9 Psychological Science 79, 81 (1998). See also D. Druckman and J.L. Lacey, Brain and Cognition: Some New Technologies (1989); M.I. Posner and M.E. Raichle, Images of Mind (1994).

19. 702 F Supp 1031, 9 USPQ2d 1442 (SDNY 1988), revd 875 F2d 1026, 10 USPQ2d 1961 (CA 2 1989).

ing activation, commenting as follows: "Plaintiff's expert's explanation . . . is appealing. He explained the way in which the human brain stores and retrieves memory, pointing to articles on cognitive networks and spreading activation."[20]

Further, as noted by Hunt and Ellis, "The idea of spreading activation implies that sub-threshold activation accumulates in the nodes related to the activated node. Essentially, this means that the activity of thinking about one thing automatically and unconsciously influences the status of other things."[21] As opposed to being mediated by conscious choice or reflection, most psychological phenomena (including how we perceive and interpret information in the outside world) are essentially automatic and subconscious in nature.[22] As more fully discussed below, this principle has important implications with respect to the issues of trademark confusion and dilution. Thus, our next summary statement is as follows:

    6. Spreading activation occurs automatically and subconsciously.

As noted above, the manner in which the members of a person's family are recalled from memory, generally, does not correspond to a formal linearly organized family tree. Depending upon a variety of factors, certain family members (each represented by a node in a person's "my family" cognitive network) may be called to mind "out of order." For example, though close with his first cousin Stan, because Stan's son, Len, practices intellectual property law and lives in the neighborhood and visits often, it is more likely that this author will think first of his second-cousin Len, then his first-cousin Stan, rather than the reverse. This leads to a seventh summary statement:

    7. Though sequential, thinking is not necessarily linear nor, to the outside world, logical. Influenced by many internal and external factors, it is psychological.

Moreover, as each family member is called to mind, various images, attributes and feelings associated with that individual are triggered. Some may be pleasant; others less so. Thus, another summary statement is:

    8. The activation of an informational node may call to mind related nodes consisting of related thoughts, feelings, evaluations, images and moods.

---

    20. Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club, 31 USPQ2d 1801, 1808 (SD Ind 1994).

    21. Hunt and Ellis, supra note 7 at 193.

    22. J.A. Bargh, The Automaticity of Everyday Life 1, in R.S. Wyer, Jr. and J.A. Bargh, The Automaticity of Everyday Life: Advances in Social Cognition (Vol X) (1997).

The human mind, however, is not able to cope with the simultaneous presentation of all this information. Even if we limit attention to a single cognitive network (e.g., her mother's family), it is impossible to keep every known thing regarding that topic in one's mind at the same moment. The next summary statement, thus, provides:

9. Because of "information overload,"[23] the amount of information any person can consider, much less evaluate, at any one point in time is severely limited.

Last, when one considers all the things individuals know and the feelings and evaluations individuals have about each of the various topics crammed into individuals' minds, it becomes readily apparent that the adult human mind likely contains millions, perhaps even tens of millions, of nodes and links. Truly, it qualifies as a complex system. Emerging research on complex systems—as varied as the metabolic networks of life-sustaining chemical reactions inside cells, the species in an ecosystem such as a fresh water lake, the web of power systems forming the electrical grid of the Western United States, the Internet and the World Wide Web—suggests that complex systems may all conform to the same organizational principles.

As they come together, many networks seem to organize themselves so that most nodes have very few links, and a tiny number of nodes, called hubs, have many links. The pattern can be described by what scientists call a power law. . . . As the number of connections [to a node] rises, [there will be fewer such multi-connected nodes in the system].

In a highly publicized paper in 1998, Dr. Duncan Watts, a sociologist at Columbia University, and Dr. Steven Strogatz, an applied mathematician at Cornell University, found that many networks exhibited . . . the small-world phenomenon popularized in John Guare's play "Six Degrees of Separation." Just as any two people can be linked by a chain of . . . [approximately] six acquaintances, so can any node in a small-

---

23. See, eg, J. Jacoby, D.E. Speller and C.A. Kohn, Brand Choice Behavior as a Function of Information Load, 11 Journal of Marketing Research 63 (1974); J. Jacoby, D.E. Speller and C.A.K. Berning, Brand Choice Behavior as a Function of Information Load: Replication and Extension, 1 Journal of Consumer Research 323 (1974); J. Jacoby, Information Load and Decision Quality, 14 Journal of Marketing Research 569 (1977); J. Jacoby, Perspectives on Information Overload, 10 Journal of Consumer Research 432 (1984); Naresh Malhorta, Information Load and Consumer Decision Making, 8 Journal of Consumer Research 419-30 (1982); Kevin Lane Keller and Richard Staelin, Effects of Quality and Quantity of Information on Decision Effectiveness, 14 Journal of Consumer Research 200-13 (1987).

world network be reached from any other node with just a few hops.

The World Wide Web is a small world. . . . Any two documents or sites on the Web are separated by only a small number of mouse clicks.[24]

As a complex "small world" system, each adult human mind operates in similar fashion. To illustrate, consider how one retrieves memories of people known and events experienced years ago, and how retrieval of one item of information generally leads to retrieval of related items. Especially consider how some retrieved items (e.g., hearing the name of our best friend in grade school whom we have not seen in thirty years) is capable of evoking linkages to many more items than is hearing the name of some minor acquaintance from the same period. This leads to another summary statement:

10.   In terms of their linkages with other nodes, some nodes in our mental systems (termed "hubs" or "core" nodes) are more important than are others.

### C. Cognitive Networks as They Apply to the Marketplace

These cognitive processes also apply to the way in which the name of a company, its product, its brand and the brand attribute information are stored in memory.[25] To illustrate, suppose a consumer was thirsty and wanted to have a beer. Thinking of beer might first activate the "Budweiser" node then "Bud Light" → "Anheuser-Busch" → the "City of St. Louis" → "Michelob" → "Heineken" → "a billboard ad showing a cold Heineken covered in condensation" → "Amstel" → "imported beer" → "Becks" → "Coors" → "Colorado" → "the Rockies" → "Hamms."

Thinking of a manufacturer (Anheuser-Busch) also may lead to thinking of other items from the same source, including other brands of beer (Busch®; O'Doul's®) and related products (the "A-and-Eagle" brand of salted nuts). Further, the consumer may be prompted to think of some of the recalled beers as possessing

---

24. George Johnson, First Cells, Then Species, Now the Web, F1-2, The New York Times, December 26, 2000. See D.J. Watts and S. H. Strogatz, Collective Dynamics of 'Small-World' Networks, Nature 440 (June 4, 1998); H. Jeong, B. Tombor, R. Albert, Z.N. Oltvai and A.-L. Barabasi, The Large Scale Organization of Metabolic Networks, Nature 651 (October 5, 2000); A.-L. Barabasi and R. Albert, Emergence of Scaling in Random Networks, Science 509 (October 15, 1999).

25. As examples, see illustrations and related discussions in Hoyer and MacInnis, supra note 16 at 169; J.P. Peter and J.C. Olson, Consumer Behavior and Marketing Strategy, 58 (6th ed 2002).

common or similar attributes (most are domestic, others are imported; some are high-priced, others low-priced) or as having unique attributes (the highly distinctive design of the Budweiser® container or the distinctive combination and shades of green, white and red star used on the Heineken® label). Moreover, thinking of any one of these items may evoke related feelings and evaluations, such as, St. Louis is a nice place to live or the last time I had a Heineken® it tasted bitter.

### D. The Role Played by Brand Names and Other Source-Identifying Indicia in Information Retrieval

A product's price usually is one of the most important items of information for any consumer contemplating a purchase. With only price information, however, the consumer typically can tell us relatively little about the product. For example, suppose a consumer is asked: "I'm thinking of a particular beer that costs around $4.95 a six-pack. What can you tell me about that beer?" The consumer would be unable to tell much about the beer beyond price. He would not be able to tell whether the beer was domestic or imported, the name of the manufacturer and what other items were manufactured by the same source. Thus, information regarding a product's price, while important, typically enables the consumer to make only general inferences. In most instances, important to the consumer as it may be, price information alone does not foster identification of the specific brand.

Suppose, instead, the consumer is asked: "I'm thinking of a particular beer. Its name is Budweiser®. What can you tell me about that beer?" Most adult Americans (even many who do not buy or drink beer) might be able to provide a great deal of information, including: (1) the approximate price; (2) the name of the manufacturer; (3) other brands of beer made by that same source; (4) the fact that it is "beechwood aged"; (5) that it comes in containers with labels bearing a distinctive red and white logo; (6) that it is the most popular beer in the country; (7) that it goes by the nickname "Bud" and uses the slogan "This Bud's for you"; (8) that there is also a Bud Light version; (9) that a series of "Bud Bowl" commercials broadcast in conjunction with the Super Bowl have depicted a football game played between teams composed of bottles of Bud and Bud Light; and (10) that Clydesdale horses are used in its advertising, especially during the Christmas season.

Thus, brand names serve as information "chunks." They represent core nodes in memory around which other "associated" information is connected and organized. Given only a familiar brand name, a host of relevant and important information can be

efficiently called into consciousness. Although developed primarily
to illustrate points discussed in subsequent sections, the reader is
encouraged to examine Exhibit 1 which, by way of an illustration,
endeavors to make these abstract concepts more concrete.

A unique brand name and cohesive brand identity are
probably the most powerful pieces of information for consumers.[26]
They serve as "information chunks," enabling the consumer to
efficiently organize, store, and retrieve information from mem-
ory.[27] Indeed, when consumers engage in pre-purchase decision-
making, brand name information tends to be the most frequently
accessed type of information.[28]

"Chunking" often operates virtually effortlessly and goes
unnoticed in most circumstances. At other times, though, effort is
required to learn and store a chunk. Such effort, however, may
yield great dividends. Consider the following 11-digit sequence: 1-
2-1-2-7-6-8-9-8-8-7. When viewed in isolation, a person might have
difficulty remembering these digits. When the numbers are divided
into smaller units, however, remembering becomes easier. For
example, grouping these 11 numbers into the familiar 1 digit, 3
digit, 3 digit, 4 digit pattern used for long distance phone numbers
makes it easier to commit the sequence to memory (1-212-768-
9887). The task becomes easier still when the number, by being
associated with something already in stored memory, is accorded
meaning (that is the telephone number of The International
Trademark Association). The process whereby new information is
added to existing cognitive networks is termed "accretion."[29]

"Chunking" applies to more than just names and numbers. It
also applies to logos (a "swoosh" or a horseman on a pony holding
an upraised polo mallet), shapes (the classic Coca-Cola bottle),
colors (the colors green and yellow in the context of NFL football),

---

26. Much else can be said regarding the value and function of brand names,
particularly as these come into play in the service of creating "brand equity" for the source
(eg, D.A. Aaker, Managing Brand Equity (1991); D.A. Aaker, Bulilding Strong Brands
(1996)), and "brand loyalty" for the consumer (eg, J. Jacoby and R.W. Chestnut, Brand
Loyalty: Measurement and Management (1978)). Considerable research also exists to show
that, consistent with legal theory, consumers rely heavily upon brand names to arrive at
judgments of quality (cf J. Jacoby, J.C. Olson and R.A. Haddock, Price, Brand Name and
Product Composition Characteristics as Determinants of Perceived Quality, 55 Journal of
Applied Psychology 570-79 (1971); G.J. Szybillo and J. Jacoby, Intrinsic v. Extrinsic Cues
as Determinants of Perceived Quality, 59 Journal of Applied Psychology 274-80 (1974)).

27. As described later, information chunks also play an important part in the
interpretation of information incoming from the outside world.

28. J. Jacoby, R.W. Chestnut and W.A. Fisher, A Behavioral Process Approach to
Information Acquisition in Non-Durable Purchasing, Journal of Marketing Research 532
(1978); J. Jacoby, G.J. Szybillo and J. Busato-Schach, Information Acquisition Behavior in
Brand Choice Situations, 3 Journal of Consumer Research 209 (1977); Hoyer and MacInnis,
supra note 16 at 207.

29. See Peter and Olson, supra note 25 at 61.

sounds (the pocketa-pocketa-pocketa of a Harley-Davidson motor-
cycle), aromas, or any other uniquely identifying indicia.

What makes chunking so important is that, once a distinctive
node has been activated in memory, via the process of spreading
activation, one is generally able to activate and retrieve many
other nodes from that network. Thus, Nike's "swoosh" symbol—
originally nothing more than a stylized check-like mark that likely
required a number of exposures before it stood for something in a
consumer's mind—is now able to operate as a distinctive node and
is as effective in evoking clusters of related knowledge as the
name "Nike" itself.

### E. A "Not Insubstantial"
### Proportion of Consumers

Trademark law concepts, such as acquired distinctiveness,
fame, genericism, confusion, and dilution are not, however, applied
to the contents of a single person's mind. Rather, they apply to
aggregates of people, typically, the universe of purchasers and
prospective purchasers of the particular product or service at issue.
From the perspective of trademark law, the critical point is that,
as a result of having been exposed to the same products (Coca-
Cola), advertisements and experiences (the movie Gone With The
Wind), many individuals develop cognitive networks regarding the
same item that possess many nodes in common. For example, the
name "Babe Ruth" causes many people to activate nodes such as
"baseball legend," "New York Yankees," "60 home runs in one
season." Others with more knowledge or experience in this realm
may also think "Sultan of Swat," "beefy face and physique," "once
a pitcher for the Boston Red Sox" or "enshrined in Cooperstown."
It is not that every consumer will have exactly the same nodes
organized in exactly the same way, just that their respective
cognitive networks will contain many of the same nodes organized
in similar ways.

From this example, two additional summary points emerge:

11.  By virtue of exposure to common stimuli and shared
     experiences (due, in part, to the media or advertising),
     many individuals in a given society or culture will have
     cognitive networks that possess many common nodes;
     and

12.  Cognitive networks generally contain one or more
     "distinctive" nodes, defined as a node that, by itself, is
     sufficient to elicit substantial portions of the relevant
     cognitive network from memory.

Thus, hearing the term "Sultan of Swat" may be equally as effective as the name "Babe Ruth" in evoking an individual's "Babe Ruth" network. Brand names, logos, other symbols and slogans, or even parts of slogans (e.g., "Melts in your mouth, not in your ____," or "At __, progress is our ____ important product.") also may serve as "distinctive" nodes.

When combined, nodes that, by themselves, are not distinctive, also can serve a distinctiveness function. For example, thousands of players, coaches, and owners have been associated with the "New York Yankees." Thus, to say "New York Yankees" would not necessarily identify Babe Ruth. The same is true for the nodes "baseball legend," "home run slugger" and "once a pitcher for the Boston Red Sox." Considered in isolation, none of these nodes is sufficient to enable one to automatically make a positive identification. Indeed, knowing any three of the four might still be insufficient, as there are many players who might be called to mind by the nodes: "New York Yankee," "baseball legends," including some who were "once a pitcher for the Boston Red Sox" (Roger Clemens). When these four independent, non-unique-identifying nodes are combined, however, most of those familiar with baseball will recall Babe Ruth and only Babe Ruth. In this manner, a particular combination of non-distinctive elements may come to serve a "sole source identifying" function.[30]

This leads to the next summary statement:

13.   Though not distinctive by themselves, certain combinations of nodes can operate as "collectively distinctive," thereby serving a distinctiveness function.

Before a consumer can make sense out of what is "out there" (for instance, a product name, a product package, an advertising claim), she needs to draw on and use information she already has in her mind. How she interprets (and misinterprets) the things she experiences is fundamentally influenced, and often entirely determined, by her prior knowledge and experiences. "In general, comprehension involves interpreting new input in terms of what we already know about the world."[31]

Consider the following passage:

The procedure is quite simple. First you arrange things into different groups. Of, course, one pile may be sufficient depending on how much there is to do. If you have to go

---

30.   The fact that the activation of a combination of non-distinctive nodes may also lead to mistaken identifications (eg, the combination of "New York Yankee," "baseball legends," and "once a pitcher for the Boston Red Sox" may cause some to think of Roger Clemens) will be discussed infra.

31.   Smyth et al., supra note 12 at 187.

somewhere else due to lack of facilities, this is the next step; otherwise, you are pretty well set. It is important not to overdo things. That is, it is better to do too few things at once than too many. In the short run, this may not seem important, but complications can easily arise. A mistake can be expensive as well. At first the whole procedure will seem complicated. Soon, however, it will become just another facet of life. It is difficult to see any end to the necessity for this task in the immediate future, but then one can never tell. After the procedure is completed, one arranges the material into different groups again. They then can be put into their appropriate places. Eventually they will be used once more and the whole cycle will have to be repeated. However, that is part of life.[32]

Though we understand each of the words and each of the sentences, most people are unable to identify the familiar procedure being described. Comprehension of the core idea is missing. The reason why we fail to understand the basic gist of the paragraph is because we have failed to identify and then extract the proper cognitive network (or schema) from memory to use as the basis for placing these individually meaningful sentences into the context of something we already know. However, once we are told that the passage describes washing clothes, it makes sense. In other words, comprehension of elements in the outside world is predicated on what we already stored have in memory. "Comprehension and memory are interwoven."[33] This leads to a final summary statement:

    14.  The cognitive networks in one's memory are not only
         used for storing information, but also play a funda-
         mental and often decisive role in interpreting the
         incoming information from the outside world.

## III. RELATING PSYCHOLOGICAL PRINCIPLES
## TO ACQUIRED DISTINCTIVENESS,
## GENERICISM AND FAME

The concepts discussed thus far provide a foundation for understanding how marks and trade dress can "acquire distinctiveness" and serve a source-identifying function for consumers. By repeated exposure to and apprehension of the outside world,

32. J.D. Bransford and K.D. Johnson, Contextual Prerequisites for Understanding, 11 Journal of Verbal Learning and Verbal Behavior 717 (1972).

33. Smyth et al., supra note 12 at 186.

consumers develop cognitive networks to mentally represent the companies, products, brands and stores that they encounter.[34] Once ensconced in memory, these networks assist in the interpretation (and, as we shall soon see, the misinterpretation) of what is experienced.

## A. Acquired Distinctiveness

Marks that are inherently distinctive require no showing of secondary meaning and merit the highest level of protection. The law recognizes that fanciful and arbitrary marks clearly represent intellectual property and, hence, deserve protection regardless of anything else. Despite this, it is entirely possible for arbitrary or fanciful marks at the highest end of the distinctiveness spectrum to convey no meaning whatsoever to purchasers and prospective purchasers in the pertinent product category. Suppose one were to come out with a new type of writing instrument and name it "Blyphstyk." Being arbitrary and fanciful, it would be entitled to the highest level of protection. However, such marks are of no concern here. Our focus is not on marks that, by virtue of law, are legally protectible, but on marks that have "acquired distinctiveness through secondary meaning."[35] That is, on marks and dress for which consumers have formed cognitive networks.

When a "substantial," "appreciable," or "significant" proportion of the relevant consuming public develops cognitive networks for a product or service, and these networks possess one or more nodes capable of serving to uniquely identify that product or service and only that product or service as coming from a particular (albeit anonymous) source, then, from a psychological perspective, that node (or nodes) may be said to have "acquired distinctiveness" or achieved "secondary meaning."[36] Consider

---

34. Note that the nodes formed in the consumer's mind may not be "isomorphic" (ie, identical) to the information objectively present in the outside world. For example, though a bottle of wine may be sold for $3.99, this information may be filed in the consumer's mind not as "$3.99," but as "cheap." When later questioned about that particular wine, the consumer may recall "cheap" but not be able to recall $3.99.

35. Two Pesos, Inc. v. Taco Cabana, Inc., 505 US 763, 120 L Ed2d 615, 112 S Ct 2753, 23 USPQ2d 1081, 1084 (1992).

36. In explaining what constitutes secondary meaning, Professor McCarthy writes: "It is not necessary that each and every member of the buyer class associate the mark with a single source. . . . It is apparent that 'it is only necessary to show that a *substantial segment* of the relevant group of consumers made the requisite association' between symbol and source to prove secondary meaning." 2 McCarthy, supra note 3, §15:5 at 15-9 (emphasis is original). At several places in §15:5, Professor McCarthy goes to great lengths to explain that secondary meaning is essentially nothing other than a *mental association*: "The prime element of secondary meaning is a *mental association* in buyers' minds between the alleged mark and a single source of the product." 2 McCarthy, id, §15:45 at 15-68 (emphasis in original).

tarnishment and disparagement. While the notions of secondary meaning, likelihood of confusion and genericism refer to the presence (or absence) and strength (or weakness) of associations or mis-associations, blurring, tarnishment and disparagement refer to weakening or reduction in the ability of the mark to clearly and unmistakably distinguish one source and thereby require the evaluation of the ability to make those associations.[86a]

### F. Implications for Measuring Dilution

As the Hershey Foods court commented: "There is [sic] no standard criteria for surveying for dilution."[86b] The discussion just concluded yields several concrete suggestions as to appropriate measurement approaches and criteria, some of which differ for blurring and tarnishment. For either blurring or tarnishment, testing for dilution requires that several key questions be addressed. These include: Within what universe should it be tested (general public or niche market)? Which mark (plaintiff's, defendant's or both) should be tested? What elements need to be incorporated in the test protocol?

Is the proper universe the general public or a niche market? This question is yet to be decided definitively. Different courts have come down on both sides of the issue.[87]

Whose mark should be tested? The Ringling Bros. court held "It is Ringling's famous mark that should be the focus of the dilution survey, for it is injury to that mark that is in issue."[88] The court even went so far as to suggest that instead of having respondents complete the phrase: "THE GREATEST ___ ON EARTH," it would have been better had they been shown a card displaying plaintiff's mark.[89] In this writer's opinion, while a focus on plaintiff's mark is required for assessing the fame of the mark at issue (the first prong of the empirical assessment), when assessing the degree to which there is a risk of blurring of distinctiveness (the second prong of the empirical assessment), the continued emphasis on testing plaintiff's mark may be misplaced. Consider the following rationale:

Regardless of whether the focus is on blurring or tarnishment, the federal dilution doctrine applies only to famous marks. Thus, dilution is a two-tiered concept. Before one can raise issues of

86a. Id, §§24:67-67 at 24-119 to 121.

86b. Supra note 38 at 518.

87. See supra notes 41 and 42 and accompanying text.

88. Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development, 955 F Supp 605, 617, 42 USPQ2d 1161, 1169 (ED Va 1997), affd 170 F3d 449, 50 USPQ2d 1065 (CA 4 1999).

89. Id at 618 fn 23, 42 USPQ2d at 1170.

blurring or tarnishment, evidence first must be adduced to establish that the plaintiff's mark is famous. Absent a showing of fame, questions of blurring or tarnishment become irrelevant. Although one may rely on other forms of evidence to establish fame (e.g., duration of use, duration and amount of advertising expenditures, licensing or co-branding relationships), these only provide indirect and sometimes misleading evidence of the consumers' states of mind. To determine whether a mark truly is famous, the most direct evidence would come from a properly designed survey conducted with members of the relevant universe. Only after fame has been determined does it makes sense to test whether that mark has been blurred or tarnished. The threshold issue of fame cannot be tested using defendant's mark.

The Ringling court's holding that blurring (the second tier issue) should be tested using plaintiff's mark likely was a result of the case's circumstances. Defendant's mark (The Greatest Snow on Earth) was already widely known among the relevant populace because it was emblazoned on all the license plates in the State of Utah. Under these circumstances, it might be possible to assess impact of defendant's mark by testing plaintiff's mark. This approach, however, requires that one wait until after defendant's mark comes to enjoy at least a certain measure of widespread use. Logically, if testing is done before defendant's mark becomes known to members of the public, one could not expect it to exert much of an effect. However, if plaintiff's mark is indeed famous, by this point, the horse is already out of the barn and plaintiff's mark is likely to have suffered damage. To prevent such damage, plaintiffs need to be able to test for the likelihood of blurring either before or immediately after defendant's mark has been introduced. Doing so requires determining whether exposure to defendant's mark causes consumers to make associations to plaintiff and its mark, not the reverse. If exposure to defendant's use of its mark produces no such associations, then where is the harm qua blurring? Thus, while fame (the first tier of dilution) needs to be tested using plaintiff's mark, blurring (the second tier) likely is best tested using defendant's mark as the latter is "used in commerce."

A similar rationale with an added wrinkle applies to the test for tarnishment. Consumers may draw negative associations to plaintiff's famous mark for many reasons, some or all of which may predate defendant's use of its mark. If defendant's use of its mark cannot be shown to be the cause of one or more of these negative associations, then where is the harm qua tarnishment? For this reason, as is the case with blurring, while fame needs to be tested using plaintiff's mark and tarnishment needs to be tested

using defendant's mark. The wrinkle is that, that defendant's use of its mark must be shown to cause not just any association, but a negative association.

The author has employed the rationale outlined above in various surveys proffered as evidence in litigated matters. Because they provide concrete illustrations of the concepts outlined above, two of these studies are discussed below.

### 1. Testing Blurring of Distinctiveness

With the objectives of assessing confusion, the efficacy of disclaimers and dilution, the survey proffered in Pebble Beach Co. et al. v. Tour 18 I, Ltd.[90] had several interwoven components. Relying on the findings pertaining to confusion, both the district court and Court of Appeals for the Fifth Circuit declined to discuss the dilution component. Yet, consideration of this approach is instructive.

Situated in Humble, Texas, a Houston suburb, Tour 18 I Ltd. designed and operated a regulation eighteen-hole golf course that consisted of topographical replicas of holes from thirteen golf courses situated across the United States. These courses included: Pebble Beach (California), Augusta (Georgia), Sawgrass (Florida), Shinnecock Hills (New York), Harbour Town (South Carolina) and Pinehurst (North Carolina). As preparation for constructing their course, Tour 18 videotaped and secured topographic maps of the original holes from outside sources. The replicas were reasonable simulations, down to including non-playing-related details. For example, among other features, Harbour Town's eighteenth hole is known for its location near a picturesque lighthouse on the Sea Pines golf course. Not only was its topography generally the same, but the Tour 18 version also included a replica of this lighthouse.

Among other arguments, plaintiffs Pebble Beach Company, Sea Pines Company, Inc. and Resorts of Pinehurst, Inc. contended that use of their names on defendant's promotional brochures and golf course would cause dilution via blurring. Accordingly, this author was retained to develop a survey to test both tiers of the dilution argument (fame + blurring).

The respondents consisted of those golfers who had played Tour 18 and used a credit card when making reservations.[91]

---

90. 942 F Supp 1513 (SD Tex 1996), affd as modified 155 F3d 526, 48 USPQ2d 1065 (CA 5 1998).

91. There were two hundred thirty-five individuals randomly selected from a comprehensive listing of those who had used a credit card when booking a reservation to play at Tour 18. Most were from Texas, approximately twenty-five percent were from out-of-state. On average, the respondents reported golfing for approximately nineteen years; well over ninety percent reported golfing for more than five years. On average, the respondents

Interviewing was conducted by phone in two waves. Wave 1 tested for fame and included preliminary questions for assessing dilution. Wave 2 conducted approximately a week to ten days later, included the remaining dilution questions.

*Assessing Fame:* At the time, more than thirteen thousand regulation eighteen-hole golf courses were located within the United States.[92] To determine whether plaintiffs' possessed famous marks, the survey began with the following question: "In your opinion, what are the most famous golf courses located within the United States? You can tell me up to five." In response to this open-ended question, Pebble Beach was the most frequently named course (by eighty-seven percent of the respondents); Pinehurst #2 was the fourth-most named course (by twenty-five percent) of the respondents. As the probability of any one of the thirteen thousand courses being named as one of the top five courses in the country is less than .0004 percent, beyond a doubt, plaintiffs' courses were considered famous by defendant's customers.

Open-ended questions generally probe only "top of mind" contents, the "most accessible" region of the mind (see Exhibit 1). Accordingly, those not mentioning one or both of these courses in answer to the open-ended question were then asked the following closed ended question: "Would you or wouldn't you rank (Pebble Beach; Pinehurst #2; Nathanville) among the 100 most famous golf courses within the United States, or you have no opinion on that?" In response, no-one said they would rank Nathanville (a control name for a non-existent course) among the one hundred most famous golf courses in the country. In contrast, when combined with the answers to the open-ended question, two hundred twenty-four of the two hundred thirty-five respondents (ninety-nine point six percent) said they would consider Pebble Beach to be among the one hundred most famous golf courses in the country. Ninety-two percent included Pinehurst #2.

Respondents were next asked "If you know, in what city or state is Pebble Beach (Pinehurst #2) located?" The answers revealed that not only did respondents consider these courses to be among the most famous golf courses in the country, but most (ninety-six percent for Pebble Beach and sixty-six percent for Pinehurst) also knew where these courses were located.

---

reported having golfed approximately forty times during the preceding twelve months; only eleven percent reported having golfed fewer than ten times during this twelve-month period. The majority (sixty-eight percent) had golfed at Tour 18 two or more times; most (ninety percent) said they were likely to return (thereby qualifying both as past and prospective users of defendant's course).

92. National Golf Foundation, Golf Facilities in the United States, at 23 (1995).

**1056**

In terms of our prior discussion, via the first, open-ended question, the respondents were asked to activate their "golf course" cognitive networks. Quite likely, these cognitive networks contained many common nodes, including: greens, sand traps, club houses, golf carts, pro shops, etc. The word "famous" in the question further prompted the respondents to call forth only certain nodes within their "golf course" networks, namely, those that contained the names of what they considered to be "famous" golf courses. Since no specific names were mentioned in the question, the direction of flow within the respondents' networks was from the generic hub or sub-category "famous golf courses" to nodes they considered to be exemplars of that category.

Of course, it also is possible for the flow to be activated in the other direction, that is, from the specific mark to a node encapsulating its meaning. Consider one commentator's caution: "It is submitted, however, that protection from dilution must be limited to that appreciable sector of the market in which, abstractly, a brand has only one import."[93] Presumably, a brand's import could be accomplished by showing plaintiff's mark and then asking respondents what they associate to this mark. Two reservations remain, however. First, asking respondents to indicate the meaning of a mark is a less stringent approach than simply asking the respondent to identify famous exemplars of the category at issue because it supplies the mark to the respondent rather than having it evoked in the respondent's mind. Second, when providing marks that are widely acknowledged to be famous, respondents may legitimately evoke many associations to that mark (e.g., soft-drink, drug, and coal for "Coke;" or an upscale retailer, colored glass lamp shades and the first name of a particular rock singer for "Tiffany.") Some associations may be generated even to competing marks (e.g., "Coke" may elicit an association to "Pepsi"). Interpreting such responses may prove problematic. Notwithstanding these reservations, from a cognitive network perspective, providing respondents with a mark and asking them to associate it with a node encapsulating its meaning appears to represent a viable possibility.

Last, in the present instance, the fame of plaintiffs' marks was tested on defendant's customers. No doubt, fame could also have been assessed with varying results among the successively broader universes of plaintiffs' customer base, golfers in general, and the adult population at large.

*Assessing Blurring of Distinctiveness:* Inasmuch as Pebble Beach and Pinehurst #2 qualify as two of the most famous service

---

93. Swann, *supra* note 75 at 857.

**Vol. 91 TMR**

marks for golfers, the Second Tier issue becomes: To what extent, if any, had the presence of Tour 18 and its promotional materials caused a "weakening of associations," a "blurring of distinctiveness" or a "whittling away of the identity and hold on the public mind" of these famous marks? This issue was addressed via questions asked during the initial interview and in a follow-up interview conducted a week so later.

In the initial interview, respondents were asked:

Before you heard about Tour 18, did you think you could play a hole called the 14th hole at Pebble Beach only at the Pebble Beach Golf Links in California (the 3rd hole at Pinehurst only at Pinehurst in North Carolina), or did you also think you could play it somewhere else?

Relying only on the answers of those who had earlier indicated they knew where each course was located, the findings were as follows:

|  | Respondents knowing location of: | |
|---|---|---|
|  | Pebble Beach (n = 226) | Pinehurst (n = 156) |
| Who answered : | | |
| "only at . . . | | |
| Pebble Beach | 73% | ------ |
| Pinehurst" | ------ | 76% |
| "somewhere else" | 7% | 6% |

Thus, for those respondents who knew where these courses were located, approximately three out of four answered that before they had heard of Tour 18, they thought they could play a Pebble Beach hole only at the Pebble Beach course in California and a Pinehurst hole only at Pinehurst course in North Carolina. Inasmuch these respondents had played Tour 18 (where two of the holes were identified as the Pebble Beach 14th hole and Pinehurst No. 2's 3rd hole), this might be taken as an indication of a "blurring of distinctiveness" or "whittling away of the identity and hold on the public mind" for these famous holes. Whereas approximately seventy-five percent of these respondents previously associated these holes with only one course, now they associated them with two courses.

Conducted between seven to fourteen days later, the second interview approached blurring in a slightly different way. Before being told anything that identified the second wave as being connected with the first, respondents were asked the following questions: "Do you know of any regulation 18-hole golf course

outside of California that identifies one of its holes as a Pebble Beach hole? [If yes:] What is the name of that golf course?" Comparable questions were asked regarding the Pinehurst hole. Though the first of these questions is worded differently, it poses essentially the same question asked during the first wave, namely, "Do you know of somewhere else?" The data below are based on the one hundred and sixty-four respondents who could be reached for the second wave. The follow-up questions provided an opportunity for respondents to identify more than one course. In response to "What is the name of that golf course?" everyone who answered "somewhere else" then identified only a single course, Tour 18.

| | Respondents knowing location of: | |
| --- | --- | --- |
| | Pebble Beach | Pinehurst |
| Percent answering "somewhere else" | | |
| From interview #1: | 7% | 6% |
| From interview #2: | 85% | 72% |
| Difference | 78% | 66% |

In other words, only six percent to seven percent said that, prior to learning of Tour 18, they thought they could play these two holes "somewhere else." After becoming aware of Tour 18, the majority (seventy-eight percent to sixty-six percent) now said they could play these holes "somewhere else," specifically, at Tour 18 in Humble, Texas. Whereas, prior to Tour 18, hearing of the 14th hole at Pebble Beach or the 3rd hole at Pinehurst No. 2 evoked associations only to the famous golf courses with these names in their cognitive networks, upon now hearing of either of these holes, associations were also evoked to Tour 18.

According to the House Report accompanying the Dilution Act, a claim for dilution "applies when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular or particular."[94] The approach and findings just discussed to provide compelling evidence that defendant's "unauthorized use of [plaintiff's] famous mark reduce[d] the public's perception that the mark signifies something unique, singular or particular," thereby causing dilution qua a blurring of distinctiveness.

Last, when asserting a Dilution Act claim, plaintiff is entitled to relief only if defendant's use began "after the [plain-

---

94. HR Rep No 104-374 at 3 (1995), reprinted in 1996 USCCAN 1029.

tiff's] mark [has] become[] famous. . . ."[95] While such was the case here, it may not always be as easy to establish fame at some earlier point in time. This suggests that, as a safeguard against any future diluting activities by others, rather than being forced into a position where they must struggle to do so retrospectively at some later point in time, those believing they possess a famous mark might consider commissioning research to establish fame at the present time.

### 2. Testing Tarnishment

Tarnishment presents a different set of issues in preparing a survey. One commentator has noted: "A pre-FTDA example of the survey offered on the issue of tarnishment is found in Anheuser-Busch, Inc. v. Balducci Publications."[96] Designed and implemented by the present author and relied upon by the Eighth Circuit Court of Appeals, that survey also had several interwoven components, including confusion and tarnishment.[97]

In 1988, as a line extension of their Michelob beer, Anheuser-Busch introduced a version under the name "Michelob Dry." Advertising for this product usually contained the slogan "One taste and you'll drink it dry."[97a] This phrase also appeared on all packaging and labeling for the product.

Balducci published and distributed a St. Louis newspaper-like tabloid named Snicker. Though consisting primarily of cartoons, Snicker also contained several legitimate advertisements. Provided within this context, one issue of the newspaper features on the outside back page a full-page illustrated advertisement for a fictitious beer named "Michelob Oily." The top half showed a hand holding a beer can (in dress similar to Michelob Dry, but identified as Michelob Oily) out of which poured a black fluid. In large type around this depiction was the phrase "One taste and you'll drink it oily." Immediately below, in the stylized font used by Anheuser-Busch for this brand, the largest type on the page contained the name Michelob Oily. At the bottom of the page was a large A and Eagle mark similar in appearance to that used by Anheuser-Busch. Below this were the words: "At the rate it's being dumped

---

95. Federal Trademark Dilution Act of 1995, §43(c)(1), 15 USC §1125(c)(1).

96. W.G. Barber, How to Do a Trademark Dilution Survey (or Perhaps How Not to Do One), 89 TMR 616, 621 (1999); Anheuser-Busch, Inc. v. Balducci Publications 28 F3d 769, 31 USPQ2d 1296 (CA 8 1994), revg 814 F Supp 791, 26 USPQ2d 1180 (ED Mo 1993), cert denied, 513 US 1112 (1995). The claim to dilution was brought under Missouri's anti-dilution statute because the case was commenced prior to adoption of the FTDA.

97. J. Jacoby, Consumer Perceptions of a "Michelob Oily" Communication Appearing in "Snicker" Magazine (1991).

97a. Anheuser-Busch, supra note 96 at 772, 31 USPQ2d 1296.

Vol. 91 TMR

into our oceans, lakes and rivers, you'll drink it oily sooner or later, anyway."[97b]

Here, fame of plaintiff's mark was not empirically assessed via consumer research, but was established based upon other criteria such as advertising expenditures. Hence, relying on the assumption that fame could readily be established via other means, the question at issue was tarnishment.

*Assessing Tarnishment:* The "study was designed to determine whether (and if so, to what extent) readers of the aforementioned Snicker 'Michelob Oily' communication ... had their beliefs regarding either Michelob and/or Anheuser-Busch, and/or their purchase intentions regarding products emanating from either of these entities, tarnished as a result of reading said communication."[98] The focus was not on whether the respondents simply made associations between defendant's use of its mark and plaintiff. Rather, it was on the impact that those associations exerted on their evaluations of, and purchase intentions[99] regarding, plaintiff and its products.

The three hundred and one respondents all lived or worked in metropolitan St. Louis, said they read or looked through newspapers or magazines at least once a week, and they had purchased and consumed beer during the preceding six months. Of these, two hundred saw the offending Michelob Oily communication; as a control, one hundred and one saw an authentic Michelob Dry advertisement. All were asked the same post-exposure questions.

The interview began with three open-ended questions designed to assess top-of-mind meanings communicated. "What was the main idea of the ad/communication you just looked at? Please tell me everything else you can remember that the ad/communication said showed or meant to you. Anything else?" Whereas none of the respondents shown plaintiff's Michelob Dry ad answered these questions by associating a negative meaning with Michelob or Anheuser Busch, thirty-seven percent of those shown defendant's Michelob Oily communication provided such negative associations. Thus, even if one were to rely only on these data (gathered via open-ended questions which generally probe only "top of mind" or "most accessible" contents of the mind,[99a] one could conclude that exposure to defendant's Michelob Oily communication was likely to cause a substantial proportion of consumers to draw negative associations to plaintiff's mark and "obviously tarnishes the

---

97b. Ibid.

98. Jacoby, Consumer Perceptions, supra note 97 at 4.

99. "Intentions" is a subsequent step along the Hierarchy of Effects. See Jacoby and Szybillo, supra note 26 at 224.

99a. See Exhibit 1 and supra note 8.

**Vol. 91 TMR**

mark's continually-developed images. Moreover, the tarnishment results from a negative, although vague, statement about the quality of the product represented by the trademark."[99b]

To determine the impact if any, on purchase intentions, the subsequent closed-ended question asked: "As a result of seeing this material, would you be more likely or less likely to buy Michelob beer, or wouldn't it matter?" While seven percent of those exposed to plaintiff's Michelob Dry ad answered "less likely," twenty-two percent of those exposed to defendant's Michelob Oily communication answered "less likely." The subsequent question asked: "As a result of seeing this material, would you be more likely or less likely to drink Michelob beer, or wouldn't it matter?" While five percent of those exposed to plaintiff's Michelob Dry ad answered "less likely," twenty percent of those exposed to defendant's Michelob Oily communication answered "less likely." Regardless of whether the question asked about purchase ("buy") intentions or consumption ("drink") intentions, exposure to defendant's communication caused a fifteen percent drop in positive intentions towards plaintiff's product.

To determine whether the "Oily" communication or the process of participating in the interview was affecting more than evaluations and intentions, respondents in both groups were asked: "Based on what you see here, does this page say or suggest to you that Michelob beer now costs more, Michelob beer now costs less, or [it] doesn't say or suggest anything about how much Michelob beer costs?" Approximately ninety percent of the consumers in each group answered that the communication they saw "doesn't say or suggest anything about how much Michelob beer costs." Thus, defendant's communication did not exert any differential effect on "control" information, that is, information not present in either communication.

As a last tarnishment question, all respondents were asked "Does this ad/communication say or suggest to you that Michelob beer is or was in some way contaminated with oil, Michelob beer isn't or wasn't in some way contaminated with oil, or [does it say or suggest nothing about whether Michelob beer was contaminated with oil]?" As compared to one percent of those exposed to plaintiff's Michelob Dry ad, fifty-five percent of those exposed to defendant's Michelob Oily communication said that the communication they saw said or suggested that "Michelob beer is or was in some way contaminated with oil."[99c]

99b. Anheuser-Busch, supra note 96 at 777, 31 USPQ2d 1296.

99c. Id at 773, 31 USPQ2d 1296.

Consistent with answers given to the open-ended questions, the answers to the closed ended questions reveal a clear pattern of defendant's Michelob Oily communication causing those exposed to it to draw negative associations to plaintiff's mark and "to undermine or damage the positive associations evoked by [plaintiff's] mark." Since being exposed to defendant's communication caused more than fifty percent of the respondents to develop such negative associations, it was concluded that compelling evidence had been adduced showing tarnishment.

### 3. A Comment on Controls

The consideration of cognitive networks also provides guidance on the "controls" to use when assessing blurring of distinctiveness.

By definition, a famous mark represents a hub node that evokes a highly similar and singular cognitive network in minds of a large proportion of the relevant public. Whether one chooses to provide consumer survey evidence on this question (as was the case in Pebble Beach) or offer other, less direct evidence (as was the case for Michelob Dry), in essence, the famous mark (for example, Cartier; Gucci; Mercedes) has already been tested by time. It already evokes a highly similar and singular cognitive network in the minds of a large proportion of the public and establishes the standard against which defendant's mark can be compared. For any test of blurring, the essential question is whether defendant's mark causes the same singular cognitive network to be evoked in the minds of the relevant public.

When testing defendant's mark, essentially, the ability of this "test" stimulus to cause evocation of that cognitive network is being compared to the original. In a very real sense, the original serves as the "control." It matters not whether other marks may yield similar findings; if used in commerce, they may become actionable as well. Precisely this issue surfaced in NFL Properties v. ProStyle.

As with Pebble Beach and Michelob, the survey proffered in NFL Properties v. ProStyle[100] had several interwoven components, two of which were to assess dilution and likely confusion. A total of six hundred and forty-eight respondents were tested in three Wisconsin cities (Green Bay, Appleton and Milwaukee) as well as in Chicago, Illinois and Minneapolis Minnesota. Approximately half were tested using three of defendant's as-sold gar-

---

100. J. Jacoby, The Extent to which Green and Yellow, when Seen in the Context of Other Pertinent "Cues," Have Acquired Secondary Meaning and are Likely to Cause Consumer Confusion, April 1997.

ments, with more than one hundred respondents tested on each of defendant's three shirts. To be used when assessing confusion, the other half were tested on corresponding "control" garments. As with defendant's test garments, more than one hundred respondents were tested on each of the control shirts. These shirts faithfully mimicked defendant's garments in all respects except one. In two instances, the name "Green Bay" was replaced with the name "Ellison Bay." In the third, the colors were changed from green and yellow printed on a gray shirt containing large football player-identifying numerals to red printed on a light blue shirt from which the numerals had been removed.

For reasons explained by the court in its Preliminary Injunction opinion,[101] data obtained from the questions assessing likely confusion were not admitted. Other than later questions assessing consumer interest in sports and purchase behavior, this left Question 1 as the only substantive question. After being provided with as much time as they wished to examine the garment they were handed, Question 1 asked: "What, if anything, do you think of when you see this shirt?" As dilution was tested using only two of defendant's three shirts,[102] attention is limited to these data.

In response to this open-ended question, seventy-one percent of respondents shown defendant's first shirt and sixty-four percent of respondents shown defendant's second shirt answered that the shirt they examined caused them to think of the Green Bay Packers and/or the National Football League.[103] Testing defendant's garments/marks thus found that they evoked respondent's "Green Bay Packers/NFL" cognitive networks among more than two thirds of the respondents. Based on these data, plaintiff argued there was compelling evidence of dilution. The court held otherwise and excluded this evidence.[104] Recall that the control shirts were never "used in commerce," but were created by this

---

101. The Preliminary Injunction and Trial on the Merits opinions by the district court in NFL Properties v. ProStyle court contained a number of negative views regarding this author's prior research and the study being proffered in that matter. It is submitted that, while a court certainly is entitled to its conclusions, when published opinions contain numerous factual errors and display an ignorance of accepted scientific procedure, this harms both the judiciary and the search for justice.

102. One of these shirts came in precisely the same green and yellow colors as used by the Green Bay Packers, contained the name "Green Bay," an embossed football helmet on front and numerals on the back. The second shirt also came in precisely the same green and yellow colors as used by the Green Bay Packers, contained the name "Green Bay," had a large letter P on the front and numerals on the back.

103. It appears safe to assume that had plaintiff's garments been tested, they would have caused association levels at least as high, and probably higher.

104. Though the court would not permit this evidence to come before the jury, in finding for the plaintiff, the jury held otherwise.

researcher for the express purpose of being used as controls for assessing likelihood of confusion. However, because they also generated high (albeit nowhere near as high) levels of association with the Green Bay Packers and/or the National Football League, the court held that they essentially served as controls for assessing dilution. It is submitted that, for reasons discussed below, the logic of this argument fails.

First, the Dilution Act states that plaintiffs are entitled to an injunction when another's "commercial use in commerce of a mark or trade name" is shown to be the cause of dilution. In other words, tests of blurring or tarnishment need to test marks as used in commerce, not researcher-developed marks created for a purpose having nothing whatever to do with commercial use.

Second, had these researcher-created marks been used by some party in commerce and been shown to cause high levels of association with plaintiff's marks, then they would have become the focus of another lawsuit. Just as one cannot use another confusing mark as a control in a likelihood of confusion test, one cannot use another diluting mark as a control in a dilution test. Plaintiff always has the option of pursuing any third, fourth, or nth comer.

The reader is asked to envision a universe of possibilities from a dozen actual and potential shirts are taken, as indicated below. These twelve shirts reflect a spectrum ranging from a plain white dress shirt with nothing on it at one end (#1), to an authorized Green Bay Packers tee shirt (#12) at the other. The likelihood that a white dress shirt would cause respondents to evoke their Green Bay Packer/NFL cognitive networks is so small that, for all practical purposes, it can be assumed to be zero. The same would be true for the plain white tee shirt (#2) as well as for the white tee shirt containing the name Mumford H.S on the front and Cowboys on the back (#3). However, the closer a shirt's colors and indicia come to those on the authorized shirt, the greater becomes the likelihood that such a shirt would activate the respondents' Green Bay Packers/NFL cognitive networks. Substituting the words "Groin" and "Groan" for "Green," shirts #8 and #9 illustrate shirts that might cause tarnishment. Shirts #10 and #11 correspond to those manufactured and sold by defendants.

| Shirt | Type | Color(s) | Name on front | Other indicia |
|---|---|---|---|---|
| 1 | Dress | white | none | none |
| 2 | Tee | white | none | none |
| 3 | Tee | white | Cowboys | Mumford H.S. on back |
| 4 | Tee | blue & white | Dallas | Cowboys on back |

| Shirt | Type | Color(s) | Name on front | Other indicia |
|-------|------|----------|---------------|---------------|
| 5 | Tee | blue & white | Ellison Bay | Football helmet on front |
| 6 | Tee | yellow & brown | Ellison Bay | Football helmet on front |
| 7 | Tee | green & yellow | Ellison Bay | P on front |
| 8 | Tee | green & yellow | Groin Bay | Football helmet on front |
| 9 | Tee | green & yellow | Groan Bay | Football helmet on front |
| 10 | Tee | green & yellow | Green Bay | Football helmet on front |
| 11 | Tee | green & yellow | Green Bay | P on front |
| 12 | Tee | green & yellow | Green Bay | Packers on rear |

Shirt #7 corresponds to one of the shirts this author created to serve as a "strong control" when assessing confusion. Except for substituting the term Ellison for Green, this shirt was identical in all other respects to one of defendant's garments (#11). Few, if any, respondents were expected to be confused into thinking that a shirt with the name Ellison Bay came from or was authorized by the Green Bay Packers and/or the NFL. This expectation was confirmed. While thirty-two percent gave such an answer for shirt #11, only one and one-half percent gave such an answer for shirt #7, with the net difference (over thirty percent) generally being sufficient to reflect an actionable level of likely confusion.

According to the statute, dilution of the distinctive quality of a mark can occur "regardless of the presence or absence of [a] likelihood of confusion, mistake or deception." Though shirt #7, if used in commerce, may cause few, if any, consumers to be confused, it may still cause dilution (qua blurring) of plaintiff's mark for great numbers of consumers. The capacity to dilute is independent of the capacity to confuse. The fact that shirts can be envisioned and devised that may cause as much or more dilution than defendant's marks should have no bearing on whether action can be taken against defendant's mark. If and when such devised marks are used in commerce, plaintiff would be fully justified in pursuing the users of such marks as well.

## G. Parallels and Difference in Assessing Confusion and Dilution

For many matters, both confusion and dilution require two-tiered tests. As discussed, in matters involving dilution, one first must establish fame before it makes sense to test for either blurring or tarnishment. Similarly, for marks that are neither fanciful nor arbitrary, one first must confirm secondary meaning before it makes sense to test for a likelihood of confusion. In many instances, the first tier (either fame in a dilution matter or

secondary meaning in a confusion matter) is assumed, or may be argued on the basis of indirect (non-consumer) evidence.

When testing trade dress, assessing fame or secondary meaning of the dress requires that all other source-identifying indicia (e.g., brand name, name of the manufacturer, logos, etc.) be removed from plaintiff's dress. Otherwise, identification with the correct source might simply be a matter of respondents attending to these other indicia rather than to the trade dress. On the other hand, testing for dilution (qua blurring) or a likelihood of confusion both require that defendant's product be unmodified and tested as they appear in the marketplace.

In Hershey Foods Corp. v. Mars, Inc. a study was designed in which color-faithful replicas were prepared of the front panel of packages of Reese's Peanut Butter Cups and five other chocolate and peanut candies[105] to adduce evidence regarding fame. As the issue concerned only the particular shades and combinations of colors, to avoid type size, angle or style of type, number of letters or any other visual features to serve as a basis for respondents inferring the brand name and making a correct identification, these features were all replaced by the name "Brand X" placed horizontally on each bar. Under these conditions, since ninety-four percent of the respondents correctly identified the Reese's replica, the court agreed that the survey provided ample evidence to qualify Reese's trade dress as being famous.[106]

A second group was used to test the blurring of distinctiveness alleged by that plaintiff alleged was being caused by M&M Mars' use of the same color on packages of M&M's Peanut Butter chocolate candies. The procedures and questions were all the same, except for the fact that, for this group, a color-faithful replica of the M&M's package was substituted for the color-faithful replica of the Reese's Peanut Butter Cups package. While only seven percent of the respondents correctly identified the replica of the M&M's Peanut Butter package, fifty-one percent misidentified it as a package of Reese's Peanut Butter Cups. Asserting that the modifications made to create the M&M's Peanut Butter replica package may have misled the respondents, the court held there was no proof of dilution.[106a] In essence, the court's holding focused on the language in the Dilution Act that states that plaintiff's would be entitled to an injunction when another's "commercial use in commerce of a mark or trade name" was

---

105. Supra note 38.

106. (The other candies were Nestle's Butterfinger and Crunch bars, Hershey's Skor, Goldenberg's Peanut Chews and Milka, a chocolate bar from Germany not sold in the United States.)

106a. Hershey Foods, supra note 38 at 511, 515.

shown to be the cause of the dilution.[106b] In other words, just as is the case for tests of likelihood of confusion, tests of either blurring or tarnishment must utilize defendant's mark as it is used in commerce.

## H. Disclaimers as a Remedy
## for Confusion and Dilution

Evidence shows that disclaimers typically have either little or no effect in reducing or eliminating confusion. Indeed, when consumers simply glance at the disclaimer, the likelihood of confusion may even be increased.[107] It is not surprising, then, that some courts have exhibited a hostility toward the use of disclaimers as a remedy for likely consumer confusion.[108]

Should a court consider imposing a disclaimer in a dilution matter? An understanding of how cognitive networks operate suggest that employing a disclaimer as a remedy in a dilution case would produce an opposite effect to that intended.

Consider the advertising slogan, "Not your father's Oldsmobile" used by Oldsmobile and the name "notHarvard.com," formerly used by a firm active in supplying online educational services to corporations. The trademarks "Oldsmobile" and "Harvard" possess universal fame, in that both are known to the vast majority of consumers and non-consumers of the products and services offered under these marks. Thus, it can be assumed that the marks will evoke pre-existing cognitive networks (those for Oldsmobile and Harvard) in the minds of readers and listeners. In both instances, to understand the meaning of "not" requires that one first understand the term to which it is attached. In the case of "Not your father's Oldsmobile," the Oldsmobile company is the only source involved. Hence, any evocation of a pre-existing Oldsmobile cognitive network is not harmful and may even be seen as being beneficial. However, while the term "not" in the name "notHarvard" may (or may not) be sufficient to preclude

---

106b. Id at 503.

107. J. Jacoby and R.L. Raskopf, Disclaimers in Trademark Infringement: More Trouble Than They Are Worth?, 76 TMR 35 (1986); Jacoby and Szybillo, supra note 81; J. Jacoby and M. Morrin, "Not Manufactured or Authorized by . . .": Recent Federal Cases Involving Disclaimers, 17 Journal of Public Policy and Marketing 97 (1998).

108. See, eg, Pebble Beach, supra note 90 ("inconspicuous disclaimers" did not avoid likelihood of confusion); Home Box Office, Inc. v. Showtime/Movie Channel, Inc., 832 F2d 1311, 4 USPQ2d 1789 (CA 2 1987) (burden is on infringer to prove that disclaimer would significantly reduce likelihood of confusion); E. & J. Gallo Winery v. Gallo Cattle Co., 955 F2d 1327, 21 USPQ2d 1824 (CA 9 1992), amended 967 F2d 1280 (CA 9 1992) (confusion increased through use of disclaimer); see 17 Journal of Public Policy and Marketing 97.

confusion,[108] because it necessarily calls to mind at least some core nodes associated with the consumer's "Harvard" cognitive network, the term "not" is insufficient to preclude dilution. Indeed, understanding how cognitive networks operate suggests that a disclaimer would have just the opposite effect. Thus, it may be impossible to meaningfully employ a disclaimer remedy to counteract the dilution of a famous mark.

## V. CONCLUSION

It is undeniable that Sections 43(a) and 43(c) of the Lanham Act focus upon consumer psychological processes and states of mind. Indeed, without reference to the psychology of consumers, these sections of the Lanham Act possess little or no meaning.

There was a point in time when those practicing, litigating or adjudicating trademark law had to rely on common sense or speculation regarding how the consumer's mind operates. However, as new findings regarding cognitive processes are adduced and then replicated by subsequent psychological, cognitive and neurological research, there is less justification for continuing to do so. Those willing to devote the time and effort to understanding these scientific concepts and related findings are likely to acquire a better understanding of the scientific foundations that exist to support trademark law and practice. At the very least, armed with such background, they will be better able to avoid falling prey to unreliable intuition or those who promulgate "junk science."

---

108. One can envision circumstances where some readers may interpret "notHarvard" to mean off-campus educational services offered by Harvard University that are outside the line of traditional Harvard offerings.



**EXHIBIT 1:** Using a cognitive network* in memory to interpret the outside world.

*NOTE: The encircled cognitive network is likely a substantial simplification of those that exist in the minds of NFL football fans.



**EXHIBIT 2: Depicting Dilution**