# Exhibit C

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

VIP Products, L.L.C., an            )

Arizona limited liability          )

company,                           )

     Plaintiff and               )

     Counterdefendant,           )   Civil Action No.

vs.                                )   2:14-cv-02057-DGC

Jack Daniel's Properties, Inc.,    )

a Delaware corporation,            )

     Defendant and               )

     Counterclaimant.            )

- - - - - - - - - - - - - - - - -


Deposition of Itamar Simonson, Ph.D.

Thursday, June 18, 2015




Shelley M. Sailor
Certified Reporter
Certification No. 10254

1       refers to situations where you do have test and control.

2       More than one test group and more than one control group

3       and so on.

4           Q.    So properly maybe in your mind it would break

5       out between controlled experiments and then surveys in

6       the quantitative, and qualitative area would be more

7       like focus groups?

8           A.    In the legal arena, we often use the term

9       "survey" when we really run an experiment.  So we have a

10      test version.

11          Q.    Right.

12          A.    And a control version.

13          Q.    Right.

14          A.    We still call it a survey.

15          Q.    Okay.  Okay.  All right.  Thank you.

16                In terms of your research, what kind of

17      information have you established just generally speaking

18      in the type of research you have done using the

19      quantitative or qualitative methods?  What's been the

20      focus of your research?

21          A.    Various topics, but probably the most common

22      general area is how consumers make decisions.

23          Q.    And have you done research, quantitative or

24      qualitatively, to determine whether you believe that

25      consumers are confused by competing brands?

```
 1        A.    Are you referring to like the confusion
 2    surveys?
 3        Q.    Yes.
 4        A.    I have.
 5        Q.    Approximately how many of those have you done?
 6        A.    Probably hundreds.
 7        Q.    Has that been for litigation purposes as well
 8    as for just your academic research?
 9        A.    Primarily litigation.
10        Q.    Primarily litigation.  Have you done surveys
11    in connection with what's called "trademark dilution"?
12        A.    I have.
13        Q.    Approximately how many of those have you done?
14        A.    Perhaps ten.
15        Q.    Have those been done exclusively for
16    litigation or been done for academic research purposes
17    or other reasons?
18        A.    Dilution is directly related to what we teach
19    about brands and brand associations.  So in that regard,
20    even though perhaps the topic was not dilution in the
21    legal sense of the term, it has to do with factors that
22    influence brand perceptions, for example, and brand
23    choice.  So it's different things.  But when I talked
24    about ten, I was referring to the legal question of
25    dilution.
```

1       A.      Cases where I was deposed.

2       Q.      Thanks for the clarification, where you were

3   deposed or gave testimony or something of that nature.

4       A.      Correct.

5       Q.      Dr. Simonson, the report has been marked as

6   Deposition Exhibit 3.   Paragraph 8 on page 3 refers to

7   some work you did as a marketing capacity in a

8   subsidiary of Motorola?

9       A.      Correct.

10      Q.      Since then have you been employed in

11  connection with providing services or working for an

12  operating business appraising products since then?

13      A.      Other than consulting work, no.

14      Q.      On paragraph 9 on the same page, it refers to

15  work you've done in connection with what you call

16  marketing research studies.   And I wondered if you could

17  tell me of those 1,000 studies, do you have an idea how

18  many of those related to marketing research that was

19  done for businesses, actual businesses as your clients

20  as opposed to academic work?

21      A.      As I said, well over a thousand.   I've been

22  using the term well over a thousand for a thousand

23  years, so it's probably well over a few thousand.   But

24  I'd say the majority are for academic purposes.

25      Q.      And by majority, do you mean over 50 percent

1    A.    Something like that.

2    Q.    Rough estimates.  Of the marketing research

3  studies that you've done for business clients, have you

4  done any for any business clients that sell alcoholic

5  beverages?

6         MR. LARKIN:  Could I have the question read

7  back.

8         (Whereupon, the record was read by the

9  Reporter.)

10        THE WITNESS:  I think I've done some studies

11 for wineries.

12 BY MR. LONG:

13   Q.    Do you know how many?

14   A.    I'm trying to think if I have done for others.

15 I vaguely recall doing one or two studies in relation to

16 tequila.  Maybe at some point there was something

17 related to rum.

18   Q.    And what wineries were those?

19   A.    I couldn't tell you.  You mean consulting?  I

20 cannot tell you about that.

21   Q.    Same for the tequila or rum?

22   A.    Correct.

23   Q.    What was the nature of that research?

24   A.    Tell you the truth, I don't remember exactly.

25 I just remember doing the work.

1        Q.     How about of those marketing research studies

2    that you've done for business clients, how many of those

3    involved products for pets?

4        A.     I cannot tell you about ongoing matters where

5    I've been disclosed.

6        Q.     You can tell me if you're doing one --

7        A.     I am doing one now.

8        Q.     Okay.  Any before now?

9        A.     I don't know if I was disclosed in the

10   previous matter, but it had to do with dogs.

11       Q.     Dog toys?

12       A.     No.

13       Q.     Just dogs in general?

14       A.     Yes.  Dog food.

15       Q.     Some products for dogs?

16       A.     Right.

17       Q.     And that one for dog food was done how long

18   ago?

19       A.     Maybe a year ago.

20       Q.     Am I correct in assuming that the identity of

21   that client is something you consider confidential?

22       A.     I'm not sure I was disclosed at the end of the

23   day.  I'd rather not.

24              MR. LONG:  Now, we have a protective order in

25   place, Chris, and it's the type of thing that if you

1     likely to dilute through tarnishment the Jack Daniel's

2     trade dress.

3          A.    Yes.

4          Q.    What do you mean when you say, "dilute through

5     tarnishment"?

6          A.    That Jack Daniel's has certain brand

7     associations.  By adding a negative association, such as

8     No. 2, sometimes referred to as "poo," you are adding a

9     negative association, and you are creating dilution by

10    tarnishment.

11         Q.    First just talking generally about dilution

12    through tarnishment so I understand.  Dilution through

13    tarnishment -- is it your testimony that dilution by

14    tarnishment involves an association -- a negative

15    association?  Is that what it is?

16         A.    It is a negative association that is likely to

17    affect the overall response to the brand.

18         Q.    So dilution by tarnishment is a negative

19    association that is -- that is -- what's the rest of his

20    answer?

21              (Reporter read as follows:  "That is likely to

22    affect the overall response to the brand.")

23              THE WITNESS:  Yes.

24    BY MR. LONG:

25         Q.    When you say "likely to affect the overall

1    response," what do you mean by that?

2         A.    How people respond, whether they like it more

3    or less, whether they are inclined to buy it or not,

4    whether when viewing people drinking it, whether that

5    elicits more or less favorable response.  So it's a

6    variety of things.

7         Q.    Okay.  In connection with reaching your --

8    strike that.

9              And what was your conclusion to the likelihood

10   of dilution as it relates to the VIP Products and the

11   Jack Daniel's trade dress?

12        A.    That it is likely to create dilution by

13   tarnishment.

14        Q.    And by dilution by tarnishment, you mean

15   dilution by tarnishment as you just defined it?

16        A.    Yes.

17        Q.    What information about the VIP product that's

18   identified on Deposition Exhibit 5 did you review

19   before -- on Deposition Exhibit 4, did you review and

20   come to that conclusion?

21        A.    What do you mean specifically?

22        Q.    Tell me what information -- read the question

23   back.

24              (Whereupon, the record was read by the

25   Reporter.)

1    have the problem of one person influencing the other.

2    That does not mean that qualitative groups serve no

3    purpose.  As I said earlier, yeah, they can suggest

4    insights.  They are often quick to complete.  They are

5    less expensive.  So they can be informative.

6         Q.    But not informative in this situation?

7         A.    They are not capable of measuring likelihood

8    of dilution.  That is correct.

9         Q.    So in your opinion, one person is capable of

10   measuring likelihood of dilution, that person schooled

11   in certain theories and knowledgeable about the

12   literature without any research, without any specific

13   research, but a survey is not -- a quantitative survey

14   is not adequate for determining that and qualitative

15   research is not adequate to determine that.  That's your

16   testimony.

17              MR. LARKIN:  Objection to form.

18              THE WITNESS:  I think you are completely

19   mischaracterizing what I said.

20   BY MR. LONG:

21        Q.    Well, then, please, correct me.

22        A.    What I am saying, there are no -- and I am not

23   aware of anyone doing it, quantitative techniques or

24   qualitative techniques designed for them or capable of

25   doing that.  What you need to do is first establish that

1    one brings the other to mind.   Fortunately, we don't

2    have that problem here.   And then you have someone who

3    knows the literature, knows perhaps hundreds of studies

4    that are relevant to that question, someone who has

5    information about particular products at issue, and on

6    that basis, that person, like me, an expert, reaching

7    conclusions about the likelihood of dilution.

8         Q.    And then so the analytical approach, as you

9    defined it, is a two-step approach, generally speaking.

10   One is to determine first whether one brand brings the

11   other to mind, and the second step is a conclusion about

12   likelihood of dilution.   I understand the first step.

13   It's association.   There's some association right there.

14   I just want to make sure I understand what you mean when

15   you say what the second step is.   Maybe you want to

16   elaborate.

17        A.    Sure.   And I tried to explain it in more

18   detail in my report.   To assess for dilution, you need

19   two things.   First, one mark, if you will, should bring

20   the other to mind.   If it doesn't even bring it to mind,

21   then it's probably incapable of diluting it.

22        Q.    I understand.

23        A.    Now, the other component is analyzing the

24   brand allegedly being diluted.   The brand allegedly

25   diluting, what information it conveys with respect to

1    of deposition does it say Old No. 2.

2         A.    I think we can -- going beyond this paragraph,

3    if you look at their depositions, if you look at the

4    deposition of Ms. Phillips, for example, she talks about

5    that, that she felt associating the product with

6    defecation was fine.

7         Q.    Okay.  So was it funny?  Is that the message

8    that was to be conveyed?  Fun?

9         A.    It was their belief that it was parody.  They

10   apparently did not care what harm, if any, it causes to

11   the brand.  It appears that Mr. Sacra didn't even think

12   about that.  He thought it was funny.  He thought it was

13   effective.  If you look at their deposition testimony

14   and Ms. Phillips' testimony, that was specifically what

15   they chose to do.  It says here literally white on black

16   that it's No. 2.  On your Tennessee carpet, and it is 43

17   percent poo by volume.  It's right here.  I mean

18   speaking of facts.  That's what they chose to put on the

19   label.

20        Q.    But the question goes back to what you said is

21   what the intent was, what the message was intended to be

22   conveyed.  You have interpreted it as that.  They have

23   testified that it was fun.  You have interpreted it,

24   apparently, that what's written on there is not fun.

25   But what is to say that the consumer is not going to see

1    it as fun?

2        A.    I don't know.  I don't find it funny, but that

3    doesn't matter.

4        Q.    Well, it does matter because you are going an

5    opinion right now.  It matters a lot.

6        A.    If I could please complete my answer.

7        Q.    Please do.

8        A.    My understanding is that Mr. Sacra and

9    Ms. Phillips believed that it would be perceived as

10   good-hearted fun.  Nothing else.  They never tested it.

11   I did not design this label, nor did Jack Daniel's.

12   They designed it.  I think there's no debate that

13   drinking No. 2 is not -- is frankly disgusting.  And I

14   don't think there would be any dispute about that.  And

15   therefore, at the very least, Mr. Sacra should have

16   conducted some research, maybe even just qualitative

17   research, find out how people perceive it.  Does that

18   affect the way they think about the brand.  They could

19   conduct some studies.

20        I don't think Dr. Jacoby's particular

21   methodology is the right one, but Mr. Sacra could have

22   done that.  He could have designed other studies before

23   he just says, hey, you know, me and Ms. Phillips, we

24   just decided it's fun, who cares what it does to the

25   brands.  I didn't bother to study that.  I have never

1    rephrase it -- was that a focus group, you believe that

2    use this as a stimulus would run the same focus bias --

3          A.     Focalism.  I said focalism, bias, and demand

4    effects.  Yes.  Again, even if you are doing qualitative

5    studies, like focus groups, and you are showing this

6    product, that will generate negative associations about

7    Jack Daniel's.  So I don't think that your client would

8    like the results from such a study.

9          Q.     Okay.  And looking at Deposition Exhibit 3,

10   page 5, paragraph 13, you start out in the first

11   sentence of paragraph 13, when you refer there to

12   Mr. Sacra not testing his assumptions regarding the

13   impact of the VIP product, you are suggesting what type

14   of tests might he have done?

15         A.     Well, I think even if he is not a market

16   research expert, he could have just shown this product

17   and say what comes to mind.  I mean, try to ask

18   questions that are non-leading as possible and see what

19   he gets.  Maybe he can get them to rate it on a funny/

20   not funny scale, disgusting/not disgusting scale.  Maybe

21   he can do the same thing for other products as controls.

22   So he might be able to do different things that will be

23   somewhat less susceptible to bias.

24         Q.     But if he had done that and found that there

25   was a positive association with it, would that have been

1    reliable evidence that it was not dilution by

2    tarnishment?

3        A.    I think that would be useful information.  If

4    you -- if he ran a survey and he showed the image of

5    this product, using an online survey these days, it's

6    fairly quick and not that expensive, and he showed that,

7    and people said, yeah, now I really feel like buying a

8    Jack Daniel's Old No. 7, if he found that, I certainly

9    would pay attention to that, and it may certainly affect

10   my opinions.  I think it's highly unlikely.

11       Q.    Say for like a focus group discussion of the

12   same thing?

13       A.    Yeah, we discussed earlier focus group has

14   some limitations --

15       Q.    But with the appropriate questions.

16       A.    You could provide some useful information,

17   yes.

18            (Exhibit 25 was marked for identification.)

19   BY MR. LONG:

20       Q.    Dr. Simonson, I'm handing you a document

21   marked as Deposition Exhibit 25.  Do you recognize this

22   document?

23       A.    Yes.  That's one of the articles that I cited.

24       Q.    Is it the article you cited in footnote 11 on

25   page 11 of Deposition Exhibit 3?

```
1     ///
2     BY MR. LONG:
3          Q.    In your experience, have you seen products
4     sold through use of a imagery involving animals or pets?
5          A.    Yes.
6          Q.    Are you familiar with the Budweiser beer ads
7     using a dog and wagons with large Clydesdale horses?
8          A.    I remember that.  Might have been on a Super
9     Bowl.
10         Q.    I would think an advertising marketing
11    professor would remember that.  Do you consider
12    Budweiser using the association with dogs -- a dog and
13    large horses in that to create a positive association
14    with their brand?
15         A.    It's possible.
16         Q.    What do you think in your opinion?  Is that
17    what's intended?
18         A.    I assume that's intended.  That and the
19    connection between the dog and the horse.  Yeah, quite
20    possible.  I don't remember seeing on any of those
21    commercials anything related to No. 2, but yeah, I think
22    that it may very well be a heartwarming commercial.
23         Q.    If the VIP product had said Old No. 4 instead
24    of Old No. 2, would that change the association of the
25    product in your mind?
```

Itamar Simonson, Ph.D. - June 18, 2015          141

```
 1              MR. LARKIN:  Objection to form.
 2              THE WITNESS:  So it would Old No. 4 on your
 3    Tennessee carpet, 43 percent poo by volume?  Well, it
 4    will be perhaps slightly better.  I didn't test it, as
 5    we discussed.  It won't be that easy.  It still would
 6    not be favorable.
 7    BY MR. LONG:
 8         Q.   Now, when you say you didn't test it, make
 9    sure I understand, what is that testing process?
10         A.   It's evaluation based on your understanding of
11    how response to brands takes place.
12         Q.   So your testing of an alternative that used
13    No. 4 instead of No. 2 would really just be going
14    through your cognitive process.
15         A.   It would be if you look at elements in
16    combination of what's conveyed here on the package.
17    No. 2 on your carpet, poo.  You know, all of that,
18    together it creates a very specific association.
19         Q.   By you running that over in your mind and
20    assessing it based on your experience and education.
21         A.   No.  It's more -- it's not quite like that.  I
22    review literature, which I cited in my report.  For
23    example, I think that discussed literature, which by the
24    way goes all the way back to Charles Darwin.  It is
25    quite relevant.  So I think the literature in prior
```

1      A.     I think maybe the sentence I put here is

2   unclear.  What I am saying here, I am making here is

3   very simple.  If you are selling a product where its, if

4   you will, unique feature is something that looks like

5   another product, and you say it's a parody of that other

6   product, you are clearly targeting people who would, if

7   you will, appreciate the joke.  In other words, they

8   have to be familiar with the target of that presumed

9   joke.  I mean, it's a very simple proposition.  It has

10  nothing to do with expertise in dog products or any

11  other kind of product.  It's a very simple and I think

12  straightforward proposition.

13     Q.     Okay.  But that wasn't my question.  Could you

14  read my question back again?

15            (Whereupon, the record was read by the

16  Reporter.)

17            THE WITNESS:  Nothing specific.

18  BY MR. LONG:

19     Q.     What evidence or facts did you rely upon as it

20  relates to how purchasers of alcoholic beverages make

21  their purchasing decisions in reaching your conclusions

22  expressed in Deposition Exhibit 3?

23     A.     Just my general knowledge of how consumers

24  form impressions and evaluate brands.  It's not

25  dependent on this or that category.

Itamar Simonson, Ph.D. - June 18, 2015          168

1        Q.     So nothing specific about --

2        A.     Nothing specific.

3        Q.     In paragraph 14, page 5 again, in the middle

4   of your paragraph you say that the -- I'm paraphrasing

5   here, so you can correct me if I'm wrong -- the

6   unfavorable mental association consciously or

7   unconsciously is likely to create a less favorable

8   effective reaction to the brand and harm the value of

9   the mark's equity.

10        And I want to make sure I understand the basis

11  for that.  Is that based on the -- is that based on the

12  discussed reactive theory that you relied on, you

13  mentioned earlier?

14        A.     Discussed is one important element.  I think

15  it's just a negative association that you are adding to

16  the knowledge about this brand.  It's knowledge that's

17  activated when you encounter that particular brand.

18        Q.     In making that determination, are you thinking

19  of an abstract or in terms of actual practical effect?

20        MR. LARKIN:  Objection to form.  Do you

21  understand?

22        THE WITNESS:  I don't.

23  BY MR. LONG:

24        Q.     Okay.  Is this a conclusion you make in terms

25  of a abstract notion of what the mark's equity is, or is

Itamar Simonson, Ph.D. - June 18, 2015          175

1      Q.    And that was why I asked if you considered

2    relative sales of the products in making that

3    conclusion.

4      A.    And as I said, no.  That was not a factor in

5    my assessment.

6      Q.    Did you factor in in your assessment the

7    likely intersection between purchasers of the VIP

8    product and purchasers of Jack Daniel's products?

9      A.    Not specifically.

10     Q.    How generally did you do it?  How did you do

11   it in a general sense?

12     A.    I just think that's some -- Jack Daniel's

13   consumers and prospective consumers or buyers are also

14   owners of dogs.

15     Q.    And owners of dogs, they would be likely to

16   purchase toys for their dogs.  Is that it?

17     A.    They might.

18     Q.    Other than that general presumption, nothing

19   specific?

20     A.    Nothing specific.

21     Q.    In your mind and is it your opinion when you

22   talk about harm to the value of a brand, would one

23   dollar in reduction in value be considered harm in your

24   mind?

25     A.    I don't think in terms of the numbers of

1   activated and is likely to have negative effect on

2   responses to the Jack Daniel's brand.

3        Q.    So it's not a specific, in your mind or your

4   opinion, a specific -- any specific representation about

5   what Jack Daniel's is.  It's just an added association

6   that you conclude is an unwelcome one, or a negative

7   one.

8        A.    Yeah, you can say that.

9        Q.    And as well as animal defecation or whatever

10  it is, excrement, that could be true for other negative

11  associations as well.

12             (Exhibit 33 was marked for identification.)

13  BY MR. LONG:

14       Q.    Dr. Simonson, I'm handing you a document

15  that's marked as Deposition Exhibit 33.  Have you ever

16  seen this image before?

17       A.    I don't remember seeing it.

18       Q.    Does it appear to you to be an advertisement

19  for Jack Daniel's?

20       A.    No.

21       Q.    It does not?

22       A.    It does not.

23       Q.    Does the Jack Daniel's bottle appear on it?

24       A.    It does.

25       Q.    And what makes you conclude or reach

1  impression that it's not a Jack Daniel's advertisement?

2       A.    It says, "Questionable Joints."

3       Q.    Is that something you would consider unlikely

4  for Jack Daniel's to include in its advertisement?

5       A.    Right.

6       Q.    And why would that be?

7       A.    I just don't think that's something that they

8  would do.

9       Q.    Why not?

10      A.    Because the "questionable" is a negative term.

11 I don't think that Jack Daniel's is likely to do that.

12      Q.    And this would be -- would this be an

13 advertisement that in your mind would create negative

14 associations that would dilute brand equity?

15      A.    It might.

16      Q.    Any reason why it wouldn't?

17      A.    You showed it to me just now.  Haven't seen it

18 before, haven't thought about it.  But as I said, it

19 might.

20      Q.    What other analysis would you need to do to

21 reach that conclusion in your mind?

22      A.    I would like to know where it appeared -- I

23 mean, I need to know who advertised it.

24      Q.    Does that matter who advertises it as to

25 whether or not it creates a negative association?

1              (Exhibit 35 was marked for identification.)

2     BY MR. LONG:

3         Q.    Dr. Simonson, I'm handing you a document

4     that's been marked Deposition Exhibit 35.   Can you

5     identify it?

6              MR. LARKIN:   Do you know what it is?

7              THE WITNESS:   I don't know what it is.   It

8     says at the bottom "Your friends at Jack Daniel's remind

9     you to drink responsibly."

10    BY MR. LONG:

11        Q.    Does this appear to you to be an advertisement

12    for Jack Daniel's?

13        A.    I have no idea what it is.

14        Q.    Does it look like an advertisement for Jack

15    Daniel's?

16        A.    I just don't know.

17        Q.    Do you associate any message with this

18    advertisement?

19        A.    I don't know what it means.   Kind of strange

20    but I don't know what it means.

21        Q.    You are not able to interpret that there's any

22    message in this one in Deposition Exhibit 35?

23        A.    No.   I need some context.

24        Q.    But based on your experience or expertise and

25    education?

1        A.    That's -- my expertise and education require
2   me to have some background and context.
3        Q.    What background and context would you need to
4   evaluate this one?
5        A.    Is this part of something?  What -- where did
6   that come from?  Who put it wherever it appeared?
7        Q.    Does it matter who placed the ad as to whether
8   or not it has a negative association?
9        A.    It does.  I need to know who put it, why,
10  where it is.  Give me some background context.
11       Q.    That's all important for determining what the
12  consumer's reaction is going to be?
13       A.    Yes.
14       Q.    So would your opinion about the VIP product be
15  different if that was a product sold by Jack Daniel's?
16       A.    No.
17             MR. LARKIN:  If it was a product sold by Jack
18  Daniel's, we wouldn't be here today.
19             MR. LONG:  Is that your testimony, Chris, or
20  his?
21             MR. LARKING:  (Phone ringing.)  I'm sorry, can
22  I --
23             MR. LONG:  Sure.
24             (Off the record.)
25  BY MR. LONG:

1    consumers think about Jack Daniel's, and they should not

2    take it so seriously.  But for Jack Daniel's, I would

3    assume taking it seriously and making sure that it

4    stands for the association that Jack Daniel's intends.

5    That is important.  That's the quality they are trying

6    to build.

7         Q.    So by quality here, you are not referring to

8    product quality.

9         A.    No.  I'm not talking about product quality.

10   I'm not sure if there is any objective product quality

11   to speak of.  Maybe there is --

12        Q.    Really --

13        A.    -- I'm not an expert on whiskey.  And maybe in

14   blind taste tests, experts can tell the difference.

15   Maybe.  That's not what I'm talking about.  I'm talking

16   about the way consumers perceive the product, what it

17   means, what consuming it means.

18        Q.    So your opinion is not -- does not reflect or

19   intended to rely on anything that would indicate that

20   VIP was intending to effect the perceived quality of

21   Jack Daniel's product.

22        A.    What do you mean by quality?

23        Q.    I'm referring here to the testimony here

24   before where it says -- because your statement here is

25   that VIP recognized, apparently recognized, VIP itself,