QUARLES & BRADY LLP
Gregory P. Sitrick
Isaac S. Crum
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 229-5317
Facsimile: (602) 420-5198
E-mail: Gregory.sitrick@quarles.com

SEYFARTH SHAW LLP
Christopher C. Larkin (admitted pro hac vice)
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 201-5289
Facsimile: (310) 201-5219
E-mail: clarkin@seyfarth.com

*Attorneys for Defendant and Counterclaimant*
*JACK DANIEL'S PROPERTIES, INC.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| VIP Products, LLC, | No. CV-14-2057-PHX-SMM |
| Plaintiff, | |
| v. | **OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT ITAMAR SIMONSON** |
| Jack Daniel's Properties, Inc., | |
| Defendant. | |
| And Related Counterclaims. | |

## I. INTRODUCTION

On September 24, 2015, plaintiff and counterdefendant VIP Products, LLC ("VIP") filed a motion asking the Court to exclude one of defendant and counterclaimant Jack Daniel's Properties, Inc.'s ("JDPI") experts (the "Motion"). (Doc. 92). VIP's Motion argues that the testimony of JDPI's dilution expert, Itamar Simonson, fails to meet the standard for expert testimony established by the U.S. Supreme Court in *Daubert* and codified in Rule 702 of the Federal Rules of Evidence. Because Dr. Simonson's opinions and testimony are based upon specialized knowledge, are relevant and reliable, and will assist the trier of fact, and because Dr. Simonson is eminently qualified to provide his expert opinions, VIP's Motion should be denied.

## II. LEGAL STANDARD

By its plain terms, Rule 702 permits an expert to testify if he is "qualified" by "knowledge, skill, experience, training, or education" to provide testimony that (1) "is based upon sufficient facts or data," (2) "is the product of reliable principles and methods," and (3) "applie[s] the principles and methods reliably to the facts of the case" in a manner that "will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. The Ninth Circuit has held that neither Rule 702, nor *Daubert* or *Kumho Tire,* requires the application of a rigid checklist of factors; instead, the admissibility of expert testimony resides within the broad discretion of the district court. *See, e.g., United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (admitting expert testimony on gang behavior based on expert's "street intelligence").

Under the Federal Rules of Evidence, expert testimony is not required to quantify findings through prescribed "scientific" methodology; conclusions also may be based on specialized knowledge and principles accepted within a relevant area of expertise. *See, e.g., Visa Int'l Serv. Ass'n v. JSL Corp.*, No. 2:01-cv-0294, 2006 WL 3248394, at *3 (D. Nev. Nov. 7, 2006) (admitting Dr. Simonson's expert testimony on dilution based on his presentation of "specialized knowledge evidence"). When an expert's testimony is not

1

scientific or technical, the reliability of that testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004); *see also* FED. R. EVID. 702, Adv. Comm. Note (2000).

Rule 702 is to be applied with a liberal thrust favoring admission. *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). "This is all the more true in [a] bench trial." *Myers v. U.S.*, No. 02-cv-1349-BEN, 2014 WL 6611398, at *3 (S.D. Cal. Nov. 20, 2014). Indeed, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, Adv. Comm. Note (2000).

### III. SUMMARY OF DR. SIMONSON'S OPINION ON CONSUMER BEHAVIOR AS IT RELATES TO DILUTION BY TARNISHMENT

In Dr. Simonson's report (attached as Exhibit A (Doc. 92-1) to VIP's Motion (hereafter the "Report")), he explains:

- The basics of consumer behavior and "how marks such as famous trade dress are represented in memory." (*Id.* at 4, 7–9.)
- The basics of the "associative network memory model" which are accepted by experts in the consumer behavior field. (*Id.* at 4–5.)
- The application of the "associative network memory model" to the instant case. (*Id.* at 10–12.)
- The conclusion that VIP's Bad Spaniels toy causes negative implication for JDPI's trade dress and marks and thus is likely to tarnish them. (*Id.* at 10–14.)

IV.  **DR. SIMONSON'S EXPERT OPINION IS PROPER AND SHOULD NOT BE EXCLUDED**

The preamble to Rule 702 allows that in certain circumstances, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." That is, the proffered witness must be an expert in *something* before the Court will even consider allowing the individual to testify under Rule 702. Once it is established that the proffered witness is an expert, the Court then must consider whether the proposed testimony is relevant, reliable and will assist the trier of fact, which is what *Daubert* addressed and what is codified in Rule 702. In areas of expertise which are not amenable to strict methodology, the reliability of that testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter*, 373 F.3d at 1018; *see also* FED. R. EVID. 702, Adv. Comm. Note (2000).

Turning first to Dr. Simonson's expertise, under the proper standard (which includes education), there is no dispute about his qualifications. Indeed, VIP acknowledges that Dr. Simonson has "impressive credentials." (Mot. 8.) The evidence fully supports a finding that Dr. Simonson is an expert in consumer behavior, and he has been qualified as one in multiple cases. After acknowledging Dr. Simonson's expertise, VIP's Motion takes issue with the *methodology* used by Dr. Simonson to reach the conclusions presented in his opinion. However, VIP's methodological attack is founded on a legal and logical fallacy: that post-*Daubert* expert opinion requires the performance of "surveys, focus groups, studies or other real world tests," (Mot. 1.), and that *Daubert* precludes an expert from merely applying his expertise to the facts of the case. (Mot. 1.) As explained below, that is not the law. Instead, in areas of expertise which are not amenable to strict methodology (such as consumer behavior), the reliability of the testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter,* 373 F.3d at 1018; *see also* FED. R. EVID. 702, Adv. Comm. Note (2000).

Because Dr. Simonson is properly qualified as an expert in consumer psychology and consumer behavior, he is properly qualified to testify in this case. Finally, even assuming, *arguendo*, that the methodology behind this type of testimony should be examined in a *Daubert* motion, Dr. Simonson properly explains and applies the accepted theory of the "associative network memory model" to this case. His testimony should be permitted.

### A.  It is Uncontroverted That Dr. Simonson Is Qualified As an Expert in Consumer Behavior.

Dr. Simonson, is the Sebastian S. Kresge Professor of Marketing at the Stanford University Graduate School of Business and a recognized expert on consumer behavior. (Decl. of Isaac Crum In Support of Opposition ("Crum Decl.") at Exhibit A, Decl. of Dr. Itamar Simonson ("Simonson Decl") at ¶ 1; *see also* Report, 1–4); *Visa,* 2006 WL 3248394, at *3 (reciting Dr. Simonson's credentials). Dr. Simonson has a PhD in Marketing and has won multiple awards for his scholarship and research in the fields of marketing and consumer behavior. (Simonson Decl. ¶ 4; Report, 1–2.)

He has been an expert in over 28 cases in just the last four years. (Report, 29–30.) This includes cases where he has testified as an expert on dilution. *See, e.g., Visa,* 2006 WL 3248394, at *3. Dr. Simonson is not aware of a single instance where he offered an opinion on dilution which was successfully challenged on a *Daubert* motion. (Simonson Decl. ¶ 19.) In short, there can be no dispute that Dr. Simonson is qualified to provide his expert opinion through his advanced degrees, 30+ year academic career, and extensive peer recognition in the field of consumer behavior and marketing.

### B.  Dr. Simonson's Opinion is Also Relevant and Reliable.

The relevance and reliability of Dr. Simonson's opinion should likewise be beyond dispute. Yet, by conflating the issues and repeating a refrain focused on the absence of scientific "tests" or "procedures," VIP asserts that Dr. Simonson's opinion should be excluded. VIP's argument, however, relies on a misunderstanding of the scope of Dr. Simonson's report and opinion. As explained below, Dr. Simonson is being offered on an

4

1  element of dilution for which there is no accepted empirical test or procedure  (*see*
2  Simonson Decl. ¶¶ 14–15), and on which he has previously testified on the basis of his
3  expertise in consumer behavior, without conducting surveys or other empirical inquiries.
4  (*See id.* ¶¶ 17–18.)  Dr. Simonson is **not** testifying about the threshold element of
5  dilution—i.e., whether there is an association or connection in consumer's minds between
6  the VIP Bad Spaniels product and JDPI's trade dress or trademark.  (*Id.* ¶ 12.)  There is no
7  need for expert testimony on that issue because VIP admits, indeed asserts, that it intended
8  to create such an association, and succeeded in doing so, in order to parody Jack Daniel's
9  whiskey.  Instead, Dr. Simonson has been retained as an expert witness to testify regarding
10 the second question—i.e., the implication(s) of the admitted association between the Bad
11 Spaniels toy and Jack Daniel's whiskey on JDPI's trade dress and marks and the meaning
12 of the mark/brand to consumers.  On this issue, there is no accepted empirical
13 methodology.  (*Id.* ¶¶ 14–15.)  This is because dilution, including by tarnishment, is a long
14 term, slow process (often referred to as a "gradual whittling away"[1]) that no accepted
15 survey or other empirical methodology can capture.[2]  (*Id.*)

16      To this end, Dr. Simonson's report explains the empirical model used by consumer
17 behavior experts (called the "associative network memory model") and explains how the
18 association with VIP's product will adversely affect JDPI's trademarks and brands.  When
19 Dr. Simonson's report is considered properly in the context of what he is being called on to
20 testify about, it is clear that his testimony is admissible for at least four reasons: *First*, Dr.
21 Simonson's opinion regarding the evolving mindset of consumers is not technical in

---

[1] *See Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 805 (9th Cir. 2002) ("Dilution, which was not defined by the statute, has been described by the courts as 'the gradual 'whittling away' of a trademark's value.'  Traditionally, courts have recognized two forms of dilution: blurring and tarnishment.").

[2] VIP contends that such an accepted survey is found in the Jacoby article attached as Exhibit B to VIP's motion.  However, as will be discussed below in section IV.B.3, Dr. Jacoby's methodology dating back to the early 1990s has not been accepted by courts.

nature, and testimony such as Dr. Simonson's can be found reliable based on the expert's knowledge and experience alone. *Second,* the methodology that is used by Dr. Simonson is reliably based on sound science supported by numerous peer-reviewed papers. *Third,* while it may theoretically be possible to craft a survey which measures the effect a diluting product has on a consumer's impression of a trademark, no accepted survey methodology exists and such testimony is commonly presented not through a survey, but instead through the testimony of behavioral experts like Dr. Simonson.[3] *Finally*, this is not Dr. Simonson's first rodeo. He has offered this same type of evidence in several dilution cases, and where it has been challenged it has passed muster. For each of these reasons, his opinion should be found to be relevant and reliable and the Court should deny VIP's Motion.

### 1. Standard for Admissibility for Non-Scientific Expert Opinion

As noted above, when an expert's testimony is not scientific or technical in nature, the reliability of that testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter*, 373 F.3d at 1018; FRE 702, Adv. Comm. Note (2000); *see also, Visa*, 2006 WL 3248394, at *3 (admitting Dr. Simonson's expert dilution testimony based on his presentation of "specialized knowledge evidence" with the application of the "associative network memory model"). Thus, contrary to VIP's assertions, Dr. Simonson did not need to "perform [any] single test, survey, focus group, or any other procedure" for his expert testimony to be accepted in this case. (Mot. 8.)

Perhaps understanding that the bulk of its Motion applies the wrong *Daubert* test (*see* Mot. 4–8), VIP also half-heartedly argues that Dr. Simonson lacks "real world" "skill" or "specialized knowledge" to permit him to testify as an expert under *Hankey*. (Mot. 8–9.) Under *Hankey* and its progeny, experts are permitted to testify based on their specialized knowledge even where there is no rigid methodology for the expert to apply.

---

[3] *See* footnote 2 (above) and section IV.B.3 (below).

Thus, the reliability of the testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter*, 373 F.3d at 1018. Indeed, "[i]f an expert's training and experience is in a field closely related to the area of the proposed testimony, that may—in appropriate circumstances—be sufficient to meet Rule 702's qualification standards." *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 13 CIV. 5242 LAP, 2015 WL 1499449, at *16 (S.D.N.Y. Mar. 31, 2015) (*quoting SEC v. Tourre*, 950 F.Supp.2d 666, 674 (S.D.N.Y. 2013)).

As stated in Section IV.A, above, Dr. Simonson's knowledge and experience in the field of consumer behavior is *nonpareil*. This is why VIP focuses on Dr. Simonson's alleged lack of "real world" experience with whiskey and pet toys. (Mot. 13.) Dr. Simonson's expertise and opinion, however, concern consumer behavior generally and are not dependent on Dr. Simonson's personal experience with specific products. (Simonson Decl. ¶¶ 21–22.) Indeed, the same principles reliably applied by Dr. Simonson in this case have been applied by him and other consumer experts to a wide variety of goods and services, including credit cards, coffee, and fashion—expertise in consumer behavior is the constant regardless of the particular business in which it is applied. (*Id*. ¶¶ 17–18); *see also Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 439 (S.D.N.Y. 2012). As a result, Dr. Simonson meets the standard of having "specialized knowledge" relevant to the particular question of the reaction of consumers to VIP's product and its impact on JDPI's trade dress and trademarks.

 2. Dr. Simonson's Opinion Is Based Not On "Junk Science" But Instead On Sound Science And Theories Widely Recognized In The Field of Consumer Behavior

Expert testimony is relevant if it helps a fact finder to better understand a fact in issue and concerns matters beyond the "common knowledge" of average persons. Fed. R. 702; *United States v. Finley,* 301 F.3d 1000, 1007 (9th Cir. 2002) (identifying, as a requirement of Rule 702, that "the subject matter at issue must be beyond the common knowledge of the average layman"). Here, the cognitive consumer behavioral psychology

7

1 and marketing principles on which Dr. Simonson relies are clearly not within the "common
2 knowledge" of the average person. (Simonson Decl. ¶ 6.) Rather, these concepts and
3 principles constitute a body of knowledge attained through years of learning, research,
4 teaching, and study. (*Id.*) For instance, the average person is not familiar with how the
5 brain stores information or forms associations between nodes of information. (*Id.*) The
6 basis of this understanding is the so-called "associative network memory model," and it
7 has been applied and discussed in other trademark infringement cases. (*Id.* ¶¶ 17–18); *see*
8 *also Gucci,* 843 F. Supp. 2d at 439. This theory has been explained in trademark law
9 articles as follows:

> [I]nformation stored in long-term memory consists of networks containing nodes (concepts) connected by links (relations or associations). The associations include relations such as category membership and the possession of attributes. During memory retrieval, when a particular node is activated, a fixed amount of activation is hypothesized to spread outward along all links connected to that node. If the amount of activation that travels outward along a link to a connected node (e.g., for a product category) is sufficient to reach the connected node's threshold level of activation, that node is brought from long-term memory into working memory; that is, the person retrieves that information and becomes conscious of it. When additional associations are added to a preexisting network, the speed of retrieval is typically slowed, especially if the information bears little semantic relatedness to that already existing in the network.

Irina D. Manta, *Hedonic Trademarks*, 74 Ohio St. L.J. 241, 252 (2013) (*citing* Maureen Morrin & Jacob Jacoby, *Trademark Dilution: Empirical Measures for an Elusive Concept*, 19 J. Pub. Pol'y & Marketing 265, 267 (2000); *see also* Alexander F. Simonson, *How and When Do Trademarks Dilute: A Behavioral Framework to Judge "Likelihood" of Dilution*, 83 Trademark Rep. 149, 152–61 (1993) (explaining a similar mechanism for dilution)). This understanding of human memory has been applied by Dr. Simonson and others in trademark dilution cases. (Simonson Decl. ¶¶ 17–18); *see Gucci*, 843 F. Supp. 2d at 439 (court admitted testimony of Guess's expert, Dr. Michel Tuan Pham, who opined that Guess's use of Gucci's marks was likely to dilute Gucci's designs by applying Dr. Pham's "expertise" regarding, among other things, associative network theory, to his own analysis of the allegedly infringing and genuine marks.)

In this case, Dr. Simonson has used his expertise and applied the associative network memory model and other principles of consumer psychology and behavior in order to ascertain whether dilution by tarnishment is likely. (Simonson Decl. ¶ 16) This procedure is neither novel nor objectionable. Instead, it is a well-known empirical model. (*Id.* ¶¶ 17–18); *see also Gucci*, 843 F. Supp. 2d at 439. VIP's argument that Dr. Simonson "provides no data applying [the associative network memory model] to the products in this case" is directly contradicted by Dr. Simonson's report. (Mot. 9.) Indeed, Paragraphs 27–33 of Dr. Simonson's report apply the associative network memory model to the facts of this case. (Simonson Decl. ¶ 16.)

VIP also argues that Dr. Simonson "purports to be able to look at a product or advertisement and discern whether it dilutes a company's trademark, based on no more than his knowledge of certain literature and his familiarity with the 'associative network memory model.'" (Mot. 10.) This statement mischaracterizes Dr. Simonson's report. Dr. Simonson has never stated that he can simply look at two products and ascertain, without analysis and the application of his learning and expertise, whether one is likely to tarnish the other.[4] Instead, Dr. Simonson has provided testimony consistent with empirical principles of the "associative network memory model"[5] as applied to the facts of this case. VIP's claims that Dr. Simonson has not employed a "scientific methodology" are incorrect.

---

[4] Indeed, when asked to perform this type of ad hoc analysis at his deposition, Dr. Simonson clearly stated that without more information, he could not do so. (Crum Decl., Ex. B, June 18, 2015 Simonson Deposition Transcript ("Simonson Dep. Tr.") at 183–93.) VIP's claim that his opinions should be rejected because he was unwilling to engage in such off-the-cuff tarnishment assessments (Mot. 10) is silly. No expert worth his or her salt would provide an expert opinion on-the-fly without further information, reflection, and thought.

[5] VIP also charges that Dr. Simonson's approach "was developed exclusively" for the purposes of this litigation which makes his opinion unreliable. (Mot. 10.) As shown above, that is demonstrably false. The "associative network memory model" is well known and has been applied by experts in trademark dilution cases.

### 3. Marketing Experts Routinely Testify on Consumer Behavior Based on their Expertise Rather than Survey Evidence

VIP also appears to argue that to be admissible under *Daubert*, Dr. Simonson *must* test his expert opinion by conducting a focus group or commissioning a survey. (Mot. 6 ("Simonson's approach in preparing his opinion . . . did not involve any such methodology . . . [he] did not use an online survey, or focus groups, or interviews…").) That is simply not the law. Moreover, Dr. Simonson is not aware of a focus group ever being used to prove or disprove likelihood of dilution. (Simonson Decl. ¶ 20.) VIP's own rebuttal expert, Bruce Silverman, agrees that qualitative research, like focus groups, unlike *quantitative* research, is not projectable—i.e., it is erroneous to extrapolate the results of a focus group to "consumers" writ large. (Crum Decl. at Ex. C, Aug. 13, 2015 Dep. Tr. of Bruce Silverman ("Silverman Tr.") at 73:19–75:10.) Mr. Silverman also testified that in every single trademark case in which he has offered an expert opinion, he has done so based solely on his experience in the advertising business and without conducting any sort of survey, test, or other research:

> Q. Is it your opinion that expert opinions on issues like likelihood of confusion or dilution must be based on empirical data to be valid?
> **A. No.**
>
> Q. Do they need to be based on a quantitative or qualitative survey to be valid?
> **THE WITNESS: No.**
>
> Q. Have you offered in your previous services as an expert an expert opinion in a trademark case without a quantitative or qualitative consumer survey?
> **A. I have.**
>
> Q. In fact, if I remember your testimony correctly, I think that you've done that on every trademark case in which you've served as an expert?
> A. I believe that would be correct.

(Silverman Tr. 67:18–68:12 (emphasis added and objections omitted).) Because things like focus groups and surveys are not suited to test whether a particular association results in the dilution of a mark (Simonson Decl. ¶¶ 14–15, 20), testimony from marketing experts

10

based on their expertise but not empirical data is regularly admitted on the question of consumer perception and related issues. In one case, the court held that a marketing expert's testimony concluding that plaintiff's trademark "would not indicate to consumers a single source" was admissible under Rule 702 because it was both relevant (as it would assist the trier of fact in determining whether the mark at issue was generic or descriptive) and reliable (as the expert's review of "widely used dictionary and thesaurus entries" of the terms at issue formed a sufficient basis for his conclusions). *Half Price Books, Records, Magazines, Inc. v. BarnesAndNoble.com, LLC*, No. 3:02-cv-02518, 2004 U.S. Dist. LEXIS 23691, at *12–17 (N.D. Tex. Nov. 22, 2004) (Crum Decl., Ex. D). As to reliability, the court noted that "[a]n analysis under *Daubert* and its progeny is not intended to replace the adversary system," and that the plaintiff was free to attack the content and sufficiency of the expert's testimony in its response to the defendant's motion for summary judgment and at trial by presenting contrary evidence and through cross-examination. *Id.* at *17.

Likewise, in *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 08 C 242, 2010 WL 3397358, at *15 (N.D. Ill. Aug. 24, 2010), the court permitted an expert to testify based on his extensive expertise in consumer research and marketing, despite the fact that he did not himself perform a survey or other test:

> In reaching his opinions, Dr. Wind applies his extensive expertise in the area of consumer research and marketing research. *See Smith [v.] Ford Motor Co.*, 215 F.3d [713] at 718 [(7th Cir. 2000)] ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience ...") While Dr. Wind did not conduct an independent market study or consumer survey to reach his opinion, he instead applied his experience in this area to render his opinions. Given his level of experience in this particular area, this opinion offered by Dr. Wind meets the mandates of *Daubert* and Rule 702.

*Id*. The same conclusion was reached with respect to an expert who testified based on his marketing expertise in *Clear With Computers, LLC v. Hyundai Motor Am., Inc.*, 6:09-CV-479, 2012 WL 8144915, at *5 (E.D. Tex. Jan. 9, 2012) *aff'd*, 496 Fed. Appx. 88 (Fed. Cir. 2013) (unpublished). There, the Court stated:

> Chiagouris has a Ph.D. in business with a specialization in marketing and consumer behavior, and he has approximately seventeen years of experience providing marketing-focused consulting for commercial clients. *Id.* at 23:10–24. Using his marketing expertise and data provided by HMA, Chiagouris assessed the effectiveness and value of HMA's vehicle landing pages to its overall marketing efforts. *See id.* at 41:9–19 (stating his conclusions regarding the effectiveness of the vehicle landing pages); *id.* at 69:19–70:23 (noting that the HMA web-tracking data provided was more reliable for marketing analysis than surveys). Bersin and Chiagouris both have appropriate credentials and prior experience in their respective fields. Further, both testified that they employed generally accepted methodologies in their analysis. Accordingly, the Court finds that their methodologies were generally accepted in their respective fields of practice, and their expert testimony is both relevant and reliable.

*Id.* Similarly, in *Merisant Co. v. McNeil Nutritionals, LLC*, No. Civ. A. 04-5504, 2007 WL 707359 at *27 (E.D. Pa. Mar. 2, 2007), the defendant sought to exclude the testimony of the plaintiff's marketing expert in a Lanham Act false advertising case, claiming that the expert's opinions were not based on a "sound foundation" under *Daubert*. The court held that the expert's opinions concerning the defendant's brand positioning strategies (i.e., the ways in which the defendant positioned its product to members of the public) were admissible because they "fit" the issue at hand and were reliable. *Id.* at *29. In doing so, the court observed that "when an issue before the court pertains to the effect of a marketing an[d] advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies." *Id.* at *29. The court also noted that, if the defendant objected to the materials on which the expert relied as not providing a sound foundation for his testimony, "that issue can be addressed at trial" and was not grounds for exclusion, and that if the defendant disagreed with the expert's opinions, "skillful cross-examination will reveal [any] inconsistencies." *Id.* at *28.

Other courts have likewise admitted marketing expert testimony on the issue of consumer perceptions and other issues. *See, e.g., Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556, 1572–73 (Fed. Cir. 1994) (district court properly relied on testimony of "expert on consumer psychology" for finding that consumers rarely look at disclaimers); *see also Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1403 (3rd Cir. 1985); *Edina Realty, Inc. v. TheMLSonline.com*, No. 04-4371 (JRT/FLN), 2006 WL

737064, at *7 (D. Minn. Mar. 20, 2006); *Schwab v. Phillip Morris USA, Inc*., No. CV 04-1945 (JBW), 2005 U.S. Dist. LEXIS 21610, at *11-13 (E.D.N.Y. Sept. 29, 2005); *Chase Manhattan Bank v. Freedom Card, Inc*., 333 F. Supp. 2d 239, 249 n. 17 (D. Del. 2004).

In order to undermine Dr. Simonson's opinion, VIP presents attorney argument claiming that a survey described in a 2001 article by Jacob Jacoby "expressly recognizes the availability of testing for tarnishment" and faulting Dr. Simonson for not performing a survey to determine whether the association in consumers' minds would in fact be negative. (Mot. 4–5.) This argument, however, is fatally flawed. The survey identified in the Jacoby article was a survey Dr. Jacoby performed *in the early 1990s* in connection with *Anheuser-Busch, Inc. v. Balducci Publications,* No. 89–0872–C(7) (E.D. Mo.). (*See* Mot., Ex. B at 1059, n. 96.) The Jacoby survey was directed to plaintiff's claim under Missouri's anti-dilution statute since the case pre-dated the Federal Trademark Dilution Act. (*Id.*) Moreover, neither the district court nor the Eighth Circuit on appeal analyzed whether the Jacoby survey showed tarnishment. *See Anheuser-Busch, Inc. v. Balducci Publications*, 814 F. Supp. 791, 799 (E.D. Mo. 1993) *rev'd*, 28 F.3d 769 (8th Cir. 1994); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 777 (8th Cir. 1994). Subsequent surveys by Dr. Jacoby to test tarnishment under the Federal Trademark Dilution Act were rejected and excluded by the courts in *Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 611 (S.D.N.Y. 2007) and *Smith v. Wal-Mart Stores, Inc.*, 537 F.Supp.2d 1302, 1334–35 (N.D. Ga. 2008). In *Malletier*, the Court stated:

> Dr. Jacoby does not explain why a respondent's statement that she is less likely to want to buy the Murakami bags in light of the availability in the marketplace of the It–Bags indicate blurring or tarnishment. . . . Because these survey questions and answers do not indicate dilution under the substantive law, there is accordingly no "fit" between Dr. Jacoby's findings with respect to them and the facts of the case.

*Malletier,* 525 F. Supp. 2d at 611. The Court went on to essentially agree with Dr. Simonson's view on the concept of dilution by "recognizing that dilution" is a "'dauntingly elusive concept.'" *Id.* (*quoting Ringling Bros.-Barnum & Bailey Combined*

13

OPP'N. TO MOT. TO EXCLUDE TESTIMONY OF ITAMAR SIMONSON

*Shows, Inc. v. Utah Div. of Travel Development,* 170 F.3d 449, 451 (4th Cir. 1999)). In *Smith*, the Court considered a survey which included a "fifth set of questions, which [purported to] test[] for dilution by Tarnishment." *Smith,* 537 F.Supp.2d at 1319. The Court ultimately excluded Dr. Jacoby's survey, finding that "the survey was so flawed that it does not create a genuine issue of material fact. . . [since] Jacoby surveyed an overbroad universe, failed to adequately replicate the shopping experience, and asked leading questions. He also surveyed a non-random sample that in any case was too small to allow the results to be projected upon the general market." *Id.* at 1334–35.

In short, the law is clear: marketing experts are routinely permitted to testify based on their experience and education regarding consumer perception and behavior. That is *exactly* what Dr. Simonson is doing in this case. The survey methodology used by Dr. Jacoby and promoted by VIP is unnecessary and has been *rejected* by courts.

### 4. Dr. Simonson Has Already Faced—And Survived This Very Same Challenge—In Other Cases

This *very same* challenge was brought against Dr. Simonson in *Visa*, 2006 WL 3248394, at *3. There, Dr. Simonson was permitted to testify on the ultimate issue of dilution and the only surveys which were conducted were directed to the *fame* of the mark.[6] In permitting Dr. Simonson's testimony, the Court in *Visa* fully addressed (and disposed of) the very same argument VIP is advancing by denying the *Daubert* motion seeking to exclude Dr. Simonson's testimony:

> The court has reviewed *Daubert*, *Kuhmo Tire*, and *Hankey* and concludes that Visa is correct in its assertion that the *Daubert* factors for scientific evidence are inapplicable to cases involving specialized knowledge evidence. Further, the court finds that the evidence presented by Dr. Simonson is specialized knowledge evidence rather

---

[6] The surveys referenced by the district court in *Visa* were surveys to test the *fame* of the mark and not the association. Further, the validation "survey" was nothing more than a third-party firm contacting a certain number of the participants in the 2000 Visa surveys to confirm that the responding individuals were in fact surveyed.

> than scientific evidence. **It is uncontested, at this stage, that no scientific method exists for determining whether actual dilution of a mark occurred**. However, Dr. Simonson still presents an opinion on the likelihood that actual dilution occurred based on his review of relevant surveys **and the application of his specialized knowledge in the field to the results of those surveys**. As such, Dr. Simonson is not presenting scientific evidence, but rather evidence based on his specialized knowledge in the field. Accordingly, the court will exercise its gate-keeper function, as required by *Daubert*, under the Ninth Circuit's guidance regarding specialized knowledge experts as defined in *Hankey*.
>
> Under *Hankey*, courts exercising their gate-keeping function in expert specialized knowledge situations look to six factors in determining admissibility: (1) whether the opinion is based on scientific, technical, or other specialized knowledge; (2) whether the opinion would assist the trier of fact in understanding the evidence or determining a fact in issue; (3) whether the expert has the appropriate qualifications to render the opinion; (4) whether the testimony is relevant and reliable; (5) whether the methodology or technique used fits the conclusions; and (6) whether the opinion's probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues or undue consumption of time. *Hankey*, 203 F.3d at 1168.
>
> In the present case, the proffered opinion is based on Dr. Simonson's specialized knowledge of trademark dilution and marketing issues. Further, the court concludes that such evidence would be helpful to the trier of fact in determining whether actual dilution of Visa's mark occurred. Dr. Simonson, himself, is the Sebastian S. Kresge Professor of Marketing at the Stanford University Graduate School of Business and a recognized expert on consumer behavior. He has won multiple awards for his scholarship and research in the fields of marketing and consumer behavior. He relied on surveys conducted by Visa in 2000, his own validation survey, studies of on-line payments from 2000 to 2001, **and his own personal expertise to reach the conclusions in his opinion.** The court considers these sources and Dr. Simonson's methodology to satisfy the requirements of reliability and proper methodology for this type of evidence. In addition, the court considers Dr. Simonson's qualifications sufficient to render him an expert in the subject at hand. Finally, the court does not see any prejudice arising out of the use of Dr. Simonson's opinion and therefore finds that the probative value of Dr. Simonson's opinion is not substantially outweighed by the potential for prejudice, confusion of the issues or undue consumption of time.
>
> Accordingly, the court will not strike Dr. Simonson as an expert witness in this matter.

*Visa*, 2006 WL 3248394, at *3–5 (emphasis added). The same analysis compels the same result here, where Dr. Simonson's testimony regarding tarnishment is based on demonstrated expertise and accepted principles of consumer behavior.

The *Visa* court's *Daubert* opinion was later challenged on appeal to the Ninth Circuit. On appeal, the defendant (JSL) argued, as VIP does here, that a market survey should be required to show dilution. The Ninth Circuit disagreed:

> JSL vigorously contests the validity of market surveys and expert testimony introduced by Visa to show that eVisa dilutes the Visa mark, and it claims that evidence should have been excluded under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). **But a plaintiff seeking to establish a likelihood of dilution is not required to go to the expense of producing expert testimony or market surveys; it may rely entirely on the characteristics of the marks at issue.** *See* 15 U.S.C. § 1125(c)(2)(B) (listing relevant factors). Expert testimony and survey evidence may be necessary in marginal cases, or where a defendant introduces significant evidence to show that dilution is unlikely. But JSL presented nothing, other than Orr's statement that he did not intend to dilute the Visa mark, to rebut the inference of likely dilution created by the strength and similarity of the marks. Good intentions alone do not negate a showing of a likelihood of dilution. We therefore need not reach the admissibility of Visa's expert testimony and market survey evidence.

*Visa Intern. Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1091 (9th Cir. 2010) (emphasis added). Dr. Simonson's similar testimony on dilution was admitted in *Starbucks Corp. v. Lundberg,* No. 02-cv-948-HA, 2005 WL 3183858 (D. Oregon Nov. 29, 2005), where he was allowed to testify that the use of "Sambuck's" "creates a likelihood of both types of dilution" and that "the Sambuck's brand would affect and dilute the brand associations of Starbucks," once association was established by a survey. *Id.* at *8; (*see also* Decl. at ¶¶ 16–18.)

        5.    <u>Finally, Any Alleged Deficiencies Concerning the Bases and Information Considered for Dr. Simonson's Opinions Should Be Addressed in Cross-Examination, Not Through Exclusion of His Report</u>

The Supreme Court has emphasized the liberal policy of admitting expert testimony and that alleged deficiencies concerning such testimony normally go to weight, not admissibility. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.... These conventional

devices, rather than wholesale exclusion ... are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702."); Fed. R. 702 advisory committee's note ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule... the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system."). Any alleged deficiencies in Dr. Simonson's testimony can and should be addressed through cross-examination, and VIP's rebuttal expert, not exclusion.

## V.    CONCLUSION

For the reasons stated above, VIP's Motion to Exclude Testimony of Defendant's Expert Itamar Simonson (Doc. 92) should be denied.

DATED: October 12, 2015                     Respectfully submitted,

                                                               */s/ Isaac S. Crum*
Gregory P. Sitrick (AZ Bar #028756)
Gregory.Sitrick@quarles.com
Isaac S. Crum (AZ Bar #026510)
Isaac.Crum@quarles.com
Quarles & Brady LLP
Firm State Bar No. 00443100
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004
Telephone (602) 229-5200
Fax (602) 229-5690

SEYFARTH SHAW LLP
Christopher C. Larkin
(admitted pro hac vice)
clarkin@seyfarth.com
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 201-5289
Facsimile: (310) 201-5219

*Attorneys for Jack Daniel's Properties, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record in this case.

*/s/ Isaac S. Crum*
Isaac S. Crum