# Exhibit A

1
2
3
4
5
6
7

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| VIP Products, LLC, | ) | No. CV-14-2057-PHX-SMM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF ITAMAR** |
| v. | ) | **SIMONSON IN SUPPORT OF** |
| | ) | **DEFENDANT'S OPPOSITION** |
| Jack Daniel's Properties, Inc., | ) | **TO PLAINTIFF'S MOTION TO** |
| | ) | **EXCLUDE TESTIMONY OF** |
| Defendant. | ) | **ITAMAR SIMONSON** |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| And Related Counterclaims. | ) | |
| ———————————————— | ) | |

I, Dr. Itamar Simonson, declare as follows:

1. I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University. A copy of my curriculum vitae, which includes a complete list of my publications, is attached to Plaintiff's Motion to Exclude Testimony of Defendant's Expert Itamar Simonson (Doc. 92) (the "Motion") as Exhibit A (Doc. 92-1).

2. I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3. My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, study methods, and human judgment and decision making. Most of my research has focused on buyers' purchasing behavior, the effect of brand characteristics (such as brand name, price, and features), the

1

**DECLARATION OF ITAMAR SIMONSON**

competitive context, and marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement from the buyer's perspective.

4.      I have received several awards, including (a) the award for the Best Article published in the Journal of Consumer Research (the major journal on consumer behavior) between 1987 and 1989; (b) The Ferber Award from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (c) the 1997 O'Dell Award, given for the Journal of Marketing Research (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (d) the 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005, 2007, 2008, and 2012); (e) the award for the Best Article published in the Journal of Public Policy & Marketing (the major journal on public policy and legal aspects of marketing) between 1993 and 1995; (f) the 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award; (g) the 2002 American Marketing Association award for the Best Article in the area of services marketing; (h) the 2012 elected Fellow of the Association for Consumer Research, and (i) winner in a competition dealing with research on the effectiveness of direct marketing programs, which was organized by the Direct Marketing Association and the Marketing Science Institute. In addition to these awards, my research has been widely cited by other researchers in the marketing, consumer behavior, and other fields, and my publication record has been ranked as one of the most prolific and influential.[1]

5.      Based on my 30+ years of experience in consumer behavior and lengthy history as a trademark expert, I have specialized knowledge relevant to the particular question of the reaction of consumers to products and consumer reactions' impact(s) on trademarks and brands.

_____

[1] *See, e.g.*, S. Seggie and D. Griffith (2009), "What does it take to get promoted in marketing academia? Understanding exceptional publication productivity in the leading marketing journals," Journal of Marketing, 73, 122-132.

**DECLARATION OF ITAMAR SIMONSON**

6.      The consumer behavioral psychology and marketing principles on which I rely are known to me based on these years of experience, acquired through doctoral learning and study, and are not within the common knowledge of the average person.  For instance, the average person is not familiar with how the brain stores information or forms associations between nodes of information or the "associative network memory model," which is commonly applied in consumer behavior research and which has been discussed in other trademark cases.

7.      I was asked by counsel for Jack Daniel's Properties, Inc. ("JDPI") to evaluate, based on principles of consumer psychology and consumer processing of information about brands/marks, whether VIP Products, LLC's ("VIP") "Bad Spaniels-The Old No. 2" dog toy ("Old No. 2") is likely to dilute through tarnishment the Jack Daniel's trade dress and marks.

8.      In response to this request, I prepared the expert report dated May 7, 2015, which is attached to the Motion as Exhibit A (Doc. 92-1) ("Report").

9.      My Report described in detail the scientific bases for my conclusion that VIP's Bad Spaniel's toy is likely to dilute by tarnishment the Jack Daniel brand/marks and trade dress.  My analysis was based on the same scientific principles that I have used in my research and teaching of doctoral and masters students at Stanford University.  These principles build on a great deal of research published in numerous scientific publications as well as on legal matters in which I opined on likelihood of dilution and on court decisions of which I am aware (including those cited in my expert report).  These sources and my expertise in the area of branding led to my opinion that the VIP toy, including its trade dress and references to "Old No. 2" and "poo by volume," are likely to cause dilution by tarnishment.

10.      As described in more detail in my report, my analysis was based on widely accepted scientific principles regarding the manner in which brand associations are formed and the impact of adding a new association.  For example, the "associative network memory model" I relied on is a widely accepted model pertaining to the formation and

**DECLARATION OF ITAMAR SIMONSON**

1    updating of brand perceptions.  As further described in my Report, I also relied on multiple

2    articles explaining why an undesirable association is likely to dilute and tarnish the brand

3    equity of a well-known and well regarded mark.

4         11.    The assessment of likelihood of dilution by tarnishment or blurring typically

5    has two components:

6              a.    Assessing the likelihood that the allegedly diluting mark brings the

7    diluted mark to mind.  This element indeed calls for a survey in cases where there is a

8    dispute as to whether such an association exists.

9              b.    Assuming that such a mental association exists, assessing its

10   implications for the diluted mark and the meaning of the mark/brand to consumers.

11        12.    In preparing my Report, I assumed that a connection or association exists in

12   consumer's minds between the VIP toy and Jack Daniel's trade dress and marks.  The

13   basis for this assumption is my understanding that VIP asserts that the Bad Spaniels toy is

14   a "parody" which was deliberately intended to mimic and bring to mind the Jack Daniel's

15   trademark/trade dress, and thus to associate the toy with Jack Daniel's.

16        13.    My Report was directed to the second component of dilution: to identify and

17   explain the implications of that association for JDPI's trade dress and marks and the

18   meaning of the mark/brand to consumers.

19        14.    It is my opinion, as an expert in consumer behavior, that on this second

20   issue, there is no accepted survey methodology, i.e., there is no accepted survey

21   methodology that can determine whether an association is likely to cause dilution of a

22   mark by tarnishment.

23        15.    This is because dilution, including by tarnishment, is a long term, slow

24   process (often referred to in the context of dilution as a "gradual whittling away") that no

25   accepted survey methodology can capture.

26        16.    As a result of this, in performing my analysis I employed the "associative

27   network memory model" and my experience and expertise to explain how the admitted and

28   intended association of VIP's product with Jack Daniel's would affect JDPI's trade dress

**DECLARATION OF ITAMAR SIMONSON**

and trademarks.  My application of this methodology may be seen in paragraphs 27–33 of my Report.

17.    I have applied this same methodology in other dilution cases where the threshold association was established by a survey rather than having been admitted and intended to determine whether this association leads to dilution, including:

> a.  *Visa Intern. Serv. Ass'n v. JSL Corp.*, No. 2:01-cv-0294-LRH (D. Nev.)
>
> b.  *Starbucks Corp. v. Lundberg,* No. 02-cv-948-HA (D. Oregon)

18.    For example, in *Visa Intern. Serv. Ass'n v. JSL Corp.*, No. 2:01-cv-0294-LRH (D. Nev.), I relied on Visa's own surveys to show that there was an association between the marks at issue and the accused product.  Based on those surveys, I assessed that association's implications for the diluted mark and the meaning of the mark/brand to consumers.  I did not conduct a survey which purported to show that the association was likely to dilute by tarnishment the Visa trademark.  In that case, like in this one, I did not conduct such a survey because dilution, including by tarnishment, is a long term, slow process that no accepted survey methodology can capture.

19.    I am not aware of a single instance where I have offered an opinion on dilution which was deemed inadmissible under *Daubert*.

20.    I am not aware of any expert witness who has ever claimed that a focus group can prove or disprove likelihood of dilution (or can prove or disprove anything else in litigation for that matter).  To the contrary, it is my opinion that neither surveys nor focus groups can prove or disprove the likelihood of dilution by tarnishment resulting from a proven or admitted association of one mark with another.

21.    It is my opinion that no specific product expertise or experience with particular categories of products (e.g., whiskey or dog toys) is needed to assess likelihood of dilution by tarnishment.  In my experience, most experts do not have specific product category expertise when forming an opinion on trademark matters.  Rather, the principles that I rely on in forming my opinions are universal principles based on research in a variety of product and service categories and are not limited to any particular one.

**DECLARATION OF ITAMAR SIMONSON**

1     22.    It is my opinion that there is no scientific basis for the notion that some
2 general prior experience in a particular products category assists an expert in opining on
3 whether a particular product is likely to be diluted by another particular product.  Instead,
4 expertise in the general principles that determine the impact of a negative association on
5 the affected brand equity is what is needed.  I believe that I have such expertise based upon
6 my academic training, research, and teaching, and that I properly applied it in forming the
7 opinions set forth in my Report.

8     I declare under penalty of perjury under the laws of the United States of America
9 that the foregoing is true and, if called upon, I could and would testify as stated above.

11 DATED: October 11, 2015

12 Dr. Itamar Simonson

6

**DECLARATION OF ITAMAR SIMONSON**