# Exhibit B

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, L.L.C., an ) | |
| Arizona limited liability ) | |
| company, ) | |
|     Plaintiff and ) | |
|     Counterdefendant, ) | Civil Action No. |
| vs. ) | 2:14-cv-02057-DGC |
| Jack Daniel's Properties, Inc., ) | |
| a Delaware corporation, ) | |
|     Defendant and ) | |
|     Counterclaimant. ) | |

- - - - - - - - - - - - - - - - -

Deposition of Itamar Simonson, Ph.D.

Thursday, June 18, 2015

Shelley M. Sailor
Certified Reporter
Certification No. 10254

```
 1    image on the VIP product, or are you talking about image
 2    in just association?
 3        A.   No. 2 and poo are things that most people are
 4    quite familiar with, so it doesn't take a great deal of
 5    effort to bring it to mind.
 6        Q.   It's a diluting image.  Okay.  Is the VIP
 7    product a beverage?
 8        A.   No.
 9        Q.   Does it convey anything about a beverage?
10             MR. LARKIN:  Objection to form.  Do you
11    understand the question?
12             THE WITNESS:  I think I do.  Only as it
13    relates to Jack Daniel's.
14    BY MR. LONG:
15        Q.   And so to be specific, what does it
16    specifically say about Jack Daniel's in your mind?
17        A.   We already discussed that extensively.
18        Q.   Is it -- all right.  But so let me clarify.
19             The message is, in your opinion, that that
20    product says that Jack Daniel's bottles are full of
21    feces?
22        A.   No.  I explained in detain in my report, as we
23    already discussed today, it adds a negative disgusting
24    association to our representation of the Jack Daniel's
25    brand in association that's likely to be dramatically
```

```
 1    activated and is likely to have negative effect on
 2    responses to the Jack Daniel's brand.
 3        Q.    So it's not a specific, in your mind or your
 4    opinion, a specific -- any specific representation about
 5    what Jack Daniel's is.  It's just an added association
 6    that you conclude is an unwelcome one, or a negative
 7    one.
 8        A.    Yeah, you can say that.
 9        Q.    And as well as animal defecation or whatever
10    it is, excrement, that could be true for other negative
11    associations as well.
12            (Exhibit 33 was marked for identification.)
13    BY MR. LONG:
14        Q.    Dr. Simonson, I'm handing you a document
15    that's marked as Deposition Exhibit 33.  Have you ever
16    seen this image before?
17        A.    I don't remember seeing it.
18        Q.    Does it appear to you to be an advertisement
19    for Jack Daniel's?
20        A.    No.
21        Q.    It does not?
22        A.    It does not.
23        Q.    Does the Jack Daniel's bottle appear on it?
24        A.    It does.
25        Q.    And what makes you conclude or reach
```

```
 1   impression that it's not a Jack Daniel's advertisement?
 2        A.    It says, "Questionable Joints."
 3        Q.    Is that something you would consider unlikely
 4   for Jack Daniel's to include in its advertisement?
 5        A.    Right.
 6        Q.    And why would that be?
 7        A.    I just don't think that's something that they
 8   would do.
 9        Q.    Why not?
10        A.    Because the "questionable" is a negative term.
11   I don't think that Jack Daniel's is likely to do that.
12        Q.    And this would be -- would this be an
13   advertisement that in your mind would create negative
14   associations that would dilute brand equity?
15        A.    It might.
16        Q.    Any reason why it wouldn't?
17        A.    You showed it to me just now.  Haven't seen it
18   before, haven't thought about it.  But as I said, it
19   might.
20        Q.    What other analysis would you need to do to
21   reach that conclusion in your mind?
22        A.    I would like to know where it appeared -- I
23   mean, I need to know who advertised it.
24        Q.    Does that matter who advertises it as to
25   whether or not it creates a negative association?
```

1      A.   Right now you just showed it to me.  I
2  hesitate to give you an opinion about --
3           MR. LARKIN:  Don't speculate.  If you don't
4  know what it is --
5           THE WITNESS:  -- something I know nothing
6  about.
7  BY MR. LONG:
8      Q.   Just as an example.
9      A.   I said all I can say.
10          (Exhibit 34 was marked for identification.)
11 BY MR. LONG:
12     Q.   Dr. Simonson, I'm going to hand you a document
13 that's marked as Deposition Exhibit 34.  Can you
14 identify this document?
15     A.   I have no idea what it is.
16     Q.   Does it appear to you to be an advertisement
17 for Jack Daniel's?
18          MR. LARKIN:  Don't speculate.  If you know,
19 tell him.  If you --
20          THE WITNESS:  I have no idea.
21 BY MR. LONG:
22     Q.   Does it have a picture of a Jack Daniel's
23 bottle on it?
24     A.   It does.
25     Q.   Is that the same trade dress of Jack Daniel's

```
 1    that you considered in doing your analysis in your
 2    opinion in Deposition Exhibit 3?
 3         A.   It is.
 4         Q.   Do you consider this advertisement to create a
 5    positive or negative association with Jack Daniel's?
 6              MR. LARKIN:  Objection.
 7              THE WITNESS:  You know, I don't know anything
 8    about it.
 9    BY MR. LONG:
10         Q.   Just as an example.
11              MR. LARKIN:  Well, that's meaningless.  We
12    don't know where this is --
13    BY MR. LONG:
14         Q.   Not where it came from.  Whether it -- if it
15    came from VIP Products, would you consider this or
16    someone like it, someone independent from Jack Daniel's,
17    would you consider this to have a positive or negative
18    association?
19         A.   You know, I think that if I'm not wrong, and I
20    could be wrong, spirits company or beer company at some
21    point were trying to discourage people from drinking.
22    And if I recall correctly, they showed, you know,
23    negative consequences.  And it's quite possible that
24    people gave them points for warning consumers about the
25    possible consequences.  But again, I have no idea what
```

```
 1   this is about.  If you can show me where it came from --
 2       Q.   Taking it on the face case itself, I mean
 3   evaluating it as you evaluated a VIP product, what do
 4   you believe the message of this advertisement is?
 5            MR. LARKIN:  Objection --
 6            THE WITNESS:  I don't know.
 7            MR. LARKIN:  -- we don't know where this
 8   [indicating) came from.  We know where this [indicating)
 9   came from.
10   BY MR. LONG:
11       Q.   Regardless of where it came from, regardless
12   of where it came from --
13            MR. LARKIN:  Wait -- go ahead.
14   BY MR. LONG:
15       Q.   Regardless of where it came from, what do you
16   consider the associations, given your expertise and
17   education, of this particular advertisement?
18            MR. LARKIN:  Objection.  What does that have
19   to do with his opinion?
20            MR. LONG:  His opinion is to an example of how
21   he exercises an analysis of the associated network model
22   in connection with the product, critically a Jack
23   Daniel's product.
24            MR. LARKIN:  Not a real product, though.  We
25   don't know what this is --
```

1           MR. LONG:  Well, real or not, doesn't make any
2      difference.  It's evidence of how he exercises his
3      analytical approach.
4           THE WITNESS:  I need to see the context.
5      Otherwise, I just cannot form an opinion.  And all you
6      showed me is a photo of this product.  I wouldn't opine
7      on that either.
8      BY MR. LONG:
9         Q.   What was the context that you considered in
10     terms of the VIP product?
11        A.   Well, all the information I had about the
12     product.
13        Q.   What was that information you had about the
14     product other than the product itself?
15        A.   Well, we talked about --
16             MR. LARKIN:  Asked and answered.
17             THE WITNESS:  We talked about all the
18     components of the trade dress.
19     BY MR. LONG:
20        Q.   Okay.  But that describes the product itself.
21        A.   So I -- I think that's --
22        Q.   What more information would you need about --
23     why would you need more information about the example
24     that's in Deposition Exhibit 34 to determine its
25     associative consequences than you would need for the VIP

```
 1    product?
 2              MR. LARKIN:  Objection.  Because we don't know
 3    what it is.  We don't have any information.  Go ahead.
 4              THE WITNESS:  This is -- I know what it is,
 5    how it's sold, for what purpose.  I know where it's
 6    coming from.  I know what stores it's sold.  I know why
 7    presumably it looks the way it is.  This thing is just a
 8    piece of paper.  I don't know what it is.  You need to
 9    give me the context before I can try to form any
10    opinion.
11   BY MR. LONG:
12       Q.    In the terms of context of an advertisement,
13   this being a copy of a print advertisement, that's not
14   sufficient context for you?
15       A.    No.  I need to know a lot more about what's
16   behind it.
17       Q.    If it appeared in public, published in a
18   magazine?
19             MR. LARKIN:  Objection.  We haven't
20   established that it did or it's a real ad or who put it
21   out.  Go ahead.
22   BY MR. LONG:
23       Q.    Anything to add?
24       A.    No.  I just don't know anything about that
25   other than the picture that you are showing me.
```

```
 1              (Exhibit 35 was marked for identification.)
 2     BY MR. LONG:
 3         Q.    Dr. Simonson, I'm handing you a document
 4     that's been marked Deposition Exhibit 35.  Can you
 5     identify it?
 6               MR. LARKIN:  Do you know what it is?
 7               THE WITNESS:  I don't know what it is.  It
 8     says at the bottom "Your friends at Jack Daniel's remind
 9     you to drink responsibly."
10     BY MR. LONG:
11         Q.    Does this appear to you to be an advertisement
12     for Jack Daniel's?
13         A.    I have no idea what it is.
14         Q.    Does it look like an advertisement for Jack
15     Daniel's?
16         A.    I just don't know.
17         Q.    Do you associate any message with this
18     advertisement?
19         A.    I don't know what it means.  Kind of strange
20     but I don't know what it means.
21         Q.    You are not able to interpret that there's any
22     message in this one in Deposition Exhibit 35?
23         A.    No.  I need some context.
24         Q.    But based on your experience or expertise and
25     education?
```

Itamar Simonson, Ph.D. - June 18, 2015					192

```
 1         A.    That's -- my expertise and education require
 2   me to have some background and context.
 3         Q.    What background and context would you need to
 4   evaluate this one?
 5         A.    Is this part of something?  What -- where did
 6   that come from?  Who put it wherever it appeared?
 7         Q.    Does it matter who placed the ad as to whether
 8   or not it has a negative association?
 9         A.    It does.  I need to know who put it, why,
10   where it is.  Give me some background context.
11         Q.    That's all important for determining what the
12   consumer's reaction is going to be?
13         A.    Yes.
14         Q.    So would your opinion about the VIP product be
15   different if that was a product sold by Jack Daniel's?
16         A.    No.
17               MR. LARKIN:  If it was a product sold by Jack
18   Daniel's, we wouldn't be here today.
19               MR. LONG:  Is that your testimony, Chris, or
20   his?
21               MR. LARKING:  (Phone ringing.)  I'm sorry, can
22   I --
23               MR. LONG:  Sure.
24               (Off the record.)
25   BY MR. LONG:
```

1    Q.   Dr. Simonson, I want to understand.  Based on
2  your most recent testimony, you said it's important to
3  know who put it out in order to determine what the
4  consumer reaction is to a product.  That's what I heard
5  you to say.  Was that incorrect?
6    A.   I think that my education and training and
7  what I teach all call for due diligence, just
8  understanding the context of stimuli that you are trying
9  to analyze.  Here you're putting in front of me some
10 piece of paper with a picture and some words.  I don't
11 know anything about it.  And that's not sufficient basis
12 to say anything about it.
13   Q.   So you don't feel you can give an opinion as
14 to what an intended message is of an advertisement
15 without knowing who provided the advertisement, placed
16 the advertisement?
17   A.   I don't know anything about this piece of
18 paper.
19   Q.   No, but I'm not asking you about a piece of
20 paper.  I'm asking you about a message, an advertising
21 message on a piece of paper and its association with a
22 particular product.
23   A.   I don't know what this message means.
24   Q.   You are not able to interpret this message?
25   A.   No.  I don't understand what it means without

*** ERRATA SHEET ***

CASE: VIP PRODUCTS, L.L.C., V.JACK DANIEL'S PRPERTIES
DATE OF DEPOSITION: JUNE 18, 2015
WITNESS: ITAMAR SIMONSON

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 18 | 10 | controlled | control | TE* |
| 25 | 5 | been | not been | TE |
| 33 | 1 | area | areas | TE |
| 37 | 23 | from predominately | predominately | TE |
| 39 | 15 | in | on | TE |
| 65 | 12 | user's | users | TE |
| 71 | 15 | aren't on | interested in | TE |
| 71 | 24 | Samback | Sambucks | TE |
| 72 | 4 | Sambacks | Sambucks | TE |
| 82 | 12 | to | tend to | TE |
| 85 | 15 | fairly | fatally | TE |
| 86 | 8 | it's | as | TE |
| 87 | 7 | likely little | likelihood of | TE |
| 88 | 11 | don't | didn't | TE |
| 89 | 15 | many | so many | TE |
| 98 | 6 | it | he | TE |
| 106 | 17 | methods | method | TE |
| 112 | 16 | your | their | TE |
| 116 | 5 | Dissolution | Dilution | TE |

| 120 | 5-9 | A. Said an alternative perspective argues that categories have product typicality or typicality gradients, that is more typical members of the category share more attributes than less typical members with other category members. | An alternative perspective argues that categories have prototypicality (or typicality) "gradients," that is, more typical members of a category share more attributes than less typical members with other category members. | TE |
|---|---|---|---|---|
| 120 | 18 | are | have | TE |
| 120 | 22 | a | an | TE |
| 138 | 1 | discussed | disgust | TE |
| 143 | 1 | discussed | on disgust | TE |
| 146 | 4 | we going | went on | TE |
| 168 | 14 | discussed | disgust | TE |
| 174 | 15 | product | product? | TE |
| 177 | 12 | a roll-off | that type of | TE |
| 178 | 18 | network | network of | TE |
| 182 | 11 | papers | books | TE |
| 183 | 22 | detain | detail | TE |
| 195 | 16 | doing | knowing | TE |
| 197 | 5 | lobbied | loved it | TE |
| 210 | 11 | that is | that | TE |
| 214 | 23 | said no, | said | TE |
| 218 | 5 | likely | unlikely | TE |
| 218 | 23 | through | to | TE |
| 233 | 21 | which Absolut | Absolut | TE |
| 239 | 23 | how | now | |

\* TE – Transcription error

I attest that all of the above is true.

Date: 7/28/2015

*I. Simonson*

Itamar Simonson, Ph.D.