# Exhibit C

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ARIZONA
 3
 4   VIP PRODUCTS, LLC, an Arizona    )
 5   limited liability company,       )
 6    Plaintiff and Counterdefendant,)
 7                 vs.                ) Case No.
 8   JACK DANIEL'S PROPERTIES, INC., ) CV-14-2057-PHX-SMM
 9   a Delaware corporation,          )
10   Defendant and Counterclaimant.   )
11   _____
12
13
14          DEPOSITION OF BRUCE G. SILVERMAN
15              Los Angeles, California
16            Thursday, August 13, 2015
17                    Volume 1
18
19
20   Reported by:
21   WENDY S. SCHREIBER
22   CSR No. 3558
23   Job No. 2117367
24
25   PAGES 1 - 260
```

Page 1

1       A.   That's correct.
2       Q.   And the first page of Exhibit 104, SIL 001,
3  is just a cover page with a caption?
4       A.   That's correct.
5       Q.   The body of Exhibit 104 is your report in
6  this case, correct?
7       A.   Yes.
8       Q.   Turn to paragraph 24 on numbered page 8 in
9  your report.
10      A.   Yes.
11      Q.   Four lines down in that paragraph you wrote,
12 "...the opinions he..." -- Dr. Simonson --
13 "...offers in this matter are not based on empirical
14 data.  He did not conduct a quantitative or
15 qualitative consumer survey."
16           Do you see that?
17      A.   Yes.
18      Q.   Is it your opinion that expert opinions on
19 issues like likelihood of confusion or dilution must
20 be based on empirical data to be valid?
21      A.   No.
22           MR. BRAY:  Objection to form.
23 BY MR. LARKIN:
24      Q.   Do they need to be based on a quantitative
25 or qualitative survey to be valid?

Page 67

1              MR. BRAY:  Objection to form.
2              THE WITNESS:  No.
3     BY MR. LARKIN:
4         Q.   Have you offered in your previous services
5     as an expert an expert opinion in a trademark case
6     without a quantitative or qualitative consumer
7     survey?
8         A.   I have.
9         Q.   In fact, if I remember your testimony
10    correct, I think that you've done that on every
11    trademark case in which you've served as an expert?
12        A.   I believe that would be correct.
13        Q.   Is that also correct for the non-trademark
14    cases in which you have offered expert opinions,
15    you've done them without a quantitative or
16    qualitative consumer survey?
17        A.   I think in some of those cases -- I'd have
18    to go through that list again -- but I think in some
19    of those cases I had access to surveys that had been
20    done and I reviewed those surveys and that helped me
21    form my opinion.  It was one of them -- would be --
22    it wasn't obviously entirely based on the survey.
23    The survey had the wrong report.
24        Q.   Do you remember how many cases that occurred
25    in?

Page 68

1       A.   Maybe one or two.
2       Q.   Can you remember which cases?
3       A.   I could go through them.  I really don't
4  recall offhand.  I'm not even sure I will recall if
5  I go down the list.
6       Q.   Those were not trademark cases, correct?
7       A.   The case I remember best when there was a
8  survey was a case involving General Chuck Yeager,
9  the man who broke the sound barrier, and this was a
10 publicity rights case and there was a survey done to
11 determine the consumer awareness of Chuck Yeager,
12 what he did and what he stood for.
13      Q.   Did you consider or rely on that survey in
14 forming the opinions that you offered in that case?
15      A.   Not really, because my main thing I relied
16 on is what Yeager had been paid by various
17 advertisers during the period that his image was
18 used without authorization by an advertiser.
19      Q.   And other than the case involving
20 Mr. Yeager, do you recall any other instances where
21 you relied on a qualitative or quantitative consumer
22 survey to assist you in forming your opinions?
23      A.   There may be one other.  I just can't
24 remember what it is offhand.
25      Q.   Is this the first case involving the

Page 69

```
 1    trademark doctrine of dilution in which you have
 2    served as an expert?
 3        A.   Yes.
 4        Q.   Do you have any understanding of what
 5    dilution is in trademark law?
 6        A.   As far as very specifically the law?  I
 7    have -- I think I have a layman's understanding.
 8        Q.   Let me ask it this way.  What understanding
 9    of dilution did you bring to the formation of your
10    opinions in this case?
11        A.   Well, I think anyone who has been involved
12    in branding as long as I have understands that
13    brands can be damaged and if a brand is damaged,
14    that's, I think, a synonym for -- more or less a
15    synonym for dilution.  The value of the brand
16    declines.  When Tylenol -- when Tylenol products
17    were distributed with poison material in them,
18    Tylenol's brand for a period of time was severely
19    damaged.  Sales went down because people were afraid
20    that the product might be dangerous.  So that's how
21    I look at dilution.  Dilution is basically a synonym
22    for damage.
23        Q.   Have you heard of the concept of dilution by
24    tarnishment?
25        A.   Not until this case.  That term was new.
```

Page 70

1      Q.   Okay.  Did you gain an understanding of the
2   meaning of that term for purposes of forming your
3   opinions in this case?
4      A.   I think I did.
5      Q.   What was your understanding?
6      A.   Is that for whatever -- in whatever
7   method -- it could be through advertising, it could
8   be through in this case a parody product -- that --
9   that consumers could be left with an impression that
10  would have the effect of tarnishing or damaging
11  another brand.  The allegation here, at least as I
12  understand it, is not that consumers would be
13  confused from a pure trademark standpoint -- in
14  other words, the name of the product or the trade
15  dress of the product -- but, rather, that the brand
16  was allegedly damaged because of the actions of
17  another party.
18     Q.   Did you review Jack Daniel's Properties'
19  Answer and counterclaims in this case in connection
20  with forming your opinion?
21     A.   I did.
22     Q.   Did you review the allegations made in there
23  about infringement?
24     A.   I did.
25     Q.   But that was not part of your assignment in

1  this case?
2      A.   Not part of my assignment.  I stick to my
3  assignment.
4      Q.   Have you ever reviewed any academic
5  literature about how dilution may occur?
6      A.   The closest I've come to academic literature
7  on that subject is reading Dr. Simonson's report.
8      Q.   Did you review any of the source materials
9  that were cited in Dr. Simonson's report?
10     A.   No.
11     Q.   Are you familiar with any of them?
12     A.   I've read David Aaker's book who he
13  mentions, although I think he mentioned that in the
14  context of what branding is all about.  I think
15  there was another book that he mentioned that I've
16  also read -- in fact, I have copies of -- that I
17  sometimes cite pretty much the same way he cites it.
18  I didn't -- I certainly never read the stuff about
19  the psychological approach that he bases his opinion
20  on.
21     Q.   Other than the Aaker book and the other book
22  you just referenced, you have never reviewed any of
23  the academic literature that Dr. Simonson cited?
24     A.   I don't think so.
25     Q.   In paragraph 17 of your report -- that's

1   Exhibit 104 -- at the top of page 7 --
2       A.   Whoops, wait a minute.
3       Q.   Paragraph 17.
4       A.   I thought you said page 17.
5       Q.   Paragraph 17 which begins on page 6 and
6   bleeds over onto page 7.  In that paragraph you
7   said, "I have observed more than 3,500 focus group
8   sessions as well, including..." -- I'm sorry.
9       A.   Let me just get it.  I had the wrong pile.
10      Q.   It's the top of page 7.
11      A.   Got it.
12      Q.   You state, "I have observed more than 3,500
13  focus group sessions as well, including many groups
14  in which alcoholic beverages (whiskey, vodka, beer
15  and wine) and pet products were at issue."
16           Were any of those focus groups ever used in
17  any manner in litigation?
18      A.   Not to my knowledge.
19      Q.   Focus groups are a -- -- as part of your
20  criticism of Dr. Simonson's report in paragraph 24
21  of your report, you referenced quantitative and
22  qualitative consumer surveys.  Focus groups are a
23  form of qualitative consumer research; is that
24  correct?
25      A.   That's correct.

Page 73

1  Q.  How do they differ from what you refer to in
2  paragraph 24 as a quantitative survey?
3  A.  A quantitative study, as the name implies,
4  involves using large numbers of respondents that are
5  broken into appropriate demographic groups and
6  sometimes psychographic groups to get a
7  statistically --
8  Q.  It's a tough word.
9  A.  I hate that word.  -- statistically-reliable
10 number that gives you theoretically an answer to a
11 question.
12          Qualitative studies are used far more than
13 quantitative studies to get at thoughts and feelings
14 because thoughts and feelings are very difficult to
15 get at through quantitative studies.  The nature of
16 quantitative studies is you just have to interview
17 so many people that today in most instances
18 quantitative studies are done via the Internet.  So
19 it's a matter of consumers answering on a scale of 1
20 to 7 or 1 to 10, and you obviously have no
21 opportunity to interact.  You have no opportunity to
22 see physical reactions.  So both qualitative and
23 quantitative studies research techniques are very
24 useful.  Qualitative studies are very rarely
25 projectable.  I've seen qualitative studies

Page 74

1   involving interviewing so many people that you
2   probably could make the case for them to be
3   projectable but I don't know any market researchers
4   that would actually do it.  But it's a tool.  And
5   it's a very important tool, as I previously
6   testified.  It's one of the reasons that that crazy
7   number there is 3,500.  You live with it.  And
8   it's -- besides being useful for a given assignment,
9   it contributes a lot to forming expertise by people
10  like me.
11      Q.  In paragraph 17 of your report -- that's on
12  page 6 -- you stated, "In addition to deriving
13  useful information from the thousands of
14  quantitative studies I reviewed related to my
15  client's products and competitors..."  Have you,
16  in fact, throughout the course of your career
17  reviewed thousands of quantitative studies?
18      A.  I have.  Most of those studies have to do
19  with awareness and attitudes towards advertising,
20  very specifically towards advertising campaigns,
21  whether people have been watching them, whether they
22  understand them, whether they have issues with them,
23  et cetera.  I've worked most of my career on very
24  large brands that invested millions of dollars
25  annually in research to make sure that the hundreds