# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

NOV 2 2 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| HALF PRICE BOOKS, RECORDS, MAGAZINES, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| VS. | ) | 3:02-CV-2518-G |
| | ) | |
| BARNESANDNOBLE.COM, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

Before the court are (1) the motion of the defendant Barnesandnoble.com,

LLC's ("BN.com" or the "defendant") for summary judgment on all claims asserted

by the plaintiff Half Price Books, Records, Magazines, Incorporated ("HPB" or the

"plaintiff") and (2) the motion of HPB to strike evidence submitted by the defendant

in support of its motion for summary judgment ("motion to strike"). For the reasons

discussed below, HPB's motion to strike is denied, and BN.com's motion for

summary judgment is also denied.

## I. BACKGROUND

This case arises out of a trademark infringement claim brought by HPB under

Sections 1114 and 1125 of the Lanham Act, 15 U.S.C. §§ 1051-1127, as well as

trademark and dilution claims under Texas law. *See* Second Amended Complaint for Trademark Infringement and Demand for Jury ("Complaint") at 5-7. HPB and BN.com both sell new and used books, as well as audio and video recordings. Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment ("HPB's Response") at 1; Declaration of Anthony Astarita ("Astarita Declaration") ¶ 2, Appendix in Support of Defendant's Motion for Summary Judgment ("Defendant's Appendix") at 1. HPB sells its products utilizing an online store and 84 "brick and mortar" retail stores in 13 states. HPB's Response at 1. HPB's annual sales exceed $126 million. *Id.* BN.com operates a website generating annual sales of approximately $404 million. Astarita Declaration ¶ 5, Defendant's Appendix at 2.

HPB's registered trade name and trademark is "Half Price Books, Records, Magazines." HPB's Response at 4; Appendix to Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment ("Plaintiff's Appendix") at 337-38. HPB more commonly conducts business under the abbreviated name "Half Price Books," for which HPB obtained a registered trademark on September 2, 2003. HPB's Response at 4; Plaintiff's Appendix at 339-40. This mark is the subject of this infringement action.

On or about April 11, 2002, BN.com began using the phrases "Half-Price Books & Special Values" or "Half-Price Books" to classify certain pages on its website that sold "books [of] high quality with deep discounts." Astarita Declaration ¶¶ 29-

33, Defendant's Appendix at 11-12.  On November19, 2002, HPB brought this action alleging that BN.com's use of the term "Half-Price Books," or substantially similar phrases, infringed its rights under both federal and state trademark law.  *See generally* Original Complaint, filed on November 19, 2002.  In conjunction with its original complaint, HPB filed a motion for preliminary injunction, in which it sought to enjoin BN.com's use of the phrase "Half-Price Books."  *See generally* Plaintiff's Motion for Preliminary Injunction, filed on November 19, 2002.  On August 15, 2003, this court denied HPB's motion for preliminary injunction.  Memorandum Order filed August 15, 2003 ("August 15, 2003 Order").

On December 29, 2003, BN.com filed this motion for summary judgment on HPB's infringement claims.  *See generally* Defendant's Motion for Summary Judgment.  In the course of responding to BN.com's motion for summary judgment, HPB filed the instant motion to strike certain evidence submitted by BN.com in support of its motion.  *See generally* Motion to Strike.

## II. <u>ANALYSIS</u>

### A. <u>HPB's Motion to Strike</u>

In its motion to strike, HPB challenges the admissibility, for summary judgment purposes, of certain portions of the declaration of Anthony Astarita, vice president of BN.com.  Motion to Strike at 2-5.  Additionally, HPB's motion to strike

challenges the admissibility of the expert report of Gabriel M. Gelb ("Gelb Report").
*Id.* at 6.

### 1. *Astarita Declaration*

HPB asserts that certain portions of the Astarita Declaration are inadmissible because Astarita's testimony is either irrelevant, conclusory, or improper commentary on aspects of trademark law. Motion to Strike at 2-5. Thus, HPB argues, his testimony is not proper evidence for the court to consider in determining BN.com's motion for summary judgment. *Id.* Furthermore, HPB urges the court to strike those portions of the Astarita Declaration which are not cited by BN.com in support of its motion for summary judgment. Motion to Strike at 5.

In his declaration, Astarita occasionally uses the term "generic" and various statements incorporating some form of the term "trademark." HPB objects to Astarita's use of these terms and states that they are either conclusory or improper opinions of a lay person on trademark law. *Id.* at 2-5. However, when viewed in context of the declaration, the use of these terms by Astarita generally refers to BN.com's marketing decisions regarding the use of the phrase "Half-Price Books." *E.g.*, Astarita Declaration ¶ 28, Defendant's Appendix at 10-11. These references are not conclusory and offer the court insight into the marketing decisions and strategies used by BN.com in regards to its use of the term "Half-Price Books." Astarita's declaration contains admissible testimony based on his personal knowledge as an

executive of BN.com, and thus it is appropriate evidence for the court to consider in ruling on BN.com's motion for summary judgment. *See* FED. R. CIV. P. 56(e).

HPB argues that because it "is not the job of the court to sift through Defendant's Appendix to determine which pieces of evidence support Defendant's position," the court should strike those portions of the Astarita Declaration that are not cited by BN.com in support of its motion for summary judgment. Motion to Strike at 5 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied sub nom.*, *Forsyth v. Vines*, 513 U.S. 871 (1994), and *Janik v. City of Dallas*, No. Civ.A.3:95-CV-2594-D, 1998 WL 204623 at *2 (N.D. Tex. Apr. 16, 1998) (Fitzwater, J.)). The cases HPB cites in support of its position are easily distinguished. In these cases, the courts were addressing the *nonmovant's* failure to establish the existence of a genuine issue of material fact outside of the pleadings. *Forsyth*, 19 F.3d at 1537; *Janik*, 1998 WL 204623 at *2. Furthermore, in those instances there was a complete failure by the *nonmovant* to direct the court to any specific documents, or portions therein, in the record. *Forsyth*, 19 F.3d at 1537; *Janik*, 1998 WL 204623 at *2. In the instant action BN.com, as *movant*, has directed the court to certain paragraphs of the Astarita Declaration in support of its motion for summary judgment. Those portions of the Astarita Declaration which are not expressly cited by BN.com may provide sufficient background or assistance in analyzing those paragraphs which are cited. The court can determine on its own the admissibility of the uncited paragraphs, to the extent it

- 5 -

must rely on them.  See *Saudi v. S/T Marine Atlantic*, 159 F. Supp. 2d 512, 526 (S.D.

Tex. 2001).  Thus, HPB's motion to strike, as it relates to the Astarita Declaration, is

denied.

### 2.  *Gelb Report*

#### a.  Standard for Admissibility of Expert Testimony

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993),

"[t]he Supreme Court held that when expert testimony is offered, the trial judge

must perform a screening function to ensure that the expert's opinion is reliable and

relevant to the facts at issue in the case."  *Watkins v. Telsmith, Inc.*, 121 F.3d 984,

988-89 (5th Cir. 1997) (citing *Daubert*, 509 U.S. at 589).  The proponent of expert

testimony has the burden of demonstrating that "(1) the expert is qualified, (2) the

evidence is relevant to the suit, and (3) the evidence is reliable."  *American Tourmaline

Fields v. International Paper Company*, 1999 WL 242690, *2 (N.D. Tex. 1999) (citing

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Watkins*, 121 F.3d at

988-89; and *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en

banc), *cert. denied*, 526 U.S. 1064 (1999)).  Federal Rule of Evidence 702 provides the

standard for admissibility of expert testimony in federal court.  That rule provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if
> (1) the testimony is based upon sufficient facts or data,

- 6 -

> (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

FED. R. EVID. 702. The decision to admit or to exclude evidence is committed to the

sound discretion of the district court. See, *e.g.*, *United States v. West*, 22 F.3d 586,

591 (5th Cir.), *cert. denied*, 513 U.S. 1020 (1994).

Thus, when faced with a proffer of expert testimony, a trial judge must first

determine whether the expert is proposing to testify to (1) scientific, technical, or

specialized knowledge that (2) will assist the trier of fact to understand or determine

a fact in issue. See *Daubert*, 509 U.S. at 590-92. "Expert testimony which does not

relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 590. In

sum, if this court determines that the proffered testimony of Gelb will not assist the

factfinder to understand the evidence or to determine a fact in issue, then such

testimony is, by definition, not relevant (and undoubtedly non-helpful). The court

may then, in its sound discretion, exclude that testimony. See, *e.g.*, *West*, 22 F.3d at

591.

### b. HPB's Argument

HPB argues that the Gelb Report should be stricken because (1) Gelb "does

not explain, nor is it apparent from his Report, what specialized knowledge he has to

support his conclusions or how his testimony would assist the finder of fact on these

issues;" (2) "Gelb's opinions are unreliable and entirely subjective;" and (3) "Gelb's

opinions are irrelevant and/or misleading as to the actual issues in controversy."
Plaintiff's Brief in Support of its Objections to and Motion to Strike Gabriel M.
Gelb's Expert Report ("Motion to Strike Gelb Report") at 3.

BN.com asserts that Gelb's experience in marketing and consumer behavior
analysis establishes the requisite specialized knowledge. Brief of Defendant
Barnesandnoble.com LLC in Opposition to [Motion to Strike Gelb Report]
("Opposition Brief") at 5. Specifically, BN.com directs the court to the qualifications
Gelb lists in his report, such as the facts that Gelb "has over 37 years of experience in
market analysis," Gelb "is frequently retained to advise companies on marketing
issues," Gelb "has written numerous books and articles and conducted extensive
research on the subjects of marketing and advertising, including consumer behavior,"
and Gelb "has served as an expert witness in approximately 30 lawsuits involving
trademarks, trade dress . . . and has [been] . . . cited with approval by the Fifth and
Fourth Circuits in two different cases." *Id.* at 5. An expert may establish "specialized
knowledge" through extensive experience and credentials in his field. See *Employers
Reinsurance Corporation v. Mid-Continent Casualty Company*, 202 F. Supp. 2d 1212,
1216 (D. Kan. 2002) (the insurance background and credentials of an expert
qualified him to testify as to industry standards); *Cary Oil Company, Inc. v. MG
Refining & Marketing, Inc.*, No. 99 CIV. 1725 (VM), 2003 WL 1878246, at *2
(S.D.N.Y. Apr. 11, 2003) (an expert who had experience in petroleum distribution

was qualified to testify as to alternative distribution techniques). Here, the court finds that Gelb's experience in the marketing analysis and consulting profession, as well as his research and writing in the field, constitute "specialized knowledge" for purposes of determining the admissibility of his testimony and report.

"The requirement that the testimony 'assist the trier of fact' means the evidence must be relevant." *Mathis v. Exxon Corporation*, 302 F.3d 448, 460 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 591). "The expert testimony must be relevant, not simply in the sense that all testimony must be relevant,[1] . . . but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581, 584 (5th Cir.) (citing *Daubert*, 509 U.S. at 591-92), *cert. denied sub nom.*, *Sandoz v. Bocanegra*, ___ U.S. ___, 124 S.Ct. 180 (2003). Simply put, to be relevant there must be a valid connection between the expert testimony and the issue(s) in controversy. *Id.*

The Gelb Report offers the opinion that the term "Half Price Books" would not indicate to consumers a single source. Gelb Report at 3, Defendant's Appendix at 79. BN.com asserts that "an opinion from a marketing expert . . . to the effect that consumers would not understand the phrase 'half price books' to refer to a single source . . . clearly relates to issues in this case and will assist the trier of fact in

---

[1]    Generally, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

determining whether the mark is descriptive or merely generic." Opposition Brief at

7. As discussed below, an important factor in any trademark infringement case is the

classification of the mark. See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768

(1992). In this action, HPB and BN.com dispute classification of the mark "Half

Price Books." Gelb's testimony regarding the perception of the term by consumers

may assist the court, for summary judgment purposes, or the jury, at trial, in

determining whether the mark is generic or descriptive. Therefore, a valid connection

exists between the testimony in the Gelb Report and the issues constituting the

instant controversy.

The final inquiry in determining the admissibility of the Gelb Report is the

reliability of the testimony contained therein. *Mathis*, 302 F.3d at 460. In analyzing

the reliability of an expert's testimony, the Supreme Court in *Daubert* provided an

"illustrative list of factors that may aid a court in evaluating reliability:"

> (1) whether the expert's theory can be or has been tested;
> (2) whether the theory has been subject to peer review and
> publication; (3) the known or potential rate of error of a
> technique or theory when applied; (4) the existence and
> maintenance of standards and controls; and (5) the degree
> to which the technique or theory has been generally
> accepted in the scientific community.

*Id.* (quoting *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en

banc)). While the expert testimony in the Gelb Report is not scientific in nature, the

"application of the *Daubert* factors is germane to evaluating whether the expert is a

- 10 -

hired gun or a person whose opinion in the courtroom will withstand the same
scrutiny that it would among his professional peers." *Watkins*, 121 F.3d at 991.  The
*Daubert* factors are flexible and they "may or may not be pertinent in assessing
reliability, depending on the nature of the issue, the expert's particular expertise, and
the subject of his testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir.
2002) (citing *Kumho Tire*, 526 U.S. at 150).  In determining the Gelb Report's
reliability, whatever factors are considered, the court's objective is to "ensure that the
opinion comports with applicable professional standards outside the courtroom and
that it 'will have a reliable basis in the knowledge and experience of [the] discipline.'"
*Watkins*, 121 F.3d at 991 (quoting *Daubert*, 509 U.S. at 592).

HPB claims that the Gelb Report is unreliable because Gelb has failed to
adequately explain how he reached the conclusions in the report.  Plaintiff's Reply
Brief in Support of Its Objections to and Motion to Strike Gabriel M. Gelb's Expert
Report ("HPB's Reply to Gelb Report") at 5.  Specifically, HPB argues that Gelb
failed to define the terms "common" or "generic" in his report.  Motion to Strike
Gelb Rport at 4; HPB's Reply to Gelb Report at 3-4.  HPB argues that by failing to
define these "key terms" on which his opinions are based, the Gelb Report lacks the
required reliability.  HPB's Reply to Gelb Report at 3.  HPB further argues that the
term "generic" has specific meaning in trademark law, which is of critical importance
in this case, and that Gelb's failure to define the term is grounds for striking the

- 11 -

report. *Id.* at 3-4. An expert may not usurp the role of the court in defining key legal terms. See *Crow v. United Benefit Life Insurance Company*, No. Civ. A. 3:00-CV-1375-G, 2001 WL 285231 at *3 (N.D. Tex. Mar. 16, 2001). Therefore, Gelb need not define "generic" in his report, as the court will apply the legal definition of the term given by the Fifth Circuit in its trademark jurisprudence.

Additionally, HPB argues that the Gelb Report is unreliable because Gelb fails to explain how he reaches the conclusion that the terms "half" and "half-price" are generic terms. *Id.* at 4-5. In the report, Gelb referenced widely used dictionary and thesaurus entries of the terms "half" and "half-price." Gelb Report at 4. HPB would have the court disregard this evidence because of the "obviously large number of dictionaries and thesauruses that apparently do not contain definitions of 'half' or 'half-price.'" HPB's Reply to Gelb Report at 4. Whether the terms "half" or "half-price" are generic is a critical issue in determining the outcome of this action. An analysis under *Daubert* and its progeny is not intended to replace the adversary system. *Pipitone*, 288 F.3d at 250. In its role as gatekeeper, the court should not determine the merits of the case, but instead determine whether the evidence at issue is admissible. *Id.* At this point, the court is merely determining whether the Gelb Report is admissible, not the quality or effect of the testimony therein. HPB may attack the content and sufficiency of Gelb's testimony in its response to BN.com's

- 12 -

motion for summary judgment, and, at trial, by presenting contrary evidence and cross-examining Gelb.  See *id.*

"A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendments.  The Gelb Report appears to meet the standard for admissibility under Rule 702 and thus the court will consider it in determining BN.com's motion for summary judgment.  To the extent HPB disagrees with Gelb's testimony, it may -- and apparently does -- attack the sufficiency of the Gelb Report in its response to BN.com's motion.  HPB's Response at 23.

For the reasons stated, HPB's motion to strike the Gelb Report is denied.

### B.  BN.com's Motion for Summary Judgment

BN.com moves for summary judgment on HPB's claim of trademark infringement and its related claim under the Texas Anti-Dilution Statute. Specifically, BN.com asserts that "Half Price Books" is not a protectable trademark, that its use of the term does not rise to actionable infringement, and that, even if its actions were deemed infringing conduct, BN.com's use of the term falls under the fair use defense.  Regarding the Texas state law claim, BN.com argues that "Half Price Books" is not a mark that falls within the scope of the statute's protection.

1.  *Evidentiary Burdens on Motion for Summary Judgment*

Summary judgment is proper when the pleadings and evidence before the court show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).[2]  The movant makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists.  FED. R. CIV. P. 56(c).

Once the movant makes this showing, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.  To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*

---

[2]      The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

- 14 -

*Corporation*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must show that the evidence is sufficient to support a resolution of the factual issue in its favor. *Anderson*, 477 U.S. at 249.

While all of the evidence must be viewed in a light most favorable to the nonmovant, *id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (citing *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). Summary judgment in favor of the movant is proper if, after adequate time for discovery, the motion's opponent fails to establish the existence of an element essential to its case and as to which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

### 2. *Trademark Infringement Claim*

The Fifth Circuit has distilled the trademark infringement inquiry down to a two step determination. *Security Center, Ltd. v. First National Security Centers*, 750 F.2d 1295, 1298 (5th Cir. 1985). The first step requires the court to determine whether the plaintiff has a protectable right in its mark. *Id.* A mark is protectable if it "*either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769 (emphasis in original); see also *Security Center*, 750 F.2d at 1298; *Chevron Chemical Company v. Voluntary Purchasing*

- 15 -

*Groups, Inc.*, 659 F.2d 695, 702 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126 (1982).
If the plaintiff has a protectable right in the mark, the second step requires the court
to determine whether there is infringement as judged by the likelihood of confusion
between the protectable mark and the challenged mark. *Security Center*, 750 F.2d at
1298. In light of this two step inquiry, the court must first determine if HPB has a
protectable right in the mark "Half Price Books."

### a. Is the Mark "Half Price Books" Protectable?

A trademark serves as a label "that identifies and distinguishes a particular
product." *Sport Supply Group, Inc. v. Columbia Casualty Company*, 335 F.3d 453,
461(5th Cir. 2003). Trademark law classifies marks into five types: (1) generic;
(2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos*, 505 U.S. at
768; see also *Sport Supply*, 335 F.3d at 460 n.7; see generally *Zatarains, Inc. v. Oak
Grove Smokehouse, Inc.*, 698 F.2d 786, 790-92 (5th Cir. 1983) ("These categories, like
the tones in a spectrum, tend to blur at the edges and merge together."). Each
classification reflects the strength and distinctiveness of a given mark and determines
"the scope of protection [the mark] should be accorded." *Amstar Corporation v.
Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.), *cert. denied*, 449 U.S. 899 (1980);
*Lawfinders Associates, Inc. v. Legal Research Center, Inc.*, 65 F. Supp. 2d 414, 425 (N.D.
Tex. 1998), *aff'd*, 193 F.3d 517 (5th Cir. 1999) (table).

Generic and descriptive marks are not inherently distinctive. *Two Pesos*, 505 U.S. at 768; *Zatarains*, 698 F.2d at 790-91. A generic mark identifies an entire class of products or services but does not distinguish a certain product or service within that class and therefore receives no protection under trademark law. *Two Pesos*, 505 U.S. at 768; *Union National Bank of Texas, Laredo, Texas v. Union National Bank of Texas, Austin, Texas*, 909 F.2d 839, 845 (5th Cir. 1990). The word "airplane" is an example of a generic mark. *Sport Supply*, 335 F.3d at 460 n.7. A descriptive mark describes a product, such as "barbecue beans," and generally does not "inherently identify a particular source, and hence cannot be protected." *Two Pesos*, 505 U.S. at 769; see also *Union National Bank*, 909 F.2d at 845. When, however, the public almost exclusively associates a descriptive mark with a given product, such as the term "all bran" with the product "All Bran," the mark is deemed to have acquired distinctiveness or secondary meaning and is accorded protection under trademark law. *Id.*; *Sport Supply*, 335 F.3d at 460 n.7; *Security Center*, 750 F.2d at 1300-01.

The latter three types of marks -- suggestive, arbitrary and fanciful -- link a given product or service with a particular source and therefore are distinctive and entitled to protection. *Two Pesos*, 505 U.S. at 768. A suggestive mark "suggests rather than describes, some particular characteristic of the goods or services to which [the mark] applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of goods and services." *Union National*, 909 F.2d

- 17 -

at 845 (quoting *Zatarains*, 698 F.2d at 791 (internal quotations omitted)). Examples of suggestive marks include "Penguin" for refrigerators or "Business Week" for a business periodical. See *Union National Bank*, 909 F.2d at 845; *Sport Supply*, 335 F.3d at 460 n.7. An arbitrary mark employs common words in an uncommon way, such as "Apple Computer," while a fanciful mark uses invented or coined words to identity a product, such as "Kodak" or "Exxon." *Id.*

It is undisputed that the mark "Half Price Books" is not suggestive, arbitrary, or fanciful. Rather, the issue is whether the mark "Half Price Books" is generic, or whether it is descriptive and has acquired secondary meaning.

HPB has validly registered the marks "Half Price Books" and "Half Price Books, Records, Magazines" in accordance with Title 15 of the United States Code. HPB's Response at 6-7. The registration of the mark "Half Price Books," the mark at issue, creates a rebuttable presumption that the mark is valid. *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979) *cert. denied,* 444 U.S. 1016 (1980) (citing 15 U.S.C. § 1115(a)). The presumption shifts the burden of proof to BN.com to show by a preponderance of the evidence either that the mark is generic or that the mark is descriptive and lacks a secondary meaning. *Id.*; *Burke-Parsons-Bowlby Corporation v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir. 1989); *March Madness Athletic Association, L.L.C. v. Netfire, Inc.*, 162 F. Supp. 2d 560, 568-69 (N.D. Tex. 2001); *Credit Counseling Centers of America v. National Foundation for Consumer Credit,*

- 18 -

*Inc.*, No. Civ. A. 3:94-CV-1855-D, 1997 WL 160180 at *3 (N.D. Tex. Apr. 1, 1997) (Fitzwater, J.).

The Fifth Circuit has held that "the test for genericness [sic] is whether the public perceives the term primarily as the designation of the article." *Society of Financial Examiners v. National Association of Certified Fraud Examiners Inc.*, 41 F.3d 223, 227 (5th Cir.) (citing *Blinded Veterans Association v. Blinded American Veterans Foundation*, 872 F.2d 1035, 1041 (D.C. Cir. 1989)), *cert. denied*, 515 U.S. 1103 (1995). "Put another way, the primary significance of a trademark in the minds of the consuming public is not the product but the producer." *Id.* (citing *Kellogg Company v. National Biscuit Company*, 305 U.S. 111, 118 (1938)) (internal quotations marks omitted). Although whether a term constitutes a generic mark is a question of fact normally reserved for the jury, summary judgment is appropriate when no issue of fact exists regarding the classification of the term. See *Society of Financial Examiners*, 41 F.3d at 225; FED. R. CIV. P. 56(c).

In support of its argument that "Half Price Books" is a generic term, BN.com argues that it has presented the court with "overwhelming evidence" that rebuts the presumption of validity. Reply Brief of BN.com in Support of Its Motion for Summary Judgment ("BN.com's Reply") at 4. Specifically, BN.com directs the court to three evidentiary items or categories: (1) the 1984 determination by the Trademark Trial and Appeal Board ("TTAB") that the mark "Half Price Books,

- 19 -

Records, Magazines" was generic; (2) the Gelb Report; and (3) extensive third-party use of the term "half price" in connection with books and other products and services. *Id.*

HPB relies heavily on the existence of the certificate of registration to buttress its argument that summary judgment is inappropriate on the issue of the mark's categorization. HPB's Response at 18-24. HPB contends that summary judgment is rarely appropriate in cases in which there is a registered mark. *Id.* at 19 (citing *America Online, Inc. v. AT&T Corporation*, 243 F.3d 812, 818 (4th Cir. 2001)). Furthermore, HPB argues that the registration of both "Half Price Books, Records, Magazines" and "Half Price Books" weakens the strength of BN.com's reliance on the 1984 TTAB determination. Additionally, HPB offers the testimony of its linguistic expert, Professor John Hawkins, to support its claim that the "Half Price Books" is not generic but instead descriptive with a secondary meaning. *Id.* at 21-24. Professor Hawkins' declaration concludes that the term "Half Price Books" is not generic because it does not refer to a "separate genus or subcategory of books." Declaration of John A. Hawkins ("Hawkins Declaration") at 15, Plaintiff's Appendix at 579. In his declaration, Professor Hawkins bases his opinions regarding the classification of the mark in issue on the well-known treatise, McCarthy on Trademarks and Unfair Competition ("McCarthy on Trademarks"). *Id.* at 1, Plaintiff's Appendix at 565. In determining the classification of the mark, Professor Hawkins applies his knowledge

of the English language to the definitions of generic, descriptive, suggestive, *etc.* as defined in McCarthy on Trademarks. *Id.* at 5-7, Plaintiff's Appendix at 569-571 (citing 2 J. Thomas McCarthy, McCarthy on Trademarks §§ 11-12 (4th ed. 1999)).

BN.com urges the court to disregard the Hawkins Declaration in its entirety. BN.com's Reply at 9-10. Relying on this court's opinion in *Crow v. United Benefit Life Insurance*, BN.com argues that Hawkins has usurped the roles of the court and the trier of fact by defining legal terms and applying the facts to those definitions. *Id.* (citing *Crow*, 2001 WL 285231 at *3). While the definitions cited in the Hawkins Declaration may not be precisely those used in this circuit, the court may evaluate the testimony for summary judgment purposes employing the appropriate legal definitions when necessary. Therefore, the court will not, as BN.com requests, disregard the testimony of Professor Hawkins.

BN.com may rebut the presumption of validity by showing that even if the mark is descriptive, rather than generic, it lacks secondary meaning. *Vision Center*, 596 F.2d at 119. In arguing that it has met its burden of production, BN.com directs the court to the August 15, 2003 order. BN.com's Reply at 11. In that order, this court refused to issue a preliminary injunction, holding that HPB had not presented sufficient evidence that the mark "Half Price Books" has acquired secondary meaning. August 15, 2003 Order at 11-12. When that ruling was made, the mark was not registered; thus, no presumption existed, and the burden was on HPB to

- 21 -

prove likelihood of success on the merits.  Furthermore, when the court made its ruling in the August 15, 2003 order, HPB had not submitted any survey evidence regarding confusion or consumer recognition.  *Id.* at 11.  In connection with its response to BN.com's motion for summary judgment, however, HPB has submitted a survey which it contends establishes secondary meaning.  Half Price Book, Inc. Secondary Meaning Survey Report, Plaintiff's Appendix at 437-48.[3]

As stated above, the classification of a mark is an issue of fact that should normally be resolved by the jury.  However, if no genuine issue of material fact exists as to the mark's classification, then summary judgment is appropriate.  See *Celotex*, 477 U.S. at 323.  To avoid summary judgment, there must be sufficient evidence in the record to support a finding by the jury in favor of HPB.  See *Anderson*, 477 U.S. at 248.  If the evidence relating to classification is viewed in the light most favorable to HPB, a reasonable jury might classify the term "Half Price Books" as descriptive. Furthermore, there is sufficient evidence in the record, when viewed in a light most favorable to HPB, to support a jury finding that secondary meaning has attached to the term.

---

[3]       BN.com argues that the survey submitted by HPB is unreliable. BN.com's Reply at 12-13.  Specifically, BN.com states that the geographical scope, mode of questioning, and resulting responses to the survey render it unreliable.  *Id.* at 12-19.  Because the reliability of the survey is in dispute, the trier of fact should be allowed to determine what weight to give it.

b. Likelihood of Confusion

The second step in analyzing a trademark infringement claim is for the court to determine whether there is infringement, as judged by the likelihood of confusion between the protectable mark and the challenged mark. *Security Center*, 750 F.2d at 1298. Generally, in trademark infringement cases, a plaintiff alleging infringement must prove that the defendant's use of the protected mark "was likely to create confusion in the minds of potential purchasers as to source, affiliation, or sponsorship of the parties' products." *Society of Financial Examiners*, 41 F.3d at 227. The Fifth Circuit has offered a non-exclusive list of factors, or "digits," to be considered in determining whether a likelihood of confusion exists: "(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion." *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000). "No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these 'digits of confusion.'" *Id.* The court may also consider factors not included in this non-exhaustive list. *Id.*

HPB argues that likelihood of confusion is not an appropriate issue to be determined on summary judgment. HPB's Response at 25. However, the Fifth Circuit has held that the issue of confusion may be resolved on summary judgment.

- 23 -

*King v. Ames*, 179 F.3d 370, 374 (5th Cir. 1999). Therefore, HPB must direct the court's attention to evidence in the record sufficient to support a favorable resolution of a genuine issue of material fact regarding the likelihood of confusion between its mark and BN.com's use of the term. See *Anderson*, 477 U.S. at 249.

### i. *Type of Mark*

A "vital factor" in the determination of whether a likelihood of confusion exists is the strength or weakness of HPB's mark. *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association*, 651 F.2d 311, 315 (5th Cir. 1981). Marks that are categorized as suggestive, arbitrary or fanciful are afforded greater "strength" than descriptive marks that have acquired secondary meaning. *Id.* In the instant case, the parties dispute the classification of the mark "Half Price Books;" however, HPB contends that the mark is valid because it is descriptive and has acquired secondary meaning. HPB's Response at 5-18. Therefore, even if the mark "Half Price Books" is determined to be a valid mark, it would most likely rest at the "weaker" end of the spectrum.

### ii. *Similarity of Marks*

Similarity of the marks, or design of the marks, "is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." *Exxon Corporation v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504-05 (5th Cir. 1980). BN.com cites several cosmetic

- 24 -

differences between its use of the term "Half-Price Books" and HPB's mark "Half Price Books." BN.com's Motion at 23. Among the differences listed are the sizes and color of the terms, as well as BN.com's conjunction of the term with "Barnes & Noble" or "& Special Values" on its website and in its internet advertisements. *Id.* In response, HPB directs the court to evidence in the record showing BN.com's actual use of the terms "Half-Price Books" or "Half Price Books" on the internet. HPB's Response at 26; Plaintiff's Appendix at 361-62, 369, 372-77. The proffered evidence is a compilation of print-outs displaying links to BN.com that were returned after entering "half price books" on several internet search engines. Plaintiff's Appendix at 372-77. The link most often returned by the search engines states "Buy Half Price Books at Barnes & Noble." *Id.* at 372, 374-77 The other link returned by the search states "Barnes Noble.com Half-Price Books Other Bargains." *Id.* at 373. The final reference cited is a "banner ad" which is a direct link to BN.com's website. *Id.* at 361-62. In this ad, the phrase "Half-Price Books" sits above the phrase "& Special Values," with "Half-Price Books" being slightly larger. *Id.* "Barnes & Noble" is displayed in the right portion of the banner, which comprises approximately one-third of the entire banner. *Id.* The coloring of the banner ad is indistinguishable as the court has been provided with only a black and white print-out of the webpage; however, other evidence in the record shows that the ad is likely comprised of several different colors. See *id.*; Astarita Declaration ¶ 19, Defendant's Appendix at 6.

### iii. *Similarity of the Products, Identity of the Purchasers, Identity of the Advertising Media*

The next three digits, similarity of products, identity of purchasers, and identity of advertising media, all weigh in HPB's favor. HPB and BN.com sell substantially similar products, namely books, audio, and video. Astarita Declaration ¶ 2, Defendant's Appendix at 1-2; HPB's Response at 1. Moreover, HPB and BN.com target the same consumer group, the general book-buying public. See *Exxon*, 628 F.2d 500, 505 (members of the "car driving public" sufficient to establish a "strong similarity" between purchasers). Furthermore, as evinced by the subject matter of this case, both parties use the internet as a major tool for advertising.

### iv. *BN.com's Intent*

BN.com argues that HPB cannot show any bad intent by BN.com in using the term "Half Price Books." BN.com's Motion at 25. In its motion, BN.com states that it used "half-price books" instead of "bargain books" purely for marketing reasons. *Id.* (citing the Astarita Declaration). In response, HPB directs the court to the use of other major book sellers who use the term "bargain books," either in their retail stores or on-line. HPB's Response at 28; Plaintiff's Appendix at 364, 524-36. The use of the term "bargain books" by third-parties, HPB argues, undermines the validity of BN.com's proffered reasoning for using "Half-Price Books" rather than another term descriptive of the products. However, HPB has produced no direct evidence

establishing any intent on the part of BN.com to infringe on HPB's mark or confuse customers as to the source of the books.

v. *Actual Confusion*

"Although evidence of actual confusion is not necessary to a finding of a likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." *Society of Financial Examiners*, 41 F.3d at 228 (citing *Amstar Corporation*, 615 F.2d at 263). "An absence of, or minimal, actual confusion, however, over an extended period of time of concurrent sales weighs against a likelihood of confusion." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998).

HPB has provided 22 declarations of individuals who claim that they were misled or confused by the "Half-Price Books" page on BN.com's website or by BN.com banner ads using the term. Plaintiff's Appendix at 385-414. Twelve of these declarations are from unrelated consumers, while ten of them were made by employees of HPB or persons with business relationships with HPB. *Id.* This court has previously held in this case that "ten instances of consumer confusion for seventy-five retail stores in eleven states with annual sales exceeding $110,000,000 are more accurately characterized as statistically insignificant rather than evidence of secondary meaning." August 15, 2003 Order at 11. While the court was addressing secondary meaning in the August 15 order, the same analysis may be applied to this

- 27 -

issue. Therefore, the small number of instances of actual confusion renders the existence of a genuine issue of material fact regarding actual confusion unlikely.

### vi. *Weighing the Digits*

As stated above, no single digit is dispositive of the issue, nor is a majority of the issues in favor of one party. *Westchester Media*, 214 F.3d at 664. Therefore, HPB need not establish the existence of a genuine issue of material fact on each of the digits to survive summary judgment. *Society of Financial Examiners*, 41 F.3d at 228 n. 15. Instead, HPB must establish a genuine issue of material fact from which a reasonable jury could find that the actions of BN.com were likely to cause confusion. *Id.*

It appears that there is sufficient evidence in the record to establish the existence of a genuine issue of material fact on the likelihood of confusion stemming from BN.com's use of the terms "half-price books" and "half price books." The similarity of the products, target purchasers, and advertising media all weigh heavily in the favor of HPB. Furthermore, there is a material dispute as to the similarity of the marks and BN.com's intent that, when viewed in a light most favorable to HPB, a reasonable jury could determine in HPB's favor.

### c. Fair Use

BN.com argues that even if "Half Price Books" is a protectable mark and a likelihood of confusion is shown, HPB's trademark infringement claim must fail as a

matter of law because BN.com's use of the mark is protected by the fair use defense. BN.com's Motion at 29. The fair use defense applies where "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party." 15 U.S.C. § 1115(b)(4). The fair use defense may shield an infringement defendant from liability even if a likelihood of confusion exists. See *Pebble Beach Company v. Tour 18 I Limited*, 155 F.3d 526, 545 n.12 (5th Cir. 1998); *Soweco, Inc. v. Shell Oil Company*, 617 F.2d 1178, 1189 n.30 (5th Cir. 1980), *cert. denied*, 450 U.S. 981 (1981). The fair use defense is available "only when the allegedly infringing term is used not as a trademark but 'fairly and in good faith only to describe the goods and services of [a] party.'" *Soweco*, 617 F.2d at 1185 (citing 15 U.S.C. § 1115(b)(4)).

HPB does not dispute the availability of the fair use defense to BN.com when "Half-Price Books" is used in a purely descriptive manner. HPB's Response at 30. However, HPB argues that BN.com has not used the term in a descriptive manner but as a trademark. *Id.* at 30-31. Specifically, HPB states that BN.com used the mark as an "attention-getting symbol," which HPB maintains is a trademark use. *Id.* at 31. HPB has submitted to the court several print-outs of BN.com's webpage usage of the term "Half-Price Books." Plaintiff's Appendix at 365-68. The print-outs display webpages wherein "BARNES & NOBLE.com" is found in the upper left-hand

- 29 -

corner of the webpage, while a sub-title "Half-Price Books & Special Values" appears directly under menu tabs running across the top of the page. *Id.* at 365. "Half-Price Books" appears in a bolder, larger font directly above "& Special Values." *Id.* Even though "BARNES & NOBLE.com" is displayed in all capital letters, the font size is quite similar to that of "Half-Price Books." *Id.* Moreover, while the print-outs are in black and white, HPB asserts (and the court has no reason to doubt) that the term "Half-Price Books" is displayed in a color "that is strongly reminiscent of the red in which HALF PRICE BOOKS is frequently presented on [HPB]'s signs." HPB's Response at 31. *See* Astarita Declaration ¶ 23, Defendant's Appendix at 9.

While BN.com's name is displayed on each and every page, a reasonable jury may find that the usage of "Half-Price Books" on the webpage is sufficiently prominent to suggest that there is an affiliation between HPB and BN.com. See *Pebble Beach Company*, 155 F.3d at 546 (citing *Sands, Taylor & Wood Company v. Quaker Oats Company*, 978 F.2d 947, 953-54 (7th Cir. 1992)). Therefore, HPB has directed the court to sufficient evidence in the record from which a reasonable jury could find in its favor on the issue of fair use.

### 3. *Texas Anti-Dilution Claim*

The Texas Anti-Dilution Statute provides that a "person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade

- 30 -

name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services." TEX. BUS. & COM. CODE Ann. § 16.29 (Vernon 2002). To succeed on a claim under the Anti-Dilution Statute, HPB must show (1) that it owns a distinctive mark and (2) that there is a likelihood of dilution. *E. & J. Gallo Winery v. Spider Webs Limited*, 286 F.3d 270, 278 (5th Cir. 2002).

   In its motion for summary judgment, BN.com asserts that HPB's dilution claim must fail because "Half Price Books" is not a distinctive mark. BN.com's Motion at 31-32. To support its contention that the mark is not distinctive, BN.com reurges its arguments regarding the mark's classification and its argument that the mark lacks any secondary meaning. *Id.* However, a mark may be distinctive under the Anti-Dilution Statute if it has acquired secondary meaning. See *E. & J. Gallo Winery v. Spider Webs Limited*, 129 F. Supp. 2d 1033, 1037 (S.D. Tex. 2001) ("Distinctiveness can be proved through the uniqueness of the mark or because it has acquired a secondary meaning."), *aff'd*, 286 F.2d 270 (5th Cir. 2002). As stated above, sufficient evidence exists on the issue of whether "Half Price Books" has acquired secondary meaning to support a finding in favor of HPB; the resolution of this issue will greatly affect the validity of HPB's dilution claim. Thus, there is sufficient evidence in the record to create a genuine issue of material fact as to HPB's dilution claim.

- 31 -

## III. CONCLUSION

For the reasons stated above, HPB's motion to strike is **DENIED**.  Genuine issues of material fact exist with regard to the claims asserted by HPB; thus, BN.com's motion for summary judgment is also **DENIED**.

**SO ORDERED**.

November **22**, 2004.

_____
A. JOE FISH
CHIEF JUDGE