1   QUARLES & BRADY LLP
    Gregory P. Sitrick
2   Isaac S. Crum
    One Renaissance Square
3   Two North Central Avenue
    Phoenix, Arizona 85004-2391
4   Telephone: (602) 229-5317
    Facsimile: (602) 420-5198
5   E-mail: Gregory.sitrick@quarles.com

6   SEYFARTH SHAW LLP
    Christopher C. Larkin (admitted *pro hac vice*)
7   2029 Century Park East
    Suite 3500
8   Los Angeles, California 90067-3021
    Telephone: (310) 201-5289
9   Facsimile: (310) 201-5219
    E-mail: clarkin@seyfarth.com
10
    Attorneys for Defendant and Counterclaimant
11  JACK DANIEL'S PROPERTIES, INC.

12              **UNITED STATES DISTRICT COURT**

13              **FOR THE DISTRICT OF ARIZONA**

14  VIP PRODUCTS, LLC,                    Case No. CV-14-2057-PHX-SMM

15              Plaintiff,                **MOTION AND MEMORANDUM
                                          OF POINTS AND AUTHORITIES
16          v.                            IN SUPPORT OF MOTION FOR
                                          PARTIAL SUMMARY JUDGMENT
17  JACK DANIEL'S PROPERTIES, INC.,

18              Defendant.

19                                        **ORAL ARGUMENT REQUESTED**
    AND RELATED COUNTERCLAIMS
20

21

22

23

24

25

26

27

28

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

LEGAL STANDARD FOR SUMMARY JUDGMENT ................................. 2

ARGUMENT ............................................................................................. 3

I.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT THE JACK DANIEL'S TRADE DRESS IS DISTINCTIVE AND NOT FUNCTIONAL ............................................. 3

    A.    The Jack Daniel's Trade Dress Has Acquired Distinctiveness as a Matter of Law. ................................. 5

        1.    VIP intentionally copied the Jack Daniel's Trade Dress ........................................................................ 5

        2.    Extensive and longstanding use, advertising, and exposure establish secondary meaning in the Jack Daniel's Trade Dress. .............................................. 9

    B.    Mr. Wolinsky's Opinion Does Not Create a Genuine Dispute of Fact as to Distinctiveness. ........................... 11

        1.    Mr. Wolinsky failed to even consider whether the Jack Daniel's Trade Dress had acquired distinctiveness. ............. 11

        2.    Mr. Wolinsky's deposition testimony confirms that the Jack Daniel's Trade Dress has acquired distinctiveness. ................................................... 12

        3.    Mr. Wolinsky applied an incorrect legal framework. ........... 13

    C.    There is No Genuine Dispute of Material Fact That Jack Daniel's Trade Dress is Non-Functional as a Matter of Law. ........................................................ 14

        1.    The Jack Daniel's Trade Dress is not functional as a utilitarian matter. ................................................ 14

        2.    The Jack Daniel's Trade Dress is not aesthetically functional. ........................................................ 17

II.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT THE MARK SHOWN IN THE REGISTRATION IS DISTINCTIVE AND NOT FUNCTIONAL. .............................................. 20

    A.    There is No Genuine Dispute of Material Fact That the Mark Shown in the Registration is Distinctive. .................... 20

    B.    There is No Genuine Dispute of Material Fact That the Mark Shown in the Registration is Not Functional. .................... 21

i

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1

1.     Advertisements for Jack Daniel's whiskey do not tout the utilitarian advantages of the mark shown in the Registration. ...........................................................................22

2.     The mark shown in the Registration does not result from a comparatively simple or inexpensive method of manufacture. ...........................................................................22

3.     The mark shown in the Registration does not yield a utilitarian advantage. ...........................................................23

4.     There are numerous alternative designs to the mark shown in the Registration. ......................................................28

CONCLUSION ...........................................................................................................30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

QB\37088998.5

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ............................................................... 2

4

*Anheuser-Busch, Inc. v. VIP Products, LLC*,
    666 F. Supp. 2d 974 (E.D. Mo. 2008) .................................... 1

5

6

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
    581 F.3d 1138 (9th Cir. 2009) ............................................... 9

7

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
    457 F.3d 1062 (9th Cir. 2006) ................................. 17, 18, 19

8

*Brunswick Corp. v. British Seagull*,
    35 F.3d 1527 (Fed. Cir. 1994) ............................................. 17

9

10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................. 2

11

*Clamp Mfg. Co. Inc. v. Enco Mfg. Co. Inc.*,
    870 F.2d 512 (9th Cir.1989) ................................................. 9

12

13

*Clicks Billiards v. Sixshooters Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ............................. 4, 13, 15, 16

14

*Disc Golf Ass'n v. Champion Discs, Inc.*,
    158 F.3d 1002 (9th Cir. 1998) ............................. 15, 16, 21, 22

15

16

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir.1992) ............................................... 9

17

*Elliot v. Google Inc.*,
    45 F. Supp. 3d 1156 (D. Ariz. 2014) .................................... 3

18

19

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
    741 F. Supp. 2d 1165 (C.D. Cal. 2012) ..........................passim

20

*Fuddruckers, Inc., v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir.1987) ............................................... 16

21

22

*Globefill Inc. v. Elements Spirits, Inc.*,
    473 F. App'x 685 (9th Cir. 2012) (unpublished) ................. 29

23

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
    4 F.3d 819 (9th Cir. 1993) .............................................. 4, 15

24

25

*Lisa Frank, Inc. v. Impact Int'l, Inc.*,
    799 F. Supp. 980 (D. Ariz. 1992) ......................................... 5

26

*Pagliero v. Wallace China Co.*,
    198 F.2d 339 (9th Cir. 1952) .............................................. 17

27

28

iii

QB\37088998.5

*Schieffelin & Co. v. The Jack Co. of Boca, Inc.*,
   850 F. Supp. 2d 232 (S.D.N.Y. 1994)......................................................... 8

*Switchmusic.com, Inc. v. U.S. Music Corp.*,
   416 F. Supp. 2d 812 (C.D. Cal. 2006)....................................................... 3

*Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*,
   349 F.3d 601 (9th Cir. 2003)............................................................. 15, 20

*Tie Tech, Inc. v. Kinedyne Corp.*,
   296 F.3d 778 (9th Cir. 2002)................................................................... 21

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
   532 U.S. 23 (2001)................................................................................. 18

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985)................................................................. 5

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992)................................................................................. 5

*Vision Sports, Inc. v. Melville Corp.*,
   888 F.2d 609 (9th Cir. 1989)......................................................... 4, 5, 9

*Vuitton Et Fils S.A. v. J. Young Enters., Inc.*,
   644 F.2d 769 (9th Cir. 1981)................................................................. 19

*Zobmondo Entertainment, LLC v. Falls Media, LLC*,
   602 F.3d 1108 (9th Cir. 2010)............................................................... 20

**Statutes**

15 U.S.C. § 1057 .......................................................................................... 20

15 U.S.C. § 1115 .......................................................................................... 20

15 U.S.C. § 1125 ............................................................................................ 4

**Other Authorities**

May 15, 2015 Order granting VIP's Motion to Amend (Doc. 47)........................... passim

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 2

iv

1    Plaintiff VIP Products, LLC's ("VIP") Amended Complaint (Doc. 49) contains

2    three claims for relief.  Defendant Jack Daniel's Properties Inc. ("JDPI") moves for

3    partial summary judgment dismissing the Second and Third Claims, which respectively

4    seek: (1) a declaratory judgment that the Jack Daniel's Trade Dress and the mark shown

5    in United States Trademark Registration No. 4,106,178 (the "Jack Daniel's Bottle

6    Design" or the "Registration") are functional (AC ¶ 51), contain merely ornamental and

7    decorative features that do not function as trademarks (AC ¶ 52), are generic (¶¶ 53–54),

8    and are non-distinctive (¶¶ 55–56),[1] and (2) cancellation of the Registration on the

9    grounds asserted in the Second Claim for Relief (AC ¶¶ 57–62).  JDPI also moves for

10   partial summary judgment striking the related Affirmative Defenses in ¶¶ 65–67 and 71–

11   72 (alleging that the asserted marks and trade dress failed to achieve secondary meaning

12   and are invalid) of VIP's Amended Answer to JDPI's Counterclaims (Doc. 50) as to all

13   of Jack Daniel's asserted trademarks and trade dress.[2]

14                              **INTRODUCTION**

15   VIP makes "parody" dog toys that copy the packaging of well-known products.

16   Its choice to do so has nothing to do with competitive need and everything to do with the

17   knowledge that toys that look like instantly-recognizable brands will sell better than

18   generic toys.  To paraphrase the Geico television commercials, when you're a self-styled

19   "parodist" like VIP, you copy packaging that's famous and distinctive.  It's what you do.

20   It's what VIP did in *Anheuser-Busch, Inc. v. VIP Products, LLC*, 666 F. Supp. 2d 974

21   (E.D. Mo. 2008) (enjoining sales of VIP's "Buttwiper" toy), where VIP stipulated to the

---

[1] Judge Campbell held in his May 15, 2015 Order granting VIP's Motion to Amend (Doc. 47) ("Order") that VIP's genericness and ornamentation claims "are simply different ways of claiming that the bottle design is not distinctive."  Order at 3, n.1.  JDPI thus will not separately address genericness and ornamentation on this motion.

[2] VIP nominally has raised the defense that JDPI's thirteen registered trademarks (*see* Counterclaim ¶¶ 11–12 (Doc. 15-1)) are invalid.  JDPI's registrations are presumptively valid and no evidence has been adduced to the contrary.  Summary judgment striking this portion of the affirmative defenses is appropriate.

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

distinctiveness and non-functionality of the Budweiser beer trade dress that it had copied. And it's what VIP did here.

What you don't do—indeed what you couldn't do—is copy packaging that is non-distinctive, functional, merely ornamental, or generic.  But ever since VIP was allowed to amend its pleadings, it has claimed, in effect, that it did just that.  That claim is baseless. VIP's owner Stephen Sacra *admitted* that making a parody toy involves "incorporating memorable elements to be able to make the parody more effective," that "Jack Daniel's is more recognizable than other brands.  But they've spent a lot of money to make that recognition," and that the success of the Bad Spaniels toy "comes from the fact that people are familiar with Jack Daniel's . . .  and have seen it before, and will get the parody."  Statement of Undisputed Facts ("Stmt.") ¶¶ 40–42.  For the reasons discussed below, VIP's admitted copying, and the reasons for it, require that VIP's invalidity claims and defenses be summarily dismissed, leaving for trial the issue on which VIP originally began this action: whether its alleged parody infringes or dilutes the Jack Daniel's trademarks and trade dress.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  JDPI bears the initial burden of proving the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  For issues on which JDPI bears the burden of proof at trial, e.g., the protectability of the Jack Daniel's Trade Dress, JDPI's initial summary judgment burden is met by marshaling the evidence to foreclose the possibility that a reasonable trier of fact could find for VIP. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 147 (1970).  Where VIP bears the burden of proof at trial, e.g., on its challenge to the Registration, JDPI may carry its initial burden by proving the absence of evidence to support VIP's case.  *Celotex*, 477 U.S. at 325. Summary judgment may be granted where there is insufficient evidence to support the non-movant's claim that a trademark or trade dress is invalid.  *Elliot v. Google Inc.*, 45 F.

2

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Supp. 3d 1156, 1160 (D. Ariz. 2014) (granting summary judgment dismissing declaratory judgment claims and petition to cancel registered marks on ground of genericness). Summary judgment is appropriate here on VIP's claims that JDPI's registered trademark and unregistered trade dress are non-distinctive and functional because a reasonable trier of fact could only find for JDPI on those claims.

## ARGUMENT

JDPI served discovery directed to the factual bases for VIP's allegations that the asserted Jack Daniel's Trade Dress and the Jack Daniel's Bottle Design were invalid. VIP responded that it would rely on its experts John Howard and Martin Wolinsky, and a document entitled "American Whiskey/Bourbon Report" prepared during this case by Mr. Sacra based on Internet research ("Sacra Report").[3] Stmt. ¶ 2. The undisputed facts derived from the reports and depositions of VIP's experts, from the depositions of Mr. Sacra and VIP's designer Elle Phillips, and from the declarations of Philip Epps, Michael Taylor, and Christopher Hungerford, employees of JDPI's licensee Brown-Forman Corporation ("Brown-Forman"), show that the Jack Daniel's Trade Dress and the Jack Daniel's Bottle Design are non-functional and distinctive as a matter of law.

**I.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT THE JACK DANIEL'S TRADE DRESS IS DISTINCTIVE AND NOT FUNCTIONAL**

"'Trade dress refers generally to the total image, design, and overall appearance of a product,' and may include the packaging of a product or the design of a bottle." Order at 3 (*quoting Switchmusic.com, Inc. v. U.S. Music Corp.*, 416 F. Supp. 2d 812, 819 (C.D. Cal. 2006)). "A protectable trade dress is a list of discrete elements that make up the 'total image' of a product and may include features such as size, shape, color, color combinations, texture or graphic'." *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1172 (C.D. Cal. 2012) (*quoting Int'l Jensen, Inc. v.*

---

[3]Mr. Sacra is not being offered as an expert, Stmt. ¶ 109, and it is doubtful that the Sacra Report meets the requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure, but as shown below, even if any of it is admissible, it does not create a triable dispute on any issue.

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    *Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)).  "Trade dress protection is
2    broader in scope than trademark protection because it 'protects aspects of packaging and
3    product design that cannot be registered for trademark protection' and because it
4    'requires the court to focus on the entire selling image'." *Id.* (*quoting Vision Sports, Inc.*
5    *v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989)).  In analyzing trade dress for all
6    purposes, courts focus "not on the individual elements, but rather the overall visual
7    impression that the combination and arrangement of those elements create." *Clicks*
8    *Billiards v. Sixshooters Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001).
9         JDPI alleges that it owns a trade dress consisting of a combination of square bottle
10   with a ribbed neck, a black cap, a black neck wrap closure with white printing bearing the
11   OLD NO. 7 mark and a black front label with white printing and a filigreed border
12   bearing the JACK DANIEL'S mark depicted in arched lettering at the top of the label, the
13   OLD NO. 7 mark contained within a filigreed oval design in the middle portion of the
14   label beneath the JACK DANIEL'S mark and the words "Tennessee Sour Mash
15   Whiskey" in the lower portion of the label with the word
16   "Tennessee" depicted in script (the "Jack Daniel's Trade Dress").



17   Stmt. ¶ 1.  It is shown to the right:
18
19        Although many elements of the Jack Daniel's Trade Dress
20   are registered, including the entire front label and the stylized
21   JACK DANIEL'S and OLD NO. 7 marks, (Counterclaim ¶¶ 11–
22   12 (Doc. 15-1)), their combination is not, and JDPI bears the
23   burden of proving that the Jack Daniel's Trade Dress is
24   distinctive and non-functional.  *Clicks,* 251 F.3d at 1258; 15 U.S.C. § 1125(a)(3).
25        The undisputed facts show that VIP copied the Jack Daniel's Trade Dress in
26   creating its Bad Spaniels toy to take advantage of the public recognition of the Jack
27   Daniel's packaging resulting from extensive and longstanding sales, advertising, and
28   public exposure of the product.  They establish that the Jack Daniel's Trade Dress has

4

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    acquired distinctiveness as a matter of law.  The undisputed facts also show that the

2    combination of elements in the Jack Daniel's Trade Dress is not functional, as a matter of

3    utility or aesthetically, as a matter of law.

4

5    **A.    The Jack Daniel's Trade Dress Has Acquired Distinctiveness as a Matter of Law.[4]**

6         "The trade dress of a product is 'distinctive and capable of being protected if it

7    *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary

8    meaning'."  Order at 4 (*quoting Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769

9    (1992)) (emphasis in original).  Here, there is no genuine dispute of material fact that the

10   Jack Daniel's Trade Dress has *acquired* distinctiveness for at least two reasons: (1) VIP

11   intentionally copied the Jack Daniel's Trade Dress, which strongly supports an inference

12   of secondary meaning, and indeed admitted its existence, and (2) there is uncontroverted

13   evidence establishing secondary meaning.

14         1.    VIP intentionally copied the Jack Daniel's Trade Dress.

15         One factor in analyzing secondary meaning is "proof of intentional copying of the

16   trade dress by the defendant."  *Fiji Water*, 741 F. Supp. 2d at 1177 (*citing Vision Sports*,

17   888 F.2d at 615).  Proof of intentional copying "strongly supports" an inference of

18   secondary meaning.  *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 989 (D.

19   Ariz. 1992) (*citing Vision Sports*, 888 F.2d at 615); *see also Transgo, Inc. v. Ajac*

20   *Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) ("[t]here is no logical

21   reason for the precise copying save an attempt to realize upon a secondary meaning that

22   is in existence.")  Unlike in most trade dress cases, where copying is denied, VIP admits

23   that it copied the Jack Daniel's Trade Dress—and that it did so precisely to enable

24   consumers to instantly recognize Jack Daniel's whiskey as the "target" of the Bad

25

26   _____

27   [4]Because VIP's claims of genericness and ornamentation are subsumed within its claim
     that the Jack Daniel's Trade Dress is not distinctive, Order at 3, n.1, proof of acquired
     distinctiveness as a matter of law precludes the subsumed claims as well.  Mr. Wolinsky
28   and Mr. Sacra also agreed that the Jack Daniel's packaging is not generic.  Stmt. ¶ 88.

Spaniels toy.  Mr. Sacra testified that "[i]t's not easy creating parody," which involves "incorporating memorable elements to be able to make the parody more effective," and he claimed that the success of the Bad Spaniels toy "comes from the fact that people are familiar with Jack Daniel's . . .  and have seen it before, and will get the joke."   Stmt. ¶¶ 40–42.  The undisputed facts regarding the creation of the Bad Spaniels toy show that the Jack Daniel's Trade Dress has acquired distinctiveness as a matter of law.

Mr. Sacra recalled getting the inspiration for the toy while having dinner in a bar.  Stmt. ¶ 3.  VIP's Amended Complaint shows a number of whiskey brands, but Mr. Sacra was aware of only three of them, Jack Daniel's, Jim Beam, and Evan Williams, when he conceived of the toy, and Jack Daniel's was the first product that popped up in his mind.  Stmt. ¶¶ 4–5.  He promptly called Elle Phillips, who has designed all the toys in VIP's Silly Squeaker line.  Stmt. ¶ 6.  The call was very short, with Mr. Sacra simply saying something to the effect of "Bad Spaniels.  You figure it out."  Stmt. ¶ 7.  Ms. Phillips got the reference to Jack Daniel's whiskey and started designing a label.  Stmt. ¶ 8.

Mr. Sacra did not tell Ms. Phillips what the label should look like, Stmt. ¶ 9, but he did not need to.  Ms. Phillips has been familiar with Jack Daniel's since she was a teenager, and has consumed it in bars and at home.  Stmt. ¶ 10.  Before pulling a bottle from her liquor cabinet, she recalled from memory "[t]he black and white label, sort of a cursive font for Tennessee, simple type."  She remembered the label from print ads.  Stmt. ¶ 12.  She also recalled from memory the square shape of the bottle and the use of a number on the neck label.  Stmt. ¶ 11.  After she got the bottle, she looked at and examined it to "get inspiration," and placed it on her desk while she sketched a label.  She referenced it "every now and then throughout the process."  Stmt. ¶ 13.

Ms. Phillips placed "Old No. 2" in her label sketch in the middle of an oval, where "Old No. 7" appears on the Jack Daniel's label, "[b]ecause I wanted it to be similar to the Jack Daniel's bottle."  Stmt. ¶ 14.  She placed the word "Tennessee" at the bottom of her label because "we wanted it to be a parody of the Jack Daniel's bottle, and 'Tennessee' is a very prominent piece of that."  Stmt. ¶ 15.  Her completed sketch had some "decent

6

1    similarities" to the bottle, and she e-mailed it to Mr. Sacra.  He replied "Looks good.
2    Mock it up."  Stmt. ¶ 16.
3         Ms. Phillips then created a digital label and sent it to Mr. Sacra.  Stmt. ¶ 17.  She
4    chose a black-and-white color scheme because those are the colors of the Jack Daniel's
5    label.  Stmt. ¶ 18.  It was important for her label to be close to the Jack Daniel's
6    label, so on her own initiative she sent Mr. Sacra a second label that she told him was "maybe a bit
7    closer to the JD label," because it moved "Bad Spaniels" inside the banner, where the
8    JACK DANIEL'S word mark appears.  Stmt. ¶¶ 19–20, 22.  She assumed that she
9    depicted "Bad Spaniels" in an arched format in the second label because the JACK
10   DANIEL'S word mark appears that way on its label.  Stmt. ¶ 21.  Mr. Sacra liked the
11   second label better than the first.  Stmt. ¶ 23.
12        Ms. Phillips next developed artwork for the product, as well as the product's neck
13   label and bottle cap, using elements from the label to do so.  Stmt. ¶ 24.  The artwork
14   bore a disclaimer referencing the Jack Daniel Distillery, which Ms. Phillips inserted on
15   her own.  Stmt. ¶ 25.  She also developed a "hang tag" to be attached to the back of the
16   toy, which bore the same disclaimer.  Stmt. ¶¶ 26–27.  She later created pages for VIP's
17   2014 and 2015 catalogs that showed the Bad Spaniels toy in a bar setting with hanging
18   bottles, one of which she said might be recognized as a Jack Daniel's bottle.  Stmt. ¶ 28.
19        Mr. Sacra was responsible for the appearance of the toy's vinyl "bottle."  Stmt.
20   ¶ 29.  He sent his manufacturer in China a "concept for a new bottle shape," which was a
21   picture of three Jack Daniel's whiskey bottles that he got off the Internet in "response to a
22   search for Jack Daniel's," together with Ms. Phillips' label and artwork.  Stmt. ¶ 30.  The
23   picture was the first one that came up in his search, and he did not consider using any
24   other bottles.  Stmt. ¶ 31.  VIP's manufacturer created a mock bottle bearing a different
25   label and sent a picture of it to Mr. Sacra.  Stmt. ¶ 32.  The mock bottle was in the shape
26   of the bottle shown in the Registration, not the earlier generation of the bottle that was
27   shown in Mr. Sacra's picture, but Mr. Sacra did not notice any difference at the time.
28   Stmt. ¶ 33.  He simply responded, "The bottle is Perfect."  Stmt. ¶ 33.  He did not know

7

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

until this litigation that there had even been a bottle change, but he agreed that the pre-

and post-2011 bottles were essentially the same.  Stmt. ¶ 34.

The finished Bad Spaniels toy is shown to the right.

Mr. Sacra agreed that it copied all of the claimed elements

of the Jack Daniel's Trade Dress, including the shape of the

bottle, the color scheme of the neck and front labels, the

stylization and positioning of the JACK DANIEL'S and OLD

NO. 7 marks and the word "Tennessee," and the product's font

and other graphic elements.  Stmt. ¶ 36.  He felt that the toy

would "bring up imagery of Jack Daniel's," the sole target of its

alleged humorous message.  Stmt. ¶¶ 37–38.  After its introduction, it was referred to by

a VIP customer online as a "Jack Daniel's style squeaker toy."  Mr. Sacra did not tell the

customer to do so.  Stmt. ¶ 35.



"[I]t is unremarkable that [VIP] selected as the target of parody a readily

recognizable product; indeed, one would hardly make a spoof of an obscure or unknown

product!"  *Schieffelin & Co. v. The Jack Co. of Boca, Inc.*, 850 F. Supp. 2d 232, 248

(S.D.N.Y. 1994) (enjoining parody of Dom Perignon champagne bottle).[5]  VIP's own

witnesses agreed that Jack Daniel's whiskey is a readily "recognizable product."  Mr.

Sacra testified that it "is more recognizable than other brands.  But they've spent a lot of

money to make that recognition."  Stmt. ¶ 42.  Ms. Phillips, who advises her clients about

branding, testified that Jack Daniel's is a well-known brand, that the Jack Daniel's label

is very recognizable, and that the combination of the bottle and label is well known.

Stmt. ¶ 44.  VIP's expert Mr. Wolinsky, a former spirits industry executive, testified that

Jack Daniel's is one of the best-selling whiskeys in the United States, and the best seller

among the brands that he discussed in his report.  Stmt. ¶ 45.  The undisputed facts

---

[5]VIP has similarly "targeted" other well-known products in its Silly Squeakers line.
Stmt. ¶ 39.

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    regarding the sales, advertising, and exposure of Jack Daniel's whiskey, corroborate this

2    testimony, and confirm acquired distinctiveness as a matter of law.

3              2.      Extensive and longstanding use, advertising, and exposure establish
                       secondary meaning in the Jack Daniel's Trade Dress.
4

5         "Secondary meaning can [also] be established by . . . the length and manner of

6    advertising, the amount of sales and number of customers, the length, manner and

7    exclusive use of the particular trade dress. . ." *Fiji Water*, 741 F. Supp. 2d at 1177 (*citing*

8    *Vision Sports*, 888 F.2d at 615).  Survey evidence and direct consumer testimony are not

9    required.  *Art Attacks Ink, LLC v. MGA Entm't Inc*., 581 F.3d 1138, 1145–46 (9th Cir.

10   2009).  Evidence of use and advertising over a substantial period of time can establish

11   secondary meaning.  *Clamp Mfg. Co. Inc. v. Enco Mfg. Co. Inc*., 870 F.2d 512, 517 (9th

12   Cir.1989); *E. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1291 (9th Cir.1992)

13   (holding that a mark acquired secondary meaning due to continued use for forty-six years

14   and "extensive and expensive advertising and promotion").

15        Jack Daniel's whiskey has been sold for more than 100 years.  Stmt. ¶ 46.  By the

16   mid-1950's, the packaging and labeling for Jack Daniel's whiskey had taken the basic

17   form in which it has appeared ever since.  Stmt. ¶ 47.  Mr. Wolinsky, who reviewed

18   historical Jack Daniel's packaging, agreed that the product's black cap, black neck wrap

19   with the OLD NO. 7 mark in white printing, and black front label with white printing

20   containing the JACK DANIEL'S mark in arched lettering at the top, the OLD NO. 7

21   mark in a filigreed oval in the middle, and the words "Tennessee Sour Mash Whiskey" in

22   script at the bottom of the label, have remained essentially the same in appearance for

23   decades.  Stmt. ¶ 48.

24        Jack Daniel's whiskey has been the best-selling whiskey in the United States for

25   nearly 20 years.  Stmt. ¶ 50.  Through its distribution and sale in various sizes, the Jack

26   Daniel's packaging has been exposed for decades to millions of consumers through

27   display of the product in "off-premise" (retail) and "on-premise" (bar and restaurant)

28   accounts.  Stmt. ¶ 49.  JDPI's licensee Brown-Forman has supported sales of the product

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  through distribution of point-of-sale promotional items, many of which feature or have

2  consisted of the product's packaging.  Stmt. ¶ 52.  Between 1997 and 2015, total case

3  sales of Jack Daniel's whiskey from Brown-Forman to distributors exceeded 75,000,000

4  units, yielding revenues exceeding $10,000,000,000.  Stmt. ¶ 51.  The vast majority of

5  these sales was in packaging bearing the Jack Daniel's Trade Dress.  Stmt. ¶ 51.

6       Print advertising for Jack Daniel's whiskey commenced in the 1950s and has

7  continued to the present, making the campaign one of the longest-running consumer

8  campaigns in American history.  Stmt. ¶ 53.  Most of it has highlighted the Jack Daniel's

9  packaging.  Print advertisements for Jack Daniel's whiskey have appeared in a wide

10 variety of publications (Stmt. ¶ 54) and many hundreds of millions of dollars have been

11 expended on advertising and promotion of Jack Daniel's whiskey.   Stmt. ¶ 55.  Within

12 the past several years, advertising for Jack Daniel's whiskey has been concentrated on

13 television, the Internet and social media, and out-of-home ("OOH") media such as

14 billboards.  Stmt. ¶ 56.  The Jack Daniel's packaging has been highlighted in most of the

15 television and on-line advertising, and is the focal point of the OOH advertising.  Stmt.

16 ¶ 57.  More than $100,000,000 has been expended to date in the United States on such

17 television advertising.  Stmt. ¶ 58.  For the past several years, Brown-Forman's annual

18 budget for advertising in these three media has exceeded $15,000,000.  Stmt. ¶ 59.

19      The Jack Daniel's packaging has appeared in numerous motion pictures and

20 television programs seen by many millions of Americans, and has been exposed to the

21 American public through its status as the unofficial "drink of choice" of celebrities such

22 as Frank Sinatra and Mick Jagger.  Stmt. ¶¶ 60–62.  The packaging is also featured

23 prominently on the website at www.jackdaniels.com, which last year was visited more

24 than 4,000,000 times, on social media pages for the brand, at well-attended events like

25 music festival and motorcycle rallies, where it often takes the form of a large inflatable

26 whiskey bottle, and at the Jack Daniel Distillery in Lynchburg, Tennessee, which last

27 year had about 270,000 visitors.  Stmt. ¶¶ 63–66.  Brown-Forman's tracking studies

28 confirm a very high level of awareness for the Jack Daniel's brand.  Stmt. ¶ 43.

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    VIP's deliberate copying and the undisputed facts regarding the sale, advertising,

2    promotion, and public exposure of Jack Daniel's whiskey establish that the Jack Daniel's

3    Trade Dress has acquired distinctiveness.  *Fiji Water*, 741 F. Supp. 2d at 1177.  VIP

4    cannot rebut this showing.

5

6    **B.    Mr. Wolinsky's Opinion Does Not Create a Genuine Dispute of Fact as to Distinctiveness.**

7    VIP stated it would rely on Mr. Wolinsky to show that Jack Daniel's Trade Dress

8    is not distinctive.  Stmt. ¶ 2.  He opined in his report that "the overall Jack Daniel's

9    Tennessee whiskey package *is not distinctive* (not Unique) . . ."  Stmt. ¶ 77 (emphasis in

10   original).  No reasonable trier of fact could find that his opinion creates a genuine dispute

11   of material fact on the issue of acquired distinctiveness because his report completely

12   fails to address that issue.  Moreover, his deposition testimony actually supports the

13   existence of acquired distinctiveness and he did not apply the proper legal framework for

14   his opinions, as he focused on individual elements of the trade dress rather than the

15   overall impression of the combination of elements.  Given these failures, JDPI's evidence

16   of acquired distinctiveness is unrebutted.

17        1.    Mr. Wolinsky failed to even consider whether the Jack Daniel's Trade Dress had acquired distinctiveness.

18

19   Mr. Wolinsky had no understanding of the term "distinctiveness" in trademark

20   law.  He could not define it, and had never heard of the concepts of inherent and acquired

21   distinctiveness.  Stmt. ¶ 77.  He did not know whether packaging could become

22   distinctive through sales, advertising, and exposure of a product to the public, and he did

23   not believe that any copying of the Jack Daniel's Trade Dress by VIP mattered on the

24   issue of distinctiveness.  Stmt. ¶¶ 78–79.  Mr. Wolinsky's report and opinions are limited

25   (unwittingly) to his understanding of *inherent* distinctiveness, not acquired

26   distinctiveness, even though he had never heard of that concept.  In his report, he opined

27   that distilled spirits packaging falls into one of two categories: "Uniform" or "Unique."

28   Stmt. ¶ 80.  "Uniform" packaging "adopts the 'functional' path," while "'Unique'

11

packaging totally breaks away from the Uniform path of brands of the Segment and introduces a totally different overall 'look' to the package, appearing distinct." Stmt. ¶ 80.  He testified that "[d]istinctive" packaging is packaging that "looks like it's not part of the uniform." Stmt. ¶ 81.  This led him to categorize the trade dress of well-known spirits like Jim Beam bourbon, Beefeater gin, Absolut vodka, and Jose Cuervo tequila as all not distinctive (and thus all unprotectable, in his view) because they are not "Unique." Stmt. ¶ 82.

While it may be true that to be inherently distinctive, trade dress must be "so 'unique, unusual, or unexpected in [a] market that one can assume without proof that that it will be automatically be perceived by consumers as an indicator of origin,'" *Fiji Water*, 741 F. Supp. 2d at 1176, it is self evident that trade dress does not need to be "unique" to acquire distinctiveness and become protectable.  Order at *3 (trade dress may be inherently distinctive *or* "may also acquire distinctiveness through secondary meaning"). The opinion in Mr. Wolinsky's report does not create a genuine dispute of fact on the issue of distinctiveness because JDPI is not required to show that the Jack Daniel's Trade Dress was or is "Unique" to establish that it has become protectable through acquired distinctiveness, and his opinion never addresses acquired distinctiveness.

2.   Mr. Wolinsky's deposition testimony confirms that the Jack Daniel's Trade Dress has acquired distinctiveness.

At his deposition, Mr. Wolinsky claimed that "distinctiveness is a continuum" even though his report categorized packaging only as "Unique" or "Uniform." Stmt. ¶ 83.  He stated that if he were to "redo the report" after being deposed, it would "be more--it would be deeper" and "it was not laid out here as it could have been." Stmt. ¶ 84.  He then claimed that within categories of "Uniform" products there are "levels" of distinctiveness, and that within the bourbon/Tennessee whiskey category, there is "some distinction, but not pure distinction." Stmt. ¶ 85.  He effectively conceded that distinctiveness can be acquired by a "Uniform" product whose packaging is not "Unique" as he defined that term.  He went on to testify that Jack Daniel's whiskey has achieved

12

significant sales success and was the best-selling product among the bourbon/Tennessee whiskey products that he considered, and he opined that the Jack Daniel's packaging was more distinctive than two of the other five whiskeys in his report.  Stmt. ¶ 86.  A reasonable trier of fact could only find that this opinion supports JDPI's showing of acquired distinctiveness.

### 3. Mr. Wolinsky applied an incorrect legal framework.

In trade dress cases, courts must focus "not on the individual elements, but rather the overall visual impression that the combination and arrangement of those elements create."  *Clicks,* 251 F.3d at 1259.  Mr. Sacra agreed: "It has been made clear by the courts that you cannot consider the use of individual elements on their own and you must look at the combination of the elements as a group in their entirety."  Stmt. ¶ 67.  But Mr. Wolinsky did not do so.[6]  While his opinion purports to address the "overall Jack Daniel's Tennessee packaging," which he testified was "the visual as a consumer would see it," the entire package shown in his report, Stmt. ¶ 71, he did not actually consider the entire package, instead cherry-picking what he called the "four common characteristics" of bourbon/Tennessee whiskey packaging: (1) a square bottle with a ribbed neck, (2) a black cap, (3) a black wrap closure with white printing, and (4) a black front label with white printing.  Stmt. ¶ 88.  He undoubtedly did so because he had no idea what the term "trade dress" means in trademark law or in the spirits business, and had never heard the term before this case.  Stmt. ¶ 70.

Mr. Wolinsky's report focuses solely on these four individual features.  Stmt. ¶¶ 72–76, 88.[7]  He claimed that his understanding of the elements of the Jack Daniel's Trade Dress was based on what was shown and described in JDPI's counterclaims, and

---

[6]Neither did the Sacra Report, whose report suffers from the same flaws as Mr. Wolinsky's opinion, as it focuses on individual elements rather than the overall impression of the combination of elements.  Stmt. ¶¶ 67, 69.

[7]It is self-evident that JDPI does not claim an exclusive right to use these features, either alone or in combination, because Jack Daniel's whiskey co-exists with other products whose packaging embodies some or all of these features.

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

that he did not know where he got his understanding that JDPI sought exclusive rights in the "four common characteristics" or why he did not include the other elements of the Jack Daniel's Trade Dress in his report. *Id.* He agreed that the omitted elements were important to the appearance of the overall Jack Daniel's package to some degree or another because, as he put it, "as the consumer sees the package, they probably do not dissect it as we are trying to do here today." Stmt. ¶ 73. When asked whether he ever considered incorporating the omitted elements in his definition of the overall Jack Daniel's packaging in his report, he admitted "I should have." Stmt. ¶ 74. But after reviewing his transcript, he changed his answer to "I did." Stmt. ¶ 75. He claimed that he had misunderstood the question, even though he was admonished to say so on the record and did not do so when this question was asked. Stmt. ¶ 75.

Mr. Sacra, who claimed to have done an exhaustive study of whiskey packaging, admitted that he has not seen any other packaging that embodies all elements of the Jack Daniel's Trade Dress. Stmt. ¶ 68. That fact separately makes Mr. Wolinsky's opinion regarding distinctiveness worthless because it is not based on the required consideration of all elements of the Jack Daniel's Trade Dress. *See Fiji Water*, 741 F. Supp. 2d at 1176 (finding plaintiff's trade dress to be distinctive, even though use of certain elements was "fairly common" in the industry, because no other brands combined the claimed elements of the trade dress).

The undisputed facts show that the Jack Daniel's Trade Dress has acquired distinctiveness as a matter of law. VIP's Second Claim for Relief directed to the non-distinctiveness of the Jack Daniel's Trade Dress should be dismissed.

### C. **There is No Genuine Dispute of Material Fact That Jack Daniel's Trade Dress is Non-Functional as a Matter of Law.**

#### 1. The Jack Daniel's Trade Dress is not functional as a utilitarian matter.

To determine whether trade dress is functional as a utilitarian matter, the Ninth Circuit "considers four factors: (1) whether advertising touts the utilitarian advantages of

the design, (2) whether the particular design results from a comparatively simple or inexpensive method of manufacture, (3) whether the design yields a utilitarian advantage, and (4) whether alternative designs are available." *Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003) (citing *Disc Golf Ass'n v. Champion Discs, Inc*., 158 F.3d 1002, 1006 (9th Cir. 1998)).  The functionality "'inquiry is not directed at whether the individual elements are functional, but whether the whole collection of elements taken together are functional.'"  *Fiji Water,* 741 F. Supp. 2d at 1172 (*quoting Int'l Jensen,* 4 F.3d at 822); *see also Clicks,* 251 F.3d at 1259.

Summary judgment is appropriate on this issue because the Jack Daniel's Trade Dress reflects aesthetic design choices and embodies branding features that focus on the historical identification of the product, and that are wholly unrelated to utility.  Stmt. ¶ 95.  Mr. Sacra agreed: "[I]f you combine all the parts of the trade dress as a whole--I mean, Old No. 7 or Jack Daniel's or--filigree, those are all ornamental" and "the filigree, the name, the cartouche, all of those things are just ornamental," because "they express to someone the message they are trying to convey."  Stmt. ¶ 166.  Just like the *Fiji Water* plaintiff, JDPI seeks to protect the square "shape of the bottle, together with aesthetic elements" of the Jack Daniel's Trade Dress—nothing more.  *Id.* at 1174.  "Taken together, the design elements of [the Jack Daniel's bottle] are purely aesthetic."  *Id.*  As in *Fiji Water*, this truncates and simplifies the analysis of utilitarian functionality.

VIP indicated that it would attempt to show functionality through its experts' reports and the Sacra Report.  Stmt. ¶ 2.  But as shown below at pp. 22–23, Mr. Howard *admitted* that advertising for Jack Daniel's whiskey does not tout any utilitarian advantages of the Jack Daniel's Bottle Design, and a review of the advertising confirms that it does not tout any utilitarian advantage of the other elements of the Jack Daniel's Trade Dress.  Stmt. ¶¶ 54, 110–113.  The advertising instead focuses on the quality and history of Jack Daniel's whiskey.  *Id.*  This *Disc Golf* factor can only support a finding that the Jack Daniel's Trade Dress is not functional.  As shown below at pp. 22–23, the Jack Daniel's Trade Dress is not the result of a comparatively simply or inexpensive

15

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    process of manufacture.  This *Disc Golf* factor also can only support a finding that the

2    Jack Daniel's Trade Dress is not functional.

3          The Jack Daniel's Trade Dress does not provide any utilitarian advantages.

4    "[A]esthetic elements such as the font and size of the lettering on the label, the strategic

5    placement of certain design elements, or the use of a particular phrase are not utilitarian

6    advantages." *Fiji Water,* 741 F. Supp. 2d at 1172.  As shown below at pp. 23–28, VIP

7    cannot show that the Jack Daniel's Bottle Design *per se* provides any utilitarian

8    advantages, but even if it could, that would be insufficient as a matter of law to show that

9    the Jack Daniel's Trade Dress as a whole is functional "because it focuses on a single

10   element rather than 'the overall visual impression' of the trade dress as a whole."  *Id.* at

11   1172 (even if square bottle element of plaintiff's claimed trade dress might be functional,

12   that would not make plaintiff's trade dress functional because the "'fact that individual

13   elements of the trade dress may be functional does not necessarily mean that the trade

14   dress *as a whole* is functional'" (*quoting Clicks,* 251 F.3d at 1259)); *see also*

15   *Fuddruckers, Inc., v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir.1987) ("We

16   examine trade dress as a whole to determine its functionality; functional elements that are

17   separately unprotectable can be protected together as a part of a trade dress." (internal

18   citation omitted)).

19         Finally, as shown in the Sacra Report and elsewhere, there are many, many

20   alternative trade dresses available and in use for whiskey.  Stmt. ¶¶ 96, 159.  Some spirits

21   companies use discrete elements of the Jack Daniel's Trade Dress, including a square

22   bottle, and graphic features such as filigree and arched lettering, but as Mr. Sacra

23   admitted, Stmt. ¶ 68, "none combine all of these elements together with" the other

24   elements of the Jack Daniel's Trade Dress.  *Fiji Water,* 741 F.Supp.2d at 1174.  "Since

25   competitors routinely use alternative designs in packaging their [whiskey], protecting the

26   particular combination of elements in the [Jack Daniel's] packaging will not hinder

27   competition in the [spirits] industry."  *Id*.

28

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

QB\37088998.5

1    VIP can offer no contrary evidence that the Jack Daniel's Trade Dress is

2    functional as a matter of utility, as Mr. Wolinsky claims only that the Jack Daniel's Trade

3    Dress is aesthetically functional and Mr. Howard offers no opinion on the subject.  Stmt.

4    ¶¶ 108, 163.  The undisputed facts show that the Jack Daniel's Trade Dress is not

5    functional as a matter of utility as a matter of law.  VIP's Second Claim for Relief

6    directed to the utilitarian functionality of the Jack Daniel's Trade Dress should be

7    dismissed.

8              2.    The Jack Daniel's Trade Dress is not aesthetically functional.

9          The doctrine of aesthetic functionality only "retains some limited vitality" in the

10   Ninth Circuit.  *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062,

11   1070 (9th Cir. 2006).  As Judge Campbell stated in the Order, "trade dress is aesthetically

12   functional when it "'serve[s] an aesthetic purpose wholly independent of any source

13   identifying function,' or in other words, where the consumer is driven to purchase the

14   product based on how it looks."  Order at 4 (quoting *Fiji Water*, 741 F. Supp. 2d at 1173

15   (*quoting Au-Tomotive Gold*, 457 F.3d at 1072–74)).

16         "The concept of an 'aesthetic' function that is non-trademark-related has enjoyed

17   only limited application."  *Au-Tomotive Gold*, 457 F.3d at 1073.  Two examples given in

18   that case of trade dress that serves an "'aesthetic' function that is non-trademark-related,"

19   and that could cause consumers to purchase a product based on how it looks, were the

20   color black for outboard motors at issue in *Brunswick Corp. v. British Seagull*, 35 F.3d

21   1527, 1532 (Fed. Cir. 1994), which the *Au-Tomotive Gold* court said "served [a]

22   nontrademark purpose by reducing the apparent size of [an] outboard motor engine," and

23   the decorative floral patterns on hotel china at issue in *Pagliero v. Wallace China Co.*,

24   198 F.2d 339, 343 (9th Cir. 1952), which the *Au-Tomotive Gold* court said "were

25   attractive and served nontrademark purpose because 'one of the essential selling features

26   of hotel china, if, indeed, not the primary, is the design'."  *Id.*  It "is difficult to

27   extrapolate from cases involving a true aesthetically functional feature, like a box shape

28   or certain uses of color, to cases involving well-known registered logos and company

17

names, which generally have no function apart from their association with the trademark holder." *Id.* As a matter of law, the Jack Daniel's Trade Dress, which includes the "well-known registered logos and company names" JACK DANIEL'S and OLD NO. 7 and a registered label design, does not constitute a "true aesthetically functional feature" that "serve[s] an aesthetic purpose wholly independent of any source identifying function." *Fiji Water*, 741 F. Supp. 2d at 1173.

"[U]nder the aesthetic functionality test, trade dress is functional if 'protection of the [trade dress] as a trademark would impose a significant non-reputation-related competitive disadvantage." Order at 4 (*quoting Au-Tomotive Gold*, 457 F.3d at 1072 (*citing TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32–33 (2001)). Because the combination of elements in the Jack Daniel's Trade Dress is not a true aesthetically functional feature that serves an aesthetic purpose wholly independent of any source-identifying function, enforcing the Jack Daniel's Trade Dress against VIP's dog toy cannot possibly impose *any* non-reputation-related disadvantage on any spirits companies. As noted above, some spirits companies already use the "four elemental elements" of the Jack Daniel's trade dress that VIP claims renders the Jack Daniel's Trade Dress aesthetically functional, but "none combine all of these elements together with" the other elements of the Jack Daniel's Trade Dress. *Fiji Water*, 741 F. Supp. 2d at 1174. "Since competitors routinely use alternative designs in packaging their [whiskey], protecting the particular combination of elements in the [Jack Daniel's] packaging will not hinder competition in the [spirits] industry." *Id*. There is no evidence to the contrary.

Mr. Wolinsky's opinion does not create a genuine dispute of fact here either. He opined that the overall Jack Daniel's Tennessee whiskey package "*is clearly aesthetically functional*," Stmt. ¶ 163 (emphasis in original), but as with the concept of distinctiveness, he had no idea what aesthetic functionality means in trademark law, testifying that "[t]hose words are way beyond me," and that he was not even sure if the term was a real one. Stmt. ¶ 89. He thought that it described packaging "that appeals to the consumer and it looks like part of a category." Stmt. ¶ 90. This is at odds with Ninth Circuit law,

18

1   which has "squarely rejected the notion that 'any feature of a product which contributes

2   to the consumer appeal and saleability of the product is, as a matter of law, a functional

3   element of that product'." *Au-Tomotive Gold*, 457 F.3d at 1073 (*quoting Vuitton Et Fils*

4   *S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 773 (9th Cir. 1981)).  Under his

5   "understanding" of aesthetic functionality trade dress protection could not exist in the

6   spirits industry (except for a handful of products) because he opined that the trade dress

7   of Beefeater gin, Jose Cuervo tequila, and Canadian Club whiskey, and of all of the

8   American whiskeys in his report, were *all* aesthetically functional.  Stmt. ¶ 91.  No

9   reasonable trier of fact could accept his opinion on the aesthetic functionality of the Jack

10  Daniel's Trade Dress simply based on his misunderstanding of the concept.

11       Mr. Wolinsky's report also concluded that "giving Jack Daniel's exclusive rights

12  to use the combined four features of the bottle and label design of the Jack Daniel's Old

13  No. 7 Tennessee whiskey would impose a competitive disadvantage on other companies

14  selling Kentucky and Tennessee American whiskey" by "depriv[ing] those competing

15  companies [of] the ability to use a standard industry 'uniform,'" but he failed to provide

16  any supporting bases or evidence.  Stmt. ¶¶ 92–93, 164.  As discussed above, JDPI does

17  not and could not claim the exclusive right to use these "combined four features of the

18  bottle and label design" because some competitors already use them.  Under the

19  circumstances, it is not surprising that Mr. Wolinsky could not explain how or why (or

20  even which) competitors would be disadvantaged if JDPI prevailed against the Bad

21  Spaniels toy.  He eventually opined that only those seeking to enter the marketplace

22  would be disadvantaged because, as to competitors already using the "four common

23  characteristics," "[w]ell, they are in the marketplace,"  Stmt. ¶ 93, but he did not explain

24  how.  Mr. Sacra similarly admitted that he had no evidence that the claimed Jack Daniel's

25  Trade Dress had any effect on the ability of competitors to compete with Jack Daniel's.

26  Stmt. ¶ 94.  VIP simply has no evidence that the Jack Daniel's Trade Dress is

27  aesthetically functional.

28

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  The undisputed facts show that the Jack Daniel's Trade Dress is not aesthetically

2  functional as a matter of law.  VIP's Second Claim for Relief directed to the aesthetic

3  functionality of the Jack Daniel's Trade Dress should be dismissed.

4  **II.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT THE
         MARK SHOWN IN THE REGISTRATION IS DISTINCTIVE AND NOT
5        FUNCTIONAL.**

6  The mark in the Registration is shown to the right:



7  A federal registration is prima facie evidence of a mark's

8  validity, shifting the burden on any invalidity claim from the registrant

9  to the challenger.  15 U.S.C. §§ 1057(b); 1115(a); *see, e.g., Zombondo*

10 *Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 (9th

11 Cir. 2010) ("federal registration provides 'prima facie evidence' of the

12 mark's validity and entitles the plaintiff to a 'strong presumption' that

13 the mark is a protectable mark").  The Patent and Trademark Office issued the

14 Registration without requiring JDPI to prove the distinctiveness of the mark, Stmt. ¶ 97,

15 which creates a presumption that the mark is inherently distinctive.  *Zombondo*, 602 F.3d

16 at 1114.  The Registration also creates a presumption that the mark is non-functional.

17 *Talking Rain*, 349 F.3d at 603.  "[T]he presumption of validity is a strong one and the

18 burden on the defendant necessary to overcome that presumption at summary judgment is

19 heavy."  *Zombondo*, 602 F.3d at 1115.

20

21 **A.    There is No Genuine Dispute of Material Fact That the Mark Shown in
         the Registration is Distinctive.**

22 VIP stated that Mr. Wolinsky's report would show that the Registration is invalid

23 on multiple grounds, but his report never even mentions any such ground.  Stmt. ¶¶ 2, 98.

24 Mr. Howard, however, testified that the shape of the Jack Daniel's bottle "is part of a

25 marketing program to make the bottle distinctive from competitors," which has

26 succeeded because the bottle was "very distinctive," Stmt. ¶¶ 100–101, that the bottle has

27 become a "classic design" for whiskey, Stmt. ¶ 102, and that the bottle shape is more eye-

28 catching than the "Jack Daniel" signature and is what does the most to identify the

20

1  product as coming from Jack Daniel's.  Stmt. ¶ 103–104.  He also testified that another

2  company that used the features in the Registration would infringe JDPI's rights.  Stmt.

3  ¶ 105.  Because the mark in the Registration is already presumed to be inherently

4  distinctive and because VIP's own expert admitted that the mark is distinctive, a

5  reasonable trier of fact could only find that the mark is distinctive, and is not generic or

6  ornamental, and summary judgment on this claim is appropriate.

7

8  **B.     There is No Genuine Dispute of Material Fact That the Mark Shown in the Registration is Not Functional.**

9  The Registration covers "the three-dimensional configuration of the square shaped

10  bottle container for the goods, having an embossed ridge or scalloped design on the neck

11  portion of the bottle, and an embossed signature design comprised of the words 'JACK

12  DANIEL'."  Mr. Howard agreed that the registered mark is a combination of these

13  elements rather than the discrete elements themselves.  Stmt. ¶ 106.

14  The test for utilitarian functionality under the Ninth Circuit's *Disc Golf* case is

15  discussed at pp. 14–15 above.  To survive summary judgment, VIP must overcome the

16  presumption of non-functionality afforded by the Registration by introducing "sufficient

17  and undisputed facts demonstrating functionality."  *Tie Tech, Inc. v. Kinedyne Corp*., 296

18  F.3d 778, 783 (9th Cir. 2002).  It cannot do so.

19  VIP's evidence of functionality consists of Mr. Howard's report and testimony.[8]

20  This is insufficient to overcome the presumption of non-functionality because Mr.

21  Howard failed to consider the functionality of the "the whole collection of elements taken

22  together," *Fiji Water*, 741 F. Supp. 2d at 1172, and, in any event, cannot provide any

23  evidence on any *Disc Golf* factor that shows that the registered mark as a whole is

24  primarily functional.  In fact, the *Disc Golf* factors when taken together weigh *against* a

25

26  _____

   [8]As noted above, Mr. Wolinsky never addresses the Registration, and Mr. Sacra testified
27  that he has no knowledge of whether the shape of the Jack Daniel's bottle affects the cost
   of the product or its packaging or its ease of use, or whether it was the result of a
28  comparatively simple or inexpensive method of manufacture.  Stmt. ¶ 109.

QB\37088998.5

finding of functionality and do not overcome the presumption of validity of the

Registration.

   1.   Advertisements for Jack Daniel's whiskey do not tout the utilitarian advantages of the mark shown in the Registration.

   Mr. Howard agreed that the Jack Daniel's whiskey bottle embodies the registered

mark, Stmt. ¶ 99, and admitted that advertising for the product does not tout any

utilitarian advantages of the mark.  Stmt. ¶ 110–113.  He "looked to see if there was any

copy or advertising statements about the shape of the bottle being an advantage and I

really couldn't find very much."  *Id*.  The only advertising mentioned in his report was on

the Jack Daniel's websites, and "the copy in the ads was not--I guess touting is the best

word.  They weren't touting the functionality of the bottle."  *Id*.  They were "just talking

about the way it looks" (the aesthetic appearance of the bottle, "[b]ut that's not touting

the utilitarian advantage."  Stmt. ¶ 112.  He agreed that other Jack Daniel's advertising

did not tout the utilitarian advantages of the bottle design.  Stmt. ¶ 113.  Mr. Sacra, VIP's

Rule 30(b)(6) designee on its invalidity claims and defenses, testified that he had not seen

any such advertising.  Stmt. ¶ 165.  The undisputed facts show that this factor can only

support a finding that VIP has not rebutted the presumption that the mark shown in the

Registration is not functional.

   2.   The mark shown in the Registration does not result from a comparatively simple or inexpensive method of manufacture.

   Mr. Howard was not even asked to look at this *Disc Golf* factor, Stmt. ¶ 114, but

he admitted that the production of the Jack Daniel's Bottle Design does not result from a

comparatively simple or inexpensive method of manufacture.  Stmt. ¶¶ 115–118.  He

testified that a round bottle would very possibly be less expensive and easier to

manufacture than a square bottle, and that the Jack Daniel's bottle was probably a more

expensive and complex bottle to manufacture than a round one.  *Id*.  This was due to the

glass blowing process and the natural tendency of molten glass to assume a round shape.

Stmt. ¶ 117.  He acknowledged that the greater cost and complexity involved in the

manufacture of a square bottle and the use of an embossed signature was why so few

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  such bottles with those features are actually in use.  Stmt. ¶ 118.  His testimony is

2  consistent with the actual process of manufacturing the bottle shown in the Registration,

3  which is more expensive and more difficult to manufacture than its predecessor and any

4  round bottles, and involves the most complex bottle structure that Brown-Forman has

5  used in at least the past 20 years.  Stmt. ¶¶ 117, 119, 121.

6        Mr. Howard explicitly testified that the features shown in the Registration do not

7  affect the cost or quality of Jack Daniel's whiskey, or that if they do, they affect the

8  product by *increasing* the cost of the bottle.  Stmt. ¶¶ 119–120.  His testimony confirms

9  that the Jack Daniel's Bottle Design is not the result of a comparatively simple or

10  inexpensive process of manufacture.  The undisputed facts show that this factor can only

11  support a finding that VIP has not rebutted the presumption afforded by the Registration

12  that the mark is not functional.

13            3.  <u>The mark shown in the Registration does not yield a utilitarian</u>
14               <u>advantage.</u>

15        In Mr. Howard's report, he claimed that the combined features of the mark shown

16  in the Registration yielded several utilitarian advantages.  They are discussed below, with

17  some aggregation, summary, and reorganization for the Court's ease of reference.

18        **Opinion 1:** <u>The square bottle shape minimizes the cubic inches required for</u>
19               <u>packaging.</u>

20        Mr. Howard essentially recanted this claim at his deposition.  He denied that he

21  meant that fewer cubic inches of glass are used for the same volume of liquid when the

22  package shape is square, not round, Stmt. ¶ 120, and claimed that he was actually talking

23  about "when you start to package it or display it or how it's utilized."  Stmt. ¶ 120.

24        **Opinion 2:** <u>The square shape reduces the cost of packing, shipping and displaying</u>
25               <u>the bottle and allows more bottles to be displayed in retail stores.</u>

26        Mr. Howard could not substantiate this opinion.  He opined that a square shape

27  allows more bottles to be displayed on a retail shelf, but admitted that: (1) he never asked

28  any retailers how they determined the number of "facings" (the number of bottles

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    displayed on a shelf), (2) retailers were likely to determine the number of facings by the

2    level of sales of the respective products, not by the shape of their bottles, because "what

3    happens is you are allocated so much shelf space for each brand," (3) he would have to

4    measure shelf space to determine whether by using a square bottle rather than a round

5    bottle, a retailer could display a larger number of bottles in the same shelf space, but had

6    never measured bottles or counted the number of facings in any retailer, and (4) a square

7    bottle and a round bottle holding the same volume of liquid could have the same

8    "footprint" (width), and the same number of bottles with the same footprint could be

9    placed on a given shelf.  Stmt. ¶¶ 123–127.  The footprints of 750 ml. bottles of Jack

10   Daniel's whiskey and of Canadian Mist whiskey (sold in a round bottle) are in fact

11   virtually the same.  Stmt. ¶ 137.  This opinion does not create a genuine dispute of fact.

12          Mr. Howard opined that a square shape allows more bottles to be displayed on a

13   floor or point-of-purchase display, but admitted that: (1) he had only looked at and

14   measured a display carton for Jack Daniel's whiskey, (2) while he "had a feeling" that

15   shipping cartons for round bottles would take more paperboard and be larger, he had

16   taken no measurements of any other cartons, even though "they were there right in front

17   of me," and (3) while he "believed" that less corrugated paperboard would be used to

18   make a carton for round bottles, he "would want to verify it," and had not done so.  Stmt.

19   ¶¶ 127–132.  The cartons for bottles of Jack Daniel's Old No. 7 whiskey and of Canadian

20   Mist Canadian whiskey are in fact virtually the same size.  Stmt. ¶ 137.  This opinion

21   does not create a genuine dispute of fact.

22          Mr. Howard opined that the use of a square bottle would reduce shipping costs

23   because of the use of less corrugated paperboard, but admitted that he did not take any

24   measurements, do any research, or look at any literature, articles, or anything else to test

25   what he called his "supposition."  Stmt. ¶ 131.  Equally speculative was his opinion that

26   "the cartons for square bottles fit better on a standard pallet size, which eliminates the

27   additional costs and reduces the likelihood of damage if cartons need to hang over the

28   edge of the pallet to maximize the number of cartons-per-pallet," because his opinion was

24

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

based on the relative sizes of cartons for square bottles and round bottles, about which he had no information.  Stmt. ¶¶ 132–133.  He further admitted that: (1) his opinions regarding what he called "palletization" were not based on any measurements or review of pallets, (2) he had no idea how frequently pallet displays were used in the retailing of alcoholic beverages or in what types of retail outlets they were used, (3) there was a standard size pallet, applicable to a variety of products, on which he saw Jack Daniel's bottles mounted, but he did not know its dimensions, (4) he did not see any pallets displaying cartons containing other bottles, and (5) he did not know the relative pallet sizes for spirits sold by Brown-Forman in round bottles or whether they were different. Stmt. ¶¶ 133–137.  The pallet sizes for Jack Daniel's whiskey and Canadian Mist whiskey are virtually the same.  Stmt. ¶ 137.  This opinion does not create a genuine dispute of fact.

**Opinion 3:**  <u>The square shape enhances retail display and the legibility of the labels.</u>

Mr. Howard could not substantiate his opinion that the flat sides of a square bottle enhance the visual display and legibility of labeling.  He opined that square bottles display labels better than round bottles because on round bottles "the graphics are receding around the bottle," Stmt. ¶ 138, but admitted that he did not do or see any studies, tests, or measurements about how much information is "lost" when a label is used on a round bottle as opposed to a square bottle, and thus could not quantify the claimed effect.  Stmt. ¶ 141.  He also admitted that this "problem" could be solved simply by making labels on round bottles slightly smaller in size.  Stmt. ¶ 138.

The square Jack Daniel's bottle has a three-sided label, and two of the three sides are not visible when the bottle has a frontal shelf facing, but Mr. Howard did not think that this was a problem because the non-visible sides contain "mostly body copy.  It's not the brand name or the contents."  Stmt. ¶ 139.  The Sacra Report shows numerous non-square bottles that bear labels clearly showing the brand name and the contents of the products, the key labeling elements identified by Mr. Howard.  Stmt. ¶ 140.  He claimed

that a number of these labels were not clearly visible, Stmt. ¶ 140, but no reasonable trier of fact could agree with him, as no spirits producer would use labeling that did not clearly and legibly display the brand name and contents.

Mr. Howard acknowledged that round bottles were far more prevalent than square bottles despite the claimed labeling problem, "[p]robably because of the cost," Stmt. ¶ 142, and that he had no knowledge of how labels are applied either to the square Jack Daniel's bottle or the round Canadian Mist bottle. Stmt. ¶ 143. It is in fact more difficult to apply labels to the square Jack Daniel's bottle than to a round bottle such as the Canadian Mist bottle. Stmt. ¶ 144. This opinion does not create a genuine dispute of fact.

**Opinion 4:** <u>The corners of the bottle keep it from chipping or breaking during bottling and shipping.</u>

Mr. Howard testified that it "had been a while" since he last looked at a glass bottling line, possibly more than 10 years, Stmt. ¶ 150, and admitted that: (1) he had no familiarity with the Jack Daniel's labeling and filling line, (2) had made no effort to inspect it, (3) did not know how it actually worked, and (4) had no knowledge about the chipping and breaking rates for bottles in the line. Stmt. ¶ 146. His knowledge of chipping and breaking during the labeling and filing of glass bottles was based on his experience in the 1970s and not on any research or studies. Stmt. ¶ 147. The Jack Daniel's Bottle Design created breakage problems in production, on the filing and labeling line, and in the field, the latter of which required a redesign of the bottle's shoulder. Stmt. ¶ 148. This opinion does not create a genuine dispute of fact.

**Opinion 5:** <u>The square shape of the bottle and the embossed scalloped design of the neck improve gripping.</u>

Mr. Howard said that he "believed," in forming this opinion, that the Jack Daniel's bottle was gripped by the "flats" (the body) when it is moved and by the neck when it is poured, but his belief was not based on any observation of people in stores, bars, or restaurants, but rather on "Myself. Stmt. ¶ 149. I've had the bottles for a couple of

26

1    weeks," and his wife.  *Id.*  He was not aware of any studies on how or how well people

2    grip bottles.  Stmt. ¶ 150.

3        With respect to the improved grip made possible by a square bottle, Mr. Howard

4    testified that a round bottle is more likely to slip out of the hand than a square bottle when

5    the bottle is wet, but that it in the case of dry bottles, the only basis for his opinion was

6    "the ergonomics of your hand interface with various products."  Stmt. ¶ 151.  His opinion

7    regarding how the "hand interface[s] with various products" led him to conclude that the

8    square shape of the bottle's body and what he called the "rounded" shape of the bottle's

9    neck *both* improve gripping, and to opine that a square bottle neck might be as good as

10    the round one that he said in his report was optimal.  Stmt. ¶¶ 151–152.  This

11    contradiction undercuts Mr. Howard's entire claim because if both round and square

12    surfaces provide the same gripping benefits, round bottles are comparable alternatives

13    when it comes to gripping, which may partially explain why they are so much more

14    prevalent in the marketplace than square bottles.  This opinion does not create a genuine

15    dispute of fact.

16

17        **Opinion 6:**  <u>The embossed signature design is useful to identify the product at</u>
        <u>retail.</u>

18        This element of the mark in the Registration is limited to "an embossed signature

19    design comprised of the words 'JACK DANIEL'."  Mr. Howard acknowledged that the

20    "Jack Daniel" signature is branding, and that the important thing about it is that it consists

21    of JDPI's well-known brand name.  Stmt. ¶ 107.  He claimed that the benefit of the

22    embossed signature is that it "cannot be removed without destroying the bottle, providing

23    an indelible identifier of the product inside."  Stmt. ¶ 153.  This claimed benefit is

24    illusory, a "solution in search of a problem," because Mr. Howard could not explain how

25    frequently non-embossed signatures were removed, or even if it happened at all.  *Id.*  He

26    again agreed that embossing was uncommon because "it's a cost factor," Stmt. ¶ 153–

27    154, which is consistent with the facts that the Jack Daniel's embossed signature

28    increases the cost and complexity of the production of the bottle, and comprise

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

production quality control.  *Id.*  There is no evidence that the embossed "Jack Daniel" signature confers any benefit other the aesthetic one of branding.  This opinion does not create a genuine dispute of fact.

Mr. Howard could not provide evidence that the c*ombination* of the three features in the mark in the Registration provides any utilitarian benefits.  *See Fiji Water*, 741 F. Supp. 2d at 1172 (in analyzing functionality of a trademark, "the whole collection of elements" must be considered "together").  The undisputed facts show that this factor can only support a finding that VIP has not rebutted the presumption afforded by the Registration that the mark is not functional.

4.      There are numerous alternative designs to the mark shown in the Registration.

As shown above, Mr. Howard's claimed utilitarian advantages are unsubstantiated and do not create a genuine dispute of fact upon which a reasonable trier of fact could find that the presumption of validity has been overcome.  Any alleged advantages were only available through what he termed "cost trade-offs" in terms of how much it costs to manufacture the bottle.  Stmt. ¶ 155.  As a result, square bottles are relatively rare in the whiskey business.  According to Mr. Howard, the percentage of whiskey bottles in a square shape is "relatively small.  I'd say maybe eight to ten percent," and that the most common shape in use today was "probably round because of the cost, smaller cost."  Stmt. ¶¶ 156–157.  The Sacra Report similarly concluded that only 18 whiskey bottles (16% of the market as defined by VIP) embody a square shape, an embossed ridge or scalloped design on the neck portion of the bottle, and *some* embossed signature (although only JDPI uses the "Jack Daniel" signature), and just two companies use such bottles, one of whom is Brown-Forman itself.  Stmt. ¶ 158.  But merely because some competitors use one feature, such as a square bottle or a scalloped neck, does not mean that the mark as a whole is so essential that competitors will be disadvantaged if precluded from using it.  *Fiji Water*, 741 F. Supp. 2d at 1174 ("Several other brands do use square-shaped bottles . . . many brands use blue caps. . . and several brands use

28

QB\37088998.5

1   tropical foliage elements . . . but none combine all of these elements together with the

2   font and three-dimensional effect identified in FIJI's trade dress . . . Since competitors

3   routinely use alternative designs in packaging their bottled water products, protecting the

4   particular combination of elements of the FIJI packaging will not hinder competition in

5   the bottled water industry.").  As noted above, there are many, many alternative bottle

6   designs available and in use for whiskey.  Stmt. ¶¶ 96, 159.  Where "alternative bottle

7   designs are available in abundance; and using the design increases, rather than decreases,

8   [] manufacturing" costs, those elements weigh in favor of a finding of nonfunctionality.

9   *See Globefill Inc. v. Elements Spirits, Inc.*, 473 F. App'x 685, 686 (9th Cir. 2012)

10  (unpublished).

11          As with the Jack Daniel's Trade Dress, VIP cannot show that any distillers will be

12  disadvantaged if they are not permitted to use the precise combination of elements in the

13  Registration, including the "Jack Daniel" signature.  The Sacra Report claims that there

14  are other square whiskey bottles with embossed or scalloped necks and embossed

15  signatures, as well as bottles containing one or two of those features, and Mr. Sacra had

16  no information that since the issuance of the Registration, any competitor had been

17  impacted by it.  Stmt. ¶167.  If the Registration gave JDPI the unlawful competitive

18  advantage alleged by VIP, one or more distillers would have opposed the application that

19  matured into the Registration when it was published for opposition in 2010, or sought

20  cancellation of the Registration after it issued in 2012.  But none did.  Stmt. ¶¶ 161–162,

21  167.  VIP has no information that since the issuance of the Registration, any competitor

22  has been impacted by the existence of the Registration.  Stmt. ¶ 162.  The only reasonable

23  inference to be drawn from these facts is that there is no competitive need to use the

24  combination of elements shown in the Registration.

25          VIP cannot introduce "sufficient and undisputed facts demonstrating

26  functionality" of the mark in the Registration to overcome the presumption that it is not

27  functional.  Because the undisputed facts show that VIP cannot rebut the presumption of

28

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   non-functionality afforded by the Registration, its Second and Third Claims for Relief

2   directed to the Registration should be dismissed.

3                                   **CONCLUSION**

4          For all of the foregoing reasons, JDPI's Motion for Partial Summary Judgment

5   dismissing the Second and Third Claims for Relief in the Amended Complaint (Doc. 49)

6   of VIP and striking VIP's Affirmative Defenses in paragraphs 65–67 and 71–72 in VIP's

7   Amended Answer to JDPI's Counterclaims (Doc. 50) should be granted in its entirety.

8   October 23, 2015                            Respectfully submitted,

9                                               */s/ Gregory P. Sitrick*
                                                Gregory P. Sitrick  (AZ Bar #028756)
10                                              Gregory.Sitrick@quarles.com
                                                Isaac S. Crum (AZ Bar #026510)
11                                              Isaac.Crum@quarles.com
                                                QUARLES & BRADY LLP
12                                              Firm State Bar No. 00443100
                                                One Renaissance Square
13                                              Two North Central Avenue
                                                Phoenix, AZ 85004
14                                              Telephone (602) 229-5200
                                                Facsimile: (602) 229-5690
15
                                                SEYFARTH SHAW LLP
16                                              Christopher C. Larkin
                                                (admitted *pro hac vice*)
17                                              clarkin@seyfarth.com
                                                2029 Century Park East, Suite 3500
18                                              Los Angeles, California 90067-3021
                                                Telephone: (310) 201-5289
19                                              Facsimile: (310) 201-5219

20                                              Attorneys for Defendant and
                                                Counterclaimant
21                                              JACK DANIEL'S PROPERTIES, INC.

22

23

24

25

26

27

28

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT

QB\37088998.5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record in this case.

*/s/ Gregory P. Sitrick*

Gregory P. Sitrick

QB\37088998.5