1    QUARLES & BRADY LLP
     Gregory P. Sitrick
2    Isaac S. Crum
     One Renaissance Square
3    Two North Central Avenue
     Phoenix, Arizona 85004-2391
4    Telephone: (602) 229-5317
     Facsimile: (602) 420-5198
5    E-mail: Gregory.sitrick@quarles.com

6    SEYFARTH SHAW LLP
     Christopher C. Larkin (admitted *pro hac vice*)
7    2029 Century Park East
     Suite 3500
8    Los Angeles, California 90067-3021
     Telephone: (310) 201-5289
9    Facsimile: (310) 201-5219
     E-mail: clarkin@seyfarth.com
10
     Attorneys for Defendant and Counterclaimant
11   JACK DANIEL'S PROPERTIES, INC.

12                  **UNITED STATES DISTRICT COURT**

13              **FOR THE DISTRICT OF ARIZONA**

14   VIP PRODUCTS, LLC,                    Case No. CV-14-2057-PHX-SMM

15                 Plaintiff,              **STATEMENT OF UNDISPUTED
                                           FACTS IN SUPPORT OF MOTION
16          v.                             FOR PARTIAL SUMMARY
                                           JUDGMENT**
17   JACK DANIEL'S PROPERTIES, INC.,

18                 Defendant.

19
     AND RELATED COUNTERCLAIMS
20

21

22

23

24

25

26

27

28

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1    Pursuant to Local Rule 56.1, defendant and counterclaimant Jack Daniel's
2   Properties, Inc. ("JDPI") submits its Statement of Undisputed Facts in support of its
3   motion for partial summary judgment on the invalidity claims and defenses of plaintiff
4   and counter-defendant VIP Products, LLC ("VIP").  The undisputed facts are derived
5   from the declarations of JDPI's witnesses Philip Epps, Christopher Hungerford, and
6   Michael Taylor, and the exhibits thereto, and the declaration of Christopher C. Larkin,
7   which authenticates pages and exhibits from the depositions of VIP's fact and expert
8   witnesses Stephen Sacra (individually and as a Rule 30(b)(6) designee), Elle Phillips,
9   John Howard, and Martin Wolinsky and other documents.

10                    **UNDISPUTED FACTS**

11         1.    Jack Daniel's Trade Dress consists of a square bottle with a ribbed neck, a
12  black cap, a black neck wrap closure with white printing bearing the OLD NO. 7 mark
13  and a black front label with white printing and a filigreed border bearing the JACK
14  DANIEL'S mark depicted in arched lettering at the top of the label, the OLD NO. 7 mark
15  contained within a filigreed oval design in the middle portion of the label beneath the
16  JACK DANIEL'S mark and the words "Tennessee Sour Mash Whiskey" in the lower
17  portion of the label with the word "Tennessee" depicted in script.  Counterclaim ¶ 6
18  (Doc. 15-1).

19         2.    VIP stated that it would rely on its experts John Howard and Martin
20  Wolinsky, and a document entitled "American Whiskey/Bourbon Report" prepared
21  during this case by VIP's owner Stephen Sacra based on Internet research ("Sacra
22  Report"), on its claims regarding the Jack Daniel's Bottle Design and Jack Daniel's Trade
23  Dress.  Larkin Decl. Ex. 8 (Interrogatory Responses).

24         3.    Mr. Sacra believes that he got the inspiration for the Bad Spaniels toy by
25  having dinner in a bar.  Larkin Decl. Ex. 2 ("Sacra Tr.") 78:14–79:3, 81:18–25.

26         4.    When Mr. Sacra conceived of the toy, he was aware of Jack Daniel's, Jim
27  Beam, and Evan Williams whiskeys, and had not seen or heard of the other whiskeys

28

1

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  shown in VIP's amended complaint.  Sacra Tr. 188:7–15; 189:11–19; 261:6–18; 263:2–

2  25; Ex. 69; 264:1–4.

3          5.      Jack Daniel's was the first product that popped up in his mind.  Sacra Tr.

4  220:24–221:6.

5          6.      Mr. Sacra promptly called Elle Phillips, VIP's designer, who has designed

6  all of the toys in VIP's Silly Squeaker line.  Larkin Decl. Ex. 1 ("Phillips Tr.") 41:12–

7  42:15; 49:11–25; Ex. 4.

8          7.      The call was very short, as Mr. Sacra simply said something to the effect of

9  "Bad Spaniels.  You figure it out."  Phillips Tr. 49:11–50:6; Sacra Tr. 82:1–17.

10         8.      Ms. Phillips figured out that "Bad Spaniels" was a reference to "Jack

11  Daniel's," and set to work on designing the label.  Phillips Tr. 50:10–16.

12         9.      Mr. Sacra did not tell Ms. Phillips what the label should look like.  Phillips

13  Tr. 50:17–20; Sacra Tr. 85:12–86:6; 88:1–4.

14         10.     Ms. Phillips has been familiar with Jack Daniel's since she was a teenager,

15  and has consumed it in bars and in her home.  Phillips Tr. 52:9–53:1.

16         11.     Before pulling a bottle of Jack Daniel's from her liquor cabinet, she

17  recalled from memory "[t]he black and white label, sort of a cursive font for Tennessee,

18  simple type," and the square shape of the bottle and the use of a number on the neck

19  label.  Phillips Tr. 53:24–54:14.

20         12.     Ms. Phillips recalled seeing the black and white label in Jack Daniel's print

21  ads.  Phillips Tr. 52:4–7.

22         13.     After retrieving the bottle, Ms. Phillips "looked at it, examined it," to get

23  inspiration, and placed the bottle on her desk while she developed a sketch.  Phillips Tr.

24  54:24–55:8; Ex. 9.  She referenced the bottle "every now and then throughout the

25  process."  Phillips Tr. 66:20–67:1.

26         14.     Ms. Phillips used "Old No. 2" in a sketch of a label and placed it in the

27  middle of an oval, where "Old No. 7" appears on the Jack Daniel's bottle, "[b]ecause I

28  wanted it to be similar to the Jack Daniel's bottle."  Phillips Tr. 56:17–57:9.

2

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

15.    Ms. Phillips placed the word "Tennessee" at the bottom of the label in her sketch, where it appears on the Jack Daniel's bottle, "[b]ecause we wanted it to be a parody of the Jack Daniel's bottle, and 'Tennessee' is a very prominent piece of that." Phillips Tr. 57:18–25.

16.    When Ms. Phillips finished her sketch, she believed that it had some "decent similarities" to the Jack Daniel's bottle, Phillips Tr. 59:13–21, and she e-mailed it to Mr. Sacra.  He responded "Looks good. Mock it up."  Phillips Tr. 60:10–16; Ex. 9; Sacra Tr. 88:5–19; Ex. 46.

17.    Ms. Phillips next developed a mock label in digital form and e-mailed it to Mr. Sacra.  Phillips Tr. 61:11–20; Ex. 10.

18.    Ms. Phillips chose a black-and-white color scheme because that is the color scheme of the Jack Daniel's label.  Phillips Tr. 62:11–17.

19.    It was important to Ms. Phillips that her design be close to the Jack Daniel's label.  Phillips Tr. 67:2–8.

20.    Ms. Phillips sent Mr. Sacra a second mock label, on her own initiative, Sacra Tr. 98:11–21; Phillips Tr. 66:9–12, under cover of an e-mail stating that the second label was "maybe a bit closer to the JD [Jack Daniel's] label."  Phillips Tr. 65:7–66:8; Ex. 12.

21.    Ms. Phillips assumed that she depicted the "Bad Spaniels" name in an arched format in the second label because "Jack Daniel's" appears in an arched format on the product label.  Phillips Tr. 67:9–19.

22.    The second label was closer to the Jack Daniel's label because it moved "Bad Spaniels" inside the banner.  Phillips Tr. 66:2–19.

23.    Mr. Sacra liked the second label better than the first.  Sacra Tr. 100:15–17.

24.    Ms. Phillips next developed artwork for an art card for the product and the product's neck and bottle cap, using elements from the label design.  Phillips Tr. 71:13–22; Ex. 15; 73:3–13.

25.    The art card contained a disclaimer on its back referring to the Jack Daniel

3

Distillery.  Phillips Tr. 74:14–23.  Ms. Phillips inserted the reference to the Jack Daniel Distillery with no input from Mr. Sacra.  Phillips Tr. 74:20–23; Sacra Tr. 173:13–17.

26.    Ms. Phillips developed the Bad Spaniel's neck label by pulling elements from the Jack Daniel's label design.  Phillips Tr. 79:11–14.

27.    Ms. Phillips also developed a package "hang tag" that was used for the back of the toy, which also contained a disclaimer referring to the Jack Daniel Distillery. Phillips Tr. 96:12–98:2; 99:13–100:1; 101:10–24; Ex. 26 & 30.

28.    Ms. Phillips later created pages that appeared in VIP's 2014 and 2015 catalogs showing the Bad Spaniels toy in a bar setting with hanging bottles, one of which she said could be recognized as an actual Jack Daniel's bottle.  Phillips Tr. 116:10–119:19; Exs. 41–42.

29.    Mr. Sacra was responsible for the design of the vinyl bottle for the Bad Spaniels toy.  Sacra Tr. 106:9–11; Ex. 47.

30.    Mr. Sacra e-mailed his bottle manufacturer in China a "concept for a new bottle shape," which covered a picture of three bottles of Jack Daniel's whiskey that he got from the Internet in "response to a search for Jack Daniel's," together with Ms. Phillips' label and artwork.  Sacra Tr. 107:8–15; 109:6–16; Ex. 47.

31.    The picture of the Jack Daniel's bottles was the first one that came up in response to Mr. Sacra's search.  Sacra Tr. 109:11–16.  He did not consider sending his manufacturer any other whiskey bottles.  Sacra Tr. 111:6–9.

32.    VIP's manufacturer did a mock up bottle bearing a different label and sent a picture of it to Mr. Sacra.  Sacra Tr. 114:15–115:6; Ex. 18.

33.    The mock up bottle was the post-2011 Jack Daniel's bottle that is shown in the Registration, not the pre-2011 bottle that was shown in Mr. Sacra's pictures, but Mr. Sacra did not notice any difference at the time.  Sacra Tr. 116:5–15.  He responded that "[t]he bottle is Perfect."  Sacra Tr. 116:21–117:13; Ex. 51.

34.    Mr. Sacra did not know until this litigation that there had been a bottle change, Sacra Tr. 117:20–118:11, but agreed that the pre- and post-2011 bottles were

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   essentially the same.  Larkin Decl. Ex. 3 ("VIP Tr.") 183:4–17.

2          35.    Following the introduction of the Bad Spaniels toy, it was displayed by one

3   of VIP's customers online as its "Jack Daniel's style squeaker toy."  Larkin Decl. ¶ 8; Ex.

4   7 (VIP Responses to Reqs. For Admission Nos. 1–6).  Mr. Sacra did not tell the customer

5   to describe the toy that way.  Sacra Tr. 236:14–237:2, 22–25; 239:1–5; Exs. 63–64.

6          36.    The completed Bad Spaniels toy copies all of the elements of the Jack

7   Daniel's Trade Dress as shown and described, including the shape of the bottle, the color

8   scheme of the neck and front labels, the stylization of the marks JACK DANIEL'S and

9   OLD NO. 7, and of the word "Tennessee," and the font and other graphic elements of the

10  product.  Sacra Tr. 223:14–224:10; 225:1–5, 19–25; 226:10–228:4.

11         37.    The Bad Spaniels toy was intended to correspond to, and did correspond to,

12  Jack Daniel's, Sacra Tr. 187:14–16, and would "bring up imagery of Jack Daniel's."

13  Sacra Tr. 188:3–4.

14         38.    The alleged humorous message of the toy was directed at Jack Daniel's

15  only and Mr. Sacra did not intend the toy to be associated with any other product.  Sacra

16  Tr. 188:21–189:10, 17–19; 217:5–218:3; 218:21–219:5; 269:4–15; 270:16–271:10;  Ex.

17  62.

18         39.    VIP has copied the packaging of other well-known brands in its Silly

19  Squeakers line.  Sacra Tr. 44:3–11; 62:8–15; 64:22–66:16; Exs. 2, 4.

20         40.    Mr. Sacra believed that "[i]t's not easy creating parody," and that the

21  success of the Bad Spaniels toy "comes from the fact that people are familiar with Jack

22  Daniel's . . .  and have seen it before, and will get the parody."  Sacra Tr. 221:6; 222:23–

23  223:1.

24         41.    The process of creating a parody involves "incorporating memorable

25  elements to be able to make the parody more effective."  Sacra Tr. 99:6–8.

26         42.    "Jack Daniel's is more recognizable than other brands.  But they've spent a

27  lot of money to make that recognition."  Sacra Tr. 221:15–17.

28         43.    Brown-Forman's tracking studies confirm a high level of aided and unaided

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  brand awareness for the Jack Daniel's brand.  Epps Decl. ¶ 5.

2       44.     Ms. Phillips, who advises her clients on their brands, testified that Jack

3  Daniel's is a well-known brand, the Jack Daniel's label is very recognizable in the United

4  States, and the combination of the bottle and label is well known in the United States.

5  Phillips Tr. 123:5–25.

6       45.     Mr. Wolinsky testified that Jack Daniel's whiskey is one of the best-selling

7  whiskeys in the United States, has been the most successful of the whiskeys that he

8  considered, and is the best known Tennessee whiskey.  Larkin Decl. at Ex. 5 ("Wolinsky

9  Tr.") 61:21–25; 235:12–236:12; 240:16–20.

10      46.     Jack Daniel's whiskey has been sold for over 100 years.  Epps Decl. ¶ 4.

11      47.     By the mid-1950's, the packaging and labeling for Jack Daniel's whiskey

12  had taken the basic form in which it has appeared ever since.  Hungerford Decl. ¶¶ 3–5;

13  Exs. 1–4.

14      48.     Mr. Wolinsky, who reviewed historical Jack Daniel's packaging, agreed

15  that elements of the Jack Daniel's label, including the black cap, a black neck wrap with

16  Old No. 7 in white printing, and a black front label with white printing containing the

17  Jack Daniel's mark in arched lettering at the top, the Old No. 7 mark in a filigreed oval in

18  the middle, and the words "Tennessee Sour Mash Whiskey" in script at the bottom of the

19  label,  have remained essentially the same for many decades.  Wolinsky Tr. 163:6–12;

20  164:4–165:6; Ex. 91 (JDPICON00023).

21      49.     Through distribution and sales of Jack Daniel's whiskey in various sizes,

22  the product's packaging has been exposed for decades to millions of consumers through

23  display of the product in retail ("off-premise") accounts, including state-owned or state-

24  regulated liquor stores, private liquor stores, grocery stores, mass merchandisers, airlines,

25  and duty-free stores, and in bar and restaurant  ("on-premise") accounts.  Epps Decl.

26  Decl. ¶ 5.

27      50.     Jack Daniel's whiskey has been the best-selling whiskey in the United

28  States since 1997.  Epps Decl. ¶ 5.

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

51.    Between 1997 and April 30, 2015, total unit sales of Jack Daniel's whiskey in the United States in various sizes exceeded 75,000,000 units, resulting in revenues exceeding $10,000,000,000.  The vast majority of these sales were in packaging bearing the Jack Daniel's Trade Dress.  Epps Decl. ¶ 6.

52.    Brown-Forman has supported sales of Jack Daniel's whiskey in on- and off-premise outlets through distribution of thousands of point-of-sale promotional items, many of which featured or, in some instances, have consisted of, the Jack Daniel's packaging.  Epps Decl. ¶ 6; Ex. 1.

53.    Print advertising for Jack Daniel's whiskey commenced in the United States in 1955 and has continued to the present, making the campaign one of the longest-running consumer advertising campaigns in American history.  Epps Decl. ¶ 7.

54.    Print advertising highlighting the Jack Daniel's packaging has appeared in a wide variety of publications, including national magazines, local magazines, newspapers, trade publications, and event programs.  Epps Decl. ¶ 7; Ex. 2.

55.    Many hundreds of millions of dollars have been expended on advertising and promotion of Jack Daniel's whiskey in the United States since 1997.  Epps Decl. ¶ 7

56.    Within the past several years, advertising for Jack Daniel's whiskey has focused on television advertising, advertising on the Internet and social media, and out-of-home ("OOH") advertising such as billboards.  Epps Decl. ¶ 8.

57.    The Jack Daniel's packaging has been highlighted in most of the television and on-line advertising, and is the focal point of the OOH advertising.  Epps Decl. ¶¶ 8–9; Exs. 3–4.

58.    Well in excess of $100,000,000 has been expended on TV advertising for Jack Daniel's whiskey since television advertising resumed after a self-imposed industry ban on the television advertising of spirits was lifted.  Epps Decl. ¶ 8.

59.    For the past several years, the current annual budget for advertising and promoting Jack Daniel's whiskey on television, in digital media, and through OOH advertising has been in excess of $15,000,000.  Epps Decl. ¶ 8.

7

60.     The packaging of Jack Daniel's whiskey has appeared in numerous motion pictures seen by many millions of Americans, including *Raiders of the Lost Ark, A Few Good Men, Mystic River, Waterworld, Pearl Harbor, Any Which Way You Can, Fisher King, Gone in 60 Seconds, Mr. Mom, Platoon, The Shining, Man on Fire, Guarding Tess, The Bridges of Madison County, Rock Star, Almost Famous, The Hard Way, The Flintstones, Blue Steel, Nobody's Fool, Lethal Weapon 3, Animal House, Goldeneye, Rock of Ages, Ted, and Won't Back Down*, and the product has been referenced in other films such as *Hud, Basic Instinct, Gran Torino, Rainmaker, Monster's Ball, and Christmas Vacation*.  Epps Decl. ¶ 10; Ex. 5.

61.     The packaging for Jack Daniel's whiskey has appeared in numerous television programs, including *Treme, True Blood, The Office, Psych, 30 Rock, Bored to Death, Bar Rescue, New Girl, Two Broke Girls, Justified, and Criminal Minds*.  Epps Decl. ¶ 10; Ex. 6.

62.     Jack Daniel's whiskey has received exposure to the public by being featured on non-entertainment television programs and by being held, or shown in use, publicly by celebrities and entertainers such as Frank Sinatra and Mick Jagger.  Epps Decl. ¶ 11; Ex. 7.

63.     Brown-Forman has also promoted a "Jack Daniel's Experience" at well-attended events like music festivals and motorcycle rallies around the country, at which it frequently uses a large inflatable version of the Jack Daniel's Old No. 7 Tennessee whiskey bottle to help event attendees identify and locate the Jack Daniel's Experience. Epps Decl. ¶ 11.

64.     The packaging for Jack Daniel's whiskey is featured prominently on the website at www.jackdaniels.com, which during calendar year 2014 was visited more than 4,000,000 times.  Epps Decl. ¶ 12; Ex. 8.

65.     The packaging for Jack Daniel's whiskey also appears on social media pages for the brand.  Epps. Decl. ¶ 12; Ex. 9.

66.     The historic Jack Daniel Distillery in Lynchburg, Tennessee, which has

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1    been in operation since the 19th Century, has offered tours of its facility for many years.

2    During calendar year 2014 the distillery had about 270,000 visitors.  The Jack Daniel's

3    packaging is displayed on various parts of the tour and elsewhere at the distillery.  Epps

4    Decl. ¶ 13.

5    67.    It has been made clear by the courts that you cannot consider the use of

6    individual elements on their own and you must look at the combination of the elements as

7    a group in their entirety.  VIP Tr. 198:17–199:2; 203:6–16.

8    68.    Mr. Sacra had not seen any whiskey product that contains all of the

9    elements of the Jack Daniel's Trade Dress claimed in this case.  VIP Tr. 200:22–201:15.

10    69.    Mr. Sacra's Report focused only on "four elemental features," not on the

11    combination of elements actually claimed by JDPI.  VIP Tr. 126:8–127:12; 129:9–16;

12    195:13–25; 220:24–221:5.

13    70.    Mr. Wolinsky had no understanding of the term "trade dress" as it is used

14    in trademark law or in the spirits business, and had never heard the term before this case.

15    Wolinsky Tr. 176:10–20.

16    71.    Mr. Wolinsky claimed that the "overall Jack Daniel's Tennessee

17    packaging" referenced in his report is "the visual as a consumer would see it," the entire

18    package as it is shown on page WOL0008 of his report, Wolinsky Tr. 152:5–14, but his

19    report focused only on the "four elemental elements."  Wolinsky Tr. 160:8–161:5.

20    72.    Mr. Wolinsky claimed that his understanding of the elements of the Jack

21    Daniel's Trade Dress was based on what was shown and described in JDPI's

22    counterclaims, Wolinsky Tr. 158:7–12, and that he did not know why he did not include

23    the omitted elements in his analysis in his report.  Wolinsky Tr. 158:16–18.

24    73.    The omitted elements were important to the appearance of the package to

25    some degree or another because "as the consumer sees the package, they probably do not

26    dissect it as we are trying to do here today."  Wolinsky Tr. 161:6–9; 260:11–17.

27    74.    When Mr. Wolinsky was asked whether he ever considered incorporating

28    the omitted elements in his definition of the overall Jack Daniel's packaging in his report,

9

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1    he replied "I should have."  Wolinsky Tr. 161:10–13.

2    75.    After reviewing his deposition transcript, Mr. Wolinsky changed this

3    answer to "I did."  His explanation was that he had misunderstood the question.

4    Wolinsky Tr. 263.  He was admonished at the outset of his deposition to say when he did

5    not understand a question, Wolinsky Tr. 8:11–9:1, and he did not do so in response to this

6    question.

7    76.    Mr. Wolinsky did not recall where he got the understanding that JDPI was

8    seeking exclusive rights in the four elements that he identified in his report.  Wolinsky

9    Tr. 244:17–22.

10   77.    Mr. Wolinsky opined in his report that the overall Jack Daniel's Tennessee

11   whiskey package "*is not distinctive* (not Unique)," Wolinsky Tr. Ex. 96, but he did not

12   know the meaning of the term "distinctive," Wolinsky Tr. 176:21–24, and had never

13   heard of the concepts of inherent distinctiveness or acquired distinctiveness.  Wolinsky

14   Tr. 176:25–177:5.

15   78.    Mr. Wolinsky did not know whether packaging could acquire

16   distinctiveness through sales, advertising, and exposure of the product to the public.

17   Wolinsky Tr. 180:13–20; 237:24–238:17.

18   79.    Any intentional copying of the Jack Daniel's Trade Dress by VIP did not

19   matter to Mr. Wolinsky on the issue of whether the trade dress was distinctive.  Wolinsky

20   Tr. 165:7–166:24.

21   80.    In his report, Mr. Wolinsky opined that distilled spirits packaging falls into

22   one of two categories: "Uniform" or "Unique."  Wolinsky Tr. Ex. 96 at WOL0004.  He

23   wrote that  "Uniform" packaging "adopts the 'functional' path," *id*., while "'Unique'

24   packaging totally breaks away from the Uniform path of brands of the Segment and

25   introduces a totally different overall 'look' to the package, appearing distinct."

26   81.    Mr. Wolinsky believed that "Distinctive" packaging is packaging that

27   "looks like it's not part of the uniform."  Wolinsky Tr. 177:6–10; 198:8–10.

28   82.    In Mr. Wolinsky's report, he opined that the packaging of many other well-

10

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  known spirits brands such as Jim Beam bourbon, Beefeater gin, Absolut, Belvedere, Grey
2  Goose vodkas, and Patron tequila is not distinctive because it is not "Unique."  Wolinsky
3  Tr. Ex. 96.

4     83.     At his deposition, Mr. Wolinsky claimed that "distinctiveness is a
5  continuum," even though his report only categorized packaging as "Unique" or
6  "Uniform."  Wolinsky Tr. 177:18–21; 179:5–18; 180:1–9.

7     84.     If Mr. Wolinsky were to "redo the report" after being deposed, it would be
8  "be more--it would be deeper" and "it was not laid out here as it could have been."
9  Wolinsky Tr. 180:1–9.

10    85.     Mr. Wolinsky claimed that within a category of "Uniform" products, there
11  are levels of distinctiveness, Wolinsky Tr. 186:14–21, and that within the bourbon
12  category, there is "some distinction but not pure distinction."   Wolinsky Tr. 255:7–16.

13    86.     The Jack Daniel's packaging is more distinctive than the Evan Williams
14  and Benchmark packaging shown in Mr. Wolinsky's report.  Wolinsky Tr. 196:15–197:3.

15    87.     The sales success of Jack Daniel's whiskey did not matter to Mr. Wolinsky
16  on the issue of whether the Jack Daniel's package was distinctive.  Wolinsky Tr. 235:11–
17  25; 236:4–17.

18    88.     The overall Jack Daniel's packaging shown in Mr. Wolinsky's report and
19  the combination of what VIP called the four "elemental features" of the Jack Daniel's
20  Trade Dress are not generic.  Wolinsky Tr. 187:6–13; VIP Tr. 198:13–16.

21    89.     Mr. Wolinsky had no understanding of the term "aesthetic functionality."
22  Wolinsky Tr. 180:22–25; 181:17–182:7; 241:6–25.  "Those words are way beyond me,"
23  Wolinsky Tr. 73:25–74:5, and he was not even sure if the term was a real one.  Wolinsky
24  Tr. 241:14–17.

25    90.     Mr. Wolinsky used the term "aesthetic[] functionality" to describe
26  packaging "that appeals to the consumer and it looks like part of a category."  Wolinsky
27  Tr. 180:25–181:5.

28    91.     Mr. Wolinsky believed that a number of well-known gins, tequilas, and

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   Canadian whiskeys, and all of the American whiskeys shown in his report, are sold in

2   packaging that is all aesthetically functional.  Wolinsky Tr. 186:22–187:1; 189:7–12;

3   189:25–190:3, 17–20.

4       92.    Mr. Wolinsky did not know how or why other companies would be

5   disadvantaged if JDPI prevails in this case.  Wolinsky Tr. 246:14–247:1; 254:3–10.

6       93.    Companies already in the marketplace would not be disadvantaged if JDPI

7   prevailed because "[w]ell, they are in the marketplace."  Wolinsky Tr. 253:6–13.

8       94.    VIP has no evidence that the claimed Jack Daniel's Trade Dress has had

9   any effect on the ability of competitors to compete with Jack Daniel's.  VIP Tr. 196:19–

10  24.

11      95.    The packaging for Jack Daniel's whiskey embodies design choices that are

12  not based on any considerations of utility but are instead intended to identify the product

13  as a Jack Daniel's product and to remain true to the historical labeling, heritage, and

14  quality image of the product.  Hungerford Decl. ¶¶ 6–9; Exs. 3–5; Taylor Decl. ¶ 4.

15      96.    There are numerous other alternative package designs available for use and

16  in use in the marketplace for whiskey in the United States.  Hungerford Decl. ¶ 10; Ex. 6;

17  Larkin Decl. Ex. 7 (VIP Responses to Reqs. For Admission Nos. 12–16).

18      97.    The United States Patent and Trademark Office issued Registration No.

19  4,106,178 (the "Registration") without requiring JDPI to prove the distinctiveness of the

20  mark.  Larkin Decl. Ex. 6.

21      98.    Mr. Wolinsky never mentions the Registration in his report.  Wolinsky Tr.

22  Ex. 96.

23      99.    The bottle for Jack Daniel's whiskey currently in use embodies the mark

24  shown in the Registration.  Larkin Decl. at Ex. 4 ("Howard Tr.") 106:5–9.

25      100.   The shaping of the Jack Daniel's bottle "is part of a marketing program to

26  make the bottle distinctive from competitors."  Howard Tr. 205:4–6.

27      101.   The Jack Daniel's bottle is very distinctive.  Howard Tr. 205:8–16.

28      102.   The Jack Daniel's bottle design has become a "classic design" for whiskey.

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   Howard Tr. 84:15–85:8.

2       103.    The overall shape of the Jack Daniel's bottle is what identifies its contents

3   as a Jack Daniel's product.  Howard Tr. 109:8–14.

4       104.    The shape of the bottle is even more eye-catching than the "Jack Daniel"

5   signature and does the most to identify the product as coming from Jack Daniel's.

6   Howard Tr. 108:10–109:6.

7       105.    If another company used the features of the mark shown in the Registration,

8   that company would be infringing JDPI's rights.  Howard Tr. 129:5–130:3.

9       106.    The mark in the Registration is a combination of elements as shown and

10  described therein rather than the discrete elements themselves.  Howard Tr. 101:11–16.

11      107.    The "Jack Daniel" signature in the mark in the Registration is branding, and

12  the important thing about the signature is that it consists of the well-known brand name

13  Jack Daniel's.  Howard Tr. 101:17–102:4, 12–16.

14      108.    Mr. Howard offered no opinion on the functionality of the Jack Daniel's

15  Trade Dress as a whole.  Howard Tr. 108:2–9.

16      109.    Mr. Sacra is not being offered as an expert, VIP Tr. 106:8–10, and had no

17  knowledge of whether the shape of the Jack Daniel's bottle affects the cost of the product

18  or its packaging, or the ease of use of the product, Sacra Tr. 265:13–266:1, or whether it

19  was the result of a comparatively simple or inexpensive method of manufacture.  VIP Tr.

20  60:13–17.

21      110.    Before preparing his report, Mr. Howard "looked to see if there was any

22  copy or advertising statements about the shape of the bottle being an advantage and I

23  really couldn't find very much."  Howard Tr. 205:22–206:5.

24      111.    Mr. Howard's references to advertisements in this report were to pages

25  from the Jack Daniel's websites and "the copy in the ads was not--I guess touting is the

26  best word.  They weren't touting the functionality of the bottle."  Howard Tr. 206:6–

27  207:2.

28      112.    The Jack Daniel's website advertising was "just talking about the way it

13

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   looks" (the aesthetic appearance of the packaging), "[b]ut that's not touting the utilitarian

2   advantage." Howard Tr. 207:9–208:9; 213:2–8; Ex. 86.

3        113.   Other Jack Daniel's advertising did not tout the utilitarian advantages of the

4   Jack Daniel's bottle design. Howard Tr. 208:16–25; Ex. 87; VIP Tr. 60:8–12.

5        114.   Mr. Howard was not asked to look at whether the Jack Daniel's bottle

6   design is the result of a comparatively simple or inexpensive method of manufacture.

7   Howard Tr. 183:6–14.

8        115.   Mr. Howard has no knowledge of the manufacturing cost of the Jack

9   Daniel's bottle. Howard Tr. 183:15–20.

10        116.   A round bottle is less expensive and easier to manufacture than a square

11   bottle. Howard Tr. 182:8–183:5; 196:6–9; Taylor Decl. ¶¶ 4–5.

12        117.   The Jack Daniel's bottle is more expensive and complex to manufacture

13   than a round bottle because of the process of glass blowing and the natural tendency of

14   glass to assume a round, not square, shape. Howard Tr. 184:10–185:8; Taylor Decl. ¶¶

15   4–5.

16        118.   The greater cost and complexity involved in the manufacture of a square

17   bottle and the use of an embossed signature is why so few such bottles with those features

18   are actually in use. Howard Tr. 182:12–17; 196:6–9; 200:15–18.

19        119.   The features of the mark shown in the Registration do not affect the cost or

20   quality of Jack Daniel's whiskey. Howard Tr. 214:13–20; 215:14–18. To the extent that

21   the design of the Jack Daniel's bottle affects the quality of the finished product or its cost,

22   the design increases, rather than decreases, the cost of the product due to the higher cost

23   of manufacturing the square bottle. Howard Tr. 215:23–217:18, 24–219:4; Taylor Decl.

24   ¶¶ 4–5.

25        120.   The square bottle shape in the Registration does not minimize the cubic

26   inches required to package the liquid contents of the bottle in comparison to a round

27   bottle and Mr. Howard testified that he was actually talking about "when you start to

28   package it or display it or how it's utilized." Howard Tr. 133:22–25; 134:1–4, 9–23.

14

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1    121.    The square bottle shape in the Registration does not reduce the cost of

2    producing, filing, labeling, packing, or displaying the bottle.  Taylor Decl. ¶¶ 5–10.

3    122.    Mr. Howard never asked any retailers how they determined the number of

4    "facings" (the number of competing bottles displayed on a shelf).  Howard Tr. 138:2–13;

5    141:13–20.

6    123.    Retailers are likely to determine the number of facings by the level of sales

7    of the respective products to be displayed, not by the shape of their bottles, Howard Tr.

8    141:21–25, because retailers allocated so much shelf space for each brand.  Howard Tr.

9    138:14–17; Taylor Decl. ¶ 10.

10    124.    Mr. Howard would have to measure shelf space to determine whether by

11    using a square bottle rather than a round bottle, a retailer could display a larger number of

12    bottles in the same shelf space, but he never measured bottles or counted the number of

13    facings in any retailer.  Howard. Tr. 93:1–94:15; 140:23–141:12.

14    125.    Mr. Howard took no measurements of pallets, store shelves, or bottles

15    during his engagement.  Howard Tr. 65:17–25.

16    126.    A square and round bottle holding the same volume of liquid could have

17    the same "footprint" (width), and the same number of bottles with the same footprints

18    could be placed on a given shelf.  Howard Tr. 145:14–146:2; Taylor Decl. ¶ 10.

19    127.    Mr. Howard looked at and measured only a display carton for Jack Daniel's

20    whiskey.  Howard Tr. 64:14–19; 66:1–7.

21    128.    Mr. Howard had "a feeling" that shipping cartons for round bottles would

22    take more paperboard and be larger, Howard Tr. 148:9–11, but took no measurements of

23    any other cartons, Howard Tr. 66:21–67:7; 67:20–69:7; 148:2–18; 149:3–15; 150:11–18,

24    even though "they were there right in front of me."  Howard Tr. 150:1–4.

25    129.    Mr. Howard "believed" that less corrugated paperboard would be used to

26    make a carton for round bottles, but would need to verify it and did not do so.  Howard

27    Tr. 151:6–152:1.

28    130.    Mr. Howard took no measurements and did no research to assess his

15

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   hypothesis that every carton for a certain number of round bottles would be larger than a

2   carton for the same number of square bottles.  Howard Tr. 157:14–158:3.

3      131.   Mr. Howard took no measurements, did no research, and looked at no

4   literature or articles or anything else to test what he called his "supposition" that the use

5   of a square bottle would reduce shipping costs because of the use of less corrugated

6   paperboard.  Howard Tr. 152:14–23; 155:5–13; 157:14–158:8.

7      132.   Mr. Howard's opinion that "the cartons for square bottles fit better on a

8   standard pallet size, which eliminates the additional costs and reduces the likelihood of

9   damage if cartons need to hang over the edge of the pallet to maximize the number of

10  cartons-per-pallet," Tr. Ex. 73 at 6, was based on the relative sizes of cartons for square

11  bottles and round bottles, something he had no information about.  Howard Tr. 152:14–

12  23; 155:5–13; 157:14–158:8.

13     133.   Mr. Howard's opinions regarding what he called "palletization" were based

14  on a few conversations with unnamed store clerks in a single chain, but not on any

15  measurements or review of pallets.  Howard Tr. 93:1-94:15.

16     134.   Mr. Howard has no idea how frequently pallet displays were used in the

17  retailing of alcoholic beverages or in what types of retail outlets they were used.  Howard

18  Tr. 159:17–19; 160:11–14.

19     135.   There is a standard size pallet, applicable to a variety of products, on which

20  Mr. Howard saw Jack Daniel's bottles mounted, but he did not know its dimensions.

21  Howard Tr. 65:3–19; 160:15–161:4.

22     136.   Mr. Howard did not see any pallets displaying cartons containing other

23  bottles, Howard Tr. 158:13–23, and did not know the relative pallet sizes for spirits sold

24  by Brown-Forman in round bottles or whether they were different.  Howard Tr. 161:5–

25  12.

26     137.   The pallet sizes for Jack Daniel's whiskey sold in a square bottle and

27  Canadian Mist whiskey sold in a round bottle with the same volume are virtually the

28  same dimensions in length and width.  Taylor Decl. ¶ 10.  The shipping cartons for those

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1    products also share virtually the same dimensions in length and width, Taylor Decl. ¶ 10,

2    and those bottles also share the same dimensions in length and width.  *Id.*

3         138.    Mr. Howard claimed that square bottles display labels better than round

4    bottles because on round bottles "the graphics are receding around the bottle," Howard

5    Tr. 185:21–186:1, but this can be addressed by making labels on round bottles slightly

6    smaller in size.  Howard Tr. 191:11–25.

7         139.    The square Jack Daniel's bottle has a three-sided label, and two of the three

8    sides are not visible when the bottle has a frontal shelf facing, Howard Tr. 196:10–16, but

9    Mr. Howard believed that this is not a problem because the non-visible sides contain

10   "mostly body copy.  It's not the brand name or the contents."  Howard Tr. 196:15–16.

11        140.    Mr. Howard claimed that a number of the labels on the non-square bottles

12   that VIP claims are representative of bottles in the marketplace were not clearly visible,

13   Tr. 192:2–196:5, Ex. 53, but these labels show the brand name and the contents of the

14   products.  Ex. 53.

15        141.    Mr. Howard did not do or see any studies, tests, or measurements about

16   how much information is "lost" when a label is used on a round bottle as opposed to a

17   square bottle.  Howard Tr. 190:3–8.

18        142.    Round bottles are far more prevalent than square bottles "[p]robably

19   because of the cost."  Howard Tr. 196:6–9.

20        143.    Mr. Howard had no knowledge of how labels are applied to the Jack

21   Daniel's bottle and the round Canadian Mist bottle.  Howard Tr. 197:20–198:2.

22        144.    It is more difficult to apply labels to the square Jack Daniel's bottle than to

23   a round bottle such as the Canadian Mist bottle.  Taylor Decl. ¶ 8.

24        145.    It has "been a while," possibly 10 years, since Mr. Howard last looked at a

25   glass bottling line.  Howard Tr. 170:3–7.

26        146.    Mr. Howard had no familiarity with the Jack Daniel's labeling and filling

27   line, made no effort to inspect it, did not know how it actually works, and had no

28   knowledge about the chipping and breaking rates for bottles in the line.  Howard Tr.

17

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  170:8–171:20.

2      147.    Mr. Howard's knowledge of chipping and breaking during the labeling and

3  filing of glass bottles was based on his experience in the 1970s and not on any research or

4  studies.  Howard Tr. 171:22–173:6.

5      148.    The design of the mark shown in the Registration created breakage

6  problems on the filing and labeling line, as well as breakage problems in the field that

7  required a redesign of the shoulder of the bottle.  Taylor Decl. ¶¶ 7–8, 11.

8      149.    Mr. Howard believed that the Jack Daniel's bottle was gripped by the

9  "flats" (the body) when it is moved and by the neck when it is poured, Howard Tr.

10  176:10–19, but his belief was not based on observation of people in stores, bars or

11  restaurants, Howard Tr. 177:2–19, but rather on "Myself.  I've had the bottles for a

12  couple of weeks," Howard Tr. 176:10–23, and his wife.  Howard Tr. 178:13–18.

13      150.    Mr. Howard was not aware of any studies on the gripping of bottles since

14  the 1960s.  Howard Tr. 177:20–25.

15      151.    Mr. Howard testified that with respect to the square shape of the bottle *per*

16  *se*, a round bottle is more likely to slip out of the hand than a square bottle when the

17  bottle is wet, but in the case of dry bottles, his opinion was based solely on "the

18  ergonomics of your hand interface with various products."  Howard Tr. 179:20–180:3.

19      152.    Mr. Howard claimed that the square shape of the Jack Daniel's Bottle

20  Design and the "rounded" shape of the bottle's neck both improve gripping, and a square

21  shaped neck might be as good as a round one in terms of gripping.  Howard Tr. 180:18–

22  182:7.

23      153.    With respect to Mr. Howard's claimed benefit that the embossed signature

24  design in the Jack Daniel's Bottle Design "cannot be removed without destroying the

25  bottle, providing an indelible identifier of the product inside," he could not explain how

26  frequently non-embossed signatures were removed or even if it happened at all.  Howard

27  Tr. 198:21–200:8.

28      154.    The embossed signature on the bottle in the Registration increases the cost

18

1    and complexity of manufacturing the bottle, and impedes the manufacturer's quality
2    control processes.  Howard Tr. 200:15–18; Taylor Decl. ¶¶ 5–6.

3          155.    The Jack Daniel's Bottle Design involves "cost trade-offs" in terms of how
4    much it costs to manufacture the bottle.  Howard Tr. 211:14–212:2.

5          156.    The percentage of whiskey bottles in a square shape as opposed to another
6    shape is "relatively small.  I'd say maybe eight to ten percent."  Howard Tr. 204:13–24.

7          157.    The largest percentage bottle shape in use today was "probably round
8    because of the cost, smaller cost."  Howard Tr. 204:25–205:4.

9          158.    The Sacra Report concluded that only 18 whiskey bottles in the market as
10   defined by VIP (16%) contain all three of what VIP claims are the three elements of the
11   mark shown in the Registration, and they are all used by only two companies, one of
12   which is JDPI's licensee Brown-Forman Corporation.  VIP Tr. Ex. 3 (SAC0023).

13         159.    There are a number of available alternative designs for whiskey bottles.
14   VIP Tr. 59:12–15; Hungerford Decl. ¶ 10; Ex. 6; Larkin Decl. Ex. 7.

15         160.    The Jack Daniel's Bottle Design is the most complex bottle structure that
16   Brown-Forman has used in at least 20 years.  Taylor Decl. ¶ 4.

17         161.    No one opposed the application that matured into the Registration when it
18   was published for opposition, and no one has sought cancellation on the ground of
19   functionality other than VIP.  Larkin Decl. ¶ 7.

20         162.    VIP had no information that since the issuance of the Registration, any
21   competitor had been impacted by the existence of the Registration.  VIP Tr. 136:17–23.

22         163.    Mr. Wolinsky opined that the overall Jack Daniel's packaging "is clearly
23   aesthetically functional" and does not offer an opinion regarding whether the Jack
24   Daniel's packaging is functional in a utilitarian sense.  Wolinsky Tr. at 180:11–181:7; Ex.
25   96 at WOL006.

26         164.    Mr. Wolinsky's opined that "giving Jack Daniel's exclusive rights to use
27   the combined four features of the bottle and label design of the Jack Daniel's Old No. 7
28   Tennessee whiskey would impose a competitive disadvantage on other companies selling

19

1    Kentucky and Tennessee American whiskey" by "depriv[ing] those competing

2    companies [of] the ability to use a standard industry 'uniform'."  Wolinsky Tr. at 246:14–

3    22; Ex. 96 at WOL006.

4        165.   Mr. Sacra, VIP's Rule 30(b)(6) designee, testified that he had not seen any

5    advertising for Jack Daniel's whiskey which touted any utilitarian advantages of the mark

6    or trade dress.  VIP Tr. 59:16–60:12.

7        166.   "[I]f you combine all the parts of the trade dress as a whole--I mean, Old

8    No. 7 or Jack Daniel's or--filigree, those are all ornamental" and "the filigree, the name,

9    the cartouche, all of those things are just ornamental," because "they express to someone

10   the message they are trying to convey."  VIP Tr. 79:9-12; 79:25-80:5.

11       167.   The Sacra Report claims that there are other square whiskey bottles with

12   embossed or scalloped necks and embossed signatures, as well as bottles containing one

13   or two of those features, and Mr. Sacra had no information that since the issuance of the

14   Registration, any competitor had been impacted by it.  VIP Tr. 136:17–23.

15   October 23, 2015                    Respectfully submitted,

16                                        */s/ Gregory P. Sitrick*
17                                        Gregory P. Sitrick  (AZ Bar #028756)
                                          Gregory.Sitrick@quarles.com
18                                        Isaac S. Crum (AZ Bar #026510)
                                          QUARLES & BRADY LLP
19                                        Firm State Bar No. 00443100
                                          One Renaissance Square
20                                        Two North Central Avenue
                                          Phoenix, AZ 85004
21                                        Telephone (602) 229-5200
                                          Facsimile: (602) 229-5690
22
                                          SEYFARTH SHAW LLP
23                                        Christopher C. Larkin
                                          (admitted *pro hac vice*)
24                                        clarkin@seyfarth.com
                                          2029 Century Park East, Suite 3500
25                                        Los Angeles, California 90067-3021
                                          Telephone: (310) 201-5289
26                                        Facsimile: (310) 201-5219

27                                        Attorneys for Defendant and
                                          Counterclaimant
28                                        JACK DANIEL'S PROPERTIES, INC.

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

<u>**CERTIFICATE OF SERVICE**</u>

1
2
      I hereby certify that on October 23, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record in this case.

3
4
5
6
                                  */s/ Gregory P. Sitrick*
7
                                    Gregory P. Sitrick

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

QB\37107491.2