# Exhibit 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


VIP PRODUCTS, LLC, an Arizona          )
limited liability company,             )
                                       )
          Plaintiff and Counterdefendant, )
                                       )
          vs.                          ) Case No.
                                       ) 14-cv-02057-PHX-DGC
JACK DANIEL'S PROPERTIES, INC., a      )
Delaware corporation,                  )
                                       )
          Defendant and Counterclaimant.  )
_____)




DEPOSITION OF STEPHEN SACRA


Phoenix, Arizona
April 23, 2015
8:52 a.m.




REPORTED BY:
GENE RICHARDS, BA, RMR
Certified Reporter
Certificate No. 50026

PREPARED FOR:
(Original)
DISTRICT COURT



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 44

1  bring me a beer."  And this took that fun idea that

2  everybody had, and made it a reality.

3       Q.   Looking at Exhibit 2, what product was the

4  inspiration for the Cataroma Extra?

5       A.   Inspiration?

6       Q.   Or what product is that supposed to resemble?

7       A.   The inspiration for that product, or if you would

8  say the imagery that we mimic, is that of Corona.

9       Q.   And the Buttwiper, that's Budweiser or Bud.

10 Correct?

11      A.   Correct.

12      Q.   When the two-pack -- Cataroma and Buttwiper

13 two-pack first appeared on VIP's website, did it appear in

14 the form in which we see it in Exhibit 2?

15      A.   That is correct.

16      Q.   There is a notation below the two products that

17 reads, quote, "This product is in no way affiliated with

18 Anheuser-Busch, Inc., or Group Modelo S.A. de C.V."  Do

19 you see that?

20      A.   Yes.

21      Q.   Was that -- what do you call that notation?

22      A.   We call that a disclaimer.

23      Q.   Did the disclaimer appear under the products from

24 the first time they were displayed on VIP's website?

25      A.   I don't recall.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 62

1   something fun where a human and a dog can interact, they

2   can laugh at each other, they can laugh at their

3   relationship.  They can laugh at the fact that it's poking

4   fun at not only the dog, but imagery and brands that they

5   see in their daily lives.  And, honestly, it's a great

6   thing because we could all use a little bit more humor in

7   our life.

8       Q.   Do you agree that all the bottle products shown

9   on VIP 89 to 93 mimic well-known products?

10          MR. BRAY:  Objection.  Form.

11          THE WITNESS:  Each one of them mimics imagery

12  that people have seen in their daily lives at some point

13  or other.  Each one of them may reflect differently to

14  each person, depending on the experiences that they've

15  had.

16          Some person might -- one person may look at it

17  and go, "All right, I get it."  And then some people will

18  look at it and go, "Oh, my gosh, this is hilarious,"

19  because I've seen this, or I know about this, or this

20  product is awesome.  And they see the imagery and --.

21  But, once again, they reflect back on their dog's carrying

22  a beer through the living room.  Or it says something

23  funny like "Deers Bite" on the front of it; where deers

24  don't normally bite.

25      Q.   BY MR. LARKIN:  You mentioned earlier in your



Page 64

1   that's what dogs do every day.

2         "Pawschitngo" -- which you're not going to know

3   how to spell that -- it's a Chihuahua who is pooping and

4   getting ready to go, and waiting for his impatient owner.

5         "Hamster Light" is a hamster with two matches.

6   It's not my favorite one.

7         "Deers Bite"; deers attack, deers do a lot of

8   things.  So that gets you through the --

9      Q.   The beers?

10     A.   The beers.  Well, the beers and soda.  That we

11  went through.

12     Q.   Let's go back to the start of those for just a

13  minute.  Can you tell me -- tell me what the corresponding

14  product is for each one.  What did you mimic in developing

15  each product starting with Drools?

16     A.   Drools, I have no idea.

17     Q.   Is that O'Doul's?

18     A.   No.  That would not be O'Doul's.  O'Doul's one

19  was a different one.

20     Q.   You don't remember what that one was?

21     A.   I don't remember.

22          HeineSniffin is Heineken.

23          Cataroma is Corona.

24          Mountain Drools is Mountain Dew.

25          Barks is Barq's but with -- I think they spell



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 65

1    theirs with a "Q."

2        Q.   That's a root beer product?

3        A.   Yeah, it's made by Pepsi.

4             Killer Bite, instead of Miller Lite.

5             Dos Perros, instead of Dos Equis.

6             Smella R Crotches is Stella Artois.

7        Q.   Atrois?

8        A.   I don't drink all these so --.

9             Pissness, instead of Guinness.

10            Blue Cats Tripping, instead of Pabst Blue Ribbon.

11            Lickate I believe is Tecate.

12            Pawschitngo is Pacifico.

13            Hamster Light is Amstel Light.

14            Deers Bite is Coors Light.

15       Q.   And now we're up to the wines, which begin on VIP

16   92?

17       A.   Yes.

18       Q.   Can you tell me which product each mimics and

19   sort of the nature of the humor in each?

20       A.   Well --

21       Q.   In your --

22       A.   Oh, yeah, yeah, yeah.

23       Q.   -- your view.

24       A.   Kennel Relaxing is a dog chilling on a grape

25   leaf; and Kendall-Jackson to your question earlier.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 66

1    Chew Breederes.  Chewy Breeder.  Which is a
2    Crispaw Champion.  This one is the classy one that you get
3    when you've done something fantastic and at the end of the
4    day you want to celebrate.
5    Grrrobert Slobbery is a dog slobbering, but a
6    very classy dog who is slobbering into his red wine glass.
7    And then Meow Chased One is a picture of a cat
8    that -- dogs like to chase cats, so --.
9    Q.   And that's Moet?  Moet?
10   A.   Moet Chandon.  Sorry.
11   And the other one Robert Mondavi versus Grrrobert
12   Slobbery.
13   Q.   And on 93, what is the --
14   A.   93 is Bad Spaniels where a spaniel has been bad
15   and done the old number two on the Tennessee carpet.  And
16   that is an imagery of a Jack Daniel's bottle.
17   Q.   And in the course of creating these various
18   products, did you give any consideration to whether the
19   humor that you tried to communicate would reflect badly on
20   the brands that you mimicked?
21   A.   Well, we're not reflecting on the brands.  We are
22   employing imagery that people have in their minds, and
23   we're creating a parody.  So our goal in creating these
24   products is to make sure that we have an effective parody.
25   And if the effective parody uses a few small elements that



Page 78

1    there are people who make other ones that are in different

2    shapes, but flat fascias and square is predominant.

3         Q.   What do you mean by "flat fascia"?  Is that a

4    term of art?

5         A.   Face of the bottle.  Versus a beer bottle is

6    rounded.  And this is the face of it, which is the fascia

7    is flat.  There's none of that.  It's not a curved surface

8    or a manipulated surface.

9         Q.   You recall that Ms. Phillips said she got a phone

10   call from you that started the process of creating the Bad

11   Spaniels product.  Do you remember that testimony from her

12   examination?

13        A.   Yeah.

14        Q.   What happened in advance of that to give you the

15   idea of doing a liquor bottle product?

16        A.   Dinner.

17        Q.   Do you remember when that occurred?

18        A.   I don't recall.

19        Q.   Do you remember what year it was?

20        A.   It was shortly before the communications before

21   Elle and I started talking back and forth.  Whatever date

22   that was.

23        Q.   Do you remember specifically sitting at dinner

24   and viewing a bar back and coming up with the idea for Bad

25   Spaniels?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 79

1    A.   There's a -- I don't remember the dinner that I

2  was at.  But there's good likelihood that I would have

3  been in a bar.

4    Q.   So you don't remember -- do you remember a

5  specific dinner, regardless of where it was --

6    A.   No.

7    Q.   -- or when it was?

8         So there was no one dinner where you sat down and

9  it came to you, and you then started the process that

10  resulted in the product?

11    A.   No.

12    Q.   Was it at --

13    A.   Not that I remember.

14    Q.   Was it a gradual thinking about doing a liquor

15  bottle?

16    A.   No.  It was just -- I guess you have to

17  understand my mind.  It's like a million miles an hour

18  with a thousand different thoughts going on all the time

19  simultaneously.  And then all of a sudden something will

20  pop in my head and it's like, "Holy crap, this is

21  awesome."  And I pick up the phone and call Elle and say,

22  "Do this."  And then I talk about my thought after the

23  fact.  It's like I execute, and then there we are.

24    Q.   Do you remember having Bad Spaniels comes to you

25  at some point?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 81

1    Q.   And do you remember that's how it worked in this

2    particular instance?

3    A.   That's how it works in every instance, every

4    product we've ever come up with; including the Silly

5    Squeakers, Tuffys, Mighty.  You sit there and -- because

6    you know you have to come up with new products.  You can't

7    just be a one-product show.

8    Q.   Sitting here, you can't remember the specific

9    circumstances when Bad Spaniels came to you?

10    A.   No.

11    Q.   You can't remember where you were?

12    A.   No.

13    Q.   Or what you were looking at?

14    A.   No.

15    Q.   Or whether you were in a bar or restaurant

16    looking at liquor bottles?

17    A.   No.

18    Q.   Can you remember how far in advance of the phone

19    call that Ms. Phillips testified about, you got the

20    inspiration to do Bad Spaniels?

21    A.   Probably about 20 seconds.  As fast as I could

22    dial.  It's either that, or if I can't get hold of her, I

23    text it to myself or put it on my phone so I can call her

24    later as soon as she calls me back.  She's usually good

25    about getting back with me relatively quickly.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 82

1    Q.   Do you recall the telephone call that

2   Ms. Phillips testified to about -- at her deposition where

3   you told her Bad Spaniels is the name?

4    A.   Yeah.

5    Q.   You recall the call?

6    A.   Well, I recall calling her and saying "Bad

7   Spaniels."

8    Q.   How long did that call take?

9    A.   Maybe ten seconds.  Maybe 15 seconds.  Long

10  enough for her to answer.

11   Q.   Did you tell her anything more than "Bad

12  Spaniels"?

13   A.   No.

14   Q.   Did you tell her what type of product it was?

15   A.   Didn't need to.

16   Q.   Why is that?

17   A.   Because Bad Spaniels -- she got it.

18   Q.   Why didn't -- did you think about?

19   A.   Maybe she said she got it.  She said, "I got it.

20  I'll get back to you."  So what she did from that point,

21  that's her.

22   Q.   Well, can you tell me everything that she said to

23  you and you said to her during that call?

24   A.   "Bad Spaniels.  Hi, Elle."

25       Like, "Hey, Steve, what's up?"



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 85

1    Q.    Okay, fair enough.  You do recall receiving the

2    hand drawing?

3    A.    Oh, yeah.

4    Q.    Let's look at the hand drawing a minute.  So the

5    Bad Spaniels portion of the drawing was the name that you

6    gave Ms. Phillips in your ten- or 15-second telephone call

7    with her?

8    A.    Correct.

9    Q.    Was the rest of what is shown on the second page

10   of Exhibit 46 entirely her work?

11   A.    Yes.

12   Q.    You had no input at all, beyond calling her and

13   saying "Bad Spaniels"?

14   A.    Yeah, that's it.

15   Q.    So Ms. Phillips selected the form of the label

16   that appears on --

17   A.    Well, she sketched this.  Yes.

18   Q.    She sketched that?

19   A.    Correct.

20   Q.    But she was the one that decided what the sketch

21   would look like?

22   A.    That's correct.

23   Q.    She's also the one that decided to use the words

24   "Do old number two" and to place them within an oval.

25   Correct?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 86

1    A.    She created the entirety of this sketch.  So
2  every element of it is hers.
3    Q.    And that was created without any input from you
4  beyond --
5    A.    Other than me saying the words "Bad Spaniels" to
6  her, 100 percent of this is her creation.
7    Q.    When you received the sketch that's the second
8  page of Exhibit 46, did you have an image in your mind's
9  eye of what the label would look like when it was in
10  color?
11    A.    No.  Because this is the sketch process.  She
12  sends over a sketch.  I just look at the simple form.  And
13  I go, "It says 'Bad Spaniels.'  It's got a spaniel on it."
14  At that point then I go, "Oh, that's funny."  And at that
15  point in time because -- from a sketch to actual what gets
16  made, is something completely different.
17        A sketch is, like, takes two seconds, look at it,
18  laugh, and move on.  Because I know what I'm going to get
19  next is going to be obviously -- because she doesn't want
20  to go through the process of scanning in and coloring a
21  dog because that's a huge -- the art process of putting
22  these dogs on there, and that creativity part.  So if I
23  look at the dog and go, "The dog's got to change," I would
24  tell her.  But I'm more concerned about the dog and that
25  portion of it because it is such a large portion of each



Page 88

1    Q.   So when you got the sketch, you didn't -- you

2  didn't visualize in your mind's eye what a label might

3  look like.  You left that issue to Ms. Phillips?

4    A.   Yeah.

5    Q.   If you look at the two E-mails that are the first

6  page of Exhibit 46, it says that you got it at about a

7  little after noon, and you sent back:  "Mock it up, looks

8  good," at about 2:25.  Did you discuss the sketch with

9  your wife or anybody else at the company?

10    A.   Um um.  I mean, I wouldn't discuss anything in

11  its design phase with anyone, because I really don't care

12  about their personal opinions, I mean.

13    Q.   That's yours and that's it.

14    A.   I'm going to do what I want to do.  And a sketch

15  phase, you wouldn't -- you're not going to show something

16  that's raw, and hope that they understand your vision.

17    Q.   And you responded to Ms. Phillips:  "Mock it up.

18  Looks good"?

19    A.   Yeah.

20    Q.   Okay.

21    A.   Short and to the point.

22    Q.   It is.

23    MR. LARKIN:  Let's mark as what was previously

24  marked Exhibit 10.

25    (Exhibit No. 10 marked for identification.)



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 99

1    could only take her word on that.

2        Q.   You didn't do a comparison, I guess?

3        A.   No.

4        Q.   Did you view that -- if it was maybe a bit closer

5    to the JD label, was that good from your perspective?

6        A.   I don't think it really matters.  I mean, the

7    reality is that you're incorporating memorable elements to

8    be able to make the parody effective.  And this -- when

9    you look at these two -- sorry.  If you go back to Exhibit

10   10, this has poor balance.

11       Q.   I'm sorry, I didn't hear.

12       A.   Poor balance.

13       Q.   What do you mean by that?

14       A.   Meaning this little thing she did with the

15   scrolling.

16       Q.   Indicating the ribbon?

17       A.   The Bad Spaniels banner thing.

18       Q.   Banner.

19       A.   It's not balanced with -- it's, like, cutting off

20   half the dog's ear and it makes it feel lopsided.  So when

21   you compare the two, this one has better balance and that

22   is --

23       Q.   Referencing Exhibit 12?

24       A.   Referencing Exhibit 12.

25            So the way that the Bad Spaniels is not in a



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 100

1    banner and is over the oval, I guess that has better

2    balance.  And just based on that alone, I would choose

3    this one.

4         Q.   Are you telling me what you think today, or are

5    you recalling --

6         A.   No, I'm recalling exactly when I looked at the

7    two of them, I'm, like, "This banner is ugly."

8         Q.   Referencing Exhibit 10?

9         A.   Yeah.  A lot of times when you're doing design,

10   you're trying to convey a message; having too many

11   elements can clutter the message.  And this has too many

12   elements with the little lines and the squirrelly banner.

13        Q.   Again, referencing Exhibit?

14        A.   Referencing Exhibit 10.

15        Q.   So when you received the second version from

16   Ms. Phillips, you liked it better than the first one.  Is

17   that your recollection?

18        A.   That is my recollection.

19        Q.   And did you discuss the two treatments with

20   Ms. Phillips?

21        A.   No.

22        Q.   Do you remember what happened next in the process

23   after you received the two mock-ups or the two treatments

24   from Ms. Phillips?

25        A.   The next process is -- the next process that we



Page 106

1   wouldn't work.

2        MR. LARKIN:  Let's take a short break and then

3   we'll go to 12:25 and get to lunch.

4        (Break taken from 11:37 until 11:40 a.m.)

5    Q.   BY MR. LARKIN:  Let's go back on the record.

6   Let's mark as Exhibit 47, documents bearing production

7   numbers VIP 15 through 20.

8        (Exhibit No. 47 marked for identification.)

9    Q.   BY MR. LARKIN:  Mr. Sacra, do you recognize what

10  we've marked as Exhibit 47?

11   A.   Yes.

12   Q.   Do you recognize the first page, which is an

13  E-mail from you to a David at flyingpony.com on Wednesday,

14  November 27, 2013?

15   Q.   Is David --

16   A.   Bai.

17   Q.   -- Bai who you referred to earlier in your

18  testimony?

19   A.   Yes.

20   Q.   And his company is Flying Pony?

21   A.   Yes.

22   Q.   You didn't pick the name, at least.

23   A.   Well, we make equestrian products, so Flying

24  Pony.

25   Q.   And his company is located in China?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.   4/23/2015

Page 107

1        A.    That is correct.

2        Q.    And he has done all of the past -- prior to this

3   product, he had done all of the Silly Squeakers products.

4   Correct?

5        A.    Correct.

6        Q.    The first line of your E-mail to Mr. Bai --

7        A.    Yeah.

8        Q.    -- you wrote, "Here is a concept for a new bottle

9   shape."  Do you see that?

10       A.    Yes.

11       Q.    What was new about the bottle shape that you sent

12   him?

13       A.    That this was not any of the previous bottles

14   that we had used, or any mold we had that was existing.

15   So that means make a new mold.

16       Q.    The next line of the first page of Exhibit 47 you

17   wrote, "We want to make the bottle the same height as beer

18   bottle but in this new square shape."  Do you see that?

19       A.    Yeah.

20       Q.    By "beer bottle" were you referencing the

21   previous Silly Squeakers beer bottles?

22       A.    Beer bottle.  Yeah.

23       Q.    And the third sentence of Exhibit -- of the first

24   page of Exhibit 47 you wrote, "I have included a test

25   label size bottle neck size and art size."  Do you see



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 109

1    that reads, "I have included a test label size bottle neck

2    size and art size"?

3         A.    There you go.

4         Q.    Does that refresh your memory?

5         A.    That refreshes my memory.

6         Q.    Look at the second page of Exhibit 47, which is

7    VIP 16.

8         A.    Okay.  Yes.

9         Q.    Is that what you sent to Mr. Bai?

10        A.    That is correct.

11        Q.    Where did you get that picture?

12        A.    On the Internet.  It's the first picture that

13   comes up.

14        Q.    The first picture that comes up in response to

15   what?

16        A.    In response to a search for Jack Daniel's.

17        Q.    So you --

18        A.    It's one of the first that came up, so --.

19        Q.    Did you use the search?  Did you type "Jack

20   Daniel's" into a search engine to find that picture of the

21   bottle?

22        A.    I don't recall.

23        Q.    You recall that the first thing you saw when

24   whatever you did in the way of a search, was VIP 16?

25        A.    Yes, this is one of the ones that came up.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 111

1    engine search into the form in which you sent it to

2    Mr. Bai?

3        A.   Right mouse click, "save image as."

4        Q.   Okay.

5        A.   That's how I would save an image.

6        Q.   Did you consider sending Mr. Bai any other

7    whiskey bottles as examples of the square bottle you

8    wanted him to do?

9        A.   No.

10       Q.   Going back to the first page of Exhibit 47, your

11   E-mail, the last couple of sentences you wrote, "We do not

12   know if these art sizes are correct to work with final

13   molded product.  Can you please make the sample bottle

14   then check the art size we can adjust after you let us

15   know if the art is okay."  What do you mean by "sample

16   bottle" in that sentence?

17       A.   "Sample bottle" means that he will go create a

18   square-shaped bottle; and then after he creates it, then

19   he will look at labels, the label scaling size, to see if

20   it fits appropriately; or if we need to actually change it

21   to finalize the actual label size.  Because the last thing

22   we do is print labels because it's expensive.  You screw

23   that up, and it's --.

24       Q.   You used the royal "we" there?

25       A.   "We" as in me and David.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 114

1    A.    Correct.

2    Q.    Let's mark as Exhibit 50 a one-page document

3  bearing production number VIP 23.

4        (Exhibit No. 50 marked for identification.)

5    Q.    BY MR. LARKIN:  Mr. Sacra, do you recognize what

6  we've marked as Exhibit 50?

7    A.    Yes.

8    Q.    Okay.  During the process of creating this sample

9  Bad Spaniels bottle, do you have any phone calls with

10  Mr. Bai?

11    A.    No.

12    Q.    Is most of your, if not all, of your

13  correspondence with him, done by E-mail?

14    A.    Yeah.

15        MR. LARKIN:  Let's mark as what was previously

16  marked as Exhibit 18 at Ms. Phillips' deposition,

17        (Exhibit No. 18 marked for identification.)

18    Q.    BY MR. LARKIN:  Okay.  Mr. Sacra, do you

19  recognize what was marked as Exhibit 18 at Ms. Phillips'

20  deposition?

21    A.    Yes.

22    Q.    And that is an E-mail from Mr. Bai to you dated

23  December 17, 2013, covering a sample.  Do you recall

24  receiving the sample that's the second page of Exhibit 18?

25    A.    I recall receiving the attachment, a photograph,



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 115

1   which is VIP 25, as an attachment to this E-mail, which is

2   VIP 24 of Exhibit 18.

3        Q.   You got the photograph, and I guess he took a

4   photograph of his -- he created a mock-up sample in China

5   and sent you a photograph of it.  Is that correct?

6        A.   Yeah.

7        Q.   Did you, when you received Exhibit 18, did you

8   show the photo of the bottle to anybody else?

9            MR. BRAY:  Objection.  Form.

10           THE WITNESS:  I don't recall.

11       Q.   BY MR. LARKIN:  Did you --

12       A.   I wouldn't show anybody this.  I mean, it's

13   not --

14       Q.   Okay.  Not worth showing?

15       A.   No, it's not.  It's a Dos Perros.

16       Q.   Dos Perros was -- is another product in the Silly

17   Squeakers line?

18       A.   Yes, that's correct.

19       Q.   Who decided on the color of the bottle that's

20   shown on the second page of Exhibit 18?

21       A.   That's the same color as the -- it appears to be

22   the same color as the beer bottles.  Most likely the

23   factory had this blend already sitting there because of

24   the production that we do.  So they took existing

25   production material and shot this out.  So if we were in a



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 116

1    production of doing something blue, it would be blue.

2        Q.   You didn't make that decision.  It was somebody

3    in Mr. Bai's?

4        A.   Yeah.  That's all done.

5        Q.   What do you think when you received Exhibit 18?

6        A.   It's square and it looks like a whiskey bottle.

7    That's all I thought.

8        Q.   Did you go back and compare it to the photograph

9    that was attached as part of Exhibit 47, your --

10       A.   No.

11       Q.   -- E-mail?

12       A.   Because if I did, I would have noticed it's

13   completely different.

14       Q.   But you didn't notice it at the time?

15       A.   No, I didn't notice it at the time.

16       Q.   You didn't make a comparison at the time?

17       A.   No.

18       Q.   Let's mark as Exhibit 51 a one-page document

19   bearing production number VIP 26.

20            (Exhibit No. 51 marked for identification.)

21       Q.   BY MR. LARKIN:  Mr. Sacra, do you recall --

22   strike that.

23            Have you seen Exhibit 51?

24       A.   Yes.

25       Q.   Do you recall receiving it from Mr. Bai in



Page 117

1    December of 2013?

2        A.   I did not receive this from Mr. Bai.

3        Q.   I'm sorry.  You sent it to him?

4        A.   I sent it to Mr. Bai.

5        Q.   Thank you.  You caught me.

6             Do you recall sending it to Mr. Bai?

7        A.   Yes.

8        Q.   As you said, you're a man of few words.  You

9    wrote, "The bottle is perfect."  Why did you consider the

10   bottle that he sent you perfect?

11       A.   Because it was square.

12       Q.   Any other reason?

13       A.   No.

14       Q.   Did you think that it accurately depicted the

15   Jack Daniel's bottles that you sent him?

16            MR. BRAY:  Objection.  Form.

17            THE WITNESS:  I didn't even look at what I sent

18   him.  Because if I did, I would clearly notice it was

19   different.

20       Q.   BY MR. LARKIN:  In what respects is it different

21   from what you sent him?

22       A.   Well, what I sent him -- I'm sorry, I know now,

23   through this litigation, that what I sent him was images

24   of the Jack Daniel's bottle that was prior to 2011.  And

25   that at 2011 Jack Daniel's changed the shape of their



Page 118

1   bottle.  And through this litigation I've learned that it

2   more resembles that one, than the one I sent.

3       Q.   At this time that you sent Mr. Bai the Jack

4   Daniel's bottle, that was what you thought the bottle

5   looked like, correct?  The Jack Daniel's bottle that you

6   sent him?

7       A.   I just -- yeah.

8       Q.   That's what you found when you did a search for a

9   Jack Daniel's bottle on the Internet.  Correct?

10      A.   Yeah, I did a Jack Daniel's, got a square bottle,

11  sent it over, and he gave it back.

12      Q.   When you wrote Mr. Bai in Exhibit 1, "The bottle

13  was perfect"; you didn't know that there had been a bottle

14  change.  Correct?

15      A.   No.  No.

16      Q.   I'm not sure I got an answer.  Did you compare

17  what he sent you to what you had sent him?

18      A.   No.  I'm more of a visual person.  I just look at

19  it and go, "It's good."  On to the next thing.

20      Q.   You were satisfied that that accurately depicted

21  what you wanted the Bad Spaniels bottle to look like?

22      A.   It -- the answer is:  Even if it didn't, to

23  change it, it's not a simple process.  Meaning that it

24  came back, I looked at it, looks good.  Until I have one

25  in my hands and can actually hold it and touch it, it



Page 173

1    tiny little art, you don't have a lot of place, so --.

2    That's in the right place.

3        Q.   The first -- the two lines at the bottom that I

4    just read from paragraph 12 in the complaint, as well; the

5    first line is:  "The product and its design belong to VIP

6    Products."  What information is supposed to be

7    communicated through that line?

8        A.   That exactly as it says.  The product, which is

9    represented by what someone is purchasing, and the design

10   of that product, belong to VIP Products because it's a

11   unique creation that we created that carries -- would

12   carry its own copyright and trade dress.

13       Q.   And how did you identify Jack Daniel's Distillery

14   as the entity that was -- that was put into the disclaimer

15   reading this product was not of affiliated with?

16       A.   I did not do that.  That was done by Elle

17   Phillips.

18       Q.   Did you have any involvement in that process at

19   all?

20       A.   No.  And go ahead.  I didn't have anything to

21   say.  Sorry.

22       Q.   Looking at the hang tag, Exhibit 60, when the Bad

23   Spaniels toy is received by a consumer from an on-line

24   order or purchased in a retail store, is the hang tag

25   typically removed?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 187

1    using specific elements that can be found in the Jack

2    Daniel's bottle, we used enough of them to draw a person's

3    imagery for them to be able to make a correlation of the

4    imagery they see every day, and get the parody.

5        Q.   But parody only works if you know what the

6    product is that you're parodying.  Isn't that right?

7             MR. BRAY:  Objection.  Foundation.

8             THE WITNESS:  Could you repeat the question?

9        Q.   BY MR. LARKIN:  Well, we went through all of the

10   products in your Silly Squeakers line, and you were able

11   to tell me which product in the real world each one

12   corresponded to.  Cataroma --

13       A.   Right.  --

14       Q.   -- HeineSniffin.  Bad Spaniels corresponds to

15   Jack Daniel's.  Correct?

16       A.   Correct.

17       Q.   You didn't intend, in creating Bad Spaniels, to

18   have it correspond to Jim Beam, for example?

19       A.   That is correct.

20       Q.   Or Evan Williams?

21       A.   All of these items that you're naming are all

22   whiskeys.

23       Q.   I understand that.  But it was your intention to

24   have the Bad Spaniels product correspond with Evan

25   Williams; for it to be the product that people thought of



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 188

1    when they saw it?

2        A.   When people saw this, we -- sorry.   Rephrase

3    that.   This product would bring up imagery of Jack

4    Daniel's.   But it could also bring up imagery of other

5    bottles because there's some commonality in the trade

6    dress.

7        Q.   When you created the Bad Spaniels product, were

8    you familiar with Evan Williams, for example?

9        A.   I'm familiar with most alcohols.

10       Q.   But at the time, did you know what that bottle

11   looked like?

12       A.   Evan Williams?

13       Q.   Yeah.   At the time you created the Bad Spaniels

14   product?

15       A.   Not specifically Evan Williams.   No.

16       Q.   Ezra Brooks?

17       A.   Ezra Brooks, yes.

18       Q.   You knew at the time what that product looked

19   like?

20       A.   Pretty much, yeah.

21       Q.   Did you intend to have the Bad Spaniels product

22   associated with Ezra Brooks?

23       A.   I would say no.

24       Q.   How about Zackariah Harris?   Were you familiar

25   with that product when you created Bad Spaniels?



GRIFFIN & ASSOCIATES LLC
court reporters

Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/23/2015

Page 189

1        A.    Familiar with it in detail?  No.

2        Q.    Had you even heard of it?

3        A.    I believe I've seen it before, but it would be

4    more on a grocery store shelf.

5        Q.    And you didn't intend to have the Bad Spaniels

6    product associated with the Zackariah Harris product,

7    whatever it was?

8        A.    No.

9        Q.    That is a correct statement?

10       A.    That is a correct statement.

11       Q.    Or Benchmark.  Had you seen the Benchmark product

12   when you created the Bad Spaniels product?

13       A.    I had not seen the Benchmark product.

14       Q.    Or any product from Heaven Hill Distillery?

15       A.    I have not seen a product from Heaven Hill

16   Distillery.

17       Q.    Or any product from Garrison Brothers?

18       A.    I have not seen a product from Garrison Brothers

19   for sure.

20       Q.    Let's mark as the next in order 62.  VIP's

21   responses to Jack Daniel's first set of interrogatories.

22       A.    It's a big one.

23             (Exhibit No. 62 marked for identification.)

24       Q.    BY MR. LARKIN:  Mr. Sacra, do you recognize

25   Exhibit 62?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 217

1    around us that's such a predominant part of our lives.
2    And it's humorous to sit back and poke fun at that and
3    laugh at people and laugh at ourselves.
4        Q.   Well, farther down in your response, beginning on
5    line 22, VIP stated:  "So too in this case.  The message
6    of the Bad Spaniels parody dog toy is that business and
7    product images of Jack Daniel's need not always be taken
8    seriously."  Semicolon.  "VIP's trademark parody reminds
9    the public that they are free to laugh at the images and
10   associations linked with the mark."  Do you see that?
11       A.   Yep.
12       Q.   What aspect of the business and product image of
13   Jack Daniel's are you communicating need not be taken too
14   seriously?
15       A.   What aspects of the -- I'm sorry, could you
16   repeat the question?
17       Q.   You said the message of the Bad Spaniels parody
18   dog toy is that business and product images of Jack
19   Daniel's need not always be taken too seriously.  I just
20   want to know what aspect or --
21       A.    It's the entire aspect.  I mean, Jack Daniel's
22   has created a culture around its product.  As do all --
23   most products try to create a culture around that.  And
24   all people who are doing that take it pretty seriously, I
25   mean.  And by making fun of that or poking at them saying,



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 218

1   "Hey, you know what?  I know that you are over here trying
2   to be the best of everything and dominate the world.
3   Well, here's something funny."
4        Q.    Farther down, the last line of that page, line
5   27.  Actually, let's start with the sentence on line 25.
6   "The message is also a form of entertainment conveyed by
7   juxtaposing the irreverent representation of defendant's
8   trademark."  What do you mean by "irreverent
9   representation of defendant's trademark"?
10       A.    We're taking small portions of identifiable parts
11  of the trade dress that people have visual recognition
12  with, and juxtaposing that.  And "juxtaposition," by
13  definition, means comparing two things against one
14  another.  And by making -- we're adding elements to that
15  to make it funny and to relate it to dog owners by adding
16  a dog and making it strictly relate to dog and dog
17  products and things that dogs do.
18       Q.    And your answer says, "In this case involving a
19  common dog behavior."  Is that going number two?
20       A.    That is correct.
21       Q.    And the juxtaposition you reference on the last
22  line of page nine:  "With the idealized image created by
23  JDPI and Jack Daniels"; what are you referring to when you
24  say "idealized image"?
25       A.    Well, the idealized image are all the -- is the



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.   4/23/2015

Page 219

1   imagery that is drawn up in a person's mind when they

2   reference Jack Daniel's.  So we take small elements of

3   that to be able to key into the person's memory to trigger

4   them to recognize this isn't Jack Daniels, but it's making

5   fun at Jack Daniels.

6       Q.   What is the idealized image?  What does that

7   constitute?  How can you articulate it?

8       A.   Idealized --

9           MR. BRAY:  Objection.  I think it was asked and

10  answered, but go ahead.

11          THE WITNESS:  Didn't I just answer that?

12      Q.   BY MR. LARKIN:  It's your words.  I don't know

13  what you meant by "idealized image."  What does the image

14  consist of?

15      A.   You're asking for specific details?

16      Q.   Yeah.  You're the one who is juxtaposing the

17  idealized image with a common dog behavior that all dog

18  owners can relate to.  And I want to know what the

19  idealized image was?

20      A.   No, that's saying I'm combining a dog behavior

21  with the idealized image; meaning that there are elements

22  of the Jack Daniel's bottle that are being combined with a

23  common dog behavior.  So "with the idealized image created

24  by JDPI," means that you have an idealized image of JDPI,

25  and we're taking that image and we're combining that with



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 220

1    this other element.
2        Q.   What goes into that image?  High quality?  Long
3    heritage of sales?  What is the image you're combining
4    with the common dog behavior that all dog owners can
5    relate to?
6        A.   Well, the idealized image is -- image is
7    something that you look at.  You're talking about
8    feelings, and emotions, and things that are not an image.
9    The things that you're referencing
10       Q.   Well, do you -- in the Bad Spaniels toy, are you
11   commenting in any way on Jack Daniel's business practices?
12       A.   No, absolutely not.
13       Q.   Or the quality of their whiskey?
14       A.   Absolutely not.
15       Q.   Or the way they market the product?
16       A.   Absolutely not.
17       Q.   Or anything else that has to do with their actual
18   business?
19       A.   Absolutely not.
20       Q.   You're not criticizing those in any of -- in
21   anything of that sort.  Is that correct?
22       A.   I'm not attempting to disparage Jack Daniel's in
23   any way.
24       Q.   Why did you decide to use the idealized image of
25   Jack Daniel's, rather than the idealized image of another



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 221

1    whiskey brand?

2         A.   As we discussed earlier, when going through the

3    creative process of trying to come up with different

4    parodies, you start running them through your mind.  And

5    as I discussed earlier, this is the first one that pops up

6    in my mind.  It's not easy creating parody.

7         Q.   Look at the next page, please.  Numbered page

8    ten.

9         A.   Okay.

10        Q.   Starting at line three, in italics, "Strength of

11   the mark.  Plaintiff does not dispute defendant's mark is

12   widely recognized."  Do you agree that the Jack Daniel's

13   trademark is very well known in the United States?

14             MR. BRAY:  Objection.  Form.

15             THE WITNESS:  I think that Jack Daniel's is more

16   recognizable than other brands.  But they've spent a lot

17   of money to make that recognition.

18        Q.   BY MR. LARKIN:  Do you believe that the Jack

19   Daniel's label is more recognizable than other brands?

20             MR. BRAY:  Objection.  Form, foundation.

21             THE WITNESS:  It depends on the person.  I mean,

22   one person could look at it and go, "I don't know what

23   that is."  And someone else could look at it and go, "Oh,

24   I know what that is."  It's who you've gotten to with your

25   marketing.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 222

1  Q. BY MR. LARKIN: But you're the one who chose Jack

2 Daniel's, as opposed to Jim Beam, or Evan Williams, or

3 Ezra Brooks. Is that because the Jack Daniel's label is

4 more recognizable than the label of those products?

5  A. I chose Jack Daniel's because I was able to come

6 up with a cute parody for it. It just happened to be the

7 one that I thought of.

8  Q. There's a quotation again from the Timmy

9 Holedigger case on page ten starting about line 11.

10 Quote, "That is, it is precisely because of the mark's

11 fame and popularity that confusion is avoided, and it is

12 this lack of confusion that a parodist depends upon to

13 achieve the parody." Do you see that?

14  A. Yep.

15  Q. Do you agree that the mark's fame and the Jack

16 Daniel's mark's fame and popularity are what enable you,

17 in your mind, to avoid confusion?

18   MR. BRAY: Objection. Form.

19   THE WITNESS: I think that if you're doing --

20   MR. BRAY: Foundation.

21   THE WITNESS: -- a parody and you're trying to

22 relate to the masses of people, that -- and you're trying

23 to make them get a parody; success comes from the fact

24 that people are familiar with Jack Daniel's, and they're

25 going to -- and the -- and have seen it before, and will



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 223

1  get the parody.

2      Q.   BY MR. LARKIN:  Farther down on page ten, in

3  italics "Similarity of the marks," VIP goes on to state:

4  "While there are similarities between the two marks, they

5  are necessary to accomplish the parody; a parody which

6  in its" --

7      A.   Can you tell me where you are?

8      Q.   "Similarity of the marks."  Line 20.

9      A.   Go ahead.  "Similarity of the marks."

10      Q.   "While there are similarities between the marks,

11  they are necessary to accomplish the parody; a parody

12  which, in its broad outlines, is comparable to the parody

13  dog toy found non-infringing in the Tommy Hilfiger case."

14           What are the similarities between the Jack

15  Daniel's whiskey bottle and label that you brought to the

16  deposition today, and the Bad Spaniels dog toy?

17      A.   Similarities.  So you want me to address both the

18  bottle and the label?

19      Q.   Yeah.

20      A.   Okay.

21      Q.   I want you to tell me what the similarities are

22  between the two marks; and then tell me what you think the

23  differences are?

24      A.   Well, let's address the bottle first.  The bottle

25  is square and has scalloping.  I don't know what the



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 224

1    definition is of "scalloping," but I've heard you say it a

2    thousand times.  I believe that's the curvature of the

3    neck.  And then in addressing the label --

4        Q.   Are those the only similarities between the

5    bottle shapes, per se?  Square and scalloped necks?

6        A.    They both have a sloping angle that pulls away

7    from the neck towards the edge of the bottle.  They both

8    have what you call an indentation for the center of the

9    bottle.  I would assume that that's for the purpose of

10   protecting the label in shipping.  Both have a black cap.

11   But they don't have a black neck from the cap down.  One

12   of them has it down, and one of them doesn't.  Other than

13   that, that's -- for the bottle, that's what I got.

14       Q.   Okay.  And what differences do you see between

15   the two bottles?  Let's stay with that for a minute.

16       A.   Okay.  So the differences between the two bottles

17   is, one is smaller than the other.

18       Q.   Isn't that just a function of the size of the

19   bottle you brought today?

20       A.   Yeah, I don't -- well, the two that I'm looking

21   at, one is smaller than the other.  I don't have a line of

22   Jack Daniel's bottles to know if that one is more similar

23   to another one.  It might be.  But, obviously, if you

24   scale your bottle in that scale, then it's going to be

25   fairly similar.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 225

1        Oh, sorry, back to commonalities.  It also has an
2   edged front.  Sorry.  Going from front to side, there is
3   the appearance of about a 45-degree cut-off angle as if
4   you, like, cut off the edge of a square across the corner
5   in a triangular fashion as it curves around the side.
6        Other dissimilarities:  That our bottle is made
7   of plastic, and your bottle is made of glass.  Our bottle
8   does not incorporate the signatures of Jack Daniel's;
9   whereas the Jack Daniel's bottle does have the signature
10  across it.  Ours is full of air and is a dyed plastic
11  brown.  Yours is glass and full of alcohol.
12        And then I addressed the neck earlier with the
13  fact that your labeling goes down farther on the front,
14  and we only cover the cap.  Ours has a squeaker in it, and
15  Jack Daniel's bottle does not.
16       Q.    Let me --
17       A.    And that's -- go ahead.  On the bottle, that's
18  about all I got.
19       Q.    The color of the Bad Spaniels bottle is intended
20  to simulate the color of the liquid in the Jack Daniel's
21  bottle.  Is that correct?
22       MR. BRAY:  Objection.  Form, foundation.
23       THE WITNESS:  That's a brown spirit.  And for
24  someone to have recollection, if I made it green, people
25  wouldn't get it.  They'd be like, "What is this whole


GRIFFIN
&
ASSOCIATES LLC
court reporters

Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 226

1    green bottle?"

2        Q.   BY MR. LARKIN:   Some of the products you made

3    were green; the Smella R Crotch, and Dos Perros, and

4    HeineSniffin.   But that's because the counterparts are

5    green?

6        A.   Correct.  And the Catarama is yellow because

7    the --

8        Q.   Its counterpart is yellow?

9        A.   Its counterpart is yellow.

10       Q.   Now let's focus on the labeling.  What are the

11   similarities, and what are the differences?

12       A.   Okay.  So we'll start with the neck label.  So

13   the neck label, the only two similar -- well, I don't know

14   where your label starts, I mean, and ends.  So I don't

15   know if it covers the top.  But either way, we both have a

16   black cap.

17           But below that, your labeling extends black down

18   to I would say three quarters of the neck down, and

19   circumferences the entire top.  And our bottle has a

20   square label on the front.  Yours -- which only is visible

21   to the front of the bottle.

22           Your product says the old -- sorry.  "Old number

23   seven" brand.  And ours says -- and that's just text with

24   a small "old" large number "seven."  And ours says "Bad

25   Spaniels" in an arced form over a wide-angle oval, that is



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/23/2015

Page 227

1  a double border that says in text -- I'm going to have to

2  look closer because I'm a little bit on the blind side

3  here.

4       Q.   You and me both.  Can I come around behind you?

5  Would that be okay?

6       A.   Sure.  Yeah.  Want to grab a chair?

7       Q.   No.  I'll just stand.  Thank you.

8       A.    Inside the oval there is some sort of decorative

9  -- I don't know what you call that.  But some sort of

10  decorative lining or design.

11       Q.   Have you heard the term "filigree"?

12       A.   I've heard the term "filigree," but I still don't

13  know what it means.  You'd think I would go look it up.

14       Q.    If you don't know, don't use it.

15       A.    And then it says "the old number two."  And "the

16  old" is stacked on top of the "number two."  Oh, also on

17  the top of our cap we have the letters "BS" scribed in a

18  cursive-type font on the very tip top.

19            So moving down to the primary label on both

20  pieces, the common elements which we'll talk about first

21  is that they are both black and they both have white

22  graphics on the front.  Both have an arched name.  They

23  both incorporate the word "old."  They both have the word

24  "no" with a period after it.

25       Q.    Meaning number?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 228

1       A.    Yes.   They both have the word "Tennessee."   And
2   they both have the letters "VOL" period.   And they --
3   well, they have the percent sign and the number "4."   And
4   that's it for the commonalities.

5           And for the differences, starting at the top and
6   moving down, the Bad Spaniels bottle has what appears to
7   be a portion of, like, a flower with three leaves on it in
8   the upper left hand corner and the upper right-hand
9   corner.   It has a predominant dog, that looks like it's
10  being bad, on the front; where the Jack Daniel's does not.

11          It has a -- well, it has a border that surrounds
12  the center portion of the label, which is a double border,
13  which is thicker on the outside and thinner on the inside.
14  And is a continuous line with no intersections between
15  those lines.   Whereas the Jack Daniel's bottle has what
16  everyone has termed two filigree, which are a number of
17  lines that scribe across and intersect multiple locations
18  across the individual lines as they move through and
19  around the outside.

20          What is being referred to as the filigree on the
21  Jack Daniel's bottle starts at the bottom of the Jack
22  Daniel's and makes a U-shape and on the top goes across
23  the top.   Whereas ours is like I said; it's two continuous
24  lines and it is in the shape of -- I don't want to say
25  it's a peanut-type shape, but it bows in the center and

Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 236

1      Q.   Are you aware of anyplace where your product and
2  any product bearing the Jack Daniel's marks are sold
3  together?
4      A.   No.
5      Q.   Are you aware of any websites where you can buy
6  those?
7      A.   No.
8      Q.   Have you ever done anything to investigate that?
9      A.   I have not.
10     Q.   What's our next in the order?  Let's mark as
11  Exhibit 64, the pages that I downloaded recently from the
12  websites at Boozin' Gear; boozingear.com.
13          (Exhibit No. 64 marked for identification.)
14     Q.   BY MR. LARKIN:  Mr. Sacra, have you ever seen the
15  website at boozingear.com?
16     A.   Not at all.
17     Q.   Boozin' Gear Inc. is identified as one of VIP's
18  customers, on what we marked as Exhibit 63.  Is that
19  correct?
20     A.   Yes, it's line two.  Exhibit 63.
21     Q.   It's the second customer.  7/14/2014, Boozin'
22  Gear Inc., Jeff Eichelberger.
23     A.   Um hum.
24     Q.   So Boozin' Gear is one of VIP's customers,
25  correct?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 237

1    A.   According to these two.  According to this sales
2   document, yes.
3    Q.   Look at the third, fourth, fifth, and sixth pages
4   of Exhibit 64.  Jack Daniel's T-shirts and merchandise?
5    A.   Okay.
6    Q.   Have you ever seen any of those products before
7   today?
8    A.   No.
9    Q.   Look at the next page in Exhibit 64, which is
10   captioned "Beer and Liquor Dog Toys."  Do you see that?
11    A.   Yes, I do.
12    Q.   There the Bad Spaniels toy appears on that page.
13   Correct?
14    A.   That is correct.
15    Q.   And, in fact, I think most of the rest, if not
16   all of the rest, of the Silly Squeakers line is depicted
17   on that page.  Correct?
18    A.   That is correct.  Seagrrrms Plush squeak dog toy.
19   Someone beat us to vodka.
20    Q.   Got to move quickly in this business.
21    A.   I haven't seen that.
22    Q.   Have you ever provided any text or descriptions
23   to websites to describe the Bad Spaniels toy or any other
24   toy in the Silly Squeakers line?
25    A.   No.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 239

1      Q.   And you didn't provide the text or make any
2  recommendations to boozingear.com about where it should
3  show your product and what it should say in connection
4  with it?
5      A.   No, I have not.
6      Q.   Let's mark as Exhibit 65 --
7      A.   Are we going to reference 63 anymore?
8      Q.   I don't think so.  Yeah, just keep it handy.
9           Let's mark as Exhibit 65 what I will represent to
10  be three archived pages from the website at
11  wearyourbeer.com that I downloaded from the Wayback
12  Machine on the archive.org website.
13      A.   That's a cool site, isn't it?  That you can go
14  through the archives.
15           MR. LARKIN:  Yeah.
16           (Exhibit No. 65 marked for identification.)
17      Q.   BY MR. LARKIN:  Mr. Sacra, have you personally
18  used the website at archive.org to retrieve archived pages
19  of prior versions of websites?
20      A.   No.  Someone showed it to me a long time ago and
21  was like, "Hey, did you know if you wanted to see
22  something, you can go back here and look at it?"  And
23  that's a cool site.  I have not had a purpose for it,
24  though.
25      Q.   Do you understand that's the purpose of that



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 261

1      A.   No.

2      Q.   And how many copies of Exhibit 68 will be

3   printed?  Or is that something that is a --

4      A.   I think it's, like, the same number.  It's, like,

5   7500.  Somewhere around there.

6      Q.   Let's mark as 69 two pages which I will represent

7   are color photographs of various alcoholic beverage

8   products that appear in the proposed amended complaint

9   that VIP has filed; and that appear in VIP's first set of

10   requests for admissions to Jack Daniel's.  Color

11   photographs.

12           (Exhibit No. 69 marked for identification.)

13      Q.   BY MR. LARKIN:  Mr. Sacra, do you recognize the

14   pictures that we marked as Exhibit 69?

15      A.   Yes, I do.

16      Q.   And why do you recognize them?

17      A.   Because they were pictures that were included in

18   the amended complaint.

19      Q.   Did you take them?  Or did you -- strike that.

20   That's a bad question at the end of the day.

21           How did you get the pictures?

22      A.   (No response.)

23      Q.   Or let me ask you:  Did you personally -- you

24   Steven Sacra -- get the picture?

25      A.   These specific pictures that you have here?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page  263

1        A.    I have no knowledge of that, as well.

2        Q.    How many of these products were you aware of when

3    you came up with the idea of the Bad Spaniels product?

4        A.    I'm familiar with three of them.

5        Q.    Which are?

6        A.    Which are the Jim Beam, the Ezra Brooks, and the

7    Jack Daniel's.

8        Q.    These three you had seen before you came up with

9    the idea for the Bad Spaniels product?

10       A.    I meant Evan Williams.

11       Q.    Just so the record is clear, at the time you came

12   up with the Bad Spaniels -- the idea for the Bad Spaniels

13   product, you had seen the Jim Beam Black?

14       A.    Yeah.

15       Q.    Evan Williams?

16       A.    I used to drink Jim Beam.

17       Q.    That's how you'd seen it?

18       A.    That's how I've seen it.

19       Q.    You had also seen the Evan Williams?

20       A.    That's correct.

21       Q.    And you had seen the Jack Daniel's?

22       A.    I have seen Jack Daniel's.

23       Q.    And you had seen those three products before you

24   came up with the idea for Bad Spaniels?

25       A.    Correct.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.   4/23/2015

Page 264

1    Q.   You hadn't seen the others.  Is that right?

2    A.   I had not seen the others.

3    Q.   Had you heard of the others?

4    A.   I had not heard of the others.

5    Q.   On the second page of Exhibit 69 there are two

6    tequila products shown.  Do you see those?

7    A.   Um hum.

8    Q.   Why did you or someone acting on behalf of VIP,

9    get two products -- two pictures of tequila products?

10   A.   Well, I am a fond admirer of tequila.  I have a

11   tequila room in my house with over 600 different bottles,

12   that's air-conditioned to 250 degrees -- 52 degrees.

13   Sorry, it's 50 degrees in there.  And it is a fun little

14   place to go hang out and sample different tequilas.  And

15   if there's anything that I'm familiar with, it's that

16   brand of alcohol.  Or, sorry, that segment of alcohol.

17   Yeah.

18   Q.   What do the El Humidor products have to do with

19   this case, in your view?

20   A.   They're representative of the similar shape of

21   the Jack Daniel's bottle in the sense that they are

22   square.  But more specifically the Anejo which is depicted

23   here is -- you know, we talked about how the bottle

24   indents through the center off the top and the bottom?

25   Q.   Yes.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 265

1     A.    It has similar indentation.

2     Q.    Going back to the catalog -- I won't ask you to

3  look at it.

4     A.    And it also might be aged in Jack Daniel's

5  barrels.

6     Q.    I'm sorry, I missed --

7     A.    The Anejo might also be aged in Jack Daniel's

8  barrels.

9     Q.    Okay.  The Jose the Perro product, newest product

10  in the Silly Squeakers line; that mimics Jose Cuervo, not

11  El Humidor.  Correct?

12     A.    Yeah, that is correct.

13     Q.    Do you have any information or knowledge of how

14  the shape of the Jack Daniel's bottle, that you have in

15  front of you, affects the cost of the item?

16     A.    I would have no knowledge of that.

17     Q.    You don't have any knowledge, for example, of

18  whether doing it in that shape increases or decreases the

19  cost of the packaging?

20     A.    I have no knowledge of that.

21     Q.    Do you have any knowledge of how the shape of the

22  bottle, that you see in front of you, affects how easy it

23  is to use the product?

24     A.    No.

25     Q.    No idea one way or the other?



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 266

 1      A.    No.

 2      Q.    Last Exhibit.

 3      A.    Is there such a thing?

 4      Q.    This is 70, right?  Let's mark as 70 a copy of

 5   VIP's responses to Jack Daniel's first set of requests for

 6   production of documents and things.

 7            (Exhibit No. 70 marked for identification.)

 8      Q.    BY MR. LARKIN:  Mr. Sacra, do you recognize

 9   Exhibit 70 as a copy of VIP's written responses to Jack

10   Daniel's requests for production of documents?

11      A.    Yes.

12      Q.    Were you personally involved in searching for,

13   retrieving, and providing to Mr. Bray the documents that

14   you've produced in this case?

15      A.    Yes.

16      Q.    Can you tell me, in general, what you did to do

17   that?

18      A.    First and foremost, I went to -- as we talked

19   about having files in your file folders in your computer,

20   I went to my creation folder for Bad Spaniels, and that

21   contains the documents that I immediately, you know, keep

22   in that folder for the creation -- and not the

23   communication, but anything that I might have gotten as an

24   attachment.

25            And then I went on to my computer and I searched



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 269

1   product images of Jack Daniel's need not always be taken

2   too seriously?

3        A.   Could you repeat that again?

4        Q.   Was it your intent to make a commentary with Bad

5   Spaniels that product images of Jack Daniel's need not

6   always be taken too seriously?

7        A.   Correct.

8        Q.   Was it your intent to make a commentary that it

9   is okay for the public to laugh at images associated with

10  Jack Daniel's?

11       A.   Yes.

12       Q.   Was it your intent to make a commentary that Jack

13  Daniel's itself takes itself too seriously in its

14  marketing, for example, and its label?

15       A.   Yes.

16       Q.   And was it your intent to make a commentary that

17  the general culture that we lived in, I think you used

18  words like the "gray fog" or things that surround us --

19       A.   Yes.

20       Q.   -- takes advertising and trademarks too

21  seriously?

22       A.   Yes.

23       Q.   Was it your intent with your parody dog toy to

24  amuse the public?

25       A.   100 percent.



Stephen Sacra VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 270

1      Q.    Okay, one last thing.  Mr. Larkin asked you about

2  novelty products and the context of the pet perfume.  Do

3  you recall that?

4      A.    Yes.

5      Q.    Are you aware of any actual liquor or beer

6  products that are sold with the intention to be consumed

7  by dogs?

8      A.    No.

9      Q.    Is it your belief that the Bad Spaniels products

10  are novelty products?

11      A.    Yes.

12         MR. BRAY:  I have nothing further.

13

14            E X A M I N A T I O N

15  BY MR. LARKIN:

16      Q.    Let me just ask one follow-up question.  A moment

17  ago in response to one of Mr. Bray's questions you said

18  one of your intentions was to point out or reference the

19  fact that Jack Daniel's takes itself too seriously in its

20  marketing.  What did you mean by that?

21      A.    Well, everything -- if you look at your marketing

22  or the market of Jack Daniel's, it's not -- it's a serious

23  whiskey-based very classical-type of marketing.  And

24  you're not going out and coming out -- I haven't seen

25  anything where it's like, "Hey, let's go have a party" and



Page 271

1    be the crazy Jack Daniel's person.  It's more about -- I

2    don't know, it's more about the process, and quality, and

3    where you're from, and that type of stuff.  Or that's the

4    way I perceived it anyway.

5        Q.   And it was -- it was that perception of Jack

6    Daniel's marketing that you were referring to in response

7    to your question to Mr. Bray that one of the things you

8    were trying to communicate was Jack Daniel's takes itself

9    too seriously?

10       A.   Jack Daniel's does take itself too seriously.

11   And I point out the fact that we're in litigation, which

12   is sort of a reflection of, "Hey, we're poking at you, and

13   we woke the sleeping giant who is mad at us now."

14       Q.   You testified I think earlier, much earlier

15   today --

16       A.   I don't even know what time it is.

17       Q.   It's a little after 5:00.  We're almost done.

18            -- that alcoholic beverage companies don't

19   advertise on television.  Do you remember that testimony?

20       A.   That's correct.

21       Q.   Are you aware that the internal industry

22   agreement not to advertise on television was done away

23   with a number of years ago?

24       A.   Really?  I didn't know that.

25       Q.   Well, so I gather the answer is "no" you weren't





INTERNET ARCHIVE WaybackMachine
http://vipproducts.com/retail/files/index.php?cPath=200_215&osCsid=ee85g5n5v Go
1 captures
20 Nov 07 - 20 Nov 07
OCT NOV
20
2006 2007

Home | My Account | Shopping Cart 0 Items | Checkout

Top » Catalog » Silly Squeakers » Beer Bottles

Tuffies Retail (62)

**Silly Squeakers** (6)

**Beer Bottles** (2)

Mini Poop (5in) (1)

Mr Poop (10in) (1)

test

Mighty Dog Beds (7)

Royal Equine (189)

Shipping & Returns
Privacy Notice
Conditions Of Use
**Wholesale Portal**
Tuffies Why So Tuff
Tuffies - Testimonials
VIP Philosophy
VIP Background
VIP Capabilities
Tuffies - Construction
Mighty Bed - Contruct
Mighty Toy - Contruct
Mighty - Testimonials
VIP Design
VIP Manufacturing
Contact Us

This product is in no way affiliated with Anheuser-Busch, Inc. or Group Modelo S.A. de C.V.

Extra Views

Main

## SS-Beer Bottles- Cat Aroma/But Wiper

SS-BB-CA-BW

**$19.50**

Pick a Size/Color

Cat Aroma-But Wiper (1543)

Hiney Sniffen-ODrools (1444)

Enter a Qty
1

**Add to Cart** Go

Set of Two Silly Squeakers Beer Bottles come with the Cataroma Extra Bottle, and the Buttwiper Bottle.

The best gift for man's best friend! These fun squeaky toys are made of a custom blend of durable, safe rubber that will surely make them your dog's favorite toys, and yours too!

The two pack package is 5 1/4' x 2 3/4' x 10' ... The individual bottle is comparable to the size of a 12 oz. bottle.

Silly Squeakers One-Of-A-Kind Novelty Dog Toys!

login Software Copyright © 2006 VIP Products LLC

Exhibit No. 2
Deposition of Phillips
Date 4-21-15
Becky Baumert
Certificate 50152

**Stephen Sacra**

**From:** david [mailto:david@flyingpony.com]
**Sent:** Tuesday, December 17, 2013 6:24 PM
**To:** Stephen Sacra
**Subject:** Re: New Product Samples

Dear Steve,

Pls see Bad Spaniels mockup sample, we just use the other label to stick it for samples. Pls let me know your comments.

2013-12-18

p
B.Regards

David Bai

Exhibit No. 18
Deposition of Phillips
Date 4-21-15
Becky Baumert
Certificate 50152

1

VIP00024



VIP00025

**Subject:** RE:
**Date:** Monday, June 10, 2013 at 2:25:56 PM Mountain Daylight Time
**From:** Stephen Sacra
**To:** Elle Phillips

Mock it up... Looks Good !



Stephen Sacra - Owner
steve@vipproducts.com
(480)704-1700 Ext. 105
16515 S. 40th St. Suite 121  Phoenix AZ 85048



   

This information is for discussion purposes only. It is speculative and based on assumptions that may not be correct or complete. VIP does not represent or warrant its accuracy. Anything written above or attached to this email is not a legally binding commitment. VIP shall have no liability,and disclaims all direct , indirect, consequential, punitive or other damages, for the use of , or reliance on, this information. This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety,

**From:** Elle Phillips [mailto:design@ellephillips.com]
**Sent:** Monday, June 10, 2013 12:10 PM
**To:** Stephen Sacra
**Subject:**

Hey Steve, how about something like this for "Bad Spaniels"? Let me know your thoughts. Thanks!
Elle

**\*\*\* PLEASE NOTE:** I will be out of the office on Tuesday, June 18 through Thursday, June 20, returning to work on Friday the 21st. Please adjust your schedules accordingly. \*\*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .



elle phillips design
945 N. Eagle Hills Way
Eagle, Idaho 83616
208 562.9075
design@ellephillips.com

Page 1 of 1

ELLE0021



VIP00001

**Stephen Sacra**

**From:** Stephen Sacra
**Sent:** Wednesday, November 27, 2013 5:17 AM
**To:** david@flyingpony.com
**Subject:** New Bottle - Bad Spaniels

David,

Here is a concept for a new BOTTLE SHAPE.
We want to make the bottle to Same Height as Beer Bottle but in this new square shape.
I have included a TEST Label size Bottle Neck Size an ARt Size.

We do not know if these art sizes are correct to work with Final Molded Product. Can you please make the Sample Bottle
then check the art size we can adjust after you let us know if the art is ok.

Steve


Stephen Sacra - Owner
steve@vipproducts.com
(480)704-1700 Ext. 105
16515 S. 40th St. Suite 121  Phoenix AZ 85048



This information is for discussion purposes only. It is speculative and based on assumptions that may not be correct or complete. VIP does not represent or warrant its accuracy. Anything written above or attached to this email is not a legally binding commitment. VIP shall have no liability and disclaims all direct , indirect, consequential, punitive or other damages, for the use of , or reliance on, this information. This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety.



1



VIP00016

VIP00017

# Silly Squeakers

## Are you tired of buying the same old hum-drum rubber squeaky toys?

## So are we!

No longer does your dog have to suffer with boring squeaky animal shapes or cutesy-tootsy toys that have been around forever. Your dogs need some fun and laughter in their lives too! *Silly Squeakers*™ are a line of fun, creative and hilarious rubber squeaky toys that are sure to have everyone talking. We pushed the limits of our imagination to bring you this series of one-of-a-kind toys. They are sure to bring you and your dog tons of fun and laughter.

### *The question is will you or your dog have more fun with them?*

SILLY SQUEAKERS are made from the highest quality materials to ensure your dog's safety. Never leave a toy with your dog unattended. Dog toys are designed for interactive play and are not meant to be chewed or ingested by any animal. Failure to follow these instructions can result in injury to your pet.

LIMITED GUARANTEE: For defects in workmanship. To read the full details of our Limited Guarantee, please visit www.vipproducts.com.

## Vip Products
### Product Design and Manufacturing

© 2013  VIP Products
Subject Matter Printed on Bottle © VIP Products
All Rights Reserved 1-866-4-DogToy
Made in China

The product and its design belong to VIP Products.
This product is not affiliated with Jack Daniel's.

VIP00018



VIP00019





VIP00020

**Stephen Sacra**

**From:** Stephen Sacra
**Sent:** Wednesday, December 18, 2013 8:08 AM
**To:** 'david@flyingpony.com'
**Subject:** RE: New Product Samples

The bottle is Perfect.

Stephen Sacra - Owner
steve@vipproducts.com
(480)704-1700 Ext. 105
16515 S. 40th St. Suite 121  Phoenix AZ 85048

    

This information is for discussion purposes only. It is speculative and based on assumptions that may not be correct or complete. VIP does not represent or warrant its accuracy. Anything written above or attached to this email is not a legally binding commitment. VIP shall have no liability and disclaims all direct , indirect, consequential, punitive or other damages, for the use of , or reliance on, this information. This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety.



1

1   Firm E-Mail: courtdocs@dickinsonwright.com

2   David G. Bray (#014346)
    dbray@dickinsonwright.com
3   **DICKINSON WRIGHT, PLLC**
    1850 North Central Avenue, Suite 1400
4   Phoenix, Arizona 85004
    Phone: (602) 285-5000
5   Fax: (602) 285-5100

    *Attorneys for VIP Products, L.L.C.*
6

EXHIBIT 62
Sacra
4-23-15 GR

7         **IN THE UNITED STATES DISTRICT COURT**

8                **DISTRICT OF ARIZONA**

9   VIP Products, L.L.C., an Arizona limited   | No. 2:14-cv-02057-DGC
10  liability company,

11         Plaintiff,            **PLAINTIFF AND COUNTERDEFENDANT VIP PRODUCTS, L.L.C.'S RESPONSES TO**
12      v.               **JACK DANIEL'S PROPERTIES, INC.'S FIRST SET OF INTERROGATORIES**

13   Jack Daniel's Properties, Inc., a Delaware
14  corporation

15         Defendant.

16   Jack Daniel's Properties, Inc.,
17  a Delaware corporation,

18         Counterclaimant,

19      v.

20   VIP Products, LLC, an Arizona limited
21  liability company,

22         Counterdefendant

23

24       Plaintiff and Counterdefendant VIP Products, LLC ("VIP" or "Plaintiff"), by and

25  through undersigned counsel Dickinson Wright PLLC, hereby submit, pursuant to Rule 33

26  of the Federal Rules of Civil Procedure, their Responses to the First Set of Interrogatories

27  served by Defendant and Counterclaimant Jack Daniel's Properties, Inc. ("JDPI").

                      1

## GENERAL OBJECTIONS

1.     Plaintiff has not completed its investigation of the facts related to this case, its discovery, or its preparation for trial. Plaintiff's responses, therefore, are made only on the basis of such information and documents as it currently knows exist. Plaintiff has not completed its investigation and discovery has only just commenced in this matter. Accordingly, Plaintiff's responses do not purport to constitute a final statement of its knowledge regarding the particular subject and are made without prejudice to its right to in addition evidence or documents at the time of trial, or to supplement its responses as appropriate once it has completed its investigation, discovery and trial preparation.

2.     Plaintiff objects generally to the Definitions and Instructions to the extent that they impose obligations broader than those imposed by the applicable Rules of Civil Procedure. Plaintiff disclaims any such broader obligation purportedly imposed by such Instructions.

3.     Plaintiff objects generally to Defendant's Interrogatories (the "Request") to the extent that any Request can be read to call for information that is protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Such privileged information will not be disclosed and any inadvertent disclosure thereof will not be deemed a waiver of any privilege or protection. By accepting information in response to these Requests, the propounding party expressly accepts and acknowledges this non-waiver.

4.     Plaintiff objects to each and every Request to the extent that it seeks discovery regarding matters that are not relevant to the subject matter of the pending action or that are not reasonably calculated to lead to the discovery of admissible evidence. These Responses shall not constitute a waiver of any such objections.

5.     Plaintiff objects to each and every Request to the extent it purports to impose a burden of disclosing information not readily available to Plaintiff or is equally available to Defendant. Plaintiff further objects to each and every Request to the extent it purports to

1    impose a burden of identifying documents that are not in Plaintiff's possession, custody, or

2    control, or that cannot be found in the course of a reasonable search, or that have already

3    been produced by Plaintiff or others to Defendant.   Plaintiff refers Defendant to such

4    documents for the content thereof.

5         6.    The Responses set forth herein are based on information currently known to

6    Plaintiff.   Plaintiff has not completed its investigation and discovery has only just

7    commenced in this matter. Accordingly, Plaintiff reserves the right to supplement, amend or

8    clarify any of its responses or objections as permitted by the Federal Rules of Civil

9    Procedure.

10        7.    These Responses are given subject to and without waiving the foregoing

11   General Objections, each of which is incorporated by reference in its entirety into each of the

12   following answers.

### NON-UNIFORM INTERROGATORIES

15   **INTERROGATORY NO. 1:**    Identify all persons involved in the conception of,

16   selection of, and/or decision to use, the "Bad Spaniels" mark, and for each person so

17   identified, describe his or her role in such selection, conception, and/or decision.

18   **RESPONSE:**

19   *Conception:*   Stephen Sacra.  Mr. Sacra thought of the idea for the Bad Spaniels

20   parody dog toy.

21   *Selection:*   Stephen Sacra.  Mr. Sacra decided that the mental vision he had of the

22   product in his head was funny so he selected it for development.

23   *Decision to use:*   Stephen Sacra.  Mr. Sacra decided the Bad Spaniels parody dog toy

24   idea was funny so he decided to use it.

1      **INTERROGATORY NO. 2:**    Identify all persons involved in the design and

2    development of the Bad Spaniels Toy and Packaging, and for each person so identified,

3    describe his or her role in such design and/or development.

4      **RESPONSE:** *Design Development Packaging:* Elle Phillips. Ms. Phillips took Mr.

5    Sacra's funny idea that he described to her over the phone, and then sketched it out and then

6    made two versions.

7

8      **INTERROGATORY NO. 3:**    Identify all persons involved in the development of

9    the Disclaimer, and for each person so identified, describe his or her role in such

10   development.

11      **RESPONSE:**

12     *Development Disclaimer:* Stephen Sacra. Mr. Sacra used the boilerplate disclaimer

13   used by VIP for many years on the product hangers for VIP's "Silly Squeakers" line of

14   parody dog toys: "This Product is not affiliated with"

15     *Artwork*: Elle Phillips cut and paste these words and filled in the blank.

16

17      **INTERROGATORY NO. 4:**    Identify all persons involved in the design and

18   development of all advertisements, promotional materials, websites, social media pages,

19   and/or catalogs in which the Bad Spaniels Toy and Packaging have been displayed, and for

20   each person so identified, describe his or her role in such design and/or development.

21      **RESPONSE:**

22     *Advertisements*: Other than maintaining a website, VIP does not "advertise" in the

23   traditional sense. It does not place advertisements in magazines, or trade journals, nor does it

24   purchase radio or television air time.

25     *Promotional Materials (Sell Sheet):* Created by Elle Phillips with data provided by

26   Stephen Sacra

27

1     *Websites*: Elle Phillips takes photos of images and uploads them. Text Data input by

2 Stephen Sacra.

3     *Social Media*: VIP stopped all social media in 2014.

4     *Catalog*: Elle Phillips inserts pictures and text into catalog per Stephen Sacra

5 instructions and then final versions are approved by Stephen Sacra.

6

7     **INTERROGATORY NO. 5:**    Identify all persons involved in the development,

8 implementation, and/or review of any studies, surveys, focus groups, or consumer or market

9 research regarding the Bad Spaniels Toy and Packaging and/or the Disclaimer (including,

10 without limitation, the Disclaimer's visibility, noticeability, and understanding), and for each

11 person so identified, describe his or her role in such development, implementation, and/or

12 review.

13     **RESPONSE:**

14     VIP is a small company. It does not do surveys and use focus groups. From Mr.

15 Sacra's perspective, when you know something is funny and makes you laugh and when you

16 have been told in the past that you are kind of funny, there is a good chance that others will

17 find your parody funny.

18

19     **INTERROGATORY NO. 6:**    Describe all channels through which the Bad

20 Spaniels Toy and Packaging are marketing, advertised, promoted, distributed, or sold and, if

21 the Bad Spaniels Toy and Packaging are sold at retail, Identify five representative retailers

22 who carry them.

23     **RESPONSE:**

24     The Bad Spaniels parody dog toy was sold to small pet specialty retailers and

25 distributors of pet products. Please see VIP00123-00130 for list of all customers that VIP

26 sold the Bad Spaniels parody dog toy in 2014.

27

1     **INTERROGATORY NO. 7:**    Describe    the    general    demographics    of    the

2   purchasers of the Bad Spaniels Toy and Packaging.

3     **RESPONSE:**

4     *General Demographic*: Dog Owners.

5     Pet Specialty Retailers purchase from VIP. The end consumer that purchases a VIP

6   dog toy from the retailer is generally kind, caring, and loving person, who has a dog that they

7   dearly love, that is looking to enrich their dog's life with a new toy. People who are not

8   caring and loving don't buy their dogs a toy (very sad but these people do exist). Dogs love

9   humans unconditionally, and because of this dog owners take extraordinary care when

10   making decisions of what to purchase their dog. Without question, every time you come

11   home your dog is more excited and happier to see you than any other person or being in the

12   house. It is this reason that the dog-owning ultimate consumers of VIP's dog toys make

13   decisions to insure the safety, health, and long life of their pet.

14

15     **INTERROGATORY NO. 8:**    Describe the degree of care with which the Bad

16   Spaniel Toy and Packaging are typically purchases.

17     **RESPONSE:** Retailers are very particular in the toys that they purchase for their

18   retail stores. The toys must be considered safe for consumption and use by the animals. Each

19   toy is hand selected by the retail store owner, after they review the quality of the product, the

20   effective retail price, and evaluate if they think their customer would purchase the product.

21   As with all dog toy purchases the toy must meet the following criteria: It must be cute, fun,

22   and the customer must be able to visualize the enjoyment that both the dog and the owner

23   will share together with each other when playing interactively with the toy.

24

25

26

27

1    **INTERROGATORY NO. 9:**    State in detail the complete legal and factual basis

2    for VIP's contention in paragraph 16 of the Complaint that "[a]s a matter of law, Plaintiff's

3    use of its 'Bad Spaniel's' mark and name does not infringe or dilute any claimed trademark

4    rights that Defendant may claim in any 'Jack Daniel's' trademark for its Tennessee sour

5    mash whiskey and/or any other product," and specifically set forth any information or

6    evidence supporting or discrediting that contention.

7    **RESPONSE: Objection.** This interrogatory is unreasonably overbroad. It is simply

8    not possible, in the context of a response to an interrogatory to "state in detail" the "complete

9    legal basis" for VIP's contention in this case that its Bad Spaniels parody dog toy does not

10    infringe or dilute JDPI's trademarks. This would require, among other things, summarizing

11    whole swathes of the *McCarthy* treatise as well as scores of relevant cases and law review

12    articles that address trademark parodies and which support Plaintiff's general arguments in

13    this case. Subject to and without waving that objection, Plaintiff answers as follows:

14    The "[t]he purpose of the Lanham Act is to eliminate consumer confusion, not to

15    banish all attempts at poking fun or eliciting amusement." *Anheuser-Busch, Inc. v. L & L*

16    *Wings, Inc.,* 962 F.2d 316, 322 (4th Cir. 1992) (reinstating jury verdict in favor of

17    manufacturer of parody t-shirts that incorporated elements of Anheuser Busch's trademarks).

18    More recently, the Fourth Circuit affirmed the grant of summary judgment of Louis

19    Vuitton's trademark infringement and trademark dilution claims brought against the small

20    manufacturer of parody dog toys, one of whose products was a "Chewy Vitton" dog toy that

21    was shaped like a handbag and included elements of Louis Vuitton's famous trademarks.

22    Addressing the dilution claim, the Fourth Circuit noted:

23        Haute Diggity Dog mimicked the famous marks; it did not come so close
             to them as to destroy the success of its parody and, more importantly, to
24        diminish the LVM marks' capacity to identify a single source. Haute
             Diggity Dog designed a pet chew toy to imitate and suggest, but not use,
25        the marks of a high-fashion LOUIS VUITTON handbag. It used "Chewy
             Vuiton" to mimic "LOUIS VUITTON"; it used "CV" to mimic "LV";
26        and it adopted imperfectly the items of LVM's designs. We conclude that

27

these uses by Haute Diggity Dog were not so similar as to be likely to impair the distinctiveness of LVM's famous marks.

In a similar vein . . . it becomes apparent that Haute Diggity Dog intentionally associated its marks, but only partially and certainly imperfectly, so as to convey the simultaneous message that it was not in fact a source of LVM products. Rather, as a parody, it separated itself from the LVM marks in order to make fun of them.

In sum, when considering the relevant factors to determine whether blurring is likely to occur in this case, we readily come to the conclusion, as did the district court, that LVM has failed to make out a case of trademark dilution by blurring by failing to establish that the distinctiveness of its marks was likely to be impaired by Haute Diggity Dog's marketing and sale of its "Chewy Vuiton" products.

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 268 (4th Cir. 2007).

Similarly, in *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 412 (S.D.N.Y. 2002), the Southern District of New York granted summary judgment in favor of a small manufacturer of a parody dog cologne "Timmy Holedigger" that incorporated elements of Tommy Hilfiger's trademarks, thereby rejecting Tommy Hilfiger's claims of trademark infringement and trademark dilution as a matter of law. *Id.* at 425 ("As the Ninth Circuit recently counseled both parties in a bitterly contested trademark parody case, plaintiff is 'advised to chill.'"). The Court in *Tommy Hilfiger* noted as follows:

[T]he Second Circuit has recognized that where the unauthorized use of a trademark is part of an expressive work, such as a parody, the Lanham Act must be construed narrowly. *Harley–Davidson, Inc. v. Grottanelli,* 164 F.3d 806, 813 n. 14 (2d Cir.1999) (*quoting Restatement (Third) of Unfair Competition* § 25 cmt. i (1995)). Specifically, it has held that the public interest in avoiding consumer confusion must be balanced against the public interest in free speech. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g,* 886 F.2d 490, 494 (2d Cir.1989). Cases finding that First Amendment interests prevail involve nontrademark uses of mark—that is, where the trademark is not being used to indicate the source or origin of consumer products, but rather is being used only to comment upon and, in the case of parody, to ridicule, the trademark owner. *See, e.g., id.; Charles Atlas, Ltd., v. DC Comics, Inc.,* 112 F.Supp.2d 330 (S.D.N.Y.2000); *Yankee Publ'g Inc. v. News Am. Publ'g Inc.,* 809 F.Supp. 267 (S.D.N.Y.1992). In such cases, the parodist is not trading on the good will of the trademark owner to market its own goods; rather, the parodist's sole purpose for using the mark is the parody itself, and precisely for

that reason, the risk of consumer confusion is at its lowest. *See id.*

The balancing test adopted by the Second Circuit thus takes into account the purpose behind trademark law, and "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent, and in which there is a need to evoke the original work being parodied." *Cliffs Notes*, 886 F.2d at 495.

Hilfiger argues that Nature Labs is not entitled to any consideration under the First Amendment because, first, its product admittedly makes no comment about Hilfiger, and second, the use of the mark as a source identifier on the pet perfume is a trademark use of the mark. Hilfiger points out that when asked at his deposition whether his product was intended to make any comment about Hilfiger, Hilfiger products, or Hilfiger customers, John Harris, the general partner of Nature Labs, said no. (Harris Dep. at 36–37) Harris did, however, testify that he was intending to create a "parody ... target[ing] ... Tommy Hilfiger," "a fun play on words," or "spoof ... [t]o create enjoyment, a lighter side." (Id. at 30–31, 36) Although Harris had difficulty expressing the parodic content of his communicative message, courts have explained that:

Trademark parodies ... do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

*See L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34 (1st Cir.1987); *see also Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 321 (4th Cir.1992) (*quoting id.*). One can readily see why high-end fashion brands would be ripe targets for such mockery, and why pet perfume is a clever vehicle for it.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 414-15.*

So too in this case. The message of the Bad Spaniels parody dog toy is that business and product images of Jack Daniels need not always be taken too seriously; VIP's trademark parody reminds the public that they are free to laugh at the images and associations linked with the mark. The message is also a form of entertainment conveyed by juxtaposing the irreverent representation of Defendant's trademark -- in this case involving a common dog behavior that all dog owners can relate to -- with the idealized image created by JDPI and

9

Jack Daniels.

In this case, the relevant *Sleekcraft* factors favor VIP.

*Strength of the Mark.* Plaintiff does not dispute that Defendant's mark is widely recognized. In this case, however, this factor actually favors VIP's position that there is not a likelihood of confusion between the products:

> In the usual trademark case, a strong mark is a factor pointing toward a likelihood of confusion. However, "[w]here the plaintiff's mark is being used as part of a jest ... the opposite can be true." *Yankee Publ'g*, 809 F.Supp. at 273; *see also N.Y. Stock Exch.*, 69 F.Supp.2d at 484 (citing Hormel Foods, 73 F.3d at 502–03). "The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image." *McCarthy on Trademarks and Unfair Competition* § 31:153 (4th ed.2001) [hereinafter "*McCarthy* "]. That is, it is precisely because of the mark's fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends upon to achieve the parody. *See Hormel Foods*, 73 F.3d at 503; *Schieffelin*, 850 F.Supp. at 248. ("Certainly it is unremarkable that [defendant] selected as the target of parody a readily recognizable product; indeed, one would hardly make a spoof of an obscure or unknown product!"). In the present case, Nature Labs' adaptation of Hilfiger's famous mark likely allow consumers both immediately to recognize the target of the joke and to appreciate the obvious changes to the marks that constitute the joke. A distinctive mark will not favor plaintiff in these circumstances.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002)*

*Similarity of the marks.* While there are similarities between the two marks, they are necessary to accomplish the parody; a parody which, in its broad outlines, is comparable to the parody dog toy found non-infringing in the *Tommy Hilfiger Licensing* case:

> Nature Labs admits that its logo deliberately mimics Hilfiger's and is based upon the Hilfiger mark. (Harris Dep. at 52) It is necessary for the pet perfume to conjure up the original designer fragrance for there to be a parody at all. However, a parody also relies on "equally obvious dissimilarit[ies] between the marks" to produce its desired effect. *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785, 790 (E.D.N.Y.1983). "If the difference in wording or appearance of the designation together with the context and overall setting  is such to convey to the ordinary

10

viewer that this is a joke, not the real thing, then confusion as to source, sponsorship, affiliation, or connection is unlikely." *McCarthy* § 31:155. Here, "the very broadness of the joke is a measure of the difference" between Hilfiger's marks and Nature Labs' pet perfume. *Tetley,* 556 F.Supp. at 790. The whimsical substitution of the dog-related pun, "Holedigger," on dog perfume, and in some versions, the use of the bone-shaped logo, clearly convey a joking variation on the original. In addition to these changes, there are further alterations to the Hilfiger trademarks on both the early and current pet perfume label designs. In the original "Tommy Holedigger" label, the red and white square are reversed and a different font is used. In the current version, "Tommy" is changed to "Timmy," and the colors and shapes are revised: the red and white squares are changed to red and yellow triangles. These changes reinforce the imitative, yet comedic scheme inherent in a humorous takeoff.

"Moreover, an inquiry into the degree of similarity between the two marks does not end with a comparison of the marks themselves." *Hormel Foods,* 73 F.3d at 503 (citation omitted). One must also look to context, because "the setting in which a designation is used affects its appearance and colors the impression conveyed by it." Id. As noted, the marks in this case appear on pet perfume, a product which itself underscores the parody or pun captured in the label. Further, the packaging of the product bears headings or slogans that highlight the intended silliness. These include: "famous pet perfume"; "Strong enough for a man, but made for a chihuahua"; "T. Holedigger keeps your best friend smelling fresh and clean"; "If You Like Tommy Hilfiger, Your Pet Will Love Timmy Holedigger." (Lessem Decl. Exs. C, D, & E) As another Court put it, "such broad satirical adaptation draws a heavy line between itself and the object of satire." *Tetley,* 556 F. Supp. at 785. The last of the above-listed slogans also references a statement in red print on the back of the product that explicitly disclaims any relation between defendant and Tommy Hilfiger. Finally, the Tommy/Timmy Holedigger product is always presented to the consumer along with a variety of other parody pet colognes, such as CK–9 and Pucci, each appearing in an identically shaped bottle. As Nature Labs argues, this context immediately reinforces the message that the perfumes are a parody, and that they come from a single source rather than the multiple sources of the parodied marks.

Taken as a whole and in context, as it should be for a fair evaluation, Nature Labs' presentation accomplishes what the Second Circuit has said it must: "A parody must convey two simultaneous—and contradictory messages—that it is the original but also that it is not the original and is instead a parody." *Cliffs Notes,* 886 F.2d at 494. Because the parody is sufficiently strong, the similarities between the marks are outweighed by the differences, and do not contribute to a likelihood of confusion.

1  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 417-18 (S.D.N.Y.

2  2002)

3      *Proximity of the Products.* The two parties' products are about as different as any two

4  products could be: JDPI primarily sells expensive Tennessee whiskey, our client sells a

5  squeaking dog toy that is an obvious parody product. Again, this factor favors VIP for the

6  same reasons that the court in *Tommy Hilfiger Licensing* found that the factor favored the

7  maker of the parody dog perfume product in that case:

8      Hilfiger further cites testimony that the Holedigger product was created to
       smell like Hilfiger's fragrances, and is marketed by comparative

9      advertising, to support a professed concern that the pet perfume may serve
       as a market substitute for its own product. This argument simply does not

10     withstand scrutiny. The products in fact do not compete, and they occupy
       distinct, non-overlapping markets. Because pet perfume is for use on pets,

11     not humans, the products "differ in essential character." *Recot Inc. v.*

12     *Becton,* 2000 WL 1367190, 56 U.S.P.Q.2d 1859, 1861 (2000). Moreover,
       pet perfume, in its very conception, is a novelty item, a parody of an

13     actual product, for which there is no market independent of the parody.
       As one Court has noted, "[c]ases involving novelty items are the best

14     examples of parody precluding any possibility for consumer confusion."

15     *Schieffelin,* 725 F.Supp. at 1324. Even if there is a connection between
       fragrances for pets and humans, or even if a dense and humorless

16     consumer could mistakenly conclude that plaintiff itself sponsored the
       humorous line of fragrances, plaintiff's and defendant's products are sold

17     in different kinds of stores—the former in department or designer stores,
       the latter in pet stores or gift shops—at markedly different prices. *See*

18     *Tetley,* 556 F.Supp. at 790–91. It is thus plain that the products do not

19     have the market proximity to one another that could create a likelihood of
       confusion.

20

21  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 418-19 (S.D.N.Y.

22  2002)

23      The *Tommy Hilfiger Licensing* case the products in question were both perfume: One

24  intended for use on dogs, the other humans. In that case, the Court still found the products

25  not to be in close market proximity to each other. In this case there is even greater

26  differentiation in the market proximity of the two products at issue: One product is a pet toy

27  the other is hard liquor. JDPI's whiskey is   not sold in pet specialty retail stores.

1      *Likelihood Jack Daniels will Bridge the Gap.*

2      There has been no claim made to date that Jack Daniels is likely to bridge the gap and

3   offer an irreverently fun squeaking pet toys for dogs.  Even if, however, there were such

4   efforts, for the same reasons articulated by the Court in the *Tommy Hilfiger Licensing* case,

5   the public would not attribute such an enterprise to JDPI:

6         Plaintiff has presented no evidence that it is likely to bridge the gap and
          offer a pet perfume like defendant's, and the evidence does not suggest
7         that the purchasing public would attribute such an enterprise to plaintiff.
          "In view of [plaintiff's] concern that [defendant's] use of [plaintiff's]
8         marks may tarnish them, it would be surprising if [plaintiff] had such
          plans." *N.Y. Stock Exch.*, 69 F.Supp.2d at 485. This factor cannot favor
9         Hilfiger.

10  *Tommy Hilfiger Licensing, Inc. v. Nature Labs*, LLC, 221 F. Supp. 2d 410, 419 (S.D.N.Y.

11  2002)

12      *Consumer Confusion.*   The fact that there has been nearly one year of peaceful

13  coexistence in the marketplace between Jack Daniel's whiskey and Bad Spaniels parody dog

14  toy without a single instance of actual customer confusion indicates that there is in fact no

15  likelihood of confusion between the two parties,' two very different products.   In fact,

16  Plaintiff has never received a single piece of communication from anybody, at any time,

17  expressing any confusion as to the source or affiliation of VIP's Bad Spaniels parody dog

18  toy, nor has anybody ever communicated a belief to VIP that JDPI was in any way associated

19  or was affiliated with VIP's Bad Spaniel's toy.  In fact, the same has been true with regard to

20  all of VIP's Silly Squeakers parody dog toys.   In this case, the *absence* of responsive

21  documents is evidence of the parody nature of VIP's Bad Spaniels dog toy, the fact that the

22  parody -- the joke -- has been understood by retailers and consumer, and the fact that the

23  product is not likely to cause confusion with, or dilute, any JDPI trademark. This factor thus

24  strongly favors VIP for the same reasons cited by the Court in the *Tommy Hilfiger Licensing*

25  case:

26

27

13

Nor is there evidence of actual confusion in this case. This is not surprising, as a review of the factors thus far shows that the character and context of Nature Labs' products quickly dispels any confusion. Although actual confusion need not be shown for a plaintiff to prevail, "[i]f consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Id.* (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir.1999)). Where, as here, a product has been on the market for several years, the absence of evidence on this point is considered "a very significant deficiency." *Yankee Publ'g*, 809 F.Supp. at 274. Here, it is also significant that Nature Labs now parodies at least 13 other designer brands, not one of which has complained about consumer confusion. *See Tetley*, 556 F.Supp. at 790. That loud silence gives rise to only one inference: consumers have not been confused.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 419 (S.D.N.Y. 2002).

*Intent.*   There is no evidence in this case the VIP acted with the intent relevant in trademark cases. Again, the Court's finding in the *Tommy Hilfiger Licensing* case is directly applicable to the facts of this case:

That evidence, however, does not show that defendant acted with the intent relevant in trademark cases—that is, an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will. *See N.Y. Stock Exch.*, 293 F.3d 550, 556 n. 1; *Yankee Publ'g*, 809 F.Supp. at 275. Although it is true that the deliberate adoption of a similar mark may give rise, in the usual case, to a presumption that the copier intended to confuse consumers, in the case of parody, "the intent is not necessarily to confuse the public but rather to amuse":

In one sense, a parody is an attempt to derive benefit from the reputation of the owner of the mark, if only because no parody could be made without the initial mark. The benefit to the one making the parody, however, arises from the humorous association, not from public confusion as to the source of the marks.

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir.1987) (holding that LARDASHE mark on jeans for oversized women was an intentional parody of JORDACHE, but finding no intent to confuse); *accord Anheuser–Busch*, 962 F.2d at 321–22. The commercial success of a parodist's product is attributable to consumers who purchased

14

1   because "they were amused by the cleverness of its design," and not
2   because they believed it to be the original. *Anheuser–Busch*, 962 F.2d at
    322. Of course, confusion can exist despite the intent to create a parody.
3   "[The] single concern here, however, is whether an intent to parody an
    existing trademark supports an inference of a likelihood of confusion....
4   [I]t does not. An intent to parody is not an intent to confuse the public."
    *Jordache*, 828 F.2d at 1486.

5

6   *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 419-20 (S.D.N.Y.

7   2002).

8       *Sophistication of Customers.*   This factor also favors VIP, for the same reasons

9   articulated by the Court in the *Tommy Hilfiger Licensing* case:

10      The final factor to be considered is the sophistication of the consumers
        and the degree of care likely to exercised in purchasing the product. This
11      factor also fails to assist plaintiff. Although the record does not disclose
        the exact price of Hilfiger's product, both sides agree that it is a "high-
12      end" designer fragrance. The substantial price associated with such goods
        "requires buyers to exercise care before they part with their money, and
13      such sophistication generally militates against a finding of confusion."
14      *Charles of the Ritz*, 832 F.2d at 1323. It is also counterintuitive that
        buyers of any sophistication will "impulse buy" a bottle of pet perfume
15      priced at $10.00 a bottle. "To the extent that a shopper might make such a
        purchase, it would likely be after viewing the bottle carefully, grasping
16      the joke, and seeking to share it with others." *Schieffelin*, 850 F.Supp. at
17      250; *see also id.* ("This case is not one where unsophisticated customers
        may fall prey to similar marks of inexpensive products that are in
18      competitive proximity with each other.") Because defendant's "theme and
        pun on the [Hilfiger] marks are obvious, even a minimally prudent
19      customer would not be confused by the source or affiliation of
        [defendant's products]. The purchasing public must be credited with at
20      least a modicum of intelligence." *N.Y. Stock Exch.*, 69 F.Supp.2d at 487.

21

22  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 420 (S.D.N.Y.

23  2002).

24      Similarly, there has been no actionable dilution of JDPI's marks.  First there has been

25  no dilution by blurring as VIP's Bad Spaniels parody dog toy, like other obvious parodies,

26  tends to increase the public's identification of Jack Daniel's trademarks with Jack Daniels.

27  Again, the Court's reasoning in the Tommy  Hilfiger Licensing case is directly relevant

15

to the facts of this case:

> Although a likelihood of confusion is not necessary to find dilution, and indeed may be inconsistent with such a finding,7 many of the factors relevant to a likelihood of confusion are also relevant to a likelihood of dilution. *See Restatement (Third) of Unfair Competition* § 25 cmt. f; *see also N.Y. Stock Exch.*, 293 F.3d 550, 558; *Nabisco*, 191 F.3d at 217–222; *Yankee Publ'g*, 809 F.Supp. at 282. In this case, the above discussion of the confusion factors also disposes of Hilfiger's blurring claim. *See id.* Rather than result in this type of dilution, Nature Labs' spoof, like other obvious parodies, "tends to increase public identification of a plaintiff's mark with the plaintiff." *Jordache*, 828 F.2d at 1490 (citation omitted); *see Hormel*, 73 F.3d at 506. That is, "the use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association of the mark with the plaintiff." *Yankee Publ'g*, 809 F.Supp. at 282 (citation omitted). This may be true even when the parody is itself part of a trademark use. *See, e.g., N.Y. Stock Exch.*, 293 F.3d 550, 558; *Denicola, supra,* at 188–89 (citing cases and explaining: "The presence of a famous mark on certain products may have little diluting effect, particularly where it is obvious that the defendant intends the public to associate the use with the true owner .... [T]he joke itself reinforces the public's association of the mark with the plaintiff.") In this instance, the possibility of dilution by blurring is remote. Rather, as in the case of the "Petley Flea Bag" stickers, "the broad humor defendant employs serves to prevent the type of blurring which might result from a more subtle or insidious effort at humor at plaintiff's expense." *Tetley*, 556 F.Supp. at 794. Given the nature of the challenged use, then, and the utter lack of evidence that the selling power of Hilfiger's marks has been diminished, no rational trier of fact could conclude that Nature Labs' pet perfume is likely to impair the identification of Hilfiger's marks with its products.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs*, LLC, 221 F. Supp. 2d 410, 422 (S.D.N.Y. 2002).

Similarly, there is no dilution by tarnishment. "Dilution by tarnishment" is defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). There is no evidence that Bad Spaniels has harmed the reputation of "Jack Daniels" nor is there likely ever to be as VIP's Bad Spaniels product is an obvious parody and is a humorous, fun dog toy. Again, the reasoning of the Court in the *Tommy Hilfiger Licensing* case is directly on

1 point:

> There is nothing to suggest that a designer label has anything to lose from mere association with pets, particularly where the entire association is a light-hearted if somewhat heavy-handed parody. I agree with the conclusion of the district court in *Jordache*: "When the association is essentially a harmless, clean pun, which merely parodies or pokes fun at the plaintiff's mark, tarnishment is not likely." *Jordache Enters. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 57 (D.N.M.1985), *aff'd*, 828 F.2d 1482 (10th Cir.1987); *see also McCarthy* § 31:155 (*quoting id.*). Even *Deere*, the case upon which Hilfiger principally relies, notes: "Not every alteration will constitute dilution, and more leeway for alterations is appropriate in the context of satiric expression and humorous ads for noncompeting products." *Deere*, 41 F.3d at 45; *see also Hormel*, 73 F.3d at 507–08 (holding that a benign parody product that was not in direct competition with plaintiff's product was unlikely to cause dilution). That observation applies in this case, and I find for defendant on plaintiff's dilution claim.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002).

Finally, the famous *McCarthy* treatise provides a good summary of the parody and free speech defense to a claim for dilution by tarnishment. *McCarthy on Trademarks and Unfair Competition* § 24:90 at pp. 24-279-283 (Rel. 69, 3/2014) (hereafter, "*McCarthy*"). As stated in *McCarthy*:

> The general rule permits anyone, competitor, critic or comedian, to use a famous mark to make fun of . . . the products or policies of the mark owner. This principle is embodied in both the Constitutional guarantee of free speech and in the explicit statutory defenses under the 2007 Trademark Dilution Revision. Act (TDRA).

*McCarthy* § 24:90 at pp. 24-279.

**INTERROGATORY NO. 10:**   State in detail the complete legal and factual basis for VIP's affirmative defense in paragraph 67 of the Answer to Counterclaim that VIP's use of any term or mark "is a protected parody under the First Amendment to the United States Constitution" (including stating specifically what comment about, or criticism or ridicule of, Jack Daniel's Tennessee whiskey, the Jack Daniel's Marks, and/or the Jack Daniel Distillery is made by VIP through the Bad Spaniels Toy  and packaging), and specifically set forth

17

1   any information or evidence supporting or discrediting that affirmative defense.

2   **RESPONSE: Objection.** This interrogatory is unreasonably overbroad. It is simply

3   not possible, in the context of a response to an interrogatory to "state in detail" the "complete

4   legal basis" for VIP's contention in this case that its Bad Spaniels parody dog toy does not

5   infringe or dilute JDPI's trademarks. This would require, among other things, summarizing

6   whole swathes of the *McCarthy* treatise as well as scores of relevant cases and law review

7   articles that address trademark parodies and which support Plaintiff's general arguments in

8   this case. Subject to and without waving that objection, Plaintiff answers as follows: *See*

9   Response to Interrogatory No. 9. In addition to the facts and arguments set forth in the

10  foregoing Response to Interrogatory No. 9, Plaintiff directs JDPI to this quote from

11  *McCarthy* addressing the "hypersensitive" trademark owners:

12  **Hyper-Sensitive Owners of Famous Marks.** Some of the litigation
13  brought by trademark owners against those who make fun of their
    company's policies by the use of parodies of their trademarks reveals that
14  some mark owners are hyper-sensitive to such humorous and sometimes
    caustic criticism. Perhaps it is because many top executives in large
15  companies are not used to being mocked and made fun of. Therefore,
    they are ready, willing and able to unleash the dogs of litigation against
16  anyone who makes fun of the symbol of their company. But the more
    successful and famous a company and its products becomes, the more
17  likely it will become a societal symbol of something. Then it is more
    likely that critics will use humorous parody to take potshots at the
18  company and its symbols. A certain toughening of the hide may be a
    more effective response than asking the courts to silence the clowning
19  critic. As the Seventh Circuit observed:
20
21  When businesses seek the national spotlight, part of the territory
    includes accepting a certain amount of ridicule. The First
22  Amendment, which protects individuals from laws infringing free
    expression, allows such ridicule in the form of parody.
23
24  The irony is that the more distasteful and crude the parody, the more
    likely the target is to complain. However, the more distasteful and crude
25  the parody, the less likely it is that the public will mistakenly think that
    the trademark owner has sponsored or approved it. People and companies
26  rarely (if ever) make crude jokes mocking themselves.

27  *McCarthy* § 31:153 at pp. 31-364-365.

18

1    **INTERROGATORY NO. 11:**   State in detail the complete legal and factual basis

2  for VIP's affirmative defense in paragraph 68 of the Answer to Counterclaim that "Counter-

3  plaintiff's uses of the Marks described in the Counterclaims are being done in violation of the

4  antitrust laws," and specifically set forth any information and evidence supporting or

5  discrediting that affirmative defense.

6    **RESPONSE:**  Plaintiff does not intend to pursue this affirmative defense in this case.

7  Plaintiff will amend its Answer to JDPI's Counterclaim to, among other things, remove this

8  affirmative defense.

9
10   **INTERROGATORY NO. 12:**   State in detail the complete legal and factual basis

11 for VIP's affirmative defense in paragraph 69 of the Answer to Counterclaim and that

12 "Counter-plaintiff's claims are barred, in whole or in part, by the equitable doctrines of

13 acquiescence, waiver, laches, estoppel, and/or unclean hands," and specifically set forth any

14 information and evidence supporting or discrediting that affirmative defense.

15   **RESPONSE: Objection.** This interrogatory is unreasonably overbroad.  It is simply

16 not possible, in the context of a response to an interrogatory to "state in detail" the "complete

17 legal basis" for the affirmative defenses listed.  Subject to and without waiving that objection,

18 VIP answers as follows:   JDPI did not make any demand on Plaintiff's vis-à-vis its claims of

19 trademark infringement until several months after VIP's Bad Spaniels parody dog toy first

20 went on sale in the United States.  *See* document bates-numbered VIP00133034.  Plaintiff

21 reserves the right to supplement its response as discovery progresses.

22

23

24

25

26

27

19

1      **INTERROGATORY NO. 13:**   State in detail the complete legal and factual basis

2  for VIP's affirmative defense in paragraph 70 of the Answer to Counterclaim that "Counter-

3  plaintiff has failed, in whole or in part, to mitigate its damages," and specifically set forth any

4  information and evidence supporting or discrediting that affirmative defense.

5      **RESPONSE: Objection.**  As JDPI is not seeking damages in this matter, this

6  interrogatory is not relevant.  Plaintiff will amend its Answer to JDPI's Counterclaim to,

7  among other things, remove this affirmative defense.

8      **RESPECTFULLY SUBMITTED** this 11th day of March, 2015.

9                                     **DICKINSON WRIGHT PLLC**

10

11

12                       By: _____

13                          David G. Bray

14                          1850 North Central Avenue, Suite 1400
                             Phoenix, Arizona  85004
                             *Attorneys for VIP Products, L.L.C.*

15

16

17

18

19

20

21

22

23

24

25

26

27

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on March 11, 2015, I e-mailed and mailed Plaintiff and

3   Counterdefendant VIP Products, LLC's Responses to Defendant and Counterclaimant Jack

4   Daniel's Properties, Inc.'s First Set of Interrogatories to each of the parties set forth below:

5

6                     Christopher C. Larkin, Esq.
                        clarkin@seyfarth.com

7                     SEYFARTH SHAW LLP
                     2029 Century Park East, Suite 3500

8                     Los Angeles, California  90067-3021
                     *Attorneys for Jack Daniel's Properties, Inc.*

9

10                   Gregory P. Sitrick, Esq.
                     Gregory.sitrick@quarles.com

11                  Isaac S. Crum, Esq.
                     Isaac.Crum@quarles.com

12                  QUARLES & BRADY LLP
                     One Renaissance Square

13                  Two North Central Avenue
                     Phoenix, Arizona 85004-2391

14                  *Attorneys for Jack Daniel's Properties, Inc.*

15

16

Kristi A. Arendt

17

18

19

20

21

22

23

24

25

26

27

## VERIFICATION

STEPHEN SACRA hereby declares under penalty of perjury:

That he is the owner and manager of plaintiff/counter-defendant VIP Products, LLC ("VIP") and that he is authorized to make this verification on VIP's behalf, that he has read the foregoing Response to Defendant's First Set of Interrogatories, and that the answers contained herein are true and correct based upon his own knowledge, information and belief.

Executed within the State of Arizona this _19___ day of March, 2015

_____
STEPHEN SACRA

PHOENIX 53913-11 207435v1

| Date | Company | Customer Name | Order ID | Qty |
|------|---------|---------------|----------|-----|
| 7/9/2014 | PetCo Corp. | Kristen Reid | 172583 | 9 |
| 7/14/2014 | Boozin Gear, Inc | Jeff Eichelberger | 172608 | 20 |
| 7/14/2014 | Paws and Claws (Greenville) | Christy Jordal | 172621 | 2 |
| 7/16/2014 | Vip Products Tradeshow | Wendy Sacra | 171930 | 16 |
| 7/17/2014 | Salty Paw | Amanda Zink | 173284 | 2 |
| 7/17/2014 | Vander Marketing Assoc., LLC | Mike Streets | 173276 | 1 |
| 7/21/2014 | Amy Bossard | Amy Shapiro | 173484 | 1 |
| 7/21/2014 | Marissa Chapman | Marissa Chapman | 173485 | 1 |
| 7/21/2014 | Dog House (Las Vegas) | Jillian Plaster | 173490 | 2 |
| 7/21/2014 | Montecito Pet Shop | Mathew Petrich | 173418 | 1 |
| 7/21/2014 | Posh Puppy Boutique | Jennifer Kirk | 173417 | 1 |
| 7/21/2014 | Happy Hound | Laura Wujkowski | 173370 | 3 |
| 7/22/2014 | Pet Club (Shea) | Matt Akers | 173683 | 3 |
| 7/22/2014 | Masons Dog Boutique and Spa | Michelle Dixon | 173673 | 2 |
| 7/22/2014 | MainMerch | Roy Laniado | 173674 | 8 |
| 7/22/2014 | Sheri Scarborough | Sheri Scarborough | 173678 | 1 |
| 7/22/2014 | Melissa Sullivan | Melissa Sullivan | 173498 | 1 |
| 7/23/2014 | Paw Paws | Kevin Mulrennan | 173412 | 3 |
| 7/23/2014 | Hairy Winston | Jennie Dudley | 173693 | 6 |
| 7/24/2014 | Scalawags | Mary Beth Kvaka | 173055 | 12 |
| 7/29/2014 | Dog Krazy | Nancy Guinn | 173880 | 3 |
| 7/29/2014 | Three Dog Bakery (W Des Moines) | Aron Wilson | 173882 | 1 |
| 7/29/2014 | The Modern Dog LLC | Jennifer Bella | 173906 | 1 |
| 7/29/2014 | Paw Prints LLC | Joan Burlini | 173932 | 1 |
| 7/29/2014 | Animal Appetites LTD. | Paul Leonard | 174060 | 12 |
| 7/29/2014 | DoggyLoot | Jim Siegel | 174092 | 20 |
| 7/29/2014 | Republic of Paws | Molly Smith | 174172 | 3 |
| 7/29/2014 | Texas Tails Pet Ranch & Spaw | Garey & Patsy Kirk | 174174 | 1 |
| 7/29/2014 | KBP Pampered Pets Grooming | Marcus Knepp | 174107 | 4 |
| 7/30/2014 | Ricordare, Inc Dogma (Irvine) | Martnel Bonacquisti | 174180 | 4 |
| 7/30/2014 | Lofty Dog Village (Anderson Lane | Veronique Michalik | 174189 | 1 |
| 7/30/2014 | BowWow Babies | Jeff Silverstein | 174051 | 3 |
| 7/31/2014 | Canine Center | Robert Heger | 174194 | 3 |
| 7/31/2014 | Teton Tails | Amy Vigaroli | 174198 | 3 |
| 7/31/2014 | Dogadillo | Michael Conrad | 174236 | 3 |
| 7/31/2014 | Cornerstone Pets | Megan Matthews | 174239 | 2 |
| 7/31/2014 | Pet Outfitters | Libby Miller | 174202 | 6 |
| 7/31/2014 | Mouthfuls, Inc | Deborah Dempsey | 174207 | 2 |
| 7/31/2014 | Three Dog Bakery (Richmond) | Myra Holden | 174210 | 4 |
| 7/31/2014 | Perk Valley Pet Eatery | Gordon Kriebel | 174212 | 3 |
| 7/31/2014 | Animal Kingdom (Grover) | Adam Tipton | 174215 | 6 |
| 7/31/2014 | Three Dog Bakery (Sonoma) | Joanne Evans | 174214 | 6 |
| 7/31/2014 | My Dogs Bakery | Vicky Gardner | 174261 | 6 |
| 7/31/2014 | corbin hinton | corbin hinton | 174344 | 1 |
| 7/31/2014 | Doggie Style (Philidelphia) | Ira Goldfarb | 174225 | 20 |
| 7/31/2014 | K9 Loft (Sherman Oaks) | Gil Dan | 174270 | 2 |



EXHIBIT 63
Sacra
4-23-15 GR

VIP00123

| 8/4/2014 | Noahs Ark Pet Supply | Angie DeMars | 174292 | 6 |
|---|---|---|---|---|
| 8/4/2014 | K9 Loft (Los Angeles) | Gil Dan | 174367 | 1 |
| 8/4/2014 | Loie Archer | Loie Archer | 174671 | 1 |
| 8/4/2014 | Bone Appetit Natural Pet Pantry | Natalie Hilley | 174837 | 1 |
| 8/5/2014 | Hunter Kowall | Hunter Kowall | 174889 | 1 |
| 8/5/2014 | Farm Store (CA) | Dustin Johnston | 174850 | 2 |
| 8/5/2014 | Doggie Style Canine Cafe | Dena & Delmar Smith | 174851 | 6 |
| 8/5/2014 | bosler humane society | elaine bosler | 174861 | 1 |
| 8/5/2014 | Friends of Heart | Maria Bizzotto | 174839 | 2 |
| 8/5/2014 | Whiskers Barkery Sedona | Kelly Folse | 168568 | 2 |
| 8/5/2014 | Pooch N Paws | Starla Blancett-Pellegrino | 174388 | 2 |
| 8/6/2014 | No Bones about it (NM) | Stephanie Salyer | 175008 | 3 |
| 8/6/2014 | Rolliers Hardware | Dennis Gasper | 174864 | 3 |
| 8/6/2014 | Diggidy Dog | Marissa Dewey | 175012 | 1 |
| 8/7/2014 | Dog & Kitty in the City | Greta Glimm | 174945 | 1 |
| 8/7/2014 | Bowser Boutique/ Oregon Dachshun | Jenell Rangan | 174943 | 1 |
| 8/7/2014 | Vip Products Office | Lisa Carpenter | 174936 | 1 |
| 8/7/2014 | Duh for Garden and Home aka The | Sandy Dickerson | 175018 | 1 |
| 8/11/2014 | jessica moutinho | jessica moutinho | 175240 | 1 |
| 8/11/2014 | Healthy Pet (Aurora) | Nicole Carlson | 175037 | 3 |
| 8/11/2014 | Dixie Theatre Foundation DBA Oys | Dixie Partington | 175064 | 6 |
| 8/11/2014 | LC Pets LLC | Troy Andersen | 174858 | 3 |
| 8/11/2014 | Brownstone Bakery for Dogs | Roger Howard | 174196 | 6 |
| 8/11/2014 | Montecito Pet Shop | Mathew Petrich | 175300 | 4 |
| 8/12/2014 | Drs. Foster & Smith | Jodi Liddle | 175319 | 1 |
| 8/13/2014 | A Paw Above | Susan Darlington | 174841 | 24 |
| 8/18/2014 | All Creatures Animal Hospital | Suzanne Zervantian | 174077 | 2 |
| 8/18/2014 | Lisa Hunsberger | Lisa Hunsberger | 175841 | 1 |
| 8/18/2014 | Posh Puppy Boutique | Jennifer Kirk | 175746 | 5 |
| 8/18/2014 | Pet Food Warehouse | Susie Kupfer | 175725 | 2 |
| 8/18/2014 | Jaclyn Morse | Jaclyn Morse | 175615 | 1 |
| 8/20/2014 | Just Around The Corner Dog Groom | Alysha Merzlak | 175958 | 2 |
| 8/20/2014 | Debbie Dean Promotions | Debbie Dean-Pezzner | 175992 | 2 |
| 8/21/2014 | Petpourri | JoAnn Mancini | 176120 | 1 |
| 8/21/2014 | jody plant | jody plant | 176146 | 1 |
| 8/21/2014 | Camp Bark A Lot | Randy Barkley | 176167 | 10 |
| 8/21/2014 | Conway Sales Inc. | Scott Pace | 176103 | 2 |
| 8/21/2014 | DoggyLoot | Jim Siegel | 175513 | 20 |
| 8/25/2014 | Debbie Smith | Debbie Smith | 176295 | 1 |
| 8/25/2014 | Woof Pet Bakery | Mark Hardy | 176211 | 3 |
| 8/25/2014 | Melissa Hina | Melissa Hina | 176182 | 1 |
| 8/25/2014 | Matt Salvato | Matt Salvato | 176142 | 1 |
| 8/26/2014 | Pucci's | Ken Sciford | 176365 | 1 |
| 8/26/2014 | Inman Park Pet Works | Laura Saunders | 176376 | 1 |
| 8/26/2014 | Dog Bar | Michelle or Steven Cohen | 174067 | 12 |
| 8/28/2014 | JT Scott & Company | Candy Shapiro | 176347 | 8 |
| 9/2/2014 | Dogone Fun! | Christopher Zimowski | 176415 | 1 |

| 9/2/2014 | Michael Thomas | Michael Thomas | 176602 | 1 |
|---|---|---|---|---|
| 9/3/2014 | Pets Boutique | Maxwell Beretsky | 176942 | 1 |
| 9/3/2014 | Prosperous Pets | Nicholas Eckert | 176995 | 1 |
| 9/3/2014 | Pet House, Inc. | Wendy Guyer | 176992 | 4 |
| 9/4/2014 | Doggie Style Canine Cafe | Dena & Delmar Smith | 177005 | 6 |
| 9/4/2014 | Whole Dog Market Homewood | William Finney | 177018 | 1 |
| 9/4/2014 | Canine Cupboard | Bill Girard | 177027 | 2 |
| 9/9/2014 | Rebecca Alicea | Rebecca Alicea | 177197 | 1 |
| 9/10/2014 | Flea Bags/JIT Enterp (Henderson) | Whitney Leach | 177164 | 2 |
| 9/11/2014 | Kyle Loos | Kyle Loos | 177497 | 1 |
| 9/11/2014 | Little Lucys Canine Couture | Patricia Hurley | 177382 | 6 |
| 9/12/2014 | Furry Friends Daycare and Boardi | David Harvey | 177487 | 3 |
| 9/15/2014 | Fetch & Friskers Barkery and Bow | Michele Jaime | 177541 | 8 |
| 9/15/2014 | Three Dog Bakery (Richmond) | Myra Holden | 176533 | 3 |
| 9/15/2014 | Happy Feet Pet Shop II | hani salib | 177515 | 1 |
| 9/16/2014 | Shake A Paw (Lynbrook) | Marc Jacobs | 177855 | 2 |
| 9/16/2014 | Chew On This Dog Barkery Inc | Teresa Kara | 177567 | 3 |
| 9/16/2014 | Woofs n Hoofs LLC | Tamara Lenherr | 177573 | 1 |
| 9/16/2014 | Karie Mayben | Karie Mayben | 177147 | 1 |
| 9/16/2014 | Drs. Foster & Smith | Jodi Liddle | 177469 | 20 |
| 9/16/2014 | Taylor Tack & Feed | Thad and Cindy Taylor | 177484 | 2 |
| 9/16/2014 | Dog Savvy | Robb Horen | 177918 | 3 |
| 9/17/2014 | Inman Park Pet Works | Laura Saunders | 177921 | 1 |
| 9/18/2014 | Blue Cat & Red Dog Too | Andrea Kopelman | 178022 | 8 |
| 9/19/2014 | DigPets | Andrew Kroll | 177848 | 20 |
| 9/22/2014 | Vip Products Tradeshow | Wendy Sacra | 175911 | 2 |
| 9/23/2014 | Urban Pet | Noelle Finger | 178274 | 8 |
| 9/23/2014 | Barking Dogs Self-Wash & Groomin | Kathy Patterson | 178301 | 3 |
| 9/24/2014 | Palmetto Paws | JeanneLove Ferguson | 178278 | 2 |
| 9/25/2014 | Canine Center | Robert Heger | 178396 | 4 |
| 9/25/2014 | Republic of Paws | Molly Smith | 178460 | 2 |
| 9/25/2014 | Green Spot | Jessica Ellis | 178375 | 1 |
| 9/26/2014 | Elite Dogtique/Bonez | John McCurdy | 178420 | 5 |
| 9/29/2014 | Pete Anastasi | Pete Anastasi | 178493 | 1 |
| 9/30/2014 | Three Dog Bakery (Asheville) | Tom Flora | 178593 | 4 |
| 9/30/2014 | Dogone Fun! | Christopher Zimowski | 178670 | 1 |
| 9/30/2014 | Fur and Feathers (Mill Creek) | Pam Shockley | 178647 | 6 |
| 9/30/2014 | Animal Clinic of Baker | Stephanie Lewis | 178656 | 2 |
| 9/30/2014 | Vip Products Office | Lisa Carpenter | 178478 | 2 |
| 10/1/2014 | Beth Uscilla | Beth Uscilla | 178984 | 1 |
| 10/2/2014 | Pet Lover Central | Victoria (Tory) Quinones | 178525 | 5 |
| 10/2/2014 | Joy Utterback | Joy Utterback | 179053 | 1 |
| 10/2/2014 | Four Paws Pantry & Spa (Olathe) | Debra Manfield | 179058 | 2 |
| 10/6/2014 | Aaron Wilkerson | Aaron Wilkerson | 179285 | 1 |
| 10/6/2014 | Jill Jacobs | Jill Jacobs | 179095 | 1 |
| 10/6/2014 | Wag, LLC | Hannah Scheideman | 174385 | 8 |
| 10/6/2014 | Sarah Jensen | Sarah Jensen | 179195 | 1 |

| | | | | |
|---|---|---|---|---|
| 10/7/2014 | Everything But the Dog | Lauren Gallagher | 179106 | 2 |
| 10/8/2014 | Everything for Pets | Nichole Snider | 179382 | 2 |
| 10/9/2014 | Noahs Ark Veterinary and Boardin | Krystle Armstrong | 179467 | 2 |
| 10/14/2014 | Dogone Fun! | Christopher Zimowski | 178672 | 1 |
| 10/15/2014 | Jenna Lockwood | Jenna Lockwood | 179995 | 1 |
| 10/16/2014 | Golden State Foods | Virginia Wetterau | 180215 | 2 |
| 10/20/2014 | Island Dog | Elizabeth Klimp | 180254 | 3 |
| 10/21/2014 | bri croye | bri croye | 180476 | 2 |
| 10/22/2014 | R & R Distributors | Robert R | 180521 | 1 |
| 10/22/2014 | Paw Paws | Kevin Mulrennan | 180255 | 3 |
| 10/23/2014 | Perk Valley Pet Eatery | Gordon Kriebel | 180550 | 2 |
| 10/23/2014 | Amazon.com | Celeste Donahoe | 180264 | 20 |
| 10/24/2014 | Pet Set #1 (Briarcliff Road) | Bob Fawcett | 180617 | 2 |
| 10/27/2014 | Sharon Raynor | Sharon Raynor | 180767 | 1 |
| 10/28/2014 | PittieLove Rescue Inc. | Noreen Ford | 180837 | 2 |
| 10/28/2014 | Pet Palette LLC | Robin Kershner | 180832 | 1 |
| 10/28/2014 | All Four Paws | Iris Christ | 180823 | 1 |
| 10/28/2014 | Consol co | Yuka Yokoi | 180206 | 3 |
| 10/29/2014 | 1966 | Roger Puldon | 180916 | 1 |
| 10/30/2014 | Wags On Willow | Mary Bowler | 180928 | 3 |
| 10/30/2014 | Vip Products Home | Wendy Sacra | 181029 | 4 |
| 10/30/2014 | All About Dogs and Cats | Bud Addington | 174175 | 4 |
| 10/30/2014 | VIP Products Transfer | Tranfer Orders | 181019 | 20 |
| 11/3/2014 | Melissa Dow | Melissa Dow | 181379 | 1 |
| 11/3/2014 | Misti Cobb | Misti Cobb | 181278 | 1 |
| 11/3/2014 | Chow Down III Grand Junction | Kristi Bush | 181097 | 2 |
| 11/4/2014 | Shake A Paw (Lynbrook) | Marc Jacobs | 181492 | 2 |
| 11/4/2014 | Inman Park Pet Works | Laura Saunders | 180963 | 1 |
| 11/4/2014 | Lucky Dog Outfitters (#1) | Jennifer Ybarra | 181481 | 6 |
| 11/5/2014 | VIP Products Transfer | Tranfer Orders | 181023 | 20 |
| 11/5/2014 | Dog Store | Edward Alava | 181568 | 6 |
| 11/5/2014 | Boofy's Best for Pets | Lisa McKitrick | 181580 | 2 |
| 11/6/2014 | Chow Down Montrose | Krista/Tim Bush | 181514 | 2 |
| 11/8/2014 | Fleabags Barkery and Bow-tique | Josie Azana | 181735 | 4 |
| 11/11/2014 | VIP Donations | Wendy Sacra | 182048 | 1 |
| 11/11/2014 | Roaring Fork Valley Co-op | Roger Fazzi | 181769 | 4 |
| 11/11/2014 | Montecito Pet Shop | Mathew Petrich | 181777 | 2 |
| 11/11/2014 | Three Dog Bakery (Richmond) | Myra Holden | 176538 | 10 |
| 11/11/2014 | Three Dog Bakery (W Des Moines) | Aron Wilson | 182032 | 1 |
| 11/13/2014 | RNC Web Enterprises | Nancy Cope | 182216 | 1 |
| 11/13/2014 | Tobins Feed and Seed LLC | Cathy Norrbom | 181790 | 3 |
| 11/13/2014 | DigPets | Andrew Kroll | 182017 | 80 |
| 11/13/2014 | Sam & Willys Inc. | tom daniels | 181779 | 3 |
| 11/17/2014 | Gorge Dog | Lisa Willis | 182114 | 4 |
| 11/17/2014 | Murphys Paw | Dean Mancini | 182230 | 3 |
| 11/17/2014 | Canine Cupboard | Bill Girard | 182360 | 1 |
| 11/18/2014 | Courtney Allen | Courtney Allen | 182535 | 1 |

VIP00126

| | | | | |
|---|---|---|---|---|
| 11/18/2014 | Diggidy Dog | Marissa Dewey | 182238 | 1 |
| 11/18/2014 | K9 Loft (Echo Park) | Gil Dan | 181815 | 1 |
| 11/20/2014 | Squaw Valley Ski Corp. | Heather Cooley | 183021 | 4 |
| 11/20/2014 | Vip Products Office | Lisa Carpenter | 183018 | 2 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182873 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182872 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182874 | 1 |
| 11/20/2014 | Choice Pets | Ron Garvin | 182879 | 4 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182875 | 1 |
| 11/20/2014 | Dog-N-Scrubs | Janet Guerrero | 182881 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182856 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182866 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182865 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182864 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182863 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182860 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182859 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182871 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182870 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182869 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182868 | 1 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182867 | 1 |
| 11/20/2014 | Pawsitively Paradise Pet Resort | Bonnie Buell | 182834 | 3 |
| 11/20/2014 | Pet Palette LLC | Robin Kershner | 182810 | 20 |
| 11/20/2014 | Pet Club (Biltmore) | Jessika Archer | 182813 | 1 |
| 11/20/2014 | Three Dog Bakery (Asheville) | Tom Flora | 182790 | 6 |
| 11/21/2014 | Drs. Foster & Smith | Jodi Liddle | 183023 | 20 |
| 11/24/2014 | Tornado Tattoo | Josh Poindexter | 183224 | 1 |
| 11/24/2014 | Amazon.com | Celeste Donahoe | 183258 | 20 |
| 11/24/2014 | LONNIE MCDONALD | LONNIE MCDONALD | 183066 | 1 |
| 11/24/2014 | Woof Pet Bakery | Mark Hardy | 183063 | 1 |
| 11/25/2014 | Amazon.com | Celeste Donahoe | 183245 | 20 |
| 11/25/2014 | Dog Dish (6502 East) | Emily Langdon | 183271 | 6 |
| 11/25/2014 | Zoom Room Seattle | Cheryl Frantz | 183305 | 3 |
| 11/30/2014 | Two Pals & A Pup LLC | Jen Newhouse | 183389 | 4 |
| 12/1/2014 | Roy Rodland | Roy Rodland | 183479 | 1 |
| 12/1/2014 | constance wilder | constance wilder | 183473 | 1 |
| 12/1/2014 | Dog Bar | Michelle or Steven Cohen | 183405 | 12 |
| 12/1/2014 | D.O.G. Bakery | Karry Barolo | 183894 | 2 |
| 12/4/2014 | Republic of Paws | Molly Smith | 184069 | 1 |
| 12/4/2014 | Amazon.com | Celeste Donahoe | 183886 | 20 |
| 12/4/2014 | Planet Tails | Ericka Basile | 183876 | 2 |
| 12/4/2014 | Inman Park Pet Works | Laura Saunders | 183972 | 1 |
| 12/4/2014 | Pet Depot (MD) | Joseph Fischer | 183060 | 6 |
| 12/6/2014 | Four Paws Pantry & Spa (Olathe) | Debra Manfield | 184220 | 2 |
| 12/6/2014 | Montecito Pet Shop | Mathew Petrich | 184217 | 4 |
| 12/6/2014 | Cornerstone Pets | Megan Matthews | 183983 | 2 |

| | | | | |
|---|---|---|---|---|
| 12/6/2014 | Pawparazzi | Jane Honnor | 184074 | 1 |
| 12/8/2014 | R & R Distributors | Robert R | 182857 | 10 |
| 12/8/2014 | Brandt's Old Fashion | Angelica Bowen | 183957 | 2 |
| 12/8/2014 | Conway Sales Inc. | Scott Pace | 184243 | 4 |
| 12/8/2014 | Scott Marketing & Sales | Ken Scott | 184242 | 1 |
| 12/9/2014 | Healthy Pet (Aurora) | Nicole Carlson | 184525 | 2 |
| 12/9/2014 | Shop Dog | Ellyn Suga | 184482 | 1 |
| 12/9/2014 | Murphys Paw | Dean Mancini | 184492 | 7 |
| 12/9/2014 | Pamela Young | Pamela Young | 184273 | 2 |
| 12/10/2014 | Elite Dogtique/Bonez | John McCurdy | 184604 | 4 |
| 12/15/2014 | Michelle Mascavage | Michelle Mascavage | 185089 | 1 |
| 12/15/2014 | Alpine Shop | Angela Roam | 182240 | 15 |
| 12/15/2014 | Drs. Foster & Smith | Jodi Liddle | 184763 | 40 |
| 12/15/2014 | sonia Minors | sonia Minors | 185178 | 1 |
| 12/15/2014 | Fawn Frazer | Fawn Frazer | 185122 | 1 |
| 12/16/2014 | Steve Gray | Steve Gray | 185297 | 1 |
| 12/16/2014 | Matt Salvato | Matt Salvato | 185370 | 1 |
| 12/16/2014 | Barkly Manor | Kim Arnold | 185367 | 1 |
| 12/17/2014 | Whos Your Doggy (Fort Greene) | Julia Rosenfeld | 185226 | 3 |
| 12/17/2014 | Inman Park Pet Works | Laura Saunders | 185353 | 1 |
| 12/17/2014 | RT Nelson Sales and Marketing LL | Toby Nelson | 185332 | 1 |
| 12/18/2014 | Happy Tails of Little Rock, Inc. | Amy Dunnavant | 185401 | 3 |
| 12/18/2014 | Puppy Love | Kim Long | 185479 | 4 |
| 12/22/2014 | Debbie Taylor | Debbie Taylor | 185777 | 1 |
| 12/22/2014 | Elite Dogtique/Bonez | John McCurdy | 185631 | 6 |
| 12/22/2014 | No Bones about it (NM) | Stephanie Salyer Chittenden | 185650 | 2 |
| 12/22/2014 | Elizabeth Sanfillipo | Elizabeth Sanfillipo | 185876 | 1 |
| 12/22/2014 | Amazon.com | Celeste Donahoe | 185842 | 20 |
| 12/23/2014 | Amazon.com | Celeste Donahoe | 185845 | 20 |
| 12/23/2014 | Vip Products Tradeshow | Wendy Sacra | 179795 | 2 |
| 12/29/2014 | Carolyn Levine | Carolyn Levine | 186153 | 1 |
| 12/29/2014 | Casey Santoro | Casey Santoro | 186070 | 1 |
| 12/29/2014 | R & R Distributors | Robert R | 185962 | 5 |
| 12/31/2014 | Shake A Paw (Lynbrook) | Marc Jacobs | 186282 | 3 |
| 12/31/2014 | Three Dog Bakery (W Des Moines) | Aron Wilson | 186222 | 1 |
| 12/31/2014 | Hairy Winston | Jennie Dudley | 185980 | 4 |
| 12/31/2014 | Dogone Fun! | Christopher Zimowski | 185990 | 2 |
| 1/5/2015 | SandraLee Hartman | SandraLee Hartman | 186476 | 1 |
| 1/5/2015 | Jason Sylvester | Jason Sylvester | 186457 | 1 |
| 1/6/2015 | Amazon.com | Celeste Donahoe | 186798 | 20 |
| 1/6/2015 | Squaw Valley Ski Corp. | Heather Cooley | 186365 | 4 |
| 1/6/2015 | Teske Pet and Garden | Shelly ????? | 186855 | 2 |
| 1/7/2015 | Incredipet Select (Tates Creek R | Tracy White | 186916 | 2 |
| 1/8/2015 | Pet Club (Gilbert) | Matt Abrahamson | 187016 | 2 |
| 1/8/2015 | Pet Club (Waddell) | Torie Stanlonis | 187001 | 1 |
| 1/8/2015 | Republic of Paws | Molly Smith | 186978 | 1 |
| 1/8/2015 | Pet Palette LLC | Robin Kershner | 186956 | 40 |

VIP00128

| 1/8/2015 | Puppy Love | Kim Long | 187122 | 1 |
|----------|------------|----------|--------|---|
| 1/12/2015 | Momma's House | Lisa Hays | 187206 | 1 |
| 1/13/2015 | Noland Feed | Karen unknown | 187346 | 1 |
| 1/14/2015 | Fetch & Friskers Barkery and Bow | Michele Jaime | 187451 | 2 |
| 1/14/2015 | Shop Dog | Ellyn Suga | 187424 | 2 |
| 1/14/2015 | VIP-Inventory Adjustment | Stephen Sacra | 187505 | 1 |
| 1/15/2015 | Drs. Foster & Smith | Jodi Liddle | 187474 | 60 |
| 1/15/2015 | Calvin & Susie Beach | Joanna Yeh | 187486 | 4 |
| 1/15/2015 | Paw Paws | Kevin Mulrennan | 187408 | 2 |
| 1/19/2015 | Kristi Oldham | Kristi Oldham | 187854 | 1 |
| 1/19/2015 | K9 Loft (Sherman Oaks) | Gil Dan | 187702 | 3 |
| 1/19/2015 | Amazon.com | Celeste Donahoe | 187313 | 20 |
| 1/20/2015 | Plump Poodle | Rachel Kulbako | 187913 | 4 |
| 1/20/2015 | Amazon.com | Celeste Donahoe | 187871 | 20 |
| 1/20/2015 | Dog Dog Cat | George Richter | 187927 | 6 |
| 1/21/2015 | A Country Canine Resort | Jackie | 188022 | 2 |
| 1/22/2015 | Shannon Sharyer | Shannon Sharyer | 188142 | 1 |
| 1/22/2015 | Especially For Pets (Wayland) | Colby Greensleigh | 188093 | 1 |
| 1/27/2015 | Doggie Door | Brian Wettstein | 188231 | 2 |
| 1/28/2015 | Pet Station Salon and Boutique | Paul Blackburn | 188418 | 1 |
| 1/28/2015 | marie mason | marie mason | 188539 | 1 |
| 1/28/2015 | R. J. Paddywacks | Cedar Rose | 188365 | 2 |
| 1/29/2015 | Pet Foods Market (Lunada Bay) | Nicole Bedell | 188603 | 3 |
| 1/29/2015 | Pooch N Paws | Starla Blancett-Pellegrino | 188457 | 3 |
| 1/29/2015 | Pet Set #2 (Piedmont Ave) | Bob Fawcett | 188477 | 1 |
| 1/29/2015 | Pet Set #1 (Briarcliff Road) | Bob Fawcett | 188478 | 1 |
| 1/29/2015 | Paw Paws | Kevin Mulrennan | 188574 | 1 |
| 1/29/2015 | Lucky Dog Outfitters & Pet Suppl | Jennifer Ybarra | 188075 | 6 |
| 1/29/2015 | Canine Cupboard | Bill Girard | 188038 | 2 |
| 1/29/2015 | Inman Park Pet Works | Laura Saunders | 188027 | 1 |

VIP00129

| Date | Company | Customer | Order ID | Qty |
|------|---------|----------|----------|-----|
| 9/16/2014 | PetCo #810 Cranbury | Accounts Payable | 177854 | 288 |
| 9/17/2014 | Petco #396 Braselton | Petco #396 | 173924 | 232 |
| 9/17/2014 | PetCo #528 Mira Loma | Accounts Payable | 173929 | 265 |
| 9/17/2014 | PetCo #810 Cranbury | Accounts Payable | 173928 | 288 |
| 9/17/2014 | Petco #198 Joliet | PetCo Joliet | 173926 | 215 |
| Total Qty | | | | 1288 |

VIP00130

Case 2:14-cv-02057-SMM   Document 104-2   Filed 10/23/15   Page 95 of 107

4/16/2015   Beer Shirts & T-Shirts | Officially Licensed Beer Gear, Hats, Clothing, and Bar Merchandise from Beer and Liquor Brands





## POPULAR



**Maker's Mark Whisky Ice Balls Tray**
SALE $13.95
$11.95



**Corona Extra Tailgate Set**
$29.95



**Michelob Ultra Slim Can Koozie Set**
$19.95



**Jack Daniels Saloon T Shirt**
$21.95



**Budweiser US Flag Board Shorts**
$29.95

VIEW ALL POPULAR PRODUCTS ▶

## NEW



EXHIBIT 64
Sacca
4-23-15 GR

Case 2:14-cv-02057-SMM   Document 104-2   Filed 10/23/15   Page 96 of 107

4/16/2015          Beer Shirts & T-Shirts | Officially Licensed Beer Gear, Hats, Clothing, and Bar Merchandise from Beer and Liquor Brands







Corona Extra Floral Bikini Set
**$39.95**

Corona Extra Tied Bikini Set
**$39.95**

Corona Extra Dual Color String Bikini Set
**$39.95**

Corona Extra Strapless Bikini Set
**$39.95**

Corona Extra Navy String Bikini Set
**$39.95**

VIEW ALL NEW PRODUCTS ›



## Beer Shirts & Merchandise

Fans of beer & liquor brands around the world rejoice - both men & women alike. We've got the best selection of officially licensed beer merchandise featuring your favorite brands. So go loud, be proud of your drink.

## Why Boozin' Gear?

✓ Easy Return!   ✓ 99% of orders ship within 1 day
✓ FREE Shipping   ✓ We ship internationally

" *I really appreciate your extra effort in getting this Budweiser shirt shipped the same day ... so late in the day... it had to be there for Father's day or else i'd be worthy of a line from "Sh*t my dad says".*

★ ★ ★ ★ ★   - Sam A., Boston, MA.

LIKE US

 +20

PRIVACY GUARANTEED

McAfee SECURE

**Sign Up To Receive** ~~Monthly Give-a-ways, New Product Announcements, and Private Member-only Sales~~   add me to the cool people list   SUBSCRIBE ›

## Helpful Links

» Site Map
» Advanced Search
» Search Terms
» Contact Us

## About Boozin' Gear



» Our Story
» Social Responsibility
» Press / Media Inquiries
» Our Blog
» Follow us on Twitter

+20

## Customer Service

Putting "service" back in customer service

## Privacy & Security

We don't share nuttin' wit nobody

## 100% Satisfaction Guarantee

Don't Like it? Send it back!








© 2004-2015 Boozin' Gear, Inc.



FREE SHIPPING
on orders over $50 to the USA    Customer Service | My Account | Log In    888-BOOZIN1    🛒 Shopping Cart  (0)  $0.00    view

| Drinks | Clothing | Bar & Accessories | Occasions | Find your gear | SEARCH |

Home / Jack Daniel's

# Jack Daniel's Shirts and Merchandise

**NARROW RESULTS:**              53 Item(s)                                   Show  All  ▼ per page

### Drink

Jack Daniels (51)                                  Sort by: Position | Name | Price | Newest | ↓

### Product Type

Accessory (1)

Bar Table (2)

Bar Light (2)

Bar Mirror (3)

Bar Stool (3)

Beanie (1)

Clock (2)

Hat (13)

Shirt (23)

Sweatshirt (2)






Jack Daniels Saloon T Shirt — $21.95

Jack Daniel's Triple Bottle T Shirt — $21.95

Jack Daniel's Made In US T Shirt — $26.95

Jack Daniel's Bug Logo Distressed Tan T Shirt — $21.95

### Price

$0.00 - $100.00 (45)

$100.00 - $200.00 (3)

$200.00 - $300.00 (1)

$300.00 - $400.00 (2)

$500.00 - $600.00 (1)

$700.00 - $800.00 (1)





Jack Daniel's Grey Bottle T Shirt — $21.95

Jack Daniel's Jack Lives Here T Shirt — $21.95

Jack Daniel's Saloon Logo Charcoal T Shirt — $21.95

Jack Daniel's Lynchburg T Shirt — $21.95

### Size

S (8)

S/M (2)

M (16)

L (16)

L/XL (2)

XL (16)

XXL (9)

XXXL (4)

XXXXL (2)






Jack Daniel's Old No 7 Barrels T Shirt — $21.95

Jack Daniel's Saloon Logo Tank Top — $23.95

Jack Daniel's Old No 7 Polo Shirt — $34.95

Jack Daniel's Layers Babydoll Shirt — $27.95

### Fabric Color

Army (1)

Black (25)

4/16/2015

Jack Daniel's Shirts, Hats & Merchandise



Blue (1)

Brown (1)

Charcoal (2)

Grey (1)

Tan (2)

White (6)

### Shirt Type

Babydoll Tee (4)

Long Sleeve T-Shirt (3)

Polo Shirt (1)

T-Shirt (13)

Tank Top (8)

### Theme

Licensed (36)

Retro (1)

### Hat Type

Baseball Cap (9)









Jack Daniel's White
Burnout Women's
Babydoll Shirt
**$29.95**

Jack Daniel's
Lynchburg, TN Scoop-
Neck Women's Shirt
**$24.95**

Jack Daniels Saloon
Logo Women's Tank
Top
**$23.95**

Jack Daniels Womens
Camisole Top
**$26.95**











Jack Daniel's White
Logo Women's Tank
Top
**$23.95**

Jack Daniel's Logo
Burnout Women's Tank
Top
**$29.95**

Jack Daniels White
Burnout Women's Tank
Top
**$24.95**

Jack Daniel's Reverse
Stitch Saloon Hat
**$19.95**







Jack Daniel's Full
Saloon Logo Hat
**$23.95**

Jack Daniel's Old No. 7
Side Stamp Hat
**$19.95**

Jack Daniels Bug Logo
Wool Baseball Hat
**$25.95**

Jack Daniels Tower
Logo Hat
**$23.95**









Jack Daniel's Dual
Striped Hat
**$25.95**

Jack Daniel's Hot White
Contrast Hat
**$25.95**

Jack Daniels Blue
Denim Hat
**$19.95**

Jack Daniels Sheep
Lined Brown Hat
**SALE $19.95**
**$14.95**









Jack Daniel's White

Jack Daniel's Buckled

Jack Daniels Brimmed

Jack Daniels Winter

Straw Patch Hat
**$23.95**

Logo Tan Hat
**$23.95**

Beanie
**$21.95**

Camouflage Hat
**$18.95**



Jack Daniel's Bars Long
Sleeve T Shirt
**$24.95**



Jack Daniel's Saloon
Logo Long Sleeve T
Shirt
**$24.95**



Jack Daniel's Bug Logo
Women's Long Sleeve
Shirt
**$37.95**



Jack Daniel's Old No. 7
Arch Sweatshirt
**$49.95**



Jack Daniel's Saloon
Logo Hooded Sweatshirt
**$49.95**



Jack Daniel's Whiskey
Bottle Rocks Glasses
**$44.95**



Jack Daniel's Finish Line
Zippo
**$39.95**



Jack Daniel's 3D Bottle
Wall Art
**$59.95**



Jack Daniel's Desktop
Neon Clock
**$99.95**



Jack Daniel's Old No. 7
Neon Clock
**$99.95**



Jack Daniel's Old No. 7
Rotating Pub Light
**$289.95**



Jack Daniel's Bar Mirror
Set
**$99.95**



Jack Daniel's Bar Mirror
: Pewter Hooks
**$159.95**

Jack Daniel's Saloon
Logo Bar Stool
**$119.95**

Jack Daniel's Bar Stool
w/ Back
**$179.95**



Jack Daniel's Wooden
Bar Stool
**$349.95**






**Jack Daniels Saloon Table**
**$329.95**

**Jack Daniel's Wood Saloon Table**
**$799.95**

**Jack Daniel's Billiards Light Fixture**
**$549.95**

**Jack Daniels Saloon Logo Women's Babydoll Shirt**
**$29.95**



**Jack Daniel's Black No 7 Logo Hat**
**$17.95**

53 Item(s)

Show   All   ▼   per page

Sort by:   Position  |  Name  |  Price  |  Newest  |  ↓

---

**Sign Up To Receive** Monthly Give-a-ways, New Product Announcements, and Private Member-only Sales

add me to the cool people list     **SUBSCRIBE ›**

## Helpful Links

» Site Map

» Advanced Search

» Search Terms

» Contact Us

## About Boozin' Gear



» Our Story

» Social Responsibility

» Press / Media Inquiries

» Our Blog

» Follow us on Twitter

8+1  +20

## Customer Service

Putting "service" back in customer service

## Privacy & Security

We don't share nuttin' wit nobody

## 100% Satisfaction Guarantee

Don't Like It? Send it back!








© 2004-2015 Boozin' Gear, Inc.



# Beer & Liquor Dog Toys

**NARROW RESULTS:**

Do your pets love alcohol too? Don't let them be jealous of you during happy hour anymore! Boozin' Gear.com has brought to you our new line of toys for your four legged friend; Boozin' Dog Toys. Including mixed drinks, beer bottles and liquor bottles replicating many of your favorite alcohol brands. From rubber squeakers to plush toys made to entertain mans best friend.

**Drink**

Jagermeister (1)

**25 Item(s)**

Show | All ▼ | per page

Sort by: Position | Name | Price | Newest | ↓

**Product Type**

Accessory (1)

Dog Products (24)

**Price**

$0.00 – $10.00 (1)

$10.00 – $20.00 (24)

Arfsolut Vodka Dog Toy
: Bottle Plush Squeaker
**$13.95**

Heinie Sniff'n Beer
Squeak Dog Toy
**$13.95**

Killer Bite Beer Squeak
Dog Toy
**$13.95**

Cataroma Extra Squeak
Dog Toy
**$13.95**

Kennel Relax'n
Chardonnay Squeak
Dog Toy
**$13.95**

Crispaw Champagne
Squeak Dog Toy
**$13.95**

Jose Perro Squeak Dog
Toy
**$13.95**

Seagrrrms Plush
Squeak Dog Toy
**$13.95**



Bad Spaniel's Squeak
Dog Toy
**$13.95**



Jagermeister Black
Bandana
**$9.95**



Hamster Light Beer
Squeak Dog Toy
**$13.95**



Dos Perros Beer
Squeak Dog Toy
**$13.95**



**Deers Bite Beer Squeak Dog Toy**
$13.95



**Blue Cats Trippin Beer Squeak Dog Toy**
$13.95



**Pissness Dark Lager Squeak Dog Toy**
$13.95



**Smella R-Crotch Beer Squeak Dog Toy**
$13.95



**Lickate Beer Squeak Dog Toy**
$13.95



**Pawschitngo Beer Squeak Dog Toy**
$13.95




**Meow Chased One Champain Squeak Dog Toy**
$13.95



**Skinny Dog Marggggrita Dog Toy : Plush Squeaker**
$13.95



**Dog Julio Tequila Bottle Dog Toy : Plush Squeaker**
$13.95



**Barkardi Rum Bottle Dog Toy : Plush Squeaker**
$13.95



**Grey Dogs Vodka Bottle Dog Toy : Plush Squeaker**
$13.95



**Grrrobert Slobbery Pinot Noir Squeak Dog Toy**
$13.95



**Drools Beer Squeak Dog Toy**
$13.95

25 Item(s)

Show All ▼ per page

Sort by: Position | Name | Price | Newest | ↓

**Sign Up To Receive** Monthly Give-a-ways, New Product Announcements, and Private Member-only Sales

add me to the cool people list


SUBSCRIBE ►

## Helpful Links

» Site Map

» Advanced Search

» Search Terms

» Contact Us

## About Boozin' Gear



» Our Story

» Social Responsibility

» Press / Media Inquiries

» Our Blog

» Follow us on Twitter

$8$+1  +20

## Customer Service

Putting "service" back in customer service

## Privacy & Security

We don't share nuttin' wit nobody

## 100% Satisfaction Guarantee

Don't Like it? Send it back!

McAfee SECURE

STELLA SERVICE EXCELLENT

Privacy Guaranteed

VISA  MasterCard  PayPal

checks accepted by mail

secure GlobalSign

Authorize.Net

© 2004-2015 Boozin' Gear, Inc.



Boozin' gear.com FREE SHIPPING on orders over $50 to the USA
888-BOOZIN1
Customer Service | My Account | Log In
Shopping Cart (0) $0.00 view
Drinks Clothing Bar & Accessories Occasions Find your gear SEARCH

Home / Dog Products / **Bad Spaniel's Squeak Dog Toy**

# Bad Spaniel's Squeak Dog Toy

**MSC-0479**

Tall bottle of Bad Spaniel's liquor; our Jack Daniel's style squeaker toy. This safe, durable rubber dog toy squeaks when squeezed. This toy measures approx 10" tall.

Availability: In stock Ships: 1-2 days

your price:

**$13.95**

Qty: 1 ADD TO CART

g+1 Like Share 0 Pin it

Click on above image to enlarge

**More Views**

## QUESTIONS? 888-BOOZIN1

call our friendly customer service M-F 9am - 6pm EST

SHOP WITH CONFIDENCE

- ✓ 100% Secure Ordering
- ✓ Free Shipping on orders over $50
- ✓ Satisfaction Guarantee
- ✓ We Value Your Privacy

Add to Wishlist | Email to a Friend

**Additional Information**

**Product Type** Dog Products

**YOU MAY ALSO LIKE...**

Deers Bite Beer Squeak Dog Toy
**$13.95**

Jack Daniels Saloon T Shirt
**$21.95**

g+1 Like Share 0 Pin it

**CUSTOMER REVIEWS** **WRITE A REVIEW**

There are no reviews for this product.

Add a comment...
Comment
Facebook social plugin

Sign Up To Receive Monthly Give-a-ways, New Product Announcements, and Private Member-only Sales add me to the cool people list SUBSCRIBE

Bad Spaniel's Squeak Dog Toy | BoozinGear.com

## Helpful Links

» Site Map

» Advanced Search

» Search Terms

» Contact Us

## About Boozin' Gear



» Our Story

» Social Responsibility

» Press / Media Inquiries

» Our Blog

» Follow us on Twitter



## Customer Service

Putting "service" back in customer service

## Privacy & Security

We don't share nuttin' wit nobody

## 100% Satisfaction Guarantee

Don't Like it? Send it back!






checks accepted by mail




© 2004-2015 Boozin' Gear, Inc.

     






