# Exhibit 5

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                                    Martin Wolinsky

```
          IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF ARIZONA


------------------------------)
VIP PRODUCTS, LLC, an Arizona  )
limited liability company,     ) CASE NO.
                               ) 14-cv-02057-PHX-DGC
          Plaintiff and        )
          Counterdefendant,    )
     vs.                       )
                               )
JACK DANIEL'S PROPERTIES, INC., )
a Delaware corporation,        )
                               )
          Defendant and        )
          Counterclaimant.     )
------------------------------)



     ** CONTAINS ATTORNEYS' EYES ONLY PORTIONS **

          DEPOSITION OF:  MARTIN WOLINSKY

              DATE:  JULY 28, 2015

                   HELD AT:

          MORGAN, LEWIS & BOCKIUS, LLP
               One State Street
               Hartford, Connecticut

                     - - -
```

Reporter:  Sandra Semevolos, RMR, CRR, LSR #74

```
          BRANDON HUSEBY REPORTING & VIDEO
                (800) 852-4589
                249 Pearl Street
            Hartford, Connecticut  06103
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1        A.    Yes.

 2        Q.    If at any time -- I take breaks in

 3   depositions about an hour, every hour, hour and 15

 4   minutes or so.  If you would like one at some other

 5   point, please don't hesitate to ask.  My only request

 6   is that if there is a question pending that you have

 7   not yet answered, I would like you to answer the

 8   question and then we can take a break.

 9              Do you understand that?

10        A.    Yes.

11        Q.    I'm going to try to ask you

12   straightforward, understandable questions.  I will

13   undoubtedly fail from time to time to do that.  If

14   you don't understand my question, please just say so,

15   and I will either try to rephrase it, or I will have

16   the reporter read it back to you a second time.

17              If you answer one of my questions, I'm

18   going to assume, and I think anyone reading the

19   transcript afterwards will assume that you understood

20   my question and your answer was responsive to the

21   question that I asked you, but if at any point I'm

22   unclear or you just don't understand what I'm asking

23   you, please speak up and I'll try to either rephrase

24   it or have the reporter read it back.

25              Do you understand that?
```

07/28/2015                                                                    Martin Wolinsky

```
 1   BY MR. LARKIN:

 2       Q.    We will get into those in a moment.  So

 3   sitting here today, there is nothing that stands out

 4   in your mind as something in the Brown-Forman or Jack

 5   Daniel's documents that you recall specifically using

 6   in forming the opinions expressed in this case?

 7                   MR. LONG:  Objection, form.

 8                   THE WITNESS:  Help me out, guys.

 9                   MR. LARKIN:  You answer.

10                   MR. LONG:  If you understand the

11   question, you can answer.

12       A.    Is there anything --

13   BY MR. LARKIN:

14       Q.    Sitting here today, anything in

15   particular --

16       A.    No.

17       Q.    -- that you can recall?  No; is that

18   correct?

19       A.    That's what I said, yes.

20                   MR. LARKIN:  Let's mark as Exhibit 96

21   a copy of Mr. Wolinsky's report in this case.

22                   (Exhibit 96, Rule 26 Expert Report

23                   of Martin Wolinsky, Nos. WOL0001 -

24                   024, marked for identification.)

25   BY MR. LARKIN:
```

07/28/2015                                                    Martin Wolinsky

```
 1   maybe 2000 and 2001, but certainly nothing beyond

 2   that.

 3        Q.    Do you remember the products that were

 4   involved in your --

 5        A.    It was not product-driven.  It was the

 6   economics of the Brown-Forman portfolio, how it

 7   impacts the wholesaler, consumer pricing, et cetera.

 8        Q.    During the course of that engagement, did

 9   you look at those issues for Jack Daniel's Whiskey?

10        A.    Did I look at what issues?

11        Q.    I'm a little confused.  In your consulting

12   work for Brown-Forman --

13        A.    It was not brand-specific.  It was

14   portfolio -- the economic value of the portfolio, not

15   any brand.

16        Q.    Okay.  At the time, did you understand that

17   Jack Daniel's Whiskey was within the Brown-Forman

18   portfolio?

19        A.    I think I knew that before I was hired as a

20   consultant.

21        Q.    Do you agree that the Jack Daniel's Whiskey

22   is one of the best-selling whiskeys in the United

23   States?

24             MR. LONG:  Objection, vague.

25        A.    Yes.
```

07/28/2015                                                      Martin Wolinsky

```
 1              Are you familiar with the legal concept
 2    "likelihood of confusion" or "confusion"?
 3         A.    I don't know what that means, "familiar."
 4         Q.    What was the purpose of giving the
 5    defendant in that other case a process to go out and
 6    look at shelves and interview bartenders?
 7         A.    There was multipurposes.
 8         Q.    What were they?
 9         A.    One was to see if they were on firm ground
10    on the issue of confusion.  And two was to see if the
11    plaintiff's expert followed any process, and I
12    suggested a process to follow.
13         Q.    Was your engagement -- strike that.
14              Did your engagement in that other vodka
15    case involve looking at how distinctive the
16    plaintiff's packaging was?
17                   MR. LONG:  Objection, vague.
18         A.    Distinctive for me is relative to the
19    competitive set, and so relative to the competitive
20    set, that was part or all of the issue, but by
21    itself, you need something to compare it to.
22    BY MR. LARKIN:
23         Q.    You used the term "aesthetically
24    functional" in your report.  Did you look at the
25    issue of aesthetic functionality in that other
```

07/28/2015                                                      Martin Wolinsky

```
 1   engagement?
 2        A.    Yes.  Again, it was about process.  It was
 3   one of the things I gave them a heads-up on.  I
 4   didn't use those words.  Those words are way beyond
 5   me.
 6        Q.    Do you feel comfortable identifying the
 7   parties in that case?
 8        A.    Both of the principals have passed,
 9   so -- and the ownership has changed.  So may I ask --
10        Q.    Let me ask you this:  That case, I gather
11   from one of your previous answers, that case went to
12   trial?
13        A.    It went to trial, but it did not conclude
14   in trial.
15        Q.    It settled at some point during the trial?
16        A.    Yes.
17        Q.    Is there any reason of a -- strike that.
18             Do you have a confidentiality agreement
19   with whoever your consulting client was in that case?
20        A.    I'm not big on -- did I have a
21   confidentiality agreement?  It was all implied.  Did
22   I sign papers?  I did not sign papers.
23        Q.    Where did the trial occur?
24        A.    I believe in New York.
25        Q.    Given that the case went to trial, can you
```

07/28/2015                                                      Martin Wolinsky

```
 1   please.

 2        A.     Got it.

 3        Q.     Turn to WOL6.

 4        A.     Okay.

 5        Q.     Under Conclusion Number 1, you wrote "The

 6   overall Jack Daniel's Tennessee whiskey packaging is

 7   not distinctive (not unique) in the Bourbon/Tennessee

 8   whiskey segment," then you went on a bit there.

 9               What did you mean by "The overall Jack

10   Daniel's Tennessee whiskey packaging"?

11        A.     I meant the visual as a consumer would see

12   it.

13        Q.     And is that visual shown on page WOL008?

14        A.     Yes.

15        Q.     The entire package is depicted there?

16        A.     I don't understand.

17        Q.     Strike the question.  I'll withdraw it.

18        A.     Where are we now, so I can stay with you?

19        Q.     Let's go back to WOL006, please.

20        A.     Okay.

21        Q.     In paragraph 1, under Conclusions, you

22   listed four bullet points which you described in the

23   text above as the four common characteristics

24   summarized again below.  The first is a square bottle

25   with a ribbed neck.  The second is a black cap.  The
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1   that, please?

 2       Q.    Page 5, paragraph 6.

 3              MR. LONG:  What page is it, Chris?

 4              MR. LARKIN:  Page 5, paragraph 6.

 5       A.    Yes.

 6   BY MR. LARKIN:

 7       Q.    So the record is clear, your understanding

 8   of the trade dress that Jack Daniel's is asserting in

 9   this case is what is shown and described on page 5,

10   paragraph 6, of Jack Daniel's counterclaim; is that

11   correct?

12       A.    Correct.

13              MR. LONG:  Objection.  Asked and

14   answered.

15   BY MR. LARKIN:

16       Q.    Why didn't you reference the additional

17   elements that are claimed in there in your report?

18       A.    I can't answer that.  Don't know.

19       Q.    You only considered certain portions of the

20   trade dress as described by Jack Daniel's in your

21   report; correct?

22              MR. LONG:  Objection.

23              THE WITNESS:  The objection means

24   I --

25              MR. LONG:  Objection, I'm objecting to
```

```
 1                    THE WITNESS:  I have that.
 2                    MR. LARKIN:  And WOL005.
 3                    MR. LONG:  Why don't you look at
 4     those, refresh your recollection.  6 and 5.  He said
 5     pages 6 and 5.
 6          A.    Right.
 7     BY MR. LARKIN:
 8          Q.    Do you see that list of four?
 9          A.    I do.
10          Q.    Okay.  That list does not include
11     everything that's listed in Jack Daniel's assertion
12     of its trade dress in the Answer and Counterclaim;
13     correct?
14          A.    Let me go back and look at it.
15                I certainly see that Old No. 7 is not in
16     the report.
17          Q.    And the filigreed border bearing the Jack
18     Daniel's mark depicted in arch lettering at the top
19     of the label is not in your report either?
20          A.    That's correct.
21          Q.    The Old No. 7 mark contained within a
22     filigree oval design in the middle portion of the
23     label beneath the Jack Daniel's mark is not in your
24     report; correct?
25          A.    Correct.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                          Martin Wolinsky

1      Q.    The words "Tennessee Sour Mash Whiskey" in

2   the lower portion of the label with the word

3   "Tennessee" depicted in script is not referenced in

4   your report; correct?

5      A.    That is correct.

6      Q.    Aren't those features important to the

7   appearance of the package?

8      A.    I think the first -- to some degree or

9   another.

10      Q.    Okay.  Did you ever consider incorporating

11   them in your definition of the overall Jack Daniel's

12   Tennessee whiskey packaging in your report?

13      A.    I should have.

14      Q.    Turn for a moment, please, to Exhibit 91,

15   this one.

16      A.    Let me find my own, if I can.

17      Q.    There you go.  And would you please turn,

18   Mr. Wolinsky, in Exhibit 91, to the page marked

19   JDPI-CON 23?

20      A.    Okay.

21      Q.    And this page is entitled "JD Long-Term

22   Package Evolution."

23           Do you see that?

24      A.    Uh-huh.

25      Q.    Do you remember seeing this page when you

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                          Martin Wolinsky

```
 1    BY MR. LARKIN:

 2        Q.    Do you -- the package on the right under

 3    2011, you'll agree that that's the current package;

 4    correct?

 5        A.    It appears to be.

 6        Q.    Did you do anything in the course of your

 7    engagement in this matter to determine what the Jack

 8    Daniel's package looked like historically?

 9        A.    I saw pictures, but from this report.

10        Q.    Okay.  And you recall seeing these

11    pictures?

12        A.    I do.

13        Q.    Do you agree that each of the bottles shown

14    on page CON 23 is square in shape?

15        A.    The '90s one looks more rounded to me, as

16    does the '60s.

17        Q.    Okay.  In your report, you reference and

18    depict a bunch of square bottles.  We will get to

19    that in a moment.

20              Would you characterize each of the bottles

21    shown on CON 23 as being square shape to, at least,

22    some degree?

23        A.    The '60s is more rounded to me, as I said

24    earlier, as is the 2002, and the '90s are more

25    rounded than square.
```

```
 1      Q.    So you don't consider those to be square
 2  bottles?
 3      A.    Correct.
 4      Q.    Do you agree that each of the bottles shown
 5  on CON 23 has a black cap or a blacktop?
 6      A.    Yes.
 7      Q.    Do you agree that each of those bottles has
 8  a black neck wrap with Old No. 7 in white printing?
 9      A.    I cannot tell the '60s and the '70s.
10      Q.    How about the others?
11      A.    It looks like they have Old No. 7 on it.  I
12  can't -- my eyes are not working well enough to
13  answer the '90s one.
14      Q.    Okay.  Do you agree that each of the
15  bottles shown on JDPI-CON 23 has a black front label
16  with white printing and a filigreed border?
17      A.    Yes.
18      Q.    Do you agree that each of the bottles shown
19  on CON 23 has the Jack Daniel's mark depicted in arch
20  lettering at the top of the label?
21      A.    Yes.
22      Q.    Do you agree that each of the bottles on
23  CON 23 has the Old No. 7 mark within a filigreed oval
24  design in the middle portion of the label beneath the
25  Jack Daniel's mark?
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.
07/28/2015                                                    Martin Wolinsky

```
 1        A.    That moves as the brands evolved, but yes.
 2        Q.    And you agree that the words "Tennessee
 3   Sour Mash Whiskey" appear in the lower portion of the
 4   label with the word "Tennessee" in script in each of
 5   the bottles on CON 23?
 6        A.    Yes.
 7        Q.    Did you ever read the deposition testimony
 8   of VIP's principal Steven Sacra?
 9        A.    I did not.
10        Q.    Did you ever read the deposition testimony
11   of the designer who created the label for the Bad
12   Spaniels toy, L. Phillips?
13        A.    I did not.
14        Q.    Did you ever learn anything about how the
15   label or the shape of the Bad Spaniels toy came
16   about?
17        A.    I do not know that.
18        Q.    Would the process of designing the Bad
19   Spaniels toy have any effect on -- strike that.
20              If VIP's designer used -- had a bottle of
21   Jack Daniel's on the table in front of her when she
22   designed the label, if that were true, would that
23   affect your opinions in this case one way or the
24   other?
25                    MR. LONG:  Objection, form,
```

```
 1   foundation.

 2                    THE WITNESS:  Does that mean I answer?

 3                    MR. LARKIN:  Yes.

 4                    MR. LONG:  If you understand the

 5   question.

 6        A.    I'd probably fire the designer.

 7   BY MR. LARKIN:

 8        Q.    Why is that?

 9        A.    Because if they were trying to copy the

10   Jack Daniel's bottle, they didn't do a particularly

11   good job.

12        Q.    If it were true that Steven Sacra sent

13   photographs of the Jack Daniel's bottle to the

14   company in Asia that manufactured the Bad Spaniels

15   toy, would that affect your opinions in this case one

16   way or the other?

17                    MR. LONG:  Objection, form and

18   foundation.  And I'm not sure what opinions you are

19   talking about.

20                    MR. LARKIN:  Any of them.

21        A.    My opinion is based on visually seeing how

22   distinctive the Jack Daniel's package was within the

23   Bourbon/Tennessee whiskey category so all these

24   things would not have any impact on me.

25   BY MR. LARKIN:
```

```
 1   totally breaking away from the uniform path and
 2   introducing a totally different overall look to the
 3   package.
 4        A.    Well, maybe I overstated it with "totally,"
 5   but certainly if you put Maker's Mark, Jack Daniel's
 6   Single Barrel and Knob Creek, they do not look like
 7   first cousins, as does Benchmark, Evan Williams and
 8   Jim Beam Black.  To me, they all look like first
 9   cousins.
10        Q.    What is your understanding of the
11   term "trade dress" as it is used in trademark law?
12        A.    As used in trademark law, I don't have any
13   understanding.
14        Q.    What is your understanding of the
15   term "trade dress" as it is used in the spirits
16   business?
17        A.    Nothing.
18        Q.    Is that a term that --
19        A.    I never heard the term before Mr. Long
20   called me.
21        Q.    Okay.  What is your understanding of the
22   term "distinctive," as it is used in trademark law?
23        A.    Again, once you said trademark law, I have
24   no understanding.
25        Q.    Have you ever heard the term "inherent
```

07/28/2015                                                Martin Wolinsky

```
 1   distinctiveness"?

 2       A.    I have not.

 3       Q.    Have you ever heard the term "acquired

 4   distinctiveness"?

 5       A.    I have not.

 6       Q.    You used the term "distinctive" in a number

 7   of places in your report, Exhibit 96.  What did you

 8   mean by that when you used that word?

 9       A.    Distinctive would mean it looks like it's

10   not part of the uniform.  Again, the words that I

11   used repeatedly were "uniform" and "first cousin," so

12   it doesn't look like a part of the uniform.

13           So if you saw the Maker's Mark bottle, you

14   would not immediately jump to the conclusion that it

15   is a bourbon or Tennessee whiskey.  If you saw the

16   bottle for Evan Williams, you would jump to that

17   conclusion.

18       Q.    Is it your opinion that any distilled

19   spirits package that falls within the Uniform

20   category isn't distinctive?

21       A.    I think distinctive is a continuum.  I

22   wouldn't put it as distinctive as Maker's Mark and

23   not as uniform as the private label bourbon, so it's

24   a continuum.  It would be difficult to answer yes or

25   no to that.
```

07/28/2015                                                        Martin Wolinsky

```
 1      Q.    Let me finish my question.

 2      A.    I thought you were finished, I apologize.

 3      Q.    I'm sorry, that's my fault.  Let me

 4   withdraw that question.

 5            Can you show me in your report where you

 6   discussed a continuum from unique at one end and

 7   uniform at the other?

 8      A.    Yeah.  On page 14, I do it by category

 9   rather than segment.

10      Q.    Is there anything in your report where you

11   discuss that issue by segment?

12      A.    I'd have to read the report again.  I don't

13   recall.

14                 MR. LONG:  Take your time, read the

15   report.

16      A.    I think we do it describing by category,

17   you know, but I don't think we compare and contrast

18   as we are teasing out now.

19   BY MR. LARKIN:

20      Q.    Okay.  Let's look at -- I'm sorry, if you

21   want to -- please continue to look through your

22   report.  I jumped the gun there.

23                      (Pause.)

24      A.    Okay.

25   BY MR. LARKIN:
```

```
 1      Q.    Is there anything in your report other than

 2   the category --

 3      A.    I think the category continuum, and it

 4   should have been elaborated, if I were to redo the

 5   report after today's time with you, it would be

 6   more -- it would be deeper.  But certainly it talks

 7   by category, without the reason, that brands tend to

 8   be distinctive or unique -- and unique.  But it was

 9   not as laid out here as it could have been.

10      Q.    Just so the record is clear, is it your

11   opinion that a distilled package -- strike the

12   question.

13            Is it your opinion that a whiskey package

14   that you characterize as being in the uniform

15   category as opposed to the unique category can become

16   distinctive through sales and advertising and

17   exposure of that particular product to the public?

18                MR. LONG:  Objection, foundation and

19   form.

20      A.    I don't know the answer to that.

21   BY MR. LARKIN:

22      Q.    What is your understanding of the

23   term "aesthetic functionality" as it is used in

24   trademark law?

25      A.    I can't talk about trademark law.  I can
```

```
 1   tell you how I use it, if that's okay.

 2       Q.    Go ahead.

 3       A.    Aesthetically functionality means it

 4   appeals to the consumer and it looks like part of a

 5   category.

 6       Q.    Had you ever heard that term before your

 7   engagement in this case?

 8       A.    I've heard the term "aesthetics" and

 9   "functionality" but I don't know if I've

10   seen -- heard them together.

11       Q.    It's in your conclusions on page WOL006 in

12   your report.  The second conclusion is "The overall

13   Jack Daniel's packaging is clearly aesthetically

14   functional, italicized, utilizing all the common

15   elements of the uniform adopted by numerous other

16   brands."

17            Do I understand it before your engagement

18   in this case, you had not heard the terms "aesthetic

19   functionality" or "aesthetically functional"

20   together?

21                MR. LONG:  Objection, asked and

22   answered.

23   BY MR. LARKIN:

24       Q.    Is that correct?

25       A.    Not together, but individually, I think
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                     Martin Wolinsky

```
 1    that is --

 2         Q.    You heard "aesthetic" and you heard

 3    "functional"?

 4         A.    And I heard them in the same paragraph.

 5         Q.    But you hadn't heard the terms --

 6         A.    You are just splitting hairs, I can't

 7    answer that.

 8         Q.    Okay.  Do you have an understanding of the

 9    term "generic" as it applies to distilled spirits

10    packaging?

11         A.    I understand it as it applies to packaging.

12         Q.    What is your understanding?

13         A.    That costs are a major piece of it, and

14    it's less distinctive than brands that have made a

15    point not to be in uniform.

16         Q.    What did you mean by costs are a major

17    piece of it?

18         A.    When you have a generic package, the

19    package typically as a percent of sales is low, you

20    know, versus a package where the percent of sales is

21    high.

22         Q.    A cheaper package, to use a lay term?

23         A.    No, not necessarily.  Just that the

24    packaging costs are highly scrutinized.  We have that

25    in Smirnoff.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                              Martin Wolinsky

```
 1    in the spirits business, which of those three
 2    categories does Jack Daniel's Tennessee whiskey fall
 3    into?
 4        A.    Premium.
 5        Q.    Look at page WOL008 in your report, please.
 6        A.    Okay.
 7        Q.    Is it your opinion that the packaging for
 8    each of the products shown on that page is not
 9    distinctive?
10              MR. LONG:  Objection to form.
11        A.    To me, they look like first cousins, so
12    they would be less than distinctive on the continuum.
13    BY MR. LARKIN:
14        Q.    But is it your opinion that -- one of the
15    conclusions you reach in your report on page WOL6 is
16    that the overall Jack Daniel's Tennessee whiskey
17    packaging is not distinctive, not unique.
18              Do you have the same opinion as to the
19    other products shown on page WOL008?
20        A.    They all look like first cousins to me, so
21    the level of distinctiveness is small, not great.
22        Q.    Is it your opinion that the products shown
23    on WOL8 are all aesthetically functional?
24              MR. LONG:  Objection, form,
25    foundation.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                  Martin Wolinsky

```
 1       A.    Yes.

 2  BY MR. LARKIN:

 3       Q.    Is it your opinion that all the products

 4  shown on WOL8 are generic?

 5       A.    Not generic.

 6       Q.    Do you consider the Jack Daniel's packaging

 7  to be generic?

 8              MR. LONG:  Objection, form, as to the

 9  meaning of generic.

10  BY MR. LARKIN:

11       Q.    Go ahead.

12       A.    I do not consider the Jack Daniel's package

13  to be generic.

14       Q.    Thank you.  Look at the products shown on

15  page WOL10, the gin products.  Is it your opinion

16  that each of the products in the uniform portion of

17  that page is not distinctive?

18              MR. LONG:  Could you read that

19  question again.

20         (Record read by the court reporter.)

21              MR. LONG:  I have an objection to form

22  as to whether you are talking about the product or

23  packaging, or talking overall.  It's not clear.

24  BY MR. LARKIN:

25       Q.    Can you answer the question?
```

07/28/2015                                                                Martin Wolinsky

```
 1      A.     That is correct.

 2                    MR. LONG:  Are we referring to those

 3      in the bottom of the page?

 4                    MR. LARKIN:  Yes.

 5                    MR. LONG:  Okay.

 6      BY MR. LARKIN:

 7      Q.     Is it your opinion that the products on the

 8      bottom of the page, on WOL10, are aesthetically

 9      functional?

10      A.     On the bottom of the page?

11      Q.     Yes.

12      A.     It appears that way.

13      Q.     Look at WOL12, please.

14      A.     Okay.

15      Q.     Is it your opinion that the tequila

16      packages shown on the uniform portion of that page

17      are not distinctive?

18                    MR. LONG:  Objection to form.

19      A.     I think, again, on a continuum basis, the

20      products on the bottom of the page, certainly the two

21      on the right and the two on the left, are

22      substantially more in uniform than the brand that we

23      use on the top of the page.

24      BY MR. LARKIN:

25      Q.     Do you believe that the four tequila
```

```
 1   products at the bottom of page WOL12 are
 2   aesthetically functional?
 3       A.    I do.
 4       Q.    Look at page WOL013, please.
 5       A.    Right.
 6       Q.    Is it your opinion that the Canadian
 7   whiskey products -- strike that.
 8            Is it your opinion that the packaging for
 9   the Canadian whiskey products shown in the uniform
10   portion of page WOL13 are not distinctive?
11            MR. LONG:  Objection to form.
12       A.   I think if you look at these products and
13   were from Mars, you would say they all look like they
14   come from the same category, when Crown Royal does
15   not.
16   BY MR. LARKIN:
17       Q.   Do you believe that the, what you called
18   the uniform Canadian whiskey packages on page WOL13
19   are all aesthetically functional?
20       A.   They appear that way.
21       Q.   Look back to page WOL008, please.
22       A.   I have it.
23       Q.   Thank you.  Is it your opinion that the
24   producers of the product shown on page -- products
25   shown on page WOL008 have no rights in the overall
```

```
 1   packages is on page 9.  According to his report, page
 2   8 does not have unique and uniform.
 3                MR. LARKIN:  He just testified that
 4   page 9 was not intended to be a continuum.
 5                MR. LONG:  No, he is talking about the
 6   bottom of it.  You said the border from left to right
 7   was somehow implying an increasing gradient of
 8   distinctiveness, that's how I interpreted it.  He is
 9   saying it doesn't.  The choice of Jack Daniel's being
10   on the left doesn't mean it's more distinctive than
11   the one being on the right.
12   BY MR. LARKIN:
13       Q.    Then look at page WOL009.
14       A.    Yes.
15       Q.    Do you agree that -- do you believe that
16   the Jack Daniel's package is more distinctive than
17   the Jim Beam Black package?
18       A.    I have little to choose from between those
19   two packages.
20       Q.    So you can't make a determination there?
21       A.    It's a pick'em for me.
22       Q.    How about the Jack Daniel's versus the Evan
23   Williams package?
24       A.    The Jack Daniel's package looks more
25   distinctive than the Evan Williams package.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1      Q.    How about the Jack Daniel's versus

 2   Benchmark?

 3      A.    Same thing.

 4      Q.    Look back at 008, please.

 5            Do you believe that the Jack Daniel's

 6   package is more distinctive than the Ezra Brooks

 7   package?

 8                 MR. LONG:  Talking about overall

 9   distinctiveness?

10      A.    I think it's a push.

11                 MR. LARKIN:  I'm using the terms he

12   used.

13   BY MR. LARKIN:

14      Q.    How about is the Jack Daniel's package more

15   distinctive than the Benchmark package?

16      A.    More distinctive.

17      Q.    Why are you able to determine that the Jack

18   Daniel's package is more distinctive than the

19   Benchmark package?

20      A.    Just on visual.  As I visually look at them

21   and in my mind put them on a continuum, I have Ezra

22   Brooks closer to Jack Daniel's than I do Benchmark.

23      Q.    What is it about the Jack Daniel's package

24   and the Benchmark package that makes the Jack

25   Daniel's package more distinctive visually?
```

```
 1        A.    I think the shoulder.

 2        Q.    How about the label, anything on the label?

 3        A.    It looks slightly more premium than the

 4   Benchmark.

 5        Q.    Is that your understanding of what

 6   distinctiveness is, whether a product has a premium

 7   appearance or not?

 8        A.    No.  Distinctive means does it look like

 9   it's wearing the uniform and does it look like all

10   the rest of the first cousins.  In this dialogue, we

11   are splitting hairs.

12        Q.    On the pages in which you -- on the pages

13   other than WOL9 on which you rate products in the

14   Uniform category left to right, did you intend on any

15   of those pages to rank those products by distinctive?

16        A.    Can you be specific so I can get to that

17   page?

18        Q.    Let's take WOL10.

19        A.    And the answer is, the five bottom ones

20   were put there randomly.  They were not there to be

21   part of the continuum.  Certainly the top three ones

22   were in a separate league than the bottom five ones.

23        Q.    Okay.  And looking at WOL12, the tequila

24   packaging, is the same true there, they were just

25   placed there randomly, not in order of
```

07/28/2015                                                    Martin Wolinsky

```
 1   record.

 2                    THE WITNESS:  Right.

 3                    MR. LONG:  He asks the question and

 4   you answer to the degree you can.

 5                    Is that fair, Chris?

 6                    MR. LARKIN:  Yes.

 7                    THE WITNESS:  Okay, would you ask the

 8   question one more time, please.

 9                    MR. LARKIN:  I'll try it again.

10   BY MR. LARKIN:

11       Q.   Let's take the last 15 years, think about

12   that period, which products shown on page WOL8 of

13   your report has had the largest dollar sales during

14   that period?

15                    MR. LONG:  Objection to form,

16   foundation.

17       A.   Jack Daniel's.

18   BY MR. LARKIN:

19       Q.   And let's say the last 30 years, including

20   the time you were in the business with Heublein and

21   Smirnoff, which of the products shown on WOL8 has had

22   the largest revenue sales?

23                    MR. LONG:  Objection, form,

24   foundation.

25       A.   I would suspect it's Jack Daniel's.
```

07/28/2015                                                    Martin Wolinsky

```
 1   BY MR. LARKIN:

 2       Q.    Does the fact that Jack Daniel's -- strike

 3   that.

 4             Would you agree that Jack Daniel's has been

 5   a successful product in the United States in the last

 6   15 years?

 7                  MR. LONG:  Objection, vague.

 8       A.    What does successful mean?

 9   BY MR. LARKIN:

10       Q.    Sales success.

11       A.    In the grossest form, I would agree with

12   that.

13       Q.    Does the fact that the Jack Daniel's

14   product has been a successful seller in the last 15

15   years affect your opinion in any way as to whether

16   its packaging is distinctive?

17       A.    No.

18       Q.    Have you seen Jack Daniel's print ads?

19       A.    Not recently.

20       Q.    Have you seen Jack Daniel's television ads?

21       A.    Not at all.

22       Q.    Have you seen the Jack Daniel's product in

23   motion pictures?

24       A.    No.

25       Q.    Have you seen the Jack Daniel's product on
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                              Martin Wolinsky

```
 1   television programs?

 2        A.    Would you clarify that, please?

 3        Q.    Have you seen any television programs in

 4   which the actors drink or otherwise handle Jack

 5   Daniel's Whiskey?

 6        A.    No.

 7        Q.    Look again at your report, which you have

 8   in front of you, and your conclusions on page WOL6.

 9   Conclusion Number 1, we've talked about a bit before,

10   the overall Jack Daniel's Tennessee whiskey packaging

11   is not distinctive, not unique, in the

12   Bourbon/Tennessee whiskey segment.

13           Is it your opinion that a package that is

14   not unique can ever become distinctive because it has

15   achieved a high level of sales or it has been heavily

16   advertised or there is other evidence that it's been

17   exposed to the public?

18           MR. LONG:  Objection, foundation,

19   form.

20        A.    Could you ask the question again, please.

21   BY MR. LARKIN:

22        Q.    Your first conclusion is that Jack Daniel's

23   packaging is not distinctive, not unique.

24           Is it your opinion that a package that at

25   some point is not distinctive can become distinctive,
```

07/28/2015                                                  Martin Wolinsky

```
 1   can become recognized because it is the subject of
 2   extensive sales, heavy advertising, public exposure?
 3                MR. LONG:  You are asking him a
 4   general hypothetical?
 5                MR. LARKIN:  Yes.
 6                MR. LONG:  Not specific to --
 7                MR. LARKIN:  I'm asking him as an
 8   expert on whether he thinks a package of that sort
 9   could ever become distinctive by virtue of sales,
10   advertising and exposure.
11                MR. LONG:  Any package?
12                MR. LARKIN:  Any package.
13                MR. LONG:  Still objection as to form,
14   and the meaning of distinctive.
15   BY MR. LARKIN:
16       Q.    Go ahead.
17       A.    I don't know the answer.
18       Q.    And farther down in your first conclusion,
19   Mr. Wolinsky, you wrote "The combination of the four
20   common features of the bottle and label design of the
21   Jack Daniel's Old No. 7 Tennessee whiskey bottle
22   provide Jack Daniel's Tennessee whiskey with a
23   standard industry 'Uniform' that identifies the Jack
24   Daniel's Tennessee whiskey as an American whiskey,
25   not just a Jack Daniel's Whiskey."
```

07/28/2015                                                      Martin Wolinsky

```
 1              Do you see that?

 2      A.    I do.

 3      Q.    What is that function?

 4      A.    The function is that it is a bourbon or

 5   Tennessee whiskey.

 6      Q.    Is it your opinion that people looking at

 7   the Jack Daniel's bottle that is shown in the Answer

 8   and Counterclaims and in your report will simply

 9   understand that to be a bourbon or Tennessee whiskey,

10   not a whiskey that comes from Jack Daniel's?

11              MR. LONG:  Objection, form.

12      A.    I don't know if I can separate those two,

13   between being a bourbon or Tennessee whiskey and

14   being Jack Daniel's bottle.

15   BY MR. LARKIN:

16      Q.    Is Jack Daniel's the best known Tennessee

17   whiskey?

18              MR. LONG:  Objection, form,

19   foundation.

20      A.    Yes.

21   BY MR. LARKIN:

22      Q.    Do you think that Jack Daniel's is

23   uniquely -- strike that.

24              Among the Tennessee whiskeys that are sold,

25   is Jack Daniel's the one that is best known?
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

1                   MR. LONG:  Objection, asked and

2      answered.

3          A.    I would suspect people who drink Jack

4      Daniel's think it's a bourbon more than a Tennessee

5      whiskey.

6          Q.    Look at Conclusion Number 2 in your report

7      on page WOL6, please.  You wrote "The overall Jack

8      Daniel's packaging is clearly aesthetically

9      functional, italicized, using all the common elements

10     of the uniform adopted by numerous other major brands

11     in the Bourbon/Tennessee whiskey segment in the

12     United States as shown in the photos of competitive

13     whiskeys attached to this document."

14             Where did you -- why did you decide to use

15     the term "aesthetically functional" there?

16         A.    I put together "aesthetics" and "function."

17     I don't even know if it's a real term.

18         Q.    And I think you testified earlier, you are

19     not familiar with the term "aesthetic functionality"

20     or "aesthetically functional" as it is used in the

21     trademark; is that correct?

22         A.    As it is used in the trademark laws.

23         Q.    You do not have an understanding of that

24     one way or the other?

25         A.    Right.

```
 1   sentence, "For that reason, I believe that giving

 2   Jack Daniel's exclusive rights to use the combined

 3   four key features on the bottle and label design

 4   would impose a competitive disadvantage."

 5              MR. LONG:  So that implies a condition

 6   that if Jack Daniel's was given that, it would impose

 7   a competitive disadvantage.

 8   BY MR. LARKIN:

 9      Q.    Did you understand or assume, Mr. Wolinsky,

10   that Jack Daniel's sought the exclusive rights to use

11   a square bottle with a ribbed neck, a black cap, a

12   black neck wrap closure with white printing and a

13   black front label with white printing?

14              MR. LONG:  Objection to form.

15      A.    I'm getting lost.

16   BY MR. LARKIN:

17      Q.    Well, to make the statement that giving

18   Jack Daniel's the exclusive right to use those

19   elements certainly indicates to me that you thought

20   that that's what Jack Daniel's was trying to do in

21   this case.  Where did you get that understanding?

22      A.    I don't recall.

23      Q.    Okay.

24              MR. LARKIN:  Let's take a short break.

25   I know you need one and we will try to wrap up after
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.
07/28/2015                                                    Martin Wolinsky

```
 1      A.    I'm kind of overwhelmed now, so I don't.
 2      Q.    Okay.  Would your opinions be different if
 3  Jack Daniel's was claiming -- was not claiming simply
 4  a square bottle with a ribbed neck, a black cap, a
 5  black neck wrap closure with white printing and a
 6  black front label with white printing?
 7            MR. LONG:  Objection.  Calls for
 8  speculation.
 9            THE WITNESS:  Do I respond?
10            MR. LONG:  As always, if you
11  understand the question, you can answer it.
12      A.    It would not be any different.
13  BY MR. LARKIN:
14      Q.    In Conclusion 2 in your report, toward the
15  end, on page WOL6, and Exhibit 96, you wrote "The
16  disadvantage would be to deprive those other
17  competing companies the ability to use a standard
18  industry uniform that identifies any whiskey as an
19  American whiskey, not just a whiskey whose reputation
20  is related to Jack Daniel's."
21            Do you see that?
22      A.    Yes.
23      Q.    If Jack Daniel's prevails in this case, how
24  would that disadvantage occur?
25      A.    I don't know the answer to that.  Okay?
```

07/28/2015                                                      Martin Wolinsky

```
 1    That's not what I was charged with.
 2        Q.    Other companies in the, what you described
 3    as the Tennessee bourbon segment already use
 4    packaging that contains a square bottle with a ribbed
 5    neck, a black cap, a black neck wrap closure with
 6    white printing and a black front label with white
 7    printing; correct?
 8        A.    According to the VIP owner, that's correct.
 9        Q.    Well, but according to you as well, I mean,
10    isn't that --
11        A.    Yes, that is correct.
12        Q.    That's a definition of others wear the
13    uniform as you described it; correct?
14        A.    Correct.
15        Q.    And those others who in your view wear the
16    uniform of the Bourbon/Tennessee whiskeys category
17    use different labeling and graphics from Jack
18    Daniel's labeling and graphics; correct?
19              MR. LONG:  Objection, vague.
20        A.    Let me review this.
21    BY MR. LARKIN:
22        Q.    Okay.
23        A.    And would you ask the question again,
24    please.
25        Q.    I will.  Look at WOL8.
```

```
 1   rights," et cetera, "would impose a competitive

 2   disadvantage on other companies selling Kentucky and

 3   Tennessee American whiskey."

 4             Do you see that portion?

 5   A.    Yes.

 6   Q.    What are the other companies that would

 7   have a competitive disadvantage?

 8   A.    It would be companies that would be

 9   entering the marketplace.  It would be a barrier to

10   entry.

11   Q.    How about existing companies that are in

12   the marketplace now?

13   A.    Well, they are in the marketplace.

14             MR. LONG:  Objection.  Calls for

15   speculation.

16   BY MR. LARKIN:

17   Q.    So that means they would stay in the

18   marketplace?

19             MR. LONG:  Objection.  Foundation,

20   calls for speculation.

21   Q.    Is that your testimony?

22   A.    One second.  I'm getting confused.  I'm

23   being outmanned here, okay, which doesn't take much.

24   Q.    You testified that a competitive

25   disadvantage would be a barrier to entry; is that
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                          Martin Wolinsky

```
 1   correct?
 2      A.    That's correct.
 3      Q.    Your report indicates that there are other
 4   companies that wear the uniform, as you defined it in
 5   that category; is that correct?
 6      A.    Yes.
 7      Q.    Would they be competitively disadvantaged
 8   if Jack Daniel's prevailed in this lawsuit?
 9            MR. LONG:  Objection.
10      A.    I don't know the answer to that.
11   BY MR. LARKIN:
12      Q.    Look at Conclusion Number 3, please.  "The
13   overall packaging of the Jack Daniel's Old No. 7
14   Tennessee whiskey and that of the competitive bourbon
15   brands pictured in the attached photos look like
16   first cousins rather than individually distinctive
17   brand packaging."
18            Do you see that?
19      A.    Yes, I do.
20      Q.    Just so it's clear, you don't think that
21   any of the other packages shown on WOL8 --
22      A.    Can I get there for a second?
23      Q.    You can.
24      A.    Okay.
25      Q.    -- are distinctive?
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

 1            MR. LONG:  Objection.

 2   Mischaracterizes his testimony.  Asked and answered.

 3   BY MR. LARKIN:

 4      Q.    Is that your understanding?

 5            MR. LONG:  You better read that.  Make

 6   sure you understand the question.

 7      Q.    If they are first cousins, they are not

 8   distinctive; is that your opinion?

 9      A.    They look like they are first cousins.

10   There is some distinction, but not pure distinction.

11            MR. LARKIN:  Can we just have the last

12   part of that answer read back?

13        (Record read by the court reporter.)

14      Q.    What did you mean by "pure distinction"?

15      A.    They look like they are related, just as my

16   first cousins look like we are related.

17      Q.    I don't know your first cousins, so I can't

18   assess that, so I'll take your word for it.

19      A.    They wouldn't be happy telling people they

20   look like me.

21      Q.    Your final conclusion, Conclusion 4, "The

22   overall majority of brand equity in the Jack Daniel's

23   Old No. 7 Tennessee whiskey bottle is in the brand

24   name ('call') rather than the appearance of the

25   bottle and label."

07/28/2015                                                      Martin Wolinsky

```
 1   brand equity is in the brand name.  I'm trying to

 2   determine what the rest of brand equity in here is in

 3   beside the brand name; what is it?

 4       A.    I think it's the liquid.  If you are asking

 5   me to prioritize them, those would be Number 1 and

 6   Number 2.

 7       Q.    In your opinion, nothing to do with the

 8   shape of the bottle?

 9       A.    I think the shape of the package as the

10   consumer sees it is 3 or 4 on the list.

11       Q.    And how about the appearance of the label

12   and the other graphic elements on the package?

13       A.    I put them all together.

14       Q.    Together with the shape of the bottle?

15       A.    Right, as the consumer sees the package,

16   they probably do not dissect it as we are trying to

17   do here today.

18       Q.    Okay, fair enough.

19             Did you see anything in the Brown-Forman

20   documents that you reviewed that address the issue of

21   what the brand equity in the Jack Daniel's Whiskey

22   consists of?

23             MR. LONG:  Objection, foundation,

24   assumes facts.

25   BY MR. LARKIN:
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.
07/28/2015                                                                Martin Wolinsky

1   TRANSCRIPT CORRECTIONS

2   REPORTER: SANDRA SEMEVOLOS, RMR, CRR, LSR #74

3   CASE NUMBER: 14-cv-02057-PHX-DGC

4   CASE STYLE:

5   VIP PRODUCTS, LLC, an Arizona limited liability

6   company

7       VS.

8   JACK DANIEL'S PROPERTIES, INC., a Delaware

9   corporation

10  PAGE LINE        CORRECTION          REASON

11  53/23     change "Ruscka         SPELLING ERROR
                to RELSKM"

12  66/8      Add Bacardi was         ANSWER
              Not owner at that time  INCOMPLETE

13  6/13      - Sydney Frank          ANSWER
              importing company       INCOMPLETE

14

15  7/11      Add but closer to       CLASSIFICATION
              60 days                 OF ANSWER

16  93/16     Remove 90 days
              closer to 60 days

17  105/16    Remove "own" change     transcript
              to Notes                ERROR

18

19  134/23    Delete everything       misunderstood
              Except "certainly Absolute"  Question

20

21  135/2     Remove "I'm Not Sure
              And then scotches I don't know"

22          to Yes

23  135/21    Add its a segment

24

25  NAME: Martin Wolinsky DATE: 9 - 10 - 15
            Mut Walinsky

Brandon Huseby
(860) 549-1850          www.brandonreporting.com          Page 263

RECEIVED: 2015-09-11 05:26:10 (GMT -07:00)

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                              Martin Wolinsky

```
1   TRANSCRIPT CORRECTIONS

2   REPORTER:  SANDRA SEMEVOLOS, RMR, CRR, LSR #74

3   CASE NUMBER:  14-cv-02057-PHX-DGC

4   CASE STYLE:

5   VIP PRODUCTS, LLC, an Arizona limited liability

6   company

7       VS.

8   JACK DANIEL'S PROPERTIES, INC., a Delaware

9   corporation

10  PAGE LINE      CORRECTION       REASON

11  154/1     Add " there is              clarification
              at least one other
12            part to it also

13  161/13    Remove I should have       misunderstood
              And change to I Did        question

14

15  241/25    " As it means to           clarification

16            trademark Law "

17  254/10    Add " it depends on

18            what Brown/Forman 'S

19            Point of view is on

20            that part

21

22

23

24

25  NAME: Martin Wolinsky   DATE: 9-11-15
            Mnt Waln
```

RECEIVED: 2015-09-11 05:25:58 (GMT -07:00)

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1                            JURAT

 2        I, MARTIN WOLINSKY, do hereby certify that the

 3    foregoing testimony given by me on JULY 28, 2015, is

 4    true and accurate, including any corrections noted on

 5    the corrections page, to the best of my knowledge and

 6    belief.

 7

 8

 9                          Mart Wolinsky

10                          MARTIN WOLINSKY

11    At 2800 S. Ocean Blvd   in said County of Palm Beach.
         Boca Raton, FL . 33432

12    this 11th day of September, 2015, personally appeared

13    MARTIN WOLINSKY, and he/she made oath to the truth of

14    the foregoing corrections by him/her subscribed.

15    Before me, Amy Martin        , Notary Public.

16    My Commission Expires:  8/12/19

17

18                        AMY L. MARTIN
                          Notary Public - State of Florida
19                        Commission # FF 223510
                          My Comm. Expires Aug 12, 2019
                          Bonded through National Notary Assn.

20

21

22

23

24

25
```

RECEIVED: 2015-09-11 05:25:46 (GMT -07:00)

CONFIDENTIAL-ATTORNEYS' EYES ONLY

# Jack Daniel's Global Strategy Highlights for BF 150

## Brown-Forman Brown Family Shareholder's Committee – June 2, 2011



EXHIBIT

Wolinsky 91 ID
7-28-15  SS

1

CONFIDENTIAL-ATTORNEYS' EYES ONLY

# JD long-term package evolution

1960's     1970's     1980's     1990's     2002     2011



23

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, L.L.C., an Arizona limited liability company,<br><br>     Plaintiff,<br><br> v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation<br><br>     Defendant, | No. 2:14-cv-02057-DGC<br><br><br>**RULE 26 EXPERT REPORT OF**<br><br>**MARTIN WOLINSKY** |
| Jack Daniel's Properties, Inc., a Delaware corporation<br><br>     Counterclaimant,<br><br> v.<br><br>VIP Products, L.L.C., an Arizona limited liability company,<br><br>     Counterdefendant. | |





EXHIBIT
Wolinsky 96 JD
7-28-15   SS

# RULE 26 EXPERT REPORT OF MARTIN WOLINSKY

## Table of Contents

Introduction ................................................................................................................................... 3

The Process .................................................................................................................................... 3

Industry Strategic Packaging Issues ............................................................................................. 4

Tequila ........................................................................................................................................... 4

Gin ................................................................................................................................................. 4

Vodka ............................................................................................................................................ 5

Bourbon/Tennessee Whiskey ........................................................................................................ 5

Conclusions ................................................................................................................................... 6

Attachments ................................................................................................................................... 7

    Images of Jack Daniel's and Competitors ............................................................................... 8

    Uniform vs. a Unique Bourbon Package .................................................................................. 9

    Uniform vs. Unique Gin Packages ......................................................................................... 10

    Uniform vs. Unique Vodka Packages ..................................................................................... 11

    Uniform vs. Unique Tequila Packages .................................................................................... 12

    A Unique vs. Uniform Canadian whisky packages ................................................................ 13

    Uniform to Unique Package* Scale ........................................................................................ 14

    Survey of On/Off Premise Accounts ....................................................................................... 15

    Web-Sites Visited ..................................................................................................................... 16

    Bottle Design Chart with Web-Site Excerpts .......................................................................... 17

    Resume ...................................................................................................................................... 24

WOL0002

### Introduction

My name is Martin Wolinsky.

I am the former President of the Smirnoff Vodka Division in the U.S. for Diageo, plc., the world's largest distilled spirits company.

In this role, I led the world's largest spirit brand, in the world's most valuable vodka market (U.S.), as President, Smirnoff Division, with $2 billion+ in annual revenue.

I am widely recognized throughout the U.S. distilled spirits and wine industries as an expert in marketing, sales, organization behavior and profit maximization for distilled spirits and wine in the U.S.  I have consulted, and am currently consulting, with major U.S. distilled spirits and wine companies. My prior consulting clients have included Jim Beam Brands, Brown-Forman, Bacardi U.S.A., Sydney Frank Importing Company, Sazerac Company, E & J Gallo Winery, and others. In addition, I have consulted with major wine and spirits wholesale organizations across the country, as well as domestic and foreign companies seeking to introduce their distilled spirits products into the U.S. market.  I have also consulted in the development of new spirits products for major industry supplier clients as well as startup companies.

I earned an MBA degree from American University and am a graduate of Ohio State University.

### The Process

I have been retained by VIP Products, LLC., to collect and analyze information regarding distilled spirits packaging in the bourbon/Tennessee Whiskey market segment and Jack Daniel's brand packaging in particular.

The process detailed below is similar to the one I used as an industry executive to compare the brands I managed versus competitive brands. The process involved a number of steps taken between May 23 and June 10, 2015, including:

- I visited retail stores, viewing major distilled spirits categories including the bourbon/ Tennessee Whiskey segment brands and compared these American brand packages with Jack Daniel's, side by side on retailer shelves.*

- I visited on-premises accounts* (bars, and restaurants with bars) and questioned bartenders/waits taff, managers and proprietors regarding the brands served in their venues.

- I visited upscale hotel venues with restaurants/bars* and questioned their bartenders/wait staff, managers and proprietors.

- I visited a number of Web sites reviewing bourbon brands, such as RecentEatsSku.com and others.  (The list of sites attached also includes many common bourbon descriptive words/terms that appear on these sites)*.

- I reviewed distilled spirits reference materials regarding packaging, including the book "Bourbon Empire, American Whiskey," by author Reid  Mitenbuler.

- I reviewed certain Brown Forman documents regarding Jack Daniel's, including brand strategy, package design and labels.

-------------
*(see attached)

**Industry Strategic Packaging Issues**

From my experience, I have observed that distilled spirits brand packaging takes one of two possible paths - "Uniform," or "Unique." Uniform packaging adopts the "functional" path - where the overall look of the products, and each specific brand in a Category (whiskey), or Segment (bourbon), instantly conveys to consumers the nature and heritage of the product contained in the package (THE UNIFORM).

The advantages of using the Uniform strategy is that a brand "wearing the Uniform" provides clear communication to the consumer as to the type and heritage of the spirit. The result is the Uniform brings security and validation to the consumer for his/her brand choice.

"Unique" packaging totally breaks away from the Uniform path of brands of the Segment and introduces a totally different overall "look" to the package, appearing distinct.

Examples of Unique spirit packages include Maker's Mark in the bourbon segment and Crown Royal in the Canadian Whisky segment. The advantage of the Unique package strategy is a higher level of brand equity, rather than having a "me too" generic package in the Uniform. This strategy generally leads to more pricing power and enhanced brand equity.

**Tequila**

Tequila packaging is more varied than bourbon, but it has brands in the Uniform camp, at least for the volume brands. The exceptions to the Tequila Uniform are the higher priced, 100% agave brands. The major volume Tequila brands, including leader Jose Cuervo and Sauza, generally feature ornate Mexican design elements on the labels. The Uniform design elements of these volume brands include;

- square shoulders bottles, with design elements or text molded into the glass.

- multiple labels, face, neck, neck wrap. Yellow color labels are common for brands in this category.

- "busy" label(s) with many design elements (signatures, images of awards/seals, agave plants, etc.)

- caps match the color of the Tequila inside.

**Gin**

Gin brands packaging wears the British Uniform in the volume segment of the category-traditional brands such as Beefeater, Gordon's, Tanqueray, Bombay, etc. While there are still more exceptions to the Uniform strategy in the gin segment than in the bourbon segment, especially in the newer/higher priced gins, the traditional gin brand Uniform includes;

- "age" statement ("1820") molded into the glass bottle, or shown on the label.

- references to London, England, including license/grants/documents certifying the Queen's approval of the brand. The Queen's royal seal may appear on the label.

- "dry gin" is prominently featured on the label, as in "London Dry Gin." (was there ever a "wet" gin?).

- labels may contain drawings of persons depicted, such as the Beefeater royal guard in his uniform and carrying his scepter (Beefeater Gin), or Queen Victoria (Bombay Gin).

WOL0004

## Vodka

Vodka is the largest distilled spirits category, and features brands with Unique rather than Uniform packaging strategies. Vodka is made in countries all over the world, including the U.S., and imports to the U.S. are a significant share of category sales (30% -40%). Bottle shapes may vary from soft shoulder, graceful wine bottle shapes, to Unique medicinal/apothecary look (Absolut, (Sweden)), to hard shouldered, tapered bottles (Smirnoff), to the transparent see-through Grey Goose and Belvedere brand packages, etc. Some vodka labels are very formal, with authentic looking Russian style typefaces, either from the era of the Czars, or military/Soviet style (Stolichnaya), etc. There is no Uniform for packaging in the vodka category.

## Bourbon/Tennessee Whiskey

Many bourbon and Tennessee whiskey brand's packaging are very similar (Uniform) when compared to other competitors in this segment. In the case of Jack Daniel's, it is clear that the packaging strategy for this brand was to adopt the Uniform strategy, as shown in the attached photos of key brands in the bourbon product segment, which conveys most/all of the four characteristics of their Uniform packaging strategy;

- a square bottle with a ribbed neck
- a black cap
- a black neck wrap closure with white printing
- a black front label with white printing

Maker's Mark is an example of an exception to the common Uniform packaging in the bourbon segment, and demonstrates a UNIQUE packaging strategy for this brand (see attached whiskey bottle images).

The descriptive terms/lexicon/language used in the bourbon segment Web sites by Jack Daniel's and competitive brands are the same, or similar, in meaning, as follows:

- "Old, Old World, Century Old, Old time, Old fashioned"
- "Classic"
- "Historic, heritage, original"
- "Timeless, time honored"
- "Honored"

Importantly, recently published industry data indicates that consumer sales of the Jack Daniel's brand, like Makers Mark, Crown Royal and Grey Goose, are approximately 30% - 50% on premise (bars).[1] Therefore, in the on-premises accounts visited, bartenders were asked how their consumers "called" (ordered their drink) for the Jack Daniel's brand;

- By bottle appearance ("square bottle")?
- By label design/elements?
- By brand name?

---

[1] Confidential industry data obtained by author

All proprietors, bartenders and wait staff queried answered that Jack Daniel's Tennessee Whiskey was called for by consumers by brand name, not by bottle shape or label design/elements. According to those questioned, consumers called for the brand as "Jack Daniel's, or "Jack," or by a "nickname," such as "Black Jack."

**Conclusions**

I have reached the following conclusions based on my knowledge, long professional experience, reviews of relevant literature and my field research:

(1). The overall Jack Daniel's Tennessee Whiskey packaging *is not distinctive* (not Unique) in the bourbon/Tennessee whiskey segment in the U.S. because of clear adherence to the four common characteristics summarized again below:

- a square bottle with a ribbed neck

- a black cap

- a black neck wrap closure with white printing

- a black front label with white printing

The combination of the four common features of the bottle and label design of the Jack Daniel's Old No. 7 Tennessee whiskey bottle provide Jack Daniel's Tennessee whiskey with a standard industry "uniform" that identifies the Jack Daniel's Tennessee whiskey as an American whiskey, not just a Jack Daniel's whiskey. Therefore, common features of the bottle and label design of the Jack Daniel's Old No. 7 Tennessee whiskey bottle have a function that is wholly independent of identifying the whiskey as a Jack Daniel's whiskey.

(2). The overall Jack Daniel's packaging *is clearly aesthetically functional*, utilizing all the common elements of the Uniform adopted by numerous other major brands in the bourbon/Tennessee whiskey segment in the U.S., as shown in the photos of competitive whiskeys attached to this document. For that reason, I believe that giving Jack Daniel's exclusive rights to use the combined four key features on the bottle and label design of the Jack Daniel's Old No. 7 Tennessee whiskey bottle would impose a competitive disadvantage on other companies selling Kentucky and Tennessee American whiskey. The disadvantage would be to deprive those other competing companies the ability to use a standard industry "uniform" that identifies any whiskey as an American whiskey, not just a whiskey whose reputation is related to Jack Daniel's.

(3). The overall packaging of the Jack Daniel's Old No. 7 Tennessee whiskey and that of the competitive bourbon brands pictured in the attached photos look like "first cousins" rather than individually distinctive brand packaging.

(4). The overall majority of brand equity in the Jack Daniel's Old No. 7 Tennessee whiskey bottle is in the brand name ("call"), rather than the appearance of the bottle and label.

Martin Wolinsky,

June 10, 2015

**Attachments**

Photos - Jack Daniels, competitors

Photos - Uniform and Unique packages, selected categories

Uniform - Unique package scale

Survey - On/Off premise establishments in 2 states

Review of competitive Web sites and classic terms used at each site

Bottle Design Chart with Web-Site Excerpts

Resume

WOL0007

## Images of Jack Daniel's and Competitors

  

  

WOL0008

## Uniform vs. a Unique Bourbon Package



*Unique*

------------------------------------------------------------------------

*Uniform*

   

WOL0009

## Uniform vs. Unique Gin Packages



*Unique*

---------------------------------------------------------------------------------------------------------------------------

*Uniform*

    

WOL0010

## Uniform vs. Unique Vodka Packages



*Unique*

---------------------------------------------------------------------------------------------------------------------------------

*Uniform*



## Uniform vs. Unique Tequila Packages



*Unique*

---

*Uniform*



WOL0012

## A Unique vs. Uniform Canadian whisky packages



*Unique*

---------------------------------------------------------------------------------------------------------------------------------

*Uniform*



WOL0013

### Uniform to Unique Package* Scale

(1= most Uniform, 10= most Unique)



**Survey of On/Off Premise Accounts**

**State/Account**

**CT**

- Max's Oyster Bar
  - Bracco
  - Flemings
  - Treva
- Ruth's Chris Steakhouse
- Marriott Farmington Hotel

**NJ**

- Rennaisance Hotel
  - Kilroy
  - Vesta Italian
- Riggle Clam Bar
  - Puthenfond
  - Canistadt
- East Rutherford

WOL0015

## Web-Sites Visited

| Web-site | Classic terms used at site |
|---|---|
| Jack Daniels | "Century old methods" |
| Early Times | "Old world craftsmanship" |
| George Dickel | "The classic #8 whiskey" |
| Jim Beam | "Classic smooth sipping experience" |
| | "America's native spirit" |
| Old Crow | "Original sour mash bourbon" |
| | "Historic bourbon" |
| Clayton James | "Heritage whiskey" |
| Evan Williams | "Traditional bourbon, time honored methods" |
| Henry McKenna | "Old time quality bourbon" |
| Sazerac Benchmark | "A label that honors the storied history of the distillery." |
| Zara Harris | "Classic Kentucky bourbon" |
| Collier & McKeel | "Old fashioned way" |
| Old Bardstown | "Timeless classic" |
| Johnny Drum | "Time honored old fashioned recipe" |

WOL0016

## Bottle Design Chart with Web-Site Excerpts

| Distillery, Location and Brand | Bottle Design by Brand | Website Excerpts |
|---|---|---|
| *George Dickel* (Diageo), Cascade Hollow, Tullahoma, TN. <br><br> *"Classic ...Whiskey"* <br><br> *". . . classic, smooth – sipping experience"* |  | http://www.georgedickel.com/whiskies.aspx#!no8 <br><br> **George Dickel Classic No. 8 Whisky** <br><br> OVERVIEW \| AWARDS \| SPECIFICS <br><br> The most famous George Dickel whisky. A signature balance of Tennessee whisky flavors, handcrafted for those who want a classic, smooth-sipping experience. <br><br> A bold whisky with aromas of light caramel and wood. A smoky finish with hints of maple and buttered corn. |
| *Jim Beam* (Beam Suntory), Clermont & Boston, KY. <br><br> *"America's Native Spirit"* | Jim Beam <br><br>  | *http://www.jimbeam.com/about-bourbon/bourbon-ingredients* <br><br> **AMERICA'S NATIVE SPIRIT** <br><br> The Beam family's contribution to America: The World's Finest Bourbon. Bourbon is America's contribution to the world of whiskey. To make it official, the U.S. Congress recognized Bourbon as **America's Native Spirit** in 1964, about 200 years after the very first bourbon went into a barrel. |

| | | |
|---|---|---|
| *Jim Beam*<br>*Continued*<br><br>**"The original sour mash bourbon."**<br><br>**" . . . one of the most historic bourbons. . . . "** | Old Crow<br><br> | http://www.beamsuntory.com/brands/old-crow<br><br>**OLD CROW®**<br><br>Old Crow Bourbon is named for the inventor of the sour mash process, Dr. James C. Crow. In fact, in 1835 Old Crow bourbon was the first bourbon to begin using this process that today, has become a standard in the bourbon industry. Old Crow is the original sour mash bourbon.<br><br>Old Crow is one of the most historic bourbons. It was served in the presidential homes of Andrew Jackson, William Henry Harrison, and Ulysses S. Grant. Old Crow was enjoyed and praised by the likes of Walt Whitman, Daniel Webster, Henry Clay, Jack London and Mark Twain. |
| *Tenn South Distillery, Lynnville, TN.*<br><br><br>**"...heritage whiskey..."** |  | *http://www.tennsouthdistillery.com/our-spirits/clayton-james-whiskey/*<br><br>**Clayton James Tennessee Whiskey**<br><br>First released on October 4, 2014.<br><br>This spirit dwells in sugar maple charcoal, the Lincoln County Process, before entering the new, charred white oak barrels for aging. We use the Lincoln County Process quite a bit differently than others. Since our new whiskey is only "hearts", we don't need to use charcoal filtering to remove impurities or take a harsh edge off. Instead, we allow our spirits to acquire a unique, sweet maple smokiness from the charcoal. This signature step serves to differentiate Clayton James Tennessee Whiskey from all other Tennessee Whiskies.<br><br>Our mash bill is locally grown white corn, wheat, and malted barley which is fermented and then copper pot distilled. Our chief distiller, Clayton Cutler, makes judicious distiller's cuts during each distillation and only the select "hearts" of the run are set aside for aging. No "heads" or "tails" make it into our barrels. These selections or cuts are the reason we believe that the traditional small batch process is superior to the continuous distillation process often used these days. We invite you to taste our Southern heritage whiskey and to appreciate our quality and attention to detail.<br><br>Since we don't have a famous ancestor who made whiskey, we used the first names of the two distillery founders, Clayton Cutler and James Blair Butler, for our signature product. |

WOL0018

| *Heaven Hill*, Louisville, KY.<br><br>*"Traditional Bourbon."*<br><br>*"...producing bourbon with the same time-honored methods..."* | Evan Williams<br> | *http://www.evanwilliams.com/bourbons.php*<br><br>Discover our...<br># TRADITIONAL BOURBON<br>When it comes to good bourbon, our proof is in the barrel.<br><br>Evan Williams is a smooth, easy to drink Bourbon named after Evan Williams who, in 1783, opened Kentucky's first commercial distillery along the banks of the Ohio River. Many years and barrels later, we're still producing Bourbon with the same time-honored methods that Evan Williams did years ago. |
| *Heaven Hill*, (Continued)<br><br>*"old-time quality bourbon..."* | Henry McKenna<br> | *http://heavenhill.com/brand/19*<br><br>Henry McKenna is sipping whiskey, pure and simple. As comfortable and unpretentious as an old pair of jeans or well-worn leather gloves, it's the perfect old-time quality Bourbon to share with friends.<br><br>Henry McKenna brought his family's whiskey recipe with him from Ireland in 1837 and founded his U.S. distillery in Fairfield, KY in 1855. |

| | | |
|---|---|---|
| *Buffalo Trace (Sazerac Co.),* Frankfort, KY.<br><br>*"... [a] label that honors the storied history..."* | *Benchmark*<br><br> | http://www.buffalotracedistillery.com/brands/benchmark<br><br>**Benchmark**<br><br>Named after the McAfee brothers who surveyed a site just no Frankfort in the late 1700s, this rye recipe bourbon is yet an label that honors the storied history of the Distillery and the sits on. |
| *Barton 1792 Distillery* (Sazerac Co.), Bardstown, KY.<br><br>*"...a classic Kentucky bourbon."* | Zachariah Harris<br><br> | *http://www.sazerac.com/BrandPortfolio.aspx?parent=ZH99&PCID=7&FID=203&NBid=1*<br><br>**Zackariah Harris Bourbon**<br><br>*Brand Story*<br><br>Zackariah Harris is made in Kentucky, where bourbon is an art form and where generations respect the hard work and time honored-traditions that make it America's most treasured spirit. Rich, smooth and delicious, Zackariah Harris is a classic Kentucky bourbon.<br><br>Zackariah Harris is made in Kentucky where Bourbon is an art form and where generations respect the hard work and time honored traditions that make it America's most treasured spirit. Rich, smooth and delicious, Zackariah Harris is a Classic Kentucky Bourbon.<br><br>*Stock and display Zackariah Harris today!* |

WOL0020

| | | |
|---|---|---|
| _Brown Forman_, Shively, KY.<br><br><br><br>"...*old-world craftmanship* ...." |  | *http://www.earlytimes.com/heritage/whisky.aspx*<br><br>**EARLY TIMES KENTUCKY WHISKY**<br><br>Early Times Kentucky Whisky is distilled, aged a minimum of three years and barreled in used oak barrels at the Early Times Distillery in Shively, Kentucky. We are the only company to own its own cooperage and make its own barrels, which allows us to control how the barrel contributes to the taste characteristics of Early Times. Early Times Kentucky Whisky is known for being a high-quality whisky that delivers a consistently smooth taste and flavor profile while still being offered at a value to our consumers.<br><br>*http://www.earlytimes.com/heritage/bourbon.aspx*<br><br>Beam named his whisky Early Times, both as a tribute to its place of origin and as a nod to the old-world craftsmanship that goes into making it. He believed in the early times method of whisky-making: mashing grain in small tubs, boiling the beer and whisky in copper stills over open fires. It's an abiding belief that has stayed with the Early Times brand ever since. |
| _Jack Daniel's_<br><br>(Brown Forman), Lynchburg, TN.<br><br>"...*more than a century later, our Tennessee Whiskey is still judged the same way.*" | Jack Daniel's Tennessee Whiskey<br><br> | *http://www.jackdaniels.com/whiskey/jack-daniels-old-no-7*<br><br>**OLD NO. 7**<br><br>We do things a little differently around here – and that's what gives Jack Daniel's its distinctive character. We charcoal mellow our whiskey drop by drop, then let it age in our own handcrafted barrels. And we don't follow a calendar. Our Tennessee Sippin' Whiskey is ready only when our tasters say it is. We use our senses, just like Jack Daniel himself did. In fact, more than a century later, our Tennessee Whiskey is still judged the same way. By the way it looks. By the way it smells. And, of course, by the way it tastes. |

| | | |
|---|---|---|
| *Collier and McKeel*, Nashville, TN.<br><br>**"...the old fashioned way..."** |  | *http://www.collierandmckeel.com/products_tennessee.php*<br><br>**TENNESSEE WHISKEY**<br><br>True Tennessee Whiskey is special. It's not just whiskey made in Tennessee. And it's not Bourbon Whiskey. It's more.<br><br>To make Collier and McKeel first we bring limestone filtered water from our family farm on the Big Richland Creek and use it to make a mash of corn, rye and malted barley. Then we distill it in our hand-hammered copper pot still.<br><br>At this point it changes from plain whiskey to Tennessee Whiskey when we drip it through several feet of sugar maple charcoal, made from trees cut by<br><br>local sawmills and burned on the farm. This gives Collier and McKeel the smooth, sweet, smoky taste that Tennessee Whiskey is known for. Only true Tennessee Whiskey is put through this extra step.<br><br>We age Collier and McKeel in very small barrels that are far more expensive than standard sized barrels but adds intense flavors that are our special gift whiskey making in Tennessee. And unlike some whiskies that have an artificial time table for the proper time in a barrel, we determine when it's time to bottle the old fashioned way; when it tastes right. |
| *Willett Distillery* (Kentucky)<br><br>**"...this timeless classic..."** | Old Bardstown<br><br> | *http://www.kentuckybourbonwhiskey.com/Old-Bardstown_Black-Label-86*<br><br>In 1941 a bay filly named Twilight Tear, called Suzie for short, was foaled. She was sired by the great Bull Lea, who was the leading sire in America five times, siring 58 stakes winners, four Horses of the Year, and three Kentucky Derby winners. Twilight Tear's race record is quite impressive. In 24 races she won 18 times, and took second and third twice, respectively. In 1944 "Suzie" was named Horse of the Year, and in 1963 she was inducted into the National Thoroughbred Racing Hall of Fame.<br><br>1952 was the year in which Twilight Tear produced a bay gelding by the name of Bardstown. The bay gelding did not race until the age of four due to a series of ankle and hip problems.<br><br>In 1956 Bardstown made his first start, and quickly became one of the elite handicap horses in the country. That same year, Bardstown won the Buckeye Handicap, the Equipose Mile and the Trenton Handicap. His "1956 Earnings" was a substantial $173,050.<br><br>As a five-year-old, Bardstown had an impressive four wins in six starts, including the prestigious Widener, the Gulfstream Park and the Tropical Handicaps.<br><br>In 1959 much of the activity for Calumet Farm was provided by 7-year-old Bardstown, which, despite soundness problems, won three of his five starts, including, once again, the Widener Handicap, along with the Tropical Park Handicap.<br><br>In 31 career starts, Bardstown had 18 first place finishes, 7 second and 1 third place finish. The bay gelding had total earnings of $628,752.<br><br>This fine Kentucky Straight Bourbon Whiskey is named after Bardstown because we admire his perseverance and persistence. Sit back and enjoy this timeless classic, which is bred in the heart of the Bluegrass, just like Bardstown. |

WOL0022

| | Johnny Drum | http://www.kentuckybourbonwhiskey.com/Johnny-Drum_Black-Label |
|---|---|---|
| *Willett Distillery* (Continued)  **"...this time honored recipe..."** |  | THE YEAR WAS 1861 - CONFEDERATE FORCES began firing on Fort Sumter in Charleston Harbor on April 12, recognized as the official date the Civil War began.  Boys as young as eight years old were attempting to sign up to fight for the noble cause, but individuals under the age of 18 couldn't join the army, unless they wanted to be a drummer or bugler.

It's been said that almost every town and state had many of these fine, brave young men, and, truth be told, it has been well-documented that many a campaign may have failed had it not been for these young native drummer soldiers establishing communications and keeping some semblance of order among various units in the field.

Like so many other young men during this time, Johnny Drum attempted to join a regiment in his home state, but was turned down because of his age.  Eventually, Johnny ran away from home and found a regiment to take him in and allow him to serve as a drummer boy.

Upon completion of his duty and the end of the Civil War, legend has it that Johnny returned home to settle down amongst the rolling bluegrass knobs of his native Kentucky, where he staked his claim among a beautiful spring.  Like so many other pioneer farmers that had been granted "corn writs" in the Kentucky Territory, Johnny soon learned the importance of finding a way to convert his excess corn crop into something profitable, rather than allowing it to go to waste.  Johnny had a penchant for giving his all, regardless of cost, and it wasn't long before Johnny's determination produced an exceptional bourbon whiskey that earned him a reputation for making the finest sippin' whiskey in all of the Territory.

To this day we celebrate the passion of Johnny Drum and invite you to try this time honored recipe for what is still the finest sippin' whiskey in all of the Territory. |
| Highland Park  Holm Road, Kirkwall,  Orkney, KW15 1SU  **"...tradition rather than novelty..."**  **"...unbroken tradition of whiskey-making..."** |  | http://highlandpark.co.uk/about/the-distillery/

Highland Park is made today with the same enduring belief and integrity, to the same exacting standards, as it has been since 1798. The established attitude at Highland Park is one of custodianship rather than management, of tradition rather than novelty. That's not to say the distillery is stuck in the mud – far from it – but innovation is only used when there is a genuine benefit to the whisky not, as is often the way, a benefit to efficiency or profitability.

This approach accounts in some way for the appeal of Highland Park; there is much more to how the remote site of an illicit still became The Best Spirit in the World". This accolade was no fluke, as we managed to repeat the feat in 2009 and 2013; it was based on an unbroken tradition of whisky-making stretching back over 200 years. Highland Park is arguably the most respected single malt in the world. As everyone knows, respect has to be earned, our distilling tradition, attention to detail and honesty have combined to achieve just that. |

WOL0023

## Resume

Martin Owen Wolinsky
85 Memorial Road
West Hartford ,CT 06107

## PROFESSIONAL EXPERIENCE

**Owen Consulting**  1996 - present

President and Owner

Consultant for major U.S. distilled spirits, and wine companies. Clients have included Jim  Beam Brands ,Brown-Forman ,Bacardi U.S.A ,Sydney Frank Importing Company, Sazerac, Deep  Eddy Vodka  E&J Gallo Winery.  Also, consulted with major wine, and spirits wholesale organizations across the country and domestic and foreign companies seeking to introduce products into the U.S. market.

**DIAGEO PLC.**  1978-1996

Sr.  V.P –Distribution Strategy (1994-1996)

President, Smirnoff Vodka Company (1986-1994)

Responsibilities included –marketing and sales for a portfolio of brands including Smirnoff  Vodka, Popov Vodka, and Christian Brothers Brand

Sr. V.P. Sales- Wine and Spirits  (1984-1986)

Lead a 600 person, national sales organization

Sales Management (1978-1984)

Five promotions: Area Manager; Regional Manager; Division V.P.;V.P. Wines; V.P. Spirits; and Sr .V.P. Sales

**E.&J. Gallo Winery**  1972-1978

Seven promotions in six years.  Locations included Detroit, Los Angeles, Chicago and Twin Cities

## EDUCATIONAL EXPERIENCE

**American University** -  MBA - 1970

**Ohio State** - B.S. – 1969

## PUBLICATIONS

*None*

## PRIOR EXPERT TESTIMONY

*None*

## COMPENSATION

*$600 per hour*