1  Firm E-Mail: courtdocs@dickinsonwright.com

2  David G. Bray (#014346)
   dbray@dickinsonwright.com
3  Frank G. Long (#012245)
   flong@dickinsonwright.com
4  Jonathan Batchelor (#026882)
   jbatchelor@dickinsonwright.com
5  **DICKINSON WRIGHT PLLC**
   1850 North Central Avenue, Suite 1400
6  Phoenix, Arizona 85004
   Phone: (602) 285-5000
7  Fax: (602) 285-5100

8  *Attorneys for VIP Products, L.L.C.*

9          **IN THE UNITED STATES DISTRICT COURT**

10                  **DISTRICT OF ARIZONA**

11 | VIP Products, L.L.C., an Arizona limited | No. 2:14-cv-02057-SMM
   | liability company,
12 |                                          | **PLAINTIFF'S MOTION FOR**
   |                Plaintiff,                | **SUMMARY JUDGMENT ON ITS**
13 |                                          | **CLAIMS FOR RELIEF AND**
   |          v.                              | **MEMORANDUM IN SUPPORT**
14 |                                          |
   |                                          | **(Oral Argument Requested)**
15 | Jack Daniel's Properties, Inc., a Delaware
   | corporation,
16 |
   |                Defendant.
17

18         Plaintiff VIP Products ("VIP") moves, pursuant to Rule 56 of the Federal Rules of

19 Civil Procedure, for summary judgment on its request for declaratory judgment that its

20 SILLY SQUEAKERS® parody dog toy does not infringe or dilute any trademarks or trade

21 dress owned by defendant Jack Daniel's Properties, Inc. ("JDPI"). VIP is also entitled to

22 summary judgment on each of the counterclaims asserted by JDPI. VIP supports its Motion

23 with the attached Memorandum of Points and Authorities, a separately filed Statement of

24 Facts ("SOF"), a Supplemental Statement of Confidential Facts ("SOCONF") filed under

25 seal, and by the entire record in this case.

26

27

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    Introduction**

VIP is in the business of designing, manufacturing, marketing, and selling chew toys for dogs. Plaintiff sells various brands of dog chew toys, including the "TUFFY'S" line (durable sewn/soft toys), the "MIGHTY®" line (durable toys made of a different material than the Tuffy's line), and the "SILLY SQUEAKERS®" line of durable rubber squeaky novelty dog toys. SOF, ¶¶ 1–4.

In July 2013, VIP introduced its SILLY SQUEAKERS® "Bad Spaniels" durable rubber squeaky dog toy (the "VIP Product"), which VIP designed to be a comical parody of a Jack Daniel's whiskey bottle. SOF, ¶¶ 5, 111. On or around September 5, 2014, JDPI sent VIP a cease-and-desist letter, and demanded, among other things, that VIP stop all sales of the VIP Product. Amend. Compl. (DKT. #49), ¶ 13. This litigation began shortly thereafter.

VIP seeks a judgment: (1) declaring that its "use of its 'Bad Spaniel's' name and mark for its novelty dog toy does not infringe or dilute any trademark rights claimed by [JDPI] in the name and mark "Jack Daniel's'"; (2) "declaring that the Jack Daniel's Trade Dress and Jack Daniel's Bottle Design are functional, generic and/or non-distinctive, merely decorative, or ornamental, and not entitled to trademark protection"; (3) "ordering cancellation of [JDPI] PTO Registration (No. 4,106,178) 'for the three-dimensional configuration of a square shape bottle container . . . [] for distilled spirits"; and (4) "such additional or other relief as the Court may deem just and proper." Amend. Compl., ¶ 11.

JDPI claims that the VIP Product infringes on the "JDPI Trademarks," SOF, ¶ 6, and the "Jack Daniel's Trade Dress," which has various elements, depending on which JDPI representative describes or defines it. *See* SOF, ¶¶ 15–16, 20–21. The JDPI Trademarks and alleged Jack Daniel's Trade Dress relate to Jack Daniel's Tennessee Whiskey ("JDTW"), and are collectively referred to as the "JDTW Marks and Bottle Dress."

JDPI asserts seven causes of action: (1) "infringement of JDPI's federally-registered

marks" under the Lanham Act, 14 U.S.C. § 1114, 1116, 1117 and 1118; (2) false designation of origin and "infringement of the Jack Daniel's Trade Dress" under 15 U.S.C. § 1125(a)(1); (3) "dilution by tarnishment of the JDPI Trademarks under 15 U.S.C. § 1125(c); (4) "dilution by tarnishment of the Jack Daniel's Trade Dress" under 15 U.S.C. § 1125(c); (5) "infringement of the JDPI Trademarks and unfair competition at common law; (6) "infringement of the Jack Daniel's Trade Dress at common law"; (6) "dilution of the JDPI Trademarks" under A.R.S. § 44-448.01; and (7) "dilution of the Jack Daniel's Trade Dress" under A.R.S. § 44-1448.01. Countercl., [Dkt. #_] ¶¶ 20–63.

VIP asks this Court to deny JDPI's infringement and dilution claims on summary judgment because the nominative and First-Amendment fair-use defenses shield VIP from liability. Further, even if those defenses did not apply here, VIP is still entitled to summary judgment on all claims because JDPI cannot meet its burden in proving: (1) its dilution claim under the Trademark Dilution Revision Act ("TDRA"); (2) that the JDTW Bottle Dress is non-functional; and (3) that the JDTW Bottle Dress is distinctive.

## II.    The VIP Product is Fair Use, and is Shielded from Liability

The owner of a trademark and/or trade dress cannot exclude others from making "fair use" of that mark or dress; as set forth below, the VIP Product constitutes fair use of the JDTW Marks and Bottle Dress. The Ninth Circuit has adopted three fair-use defenses in the trade dress context: (1) classic, (2) nominative, and (3) free-speech. *Mattel, Inc. v. Walking Moun. Prods.*, 353 F.3d 792, 808-09 (9th Cir. 2003); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002)).

A defendant claiming a fair use defense is not required to rebut confusion. *KP Perm. Make-Up v. Lasting Impress'n I*, 543 U.S. 111, 111–12 (2004). Since the burden of proving likelihood of confusion rests with the plaintiff, the fair use defendant has "no freestanding

need to show that confusion is unlikely." *Id.* ("some possibility of consumer confusion is compatible with fair use.").

**A.    The VIP Product is Nominative Fair Use of the JDTW Marks and Bottle Dress**

A defendant's use of a plaintiff's mark or trade dress is "nominative fair use" where he or she "'used [] plaintiff's mark to describe [] plaintiff's product, *even if* [] *defendant's ultimate goal is to describe his own product*.'" *Walking Mount. Prods.*, 353 F.3d at 809 (quoting *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (emphasis in original)). This doctrine protects those who deliberately use another's trademark or dress for the "purpose of comparison, *criticism*[, *or*] *point of reference*." *Rock Star Videos*, 547 F.3d at 1098 (emphasis added). "Nominative [fair] use of a mark . . . lies outside the strictures of trademark law . . . [b]ecause it does not implicate the source-identification function that is the purpose of trademark." *Cairns*, 292 F.3d at 1150 (quoting *New Kids on the Block v. News Am. Publ'g*, 971 F.2d 302, 308 (9th Cir. 1992)).

The VIP Product constitutes nominative fair use of the JDTW Marks and Bottle Dress because: (1) the JDTW Marks and Bottle Dress are not readily identifiable without using several of their elements; (2) VIP used only so much of the JDTW Marks and Bottle Dress that were reasonably necessary to identify the Bottle; and (3) VIP did nothing to suggest that JDPI had sponsored or endorsed the VIP Product. *See Walking Mount. Prods.*, 353 F.3d at 809. Accordingly, VIP is entitled to summary judgment on all of JDPI's asserted claims.

**1.    *VIP's References to the JDTW Bottle Dress Are Necessary***

VIP designed its Product to parody an American whiskey bottle—and the JDTW Marks and Bottle Dress just happen to utilize several classic elements that are common to most Kentucky Bourbon/Tennessee Whiskey bottles. SOF, ¶¶ 23–30, 37–41. Given the medium of the parody—a three-dimensional dog toy—the VIP Product had to implement several key components of the JDTW Marks and Bottle Dress. If VIP had not used a square bottle, a label with black background and white lettering, a filigree border, and an oval

containing "Old No. 2" on the front label and neck wrap, VIP could not have "conjured up" JDPI, and could not have executed its parody. Amend. Compl. (Dkt. # 49), ¶ 12.

### 2.    The VIP Product Only Incorporates the JDTW Marks and Bottle Dress to the Extent Reasonably Necessary to Identify JDTW

The VIP Product is plainly distinguishable from the JDTW Marks and Bottle Dress because it does not use any of JDPI's registered marks.[1] The VIP Product only invokes the JDPI Mark and Bottle Dress to the extent necessary to ensure consumer recognition that the Product is a parody. Thus, such limited use is reasonable. *See, e.g.*, *Cairns*, 292 F.3d at 1154 (defendant's use of Princess Diana's likeness was reasonably necessary because "it [was] doubtful whether [defendant] would [have been able to] sell its '[Princess Diana] Portrait Doll' without" it).

### 3.    Nothing Suggests That JDPI Sponsored or Endorsed The VIP Product

VIP has done nothing to suggest that JDPI has sponsored or endorsed the VIP Product. In fact, VIP made special efforts in designing the VIP Product and packaging to ensure that consumers knew that JDPI had not sponsored or endorsed the Product. Specifically: (1) the VIP Product only used the common, classic elements found in most Kentucky Bourbon/Tennessee Whiskey bottles; (2) the VIP Product's label refers to "43% poo by vol." and "100% smelly"—statements that JDPI would not place on a JDPI product or licensed good, SOF, ¶ 114; (3) VIP placed a disclaimer on the packaging, stating that the "[P]roduct and its design belong to VIP Products," and that the Product is not "affiliated with Jack Daniel Distillery," SOF, ¶ 5; and (4) VIP prominently placed its SILLY SQUEAKERS® trademark on the VIP Product's hangtag, along with a cartoon dog, to ensure that consumers understood the nature of the Product, SOF, ¶¶ 5.

---

[1] It does not use the following: the Jack Daniel's" name, the number "7," the embossed "Jack Daniel's" signature on the bottle; the same filigree design on the label; and the three-sided body label. SOF, ¶ 89, 91.

VIP also made marketing choices with the intent to distinguish the VIP Product from JDPI: (1) the VIP Product is not sold in the same channels from trade as JDTW, SOF, ¶¶ 94-96, 99, 101, 103-04; (2) the VIP Product is primarily sold in the specialty dog-supply market, and JDPI is not a competitor in that market, *Id.*; and (3) JDPI has never licensed the JDTW Marks and Bottle Dress for use on a dog toy, and it has no intention to do so in the future, SOF, ¶¶ 98-99, 103-04.

Moreover, the VIP Product, by nature, is incompatible with any notion of JDPI sponsorship or endorsement. Jack Daniel's Global Brand Director testified that he found the VIP Product to be in "bad taste," and stated that JDPI would never license the JDTW Marks or Bottle Dress for any product it considered to be in bad taste. SOF, ¶ 114. Therefore, just like the "Food Chain Barbie" at issue in *Walking Mountain*, any "reasonable consumer would realize the critical nature of" the VIP Product "and its lack of affiliation with" JDPI. 353 F.3d at 811 ("Critical works are much less likely to have a perceived affiliation with the original work."). In turn, JDPI's claims must fail as a matter of law.

**B.    The VIP Product is Fair Use Under the First Amendment**

JDPI's infringement and dilution claims also must fail because VIP's parody use of the JDTW Marks and Bottle Dress is protected speech under the First Amendment. In order to strike the necessary balance between First Amendment interests and the Lanham Act, the First Amendment protects expressive use of another's trade dress unless: (1) defendant's use of the mark has no artistic relevance to the underlying work whatsoever; or (2) it explicitly misleads as to the source of the content of the work. *Rock Star Videos*, 547 F.3 at 1099.

**1.    The VIP Product is expressive use of the JDTW Marks and Bottle Dress**

To qualify for First Amendment protection, defendant must have used plaintiff's mark in an "artistic" or "expressive" work. *See MCA Record*, 296 F.3d at 900. In order to qualify as "expressive use," a defendant must have used the mark "beyond its source-identifying function," such as in a "parody, satire, editorial[,] and other forms of expression that are not

part of a commercial transaction." *MCA Records*, 296 F.3d at 900-05; *Nissan Motor Co. v. Nissan Comp.*, 378 F.3d 1002, 1017 (9th Cir. 2004) (If speech is not 'purely commercial'—that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection.").

Based on the sweeping protection of the First Amendment, a defendant's expressive use is noncommercial protected speech even when used in connection with a commercial venture or product. *MCA Records*, 296 F.3d at 906-07 ("Barbie Girl is not purely commercial speech, and is therefore fully protected"—the fact that defendant used the mark to sell copies of its song was irrelevant); *Rock Star Videos*, 547 F.3d at 1100; *Walking Mount. Prods.*, 353 F.3d at 811. Therefore, when parody does more than propose a commercial transaction, summary judgment is appropriate. *Walking Mount. Prods.*, 353 F.3d at 812 (quoting *New Kids*, 971 F.2d at 309)).

The VIP Product invokes aspects of the JDPI Marks and JDTW Bottle Dress in order to parody American consumerism and brand loyalty, as well as to invite buyers to imagine "how funny your dog would be if he was like us." SOF, ¶¶ 111-13. The VIP Product's message to consumers is that "it is ok to make fun of well-known brands"—such a message clearly does more than merely propose a commercial transaction. SOF, ¶ 111.

### 2.    *The VIP Product has artistic relevance*

The Ninth Circuit has made clear that First-Amendment protection applies unless the use has "no artistic relevance to the underlying work whatsoever." *Rock Star Videos*, 547 F.3d at 1100. The VIP Product irreverently presents an American whiskey bottle—an "iconic" symbol of masculinity—as a toy for dogs. This, without question, meets the extremely low burden of artistry that the Ninth Circuit requires. *Rock Star Videos*, 547 F.3d at 1100 ("the level of [artistic] relevance merely must be above zero.").

### 3.     The VIP Product does not explicitly mislead as to source or content

The purpose of trademark law is to "avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *Rock Star Videos*, 547 F.3d at 1100. The relevant question, therefore, is whether defendant's product would confuse consumers into believing that plaintiff somehow endorses or sponsors the defendant's product. *Id.* This standard is particularly difficult for a plaintiff to meet—specifically, "[t]o be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use. Even if [plaintiff offered] a survey demonstrating that consumers of [defendant's product] believed that [plaintiff] endorsed the [product], that *would not* support the claim that the use was explicitly misleading to consumers." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245–46 (9th Cir. 2013) (emphasis added).

The Ninth Circuit has made clear that defendant's use in connection with an unrelated product cannot be explicitly misleading. *See Rock Star Videos*, 547 F.3d at 1100 (defendant's use of plaintiff' strip-club trademarks in a video game was not explicitly misleading because, while both "offer a form of low-brow entertainment; besides this general similarity, they have nothing in common"; they "do not go together like a horse and carriage or, perish the thought, love and marriage"); *see also Louis Vuitton v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007) (luxury handbags and dog toys were unrelated).

Similarly, "[c]ritical works are much less likely to have a perceived affiliation with the original work." *Walking Mount. Prods.*, 353 F.3d at 811 ("[a]ny reasonable consumer would realize the critical nature of this work and its lack of affiliation with [plaintiff]"); *see also Louis Vuitton*, 507 F.3d at 261 (noting that defendant's parody was enhanced because it sold its "Chewy Vuiton" dog toys alongside similar parodies of other famous and expensive brands, such as "Chewnel No. 5," "Dog Perignonn, and "Sniffany & Co.").

Like the satirical images at issue in *Walking Mountain*, the VIP Product mocks the role of brands in American consumer culture. In both cases, poking fun at "iconic" brands is

1    socially valuable, and worthy of First Amendment protection. Ultimately, "[w]hen businesses

2    seek the national spotlight, part of the territory includes accepting a certain amount of ridicule.

3    The First Amendment, which protects individuals from laws infringing free expression, allows

4    such ridicule in the form of parody." *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1227 (7th

5    Cir. 1993)).

6          At bottom, this attempt to silence the VIP Product's comical message is in frustration

7    of Mr. Sacra's fundamental right to free speech. JDPI simply cannot be allowed to bully VIP

8    over a comical dog toy that no reasonable consumer could think was sponsored by JDPI.

9    **III.    JDPI Cannot Meet Its Burden to Establish its Dilution Claim**

10          VIP is entitled to summary judgment on JDPI's trade-dress dilution claim because: (1)

11    the alleged Jack Daniel's Trade Dress is not "famous" under the TDRA; (2) the VIP Product is

12    not similar enough to the JDTW Marks and Bottle Dress to dilute; and (3) the VIP Product is

13    not likely to cause dilution by tarnishment. *See Levi Strauss & Co. v. A&F Trading Co.*, 633

14    F.3d 1158, 1161 (9th Cir. 2011); *Mattel, Inc. v. MGA Entm't*, 782 F. Supp. 2d 911, 1011 (C.D.

15    Cal. 2011) (granting summary judgment because there was "no genuine issue of material fact

16    that trapezoidal packaging did not have a 'powerful consumer association' with" plaintiff).

17    Further, even if JDPI were able to meet its burden under the TDRA, VIP still could not be

18    liable for dilution because the VIP Product plainly fits under the TDRA's fair-use exemption.

19    *See* 15 U.S.C. § 1125(c)(3).

20          **A.    The JDTW Bottle Dress is not "Famous" Under the TDRA**

21          In order to state a dilution claim, plaintiff must prove that its mark is "famous"—*i.e.*,

22    that it is widely recognized by the general consuming public as a designation of source of the

23    goods or services of the mark's owner. 15 U.S.C. § 1125(c)(2)(A); *see Nordstrom, Inc. v.

24    NoMoreRack Retail Grp.*, No. C12-1853-RSM, 2013 WL 1196948, at *9 (W.D. Wash. Mar.

25    25, 2013). This high threshold requires a greater showing than "distinctiveness" to avoid

26    "upset[ting] the balance in favor of over-protecting trademarks, at the expense of potential

27

1  non-infringing uses." *Avery Denn. Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999);

2  *Apple, Inc. v. Amazon.com, Inc.*, No. C 11-1327 PJH, 2011 WL 2638191, at *10 (N.D. Cal.

3  Jul. 6, 2011).

4      In order to meet its burden under the TDRA, JDPI must show that the unregistered,

5  common-law JDTW Bottle Dress—"separate and apart from any possible fame of the JDTW

6  Marks—has become equivalent to a national "household name." 15 U.S.C. § 1125(c)(4); *see*

7  *Thane Intl, Inc. v. Trek Bicycle Corp*., 305 F.3d 894, 911 (9th Cir. 2002), *superseded by statute*

8  *on other grounds*, 15 U.S.C. § 1125; *Mibank Tweed Hadley & McCloy, LLP v. Milbank*

9  *Holding Corp.*, No. CV-06-187-RGK (JTLx), 2007 WL 1438114, at *5 (C.D. Cal. Feb. 23,

10  2007) (holding that niche-market fame is insufficient to meet burden under the TDRA);

11  *Maker's Mark Distillery v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 698–99 (W.D. Ky.

12  2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012).

13      Yet, JDPI has not and cannot show that the JDTW Bottle Dress is famous enough to

14  support its dilution claim because, as discussed below, the JDTW Bottle Dress is not a source

15  identifier. *Amazon.com Inc.*, 2011 WL 2638191, at *10 (Apple's "App Store" mark was not a

16  source indicator because the term was "used by other companies [to describe] a place to obtain

17  software applications for mobile devices."). JDPI has readily admitted that many of its

18  competitors—including its largest competitor Jim Beam—use many of the same design

19  elements in their bottle dresses. JDPI even concedes that square bottles are *so common in the*

20  *Kentucky Bourbon/Tennessee whiskey market* that "a significant number of American

21  consumers associate square bottle shape with *any* whiskey or bourbon product." *See* SOF, ¶ 42

22  (emphasis added). In turn, JDPI cannot prove fame and its TDRA claim must fail.

23      Further, even if JDPI had proven that the Bottle Dress is a source identifier, and that it

24  has achieved national recognition, JDPI still cannot prove fame under the TDRA's

25  nonexclusive, enumerated factors. 15 U.S.C. § 1125(c)(2)(A)(i)–(iv).

26

27

1    **Actual Recognition**. Evidence of actual consumer recognition is critical in the Ninth

2    Circuit, and without it, a plaintiff is unlikely to prove fame under the TDRA. *See, e.g.*, *MGA*

3    *Entm't*, 782 F. Supp. 2d at 1011; *Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132,

4    1138 (N.D. Cal. 2008) (lack of survey evidence showing actual recognition weighed against a

5    finding that plaintiff's mark was famous); *see Clearly Food & Bev. Co. v. Top Shelf Bevs.,*

6    *Inc.*, --F. Supp. 3d --, at *17 (W.D. Wash. Apr. 28, 2015). This is true even where plaintiff

7    presents evidence of its substantial marketing and advertising evidence. *Parts.com v. Yahoo!*

8    *Inc.*, 996 F. Supp. 2d 933, 941 (S.D. Cal. 2013) (evidence of extensive advertising and

9    promotion "does not necessarily mean that [such] efforts were successful," in absence of proof

10   regarding the extent of actual recognition).

11   The only direct evidence JDPI has presented to show national fame is the Ford

12   Survey—but Dr. Ford has *admitted* that his survey did not test fame. SOF, ¶ 86. Further, even

13   if the Ford Survey had tested fame, it still would not be probative because the survey

14   respondents were not representative of the general consuming public in the U.S.. *See Maker's*

15   *Mark*, 703 F. Supp. 2d at 699 (A survey of niche-market consumers is insufficient). Instead,

16   the survey sample consisted of a very narrow group people—"21 years or older who were

17   likely to purchase a dog toy." SOF, ¶ 86. The Ford Survey would also be insufficient because

18   it does not establish that at least 75% of national consumers recognize the JDTW Bottle Dress

19   itself—as opposed to JDPI's brand. *See Nissan Motor Co. v. Nissan Comp. Corp*., 378 F.3d

20   1002, 1014 (9th Cir. 2004); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks &*

21   *Unfair Competition* § 24.106 (4th ed. 2009) (noting that fame requires a minimum recognition

22   rate of 75% among the general consuming public); *See Hershey Foods Corp. v. Mars, Inc.*,

23   998 F. Supp. 500, 515 (M.D. Penn. 1998) (Despite plaintiff's survey showing 94%

24   recognition, plaintiff's trade dress was not famous). Because the Ford Survey did not test

25   national recognition and could not indicate any significant recognition of JDTW Bottle Dress,

26   JDPI has failed to show the actual recognition required to prove fame.

27

1    **Advertising and Publicity.** JDPI advertising and promotional evidence are not

2    probative of fame because they are (i) not specific to the JDTW Bottle Dress, and (ii) not

3    substantiated with proof that they created an actual recognition of the JDTW Bottle Dress.

4    *TCPIP Hold'g Co. v. Haar Commc'n, Inc.*, 244 F.3d 88, 99–100 (2d Cir. 2001) (plaintiff

5    spent "tens of millions of dollars" advertising its mark, but did not tell how many millions,

6    when the funds were expended, or how effective the advertising was); *Vallavista Corp.*, 657

7    F. Supp. 2d at 1138-39 (plaintiff failed to prove that its mark was famous where it alleged that

8    it had spent $243,000 on advertising per year, but didn't present survey evidence of actual

9    recognition).

10    The JDPI advertising and publicity evidence[2] does not show that the JDTW Bottle

11    Dress—*separate and apart from promotion of Jack Daniel's name*—has achieved national

12    recognition. Therefore, this evidence cannot show that the alleged Jack Daniel's Trade Dress

13    is famous under the TDRA. *Maker's Mark*, 703 F. Supp. 2d at 699 (plaintiff's evidence that

14    numerous newspaper articles referenced the fame of its mark did not show "fame," because

15    "general media assertions and acclamations of fame are not strong evidence that the mark is

16    famous under TDRA's particular and high standard.").

17    **Sales.** As mentioned above, JDPI has not presented survey evidence showing actual

18    recognition of the JDTW Bottle Dress. Without evidence of actual consumer recognition, the

19    evidentiary value of sales is non-existent. *Vallavista Corp.*, 657 F. Supp. 2d at 1138–39.

20    **Federal Registration**. Generally, PTO registration favors a finding of fame. However,

21    JDPI is claiming protection over the entire alleged "Jack Daniel's Trade Dress," which is not

22    a registered trade dress. Thus, while JDPI has PTO registrations for its "Jack Daniels" brand

23    name, "Old No. 7" slogan, black-and-white filigree "Jack Daniel's" bottle labels, and "Jack

24    Daniel" embossed square-shaped bottle, SOF, ¶ 6, that evidence is irrelevant for proving that

25    _____
    [2] JDPI cites to the following: film and TV appearances, social media recognition, and celebrity

26    endorsements. SOF, ¶¶ 72–78.

27

1    the JDTW Bottle Dress is famous as a whole. 15 U.S.C. § 1125(c)(4) (plaintiff must prove

2    that its unregistered trade dress is famous, independent of plaintiff's registered marks).

### B.    VIP's Product Does Not Meet the TDRA's "Similarity" Requirement

4        The JDPI dilution claim also must fail because JDPI cannot show that the VIP Product

5    is sufficiently similar to the JDTW Marks and Bottle Dress.

6        Similarity must be considered in light of how consumers will encounter the respective

7    marks in the marketplace—as opposed to a mere side-by-side comparison of the marks.

8    *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 106–07 (2d. Cir. 2009)

9    (despite having proven distinctiveness, recognition, and exclusivity, plaintiff failed to prove a

10   likelihood of dilution because, the marks—as presented to consumers—were only minimally

11   similar, and were therefore unlikely to inhibit plaintiff's mark from identifying the source of

12   plaintiff's product in a unique way).

13       The VIP Product is not sufficiently similar to the JDPI Trademarks and the JDTW

14   Bottle Dress for the following reasons: (1) the VIP Product uses the name "Bad Spaniels" in

15   place of the "Jack Daniel's" name; (2) the VIP Product uses "The Old No. 2" in place of

16   JDPI's "Old No. 7" slogan; (3) VIP has added its SILLY SQUEAKERS® brand name to

17   prominent locations on the VIP Product hangtag; and (4) VIP has added different design

18   elements and omitted several key components to VIP Product bottle design. *See Apple, Inc.*,

19   920 F. Supp. 2d at 1128–29 (holding that the parties' trade dresses were not sufficiently

20   similar because the phones varied in appearance, and defendant's was missing key features of

21   plaintiff's trade dress—this weighed heavier than expert testimony claiming that defendant's

22   phone was likely to dilute); *Nordstrom, Inc.*, 2013 WL 1196948, at *11 (parties' marks were

23   not similar "because the shared characteristics in sound and stylization of the 'Rack' portions

24   do not overcome the significant differences in overall appearance and meaning.").

25       The fact that VIP sells its Product in a completely different market than Jack Daniel's

26   whiskey further supports that the two products are not sufficiently similar.

27

### C.    The VIP Product is Unlikely to Harm JDPI's Reputation

Dilution by tarnishment "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Nordstrom, Inc.*, 2013 WL 1196948, at *11. In evaluating likelihood of dilution, courts have held that "[c]onsiderations such as complaints, reduction in sales, loss of customers, and negative press are all relevant to the overall determination." *Nordstrom, Inc.*, 2013 WL 1196948, at *13; *see Starbucks*, 588 F.3d at 110 (plaintiff failed to show likelihood of dilution by tarnishment because it did not show how "coffee named either 'Mister Charbucks' or 'Charbucks Blend' would affect the positive impressions about the coffee sold by Starbucks).

Here, JDPI has not presented evidence of "complaints, reduction in sales, loss of customers, and negative press," and it certainly has not presented evidence proving that the VIP Product is likely to change loyal consumer's perception of Jack Daniel's whiskey. The only evidence that JDPI relies upon to show likelihood of dilution is the proffered expert opinion of Dr. Itmar Simonson. However, as discussed in VIP's previously filed *Daubert* Motion (Dkt. # 92), Simonson's testimony is unreliable and should be excluded. Without Dr. Simonson's testimony, JDPI has no evidence of harm whatsoever and VIP is entitled to dismissal of JDPI's dilution claim for this reason as well.

Moreover, VIP has evidence that the VIP Product enhances rather than harms the JDTW Marks and Bottle Dress. Courts have held that, where a defendant use of plaintiff's mark is likely to *strengthen* positive impressions of plaintiff, there is no evidence of harm. *Starbucks Corp.*, 588 F.3d 97 at 111 ("Juxtaposition may bring to light more appealing aspects of a name that otherwise would not have been brought to the attention of ordinary observers."). VIP expert, Dr. Bruce Silverman, arranged several focus groups to test consumer reactions to the VIP Product. SOF, ¶ 115. Dr. Silverman's study revealed that none of the test subjects reacted negatively to the VIP Product—rather, the VIP Product actually

1    *enhanced* many of the subjects' perceptions of JDTW. *Id.* JDPI cannot rebut Dr. Silverman's

2    study because it has not disclosed any evidence of actual consumer reactions to the VIP

3    Product. SOF, ¶ 36. This too entitles VIP to summary judgment on JDPI's dilution.

> **D.    The VIP Product Design Is Excluded From Dilution Claims Under the TDRA Because It Is Fair Use and Non-Commercial Use of the JDTW Bottle Dress**

6    Even if the Court finds that JDPI has met its heavy burden under the TDRA, VIP still

7    could not be liable. As discussed above, the VIP Product is fair use and non-commercial use

8    of the JDTW Marks and Bottle Dress, and is excluded from liability under the TDRA. 15

9    U.S.C. § 1125(c)(3).

10    The VIP Product parody is "an editorial or artistic parody which satirizes [JDPI's]

11    product [that] is not actionable under an anti-dilution statute because of the free speech

12    protections of the First Amendment." *See Walking Mount. Prods.*, 353 F.3d at 812. For these

13    reasons, JDPI's dilution claim must fail as a matter of law. *Id.* (affirming the grant of

14    summary judgment because plaintiffs "cannot use 'trademark laws to . . . censor all parodies

15    or satires which use [its] name' or dress").

## IV.    JDTW BOTTLE DRESS IS FUNCTIONAL

17    JDPI claims that it has exclusive rights to its "iconic" JDTW Bottle Dress. However,

18    both the Bottle Dress and the "Jack Daniel" embossed signature bottle design are functional

19    and cannot be protected by trademark law. SOCONF, ¶¶ 1, 7, 14.

20    Product packaging is "functional" if it has aesthetic appeal, increases the utility or

21    practicality of the product, or saves the consumer or producer time or money. *See Traffix*

22    *Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29–30 (2001). Courts evaluate

23    functionality under a two-step inquiry: (1) the traditional "utilitarian inquiry," and (2) the

24    "aesthetic functionality" inquiry. If the packaging is functional under either test, it cannot

25    qualify for protection under the Lanham Act. The Bottle Dress and the "Jack Daniel"

26    embossed-signature-bottle design are largely composed of utilitarian features. In turn, if the

27

Court were to grant JDPI exclusive rights in the JDTW Bottle Dress, this would put its competitors at a "significant non-reputation related disadvantage." *See Moldex–Metric, Inc. v. McKeon Prods., Inc*., 596 Fed. Appx. 567, 567 (9th Cir. 2015) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 166 (1995)). Because the JDTW Bottle Dress is functional, no amount of evidence of secondary meaning or actual confusion will create a right to exclude others from imitating the packaging. *Talking Rain Bev. Co. v. S. Beach Bev. Co.*, 349 F.3d 601, 603 (9th Cir. 2003).

### A.    The JDTW Bottle Dress is Functional Under the Utilitarian Inquiry

The JDTW Bottle Dress is functional under the utilitarian inquiry because its features have a "significant non-trademark function," and are "essential to the use or purpose of the article [or] affects [its] cost or quality." *Inwood Labs. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n. 10 (1982).

The Ninth Circuit asks four questions to test utilitarian functionality: (1) whether the trade dress yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *See, e.g.*, *Disc Golf Ass'n v. Champ. Discs*, 158 F.3d 1002, 1006 (9th Cir. 1998)

VIP expert, John Howard, has provided a report identifying the Jack Daniel's embossed-signature bottle design as one of the several utilitarian features used in the JDTW Bottle Dress. SOF, ¶ 36. Because JDPI has not offered controverting testimony, other than the opinions of interested parties (*i.e.*, JDPI employees), this design feature is clearly functional under *Disc Golf*.

### B.    The JDTW Bottle Dress is Aesthetically Functional

In evaluating aesthetic functionality, courts must consider "both the markholder's right to enjoy the benefits of its effort to distinguish its product and the public's right to the

1  vigorously competitive market protected by the Lanham Act, which an overly broad trademark

2  might hinder." *Christian Louboutin v. Yves Saint Laurent*, 696 F.3d 206, 222 (2d Cir. 2012).

3    The "two most common tests of aesthetic functionality under the competition theory"

4  are (i) the "comparable alternatives" test; and (ii) the "effective competition test." *A&F Stores*

5  *v. Am. Eagle Outfitters*, 280 F.3d 619, 642 (6th Cir. 2002). While the Ninth Circuit has yet to

6  adopt a test for aesthetic functionality, it considers "comparable alternatives" under the *Disc*

7  *Golf* analysis. *Moldex–Metric*, 596 Fed. Appx. at 567. In addition, many district courts within

8  the Circuit consider "effective competition" in both the utilitarian and functional contexts. *See*

9  *Rodan & Fields, LLC v. Estee Lauder*, No. 10-CV-02451-LHK, 2010 WL 3910178, at *5

10  (N.D. Cal. Oct. 5, 2010); *Farmgirl Flowers, Inc. v. Bloom That, Inc*., No. 14-CV-05657-LHK,

11  2015 WL 1939424, at *6 (N.D. Cal., Apr. 28, 2015).

12    Under either test, the JDTW Bottle Dress is aesthetically functional, and thus, JDPI's

13  trade dress claims must fail as a matter of law. *See, e.g.*, *Maker's Mark*, 679 F.3d at 418–19;

14  *A&F Stores*, 280 F.3d at 642-44; *Louboutin*, 696 F.3d at 222.

15    In applying the comparative alternatives test, courts generally focus on the existence of

16  feasible alternative designs, and ask: how difficult would it be for plaintiff's competitors to

17  compete in the market if they were precluded from using plaintiff's design, and were instead

18  required to transition to a new design?

19    JDPI admits that its competitors in the Kentucky Bourbon/Tennessee Whiskey market

20  currently use many of the JDPI Bottle Dress elements in connection with marketing their own

21  branded products. SOF, ¶¶ 23-27. What's more, JDPI has admitted square bottles are *so*

22  *common in the Kentucky Bourbon/Tennessee whiskey market* that "a significant number of

23  American consumers associate square bottle shape with *any* whiskey or bourbon product."

24  SOF, ¶¶ 42, 53 (emphasis added). VIP expert Martin Wollinsky has confirmed these

25  admissions. SOF, ¶¶ 46–47. In turn, the JDTW Bottle Dress is aesthetically functional under

26  the comparative alternatives test.

27

1    In measuring functionality under the effective competition test, courts focus on whether

2    a particular design feature is pre-requisite for market participation. If, for whatever reason, the

3    cost of protection renders plaintiff's competitors unable to compete in the relevant market,

4    then the feature is not protectable under the Lanham Act.

5    JDPI admits that most of the JDTW Bottle Dress' features—including the square bottle,

6    black-and-white label, number designation, arched text, and filigree design, among others—are

7    used by many of its competitors in the Kentucky Bourbon/Tennessee Whiskey market. SOF, ¶

8    23-27. JDPI's own research confirms the functional features and aesthetic functions of the

9    alleged Jack Daniel's Trade Dress. SOCONF, ¶ 1, 7, 14. Therefore, JDPI's competitors would

10   have to incur prohibitively high costs to avoid them. In turn, the JDTW Bottle Dress is

11   aesthetically functional under the effective competition test as well.

## V.    THE JDTW BOTTLE DRESS IS NOT DISTINCTIVE

13   Even if the Court were to decide that the JDTW Bottle Dress is not functional, JDPI has

14   not proven that the JDTW Bottle Dress is a source identifier for the Jack Daniel's whiskey.

15   Instead, the available evidence shows that the JDTW Bottle Dress is, if anything, a generic

16   identifier of Kentucky Bourbon/Tennessee Whiskey—*not* Jack Daniel's whiskey in particular.

17   And, even if JDPI could meet its burden in proving non-genericness, JDPI's infringement

18   claims still must fail because it cannot prove that the JDTW Bottle Dress is inherently

19   distinctive, or that it has acquired distinctiveness.

### A.    JDPI Cannot Prove That The JDTW Bottle Dress is Not Generic

21   To prove that an alleged trade dress is not generic, a plaintiff "'must show more than a

22   subordinate meaning which applies to [its] trade dress. It must show that the [p]rimary

23   significance of the term [i]n the minds of the consuming public is not the product but the

24   producer.'" *Surgicenters of Am. v. Med. Dental Surg.*, 601 F.2d 1011, 1016 (9th Cir. 1979)

25   (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)). Further, in *Kendall-*

26   *Jackson Winery v. E. & J. Gallo Winery*, the Ninth Circuit made clear that a combination of

27

1  trade-dress features that is widely used in a particular market, is unprotectable to the extent

2  that the combination "tell[s] consumers what the product is or at least describes a characteristic

3  of a product." 150 F.3d 1042, 1050–51 (9th Cir. 1998).

4  Several district courts within the Ninth Circuit cite to *Kendall-Jackson* in applying a

5  three-part test for generic trade dress. This test considers whether: (1) plaintiff's trade dress

6  definition is overbroad or too generalized; (2) the alleged trade dress is the basic form of a type

7  of product; or (3) the alleged trade dress is so "common in the industry that it cannot be said to

8  identify a particular source." *See, e.g.*, *Walker & Zangler, Inc. v. Paragon Indus., Inc.*, 549 F.

9  Supp. 2d 1168, 1174 (N. D. Cal. 2007) (citing to *Kendall-Jackson Winery*, 150 F.3d at 1048–

10  51); *Indonesian Imports, Inc. v. Smith*, No. C97-3534 FMS, C98-2494 FMS, 1999 WL

11  183629, at *3 (N.D. Cal. Mar. 30, 1999); *Big Island Candies v. Cookie Corner*, 269 F. Supp.

12  2d 1236, 1243 (D. Haw. 2003).

13  Under this three-prong test, "[t]he above-described concepts of genericness are not

14  necessarily separate. For instance, basic product shapes are usually common in a given

15  industry, and a court may deny protection to a product design based on both its commonness

16  and its basicness." *Big Island Candies*, 269 F. Supp. 2d at 1244; *Indonesian Imports*, 1999 WL

17  183629, at *7. Therefore, if a trade dress satisfies any one of these elements, then the trade

18  dress is generic and unprotectable. *Walker & Zangler*, 549 F. Supp. 2d at 1175.

19  JDPI cannot show that the JDTW Bottle Dress is capable of generating "a mental

20  recognition" in consumers' minds that the JDTW Bottle Dress is associated with only Jack

21  Daniel's whiskey. The available evidence shows that the JDTW Bottle Dress is, at most, a

22  generic identifier that is not entitled to trade dress protection as a matter of law.

23  ### i.    The JDPI Alleged Trade Dress Is Overbroad

24  JDPI is unable to articulate a single coherent description of the alleged trade dress or its

25  constituent features. There is no consistent definition of the claimed "Jack Daniel's Trade

26  Dress. SOF, ¶¶ 115–16, 20–21. Instead, JDPI has made numerous inconsistent statements as to

27

1   what elements make up the alleged JDTW Bottle Dress. *Id.* JDPI's failure to state its claimed

2   trade dress elements with particularity is evidence that the JDTW Bottle Dress identifies the

3   product, not the producer.

4          **ii.**    **JDTW Bottle Dress is Merely a Basic Form of a Whiskey Bottle**

5          Also, JDPI bases its claim on a bottle shape and label design that are incapable of being

6   distinctive. JDPI claims that it has "always used a custom, proprietary bottle," shape, and that

7   it has "never used a stock bottle." SOF, ¶ 49. Yet, the shape of the JDTW Bottle Dress is a

8   mere variation of stock bottles sold by a bottle supplier when the predecessor of JDPI first

9   selected them and that can be purchased from Illinois Glass Company. SOF, ¶ 50. The graphic

10  design of the labels included as part of the JDTW Bottle Dress are mere variations of a black-

11  and-white label design used by the sellers of competitive whiskey products, SOF, ¶ 23, and

12  sold by graphic designers as typical whiskey bottle designs. SOF 31.

13         **iii.**    **JDTW Bottle Dress is a Common Bourbon/Whiskey Bottle Dress**

14         Just like the wine bottle at issue in *Kendall-Jackson*, the JDTW Bottle Dress is so

15  widely used by JDPI's competitors, that the Bottle Dress identifies the product, rather than the

16  source.

17         An overwhelming majority of whiskey/bourbon sellers in the United States use four

18  primary elements of the JDTW Bottle Dress into their own bottle designs. SOF, ¶ 28-30. This

19  is further supported by Brown-Forman's own focus group studies. SOCONF, ¶ 14. In fact,

20  JDPI concedes that a "significant number of American consumers associate a square bottle

21  shape with any whiskey or bourbon product," SOF, ¶ 42; and that a bottle with a black-and-

22  white label signals to consumers that the product is a Bourbon/Whiskey product. *See* SOF, ¶

23  35.

24         This evidence indicates that the combination of commonly used elements in the JDTW

25  Bottle Dress serves as an identifier of any "Kentucky Bourbon/Tennessee Whiskey." As the

26

27

1    basic, or a basic, form or incarnation of whiskey bottle packaging, the Bottle Dress is generic

2    and is not a source identifier of Jack Daniel's brand whiskey.

3                    **B.        The JDTW Bottle Dress is Not Inherently Distinctive**

4            Even if JDPI could show that the JDTW Bottle Dress is not generic, JDPI has not

5    presented any evidence to show that the Bottle Dress is inherently distinctive or has acquired

6    distinctiveness.

7            District courts within the Ninth Circuit have adopted the *Seabrook* test to evaluate

8    whether packaging is inherently distinctive. *See, e.g.*, *DCNL, Inc. v. Almar Sales Co.*, No. C-

9    97-3738 DLJ, 1997 WL 913941, at *7 (N.D. Cal. Dec. 22, 1997), *aff'd without opinion*, 178

10   F.3d 308 (Fed. Cir. 1998); *Sparks Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-

11   GW(ASx), 2014 WL 4365736, at *7 (C.D. Cal., Aug. 28, 2014); *E & J Gallo v. Proximo*

12   *Spirits, Inc.*, No. CV-F-10-411 LJO JLT, 2012 WL 273076, at *10 (E.D. Cal. Jan. 30, 2012).

13           The *Seabrook* test asks whether a claimed trade dress is: (1) a common, basic shape or

14   design; (2) unique or unusual in a particular field; or (3) mere refinement of a commonly

15   adopted and well-known form of ornamentation for a particular class of goods viewed by the

16   public as a dress or ornamentation for the goods. *Proximo Spirits, Inc.*, 2012 WL 273076, at

17   *10 (applying *Seabrook*); *Sparks Indus., LLC*, 2014 WL 4365736, at *7; *MGA Entm't, Inc.*,

18   782 F. Supp. 2d at 1004. If a trade dress satisfies one *Seabrook* factors, it cannot be inherently

19   distinctive. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 1351, 1355 (Fed. Cir. 2010).

20           The JDTW Bottle Dress is not inherently distinctive because it is comprised of a basic

21   bottle shape and label graphics that most producers of Kentucky Bourbon/Tennessee Whiskey

22   use. A square-shaped bottle with a ribbed neck, white printing on a black label and neck wrap

23   and black cap is not unique or uncommon packaging—the only significant differences between

24   JDPI's Bottle Dress and its competitors' bottles are the "Jack Daniel's" brand name and "Old

25   No. 7" slogan, which is not enough to show distinctiveness without proof of secondary

26   meaning.

27

JDPI claims that the JDTW Bottle Dress is "iconic," yet it readily admits that its competitors in the Kentucky Bourbon/Tennessee Whiskey market use many of the same features as the JDTW Bottle Dress uses. SOF ¶¶ 23–27. For example, Area Director Phillip Epps conceded that one of JDPI's competitors, George Dickel, labels its bourbon as "No. 8." *See* SOF, ¶ 25. Further, Epps admitted that JDPI did not raise an objection to such use, *id.*, and that Jim Beam—"Jack Daniel's biggest competitor in the U.S."—also uses arched lettering on its label, SOF, ¶ 26, and "there are other competitors in the Kentucky, Tennessee whiskey bourbon field that use some kind of filigree on their labels." *Id.*

JDPI admits that square bottles are so common in the Kentucky Bourbon/Tennessee Whiskey market, "a significant number of American consumers associate square bottle shape with *any* whiskey or bourbon product." *See* SOF, ¶ 34. Overall, the JDTW Bottle Dress is comprised of an ordinary square bottle shape combined with bottle label graphic designs commonly found on packaging for the same type of product. A square is a simple, "ordinary geometric shape" that is "non-distinctive and protectable only upon proof of secondary meaning." *MGA Entm't*, 782 F. Supp. 2d at 1004. In fact, VIP has evidence that the Illinois Glass Company mass-produces and sells a very similar, square-shaped stock bottle. *See* SOF, ¶ 50. The bottle label graphic design is a common design also. *See* SOF, ¶ 28-31. In fact, most of the features that constitute the combination alleged to be the "Jack Daniel's Trade Dress"—including the square bottle, black-and-white label, number designation, arched text, and filigree design, among others—are features whose combined use for whiskey packaging is common, and even very expected, in the Kentucky Bourbon/Tennessee Whiskey market.

A trade dress cannot be inherently distinctive if its design is common in plaintiff's particular field of use. *See, e.g.*, *Homeland Housewares v. Euro-Pro Operating*, No. CV14-03954 DDP (MANX), 2014 WL 4187982 at *7 (C.D. Cal. Aug. 22, 2014). Like the trade dress at issue in *Homeland Housewares*, the JDTW Bottle Dress cannot be inherently distinctive. In

the face of this evidence, it would be unreasonable to "assume without proof that [the JDTW Bottle Dress is] automatically be perceived by customers as an indicator of source."

Further, even if JDPI tried to distinguish the JDTW Bottle Dress from those used by its competitors, the third *Seabrook* factor makes clear that "a collection of common . . . elements" for products or services in its field does not qualify as inherently distinctive trade dress, even where a plaintiff utilizes a unique color theme, display box, and graphical layout. *See, e.g.*, *Sparks Indus., LLC*, 2014 WL 4365736, at *7 (citing *Lanard Toys Ltd. v. Novelty, Inc.*, No. 05–CV–8406–CAS(JJx), 2007 WL 2439505, at *11 (C.D. Cal. Mar. 17, 2006); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir. 1987).

Here, as in *Spark Industries*, the totality of evidence in the record makes clear that the alleged JDTW Bottle Dress is not unique and does not set it apart from the other whiskey bottle packaging referred to in the record. Even JDPI admits that its competitors in the Kentucky Bourbon/Tennessee Whiskey market use very similar elements in their trade dresses. *See* SOF, ¶ 23-24 ("Some other bottles for whiskey have combinations of various shapes, black caps, black neck wrap closures with white printing bearing different graphics, marks and design elements, and black front labels with white printing bearing different graphics, marks and design elements."). Merely adding the "Jack Daniel's" brand name on the "Old No. 7" slogan to the commonplace combination bottle shape and label design features of the JDTW Bottle Dress does not, and cannot, transform that combination into something distinctive, especially inherently distinctive.

## C. JDTW Bottle Dress Has Not Acquired Distinctiveness

JDPI alleges that the JDTW Bottle Dress is distinctive "by virtue of extensive sales and advertising," "extensive consumer recognition," "billions of dollars" in revenue, and because it is one of the "most iconic consumer products in American history." *See* SOF, ¶ 57. However, JDPI has failed to substantiate these vague claims with actual, probative evidence. Accordingly, any JDPI trade dress claim still must fail as a matter of law.

### i.    No Direct Evidence Showing Acquired Distinctiveness

JDPI has not presented any direct evidence to show that the JDTW Bottle Dress has acquired distinctiveness. While JDPI makes vague references to "certain research conducted [that] supports the . . . distinctiveness of the Jack Daniel's Trade Dress," JDPI has never conducted a study of any kind to test consumer recognition of the JDTW Bottle Dress itself. SOF, ¶ 54. Further, JDPI has never conducted a study to determine how well recognized the JDPI Bottle shape is without the other claimed elements. *Id.* Rather, JDPI concedes that "a significant number of American consumers associate a square bottle shape with *any* whiskey or bourbon product"—not JDPI alone. SOF, ¶ 42.

JDPI claims that "[t]he high degree of distinctiveness is also shown by the consumer survey conducted under the direction of Dr. Gerald L. Ford." SOF, ¶ 79. Yet, Dr. Ford testified that his survey did not test consumer recognition, as required in order to show secondary meaning. SOF, ¶ 80. The admissions by Dr. Ford about the limitations of his survey were confirmed by VIP expert Dr. Stephen Nowlis, whose report states: the "Ford survey was clearly not designed to test for acquired distinctiveness or secondary meaning of the [JDTW Bottle Dress]. Such a survey would require an examination of the secondary meaning of the alleged [JDTW Bottle Dress] on a whiskey bottle, and not on a dog toy which is spoofing it." SOF, ¶ 87.

JDPI has also failed to provide any consumer testimony to substantiate its claim that the JDTW Bottle Dress has acquired distinctiveness. As its only direct evidence, JDPI provided self-interested and unsubstantiated claims of its attorneys and employees that the JDTW Bottle Dress is an "iconic trade dress," SOF, ¶ 15, 51. Yet, testimonies of those who have a close relationship with a trademark holder carry only *de minimus* evidentiary weight in determining whether a mark had acquired secondary meaning, and cannot defeat a defendant's motion for summary judgment. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,

59 F.3d 902, 910 (9th Cir. 1995); *see Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1005 (S.D. Cal. 2000).

### ii.     No Circumstantial Evidence Showing Acquired Distinctiveness

Even if the Court were to conceive that JDPI could somehow prove acquired distinctiveness through circumstantial evidence alone, none of the JDPI circumstantial evidence is sufficient to establish that the JDTW Bottle Dress is unique in the Kentucky Bourbon/Tennessee Whiskey market. Rather, JDPI concedes that key components of the JDTW Bottle Dress are not unique in that market.

Despite JDPI's claim that it has "always used a custom, *proprietary bottle* that has been made to the brand's specifications," SOF, ¶ 49, 51, JDPI has not, and cannot show, that it is the sole user of a significant number of the elements claimed in the "Jack Daniel's Trade Dress." On the other hand, VIP has presented evidence showing that several of Jack Daniel's competitors use at least four of the primary elements of that alleged Trade Dress. *See* SOF, ¶ 23–30.

Not only that, but JDPI has also *admitted* that several of its competitors—including its largest competitor Jim Beam—use a number of the same design elements in their bourbon whiskey trade dress. *See* SOF, ¶ 25 (conceding that one of JDPI's competitors, George Dickel, labels its bourbon as "No. 8."); SOF, ¶ 26 (admitting that Jim Beam—"Jack Daniel's biggest competitor in the U.S."—also uses arched lettering on its label); SOF, ¶ 24 (acknowledging that "there are other competitors in the Kentucky, Tennessee whiskey bourbon field that use some kind of filigree on their labels").

Additionally, VIP has identified over 100 products that clearly imitate the JDTW Bottle label design. *See* SOF, ¶ 31. Further, JDPI's efforts to enforce its alleged trade dress rights to the JDTW Bottle Dress have been limited to only two actions involving bottle packaging and, in one of those, the Settlement Agreement allowed the defendant to continue use of the bottle shape substantially similar to the bottle shape of the JDTW Bottle Dress. *See* SOCONF, ¶ 15.

1    **Advertising Evidence**. JDPI's advertising evidence is not relevant for showing

2    acquired distinctiveness because the vast majority of its advertising does not feature the

3    claimed JDTW Bottle Dress. None of it is "image advertising" or "look for" advertising that

4    would emphasize the JDTW Bottle Dress to potential consumers as an indicator of the source

5    of the whiskey inside.

6    JDPI later admits that it advertises and promotes its whiskey—not the JDTW Bottle

7    Dress *per se*, and not the design of the "Jack Daniel" embossed signature bottle (aka the

8    "evolution bottle"). SOF,¶ 60-61. The vast majority of JDPI's cited-to advertisements neither

9    qualify as "image advertising," nor emphasize an association between the Jack Daniel's brand

10   and the JDTW Bottle Dress. For example, while most of the ads feature the "Jack Daniel's"

11   brand name and "Old No. 7" slogan, only a small number of the ads contain even a partial

12   image of the Bottle Dress or the bottle design. *See* SOF, ¶ 64.

13   **Sales.** Additionally, JDPI also claims that the JDTW Bottle Dress has acquired

14   secondary meaning through its extensive distribution and sales of its Jack Daniel's whiskey.

15   SOF, ¶ 57. However, JDPI has not given any evidence of how its sales of whiskey indicate that

16   the JDTW Bottle Dress has acquired distinctiveness.

17   **Media Coverage/Endorsements**. The movie/TV features, media coverage, and

18   celebrity endorsements produced by JDPI have no bearing on whether its product packaging

19   has acquired distinctiveness. That evidence merely refers to "Jack Daniel's" brand whiskey by

20   its brand name but not by reference to the JDTW Bottle Dress or bottle design. For example,

21   JDPI claims the Bottle Dress has acquired secondary meaning because it has "appeared in

22   numerous motion pictures seen by many millions of Americans" and has been featured on

23   various television programs. SOF, ¶¶ 72-74. However, the motion picture and TV excerpts

24   contain verbal references to the "Jack Daniel's" brand name but no verbal references to alleged

25   "iconic" bottle, the JDTW Bottle Dress, or the combined elements of the alleged "Jack

26   Daniel's Trade Dress" and only fleeting images of the JDTW bottle as a prop. *See id.*

27

JDPI also claims that the JTDW Bottle Dress has acquired distinctiveness because it has received public exposure through its status as the unofficial "drink of choice" of celebrities such as Frank Sinatra, George Clooney, and Mick Jagger. SOF, ¶ 75. However, these celebrity endorsements refer to the "Jack Daniel's" brand name, but do not refer to the alleged JDTW Bottle Dress or its combined elements.

JDPI claims that the JDTW Bottle Dress has acquired distinctiveness because Jack Daniel's whiskey has been the subject of numerous articles—some of which mention or display the JDTW Bottle Dress. SOF, ¶ 76. However, none of the articles produced by JDPI refers to the JDTW Bottle Dress; instead, the articles only refer to the "Jack Daniel's" brand name and/or the "Old No. 7" slogan. *Id.*

**Intentional Copying**. JDPI claims that "[t]he high degree of distinctiveness is also shown by . . .VIP's documents and testimony regarding the development, design, appearance, and marketing of the [VIP Product]." SOF, ¶ 82. However, VIP's good-faith parody use of the alleged JDTW Bottle Dress clearly is not evidence of an attempt to "free ride" on JDPI's success, and, thus does not show secondary meaning.

The VIP product is clearly a parody meant to poke fun at drink whiskey rather than to free ride on its success of Jack Daniel's whiskey. SOF, ¶ 89, 112 (there are drastic differences between the toy and the Jack Daniel's marks and label design). In fact, at least one of JDPI's representatives admitted that he saw how some could find the VIP Product humorous, but that he personally found the toy to be "distasteful to an iconic brand like Jack Daniel's." *See* SOF, ¶ 114.

Similarly, courts recognize that proof of intentional copying is not probative of secondary meaning if defendant's mark is "prominently displayed" in connection with plaintiff's alleged trade dress. *Sparks Indus., LLC*, 2014 WL 4365736, at *11. Just like in *Spark Industries*, VIP sells its "Bad Spaniels" dog toy with a hangtag that prominently displays VIP's "SILLY SQUEAKERS®" trademark. SOF, ¶ 5. Additionally, VIP has gone a

step further, and has placed a disclaimer on the product—VIP successfully distinguished itself from JDPI, which negates JDPI's "intentional copying" evidence.

**RESPECTFULLY SUBMITTED** this 23rd day of October, 2015.

**DICKINSON WRIGHT, PLLC**

By: s/David G. Bray
     David G. Bray
     Frank G. Long
     Jonathan S. Batchelor
     Colleen M. Ganin
     1850 North Central Avenue, Suite 1400
     Phoenix, Arizona 85012-2705
     *Attorneys for VIP Products, L.L.C.*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 23, 2015, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to all CM/ECF registrants.

5

6

s/ Kylie M. Boie

7

8

9

PHOENIX 53913-11 253799v7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27