# EXHIBIT A

1   QUARLES & BRADY LLP
    Gregory P. Sitrick (SBN 028756)
2   E-mail: Gregory.sitrick@quarles.com
    Isaac S. Crum (SBN 026510)
3   E-mail: Isaac.Crum@quarles.com
    One Renaissance Square
4   Two North Central Avenue
    Phoenix, Arizona 85004-2391
5   Telephone: (602) 229-5317
    Facsimile: (602) 420-5198
6
    Attorneys for Defendant and Counterclaimant
7   JACK DANIEL'S PROPERTIES, INC.

8

9

10              **UNITED STATES DISTRICT COURT**

                   **DISTRICT OF ARIZONA**

11

12

13   VIP PRODUCTS, LLC, an Arizona limited     Case No. CV 14-02057 PHX DGC
    liability company,
                             **ANSWER AND COUNTERCLAIMS**
14            Plaintiff,              **OF DEFENDANT AND**
                              **COUNTERCLAIMANT JACK**
15        v.                     **DANIEL'S PROPERTIES, INC.**

16   JACK DANIEL'S PROPERTIES, INC., a
    Delaware corporation,
17
            Defendant.
18

19        Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") answers the

20   complaint filed by plaintiff VIP Products, LLC ("VIP") and counterclaims as follows.

21

22

23

24

25

26

27

28

                                    ANSWER AND COUNTERCLAIMS

## ANSWER TO COMPLAINT

1.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint, and on that basis denies those allegations.

2.      JDPI admits the allegations in paragraph 2 of the Complaint.

3.      JDPI denies the allegations in paragraph 3 of the Complaint, except JDPI admits that it is a citizen of a state other than Arizona.

4.      JDPI admits the allegations in paragraph 4 of the Complaint.

5.      JDPI admits the allegations in paragraph 5 of the Complaint.

6.      JDPI admits that VIP purports to demand a trial by jury, but denies that VIP is entitled to a jury trial on any of its claims for relief.

7.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action.

8.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action, which is identified as being part of a "Silly Squeakers" line.

9.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint, and on that basis denies those allegations.

10.     JDPI denies the allegations in paragraph 10 of the Complaint.

11.     JDPI denies the allegations in paragraph 11 of the Complaint, except JDPI admits that it owns various registrations of, or containing, the trademark JACK

2

DANIEL'S in the United States and that the JACK DANIEL'S trademark has been used for many years for Tennessee whiskey in the United States.

12.     JDPI denies the allegations in paragraph 12 of the Complaint, except JDPI admits that VIP incorporated elements of the trade dress of Jack Daniel's Tennessee whiskey on VIP's "Bad Spaniels" dog toy, including a label with a black background and white lettering, and that VIP placed a statement reading "The product and its design belong to VIP Products.  This product is not affiliated with Jack Daniel Distillery." in small print at the bottom of a detachable cardboard tag affixed to the Bad Spaniels toy, as shown in JDPI's counterclaims below.

13.     JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint, and on that basis denies those allegations, except JDPI admits that it sent VIP a letter dated September 5, 2014 demanding that VIP cease all further sales of the Bad Spaniels toy.

## ANSWERING THE SINGLE CLAIM FOR RELIEF

14.     JDPI repeats its responses above to the allegations in paragraphs 1-13 of the Complaint in response to the allegations in paragraph 14 of the Complaint.

15.     JDPI admits the allegations in paragraph 15 of the Complaint.

16.     JDPI denies the allegations in paragraph 16 of the Complaint.

## AFFIRMATIVE DEFENSES

1.     The Complaint fails to state a claim upon which relief can be granted.

2.     VIP has infringed, diluted, and competed unfairly with respect to, JDPI's trademarks and trade dress, as more fully alleged in JDPI's counterclaims below, and thus comes before the Court with unclean hands and is not entitled to the equitable relief of a declaratory judgment.

## COUNTERCLAIMS

Counterclaimant JDPI counterclaims as follows:

3

QB\136435.00005\31586488.1

1.     These counterclaims arise under §§ 32(1) and 43(a)(1) and (c) of the United States Trademark Act, 15 U.S.C. §§ 1114 and 1125(a)(1) and (c), and under the statutory and common law of the State of Arizona.  The Court has jurisdiction over the subject matter of JDPI's counterclaims under § 39(a) of the United States Trademark Act, 15 U.S.C. § 1121(a), and under 28 U.S.C. §§ 1331 and 1338(a).  The Court has jurisdiction over the subject matter of JDPI's counterclaims under the law of the State of Arizona under 28 U.S.C. §§ 1338(b) and 1367.

## PARTIES

2.     JDPI is the defendant in this action and is a Delaware corporation with its principal place of business in San Rafael, California.

3.     VIP is the plaintiff in this action and has alleged in its Complaint that it is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

## JURISDICTION AND VENUE

4.     The Court has personal jurisdiction over VIP because it initiated this action and thus subjected itself to personal jurisdiction in this Court on JDPI's counterclaims and because it alleges that it resides in the State of Arizona.  Venue is proper in this Judicial District under 28 U.S.C. § 1391(b)(1) because VIP alleges that it resides in this Judicial District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF
### The Jack Daniel's Trademarks and Trade Dress

5.     JDPI owns and licenses the use of the trademarks and trade dress used in connection with Jack Daniel's Tennessee whiskey and other products in the Jack Daniel's line.  Tennessee whiskey has been sold in the United States under the JACK DANIEL'S mark continuously since 1875, except during Prohibition, making Jack Daniel's Tennessee whiskey one of the oldest, longest-selling, and most iconic consumer products in American history.  In addition to the JACK DANIEL'S trademark, Jack Daniel's

4

QB\136435.00005\31586488.1

1   Tennessee whiskey has borne the OLD NO. 7 trademark since 1875 (jointly the "JDPI
2   Trademarks").

3         6.      Since long prior to the commencement of VIP's acts of infringement,
4   dilution, and unfair competition complained of herein, and continuously to the present,
5   Jack Daniel's Tennessee whiskey has been sold in packaging embodying an iconic trade
6   dress consisting of a square bottle with a ribbed neck, a black cap, a black neck wrap
7   closure with white printing bearing the OLD NO. 7 mark, and a black front label with
8   white printing and a filigreed border bearing the JACK DANIEL'S mark depicted in
9   arched lettering at the top of the label, the OLD NO. 7 mark contained within a filigreed
10  oval design in the middle portion of the label beneath the JACK DANIEL'S mark, and
11  the words Tennessee Sour Mash Whiskey in the lower portion of the label, with the word
12  "Tennessee" depicted in script (the "Jack Daniel's Trade Dress").  The Jack Daniel's
13  Trade Dress is depicted below:



5

7.     JDPI's predecessors-in-interest and licensees have expended many hundreds of millions of dollars over many decades advertising and promoting Tennessee whiskey sold under the JDPI Trademarks and the Jack Daniel's Trade Dress in the United States. Such advertising and promotion have taken place in the print and electronic media, over the Internet, on billboards, on stadium signage, and in a variety of other manners. The primary print advertising campaign for Jack Daniel's Tennessee whiskey, which has prominently featured the Jack Daniel's Trade Dress, commenced in 1955 and has continued since then, making the campaign one of the longest continuous consumer advertising campaigns in American history. Jack Daniel's Tennessee whiskey featuring the Jack Daniel's Trade Dress has also been seen in numerous motion pictures and television programs viewed by many millions of Americans, and has also received extensive unsolicited media coverage and public exposure as the unofficial drink of choice of celebrities such as Frank Sinatra, George Clooney and Keith Richards.

8.     JDPI's predecessors-in-interest and licensees have achieved billions of dollars in sales of Jack Daniel's Tennessee whiskey in the United States under the JDPI Trademarks and in the Jack Daniel's Trade Dress. Jack Daniel's Tennessee whiskey is currently the best-selling whiskey in the United States and the JACK DANIEL'S brand has consistently been ranked among the world's most successful and valuable alcoholic beverage brands.

9.     The Jack Daniel's Trade Dress is inherently distinctive, or acquired distinctiveness long prior to the commencement of VIP's acts of infringement, dilution, and unfair competition complained of herein by virtue of extensive sales and advertising of Jack Daniel's Tennessee whiskey featuring the Jack Daniel's Trade Dress, decades of consumption by the public of Jack Daniel's Tennessee whiskey packaged in the Jack Daniel's Trade Dress, extensive consumer recognition of the Jack Daniel's Trade Dress, and association of the Jack Daniel's Trade Dress with Jack Daniel's Tennessee whiskey. The combination of elements comprising the Jack Daniel's Trade Dress is non-functional

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

1 because it is not essential to the use or purpose of Jack Daniel's Tennessee whiskey and
2 does not affect the cost or quality of the product.

3     10.   The JDPI Trademarks and the Jack Daniel's Trade Dress are famous for
4 whiskey in the United States and became famous long prior to the commencement of
5 VIP's acts of infringement, dilution, and unfair competition complained of herein.

6     11.   JDPI owns numerous federal registrations of the JDPI Trademarks and the
7 Jack Daniel's Trade Dress for whiskey, including United States Trademark Registration
8 No. 4,106,178 for the three-dimensional configuration of a square shape bottle container
9 shown below for distilled spirits,



19  United States Trademark Registration No. 2,789,278 for the mark shown below for
20 Tennessee sour mash whiskey,



7

QB\136435.00005\31586488.1

United States Trademark Registration No. 1,923,981 for the mark JACK DANIEL'S for whiskey, United States Trademark Registration No. 582,789 for the stylized mark JACK DANIEL'S shown below for whiskey,



and United States Trademark Registration No. 42,663 for the stylized mark OLD NO. 7 shown below for whiskies.

Copies of the certificates of registration of these marks and related maintenance documents are attached hereto as Exhibit 1.  These registrations are valid and subsisting and all but No. 4,106,178 have become incontestable.

12.     The JDPI Trademarks and various elements of the Jack Daniel's Trade Dress, including the label design depicted below, have been used for many years in connection with a wide variety of goods in addition to Tennessee whiskey and other alcoholic beverages.



QB\136435.00005\31586488.1

JDPI owns United States Trademark Registration No. 4,372,885 for the label design shown above for decorative magnets, decorative switch plates, and cell phone cases; United States Trademark Registration No. 4,481,424 for the label design shown above for ornamental lapel pins, clocks, watches, cuff links, necklaces, and bracelets; United States Trademark Registration No. 3,055,481 for the label design shown above (without the words SOUR MASH) for posters; United States Trademark Registration No. 4,478,408 for the label design shown above for umbrellas, luggage, duffel bags, athletic bags, backpacks, luggage tags, key cases, knapsacks, tote bags, and all-purpose canvas carrying bags, United States Trademark Registration No. 2,867,158 for the label design shown above (without the words SOUR MASH) for glass and plastic drinking containers, namely flasks, ceramic mugs, ceramic pitchers, ceramic jugs; sponges for household purposes, wood coasters, cork coasters, swizzle sticks, bowls, decorative boxes made of non-precious metal, food containers and thermal insulated containers for food or beverages, glassware for beverages, and serving trays of non-precious metals; United States Trademark Registration No. 4,526,056 for the label design shown above for footwear; headwear including caps, hats, cowboy hats, headbands, straw hats, visors, bandannas; clothing, namely, aprons, sleeve garters, t-shirts, golf shirts, work shirts, baseball shirts, woven shirts, shirts, tops, tank tops, sweatshirts, sweatpants, jogging suits, pants, dresses, skirts, sleep pants, pajamas, robes, shorts, jeans, jackets, coats, belts, neckties, neckwear, scarves, suspenders, leather jackets, rain suits, vests, parkas, gloves; United States Trademark Registration No. 4,481,425 for the label design shown above for belt buckles and clasps for clothing all made of non-precious metal and ornamental novelty pins; United States Trademark Registration No. 4,354,330 for the label design for floor mats and rugs; and United States Trademark Registration No. 4,491,564 for the label design for cigarette lighters not of precious metals.  Copies of the certificates of registration of these of JDPI's Trademarks are attached hereto as Exhibit 2.  These

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

registrations are valid and subsisting and Registrations Nos. 2,867,158 and 3,055,481 have become incontestable.

### **VIP'S Unlawful Conduct**

13.    VIP has alleged in its Complaint that it is engaged primarily in the business of designing, manufacturing, and marketing chew toys for dogs, that it sells various lines of dog chew toys, and that among those dog chew toys is a toy referred to by the brand "Bad Spaniels."                                                                      The "Bad Spaniels" dog chew toy is                                                                      depicted below:



14.    VIP has admitted in its Complaint that it "designed the 'Bad Spaniel's' label to incorporate a few elements of the Jack Daniel's label design," including "a label with

10

black background and white lettering," but the Bad Spaniel's toy goes far beyond incorporating a few elements of the Jack Daniel's label.  The Bad Spaniels toy imitates the JDPI Trademarks and slavishly copies virtually every element of the Jack Daniel's Trade Dress, as the toy embodies the following combination of features: (a) the shape of a square bottle with a ribbed neck, in almost the exact proportions of a 750 ml. bottle of Jack Daniel's Tennessee whiskey and colored to imitate the color of Jack Daniel's Tennessee whiskey when it is packaged in the bottle; (b) a black "cap" and black neck wrap "closure" with white printing bearing the stylized mark THE OLD NO. 2; (c) a front black label with white printing and a filigreed border, bearing the BAD SPANIELS mark depicted in arched lettering over the mark THE OLD NO. 2 contained within a filigreed oval design, and the words Tennessee CARPET in the lower portion of the label, with the word "Tennessee" depicted in script.  The toy bears an immediate and striking resemblance to a bottle of Jack Daniel's Tennessee whiskey bearing the Jack Daniel's Trade Dress when the toy is viewed from virtually any vantage point, including those shown on the pages from VIP's website attached hereto as Exhibit 3.  When viewed from any significant distance, the toy appears, at least at first glance, actually to be a bottle of Jack Daniel's Tennessee whiskey bearing the Jack Daniel's Trade Dress.

15.     VIP has alleged in its Complaint that it has "placed a prominent disclaimer on the packaging that plainly states: 'The product and its design belong to VIP products.  This product is not affiliated with Jack Daniel's'."  The alleged disclaimer language does not appear on the toy itself, but instead at the very bottom of what appears to be the back of a two-sided cardboard hangtag, beneath the bar code for the product.  The hangtag mimics the front label portion of the Jack Daniel's Trade Dress, as it is sized in almost the exact proportions of the label and embodies a white-on-black color scheme and a filigreed border.  Depictions of the front and back portions of the hangtag are set forth below:

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1



16.     Upon information and belief,                              the alleged disclaimer is not noticed, much less understood, by the vast majority of purchasers of the toy.  On the page from VIP's website attached hereto as Exhibit 3, the hangtag is shown as being affixed to the product when it is sold, but upon information and belief, it is not shown when the Bad Spaniels toy is displayed on the websites of on-line retailers.  Upon information and belief, the hangtag is immediately detached and discarded after the product is purchased or received, and, as shown in the page from VIP's website attached hereto as Exhibit 4, does not remain affixed to the toy when it is used.

17.     VIP has alleged in its Complaint that the Bad Spaniels toy is a "parody" because it allegedly "include[s] drastic differences from the Jack Daniel's marks and label design . . .," but the toy is not a parody because it does not ridicule, criticize, or otherwise comment upon, Jack Daniel's Tennessee whiskey, the business practices of the producer of Jack Daniel's Tennessee whiskey, or anything else.  Instead, the toy imitates the JDPI Trademarks and slavishly copies the Jack Daniel's Trade Dress to capitalize on their fame and instant recognizability for VIP's commercial gain, by drawing attention to

12

the toy and enabling it to stand out from the numerous competitive dog toys available in the marketplace, including the other toys alleged to be in VIP's line.

18.     Regardless of whether the Bad Spaniels toy parodies the JDPI Trademarks and the Jack Daniel's Trade Dress, VIP's use of the Bad Spaniel's trademark and trade dress in connection with the sale, offering for sale, distribution, and advertising of the Bad Spaniels toy is likely to cause initial interest confusion pre-sale, confusion at the point of sale, and post-sale confusion because prospective purchasers of the toy, purchasers and users of the toy, and observers of the toy while it is in use, are all likely to believe mistakenly that it originates with, or is licensed, sponsored or authorized by, JDPI.

19.     VIP's use of the Bad Spaniels trademark and trade dress is also likely to dilute the famous JDPI Trademarks and Jack Daniel's Trade Dress by tarnishment.  The Bad Spaniels toy label bears the language "The Old No. 2 On Your Tennessee Carpet," "43% Poo By Vol.," and "100% Smelly."  These references to a dog defecating and leaving its stinking excrement on a carpet associate the JDPI Trademarks and the Jack Daniel's Trade Dress with gross and disgusting imagery that harms their reputation.

## FIRST COUNTERCLAIM FOR RELIEF

### (Infringement of Federally-Registered JDPI Trademarks and Federally-Registered Jack Daniel's Trade Dress)

20.     JDPI repeats and realleges the allegations in preceding paragraphs 1-19 as if fully set forth herein.

21.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes the use in commerce, on or in connection with VIP's goods, of reproductions, copies, or colorable imitations of the federally-registered JDPI Trademarks and the federally-registered the Jack Daniel's Trade Dress,

13

which use is likely to cause confusion, to cause mistake, or to deceive, in violation of § 32(1) of the United States Trademark Act, 15 U.S.C. § 1114(1).

22.    VIP infringement of JDPI's federally-registered marks as aforesaid has caused and is likely to continue to cause substantial injury to the public and to JDPI, and JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 32, 34, 35, and 36 of the United States Trademark Act, 15 U.S.C. §§ 1114, 1116, 1117, and 1118.

23.    VIP's infringement of JDPI's federally-registered marks as aforesaid has caused and is likely to continue to cause irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its infringement, thereby causing JDPI further irreparable harm.

24.    JDPI has no adequate remedy at law.

## SECOND COUNTERCLAIM FOR RELIEF

### (Trade Dress Infringement in Violation of Federal Law)

25.    JDPI repeats and realleges the allegations in preceding paragraphs 1-24 as if fully set forth herein.

26.    VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the Jack Daniel's Trade Dress through use in commerce, in connection with VIP's goods, of a combination of symbols or devices, a false designation or origin, and a false or misleading description of fact, that is likely to cause confusion, or to cause mistake, or to deceive, as to the origin, sponsorship, or approval of VIP's Bad Spaniels toy and commercial activities with or by JDPI, in violation of § 43(a)(1) of the United States Trademark Act, 15 U.S.C. § 1125(a)(1).

27.    VIP's infringement of the Jack Daniel's Trade Dress as aforesaid has caused and is likely to continue to cause substantial injury to the public and to JDPI, and JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 32, 34, 35, and 36 of

ANSWER AND COUNTERCLAIMS

the United States Trademark Act, 15 U.S.C. §§ 1114, 1116, 1117, and 1118.

28. VIP's infringement of the Jack Daniel's Trade Dress as aforesaid has caused irreparable harm to JDPI. Unless restrained and enjoined by this Court, VIP will persist in its infringement as aforesaid, thereby causing JDPI further irreparable harm.

29. JDPI has no adequate remedy at law.

## THIRD COUNTERCLAIM FOR RELIEF

### (Dilution of JDPI Trademarks in Violation of Federal Law)

30. JDPI repeats and realleges the allegations in preceding paragraphs 1-29 as if fully set forth herein.

31. VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid is likely to cause dilution by tarnishment of the JDPI Trademarks, which became famous in Arizona and throughout the United States before VIP commenced its use of the Bad Spaniel's trademark and trade dress, by eroding the public's exclusive identification of the famous JDPI Trademarks with JDPI, tarnishing and degrading the positive associations and prestigious connotations of the JDPI Trademarks, and otherwise lessening the capacity of the JDPI Trademarks to identify and distinguish the goods and services sold under and connection with it, in violation of § 43(c) of the United States Trademark Act, 15 U.S.C. § 1125(c).

32. Upon information and belief, VIP willfully and deliberately intended to trade on the reputation and goodwill of the JDPI Trademarks, or to cause dilution of the JDPI Trademarks.

33. VIP's dilution of the JDPI Trademarks as aforesaid has caused and is likely to continue to cause substantial injury to JDPI's goodwill and business reputation, and dilution of the distinctiveness of the famous JDPI Trademarks, and JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 34, 35, 36, and 43(c) of the United States Trademark Act, 15 U.S.C. §§ 1116, 1117, 1118, and 1125(c).

15

QB\136435.00005\31586488.1

34.     VIP's dilution of the JDPI Trademarks as aforesaid has caused and continues to cause irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

35.     JDPI has no adequate remedy at law.

### FOURTH COUNTERCLAIM FOR RELIEF

### (Dilution of Jack Daniel's Trade Dress in Violation of Federal Law)

36.     JDPI repeats and realleges the allegations in preceding paragraphs 1-35 as if fully set forth herein.

37.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid is likely to cause dilution by tarnishment of the Jack Daniel's Trade Dress, which became famous in Arizona and throughout the United States before VIP commenced its use of the Bad Spaniel's trademark and trade dress, by eroding the public's exclusive identification of the famous Jack Daniel's Trade Dress with JDPI, tarnishing and degrading the positive associations and prestigious connotations of the Jack Daniel's Trade Dress, and otherwise lessening the capacity of the Jack Daniel's Trade Dress to identify and distinguish the goods and services sold under and connection with it, in violation of § 43(c) of the United States Trademark Act, 15 U.S.C. § 1125(c).

38.     Upon information and belief, VIP willfully and deliberately intended to trade on the reputation and goodwill of the Jack Daniel's Trade Dress, or to cause dilution of the Jack Daniel's Trade Dress.

39.     VIP's dilution of the Jack Daniel's Trade Dress as aforesaid has caused and is likely to continue to cause substantial injury to JDPI's goodwill and business reputation, and dilution of the distinctiveness of the famous Jack Daniel's Trade Dress, and JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 34, 35,

36, and 43(c) of the United States Trademark Act, 15 U.S.C. §§ 1116, 1117, 1118, and 1125(c).

40.     VIP's dilution of the Jack Daniel's Trade Dress as aforesaid has caused and continues to cause irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

41.     JDPI has no adequate remedy at law.

### FIFTH COUNTERCLAIM FOR RELIEF

### (Trademark Infringement in Violation of Arizona Law)

42.     JDPI repeats and realleges the allegations in preceding paragraphs 1-41 as if fully set forth herein.

43.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the JDPI Trademarks that is likely to cause mistake and deception in the minds of the public, in violation of A.R.S. §§ 44-1451, *et seq.*

44.     VIP's trademark infringement as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its trademark infringement as aforesaid, thereby causing JDPI further irreparable harm.

45.     JDPI has no adequate remedy at law.

### SIXTH COUNTERCLAIM FOR RELIEF

### (Common Law Trademark Infringement and Unfair Competition)

46.     JDPI repeats and realleges the allegations in preceding paragraphs 1-45 as if fully set forth herein.

47.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the JDPI Trademarks and unfair competition at common law.

48.     VIP's trademark infringement and unfair competition as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its trademark infringement and unfair competition as aforesaid, thereby causing JDPI further irreparable harm.

49.     JDPI has no adequate remedy at law.

## SEVENTH COUNTERCLAIM FOR RELIEF

### (Common Law Trade Dress Infringement)

50.     JDPI repeats and realleges the allegations in preceding paragraphs 1-49 as if fully set forth herein.

51.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the Jack Daniel's Trade Dress at common law.

52.     VIP's trade dress infringement as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its trade dress infringement as aforesaid, thereby causing JDPI further irreparable harm.

53.     JDPI has no adequate remedy at law.

## EIGHTH COUNTERCLAIM FOR RELIEF

### (Trademark Dilution in Violation of Arizona Law)

54.     JDPI repeats and realleges the allegations in preceding paragraphs 1-53 as if fully set forth herein.

55.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid in commerce in Arizona began long after the JDPI Trademarks became well-known, distinctive, and famous in Arizona and throughout the United States, and dilutes the distinctive quality of the JDPI Trademarks, in violation of A.R.S. § 44-1448.01.

56.     Upon information and belief, VIP willfully intended to trade on the reputation and goodwill associated with the JDPI Trademarks.

57.     VIP's dilution of the JDPI Trademarks as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

58.     JDPI has no adequate remedy at law.

### NINTH COUNTERCLAIM FOR RELIEF

### (Trade Dress Dilution in Violation of Arizona Law)

59.     JDPI repeats and realleges the allegations in preceding paragraphs 1-58 as if fully set forth herein.

60.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid in commerce in Arizona began long after the Jack Daniel's Trade Dress became well-known, distinctive, and famous in Arizona and throughout the United States, and dilutes the distinctive quality of the Jack Daniel's Trade Dress, in violation of A.R.S. § 44-1448.01.

61.     Upon information and belief, VIP willfully intended to trade on the reputation and goodwill associated with the Jack Daniel's Trade Dress.

62.     VIP's dilution of the Jack Daniel's Trade Dress as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

63.     JDPI has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, defendant and counterclaimant JDPI prays for judgment as follows:

1.     That VIP's declaratory judgment complaint be dismissed with prejudice;

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

2.     That VIP and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, or any of them, who receive actual notice of the injunctions prayed for herein by personal service or otherwise, be preliminarily and then permanently restrained and enjoined from:

(a)     Manufacturing, advertising, promoting, displaying, shipping, offering for sale, selling, or distributing the Bad Spaniels dog toy;

(b)     Manufacturing, advertising, promoting, displaying, shipping, offering for sale, selling, or distributing any other dog toy that reproduces, copies, colorably imitates, or is confusingly similar to, the JDPI Trademarks and/or the Jack Daniel's Trade Dress;

(c)     Manufacturing, advertising, promoting, displaying, shipping, offering for sale, selling, or distributing any other dog toy that dilutes the distinctiveness of the famous JDPI Trademarks and/or the Jack Daniel's Trade Dress; and

(d)     Doing any other act or thing that is likely to cause persons to believe that VIP's goods or commercial activities originate with, or are licensed, sponsored, or authorized by, JDPI;

3.     That VIP be ordered, pursuant to 15 U.S.C. § 1116, to file with the Court and to serve on counsel for JDPI, within 30 days after the entry of judgment herein, a written report under oath setting forth in detail the manner in which it has complied with the injunction ordered by the Court;

4.     That VIP be ordered, pursuant to 15 U.S.C. § 1118 and A.R.S. § 44-1451(B)(5), to deliver up to the Court for destruction or other disposition all Bad Spaniels toys, all labels, signs, prints, packages, wrappers, receptacles, and advertisements bearing the trade dress of the Bad Spaniels toy, and all plates, molds, matrices, and other means of making the same;

5.     That VIP be ordered, pursuant to 15 U.S.C. § 1117(a), to pay to JDPI its attorneys' fees and the costs of this action; and

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

6.    That JDPI be granted such other and further relief as the Court may deem just and proper.

Respectfully submitted,

QUARLES & BRADY LLP

Dated:  December 3, 2014          By: */s/  Gregory P. Sitrick*
                                      Gregory P. Sitrick
                                      Isaac S. Crum
                                      Attorneys for Defendant and
                                      Counterclaimant
                                      JACK DANIEL'S PROPERTIES, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this case.

*/s/ Gregory P. Sitrick*
Gregory P. Sitrick

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

# EXHIBIT B



JDPI000035    VIP00089

EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| _____ ) | No. 2:14-cv-02057-DGC |
| VIP Products, LLC, an Arizona ) limited liability company, ) | **DECLARATION AND RULE 26 REPORT OF DR. GERALD L. FORD** |
|       Plaintiff, ) | |
|     vs. ) | |
| Jack Daniel's Properties, Inc., ) a Delaware corporation ) | |
|       Defendant. ) | |
| _____ ) | |
| Jack Daniel's Properties, Inc., ) a Delaware corporation ) | |
|       Counterclaimant, ) | |
|     vs. ) | |
| VIP Products, LLC, an Arizona ) limited liability company, ) | |
|       Counterdefendant. ) | |
| _____ ) | |

I, Dr. Gerald L. Ford, hereby declare as follows:

<u>INTRODUCTION</u>

1.    I am a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, where I have been engaged in commercial marketing research and consulting for the past forty years.  I am also an emeritus faculty member of the School of Business Administration, California State University, Long Beach, where I held a full-time teaching position for twenty-five years, prior to my retirement in 1994.  My professional experience is further summarized below in paragraphs 34 through 44.

2.    In the instant matter, at the request of Seyfarth Shaw LLP, counsel for counterclaimant, Jack Daniel's Properties, Inc. ("JDPI" or "Jack Daniel's"), I designed and caused to be conducted a survey to address the issue of likelihood of confusion.  Specifically, this survey was designed to measure the degree, if any, to which Plaintiff's Bad Spaniels dog toy is likely to cause confusion as to the source, authorization or approval of, or business affiliation or business connection with, Jack Daniel's.

3.    This likelihood of confusion survey, hosted by Issues & Answers Network, Inc. ("Issues & Answers"), employed an online internet protocol using an internet panel created and maintained by Survey Sampling International ("SSI").

4.    The likelihood of confusion survey conducted in this matter employed a scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure likelihood of confusion, if any, with respect to the source, authorization or approval of, or business affiliation or business connection of Plaintiff's Bad Spaniels dog toy with, Jack Daniel's; and (2) a control survey cell designed to measure the extent of mismeasurement in the test cell survey results.

5.    In total, four hundred eighteen (418) interviews were completed in this likelihood of confusion survey: two hundred eleven (211) interviews were completed in the test cell; and two hundred seven (207) interviews were completed with respect to the control cell.

6.  The stimuli utilized in the survey's test cell were photographs of Plaintiff's Bad Spaniels dog toy.  The stimuli utilized in the survey's control cell were photographs of a fictitious dog toy bearing the Bad Spaniels name, but none of the claimed Jack Daniel's indicia or trade dress.

7.  In total, the results of the likelihood of confusion survey evidence, on a net basis, after adjusting the survey data for mismeasurement error based upon the control, that approximately twenty-nine percent (29.38 - 0.47 = 28.91%) of the universe of potential purchasers of a dog toy are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's dog toy has a business affiliation or business connection with Jack Daniel's.

8.  It is my opinion that the results of the survey support a finding of likelihood of confusion.  The survey results evidence that potential purchasers of a dog toy are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or is made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's, and that such confusion is due in particular to Plaintiff's use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy.

<u>SURVEY BACKGROUND</u>

9.    Attached hereto as Exhibit A are the results of the survey which addressed the issue of likelihood of confusion. Exhibit A provides photocopies of the survey exhibits, the survey screeners and questionnaires, survey screenshots, and a listing of the survey responses.  The Appendix of Exhibit A contains an electronic copy of the source data, an incidence table, and other survey-related background materials.

10.    The sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were designed in accordance with the generally accepted standards and procedures in the field of surveys.  The survey was also designed to meet the criteria for survey trustworthiness detailed in the <u>Manual for Complex Litigation</u>.[1]

11.    I was responsible for the design of the survey, the screener and test and control cell questionnaires, as well as for the procedures to be followed in conducting the interviews. Data gathering was carried out, under the direction of Ford Bubala & Associates, by Issues & Answers, an independent survey organization which hosted the online data survey using internet

_____

[1]    For the proffered poll or survey, "...Relevant factors include whether:  the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles...In addition, in assessing the validity of a survey, the judge should take into account the following factors:  whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity...."  See Federal Judicial Center, <u>Manual for Complex Litigation, Fourth</u>, Section 11.493, at 102-104 (2004).

panelists obtained from SSI.   Data gathering was conducted from April 10-21, 2015.

12.   Ford Bubala & Associates conducted validation of approximately twenty percent (20.33%) of the interviews by contacting, by telephone, survey respondents to confirm their qualification and participation in the survey.   JAK Research, an independent marketing research firm, conducted additional validation of approximately twenty percent (20.10%) of the interviews by contacting, by telephone, survey respondents to confirm their qualification and participation in the survey.   In total, approximately forty percent (40.43%) of the interviews were validated.   This level of validation exceeds industry standards.[2]   None of the interviews failed to validate.

13.   The survey conducted in this matter was administered under a double-blind protocol.   Specifically, not only were the respondents not informed as to the purpose or sponsor of the survey, but similarly, both the staff of Issues & Answers and the staff of SSI were not informed as to the purpose or sponsor of the survey.

<u>SURVEY STRUCTURE</u>

14.   This survey employed an internet panel created and maintained by SSI.   Potential respondents were invited to fill out the screening portion of the interview to determine whether or not they met the universe definition.   Subsequently, those potential respondents who met the universe definition were invited to complete the main survey.

_____

[2]      This level of validation exceeds CASRO (Council of American Survey Research Organizations) standards of 10% to 15%.

15.   The universe for this survey consisted of males and females twenty-one (21) years of age or older who were likely, within the next six months, to purchase a dog toy.[3]

16.   The respondent selection procedure employed in this survey is referred to as a quota sampling method.  This method provided a respondent base that is generally representative of the age and gender distribution of male and female adults twenty-one (21) years of age or older who reported that in the next six months they were likely to purchase a dog toy.  This age and gender distribution was based upon an ORC International internet survey conducted between February 5-8, 2015, among a nationally representative sample of approximately one thousand (956) individuals across the United States.[4]

_____

[3]   Additionally, the survey universe was also restricted to respondents (1) who were using a traditional desktop computer, a laptop/notebook computer, or a tablet computer to read and answer the survey questions; (2) who resided in the United States; (3) who did not, nor did anyone else in their household, work for an advertising agency or a market research company; or a retail store or company that makes, sells, or distributes any dog toys; (4) who agreed to answer the questions in the survey by themselves without the help or assistance of anyone else and without seeking information from any other source (e.g., internet search); (5) who, if they wore contact lenses or eyeglasses when using the device they were using, would wear them during the questionnaire; (6) who were willing to provide their name and telephone number for telephone validation purposes; and (7) who reported they could clearly see the dog toy and clearly read the hang tag.

[4]   Respondents in the ORC International survey were asked "Within the next six months, are you likely to purchase a dog a toy?"  Based on the results of the ORC International survey, age and gender quotas of purchasers were established as follows: approximately 44% male and 56% female; among males, approximately 33% 21 to 34, 40% 35 to 54, and 27% 55 or over; and among females, approximately 35% 21 to 34, 36% 35 to 54, and 29% 55 or over.

17.  As noted earlier, the likelihood of confusion survey conducted in this matter employed a scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure likelihood of confusion, if any, with respect to the source, authorization or approval of, or business affiliation or business connection of Plaintiff's Bad Spaniels dog toy with, Jack Daniel's; and (2) a control survey cell designed to measure the extent of mismeasurement in the test cell survey results.

18.  Survey respondents in the test cell first saw a photograph of a retail display that included a variety of products for dogs, including Plaintiff's Bad Spaniels dog toy. See Exhibit A, page 11.



19.  Next, survey respondents in the test cell saw a photograph of the front of the Bad Spaniels dog toy and a photograph of the back of the hang tag label that included a disclaimer stating "This product is not affiliated with Jack Daniel Distillery."  See Exhibit A, page 12-13.




20.  Survey respondents in the control cell first saw a photograph of a retail display that included a variety of products for dogs, including a fictitious dog toy bearing the name Bad Spaniels.  See Exhibit A, page 70.



21.  Next, survey respondents in the control cell saw a photograph of the front of a fictitious dog toy bearing the name Bad Spaniels, and a photograph of the back of a hang tag label that did not include the disclaimer, "This product is not affiliated with Jack Daniel Distillery."  See Exhibit A, page 71-72.



22.  The control cell provides a measure of the extent that mismeasurement exists in the likelihood of confusion test cell survey results.  Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give a Jack Daniel's response to the test cell survey questions, not as a result of Plaintiff's Bad Spaniels dog toy, but rather because of other factors, such as

the survey's questions, the survey's procedures, market share or popularity, or some other potential influence on a respondent's answers.

23.  In a fashion similar to the protocols employed in a pharmaceutical drug test, the test or experimental cell represents the drug or pill with the "active" ingredient(s) and the control cell represents the "placebo" that does not contain the active ingredient being tested.[5]

24.  The test and control cells were separate surveys. The questions and procedures for the test cell and the control cell were identical with the exception of the stimuli shown to respondents.  As noted earlier, any single respondent participated in only one of the two survey cells.

25.  In total, four hundred eighteen (418) interviews were completed in this likelihood of confusion survey: two hundred eleven (211) interviews were completed in the test cell;

_____

[5]    This methodology is consistent with the methodology discussed by Professor Diamond in the Federal Judicial Center's Reference Manual on Scientific Evidence, Third; "It is possible to adjust many survey designs so that causal inferences about the effect of a [stimulus]...become clear and unambiguous.  By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus....  Respondents in both the experimental and control groups answer the same set of questions....  The effect of the [stimulus]...is evaluated by comparing the responses made by the experimental group members with those of the control group members....  Both preexisting beliefs and other background noise should have produced similar response levels in the experimental and control groups.  In addition, if respondents who viewed the [test cell stimulus]... respond differently than respondents who viewed the control [cell stimulus]..., the difference cannot be merely the result of a leading question, because both groups answered the same question..."  See Shari Seidman Diamond "Reference Guide on Survey Research," in the Federal Judicial Center's Reference Manual on Scientific Evidence, Third, pages 398-399.

and two hundred seven (207) interviews were completed in the
control cell.

<u>SURVEY PROCEDURES AND QUESTIONS</u>

26.  Initially, potential respondents received an
invitation to fill out the screening portion of the interview to
determine whether or not they met the universe definition.  See
Exhibit A, pages 2-4.  Subsequently, those respondents who met
the universe definition were invited to complete the main survey.
At the beginning of the main survey, respondents were shown a
screen with a letter on it and were asked to record the letter
they were shown.  See Exhibit A, page 5, screen 15.  This was
done as a tracking mechanism to identify which stimuli
respondents were exposed to.

27.  Survey questions posed to test cell and control
cell respondents were identical and are as follows:

> In this survey, you are going to be shown a retail
> store display of products for dogs.
>
> Please understand that we are only interested in your
> opinions or beliefs; and if you don't have an opinion or
> belief or don't know the answer to a question, that is an
> acceptable answer.

See Exhibit A, page 6, screen 16.

Next, respondents were told:

> Please look at this display of products for dogs as
> you would if you saw it in a store and were considering
> purchasing a dog toy.
>
> Please feel free to take as much time as you like
> looking at the picture of the retail store display before
> moving on to the survey questions.

See Exhibit A, page 6, screen 17.

Next, respondents were told:

    This is a dog toy shown in the display you just saw.

    Please look at this dog toy as you would if you saw it in a store and were considering purchasing it.

See Exhibit A, page 6, screen 18.

Next, respondents were asked:

    Could you clearly see the dog toy?

See Exhibit A, page 6, screen 19.

Only respondents who answered 'yes' to this question were allowed to continue.  Next, respondents were told:

    Please look at the hang tag on this dog toy.

See Exhibit A, page 6, screen 20.

Next, respondents were asked:

    Could you clearly read the hang tag?

See Exhibit A, page 6, screen 21.

Only respondents who answered 'yes' to this question were allowed to continue.  Respondents were then asked:

    Q7.0  Who or what company do you believe makes or puts out this product?[6]  Please be as specific as possible.

See Exhibit A, page 7, screen 22.

---

[6]    The first two principal survey questions (i.e., question series 7.0 and 8.0) were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions.  See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); and J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:174 @ 448-450, Rel. #72, 12/2014.

Respondents were then asked the basis for their answer with the question:

> Q7.1  Why do you say that?[7]  Again, please be as specific as possible.

See Exhibit A, page 7, screen 23.

Next, respondents were asked:

> Q7.2  What else, if anything, makes you say that?[8]  Again, please be as specific as possible.

See Exhibit A, page 7, screen 24.

Respondents were then asked:

> Q8.0  What other product or products, if any, do you believe are made or put out by whoever makes or puts out this product?  Please be as specific as possible.

See Exhibit A, page 7, screen 25.

Respondents were then asked the basis for their answer with the question:

> Q8.1  Why do you say that?[9]  Again, please be as specific as possible.

See Exhibit A, page 7, screen 26.

Next, respondents were asked:

> Q8.2  What else, if anything, makes you say that?[10]  Again, please be as specific as possible.

See Exhibit A, page 7, screen 27.

---

[7]    Respondents who answered 'don't know' to Q7.0 were not asked Q7.1.

[8]    Respondents who answered 'don't know' to Q7.1 were not asked Q7.2.

[9]    Respondents who answered 'don't know' to Q8.0 were not asked Q8.1.

[10]    Respondents who answered 'don't know' to Q8.1 were not asked Q8.2.

Next, respondents were asked:

> Q9.0  Do you believe this product...
> _____1.  is being made or put out with the authorization or approval of any other company or companies;
> _____2.  is not being made or put out with the authorization or approval of any other company or companies; or[11]
> _____3.  don't know or have no opinion?

See Exhibit A, page 8, screen 28.

Respondents who indicated that they believed the dog toy is being made or put out with the authorization or approval of any other company or companies[12] were asked:

> Q9.1  What company or companies do you believe gave the authorization or approval to make or put out this product?[13]  Please be as specific as possible.

See Exhibit A, page 8, screen 29.

If the respondent provided a response, he/she was asked the basis for the belief with the question:

> Q9.2  Why do you say that?[14]  Again, please be as specific as possible.

--------

[11]    To guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents saw the list with the first alternative being "...is being made or put out with the authorization or approval..." and approximately one-half of the respondents saw the list with the first alternative being "...is not being made or put out with the authorization or approval...").

[12]    The last two principal survey questions (i.e., question series 9.0 and question series 10.0) were designed to address likelihood of confusion as to authorization or approval or business affiliation or business connection and were also patterned after similarly accepted questions.  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:175 at 450-451, Rel. #72, 12/2014.

[13]    Only respondents who answered 'is being made or put out...' were asked Q9.1.

[14]    Respondents who answered 'don't know' to Q9.1 were not asked Q9.2.

See Exhibit A, page 8, screen 30.

Next, respondents were asked:

> Q9.3  What else, if anything, makes you say that?[15]  Again, please be as specific as possible.

See Exhibit A, page 8, screen 31.

Next, respondents were asked:

> Q10.0  Do you believe that whoever makes or puts out this product...
> _____ 1. has a business affiliation or business connection with any other company or companies;
> _____ 2. does not have a business affiliation or business connection with any other company or companies; or[16]
> _____ 3. don't know or have no opinion?

See Exhibit A, page 9, screen 32.

Respondents who indicated that they believed that whoever makes or puts out the dog toy has a business affiliation or business connection with any other company or companies were asked:

_____

[15]    Respondents who answered 'don't know' to Q9.2 were not asked Q9.3.

[16]    Again, to guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents saw the list with the first alternative being "...has a business affiliation or business connection...." and approximately one-half of the respondents saw the list with the first alternative being "...does not have a business affiliation or business connection...").
    As an additional guard against order bias, approximately one-half of the respondents were first queried in question 9.0 about authorization or approval, and approximately one-half of the respondents were first queried in question 9.0 about business affiliation or business connection.  Similarly, approximately one-half of the respondents were first queried in question 10.0 about authorization or approval, and approximately one-half of the respondents were first queried in question 10.0 about business affiliation or business connection.  All respondents were asked both question series 9.0 and 10.0 as noted above.

Q10.1  What company or companies do you believe has a business affiliation or business connection with whoever makes or puts out this product?[17]  Please be as specific as possible.

See Exhibit A, page 9, screen 33.

If the respondent provided a response, he/she was asked the basis

for the belief with the question:

Q10.2  Why do you say that?[18]  Again, please be as specific as possible.

See Exhibit A, page 9, screen 34.

Next, respondents were asked:

Q10.3  What else, if anything, makes you say that?[19] Again, please be as specific as possible.

See Exhibit A, page 9, screen 35.

Finally, respondents were asked:

Q11.0  Do you, or does anyone else in your household, work for a company that makes, sells, or distributes any food products, clothing, fragrance, jewelry, [or] alcoholic beverages?

See Exhibit A, page 9, screen 36.

Respondents were then shown a screen that said:

Thank you for your time and participation.

See Exhibit A, page 9, screen 37.

---

[17]    Only respondents who answered '<u>has</u> a business affiliation or business connection...' were asked Q10.1.

[18]    Respondents who answered 'don't know' to Q10.1 were not asked Q10.2.

[19]    Respondents who answered 'don't know' to Q10.2 were not asked Q10.3.

SURVEY RESULTS

Test Cell

28.  In the test cell, the results of the likelihood of confusion survey evidence that approximately twenty-nine percent (29.38%) of the universe of potential purchasers of dog toys expressed the belief that Plaintiff's Bad Spaniels dog toy is being made or put out by Jack Daniel's, or that Plaintiff's Bad Spaniels dog toy is being made or put out with the authorization or approval of Jack Daniel's, or that Plaintiff has a business affiliation or business connection with Jack Daniel's due to Plaintiff's use of Jack Daniel's indicia or trade dress on its Bad Spaniels dog toy.  See Exhibit A, page 15.

| | | |
|---|---|---|
| **TABLE 1**<br>**TEST CELL** | | |
| | Response Distribution | |
| Response Categories | Number | Percent<br>(n=211) |
| 1. Jack Daniel's | 62 | 29.38 |
| 2. Silly Squeakers, VIP Products,<br>   Bad Spaniels, Tennessee Carpet | 74 | 35.07 |
| 3. Other | 30 | 14.22 |
| 4. Don't know | 45 | 21.33 |
| Total | 211 | 100.00 |

29.  Following are the verbatim responses of respondents in the test cell whose beliefs are included in the "Jack Daniel's" category.  Spelling has been corrected in the following listing for readability.

<u>Test Cell Survey Results</u>

RESPONDENT
 NUMBER    <u>RESPONSE</u>

1001    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  I believe they would have to get the approval of Jack Daniel's whiskey because the design and name is so closely related.
        Q9.2  Because they are creating a spoof of a real product so I think they would need permission so they don't get sued for copyrights or something like that.
        Q9.3  Don't know.

1003    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Design and wording style.
        Q9.3  Shape looks like a bottle of JD.

1005    Q7.0  Jack Daniel's.
        Q7.1  The bottle looks similar to No.7.
        Q7.2  It is a black label.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 The bottle looks identical.
        Q10.3 Don't know.

1008    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Sounds like it.
        Q9.3  Appearance.

1012    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Bottle design and name are plays on the Jack Daniel's brand.
        Q9.3  Nothing else.

1015    Q7.0  Jack Daniel's.
        Q7.1  Jack Daniel's.
        Q7.2  It mimics them.
        Q8.0  Jack Daniel's.
        Q8.1  It looks like their bottle.
        Q8.2  It looks like their bottle and logo.

- 19 -

Test Cell Survey Results

RESPONDENT
 NUMBER    RESPONSE

    1016    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Because the product looks like a Jack Daniel's
                  bottle/logo.
            Q9.3  Don't know.

    1020    Q8.0  It looks like a Jack Daniel's whiskey bottle.
            Q8.1  It has the similar label and colors as a Jack
                  Daniel's bottle.
            Q8.2  Nothing.  That is what I see.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's distilleries.
            Q9.2  It has the very same label and colors as s Jack
                  Daniel's whiskey bottle.
            Q9.3  Nothing.  It says it all.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 It looks like they did a license deal with Jack
                  Daniel's.
            Q10.2 As I said, label type and colors on the bottle and
                  the shape.
            Q10.3 Nothing.

    1022    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's liquor company.
            Q9.2  Because since the dog toy is resembling a Jack
                  Daniel's I'm sure the dog toy company that made this
                  toy had to get their permission and legal rights to
                  essentially copy they product in dog toy form.
            Q9.3  Don't know.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Because the dog toy resembles Jack Daniel's liquor.
            Q10.3 Don't know.

    1029    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's because the label resembles and is a
                  play on their label.
            Q9.2  It has the colors and design of the Jack Daniel's
                  label.
            Q9.3  Nothing.

    1030    Q7.0  Jack Daniel's.
            Q7.1  Because of the logo on the toy.
            Q7.2  Don't know.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

    1033    Q7.0  Jack Daniel's.
            Q7.1  Because it is a spoof on their logo.
            Q7.2  Just the look of the label.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  My best guess is that in order to use this design you
                  would have to have permission from the Jack Daniel's
                  brand.
            Q9.2  Don't know.

    1035    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  It is the same look.
            Q9.3  Don't know.

    1037    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  The name and shape.
            Q9.3  Don't know.

    1044    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Jack Daniel's name is on the front of the package.
            Q9.3  Don't know.

    1046    Q8.0  It is similar to a Jack Daniel's label but I do not
                  believe they make any dog products.
            Q8.1  Just that it looks, from a distance, like a Jack
                  Daniel's label that is on a bottle of liquor.
            Q8.2  Don't know.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  If it is put out by Jack Daniel's then they would
                  have to give authorization for approval to copy their
                  signature label.
            Q9.2  Don't know.

    1047    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  This label has been a trade mark for Jack Daniel's
                  whiskey for a century.
            Q9.3  I have no other reason to believe this other than the
                  label is a Jack Daniel's trademark.

    1054    Q8.0  Jack Daniel's whiskey.
            Q8.1  The toy looks like a Jack Daniel's bottle.
            Q8.2  Don't know.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's Inc.
            Q9.2  Don't know.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

    1056    Q7.0  Jack Daniel's.
            Q7.1  It is their bottle shape.
            Q7.2  It looks like it.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  It is their type of bottle.
            Q9.3  It is their type of logo.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 It is their type of bottle.
            Q10.3 It is their company logo.

    1062    Q8.0  Jack Daniel's.
            Q8.1  It has the same sort of label.
            Q8.2  But then it was made in China.

    1063    Q7.0  Jack Daniel.
            Q7.1  It look likes alcohol.
            Q7.2  Nothing it just looks like Jack Daniel.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel.
            Q10.2 I just do.
            Q10.3 Nothing.

    1065    Q7.0  Bad Spaniels.  It closely resembles a Jack Daniel's
                  bottle.
            Q7.1  The main name on the toy was Bad Spaniels.  On the
                  back of the tag was also listed Bad Spaniels.
            Q7.2  Don't know.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's is what the bottle resembles.
            Q9.2  This is what a Jack Daniel's bottle looks like.
                  Other than the name and some details, it's a mirror
                  image.
            Q9.3  Don't know.

    1067    Q7.0  Jack Daniel's.
            Q7.1  Looks like an alcohol bottle.
            Q7.2  Don't know.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Looks just like a bottle of Jack Daniel's.
            Q10.3 Don't know.

    1076    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  It's obvious.  It's a knockoff of Jack D's.
            Q9.3  Don't know.

Test Cell Survey Results

RESPONDENT
 NUMBER    RESPONSE

1077    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It looks like a Jack Daniel's bottle.
        Q9.3  It looks like one.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Looks like their bottle.
        Q10.3 It just does.

1082    Q7.1  It is a copy of a Jack Daniel's bottle.
        Q7.2  It is confusing.
        Q8.0  Jack Daniel's.
        Q8.1  It looks just like it.
        Q8.2  Don't know.

1083    Q7.0  Brown-Forman group.
        Q7.1  The play on Jack Daniel's.
        Q7.2  Jack Daniel's is made by the Brown-Forman group.
        Q8.0  Whiskey, Southern Comfort.
        Q8.1  The play on Jack Daniel's.
        Q8.2  Jack Daniel's is made by the Brown-Forman group.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Brown-Forman group.
        Q9.2  Brown-Forman makes Jack Daniel's.
        Q9.3  The products play on Jack Daniel's.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Brown-Forman group.
        Q10.2 Brown-Forman makes Jack Daniel's.
        Q10.3 The play on Jack Daniel's whiskey.

1092    Q7.0  Jack Daniel's.
        Q7.1  Looks like a whiskey bottle.
        Q7.2  Label and colors.

1095    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  I believe that Jack Daniel distillery wanted to help
              out.
        Q9.2  It is, because it is a good product.
        Q9.3  Nothing else makes me say that.

1098    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It's similar to the bottle design for Jack Daniel's
              and Jim Beam.
        Q9.3  Just it looks like the liquor bottle.

1099    Q8.0  Jack Daniel's.
        Q8.1  Not sure.
        Q8.2  Not sure.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

1100      Q7.0  Jack Daniel's.
          Q7.1  The logo replica.
          Q7.2  Don't know.

1106      Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  Because its Jack Daniel's.
          Q9.3  It looks like Jack Daniel's.

1108      Q7.0  JD.
          Q7.1  Don't know.
          Q8.0  Jack.
          Q8.1  Don't know.

1110      Q7.0  Jack Daniel's.
          Q7.1  The bottle.
          Q7.2  The bottle design looks like the Jack bottle.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack.
          Q10.2 Again the bottle.
          Q10.3 Same reasons.

1114      Q7.0  Jack Daniel's.
          Q7.1  Because that's what it looks like.
          Q7.2  Just the looks of it.
          Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack.
          Q9.2  It looks like there brand, bottle.
          Q9.3  Don't know.

1115      Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  Because the label is based on a Jack Daniel's label.
          Q9.3  Just the label.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Because of the label.
          Q10.3 They would have had permission to copyright the Jack
                Daniel's label.

1120      Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  The print, font and bottle looks like Jack Daniel's.
          Q9.3  Don't know.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Looks like the bottle.
          Q10.3 Don't know.

- 24 -

<u>Test Cell Survey Results</u>

RESPONDENT
 NUMBER    RESPONSE

| | | |
|---|---|---|
| 1121 | Q9.0 | IS being made or put out with authorization/approval. |
| | Q9.1 | Jack Daniel's Tennessee whiskey. |
| | Q9.2 | It has a very similar label. |
| | Q9.3 | I don't drink that particular brand of whiskey, but I know the label. |
| 1132 | Q9.0 | IS being made or put out with authorization/approval. |
| | Q9.1 | Jack Daniel's. |
| | Q9.2 | The "label" on the toy is in the same design as the label on a bottle of Jack Daniel's whiskey. |
| | Q9.3 | Nothing. |
| 1139 | Q9.0 | IS being made or put out with authorization/approval. |
| | Q9.1 | Jack Daniel. |
| | Q9.2 | That label. |
| | Q9.3 | That logo. |
| 1141 | Q10.0 | HAS a business affiliation or business connection. |
| | Q10.1 | Jack Daniel's. |
| | Q10.2 | The product seems really similar. |
| | Q10.3 | Don't know. |
| 1147 | Q8.0 | Jack Daniel's. |
| | Q8.1 | It looks like their products. |
| | Q8.2 | The appearance. |
| | Q9.0 | IS being made or put out with authorization/approval. |
| | Q9.1 | Jack Daniel's. |
| | Q9.2 | It uses their brand image. |
| | Q9.3 | It looks like their product. |
| | Q10.0 | HAS a business affiliation or business connection. |
| | Q10.1 | Jack Daniel's Tennessee whiskey. |
| | Q10.2 | They are using their brand image. |
| | Q10.3 | It looks like their product. |
| 1148 | Q10.0 | HAS a business affiliation or business connection. |
| | Q10.1 | It looks like packaging from Jack Daniel's sauces. |
| | Q10.2 | The label and color looks like it. |
| | Q10.3 | The label looks like Jack Daniel's drink, as well as the sauces. |
| 1154 | Q9.0 | IS being made or put out with authorization/approval. |
| | Q9.1 | Jack Daniel's. |
| | Q9.2 | Because the font of the text used for the product tag looks just like the package design on their products. |
| | Q9.3 | Don't know. |

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

1155    Q7.0  Jack Daniel's.
        Q7.1  It looks like the Jack Daniel bottle.
        Q7.2  Don't know.

1156    Q7.0  Jack Daniel's Tennessee whiskey.
        Q7.1  While I didn't specifically look on the hand tag for
              the maker, I saw it was made in China, where the
              manufacturer would really be, but as the toy was
              designed to look like Jack Daniel's Tennessee sour
              mash whiskey, I assume that company is the one that
              designed it, and had it manufactured.
        Q7.2  Basically it's subliminal advertising. someone will
              see the dog toy shaped and labeled to look fairly
              close to a Jack Daniel's whiskey bottle, that in
              their subconscious if they are individuals that drink
              alcoholic beverages (an I assume they would or they
              wouldn't have bought that specific dog toy), that
              they'll quite likely go to a alcoholic beverage store
              and purchase a bottle of that product.
        Q8.0  Jack Daniel's Tennessee sour mash whiskey.
        Q8.1  Jack Daniel Tennessee sour mash whiskey.
        Q8.2  Bottle shape, label color, printing on label has a
              font that is identical to that (though wording is not
              exact, but similar) of a Jack Daniel's whiskey black
              label Tennessee sour mash whiskey.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Jack Daniel's.
        Q9.3  The simile is intended to depict a whiskey bottle
              made by Jack Daniel's.  Basically a subliminal way to
              delve into the subconscious of someone, see it to put
              in their mind to go out and buy some Jack Daniel's
              whiskey.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Jack Daniel's distillery.
        Q10.3 I've already stated the answer to that exact question
              several times over, and I know I'm not inebriated on
              Jack Daniel's whiskey and seeing double or triple, as
              I don't drink alcoholic beverages.

1159    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It resembles a bottle of Jack Daniel's whiskey.
        Q9.3  Don't know.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

1160    Q7.0  Jack Daniel's.
        Q7.1  It looks like a Jack Daniel's bottle.
        Q7.2  No other reason.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Don't know.

1162    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Because the logo looks similar.
        Q9.3  Don't know.

1172    Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Don't know.

1176    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It looks like a dog version of a Jack Daniel's
              bottle.
        Q9.3  Don't know.

1179    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  The toy looks like a Jack Daniel's bottle.
        Q9.3  Nothing.

1182    Q7.0  Jack Daniel's.
        Q7.1  It is designed like their bottle.
        Q7.2  Nothing else.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Don't know.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Don't know.

1184    Q7.0  Jack Daniel's.
        Q7.1  Because the bottle looks like it.
        Q7.2  There is nothing else.

1191    Q7.0  Jack Daniel's.
        Q7.1  The look of the bottle, said so on the tag.
        Q7.2  Nothing else.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

    1194      Q7.0  Jack Daniel's.
              Q7.1  That's what I remember seeing.
              Q7.2  The actual toy is a bottle of a Jack Daniel sauce.
              Q9.0  IS being made or put out with authorization/approval.
              Q9.1  Jack Daniel's.
              Q9.2  The bottle is mimicked after the Jack Daniel BBQ
                    sauce.  So they would hold the patent therefore you
                    would have to ask permission to use the image.
              Q9.3  It is made to look like a Jack Daniel bbq sauce
                    bottle.
              Q10.0 HAS a business affiliation or business connection.
              Q10.1 Jack Daniel's.
              Q10.2 The bottle, the back of the label, the play on words.
              Q10.3 Don't know.

    1198      Q7.0  Jack Daniel's.
              Q7.1  It looks like a Jack Daniel's bottle.
              Q7.2  The label.
              Q9.0  IS being made or put out with authorization/approval.
              Q9.1  Jack Daniel's.
              Q9.2  The label.
              Q9.3  The name.
              Q10.0 HAS a business affiliation or business connection.
              Q10.1 Jack Daniel's.
              Q10.2 The bottle.
              Q10.3 The label.

    1199      Q7.0  Jack Daniel's.
              Q7.1  Looks like it.
              Q7.2  Design and look.
              Q8.0  Jack Daniel's.
              Q8.1  Don't know.
              Q10.0 HAS a business affiliation or business connection.
              Q10.1 Jack Daniel's.
              Q10.2 Looks like it.
              Q10.3 Don't know.

    1200      Q9.0  IS being made or put out with authorization/approval.
              Q9.1  Jack Daniel's.
              Q9.2  Jack Daniel's IPR/copyright.
              Q9.3  Nothing more to add.

Test Cell Survey Results

RESPONDENT
 NUMBER    RESPONSE

  1204    Q7.0  Jack Daniel's.
            Q7.1  It looks like the bottle.
            Q7.2  Nothing.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Because it says raw Daniel's and looks like a Jack
                  bottle.
            Q9.3  Nothing.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Because it looks just like the bottle.
            Q10.3 Don't know.

  1210    Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Because of similarity of names.
            Q10.3 It looks like a bourbon bottle.

Control Cell Survey Results

     30.  In the control cell, the results of the likelihood of confusion survey evidence that approximately one half of one percent (0.48%) of the universe of potential purchasers of dog toys expressed the belief that the fictitious Bad Spaniels dog toy is being made or put out by Jack Daniel's, or that the fictitious Bad Spaniels dog toy is being made or put out with the authorization or approval of Jack Daniel's, or that whoever put out the fictitious Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's. See Exhibit A, page 74.

TABLE 4
CONTROL CELL

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=207) |
| 1. Jack Daniel's | 1 | 0.48 |
| 2. Silly Squeakers, VIP Products, Bad Spaniels, Tennessee Carpet | 112 | 54.11 |
| 3. Other | 42 | 20.29 |
| 4. Don't know | 52 | 25.12 |
| Total | 207 | 100.00 |

     31.  Following is the verbatim response of the respondent in the control cell whose beliefs are included in the "Jack Daniel's" category.  Spelling has been corrected in the following listing for readability.

Control Cell Survey Results

RESPONDENT
 NUMBER    RESPONSE

   2131    Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Looks similar to their whiskey bottles.
          Q10.3 The coloration of the bottle packaging.

Summary of Survey Results

     32.  The results of the likelihood of confusion survey evidence that, on a net basis after adjusting the survey data for mismeasurement error in the test cell survey results, based upon the control cell, approximately twenty-nine percent (28.90%)[20] of the universe expressed the belief that Plaintiff's Bad Spaniels dog toy is made or put out by, or is made or put out with authorization/approval of, or that whoever makes or puts out the Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's.  See Exhibit A, page 126.

| | Response Distribution | |
| TABLE 7<br>TEST AND CONTROL CELL<br>Composite Response Analysis | | |
| Response Categories | Test Cell<br>Percent<br>(n=211) | Control Cell<br>Percent<br>(n=207) |
| 1. Jack Daniel's | 29.38 | 0.48 |

---

[20]    The adjustment for mismeasurement error is accomplished by reducing the percent of Jack Daniel's responses in the test cell by the percentage of Jack Daniel's responses in the control cell.  In this case, 29.38% of the survey respondents in the test cell indicated they believed that Plaintiff's Bad Spaniels dog toy is made or put out by, or is authorized or approved by, or has a business affiliation or business connection with Jack Daniel's.  Thus, the likelihood of confusion level would be calculated as 29.38 - 0.48 = 28.90%.

CONCLUSION

33.   It is my considered opinion, based upon my education, background, and professional experience, and based upon my review and analysis that the survey results support a finding of likelihood of confusion.  The survey results evidence that potential purchasers of a dog toy are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or is made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's, and that such confusion is due in particular to Plaintiff's use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy.

QUALIFICATIONS

34.   I hold a Bachelor's Degree in Advertising (B.A.) from San Jose State University, a Master's Degree in Business Administration (M.B.A.) from the University of Southern California, and a Doctoral Degree in Business Administration (D.B.A.) from the University of Southern California.

35.   During my twenty-five year academic appointment, my teaching responsibilities included both graduate and undergraduate level courses in a variety of subject areas.  My teaching responsibilities included courses in marketing (e.g., marketing, marketing management, advertising, promotion, consumer behavior, and marketing research) and management (e.g., principles of management; business policy and strategy; business policies, operations, and organizations; and integrated analysis).

36.    I am a member of the American Marketing Association (AMA), the American Academy of Advertising (AAA), the American Association of Public Opinion Research (AAPOR), the Council of American Survey Research Organizations (CASRO), and the International Trademark Association (INTA).

37.    As a partner with Ford Bubala & Associates, I have been retained by a variety of firms engaged in the consumer product, industrial product, and service sectors of the economy to provide marketing consulting and research services.  Approximately one-half of Ford Bubala & Associates' consultancies in which I have participated have involved the design and execution of marketing research surveys.

38.    During the past forty years, I have been retained in a number of litigation-related consultancies involving intellectual property matters, including matters before federal and state courts, the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office, and the International Trade Commission.  I have designed and executed surveys relating to intellectual property matters, including trademark, false advertising, patent, and other related matters.  I am familiar with the accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls.[21]

39.    During the past thirty-five years, I have addressed a variety of groups on the subject of surveys or polls and their use in the measurement of the state of mind of consumers, with respect to Lanham Act matters.  Specifically, I have spoken at meetings of the American Bar Association, the American Intellectual Property Law

---

[21]    Supra note 1.

Association, the American Marketing Association, the International Trademark Association, the Marketing Research Association, the Intellectual Property Law Institute of Canada, Marques, and the Practising Law Institute.

40.    I have also written on the subject of the design and execution of litigation-related surveys in Lanham Act matters.  Attached hereto as Exhibit B is a list of papers and book chapters that I have written since 2004.

41.    Since 1998 I have served as a member of the Editorial Board of *The Trademark Reporter*, the scholarly legal journal on the subject of Lanham Act matters, published by the International Trademark Association.

42.    I have been qualified and accepted as an expert in marketing and marketing research in more than sixty (60) trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board.

43.    Attached hereto as Exhibit C is a list of cases in which I have provided trial and/or deposition testimony since 1992.

44.    Attached hereto as Exhibit D is a copy of my professional history, describing my qualifications and professional background.

<u>MATERIALS CONSIDERED</u>

45.    Complaint; Answer and Counterclaims of Defendant and Counterclaimant Jack Daniel's Properties, Inc.; Plaintiff VIP Products, LLC's Answer to Jack Daniel's Properties, Inc.'s Counterclaim; an online omnibus study conducted by ORC International, February 5-8, 2015; Bad Spaniels dog toy with its hang tag; display photo of a retail display that includes a variety of products for

- 34 -

dogs; Rough Draft of Deposition Transcript of Eleanor Phillips, April 21, 2015; and Rough Draft of Deposition Transcript of Stephen Sacra, April 23, 2015.

<u>COMPENSATION</u>

46.  Ford Bubala & Associates' fees for this engagement consist solely of billable time and expenses.  Standard time is billed at the rate of $600.00 per hour for the services of a Partner and $300.00 per hour for the services of a Research Associate.  Deposition and trial time are billed at the rate of $750.00 per hour plus expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 7th day of May, 2015, in Huntington Beach, California.

Dr. Gerald L. Ford

# EXHIBIT D

QUARLES & BRADY LLP
Gregory P. Sitrick (AZ Bar #028756))
Isaac S. Crum (AZ Bar#026510)
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 229-5317
Facsimile: (602) 420-5198
E-mail: Gregory.sitrick@quarles.com

SEYFARTH SHAW LLP
Christopher C. Larkin (admitted pro hac vice)
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 201-5289
Facsimile: (310) 201-5219
E-mail: clarkin@seyfarth.com

Attorneys for Defendant and Counterclaimant
JACK DANIEL'S PROPERTIES, INC.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, LLC, an Arizona limited liability company,<br><br>        Plaintiff and Counter-Defendant,<br><br>    v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation,<br><br>        Defendant and Counterclaimant. | Case No. CV 14-02057 PHX DGC<br><br>**ANSWER OF DEFENDANT AND COUNTERCLAIMANT JACK DANIEL'S PROPERTIES, INC. TO AMENDED COMPLAINT** |

    Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") answers the amended complaint filed by plaintiff VIP Products, LLC ("VIP") as follows.

1.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Amended Complaint, and on that basis denies those allegations.

2.      JDPI admits the allegations in paragraph 2 of the Amended Complaint.

3.      JDPI denies the allegations in paragraph 3 of the Amended Complaint, except JDPI admits that it is a citizen of a state other than Arizona.

4.      JDPI admits the allegations in paragraph 4 of the Amended Complaint.

5.      JDPI admits the allegations in paragraph 5 of the Amended Complaint.

6.      JDPI admits that VIP purports to demand a trial by jury in paragraph 6 of the Amended Complaint, but denies that VIP is entitled to a jury trial on any of its claims for relief.

7.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action.

8.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action, which is identified as being part of a "Silly Squeakers" line.

9.      JDPI denies the allegations in paragraph 9 of the Amended Complaint.

10.      JDPI denies the allegations in paragraph 10 of the Amended Complaint.

11.      JDPI denies the allegations in paragraph 11 of the Amended Complaint, except JDPI admits that it owns various registrations of, or containing, the trademark JACK DANIEL'S in the United States and that the JACK DANIEL'S trademark has been used for many years for Tennessee whiskey in the United States.

ANSWER TO AMENDED COMPLAINT

QB\136435.00005\35355596.1

12.     JDPI denies the allegations in paragraph 12 of the Amended Complaint, except JDPI admits that VIP incorporated elements of the trade dress of Jack Daniel's Tennessee whiskey on VIP's "Bad Spaniels" dog toy, including a label with a black background and white lettering, and that VIP placed a statement reading "The product and its design belong to VIP Products.  This product is not affiliated with Jack Daniel Distillery" in small print at the bottom of a detachable cardboard tag affixed to the Bad Spaniels toy.

13.     JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that it sent VIP a letter dated September 5, 2014 demanding that VIP cease all further sales of the Bad Spaniels toy.

14.     JDPI admits the allegations in paragraph 14 of the Amended Complaint.

15.     JDPI admits the allegations in paragraph 15 of the Amended Complaint.

16.     JDPI admits the allegations in paragraph 16 of the Amended Complaint.

17.     JDPI admits the allegations in paragraph 17 of the Amended Complaint.

18.     JDPI admits the allegations in paragraph 18 of the Amended Complaint.

19.     JDPI denies the allegations in paragraph 19 of the Amended Complaint, except JDPI admits that United States Trademark Registration No. 4,106,178 is valid and subsisting and that it is not incontestable.

20.     JDPI denies the allegations in paragraph 20 of the Amended Complaint, and avers that the mark registered under United States Trademark Registration No. 4,106,178 is shown in the registration certificate.

21.     JDPI admits the allegations in paragraph 21 of the Amended Complaint.

22.     JDPI denies the allegations in paragraph 22 of the Amended Complaint.

23.     JDPI admits the allegations in paragraph 23 of the Amended Complaint.

24.     JDPI admits the allegations in paragraph 24 of the Amended Complaint.

ANSWER TO AMENDED COMPLAINT

QB\136435.00005\35355596.1

25. JDPI denies the allegations in paragraph 25 of the Amended Complaint, except JDPI admits that the bottles depicted in the Amended Complaint have various shapes and black caps, black neck wrap closures with white printing bearing different graphics, marks, and design elements, and black front labels with white printing bearing different graphics, marks, and design elements.

26. JDPI denies the allegations in paragraph 26 of the Amended Complaint, except JDPI admits that the bottles depicted in the Amended Complaint have various shapes and neck designs shown on the bottles, together with different graphics, marks, and design elements.

27. JDPI denies the allegations in paragraph 27 of the Amended Complaint.

28. JDPI denies the allegations in paragraph 28 of the Amended Complaint.

29. JDPI denies the allegations in paragraph 29 of the Amended Complaint.

30. JDPI denies the allegations in paragraph 30 of the Amended Complaint, except JDPI admits that some other bottles for whiskey have a black cap.

31. JDPI denies the allegations in paragraph 31 of the Amended Complaint, except JDPI admits that some other bottles for whiskey have a black neck wrap closure with white printing bearing different graphics, marks, and design elements.

32. JDPI denies the allegations in paragraph 32 of the Amended Complaint, except JDPI admits that admits that some other bottles for whiskey have a black front label with white printing bearing different graphics, marks, and design elements.

33. JDPI denies the allegations in paragraph 33 of the Amended Complaint, except JDPI admits that some other bottles for whiskey have combinations of various shapes, black caps, black neck wrap closures with white printing bearing different graphics, marks, and design elements, and black front labels with white printing bearing different graphics, marks, and design elements.

34. JDPI denies the allegations in paragraph 34 of the Amended Complaint.

35. JDPI denies the allegations in paragraph 35 of the Amended Complaint.

ANSWER TO AMENDED COMPLAINT

QB\136435.00005\35355596.1

36.     JDPI denies the allegations in paragraph 36 of the Amended Complaint.

37.     JDPI denies the allegations in paragraph 37 of the Amended Complaint.

38.     JDPI denies the allegations in paragraph 38 of the Amended Complaint.

39.     JDPI denies the allegations in paragraph 39 of the Amended Complaint, except JDPI admits that some other bottles for whiskey bearing different graphics, marks, and design elements are or appear to be square in shape to varying degrees.

40.     JDPI denies the allegations in paragraph 40 of the Amended Complaint, except JDPI admits that some other bottles for whiskey bearing different graphics, marks, and design elements have fluting or faceting on the necks of the bottles.

41.     JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that the bottle for Southern Comfort liqueur bears an embossed signature on the body of the bottle.

42.     JDPI denies the allegations in paragraph 42 of the Amended Complaint, except JDPI admits that some other bottles for whiskey bearing different graphics, marks, and design elements are or appear to be square in shape to varying degrees and have fluting or faceting in the necks of the bottles.

43.     JDPI denies the allegations in paragraph 43 of the Amended Complaint.

44.     JDPI denies the allegations in paragraph 44 of the Amended Complaint.

45.     JDPI denies the allegations in paragraph 45 of the Amended Complaint.

46.     JDPI denies the allegations in paragraph 46 of the Amended Complaint.

## ANSWERING THE FIRST CLAIM FOR RELIEF

47.     JDPI repeats its responses above to the allegations in paragraphs 1-46 of the Amended Complaint in response to the allegations in paragraph 47 of the Amended Complaint.

48.     JDPI admits the allegations in paragraph 48 of the Amended Complaint.

49.     JDPI denies the allegations in paragraph 49 of the Amended Complaint.

5

QB\136435.00005\35355596.1

## ANSWERING THE SECOND CLAIM FOR RELIEF

50.     JDPI repeats its responses above to the allegations in paragraphs 1-49 of the Amended Complaint in response to the allegations in paragraph 50 of the Amended Complaint.

51.     JDPI denies the allegations in paragraph 51 of the Amended Complaint.

52.     JDPI denies the allegations in paragraph 52 of the Amended Complaint.

53.     JDPI denies the allegations in paragraph 53 of the Amended Complaint.

54.     JDPI denies the allegations in paragraph 54 of the Amended Complaint.

55.     JDPI denies the allegations in paragraph 55 of the Amended Complaint.

56.     JDPI denies the allegations in paragraph 56 of the Amended Complaint.

## ANSWERING THE THIRD CLAIM FOR RELIEF

57.     JDPI repeats its responses above to the allegations in paragraphs 1-56 of the Amended Complaint in response to the allegations in paragraph 57 of the Amended Complaint.

58.     JDPI denies the allegations in paragraph 58 of the Amended Complaint.

59.     JDPI denies the allegations in paragraph 59 of the Amended Complaint.

60.     JDPI denies the allegations in paragraph 60 of the Amended Complaint.

61.     JDPI denies the allegations in paragraph 61 of the Amended Complaint.

62.     JDPI denies the allegations in paragraph 62 of the Amended Complaint, except JDPI admits that VIP seeks cancellation of United States Trademark Registration No. 4,106,178.

## AFFIRMATIVE DEFENSES

1.     VIP has infringed, diluted, and competed unfairly with respect to, JDPI's trademarks and trade dress, as more fully alleged in JDPI's Counterclaims in this action, and thus comes before the Court with unclean hands and is not entitled to the equitable relief of a declaratory judgment.

6

QB\136435.00005\35355596.1

2.     VIP is estopped by its deliberate, admitted, and targeted copying of JDPI's trademarks and trade dress, as more fully alleged in JDPI's Counterclaims in this action, from contending that any of JDPI's trademarks or trade dress are functional, merely ornamental or decorative, generic, non-distinctive, or otherwise invalid or unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, defendant and counterclaimant JDPI prays for judgment as follows:

1.     That VIP's Amended Complaint be dismissed with prejudice;

2.     That judgment be entered in JDPI's favor on its Counterclaims;

3.     That VIP be ordered, pursuant to 15 U.S.C. § 1117(a), to pay to JDPI its attorneys' fees and the costs of this action; and

4.     That JDPI be granted such other and further relief as the Court may deem just and proper.

DATED: June 3, 2015                    Respectfully submitted,

 */s/ Isaac S. Crum*
Gregory P. Sitrick  (AZ Bar #028756)
Gregory.Sitrick@quarles.com
Isaac S. Crum (AZ Bar #026510)
Isaac.Crum@quarles.com
Quarles & Brady LLP
Firm State Bar No. 00443100
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004
Telephone (602) 229-5200
Fax (602) 229-5690

SEYFARTH SHAW LLP
Christopher C. Larkin (admitted pro hac vice)
clarkin@seyfarth.com
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 201-5289
Facsimile: (310) 201-5219

*Attorneys for Defendant and Counterclaimant*
*JACK DANIEL'S PROPERTIES, INC.*

7

QB\136435.00005\35355596.1

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that on June 3, 2015, I electronically filed the foregoing with the Clerk

3 of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all

4 counsel of record in this case.

5

6    /s/ Isaac S. Crum
Isaac S. Crum

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANSWER TO AMENDED COMPLAINT

EXHIBIT E

1 | QUARLES & BRADY LLP
Gregory P. Sitrick
2 | Isaac S. Crum
One Renaissance Square
3 | Two North Central Avenue
Phoenix, Arizona 85004-2391
4 | Telephone: (602) 229-5317
Facsimile: (602) 420-5198
5 | E-mail: Gregory.sitrick@quarles.com

6 | SEYFARTH SHAW LLP
Christopher C. Larkin (admitted *pro hac vice*)
7 | 2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
8 | Telephone: (310) 201-5289
Facsimile: (310) 201-5219
9 | E-mail: clarkin@seyfarth.com

10 | Attorneys for Defendant and Counterclaimant
JACK DANIEL'S PROPERTIES, INC.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| VIP PRODUCTS, LLC, an Arizona limited liability company, | Case No. CV 14-02057 PHX DGC |
|---|---|
| Plaintiff, | **DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES** |
| v. | |
| JACK DANIEL'S PROPERTIES, INC., a Delaware corporation, | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS. | |

Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") hereby responds to the first set of interrogatories propounded by plaintiff and counter-defendant VIP Products, LLC ("VIP") as follows.

1    These responses are made solely for the purposes of this action. Each response is

2    made subject to all objections as to competence, relevance, materiality, propriety, and

3    admissibility, and all other objections and grounds which would require the exclusion of

4    any statements contained herein, all of which objections and grounds are expressly

5    reserved and may be interposed at the time of trial in this action.

6    JDPI's responses are based upon the information that is currently available to it.

7    JDPI's investigation and discovery in this action are ongoing and JDPI reserves the right

8    to supplement these responses in the event that additional information is obtained through

9    such investigation or discovery.

10    Nothing contained in these responses is intended to be or should be construed to be

11    an admission by JDPI of the relevance or admissibility at trial of any information

12    contained in these responses.

13                              **GENERAL OBJECTIONS**

14    JDPI objects generally to all of VIP's interrogatories on the following grounds.

15    1.    JDPI objects generally to all of VIP's interrogatories and to each

16    "Definition" and "Instruction" therein to the extent that they seek to impose upon JDPI

17    discovery obligations beyond those contained in the Federal Rules of Civil Procedure and

18    the Local Rules of the United States District Court for the District of Arizona.

19    2.    JDPI objects generally to all of VIP's interrogatories and to each

20    "Definition" and "Instruction" therein to the extent that they seek information that is

21    privileged from disclosure by the attorney-client, attorney work product, and other

22    applicable privileges, immunities, or protections from disclosure. Any inadvertent

23    disclosure of information or documents protected by the attorney-client privilege, the

24    work product doctrine, or any other applicable privilege, immunity, or protection from

25    disclosure is not intended and should not be construed to constitute a waiver of such

26    privilege, immunity, or protection.

27

28                                           2

3. JDPI objects generally to all of VIP's interrogatories and to each "Definition" and "Instruction" therein to the extent that they pertain to matters outside the United States. JDPI will confine its responses to the United States.

4. JDPI objects generally to all of VIP's interrogatories and to each "Definition" and "Instruction" therein to the extent that they seek information that is not in the possession, custody or control of JDPI. Unless otherwise expressly stated, a response shall not be deemed an admission that JDPI has any responsive information or documents in its possession, custody or control, or that any information or documents exist or ever existed.

5. JDPI objects generally to all of VIP's interrogatories and to each "Definition" and "Instruction" therein to the extent that they call for information that is already in VIP's possession, is readily available to VIP, or is obtainable by VIP from public sources.

6. JDPI objects generally to all of VIP's interrogatories and to each "Definition" and "Instruction" therein to the extent that they seek information to which VIP has equal or better access, or for which the burden on JDPI is equal to, or greater than, that of VIP in obtaining the information.

7. JDPI objects generally to all of VIP's interrogatories and to each "Definition" and "Instruction" therein to the extent that they call for information that is cumulative or duplicative.

8. The failure of JDPI to object to any specific Interrogatory on a particular ground shall not be construed as a waiver of its rights to object on any additional ground(s). JDPI reserves the right to amend and/or supplement its objections and responses at any time consistent with further investigation and discovery.

9. JDPI does not concede the relevance, materiality, or admissibility of any information or documents sought in these Interrogatories. JDPI's responses are without waiver or limitation of its right to object on grounds of relevance, privilege, admissibility

3

1  of evidence for any purpose, or any other ground to the use of any information or
2  documents provided or referred to in its responses, in discovery or in any proceeding, or
3  at the trial of this opposition.

4      10.    These objections and responses do not constitute, and shall not be
5  interpreted as, JDPI's agreement with, or admission as to the truth or accuracy of, any
6  legal or factual characterization or allegation stated or implied in VIP's "Definitions" and
7  "Instructions," and instructions or in any of the individual Interrogatories.

8          **RESPONSES TO FIRST SET OF INTERROGATORIES**
9  **INTERROGATORY NO. 1:**

10      IDENTIFY each and every fact, document and other tangible evidence that
11  supports that Counter-plaintiff has established that the JACK DANIELS TRADE DRESS
12  is famous.

13  **RESPONSE TO INTERROGATORY NO. 1:**

14      JDPI interposes its General Objections and also objects specifically to this
15  interrogatory on the ground that it is overly broad and unduly burdensome in seeking
16  "each and every fact, document and tangible evidence," which would require JDPI to
17  provide a literal inventory of its case. Without waiving those objections, JDPI responds
18  as follows: Jack Daniel's Old No. 7 Tennessee whiskey was first sold in a square-shaped
19  bottle by the brand's founder and namesake, Jasper Newton "Jack" Daniel, in 1895, and
20  has been sold, in various sizes, in a square-shaped bottle continuously since then, except
21  during the periods of national Prohibition and state prohibition in Tennessee, and at the
22  end of the 1940s, when glass was in short supply in the United States and the whiskey
23  was sold for a time in a round bottle. By the mid-1950's, the packaging for Jack Daniel's
24  Old No. 7 Tennessee whiskey had taken the basic iconic form in which it has appeared
25  ever since.

26      JDPI's parent company and licensee Brown-Forman Corporation ("Brown-
27  Forman") sells Jack Daniel's Old No. 7 Tennessee whiskey in the United States to

28                                          4

1  distributors, who in turn distribute the product to retail accounts. Brown-Forman reports

2  on a fiscal year basis (e.g., Fiscal Year ("FY") 2015 began on May 1, 2014 and ended on

3  April 30, 2015). Between FY 1997 and FY 2015, total unit sales of Jack Daniel's Old

4  No. 7 Tennessee whiskey in the United States (expressed in depletions of 9-liter cases to

5  distributors) exceeded 75,000,000 units, resulting in revenues exceeding

6  $10,000,000,000. The vast majority of these sales were in packaging bearing the Jack

7  Daniel's Trade Dress. Jack Daniel's Old No. 7 Tennessee whiskey is currently the best-

8  selling whiskey in the United States.

9      Through distribution and sales of Jack Daniel's Old No. 7 Tennessee whiskey, the

10  Jack Daniel's Trade Dress has been exposed for decades to many millions of consumers

11  through display of the product in retail ("off-premise") accounts, including state-owned

12  or state-regulated liquor stores, private liquor stores, grocery stores, mass merchandisers,

13  airlines, and duty-free stores, and in bar and restaurant ("on-premise") accounts. Jack

14  Daniel's Old No. 7 Tennessee in the Jack Daniel's Trade Dress has been exposed to

15  consumers in other manners in the course of distribution, such as its appearance on

16  delivery trucks used by several of Brown-Forman's distributors.

17      A print advertising campaign for Jack Daniel's Old No. 7 Tennessee whiskey

18  commenced in the United States in 1955 and has continued to the present, making the

19  campaign one of the longest-running consumer advertising campaigns in American

20  history. Most of the print advertising for Jack Daniel's Old No. 7 Tennessee whiskey has

21  prominently featured the Jack Daniel's Trade Dress. Print advertisements featuring the

22  Jack Daniel's Trade Dress have appeared in a wide variety of publications, including

23  national magazines such as *Field & Stream*, *Golf Digest*, *Playboy*, *Rolling Stone*, *ESPN*

24  *The Magazine*, *Redbook*, *Smithsonian*, *Time*, *Vanity Fair*, *Wine Spectator*, *Playboy*,

25  *Esquire*, *Forbes*, *Fortune*, *GQ Gentlemen's Quarterly*, and *Sports Illustrated*, local

26  magazines, newspapers such as the *Arizona Republic*, *Boston Globe*, *Chicago Tribune*,

27  *Chicago Sun Times*, *Denver Post*, *Detroit Free Press*, *Houston Chronicle*, *Indianapolis*

28

5

1    *Star, Los Angeles Times, Miami Herald, New York Times, New York Post, Newsday,*

2    *Orange County Register, Philadelphia Inquirer, Pittsburgh Post-Gazette, San Francisco*

3    *Chronicle, Seattle Times, Tampa Bay Times, USA Today, Wall Street Journal,* and

4    *Washington Post,* trade publications, and event programs. During FY 2014 and FY 2015

5    alone, print advertisements for Jack Daniel's Old No. 7 Tennessee whiskey appeared in

6    over 500 newspapers and national and regional magazines in the United States. Many

7    hundreds of millions of dollars have been expended on advertising and promotion of Jack

8    Daniel's Old No. 7 Tennessee whiskey since FY 1997. Pursuant to Rule 33(d) of the

9    Federal Rules of Civil Procedure, JDPI will produce documents reflecting the print

10   advertising campaign for Jack Daniel's Old No. 7 Tennessee whiskey.

11        The Jack Daniel's Trade Dress has also been featured in most of the television

12   advertisements for Jack Daniel's Old No. 7 Tennessee whiskey in the United States that

13   have run since spirits brands began advertising on television again beginning in 1996

14   following the lifting of a self-imposed industry ban on television advertising. The Jack

15   Daniel's Trade Dress is usually the last image seen by the viewer in these advertisements.

16   Well in excess of $100,000,000 has been expended on television advertising for Jack

17   Daniel's Old No. 7 Tennessee whiskey in the United States since such advertising

18   resumed. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will

19   produce documents reflecting television advertising of Jack Daniel's Old No. 7

20   Tennessee whiskey.

21        The Jack Daniel's Trade Dress has appeared in a variety of other forms of

22   advertising, including billboards and other forms of indoor and outdoor advertising, and

23   has been exposed in these ways to millions of Americans. Pursuant to Rule 33(d) of the

24   Federal Rules of Civil Procedure, JDPI will produce documents reflecting these forms of

25   advertising.

26        Brown-Forman has supported sales of Jack Daniel's Old No. 7 Tennessee whiskey

27   in both on- and off-premise outlets through distribution of thousands of point-of-sale

28

6

1    promotional items, such as shelf talkers, case cards, endcap displays, and posters, for the
2    off-premise trade, and table tents, banners, pennants, posters, napkins, coasters, and neon
3    signs, for the on-premise trade. Many of these items have shown or, in some instances,
4    have consisted of, the Jack Daniel's Trade Dress. Pursuant to Rule 33(d) of the Federal
5    Rules of Civil Procedure, JDPI will produce documents reflecting such promotional
6    materials.

7        The Jack Daniel's Trade Dress has appeared in numerous motion pictures seen by
8    many millions of Americans, including *Raiders of the Lost Ark*, *A Few Good Men*, *Mystic*
9    *River*, *Waterworld*, *Pearl Harbor*, *Any Which Way You Can*, *Fisher King*, *Gone in 60*
10   *Seconds*, *Mr. Mom*, *Platoon*, *The Shining*, *Man on Fire*, *Guarding Tess*, *The Bridges of*
11   *Madison County*, *Rock Star*, *Almost Famous*, *The Hard Way*, *The Flintstones*, *Blue Steel*,
12   *Nobody's Fool*, *Lethal Weapon 3*, *Animal House*, *Goldeneye*, *Rock of Ages*, *Ted*, and
13   *Won't Back Down*, and Jack Daniel's Old No. 7 Tennessee whiskey has been referenced
14   in other films, including *Hud, Basic Instinct, Gran Torino, Rainmaker, Monster's Ball*,
15   and *Christmas Vacation*. The Jack Daniel's Trade Dress has also been featured in
16   television programs such as *Treme, True Blood, The Office, Psych, 30 Rock, Bored to*
17   *Death, Bar Rescue, New Girl, Two Broke Girls, Justified*, and *Criminal Minds*. Jack
18   Daniel's Old No. 7 Tennessee whiskey in the Jack Daniel's Trade Dress has also received
19   exposure to the public in the United States through its status as the unofficial "drink of
20   choice" of celebrities such as Frank Sinatra, George Clooney, and Mick Jagger. Pursuant
21   to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will produce documents and
22   things reflecting the appearance of the Jack Daniel's Trade Dress in motion pictures and
23   television programs, and with celebrities.

24       Jack Daniel's Old No. 7 Tennessee whiskey has been the subject of numerous
25   articles in the United States, and the Jack Daniel's Trade Dress has been mentioned
26   and/or displayed in some of them. Pursuant to Rule 33(d) of the Federal Rules of Civil
27   Procedure, JDPI will produce documents reflecting these articles.

28

7

1   The Jack Daniel's Trade Dress is featured prominently on the website at

2   www.jackdaniels.com, which during calendar year 2014 was visited more than 5,000,000

3   times. The Jack Daniel's Trade Dress also appears on the Facebook, Twitter, and

4   Instagram pages for the brand, and receives sponsored and unofficial exposure in other

5   social media. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will

6   produce documents reflecting the appearance of the Jack Daniel's Trade Dress on the

7   jackdaniels.com website and in social media.

8       The historic Jack Daniel Distillery in Lynchburg, Tennessee, which has been in

9   operation since the 19th Century, has offered tours of its facility for many years. During

10  calendar year 2014 the distillery had about 270,000 visitors. The Jack Daniel Trade

11  Dress is prominently displayed on various parts of the tour and elsewhere at the distillery.

12      JDPI and its predecessor-in-interest have maintained an extensive licensing

13  program for the various Jack Daniel's marks, including elements of the Jack Daniel's

14  Trade Dress such as the bottle shape and the Jack Daniel's label, which has been

15  registered for a wide variety of goods other than Tennessee whiskey, as set forth in

16  JDPI's answer and counterclaims. JDPI currently has more than 20 licensees in the

17  United States. Licensed products have included musical instruments, equipment, and

18  accessories, ornaments, metal signs and magnets, nuts, cakes, mustard, sauces,

19  marinades, meats, playing cards, a wide variety of apparel, a wide variety of accessories,

20  a wide variety of bar and glassware, pet collars, leashes, and bowls, leather goods,

21  motorcycle parts, barrels, bar stools, games, home furnishings, and lighters, among other

22  goods. Royalties from sales of licensed products during calendar year 2014 in the United

23  States were in excess of $6,000,000. Pursuant to Rule 33(d) of the Federal Rules of Civil

24  Procedure, JDPI will produce documents reflecting licensed products.

25      The fame of the Jack Daniel's Trade Dress is also shown by the results of the

26  consumer survey conducted under the direction of Dr. Gerald L. Ford, VIP's decision to

27  "target" Jack Daniel's Old No. 7 Tennessee whiskey as the first "liquor" product in its

28

8

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES

19617887v.1

1  Silly Squeaker line, and VIP's documents and testimony regarding the development,
2  design, appearance, and marketing of the Bad Spaniels toy, including Ms. Phillips'
3  admission that she used a bottle of Jack Daniel's Old No. 7 Tennessee whiskey in
4  designing the label for the toy and Mr. Sacra's admission that he sent photographs of
5  bottles of Jack Daniel's Old No. 7 Tennessee whiskey to the company charged with
6  designing the "bottle" for the toy.

7  **INTERROGATORY NO. 2:**

8      IDENTIFY all facts and information pertaining to whether the JACK DANIELS
9  TRADE DRESS is nonfunctional, a source indicator, inherently distinctive or has
10  acquired fame.

11  **RESPONSE TO INTERROGATORY NO. 2:**

12      JDPI interposes its General Objections and also objects specifically to this
13  interrogatory on the grounds that it is overly broad and unduly burdensome in seeking
14  "all facts and information" pertaining to the Jack Daniel's Trade Dress, which would
15  require JDPI to provide a virtual inventory of its case, that it is a compound interrogatory
16  with four separate sub-parts addressing different issues, and that three sub-parts are
17  redundant of Interrogatory No. 1 and subsequent interrogatories. Without waiving those
18  objections, JDPI responds as follows: There have always been numerous "stock" bottles
19  available for use, and actually in use, as packaging for whiskey in the United States, but
20  the packaging for Jack Daniel's Old No. 7 Tennessee whiskey has never used such a
21  stock bottle. Instead, it has always used a custom, proprietary bottle that has been made
22  to the brand's specifications. The intention behind the use of customized packaging has
23  always been to provide consumers with an instantly-recognizable visual symbol of Jack
24  Daniel's Old No. 7 Tennessee whiskey.

25      The combination of features comprising the Jack Daniel's Trade Dress is not
26  essential to the use or purpose of Jack Daniel's Old No. 7 Tennessee whiskey, and does
27  not affect the cost or quality of the product. Square bottles are generally more difficult to

28

9

1  manufacture and their shape can also create problems in the bottling process. The use of

2  a customized square bottle shape for Jack Daniel's Old No. 7 Tennessee whiskey actually

3  increases the cost of producing those products above the costs that would be incurred if a

4  stock bottle or another shape were used. The customized square bottle for Jack Daniel's

5  Old No. 7 Tennessee whiskey does not provide any benefits in terms of packaging

6  efficiency, shipping, handling, or customer use.

7         The main function of a bottle neck wrap is to provide evidence against tampering.

8  Everything else, including color, graphics and whether to conceal the fill line, is a design

9  choice. Many products sold today do not have neck wraps that conceal the fill line. The

10  neck features of the Jack Daniel's Trade Dress have always been a result of design

11  choice, and have not been dictated by function or improved tactile handling by

12  consumers. For example, the faceting on the neck of the Jack Daniel's Trade Dress does

13  not provide friction or allow for a better grip than a non-faceted neck. There are

14  numerous whiskeys on the market today that do not have necks with the features of the

15  Jack Daniel's Trade Dress.

16         If the combination of features that comprises the Jack Daniel's Trade Dress were

17  the most efficient and economical to package alcoholic beverages, there would not be the

18  huge diversity of bottle shapes, designs, and features that exists in the alcoholic beverage

19  market today, including across the lines of other whiskeys sold by JDPI's licensee

20  Brown-Forman. The existence of this diversity indicates that there is no need, as a matter

21  of utility, to use the combination of features comprising the Jack Daniel's Trade Dress.

22  Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will produce

23  documents reflecting the alternative packaging available for use, and actually in use, for

24  whiskey in the United States.

25         See Response to Interrogatory No. 1 above with respect to source indication,

26  distinctiveness, and fame.

27

28
                                            10

1  **INTERROGATORY NO. 3:**

2      IDENTIFY all facts supporting your contentions regarding the fame,

3  distinctiveness, and/or strength of the JACK DANIELS TRADE DRESS.

4  **RESPONSE TO INTERROGATORY NO. 3:**

5      JDPI interposes its General Objections and also objects specifically to this

6  interrogatory on the ground that it is overly broad and unduly burdensome in seeking "all

7  facts" regarding the fame distinctiveness, and/or strength of the Jack Daniel's Trade

8  Dress, which would require JDPI to provide a virtual inventory of its case, and that it is

9  redundant of Interrogatories Nos. 1-2, and subsequent interrogatories. Without waiving

10  those objections, JDPI responds as follows: See Response to Interrogatory No. 1 above.

11  **INTERROGATORY NO. 4:**

12      IDENTIFY all evidence in which you intend to rely to establish the extent of actual

13  recognition of the JACK DANIELS TRADE DRESS.

14  **RESPONSE TO INTERROGATORY NO. 4:**

15      JDPI interposes its General Objections and also objects specifically to this

16  interrogatory on the grounds that it is overly broad and unduly burdensome in seeking

17  "all evidence" regarding the extent of actual recognition of the Jack Daniel's Trade

18  Dress, which would require JDPI to provide a virtual inventory of its case, and that it is

19  redundant of Interrogatories Nos. 1-3 above. Without waiving those objections, JDPI

20  responds as follows: See Response to Interrogatory No. 1 above.

21  **INTERROGATORY NO. 5:**

22      IDENTIFY all evidence in which you intend to rely to establish the degree of

23  similarity between the BAD SPANIELS SILLY SQUEAKER and the JACK DANIELS

24  TRADE DRESS.

25  **RESPONSE TO INTERROGATORY NO. 5:**

26      JDPI interposes its General Objections and also objects specifically to this

27  interrogatory on the ground that it is overly broad and unduly burdensome in seeking "all

28                                     11

1  evidence" regarding similarity, which would require JDPI to provide a virtual inventory
2  of its case. Without waiving those objections, JDPI responds as follows: See Response to
3  Interrogatory No. 1 above. The high degree of similarity is also shown by the consumer
4  survey conducted under the direction of Dr. Gerald L. Ford, VIP's documents and
5  testimony regarding the development, design, appearance, and marketing of the Bad
6  Spaniels toy, including Ms. Phillips' admission that she used a bottle of Jack Daniel's
7  Old No. 7 Tennessee whiskey in designing the label for the toy and Mr. Sacra's
8  admission that he sent photographs of bottles of Jack Daniel's Old No. 7 Tennessee
9  whiskey to the company charged with designing the "bottle" for the toy, and the
10  marketing of the toy on third-party websites. Pursuant to Rule 33(d) of the Federal Rules
11  of Civil Procedure, JDPI will produce documents regarding the development, design,
12  appearance, and marketing of the Bad Spaniels toy, including on third-party websites.
13  **INTERROGATORY NO. 6:**

14       IDENTIFY all evidence in which you intend to rely to establish the degree of
15  inherent or acquired distinctiveness of the JACK DANIELS TRADE DRESS.

16  **RESPONSE TO INTERROGATORY NO. 6:**

17       JDPI interposes its General Objections and also objects specifically to this
18  interrogatory on the grounds that it is overly broad and unduly burdensome in seeking
19  "all evidence" regarding distinctiveness, which would require JDPI to provide a virtual
20  inventory of its case, and that it is redundant of Interrogatories Nos. 2-3 above and
21  subsequent interrogatories. Without waiving those objections, JDPI responds as follows:
22  See Response to Interrogatory No. 1 above. The high degree of distinctiveness is also
23  shown by the consumer survey conducted under the direction of Dr. Gerald L. Ford,
24  VIP's documents and testimony regarding the development, design, appearance, and
25  marketing of the Bad Spaniels toy, including Ms. Phillips' admission that she used a
26  bottle of Jack Daniel's Old No. 7 Tennessee whiskey in designing the label for the toy
27  and Mr. Sacra's admission that he sent photographs of bottles of Jack Daniel's Old No. 7

28

12

1   Tennessee whiskey to the company charged with designing the "bottle" for the toy, and
2   the marketing of the toy on third-party websites. Pursuant to Rule 33(d) of the Federal
3   Rules of Civil Procedure, JDPI will produce documents regarding the development,
4   design, appearance, and marketing of the Bad Spaniels toy.

5   **INTERROGATORY NO. 7:**

6       IDENTIFY all evidence in which you intend to rely to establish the extent to which
7   the owner of the JACK DANIELS TRADE DRESS is engaging in substantially exclusive
8   use of the of the JACK DANIELS TRADE DRESS.

9   **RESPONSE TO INTERROGATORY NO. 7:**

10      JDPI interposes its General Objections and also objects specifically to this
11  interrogatory on the grounds that it is overly broad and unduly burdensome in seeking
12  "all evidence" regarding the use of the Jack Daniel's Trade Dress, which would require
13  JDPI to provide a virtual inventory of its case, and that it seeks information that is neither
14  relevant to VIP's claims and defenses in this action nor reasonably calculated to lead to
15  the discovery of admissible evidence to the extent that it seeks information pertaining to
16  the dilution by blurring factor, as JDPI does not allege dilution by blurring in this action.
17  Without waiving those objections, JDPI responds as follows: See Response to
18  Interrogatory No. 1 above. Substantially exclusive use of the Jack Daniel's Trade Dress
19  is also supported by the consumer survey conducted under the direction of Dr. Gerald L.
20  Ford, VIP's documents and testimony regarding the design, development, appearance,
21  and marketing of the Bad Spaniels toy, including Ms. Phillips' admission that she used a
22  bottle of Jack Daniel's Old No. 7 Tennessee whiskey in designing the label for the toy
23  and Mr. Sacra's admission that he sent photographs of bottles of Jack Daniel's Old No. 7
24  Tennessee whiskey to the company charged with designing the "bottle" for the toy, the
25  marketing of the toy on third-party websites, and the trade dress for other whiskeys sold
26  in the United States. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure,
27  JDPI will produce documents regarding the development, design, appearance, and

28

13

1   marketing of the Bad Spaniels toy, the third-party websites, and the trade dress for other
2   whiskeys sold in the United States.

3   **INTERROGATORY NO. 8:**

4        IDENTIFY with particularity each and every element of your claimed trade dress.

5   **RESPONSE TO INTERROGATORY NO. 8:**

6        JDPI interposes its General Objections and also objects specifically to this
7   interrogatory on the ground that it seeks information that is neither relevant to VIP's
8   claims and defenses in this action nor reasonably calculated to lead to the discovery of
9   admissible evidence to the extent that it seeks to dissect the Jack Daniel's Trade Dress
10  into individual elements rather than to address the Jack Daniel's Trade Dress as a whole.
11  Without waiving those objections, JDPI responds as follows: The combination of
12  elements comprising the Jack Daniel's Trade Dress is described and shown in paragraph
13  6 of JDPI's counterclaims.

14  **INTERROGATORY NO. 9:**

15       If YOU contend that your alleged trade dress is famous or is inherently distinctive,
16  describe in detail the basis for such contention, including, but not limited to, an
17  identification of those elements of the alleged trade dress that have acquired fame or are
18  inherently distinctive.

19  **RESPONSE TO INTERROGATORY NO. 9:**

20       JDPI interposes its General Objections and also objects specifically to this
21  interrogatory on the grounds that it is a compound interrogatory with two separate sub-
22  parts addressing different issues, that it is redundant of Interrogatories Nos. 1-3 and 6
23  above and subsequent interrogatories, and that it seeks information that is neither relevant
24  to VIP's claims and defenses in this action nor reasonably calculated to lead to the
25  discovery of admissible evidence to the extent that it seeks to dissect the Jack Daniel's
26  Trade Dress into individual elements rather than to address the Jack Daniel's Trade Dress
27  as a whole.  Without waiving those objections, JDPI responds as follows: See Response

28

14

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES

19617887v.1

1   to Interrogatory No. 1 above. The fame and distinctiveness of the Jack Daniel's Trade
2   Dress is also supported by the consumer survey conducted under the direction of Dr.
3   Gerald L. Ford, VIP's documents and testimony regarding design, development,
4   appearance, and marketing of the Bad Spaniels toy, including Ms. Phillips' admission
5   that she used a bottle of Jack Daniel's Old No. 7 Tennessee whiskey in designing the
6   label for the toy and Mr. Sacra's admission that he sent photographs of bottles of Jack
7   Daniel's Old No. 7 Tennessee whiskey to the company charged with designing the
8   "bottle" for the toy, and the marketing of the toy on third-party websites. Pursuant to
9   Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will produce documents
10  regarding the development, design, appearance, and marketing of the Bad Spaniels toy
11  and the third-party websites.

12  **INTERROGATORY NO. 10:**

13          IDENTIFY any and all alleged uses in commerce of the JACK DANIELS TRADE
14  DRESS, including, without limitation, each advertisement, catalog, circular, sales
15  literature, brochure, bulletin, flyer, sign, sales display, poster, point of sale, website page
16  or promotional material of any type ever published, broadcast or displayed containing or
17  depicting the JACK DANIELS TRADE DRESS.

18  **RESPONSE TO INTERROGATORY NO. 10:**

19          JDPI interposes its General Objections and also objects specifically to this
20  interrogatory on the ground that it is overly broad and unduly burdensome in seeking "all
21  alleged uses in commerce" of the Jack Daniel's Trade Dress in all media and in all
22  materials, and that it is unlimited in time and geographic scope. Without waiving those
23  objections, JDPI responds as follows: See Response to Interrogatory No. 1 above.
24  Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will produce a
25  representative sample of documents reflecting the use of the Jack Daniel's Trade Dress
26  on various promotional items and in other materials.

27

28                                              15

1

**INTERROGATORY NO. 11:**

2        IDENTIFY every product manufactured, used, sold, offered for sale, and/or
3 exported from the United States that YOU believe uses or may use any protected design,
4 trademark, or trade dress of the JACK DANIELS TRADE DRESS and the date(s) on
5 which you believe that use occurred.

6

**RESPONSE TO INTERROGATORY NO. 11:**

7        JDPI interposes its General Objections and also objects specifically to this
8 interrogatory on the grounds that it is overly broad and unduly burdensome because it is
9 unlimited in time, and that the phrase "any protected design, trademark, or trade dress of
10 the JACK DANIELS TRADE DRESS" is so vague as to be virtually incomprehensible.
11 Without waiving those objections, JDPI responds as follows: Jack Daniel's Old No. 7
12 Tennessee whiskey has been sold in the United States in the Jack Daniel's Trade Dress
13 since the 1950s. JDPI believes that Tennessee whiskey was first sold in the United States
14 under the JACK DANIEL'S word mark and stylized word mark, and under the OLD NO.
15 7 mark, in 1875.

16        Various licensed products have embodied the word marks and other elements of
17 the Jack Daniel's Trade Dress, including the label design that is part of the Jack Daniel's
18 Trade Dress. Licensed products bearing the label design that is part of the Jack Daniel's
19 Trade Dress include the products identified in JDPI's pleaded United States Trademark
20 Registrations Nos. 4,372,885 (decorative magnets, decorative switch plates, and cell
21 phone cases); 4,481,424 (ornamental lapel pins, clocks, watches, cuff links, necklaces,
22 and bracelets); 4,478,408 (umbrellas, luggage, duffel bags, athletic bags, backpacks,
23 luggage tags, key cases, knapsacks, tote bags, and all-purpose canvas carrying bags);
24 2,867,158 (without the words SOUR MASH on the label) (glass and plastic drinking
25 containers, namely flasks, ceramic mugs, ceramic pitchers, ceramic jugs; sponges for
26 household purposes, wood coasters, cork coasters, swizzle sticks, bowls, decorative
27 boxes made of non-precious metal, food containers and thermal insulated containers for

28

16

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES

19617887v.1

1   food or beverages, glassware for beverages, and serving trays of non-precious metals);
2   4,526,056 (footwear; headwear including caps, hats, cowboy hats, headbands, straw hats,
3   visors, bandannas; clothing, namely, aprons, sleeve garters, t-shirts, golf shirts, work
4   shirts, baseball shirts, woven shirts, shirts, tops, tank tops, sweatshirts, sweatpants,
5   jogging suits, pants, dresses, skirts, sleep pants, pajamas, robes, shorts, jeans, jackets,
6   coats, belts, neckties, neckwear, scarves, suspenders, leather jackets, rain suits, vests,
7   parkas, gloves); 4,481,425 (belt buckles and clasps for clothing all made of non-precious
8   metal and ornamental novelty pins); 4,354,330 (floor mats and rugs); and 4,491,564
9   (cigarette lighters not of precious metals). The dates of constructive first use and first use
10  in commerce of the label design mark for the various goods are set forth in the certificates
11  of registration attached as Exhibit 2 to JDPI's counterclaims.

12  **INTERROGATORY NO. 12:**

13      IDENTIFY all facts RELATING TO studies, including formal or informal
14  analysis, investigation, surveys, focus groups, consumer research, or other information or
15  reports that relate to, support, or refute YOUR claims in this action, including, for each
16  such study, when it was commissioned, conducted, and completed, by whom it was
17  conducted, and its conclusions.

18  **RESPONSE TO INTERROGATORY NO. 12:**

19      JDPI interposes its General Objections and also objects specifically to this
20  interrogatory on the ground that it is overly broad and unduly burdensome in seeking "all
21  facts" relating to surveys and studies pertaining to this action. Without waiving those
22  objections, JDPI responds as follows: The survey conducted under the direction of Dr.
23  Gerald L. Ford and attached to his expert report shows a likelihood of confusion as to the
24  source or sponsorship of the Bad Spaniels toy. An on-line survey conducted between
25  February 5-8, 2015 yielded similar results. The opinion of Dr. Itamar Simonson set forth
26  in his expert report supports a likelihood of dilution by tarnishment of the Jack Daniel's
27  Trade Dress and marks by the Bad Spaniels toy resulting from the association of the Jack

28

17

1  Daniel's Trade Dress and marks with dog defecation. Certain research conducted in
2  connection with a modernization of the Jack Daniel's Trade Dress between 2008 and
3  2011 supports the fame, distinctiveness, and non-functionality of the Jack Daniel's Trade
4  Dress. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will produce
5  documents regarding the on-line survey and the packaging research.

6  **INTERROGATORY NO. 13:**

7  IDENTIFY with particularity the exact elements of the alleged protectable trade
8  dress of JACK DANIELS TRADE DRESS.

9  **RESPONSE TO INTERROGATORY NO. 13:**

10  JDPI interposes its General Objections and also objects specifically to this
11  interrogatory on the grounds that the phrase "alleged protectable trade dress of JACK
12  DANIELS TRADE DRESS" is vague, that it is redundant of Interrogatory No. 8 above,
13  and that it seeks information that is neither relevant to VIP's claims and defenses in this
14  action nor reasonably calculated to lead to the discovery of admissible evidence to the
15  extent that it seeks to dissect the Jack Daniel's Trade Dress into individual elements
16  rather than to address the Jack Daniel's Trade Dress as a whole. Without waiving those
17  objections, JDPI responds as follows: The combination of elements that comprise the
18  Jack Daniel's Trade Dress is described and shown in paragraph 6 of JDPI's
19  counterclaims.

20  **INTERROGATORY NO. 14:**

21  IDENTIFY the date of first use in the United States by Counter-plaintiff of the
22  alleged JACK DANIELS TRADE DRESS.

23  **RESPONSE TO INTERROGATORY NO. 14:**

24  JDPI interposes its General Objections and also objects specifically to this
25  interrogatory on the ground that it is redundant of Interrogatory No. 11 above. Without
26  waiving those objections, JDPI responds as follows: See Response to Interrogatory No.
27  11 above.

28

18

1 **INTERROGATORY NO. 15:**

2    IDENTIFY each trade dress YOU contend VIP copied or diluted or that is

3 otherwise the subject of YOUR claims, defenses or allegations in this action.

4 **RESPONSE TO INTERROGATORY NO. 15:**

5    JDPI interposes its General Objections. Without waiving those objections, JDPI

6 responds as follows: VIP copied, infringed, and is likely to dilute the trade dress of Jack

7 Daniel's Old No. 7 Tennessee whiskey, as described and shown in paragraph 6 of JDPI's

8 counterclaims.

9 **INTERROGATORY NO. 16:**

10    IDENTIFY each and every VIP product, packaging or other matter YOU contend

11 copies or dilutes the JACK DANIELS TRADE DRESS.

12 **RESPONSE TO INTERROGATORY NO. 16:**

13    JDPI interposes its General Objections. Without waiving those objections, JDPI

14 responds as follows: VIP's Bad Spaniels toy, the hangtag for the toy, and depictions of

15 those materials in VIP's sell sheets and catalogs, copy and dilute the Jack Daniel's Trade

16 Dress.

17 **INTERROGATORY NO. 17:**

18    IDENTIFY all facts supporting the contention that the JACK DANIELS TRADE

19 DRESS is protectable including within that identification of facts all DOCUMENTS that

20 REFER OR RELATE to the foregoing and all PERSONS with knowledge of the

21 foregoing.

22 **RESPONSE TO INTERROGATORY NO. 17:**

23    JDPI interposes its General Objections and also objects specifically to this

24 interrogatory on the grounds that it is overly broad and unduly burdensome in seeking

25 "all facts" pertaining to the Jack Daniel's Trade Dress, which would require JDPI to

26 provide a virtual inventory of its case, and that it is redundant of at least Interrogatories

27 Nos. 2-3, 6-7, and 9 above. Without waiving those objections, JDPI responds as follows:

28

19

1  See Responses to Interrogatories Nos. 1 and 2 above. The individuals identified in
2  JDPI's First Supplemental Initial Disclosures have knowledge of these facts.

3  **INTERROGATORY NO. 18:**

4       For each trade dress that YOU contend VIP copied or diluted, separately
5  IDENTIFY each product sold by YOU or YOUR licensees that incorporates such trade
6  dress and, for each such product, separately state (a) the number of units, by year, of each
7  such product sold by YOU or YOUR licensees and (b) revenue received by YOU from
8  such SALES of each such product broken down by the channel of trade that the reported
9  revenue was derived from, including specifically whether any revenue was derived from
10 pet specialty retailers.

11 **RESPONSE TO INTERROGATORY NO. 18:**

12      JDPI interposes its General Objections and also objects specifically to this
13 interrogatory on the grounds that it is overly broad and unduly burdensome because it is
14 unlimited in time and geographic scope, that it is vague with respect to the phrases "each
15 trade dress" and "pet specialty retailers," and that it is a compound interrogatory with
16 separate sub-parts addressing different issues. Without waiving those objections, JDPI
17 responds as follows: VIP copied and diluted the trade dress of Jack Daniel's Old No. 7
18 Tennessee whiskey as described and shown in paragraph 6 of JDPI's counterclaims.
19 Rounded annual unit sales (expressed in depletions of 9-liter cases to distributors) of Jack
20 Daniel's Old No. 7 Tennessee whiskey in the United States from FY 1997 to FY 2015 are
21 set forth below. These sales yielded revenues in excess of $10,000,000,000.

22          FY 1997: 3,000,000
23          FY 1998: 3,100,000
24          FY 1999: 3,300,000
25          FY 2000: 3,500,000
26          FY 2001: 3,600,000
27          FY 2002: 3,600,000

28                                     20

1  FY 2003: 3,700,000

2  FY 2004: 3,900,000

3  FY 2005: 4,200,000

4  FY 2006: 4,500,000

5  FY 2007: 4,600,000

6  FY 2008: 4,600,000

7  FY 2009: 4,600,000

8  FY 2010: 4,600,000

9  FY 2011: 4,600,000

10  FY 2012: 4,700,000

11  FY 2013: 4,800,000

12  FY 2014: 4,800,000

13  FY 2015: 4,900,000 (this figure is the number compiled to date given the end of

14  FY 2015 on April 30, 2015)

15  Construing the vague term "pet specialty retailers" to be the retail stores identified

16  by VIP in its discovery responses as being the retail stores in which the Bad Spaniels toy

17  has been sold, as far as JDPI is aware, none of the revenues from the sales of Jack

18  Daniel's Old No. 7 Tennessee whiskey have been derived from pet specialty retailers.

19  **INTERROGATORY NO. 19:**

20  For each concept, design, product, product packaging or other matter that YOU

21  contend VIP copied or diluted, state all facts that support that contention, if YOU so

22  contend, that such copying or dilution was intentional or willful and include within that

23  statement pf (sic) facts the IDENTIFY all PERSONS with knowledge of such facts and

24  all DOCUMENTS that REFER OR RELATE TO such facts.

25  **RESPONSE TO INTERROGATORY NO. 19:**

26  JDPI interposes its General Objections and also objects specifically to this

27  interrogatory on the grounds that it is overly broad and unduly burdensome in seeking

28  21

1   "all facts" pertaining to the copying or dilution of the Jack Daniel's Trade Dress, which

2   would require JDPI to provide a virtual inventory of its case, and that it is vague with

3   respect to the terms "concept, design, product, product packaging or other matter that

4   YOU contend VIP copied or diluted." Without waiving those objections, JDPI responds

5   as follows: VIP copied and diluted the trade dress of Jack Daniel's Old No. 7 Tennessee

6   whiskey as described and shown in paragraph 6 of JDPI's counterclaims. Stephen Sacra

7   and Elle Phillips have knowledge of the intentional and willful nature of VIP's copying

8   and dilution of the Jack Daniel's Trade Dress in the course of the design and

9   development of VIP's Bad Spaniels toy. Their deposition testimony regarding the

10  design, development, appearance, and marketing of the Bad Spaniels toy, including Ms.

11  Phillips' admission that she used a bottle of Jack Daniel's Old No. 7 Tennessee whiskey

12  in designing the label for the toy and Mr. Sacra's admission that he sent photographs of

13  bottles of Jack Daniel's Old No. 7 Tennessee whiskey to the company charged with

14  designing the "bottle" for the toy, supports intentional and willful copying and dilution of

15  the Jack Daniel's Trade Dress.  Pursuant to Rule 33(d) of the Federal Rules of Civil

16  Procedure, JDPI will produce documents reflecting VIP's intentional and willful copying

17  and dilution of the Jack Daniel's Trade Dress in the course of the design, development,

18  and marketing of the Bad Spaniels toy.

19  **INTERROGATORY NO. 20:**

20      State all facts which support YOUR claims against VIP in THIS ACTION and

21  include within that statement of facts the IDENTIFY all PERSONS with knowledge of

22  such facts and all DOCUMENTS that REFER OR RELATE TO such facts.

23  **RESPONSE TO INTERROGATORY NO. 20:**

24      JDPI interposes its General Objections and also objects specifically to this

25  interrogatory on the ground that it is overly broad and unduly burdensome in seeking "all

26  facts" supporting all of JDPI's claims in this action, which, in this instance, would require

27

28

22

1    JDPI to provide a literal and total inventory of its case, and that it is redundant of
2    virtually all of the other interrogatories propounded by VIP.

3    **INTERROGATORY NO. 21:**

4        Describe in detail what you believe is the degree of similarity between the JACK
5    DANIELS TRADE DRESS and/ the BAD SPANIELS SILLY SQUEAKER.

6    **RESPONSE TO INTERROGATORY NO. 21:**

7        JDPI interposes its General Objections. Without waiving those objections, JDPI
8    responds as follows: There is a very high degree of similarity in overall appearance
9    between the Jack Daniel's Trade Dress and the Bad Spaniels toy resulting from the
10    virtual identity in size, shape, and coloration of the Bad Spaniel's bottle to the bottle for
11    Jack Daniel's Old Boo. 7 Tennessee whiskey, the use of a black cap on the Bad Spaniels
12    bottle, the use of a black neck label with the words "Bad Spaniels" in white arched
13    lettering over an oval containing the words "The Old. No. 2" in white and a filigree
14    design, and the use of a front black label with the words "Bad Spaniel's" in white arched
15    lettering over an oval containing the words "The Old. No. 2" in white and a filigree
16    design, the word "Tennessee" in script toward the bottom of the label, an exterior filigree
17    border, and the words "43% POO BY VOL."

18    **INTERROGATORY NO. 22:**

19        Describe in detail what you believe is the degree of inherent or acquired
20    distinctiveness of the JACK DANIELS TRADE DRESS.

21    **RESPONSE TO INTERROGATORY NO. 22:**

22        JDPI interposes its General Objections and also objects specifically to this
23    interrogatory on the grounds that it is redundant of at least Interrogatories Nos. 2-3 and 6
24    above, and that it seeks information that is neither relevant to VIP's claims and defenses
25    in this action nor reasonably calculated to lead to the discovery of admissible evidence to
26    the extent that it seeks information pertaining to the dilution by blurring factor, as JDPI
27    does not allege dilution by blurring in this action. Without waiving those objections,

28

23

1   JDPI responds as follows: To the extent that the combination of elements that comprise
2   the Jack Daniel's Trade Dress was not inherently distinctive when they were first used in
3   the 1950s, the Jack Daniel's Trade Dress has acquired a very high degree of
4   distinctiveness in the United States since the 1950s by virtue of the longstanding and
5   extensive sales and advertising of Jack Daniel's Tennessee whiskey in the Jack Daniel's
6   Trade Dress and the other exposure of the Jack Daniel's Trade Dress to the general public
7   in the manners set forth in JDPI's response to Interrogatory No. 1 above.

8   **INTERROGATORY NO. 23:**

9   IDENTIFY all evidence in which you intend to rely to establish any actual
10  association between the BAD SPANIELS SILLY SQUEAKER and the JACK DANIELS
11  TRADE DRESS.

12  **RESPONSE TO INTERROGATORY NO. 23:**

13  JDPI interposes its General Objections and also objects specifically to this
14  interrogatory on the grounds that it is overly broad and unduly burdensome in seeking
15  "all evidence" pertaining to actual association, and that it seeks information that is neither
16  relevant to VIP's claims and defenses in this action nor reasonably calculated to lead to
17  the discovery of admissible evidence to the extent that it seeks information pertaining to
18  the dilution by blurring factor, as JDPI does not allege dilution by blurring in this action.
19  Without waiving those objections, JDPI responds as follows: The deposition testimony of
20  Stephen Sacra and Elle Phillips, and exhibits thereto, regarding the design, development,
21  appearance, and marketing of the Bad Spaniels toy, including Ms. Phillips' admission
22  that she used a bottle of Jack Daniel's Old No. 7 Tennessee whiskey in designing the
23  label for the toy and Mr. Sacra's admission that he sent photographs of bottles of Jack
24  Daniel's Old No. 7 Tennessee whiskey to the company charged with designing the
25  "bottle" for the toy, and the survey conducted under the direction of Dr. Gerald L. Ford,
26  support actual association between the Jack Daniel's Trade Dress and the Bad Spaniels
27  toy.

28

24

**INTERROGATORY NO. 24:**

IDENTIFY any BOTTLE REDESIGN of the shape of the JACK DANIELS bottle in the last ten years.

**RESPONSE TO INTERROGATORY NO. 24:**

JDPI interposes its General Objections. Without waiving those objections, JDPI responds as follows: In 2008, JDPI's licensee Brown-Forman began considering what became the most recent evolution of the Jack Daniel's Trade Dress, including its labeling, to refresh and refine the package and to enhance its premium look. Several versions of modified packaging were considered and tested, and the one that is currently in use was ultimately selected. Research suggested that these modifications retained the core brand values and the immediately-identifiable elements, while modernizing the packaging and making it appear to be a more sophisticated and premium whiskey. The research also suggested that differences between the then-current package and the modified package, primarily with respect to the label changes, were apparent to respondents only in the artificial situation of a forced (e.g., side-by-side) comparison, in which respondents were asked if the packages were the same or different. Even then, about 25% of the respondents said that they saw no differences between the packages.

Brown-Forman publicly announced the packaging change in a May 16, 2011 press release, and the modified packaging was introduced in June 2011. The modified packaging embodies slightly wider neck fluting, slightly more square shoulders, and slightly sharper edges and facets than its predecessor, as well as certain changes to the package's labeling.

A number of persons at JDPI and Brown-Forman were involved in various ways in the packaging modification. The person with the most knowledge of the packaging change and related activities is Christopher R. Hungerford, who is identified in JDPI's First Supplemental Initial Disclosures.

25

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES

19617887v.1

1    Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, JDPI will produce

2    documents regarding the packaging modification.

3                                        As to objections and legal contentions:

4                                        QUARLES & BRADY LLP

5                                        SEYFARTH SHAW LLP

6    Dated: May 14, 2015              By:

7                                             Christopher C. Larkin
                                             Attorneys for Defendant and
8                                             Counterclaimant
                                             JACK DANIEL'S PROPERTIES, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        26
     DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
     PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES
     19617887v.1

1

## **VERIFICATION**

2       I, David S. Gooder, declare under penalty of perjury under the laws of the United

3  States that the foregoing Defendant and Counterclaimant Jack Daniels Properties, Inc.'s

4  Responses To Plaintiff and Counter-Defendant's First Set Of Non-Uniform

5  Interrogatories are true and correct.

6  Dated: May __ , 2015

                                      DAVID S. GOODER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES

19617887v.1

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on May 14, 2015, I served the foregoing DEFENDANT AND

3    COUNTERCLAIMANT'S RESPONSES TO PLAINTIFF AND COUNTER-

4    DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES on the parties

5    identified below in the manner identified below:

6    **VIP Products LLC (via Electronic Mail and First Class Mail)**

7    David G. Bray, Esq.
     DICKINSON WRIGHT, PLLC
8    1850 North Central Avenue, Suite 1400
     Phoenix, Arizona 85004
9    Direct Line: 602-285-5033
     DBray@dickinsonwright.com

10

11                                        _____
                                          Christopher C. Larkin

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO PLAINTIFF
AND COUNTER-DEFENDANT'S FIRST SET OF NON-UNIFORM INTERROGATORIES

19617887v.1

EXHIBIT F

Michael Taylor - July 16, 2015

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

VIP PRODUCTS, L.L.C., an Arizona     )
limited liability company            )
                                     )
    Plaintiff and Counterdefendant;  )
                                     )
              vs.                    ) No. 2:14-cv-02057-DGC
                                     )
JACK DANIEL'S PROPERTIES, INC., a    )
Delaware corporation,                )
                                     )
    Defendant and Counterclaimant.   )
_____)

DEPOSITION OF MICHAEL TAYLOR

Louisville, Kentucky

July 16, 2015

Prepared by:

GINA M. PINTOZZI-GOREY, RPR
KY-CCR #24574673

1                      INDEX TO EXAMINATION

2

    WITNESS:  MICHAEL TAYLOR
3
    DIRECT EXAMINATION  BY MR. BRAY................    4
4

5

6

7

8

9                       INDEX TO EXHIBITS

10
    EXHIBIT NO. 40 .................................    50
11      (PLAINTIFF VIP PRODUCTS, L.L.C.'S NOTICE OF
        DEPOSITION OF JACK DANIEL'S PROPERTIES,
12      INC.)
    EXHIBIT NO. 48 .................................    50
13      (DEFENDANT AND COUNTERCLAIM OF DANIEL'S
        PROPERTIES, INC.'S RESPONSES TO PLAINTIFF
14      AND FIRST SET OF INTERROGATORIES)
    EXHIBIT NO. 50 .................................     9
15      (JACK DANIEL'S GLOBAL STRATEGY POWERPOINT)
    EXHIBIT NO. 51 .................................    23
16      (PERCEPTION RESEARCH SERVICES
        REPORT ON EXPLORATORY OF NEW PACKAGE
17      DESIGN FOR JACK DANIEL'S WHISKEY BOTTLE)
    EXHIBIT NO. 53 .................................    48
18      (REPORT BY MR. SACRA)
    EXHIBIT NO. 54 .................................    45
19      (DISCLOSURES OF JACK DANIEL'S PROPERTIES,
        INC.)
20  EXHIBIT NO. 55 .................................    97
        (OWENS-ILLINOIS PRODUCTION REGARDING
21       BREAKAGE ISSUE)

22

23      (Exhibits 50 and 51 not attached due to Protective
    Order.)
24

25

1          THE DEPOSITION OF MICHAEL TAYLOR, taken

2   in the offices of COULTER REPORTING, LLC, 101 East

3   Kentucky Street, Louisville, Kentucky, on Thursday,

4   July 16, 2015, commencing at 1:52 p.m., before Gina

5   M. Pintozzi, a Certified Reporter in the State of

6   Kentucky.

7

8                  ***      ***      ***

9

10                    APPEARANCES

11

12   FOR THE PLAINTIFF AND COUNTERDEFENDANT:

13          MR. DAVID G. BRAY
            DICKINSON WRIGHT, PLLC
14          1850 N. Central Avenue, Suite 1400
            Phoenix, Arizona  85004
15          602.285.5033
            Dbray@dickinsonwright.com
16

17   FOR THE DEFENDANT AND COUNTERCLAIMANT:

18          MR. CHRISTOPHER C. LARKIN
            SEYFARTH SHAW, LLP
19          2029 Century Park East, Suite 3500
            Los Angeles, California  90067
20          310.277.7200
            Clarkin@seyfarth.com
21

22

23   ALSO PRESENT:

24          Mr. Stephen Sacra

25          Ms. Wendy Sacra

Michael Taylor - July 16, 2015                    7

1  today's deposition?

2       A.    I just had a meeting yesterday with

3  Chris Larkin and Carolyn Susman, Brown-Forman's

4  attorney.

5       Q.    Okay.  Other than the meeting with

6  Brown-Forman's counsel, have you done anything else

7  to prepare for today's deposition?

8       A.    Just looked at some of our files on

9  bottle drawings and pallet patterns.

10       Q.    Now, when you say you've looked at files

11  regarding "bottle drawings," see if you can fill in

12  the details a little bit there.

13       A.    Sure.  Just to refresh my memory of the

14  designs and the shape of the bottles.

15       Q.    And when you say "the bottles," are you

16  referring specifically to what we've been -- well,

17  let's get some nomenclature straight.

18       A.    Sure.

19       Q.    The 2011 redesign of the Jack Daniel's

20  Black Label bottle we've been calling "the evolution

21  bottle"?

22       A.    Yes.

23       Q.    That's how it's referred to internally

24  at Brown-Forman?

25       A.    Yes, it is.

Michael Taylor - July 16, 2015                    8

```
 1          Q.       Okay.  What would you like me to call
 2    the immediate predecessor bottle to that?
 3          A.       Evolution.
 4          Q.       No.
 5                   MR. LARKIN:  The current bottle is the
 6    evolution.
 7                   THE WITNESS:  I'm sorry.
 8    BY MR. BRAY:
 9          Q.       What came before the evolution bottle?
10          A.       So we have the evolution, the bevel, and
11    then the old design, which we don't have a name for.
12          Q.       Can I just call it "the old design"?
13          A.       Call it "the old design."
14          Q.       And that will refer to the design of the
15    Jack Daniel's Black Label bottle that was used, you
16    know, in the years prior to the evolution bottle.
17    And I know there was some iterations before that --
18          A.       Sure.
19          Q.       -- but I'm really interested just in the
20    bottle that was in existence 2007, '08, '09, '10, up
21    until the change.
22                   So I will call that "the old design."
23    Is that fair?
24          A.       Yes.
25          Q.       You'll understand what I'm talking
```

1    about?

2         A.      Uh-huh.

3         Q.      In your answer I think you said the

4    "evolution," "old," and then I think you said

5    "bevel"?

6         A.      Yes.   The evolution is the current

7    bottle; bevel was the bottle with bevels or flat

8    contours on the side, the corners; and the bottle

9    prior to that was the -- what I call "the old

10   bottle," which had no bevels.   It was a square

11   bottle with radiused corners.

12                MR. BRAY:   Can you hand him Exhibit 50?

13                (EXHIBIT NO. 50 PREVIOUSLY MARKED)

14                And then turn to page 19.   There's Bates

15   numbering in the lower right.

16                MR. LARKIN:   Yeah, referenced by the

17   page number in the lower right-hand side.

18   BY MR. BRAY:

19        Q.      Okay.   I just want to make sure we're on

20   the same page.

21                My understanding is that if you're on

22   page 19 of Exhibit 50 there's kind of a history of

23   the evolution of the bottle design of the Jack

24   Daniel's Black Label.

25                Under "2011," my understanding is that's

Michael Taylor - July 16, 2015                    10

1    the evolution bottle.   Is that correct?

2           A.      2011 is the evolution bottle.

3           Q.      Okay.   And then next to that it says

4    "Current," which I think we've agreed to call "the

5    old design"?

6           A.      I call that "the bevel design."

7           Q.      Okay.   The bevel design?

8           A.      Yes.

9           Q.      And then you referred to something, we

10   were talking about something called "the old" --

11          A.      The old design is similar to what I see

12   as 1964, but this picture is not very clear.   But

13   it's similar between the '64 and what's shown here

14   to be "Current" that I call "bevel."

15          Q.      Okay.

16          A.      Okay?

17          Q.      So, again, just so we have our

18   nomenclature correct, should I refer to the

19   immediate predecessor bottle to the evolution design

20   as "the bevel design"?

21          A.      Yes, please.

22          Q.      Okay.   Going back to what you did to

23   prepare for today's deposition, you said you

24   reviewed bottle drawings.

25                  Are the drawings that you reviewed

```
 1   drawings of the bevel bottle and the evolution
 2   bottle?
 3        A.    Yes.  It is the evolution, the bevel,
 4   and the old design.
 5        Q.    Just out of curiosity -- it probably
 6   doesn't make any difference -- do you know when the
 7   transition was from the old design to the bevel
 8   bottle?
 9             MR. LARKIN:  Don't guess.  If you can
10   give him an estimate or an approximation, go ahead.
11        A.    I believe it was 1999.
12   BY MR. BRAY:
13        Q.    Okay.  So this is more for my own
14   edification.
15             Going back to this picture on
16   Exhibit 50, the bottle that's labeled "Current,"
17   that was launched in approximately 1999?
18        A.    Yes, '99.  Within a few years of that is
19   my recollection.
20        Q.    That's helpful.
21             Were you employed by Brown-Forman in
22   1999?
23        A.    Yes.
24        Q.    Do you have any understanding of the
25   reason for the redesign from what we've called "the
```

Michael Taylor - July 16, 2015                    12

1    old design" to the bevel design?

2         A.      Yes.

3         Q.      And what was the reason?

4         A.      The reason was that our chief executive

5    officer had a vision of taking small, incremental

6    steps at elevating the premiumness of Jack Daniel's.

7    So he was interested in evolutionary rather than

8    revolutionary change.

9         Q.      Was it the same CEO in 2011?

10        A.      No.

11        Q.      That plan for evolutionary incremental

12   changes to the Jack Daniel's bottle to move it more

13   into the premium segment, did that continue after

14   1999?

15        A.      Yes.

16        Q.      And was the evolution bottle kind of a

17   continuation of that process?

18        A.      Yes.

19        Q.      There are certain of these documents,

20   Mr. Taylor, that have been marked as Confidential-

21   Attorneys' Eyes Only, and every time I go into one

22   substantively my clients have to leave the room.

23   I'm trying to avoid that with this question.

24             So do you anticipate or do you have any

25   knowledge as to whether there are further

Michael Taylor - July 16, 2015                    13

1    evolutionary or incremental changes planned to the

2    Jack Daniel's Black Label bottle?

3                    You don't need to describe them to me,

4    just --

5                    MR. LARKIN:  Right.  If it's a yes or

6    no, I won't require the Sacras to leave.

7         A.    I do not know of specific plans that

8    fits the model of our vision for Jack Daniel's, yes.

9    BY MR. BRAY:

10        Q.    Okay.  So you're -- from your

11   perspective, are you happy with the evolutionary

12   bottle --

13        A.    Yes.

14        Q.    -- or the evolution bottle?  Evolution

15   or evolutionary?  Evolution bottle.

16        A.    Evolution.

17        Q.    Okay.  And as far as you know, senior

18   management at Brown-Forman is happy with the

19   evolution bottle?

20        A.    Yes.

21        Q.    At least for present purposes, and who

22   knows what goes on deep in the bowels of

23   Brown-Forman, the evolution bottle is here to stay

24   for a while?

25        A.    Yes.

Michael Taylor - July 16, 2015                          45

1  problem that could harm or injure a consumer.  It

2  could be something was put in the bottle that

3  shouldn't have belonged, much like any other

4  company, food, pharmaceutical, anybody else, would

5  have as a concern.

6           Could be bottles have been tampered with

7  out in the field.  Could be breakage issues that,

8  again, could either jeopardize the brand equity,

9  impede our sales, or harm a consumer.

10      Q.    I'll aver to you, Mr. Taylor, this is a

11  disclosure statement that Jack Daniel's Properties,

12  Inc., has produced in this case.

13           (EXHIBIT NO. 54 MARKED)

14           And if you look at the top of page 5, it

15  lists information that you might have.  Lines 1 and

16  2, JDPI, in this disclosure, aver that, "Mr. Taylor

17  has discoverable information regarding the design,

18  distinctiveness, and non-functionality of the Jack

19  Daniel's bottle."

20           And I believe what's being referred to

21  here is the evolution bottle that's in use now.

22           At a 20,000-foot level tell me what

23  information you have regarding the design of the

24  evolution bottle.

25      A.    I understand the complexities of the

Michael Taylor - July 16, 2015                    46

1    design versus other structures through my
2    twenty-two years of doing bottle development and
3    working closely with our production sides, other
4    engineering departments, and the supplier, multiple
5    glass suppliers, over the years.
6              I understand the impact of design on
7    performance, the cost effectiveness of running a
8    bottle, manufacturing a bottle, and on just general
9    design development criteria that's used in
10   developing the packages.
11        Q.    And, again, at the 20,000-foot level,
12   what information do you have regarding the
13   distinctiveness of the Jack Daniel's bottle?
14             Again, I think what your counsel, JDPI's
15   counsel, was referring to there was the actual
16   bottle shape.
17        A.    I know that the structure is the most
18   complicated structure we've built yet.  It's very
19   unique to anybody in the industry.  I understand the
20   difficulties we've had in design development in
21   executing this project and maintaining the quality
22   afterwards.
23        Q.    And, finally, at the 20,000-foot level
24   tell me what information you have regarding the
25   non-functionality of the Jack Daniel's bottle.

Michael Taylor - July 16, 2015                    47

1          MR. LARKIN:  Objection.  That's getting
2   into legalities.
3          I mean, if you understand what -- if you
4   have an understanding of what "non-functionality"
5   is, go ahead and answer his question.
6       A.     I understand "non-functionality" to be
7   the basic aesthetics of the bottle as opposed to the
8   functional matters which are related to its
9   manufacturing properties and performance.
10  BY MR. BRAY:
11      Q.     You don't have a -- any kind of degree
12  in industrial design, correct?
13      A.     The degree that I have in packaging
14  technology is in industrial mechanical technology.
15  So, therefore, it is industrial design.
16      Q.     You consider that an industrial design
17  degree?
18          MR. LARKIN:  Asked and answered.  He
19  just said so.
20  BY MR. BRAY:
21      Q.     You consider that to be an industrial
22  design degree?
23      A.     Yes.
24      Q.     Does Indiana State University give
25  bachelor's degrees in industrial design?

1      A.      I don't know what they give now, but
2  perhaps.  I have not studied --
3      Q.      At the time you attended Indiana State,
4  was there a major degree offered in industrial
5  design?
6      A.      Honestly I don't recall, but the
7  function of what we were doing was industrial design
8  of packaging materials.
9      Q.      Did you take any classwork in human
10 factors?
11     A.      Yes.  I had an ergonomics class.
12     Q.      Take a look at Exhibit 53 in front of
13 you.
14              (EXHIBIT NO. 53 MARKED)
15              Before you look at it, I need to just
16 ask you generally:  Have you seen this document
17 before?
18     A.      I saw this just before coming into the
19 meeting today.
20     Q.      Okay.  So at the lunch hour?
21     A.      Yes.
22     Q.      Look at page 27.  I'll aver to you the
23 drawings and then the printed words above the line,
24 "previous silhouettes, slight modifications of
25 bottle silhouette," came from the design -- or came

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP Products, L.L.C., an Arizona )
limited liability company,       )
                                 )
              Plaintiff,          )
     vs.                          ) No. 2:14-cv-02057-DGC
                                 )
Jack Daniel's Properties, Inc.,  )
a Delaware corporation,          )
                                 )
              Defendant.          )
_____)


DEPOSITION OF DAVID GOODER


June 23, 2015


REPORTED BY:
ROBIN L. SCHMIDT, CSR
Certified Shorthand Reporter
Certification No. 5763

David Gooder - June 23, 2015                                    2

1                          I N D E X

2    EXAMINATION BY:                                   PAGE

3    MR. BRAY                                            5

4    EXHIBITS FOR
     IDENTIFICATION        DESCRIPTION                 PAGE
5
     Exhibit No. 4        Bad Spaniels Dog Toy (Picture)  5
6
     Exhibit No. 5        Jack Daniel's Old No. 7 Bottle
7                         (Picture)                      5

8    Exhibit No. 6        "Whiskey Family" (Picture)
                          Jack Daniel's Website          5
9
     Exhibit No. 7        Single Barrel                  5
10
     Exhibit No. 8        Gentleman Jack                 5
11
     Exhibit No. 9        Tennessee Honey                5
12
     Exhibit No. 10       Tennessee Fire                 5
13
     Exhibit No. 11       Silver Select Single Barrel    5
14
     Exhibit No. 12       Winter Jack                    5
15
     Exhibit No. 13       Sinatra Select                 5
16
     Exhibit No. 14       Green Label Brand              5
17
     Exhibit No. 15       No. 27 Gold Whiskey            5
18
     Exhibit No. 16       Summary - Whiskey Bottles      5
19
     Exhibit No. 33       Jack Daniel's Ad "Serving Fine
20                        Establishments and Questionable
                          Joints                       171
21
     Exhibit No. 35       Jack Daniel's Ad "Not All Men
22                        Fear Commitment"             170

23   Exhibit No. 39       Initial Disclosures of Defendant
                          And Counterclaimant Jack Daniel's
24                        Properties, Inc               24

25

David Gooder - June 23, 2015                    3

```
 1 │  EXHIBITS FOR
   │  IDENTIFICATION         DESCRIPTION              PAGE
 2 │
   │  Exhibit No. 40   Plaintiff VIP Products, LLC's
 3 │                   Notice of Deposition of Jack
   │                   Daniel's Properties, Inc          8
 4 │
   │  Exhibit No. 41   Bad Spaniels Control Cell
 5 │                   (Picture)                        30
   │
 6 │  Exhibit No. 42   TESS cancelled registration      67
   │
 7 │  Exhibit No. 43   Answer and Counterclaims of
   │                   Defendant and Counterclaimant
 8 │                   Jack Daniel's Properties, Inc    71
   │
 9 │  Exhibit No. 44   Target Men's Tees Ad            152
   │
10 │  Exhibit No. 45   Guns N Roses T-shirt (Picture) 154
   │
11 │
   │
12 │
   │                         --o0o--
13 │
   │
14 │
   │
15 │
   │
16 │
   │
17 │
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

1                         APPEARANCES:

2    FOR THE PLAINTIFF:

3            LAW OFFICES OF DICKINSON WRIGHT PLLC
             By:  DAVID G. BRAY, ESQ.
4            Attorney at Law
             1850 N. Central Avenue
5            Suite 1400
             Phoenix, AZ 85004
6            Office:  (602) 285-5033
             Fax:     (602) 285-5100
7            Cell:    (602) 617-8580
             Email:   dbray@dickinsonwright.com

8

9    FOR DEFENDANT and COUNTERCLAIMANT:

10           SEYFARTH SHAW, LLP
             By:  CHRISTOPHER C. LARKIN, ESQ.
11           Attorney at Law
             One Century Plaza
12           2029 Century Park East
             Suite 3500
13           Los Angeles, CA 90067-3021
             Phone:  (310) 277-7200
14           Fax:    (310) 201-5219
             Email:  clarkin@seyfarth.com

15

16   Also Present:  Stephen Sacra

17                         -oOo--

18

19

20

21

22

23

24

25

David Gooder - June 23, 2015                    20

1        Q.   To your knowledge does Jack Daniel's Properties

2  -- strike that.  To your knowledge -- strike that.

3        To your knowledge JDPI does not presently

4  license any of its Jack Daniel's marks to any third

5  party for use on a dog toy; is that correct?

6        A.   I'm sorry.  Ask that again?

7        MR. BRAY:  Sure.

8  BY MR. BRAY:

9        Q.   JDPI is not presently licensing any of its

10  trademarks for use on a dog toy?

11        A.   I don't think that's accurate.

12        Q.   To whom is it licensing the marks for use on a

13  dog toy?

14        A.   Lynchburg Hardware and General Store.

15        Q.   Are those toys only sold at the Lynchburg

16  Hardware and General Store?

17        A.   Yes, to my knowledge.

18        Q.   What toys are they?

19        A.   Let me back up.  They are not toys.  I'm sorry,

20  I thought you were referring to dogs products.  Back up.

21        MR. LARKIN:  I think that's the problem.

22        THE WITNESS:  Ask me your question again,

23  please, about the toys?

24        MR. BRAY:  Okay.

25  BY MR. BRAY:

```
 1         Q.   You know what a dog toy is?
 2         A.   I do.
 3         Q.   We don't need to define that term, do we?
 4         A.   We do not.
 5         Q.   At this time JDPI does not license any of its
 6    marks, any of the Jack Daniel's marks for use on a dog
 7    toy?
 8         A.   That's correct.
 9         Q.   And it presently has no plans to license any of
10    its marks for use on a dog toy?
11         A.   Correct.
12         Q.   And when you refer to products that are
13    available at the Lynchburg Hardware and General Store,
14    those were dog products such as leashes?
15         A.   Correct.
16         Q.   Can you recall specifically what else?
17         A.   Leashes, collars and I think I said a dog bowl
18    of some kind of water bowl, food bowl.
19              They were ceramic.
20         Q.   Now, with regard to the dog leashes, collars
21    and bowls that are available, apparently, at the
22    Lynchburg Hardware and General Store, are those products
23    sold anywhere else, other than the Lynchburg Hardware
24    and General Store, to your knowledge?
25         A.   If they are still available, which I don't know
```

1  that they are on sale as of today, they were never sold
2  elsewhere.
3       Q.  And, presently, JDPI has no plans to sell
4  licensed Jack Daniel's products for leashes, collars or
5  dog bowls; correct?
6       A.  I don't know whether we have any plans or not.
7       Q.  Okay.  Do you know --
8       A.  I can find out.
9       Q.  Do you know when -- it sounds like you suspect
10  that the Lynchburg Hardware and General Store no longer
11  sells pet products or dog leashes, collars and bowls
12  bearing any Jack Daniel's marks; is that correct?
13           MR. LARKIN:  Do you know?
14           THE WITNESS:  I don't know.  The last time I
15  was in the store, they were not on sale.
16           MR. BRAY:  Okay.
17  BY MR. BRAY:
18       Q.  And when was that?
19       A.  Over a year ago.
20       Q.  Are there -- and I think you said -- correct me
21  if I'm wrong, Mr. Gooder -- you said that those three
22  products, the licensed leashes, collars and dog bowls,
23  were only sold at the Lynchburg Hardware and General
24  Store; correct?
25       A.  Correct.

1        Q.   Are there other products bearing any of the

2    Jack Daniel's marks that are only sold at the Lynchburg

3    Hardware and General Store?

4        A.   Yes.

5        Q.   Can you describe what those products are?

6        A.   No.

7        Q.   Are they a certain category of products or is

8    it just --

9        A.   No.  There are specific products that are done

10   for sale only at the store, as opposed to more broadly

11   distributed.

12       Q.   Sure.  Is it, like, the store, is it, like,

13   exit at the gift shop?  People, who want to tour the

14   distillery will also be likely to visit the Lynchburg

15   Hardware and General Store?

16       A.   It's not at the distillery.  It's in the town

17   of Lynchburg, which is right next to the distillery.

18            But people frequently go from the tour of the

19   distillery to the town.

20       Q.   So in your experience, does Brown Forman or

21   Jack Daniel's Properties, Inc. try to have a number of

22   products bearing the Jack Daniel's marks available for

23   sale at that Lynchburg Hardware and General Store?

24       A.   Yes.

25       Q.   Somewhat like a museum gift shop, I suppose?

1   foundation.

2           THE WITNESS:  You have to see what the judge

3   rules.  I don't know what the judge rules or thinks.

4   I can't answer your question.  It's too hypothetical.

5   BY MR. BRAY:

6       Q.  So it's possible that if a judge doesn't rule

7   that there is a comment on the original implicitly made

8   by the Bad Spaniels toy, it could be your view,

9   depending on other circumstances, that this no longer

10  infringes the Jack Daniel's trademarks?

11          MR. LARKIN:  Objection; hypothetical.  You're

12  agreeing he goes on to say whether there is a likelihood

13  of confusion.

14          That's totally hypothetical.

15          THE WITNESS:  Yes.

16          MR. LARKIN:  I don't think it's an appropriate

17  question.  But you can answer.

18          THE WITNESS:  I don't know that I can answer

19  it.  All I -- I would only say that a ruling as to

20  whether there is a comment or not doesn't mean that it's

21  not infringing.

22  BY MR. BRAY:

23      Q.  You agree with me that the Bad Spaniels product

24  does conjure up the original Jack Daniel's product;

25  correct?

David Gooder - June 23, 2015                    48

1          A.  Yes.

2          Q.  I'm going to go through one topic on the

3     30(b)(6) notice and ask you a couple other questions and

4     then we can take a break.

5              Where would I go -- I mean, if I wanted to find

6     out what products are available currently for sale in

7     the Lynchburg Hardware and General Store today, is there

8     any way to find that out, other than to just go to the

9     store?

10         A.  As to what's in the store, no.  The only place

11    to go is there.

12             There are websites you can buy licensed

13    products.  But to see everything that is for sale in the

14    store, you'd have to go there.

15             There is a Hardware General Store website, but

16    I don't believe it's the entire in-store offering.

17         Q.  Are you aware today whether there are any

18    licensed pet products available for sale on any website?

19             Any licensed pet products involving Jack

20    Daniel's marks?

21         A.  I am not aware of any.

22         Q.  And if I wanted to see -- if I wanted to find

23    out when was the last time any pet products were sold in

24    the Lynchburg Hardware and General Store, would there be

25    -- how would I go about finding that out?

1        A.   How would you go about finding it out?

2        Q.   How would anybody go about finding it out?

3             MR. LARKIN:   How would you go about finding it

4    out?

5             THE WITNESS:   How would I go about finding it?

6    Which is it?

7    BY MR. BRAY:

8        Q.   How would you go about finding it out?

9        A.   I would have to ask them to look in their

10   inventory records and sale records.

11            And assuming they have sufficient traceability,

12   they could tell me.

13       Q.   All right.  If you would take a look at Exhibit

14   40, which is the Notice of Deposition.

15       A.   Okay.

16       Q.   Take a look on page four:  "Topics For

17   Deposition."  There is topic one.  Do you see that?

18       A.   Mm-hmm.

19       Q.   And we asked Jack Daniel's, JDPI, to "provide a

20   witness as to the basis for allegations in paragraph 19

21   of the Counterclaim that VIP's use of the Bad Spaniels

22   trademark and trade dress is also likely to dilute the

23   famous JDPI trademarks and Jack Daniel's trade dress by

24   tarnishment."

25            Do you see that?

1  BY MR. BRAY:

2       Q.  Is that famous, in your opinion?

3       A.  In my opinion.

4       Q.  Strike that.

5       A.  Let's be more specific:  We refer to that as

6  the evolution bottle, if that helps us define which

7  bottle we're talking about.

8       Q.  Perfect.  And what do you call the bottle that

9  was the predecessor to the evolution bottle?

10      A.  If there was a name for it.  But let's just

11 call it the old bottle.

12      Q.  Okay.

13      A.  Actually, the pre -- the prior generation.  My

14 basis for -- well, let me back up.

15          As to the glass shape --

16      Q.  Yes, which we're calling now the evolution

17 bottle.

18      A.  The evolution bottle, itself -- tell me what

19 you mean by "famous"?  Are you using a legal definition

20 of famous as trademark or using what's most --

21      Q.  I want to know the factual basis for the

22 allegations in your Complaint and, obviously, you can

23 only dilute a famous mark.

24      A.  Right.

25      Q.  So a legal definition of famous in the Lanham

David Gooder - June 23, 2015                              63

1    Act.

2            MR. LARKIN:  We're talking just the bottle

3    without any --

4            THE WITNESS:  Yeah, yeah.  My opinion is that

5    it's famous.

6    BY MR. BRAY:

7        Q.  And what's that based on?

8        A.  All the years I have worked on this, the

9    reaction I see to it by consumers, by people in the

10   trade, by the amount that it is infringed, by how

11   quickly infringers have adopted it, by, generally, the

12   amount of abuse of it that I see.

13       Q.  What advertising, using the evolution bottle,

14   just the bottle shape, as a designation of source for

15   Jack Daniel's Whiskey or products exists?

16           MR. LARKIN:  Objection to form.

17           THE WITNESS:  Do you mean just the glass

18   structure, itself?

19           MR. BRAY:  Yes.

20           THE WITNESS:  I don't know that there is any

21   advertising with just the glass structure itself.

22   BY MR. BRAY:

23       Q.  Is there any advertising that highlights the

24   glass structure and the shape of the glass structure as

25   a designation of source for Jack Daniel's Whiskey?

David Gooder - June 23, 2015                          64

```
 1        A.  I don't know what you mean by "advertising that
 2    designates a -- designation of source."
 3            We advertise our product.
 4        Q.  Sure.  Just because you, you know, use similar
 5    imitation on -- as part of a product design doesn't
 6    mean it necessarily has trademark significance.
 7        A.  Correct.
 8        Q.  My question is:  Are you aware of any
 9    advertising that specifically calls out the bottle shape
10    of the evolution bottle as a designation of source for
11    Jack Daniel's Whiskey?
12            MR. LARKIN:  Objection to form.
13            THE WITNESS:  As to the naked glass, no.  No,
14    that's not true.  There might be an ad that had glass
15    bottles in it.  There are so many ads, I don't know, to
16    be honest.
17    BY MR. BRAY:
18        Q.  As you sit here today, you can't think of --
19        A.  Vaguely, I'm thinking of one.  But I don't
20    recall -- not with enough specificity to be able to
21    describe it.
22        Q.  You described in answer to a question of mine
23    prior to our break that the general design of the face
24    label was a famous trademark or trade dress of
25    Jack Daniel's?
```

1        A.  Yes.

2        Q.  Does Jack Daniel's hold a trademark

3   registration today on the general design of the face

4   label?

5        A.  I don't understand your question.  When you say

6   "a trademark registration of the general design," do you

7   include words in that or not?

8        Q.  Well, let's go back and I'll have you define

9   for me when you said the general design of the face

10  label is a famous mark diluted by my client's product.

11       A.  Yes.

12       Q.  Describe for me what you mean when you say

13  "general design of the face label"?

14       A.  I think I already did.  I defined it.  What I

15  said is the general design of the face label is the

16  combination of the filigree, the swing logo, the

17  cartouche and the layout and style of the words below

18  it.

19       Q.  And those elements together of the general

20  design of the face label do not presently have a

21  trademark registration associated with them, do they?

22       A.  I don't know.  I'd have to look.

23       Q.  At one time did the general design of the face

24  label have a trademark registration associated with it?

25            MR. LARKIN:  He just answered that he didn't

```
 1              MR. BRAY:  I'm talking about --
 2              MR. LARKIN:  He's a fact witness.
 3              MR. BRAY:  Topic number three.
 4  BY MR. BRAY:
 5      Q.   What is the basis for the allegations?
 6      A.   The opinion of Mr. Simonson.
 7              MR. LARKIN:  He's not asking about that.
 8              THE WITNESS:  Ask me that question again.
 9  Sorry.
10              MR. BRAY:  Sure.
11  BY MR. BRAY:
12      Q.   As to the allegation in the Complaint that the
13  Bad Spaniels product harms the reputation of Jack
14  Daniel's through dilution by tarnishment, what are the
15  bases of those allegations, other than the fact that the
16  words exist that you described on the Bad Spaniels
17  product?
18      A.   Other than the words.  And I assume by that you
19  mean their meaning and what people understand them to
20  mean.
21      Q.   Sure.
22      A.   It's the view point of everyone internally who
23  has seen it, including lots of dog owners, that when you
24  talk about the words that your client has used on the
25  label, that conjures up a certain image.
```

1        And that's quite clearly not the image that
2   Jack Daniel's carries or has or has been, you know, that
3   has been developed over the years since its founding.
4        Q.  What is that image that Jack Daniel's has
5   developed and carried over the years since its founding?
6        A.  Masculinity, authenticity, honesty, not taking
7   yourself too seriously.  Did I say integrity?
8        MR. LARKIN:  Now you do.
9        THE WITNESS:  There are others, but that's the
10  core of it, I think.
11  BY MR. BRAY:
12       Q.  Any other factual basis as JDPI's corporate
13  designee to testify on the subject for the allegation
14  that the reputation of Jack Daniel's has been harmed
15  through dilution by tarnishment as a result of the Bad
16  Spaniels product?
17       So far you have identified the words and
18  internal discussion amongst the employees of JDPI.
19       A.  Well, not just the discussions.  The opinions
20  of not only people at JDPI but the people at Brown
21  Forman, who have seen it, including that group of
22  people.
23       So I guess the answer is:  I'm not aware of
24  anything else.
25       Q.  And you referred to Dr. Simonson JDPI has

1   retained as an expert on this topic?

2        A.  Yes.

3        Q.  Have you reviewed Dr. Simonson's report?

4        A.  I have not.

5        Q.  You mentioned a number of individuals or you

6   mentioned quote, unquote, individuals at Brown Forman

7   that have the same opinion that you do.

8            Who are those individuals, specifically?

9        A.  John Hayes.

10       Q.  What's his title?

11       A.  Currently, I don't know specifically.

12       Q.  Okay.

13       A.  Phil Epps, Chris Hungerford, Tobey Rousch, Mark

14   MacCallum.

15       Q.  And what's Mr. MacCallum's title?

16       A.  President Jack Daniel's brands.  I don't know

17   who else.  I don't know all of who else has seen it.

18           Those people I know for sure have because I've

19   spoken to them about it.

20           There are -- your question was in addition to

21   my team here; correct?

22       Q.  Yeah.  And your team here is Ms. Susman.

23   Anybody else?

24       A.  Yes.

25       Q.  Who are those individuals?

David Gooder - June 23, 2015                    93

1        A.  Correct.

2        Q.  Same question:  The Jack Daniel's toy didn't

3    associate -- or didn't copy the trade dress element

4    "matured" with the art associated with that; correct?

5        A.  Correct.

6        Q.  Same answer is true of the "tasted"?

7        A.  Correct.

8        Q.  And "awarded"?

9        A.  Correct.

10       Q.  In fact, the Bad Spaniels product does not have

11   a side label at all; correct?

12       A.  Correct.

13       Q.  And on the other side, the Jack Daniel's

14   product did not copy or use a picture of Jack Daniel's;

15   correct?

16       A.  Correct.

17           MR. LARKIN:  You referenced the Jack Daniel's

18   product.

19           MR. BRAY:  I'm sorry.

20   BY MR. BRAY:

21       Q.  The Bad Spaniels product did not copy or

22   incorporate a picture of Jack Daniel's; correct?

23       A.  Correct.

24       Q.  In fact, there is no picture at all of a human

25   being on the Bad Spaniels product; correct?

1    A.   Correct.

2    Q.   And is this an element of the trade dress:

3  "Every day we make it, we make it the best we can"?

4    A.   No.

5    Q.   Why is that not an element of the Jack Daniel's

6  trade dress?

7    A.   Because trade dress to me is more visual and

8  that is text on the side label.  So it does not stand

9  out as much as the other elements of trade dress do.

10    Q.   And, again, the Bad Spaniels toy doesn't

11  include a side label on either side of its product;

12  correct?

13    A.   Correct.

14    Q.   So would you agree with me that, you know,

15  we've now identified so far about at least eight

16  elements of the Jack Daniel's trade dress that's not

17  copied by the Bad Spaniels product; correct?

18    A.   I wasn't keeping track.

19    Q.   Jack Daniel's embossing, "mellowed" and

20  artwork, "matured" and artwork, "tasted" and artwork,

21  "awarded" and artwork, side label with those elements

22  and a picture of Jack Daniels or a picture of any human

23  being and no side label on the other side?

24    A.   Okay.

25    Q.   So there is eight elements there that are not

David Gooder - June 23, 2015                    95

1    incorporated by the Bad Spaniels product?

2         A.   Yes.

3         Q.   The side writing:  "Quality and craftmanship

4    since 1866," is that part of the trade dress that's on

5    the two corners of the bottle?

6         A.   It could be.  Trade dress is a pretty

7    interesting concept but --

8         Q.   Are the words "sour mash" part of the trade

9    dress?

10        A.   No.

11        Q.   Would you agree with me that the Bad Spaniels

12   product, the -- what do you call this wrapping around

13   here?  Strike that question.

14             What do you call the wrapping on the Jack

15   Daniel's product that encloses the neck?

16        A.   That's referred to in the industry as a shrink

17   band.

18        Q.   Shrink band?

19        A.   Yes.

20        Q.   Would you refer to the -- even though it's not

21   real -- but what's on the Bad Spaniels product, is that

22   a shrink band as well or would you call it something

23   else?

24        A.   I think it's intended to look like a shrink

25   band.

David Gooder - June 23, 2015                          96

1        Q.  Would you agree that the two shrink bands

2   differ in appearance between the Bad Spaniel shrink band

3   and the --

4        A.  Yes, they appear different.

5        Q.  So Jack Daniel's (sic) did not copy exactly how

6   the shrink band of the Jack Daniel's product goes at

7   least three quarters of the way down the neck?

8            MR. LARKIN:  Objection to form.  You said

9   Jack Daniel's copied.  You're the copier, not us.

10  BY MR. BRAY:

11       Q.  Would you agree with me that the Bad Spaniels

12  toy does not copy the shrink wrap neck such that it goes

13  continuously three quarters of the way down the neck as

14  does the Jack Daniel' shrink wrap?

15           MR. LARKIN:  Objection to form.

16           THE WITNESS:  Continuously, no.  From an image

17  perspective, yes.

18           MR. BRAY:  Okay.

19  BY MR. BRAY:

20       Q.  And while Jack Daniel's uses the "Old No. 2,"

21  Bad Spaniels uses "The Old No. 2."  It adds the word

22  "the;" is that correct?

23       A.  Jack Daniel's doesn't use "Old No. 2."

24       Q.  Sorry.  Jack Daniel's uses "Old No. 7" and

25  Bad Spaniels uses "The Old No. 2;" correct?

1    Daniel's or JDPI means in its Complaint when it says:
2    "Virtually every element of its trade dress is copied by
3    the Bad Spaniels toy"?
4        A.  Do I have an understanding of that?
5        Q.  Sure.
6        A.  Yes.
7        Q.  What does that mean?
8        A.  To me that means that the -- it virtually goes
9    at not only quantity but quality of it.  So the
10   significant elements of it were all copied.
11            You can always find little elements that
12   weren't.  But your product copies the significant
13   elements of it.
14       Q.  So every element of the Jack Daniel's Old
15   No. 7 trade dress that doesn't appear on the Bad
16   Spaniels toy is not a significant element of the Jack
17   Daniel's trade dress?
18            MR. LARKIN:  Objection to the form.
19            THE WITNESS:  No.  They aren't as significant
20   as the other ones.
21   BY MR. BRAY:
22       Q.  So the embossing of Jack Daniel's name on the
23   glass at the top of the -- at the ridge of the Jack
24   Daniel's bottle, that's not a significant element of its
25   trade dress?

1        A.   I didn't say that.

2        Q.   That is a significant element of the trade

3    dress?

4        A.   Of the trade dress? -- it's an element.

5        Q.   Well, rather than me poke around with each one,

6    you said in terms of the, you know, there is quality and

7    quantity in terms of the elements.

8             And then you just described that we copied the

9    quote, unquote:  Significant elements of the Jack

10   Daniel's trade dress.

11            Can you describe for me -- identify all of the

12   significant elements of the Jack Daniel's trade dress,

13   not just those that are allegedly copied in the Bad

14   Spaniels toy.

15            But which elements of the Jack Daniel's trade

16   dress that we have been discussing, do you view as

17   JDPI's corporate designee as significant?

18       A.   I don't know what you mean by "significant."

19            Going from top to bottom, again -- I'm sorry,

20   ask your question again.

21       Q.   Identify the quote, unquote:  Significant

22   elements of Jack Daniel's trade dress in its Old No. 7

23   bottle product?

24       A.   To me they are black shrink band at the top or

25   the black coloring at the top of the bottle, the upper

David Gooder - June 23, 2015                    100

1    part of the neck, the fact that Old No. 7 is on that;

2            The overall trade dress -- excuse me -- the

3    overall design of the bottle itself, the glass.

4        Q.  What was that bottle called?  The evolution

5    bottle?

6        A.  Evolution bottle.  The Jack Daniel's

7    signature and the label design.

8            And I think I've defined that previously as the

9    combination of the words "Jack Daniel's" and the swing

10   logo format, the cartouche design, the filigree frame

11   and the layout of the rest of the words below the

12   cartouche, the words "Tennessee" and "Whiskey" and the

13   white on black color.

14       Q.  Are you familiar with other American whiskey

15   and bourbon brands, other than Jack Daniel's?

16       A.  Yes.

17       Q.  And you'll agree with me that there are a

18   number of American whiskey and bourbon products that

19   have black shrink wrap at the top?

20       A.  There are other shrink bands that have black

21   on them, yes.

22       Q.  And you'll agree with me that there are other

23   American whiskey bourbon brands that have white labels

24   with black writing?

25       A.  Yes, there are white labels with black writing.

1      Q.   White with black color, however you described

2    it?

3            MR. LARKIN:   That's not what he said.

4    BY MR. BRAY:

5      Q.   How would you describe it?   I'm sorry.

6      A.   I said white on black.

7      Q.   White on black?

8      A.   Yeah.

9      Q.   So there are other American whiskey and bourbon

10   brands that have white on black labels?

11     A.   To some extent, yeah.

12     Q.   Is the side of the bottle with the "mellowed,

13   matured, tasted, awarded," is that side label and the

14   design of that label a significant element of the design

15   of the Old No. 7 product?

16     A.   No.

17     Q.   Why not?

18     A.   Because it's on the side label, first of all.

19   Second of all, it is not as prominent and it's not as

20   important as the others.

21     Q.   How about the other side label with the picture

22   of Jack Daniels?   Is that a significant part of the

23   Jack Daniel's trade dress?

24     A.   What part of it are you referring to?

25     Q.   Any part of it?

1        A.   The cameo is important.   The rest of it is just

2   the layout of the design.

3        Q.   When you say "the cameo"?

4        A.   Yeah.

5        Q.   The picture?

6        A.   Yeah.   It is not significant.   In the way

7   you're asking about it, it's not significant.

8        Q.   Nothing on that side label is a significant

9   part of the trade dress of the Jack Daniel's Old No. 7

10  product?

11       A.   Not as it is laid out there.

12       Q.   Okay.   But the picture of Jack Daniels has

13  other significance?

14       A.   Yeah.   He's the founder.

15       Q.   And you don't think his picture on the classic

16  Jack Daniel's Old No. 7 label is a significant part of

17  the trade dress of the bottle?

18            MR. LARKIN:   Asked and answered.

19            THE WITNESS:   No.

20  BY MR. BRAY:

21       Q.   Because it appears on the side?

22       A.   No.   That's not why it's not significant.

23       Q.   Why is it not significant?

24       A.   Because it's never been on the front label.

25  So it's not significant, from a trade dress perspective.

1          It's incredibly significant as to the heritage

2    of the product.

3          Q.  If you take a look at topic number five?  It

4    asks for the basis of JDPI's allegation in paragraph 14

5    of the Counterclaim that the Bad Spaniels toy, quote:

6    "bears an immediate resemblance to a bottle of Jack

7    Daniel's Tennessee Whiskey bearing the Jack Daniel's

8    trade dress when the toy is viewed from any vantage

9    point."

10         Do you see that?

11         A.  Yes.

12         Q.  What is the basis for that allegation?

13         A.  Visual analysis.

14         Q.  What does each side of the Bad Spaniels toy

15   consist of, other than the front?

16         A.  I'm sorry?

17         MR. LARKIN:  Objection to form.

18   BY MR. BRAY:

19         Q.  Isn't it true that each side of the Bad

20   Spaniels toy, other than the front, is simply a blank

21   red plastic face?

22         A.  No, it's not true.

23         Q.  Okay.  Is there any label on the side of the

24   Bad Spaniels toy?

25         A.  On the side of the container, no -- or what

David Gooder - June 23, 2015                    104

1    appears to be the container, no.

2        Q.   And no label on the back of the container for

3    the Bad Spaniels toy; correct?

4        A.   Correct.

5        Q.   There is no label on the other side of the

6    Bad Spaniels toy; correct?

7        A.   Correct.

8        Q.   And Jack Daniel's Whiskey is not sold with a

9    hang tag, such as the hang tag that is used by the Bad

10   Spaniels toy when it's sold at retail?

11       A.   Not done that way, no.

12       Q.   Okay.  And what's the basis for your testimony

13   that, when looked at from the rear, the Bad Spaniels toy

14   bears an immediate resemblance to a bottle of Jack

15   Daniel's Tennessee Whiskey bearing the Jack Daniel's

16   trade dress?

17       A.   Well, when you look at it, you see the back of

18   the hanging piece as well, which also uses -- copies the

19   swing logo, copies the filigree, copies the white on

20   black.

21           And then you get the depiction of the bottle,

22   which is virtually identical to the Jack Daniel's

23   bottle.

24       Q.   Okay.  How about the side?

25       A.   You get the black top of the bottle.  You get

1   the wrap-around part of the label.

2            So you get, again, the bottle glass structure

3   design.  And also you get the, like I say, the black top

4   it wraps.  It doesn't wrap all the way but you see it

5   from the side.

6        Q.  So is it your testimony, Mr. Gooder -- or

7   strike that.

8            Let's look at topic six.  Topic six asks Jack

9   Daniel's Properties, Inc. to produce a witness to

10  testify as to the basis for its allegation contained in

11  paragraph 16 on the Complaint -- or the Counterclaim,

12  sorry -- that the disclaimer that appears on the Bad

13  Spaniels toy -- Bad Spaniels hang tag is -- quote --

14  "not understood by the vast majority of the purchasers

15  of the toy."

16           What did you do to prepare for this portion of

17  your deposition today as JDPI's corporate designee?

18       A.  Nothing different than I told you before.

19       Q.  Did you review any documents?

20       A.  For this portion?

21       Q.  Yes.

22       A.  Nothing different than I told you before.

23       Q.  Okay.  Did you review any studies of any kind

24  regarding the effectiveness of disclaimers?

25       A.  No.

```
 1          THE WITNESS:  Is your question whether I've
 2   seen a disclaimer that people understood?
 3          MR. BRAY:  Well, let me back up and I'll ask
 4   this question and I'll try to circle back to my original
 5   one.
 6   BY MR. BRAY:
 7      Q.  Have you ever seen a disclaimer that satisfied
 8   you that it was effective?
 9      A.  On its own, no.
10      Q.  Okay.  Is there any disclaimer that VIP could
11   put on the Bad Spaniels product that, in your view,
12   would diminish the likelihood -- what you view as the
13   likelihood of confusion between Bad Spaniels and the
14   Jack Daniel's No. 7 product?
15          MR. LARKIN:  Objection; relevance; purely
16   hypothetical question.  We don't know what the rest of
17   the product looks like or anything else for that matter.
18          Can you answer?
19          THE WITNESS:  I don't think so.  I mean, no.  I
20   guess the answer is:  I don't think so.
21          MR. BRAY:  Okay.
22   BY MR. BRAY:
23      Q.  And, again, if I asked this already, I
24   apologize.  What are the factual bases of the
25   allegations -- of the allegation in JDPI's Counterclaim
```

David Gooder - June 23, 2015                    110

1    that the disclaimer contained on the Bad Spaniels hang

2    tag is not understood by consumers of the product?

3              MR. LARKIN:  Do you want to look at the --

4              THE WITNESS:  Yeah.  I need to look at what

5    you're referring to.

6              MR. LARKIN:  Okay.  It's paragraph 16.

7              THE WITNESS:  I'm sorry --

8              MR. LARKIN:  We have it.

9              THE WITNESS:  Yeah, we have it.

10              (Deponent reading document.)

11              THE WITNESS:  So, I'm sorry, your question?

12              MR. LARKIN:  I'll also note that the topic

13    category definition is incomplete.  I don't know whether

14    that's deliberate or otherwise summary of the allegation

15    in paragraph 16, which reads:

16              "Upon information we believe the alleged

17    disclaimer is not noticed, much less understood by the

18    vast majority of purchasers of the toy."

19              MR. BRAY:  Well, we can dissect that.

20              MR. LARKIN:  That's fine.

21    BY MR. BRAY:

22         Q.  Is it your contention -- is it JDPI's

23    contention -- and you're here to testify as the

24    corporate designee of JDPI -- that the disclaimer that

25    appears on the hang tag of the Bad Spaniels toy is not

David Gooder - June 23, 2015                    111

1   understood by the majority of purchasers or consumers of

2   the Bad Spaniels product?

3        A.   I think they understand the words or most would

4   understand the words, if they're fluent in the English

5   language.

6             A lot of this country isn't.  But considering

7   they have some fluency in English, I think they

8   understand what the words mean.

9             I don't know that they necessarily understand

10  what it means relative to that product.

11       Q.   Let's parse that up:

12            For English speakers that read the words, it's

13  your testimony that you believe that those English

14  speakers can understand what those words mean?

15            MR. LARKIN:  Objection; foundation.  It assumes

16  that they read the words.  But on that assumption, you

17  can go ahead and answer.

18            THE WITNESS:  Yes.  I am assuming that if

19  somebody reads all the words and they're fluent in the

20  English language, I think they would probably understand

21  what the words say.

22            What they mean is something different.

23            MR. BRAY:  Okay.

24  BY MR. BRAY:

25       Q.   As to the sentence:  "The product and its

1  design belong to VIP Products," just parse that sentence
2  out of it.
3          An English speaker could understand what those
4  words say?
5      A.  Yeah.
6      Q.  Could they not understand what those words
7  mean?
8      A.  Well, they might not.
9      Q.  Okay.  If VIP wanted to create a disclaimer and
10  articulate the fact that it's the owner of the product
11  and design, how could it word it better than it's
12  already worded on the existing Bad Spaniels toy to
13  communicate that meaning?
14          MR. LARKIN:  Objection; relevance; purely
15  hypothetical.  He's not here to rewrite your text or
16  anything.  Can you answer it?
17          THE WITNESS:  No.
18  BY MR. BRAY:
19      Q.  You can't think of another way that could be
20  written to communicate that idea more effectively than
21  the way it's worded on the Bad Spaniel's product?
22          MR. LARKIN:  Not relevant.  That's not what is
23  -- what is on the product is what's on the product.
24          MR. BRAY:  Your counsel's not --
25          THE WITNESS:  Can I think of other things to

```
 1   say?  Yes, I can think other things to say.  Whether
 2   it's effective or not, I don't know.
 3           I don't write disclaimers for a living.
 4           MR. BRAY:  Okay.
 5           THE WITNESS:  Regardless of what you say, what
 6   it means to people or what the effect of it is also
 7   relevant.
 8   BY MR. BRAY:
 9       Q.  JDPI hasn't done any sort of research or
10   commissioned any sort of study to see what consumers
11   understand what the disclaimer -- what they think the
12   disclaimer means?
13       A.  No.
14       Q.  No; right?
15       A.  No.
16       Q.  And on the second part of the disclaimer says:
17   "This product is not affiliated with Jack Daniel's
18   distillery."
19           It's your testimony that a person reasonably
20   fluent in the English language could understand those
21   words; right?
22       A.  Yes.
23       Q.  But you think those words might be subject to
24   more than one meaning?
25       A.  In the context, I think those words can be --
```

1   what that means relevant to the product, I don't know

2   that consumers understand or whether they're effective

3   in communicating that to them.

4        Q.   Okay.  Well, there are two issues at play here,

5   just to be clear where I'm going.

6             And your Counsel is correct.  In the Amended

7   Complaint it refers to the size and the placement and

8   also to the words, themselves, in terms of it being

9   understood.

10             And I'm focusing now just on the words,

11   themselves.

12             And you said that a consumer looking at this

13   product is not affiliated with Jack Daniel's distillery,

14   they might not know what those words mean relative to

15   the product.

16             Is that your testimony?

17        A.   Right.

18        Q.   What meaning could there be other than:  "This

19   product is not affiliated Jack Daniel's distillery"?

20        A.   Well, I don't know what people understand

21   "affiliation" to mean.  It's a really broad term.

22             So using the word "affiliation" doesn't

23   necessarily tell me as a consumer, let's say, that there

24   is no connection there.

25             I don't know what "affiliation" means.  You see

```
 1              MR. BRAY:  Any goods or services that reference
 2    dogs, cats or pets.
 3              THE WITNESS:  Then there aren't any.  You're
 4    asking me:  Are there any registrations that refer to
 5    dogs, cats and pets?  There are none.
 6              MR. BRAY:  Okay.
 7              THE WITNESS:  That's a different question than
 8    what you asked me to look at.
 9              MR. BRAY:  Okay.
10    BY MR. BRAY:
11         Q.  Are there any registrations that cover pet
12    products using whatever definition you might use?
13         A.  And you said any product that is -- what do you
14    define "pet product" as.
15         Q.  How would you define pet product?  That would
16    be any product that a pet could use or is designed for a
17    pet.
18         A.  That's two different things.
19         Q.  Okay.
20         A.  Whether my pet uses it or I use it with my pet
21    are two different things.
22         Q.  I would describe pet products are food, goods,
23    services that a pet would use.
24         A.  Zero.  Pets don't use any of our products.
25    They might do things with our products, but they don't
```

1    use them.

2        Q.  Mr. Gooder, are you familiar with Petsmart and

3    Petco?

4        A.  Yes.

5        Q.  Does Jack Daniel's sell any products to Petco

6    or Petsmart?

7        A.  Jack Daniel's doesn't sell products to Petco or

8    Petsmart.

9        Q.  Are licensed Jack Daniel's products sold in

10   Petco or Petsmart, to your knowledge?

11       A.  I don't know.

12       Q.  As you sit here today, are you aware of any --

13   well, strike that.

14           If I used the term "pet specialty retailer," do

15   you have an understanding of what a pet specialty

16   retailer is?

17           MR. LARKIN:  Objection to form.  Maybe you

18   could give him one.

19           MR. BRAY:  Sure.  Pet specialty retailer is a

20   retail store that generates more than 80 percent of its

21   sales of goods and services for pets.

22           THE WITNESS:  Okay.

23   BY MR. BRAY:

24       Q.  Does Jack Daniel's sell or Brown Forman sell

25   any of its products to pet specialty retailers, that

David Gooder - June 23, 2015                    120

1    you're aware of?

2        A.   No, we do not sell to pet specialty retailers.

3        Q.   To your knowledge, are any licensed products of

4    Jack Daniel's sold in pet specialty retailers today?

5        A.   I don't know of any.

6        Q.   Topic nine of the Rule 30(b)(6) notice asked

7    JDPI to produce a witness to testify to the factual

8    basis for the allegation in paragraph 18 of the

9    Counterclaim that, quote:

10           "VIP's use of the Bad Spaniels trademark and

11   trade dress in connection with the sale, offering for

12   sale, distribution and advertising of the Bad Spaniels

13   toy is likely to cause initial interest, confusion

14   presale, confusion at the point of sale and post-sale

15   confusion because perspective purchasers of the toy,

16   purchasers and users of the toy and observers of the toy

17   while it is in use are all likely to believe that it

18   originates whether it is licensed, sponsored or

19   authorized by JDPI."

20           MR. LARKIN:  I believe you said topic nine and

21   that's 12.

22           MR. BRAY:  Sorry.

23           THE WITNESS:  Let me find it.  Okay, I see

24   number 12.

25   BY MR. BRAY:

1       Q.   Are you prepared to testify this afternoon as

2   JDPI's designated corporate witness on this topic?

3       A.   Yes.

4       Q.   And what did you do to prepare to testify on

5   this product?

6       A.   Nothing different than I told you already.

7       Q.   To your knowledge, have there been any known

8   instances of actual confusion among consumers over

9   whether the VIP product is associated with or originates

10  from the same source as the products sold by -- sold or

11  licensed by Jack Daniel's?

12      A.   What do you mean by "actual confusion"?

13      Q.   Has a consumer reported to Jack Daniel's or to

14  Brown Forman that they thought that the Bad Spaniels toy

15  was sponsored by, affiliated with or associated with

16  Jack Daniel's?

17      A.   Not that I'm aware of.

18      Q.   And in preparation to testify today as JDPI's

19  corporate designee on this topic, presumably if such

20  evidence existed, it would have been brought to your

21  attention or you would have found it; right?

22      A.   Yes.

23      Q.   To your knowledge there is no evidence of any

24  actual consumer confusion out there today?

25           MR. LARKIN:   Asked and answered.

```
 1            THE WITNESS:  Out where?
 2   BY MR. BRAY:
 3       Q.   In the actual marketplace?
 4       A.   I have no idea what's out in the actual
 5   marketplace.  I only know what I told you, which is none
 6   of it has been reported to me.
 7       Q.   And nobody at JDPI would have more information
 8   about evidence of actual confusion than you as the
 9   corporate designee; is that correct?
10       A.   Eventually, yes.
11       Q.   Now, there is a lot of statements in the
12   Complaint, paragraph 18.  And I'm going to parse them up
13   a little bit.
14            What is the factual basis for JDPI's allegation
15   that the use of the Bad Spaniels trade dress trademark
16   is likely to cause initial interest confusion presale?
17       A.   I'm sorry, you're talking about 12?
18       Q.   Yeah.  It's paragraph 18 of the Counterclaim,
19   topic 12.
20       A.   Oh, all right, sorry.  I missed your question.
21   I was looking for 18.
22       Q.   What is the factual basis for the allegation
23   that sales of the Bad Spaniels toy is likely to cause
24   initial interest confusion presale?
25       A.   The basis for it is what we think people take
```

 1    of confusion if it were sold in liquor stores?

 2            MR. LARKIN:  Objection; hypothetical question.

 3    If you have an opinion or you can respond to the

 4    question, go ahead.

 5            THE WITNESS:  My supposition is -- well,

 6    likelihood of confusion is relevant to channel of trade.

 7            So if you're in a liquor store and you were to

 8    see an item like that there, you might draw more of a

 9    likelihood of confusion out of that.

10            That's not to say that the absence of it in

11    another channel does or doesn't cause it.  They're all

12    independent how people -- it's not one extreme, so to

13    speak.

14            So the fact that, for instance, liquor is not

15    sold in some places where licensed merchandise is

16    doesn't necessarily alter that stream.

17            MR. BRAY:  And I apologize if I asked you this

18    before:

19    BY MR. BRAY:

20        Q.  Have you reviewed Dr. Ford's survey report?

21        A.  No.

22        Q.  And I showed you the control for Dr. Ford's

23    survey.  Do you remember that?

24        A.  Yes.

25        Q.  And we talked before about a definition of a

1    parody and whether Bad Spaniels is a parody product.

2            Do you remember that?

3        A.   Yes.

4        Q.   I assume you would testify that Dr. Ford's

5    control is not a parody?

6        A.   True.

7        Q.   Are you familiar with the channels of trade

8    for Jack Daniel's No. 7 Whiskey?

9        A.   Yes.

10       Q.   What are the channels of trade for the No. 7

11   Jack Daniel's Whiskey?

12       A.   Everywhere distilled spirits can be sold, in

13   the U.S., that is.

14       Q.   How does Jack Daniel's -- well, Jack Daniel's

15   or Brown Forman spends sums of money advertising and

16   marketing the No. 7 Whiskey; correct?

17       A.   Correct.

18       Q.   I imagine it has a large advertising budget?

19       A.   How do you define large?  It's a lot of money.

20       Q.   Bigger than whatever VIP would use.

21           Can you describe for me, perhaps in descending

22   order, the manner in which Jack Daniel's markets and

23   advertises its No. 7 Whiskey?

24           In other words, if the budget is 100 million

25   dollars, is 80 million dollars spent on television,

1   ten on radio, that sort of thing?

2       A.  I don't know the breakdown of the advertising

3   budget between the various media.  So what percentage is

4   television, what percentage is print, what percentage is

5   out of home and what percentage, obviously, those facts

6   are available, but I don't know them.

7       Q.  Would you be familiar with, kind of, the top

8   five spans of Jack Daniel's advertising and marketing

9   budget for the product?

10          MR. LARKIN:  Objection to form.

11          THE WITNESS:  Roughly, yeah.

12  BY MR. BRAY:

13      Q.  What would be the top five marketing channels

14  that Jack Daniel's or Brown Forman spend money promoting

15  and marketing its classic No. 7 Whiskey?

16          MR. LARKIN:  Objection to form; "marketing

17  channels."

18          THE WITNESS:  I don't know what "marketing

19  channel" means.

20          MR. BRAY:  Strike that.

21  BY MR. BRAY:

22      Q.  What are the top five spending in advertising

23  for Jack Daniel's Classic No. 7 Whiskey?

24      A.  Television, radio, print, out of home and

25  digital.

David Gooder - June 23, 2015                    128

1          Q.  I missed one, I'm sorry.  You said television

2    and radio --

3          A.  Television, radio, print, out of home, digital.

4          Q.  What does "out of home" mean?

5          A.  Outdoors, billboards, transit.

6          Q.  And digital, describe for me what falls within

7    the category of digital?

8          A.  Advertising via our own website, via third

9    party websites, advertising via e-mail, social media,

10   et cetera.

11         Q.  Okay.  That was going to be my question:

12             Jack Daniel's does use social media to

13   advertise the Jack Daniel's No. 7 product; right?

14         A.  Yes.

15         Q.  Does Jack Daniel's spend any advertising or

16   marketing budget -- any of its advertising or marketing

17   budget, to your knowledge, for trade shows associated

18   with the pet supply business?

19         A.  No.

20         Q.  And print, I think I know what print is.

21   That's newspapers and magazines?

22         A.  Yeah.

23         Q.  Primarily?

24         A.  Yes, primarily.

25         Q.  And do the magazines that Jack Daniel's

1    advertises its Old No. 7 Classic Whiskey and -- can they

2    be categorized in any way or are they a variety of

3    different interests?

4         A.   That would be a question to ask Phil Epps.

5              MR. LARKIN:  I don't think that was a category.

6    But if it was, I don't think we designated Mr. Gooder to

7    testify on that.

8              MR. BRAY:  Okay.

9              MR. LARKIN:  So Mr. Epps can answer those

10   questions.

11   BY MR. BRAY:

12        Q.   Based on your own personal knowledge, you

13   don't?  Do you know, based on your own personal

14   knowledge?

15        A.   As to what?

16        Q.   If the magazines that Jack Daniel's advertises

17   in for its Classic No. 7 Whiskey, are they all over the

18   map or is there a rhyme or reason they focus on certain

19   types of magazines?

20        A.   Oh, absolutely there is rhyme or reason.

21        Q.   Explain that me?

22        A.   Well, it's all demographics.  So they advertise

23   in magazines that they think -- or newspapers or

24   whatever are best suited to reach the target audience

25   for that product at whatever is happening that time of

1   registrations one by one and we will figure out what you

2   know.

3           THE WITNESS:   Okay.

4   BY MR. BRAY:

5       Q.   As to registration number 4372885 for the

6   class of goods described or the description of goods

7   described, do you have knowledge as to how those goods

8   are advertised?

9       A.   Some.

10      Q.   Describe for me what you know about how those

11  goods are advertised?

12      A.   On-line, probably direct between -- advertised

13  to whom?

14      Q.   For sale?

15      A.   To whom?

16      Q.   Anybody?

17      A.   Well, that's pretty broad.  You can advertise

18  to consumers.  You can advertise to the trade.

19      Q.   Well, let's go to consumers?

20      A.   I don't know.  Probably on-line.  I know for

21  sure on-line.

22      Q.   The trade?

23      A.   I don't know.

24      Q.   When you -- I think I know what you talked

25  about when you are saying you advertise to the trade?

David Gooder - June 23, 2015                135

1        A.   Yeah.

2        Q.   But describe to me who you mean when you say

3    "the trade"?

4        A.   Well, it depends on which category that you're

5    talking about.  So if it's alcoholic beverages, the

6    trade is a different set of types of entities than it

7    would be for, let's say, anything that's not alcoholic

8    beverages.

9             So telephone covers, things like that, the

10   trade is different than the trade for whiskey.

11       Q.   Okay.  Let's talk about the trade for whiskey.

12       A.   Okay.

13       Q.   Are there -- how do you advertise -- or strike

14   that.  Are the means that you advertise or market Old

15   No. 7 to the trade for whiskey different or distinct

16   than the means that you advertise Old No. 7 Whiskey to

17   consumers generally?

18       A.   Yes.

19       Q.   How is the marketing to the trade different or

20   advertising to the trade different?

21       A.   It's a much smaller group.  The U.S. liquor

22   distribution law requires that a producer sell only to a

23   distributor, so-called three tier system.

24            If you put consumers in there, it's a fourth

25   tier, effectively, but the law doesn't get at it that

David Gooder - June 23, 2015                    136

1    same way.

2            So a producer, like, Brown Forman, generally,

3    can only sell to distributors.  That typically is one in

4    every state in the U.S., plus some that operate in the

5    duty-free world.

6            So pretty much that's 55 entities in the U.S.

7    is the trade to us.  You get a notch below that, we

8    market to the trade via our distributors at the next

9    level.  That's retailers.

10            We cannot sell to them directly.  So how we

11    market to those people, to the retailers is via the

12    distributors and their salespeople.

13            How they then push it to their consumer is

14    their own way of doing it.  But we also advertise direct

15    to consumers in addition to what we do through the

16    trade, if that makes sense.

17            And that's just the way the system is regulated

18    in the U.S.

19        Q.  So the three tiered distribution system is

20    producers sell to distributors; distributors sell to

21    retailers?

22        A.  Correct.

23        Q.  Fourth, retailers sell to consumers?

24        A.  Correct.

25        Q.  You can't order whiskey over the Internet?

David Gooder - June 23, 2015                    137

1        A.   What's that?

2        Q.   You can't order whiskey from a producer over

3   the Internet?

4        A.   You can't get it from a producer.

5        Q.   So how does Jack Daniel's market the Old No. 7

6   Whiskey to distributors?

7        A.   Via --

8        Q.   Or advertise?

9        A.   Well, it doesn't really advertise to

10  distributors.   They're already our partners.   So it's

11  done via e-mail, conversations, trade specific

12  communication materials.

13           When they announce promotions for the year,

14  they announce many new products.   There are

15  communication materials that are created just for that

16  small group.

17           Some of those are in electronics.   Some of

18  those are in print.

19        Q.   To your knowledge, VIP Products doesn't sell

20  the Bad Spaniels toy to the alcohol trade?

21        A.   I don't know.

22        Q.   If they do, you haven't heard of that?

23        A.   Correct.

24        Q.   And you have testified that Jack Daniel's

25  doesn't sell its whiskey to the pet specialty trade?

1    A.   You asked me about pet specialty retailers, I
2 think.  No, we don't sell to them.
3    Q.   And going back to the licensed products, switch
4 blade covers, cell phone cases, do you know the volume
5 of sales?
6    A.   I told you:  No.
7    Q.   Do you know where I could purchase a decorative
8 magnet; decorative switch plate cover; a cell phone
9 case?
10    A.   Addresses?  You can buy it on-line.  And as far
11 as specific stores are concerned, I can't tell you
12 whether they're in the hardware store in Lynchburg.
13        But there are retailers, like, Target.  There
14 are retailers, all different kinds of retailers, who
15 purchase those things and sell them.
16    Q.   And you're not aware of any pet specialty
17 retailers purchasing those things, those things being
18 the goods described in registration number 4372885;
19 correct?
20    A.   I'm not aware of any, but it wouldn't surprise
21 me.
22    Q.   And if I wanted to buy the products on-line,
23 which on-line stores have them?
24        When I say the "products," I mean the goods
25 covered by registration 4372885?

David Gooder - June 23, 2015                    139

1        A.  I don't know specific ones.

2        Q.  Categories?

3        A.  Well, just like I described:  Large retailers,

4    specialty retailers, on-line retailers.

5        Q.  Okay.  How about registration number four --

6    the next one -- registration number 4481424?

7            The goods and services covered by this

8    registration are, quote:  "Ornamental lapel pins,

9    clocks, watches, cuff links, necklaces and bracelets"?

10       A.  Yep.

11       Q.  Do you know how Jack Daniel's licensees

12   advertise to sell ornamental lapel pins, clocks,

13   watches, cuff links, necklaces and bracelets?

14       A.  Generally, yes.

15       Q.  And, generally, what's the answer?

16       A.  Trade communication materials to retailers and

17   they might -- well, and on-line on the websites.

18           I don't think they advertise direct to

19   consumers separately.

20       Q.  Are these products that would be available at

21   Lynchburg Hardware and General Store?

22       A.  Some of these, yeah.

23       Q.  Any knowledge as to the volume of sale of these

24   licensed goods?

25       A.  Nope.

David Gooder - June 23, 2015                    140

1        Q.   Would that answer be the same for each
2    registration?
3        A.   Yes.  As to volume, yes -- no.  It's not quite
4    true.  With most of them, yes.
5        Q.   As you sit here today, you're not aware that
6    any Jack Daniel's licensed ornamental lapel pins,
7    clocks, watches, cuff links, necklaces and bracelets
8    are being offered for sale in a pet specialty retailer,
9    are you?
10       A.   I'm not aware.
11       Q.   The next registration is for posters.  That's
12   registration number 3055481.
13            Do you have any knowledge as to the volume of
14   sales for posters?
15       A.   No.
16       Q.   Do you have knowledge of how Jack Daniel's
17   licensed poster products are advertised?
18       A.   Same as the prior ones that I mentioned or that
19   you asked me about.
20       Q.   Are you aware of the channels of trade for Jack
21   Daniel's posters? -- licensed posters?
22       A.   Generally, yes.
23       Q.   And, generally, what are the channels of trade?
24       A.   Same as the prior one.  Specialty retailers,
25   gifts -- stores that sell gift items, large discount

1    stores, virtually any retailers that sells anything

2    related to gift items or -- especially these in the last

3    category.

4          You talked about cuff links.  Those are largely

5    gift-related items.

6          Q.  Would you want any -- would Jack Daniel's or

7    Brown Forman want any of its licensed products sold in

8    toy stores?

9          A.  No.

10         Q.  Why?

11         A.  Because toys are largely sold to people under

12   the legal drinking age.

13         Q.  Okay.

14         A.  Or used by people under the legal drinking age.

15         Q.  Would the same concern that you expressed

16   earlier that Jack Daniel's would not sell a licensed pet

17   toy out of concern because of the potential use or

18   purchase by people under the legal drinking age affect

19   Jack Daniel's decision as to whether licensed products

20   should be sold in pet specialty retailers that offered

21   pet toys?

22         MR. LARKIN:  Objection to form.

23         THE WITNESS:  I'm not sure I understood your

24   question.

25         MR. BRAY:  I'm not sure I asked a good

David Gooder - June 23, 2015                     142

```
1   question.
2           MR. LARKIN:  I'll stipulate to that.
3   BY MR. BRAY:
4       Q.  You said Jack Daniel's would not authorize the
5   sale of Jack Daniel's licensed goods in toy stores;
6   correct?
7       A.  Correct.
8       Q.  And would not approve the sales of licensed
9   Jack Daniel's products in toy stores; correct?
10      A.  Correct.
11      Q.  Would Jack Daniel's approve the sale of
12  licensed Jack Daniel's products in pet specialty stores
13  that sold dog toys?
14      A.  Depends on the demographic of that store.
15      Q.  So does that mean that before -- okay.
16          How does it depend on the demographic of the
17  store?
18      A.  Well, we require that licensees only sell to --
19  excuse me.  We prohibit licensees from selling to any
20  retailer where the average age of their consumer or a
21  percentage of their consumer is below the legal drinking
22  age.
23          And so if a pet retailer -- let me give you an
24  example:  Target, the percentage of people who shop at
25  Target is above what our threshold is.
```

1            That doesn't mean that Target doesn't sell toys

2    or doesn't sell Jack Daniel's things.

3            It's just that the percentage of people who

4    shop in there are high enough above the legal drinking

5    age that we will not prohibit it.

6            So if a retailer of pet products, for instance,

7    Petsmart comes to us and says:  "We want to sell Jack

8    Daniel's t-shirts, whatever, at our store," we would

9    say:  "Well, what's your demographic?  Who is your

10   customer?"

11           If they say:  "Well, 40 percent of our

12   consumers are under legal drinking age," then the answer

13   would be:  "No."

14           We wouldn't authorize the sale to them.

15      Q.  What's the cut-off?  You mentioned 40 percent?

16      A.  Yeah.  The cut-off is -- it's in the mid-70

17   percent range.  I would have to look at the licensee

18   agreement.

19           But it's, roughly, mid-70 percent.  Somewhere

20   around 70, 80 percent is the threshold.

21      Q.  I'm sorry, 70, 80 percent of what?

22      A.  Of the consumers are over the legal drinking

23   age.

24      Q.  And are Jack Daniel's licensing guidelines

25   printed somewhere?

David Gooder - June 23, 2015                    144

1    A.  Yes.

2    Q.  And what's the document called?

3    A.  It's in the trademark license agreement.  And

4  it's also called our marketing -- it's, generally, our

5  marketing code, if you will.

6         It's also published on the DISCUS website.  We

7  actually adopt a more strict code than DISCUS does.

8  DISCUS is the trade association for the U.S. Spirits

9  Council.

10        And they have a marketing code that all members

11 follow.  Our marketing code is more restrictive than

12 that.

13    Q.  Why?

14    A.  Because we take it really seriously and we

15 think that we can be and we should be and we should lead

16 in that issue and not just fall in line.

17    Q.  You want to error on the side of caution in

18 terms of marketing to children?

19    A.  Yeah or anybody under the legal drinking age.

20    Q.  Yeah, sorry.  In terms of license agreements

21 that Jack Daniel's enters into, I know that the economic

22 terms probably change between agreement to agreement.

23        But are there standard terms and conditions

24 that licensing agreements, kind of, follow JDPI general

25 guidelines?

1       A.  Yes.

2       Q.  And if I asked you this already, I apologize:

3   Let me see if I can accelerate going through these a

4   little bit.

5           As you sit here today, you're not aware of any

6   licensed Jack Daniel's product being sold in a pet

7   specialty retail?

8           MR. LARKIN:  Asked and answered.

9           THE WITNESS:  Correct.  And, no, I'm not aware

10  of any.

11          MR. BRAY:  Okay.

12  BY MR. BRAY:

13      Q.  And registration number 4478408 is a

14  registration for umbrellas, luggage, duffel bags, et

15  cetera, et cetera.

16          Do you see that?

17      A.  Yes.

18      Q.  Are you aware, generally, of where the goods

19  and services listed in registration number 4478408 are

20  sold?

21      A.  Generally, yes.

22      Q.  And where are they sold, generally?

23      A.  Same place I told you before, with the

24  exception that you probably see more of these in stores,

25  retailers that would have a component that sells luggage

1    or have things that would sell to travelers or

2    et cetera.

3            But by and large, they tend to be sold in the

4    same places I described earlier.

5        Q.   Are you aware of how the goods that are covered

6    by registration 4478408 are advertised?

7        A.   Generally, yes.

8        Q.   How are they advertised?

9        A.   Same as I described previously.

10       Q.   Next registration, registration number 2867158?

11       A.   Yes.

12       Q.   For glass and plastic drinking containers and

13   then a bunch of words after "namely."

14            Do you see that?

15       A.   Yes.

16       Q.   I assume you have no knowledge regarding the

17   volume of sales?

18       A.   Correct.

19       Q.   Do you have knowledge regarding the channels in

20   which these products are sold?

21       A.   Generally, yes.

22       Q.   And what is the answer?

23       A.   The same as before with the addition of things

24   in this category would also be sold in stores that would

25   also sell alcoholic beverages in addition to other kinds

1  of stores.

2      Q.  Okay.  And are you aware of how the goods

3  listed in registration No. 2867158 are marketed?

4      A.  Generally speaking, yes.

5      Q.  What's the answer?

6      A.  Same as before.

7      Q.  Next registration, registration number 4526056?

8      A.  Yes.

9      Q.  This is a registration for footwear, head wear

10  including caps, hats, cowboy hats, head bands, straw

11  hats, visors, bandanas, clothing and then a bunch of

12  stuff after "namely."

13         Do you have knowledge regarding the volume of

14  sales?

15      A.  No.

16      Q.  And as to each of the registrations that we

17  looked at, do you have knowledge, direct knowledge as to

18  the date of first use?

19      A.  What do you mean by "direct knowledge"?

20         MR. LARKIN:  Objection to form.

21         MR. BRAY:  Well, that wasn't a good question.

22  BY MR. BRAY:

23      Q.  Other than seeing what is the listed date of

24  the first use in the application, do you have any

25  independent knowledge of when Jack Daniel's licensees

1  first started selling the types of goods described in

2  this registration?

3      A.  I do not.  Our files do or records.

4      Q.  Okay.  And do you have knowledge regarding

5  where the goods listed in registration 4526056 are sold?

6      A.  Generally, yes.

7      Q.  And, generally, where are they sold?

8      A.  Same as before, with the addition of retailers

9  that would more emphasize apparel, which is essentially

10  what this covers.

11      Q.  Do you have knowledge regarding the channels in

12  which they are advertised or marketed -- strike that.

13          Do you have knowledge regarding how they were

14  marketed or advertised?

15      A.  Yes.

16      Q.  And what's your knowledge?

17      A.  Same as before.

18      Q.  Let's look at registration 4481425?

19      A.  Okay.

20      Q.  It's for the following description of goods:

21          Belt buckles and clasps for clothing all made

22  of non-precious metal, ornamental novelty pins.

23          Do you see that?

24      A.  Yes.

25      Q.  Do you have knowledge regarding the volume of

David Gooder - June 23, 2015                    174

1  look and feel for a bottle of whiskey.

2  BY MR. BRAY:

3      Q.  Earlier in the deposition you testified as to

4  the marks that JDPI contended on are at issue in this

5  case.

6          And you answered that one of the marks is the

7  overall trade dress of the bottle, including labeling

8  and shrink band on top.

9          Do you recall that?

10     A.  Yes.  Generally, yes.

11     Q.  Does overall trade dress of the bottle,

12  including label and shrink wrap on top, apply only to

13  the Jack Daniel's No. 7 product or to other Jack

14  Daniel's products?

15     A.  I don't understand what you mean by --

16         MR. LARKIN:  Objection to form.

17         THE WITNESS:  What do you mean by does it apply

18  to the other ones?

19  BY MR. BRAY:

20     Q.  Is it evidenced -- is it included as part of

21  the trade dress in any other products besides Old No. 7?

22         MR. LARKIN:  Objection to form.

23         THE WITNESS:  If you're asking are there

24  elements of the Jack Daniel's Tennessee Whiskey, what we

25  refer to as the black label product --

```
1              MR. BRAY:  Okay.

2              THE WITNESS:  -- have elements that are

3  included in our other products, the answer is yes.

4  BY MR. BRAY:

5       Q.  And what are those other elements?

6       A.  It depends on what the product is.

7       Q.  I've put a bunch of exhibits in front of you.

8  They're, like, four through 16, which show all the other

9  products.

10      A.  Yes.  I have those.

11      Q.  Can you identify what other Jack Daniel's

12 products incorporate elements of the overall trade dress

13 that's at issue or that's --

14      A.  Yeah, all of them do.  You want to ask me

15 specifically?

16      Q.  Sure.

17      A.  You have given me a whole pile here.

18      Q.  Why don't we go through each one.  In no

19 particular order, take a look at Exhibit 8?

20              MR. LARKIN:  You don't have extras for me?

21              MR. BRAY:  They're there.

22              MR. LARKIN:  Oh.  All right.  Thank you.

23              THE WITNESS:  Yes.

24 BY MR. BRAY:

25      Q.  What elements of the overall trade dress of --
```

David Gooder - June 23, 2015                    176

1    and, I'm sorry, what was the shorthand for the No. 7

2    bottle?

3         A.  Jack Daniel's Tennessee Whiskey.  We can just

4    call it black label.

5         Q.  What other elements -- what elements of the

6    overall trade dress of the Jack Daniel's black label

7    appear in Gentleman Jack depicted in Exhibit 8?

8         A.  You have -- starting from the top down, you

9    have an arched logo or primary name logo.  This happens

10   to be where "Gentleman," the other word "Jack."

11        You also have a white on black on the small

12   label.  You have the signature of Jack Daniel on it.

13        And you actually have the mark Jack Daniel's

14   on the face.

15        Q.  Anything else?

16        A.  You, essentially, have a black top.  It's

17   different in the Gentleman Jack but you, essentially,

18   have a black cap on the bottle.

19        Q.  What elements of the overall trade dress of the

20   Jack Daniel's black label whiskey appear in Exhibit 9,

21   Jack Daniel's Original Tennessee Honey?

22        A.  The bottle, the signature, the trademark Jack

23   Daniel's, the swing logo, the filigree and the overall

24   -- as I think I referred to it -- the overall style of

25   the words below the words "Tennessee Honey," et cetera,

David Gooder - June 23, 2015                    177

1    and the black top.

2          Q.   What elements of the overall trade dress of the

3    Jack Daniel's Tennessee black whiskey appear in

4    Exhibit 11?

5          A.   The structure of the neck of the bottle, the

6    swing logo with the words Jack Daniel's, a circular

7    device that's below it.

8               I believe Old No. 7 is in there and the

9    signature of Jack Daniel's.

10         Q.   What elements of the overall trade dress of the

11   Jack Daniel's black label product appear in Exhibit 12,

12   Tennessee Fire?

13         A.   12 isn't Tennessee Fire.   I have ten.

14              (Discussion off the record.)

15              MR. LARKIN:   Do you remember the question?

16              THE WITNESS:   Yes.   The black top swing logo,

17   Jack Daniel's, which is on with the signature of Jack,

18   the bottle shape, the filigree border, the style and

19   font of the words below, the swing logo.

20              That's probably it.

21              MR. BRAY:   Let's take a five-minute break,

22   Mr. Gooder.

23              (Whereupon, a recess was taken.)

24              MR. BRAY:   If you could find JDPI's initial

25   Disclosure Statement?   We'll go back to that and then we

1  will wrap up.

2          MR. LARKIN:  What's that?

3          THE WITNESS:  39.

4          MR. LARKIN:  I also note for the record that we

5  served a supplemental one so that is not the -- with

6  respect to Mr. Gooder, it's no different.

7          MR. BRAY:  Understood, Counsel.

8          MR. LARKIN:  Okay.

9  BY MR. BRAY:

10     Q.  With regard to you, Mr. Gooder?

11     A.  Yes.

12     Q.  The initial Disclosure and the Supplemental

13  Disclosure state that you have discoverable information

14  regarding JDPI's registration, use and licensing of

15  Jack Daniel's Old No. 7 and label design marks and the

16  Jack Daniel's bottle trade dress for Tennessee Whiskey

17  and other goods and services and imagery and good will

18  associated with the Jack Daniel's Old No. 7 and label

19  design marks and the Jack Daniel's bottle trade dress.

20          Do you see that?

21     A.  Yes.

22     Q.  Can you identify the good will associated with

23  the Jack Daniel's marks referenced in the initial

24  Disclosure Statement?

25     A.  I don't know how you identify good will.  I

David Gooder - June 23, 2015          180

1      Q.  Okay.  And that's with regard to Jack Daniel's;
2  right?  The mark Jack Daniel's or the brand Jack
3  Daniel's?
4      A.  It's the overall brand, yeah.
5      Q.  Now, what evidence do you have that there is
6  good will associated with the Old No. 7 mark,
7  specifically?
8      A.  The degree to which people associate with us,
9  with Jack Daniel's, which is evidenced in a variety of
10  ways, one of which is people who want to use it; people
11  who infringe it, people who pirate it, et cetera.
12          You don't get that unless there is good will in
13  there.  And not only that, you've got a certain
14  accounting good will built up as well in it.
15          But I think that is to say there is different
16  ways you talk about good will.
17          You see it in the nature of how it's carried
18  over from product to product.  Again, how consumers
19  react to it, how they identify with it.
20      Q.  Is there any measurement of that?  How
21  consumers react to it; identify with it?
22      A.  There are tracking studies, I know.  But I'm
23  not sure.  Phil Epps would know more about this type of
24  thing -- about whether -- how granular they get as to
25  which exact mark they're referring to.

David Gooder - June 23, 2015                    181

```
 1          Your question is focused very, very precisely.
 2   I'm not sure you can segregate the good will overall by
 3   this mark or that mark.
 4          It's a combined effect of a lot of them.  Maybe
 5   an expert, a good will expert can do that but --
 6          I know the accounting people can tell you there
 7   is a certain amount attributed to it.
 8          But I don't know how they get at it, other than
 9   what's spent on it and the difference between what's
10   invested and what it's worth is effectively good will,
11   according to them.
12      Q.  Are you telling me that there is an accounting
13   measure within JDPI or Brown Forman in particular as to
14   the value of the good will associated with just the
15   Old No. 7 mark?
16      A.  No, I'm not talking about that.
17      Q.  There is no -- are you aware of any internal
18   measurement of the value of the alleged good will
19   associated just with the Old No. 7 mark?
20      A.  I'm not.
21      Q.  I don't contest that there is good will
22   associated with the Jack Daniel's mark.  Our own expert
23   will say that the Jack Daniel's mark is a significant
24   part of your product and your label.
25      A.  One second.  Your question is:  Is there a way
```

David Gooder - June 23, 2015                        182

 1   of measuring good will?  That's different than measuring
 2   awareness.
 3         To the extent all those things are tied
 4   together, I'm not sure how much one is segregated from
 5   the other.
 6      Q.  I'm asking:  Is there any internal Jack
 7   Daniel's measurement, using whatever means, and I feel
 8   is appropriate, to value the customer good will
 9   associated just with the Old No. 7 mark?
10      A.  I have no knowledge of it.  I think that's a
11   question for Phil.
12      Q.  Same question as to quote, unquote:  Label
13   design marks that are referenced in --
14      A.  Same answer.
15      Q.  And the Jack Daniel's bottle trade dress?
16      A.  Same answer.
17      Q.  And did this Interbrand evaluate a measurement
18   of good will or the value of the Jack Daniel's brand --
19   what did you say it was the most -- what value brand in
20   the world?
21      A.  Mid-eighties somewhere.
22      Q.  Do you know how Interbrand -- what methodology
23   Interbrand used?
24      A.  You'd have to read their report.  It's
25   published.

David Gooder - June 23, 2015                    183

1         Q.   Fair enough.   Did Jack Daniel's participate in

2     Interbrand's report or provide it information?

3         A.   Not that I know of.

4         Q.   It's something that this independent third

5     party organization did on its own?

6         A.   Yes.

7         Q.   With no input whatsoever from Jack Daniel's?

8         A.   Not to my knowledge.

9         Q.   Does the Jack Daniel's -- strike that.

10             Remind me again what the term was for the new

11     bottle design?

12         A.   Evolution bottle.

13         Q.   Evolution bottle.   Does Jack Daniel's use the

14     evolution bottle shape for any other whiskey other than

15     the black label whiskey?

16         A.   Yes.

17         Q.   Which ones?

18         A.   Tennessee Honey and Tennessee Fire and the

19     number of limited edition products sold, like, in travel

20     retail and a collectable bottle that's sold at the

21     distillery.

22             MR. BRAY:   Give me two minutes with my client

23     and I think I might be done.

24             MR. LARKIN:   Okay.   Do you want us to step out?

25             MR. BRAY:   No.

1           (Discussion off the record; recess taken.)

2           MR. BRAY:  I have no further questions.

3           THE COURT REPORTER:  Would you both like a copy

4    of the transcript?

5           MR. LARKIN:  Yes.

6           MR. BRAY:  Yes.

7           (The deposition was concluded at 4:30 o'clock

8    p.m.)

9                            --oOo--

10

11

12

13

14

15

16

17

18

19

20

21                            _____

                               DAVID GOODER
22

23

24

25

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP PRODUCTS, L.L.C., an Arizona    )
limited liability company          )
                                   )
    Plaintiff and Counterdefendant; )
                                   )
            vs.                    ) No. 2:14-cv-02057-DGC
                                   )
JACK DANIEL'S PROPERTIES, INC., a  )
Delaware corporation,              )
                                   )
    Defendant and Counterclaimant. )
_____)


DEPOSITION OF TOBIAS JOSEPH ROUSH

Louisville, Kentucky

July 17, 2015


Prepared by:

Catherine Shay, CM

1          Deposition of Tobias Joseph Roush was taken on

2   July 17, 2015, commencing at 8:50 a.m. at the offices

3   of Coulter Reporting, LLC, 101 East Kentucky Street,

4   Suite 200, Louisville, Kentucky, before Kitty Shay, a

5   Certified Reporter in the State of Kentucky.

6

7

8                        *   *   *

9

10  APPEARANCES:

11

12          For the Plaintiffs:
                DICKINSON WRIGHT PLLC
13              By: David Bray
                1850 North Central Avenue
14              Suite 1400
                Phoenix, Arizona  85004
15

16          For the Defendants:
                SEYFARTH SHAW, LLP
17              By:  Christopher C. Larkin
                2029 Century Park East
18              Suite 3500
                Los Angeles, California  90067-3021
19

20       Also present:  David and Wendy Sacra

21

22

23

24

25

1                    I N D E X

2

3    WITNESS                              PAGE

4

5    TOBIAS JOSEPH ROUSH
     Examination by Mr. Bray                4

6

7

8                    EXHIBITS MARKED

9

     EXHIBITS        DESCRIPTION              PAGE

10

11   Exhibit 58      Two-hour Internet          44
                     Search Results

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  or toy I should say?

2          A.      I will in my responsibility

3  occasionally go across through Google searches and

4  check web sites that carry Jack Daniel's products to

5  see if they are authentically licensed product, and I

6  happened to come across the Boozin Gear site and under

7  the Jack Daniel's products the Bad Spaniels item came

8  up.

9          Q.      How many licensees does Jack Daniel's

10 have in North America, approximately?

11         A.      I would say approximately 24, 25.

12         Q.      Going back to the Bad Spaniels

13 product, you ran across it at Boozin Gear, on the

14 Boozin Gear website as a result of a Google search,

15 what did you do after that?

16         A.      I put the link in an E-mail, sent it

17 to our legal team to see if they had the concerns that

18 I had.

19         Q.      At any point -- well, prior to doing

20 the Google search that you found the Bad Spaniels toy

21 on the Boozin Gear website had you had any familiarity

22 with the VIP products?

23         A.      No, sir, I had not.

24         Q.      Had you ever seen any VIP's products

25 Tuffy or Mighty Soft Adorable dog toys?

Tobias Joseph Roush - July 17, 2015                    26

1              A.        I have not.

2              Q.        Do you own a dog?

3              A.        I do.

4              Q.        Do you ever buy it toys?

5              A.        Not a lot.

6              Q.        Prior to running across the Bad

7       Spaniels toy on the Boozin Gear website had you seen

8       any of the VIP Silly Squeakers line of products

9       previously?

10             A.        No, I have not.

11             Q.        So you are the person responsible for

12      probably seven figures in legal fees spent by both

13      sides?

14             A.        If I am I'm doing it for the right

15      reason.

16             Q.        Okay.  And this was brought to your

17      attention not because anybody in the trades reported

18      to you that they had any confusion as to potential

19      affiliation between the Bad Spaniels toy and Jack

20      Daniel's; correct?

21             A.        I'm sorry, repeat the question.

22             Q.        I actually like the way I phrased it

23      so I'm going to have her read it back.

24             A.        That's fine.

25                       (READ BACK).

Tobias Joseph Roush - July 17, 2015                    27

1                    MR. LARKIN:  Do you understand the

2    question?

3                    THE WITNESS:  I do.

4                    MR. LARKIN:  Go ahead.

5                    THE WITNESS:  No, the reason that it

6    came up or the reason that I brought it up was because

7    it came under a Jack Daniel's link and it was

8    confusingly similar in my opinion.

9        Q.      Okay.  Did you find it humorous in

10   your opinion?

11       A.      No.

12       Q.      Nothing humorous at all?

13       A.      When it comes to the Jack Daniel's

14   brand I don't take it lightly.

15       Q.      In your position as -- I'm sorry, Mr.

16   Roush, I had a problem with titles this morning

17   with --

18       A.      Licensing manager.

19       Q.      Yes.  So I want to make sure I state

20   yours correctly.

21               In your position as licensing manager

22   for Brown-Forman have you run across or dealt with

23   issues of products that the producer claimed were

24   parody products?

25                    MR. LARKIN:  Objection to form.  Do

Tobias Joseph Roush - July 17, 2015                    28

1   you understand what he means by parody?

2                      THE WITNESS:  I do, making fun of a

3   brand.

4                      MR. LARKIN:  Okay.

5           A.      I would say that I don't recall a

6   parody product.

7           Q.      Okay.

8           A.      I recall confusingly similar products,

9   but I would not say that they were parody.

10          Q.      I appreciate that.  Well, do you think

11  the Bad Spaniels toy is a parody product?

12          A.      I personally believe it's attempting

13  to be.

14          Q.      In your mind does it make fun of or

15  comment on the Jack Daniel's brand?

16          A.      I think it's confusing enough that you

17  would think so.

18          Q.      Okay.

19          A.      Especially when it's associated with

20  the Jack Daniel's name.

21          Q.      Well, I went back and forth with David

22  Gooder on this but if -- if VIP were to sell a round

23  bottle, Squeaky dog toys that just said Bad Spaniels

24  with a picture of a dog, do you think the use of just

25  Bad Spaniels in that context would infringe on any

1   rights of Jack Daniel's?

2                   MR. LARKIN:  Objection to form.  It

3   also calls for a hypothetical.  We don't know what the

4   product looks like.  If you understand the question

5   you can answer it.

6                   THE WITNESS:  Okay.  I mean without

7   seeing the product it's hard to say what I would

8   think.  If it's using similar imagery I would still

9   have issue with it.

10        Q.      But if it had no imagery just a dog

11   and Bad Spaniels?

12        A.      I would have to see the product.

13        Q.      Okay.  So it's possible VIP could

14   reconfigure the Bad Spaniels product and still call it

15   Bad Spaniels and you might think it might not be

16   confusingly similar infringing on any trademark rights

17   of Jack Daniel's; right?

18                   MR. LARKIN:  Objection to form, calls

19   for a hypothetical.  You can answer.

20                   THE WITNESS:  Provided I see an image

21   then I can make a call.  Based on your description I

22   would think there wouldn't be as many issues but,

23   again, I would have to see it.

24        Q.      It's kind of an interesting -- I mean,

25   there's a little bit of method to my madness.  Your

```
 1   counsel makes valid objections on occasion but --
 2                   MR. LARKIN:  Thank you.
 3        Q.       We may have a trial in this case
 4   eventually and the judge may or may not enter an
 5   injunction saying this is infringing and we have to
 6   stop making it, but it would only apply to this
 7   particular product.  And I'm curious when I talk to
 8   this -- my one opportunity to talk to Jack Daniel's
 9   witnesses about what they think, whether they think
10   any product using Bad Spaniels could potentially be
11   non-infringing in their mind and sounds like you think
12   there could be?
13                   MR. LARKIN:  Same objection but you
14   can answer.
15                   THE WITNESS:  Personally yes.
16        Q.       But you have to see it?
17        A.       I would.
18        Q.       Fair enough.
19                   And you're not aware of anybody --
20   strike that.
21                   In your position as licensing manager
22   for Brown-Forman you've not been informed by anybody
23   that there have been any real world examples of
24   consumers or people in the trade being confused that
25   the Bad Spaniels toy was sponsored or affiliated with
```

1    Jack Daniel's; correct?

2         A.      No, I do not think I've had anybody

3    tell me that they thought it was but I've not asked.

4         Q.      Have you ever reviewed the VIP

5    website?

6         A.      Yes, I have.

7         Q.      Have you viewed the other Silly

8    Squeaker dog toys that it sells besides the Bad

9    Spaniels?

10        A.      I have.

11        Q.      Do you have an opinion one way or the

12   other as the licensing manager for Brown-Forman

13   whether those other Silly Squeaker products infringe

14   on any trademarks?

15             MR. LARKIN:  Objection to form and

16   irrelevant but go ahead.  If you have an opinion and

17   you understand the question.

18             THE WITNESS:  I think you guys have a

19   big issue.  From a licensing perspective I would be

20   all over it.

21        Q.      Most people back down?

22             MR. LARKIN:   Is that a question or is

23   that a statement?

24             MR. BRAY:  As a matter of fact, a

25   matter of law.

```
 1                      MR. LARKIN:  I guess it's a statement.
 2          Q.      It's a statement.  My apologies.  I'm
 3   here to ask questions.
 4                      So from your perspective VIP products
 5   is serial trademark infringement?
 6          A.      I do.  I think if you look at the
 7   designs I think all of them that I saw were
 8   confusingly similar.
 9          Q.      Is it necessary in order to have a
10   successful parody product that it has to evoke -- the
11   original has to evoke the trademarks of the brand
12   being a parody?
13                      MR. LARKIN:  Objection to form.  Do
14   you understand?
15                      THE WITNESS:  I do.
16                      MR. LARKIN:  Go ahead.
17                      THE WITNESS:  I don't know.  I'm not
18   in the business.
19          Q.      Okay.  Do you think that companies
20   like VIP should not have the right to make any
21   commercial product that parodies a mark like Jack
22   Daniel's?
23                      MR. LARKIN:  Objection to form.  It
24   calls for legal conclusion.  If you understand the
25   question go ahead.
```

1  licensed products of Jack Daniel's, authorized

2  licensed products of Brown-Forman?

3          A.      Okay.  One is not licensed.

4          Q.      Okay.

5          A.      2 is not licensed.  3 is not licensed.

6  4 is not licensed.  5 is not licensed.  6 is not

7  licensed.  7 is not licensed.  8 is not licensed and 9

8  is not licensed.

9          Q.      From your perspective as -- and you

10 testified earlier, Mr. Roush, that everybody at Jack

11 Daniel's is very sensitive regarding its trademark and

12 you sometimes just do random Google searches to see if

13 you can find -- to fish to see if you can find

14 infringers; right?

15         A.      Yes.

16         Q.      From your perspective as the licensing

17 manager for the Jack Daniel's brand at Brown-Forman

18 are any of the T-shirts depicted on SAC 72 infringing

19 any mark or trade dress of Jack Daniel's?

20                 MR. LARKIN:  Objection to form,

21 relevance, calls for legal conclusion.  If you

22 understand the question from your perspective you can

23 answer.

24                 THE WITNESS:  Okay.  From my

25 perspective 2 and 3.  I would also have issue with 5

Tobias Joseph Roush - July 17, 2015                    48

```
 1   based on the filagree around.  4 looks like it has the
 2   same filagree.
 3          Q.     So of the T-shirts depicted on SAC 72,
 4   again as licensing manager for the Jack Daniel's brand
 5   you believe products 2, 3, 4, 5 are infringing on
 6   actual property rights for Jack Daniel's?
 7                 MR. LARKIN:  Same objection.
 8                 THE WITNESS:  What I would do is they
 9   cause a red flag for me, and I would forward them to
10   our legal team for confirmation and --
11          Q.     Is one of the reasons that you did not
12   identify No. 8 is because the border is not a
13   filagree?
14                 MR. LARKIN:  Same objection.  Go
15   ahead.
16                 THE WITNESS:  Sorry.  Yes, I don't see
17   filagree, I don't see type font, and I don't see a
18   cartouche which are elements I will typically look
19   for.
20          Q.     So the double line border on the
21   T-shirt No. 8 on SAC 72 is not a filagree?
22          A.     That is correct, based on my
23   definition of filagree.
24          Q.     What's your definition of filagree?
25          A.     Something that looks like a barb wire
```

1    fence, very -- it's kind of -- this is a hard

2    description.  It's kind of squiggly lines.  It's going

3    to have a diamond type shape.

4              Q.        Where they overlap at portions?

5              A.        A little bit, yes.  This No. 8 is very

6    squared.

7              Q.        And the border on the Bad Spaniels

8    product is also not a filagree, correct, from your

9    perspective, using your definition?

10             A.        That is correct.

11             Q.        And one of the elements of the Jack

12   Daniel's trade dress that you believe Jack Daniel's

13   has rights to is the filagree border?

14             A.        I believe so.

15             Q.        Okay.  Have you seen products No. 2,

16   3, 4, 5 on SAC 72 and Exhibit 58 prior to today?

17             A.        I believe I have seen 2 previously and

18   I believe I've heard about No. 3, but I have not seen

19   it prior to today.

20             Q.        Prior to today had you communicated

21   with anybody at Brown-Forman or affiliated with

22   Brown-Forman regarding product 2 or 3 potentially

23   infringing the Jack Daniel's mark or trade dress?

24                       MR. LARKIN:  If that's to a lawyer

25   that's a yes-or-no answer without getting into the

1    substance of any communication.

2                    THE WITNESS:  No.

3            Q.      Okay.  Why not?

4            A.      When it was presented to me specific

5    to No. 2 as I recall action was already being taken.

6    I am not the only one that recognizes counterfeit

7    merchandise.

8            Q.      Sure.  You said people are vigilant

9    across business divisions and whatever at Brown-Forman

10   about protecting the Jack Daniel's mark?

11           A.      Uh-huh.

12           Q.      And from your perspective is Jack

13   Daniel's an iconic mark?

14           A.      From my personal perspective?  It is.

15           Q.      And from your personal perspective as

16   the licensing manager for Brown-Forman you don't like

17   to see the Jack Daniel's mark made fun of?

18                   MR. LARKIN:  Objection to form.  Are

19   you asking him whether these make fun of it or not?

20                   MR. BRAY:  No.

21                   MR. LARKIN:  Just in general, okay.

22   Objection to form.  You can answer.

23                   THE WITNESS:  Yes, I -- the brands

24   that I represent I take very seriously.  From a

25   licensing perspective I will add a bit to that if it

1    Exhibit 58, I didn't keep an exact count but does it

2    concern you that Mr. Sacra in less than two hours of

3    internet searching was able to find 70 products or

4    more on the internet that are potentially infringing

5    in your mind of the Jack Daniel's mark?

6                    MR. LARKIN:  Objection to form.

7    Irrelevant.  You can answer.

8                    THE WITNESS:  It concerns me but from

9    my humble opinion when you have, what I interpret as

10   an iconic brand, it's part of what having a trademark

11   is and that's why we do the due diligence of trying to

12   protect it.

13        Q.    Other than the -- I don't want to get

14   too bogged down in this.  I forget how I phrased my

15   last question or my question on this topic, but of the

16   shirts that are depicted in Exhibit 58 do you recall

17   raising any of those shirts as an issue at

18   Brown-Forman?

19                    MR. LARKIN:  Objection, relevance.

20   You can answer.  That's a yes or no if you did raise

21   it with counsel.

22                    THE WITNESS:  Honestly I couldn't give

23   you a yes or no because over three and a half plus

24   years there have been times that I've done it or I've

25   seen somebody else do it so I couldn't say with 100

Tobias  Joseph  Roush  -  July  17,  2015                60

```
 1   percent clarity if I have done one of these or not.
 2        Q.      In your experience has the portions of
 3   the general public come to associate a square bottle
 4   with whiskey and bourbon?
 5        A.      You are asking me to kind of --
 6             MR. LARKIN:  Don't speculate.  If you
 7   can --
 8             THE WITNESS:  I would say I'm
 9   speculating what consumers --
10        Q.      Well, is there -- are you aware of any
11   research or study made within Brown-Forman or
12   Brown-Forman which tends to show the portions of the
13   consuming public identify square bottles of any shape
14   with whiskey and bourbon products?
15        A.      Not to my knowledge.
16        Q.      Would you agree with me, though, a
17   black and white label design is intended to telegraph
18   or does telegraph to consumers that this is a Kentucky
19   or Tennessee bourbon or whiskey that is old and has
20   heritage and history behind it?
21             MR. LARKIN:  Objection to form.  It's
22   a hypothetical question.  We don't know what product
23   you are referring to, if you are referring to one at
24   all.  Your client's product has a black and white
25   label on it.
```

Tobias Joseph Roush - July 17, 2015                    61

1        A.        It all depends on the elements and the
2    look.
3        Q.        JDPI does not presently license the
4    Jack Daniel's marks or trade dress to any party for
5    use on any pet product; correct?
6        A.        No, sir.  That is not correct.
7        Q.        How was I wrong?
8        A.        We license leashes and collars.
9        Q.        Okay.  Do you report to Mr. Epps?
10       A.        I do.
11       Q.        Okay.  Mr. Epps testified in the past
12   they had licensed it to leashes and collars and no
13   longer being offered.  Is your understanding
14   different?
15                 MR. LARKIN:  Objection.  I think that
16   mischaracterizes Mr. Epps' testimony but you can
17   answer.  Go ahead.
18                 THE WITNESS:  Okay.
19                 MR. LARKIN:  Go ahead.
20                 THE WITNESS:  I'll answer two parts.
21   Mr. Epps has been in his role for three and a half
22   months roughly so the licensing coming up through him
23   is new to him.  Secondly we do have leashes and
24   collars.
25       Q.        Where are -- well, who is your

Tobias Joseph Roush - July 17, 2015                    62

1    licensee that sells licensed leashes and collars

2    bearing the Jack Daniel's trade mark or trade dress?

3            A.        The Lynchburg hardware store in

4    Lynchburg, Tennessee.

5            Q.        Any others?

6            A.        No, sir.

7            Q.        Leashes and collars only sold in the

8    Lynchburg hardware -- I think it's called General

9    Hardware and --

10           A.        Hardware and General Store.  Yes, to

11   my knowledge that's the only place we distribute.

12           Q.        And I understand if you take the

13   distillery tour in Lynchburg there's not a gift shop

14   in the -- to exit through the gift shop in the

15   distillery if you want memorabilia or souvenirs from

16   your experience, people are encouraged to go to the

17   Lynchburg Hardware and General store?

18           A.        They are certainly notified with it on

19   the tour and we would love for them to visit.

20           Q.        Who does that Lynchburg Hardware and

21   General store belong to?

22           A.        Brown-Forman.

23           Q.        Who makes the dog collars and leashes,

24   physically manufactures them?

25           A.        I would have to defer to our team at

1    the hardware store to confirm.

2            Q.      Are they being sold -- do you know

3    whether or not today -- strike that.

4                   Do you know whether or not at any time

5    in July of 2015 whether the Lynchburg Hardware and

6    General store is selling leashes or collars?

7            A.      I can tell you we are selling them.

8    They are currently back ordered.

9            Q.      When is the last time they have been

10   physically present in the store?

11           A.      I would have to confirm with the

12   hardware store team.

13           Q.      Has it been sometime, do you know?

14           A.      No, not to my knowledge.  I believe

15   they were available as early as 30 days ago.

16           Q.      Can I purchase a licensed -- a leash

17   or a collar that bears a licensed Jack Daniel's

18   trademark or trade dress anywhere besides the

19   Lynchburg Hardware and General store?

20           A.      To my knowledge no.

21           Q.      Do you know the sales volumes of

22   leashes and collars sold at the Lynchburg Hardware and

23   General store?

24           A.      No, I do not.

25           Q.      Would you expect that on annual basis

1    would say well over 3,000 items.

2         Q.     Of those 3,000 items is there a

3    significant portion of those items -- strike that.

4               Of those 3,000 items can you give me a

5    rough percentage of what percentage of those 3,000

6    items are only available for purchase in the Lynchburg

7    Hardware and General store?

8         A.     No, I could not.

9         Q.     Okay.  If you wanted to find out that

10   information how would you go about doing it?

11        A.     I would work with the team down there

12   and have them give me an analysis.

13        Q.     20 -- first half of 2015, using that

14   time frame, are you aware of how many separate

15   licensed Jack Daniel's products are sold by anybody in

16   the United States?

17        A.     I'm sorry, repeat the question.

18        Q.     Second first half of 2015, outside of

19   the Lynchburg Hardware and General store, put that

20   aside, are you aware of how many separate products are

21   sold -- how many separate licensed Jack Daniel's

22   products are sold by third parties in the United

23   States?

24               MR. LARKIN:  I have to object to form

25   because I'm not sure whether you mean, for example,

Tobias Joseph Roush - July 17, 2015                68

```
 1   shirts, there might be 20 different types.  Are you
 2   talking about what might be described in a licensor or
 3   separate products?
 4          Q.      I'll try to circle this.  Can you give
 5   me any ballpark in the number of Skewes -- if I say
 6   Skewes, do you understand what that is?
 7          A.      I would.
 8          Q.      Can you give me an idea of how many
 9   separate Skewes there are for licensed Jack Daniel
10   products sold by third parties in 2015?
11          A.      If you are going based on Skewes, that
12   means you're talking about every size of individual
13   designed shirts, I would estimate were in excess of
14   13,000.
15          Q.      Okay.  All right.  And then if we
16   remove -- reduce from that number multiple sizes of
17   the same product, how many different products?  So
18   continue to use Skewes as kind of a baseline but
19   crunch the Skewes together for shirts, identical
20   shirts of different sizes.
21                  MR. LARKIN:  And other products I
22   assume is part of your question?
23          Q.      Yes.
24          A.      I would say we are around 5,000.  And
25   these are absolute estimates.
```

1          Q.      I appreciate that.  Jack Daniel's --

2  and occasionally I use Jack Daniel's, I use Jack

3  Daniel's interchangeably with Brown-Forman and

4  probably once in a while I'll do it with JDPI.  So if

5  I refer to Jack Daniel's or Brown-Forman and it's not

6  clear what the context is I'm using, just make sure

7  you tell me.

8                  Jack Daniel's -- I'm sorry,

9  Brown-Forman currently does not have any licensees for

10  the Jack Daniel's trade dress or trademarks for pet

11  toys; correct?

12         A.      For toys?  How do you define toys?

13         Q.      Pet toys.

14                 MR. LARKIN:  Pet toys.

15                 THE WITNESS:  No, not to my knowledge.

16  We have pet collars and pet leashes.

17         Q.      Okay.  I appreciate that.  And at this

18  time you're not aware of any present plans by

19  Brown-Forman to license the Jack Daniel's trademark or

20  trade dress for use on a pet toy?

21         A.      That is correct.

22         Q.      And you're not aware as the licensing

23  manager for Brown-Forman of any intention on the part

24  of Brown-Forman to expand sales of licensed pet

25  collars and leashes outside of the Lynchburg Hardware

 1              MR. LARKIN:  Objection to form.  You
 2   can answer.
 3              THE WITNESS:  Same response I said
 4   before.  It's our trademark and it's an infringement.
 5   I mean, again, as I referred to earlier, it's very
 6   black and white to me.
 7        Q.     Nothing about the Bad Spaniels product
 8   would cause you to think that the Jack Daniel's Black
 9   Label Whiskey is in any way associated with dog
10   excrement?  That's correct, isn't it?
11              MR. LARKIN:  The toy speaks for
12   itself.  You can answer.
13              THE WITNESS:  If I got in beyond the
14   trademark elements and being just pure infringement,
15   there is certainly an association about excrement that
16   I would never want any brand that I represent to be
17   associated with.
18        Q.     Okay.  So would it be -- other
19   witnesses in this case on the Brown-Forman side of
20   things have testified to the effect that they thought
21   the Bad Spaniels toy was somehow in bad taste.  Would
22   you agree or disagree with that?
23              MR. LARKIN:  Objection to form.  You
24   can answer.
25        A.     I personally don't like it.

```
 1              Q.      Okay.  As licensing manager for the
 2    Jack Daniel's brand for Brown-Forman would you ever
 3    consider licensing the Jack Daniel's mark or trade
 4    dress for any product you considered to be in bad
 5    taste?
 6              A.      For Jack Daniel's?
 7              Q.      Yes.
 8              A.      No.
 9              Q.      You had a licensing before you got to
10    Brown-Forman.  In all of your experience involved in
11    licensing products, can you think of an example where
12    the licensor, a case you personally have been involved
13    in, where the licensor licensed its trademark or trade
14    dress for use on a product that you considered to be
15    in bad taste?
16              MR. LARKIN:  Objection to form and
17    irrelevant.  If you can remember any such instance, go
18    ahead.
19              THE WITNESS:  I mean, there was a time
20    where there was a product that I thought was good on
21    the agent's side that the brand just deemed not on
22    strategy.
23              Q.      Okay.  Generally speaking from your
24    position as a licensing professional, you wouldn't
25    advise a trademark holder to license its trade dress
```

```
 1   or trademarks in marks for a product that you thought
 2   was in bad taste?
 3                    MR. LARKIN:  Asked and answered but
 4   you can answer.
 5                    THE WITNESS:  No, I would not consult
 6   to recommend that.
 7           Q.      Okay.  And did you -- you found the
 8   Bad Spaniels product using the Google search numbers
 9   on Boozin Gear website.  Do you recall who you sent
10   that damage to or who you contacted about a potential
11   problem?
12           A.      I believe that I forwarded it to
13   Christy Susman, Rachell Andrews -- or Rachel Andrews
14   with our JDPI legal team.
15           Q.      Did you discuss the Bad Spaniels
16   product with anybody at Brown-Forman outside the
17   presence of counsel?
18           A.      Repeat the question.
19           Q.      Did you -- have you ever discussed the
20   Bad Spaniels product with anybody at Brown-Forman
21   outside the presence of counsel?
22           A.      No.
23           Q.      When you saw the Bad Spaniels product
24   on the Boozin Gear website you knew right away it was
25   not a licensed product of Jack Daniel's; right?
```

Tobias Joseph Roush - July 17, 2015                     74

```
 1            A.        That is correct.
 2            Q.        In fact you knew that Jack Daniel's
 3   would never license a trade dress or trade marks on a
 4   product similar to Bad Spaniels; correct?
 5                      MR. LARKIN:  Objection to form, but
 6   you can answer.
 7                      THE WITNESS:  I will say never is a
 8   very general term.  In my tenure it would not have
 9   been licensed because it's not on strategy with what
10   we are doing.
11            Q.        And the strategy -- I mean, Mr. Epps
12   talked about it a little bit this morning there is a
13   focus on premiumness.  Is that one element of the
14   strategy for developing Jack Daniel's?
15            A.        Yes.
16            Q.        Okay.  And do you think the Bad
17   Spaniels product is not in alignment with the
18   premiumness prong of the marketing strategy for Jack
19   Daniel's?
20                      MR. LARKIN:  Objection to form.  If
21   you understand, go ahead.
22                      THE WITNESS:  Repeat the question.
23            Q.        Well, circle back this way.  You said
24   looking at it you knew that this was not in alignment
25   with Jack Daniel's strategy or words to that effect?
```

Tobias Joseph Roush - July 17, 2015                    75

```
 1              MR. LARKIN:  I don't know that
 2   accurately characterizes his answer but --
 3              THE WITNESS:  I told you I knew it was
 4   not a licensed product.
 5         Q.     Okay.  And you'll agree with me --
 6   well, do you think it's in alignment with Jack
 7   Daniel's strategies vis-a-vis licensing of Jack
 8   Daniel's brand or marks?
 9         A.     Not during my tenure at Brown-Forman.
10         Q.     Okay.  And in what way is it not in
11   alignment with licensing strategies for Jack Daniel's?
12         A.     We would do a premium product.  We
13   wouldn't do a toy for fear that it might be confused
14   as a kid's toy, and we are very focused on
15   responsibility and not letting products as much as
16   possible get to anybody under legal drinking age.
17         Q.     Okay.  Do you think the Bad Spaniels
18   product is not a premium product?
19         A.     I mean short of seeing it, I wouldn't
20   say -- make that call because I haven't held it, I
21   haven't had my dog chew on it so if it came apart in a
22   matter of minutes, and I have a Weimaraner my guess is
23   that would be my basis for the quality just on not
24   looking at any visuals.
25         Q.     Do you have any knowledge of the pet
```

1    industry  market  segment?

2                    MR.  LARKIN:    Objection  to  form.    I

3    don't  know  what  you  are  referring  to.    I  guess  if  the

4    witness  doesn't  either  --  okay,  fine.

5            Q.        Describe  for  me  how  much  you  know

6    about  the  pet  product  industry.

7            A.        It's  vague  at  best.    An  occasional

8    trip  to  the  pet  store  or  my  local  Wal-Mart  to  get  pet

9    food.

10           Q.        And  in  your  various  roles  in  product

11   licensing  and  brand  licensing  did  you  have  any

12   interaction  with  the  pet  industry?

13           A.        Short  of  the  current  license  for  the

14   Jack  Daniel's  collars  and  leashes,  no.

15           Q.        Again  Brown-Forman  is  the  licensee?

16           A.        The  Lynchburg  General  Hardware.

17           Q.        I  know,  I'm  sorry.    I  know  you  said

18   that,  I'm  not  trying  to  trick  you,  which  is  owned  by

19   Brown-Forman?

20           A.        Correct.

21           Q.        So  no  other  --  you've  not  been

22   involved  in  licensing  brands,  products,  anything  in

23   the  pet  supply  industry  at  all  other  than  the  license

24   agreement  with  the  Lynchburg  Hardware  and  General

25   store?

1    Q.        One of the top issues you have been

2  designated as corporate representative of JDPI to

3  testify on is No. 49.

4                MR. LARKIN:  It's on Page 9.

5    A.        Thank you.

6    Q.        Have you read it?

7    A.        49 on Page 9, yes, I have.

8    Q.        As JDPI's corporate representative to

9  testify on topic 49 in Exhibit 40 can you tell me what

10  license merchandise exists using the Jack Daniel's

11  evolution bottle shape?

12        A.        Off the top of my head we have

13  apparel.  We have key chains, ornaments, barrel

14  products with a laser etch, and if I didn't say it

15  probably glassware.

16        Q.        I'm going to try to set up just a

17  little bit.

18        A.        Okay.

19        Q.        I would like to have you limit your

20  answer to my next question to just licensed products

21  that have the three dimension shape of the revolution

22  bottle.  It doesn't have to be the exact same size,

23  but I'm talking about three dimensional products, not

24  a depiction of -- the evolution, for example.

25                With that clarification how many --

Tobias Joseph Roush - July 17, 2015                    92

1    can you identify for me any licensed products that

2    exist in the marketplace today that have the three

3    dimensional shape of the evolution bottle?

4                        MR. LARKIN:   I need to object to form.

5    I don't know what you mean by three dimensional shape.

6    If a shirt showed the bottle, but that's only in two

7    dimensions, are you excluding that from?

8            Q.      I'm excluding shirts.  That was my

9    intention.  So using a key chain, might have a little

10   bottle, that's three dimensional.  Do you understand

11   the distinction?

12           A.      I do.

13                   MR. LARKIN:  Fine.

14           Q.      Back to my question.  Identify three

15   dimensional licensed products that exist today that

16   incorporate the shape of the evolution bottle in three

17   dimensions.

18           A.      Right off the top of my head we have a

19   Christmas ornament or a holiday ornament and a key

20   chain.

21           Q.      Are those the only ones that you can

22   think of?

23           A.      To the best of my recollection, yes.

24           Q.      Is there anybody at Brown-Forman who

25   would know more than you regarding what licensed

1    products exist that incorporate the three dimensional
2    shape of the evolution bottle?
3             A.      I can't say what other people know.  I
4    don't think so, but that's purely speculation on my
5    part.
6             Q.      Okay.  And to prepare for today's
7    deposition and testify as a corporate designee on this
8    topic, you didn't review any sort of list of licensed
9    products or pictorial catalog of licensed products;
10   correct?
11            A.      Correct.
12            Q.      This is just off the top of your head?
13            A.      Yes.
14            Q.      And off the top of your head you can
15   only think of two products, a Christmas ornament and a
16   key chain?
17            A.      And I want to just clarify holiday
18   ornament.  But, yes, off the top of my head because we
19   take the substrate of the bottle and a replica of the
20   bottle very seriously, if you say the label we take
21   seriously in the trademarks.  We take the three
22   dimensional bottle probably to another degree so
23   replicas of that are -- we don't take easily.
24            Q.      You weren't employed by Brown-Forman
25   at the time of the transition from the -- gosh, it's

Tobias Joseph Roush - July 17, 2015                94

1    getting late -- the transition to the evolution

2    bottle; correct?

3            A.      No, based on my knowledge the history

4    that happened in 2010.

5            Q.      Okay.

6            A.      And that could be inaccurate, but that

7    is based on my best recollection, but I was not there

8    at the time.

9            Q.      Do you have any -- are you familiar

10   with what the prior bottle shape was before the

11   evolution bottle, immediately prior to the evolution

12   bottle?

13           A.      I have a good knowledge of it.

14           Q.      Okay.  From your perspective was the

15   evolution bottle a slight modification from the bottle

16   that came before?

17           A.      Slight modification is very generic.

18   What do you mean?  I mean, what is your question with

19   slight modification?

20           Q.      There's so many ways you can parse the

21   English language which makes time taking depositions

22   difficult so let me ask you in your own words how

23   would you describe the degree of difference between

24   the evolution bottle and the prior bottle?

25           A.      Based on my knowledge there were lines

Tobias Joseph Roush - July 17, 2015                    95

1    on the neck.   Based on my recollection the shoulders

2    were not squared.   They were more rounded.   Even

3    though it was a square bottle we did not have the

4    beveled edges previously.

5              Q.         From your perspective was it a

6    significant change?

7                        MR. LARKIN:   Objection to form.   Do

8    you have an answer one way or another?

9                        THE WITNESS:   I thought it was a much

10   cleaner look than the previous bottle.

11             Q.         Okay.   You said you take -- one theme

12   throughout the deposition Jack Daniel's takes its

13   trademark seriously?

14             A.         Yes.

15             Q.         Or Brown-Forman takes the Jack

16   Daniel's mark seriously.   And in your role as

17   licensing manager for Brown-Forman you take the Jack

18   Daniel's mark seriously?

19             A.         Yes.

20             Q.         And I think you just said a minute ago

21   that you, in terms of the licensing aspect of the job,

22   you take special care with the three dimensional

23   bottle shape?

24             A.         That is accurate.   We don't easily

25   license or allow replica bottles without a lot of

Tobias  Joseph  Roush  -  July  17,  2015                    96

```
 1   attention and consideration.
 2         Q.      You would agree with me, Mr. Roush, as
 3   the licensing manager for Brown-Forman that the Jack
 4   Daniel's name and mark, being just Jack Daniel's, is
 5   more valuable than the shape of the evolution bottle?
 6               MR. LARKIN:  Objection to form.  What
 7   do you mean by valuable?  The license is the mark.  I
 8   don't know what you mean.  Do you know what he means?
 9               THE WITNESS:  I don't -- I'm not clear
10   on it.
11         Q.      To your knowledge has Brown-Forman
12   ever conducted a study of any kind that would be
13   designed to test consumer recognition of the shape of
14   what I'll call a naked evolution bottle as being a
15   Jack Daniel's bottle?
16         A.      Not to my knowledge.
17         Q.      Okay.  And is it your understanding as
18   the licensing manager for Brown-Forman that the Jack
19   Daniel's mark -- and when I say that I just mean the
20   name Jack Daniel's or maybe even the shape is one of
21   the most valuable marks in the liquor and spirits
22   industry?
23         A.      Do I personally think that the mark is
24   one of the most valuable?
25         Q.      In the liquor and spirits industry.
```

```
 1              A.       I do.
 2              Q.       And have you been involved in any
 3   project, discussions at Brown-Forman that attempted to
 4   assign a value to the Jack Daniel's mark?
 5              A.       Assign a value to the mark.
 6              Q.       Just the Jack Daniel's mark.
 7              A.       No, not to my knowledge.
 8              Q.       Okay.  Why does Jack Daniel's take
 9   particular care -- strike that.
10              Why does the licensing division of
11   Brown-Forman take particular care vis-a-vis licensing
12   of replica bottles?
13              A.       Because the substrate, in addition to
14   the trademarks, are a vital part of the brand
15   recognition.  And the closer you get to the bottle
16   likeness, the greater potential for confusion in the
17   marketplace.
18              Q.       But I'm confused.  I mean, we're
19   talking about licensed products; right?
20              A.       We are.
21              Q.       So if a licensed product bears the
22   Jack Daniel's mark, which you understand to be one of
23   the most valuable marks in the liquor and spirits
24   industry, wouldn't that cause confusion as to the
25   affiliation with Jack Daniel's?
```

Tobias Joseph Roush - July 17, 2015                98

```
 1            A.        Rephrase the question.
 2            Q.        You were making a distinction, you
 3   said -- I think you used the word substrate.  Is that
 4   bottle shape?
 5            A.        That is.
 6            Q.        I learn something new every day.
 7                      You made -- with regard to your
 8   licensing efforts where you grant permission to
 9   somebody to manufacture a licensed product that
10   includes some element of the Jack Daniel's trademark
11   or trade dress, maybe all the elements I don't know,
12   you said you had particular concern regarding the
13   substrate because it has the potential of being
14   confusing to the public; is that right?
15            A.        On a licensed product?
16            Q.        Yes.
17            A.        If not executed correctly.  If you do
18   a round bottle with the Jack Daniel's trademark and
19   it's not the square bottle with the beveled corners
20   the general public would, knowing the whole story
21   about Jack Daniel's, question if that was an
22   officially licensed product.  So you want to pay
23   attention to the detail of a product like that.
24            Q.        Okay.  So I think we are coming at it
25   from different sides and I misunderstood you.
```

 1              From your perspective as the licensing
 2    manager for Brown-Forman you are concerned the Jack
 3    Daniel's trademarks or trade dress being used on a
 4    three dimensional substrate that doesn't conform to
 5    the evolution bottle, the shape of the evolution
 6    bottle?
 7                        MR. LARKIN:  Objection.
 8                        THE WITNESS:  I'm sorry, what was the
 9    question?
10                        MR. LARKIN:  Object to form.
11         Q.        Your concern was that you don't want a
12    licensee selling a licensed product that bears the
13    Jack Daniel's trademark or trade dress on a three
14    dimensional substrate that doesn't look like the
15    evolution bottle?
16         A.        Correct.  I want it to be accurate.
17         Q.        I thought your concern was you don't
18    want to license the substrate, the evolution bottle
19    because people would think that the licensed product
20    was affiliated with Jack Daniel's.  That's not your
21    concern; right?
22         A.        I'll be honest I'm still not catching
23    what you are saying.  Are you -- you are saying the
24    substrate or the bottle not with the Jack Daniel's
25    logo or because -- I'll be honest, it's not clear what

```
 1          Q.        Okay.  With regard to the licensed
 2   products that are a two dimensional depictions of the
 3   evolution bottle, the apparel pieces, do you know
 4   where they are sold?
 5          A.        They are sold in the hardware store,
 6   on our E commerce site, and boutiques in Nashville,
 7   boutiques stores downtown Nashville and in stores
 8   around the square in Lynchburg.  And although I cannot
 9   give you a particular site, I am sure you could find
10   it in other E commerce or web sites on the web.
11          Q.        Not sold at mass market merchandisers?
12          A.        We do not, no.
13          Q.        Not sold in pet specialty stores like
14   Petco, Pet Smart and Petland?
15          A.        Not to my knowledge.  I think that I
16   would be aware of that.
17          Q.        And I think you said there's a
18   standard license agreement more or less that
19   Brown-Forman uses with licensees?
20          A.        Correct.
21          Q.        Are there restrictions in the standard
22   license agreement vis-a-vis -- I am sure that your
23   license agreements contain geographic scope of where
24   they are authorized to sell, what geographic territory
25   they are authorized to sell Jack Daniel's licensed
```

1    products; correct?

2         A.      Correct.

3         Q.      I imagine with some detail describe

4    which products particularly they are entitled to sell?

5         A.      Yes, category geographic region.

6         Q.      Okay.  Is there -- and I only have so

7    much room in my suitcase and the Fed Ex box to get

8    documents here.  Is there a provision in the standard

9    license agreement used by Brown-Forman that provides

10   what channel of trade the licensee can sell the

11   licensed goods in?

12        A.      Yes.

13        Q.      Okay.  Your counsel correctly

14   indicated that a couple license agreements could be

15   produced, and I can go look at them, but since you are

16   here let me ask, is there a restriction from selling

17   licensed Jack Daniel's goods in mass merchandise

18   retailers?

19        A.      Depending on the category there are

20   restrictions, yes.

21        Q.      Okay.  And I talked to Mr. Gooder or

22   someone about this is that the category being -- well,

23   rather than me trying to guess or articulate, probably

24   a bad question.

25               Why depending on the category does it

Tobias Joseph Roush - July 17, 2015                107

1   vary?

2        A.     Because we strategically are okay with

3   culinary products being sold in mass.  They are also

4   typically grocery.  So we are okay with culinary being

5   at mass, we are okay with our barbecuing grilling

6   being at mass, but those are the categories we are

7   okay with.

8        Q.     You're not okay with apparel being

9   sold at mass?

10       A.     No, we are not.

11       Q.     Is that because that children might be

12  consumers of the apparel, or not children, under 21?

13       A.     That's one concern, but the other is

14  mass is not considered premium in the apparel

15  category.

16       Q.     In your mind is a key chain considered

17  a premium product?

18       A.     It depends on how it is executed.

19       Q.     I guess that's right.  I had a Tiffany

20  key chain at one time.

21              MR. LARKIN:  There you go.

22       Q.     I don't have it with me.

23              MR. LARKIN:  I'll take your word for

24  it.

25       Q.     Is the key chain, the licensed Jack

Tobias Joseph Roush - July 17, 2015                108

1  Daniel's key chain, sold in Lynchburg Hardware and
2  General store made out of sterling silver?
3          A.      No.
4          Q.      Do you know what the price point is?
5          A.      No.  I believe it's around the 8 or
6  10-dollar price point.
7          Q.      Do you believe amongst the world of
8  key chains that the Jack Daniel's licensed key chain
9  sold in the Lynchburg Hardware and General store is a
10  premium product?
11              MR. LARKIN:  Objection to form.  I
12  don't know -- if you know the key chain market, go
13  ahead and answer.
14              THE WITNESS:  Yeah.  I mean, I would
15  have to have a point of reference or a competitive set
16  to make that call.  I personally think it's a nice key
17  chain.  I mean, there aren't a lot of key chains I
18  would pay $10 for.
19          Q.      Is it plastic?
20          A.      No, it is not.
21          Q.      What's it made out of?
22          A.      Pewter.
23          Q.      Okay.  Let me try to speed things up.
24  I said I was going to be valuable with your time.
25  I've definitely slowed down.

# EXHIBIT I

Christopher Hungerford - July 16, 2015

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

VIP PRODUCTS, L.L.C., an Arizona  )
limited liability company         )
                                  )
    Plaintiff and Counterdefendant; )
                                  )
              vs.                 ) No. 2:14-cv-02057-DGC
                                  )
JACK DANIEL'S PROPERTIES, INC., a )
Delaware corporation,             )
                                  )
    Defendant and Counterclaimant. )
_____)

DEPOSITION OF CHRISTOPHER HUNGERFORD

July 16, 2015

Prepared by:

GINA M. PINTOZZI-GOREY, RPR
KY-CCR #24574673

**Coash & Coash, Inc.**
**602-258-1440    www.coashandcoash.com**

```
1                    INDEX TO EXAMINATION

2
    WITNESS:  CHRISTOPHER HUNGERFORD
3
    EXAMINATION  BY MR. BRAY .....................   4
4

5

6

7

8

9                    INDEX TO EXHIBITS

10
    EXHIBIT NO. 16 ...................................
11      (CONFIDENTIAL PORTION)
    EXHIBIT NO. 43 ...................................  73
12      (ANSWER AND COUNTERCLAIMS FILED BY JACK
        DANIEL'S)
13  EXHIBIT NO. 46 ...................................  10
        (HAND-DRAWN ORGANIZATIONAL CHART)
14  EXHIBIT NO. 47 ...................................  41
        (RULE 26(A)(2)(C) DISCLOSURE OF DEFENDANT
15      AND COUNTERCLAIMANT JACK DANIEL'S
        PROPERTIES, INC.)
16  EXHIBIT NO. 48 ...................................  82
        (DEFENDANT AND COUNTERCLAIM OF JACK
17      DANIEL'S PROPERTIES, INC.'S RESPONSES TO
        PLAINTIFF AND FIRST SET OF
18      INTERROGATORIES)
    EXHIBIT NO. 49 ...................................  88
19      (ILLINOIS GLASS COMPANY CATALOG, 1906)
    EXHIBIT NO. 50 ...................................
20      (CONFIDENTIAL PORTION)
    EXHIBIT NO. 51 ...................................
21      (CONFIDENTIAL PORTION)
    EXHIBIT NO. 52 ................................... 108
22      (RULE 26 EXPERT REPORT OF JOHN HOWARD)
    EXHIBIT NO. 53 ................................... 119
23      (REPORT BY MR. SACRA)

24

25
```

1             THE DEPOSITION OF CHRISTOPHER

2     HUNGERFORD, taken in the offices of COULTER

3     REPORTING, LLC, 101 East Kentucky Street,

4     Louisville, Kentucky, on Thursday, July 16, 2015,

5     commencing at 8:38 a.m., before Gina M. Pintozzi, a

6     Certified Reporter in the State of Kentucky.

7

8                  ***        ***        ***

9

10                        APPEARANCES

11

12    FOR THE PLAINTIFF AND COUNTERDEFENDANT:

13           MR. DAVID G. BRAY
             DICKINSON WRIGHT, PLLC
14           1850 N. Central Avenue, Suite 1400
             Phoenix, Arizona  85004
15           602.285.5033
             Dbray@dickinsonwright.com
16

17    FOR THE DEFENDANT AND COUNTERCLAIMANT:

18           MR. CHRISTOPHER C. LARKIN
             Seyfarth Shaw, LLP
19           2029 Century Park East, Suite 3500
             Los Angeles, California  90067
20           310.277.7200
             Clarkin@seyfarth.com
21

22

23    ALSO PRESENT:

24           Mr. Stephen Sacra

25           Ms. Wendy Sacra

1      A.      I'm referring to the square bottle, the
2  black cap, the neck wrap, the trade dress, which is
3  the Jack Daniel's arched logo, the cartouche that's
4  in the middle that says "Old No. 7."
5      Q.      And are you familiar with the trademark
6  that Jack Daniel's has received or Brown-Forman has
7  received for the evolution bottle design?
8      A.      Yes.
9      Q.      Are these elements the same as are
10  included in the registration for the evolution
11  bottle trademark?
12      A.      Yes.
13      Q.      Does the evolution bottle trademark
14  include the black front label?
15          MR. LARKIN:  Don't speculate.  If you
16  need to see it --
17      A.      Okay.  Then show it to me.
18          MR. BRAY:  We're using consistent
19  exhibits, at least for our witnesses, so you can
20  mark that as Exhibit 43.
21          (EXHIBIT NO. 43 PREVIOUSLY MARKED)
22  BY MR. BRAY:
23      Q.      If you would take a look at Exhibit 1 to
24  Exhibit 43 --
25          MR. LARKIN:  I'll get it for you.

Christopher Hungerford - July 16, 2015                74

1    BY MR. BRAY:

2        Q.      -- which I'll aver to you,

3    Mr. Hungerford, is the answer and counterclaim as

4    filed by Jack Daniel's.

5            Do you understand this to be the

6    trademark registration -- I'm sorry.

7            Do you understand Exhibit 1, which is

8    trademark registration number 4106178 -- and that's

9    Exhibit 1 to the complaint which is Exhibit 43 to

10   your deposition.

11           Do you understand this trademark to be

12   the trademark that Jack Daniel's obtained for its

13   evolution bottle?

14       A.      Yes.

15       Q.      All right.  Is that the -- are the

16   elements reflected in registration number 4106178

17   the same or different than the combination of

18   elements that you identified as Jack Daniel's trade

19   dress in your opinions?

20       A.      They are similar but not exact.

21       Q.      Okay.  And, for instance, trademark

22   4106178 doesn't include, as part of its elements, a

23   black front label bearing the Jack Daniel's and Old

24   No. 7 brand marks and other elements in white,

25   correct?

1          A.      I do not see that here.

2          Q.      Okay.  How did you select the

3    combination of elements that you identified in your

4    opinion as not affecting the cost and quality of

5    Jack Daniel's Tennessee Whiskey?  Or strike that.

6                  How did you identify the combination of

7    elements included in your expert opinion as

8    comprising Jack Daniel's trade dress?

9                  Do you understand that question?

10         A.      I don't.

11                 (BEGIN CONFIDENTIAL EXCERPT)

12   ///

13   ///

14   ///

15

16

17

18

19

20

21

22

23

24

25

```
1              MR. BRAY:  Okay.  All right.  I think we
2    can bring Steve in.
3              MR. LARKIN:  We can go off the
4    Attorneys' Eyes Only portion.
5              (MR. AND MRS. SACRA AGAIN PRESENT)
6    BY MR. BRAY:
7         Q.    Continuing on Exhibit 47, the last part
8    of page 3 under "Materials," go ahead and read
9    those -- read that sentence and then just look up
10   when you're done.
11        A.    Okay.
12        Q.    Okay.  Your expert disclosure says:  "In
13   giving testimony in the above-captioned matter,
14   Mr. Hungerford may rely upon the testimony of other
15   witnesses."
16              Do you see that?
17        A.    Yes.
18        Q.    What other -- what testimony of other
19   witnesses do you anticipate relying on?
20        A.    I think the one I was thinking of was --
21   I'm sure you're talking to Mike Taylor a little
22   later in beverage packaging, because he's the
23   engineering expert.
24        Q.    Okay.  Any others?
25        A.    Phil Epps, who I think is from the
```

1    with each plant, whether it be Lynchburg, our

2    Louisville facility, our external manufacturing, all

3    vendors when it comes to shipping -- or printing and

4    providing shippers and gift boxes and the glass

5    suppliers.  Any part of the materials that make up a

6    package is under her.

7         Q.    Again, going back to Exhibit 47, which

8    is your disclosure of expert opinions that was

9    provided to us on May 8, 2015, you didn't talk to

10   Mr. Taylor to assist you in crafting the opinions

11   that are disclosed in Exhibit 47, did you?

12        A.    No.

13        Q.    In fact, your first discussion with

14   Mr. Taylor regarding this case was not until

15   sometime in June of this year?

16        A.    Yeah, sometime in June.

17        Q.    And you believe that was in conjunction

18   with Jack Daniel's needing to designate witnesses in

19   response to our Rule 30(b)(6) notice?

20        A.    Correct.

21        Q.    Okay.  In drafting the summary of

22   opinions contained in Exhibit 47, you didn't rely on

23   information received from other witnesses in order

24   to draft these opinions, correct?

25        A.    No.  I mean, correct, I did not.

1        Q.      So the opinions contained in Exhibit 47,

2   as they're drafted, are entirely your work done on

3   your own in conjunction with counsel, I understand?

4        A.      Correct.

5        Q.      Mr. Taylor played no role in them?

6        A.      He did not.

7        Q.      You didn't consult with Mr. Taylor

8   before creating these opinions, correct?

9        A.      I did not.

10       Q.      You didn't consult with anybody else --

11  or I'm sorry -- with anybody at Jack Daniel's in

12  order to create these opinions, correct?

13       A.      Correct.

14       Q.      And the only consultation you had --

15  and, again, I don't want to know the substance --

16  was with your counsel or Brown-Forman's counsel?

17       A.      Correct.

18               MR. BRAY:  Would you mark these as

19  Exhibit 48?

20               (EXHIBIT NO. 48 MARKED)

21  BY MR. BRAY:

22       Q.      I've handed you what's been marked as

23  Exhibit 48, Mr. Hungerford, which I'll aver to you

24  is entitled "Defendant and Counterclaimant Jack

25  Daniel's Properties, Inc.'s Responses to Plaintiff

1    and Counterdefendant's First Set of Non-Uniform

2    Interrogatories."

3                    Do you see that?

4        A.        Yes.

5        Q.        I will tell you that, if you'll turn to

6    the last page, they were verified by David Gooder

7    and not by you.  Sometimes witnesses see a lot of

8    legal documents, and they can't remember what

9    they've seen and what they haven't seen.

10                  Take as long as you need to look through

11   this document, Exhibit 48, and tell me if you've

12   seen it before today.

13       A.        Okay.  To be honest, I'm not sure if

14   I've seen it.

15       Q.        Okay.  I'm going to ask you some

16   questions about it.  This may go quick, or it may go

17   slow.  We'll see what you know.

18       A.        Okay.

19       Q.        Take a look on page 9, and then if you

20   could look at Interrogatory No. 2.

21                  And then you're welcome to read the full

22   response which goes on to the next page, but I'm

23   only going to ask you about something in the first

24   paragraph of the response on page 9.

25                  Read as much as you want, and then when

Christopher Hungerford - July 16, 2015          84

1    you've read it, you can look up.

2                  Okay.  Starting on page 18 --

3                  MR. LARKIN:  You mean line 18?

4                  MR. BRAY:  Sorry.

5    BY MR. BRAY:

6        Q.      Before I ask you that, do you recall

7    providing an answer to this interrogatory or -- I

8    know you said you can't recall whether you saw the

9    whole document or not.

10                 Do you have any recollection regarding

11   this particular interrogatory?

12       A.      I have had conversations around that

13   particular statement.

14       Q.      Okay.  Starting on line 18, it states

15   after the colon:

16                 "There have always been numerous 'stock'

17   bottles available for use, and actually in use, as

18   packaging for whiskey in the United States, but the

19   packaging for Jack Daniel's Old No. 7 Tennessee

20   Whiskey has never used such a stock bottle."

21                 Do you see that?

22       A.      I do.

23       Q.      Do you have any knowledge in your

24   position as director of global designs for Jack

25   Daniel's whether or not Jack Daniel's has ever used

Christopher Hungerford - July 16, 2015                    85

1   a stock bottle for its Old No. 7 Tennessee Whiskey?

2          A.      I do not believe we've ever used a stock

3   bottle.

4          Q.      Okay.   How do you know that?

5          A.      Our bottle has always been proprietary

6   because it's blown-in decoration, "blown-in

7   decoration" meaning the words "Jack Daniel's" with a

8   signature.   We've always had something blown into

9   the glass as long as I can remember.

10         Q.      Okay.   Other than whatever it is blown

11  in the signature, do you know whether the actual --

12  otherwise the shape of the bottle that Jack Daniel's

13  has used, whether it's ever conformed to a stock

14  bottle that was otherwise available for purchase

15  from Owens Glass, Owens-Illinois?

16         A.      As far as I know, it's been proprietary.

17         Q.      Okay.   And have you reviewed any

18  documents in terms of going back to the history of

19  the bottles that Jack Daniel's has used for its Old

20  No. 7?

21         A.      Not documents, by formal documents.  The

22  images that I have seen have been either collected

23  photography, actual bottles, or some of the books

24  that have been written by third parties about our

25  products.

1      Q.     And do you have any knowledge regarding

2  the statement that there have always been numerous

3  stock bottles available for use and actually in use

4  as packaging for whiskeys in the United States?

5      A.     Yes.   There are hundreds of stock

6  bottles available for any product you want to use,

7  any product, whiskey, gin, vodka.

8      Q.     Do you know who sells the stock bottles?

9      A.     I don't know any of their names.

10      Q.     Do you know if Owens-Illinois or its

11  predecessors in interest sold stock bottles?

12      A.     I don't know for a fact.

13      Q.     And how far back -- do you know when the

14  first bottle of Jack Daniel's whiskey was sold?

15             Apparently there's some debate about it.

16      A.     To my knowledge -- in the glass bottle?

17      Q.     Yeah.

18      A.     In 1895 I think is the year that I have

19  in mind.

20      Q.     During any time frame, do you have any

21  knowledge as to what a stock whiskey bottle would

22  look like?

23      A.     They can be in many shapes.

24      Q.     Would they be in shapes very similar to

25  the Jack Daniel's shape?

Christopher Hungerford - July 16, 2015          87

```
 1                MR. LARKIN:  Objection to form.
 2  BY MR. BRAY:
 3        Q.    Or do you know if stock bottles were
 4  available in a shape similar to pre-evolution bottle
 5  Jack Daniel's bottles?
 6        A.    I am not aware of any specific square
 7  bottles, if that's what you're referring to, that
 8  are stock.
 9        Q.    You don't know that they don't exist,
10  though, right?
11                MR. LARKIN:  Objection to form.  Calls
12  for speculation.  You can answer.
13        A.    I don't know.
14  BY MR. BRAY:
15        Q.    Have you ever reviewed old Illinois
16  Glass Company, Owens-Illinois, catalogs to review
17  what stock bottles were available for sale?
18        A.    Old?
19        Q.    Yeah.
20        A.    I've never seen an old catalog.
21        Q.    Okay.  Do you have personal knowledge,
22  Mr. Hungerford, as to whether, for Jack Daniel's Old
23  No. 7 Tennessee Whiskey, it has always used a custom
24  proprietary bottle made to the brand specifications
25  from 1894?
```

1              MR. LARKIN:    Asked and answered.

2        A.      My knowledge is that we've always been

3    in a proprietary bottle since we've been in a

4    bottle.

5    BY MR. BRAY:

6        Q.      Somebody has told you that, right?

7        A.      Yes.

8        Q.      You didn't research that on your own?

9        A.      I did not.

10       Q.      So that's what I meant by "personal

11   knowledge," which distinguishes it from my prior

12   question.

13              You haven't gone back and actually

14   looked at old Jack Daniel's bottles and tried to

15   figure this out?

16       A.      I have not.

17       Q.      Okay.  And do you know who told you that

18   you've always heard Jack Daniel's has always used a

19   custom proprietary bottle?

20       A.      It could have been -- I'm not sure.  It

21   could have been someone on the marketing team.  It

22   could have been our PR agent.

23              MR. BRAY:  Mark this as Exhibit 49.

24              (EXHIBIT NO. 49 MARKED)

25

```
 1   BY MR. BRAY:
 2        Q.    I'll represent to you that Exhibit 49
 3   consists of pages from a 1906 illustrated catalog
 4   and price list from Illinois Glass Company.
 5             And have you ever seen Illinois Glass
 6   Company catalogs or price lists before?
 7             MR. LARKIN:  Well, are you -- Mr. Bray,
 8   are you authenticating Exhibit 49?
 9             MR. BRAY:  I'm representing what it is.
10             MR. LARKIN:  Okay.  Well --
11             MR. BRAY:  Obviously --
12             MR. LARKIN:  I mean, we don't know what
13   it is, and we don't know where you got it or
14   anything.  You can certainly ask the witness
15   questions about it.
16             MR. BRAY:  That's all I'm doing.
17             MR. LARKIN:  Okay.
18             MR. BRAY:  I'm not self-authenticating a
19   catalog.
20   BY MR. BRAY:
21        Q.    If you look at page -- let me say:  Have
22   you ever seen a catalog like this before?
23        A.    I have not seen an old catalog like
24   this.  I've seen a newer catalog.  So I'm not sure
25   if it's from Owens or not.
```

1        Q.      Can you recall anything about the

2   catalog that you've seen that you refer to?

3        A.      No.  They were simply binders with lots

4   of images in them.

5        Q.      And do you remember when you've seen

6   that?

7        A.      Maybe a year ago I saw one.

8        Q.      Okay.  Do you remember the context of

9   why you were looking at it?

10       A.      It was for a -- we were looking for a

11  stock bottle for a new product that didn't amount to

12  anything, but...

13       Q.      Okay.  You're familiar with the Jack

14  Daniel's -- I'm having a hard time with your

15  designation of the pre-evolution bottle as "the

16  current bottle."

17       A.      Call it "old" then.

18       Q.      You want to call it "the old bottle"?

19       A.      Yes.

20       Q.      So if we call it the bottle that was the

21  immediate predecessor to the evolution bottle, "the

22  old bottle" --

23       A.      I will be clear.

24       Q.      -- that will be the same bottle that we

25  sometimes referred to as "the current bottle."  So

1    it will be clear as mud in the transcript.

2              In your position as director of global

3    design for Jack Daniel's, the liquor bottle depicted

4    on page VIP 00280 as a stock liquor bottle available

5    for purchase from the Illinois Glass Company, does

6    the middle bottle depicted on that page resemble, in

7    your mind, the old Jack Daniel's bottle?

8              MR. LARKIN:  Objection to form.  You can

9    answer.

10        A.    It has similarities, but it's obviously

11   wider and shorter than Jack.  They even call it a

12   "squat bottle."

13   BY MR. BRAY:

14        Q.    Sure.

15              And this isn't one of your -- it's not

16   in your expert report.  It's not one of the

17   designated 30(b)(6) topics.

18              But as you sit here today, are you

19   familiar with what the packaging was for the Jack

20   Daniel's bottle in 1906 in terms of the bottle?

21        A.    Yes.

22        Q.    And can you describe the differences

23   between the Jack Daniel's 1906 bottle and the bottle

24   depicted in the middle picture of VIP 00280?

25        A.    The neck was different and the -- well,

Christopher Hungerford - July 16, 2015                    92

1   of course, the label, and I'm fairly certain that

2   there was some sort of blown-in deco in the glass

3   itself.

4        Q.      All right.    Take a look at the next page

5   of Exhibit 49, which is VIP 00281, which are more

6   depictions of stock glass bottles from Illinois

7   Glass Company.

8              Does the far left bottle resemble the

9   Jack Daniel's whiskey bottle that was for sale in

10  1906?

11       A.      It has some similarities, yes.

12       Q.      And what are those similarities?

13       A.      Square shape, fluted neck.    I think

14  that's about it.

15       Q.      What differences do you see?

16              Just so the record is clear, what

17  differences can you identify between the bottle

18  depicted on VIP 00281, the far left picture, as

19  compared to the bottle that was being used by Jack

20  Daniel's in approximately 1906 for its Black Label

21  whiskey?

22       A.      To be honest, I'm not remembering if it

23  had the scallops on it or not, which would be around

24  the neck and shoulder.

25       Q.      Do you know at any of your focus

Christopher Hungerford - July 16, 2015                93

1    groups -- Chris, once you get the question, you can
2    tell me if Steve needs to leave -- revealed whether
3    the American consuming public associates -- or let
4    me strike that.
5            Have any of your focus groups revealed
6    that your consumers perceive or expect Kentucky or
7    Tennessee whiskey to appear in a square bottle with
8    a fluted neck?
9            MR. LARKIN:  You can -- if that's the
10   question, you can answer.  We won't go off.
11       A.    I would say yes.
12   BY MR. BRAY:
13       Q.    And there are other American -- strike
14   that.
15            Can you read my question and answer
16   back?
17            MR. LARKIN:  Yeah, I'd like to hear it,
18   too.  And you would, too.
19            THE WITNESS:  Yeah, right.
20            (REPORTER READS THE RECORD)
21            MR. BRAY:  I think we're done with
22   Exhibit 49.
23   BY MR. BRAY:
24       Q.    All right.  If you could go back to
25   Exhibit 48, which are the interrogatory responses,

1   Mr. Hungerford.

2              I am going to ask you about the second

3   paragraph under Interrogatory No. 2 or the response

4   to Interrogatory No. 2.  It starts on page 9, and

5   then it goes to page 10.

6              And then if you could read it, and when

7   you're done reading it, look up and I'll ask you

8   some questions.

9              The second sentence of the paragraph,

10  second paragraph, the bottom of page 9 of

11  Exhibit 48, states:  "Square bottles are generally

12  more difficult to manufacture, and their shape can

13  also create problems in the bottling process."

14             Do you see that?

15       A.    I do.

16       Q.    Do you consider yourself an expert in

17  terms of whether -- the bottling manufacturing

18  process?

19       A.    I am not an expert.

20       Q.    Do you have an opinion whether square

21  bottles generally are more difficult to manufacture

22  than other shaped bottles?

23       A.    I do have an opinion.

24       Q.    What's your opinion?

25       A.    My opinion is that they are more

1    is the interrogatory responses.

2            On page 10 I'm going to ask you about

3    some statements in the second paragraph starting at

4    line 7.  If you want to read that and just look up

5    when you're done?

6        A.    Okay.

7        Q.    The first sentence says, "The main

8    function of a bottle neck wrap is to provide

9    evidence against tampering."

10           Do you see that?

11       A.    Yes.

12       Q.    Do you agree that a bottle neck wrap is

13   functional?

14       A.    Yes.

15       Q.    And then you state -- or I'm sorry.

16   Jack Daniel's Properties, Inc., in its interrogatory

17   response states:  "Everything else, including color,

18   graphics, and whether to conceal the fill line, is a

19   design choice."

20           Do you see that?

21       A.    I do.

22       Q.    Do you know whether you played any role

23   in answering this interrogatory, Mr. Hungerford?

24       A.    I did not play any role in answering

25   this.

1      Q.      Do you agree with the statement that
2  everything else, including color, graphics, and
3  whether to conceal the fill line, is a design
4  choice?
5      A.      Yes.
6      Q.      And when you say that, what's your
7  understanding of what a -- strike that.
8              What do you mean by "design choice"?
9      A.      That shrink wrap -- that neck wrap --
10  excuse me.  The neck wrap for that could be clear.
11  So it was our choice to make it black.  It was our
12  choice to have a black cap.  It was our choice to
13  put a graphic on it.  Those were all choices that we
14  made.
15      Q.      As the director of global design, would
16  you agree with me that there are certain elements of
17  packaging, production design, used by a number of
18  American Tennessee/Kentucky whiskey and bourbons in
19  order to invoke sort of an old-time or classic feel?
20              MR. LARKIN:  Objection to form.  If you
21  understand the question, go ahead.
22      A.      I do.
23              Yes, they are more prevalent in labels,
24  but people do use an antiqued finish on a label to
25  make it look old-timey.

```
 1   BY MR. BRAY:
 2        Q.      And when Jack Daniel's or Brown-Forman
 3   includes some of those elements -- well, strike
 4   that.
 5              Brown-Forman includes design elements as
 6   part of its Jack Daniel's Black Label product to
 7   invoke the heritage and history of the product; is
 8   that right?
 9              MR. LARKIN:  Objection to form.
10        A.      Some of the elements on the label evoke
11   history and authenticity, not all of them.
12   BY MR. BRAY:
13        Q.      And as the director of global design, is
14   it your belief that a black-and-white label connotes
15   to consumers history and heritage?
16              MR. LARKIN:  Objection.  You mean any
17   black-and-white label or the one that's on the
18   product at issue in the case?
19              MR. BRAY:  Let's start with the Jack
20   Daniel's black-and-white label, and not focusing on
21   the elements but the fact that it's black and white.
22              THE WITNESS:  Can I mention what we
23   talked about earlier?
24              MR. LARKIN:  Go ahead.  Is this going to
25   get into confidential?
```

```
 1                    THE WITNESS:  Well, it is.
 2               MR. LARKIN:  Sorry.
 3               MR. BRAY:  All right.  Well, we'll text
 4   or send Chris.
 5               MR. SACRA:  We will be sitting in our
 6   two little chairs.
 7               MR. LARKIN:  I don't think it will be
 8   long.
 9                    (EXIT MR. AND MRS. SACRA)
10                    (BEGIN CONFIDENTIAL EXCERPT)
11   ///
12   ///
13   ///
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT J

1    QUARLES & BRADY LLP
     Gregory P. Sitrick
2    Isaac S. Crum
     One Renaissance Square
3    Two North Central Avenue
     Phoenix, Arizona 85004-2391
4    Telephone: (602) 229-5317
     Facsimile: (602) 420-5198
5    E-mail: Gregory.sitrick@quarles.com

6    SEYFARTH SHAW LLP
     Christopher C. Larkin (admitted *pro hac vice*)
7    2029 Century Park East, Suite 3500
     Los Angeles, California 90067-3021
8    Telephone: (310) 201-5289
     Facsimile: (310) 201-5219
9    E-mail: clarkin@seyfarth.com

10    Attorneys for Defendant and Counterclaimant
      JACK DANIEL'S PROPERTIES, INC.

11

12

13                **UNITED STATES DISTRICT COURT**

14                   **DISTRICT OF ARIZONA**

15

| | |
|---|---|
| 16   VIP PRODUCTS, LLC, an Arizona limited liability company, | **Case No. CV 14-02057 PHX DGC** |
| 17             Plaintiff, | **DEFENDANT AND COUNTERCLAIMANT JACK** |
| 18      v. | **DANIELS PROPERTIES, INC.'S RESPONSES TO PLAINTIFF AND** |
| 19   JACK DANIEL'S PROPERTIES, INC., a | **COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR** |
| 20   Delaware corporation, | **ADMISSIONS** |
| 21             Defendant. | |
| 22 | |
| 23   AND RELATED COUNTERCLAIMS. | |

24

25

26

27

28

1    Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") hereby

2 responds to the first set of request for admissions propounded by plaintiff and counter-

3 defendant VIP Products, LLC ("VIP") as follows.

4    These responses are made solely for the purposes of this action.  Each response is

5 made subject to all objections as to competence, relevance, materiality, propriety, and

6 admissibility, and all other objections and grounds which would require the exclusion of

7 any statements contained herein, all of which objections and grounds are expressly

8 reserved and may be interposed at the time of trial in this action.

9    JDPI's responses are based upon the information that is currently available to it.

10 JDPI's investigation and discovery in this action are ongoing and JDPI reserves the right

11 to supplement these responses in the event that additional information is obtained through

12 such investigation or discovery.

13    Nothing contained in these responses is intended to be or should be construed to be

14 an admission by JDPI of the relevance or admissibility at trial of any information

15 contained in these responses.

16                      **GENERAL OBJECTIONS**

17    JDPI objects generally to all of VIP's request for admissions on the following

18 grounds.

19    1.    JDPI objects generally to all of VIP's requests to the extent that they seek to

20 impose upon JDPI discovery obligations beyond those contained in the Federal Rules of

21 Civil Procedure and the Local Rules of the United States District Court for the District of

22 Arizona.

23    2.    JDPI objects generally to all of Plaintiffs' requests to the extent that they

24 seek information that is privileged from disclosure by the attorney-client or attorney work

25 product privileges.

26

27

28

                              2

**RESPONSES TO FIRST SET OF REQUEST FOR ADMISSIONS**

**REQUEST NO. 1:**

Admit that the JACK DANIELS TRADE DRESS is not registered.

**RESPONSE TO REQUEST NO. 1:**

JDPI interposes its General Objections. Without waiving those objections, JDPI responds as follows: JDPI admits that the Jack Daniel's Trade Dress as shown and described in paragraph 6 of JDPI's counterclaims is not registered in the United States Patent and Trademark Office, although various elements are registered, as set forth in JDPI's counterclaims..

**REQUEST NO. 2:**

Admit the Evan Williams bottle depicted here is packaging for distilled spirits.



**RESPONSE TO REQUEST NO. 2:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 3:**

Admit the Ezra Brooks bottle depicted here is packaging for distilled spirits.

1
2
3
4
5
6
7
8



9  **RESPONSE TO REQUEST NO. 3:**

10    JDPI interposes its General Objections and also objects specifically to this request

11  on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

12  or defenses in this action nor reasonably calculated to lead to the discovery of admissible

13  evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

14  **REQUEST NO. 4:**

15    Admit the Benchmark bottle depicted here is packaging for distilled spirits.

16
17
18
19
20
21
22



23  **RESPONSE TO REQUEST NO. 4:**

24    JDPI interposes its General Objections and also objects specifically to this request

25  on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

26  or defenses in this action nor reasonably calculated to lead to the discovery of admissible

27  evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

28

4

1

**REQUEST NO. 5:**

2

Admit the Jim Beam Black bottle depicted here is packaging for distilled spirits.

3

4

5

6

7

8

9



10

11

**RESPONSE TO REQUEST NO. 5:**

12

JDPI interposes its General Objections and also objects specifically to this request

13

on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

14

or defenses in this action nor reasonably calculated to lead to the discovery of admissible

15

evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

16

**REQUEST NO. 6:**

17

Admit the Zachariah Harris bottle depicted here is packaging for distilled spirits.

18

19

20

21



22

23

24

25

**RESPONSE TO REQUEST NO. 6:**

26

JDPI interposes its General Objections and also objects specifically to this request

27

on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

28

5

or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 7:**

Admit the Heaven Hill bottle depicted here is packaging for distilled spirits.



**RESPONSE TO REQUEST NO. 7:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 8:**

Admit the Garrison Brothers bottle depicted here is packaging for distilled spirits.



6

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR ADMISSIONS

19631651v.1

**RESPONSE TO REQUEST NO. 8:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 9:**

Admit the el Jimador Tequila Blanco bottle depicted here is packaging for distilled spirits.



**RESPONSE TO REQUEST NO. 9:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 10:**

Admit the el Jimador Tequila Ariejo bottle depicted here is packaging for distilled spirits.



DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR ADMISSIONS

19631651v.1

**RESPONSE TO REQUEST NO. 10:**

JDPI interposes its General Objections and also objects specifically to this request on the grounds that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence and that there is no El Jimador product called "Ariejo." Without waiving those objections and construing "Ariejo" to mean "Añejo," JDPI responds as follows: Admitted.

**REQUEST NO. 11:**

Admit that YOU have never licensed any mark owned by JDP for use on a pet toy.

**RESPONSE TO REQUEST NO. 11:**

JDPI interposes its General Objections. Without waiving those objections, JDPI responds as follows: JDPI admits that it has not licensed any of its marks for pet toys, although it has licensed and authorized the use of various of its marks for pet products such as collars, leashes, and bowls.

**REQUEST NO. 12:**

Admit that YOU presently have no plans to license any mark and/or trade dress owned by JDP for use on a pet toy.

**RESPONSE TO REQUEST NO. 12:**

JDPI interposes its General Objections. Without waiving those objections, JDPI responds as follows: JDPI admits that it presently has no plans to license any of its marks or trade dress for pet toys, although it has licensed, and intends to license, the use of various of its marks for pet products such as collars, leashes, and bowls.

**REQUEST NO. 13:**

Admit that YOU have received no COMMUNICATION from any consumer expressing any confusion as to whether or not JDP and/or JACK DANIELS was the source of the BAD SPANIELS SILLY SQUEAKERS dog toy.

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR ADMISSIONS

19631651v.1

1    **RESPONSE TO REQUEST NO. 13:**

2        JDPI interposes its General Objections.  Without waiving those objections, JDPI

3    responds as follows: Admitted.

4    **REQUEST NO. 14:**

5        Admit that Jack Daniel's whiskey is not sold in pet specialty retailers (e.g. Petco,

6    PetSmart, Pet Value, Pet Supplies "Plus", Global Pet Foods, Pet Supermarket, Petland,

7    Petland Discounts, Unleashed by Petco, Petsense, Mondou, Pet Planet, Pet Food Express,

8    Bosleys Pet Food Plus, Woof Gang Bakery, Pet Club Pet Depot, Jack's Pets, Mud Bay

9    Granary, Chuck and Don's Pet Food, Pet Pros, Concord Pets, Kahoots Pet Store, Krisers,

10   Pet People and any other retailer which generates the majority of its revenue from the

11   sale of pet products, pet supplies, and pet services).

12   **RESPONSE TO REQUEST NO. 14:**

13       JDPI interposes its General Objections and also objects specifically to this request

14   on the ground that it JDPI does not have knowledge of the identity of every "retailer

15   which generates the majority of its revenue from the sale of pet products, pet supplies,

16   and pet services."  Without waiving those objections, JDPI responds as follows:  JDPI

17   admits that Jack Daniel's whiskey is not sold in the identified retailers.

18                                QUARLES & BRADY LLP

19                                SEYFARTH SHAW LLP

20   Dated:  May 14, 2015          By:_____
                                        Christopher C. Larkin
21                                      Attorneys for Defendant and
                                        Counterclaimant
22                                      JACK DANIEL'S PROPERTIES, INC.

23

24

25

26

27

28
                                    9

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on May 14, 2015, I served the foregoing DEFENDANT AND

3

COUNTERCLAIMANT'S RESPONSES TO PLAINTIFF AND COUNTER-

4

DEFENDANT'S FIRST SET OF REQUEST FOR ADMISSIONS on the parties

5

identified below in the manner identified below:

6

**VIP Products LLC (via Electronic Mail and First Class Mail)**

7

David G. Bray, Esq.

8

DICKINSON WRIGHT, PLLC
1850 North Central Avenue, Suite 1400

9

Phoenix, Arizona 85004
Direct Line: 602-285-5033

10

DBray@dickinsonwright.com

11

Christopher C. Larkin

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR ADMISSIONS

19631651v.1

# EXHIBIT K

*"A square shooter like you should have a bottle to match"*

Finally, Lem's determined arguing wore down his uncle's stubborn resistance; they would give it a try.

The Alton Glass Company had been sending their representative down from Illinois for months to call on Mr. Daniel, receiving nothing but polite turndowns for their efforts. Now the frustrated rep was invited to return. According to the late Mr. Overton Thompson, the sale was effected as follows:

The Alton man was getting nowhere; none of his standard samples were impressing Mr. Daniel. In desperation, he reached for his final sample. It was a radical design, new and untested: a square bottle with a fluted neck.

As though saving the best 'til last, he produced the bottle with a flourish, and proclaimed in his best salesman's rhetoric: "A square shooter like you, Mr. Daniel, should have a bottle to match!" And he leaned back, waiting for Mr. Daniel's response.

Jack studied the bottle. The fact that no other whiskey was bottled in square bottles, he figured was a plus. His charcoal-mellowed whiskey was different; the bottle he put it in should be different too. He was sold.

So, in the summer of 1895, Lem's kid brother, Tom Motlow, on vacation from school, was put to work bottling whiskey at his Uncle Jack's distillery. Two hundred cases were filled that summer, from barrels personally selected and tasted by Mr. Daniel himself.

16

JDPI004125

  

### Square Bottles

*Since 1895, the standard containers for Jack Daniel's in the quart and fifth sizes has been the square bottle shown here, with only minor modifications. Most obvious is the change in neck contour, and different cap accommodation. Early bottles were cork finished. When cork became hard to get, metal caps were adopted. During World War I, when metal was called up for the war effort, distillers went back to cork temporarily. (L) The oldest bottle is on the left. Long neck, cork finish. (c. 1895) (C) The center bottle is from the 1905-1910 period. Its neck is shorter, contour is more pronounced, and the double-tooled lip indicates some sort of metal cap. Circle embossed around "No. 7." (R) Final bottle is dated by wartime disclaimer around neck, apologizing for reversion to the cork finish. Actually, the stopper confusion was academic; prohibition solved the problem in 1920.*

46

JDPI004126

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP PRODUCTS, L.L.C., an Arizona    )
limited liability company           )
                                    )
    Plaintiff and Counterdefendant; )
                                    )
            vs.                     ) No. 2:14-cv-02057-DGC
                                    )
JACK DANIEL'S PROPERTIES, INC., a   )
Delaware corporation,               )
                                    )
    Defendant and Counterclaimant.  )
_____ )



DEPOSITION OF PHILIP EPPS

Louisville, Kentucky

July 17, 2015




Prepared by:

Catherine Shay, CM

```
 1   Daniel's Black product; right?
 2          A.      I wouldn't say it's different.  I
 3   would say it's less.
 4          Q.      Okay.
 5          A.      But it's a consistent style.
 6          Q.      Fair enough.  If you take a look at
 7   the Tennessee -- you tell me.  I'm sorry, this
 8   document doesn't have a Bates number, but it's a Green
 9   Label Jack Daniel's model.  What's that product
10   called?
11          A.      Green Label.
12          MR. LARKIN:  There you go.
13          Q.      Sometimes you hit things by accident.
14          You would agree there's no filigree on
15   the front label of the Green Label brand extension?
16          A.      Yes.
17          Q.      So there's a little bit of filigree
18   that varies in size -- never mind.  Strike that.
19          Your present position, global brand
20   director, and forgive me if you covered this already,
21   give me kind of the one-minute overview, two-minute
22   overview of your responsibilities and role in the
23   company in this position.
24          A.      So I'm officially only two and a half
25   months into it, I'm still trying to figure it out, but
```

1   the job description really is to manage the strategy

2   and the positioning of Jack Daniel's Tennessee Whiskey

3   Black Label globally to deliver advertising, tool kits

4   and promotional tool kits around the world to ensure

5   consistency from market to market in our

6   communications, to ensure we deliver our annual and --

7   well, our short and long-term business goals.  And

8   then the same breath as well I've taken on

9   responsibility for our licensing.

10          Q.      And in your role as global brand

11  director for Brown-Forman --

12                  MR. LARKIN:  Not for Brown-Forman.

13          Q.      Well --

14                  MR. LARKIN:  For Jack Daniel's.

15          Q.      You're an employee of Brown-Forman

16  with the title of global brand director for Jack

17  Daniel's?

18          A.      Yes.

19          Q.      In that role you're not aware of any

20  licensing by Brown-Forman of the Jack Daniel's mark

21  for use on a pet toy; correct?

22          A.      Correct.

23          Q.      In fact Jack Daniel's would not

24  license to your knowledge any of the Jack Daniel's

25  marks for use on a pet toy out of concern of being

 1  perceived to market to underage individuals?

 2                  MR. LARKIN:  Objection to form.  You

 3  can answer that.

 4                  THE WITNESS:  Yes.  So from my

 5  perspective I don't think we license it just because

 6  we wouldn't think it's an appropriate premium

 7  offering.  I'm not sure actually the underage piece

 8  would come into it.

 9          Q.      Okay.  If Mr. Gooder testified that in

10  fact there would be a concern not the underage piece,

11  would you have any reason to disagree with it?

12          A.      No.

13          Q.      You referred to a tool kit,

14  advertising and promotional tool kits for use around

15  the world.  I'm starting to learn your industry and

16  Brown-Forman but I don't know what an advertising tool

17  kit is.  Can you describe that in a little bit more

18  detail?

19          A.      Yes.  So the theory we would deliver

20  advertising assets so they might be TV spots or TV

21  advertising that would be suitable for specific

22  markets.  It would be print, an out of home

23  advertising, and that might be in the form of a

24  template that can be kind of localized, but that would

25  be the look, the creative design as well as the

Philip Epps - July 17, 2015                    29

1   remember the exact detail, but the key things in there

2   is the licensing strategy, what is it we are trying to

3   do with licensing and what are the key objectives of

4   licensing.

5        Q.    Okay.  Do you know who prepared that

6   Power Point?

7        A.    Tobey.

8        Q.    I won't spend a lot of time with you

9   on this if Mr. Roush is the one with more knowledge,

10  but describe for me as you understand it what

11  objective licensing strategy is, whether it's

12  reflected in that Power Point or otherwise.

13       A.    It links to the strategy of the whole

14  trademark, which is around making friends that have an

15  enjoying relationship for life, and licensing we think

16  really fits into that.

17            The three key objectives as we see

18  them are -- let me get these right.  One is to protect

19  the mark and to protect us outside of class, I forget

20  the class, 31 or 33, I think Dave could have maybe

21  mentioned it.  The other one is to build the equity of

22  the brand.  I'm forgetting the third one.

23       Q.    Mr. Epps, do you know why -- well,

24  from your perspective is it important to protect the

25  Jack Daniel's mark outside the class of goods for

1  spirits?

2       A.    I'm sorry, say that again.

3       Q.    You mentioned that one of the key

4  objections was protecting the mark outside of class.

5              MR. LARKIN:  Objectives, not

6  objections.

7       Q.    Objectives, sorry.  Is that correct?

8       A.    It is.

9       Q.    I assume the class, and I don't know

10 off the top of my head which international classes

11 were liquors or spirits, but I assume what you were

12 referring to protecting it beyond liquors and spirits?

13      A.    Correct.

14      Q.    Do you know why it's a key objective

15 to protect the mark outside of class?

16      A.    That's a good question.  From my

17 perspective we have a huge and powerful trademark.  We

18 want to make sure we protect it.

19      Q.    And the hugely powerful trademark you

20 are referring to is the Jack Daniel's name; correct?

21      A.    No.  It's more than that.

22      Q.    Well, I'll go into that.  Is the most

23 powerful, most valuable trademark that Brown-Forman

24 owns related to Jack Daniel's, the Jack Daniel's name

25 and mark?

Philip Epps - July 17, 2015                      31

1          A.        Yes.

2          Q.        You said it was more than that.  What

3    else is it?

4          A.        So the reason I said that is because

5    my interpretation of what you said was that it was

6    really just the name and the logo.  I believe that the

7    brand is one of the most iconic in the world, and it's

8    more than just that.  What we call the arched logo and

9    the black and white, it's the square bottle, it's the

10   filigree.  It's the perceived potency of the brand,

11   and that's the reason why we see so many people

12   wanting to use that and wanting to band themselves

13   with it.

14         Q.        I assume if some third party in the

15   liquor and bourbon industry wanted -- or you found out

16   that some third party in the liquor and bourbon

17   industry was using the Jack Daniel's mark, that would

18   raise an immediate objection or concern for you?

19         A.        It would.

20         Q.        Okay.  If a third party whiskey -- or

21   a competitor in the whiskey and bourbon field was

22   selling their product in a square bottle, would that

23   raise a similar concern for you?

24              MR. LARKIN:  Objection.  It's

25   hypothetical.  We don't know what else is on the

1    square bottle.

2              Q.       You can answer the question unless

3    Mr. --

4                       MR. LARKIN:  If you understand it, go

5    ahead.

6                       THE WITNESS:  If is just the square

7    bottle then no.

8              Q.       So Jack Daniel's, as the global brand

9    director for Jack Daniel's, you're not asserting Jack

10   Daniel's has the exclusive rights to use a square

11   shaped bottle for a Kentucky or Tennessee Whiskey or

12   bourbon product?

13             A.       Correct.

14             Q.       And there are also other competitors

15   in the Kentucky, Tennessee whiskey bourbon field that

16   use some kind of filigree on their labels; is that

17   correct?

18             A.       They do.

19             Q.       So those elements a competitor could

20   use in some manner or another without necessarily

21   raising an objection at Brown-Forman; correct?

22                      MR. LARKIN:  Objection.  Calls -- it's

23   a hypothetical.  We don't know what else is on the

24   bottle.  You may answer.

25                      THE WITNESS:  Can you ask the question

```
 1   again?
 2          Q.      A competitor could use a square bottle
 3   and some filigree elements under label without
 4   necessarily raising an objection at Jack Daniel's;
 5   correct?
 6                  MR. LARKIN:  Same objection.
 7                  THE WITNESS:  I don't know if I can
 8   answer that.  It depends.
 9          Q.      Okay.  But when you say it depends,
10   there is a circumstance where a competitor could use
11   those elements and you would say, okay, that's not a
12   problem?
13                  MR. LARKIN:  Same objection.  If you
14   can answer.
15                  THE WITNESS:  I don't know.  There's
16   an example where there was a brand that did just that
17   and we objected loudly.
18          Q.      Which one?
19          A.      It's Sweet Revenge was the name of the
20   brand.
21          Q.      And you've reached a settlement
22   agreement with Sweet Revenge?
23          A.      I don't know the details of that.
24          Q.      Are you familiar with the Sweet
25   Revenge bottle that's still being marketed and sold
```

Philip Epps - July 17, 2015                    34

```
 1  today?
 2        A.      No, I haven't seen it since it was...
 3        Q.      Would it surprise you that they are
 4  still selling a square bottle with a fluted neck?
 5              MR. LARKIN:  Objection.  Assumes facts
 6  not in evidence.
 7              THE WITNESS:  I haven't seen it.
 8        Q.      Describe for me generally what you
 9  know about the issue that Brown-Forman had with Sweet
10  Revenge.
11        A.      They were selling a pink liquid in a
12  square bottle with familiar, I'll call it familiar
13  labelling, architecture to ours.  They had a number on
14  that, for instance.  And then they were aggressively
15  merchandising it.  By that I mean trying to get it
16  sold on the shelf next to Jack Daniel's Black Label
17  which assumed an association.
18        Q.      Okay.  Are you familiar with any of
19  the George Dickel whiskey or bourbon products?
20        A.      I know of them.
21        Q.      Okay.  Do you know that on their
22  labels they use the No. 8?
23        A.      Yes.
24        Q.      Okay.  That doesn't raise an objection
25  with Brown-Forman?
```

Philip Epps - July 17, 2015                    35

1          A.        No.

2          Q.        And the only distinction I was trying

3    to make, Mr. Epps, was unlike the square shape, unlike

4    the filigree where there are existing competitors that

5    use certain elements today, if a competitor were to

6    use the Jack Daniel's name or mark under all

7    circumstances unless they were an authorized licensee

8    that would be objectionable at Brown-Forman; correct?

9          A.        Can you say that again, please?

10         Q.        Okay.  Unlike a square bottle or

11   filigree which do exist in some form or the other in

12   competitive brands if a competitor in your sphere were

13   to use the Jack Daniel's name and they weren't an

14   authorized licensee that in all cases would be

15   objectionable to Brown-Forman?

16         A.        It would.

17         Q.        So somebody using Jack Daniel's always

18   is objectionable, they need to be a licensee, correct,

19   an authorized licensee?

20         A.        Yes.

21         Q.        In terms of the square bottle, the

22   filigree, it depends?

23         A.        Yes.

24         Q.        Did you work with -- I don't want any

25   communications you may have had with any lawyer for

```
 1   Brown-Forman, I just want to know if you had
 2   communications.  Did you have any communications with
 3   any counsel for Brown-Forman vis-a-vis the Sweet
 4   Revenge litigation or issue?
 5         A.      Yes.
 6                 MR. LARKIN:  Go ahead.  That's fine.
 7         Q.      Were you involved at all in assisting
 8   or supporting counsel vis-a-vis the litigation with
 9   Sweet Revenge?
10         A.      I had a conversation about --
11                 MR. LARKIN:  Mr. Epps, don't get into
12   the substance.  I think that's a yes or no.
13                 THE WITNESS:  Yes.
14         Q.      Okay.
15                 MR. LARKIN:  Maybe he wants to ask
16   more questions, but with respect to the substance of
17   communications with counsel I suggest you invoke the
18   attorney-client privilege.
19                 THE WITNESS:  Okay.
20         Q.      That's fine.  Mark this as an exhibit.
21          (EPPS DEPOSITION EXHIBIT 56 MARKED).
22         Q.      I've handed you what's been marked as
23   Exhibit 56.  And my question for you, Mr. Epps, is as
24   global brand director for Jack Daniel's, do you have
25   any objection that the Sweet Revenge bottle depicted
```

```
 1           A.        It was, used once for that one
 2    publication.
 3           Q.        You said a minute ago, Mr. Epps, that
 4    Exhibit 57 were examples of magazine and newspapers
 5    advertisements and that may have been why they were
 6    produced to me.  You said before that that today, with
 7    the exception of perhaps one off deals Brown-Forman
 8    doesn't advertise Jack Daniel's Black Label in
 9    magazines; correct?
10           A.        Correct.
11           Q.        Does it advertise Jack Daniel's Black
12    Labels in newspapers today?
13           A.        If it does it's randomly and it's the
14    same with magazines.  We will be in some magazines but
15    not regularly.
16           Q.        And do you know if there's one or two
17    magazines in particular that it's more likely that one
18    off Jack Daniel's Black ad will appear as opposed to
19    another magazine?
20           A.        There aren't any.
21           Q.        Okay.  And I think I know the answer
22    to this, but in the past newspaper and magazine
23    advertising was more important for the Jack Daniel's
24    Black product?
25           A.        Yes.
```

Philip Epps - July 17, 2015                    77

1      Q.      And it's become less important over

2 time?

3      A.      Yes.

4      Q.      Why is that?

5      A.      There's a number of reasons.  So one

6 is the today we're now able to advertise in

7 television, and so there was that gradual move in, I

8 think it was the mid to late 2000, mid to late 2000s

9 where we could do that.

10     Q.      How big -- do you know how big Jack

11 Daniel's advertising marketing budget is for a year?

12     A.      For the U.S.?

13     Q.      Yeah, let's stick with the U.S.

14     A.      Are we allowed to share that?

15     Q.      I don't need the exact number, if you

16 can give me like a range.  If that's confidential --

17              MR. LARKIN:  Let me think about that

18 for a minute.  I think we provided that in a document

19 that was marked confidential so Sacras can remain so I

20 would like your testimony on that to be designated as

21 confidential under the protective order and

22 separately.  You are allowed -- there's a protective

23 order in place in the case that prevents the public

24 dissemination of information that we designate as

25 confidential so we'll designate this as confidential

1   you can answer.

Philip Epps - July 17, 2015                              81

```
 1            Q.        Mr. Epps, are you aware with regard to
 2   the television advertising budget are you aware as to
 3   particular channels or events, sporting events that
 4   Jack Daniel's buys television advertisement for?
 5            A.        Yes.
 6            Q.        Okay.  So I'm guessing it's probably
 7   not Lifetime for Women?
 8            A.        Right.
 9            Q.        Can you give me kind of -- and the
10   exact numbers and or all the details I don't need a
11   comprehensive overview, it's not important for this
12   case.  I'm just curious as kind of the top three
13   television channels or --
14            A.        Yeah.
15            Q.        -- focus for your television
16   advertising?
17            A.        So --
18                      MR. LARKIN:  Do you consider that -- I
19   assume you don't consider that to be confidential?
20                      THE WITNESS:  No, it's fine.
21                      MR. LARKIN:  Just the general types
22   of --
23                      THE WITNESS:  That's fine.  ESPN we
24   spend a little money with ESPN.  We'll spend a
25   significant amount of money what we would call late
```

Philip Epps - July 17, 2015                           82

```
 1   night.  By that we mean kind of the Jimmy Fallon,
 2   Jimmy Kimmel type, that time slot, and then kind of
 3   lifestyle stuff so Discovery, History channel, those
 4   kind of things.
 5            Q.       Is there a certain demographic that
 6   Brown-Forman is attempting to reach through its
 7   television advertising?
 8            A.       Yeah, we'll target broadly speaking
 9   men 25 to 40.
10            Q.       I assume you have no knowledge in
11   terms of the gender breakdown in terms of who buys
12   more dog toys, men or women?
13            A.       I don't.
14            Q.       I assume you do have knowledge who
15   buys more Jack Daniel's Black?
16            A.       I do.
17            Q.       Is it men?
18            A.       It is.
19            Q.       Do you have knowledge of approximate
20   percentage breakdown?
21            A.       I do.
22                     MR. LARKIN:  Is this confidential?
23                     THE WITNESS:  No, this is fine.
24                     MR. LARKIN:  Sorry.
25                     THE WITNESS:  It's about 70 percent
```

1          Q.        Focus groups at all commonly used by

2    brand managers?

3          A.        Yes.

4          Q.        For Jack Daniel's at Brown Forman?

5          A.        Yes.

6          Q.        Okay.  And to your knowledge

7    generally?

8          A.        Yes.

9          Q.        And in your experience focus groups

10   provide valuable feedback to Brown-Forman?

11         A.        Yes.

12         Q.        Would Jack Daniel's make -- would you

13   advise Brown-Forman to make any significant change to

14   the Jack Daniel's Black Label product without focus

15   group input?

16                   MR. LARKIN:  Objection to form.  It's

17   a hypothetical question.  You can answer.

18                   THE WITNESS:  If we were to change --

19   if we would be looking to evolve the product, again we

20   would do it in focus groups.

21         Q.        Fair enough.  You did evolve product

22   in 2008 to 2011 time frame you did use focus groups?

23         A.        Correct.

24         Q.        Not only did you use focus groups in

25   the U.S. you used focus groups in the U.K. too?

1          A.        Yes, and it was the focus groups in
2    the U.K. I sat in.
3          Q.        Do you know whether Brown-Forman used
4    focus groups in any other countries?
5          A.        They did.  I'm not sure exactly which
6    ones they would have been.  I can guess but I'm told
7    not to do that.
8                    MR. LARKIN:  If you know.
9          Q.        All right.  Would you anticipate that
10   for significant markets -- well, strike that.
11                   You can break it down by top five or
12   six, what are the most significant geographic markets
13   for sales of the Jack Daniel's Black product?
14                   MR. LARKIN:  You mean worldwide?
15         Q.        Worldwide.
16                   MR. LARKIN:  Objection to relevance.
17                   THE WITNESS:  Today or 2011?
18         Q.        Let's talk about 2011.  Good point.
19   Thank you, Mr. Epps.
20         A.        Germany, Australia, U.K. and then of
21   course the U.S.  They would have been the big four.
22         Q.        And Australia really likes the Black
23   Label, don't they?
24         A.        They do.
25         Q.        Would you expect that -- or do you

```
 1   know whether or not Brown-Forman did a focus group
 2   with regard to the evolution bottle in Australia?
 3           A.      I don't know.
 4           Q.      Would you expect they would have?
 5           A.      They would.
 6                   MR. LARKIN:  Objection, calls for
 7   speculation.  You can answer.
 8           A.      I didn't.  Well, kind of.
 9           Q.      Did he answer?  You've got the record.
10                   THE REPORTER:  He said they would.
11           Q.      I told you she takes down everything
12   verbatim.
13                   All right.  Television we've covered
14   20 percent of the Jack Daniel's A & P budget.  Is that
15   the biggest line item for A & P for Jack Daniel's?
16           A.      Yes.
17
18
19
20
21
22
23
24
25
```

1          A.       Yeah, from Ms. Phillips one, yeah.

2          Q.       What's that?

3          A.       In terms of what she said about she

4    designed this product based on the Jack Daniel's

5    package.

6          Q.       Okay.  And why did that make an

7    impression on you?

8          A.       Because it felt like an admission.

9          Q.       If the Bad Spaniels toy, if the mold

10   was changed such that the shape mimicked a Jim Beam

11   bottle instead of the evolution bottle, from your

12   perspective as director of Louisville design for

13   Brown-Forman would you then have an issue with the

14   product?

15              MR. LARKIN:  Objection to form.  It's

16   a hypothetical.  We don't know what the product looks

17   like.

18         Q.       It looks exactly like it does now

19   except it's in a Jim Beam shaped bottle.

20              MR. LARKIN:  One of your positions in

21   the case is the Jim Beam bottle is like this bottle so

22   I don't know -- without having him see something I

23   don't think it's fair to ask him to answer that

24   question.

25         Q.       Sitting here today, Mr. -- you are

 1  familiar with what a Jim Beam bottle looks look?

 2          A.      Yeah.

 3          Q.      Jim Beam is probably Jack Daniel's

 4  biggest competitor in the U.S.?

 5          A.      Yeah.

 6          Q.      If you could turn to Exhibit 53.  I'll

 7  show you what it looks like.  It's this document.  And

 8  bottom right there's Bates numbers SAC.  Turn to Page

 9  28.  The picture to the right of SAC 0028 is a Jim

10  Beam bourbon bottle.  Do you see that?

11          A.      I do.

12          Q.      Is that an accurate picture, you

13  understand what a Jim Beam bottle looks like?

14          A.      It is.

15          Q.      So my question to you as director of

16  global design for -- did I get your title right?

17          A.      No.

18          Q.      What's your title?

19          A.      Global brand director.

20          MR. LARKIN:  Wrong witness.

21          Q.      In your position as global brand

22  manager for Jack Daniel's my question to you, Mr.

23  Epps, if VIP produced a Bad Spaniels dog toy that's

24  identical to the toy you are viewing now with the

25  exception that it is in a shape of the Jim Beam bottle

1   depicted on 0028, would you have an issue with it?

2                   MR. LARKIN:  Objection.  Calls for an

3   answer to a hypothetical question.  We don't know what

4   it looks like.

5                   MR. BRAY:  I think you do know what it

6   looks like.

7                   MR. LARKIN:  We don't know what it

8   looks like.  Your description doesn't substitute for

9   the actual product.

10                  Q.    Okay.  Let me circle it.  As you are

11  sitting here today as director of brand, global brand

12  manager for Jack Daniel's you can't tell me that you,

13  Brown-Forman, would have an issue with a Bad Spaniels

14  product identical to the one in the market today

15  except that it's in the shape of a Jim Beam bottle;

16  you can't tell me, right?

17                  MR. LARKIN:  Objection to form.  I

18  don't know what identical product means either.  One

19  of the problems, one of your positions in this case is

20  the Jim Beam bottle and the Jack Daniel's bottle are

21  essentially the same bottles.  I don't know what you

22  mean.  Do you mean if it appears with the white label

23  and some other brand or what?  I don't know how --

24                  MR. BRAY:  There's limits to how I can

25  parse the English language, counsel.  What I'm trying

Philip Epps - July 17, 2015                    104

```
 1   to say and I think you understand me, Mr. Epps, is the
 2   toy I'm talking about was identical to the toy you are
 3   looking at, the Bad Spaniels toy, the label is the
 4   same, everything is the same, the color is the same.
 5   The only difference is the shape of the bottle mimics
 6   the shape of the Jim Beam bottle.  You can't tell,
 7   it's true, Mr. Epps, as the global brand manager of
 8   Brown-Forman you can't tell me whether Brown-Forman
 9   would consider that infringement or not; right?
10              MR. LARKIN:  Objection to relevance
11   and a hypothetical question.  If you understand what
12   he's saying you can answer.
13              THE WITNESS:  I would still have an
14   issue with it.
15         Q.     Why?
16         A.     Because I think to a layman, to a
17   consumer a square bottle with all of this decoration
18   is still a Jack Daniel's interpretation.
19         Q.     Do you agree the evolution -- let me
20   get the nomenclature right again.  Mr. Taylor
21   yesterday afternoon, we talked about three different
22   bottles, the evolution bottle.  He said the bottle
23   immediately preceding that bottle was called a bevel
24   design?
25         A.     Right.
```

Philip Epps - July 17, 2015                    105

1          Q.       And the bottle immediately preceding
2     that was called the old bottle?
3          A.       Right.
4          Q.       And then the bevel design came out in
5     '99, the evolution bottle came out in 2011; right?
6          A.       That sounds right.
7          Q.       Would you characterize the change from
8     the bottle shape, change from the bevel design to the
9     evolution bottle as a slight modification?
10          A.       I would now.
11          Q.       In the past you might have answered
12     differently?
13          A.       As we were looking at it it felt
14     pretty radical but only because we were so close to
15     it.
16          Q.       Okay.  Fair enough.  Going back to
17     preparing for today's deposition, telephone
18     conversation with counsel, interrogatory responses
19     marked as Exhibit 48, the Boozin Gear website, the
20     deposition of Mr. Sacra and Ms. Phillips, did you do
21     anything else to prepare for today's deposition?
22          A.       That was about it.
23          Q.       Mr. Sacra actually gave two
24     depositions in the case.  One was in his personal
25     capacity and then one was as a corporate designee of

1    VIP Products.  Did you read both depositions or only

2    the first one?

3            A.      I only read one of them.

4            Q.      And what's in front of you is Exhibit

5    53.  Have you seen Exhibit 53 before today?

6            A.      No.

7            Q.      Somewhere in your stack of exhibits,

8    Mr. Epps, is Exhibit 40, the notice of deposition.

9    Are you familiar with the evolution bottle when

10   Brown-Forman gets the glass bottle delivered from

11   Owens, Illinois or the other manufacturer it uses,

12   it's just clear glass with the etching, no labels or

13   anything, right, it's just --

14           A.      To my understanding, yes.

15           Q.      All right.  You're not aware that

16   Brown-Forman trying to -- or conducting any study

17   determining what percentage of the American consuming

18   public recognizes just that naked bottle shape as Jack

19   Daniel's?

20           A.      No, I don't know percentage.

21           Q.      Okay.  Not just a percentage, Jack

22   Daniel's or Brown-Forman hasn't conducted a study to

23   try to determine how well-known just the bottle shape

24   is?

25           A.      Not on its own.

Philip Epps - July 17, 2015                    107

1          Q.        Okay.  And as the global brands

2    manager for Brown -- for Jack Daniel's you have no

3    idea what percentage of the American consumer public

4    might recognize a naked evolution bottle as being the

5    bottle that Jack Daniel's comes in; correct?

6          A.        I have a pretty good idea because

7    that's one of the reasons why we felt confident enough

8    to be able to do that ad, JDPI 004452.

9          Q.        Okay, but that's -- the pretty good

10   idea is just based on your perception of things as the

11   global brand manager and your work history at

12   Brown-Forman?

13         A.        Yeah, based on the consumer data we

14   have in terms of brand awareness.

15         Q.        Okay.  But, again, there was never an

16   effort to test awareness just of the naked bottle

17   shape without other elements of the Jack Daniel's?

18         A.        Correct.

19                   MR. LARKIN:  Are you referring to the

20   naked bottle shape with Jack Daniel's, the signature

21   on it or literally the naked bottle shape?

22         Q.        Either one.  You don't have a study

23   for either one, do you?

24         A.        No.

25         Q.        Thank you, counsel.

1                Are you aware of whether or not --

2    would you agree with me that a significant number of

3    American consumers associate a square bottle shape

4    for -- with, I'm sorry, a whiskey or bourbon product?

5                MR. LARKIN:  Objection to form.  Don't

6    speculate.  If you have basis to answer, go ahead.

7    You mean any bourbon product?

8                THE WITNESS:  Yeah, I would agree with

9    that.

10        Q.      Were you involved in the -- strike

11   that.  I think you did say that you were -- you worked

12   with focus groups in the UK vis-à-vis the evolution

13   bottle; right?

14        A.      I observed them, yes.

15        Q.      Observed them.  Are you familiar with

16   the various alternatives that were considered, that

17   were put together by the agency in conjunction with

18   Brown-Forman that were considered by Brown-Forman?

19        A.      Yeah, I remember seeing them.

20        Q.      Did you think in -- in the relevant

21   time frame 2008 to 2011 because I recognize it was a

22   lengthy process, did you think in your positions that

23   you held at Brown-Forman at that time that it would be

24   a good idea to change from the square bottle to a

25   different shape bottle?

```
 1              A.      No.

 2              Q.      Why not?

 3              A.      Because it's part of the brand, and I

 4  think you mentioned a square bottle is now synonymous

 5  with American whiskey and bourbon.  Jack Daniel's is

 6  by far the biggest American whiskey.  If you include

 7  bourbon in that we kind of own that category.  And so

 8  although it's synonymous with the category we are the

 9  leader of that category.

10              Q.      Who is the second biggest, Jim Beam?

11              A.      Yep, Jim Beam.

12              Q.      They spend a lot of money on A & P?

13              A.      I'm sure, yeah.

14              Q.      They sell millions of bottles of --

15              A.      They do.

16              Q.      -- Jim Beam whiskey?

17              A.      They do.

18              Q.      Is it whiskey or bourbon?

19              A.      It's bourbon.  You can call it either.

20              Q.      I had an objection from your counsel

21  earlier.  I was trying to use the right --

22              MR. LARKIN:  Beam is a bourbon.

23              Q.      -- nomenclature?

24              MR. LARKIN:  And a whiskey.

25              Q.      Did any of your positions at
```

1    Brown-Forman have -- well, you've witnessed consumers

2    interact with products or potential products under

3    development in the focus group setting?

4              A.      Yes.

5              Q.      Have you as part of your job witnessed

6    consumers in the field in the real world interact with

7    any of the Brown-Forman products?

8              A.      Yes.

9              Q.      And how so?  What context?

10             A.      I've witnessed consumers picking a

11   bottle up off the shelf, putting it in their basket.

12   I've witnessed consumers ordering it at bars.

13             Q.      You've never witnessed a consumer

14   purchasing a Bad Spaniels liquor?

15             A.      I haven't.

16             Q.      You have no real world experience in

17   terms of observing how a consumer actually reacts to

18   the product; correct?

19             A.      Correct.

20             Q.      Not in the focus group?

21                     MR. LARKIN:  Asked and answered.

22                     THE WITNESS:  Yeah, correct.

23             Q.      Not otherwise?

24             A.      Right.

25                     MR. LARKIN:  Same objection.

Philip Epps - July 17, 2015                    111

1        Q.        Does the Bad Spaniels product in any
2   way make you think that the Jack Daniel's Black Label
3   product contains dog excrement?
4        A.        No.
5                  MR. LARKIN:  Object to form.
6        Q.        Isn't that kind of ridiculous?
7                  MR. LARKIN:  Isn't what kind of
8   ridiculous?
9        Q.        The idea that somebody looking at the
10  Bad Spaniels toy would think that Jack Daniel's
11  contains dog excrement.
12       A.        I don't know how people would react.
13       Q.        I mean, can you imagine in your own
14  mind a chain of thoughts that would lead somebody to
15  think, oh, I looked at this toy, I'm thinking now that
16  Jack Daniel's Tennessee Whiskey actually contains dog
17  excrement??
18                 MR. LARKIN:  Objection to form.  Calls
19  him to speculate about how somebody thinks.
20       Q.        You can answer.
21       A.        I wouldn't think that.  I wouldn't
22  have that interpretation myself, no.
23       Q.        It probably takes a Ph.D. Stanford
24  professor to make that connection, don't you think?
25                 MR. LARKIN:  Objection to form.  Do

```
 1   you want to withdraw the question?  Do you really want
 2   an answer to it?
 3            Q.      I withdraw the question.
 4                    Have you reviewed Dr. Simonson's
 5   report in this matter?
 6            A.      No.
 7            Q.      Is there -- I'm going to get an
 8   objection, but the gist of it is reported, in my
 9   opinion, is that consumers dealing with Bad Spaniels
10   product will create an association such that they now
11   think that Jack Daniel's product somehow contains dog
12   poop or dog excrement.
13                    MR. LARKIN:  Come on.  That's
14   absolutely a mischaracterization of Dr. Simonson's
15   report.  He was examined on that very point and said
16   something totally different.
17                    He hasn't read the report and your
18   characterization is completely inaccurate.
19            Q.      Assuming it was an accurate
20   characterization, you wouldn't agree with that?
21                    MR. LARKIN:  Again calls for
22   speculation.  He's not an expert and he doesn't know
23   what goes on in people's minds.
24            Q.      You can answer the question unless he
25   tells you not to.  He's preserved the record.
```

Philip Epps - July 17, 2015                        113

```
 1          A.        I would be surprised if people thought
 2   that Jack had dog excrement in it having seen this.
 3          Q.        Thank you.   Do you find that Bad
 4   Spaniels product amusing at all?
 5          A.        No.
 6          Q.        Are you a dog owner?
 7          A.        No.  I used to be.
 8          Q.        Have you seen any of the Silly
 9   Squeakers, any of the other Silly Squeakers lines of
10   dog toys other than the Bad Spaniels toys?
11          A.        I saw some of them online.
12          Q.        Any of them funny to you?
13          A.        No, funny isn't the word I would use,
14   no.
15          Q.        What word would you use?
16          A.        Silly.
17          Q.        That's in the title.
18          A.        Yeah.
19          Q.        Do you find the VIP Bad Spaniels toy
20   to be silly?
21          A.        No.
22          Q.        So some of the toys are silly, some of
23   the Silly Squeakers toys you find to be silly but not
24   the Bad Spaniels?
25          A.        No.
```

1          Q.      Why not?

2          A.      I found this one to be bad taste but

3     then I'm more protective of the brand than the other

4     ones.

5          Q.      When you view all the other Bad

6     Spaniels the first thought to your mind this is a

7     serial trademark infringement?

8                  MR. LARKIN:  Objection to form.  What

9     do you mean by serial trademark infringement?  What do

10    you mean?  I mean, do you understand what he means?

11                 THE WITNESS:  That's not my area of

12    expertise.

13         Q.      Did you think reviewing the other Bad

14    Spaniels toys that every one of -- let me clarify.

15    When you reviewed the other toys in the Silly

16    Squeakers lines did you think that each of those toys

17    infringed some company's trademark?

18         A.      Yes.

19         Q.      Do you think Brown-Forman has a right

20    to prevent ridicule or comment on -- strike that.

21                 Would you agree with me as the global

22    brand manager for Jack Daniel's that the Bad Spaniels

23    toy is a parody product?

24                 MR. LARKIN:  Objection to form.  Do

25    you understand what parody means?

Philip Epps - July 17, 2015                    116

1          Q.        Let me have a cleaner record.

2          A.        Okay.

3          Q.        What is the basis for your view that

4    the Bad Spaniels toy diminishes the Jack Daniel's

5    brand?

6          A.        So we would call ourselves a premium

7    price product and so on average, depending where you

8    are in the country we will be between 22 to $26

9    dollars for a 750 bottle.  I've already said how much

10   money we spend to build the brand and promote it.  To

11   have a product out there that some consumers think we

12   endorse that has what I would call bad taste messaging

13   I think diminishes the efforts of the brand over the

14   years.

15         Q.        You're not aware of any lost sales

16   that Jack Daniel's has experienced as a result of the

17   Bad Spaniels product?

18         A.        I'm not.

19         Q.        And in assessing the brand's equity of

20   the Jack Daniel's marks and the value of the Jack

21   Daniel's marks -- strike that.

22                   Brown-Forman does from time to time

23   assess the brand equity and value of the Jack Daniel's

24   trademarks; correct?

25         A.        Correct.

1    Q.        In any of those assessments has

2  Brown-Forman indicated internally that there was any

3  diminution of the brand value or equity as a result of

4  the Bad Spaniels product?

5    A.        Not that I'm aware of.

6    Q.        For purposes of my next question I'll

7  agree just for -- to explore the issue of your

8  characterization of the Bad Spaniels as, what was it,

9  poor taste or bad taste?

10   A.        I think it's in bad taste.

11   Q.        Okay.  Are you aware of Brown-Forman

12  licensing any of its marks on any product that you as

13  the global brand manager would consider to be bad

14  taste?

15   A.        No.

16   Q.        And as global brand manager for

17  Brown-Forman with ultimate responsibility for

18  licensing would you authorize a license by

19  Brown-Forman of a Jack Daniel's mark for any product

20  that you found to be in bad taste?

21   A.        No.

22   Q.        I apologize, Mr. Epps, getting closer

23  to lunch and things run together.  You said I believe

24  that some of the Silly Squeakers toys you thought were

25  silly?

Philip Epps - July 17, 2015                    118

```
 1              A.       Right.
 2              Q.       Okay.  Do you remember which ones?
 3              A.       I don't.  I remember looking at the
 4    PBR one.  I think there was a Corona one, but I don't
 5    remember if they were the exact ones that I thought
 6    were --
 7              Q.       Silly?
 8              A.       Just bad taste.
 9              Q.       Silly can sometimes be humorous;
10    right?
11              A.       Yeah, probably, yeah.
12              Q.       But in the continuum of humor, at
13    least the ones that you recall seeing, the Silly
14    Squeakers products, they may seem silly some of them
15    but none of them became humorous in your mind?
16              MR. LARKIN:  Objection to form.  If
17    you understand the question.
18              THE WITNESS:  My definition of humor
19    is more it has to have a bit more substance or
20    intelligence to it.
21              Q.       So do you think the Bad Spaniels toy
22    does not intelligently convey a message?
23              MR. LARKIN:  Objection to form.  You
24    can answer.
25              A.       No.
```

 1   Daniel's, the mark, identify it with Jack Daniel's

 2   whiskey and bourbon product?

 3           A.      So.

 4           Q.      Whiskey product.  Sorry.

 5           A.      So I don't know if this is answering

 6   your question exactly, but when we research we have an

 7   ongoing consumer research study and we track things

 8   like awareness and usage, and when we track awareness

 9   we track what we call prompted awareness.  So you put

10   out a list of products and say, are you aware of any

11   of these products and that's called prompted

12   awareness.

13                   We then have what we call unprompted

14   awareness which is done before they see those, please

15   list out all of the spirit brands or whiskey brands

16   you know of.  So our prompted awareness is about 98

17   percent.

18           Q.      For Jack Daniel's?

19           A.      For Jack Daniel's Black Label and what

20   we would call our unprompted or our unaided awareness

21   is in the 80s, which is probably one of the highest in

22   the industry.

23           Q.      And in terms of -- you're not aware of

24   Brown-Forman conducting any consumer research study

25   that attempts to parse out awareness by consumers of

```
 1  individual components of the alleged Jack Daniel's
 2  trade dress; correct?
 3              MR. LARKIN:  Other than the Jack
 4  Daniel's mark which as you know is one.
 5          Q.      Other than the Jack Daniel's mark?
 6          A.      Not specifically so, no, not to my
 7  knowledge.
 8          Q.      Okay.  And there are other competing
 9  whiskey and bourbon brands that used arched lettering
10  besides Jack Daniel's; right?
11          A.      I'm sure, yeah.  I can't think of them
12  off the top of my head.
13          Q.      Jim Beam is one.  We have the picture?
14          A.      Yeah.
15          Q.      And Jim Beam is the largest competitor
16  to Jack Daniel's in that segment in the United States?
17          A.      Yeah.  The reason I'm hesitating on
18  that question is that it's interesting -- yes, I'll
19  say yes.
20          Q.      Who is No. 3?
21          A.      One of our biggest competitors is
22  Jameson.
23          Q.      Irish whiskey; right?
24          A.      Right.
25          Q.      Internally, this is more of a
```

```
 1   curiosity question, I promise I'll let you go to lunch
 2   here.  Does Brown-Forman distinguish competition
 3   between Irish or Scottish whiskeys versus other
 4   Kentucky and Tennessee whiskeys and bourbons?
 5                  MR. LARKIN:  Objection to form.  I
 6   don't know what you mean by distinguish competition.
 7   Do you know?  If you understand it, go ahead.
 8                  THE WITNESS:  It doesn't even have to
 9   be a whiskey.  So in the U.K. our biggest competitor
10   is Smirnoff vodka.  It's all based on occasion and
11   usage.
12        Q.     So from Brown-Forman's perspective
13   competitors are other spirits manufacturers?
14        A.     Yeah.
15        Q.     And while it might be relevant as to
16   how you compete against other Tennessee or Kentucky
17   whiskeys and bourbons the big picture wise you look at
18   the competitors by total volume of sales for spirits?
19        A.     I'm not sure I understand your
20   question.  We look at our competitors based on -- we
21   can tell what other brands Jack Daniel's consumers are
22   drinking and that tells us what our biggest
23   competitors are.
24        Q.     Do you have anything else?
25                  MR. SACRA:  No.  I can't think of
```

# EXHIBIT M

**Kentucky** (Distilleries by State)
http://recenteats.blogspot.com/p/the-complete-list-of-american-whiskey.html

***Alltech Lexington Brewing & Distilling Co. (Lyons Spirits)*** Lexington, KY. This brewery makes a malt whiskey, Pearse Lyons Reserve, and Town Branch Bourbon and Rye.

 

***Barrel House Distilling Co.,*** Lexington, KY. This microdistillery is currently marketing vodka but has plans for whiskey under the labels Woodshed Whisky, Barrel House Bourbon and Rock Castle Bourbon.



***Barton 1792 Distillery*** (Sazerac Co.), Bardstown, KY. Constellation Brands sold this Bardstown gem to Sazerac (owners of Buffalo Trace). Beloved for their Bourbon in Kentucky and for their rye in Wisconsin but little known outside those states, they are the makers of the following, some of which use the designation "Clear Spring Distilling Co." and "County Line Distillers":

**1792 Ridgemont Reserve** :

 

**Albertson's Bourbon & Blended Whiskey**



**Bar Code Blended Whiskey (formerly owned by LeVecke)**



**Barton Blended Whiskey**



VIP00343

**Bentley's (Oak Park Distilling)**





**Big House Bourbon (Underdog Spirits)**




**Black Ridge**




**Buck Horn** *(Bourbon Whiskey)*




**Carstairs White Seal Blended Whiskey** *(Bourbon Whiskey)*




**C.B. Jackson** *(Bourbon Whiskey)*



VIP00344