# EXHIBIT RR

Int. Cl.: 33

Prior U.S. Cls.: 47 and 49

Reg. No. 2,633,168

## United States Patent and Trademark Office

Registered Oct. 8, 2002

## TRADEMARK
### PRINCIPAL REGISTER

## YOU CAN ASK FOR JACK ANYWHERE

JACK DANIEL'S PROPERTIES, INC. (DELA-
WARE CORPORATION)
4040 CIVIC CENTER DRIVE
SUITE 528
SAN RAFAEL, CA 94903

FOR: ALCOHOLIC BEVERAGES; NAMELY, DIS-
TILLED SPIRITS, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 3-31-2002; IN COMMERCE 3-31-2002.

OWNER OF U.S. REG. NOS. 582,789, 1,923,981,
AND OTHERS.

SN 76-251,627, FILED 5-3-2001.

GEOFFREY FOSDICK, EXAMINING ATTORNEY

JDPI004392

# EXHIBIT SS

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, L.L.C., an Arizona limited liability company, | |
| Plaintiff, | No. 2:14-cv-02057-DGC |
| v. | |
| Jack Daniel's Properties, Inc., a Delaware corporation | **EXPERT REBUTTAL REPORT OF STEPHEN NOWLIS** |
| Defendant. | |
| Jack Daniel's Properties, Inc., a Delaware corporation, | |
| Counterclaimant, | |
| v. | |
| VIP Products, LLC, an Arizona limited liability company, | |
| Counterdefendant | |

NOW0001

I, Dr. Stephen M. Nowlis, state as follows:

## <u>QUALIFICATIONS</u>

1.    I am the August A. Busch Jr. Distinguished Professor of Marketing in the Olin Business School at Washington University in St. Louis. A copy of my curriculum vitae is attached as Appendix A, which includes a list of the cases where I have testified in the last four years.  I hold a Ph.D. in Marketing and a Master's degree in Business Administration (MBA) from the University of California at Berkeley, Haas School of Business, and a Bachelor's degree in Economics from Stanford University.  My field of expertise is marketing, consumer behavior, survey methods, and decision making.  I have acquired this expertise through my training as a doctoral student, my research and publications, my editorial duties, my work experience, past expert witness consulting work, and classes that I have taught.

2.    I teach marketing management to Executive MBA students and consumer behavior to Ph.D. students.  In my courses, I cover topics such as buyer behavior, developing marketing plans, advertising, sales promotions, retailing, marketing research, and product development.  I also recently taught Brand Management to MBA students.  After completing my undergraduate studies and before starting my MBA program, I worked for two years as an Assistant Buyer for a major retail chain.  In this capacity, I analyzed customer purchase patterns to determine why some products sold better than others.

3.    I have won several awards for my research. One of these awards was the 2001 Early Career Contribution Award from the Society for Consumer Psychology – Sheth Foundation, which is given annually to the most productive young scholar in the field of consumer behavior/marketing. Another of these awards was the 2001 O'Dell Award, given to the *Journal of Marketing Research* (the major journal for marketing research topics) article that has had the greatest impact on the marketing field in the previous five years.  This paper looked at the influence of new product features on consumer brand choice.  I also was found to be one of the top 20 most productive marketing professors in the world in terms of my publications in the top-tier marketing and consumer behavior journals.

NOW0002

4.  I currently serve as an Associate Editor at the *Journal of Marketing Research*.  As an Associate Editor, I review many papers and help determine whether they are acceptable for publication.  The criteria used to assess these papers include how much of a contribution a paper makes, whether its theoretical framework is sound, and whether the data were collected using a proper methodology.  I also serve on the editorial review boards of the *Journal of Consumer Research*, *Journal of Marketing*, *Journal of Consumer Psychology*, and *Marketing Letters*.  In this capacity, I act as a regular reviewer of papers submitted to these journals, to determine whether the papers are fit for publication.

5.  I was asked by counsel representing VIP Products LLC in the matter of VIP Products LLC v. Jack Daniel's Properties and Jack Daniel's Properties v. VIP Products LLC to review the Expert Report submitted by Dr. Gerald R. Ford.  I was asked to assess the claim made by Jack Daniel's Properties that the Ford survey tests and shows that the alleged Jack Daniel's trade dress (1) is famous and (2) has acquired distinctiveness or secondary meaning.[1]  I was also asked to examine the Ford survey in terms of its conclusions regarding likelihood of confusion.  In addition, I was asked to examine the claim made by Jack Daniel's Properties that a different survey, conducted between February 5-8, 2015 by ORC, yielded similar likelihood-of-confusion results to the Ford survey.[2]

6.  Please see Appendix B listing the documents I have reviewed.  As I continue to receive and review additional information, I reserve the right to supplement, revise, or further explain the opinions contained in this report.  I am being compensated for my work on this matter at the rate of $650 an hour. My compensation is not contingent upon the conclusions I reach nor on the outcome of this matter.

---

[1] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 8, 12, 15.
[2] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17.

NOW0003

## SUMMARY OF OPINIONS

7.    The purpose of the Ford survey was, in Dr. Ford's own words, to only "address the issue of likelihood of confusion."[3]  Since the Ford survey was designed to only test likelihood of confusion, it is therefore improper to claim that it also tests for fame and acquired distinctiveness.  Thus, I do not agree with the claim by Jack Daniel's Properties that the Ford survey tests for both fame and acquired distinctiveness, and I do not agree that its results show that the alleged Jack Daniel's trade dress is both famous and has acquired distinctiveness.  In addition, my analysis of Dr. Ford's survey on likelihood of confusion shows that its methodological flaws are so serious that they render its results meaningless for assessing the likelihood of confusion in this matter.  In particular, Dr. Ford designed an improper Control stimulus, did not mimic marketplace conditions, and improperly analyzed his data.  Finally, I do not agree with the claim made by Jack Daniel's Properties that the ORC study provides similar results to the Ford study regarding likelihood of confusion.

### The Ford Survey was Clearly Not Designed to Test for Fame

8.    Jack Daniel's Properties claims that the Ford survey shows that the alleged Jack Daniel's trade dress is famous.[4]  However, Dr. Ford mentions that the purpose of his survey was only to "address the issue of likelihood of confusion."[5]  Indeed, as Dr. Ford himself notes in a published chapter, fame is a different issue, and is analyzed differently, than likelihood of confusion.[6]  In particular, as Dr. Ford notes, "Fame is addressed by a review of such factors as the duration, extent, and geographic reach of advertising and promotion of the mark; the amount, volume, and geographic extent of sales of goods or services

---

[3] Ford Declaration, p. 2; see also, Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17, where it is noted that Dr. Ford's survey assesses likelihood of confusion.

[4] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 8, 15.

[5] Ford Declaration, p. 2; see also, Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17, where it is noted that Dr. Ford's survey assesses likelihood of confusion.

[6] Ford, Gerald L. (2012), "Survey Percentages in Lanham Act Matters," in *Trademark and Deceptive Advertising Surveys*, edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 322-323.

NOW0004

offered under the mark; the extent of actual recognition of the mark; and whether the mark is registered on the principal register.  The issue of recognition of a mark can be addressed by a variety of factors, such as attitude and awareness studies from company files, third-party recognition of the mark, survey evidence, or other evidence."[7]  Clearly, these are different issues than what Dr. Ford tested in his likelihood of confusion survey.

9.    The Ford survey was clearly not designed to test for the fame of the alleged Jack Daniel's trade dress.  Such a survey would require an examination of the fame of the alleged Jack Daniel's trade dress on a whiskey bottle, and not on a dog toy which is spoofing it.  Therefore, I do not agree with the Jack Daniel's Properties claim that the Ford survey shows that the alleged Jack Daniel's trade dress is famous.

### The Ford Survey was Clearly Not Designed to Test for Acquired Distinctiveness

10.    Jack Daniel's Properties claims that the Ford survey also shows that the alleged Jack Daniel's trade dress has acquired distinctiveness or secondary meaning.[8]  However, here again, Dr. Ford mentions that the purpose of his survey was only to "address the issue of likelihood of confusion."[9]  Indeed, secondary meaning is a different issue, and is analyzed differently, than likelihood of confusion.[10]  A survey on the secondary meaning of the alleged Jack Daniel's trade dress would have a different set of questions than the Ford survey on likelihood of confusion.[11]

11.    The Ford survey was clearly not designed to test for the acquired distinctiveness or secondary meaning of the alleged Jack Daniel's trade dress.  Such a survey would require an examination of the secondary meaning of the alleged Jack Daniel's trade dress on a whiskey bottle, and not on a dog toy which is spoofing it.    Therefore, I do not agree with

---

[7] Ford, p. 322;  See also Visa v. JSL, which notes a fame survey conducted by Dr. Itamar Simonson.
[8] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 12, 15.
[9] Ford Declaration, p. 2; see also, Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17, where it is noted that Dr. Ford's survey assesses likelihood of confusion.
[10] Palladino, Vincent N. (2012), "Secondary Meaning Surveys," in *Trademark and Deceptive Advertising Surveys*, edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 322-323.
[11] Palladino.

NOW0005

the Jack Daniel's Properties claim that the Ford survey shows that the alleged Jack Daniel's trade dress has acquired distinctiveness.

## **The Ford Survey Does Not Properly Test Likelihood of Confusion**

12.    I will next analyze the design and results from the Ford study as they relate to likelihood of confusion, as that was the stated purpose of the survey.  My analysis of the Ford survey shows that its methodological flaws are so serious that they render its results meaningless for assessing the likelihood of confusion in this matter.  In particular, Dr. Ford designed an improper Control stimulus, did not mimic marketplace conditions, and improperly analyzed his data.  I will next discuss each of these defects in more detail.

### *Failure to design an appropriate Control stimulus*

13.    Dr. Ford's survey respondents were assigned to either a Test group or a Control group. The Test group of respondents viewed an image of the Bad Spaniels dog toy at issue, and the Control group of respondents viewed a heavily modified image of a dog toy.  The function of a Control group is, as stated by Dr. Ford:  "Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give a Jack Daniel's response to the test cell survey questions, not as a result of Plaintiff's Bad Spaniels dog toy, but rather because of other factors, such as the survey's questions, the survey's procedures, market share or popularity, or some other potential influence on a respondent's answers."[12]  If the Control stimulus is designed properly, it can accurately measure the "baseline" response which captures the "noise" that can come from a survey.  This "noise" can then be removed from the Test results to generate an accurate rate of net confusion.  However, as detailed below, Dr. Ford's Control stimulus was not at all properly designed, thus making it incapable of removing the proper amount of survey "noise" from the Test group.

14.    An extremely important principle of survey design is to ensure that the stimuli shown to the Test group and the Control group are as similar as possible, and differ only in terms

---

[12] Ford, p. 10-11.

NOW0006

of the characteristic whose influence is being tested. [13]  It is also important to have good reason for testing the influence of that particular characteristic.  However, Dr. Ford's choice of a Control stimulus did not adhere to these very important principles of proper survey methodology.

15. My understanding is that Plaintiffs allege the "Jack Daniel's Trade Dress" supposedly consists of the combination of the following features:  (1) A square bottle with a ribbed neck, (2) a black cap, (3) a black neck wrap closure with white printing bearing the Old No. 7 mark, and (4) a black front label with white printing and a filigreed border bearing the Jack Daniel's mark depicted in arched lettering at the top of the label, the Old No. 7 mark contained within a filigreed oval design in the middle portion of he label beneath the Jack Daniel's mark and the words 'Tennessee Sour Mash Whiskey' in the lower portion of the label, with the word 'Tennessee' depicted in script.[14]  However, as mentioned above, neither the Ford survey, nor to my understanding any survey, have shown that the combination of these particular features has acquired distinctiveness or secondary meaning.  Thus, my understanding is that, given there is no evidence of acquired secondary meaning of the alleged Jack Daniel's trade dress, it is improper to even test the influence of these characteristics on likelihood of confusion in the first place.

16. Furthermore, competing brands of whiskey also have the following features:  (1) a ribbed neck, (2) a black cap, (3) a black neck enclosure with white lettering, (4) a black front label with white printing, and (5) arched lettering at the top of the label, and (6) the Old No. 8 in the middle portion of the label.[15]  Based on these facts, and based on, as just mentioned, Jack Daniel's has not established secondary meaning of its alleged trade dress, Dr. Ford's Control dog toy should not have eliminated all of these elements to create the Control dog toy.

17. Yet, Dr. Ford's Control stimulus (1) changed the bottle from a square shape with a ribbed neck to a shape with a rounded top and smooth neck that looks like a wine bottle, (2) changed the black cap with the letters BS on the top and a square neck label to a gold

---

[13] Diamond, p. 399.
[14] Amended Complaint, p. 3-4.
[15] See Appendix C: Amended Complaint, p. 5, ¶23-24; Answer of Jack Daniel's Properties to Amended Complaint, p. 3, ¶¶ 23 and 24; Jack Daniel's Responses to VIP's First Set of Requests for Admissions, pp. 3-6; Request Nos. 2-7.

label that wraps around the neck of the bottle, (3) replaced the words "Old No. 2" on the neck of the bottle with the words "Poo Poo on your Tennessee Carpet," (3) completely removed the black front labeling, (4) replaced the words "The Old No. 2" on the front of the label with "Poo Poo," (5) removed the white filigreed border completely, (6) changed the font on the front of the label and replaced curved letters with straight letters, and (7) even changed the color of the hangtag from black to yellow and removed the white border around it.

 

In addition, the words "Limited Guarantee: For defects in workmanship. To read the full details of our Limited Guarantee, please visit www.vipproducts.com" and "This product is not affiliated with Jack Daniel Distillery" were also removed from the Test dog toy to

7

create the Control toy.  In fact, the only direct similarities between the Test and Control toys are the picture of the dog itself, the design of the "Silly Squeakers" brand name, and some of the words on the back of the hangtag.




18.    Thus, the Control toy is drastically different from the Test toy.  It does not even look like a whiskey bottle anymore,[16] but now looks like, in my opinion, a wine bottle.  The Control toy has also removed all black coloring from the bottle labels, completely changed the fonts, simply removed white borders without replacing them with other types of borders, removed mention of "The Old No. 2" without replacing it with something comparable, and even changed the design and color of the hangtag.

19.    As mentioned above, Dr. Ford discusses the purpose of a Control stimulus in his report as, "Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give a Jack Daniel's response to the test cell

---

[16] See, for example, Diamond, Shari Seidman (2012), "Control Foundations:  Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 212:  "A good control stimulus, if it is a control for an allegedly infringing mark, should appear to be a plausible member of the same product category."

NOW0009

survey questions….because of other factors, such as…...market share or popularity, or some other potential influence on a respondent's answers."[17]  And, Jack Daniel's Properties is claiming that its alleged trade dress is famous.  And yet, less than 1% of respondents seeing the Control dog toy thought that it was put out by Jack Daniel's.  This very low number indicates that the design of the Control dog toy is likely defective.  In particular, this very low number indicates that respondents likely did not even think of the Control dog toy as a whiskey bottle because, if they did, more than 1% of respondents should have mentioned Jack Daniel's, since the alleged Jack Daniel's trade dress is supposedly a famous trade dress of whiskey.

20.    In sum, Dr. Ford failed to adhere to very important survey design principles.  First, he tested the influence of particular design features that are allegedly part of the Jack Daniel's trade dress, and yet these design features have never, to my understanding, been shown to have acquired secondary meaning.  This is improper, since Dr. Ford is testing an issue that, to my understanding, cannot be defended.  In addition, even if Jack Daniel's had been able to establish secondary meaning, the Control dog toy should not have been vastly different from the Test toy.  Instead, the Control dog toy should have replaced the elements of the alleged trade dress with similar elements, and kept other elements that are not part of the trade dress (such as, to my understanding, the color black on the labels or hangtag).  As a result, the Control dog toy is defective and incapable of removing the appropriate level of "noise" from the Test results, thus making it impossible to determine the correct level of net confusion.

### Failure to replicate marketplace conditions

21.    It is important for any stimulus in a likelihood of confusion survey to resemble as closely as feasible what the survey respondent would be able to view in the actual marketplace.[18]  However, Dr. Ford deviated from this important principle in a number of very significant ways.  In particular, Dr. Ford told respondents to "Please look at this dog toy as you

---

[17] Ford, p. 10-11.
[18] See, for example, Swann, Jerre B. (2012), "Likelihood of Confusion," in *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 76.

NOW0010

would if you saw it in a store and were considering purchasing it."[19]  However, Dr. Ford only allowed respondents to see two direct views of the product:  a front view and the back of the hang tag.[20]  Thus, the respondents could not see either side of the product, or the back of the product, or the top of the product (with the word BS on it), or the bottom of the toy (which has a little round button where a squeaking noise is emitted if someone squeezes the toy).



In addition, respondents could not read the front of the hang tag, because it was blocked by the toy and respondents had no way to manipulate the toy so that they could read it.[21] This was true even if the respondent clicked on the survey image to enlarge the image of the toy, because the words on the front of the label were still too small and blurry to read.[22]  And, note that respondents 1001 even said, "The tag says 'Silly S-----S' but because of the toy, I cannot read the bottom word."[23]  Thus, respondents could not read either the details about the product on the front of the hang tag, nor even the brand name

---

[19] Ford, Tab A, p. 6.
[20] Ford, Appendix C, C-19 and C-22.
[21] Ford, Appendix C, C-20.
[22] Ford, Appendix C, C-20.
[23] Ford, Appendix B, B-2.

NOW0011

itself in some cases, because the toy blocked the brand name, and again respondents had no way to handle the product so that the front of the label could be read. And, it is even difficult to read all of the words that appear on the front of the toy itself, such as "43% poo by volume" and "100% smelly" even if the image is enlarged.[24] Thus, Dr. Ford's survey clearly does not fulfill its objective to allow respondents to get the visual information they would be able to get if they were shopping in an actual store.

22.    In addition, if a consumer were shopping for the Bad Spaniels dog toy in a store in the actual marketplace, the consumer would be able to touch the toy. This is important because the toy emits a squeaking noise if squeezed. The failure to allow consumers to have this tactile or auditory information is a major defect in the methodology of the Ford survey.

23.    Finally, Dr. Ford showed respondents a picture of a display of products, and told respondents to "Please look at this display of products for dogs as you would if you saw it in a store and were considering purchasing a dog toy."

 

---

[24] Ford, Appendix C, C-20.

NOW0012

However, the display that Dr. Ford showed to respondents featured both dog toys and dog treats, when it is more common for a display such as this to only feature one type of product (either toys or treats). In addition, it is more common for products to be organized together by brand, whereas Dr. Ford showed the Silly Squeaker products separated by other brands. Furthermore, it is more common for the same product to be on the same hanger rather than separated. And yet, there are two different images of the Bad Spaniels toy separated by other toys, and the Bad Spaniels toys appear to be covering up other types of toys. Finally, it is not possible to read all of the words on the many products shown on the display, whereas in the actual marketplace, consumers would be able to read these words. In sum, the image of the display that Dr. Ford showed to respondents also does not mimic marketplace conditions.

24.    In conclusion, Dr. Ford wanted consumers to view the Bad Spaniels dog toy as they would if they were shopping at a store in the actual marketplace. However, Dr. Ford's survey simply did not allow this, since he did not give respondents the opportunity to see, touch, or hear important information that is in fact available in the actual marketplace. This mistake is a very serious methodological problem, and as a result, in my opinion does not allow for the extrapolation of his results to what would likely happen in the actual marketplace.

### *Failure to properly code and analyze data*

25.    Dr. Ford believes that his survey results show that approximately 29% of respondents were confused between the Bad Spaniels dog toy and Jack Daniel's. However, the Bad Spaniels dog toy is a parody of a Jack Daniel's bottle, and Dr. Ford's results need to be analyzed with this in mind. First, I found that some respondents, in their explanations of their answers, explicitly stated that the product was a spoof while others realized that the Bad Spaniels toy was put out by a different company but were trying to interpret the questions in terms of whether a spoof needs to get permission or approval from the company it is spoofing. For example, respondent 1001 said, "Because they are creating a spoof of a real product so I think they would need permission so they don't get sued for

12

copyrights or something like that" (and this respondent realized in an earlier response that this product was put out by 'Silly somethings.') [25]

26. Also, note that, of the four questions designed to test likelihood of confusion (made or put out, other products made or put out, authorization/approval, and affiliation/connection), the largest group who were counted by Dr. Ford as supposedly confused were those answering the question about authorization or approval.[26] In particular, 27 respondents, or 12.8%, believe that the company needed authorization or approval; 25 respondents, or 11.8%, believe that the dog toy was made or put out by Jack Daniels; 6 respondents, or 2.8%, believed that the company making the dog toy also makes whiskey; and 4 respondents, or 1.9%, believe that the company had a business affiliation or connection. Such results need to, again, be interpreted in light of the fact that the dog toy at issue is a parody. In particular, the largest group of respondents (12.8%) were likely trying to figure out if a parody needs authorization or approval from the company it is spoofing (since the greatest alleged "confusion" from the four likelihood of confusion questions came from the question about authorization or approval).

27. In addition, I found that 20 respondents who were counted by Dr. Ford as supposedly confused (due to their responses to a later question) actually recognized, in response to the initial question about who made or put out the product, that the Bad Spaniels dog toy was in fact made or put out by VIP/Bad Spaniels/Silly Squeakers.[27] Thus, these

---

[25] Respondent 1001 said that the survey was set up such that he/she was unable to read the word coming after "Silly." Other examples of respondents noting the product was a spoof or trying to interpret what a spoof needs to do to get permission or approval from the company it is spoofing include respondent 1012: "Bottle design and name are plays on the Jack Daniel's brand," respondent 1015: "It mimics them," respondent 1020: "It looks like they did a license deal with Jack Daniels" (and who also responded that the product was put out by VIP toys), respondent 1022: "I'm sure the dog toy company that made this toy had to get their permission and legal rights to essentially copy they product in dog toy form" (and who also responded that the product was put out by Bad Spaniels), respondent 1029: "Jack Daniel's because the label resembles and is a play on their label" (and who also responded that the product was put out by Silly Squeakers), respondent 1033: "Because it is a spoof on their label," respondent 1046: "It is similar to a Jack Daniel's label but I do not believe they make any dog products….If it is put out by Jack Daniel's then they would have to give authorization for approval to copy their signature label," and respondent 1194: "The bottle is mimicked after the Jack Daniel BBQ sauce. So they would hold the patent therefore you would have to ask permission to use the image."
[26] 25 respondents, or 11.8%, believe that the dog toy was make or put out by Jack Daniels; 6 respondents, or 2.8%, believed that the company making the dog toy also makes whiskey; 27 respondents, or 12.8%, believe that the company needed authorization or approval; and 4 respondents, or 1.9%, believe that the company had a business affiliation or connection.
[27] Respondents 1001, 1020, 1022, 1029, 1035, 1044, 1054, 1062, 1065, 1095, 1098, 1099, 1106, 1132, 1139, 1147, 1172, 1176, 1179, and 1210.

13

respondents were counted as supposedly confused only because of their response to a latter question about authorization/approval or affiliation/connection, even though they did realize in their response to the initial made-or-put-out question who in fact made or put out the product. In other words, these respondents did in fact know that the product was made or put out by VIP/Silly Squeakers/Bad Spaniels, but likely only mentioned Jack Daniel's to the latter questions about authorization/approval and affiliation/connection because they were trying to interpret these questions in response to their knowledge that the product was made by a different company (VIP) and was a spoof of Jack Daniel's.

28. Thus, my analysis of Dr. Ford's results shows that they need to be interpreted in light of the fact that the Bad Spaniels dog toy is a parody of a Jack Daniel's liquor bottle. When this is done, it is clear that many respondents in fact recognized that the product is made or put out by VIP products, and yet were thinking that VIP would need to get authorization or approval from Jack Daniel's in order to sell such a parody product.

29. In conclusion, my analysis of the Ford survey as it relates to the issue of likelihood of confusion shows that its methodological flaws are so serious that they render its results meaningless for assessing the likelihood of confusion in this matter. In particular, Dr. Ford designed an improper Control stimulus, did not mimic marketplace conditions, and improperly analyzed his data.

### The ORC Survey Does Not Properly Test Likelihood of Confusion

30. Jack Daniel's Properties claims that an ORC survey conducted from February 5-8, 2015 yielded similar likelihood-of-confusion results to the results in the Ford survey.[28] However, this survey is so seriously and fatally flawed that it is impossible to draw any meaningful conclusions about likelihood of confusion. In particular, (1) there is no Control dog toy whatsoever with which to compare against the responses to the Test dog toy, (2) it does not mimic marketplace conditions because not all of the angles of the product can be seen, it is not known that the product makes a squeaking noise if

---

[28] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17; JDPI0355-0396.

NOW0015

squeezed, and the product images cannot even be enlarged so that the words can be properly read, (3) the question, "Who, or what company, if any, do you believe is sponsoring or promoting this dog toy?" and, "What other products or services, if any, do you believe are made or put out by whoever is sponsoring or promoting this dog toy?" are the only questions asked, and improper questions at that, for assessing likelihood of confusion,[29] (4) respondents were not provided with the proper instructions, such as to not guess, and to wear eyeglasses as needed, and (5) the survey was not validated.[30]

31. Because of these serious methodological defects, I do not agree with the claim that the ORC survey provides similar results to the highly flawed Ford survey. In fact, its methodology is so flawed that, in my opinion, it would be improper to rely on its results to form any conclusions about likelihood of confusion.

Dated: July 10, 2015

_____

Dr. Stephen M. Nowlis, Ph.D.

---

[29] For example, note that Dr. Ford in his survey asked questions such as "Who or what company do you believe makes or puts out this product?"
[30] Whereas, for example, Dr. Ford did validate his survey. Validation occurs when it is ensured that survey respondents actually participated in the survey.

NOW0016

# Appendix A:  Vita of Stephen M. Nowlis

Olin Business School, Washington University
One Brookings Dr., Campus Box 1133
St. Louis, MO  63130
Phone:  314-935-5113
email:  nowlis@wustl.edu

## Education

Ph.D.    Business Administration (Marketing concentration), Haas School of Business, University of California at Berkeley, 1994

Thesis:  Competitive Brand Strategies of High-Tier and Low-Tier Brands:  A Consumer Choice Perspective

M.B.A.  Haas School of Business, University of California at Berkeley, 1990

B.A.    Economics, with Distinction, Stanford University, 1986

## Academic employment

Department Chair, Marketing Department, Olin Business School, Washington University, St. Louis, MO, 2014 –

August A. Busch, Jr. Distinguished Professor of Marketing, Olin Business School, Washington University, St. Louis, MO, 2010 -

AT&T Distinguished Research Professor of Marketing, WP Carey School of Business, Arizona State University, Tempe, AZ, 2003-2009

Associate Professor, WP Carey School of Business, Arizona State University, Tempe, AZ, 2000-2003

Assistant Professor, WP Carey School of Business, Arizona State University, Tempe, AZ, 1996-2000

Assistant Professor, Washington State University, Pullman, WA, 1994-1996

## Professional service

Guest Editor, *Journal of Consumer Research*, *Journal of Marketing Research*

Associate Editor, *Journal of Marketing Research*, 2009-

Associate Editor, *Journal of Marketing*, 2011-2014

Associate Editor, *Journal of Consumer Psychology*, 2008-2011

Associate Editor, *Journal of Consumer Research*, 2002-2008

Editorial Review Board, *Journal of Marketing*, 2005-2010, 2014-

Editorial Review Board, *Journal of Consumer Research*, 2000-2001, 2008-

Editorial Review Board, *Marketing Letters*, 2001-

NOW0017

Editorial Review Board, *Journal of Marketing Research*, 2001-2008
Editorial Review Board, *Journal of Consumer Psychology*, 2012-

Ad-Hoc Reviewer, *Marketing Science, Management Science, Journal of Retailing, Current Anthropology, Nonprofit & Voluntary Sector Quarterly, Industrial and Corporate Change,* Reviewer for Association for Consumer Research conferences, American Marketing Association conferences, AMA John A. Howard Doctoral Dissertation Competition, Society for Consumer Psychology conferences.  Program Committee, Association for Consumer Research conference, 2001 and 2003.  Representative of the Society for Consumer Psychology at the main meeting of the American Psychological Association, 2001.  Advisory Board for the MSI-JCP Research Competition on Product Assortment and Variety-Seeking in Consumer Choice, 2004.

## Honors and Awards

A January 2009 study in the *Journal of Marketing* (by Seggie and Griffith) found that I am the 18th most productive marketing professor in the world in terms of my publications in top-tier marketing journals.

My doctoral student, Maura Scott, won Honorable Mention (2nd place) for the 2009 Ferber Award (best paper based on a dissertation), for our paper:  Scott, Maura L., Stephen M. Nowlis, Naomi Mandel, and Andrea C. Morales (2008), "The Effects of Reduced Food Size and Package Size on the Consumption Behavior of Restrained and Unrestrained Eaters," *Journal of Consumer Research*, 35 (October), 391-405.

Winner of the 2008 Emerald Management Reviews Citation of Excellence Award for "A Bite to Whet the Reward Appetite: The Influence of Sampling on Reward-Seeking Behaviors." This award means that this article was selected as one of the top 50 business and management articles from 15,000 published in 2008, and the only article from *Journal of Marketing Research* to receive this award.

Co-Chair of AMA doctoral consortium, 2007

Co-Chair of ACR doctoral symposium, 2006

Ferber Award Judge, 2005

Finalist for Paul Green Award, 2005

Outstanding Reviewer Award, *Journal of Consumer Research*, 2002.

Winner of the 2001 William F. O'Dell Award.  Given for the article appearing in the *Journal of Marketing Research* in 1996 that has made the most significant long-term contribution to the marketing discipline in the five year period 1996-2001.

NOW0018

Finalist (top 4) for the 2002 William F. O'Dell Award.  Given for the article appearing in the *Journal of Marketing Research* in 1997 that has made the most significant long-term contribution to the marketing discipline in the five year period 1997-2002.

Winner of the 2001 Early Career Contribution Award from the Society for Consumer Psychology – Sheth Foundation, Division 23, American Psychological Association.  Given annually to the most productive researcher in the field of consumer behavior/marketing who has been a faculty member for less than ten years.

Winner of Best Theoretical Paper award (Stephen M. Nowlis and Deborah B. McCabe), "Online vs. Off-line Consumer Decision Making: The Effect of the Ability to Physically Inspect Merchandise," at 2nd INFORMS "Marketing Science and the Internet:  Understanding Consumer Behavior on the Internet," conference, sponsored by Andersen Consulting and the Marshall School of Business, April 29 - 30, 2000.  Prize paid $2500.

Voted Outstanding Graduate Student Instructor, Haas School of Business, University of California at Berkeley, 1992-1993

Winner of Delbert Duncan Award for Best Marketing MBA student, 1988-1990

## Publications

Scott, Maura and Stephen M. Nowlis (2013), "The Effect of Goal Specificity on Consumer Goal Reengagement," *Journal of Consumer Research*, 40 (3), 444-459.

Castro, Iana A., Andrea C. Morales, and Stephen M. Nowlis (2013), "The Influence of Disorganized Shelf Displays and Limited Product Quantity on Consumer Purchase," *Journal of Marketin*g, 77 (4), 118-133.

Nowlis, Stephen M., Ravi Dhar, and Itamar Simonson (2010), "The Effect of Decision Order on Purchase Quantity Decisions," *Journal of Marketing Research*, 47 (August), 725-737.

Griskevicius, Vladas, Michelle Shiota, and Stephen M. Nowlis (2010), "The Many Shades of Rose-Colored Glasses:  An Evolutionary Approach to the Influence of Different Positive Emotions," *Journal of Consumer Research*, 37 (2), 238-250.

Frederick, Shane, Nathan Novemsky, Jing Wang, Ravi Dhar, and Stephen M. Nowlis (2009), "Opportunity Cost Neglect," *Journal of Consumer Research*, 36 (4), 553-561.

Scott, Maura L., Stephen M. Nowlis, Naomi Mandel, and Andrea C. Morales (2008), "The Effects of Reduced Food Size and Package Size on the Consumption Behavior of Restrained and Unrestrained Eaters," *Journal of Consumer Research*, 35 (October), 391-405.  This paper won Honorable Mention for the 2009 Ferber Award.

Wadhwa, Monica, Baba Shiv, and Stephen M. Nowlis (2008), "A Bite to Whet the Reward Appetite: The Influence of Sampling on Reward-Seeking Behaviors," *Journal of Marketing*

NOW0019

*Research,* 45 (August), 403-413.  This paper won the 2008 Emerald Citation of Excellence Award.

Mandel, Naomi and Stephen M. Nowlis (2008), "The Effect of Making a Prediction about the Outcome of a Consumption Experience on the Enjoyment of that Experience," *Journal of Consumer Research*, 35 (June), 9-20.

Kahn, Barbara E., Mary Frances Luce, and Stephen M. Nowlis (2006), "Debiasing Insights from Process Tests," *Journal of Consumer Research,* 33 (June), 131-138.

Nowlis, Stephen M. and Baba Shiv (2005), "The Influence of Consumer Distractions on the Effectiveness of Food Sampling Programs," *Journal of Marketing Research*, 42 (May), 157-168.

Shiv, Baba, Alexander Fedorikhin, and Stephen M. Nowlis (2005), "Interplay of the Heart and Mind in Decision Making," in *Inside Consumption:  Frontiers of Research on Consumer Motives, Goals, and Desire*, ed. Ratti Ratneshwar and David Mick.

Nowlis, Stephen, Naomi Mandel, and Deborah Brown McCabe (2004), "The Effect of a Delay Between Choice and Consumption on Consumption Enjoyment," *Journal of Consumer Research*, 31 (December), 502-510.

Shiv, Baba and Stephen M. Nowlis (2004), "The Effect of Distractions while Tasting a Food Sample:  The Interplay of Informational and Affective Components in Subsequent Choice," *Journal of Consumer Research*, 31 (December), 599-608.

Dhar, Ravi and Stephen M. Nowlis (2004), "To Buy or Not to Buy: Response Mode Effects on Consumer Choice," *Journal of Marketing Research*, 41 (November), 423-432.

Nowlis, Stephen M. and Deborah B. McCabe (2004), "The Effect of Examining Actual Products or Product Descriptions on Consumer Preference," *Journal of Consumer Psychology*, 13 (4), 431-439.

Nowlis, Stephen M., Barbara E. Kahn, and Ravi Dhar (2002), "Coping with Ambivalence: The Effect of Removing a Neutral Option on Consumer Attitude and Preference Judgments," *Journal of Consumer Research*, 29 (December), 319-334.

Lemon, Katherine and Stephen M. Nowlis (2002), "Developing Synergies Between Promotions and Brands in Different Price-Quality Tiers," 39 (May) *Journal of Marketing Research,* 171-185.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, Stephen M. Nowlis (2001), "Consumer Research:  In Search of Identity," *Annual Review of Psychology*, 52, 249-275.

19

Simonson, Itamar and Stephen M. Nowlis (2000), "The Role of Explanations and Need for Uniqueness in Consumer Decision Making:  Unconventional Choices Based on  Reasons," *Journal of Consumer Research*, 27 (June), 49-68.

Dhar, Ravi, Stephen M. Nowlis, and Steven J. Sherman (2000), "Trying Hard or Hardly Trying: Context Effects in Choice," *Journal of Consumer Psychology*, 9 (4), 189-200.

Nowlis, Stephen M. and Itamar Simonson (2000), "Sales Promotions and the Choice Context as Competing Influences on Consumer Decision Making," *Journal of Consumer Psychology*, 9 (1), 1-16.

Dhar, Ravi, Stephen M. Nowlis, and Steven J. Sherman (1999), "Comparison Effects On Preference Construction," *Journal of Consumer Research,* 26 (December), 293-306.

Ravi Dhar and Stephen M. Nowlis (1999), "The Effect of Time Pressure on Consumer Choice Deferral," *Journal of Consumer Research*, 25 (March), 369-384.

Nowlis, Stephen M. and Itamar Simonson (1997), "Attribute-Task Compatibility as a Determinant of Consumer Preference Reversals," *Journal of Marketing Research*, 34 (May), 205-218.  This paper was a finalist for the 2002 O'Dell Award.  A Brief of this paper is written by John T. Landry in *Harvard Business Review* (1996), 74 (November/December), 13. This article was reprinted in *The Construction of Preference* (2006), eds. Sarah Lichtenstein and Paul Slovic, Cambridge University Press:  New York, NY, p. 192-219.

Nowlis, Stephen M. and Itamar Simonson (1996), "The Effect of New Product Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46.  This paper won the 2001 O'Dell Award.

Nowlis, Stephen M. (1995), "The Effect of Time Pressure on the Choice Between Brands that Differ in Quality, Price, and Product Features," *Marketing Letters*, 6(4), 287-295.

Simonson, Itamar, Stephen M. Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," *Marketing Science*, 12 (4), 357-377

Simonson, Itamar, Stephen M. Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," *Journal of Consumer Psychology*, 2 (3), 287-306.

## Industry experience

Assistant Buyer, May Company Department Stores, Los Angeles, CA, 1986-1988
Expert Witness Consulting, 2001-

NOW0021

**Expert Witness Consulting (deposition or trial testimony in the last 5 years)**

Kerzner International Resorts, Inc. v. Monarch Casino & Resort, Inc.
- Greenberg Traurig, Las Vegas NV
- Deposition
- 2009

LG Electronics v. Whirlpool Corporation
- Reed Smith, Chicago IL
- Deposition
- 2009

National  Products Inc. v. Gamber-Johnson
- Darby & Darby, Seattle, WA
- Deposition, trial testimony
- 2009

Miller and Tompkins et al. v. Basic Research et al.
- Burbridge, Mitchell & Gross
- Deposition
- 2010

Brighton Collectibles, Inc. v. Coldwater Creek, Inc.
- Sheppard Mullin Richter & Hampton LLP, San Diego, CA
- Deposition
- 2010

North Atlantic Operating Company, Inc., et al. v. DRL Enterprises, Inc
- Cowan Liebowitz & Latman, New York, NY
- Deposition
- 2011

L'Oreal USA Inc. v. Bot Hair et al.
- Alston & Bird, Dallas, TX
- Deposition
- 2011

Youngblood Timepieces, Inc. v. Fossil, Inc., et al.
- Standly and Hamilton LLP, Dallas TX
- Deposition
- 2012

FragranceNet.com, Inc. and Telescents, Inc. v. FragranceX.com, Inc.
- Reitler, Kailas & Rosenblatt, New York, NY
- Deposition

NOW0022

- 2012

Sporting Supplies International Inc. v. Tulammo USA Inc.
- Morrison & Foerster LLP, Los Angeles, CA
- Deposition
- 2012

Morgan v. Gay et al.
- Manning, Curtis, Bradshaw & Bednar LLC, Salt Lake City, UT
- Deposition
- 2012

J.T. Colby & Company, Inc. v. Apple Inc.
- Kirkland & Ellis, New York, NY
- Deposition
- 2012

Meyer v. Telebrands
- Cooper & Dunham, LLP, New York, NY
- Deposition
- 2013

H&R Block Eastern Enterprises, Inc. et al. v. Intuit, Inc.
- Manatt, New York, NY
- Trial testimony
- 2013

Wells v. Abbott Laboratories, Inc.
- Winston & Strawn, Los Angeles, CA
- Deposition
- 2013

CERT v. Starbucks et al.
- Morrison & Foerster LLP, San Francisco, CA
- Deposition, Trial Testimony
- 2014

Hulsey et al. v. WhiteWave Foods Company
- Liner LLP, Los Angeles, CA
- Deposition
- 2014

Fox Broadcasting Company et al. v. DISH Network et al.
- Jenner & Block, Los Angeles, CA
- Deposition
- 2014

NOW0023

Bowe and Morgan v. Public Storage
- Newport Trial Group, Newport Beach, CA
- Deposition
- 2015

His & Her Corp. v. Shake-N-Go Fashion, Inc., et al.
- Steptoe & Johnson, Los Angeles, CA
- Deposition
- 2015

LOEC, Inc. v. Zippmark, Inc. and Zippo Manufacturing Company
- Dykema, Chicago, IL
- Deposition
- 2015

Converse v. Fortune Dynamic
- HFL Law Group, Los Angeles, CA
- Deposition
- 2015

NOW0024

# Appendix B:  List of Documents Reviewed

In addition to the documents I cite in my Expert Report:

1. Expert Report of Martin Wolinsky

2. VIP's Responses to 2nd set of Interrogatories

3. JDPI 0327-0334, 0401-0418

4. JDPI response to first set of non-uniform interrogatories

5. JDPI response to first set of request for production of documents

6. JDPI responses to first set of requests for admissions

7. JDPI answer and counterclaim

8. VIP answer to counterclaim

9. VIP motion to supplement its complaint and counterclaim

10. Expert report of Dr. Itamar Simonson

11. Rule 26(a) disclosure of JDPI

NOW0025

# Appendix C:

**Amended Complaint, p. 5, ¶23-24**



17      23.   The following images depict bottles for bourbon or other corn based whiskey
18   not originating from the Jack Daniels distillery:

1      24.   The bottles depicted in the images above are used by competitors of Jack
2   Daniel's in the sale of distilled spirits, and whiskey in particular.

**Answer of Jack Daniel's Properties to Amended Complaint, p. 3, ¶¶ 23 and 24**

25      23.   JDPI admits the allegations in paragraph 23 of the Amended Complaint.
26      24.   JDPI admits the allegations in paragraph 24 of the Amended Complaint.

3

NOW0026

**Jack Daniel's Responses to VIP's First Set of Requests for Admissions, pp. 3-6; Request Nos. 2-7.**

| | |
|---|---|
| 10 | **REQUEST NO. 2:** |
| 11 | Admit the Evan Williams bottle depicted here is packaging for distilled spirits. |



| | |
|---|---|
| 19 | **RESPONSE TO REQUEST NO. 2:** |
| 20 | JDPI interposes its General Objections and also objects specifically to this request |
| 21 | on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims |
| 22 | or defenses in this action nor reasonably calculated to lead to the discovery of admissible |
| 23 | evidence. Without waiving those objections, JDPI responds as follows: Admitted. |
| 24 | **REQUEST NO. 3:** |
| 25 | Admit the Ezra Brooks bottle depicted here is packaging for distilled spirits. |

3

26

NOW0027



**RESPONSE TO REQUEST NO. 3:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 4:**

Admit the Benchmark bottle depicted here is packaging for distilled spirits.

**RESPONSE TO REQUEST NO. 4:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

NOW0028

1 | REQUEST NO. 5:

2     Admit the Jim Beam Black bottle depicted here is packaging for distilled spirits.



11 | RESPONSE TO REQUEST NO. 5:

12     JDPI interposes its General Objections and also objects specifically to this request

13 on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

14 or defenses in this action nor reasonably calculated to lead to the discovery of admissible

15 evidence. Without waiving those objections, JDPI responds as follows: Admitted.

16 | REQUEST NO. 6:

17     Admit the Zachariah Harris bottle depicted here is packaging for distilled spirits.



25 | RESPONSE TO REQUEST NO. 6:

26     JDPI interposes its General Objections and also objects specifically to this request

27 on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

1    or defenses in this action nor reasonably calculated to lead to the discovery of admissible

2    evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

3    **REQUEST NO. 7:**

4        Admit the Heaven Hill bottle depicted here is packaging for distilled spirits.



12   **RESPONSE TO REQUEST NO. 7:**

13      JDPI interposes its General Objections and also objects specifically to this request

14   on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

15   or defenses in this action nor reasonably calculated to lead to the discovery of admissible

16   evidence.  Without waiving those objections, JDPI responds as follows: Admitted.

NOW0030

# EXHIBIT TT

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


VIP PRODUCTS, LLC, an Arizona          )
limited liability company,             )
                                       )
          Plaintiff and Counterdefendant, )
                                       )
          vs.                          ) Case No.
                                       ) 14-cv-02057-PHX-DGC
JACK DANIEL'S PROPERTIES, INC., a      )
Delaware corporation,                  )
                                       )
          Defendant and Counterclaimant.  )
_____)



DEPOSITION OF STEPHEN SACRA



Phoenix, Arizona
April 23, 2015
8:52 a.m.



REPORTED BY:
GENE RICHARDS, BA, RMR
Certified Reporter
Certificate No. 50026

PREPARED FOR:
(Original)
DISTRICT COURT



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 32

1    Q.   What do they do in the process of getting
2  products from VIP to its ultimate retail customers?
3    A.   There's two different ways.  One is they buy the
4  product from us, we ship the product to their distribution
5  center.  Their sales rep or customer service team will get
6  an order placed to them through the customer, at which
7  point in time they will ship it to the customer or deliver
8  it to the customer.
9        The benefit to using a distributor in the pet
10  industry is that you always have food being delivered.  So
11  if you are a very small store and can't afford to have --
12  you can't afford to just buy a bunch of inventory, a
13  distributor allows you to maybe get one or two toys
14  delivered to you with your food order.  And that's
15  happening twice a week.
16    Q.   When you say "food," you're meaning pet food?
17    A.   Pet food, correct.
18        And another way that we work with the
19  distributors, because our line is ever expanding and no
20  distributor will carry all of the products that we have;
21  if a customer is interested, the distributor will place a
22  drop-ship order, and we will ship directly to the customer
23  for them.
24    Q.   And then customer -- how do they get compensated
25  for their role in that?



Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 33

1      A.    Well, the customer would -- if the customer buys
2    it from the distributor, they pay the distributor, the
3    distributor pays us.  But in the scheme of things we --
4    because we have so many products, we work more directly
5    with one-on-one with our customers than through
6    distributors.
7      Q.    How many customers of the sort you mentioned in
8    your last answer, does VIP currently have?
9      A.    Plus or minus 3,000 would be --
10      Q.    Somewhere in that area?
11      A.    Somewhere in that area.
12      Q.    What do they consist of?
13      A.    They consist of pet food stores, or pet stores,
14    or specifically dog stores.  And we have some parrot
15    stores.  But I think it's called "pet specialty," is the
16    industry term.  And those customers also represent
17    themselves on line, and then those customers also take the
18    same products they have in their stores and sell it on
19    Ebay or sell it however.
20          But we also sell to, like, big box stores like on
21    an order basis, not on a continual basis.  But like
22    Costco.  Or I'm trying to think of any other ones that are
23    outside the pet specialty.  But, obviously, we do all the
24    big box stores:  Petco, Petsmarts, Wal-Mart.
25      Q.    Petco, Petsmart, are pet specialty stores, right?


185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 34

1    A.    Right.    And then Wal-Mart would be a mass
2    retailer.
3    Q.    And that sells everything, including pet
4    supplies?
5    A.    Right.    I think they want to attack Amazon and
6    sell everything.
7    Q.    Other than pet food stores or dog stores and the
8    big box stores, are there other types of customers that
9    VIP currently has?
10    A.    Equestrian is really pet.    And only really the
11    stores that, I mean, that have a pet section.    I mean,
12    it's a huge -- Home Depot recently said they want to get
13    into the pet business.    And it's like tools and pet toys?
14    It's bizarre.    But to each their own, I suppose.
15    Q.    Does VIP ship directly to some portion of its
16    3,000 -- do you call them or consider them retail
17    customers?
18    A.    Yeah, we call them retailers.
19    Q.    Does VIP ship directly to its retail customers,
20    rather than going to a distributor?
21    A.    That is correct.
22    Q.    Is that the more common way in which the product
23    gets from VIP to your retail customers?
24    A.    That is correct.
25    Q.    Let's mark what was previously marked as Exhibit



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 35

1    4 at Ms. Phillips' deposition?

2            (Exhibit No. 4 marked for identification.)

3        Q.    BY MR. LARKIN:  Mr. Sacra, Exhibit 4 was marked

4    at Ms. Phillips' deposition.  Is that the VIP Products

5    product catalog that was available during 2014?

6        A.    That is correct.

7        Q.    And you brought with you actual -- the next

8    iteration of that catalog.  Correct?

9        A.    Correct.

10       Q.    We'll mark that a bit later.

11            Does Exhibit 4 show the entirety of the VIP

12   product line in 2014?

13       A.    For dog toys.

14       Q.    You anticipated my next question.  With respect

15   to --

16       A.    With respect to dog toys.

17       Q.    -- to your pet business, does it show the

18   entirety of the line?

19       A.    For pet business, no, that does not.  For dog

20   toys, it does.  We manufacture things for other people.

21       Q.    Tell me -- on a private-label basis?

22       A.    That is correct.

23       Q.    What sort of products are manufactured on a

24   private-label basis?

25       A.    For pet?



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 56

1    specifically, did I go take a class, or did I go get a
2    book, or go to a library and specifically do that?  No.
3         Q.   Or go on-line and see if there are any studies of
4    how effective disclaimers are?
5         A.   No, no.
6         Q.   That's something that never concerned you?
7         A.   No.
8         Q.   Wrapping up in Exhibit 2, when you created the
9    Cataroma and Buttwiper products, did you believe that the
10   products made it obvious that those did not come from
11   Corona or Anheuser-Busch?
12        A.   Yes.
13        Q.   Why did you use a disclaimer at all?
14        A.   The purpose of a disclaimer is to give someone
15   assurance that this product is not affiliated with another
16   product.
17        Q.   Why did you feel it was necessary to do that, if
18   it was obvious from the product itself, in your mind?
19        A.   It's like the icing on the cake.  When you're
20   making a parody product and you're incorporating -- I'm
21   sorry.  When you're imitating imagery that people are
22   familiar with, it's always a good idea to make sure that
23   you take every precaution possible.
24        Q.   Let's look at -- back to the 2014 catalog,
25   Exhibit 4.  Do you have it in front of you?



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/23/2015

Page 57

1      A.    Page 89?

2      Q.    Yeah.

3      A.    Okay.  It's actually page 32, reference VIP00089.

4      Q.    It's catalog page 32.  We probably ought to use

5   that Exhibit number.  So it's VIP 89 through -- well, is

6   it correct that VIP 89 through VIP 93 showed the bottle

7   toys that were available in 2014?

8      A.    Correct.

9      Q.    Is there a -- you consider each of the products

10  shown in the bottle line to be humorous.  Is that correct?

11     A.    That is correct.

12     Q.    Is there something that's -- is there some common

13  humor to each of the products?  Or do they -- in your

14  mind, are they funny for different reasons?

15          MR. BRAY:  Objection.  Form.

16          THE WITNESS:  There is commonality across the

17  entire product line.

18     Q.    BY MR. LARKIN:  What is that?

19     A.    Well, and that would speak to the parody.  First

20  of all, they're all parody products.  And with the parody

21  product, you realize that people, in their daily lives,

22  take things, maybe, a little bit too seriously.  Companies

23  take themselves a little bit too seriously.  And there's

24  nothing wrong with people having -- taking a moment to

25  look at the juxtaposition of elements of imagery that they



Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 58

1   see in their daily lives, and take a moment to sit back
2   and laugh at it and enjoy the humor in an otherwise pretty
3   serious world that we live in.
4           And, further, you know, we created this line of
5   Silly Squeaker dog toys to reflect things that people have
6   in their everyday life; such as beer bottles, wine
7   bottles, soda bottles, liquor bottles.  These are all
8   things that people interact with every single day.  So
9   it's something that they can relate to.  But then it's
10  also something where we can take imagery in their lives
11  and create humor.
12          So we take these two elements and put them
13  together.  But then as I was talking about earlier about
14  the humanization of the animal, that's been something
15  that's increased over time.
16          If you remember back in the '70s, we had dogs
17  playing poker.  We had dogs playing pool.  You had all
18  this.  And people, they found humor in those things.  And,
19  I mean, it's like a dog would never play pool, but it was
20  funny to see.  Or the idea of a dog carrying a product out
21  of the -- out of the -- out of the frige.
22          So we're doing a play on a dog who doesn't do a
23  human habit; because a dog is not going to drink beer and
24  you wouldn't feed a dog beer; but with the humanization of
25  the animal, what makes this product funny is you're



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 59

1   getting your dog to do something that they normally, in
2   real life, wouldn't be doing.  And people find humor in
3   that.  Just like the dogs playing pool or the dogs playing
4   poker.
5               And so you could have a product that's just a
6   beer bottle that says "beer" on it, but that doesn't
7   connect to the consumer.  Because the con- -- a person in
8   their daily lives doesn't sit there with a generic bottle
9   that says "beer" on it and says, "Oh, drinking a beer."
10  No.  They drink beers, or sodas, or wines, or liquors that
11  are being bombarded in the world around them through
12  advertising, and marketing, and mass -- I don't know if
13  you want to call it the gray fuzz that surrounds us,
14  that's everywhere.
15              And so by taking that imagery and putting it onto
16  a product such as this, you're now making the connection
17  back to the consumer with something that they're familiar
18  with as part of their daily lives.  And you're only
19  incorporating certain small elements to spark that
20  connection.
21              So on another level, the common aspect of all
22  these products is that we -- you know, everyone who has a
23  dog, or a cat, or whatever; they deal -- there's a
24  wonderful positive side about how wonderful they are, and
25  happy they are, and loving they are, and they're your



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 60

1   favorite, they're your pet, and you love them.

2         But the other side of a pet is, you know your

3   dogs do things like they pee, and they poop, and lick

4   themselves, and bite things, and do things that humans

5   don't do.  So you know there's the dog that is mad at you

6   when you come home and goes poop in front of the door, and

7   you open up the door and you smear it across the floor.

8         There's your friend that tells you the story

9   about how they walked out of their bedroom and it was

10  dark, and it's like "Oh, my gosh."  And it's the dog is

11  humiliating, if you will, the human back by saying, you

12  know, "Hey, you left me alone all day.  That wasn't very

13  nice.  So I'm going to do this."  And maybe they do it

14  just because they can.

15        But we take those aspects of a dog, and we make

16  fun of the dog by putting them on there.  And it opens up

17  -- it's something that everybody talks about in their

18  daily life.  It happens every single day to people.  And

19  you're making another association with the dog to the

20  bottle.

21        And as I said before, you know dogs don't drink

22  beer, but if a dog did have a beer, what would it look

23  like?  Well, it would be fun and it would be funny,

24  because dogs are fun and funny.  And it would poke fun at

25  the human-dog relationship.  So those different aspects



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/23/2015

Page 61

1    are what we put together on three different levels.  So
2    you have the dog doing something that is a human behavior.
3            Q.    That would be urination or --
4            A.    No.  No.  No.  Let's take the dog drinking.
5            Q.    Okay, fine.  Sorry.  Go ahead.
6            A.    That's the dog being humanized.  And then you
7    have the dog -- sorry.  I lost my train of thought there.
8            Q.    You said there were three levels?
9            A.    Well, I'm saying you have the humanization of
10   the dog.  Then you have the poking fun of the human-dog
11   relationship.  And bring that all together through using
12   imagery in the human's everyday life and imitating what is
13   a part of their life to make the actual parody work.  So
14   it's not just -- it's not just -- I mean, it's -- it's
15   very complex.
16            But the last part which I talked to earlier is
17   that all the products that we made prior to Silly
18   Squeakers are serious products.  And here we are as a
19   serious company.  But we're all fun people, and we're all
20   trying to enjoy life and have fun and do things.  And a
21   way for us to share that with our consumers is to be able
22   to create a line that is, in a way, kind of parodying us
23   because we're serious and we're making fun now.
24            And we're doing this to, basically, take the
25   world around you, put it into something small and



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/23/2015

Page 62

1    something fun where a human and a dog can interact, they
2    can laugh at each other, they can laugh at their
3    relationship.  They can laugh at the fact that it's poking
4    fun at not only the dog, but imagery and brands that they
5    see in their daily lives.  And, honestly, it's a great
6    thing because we could all use a little bit more humor in
7    our life.
8        Q.   Do you agree that all the bottle products shown
9    on VIP 89 to 93 mimic well-known products?
10            MR. BRAY:  Objection.  Form.
11            THE WITNESS:  Each one of them mimics imagery
12    that people have seen in their daily lives at some point
13    or other.  Each one of them may reflect differently to
14    each person, depending on the experiences that they've
15    had.
16            Some person might -- one person may look at it
17    and go, "All right, I get it."  And then some people will
18    look at it and go, "Oh, my gosh, this is hilarious,"
19    because I've seen this, or I know about this, or this
20    product is awesome.  And they see the imagery and --.
21    But, once again, they reflect back on their dog's carrying
22    a beer through the living room.  Or it says something
23    funny like "Deers Bite" on the front of it; where deers
24    don't normally bite.
25        Q.   BY MR. LARKIN:  You mentioned earlier in your



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 63

1    answer that dogs poop, dogs pee, and so on.  How many of

2    the products that are shown on those five pages

3    reference --

4         A.   A dog's behavior?

5         Q.   -- that bodily function?

6         A.   Well, I'll go through each of the bottles and

7    tell you what each of them references to a dog's --

8         Q.   You want to do that quickly?  Sure.

9         A.   "Drools" is drooling.

10             "HeineSniffin" is two dogs who are smelling each

11   other's back door and saying hello.

12             "Cataroma" is because dogs have an innate want

13   and desire to eat cat litter and stuff inside of it.

14             "Mountain Drool" is drool.

15             "Barks" is barking.

16             "Bite" is biting.

17             "Dos Perros" is just two dogs in friendship, but

18   a lot of people have two dogs.

19             "Smella R Crotch"; that's how dogs say hi to each

20   other.  That happens every time they run into each other.

21             "Pissness" is a dog who is peeing on a fire

22   hydrant because dog's pee on fire hydrants.

23             "Blue Cats Tripping"; cats are not human or dogs.

24   They're crazy.  That's why we have two cats tripping.

25             "Lickate" is a dog licking its privates because



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 192

 1    involved in any of those activities?
 2         A.    That is correct.
 3         Q.    Look at the -- let me just ask that question
 4    generally.  She had no involvement in the design of the
 5    toy; the Bad Spaniels toy?
 6         A.    No.
 7         Q.    Other than whatever you might have shared with
 8    her?
 9         A.    Yeah.
10         Q.    But she didn't come up with a name; didn't
11    interact with Elle Phillips about the design of the toy;
12    or interact with Mr. Bai about the design of the bottle?
13         A.    Absolutely.  What you said is true.
14         Q.    Look at page four of the interrogatory responses,
15    please.
16         A.    Okay.
17         Q.    At the bottom, starting line 22, the response is:
18    "VIP does not 'advertise' in the traditional sense.  It
19    does not place advertisements in magazines, trade
20    journals, nor does it purchase radio or television air
21    time."  Is that also correct today?
22         A.    Yeah, that's correct.
23         Q.    And the only POS materials that the company
24    provides are the ones that you described earlier having to
25    do with the Tuffy line and some of the others?



Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/23/2015

Page 193

1      A.    Yeah.

2      Q.    And look at the top of page five, please.  Line

3   three.  "Social Media:  VIP stopped all social media in

4   2014."

5      A.    Yes, sir.

6      Q.    Have you resumed it?

7      A.    Not planning to do it ever.

8      Q.    I assume the Bad Spaniels product never appeared

9   on any VIP social media?

10     A.    No, not that I'm aware of.

11     Q.    Look at response to interrogatory number five,

12   please.  Farther down that page, please.  Page five.

13     A.    I'm sorry, go ahead.

14     Q.    The question has to do with development,

15   implementation, or review of studies, surveys, focus

16   groups, consumer or market research about the Bad Spaniels

17   toy and the packaging -- and so on.  Have you ever done

18   any sort of formal or informal studies, surveys, focus

19   groups or anything else having to do with the Bad Spaniels

20   product?

21     A.    No.

22     Q.    Look farther down that page, please.  Page five.

23   Interrogatory six.  The question:  "Describe all channels

24   through which Bad Spaniels toy and packaging are marketed,

25   advertised, promoted, distributed, or sold and, if the Bad



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 194

1    Spaniels toy and packaging are sold at retail, identify
2    five representative retailers who carry them."
3            The response is:  "The Bad Spaniels parody dog
4    toy was sold to small pet specialty retailers and
5    distributors of pet products."  And then you reference a
6    list of customers.
7        A.    Yeah.
8        Q.    Have there been any other channels through which
9    the Bad Spaniels toys have been distributed, besides small
10   pet specialty retailers, distributors of the pet products,
11   and over the Internet?
12       A.    Not to my knowledge.
13       Q.    Have there been any new or different channels
14   since the interrogatory answers were served in March of
15   this year?
16       A.    No.
17       Q.    Let's mark as 63 --
18       A.    Can I clarify one thing?
19       Q.    Yes, sure.
20       A.    I know this says "small pet specialty retailers."
21   And as a matter of language, a big-box retailer like
22   Petsmart would qualify.  I mean, it's a pet specialty
23   retailer, but it's not necessarily small.  But that would
24   be the only difference.
25       Q.    Let's mark as 63 the pages identified as VIP 123



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 195

1    to VIP 130 that are referenced in the response to
2    interrogatory number six.
3                (Exhibit No. 63 marked for identification.)
4        Q.    BY MR. LARKIN:  Mr. Sacra, do you recognize
5    Exhibit 63?
6        A.    Yes.
7        Q.    Does that reflect all sales of the Bad Spaniels
8    toy from July 9th, 2014, up until January 29th, 2015?
9        A.    This was printed out and it was a snapshot at the
10   time it was printed out.  And so whatever date that was,
11   that's what it represented.
12       Q.    Well, the first date listed is July 9th, 2014.
13   And the last date listed is January 29th, 2015.
14       A.    Okay.  Using the dates as a reference, you were
15   correct.
16       Q.    I'm sure there have been sales since then.
17       A.    Yeah, right.  But it encapsulates those two dates
18   you mentioned.
19       Q.    Are you familiar with the -- what do you call
20   this?  A sales report?
21       A.    I'm familiar.
22       Q.    What term do you use to describe this document?
23       A.    This document is a report designed to provide
24   information to you specifically.  This is not a report
25   that I look at regularly.



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 216

1    a lengthy quotation that ends about line 19 from the Tommy

2    Hilfiger, Timmy HolediGger case.  And I want to look at

3    the portion of that quotation that begins on line 13

4    starting:

5            "Trademark parodies do convey a message.  The

6    message may be simply that business and product images

7    need not always be taken too seriously; a trademark parody

8    reminds us that we are free to laugh at the images and

9    associations linked with the mark.  The message also may

10   be a simple form of entertainment conveyed by juxtaposing

11   the irreverent representation of the trademark with the

12   idealized image created by the mark's owner."

13           Do you see what I just read?

14       A.   Yes.

15       Q.   What is the message that is conveyed by the Bad

16   Spaniels toy?

17       A.   (No response.)

18       Q.   Is it simply that business and product images

19   need not be always taken too seriously, or is there more?

20       A.   Well, earlier, we went over the entire line of

21   the Silly Squeakers dog toys and what creates a successful

22   parody.  And, yes, the message is that, in a very serious

23   world, that we need to sit back and be able to laugh at

24   ourselves and laugh at the humor of the constant

25   bombardment of advertising and marketing that's going on



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 217

1    around us that's such a predominant part of our lives.

2    And it's humorous to sit back and poke fun at that and

3    laugh at people and laugh at ourselves.

4        Q.    Well, farther down in your response, beginning on

5    line 22, VIP stated:  "So too in this case.  The message

6    of the Bad Spaniels parody dog toy is that business and

7    product images of Jack Daniel's need not always be taken

8    seriously."  Semicolon.  "VIP's trademark parody reminds

9    the public that they are free to laugh at the images and

10    associations linked with the mark."  Do you see that?

11        A.    Yep.

12        Q.    What aspect of the business and product image of

13    Jack Daniel's are you communicating need not be taken too

14    seriously?

15        A.    What aspects of the -- I'm sorry, could you

16    repeat the question?

17        Q.    You said the message of the Bad Spaniels parody

18    dog toy is that business and product images of Jack

19    Daniel's need not always be taken too seriously.  I just

20    want to know what aspect or --

21        A.    It's the entire aspect.  I mean, Jack Daniel's

22    has created a culture around its product.  As do all --

23    most products try to create a culture around that.  And

24    all people who are doing that take it pretty seriously, I

25    mean.  And by making fun of that or poking at them saying,



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 218

1    "Hey, you know what?  I know that you are over here trying
2    to be the best of everything and dominate the world.
3    Well, here's something funny."
4        Q.   Farther down, the last line of that page, line
5    27.  Actually, let's start with the sentence on line 25.
6    "The message is also a form of entertainment conveyed by
7    juxtaposing the irreverent representation of defendant's
8    trademark."  What do you mean by "irreverent
9    representation of defendant's trademark"?
10       A.   We're taking small portions of identifiable parts
11   of the trade dress that people have visual recognition
12   with, and juxtaposing that.  And "juxtaposition," by
13   definition, means comparing two things against one
14   another.  And by making -- we're adding elements to that
15   to make it funny and to relate it to dog owners by adding
16   a dog and making it strictly relate to dog and dog
17   products and things that dogs do.
18       Q.   And your answer says, "In this case involving a
19   common dog behavior."  Is that going number two?
20       A.   That is correct.
21       Q.   And the juxtaposition you reference on the last
22   line of page nine:  "With the idealized image created by
23   JDPI and Jack Daniels"; what are you referring to when you
24   say "idealized image"?
25       A.   Well, the idealized image are all the -- is the



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 219

1   imagery that is drawn up in a person's mind when they
2   reference Jack Daniel's.  So we take small elements of
3   that to be able to key into the person's memory to trigger
4   them to recognize this isn't Jack Daniels, but it's making
5   fun at Jack Daniels.
6        Q.   What is the idealized image?  What does that
7   constitute?  How can you articulate it?
8        A.   Idealized --
9             MR. BRAY:  Objection.  I think it was asked and
10  answered, but go ahead.
11            THE WITNESS:  Didn't I just answer that?
12       Q.   BY MR. LARKIN:  It's your words.  I don't know
13  what you meant by "idealized image."  What does the image
14  consist of?
15       A.   You're asking for specific details?
16       Q.   Yeah.  You're the one who is juxtaposing the
17  idealized image with a common dog behavior that all dog
18  owners can relate to.  And I want to know what the
19  idealized image was?
20       A.   No, that's saying I'm combining a dog behavior
21  with the idealized image; meaning that there are elements
22  of the Jack Daniel's bottle that are being combined with a
23  common dog behavior.  So "with the idealized image created
24  by JDPI," means that you have an idealized image of JDPI,
25  and we're taking that image and we're combining that with



# EXHIBIT UU

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

VIP Products, L.L.C., an Arizona limited
liability company,

        Plaintiff,

   v.

Jack Daniel's Properties, Inc., a Delaware
corporation

        Defendant.

Jack Daniel's Properties, Inc.,
a Delaware corporation,

        Counterclaimant,

   v.

VIP Products, LLC, an Arizona limited
liability company,

        Counterdefendant

No. 2:14-cv-02057-DGC

**EXPERT REBUTTAL REPORT OF
BRUCE G. SILVERMAN**

SIL0001



# SILVERMAN CONSULTING LLC

<br/>

## **<u>EXPERT REBUTTAL REPORT OF BRUCE G. SILVERMAN</u>**

*VIP PRODUCTS, LLC, AN ARIZONA LIMITED LIABILITY COMPANY,*
*PLAINTIFF*

*vs.*

*JACK DANIEL'S PROPERTIES, INC., A DELAWARE CORPORATION, DEFENDANT*

---

*JACK DANIEL'S PROPERTIES, INC., A DELAWARE CORPORATION,*
*COUNTERCLAIMANT*

*vs.*

*VIP PRODUCTS, LLC, AN ARIZONA LIMITED LIABILITY COMPANY,*
*COUNTERDEFENDANT*

In the United States District Court, District of Arizona

Case No. 2:14-cv-02057-DGC

*July 7, 2015*

SILVERMAN CONSULTING LLC
3168 DONA MEMA PLACE  STUDIO CITY CA 91604
TEL: 323-654-7659  MOBILE: 310-200-7670
BGSLA@ROADRUNNER.COM   WWW.BRUCESILVERMANCONSULTING.COM

SIL0002

TABLE OF CONTENTS

I.    Introduction ....................................................................................................2

II.   Qualifications ..................................................................................................2

III.  Summary of Opinions ....................................................................................7

IV.   Analysis: Dr. Simonson's Report ..................................................................7

V.    What Consumers Think about Bad Spaniels.................................................9

VI.   Other Flaws in Dr. Dr. Simonson's Analysis ..........................................21

VII.  In Conclusion ...............................................................................................26

Exhibit A (Material Reviewed and Considered)................................................29

Exhibit B (Bruce G. Silverman CV) .................................................................31

Exhibit C (Focus Group Transcripts).................................................................50

SIL0003

## I.  INTRODUCTION

1.      I have been retained through the TASA Group, Inc. by the attorneys for VIP PRODUCTS, LLC ("VIP") to analyze and opine upon certain opinions and conclusions offered in the expert report and deposition testimony of Dr. Itamar Simonson on behalf of the Defendant/Counterclaimant, JACK DANIEL'S PROPERTIES, INC. ("JACK DANIEL'S").

2.      My opinions as set forth herein are based, among other things, on the following:

    a)      My more than 45 years of professional experience in the marketing communications industry, as set forth in further detail below;

    b)      A review of the pleadings, exhibits and other material listed in Exhibit "A" of this report;

    c)      A review of Dr. Simonson's report and deposition testimony; and,

    d)      Information gleaned from a Focus Group Study conducted under my direction specifically for this case.

3.      TASA's fees for my services as an expert witness are $620 per hour for consultation and $4,960 per day for deposition or trial testimony.  Additionally, they are to be compensated for travel and preparation expenses associated with my work on this case.  My compensation is not in any way contingent on the outcome of the case.

## II.  QUALIFICATIONS

4.      My name is Bruce G. Silverman.  I am the owner and manager of Silverman Consulting LLC, an advertising and branding consultancy that provides advice

- 2 -

and counsel to advertisers and advertising agencies both in the U.S. and abroad engaged in marketing consumer goods and services. In addition, I work with law firms both as a consultant and as an expert witness on cases relating to false and misleading advertising, trademark infringement, advertising industry custom and practice, publicity rights and media. I have testified in state and federal courts, at arbitrations and before the Copyright Royalty Judges of the Library of Congress.

5.     Attached hereto as Exhibit "B" is a copy of my *curriculum vitae*, which includes a list of cases in which I have given expert witness testimony since the year 2010.

6.     My opinions are based on the knowledge, insights and expertise I have gained over the course of a 45 year career working in the "real world" of advertising.

7.     After graduating with a Bachelor of Arts degree from Adelphi University (Garden City, New York) in 1966 and attending Albany (New York) Law School for one year, I began my advertising career as a messenger at the Ogilvy & Mather ("O&M") advertising agency in New York in late 1967. During my 13+ years at O&M I was very fortunate to work side-by-side with advertising legend David Ogilvy, the agency's founder and one of the three most important advertising figures of the 20th century. Under Mr. Ogilvy's tutelage I became a copywriter, later a copy supervisor, eventually a creative director and finally, a member of the agency's Board of Directors and Senior Vice President/Executive Creative Director of the firm's flagship New York office. At that time O&M was the fifth-largest advertising agency in the United States, serving such clients as American Express, Hershey's, General Foods, Mattel, Mercedes-Benz, Merrill Lynch, Sears, Shell, TWA and Unilever.

SIL0005

8.    I later held similar senior management positions at two other global advertising agencies, Bozell & Jacobs and BBDO, as well as at two top-100 entrepreneurial shops, Asher/Gould and Wong Doody. My clients at those agencies included Autodesk, Apple, American Airlines, Baskin-Robbins, Coldwell Banker, Pepsi-Cola, Quaker Oats, Pizza Hut and Suzuki.

9.    I also served for six years as President/CEO of the principal U.S. unit of the world's largest ($22 billion in annual billings) media planning and buying agency, Initiative Worldwide, which represented such clients as Carl's Jr/Hardee's, The Walt Disney Company, Honda, The Home Depot, Johnson & Johnson, Taco Bell and Unilever.

10.    The combined budgets of the advertising campaigns I have managed over the course of my career totals more than $65 billion.   A list of clients I served during and after my advertising agency career is included in my CV (Exhibit "B").

11.    I have worked closely with companies that market alcoholic beverages (Stolichnaya and Vincent Van Gogh vodkas, Old Crow bourbon, Gallo and Sebastiani wineries, Pabst Blue Ribbon, Hamm's and Olympia beers, etc.) and pets and pet-related products (e.g., Puppy Palace, Gaines Meal, Purina dog chows, pet toys at Sears, etc.).

12.    Advertising practitioners are most typically recognized within the industry for the campaigns they helped create.  I coined the slogan "Don't Leave Home Without It" for the American Express card, initially positioning it in 1969 as "the new money" and later as "the world's most respected" credit card.  I suggested the design for the now famous Merrill Lynch logo, which grew out of the "Merrill Lynch is Bullish on America" campaign that I created in 1973.  (Merrill Lynch's original logo was a construct of the initials "M, L, P, F & S.")   I helped America rethink its opinion of Mercedes-Benz

- 4 -

automobiles by advertising them as "The Best Engineered Car in the World." (Previously, Mercedes was best known for the giant staff cars that Nazi officials drove around Berlin before and during World War II.)  My global "Shell Answer Man" campaign de-commoditized Shell gasoline, helping propel the company to market leadership for more than a decade.  I created advertising that attacked a salsa made in "Nooo Yawk Ciddy," which resulted in Pace Picante Sauce, then marketed by a tiny company in San Antonio, becoming one of America's best-selling condiments.  I am particularly proud of the role I played in creating a brand called "Big Tobacco," which helped reveal the manipulative and venal nature of the cigarette industry's marketing programs.

13.    I served on the Board of Directors of the American Association of Advertising Agencies (the principal trade association of the advertising industry) and on the boards of the Los Angeles Advertising Agency Association, the Dallas Advertising Club and the Houston Advertising Federation.  I am also a long-standing member of commercials peer group of The Television Academy (the "Emmys" organization).

14.    I have been the recipient of virtually every significant award for creativity and effectiveness offered by the advertising industry, including twice winning the Gold Lion at the Cannes International Advertising Festival, the industry's most prestigious awards competition.  I was also the recipient of the "Effie" Award for advertising effectiveness on three occasions.[1]  I have been interviewed by *The New York Times*, *The Los Angeles Times, The Wall Street Journal*, *The New Yorker* and many other newspapers

---

[1] The Effie Awards are marketing communications awards given yearly by Effie Worldwide, Inc., a nonprofit organization, to honor the most effective marketing communications ideas.  The Effie Awards were started in 1968 in the United States by the American Marketing Association a non-profit organization dedicated to advancing the art of marketing among professionals.

SIL0007

and magazines as well as by on-air personalities at television and radio networks and stations about advertising, branding and media-related issues.

15.     I have taught advertising at Pepperdine University and UCLA Extension, where I also served for five years as a member of the Dean's Board of Advisors.   In addition, I have guest-lectured at many of America's top colleges and universities, among them Arizona State, NYU, Rice University, Southern Methodist, Stanford, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Houston, University of Southern California, University of Texas and the Thunderbird School of Management.

16.     I have written and produced hundreds of national, regional and local television and radio commercials, many of which have been referenced in popular books about advertising or advertising textbooks written by leading academics.  Thousands of the advertisements I created have been published in consumer and business magazines, newspapers, billboards and on web sites.

17.     One of the keys to creating effective advertising campaigns is to "walk in the consumer's shoes;" to do everything possible to understand how they think and feel about the products and services they are considering purchasing.  For that reason, advertisers and agencies spend millions of dollars annually on primary and secondary research studies that provide insights into what consumers understand and believe (or disbelieve) about the client's products and advertising.  In addition to deriving useful information from the thousands of quantitative studies I reviewed related to my client's products and competitors, over the course of my career I estimate that I have personally interviewed more than 5,000 consumers about advertising for products and services

SIL0008

ranging from dog food to business jets. I have observed more than 3,500 focus group sessions as well, including many groups at which alcoholic beverages (whiskey, vodka, beer and wine) and pet products were at issue. I also worked directly with hundreds of the world's best and brightest marketing and advertising professionals, people who directed product development, research, advertising and promotion for many of the most successful brands ever marketed. I shamelessly picked their brains every chance I had.

18.    Altogether, I have spent more than 45 years working closely with hundreds of local, regional, national and global advertisers. This has enabled me to amass a wealth of real-world, practical knowledge about how consumers interact and react to virtually every form of labeling, packaging, advertising and other promotional materials. I therefore believe that I am well qualified to analyze and comment on the opinions put forth by Jack Daniel's expert, Dr. Simonson, as they relate to this matter.

## III. SUMMARY OF OPINIONS

19.    *Please note: My rationale for the opinions that follow are detailed in Sections IV-VI of this report.*

20.    I disagree with Dr. Simonson's opinion that "the largely look-like trade dress (of VIP's Bad Spaniels Silly Squeakers dog toy) associates Jack Daniel's trade dress with defecation."[2]

21.    I disagree with Dr. Simonson's assertion that Jack Daniel's Old Number 7 brand, or any other Jack Daniel's product, has been or will be harmed in any way by association with VIP's Bad Spaniels Silly Squeakers dog toy.[3]

---

[2] Expert Report of Itamar Simonson, May 7, 2011, Paragraph 11.
[3] *Ibid*, Paragraph 14.

- 7 -

SIL0009

## IV. ANALYSIS: DR. SIMONSON'S REPORT

22.    Dr. Simonson's opinions and assertions in this case are primarily based on a theoretical model he describes as the "associative network memory model," which he uses to *speculate* on how Jack Daniel's consumers *might* react after encountering VIP's product.[4]  His opinion relies on an *assumption*: that after encountering VIP's Bad Spaniels dog toy, the <u>main idea</u> consumers would take away from the product is <u>defecation.</u>  In his report he writes, "…the present case involves likelihood of dilution by tarnishment due to the unmistakable (and intended) resemblance of the allegedly diluting VIP product and Jack Daniel's flagship trade dress…"  He continues, "It is different from most other dilution by tarnishment matters because the diluting image involves defecation, which is likely to be particularly aversive and even disgusting as it relates to a beverage."[5]

23.    But what if consumers <u>do not</u> think about VIP's Bad Spaniels dog toy as Dr. Simonson (and his clients) assumes they do?  What if defecation does <u>not</u> play a significant role in their thinking about the toy or how they associate it with Jack Daniel's?

24.    Although Dr. Simonson states in his report that he has "conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to consumer behavior and information processing"[6] and ten of which were conducted in connection with trademark dilution litigation,[7] the opinions he offers in this matter are not based on empirical data.  He did not conduct a quantitative or qualitative consumer survey.  In fact, it does not appear he made any effort whatsoever to determine

---

[4] *Ibid*, Paragraph 12.
[5] *Ibid*, Paragraph 16.
[6] *Ibid*, Paragraph 9.
[7] Deposition of Itimar Simonson, 6/18/2015. Page 20, line 10 – Page 21, line 5.

SIL0010

if *anyone* (other than himself and his clients at Jack Daniel's) had actually come to associate Jack Daniel's with defecation – or would associate it with defecation – after encountering VIP's Bad Spaniels dog toy.

### V. WHAT CONSUMERS THINK ABOUT BAD SPANIELS

25.    VIP's Bad Spaniels squeaky dog toy is, admittedly, a parody or "spoof" product. But does its labeling conjure up the sense of disgust Dr. Simonson assumes it does? Would a reasonable Jack Daniel's consumer agree with him? "Disgust" is the lynchpin on which Dr. Simonson's opinion is based. If consumers do not see VIP's product the way Dr. Simonson does, his speculative opinion is worthless.



*Figure 1. VIP's "Bad Spaniels" dog toy.*

26.    I therefore decided to find out what *unbiased consumers* thought about Bad Spaniels. Accordingly, I arranged a series of four focus groups in Los Angeles on the evening of May 21, 2015 to explore consumer thoughts and feelings about how Bad Spaniels and Jack Daniel's relate to each other, and most importantly, to learn if Dr. Simonson's speculative thinking about "disgust" had validity.

27.    "Focus groups are a research method whereby consumers from the target market are led through a discussion regarding a particular topic. Focus groups give

- 9 -

SIL0011

insight as to why and how consumers use a product or service, what is important to them in choosing a particular brand, what they like and don't like about various products or services, and any special needs they might have that aren't being satisfied."[8]

28.    Focus group studies are regularly used by advertising agencies as well as by research departments at major companies that market products and services to provide guidance for product and packaging development, as well as other marketing activities. In fact, I have learned that focus group studies are one of the research methods used by Jack Daniel's itself to help it evaluate and develop its packaging as well as its marketing strategies.[9]

29.    Dr. Simonson himself testified at his deposition that he has conducted focus group qualitative studies (though not for this case), and in fact has taught about this research methodology in his marketing classes.  He stated that qualitative studies often provide useful insights.[10]  And, as discussed below, he also testified that a focus group study regarding the "disgust" issue would provide useful information.

30.    In his report, Dr. Simonson complained that Mr. Stephen Sacra, VIP's owner, had not tested his assumptions regarding the impact of the VIP product.[11]  At his deposition, he was asked "what type of tests might he (Sacra) have done?"[12]

---

[8] Belch, George E. & Belch, Michael A., *Advertising and Promotion, An Integrated Marketing Communication Perspective, Sixth Edition.* New York, NY, McGraw Hill, 2004, page 250.
[9] *Jack Daniels Global Strategy Highlights for BF140, Brown-Forman Family Shareholder's Committee – June 2, 2011,* pages JDPI-CON000001-13; *A Qualitative Exploratory of New Package Structures for Jack Daniel's Whiskey, December 2008,* JDPI-CON000034-78; *Jack Daniel's Look and Feel Qualitative Research Report,* October 2, 2008, JDPI-CON000079-133; *Packaging Assessment, Jack Daniel's Tennessee Whiskey,* September, 2009, JDPI-CON000134-234; *Package Evaluation Summary Report,* March 2010, JDPI-CON000235-278; *Jack Daniel's Identity Deconstruction – Initial Topline Observations, March 26, 2008,* JDPI-CON000279-311.
[10] Simonson deposition, Page 62, lines 7-15.
[11] Simonson report, Page 5, paragraph 13.
[12] Simonson deposition, Page 100, lines 13-14.

SIL0012

31.    Dr. Simonson's answer: "…he could have just shown this product and say what comes to mind.  I mean, try to ask questions that are non-leading as possible and see what he gets.  Maybe he can get them to rate it on a funny/not funny scale, disgusting/not disgusting scale."[13]

32.    Dr. Simonson was then asked "… if he (Mr. Sacra) had done that and found there was a positive association with it (the dog toy/Jack Daniel's), would that have been reliable evidence that it was not dilution by tarnishment?"  Dr. Simonson responded "I think that would be useful information."  He then went on to say "…if he found that, I certainly would pay attention to that, and it may certainly affect my opinions."  Dr. Simonson later acknowledged that a focus group, conducted appropriately, would provide some useful information.[14]

33.    I engaged The Right Brain Studio, a well-respected brand strategy and consumer insights company based in Studio City, California to organize the focus groups to explore the "disgust" issue.  Participants for the groups were recruited by Schlesinger Associates, a global qualitative research company based in New Jersey with offices and facilities in Los Angeles and around the world.  The sessions were held at Schlesinger's facility in the Westwood section of Los Angeles.  The Right Brain's president, Jeff Hirsch, moderated the sessions based on a discussion guide he and I devised. Video and audio recordings of the sessions were made and transcripts of the discussion groups are included in Exhibit "C" of this report.

---

[13] *Ibid*, Page 100, lines 11-20.
[14] *Ibid*, Page 102, lines 11-17.

SIL0013




*Figure 2.  5 p.m. group: Female Jack Daniel's drinkers/dog owners*

*Figure 3. 6 p.m. group; Jack Daniel's drinkers/non-dog owners.*





*Figure 4. 7 p.m. group.  All Jack Daniel's drinkers/all dog owners.*

*Figure 5.  8 p.m. group.  Non-Jack Daniel's drinkers/all dog owners.*

34.     Four sessions were conducted. The 5:00 p.m. group consisted of five adult women, all of whom identified themselves as Jack Daniel's drinkers and dog owners.

35.     Our 6:00 p.m. group consisted of five <u>non-dog</u> owners who identified themselves as Jack Daniel's drinkers.  This group was specifically formed to give us a sense of how <u>non-dog</u> owners would react to the allegedly "disgust-causing" Bad Spaniels label.

36.     The 7:00 p.m. group respondents were males aged 25-53 male; all drank Jack Daniel's; all owned dogs.

- 12 -

SIL0014

37.    Our fourth group consisted of two male and two female whiskey drinkers who favored brands <u>other than</u> Jack Daniel's. All members of this group owned dogs. Our purpose in forming this group was to hear from consumers who were not as emotionally tied to the Jack Daniel's brand as were the respondents in the three other groups.

38.    We began each group with an exercise designed to observe how the participants reacted to "spoof" products (such as VIP's Bad Spaniels dog toy) and spoof advertisements.  The moderator showed each group a series of ten or eleven "spoof" product photographs, some of which are illustrated below.



*Figure 6. Six of the "spoof products/advertisements" shown to Focus Group participants.*

SIL0015

39.    The participants were asked to classify each "spoof" as either, a) Clearly a joke; b) It could be a joke or it might not be a joke; or c) Not a joke, they're really insulting somebody.

40.    The reaction of the participants to the samples shown to them in this exercise was interesting.  All were quick to categorize each image based on the criteria discussed above; they had a lot to say about images such as "Murder King" (e.g., "Was it produced by PETA?") and "Absolut Impotence" (e.g., "Not funny.").  Very few images landed in the "could be/might not be" pile; to the respondents, an image either was "just a joke" or not.  Every participant in each group immediately classified the photo of VIP's Bad Spaniels dog toy as "funny."

41.    We then gave each participant an actual Bad Spaniels toy (complete with hang-tag) and asked them to closely examine it.  The reaction to the product itself was very positive; the women in the first group giggled and two of them suggested it would make for a great gag gift for a friend who was really into Jack Daniel's.[15]  Another said, "This is fabulous."[16]  That sentiment was repeated over and over in each group.

42.    I first began observing focus group sessions in the late 1960's and I have been doing it ever since.  As discussed earlier, I estimate that I have observed more than 3,500 group sessions over the course of my career.  And while I recognize that focus groups are not quantitative surveys, it has been my experience that qualitative studies are often the best way to assess *thoughts and feelings* about individual brands, product and service categories and advertising.  Not surprisingly, it is quite rare for there to be unanimity of opinion by focus group participants about anything.

---

[15] Video: 5 P.M. Group at 27:11.
[16] *Ibid*, at 27:18.

SIL0016

43.    But the reaction of the nineteen participants at our Bad Spaniels focus groups was <u>unanimous</u> as to the disgust issue. They saw the Bad Spaniels toy as a "spoof product" that it is "funny," "hilarious" "cheeky," "silly" and "cute." If anything, it reminded the Jack Daniel's drinkers in the groups how much they liked Jack Daniel's! It even seemed to make the non-Jack Daniel's drinkers like Jack Daniel's.

44.    When asked "what goes through your mind when you see this Bad Spaniels thing," the participants in our groups responded "cute," "entertaining," "I think if I had a friend who loved Jack Daniel's and had a dog I'd give it to him as a present," "I think it would be funny if you had a party at your house and you were drinking the real one (i.e., Jack Daniel's) and your dog was playing with the squeaky toy."[17]

45.    When specifically asked "what might go through your mind (after seeing the Bad Spaniels dog toy) the next time you look at a Jack Daniel's bottle or think about the brand," the respondents <u>unanimously</u> had <u>positive</u> things to say about Jack Daniel's. One respondent in our first group said, "It wouldn't change my human feelings about Jack Daniel's; I'd think it was funny with my dog."[18] Another participant said, "I would want to have a drink with my dog."[19] Yet another positive comment was, "If your dog was playing with it, you just might crave it (Jack Daniel's)."[20] "It's just a cute thing; nothing negative or positive."[21] "It would be a great gift for someone who drinks Jack Daniel's."[22]

---

[17] Video: 5 p.m. Group at 22:15.
[18] *Ibid*, at 23:15.
[19] *Ibid*, at 23:17.
[20] *Ibid*, at 23:22.
[21] Video: 7 p.m. Group at 16:55.
[22] *Ibid*, at 16:49.

- 15 -

SIL0017

46.    When asked "Do you think this product would associate Jack Daniel's in any way with dogs, the <u>unanimous</u> response was "No."[23]  When asked "would this have any effect on you drinking Jack Daniel's in the future, the almost unanimous response was "No."[24]  (The single exception: One member of the non-dog owner group said that he found the toy's squeak sound very irritating, and that if he had a dog – which he did not – and the toy squeaked all the time that might make him not buy Jack Daniel's.[25]  But when asked if "Jack Daniel's is bad," or "Jack Daniel's has dog poop in it," the participant's response was "No, no that, but the (he then squeaked the toy over and over).[26]

47.    On the other hand, a respondent in our first group said, "It might make you want to drink it."[27]  The group members agreed that there was "no negative connotation."[28]

48.    When asked if they had any comments on the label, the general response was "It's funny."[29]  One participant said, "It's like *Mad Magazine* to me. Obviously they are spoofing a brand but in a fun, lighthearted way."[30]

49.    When explicitly asked "if this product would evoke associations with <u>dog poo or pee</u> in any way," the <u>unanimous</u> response was "No."[31]  In fact, the participants found that idea laughable.

50.    The moderator called the participants attention to the label, literally reading aloud the "43 percent poo by volume," and "100 percent smelly" copy on it.  The

---

[23] Video: 5 p.m. Group at 24:06;
[24] *Ibid*, at 24:50; at 17:33; at 21:16.
[25] *Ibid*, at 21:16.
[26] Video: 6 p.m. Group at 22:14.
[27] Video: 5 p.m. Group at, 24:54.
[28] *Ibid*, at 24:04.
[29] Video: 7 p.m. Group at 18:10.
[30] *Ibid*, at 18:31.
[31] Video: 5 p.m. Group at 25:23.

SIL0018

participants thought that was funny.[32]  A woman in the non-dog owner group read that copy aloud and said, "Hilarious,"[33] and went on to say, "Good jokes."  After reading the label and laughing at the "Old No. 2" reference another participant said, "I think it's really cute."[34]  Nobody thought it disparaged Jack Daniel's in any way.

51.    Nobody even came close to thinking there was dog poo in the toy OR in Jack Daniel's. (In fact, they laughed at that notion). [35]  Nobody was disgusted… or suggested that anyone would be disgusted by the toy or disgusted by Jack Daniel's because of the toy.  "It's just a fun, lighthearted toy."[36]  In fact, the participants in our 8 p.m. group (non-Jack Daniel's drinkers/dog owners) thought it would be a great idea for Jack Daniel's to offer VIP's Bad Spaniels product as a product tie-in to its customers![37]

52.    In short, nineteen "real world" adult consumers of distilled spirits unanimously categorized VIP's Bad Spaniels dog toy as a "light-hearted" and "funny" spoof product.  Not one participant thought anything about the toy was "disgusting" or that it would elicit disgust in any way.  Not one participant thought it might cast a negative shadow on Jack Daniel's.  All nineteen participants found the idea that Bad Spaniels could somehow result in Jack Daniel's being associated with defecation laughable.

53.    One of the benefits of focus group research is that the *physical reactions* of the participants to whatever the subject matter happens to be are visible to observers

---

[32] *Ibid*, at 28:21.
[33] Video: 6 p.m. Group at 16:55.
[34] Video: 8 p.m. Group at 16:19.
[35] Video: 6 p.m. Group at 19:53; 7 p.m. Group at 18:57; 8 p.m. Group at 18:10.
[36] Video: 7 p.m. Group at 19:06.
[37] Video: 8 p.m. Group at 18:10.

SIL0019

(through a one-way mirror as well as on video recordings of the sessions). Being able to note the physical reactions of the participants is usually quite important, as it provides non-verbal insights into the respondent's feelings. In this instance, the respondent's physical reactions to the Bad Spaniels toy matched their statements; they laughed, giggled and smiled. No signs of "disgust" were evident.

54.    As previously discussed, Dr. Simonson's opinion hinges on his *personal* belief that the Bad Spaniels dog toy would elicit feelings of disgust. At no point in his report or at his deposition did Dr. Simonson explain how he came to his "disgust" opinion; it appears that he somehow just *knew* he was right. And he was so confident that his personal opinion was correct that he testified at his deposition it was "highly unlikely" that consumers would disagree with him.[38] But not one of the nineteen unbiased participants at our focus groups shared his opinion.

55.    Dr. Simonson did not think it necessary to conduct any sort of consumer study to support his belief that VIP's Bad Spaniels dog toy would elicit disgust. Yet at his deposition Dr. Simonson repeatedly refused to offer an opinion *without* the benefit of a survey as to whether the content of a series of Jack Daniel's advertisements (illustrated in deposition exhibits 33, 34, 35, 36 and 37) would convey positive or negative imagery to consumers.[39]

---

[38] Simonson deposition, Page 101, line 9 – Page 102, line 10.
[39] It should be noted that it is unclear whether the Jack Daniel's advertisements presented to Dr. Simonson were actually produced by Jack Daniel's. In my opinion, whether the ads are genuine or not is immaterial, as the purpose of the questioning was to understand the methodology Dr. Simonson used to determine what a reasonable consumer might take away from a particular advertisement.

SIL0020

56.    When asked if the Jack Daniel's advertisement illustrated at right in Figure 2 had positive or negative content, Dr. Simonson's answer was "I cannot look at this and tell you."[40]    He then went on to say "…<u>you might want to run a study and find out what comes to mind when people see this</u>."[41]

57.    When asked whether the Jack Daniel's advertisement illustrated below in Figure 3 had a clear-cut message, Dr. Simonson's answer was "<u>I don't know what the general reaction will be, and I think there is some ambiguity here.    And I would test it given that it's so ambiguous</u>."[42]



**Figure 2. Simonson deposition exhibit 36.**



**Figure 3.  Simonson deposition exhibit 35.**

---

[40] Simonson deposition, Page 205, line 22 – Page 206, line 3.
[41] *Ibid*, Page 206, lines 9-21.  Emphasis added.
[42] *Ibid*. Page 206, line 22, lime 22 – Page 207, line 3.  Emphasis added.

- 19 -

SIL0021

58.    When asked if, in his mind, the Jack Daniel's advertisement illustrated at right in Figure 4 had an ambiguous message, Dr. Simonson's response was "I don't find it attractive.  But…"  "It looks really old.  <u>I don't know</u>.  Maybe when it was used, if was used, let's say in the '50s, maybe some people found it appealing.  <u>I don't know</u>.  As we know, you didn't give me any additional information about that."[43]



*Figure 4. Simonson deposition exhibit 34.*

59.    Dr. Simonson, who is best known for his work in market research, was unwilling to express opinions *without* the benefit of a survey to figure out what consumers might take away from these advertisements.  Yet he did *not* need a study to form his opinion that Bad Spaniels would elicit feelings of disgust; he just *knew it*.  Whatever process he used to come to that opinion most certainly was not based on science, or even his professional experience.  If he was not able to use his more than 30 years of experience as a marketing research expert to opine on what an ad communicates, how can he possibly testify as to what a dog toy label conveys?

60.    Dr. Simonson also testified at his deposition that had Mr. Sacra conducted proper studies which showed that consumers might be more likely to buy Jack Daniel's

---

[43] Simonson deposition, Page 207, lines 4-16.  Emphasis added.

SIL0022

because of the toy, "maybe he would have shown me wrong.  But he hasn't done that."
While Dr. Simonson is correct that Mr. Sacra did not conduct studies *before* taking Bad
Spaniels to market, the fact is that such a study now exists.  And it clearly shows that Dr.
Simonson's opinion is incorrect.

## VI. OTHER FLAWS IN DR. SIMONSON'S ANALYSIS

61.     I found it interesting that in his report Dr. Simonson consistently referred
to VIP's product as "Old Number 2" (a synonym for defecation) rather than by its brand
name, Bad Spaniels.  When asked at his deposition why he consistently referred to the
product as "Old Number 2," he responded "Just found it was a good way of doing it."
When asked why he didn't refer to it as Bad Spaniels, he acknowledged that he could
have done that, but opted not to.[44]  This suggests to me that he was trying to "sell" his
speculative theory that exposure to Bad Spaniels would elicit a feeling of disgust, which I
believe to be inappropriate for an expert witness to do. None of the participants in our
groups thought to call Bad Spaniels "Old Number 2," and in fact, only a handful seemed
to even "get" the "Number 2" joke. (After all, our focus group participants were not
children. In my experience, very few people refer to elimination functions as "Number
One" or "Number Two" after they pass age 10.)

62.     While Dr. Simonson's academic credentials are impressive, it does not
appear he has ever directly been involved with marketing alcoholic beverages or pet
products.  Nor does it appear that he has extensive experience researching consumer
behavior as regards those two product categories. When asked at his deposition "...what's
been your professional experience in terms of consumer behavior for purchasers of pet

---

[44] *Ibid*, Page 35, line 5 – Page 36, line 5.

SIL0023

products," his answer was "Over the years I have used pet products as examples in my teaching."[45] When asked "Do you have – are there specific evidence or specific facts that you relied upon about how purchasers of pet products make their decisions in reaching your opinion…?" Dr. Simonson's response was "Nothing specific."[46] Similarly, when asked "What evidence or facts did you rely upon as it relates to how purchasers of alcoholic beverages make their purchasing decisions…" Dr. Simonson again responded, "Nothing specific."[47]

63.    I, on the other hand, have been deeply involved with advertising and promoting alcoholic beverages and pet products (as well as products and services in dozens of other categories) for nearly half a century.  Based on my "real world" experience working with top-tier marketers in these categories I believe it very unlikely that a reasonable consumer would take the labeling that appears on an intentionally and obviously silly dog toy seriously and somehow come to believe (consciously or not) that Jack Daniel's Old Number 7 is somehow full of… defecation.   Or associate it with excrement.

64.    I think it is important to recognize that VIP's Bad Spaniels product is a *dog toy*.  In my opinion, it most likely would be purchased by an adult dog owner that drinks Jack Daniel's (or as a gift for someone who drinks Jack Daniel's) for much the same reason Jack Daniel's loyalists wear Jack Daniel's ball caps and belt buckles.

65.    Dr. Simonson's analysis ignores the marketplace reality that consumers who consider themselves product loyalists love to acquire products – sometimes including funny ones – that complement their chosen brand.  That is why the participants

---

[45] Simonson deposition, Page 166, lines 16-21.
[46] *Ibid*, Page 166, line 22 – 167, line 17.
[47] *Ibid*, Page 167, line 19 – Page 168, line 2.

SIL0024

at our focus groups so enthusiastically supported the idea that Jack Daniel's users would love VIP's Bad Spaniels toy.  Even though Bad Spaniels is clearly not a licensed product (none of our focus group participants believed that the toy was marketed by or authorized by Jack Daniel's even before they read the hang-tag disclaimer), most thought a true Jack Daniel's fan who had a dog would buy one because it is funny, not disgusting.

66.    Dr. Simonson, who does not claim to be an expert on pet products, has obviously not considered the fact that people who buy toys for their dogs do so because they love their animals.  In my experience, people do not buy toys – or for that matter, any product for their dogs – that disgusts them.  Especially if in any way that toy might cast a shadow on a brand they regularly use or identify with.

67.    Dr. Simonson has also ignored the marketplace reality that most American consumers like to buy products that they find amusing or from companies they think have a sense of humor.  That is why so many television commercials are grounded in humor.  "Generally, the goal of humor in advertising is to create in the receiver a pleasant and memorable association with the brand. Recent advertising campaigns as diverse as those for ESPN ("This is Sports Center"), California Milk Processing Board ("Got Milk?") and the Las Vegas Convention and Visitor's Authority ("What Happens in Vegas, Stays in Vegas") have all successfully used humor as the primary message theme."[48]  Simply stated, humor does not beget disgust.

68.    I have been advised that VIP does not advertise its dog toy products in any meaningful way; its products have to "sell themselves" at retail (or while displayed on a website).  Therefore, the product is, in and of itself, its ad.  In my opinion, which was

---

[48] O'Guinn, Allen, Semenik, *Advertising & Integrated Brand Promotion*, *Fifth Edition*" Mason, OH, South-Western Cengage Learning, 2009, Page 354.

SIL0025

supported by all nineteen participants at our focus groups, VIP's Bad Spaniels dog toy is very likely to be viewed as funny to those people who recognize it as a parody of Jack Daniel's. And funny sells. And in this instance, the fun factor is neither intended to disparage Jack Daniel's or in any way convey an idea that might cause an association with a disgusting subject (defecation) in the minds of Jack Daniel's customers. Conversely, the Bad Spaniels toy will be almost meaningless to people who do not recognize it as a parody of Jack Daniel's, and therefore, they are not likely to purchase it.

69.    Dr. Simonson also ignored the marketplace reality that dog toys are usually not sold in close proximity to whiskey. Dog toys are sold primarily at pet shops (e.g., Pet Smart, Petco, etc.) or in the pet products department at major merchandisers. Whiskey is sold at liquor stores, in some supermarkets and drugstores (this varies by state) and by some mass merchandisers. Therefore, the likelihood of vast numbers of Jack Daniel's customers actually encountering a Bad Spaniels dog toy is almost ridiculously low. Dr. Simonson's speculative opinion requires Jack Daniel's customers and prospects to be aware of Bad Spaniels and to develop an unconscious feeling of disgust as a result of reading its label. Neither is likely to happen.

70.    Dr. Simonson also ignores the reality that the Bad Spaniels product is not a real bottle of whiskey. That means it will not be displayed in the liquor cabinet of its purchasers. Nor will it be displayed on the shelf in a bar. <u>It will be on the floor with the dog</u>. (Or, as often happens with the toys my two dogs play with, it will disappear under the bed!)

SIL0026

71.    In general, I agree with Dr. Simonson's very well stated discussion of the meaning and advantages of strong brands,[49] although I think his inclusion of the ill-founded rumor that worms have been found in the ground meat used by McDonald's as analogous to the matter at hand to be ludicrous. The "worms" rumor was not prompted by a parody product or advertisement; it was just one of those "urban legends" that sometimes appear almost out of nowhere.

72.    Likewise, his reference to American Express Co. v. Vibra Approved Lab. Corp., (1989) is not analogous to this case.[50]  American Express' primary purpose in that matter was to protect its trademarked slogan which had been misappropriated by a condom manufacturer.  The condoms were not spoofs of American Express' credit cards or its traveler's checks.

73.    I agree with Dr. Simonson's opinion that Jack Daniel's is a strong brand. But I do not agree that its brand has in any way – or would be in any way – damaged by an association with VIP's Bad Spaniels funny dog toy.  And the participants in our focus groups share that view. In fact, a number of group participants actually believe consumers would like Jack Daniel's even more than they currently do if they were exposed to VIP's Bad Spaniels product.  The following discussion occurred close to the end of our fourth focus group session:

Mark (respondent):    "Yeah. I think if you had this in the liquor section with Jack Daniel's as a free gift, people would actually tend to buy the Jack Daniel's that much more."

---

[49] Simonson Report, Paragraphs 18-25,
[50] Simonson Report, Paragraph 26.

SIL0027

*Jeff (Moderator):  "So you think this would help? They don't sell this in liquor stores, but if they did a tie in with this product, you think they'd sell more Jack Daniel's?"*

*Craig (respondent):   "Definitely."*

*Mark:  "Yeah."*

*Margaret (respondent):  "Oh, definitely."*

*Mark: "Oh, yeah. I think it's cute."[51]*

After a brief discussion (initiated by a participant) about a giveaway promotion currently being conducted by Stella Artois (beer), the participants returned to the subject of Bad Spaniels and Jack Daniel's:

*Mark: "What guy who drinks whiskey and has a dog would <u>not</u> buy this for his dog?  Seriously."*

*Craig: (laughing) "That's true."*

*Linda: (laughing) "It'll promote their sales."*

*Jeff (the moderator):   "This (Bad Spaniels) will promote Jack Daniel's sales?"*

*Linda: "Yeah."*

*All: (Talking over each other) "Definitely, definitely."[52]*


## VII.  IN CONCLUSION

74.    Dr. Simonson concludes his report by opining that "the negative associations of the "Old No. 2" are not limited to the trade dress of Jack Daniel's "Old No. 7" or just to the core Jack Daniel's brand.  Rather, the negative effect likely influences the entire family of Jack Daniel's brands..." "Instead of being judged on their

---

[51] Video: 8 p.m. Group at 00:19:07.
[52] Video: 8 p.m. Group at 00:19:46.

SIL0028

own merit or perceived characteristics, (for those who have been exposed to VIP's product), the "Old No. 2" is likely to come to mind. As a result, new and existing buyers are likely to be less receptive, not just to the Old No. 7, but also to new brand extensions."[53]

75.    Dr. Simonson's opinion is based entirely on his *assumption* that a reasonable consumer would associate Jack Daniel's with defecation (or as he prefers to refer to it: "No. 2") after encountering VIP's dog toy. He provides no empirical evidence to support that assumption. In my experience, consumers do not giggle at something they find disgusting.  They grimace.  I saw no grimaces at our focus groups.

76.    Further, my many years of experience marketing products to dog owners (e.g., Gaines and Ralston-Purina dog chows, Puppy Palace pet shops, Sears' pet supplies, etc.) also tells me that his assumption is ill-founded.  Consumers do not purchase "disgusting" toys for the pets they love.  Common sense says that Dr. Simonson is wrong. And at least nineteen reasonable consumers, all of whom drink whiskey including Jack Daniel's, would disagree with him as well.   In reality, it appears VIP's Bad Spaniels is far more likely to enhance Jack Daniel's sales than diminish them.

77.    The opinions I have expressed herein are offered to a reasonable degree of certainty based on my experience as an advertising and marketing professional.

78.    I reserve the right to amend this report if I am provided with additional evidence obtained through further discovery or if any expert witness report is received and/or any related deposition taken.

---

[53] Simonson Report, Paragraph 35.

SIL0029

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of July, 2015 in Studio City, California.

_____

Bruce G. Silverman

SIL0030

# EXHIBIT "A"

SIL0031

<u>DOCUMENTS AND OTHER MATERIAL REVIEWED AND CONSIDERED</u>

1. VIP Products Amended Complaint

2. Order granting Motion to Amend

3. Answer and Counterclaims of Defendant and Counterclaimant Jack Daniel's Properties, Inc.

4. Expert Report of Itamar Simonson dated May 7, 2015

5. Itamar Simonson Deposition testimony and dated June 18, 2015

6. Deposition Testimony of Stephen Sacra dated April 23, 2015

7. Four Focus Groups conducted May 21, 2015 in Los Angeles California; Videos and transcripts of these groups (Transcripts attached as Exhibit C.)

8. *Jack Daniels Global Strategy Highlights for BF140, Brown-Forman Family Shareholder's Committee – June 2, 2011*, JDPI-CON000001-13

9. *A Qualitative Exploratory of New Package Structures for Jack Daniel's Whiskey, December 2008*, JDPI-CON000034-78

10. *Jack Daniel's Look and Feel Qualitative Research Report, October 2, 2008*, JDPI-CON000079-133

11. *Packaging Assessment, Jack Daniel's Tennessee Whiskey, September, 2009*, JDPI-CON000134-234

12. *Package Evaluation Summary Report, March 2010*, JDPI-CON000235-278

13. *Jack Daniel's Identity Deconstruction – Initial Topline Observations, March 26, 2008*, JDPI-CON000279-311

14. O'Guinn, Allen, Semenik, *Advertising & Integrated Brand Promotion*, *Fifth Edition*" Mason, OH, South-Western Cengage Learning, 2009

15. Belch, George E. and Belch, Michael A., *Advertising and Promotion, An Integrated Marketing Communication Perspective, Sixth Edition*. New York, NY, McGraw Hill, 2004, page 250.

SIL0032

# EXHIBIT "B"

SIL0033



SILVERMAN
CONSULTING LLC

## BRUCE G. SILVERMAN
*CURRICULM VITAE*

May 2005 – Present

**SILVERMAN CONSULTING LLC**
**Principal**

Adviser to a number of international companies and marketing services firms.  Interim CEO at Dynasty Visual Effects LLC and 24/6, Inc. (dba Pocket Billboards).  Expert witness (case list attached) for law firms representing clients in cases where marketing, advertising, media and/or branding is at issue.

January 2004 – April, 2005

**WONG DOODY ADVERTISING (Los Angeles)**
**President**

Wong Doody is an independently-owned advertising agency best known for its excellent creative product. Clients included Alaska Airlines, Autodesk, MGM Home Entertainment, Sony Pictures, Los Angeles Dodgers, Alpine Electronics, Clif Bar, Inc., UCLA/Anderson School of Management.

April, 1997 – Dec., 2003

**INITIATIVE PARTNERS (Los Angeles)**
**President/CEO**

Management responsibility for principal U.S. unit of world's largest ($22BB+) advertising media agency. Member, Initiative Worldwide Board of Directors. Accounts included Walt Disney Company (all divisions), Carl's Jr./Hardee's, Unilever, Arco, E*Trade, Albertson's, Baskin-Robbins, Cisco Systems, HealthNet, The Home Depot, Taco Bell plus more than 100 advertising agencies operating throughout the United States and Canada.

SILVERMAN CONSULTING LLC
3168 DONA MEMA PLACE  STUDIO CITY CA 91604
TEL: 323-654-7659  MOBILE: 310-200-7670
BGSLA@ROADRUNNER.COM   WWW.BRUCESILVERMANCONSULTING.COM

REV: 5/21/2015

SIL0034

January 86 – March '97      **ASHER/GOULD ADVERTISING, INC. (Los Angeles)**
**President/Chief Creative Officer/Chief Operating**
**Officer**

Principal, Board of Directors.  Clients included Suzuki cars
and trucks; Pabst Brewing Company, Southern California
Cable Marketing Council, Pizza Hut, Sanyo, ITT/Sheraton,
State of California Department of Health Services,
American Savings Bank, Baskin-Robbins, SunAmerica,
Avery Dennison, The Men's Wearhouse.

January 84 – December '86      **BBDO/WEST, INC. (Los Angeles, San Francisco)**
**Executive Vice President; General Manager and Chief**
**Creative Officer**
Vice Chairman, Board of Directors.  Accounts included
Apple Computer International, Coldwell Banker, Sizzler,
PIP Printing, Hughes Supermarkets, Sanyo/Fisher,
Southern California Dodge Dealers, Sebastiani Vineyards

January 81 – December '83      **BOZELL & JACOBS, SOUTHWEST, INC. (Dallas)**
**Executive Vice President; Chief Creative Officer**
Member, Bozell & Jacobs, Inc. Board of Directors.
Accounts included American Airlines, Greyhound,
Symantec, Zale Corporation, Pace Foods, Quaker Oats,
Armour Foods.

August 67 – December '80      **OGILVY & MATHER, INC. (New York)**
Senior Vice President; Executive Creative Director, O&M
New York. Also ECD, Los Angeles (1977-80); Houston
(1974-77); Associate Creative Director, O&M New York
(1972-74).

Member, O&M USA Council of Directors.  Accounts
included American Express, Shell, Merrill Lynch,
Mercedes Benz, Panasonic, Maxwell House, Nabisco, Post
cereals, Imperial Margarine, Dove soap, IBM, Smith
Barney, Mattel, Universal Studios, Trailways, Korean
Airlines, TWA, KLM, Puerto Rico Tourism, British
Tourism, French Tourism, Nickelodeon, MTV.

**EDUCATION**      June 1966 BA, Adelphi University, Garden City, New
York

SIL0035

| | |
|---|---|
| **INDUSTRY** | Vice Chairman, Western Region – American Association of Advertising Agencies (industry trade association) (1995-2002) |
| | National Board of Directors – American Association of Advertising Agencies (1995-2002) |
| | Vice President – Los Angeles Advertising Agencies Association (1995-2002) |
| | Member, Los Angeles Advertising Club (1978-1980; 1984-2005) |
| | Vice President – Dallas Advertising Club (1981-1983) |
| | Vice President – Houston Advertising Federation (1975-1977 |
| | Member – The Television Academy |
| | Director – Los Angeles Chapter, Forensic Expert Witness Association |
| **TEACHING POSITIONS** | Instructor: Pepperdine University, UCLA Extension |
| | Guest Instructor: Arizona State University, California State University Northridge, California State University San Diego, California State University Los Angeles, California State University San Francisco, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Hawaii, University of Houston, University of Southern California, University of Texas, Thunderbird School of Management; Dean's Board of Advisors, UCLA Extension |
| **OTHER** | Author: *How to Create Tobacco-Use Prevention Advertising That Works*; University of Florida Press, 1996 |
| | Author: *How to Complain for Fun and Profit;* Schulzke Publishing, 2008 |
| | Media Appearances:  Frequent "advertising/marketing guest authority" on Bloomberg News, NBC News, ABC 20/20; cited in articles in *Wall Street Journal, New York Times, Los Angeles Times, USA Today, Advertising Age, AdWeek* |

- 34 -

SIL0036

**AWARDS:**                    Multiple Clios, One Show "Pencils," multiple Beldings,
two Gold Lions at Cannes International Advertising
Festival; three "Effie" awards, two David Ogilvy Awards.

SIL0037

## CLIENTS SERVED (BY CATEGORY)

### (Partial List; 1968-2015)

**Apparel/Fashion**

C& R Clothiers (Asher/Gould)

Cherokee Apparel (Asher/Gould)

The Men's Wearhouse (Asher/Gould)

Harris & Frank Clothiers (Asher/Gould)

Kennedy's Clothiers (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

**Automotive**

Acura (Initiative)

Chevrolet (Initiative)

Dodge and Dodge Dealer Associations (BBDO)

Kia (Initiative)

Jaguar (Bozell)

Mercedes-Benz (Ogilvy)

Peugeot (Ogilvy)

Suzuki (Asher/Gould)

**Beverages**

Ballantine Ale (Asher/Gould)

Brew 102 Beer (Asher/Gould)

Country Club Malt Liquor (Asher/Gould)

Country Time Lemonade (Ogilvy)

Falstaff Beer (Ogilvy; Asher/Gould)

Hamm's Beer (Asher/Gould)

Mountain Dew (Ogilvy)

M. LaMont Vineyards (Ogilvy)

Old Crow Bourbon Whisky (Ogilvy)

Olde English 800 Malt Liquor (Asher/Gould)

Olympia Beer (Asher/Gould)

Pabst Blue Ribbon Beer (Asher/Gould)

Pearl Beer (Asher/Gould)

Pepsi Light (Ogilvy)

Private Stock Malt Liquor by Haffenreffer  (Asher/Gould)

Schaeffer Beer (Ogilvy)

Sebastiani Vineyards (BBDO)

Stolichnaya Vodka (Ogilvy)

- 36 -

SIL0038

Van Gogh Vodka (Wong Doody)

Vitel Mineral Water (BBDO)

**Corporate**

Autodesk (Wong Doody)

Avery Dennison (Asher/Gould)

Cessna Citation (Ogilvy)

Church of Jesus Christ of Latter Day Saints (Initiative)

City Investing (Ogilvy)

Cooper Industries (Ogilvy)

Dresser Industries (Ogilvy)

IBM (Ogilvy)

International Nickel (Ogilvy)

International Paper (Ogilvy)

Owens-Corning Fiberglas (Ogilvy)

Rail LA (Silverman LLC)

Shell Oil Company (Ogilvy)

Worldwide Church of God (BBDO)

**Consumer Electronics**

Alpine Electronics (Wong Doody)

Fisher (BBDO)

Panasonic (Ogilvy)

Sanyo (Asher/Gould)

**Direct Response**

American Express cards (Ogilvy)

Associates Financial (Bozell)

Bally's Health and Fitness (Initiative)

Bryman College (Asher/Gould)

HBO (Asher/Gould)

Intercept Program (Asher/Gould)

Jenny Craig (Initiative)

Kaiser/Permanente (Initiative)

Law Offices of Larry H. Parker (Asher/Gould; Silverman LLC)

Mobile Dynamics (Wong Doody)

National Education Centers (Asher/Gould)

Nationwide PharmAssist (Silverman LLC)

Paintrol Clinics (Asher/Gould)

Southern California Cable Marketing Council (Asher/Gould)

UCLA Anderson School of Management (Wong Doody)

- 37 -

SIL0039

| | |
|---|---|
| **Education** | Bryman College (Asher/Gould) |
| | Mobile Dynamics (Wong Doody) |
| | National Education Centers (Asher/Gould) |
| | National University (Initiative) |
| | UCLA Anderson School of Management (Wong Doody) |
| **Entertainment** | Buena Vista Pictures (Initiative) |
| | Center Theatre Group/Ahmanson Theatre; Mark Taper Forum (Initiative) |
| | Circus World (Ogilvy) |
| | Disney Home Video (Initiative) |
| | Grand Ol' Opry (Ogilvy) |
| | HBO (BBDO and Asher/Gould) |
| | Houston Grand Opera (Ogilvy) |
| | Los Angeles Dodgers (Wong Doody) |
| | MGM Home Video (Wong Doody) |
| | MTV (Ogilvy) |
| | Nickelodeon (Ogilvy) |
| | Opryland USA (Ogilvy) |
| | Ringling Brothers Barnum & Bailey Circus (Ogilvy) |
| | Six Flags (Ogilvy) |
| | Sony Pictures Digital Entertainment (Wong Doody) |
| | Southern California Cable Marketing Council (Asher/Gould) |
| | The Walt Disney Company (Initiative) |
| | Touchstone Pictures (Initiative) |
| | UCLA Athletics (Silverman LLC) |
| | UPN (Initiative) |
| | Walt Disney Pictures (Initiative) |
| | Warner Brothers  (Initiative) |
| | World Poker Tour (Wong Doody) |
| **Financial Services** | Allied Bank of Texas (Bozell) |
| | American Express Credit Cards (Ogilvy) |
| | American Express International Bank (Ogilvy) |
| | American Savings Bank (Asher/Gould) |
| | Associates Financial (Bozell) |
| | Bowery Savings Bank (Ogilvy) |

SIL0040

E*Trade (Initiative)

Gibraltar Savings & Loan of California (Ogilvy)

Gibraltar Savings & Loan of Texas (Ogilvy)

Merrill Lynch (Ogilvy)

J. P. Morgan & Co. (Ogilvy)

Nationwide Insurance (Ogilvy)

Plastic Cash International  (Wong Doody)

Republic Bank of Texas (Bozell)

Smith Barney (Ogilvy)

SunAmerica (Asher/Gould)

Union Bank of California (BBDO)

U.S. Trust (Ogilvy)

Valley National Bank – AZ (Bozell)

Wei Dong Investment Holdings Ltd.  (Silverman LLC)

**Gaming**

Augustine Casino (Wong Doody)

Bellagio Hotel & Casino (Initiative)

California Lottery (Initiative)

Desert Inn Hotel & Casino (Asher/Gould)

Las Vegas Convention and Visitor's Authority (Initiative)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino (Asher/Gould)

Treasure Island Hotel & Casino (Initiative)

**Grocery Products (includes. Packaged Goods)**

Armour Foods (Bozell)

Balance Bar (Initiative)

Beijing Zhong Gao International HR Co. Ltd. (Silverman LLC)

California Avocados (Asher/Gould)

California Eggs (Asher/Gould)

Clif Bar (Wong Doody)

Conagra Foods (Bozell)

Gaines (Ogilvy)

Dove Liquid (Ogilvy)

Heath Bars (Bozell)

Hershey (Ogilvy)

Imperial Margarine (Ogilvy)

Luna Bar (Wong Doody)

- 39 -

SIL0041

Nabisco Double Stuf (Ogilvy)

Nabisco Krazy Glazy (Ogilvy)

Nabisco Saltine Crackers (Ogilvy)

Nabisco Sooper Kookies (Ogilvy)

Pace Picante Sauce (Bozell)

Pepperidge Farm (Ogilvy)

Post Alpha-Bits (Ogilvy)

Post Cocoa Pebbles (Ogilvy)

Post Fruity Pebbles (Ogilvy)

Purina dog chows (Ogilvy)

Post Super Sugar Crisp (Ogilvy)

Ralston-Purina cereals (Ogilvy)

Reese's Peanut Butter Cups (Ogilvy)

Quaker Oats (Bozell)

Swanson Frozen Dinners (Ogilvy)

**Health & Beauty Aids**

Avon Cosmetics (Ogilvy)

Contac (Ogilvy)

Dove Beauty Bar (Ogilvy)

Kinerase (Wong Doody)

Mary Kay Cosmetics (Bozell)

Mead-Johnson Enfamil (Ogilvy)

Mead-Johnson Metrecal (Ogilvy)

Pears Soap (Ogilvy)

Rembrandt Whitening Toothpaste (Wong Doody)

Twice as Nice shampoo (Ogilvy)

**Healthcare**

Century Aesthetics (Silverman LLC)

Century City Doctors Hospital (Silverman LLC)

Doctor Campbell Credit Dentists (Asher/Gould)

Geisinger Health System (Silverman LLC)

Intercept Program (Asher/Gould)

Kaiser Permanente (Initiative)

Modern Diagnostics (Silverman LLC)

Nationwide PharmAssist (Silverman LLC)

Paintrol Clinics (Asher/Gould)

Private Health Management (Silverman LLC)

Salus Surgical Centers (Silverman LLC)

SIL0042

|                | UCLA Health System (Silverman LLC) |
|                | United Health Plan (Asher/Gould) |

**Hi-Tech**

Apple Computers/International (BBDO)

Autodesk (Wong Doody)

Cadforce (Silverman LLC)

Cisco (Initiative)

Compaq (Ogilvy)

Gateway (Initiative)

IBM (Ogilvy)

Intel (Initiative)

Symantec (Bozell)

**Industrial**

Cessna (Ogilvy; Bozell)

International Paper (Ogilvy)

Dresser Industries (Ogilvy)

Falcon Waterfree (Silverman LLC)

Owens-Corning Fiberglas (Ogilvy)

Shell Farm Chemicals (Ogilvy)

Shell Industrial Chemicals (Ogilvy)

Shell Plastics and Resins (Ogilvy)

Shell Synthetic Rubber (Ogilvy)

**Internet**

America On-Line (Initiative)

E-Trade On-Line (Initiative)

Event 411.com (Initiative)

Petstore.com (Initiative)

PlasticCash.com (Wong Doody)

Yahoo! (Initiative)

**Marketing Communications Agencies**

Ayzenberg (Silverman LLC)

Beijing Reach-All Investment Company Ltd. (Silverman LLC)

BH Direct (Silverman LLC)

Bright Strategic Design (Silverman LLC)

Bullpen Integrated Marketing (Silverman LLC)

Eclipse Studio, Beijing (Silverman LLC)

Glyphix (Silverman LLC)

Horizon Media (Silverman LLC)

M Creative Group (Silverman LLC)

- 41 -

SIL0043

Nice Advertising (Silverman LLC)

Radarworks (Silverman LLC)

Rogers & Associates (Silverman LLC)

Schiller LLC (Silverman LLC)

U.S. International Media (Silverman LLC)

**Media/Publishing**          Frontiers Media LLC (Silverman LLC)

Sirius XM (Silverman LLC)

Triton Media (Silverman LLC)

**Miscellaneous Products**    Paragon Luggage  (Wong Doody)

Zippo (Ogilvy)

**Office Products**           Avery Dennison (Asher/Gould)

Intuit – QuickBooks (Wong Doody)

**Petroleum Products**        Arco (Initiative)

Shell Fire & Ice Motor Oil (Ogilvy)

Shell Gasoline (Ogilvy)

**Professional Services**     CFO911 (Silverman LLC)

Law Offices of Larry H. Parker  (Asher/Gould; Silverman LLC)

**Real Estate**               Coldwell Banker (BBDO)

Esprit (Silverman LLC)

Move.com (Silverman LLC)

Pacifica Ventures (Silverman LLC)

Relocation.com (Silverman LLC)

Waterwood (Ogilvy)

The Woodlands (Ogilvy)

**Restaurants**               Acapulco (Asher/Gould)

Baskin-Robbins (Ogilvy; Asher/Gould)

Bennigan's (Bozell)

Burger Chef (Ogilvy)

Carl's Jr. (Initiative)

Der Weinerschnitzel (Initiative)

Godfather's Pizza (Bozell)

Hardee's (Initiative)

KFC (Initiative)

- 42 -

SIL0044

Packard's Grill (Asher/Gould)

Pioneer Chicken (Asher/Gould)

Pizza Hut (Asher/Gould)

Sizzler (BBDO)

Steak & Ale (Bozell)

Taco Bell (Initiative)

Togo's (Initiative)

Tom Sawyer's Old Fashioned Fried Chicken (Ogilvy)

**Retail**          Aaron Brothers Art Marts (Asher/Gould)

Albertson's Supermarkets (Initiative)

Arco (Initiative)

Bailey Banks & Biddle Jewelers (Bozell)

Big Lots (Initiative)

C&R Clothiers (Asher/Gould)

Checker Auto Parts (Bozell)

Circle K (Initiative)

Factory2You Stores (Asher/Gould)

Family Bargain Center Stores (Asher/Gould)

Harris & Frank Clothiers (Asher/Gould)

Hughes Supermarkets (BBDO)

Kennedy's Clothiers (Asher/Gould)

Men's Wearhouse (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

Puppy Palace (Ogilvy)

PIP Printers (BBDO)

Ralphs Supermarkets (Initiative)

Safeway Supermarkets (Initiative)

Sears (Ogilvy)

Sit 'n Sleep (Silverman LLC)

Stater Brothers Supermarkets (Initiative)

The Home Depot (Initiative)

Tesco (Silverman LLC)

Vons Supermarkets (Initiative)

Wherehouse Records & Tapes (Asher/Gould)

Zale Jewelers (Bozell)

- 43 -

SIL0045

| | |
|---|---|
| **Social Marketing** | California Dept. of Boating and Waterways (Boating Safety) (Initiative) |
| | California Department of Health Services – BabyCal (Asher/Gould) |
| | California Department of Health Services – First5 (Asher/Gould) |
| | California Department of Health Services – HIV Prevention (Asher/Gould) |
| | California Department of Health Services – Tobacco-Use Prevention (Asher/Gould) |
| | Oregon Health Department – Tobacco-Use Prevention (Asher/Gould) |
| | United States Department of Commerce, Census 2000 (Initiative) |
| | United States Government; Centers for Disease Control – Tobacco-Use Prevention (Initiative) |
| | White House office of National Drug Control Policy – Drug-use Prevention (Initiative) |
| **Telecommunications** | Nextel (Initiative) |
| | Telcentris (Silverman LLC) |
| | Southwestern Bell (Bozell) |
| | VoxOx (Silverman LLC) |
| **Tobacco** | Tijuana Smalls (Ogilvy) |
| **Tires/Batteries/Accessories** | Arco (Initiative) |
| | Goodyear (Ogilvy) |
| | Shell (Ogilvy) |
| **Toys/Games** | Electronic Arts (Initiative) |
| | Mattel Electronics (Ogilvy) |
| | Mattel Toys and Games (Ogilvy) |
| **Travel/Tourism** | Alaska Airlines (Wong Doody) |
| | Alaska Tourism (Initiative) |
| | ALM Royal Dutch Airlines (Ogilvy) |
| | American Airlines (Bozell; Initiative) |
| | American Express Travel Service (Ogilvy) |
| | Avis Rent-a-Car (Bozell) |
| | Bellagio Hotel & Casino |
| | British Tourist Authority (Ogilvy) |
| | Cunard Lines (Ogilvy) |
| | Desert Inn Hotel & Casino (Asher/Gould) |
| | Disneyland and Walt Disney World |

- 44 -

SIL0046

French Government Tourist Office (Ogilvy)

Greyhound Lines (Bozell)

Hyatt Regency Maui (Ogilvy)

Hyatt Regency Waikiki (Ogilvy)

KLM Royal Dutch Airlines (Ogilvy)

Korean Airlines (Ogilvy)

Las Vegas Convention & Visitors Bureau (Initiative)

Loreto Bay (Wong Doody)

Marriott (Ogilvy)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino (Asher/Gould)

Opryland USA (Ogilvy)

Six Flags (Ogilvy)

Trailways Bus Lines (Ogilvy)

Treasure Island Hotel & Casino

TWA (Ogilvy)

United States Travel Authority (Ogilvy)

Universal Studios Hollywood (Ogilvy)

Yosemite National Park and the Curry Company (Ogilvy)

**Utilities**                    Houston Lighting & Power (Ogilvy)

Nextel (Initiative)

Salt River Project (Bozell)

Southwestern Bell (Bozell)

SIL0047

## EXPERT WITNESS EXPERIENCE

1. I have been designated as an Expert Witness 60 times.  (I have consulted on a number of other branding/trademark/marketing/advertising/media-related cases as well.)

2. I have prepared Expert Reports and/or Declarations 49 times.

3. I have been deposed as an Expert 29 times.

4. I have been qualified and have testified as an Expert in court/and or at arbitration hearings 15 times.

   - Circuit Court of Greene County, Missouri 2015
   - Arbitration Hearing, JAMS, Los Angeles 2015
   - Arbitration Hearing, JAMS, City of Orange, CA 2015
   - Arbitration Hearing, AAA, Los Angeles 2013
   - Arbitration Hearing, AAA, Bakersfield, CA 2012
   - United States District Court, Portland, OR 2012
   - Superior Court for the State of California, Los Angeles 2011
   - Arbitration Hearing, JAMS, Santa Monica, CA 2011
   - Arbitration Hearing, Los Angeles, 2009
   - Superior Court for the State of California, Santa Ana, CA 2009
   - Superior Court for the State of California, Norwalk, CA 2008
   - Copyright Royalty Judges of the Library of Congress, Washington, DC 2007
   - United States District Court,  Los Angeles 2006
   - Superior Court for the State of California, Los Angeles 2003
   - Superior Court for the State of California, San Diego 2002

5. Approximately 30 percent of my professional time is spent as an "Expert Witness."

6. Approximately 67 percent of my work has been for the plaintiff.

7. Approximately 33 percent of my work has been for the defendant.

- 46 -

SIL0048

## DEPOSITION, ARBITRATION AND/OR TRIAL TESTIMONY

2010-2015

*ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C. v. DALLAS UNIQUE COMFORT, LTD.*
United States District Court, Middle District of Florida, Tampa
Case No. 8:13-cv-3278
Deposed 6/18/2015

*MERIDIAN CREATIVE ALLIANCE, LLC v. O'REILLY AUTOMOTIVE, INC.*
In the Circuit Court of Greene County, Missouri
Case No. 0931-CV08770
Deposed 4/28/2015; Testified 6/11/2015

*INFORM VENTURES LLC v. TOYOTA MOTOR SALES U.S.A., INC.,*
Judicial Arbitration and Mediation Services (JAMS)
Arbitration No. 1220048952
Deposed 5/8/2015; Testified 5/20/2015

*J.R. MATS, INC. v. INTERNETSHOPSINC.COM d/b/a/ D.W. QUAIL GOLF*
United States District Court for the Eastern District of Pennsylvania
Case No.: 2:14-cv-03427-TJS
Deposed 4/1/2015

*SCOTT EHREDT v. MEDIEVAL TIMES et. al.*
Judicial Arbitration and Mediation Services (JAMS)
Arbitration No. 1220047549
Deposed 2/27/2015; Testified 3/10/2015

*GLENNON MARRERO v. MICHAEL RAY NGUYEN-STEVENSON; UNIVERSAL MUSIC GROUP, INC.; TILLY'S, INC.; SHIEKH SHOES; AND DOE CORPORATION*
United States District Court, Central District of California, Western Division
Case No. 13-Cv-09291-Cbm-Pjw
Deposed 11/7/2014

*POQUITO MAS LICENSING CORPORATION v. TACO BELL CORP*
United States District Court, Central District Of California
Case No. 8:13-Cv-01933-Doc-Jpr
Deposed 10/16/2014

- 47 -

SIL0049

*PRIME MEDIA GROUP LLC v. ACER AMERICA CORPORATION*
United States District Court
Northern District of California, San Jose Division
Case No. 5:12-cv-05020-EJD
Deposed 9/11/2014

*BASIC RESEARCH, LLC v. JASPER PRODUCTS, LLC*
In the Third Judicial District Court in and for Salt Lake County, State of Utah
Case No. 110903662
Deposed 7/16/2014

*ZENON KESIK v. NATIONAL TV SPOTS, INC.*
The Arbitration Tribunals of the American Arbitration Association
AAA No. 72 147770 12 S1M
Testified 11/25/2013

*YU HSIANG M. ALEXANDER and CAROL A. WETTERLING-FOOS v. L'OREAL U.S.A. INC.*
Superior Court of the State of California, County of Los Angeles
Case No: BC 431491
Deposed 10/21/2013

*IN THE MATTER OF ARBITRATION BETWEEN THE SUN PACIFIC GROUP, CLAIMANT AND THE PARAMOUNT GROUP, RESPONDENT AND COUNTERCLAIMANT*
The Arbitration Tribunals of the American Arbitration Association
AAA No. 72 0180-Y-01187-11
Testified 12/19/2012

*FLIR SYSTEMS, INC. v. SIERRA MEDIA, INC. AND FLUKE CORPORATION*
United States District Court, District Of Oregon, Portland Division
Case No. 3:10-cv-00971-HU
Deposed 4/18/2012; Testified 12/14/2012

*IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION (Retained by Plaintiffs)*
United States District Court Central District of California
Case No. 8:10ML2151 JVS (FMOx)
Deposed 8/24/2012 and 9/3/2012

*SPORTING SUPPLIES INTERNATIONAL, INC. v. TULAMMO USA, INC., ET AL.*
United States District Court, Central District of California at Santa Ana
Case No. SACV10-1338 AG (RNBx)
Deposed 6/13/2012

SIL0050

*MARKETQUEST GROUP, INC., d/b/a All-In-One, v. BIC CORPORATION; BIC USA INC; and NORWOOD PROMOTIONAL PRODUCTS, LLC*
United States District Court, Southern District of California
Case No. 11cv0618 Jls Wmc
Deposed 6/6/2012

*PACIFIC BIOSCIENCE LABORATORIES, INC. v. NUTRA LUXE MD, LLC; and NUTRA BOTANICAL MD, INC.*
United States District Court, Western District of Washington at Seattle
Case No. 2:10-cv-00230-JLR
Deposed 5/11/2012

*IN RE: POM WONDERFUL LLC MARKETING AND SALES PRACTICES LITIGATION (Retained by Plaintiffs)*
United States District Court, Central District of California
Master File No. 2:10-ml 2199-DDP (RZx) [MDL No. 2199]
Deposed 5/29/2012 and 8/23/2013

*CONCEPT CHASER CO., INC. v. PENTEL OF AMERICA, ET AL.*
Superior Court of the State of California, County of Los Angeles, Central District
Case No.  BC429108
Deposed 9/19/2011; Testified 11/21/2011

*SHANE MALEK; NHSI, INC.; and CELMATRIX, v. GR HAIR SOLUTIONS, LLC and GUTHY-RENKER CORPORATION*
Judicial Arbitration and Mediation Services (JAMS)
Arbitration No. 1210028833
Deposed 10/25/2011; Testified 11/15/2011

*ZOOEY DESCHANEL v. STEVEN MADDEN LTD., STEVEN MADDEN RETAIL, INC., ICONIX BRAND GROUP a/k/a CANDIES' INC., IP HOLDINGS, LLC, KOHL'S DEPARTMENT STORES ET AL*
Superior Court of the State of California for Los Angeles County
Case No. BC 451472
Deposed 10/19/2011

*NEW HGE, INC. d/b/a HOUSTON GOLD EXCHANGE v. JEWELRY BUYERS, INC.*
In the District Court Of Harris County, Texas, 333rd Judicial District
Cause No. 2009-78988
Deposed 2/22/2011and 8/10/2011

*JESSICA ANN COLLINS v. 4 LIFE WEIGHT LOSS CENTERS, INC.*
In the Circuit Court of Jackson County, Missouri at Kansas City, MO
Case No. 0916-CV17572 Division 4
Deposed 5/14/2010

- 49 -

SIL0051

# EXHIBIT "C"

SIL0052



## Order

| Client | Jeffrey Hirsch |
|---|---|
| Order # | TC0774560026 |

## Audio

| File URL | VIP Group 1.mp3 |
|---|---|
| Length | 34 min |
| Audio Quality | ★ ★ ★ ★ ☆ (Good) |
| Typist Comment | Each speaker was clear most of the time. However, most of the women's talking is "crosstalk" - I've labeled it in a few places, but mostly just trying to focus on important sentences. Also, hardly ever sure who was speaking. I've given a shot to do some voice matching, but it's not exact at all. |

| Transcriptionist | Jennifer B. |
|---|---|

### How did Jennifer do?



If you rate this transcript 3 or below, Jennifer B will not work on your future orders

Need Help? mailto:support@rev.com

SIL0053

Felicia:        [inaudible 00:00:25]

Jeff:           Hello everybody.

Felicia:        Hello.

Jeff:           How are you doing?

Felicia:        I'm good, how are you?

Jeff:           Good. Hi, I'm Jeff. [inaudible 00:00:42] Has anybody been here before? Done this kind of thing?

Felicia:        No.

Jeff:           Has anyone not done this kind of thing before? Felicia, did I say that right? You haven't done this before?

Felicia:        Perfectly.

Jeff:           Really?

Felicia:        You said it perfectly. That's a first.

Jeff:           There you go. Yeah, you got the Melissa and all kinds of funny things, right?.

Felicia:        Felicia. I answer to just about.

Jeff:           All right. Well, this is something we call focus group. Companies do these because they want to know what people think, so we've got people, and we have a group, and we talk. It's going to be very casual. It's going to be fun. It's short. It's going to be short and fun so it'll be good. There's a secret one-way mirror behind me, in case you've never been to one of these places before, like you. There's one of my colleagues sitting back there, he may or may not come in at the end, doesn't matter. One person is watching, we don't try to fool you. The microphone is up somewhere up there, it's either here or back there. Pay them no mind, we just set them up this way, again not to fool you, just so we can have one person in here to lead the conversation so that you all don't get confused.

                That's it. That's all I have to say for now. I'll tell you more about me in a moment, but let me go around the table. I see your first name, but say your first name, tell me where you live, tell me who you live with, tell me if you've got any pets, all the essential information. [inaudible 00:02:09] Go ahead, Stephanie.

SIL0054

Stephanie:     I'm Stephanie Tucker. I live with my boyfriend in Santa Monica and we have a dog, a cat and a couple of fish.

Jeff:          A dog, a cat and a couple of fish. Okay, cool. What kind of dog?

Stephanie:     A Shar Pei, like a wrinkly one.

Jeff:          All right, cool. What do you do?

Stephanie:     I work for a technology company in the Marina.

Jeff:          In Silicon Alley, or what do they call it?

Stephanie:     We're not in anywhere cool. We're just-

Jeff:          What do they call that?

Stephanie:     Silicon Valley?

Jeff:          No, no. They have a ... There's an expression for all those tech places by the beach down there, and I'm getting it wrong.

Stephanie:     Oh yeah. I don't know.

Jeff:          You know what I'm talking about?

Stephanie:     Yeah.

Jeff:          What does your company do?

Stephanie:     Everything. A little bit of everything. It's kind of a consulting company.

Jeff:          Okay. Cool. Thanks.

Felicia:       [inaudible 00:02:59] Vista.

Jeff:          No, it's-

Felicia:       Silicon Beach.

Stephanie:     Oh yeah, Silicon Beach. Yeah.

Jeff:          Thank you very much.

SIL0055

Stephanie:     We're in the marina.

Jeff:     Silicon Beach, right. That is kind of Silicon Beach though. That's what they mean by it.

Aliza:     My name is Aliza [Fornier 00:03:15], I live in [Tahunga 00:03:16]. I live with my parents and my little brother. I have a husky and I have a parrot.

Jeff:     Wow. Okay. We've got multi-pet families here. It's going to be really interesting. Dana?

Gail:     I'm name's Gail [Suski 00:03:28]. I live with my sister and her roommate, and we have dogs and cats.

Jeff:     Dogs and cats?

Gail:     Yeah.

Jeff:     Wow. How many?

Gail:     Well, between ... I have two dogs and my sister has a dog, and our roommate has two dogs. It's a lot. And a cat.

Jeff:     In an apartment?

Gail:     No, it's a house. It's a four bedroom house.

Jeff:     Great. I'm sorry, where did you say you live?

Gail:     Reseda.

Jeff:     What do you do?

Gail:     A sound editor.

Jeff:     Oh, okay, nice. For TV? Movies?

Gail:     TV.

Jeff:     TV. Great.

Felicia:     I'm Felicia [Pifko 00:04:01]. I live in Beverly Hills. I'm widowed and I have a black lab.

SIL0056

Jeff:       Okay, nice. Do you work?

Felicia:    No. Well, I volunteer at Cedar's twice a week.

Jeff:       Very nice. Good for you. And Kerri?

Kerri:      I'm Kerri. I live in Brentwood. I have a dog, a Bichon poodle, miniature Bichon poodle mix, and I have a cat as well, a black cat. I work in human resources.

Jeff:       Great. For what kind of company?

Kerri:      We do just a recruiting staffing front.

Jeff:       I'm Jeff and this is my job. This is what I do. I have a research company and I travel all over the place and talk to people. I'm leaving the country on Sunday to go to Panama and Jamaica.

Kerri:      Cool.

Felicia:    Oh cool.

Jeff:       Bahamas. For work, for work! Tough job, but someone's got to do it. Usually it's just in the States and I go to Chicago, Dallas, or whatever. I live in Studio City, so this is great for me because I'm home. It's just a quick drive before traffic built up over the hill today. This is what I do. I am an independent researcher. I can't stress that too much. I'm going to show you some things. I don't care whether you like something, don't like something. I do care that you stress what you really feel, but other than that, you're not going to hurt my feelings. You're not going to flatter me. Anything you have to say, none of this has to do with me. I just want your honest reactions to everything that we talk about. I have two [ex 00:05:35] poodles, they're getting on, yeah, sad. I have three kids too, but they're all grown up. Okay, good, why don't we ... We'll just jump in. I want to talk ... See if we can kind of ... If you know what I'm talking about here. I want to talk about products that are spoofs or satires. Things that make fun of other things. Can you think of anything at all like that? Something that's kind of a spoof?

Aliza:      The actual product or the ad?

Jeff:       Either. I don't care. Maybe a joke product you might think of?

Aliza:      Like the Snuggie kind of thing? Like that kind of thing?

Jeff:       What's that?

Aliza:          The Snuggie, or Snuggle or whatever it is, that pajama blanket.

Jeff:           That's a real thing-

Aliza:          I know.

Jeff:           That's not a joke. You can make jokes about it. So, okay, so Saturday Night Live did a spoof on that, which they probably have, that would be ... That's not a product, but you might think of some Saturday Night Live things, like they did an airline.

Aliza:          Oh, it could be fake?

Jeff:           Yeah, it could be fake. It could be fake or ... What I want to get to, and I'll show you some examples in a little while, are actual products that are out there, that kind of spoof other things.

Gail:           Well, what about all these new cigarettes? They're supposedly not real cigarettes, they're plastic. I don't know what-

Stephanie:      The e-cigarette things?

Gail:           Yeah.

Jeff:           Yeah, that's not a spoof product, that's a-

Gail:           That's not?

Stephanie:      That's a real product.

Jeff:           That's a real product that's-

Gail:           But aren't they spoofing real cigarettes, or-

Jeff:           No, I don't think they're trying to poke fun at real cigarettes. I think they're providing an alternative nicotine delivery system is what they're doing actually, right?

Gail:           Oh, okay.

Aliza:          [Choosing 00:07:30] a blog post with a bunch of these, I just can't remember any of them.

Jeff:           Yeah.

SIL0058

Stephanie:     Yeah, I was just trying to think. I feel like I see ads all ... Kind of like when Samsung makes fun of Apple in their ads?

Jeff:          Maybe.

Stephanie:     I mean, they're kind of making fun of them, not spoofing them.

Felicia:       You know what? Now that I'm thinking about it, there's a lot of products that you could buy on Amazon or something.

Jeff:          Sure.

Felicia:       That are spoof products.

Jeff:          Yeah, like what?

Felicia:       Like you're doing research because you want to find a certain ingredient or something in there, and you're trying to find it, and you're looking for maybe a specific thing. But all these things come up that ... And there's the fake wannabe, but it's not the real thing, and then you want to go ahead and order it. But it's not a good idea to order it because it's not the original. Or something. I don't know if you mean-

Jeff:          I'm really talking about humor, not just a poor substitute. I'm talking about things that are ... Remember Mad Magazine, anybody?

Felicia:       Yes.

Jeff:          I thought you were all women, maybe you don't read Mad. Yeah, I read Mad Magazine when I was a kid. It's that kind of humor.

Stephanie:     Like those trinkets I saw on Amazon? Like the holder for your banana and stuff like that, products you would never need that are kind of funny?

Jeff:          I'm going to show you some things. These are like ads, and ... Here's what I want to do. We'll just get right to this, okay? These are in no particular order. I'm going to try to ... I think they're in alphabetical order now, the way I printed them out on my computer. I'm just going to kind of go through these, okay? So, this would be ... Here. Here's what I want to do. I'm going to show these to you and I want to make three piles, okay? Things that are just, to you, this is how you perceive them. There's no right or wrong here. It's just what you get, okay? [These are 00:09:25] the things. That's clearly a joke. They're clearly joking around. The middle pile might be, it could be a joke or it might not be a joke. Then there's

SIL0059

another pile with, that's not a joke, that's serious. They're really insulting somebody. Okay? You get the distinction?

Stephanie:     Mm-hmm (affirmative).

Jeff:          So, okay, here's a T-shirt. This says Murder King.

Stephanie:     Oh, yeah.

Jeff:          Okay? It looks like what? They're spoofing what?

Stephanie:     Burger King.

Jeff:          Burger King, right. Where would you put this? Is it definitely a joke, maybe they're really saying something nasty about Burger King, or somewhere in the middle.

Stephanie:     Like it is-

Jeff:           Where would this fall?

Felicia:       They're making fun of it.

Stephanie:     Yeah, it's definitely.

Felicia:       A joke product.

Aliza:         Unless they're vegetarians and they're saying-

Felicia:       Right.

Stephanie:     Oh, I see it.

Felicia:       [crosstalk 00:10:11] they're not.

Aliza:         It could be in the middle.

Jeff:          Yeah, this might be in the middle.

Stephanie:     It could be a serious organization like PETA making it, or it could be some guy that thought it was funny, so in the middle.

Jeff:          So, we're not sure. It could be in the middle, but it's clearly something ... Here's another one. This says Kellogg's All-Brain, and it has little pictures of the brain.

VIP Group 1                                                    Page 8 of 24

Stephanie:     A joke.

Jeff:          You remember, there's this product called Wacky Packs that you might remember. I think this is like a Wacky Pack.

Stephanie:     Looks like one of those.

Jeff:          Is this just an out-and-out joke? Is it maybe in the middle? Or are they really insulting ... This is spoofing what?

Stephanie:     The bran flakes?

Jeff:          Yeah. Kellogg's All-Bran.

Felicia:       Yeah.

Jeff:          So are they trying to say something disparaging All-Bran here, or is it a joke, or is it in the middle?

Felicia:       No, I think it's a joke.

Jeff:          It's just a joke.

Stephanie:     It's like an S&L joke or something.

Felicia:       Well, bran is supposed to be good for your brains. Therefore, to me it's like a joke.

Jeff:          I don't want you to think too hard about this.

Stephanie:     It's a joke.

Jeff:          Yeah, it's a joke, so ... For instance, you can look at this, would this keep you from buying All-Bran, if you bought All-Bran?

Stephanie:     No. I mean I would see that on Jimmy Kimmel or something.

Jeff:          Right, okay, all right, good. Here's one, this one kind of ... This looks like ... I'm going to show you. I think I'll just do a couple of these. This is a ... This says ... I think this is a chew toy for a dog. It's called a Silly Squeaker, and it says, "Cat aroma extra." Spoofing what product?

Stephanie:     Corona.

SIL0061

Felicia:        Corona.

Jeff:           So, joke, insult?

Felicia:        What is it? I don't know what that-

Jeff:           It's a chew toy. It's like a rubber chew toy for dogs.

Stephanie:      Shaped like a beer?

Aliza:          That's a joke.

Stephanie:      That's a joke.

Jeff:           It's a joke. Does it say anything bad about Corona?

Stephanie:      No.

Jeff:           Okay. Let's see. This is a T-shirt that says ... This has got a ... I'm not trying to get political at all here, so I don't care what you think of this guy, but just about this T-shirt. It has a big picture of George W. Bush. It says, "Miss me yet?" Which probably came out right after he left office. Is this, how do you feel about this? Pure joke, somewhere in the middle, or are they really trying to insult W here.

Stephanie:      No.

Aliza:          Middle maybe? Joke?

Felicia:        I don't think they're trying to insult W. I think they're trying to insult Obama. Exactly.

Jeff:           Actually, you're right about that. That could go ... That's so interesting. Could go either way, depending on whether you're Republican or Democrat, right? The Democrat's going to go, "Uh, no," and the Republican's going to go [crosstalk 00:12:56]. Exactly.

Felicia:        Exactly.

Jeff:           That's in the middle. Okay, here's one, this says, "Mr. Mean, are you supporting animal testing?" And there's some copy here. So, is it-

Stephanie:      That's not a joke.

Jeff:           That's not a joke.

SIL0062

Stephanie:     No.

Jeff:          And why is this not a joke?

Aliza:         It's because they're trying to bring awareness that Mr. Clean brand, I guess maybe tests on animals, or whatever.

Jeff:          So this one, so yeah.

Stephanie:     They're just insulting him.

Jeff:          So would you say, this category here, this is the jokes. Tell me about all these different piles. The pure jokes, the one we're not sure of, and the one that are definitely ... What's the intent here? What's the intent of just the jokes? That category?

Felicia:       I think the jokes are just trying to use a well-known product and change it around to get the exposure and to draw people's attention to it and make it a joke. So, the bottle is shaped like the Corona, but it's advertising something else. I don't think there's any-

Stephanie:     It's just silly.

Felicia:       Meanness or anything involved with that. It's just trying to draw attention to it.

Jeff:          This [crosstalk 00:14:04] though, it says Mr. Mean but ... This one they're really coming after-

Stephanie:     They're really [inaudible 00:14:08] the product down.

Jeff:          Yeah. So here's a ... I just have some, in no particular order, I don't have to do too many more of these. Some of them are kind of the same. Here's one. This says Kentucky Fried Fingers. It's kind of gross.

Aliza:         That's like those Garbage Pail Kid cards.

Jeff:          That might be what it is. That's just a joke, but-

Felicia:       I hope.

Stephanie:     Yeah, I don't think they're actually saying Kentucky Fried Chicken puts fingers in your chicken. I think they're just making a joke, like play on words.

SIL0063

Jeff:          Okay. Here's one, let me see, this one says, this is in the shape, well you tell me what this is. This says Bad Spaniels Hennessee Carpet. This is another doggie chew toy. It's-

Stephanie:     Jack Daniels.

Jeff:          It's a joke?

Felicia:       Yeah.

Jeff:          Who are they making fun of here?

Gail:          I think they're just trying, like you said, to make it look like a product you have, and you're like, "That's funny, my dog can chew on the same bottle I have," I don't know.

Jeff:          Okay. Anybody drink Jack Daniels here?

Felicia:       On occasion.

Jeff:          We'll come back.

Felicia:       Are we getting samples?

Jeff:          You are getting samples, but not of Jack Daniels. It's funny. I never thought of that. Okay, a couple more. Here's one. This one says Absolute Impotence.

Gail:          Oh.

Felicia:       That's insulting.

Gail:          Insulting.

Jeff:          That's insulting. Okay. Real quick, just a couple more. This says Captain Crud.

Gail:          That's funny.

Stephanie:     Yeah, that's a joke.

Gail:          I don't, I think [crosstalk 00:15:47].

Felicia:       I think that's insulting.

Jeff:          You think that goes there?

VIP Group 1                                                          Page 12 of 24

SIL0064

Gail:          Yeah.

Jeff:          Okay. We did one of these, let's see. There. Band Aches strips off skin.

Stephanie:     Ooh, gross.

Jeff:          Yeah, that's gross, but-

Stephanie:     I think it's supposed to be a joke but it is kind of a disparaging [inaudible 00:16:08].

Jeff:          [Gulp Oil 00:16:10]?

Stephanie:     Joke, I guess.

Jeff:          You think this-

Gail:          I don't know.

Jeff:          The reason you would put it here-

Stephanie:     It could be, it's funny.

Jeff:          The reason you put it in this pile is like-

Felicia:       They're insulting the company, and I don't think they're insulting the company. They're insulting whoever's using it, in case if they're going to gulp it or drink it down.

Jeff:          It's just stupid. [crosstalk 00:16:35] All right, that's enough. That's plenty. Yeah, that's good. How about this one? Donut cereal.

Felicia:       Isn't that a real product?

Jeff:          It is a real product. I just ... I couldn't believe it. I look at this stuff, is this real?

Felicia:       Not that I've ever bought it, but-

Stephanie:     It kind of looks real.

Jeff:          I don't think they made it anymore.

Stephanie:     Some of those things they only gave us before they cared about all-

SIL0065

Felicia:        My generation.

Jeff:           If you were to summarize these things in your own words, just describe these three piles ... I described them but I want you to describe them in your own words, what these represent. This pile that you thought was out-and-out joke, this one where we're not sure, maybe ambiguous, and this pile which is probably really ... These are real [inaudible 00:17:37]. Just tell me the difference between those things.

Stephanie:      Can I, okay-

Jeff:           Yeah, go ahead.

Stephanie:      It seems like this could be coming directly from-

Felicia:        Competitor?

Stephanie:      No, it could be from a competitor or it could be from PETA, or an organization that supports animal rights.

Jeff:           Right.

Gail:           So, trying to get you not to buy that product.

Stephanie:      Right.

Jeff:           And they're targeting-

Stephanie:      Certain organization, yeah, because this product has chemicals in it, and this one is bad for you and could cause erectile dysfunction, I don't know, whatever. These are different corporations that are against something, ingredients in this product.

Gail:           There's a reason they don't want you to buy it.

Jeff:           There's somebody behind those who's having it-

Stephanie:      The chemicals in these products.

Jeff:           But there's somebody behind these who has an agenda. That agenda is to what?

Gail:           To get rid of them.

Stephanie:      To get people not to buy the product.

SIL0066

Gail:            Make you aware of what they're doing.

Stephanie:       Make you aware of what they're doing.

Jeff:            In between is in between, so we'll just leave that for now. What about these guys over here?

Stephanie:       I think they're just trying to make a product-

Gail:            It's like a parody, to take the popularity of the real product.

Felicia:         The real product.

Gail:            To just make money for themselves and sell things.

Jeff:            Right. But what do these say, if anything, about the real products? Because these are all based on, so this is Jack Daniels and this is Gulf Oil. Is Gulf Oil still around? Gulf stations?

Stephanie:       On the east coast there is.

Jeff:            Yeah, and Kentucky Fried Chicken-

Aliza:           I think they're trying to advertise it in a funny way.

Jeff:            Huh?

Aliza:           They might even be trying to advertise it in a funny way.

Jeff:            Yeah, it could even be from those very companies?

Aliza:           I think they're trying to advertise it.

Gail:            I think these are well-known brands that people actually like, so they thought, "We should do something funny off of them." Not that it's a different ... Just to have fun with it, because they're well known. Everyone knows these brands.

Felicia:         [crosstalk 00:19:40] advertise that way.

Stephanie:       They're like kitschy in parodies. I don't know, like at work sometimes when I go in the store if I see something that looks like a human product for my pet, I'm like, "Oh that's kind of cute and funny." Then I'll buy it for them.

VIP Group 1                                                          Page 15 of 24

Gail:        The play on words people like, especially when it comes to pets, I think. Coming back to that, if I were to walk into Petco or something and see something that says Kellogg's All-Brain or something, "good for your dog, will make him smarter." I would buy it.

Jeff:        You would?

Gail:        Or something. [crosstalk 00:20:11] Helps with joints, or whatever.

Stephanie:   It'd be funny to like-

Jeff:        It's really the opposite of this disparaging, right? It almost makes you think-

Felicia:     It draws you to it.

Jeff:        Think better of these things. That's surprising, but ... So, let me ask you this. You all [inaudible 00:20:29] Jack Daniels. No Jack Daniels samples. You will get a sample, of something, later. When you see this, I asked you, do you drink, you probably eat a lot of, take this out of it, but Gulf Oil's not here, but most of you if you've ever had a beer maybe you've had a Corona. You've probably had some bran cereal. You probably ate at KFC, and all of you said you've had a drink of Jack Daniels at some point in your lives. Let's think about that brand in particular. What is this, if anything, do you, when you look at that, what do you think about? Just top of your mind, when you look at this Bad Spaniels thing, what goes through your mind?

Stephanie:   Cute.

Jeff:        Cute, funny?

Gail:        Entertaining.

Stephanie:   We think it [crosstalk 00:21:23] bad on Jack Daniels.

Jeff:        You would?

Stephanie:   I think if I had a friend that loved Jack Daniels and had a dog, I'd be like, "Oh, a good present."

Aliza:       It's a conversation starter.

Stephanie:   I just think it would be funny if you're at a party at your house, like people are drinking the real one and then your dog's [inaudible 00:21:33] a squeaky toy and

SIL0068

|          | it looks like a beer or something. It's kind of like, this is funny, it's cute. I don't know. |
|----------|----------|

Felicia:   You may just have discovered something. [crosstalk 00:21:45]

Gail:   It kind of reminds me of, you know how they do those commercials, just the Corona commercials, where you've got ... Or the openers to the cans or someone has a life thing around their neck that looks like a keychain to open a beer or something. Just something and they're making fun and they're saying, "Ai Corona."

Jeff:   Yeah.

Gail:   Something like that, with a dog, or, you know, like "Ai, Jack Daniels," you know? In a funny way.

Jeff:   Hmm. Do you think that, with this ... I'm sorry if I'm being repetitive here. The next time you want to have a drink, you've seen this now, right? Maybe, let's say you've bought one. Let's say I give you one to take home. Okay, your dogs are now chewing on this thing. It's around your house. Next time you go to have a drink of some kind of bourbon or Jack Daniels or something, what's going to go through your mind? Has your feeling about what Jack Daniels is, has it changed at all? That you've seen this?

Felicia:   Yeah, it's going to make me laugh.

Aliza:   Yeah.

Stephanie:   I don't think it would change my human feeling towards Jack Daniels. I would just think it was funny with my dog.

Gail:   I would want to have a drink with my dog.

Stephanie:   Yeah.

Kerri:   It could be something where your dog might be playing with it and you just crave it.

Gail:   Right, and you want to go to the fridge and grab some Jack Daniels.

Kerri:   It's something that'll make you want to drink it.

Gail:   Right.

SIL0069

Kerri:          Or if you forget about it and one day your dog's playing with it, you're like, "Oh maybe I should buy this tonight."

Gail:           It's top-of-mind awareness, probably, about the product. Like if you have a keychain or something around, like this, or a squishy toy. People look at it and go, "Oh, I should go get it out of the fridge right now."

Jeff:           Okay. I'm going to ask you some very specific questions, okay? They want me to ask you. Again, you've got one of these in your house, or maybe you don't, but you've seen it, right? Would you associate Jack Daniels with dogs in any way because you saw this?

Gail:           No.

Stephanie:      No.

Jeff:           No, you wouldn't. Okay, but it's a dog-

Gail:           Unless you had a cocker spaniel.

Jeff:           Oh, because it's a bad spaniel, right. Unless you had a bad cocker spaniel.

Gail:           Yeah.

Jeff:           Okay. Would you think anything after this? Would anything change next time you look at a bottle of Jack Daniels based on this?

Aliza:          I don't think so.

Stephanie:      Probably laugh.

Jeff:           You'd laugh?

Kerri:          Yeah, I would just laugh.

Stephanie:      Or maybe say like-

Felicia:        Remind me of the toy, and-

Stephanie:      Yeah, maybe say to somebody, "Oh, I went to the dog toy, it looked like it was pretty funny." I don't know. But I don't know that I would associate-

SIL0070

Jeff:            And with this, I'm kind of asking the same thing in different ways, but that's okay, you can answer me. Would this have any effect on you drinking or not drinking Jack Daniels in the future, if you saw this?

Gail:            No.

Stephanie:       Like I say, it might want to make you drink it. But I don't think it would be negative, like, "I'm not going to drink this."

Gail:            No, I don't think [crosstalk 00:24:43].

Stephanie:       There's no negative connotation, it's like this.

Jeff:            There's no negative connotation.

Stephanie:       [crosstalk 00:24:48] like dogs are cute, so it's not like, "Ooh, I saw a dog with a bottle that looked like that. I'm never drinking it again." It's like, "Oh, that's cute." I don't know.

Jeff:            Okay. I want to ask you this very specifically, okay? Do you think this product would evoke associations with dog poop or pee in any way, shape or form?

Felicia:         No.

Stephanie:       Wait, say that again. What?

Jeff:            You heard me right. Would this product evoke any associations with dog poop or dog pee in any way, shape or form.

Aliza:           No.

Stephanie:       No.

Stephanie:       Would that even enter your mind if I-

Felicia:         No, not until you said something.

Stephanie:       Because they're playing. They're not out for a walk, I don't know. No. If it was at the bottom of my cat's litter box.

Gail:            But if it did, that's kind of not a good thing, because I'm looking at the bottle and I'm thinking about pee [crosstalk 00:25:33] a bottle.

Stephanie:       Like if-

SIL0071

Gail:            It doesn't make sense.

Stephanie:       It's not like on his doggy [inaudible 00:25:40] or something, like assemble. [crosstalk 00:25:45]

Jeff:            This is the actual-

Stephanie:       Oh, oh, they're huge.

Jeff:            Yeah, I know, they're big. But this is the ... You can take that out, you can have these to take home.

Felicia:         Oh, great.

Gail:            Oh.

Stephanie:       Conan will love it.

Jeff:            When you take them home, I'm going to give you these paper bags to put them in, because there's people coming in after you and I don't want them to see these.

Stephanie:       This is cute.

Felicia:         This is great.

Kerri:           This is going to drive you nuts.

Gail:            Everything just be a perfect kind of gadget for someone that drinks whisky all the time, and that's cute.

Stephanie:       I feel like I've seen stuff like this in Petco before, where it looks like a box of food that a person would eat, or a remote control for the TV, something like that, but it's rubbery for the dog.

Felicia:         A hundred percent smelly? Or 80 percent poo by volume?

Stephanie:       It doesn't smell does it?

Felicia:         No, it's down here, it says "100 percent smelly, 43 percent by volume, poo by volume."

Stephanie:       It's weird. It feels weird. It's like very-

SIL0072

Kerri:        So this is what they have to do for each other.

Felicia:      I think it would be a great gadget [crosstalk 00:26:54] Jack Daniels.

Kerri:        [crosstalk 00:26:58] give my pets alcohol?

Felicia:      I think this is fabulous.

Kerri:        It's cool.

Stephanie:    It's really cute. It's a good, if you're going to somebody's house-warming, and
              you're bringing them a bottle of-

Felicia:      I just said that, yeah.

Stephanie:    And then you give the dog-

Kerri:        Oh yeah.

Jeff:         Okay, so, here's where that question came from. Now I see why they wanted to
              ask that, because that's "43 percent poop by volume, 100 percent smelly."

Kerri:        [crosstalk 00:27:24] but I don't think it would make me think-

Gail:         Is it supposed to be, or is there a product that's actually a deodorizer or
              something?

Stephanie:    I think they're just trying to make [crosstalk 00:27:31].

Gail:         No, I think it's just [crosstalk 00:27:31] how the Jack Daniels bottle's like 43
              percent liquor or something, right?

Jeff:         Right. Alcohol by volume. [crosstalk 00:27:38] Okay, so.

Felicia:      This is specifically made for dogs. It says, "Safety of your dog."

Jeff:         But does anybody think, reading this label, it says, "43 percent poop by volume,"
              does anybody think that there is poop in here?

Felicia:      No.

Jeff:         Does anybody think that there's poop in Jack Daniels because it says, "43 percent
              poop by volume"?

SIL0073

Felicia:        No.

Kerri:          It's funny.

Stephanie:      In fact, I wouldn't think this had any association with the actual Jack Daniels.

Felicia:        I think it's very clever.

Jeff:           That was my next question. Does Jack Daniels make this product, do you think?

Stephanie:      No. Looks like somebody else made it.

Jeff:           Yeah. Okay, stay here. We have more, we may not. You might be out really early. Let me see.

Felicia:        God, this is going to drive me crazy every time it squeaks. [crosstalk 00:28:28]

Kerri:          Well, my dog is-

Gail:           You go like this ... Tilt his head.

Kerri:          Okay, never mind.

Stephanie:      It's too big for a little tiny dog.

Felicia:        Well, mine is a big dog. [crosstalk 00:28:43]

Stephanie:      Yeah, if you have a small dog that's not- [crosstalk 00:28:51] Maybe he'll just chase around the squeak noise.

Felicia:        I think I'm going to have to take the squeaker out. This is actually very clever.

Kerri:          It is.

Stephanie:      I like the Corona one.

Kerri:          Yeah, the Corona one's really cute.

Stephanie:      It's really cute.

Felicia:        Oh, do they have any of those?

Stephanie:      I don't know.

SIL0074

Kerri:          It doesn't smell like a Corona. [crosstalk 00:29:09]

Gail:           It's just too big for ... I think, yeah, of course, a dog with a huge mouth could-

Stephanie:      Yeah, it's huge, you have to need a bigger-

Jeff:           Hi, everybody.

Bruce:          I'm Mr. Spaniel.

Jeff:           This is Bruce.

Bruce:          I've been sitting back there watching you.

Gail:           Very clever.

Stephanie:      Yeah, it's very cute.

Bruce:          Would you mind if I took a picture of the group?

Stephanie:      Sure.

Felicia:        Absolutely.

Bruce:          That was fun. It was fun to hear your guys. It was really fun. Thanks for coming
                out tonight.

How did Jennifer do?



SIL0075

If you rate this transcript 3 or below, Jennifer B will not work on your future orders

SIL0076



# Order

| | |
|---|---|
| Client | Jeffrey Hirsch |
| Order # | TC0774560026 |

# Audio

| | |
|---|---|
| File URL | VIP Group 2.mp3 |
| Length | 30 min |
| Audio Quality | ★★★★☆ (Good) |
| Typist Comment | The first minute is chit-chat and crosstalk among the participants and is difficult to make out. |

| | |
|---|---|
| Transcriptionist | Jennifer O. |

How did Jennifer do?



If you rate this transcript 3 or below, Jennifer O will not work on your future orders

Need Help? mailto:support@rev.com

SIL0077

| | |
|---|---|
| Female: | It's very good, with not spilling it or anything. We're here to talk about pets, or [crosstalk 00:00:12]? |
| Male: | You're really good at computers? |
| Female: | Back when I was in junior high school, I was [inaudible 00:00:22] a little bit. I don't really want to talk about that. |
| Male: | [Inaudible 00:00:26]? You still don't? |
| Female: | No. |
| Male: | Don't want to talk about it, huh? |
| Female: | I don't. |
| Male: | No comment; one of those. You take the fifth. |
| Female: | It was a different cat, and many years ago. |
| Male: | Many moons ago. I asked him if we're going to sample any booze, they said no. They don't want to get us drunk. |
| Female: | Can you switch your phones on mute, too? |
| Male: | Sure. |
| Jeff: | Hi, everybody. |
| Group: | Hi. |
| Jeff: | Guess who I am? |
| Female: | The moderator. |
| Jeff: | Yes. Thanks for coming. Anybody not done one of these before? Have you done one of these before, or one of these sessions? |
| Female: | I've done them. |

VIP Group 2.doc                                                                                   Page 2 of 22

Jeff:          Yes, all of you?

Female:        Automobile interiors …

Jeff:          You've done one?

Male:          Yeah, this is my second one.

Jeff:          [Inaudible 00:01:22], I just like to ask because it's a pretty straightforward thing, a bunch of people talking about stuff. There's the old secret one-way mirror back there. One colleague of mine is back there. He'll probably come out at the very end. I don't think we're going to take long. If we're here for 45, 50 minutes, I'd be surprised. It should be short and sweet and fun for you.

               Again, my name's Jeff. I once … I'll tell you more about me after we go around the table. First, I just want to go around and just tell me … I see your first name, but tell me your first name, where you live, who you live with, what you do, all that kind of good stuff. Go ahead, [Kiara 00:02:03].

Kiara:         Kiara, I live in Hollywood. I live with my boyfriend. I am an artist, I guess.

Jeff:          You guess? You've got to be committed to that, right?

Kiara:         I'm still trying to figure it out. Yeah, I do different things; wardrobe, special events, a little bit of acting, just different stuff.

Jeff:          Typical L.A., right? Nobody's who they seem to be. I like that; what do you do, and what do you really do? John, go ahead.

John:          John, I live in Westwood. I work in an investment business. What else did you want to know?

Jeff:          That's good; who do you live with, do you live with anybody, are you single?

John:          I live alone, yeah.

Jeff:          OK, good. Brian?

Brian:         Brian, I live in Santa Monica. I live alone as well, and I do social media marketing and managing.

SIL0079

Jeff:        Who do you work for?

Brian:       Just different people.

Jeff:        I don't know how you got in here, but it's OK. Matthew?

Matthew:     My name is Matthew. I live in Van Nuys, by myself, and I'm in … I'm an antique
             dealer. I sell on eBay and stuff like that, do swap meets as well.

Jeff:        Marti?

Marti:       I'm Marti. I came all the way from Long Beach, in good traffic. It was great
             watching it go the other way. I did payroll at the racetrack for 13 years, and I've
             been laid off for a little while.

Jeff:        You worked at the racetrack?

Marti:       Yes, I did payroll for 31 off-track wagering locations, in horse racing, but my
             company closed not long ago, so I'm kind of contracting and doing focus groups.
             I'm very happy to be here.

Jeff:        You're not supposed to say you're doing focus groups.

Marti:       No, I'm very happy to be here. It's been over a year, so this is some income.

Jeff:        That was the right answer.

Marti:       That's the truth.

Jeff:        We don't like having professionals.

Marti:       No, I'm not a professional.

Jeff:        It's funny, though. I've been doing this for quite a long time, and it's rare now
             that I run into people who haven't been in a focus group. It's like, all of America
             has been focus grouped at one time or another. It used be like, when I started
             out, they'd always say, "You've got to get some virgins," meaning focus group
             virgins, people who have never done it before.

SIL0080

I'm Jeff. I live in Studio City, but I go all over the country, all over the world sometimes, doing this kind of work. I have an independent marketing research company, with an underlying independence. We're going to look at some things, and talk about some stuff. I don't care what you say, as long as it's what you feel. Opinions one way or the other, it doesn't affect me whatsoever. I just want to know what you're thinking about.

Let's start, and I don't know if you'll be able to answer this, but I'll throw it out there to see if you can. I'm thinking about spoof products; things that, products you might buy that make fun of something else. Maybe it's a T-shirt that says, "I'm with stupid," or something. That's not quite right, because it's not really making fun of anything.

Marti:      Then he's stupid, right?

Jeff:       Yeah. I'm talking about "Mad" magazine kind of stuff, "SNL" kind of stuff. Can you think of any products out there, that are kind of spoofing something else? It's a product that's spoofing another brand? You know what I'm talking about though, right?

Kiara:      Yeah.

Male:       I don't know where to get them. I don't know of any offhand, though.

Jeff:       Yeah, that's fine.

Male:       The only one I can think of coming to mind is the guys set up a Stupid Starbucks.

Jeff:       Tell me about that. That's interesting.

Male:       This guy set up a coffee shop called a Stupid Starbucks.

Jeff:       What was it?

Marti:      It did really well, right?

Male:       It was a coffee shop. He had a line around the building, yeah, over in Silver Lake area, I think.

Jeff:       Did they … I'm sure, did they make him stop?

SIL0081

Male:       No, because he was actually under the … There's a spoofing law. I don't know if that's the term, but there is a … He was under that law, so he was protected, so no, they couldn't stop him.

Jeff:       I remember reading about that.

Male:       Yeah, I read it. I thought it was really interesting, too, and I couldn't figure out how they didn't stop him.

Jeff:       What made it stupid, do you remember? Is that just the name?

Male:       Yeah, it's just the name. I'm trying to remember if there was anything in there that was actually …

Marti:      They were just totally, I think, directly spoofing Starbucks, to see what happened.

Male:       Yeah, he might have changed the names around, and made funny names or whatever for the coffees.

Jeff:       It was like a "Mad" magazine version of Starbucks.

Male:       Yeah.

Marti:      Successful.

Jeff:       It was successful, and what did that say, do you think … If you haven't heard of it, or if you haven't seen it, you probably can't answer. What did that say about Starbucks? Do you think people who went there were thinking …

Kiara:      They probably didn't want to go to Starbucks.

Marti:      I think so, too.

Kiara:      They didn't want to support Starbucks.

Marti:      I think they wanted to support anyone who was spoofing Starbucks.

Jeff:       He might have been … What I want to get to in a minute, is sometimes things are just jokes. They're just funny. Sometimes they're kind of directed at somebody

SIL0082

like, "I want you to think ill of Starbucks." What was the case for this guy, do you think, or somewhere in the middle?

Male:       Probably making fun of Starbucks, I would think.

Jeff:       Because he's trying to be funny, because it's a joke, or because he really hates Starbucks, and he thinks that the chains are evil?

Marti:      I think he just wanted to test people's thoughts, and see if it would work.

Male:       Yeah, kind of a social experiment kind of thing.

Marti:      Yeah, that's what I think, too.

Kiara:      It would depend on how much he knew about Starbucks.

Jeff:       you see where I'm getting at, though; there's some products that are like, "You're targeting …"

Male:       The purpose behind, yeah.

Jeff:       You're being nasty, and you're targeting something. You've got an agenda. Otherwise, that's funny, that's a joke.

            I've got some things here. I'm going to just show you some pictures here, and I want to put these things into three categories. I know this is a joke; that would be the first category. This may or may not be a joke, or, this is mean, this is targeted towards somebody.

            In no particular order, here's one. This says, "Absolute [inaudible 00:08:06]." Is it just a joke? Is it like maybe, don't know, or is it like, they're targeting somebody, targeting …

Marti:      Joke.

Male:       Joke.

Kiara:      I would say middle.

Male:       Probably joke.

VIP Group 2.doc                                                    Page 7 of 22

SIL0083

Male:        Joke.

Marti:       I'd say, absolute joke.

Jeff:        Joke, OK.

Marti:       They're funny.

Jeff:        That's funny.

Male:        Mm-hmm.

Jeff:        Here's one. I don't know if you had these when you were kids, but this says, a whole series of these things, I'll show you a couple of them. It says, "Band-Ache brand strips off skin."

Male:        I remember those when I was a kid, stuff like that.

Marti:       That's very "Mad" magazine.

Jeff:        Yeah, and they're making fun of who here?

Marti:       Band-Aid.

Male:        Johnson & Johnson.

Jeff:        Yeah, Band-Aids, right. Again, is this just a funny joke? Is it somewhere in between, or is it like …

Kiara:       That's targeted.

Jeff:        "They're evil, you shouldn't use their product." What do you think it is?

Male:        Joke.

Male:        Joke.

Male:        Joke.

SIL0084

Jeff:       It's a joke, yeah. How do you know it's a … It's a stupid question, but I just want to ask you, how do you … Why is this a joke? How do you know this is a joke?

Marti:      Because it's so ridiculous.

Male:       Yeah, it's like so over-the-top.

Marti:      And so immature; immature and silly.

Jeff:       Like "Mad" magazine stuff; I think I liked that when I was 12.

Marti:      I still like it.

Jeff:       Yeah, I probably would still like it, but I used to. Here's another one. This is "Kentucky Fried Fingers."

Kiara:      It's a joke.

Jeff:       Yeah, a joke. Here, this one says, "Mr. Mean, are you supporting animal testing?" There's some copy here about Mr. Clean.

Male:       Put that one over in that stack.

Kiara:      Yeah, that's the other way.

Male:       That could be targeted.

Jeff:       This is like, you know the stuff when you see it, whether it's one thing or another here. Here's one; this is "Bad Spaniel Tennessee Carpet," and this is like a chewy toy, I think … It's a rubber chew toy for dogs. They're spoofing what?

Male:       Chicken.

Male:       Spaniels.

Male:       It's a joke.

Jeff:       It's a joke?

Marti:      A stupid joke.

VIP Group 2.doc                                                    Page 9 of 22

SIL0085

Jeff:       Stupid; you just look at this and you go, "Stupid."

Male:       Mm-hmm.

Marti:      I do.

Male:       I don't think it's stupid.

Marti:      That was my …

Male:       It's Jack Daniels, and you have a dog …

Marti:      It wasn't attacking.

Kiara:      I finally thought of a company that spoofs. Their name is Sniffany and Company. They do dog toys.

Marti:      That's cute.

Kiara:      They [inaudible 00:10:40].

Marti:      Do they come in the blue?

Jeff:       Luxury brands, like Sniffany, that's very funny. OK, good. Here's one, let's see, "Murder King."

Male:       That's targeting.

Male:       Targeting, right.

Jeff:       Yeah, so this is more … What's behind this? Why is this … What are they targeting, and how are they doing it?

Male:       Burger King.

Male:       Meat eaters.

Male:       It's still a joke. It's not that big a deal.

Male:       To some people. To other people, it's a huge deal.

SIL0086

Jeff:        It's still a joke, but as we go through these, I'm going to basically …

Marti:       It's more attacking, too.

Jeff:        What I'm asking is like, "What's the agenda behind these things? Is the agenda to make you laugh, or is the agenda to really raise an issue?"

Marti:       I think it's like, "Don't buy their stuff," because they're attacking it. They want you to not buy their stuff.

Jeff:        This is where it belongs, here?

Marti:       I think so.

Jeff:        Here's another one. I want to know where to put this. This says, "Miss me yet?" I want to be apolitical, because republicans might say, "Yeah, we miss you," and democrats might say, "No, we don't". Here's a T-shirt; is this a joke, or is this in between, or are they targeting?

Female:      It's a joke.

Male:        It's a joke.

Jeff:        It's a joke, OK.

Male:        I actually think it could be considered over there.

Marti:       It could be.

Male:        It could be considered  mean-spirited like, we know that person put that T-shirt out to be …

Jeff:        Yeah, the Democratic National Committee could have done this, because they don't want you to vote for whoever the successor is.

Marti:       Remind you of what his legacy was.

Male:        The people who put it out, are trying to stir people up.

Marti:       Be mean-spirited.

VIP Group 2.doc                                          Page 11 of 22

SIL0087

Jeff:          Just a couple, because we definitely get what's going on here, and here. This one is, "Kelloff's All-Brain, the Cereal that Goes to Your Head."

Male:          Spoof.

Marti:         That's totally a joke.

Jeff:          Totally a joke.

Kiara:         Is it?

Marti:         I'm not sure if I totally get it, though; "It goes to your head."

Kiara:         It's not really a joke.

Jeff:          Why not?

Kiara:         Because there are trace metals in cereals.

Marti:         Is that what it is? Is that what that means?

Kiara:         Yeah.

Marti:         I don't get that.

Kiara:         That's what it's referring to.

Marti:         Really?

Jeff:          Do you think …?

Kiara:         If more people knew that, then maybe it wouldn't be …

Jeff:          Do you think the company behind this, it's their agenda?

Kiara:         They probably know that, and they want people to be more aware of it.

Marti:         Now knowing that, it should be over there, if that's what it is.

Jeff:          You think?

SIL0088

Marti:      Yeah, they're trying to … They're expecting …

Male:       I don't think so. You could read into that.

Kiara:      How many people don't know that?

Marti:      I didn't.

Kiara:      That's probably …

Jeff:       Just looking at this thing, let's …

Male:       Put it in the middle, man.

Jeff:       Let's not over-think it. Does this change … It's interesting.

Marti:      It looks like little blobs of ground beef, so I don't know.

Kiara:      Yeah, it's referring to your brains.

Jeff:       It's all brains.

Marti:      That's a brain, oh, OK.

Jeff:       It's the cereal that goes to  your head.

Marti:      OK, All-Brain; now I got it.

Jeff:       Tell me, what is the essential difference, if we could sum it up here, between …
            Tell me why you know these are jokes when you see them? These are jokes,
            these are like, we can interpret them either way. These are pretty clearly going
            after somebody.

Marti:      It says "Murder." That's pretty harsh. It's not like killing me softly, it's murder.

Jeff:       Right, and that says …

Marti:      It didn't say "homicide."

Male:       The things that are politically charged, are generally more towards that side.

SIL0089

Jeff:       Here is like, this one says "Mr. Mean." If it were just Mr. Mean doing something funny, it might be OK. Here, it's specifically in the context of animal testing, so you know …

Marti:      The colors are also the same. I don't think that's just a coincidence, but see the blue?

Jeff:       That's a total coincidence; just those are those brand colors. Here's one, it's "Captain Crud and Mr. Mean." How do I know this one's a joke, and this one's not? We didn't establish this as a joke.

Marti:      It's so obviously.

Jeff:       Why is it obvious? Why are these obvious? All these here, these … Why are these …?

Marti:      "Tastes cruddy even in milk." To me, the word "cruddy," it doesn't say it burns your tongue.

Jeff:       All these here; these, I'm just going to take these away for a moment. All these …

Male:       I think it's very targeted and mean-spirited when it is actually based on something that they actually are accused or, or something they actually do. The other ones are just over the top. We don't think Kentucky Fried Chicken serves fingers. When it comes to the animal testing …

Marti:      We know that that's going on.

Male:       Right, that may go on.

Jeff:       P&G might be testing, or …

Male:       Right. We know Burger King kills cows to sell beef, so we know that's true.

Jeff:       I hope so.

Marti:      It is murder.

Male:       You know a Jack Daniels' chew toy is not really something that's really …

VIP Group 2.doc                                            Page 14 of 22

Marti:          Hurting anyone.

Male:           … Serious, that Jack Daniels does, yeah. The Band-Aid doesn't really rip your skin off. It may hurt a little bit, but obviously it doesn't look like that …

Marti:          You can't die from it.

Male:           … After you take it off. It's based on some sort of joke.

Jeff:           None of these really … None of these you would say, "They're really going after the Quaker company, or they're going after KFC, or they're going after Johnson and Johnson." These are just what?

Kiara:          Spoofs.

Jeff:           Spoofs, and you know it when you see it.

Marti:          I think so.

Jeff:           I want to focus on this one for a minute, this one with the Bad Spaniels. Its like a rubber chew toy. I don't actually have any samples of Jack Daniels. I do have samples of this toy.

Marti:          Whip them out.

Jeff:           I'm sure … You don't have any … This is a group that doesn't own dogs, right? You don't own dogs?

Marti:          Yes.

Jeff:           Now you have a present for somebody.

Marti:          There's tons of dogs in my neighborhood.

Male:           We get to keep them?

Jeff:           Squeaky toy, right?

Male:           We can keep it?

SIL0091

Jeff:        You can. [crosstalk 00:16:41] You get the money, and [inaudible 00:16:47]. You can take the thing out, take a look, tell me anything you think of. Read the label, tell me anything you can think of when you see it.

Marti:       It's loud.

Male:        It's loud.

Male:        I think of number 7, of course, that's the number.

Marti:       Great, hilarious; it's very funny.

Jeff:        Funny?

Marti:       Very funny; good little jokes.

Jeff:        What do you … Do you guys drink Jack Daniels?

Male:        Yeah.

Jeff:        You drink Jack Daniels, so you're Jack Daniels drinkers. Now that you've seen this product, does it have any effect whatsoever on how you feel about Jack Daniels?

Male:        No.

Male:        No.

Jeff:        No, OK.

Marti:       I guess I would think a positive feeling, if they're aware of this, and they're allowing it, and not fighting it. I would think, "What the hell, let's have fun."

Jeff:        Whether or not they're … Does it come from Jack Daniels?

Marti:       No.

Male:        No, I wouldn't say.

Male:        Silly Squeaker, or something like that.

VIP Group 2.doc

SIL0092

Marti:      I think they would have nothing to do with it.

Jeff:       Nothing to do with it?

Marti:      If they're not fighting it, then good for them.

Male:       There's nothing they could do about it.

Jeff:       Whether they are or not isn't really the issue. It's just what you think.

Marti:      It's cute.

Jeff:       It's cute? When you look at … The next time you look at a bottle of Jack Daniels, are you going to think anything different than what you thought before?

Marti:      No.

Male:       It kind of lessens the value, I think, a tiny bit. This thing could be awfully annoying, I could imagine, too. It might be like, you might have a brand association with this annoying product, and drinking that liquor.

Jeff:       True, but if the … That's very interesting. We're setting up a Pavlovian kind of response, the squeaky, squeaky, squeaking …

Marti:      You might want to disassemble the squeaky part.

Jeff:       In terms of the actual, what's in the Jack Daniels bottle, does this product have any effect on how you think about that, whatsoever?

Male:       I don't think so.

Marti:      No.

Jeff:       Can you read some of the things on the label for me?

Marti:      I love the poo by volume.

Male:       43 percent.

Kiara:      43 percent …

SIL0093

Male:        Poo by volume.

Marti:       We're number 2, uh-huh; not number 1, we're 2. Yeah, everything about it is just cute.

Jeff:        Isn't it old number 7?

Male:        Yeah.

Marti:       They're saying number 2, not number 1, because it's poo.

Jeff:        Oh, I get it, I get it.

Male:        If I was Jack Daniels … This is not made and associated with Jack Daniels at all?

Jeff:        What do you think?

Male:        I would think they could sue, because it looks just like it. They're ripping their name off.

Jeff:        I don't want to get into any legal stuff. I don't know whether they could or not.

Marti:       There's copyrights and trademarks on it.

Jeff:        All I want to ask is like, when you look at this bottle, does it affect your … It says, "43 percent poo by volume," right?

Male:        Yeah.

Jeff:        Does that … Again, when you look at the Jack Daniels bottle …

Marti:       It's 40.

Jeff:        Would you think that … It's 40, it's not 43?

Male:        40 year, by volume.

Male:        They probably did this on purpose, because if they put 40, then maybe they could get sued.

SIL0094

Marti:      Different [inaudible 00:19:46].

Jeff:       Regardless, if it says "43 percent poo," I think the "poo" is the key word there, not the 40 or 43 percent. Does that suggest anything about Jack Daniels? Would you look at a Jack Daniels bottle and say, "Oh, there's poop in there?"

Male:       No.

Jeff:       No, seriously.

Male:       I wouldn't.

Kiara:      I think the fact that it's … No, it's just a dog toy.

Marti:      Not at all.

Jeff:       It's just a dog toy. You think it's a dog toy, and nothing else?

Marti:      Yeah.

Male:       Yeah.

Jeff:       All right, good.

Kiara:      It could be like a little smaller. Maybe the size [crosstalk 00:20:17].

Male:       Maybe it's for a large dog.

Kiara:      If it was a little smaller, then you would know right away that it was a dog toy. I wouldn't just know right away, from afar, that it was a dog toy, until I read it, and then I would know. If it was smaller, then …

Male:       It could be a kid toy, too.

Jeff:       It could be anything, and it's a little unfair to you, because it's a little out of context. I think where you would see this would not be in a liquor store.

Male:       No.

SIL0095

Jeff:      It would be in Petco, or it would be on a Web site, that sells dog toys. I think that when you bought it, I agree with you that if it were sitting on a shelf in a store next to a rack of Jack Daniels, that would be … Might cause some confusion. If you know this is a dog toy, if you were buying this in a pet store, or you're buying this on line from a pet company, no confusion, right?

Kiara:     No.

Male:      Right.

Jeff:      Again, I asked some of these things already. I just want to ask them again. Would it have any effect on whether you drink Jack, again, or not?

Male:      No.

Jeff:      No, and again …

Male:      Again, I said I felt it could.

Jeff:      It could, but knowing what you know now …

Male:      I think it still could. I would lean toward that it might.

Jeff:      In what way?

Male:      I told you, I would get … If I had a dog, and they were doing this, and then I was drinking Jack, it might potentially make me not want to buy Jack anymore; it could.

Jeff:      The source of that irritation comes from what?

Male:      Looking at this bottle and seeing the same thing, and then knowing I'm drinking it and being annoyed with my dog and just being like, "OK, I'm going to buy a different alcohol."

Jeff:      That's what I'm asking; where does the annoyance come from? What's the annoyance?

Male:      (squeak)

VIP Group 2.doc                                                          Page 20 of 22

SIL0096

Jeff:          Got it.

Male:          I would die, if I had a dog it and was doing this. That would …

Jeff:          You don't have a dog?

Male:          I don't have a dog.

Marti:         It's just as simple, you pull that squeaky thing out.

Male:          Just what I did was, I could hear a dog doing this; you couldn't sit there.

Marti:         That's why we have cats.

Jeff:          I totally get what you're saying. I just want to make sure that there's nothing that
               … I get that bad association. I just want to check in that it's not about, "I look at
               this bottle and I think, "Jack Daniels is bad," or "Jack Daniels has dog poop in it."

Male:          No, no that, but the other.

Jeff:          Boy, this is quick. We might be just about done.

Male:          Who are you working for, this company?

Jeff:          I can't say.

Kiara:         I have a question. Can I have another one? This one's kind of …

Jeff:          You can have two.

Kiara:         I don't want two.

Male:          Here, you can have two.

Kiara:         I'd give it away.

Male:          Brian, I can't believe you're not taking that home.

Male:          I really don't have anybody to give it to.

VIP Group 2.doc                                              Page 21 of 22

Kiara:          You should.

Jeff:           Do you want a dog? [crosstalk 00:23:10]

Marti:          I have two dogs in my place.

Male:           We have a dog park.

Jeff:           I don't care if you take them home.

Male:           Whoever you give this to better … They're going to need it.

Marti:          They live … My people …

Male:           Squeak it a couple more times, I'm getting close.

Marti:          They're all like 100 yards away from me.

Male:           Don't give any to your neighbors. This is really annoying.

Marti:          Just like when you get a car, and you have to …

Jeff:           Thank you.

How did Jennifer do?



If you rate this transcript 3 or below, Jennifer O will not work on your future orders

SIL0098



# Order

| | |
|---|---|
| Client | Jeffrey Hirsch |
| Order # | TC0774560026 |

# Audio

| | |
|---|---|
| File URL | VIP Group 3.mp3 |
| Length | 26 min |
| Audio Quality | ★★★☆☆ (Fair)<br>Top five tips for recording clear audio |
| Typist Comment | It was hard to distinguish who was whom when everyone started giving their opinions. Audio quality was not bad at all. Maybe address people by their names more within the session so I can more accurately tell you who was giving their opinion if that is something needed for your records. |

| | |
|---|---|
| Transcriptionist | Rachel V. |

How did Rachel do?



If you rate this transcript 3 or below, Rachel V will not work on your future orders

Need Help? mailto:support@rev.com

SIL0099

Jeff:           Um anybody been to a place like this or this place before? To do this kind
                of stuff.

Male:           I have.

Male:           Yeah, I've done it once before.

Jeff:           Anybody not done it?

Male:           No, I've done one.

Jeff:           You've done one of these? Okay so everybody knows kind of what's going
                on here. If you're a, what we call a focus group version and there are
                fewer and fewer of them around. Everybody seems to have been to one
                of these. I've explained the one way mirror in the back and obviously we
                are not fooling anybody with that. One colleague of mine back there
                watching, he'll probably come in at the end. And they just set it up that
                way so one person can come lead the discussion, its just simpler. Not
                trying to fool anybody. And yeah, that's it. So you've done this, you know
                the drill. We are starting early, well get out early, it'll be good. Should be
                short and sweet and fun, I hope.

                Let me start by going around the room, Ill go last. But well go around the
                room, well start with Cammure here, did I say that right?

Male:           Actually, you did, you're right on point.

Jeff:           Okay good, I'm getting better and better at this. So I see your first name
                just tell me its, just tell me your first name, where you live, who you live
                with, people, pets, all that kind of stuff. What you do, what you do for a
                living? Go ahead.

Male:           Well I'm Cammure, I work in construction and management. I live with
                my girlfriend and I have a Siberian husky.

Jeff:           Nice, big dog.

Male:           Big dog yeah.

Jeff:           Yeah good. Hey thanks. What part of town do you live in?

Male:           West LA

SIL0100

Jeff:          Oh so close to here. Good.

               Michael?

Male:          Hi, my name's Michael and I am married, no children lots of dogs. Our kids are our dogs and cats.

Jeff:          Dogs and cats.

Male:          Dogs yes. And I'm a project manager for electrical construction and I live close to downtown LA.

Jeff:          How many dogs and cats do you have?

Male:          Two dogs, Chihuahuas, sisters. One's older and one's really young. And probably 3 or 4 cats. Three, no two cats at home and then cats outside that we feed. Part of me feels like my wife just feeds everything living you know?

Jeff:          Okay, so two that live inside and various others.

Male:          Yes others outside that are always wanting food.

Jeff:          Okay good.

Male:          William, I live in Pasadena with my wife and my Chihuahua mix. I work in transportation management and been doing that for about almost 30 years now. So trying to get slowly transitioning towards retirement here pretty soon.

Jeff:          Sounds good.

Male:          Hi, I'm Justin I'm a personal assistant to a photographer and graphic designer. I live in West Hollywood and I also have a Chihuahua mix. [crosstalk 00:02:52]

Male:          I'm Mark I live in West Hollywood also. I manage an IT company and what do we have at the house? We have a 15 year old African love bird. None of us were bird people, my wife and I. We are now! And I have a, because of the place we live in, I grew up with big dogs but we have a Maltese, which is really actually the smartest dog I think I think I have ever owned, out of all the dogs I've ever owned. The poodle, it is true what they say, so yeah.

SIL0101

Jeff:          Smart as a whip.

Male:          Its incredible. [crosstalk 00:03:37] I want a big dog, out here its just the space.

Jeff:          So my name is Jeff, I have two S poodles, standard poodles, they're big dogs. They're real smart.

Male:          They're the big one, the big poodle.

Jeff:          The big poodles yeah. They're really smart and just really nice dogs. Anyhow, I also have three kids but they're grown up. And yeah, this is what I do for a living, this is my job. I have an independent research marketing company. Companies hire people like me because we are independent. You know, we don't care what you think. We care that you think things and we want to hear your opinions but we don't judge them either way, we don't care. I'm just here to ask the questions and get the conversation going. I live over in Studio City, I think I pointed the wrong way, I think it's that way. And I travel a lot so this is great for me when I am in town, can get home and do some good stuff.

               All right, so let's jump in. I want to talk about something I am not sure how else to talk about this. But call them, kind of a spoof products. Products that make fun of other products, people or things. Think MAD Magazine and Saturday Night Live, you know, stuff like that. Can you think of any? Ill show you some examples. I'm just curious off the top of your head can you think of any products like that.

Male:          Funny or Die

Jeff:          Oh Funny or Die, that's a video ...

Male:          Well you mentioned Saturday Night Live.

Jeff:          Yeah, with Will Ferrell right but ... I don't quite mean that I mean that's a website or a YouTube Channel and they make funny videos. I'm talking about something that is a product that makes fun of another product.

Male:          Um, Duluth Trading Jeans. I've been seeing those commercials left and right.

Jeff:          What is that?

Male:          It's the best commercials.

SIL0102

Male:       They're an apparel company that will come in and say, these are waterproof jeans, these are the competitions jeans. Or they have one ballroom dancing. Some of them are a little ... they push the envelope a little bit. Some of them are ballroom dancing, they're jeans have more space in the crotch and they do an animated thing with each commercial. They're short and they play them on Fox Business News in the morning and the business channels and they're on all the time now.

Jeff:       Is this a real product you can buy?

Male:       Yeah, its not only pants its underwear.

Male:       No they have an underwear one, that one's called Naked. [crosstalk 00:06:15]

Male:       They always have a gimmick.[crosstalk 00:06:18]

Jeff:       You're right. I saw like a gym. I saw some Duluth Trading Company underwear but it was about comfortable underwear.

Male:       Yeah, yeah right so they do underwear and shorts, they have a short that's cool, I just saw that was the new one. You know, more space in the jeans, they're really great campaigns. But they're saying its their product is better than any of their competitors.

Jeff:       Right, but they're selling a real product, I mean right?

Male:       Correct.

Jeff:       They're selling jeans and underwear and stuff. They're just selling it in a very funny way right?

Male:       Yeah.

Jeff:       Yeah, its funny that you mention that. It must be a new company cause I ...

Male:       No, they've been around for a while but these campaigns are incredible.

Male:       Especially the last year or two.

Jeff:       So its raising some awareness and ...

Male:       Its a low voice, you know, country guy, you know.

SIL0103

Male:                The Direct and Dish do a lot of back and forth. Direct and Dish TV.

Jeff:                  Yep.

Male:                They both sell the same crap. They claim that they're better than the other one. I've had both and its the same garbage.

Jeff:                  Its better than Time Warner whatever it is.

Male:                Seriously.

Jeff:                  Right? So, Ill tell yeah what. Ill just have some examples here. I'm going to show you some things. These are just pictures in no particular order. Just like ... Here's what I want to do. Sometimes, things are just a joke right, and you recognize it as such, you know how they're just trying to be funny. Sometimes its, it might be funny, you know it might be humor, but they're really targeting, there's an agenda. And the agenda is, I want to damage something or I want you to think about something in a different way. So as we go through these I just want you guys as a group to tell me which of three piles I should put them in. That's a joke, that's clearly a joke. That may or may not be a joke. And that's something that's really targeted and you know, I don't know about mean spirited but you know getting, you know its trying to take something away from somebody else. Okay?

So here's one this is like, it says Gulf Oil and you know it looks like a can of motor oil. You know Gulf is actually a product, you know Gulf?

Male:                Oh yeah, yeah.

Jeff:                  I don't know if they're still around but yeah.

Male:                East Coast

Jeff:                  Yeah, East Coast. So what is this, is this a joke? Is this in between or is this something were they're really trying to make fun.

Male:                I think its somebody they're trying to push alternative energy and they ...

Male:                One second, I can't see the gentleman.

Male:                I see it as a joke.

Jeff:                  Looks like a monkey to me.

SIL0104

Male:             If you just put it over here.

Jeff:             I'm sorry.

Male:             I think its somebody who's trying to explain the fact that, you know using up our natural resources. More of an environmental, or something like that. I would say its mean spirited, I would say its more like ...

Jeff:             That's interesting. [crosstalk 00:09:04] Could go either way. Okay

                  So this looks like a, I think what this is, is some kind of like dog or cat toy or something. I think its a rubber thing that says "cataroma extra," what are they making fun of here?

Multiple people:  Corona

Jeff:             Right, Corona. Is this, like a joke or are they trying to say or are they trying to say Corona is bad stuff?

Male:             Its a joke I think.

Male:             That's a joke. Pushing the envelope a little bit maybe.

Male:             I think its a joke. I'm seeing it as a joke.

Jeff:             Yeah, I'm going to go through a couple more. So here's one, this says, "absolute Impotence." Is that a joke or is that serious?

Male:             I would say serious.

Male:             Serious.

Male:             It's serious, yeah.

Male:             Feels that way.

Male:             Yeah.

Jeff:             So they're actually trying to say ... what are trying ... I want to ask you not tell you. What are they trying to say here?

Male:             Alcohols ...

Male:             Consequences of alcohol.

VIP Group 3                                                      Page 7 of 14

SIL0105

Male:             Or that specific alcohol even though [crosstalk 00:10:08]

Jeff:             So, there's an agenda here. They're telling you not to drink this product. Do you think there's an agenda here with the Corona thing?

Multiple people:  No

Jeff:             This is funny, this is mean. It could be funny, it could be very funny but there's another message here other than just humor. Let's see. Let me pick a winner here.

                  Here's one that says "Kentucky fried fingers."

Multiple people:  Hmm.

Male:             Seems like a joke.

Male:             Its in the middle for me.

Jeff:             Its in the middle for you? What do the other guys say?

Male:             Joke, for me.

Jeff:             Okay the majority.[crosstalk 00:10:56] Okay let's do a couple more. Here's one. This one says its a t-shirt and it says "murder king." [crosstalk 00:11:10]

Male:             That's got an agenda yeah.

Jeff:             What are they saying here?

Male:             They're pushing meat is murder type thing.

Male:             Meat is murder, people [inaudible 00:11:15] as a good or something like that.

Jeff:             Okay here's a ... just a couple more that I'm looking for but can't find. Its pretty Important. Ah, here it is. This one says "bad spaniels," its another kind of I think a dog toy. Squeaky dog toys. What product are they spoofing?

Male:             Jack Daniels

Multiple people:  Joke.

SIL0106

Male:          I see it as more of a joke.

Male:          Yeah, that's more of a joke.

Jeff:          Yeah and just a couple more. Here's one that says " Mr. Mean, are you supporting animal testing?"

Male:          No that's mean

Jeff:          No yeah, and you know that. And here's one, here's one that says "all brain." What are they spoofing here?

Male:          Like a bran cereal.[crosstalk 00:12:12]

Jeff:          Yeah, all bran, its "all brain" instead of all all bran. It says "the cereal that goes to your head."

Male:          Seems like a [inaudible 00:12:19] type of thing.

Jeff:          I think that's enough. So let's just talk about, just tell me in your own words the difference between you know if somebody is a Supreme Court Justice [inaudible 00:12:33] homes pornography, Ill know it when I see it. And I don't know if that applies to this. Like you know its a joke. I know that's a joke when I see it or I don't know its a joke when I see it. Why do these things get put in these ... let's forget about this, this was in the middle. Let's just talk about the two extremes here. These are the ones that you'd pretty quickly put in this joke category and you put these pretty quickly in the kind of agenda or mean spirited category.

Male:          Key thing is when I they say "murder" that's not cool it seems like an adverseness to me.

Jeff:          Right.

Male:          I think the seriousness of the word "murder" or even "Impotence" here is pretty you know derisive but the animal testing is what that one was kind of easy with the bunny and so they seem to be really polarized.

Male:          I think all those are like specifically targeting specific brands in a negative way where as none of those are.

Jeff:          Why do you say that?

Male:          And I think that's ...

SIL0107

Jeff:                          How do you know these aren't targeting like ... Why aren't they making fun of Corona, well they are making fun of Corona, but they ....

Male:                         But they're not saying anything negative about the brand or what the company is doing. I feel like.

Jeff:                          Give me some other words to describe these. Like the intent behind these and how they come off to you.

Male:                         Cheeky, funny silly

Jeff:                          Silly.

Male:                         Yeah, silly stuff.

Jeff:                          And you know they're silly how? I mean you know they're silly right away by looking at them.

Male:                         I personally don't get the joke. I don't think its funny and I don't even get the joke. I don't

Jeff:                          Which joke? Any of of these?

Male:                         This side. A couple of them I do. "Chicken fingers" or whatever the heck.

Jeff:                          Yeah, its pretty over the top, its pretty ...

Male:                         I don't get the reference.

Jeff:                          Okay but you know ...

Male:                         On that side its obvious the message they're conveying but here ...

Jeff:                          Are these like purposely saying don't use these products or these products are bad? Or ...

Multiple people:         I don't think they're bad.

Male:                         They want to grab you and ...

Male:                         Like the Corona, I mean maybe somebody is trying to indicate that has a weird or really bad smell I don't know. What is it "cataroma" or something like that?

VIP Group 3                                                          Page 10 of 14

SIL0108

Jeff:                        Yeah "Cataroma"

Male:                        So its like some people may find it offensive. You know maybe they're just making fun of it. I don't think their intent is to tell you not to purchase it.

Jeff:                        Right and here that is certainly their intent.

Multiple people:             Yeah

Male:                        Yeah that's they're intent.

Jeff:                        All right. So let's just focus on this one you guys drink Jack Daniels? So Jack Daniels drinkers when you look at this product, I have this. I don't have a sample of Jack for you, I do have a sample of that toy though. So these are them. You guys get to bring these home. How do you like that?

Male:                        Oh yay!

Jeff:                        They're bigger than your Chihuahuas that's the problem.

Male:                        Thank you.

Jeff:                        That ones all wrapped up but they're all the same. So just tell me more about that. You're Jack Daniels drinkers and you see this product. How's it make you feel about drinking Jack Daniels? Any different?

Male:                        No.

Male:                        No its just kind of cute-sy. And its just a fun thing. I don't look at it in any negative or positive connotation what-so-ever.

Male:                        They're just making that correlation with the brand I feel like. So it would be a great gift for someone who drinks a lot of Jack Daniels and has a dog.

Male:                        Its a good conversation piece.

Jeff:                        Conversation piece.

Male:                        I think they're trying to get the younger generation to figure out what Jack Daniels is kind of. I think that's what ...

Jeff:                        The people who make the product?

SIL0109

Male:            Well you start them at a young age. Market them. No, no I mean just the name.

Jeff:            Well let me ask you does anybody here think this product here is made by Jack Daniels?

Male:            I don't think so.

Male:            No.

Male:            It reminds me of a piece like Jay Leno would do. He'll bring out items but like make reference to other products.

Jeff:            Yes, so it could be something that was on the old Tonight Show. You know its a joke when you see it.

Male:            Or David Letterman.

Jeff:            Oh Dave's gone.

Male:            It was funny last night.

Jeff:            I DVR'd it.

Male:            You'll enjoy it.

Jeff:            Um, I already saw the Top Ten. I don't know if you've read that label. Have you read everything on that label there? Do you have any comments about anything on the label?

Male:            Its funny. You know its just [inaudible 00:17:52]

Male:            Bad Spaniels, you're Tennessee [inaudible 00:18:00]

Male:            Its like MAD Magazine to me. You know like you mentioned. Obviously they are spoofing a brand but in a fun light-hearted way.

Male:            Yeah

Jeff:            Do these people have malice you think towards Jack Daniels? The people who make this.

Multiple people:  No

VIP Group 3                                              Page 12 of 14

Jeff:                There's a ... nobody said it, I know you all read it cause I asked you to look at the label, it says 43% poo by content or something like that. Right? So does that imply anything about Jack Daniels what's in Jack Daniels? Is there poop in Jack Daniels? Would that even cross your mind.

Multiple people:     No

Male:                I think its just silly. Its just a light-hearted thing.

Male:                It also says the old number 2.

Male:                I was going to say that, number 2.

Jeff:                As opposed to whatever number 7 is. [crosstalk 00:18:57] Okay so you're all Jack Daniels drinkers. Next time you see Jack Daniels are you going to think about it any differently cause now you've seen this product?

Multiple people:     No

Jeff:                Okay would you think anything different about Jack Daniels when you look at? Would it evoke any suggestion of something being wrong with the product or? There's pee in it, there's poop in it? Anything like that?

Male:                No I think its humorous.

Male:                No if anything I think it might remind, like oh

Male:                Might look at it and think "oh I could use a [crosstalk 00:19:39]

Jeff:                You see it as a positive?

Male:                Yeah cause it will remind me to, you know, have some whiskey myself. And if Jack Daniels is okay with them making a product like this then it makes me like them better as a brand, cause I'm a dog owner so I just feel like if they support that, that's great for me.

Jeff:                So I asked you all before if you thought Jack Daniels made this and you all said no. But what you're saying is if, if they did, which they don't by the way, it would almost be like, you like them more.

Male:                Right, like a humor. Like a sense of humor.

Male:                Id be indifferent.

SIL0111

Male:             Any corporation that doesn't take themselves too seriously, I like that corporation.

Jeff:             Right. Why is that? Its interesting.

Male:             Its just a human quality.

Male:             They'll laugh at yourself.

Male:             There's not many corporations that use that.

Jeff:             Yeah, it makes them more human. We don't take ourselves seriously. Were infallible where corporate, you know. Okay so that was Dave Letterman's thing. No, seriously. I am going to go get my colleague Bruce who is going to come in here and chat with you for a minute. Ill be right back.

Male:             [crosstalk 00:21:00] That's going to get annoying. [crosstalk 00:21:14]

Male:             They clearly need to make this in a smaller size for you guys with Chihuahuas. [crosstalk 00:21:18]

Male:             It was a cocktail party and he just was like this. He brought his own, he actually brought his own, you know they have a couple of editions he brought something yeah. He took it very seriously.

How did Rachel do?



If you rate this transcript 3 or below, Rachel V will not work on your future orders

SIL0112



# Order

| | |
|---|---|
| Client | Jeffrey Hirsch |
| Order # | TC0774560026 |

# Audio

| | |
|---|---|
| File URL | VIP Group 4.mp3 |
| Length | 33 min |
| Audio Quality | ★★★★☆(Good) |

| | |
|---|---|
| Transcriptionist | Terri H. |

How did Terri do?



If you rate this transcript 3 or below, Terri H will not work on your future orders

SIL0113

Jeff:          My last group of the night. So it's got to be really good. It's got to be better than the other three I did.

Craig:         It's not quantity, it's quality.

Jeff:          It's quality, right. This time of night I always like to ask everybody to suck it up a little bit. I know it's late and you'd probably rather be somewhere else. This will actually be pretty quick and it should be fun. We'll get out of here way early. My name's Jeff. Here I am. Who's done this kind of thing before? Everybody? Okay, good. Back in the old days we used to have to explain every time, one way mirror and all that, but you know what's going on. One of my colleagues is back there. He'll be back, he'll come in at the end and say hi. No mysteries there. I'll tell you about me in a minute. I first want to go around the room. I see your first name. Tell me your first name, where you live, what you do, who you live with, people, animals, all that kind of thing. Start with Linda.

Linda:         I'm sorry.  I'm from Winnetka.

Jeff:          See, you remember. It's who you are, what you do.

Linda:         I had an all-heimers moment there.

Jeff:          Yeah, I have them all the time.

Linda:         I have a dog, one dog, a Chow. My son and my mother live with me. I'm a mom.

Jeff:          Three generations.

Linda:         Yep. I'm an employee service representative for health insurance. Been doing that for 30 years. Just about 30 years.

Jeff:          Okay. Good for you. Thanks. Craig?

Craig:         My name's Craig. I live in Calabasas. I have two Rhodesian Ridge backs and some fish, clear water fish, not mineral fish. I'm in the tech industry. Mobile tech, telephony. That's about it.

Jeff:          I love those dogs. I wanted one. They are great, great dogs.

Craig:         Call me in six months. We're going to start breeding.

Jeff:          Wish I could have one.

SIL0114

Craig:       What's stopping you?

Jeff:        That's another story for another time. Margaret?

Margaret:    I am Margaret. I live in Grenada Hills. I have a family, two kids, one girl and a
             husband and a Samoyed, a cat, fish and a bird, a pigeon. A racing pigeon.

Jeff:        A racing pigeon?

Margaret:    Yeah. We just adopted it.

Jeff:        This is a really stupid question. What do you do with a racing pigeon? Do they go
             out and race and come back?

Margaret:    Yeah, they do. I don't get into it. I'm just keeping this for this person. He is an
             Armenian guy.  I guess that's kind of a thing, they raise pigeons. It's a beautiful
             pigeon, you know? Anyway, we have that, and we don't know what sex it is. I
             should have asked him. He just sort of dumped it on us.

Jeff:        How old are your kids?

Margaret:    13 and 15. And I'm a musician.

Jeff:        Oh, yeah? What do you play?

Margaret:    I'm a harpist.

Jeff:        Really? Where do you play?

Margaret:    I played at the peninsula today over in Beverly Hills and I freelance.

Jeff:        Fantastic.

Mark:        My name's Mark. I'm a third generation Santa Monican.  Still live there, believe it
             or not, been around a long time. Live at home with my number one out of two
             sons, adult son, and a Bernese Mountain Dog almost as big as my son. I'm a semi
             retired professional athlete. I indulge in a lot of other things now. I do a lot of life
             coach training for people in their situations. Love to do everything outside.

Jeff:        Fantastic. What sport?

Mark:        I was a jockey for 20 years on four continents.

Jeff:        Really? Fun. I lived in Louisville, Kentucky for a while.

SIL0115

Mark:       We might have a Triple Crown winner this year. America's Girl.

Jeff:       We'll see.

Mark:       Cross my fingers. Exciting.

Jeff:       It's always that third race, messes them up, right? That's the longer one, right?

Mark:       Yeah. He looks like the real deal. Mile and a half. The Belmont. Biggest racetrack in the country. It's a beautiful track.

Jeff:       Yeah. I've been there.

Mark:       I've rode there.

Jeff:       Yeah, I bet. Great. Okay, cool. My name's Jeff and I'd like to be a professional athlete. I still think I could play center field for the nationals. I've still got it. I'd also like to be a musician, but this is what I do.  This is my job and I really do like what I do. I have an independent market research company. Clients hire our firm to come in and do this kind of work because we're independent and we can ask questions and I do care what you think but I don't really care positive/negative, like/dislike, any of that stuff. Whatever you want to tell me is good. I live in Studio City. Every time I work at home, I'm happy, because I didn't have to travel a lot. This is good. Just get to drive over the hill at the end of the night.

            Okay, let's get going. I want to talk about something I might call ...  I'm not sure how to put this one. When I start showing you things, you'll totally understand what I talk about. I just want to throw this out to you guys. Let's talk about what I might call spoof products or joke products, or satire, things like that. Products that make fun of other products. Can you think of any examples?

Craig:      Coke and Pepsi kind of thing.

Jeff:       It wouldn't be like Coke making a commercial that says Pepsi's bad or anything. I'm talking about Choke-a-Cola. Some funny product that makes fun of something else.

Craig:      There's some of these high bred energy drinks have done that. Made fun of Monster and Red Bull. I've seen a few of those, where they kind of make jokes with them coming out with a off brand. Saying "We may not be this, but we can do this," kind of thing. I've seen that before.

Jeff:       Okay.

SIL0116

Margaret:    Even with Arby's I think. Don't they have a guy with a deep voice, an actor. Making fun of other sandwiches.

Craig:    There's the Jack in the Box one too. Remember that? The one guy was saying "You're ruining, how can ..."

Jeff:    Oh, yeah, yeah, I remember that. The guy in the restaurant. He's filming in somebody's else's restaurant?

Craig:    Yeah. I thought that was funny, that was hilarious.

Jeff:    That's not quite what I'm talking about. I'm talking about something that you look at it and clearly, it's a spoof on another product. [crosstalk 00:07:24] I know, it's hard to think about. There are these things you might have played with as a kid and I'll show you some examples. Here's what I'm going to do. I'm going to show you some stuff, okay? Here's what I want you to do. I want you to tell me if these things are jokes, out and out jokes. I'll make three piles here. It's a joke, I get it, it's a joke. The other extreme would be that's not a joke. They might be using humor but they have an agenda, they want you to not buy something. They're disparaging the product. I can have a product that's affectionate, like a Mad magazine kind of thing.

Mark:    The one with the chicken, you see the billboards, what is it?

Craig:    The Chic-Fil-A.

Mark:    Chic-Fil-A, yeah. That's kind of [inaudible 00:08:08]

Jeff:    Yeah, but they're still selling chicken sandwiches at the end of the day, right? Here's something, in no particular order. I do want to put them in some kind of order. Here. This is Cap'n Crud. Is it a joke or are they really saying don't eat Cap'n Crunch? What do you think?

Mark:    I think it's a joke.

Jeff:    I don't want you to over think any of this. And you know it's a joke, why?

Craig:    Who would use the word crud for anything? It's over the top.

Jeff:    Okay. This one says Mr. Mean, are you supporting animal testing? They're making fun of what brand?

Craig:    I would actually be able to believe that.

SIL0117

Mark:       Yeah, that's not a joke. That's like Greenpeace putting out a corporate ad.

Craig:      It's like a PETA thing.

Jeff:       Right. So right off the bat, what's the difference between them. They both take existing brands and they're playing off existing brands, but they're different.

Craig:      Well, that one's got an agenda. That one wants to make you aware of something. The cats don't cry about it.

Mark:       Health conscious.

Craig:      That ain't funny. That's not a joke, that's a symbol.

Jeff:       Okay. This one says Bad Spaniels. Bad Spaniels Tennessee Carpet. This is, I think, a chewy, like a rubber chewy toy for a dog. This is a real product you can buy. Is this a joke, is this in between?

Craig:      It's kind of in between.

Mark:       I would say that would be kind of in between.

Craig:      Looks like people look at him and say, "Hey, it looks like a Jack Daniel's bottle, but so be it." You laughing for it.

Mark:       But they can get away with it because it doesn't really emphasize that it's Jack Daniel's. They're sending a note that it's ...

Jeff:       Is there anything about this that says "Don't drink Jack Daniel's" or "Jack Daniel's is bad?"

Linda:      No.

Mark:       Not really.

Craig:      No, if you're saying [crosstalk 00:10:26]

Margaret:   [crosstalk 00:10:26] if you stay away from the tequila because you're saying the Spanish as opposed to the whisky.

Jeff:       Say that again. What?

Margaret:   Because you said Spanish, right?

SIL0118

Jeff:          No. That's spaniels.

Margaret:      Oh, spaniels.

Jeff:          Not that bad Spanish.

Craig:         Like Cocker Spaniels.

Mark:          No, [crosstalk 00:10:41]

Jeff:          Like the Spanish Inquisition, okay? Those are bad Spanish.

Mark:          That's something, if I saw it in a pet store, I would laugh. I would go "This is funny." Because it sends a message, if you drink, Jack Daniel's, it sends a message.

Jeff:          Here's one. Would have put that one in the middle though, hmm?

Craig:         Yeah. Yeah, definitely.

Jeff:          So you don't think this is like, it could be serious? Why is it in the middle?

Craig:         Because it's selling a product [crosstalk 00:11:12]

Mark:          I think it's kind of in between. It's silly, but at the same time it's believable. In other words, it's not really sending a bad message, but at the same time it's something you could find in a pet store.

Jeff:          Oh, right. Okay, I got it.

Mark:          You see what I'm saying?

Jeff:          I see what you're saying. It's still funny, it's still kind of a joke, you're just putting it here because this is a fake product and this is a real product. That's why it's in the middle.

Linda:         Right.

Jeff:          Got it. Okay. Here's a t-shirt says Murder King.

Mark:          Ewwww.

Jeff:          You put this over here?

SIL0119

Margaret:       That's got a message.

Jeff:           Yeah. It's got a message.

Craig:          It's sending a message going "Ewwww."

Jeff:           That Burger King's not a good place to eat, right?

Craig:          Right.

Jeff:           This is one. Band Ache brand strips off skin.

Linda:          Are you kidding?

Craig:          That's a Mad Magazine. Just ridiculous.

Jeff:           Right. All three of these things over here, these are all saying don't buy these
                products, or these are all bad. Just a couple more. So many of these, okay. This
                one says Kentucky Fried Fingers.

Margaret:       That's be in that pile.

Craig:          It's the silly pile.

Jeff:           This one says Absolute Impotence.

Margaret:       That'd be in that pile.

Jeff:           You guys agree?

Craig:          Yeah.

Mark:           Yes.

Jeff:           You're all pretty quick and unified when you're judging these things, right? If I
                had to put this in one of these piles or the other, where would you put this one,
                Bad Spaniels?

Craig:          Closer to the silly pile.

Jeff:           It's closer to this why?

Craig:          Because it doesn't actually mean home. It's tongue in cheek and it doesn't have
                an agenda.

SIL0120

Mark:          Doesn't send messages.

Margaret:      It's not as extreme as the others.

Mark:          Even though it looks close to the Jack Daniel's bottle, it really doesn't say [crosstalk 00:13:22].

Craig:         But even if it was a Jack Daniel's bottle, there's no disparity to the Jack Daniel's bottle.

Mark:          Yeah.

Jeff:          There isn't?

Craig:         No, there's no disparity.

Mark:          Unless dogs were known for drinking Jack Daniel's, then I could see it, but they're not.

Jeff:          Those would be bad doggies.

Craig:         Those would be St. Bernards. Those little kegs.

Jeff:          Yeah, exactly. Okay. These were pretty clear. You seem to know the scoop when you saw the spoof and you know when the spoof means no harm. These mean no harm? These ones over here? These ones clearly do in my mind. Anybody drink Jack Daniel's here?

Mark:          I have.

Margaret:      I have. Yeah.

Linda:         Yes.

Jeff:          If you saw this, and they sell this on the internet, they sell it at Petco I think, in the pet section. Would this change anything in your mind about Jack Daniel's?

Mark:          No, but I would buy it for a friend of mine that I knew had pets and loved to drink Jack Daniel's.

Jeff:          Okay.

Mark:          Because he would get it. He would get it.

SIL0121

Jeff:        What would he get?

Mark:       The likeness of the bottle, and say "Oh my dog's chewing on my bottle." Just for fun kind of thing. Silly humor, yeah.

Jeff:        I have samples, not of Jack Daniel's, but of this product.

Craig:      If it was actually endorsed by and even made by Jack Daniel's, I'd think even highly of it.

Mark:       I would.

Jeff:        You'd think highly of it?

Craig:      Yeah, because if it's a Chinese third party, just woke up like hell when there was somebody leveraging brand awareness. Like [inaudible 00:15:05] association. If Jack Daniel's actually made it I'd be "Wow, this is a company that thought outside the box." Maybe there's some pet owners there themselves, they could make fun of themselves.  They could put humor, there's nothing disparaging about it, and hey, if you drink a bottle of this you'd be a bad human instead of a bad Cocker Spaniel. Same thing.  [crosstalk 00:15:29]

Jeff:        Do you think Jack Daniel's makes this product?

Craig:      No, but it wouldn't surprise me if it did.

Mark:       I wouldn't either. I wouldn't either. I mean, why not?

Margaret:  How would that be any different from the toys that are out there with Coors beer on it?

Jeff:        There's doggy toys with Coors beer on it?

Craig:      There's doggy squeak toys with all kind of product placement. I've seen them before. I shouldn't say I've seen them, I've had them.

Jeff:        Here's a free gift.

Craig:      Yay.

Jeff:        That's better for those who have bigger dogs, because these are big [crosstalk 00:15:57]

Mark:       My dog would love this.

SIL0122

Craig:          My dogs would have that for awhile.

Linda:          She's going to look at the bottle and her mom like "What'd she do?"

Jeff:           You can take it out. I'd like you to take it out of this. Look at it, look at the label.
                I'm going to ask you a bunch of questions after you look at it.

Mark:           Barnyard Tennessee Carpet. That's awesome. Actually, I think it's really cute. I
                think it's very gimmicky, which is good for something like this. The fact that it's
                quite larger than most squeak toys, because my dog, this would last a little
                longer and it would take him months ...

Margaret:       I wonder how long it would last.

Mark:           Well, you know how they like to find it ...

Linda:          Flying out of the room.

Jeff:           Here's what I really want to talk about. Not how long this will last or anything like
                that. I really want to think about this in relationship to Jack Daniel's, and again,
                does this disparage Jack Daniel's in any way.

Linda:          No.

Margaret:       No.

Craig:          No, I think it's awesome.

Mark:           Nope. I think it's awesome.

Craig:          I agree with you. Mark might take his young sons there and they'll be "Dad, why
                are you doing this?" He goes, "Well, Jimmy drinks that brand and so I bought
                that brand."

Jeff:           So I think you all maybe drink some kind of whisky sometime, right? Maybe
                Scotch or something.

Mark:           Bourbon.

Jeff:           Bourbon. You might once in a while have a glass of Jack Daniel's somewhere and
                if you have this product, if this bottle were actually sitting next to the Jack
                Daniel's bottle, would it suggest anything about the Jack Daniel's product?

Linda:          It may draw a little attention if you have friend over.

SIL0123

Margaret:     Yeah. You'd start talking about Jack Daniel's [crosstalk 00:17:45]

Mark:         I think it would actually be a conversation piece. I don't this it would disparage anybody from saying, "Ewww, I'm not drinking Jack Daniel's anymore because my dog bites on a squeaky toy like this."

Jeff:         But there's something really specific on there I want you to look at. It's on the bottom. It says 5% smelly and 43% poop by volume.

Margaret:     It's cute. It's funny.

Linda:        It is cute.

Jeff:         Does that in any way suggest that there's poop in Jack Daniel's?

Linda:        No.

Margaret:     No.

Craig:        No.

Jeff:         Is there any association with Jack Daniel's. Does this product make you think of any associations that Jack Daniel's might have with defecation, urine, anything like that.

Craig:        No, because it's what association? Dogs poop. If it was like 43% worms or un-purified. That it's closely or barely related to Jack Daniel's, then maybe.

Mark:         Yeah. I think if you had this in the liquor section, with Jack Daniel's, as a free gift? People would actually tend to buy the Jack Daniel's that much more.

Jeff:         So you think this would help. They don't sell this in liquor stores, but if they did a tie in with this product, you think they'd sell more Jack Daniel's?

Craig:        Definitely.

Mark:         Yeah.

Margaret:     Oh, definitely.

Mark:         Oh, yeah. I think it's cute.

Linda:        Or even a commercial. [crosstalk 00:19:07]

SIL0124

Craig:      Didn't Mustela just have a promotion, buy five Stella's, get a free goblet for the water, save water eco fund and they released limited edition goblets for Stella Artois.

Jeff:       Yeah, but that's a goblet. That's their whole ad campaign, it's not a glass, it's a goblet.

Craig:      Okay, so that's a little bit more sophisticated than you can get- I mean, that's a bloodhound in Tennessee. It's not hard to get a correlation with.

Mark:       What guy drinks whiskey and has a dog, would not buy this for his dog? Seriously.

Craig:      That's true.

Linda:      It'll promote their sales.

Jeff:       This will promote Jack Daniel's.

Linda:      Yeah.

Jeff:       Just to be entirely, 100% clear, there's no chance of you thinking of this product over here in this category that's disparaging products. This company who makes this, if we could talk to them, and you could interview them, is there any thought in your mind that there's something about Jack Daniel's they don't like and they're out to get Jack Daniel's?

Craig:      No, I think it's the exact reverse. I'd probably look at it and say which brand's owners are probably going to be more susceptible to this kind of product.

Mark:       Well if you read the whole label there isn't anything on here that mentions any kind of alcoholic content or drinkable substance or anything else. It all dials towards the pooch, or it's pup. I think that keeps them separate.

Jeff:       So there's no confusion about this being a product with whiskey or something that you would drink.

Linda:      No.

Mark:       Right.

Jeff:       Okay. All right. Good. These keep getting faster and better and easier.

Margaret:   I think it's a cute product.

VIP Group 4                                                    Page 13 of 14

SIL0125

Jeff:        Well you guys get to take it home.

Linda:       It'll stop the dog from barking next door and it'll keep my dogs out of the room I ...

Jeff:        That's [inaudible 00:21:05] You could probably take two if you wanted. Let me get my colleague Bruce to come in and chat with you a little bit.

Mark:        That is pretty cute. It's pretty funny. [crosstalk 00:21:31]

Margaret:    My friend in Texas, she'd love that.

Jeff:        This is my friend, Bruce. [crosstalk 00:21:33] This is my friend Bruce.

Mark:        Hey Bruce.

Craig:       Hey Bruce.

Bruce:       I grew up next to Belmont. As a kid I would sneak in. As a grownup,

## How did Terri do?



If you rate this transcript 3 or below, Terri H will not work on your future orders

SIL0126

EXHIBIT VV

Gerald L. Ford - August 19, 2015

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP Products, L.L.C., an Arizona )
limited liability company, )
)
  Plaintiff and Counterdefendant, )
)
        vs. ) No. 2:14-cv-02057-DGC
)
Jack Daniel's Properties, Inc., a )
Delaware corporation, )
)
   Defendant and Counterclaimant, )
_____)


DEPOSITION OF GERALD L. FORD

Huntington Beach, California

Wednesday, August 19, 2015


REPORTED BY:
BARBARA R. SWENGEL
RPR, CSR NO. 7415

Gerald L. Ford - August 19, 2015                              2

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF ARIZONA

 3

 4     VIP Products, L.L.C., an Arizona  )
       limited liability company,        )
 5                                        )
         Plaintiff and Counterdefendant, )
 6                                        )
                  vs.                     ) No. 2:14-cv-02057-DGC
 7                                        )
       Jack Daniel's Properties, Inc., a )
 8     Delaware corporation,             )
                                          )
 9        Defendant and Counterclaimant, )
       _____)
10

11

12                  Deposition of GERALD L. FORD, taken on

13                  behalf of Plaintiff and Counterdefendant

14                  VIP Products, L.L.C. at 16400 Pacific

15                  Coast Highway, Suite 211, Huntington Beach,

16                  California, commencing at 9:16 a.m. on

17                  Wednesday August 19, 2015, before

18                  Barbara R. Swengel, CSR No. 7415, a

19                  Certified Shorthand Reporter in and for the

20                  County of Riverside, State of California.

21

22

23

24

25
```

```
 1     APPEARANCES:

 2     FOR PLAINTIFF AND COUNTERDEFENDANT VIP PRODUCTS, L.L.C.:

 3                     DICKINSON WRIGHT, PLLC
                       BY:   DAVID G. BRAY
 4                           Attorney at Law
                       1850 North Central Avenue
 5                     Suite 1400
                       Phoenix, Arizona  85004
 6                     (602) 285-5000
                       dbray@dickinsonwright.com
 7

 8

 9     FOR DEFENDANT AND COUNTERCLAIMANT JACK DANIEL'S
       PROPERTIES, INC., A DELAWARE CORPORATION:
10
                       SEYFARTH SHAW, LLP
11                     BY:   CHRISTOPHER C. LARKIN
                             Attorney at Law
12                     One Century Plaza
                       2029 Century Park East
13                     Suite 3500
                       Los Angeles, California  90067-3021
14                     (310) 277-7200
                       clarkin@seyfarth.com
15

16

17      ALSO PRESENT:

18                     MATTHEW G. EZELL

19

20

21

22

23

24

25
```

1      Q    So how does the survey -- and please just speak

2      in general terms.  I don't need to get into the leads or

3      the details.  Describe for me the structure of the

4      survey, the type of questions that were asked in the

5      PODS Enterprises case.

6      A    They were no different than we've ever asked in

7      a fame survey.  They began with open-ended questions,

8      asking people to describe brands of storage containers,

9      I believe, but I -- without having the survey in front

10     of me, I can't tell you for sure.

11     Q    Okay.

12     A    But our normal practice is to do unaided,

13     open-ended list.  And I'll give you an example just so

14     that it's less obscure than PODS.

15          Did a fame survey recently for Facebook, and we

16     asked people to identify social networking internet

17     sites.  And then after that, we gave them a list of

18     social networking sites that we got from -- and I don't

19     remember the source anymore, but we took -- there

20     were -- we took the top hundred sites, and we took five

21     from each cortile.  So you had -- maybe it wasn't five.

22     That would be too many.  I think we took three from each

23     cortile, and then we made up an -- a social networking

24     site that didn't exist.  Anyhow, so that was the aided

25     list.

Gerald L. Ford - August 19, 2015                          22

1              And our -- our procedures for fame have not

2      changed, really, at all since the Federal Dilution Act

3      and the TDRA.

4          Q      The survey that was conducted in this case, the

5      VIP/Jack Daniel's case that you referred to in your

6      declaration, which has been marked as Exhibit 61, is not

7      a fame survey; correct?

8          A      It's not being offered for that, no.

9          Q      And generally speaking, you ask -- in your

10     field, if -- you would ask different questions to test

11     for fame than you would to test for likelihood of

12     confusion; correct?

13         A      Generally that's true, although I think you

14     have to be cautious.  If you get significant levels of

15     likelihood of confusion, I think that a professional

16     could easily say that that provides underlying evidence

17     of fame -- secondary evidence of fame.

18         Q      And counsel on this case did not ask you to

19     conduct a fame survey on any of -- any element of Jack

20     Daniel's intellectual property rights at issue in this

21     case; correct?

22         A      That's correct.

23         Q      And if you had been asked to conduct a fame

24     survey on any of the elements of Jack Daniel's trade --

25     or intellectual property at issue in this case, you

Gerald L. Ford - August 19, 2015                    23

1      would have asked or you would have had the survey firm
2      ask different questions than the questions that were
3      presented to respondents in Exhibit 61?
4           A      That's generally correct.
5           Q      Okay.  Do you agree that Jack Daniel's, the
6      name, is a well-known mark in the United States?
7           A      I have not done any empirical research on that,
8      but I would -- I would -- I know you're not supposed to
9      speculate in a deposition, but I would speculate that it
10     probably is --
11          Q      All right.
12          A      -- well-known and probably a famous mark.
13          Q      Sure.  Barbie, that would be another example of
14     a well-known famous mark.  Would you agree with that?
15                 MR. LARKIN:  Calls for speculation, but if you
16     can answer, go ahead.
17                 THE WITNESS:  You know, that's a closer call.
18     There are lots of uses of Barbie that are not associated
19     with toy dolls.
20     BY MR. BRAY:
21          Q      When you say it's a closer call, is it your
22     belief that Jack Daniel's is a stronger, more well-known
23     mark than Barbie?
24          A      If you restrict Jack Daniel's to -- to whiskey
25     or Tennessee whiskey, then I don't think it's a closer

1    call than Barbie for a toy doll.

2            I think that Barbie is -- excuse me -- a little

3    bit like Chanel.  It's a crowded field, and other people

4    use that mark.  I don't think anyone else uses Jack

5    Daniel's that I'm aware of.

6        Q    Are you aware of any third party besides Mattel

7    using Barbie for toys?

8        A    As I sit here, no, but I'm aware of other

9    people using Barbie for a variety of businesses.  It was

10   the subject of litigation that we were involved in in

11   federal court in Canada that went up to the Canadian

12   Supreme Court, where they found --

13       Q    So when we're talking Barbie, we're not just

14   totally speculating.  It's a case that you had worked

15   on --

16       A    Well, yes.

17       Q    -- at least some elements in the past?

18       A    You know, our practice is not just limited to

19   the United States.  It's part of the problem, so --

20       Q    What year were you retained for the Barbie case

21   in Canada, ballpark?

22       A    Probably five years ago.

23       Q    Okay.  And what was the issue or what were you

24   asked to do in conjunction with the Barbie case?

25       A    In that case, I was only a consulting expert.

```
 1          A    Something like that.
 2          Q    In the typical -- well, to the extent that you
 3     can generalize, is it unusual in the surveys that you
 4     have conducted to have the control come in at less than
 5     two percent?
 6          A    I don't think you could generalize.
 7          Q    Oftentimes, does the control come in higher
 8     than one percent?
 9          A    Oftentimes it does.  Oftentimes it doesn't come
10     in at all.
11          Q    You weren't asked -- you don't have any opinion
12     as to whether or not any element of Jack Daniel's trade
13     dress has acquired distinctiveness, correct, either
14     alone or in combination?
15          A    Well, I think if you look in combination, and
16     you take guidance from, let's say, the Eveready --
17     Union Carbide versus Eveready case, and you look at
18     the percentage numbers, I think you could -- you can say
19     that those would support a finding of secondary meaning
20     for the trade dress as tested.
21          Q    So it's your opinion that there might be some
22     authority in the case law, but it's not -- it's not an
23     opinion that you gave in your report; correct?
24          A    No, it is --
25          Q    It is not an opinion that you anticipate
```

Gerald L. Ford - August 19, 2015                    130

1     testifying to at trial; correct?

2          A     Not unless asked.

3          Q     Okay.  And you were not asked in -- when you

4     conducted -- when Jack Daniel's or its counsel

5     commissioned you as an expert, they did not ask you to

6     opine as to whether any element of the Jack Daniel's

7     trade dress had acquired distinctiveness; correct?

8          A     No.  We never tested any particular element.

9     We tested the overall trade dress.

10         Q     And when you tested the overall trade dress,

11    you weren't testing it for acquired distinctiveness?

12    You were testing likelihood of confusion; correct?

13         A     Absolutely.

14         Q     Have you ever conducted a survey in order to

15    test acquired distinctiveness of one or more elements of

16    the trade dress?

17         A     Probably that would be true to all of the

18    Adidas cases.

19         Q     Okay.

20         A     There were a variety of trade dress elements

21    both in the shoe shape as well as in the stripes

22    coming -- downward stripes from the laces to the sole.

23         Q     And generally speaking, a survey that would

24    test acquired distinctiveness would ask different

25    questions than a survey you would use to test likelihood

 1      of confusion; correct?

 2              MR. LARKIN:  Asked and answered.

 3              THE WITNESS:  You would generally ask an

 4      association question.

 5      BY MR. BRAY:

 6         Q    Do you acknowledge -- well, Professor McCarthy,

 7      in his treatise, writes, quote, parody is a recognized

 8      form of free speech protected by the First Amendment,

 9      end quote.

10              Do you agree with that?

11              MR. LARKIN:  That calls for a legal conclusion.

12              THE WITNESS:  I agree he says that, but he makes

13      exceptions to that when he says it's not covered when

14      there's likelihood of confusion.

15      BY MR. BRAY:

16         Q    Do you agree with the general principle that

17      parody is a recognized form of free speech --

18              MR. LARKIN:  Same objection.

19      BY MR. BRAY:

20         Q    -- protected by the First Amendment?

21              MR. LARKIN:  Sorry.  Same objection.

22              THE WITNESS:  I have read that.  I'm not a

23      lawyer, so I -- you're asking me really legal questions

24      now.

25      BY MR. BRAY:

# EXHIBIT WW
# Non Electronic Exhibit

# EXHIBIT XX

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP Products, L.L.C., an            )

Arizona limited liability           )

company,                            )

      Plaintiff and                )

      Counterdefendant,            )   Civil Action No.

vs.                                 )   2:14-cv-02057-DGC

Jack Daniel's Properties, Inc.,     )

a Delaware corporation,             )

      Defendant and                )

      Counterclaimant.             )

- - - - - - - - - - - - - - - - -



Deposition of Itamar Simonson, Ph.D.

Thursday, June 18, 2015






Shelley M. Sailor
Certified Reporter
Certification No. 10254

```
 1                    (End of Confidential Section)

 2

 3                              -oOo-

 4

 5              (Exhibit 23 was marked for identification.)

 6    BY MR. LONG:

 7         Q.    Dr. Simonson, I am handing you a document

 8    that's been marked as Deposition Exhibit 23.  Do you

 9    recognize this document?

10         A.    Yes.

11         Q.    What is it?

12         A.    It's an article by Morrin, M-o-r-r-i-n, and

13    Jacoby that was published in the journal of public

14    policy in marketing.

15         Q.    Have you seen this document before?

16         A.    I did.

17         Q.    And where have you seen it before, do you

18    recall?  How are you familiar with this document?

19         A.    Well, in a number of ways.  If I'm not wrong,

20    I might have even cited it in the present report, or

21    maybe I didn't.

22         Q.    I think you did.

23         A.    Okay.  But I have seen it before, and I'm

24    familiar with the concept that Morrin and Jacoby

25    introduced here.
```

1     Q.     Do they suggest trademark dilution is
2   incapable of being measured through a survey method?
3     A.     They came up with a new idea of doing it.   To
4   my knowledge, they tried to use it once unsuccessfully.
5   In fact, that was a case I was involved in, and I am not
6   aware of any court actually accepting that methodology.
7   So I don't think it's a valid methodology where they're
8   suggesting that you can expose -- if I recall correctly,
9   if you expose respondents to a mark, and then you
10   instantly see that -- I think it takes people longer to
11   identify the mark.  So I think it had to do with
12   dilution by blurring, if I recall correctly, not
13   tarnishment.  But in any case, they suggested that you
14   could look at the response time, measure that, and
15   thereby document or demonstrate dilution.  As I said, to
16   my knowledge, it was relied on once unsuccessfully.
17     Q.     And so you're -- it is not a reliable way to
18   measure trademark dilution?
19     A.     That's correct.  Even for its intended purpose
20   of dilution by blurring.
21     Q.     And would it be in your opinion particularly
22   inappropriate for determining dilution by tarnishment?
23     A.     I don't see how that would be relevant to
24   dilution by tarnishment.
25     Q.     Is there any survey that you know of that's

1    suitable for assessing dilution by tarnishment, any sort

2    of methodology?

3        A.    I'm not familiar with one.  As I said,

4    dilution by tarnishment or dilution by blurring, it's

5    normally a process.

6        Q.    Um-hmm.

7        A.    So therefore -- I could be wrong.  I may

8    change my mind.  Maybe I'll develop something.  But at

9    this point, I have not come up with that, and I am not

10   aware of any such approach which explains why I think

11   most likely dilution surveys -- dilution surveys are

12   merely intended to find out whether one mark brings the

13   other to mind.

14       Q.    And that's only part of the analysis in a

15   dilution by tarnishment?

16       A.    That is correct.  You need -- that's why I

17   think that to assess dilution, you need an expert.  If I

18   may use myself, I would say an expert like me.  Someone

19   who is expert on branding and understand the psychology

20   of brands and how knowledge about brands is represented

21   in consumers' minds.  I don't think that a survey

22   expert, who is not also an expert on consumer

23   psychology, can conclude that there is likelihood of

24   dilution.  And we are talking about likelihood of

25   dilution.

1     Q.     How about qualitative research such as those
2   we talked about earlier, are those suitable for making
3   that determination?
4     A.     No.
5     Q.     Why not?
6     A.     Because of the reasons that we discussed
7   earlier.  I don't see any way in which that could be
8   done.  I'm not sure exactly -- you are not suggesting
9   any particular methodology.  I don't think you can ask
10  direct questions and say does that affect you?  That
11  would not be meaningful.  And qualitative techniques
12  have limitations that we discussed earlier.
13    Q.     Jack Daniel's used those qualitative methods
14  for obviously making some important decisions related to
15  the advertising promotion of their brands, but you don't
16  think those are appropriate -- and I guess that reflects
17  consumer reactions.  That's my understanding from
18  talking to you.  But in your opinion, that's not a valid
19  method for determining consumer reactions to product
20  like a VIP product?
21    A.     It's not appropriate for establishing
22  likelihood of dilution.  There are no questions.  I'm
23  not aware of anyone even suggesting that something like
24  that is possible.  I don't know what questions they
25  would ask.  We have the problem of small sample.  We

1    have the problem of one person influencing the other.

2    That does not mean that qualitative groups serve no

3    purpose.  As I said earlier, yeah, they can suggest

4    insights.  They are often quick to complete.  They are

5    less expensive.  So they can be informative.

6         Q.    But not informative in this situation?

7         A.    They are not capable of measuring likelihood

8    of dilution.  That is correct.

9         Q.    So in your opinion, one person is capable of

10   measuring likelihood of dilution, that person schooled

11   in certain theories and knowledgeable about the

12   literature without any research, without any specific

13   research, but a survey is not -- a quantitative survey

14   is not adequate for determining that and qualitative

15   research is not adequate to determine that.  That's your

16   testimony.

17              MR. LARKIN:  Objection to form.

18              THE WITNESS:  I think you are completely

19   mischaracterizing what I said.

20   BY MR. LONG:

21        Q.    Well, then, please, correct me.

22        A.    What I am saying, there are no -- and I am not

23   aware of anyone doing it, quantitative techniques or

24   qualitative techniques designed for them or capable of

25   doing that.  What you need to do is first establish that

1    one brings the other to mind.  Fortunately, we don't

2    have that problem here.  And then you have someone who

3    knows the literature, knows perhaps hundreds of studies

4    that are relevant to that question, someone who has

5    information about particular products at issue, and on

6    that basis, that person, like me, an expert, reaching

7    conclusions about the likelihood of dilution.

8        Q.    And then so the analytical approach, as you

9    defined it, is a two-step approach, generally speaking.

10   One is to determine first whether one brand brings the

11   other to mind, and the second step is a conclusion about

12   likelihood of dilution.  I understand the first step.

13   It's association.  There's some association right there.

14   I just want to make sure I understand what you mean when

15   you say what the second step is.  Maybe you want to

16   elaborate.

17       A.    Sure.  And I tried to explain it in more

18   detail in my report.  To assess for dilution, you need

19   two things.  First, one mark, if you will, should bring

20   the other to mind.  If it doesn't even bring it to mind,

21   then it's probably incapable of diluting it.

22       Q.    I understand.

23       A.    Now, the other component is analyzing the

24   brand allegedly being diluted.  The brand allegedly

25   diluting, what information it conveys with respect to

1    the allegedly diluted brand and how that is likely to

2    affect the response to the allegedly diluted brand.

3          Q.      And it's that second part that you feel is

4    something that traditional methods of qualitative or

5    quantitative research is incapable of assessing.  Is

6    that correct?

7          A.      Certainly qualitative is incapable of, and I

8    am not aware of quantitative methods that have been used

9    or that I think have been accepted as reliable.

10

11              (Whereupon, the following pages, 81 through

12    82, were designated Confidential - Attorneys' Eyes Only

13    pursuant to protective order and bound separately.  See

14    Volume 1A.)

15                      (See next page.)

16              (Lunch recess was taken from 11:47 a.m. to

17    12:23 p.m.)

18

19

20

21

22

23

24

25

1              (Whereupon, the following pages, 81 through

2       82, were designated Confidential - Attorneys' Eyes Only

3       pursuant to protective order and bound separately.)

4

5                      (See next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    studies and designed many studies, I can tell you a

2    study like that would have worked against your client's

3    position.  But it doesn't mean I would be just as

4    critical, because I think such a survey would have been

5    biased in favor of Jack Daniel's.

6        Q.    And likewise, a focus group study like those

7    that Jack Daniel's conducted?

8        A.    No.  That's a different issue at all.  We can

9    look at questions to the extent -- I don't know if they

10   all provided specific questions.  But in some cases it's

11   what do you think about this, what do you think about

12   that without showing a particular stimulus and saying

13   what does that tell you, and would that make you more or

14   less likely to buy the product.

15       Q.    But showing a stimulus you think would convey

16   the same problem, create the same demand effect?  That

17   is the stimulus of the VIP product?

18       A.    What is the question exactly?

19       Q.    You said that focus groups -- if I understand

20   you correctly, you said that qualitative research like

21   focus groups where questions don't involve a specific

22   stimulus may result in different types of answers than

23   one where the stimulus is present and a specific focus

24   is made to the question.  So I was trying to contrast

25   those two.  And my question was -- and let me just

1    rephrase it -- was that a focus group, you believe that

2    use this as a stimulus would run the same focus bias --

3         A.    Focalism.  I said focalism, bias, and demand

4    effects.  Yes.  Again, even if you are doing qualitative

5    studies, like focus groups, and you are showing this

6    product, that will generate negative associations about

7    Jack Daniel's.  So I don't think that your client would

8    like the results from such a study.

9         Q.    Okay.  And looking at Deposition Exhibit 3,

10   page 5, paragraph 13, you start out in the first

11   sentence of paragraph 13, when you refer there to

12   Mr. Sacra not testing his assumptions regarding the

13   impact of the VIP product, you are suggesting what type

14   of tests might he have done?

15        A.    Well, I think even if he is not a market

16   research expert, he could have just shown this product

17   and say what comes to mind.  I mean, try to ask

18   questions that are non-leading as possible and see what

19   he gets.  Maybe he can get them to rate it on a funny/

20   not funny scale, disgusting/not disgusting scale.  Maybe

21   he can do the same thing for other products as controls.

22   So he might be able to do different things that will be

23   somewhat less susceptible to bias.

24        Q.    But if he had done that and found that there

25   was a positive association with it, would that have been

1    reliable evidence that it was not dilution by

2    tarnishment?

3        A.    I think that would be useful information.  If

4    you -- if he ran a survey and he showed the image of

5    this product, using an online survey these days, it's

6    fairly quick and not that expensive, and he showed that,

7    and people said, yeah, now I really feel like buying a

8    Jack Daniel's Old No. 7, if he found that, I certainly

9    would pay attention to that, and it may certainly affect

10   my opinions.  I think it's highly unlikely.

11       Q.    Say for like a focus group discussion of the

12   same thing?

13       A.    Yeah, we discussed earlier focus group has

14   some limitations --

15       Q.    But with the appropriate questions.

16       A.    You could provide some useful information,

17   yes.

18            (Exhibit 25 was marked for identification.)

19   BY MR. LONG:

20       Q.    Dr. Simonson, I'm handing you a document

21   marked as Deposition Exhibit 25.  Do you recognize this

22   document?

23       A.    Yes.  That's one of the articles that I cited.

24       Q.    Is it the article you cited in footnote 11 on

25   page 11 of Deposition Exhibit 3?

Itamar Simonson, Ph.D. - June 18, 2015                103

1        A.    Yes.

2        Q.    Is it a research paper?

3        A.    It is.

4        Q.    Is it a research paper about assessing

5    dilution, trademark dilution?

6        A.    It's titled "Brand Dilution:  When Do New

7    Brands Hurt Existing Brands."

8        Q.    Is it referring specifically to dilution,

9    trademark dilution, the discussion of our deposition

10   today and the subject of this litigation?

11       A.    Yes.  It's focused more on blurring.  But yes.

12       Q.    If I could turn your attention, Dr. Simonson,

13   to page 64 of Deposition Exhibit 25, is there a

14   discussion on there in the right-hand column towards the

15   bottom about dilution by tarnishment?

16       A.    Yeah.  There is one section here about that.

17       Q.    Now, is Exhibit 25 a discussion of an

18   assessment of dilution through a survey methodology?

19       A.    Could you repeat that?

20             (Whereupon, the record was read by the

21   Reporter.)

22             THE WITNESS:  I'm not sure I understand the

23   question.

24   BY MR. LONG:

25       Q.    Okay.  Let me rephrase it, then.