Firm E-Mail: courtdocs@dickinsonwright.com

David G. Bray (#014346)
dbray@dickinsonwright.com
Frank G. Long (#012245)
flong@dickinsonwright.com
Jonathan Batchelor (#026882)
jbatchelor@dickinsonwright.com
Colleen M. Ganin (#032456)
cganin@dickinsonwright.com
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (602) 285-5100

*Attorneys for VIP Products, L.L.C.*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| VIP Products, L.L.C., an Arizona limited liability company,<br><br>                Plaintiff,<br><br>        v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation,<br><br>                Defendant. | No. 2:14-cv-02057-SMM<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT ITAMAR SIMONSON** |

## **INTRODUCTION**

A central issue in this case is whether average consumers believe, or are likely to believe, that a parody dog toy has harmed the reputation of a whiskey beverage. For expert testimony to be admissible, it must be narrowly tailored to fit the issue in question, it must be reliable, and it cannot be based on the pure speculation or ipse dixit of the testifying expert. The proposed testimony of Defendant's expert Simonson—even if the Court were to consider untimely declaration submitted in opposition to the pending motion—fails that test.

1

Simonson could have shown consumer opinions by conducting a survey or focus group—that is what Plaintiff did when it commissioned several different focus groups to evaluate the pet toy.  Yet, Simonson claims that neither surveys nor focus groups would be useful in a case like this.  He and Defendant claim that there is no scientific methodology that fits the issue in this case.  They claim that the Court should rely solely on the opinion of a "specialized knowledge" expert who has academic knowledge of theory, but no specialized knowledge of the products or markets involved. Simonson admits that he does not have any actual experience with the products or market at issue in this case.  He also does not claim to have any knowledge of what consumers actually think about the two products at issue, and does not claim to have taken any steps to find out. He is adamant that he has based his approach in this case on "scientific bases," "scientific principles," "a great deal of research published in numerous scientific publications," and "widely accepted scientific principles." Declaration of Itamar Simonson in Support of Defendant's Opposition to Plaintiff's Motion to Exclude Testimony of Itamar Simonson ("Simonson Declaration") at ¶¶ 9-10.  Yet, in his new declaration (submitted in untimely fashion after the opening brief on this motion pointed out Simonson's complete lack of any scientific methodology), Simonson claims that he is a "specialized knowledge" expert as well. *Id.* at ¶ 5.

Simonson, in short, is an expert who claims that he based his approach on science, but who simultaneously (and adamantly) defends his failure to use any scientific methodology to support his conclusions.  He claims to be a specialized knowledge expert, but the only specialized knowledge he claims is of general consumer-psychology principles—a scientific field. The Court should disregard the assertions in Simonson's latest declaration as untimely. However, even if the Court did consider them, these claims still could not save Simonson's deficient testimony.  The "specialized knowledge" category does not include the speculative

application of general principles by a purported social-science expert, who cannot identify any scientific methodology that he employed to support his conclusions.

Appellate courts have equipped federal district courts with ample authority and discretion to exercise their gatekeeper function in excluding expert testimony that lacks foundation, is unreliable, and does not fit the case. Simonson's testimony and report fail to meet these threshold requirements for admission of expert opinion, and, therefore, should be excluded.

## ARGUMENT

### 1. The District Court's "Gatekeeper" Role Is not Intended to be a Mere Formality.

*Daubert* empowers federal district courts to make a determination, before trial, as to whether proffered expert testimony is sufficiently reliable and thus admissible at trial. Recognizing that a "one size fits all" approach would hamstring district court judges and prevent them from properly exercising their gatekeeping function, the Ninth Circuit has held that a wide variety of factors may be considered by district courts in connection with their gatekeeping function. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("[F]ar from requiring trial judges to mechanically apply the *Daubert* factors—or something like them—to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function."). Further recognizing the significance of the district court gatekeeping role and the importance of vesting trial judges with full discretion, the Ninth Circuit has ruled that "a trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Hangartner v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citations omitted) (emphasis in original).

## 2. **Simonson's Testimony Does Not "Fit" This Case.**

Defending the need for a "specialized knowledge" expert in this case, Defendant argues that: "[T]he average person is not familiar with how the brain stores information or forms associations between nodes of information." Opposition to Motion to Exclude Testimony of Defendant's Expert Itamar Simonson ("Opposition") at 8:4-5. That, however, is not the issue in this case. The issue is how the average person reacts to the two products in this case—whether because of conscious or subconscious impulses, or because of activation of "nodes," or for any other reason. Simonson's report and testimony are devoid of any factual basis for an opinion about how consumers react to the two specific products at issue in this case. Thus, there is no "fit" between Simonson's testimony and this case.

This was unequivocally established in Simonson's deposition. The central premise of Simonson's report is that, because of his familiarity with the "associative network memory model," he can look at the advertisements, packaging, and branding of one product and determine, without more, whether they will dilute the brand of another product. If Simonson did have such expertise, then he should be able to look at an advertisement for a particular product and determine whether it would dilute Jack Daniels' brand in the mind of consumers. Yet he was repeatedly unable to do so in his deposition.

Exhibit A sets forth Simonson's testimony, together with images of the exhibits, showing Simonson's reaction to a series of Jack Daniels' own advertisements. Simonson was either unable or unwilling to opine as to whether those advertisements would dilute Jack Daniels' own marks. Defendant argues that, "No expert worth his or her salt would provide an expert opinion on-the-fly without further information, reflection, and thought," Opposition at 9, n.4—but why? If the associative network memory model is an accurate predictive tool *in particular cases* as to whether there would be a dilutive effect for average people *relating to the particular products at issue*, why would Simonson not be able to perform an on-the-

4

spot analysis? What is the added "information" that he requires? What further "reflection" is necessary? What additional "thought" must he engage in, in order to form his opinion? These questions have not been answered in Simonson's deposition or in the Opposition. Without identification of some methodology or other support beyond Simonson's mere assertions, his testimony is inadmissible. *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) ("Bajaj's testimony that his opinion as to 'economically material' information is based on 'economic logic' is simply a form of inadmissible ipse dixit. The law is clear that mere ipse dixit is not appropriate expert testimony because it is not based on reliable methodology, as *Daubert* requires.").

The fact that Defendant and Simonson do not even agree on what type of expert testimony Simonson has provided is further proof that the testimony is unreliable and lacks foundation. On the one hand, Defendant argues that, because Simonson's testimony is neither scientific nor technical, it need not be based on a "particular methodology or technical framework." Opposition at 1:23-2:4. Elsewhere, however, Defendant argues that, "VIP's claims that Dr. Simonson has not employed a 'scientific methodology' are incorrect." *Id*. at 9:18-19. Yet Defendant never identifies any such "scientific methodology." In an attempt to plug numerous holes in his report that became apparent after Plaintiff filed its motion to exclude, Simonson submitted an untimely declaration that: describes "the scientific bases" for his conclusions; alleges that his analysis "was based on the same scientific principles" that he uses in his academic work; asserts that "a great deal of research published in numerous scientific publications" supports his opinions; and claims that "my analysis was based on widely accepted scientific principles." Simonson Declaration at ¶¶ 9-10.

Simonson's new, untimely declaration presents three problems for Defendant. First, it reveals that Defendant felt that Simonson's initial report and deposition testimony were insufficient to counter the pending motion. Otherwise, there would be no need for a

5

supplemental declaration. Second, in his zeal to tout the "scientific basis" and "widely accepted scientific principles" underlying his report, Simonson ***forgot that he is not supposed to be doing science at all.*** If Simonson's opinion was scientifically based, it must be excluded, because it is not supported by anything akin to a scientific methodology. If Simonson's opinion was based on real world experience, rather than science, the seeming inability of both Defendant and Simonson to keep their story straight in that regard is itself revealing. The failure to state a consistent conceptual basis for Simonson's testimony is a product of the fact that Simonson employed no scientific methodology, but also has no specialized knowledge applicable to the circumstances of the issue at hand.

Third, the new declaration should be struck as untimely. It was presented three months after the July 17, 2015 discovery deadline and several months after the expert disclosure deadline. Courts generally do not consider untimely-disclosed expert materials. As Defendant asserted in a brief in this case, "[T]he law on the preclusion issue is cut and dry." JDPI Opposition to Motion for Clarification, 6:10-11 (citing *Hostnut.com, Inc. v. Go Daddy Software, Inc.*, No. CV05-0094-PHX-DGC, 2006 WL 2573201, *3 (D. Ariz. Sep. 6, 2006)).[1]

In his new declaration, Simonson argues that his testimony has never been excluded before under *Daubert*. Without a detailed analysis of his proffered testimony in those cases, however, such an assertion is meaningless. What we do know is that neither of the cases he highlights in Paragraph 17 of his new declaration admitted Simonson's testimony where (as in this case) he merely reviewed the products at issue, engaged in unspecified "reflection"

---

[1] As the Court noted in the August 31 hearing, "Experts have to be told to comply with the rules. And if they get caught in a cross-examination, they didn't do something, they can't now say, oops, let me go back and do this all over again." [Transcript of hearing dated August 31, 2015, 30:12-31:3].

6

and "thought," and issued his opinion as to dilution. In *Visa International Service Association v. JSL Corporation*, the court noted that Simonson "presents an opinion on the likelihood that actual dilution occurred based on his review of relevant surveys and the application of his specialized knowledge in the field to the results of those surveys." No. 02:01-CV-0294-LRH(LRL), 2006 WL 3248394, at *3 (D. Nev. Nov. 7, 2006). The court further noted that Simonson "relied on surveys conducted by Visa in 2000, his own validation survey, studies of on-line payments from 2000 to 2001, and his own personal expertise to reach the conclusions in his opinion." *Id.*

In *Starbucks Corp. v. Lundberg*, the defendant moved unsuccessfully for an order "excluding all testimony and evidence relating to plaintiffs' proposed expert, Itmar [sic] Simonson, Ph.D. (Simonson), the survey he directed, and the accompanying report." CV No. 02-948-HA, 2005 WL 6036699, at *1 (D. Ore. May 25, 2005). The court allowed Simonson's testimony, and the survey, noting:

> Here, according to its Introduction, the survey had two purposes: (1) to determine whether consumers are likely to associate the "Sambuck's Coffeehouse" name with Starbucks, which would indicated that "dilution of the 'Starbucks' mark is likely to occur" and (2) assuming the analysis leads to the conclusion that "Sambuck's Coffeehouse" brings to mind the "Starbucks" mark, to examine the impact of such a mental association on the "Starbucks" mark's uniqueness and distinctiveness. Pls.'s Opp. to Def's Mot. *In Limine* to Exclude Expert Test, of Professor Itamar Simonson, Ex. 1 at 4.

*Id.* at *2.

In neither *Visa Int'l* nor *Starbucks* was Simonson permitted to offer the same kind of testimony he offers here: his own personal view unsupported by any survey or other objective, verifiable evidence. If any state or federal court has admitted such Simonson testimony, neither the Opposition nor Simonson's new declaration made note of this.

7

1 Contrary to Defendant's claim that numerous other courts have admitted similar Simonson
2 testimony, this Court would in fact be plowing new ground.

3 Defendant takes a swipe at Plaintiff's expert Silverman, but no motion has been made
4 to exclude Silverman's testimony. In any event, Defendant's critiques of Silverman are not
5 well taken. Defendant implies that Silverman stated that he has testified many times in
6 dilution cases; that he has never used quantitative or qualitative surveys in dilution cases; and
7 that focus groups are not very helpful. In fact, Silverman explained that this is the first
8 dilution case in which he has served as an expert. Deposition of Bruce G. Silverman,
9 Opposition Exh. C, at 69:25–70:3. He testified that, in his real world experience, he has
10 observed more than 3,500 focus groups to determine what consumers thought about a variety
11 of products, including alcoholic beverages and pet products. He further testified:

> Qualitative studies are used far more than quantitative studies to get at thoughts and feelings because thoughts and feelings are very difficult to get at through quantitative studies. The nature of quantitative studies is you just have to interview so many people that today in most instances quantitative studies are done via the Internet. So it's a matter of consumers answering on a scale of 1 to 7 or 1 to 10, and you obviously have no opportunity to interact. You have no opportunity to see physical reactions. So both qualitative and quantitative studies['] research techniques are very useful.

[*Id.* at 74:12-24].

However, the words of an article quoted by Defendant *are* well taken. Alexander F. Simonson, *How and When Do Trademarks Dilute: A Behavioral Framework to Judge "Likelihood" of Dilution*, observes:

> It is the premise of this article that as surveys have become the empirical fodder for trademark-confusion litigation, so too empirical realities must eventually take root in dilution jurisprudence. As judges become more empirically demanding, predictions of reality will be guided **less by intuition and more by real evidence** and arguments based on firm behavioral underpinnings. The future of dilution analysis rests, therefore, with understanding and predicting these behavioral patterns so that one can properly assess the probability or likelihood of dilution. Just as economic understanding is crucial in tort jurisprudence, so too the ability to marshall behavioral principles and empirical realities will become critical in dilution cases.

83 Trademark Rep. 149, 149-50 (1993) (emphasis added).

### 3. The Great Weight Of Authority Requires Exclusion Of Simonson's Unsupported Testimony; Defendant's Description Of The Case Law Is Misleading.

Defendant describes *LG Electronics U.S.A., Inc. v. Whirlpool Corp.* as "permit[ing] an expert to testify based on his extensive expertise in consumer research and marketing, despite the fact that he did not himself perform a survey or other test." Opposition at 11:14-24 (citing *LG Elec. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358 (N.D. Ill. Aug. 24, 2010)). The subject expert, however, was a rebuttal expert who was merely critiquing the work performed by the other side's expert. The court notes that, "Dr. Wind has reviewed Whirlpool documents, including the surveys conducted by Insperience, to rebut Dr. Nowlis' criticism of the Reitter Survey's conclusions." *Whirlpool Corp.*, 2010 WL 3397358, at *15. Thus, while the expert himself did not conduct a survey, he was merely a rebuttal expert, and he specifically relied on surveys performed by others.

In *Clear With Computers, LLC v. Hyundai Motor Am., Inc.*, the court makes clear that the challenged expert was using both "his marketing expertise and data provided by HMA"; he specifically testified that web tracking data provided by Hyundai Motor America "was more reliable for marketing analysis than surveys." No. 6:09-CV-479, 2012 WL 8144915, at *5 (E.D. Tex. Jan. 9, 2012), *aff'd*, 496 Fed. Appx. 88 (Fed. Cir. 2013).

In *Half Price Books, Records, Magazines, Inc. v. Barnesandnoble.com, LLC*, the challenged expert specified objective evidence in support of his opinions, namely "widely used dictionary and thesaurus entries of the terms 'half' and 'half-price.'" No. 3:02-CV-2518-G, 2004 U.S. Dist. LEXIS 23691, at *16 (N.D. Tex. Nov. 22, 2004). Simonson provides no such external support with respect to the two products at issue in this case.

In its opening brief, Plaintiff noted that a source cited by Simonson as authoritative—namely, Jacob Jacoby, *The Psychological Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion and Dilution*, 91 Trademark Rep. 1013, 1013-71 (2001) ("Jacoby")—expressly recognizes the availability of testing for tarnishment. All of the sudden Jacoby became not so authoritative in the eyes of the Defendant. Defendant argues that the survey described in Jacoby's article related to a case decided under Missouri's anti-dilution statute, which is irrelevant to whether such surveys are possible. Opposition at 13-14. Defendant further argues that neither the District Court nor the Eighth Circuit on appeal analyzed Jacoby's survey—facts that hardly show unreliability. Defendant then argues that two surveys by Jacoby were rejected in other cases, which merely goes to show that a survey must be properly designed in order to be admissible. *Id*.

In *Hangarter v. Provident Life and Accident Insurance Co.*, the challenged expert in insurance bad faith "has twenty-five years' experience working for insurance companies and as an independent consultant." 373 F.3d 998, 1015–16 (9th Cir. 2004). His experience has included evaluating insurance claims, assisting insureds in dealing with insurance companies to obtain payment of their claims, marketing insurance products, and evaluating insurance policies." He "received training on how insurance companies in general, and Defendants in particular, adjust claims." *Id*. Here, there is simply no evidence of any real world experience, data, research, or other information that would supply the missing link between what Simonson did (looked at the two products) and what he concluded (likelihood of dilution). Courts exclude such unsupported testimony. *See, e.g.*, *AT&T Wireless Servs. of Calif. LLC v. City of Carlsbad*, 308 F.Supp. 2d 1148 (S.D. Cal. 2003) (excluding specialized knowledge expert; "What is notably lacking, despite the City's assertion to the contrary, is any evidence that explains for the court how the review of the documents allowed Kramer to conclude the availability of alternative sites" for wireless antenna); *Vaughn v. Hyster Co., Inc.*, No. 4:09-

CV-570-VEH, 2010 WL 9936530, at *4, 10 (N.D. Ala. Dec. 3, 2010) (excluding experience-based witness; "the burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion…"; plaintiffs "offered no explanation, no factual support, no case law, and no argument to support a conclusion that the methodology used by Gamel in formulating his opinions is reliable. . . . Based upon the record, the court cannot conclude that the methodology used by Gamel in formulating his opinions is reliable").

## CONCLUSION

*Daubert* motions often present gray areas. Sometimes courts admit even "shaky" expert testimony with the thought that challenges can be sorted out through cross-examination at trial. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). As Samuel Johnson observed, however, the existence of twilight does not mean there is no difference between night and day. This is a clear-cut case. There simply is no reliable, testable, scientific, or real-world support for Simonson's untethered speculations about how average people are likely to respond to the products at issue in this case. Based on the foregoing, Simonson's testimony and report should be excluded.

**RESPECTFULLY SUBMITTED** this 30th day of October, 2015.

**DICKINSON WRIGHT, PLLC**

By: s/Frank G. Long
 David G. Bray
 Frank G. Long
 Jonathan S. Batchelor
 Colleen M. Ganin
 1850 North Central Avenue, Suite 1400
 Phoenix, Arizona 85012-2705
 *Attorneys for VIP Products, L.L.C.*

11

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ Kristi A. Arendt

PHOENIX 53913-11 255096v5