# EXHIBIT A

Simonson Deposition Transcript

| Page/ Line | Testimony |
|---|---|
| 184/12 – 186/9 | **Exhibit 33** |

JACK DANIEL'S
Tennessee WHISKEY
★ SERVED IN ★
FINE ESTABLISHMENTS
AND QUESTIONABLE JOINTS
SINCE 1866

(Exhibit 33 was marked for identification.)
BY MR. LONG:
Q. Dr. Simonson, I'm handing you a document that's marked as Deposition Exhibit 33. Have you ever seen this image before?
A. I don't remember seeing it.
Q. Does it appear to you to be an advertisement for Jack Daniel's?
A. No.
Q. It does not?
A. It does not.
Q. Does the Jack Daniel's bottle appear on it?
A. It does.
Q. And what makes you conclude or reach

Page 185

impression that it's not a Jack Daniel's advertisement?
A. It says, "Questionable Joints."
Q. Is that something you would consider unlikely for Jack Daniel's to include in its advertisement?
A. Right.
Q. And why would that be?
A. I just don't think that's something that they would do.
Q. Why not?
A. Because the "questionable" is a negative term. I don't think that Jack Daniel's is likely to do that.
Q. And this would be -- would this be an advertisement that in your mind would create negative associations that would dilute brand equity?
A. It might.
Q. Any reason why it wouldn't?
A. You showed it to me just now. Haven't seen it before, haven't thought about it. But as I said, it might.
Q. What other analysis would you need to do to reach that conclusion in your mind?
A. I would like to know where it appeared -- I mean, I need to know who advertised it.
Q. Does that matter who advertises it as to whether or not it creates a negative association?

Page 186

A. Right now you just showed it to me. I hesitate to give you an opinion about --
MR. LARKIN. Don't speculate. If you don't know what it is --
THE WITNESS: -- something I know nothing about.
BY MR. LONG:
Q. Just as an example.
A. I said all I can say.

186/10 – 190/25

**Exhibit 34**

(Exhibit 34 was marked for identification.)
BY MR. LONG:
Q. Dr. Simonson, I'm going to hand you a document that's marked as Deposition Exhibit 34. Can you identify this document?
A. I have no idea what it is.
Q. Does it appear to you to be an advertisement for Jack Daniel's?
MR. LARKIN. Don't speculate. If you know, tell him. If you --
THE WITNESS: I have no idea.
BY MR. LONG:
Q. Does it have a picture of a Jack Daniel's bottle on it?
A It does.
Q. Is that the same trade dress of Jack Daniel's

Page 187

that you considered in doing your analysis in your opinion in Deposition Exhibit 3?
A. It is.
Q. Do you consider this advertisement to create a positive or negative association with Jack Daniel's?
MR. LARKIN: Objection.
THE WITNESS: You know, I don't know anything about it.
BY MR. LONG:
Q. Just as an example.
MR. LARKIN: Well, that's meaningless. We don't know where this is --
BY MR. LONG:
Q. Not where it came from. Whether it -- if it came from VIP Products, would you consider this or someone like it, someone independent from Jack Daniel's, would you consider this to have a positive or negative association?
A. You know, I think that if I'm not wrong, and I could be wrong, spirits company or beer company at some point were trying to discourage people from drinking. And if I recall correctly, they showed, you know, negative consequences. And it's quite possible that people gave them points for warning consumers about the possible consequences. But again, I have no idea what

Page 188

this is about. If you can show me where it came from --
Q. Taking it on the face case itself, I mean evaluating it as you evaluated a VIP product, what do you believe the message of this advertisement is?
MR. LARKIN: Objection --
THE WITNESS: I don't know.
MR. LARKIN: -- we don't know where this [indicating) came from. We know where this [indicating) came from.
BY MR. LONG:
Q. Regardless of where it came from, regardless of where it came from --
MR. LARKIN: Wait -- go ahead.
BY MR. LONG:
Q. Regardless of where it came from, what do you consider the associations, given your expertise and education, of this particular advertisement?
MR. LARKIN: Objection. What does that have to do with his opinion?
MR. LONG: His opinion is to an example of how he exercises an analysis of the associated network model in connection with the product, critically a Jack Daniel's product.
MR. LARKIN: Not a real product, though. We don't know what this is --

**Exhibit 34**

Page 189

MR. LONG: Well, real or not, doesn't make any difference. It's evidence of how he exercises his analytical approach.
THE WITNESS: I need to see the context. Otherwise, I just cannot form an opinion. And all you showed me is a photo of this product. I wouldn't opine on that either.
BY MR. LONG:
Q. What was the context that you considered in terms of the VIP product?
A. Well, all the information I had about the product.
Q. What was that information you had about the product other than the product itself?
A. Well, we talked about --
MR. LARKIN: Asked and answered.
THE WITNESS: We talked about all the components of the trade dress.
BY MR. LONG:
Q. Okay. But that describes the product itself.
A. So I -- I think that's --
Q. What more information would you need about -- why would you need more information about the example that's in Deposition Exhibit 34 to determine its associative consequences than you would need for the VIP

Page 190

product?
MR. LARKIN: Objection. Because we don't know what it is. We don't have any information. Go ahead.
THE WITNESS: This is -- I know what it is, how it's sold, for what purpose. I know where it's coming from. I know what stores it's sold. I know why presumably it looks the way it is. This thing is just a piece of paper. I don't know what it is. You need to give me the context before I can try to form any opinion.
BY MR. LONG:
Q. In the terms of context of an advertisement, this being a copy of a print advertisement, that's not sufficient context for you?
A. No. I need to know a lot more about what's behind it.
Q. If it appeared in public, published in a magazine?
MR. LARKIN: Objection. We haven't established that it did or it's a real ad or who put it out. Go ahead.
BY MR. LONG:
Q. Anything to add?
A. No. I just don't know anything about that other than the picture that you are showing me.

| 191/1 – 194/8 | Exhibit 35 |
|---|---|

Page 191

(Exhibit 35 was marked for identification.)
BY MR. LONG:
Q. Dr. Simonson, I'm handing you a document that's been marked Deposition Exhibit 35. Can you identify it?
MR. LARKIN: Do you know what it is?
THE WITNESS: I don't know what it is. It says at the bottom "Your friends at Jack Daniel's remind you to drink responsibly."
BY MR. LONG:
Q. Does this appear to you to be an advertisement for Jack Daniel's?
A. I have no idea what it is.
Q. Does it look like an advertisement for Jack Daniel's?
A. I just don't know.
Q. Do you associate any message with this advertisement?
A. I don't know what it means. Kind of strange but I don't know what it means.
Q. You are not able to interpret that there's any message in this one in Deposition Exhibit 35?
A. No. I need some context.
Q. But based on your experience or expertise and education?

Page 192

A. That's -- my expertise and education require me to have some background and context.
Q. What background and context would you need to evaluate this one?
A. Is this part of something? What -- where did that come from? Who put it wherever it appeared?
Q. Does it matter who placed the ad as to whether or not it has a negative association?
A. It does. I need to know who put it, why, where it is. Give me some background context.
Q. That's all important for determining what the consumer's reaction is going to be?
A. Yes.
Q. So would your opinion about the VIP product be different if that was a product sold by Jack Daniel's?
A. No.
MR. LARKIN: If it was a product sold by Jack Daniel's, we wouldn't be here today.
MR. LONG: Is that your testimony, Chris, or his?
MR. LARKING: (Phone ringing.) I'm sorry, can I --
MR. LONG: Sure.
(Off the record.)
BY MR. LONG:

Q. Dr. Simonson, I want to understand. Based on your most recent testimony, you said it's important to know who put it out in order to determine what the consumer reaction is to a product. That's what I heard you to say. Was that incorrect?
A. I think that my education and training and what I teach all call for due diligence, just understanding the context of stimuli that you are trying to analyze. Here you're putting in front of me some piece of paper with a picture and some words. I don't know anything about it. And that's not sufficient basis to say anything about it.
Q. So you don't feel you can give an opinion as to what an intended message is of an advertisement without knowing who provided the advertisement, placed the advertisement?
A. I don't know anything about this piece of paper.
Q. No, but I'm not asking you about a piece of paper. I'm asking you about a message, an advertising message on a piece of paper and its association with a particular product.
A. I don't know what this message means.
Q. You are not able to interpret this message?
A. No. I don't understand what it means without

the context. And everything that I know about the product we are discussing today.
Q. What do you think the statement "Not all men fear commitment" means?
A. I am not going to speculate about that.
Q. No opinion?
MR. LARKIN: Do you have an opinion?
THE WITNESS: No.

Simonson Deposition Transcript

194/9 – 196/25

**Exhibit 36**

(Exhibit 36 was marked for identification.)
BY MR. LONG:
Q. Hand you a document that's been marked as Deposition Exhibit 36. Can you identify it?
A. What do you mean?
Q. Can you identify any images on the document that's been identified as Deposition Exhibit 36?
A. Looks like a Jack Daniel's, I guess, bottle.
Q. Okay. Does this image create any association in your mind between Jack Daniel's --
A. Same thing I just said. You have shown me another piece of paper. I don't know what it means, and I cannot analyze it.
Q. Because you don't know who put it out?
A. I don't think that's what I said. I don't know anything about it.
Q. Just so I understand, what more would you need

Page 195

to know about it? Would you need to know where it was placed, is that it? Would you need to know where it appeared in public in order to make a decision about that?
A. No. The meaning of that depends on where they put it out, why they --
Q. See, this is what I don't understand. Why does who put something out make a difference in deciding how consumers are going to react to it?
A. Well, in the case that we are discussing today, we know exactly what Mr. Sacra had in mind and why he did what he did.
Q. Okay.
A. I have no idea what whoever did this had in mind. What's the message here? I just don't understand. And I have no way of doing it. And that's not the way I form my opinions.
Q. So why does what Mr. Sacra intended make a difference in your mind to how consumers react to the product?
A. I need to understand where this thing -- I don't know if it's an ad or whatever it is, where it came from, why it was created, who saw it, is it part of a campaign, is it -- I don't know what it is.
Q. That wasn't my question.

Page 196

MR. LARKIN: Can you tell him? Maybe he seems to need additional information. If you have it.
MR. LONG: I would like to see if I can get an answer to my question, if you could read my question back.
(Whereupon, the record was read by the Reporter.)
THE WITNESS: As we discussed earlier, he thought -- at least he said he thought it was a parody. He also said I didn't spend any time thinking what it would do to the Jack Daniel's brand nor did he conduct any study or attempt any study to find out what the impact would be. This is all useful information.
BY MR. LONG:
Q. To how consumers react?
A. Maybe he did studies about how consumers react, and he can show evidence that consumers reacted this way or that way.
Q. That makes no sense, Doctor, with all due respect. You're giving an opinion on how consumers who surely do not know Mr. Sacra, do not know what VIP Products was intending to do, and why this product came about, react on seeing the product.
A. Apparently my answer was unclear to you.
Q. Yeah. It is totally unclear.

194/9 – 196/25

A. And let me explain again. Had Mr. Sacra conducted studies to inform him and us about consumer reactions, perhaps that would have convinced us that contrary to what my analysis would suggest, that actually consumers lobbied. They like now Jack Daniel's more than ever and say if Jack Daniel's would go up, let's say he presented evidence like that, that would be relevant to my assessment --
Q. Yeah, but would that change your opinion?
A. If he showed convincing evidence, it might. I think it's extremely unlikely, and as a matter of fact, he did not produce such evidence.
Q. So because he didn't produce it in terms of before he launched the product, that determines for you how consumers are going to react to the product? Because -- here's the thing, Dr. Simonson. If I were thinking about how consumers react, I would think that most consumers have no idea why a product comes out or what the genesis of it is, whatever, focus group studies, anything, analysis done beforehand. They just see a product. Honestly, until now, I thought that was what your opinion was. This is how consumers would react upon seeing the product, not knowing anything about the origins of it.
MR. LARKIN: No --

MR. LONG: I'm just clarifying. I'm just clarifying.
MR. LARKIN: Okay. Finish.
BY MR. LONG:
Q. But now I have the understanding, correct me if I'm wrong, that how consumers react in your mind depends on where the product comes from and why it's being put into the marketplace.
A. I'm not sure -- now I'm losing you. What I said was very simple. My analysis leads to the conclusions presented in my report as we discussed today. Now, in the unlikely event that Mr. Sacra conducted proper studies and he showed that actually consumers love this product, they are more likely to buy Jack Daniel's product because of this toy, you know, maybe he would have shown me wrong. But he hasn't done that.
Q. But that's not what I'm asking right now. I'm asking right now, I'm asking looking at this situation and determining how you reach your conclusion, and I'm trying to understand your point right now that in order to reach a conclusion as to how the consumers are going to react to this, you need to know why the product was put out. And that's why you're saying you can't give an opinion on these examples that I provide here because I

don't know who put them out.
MR. LARKIN: That mischaracterizes testimony. I mean look, Frank, his report is about a real product. Now you're showing him all kinds of things that we don't know what they are, and it sounds like you don't know what they are, because he's told you he would like some more information. If you could provide that to him, then maybe he could respond to your question but I also --
MR. LONG: I'm trying to understand the analytical approach, Chris. And I've read these examples that we talked about before where there's academic studies done on hypotheticals. We have talked about them today. People write papers, get published, become professors, based on coming up with completely academic examples of what advertisements might be and test them and run all kinds of studies and then end up teaching other people about it. That seems to rely highly on hypotheticals. And we do have an actual product here. We have other examples here. We have an expert here who says he can understand and analyze advertisements based on their message, implicit or otherwise, because of an associative network model. I'm trying to see how that can be applied, and I'm being told now that it can't be applied.

MR. LARKIN: What do these other products have to do with his opinion as to the real product?
MR. LONG: Because they have to do with the understanding of the image of Jack Daniel's and how the image of Jack Daniel's can be considered and whether or not a message is going to be considered, I don't know, positive or negative. And I'm trying to test him, my understanding of this expert's expertise as it relates to this associative network model, which this expert has testified he is able to do on just viewing a product.
MR. LARKIN: I think that mischaracterizes his testimony, too. My problem is -- certainly you get leeway with an expert. We're talking about -- I don't know whether, with all due respect, you printed these up yesterday. We don't know what these are. We don't know whether they are even real or not. If you have that information, why don't you give it to him, and he may be able to respond to your questions. I don't know --
MR. LONG: I have information that these are ads that were published by Jack Daniel's about Jack Daniel's. Okay? That's what I understand.
MR. LARKIN: I can give you information to the contrary.
MR. LONG: Well, why don't you --
MR. LARKIN: But I'm not testifying today.

201/1 – 204/16

MR. LONG: Okay. All right.

MR. LARKIN: What we don't know is what these are. No one has established that.

MR. LONG: Well, what they are are advertisements of -- and that include Jack Daniel's, and they relate to -- and they have messages with them. If they don't come from Jack Daniel's, then there shouldn't be any concern about whether -- what Dr. Simonson's opinion might be about them. So if you know, for instance, that these are just somebody else's parody ads, let him opine. I don't know -- I see these as advertisements. I see the Jack Daniel's name on them. I see them making references. I would think -- I would learn from Dr. Simonson's evaluation of these just as I have learned of his evaluation of the VIP product, and I don't see why there's any controversy in letting him give an opinion.

MR. LARKIN: Well, let's assume that some of these are not Jack Daniel's ads. If we were to make that assumption, Dr. Simonson, could you respond to his questions about -- I don't know what your questions would be --

MR. LONG: Let's go -- let's make no assumptions at all about the origins of them. Let's just look at them as advertisements.

MR. LARKIN: But he's answered he can't -- it matters if these are real ads that actually ran or if they're just --

MR. LONG: Let me ask you this: Why did that matter in this context, but it doesn't matter in the context of doing academic research?

MR. LARKIN: Because he gave an opinion on a real product --

MR. LONG: No, no, no, no. I'm talking about -- I'll pull them out. We've already marked some of them. Let's do them. And look at the research that's gone and been cited in his report where people reach conclusions of what the consumer behavior is based on hypothetical advertisements.

MR. LARKIN: If we were to assume that these are hypothetical ads, what you want him to tell you is -- well, I'm not sure what you want --

MR. LONG: Well, let's do it. Let's assume they're hypothetical ads. I would like you to look at them and tell me, based on your knowledge and experience and expertise, what would be the association? Would it be positive or negative in the consumers viewing these.

MR. LARKIN: How would that affect wether --

MR. LONG: It helps in understanding the expert's approach.

MR. LARKIN: Well, he's laid out his approach.

MR. LONG: In this particular context, but I'm trying to explore how this model works.

MR. LARKIN: Are you asking him whether, if these are actually out there, how they would impact on the tarnishment of the Jack Daniel's mark by this product or --

MR. LONG: Well, I'm trying -- I am not asking about -- these are not related to VIP. This is related to an understanding of the analytical process that this expert used in producing a report where he rendered an opinion about that. But I'm understanding how this analytical approach works, and these are situations --

MR. LARKIN: Well, ask -- can you answer how you would approach this on the assumption that it was actually a real ad?

THE WITNESS: None of these relates to poo.

MR. LONG: That's not the question.

MR. LARKIN: Yeah. That is not the question.

THE WITNESS: So can you -- why don't you restate your question.

BY MR. LONG:

Q. Absolutely. Absolutely. Let's go to the report, and let's talk about that. The meanings and advantages of strong brands and even how knowledge about

brands is organized and stored in memory.

And we're talking about the way to think about brand knowledge in organization through the associative network memory model. Okay? And under this, the dimensions by which brand associates can be characterized, such as their positive or negative content, and whether they are related to the brand or not.

So with these, I would be interested in having your opinion as to the dimensions by which brand associations can be characterized in these ads and whether those would be positive or negative in your mind, whether they are related to the brand or not.

A. Are you asking about all of these?

Q. No. Let's take them in turn. Let's start over and look at each one.

Simonson Deposition Transcript

| 204/17 – 206/21 | Exhibit 36 |
|---|---|

MR. LARKIN: We can start with the one we just --

MR. LONG: Which one, 36?

MR. LARKIN: Yeah.

BY MR. LONG:

Q. Does that one, in your mind, have a positive or negative con -- does it have positive or negative content whether it's related to the brand or not?

MR. LARKIN: I'm going to have a continuing

Page 205

objection to the relevance of all this. But go ahead.

THE WITNESS: I cannot look at this and tell you.

BY MR. LONG:

Q. And the reason is?

A. You know, I had a couple of months to develop my opinion about that, and I had quite a few documents. Here, I don't know anything. It's not as clear-cut as this, as the VIP product. So --

Q. Not clear-cut, you mean in what respect?

A. I don't know. It doesn't talk about No. 2. It talks about --

Q. Unshaven?

A. Unshaven.

Q. Haven't showered, sitting in your underwear, that doesn't create any content or associations in your mind?

A. I -- I -- you know, you can ask me on the spot what I think about it. I don't know. I probably wouldn't write this particular text, but I haven't studied it.

Q. Why not? Just taking your initial reaction, why would you say you wouldn't write this particular text?

A. You know, I wouldn't but I have not tested it.

Page 206

And maybe it appeals to someone. So I'm just not sure. I don't see who will find this appealing --

Q. We're not -- we're not talking --

A. -- of all Jack Daniel's consumers. I can see why some prospective purchasers of Jack Daniel's may find this (indicating) appealing.

Q. Deposition 36?

A. I haven't tested that.

Q. The test you're talking about is considering it in your mental analysis.

A. I mean, given that this one is clear-cut (indicating), this one I think there is some ambiguity. That would be something that, you know, maybe you want to run a study and find out what comes to mind when people see that.

Q. I understand now. So that one might because of its ambiguity require some qualitative or quantitative assessment.

A. You may want -- to the extent that was an issue here, you may want to conduct a quantitative study.

| 206/22 – 207/3 | **Exhibit 35** |
| --- | --- |

Q. Okay. That was 36. Let's look at 35. Does that one have, in your mind, a clear-cut message?
A. Yeah, same thing.
Q. Same thing meaning what?

Page 207

A. Same thing. I don't know what the general reaction will be, and I think there is some ambiguity here. And I would test it given that it's so ambiguous.

| 207/4-16 | **Exhibit 34** |
|---|---|

Q. Okay. How about Deposition Exhibit 34?
A. Again, I don't know what --
Q. Does this have an ambiguous message in your mind?
A. I don't find it attractive. But --
Q. So would you -- when you say you don't find it attractive, is that your way of saying it has a negative association in your mind?
A. For me personally, it does. It looks really old. I don't know. Maybe when it was used, if it was used, let's say in the '50s, maybe some people found it appealing. I don't know. As we know, you didn't give me any additional information about that.

| 207/17 – 208/2 | **Exhibit 33** |
|---|---|

Q. Let's look at Exhibit 33 we talked about earlier. Does that one call to your mind any positive or negative association?
A. As I said, I don't find that a positive association. It's not as bad as the VIP product, but I would not recommend using it unless I saw compelling tests otherwise. But I would not -- think that this would create a favorable association.
Q. And that unfavorable association could affect

Page 208

the brand equity?
A. It could.

| 208/3-25 | **Exhibit 37** |
|---|---|

(Exhibit 37 was marked for identification.)
BY MR. LONG:
Q. Dr. Simonson, if you could review Deposition Exhibit 37 and tell me what impression you have on whether or not the ad that's depicted there creates a positive or negative association?
A I would say negative.
Q. Why is that?
A. Looks very old. I don't know if it's some era --
Q. Is it negative because it's old?
A. No. But I can't imagine when it was positive. But I find it negative and it could hurt -- if that were used and shown extensively by anyone, I would think that that would cause harm to the brand.
Q. Does it have to be shown extensively to cause harm to the brand?
A. No. Obviously if it's seen more, it can have greater harm. But if you think about the principle of -- does that create a negative association for those who are exposed to it? I would think so.
Q. Go back to your report, paragraph 25 -- paragraph 25 on page 9 of Deposition Exhibit 3. I just