QUARLES & BRADY LLP
Gregory P. Sitrick
Isaac S. Crum
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 229-5317
Facsimile: (602) 420-5198
E-mail: Gregory.Sitrick@quarles.com
       Isaac.Crum@quarles.com

SEYFARTH SHAW LLP
Christopher C. Larkin (admitted pro hac vice)
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 201-5289
Facsimile: (310) 201-5219
E-mail: clarkin@seyfarth.com

*Attorneys for Defendant and Counterclaimant*
*JACK DANIEL'S PROPERTIES, INC.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, LLC, | No. CV-14-2057-PHX-SMM |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Jack Daniel's Properties, Inc., | |
| Defendant. | |
| And Related Counterclaims. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

LEGAL STANDARD FOR SUMMARY JUDGMENT ....................................... 1

ARGUMENT ........................................................................................................... 2

I.   JDPI'S CLAIMS ARE NOT BARRED BY THE NOMINATIVE
     FAIR USE DOCTRINE OR THE FIRST AMENDMENT AS A
     MATTER OF LAW. .................................................................................. 2

     A.   The Nominative Fair Use Test is Inapplicable as a Matter of
          Law. ................................................................................................. 3

     B.   The *Rogers* Test is Inapplicable as a Matter of Law ................... 6

     C.   There is a Genuine Dispute Under the Applicable *Sleekcraft*
          Test. ............................................................................................... 11

II.  THERE IS A GENUINE DISPUTE OF FACT ON JDPI'S
     DILUTION CLAIM. ................................................................................ 11

     A.   There Is a Genuine Dispute of Fact as to Whether the Jack
          Daniel's Trade Dress Is "Famous" Under the TDRA. ................ 12

          1.   VIP has not shown a complete lack of evidence that
               the Jack Daniel's Trade Dress is a source identifier. ........ 12

          2.   VIP has not shown a complete lack of evidence
               establishing the fame of the Jack Daniel's Trade Dress. ........ 13

     B.   There Is a Genuine Dispute of Fact as to Whether the Bad
          Spaniels Toy Is Sufficiently Similar to the Jack Daniel's
          Trade Dress to Dilute It. ............................................................... 15

     C.   There Is a Genuine Dispute of Fact as to Whether the Bad
          Spaniel's Toy Is Likely to Harm JDPI's Reputation. ................ 16

     D.   The Bad Spaniels Toy Is Not Excluded from Liability Under
          the TDRA. ..................................................................................... 17

III. THE JACK DANIEL'S TRADE DRESS IS NON-FUNCTIONAL
     AND DISTINCTIVE AS A MATTER OF LAW. ................................ 18

     A.   The Jack Daniel's Trade Dress Is Not Functional as a Matter
          of Utility. ....................................................................................... 18

     B.   The Jack Daniel's Trade Dress Is Not Aesthetically
          Functional. ..................................................................................... 19

     C.   The Jack Daniel's Trade Dress Is Distinctive. ........................... 21

          1.   The Jack Daniel's Trade Dress is not generic. ................... 21

i

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

2.    The inherent distinctiveness of the Jack Daniel's Trade Dress................................................................................. 23

3.    The Jack Daniel's Trade Dress has acquired distinctiveness. ........................................................................ 24

a.    VIP's Copying Establishes Acquired Distinctiveness as a Matter of Law............................... 24

b.    The Ford Survey Supports a Finding of Acquired Distinctiveness. ........................................... 25

c.    The Undisputed Circumstantial Evidence Compels a Finding of Acquired Distinctiveness as a Matter of Law. ........................................... 26

CONCLUSION ................................................................ 30

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

QB\37489096.9

# TABLE OF AUTHORITIES

## Cases

*Adidas-America, Inc. v. Payless Shoesource, Inc.*,
    546 F. Supp. 2d 1029 (D. Or. 2008)........................................................ 14

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)..........................................................passim

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................... 1, 16

*Anheuser-Busch, Inc. v. VIP Products, LLC*,
    666 F. Supp. 2d 974 (E.D. Mo. 2008)..................................... 1, 8, 9, 11

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
    920 F. Supp. 2d 1116 (N.D. Cal. 2013) ......................................... 16

*Audi AG v. Shokan Coachworks, Inc.*,
    592 F. Supp. 2d 246 (N.D.N.Y. 2008) .......................................... 14

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
    457 F.3d 1062 (9th Cir. 2006)....................................................... 20

*Bacardi & Co. Ltd. v. New York Lighter Co., Inc.*,
    No. 97-cv-7140, 2000 U.S. Dist. LEXIS 19852 (E.D.N.Y. Sept. 5, 2000) ............ 9

*Brown v. Electronic Arts, Inc.*,
    724 F.3d 1235 (9th Cir. 2013)........................................................ 7

*Cairns v. Franklin Mint Co.*,
    292 F.3d 1139 (9th Cir. 2002)........................................................ 4

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................... 1, 13, 16

*Clearly Food & Bev. Co. v. Top Shelf Bevs., Inc.*,
    No. C13-1763JLR, 2015 WL 1926503 (W.D. Wash. Apr. 28, 2015) ................. 13

*Clicks Billiards v. Sixshooters Inc.*,
    251 F.3d 1252 (9th Cir. 2001)................................................... 12, 19

*Decorations for Generations, Inc. v. Home Depot USA, Inc.*,
    No. CIV-S-01-0284, 2003 U.S. Dist. LEXIS 26608 (E.D. Cal. Sept. 22, 2003)... 21

iii

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

*Diller v. Barry Driller, Inc.*,
    104 USPQ 2d (BNA) 1676, 2012 WL 4044732 (C.D. Cal. Sept. 10, 2012) ... 5, 6, 9

*Disc Golf Ass'n v. Champion Discs, Inc.*,
    158 F.3d 1002 (9th Cir. 1998) ............................................................ 18, 20

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997)................................................................ 3, 9, 10

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*,
    547 F.3d 1095 (9th Cir. 2008)................................................................ 5, 7, 9

*Farmgirl Flowers, Inc. v. Bloom That, Inc.*,
    No. 14-CV-05657-LHK, 2015 WL 1939424 (N.D. Cal. Apr. 28, 2015).............. 20

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
    741 F. Supp. 2d 1165 (C.D. Cal. 2012)..........................................................passim

*Fuddruckers, Inc. v. Doc's B. R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987)................................................................ 24, 27

*Gucci Am., Inc. v. Guess?, Inc.*,
    843 F. Supp. 2d 412 (S.D.N.Y. 2012) .................................................... 17

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
    No. 07 CIV. 10470, 2015 WL 1931168 (S.D.N.Y. Apr. 28, 2015) ........................ 2

*Jack Daniel's Properties, Inc. v. Quest Associates, Ltd.*,
    Opp. No. 105022, 2000 WL 992415 (TTAB July 12, 2000) ................................ 28

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008)................................................................ 14, 15

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
    150 F.3d 1042 (9th Cir. 1998)................................................................ 21, 22

*Knorr-Narhmittel A.G. v. Reese Finer Foods, Inc.*,
    695 F. Supp. 787 (D.N.J. 1988) ............................................................ 25

*LeSportsac, Inc. v. K mart Corp.*,
    754 F.2d 71 (2d Cir. 1985)................................................................ 27

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
    633 F.3d 1158 (9th Cir. 2011)................................................................ 15

*Lisa Frank, Inc. v. Impact Int'l, Inc.*,
    799 F. Supp. 980 (D. Ariz. 1992)................................................................ 29

iv

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*Lopez v. Gap, Inc.*,
   883 F. Supp. 2d 400 (S.D.N.Y. 2012) ............................................................. 27

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
   507 F.3d 252 (4th Cir. 2007) ........................................................ 7, 9, 14, 17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................. 1, 17

*Mattel Inc. v. MGA Ent. Inc.*,
   782 F. Supp. 2d 911 (C.D. Cal. 2011) ............................................................. 13

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) .............................................................. 3, 7, 9

*Mattel, Inc. v. Walking Mountain Productions*,
   353 F.3d 792 (9th Cir. 2003) .............................................................. 4, 5, 7

*Moldex-Metric, Inc. v. McKeon Prods., Inc.*,
   596 Fed. Appx. 567 (9th Cir. 2015) .............................................................. 20

*New Kids on the Block v. News America Pub., Inc.*,
   971 F.2d 302 (9th Cir. 1992) .............................................................. 2, 3, 4

*Nike, Inc. v. Just Did It Enters.*,
   6 F.3d 1225 (7th Cir. 1993) ............................................................................. 7

*Nike, Inc. v. Maher*,
   100 USPQ 2d (BNA) 1018, 2011 WL 3828723 (TTAB 2011) ........................... 15

*Nike, Inc. v. Nikepal Intern., Inc.*,
   No. 05-1468, 2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) ............................ 14

*Nissan Motor Co. v. Nissan Comp.*,
   378 F.3d 1002 (9th Cir. 2004) ........................................................................ 7

*Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*,
   No. C12-1853-RSM, 2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) .......... 15, 16

*Parts.com v. Yahoo! Inc.*,
   996 F. Supp. 2d 933 (S. D. Cal. 2013) .......................................................... 14

*Playboy Enterprises, Inc. v. Welles*,
   279 F.3d 796 (9th Cir. 2001) ...................................................................... 5, 15

*Rodan & Fields, LLC v. Estee Lauder Companies, Inc.*,
   No. 10-CV-02451-LHK, 2010 WL 3910178 (N.D. Cal. Oct. 5, 2010) ................ 20

v

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

*Rogers v. Grimaldi,*
　　875 F.2d 994 (2d Cir. 1989).............................................................................. passim

*Schieffelin & Co. v. The Jack Co., Inc.,*
　　850 F. Supp. 232 (S.D.N.Y 1994)........................................................................ 8, 9

*Smith v. City of Oakland,*
　　No. C-05-4045-EMC, 2007 WL 2288328 (N.D. Cal. Aug. 9, 2007) ................... 18

*Spark Indus., LLC v. Kretek Int'l, Inc.,*
　　No. CV 14-5726-GW ASX, 2014 WL 4365736 (C.D. Cal. Aug. 28, 2014) .. passim

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,*
　　588 F.3d 97 (2d Cir. 2009) ................................................................................... 16

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,*
　　221 F. Supp. 2d 410 (S.D.N.Y. 2002) ..................................................................... 8

*Transgo, Inc. v. Ajac Transmission Parts Corp.,*
　　768 F.2d 1001 (9th Cir. 1985) ............................................................................. 25

*Ultimate Creations, Inc. v. THQ Inc.,*
　　No. 05-CV-051134-PHX-SMM, 2008 WL 215827 (D. Ariz. Jan. 24, 2008) ....... 11

*Union Carbide Corp. v. Ever-Ready, Inc.,*
　　531 F.2d 366 (7th Cir. 1976).............................................................................. 26

*Vallavista Corp. v. Amazon.com, Inc.,*
　　657 F. Supp. 2d 1132 (N.D. Cal. 2008) ............................................................... 13

*Visa Int'l Serv. Ass'n v. JSL Corp.,*
　　610 F.3d 1088 (9th Cir. 2010)............................................................................. 16

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
　　529 U.S. 205 (2000) ......................................................................... 19, 21, 28

**<u>Statutes</u>**

15 U.S.C. § 1125 ....................................................................................... passim

Fed. R. Civ. P. 56 ............................................................................................... 1

**<u>Treatises</u>**

4 *McCarthy on Trademarks and Unfair Competition* (4th ed. 2015) ................. 4, 7, 12, 28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

QB\37489096.9

**INTRODUCTION**

VIP was enjoined previously in a case involving its "Buttwiper" dog toy, *Anheuser-Busch, Inc. v. VIP Products, LLC*, 666 F. Supp. 2d 974 (E.D. Mo. 2008), so it has tried shifting tactics here. VIP claimed initially that even though its Bad Spaniels toy admittedly copies elements of the Jack Daniel's trademarks and trade dress, there is no likelihood of confusion under what VIP called the "controlling" factors set forth in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). VIP later decided that the Jack Daniel's trade dress does not exist, and amended its pleadings to assert invalidity claims. VIP now asserts, for the first time, that the "controlling" *Sleekcraft* factors actually do not control, and that alternative tests for infringement should be applied, asking the Court to make new law by expanding the application of two narrow and specialized trademark law doctrines to encompass commercial parody products. For the reasons discussed below, this request and the rest of VIP's motion should be rejected.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

VIP moves for summary judgment, but never mentions, let alone discusses, the applicable standards. Rule 56 allows a court to grant summary judgment only if, after drawing all inferences in favor of the non-movant, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those parts of the record that demonstrate the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[S]ummary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Summary judgment is inappropriate here in favor of VIP, but as shown on JDPI's motion for partial summary judgment (the "JDPI

---

1

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1  Motion") (Doc. 101) and below, it should be granted in JDPI's favor on a number of

2  VIP's invalidity claims.

3  <u>**ARGUMENT**</u>

**I.  JDPI'S CLAIMS ARE NOT BARRED BY THE NOMINATIVE FAIR USE**
4  **DOCTRINE OR THE FIRST AMENDMENT AS A MATTER OF LAW.**

5        VIP seeks summary judgment on JDPI's infringement and dilution claims because

6  the "nominative and First-Amendment fair-use defenses shield VIP from liability," Mot.

7  2:10–11, arguing that the issue of infringement must be decided not under the *Sleekcraft*

8  factors, but rather under two alternative tests that are applied in the Ninth Circuit to

9  infringement claims only in certain special circumstances: (1) the *New Kids on the Block*

10  nominative fair use test, and (2) the *Rogers* artistic or expressive work test.  This is a total

11  change of position by VIP.  In the Initial Case Management Conference Report, VIP

12  agreed that *Sleekcraft* was "controlling" on the issue of infringement (Doc. 23 at 4:22),

13  and in response to JDPI's contention interrogatories regarding infringement, dilution,

14  parody, and the First Amendment, VIP discussed the "relevant *Sleekcraft* factors" at

15  length.  Defendant's Controverting Statement of Facts in Opposition to Plaintiff's Motion

16  for Summary Judgment ("CSF") ¶ 116.  Because VIP did not disclose the alternative tests

17  in its interrogatory responses, it should be precluded from relying on them here.  *See,*

18  *e.g., In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, No. 07 CIV. 10470,

19  2015 WL 1931168, *9 (S.D.N.Y. Apr. 28, 2015) ("Contention interrogatories are treated

20  as judicial admissions which usually estop the responding party from later asserting

21  positions not included in its answers, 'unless the failure was substantially justified or is

22  harmless.'  Failure to amend a contention interrogatory pursuant to Federal Rule of Civil

23  Procedure 26(e) can bar use of a theory of liability. . .").  But even if the Court permits

24  VIP to assert its new theories, they must be rejected because neither alternative test

25  applies in this case.

26        VIP first argues that the Court should apply the nominative fair use test from *New*

27  *Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302 (9th Cir. 1992).  This test

28  applies only where a defendant uses the plaintiff's identical mark or trade dress to refer to

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1    the plaintiff and its products.  It does not apply here because VIP did not use JDPI's

2    identical marks or trade dress.  VIP next argues that the Court should apply a special

3    liability test designed for infringement claims against artistic works such as movies,

4    books, and video games that originated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.

5    1989), and was adopted by the Ninth Circuit in *Mattel, Inc. v. MCA Records, Inc.*, 296

6    F.3d 894 (9th Cir. 2002).  This test does not apply here because VIP's dog toy is not an

7    artistic or expressive work, but rather a commercial product that uses VIP's adaptations

8    of JDPI's marks and trade dress as VIP's own trademarks and trade dress.

9         As much as VIP would like to believe otherwise, this case is simply "a traditional

10    trademark infringement suit founded on the likelihood of confusion rationale [where] the

11    claim of parody is not really a separate 'defense' as such, but merely a way of phrasing

12    the traditional response that customers are not likely to be confused as to source,

13    sponsorship or approval." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109

14    F.3d 1394, 1405 (9th Cir. 1997).  As the Ninth Circuit explained in *Dr. Seuss*, "'[s]ome

15    parodies will constitute an infringement, some will not.  But the cry of 'parody!' does not

16    magically fend off otherwise legitimate claims of trademark infringement or dilution.

17    There are confusing parodies and non-confusing parodies.  All they have in common is

18    an attempt at humor through the use of someone else's trademark.  A non-infringing

19    parody is merely amusing, not confusing'." *Id.* (quoting *McCarthy on Trademarks*, §

20    31:38[1], at 31-216 (rev. ed. 1995)).  VIP has not shown that its Bad Spaniels toy is a

21    "non-confusing parody" as a matter of law under the applicable *Sleekcraft* test, and that

22    issue must be left for trial.

23        **A.**  **The Nominative Fair Use Test is Inapplicable as a Matter of Law.**

24         The Ninth Circuit created a special "nominative fair use" test in *New Kids*, *supra*.

25    "The Ninth Circuit, in crafting a separate category of a 'nominative fair use' analysis,

26    created a specialized tool to analyze a certain class of cases of alleged infringement.  In

27    that class of cases, there may be a competitive need to use another's trademark to identify

28    the plaintiff in a way that is not likely to confuse consumers."  4 *McCarthy on*

3

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1  *Trademarks and Unfair Competition*, § 23:11 at 23-104 (4th ed. 2015).  The nominative

2  fair use doctrine applies "where a defendant has used the plaintiff's mark to describe the

3  plaintiff's product, *even if the defendant's ultimate goal is to describe his own product*."

4  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (emphasis in original).

5  But VIP cites no cases where it has been applied to a commercial parody product, Mot.

6  3–5, and the Ninth Circuit decisions regarding nominative fair use cited by VIP *foreclose*

7  its application here.

8         *Cairns* involved the use of the name and likeness of Princess Diana in connection

9  with jewelry, plates, and dolls.  The court noted that in *New Kids*, the defendant had used

10 the plaintiff band's mark NEW KIDS ON THE BLOCK "to describe the plaintiff's

11 product" (the band), *id*. at 1152, and that in the cases cited in *New Kids*, "the alleged

12 infringer used the trademark—'Volkswagen,' 'Boston Marathon,' and 'Chanel # 5,' to

13 describe the alleged *infringee's* product-the automobile, sports event, and perfume

14 designated by that name.  In each of these cases, however, the alleged infringer's ultimate

15 goal was to describe his *own* product—an automobile repair business specializing in the

16 repair of Volkswagens, a television broadcast of the Boston Marathon, and a perfume

17 indistinguishable from Chanel # 5."  *Id*. (emphasis in original).  The *Cairns* court found

18 that it was necessary for the defendant to use the name and likeness of Princess Diana to

19 refer to its "Diana-related" merchandise.

20        In *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003),

21 the Ninth Circuit applied the nominative fair use doctrine where the defendant used

22 Mattel's BARBIE mark and an actual Barbie doll (in which Mattel claimed trade dress

23 rights) to identify a series of photographs entitled "Food Chain Barbie" in which the

24 defendant "depicted Barbie in various absurd and often sexualized positions."  353 F.3d

25 at 796.  "The Barbie mark in the titles of Forsythe's works and on his website accurately

26 describe[d] the subject of his photographs, which in turn, depict[ed] Barbie and target[ed]

27 the doll with Forsythe's parodic message," *id*. at 807, and he "used Mattel's Barbie figure

28

4

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**

1  and head in his works to conjure up associations of Mattel, while at the same time to

2  identify his own work, which is a criticism and parody of Barbie." *Id*. at 810.

3       In *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th

4  Cir. 2008), the Ninth Circuit addressed infringement claims by the owner of the PLAY

5  PEN trademark and trade dress for a strip club against the use of the mark PIG PEN for a

6  strip club that appeared in the video game *Grand Theft Auto: San Andreas*.  The

7  plaintiff's "'logo' consist[ed] of the words 'the Play Pen' (and the lower- and upper-case

8  letters forming those words) and the phrase 'Totally Nude' displayed in a publicly

9  available font, with a silhouette of a nude female dancer inside the stem of the first 'P'."

10  *Id*. at 1097.  The defendant's video game contained a "virtual, cartoon-style strip club

11  known as the 'Pig Pen'." *Id*.  The defendant raised a nominative fair use defense, but the

12  Ninth Circuit affirmed its rejection by the district court.  After citing *Walking Mountain*

13  for the proposition that the nominative fair use "doctrine protects those who deliberately

14  use another's trademark or trade dress 'for the purposes of comparison, criticism[,] or

15  point of reference," the *E.S.S.* court held that the defendant's "use of 'Pig Pen' is not

16  'identical to the plaintiff's [Play Pen] mark . . . Since [the defendant] did not use the

17  trademarked logo to describe ESS's strip club, the district court correctly held that the

18  nominative fair use defense does not apply in this case." *Id*. at 1098–99.  The court cited

19  *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2001), which held that

20  "[w]hen a defendant uses a trademark nominally, the trademark will be identical to the

21  plaintiff's mark, at least in terms of the words in question."  The *Welles* court explained

22  that it was the defendant's very use of the plaintiff's identical trademark that made the

23  nominative fair use analysis necessary because "application of the *Sleekcraft* test, which

24  focuses on the similarity of the mark used by the plaintiff and the defendant, would lead

25  to the incorrect conclusion that virtually all nominative uses are confusing."  *Id*.

26       The holding in *E.S.S.* rejecting the application of the nominative fair use doctrine

27  was followed in *Diller v. Barry Driller, Inc.*, 104 USPQ 2d (BNA) 1676, 1680, 2012 WL

28  4044732, *4 (C.D. Cal. Sept. 10, 2012), a commercial parody case involving an

5

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    infringement claim by executive Barry Diller against use of the domain name

2    "barrydriller.com" and the mark BARRY DRILLER for a web streaming service.  The

3    defendants claimed that "they selected 'Barry Driller' and the graphics of a man as a

4    parody of Plaintiff and sought to distance themselves from Plaintiff's and Aereo's

5    service," *id*. at *1, and that their uses were subject to the nominative fair use doctrine.

6    The court refused to "apply the three-part [nominative use] test in place of the Sleekcraft

7    factors because this is not a 'nominative use' case.  Defendants have not used Plaintiff's

8    real name to refer to him directly -- they have used an alteration with an additional 'r' in

9    his last name to refer to their own internet broadcast service." *Id.* at *4.

10       As shown in the Statement of Undisputed Facts ("Stmt.") (Doc. 102) on the JDPI

11   Motion, Stmt. ¶¶ 3–42, the Bad Spaniels toy closely imitates the Jack Daniel's Trade

12   Dress and marks, but it "does not use any of JDPI's registered marks," including "the

13   Jack Daniel's name; the number '7;' the embossed 'Jack Daniel's' signature on the

14   bottle; the same filigree design on the label; and the three-sided body label," Mot. 4:5,

15   n.1, or the identical combination of elements constituting the trade dress.  Mot. 12:13–18.

16   VIP claims that it "only invokes the JDPI Mark and Bottle Dress to the extent necessary

17   to ensure consumer recognition that the Product is a parody," Mot. 4:5–7, n.1, and that

18   there are "drastic differences between the toy and the Jack Daniel's marks and label

19   design." Mot. 26:17–18.  Because it is undisputed that VIP did not use JDPI's identical

20   marks or trade dress in its Bad Spaniels toy, the nominative fair use doctrine does not

21   apply as matter of law.

22   **B.  The *Rogers* Test is Inapplicable as a Matter of Law.**

23       VIP separately claims that JDPI's infringement and dilution claims must fail

24   because VIP's dog toy is protected speech under the First Amendment, Mot. 5–8, but

25   again there is no support in the law for VIP's claim.

26       The Ninth Circuit has "adopted the Second Circuit's approach from *Rogers v.*

27   *Grimaldi,* which 'requires courts to construe the Lanham Act 'to apply to artistic works

28   *only* where the public interest in avoiding consumer confusion *outweighs* the public

6

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**

interest in free expression.'" *E.S.S.*, 547 F.3d at 1099 (*quoting Walking Mountain*, 353
F.3d at 807) (emphasis in original and internal quotation omitted).  "*Rogers* concluded
that literary titles do not violate the Lanham Act 'unless the title has no artistic relevance
to the underlying work whatsoever, or, if it has some artistic relevance, unless the title
explicitly misleads as to the source or the content of the work'."  *MCA Records*, 296 F.3d
at 902 (*quoting Rogers*, 875 F.2d at 999).  The Ninth Circuit extended the *Rogers* test to
the contents of artistic works in *E.S.S.*  507 F.3d at 1099.

The "*Rogers* test is reserved for expressive works," *Brown v. Electronic Arts, Inc.*,
724 F.3d 1235, 1241 (9th Cir. 2013) (holding that a video game is an "expressive work"
following a Supreme Court decision to that effect), which the Ninth Circuit called
"artistic works" in *MCA Records*, *Walking Mountain*, and *E.S.S.*  It "is not applicable to
the unpermitted use of a mark in 'commercial' works such as traditional advertisement or
an infomercial.  The Rogers test applies only to use of a mark in accused expressive
works such as art works, motion pictures and books, not to ordinary, non-artistic,
commercial speech." *McCarthy*, § 31:144.50 at 31-348.3.  *Rogers* dealt with a motion
picture, and the Ninth Circuit has applied the *Rogers* test to a song (*MCA Records*),
photographs (*Walking Mountain*), and video games (*E.S.S.* and *Brown*).

VIP acknowledges that the *Rogers* test is limited to marks used "in an 'artistic' or
'expressive work'," Mot. 5:23–25, but only argues that its toy is what it calls an
"expressive use," not that the toy is an expressive "work" of the sort required for the
application of *Rogers.  Id.*  VIP cites no case from the Ninth Circuit or elsewhere that has
applied *Rogers* to alleged parody products.[1]  Cases considering alleged parody products,

---

[1]VIP also cites *Nissan Motor Co. v. Nissan Comp.*, 378 F.3d 1002 (9th Cir. 2004), *Louis
Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007), and
*Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225 (7th Cir. 1993).  Mot. 6–8.  *Louis Vuitton*
and *Nike* applied a likelihood of confusion analysis to alleged parody dog toys and T-
shirts, while *Nissan* applied the *Sleekcraft* factors to the defendant's use of his mark for
his business.

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

QB\37489096.9

1    including district court cases from the Second Circuit where the *Rogers* test originated,

2    have uniformly applied the standard likelihood of confusion analysis.

3         In *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410

4    (S.D.N.Y. 2002), a case relied on by VIP in the *Anheuser-Busch* case, and discussed at

5    length in VIP's interrogatory answers here, CSF ¶ 116, the court considered trademark

6    and dilution claims by the owner of the Tommy Hilfiger marks for clothing against a

7    "Timmy Holedigger" alleged parody "dog perfume."  The defendant "argued that even if

8    there was some confusion, trademark parodies are a protected form of expression under

9    the First Amendment," *id*. at 414, while the plaintiff argued that the defendant was

10   entitled to no protection under the First Amendment because "the use of the mark as a

11   source identifier on the pet perfume is a trademark use of the mark."  *Id*. at 415.  The

12   court agreed with the plaintiff, never discussing *Rogers* in holding that "it is clear that

13   when another's mark is used for source identification in a way likely to cause confusion,

14   it is actionable under the Lanham Act."  *Id*.  The plaintiff "arguably uses an adaptation of

15   the Hilfiger mark for the dual purpose of making an expressive comment and selling a

16   non-competing product, an area where it has been noted that line-drawing becomes rather

17   difficult. . . . However, because the mark is being used at least in part to promote a

18   somewhat non-expressive, commercial product, the First Amendment does not extend to

19   such use, or to the extent that it does, the balance tips in favor of allowing trademark

20   recovery, if in fact consumers are likely to be confused. . . . When a parodist makes

21   trademark use of another's mark, it should be entitled to less indulgence, even if this

22   results in some residual effect on the free speech rights of commercial actors."  *Id*. at

23   415–16 (citations omitted).  The court then applied the Second Circuit's *Polaroid* factors

24   (that circuit's analog to the *Sleekcraft* factors) to find, on the record of that case, that

25   confusion was not likely because defendant had created a non-confusing parody product.

26        In *Schieffelin & Co. v. The Jack Co., Inc.*, 850 F. Supp. 232 (S.D.N.Y 1994), the

27   court considered trademark infringement and dilution claims by the owner of the Dom

28   Perignon trademarks and trade dress for champagne against a "Dom Popignon" parody

8

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1   popcorn. The court accepted that "defendants' product is plainly a humorous takeoff on

2   DOM PERIGNON. The very name 'DOM POPINGNON' is obviously a pun, and close

3   examination of defendants' label reveals an imitative, comic scheme not unlike that of

4   other parody cases." *Id*. at 248. "The fact that defendants' product is a joke, however,

5   does not end the court's inquiry. The junior user or parodist of another's mark may not

6   invoke parody as a talisman to defeat liability under the Lanham Act, nor is parody a

7   defense to infringement." *Id*. The *Schieffelin* court framed the issue as "whether the

8   similarity of the marks is likely to cause confusion among consumers as to the source or

9   sponsorship of defendants' product," *id*. at 242, and applied the *Polaroid* factors to find,

10  on the record of that case, that confusion was likely because defendant had created a

11  confusing parody product. *See also Bacardi & Co. Ltd. v. New York Lighter Co., Inc.*,

12  No. 97-cv-7140, 2000 U.S. Dist. LEXIS 19852 (E.D.N.Y. Sept. 5, 2000) (granting

13  summary judgment to the owner of the BACARDI mark and label design for rum on

14  infringement claims against alleged BACARBI parody liquor bottle cigarette lighter

15  under the *Polaroid* factors).

16      In *Louis Vuitton* and *Anheuser-Busch*, the courts considered infringement claims

17  against alleged parody dog toys under the traditional likelihood of confusion tests. The

18  *Louis Vuitton* court found, on the record in that case, that there was no likelihood of

19  confusion because the defendant had created a non-confusing parody product. 507 F.3d

20  at 261. The *Anheuser-Busch* court cited the Ninth Circuit's holding in *Dr. Seuss* that

21  some parodies will infringe while others will not, 666 F. Supp. 2d at 985, and held, on a

22  motion for a preliminary injunction, that VIP's "Buttwiper" toy was likely to cause

23  confusion. The court in *Diller*, *supra,* rejected the defendants' claim that their claimed

24  parody "dispel[led] any possibility of confusion," and held, on a motion for a preliminary

25  injunction, that the plaintiff was likely to prove infringement under the *Sleekcraft* factors.

26  *Diller,* 104 USPQ 2d at 1680, 2012 WL 4044732, *4. The *Diller* court never discussed

27  *MCA Records* or *Rogers* and cited *E.S.S.* only in rejecting the defendants' nominative fair

28  use defense. *Id*.

9

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1    As a matter of law, the Bad Spaniels dog toy is not an artistic or expressive work

2    for purposes of the application of the *Rogers* test because VIP makes trademark use of its

3    adaptations of JDPI's marks and the Jack Daniel's Trade Dress to sell a commercial

4    product.  VIP's motion cites "use of its Bad Spaniel's (sic) name and mark for its novelty

5    dog toy," Mot. 1:13, and in paragraph 10 of VIP's Amended Complaint (Doc. 49), VIP

6    alleges "owner[ship] of all rights in its 'Bad Spaniels' trademark and trade dress for its

7    durable rubber squeaky novelty dog toy."  VIP's toy is sold "primarily in the specialty

8    dog-supply market," Mot. 5:3, is advertised in VIP's catalog together with hundreds of

9    other dog toys and products, and is used for dog play.  CSF ¶ 117.[2]  The toy's detachable

10   hangtag discusses the materials from which the toy is made, advises dog owners

11   regarding its safe use, and provides a limited guarantee for defects in workmanship.  CSF

12   ¶ 118.  These product attributes are not characteristic of an "artistic" or "expressive"

13   "work."  Like the dog perfume in *Hilfiger,* VIP's toy is a commercial product branded

14   with VIP's Bad Spaniels' trademark and trade dress that arguably has a dual purpose of

15   making some expressive comment.  It is not an expressive or artistic work like those to

16   which the *Rogers* test has been applied by the Ninth Circuit.

17   VIP's claim that its toy is subject to the *Rogers* test would rewrite Ninth Circuit

18   trademark law if it were accepted.  Every alleged "parody" product or service—whether a

19   dog toy, popcorn, perfume, a cigarette lighter, an online streaming service, or anything

20   else, and whether confusing or non confusing—would effectively receive immunity from

21   infringement claims under the very strict *Rogers* standard for liability, despite the Ninth

22   Circuit's admonition that "[t]he cry of 'parody!' does not magically fend off otherwise

23   legitimate claims of trademark infringement or dilution."  *Dr. Seuss*, 109 F.3d at 1405.

24

25

26   ---
     [2]Unlike the dog perfume in *Hilfiger*, which had no real market or purpose other than as a
27   parody, there is a market for dog toys independent of parody and VIP is in it.  CSF ¶ 119.

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**

1   No court has applied the *Rogers* test to an alleged commercial parody product and there

2   is no basis for this Court to be the first.

3       **C.  There is a Genuine Dispute Under the Applicable *Sleekcraft* Test.**

4           VIP never mentions the *Sleekcraft* factors on this motion, but there is substantial

5   evidence in the record from which a reasonable trier of fact could find for JDPI on its

6   infringement claims under that test.  The JDPI Motion established VIP's copying, the

7   close similarity between the Bad Spaniels trademark and trade dress to the Jack Daniel's

8   trademarks and trade dress, and the longstanding and extensive sales, advertising, and

9   public exposure of Jack Daniel's whiskey.  Stmt. ¶¶ 3–38, 40–42, 44–66.  On this motion,

10  VIP introduced the survey conducted by Dr. Gerald L. Ford (VIP Ex. C), in which about

11  29% of the respondents stated that they believed that the Bad Spaniels toy originated with

12  or was authorized by Jack Daniel's, or that there was a business affiliation between the

13  toy's producer and Jack Daniel's.  Similar evidence, including a survey showing about

14  30% confusion, was found by the court in *Anheuser-Busch* to justify a preliminary

15  injunction against VIP's "Buttwiper" toy.  666 F. Supp. 2d at 983–84.  The issue of

16  likelihood of confusion is rarely appropriate for summary judgment, *Ultimate Creations,*

17  *Inc. v. THQ Inc.,* No. 05-CV-051134-PHX-SMM, 2008 WL 215827, *3 (D. Ariz. Jan. 24,

18  2008), and there is clearly a triable dispute of fact on infringement.  The Court should

19  deny this portion of VIP's motion, but should grant summary judgment *sua sponte* to

20  JDPI striking VIP's claimed fair use defenses.

22  **II.  THERE IS A GENUINE DISPUTE OF FACT ON JDPI'S DILUTION CLAIM.**

23          VIP moves for summary judgment on JDPI's claim for dilution of the Jack

24  Daniel's Trade Dress on four grounds: (1) lack of fame under the Trademark Dilution

25  Revision Act ("TDRA"), (2) insufficient similarity between the Bad Spaniels toy and the

26  Jack Daniel's Trade Dress, (3) lack of harm to JDPI's reputation, and (4) exclusion from

27  liability for fair, non-commercial use of the Jack Daniel's Trade Dress.  Mot. 8–14.  VIP

28

11

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

QB\37489096.9

1   does not move with respect to JDPI's dilution claims as to its JACK DANIEL'S

2   trademark or under state law.  Each of VIP's arguments is meritless.

3   **A.  There Is a Genuine Dispute of Fact as to Whether the Jack Daniel's Trade Dress Is "Famous" Under the TDRA.**

4   VIP argues that the Jack Daniel's Trade Dress is not famous because: (1) it is not a

5   "source identifier" and (2) JDPI cannot prove its fame under the TDRA's nonexclusive,

6   enumerated factors.  Mot. 9–11.  As shown below, VIP's "source identifier" argument

7   should be rejected out of hand.  VIP's argument regarding fame should be rejected

8   because it incorrectly claims that a party asserting fame *must* offer direct evidence (as

9   opposed to circumstantial evidence) of actual consumer recognition.  Considering all of

10  the undisputed facts, and drawing all reasonable inferences from them in favor of JDPI,

11  there is a genuine dispute of fact regarding fame.

12

13  1.  *VIP has not shown a complete lack of evidence that the Jack Daniel's Trade Dress is a source identifier.*

14  VIP first argues that JDPI's dilution claim must fail because the Jack Daniel's

15  Trade Dress is not a "source identifier."  Mot. 9.  VIP makes the same argument here that

16  it makes with respect to genericness and distinctiveness, e.g., that other sellers of whiskey

17  use individual elements of the trade dress such as a square bottle.  *See* pp. 21–22 below.

18  But in analyzing trade dress for all purposes, courts must focus "not on the individual

19  elements, but rather the overall visual impression that the combination and arrangement

20  of those elements create."  *Clicks Billiards v. Sixshooters Inc.,* 251 F.3d 1252, 1259 (9th

21  Cir. 2001).  VIP argues that for the Jack Daniel's Trade Dress to be famous, the Court

22  must consider it "separate and apart from any possible fame of the JDTW Marks," Mot.

23  9:5–6, citing 15 U.S.C. § 1125(c)(4), but the cited provision of the Lanham Act does not

24  allow the Court to deconstruct the elements of the Jack Daniel's Trade Dress.  Instead, as

25  Professor McCarthy explains, "this provision means that if the trade dress that is alleged

26  to be likely to be diluted includes both registered and unregistered matter, then the trade

27  dress as a whole must be proven to be 'famous.'"  4 *McCarthy on Trademarks and*

28  *Unfair Competition* § 24:102 at 24-315 (4th ed. 2015).  The Jack Daniel's Trade Dress, as

12

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

a whole, serves as a source identifier for Jack Daniel's whiskey.  Stmt. ¶¶ 3–38, 40–42, 44–66, 71–73, 95–96, 159.

 2. *VIP has not shown a complete lack of evidence establishing the fame of the Jack Daniel's Trade Dress.*

VIP correctly asserts that "[i]n order to state a dilution claim, [JDPI] must prove that its mark is 'famous'—i.e., that it is widely recognized by the general consuming public as a designation of the source of the goods or services of the mark's owner."  Mot. 8:21–23.  But VIP must show on this motion that there is a complete lack of evidence to support such fame, *see Celotex,* 477 U.S. at 325, and it has not met this burden.  VIP argues that (1) there is no *direct* (e.g., survey) evidence of actual recognition; and (2) the indirect evidence of fame (such as advertising and sales) is insufficient as a matter of law because it is not accompanied by evidence of actual recognition.  Mot. 11:1–3; 11:18–19 ("[w]ithout evidence of actual recognition, the evidentiary value of sales is non-existent").  Both of these arguments are unfounded.

None of the district court cases relied on by VIP held that "evidence of actual consumer recognition is critical in the Ninth Circuit" or that "without it, a plaintiff is unlikely to prove fame," Mot. 10, or involved facts even remotely similar to those here.  In *Mattel Inc. v. MGA Ent. Inc*., 782 F. Supp. 2d 911, 942 (C.D. Cal. 2011), MGA claimed that Mattel's use of trapezoidal packaging for its dolls diluted MGA's trapezoidal packaging trade dress, but the court held that MGA had presented no evidence of the fame of its packaging.  Similarly, in *Vallavista Corp. v. Amazon.com, Inc.,* 657 F. Supp. 2d 1132, 1138–39 (N.D. Cal. 2008), the court held that the lack of survey evidence was not dispositive, *id*. at 1138, but found that the limited evidence of use, coupled with very modest sales and advertising expenditures, was insufficient to prove fame.  *Id.*  In *Clearly Food & Bev. Co. v. Top Shelf Bevs., Inc.*, No. C13-1763JLR, 2015 WL 1926503, *17 (W.D. Wash. Apr. 28, 2015), the lack of a survey was fatal to a dilution claim because the product bearing the allegedly famous mark had been out of production for six years, only negligible sales were still occurring, and the defendant's survey showed very low recognition of the mark.  Finally, in *Parts.com v. Yahoo! Inc.,*

13

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1   996 F. Supp. 2d 933, 941 (S. D. Cal. 2013), the court dismissed a dilution claim on a

2   Rule 12(b)(6) motion, holding that the complaint insufficiently pleaded fame because

3   there were no allegations of the "amount, volume, and geographic extent of sales" and, as

4   to advertising, nothing "beyond the bare bones assertion that Plaintiff has 'expended a

5   significant amount of resources' to 'promote[ ] ... [the] mark throughout the United

6   States.'" *Id*.

7           Contrary to VIP's argument, the dilution act expressly states that in determining

8   whether a mark is famous, a court may consider "all relevant factors," including indirect

9   evidence of fame such as advertising or sales. 15 U.S.C. § 1125(c)(2)(A).[3]  Evidence of

10  actual recognition such as a survey is not required in the Ninth Circuit to prove fame.

11  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2008) (evidence of use of

12  HOT WHEELS mark for 37 years, advertising expenditures of $350 million, and sales of

13  3 billion units nationwide sufficient to defeat summary judgment, without proof of actual

14  recognition); *see also Nike, Inc. v. Nikepal Intern., Inc.*, No. 05-1468, 2007 WL 2782030,

15  at *5–6 (E.D. Cal. Sept. 18, 2007) (NIKE mark found famous because of promotional

16  expenditures of more than $1 billion, gross sales of at least $1 billion per year,

17  recognition of success of mark by various publications and registration).  Many other

18  cases have similarly found fame without reliance on actual recognition or a survey.  *See,*

19  *e.g., Louis Vuitton,* 507 F.3d at 265; *Audi AG v. Shokan Coachworks, Inc.*, 592 F. Supp.

20  2d 246, 280 (N.D.N.Y. 2008); *Adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F.

21  Supp. 2d 1029, 1063 (D. Or. 2008).  When considered against the backdrop of VIP's

22  deliberate copying, the undisputed facts regarding the sales, advertising, and public

23  exposure of Jack Daniel's whiskey discussed below at pp. 23–30 provide sufficient

24

25  _____

26  [3]The list of fame factors is non-exclusive, and a "relevant factor" here is VIP's deliberate
    copying to take advantage of the public's recognition of the Jack Daniel's Trade Dress.
27  *See* pp. 23–25 below.

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1   indirect evidence from which a reasonable trier of fact could find the fame of the Jack

2   Daniel's Trade Dress.  *Jada Toys*, 518 F.3d at 635.

3   **B. There Is a Genuine Dispute of Fact as to Whether the Bad Spaniels Toy Is Sufficiently Similar to the Jack Daniel's Trade Dress to Dilute It.**

4          Prior to the TDRA, a party had to prove that its mark and the accused mark were

5   identical or nearly identical for dilution to occur, *Welles,* 279 F.3d at 806, but "the

6   'identical or nearly identical' standard did not survive Congress's enactment of the

7   TDRA."  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158, 1159

8   (9th Cir. 2011).  Now a party only must show "similarity" between the famous mark and

9   the accused mark.  *See* 15 U.S.C. § 1125(c)(2)(C) ("'dilution by tarnishment' is

10  association arising from the similarity between a mark or trade name and a famous mark

11  that harms the reputation of the famous mark."); *Nordstrom, Inc. v. NoMoreRack Retail*

12  *Grp., Inc.*, No. C12-1853-RSM, 2013 WL 1196948, at *11 (W.D. Wash. Mar. 25, 2013)

13  ("the same requirement of similarity applies for both blurring and tarnishment claims");

14  *Nike, Inc. v. Maher,* 100 USPQ 2d (BNA) 1018, 1030, 2011 WL 3828723, *14, (TTAB

15  2011) (TDRA allows dilution claims against "a 'look-alike' mark, one that is close

16  enough to the famous mark that consumers will recall the famous mark and be reminded

17  of it").  VIP admits that the Bad Spaniels toy was designed to be close enough to the Jack

18  Daniel's Trade Dress that consumers would recall and be reminded of the famous Jack

19  Daniel's whiskey.  Stmt. ¶¶ 3–42.

20          VIP argues that the following differences between its Bad Spaniel's toy and the

21  Jack Daniel's Trade Dress preclude a finding of dilution as a matter of law: (1) the use of

22  "Bad Spaniels" in place of "Jack Daniel's," (2) the use of "Old No. 2" in place of "Old

23  No. 7," (3) the addition of "Silly Squeakers" on the hang-tag (but not on the toy itself),

24  and (4) the use of "different design elements" and the omission of "several key

25  components" of the Jack Daniel's Trade Dress.  Mot. 12:14–18.  Here, as so often in its

26  motion, VIP focuses on discrete differences between the products instead of how a

27  consumer would see their trade dresses *as a whole.*  The proper inquiry is whether

28  considering the asserted trade dress and the accused product in their entireties, there is

15

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    enough similarity to create in the mind of consumers an "association arising from the

2    similarity between a mark or trade name and a famous mark." *See* 15 U.S.C. §

3    1125(c)(2)(C). "Similarity" is a highly fact-specific inquiry and none of the cases cited

4    by VIP found a lack of similarity as a matter of law. *See Nordstrom*, 2013 WL 1196948,

5    at *14 (denial of preliminary injunction); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 920 F.

6    Supp. 2d 1116, 1131 (N.D. Cal. 2013) (denial of post-trial motion for judgment as a

7    matter of law seeking to overturn jury finding of no dilution); *Starbucks Corp. v. Wolfe's*

8    *Borough Coffee, Inc.*, 588 F.3d 97, 102 (2d Cir. 2009) (appeal following a full bench trial

9    on dilution). There is considerable evidence in the record of similarity. Stmt. ¶¶ 3–42.

10   VIP has presented no evidence that a reasonable trier of fact could not find such

11   similarity, and summary judgment must therefore be denied. *Anderson*, 477 U.S. at 249.

12

13   **C.  <u>There Is a Genuine Dispute of Fact as to Whether the Bad Spaniel's Toy Is</u>**
      **<u>Likely to Harm JDPI's Reputation.</u>**

14        VIP next argues that its toy "is unlikely to harm JDPI's reputation," Mot. 13:1, but

15   VIP has not shown that no reasonable trier of fact could conclude otherwise. *Celotex,*

16   477 U.S. at 325. Tarnishment is an "association arising from the similarity between a

17   mark or trade name and a famous mark that harms the reputation of the famous mark."

18   15 U.S.C. § 1125(c)(2)(C). The act does not require any particular manifestation of such

19   harm or any particular type of evidence. While VIP argues that "[c]onsiderations such as

20   complaints, reduction in sales, loss of customers, and negative press are all relevant to the

21   overall determination," Mot. 13:5–7, such evidence is not the only way to show harm and

22   is not required in all cases. *See Nordstrom, Inc.*, 2013 WL 1196948 at *11, 13 (holding

23   that where, as here, "the [famous] trademark is . . . is portrayed in an unwholesome or

24   unsavory context likely to evoke unflattering thoughts about the owner's product"

25   tarnishment "generally arises"). Although expert testimony on harm is not required, *cf.*

26   *Visa Int'l Serv. Ass'n v. JSL Corp.,* 610 F.3d 1088, 1091 (9th Cir. 2010) (in a case of

27   dilution by blurring, a mark owner "is not required to go to the expense of producing

28   expert testimony or market surveys; it may rely entirely on the characteristics of the

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**

1    marks at issue"), JDPI will offer expert testimony at trial from Dr. Itamar Simonson

2    about the negative impact of the Bad Spaniel toy on the Jack Daniel's Trade Dress and

3    marks. CSF ¶ 115. As discussed in JDPI's opposition to VIP's *Daubert* motion as to Dr.

4    Simonson's testimony (Doc. 96), this sort of expert testimony is evidence of tarnishment

5    and is sufficient to defeat a motion for summary judgment. *Gucci Am., Inc. v. Guess?,*

6    *Inc.*, 843 F. Supp. 2d 412, 439 (S.D.N.Y. 2012).

7       VIP claims to have evidence of positive associations of the toy with Jack Daniel's

8    from focus groups conducted by its expert Bruce Silverman. Mot. 13:19–14:1. VIP cites

9    no case that has accepted such evidence for litigation purposes, and Mr. Silverman

10    admitted that focus groups are qualitative, not quantitative, research, that they are not

11    projectable, that their results are not quantifiable in the manner of a survey, that they are

12    not representative of the views of consumers around the United States, that he has never

13    previously relied on a focus group in expert testimony in trademark litigation, and that

14    the focus groups that he conducted here do not disprove Dr. Simonson's view that the

15    Jack Daniel's mark would be tarnished by the VIP toy. CSF ¶¶ 120–150. VIP has not

16    shown that a reasonable trier of fact could believe only Mr. Silverman and not Dr.

17    Simonson, and the credibility of their respective positions is for the trier of fact to assess

18    at trial. Drawing all reasonable inferences in favor of JDPI, summary judgment cannot

19    be granted on this issue. *Matsushita*, 475 U.S. at 587.

20      **D. <u>The Bad Spaniels Toy Is Not Excluded from Liability Under the TDRA.</u>**

21       VIP lastly claims that its toy "is fair use and non-commercial use of the JDTW

22    Marks and Bottle Dress, and is excluded from liability under the TDRA. 15 U.S.C. §

23    1125(c)(3)." Mot. 14:7–9. This argument is incorrect as a matter of law. Section

24    1125(c)(3)(A) provides an exclusion for liability for "[a]ny fair use . . . other than as a

25    designation of source for the person's own goods or services, including use in connection

26    with . . . (ii) parodying . . . ." "Under the statute's plain language, parodying a famous

27    mark is protected by the fair use defense only if the parody is *not* 'a designation of source

28    for the person's own goods or services'." *Louis Vuitton*, 507 F.3d at 266 (emphasis in

17

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO<br>MOTION FOR SUMMARY JUDGMENT**

1  original).  The exclusion did not apply in that case because the defendant used CHEWY

2  VUITTON as a mark to designate the source of its dog toy.  *Id*. at 267.  It similarly does

3  not apply here because, as shown at pp. 9–10 above, VIP alleges that it uses its Bad

4  Spaniels trademark and trade dress as source identifiers.

5  **III.    THE JACK DANIEL'S TRADE DRESS IS NON-FUNCTIONAL AND**

6  **DISTINCTIVE AS A MATTER OF LAW.**

7          As shown in the JDPI Motion, the Jack Daniel's Trade Dress has been used at

8  least since the 1960s with only minor modifications.  Stmt. ¶¶ 47–48.  VIP has failed to

9  show that it is functional and non-distinctive at all, much less as a matter of law.

10         **A.  The Jack Daniel's Trade Dress Is Not Functional as a Matter of Utility.**

11         VIP half-heartedly argues that the Jack Daniel's Trade Dress is functional as a

12  matter of utility, reciting (without analyzing) the Ninth Circuit's functionality factors in

13  *Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).  Mot.

14  15:9–22.  "Given the functionality doctrine's underlying purpose, the Ninth Circuit has

15  suggested that it may apply with somewhat less force in most product packaging cases, as

16  opposed to cases involving product configuration."  *Spark Indus., LLC v. Kretek Int'l,*

17  *Inc.*, No. CV 14-5726-GW ASX, 2014 WL 4365736, *4 (C.D. Cal. Aug. 28, 2014)

18  (citations omitted).  JDPI showed at pp. 14–17 of the JDPI Motion that analysis of the

19  *Disc Golf* factors compels a funding of non-functionality as a matter of law.  VIP relies

20  here solely on Mr. Howard's report,[4] which VIP claims identifies "the Jack Daniel's

21  embossed-signature bottle design as one of several utilitarian features used in the JDTW

22

23  _____

24  [4]JDPI objects to this report and to the other expert reports submitted by VIP on the
    ground that they are unsworn hearsay and are thus inadmissible under Rule 56(c).  *See*
25  *Smith v. City of Oakland,* No. C-05-4045-EMC, 2007 WL 2288328, at *4 (N.D. Cal.
    Aug. 9, 2007) ("'Unsworn expert reports prepared in compliance with Rule 26(a)(2) do
26  not qualify as affidavits or otherwise admissible evidence for purpose of Rule 56, and
    may be disregarded by the court when ruling on a motion for summary judgment.' 11-56
27  Moore's Fed. Prac.-Civ. § 56.14").

28

                                        18
        **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
                        **MOTION FOR SUMMARY JUDGMENT**

1  Bottle Dress," Mot. 15:18–20, even though he had no opinion on the functionality of the

2  Jack Daniel's Trade Dress as a whole.  Stmt. ¶ 118.

3        As shown at pp. 20–30 of the JDPI Motion, Mr. Howard fails to rebut the

4  presumption of validity of JDPI's registered mark, but even if his opinion raised a

5  genuine dispute of fact as to the functionality of the registered mark, that would be

6  insufficient as a matter of law to prove the functionality of the Jack Daniel's Trade Dress

7  as a whole.  "[A]s the Ninth Circuit has repeatedly cautioned, it would be a mistake to

8  pick apart the claimed trade dress and analyze each component in isolation. . . . Instead,

9  the Court must look at the packaging as a whole, with a particular focus on whether [the]

10  particular integration of the various elements on [the] packaging leaves competitors with

11  commercially-feasible alternatives."  *Spark,* 2014 WL 4365736, at *6 (citing *Clicks,* 251

12  F.3d at 1252 and *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d

13  1165, 1174 (C.D. Cal. 2012)).  As shown at pp. 14–20 of the JDPI Motion, "there is no

14  function being served by the [Jack Daniel's] trade dress's particular arrangement or

15  several particular elements," *id*. at *6, such as font, color, and "the strategic placement of

16  certain items of text," *id*., and "both parties have come forward with evidence of feasible

17  alternative [whiskey] packaging."  *Id*.  Even assuming "the existence of discrete

18  functional elements, courts have repeatedly found product packaging non-functional

19  under similar circumstances."  *Id*. (citing cases); *see also Fiji Water*, 741 F. Supp. 2d at

20  1174–76.  Because "product packaging is the quintessential form of trade dress--as it

21  'normally is taken by the consumer to indicate origin,'" *Spark,* 2014 WL 4365736, at *6

22  (*quoting Wal-Mart Stores, Inc. v. Samara Bros., Inc*., 529 U.S. 205, 215 (2000)), the

23  combination of elements in the Jack Daniel's Trade Dress is not functional as a matter of

24  utility.  *Id*.

25      **B.  The Jack Daniel's Trade Dress Is Not Aesthetically Functional.**

26        VIP claims that the Ninth Circuit "has yet to adopt a test for aesthetic

27  functionality," Mot. 16:5–6, ignoring the Circuit's most recent significant decision on the

28  subject, *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc*., 457 F.3d 1062, 1072 (9th

19

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

Cir. 2006), which held that in "the case of a claim of aesthetic functionality, an alternative test [to *Disc Golf*] inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." VIP posits "comparable alternatives" and "effective competition" tests, citing *Moldex-Metric, Inc. v. McKeon Prods., Inc.*, 596 Fed. Appx. 567 (9th Cir. 2015), *Rodan & Fields, LLC v. Estee Lauder Companies, Inc.*, No. 10-CV-02451-LHK, 2010 WL 3910178 (N.D. Cal. Oct. 5, 2010) and *Farmgirl Flowers, Inc. v. Bloom That, Inc.*, No. 14-CV-05657-LHK, 2015 WL 1939424 (N.D. Cal. Apr. 28, 2015), and cases from outside the Ninth Circuit. The cases applying controlling Ninth Circuit law do not support VIP's position. *Moldex-Metric* reversed a summary judgment finding the color green functional for ear plugs, noting that the district court had to consider whether the color was "essential" to the use of the product (and expressing doubt that summary judgment would ever be appropriate). 596 Fed. Appx. at 567–68. *Rodan & Fields* found functional "a vertically rectangular cardboard bag with a flat bottom, a handle at the top, and a two-toned color scheme." 2010 WL 3910178, at *5. *Farmgirl* found functional burlap "not limited to . . . a certain color, shape, or size [or] bearing a particular pattern or logo." 2015 WL 1939424, at *8. The Jack Daniel's Trade Dress is nothing like these claimed trade dresses in terms of its elements or nature.

VIP argues that JDPI has admitted that "most of the JDTW Bottle Dress' features—including the square bottle, black-and-white label, number designation, arched text, and filigree design, among others—are used by many of its competitors in the Kentucky Bourbon/Tennessee whiskey market," and that JDPI's competitors "would have to incur prohibitively high costs to avoid them." Mot. 17:5–7, 9–10. These claimed admissions are exaggerated, CSF ¶¶ 23–27, but if the third-party uses show anything, it is that multiple comparable alternatives exist and are in use, and that the use of the combination of features in the Jack Daniel's Trade Dress for decades has had, and will have, no impact on the ability of competitors to use individual features, singly or in combination. VIP's own evidence thus corroborates JDPI's showing at pp. 17–20 of the

20

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1  JDPI Motion that the Jack Daniel's Trade Dress is not aesthetically functional under any

2  test. "Since competitors routinely use alternative designs in packaging their [whiskey],

3  protecting the particular combination of elements in the [Jack Daniel's] packaging will

4  not hinder competition in the [spirits] industry." *Fiji Water*, 741 F. Supp. 2d at 1174.

5  **C. The Jack Daniel's Trade Dress Is Distinctive.**

6      *1. The Jack Daniel's Trade Dress is not generic.*

7      VIP's claim that the Jack Daniel's Trade Dress is generic, Mot. 17–20, is

8  remarkable considering that it consists of a combination of bottle and label elements,[5]

9  which VIP acknowledges in its dilution argument includes the JACK DANIEL'S and

10 OLD NO. 7 word marks, Mot. 9:5–6, and that JDPI owns federal registrations of the

11 bottle design with the embossed "Jack Daniel" signature and the front label, which bears

12 the registered word marks. CSF ¶ 6. It is also remarkable because Mr. Wolinsky and Mr.

13 Sacra both testified that the Jack Daniel's packaging is not generic. Stmt. ¶ 88. Those

14 admissions should suffice to defeat VIP's claim as a matter of law.

15     VIP "primarily cite[s] *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150

16 F.3d 1042, 1049 (9th Cir. 1998), which held that a grape leaf alone as a trademark for a

17 brand of wine had become generic and could not be protected due to its wide use in the

18 industry." *Decorations for Generations, Inc. v. Home Depot USA, Inc.*, No. CIV-S-01-

19 0284, 2003 U.S. Dist. LEXIS 26608, *8 (E.D. Cal. Sept. 22, 2003).[6] *Kendall-Jackson*

20

---

21 [5]VIP claims "numerous inconsistent statements as to what elements make up the alleged
   JDTW Bottle Dress," Mot at 18:25–19:1, but cites only trivial differences between its
22 description in JDPI's counterclaims and in JDPI's President's testimony. CSF ¶¶ 15–16,
   20–21. This is much ado about nothing. The Jack Daniel's Trade Dress is described with
23 the required specificity, *Spark*, 2014 WL 4365736, at *3–4, and is not "overbroad" in any
   way.
24

25 [6]The other cases cited by VIP, Mot. 18, all involved claimed trade dress in product
   design, which "almost invariably serves purposes other than source identification." *Wal-*
26 *Mart*, 529 U.S. at 213. Product packaging, like the Jack Daniel's Trade Dress, however,
   is "normally is taken by the consumer to indicate origin'." *Spark*, 2014 WL 4365736, at
27 *6 (*quoting Wal-Mart*, 529 U.S. at 215).

28

---

21

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1   does not support VIP's claim that the Jack Daniel's Trade Dress is generic.  The Kendall-

2   Jackson trade dress consisted of its leaf design coupled with an exposed cork, a rounded

3   bottle flange, a dark neck label, and an off-white label, 150 F.3d at 1045, but no word

4   marks, font styles, or logos.  "Although the *Kendall-Jackson* court granted summary

5   judgment on the trademark question, the court let the trade dress issue go to a jury.  The

6   jury found no trade dress infringement, but the court noted that Kendall-Jackson had

7   presented enough evidence to support a jury finding that its trade dress was non-

8   functional and distinctive, although the evidence did not compel that conclusion.  Thus,

9   the claimed trade dress was not generic, although it included the generic grape leaf."  *Id*.

10  at *9.

11          The Jack Daniel's Trade Dress involves a combination of features, including the

12  depiction and placement of the JACK DANIEL'S and OLD NO. 7 marks, that VIP

13  imitated to associate its product specifically with Jack Daniel's whiskey, Stmt. ¶¶ 14–21,

14  26, 36–38, not just with "any 'Kentucky Bourbon/Tennessee Whiskey'."  Mot. 19:25.

15  VIP claims that this combination is generic because an "overwhelming majority of

16  whiskey/bourbon sellers in the United States use four primary elements of the JDTW

17  Bottle Dress" and because JDPI concedes that a significant number of American

18  consumers associate a square bottle with any whiskey or bourbon product and that "a

19  bottle with a black-and-white label signals to consumers that the product is a

20  Bourbon/Whiskey product."  Mot. 19.  But under *Kendall-Jackson,* "the proper inquiry is

21  not whether individual features of a product are functional or nondistinctive, but whether

22  the whole collection of features taken together are functional or nondistinctive."  150

23  F.3d at 1050.  As with functionality, the fact that some distillers use discrete elements of

24  the Jack Daniel's Trade Dress, alone or in some combination, does not make generic the

25  overall combination of elements comprising the Jack Daniel's Trade Dress, including the

26  depiction and positioning of the JACK DANIEL'S and OLD NO. 7 marks.  No

27  reasonable trier of fact could find that the Jack Daniel's Trade Dress, as a "whole

28  collection of features taken together," *id*., including the JACK DANIEL'S and OLD NO.

22

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1    7 marks, merely "serves as an identifier of any 'Kentucky Bourbon/Tennessee Whiskey."

2    Mot 19:25.

3          *2.   The inherent distinctiveness of the Jack Daniel's Trade Dress.*

4          In 1895, Mr. Jack Daniel first began selling his whiskey in a square bottle.  Stmt.

5    ¶ 47.  According to VIP's own evidence, in the early 1900s square bottles were used for

6    brandy while round bottles were used for whiskey.  VIP Ex. N (Doc. 115), at SAC31.

7    Mr. Daniel's choice to depart from the standard round bottle distinguished his whiskey

8    from those of his competitors, and made his packaging distinctive at the time.  His

9    successors began use of a black-and-white label at least as early as the 1940s, and

10   elements of the Jack Daniel's Trade Dress appeared on those labels.  Stmt. ¶ 47.  As the

11   undisputed facts show, and as Mr. Wolinsky acknowledged, the Jack Daniel's Trade

12   Dress has remained essentially the same since at least the 1960s.  Stmt. ¶¶ 47–48.  There

13   is no evidence that competitors used the elements of the Jack Daniel's Trade Dress then.

14         Next year, however, will be the 150th anniversary of the first sale of Jack Daniel's

15   whiskey, and while no other whiskey company uses all of the elements of the Jack

16   Daniel's Trade Dress, JDPI acknowledges that during that period some began using

17   square bottles and other individual elements of the Jack Daniel's Trade Dress.  JDPI

18   believes that Jack Daniel's whiskey effectively became a victim of its own success—

19   spawning a number of other whiskey bottle designs that use individual elements of the

20   Jack Daniel's Trade Dress.  Because the law requires that to be inherently distinctive,

21   packaging must be "so unique, unusual, or unexpected in the market that one can assume

22   without proof that it will automatically be perceived by consumers as an indicator of

23   origin," *Fiji Water*, 741 F. Supp. 2d at 1176, JDPI does not intend to argue that in 2015

24   the Jack Daniel's Trade Dress is inherently distinctive.  JDPI will rely instead on the

25   undisputed evidence, discussed below, that shows that the Jack Daniel's Trade Dress has

26   acquired distinctiveness as a matter of law.

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

QB\37489096.9

3. _The Jack Daniel's Trade Dress has acquired distinctiveness._

    a. <u>VIP's Copying Establishes Acquired Distinctiveness as a Matter of Law.</u>

"While not rising to the level of a presumption, evidence of deliberate copying may also support an inference of secondary meaning in appropriate cases." _Spark_, 2014 WL 4365736, at *10 (citing _Fuddruckers, Inc. v. Doc's B. R. Others, Inc._, 826 F.2d 837, 844 (9th Cir. 1987)). There is no more appropriate case for such an inference than this one. Mr. Sacra testified that in creating its alleged parody toys, VIP is taking "small portions of _identifiable parts of the trade dress that people have visual recognition with_, and juxtaposing that." VIP Ex. TT 218:10–12 (emphasis added). VIP argues that it designed the Bad Spaniels toy "to be a comical parody of a Jack Daniel's whiskey bottle," Mot. 1:9–10, by making "use of the alleged JDTW Bottle Dress," Mot. 26:13–14, to take advantage of the fact that "Jack Daniel's is more recognizable than other brands [because] they've spent a lot of money to make that recognition." Stmt. ¶ 42. According to VIP, the toy's success as a parody "comes from the fact that people are familiar with Jack Daniel's[,] . . . have seen it before, and will get the parody." Stmt. ¶ 40.

    The only reasonable inferences to be drawn from these admissions are that: (1) the longstanding sales, advertising, and public exposure of Jack Daniel's whiskey has made the "JDTW Bottle Dress" that VIP admits using more "recognizable than other brands;" (2) this is because Jack Daniel's has "spent a lot of money to make that recognition;" (3) "people are familiar with Jack Daniel's whiskey" because they "have seen it before" in retail stores, in bars and restaurants, in print, television, and outdoor advertising, in movies and television shows, in popular culture, and elsewhere; and (4) VIP used the "identifiable parts" of the Jack Daniel's Trade Dress "that people have visual recognition with." Nevertheless, and without citing any authority, VIP claims that its copying "is not evidence of an attempt to 'free ride' on JDPI's success, and thus does not show secondary meaning." Mot. 26:14–15. But even assuming that VIP "meant to poke fun . . . rather than to free ride on the success of Jack Daniel's whiskey," Mot. 26:16–17, VIP's copying of the "identifiable parts of the trade dress that people have visual recognition with" was

24

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    indisputably "an attempt to realize upon [an existing] secondary meaning." *Spark*, 2014

2    WL 4365736, at \*11 (*quoting Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d

3    1001, 1016 (9th Cir. 1985)).

4    　　　　VIP also cites *Spark* for the proposition that "courts recognize that proof of

5    intentional copying is not probative of secondary meaning if defendant's mark is

6    'prominently displayed' in connection with plaintiff's alleged trade dress," Mot. 26:22–

7    24, but the court actually held that the defendant's copying "support[ed] an inference--

8    albeit a muted one--that [plaintiff's] trade dress has acquired secondary meaning," 2014

9    WL 4365736, at \*12, because it would have been "'naïve to suggest that [defendant]

10   happened upon a design that imitates in significant ways the successful [plaintiff's line]'

11   if [defendant] was not intending to capitalize on [plaintiff's] secondary meaning." *Id.*

12   (*quoting Knorr-Narhmittel A.G. v. Reese Finer Foods, Inc.*, 695 F. Supp. 787, 792–93

13   (D.N.J. 1988)).  VIP claims here that it "designed its Product to parody an American

14   whiskey bottle--and the JDTW Marks and Bottle Dress just happen to utilize several

15   classic elements that are common to most Kentucky Bourbon/Tennessee Whiskey

16   bottle," Mot. 3:21–23, but the undisputed facts show that it would be far beyond "naive"

17   to believe this.  No reasonable trier of fact could find that VIP's intent was anything other

18   than to associate the Bad Spaniels toy with Jack Daniel's, and Jack Daniel's only.  VIP's

19   copying, in and of itself, should suffice to show secondary meaning as a matter of law.

20   　　　　b.  <u>The Ford Survey Supports a Finding of Acquired Distinctiveness.</u>

21   　　　　VIP claims that Dr. Ford's likelihood of confusion survey is not probative of the

22   issue of acquired distinctiveness, Mot. 23:10–18, but although the survey did not test for

23   acquired distinctiveness *per se*, its results bear on that issue.  The verbatim explanations

24   (VIP Ex. C at ECF pp. 44–54) of why respondents believed that the Bad Spaniels toy was

25   being made or put out by, or with the authorization or approval of, Jack Daniel's,

26   included:

27   　　　　●"Design and wording style.  Shape looks like a bottle of JD" (Respondent 1003);

28   　　　　●"It looks like their bottle and logo." (1015);

25

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO<br>MOTION FOR SUMMARY JUDGMENT**

1      ● "Because the product looks like a Jack Daniel's bottle/logo." (1016);

2      ● "The toy looks like a Jack Daniel's bottle." (1054);

3      ● "It is their type of bottle.  It is their type of logo." (1056);

4      ● "This is what a Jack Daniel's bottle looks like.  Other than the name and some

5          details, it's a mirror image." (1065);

6      ● "Looks just like a bottle of Jack Daniel's." (1067);

7      ● "The print, font, and bottle looks like Jack Daniel's." (1120);

8      ● "It looks like their products.  The appearance.  It uses their brand image." (1147);

9      ● "Bottle shape, label color, printing on label has a font that is identical to that

10         (though wording is not exact, but similar) of a Jack Daniel's whiskey black

11         label Tennessee sour mash whiskey."  (1156).

12  As Dr. Ford explained at his deposition, CSF ¶ 80, these responses are probative of the

13  acquired distinctiveness of the Jack Daniel's Trade Dress, and its strength.  *Union

14  Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 381 (7th Cir. 1976) (results of

15  likelihood of confusion survey supported finding of acquired distinctiveness because "the

16  only conclusion that can be drawn from these results" is that respondents associated

17  plaintiff's product with plaintiff); *Fiji Water*, 741 F. Supp. 2d at 1176, 1179–80 (survey

18  responses that defendant's water was associated with plaintiff because defendant's bottle

19  was "square," because of the "style of the bottle.  Just the design or font of the words is

20  all," "because of the bottle and sticker inside," and because the "whole design is the

21  same" evidenced recognition of elements of the trade dress apart from the FIJI word

22  mark, and provided "substantial evidence that actual consumers do know and recognize

23  the FIJI brand, based at least in part on its trade dress").

24         c.   The Undisputed Circumstantial Evidence Compels a Finding of Acquired
               Distinctiveness as a Matter of Law.

25

26         Despite Mr. Sacra's and Ms. Phillips' testimony about the distinctiveness of the

27  Jack Daniel's Trade Dress, Stmt. ¶¶ 37–42, 44, and the testimony of VIP's experts

28  Wolinsky and Silverman that Jack Daniel's whiskey is well known (in Mr. Silverman's

26

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1    words, a "very big, very important brand" whose packaging, "like most successful brands

2    . . . is well known") Stmt. ¶ 45; CSF ¶¶ 151–153, VIP now argues that the recognition of

3    the packaging does not exist as a matter of law.  This argument is meritless.

4        VIP claims that "none of the JDPI circumstantial evidence is sufficient to establish

5    that the JDTW Bottle Dress is unique in the Kentucky Bourbon/Tennessee whiskey

6    market," Mot. 24:5–7, but trade dress obviously does not need to be unique to acquire

7    distinctiveness.  *See Spark*, 2014 WL 4365736, at *9 (plaintiff's trade dress was not

8    inherently distinctive, but could be protectable through a showing of acquired

9    distinctiveness); *Fuddruckers,* 826 F.2d at 844 (same).  The fact that competitors may use

10   discrete elements of the Jack Daniel's Trade Dress, Mot. 24:9–21, does not mean that the

11   Jack Daniel's Trade Dress as a whole has not acquired distinctiveness.[7]  *Fiji Water*, 714

12   F. Supp. 2d at 1174, 1176–77 (bottled water trade dress found to have acquired

13   distinctiveness even though a number of competitors used discrete elements and "the

14   square bottle and blue cap elements [were] fairly common in the bottled water industry").

15       The undisputed facts regarding the sales, advertising, and public exposure of Jack

16   Daniel's whiskey are similar to those that established acquired distinctiveness in *Fiji*

17   *Water*.  Between 1997, when FIJI water was first sold, and 2010, Fiji sold nearly 65

18   million cases worldwide and expended more than $65 million in advertising.  *Id.* at 1177.

19   Between 1997 and 2015, sales of Jack Daniel's whiskey in the United States exceeded 75

20   million cases, and advertising expenditures were in the hundreds of millions of dollars.

21   Stmt. ¶¶ 51, 55.  Like the FIJI bottle, *id.* at 1177, the Jack Daniel's bottle has appeared in

22   numerous movies and television shows.  Stmt. ¶¶ 60–61.  But the inference of acquired

---

[7]Neither does the fact that third parties have joined VIP in imitating elements of the Jack Daniel's Trade Dress.  Mot. 24.  This actually *supports* a finding of acquired distinctiveness.  *See, e.g., LeSportsac, Inc. v. K mart Corp.*, 754 F.2d 71, 78 (2d Cir. 1985); *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 428 (S.D.N.Y. 2012) ("Evidence that a mark has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the mark has become a 'strong source identifier in the eyes of the purchasing public.'").

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

QB\37489096.9

1   distinctiveness is much more powerful here.  Jack Daniel's whiskey has been sold and

2   advertised in the Jack Daniel's Trade Dress for at least 30 years longer than FIJI water,

3   Stmt. ¶¶ 47–48, and was already very well known when sales of FIJI water were just

4   beginning.  *See Jack Daniel's Properties, Inc. v. Quest Associates, Ltd.*, Opp. No.

5   105022, 2000 WL 992415, at *6 (TTAB July 12, 2000) (holding in 2000 that there was

6   "no question" that the Jack Daniel's marks were famous on the basis of sales, advertising,

7   and public exposure of Jack Daniel's whiskey up to then).  And unlike in *Fiji Water*,

8   where there was only circumstantial evidence of copying, 741 F.Supp.2d at 1177, there is

9   admitted copying here precisely because "Jack Daniel's is more recognizable than other

10  brands [because] they've spent a lot of money to make that recognition."  Stmt. ¶ 42.

11          VIP's attack on the undisputed facts regarding the sales, advertising, and public

12  exposure of Jack Daniel's whiskey is essentially that most of the print advertising does

13  not contain an image of the trade dress, Mot. 25:11–12, and that the appearance of the

14  Jack Daniel's packaging in advertising, product placement, and popular culture is not

15  accompanied by verbal or textual references to the trade dress.  Mot. 25–26.  VIP's

16  claims are meritless.  To be probative of secondary meaning, advertising must "highlight

17  the claimed trade dress features," *Spark,* 2014 WL 4365736, at *13, but this does not

18  require verbal or textual references to the trade dress.  Such references might be

19  necessary if the claimed trade dress were a "feature like shape or color . . . or commonly

20  used packaging or background designs, such as squares, circles and stars" because such

21  features "will not normally be perceived by buyers as an indication of origin."

22  *McCarthy*, § 7:30 at 7-89–7-95 (collecting cases); *see also Spark,* 2014 WL 4365736, at

23  *10–14 (collecting cases involving features like the yellow color and shape of an

24  antifreeze jug, the design of stone and ceramic decorative tiles, the wavy vents of a hair

25  brush, and lingerie styles).  But overall "product packaging is the quintessential form of

26  trade dress -- as it "normally is taken by the consumer to indicate origin'."  *Id.* at *6

27  (*quoting Wal-Mart*, 529 U.S. at 215).  It is sufficient that the Jack Daniel's

28  advertisements prominently "display the trade dress itself."  *Lisa Frank, Inc. v. Impact*

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*Int'l, Inc.*, 799 F. Supp. 980, 992 (D. Ariz. 1992); *see also Fiji Water,* 741 F. Supp. 2d at 1175 (plaintiff's ads supported acquired distinctiveness in the bottle trade dress even though "most of [them] feature[d] the water's pristine purity, its high silica content, and the quality assurance that comes from bottling the water at its source").

The Jack Daniel's advertising in all media highlights the trade dress.  CSF ¶¶ 63–65, 67, 69, 73.  Most of the print ads have shown all or substantial parts of the packaging, often as the most eye-catching visual element.  CSF ¶¶ 63–65, 67.  Two ads from the 1950s mentioned "the square bottle with the old-fashioned black label" and the "old-fashioned square bottle with the famous black label," Stmt. ¶ 47, while later ads highlighted the packaging in the lower right-hand corner, sometimes accompanied by the vertical tagline "Charcoal Mellowed Drop by Drop."  VIP Ex. Z (JDPI 259–268); CSF ¶¶ 63–64.  Print ads since 2000 have shown the packaging together with brief headlines like "On Tour Since 1866" that appear next to the packaging and direct attention to it.  CSF ¶ 63.  The TV ads similarly highlight the packaging, usually as the last thing seen by the viewer, with several showing close-ups of the label and full shots of the entire bottle.  TV ads featuring Frank Sinatra show him pouring from the bottle and accompany a picture of the bottle and a close-up of the label with his voice stating "That's the nectar of the gods, baby."  Other TV ads similarly use voiceovers directing attention to the packaging.  CSF ¶ 73.  Out-of-home advertising uses large depictions of the packaging as the focal point of branding, VIP Exs. HH–II, while point-of-purchase promotional items and carton displays often consist of or display large depictions of the packaging.  VIP Ex. GG.  The appearance of the packaging in dozens of movies and TV programs, in unsolicited media coverage (some of which specifically references the trade dress, CSF ¶ 76), and in the hands of well-known public figures, Stmt. ¶ 62, supports a finding of acquired distinctiveness.  *Fiji Water,* 741 F. Supp. 2d at 1177, 1179.

VIP barely addresses the extensive sales of Jack Daniel's whiskey, Mot. 25:13–16, but they too indisputably establish acquired distinctiveness.  There is "no fixed amount of time that packaging must be in circulation before it can acquire secondary meaning,"

29

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1 | *Spark,* 2014 WL 4365736, at *12, and even the two years' of exclusive use of the

2 | plaintiff's trade dress in *Spark* "somewhat favor[ed] a finding of secondary meaning." *Id*.

3 | The Jack Daniel's Trade Dress has been used exclusively for more than 50 years, Stmt.

4 | ¶¶ 47–48, 68, and on the best-selling US whiskey for almost 20 years.  If those sales do

5 | not establish acquired distinctiveness, none can.

6 |       Taken together, VIP's copying, and the undisputed facts regarding the sales,

7 | advertising, and public exposure of Jack Daniel's whiskey, do not just establish a genuine

8 | dispute of fact on the issue of the acquired distinctiveness of the Jack Daniel's Trade

9 | Dress, but compel a finding of acquired distinctiveness as a matter of law.

10 | **CONCLUSION**

11 |       For all of the foregoing reasons, VIP's motion for summary judgment should be

12 | denied in its entirety, the Court should grant summary judgment *sua sponte* striking

13 | VIP's fair use defenses, and the Court should grant the JDPI Motion.

14 | Dated: December 11, 2015

Respectfully submitted,

15 | */s/ Isaac S. Crum*

16 | Gregory P. Sitrick (AZ Bar #028756)
Gregory.Sitrick@quarles.com
Isaac S. Crum (AZ Bar #026510)

17 | Isaac.Crum@quarles.com

18 | Quarles & Brady LLP
One Renaissance Square,

19 | Two North Central Avenue
Phoenix, AZ 85004

20 | Telephone (602) 229-5200

21 | Fax (602) 229-5690

22 | SEYFARTH SHAW LLP

23 | Christopher C. Larkin (admitted pro hac vice)
clarkin@seyfarth.com

24 | 2029 Century Park East

25 | Suite 3500
Los Angeles, California 90067-3021

26 | Telephone: (310) 201-5289

27 | Facsimile: (310) 201-5219
*Attorneys for Jack Daniel's Properties, Inc.*

28 |

30

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record in this case.

*/s/ Isaac S. Crum*

Isaac S. Crum

QB\37489096.9