# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

No. 2:14-cv-02057-DGC

VIP Products, LLC, an Arizona limited liability company,

     Plaintiff,

  vs.

Jack Daniel's Properties, Inc., a Delaware corporation

     Defendant.

---

Jack Daniel's Properties, Inc., a Delaware corporation

     Counterclaimant,

  vs.

VIP Products, LLC, an Arizona limited liability company,

     Counterdefendant.

## RULE 26 EXPERT REPORT OF DR. ITAMAR SIMONSON

**EXPERT REPORT OF DR. ITAMAR SIMONSON**

1.      I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University.  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2.      I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3.      My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, study methods, and human judgment and decision making.  Most of my research has focused on buyers' purchasing behavior, the effect of brand characteristics (such as brand name, price, and features), the competitive context, and marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement from the buyer's perspective.

4.      I have received several awards, including (a) the award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 1987 and 1989; (b) The Ferber Award from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (c) the 1997 O'Dell Award, given for the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (d) the 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005, 2007, 2008, and 2012); (e) the award for the Best Article published in the *Journal of Public Policy & Marketing* (the major journal on public policy and legal aspects of marketing) between 1993 and 1995; (f) the 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award; (g) the 2002 American Marketing Association award for the Best Article in the area of

1

services marketing; (h) the 2012 elected Fellow of the Association for Consumer Research, and (i) winner in a competition dealing with research on the effectiveness of direct marketing programs, which was organized by the Direct Marketing Association and the Marketing Science Institute. In addition to these awards, my research has been widely cited by other researchers in the marketing, consumer behavior, and other fields, and my publication record has been ranked as one of the most prolific and influential.[1]

5.    I have published many articles in my career, which are listed in my attached C.V. Among those are four articles relating to trademark surveys and trademark infringement from the buyer's perspective. Two of those articles were published in the *Trademark Reporter*: "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test,"[2] and "An Empirical Investigation of the Meaning and Measurement of Genericness."[3] The third article, which was published in The *Journal of Public Policy & Marketing* and titled "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications,"[4] was selected (in 1997) as the Best Article published in that journal between 1993 and 1995. I have also co-authored a chapter on "Demand Effects in Likelihood of Confusion Surveys," in the ABA-published book entitled *Trademark and Deceptive Advertising Surveys*.[5]

---

1 *See, e.g.*, S. Seggie and D. Griffith (2009), "What does it take to get promoted in marketing academia? Understanding exceptional publication productivity in the leading marketing journals," *Journal of Marketing*, 73, 122-132.

[2]    Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," *Trademark Reporter*, 83 (3), 364-393.

[3]    Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," *Trademark Reporter*, 84 (2), 199-223.

[4]    Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," *Journal of Public Policy and Marketing*, 13(2), 181-199.

[5] Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," *Trademark and Deceptive Advertising Surveys*, Chapter 11, Shari Diamond and Jerre Swann, Eds., American Bar Association.

6.    At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing. I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing. In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7.    I have taught several doctoral courses. One doctoral course examines methods for conducting consumer research. It focuses on the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. A second doctoral course that I have taught focused on buyer behavior, covering such topics as buyer decision making processes, influences on purchase decisions, and persuasion. A third doctoral course that I have taught deals with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.    After completing my MBA studies and before starting the Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for two-way communications products. My work included (a) defining new products and designing marketing plans for new product introductions, (b) buyer and competitor analysis, and (c) sales forecasting.

9.    I have conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to consumer behavior and information processing, brand equity and strategies for building strong brands, trademark, branding, marketing strategies, and advertising-related issues. I serve on eight editorial boards, including leading journals such as the Journal of Consumer Research, Journal of Marketing Research, and the Journal of Consumer

3

Psychology. I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. I received (twice) the Outstanding Reviewer Award from the *Journal of Consumer Research*. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. And I have served as an expert in prior litigations involving various marketing and buyer behavior issues, class actions, trademark-related matters, false advertising, branding, and other areas. A list of cases in which I provided sworn testimony during the past four years is included in Exhibit B. I am being compensated at my standard rate of $750 an hour.

10.    I was asked by counsel for Jack Daniel's Properties, Inc. ("Jack Daniel's ") to evaluate, based on principles of consumer psychology and consumer processing of information about brands/marks whether VIP Products', LLC ["VIP"] "Bad Spaniels – The Old No. 2" dog toy ("Old No. 2") is likely to dilute through tarnishment the Jack Daniel's trade dress.

<u>SUMMARY OF CONCLUSIONS</u>

11.    An analysis based on principles of consumer psychology and the manner in which brands and marks, such as the trade dress of Jack Daniel's "Old No. 7," are represented in consumers' minds indicates that the association made by consumers between Jack Daniel's marks and VIP's "Old No. 2" is likely to dilute Jack Daniel's trade dress through tarnishment. In particular, regardless of Mr. Sacra's speculation that consumers share his view that Jack Daniel's takes itself too seriously and that associating the brand with the "Old No. 2" is funny and changes the brand's culture, the largely look-like trade dress associates Jack Daniel's trade dress with defecation; this added association effectively tarnishes and harms the brand by adding an unsavory association in consumers' minds.

12.    To understand the dilution by tarnishment process in this case, I review the currently accepted principles of how marks such as a famous trade dress are represented in memory. This framework is known in the scientific literature as the associative network

4

memory model, whereby the network includes the various brand associations in consumers' minds. There are a number of dimensions by which brand associations may be characterized, such as their (positive or negative) content. Because of the unmistakable (and intended) resemblance between VIP's Old No. 2 product and the Jack Daniel's trade dress, this unfavorable association is added to the mark's associative network in consumers' minds.

13.    Although Mr. Sacra may not be an expert on consumer psychology and he has not tested his assumptions regarding the impact of his Old No. 2 product on consumers, his testimony suggests that changing how consumers think about Jack Daniel's brands was his intention. As he explained during his deposition, Jack Daniel's thinks that it is the best and has created a culture around that, so he decided to make fun of the brand by associating it with defecation.

14.    This alleged "parody" targets those consumers familiar with Jack Daniel's (i.e., those likely to recognize the link between VIP's product and Jack Daniel's trade dress) and adds an unfavorable mental association in these consumers' minds, which is particularly damaging for a product that consumers drink. Thus, consciously and/or unconsciously, this added mental association is likely to create a less favorable affective reaction to the brand and harm the value of the mark's equity. Accordingly, while Jack Daniel's has invested great resources building a strong family of marks that provide important benefits for Jack Daniel's in the marketplace, an association with the Old No. 2 is likely to lower its marks' value. It will also harm the value of brand extensions (i.e., other Jack Daniel's brands, which are associated with the brand's flagship brand – the "Old No. 7") and interferes in Jack Daniel's ability to maintain and promote its favorable image and communications efforts.

## INTRODUCTION

15.    As I explain in this report, VIP's product and trade dress at issue (the "Bad Spaniels Label – the Old No. 2"), which was designed to resemble the trade dress of the classic "Jack Daniel's – Old. No. 7" whiskey is likely to dilute and tarnish the brand equity of this and

5

other Jack Daniel's products.  In particular, as explained below, the association between Jack
Daniel's brand with the "Bad Spaniels – the Old No. 2" damages the Jack Daniel's brand, creates
an image that is likely to be aversive to Jack Daniel's buyers, and interferes in Jack Daniel's
ability to maintain and promote its favorable image and communications efforts.

16.    Prior research as well as court decisions have examined other cases involving
dilution by tarnishment (whether or not they were formally filed as federal dilution by
tarnishment cases), though typically not involving defecation.  As Morrin and Jacoby (2000)[6]
discussed:

> Consider a similar situation in which, without evoking consumer confusion, a name is used
> as a parody of the original mark.  For example, a dog snack was introduced under the name
> Dogiva dog biscuits as a parody of Godiva chocolates (*Grey v. Campbell Soup Co.* 1986).
> Instances such as this one (which, like instances of blurring, do not involve consumer
> confusion),  are also considered instances of dilution by the Dilution Act.  They are
> distinguished from  instances of blurring, however, because they generally have some
> derogatory connotations, and  hence are referred to as cases of dilution by "tarnishment"
> (McCarthy 1992).  Other examples of  real-world tarnishment include a promotion for
> condoms using the American Express tag line  "Don't leave home without it" (*American
> Express Co. v. Vibra Approved Lab. Corp.* 1989), a  poster reading "Enjoy Cocaine" (*Coca-
> Cola Co. v. Gemini Rising, Inc.* 1972), bubble gum trading  cards featuring the Garbage Pail
> Kids (*Original Appalachian Artworks, Inc. v. Topps Chewing  Gum, Inc.* 1986), Roadkill

---

[6] See *Grey v. Campbell Soup Co.* (1986), 650 F. Supp. 1166, 1175 (C.D. Cal.), aff'd 830 F.2d 197 (9th Cir.
1987);  Maureen Morrin, Jacob Jacoby (2000), "Trademark Dilution: Empirical Measures for an Elusive
Concept," Journal of Public Policy & Marketing: Fall  Vol. 19, No. 2, pp. 265-276.  The subsequent
analysis of dilution by tarnishment as it applies in the present and other cases builds on prior published
research, including C. Pullig et al. (2006), "Brand Dilution: When Do New Brands Hurt Existing Brands?"
*Journal of Marketing*, 70, 52-66; Alexander Simonson (1993), "How and When Trademarks Dilute? ..",
*Trademark Dilution*, 83, 149-74; Boush et al. (1987), "Affect Generalization to Similar and Dissimilar
Brand Extensions," *Journal of Psychology & Marketing*, 4, 225-37; K. Keller (2003), *Strategic Brand
Management*, 2nd ed., Pearson; S. Hoeffler and K. Keller (2003), "The Marketing Advantages of Strong
Brands," *Brand Management*, 10, 421-45; B. Loken and D. John (1993), "Diluting Brand Beliefs: …,"
*Journal of Marketing*, 57, 71-84.

Helper (*General Mills, Inc. v. Johnson* 1983), Mutant of Omaha Nuclear Holocaust Insurance (*Mutual of Omaha insurance, Mutual of Omaha Ins. Co. v. Novak* 1987), and Michelob Oily (*Anheuser-Busch, Inc. v. Balducci Publications* 1994).

Similarly, the present case involves likelihood of dilution by tarnishment due to the unmistakable (and intended) resemblance of the allegedly diluting VIP product and Jack Daniel's flagship trade dress – the Old No. 7 (Black Label). It is different from most other dilution by tarnishment matters because the diluting image involves defecation, which is likely to be particularly aversive and even disgusting as it relates to a beverage.

17.    My analysis is based on well-established principles and prior research concerning the roles of brands, brand associations and representation in memory, brand equity, and the factors that influence consumers' responses to brands. I begin with a general overview of the functions and benefits of strong brands or marks such as a famous trade dress that has favorable associations in consumers' minds. I also explain the general and specific psychological mechanisms by which VIP's product at issue is likely to create dilution by tarnishment of Jack Daniel's trade dress and brand regardless of the likelihood of confusion between them.

## THE MEANING AND ADVANTAGES OF STRONG BRANDS

18.    Brand equity has been defined in different ways. One accepted definition (Keller 2003[7]) is that brand equity is the differential effect that brand knowledge has on consumer response to marketing activity. David Aaker (1991)[8] defined brand equity as including four key components: Brand awareness, brand associations, brand loyalty, and perceived quality.

19.    It is important to consider how knowledge about brands is organized and stored in memory. As explained in more detail below, a useful way to think about brand knowledge and organization is referred to in the scientific literature as the associative network memory

---

[7] K. Keller (2003), *Strategic Brand Management*, 2nd ed., Pearson

[8] D. Aaker (1991), *Managing Brand Equity*, Free Press.

model. According to this model, brand knowledge in memory can be represented as a network with various nodes. Different types of nodes may be linked to the brand to make up its network in memory. Moreover, there are a number of dimensions by which brand associations may be characterized, such as their positive or negative content and whether they are related to the brand or not. For example, the McDonald's brand network may be linked not just to fast food, hamburgers, and French fries, but also to children, Ronald McDonald's, the Golden Arches, the slogan "I'm loving it," and other mental associations. Some negative associations that were out of McDonald's control have likely harmed the brand. For example, at different times (including as recently as 2014), rumors have spread that McDonald's has used worms' meat in its hamburgers. One study found that marketing attempts to directly refute such rumors tend to be ineffective.[9] Just as is the case here, the favorability of the various associations of which consumers are aware is very important for consumers' evaluations of and responses to McDonald's services and communications efforts. I next elaborate on some of the advantages of strong brands.

20.    The reason that many companies spend great efforts and resources to build strong brands is that such brands have important advantages in terms of the manner in which consumers process information about them, respond to the brand, and respond to brand extensions that fall under the same brand umbrella, as well as in terms of consumers' willingness to pay for brands linked with the flagship brand. Also, consumers are more likely to pay attention to and later recall information about brands with favorable associations. Thus, it is easier for consumers to recognize, learn, and recall new information about high equity brands, including brand extensions.

---

[9] See A. Tybout, B. B. Calder, and Sternthal (1981), "Using Information Processing Theory to Design Marketing Strategies," *Journal of Marketing Research*, 18, 73-9 (see: http://www.cfs.purdue.edu/richardfeinberg/csr%20331%20consumer%20behavior%20%20spring%20 2011/grad/readings/7%20Using_Information_Processing_Theory_to_Design_Marketing_Strategies.pd f)

21.     Thus, strong, favorable brand equity has important implications for the in/effectiveness of key aspects of a brand's marketing activities.  As indicated, favorable brand associations can affect consumer brand evaluations, perceptions of quality, purchase rates, and market share.  This tendency may be especially apparent for difficult-to-assess "experience goods" whose quality can be assessed only after experience (or not even after experiencing it).  Similarly, assuming a consumer cannot try an ice cream flavor before buying and trying it, favorable associations based on brand name, for example, can play an important role in the decision whether to purchase that product.

22.     Furthermore, strong  brand equity and recognition have been shown to increase consumer confidence in the brand and mitigate the potential long term impact of negative brand experiences.  In addition, research has shown that that strong brands can extend more successfully and use the brand name to enter more diverse categories.

23.     Consumers differ in terms of the price and any premium they are willing to pay for one brand compared to others, which depends (consciously or unconsciously) on brand associations in memory.  Consumers may also differ in terms of how they respond to price increases.  In particular, research has demonstrated that strong brands can command greater price premiums and are more immune from negative responses to price increases.

24.     Marketing communications activities include advertising, consumer and trade promotions, public relations, event sponsorship, personal selling, and so on.  Consumers often differ in their willingness to pay attention to a brand's message, the manner by which they process brand messages, and their later ability to recall the content brand messages.  Strong brands rate highly on these dimensions.  Furthermore, strong brands are better able to withstand interference from competitive advertisements.  In addition, consumers who are highly loyal to a brand are more likely to increase purchases when advertising for the brand increases.

25.     In the present case, given the strength of Jack Daniel's marks and trade dress, it has much to lose from this process of tarnishment.  For example, one recent study compared

9

the Jack Daniel's brand with other leading brands in the spirits category. The results showed that Jack Daniel's compares favorably with these brands. That is, Jack Daniel's compares favorably in terms of unaided awareness, the brand potential index, brand awareness, and advertising awareness.

## THE IMPACT OF "BAD SPANIELS – OLD NO. 2" ON JACK DANIEL'S "OLD NO. 7" AND OTHER JACK DANIEL'S BRANDS

26.    In general, dilution may take two broad forms: (1) tarnishment and (2) blurring. One way to define "tarnishment" is as a lowered evaluation of a senior brand (e.g., Jack Daniel's) due to consumers' exposure to the junior brand (e.g., VIP's product at issue). Some of the damages of tarnishment are fairly obvious in that there is the attachment of a negative association to the senior brand. For example, in one case American Express slogan "Don't leave home without it" was used to promote condoms by another firm (*American Express Co. v. Vibra Approved Lab. Corp.* 1989). American Express believed that the association of condoms with its slogan could create a negative association for its traveler's check brand, even though there was likely no confusion that it was the maker of the condoms.

27.    The process that causes dilution by tarnishment operates in multiple ways. First, as discussed above, one accepted and useful way to think about brand knowledge and organization is based on the "associative network memory model." Suppose now that a prospective buyer of Jack Daniel's flagship brand (the Old No. 7) is exposed to VIP's product at issue; in that case, regardless of any confusion, the Jack Daniel's brand is likely to acquire a new, negative mental association that becomes part of the brand's associative network in memory. As a result, when the name Jack Daniel's comes up or a consumer is considering Jack Daniel's among other comparable brands, the Jack Daniel's flagship and related brands are likely to have a negative association and the negative feeling associated with it. Such a consumer is less likely to select the Jack Daniel's brands and may opt instead to choose an alternative.

28.    To elaborate on this process, consider how brand information, including the affiliated brands' trade dress, is stored in and retrieved from memory. The associative network model that brand information is encoded in long-term memory as a pattern of linkages between concept nodes (e.g., associations between the brand and its aspects). In the present case, VIP's product is now linked in people's minds to Jack Daniel's flagship brand. Although the two brands may not be related from the perspectives of ownership, business affiliation, or sponsorship, they are now related by the similar trade dress.

29.    A question that may arise is why would the consumer not simply use his or her knowledge that the brands are unrelated (assuming that were the case) to selectively "ignore" the junior ("Old No. 2") brand associations when thinking about the senior brand ("Old No. 7")? The answer has to do with the manner in which knowledge is retrieved from memory. When a stimulus such as a similar trade dress is encountered, its associations are activated according to their accessibility. Highly accessible associations contribute to an "automatic interpretation" of the construct. This automatic interpretation incorporates any associations of the similar junior trade dress. This automatic interpretation may be corrected through the consideration of less accessible associations or externally available information, such as the knowledge that the brands are unrelated. However, such correction requires cognitive effort, and as a result, under-correction is common (Jacoby 2001; Johar and Simmons 2000[10]). Thus, the accessibility of Jack Daniel's associations can be influenced by the associations of VIP's product, even if there is no confusion. Such a process of tarnishment negatively affects the likelihood that consumers consider and then choose the brand.[11]

---

[10] Jacoby, Jacob (2001), "The Psychological Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion, and Dilution," *The Trademark Reporter*, 91 (5), 1013–1071; Johar, Gita Venkataramani and Carolyn J. Simmons (2000), "The Use of Concurrent Disclosures to Correct Invalid Inferences," *Journal of Consumer Research*, 26 (March), 306–321.

[11] C. Pullig et al. (2006), "Brand Dilution: When Do New Brands Hurt Existing Brands?" *Journal of Marketing*, 70, 52-66.

11

30.    There is probably no dispute in the present case that VIP relied on trade dress resemblance to associate its product with those of Jack Daniel's. For example, during her deposition (pages 56-59), Ms. Phillips testified that she designed the VIP product to be similar in many respects to Jack Daniel's Old No. 7 trade dress. Thus, there is apparently no dispute that VIP's "Old No. 2" toy was designed to capture key elements of Jack Daniel's "Old No. 7" trade dress.

31.    As a result, VIP's product is likely to bring Jack Daniel's to mind. Furthermore, as explained above, consumers who are exposed to VIP's product add another mental association to the Jack Daniel's flagship brand and other Jack Daniel's brands. The new brand association – a dog's No. 2 – is negative, for many it is likely to be even disgusting. Prior research has shown that a feeling of disgust leads consumers to avoid things that are associated in any way with that feeling.[12] In the present case, this prior research supports the common sense conclusion that an association between a famous whiskey brand and a dog's no. 2 is likely, consciously or consciously, to diminish consumers' attraction to and interest in purchasing Jack Daniel's brands.

32.    Although VIP has conducted no studies to confirm its claim that associating Jack Daniel's brands with defecation is just fun, it apparently recognized that this product was designed to affect Jack Daniel's perceived quality. As Mr. Sacra testified (Rough transcript, p. 111):

A.  It's the entire aspect.  I mean, Jack Daniel's  has created a culture
around its product.  As do all -- most products try to create a culture
around that.  And  all people who are doing that take it pretty
seriously, I mean.  And by making fun of that or poking at them
saying, "Hey, you know what?  I know that you are over here trying

---

[12] See, for example, S. Han et al. (2012), "The Disgust-Promotes-Disposal Effect," *J.O. Risk and Uncertainty*, 44, 101-113; S. Han et al. (2007), "Feelings and Consumer Decision Making ...," *J.O. Consumer Psychology,* 17, 158-68.

to be the best of everything and dominate world. Well, here's

something funny."

Evidently, while Mr. Sacra assumed that associating Jack Daniel's marks with "Old No. 2" is pure

fun, he recognized that this "fun" goes against Jack Daniel's attempts to build a strong brand

and "culture." However, regardless of whether consumers find it funny, the added association

is unquestionably inconsistent with Jack Daniel's attempts to maintain its strong brand

associations (e.g., authenticity, masculinity).

      33.     It is especially inconsistent with the brand's objective of acquiring new buyers.

Such prospective buyers are likely to be particularly susceptible to influence by exposure to

negative brand associations such as those represented by VIP's product. Furthermore, while

my understanding is that Jack Daniel's makes every effort not to associate its brand with

underage consumers, families with kids and dogs are likely to be a key target market of VIP's

dog toy.

### THE IMPACT OF VIP'S "OLD NO. 2" ON JACK DANIEL'S BRAND EXTENSIONS

      34.     Jack Daniel's has already introduced a number of brand extensions, including the

following:

- *Gentleman Jack*: Charcoal filtered twice, compared to once with Old No. 7 (80 proof/40% ABV).

- *Single Barrel*: Whiskey sourced from a single barrel in the company's warehouse (94 proof/46% ABV).

- *Tennessee Honey*: Honey liqueur blended with less than 20% whiskey (70 proof/35% ABV).

- *Tennessee Fire*: Cinnamon liqueur blended with less than 20% whiskey (70 proof/35% ABV).

- *Green Label*: A lighter-bodied bottling of Old No. 7, not available everywhere (80 proof/40% ABV).

13

- *Silver Select*: For export only (100 proof/50% ABV).
- *Winter Jack*: Seasonal blend of apple cider liqueur and spices (30 proof/15% ABV).
- *No. 27 Gold*: Limited release (80 proof/40% ABV) [46]
- Sinatra Select

35.    As indicated, the negative associations of the "Old No. 2" are not limited to the trade dress of Jack Daniel's "Old No. 7" or just to the core Jack Daniel's brand.  Rather, the negative effect likely influences the entire family of Jack Daniel's brands, which are naturally associated with Jack Daniel's flagship brand and trade dress.  Instead of being judged on their own merit or perceived characteristics, (for those who have been exposed to VIP's product) the "Old No. 2" is likely to come to mind.  As a result, new and existing buyers are likely to be less receptive, not just to the Old No. 7, but also to new brand extensions.  That is, Jack Daniel's will have less influence over perceptions of its brand extensions, because of tarnishment and tainting by VIP's Old No. 2.  This further diminishes the value of Jack Daniel's trade dress.


Date: 5/7/2015

*I. Simonson*
_____
Itamar Simonson, Ph.D.

# Exhibit A

Itamar Simonson

**ADDRESSES**                                                  January 2015

Home:                                          Office:
 1561 Newlands Ave.                             Graduate School of Business
 Burlingame, CA 94010                            655 Knight Center, Stanford University
 (650) 343-3320                                Stanford, CA 94305-5015
Cell: (650) 387-7677                             (650) 725-8981
itamar.simonson@gmail.com                        itamars@stanford.edu


**EDUCATION**

Ph.D.                        Duke University, Fuqua School of Business
                             Major: Marketing;  May 1987

M.B.A.                       UCLA,  Graduate School of Management
                             Major: Marketing;  March 1978

B.A.                         Hebrew University, Jerusalem, Israel
                             Major: Economics, Political Science;  August 1976


**ACADEMIC POSITIONS**

July 1987 - June 1993   University of California, Berkeley
                             Haas School of Business
                             Assistant Professor

July 1993 – Aug. 1996   Stanford Graduate School of Business
                             Associate Professor of Marketing

Sept. 1996 – Aug. 1999       Stanford Graduate School of Business
                             Professor of Marketing

Sept. 1999 –    Present      Stanford Graduate School of Business
                             Sebastian S. Kresge Professor of Marketing

1994 – 2000                  Stanford Graduate School of Business
                             Marketing Group Head

2000, 2004, 2012             Visiting Professor of Marketing: MIT; NYU; Columbia

**AWARDS**

- Best Article in the *Journal of Consumer Research* during the period 1987-1989.

- The 1997 O'Dell Award (for the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years).

- The 2001 O'Dell Award.

- Finalist for the O'Dell Award: 1995; 2002; 2004; 2005; 2007; 2008; 2012.

- Best Article in the *Journal of Public Policy & Marketing* during the period 1993-1995.

- Elected Fellow of the Association for Consumer Research.

- The 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award.

- The 2002 American Marketing Association Award for the Best Article on Services Marketing.

- The Association for Consumer Research 1990 "Ferber Award."

- Finalist for the 2003 Paul Green Award (for the *Journal of Marketing Research* article with the greatest potential to contribute to the practice of marketing research).

- Runner-up for the 2005 *Journal of Consumer Research* Best Article Award.

- Winner in the Marketing Science Institute and Direct Marketing Association competition on "Understanding and Measuring the Effect of Direct Marketing."

- Runner-up for the 1993 *California Management Review* Best Article Award.

- National Science Foundation Grant (for 1996-8).

- Outstanding Reviewer Award, *Journal of Consumer Research*, 2005, 2009.

- Honorable Mention for the Sloan Executive Program Teaching Award.


**TEACHING EXPERIENCE**

Stanford University:

       Marketing Management  (for MBAs and the Sloan Executive Program)

       Marketing to Businesses (for MBAs);  Technology Marketing  (for MBAs)

       Critical Analytical Thinking (for MBAs)

       Research Methods for Studying Buyer Behavior  (a Ph.D. Course)

       Decision Making  (a Ph.D. Course)

       Consumer Behavior (a Ph.D. course)

University Of California, Berkeley:

       MBA, Ph.D. and Executive Education Classes on Marketing Management and Consumer Behavior.

## BUSINESS EXPERIENCE

October 1978-August 1983    Motorola, Inc.
Worked in an international subsidiary; responsibilities included marketing research and customer analysis, definition of new products, pricing, analysis of sales force performance, competitive intelligence, and forecasting.  Conducted studies of markets for various communications products.  Last two years served as Product Marketing Manager for communications products.

## Consulting:

Consulted for clients from a wide range of industries such as technology, communications, services, and manufacturing sectors.
Expert witness assignments: trademark infringement, deceptive advertising, surveys, consumer behavior, marketing management, branding, retailing, distribution, assessment of demand drivers and feature value, and other marketing issues.

## PUBLICATIONS

Itamar Simonson (2015), "Mission (Largely) Accomplished:  What's Next for Consumer BDT-JDM Researchers?" *Journal of Marketing Behavior*; in press.

Itamar Simonson (2015), "The BDT Effect and Future:  A Reply to John Lynch and Norbert Schwarz" *Journal of Marketing Behavior*; in press.

Itamar Simonson (2014), "Vices and Virtues of Misguided Replications:  The Case of Asymmetric Dominance," *Journal of Marketing Research*; 51 (4), 514-9.

Itamar Simonson and Emanuel Rosen (2014), *Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information*, HarperCollins Publishers.

Itamar Simonson and Emanuel Rosen (2014), "What Marketers Misunderstand About Online Reviews," *Harvard Business Review*, January, 23-5.
(*HBR Blog*:  "Three Long-Held Concepts Every Marketer Should Rethink," January 22, 2014)

Leilei Gao, YanLiu Huang, and Itamar Simonson (2014), "The Influence of Initial Possession Level on Consumers' Adoption of A Collection Goal: A Tipping Point Effect," *Journal of Marketing,* 78, 143-156.

Aner Sela, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, Vol. L (December), 691-705.

Itamar Simonson, James Bettman, Thomas Kramer, and John Payne (2013), "Comparison Selection: An Approach to the Study of Consumer Judgment and Choice," *Journal of Consumer Psychology*, 23(1), 137-149.

Itamar Simonson, James Bettman, Thomas Kramer, and John Payne (2013), "Directions for Judgment and Decision Making Research Based on Comparison Selection:  Reply to Arkes, Johnson, and Kardes," *Journal of Consumer Psychology*, 23(1), 161-3.

Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Ch. 11 in *Trademark and False Advertising Surveys*, Edited by Shari Diamond and Jerre Swann, American Bar Association.

Thomas Kramer, Michal Maimaran, and Itamar Simonson (2012), "Asymmetric Option Effects on Ease of Choice Criticism and Defense," *OBHDP*, 117, 179-91.

Michal Maimaran and Itamar Simonson (2011), "Multiple Routes to Self Versus Other-Expression in Consumer Choice," *Journal of Marketing Research*, August, 755-66.

Itamar Simonson and Aner Sela (2011), "On the Heritability of Consumer Decision Making: An Exploratory Approach for Studying Genetic Effects on Judgment and Choice," *Journal of Consumer Research*, 37, 951-66.

Stephen Nowlis, Ravi Dhar, and Itamar Simonson (2010), "The Effect of Decision Order on Purchase Quantity Decisions," *Journal of Marketing Research*, 40 (4), 725-737.

Chezy Ofir, Itamar Simonson, and Song-Oh Yoon (2009), "The Robustness of the Effects of Consumers' Participation in Market Research: The Case of Service Quality Evaluations," *Journal of Marketing*, 73 (November), 105-14.

Aimee Drolet, Mary Frances Luce, and Itamar Simonson (2009), "When Does Choice Reveal Preference? Moderators of Heuristic vs. Goal Based Choice," *Journal of Consumer Research*, 36 (1).

Itamar Simonson (2008), "Regarding Inherent Preferences," *Journal of Consumer Psychology*, 18, 191-196.

Itamar Simonson (2008), "Will I Like a 'Medium' Pillow? Another Look at Constructed and Inherent Preferences," *Journal of Consumer Psychology*, 18, 155-169.

Song-Oh Yoon and Itamar Simonson (2008), "The Context of Construction as a Determinant of the Strength and Stability of Consumer Preferences," *Journal of Consumer Research*, 35, September, 324-336.

Itamar Simonson (2007), "Decision Making," *Encyclopedia of Social Psychology*; Sage.

Jonah Berger, Michaela Draganska, and Itamar Simonson (2007), "The Influence of Product Variety on Brand Perceptions, Choice, and Experience," *Marketing Science*, 26, July-August, 460-72.

Nathan Novemsky, Ravi Dhar, Norbert Schwarz, and Itamar Simonson (2007), "Preference Fluency in Choice," *Journal of Marketing Research*, XLIV, 347-356.

Chezy Ofir and Itamar Simonson (2007), "The Effect of Stating Expectations on Customer Satisfaction and Shopping Experience," *Journal of Marketing Research*, February, 164-174.

Ray Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2007), "Racial Preferences in Dating," *Review of Economic Studies*, 75, 1, 117-132.

Raymond Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2006), "Gender Differences in Mate Selection: Evidence from a Speed Dating Experiment," *Quarterly Journal of Economics*, 121 (2), 673-697.

Itamar Simonson (2005), "Determinants of Customers' Responses to Customized Offers: Conceptual Framework and Research Propositions," *Journal of Marketing*, 69 (January), 32-45.

Itamar Simonson (2005), "In Defense of Consciousness: The Role of Conscious and Unconscious Inputs in Consumer Choice," *Journal of Consumer Psychology*,15(3), 211-217.

Donnel Briley, Michael Morris, and Itamar Simonson (2005), "Cultural Chameleons: Biculturals, Conformity Motives, and Decision Making," *Journal of Consumer Psychology*, 15 (4), 351-362.

Uptal Dholakia and Itamar Simonson (2005), "The Effect of Explicit Reference Points on Consumer Choice and Online Bidding Behavior," *Marketing Science*, 24, 206-17.

Itamar Simonson, Thomas Kramer, and Maia Young (2004), "Effect Propensity," *Organizational Behavior and Human Decision Processes*, 95 (November), 156-74.

Itamar Simonson and Aimee Drolet (2004), "Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," *Journal of Consumer Research*, 31 (December), 681-90.

Ran Kivetz and Itamar Simonson (2003) "The Idiosyncratic Fit Heuristic: The Role of Effort Advantage in Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40 (November), 454-67.

Dan Ariely and Itamar Simonson (2003), "Buying, Bidding, Playing, or Competing? Value Assessment and Decision Dynamics in Online Auctions," *Journal of Consumer Psychology*, 13(1&2), 113–123.

Ravi Dhar and Itamar Simonson (2003), "The Effect of Forced Choice on Choice," *Journal of Marketing Research*, 40 (May), 146-60.

Ran Kivetz and Itamar Simonson (2002), "Self Control for the Righteous: Toward a Theory of Luxury Pre-Commitment," *Journal of Consumer Research*, 29 (September), 199-217.

Ran Kivetz and Itamar Simonson (2002), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39 (May), 155-70.

Chezy Ofir and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," *Journal of Marketing Research*, 38 (May), 170-82.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, and Stephen Nowlis (2001), "Consumer Research: In Search of Identity," *Annual Review of Psychology*, 52, 249-275.

Donnel Briley, Michael Morris, and Itamar Simonson (2000), "Reasons as Carriers of Culture: Dynamic Vs. Dispositional Models of Cultural Influence on Decision Making," *Journal of Consumer Research*, 27 (September), 157-178.

Aimee Drolet, Itamar Simonson, and Amos Tversky (2000), "Indifference Curves that Travel with the Choice Set," *Marketing Letters*, 11(3), 199-209.

Stephen Nowlis and Itamar Simonson (2000), "Sales promotions and the Choice Context as Competing Influences on Consumer Decision Making," *Journal of Consumer Psychology*, 9(1), 1-17.

Ran Kivetz and Itamar Simonson (2000), "The Effect of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-48.

Itamar Simonson and Stephen Nowlis (2000), "The Effect of Explaining and Need for Uniqueness on Consumer Decision Making:  Unconventional Consumer Choices Based on Reasons," *Journal of Consumer Research*, 27 (June), 49-68.

Itamar Simonson (1999), "The Effect of Product Assortment on Consumer Preferences," *Journal of Retailing*, 75(3), 347-70.

Ravi Dhar and Itamar Simonson (1999), "Making Complementary Choices in Consumption Episodes:  Highlighting Versus Balancing" *Journal of Marketing Research*, 36 (February), 29-44.

Houghton, David, ..., and Itamar Simonson (1999), "Correction Processes in Consumer Choice," *Marketing Letters*, 10(2),107-112.

Ziv Carmon and Itamar Simonson (1998), "Price-Quality Tradeoffs in Choice Versus Matching: New Insights into the Prominence Effect," *Journal of Consumer Psychology*, 7(4), 323-343.

Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," *Journal of Marketing Research*, 34 (May), 205-218.

Joel Huber, ..., and Itamar Simonson (1997), "Thinking About Values in Prospect and Retrospect: Maximizing Experienced Utility," *Marketing Letters*, 7, 324-334.

Stephen Nowlis and Itamar Simonson (1996), "The Impact of New Product Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46.

Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," *Journal of Public Policy and Marketing*, 13(2), 181-199.

Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness,"  *Trademark Reporter*, 84 (2), 199-223.

Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice,"  *Marketing Science*, 13 (1), 23-40.

Itamar Simonson (1993), "Get Closer to Your Customers by Understanding How They Make Choices," *California Management Review*, 35 (4), 68-84.

Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," *Trademark Reporter*, 83 (3), 364-393.

Itamar Simonson, Stephen Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," *Marketing Science*, 12 (4), 357-377.

Itamar Simonson, Stephen Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," Journal of Consumer Psychology, 2 (3), 287-306.

Eldar Shafir, Itamar Simonson, and Amos Tversky (1993), "Reasons-Based Choice," *Cognition*, 49, 11-36.

Amos Tversky and Itamar Simonson (1993), "Context-Dependent Preferences," *Management Science*, 39 (10), 1179-1189.

Itamar Simonson (1992), "Influences of Anticipating Regret and Responsibility on Purchase Decisions," *Journal of Consumer Research*, 19 (June), 105-118.

Itamar Simonson and Peter Nye (1992), "The Effect of Accountability on Susceptibility to Decision Errors", *Organizational Behavior and Human Decision Processes*, 51 (3), 416-446.

Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29 (August), 281-295.

Itamar Simonson and Barry Staw (1992), "De-Escalation Strategies: A Comparison of Techniques for Reducing Commitment to Losing Courses of Action," *Journal of Applied Psychology*, 77 (4), 419-426.

Itamar Simonson and Russell S. Winer (1992), "The Influence of Purchase Quantity and Display Format on Consumer Preference for Variety," *Journal of Consumer Research*, 19 (June), 133-138.

Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," *Journal of Marketing Research*, 29 (November), 430-440.

William T. Ross and Itamar Simonson (1991), "Evaluations of Pairs of Experiences: A Preference for Happy Endings," *Journal of Behavioral Decision Making*, 4(4), 273-282.

Itamar Simonson (1991), "The Effect of Buying Decisions on Consumers' Assessments of Their Tastes", *Marketing Letters*, 2, 1, 5-14.

Itamar Simonson (1990), "The Effect of Purchase Quantity and Timing on Variety Seeking Behavior," *Journal of Marketing Research*, 27 (May), 150-162.

Itamar Simonson (1989), "Choice Based on Reasons: The Case of Attraction and Compromise Effects," *Journal of Consumer Research*, 16 (September), 158-174.

Itamar Simonson, Joel Huber, and John Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", *Journal of Consumer Research*, (March), 14,4, 566-78.

## ARTICLES UNDER REVIEW

Leilei Gao and Itamar Simonson, "Buying First and Choosing First: The Impact of Decision-Making Order on Consumer Choice"

Itamar Simonson, Aimee Drolet, and Aner Sela, "Construction Disposition: The Case of Compromising."

Leilei Gao and Itamar Simonson, "Whether versus Which to Buy: Decision Dynamics as a Driver of Purchase Likelihood

Haiyang Yang, Ziv Carmon, and Itamar Simonson, "The Preference for Practical Knowledge: Its Conceptualization, Measurement, and Ability to Predict Consumer Behaviors."

Wendy Liu and Itamar Simonson, "Jeopardy! Understanding the Beat-the-Incumbent Choice Process."

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson "The Prominence Detraction Hypothesis: Context Effects as a Function of Attribute Prominence."

Itamar Simonson and Emanuel Rosen, "Consumer Decision Making in an Information-Rich Socially-Intensive Environment."

**Doctoral Dissertations Chaired:**

Ravi Dhar (Chaired Professor, Yale U.)
Aimee Drolet (Chaired Professor, UCLA)
Stephen Nowlis (Chaired Professor, Washington U., St. Louis)
Ziv Carmon (Chaired Professor, INSEAD)
Ran Kivetz (Chaired Professor, Columbia U.)
Donnel Briley (Professor, U.O. Sydney)
Thomas Kramer (Tenured Associate Professor, U.O. South Carolina)
Wendy Liu (Tenured Associate Professor, U.O. Calif., San Diego)
Sanjay Sood (Tenured Professor, UCLA)
Song-Oh Yoon (Assistant Professor, Korea U.)
Michal Maimaran (Clinical Assistant Professor, Kellogg School)
Leilei Gao (Assistant Professor, Chinese University, Hong Kong)
Aner Sela (Assistant Professor, U. O. Florida)
Jonah Berger (Tenured Associate Professor, Wharton School, U.O. Penn.)

**EDITORIAL ACTIVITIES**

Editorial Boards: *Journal of Marketing Research, Journal of Consumer Psychology, Journal of Marketing, Journal of Consumer Research, Journal of Behavioral Decision Making, International Journal of Research in Marketing, Journal of Marketing in Emerging Economies, Marketing Letters, Journal of Academy of Marketing Science, Review of Marketing Research.*

Reviewer for *Marketing Science, Journal of Economic Behavior and Organization, Science, Management Science, Journal of Retailing and Consumer Services, Journal of Marketing, Journal of Retailing, Organizational Behavior and Human Decision Processes, Journal of Experimental Psychology, Psychological Review, Psychological Bulletin, Journal of Personality and Social Psychology, Psychological Science, California Management Review, Journal of Economic Psychology, European Journal of Social Psychology, Journal of Judgment and Decision Making, Medical Decision Making,* and National Science Foundation.

**PROFESSIONAL AFFILIATIONS**

> Association for Consumer Research
> Judgment and Decision Making Society
> American Psychological Society

**PERSONAL DATA**

Birth Date:          December 25, 1951
Marital Status:      Married, 2 children

# Exhibit B

EXHIBIT B

Cases in which Dr. Itamar Simonson Testified as an Expert at Trial (including written expert reports submitted to the court) or by Deposition in the Past Four Years

1. The Hershey Company v. Promotion in Motion (Dist. of NJ; 07-CV-1601) (trial)

2. Car Freshner v. Exotica Fresheners (SDNY; 14-CV-391) (deposition)

3. Keurig, Incorporated v. Sturm Foods, inc. (Dist. of Del.; 10-cv-008411490) (deposition)

4. Quia Corp. v. Mattel, Inc. (North. Dist. of CA; C 10-1092 JF) (deposition).

5. Sharp Corp. v. Dell, Inc. (Dist. of NJ; 08-CV-05088) (deposition; testimony at a court hearing).

6. BDO Remit v. Stichting BDO (Cent. Dist. CA West. Div., 1104054 MMM) (trial).

7. Romag Fasteners, Inc. v. Fossil Inc. et al. (Dist. of Conn.; 3: 10CV1827) (deposition).

8. Laura McCabe et al. v. Six Continents Hotels, Inc. (No. Dist. of CA, SF Div., 12–cv–04818 NC) (deposition).

9. Mobilemedia Ideas v. Research in Motion Limited (Nor. Dist. of TX; Dallas Div.; 3:11-CV-2353-N) (deposition)

10. Dongguk University v. Yale University (Dist. of CT; 3:08-CV-00441). (deposition)

11. Gucci America, Inc. v. Guess?, Inc. (S.D.N.Y.; 09-cv-4373).

12. GeoTag, Inc. v. AT&T et al. (Nor. Dist. of Texas, Dallas Div.; 2:10-CV-57O) (deposition)

13. POM Wonderful LLC Marketing and Sales Practices Litigation (Cent. Dist. of CA; 2:10-ml 2199-DDP

14. Poquito Mas Licensing Corp. v. Taco Bell Corp. (Cent. Dist. of CA; 8:13-CV-01933) (deposition)

15. Whirlpool Corp. Front-Loading Washer Products Liability Litigation (Nor. Dist. Ohio; 1:08-wp-65000; MDL 2001) (trial).

16. Playtex Products, LLC v. Munchkin, Inc. (Cent. Dist. CA; CASE NO. CV 11-0503 AHM (RZX) (trial)

17. Tria Beauty, Inc. v. Radiancy, Inc. (No. Dist. of CA, SF Div.; C 10-5030 RS).

- 1 -

18. (on behalf of <u>Sound Exchange</u>) In the Matter of Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (United States Copyright Judges, Washington, D.C., trial).

19. Timelines, Inc. v. <u>Facebook, Inc</u>. (No. Dist. of IL., 11 CV 6867) (deposition)

20. Under Armour, Inc. v. <u>Body Armor Nutrition</u> (Dist. of MD, Baltimore Div.; 1:12-01283-JKB) (deposition).

21. <u>Fage Dairy Processing Industry, S.A.</u> v. General Mills, Inc. (Nort. Dist. of NY; 6:11-cv-01174) (deposition)

22. <u>Fox Broadcasting Company et al</u>. v. Dish Network (Cent. Dist. of CA; 12-04529) (deposition)

23. Skye Astiana et al. v. <u>Kashi Company</u> (South. dist. of CA; 11-CV-1967-HBGS) (deposition)

24. Edward Tovey v. <u>Nike, Inc</u>. (Nor. Dist. of Ohio; 1:12 CV 448) (deposition)

25. RPI v. <u>Apple Inc.</u> (No. Dist. of NY, Albany Div.; 1:13-CV-633) (deposition)

26. <u>WNET, ABC et al.</u> (Broadcast networks) v. Aereo, Inc. (SDNY; 12-cv-1540)

27. Prism Technologies v. <u>AT&T Mobility</u> (Dist. of Nebraska; 8:12CV122) (deposition)

28. <u>Western Sugar Cooperative et al.</u> v. Archer-Daniels-Midland Company et al. (Cent. Dist. of CA, CV11-3473-CBM) (deposition)

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2015, I served the foregoing EXPERT

REPORT OF DR. ITAMAR SIMONSON on the parties identified below in the

manner identified below:

### VIP Products LLC (via Electronic Mail and First Class Mail)

David G. Bray, Esq.
DICKINSON WRIGHT, PLLC
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Direct Line: 602-285-5033
DBray@dickinsonwright.com

Christopher C. Larkin