Exhibit 3

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ARIZONA
 3
 4   VIP PRODUCTS, LLC, an Arizona   )
 5   limited liability company,      )
 6    Plaintiff and Counterdefendant,)
 7                  vs.              ) Case No.
 8   JACK DANIEL'S PROPERTIES, INC., ) CV-14-2057-PHX-SMM
 9   a Delaware corporation,         )
10   Defendant and Counterclaimant.  )
11   _____
12
13
14           DEPOSITION OF BRUCE G. SILVERMAN
15              Los Angeles, California
16             Thursday, August 13, 2015
17                    Volume 1
18
19
20   Reported by:
21   WENDY S. SCHREIBER
22   CSR No. 3558
23   Job No. 2117367
24
25   PAGES 1 - 260
```

Page 1

1    Exhibit 101.

2          THE WITNESS:  Jack Daniel's.  I should know

3    that by now.

4    BY MR. LARKIN:

5        Q.   Do you recall reviewing at some point in

6    connection with your engagement in this case certain

7    documents produced by Jack Daniel's or generated by

8    Brown-Forman Corporation?

9        A.   Yes.

10       Q.   I want to go quickly through your background

11   that's set forth in considerable detail in your

12   report.

13          When did you graduate from college?

14       A.   1966.

15       Q.   Where did you go?

16       A.   I graduated from Adelphi University,

17   A-D-E-L-P-H-I, which is in Garden City, New York.

18       Q.   What did you receive a degree in?

19       A.   Bachelor of arts in history.

20       Q.   Did you study business while you were an

21   under grad at Adelphi?

22       A.   No, I actually intended to be a lawyer.

23       Q.   When you graduated from Adelphi, did you

24   enter law school?

25       A.   I did.

Veritext Legal Solutions
866 299-5127

1      Q.    Where did you go?

2      A.    Albany Law School in Albany, New York.  It's

3   part of Union University.

4      Q.    Did you graduate from Albany Law School?

5      A.    No.

6      Q.    How many years did you attend?

7      A.    Just one.

8      Q.    Do you have any degrees beyond a bachelor of

9   arts?

10     A.    No.

11     Q.    Have you had any formal education beyond

12  your four years at Adelphi and your one year at

13  Albany Law School?

14     A.    I attended a three-month program at Harvard

15  University at the business school of Harvard

16  University which was -- the best -- I don't know if

17  they still do these things but it was a sort of very

18  foreshortened executive MBA program for working

19  professionals.  The company that I worked for at

20  that time sent me there, paid for it, paid all of my

21  expenses, et cetera, and the program was really

22  designed for people like me who didn't have formal

23  business training but who had reached certain levels

24  within their companies where it would be beneficial

25  to them to get some fundamentals down because they

Veritext Legal Solutions
866 299-5127

1    expert?

2        A.    I recently updated my C.V.  I didn't update

3    it on my website, I updated it in my computer.    In

4    going through it I came across one case that I

5    worked on that for some reason wasn't in this

6    listing that I had just somehow omitted, except I

7    can't remember what the case is and I can't remember

8    what the subject was at this point.

9        Q.    Okay.

10       A.    But in general these are all the trademark

11   cases.

12       Q.    Okay.  And there are other cases in other

13   subject areas, too, such as false and misleading

14   advertising and so on?

15       A.    Yes.

16       Q.    Did you testify on the issue of dilution in

17   any of the trademark cases in which you served as an

18   expert?

19       A.    No.

20       Q.    In any of the trademark cases listed in

21   Exhibit 103 did you conduct focus groups?

22       A.    No.

23       Q.    Did you conduct focus groups in any of the

24   cases listed in Exhibit 103?

25       A.    No.

Veritext Legal Solutions
866 299-5127

1    Q.   Is it correct that this case -- your

2    retention in this case is the first time that you

3    have conducted focus groups for purposes of expert

4    testimony?

5    A.   That's correct.

6    Q.   Were there focus groups offered as evidence

7    in any of the cases -- by any party in any of the

8    cases listed in Exhibit 103?

9    A.   Not to my knowledge.

10    Q.   Are you aware of any case in which a court

11    has accepted a focus group as evidence of

12    infringement or dilution?

13    A.   I'm not an attorney.  I wouldn't answer

14    that.

15    Q.   Whether or not you're an attorney, you're

16    not aware of any case in which a court has accepted

17    a focus group as evidence of dilution or

18    infringement?

19    A.   As I said, I wouldn't -- I wouldn't know.  I

20    don't follow court decisions.

21    Q.   Did you do any sort of studies or surveys or

22    generate any empirical data in any of the cases

23    involving trademark infringement in which you served

24    as an expert?

25    A.   I did not conduct surveys.  In a number of

Page 46

1    considered empirical data or not but I certainly

2    would rely on it.

3        Q.   You didn't -- in any of the trademark cases

4    on which you served as an expert, did you conduct

5    any sort of study or research to help you formulate

6    your opinions on what consumer takeaway from

7    exposure to a product or an ad would be?

8        A.   I don't think so.  My opinions were offered

9    based on my experience very specifically in a

10   related category or in a specific category.  For the

11   most part my opinions seem to hold water.

12       Q.   Let's go quickly through the trademark cases

13   listed in Exhibit 103 and I'd like you just to tell

14   me for each of the ones sort of the general nature

15   of your opinion in this case.  I don't need detail

16   and I don't need what happened and so on.  I just

17   want to get a sense from you of what issue you were

18   asked to look at in each of those cases.

19            I think the first one is -- at least the

20   first one on the list -- Rudolph Bonetati vs. Moran.

21   Do you see that?

22       A.   Yes.

23       Q.   What was the general nature of your opinion

24   there?

25       A.   Basically there were two companies operating

Veritext Legal Solutions
866 299-5127

```
 1        A.    That's correct.
 2        Q.    And the first page of Exhibit 104, SIL 001,
 3   is just a cover page with a caption?
 4        A.    That's correct.
 5        Q.    The body of Exhibit 104 is your report in
 6   this case, correct?
 7        A.    Yes.
 8        Q.    Turn to paragraph 24 on numbered page 8 in
 9   your report.
10        A.    Yes.
11        Q.    Four lines down in that paragraph you wrote,
12   "...the opinions he..." -- Dr. Simonson --
13   "...offers in this matter are not based on empirical
14   data.  He did not conduct a quantitative or
15   qualitative consumer survey."
16              Do you see that?
17        A.    Yes.
18        Q.    Is it your opinion that expert opinions on
19   issues like likelihood of confusion or dilution must
20   be based on empirical data to be valid?
21        A.    No.
22              MR. BRAY:   Objection to form.
23   BY MR. LARKIN:
24        Q.    Do they need to be based on a quantitative
25   or qualitative survey to be valid?
```

Veritext Legal Solutions
866 299-5127

1            MR. BRAY:  Objection to form.

2            THE WITNESS:  No.

3    BY MR. LARKIN:

4        Q.   Have you offered in your previous services

5    as an expert an expert opinion in a trademark case

6    without a quantitative or qualitative consumer

7    survey?

8        A.   I have.

9        Q.   In fact, if I remember your testimony

10   correct, I think that you've done that on every

11   trademark case in which you've served as an expert?

12       A.   I believe that would be correct.

13       Q.   Is that also correct for the non-trademark

14   cases in which you have offered expert opinions,

15   you've done them without a quantitative or

16   qualitative consumer survey?

17       A.   I think in some of those cases -- I'd have

18   to go through that list again -- but I think in some

19   of those cases I had access to surveys that had been

20   done and I reviewed those surveys and that helped me

21   form my opinion.  It was one of them -- would be --

22   it wasn't obviously entirely based on the survey.

23   The survey had the wrong report.

24       Q.   Do you remember how many cases that occurred

25   in?

                                      Page 68

1   this case?

2       A.   Not part of my assignment.  I stick to my

3   assignment.

4       Q.   Have you ever reviewed any academic

5   literature about how dilution may occur?

6       A.   The closest I've come to academic literature

7   on that subject is reading Dr. Simonson's report.

8       Q.   Did you review any of the source materials

9   that were cited in Dr. Simonson's report?

10      A.   No.

11      Q.   Are you familiar with any of them?

12      A.    I've read David Aaker's book who he

13  mentions, although I think he mentioned that in the

14  context of what branding is all about.  I think

15  there was another book that he mentioned that I've

16  also read -- in fact, I have copies of -- that I

17  sometimes cite pretty much the same way he cites it.

18  I didn't -- I certainly never read the stuff about

19  the psychological approach that he bases his opinion

20  on.

21      Q.   Other than the Aaker book and the other book

22  you just referenced, you have never reviewed any of

23  the academic literature that Dr. Simonson cited?

24      A.   I don't think so.

25      Q.   In paragraph 17 of your report -- that's

Page 72

1    Exhibit 104 -- at the top of page 7 --

2        A.    Whoops, wait a minute.

3        Q.    Paragraph 17.

4        A.    I thought you said page 17.

5        Q.    Paragraph 17 which begins on page 6 and

6    bleeds over onto page 7.  In that paragraph you

7    said, "I have observed more than 3,500 focus group

8    sessions as well, including..." -- I'm sorry.

9        A.    Let me just get it.  I had the wrong pile.

10        Q.    It's the top of page 7.

11        A.    Got it.

12        Q.    You state, "I have observed more than 3,500

13    focus group sessions as well, including many groups

14    in which alcoholic beverages (whiskey, vodka, beer

15    and wine) and pet products were at issue."

16            Were any of those focus groups ever used in

17    any manner in litigation?

18        A.    Not to my knowledge.

19        Q.    Focus groups are a -- -- as part of your

20    criticism of Dr. Simonson's report in paragraph 24

21    of your report, you referenced quantitative and

22    qualitative consumer surveys.  Focus groups are a

23    form of qualitative consumer research; is that

24    correct?

25        A.    That's correct.

Veritext Legal Solutions
866 299-5127

1    Q.   How do they differ from what you refer to in

2    paragraph 24 as a quantitative survey?

3    A.   A quantitative study, as the name implies,

4    involves using large numbers of respondents that are

5    broken into appropriate demographic groups and

6    sometimes psychographic groups to get a

7    statistically --

8    Q.   It's a tough word.

9    A.   I hate that word.  -- statistically-reliable

10   number that gives you theoretically an answer to a

11   question.

12        Qualitative studies are used far more than

13   quantitative studies to get at thoughts and feelings

14   because thoughts and feelings are very difficult to

15   get at through quantitative studies.  The nature of

16   quantitative studies is you just have to interview

17   so many people that today in most instances

18   quantitative studies are done via the Internet.  So

19   it's a matter of consumers answering on a scale of 1

20   to 7 or 1 to 10, and you obviously have no

21   opportunity to interact.  You have no opportunity to

22   see physical reactions.  So both qualitative and

23   quantitative studies research techniques are very

24   useful.  Qualitative studies are very rarely

25   projectable.  I've seen qualitative studies

Page 74

1    involving interviewing so many people that you

2    probably could make the case for them to be

3    projectable but I don't know any market researchers

4    that would actually do it.  But it's a tool.  And

5    it's a very important tool, as I previously

6    testified.  It's one of the reasons that that crazy

7    number there is 3,500.  You live with it.  And

8    it's -- besides being useful for a given assignment,

9    it contributes a lot to forming expertise by people

10   like me.

11        Q.   In paragraph 17 of your report -- that's on

12   page 6 -- you stated, "In addition to deriving

13   useful information from the thousands of

14   quantitative studies I reviewed related to my

15   client's products and competitors..."  Have you,

16   in fact, throughout the course of your career

17   reviewed thousands of quantitative studies?

18        A.   I have.  Most of those studies have to do

19   with awareness and attitudes towards advertising,

20   very specifically towards advertising campaigns,

21   whether people have been watching them, whether they

22   understand them, whether they have issues with them,

23   et cetera.  I've worked most of my career on very

24   large brands that invested millions of dollars

25   annually in research to make sure that the hundreds

Veritext Legal Solutions
866 299-5127

1    of millions of dollars that are being spent on

2    advertising were being as well spent as possible.

3            THE REPORTER:  Excuse me, my computer just

4    took a dive so I need to go off the record.

5                    (Recess taken.)

6    BY MR. LARKIN:

7        Q.   Did I understand your last answer correctly,

8    Mr. Silverman, that most of the quantitative studies

9    that you've reviewed were advertising-recognition

10   studies?

11       A.   Well, I wouldn't say that it was all but

12   certainly a lot of the studies were designed to

13   track advertising, track awareness and track

14   attitudes towards corporations and brands.  Many of

15   the other studies were marketing studies about, you

16   know, given product categories.  Others were more or

17   less general studies about consumer purchasing

18   behavior, particularly consumer media usage

19   behavior, et cetera.  Again, in the positions that I

20   held in the advertising business I think, including

21   what I do now, information is the life blood of what

22   we do.

23       Q.   Do you agree that focus groups don't

24   replicate a purchase environment for a product?

25       A.   In most instances they do not.

Veritext Legal Solutions
866 299-5127

1    Q.   You agree that in most instances they aren't

2  intended to do that?

3    A.   That's correct, I would agree.

4    Q.   In paragraphs 23 and 25 of your report --

5  that's on page 8 and 9 respectively --

6    A.   I'm hearing you but I'm not listening.

7    Q.   In paragraph 23 you ask two questions:  "But

8  what if consumers do not think about VIP's Bad

9  Spaniels dog toy as Dr. Simonson (and his clients)

10  assumes they do?  What if defecation does not play a

11  significant role in their thinking about the toy or

12  how they associate it with Jack Daniel's?"

13         And then over on 25 -- paragraph 25 you ask

14  the question, "But does its labeling conjure up the

15  sense of disgust Dr. Simonson assumes it does?

16  Would a reasonable Jack Daniel's consumer agree with

17  him?"

18         Were those the things that you were trying

19  to determine through the use of the focus groups in

20  this case?

21    A.   Well, actually, it's a little bit backwards

22  from that.  When I read Dr. Simonson's report, the

23  thing that immediately struck me was that he made a

24  leap -- at least I believe he made a leap -- and the

25  leap was consumers would be disgusted by this and --

Page 77

1    based on my experience with dog owners.  That was --

2    it's hard for me in something this narrow to

3    differentiate between my professional understanding

4    of consumers and how they may react, et cetera.

5         So, you know, it struck me that it would be

6    useful to bolster my opinion by seeing whether or

7    not anybody else shared my view or did people share

8    Dr. Simonson's view, which Dr. Simonson testified he

9    believed that everybody would agree with him.

10    Q.   Were there ways of, as you said, bolstering

11    or perhaps testing your opinion other than focus

12    groups available to you?

13    A.   As a practical matter?  No. 1, there wasn't

14    a lot of time.  Second, I personally couldn't think

15    of a way to do a quantitative test, a projectable

16    survey on this issue, because you're really dealing

17    with thoughts and feelings which are very hard to

18    measure in any way other than a -- the reason you do

19    qualitative testing is to get at this.  I think

20    Dr. Simonson said that as well.

21    Q.   I was going to ask you, his -- one of his

22    views was that there was no quantitative way in

23    which to measure what he was looking at.  Do you

24    agree with that or did you agree with that at the

25    time of your assignment?

Page 81

1        A.   Well, there's a difference between

2   Dr. Simonson and myself.  Dr. Simonson is primarily

3   a research professional.  That's really his field of

4   expertise, as he said.  I have reviewed a lot of

5   surveys but he's conducted many.  I don't consider

6   myself a research specialist.  In the business I

7   worked in we had research specialists.  But you

8   don't get to where I got without knowing a lot about

9   almost all the aspects of the business.  I didn't

10  think it would be a valid way to do it even if it

11  was available, if there was a budget for it.  I

12  just -- you're dealing with how do people react when

13  they actually get close up and handle this product.

14  Especially, you know, you have to say to yourself,

15  well, gee, the only people that really matter in

16  this are people who would be exposed to the product

17  and the most likely people exposed to it are people

18  who are either owners of dogs or go to places where

19  this kind of thing is sold.  And it's -- you know,

20  it's mostly sold in places where dog products are

21  sold and rarely sold anywhere close to where liquor

22  is sold.  So it would have been hard -- it wasn't

23  easy for us to find the people we found for a

24  qualitative study, a limited qualitative study at

25  that.

Page 82

1    Q.   Let me -- when you -- when you were thinking

2    about how to answer the questions that you described

3    in your report, did you consider first addressing

4    Dr. Simonson's opinions about what he described as

5    the associate network memory model?

6    A.   No.  No. 1, I'm not a psychologist so I

7    couldn't speak to that as an expert.

8    Q.   Are you familiar with that concept?

9    A.   You know, I've never heard it expressed the

10   way Dr. Simonson did, but I always thought it was

11   common sense.  If you have -- if you somehow or

12   other come to have negative attitudes about a

13   product that you might associate with another

14   product, a similar product, I wouldn't argue with

15   him about that.  The issue is how you come about

16   having the negative attitudes.  That's where I think

17   all he did was just pull one out -- pull one out of

18   the sky.

19        I was going to say something else but I

20   won't do that here.

21   Q.   Thank you for keeping the record clean.

22        So is it correct that you didn't -- you

23   didn't consider looking at -- responding to his

24   report by looking at the academic literature that he

25   cited or drawing your own conclusions about the

Page 83

1    associate network memory model or dealing with any

2    of those things?

3        A.    No.   I'm willing to concede that that may be

4    correct.   I just think his starting point is without

5    merit.

6        Q.    Okay.   And is it correct that -- did you

7    consider at all actually trying to do a quantitative

8    survey or is that something you simply dismissed as

9    not being workable?

10       A.    I didn't think it was workable.

11   Dr. Simonson, who knows more about research than I

12   do, he didn't think it was workable either.

13       Q.    Did you consider any other sort of research

14   or studies besides focus groups?

15       A.    Not really.   I'm not sure what they would

16   have been to do.   I thought -- before focus groups I

17   gave a little thought to standing and -- at a

18   PetSmart or a Petco or someplace where people buy

19   dog stuff and ask them about it, but I -- I just

20   didn't think that would be anywhere close to an

21   appropriate way to do it.   It would be too random.

22       Q.    Look at paragraph 27 of your report, please.

23   It begins at the bottom of page 9 and continues over

24   to page 10.   You wrote, "Focus groups are a research

25   method whereby consumers from the target market are

Veritext Legal Solutions
866 299-5127

1    led through a discussion regarding a particular

2    topic.  Focus groups give insight as to why and how

3    consumers use a product or service, what is

4    important to them in choosing a particular brand,

5    what they like and don't like about various products

6    or services, and any special needs they might have

7    that aren't being satisfied."

8         And then there's a footnote to a publication

9    called Belch and Belch, Advertising & Promotion, An

10   Integrated Marketing Communications Perspective,

11   Sixth Edition.

12        Do you see what I just read?

13   A.   Yes.

14   Q.   Why did you reference the Belch publication?

15   A.   It just struck me that they had a very nice,

16   clean, clear description of what focus groups were,

17   what they were used for.  They're noted academics.

18   Both father and son teach marketing and advertising

19   I believe it's at either San Diego State or UC

20   San Diego or University of San Diego.  It's one of

21   those places.  And their textbook is one of the two

22   most widely-used textbooks in advertising classes.

23   And I certainly could have written something that

24   would have been more or less a paraphrase but why

25   not cite a good one?

1   they are often overused?

2       A.   I wouldn't agree with that.  In fact, I

3   think this is the view from an academic.  It's his

4   opinion.  I think that people that hold significant

5   marketing and research positions at major companies

6   that use focus groups are pretty smart.  They have

7   great experience.  They're in the real world where

8   if the work they do proves to be useless, they can

9   lose their job, which is not something that happens

10  to academics.  They get tenure.  Nobody has tenure

11  in advertising.  So I wouldn't necessarily agree

12  with that.  I think that there are certainly -- for

13  as long as I've been involved in marketing there's

14  always arguments about the benefits of quantitative

15  research versus qualitative research.  I think both

16  forms of information gathering are tremendously

17  useful.  I think they play different roles.  I think

18  if you're using qualitative research and pretending

19  it's the same as quantitative research, I think

20  that's not -- that's not -- that's not okay.  But if

21  you're using it to understand the thoughts and

22  feelings, it's the best possible way to do it.

23      Q.   Figure 19-4 on page 629 is entitled,

24  "Weaknesses associated with focus groups through

25  research" and there's a series of bullet points

1  there.  Do you see that?

2      A.    Yes.

3      Q.    The first bullet point is, "The results are

4  not quantifiable."

5          Do you agree with that?

6      A.    I would.

7      Q.    What does that mean?

8      A.    Well, I think that what he's speaking to --

9  what the authors are speaking to there is the idea

10  of making a projectably statistically-reliable

11  sample but I don't think that's -- focus groups are

12  not used to that if you're using it to learn

13  different things than you can learn from a

14  statistical study.

15      Q.    The second bullet point is, "Sample sizes

16  are too small to generalize to larger populations."

17          Do you see that?

18      A.    I do.

19      Q.    Do you agree with that statement?

20      A.    Not necessarily.  My experience has been --

21  I've been doing focus groups for more than 40 years

22  and it's amazing how much useful information is

23  derived and how accurate that information often

24  turns out to be or more often than not it turns out

25  to be.

Veritext Legal Solutions
866 299-5127

1      Q.    Do you agree that the sample sizes of focus

2    groups make the results not statistically

3    projectable to larger populations?

4      A.    Yes.

5      Q.    The third bullet point is, "Group influences

6    may bias participants' responses."

7            Do you see that?

8      A.    Yes.

9      Q.    Do you agree with that?

10     A.    That can happen, yes.

11     Q.    What does that mean and how does it happen?

12     A.    I actually mentioned this earlier.  You

13   sometimes encounter a person -- a person in a group,

14   sometimes two, that are sort of alpha personalities

15   that want to dominate a group to the point of

16   intimidating other participants.  If I was a lawyer,

17   think about jurors.  And that's a weakness.  A good

18   moderator can nearly always mitigate against that.

19   I've literally witnessed groups where a particular

20   person was asked to leave.  They find nice ways of

21   doing it but they do it because the person is

22   damaging the group.  So you can have that happen.

23   That's one of the reasons that today most groups are

24   smaller.  It's much easier to manage a small group.

25   You just typically do more of them.  In fact, if you

Page 91

1   didn't -- nobody disliked, they just weren't Jack

2   Daniel's drinkers.  They drank other whiskey

3   products.  And I figured, gee, you know, it would be

4   interesting to see what an unbiased consumer thinks.

5   And I think that would be helpful.  I believe the

6   purpose of being an expert witness is to be helpful

7   to the court.  I think that's the job.  I don't

8   think we're advocates.

9       Q.   Is it your opinion that the four focus

10  groups prove or, rather, disprove Dr. Simonson's

11  view that the Jack Daniel's mark would be tarnished

12  by the VIP product?

13          MR. BRAY:  Objection to form.

14          THE WITNESS:  I wouldn't say they disprove

15  it.  I think that they raise very, very serious

16  questions about Dr. Simonson's opinion that the

17  product would elicit feelings of disgust that would

18  result in tarnishing the Jack Daniel's brand.

19  Dr. Simonson testified at his deposition that he

20  believed that nobody would disagree with him.  Well,

21  19 people disagreed with him.  Actually, 20 if you

22  count me.  That's the -- that's the hinge point of

23  his testimony.  Everything else is based on that.

24  Without that nothing else in his report is

25  meaningful.  So proof?  Proof is an absolute, I

1    think.  But certainly the weight of the evidence

2    here is such that Dr. Simonson's opinion is probably

3    incorrect.

4        Q.  Is it your opinion that the four focus

5    groups show that consumers of the VIP -- purchasers

6    of the VIP product or others who are exposed to it

7    will not find it to be disgusting or will not take

8    away negative associations with the Jack Daniel's

9    brand?

10            MR. BRAY:  Objection to form.

11            THE WITNESS:  Could you repeat that?

12        (The pending question was read as follows:

13                "Q.  Is it your opinion

14            that the four focus groups show

15            that consumers of the VIP --

16            purchasers of the VIP product or

17            others who are exposed to it will

18            not find it to be disgusting or

19            will not take away negative

20            associations with the Jack Daniel's

21            brand?")

22            MR. BRAY:  Same objection.

23            THE WITNESS:  I don't think that I could say

24    with absolute certainty what a prospective purchaser

25    might do, but I think that a reasonable consumer --

Page 100

1    these -- these illustrations, I hadn't really

2    thought about that very much.  I had seen some of

3    them before.  I saw the Absolut one before but --

4    so, you know, I probably would have been wary enough

5    of the category to say let's try to get some other

6    people's opinions.

7        Q.   In that situation would you as an expert be

8    comfortable with a court accepting the results of

9    focus groups as proof of what the consumer takeaway

10   for those products was?

11            MR. BRAY:  Objection:  form, calls for

12   speculation and a legal conclusion.

13            THE WITNESS:  Exactly.  I'm not a lawyer.  I

14   can't offer, and I won't offer, an opinion on what

15   the court would accept or not accept.  That's for

16   people with much better educational backgrounds than

17   me to figure out.

18   BY MR. LARKIN:

19       Q.   Who have finished law school?

20       A.   Or at least are members of the Bar.  I have

21   a friend here in town who never went to law school

22   and is senior partner of the largest law firm in

23   town.  But I'm not offering this as a survey in the

24   conventional sense.  This is -- is illustrative of

25   how consumers feel or at least consumers that are

                                    Page 102

1    exposed to the toy who actually know what Jack

2    Daniel's is.

3        Q.   What did you mean by your reference in the

4    last answer to a survey in the conventional sense?

5        A.   Well, my experience as an expert witness is

6    that when surveys are done, they're done to certain

7    specifications and they're quantitative.  I wasn't

8    attempting to do a quantitative survey.  I was

9    attempting to understand what people who knew more

10   about Jack Daniel's or at least were bigger fans of

11   Jack Daniel's than I am, who had dogs and who saw

12   this toy, were exposed to it, had a chance to hold

13   it, had a chance to read the label probably in

14   greater depth than anybody ever would at retail,

15   what their reaction was.  I think that it's a very

16   useful way for an expert to understand what he's

17   trying to offer an opinion about.

18           Now, in this case I wasn't -- I mean, my

19   opinion is that it's not disgusting, it doesn't

20   elicit feelings of disgust.  Dr. Simonson clearly

21   believes it elicits feelings of disgust.  I'm not

22   sure that Dr. Simonson would be in the target for

23   this product.  He certainly doesn't seem to like

24   dogs.  He doesn't want his children to have dogs.  I

25   think that dogs are good for kids.  So that's his

Page 103

1    opinion but it's not -- it's just his opinion.  And

2    he's absolutely convinced he's right.  In his

3    deposition he makes the statement everybody would

4    agree -- something -- I'll paraphrase but "Everybody

5    would agree with me."  Well, everybody doesn't agree

6    with him.  You know, I was actually -- I put in my

7    report I was actually rather stunned that everybody

8    had the same view.  I don't think I've ever

9    encountered a focus group or a series of focus

10   groups before where there was unanimity on anything.

11   I've had people that hated Hershey bars.  I don't

12   know how they can but they did.

13        Q.   Do you agree that the focus groups here are

14   not projectable to any relevant consumer population?

15        A.   They're not intended to be projectable.

16   They're intended to be useful information about how

17   consumers think and feel -- how a reasonable

18   consumer thinks and feels.

19        Q.   Do you agree that the focus groups here were

20   conducted only of what I'm going to call

21   Los Angeles-area residents?  Is that a fair

22   characterization?

23        A.   Los Angeles area.

24        Q.   They may have come from farther but it was

25   in Westwood of Los Angeles-area residents.  Is that

Page 104

1    a fair characterization?

2        A.    Well, greater Los Angeles.  The sessions

3    were in Westwood.  The people lived -- in most

4    instances the people worked somewhere near the

5    facility.  I don't think people would drive from the

6    far northwest Valley down to Westwood on a weekday

7    night to do this.

8        Q.    Do you agree that the opinions of those

9    people who live in the Greater Los Angeles area are

10   not representative of what the rest of the country

11   might think about the product?

12       A.    It's possible.  I'm not as absolute in my

13   thinking as Dr. Simonson.

14       Q.    If you turn back to Exhibit 105 in the

15   Belch -- what Belch and Belch wrote as weaknesses

16   associated with focus group results -- research, I'm

17   sorry, are there other problems or limitations on

18   focus groups -- the use of focus group research that

19   are not listed in their bullet points?

20       A.    Gosh, I've seen focus groups where if the

21   groups aren't assembled well, if they don't get --

22   if they don't get the right kind of people, that's a

23   weakness.  That's really a weakness of whoever is

24   creating -- or managing the focus group process.

25   And I certainly have seen instances where focus

Page 105

1    stuff is it tends to be more female than male.

2        Q.    Look at page 157, the next page.  The

3    instruction there is to recruit no more than two

4    non-Caucasian/white respondents for each group.

5    What was the purpose for that?

6        A.    These were small groups, four to five

7    people, so we -- we didn't want the groups to be

8    overly representative of minority populations.  By

9    doing it this way we got a reasonable cross-section.

10       Q.    Is that the same thinking behind the

11   instruction recruit no more than one 65+ respondent

12   for each group?

13       A.    Yes, to a degree.  Part of that is that

14   people 65+ actually while they may be Jack Daniel's

15   drinkers were less likely to buy dog toys in

16   general.  It's a younger population.

17       Q.    Look at page 159, please.  The instruction

18   at the bottom of that page is all respondents must

19   drink bourbon, scotch or other type of whiskey.

20   What was the reason for that?

21       A.    We wanted people who would be if not Jack

22   Daniel's drinkers at least be familiar with the

23   brand.  Jack Daniel's is a very big, very important

24   brand.  If they drink brown whiskey, they would

25   likely have awareness of Jack Daniel's.

Page 116

1    correct?

2        A.    Well, this one it's a little hard to tell.

3    I mean, you know, when you ask -- with that question

4    demographics include, as I'm sure you know, age,

5    income, education, ethnicity, et cetera.  I could

6    look at all this but without really analyzing it I'd

7    have to sit and couldn't tell you whether or not

8    it's precisely correct.

9        Q.    Was it your intention --

10       A.    We weren't -- we couldn't -- in focus groups

11   like this when we were pulling in 19 people -- we

12   were hoping for 20 -- you're not going to be able to

13   replicate to any degree -- any degree of certainty

14   the U.S. population.  That's not what focus groups

15   are for.  That's why you do quantitative studies.

16       Q.    Fair enough.  261 is the part of the

17   spreadsheet that shows the number of times that the

18   respondents told the screener that they had consumed

19   Jack Daniel's in the last six months, correct?

20       A.    Yes.

21       Q.    Look at 262 and 263, please.  That's the

22   demographic information that the screener obtained

23   or was obtained in the screening process about the

24   participants in Group 4 at 8:00 p.m., correct?

25       A.    Correct.

Veritext Legal Solutions
866 299-5127

1   campaigns I ever did was for Pace Picante sauce with

2   these cowboys.  I don't think that's funny.  It

3   never has elicited big yuks but it is -- it has a

4   point.  It's humorous and it's resulted in Pace

5   becoming the second-best selling condiment in

6   America.

7      Q.   In the last sentence of paragraph 67 in your

8   report you wrote, "Simply stated, humor does not

9   beget disgust."

10      Do you see that?

11   A.   Yes.

12   Q.   Would it be possible for someone to find

13   something humorous yet find it disgusting?

14   A.   There's certainly a lot of dirty jokes.

15   Q.   I'm not talking about jokes.

16   A.   Yeah, but I think in marketing -- I think in

17   marketing the likelihood of humor begetting disgust

18   is low because if that's what it does, you know, you

19   find that out pretty quickly and that isn't going to

20   continue.

21   Q.   Is it your opinion that someone exposed to

22   the Bad Spaniels product could not both find it to

23   be humorous yet find it to be disgusting?

24   A.   I'll answer the question this way.  Someone?

25   Sure, there may be somebody out there.  But

Page 242

1       A.    Yes.

2       Q.    Do you believe that defecation is a

3    disgusting subject?

4       A.    In and of itself, yeah, it is.

5       Q.    Okay.  What was the basis for your claim

6    that the VIP toy, the Bad Spaniels, neither intended

7    to disparage Jack Daniel's or in any way convey an

8    idea that might cause an association with a

9    disgusting subject, defecation?

10      A.    Well, I read Mr. Sacra's deposition.  He

11   clearly was going to make fun of Jack Daniel's but I

12   don't think -- it doesn't appear that he in any way

13   wanted to disparage Jack Daniel's.  And the

14   defecation factor was a joke.  So it's funny.  And

15   based on my opinion, my professional opinion as well

16   as the opinions of the people who bolstered my

17   opinion, the people in the focus groups, it just

18   didn't work out that way.  It didn't -- it didn't

19   associate.  When I first looked at this and -- and I

20   knew what the issues were in the case but I looked

21   at it and I said, "Why is this case happening?"

22   Honestly.  I said, "This is a silly case."

23      Q.    In paragraph 68, the portion I just read to

24   you, your opinion was that the -- what you called

25   the fun factor is not intended to in any way convey

                                        Page 245

1    Express' credit cards or its traveler's checks."

2            What's your basis for that statement?

3        A.    Reading about the case, they used the slogan

4    but it wasn't -- they weren't spoofing the same way

5    anything like this.

6        Q.    Did you -- have you ever actually seen the

7    product that was at issue in the case?

8        A.    No, I haven't.

9        Q.    Were you involved in any way in the case?

10       A.    No, no.  I wrote Don't Leave Home Without

11   It.  It's one of my favorite slogans.

12       Q.    And a very successful one at that.

13       A.    I wish I had a nickel for every time it's

14   used.

15       Q.    Were you aware of the case when it was going

16   on in 1989?

17       A.    No.  This is the first time I heard of it.

18       Q.    In paragraph 73 on page 25 you wrote, "I

19   agree with Dr. Simonson's opinion that Jack Daniel's

20   is a strong brand."

21            Why do you believe Jack Daniel's is a strong

22   brand?

23       A.    Well, first of all, you know, he said it but

24   I'm well aware that Jack Daniel's is one of the

25   best-selling alcoholic beverages.  I think he

Page 255

```
 1    actually talked about what its market size was so I
 2    have no reason to disagree with that and
 3    information -- you know, there's information all
 4    over the place about leading products in various
 5    categories.  So it appears to me to be a strong
 6    brand.
 7         Q.   Do you believe that the packaging for Jack
 8    Daniel's whiskey is well known?
 9              MR. BRAY:  Objection to form.
10              THE WITNESS:  I think it's well known by
11    Jack Daniel's aficionados and people that buy
12    whiskey and bourbon and those kind of products.  I
13    think so.  I think it's -- like most successful
14    brands, the product packaging is well known.
15    BY MR. LARKIN:
16         Q.   Have you seen Jack Daniel's print ads over
17    your career in the advertising business?
18         A.   I've seen some.  I've never paid very much
19    attention to them.  I certainly haven't paid much
20    attention in recent years.  I probably paid
21    attention when I was working on brands that were in
22    some way competitive or roughly competitive but not
23    in recent years.
24         Q.   I'm sorry, I didn't mean to cut you off.
25              Have you seen Jack Daniel's television ads?
```

Veritext Legal Solutions
866 299-5127

1    A.    I think I have, yeah.  I don't -- I don't

2    watch many commercials.

3    Q.    That seems like an unusual statement for an

4    advertising guy.

5    A.    Well, I have a thumb and I push that button.

6    Q.    The -- would you agree that the other spoof

7    products that Jeff found on the Internet all spoofed

8    well-known brands?

9    A.    Yes, I think so.  I don't recall any that

10   were dealing with something that was lesser known.

11   Q.    When you saw the products that Jeff had I

12   guess pulled off the Internet, did you instantly

13   recognize the corresponding product that was being

14   spoofed?

15   A.    Yes.  I think the only one -- there was one

16   that I wasn't sure about.  I think it might have

17   been in the cereal category.  No, it was the donut

18   thing.  I knew it was a donut but I wasn't sure if

19   it was spoofing some specific donut.

20   Q.    Do you agree that spoofs or parodies only

21   work if the -- if they are connected to well-known

22   brands so people get the joke?

23   A.    Yeah, I do.

24        MR. LARKIN:  I have nothing further.

25        MR. BRAY:  We'll read and sign.

Page 257





*Silverman*
EXHIBIT NO. *105*
8/13/15
Wendy S. Schreiber

# Preface

## The Changing World of Advertising and Promotion

Nearly everyone in the modern world is influenced to some degree by advertising and other forms of promotion. Organizations in both the private and public sectors have learned that the ability to communicate effectively and efficiently with their target audiences is critical to their success. Advertising and other types of promotional messages are used to sell products and services as well as to promote causes, market political candidates, and deal with societal problems such as alcohol and drug abuse. Consumers are finding it increasingly difficult to avoid the efforts of marketers, who are constantly searching for new ways to communicate with them.

Most of the people involved in advertising and promotion will tell you that there is no more dynamic and fascinating a field to either practice or study. However, they will also tell you that the field is undergoing dramatic changes that are changing advertising and promotion forever. The changes are coming from all sides—clients demanding better results from their advertising and promotional dollars; lean but highly creative smaller ad agencies; sales promotion and direct-marketing firms, as well as interactive agencies, which want a larger share of the billions of dollars companies spend each year promoting their products and services; consumers who no longer respond to traditional forms of advertising; and new technologies that may reinvent the very process of advertising. As the new millennium begins, we are experiencing perhaps the most dynamic and revolutionary changes of any era in the history of marketing, as well as advertising and promotion. These changes are being driven by advances in technology and developments that have led to the rapid growth of communications through interactive media, particularly the Internet.

For decades the advertising business was dominated by large, full-service Madison Avenue–type agencies. The advertising strategy for a national brand involved creating one or two commercials that could be run on network television, a few print ads that would run in general interest magazines, and some sales promotion support such as coupons or premium offers. However, in today's world there are a myriad of media outlets—print, radio, cable and satellite TV, and the Internet—competing for consumers' attention. Marketers are looking beyond the traditional media to find new and better ways to communicate with their customers. They no longer accept on faith the value of conventional advertising placed in traditional media. The large agencies are recognizing that they must change if they hope to survive in the 21st century. Keith Reinhard, chairman and CEO of DDB Worldwide, notes that the large agencies "have

finally begun to acknowledge that this isn't a recession we're in, and that we're not going back to the good old days."

In addition to redefining the role and nature of their advertising agencies, marketers are changing the way they communicate with consumers. They know they are operating in an environment where advertising messages are everywhere, consumers channel-surf past most commercials, and brands promoted in traditional ways often fail. New-age advertisers are redefining the notion of what an ad is and where it runs. Stealth messages are being woven into the culture and embedded into movies and TV shows or made into their own form of entertainment. Many experts argue that "branded content" is the wave of the future, and there is a growing movement to reinvent advertising and other forms of marketing communication to be more akin to entertainment. Companies such as BMW, Levi Straus & Co., Nike, and Skyy Spirits are among the marketers using "advertainment" as a way of reaching consumers: They create short films or commercials that are shown on their websites.

Marketers are also changing the ways they allocate their promotional dollars. Spending on sales promotion activities targeted at both consumers and the trade has surpassed advertising media expenditures for years and continues to rise. In his book *The End of Marketing as We Know It,* Sergio Zyman, the former head of marketing for Coca-Cola, declares traditional marketing is "not dying, but dead." He argues that advertising in general is overrated as part of the marketing mix and notes that all elements of the marketing mix communicate, such as brand names, packaging, pricing, and the way a product is distributed. The information revolution is exposing consumers to all types of communications, and marketers need to better understand this process.

A number of factors are impacting the way marketers communicate with consumers. The audiences that marketers seek, along with the media and methods for reaching them, have become increasingly fragmented. Advertising and promotional efforts have become more regionalized and targeted to specific audiences. Retailers have become larger and more powerful, forcing marketers to shift money from advertising budgets to sales promotion. Marketers expect their promotional dollars to generate immediate sales and are demanding more accountability from their agencies. The Internet revolution is well under way and the online audience is growing rapidly, not only in the United States and Western Europe but in many other countries as well. Many companies are coordinating all their communications efforts so that they can send cohesive messages to their customers. Some companies are building brands with little or no use of traditional media advertising. Many

vi

| Belch: Advertising and Promotion, Sixth Edition | VI. Monitoring, Evaluation, and Control | 19. Measuring the Effectiveness of the Promotional Program | | © The McGraw–Hill Companies, 2003 |
|---|---|---|---|---|

Clearly, there are appropriate and inappropriate circumstances for employing this methodology.

Another way to gather consumers' opinions of concepts is mall intercepts, where consumers in shopping malls are approached and asked to evaluate rough ads and/or copy. Rather than participating in a group discussion, individuals assess the ads via questionnaires, rating scales, and/or rankings. New technologies allow for concept testing over the Internet, where advertisers can show concepts simultaneously to consumers throughout the United States, garnering feedback and analyzing the results almost instantaneously. While this methodology is gaining acceptance, traditional methods are more commonly used (See Figure 19-5).

## Rough Art, Copy, and Commercial Testing

Because of the high cost associated with the production of an ad or commercial (many network commercials cost hundreds of thousands of dollars to produce), advertisers are increasingly spending more monies testing a rendering of the final ad at early stages. Slides of the artwork posted on a screen or animatic and photomatic roughs may be used to test at this stage. (See Figure 19-6 for an explanation of terminology.) Because such tests can be conducted for about $3,000 to $5,000, research at this stage is becoming ever more popular.

But cost is only one factor. The test is of little value if it does not provide relevant, accurate information. Rough tests must indicate how the finished commercial would perform. Some studies have demonstrated that these testing methods are reliable and the results typically correlate well with the finished ad.[16]

Most of the tests conducted at the rough stage involve lab settings, although some on-air field tests are also available. Popular tests include comprehension and reaction tests and consumer juries. Again, the Internet allows field settings to be employed.

1. *Comprehension and reaction tests.* One key concern for the advertiser is whether the ad or commercial conveys the meaning intended. The second concern is the reaction the ad generates. Obviously, the advertiser does not want an ad that evokes a negative reaction or offends someone. **Comprehension and reaction tests** are designed to assess these responses (which makes you wonder why some ads are ever brought to the marketplace).

Tests of comprehension and reaction employ no one standard procedure. Personal interviews, group interviews, and focus groups have all been used for this purpose, and sample sizes vary according to the needs of the client; they typically range from 50 to 200 respondents.

2. *Consumer juries.* This method uses consumers representative of the target market to evaluate the probable success of an ad. **Consumer juries** may be asked to rate a selection of layouts or copy versions presented in pasteups on separate sheets. The

**Figure 19-6**   Rough testing terminology

A *rough* commercial is an unfinished execution that may fall into three broad categories:

| *Animatic Rough* | *Photomatic Rough* | *Live-Action Rough* |
|---|---|---|
| Succession of drawings/cartoons | Succession of photographs | Live motion |
| Rendered artwork | Real people/scenery | Stand-in/nonunion talent |
| Still frames | Still frames | Nonunion crew |
| Simulated movement: Panning/zooming of frame/ rapid sequence | Simulated movements: Panning/zooming of frame/ rapid sequence | Limited props/minimal opticals |
| | | Location settings |

A *Finished Commercial Uses:*

Live motion/animation

Highly paid union talent

Full union crew

Exotic props/studio sets/special effects

| *Objective:* | Explores consumers' responses to various ad concepts as expressed in words, pictures, or symbols. |
| *Method:* | Alternative concepts are exposed to consumers who match the characteristics of the target audience. Reactions and evaluations of each are sought through a variety of methods, including focus groups, direct questioning, and survey completion. Sample sizes vary depending on the number of concepts to be presented and the consensus of responses. |
| *Output:* | Qualitative and/or quantitative data evaluating and comparing alternative concepts. |

**Figure 19-3**  Concept testing

ing, but it goes a long way toward improving the state of the art and alleviates at least one of the testing problems cited earlier.

Testing may occur at various points throughout the development of an ad or a campaign: (1) concept generation research, (2) rough, prefinished art, copy, and/or commercial testing, (3) finished art or commercial pretesting, and (4) market testing of ads or commercials (posttesting).

## The Testing Process

### Concept Generation and Testing

Figure 19-3 describes the process involved in advertising **concept testing,** which is conducted very early in the campaign development process in order to explore the targeted consumer's response to a potential ad or campaign or have the consumer evaluate advertising alternatives. Positioning statements, copy, headlines, and/or illustrations may all be under scrutiny. The material to be evaluated may be just a headline or a rough sketch of the ad. The colors used, typeface, package designs, and even point-of-purchase materials may be evaluated.

One of the more commonly used methods for concept testing is focus groups, which usually consist of 8 to 10 people in the target market for the product. Companies have tested everything from product concepts to advertising concepts using focus groups. For most companies, the focus group is the first step in the research process. The number of focus groups used varies depending on group consensus, strength of response, and/or the degree to which participants like or dislike the concepts. Some companies use 50 or more groups to develop a campaign, although fewer than 10 are usually needed to test a concept sufficiently.

While focus groups continue to be a favorite of marketers, they are often overused. The methodology is attractive in that results are easily obtained, directly observable, and immediate. A variety of issues can be examined, and consumers are free to go into depth in areas they consider important. Also, focus groups don't require quantitative analysis. Unfortunately, many managers are uncertain about research methods that require statistics, and focus groups, being qualitative in nature, don't demand much skill in interpretation. Weaknesses with focus groups are shown in Figure 19-4.

- The results are not quantifiable.
- Sample sizes are too small to generalize to larger populations.
- Group influences may bias participants' responses.
- One or two members of the group may steer the conversation or dominate the discussion.
- Consumers become instant "experts."
- Members may not represent the target market. (Are focus group participants a certain type of person?)
- Results may be taken to be more representative and/or definitive than they really are.

**Figure 19-4**  Weaknesses associated with focus group research