Exhibit 6

1 | Firm E-Mail: courtdocs@dickinsonwright.com

2 | David G. Bray (#014346)
dbray@dickinsonwright.com

3 | **DICKINSON WRIGHT, PLLC**
1850 North Central Avenue, Suite 1400

4 | Phoenix, Arizona 85004
Phone: (602) 285-5000

5 | Fax: (602) 285-5100

6 | *Attorneys for VIP Products, L.L.C.*

7 | **IN THE UNITED STATES DISTRICT COURT**

8 | **DISTRICT OF ARIZONA**

9 | VIP Products, L.L.C., an Arizona limited
liability company,

10 |

No. 2:14-cv-02057-DGC

11 | Plaintiff,

**PLAINTIFF AND
COUNTERDEFENDANT VIP
PRODUCTS, L.L.C.'S RESPONSES TO
JACK DANIEL'S PROPERTIES, INC.'S
FIRST SET OF INTERROGATORIES**

12 | v.

13 | Jack Daniel's Properties, Inc., a Delaware
corporation

14 |

15 | Defendant.

16 | Jack Daniel's Properties, Inc.,

17 | a Delaware corporation,

18 | Counterclaimant,

19 | v.

20 | VIP Products, LLC, an Arizona limited
liability company,

21 |

22 | Counterdefendant

23 |

24 | Plaintiff and Counterdefendant VIP Products, LLC ("VIP" or "Plaintiff"), by and

25 | through undersigned counsel Dickinson Wright PLLC, hereby submit, pursuant to Rule 33

26 | of the Federal Rules of Civil Procedure, their Responses to the First Set of Interrogatories

27 | served by Defendant and Counterclaimant Jack Daniel's Properties, Inc. ("JDPI").

1

## GENERAL OBJECTIONS

1.      Plaintiff has not completed its investigation of the facts related to this case, its discovery, or its preparation for trial.  Plaintiff's responses, therefore, are made only on the basis of such information and documents as it currently knows exist.  Plaintiff has not completed its investigation and discovery has only just commenced in this matter.  Accordingly, Plaintiff's responses do not purport to constitute a final statement of its knowledge regarding the particular subject and are made without prejudice to its right to in addition evidence or documents at the time of trial, or to supplement its responses as appropriate once it has completed its investigation, discovery and trial preparation.

2.      Plaintiff objects generally to the Definitions and Instructions to the extent that they impose obligations broader than those imposed by the applicable Rules of Civil Procedure.  Plaintiff disclaims any such broader obligation purportedly imposed by such Instructions.

3.      Plaintiff objects generally to Defendant's Interrogatories (the "Request") to the extent that any Request can be read to call for information that is protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Such privileged information will not be disclosed and any inadvertent disclosure thereof will not be deemed a waiver of any privilege or protection.  By accepting information in response to these Requests, the propounding party expressly accepts and acknowledges this non-waiver.

4.      Plaintiff objects to each and every Request to the extent that it seeks discovery regarding matters that are not relevant to the subject matter of the pending action or that are not reasonably calculated to lead to the discovery of admissible evidence.  These Responses shall not constitute a waiver of any such objections.

5.      Plaintiff objects to each and every Request to the extent it purports to impose a burden of disclosing information not readily available to Plaintiff or is equally available to Defendant.  Plaintiff further objects to each and every Request to the extent it purports to

1  impose a burden of identifying documents that are not in Plaintiff's possession, custody, or
2  control, or that cannot be found in the course of a reasonable search, or that have already
3  been produced by Plaintiff or others to Defendant.    Plaintiff refers Defendant to such
4  documents for the content thereof.

5        6.    The Responses set forth herein are based on information currently known to
6  Plaintiff.    Plaintiff has not completed its investigation and discovery has only just
7  commenced in this matter.  Accordingly, Plaintiff reserves the right to supplement, amend or
8  clarify any of its responses or objections as permitted by the Federal Rules of Civil
9  Procedure.

10       7.    These Responses are given subject to and without waiving the foregoing
11 General Objections, each of which is incorporated by reference in its entirety into each of the
12 following answers.

### NON-UNIFORM INTERROGATORIES

15      **INTERROGATORY NO. 1:**    Identify all persons involved in the conception of,
16 selection of, and/or decision to use, the "Bad Spaniels" mark, and for each person so
17 identified, describe his or her role in such selection, conception, and/or decision.

18      **RESPONSE:**

19 *Conception:*  Stephen Sacra.   Mr. Sacra thought of the idea for the Bad Spaniels
20 parody dog toy.

21 *Selection:*  Stephen Sacra.  Mr. Sacra decided that the mental vision he had of the
22 product in his head was funny so he selected it for development.

23 *Decision to use:*  Stephen Sacra.  Mr. Sacra decided the Bad Spaniels parody dog toy
24 idea was funny so he decided to use it.

1      **INTERROGATORY NO. 2:**    Identify all persons involved in the design and

2  development of the Bad Spaniels Toy and Packaging, and for each person so identified,

3  describe his or her role in such design and/or development.

4      **RESPONSE:** *Design Development Packaging:* Elle Phillips. Ms. Phillips took Mr.

5  Sacra's funny idea that he described to her over the phone, and then sketched it out and then

6  made two versions.

7

8      **INTERROGATORY NO. 3:**    Identify all persons involved in the development of

9  the Disclaimer, and for each person so identified, describe his or her role in such

10  development.

11      **RESPONSE:**

12      *Development Disclaimer:* Stephen Sacra.  Mr. Sacra used the boilerplate disclaimer

13  used by VIP for many years on the product hangers for VIP's "Silly Squeakers" line of

14  parody dog toys: "This Product is not affiliated with"

15      *Artwork*: Elle Phillips cut and paste these words and filled in the blank.

16

17      **INTERROGATORY NO. 4:**    Identify all persons involved in the design and

18  development of all advertisements, promotional materials, websites, social media pages,

19  and/or catalogs in which the Bad Spaniels Toy and Packaging have been displayed, and for

20  each person so identified, describe his or her role in such design and/or development.

21      **RESPONSE:**

22      *Advertisements*: Other than maintaining a website, VIP does not "advertise" in the

23  traditional sense.  It does not place advertisements in magazines, or trade journals, nor does it

24  purchase radio or television air time.

25      *Promotional Materials (Sell Sheet):* Created by Elle Phillips with data provided by

26  Stephen Sacra

27

1   *Websites*: Elle Phillips takes photos of images and uploads them. Text Data input by

2   Stephen Sacra.

3   *Social Media*: VIP stopped all social media in 2014.

4   *Catalog*: Elle Phillips inserts pictures and text into catalog per Stephen Sacra

5   instructions and then final versions are approved by Stephen Sacra.

6

7   **INTERROGATORY NO. 5:**     Identify all persons involved in the development,

8   implementation, and/or review of any studies, surveys, focus groups, or consumer or market

9   research regarding the Bad Spaniels Toy and Packaging and/or the Disclaimer (including,

10  without limitation, the Disclaimer's visibility, noticeability, and understanding), and for each

11  person so identified, describe his or her role in such development, implementation, and/or

12  review.

13  **RESPONSE:**

14  VIP is a small company. It does not do surveys and use focus groups. From Mr.

15  Sacra's perspective, when you know something is funny and makes you laugh and when you

16  have been told in the past that you are kind of funny, there is a good chance that others will

17  find your parody funny.

18

19  **INTERROGATORY NO. 6:**     Describe all channels through which the Bad

20  Spaniels Toy and Packaging are marketing, advertised, promoted, distributed, or sold and, if

21  the Bad Spaniels Toy and Packaging are sold at retail, Identify five representative retailers

22  who carry them.

23  **RESPONSE:**

24  The Bad Spaniels parody dog toy was sold to small pet specialty retailers and

25  distributors of pet products. Please see VIP00123-00130 for list of all customers that VIP

26  sold the Bad Spaniels parody dog toy in 2014.

27

1    **INTERROGATORY NO. 7:**    Describe    the    general    demographics    of    the

2    purchasers of the Bad Spaniels Toy and Packaging.

3    **RESPONSE:**

4    *General Demographic*: Dog Owners.

5    Pet Specialty Retailers purchase from VIP.  The end consumer that purchases a VIP

6    dog toy from the retailer is generally kind, caring, and loving person, who has a dog that they

7    dearly love, that is looking to enrich their dog's life with a new toy. People who are not

8    caring and loving don't buy their dogs a toy (very sad but these people do exist).  Dogs love

9    humans unconditionally, and because of this dog owners take extraordinary care when

10    making decisions of what to purchase their dog. Without question, every time you come

11    home your dog is more excited and happier to see you than any other person or being in the

12    house.  It is this reason that the dog-owning ultimate consumers of VIP's dog toys make

13    decisions to insure the safety, health, and long life of their pet.

14

15    **INTERROGATORY NO. 8:**    Describe the degree of care with which the Bad

16    Spaniel Toy and Packaging are typically purchases.

17    **RESPONSE:**  Retailers are very particular in the toys that they purchase for their

18    retail stores.  The toys must be considered safe for consumption and use by the animals. Each

19    toy is hand selected by the retail store owner, after they review the quality of the product, the

20    effective retail price, and evaluate if they think their customer would purchase the product.

21    As with all dog toy purchases the toy must meet the following criteria:  It must be cute, fun,

22    and the customer must be able to visualize the enjoyment that both the dog and the owner

23    will share together with each other when playing interactively with the toy.

24

25

26

27

1  **INTERROGATORY NO. 9:**    State in detail the complete legal and factual basis

2  for VIP's contention in paragraph 16 of the Complaint that "[a]s a matter of law, Plaintiff's

3  use of its 'Bad Spaniel's' mark and name does not infringe or dilute any claimed trademark

4  rights that Defendant may claim in any 'Jack Daniel's' trademark for its Tennessee sour

5  mash whiskey and/or any other product," and specifically set forth any information or

6  evidence supporting or discrediting that contention.

7  **RESPONSE: Objection.** This interrogatory is unreasonably overbroad.  It is simply

8  not possible, in the context of a response to an interrogatory to "state in detail" the "complete

9  legal basis" for VIP's contention in this case that its Bad Spaniels parody dog toy does not

10  infringe or dilute JDPI's trademarks.  This would require, among other things, summarizing

11  whole swathes of the *McCarthy* treatise as well as scores of relevant cases and law review

12  articles that address trademark parodies and which support Plaintiff's general arguments in

13  this case.  Subject to and without waving that objection, Plaintiff answers as follows:

14  The "[t]he purpose of the Lanham Act is to eliminate consumer confusion, not to

15  banish all attempts at poking fun or eliciting amusement." *Anheuser-Busch, Inc. v. L & L*

16  *Wings, Inc.,* 962 F.2d 316, 322 (4th Cir. 1992) (reinstating jury verdict in favor of

17  manufacturer of parody t-shirts that incorporated elements of Anheuser Busch's trademarks).

18  More recently, the Fourth Circuit affirmed the grant of summary judgment of Louis

19  Vuitton's trademark infringement and trademark dilution claims brought against the small

20  manufacturer of parody dog toys, one of whose products was a "Chewy Vitton" dog toy that

21  was shaped like a handbag and included elements of Louis Vuitton's famous trademarks.

22  Addressing the dilution claim, the Fourth Circuit noted:

23  Haute Diggity Dog mimicked the famous marks; it did not come so close
to them as to destroy the success of its parody and, more importantly, to
24  diminish the LVM marks' capacity to identify a single source.  Haute
Diggity Dog designed a pet chew toy to imitate and suggest, but not use,
25  the marks of a high-fashion LOUIS VUITTON handbag.  It used "Chewy
Vuiton" to mimic "LOUIS VUITTON"; it used "CV" to mimic "LV";
26  and it adopted imperfectly the items of LVM's designs.  We conclude that
27

these uses by Haute Diggity Dog were not so similar as to be likely to impair the distinctiveness of LVM's famous marks.

In a similar vein . . . it becomes apparent that Haute Diggity Dog intentionally associated its marks, but only partially and certainly imperfectly, so as to convey the simultaneous message that it was not in fact a source of LVM products. Rather, as a parody, it separated itself from the LVM marks in order to make fun of them.

In sum, when considering the relevant factors to determine whether blurring is likely to occur in this case, we readily come to the conclusion, as did the district court, that LVM has failed to make out a case of trademark dilution by blurring by failing to establish that the distinctiveness of its marks was likely to be impaired by Haute Diggity Dog's marketing and sale of its "Chewy Vuiton" products.

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 268 (4th Cir. 2007).

Similarly, in *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 412 (S.D.N.Y. 2002), the Southern District of New York granted summary judgment in favor of a small manufacturer of a parody dog cologne "Timmy Holedigger" that incorporated elements of Tommy Hilfiger's trademarks, thereby rejecting Tommy Hilfiger's claims of trademark infringement and trademark dilution as a matter of law. *Id.* at 425 ("As the Ninth Circuit recently counseled both parties in a bitterly contested trademark parody case, plaintiff is 'advised to chill.'"). The Court in *Tommy Hilfiger* noted as follows:

[T]he Second Circuit has recognized that where the unauthorized use of a trademark is part of an expressive work, such as a parody, the Lanham Act must be construed narrowly. *Harley–Davidson, Inc. v. Grottanelli,* 164 F.3d 806, 813 n. 14 (2d Cir.1999) (*quoting Restatement (Third) of Unfair Competition* § 25 cmt. i (1995)). Specifically, it has held that the public interest in avoiding consumer confusion must be balanced against the public interest in free speech. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g,* 886 F.2d 490, 494 (2d Cir.1989). Cases finding that First Amendment interests prevail involve nontrademark uses of mark—that is, where the trademark is not being used to indicate the source or origin of consumer products, but rather is being used only to comment upon and, in the case of parody, to ridicule, the trademark owner. *See, e.g., id.; Charles Atlas, Ltd., v. DC Comics, Inc.,* 112 F.Supp.2d 330 (S.D.N.Y.2000); *Yankee Publ'g Inc. v. News Am. Publ'g Inc.,* 809 F.Supp. 267 (S.D.N.Y.1992). In such cases, the parodist is not trading on the good will of the trademark owner to market its own goods; rather, the parodist's sole purpose for using the mark is the parody itself, and precisely for

that reason, the risk of consumer confusion is at its lowest. *See id.*

The balancing test adopted by the Second Circuit thus takes into account the purpose behind trademark law, and "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent, and in which there is a need to evoke the original work being parodied." *Cliffs Notes,* 886 F.2d at 495.

Hilfiger argues that Nature Labs is not entitled to any consideration under the First Amendment because, first, its product admittedly makes no comment about Hilfiger, and second, the use of the mark as a source identifier on the pet perfume is a trademark use of the mark. Hilfiger points out that when asked at his deposition whether his product was intended to make any comment about Hilfiger, Hilfiger products, or Hilfiger customers, John Harris, the general partner of Nature Labs, said no. (Harris Dep. at 36–37) Harris did, however, testify that he was intending to create a "parody ... target[ing] ... Tommy Hilfiger," "a fun play on words," or "spoof ... [t]o create enjoyment, a lighter side." (Id. at 30–31, 36) Although Harris had difficulty expressing the parodic content of his communicative message, courts have explained that:

Trademark parodies ... do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

*See L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 34 (1st Cir.1987); *see also Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 321 (4th Cir.1992) (*quoting id.*). One can readily see why high-end fashion brands would be ripe targets for such mockery, and why pet perfume is a clever vehicle for it.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 414-15.*

So too in this case. The message of the Bad Spaniels parody dog toy is that business and product images of Jack Daniels need not always be taken too seriously; VIP's trademark parody reminds the public that they are free to laugh at the images and associations linked with the mark. The message is also a form of entertainment conveyed by juxtaposing the irreverent representation of Defendant's trademark -- in this case involving a common dog behavior that all dog owners can relate to -- with the idealized image created by JDPI and

Jack Daniels.

In this case, the relevant *Sleekcraft* factors favor VIP.

*Strength of the Mark.*    Plaintiff does not dispute that Defendant's mark is widely recognized.  In this case, however, this factor actually favors VIP's position that there is not a likelihood of confusion between the products:

> In the usual trademark case, a strong mark is a factor pointing toward a likelihood of confusion. However, "[w]here the plaintiff's mark is being used as part of a jest ... the opposite can be true." *Yankee Publ'g*, 809 F.Supp. at 273; *see also N.Y. Stock Exch.*, 69 F.Supp.2d at 484 (citing Hormel Foods, 73 F.3d at 502–03). "The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image." *McCarthy on Trademarks and Unfair Competition* § 31:153 (4th ed.2001) [hereinafter "*McCarthy*"]. That is, it is precisely because of the mark's fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends upon to achieve the parody. *See Hormel Foods*, 73 F.3d at 503; *Schieffelin*, 850 F.Supp. at 248. ("Certainly it is unremarkable that [defendant] selected as the target of parody a readily recognizable product; indeed, one would hardly make a spoof of an obscure or unknown product!"). In the present case, Nature Labs' adaptation of Hilfiger's famous mark likely allow consumers both immediately to recognize the target of the joke and to appreciate the obvious changes to the marks that constitute the joke. A distinctive mark will not favor plaintiff in these circumstances.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002)*

*Similarity of the marks.*    While there are similarities between the two marks, they are necessary to accomplish the parody; a parody which, in its broad outlines, is comparable to the parody dog toy found non-infringing in the *Tommy Hilfiger Licensing* case:

> Nature Labs admits that its logo deliberately mimics Hilfiger's and is based upon the Hilfiger mark. (Harris Dep. at 52) It is necessary for the pet perfume to conjure up the original designer fragrance for there to be a parody at all. However, a parody also relies on "equally obvious dissimilarit[ies] between the marks" to produce its desired effect. *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785, 790 (E.D.N.Y.1983). "If the difference in wording or appearance of the designation together with the context and overall setting  is such to convey to the ordinary

viewer that this is a joke, not the real thing, then confusion as to source, sponsorship, affiliation, or connection is unlikely." *McCarthy* § 31:155. Here, "the very broadness of the joke is a measure of the difference" between Hilfiger's marks and Nature Labs' pet perfume. *Tetley,* 556 F.Supp. at 790. The whimsical substitution of the dog-related pun, "Holedigger," on dog perfume, and in some versions, the use of the bone-shaped logo, clearly convey a joking variation on the original. In addition to these changes, there are further alterations to the Hilfiger trademarks on both the early and current pet perfume label designs. In the original "Tommy Holedigger" label, the red and white square are reversed and a different font is used. In the current version, "Tommy" is changed to "Timmy," and the colors and shapes are revised: the red and white squares are changed to red and yellow triangles. These changes reinforce the imitative, yet comedic scheme inherent in a humorous takeoff.

"Moreover, an inquiry into the degree of similarity between the two marks does not end with a comparison of the marks themselves." *Hormel Foods,* 73 F.3d at 503 (citation omitted). One must also look to context, because "the setting in which a designation is used affects its appearance and colors the impression conveyed by it." Id. As noted, the marks in this case appear on pet perfume, a product which itself underscores the parody or pun captured in the label. Further, the packaging of the product bears headings or slogans that highlight the intended silliness. These include: "famous pet perfume"; "Strong enough for a man, but made for a chihuahua"; "T. Holedigger keeps your best friend smelling fresh and clean"; "If You Like Tommy Hilfiger, Your Pet Will Love Timmy Holedigger." (Lessem Decl. Exs. C, D, & E) As another Court put it, "such broad satirical adaptation draws a heavy line between itself and the object of satire." *Tetley,* 556 F. Supp. at 785. The last of the above-listed slogans also references a statement in red print on the back of the product that explicitly disclaims any relation between defendant and Tommy Hilfiger. Finally, the Tommy/Timmy Holedigger product is always presented to the consumer along with a variety of other parody pet colognes, such as CK–9 and Pucci, each appearing in an identically shaped bottle. As Nature Labs argues, this context immediately reinforces the message that the perfumes are a parody, and that they come from a single source rather than the multiple sources of the parodied marks.

Taken as a whole and in context, as it should be for a fair evaluation, Nature Labs' presentation accomplishes what the Second Circuit has said it must: "A parody must convey two simultaneous—and contradictory messages—that it is the original but also that it is not the original and is instead a parody." *Cliffs Notes,* 886 F.2d at 494. Because the parody is sufficiently strong, the similarities between the marks are outweighed by the differences, and do not contribute to a likelihood of confusion.

1  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 417-18 (S.D.N.Y.

2  2002)

3      *Proximity of the Products.*  The two parties' products are about as different as any two

4  products could be:  JDPI  primarily sells expensive Tennessee whiskey, our client sells a

5  squeaking dog toy that is an obvious parody product.  Again, this factor favors VIP for the

6  same reasons that the court in *Tommy Hilfiger Licensing* found that the factor favored the

7  maker of the parody dog perfume product in that case:

8      Hilfiger further cites testimony that the Holedigger product was created to
smell like Hilfiger's fragrances, and is marketed by comparative

9  advertising, to support a professed concern that the pet perfume may serve
as a market substitute for its own product. This argument simply does not

10  withstand scrutiny. The products in fact do not compete, and they occupy
distinct, non-overlapping markets. Because pet perfume is for use on pets,

11  not humans, the products "differ in essential character." *Recot Inc. v.
Becton,* 2000 WL 1367190, 56 U.S.P.Q.2d 1859, 1861 (2000). Moreover,

12  pet perfume, in its very conception, is a novelty item, a parody of an
actual product, for which there is no market independent of the parody.

13  As one Court has noted, "[c]ases involving novelty items are the best
examples of parody precluding any possibility for consumer confusion."

14  *Schieffelin,* 725 F.Supp. at 1324. Even if there is a connection between
fragrances for pets and humans, or even if a dense and humorless

15  consumer could mistakenly conclude that plaintiff itself sponsored the
humorous line of fragrances, plaintiff's and defendant's products are sold

16  in different kinds of stores—the former in department or designer stores,
the latter in pet stores or gift shops—at markedly different prices. *See*

17  *Tetley,* 556 F.Supp. at 790–91. It is thus plain that the products do not
have the market proximity to one another that could create a likelihood of

18  confusion.

19   

20   

21  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 418-19 (S.D.N.Y.

22  2002)

23      The *Tommy Hilfiger Licensing* case the products in question were both perfume:  One

24  intended for use on dogs, the other humans.  In that case, the Court still found the products

25  not to be in close market proximity to each other.  In this case there is even greater

26  differentiation in the market proximity of the two products at issue:  One product is a pet toy

27  the other is hard liquor.  JDPI's whiskey is   not sold in pet specialty retail stores.

1        *Likelihood Jack Daniels will Bridge the Gap.*

2        There has been no claim made to date that Jack Daniels is likely to bridge the gap and

3    offer an irreverently fun squeaking pet toys for dogs.  Even if, however, there were such

4    efforts, for the same reasons articulated by the Court in the *Tommy Hilfiger Licensing* case,

5    the public would not attribute such an enterprise to JDPI:

6           Plaintiff has presented no evidence that it is likely to bridge the gap and
           offer a pet perfume like defendant's, and the evidence does not suggest
           that the purchasing public would attribute such an enterprise to plaintiff.
7           "In view of [plaintiff's] concern that [defendant's] use of [plaintiff's]
           marks may tarnish them, it would be surprising if [plaintiff] had such
8           plans." *N.Y. Stock Exch.,* 69 F.Supp.2d at 485. This factor cannot favor
           Hilfiger.
9

10   *Tommy Hilfiger Licensing, Inc. v. Nature Labs,* LLC, 221 F. Supp. 2d 410, 419 (S.D.N.Y.

11   2002)

12        *Consumer Confusion.*  The fact that there has been nearly one year of peaceful

13   coexistence in the marketplace between Jack Daniel's whiskey and Bad Spaniels parody dog

14   toy without a single instance of actual customer confusion indicates that there is in fact no

15   likelihood of confusion between the two parties,' two very different products.  In fact,

16   Plaintiff has never received a single piece of communication from anybody, at any time,

17   expressing any confusion as to the source or affiliation of VIP's Bad Spaniels parody dog

18   toy, nor has anybody ever communicated a belief to VIP that JDPI was in any way associated

19   or was affiliated with VIP's Bad Spaniel's toy.  In fact, the same has been true with regard to

20   all of VIP's Silly Squeakers parody dog toys.  In this case, the *absence* of responsive

21   documents is evidence of the parody nature of VIP's Bad Spaniels dog toy, the fact that the

22   parody -- the joke – has been understood by retailers and consumer, and the fact that the

23   product is not likely to cause confusion with, or dilute, any JDPI trademark.  This factor thus

24   strongly favors VIP for the same reasons cited by the Court in the *Tommy Hilfiger Licensing*

25   case:

26

27

                                          13

Nor is there evidence of actual confusion in this case. This is not surprising, as a review of the factors thus far shows that the character and context of Nature Labs' products quickly dispels any confusion. Although actual confusion need not be shown for a plaintiff to prevail, "[i]f consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Id.* (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir.1999)). Where, as here, a product has been on the market for several years, the absence of evidence on this point is considered "a very significant deficiency." *Yankee Publ'g*, 809 F.Supp. at 274. Here, it is also significant that Nature Labs now parodies at least 13 other designer brands, not one of which has complained about consumer confusion. *See Tetley*, 556 F.Supp. at 790. That loud silence gives rise to only one inference: consumers have not been confused.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 419 (S.D.N.Y. 2002).

*Intent.* There is no evidence in this case the VIP acted with the intent relevant in trademark cases. Again, the Court's finding in the *Tommy Hilfiger Licensing* case is directly applicable to the facts of this case:

That evidence, however, does not show that defendant acted with the intent relevant in trademark cases—that is, an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will. *See N.Y. Stock Exch.*, 293 F.3d 550, 556 n. 1; *Yankee Publ'g*, 809 F.Supp. at 275. Although it is true that the deliberate adoption of a similar mark may give rise, in the usual case, to a presumption that the copier intended to confuse consumers, in the case of parody, "the intent is not necessarily to confuse the public but rather to amuse":

In one sense, a parody is an attempt to derive benefit from the reputation of the owner of the mark, if only because no parody could be made without the initial mark. The benefit to the one making the parody, however, arises from the humorous association, not from public confusion as to the source of the marks.

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir.1987) (holding that LARDASHE mark on jeans for oversized women was an intentional parody of JORDACHE, but finding no intent to confuse); *accord Anheuser–Busch*, 962 F.2d at 321–22. The commercial success of a parodist's product is attributable to consumers who purchased

14

1    because "they were amused by the cleverness of its design," and not
     because they believed it to be the original. *Anheuser–Busch*, 962 F.2d at
2    322. Of course, confusion can exist despite the intent to create a parody.
     "[The] single concern here, however, is whether an intent to parody an
3    existing trademark supports an inference of a likelihood of confusion....
     [I]t does not. An intent to parody is not an intent to confuse the public."
4    *Jordache*, 828 F.2d at 1486.

5

6    *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 419-20 (S.D.N.Y.

7    2002).

8        *Sophistication of Customers.*    This factor also favors VIP, for the same reasons

9    articulated by the Court in the *Tommy Hilfiger Licensing* case:

10       The final factor to be considered is the sophistication of the consumers
         and the degree of care likely to exercised in purchasing the product. This
11       factor also fails to assist plaintiff. Although the record does not disclose
         the exact price of Hilfiger's product, both sides agree that it is a "high-
12       end" designer fragrance. The substantial price associated with such goods
         "requires buyers to exercise care before they part with their money, and
13       such sophistication generally militates against a finding of confusion."
         *Charles of the Ritz*, 832 F.2d at 1323. It is also counterintuitive that
14       buyers of any sophistication will "impulse buy" a bottle of pet perfume
         priced at $10.00 a bottle. "To the extent that a shopper might make such a
15       purchase, it would likely be after viewing the bottle carefully, grasping
         the joke, and seeking to share it with others." *Schieffelin*, 850 F.Supp. at
16       250; *see also id.* ("This case is not one where unsophisticated customers
17       may fall prey to similar marks of inexpensive products that are in
         competitive proximity with each other.") Because defendant's "theme and
18       pun on the [Hilfiger] marks are obvious, even a minimally prudent
19       customer would not be confused by the source or affiliation of
         [defendant's products]. The purchasing public must be credited with at
20       least a modicum of intelligence." *N.Y. Stock Exch.*, 69 F.Supp.2d at 487.

21

22   *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 420 (S.D.N.Y.

23   2002).

24       Similarly, there has been no actionable dilution of JDPI's marks.  First there has been

25   no dilution by blurring as VIP's Bad Spaniels parody dog toy, like other obvious parodies,

26   tends to increase the public's identification of Jack Daniel's trademarks with Jack Daniels.

27   Again, the Court's reasoning in the Tommy  Hilfiger Licensing case is directly relevant

                                            15

to the facts of this case:

> Although a likelihood of confusion is not necessary to find dilution, and
> indeed may be inconsistent with such a finding,7 many of the factors
> relevant to a likelihood of confusion are also relevant to a likelihood of
> dilution. *See Restatement (Third) of Unfair Competition* § 25 cmt. f; *see
> also N.Y. Stock Exch.*, 293 F.3d 550, 558; *Nabisco*, 191 F.3d at 217–222;
> *Yankee Publ'g*, 809 F.Supp. at 282. In this case, the above discussion of
> the confusion factors also disposes of Hilfiger's blurring claim. *See id.*
> Rather than result in this type of dilution, Nature Labs' spoof, like other
> obvious parodies, "tends to increase public identification of a plaintiff's
> mark with the plaintiff." *Jordache*, 828 F.2d at 1490 (citation omitted);
> *see Hormel*, 73 F.3d at 506. That is, "the use of famous marks in parodies
> causes no loss of distinctiveness, since the success of the use depends
> upon the continued association of the mark with the plaintiff." *Yankee
> Publ'g*, 809 F.Supp. at 282 (citation omitted). This may be true even when
> the parody is itself part of a trademark use. *See, e.g., N.Y. Stock Exch.*,
> 293 F.3d 550, 558; *Denicola, supra,* at 188–89 (citing cases and
> explaining: "The presence of a famous mark on certain products may have
> little diluting effect, particularly where it is obvious that the defendant
> intends the public to associate the use with the true owner .... [T]he joke
> itself reinforces the public's association of the mark with the plaintiff.") In
> this instance, the possibility of dilution by blurring is remote. Rather, as in
> the case of the "Petley Flea Bag" stickers, "the broad humor defendant
> employs serves to prevent the type of blurring which might result from a
> more subtle or insidious effort at humor at plaintiff's expense." *Tetley*,
> 556 F.Supp. at 794. Given the nature of the challenged use, then, and the
> utter lack of evidence that the selling power of Hilfiger's marks has been
> diminished, no rational trier of fact could conclude that Nature Labs' pet
> perfume is likely to impair the identification of Hilfiger's marks with its
> products.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs*, LLC, 221 F. Supp. 2d 410, 422 (S.D.N.Y.

2002).

Similarly, there is no dilution by tarnishment. "Dilution by tarnishment" is defined as

"association arising from the similarity between a mark or trade name and a famous mark

that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). There is no

evidence that Bad Spaniels has harmed the reputation of "Jack Daniels" nor is there likely

ever to be as VIP's Bad Spaniels product is an obvious parody and is a humorous, fun dog

toy. Again, the reasoning of the Court in the *Tommy Hilfiger Licensing* case is directly on

point:

> There is nothing to suggest that a designer label has anything to lose from mere association with pets, particularly where the entire association is a light-hearted if somewhat heavy-handed parody. I agree with the conclusion of the district court in *Jordache*: "When the association is essentially a harmless, clean pun, which merely parodies or pokes fun at the plaintiff's mark, tarnishment is not likely." *Jordache Enters. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 57 (D.N.M.1985), *aff'd*, 828 F.2d 1482 (10th Cir.1987); *see also McCarthy* § 31:155 (*quoting id.*). Even *Deere*, the case upon which Hilfiger principally relies, notes: "Not every alteration will constitute dilution, and more leeway for alterations is appropriate in the context of satiric expression and humorous ads for noncompeting products." *Deere*, 41 F.3d at 45; *see also Hormel*, 73 F.3d at 507–08 (holding that a benign parody product that was not in direct competition with plaintiff's product was unlikely to cause dilution). That observation applies in this case, and I find for defendant on plaintiff's dilution claim.

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002).

Finally, the famous *McCarthy* treatise provides a good summary of the parody and free speech defense to a claim for dilution by tarnishment. *McCarthy on Trademarks and Unfair Competition* § 24:90 at pp. 24-279-283 (Rel. 69, 3/2014) (hereafter, "McCarthy"). As stated in *McCarthy*:

> The general rule permits anyone, competitor, critic or comedian, to use a famous mark to make fun of . . . the products or policies of the mark owner. This principle is embodied in both the Constitutional guarantee of free speech and in the explicit statutory defenses under the 2007 Trademark Dilution Revision. Act (TDRA).

*McCarthy* § 24:90 at pp. 24-279.

**INTERROGATORY NO. 10:**    State in detail the complete legal and factual basis for VIP's affirmative defense in paragraph 67 of the Answer to Counterclaim that VIP's use of any term or mark "is a protected parody under the First Amendment to the United States Constitution" (including stating specifically what comment about, or criticism or ridicule of, Jack Daniel's Tennessee whiskey, the Jack Daniel's Marks, and/or the Jack Daniel Distillery is made by VIP through the Bad Spaniels Toy  and packaging), and specifically set forth

1   any information or evidence supporting or discrediting that affirmative defense.

2   **RESPONSE: Objection.** This interrogatory is unreasonably overbroad. It is simply

3   not possible, in the context of a response to an interrogatory to "state in detail" the "complete

4   legal basis" for VIP's contention in this case that its Bad Spaniels parody dog toy does not

5   infringe or dilute JDPI's trademarks. This would require, among other things, summarizing

6   whole swathes of the *McCarthy* treatise as well as scores of relevant cases and law review

7   articles that address trademark parodies and which support Plaintiff's general arguments in

8   this case. Subject to and without waving that objection, Plaintiff answers as follows: *See*

9   Response to Interrogatory No. 9. In addition to the facts and arguments set forth in the

10  foregoing Response to Interrogatory No. 9, Plaintiff directs JDPI to this quote from

11  *McCarthy* addressing the "hypersensitive" trademark owners:

12  **Hyper-Sensitive Owners of Famous Marks.** Some of the litigation
    brought by trademark owners against those who make fun of their
13  company's policies by the use of parodies of their trademarks reveals that
    some mark owners are hyper-sensitive to such humorous and sometimes
14  caustic criticism. Perhaps it is because many top executives in large
    companies are not used to being mocked and made fun of. Therefore,
15  they are ready, willing and able to unleash the dogs of litigation against
    anyone who makes fun of the symbol of their company. But the more
16  successful and famous a company and its products becomes, the more
    likely it will become a societal symbol of something. Then it is more
17  likely that critics will use humorous parody to take potshots at the
    company and its symbols. A certain toughening of the hide may be a
18  more effective response than asking the courts to silence the clowning
    critic. As the Seventh Circuit observed:
19

20  When businesses seek the national spotlight, part of the territory
21  includes accepting a certain amount of ridicule. The First
    Amendment, which protects individuals from laws infringing free
22  expression, allows such ridicule in the form of parody.

23  The irony is that the more distasteful and crude the parody, the more
24  likely the target is to complain. However, the more distasteful and crude
    the parody, the less likely it is that the public will mistakenly think that
25  the trademark owner has sponsored or approved it. People and companies
    rarely (if ever) make crude jokes mocking themselves.
26

27  *McCarthy* § 31:153 at pp. 31-364-365.

1     **INTERROGATORY NO. 11:**    State in detail the complete legal and factual basis

2     for VIP's affirmative defense in paragraph 68 of the Answer to Counterclaim that "Counter-

3     plaintiff's uses of the Marks described in the Counterclaims are being done in violation of the

4     antitrust laws," and specifically set forth any information and evidence supporting or

5     discrediting that affirmative defense.

6     **RESPONSE:**  Plaintiff does not intend to pursue this affirmative defense in this case.

7     Plaintiff will amend its Answer to JDPI's Counterclaim to, among other things, remove this

8     affirmative defense.

9

10    **INTERROGATORY NO. 12:**    State in detail the complete legal and factual basis

11    for VIP's affirmative defense in paragraph 69 of the Answer to Counterclaim and that

12    "Counter-plaintiff's claims are barred, in whole or in part, by the equitable doctrines of

13    acquiescence, waiver, laches, estoppel, and/or unclean hands," and specifically set forth any

14    information and evidence supporting or discrediting that affirmative defense.

15    **RESPONSE: Objection.**  This interrogatory is unreasonably overbroad.  It is simply

16    not possible, in the context of a response to an interrogatory to "state in detail" the "complete

17    legal basis" for the affirmative defenses listed.  Subject to and without waiving that objection,

18    VIP answers as follows:    JDPI did not make any demand on Plaintiff's vis-à-vis its claims of

19    trademark infringement until several months after VIP's Bad Spaniels parody dog toy first

20    went on sale in the United States.    *See* document bates-numbered VIP00133034.  Plaintiff

21    reserves the right to supplement its response as discovery progresses.

22

23

24

25

26

27

1    **INTERROGATORY NO. 13:**    State in detail the complete legal and factual basis

2    for VIP's affirmative defense in paragraph 70 of the Answer to Counterclaim that "Counter-

3    plaintiff has failed, in whole or in part, to mitigate its damages," and specifically set forth any

4    information and evidence supporting or discrediting that affirmative defense.

5    **RESPONSE: Objection.**    As JDPI is not seeking damages in this matter, this

6    interrogatory is not relevant.    Plaintiff will amend its Answer to JDPI's Counterclaim to,

7    among other things, remove this affirmative defense.

8    **RESPECTFULLY SUBMITTED** this 11th day of March, 2015.

9                                    **DICKINSON WRIGHT PLLC**

10

11

12    By: _____
                David G. Bray
13                1850 North Central Avenue, Suite 1400
                  Phoenix, Arizona  85004
14                *Attorneys for VIP Products, L.L.C.*

15

16

17

18

19

20

21

22

23

24

25

26

27

20

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2015, I e-mailed and mailed Plaintiff and Counterdefendant VIP Products, LLC's Responses to Defendant and Counterclaimant Jack Daniel's Properties, Inc.'s First Set of Interrogatories to each of the parties set forth below:

Christopher C. Larkin, Esq.
clarkin@seyfarth.com
SEYFARTH SHAW LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
*Attorneys for Jack Daniel's Properties, Inc.*

Gregory P. Sitrick, Esq.
Gregory.sitrick@quarles.com
Isaac S. Crum, Esq.
Isaac.Crum@quarles.com
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
*Attorneys for Jack Daniel's Properties, Inc.*

Kristi A. Arendt