1  Firm E-Mail: courtdocs@dickinsonwright.com

2

3  David G. Bray (#014346)
   dbray@dickinsonwright.com
   Frank G. Long (#012245)
4  flong@dickinsonwright.com
   Jonathan S. Batchelor (#026882)
5  jbatchelor@dickinsonwright.com
   Colleen M. Ganin (#032456)
6  cganin@dickinsonwright.com

7  **DICKINSON WRIGHT, PLLC**
   1850 North Central Avenue, Suite 1400
8  Phoenix, Arizona 85004
   Phone: (602) 285-5000
9  Fax: (602) 285-5100

10 *Attorneys for Plaintiff and Counterdefendant*
   *VIP Products, L.L.C.*
11

12              **IN THE UNITED STATES DISTRICT COURT**

13                      **DISTRICT OF ARIZONA**

14
   VIP Products, L.L.C., an Arizona limited          Case No. 2:14-cv-02057-SMM
15 liability company,

16                                                    **VIP'S RESPONSE TO JACK DANIEL'S**
                   Plaintiff and Counterdefendant,    **PROPERTIES' MOTION FOR**
17                                                    **PARTIAL SUMMARY JUDGMENT**
          v.
18
19 Jack Daniel's Properties, Inc., a Delaware
   corporation
20                                                    **(Oral Argument Requested)**
                   Defendant and
21 Counterclaimant.

22 **I.    INTRODUCTION.**

23         On October 23, 2015 Plaintiff/counterdefendant VIP Products, L.L.C. ("VIP") filed its

24 own motion for summary judgment (Dkt. # 110) ("VIP's Motion") on all of the claims for

25 relief asserted by Jack Daniel's Properties, Inc. ("JDPI") in its Counterclaim. Therein, VIP

26 demonstrated that it is entitled to summary judgment on JDPI's infringement and dilution

27 claims because its fair use of JDPI's alleged trade dress cannot give rise to liability under the

28

                                         1

Lanham Act and the First Amendment. VIP further demonstrated that it was entitled to summary judgment on JDPI's claims because JDPI cannot prove that alleged Jack Daniel's Trade Dress is non-functional and distinctive, nor can it prove its dilution claim under the Trademark Dilution Revision Act.

In contrast to the case-dispositive VIP motion, JDPI's partial motion for summary judgment (Dkt. #101) ("Motion") is much narrower, focusing not on the merits of JDPI's infringement and dilution claims but rather on VIP's claim that JDPI's asserted trade dress is not protectable. In turn, JDPI's Motion asks the Court to rule that its asserted trade dress is non-functional and has acquired distinctiveness as a matter of law. However, for the reasons set forth in VIP's Motion, VIP is entitled summary judgment on this issue, as well as on its related claim that JDPI's PTO registration of its functional and non-distinctive bottle design should be cancelled. In turn, JDPI's Motion must be denied.

As detailed below, JDPI's Motion relies on misapplication of the law, mischaracterization of witness testimony, and unfounded assertions to support its arguments that its alleged trade dress is protectable. In short, JDPI asserts trademark and trade dress rights that are based on a myth, not facts. JDPI's repeated invocation of the words "iconic Jack Daniel's Trade Dress" cannot compensate for JDPI's lack admissible evidence to support its claims, and does not supplant the clear language of the Lanham Act.

The myth of the Jack Daniel's "Iconic Trade Dress" distorts the truth; as detailed below, the alleged "Jack Daniel's Trade Dress" is neither iconic nor a valid trade dress under the Lanham Act. At most, the alleged Trade Dress combines a common liquor bottle shape with generic labeling and graphics, mimicking a customary bottle packaging that a wide variety of American whiskey makers' use. Its ubiquity makes it *familiar*, but not exclusive.

Here, JDPI attempts to use the Myth to stifle free speech by VIP. The factual and legal foundations of trademark and trade dress rights are critical. They keep those rights within their legitimate bounds. If taken out of context, or if based on myth instead of facts, trademark

rights become wrongs. This Court should follow the facts and law rather than the Myth of the Jack Daniel's "Iconic Trade Dress" by denying JDPI's Motion in its entirety.

## II. FACTUAL BACKGROUND.

VIP sells chew toys for dogs. VIP's Controverting Statement of Facts and Statement of Additional Facts ("CSOF") ¶ 168. Among VIP's products is the SILLY SQUEAKERS® line of chew toys, which includes a line of rubber squeaky toys shaped like bottles, with names parodying well-known beverages, such as "Mountain Drool," "Hein'e'sniff'n," and the toy at issue in this case, pictured below. CSOF ¶ 168.



The SILLY SQUEAKERS® toy is, exactly as the name says, a silly squeaker toy. CSOF ¶ 169. It invites buyers to imagine "how funny your dog would be if he was like us." CSOF ¶ 170. The SILLY SQUEAKERS® toy's message to consumers is that "it is ok to make fun of well-known brands." CSOF ¶ 170. The toy is an irreverent parody of an American whiskey brand. VIP sells only a few thousand units of the SILLY SQUEAKERS® toy per year, and total revenue from the product amounts to a tiny fraction of the cost of this litigation—litigation which has, ironically, become necessary to establish that a well-known brand cannot stifle free speech and prohibit parody. CSOF ¶ 171.

The SILLY SQUEAKERS® toy resembles an American whiskey bottle. CSOF ¶ 172. It borrows the common liquor bottle shape and label graphics similar to those used by several American whiskey makers, including Jack Daniel's Tennessee Whiskey ("JDTW"). CSOF ¶ 173. JDPI admits that the following bottles are American whiskey packaging from various sources:

    

1  CSOF ¶ 174. However, third-party use of this design in the American whiskey market is not

2  limited to the above examples. Many other whiskey brands use a similar packaging as well.

3  CSOF ¶ 175.

4       The SILLY SQUEAKERS® toy includes the words "Bad Spaniels" and "The Old No.

5  2" on the label. CSOF ¶ 177. Those words obviously parody the "Jack Daniel's Old No. 7"

6  brand of Tennessee whiskey specifically, but VIP was careful to ensure the toy is also

7  distinctly original. CSOF ¶ 178.

8       For example, the SILLY SQUEAKERS® toy does not use the "Jack Daniel's" name,

9  the number "7"; the embossed "Jack Daniels" signature; the same filigree design as the JDTW

10 label; or the three-sided JDTW body label. CSOF ¶ 179. In addition, VIP prominently placed

11 its SILLY SQUEAKERS® trademark on the VIP Product's hangtag, added a cartoon dog on

12 the label, and changed the location of its elements, as seen in the image below.

13

14

15

16

17

18                              

19

20

21 CSOF ¶ 180.

22       In addition, VIP placed a disclaimer on the hangtag stating that the "product and its

23 design belong to VIP Products," and that the product is not "affiliated with Jack Daniel

24 Distillery." CSOF ¶ 181. The SILLY SQUEAKERS® toy label refers to "43% poo by vol."

25 and "100% smelly," CSOF ¶ 182, something Jack Daniel's Global Brand Director testified

26 that he found to be in "bad taste," and stated that JDPI would never license any JDPI marks or

27 trade dress for any product it considered to be in bad taste. CSOF ¶ 183.

28

In fact, there are over 50 specific design differences between the SILLY SQUEAKERS® toy and the JDTW bottle packaging. CSOF ¶ 184. Moreover, the SILLY SQUEAKERS® Bad Spaniel dog toy design uses as many as 15 different generic and non-exclusive features found in various combinations on bottles of Kentucky bourbon and Tennessee whiskey from different sources. CSOF ¶ 185.

These stark differences between VIP's SILLY SQUEAKERS® Bad Spaniel toy and Jack Daniel's whiskey and the obvious parodic nature of VIP's products (it is typically sold with other models of SILLY SQUEAKERS® toys parodying other beer, wine, liquor, and soda brands) make consumer confusion extremely unlikely. CSOF ¶ 186. Moreover, the two companies' products are further distinguished by the fact that VIP's SILLY SQUEAKERS® toy is not sold in the same channels of trade as JDTW. CSOF ¶ 187. The toy is primarily sold in the specialty dog-supply market, and JDPI is not a competitor in that market. CSOF ¶ 188. JDPI has never licensed any JDTW marks and trade dress for use on a dog toy, and it has no intention to do so in the future. CSOF ¶ 189. Not surprisingly, there has never been a single reported incidence of actual consumer confusion involving VIP's SILLY SQUEAKERS® toy.

JDPI nonetheless claims that the SILLY SQUEAKERS® Toy infringes the "Jack Daniel's Trade Dress" that JDPI claims is "an iconic trade dress consisting of" several combined elements. JDPI also maintains that VIP's pet toy infringes the JDTW bottle label, the "Jack Daniel's" brand name, the "Old No. 7" slogan and a "Jack Daniel" signed square bottle for "distilled spirits," all of which are registered with the U.S. Patent and Trademark Office ("PTO"). The alleged Jack Daniel's Trade Dress is not registered with the PTO, and the specific features of the alleged Jack Daniel's Trade Dress vary depending on what JDPI representative describes them and when. JDPI consumer research



5

identifies select features of the alleged Jack Daniel's Trade Dress as the key visual attributes of the JDPI package. The four fundamental features are a: (1) square bottle and ribbed neck: (2) black cap; (3) black neck wrap with white printing; and (4) black front label with white printing and filigreed border. The alleged Trade Dress, depicted at right, also includes the "Old No. 7" slogan on the neck wrap and front label and the "Jack Daniel's" brand name on the front label only, along with the words "Tennessee" and "Sour Mash Whiskey." CSOF ¶ 190.

JDPI claims that the "basic form" of the "packaging and labeling" for JDTW was established in the 1950s, Motion (Dkt. # 101) at 9:16–17, though some graphical and structural features of the alleged Trade Dress have changed over that time. CSOF ¶ 191. As recently as 2011, JDPI modified the bottle shape and label, creating a new design, which JDPI refers to as the "Evolution Bottle" design. CSOF ¶ 192.

JDPI claims common law "iconic trade dress" rights in the combination of the common bottle shape and generic labeling and graphics used by the SILLY SQUEAKERS® pet toy. However, JDPI cannot settle on exactly what comprises its "iconic trade dress." CSOF ¶ 195. VIP's expert, Martin Wolinsky testified that, if other whiskey producers were prevented from using this style of packaging that signifies to consumers that it is an American whiskey, the other producers would be at a disadvantage. CSOF ¶ 196.

JDPI disclosed no rebuttal expert on this issue. Indeed JDPI has not controverted Mr. Wolinksy's testimony regarding the use of these packaging elements by JDPI's competitors in the Whiskey industry. Instead, JDPI argues that Mr. Wolinsky's answers to questions in his deposition (made over VIP's counsel's foundational objections) that were framed by JDPI's counsel with common words like "distinctive" and "generic" *without Mr. Wolinsky having any understanding as to the meaning of those words as legal terms of art* somehow constitute admissions binding on behalf of VIP. *See* CSOF ¶¶ 77, 88. That is obviously not the law.[1]

---

[1] Because VIP has objected to this evidence (here, as well as in the depositions), JDPI must prove that "its evidence is admissible as presented or would be presented in admissible form at trial." JDPI has not met this burden, and thus, the Court must sustain these objections.

Unfortunately for JDPI, Mr. Wolinsky is not a legal expert, and did not and could not offer *legal* opinions. Instead Martin Wolinsky, a former president of one of the worlds' largest liquor companies, is an expert in *the spirits and whiskey industry*, who testified that in his experience, these packaging elements are commonly used in the industry to designate a product as an "American Whiskey/bourbon." CSOF ¶ 197. Indeed, research relied on by JDPI revealed that consumers ███████████████████████████████████████████ ████████████████. CSOF ¶ 198.

## III.   JDPI'S MOTION MUST BE DENIED BECAUSE THE ALLEGED JACK DANIEL'S TRADE DRESS IS FUNCTIONAL AND NON-DISTINCTIVE.

As set forth in VIP's Motion, the undisputed facts establish that the alleged common law Jack Daniel's Trade Dress is functional under *Disc Golf*'s utilitarian inquiry *and* the aesthetic functionality inquiry. *See* VIP's Motion (Dkt. # 110) at 15–16. Further, even if the Court somehow finds that JDPI has proven non-functionality, JDPI's claim still must fail because it has not shown that the Trade Dress serves as a distinctive source identifier for Jack Daniel's brand whiskey.

### A.   JDPI Failed To Prove its Jack Daniel's Trade Dress is Non-Functional.

"[O]ne who seeks to establish trade dress protection *must carry the heavy burden of showing that the feature is not functional*." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001) (emphasis added).

JDPI contends the Jack Daniel's Trade Dress is nonfunctional because "[t]he packaging for Jack Daniel's whiskey embodies design choices that are not based on any considerations of utility but are instead intended to identify the product as a Jack Daniel's

---

*Barnett v. Lincoln Nat. Life Ins. Co.*, No. CV–12–2160–PHX–SMM, 2014 WL 4259482, at *2 (D. Ariz. Aug. 28, 2014) (sustaining party's specific objections because proponent failed to show that the evidence was admissible at trial) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). As statements inadmissible at trial, these statements must be excluded at the summary judgment stage. *Id.* at *1 ("a court ruling on summary judgment may not consider evidence that would be inadmissible at trial."); *see Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).

product and to remain true to the historical labeling, heritage, and quality image of the product." JDPI's Supplemental Statement of Facts in Support of its Motion for Partial Summary Judgment (Dkt. # 102) ¶ 9 ("JDPI's SOF"). Whatever the intentions, the facts reveal that the "design choices" by JDPI had functional consequences for the alleged Jack Daniel's Trade Dress.

In evaluating functionality, courts rely on the non-exclusive factors described in *Disc Golf Ass'n, Inc. v. Champion Discs*, 158 F.3d 1002, 1006 (9th Cir. 1998), as clarified by the recent *Moldex-Metric* decision. *See Moldex–Metric, Inc. v. McKeon Prods., Inc.*, 596 Fed. Appx. 567, 567–68 (9th Cir. 2015). Based on those factors, JDPI has failed to carry its "heavy burden" for proving that the alleged common law Jack Daniel's Trade Dress is not functional.

Specifically, courts apply a two-step test in evaluating functionality: (1) a "utilitarian" inquiry and (2) an "aesthetic" inquiry. *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006). If a plaintiff cannot meet its burden under the utilitarian test, its trade dress is functional and not entitled to protection. On the other hand, if a plaintiff meets its burden and passes the utilitarian test, it must then prove that its trade dress is not aesthetically functional under the "competitive necessity" test. Specifically, the plaintiff must prove that its trade dress does not "perform some function such that the 'exclusive use of [the feature] would put competitors at a significant, non-reputation related disadvantage.'" *Qualitex Co. v. Jacobson Prods., Co.*, 514 U.S. 159, 165 (1995). The Ninth Circuit recently confirmed that the *Qualitex* doctrine precludes any single competitor from claiming exclusive rights to features that are essential to effective competition. *See Moldex– Metric*, 596 Fed. Appx. at 567–68; *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd.*, 668 F.3d 677, 686–87 (9th Cir. 2012).

JDPI fails to meet its heavy burden to prove that the alleged Jack Daniel's Trade Dress is not utilitarian based on the factors set forth in the *Disc Golf* decision. That failure of

proof by JDPI is confirmed by evidence (including JDPI admissions) proving that the Jack

Daniel's Trade Dress is functional under both the utilitarian and aesthetic inquiries.

### 1. JDPI Has Failed to Prove That the Jack Daniel's Bottle Dress is Nonfunctional under *Disc Golf*.

JDPI has failed to meet its "heavy burden" under *Disc Golf* because it has not shown

that: (1) the alleged Jack Daniel's Trade Dress does not yield a utilitarian advantage; (2) there

are alternative designs that provide the same benefits as the alleged Jack Daniel's Trade Dress;

(3) the JDTW advertising does not promote the advantages of the alleged Trade Dress; and (4)

the alleged Jack Daniel's Trade Dress does not yield "economies in manufacture or use." *Disc

Golf*, 158 F.3d at 1006; *see Talking Rain Bev. Co. v. S. Beach Bev. Co.*, 349 F.3d 601, 603 (9th

Cir. 2003). In order to establish nonfunctionality, the party "with the burden must demonstrate

that the product feature serves *no purpose* other than identification." *Disc Golf*, 158 F.3d at

1007.

### a.) JDPI Failed to Prove That the Jack Daniel's Bottle Dress Does Not Yield Utilitarian Advantages

JDPI claims that the "Jack Daniel's Trade Dress does not provide any utilitarian

advantages," because "'[a]esthetic elements such as the font and size of the lettering on the

label, the strategic placement of certain design elements, or the use of a particular phrase are

not utilitarian advantages.'" Motion (Dkt. # 101) at 16:3–7; JDPI's SOF (Dkt. # 102) ¶ 9.

Even if true, this claim is irrelevant because design choices made to enhance a

product's appearance can yield utilitarian advantages. *See, e.g.*, *Secalt*, 668 F.3d at 686 (the

asserted trade dress was not protectable because "at least some . . . utilitarian advantages

stem[med] from [its] visual appearance"); *Rodan & Fields, LLC v. Estee Lauder*, No. 10-CV-

02451-LHK, 2010 WL 3910178, at *5 (N.D. Cal. Oct. 5, 2010) ("numerous examples of the

functional use of color coding to distinguish products (as opposed to identifying brands) in

many industries, including the cosmetics industry"); *see also Apple, Inc. v. Samsung Elec.,

Co.*, 786 F.3d 983, 993 (Fed. Cir. 2015) (plaintiff's unregistered trade dress was not

protectable because the design pursued more than "just beauty," and because plaintiff admitted that the design "improved the quality [of the iPhone] in some respects.").

More importantly, JDPI fails to prove that other structural elements included in the combination of features that compromise the alleged Trade Dress do not yield utilitarian advantages. This oversight is fatal because VIP submitted expert testimony identifying several significant utilitarian advantages provided by the structural aspects of the alleged Trade Dress. CSOF ¶ 199.

### b.) JDPI Has Not Shown Available Superior or Equivalent Alternative Designs.

JDPI's claim that there are many alternative designs for whiskey packaging available amounts to a mere equivocation as to the meaning of "alternative designs." Motion (Dkt. # 101) at 29:5–6. "Alternative designs" are only relevant if they provide the same advantages as the alleged Jack Daniel's Trade Dress—the critical consideration being whether the design alternatives are comparable, not merely "available and in use." *See Leatherman Tool Grp. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013–14, n. 7 (9th Cir. 1999) (a claimant "does not have rights under trade dress law to compel its competitors to resort to alternative designs which have a different set of advantages and disadvantages"); *see also Apple, Inc.*, 786 F.3d at 993.

Here, JDPI has offered no evidence that any of these "many, many alternatives" can match the utilitarian advantages of the combined Jack Daniel's Trade Dress features. Yet, VIP's evidence reveals that alternative bottle designs do not offer the same advantages as the alleged Jack Daniel's Trade Dress. CSOF ¶ 200.

### c.) JDPI Has Not Shown That its Advertising Does Not Promote the Advantages of the Alleged Trade Dress

JDPI has not met its burden in showing that its advertising does not promote the "utilitarian advantages of its packaging." *Disc Golf*, 158 F.3d at 1009. Accordingly, this factor supports a finding that the alleged Jack Daniel's Trade Dress is functional.

*d.) JDPI Has Not Shown That The Trade Dress Is Less Economically Efficient Than Other Design Options.*

JDPI must prove that the alleged Trade Dress does not represent an economically efficient design, or put another way, that "the design [does not] achieve[] economies in manufacture or use." *Disc Golf*, 158 F.3d at 1009 (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993)). Yet, JDPI has presented evidence showing only that the Jack Daniel's Trade Dress has a higher manufacturing cost than other bottle shapes, particularly those bottle shapes that are round. JDPI's SOF (Dkt. # 102) ¶¶ 117–19. VIP has submitted evidence, in conjunction with its own Motion for Summary Judgment on this issue, revealing that features of the alleged Trade Dress reduce the overall cost of per unit. CSOF ¶ 201. Such evidence is proof of functionality. *See Farmgirl Flowers, Inc. v. Bloom That, Inc.*, No. 14-CV-05657-LHK, 2015 WL 1939424, at *6 (N.D. Cal. Apr. 28, 2015) (use of burlap to package flowers was functional because defendant "would incur substantially more costs if it were to use an alternative fabric with similar [utilitarian benefits], such as canvas or hemp").

Rather than provide evidence addressing other aspects of packaging costs, JDPI has merely contested the VIP evidence. *See* Motion (Dkt. # 101) P.16. The JDPI challenges lack any supporting data and are based solely on the uncorroborated testimony of self-interested JDPI employees, *see* JDPI's SOF (Dkt. # 102) ¶¶ 117–19 (citing Taylor Decl. ¶¶ 4–5), which have little evidentiary value at the summary judgment stage. *See Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1152 (9th Cir. 1999) (affirming summary judgment because plaintiff's insider affidavit in opposition to defendant's motion was "vague, uncorroborated, and clearly self-interested"); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995).

Most significantly, JDPI failure to provide any evidence to satisfy the fourth *Disc Golf* factor effectively confirms the utilitarian functionality of the alleged Trade Dress.

**B.**    **JDPI Has Not Proven That The Jack Daniel's Trade Dress Is Not Aesthetically Functional.**

Even if the alleged Jack Daniel's Trade Dress could pass the utilitarian functionality test, JDPI must also prove it is not aesthetically functional. To do so, JDPI must show that its competitors would not be placed at "a significant non-reputation-related disadvantage" if it is granted exclusive rights in the alleged Jack Daniel's Trade Dress. *See Moldex-Metric*, 596 Fed. Appx. at 567; *Qualitex*, 514 U.S. at 170 (holding that the "ultimate test of aesthetic functionality . . . is whether the recognition of trademark rights would significantly hinder competition"); *see also Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 222 (2d Cir. 2012) ("a mark is aesthetically functional, and, therefore ineligible for protection under the Lanham Act, where protection of the mark significantly undermines competitors' ability to compete in the relevant markets").

JDPI has failed to meet this burden. In fact, both parties' evidence *confirms* that the design of the alleged common law Jack Daniel's Trade Dress is such a common bottle packaging in the whiskey market that, if JDPI were granted exclusive rights, it would place competitors at a significant non-reputation-related disadvantage. CSOF ¶ 202. Thus it is VIP's Motion for Summary Judgment that should be granted on this issue, not JDPI's.

Generally, "the exclusive use of [a design] would put competitors at a significant, non-reputation-related disadvantage,'" if the design is so widely used that it identifies a product category. *See, e.g., Rodan & Fields*, 2010 WL 3910178, at *5 (plaintiff's color-coded cosmetics packaging was functional because competitors "would be at a significant disadvantage if they could not continue to package their products" in a similar manner); *Nora Bevs., Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114 (2d Cir. 2001) (1.5 liter clear, ribbed polyethylene bottle for spring water was "generic," but could as well have been found to be "functional"—the primary evidence was that, as of the date of the accused infringer's entry into the market, the bottle design "was used, with minor variations, throughout the entire market of similar products").

Here, JDPI admits that its direct competitors in the whiskey industry use bottle designs that are very similar to the alleged Jack Daniel's Trade Dress. Motion (Dkt. # 101) at 19:15–17 ("some spirits companies already use the 'four elemental elements' of the Jack Daniel's trade dress"); *see also* CSOF ¶ 203. In fact, JDPI's own market research confirms that consumers *expect* Kentucky Bourbon and Tennessee Whiskey to be sold in a square bottle with a fluted neck. CSOF ¶ 198. Many brands of Kentucky Bourbon or Tennessee Whiskey use: (1) a square bottle with a fluted neck, (2) a black cap, and (3) a black neck-wrap closure. CSOF ¶ 204. As a result, "giving Jack Daniel's exclusive rights to use [those] features . . . would impose a competitive disadvantage on" the other brands that currently use them. CSOF ¶ 205. "The disadvantage would be to deprive those other competing companies of the ability to use a standard industry 'uniform' that identifies any whiskey as an American whiskey." CSOF ¶ 205. It would also make it virtually impossible for VIP to make a squeaky dog toy that was recognizable as a parody of any American whisky bottle.

Additionally, JDPI effectively admits the alleged Trade Dress is aesthetically functional by stating in its Motion that "[t]he Jack Daniel's Trade Dress reflects aesthetic design choices and embodies branding features that focus on the historical identification of the product, and that are wholly unrelated to utility." Motion (Dkt. # 101) at 15:9–11. The "historical identification of the product" is an aesthetic function.

Features of the alleged Jack Daniel's Trade Dress are intended to evoke history and authenticity, masculinity and honesty. CSOF ¶ 206. Those features, including the square bottle and fluted neck, convey to consumers that product inside the bottle packaging is a Kentucky or Tennessee whiskey with an old time or classic heritage. CSOF ¶ 207. JDPI made its 2011 re-design of the prior whiskey bottle "packaging structure" and adopted the Evolution Bottle design in order ██████████████████████████████████ CSOF ¶ 208.

During the re-design process, JDPI obtained consumer research revealing that the "██████████████" of the alleged Jack Daniel's Trade Dress elevate "████████████████," and the new bottle design "████████████████

1    ████ " and " ███████████████████████████████," including the following

2    specific functions:

3

4

5

6

7

8

9

10

11

12

13

14

15          **C.    JDPI Has Not Proved That the Jack Daniel's Trade Dress is Distinctive.**

16          Even if the Court were persuaded that the alleged Jack Daniel's Bottle Dress is non-

17    functional, JDPI's claim still must fail because it has not shown that the alleged common law

18    Trade Dress is distinctive. Conceding that its alleged Trade Dress is not inherently distinctive,

19    JDPI claims that the Jack Daniel's Trade Dress has *acquired* distinctiveness because "VIP

20    intentionally copied the [Jack Daniel's Trade Dress]," and because of the "extensive and

21    longstanding use, advertising, and exposure of Jack Daniel's whiskey." Motion (Dkt. # 101)

22    at 5:9–16, 9:2–4, 10:6–10. As set forth below, JDPI's arguments are unsupported by both the

23    facts and the law.

24          **1.    Intentional Copying Does Not Show Acquired Distinctiveness.**

25          JDPI claims that "VIP's deliberate copying" establishes "that the Jack Daniel's Trade

26    Dress has acquired distinctiveness." Motion (Dkt. # 101) at 11:1–3. According to JDPI:

27    "[p]roof of intentional copying 'strongly suggests' an inference of secondary meaning," and

28    "VIP copied the Jack Daniel's Trade Dress . . . to take advantage of the public recognition of

1  the Jack Daniel's packaging resulting from extensive and longstanding sales, advertising, and
2  public exposure of the product." Motion (Dkt. # 101) at 4:25–28, 5:18–23.

3       However, JDPI's claims are misleading in both respects. The actual rule is that only an
4  "*[u]nexplained* proof of intentional copying" is probative of secondary meaning." *Spark*
5  *Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-GW(ASx), 2014 WL 4365736, at *11 (C.D.
6  Cal. Aug. 28, 2014) (emphasis added). If a defendant copies a plaintiff's product for some
7  reason other than to confuse consumers, such evidence is not probative of secondary meaning.
8  *Id.* ("[N]on-nefarious explanations for intentional copying—like the desire to emulate a trade
9  dress's functional elements or other *non-protectable qualities*—may refute an inference that
10 the defendant was trying to capitalize on an existing (or at least perceived) secondary
11 meaning."); *see Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844–45 (9th Cir.
12 1987).

13      In this case, VIP did not copy all elements of the Jack Daniel's Tennessee Whiskey
14 bottle packaging, but copied only its generic and non-exclusive features, and only to the
15 extent necessary to successfully execute its parody. CSOF ¶ 211. These facts preclude any
16 inference that VIP intended to "free ride on the success" of Jack Daniel's whiskey, or to
17 confuse consumers into believing that the VIP pet toy is affiliated with Jack Daniel's or that
18 the alleged common law Jack Daniel's Trade Dress has secondary meaning.

19      Further, VIP sells its SILLY SQUEAKERS® "Bad Spaniels" dog toy with a hangtag
20 that prominently displays the SILLY SQUEAKERS® trademark and that includes a disclaimer
21 stating that the VIP pet toy is "not affiliated with Jack Daniel Distillery." CSOF ¶¶ 180-81.
22 This evidence further "refute[s] an inference that [VIP] copied [JDPI's] trade dress in order to
23 capitalize on . . . [its] secondary meaning." *Spark Indus*, 2014 WL 4365736, at *11; *see also*
24 *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994) ("Because of [the
25 defendant's] conspicuous use of its own trademarks, therefore, it was clearly erroneous to
26 infer from [the defendant's] copying of [the plaintiff's] product that the marks at issue here had
27 acquired secondary meaning"); *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d
28 1198, 1214 (D. Minn. 2007) ("While secondary meaning can be inferred from evidence of

deliberate copying, courts will not infer secondary meaning when the defendant conspicuously uses its own trademark to identify the product.").

Indeed, there are drastic differences between the VIP pet toy and the Jack Daniel's marks and label design. JDPI's Answer to VIP's Complaint (Dkt # 12) ¶¶ 14, 17. Finally, none of the focus groups who viewed the VIP pet toy confused it with Jack Daniel's whiskey. CSOF ¶ 212. Thus, any intentional copying by VIP is not even probative of secondary meaning of the alleged Jack Daniel's Trade Dress.

### 2. The Evidence of "Extensive and Longstanding Use, Advertising, and Exposure" Does Not Show Acquired Distinctiveness.

JDPI also claims its alleged Trade Dress has secondary meaning because of its whiskey's high sales revenues, its substantial advertising expenditures, and its media, celebrity, and sales exposure. Motion (Dkt. # 101) at 4:25–28. At most, this evidence shows merely that Jack Daniel's whiskey is *popular*—and popularity, without more, is irrelevant to whether product packaging has acquired distinctiveness. *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1005 (C.D. Cal. 2011) ("To find otherwise would provide trade dress protection for any successful product or for the packaging of any successful product.").

#### a.) Extensive and Longstanding Use

JDPI claims that the Jack Daniel's Trade Dress has acquired distinctiveness based on its large number of sales over a long period of time. Motion (Dkt. # 101) at 9:15–16. However, a product's raw sales data cannot prove secondary meaning of the product's packaging. 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS § 15:47 (4th ed. 2010) ("Evidence which merely shows that a product is popular is not probative evidence of secondary meaning in the trademark for that product. . . . Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark."). JDPI fails to provide any context for its sales evidence and sales figures and, accordingly, this evidence does not establish secondary meaning of its product packaging. *See Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1003 (S.D. Cal. 2000) (for sales data to be probative of secondary meaning, the claimant must also show: "the size of the relevant

market or the market share [plaintiff] achieved"; "compare its sales to those of its competitors"; "geographic distribution of its sales or the average number of units purchased per customer"; and "the frequency of repeat and volume purchases").

At most, the JDPI sales evidence shows only the presumed popularity of the Jack Daniel's whiskey itself. However, product popularity is not proof that consumers have come to view the packaging for that product as a source-identifying mark for that product. "McDonalds can't stop other fast food manufacturers from selling food in paper bags and Scotch can't stop other manufacturers of office products from using circular tape dispensers." *Mattel, Inc.*, 782 F. Supp. 2d at 1005. Likewise, evidence of Jack Daniel's whiskey sales cannot support a trade dress claim that would allow JDPI to stop other whiskey manufacturers from using common bottle packaging.

*b.) Advertising*

JDPI's reliance on advertising to establish secondary meaning is misplaced because the advertising disclosed by JDPI does not focus on its alleged trade dress as opposed to the "Jack Daniel's" or "Old No. 7" marks alone. Motion (Dkt. # 101) at 9:10–14. Spending large sums of money on any advertising does *not* create legally protectable rights without proving the "effectiveness of those expenditures." *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 992 (D. Ariz. 1992) (citing *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987)). This is particularly relevant in this case where JDPI seeks to establish secondary meaning not for JDPI's Jack Daniel's mark, but for its trade dress.

JDPI expenditures "on advertising and promotion of Jack Daniel's Whiskey" do not show that the alleged Jack Daniel's Trade Dress has acquired distinctiveness. Numbers alone merely suggest that, at most, JDPI evidence of its advertising expenditures "may simply serve to indicate the popularity of" Jack Daniel's whiskey and recognition of its Jack Daniel's brand name, rather than the alleged common law Jack Daniel's Trade Dress itself. *See, e.g.*, *Target Brands, Inc. v. Shaun N.G. Hughes*, 85 U.S.P.Q.2d 1676, 1682, n.6 (T.T.A.B. 2007).

Likewise, the Jack Daniel's whiskey advertisements themselves are not probative of secondary meaning because they do not direct consumers' attention to the alleged Jack

Daniel's Trade Dress. *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1180 (N.D. Cal. 2007) (to be evidence of secondary meaning, "advertising *must direct the consumer to those features claimed as trade dress*; merely 'featuring' the relevant aspect of the product does not suffice") (emphasis added); *see also First Brands Corp.*, 809 F.2d at 1383; *Spark Indus.*, 2014 WL 4365736, at *13.

While JDPI maintains that "[m]ost of [JDPI's print advertising] has *highlighted* the Jack Daniel's packaging," Motion (Dkt. # 101) at 10:6–10 (emphasis added), JDPI has admitted that it advertises its Jack Daniel's product and not the *packaging in which it is bottled*. CSOF ¶ 213. In fact, the JDPI evidence reveals that none of its advertisements include any textual or visual references directing consumers' attention to features of the alleged Jack Daniel's Trade Dress. CSOF ¶ 214. Thus, these advertisements do not prove that JDPI's alleged common law trade dress has obtained secondary meeting.

### c.)    Media Coverage

JDPI claims that the alleged Trade Dress has acquired distinctiveness because it "has appeared in numerous motion pictures and television programs," and is the "official drink of choice" of celebrities. Motion (Dkt. # 101) at 10:19–22. However, the evidence reveals that none of this media coverage refers to the alleged Jack Daniel's Trade Dress itself, or any of its elements other than the "Jack Daniel's" brand name and the "Old No. 7" mark. CSOF ¶ 215. Thus, JDPI's media exposure evidence also does not prove that its alleged trade dress has acquired distinctiveness.

### 3.    JDPI Has Not Presented Any Other Evidence Showing Acquired Distinctiveness.

The failure of JDPI to provide evidence of alleged common law Jack Daniel's Trade Dress secondary meaning is compounded by JDPI's complete failure to present any further evidence of secondary meaning, such as survey evidence, consumer testimony, or evidence of exclusive use of the alleged Trade Dress. In fact, both parties' evidence reveals that the

design used in the alleged Jack Daniel's Trade Dress is common in the American bourbon/whiskey market. CSOF ¶ 202.

### a.) No Direct Evidence (Survey/Consumer Testimony)

JDPI asserts that "survey evidence and direct consumer testimony are not required" to prove secondary meaning. Motion (Dkt. # 101) at 9:8–9 (citing *Art Attacks Ink, LLC v. MGA Entm't, Inc.*, 581 F.3d 1138, 1145–46 (9th Cir. 2009)). However, JDPI fails to mention that "[a]n expert survey of purchasers can provide the *most persuasive evidence* of secondary meaning." *Vision Sports, Inc. v. Melville, Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (emphasis added); *see Lisa Frank, Inc*, 799 F. Supp. at 990 (D. Ariz. 1992).[2]

In fact, most trade dress claimants are unlikely to meet their burden of proof without survey evidence. *See Univ. of Ala. v. Pitts*, 107 U.S.P.Q.2d 2001, 2018 (T.T.A.B. 2013) (finding that, "[w]hile survey evidence is not required, considering the ornamental nature of the [design], the lack of a survey in the absence of other probative evidence of acquired distinctiveness leaves little basis for us to recognize opposers' alleged ownership of trademark rights in the [design].").

Here, survey evidence of secondary meaning is critical because JDPI has *admitted* that several of its competitors—including Jim Beam, its largest competitor—use a number of the same design elements in their trade dress for their Kentucky bourbon and Tennessee whiskey. CSOF ¶ 216. Yet, the licensing manager for Brown-Forman, JDPI's corporate parent, could not recall Brown-Forman ever having conducted a study of any kind to test consumer recognition of the shape of the bottle currently used for Jack Daniel's Tennessee Whiskey. SOF ¶ 217.

---

[2] Indeed, in *Art Attacks* (relied on by JDPI), the Ninth Circuit held that the plaintiff—a trade dress holder who did not submit a survey and provided direct consumer testimony from only one individual—had "fail[ed] to demonstrate that purchasers of a product that displayed large eyes, oversized feet, and other characteristics typical of the Spoiled Brats would link that product with a single source." 581 F.3d at 1146. Here, JDPI goes further because it has submitted no direct consumer testimony *and* no survey evidence.

Under these circumstances, the failure by JDPI to provide any survey or direct consumer testimony to support the alleged distinctiveness by its trade dress is fatal to its acquired distinctiveness claim. *See E & J Gallo v. Proximo Spirits, Inc.*, No. CV–F–10–411 LJO JLT, 2012 WL 273076, at *13 (E.D. Cal. Jan. 30, 2012) (granting defendant's motion for summary judgment where defendants asserted that plaintiff's bottle shape alone did not indicate source, and plaintiff "chose not to do a consumer survey").

### b.) Evidence of Non-Exclusive Use

Further, JDPI has not proven the alleged Jack Daniel's Trade Dress has acquired distinctiveness because JDPI has not shown, and cannot show, that it is the sole user of a significant number of the elements claimed in the alleged Jack Daniel's Trade Dress. Rather, JDPI admits that "some spirits companies already use elements of" the alleged Jack Daniel's Trade Dress, Motion (Dkt. # 101) 18:15–16, and that "other bottles for whiskey have combinations of various shapes, black caps, black neck wrap closures with white printing bearing different graphics, marks and design elements, and black front labels with white printing bearing different graphics, marks and design elements." CSOF ¶ 218. Those "other bottles of whiskey" include the following specific brands:



CSOF ¶ 174.

Indeed, VIP's evidence confirms that a majority of JDPI's direct competitors use some combination (if not all) of the Trade Dress' claimed elements. CSOF ¶ 219. The trivial nature the alleged Jack Daniel's Trade Dress' design is underscored by the charts on Pages 29 and 30 of this Response.

1    JDPI maintains that such evidence does not conflict with its acquired distinctiveness

2    claim because "it is self-evident that trade dress does not need to be unique to acquire

3    distinctiveness and become protectable." Motion (Dkt. # 101) at 12:8–12. However, JDPI

4    misses the point. To establish secondary meaning for trade dress, a claimant *must* prove that

5    consumers actually identify the alleged trade dress with only one brand. *See Big Island*

6    *Candies v. Cookie Corner*, 269 F. Supp. 2d 1236, 1251 (D. Haw. 2003) (In order to show that

7    a trade dress is distinctive, a plaintiff must prove that the "primary significance of the [trade

8    dress] in the minds of the consuming public is not the product but the producer.") (quoting

9    *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 119 (1938)).

10    In this case, evidence of the lack of exclusive use of the combination of elements that

11    comprise the alleged Jack Daniel's Trade Dress is manifest, and *is proof that consumers do*

12    *not identify the alleged Trade Dress only with one producer.*

13                    *c.) Unlicensed Clothing Using JD Label Design*

14    VIP evidence reveals that there are many unlicensed clothing products for sale online

15    that incorporate elements of the alleged Jack Daniel's Trade Dress. CSOF ¶ 220.

16    Specifically, VIP discovered over a hundred products that imitate the alleged Jack Daniel's

17    Trade Dress, including the following wide variety of t-shirts below:



CSOF ¶ 221. None of those t-shirts or other products were authorized by JDPI. CSOF ¶ 222. JDPI has not disclosed any evidence indicating that it has taken any action to stop any of these unlicensed uses of the alleged Jack Daniel's Trade Dress. CSOF ¶ 223. Such a failure to enforce the alleged Jack Daniel's Trade Dress is further evidence that it has not acquired distinctiveness. *See Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 317 (6th Cir. 2001) (evidence that a plaintiff has failed to police imitators weighs against a finding of acquired distinctiveness).

### D. The Undisputed Facts Prove that The Jack Daniel's Trade Dress is Generic and thus Unprotectable.

Evidence that the alleged Jack Daniel's Trade Dress is a combination of common and non-exclusive elements that identifies a type of product—Kentucky Bourbon or Tennessee Whiskey—rather than an individual producer of that product, is evidence that the alleged Trade Dress is generic. Generic trade dress cannot be protected by trademark law, rendering any secondary meaning evidence irrelevant. *See Kendall-Jackson Winery Ltd. v. E & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998); *Indonesian Imports, Inc. v. Smith*, No. C97-3534 FMS, C98-2494 FMS, 1999 WL 183629, at *8 (N.D. Cal. Mar. 30, 1999).

A combination of trade-dress features that is widely used in a particular market is unprotectable to the extent that it "tells consumers what the product is or at least describes a characteristic of a product." *Kendall-Jackson*, 150 F.3d at 1047. Several district courts within the Ninth Circuit have applied the Second Circuit's three-part test for genericness as set out by *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995). Under the *Milstein* test, courts evaluate whether an alleged trade dress: (1) has a definition that is overbroad or too generalized; (2) is the basic form of a type of product; or (3) is so common in the industry that it cannot be said to identify a particular source. *See, e.g.*, *Walker & Zangler, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1174 (N. D. Cal. 2007); *Indonesian Imports,* 1999 WL 183629, at *3 (noting that the *Milstein* approach is consistent

1    with *Taco Cabana* and *Kendall-Jackson*); *Big Island Candies*, 269 F. Supp. at 1243–44

2    (applying Milstein and Kendall-Jackson's definition of "genericness").

3         Under this three-prong test, "[t]he above-described concepts of genericness are not

4    necessarily separate." *Big Island Candies*, 269 F. Supp. 2d at 1244. "For instance, basic

5    product shapes are usually common in a given industry, and a court may deny protection to a

6    product design based on both its commonness and its basicness." *Id.* Therefore, if a

7    proponent's trade dress satisfies any one of these prongs, it is generic and its trade-dress claim

8    must fail. *See id.* In this case, the combination of features that constitute the alleged Jack

9    Daniel's Trade Dress satisfies not just one, but all three of the tests for generic trade dress.

10        First, the alleged Trade Dress is generic because JDPI is unable to articulate a single

11   consistent description of the alleged Trade Dress or its constituent features. Instead, JDPI has

12   made numerous inconsistent statements regarding the elements of its claimed Jack Daniel's

13   Trade Dress. CSOF ¶ 224. Such inconsistency and incoherence is evidence that alleged trade-

14   dress is both overbroad and generic. *Indonesian Imports,* 1999 WL 183629, at *4,6 (plaintiff's

15   failure to "set out a coherent list of the elements it claims make up its trade dress" proved that

16   it sought "protection for an unprotectable style or theme").

17        Next, the alleged Jack Daniel's Trade Dress is generic because it represents a basic

18   form of packaging for American whiskey, particularly Kentucky bourbon and Tennessee

19   whiskey. CSOF ¶ 225. JDPI admits that other bottles of whiskey use the same combination of

20   the following features included in the alleged Jack Daniel's Trade Dress: square bottle shape;

21   fluting or faceting on bottle neck; white on black labels; a black neck wrap; and a black bottle

22   cap. CSOF ¶ 226. Not surprisingly, Brown-Forman's █████████████████████████

23   ██████████████████████████████████████████████████████████████████████████

24   ██████████" CSOF ¶ 227.

25        Finally, the combination of features of the alleged Trade Dress is generic because it is

26   commonly used to package distilled spirits, including another brand Tennessee Whiskey,

27   George Dickel, and the "biggest competitor" to Jack Daniel's whiskey: Jim Beam bourbon.

28   CSOF ¶ 228. In addition, VIP's evidence confirms the wide use of combined features of the

1  alleged Jack Daniel's Trade Dress by its competitors in the American whiskey market. CSOF
2  ¶ 176.



6      Evidence that trade dress is in common use is proof it is generic. *See Mattel, Inc.*, 782
7  F. Supp. 2d at 1005 (packaging that is customary or commonplace in a particular industry is
8  generic, and not entitled to protection under the Lanham Act). JDPI's alleged Trade Dress is
9  in common use in the whiskey industry and is, therefore, generic and not entitled to trade
10 dress protection.

### IV.    JDPI IS NOT ENTITLED TO SUMMARY JUDGMENT ON VIP'S THIRD CLAIM FOR RELIEF FOR CANCELLATION OF THE JD BOTTLE REGISTRATION.

14     VIP's Third Claim for Relief asserts that the Court should cancel U.S.
15 Trademark Registration No. 4,106,178 for the Jack Daniel Signature Bottle
16 because the bottle configuration, shown in the image at right, is both functional
17 and non-distinctive. Essentially, the Bottle Registration is for the Jack Daniel's
18 Whiskey bottle without its labels (the "Bottle Design"). CSOF ¶ 229.

19     JDPI relies on the PTO Registration to establish that the Bottle Design is
20 distinctive and non-functional. Although, a registered mark is presumed to be
21 inherently distinctive and non-functional, it cannot "survive summary judgment
22 solely on the basis of its registration." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d
23 1108, 1115 (9th Cir. 2010).[3] As "prima facie evidence of validity," the registration certificate,
24 "in the judgment of the law, is sufficient to establish a given fact, or the group or chain of
25 facts constituting the party's claim, and which *if not rebutted or contradicted*, will remain

---

[3] The Bottle Design's PTO Registration has been vulnerable to challenges of functionality and distinctiveness from the start. Upon receiving JDPI's "intent to use" application for the Bottle Design, the examining attorney advised that the application could be refused on both functionality and non-distinctiveness grounds. CSOF ¶ 161.

1  sufficient." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782 (9th Cir. 2002) (quoting

2  BLACK'S LAW DICTIONARY 1190 (6th ed. 1990) (emphasis added)). "Once the presumption of

3  validity afforded to a registered trademark has been rebutted, mere registration does not

4  enable a trademark holder to survive summary judgment." *Talking Rain*, 349 F.3d at 603.

5      ### A.    <u>VIP Has Proven That the Bottle Design is Not Distinctive</u>

6      District courts within the Ninth Circuit apply the *Seabrook* test to evaluate whether

7  packaging is inherently distinctive. *See, e.g.*, *DCNL, Inc. v. Almar Sales Co.*, No. C-97-3738

8  DLJ, 1997 WL 912941, at *7 (N.D. Cal. Dec. 22, 1997), *aff'd without opinion*, 178 F.3d 308

9  (Fed. Cir. 1998); *Sparks Indus.*, 2014 WL 4365736, at *10; *Proximo Spirits*, 2012 WL

10 273076, at *10. Under *Seabrook*, courts ask whether a trade dress is: (1) a common, basic

11 shape or design; (2) unique or unusual in a particular field; or (3) a mere refinement of

12 commonly adopted and well-known form in its field. *Seabrook Foods, Inc. v. Bar-Well Foods

13 Ltd.*, 568 F.2d 1342, 1344 (C.P.P.A 1977). If a trade dress satisfies any of the *Seabrook*

14 factors, it is not inherently distinctive. *See Spark Indus.*, 2014 WL 4365736, at *7.

15     In this case, VIP has overcome the presumption of validity because the Bottle Design

16 is comprised of a basic square shape, a fluted neck, and an embossed signature—this

17 combination is far from unique or uncommon packaging, as it also used by Jack Daniel's

18 biggest direct competitor, Jim Beam. Further, JDPI's own

19

20                                                         . CSOF ¶¶ 93, 233. Accordingly,

21 because the Bottle Design amounts to "ordinary geometric shape[d]" packaging that is widely

22 used in the market, it is "non-distinctive and protectable only upon proof of secondary

23 meaning." *MGA Entm't*, 782 F. Supp. 2d at 1004. JDPI has not submitted any evidence to

24 meet this burden.

25     In fact, the Bottle Design satisfies all three elements of the three-prong test for generic

26 trade dress because the definition of the Bottle Design is so general and overbroad and the

27 constituent features themselves are so basic and widely used in the distilled spirits industry

28

that the Bottle Design is not capable of generating "a mental recognition in buyers' and potential buyers' minds that products connected with" the Bottle Design are associated with Jack Daniel's whiskey alone. Rather, the evidence reveals that the combined features of the Bottle Design, excluding only the "Jack Daniel" name itself, conveys to customers only that the bottle contains liquor, not the source thereof. CSOF ¶ 235.

Finally, even if the Court found that the Bottle Design is not generic, the Bottle Registration still is invalid and should be cancelled. VIP's evidence discussed above establishes that the Bottle Design is merely descriptive trade dress that has not acquired secondary meaning and nothing offered by JDPI establishes otherwise.

### B.    VIP Has Proven That the Bottle Design is Functional

Additionally, even if the Bottle Design was distinctive, the PTO Registration is still subject to cancellation because it is functional.15 U.S.C. § 1064(3); *In re Rolf Dietrich*, 91 U.S.P.Q.2d 1622, 1624 (T.T.A.B. 2009) ("[t]he determination that a proposed mark is functional constitutes an absolute bar to registration" regardless of the evidence of acquired distinctiveness.); *George-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723 (7th Cir. 2011) (registered toilet paper design found functional, and registration was cancelled); *Sportvision, Inc. v. Sportsmedia Tech. Corp.*, No. C 04 –03115 JW, 2005 WL 1869350, at *7–8 (N.D. Cal. Aug. 4, 2005).

VIP has rebutted the presumption that the Bottle Design is non-functional through evidence that it yields several utilitarian advantages, and is a cost effective packaging for distilled spirits. *See Talking Rain*, 349 F.3d at 604–05, n. 2. Specifically, the Bottle Design yields the following utilitarian advantages: (1) the square bottle shape "reduces the cost of packing, shipping and displaying the bottle" and "enhances the grip on the body of the bottle;" (2) the "embossed scalloped design on the neck portion of the bottle improves the grip of the bottle . . . from an ergonomic standpoint"; and (3) an "embossed signature on the bottle is useful to identify the product easily in the retail marketplace" and "provide[es] an indelible identifier of the product inside." CSOF ¶ 230. On that basis, the Bottle Design clearly serves

purposes "other than source identification," and is not protectable. *See Apple, Inc.*, 786 F.3d at 993; *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1278 (Fed. Cir. 2002) ("[I]f the Board identifies *any* competitively significant single use in the recited identification of goods for which the mark as a whole is functional, the Board should deny registration.") (citing 15 U.S.C. § 1052(e)(5) (2000)).

Additionally, the Bottle Design is aesthetically functional as well. A square-shaped bottle with an embossed signature and fluted neck is a "well-known form" in the distilled spirits industry, as illustrated by the chart inserted at pages 29 and 30 of this Response. As mentioned above, even ███████████████████████████████████████ ████████████████████████████████████████████. CSOF ¶¶ 93, 233. In fact, the only feature of the Bottle Design that is not already used by Jack Daniel's competitors is the "Jack Daniel" name used in the signature. CSOF ¶ 234. JDPI has no evidence to the contrary.[4]

In short, the Bottle Design is not a valid trademark because it is both non-distinctive and functional. Accordingly, the Court should cancel the Bottle Registration.

## V.    CONCLUSION.

For the foregoing reasons, JDPI's Motion should be denied in its entirety.

---

[4] As noted above, there is no JDPI or Brown-Forman study of any kind that was designed to test consumer recognition of the shape of the evolution bottle. Brown-Forman's licensing manager could not recall Brown-Forman ever having conducted a study designed to test consumer recognition of the shape of the evolution bottle. CSOF ¶ 217. JDPI has never conducted a study to determine how well recognized the Jack Daniel's bottle shape is without other elements. CSOF ¶ 236. In fact, JDPI admits that a ███████████████████████ ██████████████████████████████████████████████████. CSOF ¶ 237.

1

**RESPECTFULLY SUBMITTED** this 11th day of December, 2015.

2

3

**DICKINSON WRIGHT PLLC**

4

5
By: s/David G. Bray

6
David G. Bray
Frank G. Long

7
Jonathan S. Batchelor
Colleen Ganin

8
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004

9
*Attorneys for VIP Products, L.L.C.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*"The current packaging retains a combination of a **square-shaped bottle**, a **black cap**, a **black neck wrap** with the OLD NO.7 mark in white, a **white-on-black front label** with the JACK DANIEL'S mark in arched lettering at the top of the label, the OLD NO.7 mark in a filigreed oval in the middle portion of the label beneath the JACK DANIEL'S mark, and the words "Tennessee Sour Mash Whiskey" in the lower portion of the label with the word "Tennessee" depicted in script."* - Declaration of Christopher Hungerford



| Feature | Jack Daniels | George Dickel | Evan Williams | Jim Beam | Kentucky Beau | Old Bardstown | Johnny Drum | Benchmark 8 |
|---|---|---|---|---|---|---|---|---|
| Square Shaped Bottle | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Black Cap | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Black Neck Wrap | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| White Text on Neck Wrap | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| White-on-Black Front Label | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Arched Lettering at top of label | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✗ | ✓ |
| Filigreed Oval in middle portion of label | ✓ | ✗ | ✓ | ✗ | ✓ | ✗ | ✓ | ✗ |
| Description of product in lower portion of label | Tennessee Sour Mash Whiskey | Tennessee Sour Mash Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey |
| State of origin in Script | Tennessee | Tennessee | Kentucky | Kentucky | Kentucky | Kentucky | Kentucky | Kentucky |

| Feature | Jack Daniels | Heaven Hill | Ezra Brooks | Jim Beam Honey | White Tail | Virgin Bourbon | Buck Horn | JTS Brown |
|---|---|---|---|---|---|---|---|---|
| Square Shaped Bottle | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Black Cap | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Black Neck Wrap | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| White Text on Neck Wrap | ✓ | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ |
| White-on-Black Front Label | ✓ | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ |
| Arched Lettering at top of label | ✓ | ✗ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| Filigreed Oval in middle portion of label | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ |  |
| Description of product in lower portion of label | Tennessee Sour Mash Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon | Kentucky Straight Bourbon Whiskey | Whiskey | Bourbon | Kentucky Straight Bourbon Whiskey | Sour Mash |
| State of origin in Script | Tennessee | Kentucky | Kentucky | Kentucky |  |  | Kentucky |  |

CSOF ¶ 234.



CSOF ¶ 234.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 11, 2015, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:


　　　　*<u>s/ Kylie M. Boie</u>*


PHOENIX 53913-11 264435v1