1  Firm E-Mail: courtdocs@dickinsonwright.com

2  David G. Bray (#014346)
   dbray@dickinsonwright.com
3  Frank G. Long (#012245)
   flong@dickinsonwright.com
4  Jonathan Batchelor (#026882)
   jbatchelor@dickinsonwright.com
5  Colleen M. Ganin (#032456)
   cganin@dickinsonwright.com
6
   **DICKINSON WRIGHT, PLLC**
7  1850 North Central Avenue, Suite 1400
   Phoenix, Arizona 85004
8  Phone: (602) 285-5000
   Fax: (602) 285-5100

9  *Attorneys for Plaintiff and Counterdefendant*
   *VIP Products, L.L.C.*

10

11                    **IN THE UNITED STATES DISTRICT COURT**

12                          **DISTRICT OF ARIZONA**

13  VIP Products, L.L.C., an Arizona limited          No. 2:14-cv-02057-SMM
    liability company,
14                                                    **RESPONSIVE STATEMENT OF FACTS**
                  Plaintiff and Counterdefendant,
15
         v.
16
    Jack Daniel's Properties, Inc., a Delaware
17  corporation

18
                  Defendant and Counterclaimant.
19

20          Pursuant to Local Rule 56.1, Plaintiff and Counterdefendant VIP Products,

21  LLC ("VIP") responds to each numbered paragraph in Defendant and Counterclaimant Jack

22  Daniel's Properties, Inc. ("JDPI's") Statement of Facts in Support of its Motion for Partial

23  Summary Judgment (Dkt. 102) ("JDPI SOF").

24

25

26

27                                          1

## RESPONSIVE STATEMENT OF FACTS

1.    **Disputed**. JDPI has defined the Jack Daniel's Trade Dress in a variety of ways, *see* Answer of Defendant and Counterclaimant Jack Daniel's Properties, Inc. to Amended Complaint (Exhibit A – Answer to Amd. Comp.) ¶ 14; Answer and Counterclaims of Defendant and Counterclaimant Jack Daniel's Properties, Inc. (Exhibit B – Answer and Counterclaim) ¶ 6; Deposition Transcript of David Gooder (Exhibit C – Gooder Tr.) at 90:10–92:4; *see also* Deposition Transcript of Phillip Epps (Exhibit D – Epps Tr.) at 30:22–31:13, each listing a different set of elements that comprise the Jack Daniel's Trade Dress.

2.    For purposes of this Motion, this fact is not disputed.

3.    For purposes of this Motion, this fact is not disputed.

4.    For purposes of this Motion, this fact is not disputed.

5.    **Disputed**. The cited testimony does not support JDPI's claim that "Jack Daniel's was the first product that popped up in [Mr. Sacra's] mind." Rather, Mr. Sacra testified:

> **Q:** Why did you decide to use the idealized image of Jack Daniel's, rather than the idealized image of another whiskey brand?
>
> **A:** As we discussed earlier, when going through the creative process of trying to come up with different parodies, you start running them through your mind. And as I discussed earlier, this is the first one that pops up in my mind. It's not easy creating parody.

*See* Deposition Transcript of Stephen Sacra (Exhibit E – Sacra Tr.) at 220:24–221:6. In any event, this assertion is immaterial. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

6.    For purposes of this Motion, this fact is not disputed.

7.    For purposes of this Motion, this fact is not disputed.

8.    For purposes of this Motion, this fact is not disputed.

9.    For purposes of this Motion, this fact is not disputed.

10.    For purposes of this Motion, this fact is not disputed.

11.    **Disputed**. The cited testimony does not support this factual assertion. Ms. Phillips testified that she recalled "sort of a square shape" bottle, and that "the label" had "a number on it." She did not mention a neck label at all, and was explicitly vague in her reference to the shape of the bottle. (JDPI SOF) ¶ 11.

12.    For purposes of this Motion, this fact is not disputed.

13.    For purposes of this Motion, this fact is not disputed.

14.    For purposes of this Motion, this fact is not disputed.

15.    For purposes of this Motion, this fact is not disputed.

16.    For purposes of this Motion, this fact is not disputed.

17.    For purposes of this Motion, this fact is not disputed.

18.    For purposes of this Motion, this fact is not disputed.

19.    VIP does not dispute that Ms. Phillips wanted her design to resemble the Jack Daniel's label. However, VIP **disputes** the implication that Ms. Phillips wanted to directly copy the Jack Daniel's bottle label; in fact, VIP took steps to differentiate its product from the Jack Daniel's packaging—for example, VIP did not use: a black neck wrap closure, the "OLD NO. 7" mark, the "JACK DANIEL'S MARK," the words "sour mash whiskey," and the embossed Jack Daniel's signature. Additionally, VIP added several distinguishing elements, including a color cartoon dog photo, the "Bad Spaniels" mark. *See* Physical Copy of SILLY SQUEAKERS® "Bad Spaniels" dog toy (Exhibit F – Bad Spaniels Toy, submitted to the Court pursuant to VIP's Motion to File Physical Exhibit (Doc. 141)); Declaration of Stephen Sacra ¶ 16 (Exhibit G – Sacra Declar.).

20.    For purposes of this Motion, this fact is not disputed.

21.    **Disputed**. VIP objects to Ms. Phillips underlying testimony as speculative:

> **Q.** Do you remember that the mark "Jack Daniel's" appears
> in arched format on  the Jack Daniel's whiskey label?

3

**A.** I don't recall at this moment.

**Q.** Do you recall thinking about that at the time you created the second mock-up?

**A.** I assume.

*See* Deposition Transcript of Elle Phillips (Exhibit H – Phillips Tr.) at 67:13–19. Accordingly, because Ms. Phillips lacked personal knowledge to give this testimony, it is inadmissible.

22.    **Disputed**. The cited testimony does not support this factual assertion—Ms. Phillips testified that she moved the words "Bad Spaniels" *outside* the banner. (Exhibit H – Phillips Tr.) at 66:18–19.

23.    VIP does not dispute that Mr. Sacra liked the second label better than the first, but **disputes** the implication that this was due to any similarity between the second label and the Jack Daniel's label. Nothing in the cited testimony supports that implication. *See* JDPI SOF ¶ 23.

24.    **Disputed.** This factual assertion is vague and misleading. Ms. Phillips testified that she used elements from the Bad Spaniels label design to create an art card, not from the Jack Daniel's label design. *See* JDPI SOF ¶ 24.

25.    **Disputed**. Ms. Phillips testified to adding a disclaimer stating that the Bad Spaniels toy was not affiliated with Jack Daniels, (Exhibit H – Phillips Tr.) at 74:14–19—no other "reference" to the Jack Daniel Distillery was made. (Exhibit E – Sacra Tr.) at Exh. 60.

26.    **Disputed**. Ms. Phillips testified that she developed the Bad Spaniels neck label by pulling elements from the Bad Spaniels label design—not the Jack Daniel's label design, as JDPI claims. She further testified that she did not look at Jack Daniel's bottle when designing the neck label. (Exhibit H – Phillips Tr.) at 79:11–18.

27.    For purposes of this Motion, this fact is not disputed.

28.    For purposes of this Motion, the materiality of this assertion is **disputed**. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

29.    **Disputed**. In Mr. Sacra's cited testimony, he does not mention who designed the vinyl bottle component of the Bad Spaniels toy. Additionally, the Bad Spaniels product is not a *vinyl bottle*; rather, it is a vinyl bottle-shaped dog toy. (Exhibit F – Bad Spaniels Toy). In any event, VIP disputed the materiality of this assertion.

30.    **Disputed**. As mentioned in Paragraph 29, the Bad Spaniels product is a bottle-shaped dog toy—not an actual bottle. *See* (Exhibit F – Bad Spaniels Toy). Accordingly, Mr. Sacra sent the referenced email to his *toy* manufacturer. (Exhibit E – Sacra Tr.) at Exh. 47.

31.    For purposes of this Motion, this fact is not disputed.

32.    **Disputed**. VIP's toy manufacturer did a mark-up of the Bad Spaniels bottle-shaped toy, not of an actual bottle. (Exhibit E – Sacra Tr.) at Exh. 18; (Exhibit F – Bad Spaniels Toy).

33.    **Disputed**. The cited to testimony is misleading because it implies that the photos of the Jack Daniel's bottle and the mock toy were so similar that "he did not notice any differences at the time." Rather, Mr. Sacra testified that he did not notice differences between the two because he did not compare the photos, and if he had, he "would have noticed it's completely different." (Exhibit E – Sacra Tr.) at 116:8–17. Further, Mr. Sacra did not testify as to which version of the Jack Daniel's bottle was featured in the photo sent to Mr. Bai. (Exhibit E – Sacra Tr.) at 116:5–15.

34.    **Disputed** to the extent JDPI relies on Mr. Sacra's testimony as proof that the "pre- and post-2011 bottles were essentially the same"—the post-2011 bottle has several distinct differences from the preceding design, including: (1) squared shoulders; (2) beveled edges; and (3) a "cleaner look than the previous bottle." *See* Deposition Transcript of

Toby Roush (Exhibit I – Roush Tr.) at 94:9–95:10.

35.    In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

36.    **Disputed**. As discussed in paragraph 1, JDPI has not defined the Trade Dress' elements with consistency. However, assuming JDPI refers to the elements listed at paragraph 1 of its SOF, the Bad Spaniels toy does not copy "all of the elements" that JDPI claims. *See* ¶ 19 *supra*; (Exhibit G – Sacra Declar.)

37.    **Disputed**. There is nothing about "intent" in the cited testimony. *See* **JDPI SOF** ¶ 37.

38.    **Disputed**. The cited evidence does not support JDPI's assertion. Mr. Sacra did not testify that the Bad Spaniels humorous message was directed  solely at Jack Daniels, nor that he intended the toy to be associated with Jack Daniel's alone. Rather, Mr. Sacra testified that his products aim to remind people that its "humorous to sit back and laugh at [consumer culture] and laugh at ourselves." (Exhibit E – Sacra Tr.) at 216:20–217:3. Further, to the extent that Mr. Sacra testified that he did not intend for the Bad Spaniels toy to target brands like Zackariah Harris and Ezra Brooks, such testimony does not mean that VIP only intended to target Jack Daniels—Mr. Sacra testified that he was parodying "American whiskey/bourbon." *See* 30(b)(6) Deposition Transcript of Stephen Sacra (Exhibit J – VIP Tr.) at 110:7–9, 114:2–4, 119:4–9.

39.    **Disputed**. The cited evidence does not support the factual assertion. Mr. Sacra does not testify that VIP has "copied" other well-known brands; he testified that other *products*, (Exhibit E – Sacra Tr.) at 62:8–15, were the "inspiration" for other Silly Squeakers

1    toys, or that they were the "imagery that [VIP] mimic[ed]." (Exhibit E – Sacra Tr.) at 44:3–

2    11.

3        40.    **Disputed**. These fragments of Mr. Sacra's testimony are taken out of context—

4    Mr. Sacra discusses "success" in terms of effectively executing a parody, not in reference to

5    high-product sales. Mr. Sacra testified that he intended to "create a parody and create

6    something funny. And if you look at it and say it's funny and it incorporates the elements

7    which I discussed earlier, then we have *success*." (Exhibit E – Sacra Tr.) at 67:4–10.

8        41.    For purposes of this Motion, this fact is not disputed.

9        42.    **Disputed**. VIP objects to use of the cited testimony because it lacks

10    foundation—Mr. Sacra is not qualified to testify whether "Jack Daniel's is more recognizable

11    than other brands" to the consuming public, nor does have personal knowledge as to the

12    money Jack Daniel's has expended in order to become recognizable. VIP further disputes this

13    assertion because recognition of the Jack Daniel's brand is immaterial to whether the Jack

14    Daniel's Trade Dress is recognizable.

15        43.    **Disputed**. JDPI never produced evidence of Brown-Forman's tracking studies

16    during discovery, despite VIP's numerous discovery requests and letters to JDPI's counsel

17    requesting this information. *See* Plaintiff's Motion to Exclude Defendant's Belatedly

18    Disclosed Supplemental Declaration of Itamar Simonson and Evidence Offered by Phillip

19    Epps (Exhibit K – Motion to Exclude).

20        44.    **Disputed**. VIP objects to the use of this testimony because it lacks

21    foundation—Ms. Phillips, a graphic designer, is not qualified to testify whether a particular

22    brand is "well known" to the consuming public, and JDPI failed to establish foundation for

23    this testimony. (Exhibit H – Phillips Tr.) at 123:5–25.

24        45.    **Disputed**. Mr. Wolinsky is not qualified to testify that Jack Daniel's whiskey is

25    one of the best-selling whiskeys in the U.S., and JDPI failed to established foundation for this

26

27                                              7

testimony. *See* Deposition Transcript of Martin Wolinsky (Exhibit L – Wolinsky Tr.) at 61:21–25; Declaration of Martin Wolinsky (Exhibit M – Wolinsky Declar.) ¶ 5.

46.     **Disputed**. Mr Epps began serving as Jack Daniel's Global Brand Director on May 1, 2015. *See* Declaration of Phillip Epps in Support of Motion for Partial Summary Judgment (Dkt. #105) (Epps Declar. ¶ 3). Accordingly, the cited testimony is inadmissible hearsay—Mr. Epp does not have personal knowledge of whether Jack Daniel's has been sold "for over 100 years," and JDPI failed to establish foundation for his testimony.

47.     **Disputed**. In the cited testimony, Mr. Hungerford relies on *A Tennessee Legend*, a book written by Jack Daniel's Distillery in 1992. This book is inadmissible hearsay because JDPI has failed to authenticate it. Additionally, Mr. Hungerford was hired as a designer by Brown-Forman in 1996. *See* Declaration of Christopher Hungerford in Support of Motion for Partial Summary Judgment (Dkt. #106) (Hungerford Declar. ¶ 2). Accordingly, he could not have personal knowledge as to whether, "[b]y the mid-1950's, the packaging and labeling for Jack Daniel's whiskey had taken the basic from in which it has appeared ever since," and JDPI failed to establish foundation for this testimony.

48.     **Disputed**. The cited testimony does not show that Mr. Wolinsky "agreed that the elements of the Jack Daniel's label . . . have remained essentially the same for many decades." Rather, Mr. Wolinsky was shown a series of Jack Daniel's bottles, and asked whether each of the bottles had "a square shape," (Exhibit L – Wolinsky Tr.) at 163:20–22; "a black cap," *Id.* at 164:4–6; a black neck wrap with Old No. 7 in white printing, *Id.* at 164:7–13; a "black front label with white printing and a filigreed border," *Id.* at 164:14–17; "the Jack Daniel's mark depicted in arch lettering at the top of the label," *Id.* at 164:18–21; "the Old No. 7 mark within a filigreed oval design in the middle portion of the label beneath the Jack Daniel's mark," *Id.* at 164:22–165:1; and "the words 'Tennessee Sour Mash Whiskey' . . . in the lower portion of the label with the word 'Tennessee' in script." *Id.* at

165:2–6. Mr. Wolinsky also noted that the several of the earlier bottles were more "rounded" than the current bottle, *Id.* at 163:23–25, and observed that the "Old No. 7" mark inside the filigreed oval design "moves as the brand evolves." *Id.* at 165:1. Further, VIP disputes JDPI's assertion that the Jack Daniel's packaging has "essentially remained the same for decades"; the evidence shows that Brown-Forman changed the packaging in 2011.

49.    **Disputed**. The evidence shows that Brown-Forman redesigned the Jack Daniel's packaging in 2011. *See* Deposition of Michael Taylor (Exhibit N – Taylor Tr.) at 8:9–10:21. Accordingly, JDPI cannot rely on evidence of packaging exposure from prior to the 2011 redesign. Further, to the extent that this evidence relates to the redesigned packaging, Mr. Epps lacks personal knowledge to testify about any packaging exposure that occurred prior to May 1, 2015. (Epps Declar. ¶ 3).

50.    **Disputed**. Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (Epps Declar. ¶ 3). Accordingly, the cited testimony is inadmissible hearsay— Mr. Epps does not have personal knowledge of whether Jack Daniel's was the best-selling whiskey in the U.S. from 1997 to the April 31, 2015, and JDPI failed to establish foundation for his testimony.

51.    **Disputed**. Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (**Epps Declar**. ¶ 3). Therefore, Mr. Epps does not have personal knowledge of Jack Daniel's sales prior to May 1, 2015, and JDPI has not established foundation for his testimony. For these same reasons, Mr. Epps does not have personal knowledge of whether the "vast majority" of those sales "were in packaging bearing the Jack Daniel's Trade Dress."

52.    **Disputed**. The cited evidence does not support this assertion.

53.    **Disputed**. The cited testimony is inadmissible hearsay. Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (Epps Declar. ¶ 3). Therefore, he does not have personal knowledge of when JDPI's print advertising campaign began.

Additionally, Mr. Epps does not have personal knowledge to support his claim that this campaign is one of "the longest-running consumer advertising campaigns in American history." JDPI failed to establish foundation to support Mr. Epps' testimony in either respect.

54.    **Disputed**. The cited testimony does not show that JDPI's print advertising *highlights* the Jack Daniel's packaging. In fact, JDPI admitted that it "and its licensee Brown-Forman . . . do not advertise and promote the Jack Daniel's Trade Dress per se but rather products sold in the Jack Daniel's Trade Dress." *See* Defendant and Counterclaimant Jack Daniel's Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Request for Production of Documents (Exhibit O – Responses to RFP) ¶1–2.

55.    **Disputed**. The cited testimony is inadmissible hearsay. Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (Epps Declar. ¶ 3). Therefore, he does not have personal knowledge on JDPI's advertising expenditures prior to then, and JDPI failed to establish foundation for this testimony.

56.    **Disputed**. The cited testimony is inadmissible hearsay. Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (Epps Declar. ¶ 3). Therefore, he does not have personal knowledge on the focus of JDPI's marketing campaigns prior to that time, and JDPI has failed to establish foundation for this testimony.

57.    **Disputed**. The cited evidence does not show that the Jack Daniel's packaging has been "highlighted" in *most of* JDPI's television and online advertising. JDPI admitted that it "and its licensee Brown-Forman . . . do not advertise and promote the Jack Daniel's Trade Dress per se but rather products sold in the Jack Daniel's Trade Dress." (Exhibit O – Responses to RFP).

58.    **Disputed**. The cited testimony is inadmissible hearsay. As stated in paragraph 50, Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (Epps Declar. ¶ 3). Therefore, he does not have personal knowledge of JDPI's advertising

expenditures prior to that time, and JDPI has not established foundation for this testimony. Further, VIP challenges the materiality of this assertion. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

59. **Disputed**. The cited testimony is inadmissible hearsay. Mr. Epps began serving in his current role with Brown-Forman on May 1, 2015. (Epps Declar. ¶ 3). Therefore, he does not have personal knowledge on JDPI's annual advertising budget prior to 2015, and JDPI has not established foundation for this testimony. Further, VIP challenges the materiality of this assertion. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

60. **Disputed**. The cited movie clips do not all feature the Jack Daniel's packaging entirely, and some do not feature the packaging at all—at most, the Jack Daniel's packaging only appears as a prop, and is not the focus of the cited evidence. (Epps Declar. Exhibit 5). Additionally, most of the cited films were made prior to 2011, and, if anything, feature a version of the Jack Daniel's packaging that is not at issue in this litigation. Accordingly, this evidence is immaterial. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

61. **Disputed**. The cited TV clips do not all feature the Jack Daniel's packaging entirely, and some do not feature the packaging at all—at most, the Jack Daniel's packaging only appears as a prop, and is not the focus of the cited evidence. (Epps Declar. Exhibit 7). Additionally, several of the cited TV clips were filmed prior to 2011, and, if anything, feature a version of the Jack Daniel's packaging that is not at issue in this litigation. Accordingly, this evidence is immaterial. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

62. **Disputed**. The cited to evidence does not feature the Jack Daniel's packaging and, at most, merely mentions the name "Jack Daniel's." (Epps Declar. Exhibit 7).

1    Accordingly, this evidence is immaterial because it is unnecessary to JDPI's Motion for

2    Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only

3    those facts that the Court needs to decide the motion").

4        63.    **Disputed**. The cited to evidence does not support the assertion that Brown-

5    Forman *frequently* uses a large inflatable version of the Jack Daniel's packaging at its "Jack

6    Daniel's experience." *See* JDPI SOF ¶ 63.

7        64.    **Disputed**. This is not a fact; Mr. Epps gives his opinion that Jack Daniel's

8    website "prominently" features the Jack Daniel's whiskey packaging. Additionally, the cited

9    evidence does not show how many people visited the website. (Epps Declar. Exhibit 8).

10       65.    Disputed. The cited evidence does not support JDPI's assertion that the Jack

11   Daniel's packaging "appears on social media pages for the brand." JDPI has only provided

12   photos of its Twitter feed, which, by nature, is ever-changing. (Epps Declar. Exhibit 9).

13       66.    **Disputed**. Mr. Epps lacks personal knowledge of how long the Jack Daniel's

14   Distillery has been in operation for, as well as how many visitors it had in 2014. (Epps

15   Declar. ¶ 3).

16       67.    **Disputed**. The question improperly asks Mr. Sacra to reach a legal conclusion,

17   which is a job reserved for the fact finder. Additionally, Mr. Sacra is not a legal expert, and

18   lacks foundation to opine on legal standards.

19       68.    Immaterial. *See* L.R.Civ.56.1 ("The separate statement of facts should include

20   only those facts that the Court needs to decide the motion").

21       69.    **Disputed**. Mr. Sacra's report did not focus "only on four elemental features"—

22   while Mr. Sacra devotes a significant portion of his analysis to those elements, he also

23   analyzes bottles with: filigrees, embossed signatures, the number 7, and the words "old no."

24   *See* American Whiskey/Bourbon Report by Stephen Sacra and 2 Hour Test (Exhibit P - Sacra

25   Report) pp. 57–60. In any event, this assertion is immaterial—regardless of what the report

26

27                                              12

1    "focuses on," the report reveals that the combination of elements used in the Trade Dress are

2    widely used in the bourbon/Tennessee whiskey market.

3        70.    **Disputed**. The examiner's question improperly asks Mr. Wolinsky to define the

4    legal term "trade dress." (Exhibit L – Wolinsky Tr.) at 176:10 –11. Mr. Wolinsky is not a

5    legal expert, and accordingly, doesn't "have any understanding" of legal terms of art.

6    (Exhibit L – Wolinsky Tr.) at 176:12–13. Further, this fact is immaterial as it is unnecessary

7    to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts

8    should include only those facts that the Court needs to decide the motion.").

9        71.    **Disputed**. The cited testimony does not support that Mr. Wolinsky's report

10   only focused on the "four elemental elements"—while Mr. Wolinsky's report makes

11   reference to these four elements, it also states that the "*overall* Jack Daniel's Tennessee

12   Whiskey packaging is not distinctive (not Unique) in the bourbon/Tennessee whiskey

13   segment" of the whiskey market. *See* Rule 26 Expert Report of Martin Wolinsky (Exhibit Q –

14   Wolinsky Report) p. 6. Additionally, Mr. Wolinsky's comparison of "Uniform vs. a Unique

15   Bourbon Package" on page 9 of his report focuses on the overall look of various packaging,

16   rather than focusing on any specific design feature. (Exhibit Q – Wolinsky Report) p. 9.

17   Further, this fact is immaterial as it is unnecessary to JDPI's Motion for Summary Judgment.

18   *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the

19   Court needs to decide the motion.").

20       72.    **Disputed**. Mr. Wolinsky did not testify that he did not know why he did not

21   "include the omitted elements"—rather, he testified that he could not answer the question:

22   "Why didn't you reference the additional elements that are claimed in there in your report?"

23   (Exhibit L – Wolinsky Tr.) at 158:16–18. Additionally, as discussed in Paragraph 71 *supra*,

24   Mr. Wolinsky's report contains several references to the overall Jack Daniel's packaging. *See*

25   (Exhibit Q – Wolinsky Report), pp. 6, 9.

26

27                                               13

73.    **Disputed**. JDPI cites to unrelated portions of Mr. Wolinsky's testimony, which do not support JDPI's assertion. As discussed in Paragraph 71 *supra*, while Mr. Wolinsky did extrapolate individual elements of the Trade Dress in his report, he also considered the overall appearance of the Trade Dress. (Exhibit Q – Wolinsky Report), pp. 6, 9.

74.    **Disputed**. JDPI's cannot rely on this portion of Mr. Wolinsky's testimony because, as discussed in paragraph 75 of JDPI's statement of facts, Mr. Wolinsky misunderstood the question, rendering his answer to that question unreliable. *Compare* Wolinsky Tr. 161:10 –13 *with id.* at 263.

75.    For purposes of this Motion, this fact is not disputed. *But see* ¶ 74 *supra*.

76.    **Disputed**. Mr. Wolinsky did not testify that he understood that JDPI was seeking rights in the four elements identified in his report. Rather, the examiner assumed that this was Mr. Wolinsky's understanding: "Well, to make the statement that giving Jack Daniel's the exclusive right to use those elements certainly indicates to me that you thought that that's what Jack Daniel's was trying to do in this case. Where did you get that understanding?" (Exhibit L – Wolinsky Tr.) at 244:17–21. In any event, VIP challenges the materiality of this evidence. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.")

77.    **Disputed**. Mr. Wolinsky testified that he is not a legal expert, and that he does not have personal knowledge of what "distinctive" means when used as a legal term of art. (Exhibit L – Wolinsky Tr.) at 176:21–24 ("Again, once you said trademark law, I have no understanding."). Mr. Wolinsky only used the word "distinctive" in his report based on his understanding of what it means: that a packaging "looks like it's not part of the uniform. Against, the words that I used repeatedly were 'uniform' and 'first cousin,' so it doesn't look like part of a uniform." (Exhibit L – Wolinsky Tr.) at 177:9–17, 73:18–21; (Exhibit Q – Wolinsky Report), p. 6. Further, it is immaterial that Mr. Wolinsky was not familiar with

1  legal terms such as "distinctiveness," "inherent distinctiveness," and "acquired

2  distinctiveness." L.R.Civ.56.1 ("The separate statement of facts should include only those

3  facts that the Court needs to decide the motion.").

4      78.    **Disputed**. Mr. Wolinsky is not a legal expert, and even testified that he had

5  never heard of the term "acquired distinctiveness." (Exhibit L – Wolinsky Tr.) at 177:3–5.

6  Accordingly, VIP objects to use of this testimony because Mr. Wolinsky lacks personal

7  knowledge to opine on trademark law issues. Further, the fact that Mr. Wolinsky did not

8  know the various means of which a packaging could "acquire distinctiveness" is immaterial.

9  L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court

10  needs to decide the motion.").

11      79.    **Disputed**. Mr. Wolinsky is not a legal expert and is not qualified to opine on

12  the legal significance of VIP's intentional copying of the Jack Daniel's Trade Dress. *See*

13  (Exhibit L – Wolinsky Tr.) at 176:21–24

14      80.    **Disputed**. Contrary to JDPI's claim, Mr. Wolinsky did not opine "that distilled

15  spirits packaging falls into one of two categories"—rather, Mr. Wolinsky testified that he

16  evaluated distinctiveness on a continuum. (Exhibit L – Wolinsky Tr.) at 177:21–25; 178:16–

17  20, 179:5–8. Further, page 14 of Mr. Wolinsky's report makes clear that he evaluated

18  distinctiveness on a continuum. (Exhibit Q – Wolinsky Report), p. 14.

19      81.    **Disputed**. Mr. Wolinsky used the term "distinctive" based on his understanding

20  of the word—he did not use it as a legal term of art. (Exhibit L – Wolinsky Tr.) at 176:21–24,

21  177:9–17.

22      82.    **Disputed**. Mr. Wolinsky's report speaks for itself.

23      83.    **Disputed**. As stated in paragraph 80, Mr. Wolinsky's testimony and report

24  confirm that he evaluated the bottles in his report on a distinctiveness continuum. (Exhibit L

25  – Wolinsky Tr.) at 177:21–25; 178:16–20, 179:5–8; (Exhibit Q – Wolinsky Report), p. 14.

26

27                                     15

84.    In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

85.    VIP **disputes** this assertion to the extent that it implies that Mr. Wolinsky gave a legal opinion on distinctiveness. Mr. Wolinsky used the term "distinctive" based on his understanding of the word—he did not use it as a legal term of art (Exhibit L – Wolinsky Tr.) at 176:21–24, 177:9–17. Additionally, Mr. Wolinsky is not a legal expert, and lacks foundation to opine about legal conclusions.

86.    **Disputed**. Mr. Wolinsky used the term "distinctive" based on his understanding of the word—he did not use it as a legal term of art (Exhibit L – Wolinsky Tr.) at 176:21–24, 177:9–17. Further, Mr. Wolinsky is not a legal expert, and lacks foundation to opine about legal conclusions.

87.    This assertion is **disputed** to the extent that JDPI implies that Mr. Wolinsky gave a legal opinion on distinctiveness. Mr. Wolinsky is not qualified as a legal expert, and lacks foundation to offer such an opinion (Exhibit L – Wolinsky Tr.) at 176:21–24, 177:9–17; (Exhibit M – Wolinsky Declar.) ¶ 9.

88.    **Disputed**. The examiner's question is ambiguous with respect to the term "generic." Further, VIP objects to the extent that the question improperly asks Mr. Wolinsky to reach a legal conclusion. Mr. Wolinsky testified that he understands the term "generic" in terms of price, and that he did not understand what the term meant in trademark law. (Exhibit L – Wolinsky Tr.) at 182:8–13, 183:1–3, 184:17–20, 185:13–21; (Exhibit M – Wolinsky Declar.) ¶ 9.

89.    **Disputed**. Mr. Wolinsky used the phrase "aesthetic functionality" based on his understanding of the two terms, and has no understanding of how it is used in trademark law

(Exhibit L – Wolinsky Tr.) at 241:14–22, 73:25–74:5. Accordingly, this testimony is immaterial. L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

90.    **Disputed**. Mr. Wolinsky is not qualified to offer opinions on the legal meaning of "aesthetic functionality." Mr. Wolinsky testified that he used the terms "aesthetic" and "functionality" under their common meanings (Exhibit L – Wolinsky Tr.) at 241:14–22, 73:25–74:5.

91.    **Disputed**. The cited testimony does not support the fact asserted; Mr. Wolinsky testified about *products* depicted in his report—not the brands that make those products (Exhibit L – Wolinsky Tr.) at 186:22–187:1; 189:7–12. Further, VIP disputes the materiality of this evidence. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion").

92.    **Disputed**. The cited testimony does not support JDPI's factual assertion. Mr. Wolinsky testified that other companies would be disadvantaged if they were prevented from using the "standard industry uniform that identifies any whiskey as an American whiskey." (Exhibit M – Wolinsky Declar.) ¶ 12. Further, VIP objects to use of this testimony because Mr. Wolinsky is not qualified as a legal expert, and lacks foundation to opine on the legal consequences of any particular result of this case.

93.    **Disputed**. The cited testimony does not support JDPI's factual assertion. Mr. Wolinsky's opinion is that, if JDPI can claim exclusive rights to using the Jack Daniel's Trade Dress, it may harm market competitors and entrants in the future because the design is symbolic of bourbon and Tennessee whiskey. (Exhibit M – Wolinsky Declar.) ¶ 12. ███████████████████████████████████████████████████████████████. *See* Deposition Transcript of Christopher Hungerford (Exhibit R – Hungerford Tr.) at 93:5–11.

1    94.    **Disputed**.

2

3

4                                                        . In any event, VIP **disputes** the materiality of

5    this assertion. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those

6    facts that the Court needs to decide the motion.").

7    95.    **Disputed**. The cited evidence does not support that the Jack Daniel's packaging

8    "embodies design choices that are not based on *any* considerations of utility." For example,

9    in Mr. Hungerford's deposition, he testified that the bottle neck wrap provides evidence of

10   tampering (Exhibit R – Hungerford Tr.) at 104:2–14. In any event, VIP **disputes** that

11   materiality of this assertion. *See* L.R.Civ.56.1 ("The separate statement of facts should

12   include only those facts that the Court needs to decide the motion.").

13   96.    **Disputed**. The cited testimony references the wrong market. As discussed in

14   Mr. Wolinsky's report, when examining the Jack Daniel's packaging in comparison with

15   other market competitors, the focus must be narrowed to the bourbon/Tennessee segment of

16   the whiskey market. (Exhibit Q – Wolinsky Report), p. 5. Additionally, Mr. Sacra testified

17   that he focused his report on the American bourbon/whiskey industry because that was

18   "staying with the parody of American whiskey/bourbon. And to do something that was

19   outside the scope of that would be overly broad." (Exhibit J – VIP Tr.) at 110:2–19, 113:19–

20   22.

21   97.    For purposes of this Motion, this fact is not disputed.

22   98.    For purposes of this Motion, this fact is not disputed.

23   99.    For purposes of this Motion, this fact is not disputed.

24   100.   **Disputed**. Mr. Howard does not have personal knowledge as to whether the

25   "shaping of the Jack Daniel's bottle is 'part of a marketing program to make the bottle

26

27                                                        18

1   distinctive from competitors.'" Additionally, Mr. Howard's use of the phrase "I think"

2   supports that he did not base his on personal knowledge. *See* Deposition Transcript of John

3   Howard (**Exhibit U – Howard Tr.**) at 204:25–205:6.

4       101.   **Disputed**. Mr. Howard is a packaging expert and was offered for the narrow

5   purpose of proving functionality. *See* Rule 26 Expert Report of John Howard (Exhibit V –

6   Howard Report), pp. 2, 10–11. Mr. Howard is not qualified to offer his opinion—legal or

7   otherwise—on whether the Jack Daniel's bottle is distinctive.

8       102.   For purposes of this Motion, this fact is not disputed.

9       103.   **Disputed**. Mr. Howard is not qualified to opine on whether the "overall shape

10  of the Jack Daniel's bottle" identifies the contents as a Jack Daniel's product—Mr. Howard

11  was offered for the narrow purpose of showing utilitarian functionality, and cannot speak to

12  issues outside that scope. (Exhibit V – Howard Report), pp. 2, 10–11. Further, JDPI

13  improperly cites Mr. Howard's testimony as support for its legal conclusion that the "overall

14  shape of the Jack Daniel's bottle" is a source identifier for Jack Daniel's whiskey.

15      104.   **Disputed**. JDPI improperly relies on Mr. Howard's testimony in claiming that

16  "the shape of the bottle is even more eye-catching than the 'Jack Daniel' signature and does

17  more to identify the product as coming from Jack Daniel's. (Exhibit U – Howard Tr.) at

18  108:10–109:6. Mr. Howard's expertise is limited to the utilitarian functions of product

19  packaging, and is not qualified to opine on consumer perception of the Jack Daniel's

20  embossed signature and bottle shape. (Exhibit V – Howard Report), pp. 2, 10–11.

21      105.   **Disputed**. Mr. Howard is not a legal expert, and lacks foundation to offer an

22  opinion about trademark infringement. (Exhibit V – Howard Report), pp. 2, 10–11.

23      106.   **Disputed**. Mr. Howard is not a legal expert and not qualified to offer an

24  opinion about the legal definition of a trademark. (Exhibit V – Howard Report), pp. 2, 10–11.

25

26

27

19

107.   **Disputed**. Mr. Howard is not qualified to opine on whether the Jack Daniel's embossed signature qualifies as "branding." Mr. Howard also is not qualified to discuss what aspects of the signature are "important." (Exhibit V – Howard Report) PP. 2, 10–11.

108.   In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

109.   For purposes of this Motion, this fact is not disputed.

110.   In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

111.   **Disputed**. Mr. Howard is not a legal expert and cannot testify as to what qualifies as "touting utilitarian advantages" in the legal sense. *See* Declaration of John Howard (Exhibit W – Howard Declar.) ¶ 4; (Exhibit V – Howard Report) PP. 2, 10–11.

112.   **Disputed**. Mr. Howard is not a legal expert and cannot testify as to what qualifies as "touting utilitarian advantages" in the legal sense. (Exhibit W – Howard Declar.) ¶ 4; (Exhibit V – Howard Report) PP. 2, 10–11. Further, VIP disputes the materiality of this assertion. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

113.   **Disputed**. This testimony does not support JDPI's assertion that no other Jack Daniel's advertising touted the utilitarian advantages of the Jack Daniel's bottle design. Mr. Howard's testimony was limited to the specific ads shown in exhibit 87 to the Howard Deposition Transcript. JDPI's factual assertion is also controverted by ███████ ████████████████████████████████████████████. Additionally, VIP objects to

1 JDPI's use of this testimony because Mr. Howard lacks foundation to opine on Jack Daniel's

2 marketing efforts.

3      114.    **Disputed**. Mr. Howard's cited testimony was limited to direct manufacturing

4 costs. (Exhibit W – Howard Declar.) ¶ 6. Additionally, Mr. Howard's report contradicts

5 JDPI's assertion by making clear that square bottles provide for easier labeling and filling.

6 (Exhibit V – Howard Report) pp. 3–4, 6; (Exhibit U – Howard Tr.) at 210:21–211:9.

7      115.    VIP does not dispute that Mr. Howard has no personal knowledge of the cost to

8 manufacture the Jack Daniel's bottle specifically. However, it does **dispute** this assertion to

9 the extent it implies that Mr. Howard lacks knowledge of manufacturing costs associated

10 with liquor bottles in general. Mr. Howard has worked in the packaging industry for almost

11 30 years, and has extensive knowledge of the packaging manufacturing process. (Exhibit V –

12 Howard Report), p.2.

13      116.    **Disputed**. Mr. Howard's cited testimony was limited to direct manufacturing

14 costs. *See* (Exhibit W – Howard Declar.) ¶ 6. Additionally, Mr. Howard's report contradicts

15 JDPI's assertion by making clear that square bottles provide for easier labeling and filling.

16 (Exhibit V – Howard Report), pp. 3–4, 6; (Exhibit U – Howard Tr.) at 210:21–211:9.

17      117.    **Disputed**. Mr. Howard's report makes clear that square bottles' increased

18 manufacturing cost are offset because they are easier to label and fill. (Exhibit V – Howard

19 Report), pp. 3–4, 6; (Exhibit U – Howard Tr.) at 210:21–211:9; (Exhibit W – Howard

20 Declar.) ¶ 6.

21      118.    **Disputed**. JDPI improperly relies on this testimony because Mr. Howard had

22 no personal knowledge of why "so few" liquor producers use square bottles with embossed

23 signatures. Mr. Howard merely speculated that he "would imagine," and was "assuming,"

24 that this was due to the "greater cost and complexity" involved in manufacturing such a

25 bottle. Additionally JDPI's assertion is contradicted by Howard's testimony that the square

26

27

1  bottles and embossed signatures have utilitarian advantages. (Exhibit V – Howard Report),

2  pp. 3–4, 6; (Exhibit W – Howard Declar.) ¶ 11.

3       119.  **Disputed**. Mr. Howard's cited testimony does not support JDPI's claim that the

4  "features of the mark shown in the Registration do not affect the cost or quality of Jack

5  Daniel's whiskey." Mr. Howard's report makes clear that the square bottle, the fluted neck,

6  and the embossed signature all have advantages that affect the cost or quality of Jack

7  Daniel's whiskey. (Exhibit V – Howard Report), pp. 3–4, 6.

8       120.  In the context of the present Motion, the materiality of this fact is **disputed**.

9  This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

10  separate statement of facts should include only those facts that the Court needs to decide the

11  motion.").

12       121.  **Disputed**. JDPI's factual statement is controverted by Mr. Howard's testimony

13  and report, which states that a square bottle shape reduces the cost of producing, filing,

14  labeling, packing, and displaying a bottle. (Exhibit V – Howard Report), pp. 3–4, 6; (Exhibit

15  W – Howard Declar.) ¶¶ 6 –10.

16       122.  **Disputed**. The cited testimony does not indicate that Mr. Howard has *never*

17  asked *any* retailers how they determine facings; however, he actually testified that, while he

18  had asked some store personnel about palletizing, their conversation didn't address how they

19  determine the number of facings (Exhibit U – Howard Tr.) at 141:10–17. That does not mean

20  that Mr. Howard has never spoken with retailers about this in the past. In any event, VIP

21  challenges the materiality of this assertion. *See* L.R.Civ.56.1 ("The separate statement of

22  facts should include only those facts that the Court needs to decide the motion.").

23       123.  **Disputed**. The two testimonies that JDPI relies on contradict one another and

24  create an issue of fact. Specifically, Mr. Howard testified that the shape of the bottle affects

25

26

27

1  the number of facings, and Mr. Taylor disagreed. *Compare* (Exhibit U – Howard Tr.)

2  141:21–25 *with* JDPI SOF ¶ 123.

3  124.  **Disputed**. JDPI's asserts that "Mr. Howard would have to measure shelf space

4  to determine" whether a "retailer could display a larger number of" square bottles than round

5  bottles. This is contradicted by Mr. Howard's testimony that he took pictures so that he could

6  count the number of square bottles displayed versus the number of round bottles displayed.

7  (Exhibit U – Howard Tr.) at 94:1–8. Further, VIP disputes the materiality of this testimony.

8  *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the

9  Court needs to decide the motion.").

10  125.  **Disputed**. This assertion is rebutted by Mr. Howard's testimony that he took

11  pictures so that he could compare the pallets, store shelves, and bottles after his visit (Exhibit

12  U – Howard Tr.) at 94:1–8. Further, VIP **disputes** the materiality of this testimony. *See*

13  L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court

14  needs to decide the motion.").

15  126.  In the context of the present Motion, the materiality of this fact is **disputed**.

16  This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

17  separate statement of facts should include only those facts that the Court needs to decide the

18  motion.").

19  127.  **Disputed**. The cited testimony does not support JDPI's assertion. While Mr.

20  Howard testified that he measured a carton, he did not testify that he only looked at one

21  carton. This assertion is also disputed by Mr. Howard's report, which makes clear that he has

22  professional experience in designing cartons. (Exhibit V – Howard Report), PP. 6–7, 10.

23  128.  **Disputed**. Mr. Howard's report makes clear that he has professional experience

24  in designing cartons. (Exhibit V – Howard Report), PP. 6–7, 10. Additionally, VIP **disputes**

25  the materiality of this assertion because it is unnecessary to decide JDPI's Motion for

26

27

Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

129.   **Disputed**. Mr. Howard's report makes clear that he has professional experience in designing cartons. (Exhibit V – Howard Report), PP. 6–7, 10. Additionally, VIP **disputes** the materiality of this assertion because it is unnecessary to decide JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

130.   In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

131.   In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

132.   **Disputed**. Mr. Howard's report makes clear that he has information about cartons and pallet sizes based on his professional experience. (Exhibit V – Howard Report), PP. 4, 6–7, 10. Additionally, VIP **disputes** the materiality of this assertion because it is unnecessary to decide JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

133.   **Disputed**. Mr. Howard's report makes clear that he has personal knowledge of "palletization." (Exhibit V – Howard Report), PP. 4, 6–7, 10. Additionally, VIP **disputes** the materiality of this assertion because it is unnecessary to decide JDPI's Motion for Summary

1    Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts
2    that the Court needs to decide the motion.").

3        134.    **Disputed**. The cited testimony does not support JDPI's factual assertion. Mr.
4    Howard does not say he "has no idea" what types of retail outlets use pallet displays were
5    used. Rather, he simply says that he does not know how often they are used because he only
6    went to "three different outlets." (Exhibit U – Howard Tr.) at 160:14.

7        135.    **Disputed**. JDPI's factual assertion is not supported by the cited testimony. Mr.
8    Howard testified that he did not know "off the top of [his] head" what the dimensions of a
9    standard-sized pallet are. This assertion is rebutted by Mr. Howard's report, which makes
10   clear that his personal experience qualifies him to discuss pallet sizes. (Exhibit V – Howard
11   Report), PP. 4, 6–7, 10. Additionally, VIP **disputes** the materiality of this assertion because it
12   is unnecessary to decide JDPI's Motion for Summary Judgment.

13       136.    **Disputed**. While Mr. Howard does not have personal knowledge about the
14   relative pallet sizes used by Brown-Forman in particular, Mr. Howard is qualified to discuss
15   pallet sizes generally. (Exhibit V – Howard Report), PP. 4, 6–7, 10.

16       137.    This is assertion is **disputed** to the extent that this is interpreted as
17   contradicting Mr. Howard's opinion that, "[f]rom a palletizing and shipping standpoint, the
18   cartons for square bottles fit better on a standard pallet size, which eliminates additional costs
19   and reduces the likelihood of damage." (Exhibit V – Howard Report), p. 7. VIP also **disputes**
20   the materiality of this assertion.

21       138.    **Disputed**. The cited testimony does not support JDPI's assertion that one can
22   fix labeling problems on round bottles by making the labels smaller in size. Rather, Mr.
23   Howard's report makes clear that, generally, square bottles are more effective for displaying
24   bottle labels. (Exhibit V – Howard Report), PP. 4, 6.

25

26

27                               25

139.    **Disputed**. JDPI's depiction of Mr. Howard's testimony is misleading. While Mr. Howard did testify that the visibility of the Jack Daniel's bottle's sides is "not a problem," he says so based on his opinion that the primary forward-facing label is more visible than if it were displayed on a round bottle (Exhibit U – Howard Tr.) at 137:19–20:1; (Exhibit V – Howard Report), PP. 4, 6.

140.    **Disputed**. JDPI's assertion is not supported by the cited evidence. Mr. Howard testified that many of the labels on the round bottles were *not* visible (Exhibit U – Howard Tr.) at 192:2–193:5, 193:21–194:16.

141.    In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

142.    **Disputed**. JDPI's rewording of Mr. Howard's testimony is misleading. Mr. Howard's opinion is that "the smaller direct manufacturing cost of a round bottle contributes to its popularity, but the overall advantages of square bottles make them more attractive choices to industry leaders." (Exhibit W – Howard Declar.) ¶ 11. In any event, this assertion is immaterial because it is not necessary to deciding JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

143.    **Disputed**. The cited testimony does not support this assertion:

> **Q:** Do you know anything about how the labels are
> applied to the Jack Daniel's bottle?

> **A:** Not specifically. I know how labels are applied to a lot
> of bottles.

(**Exhibit U – Howard Tr.) at 197:20**–23.

144.   **Disputed**. This assertion is contradicted by Mr. Howard's testimony that round bottles can make labeling more difficult (Exhibit V – Howard Report) PP. 4, 6.

145.   In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

146.   **Disputed**. JDPI's rewording of Mr. Howard's testimony is misleading. Mr. Howard testified that he did not have knowledge about the labeling and filling lines for Jack Daniel's whiskey specifically, but that he's "familiar with labeling, the way labeling works" (Exhibit U – Howard Tr.) at 170:10–11, 197:20–23. Accordingly, this assertion is immaterial. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

147.   **Disputed**. Mr. Howard testified that knowledge of chipping and breaking during the labeling and filing of glass bottles was based on his experience—and while he cited to a particular event that happened in the 1970s, he did not say that he does not have more recent experience (Exhibit U – Howard Tr.) at 171:22–173:6. Further, this assertion is immaterial. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

148.   In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide the motion.").

149.   **Disputed**. Mr. Howard's belief about the Jack Daniel's bottle's gripability was based on his experience that the bottle has a very natural form in terms of being able to grip (Exhibit U – Howard Tr.) at 181:2–7. In any event, this fact is immaterial because it is not

1  necessary to deciding JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

2  separate statement of facts should include only those facts that the Court needs to decide the

3  motion.").

4       150.    In the context of the present Motion, the materiality of this fact is **disputed**.

5  This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

6  separate statement of facts should include only those facts that the Court needs to decide the

7  motion.").

8       151.    In the context of the present Motion, the materiality of this fact is **disputed**.

9  This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

10  separate statement of facts should include only those facts that the Court needs to decide the

11  motion.").

12       152.    In the context of the present Motion, the materiality of this fact is **disputed**.

13  This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

14  separate statement of facts should include only those facts that the Court needs to decide the

15  motion.").

16       153.    In the context of the present Motion, the materiality of this fact is **disputed**.

17  This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The

18  separate statement of facts should include only those facts that the Court needs to decide the

19  motion.").

20       154.    **Disputed**. JDPI misrepresents Mr. Howard's testimony. Rather, Mr. Howard

21  referred to the embossed signature as a "cost factor" because it requires the purchase of a

22  separate manufacturing tool (Exhibit U – Howard Tr.) at 200:18. However, Mr. Howard

23  makes clear that the purchase of a non-depreciating asset is a one-time expenditure that does

24  not affect the cost per-unit in the long-term. (Exhibit W – Howard Declar.) ¶ 16. Further, this

25  fact is immaterial because it is unnecessary to deciding JDPI's Motion for Summary

26

27

1  Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts

2  that the Court needs to decide the motion.").

3      155.  **Disputed**. Mr. Howard lacks personal knowledge as to what "cost-trade-offs"

4  are associated with the Jack Daniel's bottle design in particular, and JDPI did not establish

5  foundation for this testimony.

6      156.  **Disputed**. Mr. Howard is not qualified to testify to the frequency of the use of

7  any given type of bottle in the marketplace, and JDPI did not establish foundation for this

8  testimony. Additionally, the Sacra report contradicts JDPI's assertion by finding that 36% of

9  participants in the bourbon/Tennessee whiskey market use a square bottle with a fluted neck.

10  (Exhibit P - Sacra Report), p. 23. Additionally, Brown-Forman's own market research

11  ███████████████████████████████████████████████████████████

12  ███. (Exhibit R – Hungerford Tr.) at 93:5–11.

13      157.  **Disputed**. Mr. Howard's cited testimony was limited to direct manufacturing

14  costs. (Exhibit W – Howard Declar.) ¶ 6. Additionally, Mr. Howard's report contradicts

15  JDPI's assertion by making clear that square bottles provide for easier labeling and filling.

16  (Exhibit V – Howard Report) pp. 3–4, 6; (Exhibit U – Howard Tr.) at 210:21–211:9.

17      158.  VIP does not dispute that 16% of whiskey bottles in the market contain all three

18  of the elements of the allegedly protected Registration. However, VIP **disputes** this assertion

19  to the extent JDPI attempts to minimize its significance. For example, Jim Beam, Jack

20  Daniel's biggest competitor in the U.S., (Exhibit D – Epps Tr.) at 102:3–5, uses a bottle that

21  has all three elements. (Exhibit P - Sacra Report), pp. 23.

22      159.  VIP does not dispute that there are alternative designs for whiskey bottles;

23  however, it **disputes** this assertion on the basis that JDPI relies on an improper definition of

24  the market. As discussed in Mr. Wolinsky's report, when examining the Jack Daniel's

25  packaging in comparison with other market competitors, the focus must be narrowed to the

26

27

bourbon/Tennessee segment of the whiskey market. (Exhibit Q – Wolinsky Report), p. 5. Additionally, Mr. Sacra testified that he focused his report on the American bourbon/whiskey industry because that was "staying with the parody of American whiskey/bourbon. And to do something that was outside the scope of that would be overly broad." (Exhibit J – VIP Tr.) at 110:2–19, 113:19–22.

160.    In the context of the present Motion, the materiality of this fact is **disputed**. This fact is unnecessary to JDPI's Motion for Summary Judgment. *See* L.R.Civ.56.1 ("The separate statement of facts should include only those facts that the Court needs to decide.

161.    **Disputed**. This fact is misleading because, while it is true that no one has opposed the Registration, the Patent and Trademark Office's examining attorney warned JDPI that the registration application could be refused on both functionality and non-distinctiveness grounds. *See* Declaration of Christopher Larkin (Larkin Declar.) Exhibit 6.

162.    **Disputed**. Mr. Sacra is not qualified to testify as to whether Jack Daniel's competitor's rights have been impacted by the registration, and JDPI has not established foundation to prove otherwise.

163.    For purposes of this Motion, this fact is not disputed.

164.    For purposes of this motion, this fact is not disputed.

165.    **Disputed**. Mr. Sacra is not a legal expert and was not offering a legal opinion concerning whether JDPI's advertising touts the utilitarian advantages of the Jack Daniel's packaging.

166.    **Disputed**. Mr. Sacra is not a legal expert and was not offering a legal opinion on whether the Jack Daniel's packaging was ornamental.

167.    **Disputed**. Mr. Sacra is not a legal expert and is not qualified to testify as to whether Jack Daniel's competitors' rights have been impacted by the registration.

## STATEMENT OF ADDITIONAL FACTS

168.    VIP sells chew toys for dogs. Among VIP's products is the SILLY SQUEAKERS® line of chew toys, which includes a line of rubber squeaky toys shaped like bottles, with names parodying well-known beverages, such as "Mountain Drool," "Hein'e'sniff'n," and the toy at issue in this case, pictured below. See Plaintiff's Statement of Facts in Support of its Motion for Summary Judgment Against Defendant Jack Daniel's Properties, Inc. (Doc. 111) ("VIPSOF") at ¶¶ 1-2.

 

170.    The Silly Squeakers Toy is, exactly as the name says, a silly squeaker toy (Exhibit F – Bad Spaniel's Toy).

171.    The Silly Squeakers Toy invites buyers to imagine "how funny your dog would be if he was like us." Its message to consumers is that "it is ok to make fun of well-known brands." (Exhibit G – Sacra Declar.) (Exhibit E – Sacra Tr.).

172.    The VIP Toy is an irreverent parody of a major American whiskey brand. VIP sells only a few thousand of the Silly Squeaker Toy in a year, and total revenue from the product amounts to a tiny fraction of the cost of this litigation—litigation which has,

1    ironically, become necessary to establish that indeed it is still okay to make fun of well-

2    known brands. (Exhibit G – Sacra Declar.) ¶20.

3         173.    The SILLY SQUEAKERS® toy resembles an American whiskey bottle.

4    (Exhibit G – Sacra Declar.) ¶17.

5         174.    It borrows the common liquor bottle shape and label graphics similar to those

6    used by several American whiskey makers, including Jack Daniel's. (Exhibit G – Sacra

7    Declar.) ¶17.

8         175.    American whiskey packaging from various sources are pictured here:



16         See VIPSOF ¶ 23; (Exhibit A – Answer to Amd. Comp.) ¶23-26; See also Defendant

17    and Counterclaimant Jack Daniel's Properties, Inc.'s Responses to Plaintiff' and Counter-

18    defendant's First Set of Requests for Admissions (Exhibit X – Responses to RFA) ¶2-10.

19         176.    The packaging of many other whiskeys and spirits are also similar (Exhibit G –

20    Sacra Declar.) ¶17 and Exhibit G.

21         177.    Other products in the industry with similar packaging are shown here:



25    (Exhibit G – Sacra Declar.) ¶17 and Exhibit B.

178. The Silly Squeakers Toy also includes the words "Bad Spaniels" and "Old No. 2" on the label. (Exhibit F – Bad Spaniel's Toy).

179. VIP was careful to ensure the toy is also distinctly original. (Exhibit G – Sacra Declar.) ¶19.

180. The Silly Squeakers Toy does not use the "Jack Daniel's" name, the number "7," the embossed "Jack Daniel's" signature on the bottle; the same filigree design on the label; or the three-sided body label. (VIPSOF )¶¶ 89, 91; (Exhibit G – Sacra Declar.) ¶19.

181. VIP prominently placed its SILLY SQUEAKERS® trademark on the VIP Product's hangtag, along with a cartoon dog, and changed the location of its elements, as shown here:



(Exhibit G – Sacra Declar.) ¶18. VIP placed a disclaimer on the packaging, stating that the "[P]roduct and its design belong to VIP Products," and that the Product is not "affiliated with Jack Daniel Distillery," (Exhibit F – Bad Spaniel's Toy); (Exhibit G – Sacra Declar.) ¶18.

182. The VIP Toy's label refers to "43% poo by vol." and "100% smelly." (Exhibit F – Bad Spaniel's Toy)

183. Jack Daniel's Global Brand Director testified that he found the VIP Product to be in "bad taste," and stated that JDPI would never license the JDTW Marks or Bottle Dress for any product it considered to be in bad taste. (VIPSOF ) ¶ 114; (Exhibit D – Epps Tr.) at 117:6-21.

184. There are over 50 specific design differences between the SILLY SQUEAKERS® toy and the JDTW bottle packaging. (Exhibit G – Sacra Declar.) ¶19.

185.    The SILLY SQUEAKERS® Bad Spaniel's dog toy design uses as many as 15 different generic and non-exclusive features found in various combinations on bottles of Kentucky bourbon and Tennessee whiskey from different sources. (Exhibit G – Sacra Declar.) ¶21.

186.    VIP's SILLY SQUEAKERS® Bad Spaniel's toy is typically sold with other models of SILLY SQUEAKERS® toys parodying other beer, wine, liquor and soda brands. (VIPSOF ) ¶ 4.

187.    The Silly Squeakers Toy is not sold in the same channels of trade as JDTW. (VIPSOF ) ¶¶ 94-96, 99, 101, 103-104.

188.    It is primarily sold in the specialty dog-supply market, and JDPI is not a competitor in that market. (VIPSOF ) ¶¶ 94-96, 99, 101, 103-104.

189.    JDPI has never licensed the JDTW Marks and Bottle Dress for use on a dog toy, and it has no intention to do so in the future. (VIPSOF ) ¶¶ 98-99, 103-04.

190.    JDPI claims that the "Jack Daniel's Trade Dress" is "an iconic trade dress consisting of" several combined elements.  The specific features of the alleged Jack Daniel's Trade Dress vary, depending on what JDPI representative describes them and when, but four fundamental features are a: (1) square bottle and ribbed neck: (2) black cap; (3) black neck wrap with white printing; and (4) black front label with white printing and filigreed border. The alleged Trade Dress, depicted at right, also includes the "Old No. 7" slogan on the neck wrap and front label and the "Jack Daniel's" brand name on the front label only, along with the words "Tennessee" and "Sour Mash Whiskey." (Exhibit A – Answer to Amd. Comp.) ¶ 14; (Exhibit B – Answer and Counterclaim) ¶ 6; Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories (Exhibit Y – Responses to NUI) ¶ 8.

191.    JDPI claims also that the combination of features that comprise the alleged Trade Dress have been used for Jack Daniel's whiskey since the 1950s. (VIPSOF ) ¶ 20.

192.    In 2011, however, JDPI modified the bottle shape and label, creating a new design that is referred to by JDPI as the "Evolution Bottle" design. (VIPSOF ) ¶ 9; (Exhibit N – Taylor Tr.) at 8:9-9:11.

193.    Neither the alleged Jack Daniel's Trade Dress claimed to be used since the 1950s nor the new alleged Jack Daniel's Trade Dress using the Evolution Bottle design introduced in 2011 are registered with the U.S. Patent and Trademark Office ("PTO"). (VIPSOF ) ¶ 14.

194.    JDPI claims common law "iconic trade dress" rights in the combination of the common bottle shape and generic and non-exclusive labeling and graphics used by the VIP pet toy. (VIPSOF ) ¶¶ 15-17, 21-22.

195.    JDPI cannot, however, settle on exactly what comprises its "iconic trade dress."

196.    VIP's expert, Martin Wolinsky testified that if other whiskey producers were prevented from using this style of packaging that signifies to consumers that it is an American whiskey, the other producers would be at a disadvantage.  (Exhibit Q – Wolinsky Report) ¶12.

197.    Mr. Wolinsky is an expert in the spirits and Whiskey industry, and he testified that in his experience, these packaging elements are commonly used in the industry to designate a product as American whiskey/bourbon." (Exhibit Q – Wolinsky Report) ¶¶ 3-5.

198.    Research relied on by JDPI/Brown-Forman reveled that ███████████████ ███████████████████████████████████████████████████████████████████████. [Hungerford 93:5-11].

199.    VIP submitted expert testimony identifying several significant utilitarian advantages provided by the structural aspects of the alleged Trade Dress. (Exhibit V – Howard Report).

200.    VIP's evidence reveals that alternative bottle designs do not offer the same advantages as the alleged Jack Daniel's Trade Dress.  (Exhibit V – Howard Report).

201.    VIP has submitted evidence in conjunction with its own Motion for Summary Judgment on this issue that features of the alleged Trade Dress generate economies in other aspects of the overall cost of the package design. (VIPSOF ) ¶ 36.

202.    In fact, both parties' evidence confirms that the combined features of the alleged common law Jack Daniel's Trade Dress is common bottle packaging in the whiskey market that, when claimed by JDPI as its exclusive trade dress, has placed (and will continue to place) JDPI competitors at a significant non reputation related disadvantage. (Exhibit R – Hungerford Tr.) at 93:5-11. (VIPSOF ) ¶ 36.

203.    JDPI admits that its direct competitors in the whiskey industry use bottle designs that are very similar to the alleged Jack Daniel's Trade Dress. *See* Motion and Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment (Doc. 101) at 19:15-17; (Exhibit A – Answer to Amd. Comp.) ¶¶ 22-23; (Exhibit X – Responses to RFA) ¶ 2.

204.    Many brands of Kentucky Bourbon or Tennessee Whiskey that use (1) a square bottle with a fluted neck, (2) a black cap, and (3) a black neck-wrap closure. (Exhibit G – Sacra Declar.); (VIPSOF ) ¶¶ 29-30.

205.    As a result, "giving Jack Daniel's exclusive rights to use [those] features . . . would impose a competitive disadvantage on" the other brands that currently use them. "The disadvantage would be to deprive those other competing companies of the ability to use a

standard industry 'uniform' that identifies any whiskey as an American whiskey." (Exhibit Q – Wolinsky Report).

206. Features of the alleged Jack Daniel's Trade Dress are intended to evoke history and authenticity, masculinity, honesty and not taking yourself too seriously (Exhibit C – Gooder Tr.) at 82:4-7.

207. Those features, including the square bottle and fluted neck, convey to consumers that product inside the bottle packaging is a Kentucky or Tennessee whiskey with an old time or classic heritage (Exhibit I – Roush Tr.) at 60:10-20.

208. [redacted]

209. JDPI obtained consumer research revealing that [redacted]

210. Additional consumer research by JDPI for the [redacted]

211.    VIP did not copy all elements of the Jack Daniel's Tennessee Whiskey bottle packaging but copied only its generic and non-exclusive features and only to the extent necessary for parody. (Exhibit G – Sacra Declar.).

212.    None of the focus groups that viewed the VIP pet toy confused it with Jack Daniel's whiskey. VIPSOF ¶ 115.

213.    JDPI has admitted that it advertises its Jack Daniel's product and not the packaging in which it is bottled.

214.    The JDPI evidence reveals that none of its advertisements include any textual or visual references directing consumers' attention to features of the alleged Jack Daniel's Trade Dress. (VIPSOF ) ¶¶ 59-78.

215.    None of the articles discussing Jack Daniel's whiskey refer to the alleged Jack Daniel's Trade Dress itself, or any of its elements other than the "Jack Daniel's" brand name and the "Old No. 7" mark. (VIPSOF ) ¶ 76.

216.    JDPI has admitted that several of its competitors—including Jim Beam, its largest competitor—use a number of the same design elements in their trade dress for their Kentucky bourbon and Tennessee whiskey. (VIPSOF ) ¶¶ 24-26.

217.    The licensing manager for Brown-Forman, JDPI's corporate parent, could not recall Brown-Forman ever having conducted a study of any kind to test consumer recognition of the shape of the bottle currently used for Jack Daniel's Tennessee Whiskey. (VIPSOF ) ¶ 44.

218.    JDPI admits that "some spirits companies already use elements of" the alleged Jack Daniel's Trade Dress, Motion, 18:15–16, and that "other bottles for whiskey have

1  combinations of various shapes, black caps, black neck wrap closures with white printing

2  bearing different graphics, marks and design elements, and black front labels with white

3  printing bearing different graphics, marks and design elements."

4       219.   VIP's evidence confirms that a majority of JDPI's direct competitors use some

5  combination (if not all) of the Trade Dress' claimed elements. (VIPSOF ) ¶¶ 22-30.

6       220.   VIP evidence reveals that there are many unlicensed clothing products for sale

7  online that that incorporate elements of the alleged Jack Daniel's Trade Dress. (Exhibit G –

8  Sacra Declar.)

9       221.   VIP  discovered  over  a  hundred  products  imitating  variations  on  the

10  combination of elements that comprise the alleged Jack Daniel's Trade Dress, including the

11  following wide variety of t-shirts below:



23  (VIPSOF ) ¶ 31; (Exhibit P - Sacra Report)

24       222.   None of those t-shirts or other products were authorized by JDPI.

25       223.   JDPI has not disclosed any evidence indicating that it had taken any action to

26  stop any of these unlicensed used of the alleged Jack Daniel's Trade Dress. (Exhibit I –

27                                          39

1  Roush Tr.) at 54: 8-22.

2      224.   JDPI has made numerous inconsistent statements regarding the elements of its

3  claimed Jack Daniel's Trade Dress. (VIPSOF ) ¶¶ 15-22.

4      225.   Features of the alleged Trade Dress are commonly used to package distilled

5  spirits, including Jim Beam, bourbon whiskey. (VIPSOF ) ¶¶ 24-26, (Exhibit G – Sacra

6  Declar.) (Exhibit Q – Wolinsky Report) pp. 5–6.

7      226.   JDPI recognizes Jim Beam as the "biggest competitor," to Jack Daniel's

8  whiskey (Exhibit D – Epps Tr.) at 102:3-5 (recognizing that Jim Beam as the "biggest

9  competitor," to Jack Daniel's whiskey); see also id. at 128:9-11 (acknowledging that

10  competitor George Dickel uses a very similar bottle design. (VIPSOF ) ¶¶ 24-26.

11      227.   ██████████████████████████████████████████████

12  █████████████████████████████████████████████████████████

13  █████████████████

14      227.   Features of the alleged Trade Dress are commonly used to package distilled

15  spirits, including another brand Tennessee Whiskey, George Dickel, and the "biggest

16  competitor" to Jack Daniel's whiskey: Jim Beam bourbon whiskey (VIPSOF ) ¶¶ 24-26;

17  (Exhibit D – Epps Tr.) at 102:3-5.

18  228.   JDPI also owns a PTO registration of a mark for "distilled spirits" that "consists of the

19  three-dimensional configuration of the square shaped bottle container for

20  the goods, having an embossed ridge or scalloped design on the neck

21  portion of the bottle, and an embossed signature design comprised of the

22  words 'JACK DANIEL'" (the "Bottle Registration"), (Exhibit A – Answer

23  to Amd. Comp.) ¶ 21, and that is depicted as shown here   in the

24  registration certificate for Registration No. 4,106,178: (Exhibit A –

25  Answer to Amd. Comp.) ¶¶ 18 and 20; Declaration of Christopher Larkin



26

27

(Larkin Declar.) Exhibit 6].

229.    The utilitarian advantages of the JD Signature Bottle as packaging for distilled spirits are: (1) the square bottle shape "reduces the cost of packing, shipping and displaying the bottle" and "enhances the grip on the body of the bottle;" (2) the "embossed scalloped design on the neck portion of the bottle improves the grip of the bottle. . .from an ergonomic standpoint"; and (3) an "embossed signature on the bottle is useful to identify the product easily in the retail marketplace" and "provide[es] an indelible identifier of the product inside." (Exhibit V – Howard Report) pp. 3-4.

230.    JDPI admits that different bottle shapes "create different difficulties with respect to the bottling process" and that "[e]very shape has its own set of issues." (Exhibit N – Taylor Tr.) at 65:5-14.

231.    The Bottle Registration is for the Jack Daniel's Whiskey bottle without its labels (the "Bottle Shape"). Declaration of Christopher Larkin (Larkin Declar.) Exhibit 6 at JDPI003147; (Exhibit R – Hungerford Tr.) at 74:15-75:1.

232.    JDPI agrees that a significant number of American consumers associate a square bottle shape with any whiskey or bourbon product. (Exhibit D – Epps Tr.) at 108:1-9.

233.    In fact the only feature of the Bottle Design that is not used already by competitors of Jack Daniel's whiskey is the "Jack Daniel" name used in the signature.

234.    The combined features of the Bottle Design, excluding only the "Jack Daniel" name itself, conveys to customers that the bottle contains liquor – from no single particular source. (Exhibit G – Sacra Declar.) ¶¶ 9-11 and Exhibit C.

235.    JDPI has never conducted a study to determine how well-recognized the Jack Daniel's bottle shape is without other elements. (Exhibit D – Epps Tr.) at 106:15-107:18.

236.    In fact, JDPI admits that a significant number of American consumers associate a square bottle shape with any whiskey or bourbon product. (Exhibit D – Epps Tr.) at 108:1-9

237.    JDPI admits that the PTO registration 4,106,178 is not incontestable. (Exhibit Y – Responses to NUI) ¶ 24; (Exhibit A – Answer to Amd. Comp.) ¶ 19; (Exhibit B – Answer and Counterclaim) ¶ 11.

238.    The Jack Daniel's Bottle Configuration was introduced in June 2011 and there have been three recent generations of the Jack Daniel's bottle. The current bottle JDPI refers to as "the evolution bottle." (Exhibit N – Taylor Tr.) at 8:9-9:11.

239.    The "bevel design" sometimes referred to as the "current" bottle was in use from approximately 1999 through 2011.  (Exhibit N – Taylor Tr.) at 9:12-10:21.

240.    JDPI changed the design of the Jack Daniel's bottle because their chief executive had a vision for taking small incremental steps at elevating the premiumness of Jack Daniel's.  (Exhibit N – Taylor Tr.) at 11: 24-12:8.

241.    JDPI changed the Jack Daniel's bottle when it redesigned it in 2011 so that (1) the shoulders were more squared, (2) added beveled edges to the new bottle, (3) removed the lines on the neck and (4) overall gave the bottle a cleaner look than the previous bottle. (Exhibit I – Roush Tr.) at 94:9-95:10.

242.    The "evolution bottle" has been in use since it was introduced in 2011. (Exhibit N – Taylor Tr.) at 9:12-20:2.

**RESPECTFULLY SUBMITTED** this 11th day of December, 2015.

**DICKINSON WRIGHT PLLC**

By: s/David G. Bray
David G. Bray
Frank G. Long
Jonathan S. Batchelor
Colleen M. Ganin
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
*Attorneys for VIP Products, L.L.C.*

42

1

**<u>CERTIFICATE OF SERVICE</u>**

2      I hereby certify that on December 11th 2015, I electronically transmitted the above

3   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4   Notice of Electronic Filing to all CM/ECF registrants:

5

6                                    s/ Kylie M. Boie

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

PHOENIX 53913-11 264437v1

22

23

24

25

26

27