# EXHIBIT A

1 | QUARLES & BRADY LLP
Gregory P. Sitrick (AZ Bar #028756))
2 | Isaac S. Crum (AZ Bar#026510)
One Renaissance Square
3 | Two North Central Avenue
Phoenix, Arizona 85004-2391
4 | Telephone: (602) 229-5317
Facsimile: (602) 420-5198
5 | E-mail: Gregory.sitrick@quarles.com

6 | SEYFARTH SHAW LLP
Christopher C. Larkin (admitted pro hac vice)
7 | 2029 Century Park East
Suite 3500
8 | Los Angeles, California 90067-3021
Telephone: (310) 201-5289
9 | Facsimile: (310) 201-5219
E-mail: clarkin@seyfarth.com
10
Attorneys for Defendant and Counterclaimant
11 | JACK DANIEL'S PROPERTIES, INC.

12

13 | **UNITED STATES DISTRICT COURT**

14 | **DISTRICT OF ARIZONA**

15

16

17 | VIP Products, LLC, an Arizona limited liability company,

Case No. CV 14-02057 PHX DGC

18 | Plaintiff and Counter-Defendant,

**ANSWER OF DEFENDANT AND COUNTERCLAIMANT JACK DANIEL'S PROPERTIES, INC. TO AMENDED COMPLAINT**

19

20 | v.

21 | Jack Daniel's Properties, Inc., a Delaware corporation,

22 | Defendant and Counterclaimant.

23

24 | Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") answers the

25 | amended complaint filed by plaintiff VIP Products, LLC ("VIP") as follows.

26

27

28

QB\136435.00005\35355596.1

1.	JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Amended Complaint, and on that basis denies those allegations.

2.	JDPI admits the allegations in paragraph 2 of the Amended Complaint.

3.	JDPI denies the allegations in paragraph 3 of the Amended Complaint, except JDPI admits that it is a citizen of a state other than Arizona.

4.	JDPI admits the allegations in paragraph 4 of the Amended Complaint.

5.	JDPI admits the allegations in paragraph 5 of the Amended Complaint.

6.	JDPI admits that VIP purports to demand a trial by jury in paragraph 6 of the Amended Complaint, but denies that VIP is entitled to a jury trial on any of its claims for relief.

7.	JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action.

8.	JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action, which is identified as being part of a "Silly Squeakers" line.

9.	JDPI denies the allegations in paragraph 9 of the Amended Complaint.

10.	JDPI denies the allegations in paragraph 10 of the Amended Complaint.

11.	JDPI denies the allegations in paragraph 11 of the Amended Complaint, except JDPI admits that it owns various registrations of, or containing, the trademark JACK DANIEL'S in the United States and that the JACK DANIEL'S trademark has been used for many years for Tennessee whiskey in the United States.

12.     JDPI denies the allegations in paragraph 12 of the Amended Complaint, except JDPI admits that VIP incorporated elements of the trade dress of Jack Daniel's Tennessee whiskey on VIP's "Bad Spaniels" dog toy, including a label with a black background and white lettering, and that VIP placed a statement reading "The product and its design belong to VIP Products.  This product is not affiliated with Jack Daniel Distillery" in small print at the bottom of a detachable cardboard tag affixed to the Bad Spaniels toy.

13.     JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that it sent VIP a letter dated September 5, 2014 demanding that VIP cease all further sales of the Bad Spaniels toy.

14.     JDPI admits the allegations in paragraph 14 of the Amended Complaint.

15.     JDPI admits the allegations in paragraph 15 of the Amended Complaint.

16.     JDPI admits the allegations in paragraph 16 of the Amended Complaint.

17.     JDPI admits the allegations in paragraph 17 of the Amended Complaint.

18.     JDPI admits the allegations in paragraph 18 of the Amended Complaint.

19.     JDPI denies the allegations in paragraph 19 of the Amended Complaint, except JDPI admits that United States Trademark Registration No. 4,106,178 is valid and subsisting and that it is not incontestable.

20.     JDPI denies the allegations in paragraph 20 of the Amended Complaint, and avers that the mark registered under United States Trademark Registration No. 4,106,178 is shown in the registration certificate.

21.     JDPI admits the allegations in paragraph 21 of the Amended Complaint.

22.     JDPI denies the allegations in paragraph 22 of the Amended Complaint.

23.     JDPI admits the allegations in paragraph 23 of the Amended Complaint.

24.     JDPI admits the allegations in paragraph 24 of the Amended Complaint.

ANSWER TO AMENDED COMPLAINT

QB\136435.00005\35355596.1

25.     JDPI denies the allegations in paragraph 25 of the Amended Complaint, except JDPI admits that the bottles depicted in the Amended Complaint have various shapes and black caps, black neck wrap closures with white printing bearing different graphics, marks, and design elements, and black front labels with white printing bearing different graphics, marks, and design elements.

26.     JDPI denies the allegations in paragraph 26 of the Amended Complaint, except JDPI admits that the bottles depicted in the Amended Complaint have various shapes and neck designs shown on the bottles, together with different graphics, marks, and design elements.

27.     JDPI denies the allegations in paragraph 27 of the Amended Complaint.

28.     JDPI denies the allegations in paragraph 28 of the Amended Complaint.

29.     JDPI denies the allegations in paragraph 29 of the Amended Complaint.

30.     JDPI denies the allegations in paragraph 30 of the Amended Complaint, except JDPI admits that some other bottles for whiskey have a black cap.

31.     JDPI denies the allegations in paragraph 31 of the Amended Complaint, except JDPI admits that some other bottles for whiskey have a black neck wrap closure with white printing bearing different graphics, marks, and design elements.

32.     JDPI denies the allegations in paragraph 32 of the Amended Complaint, except JDPI admits that admits that some other bottles for whiskey have a black front label with white printing bearing different graphics, marks, and design elements.

33.     JDPI denies the allegations in paragraph 33 of the Amended Complaint, except JDPI admits that some other bottles for whiskey have combinations of various shapes, black caps, black neck wrap closures with white printing bearing different graphics, marks, and design elements, and black front labels with white printing bearing different graphics, marks, and design elements.

34.     JDPI denies the allegations in paragraph 34 of the Amended Complaint.

35.     JDPI denies the allegations in paragraph 35 of the Amended Complaint.

4

36.     JDPI denies the allegations in paragraph 36 of the Amended Complaint.

37.     JDPI denies the allegations in paragraph 37 of the Amended Complaint.

38.     JDPI denies the allegations in paragraph 38 of the Amended Complaint.

39.     JDPI denies the allegations in paragraph 39 of the Amended Complaint, except JDPI admits that some other bottles for whiskey bearing different graphics, marks, and design elements are or appear to be square in shape to varying degrees.

40.     JDPI denies the allegations in paragraph 40 of the Amended Complaint, except JDPI admits that some other bottles for whiskey bearing different graphics, marks, and design elements have fluting or faceting on the necks of the bottles.

41.     JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 of the Amended Complaint, and on that basis denies those allegations, except JDPI admits that the bottle for Southern Comfort liqueur bears an embossed signature on the body of the bottle.

42.     JDPI denies the allegations in paragraph 42 of the Amended Complaint, except JDPI admits that some other bottles for whiskey bearing different graphics, marks, and design elements are or appear to be square in shape to varying degrees and have fluting or faceting in the necks of the bottles.

43.     JDPI denies the allegations in paragraph 43 of the Amended Complaint.

44.     JDPI denies the allegations in paragraph 44 of the Amended Complaint.

45.     JDPI denies the allegations in paragraph 45 of the Amended Complaint.

46.     JDPI denies the allegations in paragraph 46 of the Amended Complaint.

## ANSWERING THE FIRST CLAIM FOR RELIEF

47.     JDPI repeats its responses above to the allegations in paragraphs 1-46 of the Amended Complaint in response to the allegations in paragraph 47 of the Amended Complaint.

48.     JDPI admits the allegations in paragraph 48 of the Amended Complaint.

49.     JDPI denies the allegations in paragraph 49 of the Amended Complaint.

5

QB\136435.00005\35355596.1

## ANSWERING THE SECOND CLAIM FOR RELIEF

50.     JDPI repeats its responses above to the allegations in paragraphs 1-49 of the Amended Complaint in response to the allegations in paragraph 50 of the Amended Complaint.

51.     JDPI denies the allegations in paragraph 51 of the Amended Complaint.

52.     JDPI denies the allegations in paragraph 52 of the Amended Complaint.

53.     JDPI denies the allegations in paragraph 53 of the Amended Complaint.

54.     JDPI denies the allegations in paragraph 54 of the Amended Complaint.

55.     JDPI denies the allegations in paragraph 55 of the Amended Complaint.

56.     JDPI denies the allegations in paragraph 56 of the Amended Complaint.

## ANSWERING THE THIRD CLAIM FOR RELIEF

57.     JDPI repeats its responses above to the allegations in paragraphs 1-56 of the Amended Complaint in response to the allegations in paragraph 57 of the Amended Complaint.

58.     JDPI denies the allegations in paragraph 58 of the Amended Complaint.

59.     JDPI denies the allegations in paragraph 59 of the Amended Complaint.

60.     JDPI denies the allegations in paragraph 60 of the Amended Complaint.

61.     JDPI denies the allegations in paragraph 61 of the Amended Complaint.

62.     JDPI denies the allegations in paragraph 62 of the Amended Complaint, except JDPI admits that VIP seeks cancellation of United States Trademark Registration No. 4,106,178.

## AFFIRMATIVE DEFENSES

1.     VIP has infringed, diluted, and competed unfairly with respect to, JDPI's trademarks and trade dress, as more fully alleged in JDPI's Counterclaims in this action, and thus comes before the Court with unclean hands and is not entitled to the equitable relief of a declaratory judgment.

6

QB\136435.00005\35355596.1

2. VIP is estopped by its deliberate, admitted, and targeted copying of JDPI's trademarks and trade dress, as more fully alleged in JDPI's Counterclaims in this action, from contending that any of JDPI's trademarks or trade dress are functional, merely ornamental or decorative, generic, non-distinctive, or otherwise invalid or unenforceable.

### PRAYER FOR RELIEF

WHEREFORE, defendant and counterclaimant JDPI prays for judgment as follows:

1. That VIP's Amended Complaint be dismissed with prejudice;

2. That judgment be entered in JDPI's favor on its Counterclaims;

3. That VIP be ordered, pursuant to 15 U.S.C. § 1117(a), to pay to JDPI its attorneys' fees and the costs of this action; and

4. That JDPI be granted such other and further relief as the Court may deem just and proper.

DATED: June 3, 2015                Respectfully submitted,

                                   */s/ Isaac S. Crum*
                                   Gregory P. Sitrick  (AZ Bar #028756)
                                   Gregory.Sitrick@quarles.com
                                   Isaac S. Crum (AZ Bar #026510)
                                   Isaac.Crum@quarles.com
                                   Quarles & Brady LLP
                                   Firm State Bar No. 00443100
                                   One Renaissance Square
                                   Two North Central Avenue
                                   Phoenix, AZ 85004
                                   Telephone (602) 229-5200
                                   Fax (602) 229-5690

                                   SEYFARTH SHAW LLP
                                   Christopher C. Larkin (admitted pro hac vice)
                                   clarkin@seyfarth.com
                                   2029 Century Park East
                                   Suite 3500
                                   Los Angeles, California 90067-3021
                                   Telephone: (310) 201-5289
                                   Facsimile: (310) 201-5219

                                   *Attorneys for Defendant and Counterclaimant*
                                   *JACK DANIEL'S PROPERTIES, INC.*

7

ANSWER TO AMENDED COMPLAINT

QB\136435.00005\35355596.1

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on June 3, 2015, I electronically filed the foregoing with the Clerk

3 of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all

4 counsel of record in this case.

5

6          */s/ Isaac S. Crum*
           Isaac S. Crum

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

QB\136435.00005\35355596.1

# EXHIBIT B

1  QUARLES & BRADY LLP
   Gregory P. Sitrick (SBN 028756)
2  E-mail: Gregory.sitrick@quarles.com
   Isaac S. Crum (SBN 026510)
3  E-mail: Isaac.Crum@quarles.com
   One Renaissance Square
4  Two North Central Avenue
   Phoenix, Arizona 85004-2391
5  Telephone: (602) 229-5317
   Facsimile: (602) 420-5198
6
7  Attorneys for Defendant and Counterclaimant
   JACK DANIEL'S PROPERTIES, INC.
8
9
10                 **UNITED STATES DISTRICT COURT**
11                     **DISTRICT OF ARIZONA**
12
13  VIP PRODUCTS, LLC, an Arizona limited      Case No. CV 14-02057 PHX DGC
    liability company,
14                                             **ANSWER AND COUNTERCLAIMS**
                    Plaintiff,                 **OF DEFENDANT AND**
15                                             **COUNTERCLAIMANT JACK**
           v.                                  **DANIEL'S PROPERTIES, INC.**
16
    JACK DANIEL'S PROPERTIES, INC., a
17  Delaware corporation,
18                  Defendant.
19
20        Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") answers the
21  complaint filed by plaintiff VIP Products, LLC ("VIP") and counterclaims as follows.
22
23
24
25
26
27
28
                                                      ANSWER AND COUNTERCLAIMS

# ANSWER TO COMPLAINT

1.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint, and on that basis denies those allegations.

2.      JDPI admits the allegations in paragraph 2 of the Complaint.

3.      JDPI denies the allegations in paragraph 3 of the Complaint, except JDPI admits that it is a citizen of a state other than Arizona.

4.      JDPI admits the allegations in paragraph 4 of the Complaint.

5.      JDPI admits the allegations in paragraph 5 of the Complaint.

6.      JDPI admits that VIP purports to demand a trial by jury, but denies that VIP is entitled to a jury trial on any of its claims for relief.

7.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action.

8.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint, and on that basis denies those allegations, except JDPI admits that VIP has marketed and sold certain chew toys for dogs, including the toy at issue in this action, which is identified as being part of a "Silly Squeakers" line.

9.      JDPI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint, and on that basis denies those allegations.

10.     JDPI denies the allegations in paragraph 10 of the Complaint.

11.     JDPI denies the allegations in paragraph 11 of the Complaint, except JDPI admits that it owns various registrations of, or containing, the trademark JACK

2

QB\136435.00005\31586488.1

1  DANIEL'S in the United States and that the JACK DANIEL'S trademark has been used
2  for many years for Tennessee whiskey in the United States.

3      12.    JDPI denies the allegations in paragraph 12 of the Complaint, except JDPI
4  admits that VIP incorporated elements of the trade dress of Jack Daniel's Tennessee
5  whiskey on VIP's "Bad Spaniels" dog toy, including a label with a black background and
6  white lettering, and that VIP placed a statement reading "The product and its design
7  belong to VIP Products.  This product is not affiliated with Jack Daniel Distillery." in
8  small print at the bottom of a detachable cardboard tag affixed to the Bad Spaniels toy, as
9  shown in JDPI's counterclaims below.

10     13.    JDPI lacks knowledge or information sufficient to form a belief as to the
11  truth of the allegations in paragraph 13 of the Complaint, and on that basis denies those
12  allegations, except JDPI admits that it sent VIP a letter dated September 5, 2014
13  demanding that VIP cease all further sales of the Bad Spaniels toy.

14                **ANSWERING THE SINGLE CLAIM FOR RELIEF**

15     14.    JDPI repeats its responses above to the allegations in paragraphs 1-13 of the
16  Complaint in response to the allegations in paragraph 14 of the Complaint.

17     15.    JDPI admits the allegations in paragraph 15 of the Complaint.

18     16.    JDPI denies the allegations in paragraph 16 of the Complaint.

19                        **AFFIRMATIVE DEFENSES**

20     1.    The Complaint fails to state a claim upon which relief can be granted.

21     2.    VIP has infringed, diluted, and competed unfairly with respect to, JDPI's
22  trademarks and trade dress, as more fully alleged in JDPI's counterclaims below, and
23  thus comes before the Court with unclean hands and is not entitled to the equitable relief
24  of a declaratory judgment.

25                            **COUNTERCLAIMS**

26  Counterclaimant JDPI counterclaims as follows:

27

28

                                     3

                                                    ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

1.     These counterclaims arise under §§ 32(1) and 43(a)(1) and (c) of the United States Trademark Act, 15 U.S.C. §§ 1114 and 1125(a)(1) and (c), and under the statutory and common law of the State of Arizona.  The Court has jurisdiction over the subject matter of JDPI's counterclaims under § 39(a) of the United States Trademark Act, 15 U.S.C. § 1121(a), and under 28 U.S.C. §§ 1331 and 1338(a).  The Court has jurisdiction over the subject matter of JDPI's counterclaims under the law of the State of Arizona under 28 U.S.C. §§ 1338(b) and 1367.

## PARTIES

2.     JDPI is the defendant in this action and is a Delaware corporation with its principal place of business in San Rafael, California.

3.     VIP is the plaintiff in this action and has alleged in its Complaint that it is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

## JURISDICTION AND VENUE

4.     The Court has personal jurisdiction over VIP because it initiated this action and thus subjected itself to personal jurisdiction in this Court on JDPI's counterclaims and because it alleges that it resides in the State of Arizona.  Venue is proper in this Judicial District under 28 U.S.C. § 1391(b)(1) because VIP alleges that it resides in this Judicial District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF
### The Jack Daniel's Trademarks and Trade Dress

5.     JDPI owns and licenses the use of the trademarks and trade dress used in connection with Jack Daniel's Tennessee whiskey and other products in the Jack Daniel's line.  Tennessee whiskey has been sold in the United States under the JACK DANIEL'S mark continuously since 1875, except during Prohibition, making Jack Daniel's Tennessee whiskey one of the oldest, longest-selling, and most iconic consumer products in American history.  In addition to the JACK DANIEL'S trademark, Jack Daniel's

4

1  Tennessee whiskey has borne the OLD NO. 7 trademark since 1875 (jointly the "JDPI
2  Trademarks").

3      6.      Since long prior to the commencement of VIP's acts of infringement,
4  dilution, and unfair competition complained of herein, and continuously to the present,
5  Jack Daniel's Tennessee whiskey has been sold in packaging embodying an iconic trade
6  dress consisting of a square bottle with a ribbed neck, a black cap, a black neck wrap
7  closure with white printing bearing the OLD NO. 7 mark, and a black front label with
8  white printing and a filigreed border bearing the JACK DANIEL'S mark depicted in
9  arched lettering at the top of the label, the OLD NO. 7 mark contained within a filigreed
10 oval design in the middle portion of the label beneath the JACK DANIEL'S mark, and
11 the words Tennessee Sour Mash Whiskey in the lower portion of the label, with the word
12 "Tennessee" depicted in script (the "Jack Daniel's Trade Dress").  The Jack Daniel's
13 Trade Dress is depicted below:



ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

7.     JDPI's predecessors-in-interest and licensees have expended many hundreds of millions of dollars over many decades advertising and promoting Tennessee whiskey sold under the JDPI Trademarks and the Jack Daniel's Trade Dress in the United States. Such advertising and promotion have taken place in the print and electronic media, over the Internet, on billboards, on stadium signage, and in a variety of other manners.  The primary print advertising campaign for Jack Daniel's Tennessee whiskey, which has prominently featured the Jack Daniel's Trade Dress, commenced in 1955 and has continued since then, making the campaign one of the longest continuous consumer advertising campaigns in American history.  Jack Daniel's Tennessee whiskey featuring the Jack Daniel's Trade Dress has also been seen in numerous motion pictures and television programs viewed by many millions of Americans, and has also received extensive unsolicited media coverage and public exposure as the unofficial drink of choice of celebrities such as Frank Sinatra, George Clooney and Keith Richards.

8.     JDPI's predecessors-in-interest and licensees have achieved billions of dollars in sales of Jack Daniel's Tennessee whiskey in the United States under the JDPI Trademarks and in the Jack Daniel's Trade Dress.  Jack Daniel's Tennessee whiskey is currently the best-selling whiskey in the United States and the JACK DANIEL'S brand has consistently been ranked among the world's most successful and valuable alcoholic beverage brands.

9.     The Jack Daniel's Trade Dress is inherently distinctive, or acquired distinctiveness long prior to the commencement of VIP's acts of infringement, dilution, and unfair competition complained of herein by virtue of extensive sales and advertising of Jack Daniel's Tennessee whiskey featuring the Jack Daniel's Trade Dress, decades of consumption by the public of Jack Daniel's Tennessee whiskey packaged in the Jack Daniel's Trade Dress, extensive consumer recognition of the Jack Daniel's Trade Dress, and association of the Jack Daniel's Trade Dress with Jack Daniel's Tennessee whiskey. The combination of elements comprising the Jack Daniel's Trade Dress is non-functional

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

because it is not essential to the use or purpose of Jack Daniel's Tennessee whiskey and does not affect the cost or quality of the product.

10.    The JDPI Trademarks and the Jack Daniel's Trade Dress are famous for whiskey in the United States and became famous long prior to the commencement of VIP's acts of infringement, dilution, and unfair competition complained of herein.

11.    JDPI owns numerous federal registrations of the JDPI Trademarks and the Jack Daniel's Trade Dress for whiskey, including United States Trademark Registration No. 4,106,178 for the three-dimensional configuration of a square shape bottle container shown below for distilled spirits,



United States Trademark Registration No. 2,789,278 for the mark shown below for Tennessee sour mash whiskey,



ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

United States Trademark Registration No. 1,923,981 for the mark JACK DANIEL'S for whiskey, United States Trademark Registration No. 582,789 for the stylized mark JACK DANIEL'S shown below for whiskey,



and United States Trademark Registration No. 42,663 for the stylized mark OLD NO. 7 shown below for whiskies.



Copies of the certificates of registration of these marks and related maintenance documents are attached hereto as Exhibit 1.  These registrations are valid and subsisting and all but No. 4,106,178 have become incontestable.

12.     The JDPI Trademarks and various elements of the Jack Daniel's Trade Dress, including the label design depicted below, have been used for many years in connection with a wide variety of goods in addition to Tennessee whiskey and other alcoholic beverages.



JDPI owns United States Trademark Registration No. 4,372,885 for the label design shown above for decorative magnets, decorative switch plates, and cell phone cases; United States Trademark Registration No. 4,481,424 for the label design shown above for ornamental lapel pins, clocks, watches, cuff links, necklaces, and bracelets; United States Trademark Registration No. 3,055,481 for the label design shown above (without the words SOUR MASH) for posters; United States Trademark Registration No. 4,478,408 for the label design shown above for umbrellas, luggage, duffel bags, athletic bags, backpacks, luggage tags, key cases, knapsacks, tote bags, and all-purpose canvas carrying bags, United States Trademark Registration No. 2,867,158 for the label design shown above (without the words SOUR MASH) for glass and plastic drinking containers, namely flasks, ceramic mugs, ceramic pitchers, ceramic jugs; sponges for household purposes, wood coasters, cork coasters, swizzle sticks, bowls, decorative boxes made of non-precious metal, food containers and thermal insulated containers for food or beverages, glassware for beverages, and serving trays of non-precious metals; United States Trademark Registration No. 4,526,056 for the label design shown above for footwear; headwear including caps, hats, cowboy hats, headbands, straw hats, visors, bandannas; clothing, namely, aprons, sleeve garters, t-shirts, golf shirts, work shirts, baseball shirts, woven shirts, shirts, tops, tank tops, sweatshirts, sweatpants, jogging suits, pants, dresses, skirts, sleep pants, pajamas, robes, shorts, jeans, jackets, coats, belts, neckties, neckwear, scarves, suspenders, leather jackets, rain suits, vests, parkas, gloves; United States Trademark Registration No. 4,481,425 for the label design shown above for belt buckles and clasps for clothing all made of non-precious metal and ornamental novelty pins; United States Trademark Registration No. 4,354,330 for the label design for floor mats and rugs; and United States Trademark Registration No. 4,491,564 for the label design for cigarette lighters not of precious metals.  Copies of the certificates of registration of these of JDPI's Trademarks are attached hereto as Exhibit 2.  These

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

registrations are valid and subsisting and Registrations Nos. 2,867,158 and 3,055,481 have become incontestable.

### VIP'S Unlawful Conduct

13.    VIP has alleged in its Complaint that it is engaged primarily in the business of designing, manufacturing, and marketing chew toys for dogs, that it sells various lines of dog chew toys, and that among those dog chew toys is a toy referred to by the brand "Bad Spaniels." The "Bad Spaniels" dog chew toy is depicted below:



14.    VIP has admitted in its Complaint that it "designed the 'Bad Spaniel's' label to incorporate a few elements of the Jack Daniel's label design," including "a label with

10

black background and white lettering," but the Bad Spaniel's toy goes far beyond incorporating a few elements of the Jack Daniel's label. The Bad Spaniels toy imitates the JDPI Trademarks and slavishly copies virtually every element of the Jack Daniel's Trade Dress, as the toy embodies the following combination of features: (a) the shape of a square bottle with a ribbed neck, in almost the exact proportions of a 750 ml. bottle of Jack Daniel's Tennessee whiskey and colored to imitate the color of Jack Daniel's Tennessee whiskey when it is packaged in the bottle; (b) a black "cap" and black neck wrap "closure" with white printing bearing the stylized mark THE OLD NO. 2; (c) a front black label with white printing and a filigreed border, bearing the BAD SPANIELS mark depicted in arched lettering over the mark THE OLD NO. 2 contained within a filigreed oval design, and the words Tennessee CARPET in the lower portion of the label, with the word "Tennessee" depicted in script. The toy bears an immediate and striking resemblance to a bottle of Jack Daniel's Tennessee whiskey bearing the Jack Daniel's Trade Dress when the toy is viewed from virtually any vantage point, including those shown on the pages from VIP's website attached hereto as Exhibit 3. When viewed from any significant distance, the toy appears, at least at first glance, actually to be a bottle of Jack Daniel's Tennessee whiskey bearing the Jack Daniel's Trade Dress.

15. VIP has alleged in its Complaint that it has "placed a prominent disclaimer on the packaging that plainly states: 'The product and its design belong to VIP products. This product is not affiliated with Jack Daniel's'." The alleged disclaimer language does not appear on the toy itself, but instead at the very bottom of what appears to be the back of a two-sided cardboard hangtag, beneath the bar code for the product. The hangtag mimics the front label portion of the Jack Daniel's Trade Dress, as it is sized in almost the exact proportions of the label and embodies a white-on-black color scheme and a filigreed border. Depictions of the front and back portions of the hangtag are set forth below:

QB\136435.00005\31586488.1



16.     Upon information and belief,                               the
alleged disclaimer is not noticed, much less understood, by the vast majority of
purchasers of the toy.  On the page from VIP's website attached hereto as Exhibit 3, the
hangtag is shown as being affixed to the product when it is sold, but upon information
and belief, it is not shown when the Bad Spaniels toy is displayed on the websites of on-
line retailers.  Upon information and belief, the hangtag is immediately detached and
discarded after the product is purchased or received, and, as shown in the page from
VIP's website attached hereto as Exhibit 4, does not remain affixed to the toy when it is
used.

17.     VIP has alleged in its Complaint that the Bad Spaniels toy is a "parody"
because it allegedly "include[s] drastic differences from the Jack Daniel's marks and
label design . . .," but the toy is not a parody because it does not ridicule, criticize, or
otherwise comment upon, Jack Daniel's Tennessee whiskey, the business practices of the
producer of Jack Daniel's Tennessee whiskey, or anything else.  Instead, the toy imitates
the JDPI Trademarks and slavishly copies the Jack Daniel's Trade Dress to capitalize on
their fame and instant recognizability for VIP's commercial gain, by drawing attention to

12

QB\136435.00005\31586488.1

the toy and enabling it to stand out from the numerous competitive dog toys available in the marketplace, including the other toys alleged to be in VIP's line.

18.     Regardless of whether the Bad Spaniels toy parodies the JDPI Trademarks and the Jack Daniel's Trade Dress, VIP's use of the Bad Spaniel's trademark and trade dress in connection with the sale, offering for sale, distribution, and advertising of the Bad Spaniels toy is likely to cause initial interest confusion pre-sale, confusion at the point of sale, and post-sale confusion because prospective purchasers of the toy, purchasers and users of the toy, and observers of the toy while it is in use, are all likely to believe mistakenly that it originates with, or is licensed, sponsored or authorized by, JDPI.

19.     VIP's use of the Bad Spaniels trademark and trade dress is also likely to dilute the famous JDPI Trademarks and Jack Daniel's Trade Dress by tarnishment.  The Bad Spaniels toy label bears the language "The Old No. 2 On Your Tennessee Carpet," "43% Poo By Vol.," and "100% Smelly."  These references to a dog defecating and leaving its stinking excrement on a carpet associate the JDPI Trademarks and the Jack Daniel's Trade Dress with gross and disgusting imagery that harms their reputation.

## FIRST COUNTERCLAIM FOR RELIEF

### (Infringement of Federally-Registered JDPI Trademarks
### and Federally-Registered Jack Daniel's Trade Dress)

20.     JDPI repeats and realleges the allegations in preceding paragraphs 1-19 as if fully set forth herein.

21.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes the use in commerce, on or in connection with VIP's goods, of reproductions, copies, or colorable imitations of the federally-registered JDPI Trademarks and the federally-registered the Jack Daniel's Trade Dress,

13

QB\136435.00005\31586488.1

which use is likely to cause confusion, to cause mistake, or to deceive, in violation of §
32(1) of the United States Trademark Act, 15 U.S.C. § 1114(1).

22.    VIP infringement of JDPI's federally-registered marks as aforesaid has
caused and is likely to continue to cause substantial injury to the public and to JDPI, and
JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 32, 34, 35,
and 36 of the United States Trademark Act, 15 U.S.C. §§ 1114, 1116, 1117, and 1118.

23.    VIP's infringement of JDPI's federally-registered marks as aforesaid has
caused and is likely to continue to cause irreparable harm to JDPI.  Unless restrained and
enjoined by this Court, VIP will persist in its infringement, thereby causing JDPI further
irreparable harm.

24.    JDPI has no adequate remedy at law.

## SECOND COUNTERCLAIM FOR RELIEF

### (Trade Dress Infringement in Violation of Federal Law)

25.    JDPI repeats and realleges the allegations in preceding paragraphs 1-24 as if
fully set forth herein.

26.    VIP's use of the Bad Spaniels trademark and trade dress in the manufacture,
advertisement, promotion, display, shipment, offering for sale, sale, and distribution of
the Bad Spaniels toy as aforesaid constitutes infringement of the Jack Daniel's Trade
Dress through use in commerce, in connection with VIP's goods, of a combination of
symbols or devices, a false designation or origin, and a false or misleading description of
fact, that is likely to cause confusion, or to cause mistake, or to deceive, as to the origin,
sponsorship, or approval of VIP's Bad Spaniels toy and commercial activities with or by
JDPI, in violation of § 43(a)(1) of the United States Trademark Act, 15 U.S.C. §
1125(a)(1).

27.    VIP's infringement of the Jack Daniel's Trade Dress as aforesaid has caused
and is likely to continue to cause substantial injury to the public and to JDPI, and JDPI is
entitled to injunctive relief and its attorneys' fees and costs under §§ 32, 34, 35, and 36 of

14

the United States Trademark Act, 15 U.S.C. §§ 1114, 1116, 1117, and 1118.

28.     VIP's infringement of the Jack Daniel's Trade Dress as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its infringement as aforesaid, thereby causing JDPI further irreparable harm.

29.     JDPI has no adequate remedy at law.

## THIRD COUNTERCLAIM FOR RELIEF

### (Dilution of JDPI Trademarks in Violation of Federal Law)

30.     JDPI repeats and realleges the allegations in preceding paragraphs 1-29 as if fully set forth herein.

31.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid is likely to cause dilution by tarnishment of the JDPI Trademarks, which became famous in Arizona and throughout the United States before VIP commenced its use of the Bad Spaniel's trademark and trade dress, by eroding the public's exclusive identification of the famous JDPI Trademarks with JDPI, tarnishing and degrading the positive associations and prestigious connotations of the JDPI Trademarks, and otherwise lessening the capacity of the JDPI Trademarks to identify and distinguish the goods and services sold under and connection with it, in violation of § 43(c) of the United States Trademark Act, 15 U.S.C. § 1125(c).

32.     Upon information and belief, VIP willfully and deliberately intended to trade on the reputation and goodwill of the JDPI Trademarks, or to cause dilution of the JDPI Trademarks.

33.     VIP's dilution of the JDPI Trademarks as aforesaid has caused and is likely to continue to cause substantial injury to JDPI's goodwill and business reputation, and dilution of the distinctiveness of the famous JDPI Trademarks, and JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 34, 35, 36, and 43(c) of the United States Trademark Act, 15 U.S.C. §§ 1116, 1117, 1118, and 1125(c).

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

34.     VIP's dilution of the JDPI Trademarks as aforesaid has caused and continues to cause irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

35.     JDPI has no adequate remedy at law.

### FOURTH COUNTERCLAIM FOR RELIEF

### (Dilution of Jack Daniel's Trade Dress in Violation of Federal Law)

36.     JDPI repeats and realleges the allegations in preceding paragraphs 1-35 as if fully set forth herein.

37.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid is likely to cause dilution by tarnishment of the Jack Daniel's Trade Dress, which became famous in Arizona and throughout the United States before VIP commenced its use of the Bad Spaniel's trademark and trade dress, by eroding the public's exclusive identification of the famous Jack Daniel's Trade Dress with JDPI, tarnishing and degrading the positive associations and prestigious connotations of the Jack Daniel's Trade Dress, and otherwise lessening the capacity of the Jack Daniel's Trade Dress to identify and distinguish the goods and services sold under and connection with it, in violation of § 43(c) of the United States Trademark Act, 15 U.S.C. § 1125(c).

38.     Upon information and belief, VIP willfully and deliberately intended to trade on the reputation and goodwill of the Jack Daniel's Trade Dress, or to cause dilution of the Jack Daniel's Trade Dress.

39.     VIP's dilution of the Jack Daniel's Trade Dress as aforesaid has caused and is likely to continue to cause substantial injury to JDPI's goodwill and business reputation, and dilution of the distinctiveness of the famous Jack Daniel's Trade Dress, and JDPI is entitled to injunctive relief and its attorneys' fees and costs under §§ 34, 35,

16

36, and 43(c) of the United States Trademark Act, 15 U.S.C. §§ 1116, 1117, 1118, and 1125(c).

40.    VIP's dilution of the Jack Daniel's Trade Dress as aforesaid has caused and continues to cause irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

41.    JDPI has no adequate remedy at law.

### FIFTH COUNTERCLAIM FOR RELIEF

### (Trademark Infringement in Violation of Arizona Law)

42.    JDPI repeats and realleges the allegations in preceding paragraphs 1-41 as if fully set forth herein.

43.    VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the JDPI Trademarks that is likely to cause mistake and deception in the minds of the public, in violation of A.R.S. §§ 44-1451, *et seq.*

44.    VIP's trademark infringement as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its trademark infringement as aforesaid, thereby causing JDPI further irreparable harm.

45.    JDPI has no adequate remedy at law.

### SIXTH COUNTERCLAIM FOR RELIEF

### (Common Law Trademark Infringement and Unfair Competition)

46.    JDPI repeats and realleges the allegations in preceding paragraphs 1-45 as if fully set forth herein.

47.    VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the JDPI Trademarks and unfair competition at common law.

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

48.     VIP's trademark infringement and unfair competition as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its trademark infringement and unfair competition as aforesaid, thereby causing JDPI further irreparable harm.

49.     JDPI has no adequate remedy at law.

### SEVENTH COUNTERCLAIM FOR RELIEF
### (Common Law Trade Dress Infringement)

50.     JDPI repeats and realleges the allegations in preceding paragraphs 1-49 as if fully set forth herein.

51.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid constitutes infringement of the Jack Daniel's Trade Dress at common law.

52.     VIP's trade dress infringement as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its trade dress infringement as aforesaid, thereby causing JDPI further irreparable harm.

53.     JDPI has no adequate remedy at law.

### EIGHTH COUNTERCLAIM FOR RELIEF
### (Trademark Dilution in Violation of Arizona Law)

54.     JDPI repeats and realleges the allegations in preceding paragraphs 1-53 as if fully set forth herein.

55.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid in commerce in Arizona began long after the JDPI Trademarks became well-known, distinctive, and famous in Arizona and throughout the United States, and dilutes the distinctive quality of the JDPI Trademarks, in violation of A.R.S. § 44-1448.01.

QB\136435.00005\31586488.1

56.     Upon information and belief, VIP willfully intended to trade on the reputation and goodwill associated with the JDPI Trademarks.

57.     VIP's dilution of the JDPI Trademarks as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

58.     JDPI has no adequate remedy at law.

## NINTH COUNTERCLAIM FOR RELIEF

### (Trade Dress Dilution in Violation of Arizona Law)

59.     JDPI repeats and realleges the allegations in preceding paragraphs 1-58 as if fully set forth herein.

60.     VIP's use of the Bad Spaniels trademark and trade dress in the manufacture, advertisement, promotion, display, shipment, offering for sale, sale, and distribution of the Bad Spaniels toy as aforesaid in commerce in Arizona began long after the Jack Daniel's Trade Dress became well-known, distinctive, and famous in Arizona and throughout the United States, and dilutes the distinctive quality of the Jack Daniel's Trade Dress, in violation of A.R.S. § 44-1448.01.

61.     Upon information and belief, VIP willfully intended to trade on the reputation and goodwill associated with the Jack Daniel's Trade Dress.

62.     VIP's dilution of the Jack Daniel's Trade Dress as aforesaid has caused irreparable harm to JDPI.  Unless restrained and enjoined by this Court, VIP will persist in its dilution, thereby causing JDPI further irreparable harm.

63.     JDPI has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, defendant and counterclaimant JDPI prays for judgment as follows:

1.     That VIP's declaratory judgment complaint be dismissed with prejudice;

QB\136435.00005\31586488.1

2. That VIP and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, or any of them, who receive actual notice of the injunctions prayed for herein by personal service or otherwise, be preliminarily and then permanently restrained and enjoined from:

(a) Manufacturing, advertising, promoting, displaying, shipping, offering for sale, selling, or distributing the Bad Spaniels dog toy;

(b) Manufacturing, advertising, promoting, displaying, shipping, offering for sale, selling, or distributing any other dog toy that reproduces, copies, colorably imitates, or is confusingly similar to, the JDPI Trademarks and/or the Jack Daniel's Trade Dress;

(c) Manufacturing, advertising, promoting, displaying, shipping, offering for sale, selling, or distributing any other dog toy that dilutes the distinctiveness of the famous JDPI Trademarks and/or the Jack Daniel's Trade Dress; and

(d) Doing any other act or thing that is likely to cause persons to believe that VIP's goods or commercial activities originate with, or are licensed, sponsored, or authorized by, JDPI;

3. That VIP be ordered, pursuant to 15 U.S.C. § 1116, to file with the Court and to serve on counsel for JDPI, within 30 days after the entry of judgment herein, a written report under oath setting forth in detail the manner in which it has complied with the injunction ordered by the Court;

4. That VIP be ordered, pursuant to 15 U.S.C. § 1118 and A.R.S. § 44-1451(B)(5), to deliver up to the Court for destruction or other disposition all Bad Spaniels toys, all labels, signs, prints, packages, wrappers, receptacles, and advertisements bearing the trade dress of the Bad Spaniels toy, and all plates, molds, matrices, and other means of making the same;

5. That VIP be ordered, pursuant to 15 U.S.C. § 1117(a), to pay to JDPI its attorneys' fees and the costs of this action; and

ANSWER AND COUNTERCLAIMS

QB\136435.00005\31586488.1

6.      That JDPI be granted such other and further relief as the Court may deem just and proper.

                              Respectfully submitted,

                              QUARLES & BRADY LLP


Dated:  December 3, 2014          By: */s/  Gregory P. Sitrick*
                                  Gregory P. Sitrick
                                  Isaac S. Crum
                                  Attorneys for Defendant and
                                  Counterclaimant
                                  JACK DANIEL'S PROPERTIES, INC.


## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this case.



        */s/ Gregory P. Sitrick*
        Gregory P. Sitrick

21

QB\136435.00005\31586488.1

EXHIBIT C

David Gooder - June 23, 2015                          1

```
                IN THE UNITED STATES DISTRICT COURT

                      DISTRICT OF ARIZONA




VIP Products, L.L.C., an Arizona )
limited liability company,       )
                                 )
              Plaintiff,          )
         vs.                      ) No. 2:14-cv-02057-DGC
                                 )
Jack Daniel's Properties, Inc.,  )
a Delaware corporation,          )
                                 )
              Defendant.          )
_____)




                DEPOSITION OF DAVID GOODER


                     June 23, 2015
```

                              REPORTED BY:
                              ROBIN L. SCHMIDT, CSR
                              Certified Shorthand Reporter
                              Certification No. 5763

David Gooder - June 23, 2015                          81

```
 1              MR. BRAY:  I'm talking about --
 2              MR. LARKIN:  He's a fact witness.
 3              MR. BRAY:  Topic number three.
 4    BY MR. BRAY:
 5        Q.  What is the basis for the allegations?
 6        A.  The opinion of Mr. Simonson.
 7              MR. LARKIN:  He's not asking about that.
 8              THE WITNESS:  Ask me that question again.
 9    Sorry.
10              MR. BRAY:  Sure.
11    BY MR. BRAY:
12        Q.  As to the allegation in the Complaint that the
13    Bad Spaniels product harms the reputation of Jack
14    Daniel's through dilution by tarnishment, what are the
15    bases of those allegations, other than the fact that the
16    words exist that you described on the Bad Spaniels
17    product?
18        A.  Other than the words.  And I assume by that you
19    mean their meaning and what people understand them to
20    mean.
21        Q.  Sure.
22        A.  It's the view point of everyone internally who
23    has seen it, including lots of dog owners, that when you
24    talk about the words that your client has used on the
25    label, that conjures up a certain image.
```

1          And that's quite clearly not the image that
2    Jack Daniel's carries or has or has been, you know, that
3    has been developed over the years since its founding.
4          Q.  What is that image that Jack Daniel's has
5    developed and carried over the years since its founding?
6          A.  Masculinity, authenticity, honesty, not taking
7    yourself too seriously.  Did I say integrity?
8          MR. LARKIN:  Now you do.
9          THE WITNESS:  There are others, but that's the
10   core of it, I think.
11   BY MR. BRAY:
12         Q.  Any other factual basis as JDPI's corporate
13   designee to testify on the subject for the allegation
14   that the reputation of Jack Daniel's has been harmed
15   through dilution by tarnishment as a result of the Bad
16   Spaniels product?
17         So far you have identified the words and
18   internal discussion amongst the employees of JDPI.
19         A.  Well, not just the discussions.  The opinions
20   of not only people at JDPI but the people at Brown
21   Forman, who have seen it, including that group of
22   people.
23         So I guess the answer is:  I'm not aware of
24   anything else.
25         Q.  And you referred to Dr. Simonson JDPI has

```
 1   retained as an expert on this topic?
 2       A.  Yes.
 3       Q.  Have you reviewed Dr. Simonson's report?
 4       A.  I have not.
 5       Q.  You mentioned a number of individuals or you
 6   mentioned quote, unquote, individuals at Brown Forman
 7   that have the same opinion that you do.
 8           Who are those individuals, specifically?
 9       A.  John Hayes.
10       Q.  What's his title?
11       A.  Currently, I don't know specifically.
12       Q.  Okay.
13       A.  Phil Epps, Chris Hungerford, Tobey Rousch, Mark
14   MacCallum.
15       Q.  And what's Mr. MacCallum's title?
16       A.  President Jack Daniel's brands.  I don't know
17   who else.  I don't know all of who else has seen it.
18           Those people I know for sure have because I've
19   spoken to them about it.
20           There are -- your question was in addition to
21   my team here; correct?
22       Q.  Yeah.  And your team here is Ms. Susman.
23   Anybody else?
24       A.  Yes.
25       Q.  Who are those individuals?
```

```
 1              MR. LARKIN:  Objection to form.
 2              MR. BRAY:  Either you are or not.
 3              THE WITNESS:  No, I'm not aware.
 4              MR. BRAY:  Okay.  Topic four is the basis for
 5    JDPI's allegation in paragraph 14 of the Counterclaim
 6    that the Bad Spaniels toy imitates the JDPI trademarks
 7    and slavishly copies every element of the Jack Daniel's
 8    trade dress.
 9    BY MR. BRAY:
10         Q.  Do you see that?
11         A.  Yes.
12         Q.  Are you prepared to testify as JDPI's corporate
13    designee on that topic?
14         A.  Yes.
15         Q.  And what are the elements of Jack Daniel's
16    trade dress contained on the Jack Daniel's Old No. 7
17    brand bottle?
18              Not what's allegedly infringed or copied by
19    Bad Spaniels, but what elements of the Jack Daniel's
20    bottle and label product you identify as having
21    protectable trade dress associated with them?
22              MR. LARKIN:  Objection to form.  The
23    Counterclaim describes what's being asserted in this
24    case.  But if you can answer, go ahead.
25              THE WITNESS:  Well, trade dress by definition
```

David Gooder - June 23, 2015                                    90

```
 1   is a combination of elements.  So I don't understand
 2   your question.
 3   BY MR. BRAY:
 4       Q.  You can't describe the trade dress on the
 5   Jack Daniel's Old No. 7 bottle?
 6       A.  Sure I can.
 7       Q.  Okay.  Well, paragraph 14 of the Counterclaim
 8   talks about slavishly copying of virtually every element
 9   of Jack Daniel's trade dress.
10           What I'm trying to determine is to break down
11   what the elements of Jack Daniel's trade dress are.
12           If Jack Daniel's trade dress has 20 elements
13   and we slavishly copied four, allegedly, I would say
14   that's not virtually every element.
15           So first, I'm trying to figure out what are
16   the elements of Jack Daniel's trade dress that JDPI
17   alleges exist and that you can testify as the corporate
18   designee of JDPI on this topic?
19       A.  Start at the top of the bottle and work our way
20   down.  The black top.  I don't mean the cap.  I mean the
21   section of the neck.
22           The fact that the Old No. 7 appears also on
23   that, on the neck.  I'll include the whole shape of the
24   bottle because that's part of the trade dress.
25           The white on black color scheme, what I
```

David Gooder - June 23, 2015                    91

1    previously referred to as the swing logo and the

2    cartouche design.

3            The filigree and the overall layout of the

4    words and the font below that.

5        Q.  Any other elements?

6        A.  Nope.

7        Q.  How about the Jack Daniel's being embossed on

8    the ridge?  Is that an element of the trade dress of the

9    Jack Daniel's Old No. 7 bottle?

10       A.  It is.  But I understood your question to ask

11   what was being infringed.

12       Q.  No, no.  It's the exact opposite.  I'm asking

13   you to identify of all the elements.

14       A.  Oh, all of the elements.  And then if you want

15   to move to the side labels and back labels, too?

16       Q.  Sure.

17       A.  Yes.  The embossed in the glass above the

18   shoulder, the fact that the label wraps around on the

19   square bottle.  On the one side, as the bottle faces

20   you, as you look to the right side, there is, again,

21   continues the text.

22           There is an image of Mr. Jack.  On the other

23   side there are the four, sort of, if you want to call

24   them, topics or pillars or whatever you want to call it

25   of "mellowed, matured, tasted and awarded."

David Gooder - June 23, 2015                    92

1          And on the back label you have got the

2    Old No. 7, what we refer to as circle logo.

3          Q.   Anything else?

4          A.   I think that's it.

5          Q.   And with the side with the "mellowed, matured

6    tasted and awarded," there is art associated with that;

7    correct?

8          A.   Yes.

9          Q.   Under each one?

10         A.   There is.

11         Q.   Okay.  The Bad Spaniels toy did not slavishly

12    copy the Jack Daniel's embossing on the ridge of the

13    Jack Daniel's bottle; correct?

14         A.   Correct.

15         Q.   The Bad Spaniels toy did not copy "mellowed" on

16    the side label or any of the art associated with

17    "mellowed"?

18         A.   Is that a question?

19         Q.   Yes.

20         A.   I'm sorry, I didn't hear a question.  I heard a

21    statement.

22         Q.   Oh.  The Bad Spaniels toy did not incorporate

23    the element of the trade dress on the Jack Daniel's

24    bottle called "mellowed" with the art associated with

25    that; correct?

David Gooder - June 23, 2015                              93

```
1         A.  Correct.
2         Q.  Same question:  The Jack Daniel's toy didn't
3    associate -- or didn't copy the trade dress element
4    "matured" with the art associated with that; correct?
5         A.  Correct.
6         Q.  Same answer is true of the "tasted"?
7         A.  Correct.
8         Q.  And "awarded"?
9         A.  Correct.
10        Q.  In fact, the Bad Spaniels product does not have
11   a side label at all; correct?
12        A.  Correct.
13        Q.  And on the other side, the Jack Daniel's
14   product did not copy or use a picture of Jack Daniel's;
15   correct?
16        A.  Correct.
17            MR. LARKIN:  You referenced the Jack Daniel's
18   product.
19            MR. BRAY:  I'm sorry.
20   BY MR. BRAY:
21        Q.  The Bad Spaniels product did not copy or
22   incorporate a picture of Jack Daniel's; correct?
23        A.  Correct.
24        Q.  In fact, there is no picture at all of a human
25   being on the Bad Spaniels product; correct?
```

# EXHIBIT D

Philip Epps - July 17, 2015                         1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP PRODUCTS, L.L.C., an Arizona    )
limited liability company           )
                                    )
    Plaintiff and Counterdefendant; )
                                    )
              vs.                   ) No. 2:14-cv-02057-DGC
                                    )
JACK DANIEL'S PROPERTIES, INC., a   )
Delaware corporation,               )
                                    )
    Defendant and Counterclaimant.  )
_____)




DEPOSITION OF PHILIP EPPS

Louisville, Kentucky

July 17, 2015








Prepared by:

Catherine Shay, CM

Philip Epps - July 17, 2015                              29

```
 1   remember the exact detail, but the key things in there
 2   is the licensing strategy, what is it we are trying to
 3   do with licensing and what are the key objectives of
 4   licensing.
 5           Q.      Okay.  Do you know who prepared that
 6   Power Point?
 7           A.      Tobey.
 8           Q.      I won't spend a lot of time with you
 9   on this if Mr. Roush is the one with more knowledge,
10   but describe for me as you understand it what
11   objective licensing strategy is, whether it's
12   reflected in that Power Point or otherwise.
13           A.      It links to the strategy of the whole
14   trademark, which is around making friends that have an
15   enjoying relationship for life, and licensing we think
16   really fits into that.
17                   The three key objectives as we see
18   them are -- let me get these right.  One is to protect
19   the mark and to protect us outside of class, I forget
20   the class, 31 or 33, I think Dave could have maybe
21   mentioned it.  The other one is to build the equity of
22   the brand.  I'm forgetting the third one.
23           Q.      Mr. Epps, do you know why -- well,
24   from your perspective is it important to protect the
25   Jack Daniel's mark outside the class of goods for
```

Philip Epps - July 17, 2015                              30

```
 1   spirits?
 2           A.       I'm sorry, say that again.
 3           Q.       You mentioned that one of the key
 4   objections was protecting the mark outside of class.
 5                    MR. LARKIN:  Objectives, not
 6   objections.
 7           Q.       Objectives, sorry.  Is that correct?
 8           A.       It is.
 9           Q.       I assume the class, and I don't know
10   off the top of my head which international classes
11   were liquors or spirits, but I assume what you were
12   referring to protecting it beyond liquors and spirits?
13           A.       Correct.
14           Q.       Do you know why it's a key objective
15   to protect the mark outside of class?
16           A.       That's a good question.  From my
17   perspective we have a huge and powerful trademark.  We
18   want to make sure we protect it.
19           Q.       And the hugely powerful trademark you
20   are referring to is the Jack Daniel's name; correct?
21           A.       No.  It's more than that.
22           Q.       Well, I'll go into that.  Is the most
23   powerful, most valuable trademark that Brown-Forman
24   owns related to Jack Daniel's, the Jack Daniel's name
25   and mark?
```

Philip Epps - July 17, 2015                              31

1          A.       Yes.

2          Q.       You said it was more than that.  What

3   else is it?

4          A.       So the reason I said that is because

5   my interpretation of what you said was that it was

6   really just the name and the logo.  I believe that the

7   brand is one of the most iconic in the world, and it's

8   more than just that.  What we call the arched logo and

9   the black and white, it's the square bottle, it's the

10  filigree.  It's the perceived potency of the brand,

11  and that's the reason why we see so many people

12  wanting to use that and wanting to band themselves

13  with it.

14         Q.       I assume if some third party in the

15  liquor and bourbon industry wanted -- or you found out

16  that some third party in the liquor and bourbon

17  industry was using the Jack Daniel's mark, that would

18  raise an immediate objection or concern for you?

19         A.       It would.

20         Q.       Okay.  If a third party whiskey -- or

21  a competitor in the whiskey and bourbon field was

22  selling their product in a square bottle, would that

23  raise a similar concern for you?

24              MR. LARKIN:  Objection.  It's

25  hypothetical.  We don't know what else is on the

1    square bottle.

2            Q.      You can answer the question unless

3    Mr. --

4                    MR. LARKIN:  If you understand it, go

5    ahead.

6                    THE WITNESS:  If is just the square

7    bottle then no.

8            Q.      So Jack Daniel's, as the global brand

9    director for Jack Daniel's, you're not asserting Jack

10   Daniel's has the exclusive rights to use a square

11   shaped bottle for a Kentucky or Tennessee Whiskey or

12   bourbon product?

13           A.      Correct.

14           Q.      And there are also other competitors

15   in the Kentucky, Tennessee whiskey bourbon field that

16   use some kind of filigree on their labels; is that

17   correct?

18           A.      They do.

19           Q.      So those elements a competitor could

20   use in some manner or another without necessarily

21   raising an objection at Brown-Forman; correct?

22                   MR. LARKIN:  Objection.  Calls -- it's

23   a hypothetical.  We don't know what else is on the

24   bottle.  You may answer.

25                   THE WITNESS:  Can you ask the question

```
 1            A.      Yeah, from Ms. Phillips one, yeah.

 2            Q.      What's that?

 3            A.      In terms of what she said about she

 4    designed this product based on the Jack Daniel's

 5    package.

 6            Q.      Okay.  And why did that make an

 7    impression on you?

 8            A.      Because it felt like an admission.

 9            Q.      If the Bad Spaniels toy, if the mold

10    was changed such that the shape mimicked a Jim Beam

11    bottle instead of the evolution bottle, from your

12    perspective as director of Louisville design for

13    Brown-Forman would you then have an issue with the

14    product?

15                    MR. LARKIN:  Objection to form.  It's

16    a hypothetical.  We don't know what the product looks

17    like.

18            Q.      It looks exactly like it does now

19    except it's in a Jim Beam shaped bottle.

20                    MR. LARKIN:  One of your positions in

21    the case is the Jim Beam bottle is like this bottle so

22    I don't know -- without having him see something I

23    don't think it's fair to ask him to answer that

24    question.

25            Q.      Sitting here today, Mr. -- you are
```

Philip Epps - July 17, 2015                    102

1   familiar with what a Jim Beam bottle looks look?

2          A.      Yeah.

3          Q.      Jim Beam is probably Jack Daniel's

4   biggest competitor in the U.S.?

5          A.      Yeah.

6          Q.      If you could turn to Exhibit 53.  I'll

7   show you what it looks like.  It's this document.  And

8   bottom right there's Bates numbers SAC.  Turn to Page

9   28.  The picture to the right of SAC 0028 is a Jim

10  Beam bourbon bottle.  Do you see that?

11         A.      I do.

12         Q.      Is that an accurate picture, you

13  understand what a Jim Beam bottle looks like?

14         A.      It is.

15         Q.      So my question to you as director of

16  global design for -- did I get your title right?

17         A.      No.

18         Q.      What's your title?

19         A.      Global brand director.

20                 MR. LARKIN:  Wrong witness.

21         Q.      In your position as global brand

22  manager for Jack Daniel's my question to you, Mr.

23  Epps, if VIP produced a Bad Spaniels dog toy that's

24  identical to the toy you are viewing now with the

25  exception that it is in a shape of the Jim Beam bottle

1    depicted on 0028, would you have an issue with it?

2                    MR. LARKIN:  Objection.  Calls for an

3    answer to a hypothetical question.  We don't know what

4    it looks like.

5                    MR. BRAY:  I think you do know what it

6    looks like.

7                    MR. LARKIN:  We don't know what it

8    looks like.  Your description doesn't substitute for

9    the actual product.

10           Q.    Okay.  Let me circle it.  As you are

11   sitting here today as director of brand, global brand

12   manager for Jack Daniel's you can't tell me that you,

13   Brown-Forman, would have an issue with a Bad Spaniels

14   product identical to the one in the market today

15   except that it's in the shape of a Jim Beam bottle;

16   you can't tell me, right?

17                   MR. LARKIN:  Objection to form.  I

18   don't know what identical product means either.  One

19   of the problems, one of your positions in this case is

20   the Jim Beam bottle and the Jack Daniel's bottle are

21   essentially the same bottles.  I don't know what you

22   mean.  Do you mean if it appears with the white label

23   and some other brand or what?  I don't know how --

24                   MR. BRAY:  There's limits to how I can

25   parse the English language, counsel.  What I'm trying

1          Q.        And the bottle immediately preceding
2  that was called the old bottle?
3          A.        Right.
4          Q.        And then the bevel design came out in
5  '99, the evolution bottle came out in 2011; right?
6          A.        That sounds right.
7          Q.        Would you characterize the change from
8  the bottle shape, change from the bevel design to the
9  evolution bottle as a slight modification?
10         A.        I would now.
11         Q.        In the past you might have answered
12 differently?
13         A.        As we were looking at it it felt
14 pretty radical but only because we were so close to
15 it.
16         Q.        Okay.  Fair enough.  Going back to
17 preparing for today's deposition, telephone
18 conversation with counsel, interrogatory responses
19 marked as Exhibit 48, the Boozin Gear website, the
20 deposition of Mr. Sacra and Ms. Phillips, did you do
21 anything else to prepare for today's deposition?
22         A.        That was about it.
23         Q.        Mr. Sacra actually gave two
24 depositions in the case.  One was in his personal
25 capacity and then one was as a corporate designee of

Philip Epps - July 17, 2015                    106

```
 1   VIP Products.  Did you read both depositions or only
 2   the first one?
 3           A.      I only read one of them.
 4           Q.      And what's in front of you is Exhibit
 5   53.  Have you seen Exhibit 53 before today?
 6           A.      No.
 7           Q.      Somewhere in your stack of exhibits,
 8   Mr. Epps, is Exhibit 40, the notice of deposition.
 9   Are you familiar with the evolution bottle when
10   Brown-Forman gets the glass bottle delivered from
11   Owens, Illinois or the other manufacturer it uses,
12   it's just clear glass with the etching, no labels or
13   anything, right, it's just --
14           A.      To my understanding, yes.
15           Q.      All right.  You're not aware that
16   Brown-Forman trying to -- or conducting any study
17   determining what percentage of the American consuming
18   public recognizes just that naked bottle shape as Jack
19   Daniel's?
20           A.      No, I don't know percentage.
21           Q.      Okay.  Not just a percentage, Jack
22   Daniel's or Brown-Forman hasn't conducted a study to
23   try to determine how well-known just the bottle shape
24   is?
25           A.      Not on its own.
```

Philip Epps - July 17, 2015                    107

1      Q.       Okay.  And as the global brands

2  manager for Brown -- for Jack Daniel's you have no

3  idea what percentage of the American consumer public

4  might recognize a naked evolution bottle as being the

5  bottle that Jack Daniel's comes in; correct?

6      A.       I have a pretty good idea because

7  that's one of the reasons why we felt confident enough

8  to be able to do that ad, JDPI 004452.

9      Q.       Okay, but that's -- the pretty good

10 idea is just based on your perception of things as the

11 global brand manager and your work history at

12 Brown-Forman?

13     A.       Yeah, based on the consumer data we

14 have in terms of brand awareness.

15     Q.       Okay.  But, again, there was never an

16 effort to test awareness just of the naked bottle

17 shape without other elements of the Jack Daniel's?

18     A.       Correct.

19              MR. LARKIN:  Are you referring to the

20 naked bottle shape with Jack Daniel's, the signature

21 on it or literally the naked bottle shape?

22     Q.       Either one.  You don't have a study

23 for either one, do you?

24     A.       No.

25     Q.       Thank you, counsel.

Philip Epps - July 17, 2015                    108

1                      Are you aware of whether or not --
2      would you agree with me that a significant number of
3      American consumers associate a square bottle shape
4      for -- with, I'm sorry, a whiskey or bourbon product?
5                      MR. LARKIN:   Objection to form.   Don't
6      speculate.   If you have basis to answer, go ahead.
7      You mean any bourbon product?
8                      THE WITNESS:   Yeah, I would agree with
9      that.
10             Q.      Were you involved in the -- strike
11     that.   I think you did say that you were -- you worked
12     with focus groups in the UK vis-à-vis the evolution
13     bottle; right?
14             A.      I observed them, yes.
15             Q.      Observed them.   Are you familiar with
16     the various alternatives that were considered, that
17     were put together by the agency in conjunction with
18     Brown-Forman that were considered by Brown-Forman?
19             A.      Yeah, I remember seeing them.
20             Q.      Did you think in -- in the relevant
21     time frame 2008 to 2011 because I recognize it was a
22     lengthy process, did you think in your positions that
23     you held at Brown-Forman at that time that it would be
24     a good idea to change from the square bottle to a
25     different shape bottle?

```
 1              A.       No.

 2              Q.       Why not?

 3              A.       Because it's part of the brand, and I

 4    think you mentioned a square bottle is now synonymous

 5    with American whiskey and bourbon.  Jack Daniel's is

 6    by far the biggest American whiskey.  If you include

 7    bourbon in that we kind of own that category.  And so

 8    although it's synonymous with the category we are the

 9    leader of that category.

10              Q.       Who is the second biggest, Jim Beam?

11              A.       Yep, Jim Beam.

12              Q.       They spend a lot of money on A & P?

13              A.       I'm sure, yeah.

14              Q.       They sell millions of bottles of --

15              A.       They do.

16              Q.       -- Jim Beam whiskey?

17              A.       They do.

18              Q.       Is it whiskey or bourbon?

19              A.       It's bourbon.  You can call it either.

20              Q.       I had an objection from your counsel

21    earlier.  I was trying to use the right --

22                       MR. LARKIN:  Beam is a bourbon.

23              Q.       -- nomenclature?

24                       MR. LARKIN:  And a whiskey.

25              Q.       Did any of your positions at
```

```
 1              Q.      Let me have a cleaner record.
 2              A.      Okay.
 3              Q.      What is the basis for your view that
 4     the Bad Spaniels toy diminishes the Jack Daniel's
 5     brand?
 6              A.      So we would call ourselves a premium
 7     price product and so on average, depending where you
 8     are in the country we will be between 22 to $26
 9     dollars for a 750 bottle.  I've already said how much
10     money we spend to build the brand and promote it.  To
11     have a product out there that some consumers think we
12     endorse that has what I would call bad taste messaging
13     I think diminishes the efforts of the brand over the
14     years.
15              Q.      You're not aware of any lost sales
16     that Jack Daniel's has experienced as a result of the
17     Bad Spaniels product?
18              A.      I'm not.
19              Q.      And in assessing the brand's equity of
20     the Jack Daniel's marks and the value of the Jack
21     Daniel's marks -- strike that.
22                      Brown-Forman does from time to time
23     assess the brand equity and value of the Jack Daniel's
24     trademarks; correct?
25              A.      Correct.
```

Philip Epps - July 17, 2015                    117

1          Q.        In any of those assessments has
2    Brown-Forman indicated internally that there was any
3    diminution of the brand value or equity as a result of
4    the Bad Spaniels product?
5          A.        Not that I'm aware of.
6          Q.        For purposes of my next question I'll
7    agree just for -- to explore the issue of your
8    characterization of the Bad Spaniels as, what was it,
9    poor taste or bad taste?
10         A.        I think it's in bad taste.
11         Q.        Okay.  Are you aware of Brown-Forman
12   licensing any of its marks on any product that you as
13   the global brand manager would consider to be bad
14   taste?
15         A.        No.
16         Q.        And as global brand manager for
17   Brown-Forman with ultimate responsibility for
18   licensing would you authorize a license by
19   Brown-Forman of a Jack Daniel's mark for any product
20   that you found to be in bad taste?
21         A.        No.
22         Q.        I apologize, Mr. Epps, getting closer
23   to lunch and things run together.  You said I believe
24   that some of the Silly Squeakers toys you thought were
25   silly?

```
 1              A.        Right.
 2              Q.        Okay.  Do you remember which ones?
 3              A.        I don't.  I remember looking at the
 4     PBR one.  I think there was a Corona one, but I don't
 5     remember if they were the exact ones that I thought
 6     were --
 7              Q.        Silly?
 8              A.        Just bad taste.
 9              Q.        Silly can sometimes be humorous;
10     right?
11              A.        Yeah, probably, yeah.
12              Q.        But in the continuum of humor, at
13     least the ones that you recall seeing, the Silly
14     Squeakers products, they may seem silly some of them
15     but none of them became humorous in your mind?
16                        MR. LARKIN:  Objection to form.  If
17     you understand the question.
18                        THE WITNESS:  My definition of humor
19     is more it has to have a bit more substance or
20     intelligence to it.
21              Q.        So do you think the Bad Spaniels toy
22     does not intelligently convey a message?
23                        MR. LARKIN:  Objection to form.  You
24     can answer.
25              A.        No.
```

# EXHIBIT E

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.   4/23/2015

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


VIP PRODUCTS, LLC, an Arizona          )
limited liability company,             )
                                       )
          Plaintiff and Counterdefendant, )
                                       )
          vs.                          ) Case No.
                                       ) 14-cv-02057-PHX-DGC
JACK DANIEL'S PROPERTIES, INC., a      )
Delaware corporation,                  )
                                       )
          Defendant and Counterclaimant.  )
_____)




          DEPOSITION OF STEPHEN SACRA



               Phoenix, Arizona
               April 23, 2015
                8:52 a.m.






REPORTED BY:
GENE RICHARDS, BA, RMR
Certified Reporter
Certificate No. 50026

PREPARED FOR:
(Original)
DISTRICT COURT



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 43

1    moving over to vinyl gave us that flexibility.

2        Q.    What was the material that was used for the prior
3    products you just described?

4        A.    All of those products are what are called "cut
5    and sew."  And the materials vary, depending on the item.
6    But it's mostly polyester and fleece.  And this is an
7    injected molded product that you can pretty much make into
8    any fun shape you can think of.

9        Q.    And why did you, when you decided to, as you
10   said, to share your lifestyle with customers; why did you
11   decide to do that in the form of products shaped like
12   bottles?

13       A.    Can you ask the question again, please?

14       Q.    Let me try it again.

15       A.    I got lost in that, so --

16       Q.    No problem.

17           Why did your desire to share your fun, humorous
18   lifestyle with your customers take the form of selling
19   vinyl products that looked like bottles, as opposed to
20   some other type of product?

21       A.    Well, man has always longed for a dog to be able
22   to bring him a beer from a cooler or from the frige.  And
23   in modern times, now you can go on-line and see all the
24   people that actually trained their dogs to do it.  But
25   that's always been a funny concept of, "Hey, my dog can



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 44

1    bring me a beer."  And this took that fun idea that

2    everybody had, and made it a reality.

3        Q.    Looking at Exhibit 2, what product was the

4    inspiration for the Cataroma Extra?

5        A.    Inspiration?

6        Q.    Or what product is that supposed to resemble?

7        A.    The inspiration for that product, or if you would

8    say the imagery that we mimic, is that of Corona.

9        Q.    And the Buttwiper, that's Budweiser or Bud.

10   Correct?

11       A.    Correct.

12       Q.    When the two-pack -- Cataroma and Buttwiper

13   two-pack first appeared on VIP's website, did it appear in

14   the form in which we see it in Exhibit 2?

15       A.    That is correct.

16       Q.    There is a notation below the two products that

17   reads, quote, "This product is in no way affiliated with

18   Anheuser-Busch, Inc., or Group Modelo S.A. de C.V."  Do

19   you see that?

20       A.    Yes.

21       Q.    Was that -- what do you call that notation?

22       A.    We call that a disclaimer.

23       Q.    Did the disclaimer appear under the products from

24   the first time they were displayed on VIP's website?

25       A.    I don't recall.



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 45

1      Q.   VIP was sued by Anheuser-Busch with respect to
2   the Buttwiper product.  Correct?
3      A.   Correct.
4      Q.   And at some point VIP stopped selling that
5   product?
6      A.   Correct.
7      Q.   The court issued an injunction against that
8   product?
9      A.   I don't recall the specifics.  I'd have to look
10  at the legal documents again to determine that.
11     Q.   Do you recall that the disclaimer appeared on
12  VIP's website before Anheuser-Busch sued, or afterwards?
13     A.   I don't recall.
14     Q.   Who wrote that disclaimer?
15     A.   That would have been myself.
16     Q.   Where did you get the language?
17     A.   It's not complicated language.
18     Q.   Where did you get it?
19     A.   I wrote it.
20     Q.   Did you look at other disclaimers to develop your
21  own?
22     A.   I don't recall.
23     Q.   Did you do any research to see what the language
24  of other disclaimers was?
25     A.   I don't recall.



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 61

1   are what we put together on three different levels.  So
2   you have the dog doing something that is a human behavior.
3       Q.    That would be urination or --
4       A.    No.  No.  No.  Let's take the dog drinking.
5       Q.    Okay, fine.  Sorry.  Go ahead.
6       A.    That's the dog being humanized.  And then you
7   have the dog -- sorry.  I lost my train of thought there.
8       Q.    You said there were three levels?
9       A.    Well, I'm saying you have the humanization of
10  the dog.  Then you have the poking fun of the human-dog
11  relationship.  And bring that all together through using
12  imagery in the human's everyday life and imitating what is
13  a part of their life to make the actual parody work.  So
14  it's not just -- it's not just -- I mean, it's -- it's
15  very complex.
16          But the last part which I talked to earlier is
17  that all the products that we made prior to Silly
18  Squeakers are serious products.  And here we are as a
19  serious company.  But we're all fun people, and we're all
20  trying to enjoy life and have fun and do things.  And a
21  way for us to share that with our consumers is to be able
22  to create a line that is, in a way, kind of parodying us
23  because we're serious and we're making fun now.
24          And we're doing this to, basically, take the
25  world around you, put it into something small and



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/23/2015

                                                                    Page 62

1    something fun where a human and a dog can interact, they

2    can laugh at each other, they can laugh at their

3    relationship.  They can laugh at the fact that it's poking

4    fun at not only the dog, but imagery and brands that they

5    see in their daily lives.  And, honestly, it's a great

6    thing because we could all use a little bit more humor in

7    our life.

8        Q.   Do you agree that all the bottle products shown

9    on VIP 89 to 93 mimic well-known products?

10            MR. BRAY:  Objection.  Form.

11            THE WITNESS:  Each one of them mimics imagery

12   that people have seen in their daily lives at some point

13   or other.  Each one of them may reflect differently to

14   each person, depending on the experiences that they've

15   had.

16            Some person might -- one person may look at it

17   and go, "All right, I get it."  And then some people will

18   look at it and go, "Oh, my gosh, this is hilarious,"

19   because I've seen this, or I know about this, or this

20   product is awesome.  And they see the imagery and --.

21   But, once again, they reflect back on their dog's carrying

22   a beer through the living room.  Or it says something

23   funny like "Deers Bite" on the front of it; where deers

24   don't normally bite.

25       Q.   BY MR. LARKIN:  You mentioned earlier in your



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 63

1  answer that dogs poop, dogs pee, and so on.  How many of
2  the products that are shown on those five pages
3  reference --
4       A.    A dog's behavior?
5       Q.    -- that bodily function?
6       A.    Well, I'll go through each of the bottles and
7  tell you what each of them references to a dog's --
8       Q.    You want to do that quickly?  Sure.
9       A.    "Drools" is drooling.
10            "HeineSniffin" is two dogs who are smelling each
11  other's back door and saying hello.
12            "Cataroma" is because dogs have an innate want
13  and desire to eat cat litter and stuff inside of it.
14            "Mountain Drool" is drool.
15            "Barks" is barking.
16            "Bite" is biting.
17            "Dos Perros" is just two dogs in friendship, but
18  a lot of people have two dogs.
19            "Smella R Crotch"; that's how dogs say hi to each
20  other.  That happens every time they run into each other.
21            "Pissness" is a dog who is peeing on a fire
22  hydrant because dog's pee on fire hydrants.
23            "Blue Cats Tripping"; cats are not human or dogs.
24  They're crazy.  That's why we have two cats tripping.
25            "Lickate" is a dog licking its privates because


185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 66

1          Chew Breederes.  Chewy Breeder.  Which is a
2    Crispaw Champion.  This one is the classy one that you get
3    when you've done something fantastic and at the end of the
4    day you want to celebrate.
5          Grrrobert Slobbery is a dog slobbering, but a
6    very classy dog who is slobbering into his red wine glass.
7          And then Meow Chased One is a picture of a cat
8    that -- dogs like to chase cats, so --.
9       Q.   And that's Moet?  Moet?
10      A.   Moet Chandon.  Sorry.
11          And the other one Robert Mondavi versus Grrrobert
12    Slobbery.
13      Q.   And on 93, what is the --
14      A.   93 is Bad Spaniels where a spaniel has been bad
15    and done the old number two on the Tennessee carpet.  And
16    that is an imagery of a Jack Daniel's bottle.
17      Q.   And in the course of creating these various
18    products, did you give any consideration to whether the
19    humor that you tried to communicate would reflect badly on
20    the brands that you mimicked?
21      A.   Well, we're not reflecting on the brands.  We are
22    employing imagery that people have in their minds, and
23    we're creating a parody.  So our goal in creating these
24    products is to make sure that we have an effective parody.
25    And if the effective parody uses a few small elements that



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.     4/23/2015

Page 67

1    are recognizable to the imagery that people see in their
2    daily lives, then if that combination is successful you
3    can look at it and go:  "That's funny.  I get it."
4         And it's more about the parody.  It's not about
5    the brand, because I'm not promoting any of these brands.
6    I'm not here to say, "Oh, I want to do this and I want to
7    put this on here."  That's not the intent.  The intent is
8    to create a parody and create something funny.  And if you
9    look at it and say it's funny and it incorporates the
10   elements which I discussed earlier, then we have success.
11        Q.   Irrespective of your intent, have you ever given
12   any consideration to what associations might be made by
13   pissing or pooping, and the brands that people recognize
14   those products to mimic?
15        A.   No.
16        Q.   That's never been of concern to you?
17        A.   No.
18        Q.   I want to get into -- we'll get into the Bad
19   Spaniels in a moment.
20        A.   I know it's coming.
21        Q.   As with Ms. Phillips, I'd like you to describe
22   generally, if you could, the process by which you
23   developed the various products in the Silly Squeakers
24   line --
25        A.   Okay.



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 68

1    Q.    -- from sort of your conception in your mind or
2  something, until it gets to the state in which we see it
3  in the catalog.  Just generally.
4    A.    Generally speaking, I've worked with Elle since
5  the beginning.
6    Q.    That's Ms. Phillips?
7    A.    I'm sorry, Ms. Phillips.
8         No, actually, she started -- I forget when she
9  started.  When I got tired of doing graphic design, is
10  when she came on board to help; because there was so much
11  that needed to be done.
12    Q.    I'm sorry to interrupt you.  Were there any of
13  the bottle products that VIP developed without
14  Ms. Phillips' involvement?
15    A.    No, no.
16    Q.    So she's been with you --
17    A.    Since 2007.
18    Q.    -- from the outset?  Go ahead.
19    A.    Through the development of the initial part of
20  our relationship, she learned very quickly what my style
21  is or kind of how I see things and what I expect.  So that
22  is a direction that she's developed on her own.  To the
23  point where when we started doing these products, you
24  know, this is -- this was an opportunity to give us the
25  freedom to do really fun creative stuff.  And when you



Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 115

1  which is VIP 25, as an attachment to this E-mail, which is
2  VIP 24 of Exhibit 18.
3       Q.   You got the photograph, and I guess he took a
4  photograph of his -- he created a mock-up sample in China
5  and sent you a photograph of it.  Is that correct?
6       A.   Yeah.
7       Q.   Did you, when you received Exhibit 18, did you
8  show the photo of the bottle to anybody else?
9            MR. BRAY:  Objection.  Form.
10            THE WITNESS:  I don't recall.
11       Q.   BY MR. LARKIN:  Did you --
12       A.   I wouldn't show anybody this.  I mean, it's
13  not --
14       Q.   Okay.  Not worth showing?
15       A.   No, it's not.  It's a Dos Perros.
16       Q.   Dos Perros was -- is another product in the Silly
17  Squeakers line?
18       A.   Yes, that's correct.
19       Q.   Who decided on the color of the bottle that's
20  shown on the second page of Exhibit 18?
21       A.   That's the same color as the -- it appears to be
22  the same color as the beer bottles.  Most likely the
23  factory had this blend already sitting there because of
24  the production that we do.  So they took existing
25  production material and shot this out.  So if we were in a



Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 116

1    production of doing something blue, it would be blue.

2         Q.    You didn't make that decision.    It was somebody

3    in Mr. Bai's?

4         A.    Yeah.    That's all done.

5         Q.    What do you think when you received Exhibit 18?

6         A.    It's square and it looks like a whiskey bottle.

7    That's all I thought.

8         Q.    Did you go back and compare it to the photograph

9    that was attached as part of Exhibit 47, your --

10        A.    No.

11        Q.    -- E-mail?

12        A.    Because if I did, I would have noticed it's

13   completely different.

14        Q.    But you didn't notice it at the time?

15        A.    No, I didn't notice it at the time.

16        Q.    You didn't make a comparison at the time?

17        A.    No.

18        Q.    Let's mark as Exhibit 51 a one-page document

19   bearing production number VIP 26.

20             (Exhibit No. 51 marked for identification.)

21        Q.    BY MR. LARKIN:    Mr. Sacra, do you recall --

22   strike that.

23             Have you seen Exhibit 51?

24        A.    Yes.

25        Q.    Do you recall receiving it from Mr. Bai in



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 117

1    December of 2013?

2        A.    I did not receive this from Mr. Bai.

3        Q.    I'm sorry.  You sent it to him?

4        A.    I sent it to Mr. Bai.

5        Q.    Thank you.  You caught me.

6              Do you recall sending it to Mr. Bai?

7        A.    Yes.

8        Q.    As you said, you're a man of few words.  You

9    wrote, "The bottle is perfect."  Why did you consider the

10   bottle that he sent you perfect?

11       A.    Because it was square.

12       Q.    Any other reason?

13       A.    No.

14       Q.    Did you think that it accurately depicted the

15   Jack Daniel's bottles that you sent him?

16             MR. BRAY:  Objection.  Form.

17             THE WITNESS:  I didn't even look at what I sent

18   him.  Because if I did, I would clearly notice it was

19   different.

20       Q.    BY MR. LARKIN:  In what respects is it different

21   from what you sent him?

22       A.    Well, what I sent him -- I'm sorry, I know now,

23   through this litigation, that what I sent him was images

24   of the Jack Daniel's bottle that was prior to 2011.  And

25   that at 2011 Jack Daniel's changed the shape of their



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 215

1      A.    No, but my dog would play with one.  The store

2  next to us has one.

3      Q.    Your next-door neighbor has a Chewy Vuiton toy?

4      A.    No.  There's a store right downstairs from our

5  house, that they have the whole line-up of them.  Quite a

6  few.

7      Q.    The entire line sold by --

8      A.    Haute Diggity Dog.

9      Q.    Haute Diggity Dog?

10     A.    Yeah.

11     Q.    There's also frequent mention of the Tommy

12  Hilfiger Licensing versus Nature Labs case.  Have you ever

13  seen the toy in that case?

14     A.    That's actually Timmy Holedigger, and that is

15  actually a perfume for dogs.  And that company is owned by

16  John Harris, who I am very familiar with and have had very

17  in-depth conversations with in the past.

18     Q.    Have you ever seen the toy?

19     A.    It's not a toy.

20         MR. BRAY:  Objection.  Form.

21     Q.    BY MR. LARKIN:  I'm sorry.  Have you ever seen

22  the perfume?

23     A.    Have I ever seen the perfume?  The actual perfume

24  itself, I have not.  I've never held one in my hands, no.

25     Q.    Look on page nine, if you would, please.  There's



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 216

1    a lengthy quotation that ends about line 19 from the Tommy
2    Hilfiger, Timmy Holedigger case.  And I want to look at
3    the portion of that quotation that begins on line 13
4    starting:
5              "Trademark parodies do convey a message.  The
6    message may be simply that business and product images
7    need not always be taken too seriously; a trademark parody
8    reminds us that we are free to laugh at the images and
9    associations linked with the mark.  The message also may
10   be a simple form of entertainment conveyed by juxtaposing
11   the irreverent representation of the trademark with the
12   idealized image created by the mark's owner."
13             Do you see what I just read?
14        A.   Yes.
15        Q.   What is the message that is conveyed by the Bad
16   Spaniels toy?
17        A.   (No response.)
18        Q.   Is it simply that business and product images
19   need not be always taken too seriously, or is there more?
20        A.   Well, earlier, we went over the entire line of
21   the Silly Squeakers dog toys and what creates a successful
22   parody.  And, yes, the message is that, in a very serious
23   world, that we need to sit back and be able to laugh at
24   ourselves and laugh at the humor of the constant
25   bombardment of advertising and marketing that's going on



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 217

1  around us that's such a predominant part of our lives.
2  And it's humorous to sit back and poke fun at that and
3  laugh at people and laugh at ourselves.
4      Q.   Well, farther down in your response, beginning on
5  line 22, VIP stated:  "So too in this case.  The message
6  of the Bad Spaniels parody dog toy is that business and
7  product images of Jack Daniel's need not always be taken
8  seriously."  Semicolon.  "VIP's trademark parody reminds
9  the public that they are free to laugh at the images and
10  associations linked with the mark."  Do you see that?
11      A.   Yep.
12      Q.   What aspect of the business and product image of
13  Jack Daniel's are you communicating need not be taken too
14  seriously?
15      A.   What aspects of the -- I'm sorry, could you
16  repeat the question?
17      Q.   You said the message of the Bad Spaniels parody
18  dog toy is that business and product images of Jack
19  Daniel's need not always be taken too seriously.  I just
20  want to know what aspect or --
21      A.   It's the entire aspect.  I mean, Jack Daniel's
22  has created a culture around its product.  As do all --
23  most products try to create a culture around that.  And
24  all people who are doing that take it pretty seriously, I
25  mean.  And by making fun of that or poking at them saying,



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 218

1    "Hey, you know what?  I know that you are over here trying
2    to be the best of everything and dominate the world.
3    Well, here's something funny."
4        Q.    Farther down, the last line of that page, line
5    27.  Actually, let's start with the sentence on line 25.
6    "The message is also a form of entertainment conveyed by
7    juxtaposing the irreverent representation of defendant's
8    trademark."  What do you mean by "irreverent
9    representation of defendant's trademark"?
10       A.    We're taking small portions of identifiable parts
11   of the trade dress that people have visual recognition
12   with, and juxtaposing that.  And "juxtaposition," by
13   definition, means comparing two things against one
14   another.  And by making -- we're adding elements to that
15   to make it funny and to relate it to dog owners by adding
16   a dog and making it strictly relate to dog and dog
17   products and things that dogs do.
18       Q.    And your answer says, "In this case involving a
19   common dog behavior."  Is that going number two?
20       A.    That is correct.
21       Q.    And the juxtaposition you reference on the last
22   line of page nine:  "With the idealized image created by
23   JDPI and Jack Daniels"; what are you referring to when you
24   say "idealized image"?
25       A.    Well, the idealized image are all the -- is the



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 219

1    imagery that is drawn up in a person's mind when they
2    reference Jack Daniel's.  So we take small elements of
3    that to be able to key into the person's memory to trigger
4    them to recognize this isn't Jack Daniels, but it's making
5    fun at Jack Daniels.
6        Q.   What is the idealized image?  What does that
7    constitute?  How can you articulate it?
8        A.   Idealized --
9            MR. BRAY:  Objection.  I think it was asked and
10   answered, but go ahead.
11           THE WITNESS:  Didn't I just answer that?
12       Q.   BY MR. LARKIN:  It's your words.  I don't know
13   what you meant by "idealized image."  What does the image
14   consist of?
15       A.   You're asking for specific details?
16       Q.   Yeah.  You're the one who is juxtaposing the
17   idealized image with a common dog behavior that all dog
18   owners can relate to.  And I want to know what the
19   idealized image was?
20       A.   No, that's saying I'm combining a dog behavior
21   with the idealized image; meaning that there are elements
22   of the Jack Daniel's bottle that are being combined with a
23   common dog behavior.  So "with the idealized image created
24   by JDPI," means that you have an idealized image of JDPI,
25   and we're taking that image and we're combining that with



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 220

1   this other element.

2        Q.   What goes into that image?  High quality?  Long

3   heritage of sales?  What is the image you're combining

4   with the common dog behavior that all dog owners can

5   relate to?

6        A.   Well, the idealized image is -- image is

7   something that you look at.  You're talking about

8   feelings, and emotions, and things that are not an image.

9   The things that you're referencing

10       Q.   Well, do you -- in the Bad Spaniels toy, are you

11  commenting in any way on Jack Daniel's business practices?

12       A.   No, absolutely not.

13       Q.   Or the quality of their whiskey?

14       A.   Absolutely not.

15       Q.   Or the way they market the product?

16       A.   Absolutely not.

17       Q.   Or anything else that has to do with their actual

18  business?

19       A.   Absolutely not.

20       Q.   You're not criticizing those in any of -- in

21  anything of that sort.  Is that correct?

22       A.   I'm not attempting to disparage Jack Daniel's in

23  any way.

24       Q.   Why did you decide to use the idealized image of

25  Jack Daniel's, rather than the idealized image of another



www.arizonacourtreporters.com
602.264.2230

185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 221

1   whiskey brand?

2       A.   As we discussed earlier, when going through the

3   creative process of trying to come up with different

4   parodies, you start running them through your mind.  And

5   as I discussed earlier, this is the first one that pops up

6   in my mind.  It's not easy creating parody.

7       Q.   Look at the next page, please.  Numbered page

8   ten.

9       A.   Okay.

10      Q.   Starting at line three, in italics, "Strength of

11  the mark.  Plaintiff does not dispute defendant's mark is

12  widely recognized."  Do you agree that the Jack Daniel's

13  trademark is very well known in the United States?

14          MR. BRAY:  Objection.  Form.

15          THE WITNESS:  I think that Jack Daniel's is more

16  recognizable than other brands.  But they've spent a lot

17  of money to make that recognition.

18      Q.   BY MR. LARKIN:  Do you believe that the Jack

19  Daniel's label is more recognizable than other brands?

20          MR. BRAY:  Objection.  Form, foundation.

21          THE WITNESS:  It depends on the person.  I mean,

22  one person could look at it and go, "I don't know what

23  that is."  And someone else could look at it and go, "Oh,

24  I know what that is."  It's who you've gotten to with your

25  marketing.



185b9647-a2f4-46e7-80e2-aeca599f89c4

Stephen Sacra   VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/23/2015

Page 222

1      Q.   BY MR. LARKIN:  But you're the one who chose Jack
2    Daniel's, as opposed to Jim Beam, or Evan Williams, or
3    Ezra Brooks.  Is that because the Jack Daniel's label is
4    more recognizable than the label of those products?
5      A.   I chose Jack Daniel's because I was able to come
6    up with a cute parody for it.  It just happened to be the
7    one that I thought of.
8      Q.   There's a quotation again from the Timmy
9    Holedigger case on page ten starting about line 11.
10   Quote, "That is, it is precisely because of the mark's
11   fame and popularity that confusion is avoided, and it is
12   this lack of confusion that a parodist depends upon to
13   achieve the parody."  Do you see that?
14     A.   Yep.
15     Q.   Do you agree that the mark's fame and the Jack
16   Daniel's mark's fame and popularity are what enable you,
17   in your mind, to avoid confusion?
18          MR. BRAY:  Objection.  Form.
19          THE WITNESS:  I think that if you're doing --
20          MR. BRAY:  Foundation.
21          THE WITNESS:  -- a parody and you're trying to
22   relate to the masses of people, that -- and you're trying
23   to make them get a parody; success comes from the fact
24   that people are familiar with Jack Daniel's, and they're
25   going to -- and the -- and have seen it before, and will



185b9647-a2f4-46e7-80e2-aeca599f89c4

## Stephen Sacra

**From:** david [mailto:david@flyingpony.com]
**Sent:** Tuesday, December 17, 2013 6:24 PM
**To:** Stephen Sacra
**Subject:** Re: New Product Samples

Dear Steve,

Pls see Bad Spaniels mockup sample, we just use the other label to stick it for samples. Pls let me know your comments.

2013-12-18

p
B.Regards

David Bai



VIP00024



VIP00025

**Stephen Sacra**

---

**From:** Stephen Sacra
**Sent:** Wednesday, November 27, 2013 5:17 AM
**To:** david@flyingpony.com
**Subject:** New Bottle - Bad Spaniels

David,

Here is a concept for a new BOTTLE SHAPE.
We want to make the bottle to Same Height as Beer Bottle but in this new square shape.
I have included a TEST Label size Bottle Neck Size an ARt Size.

We do not know if these art sizes are correct to work with Final Molded Product. Can you please make the Sample Bottle
then check the art size we can adjust after you let us know if the art is ok.

Steve

Stephen Sacra - Owner
steve@vipproducts.com
(480)704-1700 Ext. 105
16515 S. 40th St. Suite 121  Phoenix AZ 85048



   

This information is for discussion purposes only. It is speculative and based on assumptions that may not be correct or complete. VIP does not represent or warrant the accuracy. Anything written above or attached to this email is not a legally binding commitment. VIP shall have no liability and disclaims all direct, indirect, consequential, punitive or other damages, for the use of, or reliance on, this information. This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety.

1



VIP00015



VIP00016



VIP00017

**Silly Squeakers**

## Are you tired of buying the same old hum-drum rubber squeaky toys?

## So are we!

No longer does your dog have to suffer with boring squeaky animal shapes or cutesy-tootsy toys that have been around forever. Your dogs need some fun and laughter in their lives too! *Silly Squeakers*™ are a line of fun, creative and hilarious rubber squeaky toys that are sure to have everyone talking. We pushed the limits of our imagination to bring you this series of one-of-a-kind toys. They are sure to bring you and your dog tons of fun and laughter.

### The question is will you or your dog have more fun with them?

SILLY SQUEAKERS are made from the highest quality materials to ensure your dog's safety. Never leave a toy with your dog unattended. Dog toys are designed for interactive play and are not meant to be chewed or ingested by any animal. Failure to follow these instructions can result in injury to your pet.

LIMITED GUARANTEE: For defects in workmanship. To read the full details of our Limited Guarantee, please visit www.vipproducts.com.

**VIP Products**
Product Design and Manufacturing

©2013  VIP Products
Subject Matter Printed on Bottle © VIP Products
All Rights Reserved 1-866-4-DogToy
Made in China

The product and its design belong to VIP Products.
This product is not affiliated with Jack Daniel's.



VIP00019





VIP00020







SILLY SQUEAKERS are made from the highest quality materials to ensure your dog's safety. Never leave a toy with your dog unattended. Dog toys are designed for interactive play and are not meant to be chewed or ingested by any animal. Failure to follow these instructions can result in injury to your pet.

LIMITED GUARANTEE: For defects in work-manship. To read the full details of our Limited Guarantee, please visit www.vipproducts.com.

1  80181 90860  6

Made In China

© 2014 VIP Products
Subject Matter Printed on Bottle © VIP Products
All Rights Reserved 1-866-4-DogToy

The product and its design belong to VIP Products.
This product is not affiliated with Jack Daniel Distillery.

# EXHIBIT F

**Physical Exhibit Filed with Court**



VIP00053

# EXHIBIT G

1  Firm E-Mail: courtdocs@dickinsonwright.com

2  David G. Bray (#014346)
   dbray@dickinsonwright.com
3  Frank G. Long (#012245)
   flong@dickinsonwright.com
4  Jonathan Batchelor (#026882)
   jbatchelor@dickinsonwright.com
5  Colleen M. Ganin (#032456)
   cganin@dickinsonwright.com

6  **DICKINSON WRIGHT, PLLC**
   1850 North Central Avenue, Suite 1400
7  Phoenix, Arizona 85004
   Phone: (602) 285-5000
8  Fax: (602) 285-5100

9  *Attorneys for VIP Products, L.L.C*

10            **IN THE UNITED STATES DISTRICT COURT**

11                     **DISTRICT OF ARIZONA**

12  VIP Products, L.L.C., an Arizona limited      No. 2:14-cv-02057-DGC
13  liability company,

14              Plaintiff and Counterdefendant,    **DECLARATION OF STEPHEN SACRA**

15        v.

16  Jack Daniel's Properties, Inc., a Delaware
17  corporation

18              Defendant and Counterclaimant.

19        I, Stephen Sacra, the undersigned, hereby declare the following under penalty of
20  perjury:

21        1.    I state the following according to my own personal knowledge.

22        2.    I am the CEO of VIP Products, LLC.

23        3.    I have more than 20 years of experience designing and manufacturing consumer
24  products.

25        4.    I have approximately 22 years of personal experience in the spirits industry.

26        5.    Defendant Jack Daniel's Properties, Inc. ("JDPI") claims that it owns "Jack
27  Daniel's Trade Dress," allegedly "an iconic trade dress consisting of" the following elements:

                                    1

1    (1) "a square bottle with a ribbed neck," (2) "a black cap," (3) "a black neck wrap closure with

2    white printing bearing the OLD NO. 7 mark," and (4) "a black front label with white printing

3    and a filigreed border bearing the JACK DANIEL'S mark depicted in arched lettering at the

4    top of the label, the OLD NO. 7 mark contained within a filigreed oval design in the middle

5    portion of the label beneath the JACK DANIEL'S mark and the words Tennessee Sour Mash

6    Whiskey in the lower portion of the label, with the word 'Tennessee' depicted in script."

7    Answer of Defendant and Counterclaimant JDPI to Amended Complaint (Dkt. 12), ¶ 14.

8         6.    I received and reviewed a copy of the JDPI Motion for Summary Judgment (the

9    "JDPI Motion") and Supplemental Statement of Facts (the "JDPI SSOF"). In my review of

10   these documents, I noted several instances where JDPI mischaracterized my testimony, and the

11   facts surrounding the design of the SILLY SQUEAKERS® Bad Spaniel's pet toy. I address

12   each of these misrepresentations in the paragraphs below.

13        7.    The Motion refers to "a document entitled 'American Whiskey/Bourbon Report'

14   prepared during this case by Mr. Sacra based on Internet research ('Sacra Report')." Motion

15   3:10-11.  That statement is true.  I prepared the Sacra Report after I evaluated and statistically

16   analyzed the use of bottles and labels by 114 different products sold in the American

17   bourbon/whiskey market in June 2015.  In order to conduct my analysis, I compiled a list of

18   makers of Kentucky bourbon and Tennessee whiskey in the U.S. and the different

19   brands/bottles they distributed. I then collected images of different bottles from the Internet

20   that, to the best of my knowledge, are (or were) sold, and I also collected data from industry

21   advertisements, blogs, and historical websites for Kentucky bourbon and Tennessee whiskey.

22   From there, I compiled a spreadsheet of bottle features, analyzed each bottle for the list of

23   features, and finally compiled the resulting data and simply organized my findings in a

24   statistical  report titled "American Whiskey/Bourbon Report" ("Report"), attached as Exhibit

25   N to VIP's Supplemental Statement of Facts in Support of its Motion for Summary Judgment

26   (Dkt. 111); a comprehensive explanation of my methodology can be found at pages 5 and 6 of

27

the Report. A spreadsheet documenting the data considered is attached as **Exhibit A**

(SAC0064–69).

8.    None of the facts in my report are disputed in the Motion or by any testimony

provided by any witness produced by JDPI in discovery.  JDPI deposed me for eight hours and

had me provide detailed testimony about my methodology used to collect data for the Report

and my conclusions expressed in my Report. From the data I collected, I created for the Report

several charts depicting various bottle shapes used by makers of Kentucky bourbon and

Tennessee whiskey in the U.S. and included those in the Report. Also, I compiled those

multiple charts of various bottle shapes into a single chart that depicts the various different

categories of bottle shapes that I discovered in my research and that identifies the combination

of elements in the alleged Jack Daniel's Trade Dress that are used by its competitors also. The

chart that compiles the chart of various bottle shapes is included on page 22 of the Report

(SAC0022) and the chart that compiles the findings of similar bottle packaging is included on

page 50 of the Report (SAC0050), and both charts are attached as **Exhibit B**.

9.    The JDPI Motion states: "The Sacra Report . . . concluded that only 18 whiskey

bottles (16% of the market as defined by VIP) embody a square shape, an embossed ridge or

scalloped design on the neck portion of the bottle, and *some* embossed signature (although

only JDPI uses the 'Jack Daniel' signature), and just two companies use such bottles, one of

whom is Brown-Forman itself." Motion 28: 20-24.   This statement is false.  The Sacra Report

identified 42 square bottles with neck fluting and faceting (which represents 36% of the total

Kentucky bourbon and Tennessee whiskey bottles surveyed) and 18 of those bottles had an

embossed signature also.

| | BRAND HOUSE | Number Of Bottles | Comment | Percentage Bottles / Total |
|---|---|---|---|---|
| 1 | Allteuh | 0 | | 0% |
| 2 | Beam Suntory | 12 | 11 Brand Embossed Bottle | 29% |
| 3 | Brown Forman | 9 | 7 Brand Embossed Bottle | 21% |
| 4 | Heaven Hill | 8 | | 19% |
| 5 | KBD (Kentucky Bourbon Distillers) | 2 | | 5% |
| 6 | Luxco | 4 | | 10% |
| 7 | Sazerac Brands | 4 | | 10% |
| 8 | Others | 3 | | 7% |
| | TOTAL | 42 | | 100% |

10.     As part of my research, I reviewed the U.S. Patent and Trademark Office registration owned by JDPI for the design of a bottle for "distilled spirits." Reg. No. 4,106,178. The Registration states that the bottle trademark "consists of the three dimensional configuration of the **square shaped bottle** container for the goods, having an **embossed ridge or scalloped design on the neck** portion of the bottle, and an **embossed signature** design comprised of the words 'JACK DANIEL.'" (Emphasis added).

11.     As stated in the Report, my research discovered that other makers of Kentucky bourbon and Tennessee whiskey use the following features claimed in the PTO Registration: (1) a square shaped bottle container; (2) an embossed ridge or scalloped design on the neck portion of the bottle; and (3) an embossed signature design. Report, P. 23. I prepared a chart to illustrate the visual similarities between the features described in the PTO registration of the "Jack Daniel" bottle and other distilled bottles, including those identified in the Report or disclosed in Defendant's Amended Response to Second Set of Requests for Admission (attached as **Exhibit C**).

12.     In a declaration by Christopher Hungerford that was filed by JDPI, Mr. Hungerford testified that: "The current packaging [of the Jack Daniel's Old No. 7 Tennessee Whiskey] retains a combination of a square shaped bottle, a black cap; a black neck wrap with the OLD NO. 7 mark in white, a white-on-black front label with the JACK DANIEL'S mark in arched lettering at the top of the label, the OLD NO. 7 mark in a filigreed oval in the middle portion of the label beneath the JACK DANIEL'S mark, and the words 'Tennessee Sour Mash Whiskey' in the lower portion of the label, with the word 'Tennessee' depicted in script." Hungerford Declar. ¶ 6.

13.     I compared Mr. Hungerford's description of the "current packaging" of Jack Daniel's Old No. 7 Tennessee Whiskey to the bottles discovered in my research and discovered that at least 42 other brands of Kentucky bourbon and Tennessee whiskey use some combination of the following four design elements identified as part of the "current packaging" for Jack Daniel's Old No. 7 Tennessee Whiskey: (1) a square bottle with ribbed

4

1  neck; (2) a black cap; (3) a black neck-wrap closure with white print; and (4) a black front

2  label with white print. Report, PP. 45–51 (photo showing bottles using all four features). A

3  chart that I created to summarize and illustrate these facts is attached as **Exhibit D**.

4        14.     As a result of my research, I identified specific similarities between the Jack

5  Daniel's Old No. 7 Tennessee Whiskey bottle and the Jim Beam Black Kentucky Bourbon

6  bottle and found that the two bottles use the following nine common features: (1) a black cap;

7  (2) black neck wrap with white lettering; (3) a fluted/faceted neck; (4) a ring at the neck base;

8  (5) an embossed signature; (6) arched white lettering on the front label; (7) a centered

9  cartouche design on the front label; (8) a black front label with white lettering; and (9) a square

10  bottle shape. I prepared a chart illustrating those nine similarities between the two bottles and a

11  copy of that chart is attached as **Exhibit E**.

12        15.     The JDPI Motion claims: "The undisputed facts show that VIP copied the Jack

13  Daniel's Trade Dress in creating its Bad Spaniels toy to *take advantage* of the public

14  recognition of the Jack Daniel's packaging." Motion, 4:25–28 (emphasis added). This is false;

15  as I testified in my April 23, 2015, deposition, the SILLY SQUEAKERS® Bad Spaniel's toy is

16  a parody meant to <u>amuse the public</u>, not to take advantage of any public recognition of any

17  Jack Daniel's packaging. *See* Sacra Depo. at 269:16–25. This conclusion is confirmed by the

18  fact that VIP not only markets the toy under its SILLY SQUEAKERS® trademark but VIP

19  includes on the toy's hangtag a disclaimer stating: "This product is not affiliated with the Jack

20  Daniel Distillery."

21        16.     The JDPI Motion also claims: "VIP admits that it copied the Jack Daniel's Trade

22  Dress—and that it did so precisely to enable consumers to instantly recognize Jack Daniel's

23  whiskey at the 'target' of the Bad Spaniels toy," Motion, 5:22–6:1; and that "Mr. Sacra agreed

24  that it copied all of the claimed elements of the Jack Daniel's Trade Dress," Motion, 8:8–13;

25  and that the SILLY SQUEAKERS® Bad Spaniel's pet toy was a result of "'VIP's deliberate

26  copying" of the Jack Daniel's Tennessee Whiskey bottle. Motion 11:1.   These are

27  misrepresentations of the facts and my testimony; while the Jack Daniel's Trade Dress was the

1   inspiration for the Bad Spaniels toy, it is <u>not a duplication</u> of the alleged Jack Daniel's Trade

2   Dress. In fact, VIP designed the Bad Spaniels toy deliberately in a way that would further

3   differentiate the pet toy from the Jack Daniel's Tennessee Whiskey bottle. For example, VIP

4   designed the SILLY SQUEAKERS® pet toy so that it <u>omitted</u> from the toy any embossed

5   signature like the "Jack Daniel" embossed signature found on the shoulders of Jack Daniel's

6   Tennessee Whiskey bottle. Also, VIP added to the front label of the pet toy a color cartoon

7   graphic of a dog's face, unlike the Jack Daniel's Tennessee Whiskey bottle which has no color

8   graphic on its label anywhere. Overall, the VIP design of the SILLY SQUEAKERS® pet toy

9   design incorporates as many as 15 features of the Jack Daniel's Tennessee Whiskey bottle that

10  are not exclusive to that brand but are generic or non-exclusive features of bottles for

11  Kentucky bourbon and Tennessee whiskey from many different sources. Those generic or non-

12  exclusive features are: four "Black Neck Wrap Features" that are either a "Generic Feature" or

13  "Non-exclusive Feature" of several whiskey bottles; three "Glass Bottle Features" that are

14  generic or non-exclusive features used by several other brands of Kentucky bourbon or

15  Tennessee whiskey; and eight "Front Back Label" features that are either a "Generic Feature"

16  or "Non-exclusive Feature" of several whiskey bottles. I prepared a chart, attached as **Exhibit**

17  **F**, identifying those 15 generic or non-exclusive features incorporated into the SILLY

18  SQUEAKERS® pet toy and the 16 bottles of Kentucky bourbon or Tennessee whiskey that use

19  some or all of those features.

20      17.    The SILLY SQUEAKERS® pet toy design uses as many as 15 different generic

21  and non-exclusive features found in various combinations on bottles of Kentucky bourbon and

22  Tennessee whiskey from several different sources. To illustrate that fact and identify those

23  whiskey bottles, I prepared another chart that compares the pet toy with 11 different bottles of

24  Kentucky bourbon and Tennessee whiskey—including the Jack Daniel's Tennessee Whiskey

25  bottle. The chart identifying these shared design features is attached as **Exhibit G**.

26      18.    The JDPI Motion also claims that the "Jack Daniel's Trade Dress" is a

27  combination of features that includes, in part, "a filigreed oval design in the middle portion of

6

1  the label beneath the JACK DANIEL'S mark and the words 'Tennessee Sour Mash Whiskey'

2  in the lower portion of the label . . . ." This statement is incorrect. In fact, the label design of

3  the Jack Daniel's Tennessee Whiskey bottle has "a filigreed oval design" in the *top half* of the

4  label beneath the Jack Daniel's name and "the words 'Tennessee Sour Mash Whiskey'" appear

5  in the middle portion of the label.



13  This is another example of the way in which the SILLY SQUEAKERS® Bad Spaniels

14  pet toy differs from the Jack Daniel's Tennessee Whiskey bottle.

15  19.    The difference is an important distinction because the actual placement of the

16  "oval design" and "Tennessee Sour Mash Whiskey" words on the Jack Daniel's Tennessee

17  Whiskey bottle are in different the locations of any oval design and reference to "Tennessee"

18  on the SILLY SQUEAKERS® pet toy. In fact, the pet toy has over 50 structural and design

19  differences from a Jack Daniel's Tennessee Whiskey bottle and I prepared a chart, attached as

20  **Exhibit H,** that identifies those differences.

21  20.    The JDPI Motion also claims: "VIP makes 'parody' dog toys that copy the

22  packaging of well-known products. Its choice to do so has nothing to do with competitive

23  need and everything to do with the knowledge that toys that look like instantly-recognizable

24  brands will sell better than generic toys." Motion 1:15-18. This statement about what VIP

25  does, and why it does it, has no factual basis. Also, the statement is wrong. As the CEO of a

26  pet toy company for 11 years, we manufacture over 400 different dog toys and I can testify

27  that our "generic" (as labeled by JDPI) non parody toys comprise the largest portion of your

1    sales sell far better than our parody toys.  Our top-selling dog toy is the U.S. today is the

2    "Mighty Bone Orange" toy and it looks like this:

3

4



5    So far in 2015 , this "generic" non parody toy  produced by VIP products sold 99,000

6    units that generated over $390,000 in revenue, a healthy sales level for any pet toy, and far

7    more units and revenue than our sales of the Bad Spaniels of 5700 units.

8    21.    The JDPI Motion also claims: "What you don't do – indeed what you couldn't

9    do – is copy packaging that is non-distinctive, functional, merely ornamental, or generic."

10   Motion 2:3-5. This statement is wrong.  As stated in paras. 16 and  17 above and illustrated in

11   Exhibits F  and G,  the VIP design of the SILLY SQUEAKERS® pet toy design incorporates as

12   many as 15 features of the Jack Daniel's Tennessee Whiskey bottle that are not exclusive to

13   that brand but are generic or non-exclusive features of bottles for Kentucky bourbon and

14   Tennessee whiskey from many different sources.

15   22.    The JDPI Motion also claims: "[T]he success of the Bad Spaniels toy 'comes

16   from the fact that people are familiar with Jack Daniel's . . . and have seen it before, and will

17   get the parody." Motion 2:9-11.  This statement is wrong, if it refers to commercial "success"

18   of the SILLY SQUEAKERS® pet toy; but it is true if refers to the "success" of SILLY

19   SQUEAKERS® pet toy as parody. As I testified: "success comes from the fact that people . . .

20   will get the parody." MSJ Stmt. Para. 40.

21   23.    The JDPI Motion states: "The undisputed facts show that VIP copied the Jack

22   Daniel's Trade Dress in creating its Bad Spaniel's toy to take advantage of the public

23   recognition of the Jack Daniel's packaging . . . ."  Motion 4:25-26.  There is no factual support

24   for this statement and this statement is wrong.  As described and depicted in paras. 16 above

25   17 and in Exhibit F and G, the SILLY SQUEAKERS® pet toy design is comprised almost

26   entirely of features that are not exclusive to Jack Daniel's Tennessee Whiskey but are generic

27

8

1   or non-exclusive features of bottles for Kentucky bourbon and Tennessee whiskey from many

2   different sources.

3        24.   The JDPI Motion states: "VIP admits that it copied the Jack Daniel's Trade

4   Dress – and that it did so precisely to enable consumers to instantly recognize Jack Daniel's

5   whiskey as the 'target' of the Bad Spaniels toy." Motion, 5:23 – 6:1.  This statement is wrong.

6   VIP copied features that are not exclusive to Jack Daniel's Tennessee Whiskey but are generic

7   or non-exclusive features of bottles for Kentucky bourbon and Tennessee whiskey from many

8   different sources including but not only the source of Jack Daniel's Tennessee Whiskey. *See*

9   paras. 16 and 17 above and Exhibits F and G.

10        25.   The JDPI Motion states: "Mr. Sacra recalled getting the inspiration for the toy

11   while having dinner in a bar" and, "when he conceived of the toy, . . . Jack Daniel's was the

12   first product that popped into his mind."  Motion 6: 7-11. The statement is wrong.  My

13   testimony, as recorded in the deposition transcript, states that the *parody* SILLY

14   SQUEAKERS® Bad Spaniels pet toy "is the first one that pops up in my mind," at that time.

15   *See* Sacra Tr. 20:24-221:6.

16        26.   The Motion states: "The mock bottle was in the shape of the bottle shown in the

17   Registration, not the earlier generation of the bottle that was shown in Mr. Sacra's picture, but

18   Mr. Sacra did not notice any difference at the time."  Motion 7:25-28.  This statement is

19   incomplete and, as a result, is incorrect. I did not notice the difference *at the time* because I did

20   not compare the design to the photograph *at that time* – and for no other reason.  My

21   deposition testimony makes that clear – and I testified that I thought the design "looks like a

22   whiskey bottle."  *See* Sacra Tr.116:5-15.

23        27.   The Motion states: "Mr. Sacra agreed that [the SILLY SQUEAKERS® Bad

24   Spaniels pet toy] copied all of the claimed elements of the Jack Daniel's trade dress, including

25   the shape of the bottle, the color scheme of the neck and front labels, the stylization and

26   positioning of the JACK DANIEL'S and OLD NO. 7 marks and the word 'Tennessee' and the

27   product's front and other graphic elements." Motion 8:4-9. This statement is not supported by

1    my deposition testimony or other facts provided in discovery in this matter and the statement is

2    wrong. I never used the word "copied" in my testimony and, in fact, the SILLY

3    SQUEAKERS® Bad Spaniel's pet toy never copied "all the claimed elements of the Jack

4    Daniel's trade dress."   As described and depicted in paras. 16 and 17 above and in Exhibits F

5    and G, the SILLY SQUEAKERS® pet toy design is comprised almost entirely of features that

6    are not exclusive to Jack Daniel's Tennessee Whiskey brand but are generic or non-exclusive

7    features of bottles for Kentucky bourbon and Tennessee whiskey from many different sources.

8    Also, a comparison of the label design of the Jack Daniel's Tennessee Whiskey bottle to the

9    SILLY SQUEAKERS® pet toy design confirms, beyond argument, that the position of the

10   "Bad Spaniels" name and "The Old No. 2" on the pet toy is different from the position of the

11   "Jack Daniel's" name and the "Old No. 7" slogan on the whiskey bottle.



21         28.      The Motion states: " . . . the Sacra Report, . . . suffers from . . . flaws . . . as it

22   focuses on individual elements rather than the overall impression of the combination of

23   elements." Motion 13: 25-26.  This statement is false.  The Sacra Report identifies and

24   documents the overall bottle packaging of 114 seperate whiskey bottles and the Report

25   illustrates each bottle *in its entirety*, allowing the reader to draw his or her own conclusions

26   over whether the Report concludes accurately that: (1) "[t]he bottle design with the largest

27   percentage in the market, at 36%, is the generic "square" bottle with fluting or faceting on the

1    neck," like the bottle design covered by the PTO registration owned by JDPI, *see* SAC 0023;

2    and (2) "each Brand House that competes with Jack Daniel's has at least 1 brand for which

3    they use the four elements alleged by Jack Daniel's to be the trade dress of their bottle." *See*

4    SAC 0051.

5         29.     The JDPI Motion states: "Mr. Sacra agreed: '[I]f you combine all the parts of the

6    trade dress as a whole – I mean, Old No. 7 or Jack Daniel's or—filigree, those are all

7    ornamental' and 'the filigree, the name, the cartouche, all of those things are just ornamental,'

8    because 'they express to someone the message they are trying to convey.'" Motion, 15:12-15.

9    This statement is not true.  JDPI took separate excerpts of my deposition testimony and

10   combined them into a new statement that does not reflect my testimony or my belief.  In fact, I

11   testified at my deposition and I believe that the alleged Jack Daniel's trade dress is not just

12   "ornamental," but that it combines parts that are functional and ornamental.  As I said, in the

13   part of my deposition transcript that JDPI omitted from the JDPI Statement of Fact: "looking

14   at it as a bottle, yes it has utilitarian . . . a utilitarian purpose of being a vessel to hold liquid. . .

15   . With the combination of all the elements the --- it's still a bottle." It is with the context that I

16   testified also: "And if I am looking at it as a whole, the other thing – the filigree, the name, the

17   cartouche, all of those things are just ornamental." I never testified, nor do I believe, that the

18   alleged Jack Daniel's Trade Dress is wholly unrelated to utility. What JDPI claims as its Jack

19   Daniel's Trade Dress has both ornamental and functional features. My concluding comment,

20   that was missing part of the sentence, was intended and directed to the individual elements,

21   and was not addressing the bottle as a whole. EXAMPLE : Filigree, (swirly Lines) by

22   themselves, added to any object would just be ornamental. However if you combine them with

23   other elements, and evaluate them as a whole, filigree could be part of the trade dress for the

24   whiskey and bourbon industry and that, in fact, make the filigree part of something that is

25   functional.  Thus, when you look strictly at the individual elements not combined with other

26   elements,  my statement " the filigree, the name, the cartouche, all of those things are just

27   ornamental" is clarified in its context and representative of what I was conveying.

30.    The JDPI Motion states: "Mr. Sacra admitted . . . 'none [of the other whiskey bottles identified] combine all of these elements together with' the other elements of the Jack Daniel's Trade Dress." Motion 16: 22-24.  This statement is false.   It combines a few words from my deposition testimony with words added by JDPI and creates a meaning different from my answer to the deposition question.  In the deposition, I answered a question  (over the objection of my attorney to the form of the question) about "whether or not [I] have seen any other bottle that have *[sic]* everything listed in the trade dress in Paragraph 6 of Exhibit 6." The Paragraph 6 in deposition Exhibit 6 combines *both* the elements of bottle packaging common among various whiskey bottles *with* the JDPI trademarks "Jack Daniel's" and "Old No. 7."  I have seen only one bottle that combines the JDPI trademarks "Jack Daniel's" and "Old No. 7" with the elements of bottle packaging common among various whiskey bottles, but the Jack Daniel's Tennessee Whiskey bottle and several whiskey bottles of other brands use the elements of bottle packaging common among various whiskey bottles and those bottles are identified in the Sacra Report.

31.    The JDPI Motion states: "enforcing the Jack Daniel's Trade Dress against VIP's dog toy cannot possibly impose *any* non-reputation-related disadvantage on any spirits companies."  This statement is false.  As the CEO of VIP, I can state with assurance and authority that enforcing the alleged Jack Daniel's Trade Dress against VIP's dog toy will certainly impose *many* non-reputation-related disadvantages on any spirits companies because it will force them to defend themselves (as it has forced VIP to defend itself) in federal court anytime that JDPI wants to force another product out of the market.

32.    The JDPI Motion states: "Mr. Sacra . . . admitted that he had no evidence that the claimed Jack Daniel's Trade Dress had any effect on the ability of competitors to compete with Jack Daniel's." Motion 19: 24-26.  This statement is false.  My deposition testimony, cited as support for this statement, does not make that statement.  Also, I can state with assurance that the claimed Jack Daniel's Trade Dress had any effect on the ability of competitors to compete with Jack Daniel's *because JDPI produced evidence that it has filed*

12

1    *against other spirits companies claiming that those companies' bottles infringed the claimed*

2    *Jack Daniel's Trade Dress. See* JDPI 00650-2070. If being sued in federal court over

3    packaging does not have an effect of the ability of the ability of a competitor to compete, then

4    I don't know what would.

5          33.    The JDPI Motion states: "The Sacra Report claims that there are other square

6    whiskey bottles with embossed or scalloped necks and embossed signatures, as well as bottles

7    containing one or two of those features, and Mr. Sacra had no information that, since the

8    issuance of the Registration, any competitor has been impacted by it." Motion 29: 13-17.

9    Also, the JDPI Motion states: "VIP has no information that since the issuance of the

10    Registration, any competitor has been impacted by the existence of the Registration." Motion

11    29:21-22. These statements are false.   They are based on statements made in my first

12    deposition which took place on April 23, 2015, and, at that time, JDPI had not produced any

13    documents in discovery. JDPI first produced discovery documents on May 14,  2015, and

14    among those documents was one settlement agreement for a trade-dress lawsuit by JDPI

15    against another distiller. *See* JDPI00288-314.  One month later, on June 17, 2015, JDPI many

16    more discovery documents that document additional JDPI lawsuits, including another lawsuit

17    that forced another whiskey brand to change its bottle packaging based on JDPI alleged Jack

18    Daniel's Trade Dress claims.  *See* JDPI00650 – 2070.   I did not have this information at my

19    first deposition because JDPI withheld that information until after my deposition. Now, since

20    JDPI has disclosed the information about its lawsuits to enforce its alleged Jack Daniel's Trade

21    dress, I know that several competitors have been impacted by the PTO registration and this

22    lawsuit is further proof that impact will continue unless the alleged Jack Daniel's Trade Dress

23    is recognized as functional and non-distinctive and the PTO Registration is cancelled.

24

25          DATED: December 9th, 2015.

26

27                                                                      _____
                                                                      Stephen Sacra

1

<u>**Exhibit List:**</u>

2

3          Exhibit A:          Sacra Report spreadsheet of survey data.

4

5          Exhibit B:          Sacra Report, pages SAC0022 and SAC OO50

6

7          Exhibit C:          Chart of PTO Registration Compared to Liquor Bottles

8

9          Exhibit D:          Chart of Trade Dress Description Compared to Whiskey Bottles

10

11         Exhibit E:          Trade Dress Comparison Jim Beam vs. Jack Daniel's

12

13         Exhibit F:          Silly Squeakers(R) Bad Spaniels – Generic or Non-Exclusive

14                              Features

15

16         Exhibit G:          Generic and Non-Exclusive Features:  Silly Squeakers(R) Bad

17                              Spaniels

18

19         Exhibit H:          50+ Differences

20

21

22

23

24

25

26

27    PHOENIX 53913-11 262528v2

# EXHIBIT A

**Column groups:** BOTTLE FEATURES — STATE (Kentucky, Tennessee) | TYPE (Whiskey, Bourbon) | SHAPE (Square, Round, Other) | Bulb Neck (Yes, No) | Scallop Feature Neck (Yes, No) | Cap Color (Black, Other) | Neck Wrap Color (Black, Other, None); LABEL FEATURES — Background (White, Black, Other) | Text Color (White, Black, Gold, Other) | NUMBER reference (7, 8, 9, 10, 12, 1, & Other) | Location # (Neck, Center) | Filagree (Yes, No) | Arched Name (Yes, No) | Brand Location (1/3, 1/2, 3/4) | State Shown (Yes, No) | State Location (1/3, 1/2, 3/4) | Center Medallion (Yes, No) | Word Old (Yes, No) | YEAR | Style (Old, New)

**Primary House 1 — Altech**
| # | Brand |
|---|-------|
| 1 | Town Branch Bourbon |
| 2 | Town Branch Rye |
| 3 | Pearse Lyons Reserve |
| | Total |
| | Percentage |

**Primary House 4 — Beam Suntory**
| # | Brand |
|---|-------|
| 4 | Jim Beam |
| 5 | Jim Beam Black |
| 6 | Jim Beam Maple |
| 7 | Jim Beam Red Stag |
| 8 | Jim Beam Devils Cut |
| 103 | Jim Beam Kentuky Fire |
| 105 | Jim Beam Distillers Series |
| 106 | Jim Beam Red Stag Spiced |
| 107 | Jim Beam Red Stag HoneyT |
| 108 | Jim Beam Choice |
| 109 | Jim Beam Red Stag Cider |
| 110 | Jim Beam Rye |
| 114 | Jim Beam Honey |
| 9 | Makers Mark |
| 10 | Makers Mark 75 years |
| 11 | Makers 46 |
| 12 | Knob Creek |
| 13 | Knob Creek Rye |
| 14 | Basil Haydens |
| 15 | Bakers 7 |
| 16 | Old Grand Dad |
| 17 | Old Grand Dad 114 |
| 18 | Old Crow |
| 19 | Old Crow Reserve |
| 20 | Bookers |
| | Total |
| | Percentage |

**Primary House 21 — Brown Foreman**
| # | Brand |
|---|-------|
| 21 | Early Times |
| 104 | Early Times Fire Eater |
| 22 | Old Forester |
| 23 | Woodford Reserve |
| 24 | Jack Daniles |
| 25 | JD Single Barrel |
| 26 | Gentlemans Jack |
| 27 | Tennesee Honey |
| 28 | Tennessee Fire |
| 29 | Sinatra Select |
| 30 | 27 Gold |
| 111 | Jack Daniels Green |
| 31 | Winter Jack |
| | Total |
| | Percentage |

**Primary House 32 — Heaven Hill**
| # | Brand |
|---|-------|
| 32 | Heaven Hill |
| 33 | Old Heaven Hill |
| 34 | Cabin Still |
| 35 | Daniel Stewart |
| 36 | Echo Springs |
| 37 | Elijah Craig |
| 38 | Evan Williams |
| 39 | Evan Williams 1783 |
| 40 | Evan Williams Bott Bond |
| 41 | Evan Williams Sngl Brl |
| 112 | Evan Williams Green |
| 113 | Evan Williams Red |
| 42 | Henry McKenna |
| 43 | Fighting Cock |
| 44 | JTS Brown |
| 45 | JW Dent |
| 46 | Old Fitzgerald |

SAC0064



| No. | Primary House | Brand | STATE: Kentucky | Tennesee | TYPE: Whiskey | Bourbon | SHAPE: Square | Round | Other | Bulb Neck: Yes | No | Scallop Feature Neck: Yes | No | Cap Color: Black | Other | Neck Wrap Color: Black | Other | None | Background: White | Black | Other | Text Color: White | Black | Gold | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | | Parkers Heritage | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | | 1 | | | 1 | |
| 48 | | Pikesville | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | 1 | | | | 1 | | |
| | | Total | 19 | 0 | 0 | 19 | 7 | 11 | 1 | 10 | 9 | 8 | 11 | 10 | 9 | 9 | 9 | 1 | 6 | 7 | 6 | 9 | 5 | 3 | 2 |
| | | Percentage | 100% | 0% | 0% | 100% | 37% | 58% | 5% | 53% | 47% | 42% | 58% | 53% | 47% | 47% | 47% | 5% | 32% | 37% | 32% | 47% | 26% | 16% | 11% |

| No. | Brand | NUMBER reference: 7 | 8 | 9 | 10 | 12 | 1 | 6 | Other | Location #: Neck | Center | Fillagree: Yes | No | Arched Name: Yes | No | Brand Location: 1/3 | 1/2 | 3/4 | State Shown: Yes | No | State Location: 1/3 | 1/2 | 3/4 | Center Medalion: Yes | No | Word Old: Yes | No | YEAR | Style: Old | New |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | Parkers Heritage | | | | | | | | | | | | 1 | 1 | | 1 | | | 1 | | | 1 | | 1 | | | 1 | | | 1 |
| 48 | Pikesville | | | | | | | | | | | 1 | | 1 | | 1 | | | | 1 | | | | 1 | | | 1 | | | |
| | Total | 0 | 1 | 0 | 0 | 2 | 3 | 1 | | 0 | 9 | 9 | 9 | 6 | 13 | 17 | 1 | 0 | 16 | 1 | 0 | 10 | 6 | 14 | 3 | 2 | 13 | | 9 | 8 |
| | Percentage | 0% | 5% | 0% | 0% | 11% | ## | 5% | | 0% | 47% | 47% | 47% | 32% | 68% | 89% | 5% | 0% | 84% | 5% | 0% | 53% | 32% | 74% | 16% | 11% | 68% | | 47% | 42% |

BOTTLE FEATURES — LABEL FEATURES

| No. | Primary House | Brand | STATE: Kentucky | Tennesee | TYPE: Whiskey | Bourbon | SHAPE: Square | Round | Other | Bulb Neck: Yes | No | Scallop Feature Neck: Yes | No | Cap Color: Black | Other | Neck Wrap Color: Black | Other | None | Background: White | Black | Other | Text Color: White | Black | Gold | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 | KBD | Johhny Drum | 1 | | | 1 | 1 | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |
| 50 | | Kentucky Vintage | 1 | | | 1 | | 1 | | 1 | | | 1 | 1 | | 1 | | | | | 1 | | 1 | | |
| 51 | Other | Noahs Mill | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | 1 | | | | | | 1 |
| 52 | | Old Barstow | 1 | | | 1 | 1 | | | 1 | | 1 | | 1 | | | | 1 | | 1 | | 1 | | | 1 |
| 53 | | Pure Kentucky XO | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | | | 1 |
| 54 | | Rowans Creek | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | 1 | | | | 1 | | |
| 55 | | Vintage Bourbon | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | 1 | | | | | 1 | |
| 56 | | Willett Family | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | 1 | | | | 1 | | |
| 57 | | Willet Pot Still | 1 | | | 1 | | 1 | | 1 | | | 1 | 1 | | 1 | | | | | 1 | | | 1 | |
| 58 | | Black Maple Hill | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | 1 | | | | | | 1 |
| 58 | | Corner Creek | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | 1 | | | | | | 1 |
| 60 | | Old Pogue | 1 | | | 1 | | | 1 | | 1 | 1 | | 1 | | | | 1 | | | 1 | 1 | | | |
| | | Total | 12 | 0 | 0 | 12 | 2 | 9 | 1 | 4 | 8 | 3 | 9 | 11 | 1 | 9 | 1 | 2 | 6 | 2 | 4 | 3 | 3 | 2 | 5 |
| | | Percentage | 100% | 0% | 0% | 100% | 17% | 75% | 8% | 33% | 67% | 25% | 75% | 92% | 8% | 75% | 8% | 17% | 50% | 17% | 33% | 25% | 25% | 17% | 42% |

| No. | Brand | NUMBER reference: 7 | 8 | 9 | 10 | 12 | 1 | 6 | Other | Location #: Neck | Center | Fillagree: Yes | No | Arched Name: Yes | No | Brand Location: 1/3 | 1/2 | 3/4 | State Shown: Yes | No | State Location: 1/3 | 1/2 | 3/4 | Center Medalion: Yes | No | Word Old: Yes | No | YEAR | Style: Old | New |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 | Johhny Drum | | | | | | | | | | | 1 | | | 1 | 1 | | | 1 | | | 1 | | 1 | | 1 | | | 1 | |
| 50 | Kentucky Vintage | | | | | | | | | | | | 1 | | 1 | | 1 | | 1 | | | 1 | | | 1 | | 1 | | 1 | |
| 51 | Noahs Mill | | | | | | | | | | | | 1 | | 1 | 1 | | | 1 | | | | 1 | 1 | | | 1 | | | 1 |
| 52 | Old Barstow | | | | | | | | | | | | 1 | 1 | | 1 | | | 1 | | | 1 | | 1 | | 1 | | | 1 | |
| 53 | Pure Kentucky XO | | | | | | | | | | | | 1 | | 1 | | 1 | | 1 | | | 1 | | | 1 | | 1 | | 1 | |
| 54 | Rowans Creek | | | | | | | | | | | | 1 | | 1 | | 1 | | 1 | | | 1 | | | 1 | | 1 | | | 1 |
| 55 | Vintage Bourbon | | | | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | | 1 | | | 1 | | | 1 |
| 56 | Willett Family | | | | | | | | | | | | 1 | | 1 | 1 | | | | 1 | | | | 1 | | | | | | 1 |
| 57 | Willet Pot Still | | | | | | | | | | | 1 | | | 1 | | 1 | | | 1 | | | | 1 | | | | | 1 | |
| 58 | Black Maple Hill | | | | | | | | | | | | 1 | | 1 | 1 | | | 1 | | | | 1 | 1 | | | | | | 1 |
| 58 | Corner Creek | | | | | | | | | | | | 1 | | 1 | 1 | | | 1 | | | | 1 | 1 | | | | | | 1 |
| 60 | Old Pogue | | | | | | | | | | | 1 | | | 1 | 1 | | | | | | | | 1 | | | | 1876 | | 1 |
| | Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 3 | 9 | 1 | 11 | 7 | 5 | 0 | 8 | 3 | 0 | 5 | 3 | 9 | 3 | 2 | 5 | | 5 | 7 |
| | Percentage | 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% | 25% | 75% | 8% | 92% | 58% | 42% | 0% | 67% | 25% | 0% | 42% | 25% | 75% | 25% | 17% | 42% | | 42% | 58% |

BOTTLE FEATURES — LABEL FEATURES

| No. | Primary House | Brand | STATE: Kentucky | Tennesee | TYPE: Whiskey | Bourbon | SHAPE: Square | Round | Other | Bulb Neck: Yes | No | Scallop Feature Neck: Yes | No | Cap Color: Black | Other | Neck Wrap Color: Black | Other | None | Background: White | Black | Other | Text Color: White | Black | Gold | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | Luxco | David Nicholson | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | 1 | | | | 1 | | |
| 62 | | Ezra Brooks | 1 | | | 1 | 1 | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |
| 63 | | Ezra Brookscinnamon | 1 | | | 1 | 1 | | | 1 | | 1 | | | 1 | | 1 | | | | 1 | 1 | | | |
| 64 | | Old Ezra Brooks | 1 | | | 1 | 1 | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |
| 65 | | Ezra Brooks 80 proof | 1 | | | 1 | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | | | 1 | | |
| 66 | | Straight Western | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | | |
| 67 | | rebel Yell Reserve | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | 1 | | 1 | | | 1 |
| 68 | | rebel Reserve | 1 | | | 1 | | 1 | | 1 | | | 1 | 1 | | | 1 | | | | 1 | | 1 | | |
| | | Total | 8 | 0 | 0 | 8 | 4 | 4 | 0 | 5 | 3 | 4 | 4 | 4 | 4 | 3 | 5 | 0 | 2 | 4 | 2 | 5 | 3 | 0 | 1 |
| | | Percentage | 100% | 0% | 0% | 100% | 50% | 50% | 0% | 63% | 38% | 50% | 50% | 50% | 50% | 38% | 63% | 0% | 25% | 50% | 25% | 63% | 38% | 0% | 13% |

| No. | Brand | NUMBER reference: 7 | 8 | 9 | 10 | 12 | 1 | 6 | Other | Location #: Neck | Center | Fillagree: Yes | No | Arched Name: Yes | No | Brand Location: 1/3 | 1/2 | 3/4 | State Shown: Yes | No | State Location: 1/3 | 1/2 | 3/4 | Center Medalion: Yes | No | Word Old: Yes | No | YEAR | Style: Old | New |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | David Nicholson | 1 | | | | | | | | | 1 | | 1 | | 1 | 1 | | | 1 | | | | 1 | 1 | | | 1 | 1843 | 1 | |
| 62 | Ezra Brooks | | | | | | | | 90 | | 1 | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | | | | 1 | |
| 63 | Ezra Brookscinnamon | | | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | | | | 1 | |
| 64 | Old Ezra Brooks | 1 | | | | | | | 101 | | 1 | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | 1 | | | 1 | |
| 65 | Ezra Brooks 80 proof | | | | | | | | 80 | | 1 | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | | | | 1 | |
| 66 | Straight Western | | | | | | | | | | | 1 | | | 1 | 1 | | | 1 | | | | 1 | 1 | | | | | | 1 |
| 67 | rebel Yell Reserve | | | | | | | | | | | | 1 | 1 | | 1 | | | 1 | | | | 1 | | 1 | | 1 | | | 1 |
| 68 | rebel Reserve | | | | | | | | | | | | 1 | | 1 | 1 | | | 1 | | | 1 | | | 1 | | 1 | | | 1 |
| | Total | 2 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 4 | 5 | 3 | 5 | 3 | 8 | 0 | 0 | 8 | 0 | 0 | 1 | 7 | 6 | 2 | 1 | 3 | | 5 | 3 |
| | Percentage | 25% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 50% | 63% | 38% | 63% | 38% | 100% | 0% | 0% | 100% | 0% | 0% | 13% | 88% | 75% | 25% | 13% | 38% | | 63% | 38% |

BOTTLE FEATURES — LABEL FEATURES

| No. | Primary House | Brand | STATE: Kentucky | Tennesee | TYPE: Whiskey | Bourbon | SHAPE: Square | Round | Other | Bulb Neck: Yes | No | Scallop Feature Neck: Yes | No | Cap Color: Black | Other | Neck Wrap Color: Black | Other | None | Background: White | Black | Other | Text Color: White | Black | Gold | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 69 | Sazerac Brands | 1792 Ridgemont Reserve | 1 | | | 1 | | | 1 | | 1 | | 1 | | 1 | | 1 | | | | 1 | 1 | | | |
| 70 | | Kentucky Gentleman | 1 | | | 1 | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | | | 1 | 1 | |
| 71 | | Kentucky Tavern | 1 | | | 1 | 1 | | | | 1 | | 1 | 1 | | | 1 | | 1 | | | | 1 | | |
| 72 | | Ten High | 1 | | | 1 | | 1 | | | 1 | | 1 | | | | 1 | | | | 1 | | | | 1 |
| 73 | | Very Old Barton | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | 1 | 1 | | 1 | 1 | |
| 74 | | Ancient Age | 1 | | | 1 | 1 | | | 1 | | 1 | | | 1 | | 1 | | | | 1 | | 1 | | |
| 75 | | Blantons | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | | 1 | | | | 1 | | 1 | | |
| 76 | | Buffalo Trace | 1 | | | 1 | | 1 | | 1 | | | 1 | 1 | | 1 | | | | | 1 | 1 | | | |
| 77 | | Eagle Rare | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | | |
| 78 | | Elmer T Lee | 1 | | | 1 | 1 | | | | 1 | | 1 | 1 | | 1 | | | | 1 | | | | 1 | |
| 79 | | George T Stag | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | | 1 | 1 | | | |
| 80 | | Hancocks Presidents | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | 1 | 1 | | 1 | 1 | |
| 81 | | Mcafees BenchMark | 1 | | | 1 | 1 | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |
| 82 | | BENCHMARK Peach | 1 | | | 1 | 1 | | | 1 | | 1 | | | 1 | | | | | | 1 | 1 | | | |
| 83 | | Old Charter | 1 | | | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | | | 1 | | 1 | | |
| 84 | | Old Charter 10 | 1 | | | 1 | | 1 | | 1 | | 1 | | | 1 | 1 | | | | 1 | | 1 | | 1 | |
| 85 | | old Rip Van Winkle | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | | 1 | | 1 | | |
| 86 | | Old Taylor | 1 | | | 1 | | 1 | | | 1 | 1 | | | 1 | | 1 | | | | 1 | | 1 | | |
| 87 | | Pappy Van Winkle | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | 1 | | | | | 1 | | 1 | | |
| 88 | | Rock Hill Farms Single | 1 | | | 1 | 1 | | | | 1 | | 1 | | 1 | | | 1 | | | 1 | 1 | | | |
| 89 | | WL Weller | 1 | | | 1 | | 1 | | 1 | | | 1 | 1 | | 1 | | | | 1 | | 1 | | 1 | |
| | | Total | 21 | 0 | 0 | 21 | 7 | 13 | 1 | 8 | 13 | 7 | 14 | 11 | 9 | 10 | 9 | 1 | 2 | 7 | 14 | 9 | 10 | 6 | 1 |
| | | Percentage | 100% | 0% | 0% | 100% | 33% | 62% | 5% | 38% | 62% | 33% | 67% | 52% | 43% | 48% | 43% | 5% | 10% | 33% | 67% | 43% | 48% | 29% | 5% |

| No. | Brand | NUMBER reference: 7 | 8 | 9 | 10 | 12 | 1 | 6 | Other | Location #: Neck | Center | Fillagree: Yes | No | Arched Name: Yes | No | Brand Location: 1/3 | 1/2 | 3/4 | State Shown: Yes | No | State Location: 1/3 | 1/2 | 3/4 | Center Medalion: Yes | No | Word Old: Yes | No | YEAR | Style: Old | New |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 69 | 1792 Ridgemont Reserve | | | | | | | | 1792 | | 1 | | 1 | | | 1 | | | 1 | | | | 1 | | 1 | | 1 | | | 1 |
| 70 | Kentucky Gentleman | | | | | | | | | | | | 1 | | 1 | 1 | | | 1 | | 1 | | | | 1 | | 1 | | ! | |
| 71 | Kentucky Tavern | | | | | | | | | | | 1 | | | 1 | 1 | | | 1 | | | 1 | | | 1 | | 1 | | 1 | |
| 72 | Ten High | | | | | | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | 1 | | | | 1879 | | 1 |
| 73 | Very Old Barton | | | | | | | | 6 | 1 | | | 1 | | 1 | 1 | | | 1 | | | | 1 | 1 | | | 1 | | 1 | |
| 74 | Ancient Age | | | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | 1 | | | 1 | | 1 | | 1 | |
| 75 | Blantons | | | | | | | | | | | | 1 | | 1 | 1 | | | 1 | | | | 1 | | 1 | | 1 | | | 1 |
| 76 | Buffalo Trace | | | | | | | | | | | | 1 | | 1 | | | 1 | 1 | | | | 1 | 1 | | | 1 | | 1 | |
| 77 | Eagle Rare | | | | 1 | | | | | 1 | | | 1 | | 1 | 1 | | | 1 | | | 1 | | | 1 | | 1 | | | 1 |
| 78 | Elmer T Lee | | | | | | | | | | | | 1 | | 1 | | 1 | | 1 | | | | 1 | 1 | | | 1 | 1919-2013 | 1 | |
| 79 | George T Stag | | | | | | | | | | | | 1 | 1 | | | 1 | | 1 | | | | 1 | 1 | | | 1 | | | 1 |
| 80 | Hancocks Presidents | | | | | | | | 88.9 | 1 | | 1 | | 1 | | 1 | | | | 1 | | | | 1 | | | 1 | | | 1 |
| 81 | Mcafees BenchMark | | 1 | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | 1 | | | 1 | |
| 82 | BENCHMARK Peach | | 1 | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | 1 | | | 1 | |
| 83 | Old Charter | | | | | 1 | | | | 1 | 1 | | 1 | | 1 | 1 | | | 1 | | | 1 | | | 1 | 1 | | | 1 | |
| 84 | Old Charter 10 | | | | | | 1 | | | | | 1 | | | 1 | 1 | | | 1 | | | 1 | | | 1 | 1 | | | 1 | |
| 85 | old Rip Van Winkle | | | | 1 | | | | | | 1 | 1 | | | 1 | | 1 | | 1 | | | | 1 | 1 | | 1 | | | | 1 |
| 86 | Old Taylor | | | | | | | | 6 | 1 | | | 1 | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | | 1 | |
| 87 | Pappy Van Winkle | | | | | | | | 15 | | 1 | 1 | | 1 | | 1 | | | 1 | | | 1 | | 1 | | | 1 | | | 1 |
| 88 | Rock Hill Farms Single | | | | | | | | | | | | 1 | | 1 | 1 | | | | 1 | | | | | | | | | | 1 |
| 89 | WL Weller | | | | | 1 | | | | 1 | 1 | | 1 | | | | 1 | | 1 | | | 1 | | | 1 | | 1 | | 1 | |
| | Total | 0 | 2 | 0 | 2 | 2 | 1 | 0 | | 6 | 5 | 8 | 12 | 7 | 12 | 14 | 6 | 1 | 19 | 2 | 1 | 9 | 9 | 11 | 9 | 6 | 13 | | 11 | 9 |
| | Percentage | 0% | 10% | 0% | 10% | 10% | 5% | 0% | | 29% | 24% | 38% | 57% | 33% | 57% | 67% | 29% | 5% | 90% | 10% | 5% | 43% | 43% | 52% | 43% | 29% | 62% | | 52% | 43% |

BOTTLE FEATURES — LABEL FEATURES

OTHERS

| No. | Primary House | Brand | STATE: Kentucky | Tennesee | TYPE: Whiskey | Bourbon | SHAPE: Square | Round | Other | Bulb Neck: Yes | No | Scallop Feature Neck: Yes | No | Cap Color: Black | Other | Neck Wrap Color: Black | Other | None | Background: White | Black | Other | Text Color: White | Black | Gold | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90 | Wild Turkey | Russels Reserve | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | | 1 | | | | | 1 |
| 91 | | Wild Turkey | 1 | | | 1 | | 1 | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | |
| 92 | | Wild Turkey Spiced | 1 | | | 1 | | 1 | | | 1 | | 1 | 1 | | | 1 | | | 1 | | 1 | | | |
| 93 | Diagio | George Dickel Old No 8 | | 1 | 1 | | | 1 | | | 1 | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |
| 94 | | George Dickel Old No 12 | | 1 | 1 | | | 1 | | | 1 | 1 | | | 1 | | 1 | | 1 | | | | 1 | | |
| 95 | | George Dickel Rye | | 1 | 1 | | | 1 | | | 1 | 1 | | | 1 | | 1 | | | | 1 | | | 1 | |
| 96 | | Garrison Brothers | | | | 1 | 1 | | | 1 | | | 1 | 1 | | 1 | | | | | 1 | 1 | | | |
| 97 | | Ozrk Distillery | | | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |

| No. | Brand | NUMBER reference: 7 | 8 | 9 | 10 | 12 | 1 | 6 | Other | Location #: Neck | Center | Fillagree: Yes | No | Arched Name: Yes | No | Brand Location: 1/3 | 1/2 | 3/4 | State Shown: Yes | No | State Location: 1/3 | 1/2 | 3/4 | Center Medalion: Yes | No | Word Old: Yes | No | YEAR | Style: Old | New |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90 | Russels Reserve | | | | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | | | 1 | | 1 | | 1 | |
| 91 | Wild Turkey | | | | | | | | | | | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | 1 | | 1 | |
| 92 | Wild Turkey Spiced | | | | | | | | | | | | 1 | | 1 | 1 | | | | 1 | | | | | 1 | | 1 | | 1 | |
| 93 | George Dickel Old No 8 | | 1 | | | | | | | | 1 | | 1 | 1 | | 1 | | | 1 | | | 1 | | | | 1 | | 1870 | 1 | |
| 94 | George Dickel Old No 12 | | | | | 1 | | | | 1 | 1 | 1 | | 1 | | 1 | | | 1 | | | 1 | | 1 | | | | 1870 | 1 | |
| 95 | George Dickel Rye | | | | | | | | 90 | | 1 | 1 | | 1 | | 1 | | | | 1 | | | | 1 | | | 1 | 1870 | 1 | |
| 96 | Garrison Brothers | | | | | | | | | | | | | | | | 1 | | | 1 | | | | 1 | | | | | | 1 |
| 97 | Ozrk Distillery | | | | | | | | | | | 1 | | 1 | | 1 | | | 1 | | | | 1 | 1 | | | | | ! | |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 98 | Cabin Fever Maple Whiskey | | | 1 | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | | 1 |
| 99 | White Tail Whiskey | | | 1 | | | | | 1 | | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | 1 | | | | 1 | | 1 | | | |
| 100 | Virgin Bourbon | 1 | | 1 | 1 | | 1 | | 1 | | 1 | | | 1 | | | 11 | 1 | 1 | | 1 | | 1 | | 1 | | 1 | | 1 |
| 101 | Lock Stock | | | 1 | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 |
| 102 | Zackariah Harris | 1 | | | 1 | | | | 1 | 1 | | | 1 | | | | | 1 | | 1 | | 1 | | | | 1 |
| | Total | 5 | 3 | 6 | 7 | 5 | 8 | 0 | 4 | 8 | 8 | 5 | 9 | 4 | 8 | 5 | 0 | 2 | 9 | 3 | 8 | 3 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | | 1 | 5 | 7 | 5 | 7 | 5 | 8 | 3 | 1 | 6 | 0 | 3 | 4 | 8 | 3 | 2 | 7 | 11 | 1 |
| | Percentage | 38% | 23% | 46% | 54% | 38% | 62% | 0% | 31% | 60% | 62% | 38% | 69% | 31% | 62% | 38% | 0% | 15% | 69% | 23% | 62% | 23% | 8% | 8% | 8% | 0% | 0% | 8% | 0% | 0% | | 8% | 38% | 54% | 98% | 54% | 38% | 60% | 23% | 8% | 46% | 0% | 23% | 31% | 62% | 23% | 15% | 54% | 85% | 8% |

SAC0066

| | | | BOTTLE FEATURES | | | | | | | | | LABEL FEATURES | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Primary House | Brand | STATE (Kentucky / Tennessee) | TYPE (Whiskey / Bourbon) | SHAPE (Square / Round / Other) | Bulb Neck (Yes / No) | Scallop Feature Neck (Yes / No) | Cap Color (Black / Other) | Neck Wrap Color (Black / Other / None) | Background (White / Black / Other) | Text Color (White / Black / Gold / Other) | NUMBER reference (7 / 8 / 9 / 10 / 11 / 1 / 6 / Other) | Location # (Neck / Center) | Fillagree (Yes / No) | Arched Name (Yes / No) | Brand Location (1/3 / 1/2 / 3/4) | State Shown (Yes / No) | State Location (1/3 / 1/2 / 3/4) | Center Metalion (Yes / No) | Word Old (Old / New) | YEAR | Style (Old / New) |

| Row | Primary House | Brand | NUMBER ref | YEAR |
|---|---|---|---|---|
| 1 | Alltech | Town Branch Bourbon | | |
| 2 | | Town Branch Rye | | |
| 3 | | Pearse Lyons Reserve | | |
| 5 | Beam Suntory | Jim Beam | | |
| 5 | | Jim Beam Black | | |
| 6 | | Jim Beam Maple | | |
| 7 | | Jim Beam Red Stag | | |
| 8 | | Jim Beam Red Stag | | |
| 8 | | Jim Beam Devils Cut | | |
| 103 | | Jim Beam Kentucky Fire | 90 | |
| 105 | | Jim Beam Distillers Series | | |
| 106 | | Jim Beam Red Stag Spiced | | |
| 107 | | Jim Beam Red Stag HoneyT | | |
| 108 | | Jim Beam Choice | | |
| 109 | | Jim Beam Red Stag Cider | | |
| 110 | | Jim Beam Rye | | |
| 114 | | Jim Beam Honey | | |
| 9 | | Makers Mark | | |
| 10 | | Makers Mark 75 years | 75 | |
| 11 | | Makers 46 | 46 | |
| 12 | | Knob Creek | | |
| 13 | | Knob Creek Rye | | |
| 14 | | Basil Haydens | | |
| 15 | | Bakers 7 | | |
| 16 | | Old Grand Dad | 80 | 1882 |
| 17 | | Old Grand Dad 114 | 114 | 1882 |
| 18 | | Old Crow | | 1835 |
| 19 | | Old Crow Reserve | | 1835 |
| 20 | | Bookers | | |
| 21 | Brown Foreman | Early Times | | 1860 |
| 104 | | Early Times Fire Eater | 354 | |
| 22 | | Old Forester | | 1870 |
| 23 | | Woodford Reserve | | |
| 24 | | Jack Daniels | | |
| 25 | | JD Single Barrel | | |
| 26 | | Gentlemans Jack | | |
| 27 | | Tennessee Honey | | |
| 28 | | Tennessee Fire | | |
| 29 | | Sinatra Select | | |
| 30 | | 27 Gold | 27 | |
| 111 | | Jack Daniels Green | 27 | |
| 31 | | Winter Jack | | |
| 32 | Heaven Hill | Heaven Hill | | |
| 33 | | Old Heaven Hill | | |
| 34 | | Cabin Still | | |
| 35 | | Daniel Stewart | | |
| 36 | | Echo Springs | | |
| 37 | | Elijah Craig | | |
| 38 | | Evan Williams | | 1783 |
| 39 | | Evan Williams 1783 | 1793 | 1783 |
| 40 | | Evan Williams Bott Bond | | 1783 |
| 41 | | Evan Williams Sngl Brl | 2001 | 1783 |
| 112 | | Evan Williams Green | | |
| 43 | | Evan Williams Red | 1855 | |
| 42 | | Henry McKenna | | 1855 |
| 44 | | Fighting Cock | | |
| 44 | | JTS Brown | | |
| 46 | | JW Dant | | |
| 46 | | Old Fitzgerald | | |
| 47 | | Parkers Heritage | | |
| 48 | | Pikesville | | |
| 49 | KBD | Jeffrey Drum | | |
| 50 | | Kentucky Vintage | | |
| 51 | Other | Noahs Mill | | |
| 52 | | Old Baristow | | |
| 52 | | Pure Kentucky XO | | |
| 54 | | Rowans Creek | | |
| 55 | | Vintage Bourbon | | |
| 56 | | Willett Family | | |
| 57 | | Willet Pot Still | | |
| 58 | | Black Maple Hill | | |
| 58 | | Corner Creek | | |
| 60 | | Old Pogue | | 1876 |
| 61 | Luxco | David Nicholson | | 1843 |
| 62 | | Ezra Brooks | 90 | |
| 63 | | Ezra Brookscinnamon | | |
| 64 | | Old Ezra Brooks | 101 | |
| 65 | | Ezra Brooks 80 proof | 80 | |
| 66 | | Straight Western | | |
| 67 | | rebel Yell Reserve | | |

SAC0067

| # | Primary House | Brand |
|---|---|---|
| 68 | | rebel Reserve |
| 69 | Sazerac Brands | 1792 Ridgemont Reserve |
| 70 | | Kentucky Gentleman |
| 71 | | Kentucky Tavern |
| 72 | | Ten High |
| 73 | | Very Old Barton |
| 74 | | Ancient Age |
| 75 | | Blantons |
| 76 | | Buffalo Trace |
| 77 | | Eagle Rare |
| 78 | | Elmer T Lee |
| 79 | | George T Stag |
| 80 | | Hancocks Presidents |
| 81 | | McAfees Benchmark |
| 82 | | BENCHMARK Peach |
| 83 | | Old Charter |
| 84 | | Old Charter 10 |
| 85 | | old Rip Van Winkle |
| 86 | | Old Taylor |
| 87 | | Pappy Van Winkle |
| 88 | | Rock Hill Farms Single |
| 89 | | WL Weller |
| 90 | Wild Turkey | Russels Reserve |
| 91 | | Wild Turkey |
| 92 | | Wild Turkey Spiced |
| 93 | Diageo | George Dickel Old No 8 |
| 94 | | George Dickel Old No 12 |
| 95 | | George Dickel Rye |
| 96 | | Garrison Brothers |
| 97 | | Oork Distillery |
| 98 | | Cabin Feaww Maple Whiskey |
| 99 | | White Fall Whiskey |
| 100 | | Virgin Bourbon |
| 101 | | Lock Stock |
| 102 | | Zackariah Harris |

Bottom header categories: STATE (Kentucky, Tennessee), TYPE (Whiskey, Bourbon), SHAPE (Square, Round, Other), Bulb Neck (Yes, No), Scallop Feature Neck (Yes, No), Cap Color (Black, Other), Neck Wrap Color (Black, Other, None), Background (White, Black, Other), Text Color (White, Black, Gold, Other), NUMBER reference (7, 8, 9, 10, 12, 1, 6 Other), Location # (Neck, Center), Filigree (Yes, No), Arched Name, Brand Location (1/3, 1/2, 3/4), State Shown, State Location, Center Medalion, Word Old (Yes, No), YEAR, Style (Old, New)

SAC0068

Annual SEC Reports Filed

**BEAM** - Beam Inc

| | Y 2013 | Y 2012 | Y 2011 |
|---|---|---|---|
| | 12/30/2013 | 12/30/2012 | 12/30/2011 |
| Sales | $3,148,400,000 | $3,063,900,000 | $2,859,600,000 |
| Less: Excise taxes | ($601,100,000) | ($604,200,000) | ($560,600,000) |
| Net sales | $2,547,300,000 | $2,459,700,000 | $2,299,000,000 |
| Cost of goods sold | $1,067,900,000 | $1,023,700,000 | $985,600,000 |
| Gross profit | $1,479,400,000 | $1,436,000,000 | $1,313,400,000 |
| Advertising and marketing expense | $401,000,000 | $398,700,000 | $358,700,000 |
| Selling, general and administrative expense | $392,200,000 | $412,900,000 | $430,000,000 |
| assets | $17,500,000 | $17,200,000 | $16,300,000 |
| Gain on sale of brands and related assets | ($13,200,000) | - | - |
| Restructuring charges | $15,300,000 | $4,300,000 | $7,700,000 |
| Business separation costs | - | $13,800,000 | $83,800,000 |
| Asset impairment charges | $49,500,000 | $15,600,000 | $31,300,000 |
| Operating income | $617,100,000 | $573,500,000 | $385,600,000 |
| Interest expense | $91,600,000 | $109,000,000 | $117,400,000 |
| Loss on early extinguishment of debt | $56,900,000 | - | $149,200,000 |
| Other income | ($8,800,000) | ($35,100,000) | ($40,400,000) |
| Income from continuing operations before income taxes | $477,400,000 | $499,600,000 | $159,400,000 |
| Income taxes | $111,900,000 | $96,200,000 | $39,800,000 |
| Income from continuing operations-Beam Inc. | $365,500,000 | $403,400,000 | $119,600,000 |
| (Loss) income from discontinued operations, net of tax | ($3,000,000) | ($18,200,000) | $787,200,000 |
| Net income | $362,500,000 | $385,200,000 | $906,800,000 |
| Less: Noncontrolling interests related to discontinued operations | - | - | $4,100,000 |
| Net income attributable to Beam Inc. | $362,500,000 | $385,200,000 | $902,700,000 |

**BFB** - Brown Forman Corp

| | Y 2014 | Y 2013 | Y 2012 |
|---|---|---|---|
| | 4/29/2014 | 4/29/2013 | 4/29/2012 |
| Net sales | $3,946,000,000 | $3,784,000,000 | $3,614,000,000 |
| Excise taxes | $955,000,000 | $935,000,000 | $891,000,000 |
| Cost of sales | $913,000,000 | $894,000,000 | $928,000,000 |
| Gross profit | $2,078,000,000 | $1,955,000,000 | $1,795,000,000 |
| Advertising expenses | $436,000,000 | $408,000,000 | $395,000,000 |
| Selling, general, and administrative expenses | $686,000,000 | $650,000,000 | $610,000,000 |
| Amortization expense | $0.00 | $0.00 | $3,000,000 |
| net | ($15,000,000) | ($1,000,000) | ($1,000,000) |
| Operating income | $971,000,000 | $898,000,000 | $788,000,000 |
| Interest income | $2,000,000 | $3,000,000 | $3,000,000 |
| Interest expense | $26,000,000 | $36,000,000 | $31,000,000 |
| Income before income taxes | $947,000,000 | $865,000,000 | $760,000,000 |
| Income taxes | $288,000,000 | $274,000,000 | $247,000,000 |
| Net income | $659,000,000 | $591,000,000 | $513,000,000 |

SAC0069

# EXHIBIT B



***This page is designed as a visual aid for you to see all of the design subsets together and easily recognize that among 114 bottles reviewed the most "Common and Generic" are square with fluted or faceted necks

SAC0022

**4th Combination, The Combination of all elements in Jack Daniel's Alleged Bottle Trade Dress**

     (1) a square bottle with a ribbed neck;  (Fluted of Faceted)
     (2) a black cap;
     (3) a black neck wrap closure
     (4) a black front label with white printing



SAC0050

EXHIBIT C

## " The Mark "

→ "Color is not claimed as a feature of the mark"

**"The mark"** consists of the three-dimensional configuration of the 1.square shaped bottle container for the goods, having an 2.embossed ridge or scalloped design on the neck portion of the bottle, and an 3.embossed signature design comprised of the words "JACK DANIEL"



| | Jack Daniels | Jim Beam | Jim Beam | Red Stag | Jose Cuervo | El Jimador | Jim Beam | Jim Beam | Jim Beam | Red Stag |
|---|---|---|---|---|---|---|---|---|---|---|
| Square Bottle | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Scalloped Neck | ✔ | ✔ | ✔ | ✔ | ✘ | ✘ | ✔ | ✔ | ✔ | ✔ |
| Embossed Signature | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| | Jack Daniel | Jim Beam | Jim Beam | Jim Beam | Jose Cuervo | "J" | Jim Beam | Jim Beam | Jim Beam | Jim Beam |

| | El Jimador | Red Stag | Red Stag | Jim Beam | Sauza | Tres Sombreros | Jim Beam | Jim Beam | Ezra Brooks | Ezra Brooks |
|---|---|---|---|---|---|---|---|---|---|---|
| Square Bottle | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Scalloped Neck | ✘ | ✔ | ✔ | ✔ | ✘ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Embossed Signature | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✘ | ✘ |
| | "J" | Jim Beam | Jim Beam | Jim Beam | Illus. Crest | Mexico | Jim Beam | Jim Beam | | |

| | Evan Williams | Evan Williams | Evan Williams | Evan Williams | White Tail | Mark Twain | Kentucky Gold | Kentucky Supreme | JTS Brown | Ezra Brooks |
|---|---|---|---|---|---|---|---|---|---|---|
| Square Bottle | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Scalloped Neck | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |

| | Daniel Stewart | Sam Clay | Kentucky Deluxe | Military Special | Cabin Fever | Virgin Bourbon | Old Bardstown | Old Mr. Boston | Johnny Drum | Ancient Age |
|---|---|---|---|---|---|---|---|---|---|---|
| Square Bottle | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Scalloped Neck | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |

| | Distillers Pride | Heaven Hill | Benchmark | Benchmark | Buck Horn | Kentucky Beau | Zackariah Harris | Early Times | Early Times | Kentucky Gentleman |
|---|---|---|---|---|---|---|---|---|---|---|
| Square Bottle | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Scalloped Neck | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✘ | ✔ | ✔ | ✔ |

# EXHIBIT D

*"The current packaging retains a combination of a **square-shaped bottle**, a **black cap**, a **black neck wrap** with the OLD NO.7 mark in white, a **white-on-black front label** with the JACK DANIEL'S mark in **arched lettering at the top of the label**, the OLD NO.7 mark in a **filigreed oval in the middle portion of the label** beneath the JACK DANIEL'S mark, and the words "**Tennessee Sour Mash Whiskey**" in the **lower portion of the label** with the word "**Tennessee**" depicted in script."*
- Declaration of Christopher Hungerford[1]



| Feature | Jack Daniels | George Dickel | Evan Williams | Jim Beam | Kentucky Beau | Old Bardstown | Johnny Drum | Benchmark 8 |
|---|---|---|---|---|---|---|---|---|
| Square Shaped Bottle | ✔ | ✘ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Black Cap | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Black Neck Wrap | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| White Text on Neck Wrap | ✔ | ✔ | ✔ | ✔ | ✘ | ✔ | ✘ | ✔ |
| White-on-Black Front Label | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Arched Lettering at top of label | ✔ | ✔ | ✘ | ✔ | ✔ | ✔ | ✘ | ✔ |
| Filigreed Oval in middle portion of label | ✔ | ✘ | ✔ | ✘ | ✔ | ✘ | ✔ | ✘ |
| Description of product in lower portion of label | Tennessee Sour Mash Whiskey | Tennessee Sour Mash Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon Whiskey |
| State of origin in script | Tennessee | Tennessee | Kentucky | Kentucky | Kentucky | Kentucky | Kentucky | Kentucky |

---

[1] Features identified in the Declaration of Christopher Hungerford ¶6 filed in support of JDPI Motion for Partial Summary Judgment

*"The current packaging retains a combination of a **square-shaped bottle**, a **black cap**, a **black neck wrap** with the OLD NO.7 mark in white, a **white-on-black front label** with the JACK DANIEL'S mark in **arched lettering at the top of the label**, the OLD NO.7 mark in a **filigreed oval in the middle portion of the label** beneath the JACK DANIEL'S mark, and the words "Tennessee Sour Mash Whiskey" in the lower portion of the label* with the word "Tennessee" depicted in script.**"*
- Declaration of Christopher Hungerford[2]



| Feature | Jack Daniels | Heaven Hill | Ezra Brooks | Jim Beam | White Tail | Virgin Bourbon | Buck Horn | JTS Brown |
|---|---|---|---|---|---|---|---|---|
| Square Shaped Bottle | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Black Cap | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Black Neck Wrap | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| White Text on Neck Wrap | ✔ | ✔ | ✔ | ✘ | ✔ | ✔ | ✔ | ✔ |
| White-on-Black Front Label | ✔ | ✔ | ✔ | ✘ | ✔ | ✔ | ✔ | ✔ |
| Arched Lettering at top of label | ✔ | ✘ | ✔ | ✔ | ✘ | ✔ | ✘ | ✔ |
| Filigreed Oval in middle portion of label | ✔ | ✔ | ✘ | ✘ | ✘ | ✔ | ✘ | ✘ |
| Description of product in lower portion of label | Tennessee Sour Mash Whiskey | Kentucky Straight Bourbon Whiskey | Kentucky Straight Bourbon | Kentucky Straight Bourbon Whiskey | Whiskey | Bourbon | Kentucky Straight Bourbon Whiskey | Sour Mash |
| State of origin in script | Tennessee | Kentucky | Kentucky | Kentucky | | | Kentucky | |

---

[2] Features identified in the Declaration of Christopher Hungerford ¶6 filed in support of JDPI Motion for Partial Summary Judgment

EXHIBIT E

# Trade Dress Comparison Jim Beam vs. Jack Daniels

Black Cap  -->

Black Neck Wrap  -->
White Lettering

Fluted / Faceted  -->
Neck

RIng at Base  -->
Exact Same Position

Embossed  -->
Signature

Arched White
Lettering  -->
Same Position
Same Degree of Arch

Centered  -->
Cartouche
Exact Same Position

Black Label-->
White Lettering

Square Shape->





# EXHIBIT F

# Silly Squeakers® Bad Spaniels - GENERIC or NON-EXCLUSIVE Features

## "Black Neck Wrap Features"

### ① Black Neck Label
### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS

### ② White Text On Neck
### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- ZACKARIAH HARRIS

### ③ Black Cap
### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS





### ④ Word "Old No."
### Non Exclusive

- JACK DANIEL'S
- GEORGE DICKEL
- VIRGIN BOURBON

## "Glass Bottle Features"

### ① Square Shape
### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS

### ② Ribbed Neck
### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES

### ③ Ring At Base of Neck
### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES

** Bottle Line Up Displaying Generic and Non Exclusive features side by side



# Silly Squeakers® Bad Spaniels - GENERIC or NON-EXCLUSIVE Features

## "Front Black Label"



**① Black Background**

### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS

**② STATE name**

### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS
- 

**③ Arched Brand Name**

### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EZRA BROOKS
- BEAM HONEY
- OLD BARSTOW
- BENCHMARK 8
- KENTEUCKY BEAU
- VIRGIN BOURBON
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS

**④ White Text**

### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS

**⑤ "40%" and "VOL"**

### Generic Feature

- JIM BEAM
- JACK DANIEL'S
- GEORGE DICKEL
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- BEAM HONEY
- WHITE TAIL
- OLD BARSTOW
- JOHNNY DRUM
- BENCHMARK 8
- VIRGIN BOURBON
- BUCKHORN
- JTS BROWN
- EARLY TIMES
- ZACKARIAH HARRIS

**⑥ Filigree Somewhere**

### Generic Feature

- JACK DANIEL'S
- EVAN WILLIAMS
- HEAVEN HILL
- EZRA BROOKS
- JOHNNY DRUM
- BENCHMARK 8
- KENTEUCKY BEAU
- VIRGIN BOURBON
- JTS BROWN
- ZACKARIAH HARRIS

**⑦ Word " Old No."**

### Non Exclusive

- JACK DANIEL'S
- GEORGE DICKEL
- BENCHMARK 8

**⑧ Oval Cartouche**

### Non Exclusive Feature

- JACK DANIEL'S
- EVAN WILLIAMS
- EZRA BROOKS
- JOHNNY DRUM
- KENTEUCKY BEAU
- VIRGIN BOURBON
- EARLY TIMES

** Bottle Line Up Displaying Generic and Non Exclusive features



EXHIBIT G

# GENERIC AND NON EXCLUSIVE FEATURES

## SILLY SQUEAKERS® Bad Spaniels

**"Black Neck Wrap"**
1. "Black Neck Wrap" is Black                    "Featured on 11 bottles"
2. "Black Neck Wrap" Text is White               "Featured on 11 bottles"
3. "Black Neck Wrap" Cap Area is Black           "Featured on 11 bottles"
4. "Black Neck Wrap" words "Old No."             "Featured on 3 bottles"

**"Bottle Details"**
5. "Bottle" is square                            "Featured on 11 bottles"
6. "Bottle" ribbed neck                          "Featured on 11 bottles"
7. "Bottle" ring at base of neck                 "Featured on 11 bottles"
8. "Bottle" similar overall features             "Featured on 11 bottles"

**"Front Black Label"**
9. "Black Label" black Background                "Featured on 11 bottles"
10. "Black Label" white text                     "Featured on 12 bottles"
11. "Black Label" arched brand name              "Featured on 8 bottles"
12. "Black Label" oval cartouche                 "Featured on 4 bottles"
13. "Black Label" form of fillagree              "Featured on 7 bottles"
14. "Black Label" "old No"                       "Featured on 3 bottles"
16. "Black Label" "40%" and "VOL."               "Featured on 5 bottles"
17. "Black Label" is square                      "Featured on 11 bottles"
15. "Black Label" "TENNESSEE"                    "Featured on 2 bottles"







# EXHIBIT H

# 50+ DIFFERNCES



**JD "No Art Card on neck" vs**
**BS "Art Card with Product Details"**

1. JD No Art Card
   BS Neck Art Has Silly Squeakers® Logo
2. JD No Disclaimer
   BS  Neck Art Has Disclaimer

Removable Cap
Not Removable

Paint
Heat Shrink
Sticker

4/5

old
No.7
BRAND

**JD "Black Neck Wrap" vs**
**BS "Black Cap and Square Sticker"**

3. JD "Black Neck Wrap" extends from top to 4/5 down neck
   BS "Black Cap and Sticker" is not a neck wrap
4. JD "Black Neck Wrap" Covers 100% Circumference Neck
   BS "Black Cap and Sticker" do not Cover 100%
5. JD "Black Neck Wrap" is heat shrink plastic
   BS "Black Cap" is painted Label is a Sticker
6. JD "Black Neck Wrap" has perforated cutting line
   BS "Black Cap" has NO perforated cutting line
7. JD "Black Neck Wrap" NO arched brand
   BS "Square Sticker" has arched "Bad Spaniels"
8. JD "Black Neck Wrap" does NOT have double line circle design
   BS "Square Sticker" Has double line circle
9. JD "Black Neck Wrap" NO fillagree
   BS "Square Sticker" has fillagree in double line circle design
10. JD "Black Neck Wrap" Contains word "Old No.7 Brand"
    BS "Square Sticker" Contains word "The Old No.2 "
11. JD " No 7 " is straight line vs reverse arch
    BS " No 2 " is reverse arch vs straight line
12. JD "Black Neck Wrap" Fonts are not the same
    BS "Square Sticker" Fonts are not the same

**"Front Black Label JD vs BS"**

13. JD "Black Label" wraps all 3 sides of bottle
    BS "Black Label" ONLY on front of bottle
14. JD "Black Label" squared swirling fillagree top of label
    BS "Black Label" NO squared swirling fillagree top of label
15. JD "Black Label" squared fillagree down sides and bottom
    BS "Black Label" NO squared fillagree down sides and bottom
16. JD "Black Label" arched brand Top 1/3 Label
    BS "Black Label" arched brand CENTER of Label
17. JD "Black Label" arched brand "Jack Daniels" different font
    BS "Black Label" arched brand "Bad Spaniels" different font
18. JD "Black Label" arched brand is "Jack Daniels"
    BS "Black Label" arched brand is "Bad Spaniels"
19. JD "Black Label" arched brand has apostrophe 'S
    BS "Black Label" arched brand has NO apostrophe 'S
20. JD "Black Label" "The old No 7" is different font
    BS "Black Label" "The old No 2" is different font
21. JD "Black Label" MISSING colored DOG
    BS "Black Label"  COLORED DOG Top 50% label
22. JD "Black Label" missing left and right spot filigree
    BS "Black Label" top of label has left and right spot filigree
23. JD "Black Label" cartouche is located top half label
    BS "Black Label" cartouche is located BOTTOM half label
24. JD "Black Label" cartouche has swirly design outside
    BS "Black Label" cartouche has swirly design INSIDE
25. JD "Black Label" cartouche says "old No 7 Brand"
    BS "Black Label" cartouche says "The old No 2"
26. JD "Black Label" cartouche text is straight not arched
    BS "Black Label" cartouche text is ARCHED not straight
27. JD "Black Label" Tennessee is located center of label
    BS "Black Label" Tennessee is located bottom 1/3 of label
28. JD "Black Label" Tennessee is different font
    BS "Black Label" Tennessee is different font
29. JD "Black Label" has words "Sour Mash"
    BS "Black Label" has words "Sour Mash"
30. JD "Black Label" has words "Whiskey"
    BS "Black Label" MISSING  words "Whiskey"
31. JD "Black Label" has words "40% Vol" at 4/5 height
    BS "Black Label" MISSING words "40% Vol" at 4/5 height
32. JD "Black Label" has "70cl"
    BS "Black Label" MISSING "70cl"
33. JD "Black Label" has "distilled and bottled by"
    BS "Black Label" MISSING "distilled and bottled by"
34. JD "Black Label" has "Jack Daniels Distillery"
    BS "Black Label" MISSING "Jack Daniels Distillery"
35. JD "Black Label" Has "Lynchburg Tennessee37352 USA"
    BS "Black Label" MISSING "Lynchburg Tennesse37352 USA"
36. JD "Black Label" MISSING Has Vertical Writing "Quality &
    Craftsmanship since 1866"
    BS "Black Label" MISSING Has Vertical Writing "Quality &
    Craftsmanship since 1866"
37. JD "Black Label" Has Vertical Writing "Every Drop made
    in Lynchburg Tennessee"
    BS "Black Label"  MISSING Has Vertical Writing "Every Drop
    made in Lynchburg Tennessee"
38. JD "Black Label" Does not have "40% Poo by Vol"
    BS "Black Label" HAS "40% Poo by Vol"
39. JD "Black Label" Does not have "100% Smelly"
    BS "Black Label" HAS "100% Smelly"
40. JD "Black Label" Does not contain words "On Your"
    BS "Black Label" HAS  words "On Your"
41. JD "Black Label" Does not have word "CARPET"
    BS "Black Label" HAS  word "CARPET"
42. JD "Black Label" Does not have double Line Crest Design
    BS "Black Label" HAS double Line Crest Design Not Fillagree
43. JD "Black Label" Does not have 2 fillagree swirls at top
    BS "Black Label" HAS 2 fillagree swirls at top
44. JD "Black Label" Does not have fillagree design under word "Carpet"
    BS "Black Label" HAS fillagree design under word "Carpet"

Top

Middle

Bottom

**JD "Glass Bottle Details" vs BS "Plastic Bottle Details"**

45. JD "Glass Bottle" removable cap
    BS "Plastic Bottle" not removable
46. JD "Glass Bottle" raised "Jack Daniels" signature
    BS "Plastic Bottle" has NO raised signature
47. JD "Glass Bottle" is clear
    BS "Plastic Bottle" is NOT clear
48. JD "Glass Bottle" holds liquid "Whiskey"
    BS "Plastic Bottle" holds air

49. JD "Glass Bottle" does not have a squeaker in bottom
    BS "Plastic Bottle" HAS a squeaker in bottom
50. JD "Glass Bottle" does not "Squeak"
    BS "Plastic Bottle" DOES "Squeak"
51. JD "Glass Bottle" is rigid
    BS "Plastic Bottle" is soft and malleable
52. JD "Glass Bottle" cannot be deformed by squeezing
    BS "Plastic Bottle" CAN be deformed by squeezing

# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


VIP PRODUCTS, LLC, an Arizona    )
limited liability company,       )
                                 )
Plaintiff and Counterdefendant,  )
                                 )
        vs.                      )  Case No.
                                 )  14-cv-02057-PHX-DGC
JACK DANIEL'S PROPERTIES, INC.,  )
a Delaware corporation,          )
                                 )
Defendant and Counterclaimant.   )
_____  )



DEPOSITION OF ELEANOR PHILLIPS




Phoenix, Arizona
April 21, 2015
8:58 a.m.







PREPARED BY:
BECKY BAUMERT
Certified Court Reporter
Certificate #50152



www.arizonacourtreporters.com
602.264.2230

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.         4/21/2015

Page 66

1        A.    Yes.

2        Q.    In your e-mail to Mr. Sacra you wrote, "Here's

3    one more version, just some different type treatment on

4    'Bad Spaniels,' maybe a bit closer to the JD label."  What

5    did you mean by "different type treatment"?

6        A.    Moving or taking the Bad Spaniels text out of the

7    banner and just putting it directly on the black

8    background.

9        Q.    Did you do that on your own initiative, or did

10   you have any sort of conversation or contact with

11   Mr. Sacra?

12       A.    I did that on my own.

13       Q.    Is that what made this different type treatment

14   maybe a bit closer to the JD label?

15       A.    Yes.

16       Q.    In what respect was it maybe a bit closer to the

17   JD label?

18       A.    Just in the way that the JD label does not have

19   "Jack Daniel's" inside the banner.  It's on its own.

20       Q.    Did you go back and look at the bottle that you

21   had pulled out of your liquor cabinet when you created the

22   second mock-up?

23       A.    I believe --

24             MR. LONG:  Object to form.

25       A.    BY THE WITNESS:  I believe I referenced it every



www.arizonacourtreporters.com
602.264.2230

014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 67

1  now and then throughout the process.

2      Q.   BY MR. LARKIN:  Was it important to you as the

3  designer on the project to be close to the Jack Daniel's

4  label?

5      A.   Yes.

6      Q.   Or as you said in your e-mail, closer than your

7  previous one.  Was that important to you?

8      A.   Yes.

9      Q.   Why did you depict the words "Bad Spaniels" in

10  your second mock-up in arched format?

11      A.   Because that's the only way it would really fit

12  underneath the dog and above the oval.

13      Q.   Do you remember that the mark "Jack Daniel's"

14  appears in arched format on the Jack Daniel's whiskey

15  label?

16      A.   I don't recall at this moment.

17      Q.   Do you recall thinking about that at the time you

18  created the second mock-up?

19      A.   I assume.

20      MR. LARKIN:  Mark as Exhibit 13 a document

21  produced by Ms. Phillips under Production Number Elle 26.

22      (Deposition Exhibit Number 13 was marked for

23  identification by the Reporter.)

24      Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize

25  what we have marked as Exhibit 13?



www.arizonacourtreporters.com
602.264.2230

014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 68

1    A.    Yes.

2    Q.    What is it?

3    A.    It's an invoice to VIP Products.

4    Q.    That particular invoice is dated June 17th, 2013,

5    correct?

6    A.    Correct.

7    Q.    Did you have a regular -- strike that.

8         Did you bill VIP monthly for your services?

9    A.    I bill weekly.

10   Q.    Weekly?

11   A.    Yes.

12   Q.    Good for you.  Maybe lawyers should think about

13   that.

14        Is it correct that if you were working at any

15   given time on a project for VIP, you would bill them that

16   week, once a week?

17   A.    Yes.

18   Q.    Let's look at the entry on this particular bill,

19   Exhibit 13.  I assume the entry that says "Bret Michaels"

20   has nothing to do with Bad Spaniels?

21   A.    Nothing to do.

22   Q.    And the sell sheet updates, I assume that has

23   nothing to do with Bad Spaniels?

24   A.    Correct.

25   Q.    The catalog updates had nothing to do at this



www.arizonacourtreporters.com
602.264.2230

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 73

1    physically affixed to the bottle?

2       A.   Yes.

3       Q.   How did you develop the front of the neck card --

4    I'm sorry -- of the art card?  The second page of

5    Exhibit 15, what did you do?

6       A.   I probably used elements from the label design

7    and then created a similar layout for the art card.

8       Q.   Is that the reason for the white on black color

9    scheme?

10      A.   Yes.

11      Q.   And the design that appears on the border of the

12   art card?

13      A.   Yes.

14      Q.   Does the second page of Exhibit 15 accurately

15   show the actual dimensions of the card?

16      A.   It looks close.

17      Q.   Turn to the third page of Exhibit 15, please.

18   This is the back of the art card?

19      A.   Yes.

20      Q.   Who provided the text that appears on the back of

21   the art card?  Strike that.

22           Did you write that text yourself?

23      A.   I don't recall exactly how it was written.  I

24   pulled it from previous bottles that we have done over the

25   years.



www.arizonacourtreporters.com
602.264.2230

014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 74

1        Q.    Did you yourself write the text on the previous
2    bottles that you used to create the back of the art card?
3             MR. LONG:  Object to the form.
4        A.    BY THE WITNESS:  Again I think it was developed
5    over time.  There might have been elements that Steve had
6    written or Wendy had written or I had written, and then
7    they were eventually composed together.
8        Q.    BY MR. LARKIN:  Safe to say that you didn't write
9    the text that appears on the third page of Exhibit 15 for
10   purposes of creating that specific art card?  You didn't
11   create that?
12       A.    Not for this specific card.  I generally used the
13   text that we used for all of them.
14       Q.    At the very bottom of the back of the art card,
15   VIP 12, there are two lines at the bottom, "The product
16   and its design belong to VIP Products.  This product is
17   not affiliated with Jack Daniel's."  Do you see those two
18   lines?
19       A.    Yes.
20       Q.    Did you have any involvement at any point in
21   creating the text of those two lines?
22       A.    The only part that I really created was adding
23   "Jack Daniel's."
24       Q.    So you had no involvement in what those two lines
25   said otherwise, correct?



014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/21/2015

Page 75

1      A.   Correct.

2      Q.   Did you ever have any discussions with Mr. Sacra

3  or anybody else at VIP about the topic of a disclaimer?

4      A.   I recall it was brought up to me at some point

5  that we needed to add a disclaimer, but that's the extent

6  of what I can remember.

7      Q.   Did you have any involvement in deciding where

8  the disclaimer would appear on the Jack -- on the Bad

9  Spaniels art card?

10     A.   I believe I placed it at the bottom underneath

11 the VIP Products logo.

12     Q.   Why did you do that?

13     A.   I thought it was a good place for it.

14     Q.   Why did you think it was a good place?

15     A.   Because it was with the rest of the copyright

16 information.

17     Q.   Did you have any input on how large the font size

18 for the disclaimer would be?

19     A.   I believe that was left to my discretion.

20     Q.   Do you agree that the disclaimer is in the

21 smallest font size on the page?

22          MR. LONG:  Object to form, foundation.

23     A.   BY THE WITNESS:  It appears as they are probably

24 the same font size as the text above it, only more narrow

25 font.



Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 78

1    Q.    BY MR. LARKIN:  What do you think people do with
2    them?
3         MR. LONG:  Objection, calls for speculation.
4    A.    BY THE WITNESS:  Keep them as a novelty.
5    Q.    BY MR. LARKIN:  Why do you believe that?
6    A.    Because it's humorous, and it should be a
7    collectible.
8    Q.    What is a collectible?  You just used the term in
9    the last answer.
10   A.    Collectible?
11   Q.    Yes.
12   A.    Often it's a toy or product of some kind that
13   people collect and save over time.
14   Q.    As a graphic designer, do you agree that it's
15   easier for people to read text that is in larger print as
16   opposed to smaller print?
17   A.    Sure.
18   Q.    Turn to the third page of Exhibit 15, please.
19   What does that page show?  I'm sorry.  That's the fourth
20   page.
21   A.    Yes.  That shows the insignia that goes at the
22   top of the bottle like the bottle cap and the neck art.
23   Q.    Is there a term for the top element on the fourth
24   page of Exhibit 15?  You said the bottom is the neck art.
25   What's the top?  Is that called the cap?



014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.      4/21/2015

Page 79

1      A.    Yes.

2      Q.    That appears on the product where the cap would

3    appear on an actual bottle holding liquid?

4      A.    Yes.

5      Q.    Does the cap on the Bad Spaniels product serve

6    any function other than decoration?

7      A.    Does it serve any other function?

8      Q.    You can't actually remove it or anything of that

9    sort, can you?

10     A.    No.

11     Q.    How did you develop the neck art that appears at

12   the bottom of the fourth page of Exhibit 15?

13     A.    I pulled elements from the label design and made

14   them into the neck design.

15     Q.    And when you did that, did you go back and look

16   at the Jack Daniel's whiskey bottle that you had used

17   originally?

18     A.    No.

19     Q.    Why did a neck design appear on the Bad Spaniels

20   product?

21     A.    Steve requested it.

22     Q.    Did he tell you why he requested it?

23     A.    No.  He usually has me create the neck and the

24   bottle cap design for the bottle product.

25           MR. LARKIN:  Mark as Exhibit 16 another one of



www.arizonacourtreporters.com
602.264.2230

014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 80

1    Ms. Phillips' invoices bearing Production Number Elle 27.

2         (Deposition Exhibit Number 16 was marked for

3    identification by the Reporter.)

4    Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

5    what we have marked as Exhibit 16?

6    A.    Yes.

7    Q.    What is that?

8    A.    An invoice to VIP Products.

9    Q.    That's dated November 25th, 2013?

10   A.    Yes.

11   Q.    Looking down through the "Project description/

12   design time" column, I guess the first two entries, Tuffy,

13   don't have anything to do with Bad Spaniels, correct?

14   A.    Correct.

15   Q.    What about the third entry, "SillySQ, new

16   three-pack and four-pack bottles packaging design;

17   revisions," did that have anything to do with Bad

18   Spaniels?

19   A.    I don't believe so, no.

20   Q.    And the next two entries, VIP and PetSmart, did

21   that have anything to do with Bad Spaniels?

22   A.    No.

23   Q.    The last entry, "SillySQ, create header card for

24   Bad Spaniels bottle; neck/top art," the entry is

25   six-tenths of an hour?



014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 122

1      A.    I believe it's close, maybe not exact.

2      Q.    Do you know what product that is in reality or

3  what is in the stock photo?

4      A.    I don't recall.

5      Q.    Do you know if it's a whiskey brand?

6      A.    I don't recall.

7      Q.    Look back at Exhibit 41, please.  When did you

8  begin work on that?

9      A.    I don't recall.

10     Q.    Was it in -- we are now in April, almost the end

11 of April 2015.  Was it sometime in 2015 as opposed to

12 2014?

13     A.    Probably.

14     Q.    Do you know when the 2015 VIP catalog will be

15 available on the company's Web site?

16     A.    I don't know.

17     Q.    On Exhibit 42, the catalog page from the 2014

18 catalog, does the VIP mark appear anywhere in the picture?

19     A.    It doesn't appear so.

20     Q.    Was there a reason why Exhibit 41, that I think I

21 understood to be the new catalog page, has the VIP mark in

22 the picture itself?

23     A.    I believe once it was actually inserted into the

24 catalog, it was covered up.

25           MR. LARKIN:  Why don't we take a short break.  I



014bb176-92b4-4952-9a56-09a5d5813829

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.    4/21/2015

Page 123

1    think I'm almost finished.  And I know the witness would

2    like to go.  So take a five-minute break, and we can wrap

3    up shortly.

4            (Recess from 12:25 p.m. to 12:32 p.m.)

5        Q.   BY MR. LARKIN:  Ms. Phillips, does part of your

6    work as a graphic designer involve branding, helping your

7    clients promote their brands?

8        A.   Yes.

9        Q.   And is one of the objectives to become a

10   well-known brand?

11       A.   Yes.

12       Q.   Do you agree that the Jack Daniel's brand is a

13   well-known brand in the United States?

14       A.   Yes.

15       Q.   A very well-known brand?

16       A.   It's a well-known brand.

17       Q.   Do you agree that the Jack Daniel's label is very

18   recognizable in the United States?

19       A.   Sure.

20       Q.   And the Jack Daniel's bottle shape?

21       A.   I've never taken notice of the bottle shape.

22       Q.   It's a combination of the label and the bottle?

23       A.   Yes.

24       Q.   You agree that's well known?

25       A.   Yes.



www.arizonacourtreporters.com
602.264.2230

Eleanor Phillips    VIP Products, LLC v. Jack Daniel's Properties, Inc.        4/21/2015

Page 124

1         MR. LARKIN:  Let's mark as 43 a page from

2    Ms. Phillips' Web site.

3         (Deposition Exhibit Number 43 was marked for

4    identification by the Reporter.)

5    Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize

6    Exhibit 43 as a page from your Web site?

7    A.   Yes.

8    Q.   About two-thirds of the way down in the text

9    there is some bolded text that reads, quote, "Please note:

10   In my designs, I do not use images or designs that you do

11   not own the rights to.  If stock photography needs to be

12   purchased in order to complete a graphic design project,

13   please contact me for details.  I always strive to

14   maintain the highest ethical standards and will not

15   knowingly infringe on anyone's copyright."  Do you see

16   that?

17   A.   Yes.

18   Q.   Do you have a similar policy for infringing trade

19   marks?

20   A.   I suppose.

21   Q.   In the course of designing your Silly Squeaker

22   products for VIP, did it ever concern you that the product

23   you are assisting VIP to design would reflect badly on

24   brands like Budweiser and Jack Daniel's?

25         MR. BRAY:  Objection, form.



014bb176-92b4-4952-9a56-09a5d5813829

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP PRODUCTS, L.L.C., an Arizona    )
limited liability company          )
                                   )
    Plaintiff and Counterdefendant; )
                                   )
            vs.                    ) No. 2:14-cv-02057-DGC
                                   )
JACK DANIEL'S PROPERTIES, INC., a  )
Delaware corporation,              )
                                   )
    Defendant and Counterclaimant. )
_____)



DEPOSITION OF TOBIAS JOSEPH ROUSH

Louisville, Kentucky

July 17, 2015




Prepared by:

Catherine Shay, CM

1    licensing manager, just to sum up this page -- start

2    over.

3                  From your perspective as licensing

4    manager for Brown-Forman with responsibility for the

5    Jack Daniel's brand, the T-shirts depicted in No. 1,

6    7, 8 and 9 or SAC 72 of Exhibit 58 do not incorporate

7    enough elements of Jack Daniel's trademarks such that

8    you believe they are potentially infringing on Jack

9    Daniel's rights?

10                 MR. LARKIN:  Objection to form.  It's

11   irrelevant.

12                 THE WITNESS:  Repeat the numbers.

13          Q.     1, 7, 8 and 9.

14          A.     They do not draw my immediate concern.

15          Q.     Let's go through the next page of

16   Exhibit 58 which is SAC 73.  Mr. Roush, can you

17   identify for me which of the T-shirts depicted on SAC

18   73 are licensed by Jack Daniel's?

19          A.      10 is not.  11 is not.  12 is not.  13

20   is not.  14 is not.  Pardon me, 15 is not.  16 is not.

21   17 is not.  18 is not.  19 is not.  20 is not one of

22   our current ones, but it's hard to read so it could be

23   an old one but it is not currently.  21 is not.

24          Q.     Okay.  Of the T-shirts depicted on SAC

25   73, and please identify by number which T-shirts you

1  believe are potentially infringing of Jack Daniel's

2  trade dress?

3                    MR. LARKIN:  Objection to form,

4  irrelevant, calls for legal conclusion.  You may

5  answer.

6                    THE WITNESS:  10, 11, 12, 15, 18, 19,

7  21 and I would give a hard look at 16.

8          Q.        Have you seen any of the T-shirts

9  depicted on SAC 73 before?

10         A.        I believe I have seen 18 or 21 before.

11  The others I do not recall seeing.

12         Q.        With regard to any of the numbered

13  T-shirts on SAC 73, again without getting into the

14  substance of any communication you may have had with

15  legal, did you raise any of the T-shirts identified in

16  SAC 73 as potentially concerning to anybody at

17  Brown-Forman including legal?

18                    MR. LARKIN:  Objection to form.

19  Irrelevant.  And he also testified he thinks he had

20  only seen two of them so you can answer.  That's a yes

21  or no.

22                    THE WITNESS:  No.

23         Q.        Now that you've seen them today do you

24  think -- do you intend to raise any -- raise the issue

25  of any of the T-shirts depicted on SAC 73 to legal?

1              MR. LARKIN:  Objection relevance.

2         Q.      You can answer.

3         A.      I would certainly do as I did before.

4   I would pull the site or refer them to our legal team

5   to confirm.  If you want to make my life easier and

6   give me the sites that would be great.

7         Q.      It's in the back of the report.

8         A.      Great.

9         Q.      You can ask your counsel for a copy.

10  I mean, if you turn to SAC 83, for example, it has the

11  first 18 sites.  They are all -- there's a handy

12  index.

13             MR. LARKIN:  Thank you.

14        Q.      And then if you look on the second

15  page of the report SAC 71 it also shows the nine sites

16  that Mr. Sacra was able to find all these products on.

17  Do you see that?

18        A.      Yes, I do.

19        Q.      Do you ever search Amazon.com in

20  addition to Google for potential infringers of the

21  Jack Daniel's mark?

22        A.      I do.

23        Q.      And how often do you engage in kind

24  of -- how often do you engage in searching on the

25  internet to try to locate potential infringers of the

1  Exhibit 58, I didn't keep an exact count but does it
2  concern you that Mr. Sacra in less than two hours of
3  internet searching was able to find 70 products or
4  more on the internet that are potentially infringing
5  in your mind of the Jack Daniel's mark?
6              MR. LARKIN:  Objection to form.
7  Irrelevant.  You can answer.
8              THE WITNESS:  It concerns me but from
9  my humble opinion when you have, what I interpret as
10  an iconic brand, it's part of what having a trademark
11  is and that's why we do the due diligence of trying to
12  protect it.
13        Q.    Other than the -- I don't want to get
14  too bogged down in this.  I forget how I phrased my
15  last question or my question on this topic, but of the
16  shirts that are depicted in Exhibit 58 do you recall
17  raising any of those shirts as an issue at
18  Brown-Forman?
19              MR. LARKIN:  Objection, relevance.
20  You can answer.  That's a yes or no if you did raise
21  it with counsel.
22              THE WITNESS:  Honestly I couldn't give
23  you a yes or no because over three and a half plus
24  years there have been times that I've done it or I've
25  seen somebody else do it so I couldn't say with 100

1    percent clarity if I have done one of these or not.

2          Q.       In your experience has the portions of

3    the general public come to associate a square bottle

4    with whiskey and bourbon?

5          A.       You are asking me to kind of --

6                   MR. LARKIN:  Don't speculate.  If you

7    can --

8                   THE WITNESS:  I would say I'm

9    speculating what consumers --

10         Q.       Well, is there -- are you aware of any

11   research or study made within Brown-Forman or

12   Brown-Forman which tends to show the portions of the

13   consuming public identify square bottles of any shape

14   with whiskey and bourbon products?

15         A.       Not to my knowledge.

16         Q.       Would you agree with me, though, a

17   black and white label design is intended to telegraph

18   or does telegraph to consumers that this is a Kentucky

19   or Tennessee bourbon or whiskey that is old and has

20   heritage and history behind it?

21                  MR. LARKIN:  Objection to form.  It's

22   a hypothetical question.  We don't know what product

23   you are referring to, if you are referring to one at

24   all.  Your client's product has a black and white

25   label on it.

Tobias Joseph Roush - July 17, 2015                    61

```
 1          A.      It all depends on the elements and the
 2   look.
 3          Q.      JDPI does not presently license the
 4   Jack Daniel's marks or trade dress to any party for
 5   use on any pet product; correct?
 6          A.      No, sir.  That is not correct.
 7          Q.      How was I wrong?
 8          A.      We license leashes and collars.
 9          Q.      Okay.  Do you report to Mr. Epps?
10          A.      I do.
11          Q.      Okay.  Mr. Epps testified in the past
12   they had licensed it to leashes and collars and no
13   longer being offered.  Is your understanding
14   different?
15                  MR. LARKIN:  Objection.  I think that
16   mischaracterizes Mr. Epps' testimony but you can
17   answer.  Go ahead.
18                  THE WITNESS:  Okay.
19                  MR. LARKIN:  Go ahead.
20                  THE WITNESS:  I'll answer two parts.
21   Mr. Epps has been in his role for three and a half
22   months roughly so the licensing coming up through him
23   is new to him.  Secondly we do have leashes and
24   collars.
25          Q.      Where are -- well, who is your
```

Tobias Joseph Roush - July 17, 2015                    93

1   products exist that incorporate the three dimensional

2   shape of the evolution bottle?

3          A.      I can't say what other people know.  I

4   don't think so, but that's purely speculation on my

5   part.

6          Q.      Okay.  And to prepare for today's

7   deposition and testify as a corporate designee on this

8   topic, you didn't review any sort of list of licensed

9   products or pictorial catalog of licensed products;

10  correct?

11         A.      Correct.

12         Q.      This is just off the top of your head?

13         A.      Yes.

14         Q.      And off the top of your head you can

15  only think of two products, a Christmas ornament and a

16  key chain?

17         A.      And I want to just clarify holiday

18  ornament.  But, yes, off the top of my head because we

19  take the substrate of the bottle and a replica of the

20  bottle very seriously, if you say the label we take

21  seriously in the trademarks.  We take the three

22  dimensional bottle probably to another degree so

23  replicas of that are -- we don't take easily.

24         Q.      You weren't employed by Brown-Forman

25  at the time of the transition from the -- gosh, it's

Tobias Joseph Roush - July 17, 2015                    94

```
 1   getting late -- the transition to the evolution
 2   bottle; correct?
 3          A.      No, based on my knowledge the history
 4   that happened in 2010.
 5          Q.      Okay.
 6          A.      And that could be inaccurate, but that
 7   is based on my best recollection, but I was not there
 8   at the time.
 9          Q.      Do you have any -- are you familiar
10   with what the prior bottle shape was before the
11   evolution bottle, immediately prior to the evolution
12   bottle?
13          A.      I have a good knowledge of it.
14          Q.      Okay.  From your perspective was the
15   evolution bottle a slight modification from the bottle
16   that came before?
17          A.      Slight modification is very generic.
18   What do you mean?  I mean, what is your question with
19   slight modification?
20          Q.      There's so many ways you can parse the
21   English language which makes time taking depositions
22   difficult so let me ask you in your own words how
23   would you describe the degree of difference between
24   the evolution bottle and the prior bottle?
25          A.      Based on my knowledge there were lines
```

Tobias Joseph Roush - July 17, 2015                95

1    on the neck.  Based on my recollection the shoulders
2    were not squared.  They were more rounded.  Even
3    though it was a square bottle we did not have the
4    beveled edges previously.
5            Q.       From your perspective was it a
6    significant change?
7                     MR. LARKIN:  Objection to form.  Do
8    you have an answer one way or another?
9                     THE WITNESS:  I thought it was a much
10   cleaner look than the previous bottle.
11           Q.       Okay.  You said you take -- one theme
12   throughout the deposition Jack Daniel's takes its
13   trademark seriously?
14           A.       Yes.
15           Q.       Or Brown-Forman takes the Jack
16   Daniel's mark seriously.  And in your role as
17   licensing manager for Brown-Forman you take the Jack
18   Daniel's mark seriously?
19           A.       Yes.
20           Q.       And I think you just said a minute ago
21   that you, in terms of the licensing aspect of the job,
22   you take special care with the three dimensional
23   bottle shape?
24           A.       That is accurate.  We don't easily
25   license or allow replica bottles without a lot of

1    attention and consideration.

2         Q.      You would agree with me, Mr. Roush, as

3    the licensing manager for Brown-Forman that the Jack

4    Daniel's name and mark, being just Jack Daniel's, is

5    more valuable than the shape of the evolution bottle?

6              MR. LARKIN:  Objection to form.  What

7    do you mean by valuable?  The license is the mark.  I

8    don't know what you mean.  Do you know what he means?

9              THE WITNESS:  I don't -- I'm not clear

10   on it.

11        Q.      To your knowledge has Brown-Forman

12   ever conducted a study of any kind that would be

13   designed to test consumer recognition of the shape of

14   what I'll call a naked evolution bottle as being a

15   Jack Daniel's bottle?

16        A.      Not to my knowledge.

17        Q.      Okay.  And is it your understanding as

18   the licensing manager for Brown-Forman that the Jack

19   Daniel's mark -- and when I say that I just mean the

20   name Jack Daniel's or maybe even the shape is one of

21   the most valuable marks in the liquor and spirits

22   industry?

23        A.      Do I personally think that the mark is

24   one of the most valuable?

25        Q.      In the liquor and spirits industry.

EXHIBIT J

**In The Matter Of:**

*VIP Products v*
*Jack Daniel's Properties*

*Stephen M. Sacra - 30(b)(6)*
*June 26, 2015*

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File ss062615.txt
Min-U-Script® with Word Index

109

1      Q.    Looking at Exhibit 8, can you identify any

2  bottles where you had a physical version of the bottle in

3  front of you when you were preparing the report?

4      A.    There were none of them that were physically in

5  my hands.

6      Q.    You did get a copy of all the images that were

7  used that were all identified as individual images, did

8  you not?

9            I'm just asking that because that was an

10 exhibit that was -- is that different than the images that

11 are actually in the report?

12     A.    The images in the report are those images, but I

13 actually had individual images as well in their full -- I

14 mean, like, how they were pulled off the Internet.

15            MR. SITRICK:  We don't have that.

16     A.    BY THE WITNESS:  All they are are the original

17 images as they were downloaded so if you wanted to look at

18 it and compare them.

19     Q.    BY MR. CRUM:  Just to make sure I'm right, for

20 each of the bottles listed in Exhibit 8, you didn't have

21 any physical bottles in front of you, but your analysis

22 was based on photographs of those bottles?

23     A.    That is correct.

24     Q.    Did you do any analysis of the bottles listed in

25 Exhibit 8 as to when they were introduced?

Stephen M. Sacra - 30(b)(6) - June 26, 2015

110

1      A.    No, I did not.

2      Q.    So the first sentence on Page 5 of your report

3   says, "This report focuses specifically at American

4   whiskey/bourbon industry."

5           Why did you select just American

6   whiskey/bourbon for the report?

7      A.    That's staying with the parody of American

8   whiskey/bourbon.  And to do something that was outside of

9   the scope of that would be overly broad.

10           So when you are looking -- when you are

11   trying to get compound data --and there's obviously

12   Canadian whiskey, there's Irish whiskey, and we were not

13   -- the Canadian whiskey and the Irish whiskey uses

14   completely different industry-type dress.  Even though

15   they are whiskeys and bourbons, they have different

16   similarities in them.

17           So by limiting it to American whiskey and

18   bourbon, you -- it's not as overly broad as if you tried

19   to include them all.

20           And not to mention, I wanted to focus on

21   direct competitors to Jack Daniel's.  People who --

22   because in one of your requests you asked me -- you asked

23   me, "Well, how much does everybody sell?"  And "How much

24   of" -- "What kind of force are they as a competitor?"

25           So my goal was to get the most relevant

1   competitors and the most relevant competitors are the ones

2   that existed from the beginning and being able to

3   create -- I don't know specifically if Irish and Canadian

4   whiskeys were competitors back in 1895.

5              But because it involves history and history

6   has a big influence on present-day market, that by

7   including different industries that weren't parallel to

8   the same time, it wouldn't make as much sense and the data

9   would be -- sets would be -- basically, it's like cutting

10  out parts of it that were irrelevant.

11      Q.   Did you consider at all limiting your purpose to

12  Tennessee whiskey?

13      A.   No, because you -- the specifics to trade dress

14  would be inclusive of both bourbon and whiskey.  And the

15  two most predominant states in bourbon and whiskey are

16  Kentucky and Tennessee both, because bourbon is whiskey.

17             It's just -- when you try to compare the

18  two, you -- and the fact that all the different elements

19  of the Jack Daniel's bottle are used rampantly throughout

20  bourbon and whiskey, and because of the fact that the

21  trademarks for Jack Daniel's are specifically for spirits

22  of all kinds, you would want to be more inclusive of those

23  items.  You wouldn't want to rule out Kentucky

24  specifically.  Or, I'm sorry, you wouldn't want to narrow

25  the focus to just Tennessee.

1      Q.   Do you know if you included all the major

2   Tennessee whiskeys in the data set?

3      A.   I went to -- focused on the brand houses.  The

4   predominant ones that I was able to locate as viable

5   competitors, because competition was what was one of the

6   focuses of some of the requests that were made of me.

7            So by looking at the primary competitors, I

8   was able to look at those specific brands within those

9   houses.

10           So, like I said, I narrowed it down, but it

11   encapsulates these -- is it five or six? -- seven

12   different brand houses that -- plus any others who

13   represent the largest portions of the sales in the

14   marketplace.

15           I mean, if I were to include all the tiny

16   little distilleries that make 100 bottle of little

17   exclusive ones, you could add them, but, once again,

18   adding -- I'm sure you could find some that use the trade

19   dress and some that do not use the trade dress, but it

20   relatively won't skew the numbers in a formidable way.

21      Q.   Do you have any idea how many distilleries or

22   brand houses actually make Tennessee whiskey?

23      A.   I didn't look for that.  I mean, Tennessee

24   whiskey is not a part of the trade dress and Jack Daniel's

25   has -- because they -- in their trademark, it says, "We do

113

1    not have exclusive use of Tennessee or sour mash whiskey,"

2    so there's no need to focus just on the word Tennessee.

3    To me, that was kind of a moot point.

4        Q.    In the next sentence there you say, "Bad Spaniels

5    dog toys is a parody ..."

6                So real quick:  That's a legal conclusion?

7        A.    That's what we are here to determine, so ...  I

8    believe it's a parody.

9        Q.    So that's your opinion?

10       A.    That would be an opinion, yes.

11       Q.    In the next sentence you say, "... including

12   spirits from other countries would make this report overly

13   broad."

14                Can you explain why including spirits from

15   other counties would make it overly broad?

16       A.    Well, I just discussed that.  The fact that the

17   trade dress of, like, Canadian whiskey or Irish whiskey is

18   slightly different in the presentation.

19                And it's overly broad, because, once again,

20   when you are including something that's focusing

21   specifically at American whiskey, by putting those in, you

22   are just clouding the data.

23                I mean, you could add another 200 bottles,

24   but what's the results going to be?

25       Q.    You are aware that Jack Daniel's is sold

114

1   globally; is that correct?

2       A.    That's true.   But this is something that has

3   become a parody in the United States and we're making a

4   parody of whiskey from the history of that.

5       Q.    Do you know one way or the other whether any of

6   the VIP products have been sold outside of the United

7   States?

8       A.    We distribute to 18 different countries.   The

9   specifics of each one of those different countries, I

10  would have to look into that information.

11      Q.    So off the top of your head, you don't know

12  whether or not this particular toy at issue is sold

13  outside of the United States?

14      A.    I can tell you that it's in my distribution

15  center in Belgium, but what the sales would be, I couldn't

16  tell you that.

17      Q.    If I can have you take a look at the next

18  paragraph.   At the end of that sentence you use the phrase

19  "market competitors."

20              On the basis of this report, who do you

21  consider market competitors?

22      A.    Market competitors would be people who -- well,

23  market competitors are other brand houses that have

24  comparable volumes or comparable number of bottles that

25  contain the same trade dress.

115

1           But, once again, I went with the primary

2    houses that are the largest, because they represent --

3    because one of the arguments I'm sure that will be made

4    will be that -- you know, someone might say, "Oh, well, if

5    you included Town Branch bourbon from Alltech and you

6    tried to compare the two, well, their sales volume level

7    might be 200 bottles a year versus Jack Daniel's, which

8    may have a much larger number."

9           And I would say, "That's not scalable

10   because we are dealing with a different competitor."

11          And so you have to have -- you have to have

12   representative volumes as equal competitors.  So that's

13   why I focused -- I'm sorry, but this is inclusive of the

14   brand houses that have bourbon/whiskey coming out of them.

15   Q.    Maybe let me take a step back on that one.

16   A.    Okay.

17   Q.    So market competitors, did you consider market

18   competitors to Brown Forman or market competitors to Jack

19   Daniel's?

20   A.    Well, market competitors -- first of all, Jack

21   Daniel's is under the house of Brown Forman because Brown

22   Forman makes brands that use the trade dress of Jack

23   Daniel's.

24          So the fact that they have two different

25   brands that use the same trade dress, then it's

118

1    results -- I mean, I could narrow it down to 22 bottles

2    and set them all in front of you and say, "Look at all of

3    them."

4                    I'm not trying to do that.  What I'm trying

5    to do is show you the entire industry as a giant picture

6    so you can look down on it and say, "This is what the

7    earth looks like and these are all the bottles and this is

8    what represents the industry by past, present, and future"

9    so we can better understand where it came from, where it

10   went to, and where it is currently today.

11       Q.   So when you refer to "the industry" in your

12   answer and then also in this report, are you referring to

13   the American whiskey and bourbon industry?

14       A.   Correct.  Specifically, in Kentucky and

15   Tennessee.

16       Q.   So considering Brown Forman as a whole, do you

17   make any adjustments to your analysis based on any

18   non-American whiskeys or bourbons that they might sell?

19       A.   I'm not aware of -- I went through and, as I said

20   before, excluded -- I went through and excluded Canadian

21   and Irish, because, once again, that clouds the whole

22   report.

23                    As we go through, it's either -- the states

24   is either Kentucky or Tennessee, one or the other.

25       Q.   But when you were looking at Brown Forman, I

119

1    guess my question is:  What, if anything, did you do to

2    adjust for non-whiskey to non-bourbon which may be sold by

3    Brown Forman?

4        A.    But I'm not looking at that.   I am looking

5    specifically at -- like I said, I do have a parody from

6    Kentucky and Tennessee, so in doing that -- I'm sorry,

7    American, which would involve Kentucky and Tennessee, so,

8    therefore, the other ones are -- it clouded data using all

9    the other ones.   It's overly broad.

10        Q.    So looking at the next paragraph, the first

11   sentence there you say, "... without having to look at

12   every bottle in existence ..."

13                So it's true that you did not look at every

14   American whiskey or bourbon bottle; is that correct?

15        A.    I don't think that's possible.  I mean, there's

16   so many micro- -- I don't know if they are micro-breweries

17   or micro-distilleries.  It would be impossible to see them

18   all.

19        Q.    And how did you ascertain -- the next sentence

20   says you, "... narrowed the focus to the largest

21   producers ..."

22                How did you ascertain what were the largest

23   producers of the American whiskey and bourbon industry?

24        A.    I started -- I told you I went to the Wikipedia

25   page.  They outlined who the predominant producers are.

120

1           And then when you start looking at all the

2     different brands that are out there, they fall within

3     these houses.

4        Q.   And other than Wikipedia, did you reference any

5     other documents or web pages to determine who the largest

6     producers were?

7        A.   When I started looking at them, I realized a lot

8     of them were private.  So it's difficult to figure out

9     what their annual income sales are.

10          The only two publicly listed are Brown

11    Forman and Beam Suntory or Suntory.

12       Q.   When identifying the bottles used in your

13    analysis, did you consider whether or not to -- strike

14    that.

15          When you were preparing the list of bottles

16    used in your analysis, is there any particular reason you

17    didn't limit your analysis to corn-based whiskeys and

18    bourbons?

19       A.    No.  I did not do that because of the fact that

20    -- the elements of the trade dress, that is the elected

21    trade dress that Jack Daniel's is claiming goes across

22    both flavors and -- what do you call it?  They are using

23    the same trade dress across flavors and -- what do you

24    call it?  Different formulas or whatever you want to call

25    it.

# EXHIBIT K

1    Firm E-Mail: courtdocs@dickinsonwright.com

2    David G. Bray (#014346)
dbray@dickinsonwright.com
3    Frank G. Long (#012245)
flong@dickinsonwright.com
4    Jonathan Batchelor (#026882)
jbatchelor@dickinsonwright.com
5    David N. Ferrucci (#027423)
dferrucci@dickinsonwright.com
6    **DICKINSON WRIGHT, PLLC**
1850 North Central Avenue, Suite 1400
7    Phoenix, Arizona 85004
Phone: (602) 285-5000
8    Fax: (602) 285-5100

9    *Attorneys for Plaintiff and Counterdefendant*
*VIP Products, L.L.C.*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, L.L.C., an Arizona limited liability company, | No. 2:14-cv-02057-SMM |
|            Plaintiff and Counterdefendant, | **PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S BELATEDLY DISCLOSED SUPPLEMENTAL DECLARATION OF ITAMAR SIMONSON AND EVIDENCE OFFERED BY PHILLIP EPPS** |
|       v. | |
| Jack Daniel's Properties, Inc., a Delaware corporation | |
|            Defendant and Counterclaimant. | |

        Plaintiff VIP Products ("VIP") moves, pursuant to Rule 37 of the Federal Rules of Civil Procedure, to exclude the declaration submitted by defendant Jack Daniels Properties, Inc. ("JDPI") in support of its Opposition to Motion to Exclude Testimony of Defendant's Expert Itamar Simonson ("Opposition") (Doc. 96) and certain evidence in support of its Motion for Partial Summary Judgment (Doc. 101).  The evidence and declarations provided in support of those motions—respectively, the Declaration of Itamar Simonson in Support of

1

Defendant's Opposition to Plaintiff's Motion to Exclude Testimony of Itamar Simonson ("Simonson Declaration") (Doc. 97-1) and the evidence offered in the Declaration of Phillip Epps in Support of Motion for Partial Summary Judgment ("Epps Declaration") (Doc. 105)—contain untimely disclosures, either because they are information not previously disclosed despite interrogatories and requests for production of documents that sought disclosure during the discovery period, or because they were improperly submitted after the discovery cut-off date.    The Federal Rules do not permit JDPI to introduce this new, previously undisclosed information through the proverbial backdoor, as declarations attached to recent motions and responses.  VIP respectfully requests that the Simonson Declaration in and certain evidence in the Epps Declaration be excluded.

## I.    <u>Introduction</u>

JDPI has insisted on strict adherence to the disclosure deadlines.  At the Telephonic Discovery Dispute Conference held in this case on August 31, 2015, this Court stated: "the deadlines are real."  *See* Transcript of Telephonic Discovery Dispute ("Transcript") at 4:8, a copy of which is attached hereto as <u>Exhibit 1</u>.  Counsel for JDPI emphatically agreed:  "It's Jack Daniel's position 100 percent with what the Court said"; "the Court's Case Management Order was clear that that the deadlines in this case are real."  *See* Transcript at 14:3-4, 17:17-18.  On that basis, JDPI "vehemently object[ed]" to the disclosure of "four additional images" by VIP's expert:

> We had an opportunity to review this expert's report.  We deposed him on this report, and now it appears that VIP is attempting to supplement its report with these images. Expert discovery, Your Honor, is closed at this point in addition to the fact discovery being closed. So Jack Daniel's vehemently objects to the inclusion of these documents and any additional supplementation of his report.

2

*See* Transcript at 14:4-10.

Yet, incredibly, JDPI has twice, since the close of discovery, filed with the Court declarations that are untimely because they supplement either previously disclosed expert testimony or interrogatory answers and document productions—all without any notice or request for special relief.  In support of its Opposition (Doc. 96), JDPI did precisely what it "vehemently object[ed]" to at the Telephonic Discovery Dispute Conference:  introduce additional supplementation of its expert's testimony.   JDPI did not move to modify this court's orders or for relief under the Federal Rules of Civil Procedure; it simply filed the supplemental Simonson Declaration without acknowledging its novelty or attempting to establish "good cause," as required by Rule 16(b)(4), or "substantial justify[cation]" or "harmless[ness]," as required by Rule 37(c)(1).  This court should reject any eleventh-hour attempts to do so now.  *See Wong v. Regents of Univ. of California*, 410 F.3d 1052, 1060-62 (9th Cir. 2005) (affirming exclusion of expert witnesses disclosed for first time in opposition to summary judgment); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001) (affirming exclusion of untimely expert disclosure); *Quevedo v. Trans-Pac. Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (affirming exclusion of expert testimony disclosed for first time in response to summary judgment motion); *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 498-99 (9th Cir. 2009) (unpublished) (same).

Similarly, and even more egregiously, JDPI submitted in the Epps Declaration new evidence that had been requested by VIP during discovery but never revealed by JDPI.  In support of its partial motion for summary judgment, JDPI introduced, without notice or

excuse, factual information about JDPI's evidence of "consumer awareness" that had been expressly requested by VIP in discovery, but never produced by JDPI, even though VIP made follow-up requests for such information and JDPI's repeated assurance that its production was complete.

VIP respectfully requests the Court to exclude the untimely supplemental declaration of Simonson and the untimely evidence disclosed by Epps, for the reasons stated herein, and for the reasons stated by JDPI's counsel at the Telephonic Discovery Dispute Conference.

## II.    Procedural Background

The Court's Case Management Order, filed January 26, 2015 (Doc. 25), required Defendant JDPI to provide full and complete expert disclosures no later than May 8, 2015. Doc. 25 at 2.  The Court's June 16, 2015, Order extended JDPI's deadline to disclose its rebuttal expert opinions on July 13, 2015.  Doc. 63.  The deadline for completion of fact discovery was July 3, 2015.  Doc. 25 at 1.  Long after these cutoff dates, and despite its repeated assurances that its production was not deficient, JDPI filed newly disclosed evidence in the Epps Declaration and supplemented its expert's report with the Simonson Declaration.  For the following reasons, this new, previously undisclosed information should be excluded.

### A.    JDPI Submits the Untimely Epps Declaration

On April 8, 2015, VIP served JDPI with its first set of non-uniform interrogatories ("NUI"), and requests for production ("RFP").  *See* RFP and NUI, copies of which are attached hereto as Exhibit 2.  In them, VIP specifically requested documents regarding consumer awareness of the Jack Daniel's Brand.  *See* RFP nos. 7 and 21, and in NUI, nos. 2

and 4. *Id.*  JDPI responded to the RFP on May 14, 2015 with general and specific objections, but did not provide responsive documents.  *See* JDPI's Responses to RFP, attached hereto as Exhibit 3.

VIP requested that JDPI supplement its discovery multiple times, and specifically identified areas where JDPI's production has been insufficient.  *See* Exhibit 4.  JDPI responded by claiming that it did not view its production to be deficient in any way, and had nothing further to produce.  *See* Exhibit 5.

On October 23, 2015, JDPI moved for partial summary judgment.  Doc. 101.  In support of its argument that the Jack Daniels Trade Dress has acquired secondary meaning, JDPI claimed that "Brown-Forman's tracking studies confirm a very high level of awareness for the Jack Daniel's brand."  *Id.* at 10:27-28.  The only support provided by JDPI for that "fact" is the Epps Declaration filed with the Motion.  In paragraph five, the Epps Declaration states:

> Brown-Forman does ongoing consumer tracking studies regarding the prompted (aided) and unprompted (unaided) awareness of Jack Daniel's Old No. 7 Tennessee whiskey. The aided awareness of the Jack Daniel's brand is consistently around 98% and the unaided awareness of the brand is consistently in the 80th decile, which I believe to be among the highest levels of unaided awareness in the whiskey business.

Doc. 105, ¶ 5.  The Epps Declaration does not provide a copy of the referenced "consumer tracking studies," nor does Mr. Epps even attempt to identify or authenticate the alleged studies.  The so-called "tracking studies" is precisely the type of information that should have been disclosed under the rules and in response to VIP's NUI nos. 2 and 4 and RFP nos. 7 and 21.  *See* Exhibit 2.

**B.     JDPI Supplements the Report of its Expert, Dr. Simonson**

On May 8, 2015, JDPI served VIP the Expert Report of Dr. Itamar Simonson ("Simonson Report").   VIP has repeatedly requested the documents relied upon by Dr. Simonson in his report.  Prior to Dr. Simonson's deposition, counsel for VIP sent a *subpoena duces tecum* to Dr. Simonson requesting the documents relied upon in forming the opinions expressed in his report.  *See* <u>Exhibit 6</u>.   JDPI and Dr. Simonson refused to produce the documents.  By letter dated June 15, 2015, VIP's counsel again requested the documents and reiterated JDPI's obligations to produce those documents under the Rules.  *See* June 15, 2015 Letter, a copy of which is attached hereto as <u>Exhibit</u> 7.  Dr. Simonson never disclosed the requested documents.

On September 24, 2015, VIP moved to exclude the testimony of Defendant's expert, Itamar Simonson because Dr. Simonson's opinion lacks a sufficient objective, scientific basis and Dr. Simonson does not have specialized knowledge to support his opinions.  Doc. 92.  In its Opposition thereto, JDPI argued that Dr. Simonson's opinions were admissible and submitted the Simonson Declaration, which supplemented the Simonson Report with previously undisclosed information purporting to set forth the basis for his "specialized knowledge." Doc. 97-1.

**III.     <u>The Simonson Declaration and Epps Disclosure Should Be Excluded</u>**

**A.     The Simonson Supplemental Expert Declaration Should be Excluded**

It cannot be disputed that the Simonson Declaration constitutes an untimely supplemental expert disclosure.  This Court's Case Management Order required Defendant

6

JDPI to provide full and complete expert disclosures no later than May 8, 2015, Doc. 25, a deadline later extended to July 13, 2015, Doc. 63, and cautioned that "absent extraordinary circumstances, parties will not be permitted to supplement expert reports after these dates." Doc. 25 at 3.  The information contained in the Simonson Declaration that JDPI seeks to use to supplement Dr. Simonson's expert report should have been disclosed to VIP prior to the expert disclosure deadlines, or at least in response to VIP's June 15, 2015 Letter requesting "all the facts and data that Dr. Simonson considered in connection with forming the opinions expressed in the Simonson Report."  *See* Exhibit 7.  JDPI failed to do so, but instead filed the Simonson Declaration on October 12, 2015, more than three months after JDPI's expert disclosure deadline.  Doc. 25.

Supplementing the Simonson Report, long after the expert disclosure deadlines and without requesting a modification of the Court's scheduling order, violates Rule 16(b).  Rule 16(b) authorizes a district court to enter a scheduling order that limits or modifies the time to complete discovery, including "the times for disclosures under Rules 26(a) and 26(e)(l) and of the extent of discovery to be permitted." FRCP 16(b)(4).  Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert witnesses and opinions and requires full disclosure of the identity of the expert witness, "accompanied by a written report" that contains "a complete statement of all opinions to be expressed and the basis and reasons therefore" and the "data or other information considered" by the witness.  FRCP 26(a)(2)(B).  Rule 16(b) provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district court[.]"  Moreover, a party may not seek to modify a scheduling

order by implication; it must "specifically request that the court modify its scheduling order." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992).

Here, JDPI did not seek to modify the scheduling order or to extend its FRCP 26(a)(2) deadlines. Instead, JDPI simply filed the supplemental Simonson Declaration in support of its Opposition. This Court should exclude JDPI's new evidence on that ground alone. *Id.* at 608-09.

In addition, because JDPI never moved to modify the scheduling order, it necessarily failed to establish "good cause," and should not be permitted to do so now. In deciding whether "good cause" exists, "the focus of the inquiry is upon the moving party's reasons for seeking modification," although the existence of prejudice to the "party opposing the modification might supply additional reasons to deny a motion." *Id.* at 609.

Here, JDPI does not and cannot provide any explanation for why it did not disclose the information contained in the Simonson Declaration. JDPI did not address the reasons for the non-disclosure in its Opposition. JDPI never asserted that it had "good cause" for failing to comply with this court's orders, or that the deadlines could not "reasonably be met despite the diligence of the party seeking the extension." Moreover, as this Court ruled in excluding four images disclosed by VIP's expert after the discovery cutoff, late expert disclosures are prejudicial:

> With regard to the four images produced by the experts, they will not be admissible. They will not be used. It's a clear violation by the expert of his duties under Rule 26. And I know Judge Campbell covers this and I cover it ad nauseam in my Rule 16 hearings that experts have to be told to comply with the rules. And if they get caught in a cross-examination they didn't do something, they can't now say, oops, let me go back and do this all over again. That's not right. He had a duty to learn and understand what the parameters were in this case. If he's a true expert and if it goes to his detriment, so be it. But they will not be available. ***The***

8

> ***defendants will be prejudiced by these additional pieces of information, and I
> find that opening up discovery again to re-depose the expert, even at imposing
> the cost on the plaintiffs, would not be fair*** to the defendants and therefore, I find
> that they are not -- those are too late, too bad, and so sad.

*See* Transcript at 30:12-31:3 (emphasis added).  The exact same analysis applies to JDPI's

undisclosed supplemental expert declaration.

Because JDPI did not move to modify the court's scheduling orders and did not

provide "good cause" for its failure to timely supplement its expert's report, this Court should

exclude the supplemental Simonson Declaration.  Federal Civil Rule 16(f) provides that if a

party or party's attorney "fails to obey a scheduling or other pretrial order," the judge, upon

motion or the judge's own initiative, "may issue any just orders, including those authorized

by Rule 37(b)(2)(A)(ii)-(vii)."  Federal Civil Rule 37(b)(2)(A)(ii) states that a district court

may issue an order "prohibiting the disobedient party from supporting or opposing designated

claims or defenses, or from introducing designated matters in evidence."  The Ninth Circuit

has observed, in similar circumstances, that any sanction other than exclusion would render

meaningless both the federal rules and the powers of the district court to effectively manage

its cases.  *See Wong*, 410 F.3d at 1060.

In *Wong*, the Ninth Circuit affirmed a district court's refusal to allow a party to oppose

summary judgment by relying on expert testimony that was disclosed after the scheduling

order deadlines.  Unlike this case, the plaintiff in *Wong* at least attempted to justify the

untimely disclosure, stating that "he had not anticipated the [defendant's] challenge" on a

particular issue.  Both the district court and the Ninth Circuit rejected the plaintiff's excuse,

noting that the

efficient treatment and resolution of cases . . . will be successful only if the deadlines are taken seriously by the parties, and the best way to encourage that is to enforce the deadlines. Parties must understand that they will pay a price for failure to comply strictly with scheduling and other orders, and that failure to do so may properly support severe sanctions and exclusions of evidence.

*Id.*; *see also Quevedo*, 143 F.3d at 1258 (affirming exclusion of expert testimony filed for first time in response to summary judgment motion because plaintiff "failed to justify his disregard for the Court's [scheduling] Order"); *Johnson*, 975 F.2d at 610 (noting that a "scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril") (citation omitted).

The purpose of this court's scheduling orders, Rule 16(b) and Rule 26(a), is to prevent the type of "trial by ambush" JDPI attempts here. For those orders and rules to have any meaning at all, this court should exclude the Simonson Declaration.

An additional, independent ground to exclude the Simonson Declaration is the "automatic" exclusion provision of FRCP 37(c)(1). A party that has failed to provide information required by Rule 26(a) or 26(e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c) "gives teeth" to the requirements of Rule 26(a) and Rule 26(e) and courts are given wide latitude to issue sanctions under Rule 37(c)(1). *See Yeti by Molly*, 259 F.3d at 1106 (holding district court did not abuse its discretion in excluding testimony of defendant's only damages expert as a sanction). Generally, the exclusion penalty is "self-executing" and "automatic." *Hoffman v. Constr. Protective Serv's, Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (noting Rule 37(c)(1)'s

1  exclusion sanction provides a strong inducement for disclosure of material and affirming

2  district court's exclusion of undisclosed damages evidence).

3      As noted, JDPI never attempted to demonstrate that its supplemental expert testimony

4  was "substantially justified" or "harmless."  Nor could it.  JDPI effectively provided a new

5  expert opinion for the first time in support of its Opposition, more than three months after

6  expert disclosures were due.  If this Court were to admit this evidence, VIP would need time

7  to re-depose Simonson, and possibly draft new expert reports and new motions.   The

8  additional time and expense cannot be considered "harmless" to this Court or to VIP.  Indeed,

9  as this Court ruled during the Telephonic Discovery Dispute Conference, any late expert

10  disclosure prejudices the other party.  *See* Transcript at 30:12 - 31:3; *see also Wong*, 410 F.3d

11  at 1062 ("Disruption to the schedule of the court and other parties in that manner is not

12  harmless."); *Yeti by Molly*, 259 F.3d at 1107 (holding disclosure of one expert report one

13  month before trial was not justified or harmless, because plaintiffs "would have had to

14  depose [the expert] and prepare to question him at trial").

15

16

17      The exact same analysis applies here. VIP respectfully submits that "automatic"

18  exclusion of the Simonson Declaration is the appropriate remedy.

19      **B.      Paragraph Five of the Epps Declaration Should Be Excluded**

20      In support of its Motion for Partial Summary Judgment (Doc. 101), JDPI submitted

21  the Epps Declaration (Doc. 105).  Mr. Epps is the Global Brand Director for Jack Daniel's

22  Tennessee Whiskey for Brown-Forman Corporation.  Doc. 105 at ¶ 1. Despite the discovery

23  cut-off, the Epps Declaration includes information on brand "awareness" studies that JDPI

24  could have, and should have disclosed during discovery in its response to VIP's RFP nos. 7

25

26

27

and 21, and NUI nos. 2 and 4. *See* <u>Exhibit 2</u>. VIP explicitly requested in RFP no. 7, documents pertaining to "consumer recognition of the Jack Daniel's Trade Dress[.]" *Id.* In RFP no. 21, VIP requested documents "in which [JDPI] intend[s] to rely to establish the extent of the actual recognition of the JACK DANIELS TRADE DRESS." *Id.* In NUI no. 2, VIP requested the identification of "all facts and information pertaining to whether the JACK DANIELS TRADE DRESS … has acquired fame." *Id.* In NUI no. 4, VIP requested the identification of "all evidence in which [JDPI] intend[s] to rely to establish the extent of actual recognition of the JACK DANIELS TRADE DRESS." *Id*.

JDPI responded to these requests with general and specific objections, and some responsive documents, but no "ongoing" consumer tracking studies of brand "awareness." *See* <u>Exhibit 3</u>. VIP has requested that JDPI supplement its discovery multiple times, and has specifically identified areas where JDPI's production has been insufficient. *See* <u>Exhibit 4</u>. JDPI responded by claiming that it did not view its production to be deficient in any way, and had nothing further to produce. *See* <u>Exhibit 5</u>.

Yet, in his declaration, Mr. Epps states:

> Brown-Forman does ongoing consumer tracking studies regarding the prompted (aided) and unprompted (unaided) awareness of Jack Daniel's Old No.7 Tennessee whiskey. The aided awareness of the Jack Daniel's brand is consistently around 98% and the unaided awareness of the brand is consistently in the 80th decile, which I believe to be among the highest levels of unaided awareness in the whiskey business.

Doc. 105, ¶ 5. It cannot be disputed that the "consumer tracking studies" referenced in the Epps Declaration was the type of information and documentation VIP explicitly requested in discovery, not just in its initial requests for production and interrogatories, *see* <u>Exhibit 2</u>, but also in numerous follow-up letters. *See* <u>Exhibit 4</u>.

As evidence withheld during discovery and disclosed after the discovery cut-off, the information in paragraph five of the Epps Declaration should be excluded from the record. The rules do not permit JDPI to surprise VIP with new evidence offered in support of its partial summary judgment motion. Instead, JDPI was obligated to disclose such evidence during fact discovery and in response to VIP's discovery requests. *See* Fed. R. Civ. P. 37(c)(1) (stating that a party that fails to disclose information during discovery is "not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"); *see also Cambridge Elec's Corp. v. MGA Elec's, Inc.*, 227 F.R.D. 313, 323-25 (C.D. Cal. 2004) (striking a declaration at summary judgment where the facts in the declaration were not previously disclosed in relevant interrogatory responses or supplementary interrogatory responses); *Cargill Inc. v. Progressive Dairy Solutions, Inc.*, No. CV-F-07-0349-LJO-SMS, 2008 WL 2235354, at * 10 (E.D. Cal. May 29, 2008) (striking declarations at summary judgment where there was a failure to disclose the statements at discovery or in supplementary interrogatory responses).

JDPI should not be permitted to flout the rules and rely on evidence disclosed only in support of its motion and long after the close of fact discovery. The information in paragraph five of the Epps Declaration should be excluded from the record.

### Conclusion

Permitting JDPI to support its claims with information supplementing testimony and discovery after the discovery cutoff unfairly prejudices VIP, openly defies this Court's Orders, and is contrary to the timely resolution of this matter. JDPI's blatant defiance of disclosure deadlines in this case, even after its counsel emphatically agreed with the Court

that those "deadlines are real," and its derelict representation that there were no deficiencies in its discovery responses, walks dangerously close to, if it does not completely cross, the line of bad faith.  For the reasons stated herein, VIP respectfully requests the Court to exclude the information in paragraph five of the Epps Declaration (Doc. 105) and the Simonson Declaration in its entirety (Doc. 97-1).

**RESPECTFULLY SUBMITTED** this 13th day of November, 2015.

**DICKINSON WRIGHT PLLC**

By: *s/David N. Ferrucci*
    David G. Bray
    Frank G. Long
    Jonathan S. Batchelor
    David N. Ferrucci
    1850 North Central Avenue, Suite 1400
    Phoenix, Arizona  85004
    *Attorneys for VIP Products, L.L.C.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 13, 2015, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

*s/ C. Wheeler*

PHOENIX 53913-11 258485v2

# EXHIBIT L

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                Martin Wolinsky

              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF ARIZONA


------------------------------)
VIP PRODUCTS, LLC, an Arizona  )
limited liability company,     )  CASE NO.
                               )  14-cv-02057-PHX-DGC
          Plaintiff and        )
          Counterdefendant,    )
     vs.                       )
                               )
JACK DANIEL'S PROPERTIES, INC., )
a Delaware corporation,        )
                               )
          Defendant and        )
          Counterclaimant.     )
------------------------------)



      ** CONTAINS ATTORNEYS' EYES ONLY PORTIONS **

          DEPOSITION OF:  MARTIN WOLINSKY

              DATE:  JULY 28, 2015

                   HELD AT:

          MORGAN, LEWIS & BOCKIUS, LLP
               One State Street
               Hartford, Connecticut

                   - - -




Reporter:  Sandra Semevolos, RMR, CRR, LSR #74

          BRANDON HUSEBY REPORTING & VIDEO
               (800) 852-4589
               249 Pearl Street
          Hartford, Connecticut  06103

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                          Martin Wolinsky

```
 1        Q.    Did you consult on the Jim Beam Black
 2   Label?
 3        A.    I did not.
 4        Q.    What Jim Beam Bourbon did you consult on?
 5        A.    The White Label, and then their auxiliary
 6   brands when they came out with Knob Creek and
 7   Booker's and Basil Hayden.
 8        Q.    What consulting work have you done for
 9   Brown-Forman?
10        A.    It was all value chain, where is the
11   profit, where should the profit be and what channels
12   of distribution are the biggest economic
13   opportunities, all quantitative.
14        Q.    When was that done?
15        A.    I'm not exactly sure, sir.
16        Q.    Within the last five years?
17        A.    No.
18        Q.    Within this century?
19              MR. LONG:  Do you mean since 2000 --
20              MR. LARKIN:  Since 2000.
21              MR. LONG:  In the past 15 years?
22              MR. LARKIN:  Thank you.
23   BY MR. LARKIN:
24        Q.    Has it been sometime in the 2000s?
25        A.    I would suspect it was in the late 1900s or
```

07/28/2015                                                                Martin Wolinsky

```
 1   maybe 2000 and 2001, but certainly nothing beyond
 2   that.
 3       Q.    Do you remember the products that were
 4   involved in your --
 5       A.    It was not product-driven.  It was the
 6   economics of the Brown-Forman portfolio, how it
 7   impacts the wholesaler, consumer pricing, et cetera.
 8       Q.    During the course of that engagement, did
 9   you look at those issues for Jack Daniel's Whiskey?
10       A.    Did I look at what issues?
11       Q.    I'm a little confused.  In your consulting
12   work for Brown-Forman --
13       A.    It was not brand-specific.  It was
14   portfolio -- the economic value of the portfolio, not
15   any brand.
16       Q.    Okay.  At the time, did you understand that
17   Jack Daniel's Whiskey was within the Brown-Forman
18   portfolio?
19       A.    I think I knew that before I was hired as a
20   consultant.
21       Q.    Do you agree that the Jack Daniel's Whiskey
22   is one of the best-selling whiskeys in the United
23   States?
24             MR. LONG:  Objection, vague.
25       A.    Yes.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1   BY MR. LARKIN:

 2       Q.    Do you agree that the Jack Daniel's

 3   trademark is one of the most valuable trademarks for

 4   whiskey in the United States?

 5               MR. LONG:  Objection, form,

 6   foundation.

 7       A.    Based on my research, I'm unclear on that.

 8   BY MR. LARKIN:

 9       Q.    What research are you referring to?  The

10   research you did for the Brown-Forman consulting

11   work?

12       A.    No.

13       Q.    The research you did for this case?

14       A.    That is correct.  Before that, it was not

15   top of mind.

16       Q.    What was the general nature of your

17   consulting work for Sazerac?

18       A.    The owner of Sazerac, it was a lot of being

19   a trusted ally and looking out for the owner,

20   Sazerac.

21       Q.    Did you consult with respect to any

22   particular brands in the Sazerac portfolio?

23       A.    We had discussions about Buffalo Trace.

24       Q.    That's a bourbon brand?

25       A.    Yes, it is.
```

07/28/2015                                                    Martin Wolinsky

```
 1   to look at?
 2       A.    Actually, it was, I gave them a process
 3   similar to the process I used, to see if there was
 4   confusion between the two brands, on the shelf and
 5   with the bartenders.
 6       Q.    We are going to get into the process that
 7   you used in this case in a bit.
 8           Did you actually engage in that process in
 9   the other case or did you just advise the company
10   that that's what it should do?
11       A.    I'm confused.  Which other case?
12       Q.    The case in which you said that you
13   gave -- the vodka infringement case where I thought
14   you testified you gave them a process like the one in
15   this case.
16       A.    Yes.
17       Q.    Did they execute that or did you actually
18   execute the process in that other case?
19       A.    Actually, the plaintiff's witnesses
20   imploded on the stand and their case was settled.
21   Their expert witness imploded.
22       Q.    Getting back to my question, did you --
23       A.    So I did not go out and do this process.
24       Q.    All right.  And the purpose of that process
25   was -- strike that.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1              Are you familiar with the legal concept
 2    "likelihood of confusion" or "confusion"?
 3        A.     I don't know what that means, "familiar."
 4        Q.     What was the purpose of giving the
 5    defendant in that other case a process to go out and
 6    look at shelves and interview bartenders?
 7        A.     There was multipurposes.
 8        Q.     What were they?
 9        A.     One was to see if they were on firm ground
10    on the issue of confusion.  And two was to see if the
11    plaintiff's expert followed any process, and I
12    suggested a process to follow.
13        Q.     Was your engagement -- strike that.
14              Did your engagement in that other vodka
15    case involve looking at how distinctive the
16    plaintiff's packaging was?
17                   MR. LONG:  Objection, vague.
18        A.     Distinctive for me is relative to the
19    competitive set, and so relative to the competitive
20    set, that was part or all of the issue, but by
21    itself, you need something to compare it to.
22    BY MR. LARKIN:
23        Q.     You used the term "aesthetically
24    functional" in your report.  Did you look at the
25    issue of aesthetic functionality in that other
```

07/28/2015                                                    Martin Wolinsky

```
 1   engagement?
 2       A.    Yes.  Again, it was about process.  It was
 3   one of the things I gave them a heads-up on.  I
 4   didn't use those words.  Those words are way beyond
 5   me.
 6       Q.    Do you feel comfortable identifying the
 7   parties in that case?
 8       A.    Both of the principals have passed,
 9   so -- and the ownership has changed.  So may I ask --
10       Q.    Let me ask you this:  That case, I gather
11   from one of your previous answers, that case went to
12   trial?
13       A.    It went to trial, but it did not conclude
14   in trial.
15       Q.    It settled at some point during the trial?
16       A.    Yes.
17       Q.    Is there any reason of a -- strike that.
18           Do you have a confidentiality agreement
19   with whoever your consulting client was in that case?
20       A.    I'm not big on -- did I have a
21   confidentiality agreement?  It was all implied.  Did
22   I sign papers?  I did not sign papers.
23       Q.    Where did the trial occur?
24       A.    I believe in New York.
25       Q.    Given that the case went to trial, can you
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                              Martin Wolinsky

```
 1   just tell me who the litigant -- who the parties
 2   were?
 3       A.    Can I ask counselor if that's -- I'm
 4   uncomfortable giving you that information, so if he
 5   tells me to do it, I'll do it.  If he doesn't --
 6       Q.    Well, the case went to trial and that's a
 7   public event.
 8       A.    Right.
 9       Q.    I'd just like to know who were the parties
10   to that trial.
11                THE WITNESS:  Advice, please.
12                MR. LONG:  Are you okay with taking a
13   recess now or do you want an answer?  Obviously he is
14   troubled a bit by --
15                THE WITNESS:  I'm troubled about my
16   relationship with those parties.
17                MR. LONG:  -- his disclosure of the
18   relationship.  I know we crossed this bridge with one
19   of the other experts where he wasn't comfortable,
20   your expert, in disclosing that kind of information
21   so we passed over it.
22                MR. LARKIN:  I think the difference
23   was this case went to trial, so these litigants --
24   the existence of this litigation was a matter of
25   public record.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                        Martin Wolinsky

```
 1        Q.    Okay.  You have to answer unless Mr. Long
 2   tells you not to.
 3        A.    Would you ask the question again, please.
 4        Q.    Yes, I will.
 5              What was your understanding when you
 6   prepared your report of the elements of the trade
 7   dress that Jack Daniel's was asserting in this case?
 8        A.    That in combination of the elements, not
 9   any element by itself, was distinctive for Jack
10   Daniel's.
11        Q.    And what elements, what combination of
12   elements did you understand Jack Daniel's --
13        A.    The ones that are listed here.  Do you want
14   me to read them to you?
15        Q.    The ones that are listed in your report or
16   the ones that are alleged in the Answer and
17   Counterclaim?
18        A.    The ones that are listed in -- wait -- in
19   the counterclaim.
20        Q.    Okay.  So your understanding of the
21   elements, the combination of elements in the trade
22   dress that Jack Daniel's was asserting in this case
23   was what was listed in the Answer and Counterclaim;
24   is that correct?
25        A.    Let me get to it.  Can you help me find
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1    that, please?

 2        Q.    Page 5, paragraph 6.

 3               MR. LONG:  What page is it, Chris?

 4               MR. LARKIN:  Page 5, paragraph 6.

 5        A.    Yes.

 6    BY MR. LARKIN:

 7        Q.    So the record is clear, your understanding

 8    of the trade dress that Jack Daniel's is asserting in

 9    this case is what is shown and described on page 5,

10    paragraph 6, of Jack Daniel's counterclaim; is that

11    correct?

12        A.    Correct.

13               MR. LONG:  Objection.  Asked and

14    answered.

15    BY MR. LARKIN:

16        Q.    Why didn't you reference the additional

17    elements that are claimed in there in your report?

18        A.    I can't answer that.  Don't know.

19        Q.    You only considered certain portions of the

20    trade dress as described by Jack Daniel's in your

21    report; correct?

22               MR. LONG:  Objection.

23               THE WITNESS:  The objection means

24    I --

25               MR. LONG:  Objection, I'm objecting to
```

07/28/2015                                                    Martin Wolinsky

```
 1    the form of the question, but you can answer.

 2    BY MR. LARKIN:

 3         Q.    Go ahead.  You can answer.

 4         A.    To me, it was do these packages look like

 5    first cousins or in uniform or not?  So the initial

 6    impression was the driven impression.

 7         Q.    In the Answer and Counterclaim, Exhibit 98,

 8    the product is shown on page 5; is that correct?

 9         A.    Right, yeah.

10         Q.    In forming your opinions in this case, you

11    didn't take into account the words on the label; is

12    that correct?

13                MR. LONG:  Objection, form.

14         A.    I don't understand the question.

15    BY MR. LARKIN:

16         Q.    Well, you described in your report in

17    multiple places the common characteristics that the

18    Jack Daniel's packaging shared in your view with

19    other products, a square bottle with a ribbed neck, a

20    black cap, a black neck wrap closure with white

21    printing and a black front label with white printing;

22    correct?

23                MR. LONG:  Where is that and which

24    section of his report are you referring to, Chris?

25                MR. LARKIN:  It's in WOL006.
```

07/28/2015                                                          Martin Wolinsky

```
 1                    THE WITNESS:  I have that.

 2                    MR. LARKIN:  And WOL005.

 3                    MR. LONG:  Why don't you look at

 4    those, refresh your recollection.  6 and 5.  He said

 5    pages 6 and 5.

 6       A.    Right.

 7    BY MR. LARKIN:

 8       Q.    Do you see that list of four?

 9       A.    I do.

10       Q.    Okay.  That list does not include

11    everything that's listed in Jack Daniel's assertion

12    of its trade dress in the Answer and Counterclaim;

13    correct?

14       A.    Let me go back and look at it.

15             I certainly see that Old No. 7 is not in

16    the report.

17       Q.    And the filigreed border bearing the Jack

18    Daniel's mark depicted in arch lettering at the top

19    of the label is not in your report either?

20       A.    That's correct.

21       Q.    The Old No. 7 mark contained within a

22    filigree oval design in the middle portion of the

23    label beneath the Jack Daniel's mark is not in your

24    report; correct?

25       A.    Correct.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                          Martin Wolinsky

```
 1      Q.    The words "Tennessee Sour Mash Whiskey" in
 2   the lower portion of the label with the word
 3   "Tennessee" depicted in script is not referenced in
 4   your report; correct?
 5      A.    That is correct.
 6      Q.    Aren't those features important to the
 7   appearance of the package?
 8      A.    I think the first -- to some degree or
 9   another.
10      Q.    Okay.  Did you ever consider incorporating
11   them in your definition of the overall Jack Daniel's
12   Tennessee whiskey packaging in your report?
13      A.    I should have.
14      Q.    Turn for a moment, please, to Exhibit 91,
15   this one.
16      A.    Let me find my own, if I can.
17      Q.    There you go.  And would you please turn,
18   Mr. Wolinsky, in Exhibit 91, to the page marked
19   JDPI-CON 23?
20      A.    Okay.
21      Q.    And this page is entitled "JD Long-Term
22   Package Evolution."
23            Do you see that?
24      A.    Uh-huh.
25      Q.    Do you remember seeing this page when you
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                          Martin Wolinsky

```
 1   reviewed --

 2        A.    I do.

 3        Q.    You do, okay.  And left to right, this

 4   shows photographs -- I'll ask you to assume for

 5   purposes of this testimony that page CON 23 shows

 6   photographs of the Jack Daniel's package --

 7        A.    23 you said now?

 8        Q.    Yes, that page.

 9        A.    Okay.

10        Q.    I'm sorry, are we on the --

11        A.    We are together now.

12        Q.    We are on the same page, as they say.

13        A.    Yes.

14        Q.    For purposes of these questions, I'm going

15   to ask you to assume that page CON 23 shows

16   photographs of the Jack Daniel's package as it

17   appeared in the 1960s, the 1970s, the 1980s, the

18   1990s, 2002 and the current package on the right.

19              MR. LONG:  So these are hypotheticals?

20              MR. LARKIN:  No, I'm just asking him

21   to assume that.

22              MR. LONG:  Without knowing for sure.

23              MR. LARKIN:  Yes, I'm asking him as an

24   expert to assume that.

25              MR. LONG:  Answer if you can.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1    BY MR. LARKIN:
 2        Q.    Do you -- the package on the right under
 3    2011, you'll agree that that's the current package;
 4    correct?
 5        A.    It appears to be.
 6        Q.    Did you do anything in the course of your
 7    engagement in this matter to determine what the Jack
 8    Daniel's package looked like historically?
 9        A.    I saw pictures, but from this report.
10        Q.    Okay.  And you recall seeing these
11    pictures?
12        A.    I do.
13        Q.    Do you agree that each of the bottles shown
14    on page CON 23 is square in shape?
15        A.    The '90s one looks more rounded to me, as
16    does the '60s.
17        Q.    Okay.  In your report, you reference and
18    depict a bunch of square bottles.  We will get to
19    that in a moment.
20              Would you characterize each of the bottles
21    shown on CON 23 as being square shape to, at least,
22    some degree?
23        A.    The '60s is more rounded to me, as I said
24    earlier, as is the 2002, and the '90s are more
25    rounded than square.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1        Q.    So you don't consider those to be square
 2   bottles?
 3        A.    Correct.
 4        Q.    Do you agree that each of the bottles shown
 5   on CON 23 has a black cap or a blacktop?
 6        A.    Yes.
 7        Q.    Do you agree that each of those bottles has
 8   a black neck wrap with Old No. 7 in white printing?
 9        A.    I cannot tell the '60s and the '70s.
10        Q.    How about the others?
11        A.    It looks like they have Old No. 7 on it.  I
12   can't -- my eyes are not working well enough to
13   answer the '90s one.
14        Q.    Okay.  Do you agree that each of the
15   bottles shown on JDPI-CON 23 has a black front label
16   with white printing and a filigreed border?
17        A.    Yes.
18        Q.    Do you agree that each of the bottles shown
19   on CON 23 has the Jack Daniel's mark depicted in arch
20   lettering at the top of the label?
21        A.    Yes.
22        Q.    Do you agree that each of the bottles on
23   CON 23 has the Old No. 7 mark within a filigreed oval
24   design in the middle portion of the label beneath the
25   Jack Daniel's mark?
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                  Martin Wolinsky

```
 1        A.     That moves as the brands evolved, but yes.

 2        Q.     And you agree that the words "Tennessee

 3   Sour Mash Whiskey" appear in the lower portion of the

 4   label with the word "Tennessee" in script in each of

 5   the bottles on CON 23?

 6        A.     Yes.

 7        Q.     Did you ever read the deposition testimony

 8   of VIP's principal Steven Sacra?

 9        A.     I did not.

10        Q.     Did you ever read the deposition testimony

11   of the designer who created the label for the Bad

12   Spaniels toy, L. Phillips?

13        A.     I did not.

14        Q.     Did you ever learn anything about how the

15   label or the shape of the Bad Spaniels toy came

16   about?

17        A.     I do not know that.

18        Q.     Would the process of designing the Bad

19   Spaniels toy have any effect on -- strike that.

20               If VIP's designer used -- had a bottle of

21   Jack Daniel's on the table in front of her when she

22   designed the label, if that were true, would that

23   affect your opinions in this case one way or the

24   other?

25                    MR. LONG:  Objection, form,
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.
07/28/2015                                                      Martin Wolinsky

```
 1  foundation.
 2              THE WITNESS:  Does that mean I answer?
 3              MR. LARKIN:  Yes.
 4              MR. LONG:  If you understand the
 5  question.
 6      A.   I'd probably fire the designer.
 7  BY MR. LARKIN:
 8      Q.   Why is that?
 9      A.   Because if they were trying to copy the
10  Jack Daniel's bottle, they didn't do a particularly
11  good job.
12      Q.   If it were true that Steven Sacra sent
13  photographs of the Jack Daniel's bottle to the
14  company in Asia that manufactured the Bad Spaniels
15  toy, would that affect your opinions in this case one
16  way or the other?
17              MR. LONG:  Objection, form and
18  foundation.  And I'm not sure what opinions you are
19  talking about.
20              MR. LARKIN:  Any of them.
21      A.   My opinion is based on visually seeing how
22  distinctive the Jack Daniel's package was within the
23  Bourbon/Tennessee whiskey category so all these
24  things would not have any impact on me.
25  BY MR. LARKIN:
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                            Martin Wolinsky

```
 1   United States within the Whiskey category?

 2      A.    I have them listed on 009, you know,

 3   Maker's Mark and Jack Daniel's Single Barrel.

 4      Q.    Are those the only ones that you consider

 5   to be unique in the United States?

 6      A.    Those are the only ones that jumped at me

 7   that have been at all successful.

 8      Q.    And within the, what you described as the

 9   Bourbon/Tennessee whiskey segment of the Whiskey

10   category, what packages in the United States do you

11   consider to be unique?

12              MR. LONG:  Objection.  Foundation.

13              THE WITNESS:  Would you repeat your

14   objection again, so I can --

15              MR. LONG:  My objection is just

16   foundation for asking you that question.

17      A.    I think I answered that question.

18   BY MR. LARKIN:

19      Q.    The same ones, Maker's Mark and Jack

20   Daniel's Single Barrel?

21      A.    That have had success.  I think Knob Creek

22   is another one that we don't have on here.

23      Q.    Well, I mean, you defined unique in your

24   report on page WOL4 not by what I think I heard you

25   to say is success in a commercial sense, but as
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.
07/28/2015                                                   Martin Wolinsky

```
 1   totally breaking away from the uniform path and
 2   introducing a totally different overall look to the
 3   package.
 4        A.   Well, maybe I overstated it with "totally,"
 5   but certainly if you put Maker's Mark, Jack Daniel's
 6   Single Barrel and Knob Creek, they do not look like
 7   first cousins, as does Benchmark, Evan Williams and
 8   Jim Beam Black.  To me, they all look like first
 9   cousins.
10        Q.   What is your understanding of the
11   term "trade dress" as it is used in trademark law?
12        A.   As used in trademark law, I don't have any
13   understanding.
14        Q.   What is your understanding of the
15   term "trade dress" as it is used in the spirits
16   business?
17        A.   Nothing.
18        Q.   Is that a term that --
19        A.   I never heard the term before Mr. Long
20   called me.
21        Q.   Okay.  What is your understanding of the
22   term "distinctive," as it is used in trademark law?
23        A.   Again, once you said trademark law, I have
24   no understanding.
25        Q.   Have you ever heard the term "inherent
```

07/28/2015                                                    Martin Wolinsky

```
 1   distinctiveness"?

 2        A.    I have not.

 3        Q.    Have you ever heard the term "acquired

 4   distinctiveness"?

 5        A.    I have not.

 6        Q.    You used the term "distinctive" in a number

 7   of places in your report, Exhibit 96.  What did you

 8   mean by that when you used that word?

 9        A.    Distinctive would mean it looks like it's

10   not part of the uniform.  Again, the words that I

11   used repeatedly were "uniform" and "first cousin," so

12   it doesn't look like a part of the uniform.

13             So if you saw the Maker's Mark bottle, you

14   would not immediately jump to the conclusion that it

15   is a bourbon or Tennessee whiskey.  If you saw the

16   bottle for Evan Williams, you would jump to that

17   conclusion.

18        Q.    Is it your opinion that any distilled

19   spirits package that falls within the Uniform

20   category isn't distinctive?

21        A.    I think distinctive is a continuum.  I

22   wouldn't put it as distinctive as Maker's Mark and

23   not as uniform as the private label bourbon, so it's

24   a continuum.  It would be difficult to answer yes or

25   no to that.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                     Martin Wolinsky

```
 1      Q.     Look at your report on page WOL6, please.

 2      A.     Okay.

 3      Q.     Under Conclusions, the first conclusion is

 4   "The overall Jack Daniel's Tennessee whiskey

 5   packaging is not distinctive," those words are

 6   italicized.  And then you put "(not unique)."

 7            In that conclusion, did you mean that

 8   if -- because the Jack Daniel's Tennessee whiskey

 9   package was not unique in your view, it was not

10   distinctive?

11      A.     I meant --

12              MR. LONG:  Objection.

13              THE WITNESS:  Objection on what?

14              MR. LONG:  No, just object on the

15   form.  Go ahead and answer.

16      A.     Okay.  I took it to mean distinctive would

17   be -- again, it's a continuum, looking more like

18   Maker's Mark or Gentleman Jack, so that to me would

19   be distinctive.  But this is a continuum.  And as we

20   try to say black or white, it becomes more difficult.

21   BY MR. LARKIN:

22      Q.     Is there anything in the text of your

23   report that discusses a continuum from unique on the

24   one end to --

25      A.     What I tried to do on the report --
```

07/28/2015                                                                Martin Wolinsky

```
 1      Q.    Let me finish my question.

 2      A.    I thought you were finished, I apologize.

 3      Q.    I'm sorry, that's my fault.  Let me

 4   withdraw that question.

 5            Can you show me in your report where you

 6   discussed a continuum from unique at one end and

 7   uniform at the other?

 8      A.    Yeah.  On page 14, I do it by category

 9   rather than segment.

10      Q.    Is there anything in your report where you

11   discuss that issue by segment?

12      A.    I'd have to read the report again.  I don't

13   recall.

14            MR. LONG:  Take your time, read the

15   report.

16      A.    I think we do it describing by category,

17   you know, but I don't think we compare and contrast

18   as we are teasing out now.

19   BY MR. LARKIN:

20      Q.    Okay.  Let's look at -- I'm sorry, if you

21   want to -- please continue to look through your

22   report.  I jumped the gun there.

23                  (Pause.)

24      A.    Okay.

25   BY MR. LARKIN:
```

07/28/2015                                                          Martin Wolinsky

```
 1        Q.    Is there anything in your report other than
 2    the category --
 3        A.    I think the category continuum, and it
 4    should have been elaborated, if I were to redo the
 5    report after today's time with you, it would be
 6    more -- it would be deeper.  But certainly it talks
 7    by category, without the reason, that brands tend to
 8    be distinctive or unique -- and unique.  But it was
 9    not as laid out here as it could have been.
10        Q.    Just so the record is clear, is it your
11    opinion that a distilled package -- strike the
12    question.
13             Is it your opinion that a whiskey package
14    that you characterize as being in the uniform
15    category as opposed to the unique category can become
16    distinctive through sales and advertising and
17    exposure of that particular product to the public?
18                  MR. LONG:  Objection, foundation and
19    form.
20        A.    I don't know the answer to that.
21    BY MR. LARKIN:
22        Q.    What is your understanding of the
23    term "aesthetic functionality" as it is used in
24    trademark law?
25        A.    I can't talk about trademark law.  I can
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1   tell you how I use it, if that's okay.

 2       Q.    Go ahead.

 3       A.    Aesthetically functionality means it

 4   appeals to the consumer and it looks like part of a

 5   category.

 6       Q.    Had you ever heard that term before your

 7   engagement in this case?

 8       A.    I've heard the term "aesthetics" and

 9   "functionality" but I don't know if I've

10   seen -- heard them together.

11       Q.    It's in your conclusions on page WOL006 in

12   your report.  The second conclusion is "The overall

13   Jack Daniel's packaging is clearly aesthetically

14   functional, italicized, utilizing all the common

15   elements of the uniform adopted by numerous other

16   brands."

17           Do I understand it before your engagement

18   in this case, you had not heard the terms "aesthetic

19   functionality" or "aesthetically functional"

20   together?

21               MR. LONG:  Objection, asked and

22   answered.

23   BY MR. LARKIN:

24       Q.    Is that correct?

25       A.    Not together, but individually, I think
```

07/28/2015                                                  Martin Wolinsky

```
 1   that is --
 2       Q.    You heard "aesthetic" and you heard
 3   "functional"?
 4       A.    And I heard them in the same paragraph.
 5       Q.    But you hadn't heard the terms --
 6       A.    You are just splitting hairs, I can't
 7   answer that.
 8       Q.    Okay.  Do you have an understanding of the
 9   term "generic" as it applies to distilled spirits
10   packaging?
11       A.    I understand it as it applies to packaging.
12       Q.    What is your understanding?
13       A.    That costs are a major piece of it, and
14   it's less distinctive than brands that have made a
15   point not to be in uniform.
16       Q.    What did you mean by costs are a major
17   piece of it?
18       A.    When you have a generic package, the
19   package typically as a percent of sales is low, you
20   know, versus a package where the percent of sales is
21   high.
22       Q.    A cheaper package, to use a lay term?
23       A.    No, not necessarily.  Just that the
24   packaging costs are highly scrutinized.  We have that
25   in Smirnoff.
```

07/28/2015                                                    Martin Wolinsky

```
 1      Q.    Do you have any understanding of what the
 2  term "generic" means in the trademark law?
 3      A.    No.
 4      Q.    Is it your opinion that any distilled
 5  spirits package that you classify in the Uniform
 6  category is generic?
 7              MR. LONG:  Objection to form.
 8  Generic, I'm not sure what generic means in that
 9  question.
10              MR. LARKIN:  Well, he just told us
11  what he understood it to mean.
12              MR. LONG:  But generic in his
13  understanding as opposed to generic as it means under
14  the trademark law?  Several different contexts in
15  that term.
16  BY MR. LARKIN:
17      Q.    Let me withdraw the question.  Look at page
18  WOL004, please.
19      A.    Okay.
20      Q.    At the top again, under the heading
21  Industry Strategic Packaging Issue, the last full
22  paragraph of that --
23      A.    The examples of unique spirit packages.
24      Q.    Yes, "Examples of unique spirit packages
25  include Maker's Mark in the bourbon segment and Crown
```

```
 1    Royal in the Canadian Whiskey segment.  The advantage

 2    of the unique package strategy is a higher level of

 3    brand equity rather than having a 'me too' generic

 4    package in the uniform."

 5              Do you see that?

 6        A.    I do.

 7        Q.    Is it your opinion that every distilled

 8    spirits package that you place in the uniform group

 9    is generic?

10        A.    No.

11              MR. LONG:  Objection.

12    BY MR. LARKIN:

13        Q.    Okay.  How -- are any of them generic?

14        A.    Are any of them?

15        Q.    Yes.

16              MR. LONG:  Objection to form.

17        A.    Certainly the ones on the lower price

18    points are generic.  Again, typically the ones that

19    are keeping packaging costs down as a percent of

20    sales is a major driver.

21    BY MR. LARKIN:

22        Q.    Where does the Jack Daniel's Tennessee

23    whiskey fall within the spectrum of price points for

24    whiskey?

25        A.    Is that based on -- would you amplify the
```

07/28/2015                                                    Martin Wolinsky

```
 1   question?

 2       Q.    You just, as I understood your last answer,

 3   you described a category of products by price point,

 4   and I thought I heard you say that products that are

 5   at a lower price point as a general rule more

 6   commonly have generic packaging.

 7            Is that a fair characterization of your

 8   answer?

 9       A.    Yes.

10       Q.    Where does Jack Daniel's Tennessee whiskey

11   rank on the spectrum of price points from the lowest

12   to the most premium?

13       A.    I typically would break down the spirits

14   business in three segments, you know, as far as price

15   is concerned.

16       Q.    Okay.

17       A.    The middle segment is Smirnoff, Bacardi and

18   Jim Beam.  And then the two segments -- the one

19   segment below tends to be generic.  The one segment

20   above, packaging is a bigger piece of the cost than

21   the one on the bottom.

22       Q.    What do you call the one that's above the

23   middle two rungs above it?

24       A.    Premium and super premium would be fine.

25       Q.    Where does Jack -- based on your experience
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                      Martin Wolinsky

```
 1   in the spirits business, which of those three

 2   categories does Jack Daniel's Tennessee whiskey fall

 3   into?

 4        A.   Premium.

 5        Q.   Look at page WOL008 in your report, please.

 6        A.   Okay.

 7        Q.   Is it your opinion that the packaging for

 8   each of the products shown on that page is not

 9   distinctive?

10             MR. LONG:  Objection to form.

11        A.   To me, they look like first cousins, so

12   they would be less than distinctive on the continuum.

13   BY MR. LARKIN:

14        Q.   But is it your opinion that -- one of the

15   conclusions you reach in your report on page WOL6 is

16   that the overall Jack Daniel's Tennessee whiskey

17   packaging is not distinctive, not unique.

18             Do you have the same opinion as to the

19   other products shown on page WOL008?

20        A.   They all look like first cousins to me, so

21   the level of distinctiveness is small, not great.

22        Q.   Is it your opinion that the products shown

23   on WOL8 are all aesthetically functional?

24             MR. LONG:  Objection, form,

25   foundation.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                      Martin Wolinsky

```
 1      A.    Yes.

 2  BY MR. LARKIN:

 3      Q.    Is it your opinion that all the products

 4  shown on WOL8 are generic?

 5      A.    Not generic.

 6      Q.    Do you consider the Jack Daniel's packaging

 7  to be generic?

 8              MR. LONG:  Objection, form, as to the

 9  meaning of generic.

10  BY MR. LARKIN:

11      Q.    Go ahead.

12      A.    I do not consider the Jack Daniel's package

13  to be generic.

14      Q.    Thank you.  Look at the products shown on

15  page WOL10, the gin products.  Is it your opinion

16  that each of the products in the uniform portion of

17  that page is not distinctive?

18              MR. LONG:  Could you read that

19  question again.

20        (Record read by the court reporter.)

21              MR. LONG:  I have an objection to form

22  as to whether you are talking about the product or

23  packaging, or talking overall.  It's not clear.

24  BY MR. LARKIN:

25      Q.    Can you answer the question?
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1      A.    Relative to the products that are unique,
 2   they form -- again, it's a continuum, and as we try
 3   to make this black or white, I get lost.  Okay.  So
 4   the products Tanqueray, Sapphire and Hendrick's are
 5   substantially more unique in packaging than the
 6   products below that.
 7      Q.    So some of the gin products -- in your
 8   opinion, some of the gin products in the uniform
 9   portion of page WOL10 are distinctive?
10               MR. LONG:  Objection.
11      A.    Distinctive relative to what, on their own?
12   BY MR. LARKIN:
13      Q.    You are the one who used the term in your
14   report.  I can't tell you what you mean.  You need to
15   tell me what you mean.
16      A.    But I mean, everything is relative, right?
17   So do I think the gin products on the bottom of the
18   page are more distinctive or less distinctive than
19   the gin products on the top of the page?  They are
20   significantly less distinctive.
21      Q.    Okay.  Among the ones in the Uniform
22   categories, are they distinctive from one another?
23      A.    They look like they are first cousins to
24   me.
25      Q.    The gin products?
```

07/28/2015                                                    Martin Wolinsky

```
 1      A.    That is correct.

 2             MR. LONG:  Are we referring to those

 3   in the bottom of the page?

 4             MR. LARKIN:  Yes.

 5             MR. LONG:  Okay.

 6   BY MR. LARKIN:

 7      Q.    Is it your opinion that the products on the

 8   bottom of the page, on WOL10, are aesthetically

 9   functional?

10      A.    On the bottom of the page?

11      Q.    Yes.

12      A.    It appears that way.

13      Q.    Look at WOL12, please.

14      A.    Okay.

15      Q.    Is it your opinion that the tequila

16   packages shown on the uniform portion of that page

17   are not distinctive?

18             MR. LONG:  Objection to form.

19      A.    I think, again, on a continuum basis, the

20   products on the bottom of the page, certainly the two

21   on the right and the two on the left, are

22   substantially more in uniform than the brand that we

23   use on the top of the page.

24   BY MR. LARKIN:

25      Q.    Do you believe that the four tequila
```

07/28/2015                                                         Martin Wolinsky

1    products at the bottom of page WOL12 are

2    aesthetically functional?

3         A.    I do.

4         Q.    Look at page WOL013, please.

5         A.    Right.

6         Q.    Is it your opinion that the Canadian

7    whiskey products -- strike that.

8              Is it your opinion that the packaging for

9    the Canadian whiskey products shown in the uniform

10   portion of page WOL13 are not distinctive?

11              MR. LONG:  Objection to form.

12        A.    I think if you look at these products and

13   were from Mars, you would say they all look like they

14   come from the same category, when Crown Royal does

15   not.

16   BY MR. LARKIN:

17        Q.    Do you believe that the, what you called

18   the uniform Canadian whiskey packages on page WOL13

19   are all aesthetically functional?

20        A.    They appear that way.

21        Q.    Look back to page WOL008, please.

22        A.    I have it.

23        Q.    Thank you.  Is it your opinion that the

24   producers of the product shown on page -- products

25   shown on page WOL008 have no rights in the overall

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1              Do you see that?

 2      A.      I do.

 3      Q.      What is that function?

 4      A.      The function is that it is a bourbon or

 5   Tennessee whiskey.

 6      Q.      Is it your opinion that people looking at

 7   the Jack Daniel's bottle that is shown in the Answer

 8   and Counterclaims and in your report will simply

 9   understand that to be a bourbon or Tennessee whiskey,

10   not a whiskey that comes from Jack Daniel's?

11              MR. LONG:  Objection, form.

12      A.      I don't know if I can separate those two,

13   between being a bourbon or Tennessee whiskey and

14   being Jack Daniel's bottle.

15   BY MR. LARKIN:

16      Q.      Is Jack Daniel's the best known Tennessee

17   whiskey?

18              MR. LONG:  Objection, form,

19   foundation.

20      A.      Yes.

21   BY MR. LARKIN:

22      Q.      Do you think that Jack Daniel's is

23   uniquely -- strike that.

24              Among the Tennessee whiskeys that are sold,

25   is Jack Daniel's the one that is best known?
```

07/28/2015                                                      Martin Wolinsky

```
 1                    MR. LONG:  Objection, asked and

 2      answered.

 3           A.   I would suspect people who drink Jack

 4      Daniel's think it's a bourbon more than a Tennessee

 5      whiskey.

 6           Q.   Look at Conclusion Number 2 in your report

 7      on page WOL6, please.  You wrote "The overall Jack

 8      Daniel's packaging is clearly aesthetically

 9      functional, italicized, using all the common elements

10      of the uniform adopted by numerous other major brands

11      in the Bourbon/Tennessee whiskey segment in the

12      United States as shown in the photos of competitive

13      whiskeys attached to this document."

14                Where did you -- why did you decide to use

15      the term "aesthetically functional" there?

16           A.   I put together "aesthetics" and "function."

17      I don't even know if it's a real term.

18           Q.   And I think you testified earlier, you are

19      not familiar with the term "aesthetic functionality"

20      or "aesthetically functional" as it is used in the

21      trademark; is that correct?

22           A.   As it is used in the trademark laws.

23           Q.   You do not have an understanding of that

24      one way or the other?

25           A.   Right.
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1       Q.    Farther down in Conclusion 2, you wrote

 2   "For that reason, I believe that giving Jack Daniel's

 3   exclusive rights to use the combined four key

 4   features on the bottle and label design of the Jack

 5   Daniel's Old No. 7 Tennessee whiskey bottle would

 6   impose a competitive disadvantage on other companies

 7   selling Kentucky and Tennessee American whiskey."

 8             Do you see that?

 9       A.    I do.

10       Q.    Is it your understanding in this case that

11   Jack Daniel's is seeking the, quote, exclusive rights

12   to use the combined four key features on the bottle

13   label design of the Jack Daniel's Old No. 7 Tennessee

14   whiskey bottle?

15       A.    That wasn't what my charge was, so I don't

16   have an opinion.

17       Q.    Okay.  Well, you wrote that if Jack

18   Daniel's were given the exclusive rights to use those

19   combined four features, that would impose a

20   competitive disadvantage.

21             Was it your understanding that Jack

22   Daniel's was asserting the exclusive rights to use

23   the combined four key features on the bottle and

24   label design?

25                      MR. LONG:  Objection.  Asked and
```

VIP PRODUCTS, LLC vs. JACK DANIEL'S PROPERTIES, INC.

07/28/2015                                                    Martin Wolinsky

```
 1   answered.

 2       A.    I believe I answered that.

 3   BY MR. LARKIN:

 4       Q.    I didn't understand what your answer was.

 5       A.    Would you repeat the question then, please.

 6             MR. LONG:  Read back the answer, the

 7   previous answer the first time he asked the question,

 8   please.

 9         (Record read by the court reporter.)

10             MR. LONG:  I think he has answered it,

11   he doesn't have an opinion.

12             MR. LARKIN:  I don't think so.

13   BY MR. LARKIN:

14       Q.    Where did you get the idea that Jack

15   Daniel's was asserting in this case the, quote,

16   exclusive rights to use the combined four features on

17   the bottle and label?

18             MR. LONG:  Objection, that

19   mischaracterizes the statement there.  It doesn't say

20   that that was.  It said -- it doesn't say that.  It

21   says if it was, it's a conditional, that giving it

22   would do that.  It doesn't say giving it does do

23   that.  It's a conditional statement.  If that were

24   the case, it would give it.

25             MR. LARKIN:  He wrote a declarative
```

07/28/2015                                                    Martin Wolinsky

1    sentence, "For that reason, I believe that giving

2    Jack Daniel's exclusive rights to use the combined

3    four key features on the bottle and label design

4    would impose a competitive disadvantage."

5              MR. LONG:  So that implies a condition

6    that if Jack Daniel's was given that, it would impose

7    a competitive disadvantage.

8    BY MR. LARKIN:

9        Q.    Did you understand or assume, Mr. Wolinsky,

10   that Jack Daniel's sought the exclusive rights to use

11   a square bottle with a ribbed neck, a black cap, a

12   black neck wrap closure with white printing and a

13   black front label with white printing?

14             MR. LONG:  Objection to form.

15       A.    I'm getting lost.

16   BY MR. LARKIN:

17       Q.    Well, to make the statement that giving

18   Jack Daniel's the exclusive right to use those

19   elements certainly indicates to me that you thought

20   that that's what Jack Daniel's was trying to do in

21   this case.  Where did you get that understanding?

22       A.    I don't recall.

23       Q.    Okay.

24             MR. LARKIN:  Let's take a short break.

25   I know you need one and we will try to wrap up after

```
 1    that.

 2          (Recess taken from 5:04 p.m. to 5:13 p.m.)

 3                  MR. LARKIN:  Back on the record.

 4          (Record read by the court reporter.)

 5    BY MR. LARKIN:

 6      Q.    Mr. Wolinsky, you understand today from

 7    reviewing the Answer and Counterclaim that Jack

 8    Daniel's is not claiming the exclusive right to use a

 9    square bottle with a ribbed neck, a black cap, a

10    black neck wrap closure with white printing and a

11    black front label with white printing; correct?

12                  MR. LONG:  Objection.

13    Mischaracterizes testimony.

14                  THE WITNESS:  Guidance, please.

15                  MR. LARKIN:  Answer it.

16                  MR. LONG:  If you understand the

17    question --

18                  THE WITNESS:  I don't understand the

19    question.

20                  MR. LONG:   -- you can answer it.

21    BY MR. LARKIN:

22      Q.    We looked at the definition of what Jack

23    Daniel's is asserting as its trade dress in the

24    Answer and Counterclaim earlier in the deposition.

25                  Do you recall that?
```

# EXHIBIT M

1  Firm E-Mail: courtdocs@dickinsonwright.com

2  David G. Bray (#014346)
   dbray@dickinsonwright.com
3  Frank G. Long (#012245)
   flong@dickinsonwright.com
4  Jonathan Batchelor (#026882)
   jbatchelor@dickinsonwright.com
5  Colleen M. Ganin (#032456)
   cganin@dickinsonwright.com

6  **DICKINSON WRIGHT, PLLC**
   1850 North Central Avenue, Suite 1400
7  Phoenix, Arizona 85004
   Phone: (602) 285-5000
8  Fax: (602) 285-5100

9  *Attorneys for VIP Products, L.L.C*

10              IN THE UNITED STATES DISTRICT COURT

11                       DISTRICT OF ARIZONA

12  VIP Products, L.L.C., an Arizona limited          No. 2:14-cv-02057-DGC
13  liability company,

                                            **DECLARATION OF MARTIN WOLINSKY**
14          Plaintiff and Counterdefendant,

15      v.

16  Jack Daniel's Properties, Inc., a Delaware
17  corporation

18          Defendant and Counterclaimant.

19      I, Martin Wolinsky, the undersigned, hereby declare the following under penalty of

20  perjury:

21      1.    I state the following according to my own personal knowledge.

22      2.    I was retained by VIP in connection with the VIP lawsuit against Jack Daniel's

23  Properties, Inc. ("JDPI").

24      3.    My expert opinions in connection with this matter are recited in my expert report

25  (the "Report"), a true and correct copy of which was filed with VIP's Statement of Facts in

26  Support of its Motion for Summary Judgment (Doc. 111) as "Exhibit T" thereto. My Report

27  accurately recites the documents and information I relied upon in forming my opinions in this

    matter.

                                        1

1    4.    I have more than 20 years of experience in the distilled spirits industry. I was an

2    executive with Diageo PLC for over 10 years, and was the President of Smirnoff Vodka

3    Company, a subsidiary of Diageo PLC, for 8 years. Additionally, I have been the President and

4    Owner of Owen Consulting for almost 20 years—I consult major U.S. distilled spirit and wine

5    companies (including Jim Beam Brands, Brown-Forman, Bacardi U.S.A, Sydney Frank

6    Importing Company, Sazerac, Deep Eddy Vodka, and E&J Gallo Winery), major wholesale

7    liquor distributers, and companies seeking to introduce new liquor products in the U.S. market.

8    A true and accurate summary of my training, education, and experience is attached to my

9    Report at P.24.

10    5.    I am not a lawyer, and I do not claim to be a legal expert. I have, based on my

11    experience as an executive and consultant in the liquor industry, specialized knowledge in

12    marketing, sales, organization behavior, and profit maximization for distilled spirits in the

13    United States. Report, P. 3.

14    6.    During my July 28, 2015 deposition, I was asked by JDPI's counsel to discuss

15    my understanding of the following terms as they are used in trademark law: "generic,"

16    Wolinsky Depo., 182:8–10, "trade dress," *id.* at 176:10–20, "aesthetic functionality," *id.* at

17    180:22–24, "distinctiveness," *id.* at 176: 21–24, "inherent distinctiveness," *id.* at 176:25, and

18    "acquired distinctiveness." *Id.* at 177:2–4 . I do not know the legal meaning of these terms, and

19    testified at the time that I "can't talk about trademark law," and that I can" only discuss "how I

20    use" the terms. *Id.* at 180:25–181:1; 176:23–24.

21    7.    When I use these terms in my Report, or discuss them in my deposition

22    testimony, I use them based on what I understand them to mean in the context of my expertise

23    and experience, and not as legal terms.

24    8.    I received a copy of JDPI's Motion for Summary Judgment ("JDPI Motion") and

25    Supplemental Statement of Facts ("JDPI's SSOF"). In my review of these documents, I noted

26    several instances where JDPI had mischaracterized my testimony. I address each of these

27    misrepresentations in paragraphs 9 and 12 below.

1       9.      At page 5, footnote 4 of the JDPI Motion, it claims: "Mr. Wolinsky . . . agrees

2  that the Jack Daniel's packaging is not generic." Motion, 4:26–28. However, this

3  mischaracterizes my testimony. While I did agree that the Jack Daniel's packaging is not

4  generic, I was not referring to "generic" as a legal term. I based my opinion on *my* layperson

5  definition, which is: a function of sales revenues. As I testified: "When you have a generic

6  package, the package typically as a percent of sales is low, you know, versus a package where

7  the percent of sales is high." Wolinsky Depo., 182:18–21.

8       10.     On pages 11 and 12, the JDPI Motion claims that my deposition testimony

9  "actually supports the existences of acquired distinctiveness," because I "claimed that

10  'distinctiveness is a continuum,'" even though my "[R]eport categorizes packaging only as

11  'Unique' or 'Uniform.'" Motion, 12:20–21. This is incorrect; the substantive discussion in the

12  Report focuses on packaging examples that were classifiable as clearly "Uniform" or

13  "Unique." *See* Report, P. 9–13. Yet, I still evaluated distinctiveness of the distilled spirits

14  packaging on a continuum, as shown by the "Uniform to Unique Package Scale" on page 14 of

15  my Report. I also referenced the distinctiveness continuum numerous times in my deposition.

16  *See* Wolinsky Depo., 177:21–25; 197:5–9; 186:11–13; 189:19 –23; 197:20–22; 198:19–22.

17      11.     At pages 12 and 13, the JDPI Motion claims that I "did not apply the proper

18  legal framework" for my opinions because I "focused on the individual elements of the trade

19  dress rather than the overall impression of the combination of elements." Motion, 12:19–24;

20  Motion, 13:14–20 (claiming that I applied the "incorrect legal framework" because I "did not

21  actually consider the entire package, instead cherry-picking . . . the 'four common

22  characteristics' of bourbon/Tennessee whiskey packaging"). As I mention above, I am not a

23  lawyer, or an expert on trademark law. I summarized my opinion that Jack Daniel's bottle

24  packaging is "Uniform" by identifying several significant design elements of the Jack Daniel's

25  bottle: the (1) square bottle with a ribbed neck; (2) black cap; (3) black neck-wrap closure with

26  white printing; and (4) black front label with white printing. I did this because, in my

27  experience, many key brands of bourbon and Tennessee whiskey use these elements in their

packaging. However, my opinion that these whiskey brands use a "Uniform" packaging  is

3

1   based on their overall common appearance , not based on those four factors alone. This is clear

2   in my Report. *See* Report, P.5. The overall visual image of the combined features of certain

3   Kentucky bourbon and Tennessee is made clear by the images on pages 8 and 9 of my Report.

4   One look at the Jack Daniel's, Jim Beam Black, Evan Williams, Benchmark, Ezra Brooks, and

5   Zackariah Harris bottles shows that they all use a very similar uniform bottle packaging. This

6   is made even more apparent when the bottle packaging is compared to the truly unique

7   packaging used for Maker's Mark and Jack Daniel's Single Barrel. Report, PP. 8–9.

8        12.    At page 19 of the JDPI Motion, it claims that I "could not explain how or why

9   (or even which) competitors would be disadvantaged if JDPI prevailed against the Bad

10  Spaniels toy. He eventually opined that only those seeking to enter the marketplace would be

11  disadvantaged because, as to competitors already using the 'four common characteristics,'

12  '[w]ell, they are in the marketplace,' [] but could not explain how." Motion, 19:19–24. This

13  misrepresents my opinion; if Jack Daniel's can claim exclusive rights to using the Jack

14  Daniel's Trade Dress, it may harm market competitors and entrants because that design is

15  symbolic of bourbon and Tennessee whiskey. For example, if Jim Beam were no longer

16  allowed to use its bottle design, it would be forced to spend significant funds in order to re-

17  design its brand; this would directly impact revenue, but, more importantly, this could have

18  indirect consequences on the brand's viability.

19

20       DATED:  December ⌣, 2015.

21

22                            _Martin Wolinsky_

23                            Martin Wolinsky

24

25

26  PHOENIX 53913-11 261593v4

27

4

# EXHIBIT N

Michael Taylor - July 16, 2015

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

VIP PRODUCTS, L.L.C., an Arizona  )
limited liability company         )
                                  )
   Plaintiff and Counterdefendant; )
                                  )
            vs.                   ) No. 2:14-cv-02057-DGC
                                  )
JACK DANIEL'S PROPERTIES, INC., a )
Delaware corporation,             )
                                  )
   Defendant and Counterclaimant. )
_____)

DEPOSITION OF MICHAEL TAYLOR

Louisville, Kentucky

July 16, 2015

Prepared by:

GINA M. PINTOZZI-GOREY, RPR
KY-CCR #24574673

1    today's deposition?

2         A.    I just had a meeting yesterday with

3    Chris Larkin and Carolyn Susman, Brown-Forman's

4    attorney.

5         Q.    Okay.  Other than the meeting with

6    Brown-Forman's counsel, have you done anything else

7    to prepare for today's deposition?

8         A.    Just looked at some of our files on

9    bottle drawings and pallet patterns.

10        Q.    Now, when you say you've looked at files

11   regarding "bottle drawings," see if you can fill in

12   the details a little bit there.

13        A.    Sure.  Just to refresh my memory of the

14   designs and the shape of the bottles.

15        Q.    And when you say "the bottles," are you

16   referring specifically to what we've been -- well,

17   let's get some nomenclature straight.

18        A.    Sure.

19        Q.    The 2011 redesign of the Jack Daniel's

20   Black Label bottle we've been calling "the evolution

21   bottle"?

22        A.    Yes.

23        Q.    That's how it's referred to internally

24   at Brown-Forman?

25        A.    Yes, it is.

Michael Taylor - July 16, 2015                    8

1          Q.      Okay.  What would you like me to call

2   the immediate predecessor bottle to that?

3          A.      Evolution.

4          Q.      No.

5                  MR. LARKIN:  The current bottle is the

6   evolution.

7                  THE WITNESS:  I'm sorry.

8   BY MR. BRAY:

9          Q.      What came before the evolution bottle?

10         A.      So we have the evolution, the bevel, and

11  then the old design, which we don't have a name for.

12         Q.      Can I just call it "the old design"?

13         A.      Call it "the old design."

14         Q.      And that will refer to the design of the

15  Jack Daniel's Black Label bottle that was used, you

16  know, in the years prior to the evolution bottle.

17  And I know there was some iterations before that --

18         A.      Sure.

19         Q.      -- but I'm really interested just in the

20  bottle that was in existence 2007, '08, '09, '10, up

21  until the change.

22                 So I will call that "the old design."

23  Is that fair?

24         A.      Yes.

25         Q.      You'll understand what I'm talking

Coash & Coash, Inc.
602-258-1440        www.coashandcoash.com

1    about?

2         A.      Uh-huh.

3         Q.      In your answer I think you said the

4    "evolution," "old," and then I think you said

5    "bevel"?

6         A.      Yes.  The evolution is the current

7    bottle; bevel was the bottle with bevels or flat

8    contours on the side, the corners; and the bottle

9    prior to that was the -- what I call "the old

10   bottle," which had no bevels.  It was a square

11   bottle with radiused corners.

12                MR. BRAY:  Can you hand him Exhibit 50?

13                (EXHIBIT NO. 50 PREVIOUSLY MARKED)

14                And then turn to page 19.  There's Bates

15   numbering in the lower right.

16                MR. LARKIN:  Yeah, referenced by the

17   page number in the lower right-hand side.

18   BY MR. BRAY:

19        Q.      Okay.  I just want to make sure we're on

20   the same page.

21                My understanding is that if you're on

22   page 19 of Exhibit 50 there's kind of a history of

23   the evolution of the bottle design of the Jack

24   Daniel's Black Label.

25                Under "2011," my understanding is that's

Michael Taylor - July 16, 2015                    10

1    the evolution bottle.   Is that correct?

2           A.       2011 is the evolution bottle.

3           Q.       Okay.   And then next to that it says

4    "Current," which I think we've agreed to call "the

5    old design"?

6           A.       I call that "the bevel design."

7           Q.       Okay.   The bevel design?

8           A.       Yes.

9           Q.       And then you referred to something, we

10   were talking about something called "the old" --

11          A.       The old design is similar to what I see

12   as 1964, but this picture is not very clear.   But

13   it's similar between the '64 and what's shown here

14   to be "Current" that I call "bevel."

15          Q.       Okay.

16          A.       Okay?

17          Q.       So, again, just so we have our

18   nomenclature correct, should I refer to the

19   immediate predecessor bottle to the evolution design

20   as "the bevel design"?

21          A.       Yes, please.

22          Q.       Okay.   Going back to what you did to

23   prepare for today's deposition, you said you

24   reviewed bottle drawings.

25                   Are the drawings that you reviewed

Michael Taylor - July 16, 2015                    11

1  drawings of the bevel bottle and the evolution

2  bottle?

3        A.    Yes.  It is the evolution, the bevel,

4  and the old design.

5        Q.    Just out of curiosity -- it probably

6  doesn't make any difference -- do you know when the

7  transition was from the old design to the bevel

8  bottle?

9              MR. LARKIN:  Don't guess.  If you can

10  give him an estimate or an approximation, go ahead.

11        A.    I believe it was 1999.

12  BY MR. BRAY:

13        Q.    Okay.  So this is more for my own

14  edification.

15              Going back to this picture on

16  Exhibit 50, the bottle that's labeled "Current,"

17  that was launched in approximately 1999?

18        A.    Yes, '99.  Within a few years of that is

19  my recollection.

20        Q.    That's helpful.

21              Were you employed by Brown-Forman in

22  1999?

23        A.    Yes.

24        Q.    Do you have any understanding of the

25  reason for the redesign from what we've called "the

Michael Taylor - July 16, 2015                    12

1    old design" to the bevel design?

2            A.        Yes.

3            Q.        And what was the reason?

4            A.        The reason was that our chief executive

5    officer had a vision of taking small, incremental

6    steps at elevating the premiumness of Jack Daniel's.

7    So he was interested in evolutionary rather than

8    revolutionary change.

9            Q.        Was it the same CEO in 2011?

10           A.        No.

11           Q.        That plan for evolutionary incremental

12   changes to the Jack Daniel's bottle to move it more

13   into the premium segment, did that continue after

14   1999?

15           A.        Yes.

16           Q.        And was the evolution bottle kind of a

17   continuation of that process?

18           A.        Yes.

19           Q.        There are certain of these documents,

20   Mr. Taylor, that have been marked as Confidential-

21   Attorneys' Eyes Only, and every time I go into one

22   substantively my clients have to leave the room.

23   I'm trying to avoid that with this question.

24                    So do you anticipate or do you have any

25   knowledge as to whether there are further

1              Square bottles going into a labeler are

2    very difficult to apply labels to, particularly a

3    three-panelled label, because of the shape of the

4    label and the equipment capabilities of the cam

5    control and the wipe-down of the labels that are

6    required to be adhered sufficiently to the bottle.

7              And the bottles, continuing their

8    journey around to the case packer, are more

9    susceptible to breakage on drop-packing into the box

10   because of surge breaks, kind of hydraulic forces of

11   the bottle -- of the liquid in the bottle pushing

12   onto the side panels.

13       Q.    I think you said at the beginning of

14   your answer or implied that a round bottle has more

15   integrity than a square bottle?

16       A.    Yes.  A round bottle has more strength

17   given the same weight and wall thickness of glass.

18       Q.    And is there a scientific principle

19   underlying that that I'm not aware of?

20       A.    Yes.  It's a hoop strength of the

21   bottle.  So columns are much stronger than

22   flat-paneled-shaped bottles.  So a round cylindrical

23   bottle has more strength than a square-shaped

24   bottle.

25       Q.    Would it be fair to say that other

Michael Taylor - July 16, 2015                 65

1   shapes of liquor bottles also have their own issues

2   vis-à-vis the manufacturing process?

3               MR. LARKIN:  Objection to form.

4   BY MR. BRAY:

5        Q.      You identified that there are problems

6   associated with square bottles.

7               Are there also challenges to be overcome

8   in the manufacturing process of round bottles?

9        A.      Every shape has its own set of issues.

10  Squares are much more difficult than rounds in terms

11  of the structural integrity, the strength of the

12  bottle.

13       Q.      And you say, "Every shape has its own

14  set of issues."

15              What are the issues associated with

16  round bottles in the filling, manufacturing, putting

17  into cartons, labeling process?

18       A.      Round bottles could have issues with

19  being out-of-round or egg-shaped.  Round bottles

20  could have problems with the label panel control,

21  the bulge and sync of the panel, affecting the label

22  application and -- however, that same effect can

23  affect squares as well.

24              If you have a sunken panel, a label does

25  not apply smoothly and completely bond to the

1    surface of the glass if it has a sunken area.

2         Q.    You are not aware of any study that

3    Brown-Forman has done comparing manufacturing cost

4    of a square bottle versus a round bottle, are you?

5         A.    No.

6         Q.    You've never conducted that kind of

7    study for Brown-Forman, correct?

8         A.    No.

9         Q.    Meaning you've never conducted a study?

10        A.    I'm sorry?

11             MR. LARKIN:  Are you agreeing with his

12   statement, you've never conducted a study comparing

13   the cost of round bottles versus square bottles?

14   You have not done that?

15             THE WITNESS:  I have not done that.

16             MR. LARKIN:  Thank you.

17             MR. BRAY:  Sometimes the record can

18   become muddled with negative leading questions.

19   BY MR. BRAY:

20        Q.    You've also been designated to testify

21   as to topic number 14 in Exhibit 40.

22        A.    Uh-huh.

23             MR. LARKIN:  You need a verbal answer.

24   Yes?

25             THE WITNESS:  Yes.

# EXHIBIT O

1  QUARLES & BRADY LLP
   Gregory P. Sitrick
2  Isaac S. Crum
   One Renaissance Square
3  Two North Central Avenue
   Phoenix, Arizona 85004-2391
4  Telephone: (602) 229-5317
   Facsimile: (602) 420-5198
5  E-mail: Gregory.sitrick@quarles.com

6  SEYFARTH SHAW LLP
   Christopher C. Larkin (admitted *pro hac vice*)
7  2029 Century Park East, Suite 3500
   Los Angeles, California 90067-3021
8  Telephone: (310) 201-5289
   Facsimile: (310) 201-5219
9  E-mail: clarkin@seyfarth.com

10 Attorneys for Defendant and Counterclaimant
   JACK DANIEL'S PROPERTIES, INC.

11

12

13                    **UNITED STATES DISTRICT COURT**

14                        **DISTRICT OF ARIZONA**

15

| | |
|---|---|
| 16  VIP PRODUCTS, LLC, an Arizona limited<br>17  liability company, | **Case No. CV 14-02057 PHX DGC** |
| 18                    Plaintiff, | **DEFENDANT AND<br>COUNTERCLAIMANT JACK<br>DANIELS PROPERTIES, INC.'S<br>RESPONSES TO PLAINTIFF AND** |
| 19           v. | **COUNTER-DEFENDANT'S FIRST<br>SET OF REQUEST FOR** |
| 20  JACK DANIEL'S PROPERTIES, INC., a<br>Delaware corporation, | **PRODUCTION OF DOCUMENTS** |
| 21                    Defendant. | |
| 22  AND RELATED COUNTERCLAIMS. | |
| 23 | |

24        Defendant and counterclaimant Jack Daniel's Properties, Inc. ("JDPI") hereby

25 responds to the first set of request for production of documents propounded by plaintiff

26 and counter-defendant VIP Products, LLC ("VIP") as follows.

27

28

---

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS
19620079v.1

1    These responses are made solely for the purposes of this action. Each response is
2  made subject to all objections as to competence, relevance, materiality, propriety, and
3  admissibility, and all other objections and grounds which would require the exclusion of
4  any statements contained herein, all of which objections and grounds are expressly
5  reserved and may be interposed at the time of trial in this action.

6    JDPI's responses are based upon the information that is currently available to it.
7  JDPI's investigation and discovery in this action are ongoing and JDPI reserves the right
8  to supplement these responses in the event that additional information is obtained through
9  such investigation or discovery.

10    Nothing contained in these responses is intended to be or should be construed to be
11  an admission by JDPI of the relevance or admissibility at trial of any information
12  contained in these responses.

13                              **GENERAL OBJECTIONS**

14    JDPI objects generally to all of VIP's request for production of documents on the
15  following grounds.

16    1.    JDPI objects generally to all of VIP's requests to the extent that they seek to
17  impose upon JDPI discovery obligations beyond those contained in the Federal Rules of
18  Civil Procedure and the Local Rules of the United States District Court for the District of
19  Arizona.

20    2.    JDPI objects to each Request and to each Definition and Instruction to the
21  extent it seeks documents protected from disclosure by the attorney-client privilege, the
22  work product doctrine or any other applicable privileges, immunities, or protections from
23  disclosure. Any inadvertent disclosure of documents protected by the attorney-client
24  privilege, the work product doctrine, or any other applicable privilege, immunity, or
25  protection from disclosure is not intended and should not be construed to constitute a
26  waiver of such privilege, immunity, or protection.

27

28

                                          2

1
2
3
4
5
6
7

3.    JDPI objects to each Request and to each Definition and Instruction to the extent that it seeks the production of documents that are not in the possession, custody or control of JDPI. Unless otherwise expressly stated, a response shall not be deemed an admission that JDPI has any responsive documents in its possession, custody or control, or that any documents exist or ever existed. When a response states that the requested documents will be produced, the response shall be construed to mean that responsive documents will be searched for and, if any are found, will be produced.

8
9
10

5.    JDPI objects to each Request to the extent it calls for the production of documents that are already in VIP's custody, possession or control, are readily available to Plaintiffs, or are obtainable by VIP from public sources.

11
12
13

6.    JDPI objects to each Request to the extent it seeks documents to which VIP has equal or better access, or for which the burden on JDPI is equal to, or greater than, that of Plaintiffs in obtaining the documents.

14
15
16

7.    JDPI objects to each Request to the extent that it calls for production of documents that are cumulative or duplicative. Where a document is responsive to more than one Request, JDPI will produce the document only once.

17
18
19

8.    JDPI objects generally to each Request to the extent that it seeks documents related to business outside the United States. JDPI's responses are confined to the United States.

20
21
22
23

9.    The failure of JDPI to object to any specific Request on a particular ground shall not be construed as a waiver of its rights to object on any additional ground(s). JDPI reserves the right to amend and/or supplement its objections and responses at any time consistent with further investigation and discovery.

24
25
26
27

10.    JDPI does not concede the relevance, materiality, or admissibility of any documents sought in these Requests. JDPI's responses are without waiver or limitation of its right to object on grounds of relevance, privilege, admissibility of evidence for any purpose, or any other ground to the use of any information or documents provided or

28

3

1   referred to in its responses, in discovery or in any proceeding, or at the trial of this or any
2   other action.

3       11.    These objections and responses do not constitute, and shall not be
4   interpreted as, JDPI's agreement with, or admission as to the truth or accuracy of any
5   legal or factual characterization or allegation stated or implied in VIP's "Definitions,"
6   "Instructions," or in any of the individual Requests.

7       **RESPONSES TO FIRST SET OF REQUEST FOR PRODUCTION**
8   **REQUEST NO. 1:**

9       All DOCUMENTS sufficient to show the advertising expenditures by Defendant
10  on an annual basis to promote the JACK DANIELS TRADE DRESS.

11  **RESPONSE TO REQUEST NO. 1:**

12      JDPI interposes its General Objections and also objects specifically to this request
13  on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
14  time, geographic area, and scope, and is vague because JDPI and its licensee Brown-
15  Forman Corporation ("Brown-Forman") do not advertise and promote the Jack Daniel's
16  Trade Dress per se but rather products sold in the Jack Daniel's Trade Dress. Without
17  waiving those objections, JDPI responds as follows: JDPI will produce documents
18  sufficient to show aggregate advertising and promotion expenditures made by Brown-
19  Forman in support of Jack Daniel's Old No. 7 Tennessee whiskey in the United States.

20  **REQUEST NO. 2:**

21      All DOCUMENTS that evidence the manner in which YOU have marketed the
22  JACK DANIELS TRADE DRESS.

23  **RESPONSE TO REQUEST NO. 2:**

24      JDPI interposes its General Objections and also objects specifically to this request
25  on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
26  time, geographic area, and scope and is vague with respect to the phrase "market the
27  JACK DANIELS TRADE DRESS" because JDPI and its licensee Brown-Forman do not

28

4

1  market the Jack Daniel's Trade Dress per se but rather products sold in the Jack Daniel's
2  Trade Dress. Without waiving those objections, JDPI responds as follows: JDPI will
3  produce representative documents showing the manners of marketing products sold in the
4  Jack Daniel's Trade Dress.

5  **REQUEST NO. 3:**

6  All DOCUMENTS referring or relating, to enforcement of trademark and trade
7  dress rights by Defendant, including copies of all correspondence, pleadings, settlements,
8  judgments and other documents related to the trademarks and trade dress of Defendant.

9  **RESPONSE TO REQUEST NO. 3:**

10  JDPI interposes its General Objections and also objects specifically to this request
11  on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
12  time, geographic area, trademarks, and trade dresses, and seeks the production of "all
13  documents" relating to enforcement of all trademark rights and all trade dress rights in all
14  jurisdictions at any time, and that it seeks the production of documents that are irrelevant
15  to VIP's claims and defenses in this action and not reasonably calculated to lead to the
16  discovery of admissible evidence to the extent that it seeks documents regarding the
17  enforcement of trademarks and trade dress that have not been asserted by JDPI in this
18  action.

19  **REQUEST NO. 4:**

20  All DOCUMENTS referring or relating to any litigation involving OR
21  RELATING TO the existence, scope and/or enforceability of the JACK DANIELS
22  TRADE DRESS, including, but not limited to, pleadings, dispositive rulings, judgments,
23  and/or discovery responses.

24  **RESPONSE TO REQUEST NO. 4:**

25  JDPI interposes its General Objections and also objects specifically to this request
26  on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
27  time and geographic area and seeks the production of "all documents" relating to all

28

5

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO
PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS
19620079v.1

1  enforcement efforts as to the Jack Daniel's Trade Dress in any jurisdiction at any time,
2  and that it seeks the production of documents that are publicly available to VIP. Without
3  waiving those objections, JDPI responds as follows: JDPI will produce the settlement
4  agreements from the actions in the United States since 2005 that have involved the Jack
5  Daniel's Trade Dress, *Jack Daniel's Properties, Inc. v. J&M Concepts, LLC, et al.*, Case
6  No. 3:13-cv-001156 in the United States District Court for the Middle District of
7  Tennessee and *Independence Spirits Company, LLC, et al. v. Jack Daniel's Properties,*
8  *Inc. et al.*, Case No. 2:12-cv-02732 TJS in the United States District Court for the Eastern
9  District of Pennsylvania. The pleadings in those actions are publicly available to VIP.

10 **REQUEST NO. 5:**

11      All DOCUMENTS in which YOU intend to rely to establish the owner of the
12 JACK DANIELS TRADE DRESS is engaging in substantially exclusive use of the mark.

13 **RESPONSE TO REQUEST NO. 5:**

14      JDPI interposes its General Objections and also objects specifically to this request
15 on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
16 time and geographic area, and seeks the production of "all documents" relating to the use
17 of the Jack Daniel's Trade Dress, that it is vague with respect to the undefined term
18 "mark," and that it seeks the production of documents that are neither relevant to VIP's
19 claims and defenses in this action nor reasonably calculated to lead to the discovery of
20 admissible evidence to the extent that it seeks documents pertaining to the dilution by
21 blurring factor, as JDPI does not allege dilution by blurring in this action. Without
22 waiving those objections, JDPI responds as follows: JDPI will produce responsive
23 documents.

24 **REQUEST NO. 6:**

25      All DOCUMENTS on which YOU intend to rely to establish that the BAD
26 SPANIELS SILLY SQUEAKER presents a danger that consumers will form unfavorable
27 associations with the JACK DANIELS TRADE DRESS.

28

6

1 | **RESPONSE TO REQUEST NO. 6:**

2      JDPI interposes its General Objections.  Without waiving those objections, JDPI
3 responds as follows: JDPI will produce responsive documents in addition to the expert
4 report of Dr. Itamar Simonson.

5 | **REQUEST NO. 7:**

6      All DOCUMENTS that refer, relate, or support the allegations set forth in
7 paragraph 9 of the Counterclaim that "[t]he Jack Daniel's Trade Dress is inherently
8 distinctive, or acquired distinctiveness long prior to the commencement of VIP's acts of
9 infringement, dilution, and unfair competition complained of herein by virtue of
10 extensive sales and advertising of Jack Daniel's Tennessee whiskey featuring the Jack
11 Daniel's Trade Dress, decades of consumption by the public of Jack Daniel's Tennessee
12 whiskey packaged in the Jack Daniel's Trade Dress, extensive consumer recognition of
13 the Jack Daniel's Trade Dress, and association of the Jack Daniel's Trade Dress with
14 Jack Daniel's Tennessee whiskey."

15 | **RESPONSE TO REQUEST NO. 7:**

16      JDPI interposes its General Objections and also objects specifically to this request
17 on the ground that it is overly broad and unduly burdensome because it is unlimited as to
18 time and seeks the production of "all documents."  Without waiving those objections,
19 JDPI responds as follows: JDPI will produce responsive documents.

20 | **REQUEST NO. 8:**

21      All DOCUMENTS that refer, relate, or support the allegations set forth in
22 paragraph 9 of the Counterclaim that "[t]he combination of elements comprising the Jack
23 Daniel's Trade Dress is non-functional because it is not essential to the use or purpose of
24 Jack Daniel's Tennessee whiskey and does not affect the cost or quality of the product."

25 | **RESPONSE TO REQUEST NO. 8:**

26      JDPI interposes its General Objections and also objects specifically to this request
27 on the ground that it is overly broad and unduly burdensome because it is unlimited as to

28 |

7

1  time and geographic area and seeks the production of "all documents." Without waiving

2  those objections, JDPI responds as follows: JDPI will produce responsive documents.

3  **REQUEST NO. 9:**

4  All DOCUMENTS that refer, relate, or support the allegations set forth in

5  paragraph 9 of the Counterclaim that title JDPI Trademarks and the Jack Daniel's Trade

6  Dress are famous for whiskey in the United States and became famous long prior to the

7  commencement of VIP's acts of infringement, dilution, and unfair competition

8  complained of herein."

9  **RESPONSE TO REQUEST NO. 9:**

10  JDPI interposes its General Objections and also objects specifically to this request

11  on the ground that it is overly broad and unduly burdensome because it is unlimited as to

12  time and seeks the production of "all documents." Without waiving those objections,

13  JDPI responds as follows: JDPI will produce responsive documents.

14  **REQUEST NO. 10:**

15  All DOCUMENTS relating to the selection or adoption of the JACK DANIELS

16  TRADE DRESS.

17  **RESPONSE TO REQUEST NO. 10:**

18  JDPI interposes its General Objections and also objects specifically to this request

19  on the ground that it is overly broad and unduly burdensome because it is unlimited as to

20  time and seeks the production of "all documents." Without waiving those objections,

21  JDPI responds as follows: The Jack Daniel's Trade Dress was selected and adopted in the

22  1950s. JDPI does not have documents from the 1950s specifically regarding the selection

23  and adoption of the Jack Daniel's Trade Dress.

24  **REQUEST NO. 11:**

25  All DOCUMENTS which refer to or relate to any of Plaintiffs' internal or external

26  trademark usage policies or guidelines for the JACK DANIELS TRADE DRESS.

27

28

8

1

## RESPONSE TO REQUEST NO. 11:

2
3
4
5
6

JDPI interposes its General Objections and also objects specifically to this request on the grounds that it is overly broad and unduly burdensome because it is unlimited as to time and geographic area, and seeks the production of "all documents." Without waiving those objections, JDPI responds as follows: JDPI has no documents regarding VIP's trademark usage policies or guidelines.

7

## REQUEST NO. 12:

8
9

All DOCUMENTS relating or referring to any definition or explanation of the elements that comprise the JACK DANIELS TRADE DRESS.

10

## RESPONSE TO REQUEST NO. 12:

11
12
13
14
15
16

JDPI interposes its General Objections and also objects specifically to this request on the grounds that it is overly broad and unduly burdensome because it is unlimited as to time and geographic area, and seeks the production of "all documents," and because it is vague with respect to the phrase "definition or explanation of the elements that comprise the JACK DANIELS TRADE DRESS." Without waiving those objections, JDPI responds as follows: JDPI will produce responsive documents.

17

## REQUEST NO. 13:

18
19

All DOCUMENTS relating or referring to the bottle shape and design being part of the JACK DANIELS TRADE DRESS.

20

## RESPONSE TO REQUEST NO. 13:

21
22
23
24
25
26

JDPI interposes its General Objections and also objects specifically to this request on the grounds that it is overly broad and unduly burdensome because it is unlimited as to time and geographic area, and seeks the production of "all documents," and because it is vague with respect to the phrase "the bottle shape and design being part of the JACK DANIELS TRADE DRESS." Without waiving those objections, JDPI responds as follows: JDPI will produce responsive documents.

27
28

9

1  **REQUEST NO. 14:**

2      All DOCUMENTS that evidence or refer to any similarities between YOUR
3  marketing materials and VIP's marketing materials.

4  **RESPONSE TO REQUEST NO. 14:**

5      JDPI interposes its General Objections and also objects specifically to this request
6  on the ground that it is vague with respect to the undefined phrase "marketing materials"
7  and, in view of VIP's testimony regarding the Bad Spaniels toy, JDPI is uncertain as to
8  what, if anything, VIP considers to be "marketing materials" used in support of its Bad
9  Spaniels toy.  Without waiving those objections, JDPI responds as follows: JDPI will
10  produce responsive documents.

11  **REQUEST NO. 15:**

12      All DOCUMENTS referring or related to the establishment by Plaintiffs of the
13  famousness of the JACK DANIELS TRADE DRESS anywhere in the world, but
14  particularly within the United States.

15  **RESPONSE TO REQUEST NO. 15:**

16      JDPI interposes its General Objections and also objects specifically to this request
17  on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
18  time and geographic area and seeks the production of "all documents."  Without waiving
19  those objections, JDPI responds as follows: JDPI has no documents regarding VIP's
20  establishment of the "famousness" of the Jack Daniel's Trade Dress.  As set forth in
21  JDPI's responses to VIP's interrogatories, JDPI will produce documents regarding the
22  fame of the Jack Daniel's Trade Dress pursuant to Rule 33(d) of the Federal Rules of
23  Civil Procedure.

24  **REQUEST NO. 16:**

25      All registrations or applications for registration of the JACK DANIELS TRADE
26  DRESS or other trade dress of any of Plaintiffs' product in any country.

27

28                                      10

1

**RESPONSE TO REQUEST NO. 16:**

2       JDPI interposes its General Objections and also objects specifically to this request
3   on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
4   time, geographic area, trade dress, and products and seeks the production of "all
5   registrations and applications for registration" of any trade dress for any product in any
6   country, that it seeks the production of documents that are irrelevant to VIP's claims and
7   defenses in this action and not reasonably calculated to lead to the discovery of
8   admissible evidence to the extent that it seeks registrations and applications of any trade
9   dress for any product in any country, and that it seeks documents that are publicly
10  available to VIP.  Without waiving those objections, JDPI responds as follows: JDPI has
11  not sought registration in the United States of the combination of elements that comprise
12  the Jack Daniel's Trade Dress as shown and described in paragraph 6 of JDPI's
13  counterclaims. The file history of United States Trademark Registration No. 4,106,178,
14  which covers certain elements of the Jack Daniel's Trade Dress, is publicly available to
15  VIP from the website of the United States Patent and Trademark Office. JDPI has no
16  responsive documents regarding any applications to register any other elements of the
17  Jack Daniel's Trade Dress in the United States since 2005.  JDPI has no documents
18  regarding any applications to register the trade dress of any of VIP's products.

19  **REQUEST NO. 17:**

20      All DOCUMENTS identified in response to Plaintiffs First Set of Non-Uniform
21  Interrogatories directed to JDP or referred to or used in the preparation of the answers to
22  the interrogatories.

23  **RESPONSE TO REQUEST NO. 17:**

24      JDPI interposes its General Objections.  Without waiving those objections, JDPI
25  responds as follows: JDPI will produce responsive documents.

26
27
28

11

1 **REQUEST NO. 18:**

2      All DOCUMENTS relating to any and all alleged uses in commerce of the JACK

3 DANIELS TRADE DRESS, including, without limitation, advertisements, catalogs,

4 circulars, sales literature, brochures, bulletins, flyers, signs, sales displays, posters, points

5 of sale, website pages or promotional materials of any type ever published, broadcast or

6 displayed containing or depicting the JACK DANIELS TRADE DRESS.

7 **RESPONSE TO REQUEST NO. 18:**

8      JDPI interposes its General Objections and also objects specifically to this request

9 on the ground that it is overly broad and unduly burdensome because it is unlimited as to

10 time and geographic area, and seeks the production of "all documents." Without waiving

11 those objections, JDPI responds as follows: JDPI will produce a representative sample of

12 advertisements, promotional materials, and social media featuring the Jack Daniel's

13 Trade Dress and used in the United States.

14 **REQUEST NO. 19:**

15      All DOCUMENTS relating to any application by Plaintiffs to register any of its

16 trade dress or marks as a trademark with any governmental authority both in the United

17 States and abroad.

18 **RESPONSE TO REQUEST NO. 19:**

19      JDPI interposes its General Objections and also objects specifically to this request

20 on the grounds that it is overly broad and unduly burdensome because it is unlimited as to

21 time, geographic area, trademark and trade dress, and seeks the production of "all

22 documents." Without waiving those objections, JDPI responds as follows: JDPI has no

23 documents regarding any application filed by VIP to register its trade dress or marks in

24 the United States.

25 **REQUEST NO. 20:**

26      All DOCUMENTS referring or relating to the Jack Daniels bottle design, shape,

27 and size.

28

12

1  **RESPONSE TO REQUEST NO. 20:**

2  JDPI interposes its General Objections and also objects specifically to this request
3  on the grounds that it is overly broad and unduly burdensome because it is unlimited as to
4  time and geographic area, and seeks the production of "all documents" of any sort
5  referring or relating in any way to the Jack Daniel's bottle design, shape, and size at any
6  time since the 19th Century.

7  **REQUEST NO. 21:**

8  All DOCUMENTS in which you intend to rely to establish the extent of the actual
9  recognition of the JACK DANIELS TRADE DRESS.

10  **RESPONSE TO REQUEST NO. 21:**

11  JDPI interposes its General Objections and also objects specifically to this request
12  on the ground that it seeks the production of documents that are neither relevant to VIP's
13  claims and defenses in this action nor reasonably calculated to lead to the discovery of
14  admissible evidence to the extent that it seeks documents pertaining to the dilution by
15  blurring factor, as JDPI does not allege dilution by blurring in this action. Without
16  waiving those objections, JDPI responds as follows: JDPI will produce responsive
17  documents.

18  **REQUEST NO. 22:**

19  All DOCUMENTS that in your opinion demonstrate similarity between the JACK
20  DANIELS TRADE DRESS and the BAD SPANIELS SILLY SQUEAKER.

21  **RESPONSE TO REQUEST NO. 22:**

22  JDPI interposes its General Objections. Without waiving those objections, JDPI
23  responds as follows: JDPI will produce responsive documents.

24  **REQUEST NO. 23:**

25  All DOCUMENTS that in your opinion demonstrate the similarity between the
26  shape and configuration of the Jack Daniels bottle design and the BAD SPANIELS
27  SILLY SQUEAKER.

28

13

1  **RESPONSE TO REQUEST NO. 23:**

2      JDPI interposes its General Objections.  Without waiving those objections, JDPI

3  responds as follows: JDPI will produce responsive documents.

4  <div align="center">QUARLES & BRADY LLP</div>

5  <div align="center">SEYFARTH SHAW LLP</div>

6  Dated:  May 14, 2015         By:

7                                    Christopher C. Larkin
                                  Attorneys for Defendant and

8                                    Counterclaimant
                                  JACK DANIEL'S PROPERTIES, INC.

14

DEFENDANT AND COUNTERCLAIMANT JACK DANIELS PROPERTIES, INC.'S RESPONSES TO PLAINTIFF AND COUNTER-DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS

1

## **CERTIFICATE OF SERVICE**

2  I hereby certify that on May 14, 2015, I served the foregoing DEFENDANT AND

3  COUNTERCLAIMANT'S RESPONSES TO PLAINTIFF AND COUNTER-

4  DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS

5  on the parties identified below in the manner identified below:

6  **VIP Products LLC (via Electronic Mail and First Class Mail)**

7  David G. Bray, Esq.
8  DICKINSON WRIGHT, PLLC
   1850 North Central Avenue, Suite 1400
9  Phoenix, Arizona 85004
   Direct Line: 602-285-5033
10  DBray@dickinsonwright.com

11  _____
    Christopher C. Larkin

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28