# EXHIBIT Q

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, L.L.C., an Arizona limited liability company,<br><br>                    Plaintiff,<br><br>        v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation<br><br><br>                    Defendant, | No. 2:14-cv-02057-DGC<br><br><br><br>**RULE 26 EXPERT REPORT OF**<br><br>**MARTIN WOLINSKY** |
| Jack Daniel's Properties, Inc., a Delaware corporation<br><br><br>                    Counterclaimant,<br><br><br>        v.<br><br><br>VIP Products, L.L.C., an Arizona limited liability company,<br><br>                    Counterdefendant. | |

WOL0001

RULE 26 EXPERT REPORT OF MARTIN WOLINSKY

Table of Contents

**Introduction** ................................................................................................................. 3

**The Process** ................................................................................................................... 3

**Industry Strategic Packaging Issues** ......................................................................... 4

**Tequila** ........................................................................................................................... 4

**Gin** .................................................................................................................................. 4

**Vodka** ............................................................................................................................. 5

**Bourbon/Tennessee Whiskey** ...................................................................................... 5

**Conclusions** ................................................................................................................... 6

**Attachments** .................................................................................................................. 7

    Images of Jack Daniel's and Competitors ................................................................. 8

    Uniform vs. a Unique Bourbon Package ................................................................... 9

    Uniform vs. Unique Gin Packages ........................................................................... 10

    Uniform vs. Unique Vodka Packages ...................................................................... 11

    Uniform vs. Unique Tequila Packages .................................................................... 12

    A Unique vs. Uniform Canadian whisky packages ................................................. 13

    Uniform to Unique Package* Scale ......................................................................... 14

    Survey of On/Off Premise Accounts ....................................................................... 15

    Web-Sites Visited .................................................................................................... 16

    Bottle Design Chart with Web-Site Excerpts .......................................................... 17

    Resume ..................................................................................................................... 24

WOL0002

**Introduction**

My name is Martin Wolinsky.

I am the former President of the Smirnoff Vodka Division in the U.S. for Diageo, plc., the world's largest distilled spirits company.

In this role, I led the world's largest spirit brand, in the world's most valuable vodka market (U.S.), as President, Smirnoff Division, with $2 billion+ in annual revenue.

I am widely recognized throughout the U.S. distilled spirits and wine industries as an expert in marketing, sales, organization behavior and profit maximization for distilled spirits and wine in the U.S.  I have consulted, and am currently consulting, with major U.S. distilled spirits and wine companies. My prior consulting clients have included Jim Beam Brands, Brown-Forman, Bacardi U.S.A., Sydney Frank Importing Company, Sazerac Company, E & J Gallo Winery, and others. In addition, I have consulted with major wine and spirits wholesale organizations across the country, as well as domestic and foreign companies seeking to introduce their distilled spirits products into the U.S. market.  I have also consulted in the development of new spirits products for major industry supplier clients as well as startup companies.

I earned an MBA degree from American University and am a graduate of Ohio State University.

**The Process**

I have been retained by VIP Products, LLC., to collect and analyze information regarding distilled spirits packaging in the bourbon/Tennessee Whiskey market segment and Jack Daniel's brand packaging in particular.

The process detailed below is similar to the one I used as an industry executive to compare the brands I managed versus competitive brands. The process involved a number of steps taken between May 23 and June 10, 2015, including:

- I visited retail stores, viewing major distilled spirits categories including the bourbon/ Tennessee Whiskey segment brands and compared these American brand packages with Jack Daniel's, side by side on retailer shelves.*

- I visited on-premises accounts* (bars, and restaurants with bars) and questioned bartenders/waits taff, managers and proprietors regarding the brands served in their venues.

- I visited upscale hotel venues with restaurants/bars* and questioned their bartenders/wait staff, managers and proprietors.

- I visited a number of Web sites reviewing bourbon brands, such as RecentEatsSku.com and others.  (The list of sites attached also includes many common bourbon descriptive words/terms that appear on these sites)*.

- I reviewed distilled spirits reference materials regarding packaging, including the book "Bourbon Empire, American Whiskey," by author Reid  Mitenbuler.

- I reviewed certain Brown Forman documents regarding Jack Daniel's, including brand strategy, package design and labels.

-------------
*(see attached)

**Industry Strategic Packaging Issues**

From my experience, I have observed that distilled spirits brand packaging takes one of two possible paths - "Uniform," or "Unique." Uniform packaging adopts the "functional" path - where the overall look of the products, and each specific brand in a Category (whiskey), or Segment (bourbon), instantly conveys to consumers the nature and heritage of the product contained in the package (THE UNIFORM).

The advantages of using the Uniform strategy is that a brand "wearing the Uniform" provides clear communication to the consumer as to the type and heritage of the spirit. The result is the Uniform brings security and validation to the consumer for his/her brand choice.

"Unique" packaging totally breaks away from the Uniform path of brands of the Segment and introduces a totally different overall "look" to the package, appearing distinct.

Examples of Unique spirit packages include Maker's Mark in the bourbon segment and Crown Royal in the Canadian Whisky segment. The advantage of the Unique package strategy is a higher level of brand equity, rather than having a "me too" generic package in the Uniform. This strategy generally leads to more pricing power and enhanced brand equity.


**Tequila**

Tequila packaging is more varied than bourbon, but it has brands in the Uniform camp, at least for the volume brands. The exceptions to the Tequila Uniform are the higher priced, 100% agave brands. The major volume Tequila brands, including leader Jose Cuervo and Sauza, generally feature ornate Mexican design elements on the labels. The Uniform design elements of these volume brands include;

- square shoulders bottles, with design elements or text molded into the glass.

- multiple labels, face, neck, neck wrap. Yellow color labels are common for brands in this category.

- "busy" label(s) with many design elements (signatures, images of awards/seals, agave plants, etc.)

- caps match the color of the Tequila inside.


**Gin**

Gin brands packaging wears the British Uniform in the volume segment of the category-traditional brands such as Beefeater, Gordon's, Tanqueray, Bombay, etc. While there are still more exceptions to the Uniform strategy in the gin segment than in the bourbon segment, especially in the newer/higher priced gins, the traditional gin brand Uniform includes;

- "age" statement ("1820") molded into the glass bottle, or shown on the label.

- references to London, England, including license/grants/documents certifying the Queen's approval of the brand. The Queen's royal seal may appear on the label.

- "dry gin" is prominently featured on the label, as in "London Dry Gin." (was there ever a "wet" gin?)

- labels may contain drawings of persons depicted, such as the Beefeater royal guard in his uniform and carrying his scepter (Beefeater Gin), or Queen Victoria (Bombay Gin).

WOL0004

**Vodka**

Vodka is the largest distilled spirits category, and features brands with Unique rather than Uniform packaging strategies. Vodka is made in countries all over the world, including the U.S., and imports to the U.S. are a significant share of category sales (30% -40%). Bottle shapes may vary from soft shoulder, graceful wine bottle shapes, to Unique medicinal/apothecary look (Absolut, (Sweden)), to hard shouldered, tapered bottles (Smirnoff), to the transparent see-through Grey Goose and Belvedere brand packages, etc. Some vodka labels are very formal, with authentic looking Russian style typefaces, either from the era of the Czars, or military/Soviet style (Stolichnaya), etc. There is no Uniform for packaging in the vodka category.

**Bourbon/Tennessee Whiskey**

Many bourbon and Tennessee whiskey brand's packaging are very similar (Uniform) when compared to other competitors in this segment. In the case of Jack Daniel's, it is clear that the packaging strategy for this brand was to adopt the Uniform strategy, as shown in the attached photos of key brands in the bourbon product segment, which conveys most/all of the four characteristics of their Uniform packaging strategy;

- a square bottle with a ribbed neck

- a black cap

- a black neck wrap closure with white printing

- a black front label with white printing

Maker's Mark is an example of an exception to the common Uniform packaging in the bourbon segment, and demonstrates a UNIQUE packaging strategy for this brand (see attached whiskey bottle images).

The descriptive terms/lexicon/language used in the bourbon segment Web sites by Jack Daniel's and competitive brands are the same, or similar, in meaning, as follows:

- "Old, Old World, Century Old, Old time, Old fashioned"

- "Classic"

- "Historic, heritage, original"

- "Timeless, time honored"

- "Honored"

Importantly, recently published industry data indicates that consumer sales of the Jack Daniel's brand, like Makers Mark, Crown Royal and Grey Goose, are approximately 30% - 50% on premise (bars).[1] Therefore, in the on-premises accounts visited, bartenders were asked how their consumers "called" (ordered their drink) for the Jack Daniel's brand;

- By bottle appearance ("square bottle")?

- By label design/elements?

- By brand name?

---

[1] Confidential industry data obtained by author

All proprietors, bartenders and wait staff queried answered that Jack Daniel's Tennessee Whiskey was called for by consumers by brand name, not by bottle shape or label design/elements. According to those questioned, consumers called for the brand as "Jack Daniel's, or "Jack," or by a "nickname," such as "Black Jack."

## Conclusions

I have reached the following conclusions based on my knowledge, long professional experience, reviews of relevant literature and my field research:

(1). The overall Jack Daniel's Tennessee Whiskey packaging *is not distinctive* (not Unique) in the bourbon/Tennessee whiskey segment in the U.S. because of clear adherence to the four common characteristics summarized again below:

- a square bottle with a ribbed neck

- a black cap

- a black neck wrap closure with white printing

- a black front label with white printing

The combination of the four common features of the bottle and label design of the Jack Daniel's Old No. 7 Tennessee whiskey bottle provide Jack Daniel's Tennessee whiskey with a standard industry "uniform" that identifies the Jack Daniel's Tennessee whiskey as an American whiskey, not just a Jack Daniel's whiskey. Therefore, common features of the bottle and label design of the Jack Daniel's Old No. 7 Tennessee whiskey bottle have a function that is wholly independent of identifying the whiskey as a Jack Daniel's whiskey.

(2). The overall Jack Daniel's packaging *is clearly aesthetically functional*, utilizing all the common elements of the Uniform adopted by numerous other major brands in the bourbon/Tennessee whiskey segment in the U.S., as shown in the photos of competitive whiskeys attached to this document. For that reason, I believe that giving Jack Daniel's exclusive rights to use the combined four key features on the bottle and label design of the Jack Daniel's Old No. 7 Tennessee whiskey bottle would impose a competitive disadvantage on other companies selling Kentucky and Tennessee American whiskey. The disadvantage would be to deprive those other competing companies the ability to use a standard industry "uniform" that identifies any whiskey as an American whiskey, not just a whiskey whose reputation is related to Jack Daniel's.

(3). The overall packaging of the Jack Daniel's Old No. 7 Tennessee whiskey and that of the competitive bourbon brands pictured in the attached photos look like "first cousins" rather than individually distinctive brand packaging.

(4). The overall majority of brand equity in the Jack Daniel's Old No. 7 Tennessee whiskey bottle is in the brand name ("call"), rather than the appearance of the bottle and label.

Martin Wolinsky,

June 10, 2015

**<u>Attachments</u>**

Photos - Jack Daniels, competitors

Photos - Uniform and Unique packages, selected categories

Uniform - Unique package scale

Survey - On/Off premise establishments in 2 states

Review of competitive Web sites and classic terms used at each site

Bottle Design Chart with Web-Site Excerpts

Resume

WOL0007

## Images of Jack Daniel's and Competitors







WOL0008

## Uniform vs. a Unique Bourbon Package

 

*Unique*

----------------------------------------------------------------------------------------------------------------------------

*Uniform*

   

WOL0009

## <u>Uniform vs. Unique Gin Packages</u>



*Unique*

-------------------------------------------------------------------------------------------------------------------

*Uniform*

   

WOL0010

## Uniform vs. Unique Vodka Packages



*Unique*

--------------------------------------------------------------------------------------------------------------------------

*Uniform*



WOL0011

## Uniform vs. Unique Tequila Packages



*Unique*

------------------------------------------------------------------------------------------------------

*Uniform*

   

WOL0012

## A Unique vs. Uniform Canadian whisky packages



*Unique*

-------------------------------------------------------------------------------------------------------------------------------

*Uniform*

  

   

WOL0013

## Uniform to Unique Package* Scale

(1= most Uniform, 10= most Unique)

**Uniform**                                                                                      **Unique**

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|----|

| | Canadian Whiskies | Bourbon/ TN whiskies | | | | Gin | | Tequila | Vodka | |

\* Packages shown are representative of their categories/segments

WOL0014

**<u>Survey of On/Off Premise Accounts</u>**

**State/Account**

**<u>CT</u>**

- Max's Oyster Bar
  - Bracco
  - Flemings
  - Treva
- Ruth's Chris Steakhouse
- Marriott Farmington Hotel

**<u>NJ</u>**

- Rennaisance Hotel
  - Kilroy
  - Vesta Italian
- Riggle Clam Bar
  - Puthenfond
  - Canistadt
- East Rutherford

WOL0015

## Web-Sites Visited

| Web-site | Classic terms used at site |
|---|---|
| Jack Daniels | "Century old methods" |
| Early Times | "Old world craftsmanship" |
| George Dickel | "The classic #8 whiskey" |
| Jim Beam | "Classic smooth sipping experience"<br>"America's native spirit" |
| Old Crow | "Original sour mash bourbon"<br>"Historic bourbon" |
| Clayton James | "Heritage whiskey" |
| Evan Williams | "Traditional bourbon, time honored methods" |
| Henry McKenna | "Old time quality bourbon" |
| Sazerac Benchmark | "A label that honors the storied history of the distillery." |
| Zara Harris | "Classic Kentucky bourbon" |
| Collier & McKeel | "Old fashioned way" |
| Old Bardstown | "Timeless classic" |
| Johnny Drum | "Time honored old fashioned recipe" |

WOL0016

## Bottle Design Chart with Web-Site Excerpts



| Distillery, Location and Brand | Bottle Design by Brand | Website Excerpts |
|---|---|---|
| *George Dickel* (Diageo), Cascade Hollow, Tullahoma, TN.<br><br>*"Classic ...Whiskey"*<br><br>*". . . classic, smooth – sipping experience"* | | *http://www.georgedickel.com/whiskies.aspx#!no8* |
| *Jim Beam (Beam Suntory),* Clermont & Boston, KY.<br><br>*"America's Native Spirit"* | Jim Beam | *http://www.jimbeam.com/about-bourbon/bourbon-ingredients* |

WOL0017

| | | |
|---|---|---|
| *Jim Beam*<br>*Continued*<br><br><br>**"The original sour mash bourbon."**<br><br>**" . . . one of the most historic bourbons. . . . "** | Old Crow<br><br>  | *http://www.beamsuntory.com/brands/old-crow*<br><br><br><br>(text too faint to read) |
| *Tenn South Distillery, Lynnville, TN.*<br><br><br>**"...heritage whiskey..."** | <br><br> | *http://www.tennsouthdistillery.com/our-spirits/clayton-james-whiskey/*<br><br> |

WOL0018

| | | |
|---|---|---|
| *Heaven Hill*, Louisville, KY.<br><br>**"Traditional Bourbon."**<br><br>**"...producing bourbon with the same time-honored methods..."** | Evan Williams<br><br> | *http://www.evanwilliams.com/bourbons.php*<br><br> |
| *Heaven Hill*, (Continued)<br><br><br>**"old-time quality bourbon..."** | Henry McKenna<br><br> | *http://heavenhill.com/brand/19*<br><br> |

| | | |
|---|---|---|
| _Buffalo Trace (Sazerac Co.)_, Frankfort, KY.<br><br>_"… [a] label that honors the storied history…"_ | Benchmark<br><br> | http://www.buffalotracedistillery.com/brands/benchmark<br><br># Benchmark<br>Named after the McAfee brothers who surveyed a site just north of Frankfort in the late 1700s. This rye recipe bourbon is yet another label that honors the storied history of the Distillery and the land it sits on. |
| _Barton 1792 Distillery (Sazerac Co.)_, Bardstown, KY.<br><br>_"…a classic Kentucky bourbon."_ | Zachariah Harris<br><br> | http://www.sazerac.com/BrandPortfolio.aspx?parent=ZH99&PCID=7&FID=203&NBid=1<br><br>## Zackariah Harris Bourbon<br><br>Zackariah Harris is made in Kentucky, where bourbon is an art form and where generations respect the hard work and time honored traditions that make it America's most treasured spirit. Full, smooth and delicious, Zackariah Harris is a classic Kentucky bourbon. |

| | | |
|---|---|---|
| *Brown Forman*, Shively, KY.<br><br><br><br>*"...old-world craftmanship...."* |  | *http://www.earlytimes.com/heritage/whisky.aspx*<br><br>[dark text box, largely illegible]<br><br><br>*http://www.earlytimes.com/heritage/bourbon.aspx*<br><br>[dark text box, largely illegible] |
| *Jack Daniel's*<br><br>(Brown Forman), Lynchburg, TN.<br><br>*"...more than a century later, our Tennessee Whiskey is still judged the same way."* | Jack Daniel's Tennessee Whiskey<br><br> | *http://www.jackdaniels.com/whiskey/jack-daniels-old-no-7*<br><br>**OLD NO. 7**<br><br>We do things a little differently around here — and that's what gives Jack Daniel's its distinctive character. We charcoal mellow our whiskey drop by drop, then let it age in our own handcrafted barrels. And we don't follow a calendar. Our Tennessee Sippin' Whiskey is ready only when our tasters say it is. We use our senses, just like Jack Daniel himself did. In fact, more than a century later, our Tennessee Whiskey is still judged the same way. By the way it looks. By the way it smells. And, of course, by the way it tastes. |

WOL0021

| *Collier and McKeel*, Nashville, TN.<br><br>**"...the old fashioned way..."** |  | http://www.collierandmckeel.com/products_tennessee.php<br><br>**TENNESSEE WHISKEY**<br><br>True Tennessee Whiskey is special. It's not just whiskey made in Tennessee and it's not Bourbon Whiskey, it's more.<br><br>To make Collier and McKeel first we bring limestone filtered water from our family farm on the Big Richland Creek and use it to make a mash of corn, rye and malted barley. Then we distill it in our hand-hammered copper pot still.<br><br>At this point it changes from plain whiskey to Tennessee Whiskey when we drip it through several feet of sugar maple charcoal, made from trees cut by  hand sawmills and burned on the farm. This gives Collier and McKeel the smooth, sweet, smoky taste that Tennessee Whiskey is known for. Only true Tennessee Whiskey is put through this extra step.<br><br>We age Collier and McKeel in very small barrels that are far more expensive than standard sized barrels but adds intense flavors that are our special gift whiskey making in Tennessee. And unlike some whiskies that have an artificial time table for the proper time in a barrel, we determine when it's time to bottle the old fashioned way when it taste right. |
| *Willett Distillery* (Kentucky)<br><br>**"...this timeless classic..."** | Old Bardstown<br><br> | http://www.kentuckybourbonwhiskey.com/Old-Bardstown_Black-Label-86<br><br>In 1941 a bay filly named Twilight Tear, called Suzie for short, was foaled. She was sired by the great Bull Lea, who was the leading sire in America five times, siring 58 stakes winners, four Horses of the Year, and three Kentucky Derby winners. Twilight Tear's race record is quite impressive. In 24 races she won 18 times, and took second and third twice, respectively. In 1944 "Suzie" was named Horse of the Year, and in 1963 she was inducted into the National Thoroughbred Racing Hall of Fame.<br><br>1952 was the year in which Twilight Tear produced a bay gelding by the name of Bardstown. The bay gelding did not race until the age of four due to a series of ankle and leg problems.<br><br>In 1956 Bardstown made his first start, and quickly became one of the elite handicap horses in the country. That same year, Bardstown won the Buckeye Handicap, the Gallorette Mile and the Trenton Handicap. His "1956 Earnings" was a substantial $173,060.<br><br>As a five-year-old, Bardstown had an impressive four wins in six starts, including the prestigious Widener, the Gulfstream Park and the Tropical Handicaps.<br><br>In 1959 much of the activity for Calumet Farm was provided by 7-year-old Bardstown, which, despite soundness problems, won three of his five starts, including, once again, the Widener Handicap, along with the Tropical Park Handicap.<br><br>In 31 career starts, Bardstown had 18 first place finishes, 7 second and 1 third place finish. The bay gelding had total earnings of $628,752.<br><br>This fine Kentucky Straight Bourbon Whiskey is named after Bardstown because we admire his perseverance and persistence. Sit back and enjoy this timeless classic, which is bred in the heart of the bluegrass, just like Bardstown. |

| | Johnny Drum | *http://www.kentuckybourbonwhiskey.com/Johnny-Drum_Black-Label* |
|---|---|---|
| *Willett Distillery* (Continued) **"...this time honored recipe..."** |  | |
| Highland Park Holm Road, Kirkwall, Orkney, KW15 1SU **"...tradition rather than novelty..."** **"...unbroken tradition of whiskey-making..."** |  | *//highlandpark.co.uk/about/the-distillery/* |

WOL0023

## Resume

Martin Owen Wolinsky
85 Memorial Road
West Hartford ,CT 06107

### PROFESSIONAL EXPERIENCE

**Owen Consulting**  1996 - present

President and Owner

Consultant for major U.S. distilled spirits, and wine companies. Clients have included Jim  Beam Brands ,Brown-Forman ,Bacardi U.S.A ,Sydney Frank Importing Company, Sazerac, Deep  Eddy Vodka  E&J Gallo Winery.  Also, consulted with major wine, and spirits wholesale organizations across the country and domestic and foreign companies seeking to introduce products into the U.S. market.

**DIAGEO PLC.**   1978-1996

Sr.  V.P –Distribution Strategy (1994-1996)

President, Smirnoff Vodka Company (1986-1994)

Responsibilities included –marketing and sales for a portfolio of brands including Smirnoff  Vodka, Popov Vodka, and Christian Brothers Brand

Sr. V.P. Sales- Wine and Spirits  (1984-1986)

Lead a 600 person, national sales organization

Sales Management (1978-1984)

Five promotions: Area Manager; Regional Manager; Division V.P.;V.P. Wines; V.P. Spirits; and Sr .V.P. Sales

**E.&J. Gallo Winery**  1972-1978

Seven promotions in six years.  Locations included Detroit, Los Angeles, Chicago and Twin Cities

### EDUCATIONAL EXPERIENCE

**American University -**  MBA - 1970

**Ohio State** - B.S. – 1969

### PUBLICATIONS

*None*

### PRIOR EXPERT TESTIMONY

*None*

### COMPENSATION

*$600 per hour*

WOL0024

EXHIBIT R

Christopher Hungerford - July 16, 2015

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP PRODUCTS, L.L.C., an Arizona    )
limited liability company          )
                                   )
    Plaintiff and Counterdefendant; )
                                   )
              vs.                   )  No. 2:14-cv-02057-DGC
                                   )
JACK DANIEL'S PROPERTIES, INC., a  )
Delaware corporation,              )
                                   )
    Defendant and Counterclaimant. )
_____)


DEPOSITION OF CHRISTOPHER HUNGERFORD


July 16, 2015









Prepared by:

GINA M. PINTOZZI-GOREY, RPR
KY-CCR #24574673

**Coash & Coash, Inc.**
**602-258-1440      www.coashandcoash.com**

1                    INDEX TO EXAMINATION

2

    WITNESS:  CHRISTOPHER HUNGERFORD

3
    EXAMINATION  BY MR. BRAY ..................... 4

4

5

6

7

8

9                    INDEX TO EXHIBITS

10
    EXHIBIT NO. 16 ..................................
11      (CONFIDENTIAL PORTION)
    EXHIBIT NO. 43 .................................. 73
12      (ANSWER AND COUNTERCLAIMS FILED BY JACK
        DANIEL'S)
13    EXHIBIT NO. 46 .................................. 10
        (HAND-DRAWN ORGANIZATIONAL CHART)
14    EXHIBIT NO. 47 .................................. 41
        (RULE 26(A)(2)(C) DISCLOSURE OF DEFENDANT
15      AND COUNTERCLAIMANT JACK DANIEL'S
        PROPERTIES, INC.)
16    EXHIBIT NO. 48 .................................. 82
        (DEFENDANT AND COUNTERCLAIM OF JACK
17      DANIEL'S PROPERTIES, INC.'S RESPONSES TO
        PLAINTIFF AND FIRST SET OF
18      INTERROGATORIES)
    EXHIBIT NO. 49 .................................. 88
19      (ILLINOIS GLASS COMPANY CATALOG, 1906)
    EXHIBIT NO. 50 ..................................
20      (CONFIDENTIAL PORTION)
    EXHIBIT NO. 51 ..................................
21      (CONFIDENTIAL PORTION)
    EXHIBIT NO. 52 .................................. 108
22      (RULE 26 EXPERT REPORT OF JOHN HOWARD)
    EXHIBIT NO. 53 .................................. 119
23      (REPORT BY MR. SACRA)

24

25

1        A.      I'm referring to the square bottle, the

2   black cap, the neck wrap, the trade dress, which is

3   the Jack Daniel's arched logo, the cartouche that's

4   in the middle that says "Old No. 7."

5        Q.      And are you familiar with the trademark

6   that Jack Daniel's has received or Brown-Forman has

7   received for the evolution bottle design?

8        A.      Yes.

9        Q.      Are these elements the same as are

10  included in the registration for the evolution

11  bottle trademark?

12       A.      Yes.

13       Q.      Does the evolution bottle trademark

14  include the black front label?

15             MR. LARKIN:  Don't speculate.  If you

16  need to see it --

17       A.      Okay.  Then show it to me.

18             MR. BRAY:  We're using consistent

19  exhibits, at least for our witnesses, so you can

20  mark that as Exhibit 43.

21             (EXHIBIT NO. 43 PREVIOUSLY MARKED)

22  BY MR. BRAY:

23       Q.      If you would take a look at Exhibit 1 to

24  Exhibit 43 --

25             MR. LARKIN:  I'll get it for you.

Christopher Hungerford - July 16, 2015                    74

1   BY MR. BRAY:

2        Q.      -- which I'll aver to you,

3   Mr. Hungerford, is the answer and counterclaim as

4   filed by Jack Daniel's.

5              Do you understand this to be the

6   trademark registration -- I'm sorry.

7              Do you understand Exhibit 1, which is

8   trademark registration number 4106178 -- and that's

9   Exhibit 1 to the complaint which is Exhibit 43 to

10  your deposition.

11             Do you understand this trademark to be

12  the trademark that Jack Daniel's obtained for its

13  evolution bottle?

14       A.      Yes.

15       Q.      All right.  Is that the -- are the

16  elements reflected in registration number 4106178

17  the same or different than the combination of

18  elements that you identified as Jack Daniel's trade

19  dress in your opinions?

20       A.      They are similar but not exact.

21       Q.      Okay.  And, for instance, trademark

22  4106178 doesn't include, as part of its elements, a

23  black front label bearing the Jack Daniel's and Old

24  No. 7 brand marks and other elements in white,

25  correct?

 1          A.      I do not see that here.

 2          Q.      Okay.  How did you select the

 3     combination of elements that you identified in your

 4     opinion as not affecting the cost and quality of

 5     Jack Daniel's Tennessee Whiskey?  Or strike that.

 6               How did you identify the combination of

 7     elements included in your expert opinion as

 8     comprising Jack Daniel's trade dress?

 9               Do you understand that question?

10          A.      I don't.

11               (BEGIN CONFIDENTIAL EXCERPT)

12     ///

13     ///

14     ///

15

16

17

18

19

20

21

22

23

24

25

Christopher Hungerford - July 16, 2015                    76

```
 1              MR. BRAY:  Okay.  All right.  I think we
 2   can bring Steve in.
 3              MR. LARKIN:  We can go off the
 4   Attorneys' Eyes Only portion.
 5              (MR. AND MRS. SACRA AGAIN PRESENT)
 6   BY MR. BRAY:
 7      Q.    Continuing on Exhibit 47, the last part
 8   of page 3 under "Materials," go ahead and read
 9   those -- read that sentence and then just look up
10   when you're done.
11      A.    Okay.
12      Q.    Okay.  Your expert disclosure says:  "In
13   giving testimony in the above-captioned matter,
14   Mr. Hungerford may rely upon the testimony of other
15   witnesses."
16              Do you see that?
17      A.    Yes.
18      Q.    What other -- what testimony of other
19   witnesses do you anticipate relying on?
20      A.    I think the one I was thinking of was --
21   I'm sure you're talking to Mike Taylor a little
22   later in beverage packaging, because he's the
23   engineering expert.
24      Q.    Okay.  Any others?
25      A.    Phil Epps, who I think is from the
```

Christopher Hungerford - July 16, 2015                    92

```
 1   of course, the label, and I'm fairly certain that
 2   there was some sort of blown-in deco in the glass
 3   itself.
 4          Q.      All right.  Take a look at the next page
 5   of Exhibit 49, which is VIP 00281, which are more
 6   depictions of stock glass bottles from Illinois
 7   Glass Company.
 8                  Does the far left bottle resemble the
 9   Jack Daniel's whiskey bottle that was for sale in
10   1906?
11          A.      It has some similarities, yes.
12          Q.      And what are those similarities?
13          A.      Square shape, fluted neck.  I think
14   that's about it.
15          Q.      What differences do you see?
16                  Just so the record is clear, what
17   differences can you identify between the bottle
18   depicted on VIP 00281, the far left picture, as
19   compared to the bottle that was being used by Jack
20   Daniel's in approximately 1906 for its Black Label
21   whiskey?
22          A.      To be honest, I'm not remembering if it
23   had the scallops on it or not, which would be around
24   the neck and shoulder.
25          Q.      Do you know at any of your focus
```

1    groups -- Chris, once you get the question, you can

2    tell me if Steve needs to leave -- revealed whether

3    the American consuming public associates -- or let

4    me strike that.

5             Have any of your focus groups revealed

6    that your consumers perceive or expect Kentucky or

7    Tennessee whiskey to appear in a square bottle with

8    a fluted neck?

9             MR. LARKIN:  You can -- if that's the

10   question, you can answer.  We won't go off.

11        A.    I would say yes.

12   BY MR. BRAY:

13        Q.    And there are other American -- strike

14   that.

15             Can you read my question and answer

16   back?

17             MR. LARKIN:  Yeah, I'd like to hear it,

18   too.  And you would, too.

19             THE WITNESS:  Yeah, right.

20             (REPORTER READS THE RECORD)

21             MR. BRAY:  I think we're done with

22   Exhibit 49.

23   BY MR. BRAY:

24        Q.    All right.  If you could go back to

25   Exhibit 48, which are the interrogatory responses,

1   Mr. Hungerford.

2           I am going to ask you about the second

3   paragraph under Interrogatory No. 2 or the response

4   to Interrogatory No. 2.  It starts on page 9, and

5   then it goes to page 10.

6           And then if you could read it, and when

7   you're done reading it, look up and I'll ask you

8   some questions.

9           The second sentence of the paragraph,

10  second paragraph, the bottom of page 9 of

11  Exhibit 48, states:  "Square bottles are generally

12  more difficult to manufacture, and their shape can

13  also create problems in the bottling process."

14          Do you see that?

15      A.      I do.

16      Q.      Do you consider yourself an expert in

17  terms of whether -- the bottling manufacturing

18  process?

19      A.      I am not an expert.

20      Q.      Do you have an opinion whether square

21  bottles generally are more difficult to manufacture

22  than other shaped bottles?

23      A.      I do have an opinion.

24      Q.      What's your opinion?

25      A.      My opinion is that they are more

1          Was your conversation with Mr. Taylor

2   regarding the customized square bottle, the

3   evolution bottle?

4          A.    It was about the evolution bottle, yes.

5          Q.    It wasn't regarding square bottles in

6   general, right?

7          A.    Correct.

8          Q.    And you don't know whether or not square

9   bottles provide any benefit in terms of packaging

10  efficiency or shipping over round bottles, do you?

11          MR. LARKIN:  Objection to form.  Calls

12  for speculation.  You can answer.

13          A.    I do not.

14  BY MR. BRAY:

15          Q.    Mr. Taylor hasn't told you anything

16  about that?

17          A.    No.

18          MR. BRAY:  Why don't we take a short

19  break?  I need to use the restroom.

20          (RECESS)

21  BY MR. BRAY:

22          Q.    Mr. Hungerford, I hope we're in the home

23  stretch.  Probably about another hour I told you

24  during the break, maybe a little bit less.

25          We're still looking at Exhibit 48, which

Christopher Hungerford - July 16, 2015                104

1    is the interrogatory responses.

2              On page 10 I'm going to ask you about

3    some statements in the second paragraph starting at

4    line 7.  If you want to read that and just look up

5    when you're done?

6         A.      Okay.

7         Q.      The first sentence says, "The main

8    function of a bottle neck wrap is to provide

9    evidence against tampering."

10             Do you see that?

11        A.      Yes.

12        Q.      Do you agree that a bottle neck wrap is

13   functional?

14        A.      Yes.

15        Q.      And then you state -- or I'm sorry.

16   Jack Daniel's Properties, Inc., in its interrogatory

17   response states:  "Everything else, including color,

18   graphics, and whether to conceal the fill line, is a

19   design choice."

20             Do you see that?

21        A.      I do.

22        Q.      Do you know whether you played any role

23   in answering this interrogatory, Mr. Hungerford?

24        A.      I did not play any role in answering

25   this.

```
 1          Q.     Do you agree with the statement that
 2   everything else, including color, graphics, and
 3   whether to conceal the fill line, is a design
 4   choice?
 5          A.     Yes.
 6          Q.     And when you say that, what's your
 7   understanding of what a -- strike that.
 8                 What do you mean by "design choice"?
 9          A.     That shrink wrap -- that neck wrap --
10   excuse me.  The neck wrap for that could be clear.
11   So it was our choice to make it black.  It was our
12   choice to have a black cap.  It was our choice to
13   put a graphic on it.  Those were all choices that we
14   made.
15          Q.     As the director of global design, would
16   you agree with me that there are certain elements of
17   packaging, production design, used by a number of
18   American Tennessee/Kentucky whiskey and bourbons in
19   order to invoke sort of an old-time or classic feel?
20                 MR. LARKIN:  Objection to form.  If you
21   understand the question, go ahead.
22          A.     I do.
23                 Yes, they are more prevalent in labels,
24   but people do use an antiqued finish on a label to
25   make it look old-timey.
```

EXHIBIT S

EXHIBIT REDACTED

EXHIBIT T

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made effective this 24 day of april , 2014 (the "Effective Date"), by and among Jack Daniel's Properties, Inc., a Delaware corporation with offices at 4040 Civic Center Drive, Suite 528, San Rafael, California 94903 ("JDPI"), on the one hand, and J&M Concepts, LLC, a Nevada limited liability company with offices at 330 W. Spring St., Suite 260, Columbus, Ohio 43215 ("J&M") and Popcorn Sutton Distilling, LLC, a Delaware limited liability company with offices at 330 W. Spring St., Suite 260, Columbus, Ohio 43215 ("PSD" and, together with J&M, the "Popcorn Sutton Parties"), on the other hand, and is made with reference to the following facts.

## RECITALS

A.      JDPI owns the trademarks and trade dress used in connection with Jack Daniel's Tennessee Whiskey, which has long been sold in a trade dress consisting of a combination of a square-shaped bottle with angled shoulders that house a raised signature on four sides, and beveled corners, and labeling with a white-on-black color scheme and various filigree designs (the "Jack Daniel's Trade Dress").  The current Jack Daniel's Trade Dress is depicted in Exhibit 1 attached hereto.

B.      The Popcorn Sutton Parties produce, market and sell Popcorn Sutton's Tennessee White Whiskey.  The current packaging for the product is depicted in Exhibit 2 attached hereto (the "Current Popcorn Sutton's Trade Dress").  A previous version of the packaging for the product is depicted in Exhibit 3 attached hereto (the "Mason Jar Packaging").

C.      On October 18, 2013, JDPI commenced an action in the United States District Court for the Middle District of Tennessee entitled *Jack Daniel's Properties, Inc. v. J&M Concepts, LLC and Popcorn Sutton Distilling, LLC*, Case No. 13-cv-01156 (the "Civil Action") against the Popcorn Sutton Parties, in which JDPI alleged that their use of the Current Popcorn

JDPI000288

Sutton's Trade Dress infringed and diluted JDPI's trademarks and the Jack Daniel's Trade Dress, and constituted unfair competition. The Popcorn Sutton Parties denied the material allegations of JDPI's complaint in the Civil Action in their answer, and interposed certain affirmative defenses.

D.     JDPI and the Popcorn Sutton Parties have discussed a resolution of the Civil Action without further litigation, and have reached an agreement to that end. This Agreement contains and constitutes the terms on which they have agreed to resolve the Civil Action.

NOW THEREFORE, in consideration of the foregoing recitals and the covenants and promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, JDPI and the Popcorn Sutton Parties hereby agree as follows:

**TERMS AND CONDITIONS**

1.     **Disposition of Products in Current Popcorn Sutton's Trade Dress Inventory and Cessation of Use of Current Popcorn Sutton's Trade Dress.**

(a)     The Popcorn Sutton Parties represent and warrant to JDPI that as of the Effective Date of this Agreement they will have in their possession, custody, or control no more than (i) 900 9-liter cases of labeled and filled bottles of Popcorn Sutton's Tennessee White Whiskey in the Current Popcorn Sutton's Trade Dress (the "Current Completed Inventory"); (ii) 2,900 9-liter cases of labeled bottles of Popcorn Sutton's Tennessee White Whiskey in the Current Popcorn Sutton's Trade Dress in the process of being filled, and unlabeled bottles of Popcorn Sutton's Tennessee White Whiskey in the process of being labeled and filled (the "Current In-Process Inventory") (together with the Current Completed Inventory, the "Current Total Inventory").

(b)     JDPI and the Popcorn Sutton Parties agree that after the Effective Date of this Agreement, the Popcorn Sutton Parties may advertise, market, promote, display, offer for sale, sell, and distribute the Current Completed Inventory until the earlier of: (i) the date upon which

2

JDPI000289

Current Completed Inventory is completely depleted (the "Complete Depletion Date"), or (ii) July 1, 2014 (the "Depletion Deadline").  The Popcorn Sutton Parties agree that if they do not fully deplete the Current Completed Inventory prior to the Depletion Deadline, they will destroy, or cause to be destroyed, any portion of the Total Current Inventory that remains in their possession, custody, or control on the Depletion Deadline, within 30 business days after the Depletion Deadline.

(c)     The Popcorn Sutton Parties agree that upon the earlier of the Complete Depletion Date or the Depletion Deadline, they will: (i) completely and permanently cease all advertisement, marketing, promotion, display, offering for sale, sale, and distribution of the Total Current Inventory; (ii) give JDPI written notice, in the manner set forth in paragraph 6 below, of the complete depletion of the Current Completed Inventory, or of the amount of the Total Current Inventory that remains in their possession, custody, or control on the Depletion Deadline, as the case may be and, in the latter case, of the date and place of the destruction of the remaining portion of the Total Current Inventory so that JDPI or its designee may have the opportunity to be present to observe the destruction; (iii) destroy or cause to be destroyed all advertising or promotional materials depicting the Current Popcorn Sutton's Trade Dress in their possession, custody, or control, and modify their Internet and social media websites and pages to remove any depictions of the Current Popcorn Sutton's Trade Dress; (iv) provide to JDPI, in the manner set forth in paragraph 6 below, the executed original of the Certificate of Destruction and Modification attached hereto as Exhibit 4; (v) never use the Current Popcorn Sutton's Trade Dress, or any trade dress that colorably imitates, or is confusingly similar to, the Jack Daniel's Trade Dress, in connection with the manufacture, promotion, advertisement, marketing, promotion, display, offering for sale, sale, or distribution of any future alcoholic beverage; and

3

(vi) never challenge, or assist any third party in challenging, JDPI's ownership of its trademarks and the Jack Daniel's Trade Dress, or the validity or enforceability of the same.

### 2.    JDPI's Consent to Alternative Packaging.

So long as the Popcorn Sutton Parties are in full compliance with their obligations under paragraph 1 above, JDPI consents to, and agrees not to challenge the Popcorn Sutton Parties' use, in connection with Popcorn Sutton's Tennessee White Whiskey, of the Mason Jar Packaging and the packaging depicted in Exhibit 5 attached hereto.

### 3.    Disposition of Civil Action.

JDPI and the Popcorn Sutton Parties agree to instruct their respective counsel of record in the Civil Action to execute and file with the Court in the Civil Action, within three calendar days of the Effective Date, the original of the Joint Motion to Dismiss attached hereto as Exhibit 6, pursuant to which they stipulate to the dismissal of the Civil Action with prejudice, with all parties to bear their own attorneys' fees and costs.

### 4.    Successors and Assigns, Etc.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties' respective successors, affiliates, licensees, and assigns.

### 5.    Representations and Warranties.

(a)    In addition to the Popcorn Sutton Parties' representations and warranties to JDPI in sub-paragraph 1(a) above, they represent and warrant to JDPI that: (i) they are limited liability companies in good standing with the legal capacity to enter into this Agreement and to bind themselves to the performance of their obligations hereunder; (ii) they are the sole owners of the Current Popcorn Sutton's Trade Dress, free and clear of any claims or ownership interests of any third party, have not transferred their respective interests in the same to any other person, and can enter into this Agreement, and bind themselves to the performance of their obligations

4

JDPI000291

hereunder, including the cessation of all uses of the Current Popcorn Sutton's Trade Dress, without having to obtain the consent or approval of any other person; (iii) they have had the opportunity to seek legal advice from counsel of their choosing in connection with the Civil Action and its resolution, and have freely and voluntarily entered into this Agreement and undertaken their obligations hereunder; and (iv) this Agreement is a binding obligation that is enforceable against them according to its terms.

(b)    JDPI represents and warrants to the Popcorn Sutton Parties that: (i) it is a corporation in good standing with the legal capacity to enter into this Agreement; (ii) it is the sole owner of the Jack Daniel's trademarks and Jack Daniel's Trade Dress and can enter into this Agreement, and bind itself to performance hereunder, without having to obtain the consent or approval of any other person; and (iii) this Agreement is a binding obligation enforceable against JDPI according to its terms.

6.    **Notices.**

Any notices required or permitted to be given under this Agreement shall be given in writing by overnight courier or e-mail as follows:

**If to JDPI:**

David S. Gooder, Esq.
Jack Daniel's Properties, Inc.
4040 Civic Center Drive, Suite 528
San Rafael, CA 94903
E-mail: david_gooder@jdpi.com

**With a copy to:**

Christopher C. Larkin, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, CA  90067-3021
E-mail: clarkin@seyfarth.com

5

JDPI000292

**If to the Popcorn Sutton Parties:**

Megan Browning Kvamme
Chief Executive Officer
330 W. Spring Street, Suite 260
Columbus, OH 43125
E-mail: megan@jandmconcepts.com

Notices shall be effective upon confirmation of the receiving party's receipt of the notice by overnight courier or e-mail.  The parties may change their addresses for purposes of notice by giving notice of the change in the manner set forth in this paragraph.

7.     **Limited Releases.**

(a)     Effective as of, and conditioned upon, JDPI's receipt of the executed original of the Certificate of Destruction and Modification attached hereto as Exhibit 4, JDPI releases and discharges the Popcorn Sutton Parties from all claims, demands, causes of action, and liabilities for trademark infringement, dilution, unfair competition, and any other claims that were asserted by JDPI in the Civil Action, or that could have been asserted by JDPI in the Civil Action on the basis of the facts alleged in JDPI's complaint therein; provided, however, that nothing contained in this limited release shall constitute any release of any other claim that JDPI has or may have against the Popcorn Sutton Parties, now or in the future, or any claim by JDPI for breach of this Agreement by the Popcorn Sutton Parties.

(b)     The Popcorn Sutton Parties hereby forever release and discharge JDPI, and its officers, directors, affiliates, employees, and attorneys from all claims, demands, causes of action, and liabilities arising from JDPI's assertion of claims for trademark infringement, dilution, and unfair competition in the Civil Action, any defenses asserted by the Popcorn Sutton Parties in the Civil Action, and any counterclaims that could have been asserted by Popcorn Sutton in the Civil Action on the basis of the facts alleged in JDPI's complaint and the Popcorn Sutton Parties' answer in the Civil Action; provided, however, that nothing contained in this

6

JDPI000293

limited release shall constitute any release of any other claims that the Popcorn Sutton Parties have or may have against JDPI, now or in the future, or any claim by the Popcorn Sutton Parties for breach of this Agreement by JDPI.

**8.**    **Disputes.**

(a)    The Popcorn Sutton Parties acknowledge and agree that any breach of any of their obligations under paragraph 1 above would cause irreparable injury to JDPI and that immediate injunctive relief against such breach would be appropriate, in addition to any other legal or equitable relief to which JDPI may be entitled, and that JDPI will not need to post any bond to obtain such injunctive relief.

(b)    JDPI and the Popcorn Sutton Parties agree that the prevailing party or parties in any dispute under this Agreement shall be entitled to its or their attorneys' fees and costs in addition to any other legal or equitable relief to which it or they may be entitled.

**9.**    **Miscellaneous.**

(a)    The parties agree that each will take such steps and execute such documents as may reasonably be required to effectuate the intent of this Agreement.

(b)    The headings of the paragraphs of this Agreement are for convenience only and shall not affect the Agreement's construction or interpretation.

(c)    The parties acknowledge and agree that this Agreement is a compromise settlement of disputed claims, and that their entry into this Agreement is not an admission of liability on the part of any party with respect to the disputed matters set forth above.

(d)    The negotiation and drafting of this Agreement have been participated in by all of the parties, and for all purposes this Agreement shall be deemed to have been drafted by all of the parties.

7

JDPI000295

(e)    If for any reason any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement nevertheless shall be construed, performed, and enforced as if the invalidated or unenforceable provision had not been included in the Agreement.

(f)    The failure by any party to this Agreement to enforce any provision of this Agreement shall not be deemed a continuing waiver or a waiver of any other rights under this Agreement.

**10.    Entire Agreement; Modification; Effective Date.**

This Agreement contains and constitutes the entire agreement among JDPI and the Popcorn Sutton Parties with respect to its subject matter.  There are no separate or independent agreement, promises, obligations, representations, or undertakings.  Any prior and contemporaneous agreements, promises, obligations, representations, and undertakings between JDPI and the Popcorn Sutton Parties are expressly superseded.  This Agreement may be modified only by a writing signed by all parties.  The Effective Date of this Agreement is the date upon which the original of this Agreement is fully executed by all parties.

WHEREFORE, the parties have executed this Agreement as of the Effective Date by the signature below of their duly-authorized representatives.

JACK DANIEL'S PROPERTIES, INC.

Dated: 4|28, 2014         By: _____
                             David S. Gooder, Managing Director

J&M CONCEPTS, LLC

Dated: 25 april, 2014      By: _____
                             Megan Browning Kvamme
                             Chief Executive Office

8

JDPI000296

POPCORN SUTTON DISTILLING, LLC

Dated: **25 april**, 2014

By: _Megang Bkvamme_

Megan Browning Kvamme
Chief Executive Officer

9

JDPI000297

# EXHIBIT 1

JDPI000298



JDPI000299

# EXHIBIT 2

JDPI000300



JDPI000301

# EXHIBIT 3

JDPI000302



JDPI000303

# EXHIBIT 4

JDPI000304

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JACK DANIEL'S PROPERTIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:13-cv-01156 |
| | ) | Judge Campbell |
| J&M CONCEPTS, LLC, and POPCORN | ) | Magistrate Judge Bryant |
| SUTTON DISTILLING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF DESTRUCTION AND MODIFICATION OF J&M CONCEPTS AND POPCORN SUTTON DISTILLING, LLC

I, MEGAN BROWNING KVAMME, hereby declare as follows:

1.     I am the Chief Executive Officer of J&M Concepts, LLC ("J&M") and Popcorn Sutton Distilling, LLC ("PSD"), the defendants in the above-captioned action.  I make this declaration on the basis of my own personal knowledge.

2.     I executed a Settlement Agreement (the "Agreement") with plaintiff Jack Daniel's Properties, Inc. ("JDPI") in this matter on behalf of J&M and PSD on April ___, 2014.  Pursuant to sub-paragraphs 1(c) (iii) and (iv) of the Agreement, I hereby certify to JDPI that as of the earlier of the Complete Depletion Date or the Depletion Deadline (both as defined in the Agreement), as the case may be: (a) all advertising and promotional material depicting the Current Popcorn Sutton's Trade Dress (as defined in the Agreement) in J&M and/or PSD's possession, custody, or control have been destroyed, and (b) J&M's and PSD's Internet and social media websites and pages have been modified to remove any depictions of the Current Popcorn Sutton's Trade Dress.

JDPI000305

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _____ day of _____, 2014 at Columbus, Ohio.

_____
MEGAN BROWNING KVAMME

JDPI000306

# EXHIBIT 5

JDPI000307



JDPI000308



JDPI000309



JDPI000310



JDPI000311

# EXHIBIT 6

JDPI000312

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JACK DANIEL'S PROPERTIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:13-cv-01156 |
| | ) | Judge Campbell |
| J&M CONCEPTS, LLC, and POPCORN | ) | Magistrate Judge Bryant |
| SUTTON DISTILLING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## JOINT MOTION TO DISMISS

COMES NOW the parties, through counsel, which jointly move the Court, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure and the parties' settlement of this action, for an order dismissing plaintiff's complaint with prejudice, with all parties to bear their own attorneys' fees and costs.

Respectfully Submitted:

BASS, BERRY & SIMS, PLLC

DATED: _____, 2014         By: _____ s/ Paige W. Miller _____
Paige Waldrop Mills
150 Third Avenue South
Suite 2800
Nashville, TN 3720
(615) 742-7700 (phone)
(615) 742-0429 (fax)
pmills@bassberry.com

*Attorneys for Plaintiff*

JDPI000313

BONE MCALESTER NORTON PLLC

DATED: _____, 2014     By: _____ s/ Anne C. Martin _____
                                    Anne C. Martin
                                    William T. Cheek, III
                                    511 Union Street, Suite 1600
                                    Nashville, Tennessee 37219
                                    (615) 238-6318 (phone)
                                    (615) 238-6301 (fax)
                                    amartin@bonelaw.com

                                    *Attorneys for Defendants*

2

EXHIBIT U

EXHIBIT REDACTED