**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, LLC, | No. CV-14-2057-PHX-SMM |
| Plaintiff, | |
| vs. | **MEMORANDUM OF DECISION AND ORDER** |
| Jack Daniel's Properties, Inc., | |
| Defendant. | |
| And Related Counterclaim. | |

Pending before the Court is Plaintiff VIP Products, LLC's ("VIP") motion for summary judgment. (Doc. 110.) VIP contends that it is entitled to judgment as a matter of law on its Amended Complaint that contains three claims for declaratory relief. (Id.) VIP further contends that it is entitled to judgment as a matter of law on all of the claims that Defendant Jack Daniel's Properties Inc.'s ("JDPI") brought as Counterclaims in its Answer. (Id.) The matter is fully briefed.

Also pending is JDPI's motion for partial summary judgment. (Doc. 101.) At issue, JDPI moves for partial summary judgment regarding VIP's second and third claims. (Id.) The matter is fully briefed.

Finally, there are pending motions associated with the parties' cross-motions for summary judgment, which are also fully briefed.

The Court will deny VIP's motion for summary judgment, grant JDPI's motion for

partial summary judgment, and resolve all of the pending motions associated with the parties' cross-motions for summary judgment.[1] The Court will set a status hearing for the parties in order to discuss the remaining matters that must be adjudicated at trial.

**FACTUAL BACKGROUND**

The Court will summarize the basic factual background here. In its discussion of the particular claims, the Court will discuss certain relevant and material facts that arise in conjunction with those particular legal claims at issue.

VIP designs, manufactures, markets, and sells chew toys for dogs. VIP sells various brands of dog chew toys, including the "Tuffy's" line (durable sewn/soft toys), the "Mighty" line (durable toys made of a different material than the Tuffy's line), and the "Silly Squeakers" line (durable rubber squeaky novelty toys). (Doc. 110 at 2.) In July of 2013, VIP introduced its latest novelty dog toy, the "Bad Spaniels" durable rubber squeaky novelty dog toy. (Doc. 158.) The Bad Spaniels toy is in the shape of a liquor bottle and features a wide-eyed spaniel over the words "Bad Spaniels, the Old No. 2, on your Tennessee Carpet." (Id.) The design for the Bad Spaniels toy has many similarities to the bottle design for Jack Daniel's Tennessee Sour Mash Whiskey ("Old No. 7 Brand"). (Doc. 157.) These similarities include the shape of the product, the use of white lettering over a black background, and font styles. Nevertheless, on the back of the Silly Squeakers packaging for the Bad Spaniels toy, it states: "This product is not affiliated with Jack Daniel's." (Doc. 158.)

JDPI promptly demanded that VIP stop selling the new toy. (Doc. 47.) VIP responded by filing this suit seeking a declaratory judgment. (Doc. 49.) In Claim 1, VIP alleged that its use of the Bad Spaniels' name and trademark does not infringe or dilute any claimed trademark rights that JDPI may claim in its Jack Daniel's trademark for its Tennessee sour mash whiskey and/or any other product. (Id. at 9.) In Claim 2, VIP alleged that neither the

---

[1] Both parties have requested oral argument. Based on the parties' extensive legal memoranda and submitted supporting evidence, the Court will not set oral argument on the parties' cross-motions as it would not aid the Court's decisional process. See e.g., Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

Jack Daniel's trade dress nor the Jack Daniel's bottle design are entitled to trademark protection because they are functional; they contain merely ornamental and decorative features; they are generic; and they are non-distinctive. (Id. at 9-10.) In Claim 3, VIP alleges that Jack Daniel's bottle design is not entitled to Patent and Trademark Office ("PTO") registration because it is functional, generic, and non-distinctive. (Id. at 10-11.) The PTO registration states that JDPI's trademark consists of a three-dimensional configuration of the square shaped bottle container for the goods having an embossed signature design comprised of the words, "Jack Daniel." (Doc. 49 at 5.) VIP contends that JDPI's trademark registration should be cancelled. (Id. at 10-11.)

In response, JDPI answered VIP's complaint and filed nine separate counterclaims: (1) Infringement of JDPI's federally-registered trademarks and trade dress under the Lanham Act, 15 U.S.C. § 1114, 1116-18; (2) Trade dress infringement in violation of federal law, 15 U.S.C. § 1114, 1116-18 and 1125; (3) Dilution by tarnishment of the JDPI trademarks under 15 U.S.C. § 1125(c); (4) Dilution by tarnishment of the Jack Daniel's trade dress under 15 U.S.C. § 1125(c); (5) Trademark infringement in violation of Arizona law, A.R.S. §§ 44-1451 et seq.; (6) Infringement of the JDPI trademarks and unfair competition at common law; (7) Infringement of the Jack Daniel's trade dress at common law; (8) Dilution of the JDPI trademarks under A.R.S. § 44-1448.01; and (9) Dilution of the Jack Daniel's trade dress under A.R.S. § 44-1448.01. (Doc. 12.)

JDPI alleged in its Answer that it owns a trade dress consisting of a combination of square bottle with a ribbed neck, a black cap, a black neck wrap closure with white printing bearing the OLD NO. 7 mark, and a black front label with white printing and a filigreed border bearing the JACK DANIEL'S trademark depicted in arched lettering at the top of the label, the OLD NO. 7 trademark contained within a filigreed oval design in the middle portion of the label beneath the JACK DANIEL'S trademark, and the words "Tennessee Sour Mash Whiskey" in the lower portion of the label with the word "Tennessee" depicted in script. (Doc. 12 at 5 ¶ 6; see also Doc. 101 at 9.)

VIP has moved for summary judgment contending that JDPI's infringement and

1   dilution claims be denied because the defenses of nominative and First Amendment fair use
2   shield it from liability. (Doc. 110.) VIP further argues that even if those defenses do not
3   apply, VIP is still entitled to summary judgment on all claims because JDPI cannot prove its
4   dilution claims under the Trademark Dilution Revision Act ("TDRA"); as to JDPI's
5   infringement claims, that Jack Daniel's Tennessee Whiskey ("JDTW") trademarks and bottle
6   dress are functional and non-distinctive. (Id. at 3, 15-28.)

7          JDPI moves for partial summary judgment on VIP's Amended Complaint. (Doc. 101.)
8   As to Claim 1, JDPI leaves for trial the issue of whether VIP's alleged parody infringes or
9   dilutes the Jack Daniel's trademarks and trade dress. (Id. at 7.) As to Claims 2 and 3, JDPI
10  acknowledges that it bears the burden of proof regarding the protectability of its Jack
11  Daniel's trade dress. (Id.) JDPI disputes that the Jack Daniel's trade dress and the trademark
12  shown in United States Trademark Registration No. 4,106,178 (See Doc. 12 at 7) are
13  functional, contain merely ornamental and decorative features that do not function as
14  trademarks, are generic, and are non-distinctive. (Doc. 101 at 6.)

15                                    **STANDARD OF REVIEW**

16         *Summary Judgment*

17         "A party may move for summary judgment, identifying each claim or defense–or the
18  part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a)
19  A court must grant summary judgment if the pleadings and supporting documents, viewed
20  in the light most favorable to the nonmoving party, show "that there is no genuine issue as
21  to any material fact and the movant is entitled to judgment as a matter of law." Id.; see
22  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union,
23  24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material.
24  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at
25  1130. "Only disputes over facts that might affect the outcome of the suit under the governing
26  law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The
27  dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could
28  return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

1    A principal purpose of summary judgment is "to isolate and dispose of factually
2    unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against
3    a party who "fails to make a showing sufficient to establish the existence of an element
4    essential to that party's case, and on which that party will bear the burden of proof at trial."
5    Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994).  The
6    moving party need not disprove matters on which the opponent has the burden of proof at
7    trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may not rest upon
8    the mere allegations or denials of the party's pleadings, but must set forth "specific facts
9    showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith
10   Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010));
11   Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). The non-movant's
12   bare assertions, standing alone, are insufficient to create a material issue of fact and defeat
13   a motion for summary judgment. Anderson, 477 U.S. at 247–48.

14   *General Trademark Principles*

15   "A trademark is a limited property right in a particular word, phrase or symbol." New
16   Kids on the Block v. News Am. Publ'n, Inc., 971 F.2d 302, 306 (9th Cir. 1992). "Throughout
17   the development of trademark law, the purpose of trademarks remained constant and limited:
18   Identification of the manufacturer or sponsor of a good or the provider of a service.[] And
19   the wrong protected against was traditionally equally limited: Preventing producers from
20   free-riding on their rivals' marks." Id. at 305.  "[T]he holder of a trademark will be denied
21   protection if it is (or becomes) generic, i.e., if it does not relate exclusively to the trademark
22   owner's product." Id. at 306.

23   To state an infringement claim, whether it be a trademark claim or a trade dress claim,
24   a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3)
25   likelihood of confusion. Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d
26   1042, 1047 (9th Cir. 1998).

27   *General Trade Dress Principles*

28   "Trade dress refers generally to the total image, design, and overall appearance of

- 5 -

a product." <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 765 n.1 (1992). It may include the packaging, the "dress" of a product or the design of a bottle. <u>See Fiji Water Co. v. Fiji Mineral Water U.S., LLC</u>, 741 F. Supp. 2d 1165, 1172-74 (C.D. Cal. 2010). A product's trade dress or packaging is protectable under trademark law so long as the trade dress is nonfunctional and distinctive. <u>See Wal-Mart Stores, Inc. v. Samara Bros.</u>, 529 U.S. 205, 210 (2000); <u>Kendall-Jackson</u>, 150 F.3d at 1047. "[T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive." <u>Kendall-Jackson</u>, 150 F.3d at 1050.

The trade dress of a product is "distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 769 (1992). Broadly speaking, trade dress is inherently distinctive if it is so "unique, unusual, or unexpected in this market that one can assume without proof that it will automatically be perceived by consumers as an indicator of origin[.]" <u>Fiji Water</u>, 741 F. Supp. 2d at 1176 (citing <u>Seabrook Foods, Inc. v. Bar-Well Foods Ltd.</u>, 568 F.2d 1342, 1344 (C.C.P.A. 1977)). Trade dress may also acquire distinctiveness through secondary meaning, that is, when the trade dress "'has come through use to be uniquely associated with a specific source.'" <u>Two Pesos</u>, 505 U.S. at 766 n.4 (quoting <u>Restatement (Third) of Unfair Competition</u> § 13 (1995)).

The trade dress of a product is functional if the trade dress is essential to the use or purpose of the product or affects the cost or quality of the product. <u>See Disc Golf Ass'n v. Champion Discs, Inc.</u>, 158 F.3d 1002, 1006 (9th Cir. 1998). The Ninth Circuit utilizes four factors to consider whether a product feature is functional: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. <u>See Disc Golf</u>, 158 F.3d at 1006. No one factor is dispositive; all are to be weighed collectively. <u>See International Jensen, Inc. v. Metrosound U.S., Inc.</u>, 4 F.3d 819, 823 (9th Cir. 1993).

1    Alternatively, under the aesthetic functionality test, trade dress may be functional if

2    "protection of the [trade dress] as a trademark would impose a significant non-reputation

3    related competitive disadvantage." <u>Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.</u>, 457

4    F.3d 1062, 1072 (9th Cir. 2006) (citing <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>,

5    532 U.S. 23, 32-33 (2001)). This means that trade dress is aesthetically functional when it

6    "serve[s] an aesthetic purpose wholly independent of any source-identifying function, or in

7    other words, where the consumer is driven to purchase the product based on how it looks."

8    <u>Fiji Water</u>, 741 F. Supp. 2d at 1173 (further quotation and citation omitted).

9    **DISCUSSION**

10   The Court will first discuss VIP's motion for summary judgment. (Doc. 110.)

11   **I. VIP's Defenses**

12   VIP first contends that all of JDPI's counterclaims for infringement and dilution must

13   be denied because VIP's defenses of nominative fair use and First Amendment fair use shield

14   it from liability. (Doc. 110 at 3.)

15   *Nominative Fair Use*

16   Trademark law recognizes a defense where a registered trademark is used only "to

17   describe the goods or services of a party, or their geographic origin. <u>See</u> <u>New Kids</u>, 971 F.2d

18   at 306. "The 'fair use' defense, in essence, forbids a trademark registrant to appropriate a

19   descriptive term for his exclusive use and so prevent others from accurately describing a

20   characteristic of their goods." <u>Id.</u> (further citation omitted).

21   To establish nominative fair use, first, "the product or service in question must be one

22   not readily identifiable without use of the trademark; second, only so much of the mark or

23   marks may be used as is reasonably necessary to identify the product or service;[] and third,

24   the user must do nothing that would, in conjunction with the mark, suggest sponsorship or

25   endorsement by the trademark holder." <u>Id.</u> at 308.

26   VIP argues that its product constitutes nominative fair use of the JDTW Marks and

27   Bottle Dress because: (1) the JDTW Marks and Bottle Dress are not readily identifiable

28   without using several of their elements. Given the medium of the parody, a three-dimensional

1   dog toy, VIP argues that it had to utilize several key components of the JDTW Marks and

2   Bottle Dress; (2) VIP used only so much of the JDTW Marks and Bottle Dress that were

3   reasonably necessary to identify the bottle. VIP otherwise states that it did not specifically

4   use any of JDPI's registered marks; and (3) VIP did nothing to suggest that JDPI had

5   sponsored or endorsed the VIP Product. (See Doc. 110 at 4.)

6       JDPI contends that the nominative fair use defense does not apply because this

7   defense only applies where a defendant uses the plaintiff's identical mark or trade dress.

8   (Doc. 142 at 10-11.) Here, VIP did not identically use JDPI's trademarks or trade dress. (Id.)

9   According to JDPI, the nominative fair use doctrine applies only "where a defendant has used

10  the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal

11  is to describe his own product," citing Cairns v. Franklin Mint Co., 292 F.3d 1139, 1151 (9th

12  Cir. 2002) (finding that it was necessary for the defendant to use the name and likeness of

13  Princess Diana to refer to its "Diana-related" merchandise). (Doc. 142 at 10-11.)

14      The Court does not find that VIP is entitled to be shielded from liability based on its

15  nominative fair use defense. VIP's Bad Spaniels toy closely imitates the Jack Daniel's Trade

16  Dress and marks, but it did not use any of JDPI's registered marks, including the Jack

17  Daniel's name; the number 7; the embossed Jack Daniel's' signature on the bottle; the same

18  filigree design on the label; the three-sided body label, or the identical combination of

19  elements constituting the trade dress. Under the New Kids test, when a defendant uses a

20  trademark nominally, the trademark will be identical to the plaintiff's mark, at least in terms

21  of the words in question. 971 F.2d at 308. As further stated in Playboy Enter., Inc. v. Welles,

22  279 F.3d 796, 801 (9th Cir. 2001), it is the defendant's very use of the plaintiff's identical

23  trademark that makes the nominative fair use analysis necessary rather than application of

24  AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) which utilizes eight factors to

25  focus on the similarity of the trademarks used by the plaintiff and the defendant in order to

26  determine liability for likelihood of confusion in the marketplace. Because it is undisputed

27  that VIP did not use JDPI's identical marks or trade dress in its Bad Spaniels toy, the

28  nominative fair use doctrine does not apply as matter of law.

*First Amendment Fair Use*

Next, VIP argues that JDPI's infringement and dilution claims must fail because VIP's Bad Spaniels' parody use of the JDTW Marks and Bottle Dress is protected speech under the First Amendment. (Doc. 110 at 6.) VIP states that its dog toy parody qualifies as an expressive work under the First Amendment. (Id.) VIP argues that in order to qualify as "expressive use," first a defendant must have used the mark "beyond its source-identifying function" (Id. at 6 (citing Mattel Inc. v. MCA Records, Inc., 296 F.3d 894, 900 (9th Cir. 2002)), and second, its parody form of expression must not be part of a commercial transaction. (Id. at 6-7, (citing Nissan Motor Co. v. Nissan Comput. Corp., 378 F.3d 1002, 1017 (9th Cir. 2004)).)

JDPI contends that VIP's dog toy is not entitled to protection under the First Amendment. (Doc. 142 at 13.) In MCA Records, 296 F.3d at 902, JDPI states that the Ninth Circuit adopted the Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989), standard for determining the balancing of interests between trademark law and the First Amendment. According to JDPI, the Rogers standard applies to artistic or expressive works and requires courts to construe trademark law only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. Rogers, 875 F.2d at 999. Because the VIP dog toy is not an artistic or expressive work, JDPI contends that the Rogers balancing test is not applicable. (Doc. 142 at 14-15.) Rather, JDPI contends that the VIP dog toy falls into those cases construing parody products–cases which have uniformly applied the standard trademark likelihood of confusion analysis. (Id.)

The Court finds that VIP's dog toy is not entitled to protection under the First Amendment because it is not an expressive work. See Brown v. Elec. Arts, Inc., 724 F.3d 1235 (9th Cir. 2013) (stating that the Rogers test is reserved for expressive works). In Rogers, the court dealt with the intersection of trademark law and the title of a motion picture. 875 F.2d at 997. The Rogers court went on to find that movies, plays, books, and songs are works of "artistic expression" and thus subject to the balancing between trademark law and the protections of the First Amendment. Id.; see also E.S.S. Entm't 2000 Inc. v. Rock

1   Star Videos, Inc., 547 F.3d 1095, 1099 (9th Cir. 2008) (stating that the Rogers balancing test

2   only applies to artistic works). Although Rogers dealt with a motion picture; the Ninth

3   Circuit has also applied the Rogers balancing test to a song (MCA Records), photographs

4   (Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003), and video games

5   (E.S.S. and Brown).

6        In this case, the Court finds that the standard trademark likelihood of confusion

7   analysis, not Rogers, is appropriate. See Sleekcraft Boats, 599 F.2d at 348-49 (establishing

8   the eight factors applicable to likelihood of confusion analysis). Under likelihood of

9   confusion principles, confusion exists where there is a likelihood that an appreciable number

10  of ordinary prudent purchasers will be misled or confused as to the source of goods, or where

11  consumers are likely to believe that the trademark's owner sponsored, endorsed, or otherwise

12  approved of the defendant's use of the trademark. Id. Based on the facts here, the First

13  Amendment affords no protection to VIP because it is trademark law that regulates

14  misleading commercial speech where another's trademark is used for source identification

15  in a way likely to cause consumer confusion. See Tommy Hilfiger Licensing, Inc. v. Nature

16  Labs, LLC, 221 F. Supp. 2d 410, 415 (S.D.N.Y. 2002) (refusing First Amendment protection

17  to "Timmy Holedigger" an alleged parody "dog perfume" in favor of the owner of the

18  Tommy Hilfiger trademarks for clothing). Here, as was similarly the case in Tommy Hilfiger,

19  VIP is using an adaptation of the Jack Daniel's trademark and trade dress for the dual

20  purpose of making an alleged expressive comment as well as the commercial selling of a

21  non-competing product. See Tommy Hilfiger, 221 F. Supp. 2d at 415. The Court agrees with

22  the analysis in Tommy Hilfiger that because the adaptation of the Jack Daniel's trademark

23  and trade dress mark are being used, at least in part, to promote a somewhat non-expressive,

24  commercial product, the First Amendment does not extend to such use. See id. at 415-16.

25       In conclusion, the Bad Spaniels dog toy is not an expressive work for purposes of the

26  application of the Rogers test because VIP makes trademark use of its adaptations of JDPI's

27  trademarks and the Jack Daniel's trade dress to sell a commercial product, its novelty dog

28  toy. The novelty dog toy is not an expressive work like those to which the Rogers test has

been applied in the Ninth Circuit. In this case, where the adaptation of the Jack Daniel's trademark and trade dress were engaged for the dual purpose of making an alleged expressive comment as well as the commercial selling of a non-competing product, the First Amendment does not establish protection.

**II. VIP's Motion for Summary Judgment Re:**
**JDPI's Counterclaims for Trade Dress Infringement**

In JDPI's Answer to VIP's Complaint for Declaratory Judgment, JDPI asserted nine counterclaims against VIP. (Doc. 12.) In five of those claims, JDPI asserted either trademark or trade dress infringement. (Id.) In the other four claims, JDPI asserted trademark and trade dress dilution. (Id.) In VIP's motion for summary judgment, it alleged entitlement to summary judgment on each of JDPI's counterclaims. (Doc. 110.) As a threshold matter, VIP contended that it is entitled to summary judgment on all of JDPI's counterclaims because the nominative fair use defense and the First Amendment fair use defense shield it from liability. (Id. at 3.)

The Court has found that neither nominative fair use nor First Amendment fair use provides a defense for VIP. Consequently, the Court turns to the merits of VIP's arguments that it is entitled to summary judgment.

*Infringement Claims*

To state an infringement claim, whether it be a trademark claim or a trade dress claim, a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion. See Kendall-Jackson, 150 F.3d at 1047. VIP alleges that the bottle dress of the Jack Daniel's Tennessee whiskey bottle and the "Jack Daniel" embossed signature bottle design lacks distinctiveness and is functional. (Doc. 110 at 15-28.)

*Lack of Distinctiveness*

*Generic*

VIP first argues that JDPI has not proven that the JDTW bottle dress is a source identifier for Jack Daniel's whiskey. Rather, VIP argues that the JDTW bottle dress is only a generic identifier of Kentucky Bourbon/Tennessee Whiskey, not Jack Daniel's whiskey in

particular. (Doc. 110 at 18.) In order for JDPI to prove that its JDTW bottle dress is not generic, VIP argues that JDPI must show more than a subordinate meaning that applies to its trade dress. (Id.) It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. (Id.)

JDPI contends that VIP's expert, Martin Wolinsky, has already conceded that the JDTW bottle dress is not generic, but a source identifier for Jack Daniel's whiskey. (See Doc. 104-5 at 23, Deposition of Martin Wolinsky ("Q: Do you consider the Jack Daniel's packaging to be generic? . . . A: I do not consider the Jack Daniel's package to be generic.")

The Court finds that the JDTW bottle dress is a source identifier for Jack Daniel's whiskey. The JDTW bottle dress is a combination bottle and label elements. It includes the Jack Daniel's and Old No. 7 word trademarks. (See Doc. 12 at 5, ¶6.) Under Kendall-Jackson, the inquiry is not whether individual features of the trade dress are nondistinctive, but whether the whole collection of features taken together are nondistinctive. See 150 F.3d at 1050. No reasonable trier of fact could find that the JDTW Bottle Dress, as a "whole collection of features taken together," id., including the Jack Daniel's and Old No. 7 trademarks, merely serves as an identifier for any Kentucky Bourbon/Tennessee Whiskey. The Court finds that the JDTW Bottle Dress is a source identifier for Jack Daniel's whiskey; it is not generic as a matter of law.

*Inherent Distinctiveness*

Next, VIP argues that JDPI's infringement counterclaims fail because it cannot prove that the JDTW bottle dress is inherently distinctive. (Doc. 110 at 18, 21-23.) JDPI acknowledges that its JDTW bottle dress is not inherently distinctive. (Doc. 142 at 30.)

*Acquired Distinctiveness-Secondary Meaning*

Next, VIP argues that JDPI's infringement counterclaims fail because it cannot prove that the JDTW Bottle Dress has acquired distinctiveness through secondary meaning. (Doc. 110 at 23-28.) In support, VIP contends that JDPI has not established any direct evidence of acquired distinctiveness through secondary meaning. (Id. at 24.) Further, VIP contends that JDPI's circumstantial evidence is also lacking. (Id. at 25-28.) VIP argues that although

1   JDPI relies on extensive sales and advertising, extensive consumer recognition, billions of

2   dollars in revenue, and allegedly being one of the most iconic consumer products in

3   American history, JDPI has failed to substantiate these vague claims with actual, probative

4   evidence. (Id.) Accordingly, VIP contends that the JDTW bottle dress has not acquired

5   distinctiveness through secondary meaning. (Id.)

6         In support of acquired distinctiveness through secondary meaning, JDPI contends that

7   it has both direct and circumstantial evidence in support. Regarding direct evidence, JDPI

8   contends that VIP intentionally copied aspects of the JDTW bottle dress. (Doc. 142 at 31-32.)

9   JDPI also contends that Dr. Gerald Ford's likelihood of confusion survey is directly

10  probative of secondary meaning. (Id. at 32-33.) In further support, JDPI contends that its

11  circumstantial evidence is probative of secondary meaning. (Id. at 33-37.) JDPI cites the

12  success of its advertising, it being the best-selling US whiskey for almost 20 years, and

13  significant media exposure of its overall product packaging. (Id.)

14        *Secondary Meaning-Direct Evidence*

15        "[A] mark has acquired distinctiveness, . . . if it has developed secondary meaning,

16  which occurs when 'in the minds of the public the primary significance of a [mark] is to

17  identify the source of the product rather than the product itself." Wal-Mart, 529 U.S. at 211.

18  "It is well established that trade dress can be protected under federal law. The design or

19  packaging of a product may acquire a distinctiveness which serves to identify the product

20  with its manufacturer or source; and a design or package which acquires this secondary

21  meaning, assuming other requisites are met, is a trade dress which may not be used in a

22  manner likely to cause confusion as to the origin, sponsorship, or approval of the goods."

23  TrafFix Devices, 532 U.S. at 28.

24        The Court finds that JDPI has established direct evidence of secondary meaning. VIP

25  admits that it intentionally copied the JDTW bottle dress, and that it did so precisely to

26  enable consumers to instantly recognize Jack Daniel's whiskey as the "target" of the Bad

27  Spaniels alleged parody. (See Doc. 110 at 2 (VIP stating that it designed the Bad Spaniels

28  dog toy to be a comical parody of a Jack Daniel's whiskey bottle).) VIP's copying of the

identifiable parts of the JDTW bottle dress was indisputably an attempt to capitalize and free ride upon the success of Jack Daniel's existing secondary meaning. In this case, intentional copying by VIP supports an inference of secondary meaning. See Vision Sports v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989) (stating that proof of copying strongly supports an inference of secondary meaning); Lisa Frank, Inc. v. Impact Int'l, Inc., 799 F. Supp. 980, 989 (D. Ariz. 1992) (same). Thus, JDPI has established direct evidence of secondary meaning.

Next, the Court also finds that JDPI has established circumstantial evidence of acquired distinctiveness through secondary meaning. Between 1997 and 2015, sales of Jack Daniel's whiskey in the United States exceeded 75 million cases, and advertising expenditures were in the hundreds of millions of dollars. (Doc. 105 at 1-6.) The sales, advertising, and public exposure of JDTW is greater than the facts that established secondary meaning in Fiji Water. Between 1997, when FIJI water was first sold, and 2010, Fiji sold nearly 65 million cases worldwide and expended more than $65 million in advertising. 741 F. Supp. 2d at 1177.  JDTW has been sold and advertised in the Jack Daniel's Trade Dress for more than 30 years longer than FIJI water. (See Doc. 106 at 1-6, Docs. 106-1 through 106-4.) Between 1997 and April 30, 2015, JDPI states that total unit sales of JDTW in the United States in various sizes exceeded 75 million units, resulting in revenues exceeding ten billion dollars. (Doc. 105 at 1-6.) JDPI further states that the vast majority of these sales were in packaging bearing the Jack Daniel's Trade Dress. (Id.)

Furthermore, VIP admits that through JDPI's advertising it has created significant customer recognition of Jack Daniel's whiskey. (See Doc. 104-2 at 34, Deposition of Stephen Sacra, Chief Executive Officer of VIP, "Q: Do you agree that the Jack Daniel's trademark is very well known in the United States? . . . A: I think that Jack Daniel's is more recognizable than other brands. But they've spent a lot of money to make that recognition.") Mr. Sacra further acknowledged that "the success of the Bad Spaniels toy "comes from the fact that people are familiar with Jack Daniel's . . . and have seen it before, and will get the parody." (Id.) Based on all of the above, the Court finds that JDPI's circumstantial evidence also demonstrates acquired distinctiveness through secondary meaning.

1   Thus, JDPI has established acquired distinctiveness through secondary meaning both

2   with direct and circumstantial evidence. Therefore, VIP's motion for summary judgment

3   regarding JDTW bottle dress's lack of distinctiveness will be denied.

4   *Nonfunctionality*

5   To state an infringement claim, whether it be a trademark claim or a trade dress claim,

6   JDPI must establish the element of nonfunctionality. VIP argues that the JDTW bottle is

7   functional; JDPI contends otherwise.

8   *Utilitarian Functionality*

9   "The functionality doctrine prevents trademark law, which seeks to promote

10  competition by protecting a firm's reputation, from instead inhibiting legitimate competition

11  by allowing a producer to control a useful product feature." Qualitex Co. v. Jacobson Prod.

12  Co., 514 U.S. 159, 164 (1995). The Ninth Circuit asks four questions to test utilitarian

13  functionality: (1) whether the trade dress yields a utilitarian advantage; (2) whether

14  alternative designs are available; (3) whether advertising touts the utilitarian advantages of

15  the design; and (4) whether the particular design results from a comparatively simple or

16  inexpensive method of manufacture. See Disc Golf, 158 F.3d at 1006. No one factor is

17  dispositive; all are to be weighed collectively, that is, whether the whole collection of

18  elements are functional. See International Jensen, 4 F.3d at 822-23. Given the functionality

19  doctrine's underlying purpose, the Ninth Circuit applies it with somewhat less force in

20  product packaging cases, as opposed to cases involving product configuration. See Clicks

21  Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1261 (9th Cir. 2001) (stating that a wide

22  range of available packaging and design options allows a producer to appropriate a

23  distinctive identity without unduly hindering his competitor's ability to compete).

24  In support of JDTW bottle dress's utilitarian functionality, VIP makes two arguments:

25  (1) that its features are "essential to the use or purpose of the article [or] affects [its] cost or

26  quality" citing Inwood Labs. v. Ives Labs., Inc., 456 U.S. 844, 850, n.10 (1982); and (2)

27  based on VIP's expert John Howard's report, VIP argues that the Jack Daniel's

28  embossed-signature bottle design is one of the several utilitarian features used in the JDTW

1    bottle dress. (Doc. 116 at 85-95.) VIP contends that because JDPI has not offered

2    controverting testimony, other than the opinions of interested parties (i.e., JDPI employees),

3    this design feature is clearly functional under Disc Golf. (Doc. 110 at 16.)

4         JDPI responds that the JDTW bottle dress reflects aesthetic design choices and

5    embodies branding features that focus on the historical identification of the product, and that

6    such are wholly unrelated to utility. (Doc. 142 at 25 (citing Doc. 101 at 20-22 in support of

7    lack of utilitarian functionality).) JDPI states that it only seeks to protect the square "shape

8    of the bottle, together with aesthetic elements" of the JDTW bottle dress, nothing more.

9    (Doc. 101 at 20.) JDPI contends that its advertising does not tout any utilitarian advantage

10   of the JDTW bottle design, rather, its advertising focuses on the quality and history of

11   JDTW. (Id.) Finally, JDPI contends that its JDTW bottle dress is not a comparatively simple

12   or inexpensive method of manufacture, given its manufacture of a square bottle and the use

13   of an embossed signature on all four sides of the bottle. (Id. at 27-28.)

14        Based on VIP's arguments regarding utilitarian functionality of the JDTW bottle

15   dress, the Court finds that VIP is not entitled to summary judgment. The Court notes that

16   based on the four factors set forth in Disc Golf, VIP chose not to address how each factor

17   supports its contention that the JDTW bottle dress is functional. See International Jensen, 4

18   F.3d at 822-23 (stating that the four factor review considers whether the whole collection of

19   product packaging are functional).

20        Initially, the Court finds that JDPI's advertising does not tout any utilitarian advantage

21   of the JDTW bottle design, rather, its advertising has focused on the quality and history of

22   JDTW. (Doc. 105 at 4, 105-2 at 1-116.) VIP's expert, John Howard, acknowledged that

23   advertising for Jack Daniel's whiskey did not tout any utilitarian advantages of the Jack

24   Daniel's bottle design. (Doc. 104-4 at 64-65.)

25        Next, the Court must look at product packaging as a whole, with a particular focus on

26   whether JDPI's particular integration of the various elements on the packaging leaves

27   competitors with commercially-feasible alternatives. See Clicks Billiards, 251 F.3d at 1261

28   (explaining that utilitarian functionality in packaging-type cases evaluates whether the

"particular integration of elements leaves a multitude of alternatives to [competitors in the] industry that would not prove confusingly similar"). As shown in Doc. 104-7 at 22, 24, and admitted by VIP (See Doc. 104-7 at 5, 22, 24, and 30-31), there are many, many alternative trade dresses available for use by the competition for whiskey. VIP acknowledged that some companies use elements of the Jack Daniel's trade dress, including a square bottle, and graphic features such as filigree and arched lettering, but none combine all of these elements together with the other elements of the Jack Daniel's trade dress. (See Doc. 104-3 at 17-18.) "Since competitors routinely use alternative designs in packaging their [whiskey], protecting the particular combination of elements in the [Jack Daniel's] packaging will not hinder competition in the [spirits] industry." Fiji Water, 741 F. Supp. 2d at 1174.

Based on the foregoing, VIP has not demonstrated that it is entitled to summary judgment that the JDTW Bottle Dress has utilitarian functionality.

*Aesthetic Functionality*

"[P]urely aesthetic product features may be protected as a trademark where they are source identifying and are not functional." Au-Tomotive Gold, 457 F.3d at 1064. Under the aesthetic functionality test, trade dress may be functional if "protection of the [trade dress] as a trademark would impose a significant non-reputation-related competitive disadvantage." Id. at 1072. In practice, aesthetic functionality thus has been limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function. Id. (stating that there was no evidence that consumers buy Auto Gold's products solely because of their intrinsic aesthetic appeal; instead the alleged aesthetic function is indistinguishable from and tied to the mark's source-identifying nature–Audi and VW Logos).

VIP argues that in order to evaluate aesthetic functionality, the Court should utilize the comparable-alternatives test or the effective-competition test. (Doc. 110 at 17-18.) Regarding the comparable-alternatives test, VIP argues that the focus is on the existence of feasible alternative designs, meaning how difficult it would be for JDTW's competitors to compete in the market if they were precluded from using the JDTW's design, and were instead required to transition to a new design, citing competitive use of square bottles. (Id.

1    at 17.) Next, regarding the effective-competition test, VIP argues that the focus is on whether

2    a particular design feature is a pre-requisite for market participation. If, for whatever reason,

3    the cost of protection renders JDTW's competitors unable to compete in the relevant market,

4    then the feature is not protectable, citing the square bottle, black-and-white label, number

5    designation, arched text, and filigree design. (Id. at 18.)

6         JDPI cites to Au-Tomotive Gold as the proper Ninth Circuit standard and its holding

7    that aesthetic functionality inquires into whether protection of the feature as a trademark

8    would impose a significant non-reputation-related competitive disadvantage. 457 F.3d at

9    1072. In response to VIP, JDPI contends that its competitor's trade dress demonstrates that

10   multiple comparable alternatives exist and are in use, and that the use of the combination of

11   features in the JDTW bottle dress for decades has had, and will have, no impact on the ability

12   of competitors to use individual features, singly or in part-combination. (Doc. 142 at 27.)

13   JDPI further contends that "[s]ince competitors routinely use alternative designs in packaging

14   their [whiskey], protecting the particular combination of elements in the [Jack Daniel's]

15   packaging will not hinder competition in the [spirits] industry" (Id. at 28 (quoting Fiji Water,

16   741 F. Supp. 2d at 1174).)

17        The Court agrees with JDPI; based on the submitted evidence, the Court first finds

18   that VIP is not entitled to summary judgment based on the argument that consumers buy Jack

19   Daniel's Tennessee Whiskey because of its intrinsic aesthetic appeal. See Au-Tomotive

20   Gold, 457 F.3d at 1073. Rather, as the court stated in Fiji Water, "[c]onsumers do not buy

21   [whiskey] based on how its packaging looks, but rather on how the [whiskey] tastes or how

22   much it costs." Fiji Water, 741 F. Supp. 2d at 1174.

23        As to JDTW's packaging, "[s]ince competitors routinely use alternative designs in

24   packaging their [whiskey], protecting the particular combination of elements in the [Jack

25   Daniel's] packaging will not hinder competition in the [spirits] industry" Id. Rather, the

26   combination of the trademarks and the aesthetic elements merely source-identify JDTW

27   bottle dress as JDTW.

28   ///

1
*Lack of Confusion*

2       The Court has found that VIP is not entitled to summary judgment regarding the first

3  two elements of JDPI's counterclaim regarding trade dress infringement, rejecting VIP's

4  contention that the JDTW bottle dress is functional and non-distinctive. VIP's motion for

5  summary judgment fails to argue lack of confusion. (Doc. 110.) In its reply in support of

6  summary judgment, VIP reiterated that it need not undertake an analysis of the <u>Sleekcraft</u>

7  likelihood of confusion factors in its motion for summary judgment because VIP is not

8  required to rebut confusion in order to receive protection under the fair use defenses. (Doc.

9  163 at 7.)[2] However, in this case, the Court has rejected VIP's nominative and First

10  Amendment fair use defenses.

11       Under <u>Sleekcraft</u>, the Court analyzes eight factors to determine likelihood of

12  confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks;

13  (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the

14  degree of care likely to be exercised by the purchaser; (7) VIP's intent in selecting the mark;

15  and (8) likelihood of expansion of the product lines. <u>See</u> 599 F.2d at 348-49.

16       The material facts are construed in favor of the non-moving party, JDPI. JDPI

17  contends that there are material facts in its favor from which a reasonable trier of fact could

18  find for JDPI on its infringement claims under <u>Sleekcraft</u>. JDPI argues that it established

19  VIP's intentional copying of various aspects of its trade dress, the close similarity between

20  the Bad Spaniels' trademark and trade dress to the Jack Daniel's trademarks and trade dress,

21  and the longstanding and extensive sales, advertising, and public exposure of Jack Daniel's

22  whiskey.

23       In general, likelihood of confusion is often a fact-intensive inquiry, and therefore

24

25       [2]Although VIP argues the <u>Sleekcraft</u> factors in its Reply (Doc. 163 at 8-10), the Court
will not consider arguments raised for the first time in a Reply. "It is well established that

26  issues cannot be raised for the first time in a reply brief." <u>Gadda v. State Bar of Cal.</u>, 511

27  F.3d 933, 937 n.2 (9th Cir. 2007). The Court need not belabor the point that VIP could have
raised alternative arguments regarding <u>Sleekcraft</u> in its motion for summary judgment; it

28  chose not to raise such arguments.

courts are reluctant to decide this issue at the summary judgment stage. See Au-Tomotive Gold, 457 F.3d at 1075. The Court finds that VIP is not entitled to summary judgment on the likelihood of confusion element regarding JDPI's counterclaims for trade dress infringement.

### III. VIP's Motion for Summary Judgment Re:<br>JDPI's Counterclaim for Trade Dress Dilution

On October 6, 2006, the Trademark Dilution Revision Act of 2006 (the "TDRA"), was signed into law. See Pub.L. 109–312, 120 Stat. 1730 (Oct. 6, 2006). The TDRA defines dilution as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

In JDPI's Answer to VIP's Complaint, it raised four counterclaims related to dilution: dilution by tarnishment of JDPI's trademarks under federal law; dilution by tarnishment of Jack Daniel's trade dress under federal law; and trademark and trade dress dilution under Arizona law. (Doc. 12 at 3-21.)

VIP claims that it is entitled to summary judgment on Jack Daniel's trade dress dilution claim under federal law because: (1) the alleged Jack Daniel's trade dress is not "famous" under the TDRA; (2) the VIP Product is not similar enough to the Jack Daniel's trade dress to dilute; (3) the VIP Product is not likely to cause dilution by tarnishment; and (4) even if JDPI were able to meet its burden under the TDRA, VIP is not liable for dilution by tarnishment because VIP's Product is exempted by TDRA's fair-use provision. (Doc. 110 at 9.)

JDPI initially notes that VIP only challenges one of its dilution counterclaims, its Jack Daniel's trade dress dilution by tarnishment claim under federal law. (Doc. 142 at 19; see Doc. 12 at 16-17 and at 5 ¶ 6) (picturing Jack Daniel's trade dress).) JDPI responds that VIP's challenge to this claim is without merit. (Doc. 142 at 9.)

1          *Federal Trade Dress Dilution-Tarnishment*

2          The TDRA provides for injunctive relief for dilution by tarnishment claims under 15

3    U.S.C. § 1125(c)(1). The TDRA further defines dilution by tarnishment, as follows: "For

4    purposes of [15 U.S.C. § 1125(c)(1)], 'dilution by tarnishment' is association arising from

5    the similarity between a mark or trade name and a famous mark that harms the reputation of

6    the famous mark." 15 U.S.C. § (c)(2)(C).

7          *VIP's Fair Use Defense*

8          Under the TDRA, VIP claims its parody product, which satirizes JDPI's product, is

9    not actionable under an anti-dilution statute because of its fair use defense. (Doc. 110 at 15.)

10         JDPI claims that VIP's argument is without merit under the TDRA. (Doc. 142 at 24.)

11   Under the TDRA, § 1125(c)(3)(A) provides an exclusion for liability for "[a]ny fair use . .

12   . other than as a designation of source for the person's own goods or services, including use

13   in connection with . . . (ii) parodying . . . ." Thus, according to JDPI, "[u]nder the statute's

14   plain language, parodying a famous mark is protected by the fair use defense only if the

15   parody is not 'a designation of source for the person's own goods or services'." (Doc. 142

16   at 24-25 (quoting Louis Vuitton Malletier S.A. v. Haute Diggity Dog LLC, 507 F.3d 252,

17   266 (4th Cir. 2007)).) JDPI contends that the fair use exclusion was not available to the

18   defendant in Louis Vuitton because the defendant used its parody dog toy, Chewy Vuitton,

19   as a trademark to designate the source. (Id. at 25 (citing Louis Vuitton, 507 F.3d at 267).) In

20   the same manner, JDPI states that the fair use defense is not applicable here because VIP uses

21   its Bad Spaniels trademark and trade dress as source identifiers of its dog toy.

22         The Court finds that the language of the statute and its application in Louis Vuitton

23   is directly applicable here and compel the result that the fair use defense is not available to

24   VIP and its alleged parody product. See Louis Vuitton, 507 F.3d at 267. Under the facts here,

25   VIP did use its Bad Spaniels trademark and trade dress as source identifiers of its dog toy,

26   which takes its alleged parody product outside the fair use defense under the TDRA.

27         *Fame of Jack Daniel's Trade Dress*

28         On the merits, VIP challenges Jack Daniel's trade dress dilution by tarnishment claim

under the FDRA. VIP alleges that Jack Daniel's trade dress, separate and apart from the possible fame of the JDTW trademarks, is not famous, that is, not being widely recognized by the general consuming public as a designation of the source of the goods of the trademark's owner. (Doc. 110 at 9-10.) According to VIP, Jack Daniel's trade dress is not famous enough to support its dilution claim because Jack Daniel's trade dress is not a source identifier. (Id. at 10 (citing the competition's use of many of the same design elements in their trade dresses, especially the use of square bottles).)

VIP further alleges that Jack Daniel's trade dress is not famous due to lack of actual recognition. According to VIP, the only direct evidence JDPI presented to show national fame is the Ford Survey, but Dr. Gerald Ford admitted that his survey did not test for fame. (Id. at 11.) Further, VIP argues that even if the Ford Survey had tested for fame, it would not be probative because the survey respondents were not representative of the general consuming public in the United States. (Id.)

With regard to the factors listed at 15 U.S.C. § 1125(c)(2)(A)(i)-(iv), VIP alleges that JDPI's advertising and promotional evidence is not probative because it is not specific to Jack Daniel's trade dress. (Id. at 12.) Regarding sales, VIP alleges that without evidence of actual consumer recognition, the evidentiary value of Jack Daniel's Tennessee whiskey's sales is non-existent. Regarding federal registration, VIP alleges that JDPI must prove that its unregistered trade dress is famous, independent of its registered trade marks. (Id.)

JDPI responds that in analyzing trade dress for all purposes, the focus is "not on the individual elements, [like square bottles,] but rather the overall visual impression that the combination and arrangement of those elements create." Clicks Billiards, 251 F.3d at 1259. JDPI argues that Jack Daniel's trade dress as a whole is widely recognized by the general consuming public as a designation of the source of the goods of the trademark's owner, that is, that it is a source identifier for Jack Daniel's Tennessee whiskey.

Regarding lack of direct evidence of fame, JDPI contends that all relevant factors should be considered including indirect evidence of fame such as advertising or sales. According to JDPI, evidence of actual recognition of fame, such as a survey, is not required.

JDPI contends that based upon VIP's deliberate copying, the undisputed success of sales, advertising, and public exposure of Jack Daniel's Tennessee Whiskey, which is packaged in the Jack Daniel's trade dress, provide sufficient indirect evidence from which a reasonable trier of fact could find the fame of the Jack Daniel's trade dress.

The Court determines that a reasonable trier of fact could find that Jack Daniel's trade dress as a whole serves as a source identifier for Jack Daniel's Tennessee Whiskey. See Clicks Billiards, 251 F.3d at 1259 (stating the Clicks Billiards could claim as its mark the particular combination and arrangement of design elements that distinguish it from others using the same concept); see also Wal-Mart, 529 U.S. at 215 (stating that overall product packaging is the typical form of trade dress and it normally is taken by the customer to indicate orgin).

Next, based on consideration of the statutory factors, see 15 U.S.C. § 1125(c)(2)(A)(i)-(iv), it is undisputed that the sales, advertising, and public exposure of Jack Daniel's whiskey packaged in the Jack Daniel's trade dress provide substantial indirect evidence of fame. Between 1997 and 2015, sales of Jack Daniel's whiskey packaged in the Jack Daniel's trade dress exceeded 75 million cases in the United States, yielding revenues in excess of $10 billion dollars and advertising expenditures in the hundreds of millions of dollars (Doc. 101 at 15); cf. Mattel Inc. v. MGA Ent. Inc., 782 F. Supp. 2d 911, 942 (C.D. Cal. 2011) (finding that MGA had presented no evidence, direct or indirect, of the fame of its trade dress); Vallavista Corp. v. Amazon.com, Inc., 657 F. Supp. 2d 1132, 1138–39 (N.D. Cal. 2008) (finding that the limited evidence of use, coupled with very modest sales and advertising expenditures, was insufficient to prove fame); Clearly Food & Bev. Co. v. Top Shelf Bevs., Inc., No. CV 13-1763, 2015 WL 1926503, *17 (W.D. Wash. Apr. 28, 2015) (finding that the product bearing the allegedly famous mark had been out of production for six years, only negligible sales were still occurring, and the defendant's survey showed very low recognition of the mark). Thus, as a whole, the Court determines that a reasonable trier of fact could find that Jack Daniel's trade dress is famous. (See Doc. 12 at 5 (picturing Jack Daniel's trade dress at ¶ 6).)

1    *VIP's Motion to Exclude Testimony of JDPI's Expert, Dr. Itamar Simonson*

2    Prior to the Court's resolution of the remaining elements of JDPI's dilution by

3    tarnishment claim, VIP moves to exclude the report and the testimony of JDPI's dilution

4    expert, Dr. Itamar Simonson. (Doc. 92.) According to VIP, JDPI's expert purports to opine

5    on the issue of whether, and how, consumers associate VIP's product with JDPI's product

6    and whether that association dilutes JDPI's trade dress by harming its reputation. (Id.) VIP

7    contends that Dr. Simonson's reported opinion is lacking in both methodology and

8    conceptual support that would permit admissibility as a scientific expert opinion. (Id. at 2.)

9    In further support of exclusion, VIP argues that Dr. Simonson does not qualify as an

10   "experienced-based" expert because an experience-based expert is someone with relevant

11   real world experience, not someone who fails to follow scientific methodology. (Id. at 3.)

12   Based on Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Fed. R.

13   Evid. 702, VIP contends that the Court should exercise its gatekeeping function and deny

14   admissibility to both Dr. Simonson's report and his testimony at trial. (Id.)

15   JDPI contends that the opinions and testimony of its dilution expert, Dr. Itamar

16   Simonson, should be admitted. (Doc. 96.) According to JDPI, Dr. Simonson has been

17   retained as an expert witness to testify regarding the implication(s) of the association between

18   the Bad Spaniels toy and Jack Daniel's whiskey on JDPI's trade dress and trademarks and

19   the meaning of the mark/brand to consumers. (Id. at 6.)

20   In summary of Dr. Simonson's expert report (Doc. 96 at 3 (citing Doc. 92-1)), JDPI

21   states that Dr. Simonson will assist the finder of fact by discussing the following at trial:

22   1)  The basics of consumer behavior and "how marks such as famous trade dress are

23   represented in memory." (Doc. 92-1 at 4, 7–9);

24   2) The basics of the "associative network memory model" which are accepted by

25   experts in the consumer behavior field. (Id. at 4–5);

26   3) The application of the "associative network memory model" to the instant case. (Id.

27   at 10–12); and

28   4) The conclusion that VIP's Bad Spaniels toy causes negative implication for JDPI's

1   trade dress and marks and thus is likely to tarnish them. (Id. at 10–14.)

2       JDPI contends that Dr. Simonson's report and testimony are admissible and will assist

3   the trier of fact because  Dr. Simonson is eminently qualified to provide his expert opinions

4   and because his opinions are relevant and reliable based upon his specialized knowledge.

5   (Doc. 96 at 2.) JDPI argues that its dilution expert is not required to quantify findings through

6   prescribed "scientific" methodology, rather, his conclusions may be based on his specialized

7   knowledge and principles that are accepted within his relevant area of expertise. (Id. at 2-3

8   (citing Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004)

9   (stating that the Daubert factors (peer review, publication, error rate, etc.) are not applicable

10  to expert testimony whose reliability depends heavily on the knowledge and experience of

11  the expert, rather than the methodology or theory behind it).)

12      In opposition to Dr. Simonson's exclusion, JDPI further cites Visa Int'l Serv. Ass'n

13  v. JSL Corp., No. CV 01-294, 2006 WL 3248394, at *3-4 (D. Nev. Nov. 7, 2006), in which

14  the Nevada District Court admitted Dr. Itamar Simonson as a dilution expert and allowed his

15  expert testimony based on his presentation of "specialized knowledge evidence" rather than

16  scientific evidence.[3]

17      The Court will deny VIP's motion to exclude Dr. Simonson and allow the

18  admissibility of Dr. Simonson's report and his expert testimony to assist the trier of fact.

19  Rule 702 is to be applied with a liberal thrust favoring admission. See Messick v. Novartis

20  Pharm. Corp., 747 F.3d 1193, 1196 (9th Cir. 2014).

21      Under Daubert, the Court is required to maintain a gatekeeping role regarding all

22  forms of expert testimony, not just scientific testimony. See White v. Ford Motor Co., 312

23  F.3d 998, 1007 (9th Cir. 2002). With regard to non-scientific testimony, the Court is required

24  to make some kind of reliability determination to fulfill its gatekeeping function. See

25  Hangarter, 373 F.3d at 1018. Under United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir.

26

27

28      [3]The Visa court found it uncontested that no scientific method exists for determining
whether actual dilution of a trademark occurred. Id. at *3.

2000), the court admitted expert testimony on gang behavior based on the expert's extensive personal knowledge of street gangs. In exercising its gatekeeping function regarding expert specialized knowledge cases, the Hankey court set forth six factors to evaluate in determining admissibility: (1) whether the opinion is based on scientific, technical, or other specialized knowledge; (2) whether the opinion would assist the trier of fact in understanding the evidence or determining a fact in issue; (3) whether the expert has the appropriate qualifications to render the opinion; (4) whether the testimony is relevant and reliable; (5) whether the methodology or technique used fits the conclusions; and (6) whether the opinion's probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

Dr. Simonson is an recognized expert in consumer behavior. In Visa, the court concluded that Dr. Simonson's opinion as an expert would not be excluded based on the following:

> Dr. Simonson, himself, is the Sebastian S. Kresge Professor of Marketing at the Stanford University Graduate School of Business and a recognized expert on consumer behavior. He has won multiple awards for his scholarship and research in the fields of marketing and consumer behavior. He relied on surveys conducted by Visa in 2000, his own validation survey, studies of on-line payments from 2000 to 2001, and his own personal expertise to reach the conclusions in his opinion. The court considers these sources and Dr. Simonson's methodology to satisfy the requirements of reliability and proper methodology for this type of evidence. In addition, the court considers Dr. Simonson's qualifications sufficient to render him an expert in the subject at hand. Finally, the court does not see any prejudice arising out of the use of Dr. Simonson's opinion and therefore finds that the probative value of Dr. Simonson's opinion is not substantially outweighed by the potential for prejudice, confusion of the issues or undue consumption of time.

Visa, 2006 WL 3248394, at *3-4.

The Court finds that Dr. Simonson's opinions regarding consumer behavior are not technical and therefore his report and testimony can be found reliable based on his knowledge and experience alone. The Court does not agree that post-Daubert expert opinion requires the performance of surveys, focus groups, studies or other real world tests or that Daubert would preclude an expert from applying his expertise to the facts of the case. Experience, training and education may provide a sufficient foundation for an expert's

1    testimony. See Hangarter, 373 F.3d at 1018.

2         On the basis of the foregoing, the Court will deny VIP's motion to exclude the report

3    and the testimony of JDPI's dilution expert, Dr. Itamar Simonson.

4                              *Similarity Requirement*

5         Next, VIP alleges that JDPI cannot show that the VIP Product is sufficiently similar

6    to the Jack Daniel's trade dress. (Doc. 110 at 13.) According to VIP, similarity must be

7    considered in light of how consumers will encounter the respective products in the

8    marketplace, as opposed to a mere side-by-side comparison of the trade dress. (Id.) In

9    support, VIP cites lack of similarity due to: (1) the VIP Product uses the name "Bad

10   Spaniels" in place of the "Jack Daniel's" name; (2) the VIP Product uses "The Old No. 2"

11   in place of JDPI's "Old No. 7" slogan; (3) VIP has added its SILLY SQUEAKERS® brand

12   name to prominent locations on the VIP Product hangtag; and (4) VIP has added different

13   design elements and omitted several key components to the VIP trade dress, citing Apple,

14   Inc. v. Samsung Elecs. Co., 920 F. Supp. 2d 1116, 1128–29 (N.D. Cal. 2013) (holding that

15   the parties' trade dresses were not sufficiently similar because the phones varied in

16   appearance, and defendant's trade dress was missing key features of plaintiff's trade

17   dress—this weighed heavier than expert testimony claiming that defendant's phone was

18   likely to dilute; the jury's findings on non-dilution was not against the clear weight of the

19   evidence). (Id.) Finally, VIP alleges a lack of similarity because VIP sells its Product in a

20   completely different market than Jack Daniel's whiskey. (Id.)

21        JDPI responds that prior to the TDRA, a party had to prove that the famous mark and

22   the accused mark were identical or nearly identical when bringing allegations of dilution,

23   (Doc. 142 at 22, (citing Welles, 279 F.3d at 806).) Quoting Levi Strauss & Co. v.

24   Abercrombie & Fitch Trading Co., 633 F.3d 1158, 1159 (9th Cir. 2011), "the 'identical or

25   nearly identical' standard did not survive Congress's enactment of the TDRA." Now a party

26   only must show "similarity" between the famous mark and the accused mark. (Id.)

27        According to JDPI, similarity or lack of similarity is a highly fact-specific inquiry

28   rarely found as a matter of law. (Id. (citing Nordstrom, 2013 WL 1196948, at *14 (denying

1  Nordstrom a preliminary injunction as a matter of law due to improbability of success on its

2  dilution by tarnishment claim)); Apple, Inc., 920 F. Supp. 2d at 1131 (denial of post-trial

3  motion for judgment as a matter of law seeking to overturn jury finding of no dilution).)

4  Thus, JDPI contends that under the TDRA it is for the fact-finder, not for the Court as a

5  matter of law, to determine the fact-specific issue of similarity. (Id. at 23.)

6        Regarding the differences that VIP alleges between its Bad Spaniels toy and the Jack

7  Daniel's trade dress, JDPI contends that rather than focusing on the discrete differences

8  between the products, the focus is on how a consumer would see their trade dresses as a

9  whole. (Id. at 22-23.) As a whole, JDPI argues that a reasonable trier of fact could find that

10  the VIP product and Jack Daniel's trade dress meet the requisite similarity, an "association

11  arising from the similarity between a mark or trade name and a famous mark. . . ." (Id. at 23

12  (quoting 15 U.S.C. § 1125(c)(2)(C)).)

13        Initially, the Court notes that under the TDRA, a party only must show "similarity,"

14  not substantial similarity or nearly identical, between the famous mark and the accused mark.

15  Levi Strauss, 633 F.3d at 1159, 1172. However, the Ninth Circuit has not issued its guidance

16  by providing a model jury instruction for the "similarity" standard in dilution by tarnishment

17  claims.

18        At this stage, the Court will not rule as a matter of law that the products are not similar

19  based upon the statutory dilution standards. Based on the factors stated by the parties, a

20  reasonable trier of fact could find that the VIP product and Jack Daniel's trade dress meet the

21  requisite similarity standard for dilution, an "association arising from the similarity between

22  a mark or trade name and a famous mark. . . ." (Id. at 23 (quoting 15 U.S.C. §

23  1125(c)(2)(C)).)

24                      *Reputational Harm*

25        VIP alleges that dilution by tarnishment "generally arises when the plaintiff's

26  trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or

27  unsavory context likely to evoke unflattering thoughts about the owner's product." (Doc. 110

28  at 14 (quoting Nordstrom, 2013 WL 1196948, at *11).) In evaluating likelihood of harm, VIP

1   contends that "[c]onsiderations such as complaints, reduction in sales, loss of customers, and

2   negative press are all relevant to the overall determination." (Id. (quoting Nordstrom, 2013

3   WL 1196948, at *13; see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d

4   97, 110 (2d Cir. 2009) (stating that plaintiff failed to show likelihood of dilution by

5   tarnishment because it did not show how "coffee named either 'Mister Charbucks' or

6   'Charbucks Blend' would affect the positive impressions about the coffee sold by Starbucks).

7        In support, VIP alleges that its expert, Dr. Bruce Silverman, arranged several focus

8   groups to test consumer reactions to the VIP Product and that his study revealed that none

9   of the test subjects reacted negatively to the VIP product. (Doc. 110 at 14.) VIP further

10  contends that JDPI cannot rebut Dr. Silverman's study because it has not disclosed any

11  evidence of actual consumer reactions to the VIP Product. (Id. at 14-15.)

12       In response, JDPI contends that its dilution expert, Dr. Itamar Simonson, his expert

13  report and testimony details how the VIP product tarnished JDPI's product. (Doc. 142 at 24.)

14  JDPI further contends that such expert evidence of alleged tarnishment is sufficient to

15  preclude summary judgment. (Id. (citing Gucci Am., Inc. v. Guess?, Inc., 843 F. Supp. 2d

16  412, 439 (S.D.N.Y. 2012)).) According to JDPI, the credibility of the parties' respective

17  positions is for the trier of fact to assess at trial. After drawing all reasonable factual

18  inferences in favor of JDPI, JDPI contends that summary judgment cannot be granted against

19  it on this issue. Matsushita, 475 U.S. at 587.

20       The Court finds that summary judgment on this issue is precluded. Both parties will

21  present expert opinions and testimony on the issue of whether the VIP product tarnished the

22  JDPI product. VIP will have its expert, Bruce Silverman, and JDPI will have its expert,

23  Itamar Simonson, present their evidence. It will be up to the trier of fact to assess and resolve

24  the facts on this issue.

25                    **IV. JDPI's Motion for Partial Summary Judgment**

26       As to Claim 1 of VIP's Amended Complaint, JDPI leaves for trial the ultimate finding

27  of whether VIP's alleged parody infringes or dilutes the Jack Daniel's trademarks and trade

28  dress. (Doc. 101 at 7.) Jack Daniel's trade dress and the trademark is shown in part by PTO

1   Trademark Registration No. 4,106,178. (See Doc. 12 at 7 ¶ 11.) JDPI moves for summary

2   judgment on VIP's second and third claim. (Doc. 101 at 6.)  As to VIP's second claim, JDPI

3   contests VIP's complaint that Jack Daniel's trade dress and the trademarks are not entitled

4   to protection because they are functional and non-distinctive. (Id.) As to VIP's third claim,

5   based on the same arguments as in Claim 2, JDPI contests VIP's cancellation argument for

6   JDPI's PTO Trademark Registration No. 4,106,178. (Id.)

7        JDPI alleges that its protectable trade dress consists of a combination of a square

8   bottle with a ribbed neck, a black cap, a black neck wrap closure with white printing bearing

9   the OLD NO. 7 mark and a black front label with white printing and a filigreed border

10  bearing the JACK DANIEL'S mark depicted in arched lettering at the top of the label, the

11  OLD NO. 7 mark contained within a filigreed oval design in the middle portion of the label

12  beneath the JACK DANIEL'S mark and the words "Tennessee Sour Mash Whiskey" in the

13  lower portion of the label with the word "Tennessee" depicted in script. (Doc. 101 at 9.) JDPI

14  states that the Jack Daniel's Trade Dress is covered, in part, by a PTO registration (No.

15  4,106,178) for the three-dimensional configuration of a square shape bottle container with

16  embossed "Jack Daniel" signature for distilled spirits. (Doc. 12 at 7 ¶ 11.)

17        *Distinctiveness and Functionality*

18        In VIP's motion for summary judgment, the Court set forth the parties' arguments as

19  to whether the Jack Daniel's trade dress and bottle design are distinctive and whether they

20  are non-functional. (*Supra* at 11-18.) The Court then resolved the issues finding that Jack

21  Daniel's trade dress and bottle design have acquired distinctiveness through secondary

22  meaning, and that Jack Daniel's trade dress and bottle design are non-functional both from

23  a utilitarian analysis and an aesthetic analysis. (*Supra* at 11-18.) As to lack of confusion in

24  the marketplace, VIP did not argue this element as part of its summary judgment motion and

25  thus its resolution is left for the trier-of-fact at trial.

26        In JDPI's motion for partial summary judgment on these same issues, the non-movant

27  VIP may avoid summary judgment if the pleadings and supporting documents, viewed in the

28  light most favorable to VIP, the nonmoving party, show that there is a genuine issue as to any

1    material fact such that JDPI would not be entitled to judgment as a matter of law.

2        As to VIP's Claim 2 in its Amended Complaint, the Court has reviewed VIP's

3    response to JDPI's motion for partial summary judgment on this claim and finds that VIP has

4    made the same legal arguments as to acquired distinctiveness, utilitarian functionality, and

5    aesthetic functionality that the Court previously considered in VIP's motion for summary

6    judgment. (See Doc. 147 at 7-24.) Therefore, the Court finds that VIP may not avoid

7    summary judgment on the Court's earlier findings that Jack Daniel's trade dress and bottle

8    design have acquired distinctiveness through secondary meaning, and that Jack Daniel's

9    trade dress and bottle design are non-functional both from a utilitarian functional analysis and

10   an aesthetic functional analysis.

11                    *Cancellation of Registration*

12       As to VIP's third claim, based on the same arguments that VIP raised in Claim 2, JDPI

13   contests VIP's cancellation argument against JDPI's PTO Trademark Registration No.

14   4,106,178 (the "'178 Registration")  (Doc. 101 at 25-35 (discussing the JDPI trademark

15   shown in Doc. 12 at 5 ¶ 11).)

16       JDPI contends that the '178 Registration is prima facie evidence of a trademark's

17   validity, shifting the burden from the registrant to the challenger. See 15 U.S.C. §§ 1057(b);

18   1115(a); see, e.g., Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1114 (9th

19   Cir. 2010) (stating that a "federal registration provides 'prima facie evidence' of the mark's

20   validity and entitles the plaintiff to a 'strong presumption' that the mark is a protectable

21   mark"). According to JDPI, the PTO issued the '178 Registration without requiring JDPI to

22   prove the distinctiveness of the mark which creates a presumption that the mark is inherently

23   distinctive. See Zobmondo, 602 F.3d at 1114. JDPI further contends that the '178

24   Registration creates a presumption that the mark is non-functional. Talking Rain, 349 F.3d

25   at 603. "[T]he presumption of validity is a strong one and the burden on the defendant

26   necessary to overcome that presumption at summary judgment is heavy." Zobmondo, 602

27   F.3d at 1115.

28       In support of distinctiveness, JDPI relies on the testimony of VIP's expert, John

Howard, who testified that the shape of the Jack Daniel's bottle "is part of a marketing program to make the bottle distinctive from competitors," which has succeeded because the bottle was "very distinctive"; that the bottle has become a "classic design" for whiskey; and that the bottle shape is more eyecatching than the "Jack Daniel" signature and is what does the most to identify the product as coming from Jack Daniel's. (Doc. 104-4 at 8-9, 15-16, 64.) Therefore, because VIP's own expert admitted that the mark is distinctive, a reasonable trier of fact could only find that the '178 Registration is distinctive. (Doc. 101 at 26.)

In support of a lack of functionality, utilitarian and aesthetic, JDPI presents its previous arguments, and these arguments need not be restated again here. (Id. at 26-35.)

VIP contends that it has sufficient evidence to rebut the presumption of validity, citing Talking Rain, 349 F.3d at 603 (stating that once the presumption of validity afforded to a registered trademark has been rebutted, mere registration does not enable a trademark holder to survive summary judgment). (Doc. 147 at 24-25.)

In support of a lack of distinctiveness, VIP argues that the bottle design of the '178 Registration amounts to ordinary geometric shaped packaging that is widely used in the market, and therefore it is non-distinctive and protectable only upon proof of secondary meaning. (Id. at 25.)

As to distinctiveness, the Court reiterates that the presumption of validity of a trademark registration is a strong one and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy. See Zobmondo, 602 F.3d at 1115. The Court finds that VIP has failed to overcome that presumption. First, and foremost, the '178 Registration includes the embossed signature, "Jack Daniel." As the Court has already concluded, the Jack Daniel's name is decidedly famous, and produces a distinctiveness on its own. Moreover, VIP's own expert, John Howard, also conceded that the '178 Registration was distinctive. (Doc. 104-4 at 8-9, 15-16, 64.)

Next, as to functionality, both utilitarian and aesthetic, both JDPI and VIP have restated a number of the functionality arguments that the Court has already considered and need not be repeated again here. (See Doc. 101 at 26-35 and Doc. 147 at 26-27.)

The Court again finds that VIP has failed to rebut the validity of the '178 Registration as it pertains to functionality, both utilitarian and aesthetic. The Court has already found that the bottle design is not functional. (See *supra* at 15-18.)

In conclusion, the Court finds that VIP has failed to rebut the validity of the '178 Registration. Therefore, the Court will not invalidate the '178 Registration by directing the Commissioner of Patents and Trademarks to cancel JDPI's federal trademark registration No. 4,106,178.

*VIP's Motion to Strike*

Pursuant to Fed. R. Civ. P. 37, VIP moves to exclude the declaration submitted by JDPI in support of its Opposition to Motion to Exclude Testimony of Defendant's Expert Itamar Simonson (Doc. 96) and certain evidence that JDPI submitted in support of its Motion for Partial Summary Judgment (Doc. 101). VIP lists the evidence as follows. The Declaration of Itamar Simonson in Support of Defendant's Opposition to Plaintiff's Motion to Exclude Testimony of Itamar Simonson ("Simonson Declaration") (Doc. 97-1) and the Declaration of Phillip Epps in Support of JDPI's Motion for Partial Summary Judgment ("Epps Declaration") (Doc. 105). VIP alleges that both contain untimely disclosures, either because they are information not previously disclosed despite interrogatories and requests for production of documents that sought disclosure during the discovery period, or because they were improperly submitted after the discovery cut-off date. (Doc. 133.)

In response, JDPI contends that VIP's motion to strike should be denied for the simple reason that it was brought in violation of the local rules. (Doc. 139.) According to JDPI, LRCiv 7.2(m)(2) is clear that a party may not file a separate motion to strike evidence supporting a written motion.

The Court finds that VIP's motion to strike does not comply with the Local Rules and will be denied. LRCiv 7.2(m)(2) provides, as follows:

> Objections to Admission of Evidence on Written Motions. An objection to (and any argument regarding) the admissibility of evidence offered in support of or opposition to a motion must be presented in the objecting party's response or reply memorandum and not in a separate motion to strike or other separate filing.

LRCiv 7.2(m)(2). The purpose of the Local Rule is to require unitary briefs, including objections to evidence and to the propriety of arguments, within the page limits established by the Court. See Pruett v. Arizona, 600 F. Supp. 2d 1065, 1074 (D. Ariz. 2009). "Litigants may not divide their briefs and multiply their page limits by styling part of the argument as a separate motion to strike." Id. VIP violated and thus disregarded the purpose of LRCiv 7.2(m)(2) by filing a separate motion to strike; its motion to strike will be denied.

### CONCLUSION

Accordingly, on the basis of the foregoing,

**IT IS HEREBY ORDERED** granting Defendant's motion for partial summary judgment. (Doc. 101.)

**IT IS FURTHER ORDERED** denying Plaintiff's motion for summary judgment. (Doc. 110.)

**IT IS FURTHER ORDERED** denying Plaintiff's motion to exclude the testimony of Defendant's expert, Dr. Itamar Simonson. (Doc. 92.)

**IT IS FURTHER ORDERED** denying Plaintiff's motion to exclude Defendant's supplemental declaration of Dr. Itamar Simonson and evidence offered by Phillip Epps. (Doc. 133.)

**IT IS FURTHER ORDERED** denying as moot Plaintiff's motion for clarification. (Doc. 88.) Prior to trial, at the time the parties file their respective motions in limine, they may argue the disputed admissibility of documentary evidence that each party would present at trial.

**IT IS FURTHER ORDERED** denying as moot the parties' stipulated motion to file documents under seal. (Doc. 152.) In resolving the parties' dispositive motions, the Court only utilized the redacted portions of the referenced documents; it was not necessary for the Court to review and consider the limited sealed portion of these documents that were lodged under seal. The Clerk of Court shall maintain as lodged under seal Doc. 153 and Doc. 154. At trial, the parties must keep in mind that referencing a confidential fact or a confidential document will in fact reveal it as a matter of course.

1    **IT IS FURTHER ORDERED** denying as moot Defendant's motion to seal. (Doc.

2    162.) The parties did not reference nor did the Court consider any of these documents during

3    resolution of the dispositive motions. The Clerk of Court shall maintain as lodged under seal

4    Doc. 119,  Doc. 119-1, and Doc. 127. At trial, the parties must keep in mind that referencing

5    a confidential fact or a confidential document will in fact reveal it as a matter of course.

6    **IT IS FURTHER ORDERED** setting this matter for a status hearing on **Wednesday,**

7    **October 26, 2016, at 2:00 p.m.**, in Courtroom 401, 401 West Washington Street, Phoenix,

8    AZ before Senior Judge Stephen M. McNamee.

9    DATED this 27th day of September, 2016.

10

11

12                              Stephen M. McNamee
                          Senior United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28