**DECLARATION OF D. PETER HARVEY IN SUPPORT
OF DEFENDANT'S MOTIONS IN LIMINE
NOS. 1 THROUGH 6**

**EXHIBIT J**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| VIP Products, LLC, an Arizona limited liability company, | ) No. 2:14-cv-02057-DGC |
| Plaintiff, | ) **DECLARATION AND RULE 26 REPORT** |
|  | ) **OF DR. GERALD L. FORD** |
| vs. | ) |
| Jack Daniel's Properties, Inc., a Delaware corporation | ) |
| Defendant. | ) |
| Jack Daniel's Properties, Inc., a Delaware corporation | ) |
| Counterclaimant, | ) |
| vs. | ) |
| VIP Products, LLC, an Arizona limited liability company, | ) |
| Counterdefendant. | ) |

I, Dr. Gerald L. Ford, hereby declare as follows:

<u>INTRODUCTION</u>

1.    I am a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, where I have been engaged in commercial marketing research and consulting for the past forty years.  I am also an emeritus faculty member of the School of Business Administration, California State University, Long Beach, where I held a full-time teaching position for twenty-five years, prior to my retirement in 1994.  My professional experience is further summarized below in paragraphs 34 through 44.

2.    In the instant matter, at the request of Seyfarth Shaw LLP, counsel for counterclaimant, Jack Daniel's Properties, Inc. ("JDPI" or "Jack Daniel's"), I designed and caused to be conducted a survey to address the issue of likelihood of confusion.  Specifically, this survey was designed to measure the degree, if any, to which Plaintiff's Bad Spaniels dog toy is likely to cause confusion as to the source, authorization or approval of, or business affiliation or business connection with, Jack Daniel's.

3.    This likelihood of confusion survey, hosted by Issues & Answers Network, Inc. ("Issues & Answers"), employed an online internet protocol using an internet panel created and maintained by Survey Sampling International ("SSI").

4.    The likelihood of confusion survey conducted in this matter employed a scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure likelihood of confusion, if any, with respect to the source, authorization or approval of, or business affiliation or business connection of Plaintiff's Bad Spaniels dog toy with, Jack Daniel's; and (2) a control survey cell designed to measure the extent of mismeasurement in the test cell survey results.

5.    In total, four hundred eighteen (418) interviews were completed in this likelihood of confusion survey: two hundred eleven (211) interviews were completed in the test cell; and two hundred seven (207) interviews were completed with respect to the control cell.

6.   The stimuli utilized in the survey's test cell were photographs of Plaintiff's Bad Spaniels dog toy.  The stimuli utilized in the survey's control cell were photographs of a fictitious dog toy bearing the Bad Spaniels name, but none of the claimed Jack Daniel's indicia or trade dress.

7.   In total, the results of the likelihood of confusion survey evidence, on a net basis, after adjusting the survey data for mismeasurement error based upon the control, that approximately twenty-nine percent (29.38 - 0.47 = 28.91%) of the universe of potential purchasers of a dog toy are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's dog toy has a business affiliation or business connection with Jack Daniel's.

8.   It is my opinion that the results of the survey support a finding of likelihood of confusion.  The survey results evidence that potential purchasers of a dog toy are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or is made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's, and that such confusion is due in particular to Plaintiff's use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy.

SURVEY BACKGROUND

9.   Attached hereto as Exhibit A are the results of the survey which addressed the issue of likelihood of confusion. Exhibit A provides photocopies of the survey exhibits, the survey screeners and questionnaires, survey screenshots, and a listing of the survey responses.  The Appendix of Exhibit A contains an electronic copy of the source data, an incidence table, and other survey-related background materials.

10.  The sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were designed in accordance with the generally accepted standards and procedures in the field of surveys.  The survey was also designed to meet the criteria for survey trustworthiness detailed in the Manual for Complex Litigation.[1]

11.  I was responsible for the design of the survey, the screener and test and control cell questionnaires, as well as for the procedures to be followed in conducting the interviews. Data gathering was carried out, under the direction of Ford Bubala & Associates, by Issues & Answers, an independent survey organization which hosted the online data survey using internet

---

[1]    For the proffered poll or survey, "...Relevant factors include whether:  the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles...In addition, in assessing the validity of a survey, the judge should take into account the following factors:  whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity...."  See Federal Judicial Center, Manual for Complex Litigation, Fourth, Section 11.493, at 102-104 (2004).

panelists obtained from SSI.  Data gathering was conducted from
April 10-21, 2015.

       12.  Ford Bubala & Associates conducted validation of
approximately twenty percent (20.33%) of the interviews by
contacting, by telephone, survey respondents to confirm their
qualification and participation in the survey.  JAK Research, an
independent marketing research firm, conducted additional
validation of approximately twenty percent (20.10%) of the
interviews by contacting, by telephone, survey respondents to
confirm their qualification and participation in the survey.  In
total, approximately forty percent (40.43%) of the interviews
were validated.  This level of validation exceeds industry
standards.[2]  None of the interviews failed to validate.

       13.  The survey conducted in this matter was
administered under a double-blind protocol.  Specifically, not
only were the respondents not informed as to the purpose or
sponsor of the survey, but similarly, both the staff of Issues &
Answers and the staff of SSI were not informed as to the purpose
or sponsor of the survey.

<u>SURVEY STRUCTURE</u>

       14.  This survey employed an internet panel created
and maintained by SSI.  Potential respondents were invited to
fill out the screening portion of the interview to determine
whether or not they met the universe definition.  Subsequently,
those potential respondents who met the universe definition were
invited to complete the main survey.

---

[2]    This level of validation exceeds CASRO (Council of
American Survey Research Organizations) standards of 10% to 15%.

15.   The universe for this survey consisted of males and females twenty-one (21) years of age or older who were likely, within the next six months, to purchase a dog toy.[3]

16.   The respondent selection procedure employed in this survey is referred to as a quota sampling method.  This method provided a respondent base that is generally representative of the age and gender distribution of male and female adults twenty-one (21) years of age or older who reported that in the next six months they were likely to purchase a dog toy.  This age and gender distribution was based upon an ORC International internet survey conducted between February 5-8, 2015, among a nationally representative sample of approximately one thousand (956) individuals across the United States.[4]

_____

[3]      Additionally, the survey universe was also restricted to respondents (1) who were using a traditional desktop computer, a laptop/notebook computer, or a tablet computer to read and answer the survey questions; (2) who resided in the United States; (3) who did not, nor did anyone else in their household, work for an advertising agency or a market research company; or a retail store or company that makes, sells, or distributes any dog toys; (4) who agreed to answer the questions in the survey by themselves without the help or assistance of anyone else and without seeking information from any other source (e.g., internet search); (5) who, if they wore contact lenses or eyeglasses when using the device they were using, would wear them during the questionnaire; (6) who were willing to provide their name and telephone number for telephone validation purposes; and (7) who reported they could clearly see the dog toy and clearly read the hang tag.

[4]      Respondents in the ORC International survey were asked "Within the next six months, are you likely to purchase a dog a toy?"  Based on the results of the ORC International survey, age and gender quotas of purchasers were established as follows: approximately 44% male and 56% female; among males, approximately 33% 21 to 34, 40% 35 to 54, and 27% 55 or over; and among females, approximately 35% 21 to 34, 36% 35 to 54, and 29% 55 or over.

17.  As noted earlier, the likelihood of confusion
survey conducted in this matter employed a scientific
experimental survey design consisting of two survey cells: (1) a
test or experimental survey cell designed to measure likelihood
of confusion, if any, with respect to the source, authorization
or approval of, or business affiliation or business connection of
Plaintiff's Bad Spaniels dog toy with, Jack Daniel's; and (2) a
control survey cell designed to measure the extent of
mismeasurement in the test cell survey results.

18.  Survey respondents in the test cell first saw a
photograph of a retail display that included a variety of
products for dogs, including Plaintiff's Bad Spaniels dog toy.
See Exhibit A, page 11.



19.  Next, survey respondents in the test cell saw a photograph of the front of the Bad Spaniels dog toy and a photograph of the back of the hang tag label that included a disclaimer stating "This product is not affiliated with Jack Daniel Distillery."  See Exhibit A, page 12-13.




20.   Survey respondents in the control cell first saw a photograph of a retail display that included a variety of products for dogs, including a fictitious dog toy bearing the name Bad Spaniels.   See Exhibit A, page 70.



21.  Next, survey respondents in the control cell saw a photograph of the front of a fictitious dog toy bearing the name Bad Spaniels, and a photograph of the back of a hang tag label that did not include the disclaimer, "This product is not affiliated with Jack Daniel Distillery."  See Exhibit A, page 71-72.



22.  The control cell provides a measure of the extent that mismeasurement exists in the likelihood of confusion test cell survey results.  Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give a Jack Daniel's response to the test cell survey questions, not as a result of Plaintiff's Bad Spaniels dog toy, but rather because of other factors, such as

the survey's questions, the survey's procedures, market share or popularity, or some other potential influence on a respondent's answers.

23.  In a fashion similar to the protocols employed in a pharmaceutical drug test, the test or experimental cell represents the drug or pill with the "active" ingredient(s) and the control cell represents the "placebo" that does not contain the active ingredient being tested.[5]

24.  The test and control cells were separate surveys. The questions and procedures for the test cell and the control cell were identical with the exception of the stimuli shown to respondents.  As noted earlier, any single respondent participated in only one of the two survey cells.

25.  In total, four hundred eighteen (418) interviews were completed in this likelihood of confusion survey: two hundred eleven (211) interviews were completed in the test cell;

_____

[5]      This methodology is consistent with the methodology discussed by Professor Diamond in the Federal Judicial Center's Reference Manual on Scientific Evidence, Third; "It is possible to adjust many survey designs so that causal inferences about the effect of a [stimulus]...become clear and unambiguous.  By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus....  Respondents in both the experimental and control groups answer the same set of questions....  The effect of the [stimulus]...is evaluated by comparing the responses made by the experimental group members with those of the control group members....  Both preexisting beliefs and other background noise should have produced similar response levels in the experimental and control groups.  In addition, if respondents who viewed the [test cell stimulus]... respond differently than respondents who viewed the control [cell stimulus]..., the difference cannot be merely the result of a leading question, because both groups answered the same question..."  See Shari Seidman Diamond "Reference Guide on Survey Research," in the Federal Judicial Center's Reference Manual on Scientific Evidence, Third, pages 398-399.

and two hundred seven (207) interviews were completed in the control cell.

<u>SURVEY PROCEDURES AND QUESTIONS</u>

26.  Initially, potential respondents received an invitation to fill out the screening portion of the interview to determine whether or not they met the universe definition.  See Exhibit A, pages 2-4.  Subsequently, those respondents who met the universe definition were invited to complete the main survey. At the beginning of the main survey, respondents were shown a screen with a letter on it and were asked to record the letter they were shown.  See Exhibit A, page 5, screen 15.  This was done as a tracking mechanism to identify which stimuli respondents were exposed to.

27. Survey questions posed to test cell and control cell respondents were identical and are as follows:

> In this survey, you are going to be shown a retail store display of products for dogs.

> Please understand that we are only interested in your opinions or beliefs; and if you don't have an opinion or belief or don't know the answer to a question, that is an acceptable answer.

See Exhibit A, page 6, screen 16.

Next, respondents were told:

> Please look at this display of products for dogs as you would if you saw it in a store and were considering purchasing a dog toy.

> Please feel free to take as much time as you like looking at the picture of the retail store display before moving on to the survey questions.

See Exhibit A, page 6, screen 17.

Next, respondents were told:

>     This is a dog toy shown in the display you just saw.
>
>     Please look at this dog toy as you would if you saw it in a store and were considering purchasing it.

See Exhibit A, page 6, screen 18.

Next, respondents were asked:

>     Could you clearly see the dog toy?

See Exhibit A, page 6, screen 19.

Only respondents who answered 'yes' to this question were allowed to continue.  Next, respondents were told:

>     Please look at the hang tag on this dog toy.

See Exhibit A, page 6, screen 20.

Next, respondents were asked:

>     Could you clearly read the hang tag?

See Exhibit A, page 6, screen 21.

Only respondents who answered 'yes' to this question were allowed to continue.  Respondents were then asked:

>     Q7.0  Who or what company do you believe makes or puts out this product?[6]  Please be as specific as possible.

See Exhibit A, page 7, screen 22.

---

[6]    The first two principal survey questions (i.e., question series 7.0 and 8.0) were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions.  See <u>Union Carbide Corp. v. Ever-Ready, Inc.</u>, 531 F.2d 366 (7th Cir. 1976), <u>cert. denied</u>, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); and J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, Vol. 6 §32:174 @ 448-450, Rel. #72, 12/2014.

Respondents were then asked the basis for their answer with the question:

> Q7.1  Why do you say that?[7]  Again, please be as
>         specific as possible.

See Exhibit A, page 7, screen 23.

Next, respondents were asked:

> Q7.2  What else, if anything, makes you say that?[8]  Again,
>         please be as specific as possible.

See Exhibit A, page 7, screen 24.

Respondents were then asked:

> Q8.0  What other product or products, if any, do you
>         believe are made or put out by whoever makes or
>         puts out this product?  Please be as specific
>         as possible.

See Exhibit A, page 7, screen 25.

Respondents were then asked the basis for their answer with the question:

> Q8.1  Why do you say that?[9]  Again, please be as
>         specific as possible.

See Exhibit A, page 7, screen 26.

Next, respondents were asked:

> Q8.2  What else, if anything, makes you say that?[10]  Again,
>         please be as specific as possible.

See Exhibit A, page 7, screen 27.

---

[7]     Respondents who answered 'don't know' to Q7.0 were
not asked Q7.1.

[8]     Respondents who answered 'don't know' to Q7.1 were
not asked Q7.2.

[9]     Respondents who answered 'don't know' to Q8.0 were
not asked Q8.1.

[10]     Respondents who answered 'don't know' to Q8.1 were
not asked Q8.2.

Next, respondents were asked:

> Q9.0  Do you believe this product...
> _____1.  is being made or put out with the authorization or approval of any other company or companies;
> _____2.  is not being made or put out with the authorization or approval of any other company or companies; or[11]
> _____3.  don't know or have no opinion?

See Exhibit A, page 8, screen 28.

Respondents who indicated that they believed the dog toy is being made or put out with the authorization or approval of any other company or companies[12] were asked:

> Q9.1  What company or companies do you believe gave the authorization or approval to make or put out this product?[13]  Please be as specific as possible.

See Exhibit A, page 8, screen 29.

If the respondent provided a response, he/she was asked the basis for the belief with the question:

> Q9.2  Why do you say that?[14]  Again, please be as specific as possible.

-------

[11]    To guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents saw the list with the first alternative being "...is being made or put out with the authorization or approval..." and approximately one-half of the respondents saw the list with the first alternative being "...is not being made or put out with the authorization or approval...").

[12]    The last two principal survey questions (i.e., question series 9.0 and question series 10.0) were designed to address likelihood of confusion as to authorization or approval or business affiliation or business connection and were also patterned after similarly accepted questions.  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:175 at 450-451, Rel. #72, 12/2014.

[13]    Only respondents who answered 'is being made or put out...' were asked Q9.1.

[14]    Respondents who answered 'don't know' to Q9.1 were not asked Q9.2.

See Exhibit A, page 8, screen 30.

Next, respondents were asked:

     Q9.3  What else, if anything, makes you say that?[15]  Again,
          please be as specific as possible.

See Exhibit A, page 8, screen 31.

Next, respondents were asked:

     Q10.0  Do you believe that whoever makes or puts out this
          product...
          _____1. <u>has</u> a business affiliation or business
                  connection with any other company or
                  companies;
          _____2. does <u>not</u> have a business affiliation or
                  business connection with any other company or
                  companies; or[16]
          _____3. don't know or have no opinion?

See Exhibit A, page 9, screen 32.

Respondents who indicated that they believed that whoever makes

or puts out the dog toy has a business affiliation or business

connection with any other company or companies were asked:

---

     [15]     Respondents who answered 'don't know' to Q9.2 were not
asked Q9.3.

     [16]     Again, to guard against any order bias, the first two
alternatives in this list were rotated (i.e., approximately one-
half of the respondents saw the list with the first alternative
being "...<u>has</u> a business affiliation or business connection...."
and approximately one-half of the respondents saw the list with
the first alternative being "...does <u>not</u> have a business
affiliation or business connection...").
     As an additional guard against order bias, approximately
one-half of the respondents were first queried in question 9.0
about authorization or approval, and approximately one-half of
the respondents were first queried in question 9.0 about business
affiliation or business connection.  Similarly, approximately
one-half of the respondents were first queried in question 10.0
about authorization or approval, and approximately one-half of
the respondents were first queried in question 10.0 about
business affiliation or business connection.  All respondents
were asked both question series 9.0 and 10.0 as noted above.

      Q10.1  What company or companies do you believe has a business affiliation or business connection with whoever makes or puts out this product?[17]  Please be as specific as possible.

See Exhibit A, page 9, screen 33.

If the respondent provided a response, he/she was asked the basis

for the belief with the question:

      Q10.2  Why do you say that?[18]  Again, please be as specific as possible.

See Exhibit A, page 9, screen 34.

Next, respondents were asked:

      Q10.3  What else, if anything, makes you say that?[19] Again, please be as specific as possible.

See Exhibit A, page 9, screen 35.

Finally, respondents were asked:

      Q11.0  Do you, or does anyone else in your household, work for a company that makes, sells, or distributes any food products, clothing, fragrance, jewelry, [or] alcoholic beverages?

See Exhibit A, page 9, screen 36.

Respondents were then shown a screen that said:

      Thank you for your time and participation.

See Exhibit A, page 9, screen 37.

---

[17]     Only respondents who answered '<u>has</u> a business affiliation or business connection...' were asked Q10.1.

[18]     Respondents who answered 'don't know' to Q10.1 were not asked Q10.2.

[19]     Respondents who answered 'don't know' to Q10.2 were not asked Q10.3.

SURVEY RESULTS

Test Cell

        28.  In the test cell, the results of the likelihood
of confusion survey evidence that approximately twenty-nine
percent (29.38%) of the universe of potential purchasers of dog
toys expressed the belief that Plaintiff's Bad Spaniels dog toy
is being made or put out by Jack Daniel's, or that Plaintiff's
Bad Spaniels dog toy is being made or put out with the
authorization or approval of Jack Daniel's, or that Plaintiff has
a business affiliation or business connection with Jack Daniel's
due to Plaintiff's use of Jack Daniel's indicia or trade dress on
its Bad Spaniels dog toy.  See Exhibit A, page 15.

TABLE 1
TEST CELL

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=211) |
| 1. Jack Daniel's | 62 | 29.38 |
| 2. Silly Squeakers, VIP Products, Bad Spaniels, Tennessee Carpet | 74 | 35.07 |
| 3. Other | 30 | 14.22 |
| 4. Don't know | 45 | 21.33 |
| Total | 211 | 100.00 |

29.    Following are the verbatim responses of respondents in the test cell whose beliefs are included in the "Jack Daniel's" category.    Spelling has been corrected in the following listing for readability.

<u>Test Cell Survey Results</u>

| RESPONDENT NUMBER | RESPONSE |
|---|---|
| 1001 | Q9.0  IS being made or put out with authorization/approval. |
| | Q9.1  I believe they would have to get the approval of Jack Daniel's whiskey because the design and name is so closely related. |
| | Q9.2  Because they are creating a spoof of a real product so I think they would need permission so they don't get sued for copyrights or something like that. |
| | Q9.3  Don't know. |
| 1003 | Q9.0  IS being made or put out with authorization/approval. |
| | Q9.1  Jack Daniel's. |
| | Q9.2  Design and wording style. |
| | Q9.3  Shape looks like a bottle of JD. |
| 1005 | Q7.0  Jack Daniel's. |
| | Q7.1  The bottle looks similar to No.7. |
| | Q7.2  It is a black label. |
| | Q10.0 HAS a business affiliation or business connection. |
| | Q10.1 Jack Daniel's. |
| | Q10.2 The bottle looks identical. |
| | Q10.3 Don't know. |
| 1008 | Q9.0  IS being made or put out with authorization/approval. |
| | Q9.1  Jack Daniel's. |
| | Q9.2  Sounds like it. |
| | Q9.3  Appearance. |
| 1012 | Q9.0  IS being made or put out with authorization/approval. |
| | Q9.1  Jack Daniel's. |
| | Q9.2  Bottle design and name are plays on the Jack Daniel's brand. |
| | Q9.3  Nothing else. |
| 1015 | Q7.0  Jack Daniel's. |
| | Q7.1  Jack Daniel's. |
| | Q7.2  It mimics them. |
| | Q8.0  Jack Daniel's. |
| | Q8.1  It looks like their bottle. |
| | Q8.2  It looks like their bottle and logo. |

- 19 -

<u>Test Cell Survey Results</u>

| RESPONDENT NUMBER | RESPONSE |
|---|---|

1016    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Because the product looks like a Jack Daniel's bottle/logo.
        Q9.3  Don't know.

1020    Q8.0  It looks like a Jack Daniel's whiskey bottle.
        Q8.1  It has the similar label and colors as a Jack Daniel's bottle.
        Q8.2  Nothing.  That is what I see.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's distilleries.
        Q9.2  It has the very same label and colors as s Jack Daniel's whiskey bottle.
        Q9.3  Nothing.  It says it all.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 It looks like they did a license deal with Jack Daniel's.
        Q10.2 As I said, label type and colors on the bottle and the shape.
        Q10.3 Nothing.

1022    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's liquor company.
        Q9.2  Because since the dog toy is resembling a Jack Daniel's I'm sure the dog toy company that made this toy had to get their permission and legal rights to essentially copy they product in dog toy form.
        Q9.3  Don't know.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Because the dog toy resembles Jack Daniel's liquor.
        Q10.3 Don't know.

1029    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's because the label resembles and is a play on their label.
        Q9.2  It has the colors and design of the Jack Daniel's label.
        Q9.3  Nothing.

1030    Q7.0  Jack Daniel's.
        Q7.1  Because of the logo on the toy.
        Q7.2  Don't know.

Test Cell Survey Results

| RESPONDENT NUMBER | RESPONSE |
|---|---|

1033   Q7.0  Jack Daniel's.
       Q7.1  Because it is a spoof on their logo.
       Q7.2  Just the look of the label.
       Q9.0  IS being made or put out with authorization/approval.
       Q9.1  My best guess is that in order to use this design you
             would have to have permission from the Jack Daniel's
             brand.
       Q9.2  Don't know.

1035   Q9.0  IS being made or put out with authorization/approval.
       Q9.1  Jack Daniel's.
       Q9.2  It is the same look.
       Q9.3  Don't know.

1037   Q9.0  IS being made or put out with authorization/approval.
       Q9.1  Jack Daniel's.
       Q9.2  The name and shape.
       Q9.3  Don't know.

1044   Q9.0  IS being made or put out with authorization/approval.
       Q9.1  Jack Daniel's.
       Q9.2  Jack Daniel's name is on the front of the package.
       Q9.3  Don't know.

1046   Q8.0  It is similar to a Jack Daniel's label but I do not
             believe they make any dog products.
       Q8.1  Just that it looks, from a distance, like a Jack
             Daniel's label that is on a bottle of liquor.
       Q8.2  Don't know.
       Q9.0  IS being made or put out with authorization/approval.
       Q9.1  If it is put out by Jack Daniel's then they would
             have to give authorization for approval to copy their
             signature label.
       Q9.2  Don't know.

1047   Q9.0  IS being made or put out with authorization/approval.
       Q9.1  Jack Daniel's.
       Q9.2  This label has been a trade mark for Jack Daniel's
             whiskey for a century.
       Q9.3  I have no other reason to believe this other than the
             label is a Jack Daniel's trademark.

1054   Q8.0  Jack Daniel's whiskey.
       Q8.1  The toy looks like a Jack Daniel's bottle.
       Q8.2  Don't know.
       Q9.0  IS being made or put out with authorization/approval.
       Q9.1  Jack Daniel's Inc.
       Q9.2  Don't know.

Test Cell Survey Results

RESPONDENT
 NUMBER    RESPONSE

1056    Q7.0  Jack Daniel's.
        Q7.1  It is their bottle shape.
        Q7.2  It looks like it.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It is their type of bottle.
        Q9.3  It is their type of logo.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 It is their type of bottle.
        Q10.3 It is their company logo.

1062    Q8.0  Jack Daniel's.
        Q8.1  It has the same sort of label.
        Q8.2  But then it was made in China.

1063    Q7.0  Jack Daniel.
        Q7.1  It look likes alcohol.
        Q7.2  Nothing it just looks like Jack Daniel.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel.
        Q10.2 I just do.
        Q10.3 Nothing.

1065    Q7.0  Bad Spaniels.  It closely resembles a Jack Daniel's
              bottle.
        Q7.1  The main name on the toy was Bad Spaniels.  On the
              back of the tag was also listed Bad Spaniels.
        Q7.2  Don't know.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's is what the bottle resembles.
        Q9.2  This is what a Jack Daniel's bottle looks like.
              Other than the name and some details, it's a mirror
              image.
        Q9.3  Don't know.

1067    Q7.0  Jack Daniel's.
        Q7.1  Looks like an alcohol bottle.
        Q7.2  Don't know.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 Looks just like a bottle of Jack Daniel's.
        Q10.3 Don't know.

1076    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It's obvious.  It's a knockoff of Jack D's.
        Q9.3  Don't know.

<u>Test Cell Survey Results</u>

| RESPONDENT NUMBER | RESPONSE |
|---|---|

1077  Q9.0  IS being made or put out with authorization/approval.
      Q9.1  Jack Daniel's.
      Q9.2  It looks like a Jack Daniel's bottle.
      Q9.3  It looks like one.
      Q10.0 HAS a business affiliation or business connection.
      Q10.1 Jack Daniel's.
      Q10.2 Looks like their bottle.
      Q10.3 It just does.

1082  Q7.1  It is a copy of a Jack Daniel's bottle.
      Q7.2  It is confusing.
      Q8.0  Jack Daniel's.
      Q8.1  It looks just like it.
      Q8.2  Don't know.

1083  Q7.0  Brown-Forman group.
      Q7.1  The play on Jack Daniel's.
      Q7.2  Jack Daniel's is made by the Brown-Forman group.
      Q8.0  Whiskey, Southern Comfort.
      Q8.1  The play on Jack Daniel's.
      Q8.2  Jack Daniel's is made by the Brown-Forman group.
      Q9.0  IS being made or put out with authorization/approval.
      Q9.1  Brown-Forman group.
      Q9.2  Brown-Forman makes Jack Daniel's.
      Q9.3  The products play on Jack Daniel's.
      Q10.0 HAS a business affiliation or business connection.
      Q10.1 Brown-Forman group.
      Q10.2 Brown-Forman makes Jack Daniel's.
      Q10.3 The play on Jack Daniel's whiskey.

1092  Q7.0  Jack Daniel's.
      Q7.1  Looks like a whiskey bottle.
      Q7.2  Label and colors.

1095  Q9.0  IS being made or put out with authorization/approval.
      Q9.1  I believe that Jack Daniel distillery wanted to help
            out.
      Q9.2  It is, because it is a good product.
      Q9.3  Nothing else makes me say that.

1098  Q9.0  IS being made or put out with authorization/approval.
      Q9.1  Jack Daniel's.
      Q9.2  It's similar to the bottle design for Jack Daniel's
            and Jim Beam.
      Q9.3  Just it looks like the liquor bottle.

1099  Q8.0  Jack Daniel's.
      Q8.1  Not sure.
      Q8.2  Not sure.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

1100      Q7.0  Jack Daniel's.
          Q7.1  The logo replica.
          Q7.2  Don't know.

1106      Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  Because its Jack Daniel's.
          Q9.3  It looks like Jack Daniel's.

1108      Q7.0  JD.
          Q7.1  Don't know.
          Q8.0  Jack.
          Q8.1  Don't know.

1110      Q7.0  Jack Daniel's.
          Q7.1  The bottle.
          Q7.2  The bottle design looks like the Jack bottle.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack.
          Q10.2 Again the bottle.
          Q10.3 Same reasons.

1114      Q7.0  Jack Daniel's.
          Q7.1  Because that's what it looks like.
          Q7.2  Just the looks of it.
          Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack.
          Q9.2  It looks like there brand, bottle.
          Q9.3  Don't know.

1115      Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  Because the label is based on a Jack Daniel's label.
          Q9.3  Just the label.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Because of the label.
          Q10.3 They would have had permission to copyright the Jack
                Daniel's label.

1120      Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  The print, font and bottle looks like Jack Daniel's.
          Q9.3  Don't know.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Looks like the bottle.
          Q10.3 Don't know.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

1121    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's Tennessee whiskey.
        Q9.2  It has a very similar label.
        Q9.3  I don't drink that particular brand of whiskey, but I
              know the label.

1132    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  The "label" on the toy is in the same design as the
              label on a bottle of Jack Daniel's whiskey.
        Q9.3  Nothing.

1139    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel.
        Q9.2  That label.
        Q9.3  That logo.

1141    Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's.
        Q10.2 The product seems really similar.
        Q10.3 Don't know.

1147    Q8.0  Jack Daniel's.
        Q8.1  It looks like their products.
        Q8.2  The appearance.
        Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  It uses their brand image.
        Q9.3  It looks like their product.
        Q10.0 HAS a business affiliation or business connection.
        Q10.1 Jack Daniel's Tennessee whiskey.
        Q10.2 They are using their brand image.
        Q10.3 It looks like their product.

1148    Q10.0 HAS a business affiliation or business connection.
        Q10.1 It looks like packaging from Jack Daniel's sauces.
        Q10.2 The label and color looks like it.
        Q10.3 The label looks like Jack Daniel's drink, as well as
              the sauces.

1154    Q9.0  IS being made or put out with authorization/approval.
        Q9.1  Jack Daniel's.
        Q9.2  Because the font of the text used for the product tag
              looks just like the package design on their products.
        Q9.3  Don't know.

- 25 -

Test Cell Survey Results

RESPONDENT
 NUMBER    RESPONSE

    1155    Q7.0  Jack Daniel's.
            Q7.1  It looks like the Jack Daniel bottle.
            Q7.2  Don't know.

    1156    Q7.0  Jack Daniel's Tennessee whiskey.
            Q7.1  While I didn't specifically look on the hand tag for
                  the maker, I saw it was made in China, where the
                  manufacturer would really be, but as the toy was
                  designed to look like Jack Daniel's Tennessee sour
                  mash whiskey, I assume that company is the one that
                  designed it, and had it manufactured.
            Q7.2  Basically it's subliminal advertising. someone will
                  see the dog toy shaped and labeled to look fairly
                  close to a Jack Daniel's whiskey bottle, that in
                  their subconscious if they are individuals that drink
                  alcoholic beverages (an I assume they would or they
                  wouldn't have bought that specific dog toy), that
                  they'll quite likely go to a alcoholic beverage store
                  and purchase a bottle of that product.
            Q8.0  Jack Daniel's Tennessee sour mash whiskey.
            Q8.1  Jack Daniel Tennessee sour mash whiskey.
            Q8.2  Bottle shape, label color, printing on label has a
                  font that is identical to that (though wording is not
                  exact, but similar) of a Jack Daniel's whiskey black
                  label Tennessee sour mash whiskey.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Jack Daniel's.
            Q9.3  The simile is intended to depict a whiskey bottle
                  made by Jack Daniel's.  Basically a subliminal way to
                  delve into the subconscious of someone, see it to put
                  in their mind to go out and buy some Jack Daniel's
                  whiskey.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Jack Daniel's distillery.
            Q10.3 I've already stated the answer to that exact question
                  several times over, and I know I'm not inebriated on
                  Jack Daniel's whiskey and seeing double or triple, as
                  I don't drink alcoholic beverages.

    1159    Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  It resembles a bottle of Jack Daniel's whiskey.
            Q9.3  Don't know.

<u>Test Cell Survey Results</u>

RESPONDENT
 <u>NUMBER</u>    <u>RESPONSE</u>

  1160     Q7.0  Jack Daniel's.
            Q7.1  It looks like a Jack Daniel's bottle.
            Q7.2  No other reason.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Don't know.

  1162     Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Because the logo looks similar.
            Q9.3  Don't know.

  1172     Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Don't know.

  1176     Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  It looks like a dog version of a Jack Daniel's
                  bottle.
            Q9.3  Don't know.

  1179     Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  The toy looks like a Jack Daniel's bottle.
            Q9.3  Nothing.

  1182     Q7.0  Jack Daniel's.
            Q7.1  It is designed like their bottle.
            Q7.2  Nothing else.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Don't know.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Don't know.

  1184     Q7.0  Jack Daniel's.
            Q7.1  Because the bottle looks like it.
            Q7.2  There is nothing else.

  1191     Q7.0  Jack Daniel's.
            Q7.1  The look of the bottle, said so on the tag.
            Q7.2  Nothing else.

<u>Test Cell Survey Results</u>

RESPONDENT
 NUMBER    RESPONSE

  1194     Q7.0  Jack Daniel's.
            Q7.1  That's what I remember seeing.
            Q7.2  The actual toy is a bottle of a Jack Daniel sauce.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  The bottle is mimicked after the Jack Daniel BBQ
                    sauce.  So they would hold the patent therefore you
                    would have to ask permission to use the image.
            Q9.3  It is made to look like a Jack Daniel bbq sauce
                    bottle.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 The bottle, the back of the label, the play on words.
            Q10.3 Don't know.

  1198     Q7.0  Jack Daniel's.
            Q7.1  It looks like a Jack Daniel's bottle.
            Q7.2  The label.
            Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  The label.
            Q9.3  The name.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 The bottle.
            Q10.3 The label.

  1199     Q7.0  Jack Daniel's.
            Q7.1  Looks like it.
            Q7.2  Design and look.
            Q8.0  Jack Daniel's.
            Q8.1  Don't know.
            Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Looks like it.
            Q10.3 Don't know.

  1200     Q9.0  IS being made or put out with authorization/approval.
            Q9.1  Jack Daniel's.
            Q9.2  Jack Daniel's IPR/copyright.
            Q9.3  Nothing more to add.

Test Cell Survey Results

RESPONDENT
  NUMBER    RESPONSE

  1204    Q7.0  Jack Daniel's.
          Q7.1  It looks like the bottle.
          Q7.2  Nothing.
          Q9.0  IS being made or put out with authorization/approval.
          Q9.1  Jack Daniel's.
          Q9.2  Because it says raw Daniel's and looks like a Jack
                bottle.
          Q9.3  Nothing.
          Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Because it looks just like the bottle.
          Q10.3 Don't know.

  1210    Q10.0 HAS a business affiliation or business connection.
          Q10.1 Jack Daniel's.
          Q10.2 Because of similarity of names.
          Q10.3 It looks like a bourbon bottle.

Control Cell Survey Results

        30.    In the control cell, the results of the likelihood of
confusion survey evidence that approximately one half of one percent
(0.48%) of the universe of potential purchasers of dog toys expressed
the belief that the fictitious Bad Spaniels dog toy is being made or
put out by Jack Daniel's, or that the fictitious Bad Spaniels dog toy
is being made or put out with the authorization or approval of Jack
Daniel's, or that whoever put out the fictitious Bad Spaniels dog toy
has a business affiliation or business connection with Jack Daniel's.
See Exhibit A, page 74.

TABLE 4
CONTROL CELL

| Response Categories | Response Distribution | |
| | Number | Percent (n=207) |
| --- | --- | --- |
| 1. Jack Daniel's | 1 | 0.48 |
| 2. Silly Squeakers, VIP Products, Bad Spaniels, Tennessee Carpet | 112 | 54.11 |
| 3. Other | 42 | 20.29 |
| 4. Don't know | 52 | 25.12 |
| Total | 207 | 100.00 |

        31.    Following is the verbatim response of the respondent in
the control cell whose beliefs are included in the "Jack Daniel's"
category.   Spelling has been corrected in the following listing for
readability.

Control Cell Survey Results

RESPONDENT
 NUMBER      RESPONSE

    2131    Q10.0 HAS a business affiliation or business connection.
            Q10.1 Jack Daniel's.
            Q10.2 Looks similar to their whiskey bottles.
            Q10.3 The coloration of the bottle packaging.

Summary of Survey Results

       32.  The results of the likelihood of confusion survey evidence that, on a net basis after adjusting the survey data for mismeasurement error in the test cell survey results, based upon the control cell, approximately twenty-nine percent (28.90%)[20] of the universe expressed the belief that Plaintiff's Bad Spaniels dog toy is made or put out by, or is made or put out with authorization/approval of, or that whoever makes or puts out the Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's.  See Exhibit A, page 126.

| | Response Distribution | |
|---|---|---|
| Response Categories | Test Cell Percent (n=211) | Control Cell Percent (n=207) |
| 1. Jack Daniel's | 29.38 | 0.48 |

TABLE 7
TEST AND CONTROL CELL
Composite Response Analysis

---

[20]    The adjustment for mismeasurement error is accomplished by reducing the percent of Jack Daniel's responses in the test cell by the percentage of Jack Daniel's responses in the control cell.  In this case, 29.38% of the survey respondents in the test cell indicated they believed that Plaintiff's Bad Spaniels dog toy is made or put out by, or is authorized or approved by, or has a business affiliation or business connection with Jack Daniel's.  Thus, the likelihood of confusion level would be calculated as 29.38 - 0.48 = 28.90%.

CONCLUSION

33.   It is my considered opinion, based upon my education, background, and professional experience, and based upon my review and analysis that the survey results support a finding of likelihood of confusion.  The survey results evidence that potential purchasers of a dog toy are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or is made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's Bad Spaniels dog toy has a business affiliation or business connection with Jack Daniel's, and that such confusion is due in particular to Plaintiff's use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy.

QUALIFICATIONS

34.   I hold a Bachelor's Degree in Advertising (B.A.) from San Jose State University, a Master's Degree in Business Administration (M.B.A.) from the University of Southern California, and a Doctoral Degree in Business Administration (D.B.A.) from the University of Southern California.

35.   During my twenty-five year academic appointment, my teaching responsibilities included both graduate and undergraduate level courses in a variety of subject areas.  My teaching responsibilities included courses in marketing (e.g., marketing, marketing management, advertising, promotion, consumer behavior, and marketing research) and management (e.g., principles of management; business policy and strategy; business policies, operations, and organizations; and integrated analysis).

36.   I am a member of the American Marketing Association
(AMA), the American Academy of Advertising (AAA), the American
Association of Public Opinion Research (AAPOR), the Council of
American Survey Research Organizations (CASRO), and the International
Trademark Association (INTA).

37.   As a partner with Ford Bubala & Associates, I have been
retained by a variety of firms engaged in the consumer product,
industrial product, and service sectors of the economy to provide
marketing consulting and research services.   Approximately one-half of
Ford Bubala & Associates' consultancies in which I have participated
have involved the design and execution of marketing research surveys.

38.   During the past forty years, I have been retained in a
number of litigation-related consultancies involving intellectual
property matters, including matters before federal and state courts,
the Trademark Trial and Appeal Board of the U.S. Patent and Trademark
Office, and the International Trade Commission.   I have designed and
executed surveys relating to intellectual property matters, including
trademark, false advertising, patent, and other related matters.   I am
familiar with the accepted principles of survey research, as well as
the tests for trustworthiness of properly conducted surveys or
polls.[21]

39.   During the past thirty-five years, I have addressed a
variety of groups on the subject of surveys or polls and their use in
the measurement of the state of mind of consumers, with respect to
Lanham Act matters.   Specifically, I have spoken at meetings of the
American Bar Association, the American Intellectual Property Law

---

[21]    Supra note 1.

Association, the American Marketing Association, the International Trademark Association, the Marketing Research Association, the Intellectual Property Law Institute of Canada, Marques, and the Practising Law Institute.

40.   I have also written on the subject of the design and execution of litigation-related surveys in Lanham Act matters.   Attached hereto as Exhibit B is a list of papers and book chapters that I have written since 2004.

41.   Since 1998 I have served as a member of the Editorial Board of *The Trademark Reporter*, the scholarly legal journal on the subject of Lanham Act matters, published by the International Trademark Association.

42.   I have been qualified and accepted as an expert in marketing and marketing research in more than sixty (60) trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board.

43.   Attached hereto as Exhibit C is a list of cases in which I have provided trial and/or deposition testimony since 1992.

44.   Attached hereto as Exhibit D is a copy of my professional history, describing my qualifications and professional background.

<u>MATERIALS CONSIDERED</u>

45.   Complaint; Answer and Counterclaims of Defendant and Counterclaimant Jack Daniel's Properties, Inc.; Plaintiff VIP Products, LLC's Answer to Jack Daniel's Properties, Inc.'s Counterclaim; an online omnibus study conducted by ORC International, February 5-8, 2015; Bad Spaniels dog toy with its hang tag; display photo of a retail display that includes a variety of products for

dogs; Rough Draft of Deposition Transcript of Eleanor Phillips, April 21, 2015; and Rough Draft of Deposition Transcript of Stephen Sacra, April 23, 2015.

<u>COMPENSATION</u>

46.  Ford Bubala & Associates' fees for this engagement consist solely of billable time and expenses.  Standard time is billed at the rate of $600.00 per hour for the services of a Partner and $300.00 per hour for the services of a Research Associate.  Deposition and trial time are billed at the rate of $750.00 per hour plus expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 7th day of May, 2015, in Huntington Beach, California.

Dr. Gerald L. Ford