**DECLARATION OF D. PETER HARVEY IN SUPPORT
OF DEFENDANT'S MOTIONS IN LIMINE
NOS. 1 THROUGH 6**

# EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

VIP Products, L.L.C., an Arizona limited
liability company,

     Plaintiff,

  v.

Jack Daniel's Properties, Inc., a Delaware
corporation

     Defendant.

---

Jack Daniel's Properties, Inc.,
a Delaware corporation,

     Counterclaimant,

  v.

VIP Products, LLC, an Arizona limited
liability company,

     Counterdefendant

No. 2:14-cv-02057-DGC

**EXPERT REBUTTAL REPORT OF
STEPHEN NOWLIS**

I, Dr. Stephen M. Nowlis, state as follows:

## QUALIFICATIONS

1.  I am the August A. Busch Jr. Distinguished Professor of Marketing in the Olin Business School at Washington University in St. Louis. A copy of my curriculum vitae is attached as Appendix A, which includes a list of the cases where I have testified in the last four years. I hold a Ph.D. in Marketing and a Master's degree in Business Administration (MBA) from the University of California at Berkeley, Haas School of Business, and a Bachelor's degree in Economics from Stanford University. My field of expertise is marketing, consumer behavior, survey methods, and decision making. I have acquired this expertise through my training as a doctoral student, my research and publications, my editorial duties, my work experience, past expert witness consulting work, and classes that I have taught.

2.  I teach marketing management to Executive MBA students and consumer behavior to Ph.D. students. In my courses, I cover topics such as buyer behavior, developing marketing plans, advertising, sales promotions, retailing, marketing research, and product development. I also recently taught Brand Management to MBA students. After completing my undergraduate studies and before starting my MBA program, I worked for two years as an Assistant Buyer for a major retail chain. In this capacity, I analyzed customer purchase patterns to determine why some products sold better than others.

3.  I have won several awards for my research. One of these awards was the 2001 Early Career Contribution Award from the Society for Consumer Psychology – Sheth Foundation, which is given annually to the most productive young scholar in the field of consumer behavior/marketing. Another of these awards was the 2001 O'Dell Award, given to the *Journal of Marketing Research* (the major journal for marketing research topics) article that has had the greatest impact on the marketing field in the previous five years. This paper looked at the influence of new product features on consumer brand choice. I also was found to be one of the top 20 most productive marketing professors in the world in terms of my publications in the top-tier marketing and consumer behavior journals.

1

NOW0002

4.      I currently serve as an Associate Editor at the *Journal of Marketing Research*.  As an Associate Editor, I review many papers and help determine whether they are acceptable for publication.  The criteria used to assess these papers include how much of a contribution a paper makes, whether its theoretical framework is sound, and whether the data were collected using a proper methodology.  I also serve on the editorial review boards of the *Journal of Consumer Research*, *Journal of Marketing*, *Journal of Consumer Psychology*, and *Marketing Letters*.  In this capacity, I act as a regular reviewer of papers submitted to these journals, to determine whether the papers are fit for publication.

5.      I was asked by counsel representing VIP Products LLC in the matter of VIP Products LLC v. Jack Daniel's Properties and Jack Daniel's Properties v. VIP Products LLC to review the Expert Report submitted by Dr. Gerald R. Ford.  I was asked to assess the claim made by Jack Daniel's Properties that the Ford survey tests and shows that the alleged Jack Daniel's trade dress (1) is famous and (2) has acquired distinctiveness or secondary meaning.[1]  I was also asked to examine the Ford survey in terms of its conclusions regarding likelihood of confusion.  In addition, I was asked to examine the claim made by Jack Daniel's Properties that a different survey, conducted between February 5-8, 2015 by ORC, yielded similar likelihood-of-confusion results to the Ford survey.[2]

6.      Please see Appendix B listing the documents I have reviewed.  As I continue to receive and review additional information, I reserve the right to supplement, revise, or further explain the opinions contained in this report.  I am being compensated for my work on this matter at the rate of $650 an hour.  My compensation is not contingent upon the conclusions I reach nor on the outcome of this matter.

---

[1] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 8, 12, 15.

[2] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17.

NOW0003

## SUMMARY OF OPINIONS

7.    The purpose of the Ford survey was, in Dr. Ford's own words, to only "address the issue of likelihood of confusion."[3] Since the Ford survey was designed to only test likelihood of confusion, it is therefore improper to claim that it also tests for fame and acquired distinctiveness. Thus, I do not agree with the claim by Jack Daniel's Properties that the Ford survey tests for both fame and acquired distinctiveness, and I do not agree that its results show that the alleged Jack Daniel's trade dress is both famous and has acquired distinctiveness. In addition, my analysis of Dr. Ford's survey on likelihood of confusion shows that its methodological flaws are so serious that they render its results meaningless for assessing the likelihood of confusion in this matter. In particular, Dr. Ford designed an improper Control stimulus, did not mimic marketplace conditions, and improperly analyzed his data. Finally, I do not agree with the claim made by Jack Daniel's Properties that the ORC study provides similar results to the Ford study regarding likelihood of confusion.

### The Ford Survey was Clearly Not Designed to Test for Fame

8.    Jack Daniel's Properties claims that the Ford survey shows that the alleged Jack Daniel's trade dress is famous.[4] However, Dr. Ford mentions that the purpose of his survey was only to "address the issue of likelihood of confusion."[5] Indeed, as Dr. Ford himself notes in a published chapter, fame is a different issue, and is analyzed differently, than likelihood of confusion.[6] In particular, as Dr. Ford notes, "Fame is addressed by a review of such factors as the duration, extent, and geographic reach of advertising and promotion of the mark; the amount, volume, and geographic extent of sales of goods or services

---

[3] Ford Declaration, p. 2; see also, Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17, where it is noted that Dr. Ford's survey assesses likelihood of confusion.

[4] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 8, 15.

[5] Ford Declaration, p. 2; see also, Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17, where it is noted that Dr. Ford's survey assesses likelihood of confusion.

[6] Ford, Gerald L. (2012), "Survey Percentages in Lanham Act Matters," in *Trademark and Deceptive Advertising Surveys*, edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 322-323.

NOW0004

offered under the mark; the extent of actual recognition of the mark; and whether the mark is registered on the principal register.  The issue of recognition of a mark can be addressed by a variety of factors, such as attitude and awareness studies from company files, third-party recognition of the mark, survey evidence, or other evidence."[7]  Clearly, these are different issues than what Dr. Ford tested in his likelihood of confusion survey.

9.    The Ford survey was clearly not designed to test for the fame of the alleged Jack Daniel's trade dress.  Such a survey would require an examination of the fame of the alleged Jack Daniel's trade dress on a whiskey bottle, and not on a dog toy which is spoofing it.  Therefore, I do not agree with the Jack Daniel's Properties claim that the Ford survey shows that the alleged Jack Daniel's trade dress is famous.

### The Ford Survey was Clearly Not Designed to Test for Acquired Distinctiveness

10.    Jack Daniel's Properties claims that the Ford survey also shows that the alleged Jack Daniel's trade dress has acquired distinctiveness or secondary meaning.[8]  However, here again, Dr. Ford mentions that the purpose of his survey was only to "address the issue of likelihood of confusion."[9]  Indeed, secondary meaning is a different issue, and is analyzed differently, than likelihood of confusion.[10]  A survey on the secondary meaning of the alleged Jack Daniel's trade dress would have a different set of questions than the Ford survey on likelihood of confusion.[11]

11.    The Ford survey was clearly not designed to test for the acquired distinctiveness or secondary meaning of the alleged Jack Daniel's trade dress.  Such a survey would require an examination of the secondary meaning of the alleged Jack Daniel's trade dress on a whiskey bottle, and not on a dog toy which is spoofing it.   Therefore, I do not agree with

---

[7] Ford, p. 322;  See also Visa v. JSL, which notes a fame survey conducted by Dr. Itamar Simonson.
[8] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 12, 15.
[9] Ford Declaration, p. 2; see also, Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17, where it is noted that Dr. Ford's survey assesses likelihood of confusion.
[10] Palladino, Vincent N. (2012), "Secondary Meaning Surveys," in *Trademark and Deceptive Advertising Surveys*, edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 322-323.
[11] Palladino.

NOW0005

the Jack Daniel's Properties claim that the Ford survey shows that the alleged Jack
Daniel's trade dress has acquired distinctiveness.

## The Ford Survey Does Not Properly Test Likelihood of Confusion

12.    I will next analyze the design and results from the Ford study as they relate to likelihood
       of confusion, as that was the stated purpose of the survey.  My analysis of the Ford
       survey shows that its methodological flaws are so serious that they render its results
       meaningless for assessing the likelihood of confusion in this matter.  In particular, Dr.
       Ford designed an improper Control stimulus, did not mimic marketplace conditions, and
       improperly analyzed his data.  I will next discuss each of these defects in more detail.

### Failure to design an appropriate Control stimulus

13.    Dr. Ford's survey respondents were assigned to either a Test group or a Control group.
       The Test group of respondents viewed an image of the Bad Spaniels dog toy at issue, and
       the Control group of respondents viewed a heavily modified image of a dog toy.  The
       function of a Control group is, as stated by Dr. Ford:  "Specifically, the control cell
       functions as a baseline and provides a measure of the degree to which respondents are
       likely to give a Jack Daniel's response to the test cell survey questions, not as a result of
       Plaintiff's Bad Spaniels dog toy, but rather because of other factors, such as the survey's
       questions, the survey's procedures, market share or popularity, or some other potential
       influence on a respondent's answers."[12]  If the Control stimulus is designed properly, it
       can accurately measure the "baseline" response which captures the "noise" that can come
       from a survey.  This "noise" can then be removed from the Test results to generate an
       accurate rate of net confusion.  However, as detailed below, Dr. Ford's Control stimulus
       was not at all properly designed, thus making it incapable of removing the proper amount
       of survey "noise" from the Test group.

14.    An extremely important principle of survey design is to ensure that the stimuli shown to
       the Test group and the Control group are as similar as possible, and differ only in terms

---

[12] Ford, p. 10-11.

5

of the characteristic whose influence is being tested. [13] It is also important to have good reason for testing the influence of that particular characteristic. However, Dr. Ford's choice of a Control stimulus did not adhere to these very important principles of proper survey methodology.

15. My understanding is that Plaintiffs allege the "Jack Daniel's Trade Dress" supposedly consists of the combination of the following features: (1) A square bottle with a ribbed neck, (2) a black cap, (3) a black neck wrap closure with white printing bearing the Old No. 7 mark, and (4) a black front label with white printing and a filigreed border bearing the Jack Daniel's mark depicted in arched lettering at the top of the label, the Old No. 7 mark contained within a filigreed oval design in the middle portion of he label beneath the Jack Daniel's mark and the words 'Tennessee Sour Mash Whiskey' in the lower portion of the label, with the word 'Tennessee' depicted in script. [14] However, as mentioned above, neither the Ford survey, nor to my understanding any survey, have shown that the combination of these particular features has acquired distinctiveness or secondary meaning. Thus, my understanding is that, given there is no evidence of acquired secondary meaning of the alleged Jack Daniel's trade dress, it is improper to even test the influence of these characteristics on likelihood of confusion in the first place.

16. Furthermore, competing brands of whiskey also have the following features: (1) a ribbed neck, (2) a black cap, (3) a black neck enclosure with white lettering, (4) a black front label with white printing, and (5) arched lettering at the top of the label, and (6) the Old No. 8 in the middle portion of the label. [15] Based on these facts, and based on, as just mentioned, Jack Daniel's has not established secondary meaning of its alleged trade dress, Dr. Ford's Control dog toy should not have eliminated all of these elements to create the Control dog toy.

17. Yet, Dr. Ford's Control stimulus (1) changed the bottle from a square shape with a ribbed neck to a shape with a rounded top and smooth neck that looks like a wine bottle, (2) changed the black cap with the letters BS on the top and a square neck label to a gold

---

[13] Diamond, p. 399.
[14] Amended Complaint, p. 3-4.
[15] See Appendix C: Amended Complaint, p. 5, ¶23-24; Answer of Jack Daniel's Properties to Amended Complaint, p. 3, ¶¶ 23 and 24; Jack Daniel's Responses to VIP's First Set of Requests for Admissions, pp. 3-6; Request Nos. 2-7.

NOW0007

label that wraps around the neck of the bottle, (3) replaced the words "Old No. 2" on the neck of the bottle with the words "Poo Poo on your Tennessee Carpet," (3) completely removed the black front labeling, (4) replaced the words "The Old No. 2" on the front of the label with "Poo Poo," (5) removed the white filigreed border completely, (6) changed the font on the front of the label and replaced curved letters with straight letters, and (7) even changed the color of the hangtag from black to yellow and removed the white border around it.



In addition, the words "Limited Guarantee: For defects in workmanship. To read the full details of our Limited Guarantee, please visit www.vipproducts.com" and "This product is not affiliated with Jack Daniel Distillery" were also removed from the Test dog toy to

7

NOW0008

create the Control toy. In fact, the only direct similarities between the Test and Control toys are the picture of the dog itself, the design of the "Silly Squeakers" brand name, and some of the words on the back of the hangtag.




18.     Thus, the Control toy is drastically different from the Test toy. It does not even look like a whiskey bottle anymore,[16] but now looks like, in my opinion, a wine bottle. The Control toy has also removed all black coloring from the bottle labels, completely changed the fonts, simply removed white borders without replacing them with other types of borders, removed mention of "The Old No. 2" without replacing it with something comparable, and even changed the design and color of the hangtag.

19.     As mentioned above, Dr. Ford discusses the purpose of a Control stimulus in his report as, "Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give a Jack Daniel's response to the test cell

---

[16] See, for example, Diamond, Shari Seidman (2012), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 212: "A good control stimulus, if it is a control for an allegedly infringing mark, should appear to be a plausible member of the same product category."

NOW0009

survey questions....because of other factors, such as......market share or popularity, or some other potential influence on a respondent's answers."[17]  And, Jack Daniel's Properties is claiming that its alleged trade dress is famous.  And yet, less than 1% of respondents seeing the Control dog toy thought that it was put out by Jack Daniel's.  This very low number indicates that the design of the Control dog toy is likely defective.  In particular, this very low number indicates that respondents likely did not even think of the Control dog toy as a whiskey bottle because, if they did, more than 1% of respondents should have mentioned Jack Daniel's, since the alleged Jack Daniel's trade dress is supposedly a famous trade dress of whiskey.

20.     In sum, Dr. Ford failed to adhere to very important survey design principles.  First, he tested the influence of particular design features that are allegedly part of the Jack Daniel's trade dress, and yet these design features have never, to my understanding, been shown to have acquired secondary meaning.  This is improper, since Dr. Ford is testing an issue that, to my understanding, cannot be defended.  In addition, even if Jack Daniel's had been able to establish secondary meaning, the Control dog toy should not have been vastly different from the Test toy.  Instead, the Control dog toy should have replaced the elements of the alleged trade dress with similar elements, and kept other elements that are not part of the trade dress (such as, to my understanding, the color black on the labels or hangtag).  As a result, the Control dog toy is defective and incapable of removing the appropriate level of "noise" from the Test results, thus making it impossible to determine the correct level of net confusion.

*Failure to replicate marketplace conditions*

21.     It is important for any stimulus in a likelihood of confusion survey to resemble as closely as feasible what the survey respondent would be able to view in the actual marketplace.[18]  However, Dr. Ford deviated from this important principle in a number of very significant ways.  In particular, Dr. Ford told respondents to "Please look at this dog toy as you

---

[17] Ford, p. 10-11.
[18] See, for example, Swann, Jerre B. (2012), "Likelihood of Confusion," in *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association, p. 76.

NOW0010

would if you saw it in a store and were considering purchasing it."[19]  However, Dr. Ford

only allowed respondents to see two direct views of the product:  a front view and the

back of the hang tag.[20]  Thus, the respondents could not see either side of the product, or

the back of the product, or the top of the product (with the word BS on it), or the bottom

of the toy (which has a little round button where a squeaking noise is emitted if someone

squeezes the toy).

 

In addition, respondents could not read the front of the hang tag, because it was blocked

by the toy and respondents had no way to manipulate the toy so that they could read it.[21]

This was true even if the respondent clicked on the survey image to enlarge the image of

the toy, because the words on the front of the label were still too small and blurry to

read.[22]  And, note that respondents 1001 even said, "The tag says 'Silly S-----S' but

because of the toy, I cannot read the bottom word."[23]  Thus, respondents could not read

either the details about the product on the front of the hang tag, nor even the brand name

---

[19] Ford, Tab A, p. 6.
[20] Ford, Appendix C, C-19 and C-22.
[21] Ford, Appendix C, C-20.
[22] Ford, Appendix C, C-20.
[23] Ford, Appendix B, B-2.

10

NOW0011

itself in some cases, because the toy blocked the brand name, and again respondents had no way to handle the product so that the front of the label could be read. And, it is even difficult to read all of the words that appear on the front of the toy itself, such as "43% poo by volume" and "100% smelly" even if the image is enlarged.[24] Thus, Dr. Ford's survey clearly does not fulfill its objective to allow respondents to get the visual information they would be able to get if they were shopping in an actual store.

22.    In addition, if a consumer were shopping for the Bad Spaniels dog toy in a store in the actual marketplace, the consumer would be able to touch the toy. This is important because the toy emits a squeaking noise if squeezed. The failure to allow consumers to have this tactile or auditory information is a major defect in the methodology of the Ford survey.

23.    Finally, Dr. Ford showed respondents a picture of a display of products, and told respondents to "Please look at this display of products for dogs as you would if you saw it in a store and were considering purchasing a dog toy."



---

[24] Ford, Appendix C, C-20.

11

NOW0012

However, the display that Dr. Ford showed to respondents featured both dog toys and dog treats, when it is more common for a display such as this to only feature one type of product (either toys or treats). In addition, it is more common for products to be organized together by brand, whereas Dr. Ford showed the Silly Squeaker products separated by other brands. Furthermore, it is more common for the same product to be on the same hanger rather than separated. And yet, there are two different images of the Bad Spaniels toy separated by other toys, and the Bad Spaniels toys appear to be covering up other types of toys. Finally, it is not possible to read all of the words on the many products shown on the display, whereas in the actual marketplace, consumers would be able to read these words. In sum, the image of the display that Dr. Ford showed to respondents also does not mimic marketplace conditions.

24.    In conclusion, Dr. Ford wanted consumers to view the Bad Spaniels dog toy as they would if they were shopping at a store in the actual marketplace. However, Dr. Ford's survey simply did not allow this, since he did not give respondents the opportunity to see, touch, or hear important information that is in fact available in the actual marketplace. This mistake is a very serious methodological problem, and as a result, in my opinion does not allow for the extrapolation of his results to what would likely happen in the actual marketplace.

### *Failure to properly code and analyze data*

25.    Dr. Ford believes that his survey results show that approximately 29% of respondents were confused between the Bad Spaniels dog toy and Jack Daniel's. However, the Bad Spaniels dog toy is a parody of a Jack Daniel's bottle, and Dr. Ford's results need to be analyzed with this in mind. First, I found that some respondents, in their explanations of their answers, explicitly stated that the product was a spoof while others realized that the Bad Spaniels toy was put out by a different company but were trying to interpret the questions in terms of whether a spoof needs to get permission or approval from the company it is spoofing. For example, respondent 1001 said, "Because they are creating a spoof of a real product so I think they would need permission so they don't get sued for

12

NOW0013

copyrights or something like that" (and this respondent realized in an earlier response that this product was put out by 'Silly somethings.') [25]

26.    Also, note that, of the four questions designed to test likelihood of confusion (made or put out, other products made or put out, authorization/approval, and affiliation/connection), the largest group who were counted by Dr. Ford as supposedly confused were those answering the question about authorization or approval.[26] In particular, 27 respondents, or 12.8%, believe that the company needed authorization or approval; 25 respondents, or 11.8%, believe that the dog toy was made or put out by Jack Daniels; 6 respondents, or 2.8%, believed that the company making the dog toy also makes whiskey; and 4 respondents, or 1.9%, believe that the company had a business affiliation or connection.  Such results need to, again, be interpreted in light of the fact that the dog toy at issue is a parody.  In particular, the largest group of respondents (12.8%) were likely trying to figure out if a parody needs authorization or approval from the company it is spoofing (since the greatest alleged "confusion" from the four likelihood of confusion questions came from the question about authorization or approval).

27.    In addition, I found that 20 respondents who were counted by Dr. Ford as supposedly confused (due to their responses to a later question) actually recognized, in response to the initial question about who made or put out the product, that the Bad Spaniels dog toy was in fact made or put out by VIP/Bad Spaniels/Silly Squeakers.[27] Thus, these

---

[25] Respondent 1001 said that the survey was set up such that he/she was unable to read the word coming after "Silly." Other examples of respondents noting the product was a spoof or trying to interpret what a spoof needs to do to get permission or approval from the company it is spoofing include respondent 1012: "Bottle design and name are plays on the Jack Daniel's brand," respondent 1015: "It mimics them," respondent 1020: "It looks like they did a license deal with Jack Daniels" (and who also responded that the product was put out by VIP toys), respondent 1022: "I'm sure the dog toy company that made this toy had to get their permission and legal rights to essentially copy they product in dog toy form" (and who also responded that the product was put out by Bad Spaniels), respondent 1029: "Jack Daniel's because the label resembles and is a play on their label" (and who also responded that the product was put out by Silly Squeakers), respondent 1033: "Because it is a spoof on their label," respondent 1046: "It is similar to a Jack Daniel's label but I do not believe they make any dog products....If it is put out by Jack Daniel's then they would have to give authorization for approval to copy their signature label," and respondent 1194: "The bottle is mimicked after the Jack Daniel BBQ sauce. So they would hold the patent therefore you would have to ask permission to use the image."

[26] 25 respondents, or 11.8%, believe that the dog toy was make or put out by Jack Daniels; 6 respondents, or 2.8%, believed that the company making the dog toy also makes whiskey; 27 respondents, or 12.8%, believe that the company needed authorization or approval; and 4 respondents, or 1.9%, believe that the company had a business affiliation or connection.

[27] Respondents 1001, 1020, 1022, 1029, 1035, 1044, 1054, 1062, 1065, 1095, 1098, 1099, 1106, 1132, 1139, 1147, 1172, 1176, 1179, and 1210.

NOW0014

respondents were counted as supposedly confused only because of their response to a latter question about authorization/approval or affiliation/connection, even though they did realize in their response to the initial made-or-put-out question who in fact made or put out the product. In other words, these respondents did in fact know that the product was made or put out by VIP/Silly Squeakers/Bad Spaniels, but likely only mentioned Jack Daniel's to the latter questions about authorization/approval and affiliation/connection because they were trying to interpret these questions in response to their knowledge that the product was made by a different company (VIP) and was a spoof of Jack Daniel's.

28. Thus, my analysis of Dr. Ford's results shows that they need to be interpreted in light of the fact that the Bad Spaniels dog toy is a parody of a Jack Daniel's liquor bottle. When this is done, it is clear that many respondents in fact recognized that the product is made or put out by VIP products, and yet were thinking that VIP would need to get authorization or approval from Jack Daniel's in order to sell such a parody product.

29. In conclusion, my analysis of the Ford survey as it relates to the issue of likelihood of confusion shows that its methodological flaws are so serious that they render its results meaningless for assessing the likelihood of confusion in this matter. In particular, Dr. Ford designed an improper Control stimulus, did not mimic marketplace conditions, and improperly analyzed his data.

## The ORC Survey Does Not Properly Test Likelihood of Confusion

30. Jack Daniel's Properties claims that an ORC survey conducted from February 5-8, 2015 yielded similar likelihood-of-confusion results to the results in the Ford survey.[28] However, this survey is so seriously and fatally flawed that it is impossible to draw any meaningful conclusions about likelihood of confusion. In particular, (1) there is no Control dog toy whatsoever with which to compare against the responses to the Test dog toy, (2) it does not mimic marketplace conditions because not all of the angles of the product can be seen, it is not known that the product makes a squeaking noise if

---

[28] Defendant and Counterclaimant Jack Daniels Properties, Inc.'s Responses to Plaintiff and Counter-Defendant's First Set of Non-Uniform Interrogatories, p. 17; JDPI0355-0396.

14

NOW0015

squeezed, and the product images cannot even be enlarged so that the words can be properly read, (3) the question, "Who, or what company, if any, do you believe is sponsoring or promoting this dog toy?" and, "What other products or services, if any, do you believe are made or put out by whoever is sponsoring or promoting this dog toy?" are the only questions asked, and improper questions at that, for assessing likelihood of confusion,[29] (4) respondents were not provided with the proper instructions, such as to not guess, and to wear eyeglasses as needed, and (5) the survey was not validated.[30]

31.    Because of these serious methodological defects, I do not agree with the claim that the ORC survey provides similar results to the highly flawed Ford survey.  In fact, its methodology is so flawed that, in my opinion, it would be improper to rely on its results to form any conclusions about likelihood of confusion.

Dated:  July 10, 2015

_____

Dr. Stephen M. Nowlis, Ph.D.

---

[29] For example, note that Dr. Ford in his survey asked questions such as "Who or what company do you believe makes or puts out this product?"

[30] Whereas, for example, Dr. Ford did validate his survey.  Validation occurs when it is ensured that survey respondents actually participated in the survey.

15

NOW0016

# Appendix A:  Vita of Stephen M. Nowlis

Olin Business School, Washington University
One Brookings Dr., Campus Box 1133
St. Louis, MO  63130
Phone:  314-935-5113
email:  nowlis@wustl.edu

---

## Education

Ph.D.   Business Administration (Marketing concentration), Haas School of Business, University of California at Berkeley, 1994

Thesis:  Competitive Brand Strategies of High-Tier and Low-Tier Brands:  A Consumer Choice Perspective

M.B.A.   Haas School of Business, University of California at Berkeley, 1990

B.A.   Economics, with Distinction, Stanford University, 1986

## Academic employment

Department Chair, Marketing Department, Olin Business School, Washington University, St. Louis, MO, 2014 –

August A. Busch, Jr. Distinguished Professor of Marketing, Olin Business School, Washington University, St. Louis, MO, 2010 -

AT&T Distinguished Research Professor of Marketing, WP Carey School of Business, Arizona State University, Tempe, AZ, 2003-2009

Associate Professor, WP Carey School of Business, Arizona State University, Tempe, AZ, 2000-2003

Assistant Professor, WP Carey School of Business, Arizona State University, Tempe, AZ, 1996-2000

Assistant Professor, Washington State University, Pullman, WA, 1994-1996

## Professional service

Guest Editor, *Journal of Consumer Research*, *Journal of Marketing Research*
Associate Editor, *Journal of Marketing Research*, 2009-
Associate Editor, *Journal of Marketing*, 2011-2014
Associate Editor, *Journal of Consumer Psychology*, 2008-2011
Associate Editor, *Journal of Consumer Research*, 2002-2008
Editorial Review Board, *Journal of Marketing*, 2005-2010, 2014-
Editorial Review Board, *Journal of Consumer Research*, 2000-2001, 2008-
Editorial Review Board, *Marketing Letters*, 2001-

NOW0017

Editorial Review Board, *Journal of Marketing Research*, 2001-2008
Editorial Review Board, *Journal of Consumer Psychology*, 2012-

Ad-Hoc Reviewer, *Marketing Science, Management Science, Journal of Retailing, Current Anthropology, Nonprofit & Voluntary Sector Quarterly, Industrial and Corporate Change,* Reviewer for Association for Consumer Research conferences, American Marketing Association conferences, AMA John A. Howard Doctoral Dissertation Competition, Society for Consumer Psychology conferences. Program Committee, Association for Consumer Research conference, 2001 and 2003. Representative of the Society for Consumer Psychology at the main meeting of the American Psychological Association, 2001. Advisory Board for the MSI-JCP Research Competition on Product Assortment and Variety-Seeking in Consumer Choice, 2004.

**Honors and Awards**

A January 2009 study in the *Journal of Marketing* (by Seggie and Griffith) found that I am the 18th most productive marketing professor in the world in terms of my publications in top-tier marketing journals.

My doctoral student, Maura Scott, won Honorable Mention (2nd place) for the 2009 Ferber Award (best paper based on a dissertation), for our paper: Scott, Maura L., Stephen M. Nowlis, Naomi Mandel, and Andrea C. Morales (2008), "The Effects of Reduced Food Size and Package Size on the Consumption Behavior of Restrained and Unrestrained Eaters," *Journal of Consumer Research*, 35 (October), 391-405.

Winner of the 2008 Emerald Management Reviews Citation of Excellence Award for "A Bite to Whet the Reward Appetite: The Influence of Sampling on Reward-Seeking Behaviors." This award means that this article was selected as one of the top 50 business and management articles from 15,000 published in 2008, and the only article from *Journal of Marketing Research* to receive this award.

Co-Chair of AMA doctoral consortium, 2007

Co-Chair of ACR doctoral symposium, 2006

Ferber Award Judge, 2005

Finalist for Paul Green Award, 2005

Outstanding Reviewer Award, *Journal of Consumer Research*, 2002.

Winner of the 2001 William F. O'Dell Award. Given for the article appearing in the *Journal of Marketing Research* in 1996 that has made the most significant long-term contribution to the marketing discipline in the five year period 1996-2001.

NOW0018

Finalist (top 4) for the 2002 William F. O'Dell Award. Given for the article appearing in the *Journal of Marketing Research* in 1997 that has made the most significant long-term contribution to the marketing discipline in the five year period 1997-2002.

Winner of the 2001 Early Career Contribution Award from the Society for Consumer Psychology – Sheth Foundation, Division 23, American Psychological Association. Given annually to the most productive researcher in the field of consumer behavior/marketing who has been a faculty member for less than ten years.

Winner of Best Theoretical Paper award (Stephen M. Nowlis and Deborah B. McCabe), "Online vs. Off-line Consumer Decision Making: The Effect of the Ability to Physically Inspect Merchandise," at 2nd INFORMS "Marketing Science and the Internet: Understanding Consumer Behavior on the Internet," conference, sponsored by Andersen Consulting and the Marshall School of Business, April 29 - 30, 2000. Prize paid $2500.

Voted Outstanding Graduate Student Instructor, Haas School of Business, University of California at Berkeley, 1992-1993

Winner of Delbert Duncan Award for Best Marketing MBA student, 1988-1990

## Publications

Scott, Maura and Stephen M. Nowlis (2013), "The Effect of Goal Specificity on Consumer Goal Reengagement," *Journal of Consumer Research*, 40 (3), 444-459.

Castro, Iana A., Andrea C. Morales, and Stephen M. Nowlis (2013), "The Influence of Disorganized Shelf Displays and Limited Product Quantity on Consumer Purchase," *Journal of Marketing*, 77 (4), 118-133.

Nowlis, Stephen M., Ravi Dhar, and Itamar Simonson (2010), "The Effect of Decision Order on Purchase Quantity Decisions," *Journal of Marketing Research*, 47 (August), 725-737.

Griskevicius, Vladas, Michelle Shiota, and Stephen M. Nowlis (2010), "The Many Shades of Rose-Colored Glasses: An Evolutionary Approach to the Influence of Different Positive Emotions," *Journal of Consumer Research*, 37 (2), 238-250.

Frederick, Shane, Nathan Novemsky, Jing Wang, Ravi Dhar, and Stephen M. Nowlis (2009), "Opportunity Cost Neglect," *Journal of Consumer Research*, 36 (4), 553-561.

Scott, Maura L., Stephen M. Nowlis, Naomi Mandel, and Andrea C. Morales (2008), "The Effects of Reduced Food Size and Package Size on the Consumption Behavior of Restrained and Unrestrained Eaters," *Journal of Consumer Research*, 35 (October), 391-405. This paper won Honorable Mention for the 2009 Ferber Award.

Wadhwa, Monica, Baba Shiv, and Stephen M. Nowlis (2008), "A Bite to Whet the Reward Appetite: The Influence of Sampling on Reward-Seeking Behaviors," *Journal of Marketing*

NOW0019

*Research,* 45 (August), 403-413.  This paper won the 2008 Emerald Citation of Excellence Award.

Mandel, Naomi and Stephen M. Nowlis (2008), "The Effect of Making a Prediction about the Outcome of a Consumption Experience on the Enjoyment of that Experience," *Journal of Consumer Research*, 35 (June), 9-20.

Kahn, Barbara E., Mary Frances Luce, and Stephen M. Nowlis (2006), "Debiasing Insights from Process Tests," *Journal of Consumer Research,* 33 (June), 131-138.

Nowlis, Stephen M. and Baba Shiv (2005), "The Influence of Consumer Distractions on the Effectiveness of Food Sampling Programs," *Journal of Marketing Research*, 42 (May), 157-168.

Shiv, Baba, Alexander Fedorikhin, and Stephen M. Nowlis (2005), "Interplay of the Heart and Mind in Decision Making," in *Inside Consumption: Frontiers of Research on Consumer Motives, Goals, and Desire*, ed. Ratti Ratneshwar and David Mick.

Nowlis, Stephen, Naomi Mandel, and Deborah Brown McCabe (2004), "The Effect of a Delay Between Choice and Consumption on Consumption Enjoyment," *Journal of Consumer Research*, 31 (December), 502-510.

Shiv, Baba and Stephen M. Nowlis (2004), "The Effect of Distractions while Tasting a Food Sample:  The Interplay of Informational and Affective Components in Subsequent Choice," *Journal of Consumer Research*, 31 (December), 599-608.

Dhar, Ravi and Stephen M. Nowlis (2004), "To Buy or Not to Buy: Response Mode Effects on Consumer Choice," *Journal of Marketing Research*, 41 (November), 423-432.

Nowlis, Stephen M. and Deborah B. McCabe (2004), "The Effect of Examining Actual Products or Product Descriptions on Consumer Preference," *Journal of Consumer Psychology*, 13 (4), 431-439.

Nowlis, Stephen M., Barbara E. Kahn, and Ravi Dhar (2002), "Coping with Ambivalence: The Effect of Removing a Neutral Option on Consumer Attitude and Preference Judgments," *Journal of Consumer Research*, 29 (December), 319-334.

Lemon, Katherine and Stephen M. Nowlis (2002), "Developing Synergies Between Promotions and Brands in Different Price-Quality Tiers," 39 (May) *Journal of Marketing Research,* 171-185.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, Stephen M. Nowlis (2001), "Consumer Research:  In Search of Identity," *Annual Review of Psychology*, 52, 249-275.

19

NOW0020

Simonson, Itamar and Stephen M. Nowlis (2000), "The Role of Explanations and Need for Uniqueness in Consumer Decision Making: Unconventional Choices Based on Reasons," *Journal of Consumer Research*, 27 (June), 49-68.

Dhar, Ravi, Stephen M. Nowlis, and Steven J. Sherman (2000), "Trying Hard or Hardly Trying: Context Effects in Choice," *Journal of Consumer Psychology*, 9 (4), 189-200.

Nowlis, Stephen M. and Itamar Simonson (2000), "Sales Promotions and the Choice Context as Competing Influences on Consumer Decision Making," *Journal of Consumer Psychology*, 9 (1), 1-16.

Dhar, Ravi, Stephen M. Nowlis, and Steven J. Sherman (1999), "Comparison Effects On Preference Construction," *Journal of Consumer Research,* 26 (December), 293-306.

Ravi Dhar and Stephen M. Nowlis (1999), "The Effect of Time Pressure on Consumer Choice Deferral," *Journal of Consumer Research*, 25 (March), 369-384.

Nowlis, Stephen M. and Itamar Simonson (1997), "Attribute-Task Compatibility as a Determinant of Consumer Preference Reversals," *Journal of Marketing Research*, 34 (May), 205-218. This paper was a finalist for the 2002 O'Dell Award. A Brief of this paper is written by John T. Landry in *Harvard Business Review* (1996), 74 (November/December), 13. This article was reprinted in *The Construction of Preference* (2006), eds. Sarah Lichtenstein and Paul Slovic, Cambridge University Press: New York, NY, p. 192-219.

Nowlis, Stephen M. and Itamar Simonson (1996), "The Effect of New Product Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46. This paper won the 2001 O'Dell Award.

Nowlis, Stephen M. (1995), "The Effect of Time Pressure on the Choice Between Brands that Differ in Quality, Price, and Product Features," *Marketing Letters*, 6(4), 287-295.

Simonson, Itamar, Stephen M. Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," *Marketing Science*, 12 (4), 357-377

Simonson, Itamar, Stephen M. Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," *Journal of Consumer Psychology*, 2 (3), 287-306.

**Industry experience**

Assistant Buyer, May Company Department Stores, Los Angeles, CA, 1986-1988
Expert Witness Consulting, 2001-

NOW0021

**Expert Witness Consulting (deposition or trial testimony in the last 5 years)**

Kerzner International Resorts, Inc. v. Monarch Casino & Resort, Inc.
- Greenberg Traurig, Las Vegas NV
- Deposition
- 2009

LG Electronics v. Whirlpool Corporation
- Reed Smith, Chicago IL
- Deposition
- 2009

National Products Inc. v. Gamber-Johnson
- Darby & Darby, Seattle, WA
- Deposition, trial testimony
- 2009

Miller and Tompkins et al. v. Basic Research et al.
- Burbridge, Mitchell & Gross
- Deposition
- 2010

Brighton Collectibles, Inc. v. Coldwater Creek, Inc.
- Sheppard Mullin Richter & Hampton LLP, San Diego, CA
- Deposition
- 2010

North Atlantic Operating Company, Inc., et al. v. DRL Enterprises, Inc
- Cowan Liebowitz & Latman, New York, NY
- Deposition
- 2011

L'Oreal USA Inc. v. Bot Hair et al.
- Alston & Bird, Dallas, TX
- Deposition
- 2011

Youngblood Timepieces, Inc. v. Fossil, Inc., et al.
- Standly and Hamilton LLP, Dallas TX
- Deposition
- 2012

FragranceNet.com, Inc. and Telescents, Inc. v. FragranceX.com, Inc.
- Reitler, Kailas & Rosenblatt, New York, NY
- Deposition

NOW0022

- 2012

Sporting Supplies International Inc. v. Tulammo USA Inc.
- Morrison & Foerster LLP, Los Angeles, CA
- Deposition
- 2012

Morgan v. Gay et al.
- Manning, Curtis, Bradshaw & Bednar LLC, Salt Lake City, UT
- Deposition
- 2012

J.T. Colby & Company, Inc. v. Apple Inc.
- Kirkland & Ellis, New York, NY
- Deposition
- 2012

Meyer v. Telebrands
- Cooper & Dunham, LLP, New York, NY
- Deposition
- 2013

H&R Block Eastern Enterprises, Inc. et al. v. Intuit, Inc.
- Manatt, New York, NY
- Trial testimony
- 2013

Wells v. Abbott Laboratories, Inc.
- Winston & Strawn, Los Angeles, CA
- Deposition
- 2013

CERT v. Starbucks et al.
- Morrison & Foerster LLP, San Francisco, CA
- Deposition, Trial Testimony
- 2014

Hulsey et al. v. WhiteWave Foods Company
- Liner LLP, Los Angeles, CA
- Deposition
- 2014

Fox Broadcasting Company et al. v. DISH Network et al.
- Jenner & Block, Los Angeles, CA
- Deposition
- 2014

NOW0023

Bowe and Morgan v. Public Storage
- Newport Trial Group, Newport Beach, CA
- Deposition
- 2015

His & Her Corp. v. Shake-N-Go Fashion, Inc., et al.
- Steptoe & Johnson, Los Angeles, CA
- Deposition
- 2015

LOEC, Inc. v. Zippmark, Inc. and Zippo Manufacturing Company
- Dykema, Chicago, IL
- Deposition
- 2015

Converse v. Fortune Dynamic
- HFL Law Group, Los Angeles, CA
- Deposition
- 2015

NOW0024

## Appendix B:  List of Documents Reviewed

In addition to the documents I cite in my Expert Report:

1.  Expert Report of Martin Wolinsky

2.  VIP's Responses to 2nd set of Interrogatories

3.  JDPI 0327-0334, 0401-0418

4.  JDPI response to first set of non-uniform interrogatories

5.  JDPI response to first set of request for production of documents

6.  JDPI responses to first set of requests for admissions

7.  JDPI answer and counterclaim

8.  VIP answer to counterclaim

9.  VIP motion to supplement its complaint and counterclaim

10.  Expert report of Dr. Itamar Simonson

11.  Rule 26(a) disclosure of JDPI

NOW0025

## Appendix C:

**Amended Complaint, p. 5, ¶23-24**

23.   The following images depict bottles for bourbon or other corn based whiskey not originating from the Jack Daniels distillery:



24.   The bottles depicted in the images above are used by competitors of Jack Daniel's in the sale of distilled spirits, and whiskey in particular.

**Answer of Jack Daniel's Properties to Amended Complaint, p. 3, ¶¶ 23 and 24**

23.   JDPI admits the allegations in paragraph 23 of the Amended Complaint.

24.   JDPI admits the allegations in paragraph 24 of the Amended Complaint.

3

NOW0026

**Jack Daniel's Responses to VIP's First Set of Requests for Admissions, pp. 3-6; Request Nos. 2-7.**

| | |
|---|---|
| 10 | **REQUEST NO. 2:** |
| 11 | Admit the Evan Williams bottle depicted here is packaging for distilled spirits. |
| 12 | |
| 13 |  |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | **RESPONSE TO REQUEST NO. 2:** |
| 20 | JDPI interposes its General Objections and also objects specifically to this request |
| 21 | on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims |
| 22 | or defenses in this action nor reasonably calculated to lead to the discovery of admissible |
| 23 | evidence.  Without waiving those objections, JDPI responds as follows: Admitted. |
| 24 | **REQUEST NO. 3:** |
| 25 | Admit the Ezra Brooks bottle depicted here is packaging for distilled spirits. |
| 26 | |
| 27 | |
| 28 | 3 |

NOW0027



**RESPONSE TO REQUEST NO. 3:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 4:**

Admit the Benchmark bottle depicted here is packaging for distilled spirits.



**RESPONSE TO REQUEST NO. 4:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

4

NOW0028

**REQUEST NO. 5:**

Admit the Jim Beam Black bottle depicted here is packaging for distilled spirits.



**RESPONSE TO REQUEST NO. 5:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, JDPI responds as follows: Admitted.

**REQUEST NO. 6:**

Admit the Zachariah Harris bottle depicted here is packaging for distilled spirits.



**RESPONSE TO REQUEST NO. 6:**

JDPI interposes its General Objections and also objects specifically to this request on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims

NOW0029

1   or defenses in this action nor reasonably calculated to lead to the discovery of admissible
2   evidence. Without waiving those objections, JDPI responds as follows: Admitted.
3   **REQUEST NO. 7:**
4       Admit the Heaven Hill bottle depicted here is packaging for distilled spirits.



12  **RESPONSE TO REQUEST NO. 7:**
13      JDPI interposes its General Objections and also objects specifically to this request
14  on the ground that it seeks the admission of a fact that is neither relevant to VIP's claims
15  or defenses in this action nor reasonably calculated to lead to the discovery of admissible
16  evidence. Without waiving those objections, JDPI responds as follows: Admitted.

NOW0030