**DECLARATION OF D. PETER HARVEY IN SUPPORT
OF DEFENDANT'S MOTIONS IN LIMINE
NOS. 1 THROUGH 6**

# EXHIBIT N

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3

4   VIP PRODUCTS, LLC, an Arizona    )

5   limited liability company,       )

6    Plaintiff and Counterdefendant,)

7                  vs.               ) Case No.

8   JACK DANIEL'S PROPERTIES, INC., ) CV-14-2057-PHX-SMM

9   a Delaware corporation,          )

10  Defendant and Counterclaimant.   )

11  _____

12

13

14          DEPOSITION OF BRUCE G. SILVERMAN

15             Los Angeles, California

16            Thursday, August 13, 2015

17                   Volume 1

18

19

20  Reported by:

21  WENDY S. SCHREIBER

22  CSR No. 3558

23  Job No. 2117367

24

25  PAGES 1 - 260

                                        Page 1

1    obviously from you to Mr. Hirsch.

2        A.    Yes, I do know what it is.

3        Q.    Okay.

4        A.    This is --

5        Q.    It has VIP's address.

6        A.    Okay, it's the following day.  Yeah, the --

7    at this point -- I don't remember whether or not we

8    had decided to do the focus groups or not, but

9    Hirsch had put together an estimate and he wanted to

10   put the name -- VIP's name on the estimate because

11   they were going to be the bill payer.

12       Q.    Look at the next page of Exhibit 102.

13   That's SIL 130.  That's an e-mail on Friday, May

14   15th, from Mr. Hirsch to you.  Do you recall that

15   that covered the estimate that you referred to a

16   moment ago?

17       A.    I believe it does, yes.

18       Q.    Had you made the decision at that point in

19   the afternoon of May 15th that you were going to do

20   focus groups as part of your retention in this case?

21       A.    I'm not sure if there was a definitive

22   decision made at that point.  One of the things I

23   was interested in is before I wanted to recommend

24   going forward was to see Hirsch's proposed

25   discussion outline.

Page 64

1  of millions of dollars that are being spent on

2  advertising were being as well spent as possible.

3          THE REPORTER:  Excuse me, my computer just

4  took a dive so I need to go off the record.

5                  (Recess taken.)

6  BY MR. LARKIN:

7      Q.   Did I understand your last answer correctly,

8  Mr. Silverman, that most of the quantitative studies

9  that you've reviewed were advertising-recognition

10 studies?

11     A.   Well, I wouldn't say that it was all but

12 certainly a lot of the studies were designed to

13 track advertising, track awareness and track

14 attitudes towards corporations and brands.  Many of

15 the other studies were marketing studies about, you

16 know, given product categories.  Others were more or

17 less general studies about consumer purchasing

18 behavior, particularly consumer media usage

19 behavior, et cetera.  Again, in the positions that I

20 held in the advertising business I think, including

21 what I do now, information is the life blood of what

22 we do.

23     Q.   Do you agree that focus groups don't

24 replicate a purchase environment for a product?

25     A.   In most instances they do not.

Veritext Legal Solutions
866 299-5127

1    Q.   You agree that in most instances they aren't

2    intended to do that?

3    A.   That's correct, I would agree.

4    Q.   In paragraphs 23 and 25 of your report --

5    that's on page 8 and 9 respectively --

6    A.   I'm hearing you but I'm not listening.

7    Q.   In paragraph 23 you ask two questions:  "But

8    what if consumers do not think about VIP's Bad

9    Spaniels dog toy as Dr. Simonson (and his clients)

10   assumes they do?  What if defecation does not play a

11   significant role in their thinking about the toy or

12   how they associate it with Jack Daniel's?"

13        And then over on 25 -- paragraph 25 you ask

14   the question, "But does its labeling conjure up the

15   sense of disgust Dr. Simonson assumes it does?

16   Would a reasonable Jack Daniel's consumer agree with

17   him?"

18        Were those the things that you were trying

19   to determine through the use of the focus groups in

20   this case?

21   A.   Well, actually, it's a little bit backwards

22   from that.  When I read Dr. Simonson's report, the

23   thing that immediately struck me was that he made a

24   leap -- at least I believe he made a leap -- and the

25   leap was consumers would be disgusted by this and --

Page 77

1  associate network memory model or dealing with any

2  of those things?

3      A.   No.  I'm willing to concede that that may be

4  correct.  I just think his starting point is without

5  merit.

6      Q.   Okay.  And is it correct that -- did you

7  consider at all actually trying to do a quantitative

8  survey or is that something you simply dismissed as

9  not being workable?

10     A.   I didn't think it was workable.

11 Dr. Simonson, who knows more about research than I

12 do, he didn't think it was workable either.

13     Q.   Did you consider any other sort of research

14 or studies besides focus groups?

15     A.   Not really.  I'm not sure what they would

16 have been to do.  I thought -- before focus groups I

17 gave a little thought to standing and -- at a

18 PetSmart or a Petco or someplace where people buy

19 dog stuff and ask them about it, but I -- I just

20 didn't think that would be anywhere close to an

21 appropriate way to do it.  It would be too random.

22     Q.   Look at paragraph 27 of your report, please.

23 It begins at the bottom of page 9 and continues over

24 to page 10.  You wrote, "Focus groups are a research

25 method whereby consumers from the target market are

Page 84

1  they are often overused?

2      A.   I wouldn't agree with that.  In fact, I

3  think this is the view from an academic.  It's his

4  opinion.  I think that people that hold significant

5  marketing and research positions at major companies

6  that use focus groups are pretty smart.  They have

7  great experience.  They're in the real world where

8  if the work they do proves to be useless, they can

9  lose their job, which is not something that happens

10  to academics.  They get tenure.  Nobody has tenure

11  in advertising.  So I wouldn't necessarily agree

12  with that.  I think that there are certainly -- for

13  as long as I've been involved in marketing there's

14  always arguments about the benefits of quantitative

15  research versus qualitative research.  I think both

16  forms of information gathering are tremendously

17  useful.  I think they play different roles.  I think

18  if you're using qualitative research and pretending

19  it's the same as quantitative research, I think

20  that's not -- that's not -- that's not okay.  But if

21  you're using it to understand the thoughts and

22  feelings, it's the best possible way to do it.

23      Q.   Figure 19-4 on page 629 is entitled,

24  "Weaknesses associated with focus groups through

25  research" and there's a series of bullet points

Veritext Legal Solutions
866 299-5127

1    there.  Do you see that?

2        A.    Yes.

3        Q.    The first bullet point is, "The results are

4    not quantifiable."

5             Do you agree with that?

6        A.    I would.

7        Q.    What does that mean?

8        A.    Well, I think that what he's speaking to --

9    what the authors are speaking to there is the idea

10   of making a projectably statistically-reliable

11   sample but I don't think that's -- focus groups are

12   not used to that if you're using it to learn

13   different things than you can learn from a

14   statistical study.

15       Q.    The second bullet point is, "Sample sizes

16   are too small to generalize to larger populations."

17            Do you see that?

18       A.    I do.

19       Q.    Do you agree with that statement?

20       A.    Not necessarily.  My experience has been --

21   I've been doing focus groups for more than 40 years

22   and it's amazing how much useful information is

23   derived and how accurate that information often

24   turns out to be or more often than not it turns out

25   to be.

Veritext Legal Solutions
866 299-5127

1      Q.    Do you agree that the sample sizes of focus

2   groups make the results not statistically

3   projectable to larger populations?

4      A.    Yes.

5      Q.    The third bullet point is, "Group influences

6   may bias participants' responses."

7            Do you see that?

8      A.    Yes.

9      Q.    Do you agree with that?

10     A.    That can happen, yes.

11     Q.    What does that mean and how does it happen?

12     A.    I actually mentioned this earlier.  You

13   sometimes encounter a person -- a person in a group,

14   sometimes two, that are sort of alpha personalities

15   that want to dominate a group to the point of

16   intimidating other participants.  If I was a lawyer,

17   think about jurors.  And that's a weakness.  A good

18   moderator can nearly always mitigate against that.

19   I've literally witnessed groups where a particular

20   person was asked to leave.  They find nice ways of

21   doing it but they do it because the person is

22   damaging the group.  So you can have that happen.

23   That's one of the reasons that today most groups are

24   smaller.  It's much easier to manage a small group.

25   You just typically do more of them.  In fact, if you

Page 91

1    look at the structure of the groups that
2    Brown-Forman did that I reviewed, they tended to be
3    smaller groups.
4        Q.    Did you observe -- you observed personally
5    from behind a one-way mirror the focus groups
6    referenced in your report, correct?
7        A.    Yeah, I sure did.
8        Q.    Did you observe any group influences in any
9    of the four focus groups you observed?
10       A.    In -- in one of the groups -- in general the
11   answer is no.  In one group there was one fellow who
12   hated the squeaky sound that the toy makes.
13       Q.    We can all see why.
14       A.    He kept doing it and he wouldn't stop.  And,
15   you know, the focus group -- we weren't terribly
16   interested in attitudes towards the squeaky sound.
17   And the moderator, Mr. Hirsch, did his best to get
18   this guy to stop.  We couldn't get him off what he
19   thought but we didn't really want to address the
20   squeak in any degree.  But, you know, he chewed up
21   some time in the group and he made -- it was a group
22   of non-dog owners and the other members of the
23   group I think they were very irritated with him.
24   "Come on, move on, move on."  But I really didn't
25   see that, no.  I mean, I witnessed all the groups

Page 92

1    anybody dominating the group.

2        Q.    The next bullet point is, "Members may not

3    represent the target market.  (Are focus group

4    participants a certain type of person?)"

5            Do you agree with that?

6        A.    Let me take it in two pieces if you don't

7    mind.  "Members may not represent the target

8    market."  If the group doesn't represent the target

9    market, it's a useless group.  That applies to any

10   conversation.  That why we used one of the best

11   facilitation companies in the business to gather the

12   group.  So it -- I suppose that could happen but

13   it's a waste of time.  So I don't believe it happens

14   very often unless it's a completely amateur job.

15           "Are focus group participants a certain type

16   of person?"  That hasn't been my experience.  Now,

17   I've done groups for very expensive products -- for

18   Jaguar cars, Mercedes Benz cars, for global

19   travel -- and you would say to yourself, you know,

20   it's very upscale.  We've paid people $1,000 who

21   have household incomes of a quarter of a million

22   dollars and they come to the group.  So I don't

23   think that there are people that live a focus group

24   life, that's first.

25           Second, good focus group facilitation

Page 96

1    opinion but it's not -- it's just his opinion.  And

2    he's absolutely convinced he's right.  In his

3    deposition he makes the statement everybody would

4    agree -- something -- I'll paraphrase but "Everybody

5    would agree with me."  Well, everybody doesn't agree

6    with him.  You know, I was actually -- I put in my

7    report I was actually rather stunned that everybody

8    had the same view.  I don't think I've ever

9    encountered a focus group or a series of focus

10   groups before where there was unanimity on anything.

11   I've had people that hated Hershey bars.  I don't

12   know how they can but they did.

13       Q.   Do you agree that the focus groups here are

14   not projectable to any relevant consumer population?

15       A.   They're not intended to be projectable.

16   They're intended to be useful information about how

17   consumers think and feel -- how a reasonable

18   consumer thinks and feels.

19       Q.   Do you agree that the focus groups here were

20   conducted only of what I'm going to call

21   Los Angeles-area residents?  Is that a fair

22   characterization?

23       A.   Los Angeles area.

24       Q.   They may have come from farther but it was

25   in Westwood of Los Angeles-area residents.  Is that

Page 104

1    a fair characterization?

2        A.   Well, greater Los Angeles.  The sessions

3    were in Westwood.  The people lived -- in most

4    instances the people worked somewhere near the

5    facility.  I don't think people would drive from the

6    far northwest Valley down to Westwood on a weekday

7    night to do this.

8        Q.   Do you agree that the opinions of those

9    people who live in the Greater Los Angeles area are

10   not representative of what the rest of the country

11   might think about the product?

12       A.   It's possible.  I'm not as absolute in my

13   thinking as Dr. Simonson.

14       Q.   If you turn back to Exhibit 105 in the

15   Belch -- what Belch and Belch wrote as weaknesses

16   associated with focus group results -- research, I'm

17   sorry, are there other problems or limitations on

18   focus groups -- the use of focus group research that

19   are not listed in their bullet points?

20       A.   Gosh, I've seen focus groups where if the

21   groups aren't assembled well, if they don't get --

22   if they don't get the right kind of people, that's a

23   weakness.  That's really a weakness of whoever is

24   creating -- or managing the focus group process.

25   And I certainly have seen instances where focus

Page 105

1    people, calling people, calling people.  They always

2    over recruit.  They -- you know, if you're asking,

3    as we were, for four to five people per group, we

4    have four groups, they probably got 30 people who

5    said they would show up, of which 19 did.

6        Q.    Okay.  So just so I understand the overall

7    process, the screener is developed by you and

8    Mr. Hirsch.  It's completed and then it's given to

9    the facility and the facility then begins the

10   process of recruiting participants by placing phone

11   calls and using this as a script to qualify them and

12   then asking if they will come in for the group.  Is

13   that it?

14       A.    That's correct.

15       Q.    On page 0156 you have four groups:  Group 1,

16   2, 3 and 4.  How did you decide who would be in each

17   of those groups?

18       A.    Over the years most focus groups try to set

19   up groups with men only and women only simply

20   because sometimes women won't be as responsive in a

21   group with men, sometimes men won't be as responsive

22   with a group of women.  So it's worthwhile

23   frequently to -- if you're going to do a series of

24   groups to get a group that only has men and only has

25   women and then you have mixed groups.  So that was

Page 111

```
1    the first thing.  And that's just a basic focus
2    group process.  That's kind of a standard way of
3    doing it.
4          We wanted a group -- we wanted groups that
5    had dog owners but we also wanted one group that
6    didn't have dog owners.  And, actually, that was
7    my -- I wanted it done that way because I said, gee,
8    you know, how would a non- -- dog owners love their
9    dogs and they love to buy their dogs toys.  Stores
10   like Petco wouldn't exist if people weren't buying
11   dog toys, and this company, VIP, wouldn't exist.
12   What about people who don't have dogs?  Those people
13   may have a different feeling.  They may have a
14   completely different attitude.  Let's find out.
15       Q.   Why did you think that was important?
16   Because in paragraph 64 of your report you offer the
17   opinion that the toy -- the Bad Spaniels toy would
18   most likely be purchased by an adult dog owner.  Why
19   did you consider the non-dog owner?
20       A.   Because some non-dog owners might be exposed
21   to it but also sort of in the interest of fairness.
22   Jack Daniel's really doesn't care about Bad
23   Spaniels, they care about Jack Daniel's, so I wanted
24   to know how a Jack Daniel's user feels about this.
25   Would it make a difference?
```

Page 112

1    stuff is it tends to be more female than male.

2         Q.   Look at page 157, the next page.  The

3    instruction there is to recruit no more than two

4    non-Caucasian/white respondents for each group.

5    What was the purpose for that?

6         A.   These were small groups, four to five

7    people, so we -- we didn't want the groups to be

8    overly representative of minority populations.  By

9    doing it this way we got a reasonable cross-section.

10        Q.   Is that the same thinking behind the

11   instruction recruit no more than one 65+ respondent

12   for each group?

13        A.   Yes, to a degree.  Part of that is that

14   people 65+ actually while they may be Jack Daniel's

15   drinkers were less likely to buy dog toys in

16   general.  It's a younger population.

17        Q.   Look at page 159, please.  The instruction

18   at the bottom of that page is all respondents must

19   drink bourbon, scotch or other type of whiskey.

20   What was the reason for that?

21        A.   We wanted people who would be if not Jack

22   Daniel's drinkers at least be familiar with the

23   brand.  Jack Daniel's is a very big, very important

24   brand.  If they drink brown whiskey, they would

25   likely have awareness of Jack Daniel's.

Page 116

1    Daniel's drinker if they had bought or drunk Jack

2    Daniel's in the past six months?

3        A.    If you look on SIL 0160, we very

4    specifically asked.

5        Q.    So it was a number of times -- you then

6    asked a follow-up questions how many times have you

7    consumed this particular brand?

8        A.    Right.  Obviously, you know, where we had

9    groups that were Jack Daniel's drinkers, people who

10   gave us an answer where Jack Daniel's was used

11   more -- we didn't encounter anybody that only drank

12   Jack Daniel's.  People drink beer, they drink wine,

13   they drink whiskey, they drink vodka.  But we did

14   want people who were likely to have a greater

15   familiarity or affinity for Jack Daniel's than not.

16   Otherwise a parody can only work if you know the

17   real product.  Otherwise -- otherwise it stands on

18   its own.

19       Q.    Do you believe this parody works for that

20   reason, people will know the real product?

21       A.    I think that people who buy it are likely to

22   say, "Oh, yeah, yeah, it reminds me of Jack

23   Daniel's."  That's what the focus groups indicated.

24       Q.    Look at page 161, please.  At the top

25   there's an instruction, "Please recruit articulate

Page 118

1      Q.    That's what I thought.  It's five women,

2  which is what I think Group 1 was, and it was at

3  five o'clock.

4      A.    Right.  I identify the groups by the time in

5  my report.

6      Q.    According to this, the five respondents here

7  were all at least college graduates and two of them

8  had postgraduate degrees.  Is that correct?

9      A.    That's what they said, yes.  Those kind of

10  questions, you know, to a degree I'm not sure you

11  can call it re screening but if you look at the

12  transcripts or watch the videos, they're asked

13  questions about that at the beginning of the group

14  in a group session.  It's a way of getting the group

15  to know each other.  I didn't see anything that

16  contradicted this.

17      Q.    I'm not suggesting it's not completely

18  accurate.  Do you know the percentage of the U.S.

19  population that has at least a bachelor's degree?

20      A.    I think the last time I looked it's about 37

21  percent.

22      Q.    On 256 there is a listing of various income

23  levels I guess, at least as I interpret it.

24      A.    That's household income.

25      Q.    Are these respondents representative of the

Page  122

1    U.S. population in terms of their education and

2    income?

3         A.    In this particular group?

4         Q.    Yes.

5         A.    I would say they're not.

6         Q.    And I noticed when we were looking -- when

7    we first started looking at these you were holding

8    page 255 -- and I think you have it now -- to the

9    right of 256.  Is that how it actually appeared on

10   the spreadsheet?

11        A.    The actual spreadsheets were --

12        Q.    Much wider?

13        A.    -- much bigger.

14        Q.    You can't copy them on 8 1/2 x 11 paper?

15        A.    Right.

16        Q.    But 255 belongs with 256, correct?

17        A.    I'm actually having -- unfortunately having

18   trouble reading the tiny little type.  I believe so.

19   Up on top it looks -- you know, I believe it does.

20   I don't think anything is missing.

21        Q.    255 has no entries under the "Jack Daniel's"

22   column.  Do you see that?

23        A.    I think the reason for that is that these

24   were all Jack Daniel's drinkers.  The question what

25   they were getting there was other products.  They

Page 123

1

2        (At the hour of 1:32 p.m. the following

3    proceedings were had at the same place with the same

4    persons present:)

5

6                    EXAMINATION (Resumed)

7    BY MR. LARKIN:

8        Q.    Back on the record.  Mr. Silverman, I'd like

9    you to turn now to page SIL 258 and 259 which should

10   be in the documents right in front of you.

11       A.    Got it.

12       Q.    This is the information collected at the

13   screening stage about the people in Group 2; is that

14   correct?

15       A.    Yeah, the six o'clock group.

16       Q.    The real Group 2?

17       A.    Yes, the real Group 2.

18       Q.    And these were non-dog owners who were also

19   Jack Daniel's drinkers, correct?

20       A.    Yes.

21       Q.    We had three out of five were college

22   graduates or held an advanced degree.  Do you see

23   that?

24       A.    Yep.

25       Q.    Is it your opinion that this group is

                                              Page 126

1    representative of the United States population?

2        A.    No.  Not demographically, no.

3        Q.    And if you look at 259, that part of the

4    spreadsheet contains the information about the

5    number of times that the participants told the

6    screener that they had consumed Jack Daniel's in the

7    last six months; is that correct?

8        A.    Yes.

9        Q.    So you had two who said two and then two

10   others who said 15 and 10.

11       A.    That's what it appears, yeah.

12       Q.    As far as you were concerned, having two

13   drinks of Jack Daniel's in the last six months makes

14   you a Jack Daniel's drinker?

15       A.    Well, it could have been in the last month.

16   So we don't exactly know.  I mean, they actually

17   do -- I mean, I don't listen in to those calls.

18       Q.    Look at SIL 260 and 261, please.

19       A.    Okay.

20       Q.    That's the spreadsheet showing the

21   demographics for the people who participated in

22   Group 3 starting at seven o'clock; is that correct?

23       A.    Yes.

24       Q.    And you don't consider this group to be

25   demographically representative of the U.S. either,

Page 127

1    correct?

2        A.   Well, this one it's a little hard to tell.

3    I mean, you know, when you ask -- with that question

4    demographics include, as I'm sure you know, age,

5    income, education, ethnicity, et cetera.  I could

6    look at all this but without really analyzing it I'd

7    have to sit and couldn't tell you whether or not

8    it's precisely correct.

9        Q.   Was it your intention --

10       A.   We weren't -- we couldn't -- in focus groups

11   like this when we were pulling in 19 people -- we

12   were hoping for 20 -- you're not going to be able to

13   replicate to any degree -- any degree of certainty

14   the U.S. population.  That's not what focus groups

15   are for.  That's why you do quantitative studies.

16       Q.   Fair enough.  261 is the part of the

17   spreadsheet that shows the number of times that the

18   respondents told the screener that they had consumed

19   Jack Daniel's in the last six months, correct?

20       A.   Yes.

21       Q.   Look at 262 and 263, please.  That's the

22   demographic information that the screener obtained

23   or was obtained in the screening process about the

24   participants in Group 4 at 8:00 p.m., correct?

25       A.   Correct.

Veritext Legal Solutions
866 299-5127

1    focus groups.

2        Q.   Let's look at SIL 163 and 164 if you would,

3    please.  Do those two pages in Exhibit 102 contain

4    the final version of the discussion guide?

5        A.   Yes.  That was the only one I had so...

6        Q.   If there were earlier drafts, they're gone?

7        A.   I never had earlier drafts.  It was just

8    stuff we talked about on the phone.

9        Q.   Who did the actual drafting of pages 163 and

10   164?

11       A.   Jeff Hirsch.

12       Q.   Did you review it and approve it before it

13   was finalized?

14       A.   I actually -- I had gone through it on the

15   phone with him.  There was this one -- the thing I

16   remember, there was one last thing that at the focus

17   group facility when he handed me this that he said,

18   "I added this."

19            And I went, "Yeah, that's a good idea."

20       Q.   The first time you actually saw the

21   discussion guide was on May 21st at the focus

22   groups?

23       A.   Yep.

24       Q.   On page 163, the second Roman numeral

25   says -- before we get into specifics, what is the

                                          Page 136

1    purpose of a discussion guide?

2         A.    Well, it's an outline of what you want to

3    cover and in the order in which you want to cover

4    it.  And to a degree it's a script for the moderator

5    to use.  And you may notice that each section has

6    time on it.  You have to use your time efficiently.

7    You have a limited amount of time to do these

8    sessions, although it turned out that we never

9    used -- I don't think we ever used the full hour,

10   but we didn't know that.  We couldn't know that

11   going in on how the conversations would go.  You set

12   up here is what I want to cover in this amount of

13   time, here is what I want to cover in this amount of

14   time and go from there.

15        Q.    Roman numeral II is entitled, "Spoof

16   Products" and underneath that the discussion guide

17   says, "I'd now like to change subjects to talk about

18   what you might describe as products that are spoofs

19   that make fun of other products, people or things.

20   Can you give me some examples of these that you've

21   seen or actually own?"  And then the guide goes on

22   to say, "How do you gauge the intention of these

23   products?  By that I mean, how do you know when they

24   are harmless jokes and how do you know if they are

25   meant to insult or diminish someone or something?

Page 137

1    Can you give me any examples?"

2          Do you see that?

3    A.   I do.

4    Q.   Why did you and Mr. Hirsch decide to open

5    the discussion by talking about spoof products?

6    A.   There's a certain irony to this.  This

7    decision was made well before Dr. Simonson was

8    deposed but Dr. Simonson actually in his deposition

9    suggested exactly the same technique.  And you have

10   to form a context when you're doing focus groups

11   otherwise the conversation can go all over the

12   place.  You need to narrow it down.  Again, that's

13   why it's called a focus group.  So here we were

14   talking about spoof products.  Spoof products are

15   kind of rare.  There just aren't many.  Consumers

16   don't necessarily encounter many.

17   Q.   I think you said you weren't personally

18   familiar with --

19   A.   I really wasn't.  You know, I've tried to

20   actually think about that.  See, we needed to get

21   them thinking about spoof products and make sure

22   that everybody understood -- already understood what

23   a spoof product was or could come to understand so

24   they understood the context of the conversation to

25   come.  And those first two paragraphs -- each

Page 138

1  topic by saying in the second full paragraph about

2  two-thirds of the way down, "All right, so let's

3  jump in.  I want to talk about something I am not

4  sure how else to talk about this.  But call them,

5  kind of a spoof products.  Products that make fun of

6  other products, people or things."

7          And then in Group 4 on SIL 116 Jeff

8  introduces the concept by saying, "Let's talk about

9  what I might call spoof products or joke products,

10  or satire, things like that.  Products that make fun

11  of other products.  Can you think of any examples? "

12          Did the participants seem to have some

13  trouble understanding what spoof products were?

14      A.   A little bit.  I mean, once -- once they saw

15  the samples, then they got it.  For the most part

16  they got it.  I think that the term "spoof product"

17  or "parody product" is not common language so I

18  think without examples it would have been difficult.

19  And even you can describe it the way Jeff described

20  it but until you see an example I think it's

21  difficult for people to comprehend.

22      Q.   Did you ever consider just showing the

23  participants the products themselves without

24  characterizing them as spoof or satire or any of the

25  other words that Jeff used?

Veritext Legal Solutions
866 299-5127

1      A.    You mean these pictures?

2      Q.    Yes.

3      A.    Because we didn't have the products there.

4      Q.    I'm sorry.

5      A.    No.  Otherwise -- "We're going to show you

6   some things."  We weren't looking -- ultimately we

7   asked people to categorize them in some fashion but

8   I don't think that would have been productive.  I

9   think, you know, the role of a moderator is to kind

10  of set the stage, which I think he did a good job

11  on.

12     Q.    Didn't calling the product spoof products

13  give cues about the purpose of the study?

14     A.    I don't think so.  I don't think it gave --

15  the purpose of the study was to find out whether or

16  not consumers -- average people who happen to be dog

17  owners and drinkers of brown whiskey or drinkers of

18  brown whiskey and didn't have dogs what they thought

19  of this particular situation.  So you have to create

20  a context or else the group is going to go nowhere.

21  This is very consistent with the way focus groups

22  are done.  Obviously I've never encountered a focus

23  group that begins with a spoof but I've never

24  encountered many spoofs.

25     Q.    In your opinion did calling the products

Page 157

1  spoofs affect the way a participant -- the way in

2  which the participants thought about them?

3          MR. BRAY:  Objection to form.

4          THE WITNESS:  No, because what they were

5  asked to do was to characterize them as -- you know,

6  as just being funny or in essence, you know, taking

7  an issue with somebody.  So I think that's where the

8  consumer -- the people in the room, the respondents

9  in the room, the participants, they created their

10  own definitions and the definition is this is

11  something that's entitled -- that is intended to get

12  you to laugh because it's a joke about something

13  that people like or -- or it turned into, in

14  essence, an attack or somewhere in between.  So

15  that's where the real definitions were I think in

16  the minds of the people who sat there.  I think -- I

17  would lay dollars to donuts that none of those

18  people if they walked in the room and we said, "Do

19  you know what a spoof product is," I'm not sure we

20  would have gotten an answer.

21      Q.  Is it your opinion that calling the products

22  spoof -- spoofs didn't suggest that they were legal

23  or as opposed to illegal?

24          MR. BRAY:  Objection to form.

25          THE WITNESS:  I don't think so at all.

Page 158

1   There was -- I don't think so, no.

2   BY MR. LARKIN:

3       Q.    Look in your report at SIL 82, please.  This

4   is from the second focus group.  Do you have SIL 82

5   in front of you?

6       A.    Yep.

7       Q.    At the top a male participant says -- is

8   talking -- go back to 81.  They're talking about a

9   coffee shop called Stupid Starbucks.  One of the

10  males is dialoguing with Jeff about the coffee shop

11  called Stupid Starbucks.  At the top of 82 the male

12  participant says, "No, because it was actually under

13  the -- There's a spoofing law.  I don't know if

14  that's the term, but there is a -- He was under that

15  law, so he was protected, so, no, they couldn't stop

16  him."

17          Do you see that?

18      A.    Yes.  Well, I remember the conversation.

19      Q.    Okay.  You don't consider characterizing a

20  product as a spoof influences how people will think

21  about it in terms of whether it's legal or illegal

22  or good or bad?

23      A.    I don't think so.  In fact -- I'm just --

24  right in here.  Let me just find the right -- let me

25  find what I'm specifically looking for.

Page 159

```
 1              Okay.  On page 082 the male guy says, "No,
 2    because he was actually under the... There's a
 3    spoofing law.  I don't know if that's the term, but
 4    there is a... He was under that law..."
 5              I suspect that's the first time he ever
 6    called "this law" a spoofing law.  He had something
 7    in his mind and he went off on this, but I don't
 8    think that using the term -- I don't think he -- I'm
 9    not sure that any of these people had heard the term
10    "spoof" before and I certainly don't think that
11    that's what drove him to talk about law.  I think
12    that he was raising the question of parody.
13    In fact, he certainly got the Starbucks thing wrong
14    because it wasn't called Stupid Starbucks.  I think
15    it was actually called Stupid Bucks or something
16    like that and it was -- it was what they call a
17    pop-up store.  It existed for one or two days and
18    there was never any litigation over it.
19        Q.   So your opinion is that characterizing --
20    before classifying them -- characterizing these
21    various products as spoofs and then describing what
22    a spoof is didn't influence the way in which the
23    respondents thought about the legality of spoof
24    products or whether they were good or bad or
25    anything else?
```

Page 160

1          MR. BRAY:  Objection to form and asked and

2     answered.

3          THE WITNESS:  I'm going to try to parse that

4     answer -- parse that question.

5          I don't think that it drove any question

6     other than this one guy about legality.  This guy

7     brought it up and this was the one and only guy and

8     the conversation went away from that.  I think what

9     it did is gave them a way to at least articulate

10    what these things were.  I mean, this is a category

11    that I think in marketing in the few instances they

12    exist are actually called parody -- P-A-R-O-D-Y --

13    products but he was calling them spoofs which is, I

14    think, as good a term.  It may not be the legal term

15    but it was a way for people to describe it.  You've

16    got to give them the right set of words otherwise

17    they don't even know how to give you an articulate

18    answer.

19    BY MR. LARKIN:

20        Q.  But you agree that the respondents appeared

21    to have some difficulty understanding "spoof" and

22    Jeff had to explain what he meant by that in several

23    instances?

24        A.  In a few instances.  I think there was some

25    people in the room -- as you will get in any focus

                                        Page 161

1    group, some people got it right away because they
2    talked about Saturday Night Live and they talked
3    about Mad magazine.  And I remember at least one or
4    two people that were really kind of unfamiliar with
5    the whole concept but because my handing out -- or
6    doing this little exercise of what is this, what is
7    this, by the time that exercise was done, it was
8    very clear to everybody what -- what we were talking
9    about, what the subject matter was.  That was why we
10   did that, which is actually what Dr. Simonson
11   recommended doing as well.
12       Q.   Are you familiar with the term "demand
13   effects" as it's used in consumer research?
14       A.   Yes, somewhat.
15       Q.   What is your understanding of it?
16       A.    It's what creates a demand for a product.
17       Q.   Specifically demand effects in the context
18   of consumer research, as a term of art in consumer
19   research?
20       A.   No.
21       Q.   Have you ever heard of the concept that
22   respondents in a survey or in some other type of
23   study will use cues that are provided by the
24   research procedures and the questions that are asked
25   to try to figure out what the purpose of the

Page 162

1    research is?

2        A.    Yes.

3        Q.    Is there another term that you associate

4    with that phenomenon?

5        A.    I probably don't have -- I mean, I know the

6    phenomenon, I recognize it, but I -- I didn't know

7    it had a label.

8        Q.    And do you also -- as part of that

9    phenomenon the respondents are using procedures and

10   questions to try to determine what the correct

11   answer is or the desired answer?

12       A.    I think I've seen some instances of that in

13   my career.  I think that, you know, some people it's

14   almost a game.  You know, why are they here and all

15   that.  I don't think that played out with these

16   groups.  I do not believe that to be the case.  I

17   mean, it -- I think the videos speak for themselves.

18       Q.    Are you familiar with the academic

19   literature in social psychology and consumer

20   behavior about demand effects?

21       A.    No, I'm familiar with what happens in

22   real-world marketing.

23       Q.    Look at page SIL 0097, please.  That's the

24   transcript of the second group.

25       A.    Okay.

                                          Page 163

1          Q.    On page 21 of 22 in the lower right-hand
2     corner, about halfway down Jeff, the moderator,
3     says, "I totally get what you're saying.  I just
4     want to make sure that there's nothing that... I get
5     that bad association.  I just want to check in
6     that it's not about, 'I look at this bottle and I
7     think, 'Jack Daniel's is bad,' or 'Jack Daniel's has
8     dog poop in it.'"
9               The male respondent says, "No, no that, but
10    the other."
11              Jeff says, "Boy, this is quick.  We might be
12    just about done."
13              The male respondent -- the male participant
14    says, "Who are you working for, this company?"
15              And Jeff says, "I can't say."
16              You observed this conversation, correct?
17         A.    Yes, I did.
18         Q.    Did you form an impression of why the male
19    participant asked Jeff who he was working for?
20         A.    No, but I've seen that happen in many focus
21    groups.  They -- you know, given -- given the
22    context of the conversation, okay, they're being
23    specifically asked if they have any negative
24    associations towards Jack Daniel's.  They're
25    trying -- they're wondering if Jeff is -- they know

                                        Page 164

```
 1   groups.  That's why you do them.
 2       Q.   Look at page SIL 71.  At the top Jeff asked
 3   the group the question, "Would this have any
 4   effect..." -- I assume he's showing the product or
 5   holding the product -- "Would this have any effect
 6   on you drinking or not drinking Jack Daniels in the
 7   future, if you saw this?"
 8           Do you see that?
 9       A.   Uh-huh.  Yes.
10       Q.   Thank you.  Then Jeff went on after getting
11   the respondents' answers to say, "Okay.  I want to
12   ask you this very specifically, okay?  Do you think
13   this product would evoke associations with dog poop
14   or pee in any way, shape or form?"
15           Do you see that?
16       A.   Yes.
17       Q.   Do you believe that -- isn't that a leading
18   question that suggests a desired answer?
19       A.   I don't think it's a leading question, no.
20   That's a -- a leading question to me happens to be a
21   legal phrase.  But we went through -- what he's gone
22   through here is are there negative associations?
23   Answer:  No, no, no, no, no.  So at this point let's
24   go to exactly where Dr. Simonson went.  Dr. Simonson
25   is all about excrement.  That's all he is.
```

Page 201

1      A.    Well, we wanted to take it -- really take it

2    to an extreme.  If you're trying to elicit -- at

3    least our thinking was if you're trying to elicit

4    some kind of feelings of disgust, this is a way to

5    try to at least trigger that.  Of course, people

6    that own dogs aren't particularly disgusted by dog

7    poop because they walk their dog two or three times

8    a day.  If they're disgusted by that, they better

9    get rid of the pooch.

10     Q.    Looking back at SIL 73, is it your opinion

11   that Jeff asking the question, "But does anybody

12   think, reading this label, it says, '43 percent poop

13   by volume,' does anybody think that there is poop in

14   here" is a question that suggests the answer?

15     A.    Suggests the answer?  I think the answer is

16   going to be no.  I don't think that people would say

17   yes.  I mean, not reasonable people.

18     Q.    Jeff could have asked, "Simply reading this,

19   you know, what is your understanding or what do you

20   interpret this to mean?"

21           MR. BRAY:  Objection to form.

22           THE WITNESS:  He could have.

23   BY MR. LARKIN:

24     Q.    Or specifically asked, "Does anybody think

25   that there is poop in there?"

Page 205

1    we have to get people in and out.  We have to be

2    flexible because certain parts of it take longer to

3    discuss than others just because of the dynamics of

4    the group.  Here considering why we were doing

5    this -- why we were doing these groups, what we

6    wanted to try to understand, I think he felt it was

7    worth reiterating.  That's -- that's what focus

8    group moderators do.

9        Q.   Let's look at Group 3 now.  If you would

10   turn to SIL 111, please.

11       A.   Okay.

12       Q.   About halfway -- actually, at the top Jeff

13   asks, "There's a...nobody said it, I know you all

14   read it because I asked you to look at the label, it

15   says 43% poo by content or something like that.

16   Right?  So does that imply anything about Jack

17   Daniels what's in Jack Daniels?  Is there poop in

18   Jack Daniels?  Would that even cross your mind?"

19            Do you see that?

20       A.   Yes.

21       Q.   Aren't those three questions -- first of

22   all, why did -- why do you think Jeff asked actually

23   four questions in that particular one?

24       A.   Well, he certainly did it because of

25   conversations that he and I had.  Dr. Simonson's

Page 209

1    times before he got an answer.  That's

2    mischaracterizing the group.  He -- he got answers

3    and then he decided he was going to ask it a

4    slightly different way.  He'd get the same answers.

5    He got the same answers over and over and over.

6    Now, if this was a commercial -- if these scripts

7    were being done for commercial purposes and you

8    really wanted to nail down what people thought, this

9    would be done.  This would happen in a focus group.

10   He's a commercial focus group moderator.  I don't

11   think he's ever done a focus group that has anything

12   remotely to do with litigation before, and as I

13   testified I haven't done this before.

14       Q.   Okay.  Let's look finally at the fourth

15   focus group, SIL 124.  Jeff asked about a third of

16   the way down, "Does that in any way suggest there's

17   poop in Jack Daniel's?"  And he gets three no

18   answers.  Then he asks, "Is there any association

19   with Jack Daniel's?  Does this product make you

20   think of any associations that Jack Daniel's might

21   have with defecation, urine, anything like that?"

22   Then he gets some further answers.

23            And then on 125, if you look at that a

24   moment, please, about two-thirds of the way down

25   Jeff says, "Just to be entirely, 100% clear, there's

Page 212

1    no chance of you thinking of this product over here

2    in this category that's disparaging products.  This

3    company who makes this, if we could talk to them,

4    and you could interview them, is there any thought

5    in your mind that there's something about Jack

6    Daniel's they don't like and they're out to get Jack

7    Daniel's?"  And then he gets answers.

8         Is it your opinion that asking those

9    questions in that manner and repeatedly did not

10   affect in any way the participants' views of the Bad

11   Spaniels study?

12   A.   First of all, this group in the

13   immediately-preceding conversation where they gave

14   their views -- this is right near the end of the

15   focus group -- so they've expressed their views.

16   Now, Jeff, you know, kind of went all the way here.

17   I never asked him to do this.  But he then -- you

18   know, this is sort of after they've expressed their

19   views and they've all expressed the views that they

20   see this as a funny, clever, toy.  He says, you

21   know, okay, is there anything malevolent about this

22   and the answer, as you can see, is "No, I think it's

23   the exact reverse.  I'd probably look at it and say

24   which brand's owners are probably going to be more

25   susceptible to this kind of product."  Whatever that

Page 213

```
 1      A.   They weren't -- they certainly weren't asked
 2   that question in those words.  What I write in my
 3   report or try to write in business English as
 4   opposed to consumer speak, but it's my job to
 5   understand consumers, isn't it?
 6      Q.   I don't know.  I'm not going to tell you
 7   what your job is.
 8      A.   Somebody has been paying me very well
 9   because they think I know.
10      Q.   Look at SIL 96 if you would, please.  This
11   is from group No. 2.  At the top Jeff says -- I
12   believe this is referring to the Bad Spaniels toy
13   because it's the portion of the group where the
14   respondent have the toy.  Is that your
15   understanding?
16      A.   Yeah, they definitely do because on the
17   preceding page Kiara says, "It could be like a
18   little smaller."
19      Q.   At that point, the point that's transcribed
20   in SIL 96, the participants had the products?
21      A.   That's correct.
22      Q.   Jeff says at the top, "It would be in Petco,
23   or it would be on a Web site, that sells dog toys.
24   I think that when you bought it, I agree that if it
25   were sitting on a shelf in a store next to a rack of
```

Page 221

1   Jack Daniels, that would be...Might cause some
2   confusion.  If you know this is a dog toy, if you
3   were buying this in a pet store, or you're buying
4   this on line from a pet company, no confusion,
5   right?"
6           Kiara said, "No."
7           And male says, "Right."
8      A.   The "no" in that is a positive answer.
9      Q.   That's affirming the statement?
10     A.   Correct.
11     Q.   Isn't the way Jeff asked that question a
12  leading question suggesting that the answer should
13  be in agreement with his statement?
14     A.   I need to look at what the context of this
15  was.
16     Q.   Okay.
17     A.   The -- the antecedent of the paragraph we're
18  discussing on the top of page 96 has to do with
19  whether or not they understood it to be a toy or
20  not.  They're saying if you saw it in the store,
21  would you recognize it as a dog toy?
22     Q.   But Jeff's question, "...I agree with you
23  that if it were sitting on a shelf in a store next
24  to a rack of Jack Daniels, that would be...Might
25  cause some confusion."  Do you see that?

Page 222