# Exhibit A

Itamar Simonson, Ph.D. - June 18, 2015                                    1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

VIP Products, L.L.C., an            )
Arizona limited liability           )
company,                            )
     Plaintiff and                 )
     Counterdefendant,             )   Civil Action No.
vs.                                 )   2:14-cv-02057-DGC
Jack Daniel's Properties, Inc.,     )
a Delaware corporation,             )
     Defendant and                 )
     Counterclaimant.              )
- - - - - - - - - - - - - - - - - -

Deposition of Itamar Simonson, Ph.D.

Thursday, June 18, 2015

Shelley M. Sailor
Certified Reporter
Certification No. 10254

1  it as fun?
2      A.    I don't know.  I don't find it funny, but that
3  doesn't matter.
4      Q.    Well, it does matter because you are going an
5  opinion right now.  It matters a lot.
6      A.    If I could please complete my answer.
7      Q.    Please do.
8      A.    My understanding is that Mr. Sacra and
9  Ms. Phillips believed that it would be perceived as
10 good-hearted fun.  Nothing else.  They never tested it.
11 I did not design this label, nor did Jack Daniel's.
12 They designed it.  I think there's no debate that
13 drinking No. 2 is not -- is frankly disgusting.  And I
14 don't think there would be any dispute about that.  And
15 therefore, at the very least, Mr. Sacra should have
16 conducted some research, maybe even just qualitative
17 research, find out how people perceive it.  Does that
18 affect the way they think about the brand.  They could
19 conduct some studies.
20           I don't think Dr. Jacoby's particular
21 methodology is the right one, but Mr. Sacra could have
22 done that.  He could have designed other studies before
23 he just says, hey, you know, me and Ms. Phillips, we
24 just decided it's fun, who cares what it does to the
25 brands.  I didn't bother to study that.  I have never

thought about it. We think it's funny. We don't know what it does to consumers. We don't know what it does to the brand. So that's it.

Q. Let me ask you, you have said several times now that they didn't test it. They could have conducted studies. I thought your testimony was that there was no study that's an accurate assessment.

A. Well, they didn't consult me first. I would have explained to them that it would be challenging. But there was no attempt to -- if I can just complete my answer.

There was no attempt to do anything. I believe that Mr. Larkin asked Mr. Sacra did you think how it would affect the Jack Daniel's brand. He said nope.

Q. But I want to get to your opinion here. And you're saying -- and this is what I don't understand. When I ask you whether it would be appropriate or necessary for you to conduct a study to make your determination as to whether or not this would be associated in a harmful, you said no, that there was no point in doing that. And then you say now that Mr. Sacra, or VIP -- let's just talk VIP -- VIP should have conducted tests or studies to determine what the association and harmful impact would have been of their

1    product.  Why would it not be necessary for you to do
2    that but it would be necessary for them, or appropriate
3    for them?
4        A.    There is a big distinction.  I did not create
5    any product suggesting that someone's beverage is
6    associated with the Old No. 2.  Mr. Sacra did just that.
7    And if I may --
8        Q.    Please.  Go ahead.  I want to just clarify.
9        A.    Therefore, I have no obligation.  I did not
10   design any product.  It's his product.  And before he
11   creates that product, if he thinks there is a way to
12   show that it's just good parody, by all means.  He can
13   at least try to do that.  He didn't try to do anything.
14   He just said I think that it's funny, and who cares what
15   happens to the brand.
16       Q.    How did what he do differ any way from what
17   you did?
18       A.    Because I did not create the product.  I am
19   not the defendant in this lawsuit because --
20           MR. LARKIN:  He's not asking you that.
21   BY MR. LONG:
22       Q.    I'm not asking that.  I said process.  In
23   terms of process, how is his process of assessing
24   whether or not this would be associated and harmful any
25   different than yours?

1   MR. LARKIN: Objection as to form.
2   THE WITNESS: Putting aside the fact that he
3   is not an expert and I am. But in addition, he's the
4   person who has the obligation, as I understand it.
5   Before I'm suggesting that someone else's beverage is
6   associated with No. 2, it's my responsibility to try to
7   show that's not so. He didn't do anything other than,
8   frankly, I have no plans of associating anyone's
9   beverage with No. 2.
10  BY MR. LONG:
11      Q.   Dr. Simonson, I want to make sure we're clear
12  on something. You talk about obligation on one hand.
13  And then we talk about effectiveness on the other hand.
14  I want to separate those two things.
15      A.   Obligation and?
16      Q.   Effectiveness?
17      A.   Effectiveness.
18      Q.   Before the break, we had a discussion about
19  the effectiveness of qualitative or quantitative
20  methods, research methods, in determining dilution by
21  tarnishment, and you were going to express your opinion
22  on effectiveness of it. Most recently now, you are
23  talking about the obligation to do research. I want to
24  separate those two concepts right now, and I want to
25  talk first about the effectiveness going back to what we

1  talked about before.  And I want to understand that in
2  your opinion, it's your opinion that it would be an
3  ineffective for you to have spent the time and money to
4  do a quantitative or qualitative research on the
5  dilution by tarnishment of the VIP product because you
6  don't believe those methods are reliable.  Is that a
7  fair overall summary?
8       A.   By my standards, they're not reliable.
9       Q.   I just want to understand, your opinion.
10 That's what I ask for.
11      A.   That's my opinion.  I don't know what
12 Mr. Sacra could have --
13      Q.   Your opinion.  Then, at the same time you say
14 Mr. Sacra should have conducted some tests or studies
15 prior to launching this product.  Is that also your
16 testimony?
17           MR. LARKIN:  Now are you asking -- are you --
18           MR. LONG:  Well, I can -- I can go to the
19 report if it helps.  Let's just go to the report.
20           THE WITNESS:  No, if I could --
21           MR. LONG:  Read it back.
22           (Whereupon, the record was read by the
23 Reporter.)
24           MR. LARKIN:  My objection was going to be you
25 just separated obligation and effectiveness.  Which are

```
 1    you referring to --
 2    ///
 3    BY MR. LONG:
 4        Q.    I'm referring to -- let's clarify that.  In
 5    terms of effectiveness, he should have done it -- he
 6    should have done it to obtain some results.
 7        A.    He might have found an expert who can do it
 8    correctly.  You know, maybe I would have criticism, or I
 9    would not have criticism.  He didn't -- he didn't do
10    anything.
11        Q.    Okay.  So then, the thing that you believe to
12    fulfill his obligation, the effective thing that
13    Mr. Sacra or VIP Products should have done prior to
14    launching this product was to consult an expert?
15        A.    I am not going to tell Mr. Sacra what to do
16    but --
17        Q.    You just did.
18              MR. LARKIN:  Objection.  Argumentative.  Have
19    you got a question?
20    BY MR. LONG:
21        Q.    I'll go to your report, then.  Let's go to
22    your report and say what you did say Mr. Sacra should
23    do.  Turn to Deposition Exhibit 12 -- page 12,
24    Deposition Exhibit 3, page 12.  Beginning of paragraph
25    32.
```

1           When you refer there to studies and you say
2  that VIP has conducted no studies to confirm its claim
3  that associating Jack Daniel's brands with defecation is
4  just fun, what studies are you referring to there?
5       A.   I didn't design any studies.  I just stated a
6  fact that it didn't conduct any studies.
7       Q.   But why is that significant?
8       A.   Well, before you associating someone else's
9  product and valuable brand with No. 2, especially when
10 we are talking about something that people ingest, I
11 think that it's reasonable for you to just to make sure
12 that it doesn't cause any harm.
13      Q.   How could you make sure of that if those
14 studies are not an effective way to do it?
15      A.   I don't recall Mr. Sacra consulting me.  He
16 might have been able to find an expert who comes up with
17 ways of doing it.
18      Q.   But you know of no way to do it?
19           MR. LARKIN:  Other than what he did in this
20 case.
21 BY MR. LONG:
22      Q.   Other than your approach, you know of no other
23 way to determine whether there's likely to be dilution
24 by tarnishment.
25      A.   I don't, but evidently Dr. Jacoby thinks that

1  he found a method.  Mr. Sacra could have consulted him.
2       Q.    But if Mr. Sacra would have followed
3  Mr. Jacoby's method, you would have said it was flawed?
4       A.    If that was the method he used in the Michelob
5  case, I would be critical of that.  And by the way, that
6  methodology would have strong, quote-unquote, evidence
7  in favor, in favor of Jack Daniel's.  Because the demand
8  effects would lead people to say that they are less
9  likely to buy the Jack Daniel's product.  Just having
10 conducted thousands of studies, having talked about
11 demand effects to doctoral students at Stanford, I think
12 I know something about that.  Even published a chapter
13 specifically about demand effects.  That would have
14 produced strong results in favor of Jack Daniel's
15 position just as it produced in that Michelob case
16 evidence of support of Budweiser.
17      Q.    The same for qualitative research methods like
18 focus groups?
19      A.    Yes.  If you use that kind of method.  Now,
20 maybe he would have found a better method, but the
21 particular method that you proposing that --
22      Q.    I am not proposing anything.  I'm just asking
23 you what Dr. Jacoby wrote.
24      A.    I can tell you that having studied demand
25 effects, published about them, having evaluated many

1  studies and designed many studies, I can tell you a
2  study like that would have worked against your client's
3  position. But it doesn't mean I would be just as
4  critical, because I think such a survey would have been
5  biased in favor of Jack Daniel's.
6      Q.   And likewise, a focus group study like those
7  that Jack Daniel's conducted?
8      A.   No. That's a different issue at all. We can
9  look at questions to the extent -- I don't know if they
10 all provided specific questions. But in some cases it's
11 what do you think about this, what do you think about
12 that without showing a particular stimulus and saying
13 what does that tell you, and would that make you more or
14 less likely to buy the product.
15     Q.   But showing a stimulus you think would convey
16 the same problem, create the same demand effect? That
17 is the stimulus of the VIP product?
18     A.   What is the question exactly?
19     Q.   You said that focus groups -- if I understand
20 you correctly, you said that qualitative research like
21 focus groups where questions don't involve a specific
22 stimulus may result in different types of answers than
23 one where the stimulus is present and a specific focus
24 is made to the question. So I was trying to contrast
25 those two. And my question was -- and let me just

1  rephrase it -- was that a focus group, you believe that
2  use this as a stimulus would run the same focus bias --
3       A.    Focalism.  I said focalism, bias, and demand
4  effects.  Yes.  Again, even if you are doing qualitative
5  studies, like focus groups, and you are showing this
6  product, that will generate negative associations about
7  Jack Daniel's.  So I don't think that your client would
8  like the results from such a study.
9       Q.    Okay.  And looking at Deposition Exhibit 3,
10 page 5, paragraph 13, you start out in the first
11 sentence of paragraph 13, when you refer there to
12 Mr. Sacra not testing his assumptions regarding the
13 impact of the VIP product, you are suggesting what type
14 of tests might he have done?
15      A.    Well, I think even if he is not a market
16 research expert, he could have just shown this product
17 and say what comes to mind.  I mean, try to ask
18 questions that are non-leading as possible and see what
19 he gets.  Maybe he can get them to rate it on a funny/
20 not funny scale, disgusting/not disgusting scale.  Maybe
21 he can do the same thing for other products as controls.
22 So he might be able to do different things that will be
23 somewhat less susceptible to bias.
24      Q.    But if he had done that and found that there
25 was a positive association with it, would that have been

```
 1   reliable evidence that it was not dilution by
 2   tarnishment?
 3        A.   I think that would be useful information.  If
 4   you -- if he ran a survey and he showed the image of
 5   this product, using an online survey these days, it's
 6   fairly quick and not that expensive, and he showed that,
 7   and people said, yeah, now I really feel like buying a
 8   Jack Daniel's Old No. 7, if he found that, I certainly
 9   would pay attention to that, and it may certainly affect
10   my opinions.  I think it's highly unlikely.
11        Q.   Say for like a focus group discussion of the
12   same thing?
13        A.   Yeah, we discussed earlier focus group has
14   some limitations --
15        Q.   But with the appropriate questions.
16        A.   You could provide some useful information,
17   yes.
18             (Exhibit 25 was marked for identification.)
19   BY MR. LONG:
20        Q.   Dr. Simonson, I'm handing you a document
21   marked as Deposition Exhibit 25.  Do you recognize this
22   document?
23        A.   Yes.  That's one of the articles that I cited.
24        Q.   Is it the article you cited in footnote 11 on
25   page 11 of Deposition Exhibit 3?
```