UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| VIP Products, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CV-14-02057-PHX-SMM |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 14, 2017 |
| Jack Daniel's Properties, Inc.,| ) | 1:59 p.m. |
| | ) | |
| Defendants. | ) | |
|_____| ) | |
| And Related Counterclaims. | ) | |
|_____| ) | |


BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

FINAL PRETRIAL CONFERENCE


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        <u>A P P E A R A N C E S</u>

2     For the Plaintiff/Counterdefendant:

3                 DICKINSON WRIGHT PLLC
                  By:  David Geoffrey Bray, Esq.
4                      David Nunzio Ferrucci, Esq.
                  1850 N. Central Ave., Ste. 1400
5                 Phoenix, AZ  85004

6     For the Defendants/Counterclaimants:

7                 HARVEY & COMPANY
                  By: Douglas Peter Harvey, Esq.
8                 4 Embarcadero Ctr. 14th Fl.
                  San Francisco, CA  94111
9
                  QUARLES & BRADY LLP- Phoenix, AZ
10                By: Isaac Scott Crum, Esq.
                  2 N. Central Ave.
11                Phoenix, AZ  85004-2391

12    Also present:  Justin Welch, Senior Trademark Counsel.

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
                         P R O C E E D I N G S
 1

 2            THE CLERK:  Civil case 14-2057, VIP Products LLC

 3    versus Jack Daniel's Properties Incorporated.

 4            This is time the set for final pretrial conference.

 5            Please announce your presence for the record.

 6            MR. BRAY:  Good afternoon, Your Honor.  David Bray,

 7    Dickinson, Wright for the plaintiff --

 8            THE COURT:  Thank you, Mr. Bray.

 9            MR. BRAY:  -- VIP Products.  With me at counsel table

10    is --

11            THE COURT:  Who's with you?

12            MR. BRAY:  -- David Ferrucci from Dickinson, Wright.

13            THE COURT:  Thank you.

14            MR. HARVEY:  Your Honor, Peter Harvey from San

15    Francisco on behalf of Jack Daniel's.  I have my colleague,

16    Isaac Crum, from Quarles & Brady with me, and I also have

17    Justin Welch, who is the Senior Trademark Counsel for Jack

18    Daniel's.

19            THE COURT:  Thank you.

20            Okay.  This is the time set for final pretrial

21    conference.  Our trial begins Monday, October the 2nd.  It will

22    conclude by October the 13th on a Friday, keeping in mind that

23    October the 9th, on a Monday, is Columbus Day, and the Court

24    will not try any cases on that day.

25            And of course I think you've got close to 400 exhibits
```

1    you all want to introduce, and some of them are very much

2    objected to.  I don't know you are going to lay the foundation

3    and get all those into evidence, unless you stipulate to them

4    or something else in two weeks we won't do anything but

5    exhibits, we won't hear any testimony.  So I would suggest that

6    we make some inroads on that.

7            The other thing is, up here we piled up on the witness

8    stand a sum total, with the exception of the latest submission

9    in this big notebook over here, the declarations and

10   supplemental declarations in support of the motions in limine,

11   all of the things that have gone on in this case, which are

12   significant.  They are important to the parties, but that's an

13   awful lot of pleadings for my recollection of what was said at

14   the last hearing, with regard to the viability of the product

15   and of the plaintiff, and the amount of money generated from

16   that product.

17           But you brought the lawsuit, and the counterclaims are

18   what are driving this, and that's one of the things we are

19   going to talk about today, because basically, the case has been

20   flip-flopped.

21           In light of our earlier rulings, it would make no

22   sense to start out with the plaintiff's case, because in

23   essence, it comes down to the counterclaims, in reality.  As I

24   understand, you are not asking for monetary damages but just

25   declaratory judgment actions.

1      MR. HARVEY:  Right.

2      THE COURT:  So that's where we are going to go.  So I

3 need guidance from you about how we are going to proceed with

4 who is going to call their witnesses first.  Plaintiff has the

5 right to call whatever witnesses you want in pursuit of what

6 claims are still left in your case.

7      But in large measure, you are defending against their

8 claims of dilution, confusion, and that's about it.

9      MR. HARVEY:  Yes, Your Honor, we agreed in preparation

10 of the pretrial order, the joint order, that the order of proof

11 would be that we would proceed first.  It does totally make

12 logical sense.

13      MR. BRAY:  Yeah, and counsel and I, despite the number

14 of exhibits, have had a number of productive phone

15 conversations about streamlining the presentation of evidence

16 at trial, and that was one aspect of streamlining the evidence.

17      THE COURT:  Okay.  Well, make sure that the streamline

18 train gets here before October the 2nd.

19      MR. HARVEY:  We will.

20      THE COURT:  And get together with our clerk of the

21 court so we can have that -- you can have those documents

22 tagged as exhibits, and we can move those in at the very

23 beginning of the case.

24      Okay.  Now, with regard to the motions in limine, let

25 me ask you -- back up.

1          If we are going to try this case this way, have you

2     both got a pretty good handle on how much time each party may

3     use, or do I just have to make an arbitrary time limit and say,

4     you have got this much time out of the two weeks you have left,

5     each one of you have X number of hours and we will keep track

6     of it and as you get closer to the end I will start going like

7     this (indicating) to let you know that you are getting near the

8     end.

9          MR. BRAY:  There are two confusion witnesses in this

10    case, Dr. Ford, who passed away last year, and then our

11    rebuttal expert, Stephen Nowlis.  And through agreement of

12    counsel, we have agreed that Mr. Nowlis' testimony can be

13    presented through his expert report, and his cross through his

14    deposition.  So we have two significant witnesses that, in a

15    typical trademark case, would probably take a day and a half,

16    that we are just presenting through the reports and

17    depositions.

18         When we were discussing the joint pretrial order, I

19    think Mr. Harvey and I estimated that we could complete the

20    trial in no more than five trial days.  So I think we have

21    plenty of time with the nine allotted.

22         THE COURT:  Then I will leave you to that on your --

23    that you can parse it out as you need it, but I do this in

24    every case, just so you know that that's -- I do that to make

25    sure that we don't spill over, or if there's going to be a

1    problem, let us know, we can work around it, that sort of

2    thing.

3              MR. HARVEY:  Your Honor, question just about the

4    Court's normal court date, as we are doing the planning and the

5    number of hours, do you have a time -- does the Court have a

6    time?

7              THE COURT:  Yes, we work from 10:00 to 2:00 with an

8    hour off for lunch.  I am just teasing you.  We go from 9:00 in

9    the morning until about 4:00 in the afternoon, so that -- now,

10   without a jury, we may go a little longer than that if

11   necessary.

12             I try and let people get out of here and get going,

13   particularly -- we don't have a jury here, but if we did, we

14   try and get them out by no later than about 4:30 in the

15   afternoon so everybody can clear out and try and beat the

16   traffic a little bit.  So we will probably go until maybe 4:00

17   4:30.

18             MR. BRAY:  Do we have an hour for lunch or 90 minutes?

19             THE COURT:  An hour.  There aren't that many places to

20   go and have lunch close to the courthouse.  I do try and vary

21   that a little bit, and if we need to take a little longer, if

22   you need a little longer, we can take a little longer.

23             But by and large, there aren't that many places in the

24   downtown area to go to.  And keeping in mind that sometimes we

25   will go until like 12:30 and do like 12:30 to 1:30, or 20 to

1    2:00, something like that so that we let the 12:00 crowd get in

2    and out, and then we are not as jammed up so you waste most of

3    your lunch hour sitting there waiting to sit down in a small

4    place.  So that's where we were.

5             MR. BRAY:  Thank you, Your Honor.

6             THE COURT:  That way you can schedule your witnesses

7    sort of accordingly.  The other aspect was your proposed

8    findings of fact and conclusions of law will be due, I think in

9    September.

10            MR. BRAY:  September 14th, I believe.

11            THE COURT:  Right.  And for those of you who are used

12   to practicing in courts where you do them at the end, I don't

13   do it that way, never have, and I found out this works out

14   better.  That way I know what to look to highlight on the

15   witness's testimony, and I can focus in on that fact and the

16   witness's credibility on those facts.

17            Next thing is -- well, we will do it in context of the

18   motions in limine.  Oh, I know what it was.  It's reports.  You

19   said that with regard to one of the doctor's reports that is

20   going to be admitted into evidence as substantive evidence,

21   any -- I have always had problems with experts, because they

22   are the ultimate hearsay testifiers.

23            If they read Little Orphan Annie, and that shaped

24   their opinions, they could so testify.  But I would not allow

25   them to keep introducing comic strips of Little Orphan Annie or

1    something like that, so I rarely admit reports.

2          So the reports, if they are coming in, there could be

3    a lot of extraneous information in there, which really if it's

4    in for one purpose, it's in for all.  If they, say, cite a

5    study on social sciences with regard to survey, that social

6    science really does not come in.  That just goes to support

7    their testimony.

8          You can cross-examine him, whether you thought that

9    social science was good, bad, or indifferent.  And then it's up

10   to me to make the judgment decision on that, but the actual

11   underlying data does not come in.  So I want to be sure we

12   understand that part of it.  I don't know if that's going to

13   affect your stipulation or not.

14         But I have always had trouble with expert reports

15   because they have all sorts of extraneous information in there

16   that justify what their opinion is, but is not admissible

17   itself.  Because oftentimes, it is hearsay information.

18   Sometimes it is double hearsay information.

19         MR. BRAY:  As that applies to both parties' reports, I

20   think as long as meat of the report gets in, I think we can

21   work with that.

22         THE COURT:  Right, if you agree to it, but -- and this

23   is a nonjury trial, so I can sift a lot of that out, but people

24   are surprised to hear that, the reports, because in the state

25   courts -- well, we all stipulate they'll come in.  Well, I

1    don't accept those stipulations because I don't know if the

2    jury is going to read them, but they contain so much extraneous

3    information in there, it goes to their opinions but is not

4    admissible independently of itself, so -- okay.  So that takes

5    care of that.

6         Now, with regard to the motions in limine, as I

7    understand it, the way it stands right now, defense motions in

8    limine one and two, there's no opposition to.  No opposition

9    was filed, correct?

10         MR. BRAY:  That's correct, as to Howard and Wolinsky,

11    there's no opposition.

12         THE COURT:  Okay.  So thank you.  So those are granted

13    because there's no objection to it.  So starts out with motion

14    in limine number 3, and I would like to get an idea of what you

15    are talking about with regard to these photographs of screen

16    savers, things like that.  Because as I understand the law, and

17    I could be absolutely wrong on this, from the cases I have read

18    from the Ninth Circuit, if it's just a picture of something and

19    they said, that's the picture that I saw on that date, then it

20    might come in as to what that person's understanding is from

21    looking at the photo.

22         However, if that person cannot talk about the

23    authenticity from the website and compared that photo to the

24    website, they can't authenticate it, and, therefore, it doesn't

25    come in.  And that's a thin line, but that's my understanding

1    of the law.  Am I correct or incorrect on that from your

2    viewpoints?

3           MR. HARVEY:  Your Honor, we agree with the Court's

4    interpretation of the law on that.  In this particular

5    instance, we have a situation where Mr. Sacra, the CEO of the

6    plaintiff company, went online and went through a series of

7    websites and extracted photographs of different shapes of

8    liquor bottles and did a study of 114 of those bottles, lining

9    them up and comparing them and so forth.

10          And our objection is exactly as the Court has

11   articulated.  He can say, I saw that, and that's fine.  But

12   what he can't say is that what he saw was an authentic

13   representation of those bottles.  So we object on those

14   grounds.

15          THE COURT:  Mr. Bray.

16          MR. BRAY:  And that's likely all that Mr. Sacra is

17   going to say, is I saw these bottles, which are representations

18   of various whiskey bottles that contain elements that Jack

19   Daniel's contends make its trade dress famous.

20          THE COURT:  Okay, fine.  Thank you.  So it's pretty

21   limited, what he is going to say.  Now, if there's objections

22   during the course of the trial I have to rule on those, because

23   a lot of it comes out about the way the questions are phrased,

24   or things like that.

25          I would appreciate it maybe if we could remain seated

1    through the hearing.  I know it's customary to stand up, but

2    the way this -- our microphones are wired up here, if you could

3    just pull those close and speak into them for the benefit of

4    the court reporter and the clerk of the court, that would be

5    very helpful, not only to mention my own ability to hear things

6    in this cavernous room here.  Okay.  That's number one.

7         But number two, the -- it's my understanding that

8    Mr. Sacra is going to testify what he did and his understanding

9    in devising this concept and developing it and then trying to

10   market it.  He's not going to be an expert witness for any -- I

11   mean, he's not an expert witness, to put it mildly, and I think

12   you so agree; is that correct?

13        MR. BRAY:  That's correct.  We've never designated

14   Mr. Sacra as an expert.

15        MR. HARVEY:  Agreed, Your Honor.  Back to his report

16   though for just one quick second.

17        THE COURT:  Wait.  His report is not admissible.  You

18   can cross-examine him with it, but if he wrote something out,

19   the only thing he is going to do is what Mr. Bray said over

20   there.  He's not going to testify as an expert.  He's going to

21   talk about what he did or maybe how, from his point of view,

22   you know -- I read his statement, which is interesting along

23   the way that -- of someone who sat at bars for a lot of nights

24   looking at bottles, he somehow has the ability to distinguish

25   all these things.

1       Now, keeping in mind also, there's a lot of litigation

2   over the shape and design and color of some of these bottles,

3   including the Coca-Cola bottles, which they found to be unique,

4   I'm trying to steer it away from this case, that found it had a

5   unique quality to it, and that's not what he is going to be

6   talking about, as I understand it.  Am I wrong?

7       MR. HARVEY:  Yeah, my understanding is that what the

8   Court has just said is that he will testify that this is what

9   he did, and he looked at these pictures.

10      THE COURT:  Yeah.

11      MR. HARVEY:  The difficulty we have with the report

12  coming in, and if the Court is saying the report is not coming

13  in, then we are finished.  It's just he is saying he saw these.

14  He's not saying, this is actually the state of affairs, this is

15  who is offering what bottles for sale, or anything like that,

16  it's just what I observed.

17      THE COURT:  No, I think it is what he observed, right,

18  Mr. Bray?

19      MR. BRAY:  Correct, Your Honor.

20      THE COURT:  There we go.  So therefore, the motion in

21  limine is -- it's sort of granted as modified in a way because

22  we now agreed what Mr. Sacra will or will not say, and that

23  comports with your understanding of the law and what Mr. Bray

24  said his client will testify to.  Now, I am sure there will be

25  a lot of other direct and cross-examinations on those points.

1          I think that moves us to number 4.  And apparently,

2     this may be obviated in light of your stipulation with regard

3     to Doctor -- is it Nowlis?  Is that his name?

4          MR. BRAY:  Yes.

5          THE COURT:  In light of what you are stipulating to.

6     And again, my problem, when I was going through some of this,

7     is that really the parties have flip-flopped, because the

8     plaintiff would more or less -- I mean, the defendant will more

9     or less have the burden on the counterclaim on this issue.

10    Dr. Nowlis is almost a reply, a responsive expert, and the

11    defendants actually would have the right of a rebuttal expert,

12    which they don't have, as I understand it, the way the case is

13    sort of flip-flopped back and forth.

14         But the point being, in light of your stipulation with

15    regard to Dr. Nowlis about his report on his opinions and how

16    he arrived at those opinions, and then his cross-examination

17    based on his deposition, is there anything under number four,

18    which is left open?

19         MR. BRAY:  That's a question for Mr. Harvey.

20         THE COURT:  Mr. Harvey.

21         MR. HARVEY:  The only issue, Your Honor, that's left

22    open is really a fairly narrow point.  Now we have testimony

23    from Dr. Ford, the late Dr. Ford, our survey expert, regarding

24    28 percent of the people shown the bottle made the connection

25    and were confused.

1       And in response to that, one of the things that
2  Dr. Nowlis is to testify about has to do with the methodology
3  that Ford followed, the adequacy of the survey stimulus, the
4  control, the usual things.
5       But in addition to that, Dr. Nowlis opined -- and we
6  have no trouble with that, that's part of the way this is going
7  to work.  The one issue we have with Dr. Nowlis' testimony is
8  that he then goes on to say -- and Ford's testimony cannot be
9  admitted or considered in connection with the issue of fame,
10 which, as the Court knows, goes to the dilution side of the
11 case, not the infringement side.  And we just say, that's bad
12 law.  That's just not the way it works.
13      If a mark is strong enough, as in this case, to
14 generate almost 30 percent confusion, that's a fact that the
15 Court is entitled to take into account as to the fame of the
16 mark.
17      We make that point when we cross-examine Dr. Nowlis on
18 the point in his deposition.  He rapidly said, I am not a
19 lawyer, I don't really know, I just know that all Ford's report
20 said was, that it was to study likelihood of confusion, which
21 is true.  We are just saying, the evidence that's gathered on
22 that side is also probative, and I think that's the point we
23 would like to have the Court consider.
24      MR. BRAY:  And, Your Honor, my reaction to that is
25 that this is a bench trial and not a jury trial.  You can

1    evaluate counsel's argument.  You can evaluate Mr. Nowlis'

2    report and Mr. Ford's report.

3          While Mr. Ford testified that his survey was not a

4    fame survey, and he wasn't retained to do an opinion on fame,

5    nonetheless, counsel is using it as a fame survey and saying

6    that it's relevant to issue of fame.  And all Dr. Nowlis is

7    saying is, that's not what you use to test fame.  And I think

8    you could look at the whole of the two reports on that issue

9    and make your own factual determination on fame.

10          MR. HARVEY:  We are not offering it as a fame study,

11    Your Honor.  We are simply saying that the evidence is

12    probative.

13          THE COURT:  You said I can -- eventually, I am going

14    to get to -- the way the case is staggered so far is, you have

15    out front is the copy -- confusion in the market place.  And

16    right -- coming up right behind that then is the dilution

17    issue.  It could have been flip flopped either way.

18          But to a certain amount, the evidence on both sides is

19    sort of a spillover, it seems to me, because they are distinct

20    theories, but they really somewhat go hand in hand.

21          So I think, Mr. Bray is correct that I can take that

22    into account as the finder of fact, based on all of the reports

23    and the testimony of both individuals.  Whether there's a

24    spillover affect, which it seems to me it probably is, even

25    though he said, I wasn't retained to do this, you can't

1    discount it.

2           Because confusion in the market place also has

3    something to do with the fame issue, of whether people confused

4    it or not.  I mean, it comes out in the end, I think everybody

5    stipulated, in some part of the pretrial order, that Jack

6    Daniel's does not sell squeaky toys.  They do not market it at

7    bars.  They don't do anything like that.  Just as though pet

8    stores do not sell the Jack Daniel's products.  I take it I'm

9    correct in that.  You haven't gone to that marketing strategy

10   yet?

11          MR. WELCH:  No, not yet.

12          THE COURT:  I just want to be sure.  So that to me, it

13   seems like -- four, it depends on -- I can't rule on that as a

14   matter of law.  That issue is left open until trial and will be

15   part of the findings of fact and conclusions of law.  I don't

16   think I can preclude it or include it on what is before me, at

17   this juncture.  So I think we leave that open until trial.

18          MR. HARVEY:  Thank you, Your Honor.

19          THE COURT:  Thank you.  Okay.  Now -- but that brings

20   me back to, and I know that there's some -- a little bit of law

21   in this area somewhere about -- and I don't know if we are

22   going to get into it in this case or not.  It kind of came kind

23   up in number three.

24          And that is, the proper format, if there is such a

25   thing, for standard of care -- not standard of care, but

1    standard of admissibility, if there's such a thing, on what is

2    a proper survey?  Has the law ever defined what is a proper

3    survey methodology, or what is a proper methodology of a focus

4    group?

5           I don't know if the law has been refined that much,

6    and I leave it to you if there is something out there, you kind

7    of fill us in.  We haven't really found anything that concrete

8    about it.  It is not like negligence, you know, if a doctor

9    comes in and testifies, here is what the standard of care would

10   be.

11          And here, what's the standard of a Ph.D university

12   professor conducting a survey group or a focus group?  Would it

13   be proper to go into, I am going to make this up as I go you

14   will have to give me some latitude here.

15          I go into a restaurant some night and there's 10

16   people at the bar sitting there, and I say, come on over to my

17   table, I want to do a survey here, or I want to do a focus

18   group, what do you think about these things?

19          Is that a proper focus group?

20          MR. HARVEY:  Yeah.

21          THE COURT:  I don't know that.  I mean, is there a

22   standard of methodology?  And if there is, I think that I need

23   to know that.  And if you can give me some cases on that when

24   you give me your proposed findings of fact and conclusions of

25   law, because it may go to the fact of whether -- since neither

1    doctor is here, whether their methodology -- because they are

2    two distinct different methodologies, survey and focus, they

3    overlap a little bit, what makes it either correct or not

4    correct?

5          Because -- and I will -- I am not throwing any

6    disparaging remarks in your direction, at this point, but I

7    have see an awful lot of lawsuits where, despite Daubert,

8    people come in and they make conclusions but there's nothing to

9    back them up.  I mean, in the methodology department.  So I

10   throw that out because I leave it to you to help me out here.

11         MR. HARVEY:  Well, Your Honor, thank you.  I won't

12   speak a lot to this point, since you've invited us to do that

13   in the findings of fact and conclusions of law, and we can

14   address it there.

15         What I can tell you from the state of many years of

16   practice in the area, there is a gold standard for the study of

17   likely confusion, and that is the test that Dr. Ford used in

18   this particular case called the Eveready test.

19         And Eveready requires -- and the scientific standards

20   for survey research that are approved by the federal judicial

21   center, require a series of steps to make sure that the survey

22   is projectable at the end.

23         So, for example, double-blind, meaning the interviewer

24   doesn't know what the subject of the study is and that's not

25   known to the person being interviewed.  There has to be a

1    control that's applied.  There's a whole series of standards.

2    I am sure the Court has run into this with an Eveready test

3    before.  Dr. Ford's report follows that.

4        Focus groups have been considered in some cases, but

5    they are subject to the same standards of admissible,

6    projectable survey research as are regular surveys.  So they

7    have to be viewed with that in mind, and so if there's a risk

8    of bias, that goes to whether the focus group can be admitted

9    and considered.

10        And in this case, we have 18 or 19 subjects in west

11   LA, in three separate focus groups, who are interviewed by

12   somebody who knew exactly who was paying his paycheck.  And

13   even in one of the survey participants, or I should say focus

14   group participants, actually said, are you being paid by VIP?

15   So I don't think we have the kind of standards here.  We are

16   not meeting the standards here that make this admissible, which

17   is why we've raised the objection.

18        MR. BRAY:  Our argument is that -- and we had filed

19   before the current motion in limine deadline, we filed a motion

20   to exclude Dr. Simonson, which was addressed in the Court's

21   memorandum and order following the summary judgment motions.

22   And our argument there is, Dr. Simonson is an academic, and

23   without performing any study whatsoever, he said applying this

24   sociological theory, the Associate Network Model, he believed

25   that likely that consumers would somehow, after seeing or using

1    the Bad Spaniels Product associate Jack Daniel's with

2    defecation.

3            Bruce Silverman, our expert, is the former creative

4    director and executive vice president of four of the largest

5    advertising agencies in the world, in his past.  He has 45

6    years of experience.  He is the gentleman that came up with

7    American Express "Don't leave home without it."  Invented the

8    first Frequent Flyer Program, and what he said is -- he's

9    refuting Dr. Simonson's report.

10           And he also says, part of what we use in the industry

11   is focus groups, which are not a quantitative study, they are a

12   qualitative study.  And this is -- I've done 35 or 4500 focus

13   groups over my career.  It's the exact -- maybe not the exact,

14   but very comparable to the type of focus groups that Jack

15   Daniel's itself conducted to gauge consumer's emotional

16   reactions to changes in the bottle and various contemplated

17   changes to the labeling of the bottle.

18           So taking the focus groups, taking his 45 years of

19   industry experience, we used Dr. Silverman as a rebuttal expert

20   to say, no, Dr. Simonson, the academic who is relying on this

21   one psychological theory, in the real world, in marketing and

22   advertising, a parody product like this doesn't evoke feelings

23   of disgust.

24           So Dr. Silverman's survey, to the extent it's really

25   focus groups, qualitative research to gauge consumer's

1    emotional reactions to the Bad Spaniels Product, goes to the

2    dilution by tarnishment claim.  It does not go to the likely to

3    confusion.

4         And that was one of the points we made in our response

5    to the motion in limine, is that JDPI is comparing apples to

6    oranges.  This is not a -- and we distinguish their cases in

7    our response.  This is not a quantitative study to survey

8    likelihood of confusion.  This is a qualitative study related

9    to dilution and related to gauge the consumer's emotional

10   reactions to the product.

11        THE COURT:  Anything else?

12        MR. HARVEY:  Only that the point that Mr. Bray was

13   just making about the purpose of the study being done.  There

14   are still the same standards that apply to the survey research,

15   and so we would make the same argument.  That if you are

16   offering any kind of a survey, it needs to meet those

17   standards.

18        And I should also point out that Mr. Silverman, in his

19   deposition, repeatedly admitted that the results of focus

20   groups are not projectable, and after all, as the gatekeeper

21   here, and as the standard setter for the proceedings under

22   Daubert, the Court would want it to be projectable, so that you

23   would have the comfort of reaching a decision that would be

24   something projected across the population of the US.  These are

25   18 or 19 people in LA.

1          THE COURT:  Are you saying that people in California,

2   being in California yourself, might be different than the rest

3   of the world?  Is that it?

4          MR. HARVEY:  I hesitate to admit that so freely, but

5   yes.

6          THE COURT:  Okay.  Now, the reasons, with the jury, we

7   just give them a general verdict form, and they fill it in, and

8   that's it.

9          With findings of fact and conclusions of law, I have

10  to figure out what is more persuasive by a preponderance of the

11  evidence than someone else.  And so that's the reason I was

12  asking about, what is the standard.  And one may be

13  admissibility, one may be -- you could use it for persuasive

14  purposes, if you found it to be valid, that sort of thing.  But

15  it may not have the preclusive affect.

16          And we go back to the point we talked about a little

17  bit earlier, and that is, I don't know if people would think

18  that -- and I am speculating here, that Jack Daniel's would

19  produce and manufacture a toy like this, a squeaky toy under

20  their label, or a parody or a representation of their label.

21          On the other hand, I don't think they would think that

22  your client, Mr. Sacra, is producing distilled liquor either

23  and trying to sell it.  Whether that's correct or not, I don't

24  know.  We are going to find that out.

25          But then, again, like I say, the tarnishment aspect

1    spills into that whole conversation.  So we will have to wait

2    and see what the evidence shows.  But that, I think, concludes

3    number 5, because it is going to depend a little bit on what is

4    produced, and we have to leave that open until trial so it's

5    not -- I think -- one is one thing, and -- one is a focus

6    group, and one is survey, and we have to see where that

7    spillover occurs and whether it will be amenable and acceptable

8    or not.

9            THE COURT:  Okay.  And then number six, this is the

10   state of mind, confusion area.  And I would like to hear some

11   comments on that, if you would, please.

12           MR. HARVEY:  Yes, Your Honor.  This pertains to the

13   possibility that Jeff Eichelberger will testify, and

14   Mr. Eichelberger has a website called Boozin Gear.  He is a

15   friend of Mr. Sacra's, as we understand it, and offers, among

16   other products, he claims to offer licensed Jack Daniel's

17   products on the website, but also sells this (squeeze's toy)

18   squeaky toy.  I got this one.

19           And he will purportedly testify -- the offer of proof

20   that's made is he himself was not confused as to the source or

21   origin or licensing of the product, and none of his customers

22   complained to him about being confused.  That's the essence of

23   what Mr. Eichelberger wants to say.

24           And then we object on a couple of different grounds.

25   One we say, the fact that he is not confused shouldn't be

1    surprising if he's a friend of Mr. Sacra's, of course he's not,

2    he's part of the story.

3            Number 2, the fact of someone saying or not saying to

4    him that they were confused is the ultimate in hearsay --

5    whether they ever said anything.  So we just say, why do we

6    call this man?  What does he prove?

7            MR. BRAY:  Our response to that, Your Honor, is, out

8    of the 400 exhibits or so, there's two exhibits, I believe,

9    from the Boozin Gear website that Jack Daniel's wants to

10   introduce to show, here is one website, out of hundreds of

11   thousands of e-commerce sites, where the same website sells a

12   Bad Spaniels Product and Jack Daniel's licensed gear.

13           So our argument with regard to that is one out of

14   100,000 or 100 million, however many e-commerce sites there are

15   is not significant.  Our further response to that is, the owner

16   of Boozin Gear, Mr. Eichelberger is a retailer of Bad Spaniels

17   of VIP, and he was never confused as to the source or the

18   affiliation of the product that the Bad Spaniels Product came

19   from VIP and didn't come from Jack Daniel's.

20           And he also has the ability, under established case

21   law to testify that as to the consumers of products on the

22   Boozin Gear website, he's not had any reports of any consumer

23   confusion, somebody buying the product from the Boozin Gear --

24   Bad Spaniels Product from the Boozin Gear website, thinking it

25   was affiliated with Jack Daniel's.

1          And the case that I cited is from the Central District

2     of California, that said the vast majority of cases which have

3     allowed statements by end consumers have held that statements

4     are nonhearsay and they go to a consumer's state of mind.

5          THE COURT:  But there is no statement.  Nobody

6     objects, but that's -- that's almost like an exculpatory

7     statement by a defendant under arrest who said, I didn't do it.

8     He can't -- you can't get that in.  That's a hearsay statement

9     by himself.  There's got to be some predicate.  Either they

10    take the witness stand, or there's got to be something else

11    attached to it, because otherwise, there's no way to

12    cross-examine the declarant.  There's no way to

13    cross-examination the declarants of which he is basing his

14    opinion, just because they didn't say -- are they making these

15    now, or what?

16          MR. BRAY:  Perhaps we can make a distinction between,

17    you know, his retailer confusion and consumer confusion, and

18    maybe this doesn't even need to be made a point.  Because one

19    of the stipulated facts that Jack Daniel's has agreed to in the

20    joint pretrial order is that there have been no documented

21    instances of consumer confusion between the two products.

22          THE COURT:  Mr. Harvey?

23          MR. HARVEY:  Well, then why is there a need for this

24    testimony, if that's the case?  That's one of the reasons --

25          THE COURT:  If you've stipulated to that, no known

1    state of confusion, then, you know, registered that way, then I

2    agree that Mr. Eichelberger's testimony is not relevant.  It's

3    hearsay and double hearsay.  But that being said, if it's a

4    stipulated fact, where's that place you in the area of

5    confusion as to the mark?  If you've stipulated to that fact?

6        MR. HARVEY:  As the Court knows, under the eight

7    Sleekcraft factors, one of the factors is the presence or

8    absence of actual confusion.  But we also know that instances

9    of reported confusion are difficult to happen, especially

10   across sales that are as thin as these have been.  I think the

11   report the Court was referring to was $40,000 in sales last

12   year.

13       So the fact that we don't have actual reported

14   instances, doesn't take away from the finding that Dr. Ford's

15   survey makes -- when people are given a standard test and

16   asked, who makes or puts this out?  Almost 30 percent say, it's

17   Jack Daniel's.  Either under license as a product that's

18   licensed from them or actually made by them.

19       MR. BRAY:  I guess I haven't --

20       THE COURT:  Well, the Sleekcraft case and its progeny

21   certainly add a lot to the mix of the eight-part test or

22   whatever it is that you go through.  But go ahead, Mr. Bray, I

23   didn't mean to cut you off.

24       MR. BRAY:  The only thing I was going to add is, there

25   are cases that say -- in fact, the most recent Louis Vuitton

1   versus My Other Bag case, that was decided in the Southern

2   District of New York and just affirmed on the Second Circuit,

3   dealing with a Louis Vuitton parody product, said after a

4   number of years, one would expect that if there was actually

5   any real consumer confusion, as opposed to an expert in a

6   survey, that -- and you will hear evidence at trial, that

7   Dr. Ford's survey question, to a large extent, just tests what

8   percentage of Americans believe that parody products require

9   the permission of the trademark owner.  These people aren't

10  saying they're confused, they're saying, there's an affiliation

11  or association.  Well, it's a parody product, of course.

12          But in this case, while it's true that I think sales

13  were relatively thin, last time we were in the courtroom, I

14  believe the Bad Spaniels Product is now sold in Walmart.  I

15  think by the time of trial, I think we're going to be six

16  figures in units.  I don't have the exact number, so I hesitate

17  to give you, and we have a four or five year sales history, at

18  least four I believe, where nobody has come forward and said,

19  gosh, why is Jack Daniel's putting out a squeaky toy?  Or I am

20  unhappy because my dog chewed through the squeaky toy, I am

21  calling Jack Daniel's customer service.

22          THE COURT:  That's just the one prong of that.  Then

23  you have the other prong on the tarnishment issue.

24          MR. BRAY:  I know, but -- and bringing it back to

25  Mr. Eichelberger, I would say that the website, if you can't

1    allow Mr. Eichelberger to testify, I own Boozin Gear, I am the

2    one that is responsible for the website, I always knew that

3    they were made by separate companies and I was never confused,

4    to me that's relevant, even if you have a stipulation fact that

5    no consumer has been confused in this case.

6         THE COURT:  Well, the stipulation is a stipulation.

7    It knocks out the need for additional testimony on that same

8    point.  It's cumulative, so therefore, I would not let that,

9    because it is cumulative.

10        The issue of trademark enforcement.  And I know this

11   is always a moving target, particularly in all of the circuits,

12   but you have companies that spend a lot of money on advertising

13   to preserve their mark, they are very proud of their mark.  And

14   yet the parody part part of it, there's a certain allowability,

15   let's say, to borrow that mark for some parody purpose.

16        But where it diminishes the mark, that's a real

17   problem.  I know the problem with, for instance, counterfeit

18   merchandise that comes in, this is not a counterfeit

19   merchandise issue.  But the argument that's made, for instance,

20   someone will smuggle in a whole line of some brand name shoe,

21   and it turns out these are made out of paper mache, just about,

22   and they fall apart and they take them back to a known retailer

23   saying, I want my money back.  This is the known manufacturer.

24   And they say, well, it's not the known manufacturer.  They took

25   their name, they took their mark, but this is not it.  And then

1    of course then it diminishes the purchaser, thinking they

2    bought the real thing.  Now, why they would think that buying

3    it out of the trunk of some guy's car on the corner of, you

4    know, Central and Baseline, or something like that, I don't

5    know, but people do that.  So that's a problem of why the

6    people who own the mark are very protective of it.  So I guess

7    we are going to keep litigating this thing about parodies

8    versus preservation of the mark.

9            MR. BRAY:  Well, speaking from VIP, this is not just

10   one product from VIP, it's a whole line of product, and it's

11   also Jack Daniel's' lawyers and business representatives have

12   met Mr. Sacra, he's a very unique individual.

13           THE COURT:  He's a what?

14           MR. BRAY:  A very unique individual.  He's about 6

15   foot 4, he has leopard print hair, wears cowboy boots.  He has

16   got a certain image -- I don't know what the word I am looking

17   for -- in the pet toy industry, and the parody products, even

18   though comparatively to the Tuffy Products, which is his major

19   seller, they're the second biggest dog toy company in the

20   country, the parody product is an important part of the company

21   image.  So there's a larger point here going on.  And, you

22   know, Mr. Sacra, if -- you know, however the trial works out, I

23   assume either party would appeal, and so kind of the end game

24   is a Ninth Circuit opinion that either is like Hot Diggity Dog,

25   or the new My Other Bag case or not, because we get -- you

1    know, it's an important part of his business, even though this

2    one product is not going to make or break his business.

3            MR. HARVEY:  Your Honor, if I could just respond?

4            THE COURT:  I always give everybody a chance to

5    respond.  Go ahead.

6            MR. HARVEY:  Thank you.  On the issue of parody, the

7    case law is very interesting here, and I know the Court is

8    aware of it.  But the fact is, that when there's free speech

9    involved, as the Court has already ruled, with respect to an

10   expressive product, an expressive work, that's speech.  And

11   here, it's not that, it's someone selling a product, using

12   somebody else's product to sell theirs.

13           And in the case of parody, the Courts have made a

14   distinction between what you might call good parodies and bad

15   parodies.  Good parodies don't confuse, bad parodies cause

16   confusion and then have people thinking that the other company

17   is behind it.  That's a simple way to say that.  And that's

18   what's happening here, and that's why we've brought this

19   action.  But, again, that's why we are in trial as well.

20           THE COURT:  I understand.  And I know you are sort of

21   a latecomer into this game due to a change of counsel, and I

22   appreciate that, but I've said all along to this case, isn't

23   there any way to settle this, and apparently there's not, and

24   that's why we are going to trial, and that's fine.

25           And we've gone through all of the motions and that's

1   why I gave you -- everyone an example of all your handiworks so

2   far.  This has not been an inexpensive piece of litigation, and

3   the parties both have a point to be made, and we'll try the

4   case, and we'll see where it comes out.  I've only heard bits

5   and pieces of the evidence so far.  So, we will go from there.

6           MR. HARVEY:  May I just ask, Your Honor, sorry to

7   interrupt you.

8           THE COURT:  Go ahead.

9           MR. HARVEY:  We had listed in the joint pretrial

10  statement, in Exhibit B, the various exhibits that we plan to

11  offer.  And, again, and I will ask my esteemed colleague

12  whether he would agree to this, but we listed joint exhibits,

13  we listed -- and then those that either party would offer.  So

14  there's three buckets of exhibits on that list.

15          As to the individual party exhibits, we also listed

16  objections.  And -- as the Court noted.  I wonder, do we want

17  to try to settle those now, or is that something -- I guess at

18  the beginning, you were inviting us to settle them before

19  trial.

20          THE COURT:  Yes, because I think the conversation was,

21  you were going to continue your conversation and see if you can

22  whittle all that down.

23          MR. HARVEY:  We can, especially in light of the

24  Court's indication regarding exhibits to experts' reports.  I

25  mean, that is some of the objections.  There's actually not a

1    great deal of objections, and one of the things that counsel

2    and I talked about last Friday was, as for those exhibits where

3    there's no objections, whether we can just stipulate to the

4    admission so we can just have trial notebooks to have.

5    THE COURT:  That would be my preference, because if

6    there's no objection to them, then we just admit them, if

7    they're relevant.  In light of the Court's rulings here, in

8    light of your new trial strategy or the change of circumstances

9    or whatever it is, you decide to eliminate some of them, that's

10    fine.  But if you don't, then it's easier to either stipulate

11    them in, rather than say, we have no objection.  Because that

12    takes -- I always try and tell people, working on objections

13    takes a lot of time -- more court time than one thinks they do.

14    Just like sidebar conferences, or if you have to excuse the

15    jury along the way, the time you eat up, but if you lose 15, 20

16    minutes during the course of a day, it's exponentially how much

17    time you've lost in terms of the trial.

18    So I am trying to conserve your time, if there's

19    really no objection on them.  Because if there would be an

20    objection, you'd make it, and we'd have to deal with it, and

21    that's fine.

22    MR. HARVEY:  I wonder if I could make a suggestion

23    then regarding this.  This is just the first time I've raised

24    it with Mr. Bray.  Perhaps we could, sometime around the filing

25    of the findings of fact and conclusions of law, the two sides

```
 1    of that, have -- agree to have a date where we sit down and

 2    work through it, and then submit to the Court those exhibits as

 3    to which we have no objection that can come directly into

 4    evidence.

 5              MR. BRAY:  I was going to suggest the same thing.

 6              THE COURT:  All right.  What day do you want?

 7              MR. BRAY:  Right now it's September 14th for the

 8    findings of fact.

 9              THE COURT:  You want to meet before then and then send

10    me a list, or are going to submit it along with your findings

11    of fact and conclusions of law?  Which is best for you all?  I

12    am trying to help you out here.

13              MR. HARVEY:  One side or the other, that is fine with

14    me.

15              MR. BRAY:  If we submit it with the findings of fact

16    and conclusions of law, we have four weeks, and I know that

17    Mr. Harvey and I can talk and work it out between --

18              MR. HARVEY:  Probably not the same day.

19              MR. BRAY:  Maybe we could do it the following Monday

20    then, the 17th.

21              MR. HARVEY:  The following week.

22              MR. BRAY:  Or the next week?

23              MR. HARVEY:  Or the next week.  So the 14th -- should

24    we say 21st.

25              MR. BRAY:  The 21th of September.
```

1           THE COURT:  I don't know how we work this out, only

2    because that's a Thursday.  I usually do things on Friday.  How

3    about do it September the 22nd?   That's a Friday.

4           MR. HARVEY:  Perfect.  Thank you, Your Honor.

5           THE COURT:  And we will -- that's when your new

6    revised list of exhibits and stipulations and or objections can

7    be filed.

8           MR. HARVEY:  Then I expect --

9           THE COURT:  It should be much narrower than what you

10   are talking about now.

11          MR. HARVEY:  Sure.  I was going to say, and then I

12   expect we're not going to have many objections and we can

13   coordinate with your clerk and get all of the exhibits over

14   here a couple weeks before the trial.

15          THE COURT:  That would be good because then she can

16   give you exhibit stickers, if you want to, or whatever -- you

17   can work with her, Ms. Richter, and she will work that out as

18   to how to get those marked.

19          MR. BRAY:  One.

20          MR. HARVEY:  One interesting thing about this case I

21   think you are going to find, Your Honor, is the discussions

22   that Mr. Harvey and I have, we are both motivated to have the

23   trial be as efficient as possible and try to get it done in

24   four or five days.

25          And one of our thoughts there is, you know, you are

1    going to hear through reports with regard to confusion, you

2    know, contrary opinions between experts, and you're going to

3    have a contrary opinion between Mr. Silverman and Mr. Simonson,

4    but there's not a whole lot of disputed facts.  It's the

5    significance of the facts and the weighing of them under the

6    Sleekcraft analysis and -- for dilution by tarnishment.

7        THE COURT:  That is the test, and that comes down to

8    some of your arguments at the end, as to how I should weigh

9    those.  Because you are trying to persuade me about how I

10   should do that.

11       MR. HARVEY:  One other question, Your Honor, just in

12   terms of housekeeping, do we coordinate with Ms. Richter then,

13   with respect to audio visual, setups and getting things teed up

14   for the Court to be able to see things on the screen.

15       THE COURT:  She can guide you, but we have an MIS

16   staff here, and it's headed by Brian Lalley.  And she will give

17   you the information with regard to him, and you can come in

18   ahead of time and get it all set up.  He will show you how to

19   use it, and where you could put your master wands and all that

20   sort of thing that -- your call-up sheets, or whatever they are

21   called.

22       MR. HARVEY:  Great.

23       THE COURT:  I mean, you recall, I did suggest that you

24   might all get seats at the Kentucky Derby and try and settle

25   this, but it didn't work out.

1          MR. HARVEY:  One other question we have, too.  Would

2     the Court intend to hear -- I guess that would be our

3     recommendation to the Court that there be brief opening

4     statements, would that be helpful?

5          THE COURT:  Yes, "brief" is the word on the openings,

6     and I will let you -- give you some latitude on the closings,

7     because that's when everything sort of comes together, at the

8     very end.  And that's where -- look at your findings of fact

9     and all the evidence that's come in to kind of highlight what

10    you think has proved your point that you're trying to make or

11    discount the other side's point as to why, by a preponderance

12    of the evidence, it's not as acceptable.

13         MR. HARVEY:  Let me ask you a question about the --

14         THE COURT:  The expert relied on Dr. Suess and The Cat

15    in the Hat to give his opinion, well, guess what?  That may be

16    obvious to some, but not maybe to all.

17         THE COURT:  One question about the opening, the

18    significant issues, as I see them, is the application of the

19    law to the facts in this case.  For the opening, when you say

20    "brief," how long are you thinking?  And then number two, do

21    you want it to be a traditional opening to a jury, the evidence

22    will show?  Or can we bleed over into argument and the

23    significance of applying the facts to the law.

24         THE COURT:  I think in this case, because it's

25    nonjury, if this were a jury, that absolutely would not happen,

1    but since it's findings of fact and conclusion of law, I would

2    allow you to do it, because I think it gives me a little bit of

3    a heads-up, and I will give both side that latitude.  Just

4    don't make it hours.

5         I think because it has been distilled -- excuse me,

6    borrowing a term from your industry, distilled down to certain

7    claims, that they wouldn't be that long, so the quantum of

8    evidence and why.  For instance, your point is, this does spill

9    into the area of -- I will take parody as a case, why it

10   does -- spills into that, and why this is not an infringement.

11        There is no confusion here, it's just everybody knows

12   it's a big joke or whatever it is.  I would allow them on the

13   other saying, you know, that's just one aspect.  Because if you

14   compare it with the other Sleekcraft eight whatever tests it

15   is, then it does, they -- when they weigh them all together, it

16   outweighs that one thing that sort of cuts in their favor.  And

17   the evidence is what it is.

18        You'd like to say -- I'm sure Mr. Sacra would like to

19   say, well, let's see, I went to my lawyers and we discussed

20   this and we researched the law in this area whatever, and he's

21   going to say, no, I didn't do that, here's what I did one day.

22   And this is how it came about, and that's -- so we don't have

23   advice of counsel in these cases.  Sometimes I do.

24        But I remember way back when, when some of us were in

25   in law school, I mean, I did go to law school.  I didn't read

1    the law, but I went to law school, and they told you, never,

2    ever write a contact on a napkin, and I've had three cases over

3    my term here where they bought and sold business for millions

4    of dollars, and the napkin comes into evidence.  It's shocking.

5         MR. HARVEY:  You never write a check on the side of a

6    cow either.

7         THE COURT:  Exactly.  I mean, they do -- the craziest

8    things happen, but you know you are there representing your

9    clients, and these clients have a point to be made, but

10   sometimes it just -- that's just the way things are, you know,

11   so --

12        MR. HARVEY:  I have to ask if the Court was making an

13   intentional reference there to the OJ Simpson cat not in the

14   hat case, because that will figure in our case, but never mind.

15   There is some reliance on that.

16        THE COURT:  No, I was referencing Dr. Suess.  Because

17   a lot of experts sometimes -- and I am not suggesting your

18   experts have done this at all, but every now and then, you will

19   get a report and it is a little far afield, let's put it that

20   way, of either their expertise, or the area has changed

21   significantly.

22        And that's what's happened with regard to -- the

23   manufacturing of tires.  The whole industry has changed, and we

24   still have people that operated back when they were, you know,

25   doing the old fashioned stuff, and there's no relevancy there,

1    so that created a little bit of a problem in the industry.

2            But I do have a little passing acquaintance with the

3    Daubert case, so you might know that.  It was a baseball score,

4    9 to nothing.  So anyway, what else shall we take up at this

5    point?

6            MR. BRAY:  Nothing from VIP's perspective.

7            MR. HARVEY:  Nothing from us either, Your Honor.

8            THE COURT:  All right.  Then we will get your findings

9    of fact -- proposed findings of fact, conclusions of law, along

10   then the next week with your reduced disagreements over

11   exhibits and maybe a reduced number of exhibits that are going

12   to come in, and we will go from there and see what we come up

13   with.

14           Now, I take it that you will have -- will your client

15   be here to testify or be a part of this trial?

16           MR. BRAY:  Yes, Your Honor.

17           THE COURT:  Okay.  And will you be here, sir, or Mr --

18   is it Welch?  Will you be here or will -- I know we are going

19   to have some people testifying from the defendant corporation,

20   also?

21           MR. HARVEY:  Correct.

22           THE COURT:  Okay.  So you will be here also?

23           MR. WELCH:  I will be at the trial, yes, sir.

24           THE COURT:  Just checking to see where we are.  Okay.

25   We have covered a lot in less than an hour, and I think that

1    speaks to all the preparation you put into this case.  This is

2    a lot of hard work.

3            I mean, like I say, with all of the -- I mean, I say

4    over here.  There's four giant volumes, plus one on my desk,

5    that would probably be at least five volumes of Shogun or War

6    and Peace, stacked on top of each other, so it's not

7    inconsequential litigation.

8            All right.  Well, thank you very much.  We will stand

9    at recess.  And if anything comes up in the meantime, or if we

10   can help you out in any way, please let me know.  But we will

11   get started on Monday, October the 2nd, and we will look

12   forward to hearing the evidence.

13           Thank you all very much.  Travel safely to wherever

14   your journeys take you, and we will get back together on

15   October the 2nd.

16           Thank you.  Go ahead.  I have got another matter.

17           (Proceedings conclude at 2:56 p.m.)

18

19

20

21

22

23

24

25

1
## C E R T I F I C A T E
2

3        I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4  appointed and qualified to act as Official Court Reporter for

5  the United States District Court for the District of Arizona.

6        I FURTHER CERTIFY that the foregoing pages constitute

7  a full, true, and accurate transcript of all of that portion of

8  the proceedings contained herein, had in the above-entitled

9  cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11        DATED at Phoenix, Arizona, this 8th day of September,

12  2017.

13

14                                    s/Elva Cruz-Lauer
                              Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25