Firm E-Mail: courtdocs@dickinsonwright.com

David G. Bray (#014346)
dbray@dickinsonwright.com
David N. Ferrucci (#027423)
dferrucci@dickinsonwright.com
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (602) 285-5100

*Attorneys for Plaintiff/Counterdefendant VIP Products, L.L.C*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products L.L.C., an Arizona limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation,<br><br>                    Defendant. | Case No. 2:14-cv-02057-SMM<br><br><br>**PLAINTIFF/COUNTERDEFENDANT VIP PRODUCTS LLC'S FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Jack Daniel's Properties Inc., a Delaware corporation,<br><br>                    Counterclaimant,<br><br>v.<br><br>VIP Products, L.L.C., an Arizona limited liability company,<br><br>                    Counterdefendant. | |

**INTRODUCTION**

1.      This dispute arises out of the production and sale of a dog toy shaped like a whiskey bottle labeled "Bad Spaniels" with the tagline "The Old No. 2 on your Tennessee Carpet." Jack Daniel's Properties, Inc., producer of Jack Daniel's Tennessee Whiskey, accused VIP Products LLC, producer of the "Bad Spaniels" dog toy of trademark infringement and dilution by tarnishment. VIP subsequently initiated this action seeking a declaratory judgment that its "Bad Spaniels" dog toy does not infringe upon Jack Daniel's trademarks, and Jack Daniel's counterclaimed under various state and federal laws for trademark infringement and dilution by tarnishment.

**FINDINGS OF FACT**

**I.      Stipulated Facts**

2.      The parties have stipulated to the following facts.

3.      VIP Products LLC ("VIP") is a limited liability company in Phoenix Arizona.

4.      VIP is engaged primarily in the business of designing, manufacturing, marketing, and selling chew toys for dogs.

5.      VIP dog chew toys include the "SILLY SQUEAKERS" line of durable rubber squeaky novelty dog toys.

6.      The Silly Squeakers line of dog toys includes the Silly Squeakers "Bad Spaniels" dog toy.

7.      Mr. Steven Sacra (Sacra) believes that he got the inspiration for the Bad Spaniels dog toy by having dinner in a bar.

8.      USPTO Registration Nos. 2,789,278; 1,923,981; 582,789; 42,663; 4,372,885; 4,481,424; 4,478,408; 4,526,056; 4,481,425; 4,354,330; 4,491,564; 3,055,481; and 2,867,158 are all current, subsisting, registered United States Trademarks

(together, the "JDPI Trademarks") owned by Defendant Jack Daniels' Properties, Inc. ("JDPI").

9.    JDPI never consented to give VIP license to use any of the following trademarks (or to use similar trademarks): USPTO Registration Nos. 2,789,278; 1,923,981; 582,789; 42,663; 4,372,885; 4,481,424; 4,478,408; 4,526,056; 4,481,425; 4,354,330; 4,491,564; 3,055,481; and 2,867,158.

10.    JDPI never consented to give VIP license to use the Jack Daniel's Trade Dress or to use similar trade dress.

11.    JDPI has never licensed any of its marks for use on a pet toy.

12.    JDPI has no plans to license any of its marks for use on a pet toy.

13.    JDPI has never received any communication from any consumer expressing any confusion as to whether or not JDPI and/or Jack Daniel's was the source of the Silly Squeakers "Bad Spaniels" dog toy.

14.    Jack Daniel's whiskey is not sold in pet specialty retailers (e.g., Petco, PetSmart, Pet Value, Pet Supplies "Plus", Global Pet Foods, Pet Supermarket, Petland Discounts, Unleashed by Petco, Petsense, Mondou, Pet Planet, Pet Food Express, Bosleys Pet Food Plus, Woof Gang Bakery, Pet Club, Pet Depot, Jack's Pets, Mud Bay Granary, Chuck and Don's Pet Food, Pet Pros, Concord Pets, Kahoots Pet Store, Krisers, Pet People or any other retailer which generates the majority of its revenue from the sale of pet products, pet supplies, and pet services).

15.    Jack Daniel's Old No. 7 Tennessee whiskey has been sold for over 100 years.

16.    The Court makes the following findings.

**II.    VIP Products LLC and the Silly Squeakers Bad Spaniels Dog Toy**

17.    VIP sells several lines of dog chew toys, including the "Tuffy" line

2

(comprising durable sewn/soft toys), the "Mighty" line (comprising durable toys made of sturdier material than the Tuffy line), and the "Silly Squeakers" line (comprising durable rubber squeaky novelty dog toys).

18.     Initially launched in approximately 2007, the Silly Squeakers line of dog toys includes a variety of toys in the shapes of beer, wine, soda, and liquor bottles. (Sacra Dep. at 38:10-17).

19.     The intent behind producing the Silly Squeakers line of toys was to develop a creative and novelty product that would amuse consumers. (Sacra Dept. at 42:18-23, 269:4-25).

20.     In order to design a humorous novelty product, Sacra, in consultation with VIP product designer Elle Phillips ("Phillips") settled on the concept of developing parody products in which dog toys would mimic human products, creating a humorous juxtaposition.

21.     VIP developed a number of different Silly Squeakers dog toys each invoking a familiar human product: Mountain Drools/Mountain Dew; Barks/Barq's; Killer Bite/Miller Lite; Kennel Relaxing/Kendall-Jackson. (Sacra Dep. at 64:22-65:14).

22.     The genesis of the Silly Squeakers "Bad Spaniels" dog toy occurred when Sacra had an idea for the toy when he was out to dinner. Sacra called Phillips, told her "Bad Spaniels," and asked her to figure it out. (Phillips Dep. at 49:11-25; Sacra Dep. at 82:1-17).

23.     Phillips then began the design process for the "Bad Spaniels" dog toy.

24.     The intent in designing the "Bad Spaniels" dog toy was to create a parody that conveys the message that in a serious world, it is important to be able to sit back and be able to laugh at ourselves and laugh at the humor of the constant bombardment of advertising and marketing. (Sacra Dep. at 216: 20-25).

25. The "Bad Spaniels" dog toy is targeted generally to the dog owning American public without emphasis on any particular subpopulation. (Sacra Dep. at 213:17-24).

26. As of April 2015, the full Silly Squeakers product line, including the "Bad Spaniels" dog toy, accounts for approximately ten to fifteen percent of gross dog products. (Sacra Dep. at 54:6-19).

27. Beyond maintaining a website, VIP does not advertise the Silly Squeakers product line, including the "Bad Spaniels" dog toy, in a traditional sense. VIP does not place advertisements in magazines or trade journals, nor does it purchase radio or television air time. (Sacra Dep. at 192:17-22).

## III.  **JDPI and Jack Daniel's Products**

28. JDPI products include Jack Daniel's Tennessee Whiskey Black Label, which is sometimes referred to as "Old No. 7," (Epps Dep. at 18:6-7), and then several brand extensions, including Jack Daniel's Tennessee Honey, (Epps Dep. at 56:16-57:1), and Jack Daniel's Tennessee Fire, (Epps Dep. at 58:9-10), both of which are priced similarly to Jack Daniel's Black Label. (Epps Dep. at 61:1-7).

29. Other brand extensions include Jack Daniel's Green Label, (Epps Dep. at 59:3-4), which is sold at a lower price point, (Epps Dep. at 62:-11-14), and Gentlemen Jack which is a single barrel whiskey and sold at a higher price point than Jack Daniel's Black Label. (Epps Dep. at 61:19-62:3).

30. JDPI views its products as a premium price product. (Epps Dep. at 116:6-9).

31. JDPI typically licenses its intellectual property only for use in connection with products they think are appropriate premium offerings. (Epps Dep. at 24:23-25:8).

32. JDPI would not license any of the Jack Daniel's marks for use on a dog

toy out of concern that dog toys would be purchased and or played with or used by individuals less than 21 years of age. (Gooder Dep. at 24:2-7).

33.    JDPI, broadly speaking, targets men 25 to 40 with its marketing, and men are the primary purchasers of Jack Daniel's Black Label at roughly 70% of purchasers. (Epps Dep. at 82:5-9, 82:14-83:1).

34.    The largest area of expenditure in JDPI's advertising and promotional budget for Jack Daniel's Black Label is television, followed by JDPI's digital advertising efforts including maintain a social media presence on sites such as Facebook, twitter, and Instagram, as well as other digital media advertising. (Epps Dep. at 79:2-10, 87:19, 88:19-89:3, 91:3-12).

35.    The third largest segment of JDPI's advertising and promotional budget goes to advertising "out of home" which includes items such as billboards and signage. (Epps Dep. at 94:6-20).

## IV.    No Evidence of Confusion in the Marketplace

### A.    Likelihood of Confusion

36.    To show that a likelihood of confusion exists, JDPI consulted with Dr. Gerald Ford ("Dr. Ford"), who conducted a survey purportedly to evaluate the likelihood of confusion caused by the "Bad Spaniels" dog toy.

37.    Dr. Ford tested for likelihood of confusion by conducting an internet survey in which participants in the "test cell" were shown photographs of the "Bad Spaniels" dog toy, and participants in the "control cell" were shown photographs of a fictitious toy. (Ford Survey at ¶¶ 3, 6).

38.    Participants were then asked a series of questions. (Ford Survey at ¶ 27).

#### i.    Dr. Ford's Survey Cannot Show Likelihood of Confusion

##### (a)    Improper Control Stimulus

5

1

2

39.     It is traditional in modern survey research to include a test cell and a control cell. (Ford Dep. at 142:6-23).

3

4

5

40.     The control cell is shown a stimulus that allows the surveyor to control for only the claimed trade dress elements and exclude "noise," or mismeasurement, based on improper control. (Ford Dep. at 142:25-143:3, 143:12-22).

6

7

8

9

10

41.     Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give a Jack Daniel's response to the test cell survey questions because of other factors such as market share, popularity, and preexisting beliefs. (Ford Survey at p. 10-11; Ford Dep. at 146:13-20, 147:4-20).

11

12

13

14

15

16

42.     As an example, if a surveyor were testing athletic shoes, regardless of whether they contained a swoosh, some percentage of the population surveyed would report Nike as the maker simply because Nike has such a high market share and is so popular. By showing the control cell an athletic shoe, a surveyor can control for the percentage of people who respond "Nike" by virtue of seeing an athletic shoe, not because of any mark on the shoe. (Ford Dep. at 147:22-148:4).

17

18

19

43.     In using a control cell, the percentage of people who express confusion is reduced by those who are confusing for reasons that have nothing to do with the trademarks at issue. (Ford Dep. at 150:23-151:4).

20

21

22

44.     It follows then that if the control cell does not adequately capture those respondents who express confusion for reasons unrelated to the trademarks at issue, then the test cell will reflect an artificially high number of respondents reporting confusing.

23

24

25

45.     For a control cell to be effective, the stimuli shown to the control cell and the test cell must be as similar as possible, and differ only in terms of the characteristic whose influence is being tested. (Nowlis Report at ¶ 14).

26

46.     Dr. Ford's control stimulus, however, made multiple changes beyond what was necessary to control for. Those changes included:

- Changed the bottle shape from a square shape with a rib neck to a rounded shape with a smooth neck

- Changed the black cap with the letters "BS" on the top and a square neck label to a gold label wrapped around the neck of the bottle

- Replaced the words "Old No. 2" on the neck of the bottle with the words "Poo Poo on your Tennessee Carpet"

- Completely removed the black front label, instead printing the text on the bottle directly

- Replaced the words "The Old No. 2" on the front of the label with "Poo Poo"

- Removed the white filigreed border

- Changed the font and placement of the letters from a curved alignment to a straight alignment

- Changed the color of the hangtag from black to yellow and removed the white border on the hangtag. (Nowlis Report at ¶ 17).

47.     Yet, JDPI is not claiming rights with respect to some of the features changed, such as the use of a front label on the bottle, the font and curved alignment of the lettering on the front of the bottle, the use of the color black for the hangtag, and the square bottle shape when separated from the other elements of the claimed trade dress. (Amended Complaint at p.3-4; Nowlis Report at ¶¶ 15, 18).

48.     JDPI is only claiming rights to the features comprising the trade dress as a whole, not as separate elements. (Ford Dep. at 130: 8:13).

49.     By changing features that JDPI is not claiming rights to, Ford changed the

7

control stimulus beyond what was necessary to control for the characteristics being tested.

50.     The control stimulus used in the Ford Survey was improperly designed.

51.     As a result of changing features to which JDPI is not claiming rights, the Ford Survey failed to account for JDPI's market share. In other words, those respondents who, when handed a whiskey bottle, would say "Jack Daniel's" simply because the product is whiskey (and not because of any of the marks on the bottle) were not controlled for in the Ford Survey.

52.     As a result of the improper control stimulus, only 1% of respondents mentioned Jack Daniel's, which does not account for JDPI's market share, popularity, or consumers' preexisting beliefs regarding whiskey producers.

53.     As a result of the significant differences between the control stimulus and the actual product at issue, Dr. Ford failed to design a control stimulus that adequately accounted for market share, popularity, and preexisting beliefs.

### (b)     Failure to Replicate Marketplace Conditions

54.     In order to properly test for likelihood of confusion, it is important that a consumer survey adequately replicate the respondent's experience in the marketplace. (*See generally* Nowlis Report at ¶¶ 21-24).

55.      The Ford Survey, conducted over the internet, only gave respondents the opportunity to view the product from the front and the back of the product. (Ford Dep. at Nowlis Report at ¶ 21).

56.     The Ford Survey did not permit respondents to view the product from other angles, including from the top, where "BS" would have been viewable, and the bottom where there is a round button from where sound is emitted if the toy is squeezed. (Ford Dep. at 85:24-86:2; Nowlis Report at ¶ 21).

57.     The Ford Survey did not permit respondents to touch, feel, or hold the toy. (Ford Dep. at 242:17-25; at Nowlis Report at ¶ 22).

58.     The Ford Survey did not permit respondents to manipulate the toy so as to be able to read the words on the hangtag. (Ford Dep. at 244:17-245:11; Nowlis Report at ¶ 21).

59.     The Ford Survey did not permit respondents to squeeze the toy, feeling the soft material the toy is made from, and hearing the squeak the toy emits when squeezed. (Ford Dep. at 242:17-25, 243:2-9; Nowlis Report at ¶ 22).

60.     In attempting to replicate marketplace conditions, the Ford Survey used an image of a store display that did not reflect how products would actually be displayed in the marketplace. (Nowlis Report at ¶ 23).

61.     Instead of grouping the toys on display by brand, which is what would typically be found in the marketplace, the Ford Survey displayed the test products on each end of a row with other brands shelved in between. In addition, the Ford Survey displayed dog toys intermingled with treats, which is not consistent with what a consumer would encounter in the marketplace. (Nowlis Report at ¶ 23).

62.     The Ford Survey did not simulate shopping at an actual store because it did not give respondents the opportunity to see, touch, or hear important information available in the actual marketplace. (Nowlis Report at ¶ 24).

63.     In total, each of these flaws resulted in the Ford Survey not adequately replicating the consumer experience in the marketplace when evaluating a product.

64.     These flaws undermine the validity and the usefulness of the Ford Survey as a measure of the likelihood of consumer confusion.

### (c)     Failure to Properly Code and Analyze Data

65.     The Ford Survey failed to consider respondents' responses in the context

of a parody product. (Nowlis Report at ¶ 25).

66.     Dr. Ford instead rejected the idea that the product's status as a parody had any relevance to a survey testing for likelihood of confusion. (Ford Dep. at 186:12-21; Nowlis Report at ¶ 25).

67.     The Ford Survey ignores the subset of consumers who believe that all spoof products must have the permission of the trademark holder. (Nowlis Report at ¶ 25; Ford Dep. at 251:4-24).

68.     Thus, some respondents who recognized that JDPI was not responsible for the toy nevertheless reported a connection because of their beliefs that spoofs require permission from the company being spoofed. For example, one respondent said "Because they are creating a spoof of a real product so I think they would need permission so they don't get sued for copyrights or something like that" after previously stating that the product was put out by "Silly somethings." (Nowlis Report at ¶ 25).

69.     Indeed, the largest group of respondents that Dr. Ford concluded were confused reported that they believed the company making the toy needed authorization or approval. (Nowlis Report at ¶ 26).

70.     Yet, Dr. Ford failed to interpret this response in light of the fact that the dog toy at issue is a parody. (Nowlis Report at ¶ 26).

71.     Instead, Dr. Ford categorized 20 respondents as confused when in reality those respondents recognized and articulated that the toy was made or put out by VIP/Bad Spaniel's/Silly Squeakers. (Nowlis Report at ¶ 27).

72.     Given that respondents recognized the toy was made or put out by VIP/Bad Spaniel's/Silly Squeakers, and only mentioned Jack Daniel's in relation to questions about authorization, it is clear that the Ford Survey ultimately only tested respondents' knowledge of trademark law on the parody products. (Nowlis Report at ¶¶

25, 28).

73.     The Ford Survey's analysis of consumer responses is flawed because it failed to take into account respondents' views on parody products specifically.

As a result of this coding flaw, the Ford Survey cannot adequately demonstrate consumer confusion.

### ii.     No Other Evidence of Confusion

74.     JDPI has no knowledge that there has ever been a real world consumer of the "Bad Spaniels" dog toy confused as to the source or origin of the toy. (Epps Dep. at 126:1-6).

## V.     No Evidence of Fame or Acquired Distinctiveness

75.     To prove fame or acquired distinctiveness of the JDPI Trademarks and the Jack Daniel's Trade dress, JDPI cannot rely on the Ford survey.

76.     Fame surveys differ from confusion surveys. (Ford Dep. at 20:17-25; Nowlis Report at ¶ 8).

77.     Dr. Ford was asked only to conduct a survey to address the issue of likelihood of confusion. (Ford Dep. at 18:2-15).

78.     Dr. Ford was not asked to perform a fame survey. (Ford Dep. at 22:18-22), nor was the survey Dr. Ford conducted offered as a fame survey. (Ford Dep. at 22:4-8).

79.     Fame is tested by asking different questions than those used to test for confusion. (Ford Dep. at 22:9-13; Nowlis Report at ¶ 8).

80.     If Dr. Ford had been asked to perform a fame survey, or test fame, Dr. Ford would have asked different questions than those that were actually used. (Ford Dep. at 22:23-23:4).

81.     The Ford Survey cannot be used to demonstrate that the JDPI trade dress is famous.

82.     Testing for acquired distinctiveness involves asking different questions than those used to test for confusion. (Ford Dep. at 130:23-131:4; Nowlis Report at ¶ 10-11).

83.     Dr. Ford did not test for acquired distinctiveness. (Ford Dep. at 130:10-13, 152:22-153:8).

84.     The Ford Survey cannot be used to demonstrate that the JDPI trade dress has acquired distinctiveness.

## VI.     No Evidence of Harm to JDPI's Reputation

85.     The evidence offered, including the testimony of Dr. Simonson, as well as that of JDPI's representatives, cannot be relied upon to establish that JDPI has experienced harm to its reputation or brand.

### i.     Dr. Simonson's Report Does not Show Harm to JDPI's Reputation

86.     Dr. Itamar Simonson's ("Dr. Simonson") research does not help JDPI establish harm to JDPI's reputation.

87.     Dr. Simonson postulates that the "Bad Spaniels" dog toy is likely to cause dilution because the toy "associates the Jack Daniel's trade dress with defecation" and "this added association effectively tarnishes and harms the brand by adding an unsavory association in consumers' minds." (Simonson Report at ¶ 11).

88.     The thrust of Dr. Simonson's opinion is that the creation in the mind of the consumer of an association between Jack Daniel's and defecation comprises tarnishment because defecation is "disgusting" and it is "likely, consciously or unconsciously, to diminish customers' attraction to and interest in purchasing Jack Daniel's brands." (Simonson Report at ¶ 31).

89.     The critical flaw in Dr. Simonson's opinion, however, is that there is no evidence that a consumer would associate the "Bad Spaniels" dog toy with defecation.

(Silverman Report at ¶ 49-52). Without this link, Dr. Simonson's theory falls apart.

90.     Further, the focus groups conducted at the direction of Bruce Silverman ("Silverman") show that in fact the opposite is true—consumers do not associate the "Bad Spaniels" dog toy with defecation, and it reflects positively on Jack Daniel's in the minds of consumers. (Silverman Report at ¶¶ 43-52).

91.     In each of the focus groups, consumers overwhelmingly felt that the "Bad Spaniels" dog toy was humorous and, if anything, promoted the Jack Daniel's brand. (Silverman Report at ¶¶ 43-52).

92.     Dr. Simonson acknowledged the value of focus groups stating that they provide "useful insights" (Simonson Dep. at 62:7-15) and admitted that the results of a focus group could "provide some useful information" on consumer perceptions of the "Bad Spaniels" dog toy (Simonson Dep. at 102:11-17).

93.     JDPI itself uses focus group studies to develop its packaging, (Hungerford Dep. at 54:18-55:12), and believes that focus groups can be "valuable to gauge the emotional reactions of consumers[.]" (Hungerford Dep. at 129:11-129:15).

94.     Although JDPI acknowledges that focus groups are a useful tool, (Gooder Dep. 77:4-7), and even though JDPI extensively uses focus groups, (Epps Dep. at 83:8-84:11), JDPI did not use a focus group to determine if actual customers believe that Jack Daniel's reputation is harmed as a result of the "Bad Spaniels" dog toy. (Gooder Dep. 77:14-24).

### ii.     No Other Evidence of Harm to JDPI'S Reputation

95.     Representatives of JDPI including Epps and Steven Gooder ("Gooder") concede that JDPI is unaware of any instances of actual harm to JDPI's Reputation.

96.     Instead, JDPI merely alleges that the Bad Spaniels dog toy is likely to damage the reputation of Jack Daniel's. (Gooder Dep. 73:17-23).

97.     Tobey Roush, JDPI's licensing manager, further confirmed the lack of harm to JDPI's reputation when he stated that the reason he thinks the "Bad Spaniels" dog toy reflects poorly on Jack Daniel's is because "it's [their] trademark and its an infringement." (Roush Dep. at 70:20-71:6).

98.     JDPI is not aware of any anecdotal feedback regarding the impact of the "Bad Spaniels" dog toy on Jack Daniel's. (Epps Dep. at 43:17-20, 48: 3-12).

99.     JDPI is not aware of any evidence—either specifically or generally—that there has been a loss in sales as a result of the "Bad Spaniels" dog toy. (Gooder Dep. 74:8-14).

100.    JDPI has no evidence of actual harm to the reputation of Jack Daniel's as a result of the "Bad Spaniels" dog toy. (Gooder Dep. 73:24-74:7; Epps Dep. at 116:15-18).

101.    Instead, JDPI appears to assert that simply because the "Bad Spaniels" dog toy includes what JDPI terms "bad taste messaging" that JDPI's brand is harmed. (Epps Dep. at 116:3-14).

## CONCLUSIONS OF LAW

### I.     Jurisdiction

1.     This Court has jurisdiction because this case arises under the Declaratory Judgment Act, Title 28 U.S.C. § 2201, under the Lanham Trademark Act, 15 U.S.C. § 1121, and under the general federal question jurisdiction of the United States District Courts under 28 U.S.C. § 1331.

2.     This Court has jurisdiction over the subject matter of JDPI's counterclaims under the law of the State of Arizona under 28 U.S.C. §§ 1338(b) and 1367.

### II.    VIP's Claim for Declaratory Judgment

3.     VIP seeks a declaratory judgment that VIP's "Bad Spaniels" dog neither

infringes nor dilutes any JDPI trademark.

4.     The Court may enter a declaratory judgment that "declare[s] the rights and other legal relations" of parties to "a case of actual controversy." 28 U.S.C. § 2201.

5.     To create an "actual controversy," a plaintiff must allege facts that "under all the circumstances, show that there is a substantive controversy, between parties have adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 771 (2007) (citations and quotation marks omitted).

6.     An actual controversy exists if the declaratory action "plaintiff has a real and reasonable apprehension that he will be subject [to suit]." *Societe de Conditionnement en Aluminium v. Hunter Engineering Co.*, 655 F.2d 938, 944 (9th Cir. 1981).

## III.     JDPI's Counterclaims

7.     JDPI's nine counterclaims can be grouped into two categories: infringement and dilution by tarnishment.

8.     JDPI's infringement claims include infringement of: federally-registered JDPI Trademarks and federally-registered Jack Daniel's Trade Dress under the Lanham Act § 32 (First Counterclaim); the Jack Daniel's Trade Dress under the Lanham Act § 43(a) (Second Counterclaim); the JDPI Trademarks under Arizona law (Fifth Counterclaim); the JDPI Trademarks, and for unfair competition, under the common law (Sixth Counterclaim); and the Jack Daniel's Trade Dress under the common law (Seventh Counterclaim).

9.     JDPI's dilution by tarnishment claims include the tarnishment of: the JDPI Trademarks (Third Counterclaim); the Jack Daniel's Trade Dress under federal law (Fourth Counterclaim); the JDPI Trademarks under Arizona law (Eighth Counterclaim);

and the Jack Daniel's Trade Dress under Arizona law (Ninth Counterclaim).

## IV.   Infringement

10.   Infringement under 15 U.S.C. § 1125(a) requires a plaintiff to prove three elements: (1) distinctiveness; (2) nonfunctionality; and (3) likelihood of confusion. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998).

11.   "Because Arizona's trademark infringement statute mirrors the Lanham Act . . . cases interpreting the Lanham Act guide the interpretation of A.R.S. § 44-1451." *Angel's Gate, Inc. v. All-Star Grand Canyon Tours, Inc.*, 2013 WL 12114580, *2 (D. Ariz. 2013).

12.   In its September 27, 2016 Memorandum Decision and Order, Document No. 171 ("Order"), this Court ruled that the JDPI Trademarks and Jack Daniel's Trade Dress are distinctive and non-functional as a matter of law.

13.   Thus, whether VIP's "Bad Spaniels" dog toy infringes upon the JDPI Trademarks and Jack Daniel's Trade Dress in violation of state and federal law turns on whether consumers are likely to be confused as to the source, origin, sponsorship, or affiliation of VIP's "Bad Spaniels" dog toy. 15 U.S.C. § 1125(a).

### A.   Likelihood of Confusion

14.   "'The core element of trademark infringement' is whether the defendant's conduct 'is likely to confuse customers about the source of the products.'" *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 933 (9th Cir. 2015); (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992)).

15.   The Ninth Circuit employs an eight-factor test for evaluating the conflicting marks and determining whether consumers are likely to be confused: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4)

evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product line." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

16.     "The *Sleekcraft* Factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011). In other words, the "eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as imply providing helpful guideposts." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,* 618 F.3d 1025, 1030 (9th Cir. 2010); *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) ("Some factors are much more important than others, and the relative importance of each individual factor will be case-specific.").

17.     Thus, while the *Sleekcraft* factors are important, other factors, including the product's status as a parody product must be considered. *Hard Rock Café Licensing Corp. v. Pacific Graphics, Inc.*, 776 F. Supp. 1454, 1462 (W. D. Wash. 1991) (holding that a mark used as a parody affects the determination as to whether a likelihood of confusion exists for trademark infringement purposes).

18.     Further, likelihood of confusion "is determined on the basis of a reasonably prudent consumer. What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield,* 174 F.3d at 1060 (internal quotations and citations omitted).

19.     Finally, in ascertaining the likelihood of confusion, confusion must "be probable and not simply possible." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2 1215, 1217 (9th Cir. 1987).

**i.    The "Bad Spaniels" Dog Toy as a Parody**

20.    Because the *Sleekcraft* factors are not exhaustive, other variables must come into play depending on the specific factual circumstances. *Multi Time*, 804 F.3d at 936; *Brookfield*, 174 F.3d at 1054 (noting that "non-listed variables may often be quite important").

21.    The fact that a mark is used as a parody affects the determination as to whether a likelihood of confusion exists and permeates the entire confusion analysis. *Hard Rock*, 776 F. Supp. at 1462. *See also Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F. 2d 316, 321 (4th Cir. 1992) (observing that parody alters the likelihood of confusion analysis):

> A true parody actually decreases the likelihood of confusion because the effect of the parody is to create a distinction in the viewer's mind between the actual product and the joke. While a parody must call to mind the actual product to be successful, the same success also necessarily distinguishes the parody from the actual product.

*Mutual of Omaha Ins. Co. v. Novak*, 648 F. Supp. 905, 910 (D. Neb. 1986).

22.    Therefore, it is necessary to evaluate the "Bad Spaniels" Dog Toy as a parody prior to considering the *Sleepcraft* factors.

23.    A successful trademark parody must convey "two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody." *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F. 3d 769, 776 (8th Cir. 1994) (quoting *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F. 2d 490, 494 (2nd Cir. 1989)) (emphasis in original).

24.    "This second message must not only differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement." *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007) (holding that "Chewy Vuiton" dog toys are a successful

1    parody of "Louis Vuitton" handbags and therefore rejecting liability for trademark
2    infringement and dilution).

3        25.    Further, a successful parody must engender "some initial confusion."
4    *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F. 2d at 1486. But, generally, the
5    more "obvious and heavy handed" the parody, the more likely it is to preserve a clear
6    distinction "in the viewer's mind between the source of the actual product and the source
7    of the parody." *Novak*, 648 F. Supp. at 910.

8        26.    The "Bad Spaniels" dog toy is a successful parody of Jack Daniel's
9    whiskey. The pet toy is obviously an intentional and irreverent representation invoking
10   elements of the Jack Daniel's Trademarks and the JDPI Trade Dress. However, it is
11   obviously not the original—the "Bad Spaniels" dog toy includes elements such as "The
12   Old No. 2 on your Tennessee Carpet" and "40% poo by volume." These are the
13   "element[s] of satire, ridicule, joking, or amusement" that *Louis Vuitton* counsel set a
14   parody apart from the original product. *Louis Vuitton*, 507 F.3d at 260.

15               **ii.    Strength of the mark**

16       27.    The strength of the mark is evaluated in terms of its conceptual strength
17   and commercial strength. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th
18   Cir. 2000).

19       28.    A mark's conceptual strength "depends largely on the obviousness of its
20   connection to the good or service to which it refers." *JL Beverage Co., LLC v. Jim Beam
21   Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016). A mark's commercial strength is
22   based on actual marketplace recognition. *Id.*

23       29.    In the case of a parody, "the strength of a famous mark allows consumers
24   immediately to perceive the target of the parody, while simultaneously allowing them to
25   recognize the changes to the mark that make the parody funny or biting." *Louis Vuitton*,
26

19

507 F.3d at 261.

30.     As discussed above, it is clear that the "Bad Spaniels" Dog Toy is a parody that invokes the Jack Daniel's Trade Dress and the JDPI Trademarks. In the case of parody, a mark's popularity and strength are "precisely the mechanism by which likelihood of confusion is avoided." *Louis Vuitton*, 507 F.3d at 260. There is evidence of the strength of the Jack Daniel's brand, including high awareness of the brand. (Epps Dep. at 131:13-22).

31.     Precisely because of the strength of the JDPI Trademarks and the Jack Daniels Trade Dress, confusion is avoided because consumers are more likely to quickly identify the "Back Spaniels" dog toy as a parody product.

32.     And in any event "when the marketplace is replete with products using a using a particular trademarked symbol, it indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will not be confused by its use." *Jim Beam*, 828 F.3d at 1107 (citation omitted).

33.     The evidence shows that a number of other products share elements in common with the Jack Daniels Trade Dress including the bottle shape, the black background, and the white border. Thus, even if the Jack Daniels Trade Dress is strong, because "the marketplace is replete with products" using common elements, the likelihood that consumers will be confused by the "Bad Spaniels" dog toy is decreased.

34.     Finally, as JDPI's expert Dr. Simonson pointed out, "strong brands are better able to withstand interference from competitive advertisements." (Simonson Report at ¶ 24).

35.     This factor weighs against a likelihood of confusion.

### iii.     Proximity of the goods

36.     "When goods are related or complementary, the danger of consumer

20

confusion is heightened." *Gallo Cattle*, 967 F.2d at 1291; *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1082 (9th Cir. 2005).

37.    "The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." *Sleekcraft*, 599 F.2d at 354.

38.    The proximity of goods is measured by whether the products are "(1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011).

39.    "When the parties' products do not compete to any extent whatsoever, the likelihood of confusion will probably be remote." *Multifab, Inc. v. ArlanaGreen.com*, 122 F. Supp. 3d 1055, 1063 (E.D. Wash. 2015) (finding this factor cut against a finding of confusion when products at issue were dramatically dissimilar, and noting, for example, that "a reasonably prudent consumer would probably not confuse a firearms website entitled 'gunsrus.com' with the 'Toys 'R' Us' trademark because the products are so dissimilar.").

40.    The evidence indicates that the goods at issue are totally dissimilar. JDPI products are, by design, premium whiskey products and JDPI carefully licenses out the Jack Daniel's Trade Dress and the JDPI Trademarks to protect and promote its status as a premium brand. In contrast, VIP produces comical dog toys available at ordinary pet stores. The risk that a consumer would encounter both JDPI and VIP products adjacent to each other on a shelf is minimal if it exists at all, and it is even more unlikely that a consumer encountering a dog toy would believe it to be a JDPI product.

41.    This factor weighs against a likelihood of confusion.

    **iv.    Similarity of the marks**

21

42.     While the similarity of the marks at issue is typically a "critical" question in the likelihood of confusion analysis, "the marks must be considered in their entirety and as they appear in the marketplace." *Jim Beam*, 828 F.3d at 1109 (citation omitted). Further, the "use of a housemark can reduce the likelihood of confusion." *Sleekcraft*, 599 F.2d at 351.

43.     Considering a mark in its entirety and how it appears in the marketplace requires consideration of the mark as a parody product. A junior mark must "conjure up the original" "for there to be a parody at all." *See Tommy Hilfiger Licensing v. Nature Labs*, 221 F. Supp. 2d 410, 417 (S.D.N.Y. 2002) (noting the visual and phonetic similarities between the famous "Tommy Hilfiger" perfume brand and the allegedly infringing "Tommy Holedigger" pet perfume). The "whimsical substitution of the dog-related pun"—Bad Spaniels—on a chew toy conveys "a joking variation" on Jack Daniel's. *Id*.

44.     In other words, in the context of a parody, similarity of marks is necessary because "that is the essence of a parody—the invocation of a famous mark in the consumer's mind, so long as the distinction between the marks is also readily recognized. While a trademark parody necessarily copies enough of the original design to bring it to mind as a target, a successful parody also distinguishes itself and, because of the implicit message communicated by the parody, allows the consumer to appreciate it." *Louis Vuitton*, 507 F.3d at 262.

45.     Thus, the similarity between the "Bad Spaniels" dog toy, and the Jack Daniel's Trade Dress, and the JDPI Trademarks does not cause consumers to be confused, but instead reduces confusion by allowing consumers to grasp the parody.

46.     This factor weighs against a likelihood of confusion.

### v.     Evidence of actual confusion

22

47.    Evidence of actual prior confusion can be persuasive as to whether future confusion is likely. *Sleekcraft*, 599 F.2d at 352; *Gallo Cattle*, 967 F.2d at 1292.

48.     However, where there has been ample opportunity for confusion, lack of evidence about actual confusion "'can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion.'" *Cohn v. PetSmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002) (quoting *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 228 (2d Cir. 1999)); *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1093 (C.D. Cal. 2003); *Brookfield,* 174 F.3d at 1050 ("We cannot think of more persuasive evidence that there is no *likelihood* of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what.").

49.    Actual confusion can be established by (1) producing the testimony of consumers that have been confused; or (2) producing a consumer survey that shows consumers are actually confused. *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 902 (9th Cir. 2002).

50.    Despite years of concurrent sales, JDPI has presented no evidence of actual confusion. JDPI itself concedes that it is unaware of any actual instances of confusion, and it concedes that it did not perform a survey or test to evaluate actual confusion.

51.    JDPI's proffer of Dr. Ford's expert testimony and report does not warrant a different conclusion. First, Dr. Ford was not surveying or testing for actual confusion, but rather only the likelihood for confusion. Second, even if Dr. Ford's survey could be construed as evaluating actual confusion, the survey's methodology suffers from flaws which render its results unreliable. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("Once the survey is admitted, however, follow-on issues of

methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey. . . .").

52.     Dr. Ford's survey was flawed in several ways, all of which impaired its credibility on the issue of actual confusion. Most apparent is Dr. Ford's failure to properly design a control stimulus which adequately accounted for JDPI's marketshare. In light of JDPI's own testimony that its aided brand awareness and unaided brand awareness are both greater than 80% and the highest in the industry, Dr. Ford's failure is particularly detrimental to the usefulness, and thus the weight attributed to Dr. Ford's survey.

53.     This factor weighs against a likelihood of confusion.

### vi.     Marketing channels used

54.     "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). "Marketing channels can converge even when different submarkets are involved so long as 'the general class of . . . purchasers exposed to the products overlap.'" *Id.* (internal citations omitted).

55.     Because dog toys neither fit in with the premium brand quality JDPI cultivates, and because JDPI does not sell its products via the same channels that the majority of the "Bad Spaniels" dog toys are sold through, there is not a convergence of marketing channels which is likely to result in increased confusion.

56.     This factor weighs against a likelihood of confusion.

### vii.    Type of goods and degree of care likely to be exercised by the purchaser

57.    A consumer exercising a great deal of care would be less likely to be confused as to the source of the product. "In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 634 (9th Cir. 2005) (internal citation omitted).

58.    It is exceedingly unlikely, even with a lesser exercise of care used, that a consumer would mistake the parties' goods for one another. First, the "Bad Spaniels" dog toy and Jack Daniel's whiskey do not sit next to each other on a grocery store shelf waiting for an unsuspecting customer to make an impulsive purchase as between the two products. This eliminates the opportunity for the consumer to reach for the "Bad Spaniels" dog toy when in actuality they think they are grabbing Jack Daniels' whiskey. Second, a purchaser of a dog toy would not pick up a bottle of whiskey thinking it is the dog toy, and vice versa. The nature of the differences in the products at issue here suggests that even a consumer acting with little care would still be able to distinguish the two products.

59.    This factor weighs against a likelihood of confusion.

### viii.    Defendant's intent in selecting the mark

60.    When there is no actual evidence of intent to deceive and the potential infringer has acted in good faith, this factor is less probative of the likelihood of confusion. *Sleekcraft*, 599 F.2d at 354. An intent to parody is not an intent to confuse the public. *Jordache*, 828 F.2d at 1486. Thus, a junior mark holder's choice to create a parody using similar mark does not, by itself, support an inference that the junior mark holder intended to deceive the public. *Id.*

61. JDPI presented no evidence that VIP intended to deceive the public as to the source of the "Bad Spaniels" dog toy. The evidence shows only that VIP intended the "Bad Spaniels" dog toy to be a parody product invoking elements of the JDPI Trademarks and the Jack Daniel's Trade dress. VIP's creation of a parody product does not warrant an inference of an intent to deceive the public.

62. This factor weighs against likelihood of confusion.

### ix. Likelihood of expansion of the product line

63. This factor turns on whether the allegedly infringing mark is hindering the senior trademark holder's expansion plans. *Surfvivor*, 406 F.3d at 634.

64. JDPI has adduced no evidence demonstrating an intent to expand its product line into pet toys, while VIP has offered evidence showing that JDPI has concerns about its marks being used in connection with "toys" because they do not have the requisite "premiumness" JDPI desires. Further, Roush testified that JDPI does premium products. They "wouldn't do a toy for fear that it might be confused as a kid's toy." (Roush Dep. at 75:10-16).

65. This factor weighs against likelihood of confusion.

### x. Conclusion on *Sleekcraft* Factors

66. The "Bad Spaniels" dog toy is a parody of Jack Daniel's whiskey, and this conclusion fundamentally alters the likelihood of conclusion analysis under *Sleekcraft*. Because the dog toy is a parody, there is obviously a similarity between the marks which, in the absence of a parody, could be considered confusion. However, the strength of the Jack Daniel's Trade Dress and the JDPI marks reduces the likelihood significantly that a consumer would be confused by VIP's product, given its humorous and irreverent nature. While VIP obviously intended to "conjure up" the Jack Daniel's Trade Dress and the JDPI Trademarks with its "Bad Spaniels" dog toy, it lacked the intent to confuse

consumers, and instead was intended to make a joke.

67.     That there is no significant likelihood of confusion is further supported by the fact that the goods are so significantly dissimilar (whiskey versus dog toys), primarily sold via through different retailers, marketed through different channels and to different target markets, and that JDPI has renounced any effort to expand in the future into dog toys. Further, there is no evidence whatsoever of any actual confusion. Finally, even if a consumer lacks care in selecting a product, there is no meaningful risk that a consumer would select the dog toy thinking its whiskey, or vice versa.

68.     On balance, the *Sleekcraft* factors weigh against a finding of likelihood of confusion. Because there is no likelihood of confusion, JDPI has failed to prove its claims for trademark infringement.

## V.     Dilution by Tarnishment

69.     The Trademark Dilution Revision Act of 2006 ("TDRA") provides protection against the dilution of a trademark: 15 U.S.C. § 1125(c)(1)).

70.     "For this reason, protection from dilution extends only those whose mark is a 'household name.'" *Clearly Food & Bev. Co., Inc. v. Top Shelf Bevs., Inc.*, 102 F. Supp. 3d 1154, 1176 (W.D. Wash. 2015) (quoting *Nissan Motor Co. v. Nissan Comp. Co.*, 378 F.3d 1002, 1011 (9th Cir. 2004)).

71.     The TDRA recognizes two forms of dilution: dilution by blurring and dilution by tarnishment. 15 U.S.C. § 1125(c)(1). JDPI is only asserting a claim of dilution by tarnishment here.

72.     To prove dilution by tarnishment in violation of the TDRA, the party asserting the violation must show that there is an association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark. 15 U.S.C. § 1125(c)(2)(C). Stated differently, the elements necessary to

prove a claim for dilution by tarnishment are (1) sufficient similarity between the junior and senior marks; (2) the senior mark is famous; (3) harm to the senior mark resulting from the association between the two marks.

73.     "The elements necessary to prove a state law trademark dilution counterclaim are basically identical." *Moab Industries, LLC v. FCA US, LLC*, 2016 WL 5859700, *8 (D. Ariz. 2016).

**A.      Whether the JDPI Trademarks, Jack Daniel's Trade Dress, and the "Bad Spaniels" dog toy are sufficiently similar**

74.     The "considerations for determining similarity for dilution have not been clearly defined." *Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*, No. C12-1853-RSM, 2013 WL 1196948, at *9 (W.D. Wash. Mar. 25, 2013).

75.     Thus, to resolve the question of similarity, we look to "the factors of appearance, sound[,] and meaning which are relevant in evaluating infringement are also relevant [under this inquiry]." *Nordstrom,* 2013 WL 1196948, at *9.

76.     However, as discussed above, the "Bad Spaniels" dog is necessarily similar to the JDPI Trademarks and Jack Daniel's Trade Dress.

**B.      Whether the JDPI Trademarks and Jack Daniel's Trade Dress are famous**

77.     "Protection from dilution is a cause of action 'reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value.'" *Clearly Food*, 102 F. Supp. 3d at 1176 (quoting *Nissan*, 378 F.3d at 1011).

78.     For this reason, dilution protection extends only to those whose mark is a "household name." *Trek Bicycle*, 305 F.3d at 911.

79.     To determine whether a mark possesses the requisite degree of recognition for protection, the court may consider all relevant factors including: "(i) The duration,

extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) The extent of actual recognition of the mark; (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." 15 U.S.C. § 1125(c)(2).

80.     Simply marketing goods worldwide is not sufficient to establish fame. Nor is expending substantial sums on advertising. *Avery*, 189 F.3d at 878–79.

81.     Further, in the absence of evidence of actual consumer recognition, "significant annual volume of sales" is insufficient to establish fame. *Avery*, 189 F.3d at 879.

82.     Finally, "registration alone does not demonstrate fame." *House of Bryant Publ'ns v. Lake City*, 30 F. Supp. 3d 711, 715 (E.D. Tenn. 2014) (finding that plaintiff failed to show "famousness," despite having registered its mark for nine different categories of goods and services); *see, e.g.*, *Maker's Mark*, 703 F. Supp. 2d at 699 (finding that plaintiff's registered trade dress was not famous).

83.     In order to prove fame, a party must prove actual consumer recognition of the mark, and a party's failure to introduce evidence of actual recognition will weigh against a finding that the mark at issue is famous. *Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1138 (N.D. Cal. 2008).

84.     In other words, in the absence of direct evidence of actual consumer recognition of the mark, substantial expenditures on advertising, marketing worldwide, and "significant annual volume of sales," are insufficient to prove fame. *Avery*, 189 F.3d at 878–79 ("Avery Dennison argues that evidence of extensive advertising and sales, international operations, and consumer awareness suffices to establish fame. We

agree that the remaining four statutory factors in the famousness inquiry likely support Avery Dennison's position. Both "Avery" and "Dennison" have been used as trademarks for large fractions of a century and registered for decades. Avery Dennison expends substantial sums annually advertising each mark, with some presumable degree of success due to Avery Dennison's significant annual volume of sales. In addition, Avery Dennison markets its goods internationally. *See* 15 U.S.C. § 1125(c)(1)(B)-(D), (G). However, we disagree that Avery Dennison's showing establishes fame.").

85.   VIP does not contest the validity of JDPI's registrations; however, that JDPI's marks are registered is not dispositive as to whether those marks have the requisite degree of fame.

86.   As evidence of fame, JDPI only offers its history of sales and its multimillion dollar expenditures on marketing and advertising. However, the law is clear that these metrics alone are insufficient to establish whether a mark or marks are famous.

87.   JDPI has presented no evidence that it tested for and measured actual recognition of the JDPI Trademarks and the Jack Daniel's Trade Dress.

88.   Dr. Ford's survey tested for likelihood of confusion only, and not fame.

89.   JDPI has offered no other credible evidence demonstrating the extent of actual recognition of the JDPI Trademarks and the Jack Daniel's Trade Dress.

90.   In the absence of such evidence, JDPI has failed to meet its burden to prove that JDPI Trademarks and the Jack Daniel's Trade Dress are famous.

**C.   Whether JDPI's marks are likely to experience reputation harm by VIP's "Bad Spaniels" product**

91.   As a general principle, dilution by tarnishment "is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. 1125(c)(2)(C).

92.   In determining whether the junior mark "harms the reputation of the

famous mark," courts generally consider whether the senior mark "is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Nordstrom*, 2013 WL 1196948, at *11 (citing *Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d 93, 111 (2d Cir. 2010)); *Playmakers, LLC v. ESPN, Inc.,* 297 F.Supp.2d 1277, 1285 (W.D.Wash. 2003) ("'Tarnishment' is a form of dilution in which the junior user places the famous mark in a bad light, generally one that involves sexual activity, obscenity, or illegal activity.").

93.    "[T]he relevant inquiry is how the junior mark's product affects the positive impressions about the famous mark's product, and not whether a consumer simply associates a negative sounding junior mark with the famous mark." *Nordstrom*, 2013 WL 1196948, at *11.

94.    In evaluating the likelihood of harm, "[c]onsiderations such as complaints, reduction in sales, loss of customers, and negative press are all relevant to the overall determination." *Nordstrom*, 2013 WL 1196948, at *13.

95.    A finding of harm is a fact-specific inquiry. *Nordstrom*, 2013 WL 1196948, at *12.

### i.    JDPI's Lack of Evidence

96.    There is no evidence on the record that the "Bad Spaniels" dog toy has resulted in complaints to JDPI, reduced sales, lost customers, or negative press, or any other negative result.

97.    Further, JDPI's agreement to run an advertisement in Playboy Magazine in 2013 undermines any argument that JDPI is concerned about the creation of "unwholesome" or "unsavory" associations.

98.    JDPI appears to be relying only on its opinion and speculation that the "Bad Spaniels" dog toy will have a negative impact on JDPI's reputation.

99.   Dr. Simonson's opinion is based on speculation and does not amount to sufficient evidence to show actual harm to JDPI's reputation.

### ii.   VIP's Evidence

100.   In contrast, VIP has offered evidence which shows that there is no harm to JDPI's brand and reputation.

101.   First, there is evidence that JDPI's concerns about "unsavory" associations ebb and flow, as JDPI has chosen to advertise in Playboy magazine as well as sponsor events at the Playboy Mansion. (Epps Dep. at 50:11-51:7, 64:17-18).

102.   Second, VIP's offered evidence includes Mr. Silverman's expert opinion which was reached in part based on the results of a focus group. That evidence clearly shows consumers were left with a favorable impression of Jack Daniel's upon seeing the "Bad Spaniels" dog toy.

103.   JDPI challenges that evidence on the basis that the focus group was an improperly conducted survey.

104.   "Focus groups are a research method whereby consumers from the target market are led through a discussion regarding a particular topic. Focus groups give insight as to why and how consumers use a product or service, what is important to them in choosing a particular brand, what they like and don't like about various products or services, and any special needs they might have that aren't being satisfied." (Silverman Report at ¶ 27).

105.   While focus group evidence may not be dispositive, it is admissible and probative of the existence of harm to JDPI's brand and reputation. *Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc.*, 1994 WL 529331, *6–*8 (N.D. Ill. Sept. 27, 1994).

106.   Further, JDPI cannot seriously contest the usefulness of focus groups in

light of its extensive use of focus groups in its own product development.

107.   Because JDPI has the burden to prove harm to its reputation in order to establish dilution by tarnishment, its failure to produce any evidence at all of actual harm is fatal to its dilution by tarnishment claim. This conclusion is further bolstered by the testimony of Mr. Silverman and the results of the focus group concluding that "Bad Spaniels" dog toy actually left consumers with a positive view of Jack Daniel's.

## CONCLUSION

108.   VIP produced a parody product that does not infringe on JDPI's trademarks or trade dress. JDPI failed to establish that there is a likelihood of confusion caused by VIP's product and for this reason, JDPI's infringement claims fail. As for JDPI's dilution by tarnishment claims, JDPI has failed to show any evidence at all of harm to its reputation or brand as a result of VIP's dog toy. If anything, the evidence establishes that consumers had favorable impressions of JDPI as a result of VIP's product which belies any notion of harm. For this reason, JDPI's claims for dilution by tarnishment fail. Finally, VIP is entitled to a declaratory judgment that its products do not infringe upon JDPI's trademarks or trade dress for the same reasons that JDPI's claims fail.

**DATED** this 15th day of September, 2017.

**DICKINSON WRIGHT PLLC**

By: *s/David Bray*
　　　David G. Bray
　　　David N. Ferrucci
　　　1850 North Central Avenue, Suite 1400
　　　Phoenix, Arizona 85012-2705
　　　*Attorneys for VIP Products, L.L.C.*

33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### CERTIFICATE OF SERVICE

I hereby certify that on September 15th, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/Janet Hawkins*

PHOENIX 53913-11 396733v1