QUARLES & BRADY LLP
Gregory P. Sitrick
Gregory.Sitrick@quarles.com
Isaac S. Crum
Isaac.Crum@quarles.com
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 229-5317
Facsimile: (602) 420-5198

HARVEY & COMPANY
D. Peter Harvey (admitted *pro hac vice*)
pharvey@harvey.law
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111-4164
Phone: (415) 926-7776
Fax: (415) 402-0058

Attorneys for Defendant and Counterclaimant
JACK DANIEL'S PROPERTIES, INC.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP PRODUCTS, LLC,<br><br>                 Plaintiff,<br><br>        v.<br><br>JACK DANIEL'S PROPERTIES, INC.,<br><br>                 Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. CV-14-2057-PHX-SMM<br><br>**JACK DANIEL'S PROPERTIES, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to Court Order (Doc. No. 189), Defendant and Counterclaimant Jack Daniel's Properties, Inc. ("Jack Daniel's") submits these Proposed Findings of Fact and Conclusions of Law in this case against Plaintiff and Counterclaim Defendant VIP Products, LLC ("VIP").

## PROCEDURAL BACKGROUND

In September 2014, VIP sued Jack Daniel's seeking a declaration that its "Bad Spaniels" dog chew toy product does not violate any trademark or trade dress rights of Jack Daniel's. (Doc. Nos. 1 ¶¶ 7-16, 49 ¶¶ 47-49.) In December 2014, Jack Daniel's counterclaimed for infringement and dilution by tarnishment under state and federal law. (Doc. No. 15-1 ¶¶ 20-63.) Specifically, Jack Daniel's alleged that VIP's "Bad Spaniels" product infringes the JACK DANIEL'S trademark, the OLD NO. 7 trademark (together, the "Jack Daniel's Trademarks") and the Jack Daniel's Trade Dress[1], which exist at common law and appear on the Principal Register. (Doc. No. 15-1 ¶¶ 20-29, 42-53.) Jack Daniel's also alleged that VIP's "Bad Spaniels" product tarnishes the Jack Daniel's Trademarks and the Jack Daniel's Trade Dress, which are famous in the United States of America and the State of Arizona. (Doc. No. 15-1 ¶¶ 30-41, 54-63.)

VIP's answer denied each counterclaim. (Doc. No. 20 ¶¶ 21-63.) Among other affirmative defenses, VIP asserted that its product "is a protected parody under the First Amendment of the United States Constitution." (Doc. No. 20 ¶ 67.) In May 2015, VIP broadened its original complaint by adding two new claims. The first sought a declaration that the Jack Daniel's Trade Dress and the Jack Daniel's Bottle Design shown in United States Trademark Registration No. 4,106,178 (the "'178 Registration") were functional, merely ornamental, decorative and/or generic. (Doc. No. 49 ¶¶ 50-56.) The

---

[1] The Jack Daniel's Trade Dress comprises a square bottle with a ribbed neck, a black cap, a black neck wrap closure with white printing bearing the OLD NO. 7 mark, and a black front label with white printing and a filigreed border bearing the JACK DANIEL'S trademark depicted in arched lettering at the top of the label, the OLD NO. 7 trademark contained within a filigreed oval design in the middle portion of the label beneath the JACK DANIEL'S trademark, and the words Tennessee Sour Mash Whiskey in the lower portion of the label, with the word "Tennessee" depicted in script. (Doc. No. 15-1 ¶ 6.)

second sought cancellation of the '178 Registration.  (Doc. No. 49 ¶¶ 57-62.)  VIP also amended its answer, claiming not only that Jack Daniel's asserted trademark and trade dress rights were functional, merely ornamental, merely descriptive and/or generic, but also that VIP's "Bad Spaniels" product was a nominative fair use, as well as an expressive fair use under the First Amendment.  (Doc. No. 50 ¶¶ 66-67, 69-70.)

Following the close of discovery, the parties cross-moved for partial and complete summary judgment.  On September 27, 2016, the Court dismissed VIP's new claims and denied VIP's challenges to the validity, enforceability, and registration of the Jack Daniel's Trademarks, the Jack Daniel's Trade Dress, and the Jack Daniel's Bottle Design.  (Doc. No. 171 at 1-2, 31-33.)  Among other things, the Court:

- Rejected VIP's First Amendment fair use defense as a matter of law, because the "Bad Spaniels" product "is not an expressive work," and because "VIP makes trademark use of its adaptations of JDPI's trademarks and the Jack Daniel's trade dress to sell a commercial product, its novelty dog toy" (*id.* at 9-10);

- Rejected VIP's nominative fair use defense as a matter of law (*id.* at 8);

- Rejected VIP's aesthetic and utilitarian functionality defenses as a matter of law (*id.* at 16-17);

- Rejected VIP's fair use defense under the Trademark Dilution Revision Act, because "[u]nder the facts here, VIP did use its Bad Spaniel's trademark and trade dress as source identifiers of its dog toy" (*id.* at 21);

- Affirmed that the Jack Daniel's Bottle Design is a "source identifier for Jack Daniel's whiskey" as a matter of law, is not generic, is not functional, and has "acquired distinctiveness through secondary meaning" (*id.* at 12, 15-18); and

- Refused to cancel the '178 Registration covering the Jack Daniel's Bottle Design (*id.* at 33).

The issues remaining for trial are whether VIP's "Bad Spaniel's" product infringes

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

or tarnishes the Jack Daniel's Trademarks and Trade Dress.

## PROPOSED FINDINGS OF FACT

1.      Plaintiff VIP Products, LLC is an Arizona limited liability company with its principal place of business at 16515 S. 40th Street, Suite 121, Phoenix, Arizona 85048. (Doc. Nos. 49 ¶ 1, 204-1 Exh. A # 5.)

2.      Defendant Jack Daniel's Properties, Inc. is a Delaware corporation with its principal place of business at 4040 Civic Center Drive, Suite 528, San Rafael, California 94903.  (Doc. Nos. 1 ¶ 2, 15-1 ¶ 2.)

## THE JACK DANIEL'S TRADEMARKS AND TRADE DRESS

3.      Jack Daniel's owns and licenses the trademarks and trade dress used in connection with Jack Daniel's products.  (Doc. Nos. 105 ¶¶ 1-2, 204-1 Exh. A # 2.)

4.      Jack Daniel's Tennessee whiskey has been sold in the United States continuously since at least 1875, except during Prohibition.  Jack Daniel's Tennessee whiskey is one of the oldest, best-recognized, and longest-selling consumer products in American history. (*See* Doc. No. 105 ¶¶ 4-5; U.S. Trademark Reg. No. 42,663.)

5.      Jack Daniel's Tennessee whiskey has borne the JACK DANIEL'S trademark and the OLD NO. 7 trademark since 1875.  (*See* U.S. Trademark Reg. Nos. 42,663, 582,789, 1,923,981.)

6.      For many decades, Jack Daniel's Tennessee whiskey has been continuously offered under the Jack Daniel's Trade Dress shown on the right, without material modification:
(Doc. No. 105 ¶ 4)

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## JACK DANIEL'S ADVERTISING AND SALES

7.      Jack Daniel's has been the best-selling whiskey in the United States since 1997. (Doc. No. 105 ¶ 5.)

8.      Jack Daniel's whiskey is sold through liquor stores, grocery stores, mass merchants, airlines, and duty-free stores (collectively, "off-premise accounts"), as well as bars and restaurants (collectively, "on-premise" accounts).  (Doc. No. 105 ¶ 5.)

9.      In the United States, between 1997 and April 30, 2015, Jack Daniel's Tennessee whiskey sales exceeded seventy-five million (75,000,000) cases, and resulting revenues exceeded ten billion dollars ($10,000,000,000).  The vast majority of these sales and revenues can be attributed to whiskey bearing the Jack Daniel's Trade Dress.  (Doc. No. 105 ¶ 6.)

10.     Print advertising for Jack Daniel's whiskey commenced in the United States in the 1950s and continues today, making it one of the longest-running consumer advertising campaigns in American history.  (Doc. No. 105 ¶ 7.)

11.     Print advertising highlighting the Jack Daniel's Trade Dress has appeared in a wide variety of publications, including national magazines, local magazines, newspapers, trade publications, and event programs.  (Doc. No. 105 ¶ 7, Exh. 2.)

12.     Many hundreds of millions of dollars have been expended to advertise and promote Jack Daniel's whiskey in the United States since 1997.  (Doc. No. 105 ¶ 7.)

13.     During the past several years, Jack Daniel's advertising efforts have focused on television, digital media, and out-of-home ("OOH") channels, such as billboards.  (Doc. No. 105 ¶ 8.)

14.     The Jack Daniel's Trade Dress has been highlighted in most such television and digital media advertising, and it is the focal point of such OOH advertising.  (Doc. No. 105 ¶¶ 8–9, Exhs. 3-4.)

15.     For the past several years, the annual budget to advertise and promote Jack Daniel's whiskey on television, in digital media, and through OOH advertising has exceeded $15,000,000.  (Doc. No. 105 ¶ 8.)

16.     The Jack Daniel's Trade Dress has appeared in numerous motion pictures seen by many millions of Americans, including the following: Raiders of the Lost Ark, A Few Good Men, Mystic River, Waterworld, Pearl Harbor, Any Which Way You Can, Fisher King, Gone in 60 Seconds, Mr. Mom, Platoon, The Shining, Man on Fire, Guarding Tess, The Bridges of Madison County, Rock Star, Almost Famous, The Hard Way, The Flintstones, Blue Steel, Nobody's Fool, Lethal Weapon 3, Animal House, Goldeneye, Rock of Ages, Ted, and Won't Back Down, and the product has been referenced in many other films such as Hud, Basic Instinct, Gran Torino, Rainmaker, Monster's Ball, and Christmas Vacation.  (Doc. No. 105 ¶ 10, Exh. 5.)

17.     The Jack Daniel's Trade Dress has appeared in numerous television programs, including Treme, True Blood, The Office, Psych, 30 Rock, Bored to Death, Bar Rescue, New Girl, Two Broke Girls, Justified, and Criminal Minds.  (Doc. No. 105 ¶ 10, Exh. 6.)

18.     The Jack Daniel's Trade Dress has been shown in countless other programs and publications.  It has also been featured in many photographs with celebrities and entertainers such as Frank Sinatra and Mick Jagger.  (Doc. No. 105 ¶ 11, Exh. 7.)

19.     The Jack Daniel's Trade Dress is prominently featured at jackdaniels.com, which was visited more than four million (4,000,000) times during 2014.  (Doc. No. 105 ¶ 12, Exh. 8.)  The Jack Daniel's Trade Dress is also prominently featured on social media pages for the brand, including a Facebook page that has been "liked" over sixteen million (16,000,000) times.  (Doc. No. 105 ¶ 12, Exh. 9.)  The Jack Daniel's Trade Dress has also been embodied in countless promotional items.  (Doc. No. 105 ¶ 6, Exh. 1.)

20.     The "Jack Daniel's Experience"—a traveling exhibit which often includes a giant inflatable version of the Jack Daniel's Trade Dress—has appeared at popular events across the country, like music festivals and motorcycle rallies.  (Doc. No. 105 ¶ 11.)

21.     The historic Jack Daniel Distillery in Lynchburg, Tennessee, which has been in operation since the 19th Century, has offered tours of its facility for many years.  There were about 270,000 visitors during 2014.  The Jack Daniel's Trade Dress is displayed during various parts of the tour and elsewhere at the distillery.  (Doc. No. 105 ¶ 13.)

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

22.     According to Jack Daniel's internal records, aided awareness of the Jack Daniel's brand is consistently around 98% and unaided awareness of the Jack Daniel's brand is consistently above 80%.  (Doc. No. 105 ¶ 5.)

## JACK DANIEL'S LICENSED USES

23.     Jack Daniel's has maintained an active brand licensing program for many years. (*See* Doc. No. 105 Exh. 1; Roush Tr. 4:10-15, 39:4-11; U.S. Trademark Reg. Nos. 4,372,885, 4,481,424, 4,478,408, 4,526,056, 4,481,425, 4,354,330, 4,491,564, 3,055,481, 2,867,158.)

24.     Through this licensing program, the Jack Daniel's Trademarks and Trade Dress have collectively appeared on thousands of offerings, other than whiskey, including food, apparel, and pet products.  (Roush Tr. 61:3-24, 66:21-67:8.)  Currently, Jack Daniel's offers JACK DANIEL'S-branded dog leashes and collars, dog beds and dog houses.

25.     Notably, the JACK DANIEL'S trademark has been continuously used on dog accessories since long before the events giving rise to this case.  (Roush Tr. 61:3-24)

26.     Jack Daniel's remains a whiskey business first and foremost.  Accordingly, Jack Daniel's has not licensed its brand for use with toys that might appeal to children.  Jack Daniel's is "very focused on responsibility and not letting products . . . get to anybody under legal drinking age."  (Roush Tr. 75:10-16.)

## JACK DANIEL'S FEDERAL REGISTRATIONS

### Bottle Design Registration

27.     Jack Daniel's owns numerous federal registrations bearing the Jack Daniel's Trademarks, the Jack Daniel's Trade Dress, and specific elements thereof.  (*See* Doc. No. 204-1 Exh. A # 2.)

28.     **Trial Exhibit J003** is a true and correct copy of United States Trademark Registration No. 4,106,178, which issued on Feb. 28, 2012, covers alcoholic beverages, namely, distilled spirits, and depicts the Jack Daniel's Bottle Design shown below.

*//*

*//*

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW



29.     This mark has been used in commerce continuously since at least as early as June 30, 2011.  (*Id.*)

### Label Registration

30.     **Trial Exhibit J005** is a true and correct copy of United States Trademark Registration No. 2,789,278, which issued on December 2, 2003, covers alcoholic beverages, and depicts the mark shown below.



31.     This mark has been used in commerce continuously since at least as early as December 31, 1991. (*Id.*)  It is incontestable under the provisions of 15 U.S.C. § 1065.

//

//

//

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Jack Daniel's Word Mark Registration # 1

32.     **Trial Exhibit J007** is a true and correct copy of United States Trademark Registration No. 1,923,981, which issued on October 3, 1995, covers whiskey, and consists of the JACK DANIEL'S word mark.

33.     This mark has been used in commerce continuously since at least as early as 1875, except during Prohibition.  (*Id.*)  It is incontestable under the provisions of 15 U.S.C. § 1065.

### Jack Daniel's Word Mark Registration # 2

34.     **Trial Exhibit J009** is a true and correct copy of United States Trademark Registration No. 582,789, which issued on November 24, 1953, covers whiskey, and depicts the stylized mark shown below.



35.     This mark has been used in commerce continuously since at least as early as 1875, except during Prohibition.  (*Id.*)  It is incontestable under the provisions of 15 U.S.C. § 1065.

### Old No. 7 Registration

36.     **Trial Exhibit J011** is a true and correct copy of United States Trademark Registration No. 42,663 which issued on May 25, 1904, covers whiskey, and depicts the mark shown below.



//

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

37.    This mark has been used in commerce continuously since at least as early as 1875, except during Prohibition.  (*Id.*)  It is incontestable under the provisions of 15 U.S.C. § 1065.

**Merchandise and Accessory Registrations**

38.    **Trial Exhibits J013, J015, J017, J019, J021, J023, J025, J027** and **J029** are true and correct copies of the following United States Trademark Registrations which issued on the dates indicated below and which cover the goods specified below:

| Registration No. | Goods Specified | Registration Date |
|---|---|---|
| 4,372,885 | Decorative magnets, decorative switch plate covers, cell phone cases. | 7/23/2013 |
| 4,481,424 | Ornamental lapel pins, clocks, watches, cuff links, necklaces and bracelets. | 2/11/2014 |
| 4,478,408 | Umbrellas, luggage, duffel bags, athletic bags, backpacks, luggage tags, key cases, knapsacks, tote bags and all purpose canvas carrying bags for use as luggage or in travel and sports. | 2/4/2014 |
| 4,526,056 | Footwear; headwear including caps, hats, cowboy hats, headbands, straw hats, visors, bandannas; clothing, namely, aprons, sleeve garters, t-shirts, golf shirts, work shirts, baseball shirts, woven shirts, shirts, tops, tank tops, sweatshirts, sweatpants, jogging suits, pants, dresses, skirts, sleep pants, pajamas, robes, shorts, jeans, jackets, coats, belts, neckties, neckwear, scarves, suspenders, leather jackets, rain suits, vests, parkas, gloves. | 5/6/2014 |
| 4,481,425 | Belt buckles and clasps for clothing, all made of non-precious metal; ornamental novelty pins. | 2/11/2014 |
| 4,354,330 | Floor mats; rugs. | 5/31/2011 |
| 4,491,564 | Cigarette lighters not of precious metal. | 3/4/2014 |
| 3,055,481 | Posters. | 1/31/2006 |

| 2,867,158 | Glass and plastic drinking containers, namely flasks, ceramic mugs, ceramic pitchers, ceramic jugs; sponges for household purposes, wood coasters, cork coasters, swizzle sticks, bowls, decorative boxes made of non-precious metal, food containers and thermal insulated containers for food or beverages, glassware for beverages, and serving trays of non-precious metals. | 7/27/2004 |
|---|---|---|

39.     Collectively, these registrations are referred to as the "Merchandise and Accessory Registrations." Each depicts the mark shown below:



(*Id.*)

40.     This mark has been used in commerce with the goods specified in the Merchandise and Accessory Registrations continuously since at least as early as the dates specified therein.  (*Id.*)

### VIP'S BUSINESS AND THE "BAD SPANIELS" PRODUCT

41.     VIP designs, manufactures, markets and sells chew toys for dogs.  (Doc. Nos. 171 at 2, 204-1 Exh A # 6.)

//

//

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    42.    In July of 2013, VIP introduced the "Bad Spaniels" chew toy for dogs depicted

2    below.  (Doc. Nos. 111 at 4, 171 at 2.)



14   43.    The "Bad Spaniels" product is in the shape of a Jack Daniel's bottle and features a

15   wide-eyed spaniel over the words "Bad Spaniels, the Old No. 2 on your Tennessee

16   carpet."  (Doc. No. 171 at 2.)

17   44.    The "Bad Spaniels" product resembles a bottle of Jack Daniel's Tennessee Sour

18   Mash Whiskey.  (Doc. Nos. 157, 171 at 2.)

19   45.    Similarities include the shape of the product, the use of white lettering over a

20   black background, and the choice of font.  (Doc. No. 171 at 2.)

21   **DEVELOPMENT OF VIP'S "BAD SPANIELS" PRODUCT**

22   46.    Stephen Sacra, VIP's President, recalls being inspired to develop the "Bad

23   Spaniels" product while dining in a bar.  (Doc. No. 204-1 Exh. A # 1; Sacra Tr. 78:14–

24   79:3.)

25   47.    Mr. Sacra promptly contacted Elle Phillips, VIP's designer.  (Phillips Tr. 41:12–

26   42:15, 49:11-25, Exh. 4; Sacra Tr. 81:18–25.)  He told Ms. Phillips, in effect, "Bad

27   Spaniels.  You figure it out."  (Phillips Tr. 49:11–50:6; Sacra Tr. 82:1–17.)

28   //

48. Ms. Phillips understood that "Bad Spaniels" was a reference to "Jack Daniel's." (Phillips Tr. 50:10–16.) She had been familiar with that brand since she was a teenager. She had consumed Jack Daniel's Tennessee whiskey in bars and in her home. (Phillips Tr. 52:9–53:1.) She had also seen it in print ads. (Phillips Tr. 52:4–7.)

49. Prior to starting the design for "Bad Spaniels," Ms. Phillips recalled various Jack Daniel's packaging features from memory, including "[t]he black and white label, sort of a cursive font for Tennessee, simple type," and the square shape of the bottle, as well as the use of a number on the neck label. (Phillips Tr. 53:24–54:14.)

50. Ms. Phillips then retrieved a bottle from her liquor cabinet. She "looked at it, examined it," and placed it on her desk while she developed a sketch. (Phillips Tr. 54:24–55:8, Exh. 9.) She referenced the bottle "every now and then throughout the process." (Phillips Tr. 66:20–67:1.)

51. Ms. Phillips wanted her sketch to be close to Jack Daniel's. (Phillips Tr. 67:2–8.)

52. For example, Ms. Phillips included "Old No. 2" in her sketch where "Old No. 7" appears on a Jack Daniel's whiskey bottle because she "wanted it to be similar to the Jack Daniel's bottle." (Phillips Tr. 56:17–57:9.)

53. Ms. Phillips placed the word "Tennessee" in her sketch where it appears on the Jack Daniel's bottle for the same reason. (Phillips Tr. 57:18–25.)

54. Ms. Phillips chose a black-and-white color scheme because that is the color scheme of Jack Daniel's. (Phillips Tr. 62:11–17.)

55. When Ms. Phillips finished her sketch, she e-mailed it to Mr. Sacra. He responded: "Mock it up. Looks good." (Phillips Tr. 60:10–16, Exh. 9; Sacra Tr. 88:5–19, Exh. 46.)

56. Ms. Phillips developed a mock label in digital form and e-mailed it to Mr. Sacra. (Phillips Tr. 61:11–20, Exh. 10.)

57. Ms. Phillips later sent him a second mock label, stating that it was "maybe a bit closer to the JD [Jack Daniel's] label." (Phillips Tr. 65:7–66:9-12, Exh. 12; Sacra Tr.

98:11–21.)  For example, it depicted the text "Bad Spaniels" in an arched format. (Phillips Tr. 66:2–19, 67:9–19.)

58.     Mr. Sacra liked the second version better than the first.  (Sacra Tr. 100:15–17.)

59.     Ms. Phillips developed a neck label and hang tag in similar fashion.  (Phillips Tr. 79:11–14, 96:12–98:2.)  For good measure, she included a small disclaimer that referenced Jack Daniel Distillery.  (Phillips Tr. 99:13–100:1, 101:10–24, Exhs. 26 & 30.)

60.     Mr. Sacra later directed the manufacture of the "Bad Spaniels" product as a three-dimensional vinyl bottle.  (*See* Sacra Tr. 106:9–109:16, Exh. 47.)

61.     He e-mailed his manufacturer in China a "concept for a new bottle shape," attaching Ms. Phillips' artwork, as well as a picture of Jack Daniel's whiskey bottles. (Sacra Tr. 107:8–15, 109:6–16, Exh. 47.)  He had retrieved that picture by searching online for "Jack Daniel's."  (Sacra Tr. 109:11–16.)

62.     When finished, the "Bad Spaniels" product featured all the elements of the Jack Daniel's Trade Dress, including the bottle shape, color scheme, and trademark stylization, as well as the word "Tennessee," and the font and other graphic elements. (Sacra Tr. 223:14–224:10, 225:1–5, 225:19–25, 226:10–228:4.)

63.     Mr. Sacra intended the "Bad Spaniels" product to mimic the Jack Daniel's brand. (Sacra Tr. 187:14–16.)  He did not intend it to evoke any other brand.  (Sacra Tr. 188:21–189:10–19; 217:5–218:3; 218:21–219:5; 269:4–15; 270:16–271:10, Exh. 62.)

64.     The "Bad Spaniels" product retails for approximately $15.  (Sacra Tr. 212:2-9.)

65.     In the 2014 and 2015 VIP catalogs, the "Bad Spaniels" product appears in a bar setting alongside various hanging bottles, one of which can be recognized as a Jack Daniel's bottle.  (Phillips Tr. 116:10–119:19, Exhs. 41–42.)

66.     Various retailers that sell Jack Daniel's licensed merchandise also sell VIP's "Bad Spaniels" product, including Walmart, Amazon.com, and Boozingear.com.  (Sacra Tr. 236:14–238:25, 242:10–15, Exhs. 64, 66.)

//

//

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

67.     Mr. Sacra attributes the success of the "Bad Spaniels" product to "the fact that people are familiar with Jack Daniel's . . .  and have seen it before . . ."  (Sacra Tr. 222:23–223:1.)

### DR. FORD'S SURVEY ON LIKELIHOOD OF CONFUSION

68.     Until his death in 2015, Dr. Gerald Ford was a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, where he was engaged in commercial marketing research and consulting for forty years.  He had also served on the faculty of the School of Business Administration, California State University, Long Beach, where he held a full-time teaching position for twenty-five years, prior to his retirement in 1994.

69.     As a partner with Ford Bubala & Associates, Dr. Ford was retained by a variety of firms engaged in the consumer product, industrial product, and service sectors of the economy to provide marketing consulting and research services.  Approximately one-half of his engagements involved the design and execution of marketing research surveys.

70.     During the past forty years, Dr. Ford was retained in a number of litigation-related consultancies involving intellectual property matters, including matters before federal and state courts, the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office, and the International Trade Commission.  He designed and executed surveys relating to intellectual property matters, including trademark, false advertising, patent, and other related matters.  He was familiar with the accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls.

71.     Dr. Ford published articles and book chapters on the design and execution of litigation-related surveys in Lanham Act matters.  **Trial Exhibit JDPI 45** is a true and correct list of papers and book chapters that Dr. Ford wrote between 2004 and his death in 2015.

72.     Dr. Ford was qualified and accepted as an expert in marketing and marketing research in more than sixty trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board.

73.   **Trial Exhibit JDPI 46** is a true and correct list of cases in which Dr. Ford provided trial and/or deposition testimony since 1992.

74.   **Trial Exhibit JDPI 47** is a true and correct copy of Dr. Ford's professional history, describing his qualifications and professional background.

75.   Dr. Ford designed a survey for this case to measure whether the "Bad Spaniels" product is likely to confuse consumers.  (Doc. No. 197-10 Exh. J ¶ 2.)

76.   In a test cell, respondents were shown photographs of the "Bad Spaniels" product. (Doc. No. 197-10 Exh. J ¶¶ 6, 19.)  In a control cell, respondents were shown photographs of a fictitious dog chew toy product bearing the "Bad Spaniels" name.  (Doc. No. 197-10 Exh. J ¶¶ 6, 20.)

77.   After viewing these photographs, respondents were asked a series of open-ended and non-leading questions about who had made, sponsored, or approved the product pictured.  (*See* Doc. No. 197-10 Exh. J at 13-17.)

78.   Over twenty-nine percent of those in the test cell—who had been shown the "Bad Spaniels" product—identified Jack Daniel's in response to these questions.  (Doc. No. 197-10 Exh. J ¶¶ 28-29.)  By contrast, almost none of those in the control cell—who had been shown the fictitious dog toy—identified Jack Daniel's in response to these questions.  (Doc. No. 197-10 Exh. J ¶¶ 30-31.)

79.   Dr. Ford concluded: "approximately twenty-nine percent . . . of potential purchasers . . . are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's dog toy has a business affiliation or business connection with Jack Daniel's."  (Doc. No. 197-10 Exh. J ¶¶ 7, 33.)

### DR. SIMONSON'S CONCLUSIONS ON TARNISHMENT

80.   Dr. Itamar Simonson is a Professor of Marketing at Stanford University and an expert in consumer behavior.  (Doc. No. 144-1 ¶¶ 1-3, 6-7, Exh. A.)

//

81.     Dr. Simonson is a member of the Association for Consumer Research, the Judgment and Decision Making Society, and the American Psychological Society.  (Doc. No. 144-1 Exh. A.)

82.     He has won numerous awards for his work in marketing and consumer research. (Doc. No. 144-1 ¶ 4, Exh. A.)

83.     He has served as an expert witness on numerous occasions, providing trial and deposition testimony on issues including marketing, consumer behavior, trademark-related matters, false advertising, and branding.  (Doc. No. 144-1 ¶ 9, Exhs. A-B.)

84.     Dr. Simonson has conducted, supervised, or evaluated over one thousand marketing research studies.  Many such studies related to consumer behavior, consumer information processing, brand equity, trademarks, branding, marketing strategies, and advertising.  He has also consulted for clients on a variety of marketing and consumer behavior topics.  (Doc. No. 144-1 ¶ 9, Exh. A.)

85.     Dr. Simonson is widely published.  He has written on topics relating to trademark surveys and infringement, marketing, and consumer research.  He has been published in the *Trademark Reporter*, *Harvard Business Review*, *Journal of Public Policy & Marketing*, *Journal of Marketing Behavior*, *Journal of Marketing Research*, *Journal of Consumer Psychology*, and the *Journal of Consumer Research*, among others.  (Doc. No. 144-1 ¶ 5, Exh. A.)  In additions to his own publications, Dr. Simonson reviews the articles of others seeking publication in scholarly journals, and he sits on the editorial boards of several leading journals.  (Doc. No. 144-1 ¶ 9, Exh. A.)

86.     For this case, Dr. Simonson testified regarding the "associative network memory model," whereby brand associations are created and recalled in the minds of consumers. (Doc. No. 144-1 ¶¶ 12, 19.)

87.     As Dr. Simonson observed, "Bad Spaniels" evokes not only Jack Daniel's but also canine excrement ("the Old No. 2 on your Tennessee carpet").  Accordingly, "Bad Spaniels" establishes a negative association between Jack Daniel's and canine excrement

1    in the minds of consumers, causing conscious or unconscious aversion to the brand.

2    (Doc. No. 144-1 ¶¶ 13-14, 27-31.)

3    88.    This negative association adversely impacts the brand, whether consumers are

4    confused or not, and whether they are amused or not.  (Doc. No. 144-1 ¶¶ 2-31.)

5    **PROPOSED CONCLUSIONS OF LAW**

6    **Trademark and Trade Dress Infringement: Likelihood of Confusion**

7    1.    To prevail on its trademark and trade dress infringement claims under federal and

8    state law, Jack Daniel's must show that at least one of its asserted rights was valid before

9    VIP's accused use began, and VIP's accused use causes a "likelihood of confusion."  *See*

10   15 U.S.C. §§ 1114, 1125(a); *Brookfield Communications, Inc. v. West Coast*

11   *Entertainment Corp.*, 174 F.3d 1036, n.8 (9th Cir. 1999); *Kendall-Jackson Winery, Ltd. v.*

12   *E. & J. Gallo Winery,* 150 F.3d 1042, 1047 (9th Cir. 1998); *Angel's Gate Inc. v. All-Star*

13   *Grand Canyon Tours Inc.*, 2013 WL 12114580, *2 (D. Ariz. 2013) ("Because Arizona's

14   trademark infringement statute mirrors the Lanham Act, 15 U.S.C. § 1125(a), cases

15   interpreting the Lanham Act guide the interpretation of A.R.S. § 44-1451."); *accord* J.

16   Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.1.50 (2017)

17   (hereinafter "*McCarthy*") ("[T]he test of infringement under both federal and state law is

18   whether there will be a likelihood of confusion.")

19   2.    In this case, all of Jack Daniel's asserted rights are presumptively senior and valid

20   because they have appeared on the Principal Register of the United States Patent and

21   Trademark Office since before VIP's use began.  *See* **Trial Exhibits J003, J005, J007,**

22   **J009, J011, J013, J015, J017, J019, J021, J023, J025, J027, J029**; 15 U.S.C. §§

23   1057(b), 1115(a); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,

24   174 F.3d 1036, 1047 (9th Cir. 1999).  Moreover, all the asserted rights are conclusively

25   senior and valid, not only because most are incontestable under the provisions of 15

26   U.S.C. § 1065, but also because all challenges thereto were defeated on summary

27   judgment.  (Doc. No. 171 at 31-33.)  Accordingly, the sole remaining trademark

28

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

infringement issue is whether the "Bad Spaniels" product causes a "likelihood of confusion."

### The *Sleekcraft* Factors

3.      In the Ninth Circuit, "likelihood of confusion" is assessed by weighing the following eight non-exclusive factors, often referred to as the *Sleekcraft* factors:

> (a)      The strength of the plaintiff's mark;
>
> (b)      The proximity or relatedness of the goods;
>
> (c)      The similarity of the parties' marks;
>
> (d)      Evidence of actual confusion;
>
> (e)      Marketing channels used;
>
> (f)      The type of goods and degree of care likely to be exercised by the buyer;
>
> (g)      The defendant's intent in adopting the junior mark; and
>
> (h)      Likelihood of expansion of the parties' product lines.

*La Quinta Worldwide LLC v. Q.R.T.M. SA de CV*, 762 F.3d 876, 874 (9th Cir. 2014); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979); *see also McCarthy* §§ 24:6, 24:39 ("The test of "likelihood of confusion" encompasses any type of confusion, including: confusion of source; confusion of sponsorship; confusion of affiliation; or confusion of connection.")

4.      The *Sleekcraft* factors are often given different weight in different cases.  In some cases, only a handful of the factors can be determinative.  "The [*Sleekcraft*] factors should not be rigidly weighed; we do not count beans."  *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (Kozinski, J.).  "Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion." *Id.* (internal citation omitted).  In *Dreamwerks,* for example, the Ninth Circuit focused on only three of the eight factors as "pivotal": the strength of plaintiff's mark, the similarity of the marks, and the relatedness of the goods and services offered.  "The other five *Sleekcraft* factors," the Court reasoned, "don't provide much guidance in this case and thus carry little weight."  *Id.* at 1130 n. 6.

5.      Application of the *Sleekcraft* factors to the facts of this case leads to the conclusion that there is a likelihood of confusion.  The most important factors here are the strength of the Jack Daniel's Trademarks and Trade Dress, the similarity of the parties' uses, the relatedness of the parties' goods, the survey evidence of actual confusion, and VIP's intent in adopting the "Bad Spaniel's" mark.  To the extent they are pertinent, the remaining factors also indicate a likelihood of confusion.

**Strength of the Jack Daniel's Trademarks and Trade Dress**

6.      "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws."  *La Quinta Worldwide LLC v. Q.R.T.M. SA de CV*, 762 F.3d 876, 874 (9th Cir. 2014); *accord McCarthy* §§ 11:73, 24:49.  The scope of protection for strong and well-known marks may extend far to other product fields.  *See McCarthy* § 24:49.

7.      In this case, Jack Daniel's asserted rights are extremely strong.  This is due to their longstanding use, abundant advertising, and widespread consumer recognition, as well as the extensive sales of a variety of goods bearing the marks.  For example, the Jack Daniel's Trademarks have been used continuously for over a century, except during Prohibition.  Jack Daniel's Tennessee whiskey has been the best-selling whiskey in the United States since 1997.  Between 1997 and April 30, 2015, Jack Daniel's whiskey sales in the United States exceeded seventy-five million (75,000,000) cases of various sizes, and resulting revenues exceeded ten billion dollars ($10,000,000,000).  The vast majority of these sales can be attributed to whiskey bearing the Jack Daniel's Trade Dress.  The vast majority of current advertising features the Jack Daniel's Trade Dress.  According to Jack Daniel's internal records, aided consumer awareness of the Jack Daniel's brand is consistently around 98% and unaided awareness of the Jack Daniel's brand is consistently above 80%.  Taken together, this is compelling evidence of strength, indeed of fame.  Thus, the "strength of the mark" factor favors Jack Daniel's.

//

JACK DANIEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Proximity or Relatedness of the Goods**

8.      Related or proximate goods are those "which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10.

9.      In this case, the parties' goods are related.  While Jack Daniel's is primarily a distiller and seller of whiskey and VIP a maker of dog chew toy products, as a result of an extensive and long-running licensing program, the Jack Daniel's Trademarks and Trade Dress appear on a wide variety of merchandise other than spirits.  Consumers have thus grown accustomed to encountering the Jack Daniel's Trademarks and Trade Dress on a broad range of products—from prepared meats to barbeque sauces, from cigarette lighters to belt buckles and cufflinks, and from charcoal to clothing.  This situation is not unique.  Courts have long recognized that famous marks are often used on collateral merchandise via licensing programs.  *See, e.g.*, *Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.*, 648 F.2d 1335, 1336 (CCPA 1981) ("[I]t is a matter of common knowledge that famous marks are frequently used on items such as clothing, glassware, and trashcans" and other "novelty items.")

10.      Significantly for this case, Jack Daniel's has for some years licensed its trademark and trade dress rights for use with dog products.  Currently, it offers dog leashes and collars, dog beds and dog houses.  Dog leashes, dog collars, dog houses, dog beds and dog toys are unquestionably related products.  *See Int'l Kennel Club of Chicago v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988) (dog shows and dog toys related); *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1289 (C.D. Cal. 2001) (pet products related).  Moreover, toy whiskey bottles are undoubtedly related to whiskey itself.  *See General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 411 (6th Cir. 2006) (toy car related to real car). *American Honda Motor Co., Inc. v. Pro-Line Protoform*, 325 F. Supp. 2d 1081, 1082-83 (C.D. Cal. 2004) (same).  Thus, the "relatedness of goods" factor favors Jack Daniels.

//

1

**Similarity of the Parties' Marks**

2   11.   "The greater the similarity between the two marks . . . the greater the likelihood of

3   confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).  In

4   this case, the parties' marks are "glaringly similar." *Id.* Indeed, VIP intended to replicate

5   the Jack Daniel's Trademarks and Trade Dress.  (*See* Findings of Fact Nos. 47-63,

6   *supra*.)  VIP has appropriated the Jack Daniel's Trade Dress in every aspect.  "Jack

7   Daniel's" has become "Bad Spaniels." "Old No. 7" has become "Old No. 2." "Tennessee

8   whiskey" has become "Tennessee carpet." Meanwhile, the square bottle shape, ribbed

9   neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and

10   styles remain virtually unchanged.  "With a single glance . . . one is immediately struck

11   by their similarity." *GoTo.com*, 202 F.3d at 1206.  Thus, the "similarity of the marks"

12   factor favors Jack Daniel's.

13   12.   VIP cannot dispel confusion with a disclaimer, particularly a disclaimer in tiny

14   font on the reverse side of its product packaging.  *See E. & J. Gallo Winery v. Gallo*

15   *Cattle Co.*, 967 F.2d 1280, 1292 n.6 (9th Cir. 1992) (disclaimer had no significant

16   impact); *McCarthy* § 23:51 ("Clearly, use of a relatively inconspicuous disclaimer will

17   not prevent likely confusion.").  "Courts have been justifiably skeptical of such devises—

18   particularly where exact copying is involved," as here.  *Au-Tomotive Gold, Inc. v.*

19   *Volkswagen of Am., Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006).

20   **Evidence of Actual Confusion**

21   12.   In the Ninth Circuit, marketplace proof of "actual confusion is not necessary to a

22   finding of likelihood of confusion under the Lanham Act." *Academy of Motion Picture*

23   *Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446 at 1456 (9th Cir.

24   1991); *accord, Sleekcraft*, 599 F.2d at 353; *McCarthy* § 23:12 ("The test of infringement

25   is the *likelihood* of confusion, not the proof of *actual* confusion.  To prove liability, the

26   plaintiff is not required to prove any instances of actual confusion.").

27   13.   Instances of actual confusion in the marketplace are often difficult to find,

28   particularly where, as here, the sales volume of the accused product is small and the

marketing is thin.  "[D]ifficulties in gathering [such] evidence of actual confusion makes its absence generally unnoteworthy."  *Au-Tomotive Gold, Inc.,* 457 F.3d at 1077 ("In this case, which involves a national market and a low degree of consumer care, nothing suggests that the lack of evidence of confusion should be particularly noteworthy."). Notably, "purchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product" such as VIP's $15 dog chew toy.  *See Beer-Nuts v. Clover Club Foods Co.*, 805 F.2d 920, 928 (10th Cir. 1986); *Au-Tomotive Gold, Inc.*, 457 F.3d at 1077.

14.     In lieu of marketplace evidence of actual confusion, courts regularly accept the results of properly-designed consumer surveys as surrogate evidence of actual confusion. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 n.28 (9th Cir. 2004) ("Surveys are commonly introduced as probative evidence of actual confusion."); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1035 (9th Cir. 2010) ("[S]urvey evidence may establish actual confusion.") (internal quotation omitted)*; see also* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 366 (Federal Judicial Center 3d ed. 2011) *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf ("A routine use of surveys in federal courts occurs in Lanham Act cases, when the plaintiff alleges trademark infringement . . . The pivotal legal question in such cases virtually demands survey research because it centers on consumer perception and memory.")

15.     The Ford survey establishes actual confusion in this case.  VIP has not identified any significant flaws in the design or results of this survey.  On the contrary, the Ford survey followed the *Everready* format, considered the "gold-standard" for trademark survey research in cases involving strong marks.  *See* J.B. Swann, *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98 TMR 739, 746 (2008); *accord McCarthy* § 32:174 (discussing *Everready* format).  The Ford survey found that twenty-nine percent of potential purchasers are confused, which is nearly double the

1   threshold to show infringement.  *See McCarthy* § 32:188 n.4 (collecting cases); *Novartis*

2   *Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*,

3   290 F.3d 578, 594 (3d Cir. 2002) ("15% confusion is sufficient to demonstrate actual

4   confusion"); *James Burroughs Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 276 (7th

5   Cir. 1976) (15% confusion "evidences a likelihood of confusion.").  It is also notable that

6   VIP did not commission or disclose a survey of its own.  Thus, the actual confusion

7   factor strongly favors Jack Daniel's.

8   ### Marketing Channels Used

9   16.    "Marketing channels can converge[,] even when different submarkets are

10  involved[,] so long as 'the general class[es] of . . . purchasers exposed to the products

11  overlap."  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) (quoting

12  *Sleekcraft*, 559 F.2d at 353).  Such is true here.  VIP attributes the success of its "Bad

13  Spaniels" product to "the fact that people are familiar with Jack Daniel's . . .  and have

14  seen it before."  (Sacra Tr. 221:6, 222:23–223:1.)  "Bad Spaniels" and Jack Daniel's

15  merchandise are not only sold to the same class of purchasers, but also in the same stores,

16  such as Walmart, Amazon.com, and Boozingear.com. (Transcript of Final Pretrial

17  Conference, August 14, 2017 at 28:13-14; Sacra Tr. 236:14-238:25, 242:10-15 and Exhs.

18  63, 64). Moreover, VIP has actively promoted an association by featuring Jack Daniel's

19  Tennessee whiskey in its marketing materials for "Bad Spaniels."  For these reasons, the

20  marketing channels factor favors Jack Daniel's.

21  ### Degree of Consumer Care

22  17.    "[L]ow prices imply correspondingly low consumer care."  *Fifty-Six Hope Road*

23  *Music, Ltd. v. A.V.E.L.A.*, 778 F.3d 1059, 1070-71 (9th Cir. 2015).  Accordingly,

24  consumers are not likely to exercise significant care and attention when purchasing the

25  "Bad Spaniels" product, which retails for approximately $15.  Since a VIP dog toy "is not

26  considered a high-end product," consumers are more likely to be confused when

27  purchasing one.  *Anheuser-Busch, Inc. v. VIP Products, LLC*, 666 F. Supp. 2d 974, 982

28  (E.D. Mo. 2008).  Thus, the consumer care factor favors Jack Daniel's.

1

**VIP's Intent**

2    18.    It is presumed "that the person who sets out to infringe on another's trademark has

3    more brains than scruples and will likely succeed." *Sara-Lee Corp. v. Kayser-Roth*

4    *Corp.*, 81 F.3d 455, 466 (4th Cir. 1996); *accord Sleekcraft*, 599 F.2d at 348 (it is

5    presumed "that the defendant can accomplish his purpose . . ."). Accordingly, "a late

6    comer who deliberately copies the dress of his competitors already in the field, must at

7    least prove that his effort has been futile." *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 77

8    (2d Cir. 1934) (Hand, J.).

9    19.    In this case, VIP admits that it intended to copy the Jack Daniel's Trade Dress.

10   Indeed, VIP intended to capitalize on Jack Daniel's goodwill. (*See* Findings of Fact Nos.

11   47-63, *supra*.) It succeeded. As noted above, the Ford Survey establishes a very high

12   rate of confusion. Thus, the intent factor favors Jack Daniel's.

13   **Likelihood of Product Line Expansion**

14   20.    When parties in trademark cases do not offer goods or services in the same field,

15   this factor assesses their likelihood of doing so. However, in this case, the parties'

16   product lines have already converged: Jack Daniel's licenses pet accessories which use

17   the Jack Daniel's Trademarks. (*See* Findings of Fact No. 25, *supra*.) Thus, the product

18   line expansion factor favors Jack Daniels.

19   **VIP's First Amendment Defense**

20   21.    The First Amendment affords VIP no protection. As the Court has previously

21   held, "[i]n this case, where the adaptation of the Jack Daniel's trademark and trade dress

22   were engaged for the dual purpose of making an alleged expressive comment as well as

23   the commercial selling of a non-competing product, the First Amendment does not

24   establish protection." (Doc. No. 171 at 11.) The Ninth Circuit agrees. *See id.* (citing

25   *Brown v. Electronic Arts*, 724 F.3d 1235, 1241 (9th Cir. 2013) and *E.S.S. Entertainment*

26   *2000 v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008)).

27   22.    While acknowledging the Court's prior holding, VIP argues that nonetheless,

28   "First Amendment values remain at play in the Court's *Sleekcraft* analysis where, as here,

the alleged infringing product is a parody product." (Doc. No. 204 at 8:3-6.) For this proposition, VIP cites a case from the Fourth Circuit and a case from the Southern District of New York. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 261 (4th Cir. 2007); *Tommy Hilfiger Licensing, Inc., v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002). Ninth Circuit law is to the contrary. Rather than allowing First Amendment values to "remain at play" in an analysis under *Sleekcraft,* the Ninth Circuit protects such values by applying a different infringement test under *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1999). It only does so, however, in cases of "artistic and expressive works." The VIP dog toy is not such a work. Moreover, the First Amendment does not provide immunity to confuse consumers or offer satiric commentary under an infringing mark. *See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400-01 (9th Cir. 1997).

**<u>Jack Daniel's Has Proven Trademark and Trade Dress Infringement</u>**

23.     Upon applying the *Sleekcraft* factors to the facts and giving them due weight, we conclude there is a likelihood of consumer confusion and thus trademark and trade dress infringement in this case. We so hold in particular considering the unquestionable strength of the Jack Daniel's Trademarks and Trade Dress; the striking similarity of the "Bad Spaniels" product; the relatedness of whiskey and pet products, on one hand, and a dog toy in the form of a whiskey bottle, on the other hand; VIP's express intention to profit from existing goodwill in the Jack Daniel's brand; and the results of the Ford survey, demonstrating that "approximately twenty-nine percent of potential purchasers are likely to be confused." Finally, far from dispelling the conclusion that there is a likelihood of confusion, the remaining factors buttress that conclusion.

24.     Accordingly, Jack Daniel's prevails on its trademark and trade dress infringement claims.

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DILUTION BY TARNISHMENT

## Elements of Proof

25.     To prevail on its dilution by tarnishment claims, Jack Daniel's must show that at least one of its asserted trademark and trade dress rights was not only valid but also famous before the accused use began, and that use is likely to cause negative associations.  *See* 15 U.S.C. § 1125(c); A.R.S. § 44-1448.01; *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1161 (9th Cir. 2011); *Moab Industries, LLC v. FCA US, LLC*, 2016 WL 5859700, *8 (D. Ariz. 2016) ("The elements necessary to prove a state law trademark dilution counterclaim are basically identical."); *see, e.g.*, *Lorillard Tobacco Company v. California Imports, LLC*, 886 F. Supp.2d 529, 536 (E.D. Va. 2012); *see also McCarthy* § 24:89 (discussing dilution by tarnishment).

## Fame of the Jack Daniel's Trademarks and Trade Dress

26.     A trademark or trade dress is famous if "it is widely recognized by the general consuming public of the United States as a designation of source."  15 U.S.C. § 1125(c)(2)(A).  All relevant factors may be considered, including: "the duration, extent, and geographic reach of advertising and publicity of the mark"; "the amount, volume, and geographic extent of sales of goods or services offered under the mark"; "the extent of actual recognition of the mark"; "and whether the mark [has been] registered . . . on the principal register." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv); *accord* A.R.S. § 44-1448.01(A)(1-8).

27.     In this case, the Jack Daniel's Trademarks and Trade Dress are famous for the same reasons they are extremely strong.  *See* Conclusions of Law, paragraph 7, *supra; see also McCarthy* § 24:104 (collecting marks held famous).  To reiterate, the Jack Daniel's Trademarks have been widely and extensively used for over a century.  Jack Daniel's expended many hundreds of millions of dollars from 1997 through April 30, 2015 to advertise and promote its brand.  Jack Daniel's sold over 75,000,000 cases of whiskey during this time, realizing over ten billion dollars in revenue.  The vast majority of these sales can be traced to whiskey bearing the Jack Daniel's Trade Dress, which

1  includes the Jack Daniel's Trademarks.  All of these rights appear on the principal

2  register.  Jack Daniel's Tennessee whiskey is the top selling whiskey in America.

3  According to Jack Daniel's internal records, aided awareness of the Jack Daniel's brand

4  is consistently around 98% and unaided awareness of the Jack Daniel's brand is

5  consistently above 80%.  It is an iconic American brand.

6  **Likelihood of Tarnishment**

7  28.     In this case, the "Bad Spaniels" product is likely to tarnish the Jack Daniel's

8  Trademarks and Trade Dress by establishing two kinds of negative associations.  First,

9  the "Bad Spaniels" product is likely to associate the Jack Daniel's Trademarks and Trade

10  Dress with canine excrement ("Old No. 2 on your Tennessee carpet").  This association is

11  apparent from the face of the "Bad Spaniels" product and has been fully explained by Dr.

12  Simonson.  It does not matter whether this association is conscious or unconscious.  *Cf.*

13  *McCarthy* § 24:3 (noting that actionable confusion may be unconscious); *E. & J. Gallo*

14  *Winery v. Gallo Cattle Co.*, 12 U.S.P.Q. 2d 1657, *22 (E.D. Cal. 1989).  It does not

15  matter whether this association is humorous or intended as such.  *See Eastman Kodak Co.*

16  *v. Rakow*, 739 F. Supp. 116, 118 (W.D.N.Y. 1989) (enjoining use of the stage name

17  KODAK by a stand-up comedian).  In any event, this association is particularly harmful

18  for a company such as Jack Daniel's that offers goods for human consumption.  Human

19  consumption and canine excrement do not mix.

20  29.     Second, the "Bad Spaniels" product is likely to tarnish the Jack Daniel's

21  Trademarks and Trade Dress by associating them with toys—particularly, the kind of

22  toys that might appeal to children.  This association might not ordinarily cause

23  reputational harm, but Jack Daniel's is in the whiskey business.  As such, Jack Daniel's

24  does not market to children.  It does not license goods for children.  It does not license

25  goods that might appeal to children.  It rightly fears reputational harm from any

26  misperception to the contrary.  *See Toys "R" Us, Inc. v. Akkaoui*, 40 U.S.P.Q.2d 1836,

27  *43 (N.D. Cal. 1996) ("'Adults R Us' tarnishes the 'R Us' family of marks by associating

28

them with a line of sexual products that are inconsistent with the image Toys 'R' Us has striven to maintain for itself.").

30.    Accordingly, Jack Daniel's prevails on its trademark and trade dress dilution claims.

## ENTITLEMENT TO INJUNCTIVE RELIEF

31.    Having prevailed on its trademark and trade dress claims, Jack Daniel's is entitled to an injunction "subject to the principles of equity." 15 U.S.C. §§ 1025(c)(1), 1116(a). According to the principles of equity, a claimant must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships tips in its favor; and (4) that the public interest would not be disserved by a permanent injunction.  *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "Injunctive relief is the preferred remedy in trademark infringement . . . cases because there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."  *DocRx, Inc. v. DocRx Dispense, Inc.*, 2015 WL 1778360, *4 (D. Ariz. Apr. 20, 2015) (*quoting Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)); *accord McCarthy* § 30:1 (A permanent injunction is the "usual and normal" remedy for trademark infringement).

32.    Jack Daniel's merits a permanent injunction in this case.  As discussed above, the "Bad Spaniels" product has caused a likelihood of confusion and reputational harm. Monetary damages are inadequate to compensate for such harm.  *See Estee Lauder Cosmetics, Inc. v. Get Your Mac On, LLC,* 2015 WL 274133, *5 (D. Ariz. Jan. 22, 2015); *McCarthy* § 20:47.30 n.17 (collecting cases).  "Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to . . . reputation cannot constitute a just or full compensation."  *McCarthy* § 30:1.  Moreover, a permanent injunction would impose no legitimate hardship on VIP, whereas permitting continued infringement and tarnishment of the Jack Daniel's Trademarks and Trade Dress would impose significant hardship on Jack Daniel's.  *See Origami Owl LLC v. Mayo*, 2017 WL 413075, *7 (D. Ariz. Jan. 31,

2017).  Finally, a permanent injunction will serve the public interest by preventing continued consumer confusion.  *See id.*

## CONCLUSION

Accordingly, VIP is liable on all claims asserted by Jack Daniel's in this case. Jack Daniel's is directed file a proposed form of injunction within 14 days after issuance of this Order.  As the prevailing party, Jack Daniel's may file a motion for attorneys' fees within 28 days after issuance of this Order under 15 U.S.C. § 1117(a).

September 15, 2017

Respectfully submitted,

*/s/ Isaac S. Crum*
QUARLES & BRADY LLP
Gregory P. Sitrick
Gregory.Sitrick@quarles.com
Isaac S. Crum
Isaac.Crum@quarles.com
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 229-5317
Facsimile: (602) 420-5198

HARVEY & COMPANY
D. Peter Harvey (admitted *pro hac vice*)
pharvey@harvey.law
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111
Phone: (415) 926-7776
Fax: (415) 402-0058

Attorneys for Defendant and
Counterclaimant
JACK DANIEL'S PROPERTIES, INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record in this case.

*/s/ Isaac S. Crum*

Isaac S. Crum