CASE NO. 2:14-cv-02057

VIP Products L.L.C.

VS. Jack Daniel's Properties, Inc.

DEFENDANT'S EXHIBIT 158

DATE: _____ IDEN.

DATE: ___10-3-17___ EVID.

BY: _____

Deputy Clerk

LexisNexis®

13 of 15 DOCUMENTS

Copyright © 1993, The International Trademark Association,
The Trademark Reporter

March, 1993 - April, 1993

*83 TMR 149*

**LENGTH:** 13381 words

DILUTION LAW: AT A CROSSROAD?  HOW AND WHEN DO TRADEMARKS DILUTE: A BEHAVIORAL FRAMEWORK TO JUDGE "LIKELIHOOD" OF DILUTION

Alexander F. Simonson *

* Member of the New York Bar and Ph.D. candidate, Columbia University Graduate School of Business.  A.B. magna cum laude, Columbia University, 1984; J.D., New York University, 1987; member of the Association for Consumer Research, the American Marketing Association, and the American Bar Association, Section of Patent, Trademark and Copyright Law.  The author wishes to thank Sidney Lirtzman of the TMR Editorial Board for his suggestions and editorial guidance.

**TEXT:**

[*149]  I.  INTRODUCTION

Trademark dilution is a psychological phenomenon causing legally cognizable economic damages.  The typical statutory standard for a dilution cause of action mandates showing a "likelihood" of dilution of the distinctive quality of the mark or of injury to business reputation, n1 thus often requiring a plaintiff to engage in fortune telling.  Yet, reasonable prediction may be possible because the "likelihood" standard suggests an empirical and cognitive orientation.

n1 See, eg, NY Gen Bus Law § 368-d (McKinney 1992).

In fact, often-invoked descriptions of dilution, such as blurring the distinctiveness of the brand, n2 whittling away of the identity and hold upon the public mind of the mark, n3 adversely affecting the value of the mark, n4 and diminishing or destroying the distinguishing quality of the mark, n5 allude to cognitive processes of consumers as they react to particular branding strategies.  One can properly assess the likelihood of dilution in this behavioral context.

n2 *Sally Gee, Inc. v. Myra Hogan, Inc., 699 F2d 621, 217 USPQ 658 (CA 2 1983).*

n3 Frank I. Schechter, The Rational Basis of Trademark Protection, 40 Harvard University Law Review 813, 22 TM Bull 139 (1927), reprinted in *60 TMR 334 (1970).*

n4 3A Rudolf Callmann, Unfair Competition, Trademarks and Monopolies § 21.11 (L. Altman 4th ed 1983).

n5 Beverly W. Pattishall, Dawning Acceptance of the Dilution Rationale for Trademark-Trade Identity, *74 TMR 289 (1984).*

It is the premise of this article that as surveys have become the empirical fodder for trademark-confusion litigation, so too empirical realities must eventually take root in dilution jurisprudence. As judges become more empirically demanding, predictions of reality will be guided less by intuition and more by real evidence and arguments based on firm behavioral underpinnings. The future of dilution analysis rests, therefore, with understanding and predicting these behavioral patterns so that one can properly assess the probability or likelihood of dilution. [**150**] Just as economic understanding is crucial in tort jurisprudence, so too the ability to marshall behavioral principles and empirical realities will become critical in dilution cases.

Thus, the focus of this article is not upon analyzing case decisions and logic concerning dilution, nor upon developing an acceptable legal position regarding dilution. Instead, it endeavors to explain dilution from a behavioral perspective and to offer important underpinnings as well as related empirical findings in order to facilitate understanding and approaching this elusive concept. Assimilation of the behavioral conceptualizations and findings into the legal doctrines has strong potential to advance the study of dilution and to aid practitioners in achieving their goals.

This article is divided into three sections. The first section explains dilution behaviorally and sets the stage for conceptually understanding the components of dilution. The second section attempts to shed light on predicting dilution by setting forth factors that have been shown to affect dilution. (In part, the section examines empirical findings from research in the related area of brand extensions.) n6 The third section summarizes important methodological issues concerning appropriate tests for dilution.

n6 A brand "extension" refers to the expansion of an existing brand name by, or with the approval of, the original brand owner. David A. Aaker and Kevin L. Keller, Consumer Evaluations of Brand Extensions, Journal of Marketing, at 27 (January 1990).

II. EXPLAINING TRADEMARK DILUTION

What do we mean when we say that a trademark may "dilute" an existing mark? While this question may seem straightforward, its answer has remained quite elusive. n7 Despite the need for a coherent set of guidelines and a more precise understanding of dilution, n8 courts and commentators alike remain hindered in their attempts to clarify dilution. n9 To date, dilution has been explored almost solely by reference to intuition.

n7 See, eg, David S. Welkowitz, Reexamining Trademark Dilution, 44 Vanderbilt University Law Review 531 (1991); Lisa M. Brownlee, Mead Data Central v. Toyota and Other Contemporary Dilution Cases: High Noon for Trademark Law's Misfit Doctrine?, *79 TMR 471 (1989).*

n8 American Bar Association, Section of Patent, Trademark and Copyright Law: Annual Report 1990-1991 (1992) [hereinafter cited as ABA].

n9 See Casenote, In Search of a Consistent Trademark Dilution Test: *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F2d 1026 (2d Cir. 1989),* 58 University of Cincinnati Law Review 1449 (1990)

IS000874

83 TMR 149, *150

[hereinafter cited as Casenote]; Welkowitz, supra note 7.

[*151] Thus, dilution remains a controversial area of law n10 due in part to the vagueness of the doctrine and its uneasy relation with the more traditional limited protection for trademarks (i.e., protection from confusion). Until 1977, courts generally did not recognize this dilution doctrine unless it was accompanied by brand confusion. n11 Even today, whether there may be any potential injury to a brand name in such cases and whether a company ought to have a complete monopoly over its name are legal questions open to heavy debate. n12 Since any explanation of trademark dilution requires assumptions concerning consumer behavior, I argue that any such undertaking can be facilitated by a new perspective, with reference to the psychology and marketing literature concerning brands.

n10 Howard J. Shire, Dilution Versus Deception -- Are State Antidilution Laws an Appropriate Alternative to the Law of Infringement?, *77 TMR 273 (1987);* Welkowitz, supra note 7. See also Walter J. Derenberg, The Problem of Trade-Mark Dilution and the Anti-Dilution Statutes, 44 California Law Review 439 (July 1956); Beverly W. Pattishall, The Dilution Rationale for Trademark-Trade Identity Protection, Its Progress and Prospects, 71 Northwestern University Law Review 618, 9 Patent Law Review 479 (1977), *67 TMR 607 (1977).*

n11 See *Allied Maintenance Corp. v. Allied Mechanical Trades, 42 NY2d 538, 369 NE2d 1162, 399 NYS2d 628, 198 USPQ 418 (NY Ct App 1977).*

n12 ABA, supra note 8; Welkowitz, supra note 7.

In this context, dilution is a phenomenon relating to "brand equity." Brand equity has been broadly defined as "a set of brand assets and liabilities linked to a brand, its name and symbol, that add to or subtract from the value provided by a product or service to a firm and/or to that firm's customers." n13 One may define brand dilution as a reduction in brand equity. As brand associations form the key building blocks of brand equity, n14 they are of primary importance in explaining brand dilution.

n13 David A. Aaker, Managing Brand Equity 15 (1991). Although the focus of this definition is on brand names that are linked inextricably by some common affiliation of source (such as Colgate toothpaste and Colgate mouthwash), it applies here more broadly to brands that are not perceived to be related as to source.

n14 See Kevin L. Keller, Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, at 1 (January 1993).

The associations comprising a brand's equity are divisible into two primary components: the evaluative component, and the awareness (or typicality) component. n15 Each of these aspects of brand equity may be diluted; I refer to these types of dilution as "evaluation dilution" and "typicality dilution," respectively. The term dilution is often used broadly to encompass both types of dilution, n16 and sometimes the word "tarnishment" is used to [*152] indicate dilution of brand evaluations. n17

n15 See Keller, supra note 14 (referring to them as brand "image" and brand "awareness," respectively).

n16 See Brownlee, supra note 7; 1 Jerome Gilson, Trademark Protection and Practice (1991).

n17 Pattishall, supra note 10; Welkowitz, supra note 7. This article addresses all types of dilution including what has been termed "pure" dilution and what has been termed "tarnishment" or "injury to business reputation." (But, as a caveat, these two primary aspects of a brand's strength, awareness and evaluation, are not coincident with the distinction between "pure" dilution and "tarnishment" dilution in the legal literature, see Welkowitz, supra note 7. Tarnishment is but a subset of potential evaluation dilution and "pure" dilution can relate not only to awareness dilution but also to evaluation dilution.) The two other major forms of dilution, dilution via

IS000875

confusion and dilution via genericide, can also be subsumed under these two aspects of brand equity.

*A. Explaining Typicality Dilution*

Typicality dilution is akin to the "whittling away" phenomenon. The "cancer-like" growth of new brands n18 destroying the distinctiveness n19 of original brand names is of interest here. n20 Typicality refers to the ability to classify instances (here, brands) into categories (here, product lines). n21 In other words, dilution in this context refers to a reduction in a brand's typicality, or its **[*153]** ability to conjure up a particular product category. n22 For example, if one were told to think of Sony and were asked what Sony product category n23 first comes to mind, this is an example of testing the typicality of Sony. n24 These tasks require memory retrieval whereby one compares a brand-name stimulus to concepts already existing in memory. n25

n18 *Allied Maintenance, supra* note 11 at 544, *369 NE2d 1162, 399 NYS2d 628, 198 USPQ 418.*

n19 In general, "distinctiveness" is often used as a proxy term for a brand's "strength." The term strength, in turn, takes on different tones depending on the focus. Here, we will focus on certain aspects of strength discussed later such as recall-type measures of typicality and dominance, certain recognition-type measures (discussed at infra note 80 and accompanying text) and hybrid measures such as overall ease of recall or recognizability.

n20 From a behavioral perspective, a brand's "distinctiveness" refers generally to certain of its associational strengths within individuals' minds. See Keller, supra note 14; Aaker, supra note 13.

n21 Douglas L. Medin and Lawrence W. Barsalou, Categorization Processes and Categorical Perception, in Categorical Perception: The Groundwork of Cognition (1987). In general, we can distinguish between two major types of brand associations relating to product categories, reflecting two separate aspects of strength: brand-to-category associations and category-to-brand associations. The strength of brand-to-category associations can be referred to as the "typicality" of a brand, see Peter H. Farquhar, Paul M. Herr and Russell H. Fazio, A Relational Model for Category Extensions of Brands, 17 Advances in Consumer Research 856 (1990) [hereinafter cited as Farquhar], and the strength of category-to-brand associations can be referred to as the "dominance" of a brand (see also definition of prototypicality, infra next paragraph). Typicality can refer, in the narrow sense, to the strength of a brand to elicit recall of its own product category, or, in the broad sense, to the strength of a brand to elicit recall of any particular product category of interest (whether or not it is a product category of the brand at hand). See infra notes 23 and 39; see also infra Section IV.B.1. for related recognition-based measures.

As used here, the term dominance is similar to "prototypicality" used in the literature on categorization. See Prakash Nedungadi and J. Wesley Hutchinson, The Prototypicality of Brands: Relationships with Brand Awareness, Preference and Usage, 12 Advances in Consumer Research 498 (1985); Joel B. Cohen and Kunal Basu, Alternative Models of Categorization: Toward a Contingent Processing Framework, 13 Journal of Consumer Research 455 (1987); Stephen E. Palmer, Fundamental Aspects of Cognitive Representation, in Cognition and Categorization (1978); Edward E. Smith and Douglas L. Medin, Categories and Concepts (1981). A prototype refers to the central tendency of the characteristics of the items comprising a category. In this respect, an item's prototypicality within a category (or the extent to which the item corresponds to the central tendency of the particular category) reflects its ability to be generated from the category. Thus "dominance" and "prototypicality" are identical herein, but "typicality" is different. (See also infra note 80 and accompanying text for types of recognition-related strength.)

n22 While dilution refers primarily to the ability to conjure up the product upon being exposed to the brand, the reverse, dominance, has implications for dilution as well, as we shall see.

IS000876

n23 This type of question, asking about "Sony" categories, reflects typicality in its narrow sense, see supra note 21. Depending on one's focus, it may also be of interest to ask about which product categories one recalls generally upon hearing "Sony," thus reflecting a measure of typicality in its broader sense.

n24 On the other hand, if one were told to think of the product category (eg, televisions) and were asked to think of the first brand of television that comes to mind, this is an example of testing for the brand's dominance.

n25 John R. Anderson and Reid Hastie, Individuation and Reference in Memory: Proper Names and Definite Descriptions, 6 Cognitive Psychology 495 (1974). In this context, memory can abstractly be viewed as being comprised of concepts and interrelations among concepts, in a metaphorical manner, by distinguishing "nodes" from "traces" or associations between nodes. John R. Anderson and Gordon H. Bower, Human Associative Memory (1973); see W.K. Estes, Cognitive Architectures From the Standpoint of an Experimental Psychologist, 41 Annual Review of Psychology 1 (1991). In the case of trademarks, brand names and product categories serve as the semantic 'nodes' forming the kernels around which retrieval of other brand names, categories and already-formed attitudes may occur.

The process of typicality dilution comprises three distinct steps, each of which can affect the extent of dilution. The entire process is summarily illustrated in Figure 1.

**[*154]** The first step begins with the existence of an established brand in the market (the senior user), as depicted in Figure 2. The arrow indicates the brand's typicality (path a); when one hears or sees the brand name, one associates the name with its product category. (This is depicted by the direction of the arrow stemming from the name to the category.)

Following the existence of this established brand, the second step entails the introduction of a new brand bearing a perceptually similar or identical brand name to that of an existing brand, as shown in Figure 3.

Here, an association is formed between the new brand and its category (path b). n26 Perhaps more importantly, an associational path is formed from the new brand name to the original brand name (path c). n27 The strengths of such paths will impact the **[*155]** potential extent of dilution via the next step, shown in Figure 4. This is the one most focused upon in litigation, that of the reduction in typicality of the original brand when one is exposed or "cued" with the original brand name.

n26 While not depicted, the strength of this association would be affected by the relationship of this brand-category combination with the original brand-category combination, see infra note 61. It would further be affected by the descriptiveness of the brand with respect to the category and by the level of promotional efforts given to the new combination.

n27 When a new brand emerges -- similarly or identically named to an existing brand -- associations are likely to exist between them because the process of memory retrieval is thought to be cue dependent. Jeroen G. Raaijmakers and Richard M. Shiffrin, Search of Associative Memory, 88 Psychological Review 93 (1981); Thomas K. Srull and Robert S. Wyer, Person Memory and Judgment, 96 Psychological Review 58 (1989). The key point here is that if someone is extremely familiar with a particular brand, and is presented with a new brand -- similarly or identically named, but unrelated in source to the familiar brand -- the familiar brand will likely be recalled, particularly if one elaborates on the new brand, Fergus I. Craik and Endel Tulving, Depth of Processing and the Retention of Words in Episodic Memory, 104 Journal of Experimental Psychology: General 268 (1975), and the retrieval cues are sufficient, see infra Section III.A., conclusion "Third." One may also see that an association can be formed from the new product category to the original product category (a diagonal path) and from the new product category to the original product category. Since these are somewhat tangential to the main points, I have omitted their representation. (Regarding the first path, see infra Section III.A., conclusion "Fourth," and regarding the second one, see infra Section III.A., conclusion "Fifth.")

IS000877

Two distinct possibilities emerge in this step as seen by the left and right sides of Figure 4. The figure on the left depicts a case wherein the brand names are distinguishable (such as McSleep and McDonald's, King Kong and Donkey Kong, or two identical names but with distinguishing logos). The figure on the right depicts a case where the brand names are indistinguishable. (This is usually via auditory means such as hearing brands like "Domino's" or "Lexis," but possibly by visual means also, such as seeing a name like "Allstate" in print, but without any distinguishing logo or color.)

Where the brands are distinguishable, the consumer is aware which of the two brand names he or she is being exposed to (e.g., perhaps via a distinctive logo). n28 Despite this awareness, memory associations may indeed still exist from the original brand to the new brand (path c) and, thereby, directly to the new product category (path d). Thus, the consumer may recall the product category of the new brand, leading to reductions in the strengths **[*156]** of the original-brand to original-category association as well (path a) (i.e., a reduction in typicality). n29

> n28 Thus, this may be the case even with identical brand names.

> n29 Al Ries and Jack Trout, Positioning: The Battle for your Mind 118 (1986); see Farquhar, supra note 21. With similarly named (but not identical) brands, presumably the brand stimuli (new brand and old brand) would be distinguishable. Perceptual differences, however, would create the additional task of cue matching or pattern matching. W.R. Garner, Aspects of a Stimulus: Features, Dimensions, and Configurations, in Cognition and Categorization (1978). In these cases, the association from original brand to new brand (path c in the lower left-hand portion of Figure 1) would vary depending on the associative strengths of the original brand, Allan M. Collins and Elizabeth F. Loftus, A Spreading-Activation Theory of Semantic Processing, 82 Psychological Review 407 (1975), the similarity of the brand names, see Garner, supra this paragraph, and the context in which one is exposed to the new brand name, see Keller, supra note 14. This association would in turn affect the extent to which dilution may occur, via changes in the strength of path a, the original brand-to-original category link.

Where the brands are indistinguishable (via sight or sound, as the case may be), dilution connotes a different behavioral phenomenon. (As we shall see, this situation sheds light on the previously troubling issue of distinguishing between what is really "confusion" and what is really "dilution.") In this case, information limitations exist in one's perception of the brand. n30 For instance, if a new brand "Sony bleach" appears on the market, when people are exposed to the brand name "Sony" *without further identification,* they may think of bleach in addition to consumer electronics, and thereby reduce the typicality of Sony. This is the type of dilution referred to in the Lexis case. n31 There, Toyota intended to introduce the "Lexus" brand automobile. Mead Data, the owner of the brand "Lexis," attempted to enjoin Toyota's intended introduction. While the "Lexis" and "Lexus" brands are spelled differently, the case revolved substantially around whether, upon hearing the word "Lexis," people would associate it with automobiles, thus diluting the "strength" (i.e., the typicality) of the brand "Lexis." n32

> n30 See Garner, supra note 29.

> n31 *Mead Data Central Inc. v. Toyota Motor Sales, U.S.A., Inc., 702 F Supp 1031, 9 USPQ2d 1442 (SDNY 1988),* revd *875 F2d 1026, 10 USPQ2d 1961 (CA 2 1989).*

> n32 Casenote, supra note 9.

This scenario demonstrates a situation in which the consumer may not have the ability at the time of exposure to determine which brand the stimulus refers to. In the Sony example, the consumer would know that there are two companies using the Sony brand. One markets bleach and one markets consumer electronics. The issue is whether, at the time of exposure to the brand name, there is sufficient cuing whereby the individual would know perceptually to which of the two Sony products the word Sony is referring. n33

n33 Even in this latter case of indistinguishable brands, the arrows do not indicate that one believes that the producers of the original brand are related to those of the new brand. Instead, the arrows represent memory retrieval paths. See infra notes 35-38 and accompanying text.

[*157] In sum, typicality dilution occurs via three distinct steps resulting in an increase in the number of categories with which a brand name may be associated. There are three important implications for conceptualizing dilution in this process-type framework.

First, by viewing dilution as a concrete series of steps, one may suggest a likelihood of dilution by referring to the strengths and changes in strengths in the associational paths at different stages of the process. While attorneys often view dilution in a gestaltist manner, without considering its component parts, arguments reflecting an understanding of the process can better focus attention to the path or paths that one subjectively considers to be key in one's arguments. Failure to recognize this well defined behavioral and cognitive process is tantamount to losing potentially important persuasive ground.

Second, as a consequence of recognizing a series of stages and corresponding associational changes, testing for dilution requires a specific, well-planned, focus. The acceptance by the courts of data ought to be facilitated by the increase in attorneys' fluency in this general behavioral process of dilution. As suggested later, maintaining empirical findings on your brand's strength prior to any potential new-brand introduction is essential. Since associational strengths and changes in these strengths throughout the various stages can be quite telling in arriving at a subjective notion of the existence of the "likelihood" of dilution, a dilution test must be carefully chosen so as not to be too narrow or too broad in scope. For example, the new-brand to original-brand association (path c in Figure 3) is but one initial step of possible dilution. One may hear the suggestion that likelihood of dilution requires that a new brand will remind one of an existing brand (path c1 in Figure 6). n34 While this does not particularly address whether dilution will occur, when a new brand name is not identical to an existing brand name and the new brand enters into the same product category as the original brand, testing the strength of this relation may be one way to approach the problem of measuring potential typicality dilution, as discussed later.

n34 Eg, *Sally Gee, supra* note 2 at 626, *217 USPQ 658* (Sally Lee ought to bring to mind Sally Gee).

Third, this conceptualization suggests the real relationship between confusion and dilution, an issue that has been of so much concern over the years. There are two different types of confusion, "sensory-perception" confusion and "general-knowledge" confusion. n35 [*158] Sensory-perception confusion is characterized by the familiar example of mistakenly reading or hearing. n36 If one views the brand Exxan quickly, and believes that one is seeing the word Exxon, this is an example of sensory-perception confusion. Similarly, viewing or hearing the word Sony, without further identification, creates perception limitations with respect to the look of the actual mark. On the other hand, general-knowledge confusion is characterized by semantic or factual mistakes. n37 For example, believing that Exxan is related as to source to Exxon after realizing that one is reading Exxan and not Exxon, reflects general-knowledge confusion.

n35 Medin and Barsalou, supra note 21.

n36 Perceptual connections refer to the similarities of the brand names in a physical, lexical sense. Thus, as examples, Citibanc appears to be closer perceptually to its familiar counterpart Citibank, and Johnny Walker appears to be closer perceptually to its familiar counterpart Johnnie Walker, than does Lardashe to Jordache or McSleep to McDonald's. (See *Citibank, N.A. v. Citibanc Group, Inc., 724 F2d 1540, 222 USPQ 292 (CA 11 1984); Tampa Cigar Company Inc. v. John Walker & Sons Ltd., 222 F2d 460, 105 USPQ 351 (CA 5 1955); Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F2d 1482, 4 USPQ2d 1216 (CA 10 1987); Quality Inns International, Inc. v. McDonald's Corp., 695 F Supp 198, 8 USPQ2d 1633 (D Md 1988),* respectively.)

IS000879

n37 Semantic connections refer to those concerning meaning and inference.  See Andrew A. Mitchell, Cognitive Processes Initiated by Exposure to Advertising, in Information Processing Research in Advertising (1983).  Here, these connections may entail similarities in brand source, product category or usage context.  While sensory-perception confusion can lead to general-knowledge confusion, the question is whether the sensory-perception confusion is so powerful as to affect inferences.

With nonidentical brands, dilution need not imply either type of confusion.  However, where brand names are indistinguishable (either via sight or via sound such as hearing Lexis or Lexus), dilution conceptually often subsumes a case of sensory-perception confusion.  Yet, the sensory-perception confusion is often limited in scope and dilution usually does not rise to deep general-knowledge confusion. n38 This view of dilution in the context of confusion is essential to clear understanding and the avoidance of ambiguities. n39

n38 When people are aware of the separate identities of the brands before proceeding to process information regarding them, the two brands ought to be conceptually separate in people's minds in the manner in which the word "ham" in ham radio is different from "ham" in baked ham, Steven E. Clark and Richard M. Shiffrin, Recognition of Multiple-item Probes, 15 Memory & Cognition 367 (1987).  While the brand names themselves can be seen as separate "nodes" due to their separate identifications and meanings, activation of one when primed with the other will likely occur depending on the perceptual, Garner, supra note 29, as well as semantic connections between the two brands, Collins and Loftus, supra note 29; Raaijmakers and Shiffrin, supra note 27.

n39 One may have noted that dilution via genericide, see Welkowitz, supra note 7, fits neatly into this orientation.  It refers to dilution caused by the use of a brand name as a generic-category indicator such as Q-Tips or Vaseline.  In the conceptualization here, this type of dilution translates into two outcomes: (1) a reduction in the strength of the brand-to-category association (path a) when measuring for typicality in its narrow sense (i.e., testing for categories on which the brand name appears), and (2) an increase in the strength of a brand-to-category association (path a, again) when measuring for typicality in its broad sense (i.e., testing for categories which the brand name evokes generally).  See supra note 21.  For example, assume that the brand name "Xerox" is often used generically.  Over time people may less strongly associate Xerox with a particular brand of copier.  This means that typicality in the narrow sense is reduced.  Yet, when asked to recall a product category when cued with "Xerox," they may be more likely to pick copiers due to its overuse in the realm of copying with respect to many other non-Xerox brands of copiers.  This, in turn, means that typicality in the broad sense is enhanced.

[*159]  B.  Explaining Evaluation Dilution

Evaluation dilution is an important component of dilution, for while courts have sometimes discounted the need of showing that brand evaluations decrease, n40 demonstrating such an outcome would help a plaintiff's cause of action sounding in "tarnishment."

n40 See Quality Inns, supra note 36 at 211, 8 USPQ2d 1633 (citing Yale Electric Corp. v. Robertson, 26 F2d 972 (CA 2 1928)).

Evaluation dilution refers to a reduction in the rating of an original brand due to the emergence of the new brand. n41 As explored later, a new product bearing an existing brand name or similar name may, in certain circumstances, reduce evaluations of the original brand and may, in certain circumstances, increase such evaluations. n42 Parodies or other tarnishment-type situations are but a type of evaluation dilution in which the new brand name or its product category creates an additional association with some unwanted perception.  This special type of evaluation dilution is depicted in Figure 5.

n41 This may occur with or without elaborative processing or involvement.

n42 See Ries and Trout, supra note 29 at 121.

Clearly, parodies and disparagement ought negatively to impact the original brand. But, beyond this limited type of evaluation dilution, one may question why there ought to be the potential for evaluation dilution at all, and, if such potential exists, why we ought to expect evaluation dilution to actually occur. The remainder of this section addresses these two questions.

[*160] On an intuitive level, one may conclude that if an individual were aware that one brand has no relation whatsoever with another brand other than name, no effects ought to be found between them concerning brand evaluation, for they are clearly unrelated. For example, it would seem plausible that an evaluation of Columbia University ought not be affected by one's evaluation of Columbia pictures, or vice versa. On the other hand, if one continues to reflect, it seems commonplace to create evaluative associations between seemingly unrelated objects or persons. Experience reveals that sometimes even trivial characteristics of a person or an object that evoke recall of negative or positive responses (or "affect") can lead to a negative or positive evaluation of the new object. The intuition behind this is supported by a number of theoretical approaches.

The potential for evaluative associations exists because brand attitudes or evaluations are retrieved from memory via associational pathways. n43 (Thus, the paths in the figures depict connections for evaluation transfer as well.) The associational connections between a new brand and an existing brand in memory are likely to increase as the similarity of the brands increases. It is through this process that evaluations may transfer despite the fact that brands may be unrelated as to source. n44 Thus, if someone were to evaluate a particular brand name that evokes another name in memory, the potential exists for evaluative associations to ensue with this other name. n45

n43 See Amitava Chattopadhyay and Joseph W. Alba, The Situational Importance of Recall and Inference in Consumer Decision Making, 15 Journal of Consumer Research 1 (1988).

n44 See Russell H. Fazio, David M. Sanbonmatsu, Martha C. Powell and Frank R. Kardes, On the Automatic Activation of Attitudes, 50 Journal of Personality and Social Psychology 229 (1986).

n45 See Thomas H. Leahey and Richard J. Harris, Human Learning (1985).

A number of explanations may be invoked as to why there ought to be evaluation transfers at all, even when we are aware that the two brands are unrelated as to source. Broad based support for the evaluation-transfer outcome stems from similar predictions from two key theories, stimulus generalization, n46 and schema theory. n47 Stimulus generalization suggests that responses arising from a stimulus will likely be triggered when a similar [*161] stimulus appears perhaps even in another context. n48 This explanation posits a mechanical-type reaction in such a manner as to make less relevant what a person may believe concerning the source of the stimuli in question. Thus, even if one believes that another maker is responsible for the new product, a stimulus generalization approach may predict some amount of evaluation transfer. n49 This view is paralleled by a process-based view whereby a script or schema, triggered by a particular brand stimulus, may likely be activated when the brand appears again. A schema is a composite representation of a set of attributes or characteristics that seem to be stored in memory as an entire category or unit n50 and can be evoked via one or more of the underlying characteristics. Thus, if there are sufficient commonalities between a new brand and an old brand, the old brand schema may be evoked, despite knowledge that the brands are unaffiliated. This can lead to evaluation transfer between the brands. n51 Together these conceptual underpinnings can help one to predict when typicality effects and evaluation effects may vary.

n46 Eric G. Heinemann and Sheila Chase, Stimulus Generalization, in 2 Handbook of Learning and Cognitive Processes (1975); Sarnoff A. Mednick and Jonathan L. Freedman, Stimulus Generalization, 57

IS000881

Psychological Bulletin 169 (1960).

n47 Susan T. Fiske, Schema-Triggered Affect: Applications to Social Perception, in Affect and Cognition: The 17th Annual Carnegie Symposium on Cognition (1982); Susan T. Fiske and Mark A. Pavelchak, Category-Based versus Piecemeal-Based Affective Responses: Developments in Schema-Triggered Affect, in Handbook of Motivation and Cognition: Foundations of Social Behavior (1986).

n48 See Heinemann and Chase, supra note 46; Mednick and Freedman, supra note 46; Donald A. Riley and Marvin R. Lamb, Stimulus Generalization, in Perception and Its Development: A Tribute to Eleanor J. Gibson (1979).

Stimulus generalization has been applied not only to choices but also to evaluations. See, eg, David M. Boush, Shamman Shipp, Barbara Loken, Esra Gencturk, Susan Crockett, Ellen Kennedy, Bettie Minshall, Dennis Misurell, Linda Rochford and Jon Strobel, Affect Generalization to Similar and Dissimilar Brand Extensions, 4 Psychology and Marketing 225 (1987) [hereinafter cited as Boush]; Joe K. Kerby, Semantic Generalization in the Formation of Consumer Attitudes, 4 Journal of Marketing Research 314 (1967).

n49 Again, with nonidentical brands, stimulus generalization can be reduced or heightened via the level of similarity of the brands. Heinemann and Chase, supra note 46; Kerby, supra note 48.

n50 See Fiske, supra note 47; Mita Sujan, Consumer Knowledge: Effects on Evaluation Strategies Mediating Consumer Judgments, 12 Journal of Consumer Research 31 (1985).

n51 Finally, even without this schema invocation, a "piecemeal"-evaluation approach would predict that one brand would be affected by another brand if some value (or "affective tag") is placed on the name. Fiske and Pavelchak, supra note 47. A piecemeal approach simply means that each attribute of an object is evaluated separately (not necessarily actively and consciously), and aggregated in some manner to produce an overall object-evaluation. See Martin Fishbein and Icek Ajzen, Belief, Attitude, Intention and Behavior: An Introduction to Theory and Research (1975). Even seemingly unimportant attributes may act as signals of quality and, thus, affect the perceived quality of the brand that employs these attributes. Jan B. Steenkamp, Conceptual Model of the Quality Perception Process, 21 Journal of Business Research 309 (1990); John J. Wheatley and John S. Chiu, The Effects of Price, Store Image, and Product and Respondent Characteristics on Perceptions of Quality, 14 Journal of Marketing Research 181 (1977); Valarie A. Zeithaml, Consumer Perceptions of Price, Quality and Value: A Means-End Model and Synthesis of Evidence, Journal of Marketing, at 2 (July 1988). A name as a symbol, however trivial it may seem, may act as a cue to quality or lack thereof. Dawn Dobni and George M. Zinkhan, In Search of Brand Image: A Foundation Analysis, 17 Advances in Consumer Research 110 (1990). These quality-related findings do not necessarily rely on any one of the underlying theories discussed above, but support the general notion of evaluation-transfer solely via a brand name.

[*162] III. PREDICTING TRADEMARK DILUTION

Explaining dilution is not in itself sufficient to capture the dilution phenomenon. It is, to be sure, a necessary precursor to the important task of predicting dilution or assessing the likelihood of dilution. This section uses the conceptual base developed earlier to explore predictors of dilution. In doing so, a parallel will sometimes be drawn between the study of brand extensions (e.g., brand licensing or other affiliations) and the study of unrelated brands, since comparable issues are at the heart of both situations.

A. Predicting Typicality Dilution

Some clear conclusions may be drawn regarding the likelihood of typicality dilution. Before listing these conclusions, recall the key associations that characterize typicality dilution. The main result of typicality dilution is that

IS000882

a new association is formed between the original brand name and the new product category (as depicted below in Figure 6, path d); this, in turn, weakens the association between the original brand and the original category (Figure 6, path a). This occurs via the associations between the brand names (Figure 6, path c1 and path c2) and the association between the new brand name and its product category (Figure 6, path b).

The conclusions that one can draw are as follows. First, the stronger the association between the original brand and its product category (path a), the less likely that dilution will occur. Second, the stronger the association between the new brand and its product category (path b), the more likely that dilution will occur. n52 Third, the more similar the brand names, the more likely that dilution will occur (via the strength of path c). Further, the stronger the brand in terms of ease of recall or recognizability, the **[*163]** more vulnerable such brand may be to dilution because the new brand will tend to evoke the original brand more strongly (path c1). n53 But, fourth, the more dominant a brand is (i.e., the more the brand is a representative prototype of its product category, such as IBM for computers), n54 the less easily extended its name is in terms of people's learning new associations (path d). n55 For example, if upon thinking of fast food one thinks first of McDonald's, this dominance will create a situation whereby the name McDonald's will be more difficult for this person to associate with new products. In terms of dilution, this would imply that highly dominant brands would be less affected by new entries with similar names because it would be more difficult for people to learn the new associations with the name. This in turn would make it more likely that the original brand would maintain its associative strength over time and less likely that dilution will occur. n56 In this respect, these findings differ from the explicit assumption in the legal literature that the strongest brands are particularly vulnerable. n57 Fifth, a final key variable affecting dilution is that of the relationship between the two product categories, as depicted in Figure 7. n58

n52 Subject to infra note 61 and accompanying text.

n53 The greater the breadth and depth of associations, the higher the chance that cuing would result in original brand retrieval, Anderson and Bower, supra note 25; Craik and Tulving, supra note 27, and original brand recognition, John R. Anderson, Cognitive Psychology and Its Implications (1980). This result would be enhanced for stronger brands because of the numerous and strong associative networks that such names possess.

n54 See supra note 21.

n55 See Farquhar, supra note 21. While here we are discussing brands perceived to be unrelated except as to their names, this difference ought not substantially affect this finding, which rests on the strength of the original brand.

n56 When one considers a dominant (or prototypical) brand, it may also be the case (but not necessarily so) that such a brand is also generally strong in being able to be recalled upon one's hearing the new brand. (See supra note 19 and infra note 80 concerning such other types of strength besides dominance and typicality.) In such a case, the prediction is moderated by the preceding prediction concerning the overall strength of the original brand, see supra note 53.

n57 See Schechter, supra note 3 at 825, 22 TM Bull 139, *60 TMR 334;* but see Welkowitz, supra note 7 at 540.

n58 It is also suggested by legal commentators that buyer sophistication ought to impact dilution. See Casenote, supra note 9. This article focuses on process-related issues apart from consumer demographics and psychographics. However, consumer expertise has been identified as creating five distinct advantages. It tends to increase a person's ability to encode information selectively, to have truer cognitive structures, to analyze, infer and solve problems better, and to remember better. Joseph W. Alba and J. Wesley Hutchinson, Dimensions of Consumer Expertise, 13 Journal of Consumer Research 411 (1987). Thus, with respect to dilution, individual differences may be important in the brand-stimulus-discrimination aspects, in semantic compartmentalization of the two brands, and in remembering the original-brand category. What is important to

IS000883

83 TMR 149, *163

bear in mind, however, is that individual differences alone may lack a tremendous amount of explanatory power; focusing on brands and brand differences may offer a more robust set of findings regarding this brand phenomenon.

[*164]  This relationship characterizes the congruence of information concerning the use of the brand names.  It has been shown that recall of information is higher when the information is incongruent with prior expectations. n59 Here, congruence can be seen as conceptually similar to the perceived fit n60 between the senior user's product category(ies) and the new product category to which the brand is being associated.  For example, people may be more surprised to see a new brand called "Kodak" tripods (high perceived fit between film and tripods) than to see one called "Kodak" air cleaners (low perceived fit between film and air cleaners).  This conclusion rests on the fact that when identical brands do enter the market, they rarely persist in close product categories, in major part due to the strength of the legal doctrine of avoiding brand confusion. n61 Thus, a higher perceived fit would  [*165]  correspond to greater incongruence and thus tend to increase the likelihood of dilution (by increasing the likelihood of recall of the new category). n62

   n59 Thomas K. Srull, Person Memory: Some Tests of Associative Storage and Retrieval Models, 7 Journal of Experimental Psychology 440 (1981); Robert S. Wyer and Sallie E. Gordon, The Recall of Information about Persons and Groups, 18 Journal of Experimental Social Psychology 128 (1982); Charles Stangor and David McMillan, Memory for Expectancy-Congruent and Expectancy-Incongruent Information: A Review of the Social and Social Developmental Literatures, 111 Psychological Bulletin 42 (1992).

   Incongruence is presumed to impact recall due to the greater elaboration of incongruent information at the time of encoding.  Shelley E. Taylor, A Categorization Approach to Stereotyping, in Cognitive Processes in Stereotyping and Intergroup Behavior (1981).  Current research has largely supported these findings, E. Tory Higgins and John A. Bargh, Social Cognition and Social Perception, 38 Annual Review of Psychology 369 (1987), and the view is consistent with the many parsimonious models of information processing (eg, the 'SAM' model of Raaijmakers and Shiffrin, supra note 27).

   n60 Due to the asymmetries inherent in similarity judgments, Amos Tversky and Itamar Gati, Studies of Similarity, in Cognition and Categorization (1978), the use of the term "fit" may be more appropriate than "similarity."

   n61 Although the congruence of the new brand name per-se to its product category may be higher when its product category highly fits with that of the original brand, it is assumed that seeing such a new brand in a similar product category would overall be more incongruent than experiencing the new brand in a remote product category.  Apart from this reasoning, the same result is predicted for another reason.  The farther the categories and situational circumstances are from each other, the less likely one would tend to recall the original brand (path c in Figure 3).  For example, seeing Sanyo coats in the situation of purchasing outerwear may less likely bring to mind Sanyo stereos than if a new product called Sanyo tapes would emerge.  This, in turn, makes it less likely that Sanyo stereos would evoke Sanyo coats (path d in Figure 4), and thus less likely to dilute the Sanyo-stereo association (path a).

   n62 One should note that when one chooses to measure brand strength via recognition and not recall, as is discussed later, there is some evidence that these predictions regarding congruence do not necessarily apply.  Congruence has been shown to strengthen recognition, see Wyer and Gordon, supra note 59; but see Stangor and McMillan, supra note 59.

*B.  Predicting Evaluation Dilution*

Predicting evaluation dilution first requires one to separate parodies and other disparagement-like activities from simple cases of brand-name proliferation.

IS000884

Parodies and other disparagement-like activities are akin to a type of persuasion. Thus, persuasion-related factors will bear on the likelihood of evaluation dilution caused by parodies. These factors include (1) the central message generated by the parody, (2) the manner of its presentation, and (3) the involvement n63 of the consumers. They all interplay so that the type and severity of the central message will bear on the original brand only for certain products.

n63 The term "involvement" has been used in different ways by different authors. See Anthony G. Greenwald and Clark Leavitt, Audience Involvement in Advertising: Four Levels, 11 Journal of Consumer Research 581 (1984). Here, it generally refers to personal relevance. See Richard E. Petty and John T. Cacioppo, The Elaboration Likelihood Model of Persuasion, in Advances in Experimental Social Psychology (1986).

In particular, a primary and empirically tested theory of persuasion, the "elaboration likelihood" model, posits that it is more likely that consumers would consider and be influenced by the central message (the parody or the disparaging innuendos) where a product elicits moderately high involvement (such as a large consumer durable good) than they would in a low-involvement situation such as for most nondurables. n64 Similarly, seemingly irrelevant cues regarding the parody will impact attitudes differentially depending on involvement. Consumers are more likely to consider (and be influenced by) issue-nonrelevant "peripheral" cues of a message such as manner of presentation, look, and the like, for low-involvement products than they would for high-involvement products or situations. n65

n64 Richard E. Petty, John T. Cacioppo, and David Schumann, Central and Peripheral Routes to Advertising Effectiveness: The Moderating Role of Involvement, 10 Journal of Consumer Research 135 (1983).

n65 See Shelley Chaiken and Charles Stangor, Attitudes and Attitude Change, 38 Annual Review of Psychology 575 (1987); Petty and Cacioppo, supra note 63; Petty, Cacioppo and Schumann, supra note 64.

[*166] Beyond parodies, the question is to what extent does a new brand potentially hurt an existing one by the new brand's very existence. Here, the key factors affecting evaluation dilution are (1) the relationship of the names, (2) the quality of the new product, and (3) the perceived relationship or "fit" between the product categories of the original brand and the new brand. n66

n66 This factor derives from brand-extension studies. For example, the most fundamental and persistent finding in the brand-extension context is that the greater the perceived "fit" between the original brand and the extension, the greater the evaluation of the extension. Aaker and Keller, supra note 6; Rajeev Batra, Donald R. Lehmann and Dipankar Singh, The Brand Personality Component of Brand Goodwill: Some Antecedents and Consequences, in Advertising and Building Strong Brands (forthcoming) [hereinafter cited as Batra]; Boush, supra note 48; David M. Boush, and Barbara Loken, A Process-Tracing Study of Brand Extension Evaluation, 28 Journal of Marketing Research 16 (1991); S. Bridges, A Schema Unification Model of Brand Extensions (1992) (working paper, Marketing Science Institute, Report No. 92-123); Dipankar Chakravarti, Deborah J. MacInnis and Kent Nakamoto, Product Category Perceptions, Elaborative Processing and Brand Name Extension Strategies, 17 Advances in Consumer Research 911 (1990) [hereinafter cited as Chakravarti].

Perceived "fit" results from the relationship between product characteristics. Perceived fit typically refers to two products' substitutability, complementarity, two companies' technological transferability, Aaker and Keller, supra note 6, overall feature or attribute similarity, Kevin L. Keller and David A. Aaker, The Effects of Sequential Introduction of Brand Extensions, 29 Journal of Marketing Research 35 (1992); Jean B. Romeo, The Effect of Negative Information on the Evaluations of Brand Extensions and the Family Brand, 18 Advances in Consumer Research 399 (1991), and higher-order conceptual or "image" fit, Batra, supra the prior paragraph; A.V. Muthukrishnan and Barton A. Weitz, Role of Product Knowledge in Evaluation of Brand Extension, 18 Advances in Consumer Research 407 (1991); C. Whan Park, Sandra Milberg and Robert Lawson, Evaluation of

IS000885

Brand Extensions: The Role of Product Feature Similarity and Brand Concept Consistency, 18 Journal of Consumer Research 185 (1991); cf Burleigh G. Gardner and Sidney J. Levy, The Product and the Brand, Harvard Business Review, at 33 (March-April 1955); William D. Tyler, The Image, The Brand, and The Consumer, Journal of Marketing, at 162 (October 1957).  (For other related measures, see Batra, supra the prior paragraph; Bridges, supra the prior paragraph; Mita Sujan and James R. Bettman, The Effects of Brand Positioning Strategies on Consumers' Brand and Category Perceptions: Some Insights from Schema Research, 26 Journal of Marketing Research 454 (1989); Chakravarti, supra the prior paragraph.)

Clearly, the stimulus-response and schema explanations would predict higher evaluation transfers as the two brands are more similar to each other in name.  Thus, all else being equal, identical names will dilute evaluations more than similar names will.

Regarding quality, studies from the brand extension area indicate somewhat equivocally that the poor quality of a new brand extension may adversely impact the original product. n67 The more highly evaluated the new brand, the less likely that the **[*167]** original brand will be hurt. n68 Due to the associational links discussed earlier, the same conclusion ought to be true in the case of similarly named brands that are unrelated as to source.  But, since there is naturally a stronger perceived relationship between a parent brand and a brand extension than there may be for unrelated brands, this finding suggests a lower likelihood of evaluation dilution concerning unrelated brands (absent disparagement of some sort).

n67 Keller and Aaker, supra note 66; Romeo, supra note 66.  The equivocality comes from the fact that when varying negative evaluations of the brand extension and fit of the extension independently, these studies found to some extent that negative evaluations of brand extensions adversely affected the original brand only when the extensions were somewhat similar to the category of the original source.

n68 This implies as well that the opposite of dilution (or "enhancement") may actually occur if the evaluations of the new brand are very high.  Even for brands unrelated as to source, findings indicate that enhancement of the original brand does occur for highly evaluated new products.  Alex Simonson, The Impact of Identical Brand Names on the Strength of New Brands and Original Brands: A Study of Brand Appropriation and Dilution (1992) (unpublished working paper, Columbia University).

The perceived fit of the new product category with the original product category itself affects likelihood of evaluation dilution, even absent poor quality of a new brand. n69 In particular, studies indicate that as the perceived fit between the product categories (of the new brand and the original brand) decreases, n70 the evaluation of the original product decreases, n71 even if the brands are unrelated as to source, n72 but as long as people are aware of the new brand while evaluating the original brand. n73 This goes beyond the traditional notions of evaluation dilution because it indicates that the mere introduction of a new brand bearing a name identical or similar to an existing brand will more likely hurt the evaluation of the original brand as its relationship with the original brand's product category decreases. n74

n69 Keller and Aaker, supra note 66, for extensions; Simonson, supra note 68, for unrelated brands.

n70 High-fitting categories are, for example, cigars and whisky.  Low-fitting categories are, for example, hardware and analgesics.

n71 Keller and Aaker, supra note 66.

n72 Simonson, supra note 68.

n73 An important finding from brand-positioning studies indicates that as a new brand positions itself closer

**IS000886**

to a strong, dominant or prototypical brand (in the same sense used earlier), it may enhance the prototypical brand, eg, Joel Huber, John W. Payne and Christopher Puto, Adding Asymmetrically Dominated Alternatives: Violations of Regularity and the Similarity Hypothesis, 9 Journal of Consumer Research 90 (1982). This change may work to the detriment of the new brand. Gregory S. Carpenter and Kent Nakamoto, Consumer Preference Formation and Pioneering Advantage, 26 Journal of Marketing Research 285 (1989). Thus, high fit may even enhance the evaluations of the original brand. See Simonson, supra note 68. But, the result here must be viewed within the context of the potential countervailing weight determined by the processes referred to earlier in the context of typicality dilution, wherein it was stated that higher fit creates higher typicality dilution (since the closer the fit, the greater the potential incongruence due to the oddity of such a case).

n74 This sort of evaluation dilution may be less extreme than that caused by poor quality. When looking at quality and fit in the realm of brand extensions, atypical brand extensions (i.e., those that fit poorly with the original brand) resulted in reduced evaluation dilution particularly when consumers were led to focus on the poor fit rather than on information concerning the poor evaluation of the new brand. Deborah Roedder John and Barbara Loken, Diluting Brand Beliefs: When Brand Extensions Have a Negative Impact (1992) (working paper, Marketing Science Institute, Report No. 92-122).

**[*168]** These findings both in the typicality area and in the evaluation area may serve as benchmarks from which to assess likelihood of dilution. Because they represent empirical suggestions rather than rules, studies must be undertaken for individual dilution cases. Such endeavors require an understanding of appropriate tests for determining dilution.

## IV. TESTING FOR DILUTION

### A. Background

Distinguishing terms such as "likely" or "probable" from "merely possible" is a subjective decision not based on statistical principles. n75 It follows that an appropriate task here is not to address the issue of the meaning of "likelihood," but instead to summarize basic methods and issues that arise in testing for dilution, thereby providing guidance in understanding, and in scrutinizing, the tests for dilution. I focus attention first on measuring the typicality and changes in typicality of a brand (i.e., typicality dilution). After this, I briefly touch on the more simple methods of measuring evaluations and changes in brand evaluations (i.e., evaluation dilution). As a caveat, since any research design chosen is a result of particular case-specific issues, and since creativity in design exists, the discussion that follows must necessarily be general in nature. It is intended to highlight the basics of dilution testing.

n75 From a statistical standpoint, the term "likelihood" refers simply to a probability. See J. Johnston, Econometric Methods (3d ed 1984). The term "probability," in turn, reflects the chance of something's occurring. Paul L. Meyer, Introductory Probability and Statistical Applications (2d ed 1970). The term "probable," as used colloquially, already assumes certain rules for assessing likelihoods.

### B. Testing for Typicality Dilution

#### 1. Testing for Associational Strengths

The major method to determine associational strengths is via the cued-recall test, n76 and, therefore, this is the major method for testing brand typicality. n77 For example, one may be asked to name the first "Sony" n78 product category that comes to mind. This test acts as a simple means of determining a brand's typicality (the **[*169]** strength of association from its name to its product category, or path a in prior figures). n79

n76 See Mitchell, supra note 37.

n77 See Farquhar, supra note 21.

n78 The "cued" in cued recall refers to this probe, here "Sony."

n79 It can also be used to determine the strength of association from the new brand name to its product category (path b in prior figures).

While this test also may act to determine the strength of the key association, that of the original brand to the new product category (path d in prior figures), a better recall test can be employed for this association. One can be asked to recall any product categories that come to mind upon hearing the particular brand name. This latter test is a stronger test of typicality, in that a brand that is considered strong here would surely be considered strong under the former test. n80

n80 Both this test and the former one specifically entail the subject's knowledge that he/she is hearing or seeing a "brand." Stronger versions of both these tests involve asking respondents what products (or what) comes to mind when they hear the following word, without stating that it is a brand name. The brand-name word is presented (or stated, as the case may be). Thus, brands that have more meaning in the English language as words (typically suggestive names or descriptive ones) may receive significantly less strength under this sort of inquiry in comparison to the more standard one. These stronger tests, in essence, incorporate a secondary-meaning component. Brands such as "McDonald's" would probably appear strong under all measurements above, while others may not fare so well. See generally *Quality Inns, supra* note 36 at 211-12, *8 USPQ2d 1633,* referring conceptually to a broad approach.

Recall-test responses can be appraised by three major measures: (1) the percentage of those who correctly recalled the product category, n81 (2) the percentage of people correctly recalling the product category early on (first or second) in a list of other recalled responses, n82 and (3) the average (or the percentiles) of consumers' response latencies, i.e., the time elapsed between presentation of the stimulus and the answer of concern. n83 The latter two measures are highly related because an elapsed time measure is thought to correspond with associational strengths much in the same way as do recall and order of recall. n84

n81 Eg, Anderson and Hastie, supra note 25; see also William N. Runquist, Verbal Behavior, in Experimental Methods and Instrumentation in Psychology (1966).

n82 An order-of-recall measure assumes that the respondent was told to list more than one response per brand-cue. While this is one way to test recall, one can simply have asked the respondent for one response per brand-cue. See Albert E. Goss and Calvin F. Nodine, Paired-Associates Learning: The role of Meaningfulness, Similarity, and Familiarization (1965). If this were the case, then only the other two measures apply. For measuring order of recall, a scale is often constructed where the number reflects the order in which the correct category was recalled. For example, if on cuing with Columbia someone states first "pictures" then "university," and the response that one is interested in is university, then the score for this respondent is a 2. If one does not mention the category at all, an issue regarding scaling is presented. As a practical matter, researchers sometimes code a no response as the highest number on a scale from 1 to this highest point (typically a five or a seven). The highest number reflects the worst recall. The lower the score, the higher the strength.

n83 Farquhar, supra note 21; Nedungadi and Hutchinson, supra note 21.

n84 See John G. Lynch and Thomas K. Srull, Memory and Attentional Factors in Consumer Research: Concepts and Research Methods, 9 Journal of Consumer Research 18 (1982); Mitchell, supra note 37.

The simplest method to test all of these is via one single sitting. A basic and short computer program can

IS000888

perform the cued-recall tests.  The program can typically display instructions and then a series of brand names, after each of which the respondent keys in the requested response (here, a product category).  The program records all keystrokes (responses) as well as the elapsed time from the display of each brand name to its respective response, to the millisecond.  (The clock will be accurate to this level with the newer personal computers.) The respondent simply types "start." Responses and latencies (times) are recorded on a file in the floppy disk (ready for data analysis).  All that is needed for large-scale surveys in different metropolitan areas are a small number of portable (laptop) computers at each location.  This method is highly versatile, extremely accurate and time efficient, requiring typically no more than 10 to 15 minutes per respondent.  For precise tests, as needed to obtain meaningful dilution analyses, the computer method is more accurate than that of personal tallying because it does not require placing such heavy reliance on the diligence of interviewers and supervisors.

  [*170]  Another method of testing for associational strengths entails use of recognition tests. n85 In general, recognition is considered a lower-order process that bypasses the search phase and retrieval phases that memory-recall reflects. n86 Thus, simpler tests of memory can be accomplished via these tests.  One can ask for levels of recognition or for dichotomous "yes" or "no" responses; having response-scales often allows one to ascertain more precise results.

> n85 Leahey and Harris, supra note 45 at 135.

> n86 Lynch and Srull, supra note 84; see Raaijmakers and Shiffrin, supra note 27.

In the context of brands, three different types of recognition tasks are generally possible depending on whether respondents are asked to recognize a word, a brand name, or a brand name with a particular product category, e.g., asking how much one recognizes either (1) Sony, (2) Sony brand, or (3) Sony brand televisions. n87

> n87 Conceptually, one could also ask if one recognizes Sony televisions (without mentioning that it is a brand).  See supra note 80.  This is extremely similar to asking someone if he/she recognizes Sony-brand televisions, except for brands that are questionably generic.  The more generic the brand name, one may be more likely to find higher strength in asking the question about a name-category combination without mentioning "brand," because people may be unaware that the name is a brand, but still recognize the word as somehow related to the product category.

In sum, a number of possibilities exist for testing the strength of the associations alluded to earlier in the figures. The strongest test is a recall test without any contextual cues (i.e., without telling the respondent that we are dealing with brands, and, thus, without asking only for categories on which the name appears).  For example, one can ask "what, if anything, comes to mind when you hear the word Sony?" The weakest test is a recognition test with such aforementioned contextual cues.  For example, one can ask "Do you (or how much do you) recognize Sony brand of televisions?" (which is extremely similar to "Are you (or how much  [*171]  are you) familiar with Sony brand of televisions?").  All the other measures lie between these two extremes.

The choice of a particular test and of which cognitive association to test is subjective, in that it must rely to some extent on the purpose of the inquiry.  The test should be viewed in the context of the factors referred to earlier and with an understanding of the dilution process underlying the use of the test.  Also, the test should be maximally strong both to withstand scrutiny in its implementation as well as to be interpretable.  Since these measures of strength have no clear established benchmarks, in order to be interpretable and have meaning, they must be juxtaposed to other measures of strength or benchmarks.  In order to create such meaningful results, it is often desirable to measure changes or differences in strength.  In this context, a test cannot be so difficult as to be unable to uncover differences in the strengths at hand.

  2.  Testing for Changes in Associational Strengths (i.e., Testing for Typicality Dilution)

IS000889

Most associational-strength measures obtained will most likely be compared to some other measures to obtain relative meaning.  Showing dilution effects often requires some comparisons.  These comparisons ought to be made statistically and not merely by intuitively eyeing the results of two independent tests, because, among other reasons, statistics gives one the probability that ones' purportedly meaningful results may have appeared even by chance.  The test comparisons essentially entail either comparing results of (1) a pre-new-product-introduction test with a post-new-product-introduction test or (2) a randomly chosen treatment group with a randomly chosen control group. n88

n88 See Donald T. Campbell and Julian C. Stanley, Experimental and Quasi-Experimental Designs for Research (1966).

An example of the pre-introduction/post-introduction design is that of comparing an original brand's strength prior to the new product's introduction to the original brand's strength some time after the new product's introduction (in a number of locations for generalizability). n89 The fact that dilution may be a long-term **[*172]** process should not necessarily be material, for it simply means that the measures of changes in strength (pre v. post) need to be more precise to elicit results, and that as future tests on other brands in question are completed, benchmarks of these changes in pre v. post will be properly obtained.  On the other hand, where new-product introductions begin with limited geographic scope, one may also maintain relative tests by comparing different groups (those naturally exposed to the product and those not yet exposed to the product).  Here, however, comparability of groups becomes an issue of concern.

n89 In general, the method to accomplish this differs depending on whether the product categories at hand are different or the same (in which latter case, incidentally, the brand names are probably somewhat different).  Where product categories are different (irrespective of the brand name relation), the method entails a paired-associates verbal learning situation, see, eg, Goss and Nodine, supra note 82; Runquist, supra note 81.  Respondents receive a paired list of words, here a brand and a product category.  They are randomly divided into two groups and are exposed to each brand-category pair in randomized order for a few seconds (five or six seconds), as is typical in similar learning tests, eg, Virginia A. Diehl and David L. Horton, Encoding Context Effects on Recognition and Cued Recall, 26 Bulletin of the Psychometric Society 393 (1988); Srull, supra note 59.  In this test appears the new brand-category combination in question.  Then, usually after a distraction task (to help control for primacy and recency effects), respondents are given a cued-recall test wherein the original brand acts as the cue and the product category as the intended "correct" response, see Runquist, supra note 81.  The results of this group are compared to the results of a second group who simply were asked the recall portion of the test (or are compared to the same group's measures of original brand strength taken in advance of the aforementioned cued-recall test).  When dealing with the strongest brands, it is unlikely that such a method would reveal differences in correct recall.  However, response latencies would likely be precise enough to reflect changes due to the introduction of the new brand.

Where product categories are identical and brand names are merely similar, the above methodology cannot be applied.  When the product categories are different only on the subordinate level, such as "auto tires" versus "jet tires," the above methodology may be applied but may yield poor results.  In such cases, we are essentially left without tests for dilution per-se.  We can, however, test for preliminary steps to dilution.  (These tests, of course, can also be applied in the cases where the products are in different categories.)  While a variety of tests can be devised, the core would entail tests of brand recall and brand recognition as opposed to category recall and category recognition.  As an example of a recall case, respondents would be given a new-brand stimulus perhaps with a series of others (depending on the choice of whether to cue that this is a brand or not, above).  Respondents would receive a random list of brands to learn (randomly ordered across respondents), similar in procedure to that described earlier.  The list would include the new brand (cloaked with other words so as to avoid the transparency of the manipulation).  Then (after a distraction task, if deemed necessary), respondents

IS000890

would receive a cued-recall test where the original brand acts as one of the cues. The results of interest are the recall measures concerning the new brand. These may be compared to recall measures of the random set of brand names unrelated to the original brand. (Note that there are statistical issues concerning proper tests and inferences for such repeated measures on the same individuals. See Huynh Huynh and Leonard S. Feldt, Conditions Under Which Mean Square Ratios in Repeated Measurement Designs have exact F-distributions, 65 Journal of the American Statistical Association 1582 (1970).)

The most conservative approach requires such comparability, and, thus, the pre-test/post-test method is most compelling. This requires that a prior measure of brand strength exist so as to make meaningful comparisons. It is vital, therefore, for companies periodically to test the strengths of their brands via surveys so as to have comparable benchmarks on file in the event of the introduction of a new brand bearing the similar or identical name.

With these concepts in mind, one can see how certain tests for dilution are less than revealing. One such test with nonidentical brands is to measure recall of the original brand upon cuing **[*173]** an individual with the new brand. This test addresses only the issue of the magnitude of cue similarity (path c in Figure 3), which constitutes one of the first possible steps in a much longer series of steps resulting in the damage of typicality dilution. Moreover, the numbers obtained from such a test yield a weak benchmark from which to interpret "likelihood" of dilution. A more appropriate test is the reverse, cuing with the original brand and determining how much people recall the new product category (path d in prior figures).

*C. Testing for Evaluation Dilution*

Testing evaluations is more straightforward. One typically asks for evaluations on 5-point to 9-point rating-scales. Testing for evaluation dilution entails a similar process of comparing results of evaluation tests. One must show specifically that evaluations of the old brand are lower than they were prior to the introduction of the new brand. In this context, the two methods suggested above apply: (1) a pre/post comparison, or (2) a comparison of two randomly chosen groups (one used as a control). Again, the comparisons made should be tested statistically. (There is little validity to the test if one fails to determine whether the differences found between the two groups had a high probability of having resulted by chance even if no real differences actually existed.) Again, a periodic evaluation survey for the files as a random-sample benchmark is advisable so as to be able to employ a meaningful comparison when the post-introduction (or post-advertisement) test is necessary.

V.  CONCLUSION

Brand dilution has emerged in the twentieth century as a significant legal concept. Yet, it is heavily reliant upon, and embroiled with, consumer behavior. Despite the connections between dilution in the law and insights regarding dilution from marketing, to date there have been few, if any, insights gleaned from consumer behavior other than the use of surveys as evidence. In attempting to address this shortcoming, this article offers a step in this direction. For ease of recall, Table 1, at the end, briefly summarizes the main points of this article.

To be sure, further empirical evidence is required in order to ascertain precisely how and when dilution occurs. Empirical research is underway in order to cast light on these issues. In this way, we can truly compare and match legal assumptions concerning consumer and brand behavior with relevant evidence.

**[*174]**  Table 1

Brief Summary

(Consult text for details and caveats)

|  | TYPICALITY DILUTION | EVALUATION DILUTION |
|---|---|---|
| I. | POTENTIAL FOR DILUTION | POTENTIAL FOR DILUTION |

IS000891

83 TMR 149, *174

|  | Associational Theory | Attitude-transfers via Associational Theory |
|---|---|---|
| EXPLAIN ING DILUTION | | |

|  | REASONS FOR DILUTION | REASONS FOR DILUTION |
|---|---|---|
| | Increased strength of new associa- tions as a result of the introduction of a new brand-category combina- tion. | Parody, Disparagement Persuasion Theory (elaboration-likelihood) |
| | For indistinguishable brands, this usually amounts to a case of sen- sory-perception confusion as well. | Non-Parody Schema Theory Stimulus Generalization Affective Tag |

| II. | FACTORS INCREASING LIKELIHOOD OF DILUTION | FACTORS INCREASING LIKELIHOOD OF DILUTION |
|---|---|---|
| PRE DICTING DILUTION | The weaker the association between the original brand and its product category, the more likely that dilution will occur. | Parody, Disparagement With low involvement, such as with many nondurable goods, the more negative the periph- eral cues of the message, the |
| | The stronger the association between the new brand and its product category, the more likely that dilution will occur. | more likely that dilution will occur. |
| | The more similar the brand names, the more likely that dilution will occur. | With higher involvement, such as with many durable goods, the more negative the central disparaging message, the more |

IS000892

83 TMR 149, *174

| | |
|---|---|
| | likely that dilution will occur. |
| The stronger the original brand in terms of its ease of recognizability or recall, the more likely that dilution will occur. | Non-Parody |
| | The more similar the brand names, the more likely that dilution will occur. |
| The less dominant an original brand (i.e., the less it is representative of its product category as a prototype), the more likely that dilution will occur. | The lower the evaluation of the new brand, the more likely that dilution will occur. |
| The stronger the relationship (or the fit) between the original brand's product category(ies) and the new brand's product category(ies), the more likely that dilution will occur. | The weaker the relationship (or the fit) between the original brand's product category(ies) and the new brand's product category(ies) and the new brand's product dilution will occur. |

| III. MEASURES | MEASURES |
|---|---|

IS000893

83 TMR 149, *174

|  | Correct Category Recall |  | Evaluation Rating-Scales |
|---|---|---|---|

TESTING

Order of Category Recall

FOR

Time to Category Recall

DILUTION

Recognition Tests

METHODS

Pre-test Post-test Comparisons

Control-Group and Treatment-Group Comparisons
 (Usually via different geographic groups depending on
 the scope of the new-product introduction)

**GRAPHIC:**

FIGURE 1, Step 1: Existence of Original Brand, Step 2: Introduction of New Brand, Step 3: Cuing with Original Brand, FIGURE 2, no caption, FIGURE 3, Step 2: Introduction of New Brand, FIGURE 4, Step 3: Cuing with Original Brand, FIGURE 5, no caption, FIGURE 6, no caption, FIGURE 7, no caption.

IS000894

```
                                                          105KR6

********** Print Completed **********

Time of Request: Wednesday, June 10, 2015  15:15:43 EST

Print Number:   2825:516918701
Number of Lines: 789
Number of Pages: 22
```

```
Send To:  LARKIN, CHRISTOPHER
          SEYFARTH SHAW LLP
          2029 CENTURY PARK E STE 3500
          LOS ANGELES, CA 90067-3063
```

**IS000895**