# *VIP Products LLC v. Jack Daniel's Properties*

## U.S. District Court, District of Arizona

## Jack Daniel's Closing Statement
### October 5, 2017

# What does the evidence show re:

1. Infringement

2. Tarnishment




## Issue #1: Infringement



The evidence shows that consumers are *likely to be confused* as to whether:

- Jack Daniel's *makes or puts out* the VIP dog toy

- Jack Daniel's *authorizes or approves* VIP's making the dog toy

- VIP is *affiliated or associated with* Jack Daniel's ?

# Applying the *Sleekcraft* Factors
## Ninth Circuit: "We don't count beans"

Eight-Factor *Sleekcraft* Test:
1. Strength of Jack Daniel's marks
2. Similarity of the parties' marks
3. Proximity of the parties' products
4. Existence of actual confusion
5. VIP's intent in adopting its mark
6. Coincidence of marketing channels
7. Degree of care of purchasers
8. Likelihood of expansion of the parties' product lines

*Only a handful of the factors can be determinative*

# Factor 1:  The Jack Daniel's Marks are Strong

Testimony of Philip Epps, Global Brand Manager:



- Largest selling American whiskey

- *Interbrand:*  Most valuable spirits brand in the world

- Between 1997 and 2015:  Over **75,000,000** cases sold

- Revenues of over **$10,000,000,000**

- VIP concedes Jack Daniel's brand is strong (Doc. 209 ¶ 30)

- Print, TV, radio, social media ads + movies and TV shows

- U.S. public has very high brand awareness

# Factor 2:  The marks are very similar



- Overall impression is very similar

- VIP admits intentional copying
  - Testimony of designer Elle Phillips and owner Steve Sacra
  - The "anti-dissection" rule



# Factor 2: Jack Daniel's Trade Dress



Black cap

Black neck wrap closure with white printing bearing the Old No. 7 mark

Square bottle with a ribbed neck

Black front label with white printing and a filigreed border bearing the Jack Daniel's mark depicted in arched lettering at the top of the label

Old No. 7 mark contained within a filigreed oval design in the middle portion of the label beneath the Jack Daniel's mark

The words Tennessee Sour Mash Whiskey in the lower portion of the label with the word "Tennessee" depicted in script (the "Jack Daniel's Trade Dress")

# Factor 2: Bad Spaniel's Trade Dress



Black cap

Black neck wrap closure with white printing bearing the Old No. **2** mark

Square bottle with a ribbed neck

Black front label with white printing and a filigreed border bearing the **Bad Spaniel's** mark depicted in arched lettering at the top of the label

Old No. **2** mark contained within a filigreed oval design in the middle portion of the label beneath the **Bad Spaniel's** mark

The words **On Your Tennessee Carpet** in the lower portion of the label with the word "Tennessee" depicted in script (the "Jack Daniel's Trade Dress")



# Factor 2: The Marks Are Highly Similar



# Factor 3: The Products Are Proximate/Related

- **Jack's trademark strength entitles it to broad protection**

- **Jack Daniel's licensing program extends to "supplemental products," including dog-related products such as leashes, collars, dog houses and dog beds**





# Factor 4: Evidence of actual confusion

- Proof of actual confusion is not required:  *Sleekcraft*

- Indicia of actual confusion include:
  - Exhibit 170:  Boozin' Gear website officially licensed Jack Daniel's merchandise adjacent to "our Jack Daniel's style" squeaker toy
  - Exhibit 171:  WearYourBeer.com website shows Bad Spaniels toy as "new item" adjacent to officially licensed Jack Daniel's merchandise
  - Exhibit 174:  Amazon.com review pages for Bad Spaniels toy mentions "Bad Spaniels (Jack Daniel's) dog toy"

- Well-designed survey constitutes surrogate evidence of actual confusion

# Factor 4: Verbatim responses from consumers

Q:  "Who or what company makes or puts out this product?"

A:  29% of consumers said, "Jack Daniel's"

Ford Report, Exhibit 134



# Actual confusion: Verbatim responses from consumers

Q: "Why do you say that?"



A: "The logo replica"

A: "The bottle"

A: "The label"

A: "The print, font and bottle looks like Jack Daniel's"

A: "It looks like the packaging from Jack Daniel's sauces"

# Flaws in Dr. Nowlis's Analysis

- **He didn't change the control stimulus.**
  - What would he change?
    - We don't know. (Dep. Tr. at 112-15)
  - What effect it would have?
    - We don't know. (Dep. Tr. at 126-27)

- **He didn't recode the responses.**
  - Which would he recode?
    - We don't know. (Dep. Tr. at 233)
  - How many would he recode?
    - We don't know. (Dep. Tr. at 233)

# Flaws in Dr. Nowlis's Analysis

- **He didn't do a rebuttal survey.**
  - He could have. (Dep. Tr. at 38-9)
  - He has before. (Dep. Tr. at 38-9)
  - He rejects critiques which are not based on empirical research:

  "[The adverse expert's] opinions about what consumers would do . . . *are simply speculation on his part, as he has not supported these conjectures with empirical tests or research*."
  – Nowlis, in another case (Dep. Tr. at 55)

# Flaws in Dr. Nowlis's Analysis

- **Dr. Ford was right all along.**

  - An internet survey was proper.
    - Bad Spaniels is sold on the internet.

  - Control eliminated "active ingredients"
    - The Jack Daniel's trade dress is defined the "overall impression"

  - The coding was proper.
    - 29% of respondents were confused.

# Factor 5: VIP's Intent



**VIP's designer used Jack Daniel's bottle as model**



**VIP's manufacturer adopted most recent Jack Daniel's design**



**Stephen Sacra approved it all**



**VIP intentionally copied**

# Factor 6: The Marketing Channels Converge

- Both parties' products are sold on the same websites
  - Exhibit 170:  Boozin' Gear website shows officially licensed Jack Daniel's merchandise adjacent to Bad Spaniels toy
  - Exhibit 171:  WearYourBeer.com website
  - Exhibit 172:  Amazon.com screen shot
  - Exhibit 174:  Amazon.com review pages for Bad Spaniels toy

# Factor 7:  Consumers Don't Exercise a High Degree of Care

- The VIP product is a "disposable" dog toy which sells for $12 to $15
- "[L]ow prices imply correspondingly low consumer care."  *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A.,* Jack Daniel's Findings of Fact and Conclusions of Law at 24.

# Factor 8:  Product Line Expansion Isn't Required – Jack Daniel's Already Offers Licensed Dog Products





# Issue #2: Tarnishment



1. **Are the Jack Daniel's brand and packaging "famous"?**

   "Famous" means "widely recognized by the general consuming public of the United States."  Lanham Act § 43(c)

2. **Tarnishment: Is the VIP dog toy likely to tarnish Jack Daniel's reputation?**

   Dr. Simonson's testimony: VIP's dog toy adversely affects Jack Daniel's brand due to association between its whiskey and dog feces.

# Dr. Simonson's Conclusions re Tarnishment

- The VIP product intentionally copies Jack Daniel's and is intended to and does bring Jack Daniel's to mind

- The VIP product introduces another mental association into the Jack Daniel's memory network

- It invokes defecation, which is inherently disgusting, especially when considered in connection with consumable products

- Common sense conclusion:  "An association between a famous whiskey brand and a dog's no. 2 is likely, consciously or unconsciously, to diminish consumers' attraction to and interest in Jack Daniel's."

# Mr. Silverman's Rebuttal is Flawed

- His views are not based on science; didn't read any of Simonson's research-based authorities or have any comment on them

- He acknowledges his focus groups are not projectable

- Moderator led the group:  "This is about *spoof products*."

- Participants were led to categorize products into "just a joke," "insulting," or "somewhere in between"

- At least two found VIP's product "in between," i.e., not "just a joke"

- At least one said VIP product would negatively affect Jack Daniel's

- He admits associative network model is "common sense"

# Flaws in Mr. Silverman's Critique

- Not a research specialist (Deposition page 82)
- Couldn't think of a way to do a quantitative test (p. 84)
- Focus groups are not quantitative and thus not projectable (p. 90)
- His study was just qualitative, and a limited one at that (p. 82)
- He always thought Dr. Simonson's "associative network memory model" was "common sense" (p. 83)
- His focus groups are not intended to be, and are not, projectable to any relevant consumer population (p. 104)
- Doesn't think moderator's calling the subject "spoof products" gave the focus groups cues about the purpose of the focus group (p. 157)

# Why Does This Case Matter?

