Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ARIZONA
 3
 4    VIP PRODUCTS, LLC, an Arizona    )
      limited liability company,      )
 5                                     )
      Plaintiff and Counterdefendant, )
 6                                     )
              vs.                      )  Case No.
 7                                     )  14-cv-02057-PHX-DGC
      JACK DANIEL'S PROPERTIES, INC., )
 8    a Delaware corporation,          )
                                       )
 9    Defendant and Counterclaimant.   )
      _____ )
10
11
12
                 DEPOSITION OF ELEANOR PHILLIPS
13
14
15
                       Phoenix, Arizona
16                     April 21, 2015
                         8:58 a.m.
17
18
19
20
21
22
23
      PREPARED BY:
24    BECKY BAUMERT
      Certified Court Reporter
25    Certificate #50152
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 2

1                          I N D E X

2

3                    E X A M I N A T I O N

4   Phillips, Eleanor                                    Page

5   By:  Mr. Larkin                                         6

6

7

8                     E X H I B I T S

9   Phillips Deposition Exhibits:                        Page

10    1    Notice of Deposition and Subpoena              6

11    2    Archived web site page of VIP Products        21

12    3    Elle Phillips' LinkedIn page                  27

13    4    VIP Products product catalog                  39

14    5    One-page photograph of VIP Products product   40
           catalog
15
      6    Photograph of Silly Squeaker bottle toys      43
16
      7    Photograph of Silly Squeaker wine bottle      44
17         toys

18    8    One-page photograph of Tuffzilla product      45

19    9    Sketch of Bad Spaniels label; e-mail from     50
           Elle Phillips dated June 10, 2013
20
      10   E-mail dated June 11, 2013 from Elle          61
21         Phillips with attached label

22    11   Source image file for Bad Spaniels label      64

23    12   E-mail from Elle Phillips dated June 11,       65
           2013 with attached Bad Spaniels label
24
      13   Service invoice from Elle Phillips Design     67
25         dated June 17, 2013



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 3

```
 1              E X H I B I T S (Continued)
 2    Phillips Deposition Exhibits:                    Page
 3    14   E-mail from Stephen Sacra dated November 22,  69
           2013
 4
      15   E-mail from Elle Phillips dated November 22,  71
 5         2013 with neck and bottle cap labels
 6    16   Service invoice from Elle Phillips Design     80
           dated November 25, 2013
 7
      17   E-mail from Stephen Sacra dated November 27,  81
 8         2013, with attached pictures of bottles
 9    18   E-mail from David dated December 17, 2013,    81
           with attached picture of Dos Perros bottle
10
      19   E-mail from Stephen Sacra dated December 18,  82
11         2013, with attached picture of Dos Perros
           bottle
12
      20   E-mail from Stephen Sacra dated February 23,  84
13         2014, with attached picture of Bad Spaniels
           bottle
14
      21   E-mail from Elle Phillips dated February 24,  86
15         2014
16    22   Three photographs of bottle with Bad         89
           Spaniels label
17
      23   36 photographs of Bad Spaniels bottle        90
18
      24   E-mail from Elle Phillips dated March 17,     93
19         2014 with attached photographs of Bad
           Spaniels packaging
20
      25   E-mails between Stephen Sacra and Elle        95
21         Phillips dated March 17, 2014
22    26   E-mail from Elle Phillips dated March 17,     96
           2014, with attached photographs of
23         packaging
24    27   E-mail from David Bai dated March 22, 2014    98
25    28   Photograph of seven Bad Spaniels bottles      98
```



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 4

```
 1              E X H I B I T S  (Continued)
 2    Phillips Deposition Exhibits:                      Page
 3    29   E-mail from Stephen Sacra dated March 18,      98
           2014
 4
      30   E-mail from Elle Phillips dated March 18,      99
 5         2014 with attached finalized, print-ready
           artwork
 6
      31   Service invoice from Elle Phillips Design     102
 7         dated March 24, 2014
 8    32   E-mails between Elle Phillips and Lisa         103
           Carpenter
 9
      33   E-mails between Wendy Sacra and Elle          106
10         Phillips dated July and August 2014
11    34   E-mail from Wendy Sacra to Elle Phillips      107
           dated September 2nd, 2014, requesting
12         hi res images of toys
13    35   E-mail from Wendy Sacra to Elle Phillips      107
           dated November 28, 2014, requesting creation
14         of sell sheets for two new Silly Squeaker
           liquor bottles
15
      36   Sell sheet for Silly Squeaker toys           108
16
      37   Sell sheet for Bad Spaniels toy             109
17
      38   Sell sheet for Bad Spaniels toy             111
18
      39   Sell sheet for Bad Spaniels toy             112
19
      40   Web site page for Bad Spaniels toy          113
20
      41   Photograph of Bad Spaniels bottle on a bar  116
21
      42   Photograph of Bad Spaniels bottle on a bar  117
22
      43   The Coffee Shop article on Elle Phillips'   124
23         Web site
24    44   Photographs of Pepsi bottle and box design  125
25
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 5

1

2

3          THE DEPOSITION OF ELEANOR PHILLIPS,

4

5    taken at 8:58 a.m. on April 21, 2015, in the law offices

6    of Dickinson Wright, PLLC, 1850 North Central Avenue,

7    Suite 1400, Phoenix, Arizona, before BECKY BAUMERT, a

8    Certified Reporter, Certificate Number 50152, in the State

9    of Arizona.

10

11   APPEARANCES:

12        For the Plaintiff and Counterdefendant VIP PRODUCTS:
              Messrs. Frank G. Long and David G. Bray
13            Dickinson Wright, PLLC
              1850 North Central Avenue, Suite 1400
14            Phoenix, Arizona  85004

15        For the Defendant and Counterclaimant JACK DANIEL's
          PROPERTIES, INC.:
16            Mr. Christopher C. Larkin
              Seyfarth Shaw LLP
17            One Century Plaza
              2029 Century Park East, Suite 3500
18            Los Angeles, California  90067-3021

19        Also present was Mr. Stephen Sacra.

20

21

22

23

24

25



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 6

1                                                Phoenix, Arizona
                                                 April 21, 2015
2                                                8:58 a.m.

3

4                          ELEANOR PHILLIPS,

5    called as a witness herein, having been first duly sworn,

6    was examined and testified as follows:

7

8                          EXAMINATION

9    BY MR. LARKIN:

10       Q.     Would you state your name and business address

11   for the record, please.

12       A.     Eleanor Phillips, 82 East State Street, Eagle,

13   Idaho.

14       Q.   Good morning, Ms. Phillips.  My name is Chris

15   Larkin.  I'm an attorney for Jack Daniel's Properties,

16   Incorporated, which is a defendant and a counterclaimant

17   in a case that is pending in the United States District

18   Court for the District of Arizona, in which VIP Products,

19   LLC is the plaintiff and counterdefendant.  You don't need

20   to worry about those issues.

21         MR. LARKIN:  Let's mark as Exhibit 1 a copy of

22   the Notice of Deposition to Ms. Phillips and a Subpoena

23   that we served on David Bray.

24         (Deposition Exhibit Number 1 was marked for

25   identification by the Reporter.)



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 7

1      Q.     BY MR. LARKIN:    Ms. Phillips, what we marked as
2   Exhibit 1 is the Notice of your deposition today.    That's
3   the formal notification that my client, JDPI, intends to
4   depose you, and about three, four pages into the document
5   there is a Subpoena that constitutes the rest of the
6   document.    Are you appearing here today in response to
7   that Subpoena?
8      A.     Yes.
9      Q.     We will come back to the Subpoena in a few
10  minutes.    Have you ever had your deposition taken before?
11     A.     No.
12     Q.     Have you ever testified in court?
13     A.     No.
14     Q.     Or any sort of administrative proceeding?
15     A.     No.
16     Q.     Okay.    Let me spend a couple of minutes going
17  over the ground rules so that we can try to make this as
18  expeditious as possible today.
19     A.     Okay.
20     Q.     Your deposition is being taken as a third party
21  witness, somebody who is not a party to the litigation
22  between VIP and JDPI.    And it is, even though we are
23  sitting in the informality of a law conference, it's a
24  formal legal proceeding.    Your testimony that you give
25  today could be used by either side in the litigation



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 8

1   between JDPI and VIP.

2          As you can see, the reporter is taking down what

3   I am saying.  My questions today, your answers, anything

4   that Mr. Long may say will be recorded by the court

5   reporter in the same way as she is recording what I am

6   saying now.  And at the end of the deposition that will be

7   transcribed into a booklet that will be known as the

8   transcript of your deposition and that will be presented

9   to you eventually under rules that Mr. Long and Mr. Bray

10  and I will stipulate to at the end of the deposition.

11         You will be given the opportunity to review it,

12  make any corrections that you deem necessary and then sign

13  it under penalty of perjury.  I want to let you know if

14  you do make any corrections of a substantive nature to the

15  transcript of your deposition, I or any other attorney can

16  comment on that at some future point in the case, if you

17  testified one way at your deposition and another way when

18  you reviewed the transcript.  We'd like to avoid that to

19  the extent possible.  So it's important that you try to

20  give your full, complete and accurate testimony today.  Do

21  you understand that?

22     A.    Yes.

23     Q.   I am going to be asking you questions.  You will

24  be answering.  Mr. Long or later Mr. Bray may be making

25  objections.  To make that process run smoothly it's



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 9

 1   important that we avoid some habits that we engage in in
 2   everyday speech, such as our conversation before the
 3   deposition.
 4          One of those is it's important not to interrupt
 5   the other person's question or answer.  Oftentimes in
 6   everyday conversation we anticipate what the end of a
 7   question is and we break in and provide the answer.  And
 8   it's important to try to avoid doing that today.  It makes
 9   the job for the reporter much more difficult.  So please
10   let me finish my question before you begin your answers,
11   and by the same token I will try to let you finish your
12   answers before I ask the next question.  Do you understand
13   that?
14        A.    Yes.
15        Q.    I am going to try to ask clear, understandable,
16   straightforward questions.  I will probably fail at some
17   points during today's deposition, so if you don't
18   understand one of my questions, please don't hesitate to
19   say so and we will either have the reporter read the
20   question back or I will try to rephrase it so that it's
21   understandable to you.  If you do answer one of my
22   questions, I will assume and anyone reading your
23   transcript later will assume you understood my question
24   and answered the question that was posed to you.  Do you
25   understand that?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 10

1          A.    Yes.
2          Q.    Okay.   You were given an oath at the outset of
3    this proceeding.   That's the same oath that the witness
4    would take testifying in court before the judge and the
5    jury.   It carries with it the same solemn duties to
6    testify truthfully.   Do you understand that?
7          A.    Yes.
8          Q.    We are going to be marking certain documents
9    today, as we did with Exhibit 1, out of this pile.   It's
10   not as bad as it looks.   Trust me.   Many of those will be
11   authored by you or received by you, and you will be
12   familiar with them.   And again in our everyday
13   conversations it is typical if you refer to it as that
14   e-mail or that letter or in your case drawing or something
15   of that sort.   It's important to try not to do that today
16   and that we try to refer to documents by the exhibit
17   numbers that will be assigned by the reporter, and as you
18   will see later, some smaller numbers that have been placed
19   on those documents by the parties producing them in
20   discovery.
21          So to the extent that we can, it's important that
22   we try to reference exhibit numbers and then specific
23   pages in the exhibit so someone who isn't present today
24   who might read your transcript later will understand what
25   you and I are referring to.   Do you understand that?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 11

1     A.    Yes.

2     Q.    If you need a break for any reason, don't

3  hesitate to ask.  I usually go about an hour or so and

4  take a break.  If you need one sooner than that, please

5  let me know.  My only request is that if there is a

6  question pending to you that hasn't been answered yet, I'd

7  like you to answer the question before we take a break.

8  Do you understand that?

9     A.    Okay.  Yes.

10    Q.    I also want to thank you on the record for making

11  yourself available here in Phoenix.  I know your office is

12  in Idaho.  And since I'm from Los Angeles, I'm very

13  grateful I didn't have to make a longer trip.

14          Did you do anything to prepare for your

15  deposition today?

16    A.    Can you clarify?

17    Q.    Did you speak with anyone?  Did you review any

18  documents?

19    A.    Yes.  I reviewed the Subpoena, and I also spoke

20  with the other lawyer, David.

21          MR. LONG:  Yes.

22    Q.    BY MR. LARKIN:  Did you review any documents

23  other than the Subpoena?

24    A.    No.

25    Q.    Mr. Bray produced to us yesterday a number of



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 12

1    documents, many of which we will mark today, that

2    apparently you gave to him in response to the Subpoena.

3    Did you review those in preparation for your testimony

4    today?

5        A.    The documents that I provided?

6        Q.    Yes.

7        A.    Yes.

8        Q.    Did you speak to Mr. Sacra today or previously

9    about your deposition?

10       A.    Yes.

11       Q.    When did you do that?

12       A.    We spoke this morning.

13       Q.    Was Mr. Long or Mr. Bray present during that

14   conversation?

15       A.    No.

16       Q.    Can you tell me generally what you and Mr. Sacra

17   spoke about this morning?  Was it more than pleasantries?

18       A.    Not really.  Just curious about how the

19   deposition will go.

20       Q.    Did you discuss with Mr. Sacra any of the

21   questions that he anticipated you being asked?

22       A.    Yes.

23       Q.    What did you discuss with him in that regard?

24       A.    We were discussing parodies.

25       Q.    Is that the first time that you discussed the



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 13

1    idea of parodies with Mr. Sacra?

2        A.    No.

3        Q.    How many prior occasions?

4        A.    Oh, I couldn't say.  We have spoken about them

5    over years.

6        Q.    What is your understanding of what a parody is?

7        A.    It's an imitation of something serious made to be

8    fun.

9        Q.    Is that the extent of your understanding of what

10   a parody is?

11       A.    That's a good generalization.

12       Q.    Have you ever -- we will get into your background

13   in more detail in a moment, but have you ever read cases

14   or consulted legal treatises about what a parody is?

15       A.    No.

16       Q.    If you would turn to the last five pages of the

17   Subpoena.  The first of those five is the one that says

18   "Requests for Production" at the top.  Got it?

19            Did you receive the Subpoena from Mr. Bray?

20       A.    Yes.

21       Q.    When you received it, what did you do to search

22   for responsive documents?

23       A.    I did a search on my computer.  I have an Apple

24   where you can search all the files in the system.  And

25   searched for anything that said Jack Daniel's and Bad



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 14

1    Spaniels.

2        Q.    What types of documents did you locate in that

3    search?

4        A.    A few e-mails and then the production files.

5        Q.    Anything else?

6        A.    Not that I recall.

7        Q.    When you do work for clients such as VIP, do you

8    maintain a particular file for each matter you work on for

9    them?

10       A.    Yes.

11       Q.    So there would be a file, for example, for the

12   Bad Spaniels toy that's the subject of this case?

13       A.    That's correct.

14       Q.    Is that the file that you located through your

15   search on your Apple computer?

16       A.    Yes.

17       Q.    What materials as a general matter are in your

18   project files or your Word files like the Bad Spaniels

19   file?

20       A.    It's any sketches that I have scanned and the

21   images that I have created that compose the complete file

22   and then the InDesign file where everything is created.

23       Q.    Was that InDesign?

24       A.    InDesign.  It's a program that I created.

25       Q.    And the letter I-N?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 15

1      A.    I-n-D-e-s-i-g-n.  And the PDF output.

2      Q.    Do you also keep e-mails, other correspondence

3  pertaining to each project in the production files for

4  that project?

5      A.    No.  E-mails are organized by client in general,

6  and I often purge e-mails after about a year.

7      Q.    That's your normal procedure?

8      A.    Yes.

9      Q.    Is there a VIP client file containing e-mails

10  that you received or sent to VIP?

11      A.    Yes.

12      Q.    Sitting here today, does that consist of

13  basically whatever was sent or received within the last

14  year?

15      A.    Generally.

16      Q.    What are the exceptions to that?

17      A.    Well, I do a general purge about once a year, so

18  sometimes there will be an e-mail that's a year old or it

19  could be only a day old, depending on when I have purged

20  the e-mails.

21      Q.    Okay.  Got it.  Did you do anything other than

22  search on your Apple computer to look for documents

23  responsive to the Subpoena?

24      A.    I also searched my backup files.

25      Q.    What are those?



Page 16

1    A.    It's a separate drive that I keep to back up in
2    case my current hard drive fails.
3    Q.    That's a redundant set of files?
4    A.    Yes, yes.
5    Q.    Did you find anything in the backup file that you
6    didn't find in your search of your main file?
7    A.    Yes.
8    Q.    What did you find?
9    A.    That's where the e-mails were.
10    Q.    Is the backup file purged?
11    A.    No.  But after some time it will get overwritten.
12    Q.    Let's look down quickly to the individual
13    Requests for Production, and I want you to tell me,
14    starting with numbered Paragraph 1, whether you found
15    anything that was responsive to each individual request.
16    Did you find anything in response to Paragraph 1?
17    A.    "All documents and things" -- I did a search for
18    Jack Daniel's, and I think one e-mail came up.
19    Q.    How about Paragraph Number 2?
20    A.    I think that would have been the same e-mail that
21    had come up.
22    Q.    Paragraph Number 3 looks like that would be your
23    production file for the Bad Spaniels toy; is that correct?
24    A.    That would be the production file.
25    Q.    Paragraph 4, which is, "All documents and things



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 17

1   which relate to or reference the disclaimer," did you find
2   anything in response to that?
3       A.   No.
4       Q.   How about Paragraph 5?
5       A.   Yes.
6       Q.   Paragraph 5 references sells sheets, catalogs,
7   Web site pages, or other materials in which the Bad
8   Spaniels toy is depicted.  Do you maintain a separate file
9   for materials of that sort that pertain to a particular
10  toy that you helped design?
11      A.   Yes.
12      Q.   In general, what are those files called?
13      A.   For sells sheets it says sheet folder.  It's a
14  catalog folder.  I didn't see any Web site pages, but I do
15  take photographs and keep photographs in a photograph
16  folder.
17      Q.   So is it correct that your production files for
18  individual projects such as the Bad Spaniels consists
19  solely of what you did to help your client design the toy
20  that is the subject of that product?
21          MR. LONG:  Objection, form.
22      A.   BY THE WITNESS:  Can you rephrase the question?
23      Q.   BY MR. LARKIN:  Sure.  Are the production files
24  that you maintain where you keep your sketches, drawings,
25  mock-ups or anything of that sort for each individual



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 18

1    project?

2            MR. LONG:   Form.

3        Q.   BY MR. LARKIN:   Taking Bad Spaniels as an

4    example -- we are going to get into the individual

5    documents -- what did you find when you searched your Bad

6    Spaniels production file, what types of documents?

7        A.   As I stated earlier, it would be the sketches,

8    the images used to put together the file and the InDesign

9    and the PDF files.

10       Q.   At what point does that file end?  When the

11   project is completed?

12       A.   Yes.

13       Q.   And then if you do anything later that has to do

14   with that particular project, such as a sell sheet, that

15   goes into a separate file, not the production file?

16       A.   Correct.

17       Q.   Paragraph 6, anything related to actual claims of

18   trademark in regard to the Bad Spaniels toy, did you find

19   anything?

20       A.   No.

21       Q.   Paragraph 7?

22       A.   Yes, I did search for those.

23       Q.   Did you find anything?

24       A.   Yes.

25       Q.   Did you produce those?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 19

1    A.    Yes.

2    Q.    Paragraph 8?

3    A.    No, I did not find anything for that.

4    Q.    Paragraph 9?

5    A.    That would be a very difficult thing to do since

6    I have worked with hundreds of companies over the last ten

7    years.

8    Q.    Okay.  I gather you didn't do that search for

9    Paragraph 9?

10    A.    No, I did not.  That would have taken far too

11    much time.

12    Q.    How about Paragraph 10?

13    A.    Same thing.  There was just no time to do such

14    search.

15    Q.    Turn the page, please.  Paragraph 11.

16    A.    I wouldn't really know how to search for

17    something like that.

18    Q.    Paragraph 12.  Let me ask you directly.  Have you

19    been a party to a case involving a claim of copyright or

20    trademark infringement in the past?

21    A.    Yes.

22    Q.    How many such cases?

23    A.    One.

24    Q.    When was that?

25    A.    I couldn't give you an exact date.  Several years



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 20

1    ago.

2         Q.    More than three years ago?  This is 2015, April.

3         A.    I can't recall exactly.  It was several years

4    ago.

5         Q.    Did that involve VIP?

6         A.    Yes.

7         Q.    Were you named as a party -- strike that.

8               If you look at the front page of the Deposition

9    Notice, there is a caption that starts about the 14th line

10   down, and the caption contains the party to the case.

11   Were you a party to that case that you referred to a

12   moment ago?

13        A.    I don't know actually.

14        Q.    Who was the plaintiff?  Who was the party

15   bringing the claim?

16        A.    Anheuser-Busch.

17        Q.    Was your deposition taken in that case?

18        A.    No.

19        Q.    What was your involvement in that case?

20        A.    I was questioned over the phone by one of the

21   Anheuser-Busch lawyers.

22        Q.    Sometimes depositions of the sort we are taking

23   today are taken over the phone.

24        A.    Oh.

25        Q.    I am telling you that.  I'm not suggesting that



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 21

1    was or wasn't, where you are sworn in like you were today,
2    and the lawyers ask questions and make objections.  Do you
3    recall if that's what happened in that case?
4        A.   That does not sound like what happened.
5        Q.   Your recollection is the lawyer from
6    Anheuser-Busch just called you up and asked you some
7    questions, not in the context of a formal deposition like
8    this?
9        A.   Correct.  He did threaten to Subpoena me if I
10   didn't answer questions over the phone.
11       Q.   Do you recall in general what he asked you about?
12       A.   A design of a bottle.
13       Q.   What product was involved?
14       A.   A squeaky bottle toy similar to this one.
15            MR. LARKIN:  Let's mark as Exhibit 2 a page that
16   I will represent to be an archived page from the VIP Web
17   site that I obtained off the Web site archive.org.
18            (Deposition Exhibit Number 2 was marked for
19   identification by the Reporter.)
20       Q.   BY MR. LARKIN:  Ms. Phillips, have you seen this
21   page before?
22       A.   Yes.
23       Q.   Okay.  And have you seen the product that is
24   depicted on the page before?
25       A.   Yes.



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 22

1      Q.   The one on the right, the name of that product is
2   ButtWiper.  Do you see that?
3      A.   Yes.
4      Q.   Is that the product that was at issue in the
5   Anheuser-Busch litigation?
6      A.   Yes.
7      Q.   Did you design both of those products?
8      A.   Yes.
9      Q.   After the Anheuser-Busch lawyers spoke to you,
10  did you have any further involvement in the lawsuit
11  between Anheuser-Busch and VIP?
12     A.   No.
13     Q.   Did you ever learn that an injunction was issued
14  against VIP prohibiting the sale of the ButtWiper toy?
15     A.   No.
16     Q.   Do you have a Web site?
17     A.   Yes.
18     Q.   What's the URL for that?
19     A.   www.ellephillips.com.
20     Q.   Are there any other domain names that get you to
21  that Web site besides ellephillips.com?
22     A.   Yes.
23     Q.   How long have you maintained a Web site at
24  ellephillips.com?
25     A.   Eleven years, I think.



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 23

1      Q.    Have you displayed toys that you have designed
2    for VIP on your site?
3      A.    Yes.
4      Q.    Did you display the ButtWiper toy at some point?
5      A.    I don't recall.
6      Q.    Other than the phone call with the Anheuser-Busch
7    lawyer, did you have any involvement in the Anheuser
8    versus VIP litigation?
9            MR. LONG:  Object to form.
10     A.    BY THE WITNESS:  No.
11     Q.    BY MR. LARKIN:  Give your answer.
12     A.    No.
13     Q.    Do you recall speaking to Mr. Sacra about the
14   case?
15     A.    I don't recall.
16     Q.    Do you recall speaking to VIP's lawyers about the
17   case?
18     A.    I recall that I did not speak with any lawyers.
19     Q.    So the Anheuser-Busch phone call was the sole
20   involvement you had in that case, correct?
21     A.    Yes.
22     Q.    About how long did that call last?
23     A.    Somewhere between 30 and 60 minutes.
24     Q.    Do you remember the name of the Anheuser-Busch
25   lawyer?  That's a tough one.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 24

1      A.    No, I don't.

2      Q.    Was it a male or a female?

3      A.    Male.

4      Q.    Did you take any notes?

5      A.    No.

6      Q.    Did the gentleman ask you to send him anything

7   about your development of the ButtWiper toy?

8      A.    No.

9      Q.    Let's go back to the document request and finish

10   that off, please.  I think you have those in front of you.

11   Let's get down to Number 14.  Is there a contract or other

12   agreement in place between you and VIP pertaining to the

13   work that you have done for VIP over the years?

14      A.    Not that I recall.

15      Q.    Is it fair to say that the work that you have

16   done for VIP has been done on a project-by-project basis?

17      A.    Yes.

18      Q.    Let's go back for just a moment to the phone call

19   with the Anheuser-Busch lawyer.  After you had that call,

20   did you tell Mr. Sacra that you had spoken to a lawyer for

21   Anheuser-Busch?

22      A.    I don't recall.

23      Q.    Did you tell Wendy Sacra that?

24      A.    I don't recall.

25      Q.    Or anybody else with VIP?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 25

```
 1       A.    I don't think so.  I don't recall.
 2       Q.    That case was about 2007 and 2008.  Is that about
 3  the time frame that you remember speaking to the lawyer
 4  for Anheuser-Busch?
 5             MR. LONG:  Objection, form.
 6       A.    BY THE WITNESS:  I don't know.  That could be.
 7       Q.    BY MR. LARKIN:  Other than that call, have you or
 8  any company that you have worked for been a party, been a
 9  charged, accused of a trademark infringement or copyright
10  infringement?
11       A.    No.
12       Q.    Have you ever had any discussions with Mr. Sacra
13  or anyone else at VIP about what would happen if VIP and
14  you were sued in a case involving one of VIP's toys?
15             MR. LONG:   Objection.  I don't know if you are
16  asking for any conversation with Counsel, but I just want
17  to be careful if you get into that area.
18             MR. LARKIN:   No.  I am not trying to invade the
19  attorney-client privilege.  Let me see if I can rephrase
20  the question.
21       Q.    BY MR. LARKIN:  Do you know what an indemnity
22  agreement is?
23       A.    No.
24       Q.    Do you know what it is to indemnify someone?
25       A.    I could only guess.
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 26

1       Q.    I don't want you to guess.

2       A.    No.

3       Q.    Have you ever had any discussions with anyone at

4   VIP outside the presence of any lawyer for VIP about

5   whether VIP would pay for your defense or provide you a

6   lawyer if you were sued along with VIP about a product

7   that you designed for VIP?

8       A.    No, we have never had such a conversation.

9       Q.    Look at Exhibit 2 again for a moment, please.  Do

10  you recall seeing that page on VIP's Web site at some

11  point?

12          MR. LONG:  Object to foundation.

13      A.    BY THE WITNESS:  I can't recall for sure.

14      Q.    BY MR. LARKIN:  The product to the left, that

15  Catarroma, do you see that?

16      A.    Yes.

17      Q.    Did you design that product?

18      A.    Yes.

19      Q.    Have you ever displayed that product on your Web

20  site?

21      A.    I can't recall.

22      Q.    Did you take the photographs that are depicted on

23  Exhibit 2 in the center of the page, not along the

24  masthead?

25      A.    Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 27

1      Q.    Each one of them?

2      A.    Yes.

3      Q.    I want to spend a few minutes about your general

4   background.  So I thought we might use your -- strike

5   that.  Do you have a LinkedIn page?

6      A.    Yes.

7           MR. LARKIN:  I thought we might use that, go over

8   your general background and maybe speed things up a little

9   bit.  So let's mark as Exhibit 3 what I think is

10  Ms. Phillips' LinkedIn page, but I'll let her verify that.

11          (Deposition Exhibit Number 3 was marked for

12  identification by the Reporter.)

13     Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

14  Exhibit 3 as your LinkedIn page?

15     A.    Yes.

16     Q.    I downloaded this on April 13th, and I know these

17  pages are dynamic and change over time.  But does

18  Exhibit 3 appear to be a reasonably accurate depiction of

19  your LinkedIn page?

20     A.    Yes.

21     Q.    What's the general purpose for your LinkedIn

22  page?

23     A.    To give my background as a professional.

24     Q.    I note that at the top your name is rendered

25  Ellie Phillips, E-l-l-i-e Phillips.  Do you see that?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 28

1      A.    Yes.

2      Q.    Are you known professionally as Ellie Phillips?

3      A.    Sometimes.

4      Q.    Is your more common professional name Elle

5    Phillips?

6      A.    Yes.

7      Q.    Turn to the last page of Exhibit 3, if you would,

8    please, under "Education."  Can you tell me what

9    subject -- strike that.

10          This says you attended Collins College and

11    received an A.A. and BFA degree; is that correct?

12      A.    Yes.

13      Q.    Where is Collins College located?

14      A.    Tempe, Arizona.

15      Q.    Are you originally from the Arizona area?

16      A.    Define "originally."

17      Q.    Where were you born?

18      A.    Illinois.

19      Q.    Okay.  At some point did you move to Arizona?

20      A.    Yes.

21      Q.    At what age?

22      A.    17.

23      Q.    How long did you live in Arizona?

24      A.    In total -- I moved away at some point and came

25    back.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 29

1      Q.    Okay.  How old were you when you entered Collins
2    College?
3      A.    17.
4      Q.    Your LinkedIn page says you first received an
5    A.A. -- I guess that's an associate of arts degree -- from
6    Collins College; is that correct?
7      A.    Yes.
8      Q.    And your major field of study was visual
9    communications?
10     A.    Yes.
11     Q.    What did that entail?  What did your study of
12   that entail?
13     A.    Graphic design, software and procedures.
14     Q.    And you received your A.A. in 1997, correct?
15     A.    Yes.
16     Q.    And then right above that it indicates that you
17   received a BFA, which I believe is a bachelor's of fine
18   arts, in visual communications from Collins College?
19     A.    Yes.
20     Q.    That was also in visual communications, correct?
21     A.    Yes.
22     Q.    It appears that you received your BFA in 2006; is
23   that right?
24     A.    Yes.
25     Q.    Is it correct that you didn't attend college



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 30

1    between 1997 and 2004?

2        A.    That is correct.

3        Q.    What were you doing during those years?

4        A.    Working as a graphic designer.

5        Q.    And is that employment history reflected

6    elsewhere on your LinkedIn page, maybe on page 2?

7        A.    Yes.

8        Q.    The first entry, I guess, in chronological order

9    on your LinkedIn page is a position as Senior Marketing

10   Project Specialist for Cougar Mountain Software.  Do you

11   see that?

12       A.    Yes.

13       Q.    Is what appears below that an accurate

14   description of what your job duties were when you held

15   that position?

16       A.    Yes.

17       Q.    And then above that, the next entry is Creative

18   Designer for QDI Wireless, July 2003 to July 2006.  Do you

19   see that?

20       A.    Yes.

21       Q.    Let me go back.  Is Cougar Mountain Software

22   located here?

23       A.    No.

24       Q.    Where is it located?

25       A.    Boise, Idaho.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 31

1      Q.    Had you moved to Idaho while you were working for
2   Cougar Mountain?
3      A.    Yes.
4      Q.    So is it correct that you lived in Idaho since
5   February 1997?
6      A.    Yes.
7      Q.    QDI Wireless was also located in Boise?
8      A.    No.
9      Q.    I should ask you, where was it located?
10     A.    Arizona.
11     Q.    Did you move back to Arizona?
12     A.    Yes.
13     Q.    And did you live in Arizona while you were
14  working for QDI Wireless?
15     A.    Yes.
16     Q.    And the period of your employment with QDI
17  Wireless corresponded with your studying for your BFA
18  degree at Collins College; is that correct?
19     A.    Yes.
20     Q.    Turn back to the first page of Exhibit 3, please.
21  The next entry in your employment history, I guess, or
22  your experience is Owner, Creative Director for Red Couch
23  Creative.  Do you see that?
24     A.    Yes.
25     Q.    And the dates listed there are January 2004 to



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 32

1    the present.  What is Red Couch Creative?

2         A.    Red Couch Creative is now the parent corporation

3    for Elle Phillips Design.

4         Q.    Is Elle Phillips Design a corporation?

5         A.    It is now, yes.

6         Q.    Look back to page 2, Exhibit 2, please.  While

7    you were working in Phoenix for ODI Wireless, were you

8    also working separately for Red Couch Creative?

9              MR. LONG:  Objection.  I think it's QDI.

10        A.    BY THE WITNESS:  It is QDI.

11        Q.    BY MR. LARKIN:  QDI.  I'm sorry.  I didn't read

12   it right.  Let me try again.

13             The entry for your employment with QDI Wireless

14   as Creative Designer in July 2003 to July 2006, and your

15   entry for Owner, Creative Director of Red Couch Creative

16   begins January 2004, continues to the present.  Was there

17   a period where you were working both for QDI and Red

18   Couch?

19        A.    At that time I was working for QDI and Elle

20   Phillips Design.

21        Q.    Okay.  Those jobs were separate.  You were

22   separately working at Elle Phillips Design, as well as

23   working for QDI?

24        A.    Yes.

25        Q.    And you were in Arizona at the time, correct?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 33

1     A.    Yes.

2     Q.    Did there come a time when you moved back to

3  Idaho?

4     A.    Yes.

5     Q.    When was that?

6     A.    I think it was 2010 or 2011.  I can't recall

7  exactly.

8     Q.    Okay.  Whatever it actually was, it was sometime

9  after you received your BFA and began working exclusively

10  for Elle Phillips Design, correct?

11     A.    Yes.

12     Q.    Look on page 3 of Exhibit 2, please.  Near the

13  top of the page there is a listing under "Courses" at

14  Collins College.  Do you see that?

15     A.    Yes.

16     Q.    Does that list some of the courses that you took

17  at Collins College that are relevant to your employment as

18  a graphics designer?

19     A.    Yes.

20     Q.    Did you take any courses at Collins College to

21  study law beyond the contract law course listed here?

22     A.    No.

23     Q.    Have you ever taken any such courses?

24     A.    No.

25     Q.    Have you ever had occasion to research or study



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 34

1   the law as it applies to graphic design?

2       A.   Yes.

3       Q.   In what context?

4       A.   I talk to my dad.

5       Q.   Is your dad a lawyer?

6       A.   Former.

7       Q.   Retired?

8       A.   Yes.

9       Q.   Good for him.  Was he functioning as your lawyer

10  at the time?

11      A.   No.

12      Q.   Do you recall the general topics you discussed

13  with your father?

14      A.   Contracts, general business law questions.

15      Q.   Did you ever have any discussions with your

16  father about copyrights or trademarks?

17      A.   No.

18      Q.   Beyond talking to your former lawyer father, have

19  you ever done any research or investigated the law of

20  copyrights or trademarks?

21      A.   Yes.

22      Q.   What did you do?

23      A.   General Internet searches keeping up on trends,

24  general knowledge just for my own protection and that sort

25  of thing.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 35

1     Q.    In the course of that investigation, did you ever
2  research parody?
3     A.    No.
4     Q.    Do you recall doing any of that sort of online
5  investigation in connection with any design work you did
6  for VIP?
7     A.    No.
8     Q.    Have you worked exclusively as either Elle
9  Phillips Design or Red Couch Creative since 2006?
10    A.    Yes.
11    Q.    You haven't been employed by anybody else in that
12 nine-year period?
13    A.    No.
14    Q.    Look at the first page of Exhibit 3 if you would,
15 please.  Does the summary that appears about halfway down
16 accurately reflect your general experience in marketing
17 and graphic design?
18    A.    Yes.
19    Q.    When did you first meet Stephen Sacra?
20    A.    I think it was 2006.
21    Q.    How did you meet him?
22    A.    He contacted me for design work.
23    Q.    When he first contacted you, were you then
24 working exclusively as Elle Phillips Design?
25    A.    Not yet, no.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 36

1      Q.    That was during the period where you were working

2    with Elle Phillips Design, also for QDI?

3      A.    Yes.

4      Q.    Is it fair to say that VIP has been one of

5    your -- do you use the word client in your business?

6      A.    Yes.

7      Q.    Not customer.  Client?

8      A.    Client.

9      Q.    Client is the term I should be using?

10     A.    Yes.

11     Q.    Is it fair to say that VIP has been one of your

12   clients continuously since sometime in 2006?

13     A.    Yes.

14     Q.    Has it been one of your larger clients?

15           MR. LONG:  Objection, form, foundation.

16     A.    BY THE WITNESS:  It depends on the year.

17     Q.    BY MR. LARKIN:  Some years it's been one of your

18   larger clients, and some years it hasn't?

19           MR. LONG:  Objection, form, foundation.

20     A.    BY THE WITNESS:  Correct.

21     Q.    BY MR. LARKIN:  Approximately how many -- your

22   best estimate of how many projects you have done for VIP

23   in the nine-year period?

24     A.    I wouldn't even begin to know how to answer that.

25     Q.    Okay.  It's been a large number?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 37

1        A.    Yes.

2        Q.    Look at the bottom of Exhibit 3 where you list

3    your experience.

4              MR. LONG:   I'm not clear on what page on

5    Exhibit 3.

6              MR. LARKIN:   The first page.  I'm sorry.

7        Q.    BY MR. LARKIN:   And do you see some bullet points

8    that begin at the bottom of the first page of Exhibit 3

9    and then continue over to the top of page 2 of Exhibit 3?

10       A.    Yes.

11       Q.    Those bullet points describe the sorts of

12   services that you have provided to clients either as Elle

13   Phillips Design or Red Couch Creative, correct?

14             MR. LONG:   Objection, form.

15       A.    BY THE WITNESS:   Yes, that's correct.

16       Q.    BY MR. LARKIN:   Can you tell me which of those

17   services you provided to VIP over the years?

18       A.    Logo/brand identity, multi-page catalogs.

19   product packaging, product photography.

20       Q.    Then there's a catchall, "and much more,"

21   exclamation point.  Do you see that?

22       A.    Yes.

23       Q.    Have you done other general types of -- strike

24   that.

25             Have you provided other general types of services



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 38

1    to VIP that are not among the five you just mentioned?

2        A.    Yes.

3        Q.    Such as?

4        A.    Sell sheets, product design in some cases,

5    pattern, making patterns.    That's all I can think of right

6    now.

7        Q.    What did you mean when you said you have provided

8    product design services for VIP?

9        A.    Sometimes creating a shape for a toy.

10       Q.    Do you know Wendy Sacra?

11       A.    Yes.

12       Q.    Over the nine or so years, eight or nine years

13   that you have worked with VIP, have most of your dealings

14   been with Stephen as opposed to Wendy?

15           MR. LONG:   Objection, form.

16           MR. LARKIN:   Strike that.   Let me ask a

17   foundational question.

18       Q.    BY MR. LARKIN:   Over the period in which you have

19   worked with VIP, have you worked directly with Wendy

20   Sacra?

21       A.    Yes.

22       Q.    On what sorts of matters?

23       A.    Typically image requests for some of their

24   customers.

25       Q.    What do you mean by image requests?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 39

1      A.   Some of their retail stores will request images
2   to either display on their Web site or put in
3   advertisement, and I would provide those images.
4      Q.   Do you provide them to Ms. Sacra or directly to
5   the retail customer?
6      A.   It goes back and forth, both.
7      Q.   Other than image requests, have you dealt with
8   Wendy Sacra on projects for VIP?
9      A.   Yes.
10      Q.   What sort of matters?
11      A.   Sell sheets.  That's about it.
12      Q.   Is it fair to say that most of your work with VIP
13   has been with Stephen Sacra as opposed to Wendy Sacra?
14      A.   Yes.
15           MR. LARKIN:  Let's mark as Exhibit 4 a catalog
16   produced to us in discovery by VIP.
17           (Deposition Exhibit Number 4 was marked for
18   identification by the Reporter.)
19      Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize
20   what we have marked as Exhibit 4?
21      A.   Yes.
22      Q.   Do you recognize that to be a 2014 VIP product
23   catalog?
24      A.   Yes.
25      Q.   Were you involved in any way in the creation of



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 40

1    the 2014 product catalog that's been marked as Exhibit 4?

2        A.    Yes.

3        Q.    What did you do?

4        A.    I designed it.

5        Q.    What do you mean by that?

6        A.    I did the layout of all the products, all the

7    pages and the graphics.

8              MR. LARKIN:  Let's mark as Exhibit 5 a page that

9    I downloaded from Ms. Phillips' Web site.  We will let her

10   verify that.

11             (Deposition Exhibit Number 5 was marked for

12   identification by the Reporter.)

13       Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

14   Exhibit 5?

15       A.    Yes.

16       Q.    That is a page that appears on your current Web

17   site?

18       A.    Yes.

19       Q.    Does that display a product catalog that we have

20   marked in Exhibit 4?

21       A.    No.  It's a former version of it.

22       Q.    Does it accurately show how the catalog actually

23   appears?  It's two-sided; it's bound with two sides; is

24   that correct?

25       A.    Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 41

1      Q.    Is that how the 2014 catalog appears?

2      A.    Once it's printed professionally, yes.

3      Q.    The reason I ask that is because the 2014

4    catalog, Exhibit 4, was produced to us in a series of

5    pages, and I just wanted to confirm that if I got an

6    actual hard copy, I would get a bound version with two

7    sides; is that right?

8      A.    I believe so, yes.

9      Q.    Does the 2014 product catalog that's been marked

10   as Exhibit 4 appear on your Web site as well?

11     A.    No.

12     Q.    Let's go back to Exhibit 4 for a moment.  We will

13   get into this in more detail later, but if you could turn

14   first to a page that is marked in the lower right-hand

15   corner as VIP 89.  Do you see that page?

16     A.    Yes.

17     Q.    Which of the VIP toys that are depicted on that

18   page did you design?

19     A.    All of them.

20     Q.    Turn to the next page in order, VIP 90.  Which of

21   the VIP toys that are depicted on VIP 90 in Exhibit 4 did

22   you design?

23     A.    All of them.

24     Q.    Turn to VIP 91, the next page.  Which of the toys

25   depicted on VIP 91 did you design?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 42

1       A.    All of them.

2       Q.    And is the same true for the products depicted on

3    VIP 92?

4       A.    Yes.

5       Q.    And VIP 93?

6       A.    Yes.

7       Q.    Have you designed other -- strike that.

8             Starting at VIP 89 -- well, in the upper

9    left-hand corner of VIP 89 is the logo for Silly

10   Squeakers.  Do you see that?

11      A.    Yes.

12      Q.    Have you designed all of the toys in VIP's Silly

13   Squeakers line?

14            MR. LONG:  Objection, form, foundation.

15      A.    BY THE WITNESS:  I think so.

16      Q.    BY MR. LARKIN:  Are there any toys in the Silly

17   Squeakers line that you have designed for VIP that are not

18   shown in the catalog we marked as Exhibit 4?

19            MR. LONG:  Objection, form, foundation.

20      A.    BY THE WITNESS:  I believe there might be some

21   new toys that don't appear in this catalog.

22      Q.    BY MR. LARKIN:  And the ButtWiper toy that we

23   looked at earlier, that doesn't appear in the catalog

24   either, correct?

25      A.    Correct.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 43

1          MR. LARKIN:  Let's mark as Exhibit 6 another page
2     from Ms. Phillips Web site.
3          (Deposition Exhibit Number 6 was marked for
4     identification by the Reporter.)
5     Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize
6     what we have marked as Exhibit 6?
7     A.   Yes.
8     Q.   What is it?
9     A.   It appears to be a portfolio picture from my Web
10    site of Squeaker bottles.
11    Q.   I think you testified earlier -- please correct
12    me if I'm wrong -- that you have had a Web site since
13    about 2006.  Does that sound about right?
14    A.   Yes.
15    Q.   Have you always had a portfolio section on your
16    Web site?
17    A.   Yes.
18    Q.   Has that portfolio section always shown at least
19    some VIP Silly Squeaker toys?
20    A.   It's shown VIP work.  I don't know if it always
21    had the Squeaker toys on there.
22    Q.   The portfolio page we marked as Exhibit 6 shows
23    five toys.  Any particular reason these five are shown as
24    examples of your work?
25    A.   I think they were just randomly selected to put



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 44

1    the page together.

2              MR. LARKIN:   Mark as Exhibit 7 another page from

3    the portfolio section of Ms. Phillips' Web site.

4              (Deposition Exhibit Number 7 was marked for

5    identification by the Reporter.)

6       Q.   BY MR. LARKIN:   Ms. Phillips, do you recognize

7    what we have marked as Exhibit 7?

8       A.   Yes.

9       Q.   What is it?

10      A.   It is Silly Squeaker wine bottle toys.

11      Q.   These are some of the wine bottle toys that you

12   designed for VIP, correct?

13      A.   Yes.

14      Q.   Any particular reason why these are displayed and

15   not others?

16      A.   They were randomly selected, and it was probably

17   put up a while back.  That may have been all we had at the

18   time.

19      Q.   Have you ever displayed the Bad Spaniels toys

20   that's the subject of this case on your Web site?

21      A.   No.

22      Q.   Any particular reason?

23      A.   I don't update my Web site that much.

24              MR. LARKIN:   Let's mark as Exhibit 8 a page that

25   I believe is from an earlier version of Ms. Phillips' Web



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 45

1    site.

2            (Deposition Exhibit Number 8 was marked for

3    identification by the Reporter.)

4        Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

5    the Web site page that appears as Exhibit 8?

6        A.    Yes.

7        Q.    Did that appear at some point on your Web site?

8        A.    Yes, a very long time ago.

9        Q.    In the upper right-hand corner reference from the

10   Archive.org Waybackmachine says June 21, 2007.  Does that

11   refresh your memory of when this toy appeared?

12       A.    It possibly could be, yes.

13       Q.    Did you design the Tuffzilla toy that's shown in

14   Exhibit 8?

15       A.    The packaging, yes.

16       Q.    What do you mean by packaging?

17       A.    I didn't design the toy itself.  I designed the

18   packaging, the tag that goes along with the toy.

19       Q.    To differentiate, Exhibit 8 shows the toy itself

20   in a standing position and then next to it -- you didn't

21   design the actual toy that's standing there; is that

22   right?

23       A.    Correct.

24       Q.    What can you tell me -- what are the pieces of

25   packaging that appear next to and behind the toy?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 46

1     A.    This is a die cut packaging piece, which means
2  it's basically cardboard and it's folded.  So what you see
3  on the right side, the very right part of the card, that's
4  the front.  And then when it's folded, it overlays over
5  the top of the far right side of the left card.
6     Q.    Okay.   Got it.   Did you ever learn that VIP was
7  sued by the owner of the Godzilla trademark for copyright?
8     A.    I think I was made aware of some type of problem
9  with the toy at some point.
10     Q.    Were you ever aware of what happened to the
11  Tuffzilla toy?
12     A.    No.
13     Q.    Did you ever stop displaying the Tuffzilla toy on
14  your Web site?
15     A.    At some point, yes.
16          MR. LARKIN:  We have been going about an hour.
17  Why don't we take a five-minute break.  Off the record.
18          (Recess from 10:04 a.m. to 10:10 a.m.)
19          MR. LARKIN:  Let's go back on the record.
20     Q.    BY MR. LARKIN:  We are going to get obviously
21  into the creation of the Bad Spaniels toy in a few
22  minutes, but I first want to ask you some questions about
23  sort of the general process of creating toys for VIP so we
24  can get some background and some context.
25          You testified a minute ago, looking at the



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 47

1    catalog, that you have designed if not all the toys in the

2    Silly Squeaker line at least shown in the catalog.  Has

3    there been a general process by which the idea for one of

4    those toys is taken by you, worked up using your skills as

5    a graphic designer that ultimately works up to the toy?

6    Is there a general way in which that happens?

7        A.    Yes.

8        Q.    Will you describe that, please.

9        A.    Usually I will get a call from Steve with a name

10   for the next toy or bottle or, you know, whatever he wants

11   to put together.  And he will say come up with something,

12   very brief.  And then I will often sketch, not all the

13   time but some of the time, if I need to come up with a

14   creative idea.  Then I will put it to the computer and

15   come up with one, two or three or however many mock-ups

16   that need to be done until he approves it.

17            And once it's approved, usually I start with --

18   just in terms of the bottles, it's just the label.  Once

19   the label has been approved, then I will do the bottle cap

20   and the top, and then I'll do a card for it, like a

21   hanging card.

22       Q.    You testified earlier, I think, that from time to

23   time you were involved in the design of the product itself

24   or the bottle itself.  On how many occasions in the Silly

25   Squeaker line has that happened?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 48

1      A.   Very few.  I have never actually designed the
2   bottle shape.
3      Q.   Have you ever suggested a bottle shape or
4   provided examples of bottle shapes for the Silly Squeaker
5   line?
6      A.   No.
7      Q.   In describing the general process, you say
8   typically starting with a call from Mr. Sacra with a name.
9   Is that the name of a brand of alcoholic beverage?
10      A.   No.  A name for the next bottle that we are going
11   to design.
12      Q.   So in the case of the Bad Spaniels, that name is
13   not just Jack Daniel's?
14      A.   Correct.
15      Q.   In the general process has Mr. Sacra typically
16   given you more than simply the name of the next product?
17      A.   Not usually, no.
18      Q.   And when you have gotten these calls, is that the
19   event that causes you to start a production file for each
20   toy?
21      A.   Yes.
22      Q.   Who typically decides on the shape of the bottle
23   on which the label for each toy will appear?
24      A.   I'm not exactly sure who specifically picks that
25   shape.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 49

1      Q.    It's not you?

2      A.    It's not me.

3      Q.    And when Mr. Sacra has called you with a name for

4  a new product, in addition to designing the labels, are

5  there other elements or graphic materials that you

6  anticipate you will be required to design for that

7  product?

8      A.    Yes.  The hanging card that usually affixes to

9  the bottle itself or a retail store sell sheet and

10  eventual catalog integration and photographs.

11      Q.    Let's turn now to the Bad Spaniels product.  When

12  did the process of designing that product begin?

13      A.    Roughly two years ago.

14      Q.    What happened?

15      A.    I got a call.  I had a typical phone call from

16  Steve.  He said, "Bad Spaniels.  You figure it out."

17          MR. LARKIN:  I'm sorry.  Can you read that back?

18          (Answer read.)

19      Q.    BY MR. LARKIN:  Is that what you recall happened

20  during that call?

21      A.    Yes.

22      Q.    What did you understand Mr. Sacra to mean by "You

23  figure it out"?

24      A.    That's typically his indication that I need to

25  design something, a product for Bad Spaniels.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 50

1      Q.    How long did that first Bad Spaniels call last?

2      A.    I can only guess, 10, 15 seconds.

3      Q.    It was that short?

4      A.    Yes.

5      Q.    A very short --

6      A.    Yes.

7      Q.    Did you take any notes?

8      A.    No.

9      Q.    I guess you really wouldn't need to if it was

10     that short.  Did you know what alcoholic beverage he was

11     referencing from Bad Spaniels?

12     A.    It took me some time to figure it out, but, yes.

13     Q.    What was that?

14     A.    Jack Daniel's.

15     Q.    How did you figure that out?

16     A.    Because it rhymes with Bad Spaniels.

17     Q.    Did he tell you anything else about what the

18     label for the new Bad Spaniels product should look like

19     during that first call?

20     A.    No.

21           MR. LARKIN:  Let's mark as Exhibit 9 a two-page

22     document consisting of a sketch and an e-mail.

23           (Deposition Exhibit Number 9 was marked for

24     identification by the Reporter.)

25     Q.    BY MR. LARKIN:  I see you grinning there, so do



Eleanor Phillips               VIP Products, LLC v. Jack Daniel's Properties, Inc.               4/21/2015

Page 51

1    you recognize these?

2         A.    Yes.

3         Q.    Is the page marked VIP 1 in the lower right-hand

4    corner a sketch that you prepared after your 10- or

5    15-second call from Mr. Sacra?

6         A.    Yes.

7         Q.    And is the page marked as Elle 21 a copy of the

8    e-mail that covered the sketch, that VIP 01?

9         A.    Yes, it appears so.

10        Q.    Let's look at the sketch first.  What did you do

11   after your 10- or 15-second call with Mr. Sacra?

12              MR. LONG:  Objection, form.

13              MR. LARKIN:  Strike the question.

14        Q.    BY MR. LARKIN:  Mr. Sacra told you during that

15   call that he wanted a Bad Spaniels product.  What did you

16   do in response?

17        A.    I sketched out an idea.

18        Q.    And that's the sketch that appears in Exhibit 9

19   or VIP 1?

20        A.    Yes.

21        Q.    What did you do to create that sketch?

22        A.    I had a pad, sketch pad that I use and pencil,

23   and I usually start with thumbnail small sketches.  They

24   are thumbnail sketch.  I narrow those down, and the last

25   one that I create larger and more detail in order to



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 52

1    present to clients.

2        Q.    Do you recall doing several thumbnail sketches

3    for the Bad Spaniels, the ultimate Bad Spaniels sketch?

4        A.    I recall doing small sketches, but I don't recall

5    specifically what they look like.

6        Q.    Before you began work on the sketches, had you

7    concluded that Bad Spaniels referenced Jack Daniel's?

8        A.    Yes.

9        Q.    Did you do anything to research what the label

10   for Jack Daniel's whiskey looked like?

11       A.    Yes.

12       Q.    What did you do?

13       A.    Pulled it out of my liquor cabinet.

14       Q.    You read my mind.   Are you a consumer of Jack

15   Daniel's whiskey?

16       A.    Not often, but sometimes.

17       Q.    When did you first consume it?

18       A.    I think I snuck some from my dad's cabinet when I

19   was about 13.

20       Q.    After you reached legal drinking age, did you

21   from time to time purchase the product?

22       A.    On occasion, yes.

23       Q.    Did you drink it in bars?

24       A.    Sometimes.

25       Q.    Did you keep a bottle at your house?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 53

1      A.    Yes.

2      Q.    Have you seen Jack Daniel's television ads?

3      A.    I don't recall any specifically.

4      Q.    Did you see any Jack Daniel's print ads?

5      A.    Yes.

6      Q.    What do you recall seeing?

7      A.    The black and white label.

8      Q.    Do you work from your home, or do you have a

9  separate office?

10     A.    I now have a separate office.

11     Q.    At the time when Mr. Sacra called on Bad

12  Spaniels, were you working in your home?

13     A.    Yes.

14     Q.    You went to your liquor cabinet and retrieved a

15  bottle of Jack Daniel's whiskey?

16     A.    Yes.

17     Q.    Do you recall what size it was?

18     A.    (Indicating.)  Whatever that size is.  I'm not

19  sure.

20     Q.    You are indicating --

21     A.    The medium-size bottle.

22     Q.    750 milliliters?

23     A.    Sounds about right.

24     Q.    Did you recall from memory what the Jack Daniel's

25  label looked like when you went to retrieve the bottle?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 54

1       A.      Yes.

2       Q.      What did you recall it looked like?

3       A.      The black and white label, sort of a cursive font

4  for Tennessee, simple type.

5       Q.      Do you recall what the bottle looked like?

6       A.      Yes.

7       Q.      What did you recall?

8       A.      Sort of a square shape.

9       Q.      Before you retrieved the bottle from your liquor

10  cabinet, did you recall some of the text that was on the

11  label?

12      A.      Some, not all.

13      Q.      What do you recall recalling?

14      A.      That there was a number on it.

15      Q.      Do you remember what the number was?

16      A.      Not until I actually looked at the bottle.

17      Q.      Do you remember where the number was positioned

18  on the bottle from your memory?

19      A.      I remember it was on the label on the neck.

20      Q.      Did you remember any of the other text on the

21  bottle before you retrieved it?

22      A.      I can't say for sure what I remember before I

23  retrieved it.

24      Q.      After you retrieved it, what did you do next?

25      A.      I looked at it, examined it.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 55

1       Q.    Why did you do that?

2       A.    To get inspiration.

3       Q.    Did you then begin sketching what ultimately

4   became the sketch in Exhibit 9?

5       A.    Yes.

6       Q.    Did you have the bottle in front of you when you

7   did that?

8       A.    I believe it was on my desk.

9       Q.    Look at the sketch for a minute, please.  Who

10  came up with the notation in the middle in the oval, "Do

11  Old No. 2"?

12      A.    I did.

13      Q.    During your short call with Mr. Sacra, did he

14  tell you anything about how the bottle should be humorous

15  or what the theme of the bottle would be?

16      A.    He didn't need to.

17      Q.    Why is that?

18      A.    Because we have done lots of funny bottles in the

19  past.

20      Q.    Have all of the bottles that you have worked on

21  for VIP had to do with urination or defecation or things

22  of that sort?

23      A.    Not specifically urination or defecation.  Other

24  various humorous elements of dog ownership.

25      Q.    Do you remember any that you created that did



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 56

1    reference dog poop or urination?

2        A.    Yes.

3        Q.    Which ones?

4        A.    Pissness comes to mind.

5        Q.    You might want to spell that for the reporter.

6        A.    P-i-s-s-n-e-s-s.

7        Q.    Any others that come to mind?

8        A.    Pawschitngo.

9        Q.    We will dispense with that so we don't have to

10   trouble your memory.  Is it your understanding that a

11   theme of that sort was what Mr. Sacra wanted for Bad

12   Spaniels?

13       A.    Not necessarily, no.

14       Q.    Is that what you thought you would design and

15   show him?

16       A.    It just came out that way.

17       Q.    You are the one who decided to use Do Old No. 2?

18       A.    Yes.

19       Q.    What did "Old No. 2" refer to there?

20       A.    Going poop.

21       Q.    And why Old No. 2?

22       A.    I thought it was a fun play on Old No. 7 from the

23   Jack Daniel's bottle, to change it to Old No. 2 referring

24   to the dog.

25       Q.    Why did you put "Do Old No. 2" in the sketch



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 57

1    inside an oval?

2        A.    Because I wanted it to be similar to the Jack

3    Daniel's bottle.

4        Q.    Is that one of the places where the Old No. 7

5    mark appears on the Jack Daniel's bottle?

6        A.    Yes.

7        Q.    And the Old No. 7 mark appears within an oval in

8    the Jack Daniel's bottle, correct?

9        A.    Yes.

10        Q.    Farther down is the text "On Your Tennessee

11    carpet."  Do you see that?

12        A.    Yes.

13        Q.    You are the one who selected those words?

14        A.    Yes.

15        Q.    And what were they intended to mean?

16        A.    That, along with the Do Old No. 2, is intended to

17    be your dog taking a poop on your nice lovely carpet.

18        Q.    Why did you use the word "Tennessee" there?

19        A.    Because we wanted it to be a parody of the Jack

20    Daniel's bottle, and "Tennessee" is a very prominent piece

21    of that.

22        Q.    Do you recall that the word "Tennessee" appears

23    on the Jack Daniel's bottle in about the same place it

24    appears on the sketch?

25        A.    Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 58

1       Q.    Did you place the Bad Spaniels words at the top
2    on the exhibit?
3       A.    Initially that's where I was thinking the
4    placement would look good.
5       Q.    What was it about that place that you thought it
6    would look good?
7       A.    Just that it encompasses and curves over the top
8    of the dog's head, centers the information on the bottle
9    below that.
10       Q.    There is a border around the dog.  Why did you
11    place a border around the dog?
12       A.    To frame the information.
13       Q.    Are you familiar with the term filigree?
14       A.    I know I have heard the term.  I couldn't exactly
15    define it.
16       Q.    What was your inspiration for the way in which
17    the border around the dog appears?
18       A.    I think I was just sketching out something that
19    would look nice.
20       Q.    At the bottom of the sketch in Exhibit 9 are the
21    words on the left, "Dog poop" and on the right "100
22    percent smelly."  Did you come up with those terms?
23       A.    Yes.
24       Q.    What were those terms intended to convey?
25       A.    Humor.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 59

1      Q.   Were there other sketches, what you referred to
2  as thumbnails, that were done that you didn't like as much
3  as the one that you sent to Mr. Sacra?
4      A.   Not to say that I liked or disliked them.
5  Thumbnails are just sort of a composition, how things
6  should be laid out, and they are not anything, no specific
7  details.
8      Q.   So not as detailed as this sketch?
9      A.   Not at all.
10     Q.   And not as useful, I guess, in the process of
11  creating the product?
12     A.   Correct.
13     Q.   When you completed the sketch as part of
14  Exhibit 9, did you compare it to the Jack Daniel's bottle
15  that you said was sitting on your desk?
16     A.   I didn't necessarily compare it.
17     Q.   Did you believe that basically replicated some
18  elements of the bottle?
19        MR. LONG:   Objection to form, foundation.
20     A.   BY THE WITNESS:   I believe that it had some
21  decent similarities.
22     Q.   BY MR. LARKIN:   Look back to the first page of
23  Exhibit 9, please, your e-mail.  The date of that e-mail
24  is Monday, June 10th, 2013.  Is that about the time that
25  you received -- strike that.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 60

1          How far in advance of your sending this e-mail do
2    you recall getting the phone call from Mr. Sacra?
3          A.    I don't recall.
4          Q.    Was it the same day?
5          A.    No.
6          Q.    The e-mail on Exhibit 9 from you to Mr. Sacra
7    covered your sketch that's the second page of Exhibit 9,
8    correct?
9          A.    Yes.
10         Q.    And Mr. Sacra's response at the top of Elle 21 in
11   Exhibit 9 says, "Mock it up.    Looks good."    Do you see
12   that?
13         A.    Yes.
14         Q.    What did you understand the term "Mock it up" to
15   mean?
16         A.    Put it into an electronic format.
17         Q.    Did you have a phone call with Mr. Sacra in
18   response to his e-mail on June 10th?
19         A.    No.
20         Q.    What did you do next?
21         A.    I started -- well, I scanned the drawing so it
22   would make a tradesmen sketch of the dog and that it would
23   be illustrated and proceeded to put together a more
24   professional design and layout.
25         Q.    And you kept the sketch as a reference point; you



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 61

1    didn't destroy the sketch?

2         A.    I did not destroy the sketch.

3         Q.    Is it correct that everything thereafter was done

4    electronically or digitally?

5         A.    Yes.

6         Q.    Did you show the sketch that's part of Exhibit 9

7    to anyone else besides Mr. Sacra?

8         A.    Probably my husband.

9         Q.    Other than maybe him, any others?

10        A.    Not that I recall.

11             MR. LARKIN:    Let's mark as Exhibit 10 an e-mail

12   and your enclosure.

13             (Deposition Exhibit Number 10 was marked for

14   identification by the Reporter.)

15        Q.    BY MR. LARKIN:    Ms. Phillips, do you recognize

16   Exhibit 10?

17        A.    Yes.

18        Q.    What is it?

19        A.    It is an e-mail from me to Steve with a digital

20   design of the Bad Spaniels label.

21        Q.    The date of that e-mail is June 11th, 2013, and

22   the previous e-mail to Mr. Sacra is dated June 10th.  Did

23   you create the mock-up in a day?

24        A.    Yes.

25        Q.    Is that ordinary?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 62

```
 1      A.   Yes.
 2      Q.   In your e-mail to Mr. Sacra, the first page of
 3 Exhibit 10 says, "I did make this label about a half-inch
 4 taller than the others we usually do, so let me know if I
 5 need to revise it back for any reason."  Why did you make
 6 it a half-inch taller?
 7      A.   Because I needed the room for height.  You can
 8 see there's extra space on the right and the left side,
 9 and in order to make it how I like it, I made it a little
10 bit taller.
11      Q.   Look at the second page of Exhibit 10, the
12 mock-up itself.  You chose a black and white color scheme
13 because that's the color scheme of the Jack Daniel's
14 label, correct?
15           MR. LONG:  Objection, form, foundation.
16      Q.   BY MR. LARKIN:  Is that correct?
17      A.   That's correct.
18      Q.   In the mock-up, the words Bad Spaniels have moved
19 from where they were on the sketch.  Why was that?
20      A.   Because the dog's face, his nose in particular
21 and mouth, were going over the oval, so I couldn't display
22 the text very well.
23      Q.   In the oval, in the middle, the word "Do" is no
24 longer there.  Did you remove the word "Do"?
25      A.   Yes.
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 63

```
 1      Q.   Why did you do that?
 2      A.   I thought it sounded better as "The Old No. 2"
 3  instead of "Do Old No. 2."
 4      Q.   Did you think the same message would be conveyed
 5  without the word "Do"?
 6      A.   Yes.
 7      Q.   In the lower left-hand corner of the mock-up in
 8  Exhibit 10 are the words "43 percent poo by volume."  Do
 9  you see those?
10      A.   Yes.
11      Q.   Did you put those there?
12      A.   Yes.
13      Q.   Those were not on the original sketch, correct?
14      A.   Correct.
15      Q.   Why did you substitute "43 percent poo by volume"
16  for 100 percent -- I'm sorry -- dog poop?
17      A.   Because I thought it was more humorous.
18      Q.   Do you recall that the words "40 percent alcohol
19  by volume" appear on the Jack Daniel's label?
20           MR. LONG:  Objection, form, foundation.
21      A.   BY THE WITNESS:  I believe it appears somewhere,
22  I'm sure.
23      Q.   BY MR. LARKIN:  Why did you use 43 percent?
24      A.   Sounded like a good number.
25           MR. LARKIN:  Mark as Exhibit 11 a one-page
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 64

1    document bearing production number Elle 7.

2         (Deposition Exhibit Number 11 was marked for

3    identification by the Reporter.)

4         Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize

5    Exhibit 11?

6         A.   Yes.

7         Q.   What is it?

8         A.   It's a source image file for the Bad Spaniels

9    label.

10        Q.   What is a source image file?

11        A.   A source image file is an image that's created in

12   Illustrator and used in the composition in the InDesign.

13        Q.   Illustrator is a graphic design program?

14        A.   Yes.

15        Q.   How did you use this image in the -- strike that.

16             Did you use this image in the development of the

17   mock-up that we marked as Exhibit 10?

18        A.   Yes.

19        Q.   How did you use it?

20        A.   As I stated, it's a source image file, so I built

21   this image, and then when it's brought into InDesign it's

22   superimposed on top of a black box type added, so on, so

23   forth.

24        Q.   So if in Exhibit 10, there was a -- look back to

25   Exhibit 10.  Did the process work as follows:  The white



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 65

1    on black label was created digitally and then you

2    superimposed the image file we marked as Exhibit 11 into

3    that document?

4        A.    Yes.

5              (Mr. David G. Bray joined the taking of the

6    deposition at 10:43 a.m.)

7              MR. LARKIN:  Let's mark as Exhibit 12 an e-mail

8    and a second mockup.

9              (Deposition Exhibit Number 12 was marked for

10   identification by the Reporter.)

11       Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

12   Exhibit 12?

13       A.    Yes.

14       Q.    What is this?

15       A.    It's a second mock-up design of the Bad Spaniels

16   label.

17       Q.    When in the process did you create the second

18   mock-up?

19       A.    I think it was probably roughly around the same

20   time as the first mock-up.  I tend to make things as I go.

21       Q.    The e-mail that's the first page of Exhibit 12,

22   it was sent at 3:47 on Tuesday, June 11th.  The e-mail

23   that's the first page of Exhibit 10 with the first mock-up

24   was sent at 3:13 on that day.  Does that refresh your

25   recollection -- did you create the two simultaneously?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 66

1      A.    Yes.

2      Q.    In your e-mail to Mr. Sacra you wrote, "Here's
3  one more version, just some different type treatment on
4  'Bad Spaniels,' maybe a bit closer to the JD label."  What
5  did you mean by "different type treatment"?

6      A.    Moving or taking the Bad Spaniels text out of the
7  banner and just putting it directly on the black
8  background.

9      Q.    Did you do that on your own initiative, or did
10 you have any sort of conversation or contact with
11 Mr. Sacra?

12     A.    I did that on my own.

13     Q.    Is that what made this different type treatment
14 maybe a bit closer to the JD label?

15     A.    Yes.

16     Q.    In what respect was it maybe a bit closer to the
17 JD label?

18     A.    Just in the way that the JD label does not have
19 "Jack Daniel's" inside the banner.  It's on its own.

20     Q.    Did you go back and look at the bottle that you
21 had pulled out of your liquor cabinet when you created the
22 second mock-up?

23     A.    I believe --

24        MR. LONG:  Object to form.

25     A.    BY THE WITNESS:  I believe I referenced it every



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 67

1    now and then throughout the process.

2        Q.    BY MR. LARKIN:  Was it important to you as the

3    designer on the project to be close to the Jack Daniel's

4    label?

5        A.    Yes.

6        Q.    Or as you said in your e-mail, closer than your

7    previous one.  Was that important to you?

8        A.    Yes.

9        Q.    Why did you depict the words "Bad Spaniels" in

10   your second mock-up in arched format?

11       A.    Because that's the only way it would really fit

12   underneath the dog and above the oval.

13       Q.    Do you remember that the mark "Jack Daniel's"

14   appears in arched format on the Jack Daniel's whiskey

15   label?

16       A.    I don't recall at this moment.

17       Q.    Do you recall thinking about that at the time you

18   created the second mock-up?

19       A.    I assume.

20           MR. LARKIN:  Mark as Exhibit 13 a document

21   produced by Ms. Phillips under Production Number Elle 26.

22           (Deposition Exhibit Number 13 was marked for

23   identification by the Reporter.)

24       Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

25   what we have marked as Exhibit 13?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 68

1     A.   Yes.

2     Q.   What is it?

3     A.   It's an invoice to VIP Products.

4     Q.   That particular invoice is dated June 17th, 2013,

5   correct?

6     A.   Correct.

7     Q.   Did you have a regular -- strike that.

8          Did you bill VIP monthly for your services?

9     A.   I bill weekly.

10    Q.   Weekly?

11    A.   Yes.

12    Q.   Good for you.  Maybe lawyers should think about

13   that.

14          Is it correct that if you were working at any

15   given time on a project for VIP, you would bill them that

16   week, once a week?

17    A.   Yes.

18    Q.   Let's look at the entry on this particular bill,

19   Exhibit 13.  I assume the entry that says "Bret Michaels"

20   has nothing to do with Bad Spaniels?

21    A.   Nothing to do.

22    Q.   And the sell sheet updates, I assume that has

23   nothing to do with Bad Spaniels?

24    A.   Correct.

25    Q.   The catalog updates had nothing to do at this



Eleanor Phillips             VIP Products, LLC v. Jack Daniel's Properties, Inc.             4/21/2015

Page 69

1    point with Bad Spaniels?

2        A.    Correct.

3        Q.    Only one is the third service, Bad Spaniels

4    drawing, digital layout and label design, correct?

5        A.    Yes.

6        Q.    Do you keep -- strike that.

7              In June 2013 did you keep time sheets for your

8    work for your clients?

9        A.    Yes.

10       Q.    And the 4.8 hours that's listed here reflects

11   what your entries on your time sheets were at the time?

12       A.    Yes.

13       Q.    Can you approximate how much time of the 4.8

14   hours was devoted to the various things that you did on

15   the Bad Spaniels drawing before you sent the two mock-ups

16   to Mr. Sacra?

17       A.    I can't recall off the top of my head right now.

18             MR. LARKIN:   Let's mark as Exhibit 14 a document

19   bearing Production Number VIP 10.

20             (Deposition Exhibit Number 14 was marked for

21   identification by the Reporter.)

22       Q.    BY MR. LARKIN:   Ms. Phillips, do you recognize

23   Exhibit 14?

24       A.    Yes.

25       Q.    That's an e-mail you received on November 22nd,



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 70

1   2013, from Mr. Sacra?

2      A.    Yes.

3      Q.    There is about a five-month gap between the bill

4   to VIP in June of 2013 and Mr. Sacra's e-mail to you.  Did

5   you have any contact with VIP about the Bad Spaniels

6   project during those five months?

7      A.    I don't recall if I had any contact about that.

8      Q.    If you had such contact, would you have

9   maintained any e-mails in your e-mail file?

10     A.    No, because we usually spoke over the phone.

11     Q.    Sitting here today, do you recall any

12  conversations over the phone in that five-month period?

13     A.    I recall conversations but not regarding Bad

14  Spaniels.

15     Q.    Okay.  That's what I meant.  During the

16  conversations you did have during that five-month period,

17  did you ever ask Mr. Sacra or anyone else at VIP what was

18  happening with Bad Spaniels?

19     A.    No.

20     Q.    Mr. Sacra's e-mail says, quote, "I need neck art

21  and an art card."  Do you see that?

22     A.    Yes.

23     Q.    What is neck art?

24     A.    Neck art is the small label that goes on the neck

25  of the bottle.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 71

1      Q.    And what is an art card?

2      A.    An art card is the cardboard packaging piece that

3  fits into the bottle so it can go on the shelf or hang

4  from a retail hanger.

5      Q.    Were neck art pieces and art cards part of what

6  you typically did for VIP in connection with its Silly

7  Squeakers line?

8      A.    Yes.

9          MR. LARKIN:    Mark as Exhibit 15 four pages

10  bearing production Number VIP 11 through 14.

11          (Deposition Exhibit Number 15 was marked for

12  identification by the Reporter.)

13      Q.    BY MR. LARKIN:    Ms. Phillips, do you recognize

14  what we have marked as Exhibit 15?

15      A.    Yes.

16      Q.    Sorry.    I didn't give you a chance to look

17  through it.    Having looked through it, do you recognize

18  it?

19      A.    Yes.

20      Q.    What is it?

21      A.    It appears to be the artwork for the art card and

22  the neck and bottle cap for the Bad Spaniels bottle.

23      Q.    And the first page of that is your cover e-mail

24  to Mr. Sacra?

25      A.    Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 72

1       Q.    That e-mail was sent about six hours after you
2    received Mr. Sacra's e-mail requesting that you draw neck
3    art and an art card.  Were you able to develop both within
4    that six-hour period?
5       A.    Yes.
6       Q.    Let's look at the second page of Exhibit 15.  Is
7    that the -- well, tell me what that shows.
8       A.    This here?
9       Q.    Yes.
10      A.    That showed the front of the art card.
11      Q.    And the third page of Exhibit 15 shows the back?
12      A.    Yes.
13      Q.    And the art card is used to hang the product at
14   retail?
15      A.    Yes.
16      Q.    On the second page of Exhibit 15, the front of
17   the art card, there are little blue rectangles at various
18   points.  Do you see those?
19      A.    Yes.
20      Q.    What do those represent?
21      A.    Well, I think the ones at the top and the very
22   bottom are mistakenly there.  They shouldn't be -- the
23   ones in the sort of the middle black area are meant to be
24   die cut so the tie can affix it to the bottle.
25      Q.    So the second and third pages of Exhibit 15 are



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 73

1    physically affixed to the bottle?

2        A.    Yes.

3        Q.    How did you develop the front of the neck card --

4    I'm sorry -- of the art card?   The second page of

5    Exhibit 15, what did you do?

6        A.    I probably used elements from the label design

7    and then created a similar layout for the art card.

8        Q.    Is that the reason for the white on black color

9    scheme?

10       A.    Yes.

11       Q.    And the design that appears on the border of the

12   art card?

13       A.    Yes.

14       Q.    Does the second page of Exhibit 15 accurately

15   show the actual dimensions of the card?

16       A.    It looks close.

17       Q.    Turn to the third page of Exhibit 15, please.

18   This is the back of the art card?

19       A.    Yes.

20       Q.    Who provided the text that appears on the back of

21   the art card?   Strike that.

22            Did you write that text yourself?

23       A.    I don't recall exactly how it was written.   I

24   pulled it from previous bottles that we have done over the

25   years.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 74

1      Q.    Did you yourself write the text on the previous

2  bottles that you used to create the back of the art card?

3            MR. LONG:   Object to the form.

4      A.    BY THE WITNESS:  Again I think it was developed

5  over time.   There might have been elements that Steve had

6  written or Wendy had written or I had written, and then

7  they were eventually composed together.

8      Q.    BY MR. LARKIN:  Safe to say that you didn't write

9  the text that appears on the third page of Exhibit 15 for

10 purposes of creating that specific art card?  You didn't

11 create that?

12     A.    Not for this specific card.   I generally used the

13 text that we used for all of them.

14     Q.    At the very bottom of the back of the art card,

15 VIP 12, there are two lines at the bottom, "The product

16 and its design belong to VIP Products.   This product is

17 not affiliated with Jack Daniel's."  Do you see those two

18 lines?

19     A.    Yes.

20     Q.    Did you have any involvement at any point in

21 creating the text of those two lines?

22     A.    The only part that I really created was adding

23 "Jack Daniel's."

24     Q.    So you had no involvement in what those two lines

25 said otherwise, correct?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 75

1       A.    Correct.

2       Q.    Did you ever have any discussions with Mr. Sacra

3    or anybody else at VIP about the topic of a disclaimer?

4       A.    I recall it was brought up to me at some point

5    that we needed to add a disclaimer, but that's the extent

6    of what I can remember.

7       Q.    Did you have any involvement in deciding where

8    the disclaimer would appear on the Jack -- on the Bad

9    Spaniels art card?

10      A.    I believe I placed it at the bottom underneath

11   the VIP Products logo.

12      Q.    Why did you do that?

13      A.    I thought it was a good place for it.

14      Q.    Why did you think it was a good place?

15      A.    Because it was with the rest of the copyright

16   information.

17      Q.    Did you have any input on how large the font size

18   for the disclaimer would be?

19      A.    I believe that was left to my discretion.

20      Q.    Do you agree that the disclaimer is in the

21   smallest font size on the page?

22            MR. LONG:  Object to form, foundation.

23      A.    BY THE WITNESS:  It appears as they are probably

24   the same font size as the text above it, only more narrow

25   font.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 76

1      Q.    BY MR. LARKIN:   By more narrow font, you mean the
2    letters are thinner, I guess, is the right word?
3      A.    They are more condensed.
4      Q.    Yes.   We should use your words, not mine.
5            Is the bottom -- strike that.
6            When you placed the disclaimer at the bottom, did
7    you think that that was the place where it was most likely
8    to be noticed by consumers?
9            MR. LONG:   Objection, form.
10     A.    BY THE WITNESS:   Yes.
11     Q.    BY MR. LARKIN:   Why?
12     A.    Because when I as a consumer go out and purchase
13   products, if I look for a disclaimer, I usually look at
14   the back and the bottom.
15     Q.    Other than your personal experience as a
16   consumer, have you ever investigated effectiveness of
17   disclaimers?
18     A.    No.
19     Q.    Have you ever investigated the extent to which
20   they are read when they appear on products?
21     A.    Not specifically, no.
22     Q.    Have you ever done that generally?
23     A.    Generally just in the capacity as a designer it
24   comes up.
25     Q.    Have you ever read any social science literature



Eleanor Phillips              VIP Products, LLC v. Jack Daniel's Properties, Inc.              4/21/2015

Page 77

1   on the topic of disclaimers?

2       A.    I have, but I couldn't cite you specific...

3       Q.    Do you believe that the disclaimer would be more

4   likely to be noticed if it was at the top of the page?

5       A.    No.

6       Q.    Or if it were in larger print?

7       A.    Maybe.

8       Q.    Why do you believe it would not be more likely

9   noticed if it was at the top of the page?

10      A.    Because I don't tend to look for the disclaimers

11  at the top of the page.

12      Q.    Why don't you believe consumers would notice it

13  if it were at the top of the page?

14      A.    Their eyes would probably glaze over it because

15  it's so prominent.

16      Q.    Have you ever had any discussions with Mr. Sacra

17  about where the disclaimer should appear on art cards for

18  any of the Silly Squeakers products?

19      A.    I don't believe we had any specific discussions

20  about that.

21      Q.    Do you know what happens to an art card when the

22  product that it's affixed to is purchased?

23            MR. LONG:  Objection, foundation.

24      A.    BY THE WITNESS:  I can only guess what people do

25  with them.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 78

1    Q.    BY MR. LARKIN:   What do you think people do with
2    them?
3          MR. LONG:   Objection, calls for speculation.
4    A.    BY THE WITNESS:   Keep them as a novelty.
5    Q.    BY MR. LARKIN:   Why do you believe that?
6    A.    Because it's humorous, and it should be a
7    collectible.
8    Q.    What is a collectible?   You just used the term in
9    the last answer.
10   A.    Collectible?
11   Q.    Yes.
12   A.    Often it's a toy or product of some kind that
13   people collect and save over time.
14   Q.    As a graphic designer, do you agree that it's
15   easier for people to read text that is in larger print as
16   opposed to smaller print?
17   A.    Sure.
18   Q.    Turn to the third page of Exhibit 15, please.
19   What does that page show?   I'm sorry.   That's the fourth
20   page.
21   A.    Yes.   That shows the insignia that goes at the
22   top of the bottle like the bottle cap and the neck art.
23   Q.    Is there a term for the top element on the fourth
24   page of Exhibit 15?   You said the bottom is the neck art.
25   What's the top?   Is that called the cap?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 79

1      A.    Yes.

2      Q.    That appears on the product where the cap would

3  appear on an actual bottle holding liquid?

4      A.    Yes.

5      Q.    Does the cap on the Bad Spaniels product serve

6  any function other than decoration?

7      A.    Does it serve any other function?

8      Q.    You can't actually remove it or anything of that

9  sort, can you?

10      A.    No.

11      Q.    How did you develop the neck art that appears at

12  the bottom of the fourth page of Exhibit 15?

13      A.    I pulled elements from the label design and made

14  them into the neck design.

15      Q.    And when you did that, did you go back and look

16  at the Jack Daniel's whiskey bottle that you had used

17  originally?

18      A.    No.

19      Q.    Why did a neck design appear on the Bad Spaniels

20  product?

21      A.    Steve requested it.

22      Q.    Did he tell you why he requested it?

23      A.    No.  He usually has me create the neck and the

24  bottle cap design for the bottle product.

25           MR. LARKIN:  Mark as Exhibit 16 another one of



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 80

1    Ms. Phillips' invoices bearing Production Number Elle 27.

2          (Deposition Exhibit Number 16 was marked for

3    identification by the Reporter.)

4      Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

5    what we have marked as Exhibit 16?

6      A.    Yes.

7      Q.    What is that?

8      A.    An invoice to VIP Products.

9      Q.    That's dated November 25th, 2013?

10     A.    Yes.

11     Q.    Looking down through the "Project description/

12   design time" column, I guess the first two entries, Tuffy,

13   don't have anything to do with Bad Spaniels, correct?

14     A.    Correct.

15     Q.    What about the third entry, "SillySQ, new

16   three-pack and four-pack bottles packaging design;

17   revisions," did that have anything to do with Bad

18   Spaniels?

19     A.    I don't believe so, no.

20     Q.    And the next two entries, VIP and PetSmart, did

21   that have anything to do with Bad Spaniels?

22     A.    No.

23     Q.    The last entry, "SillySQ, create header card for

24   Bad Spaniels bottle; neck/top art," the entry is

25   six-tenths of an hour?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 81

1     A.    Correct.

2     Q.    Do you recall that was roughly how much time you

3    spent creating the neck art and what you referred to as

4    the cap?

5     A.    That sounds about right.

6           MR. LARKIN:  Let's mark as Exhibit 17 two

7    documents bearing VIP Production Numbers 15 and 16.

8           (Deposition Exhibit Number 17 was marked for

9    identification by the Reporter.)

10    Q.    BY MR. LARKIN:  Ms. Phillips, have you seen

11   either of these documents before today?  You are not

12   listed as having received a copy or being the originator

13   of the e-mail.

14    A.    Yeah.  I don't believe I have.

15          MR. LARKIN:  Okay.  Mark as Exhibit 18 two pages

16   bearing Production Number VIP 24 and 25.

17          (Deposition Exhibit Number 18 was marked for

18   identification by the Reporter.)

19    Q.    BY MR. LARKIN:  Ms. Phillips, have you seen

20   either of the documents that we marked as Exhibit 18?

21    A.    I don't believe so.

22    Q.    The recipient of the e-mails in both Exhibits 17

23   and 18 is someone named David with the e-mail address

24   flyingpony.com.  David Bai is actually listed on Exhibit

25   18.  Do you know David Bai?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 82

1      A.    I don't know him personally, no.

2      Q.    Do you know who he is?

3      A.    I have seen his name on occasion through the

4    years, but I don't really know.

5      Q.    Have you ever spoken with him?

6      A.    No.

7      Q.    Never met him?

8      A.    No.

9      Q.    Do you have an understanding of what his

10   involvement is in the creation of Silly Squeaker toys?

11     A.    I only know that he's involved in some capacity.

12   I'm not sure what that capacity is.

13           MR. LARKIN:  Mark as Exhibit 19 a two-page

14   document bearing VIP Production Numbers 27 and 28.

15           (Deposition Exhibit Number 19 was marked for

16   identification by the Reporter.)

17     Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

18   what we have marked as Exhibit 19?

19     A.    It looks like an e-mail.

20     Q.    Do you recognize the attachment?

21     A.    I just saw it on the previous one that you showed

22   me.

23     Q.    Do you recall receiving the first page of

24   Exhibit 19, an e-mail from Mr. Sacra to you dated

25   December 18, 2013?



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 83

1      A.    I don't recall specifically, but I assume.

2      Q.    Do you recall receiving a depiction of what the

3  Bad Spaniels bottle looked like in December of 2013?

4            MR. LONG:   Objection, form, foundation.

5      A.    BY THE WITNESS:  Not specifically, but...

6      Q.    BY MR. LARKIN:  Do you recall ever seeing the toy

7  that is depicted on the second page of Exhibit 19?

8      A.    I recognize the label and so it's hard to say

9  specifically this particular toy.

10     Q.    Has that label been used -- strike that.

11           Did you design that label?

12     A.    Yes.

13     Q.    What is -- strike that.

14           Was that label used on another Silly Squeaker VIP

15  Product?

16           MR. LONG:   Objection, foundation.

17     A.    BY THE WITNESS:  Yes.

18     Q.    BY MR. LARKIN:  What product?

19     A.    The Dos Perros bottle.

20     Q.    What was the time period of the development of

21  the Dos Perros label?

22     A.    I don't remember.

23     Q.    Was it before or after the development of the Bad

24  Spaniels label?

25     A.    I'm not sure.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 84

1      Q.    Sitting here today, you don't recall receiving
2    the second page of Exhibit 19 under the cover of the first
3    page of Exhibit 19?
4      A.    I don't recall.  I may not have opened the
5    attachment or I may have.  Honestly, I can't remember.
6            MR. LARKIN:  We have been going another hour.
7    Why don't we take a five-minute break.
8            (Recess from 11:12 a.m. to 11:18 a.m.)
9            MR. LARKIN:  Back on the record.
10           Mark this as Exhibit 20, two pages, bearing
11   Production Number VIP 34.
12           (Deposition Exhibit Number 20 was marked for
13   identification by the Reporter.)
14     Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize
15   the first page of Exhibit 20?
16     A.    Yes.
17     Q.    Is that an e-mail you received from Mr. Sacra in
18   late February 2014?
19     A.    It appears so, yes.
20     Q.    Do you recall receiving it?
21     A.    Not specifically, but I recall --
22     Q.    Do you recall there being an attachment to it?
23     A.    I'm sure, yes.
24     Q.    Is the second page of Exhibit 20 that attachment?
25     A.    It appears so.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 85

1      Q.   The last e-mail that I have seen either from
2  VIP's file to your file on the Bad Spaniels bottle was
3  Exhibit 19, which was dated December 18, 2013.  The e-mail
4  in Exhibit 20 is more than two months later.
5          Do you recall any discussions with Mr. Sacra or
6  anyone else at VIP about the Bad Spaniels project during
7  those two months?
8      A.   No.
9      Q.   Do you recall your impression when you received
10 Exhibit 20?
11     A.   I'm sure I was excited.
12     Q.   Was receiving Exhibit 20 the first time you can
13 recall actually seeing the bottle on which the label that
14 you had designed would appear?
15     A.   Yes.
16     Q.   Did you think that the bottle that is the second
17 page of Exhibit 20 looked like the Jack Daniel's bottle
18 that you had in your liquor cabinet?
19     A.   I observed some similarities, yes.
20     Q.   What similarities?
21     A.   Probably the square shape.
22     Q.   Anything else about the bottle itself?
23     A.   No.  I think I was more excited just about my
24 label being on it.
25     Q.   Understandably.  When you received Exhibit 20,



Eleanor Phillips          VIP Products, LLC v. Jack Daniel's Properties, Inc.          4/21/2015

Page 86

1    did you compare the bottle that was attached -- strike
2    that -- the toy that was attached to the Jack Daniel's
3    bottle that you had originally used?
4        A.   No.
5        Q.   Do you believe that the product shown in
6    Exhibit 20 looks like the Jack Daniel's bottle?
7        A.   I believe there are similar elements.
8        Q.   What's dissimilar other than -- what's dissimilar
9    about the bottle itself as opposed to the label?
10       A.   About the bottle itself compared to the Jack
11   Daniel's bottle?
12       Q.   Yes.
13       A.   I wouldn't know.  I'm not looking at the Jack
14   Daniel's bottle.
15            MR. LARKIN:  Mark this as Exhibit 21, a document
16   bearing Production Number VIP 36.
17            (Deposition Exhibit Number 21 was marked for
18   identification by the Reporter.)
19       Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize
20   what we have marked as Exhibit 21?
21       A.   Yes.
22       Q.   What is it?
23       A.   It's an e-mail from me to Steve.
24       Q.   Was that e-mail written in response to receiving
25   Exhibit 20?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 87

1      A.    I can only assume, yes.

2      Q.    Would you have any reason to believe that it

3  wasn't?

4      A.    No.

5      Q.    The first line of your e-mail, Exhibit 21, says,

6  "OMG, that's beautiful."  For the aging among us, does OMG

7  mean, "Oh, my God"?

8      A.    "Oh, my goodness."

9      Q.    Why did you think it was beautiful?

10      A.    Because it's my artwork.

11      Q.    Beyond your understandable pride of authorship,

12  did you think the product as a whole, including the shape

13  and everything, was beautiful?

14      A.    Yes.

15      Q.    Your second line is, "I can't wait to photograph

16  it."  Why were you going to photograph it?

17      A.    I photograph all of the new toys of VIP Products.

18      Q.    Is it correct to say that all of the photographs

19  that appear on VIP's Web site and in VIP's catalogs were

20  photographs taken by you?

21      A.    Yes.

22      Q.    How did the process of photographing the Bad

23  Spaniels bottle work?  Did you receive samples from

24  Mr. Sacra?

25      A.    Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 88

1       Q.    Do you recall how long after your e-mail,
2   Exhibit 21, you got the samples?
3       A.    Oh, no, I don't recall.
4       Q.    Do you remember how many samples you got?
5       A.    I believe I received -- it would have either been
6   one or two.
7       Q.    Was that typical?
8       A.    Yes.
9       Q.    Do you have -- the second paragraph of Exhibit 21
10  asks Mr. Sacra for some samples of bottles, more bottles
11  that you can keep.  Do you have any bottles that you
12  designed for VIP at your office?
13      A.    Yes.
14      Q.    Do you have the Bad Spaniels bottle?
15      A.    Yes.
16      Q.    Do you have others?
17      A.    Yes.
18      Q.    Do you display those bottles?
19      A.    Yes.
20      Q.    Your second paragraph, Exhibit 21, you wrote to
21  Mr. Sacra, "People that come in are always excited to see
22  samples of work I've done, and I tend to get the best
23  reactions from those items."
24            What was the basis for that statement?
25      A.    I get good reactions from some of my more funny



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 89

1    productions, which would be VIP.

2        Q.    Farther down in the paragraph it says, "the

3    bottles make people laugh."  What was the basis for that

4    statement?

5        A.    Just stating that the bottles are very humorous,

6    and I get a lot of reactions when people come in and they

7    see them.

8            MR. LARKIN:  Let's mark as Exhibit 22 three pages

9    bearing Production Numbers VIP 3, 6 and 7.

10            (Deposition Exhibit Number 22 was marked for

11    identification by the Reporter.)

12        Q.    BY MR. LARKIN:  Ms. Phillips, yesterday you

13    produced to us a number of photographs of the Bad Spaniels

14    bottle that we are going to look at in a moment.  These

15    are three photographs that were produced to us by VIP

16    itself.  Do you recognize the three photographs in

17    Exhibit 22 as ones that you took?

18        A.    Yes.

19        Q.    Can you describe the process of photographing the

20    VIP Bad Spaniels bottle?

21        A.    Yes.  I have a turntable photography system,

22    which is a turntable that you can set any product on, and

23    it's hooked up to the computer and also to my digital

24    camera.  And with a few quick strokes of a few buttons, it

25    will automatically turn the product ten degrees and take



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 90

1    36 images.

2        Q.    So if my math is correct, you get the full

3    360-degree view of the product?

4        A.    That is correct.

5        Q.    What is the purpose of taking images of every

6    product at 10-degree different perspectives?

7        A.    Because once those 36 images are cleaned up, they

8    are going to be put back together and made into a digital

9    rotating image that appears to rotate.

10        Q.    What is the purpose of having a digital rotating

11    image?

12        A.    For display on Web site.

13            MR. LARKIN:    Let's mark as Exhibit 23 a document

14    bearing Production Numbers Elle 32 through 67.

15            (Deposition Exhibit Number 23 was marked for

16    identification by the Reporter.)

17        Q.    BY MR. LARKIN:    Ms. Phillips, Exhibit 23 are

18    photographs that you produced to us through your lawyers

19    yesterday.    Do they represent 36 images of the Bad

20    Spaniels bottle at 10-degree different orientation, if

21    that's the right word?

22        A.    It appears so without counting the pages

23    specifically, yes.

24        Q.    Are any of these -- strike that.  Were any of

25    these -- strike that.



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 91

1          How were these photographs used by VIP, if you
2     know?
3          A.    On occasion I use them for marketing materials.
4          Q.    Did you give the 36 photographs to VIP?
5          A.    Yes.
6          Q.    Do you know what VIP did with them?
7          A.    No.
8          Q.    Have you ever seen any of them on VIP's Web site?
9          A.    Yes.
10         Q.    What, if anything, did you do with them after you
11    gave them to VIP?
12         A.    Well, I actually upload them to his Web site.
13         Q.    Do you recall which of the views that are shown
14    in Exhibit 23 you uploaded to VIP's Web site?
15         A.    I don't recall specifically, no.
16         Q.    If we looked at VIP's Web site, would that
17    refresh your memory?
18         A.    I couldn't tell you exact number, which angle it
19    was but, yes, I would recognize them.
20         Q.    Did you do anything else with the photographs in
21    Exhibit 23 other than upload some of them to VIP's Web
22    site?
23         A.    Sure.  I made sell sheets using these images.  I
24    used these images or one of the images for the catalog.
25    Probably put one in a dog's mouth.



Eleanor Phillips                    VIP Products, LLC v. Jack Daniel's Properties, Inc.                    4/21/2015

Page 92

1     Q.    I'm sorry?

2     A.    I would additionally place a picture of the

3   bottle inside of a dog's mouth.

4     Q.    Do you own a dog?

5     A.    Yes.

6     Q.    Does the dog play with VIP toys?

7     A.    Yes.

8     Q.    I hope so.

9     A.    Yes.

10    Q.    Has your dog played with a Bad Spaniels toy?

11    A.    No.

12    Q.    Do you remove the packaging from the toys before

13  your dog plays with them?

14    A.    Not always.  They like to unpackage their toys

15  sometimes.

16    Q.    By "they like to unpackage them," you mean they

17  remove the package?

18    A.    Yes.

19    Q.    You testified earlier that -- well, strike that.

20          You described earlier the hang tag that's affixed

21  to the VIP package.  How is that physically affixed to the

22  bottle?

23    A.    With a zip tie.

24    Q.    That's a hard plastic tie that circles the neck?

25    A.    Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 93

1      Q.    Dogs are able to remove that?

2      A.    Not necessarily.  I cut that part.

3      Q.    Other than sell sheets, the Web site, catalogs

4  and the dog's mouth photos, did you do anything with the

5  photographs in Exhibit 23?

6      A.    Uploaded to the FTP service so they can do

7  whatever they like.  I don't recall anything else.

8      Q.    What do the initials FTP stand for?

9      A.    File transfer protocol.

10      Q.    That's a service or a program that would enable

11  VIP to access the photographs that are uploaded to it?

12      A.    Yes.

13           MR. LARKIN:  Let's mark as Exhibit 24 two pages

14  of documents bearing Production Numbers VIP 37 and 38.

15           (Deposition Exhibit Number 24 was marked for

16  identification by the Reporter.)

17      Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

18  what we have marked as Exhibit 24?

19      A.    Yes.

20      Q.    What is it?

21      A.    It is a concept for the packaging for the Bad

22  Spaniels bottle.

23      Q.    Is the second page with Production VIP 38 an

24  enclosure to the first page of Exhibit 24?

25      A.    Yes.



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 94

1      Q.    This e-mail that's the first page of Exhibit 24
2   was sent on March 17, about three weeks after the previous
3   e-mail we looked at.  Do you recall anything that you did
4   on the Bad Spaniels project during that period of time?
5      A.    I don't recall.
6      Q.    Do you recall any conversations with Mr. Sacra or
7   anyone else at VIP --
8      A.    Not specifically.
9      Q.    -- on the Bad Spaniels product during that
10  period?
11     A.    I can't recall specifically.  He probably asked
12  me to come up with something, a different type of package.
13     Q.    Look at the second page of Exhibit 24, please.
14  How are those pieces used on the package?
15     A.    This was an idea of actually having the side cut
16  area removed so it would fold.  This sort of rounded piece
17  was cut out and go over the top of the bottle to hold the
18  neck in place without a zip tie.
19     Q.    There are two red dots about a third of the way
20  down the labels, front and back.  Does that indicate that
21  you perforate the front and the back with the top of the
22  bottle?
23     A.    Right.  The solid red areas would actually be cut
24  out so the top of the bottle could go through it and then,
25  yeah, the line around the red dot would actually be cut,



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 95

1    and then the dashed line would be a fold.

2        Q.    Do you know if these were actually ever used?

3        A.    I don't think they were.

4        Q.    Was this the first time you had done -- strike

5    that.

6            What is your term for what's shown on the second

7    page of Exhibit 24 beyond packaging?  Is there anything

8    specific?

9        A.    I would refer to it as a die cut packaging.

10       Q.    Had you ever previously used die cut packaging

11   for products?

12       A.    Yes.

13       Q.    You don't recall doing that in the case of the

14   Bad Spaniels, correct?

15       A.    The final package is a die cut, just not in this

16   form.

17           MR. LARKIN:   Mark this as Exhibit 25, two pages

18   bearing Production Numbers Elle 020 and 019.

19           (Deposition Exhibit Number 25 was marked for

20   identification by the Reporter.)

21       Q.    BY MR. LARKIN:  Ms. Phillips, you produced these

22   documents to us through your lawyers yesterday.  Do you

23   recognize the two that we have marked as Exhibit 25?

24       A.    Yes.

25       Q.    The first page of Exhibit 25 is Mr. Sacra's



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 96

1    response to your e-mail covering the -- well, tell me what

2    it is.

3        A.    Looks like a response to my original e-mail that

4    I sent him.

5        Q.    And the second page of Exhibit 25?

6        A.    My e-mail to him saying, "New packaging attached,

7    print-quality and ready to go if all is good to you," and

8    then his request to print and attach.

9        Q.    Were you referring in these two e-mails to the

10   die cut cards or packaging that we looked at a moment ago?

11       A.    I assume so.

12            MR. LARKIN:    Mark this as Exhibit 26, three pages

13   bearing Production Numbers VIP 40 through 42.

14            (Deposition Exhibit Number 26 was marked for

15   identification by the Reporter.)

16       Q.    BY MR. LARKIN:    Ms. Phillips, do you recognize

17   what we marked as Exhibit 26?

18       A.    Yes, I do.

19       Q.    Did the e-mail dated March 17th, 12:29 p.m. cover

20   the two other pages of the exhibit?

21       A.    I assume so.

22       Q.    Look at the page with Production Number 41, the

23   second page of Exhibit 26.    What is that?

24       A.    This is the first sheet of final package header

25   card that we used for the back of the bottle.



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 97

1      Q.    I brought one with me today.  I know we don't
2  have a videographer here.  Are the two pages of Exhibit
3  26, the two last pages of Exhibit 26, the front and the
4  back of that card?
5      A.    With the exception of the UPC code, it appears
6  so, yes.
7      Q.    Do you agree that the last two pages of
8  Exhibit 26 are larger in size and print size than the
9  actual hang tag?
10     A.    Yes.
11     Q.    Did you write any of the text on the last two
12  pages of Exhibit 26?
13     A.    It's probably the same text that I pulled from
14  previous bottles.
15     Q.    Is that what you recall sitting here today having
16  done in March of 2014?
17     A.    Yes.
18     Q.    On the page Number VIP 42, the third page of
19  Exhibit 26, were you the person who made the decision
20  where to place the disclaimer on the hang tag?
21     A.    Yes.
22     Q.    You placed that at the bottom of the back portion
23  of the hang tag?
24     A.    Yes.
25     Q.    Why did you place it there?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 98

1      A.    I believe that's where people go to look for
2   disclaimers.
3            MR. LARKIN:   Let's mark as Exhibit 27 a one-page
4   document bearing Production Number VIP 43.
5            (Deposition Exhibit Number 27 was marked for
6   identification by the Reporter.)
7      Q.    BY MR. LARKIN:   Ms. Phillips, have you seen
8   Exhibit 27 before today?
9      A.    I don't recall seeing it.
10     Q.    You can put it down.
11           MR. LARKIN:   Mark as Exhibit 28 a one-page
12  document bearing Production Number VIP 44.
13           (Deposition Exhibit Number 28 was marked for
14  identification by the Reporter.)
15     Q.    BY MR. LARKIN:   Ms. Phillips, have you seen
16  Exhibit 28 before today?
17     A.    No.
18           MR. LARKIN:   Mark as 29 a one-page document
19  bearing Production Number VIP 48.
20           (Deposition Exhibit Number 29 was marked for
21  identification by the Reporter.)
22     Q.    BY MR. LARKIN:   Ms. Phillips, have you seen
23  Exhibit 29 before today?
24     A.    I assume that I have.  I don't recall it, though.
25     Q.    Sitting here today, you don't recall getting --



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 99

```
 1        A.    No.
 2        Q.    The last line on Exhibit 29 says, "Elle will
 3  forward the print file to us in the next e-mail."  Do you
 4  understand what was meant by "print file" in that section?
 5        A.    Yes.
 6        Q.    What is it?
 7        A.    Print file is a print ready PDF.
 8              MR. LARKIN:  Mark as Exhibit 30 five pages of
 9  documents bearing Production Numbers VIP 49 -- six
10  pages -- to 54.
11              (Deposition Exhibit Number 30 was marked for
12  identification by the Reporter.)
13        Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize
14  the first page of Exhibit 30?
15        A.    Yes.
16        Q.    What is it?
17        A.    It appears to be an e-mail from me to Steve with
18  print-ready artwork.
19        Q.    Do you recognize the other pages of Exhibit 30 as
20  being the attachments to that e-mail?
21        A.    Yes.
22        Q.    The second and third pages of Exhibit 30 are the
23  front and back of the hang tag that we discussed a moment
24  ago with the UPC code actually put on the hang tag,
25  correct?
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 100

1      A.    Yes.

2      Q.    What is the fourth page of Exhibit 30, VIP 52?

3      A.    This is a to-scale image of the Bad Spaniels

4   bottle inside of a dog's mouth.

5      Q.    Did you create that?

6      A.    Yes.

7      Q.    How did you do that?

8      A.    We have access to stock dog photography, so we

9   will purchase dog photos and using the magic of Photoshop

10  superimpose our product into their mouths.

11     Q.    On the right and left side of VIP 52 are inch

12  designators.  What are those?

13     A.    They are there to show what each toy will look

14  like or how it looks to scale, so we use inch indicators

15  to show scale.

16     Q.    So the dog is to scale and the toy is to scale in

17  this picture, correct?

18     A.    That's correct.

19     Q.    So if I understood your testimony a moment ago

20  correctly, you had the stock photo of the dog and you said

21  the magic of Photoshop superimposed the bottle into his

22  mouth.  Is that how it works?

23     A.    Yes.

24     Q.    Why did you use an image of the bottle without

25  the hang tag?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.              4/21/2015

Page 101

1      A.   I don't know.

2      Q.   Do you know what was done with the photograph, I

3  guess, VIP 52 in Exhibit 30?

4      A.   No.

5      Q.   Do you know if VIP itself ever used this in any

6  way?

7      A.   No.

8      Q.   You don't know or --

9      A.   I don't know if they've used it in any way.

10     Q.   Turn to the next page of Exhibit 30, please, VIP

11  53 and VIP 54, the next two pages.  Did you take these two

12  photographs?

13     A.   Probably.

14     Q.   Do they show how the hang tag that we discussed a

15  few moments ago is physically attached to the Bad Spaniels

16  toy?

17     A.   Yes.

18     Q.   Do you know how these two images, VIP 53, VIP 54,

19  Exhibit 30, were used?

20     A.   No.

21     Q.   Did you, when you received the samples of the Bad

22  Spaniels toy from Mr. Sacra, did you get a sample with a

23  hang tag attached?

24     A.   Yes.

25     Q.   Did you ever get a sample without a hang tag?



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 102

1        A.    I don't recall.

2              MR. LARKIN:   Let's mark as Exhibit 31 a document

3     bearing Production Number Elle 28.

4              (Deposition Exhibit Number 31 was marked for

5     identification by the Reporter.)

6        Q.    BY MR. LARKIN:   Ms. Phillips, do you recognize

7     what we have marked as Exhibit 31?

8        A.    Yes.

9        Q.    What is it?

10       A.    It is an invoice from me to VIP Products.

11       Q.    Dated March 24th, 2014?

12       A.    Correct.

13       Q.    And under "Project description/design time,"

14    there is an entry "SillySQ, Bad Spaniels packaging, new

15    design/layout, revisions to layout, print-ready files."

16    Do you see that?

17       A.    Yes.

18       Q.    Does this invoice charge for your services in

19    developing the materials that we just marked as Exhibit

20    30?

21       A.    Yes.

22       Q.    Was this your last statement -- strike that.

23             Was this your last invoice to VIP in connection

24    with the Bad Spaniels product?

25       A.    I don't know.  I'd have to look.



Page 103

1      Q.    I assume you did look in responding to the

2   Subpoena.  Did you find any other one?

3      A.    Well, if I found anything, I sent it to you, but

4   I can't recall at this very moment what specifically I

5   found and didn't find.

6      Q.    If you had found it, you would have provided it

7   to us?

8      A.    Absolutely.

9           MR. LARKIN:  Let's mark as Exhibit 32 a series of

10  documents that Ms. Phillips produced to us yesterday.  We

11  will start with five pages of documents bearing Production

12  Number Elle 12 through Elle 16.

13          (Deposition Exhibit Number 32 was marked for

14  identification by the Reporter.)

15     Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

16  what we have marked as Exhibit 32?

17     A.    Yes.

18     Q.    What is it?

19     A.    It is an e-mail conversation between myself and

20  Lisa regarding uploading images to the retail and

21  wholesale Web site.

22     Q.    Who is Lisa?  Is that Lisa Carpenter?

23     A.    Yes.

24     Q.    Do you know what her position is with VIP?

25     A.    I know she worked in the office.  I don't know



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 104

1    specifically what her title is.

2        Q.    Based on your correspondence with her, do you

3    know her general responsibilities?

4        A.    Actually, no, I really don't.

5        Q.    When you have corresponded with her, has it

6    typically been about the Web site?

7        A.    Yes.

8        Q.    I think you mentioned retail and wholesale Web

9    sites?

10       A.    Correct.

11       Q.    Are there two different VIP Web sites?

12       A.    Combination of the same Web site, just different,

13   I think, prices on display based on if they are a retail

14   or wholesale customer.

15       Q.    The same Web site but different portions of the

16   Web site go to retail as opposed to wholesale?

17       A.    Right.

18       Q.    Let's work from back to front in chronological

19   order starting at page 5 or 5 of 4.

20             The first correspondence in that e-mail chain is

21   Tuesday, May 20th, from Ms. Carpenter to you when she

22   says, among other things, "Elle, do you have images of all

23   these new items?"  Down that page, which is Elle 15, one

24   of them is SS-LB-BS (Bad Spaniels); do you see that?

25       A.    Yes.



Eleanor Phillips          VIP Products, LLC v. Jack Daniel's Properties, Inc.          4/21/2015

Page 105

1     Q.   Do you recall sending Ms. Carpenter images in
2  response to that e-mail?
3     A.   I believe in this e-mail she is asking to make a
4  new sell sheet, so I probably put one together for her.
5     Q.   And then farther up the chain, the second page, 2
6  of 4, Elle 13, July 15 from Ms. Carpenter to you says,
7  "The items below are all in stock, and I realize you still
8  haven't finished uploading images.  I need to send a mass
9  e-mail to customers and reps informing them these are now
10  available to order, but would like all the images uploaded
11  before I do so."
12          There is a list.  One of them is SS-LB-BS, (Bad
13  Spaniels).  Do you see that?
14     A.   Yes.
15     Q.   Did you send -- and your response is the first
16  page, page 1 of 4?
17     A.   Yes.  I uploaded the images to the retail and
18  wholesale into their item code, which means into their Web
19  site.
20     Q.   You did that remotely by uploading the images
21  from your computer to VIP's server, I guess?
22     A.   Yes.
23          MR. LARKIN:  Let's mark as Exhibit 33 two pages
24  of documents bearing Production Numbers Elle 23 and Elle
25  24.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 106

1              (Deposition Exhibit Number 33 was marked for

2       identification by the Reporter.)

3           Q.    BY MR. LARKIN:   Ms. Phillips, do you recognize

4       what we have marked as Exhibit 33?

5           A.    Yes.

6           Q.    What are they?

7           A.    It's a request from Wendy to put together sell

8       sheets, it looks like.

9           Q.    What are sell sheets?   You have used that term a

10      number of times.

11          A.    It's -- it can be one page or multi-page document

12      showing retail -- suggested retail and wholesale prices

13      for specific products.

14          Q.    Do you know how they are used by VIP?

15          A.    I'm not certain, no.

16          Q.    Is it fair to say that your involvement with the

17      sell sheet ends when you create them and provide them to

18      VIP?

19          A.    Yes.

20          Q.    The e-mails in Exhibit 33 are between you and

21      Wendy Sacra.   Is this the first time that you recall

22      corresponding with Ms. Sacra in connection with the Bad

23      Spaniels product?

24          A.    I'd say probably, yeah.   I don't remember

25      specifically, though.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 107

1      Q.   She didn't have anything -- to your knowledge,
2  she didn't have anything to do with the design of the
3  product or the design of the bottle or anything of that
4  sort?
5      A.   Not at all.
6           MR. LARKIN:   Mark as Exhibit 34 a document
7  bearing Production Number Elle 22.
8           (Deposition Exhibit Number 34 was marked for
9  identification by the Reporter.)
10     Q.   BY MR. LARKIN:   Ms. Phillips, do you recognize
11 what we have marked as Exhibit 34?
12     A.   Yes.
13     Q.   What is it?
14     A.   It is an e-mail from Wendy to me asking for hi
15 res images of toys.
16     Q.   One of those is the Bad Spaniels toy?
17     A.   Yes.
18     Q.   Do you know why Ms. Sacra was asking for hi res
19 images of the Bad Spaniels toy?
20     A.   No.
21     Q.   Do you recall providing them to her?
22     A.   Yes.
23           MR. LARKIN:   Mark as Exhibit 35 a one-page
24 document bearing Production Number Elle 25.
25           (Deposition Exhibit Number 35 was marked for



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 108

1    identification by the Reporter.)

2       Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize

3    what we have marked as Exhibit 35?

4       A.   Yes.

5       Q.   What is it?

6       A.   It is an e-mail from Wendy asking me to create a

7    sell sheet.

8       Q.   How many different sell sheets do you recall

9    creating for the Bad Spaniels toy?

10      A.   I couldn't tell you.  I don't know.

11      Q.   Is it more than one?

12      A.   Probably.

13      Q.   Exhibit 35 was sent on November 28th, 2014.  Do

14   you recall any further correspondence or work for VIP

15   regarding the Bad Spaniels toy after November of 2014?

16      A.   I don't recall.

17      MR. LARKIN:  Mark as Exhibit 36 a one-page

18   document bearing Production Number VIP 120.

19      (Deposition Exhibit Number 36 was marked for

20   identification by the Reporter.)

21      Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize

22   what we have marked Exhibit 36?

23      A.   Yes.

24      Q.   What is it?

25      A.   It is a sell sheet.



Eleanor Phillips              VIP Products, LLC v. Jack Daniel's Properties, Inc.              4/21/2015

Page 109

1      Q.    Did you create it?

2      A.    Yes.

3      Q.    Exhibit 36 shows two products, Bad Spaniels and

4    Jose El Perro.  You designed the Jose El Perro toy,

5    correct?

6      A.    Yes.

7      Q.    Did you write the text that appears within the

8    two toys that are shown in Exhibit 36?

9      A.    I copied and pasted in with what I was told.

10      Q.    Someone else provided that information, correct?

11      A.    Yes.

12      Q.    Do you recall when this particular sell sheet was

13    created?

14      A.    I don't know specifically.

15      Q.    Do you know what was done with it?

16      A.    No.

17      Q.    Do you know who receives it outside of VIP?

18      A.    No.

19      Q.    Was there ever any discussion about using a

20    disclaimer on VIP's sell sheets?

21      A.    No.

22          MR. LARKIN:  Mark as Exhibit 37 a one-page

23    document bearing Production Number Elle 72.

24          (Deposition Exhibit Number 37 was marked for

25    identification by the Reporter.)



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 110

1      Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize
2    what we have marked Exhibit 37?
3      A.    Yes.
4      Q.    What is that?
5      A.    A sell sheet.
6      Q.    Did you create it?
7      A.    Yes.
8      Q.    Did you create Exhibit 37 before you created
9    Exhibit 36, which shows two products?
10     A.    I don't remember.  I'm not sure.
11     Q.    Do you remember the sequence in which the Bad
12   Spaniels and Jose El Perro toys were produced by VIP?
13     A.    I don't remember.
14     Q.    Does looking at the words "Now available" beneath
15   the product refresh your memory as to when you created the
16   sell sheet that we marked as Exhibit 37?
17     A.    Not specifically, no.
18     Q.    Is this the wholesale sell sheet that you
19   referred to a few moments ago in your testimony?
20     A.    It refers to wholesale and retail pricing.
21     Q.    And do you know how this was used?
22     A.    No.
23     Q.    Or who used it?
24     A.    No.
25     Q.    Was there any discussion of using a disclaimer on



Eleanor Phillips               VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 111

1    this sell sheet?

2        A.    No.

3              MR. BRAY:   Objection to form.

4              MR. LARKIN:   Mark as Exhibit 38 a one-page

5    document bearing Production Number Elle 78.

6              (Deposition Exhibit Number 38 was marked for

7    identification by the Reporter.)

8        Q.    BY MR. LARKIN:   Ms. Phillips, do you recognize

9    what we have marked as Exhibit 38?

10       A.    Yes.

11       Q.    What is that?

12       A.    A sell sheet.

13       Q.    Did you create it?

14       A.    Yes.

15       Q.    Beneath the product photograph is a line that

16   begins, "Distributor: 5.35/MSRP: 15.28."  Do you see that?

17       A.    Yes.

18       Q.    Was this a distributor sell sheet for

19   distributors?

20       A.    There's never been any difference in sell sheets

21   for me.  They are all considered the same sell sheet.

22       Q.    From your perspective as the designer, you are

23   just creating a document based on the information provided

24   to you?

25       A.    Yes.



Page 112

1      Q.    Do you know who VIP's distributors are?

2      A.    No.

3      Q.    Have you ever dealt with any of them?

4      A.    Not directly, no.

5      Q.    Have you ever dealt with any of VIP's retail

6    customers directly?

7      A.    Only to send images on occasion.

8      Q.    Have you ever sent any such images for the Bad

9    Spaniels toy?

10     A.    I don't recall.

11           MR. LARKIN:  Mark as Exhibit 39 a one-page

12   document bearing Production Number Elle 75.

13           (Deposition Exhibit Number 39 was marked for

14   identification by the Reporter.)

15     Q.    BY MR. LARKIN:  Ms. Phillips, do you recognize

16   Exhibit 39 as another sell sheet that you created?

17     A.    Yes.

18     Q.    Does looking at the words "Available July 18th"

19   beneath the product picture refresh your memory about when

20   you created it?

21     A.    I would assume before July 18th.

22     Q.    Does that help you any more than that?

23     A.    No.

24           MR. LARKIN:  Let's mark as 40 a page from the VIP

25   Web site bearing Production Numbers VIP 121 and 122.



Eleanor Phillips          VIP Products, LLC v. Jack Daniel's Properties, Inc.          4/21/2015

Page 113

1          (Deposition Exhibit Number 40 was marked for

2     identification by the Reporter.)

3     Q.    BY MR. LARKIN:  Ms. Phillips, have you seen the

4     portion of the VIP Web site that is reflected in

5     Exhibit 40?

6     A.    Yes.

7     Q.    Were you involved in the creation of that page?

8     A.    Not the actual Web page.  I just upload the

9     images.

10    Q.    Did you upload the large image of the Bad

11    Spaniels product that's in the middle of the page?

12    A.    Yes.

13    Q.    Beneath that there are four photographs captioned

14    main, front, angle and side.  Do you see that?

15    A.    Yes.

16    Q.    Did you upload those photographs?

17    A.    Yes.

18    Q.    Were those photographs taken from the 36

19    photographs at 10 percent different orientations that we

20    talked about earlier?

21    A.    Yes.

22    Q.    Were you the one who decided which photographs

23    from those 36 would appear?

24    A.    Yes.

25    Q.    What was the purpose of uploading main, front,



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 114

1    angle and side photographs?

2        A.    So people could see different angles of the toy.

3        Q.    Did you write any of the text that appears on

4    Exhibit 40?

5        A.    No.

6        Q.    Did you have anything to do with its placement on

7    the page?

8        A.    No.

9        Q.    At the top of Exhibit 40 is what I am going to

10   call the masthead for the site.  Do you understand what I

11   mean by that?

12       A.    Yes.

13       Q.    Did you have any involvement in uploading images

14   to the masthead?

15       A.    Yes.

16       Q.    Did you upload the three photographs of dogs that

17   appear there?

18       A.    Yes.  That's one image I created to upload.

19       Q.    You uploaded the image of -- I don't know what

20   the breed is, but the dog that is holding the Bad Spaniels

21   product on the masthead?

22       A.    Yes.

23       Q.    Was that the same image of the image we talked

24   about earlier?

25       A.    No.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 115

1      Q.    Where did you get that image?

2      A.    He is a stock photo of a dog, and at some point I

3  superimposed the bottle into his mouth.

4      Q.    This image shows the dog holding the neck of the

5  bottle, correct?

6      A.    Yes.

7      Q.    Why did you show the bottle being held at the

8  neck without the hang tag on it?

9      A.    Probably because it looked better in his mouth

10  that way.

11      Q.    Look at the second page of Exhibit 40, please.

12  Do you recognize that to be what one sees when you visit

13  the page from VIP's Web site that's depicted in

14  Exhibit 40?

15      A.    Yes.

16      Q.    That's farther down the page from the image you

17  get when you land on that page?

18      A.    Yes.

19      Q.    Did you have any involvement in writing the text

20  that appears on the second page of Exhibit 40?

21      A.    No.

22      Q.    Or quoting the text there?

23      A.    No.

24      Q.    If I went to the VIP Web site today, every

25  picture that I see would be one that you uploaded at some



Eleanor Phillips              VIP Products, LLC v. Jack Daniel's Properties, Inc.              4/21/2015

Page 116

```
 1    point?
 2              MR. BRAY:  Object to form.
 3    A.   BY THE WITNESS:  No.
 4              MR. BRAY:  Foundation.
 5    A.   BY THE WITNESS:  Not every picture.
 6    Q.   BY MR. LARKIN:  How about the Silly Squeakers?
 7    Would it be correct that you uploaded all the images for
 8    the Silly Squeakers pages?
 9    A.   Yes.
10              MR. LARKIN:  Let's mark as Exhibit 41 a document
11    bearing Production Number Elle 5.
12              (Deposition Exhibit Number 41 was marked for
13    identification by the Reporter.)
14    Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize
15    what we have marked as Exhibit 41?
16    A.   Yes.
17    Q.   What is it?
18    A.   It is a page from the new catalog.
19    Q.   The 2014 catalog?
20    A.   It could have been 2014 or 2015.  I'm not sure.
21    Q.   Is there a new 2015 catalog?
22    A.   In production.
23    Q.   Do you know if it is actually available?
24    A.   I don't know.
25    Q.   Do you know if it appears on VIP's Web site?
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 117

```
 1      A.    I don't know.

 2      Q.    Do you know if hard copies have been distributed?

 3      A.    I don't know.

 4            MR. LARKIN:   Let's mark as Exhibit 42 a page from

 5     VIP 2014 catalog that we previously marked, I think, as

 6     Exhibit 4.

 7            (Deposition Exhibit Number 42 was marked for

 8     identification by the Reporter.)

 9      Q.    BY MR. LARKIN:   Ms. Phillips, do you recognize

10     Exhibit 42?

11      A.    Yes.

12      Q.    Do you recognize that to be a page from the 2014

13     VIP catalog?

14      A.    Yes.

15      Q.    Did you create Exhibit 42?

16      A.    Yes.

17      Q.    How did you do that?

18      A.    Photoshop magic.

19      Q.    What did you use -- strike that.

20            Well, tell me what you did in using Photoshop.

21      A.    The background image of the bar is a stock

22     photography image, and then I superimposed the Bad

23     Spaniels bottles onto the top of the bar, and I also wiped

24     out any recognizable brands that were displayed in the bar

25     background.
```



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 118

1     Q.    Is the stock image that you started with an image
2  of an actual bar?
3     A.    I believe so, yes.
4     Q.    Do you have any information about where it is?
5     A.    No.
6     Q.    Or what restaurant or bar it's in?
7     A.    No.
8     Q.    Some of the bottles and glasses appear in
9  Exhibit 42 upside down.  Was that how they appeared in the
10  stock image that you started with?
11     A.    Yes.
12     Q.    Do you know whether the stock image was a shot of
13  an actual bar that someone could enter and buy a drink?
14     A.    I believe it was, yes.
15     Q.    Do you see on the left-hand side hanging upside
16  down a bottle with an oval design, a white on black label
17  and a black neck design?
18     A.    Yes.
19     Q.    Was that a Jack Daniel's bottle in the original
20  Photoshop stock photo -- I'm sorry -- the original stock
21  photo?
22     A.    I actually don't recall.
23     Q.    Why did you excise the brand names?
24     A.    Because that's the proper thing to do when you
25  are not purchasing -- when you are purchasing royalty free



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 119

1    and you are going to be displaying it in a catalog with
2    other products.   It's a safer route so nobody can claim
3    rights to it.
4        Q.   Did you do that with every bottle that's shown on
5    that bar?
6        A.   With every bottle that had recognizable text, I
7    did, yes.
8        Q.   So looking at the bar as it appears in Exhibit
9    42, do you believe that no one can tell from viewing the
10   products what they are?
11           MR. BRAY:   Objection, form, foundation.
12       A.   BY THE WITNESS:   I believe that while the bottle
13   could still be recognizable to people, there are no actual
14   names that could be read on them.
15       Q.   BY MR. LARKIN:   Do you believe that the bottle
16   hanging upside down with the oval and the white on black
17   label could be recognized as a Jack Daniel's bottle, even
18   though the mark has been removed?
19       A.   It could be.
20       Q.   Did you write the text that appears in
21   Exhibit 42?
22       A.   Yes.
23       Q.   All of it?
24       A.   Yes.
25       Q.   Who are you referring to in the first line that



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 120

1    says, "Now Ol'" -- O-l, apostrophe, "Grand Papa Pooch has
2    a Silly Squeakers novelty liquor bottle made just for
3    him"?
4         A.   Who was I referring to?
5         Q.   Yes.
6         A.   I was referring to Grand Papa Pooch.
7         Q.   Is that someone that's identified elsewhere in
8    the catalog?  Is that just your nickname for a dog?
9         A.   It's a nickname for a dog.
10        Q.   The second sentence there says, "Please play
11   responsibly."  Why did you include that?
12        A.   I thought it was a friendly play on words for
13   "Please drink responsibly."
14        Q.   Do you know that Jack Daniel's uses the words
15   "Please drink responsibly" on its print ads?
16        A.   I assume all the beers and alcohol do.
17        Q.   Were you the one who made the decision to place
18   the disclaimer at the bottom of the picture?
19        A.   I think that was a decision that was made a long
20   time ago in prior catalogs, so we just include them all
21   now.
22        Q.   Were you the one who made the decision to show
23   the disclaimer in the type size that appears on
24   Exhibit 42?
25        A.   Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 121

1      Q.    Do you agree that it's smaller than the text
2    above it?
3      A.    Yes.
4      Q.    What was the purpose of showing a bar at all in
5    the catalog?
6      A.    I thought it enhanced the fun play on the dog
7    toy.
8      Q.    Looking at the products that appear in the
9    background of Exhibit 42, do you believe that the Bad
10   Spaniels products that are shown resemble any of them?
11     A.    Do I believe the Bad Spaniels product resembles
12   other liquors in the background of this photo?
13     Q.    Right.
14     A.    Yes.
15     Q.    Which one, or which ones?
16     A.    I believe it resembles two upside down bottles.
17     Q.    Which ones are those?
18     A.    The ones with the brown bottles.
19     Q.    The one we talked about and then the one that's
20   to the right of that?
21     A.    Yes.
22     Q.    What is it about the one to the right that is
23   similar to the Bad Spaniels bottle?
24     A.    There is black and white and brown.
25     Q.    Do you believe the bottle shape is similar?



Page 122

1      A.    I believe it's close, maybe not exact.

2      Q.    Do you know what product that is in reality or

3   what is in the stock photo?

4      A.    I don't recall.

5      Q.    Do you know if it's a whiskey brand?

6      A.    I don't recall.

7      Q.    Look back at Exhibit 41, please.  When did you

8   begin work on that?

9      A.    I don't recall.

10     Q.    Was it in -- we are now in April, almost the end

11  of April 2015.  Was it sometime in 2015 as opposed to

12  2014?

13     A.    Probably.

14     Q.    Do you know when the 2015 VIP catalog will be

15  available on the company's Web site?

16     A.    I don't know.

17     Q.    On Exhibit 42, the catalog page from the 2014

18  catalog, does the VIP mark appear anywhere in the picture?

19     A.    It doesn't appear so.

20     Q.    Was there a reason why Exhibit 41, that I think I

21  understood to be the new catalog page, has the VIP mark in

22  the picture itself?

23     A.    I believe once it was actually inserted into the

24  catalog, it was covered up.

25           MR. LARKIN:  Why don't we take a short break.  I



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 123

1    think I'm almost finished.  And I know the witness would

2    like to go.  So take a five-minute break, and we can wrap

3    up shortly.

4              (Recess from 12:25 p.m. to 12:32 p.m.)

5        Q.   BY MR. LARKIN:  Ms. Phillips, does part of your

6    work as a graphic designer involve branding, helping your

7    clients promote their brands?

8        A.   Yes.

9        Q.   And is one of the objectives to become a

10   well-known brand?

11       A.   Yes.

12       Q.   Do you agree that the Jack Daniel's brand is a

13   well-known brand in the United States?

14       A.   Yes.

15       Q.   A very well-known brand?

16       A.   It's a well-known brand.

17       Q.   Do you agree that the Jack Daniel's label is very

18   recognizable in the United States?

19       A.   Sure.

20       Q.   And the Jack Daniel's bottle shape?

21       A.   I've never taken notice of the bottle shape.

22       Q.   It's a combination of the label and the bottle?

23       A.   Yes.

24       Q.   You agree that's well known?

25       A.   Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 124

1          MR. LARKIN:  Let's mark as 43 a page from
2    Ms. Phillips' Web site.
3          (Deposition Exhibit Number 43 was marked for
4    identification by the Reporter.)
5      Q.   BY MR. LARKIN:  Ms. Phillips, do you recognize
6    Exhibit 43 as a page from your Web site?
7      A.   Yes.
8      Q.   About two-thirds of the way down in the text
9    there is some bolded text that reads, quote, "Please note:
10   In my designs, I do not use images or designs that you do
11   not own the rights to.  If stock photography needs to be
12   purchased in order to complete a graphic design project,
13   please contact me for details.  I always strive to
14   maintain the highest ethical standards and will not
15   knowingly infringe on anyone's copyright."  Do you see
16   that?
17     A.   Yes.
18     Q.   Do you have a similar policy for infringing trade
19   marks?
20     A.   I suppose.
21     Q.   In the course of designing your Silly Squeaker
22   products for VIP, did it ever concern you that the product
23   you are assisting VIP to design would reflect badly on
24   brands like Budweiser and Jack Daniel's?
25          MR. BRAY:  Objection, form.



Eleanor Phillips                 VIP Products, LLC v. Jack Daniel's Properties, Inc.                 4/21/2015

Page 125

1    A.   BY THE WITNESS:   The intent was never to reflect
2    badly.
3    Q.   BY MR. LARKIN:   Irrespective of the intent, did
4    it ever concern you that they might reflect badly on the
5    brands?
6    A.   No.
7    Q.   They might associate the brands with defecation
8    or urination, things of that sort?
9    A.   No.
10   Q.   Did you ever have a discussion on that subject
11   with Mr. Sacra?
12   A.   No.
13   Q.   Or anyone else at VIP?
14   A.   No.
15        MR. LARKIN:   Let's mark as Exhibit 44 another
16   page from Ms. Phillips' Web site.
17        (Deposition Exhibit Number 44 was marked for
18   identification by the Reporter.)
19   Q.   BY MR. LARKIN:   Ms. Phillips, do you recognize
20   Exhibit 44?
21   A.   Yes.
22   Q.   It's a page from your Web site?
23   A.   Yes.
24   Q.   Does that show a Pepsi bottle that you designed?
25   A.   Yes.



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 126

1      Q.    Was Pepsi actually sold in the packaging that

2   appears in Exhibit 44?

3      A.    Yes.

4      Q.    Did you ever design a toy for VIP that was based

5   on a Pepsi product?

6      A.    I'm not sure.

7      Q.    If Mr. Sacra asked you to do a Silly Squeaker toy

8   based on this bottle, would you have any problems doing

9   that?

10      A.    No.

11          MR. LARKIN:  I have nothing further.  Again thank

12   you very much for your time today.  I know it's an

13   imposition as a non-party in the case, and I appreciate

14   the fact that you made yourself available today.

15          Do you want to talk about what we do with the

16   transcript?

17          MR. BRAY:  We want to read and sign.

18          MR. LARKIN:  Do you want it to go to you?

19          MR. BRAY:  Yes.

20          MR. LARKIN:  We will stipulate to that.

21          MR. BRAY:  That's fine.

22          MR. LARKIN:  Thank you.

23          (12:37 p.m.)

24

25                              _____

                                ELEANOR PHILLIPS



Eleanor Phillips                VIP Products, LLC v. Jack Daniel's Properties, Inc.                4/21/2015

Page 127

```
 1   STATE OF ARIZONA     )
                          )  ss.
 2   COUNTY OF MARICOPA   )
 3           BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7
             I CERTIFY that I am in no way related to any of
 8   the parties hereto, nor am I in any way interested in the
     outcome hereof.
 9
             [X]   Review and signature was requested.
10           [ ]   Review and signature was waived.
             [ ]   Review and signature not required.
11
             I Certify that I have complied with the ethical
12   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     (J)(1)(g)(1) and (2).
13
             DATED at Phoenix, Arizona, this _____ day of May
14   2015.
15
                                 _____
16                               BECKY BAUMERT, RPR
                                 Certified Reporter
17                               Arizona CR No. 50152
18
                  *      *      *      *      *
19
20           I CERTIFY that GRIFFIN & ASSOCIATES, LLC has
     complied with the ethical obligations set forth in ACJA
21   7-206 (J)(1)(g)(1) through (6).
22
                                 _____
23                               GRIFFIN & ASSOCIATES, LLC
                                 Registered Professional Firm
24                               Arizona RRF No. R1005
25
```

