Gerald L. Ford - August 19, 2015

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


VIP Products, L.L.C., an Arizona )
limited liability company,       )
                                 )
   Plaintiff and Counterdefendant, )
                                 )
         vs.                     ) No. 2:14-cv-02057-DGC
                                 )
Jack Daniel's Properties, Inc., a )
Delaware corporation,            )
                                 )
     Defendant and Counterclaimant, )
_____)


DEPOSITION OF GERALD L. FORD

Huntington Beach, California

Wednesday, August 19, 2015


REPORTED BY:
BARBARA R. SWENGEL
RPR, CSR NO. 7415

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF ARIZONA

 3

 4    VIP Products, L.L.C., an Arizona  )
      limited liability company,        )
 5                                       )
        Plaintiff and Counterdefendant, )
 6                                       )
               vs.                       ) No. 2:14-cv-02057-DGC
 7                                       )
      Jack Daniel's Properties, Inc., a )
 8    Delaware corporation,              )
                                         )
 9       Defendant and Counterclaimant, )
      _____)
10

11

12                Deposition of GERALD L. FORD, taken on

13                behalf of Plaintiff and Counterdefendant

14                VIP Products, L.L.C. at 16400 Pacific

15                Coast Highway, Suite 211, Huntington Beach,

16                California, commencing at 9:16 a.m. on

17                Wednesday August 19, 2015, before

18                Barbara R. Swengel, CSR No. 7415, a

19                Certified Shorthand Reporter in and for the

20                County of Riverside, State of California.

21

22

23

24

25
```

1    APPEARANCES:

2    FOR PLAINTIFF AND COUNTERDEFENDANT VIP PRODUCTS, L.L.C.:

3                        DICKINSON WRIGHT, PLLC
                         BY:   DAVID G. BRAY
4                              Attorney at Law
                         1850 North Central Avenue
5                        Suite 1400
                         Phoenix, Arizona  85004
6                        (602) 285-5000
                         dbray@dickinsonwright.com
7

8

9    FOR DEFENDANT AND COUNTERCLAIMANT JACK DANIEL'S
     PROPERTIES, INC., A DELAWARE CORPORATION:
10
                         SEYFARTH SHAW, LLP
11                       BY:   CHRISTOPHER C. LARKIN
                               Attorney at Law
12                       One Century Plaza
                         2029 Century Park East
13                       Suite 3500
                         Los Angeles, California  90067-3021
14                       (310) 277-7200
                         clarkin@seyfarth.com
15

16    ALSO PRESENT:

17                       MATTHEW G. EZELL

18

19

20

21

22

23

24

25

Gerald L. Ford - August 19, 2015                    4

```
 1                         I N D E X

 2      EXAMINATION BY:                              PAGE

 3          Mr. Bray                                  5

 4

 5

 6

 7                       E X H I B I T S

 8      PLAINTIFF'S                                  PAGE
```

```
 9      Exhibit 53    American Whiskey/Bourbon Report   157
                      (63 pages)
10
        Exhibit 59    Subpoena to Testify at a            6
11                    Deposition in a Civil Action
                      (6 pages)
12
        Exhibit 60    Dr. Gerald L. Ford Trial Testimony  10
13                    1992 - 2015 (11 pages)

14      Exhibit 61    Declaration and Rule 26 Report of   17
                      Dr. Gerald L. Ford (35 pages)
15
        Exhibit 62    Trademark and Deceptive Advertising 30
16                    Surveys Law, Science, and Design
                      (26 pages)
17
        Exhibit 63    Answer and Counterclaims of        143
18                    Defendant and Counterclaimant
                      Jack Daniel's Properties, Inc.
19                    (66 pages)

20      Exhibit 64    Miscellaneous documents (43 pages) 230

21      Exhibit 65    Expert Rebuttal Report of Stephen  234
                      Nowlis (30 pages)
22
```

```
23

24

25
```

```
 1              Huntington Beach, California; August 19, 2015
 2                           9:16 a.m.
 3
 4                        GERALD L. FORD,
 5        having declared under penalty of perjury to tell the
 6        truth, was examined and testified as follows:
 7
 8                        EXAMINATION
 9        BY MR. BRAY:
10           Q     Good morning, Dr. Ford.
11           A     Good morning.
12           Q     My name is David Bray.  I represent technically
13        the plaintiff in this case, VIP Products, L.L.C.
14                 Can you state your full name for the record.
15           A     Sure.  It's Gerald Louis, L-o-u-i-s, Ford,
16        F-o-r-d.
17           Q     Okay.  And I heard you just tell the court
18        reporter you've done this before.  Have you been deposed
19        over 20 times?
20           A     Probably 200 times.
21           Q     Okay.  That's what I thought.  Any need for me
22        to do my typical ten-minute spiel for depositions --
23           A     You can do whatever you want to do.
24           Q     All right.  You generally -- you're generally
25        familiar with the rules of depositions, though?
```

Gerald L. Ford - August 19, 2015                                6

```
 1          A    I am.
 2          Q    All right.  We're going to mark our exhibits
 3     sequentially.  So I think the last exhibit was 57.  So
 4     that will be 58.
 5               MR. BRAY:  Let me just double-check that.  Hold
 6     on one second.
 7               This is off the record.
 8               (Discussion held off the record.)
 9               (Plaintiff's Exhibit 59 was marked
10               for identification.)
11     BY MR. BRAY:
12          Q    I have handed you what's been marked as
13     Exhibit 59, which is the subpoena duces tecum.
14          A    Yep.
15          Q    Are you familiar with this document?
16          A    I have seen it before.
17          Q    Okay.  Just take a look briefly at the
18     requested documents.
19          A    Uh-huh.
20          Q    Are you there?
21          A    I am there.
22          Q    Have you provided to your counsel, who has
23     provided to us, documents responsive to the subpoena?
24          A    I believe so.
25          Q    Okay.  What did you do -- after you received
```

Gerald L. Ford - August 19, 2015                    7

1    the subpoena, what did you do physically in terms of
2    complying and gathering the records that were requested?
3         A    Well, we looked through all of our E-Mails.  We
4    looked through our files.  We met with Mr. Larkin.  We
5    went through the subpoena, and we gathered documents
6    that I understand have been turned over to you.
7         Q    Okay.  And do you feel you fully complied with
8    your obligations to produce records under the
9    subpoena --
10        A    I do.
11        Q    -- to the best of your knowledge?
12        A    I do.
13        Q    I am not going to mark this unless we need to.
14        A    Oh, come on.
15        Q    All right.
16        A    No.  I'm just kidding.
17        Q    All right.  I'm handing you, but not marking as
18   an exhibit, it looks like a declaration that you did in
19   conjunction with a TTAB proceeding for Southern Comfort
20   Properties, and it's Bates numbered GLF 0016 through
21   545.
22             Are you familiar with that document?
23        A    I am.
24        Q    Okay.
25        A    So I think it was actually two documents.  I'm

1      not trying to mislead you, but I think the declaration

2      supported -- was kind of an exhibit that supported

3      Exhibit A, which is the survey report.

4           Q     Okay.

5           A     So I mean they weren't all together.

6           Q     I appreciate that.  I'll represent to you that

7      in response to the subpoena duces tecum that VIP served

8      in this case, this was the only other survey and

9      declaration supporting a survey that was produced by

10     you.

11          What was your reason for producing this

12     particular report and survey?

13          A     I think it was the time frame.

14          Q     So it was within four years?

15          A     Yes.

16          Q     Okay.  So you've not provided any other expert

17     survey reports in other matters with regard to

18     likelihood of confusion in the last four years other

19     than the report -- the declaration report Bates number

20     GLF 000160?

21          MR. LARKIN:  Well, as we indicated in our

22     response to the subpoena, we have previously produced

23     elsewhere in the case Dr. Ford's report in the Sweet

24     Revenge case.  So we did not separately produce that

25     again.

```
 1                    MR. BRAY:  Okay.  That's correct.  Thank you,
 2      Counsel.
 3      BY MR. BRAY:
 4           Q    So within the last four years, you've produced
 5      likelihood of confusion survey reports in two litigation
 6      matters?
 7           A    That's not true.
 8           Q    Okay.  What other litigation matters in the
 9      last four years have you provided a likelihood of
10      confusion survey report?
11           A    For --
12           Q    For anyone?
13           A    For anyone?
14           Q    Yes.
15           A    Oh, then I think we're going to have to get my
16      survey report out and take a look at it.
17           Q    All right.  We will come back.
18           A    I mean I think you had like ten years of
19      litigations that are --
20           Q    Sure.  And maybe that would be a logical place
21      to go next, Dr. Ford.
22           A    And I'm sorry.  I'm not trying to tell you how
23      to do the deposition.
24           Q    No.  That's all right.  That's all right.  I'll
25      take --
```

1          MR. BRAY:  Mark this as -- actually, I'll leave

2     the cover page.  That will be Exhibit 60.

3          (Plaintiff's Exhibit 60 was marked

4          for identification.)

5          THE WITNESS:  Can I put this away for a moment?

6          MR. BRAY:  Yeah.

7          MR. LARKIN:  I'm sorry.  That's Exhibit C to

8     Dr. Ford's report?

9          MR. BRAY:  Yeah.

10          THE WITNESS:  So this is Exhibit 69?

11          MR. BRAY:  60.

12          MR. LARKIN:  Exhibit 60.

13          THE WITNESS:  I'm sorry.  60.

14     BY MR. BRAY:

15          Q    I -- and is Exhibit 60 a list of matters that

16     you've given both trial testimony and deposition

17     testimony since 1992?

18          A    There's one matter that's missing there.

19          Q    And what's the missing matter?

20          A    It was Nike versus a number of -- what the ITC

21     calls respondents.  I don't know if you've ever done an

22     ITC case, but I wish you luck.  We started out with 31

23     respondents.  We ended up with four.

24          Q    I have not done an ITC case.  My best friend in

25     Phoenix, when he worked for Finnegan & Henderson in DC,

1    spent like a whole year working on one ITC case --

2        A    Oh, yeah.

3        Q    -- so I know they can be involved.

4        A    I mean I did one for Mag Instrument, the

5    flashlight company.  It lasted for three months.

6        Q    Okay.  Let's focus on the cases that you've

7    given trial testimony on.

8        A    Okay.

9        Q    Are all of the cases listed where you've given

10   trial testimony in Exhibit 60 cases where you've

11   provided a likelihood of confusion opinion?

12       A    No.

13       Q    Okay.  Can you identify for me -- well, why

14   don't we do this.  Let's start with the most recent

15   cases, and then we'll decide how much detail we want to

16   go into of all the cases.

17       A    Okay.  The most recent case, which isn't on the

18   list, is the Nike case, which was likelihood of

19   confusion.

20       Q    Okay.  In our case, Dr. Ford, VIP Products is

21   technically the plaintiff because we filed a

22   declaratory --

23       A    I understand.

24       Q    But we're in the position of being the alleged

25   infringer.  So I'm going to ask you a number of

1    questions about which side that you represented in these
2    various litigation matters.  If I use plaintiff for --
3    shorthand for the party holding the trademark rights,
4    asserting rights against an alleged infringer, will that
5    shorthand be understandable to you?
6         A    Yeah, as long as you don't say represented,
7    because we don't represent anyone.
8         Q    I'm sorry.  That's true.  And I also know in --
9    with TTAB proceedings, I think it's opposer and
10    respondent, so --
11        A    Yeah.
12        Q    But, again, the person and the party -- the
13    person and the party in the position --
14        A    No.  I understand.
15        Q    -- I'm going to refer to just as the plaintiff.
16        A    And that's probably simpler for the record to
17    call it plaintiff and defendant.
18        Q    Sure.  And same thing for the alleged
19    infringer.  I'll refer to them as the defendant.  Okay?
20        A    That's fine.
21        Q    Okay.  Let's talk about the Nike ITC matter.
22    Did you provide a likelihood of confusion opinion in
23    that matter?
24        A    Yes.
25        Q    Did you provide a report?

```
 1          A    Yes.
 2          Q    Is it generally along the lines -- structured
 3     similarly to the report that was provided to your
 4     counsel on this case?
 5          A    Yes.
 6               MR. LARKIN:  Objection to form.
 7               Go ahead and answer.
 8     BY MR. BRAY:
 9          Q    Okay.
10          A    I'm sorry.
11               MR. LARKIN:  That's all right.
12     BY MR. BRAY:
13          Q    And when did you provide that report,
14     approximately?  Obviously I don't need the exact date.
15          A    Obviously I can't give you the exact date.
16          Q    Okay.
17          A    Probably in April of this year.
18          Q    April of "2005"?
19          A    Uh-huh.
20          Q    Okay.  In that case, did you provide a report
21     on behalf of the plaintiff or the defendant?
22          A    On behalf of the plaintiff.
23          Q    Which would be Nike?
24          A    And you know that -- well, just so that the
25     record is clear, you know that Nike bought -- in 2002
```

1    bought Converse.  And so what Nike was attempting to do,

2    and I'm -- can't speak for Nike, but what they generally

3    were attempting to do is to go after imports that they

4    thought knocked off the Converse trade dress.

5         Q    Okay.  And sounds like there were a number of

6    imports in that matter?  You said there were --

7         A    About 31.

8              THE WITNESS:  Is that right, Matt?

9              MR. LARKIN:  He can't help you.  Just give

10   him --

11             THE WITNESS:  I know.

12             MR. LARKIN:  -- the best that you can.

13             THE WITNESS:  But there were 31.

14   BY MR. BRAY:

15        Q    Did you provide 31 different -- I mean did you

16   do 31 different surveys?

17        A    No.  That's an interesting question.

18             Originally -- as best I recall, the original

19   complaint was for trade dress infringement.  That

20   included all the elements of the trade dress.  And then

21   subsequently we did four other surveys.  So there would

22   be five in total.

23        Q    In your opinion, did all five surveys establish

24   a likelihood of confusion between --

25        A    Yes.  I'm sorry.

```
 1              MR. LARKIN:  Let Mr. Bray finish his questions.
 2      BY MR. BRAY:
 3          Q    -- between the alleged infringed product and
 4      some rights asserted by Nike?
 5          A    Right.  When I said five surveys, what -- just
 6      so that it's clear, and I'm not confusing you, we did
 7      one survey that had to do with the entire trade dress.
 8          Q    Okay.
 9          A    And then we did four other surveys that did
10      parts of the trade dress, because some respondents were
11      not using the entire trade dress, but only parts of the
12      trade dress.
13          Q    And the trade dress at issue in the Nike -- and
14      if I refer to that case as -- shorthand as the Nike ITC
15      case, we'll understand what we're talking about; right?
16          A    Correct.
17          Q    The trade dress at issue in the Nike ITC case
18      was actually a Converse trade dress?
19          A    Yes.
20          Q    For shoes?
21          A    For shoes.
22          Q    Okay.  And you said one survey covered all of
23      the elements of the trade dress?
24          A    Correct.
25          Q    What were all of the elements of the trade
```

Gerald L. Ford - August 19, 2015                    16

```
1     dress that you recall?
2          A     It was the overall shape, style, and appearance
3     of the shoe, including a canvas upper box stitching,
4     polished eyelets, side vents on one side of each shoe to
5     allow for ventilation, toe bumper --
6          Q     I'm sorry.  Say that again.
7          A     A toe bumper.
8          Q     Toe bumper.  Any other elements that you can
9     think of that were at issue in that case, elements of
10    the trade dress?
11         A     Well, the original survey was for, you know,
12    the whole shape, style, and appearance of the shoe,
13    which included all elements.  And in the subsequent
14    surveys, there were only partial elements that were
15    tested.
16         Q     And there were four subsequent surveys?
17         A     There were five.
18         Q     Five subsequent.  I'm sorry.
19         A     That's okay.
20         Q     And the reason for doing five subsequent
21    surveys?
22         A     When I -- you're -- I can't really speak for
23    counsel --
24         Q     Sure.
25         A     -- but --
```

```
 1          Q     What was your understanding of the --
 2          A     My understanding was that not all of the
 3    respondents or defendants, as you and I have now agreed
 4    to call them, used all the elements of the trade dress.
 5    So what Nike's counsel wanted was they wanted to test
 6    elements of the trade dress that not everybody used.
 7          Q     What did Jack Daniel's counsel want you to test
 8    in this case?
 9          A     Do you have my declaration?
10          Q     I do.
11          A     I'm sure you do.
12          MR. BRAY:  Let's go ahead and mark this as
13    Exhibit 61.
14              (Plaintiff's Exhibit 61 was marked
15              for identification.)
16          MR. LARKIN:  That's Dr. Ford's declaration.
17          MR. BRAY:  Yeah.  Without the exhibits.
18          MR. LARKIN:  Got it.
19          THE WITNESS:  Thank you very much.
20              I think it's set forth probably in the greatest
21    detail in paragraph 2, on page 2 of the declaration.
22    And I'll read it in the record, if you want me to, or
23    you can just look at it.
24          MR. BRAY:  Can you read back my question before
25    we got that soliloquy?
```

```
 1              (The record was read as follows:
 2                  "Q    What did Jack Daniel's
 3               counsel want you to test in this
 4               case?")
 5      BY MR. BRAY:
 6          Q    Okay.  I've given you Exhibit 61, which is your
 7      declaration, I think, to refresh your recollection.  If
 8      you could go ahead and answer my question, either
 9      referring to the report or in your own words.
10          A    I think that paragraph 2 specifically
11      identifies what I was asked to do.
12          Q    So Jack Daniel's asked you to conduct a
13      survey --
14          A    Design and cause to conduct a survey to address
15      the issue of likelihood of confusion.  Excuse me.
16          Q    Did --
17          A    Specifically, the survey was designed to
18      measure the degree, if any, to which Plaintiff's Bad
19      Spaniels dog toy is likely to cause confusion as to the
20      source --
21              THE WITNESS:  Am I going slow enough for you?
22      Okay.  Sometimes I don't do that.  So you can slap my
23      hand when I do.
24              -- source, authorization, or approval of or
25      business affiliation or business connection with Jack
```

Gerald L. Ford - August 19, 2015                    19

1    Daniel's.

2    BY MR. BRAY:

3        Q    What elements of the Jack Daniel's trade dress

4    were you attempting to test for confusion in this

5    matter?

6        A    I don't think that they're identified in this

7    declaration.  In the counterclaim, I think they're

8    identified on page 6, if you have the counterclaim.

9        Q    I do not have it in front of me.

10       A    I don't either.

11       Q    Do you recall what they were?

12       A    So it's a black cap, black neck wrap with the

13   No. 7 on the black neck wrap, a rectangular bottle, the

14   label that featured Jack Daniel's in an arched format, a

15   description of Tennessee sour mash whiskey, I think, at

16   the bottom of the label.  There was filagree on each

17   side of the label.  There was a -- center of the label,

18   there was a round oval with, I believe, Old No. 7.

19       Q    Was it your understanding, Dr. Ford, that you

20   are exclusively testing Jack Daniel's trade dress?

21       A    It's my understanding that I was testing

22   likelihood of confusion, and the elements that were

23   claimed to cause likelihood of confusion are those

24   general elements I just gave you.  I'm not sure I gave

25   you all of them, and we'd have to look at the -- the

Gerald L. Ford - August 19, 2015                    20

1      counterclaim and the list.  I think Dr. Nowlis actually

2      also lists them in his declaration.

3          Q    We'll come back to the opinions in this case,

4      but let's go back to your trial testimony --

5          A    Sure.

6          Q    -- which was Exhibit --

7               MR. LARKIN:  60.

8               THE WITNESS:  60.

9      BY MR. BRAY:

10         Q    We actually haven't even hit any of the cases

11     listed on Exhibit 60 yet --

12         A    I don't think we have.

13         Q    -- because we spent the whole time on the new

14     Nike ITC case.

15              PODS Enterprises versus U-Haul International --

16         A    It was a fame survey.

17         Q    How does a fame survey differ from a confusion

18     survey?

19         A    Generally -- well, I think you probably know

20     the answer to this question.  It's -- it's guided by

21     the -- the new federal revision of the Dilution Act

22     where there's a non -- non-exclusive list of factors for

23     what's considered to be fame, and then there is another

24     almost duplicate -- duplicate list of factors that are

25     used to determine whether there's dilution by blurring.

1        Q    So how does the survey -- and please just speak

2    in general terms.  I don't need to get into the leads or

3    the details.  Describe for me the structure of the

4    survey, the type of questions that were asked in the

5    PODS Enterprises case.

6        A    They were no different than we've ever asked in

7    a fame survey.  They began with open-ended questions,

8    asking people to describe brands of storage containers,

9    I believe, but I -- without having the survey in front

10   of me, I can't tell you for sure.

11       Q    Okay.

12       A    But our normal practice is to do unaided,

13   open-ended list.  And I'll give you an example just so

14   that it's less obscure than PODS.

15            Did a fame survey recently for Facebook, and we

16   asked people to identify social networking internet

17   sites.  And then after that, we gave them a list of

18   social networking sites that we got from -- and I don't

19   remember the source anymore, but took -- there

20   were -- we took the top hundred sites, and we took five

21   from each cortile.  So you had -- maybe it wasn't five.

22   That would be too many.  I think we took three from each

23   cortile, and then we made up an -- a social networking

24   site that didn't exist.  Anyhow, so that was the aided

25   list.

Gerald L. Ford - August 19, 2015                    22

```
 1              And our -- our procedures for fame have not
 2      changed, really, at all since the Federal Dilution Act
 3      and the TDRA.
 4          Q    The survey that was conducted in this case, the
 5      VIP/Jack Daniel's case that you referred to in your
 6      declaration, which has been marked as Exhibit 61, is not
 7      a fame survey; correct?
 8          A    It's not being offered for that, no.
 9          Q    And generally speaking, you ask -- in your
10      field, if -- you would ask different questions to test
11      for fame than you would to test for likelihood of
12      confusion; correct?
13          A    Generally that's true, although I think you
14      have to be cautious.  If you get significant levels of
15      likelihood of confusion, I think that a professional
16      could easily say that that provides underlying evidence
17      of fame -- secondary evidence of fame.
18          Q    And counsel on this case did not ask you to
19      conduct a fame survey on any of -- any element of Jack
20      Daniel's intellectual property rights at issue in this
21      case; correct?
22          A    That's correct.
23          Q    And if you had been asked to conduct a fame
24      survey on any of the elements of Jack Daniel's trade --
25      or intellectual property at issue in this case, you
```

1    would have asked or you would have had the survey firm

2    ask different questions than the questions that were

3    presented to respondents in Exhibit 61?

4        A    That's generally correct.

5        Q    Okay.  Do you agree that Jack Daniel's, the

6    name, is a well-known mark in the United States?

7        A    I have not done any empirical research on that,

8    but I would -- I would -- I know you're not supposed to

9    speculate in a deposition, but I would speculate that it

10   probably is --

11       Q    All right.

12       A    -- well-known and probably a famous mark.

13       Q    Sure.  Barbie, that would be another example of

14   a well-known famous mark.  Would you agree with that?

15            MR. LARKIN:  Calls for speculation, but if you

16   can answer, go ahead.

17            THE WITNESS:  You know, that's a closer call.

18   There are lots of uses of Barbie that are not associated

19   with toy dolls.

20   BY MR. BRAY:

21       Q    When you say it's a closer call, is it your

22   belief that Jack Daniel's is a stronger, more well-known

23   mark than Barbie?

24       A    If you restrict Jack Daniel's to -- to whiskey

25   or Tennessee whiskey, then I don't think it's a closer

Gerald L. Ford - August 19, 2015                          24

1        call than Barbie for a toy doll.

2               I think that Barbie is -- excuse me -- a little

3        bit like Chanel.  It's a crowded field, and other people

4        use that mark.  I don't think anyone else uses Jack

5        Daniel's that I'm aware of.

6        Q     Are you aware of any third party besides Mattel

7        using Barbie for toys?

8        A     As I sit here, no, but I'm aware of other

9        people using Barbie for a variety of businesses.  It was

10       the subject of litigation that we were involved in in

11       federal court in Canada that went up to the Canadian

12       Supreme Court, where they found --

13       Q     So when we're talking Barbie, we're not just

14       totally speculating.  It's a case that you had worked

15       on --

16       A     Well, yes.

17       Q     -- at least some elements in the past?

18       A     You know, our practice is not just limited to

19       the United States.  It's part of the problem, so --

20       Q     What year were you retained for the Barbie case

21       in Canada, ballpark?

22       A     Probably five years ago.

23       Q     Okay.  And what was the issue or what were you

24       asked to do in conjunction with the Barbie case?

25       A     In that case, I was only a consulting expert.

Gerald L. Ford - August 19, 2015                    25

```
1              Q     You didn't provide an opinion?
2              A     I did not.
3              Q     And what was the -- again, if you can give me a
4       short answer, that would be great.
5                    What was the crux of the dispute that went up
6       to the Canadian Supreme Court that involved Barbie?
7              A     Whether or not Barbie could be used as a name
8       of a store or on clothing or -- it was not on a toy
9       doll.
10             Q     Do you know what the ruling was?
11             A     That the U.S. -- the U.S. -- the Canadian
12      Supreme Court ruled in favor of the defendants in that
13      case.
14             Q     Okay.  And for which party were you the
15      consulting expert?  The plaintiff or the defendants?
16             A     For the plaintiff.
17             Q     Did you conduct -- in your work as a consulting
18      expert in that case, did you design or conduct a survey?
19             A     No.  I evaluated the surveys that were
20      conducted by both plaintiff and defendants.
21             Q     Okay.  All right.  Back to the PODS case --
22             A     Okay.
23             Q     -- which doesn't sound like the most exciting
24      of your cases --
25             A     It was pretty exciting.
```

1        Q     It was?

2        A     Yeah.  Bad facts, but it was a good case.

3        Q     Were you retained by the plaintiff in that

4     case?

5        A     Yes.  We worked for Kilpatrick Townsend, who

6     was counsel for -- for U-Haul -- I'm sorry.  I misspoke.

7     So it was the defendant.

8        Q     Oh, you did work with the defendant?

9        A     I misspoke.

10       Q     Did you work with any of the in-house lawyers

11    at U-Haul?

12       A     I did not.  Dr. Sartore did.

13       Q     Okay.  So you never met Larry Deers being on

14    the general counsel -- any of his minions there in

15    Phoenix?

16       A     She went back to a meeting with the president,

17    all of his minions.  So --

18       Q     Okay.

19       A     -- I did not join -- I did not join her in that

20    meeting.

21       Q     What did the -- and I'm sorry.  I just want to

22    lay another ground rule in terms of referring to things.

23    There will be times in the deposition where --

24    especially when I'm asking you about your prior cases,

25    about you conducting a survey.  You yourself design the

1          survey, right --

2                A     Yeah.

3                Q     -- questions?

4                A     What we do is we design and we cause the

5          surveys to be conducted.  We don't conduct surveys.

6                Q     No.  Just as a means of shorthand, if I ask you

7          a survey that you conducted or a survey you performed,

8          will you understand that -- I understand the context of

9          that is you designed it, you commissioned it to happen,

10         but some other independent firm actually asked the

11         questions?

12               A     I understand.

13               Q     Okay.  Hopefully I'll avoid like 200 form

14         objections for the rest of the deposition.

15               A     No.  That's fine.  I do understand.

16               Q     Okay.

17               A     Good shorthand.

18               Q     The fame survey that you conducted in the PODS

19         Enterprises/U-Haul International, Inc., case, what was

20         the result of that survey?

21               A     That PODS was not famous and not well-known.

22               Q     Seems like the --

23               A     At least --

24               Q     Seems like the right answer.  I never heard of

25         them.

1        A     At least it was not well-known in terms of the
2    general consuming public, which is part of the TDRA.
3        Q     So that when you're talking about a fame -- is
4    the relevant inquiry, as you understand it, in a fame
5    survey is general recognition by the larger consumer
6    public rather than just the narrow portion of the
7    consuming product that might consume the trademark goods
8    in question?
9        A     Right.  I think you probably know the answer to
10   that question.  The reason for the revision to the
11   Trademark Dilution Act was to get rid of niche fame.
12       Q     Sure.
13       A     So why the framers of the statute put in the
14   general consuming public, I can only speculate.
15       Q     I'm just curious.  I know that fame is not --
16   you weren't asked to -- it's correct you weren't asked
17   to render an opinion on fame in this case; right?
18       A     That's correct.
19       Q     And you didn't conduct any kind fame survey in
20   this case?
21       A     I'm not offering an opinion on that.
22       Q     But just out of curiosity, I think McCarthy
23   says, and don't quote me on this, that he wants to see
24   something like a 70 or 80 percent response rate in order
25   to establish fame under the Trademark Dilution Act.

Gerald L. Ford - August 19, 2015                    29

```
 1              Do you have like a ballpark percentage what you
 2      like to see in terms of a response rate before you'll
 3      give an opinion that a mark is or is not famous?
 4              MR. LARKIN:  Objection to form.  I don't know
 5      what -- and I don't know whether Dr. Ford knows what you
 6      mean by response rate.
 7              Do you understand the question?
 8              THE WITNESS:  I think I do.
 9              MR. LARKIN:  Go ahead.
10              THE WITNESS:  I -- I'm -- I know Professor
11      McCarthy very well, and I was disappointed in that
12      section, because he cites no one but himself.  So it's
13      McCarthy on McCarthy.
14      BY MR. BRAY:
15          Q    I think when you get to write a seven book,
16      thousand page treatise --
17          A    Set them --
18          Q    -- you get to cite yourself after a while.
19          A    Well, that's the only way you can buy a new
20      Mercedes every year.
21          Q    There you go.  So back to my question.  Do you
22      have a ballpark number that you like to look for before
23      you'll give an opinion that a mark has reached a level
24      of fame under the Trademark Dilution Act?
25          A    I would think it would be -- I would feel
```

1    comfortable at 50 percent.  I see you have the

2    Swann/Diamond book.  I think in that chapter there is a

3    discussion of the percentages that courts have accepted

4    for fame.

5              MR. BRAY:  Go ahead and mark this as Exhibit 62.

6              (Plaintiff's Exhibit 62  was marked

7              for identification.)

8              MR. LARKIN:  Thank you.

9              THE WITNESS:  Thank you, Madam Court Reporter.

10   BY MR. BRAY:

11       Q    Dr. Ford, I've handed you what's been marked as

12   Exhibit 62.  Is that the chapter from the Swann/Diamond

13   book that you referred to?

14       A    Yes.

15       Q    And I may come back and ask you a few questions

16   about this later, but --

17       A    That's fine.  You can do whatever you want to

18   do.

19       Q    Thank you.  My only question now is you'll see

20   on the front page that this was produced to us in

21   response to a subpoena, GLF 008 and continues through

22   33.  Was this -- do you know why this particular book

23   chapter was produced in response to the subpoena duces

24   tecum, certified VIP in this case?

25       A    I don't.

```
 1          Q    Did you rely on this or refer to this in any
 2    way in preparing your opinion in this matter, the
 3    VIP/Jack Daniel's matter?
 4          A    You know, those are -- that's a difficult
 5    question.  I think I kind of rely on my experience and
 6    everything I've written and done.  So did I specifically
 7    go back and look at this?
 8          Q    Well, let me ask you this.
 9          A    Sure.
10          Q    Let me attack it this way.  Was this an article
11    or a book chapter that you gave to counsel in response
12    to VIP's subpoena in conjunction with the materials that
13    you were producing to VIP?
14          A    I don't recall.
15          Q    Do you recall -- and did you have -- you said
16    you searched for E-Mails earlier, but did you have like
17    a file that you had in this matter, a hard copy file or
18    anything like that?
19          A    Yes.
20          Q    And when you received the subpoena, did you
21    simply have a copy made of the file and give it to
22    counsel?
23          A    No.  We just went through the file and --
24          Q    Okay.
25          A    -- looked for documents or items that were
```

```
 1     responsive to your subpoena.
 2          Q    Okay.  And do you recall whether Exhibit 62 or
 3     the book chapter was in the file or not?
 4          A    I don't recall.
 5          Q    Okay.  Is this chapter in Exhibit 62 something
 6     that you have relied on in any of your expert opinion
 7     work in the last five years?
 8          A    Again, that's a hard question to answer since
 9     it's part of my background, so --
10          Q    So is the answer you're not sure?
11          A    I would have -- I mean I know what this chapter
12     said, what -- I mean this is the second time this
13     chapter has been published, but I don't necessarily
14     recall -- remember going back and looking at this and
15     authoring my declaration in this matter.
16          Q    Okay.  So in this matter, it's your testimony
17     that you didn't rely on -- in any way on Plaintiff's
18     Exhibit 62?
19          A    Now you're putting words in my mouth, which is
20     unfair.  I don't recall.
21          MR. BRAY:  Okay.  Can we go off the record a
22     second.
23          (Discussion held off the record.)
24     BY MR. BRAY:
25          Q    All right.  Exhibit 62, is this -- is this
```

Gerald L. Ford - August 19, 2015                        33

```
 1      chapter from this book something that you've referred to
 2      in the last five years in any of your expert opinion
 3      work?
 4          A    I can't imagine that I did not.
 5          Q    Okay.  Is it something that you referred to in
 6      this case?
 7               MR. LARKIN:  Asked and answered.
 8               Go ahead.
 9               THE WITNESS:  I -- we could search my
10      declaration, but I don't think so.
11      BY MR. BRAY:
12          Q    Okay.  Is this book chapter something that
13      would be reasonable for an expert to rely on in
14      providing an opinion for likelihood of confusion?
15          A    This chapter really focuses on likelihood of
16      confusion, secondary meaning, fame, and dilution
17      percentages and survey evidence.  So it would be
18      something an expert would rely on partially, but not
19      completely.
20               And in terms of answering your question, the
21      questions that were asked in the VIP case were standard,
22      what were oftentimes referred to as Eveready
23      questions, which Professor Swann describes as the gold
24      standard.  These questions haven't changed -- well,
25      they -- I shouldn't say -- these questions have changed
```

1   since 1978 when the Union Carbide versus Eveready case

2   was tried, but as you're well aware, the Lanham Act has

3   been revised two or three times since then, and the

4   Lanham Act no longer is restricted to likelihood of

5   confusion as to source but also includes authorization,

6   approval, sponsorship, and affiliation.  And I have not

7   memorized the Lanham Act or that section, but I'm pretty

8   comfortable with it.

9        Q    I think I know what you're talking about.

10       A    I bet you do.

11       Q    But just so the record is clear, you said that

12   the questions that were used for the VIP survey were,

13   quote, unquote, Eveready questions.  Could you put

14   some meat on those bones?  What -- for the record, what

15   do you mean by Eveready questions?

16       A    Typically, these are questions that stem from

17   the Union Carbide versus Eveready light case that was

18   heard in the District Court in Chicago and went to the

19   Seventh Circuit.  In those questions, if my memory

20   serves me correctly, people were shown the Eveready

21   lightbulbs, and they were asked, "Who do you believe

22   puts out the bulbs shown in this package?" or some

23   version of that and, "Why do you say that?"

24            And I think one half of one percent said Union

25   Carbide.  And then the next question was, "What other"

Gerald L. Ford - August 19, 2015                          35

1        product or" -- in fact, it probably was more leading

2        than you would ask today.  Today you would probably ask,

3        "What other product or products, if any," but I think

4        they asked, "What other products are put out by the

5        company that puts out these" -- "the bulbs shown here?"

6        And I think 55 percent of the respondents gave you

7        batteries.

8                Do I have that right or wrong?

9        Q     I wasn't checking that.

10       A     I know.  You were --

11       Q     I'm taking your word for it.

12       A     It was highlighted.  I think I have that pretty

13       right.

14       Q     You know, I will tell you the most important

15       part of my ten-minute speech when I depose witnesses is

16       we can take a break any time you want.  It's not

17       intended to be a marathon, but I will tell you I tend to

18       take a break every 75 or 90 minutes.

19       A     Yeah.  I normally like to take a break every

20       hour.

21       Q     It's been a little over an hour.  Do you want

22       to take a break now?  Let me -- let's get one more case

23       under our belt, and then we'll plow ahead.

24       A     Sure.  It's a deal.  I'm ready.

25               And --

Gerald L. Ford - August 19, 2015                                36

1          Q    And --
2          A    -- I think there was still an outstanding
3     question about percentages that I would rely on.  And I
4     would send you to Exhibit 62, beginning on GLF 28, where
5     the title is "Fame Surveys."
6               Do you see that?
7          Q    Oh, yeah.
8          A    Okay.  And look at the very next page.  You see
9     the top paragraph says "contrary"?
10         Q    Yeah.
11         A    Okay.
12         Q    Hey, I was close.  I said 70 or 80, and
13    McCarthy apparently was 75.
14         A    Yeah.  No.  I didn't say you weren't close,
15    though.  I've read that many times, but I think I'm
16    citing cases here where courts have found a mark famous
17    based upon recognition of the mark between 40 and 60
18    percent and 70 percent and 80 to recognition.
19               Anyway, that was the answer to an outstanding
20    question.
21         Q    Thank you.  I appreciate that, Doctor.  We'll
22    do one more case --
23         A    Okay.  Cool.
24         Q    -- and then we'll take a quick break.
25    Hopefully -- we need to speed up the prior cases here on

```
 1    a --
 2         A    We're going to be here forever.
 3         Q    All right.  2013, QS Wholesale versus World
 4    Marketing case, what did you provide an opinion on in
 5    that case?
 6         A    Likelihood of confusion.
 7         Q    For whom?
 8         A    For the plaintiff, QS Wholesale, which is
 9    Quicksilver, who you probably know.
10         Q    I do.  And, again, we'll take a break in a
11    minute.
12              Let me just establish a term of art.  I think
13    in this case, according to your survey, something
14    like -- there was a response rate of 29 or so percent
15    that you say thought that the Bad Spaniels product was
16    somehow affiliated with Jack Daniel's.  Does that sound
17    about right?
18         A    I don't think it's somehow affiliated.  The
19    people thought it either came from Jack Daniel's, was
20    authorized or approved by Jack Daniel's --
21         Q    Okay.  You're absolutely right, and I
22    appreciate the level of detail.  All I'm trying to do is
23    get --
24         A    I'm not trying to extend this thing either.
25    I'm trying to be --
```

1    Q    That word cohort that, you know, you rely on

2    for survey, what -- is there a shorthand that we can

3    refer to that cohort, the cohort that found confusion or

4    the cohort that was confused or -- I mean is there any

5    shorthand word we can use?

6         And I'll tell you -- I'm not trying to hide the

7    ball.  I'll tell you what I'm getting at.  I wanted to

8    ask in this case, QS Wholesale, about what percentage in

9    the survey were -- did your survey reveal were confused?

10   But I don't know if that's the right term to use.  I'm

11   asking if there's a term of art.

12   A    I don't know.

13   Q    Maybe there's not.

14   A    I don't know that I can recall correctly.  I'm

15   sure we have those files, but I think it was less than

16   one percent.

17   Q    Less than one percent of the survey respondents

18   responded in such a way that -- to indicate that they

19   had any confusion as to the source or origin of the

20   product at issue?

21   A    We can use that as a shorthand, sure, as long

22   as we understand source or origin includes authorization

23   or affiliation and business connection and business

24   affiliation, but it's not a -- it's not a shorthand.  We

25   wouldn't -- we would not use in this office.

Gerald L. Ford - August 19, 2015                    39

```
 1            Q    Is there a shorthand you would use in this --
 2       in the office?
 3            A    I think probably likelihood of confusion as to
 4       source, sponsorship, or authorization.  We -- kind of a
 5       trilogy.
 6            Q    Say that again.
 7            A    Source, sponsorship, or authorization.  It kind
 8       of follows the language of the Lanham Act.
 9            Q    Just for talking about these cases, if I refer
10       to those people as kind of the confused cohort, will you
11       understand what I'm saying about -- I'm just trying to
12       figure out percentages in different cases.
13            A    Sure.
14            Q    So the confused cohort in the QS Wholesale case
15       was about one percent?
16            A    That's my recollection, although you would have
17       to let me check my files to tell you for sure.
18            Q    Sure.  And was it your opinion in that case
19       that there was a likelihood of confusion between the
20       marks at issue?
21            A    No.
22            Q    And you represented the plaintiff?
23            A    We didn't represent anybody.
24                 MR. LARKIN:  Objection.
25       BY MR. BRAY:
```

1        Q    Okay.  You were retained by the plaintiff?

2             MR. BRAY:  Thank you, Counsel.

3             THE WITNESS:  We were retained by O'Melveny &

4        Myers, who represented QS Wholesale.

5   BY MR. BRAY:

6        Q    What testimony did you give at trial?

7        A    I testified to the jury about the survey

8   research that was done and what the results were.

9        Q    What was -- am I missing something?  You were

10  retained by counsel for the plaintiff to provide an

11  opinion as to likelihood of confusion when the plaintiff

12  is asserting an infringement case against the defendant,

13  and you found in your survey that there was no

14  likelihood of confusion?  Is that -- do I -- am I

15  missing something?

16       A    You -- kind of.

17       Q    What am I missing?  Then we'll take a break.

18       A    Okay.  That's fine.  I think that it was a DJ

19  action, so you probably --

20            MR. LARKIN:  It was.  Go ahead.

21            THE WITNESS:  -- you probably need to switch

22  them around.

23  BY MR. BRAY:

24       Q    Okay.  That's why I was trying to establish the

25  ground rules --

Gerald L. Ford - August 19, 2015                          41

```
 1          A     Okay.  Yeah.

 2          Q     -- in the beginning.

 3          A     Yeah.

 4          Q     So --

 5          A     And when we put our -- these captions in, we

 6     put them in as they are --

 7          Q     Sure.

 8          A     -- at trial.  So it's not -- I mean we don't

 9     switch them around.

10          Q     So in QS Wholesale, you were -- you represented

11     the alleged infringer?

12                MR. LARKIN:  Objection to form.

13     BY MR. BRAY:

14          Q     Or I'm sorry.  You were retained by counsel for

15     the alleged infringer?

16          A     I testified on behalf of the alleged infringer.

17          Q     Okay.  And just to speed things up, going

18     forward again, regardless if it's a dec action or not or

19     if it's a TTAB action or if I refer to, just for

20     shorthand, the alleged infringer as the defendant and

21     the party asserting their trademark rights as the

22     plaintiff, I think that will help us go through these

23     quicker.

24          A     Okay.  That's fine.

25                MR. BRAY:  Okay.  We can take a break.
```

```
 1              THE WITNESS:  Okay.
 2              (Brief recess.)
 3              (Mr. Ezell leaves the deposition
 4          room at this time.)
 5              MR. BRAY:  Back on the record.
 6              MR. LARKIN:  I think Dr. Ford wants to correct
 7      one of his previous responses.
 8              (Mr. Ezell enters the deposition
 9          room at this time.)
10              THE WITNESS:  I do.
11              When we were on our break, Matt reminded me
12      that in the Converse case, we did secondary meaning, not
13      likelihood of confusion.
14      BY MR. BRAY:
15          Q   Okay.  Thank you.  And a secondary meaning
16      survey is different than a likelihood of confusion
17      survey; correct?
18          A   It typically is.
19          Q   Typically you would ask different questions in
20      a secondary meaning survey than you would ask in a
21      likelihood of confusion survey?
22          A   Although there are courts that have accepted
23      results from a likelihood of confusion survey as
24      evidence of secondary meaning.  And I think the classic
25      example is the Union Carbide versus Eveready case,
```

```
 1     where the Seventh Circuit found survey results supported
 2     a finding of secondary meaning even though the survey
 3     was directed at likelihood of confusion.
 4          Q    Okay.  I appreciate that, but in terms of if
 5     you were retained by counsel to provide an opinion or to
 6     investigate an issue, and the issue was likelihood of
 7     confusion -- or I'm sorry -- was secondary meaning, you
 8     would construct a survey that would ask different
 9     questions than you would if it was a likelihood of
10     confusion survey?
11          A    Generally that's true, although it's probably
12     not universally true.
13          Q    Okay.  Can you think of a case where -- that
14     you've been involved in where you provided a -- or you
15     conducted -- well, strike that.  Bad question.
16               Can you think of a case that you were involved
17     in where you were asked to provide an opinion for
18     secondary meaning and conducted a survey to determine
19     secondary meaning where the survey that was conducted
20     through you asked the same questions as what would be
21     asked in a likelihood of confusion survey?
22               MR. LARKIN:  Objection to form.
23               THE WITNESS:  The only one that comes to mind
24     right off the top of my head is the -- one of the Jack
25     Daniel's cases, the Sweet Revenge case, where I think we
```

1    did a likelihood of confusion survey.  And I opined that
2    the results of that showed --
3         Q    We'll get to that later.
4              MR. LARKIN:  Yeah.  That's fine.
5              MR. BRAY:  I appreciate that.  Saving us some
6    time.
7              THE WITNESS:  Matt, could you look at that and
8    make sure there's no marks?
9    BY MR. BRAY:
10        Q    So the Sweet Revenge case, you --
11        A    I believe so.
12        Q    -- you provided an opinion regarding secondary
13   meaning?
14        A    Regarding -- I provided opinion -- an opinion
15   with respect to likelihood of confusion, and I said it
16   also provided evidence of secondary meaning.
17             And I think you can see this in McCarthy.
18   McCarthy says you can't have -- at least in a standard
19   likelihood of confusion survey, you can't have
20   likelihood of confusion if you don't have secondary
21   meaning.
22        Q    You're not offering an opinion in this case
23   that one or more elements of Jack Daniel's trade dress
24   has secondary meaning?
25        A    No.  I'm not offering an opinion about one or

1    more elements of -- and, again you're kind of putting

2    words into my mouth.  I understand the trade dress is a

3    combination of elements.  I'm not --

4        Q    Sorry.  But, again, down to brass tacks, you're

5    not providing an opinion in this case regarding a

6    secondary meaning?

7        A    I'm not.

8        Q    Were you asked to provide an opinion in the

9    Jack Daniel's/Sweet Revenge case regarding secondary

10   meaning?

11       A    I don't remember.

12       Q    I don't have it in front of me, but did your

13   report provide an opinion regarding secondary meaning in

14   that case?

15       A    I don't have it in front of me either.

16           MR. LARKIN:  Don't guess.  If you can remember,

17   answer the question.

18           THE WITNESS:  I can't remember.

19   BY MR. BRAY:

20       Q    How does a secondary meaning survey differ from

21   a fame survey, briefly?

22       A    Well, fame is -- according to the TDRA is a --

23   you know, one of the measures is degree of recognition,

24   which is a higher standard than secondary meaning, which

25   is typically -- I think the McCarthy reports in the

1      Ninth Circuit has opined that secondary meaning is

2      association and nothing more.  So it's an association

3      question versus a recognition question.

4              And I know those are nuances, but they're big

5      nuances.

6           Q    No.  I think I understand.

7           A    So Matt has --

8              MR. EZELL:  No.

9      BY MR. BRAY:

10          Q    We'll get to that.

11          A    Okay.

12          Q    Earlier, Dr. Ford, you said you took issue with

13     McCarthy's -- Professor McCarthy's 75 percent kind of

14     cutoff for fame?

15          A    Right.

16          Q    Do you remember that?

17          A    And I really cited, too, my article in the

18     Swann/Diamond -- what I'll call the Swann/Diamond book.

19          Q    Are you familiar with the portions of

20     McCarthy's treatise where they describe parody trademark

21     cases or Professor McCarthy discussed parody in the

22     context of trademark litigation?

23          A    I am.

24          Q    Is there anything in McCarthy's treatise

25     that -- regarding his analysis of parody law that you

```
1       take issue with?  I know that's a broad question.
2              MR. LARKIN:  Yeah.  I'll object to form.  It's
3       an extremely broad question.
4       BY MR. BRAY:
5          Q    As you sit here today, can you think of
6       anything that McCarthy discusses in the parody portion
7       of his treatise regarding trademarks that you take issue
8       with?
9              MR. LARKIN:  Don't guess.  If you can remember
10      what he says, go ahead.
11             THE WITNESS:  Well, I -- in preparation for our
12      meeting today, I did review that chapter, and what he
13      said, as I recall, is that parody is not a defense if you
14      have evidence of likelihood of confusion.
15      BY MR. BRAY:
16         Q    You agree with that?
17         A    You know, I'm not a lawyer, so --
18             MR. LARKIN:  Objection.  Calls for a legal
19      conclusion.
20             THE WITNESS:  -- I'm not able to answer that.
21             MR. LARKIN:  It calls for a legal conclusion.
22             THE WITNESS:  Yeah.  You're asking me a very
23      hard question.  I know that in Chewy Vuiton and in Tommy
24      Hilfiger, both those cases the plaintiff lost, but in
25      both those cases, the court noted that there was no
```

```
 1    evidence of likelihood of confusion.
 2    BY MR. BRAY:
 3         Q    Other --
 4         A    And that's not the case here, and that wasn't
 5    the case in Buttwiser either.
 6         Q    Other than the survey you've conducted, you're
 7    not aware of any actual marketplace consumer confusion
 8    in this case; correct?
 9         A    I have not been made aware of any.  Whether
10    there is or isn't, I haven't been made aware of any.
11         Q    Would that at all be relevant to your analysis
12    or opinion?
13              MR. LARKIN:  Objection to form.
14              THE WITNESS:  You know, that's also a hard
15    question.  I don't think so.
16              This is an inexpensive dog toy that if it
17    didn't perform well or you're disappointed or you were
18    confused as to source, I'm not sure you would return it
19    to Jack Daniel's or Brown-Forman with a complaint
20    letter.
21    BY MR. BRAY:
22         Q    But you would agree with me that there was
23    evidence of actual confusion outside of the survey that
24    you conducted in the Sweet Revenge case that Jack
25    Daniel's was involved in?
```

```
 1         A    I -- I don't recall that.
 2         Q    Do you understand that the Silly Squeakers toy
 3    is one of a line of -- or I'm sorry.  Strike that.
 4              Do you understand that the Bad Spaniels toy is
 5    one of a line of a number of squeaky dog toys called
 6    Silly Squeakers that are sold by VIP Products?
 7         A    Yes.  I have seen that on their website.
 8         Q    And do you understand the Silly Squeaker
 9    products are all parodies of well-known brands?
10              MR. LARKIN:  Objection to form.  Calls for a
11    legal conclusion.
12              If you understand the question, you can answer.
13              THE WITNESS:  It appears to me lots of them are
14    replicas of famous brands.
15    BY MR. BRAY:
16         Q    Okay.  If it were the fact that there has not
17    been any evidence of actual real world confusion, ever,
18    going back more than five years, for any of the Silly
19    Squeakers toys, would that at all influence your opinion
20    as to there being a likelihood of confusion involving
21    the Bad Spaniels toy?
22              MR. LARKIN:  Objection to form.  Lacks
23    foundation.  It's a hypothetical question and irrelevant,
24    but do you understand the question?
25              THE WITNESS:  I do.
```

Gerald L. Ford - August 19, 2015                           50

```
 1              No, it would not.  I mean the survey universe
 2      here was clearly purchasers of dog toys, and when
 3      exposed to that dog toy, about 29 percent of the
 4      respondents thought it either came from or was
 5      authorized by or had a business connection or
 6      affiliation with Jack Daniel's.  One person even
 7      mentioned Brown-Forman, which amazed me.
 8      BY MR. BRAY:
 9          Q    Probably familiar with the industry in some
10      aspect or the other.
11          A    Right.  We kind of looked at that.  That's kind
12      of an interesting question.
13              You know, at the very end, we asked people
14      about whether they or someone in their household worked
15      for a variety of firms or companies, and one of those
16      was someone that made, sold, or distributed any
17      alcoholic beverages.  There were two people in the test
18      cell and one person in the control cell that said yes to
19      that question.  So even if you remove those from the
20      sample, your results don't change.
21          Q    Sure.
22          A    I'm sure you looked at that.
23          Q    Is there -- would there ever be an amount of
24      time in real world coexistence between a Silly Squeaker
25      product and the product which I think you refer to it as
```

1      mimicking or referring to?
2              MR. LARKIN:  I don't think that's what he said,
3      but go ahead and answer the question.
4      BY MR. BRAY:
5          Q    Okay.  Do you remember -- let me strike that.
6              Do you recall when I asked you about -- kind of
7      they're all parodies of well-known brands, and you said
8      they all -- most of the products, from your
9      recollection, I think you said, refer to or somehow
10     relate to a well-known brand?  Do you recall what your
11     answer was?
12         A    I don't.  Can you read back my answer?
13             MR. BRAY:  It's probably back two pages.  If you
14     can find it quickly.
15             (The record was read as follows:
16                 "THE WITNESS:  It appears to me lots
17             of them are replicas of famous brands.")
18     BY MR. BRAY:
19         Q    Okay.  Would there be an amount of time of real
20     world coexistence between Silly Squeakers brands -- any
21     of the Silly Squeakers products and the well-known
22     brands that they're, quote, unquote, replicas of, to use
23     your words, where there's been no evidence of actual
24     marketplace real world confusion that would be relevant
25     to you in determining whether there's a likelihood of

1      confusion?

2              MR. LARKIN:  Objection to form.  Lacks

3      foundation.  Calls for a hypothetical.

4              THE WITNESS:  I think it depends upon the

5      universe.  I think it depends upon the product.  I think

6      it -- it's a function of price, maybe emotional

7      attachment, and there may be other things, but --

8      BY MR. BRAY:

9          Q    So it's possible that there could be a -- that

10     there would be -- strike that.

11             In your opinion, a real world track record of

12     coexistence between a, quote, unquote, replica product

13     and the well-known brand that it's replicating without

14     any real world instances of actual confusion could

15     potentially be relevant to your opinion as to there

16     being a likelihood of confusion?

17         A    I gave you --

18             MR. LARKIN:  Objection to form.  It's an

19     incomplete hypothetical.

20             Go ahead.

21             THE WITNESS:  I gave you the -- the things that

22     could be exceptions to that rule, the emotional

23     attachment, the price, the universe, the product.

24             It kind of reminds -- well, kind of reminds me

25     of the litigation between Chrysler and General Motors

Gerald L. Ford - August 19, 2015                    53

```
 1        over the -- the grille for the Hummer which imitated the
 2        grille for the Jeep Cherokee.
 3        BY MR. BRAY:
 4            Q    Oh.
 5            A    And I mean I don't know if there was any actual
 6        confusion in that case, but I think there was emotional
 7        attachment for people that own both those brands or both
 8        those automobiles.  And I'm not sure that emotional
 9        attachment, unless there was some sort of tragic
10        malfunction, would ever get back to the manufacturer.
11        Like I don't think if I was disappointed with this dog
12        toy that I would write to Jack Daniel's or I would write
13        to VIP Products.
14            Q    How about if it choked your dog -- your dog
15        died because of the toy?
16                 MR. LARKIN:  Objection to form.  Incomplete
17        hypothetical.  Lacks foundation.
18                 If you understand it, go ahead.
19                 THE WITNESS:  That might cause me to file a
20        lawsuit.  That might cause me to send a letter to VIP
21        Products.
22        BY MR. BRAY:
23            Q    Or to Jack Daniel's, if you were confused?
24            A    Or to Jack Daniel's, if I was confused.
25            Q    And just a point of interest.  I can guarantee
```

1       you for the rest of the afternoon, until we finish our

2       deposition, Mr. Larkin will never agree that I have

3       given a complete hypothetical.

4               MR. LARKIN:  Oh, you don't know.  Maybe you'll

5       get one.

6               MR. BRAY:  Lawyers -- I don't think they exist

7       in this context.

8       BY MR. BRAY:

9       Q    Okay.  You've given me kind of general

10      exception to the rule, and you've talked about products

11      besides VIP Products.  Now I want to draw your attention

12      back just to the Silly Squeakers.

13              Is there an amount of time that Silly Squeakers

14      as a product category could be sold or a volume of sales

15      per year or total such that the history of all the sales

16      of the Silly Squeakers coexisting with the quote,

17      unquote, well-known products that they're replicating

18      without any instances of real world actual confusion,

19      where that history, that lack of real world actual

20      confusion outside your survey would be relevant to your

21      opinion as to there being a likelihood of confusion?

22              MR. LARKIN:  Objection to form.  I think that is

23      an incomplete hypothetical, but you can answer the

24      question.

25              THE WITNESS:  I don't think so, as long as -- as

1    long as the universe was correct, that it was potential

2    purchasers of a dog toy.

3    BY MR. BRAY:

4         Q    Okay.

5         A    And as long as you recognize the price of these

6    dog toys and they're not durable goods, that it's not

7    like your sport coat or your shoes or something that

8    lasts for a long period of time.  This is something

9    that's intended to be chewed up.

10        Q    So if VIP sold a million Silly Squeakers a year

11   for 20 years and neither Jack Daniel's nor VIP

12   experienced a single instance of actual real world

13   confusion, you would still say that based on the survey

14   that you conducted in this case, there is a likelihood

15   of confusion between the two products?

16             MR. LARKIN:  Well, that -- objection to form.

17   That is a complete hypothetical, but it's purely

18   hypothetical, and it's really nothing to do with the

19   reality of the sales.

20             THE WITNESS:  I don't think anyone -- yeah.

21             MR. LARKIN:  If you can -- go ahead.

22             THE WITNESS:  I --

23   BY MR. BRAY:

24        Q    In that hypothetical, would that sales history

25   be relevant to you in determining whether there's a

1    likelihood of confusion?  Yes or no?

2         A    A lot of consumers of dog toys believed that

3    that dog toy either came from, was authorized by, or has

4    a business connection or business affiliation with Jack

5    Daniel's.

6         Q    And how many -- I apologize.  I don't know this

7    off the top of my head.

8         A    That's okay.

9         Q    The universe of respondent -- it was -- how big

10   was your sample?

11        A    400.

12        Q    400?

13        A    416 or something.

14        Q    Okay.  And that wasn't the control?  That was

15   the actual Jack Daniel's?

16        A    No.  That was both the test and the control.

17        Q    416.

18        A    So it was like 200 tests.  And to round it off,

19   it was 200 tests or 207 tests and 207 -- it's in the

20   report -- controls.

21        Q    So 207 with the original and 207 in the

22   control?

23        A    Something -- something in that neighborhood.

24        Q    So going back to my hypothetical, that history

25   that I described in my last hypothetical of 20 years of

Gerald L. Ford - August 19, 2015                              57

```
 1      sales, a significant volume of sales, maybe a million a
 2      year, units a year, and no instances of real world
 3      confusion, that would not influence your opinion that
 4      there's a likelihood of confusion so long as 30 percent
 5      or 29 percent of respondents on an internet survey of --
 6      207 respondents on an internet survey answered the
 7      questions the way they did in this case?
 8              MR. LARKIN:  Same objections.  It can't possibly
 9      affect his opinion one way or the other because the
10      hypothetical you asked requires us to be 20 years from
11      today, but --
12              THE WITNESS:  Maybe we should come back 20 years
13      from now and have this deposition.
14      BY MR. BRAY:
15          Q    But it's a yes or no question.  Would it
16      influence your opinion?
17          A    Well, it's not a yes or no question.  It's a
18      hypothetical that's -- I don't understand it's true.  It
19      has no basis in fact.  We don't have millions of sales.
20      We don't have 20 years.
21          Q    Sure.
22          A    We don't have any of those things.
23          Q    Well, what I'm trying to get at is -- and maybe
24      you've answered it -- real world market conditions, real
25      world coexistence between the two, a real world history
```

1    of no actual confused consumers, in this case, looking

2    at this product, would there ever be a point in your

3    opinion, Dr. Ford, where that would be relevant to

4    influence your opinion that there's a likelihood of

5    confusion based on an internet survey of 207

6    respondents?

7        A    Well, it wasn't 207.

8        Q    Two internet surveys of 207 respondents each?

9        A    So 400 respondents.

10            You know, I think you have to go back and look

11   at the Lanham Act.  The Lanham Act doesn't talk about

12   actual confusion.  It talks about a likelihood of

13   confusion, whether or not the market -- whether or not

14   the defendants' use of a market is likely to confuse or

15   deceive a person and to -- being confused as to

16   source -- I'll use kind of your key word -- source,

17   sponsorship, or authorization.

18       Q    Sure.

19       A    And I think you have to focus on likelihood,

20   not actual, because the law doesn't require actual nor

21   does the case law, as I understand it.  And I spent a

22   whole lot of my life reading the case law, as you might

23   have figured out.  So I would send you back to the

24   Lanham Act.

25       Q    All right.

Gerald L. Ford - August 19, 2015                    59

```
1          A    Now, are we going back to cases now?

2          Q    Yeah.  Exhibit 61.

3               MR. LARKIN:  Okay.

4     BY MR. BRAY:

5          Q    And at this point, I may just finish the first

6     page and then ask you one or two general questions about

7     the other cases, and we'll move things along.

8          A    No problem.  You are --

9          Q    Kate Spade, LLC, versus Saturdays Surf, and

10    I'm, again, referring to page 1 of Exhibit 60.

11         A    Correct.

12         Q    What were you retained to do in that case?

13         A    To do a likelihood of confusion for the

14    defendant, Saturdays Surf -- I'm sorry -- excuse me.

15    Likelihood of confusion for the plaintiff, Kate Spade.

16         Q    Again --

17         A    And I think they were a DJ plaintiff too.

18         Q    Okay.  We're going to have our same problem.

19    Maybe we should say were you retained by the trademark

20    holder or the alleged infringer?  Because I think our DJ

21    case --

22         A    I think that's even harder to answer.

23         Q    Because they --

24         A    Saturdays Surf was a trademark holder.  They --

25    Saturdays Surf NYC owned a trademark registration for
```

Gerald L. Ford - August 19, 2015                    60

```
1      that.
2           Q    I'm going to try another tactic, Dr. Ford.
3           A    Okay.  I'm not trying to be difficult.
4           Q    Oh, I understand.  I'm not saying that you are.
5      We're all just doing the best job we can for our -- what
6      did you call it -- our little meeting.
7                Which party were you affiliated with in that
8      case?  For which party did you provide an opinion?
9           A    I provided an opinion for Kate Spade.
10          Q    Okay.  And what was the -- and this was a
11     confusion opinion?
12          A    That's correct.
13          Q    And what was your opinion in that case?
14          A    That there was no likelihood of confusion, and
15     the court agreed.
16          Q    Okay.  In your survey, approximately what was
17     the confused cohort --
18          A    I have no idea.
19          Q    -- if you recall?
20               You can't recall whether it was less than ten
21     percent or the percentage?
22          A    Well, I probably would not testify at less than
23     ten percent, so --
24          Q    But you don't -- regarding -- you don't recall
25     what the percentage was in that case?
```

Gerald L. Ford - August 19, 2015                          61

```
 1        A    I don't.
 2        Q    Okay.  Facebook, Inc., versus Think Computer
 3   Corporation, was this a fame survey -- or strike that
 4   question.
 5             What -- how were you retained -- with which
 6   party were you affiliated in the Facebook, Inc., versus
 7   Think Computer Corporation case?
 8        A    Facebook.
 9        Q    And did you provide an opinion in that case?
10        A    I did.
11        Q    What was your opinion?
12        A    That Facebook was famous and that there was a
13   likelihood of confusion.  There were two surveys in that
14   case.
15        Q    And the only reason I mentioned the fame survey
16   is I think earlier this morning you mentioned that you
17   had done one in conjunction with Facebook and explained
18   how you went about doing it.
19        A    Right.
20        Q    So you did a fame survey and a likelihood of
21   confusion survey?
22        A    Right.  I think the Facebook fame survey was
23   done earlier.  It was just offered in the TTAB
24   proceedings, because it was a matter of public record.
25        Q    Sure.  In any event, there were two different
```

1    surveys?

2        A    Right.  And Think Computer Corporation was

3    trying to register Face Mail for an internet mail system

4    that would -- you could chat on and it would leave

5    messages on and --

6        Q    Okay.

7        A    It was actually his Harvard roommate.

8        Q    Oh, interesting.  Which one?

9        A    None that you know.

10       Q    So not somebody from The Social Network?

11       A    No, not somebody from the movies.

12       Q    My mother-in-law has acquired a deep-abiding

13   hatred of Mark Zuckerberg just based on watching that

14   movie.

15            MR. LARKIN:  There's no question pending.

16   BY MR. BRAY:

17       Q    That's neither here nor there.

18       A    Okay.

19       Q    Did you -- and, again, I don't want to get into

20   semantics.  When I say "you conduct," I mean did you

21   commission or supervise or whatever.

22            Did you conduct the fame survey in the

23   Facebook, or was that done by somebody else?

24       A    No.  We did.

25       Q    Okay.  It was just done previously, or you

Gerald L. Ford - August 19, 2015                    63

1    don't remember?

2        A    You know, I do.  It was done a number of years

3    earlier to determine whether or not Facebook was famous.

4        Q    Was it done in conjunction with existing or

5    planned litigation, or was Facebook just thinking, "I

6    want to see what my rights are"?

7        A    Now you're kind of asking me to speak for

8    counsel.  I --

9        Q    Well, I'll strike that question.  Maybe it was

10    a bad question.

11        A    Okay.  You can ask that --

12        Q    Do you recall whether that Facebook fame survey

13    that you conducted was done in conjunction with existing

14    or planned litigation?

15        A    I don't think it was planned litigation, but I

16    think it was intended to be part of the corporate

17    records, and it was being -- it was intended to be part

18    of -- and I could be wrong.  My memory could be wrong

19    after all these years, but I think it was intended to

20    support a trademark application.

21        Q    Sure.  Kind of enhances their IP portfolio or

22    could be used for a number of different things.  And it

23    turned out it was --

24        A    Right.  Because typically, like in fame

25    surveys, much like secondary meaning surveys, they can

```
1      be used over and over and over again whether it's a
2      different defendant or not or a different forum.
3           Q    Okay.  Let's get off the fame.
4           A    Okay.
5           Q    Likelihood of confusion.  Your opinion was that
6      there was a likelihood of confusion?
7           A    Well, there's no question.  So it was -- that
8      was the opinion of the Trademark Trial and Appeal Board
9      also.
10          Q    And do you recall what the confused cohort
11     percentage was, approximately?
12          A    I don't.
13          Q    Do you recall --
14          A    But I suspect it's reported in the opinion.
15          Q    Sure.  But as you sit here today, you don't
16     remember what the percentage was?
17          A    No.  I don't memorize those.
18          Q    Not even a ballpark?
19          A    No.
20          Q    Okay.  Next case, Sara Lee Corporation versus
21     Kraft Foods?
22          A    Was a false advertising case.
23          Q    And who were you retained by?
24          A    By Sara Lee.
25          Q    Was there a survey?
```

```
1          A     Make --

2          Q     Was there a survey conducted?

3          A     Oh, there were lots of surveys.

4          Q     You say "lots of surveys."  Was there -- I

5    assume there was a survey to test whether -- to test

6    false advertising; right?

7          A     Right.

8          Q     And a false advertising survey is -- asks

9    different questions than a likelihood of confusion

10   survey, correct, as a general matter?

11         A     As a general matter.

12         Q     Okay.  You said there were a number of surveys

13   done other than a quote, unquote, false advertising

14   survey.  What other surveys were done?

15         A     There were other false advertising surveys done

16   by the other side.

17         Q     Okay.  So the only issue in that case was false

18   advertising and all the surveys --

19         A     Right.  Sara Lee owns Ball Park hot dogs.

20         Q     Uh-huh.

21         A     And Kraft Foods owns Oscar Mayer, and this was

22   the hot dog wars.

23         Q     Next case, The Gap, Inc. --

24         A     Yep.

25         Q     -- versus G.A.P. Adventures, Inc.?
```

```
 1          A    Yeah.
 2          Q    With which party were you affiliated in that
 3     case?
 4          A    I testified on behalf of The Gap.
 5          Q    Okay.  Were they the party asserting trademark
 6     rights?
 7          A    Yes.
 8          Q    And what opinion did you provide in that case?
 9          A    That it was a likelihood of dilution survey.
10          Q    Was it dilution by blurring or dilution by
11     tarnishment?
12          A    Dilution by blurring.
13          Q    Is a likelihood of dilution by blurring
14     survey -- strike that.
15               As a general matter, a likelihood of dilution
16     by blurring survey asks different questions than would
17     be asked on a likelihood of confusion survey?
18          A    I would generally agree with that.
19          Q    Okay.
20          A    So likelihood of dilution by blurring is a
21     survey that focuses on whether or not exposure to the
22     junior users more causes a mental association with a
23     senior user.  It's kind of what-comes-to-mind question,
24     if that makes any sense to you.
25          Q    Do you consider yourself an expert on dilution
```

1    by blurring surveys?

2        A    I would consider that I have expertise.  I have

3    authored three chapters in a book published by West

4    Publishing, the legal publishing company on

5    international dilution.

6        Q    International dilution?

7        A    Right.  So there -- just so it isn't so

8    obscure, there's a chapter written by someone from Japan

9    on dilution in Japan, and someone wrote a chapter about

10   dilution in the European union and in England and --

11       Q    And you wrote three chapters of that book?

12       A    I wrote one chapter that has been revised three

13   times.  The book has been -- the book has been very

14   popular.  It's been published -- we're in the third

15   publication now.

16       Q    And the book is on international dilution?

17       A    Yes.

18       Q    All right.  Was your chapter on international

19   dilution, or did it focus on dilution in the United

20   States as part of a larger worldwide analysis of

21   dilution?

22       A    It was focused on dilution in the United

23   States.

24       Q    And I assume you were qualified to testify as

25   an expert in The Gap case?

Gerald L. Ford - August 19, 2015                    68

1          A     Absolutely.

2          Q     Yeah.  Do you consider -- do you consider that

3     you have expertise in determining likelihood of dilution

4     by tarnishment?

5          A     You know, that's kind of an interesting

6     question.  I -- I don't know that there has ever been a

7     survey offered on -- not that there haven't been cases

8     on dilution by tarnishment.  I'm thinking of The Cat in

9     the Hat case and a few others, but --

10          Q     The Cat's NOT in the Hat?

11          A     The Cat's NOT in the Hat, yeah.

12                But all of those cases -- almost all involved

13     pornography, and so they were kind of easy shots for the

14     federal judge.  I don't -- I can't think of one where

15     there was a claim of dilution by tarnishment that didn't

16     succeed when you had kind of the right facts, and -- and

17     oftentimes you had pornography, which judges don't

18     really like.

19          Q     You --

20          A     That and drugs.

21          Q     I asked a question, and then you said, "That's

22     an interesting question," and you didn't give me a yes

23     or no.

24                Do you consider -- do you believe you have

25     expertise as an expert in dilution by tarnishment?  You

1    indicated you have expertise regarding dilution by

2    blurring.  Do you have expertise in dilution by

3    tarnishment?

4              MR. LARKIN:  You mean the survey aspects of it?

5    BY MR. BRAY:

6        Q    Well, let's start wide and narrow in.  In any

7    aspect of it.

8        A    Okay.  We'll start wide.  There's probably not

9    a dilution case that has been published that I haven't

10   read.

11       Q    Okay.

12       A    They -- and I don't know whether or not you

13   have, but I produce -- I shouldn't say "I," because

14   everybody in this office works on it.  I produce

15   every -- we produce every year a year in review in

16   trademark law.

17       Q    Yes.

18       A    And it has excerpts from -- from cases where we

19   think there's a teaching opinion in the case, but in the

20   back of the -- the chapter or the article is every case

21   by circuit and by subject for that entire 12 months.

22   And then there's a composite book that is published

23   electronically by the INTA that goes back to 1999

24   with -- with a bibliography that has every case in which

25   a survey has been offered.

Gerald L. Ford - August 19, 2015                    70

1        Q    Let me ask you this question, Dr. Ford, and I
2    appreciate that answer.  Have you ever been retained as
3    an expert to provide an opinion -- any kind of opinion
4    regarding dilution by tarnishment?
5        A    Not that I recall.  So I'm not -- I'm not
6    answering yes or no.  I'm just answering I can't answer
7    that yes or no, because I don't recall, but I -- none
8    that comes to mind.
9        Q    Do you feel that you're qualified to provide an
10   expert opinion on dilution by tarnishment?
11       A    The answer to that would be yes, based upon my
12   years of reading every published case in which dilution
13   was an issue, by my three chapters that -- or my one
14   chapter that's been revised twice, I guess, you should
15   say, so -- in the international dilution book.  I
16   testified on dilution.  I have read the congressional
17   history record.  I mean it's -- this is not --
18       Q    So you have a doctorate in business
19   administration; correct?
20       A    Yes.
21       Q    And I don't know many doctorates in business
22   administration.  I know lots of MBAs.  Did you have
23   to -- I assumed you had to write a dissertation for
24   that?
25       A    I did.

Gerald L. Ford - August 19, 2015                    71

1        Q    And what was your dissertation on?
2        A    It was on the Yugoslavian self-management
3   system.
4             At that time I was doing contract work for the
5   U.S. State Department in Yugoslavia, and they paid --
6        Q    So do you know that you're aging a little bit
7   when the country you wrote your dissertation on isn't --
8        A    Is gone?
9        Q    Yeah.
10       A    I know I'm aging when I look at myself in the
11  mirror.  I used to pull the white hairs out of my beard,
12  and I finally gave up because it was -- became too
13  painful.
14       Q    Have you ever provided an opinion in a dilution
15  by blurring case where you didn't conduct a survey?
16       A    None that comes to mind.
17       Q    Do you think it's possible as an expert in
18  trademark surveys to conduct a survey that would test
19  dilution by tarnishment?
20       A    I'd have to think about it, but I can't think
21  that would be out of the realm of possibilities.  It --
22  it may be challenging to figure out how to ask a
23  question that isn't leading or suggestive, but --
24       Q    That's why you hire a doctorate in business
25  administration that's been doing this for 20, 30 years.

Gerald L. Ford - August 19, 2015                    72

```
1            A    Almost 40 now.
2            Q    Okay.  Next case in Exhibit 60 -- we're down to
3     2010 -- Clinique Laboratories versus Absolute Dental
4     Cheyenne, Inc.  With which party were you affiliated?
5            A    I was -- I testified on behalf of Clinique.
6            Q    Okay.  And what was your opinion in that case?
7            A    That Absolute Dental, who was attempting to
8     register and use the mark Clinique, didn't keep --
9     Clinique didn't keep for a dental service.
10           Q    Was it a likelihood of confusion?
11           A    Yes.
12           Q    Okay.  Was there a survey?
13           A    Yes.
14           Q    And were you affiliated with the party
15    asserting trademark rights?
16           A    I was, and the Trademark Trial and Appeal Board
17    relied on my survey and finding, likelihood of
18    confusion.
19           Q    Okay.  And do you recall roughly what the
20    confused cohort was or not?
21           A    No.  We can look up all those things for you.
22                MR. LARKIN:  You -- no.  Just answer the
23    question.  If you remember, tell him the answer.
24                THE WITNESS:  Yeah.
25    BY MR. BRAY:
```

1      Q    Next case, Procter & Gamble Company versus

2    Georgia-Pacific Consumer Products, LP.  With which party

3    were you affiliated in that case?

4      A    Procter & Gamble -- I'm sorry.

5    Georgia-Pacific, the defendant.

6      Q    Okay.  Were they the alleged infringer in that

7    case?

8      A    I guess.

9      Q    Okay.  What type of opinion did you provide?

10      A    That there was no likelihood of confusion both

11    at sale or post sale.  We did two surveys, and I

12    testified at trial, and the judge relied on my testimony

13    and finding for Georgia-Pacific.

14          Procter & Gamble was asserting -- you'll get a

15    kick out of this.  They were asserting rights to the

16    pattern on their paper towels.

17      Q    Interesting.

18      A    And they thought Georgia-Pacific was borrowing

19    on that pattern.

20      Q    Two surveys, one at sale and post sale?

21      A    Right.

22      Q    Stop there.

23      A    Sure.

24      Q    The survey -- the internet survey that was

25    conducted in this case, the VIP case, was that an

```
 1        at-sale survey?
 2                    MR. LARKIN:  Objection to form.
 3                    Do you understand the question?
 4                    THE WITNESS:  I do.  It's simulated in an
 5        at-sale survey, yes.
 6        BY MR. BRAY:
 7             Q    Simulated in an at-sale survey?
 8             A    Right.  Respondents were shown the displays of
 9        dog toys, and then they were shown -- on a large scale
10        they were shown the Bad Spaniels test or control
11        stimulus.
12             Q    I'm familiar with it, and, believe me, we'll
13        cover your report --
14             A    Okay.
15             Q    -- probably mostly after lunch.
16                    The at-sale survey in the Procter & Gamble
17        case, was that also an internet survey or some other
18        survey?  It's 2009, so it might not be internet.
19             A    No.  I think that was -- it was a mall survey.
20             Q    Mall intercept survey?
21             A    Mall intercept, yes.  Both the surveys were
22        mall intercept.
23             Q    And how do you test at sale versus post sale
24        through surveys -- or strike that.
25                    Let's get specific.  I mean in the Procter &
```

```
1        Gamble case, how did you test at sale versus post sale?
2            A    So at sale they were shown either the test or
3        the control stimulus in its packaging as you would find
4        it if you went to Safeway or Albertsons or --
5            Q    Okay.
6            A    -- Kroger's.
7                 And post sale, they were shown the paper towels
8        on a nondescript paper towel display.
9            Q    Like a --
10           A    Yeah, you know, something --
11           Q    What's in my kitchen.  I don't know the name
12       for it.
13           A    Yeah.  I don't either.
14           Q    The little pole you put it on?
15           A    Yeah.  It sits on your counter, and you stick
16       the paper towels in the middle, and you pull them off.
17       So that was the post-sale stimulus.
18           Q    Okay.  And they were both mall intercept
19       surveys?
20           A    Yes.
21           Q    You said that in this case the VIP service --
22       survey was a simulated at-sale survey?
23           A    Correct.
24           Q    Is it your opinion that the at-sale survey
25       conducted in the Procter & Gamble Company case was
```

1    simulated or not simulated?

2        A    That's an interesting question.  It really

3    wasn't simulated.

4            People were handed a package of the paper

5    towels in their -- their packaging and asked to look at

6    them as they would if they were considering -- and these

7    were -- obviously it was a universe of people that were

8    primary grocery shoppers who reported that they were

9    likely in the next -- whatever the period was to buy

10   paper towels.  But they weren't shown any display.  They

11   were just handed the paper towels.

12       Q    Okay.  Was the -- is -- when you do a mall

13   intercept survey, is there a -- do you give thought as

14   to where in the mall the survey firm sets up?

15       A    You don't control that.  The mall does.

16       Q    Okay.

17       A    So it's probably more than you ever wanted to

18   know about mall intercepts, but you -- you can't do a

19   mall intercept -- you can't go around Phoenix and say,

20   "I'd like to do a mall intercept at this mall," because

21   that's private property.

22       Q    You have to have permission?

23       A    You have to have permission.  And to get

24   permission, you would need to disclose the nature and

25   the subject of the survey, which breaks the double

1        blind.

2                So you're really restricted to shopping centers

3        that have interviewing services as tenants, and they are

4        typically restricted to where they can stop people in

5        public areas of the mall and screen them.  And then our

6        procedure is after the screening, to have the

7        interviewer take the respondent to -- back to the

8        interviewing service to a private interviewing area and

9        interview them.

10           Q    And you said that the mall intercept survey

11       done in the Procter & Gamble case was not simulated

12       because it was -- more realistically encompassed the

13       market environment that a consumer would encounter the

14       product?

15               MR. LARKIN:  Objection to form.

16       Mischaracterizes his testimony.

17               THE WITNESS:  I didn't say that I said it wasn't

18       simulated.  They were just handed the product --

19       BY MR. BRAY:

20           Q    Okay.

21           A    -- as they would encounter it in the grocery

22       store in its packaging.

23           Q    The 400 and some odd survey participants in

24       this case were never handed a product; correct?

25           A    That's correct.

```
 1                    It's 11:15.
 2          Q    I'm not making an earlier flight.
 3          A    What?
 4          Q    I'm not going to make the earlier flight.
 5          A    Okay.  And I'm sorry if I'm talking too much.
 6          Q    Oh, that's all right.  We're all here to talk
 7     and do the best we can, so I appreciate it.
 8                    All right.  Let's just finish the -- do the
 9     first page of -- finish the first page of Exhibit 60,
10     and then I'm going to be done talking about cases and
11     see if we can speed it up.
12          A    Okay.
13          Q    Levi Strauss versus Abercrombie & Fitch, with
14     which party were you affiliated?
15          A    Abercrombie & Fitch.
16          Q    Were they the alleged infringer or the party
17     asserting trademark rights?
18          A    They were the alleged infringer.
19          Q    What kind of opinion did you provide?
20          A    That there was no likelihood of confusion.
21     This was on pocket stitching.
22          Q    Was a survey conducted in that case?
23          A    Yes.
24          Q    Was it a mall intercept survey?
25          A    Yes.  I --
```

1        Q    Was it an at-sale survey?

2        A    I have to go back and look.  I think it was

3     mall intercept.

4             Respondents were shown the alleged infringing

5     pocket stitching from Abercrombie and Fitch.  It -- this

6     line of stores has now kind of gone out of business.  It

7     was called Ruehl.  It was like Banana Republic is to

8     Gap, if you will.  And Levi Strauss objected to the

9     pocket stitching.  And that's the subject of the opinion

10    that you can read.

11       Q    Sure.  Google versus Nikolaus Gubernator.  With

12    which party were you affiliated?  I'm assuming Google?

13       A    Your assumption is correct.

14       Q    And I assume you're the party asserting

15    intellectual property rights?

16       A    That's correct.

17       Q    What kind of opinion did you provide?

18       A    That there was -- actually two opinions.  One,

19    we provided an opinion about whether or not Google was

20    famous based upon a survey that was done maybe ten years

21    earlier.

22       Q    Did you conduct that fame survey?

23       A    Yes.

24       Q    Okay.  And what was the second survey that you

25    did in the Nikolaus Gubernator --

```
 1          A     It was likelihood of confusion.
 2          Q     And, again, there were different surveys --
 3          A     Yes.
 4          Q     -- asked different questions.
 5                And was it a mall intercept survey?
 6          A     My recollection is yes.
 7          Q     What was the product?
 8          A     Nikolaus Gubernator wanted to start a search
 9    engine called Gubernator for chemists who were looking
10    for articles on -- scholarly articles on chemistry.
11          Q     Last case, Adidas --
12          A     Adidas.
13          Q     Is that how you pronounce it?
14          A     Well, if you're in -- if you're outside the
15    United States, it's Adidas.  If you said -- if you were
16    in Germany, and you said, "I want to buy a pair of
17    Adidas," they wouldn't know who -- what you were talking
18    about.
19          Q     Interesting.
20          A     So it's -- everywhere in the world except here
21    it's pronounced Adidas.
22          Q     Okay.  In the Adidas case --
23          A     Oh, you can call it Adidas, though.
24          Q     -- with which party were you affiliated?
25          A     For Adidas.
```

Gerald L. Ford - August 19, 2015                                    81

1        Q    And were they the party asserting intellectual
2    property rights, or were they the alleged infringer?
3        A    They were asserting intellectual property
4    rights in their -- in a variety of shoes against
5    Payless, who was using two-stripe and four-stripe shoes.
6    The two stripe -- some of those shoes were -- I'll call
7    them copies of the Adidas Superstar, the really famous
8    flat sole retro shoe.
9        Q    Was that generally a trade dress case?
10       A    You know, that's kind of an interesting
11   question.  It was -- there were trade dress elements.
12            We did ten cases for them.  This is the only
13   one that ever went to trial, but they had trade dress
14   assertions.  And they had three -- and they had stripe
15   assertions.  They claimed that, you know, four
16   stripes -- if you looked down the middle, looked like
17   three stripes, and two stripes looked like -- were
18   confusing, with -- similar to three stripes.
19       Q    Was the likelihood of confusion survey
20   conducted in that case a mall intercept survey?
21       A    Yes.
22       Q    Was the likelihood of confusion survey
23   conducted in the Nike ITC case?  And I understand there
24   was a number.  Were they mall intercept surveys or
25   internet surveys?

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

```
 1              MR. LARKIN:  I think he testified that was a
 2    secondary meaning survey.
 3              THE WITNESS:  It was a secondary meaning survey,
 4    and I think there was an internet survey.
 5    BY MR. BRAY:
 6         Q    Okay.  I apologize.
 7         A    That's okay.  Don't apologize.
 8         Q    GS Wholesale, you provided a likelihood of
 9    confusion opinion in that case, if my notes are correct.
10    Was that a mall intercept survey or a internet survey?
11              MR. LARKIN:  I'm sorry.  Which case are you
12    referring to?
13              THE WITNESS:  The second one down --
14    BY MR. BRAY:
15         Q    I think I said GS.
16         A    -- 2013.
17              MR. BRAY:  Sorry.
18              THE WITNESS:  I believe it was a mall intercept.
19    BY MR. BRAY:
20         Q    The Kate Spade survey, Kate Spade, LLC, versus
21    Saturdays Surf, LLC, was that a mall intercept survey or
22    an internet survey?
23         A    I think it was an internet survey.  I -- in
24    fact, I know it was, because the defendants in that
25    case, Saturdays Surf NYC, had a surf shop in Manhattan.
```

Gerald L. Ford - August 19, 2015                    83

```
 1       I'm not sure how many surfboards you sell in Manhattan,
 2       but there was a surf shop in Manhattan and one in
 3       New Jersey.
 4              And so we did the five boroughs in Manhattan,
 5       and we did the two counties north of Manhattan, and then
 6       we did every county in New Jersey that was on the water.
 7       And so -- and now that I keep talking, I'm thinking.
 8              So after we did all these things, they amended
 9       the complaint, and they claimed they were famous across
10       the United States because they sold not just surfboards,
11       they sold T-shirts and handbags and -- by handbags, I
12       mean canvas, carry-on bags -- throughout the United
13       States, from -- everywhere from Nordstrom's to
14       Bloomingdale's.  So that caused us to do a third survey
15       across the United States.
16       Q     Can there be advantages to doing a mall
17       intercept survey over doing a internet survey?
18       A     You know, I think McCarthy says there are not
19       anymore.
20              Just by way of a background for you, and this
21       is more than you want to know about mall intercepts, but
22       internet surveys now account for about 70 percent of all
23       marketing research dollars, and you can imagine what
24       that has done to the mall intercept locations.  We're
25       having -- I think probably of all the mall intercepts
```

Gerald L. Ford - August 19, 2015                    84

```
 1        that -- all the mall locations that we used over the
 2        last 10 years, we've lost 60 percent of them, out --
 3        gone out of business.
 4              Q    Without -- I want your personal opinion as --
 5              A    Sure.
 6              Q    -- an expert in this field for 30 years
 7        without -- Professor McCarthy with whom you sometimes
 8        agree and sometimes disagree, your personal --
 9              A    He's -- he's a personal friend, though.
10              Q    Are there -- can there be advantages to using a
11        mall intercept survey over a internet survey for
12        purposes of determining likelihood of confusion?  I'm
13        not asking about every case.  I'm just saying are there
14        cases -- can there be an advantage to using a mall
15        intercept survey?
16              A    There may be or may not be.
17              Q    Okay.  Stop there.  And we'll take a break real
18        shortly.
19                   What are the possible advantages of a mall
20        internet survey?
21              A    I don't know -- in today's technology, I don't
22        know that there really is.  We used to do all false
23        advertising surveys in malls where we used, you know, a
24        videotape and a TV.
25                   And, you know, today we can -- we have the
```

Gerald L. Ford - August 19, 2015                          85

1        capability of -- I'm -- will admit -- I'm the first
2        person to admit, I do not have the technical capability,
3        but Matt Ezell, who is here, sitting in this room, has
4        the technical capability of kind of creating anything
5        for an internet survey.
6            Q    Is one possible advantage of a mall intercept
7        survey is that the survey respondent gets a tactile
8        experience with the surveyed product?
9                 MR. LARKIN:  Objection to form.
10                THE WITNESS:  I think that that's an advantage
11       if the -- the tactile experience was a source indicator.
12       If it's not a source indicator, then it doesn't seem to
13       me that it matters.  It doesn't have any advantage.
14       BY MR. BRAY:
15           Q    Would one possible advantage be that the -- the
16       survey respondent would get to handle the product at any
17       angle that he or she might like to handle the product?
18           A    That could be an advantage if there were angles
19       where you couldn't show the product adequately, which I
20       don't think was the case here.  You have the product
21       there.
22           Q    Well --
23           A    There's nothing on the back.
24           Q    -- the internet survey that you did did not
25       offer consumers a top view of the product where they

Gerald L. Ford - August 19, 2015                              86

```
 1      could see BS on the cap; correct?
 2          A    You could not.
 3          Q    And a mall intercept survey respondent would be
 4      able to turn the product and view the top, if he or she
 5      chose to?
 6          A    That's true.
 7          Q    And that's a potential advantage to a mall
 8      internet survey?
 9               MR. LARKIN:  You mean in this case or in
10      general?
11      BY MR. BRAY:
12          Q    In this case?
13          A    If there was some evidence that the BS on the
14      top was a source indicator or not source indicator, then
15      that may be true.  I assume that if you believed that
16      the BS on top of the toy was a source indicator, that
17      you would have done a replication survey to show that it
18      made a difference.
19          Q    In general, is it a potential advantage to mall
20      intercept surveys that a consumer can view the product
21      at any angle he or she chooses as opposed to the limited
22      views that would be provided to him or her through an
23      internet survey?
24               MR. LARKIN:  Objection.  Asked and answered.
25               THE WITNESS:  I don't think so.  It depends --
```

Gerald L. Ford - August 19, 2015                87

1       it really depends upon the product.  In this case, that
2       was not the case.
3       BY MR. BRAY:
4            Q    You did a mall intercept survey in the Kate
5       Spade case; correct?
6            A    No.  It was an internet.
7            Q    My notes told me it was a mall.
8            A    Oh, I'm sorry.  If I did, I misspoke.  There
9       are literally no malls in Manhattan.
10           Q    What influences you as an expert -- well,
11      strike that.
12                Generally speaking -- strike that again.
13                Who made the decision in this case to conduct
14      an internet survey versus a mall survey -- strike that
15      again.
16                Who made the decision in this case to use an
17      internet survey versus a mall intercept survey?
18           A    That was my decision.
19           Q    In most cases that you're involved in when
20      there's a choice between conducting an internet survey
21      versus a mall intercept survey, is that your decision as
22      the expert which survey method to use?
23           A    It's always my decision --
24                MR. BRAY:  Okay.  Let's take --
25                THE WITNESS:  -- unless Mr. Larkin wanted to be

1      deposed --

2                  MR. LARKIN:  The last thing I want.

3                  THE WITNESS:  -- which I don't think he wants

4      to.

5                  MR. LARKIN:  That's the last thing I want.

6                  MR. BRAY:  Let's take a break.  I know I kept

7      you more than an hour.

8                  (Brief recess.)

9      BY MR. BRAY:

10          Q     Welcome back, Dr. Ford.

11          A     Thank you.

12          Q     We'll go to about 12:30, and then we'll take

13     our lunch break.

14          A     Okay.  Cool.

15          Q     Hopefully the crowds will be thinned out by

16     then, and we won't be too hungry.

17                  Just going back to Exhibit 60 again, and you

18     said, for instance, that Kate Spade was an internet

19     survey, and my original notes were that you told me it

20     was a --

21          A     And I'm sorry if I misspoke.

22          Q     That's okay.  Can you just identify which of

23     the likelihood of confusion surveys on page 1 of

24     Exhibit 60 were mall intercept surveys?

25          A     QS Wholesale, I think, was mall intercept.

```
 1              Q    I think you said the Procter & Gamble one
 2       was -- or Levi Strauss was mall intercept?
 3              A    That's my recollection.
 4              Q    All right.  That's good enough for now.  I may
 5       use QS as an example.
 6                   It's always your decision whether to use a mall
 7       intercept survey versus an internet survey; correct?
 8              A    Right.  We've kind of used internet more
 9       frequently recently.
10              Q    Is it cheaper to do internet versus mall?
11              A    Oh, yeah.
12              Q    And does the cost sometimes influence your
13       decision to use an internet survey?
14              A    You look at our list of our clients.  Even
15       when -- this is off the record.
16                   MR. LARKIN:  No.  Give him an answer.
17                   THE WITNESS:  Even when we went back for the
18       Adidas trial, the ITC -- I'm sorry.  The Converse trial
19       at the ITC, they -- they were so kind as to say, "Bring
20       anybody from the office you want to bring.  We'll pay for
21       it."
22                   So it's not a cost thing.  In Kate Spade, it
23       was impractical to try to do mall intercept, because
24       there are no malls in Manhattan, and there are literally
25       no malls along the coast of New Jersey, where we needed
```

Gerald L. Ford - August 19, 2015                    90

1    to interview.

2    BY MR. BRAY:

3        Q    Why do a mall intercept -- or why did you

4    choose to do a mall intercept survey in the QS Wholesale

5    case as opposed to an internet survey?

6        A    It's a national survey, and we had a -- we had

7    a shirt that we wanted to show people with a label and a

8    hang tag.  We could have just as easily done it as an

9    internet survey.

10       Q    If it's cheaper to do it as an internet survey,

11   why spend the money and do a mall intercept survey in

12   that case?  Was there -- was there -- let's leave the

13   question as it stands because I can't think of the word

14   that I'm searching for.

15       A    Okay.  There's no particular reason.  Our

16   clients have never been picky about costs.

17       Q    I assume Jack Daniel's isn't picky about costs?

18       A    Well, Chris Larkin has always been picky.

19       Q    You could have done a mall intercept survey in

20   this case; correct?

21       A    Well, it just didn't seem like it was --

22       Q    I mean --

23       A    -- practically needed.  So you could do

24   anything.

25       Q    Okay.  Let me just get a -- so the record is

Gerald L. Ford - August 19, 2015                    91

```
 1      clear, you could have done a mall intercept survey in
 2      this case VIP/Jack Daniel's; yes or no?
 3           A    Yes.
 4           Q    You elected not to; yes?
 5           A    Correct.
 6           Q    And in your experience, working with your
 7      clients, had you recommended a mall intercept survey,
 8      Brown-Forman would have authorized payment for it?
 9           A    In my experience, the answer to that question
10      is yes.  We didn't see the need for it.
11                Is the coffee okay?
12           Q    It's actually really good.
13           A    Okay.
14           Q    Thank you.
15           A    Thank Kathy when you go out.
16           Q    Talk to you a little bit about -- generally
17      about how you go your -- go about doing your job in
18      creating or conducting surveys.  And, again, here I'm
19      going to limit it to likelihood of confusion surveys.
20      Okay?
21           A    Okay.
22           Q    There are mall intercept surveys; yes?
23           A    Yes.
24           Q    There are internet surveys?
25           A    Yes.  There are telephone surveys.
```

Gerald L. Ford - August 19, 2015                    92

```
 1          Q    Okay.  Are there other types of surveys?
 2          A    There's kind of a combination of
 3     telephone/internet.
 4          Q    And --
 5          A    We've done those a few times.
 6          Q    Explain to me how that combination works.
 7          A    Do you know Autodesk?
 8          Q    It's like as a CAD?
 9          A    Yeah.  Very good.
10          Q    Yeah.  My father-in-law is an architect, but
11     he's been retired a little while.
12          A    Okay.
13          Q    I know he was the only one in the office that
14     still hand drew.
15          A    Okay.  So we were doing a survey -- a TTAB
16     opposition survey in Autodesk, and we didn't -- we knew
17     the survey universe was going to be comprised of
18     architects and engineers, of manufacturers and people in
19     construction.  So we went to Dun & Bradstreet, and we
20     bought those SIC codes.
21               Do you know what an SIC code is?
22          Q    You've got me stumped there.
23          A    That's all right.  It's Standard Industrial
24     Classification code.
25          Q    Okay.
```

Gerald L. Ford - August 19, 2015                    93

1          A    So even your law firm has one.  So every firm
2      has an SIC code.
3               So we bought a random sample of companies in --
4      SIC codes in those three industries.  And because we
5      didn't know ahead of time what portion were users in
6      architectural or engineering versus manufacturing versus
7      construction, we -- we sampled them in proportion to
8      their existence in the population.  And it turns out our
9      people in construction -- because most construction
10     people are one-man, two-man operations, probably not
11     large enough to use a Computer Assisted -- Aided Design
12     software.
13              So what we did is -- excuse me -- we called
14     them.  We called those firms.  We determined whether
15     they used Computer-Aided Design software, and if they
16     did, we asked for that person who was responsible for
17     decisions or recommendations with respect to what
18     Computer-Aided Design software they would use.
19              And at that moment, once we got a qualified
20     respondent, we asked them, you know, whether they
21     primarily made recommendations, primarily made
22     decisions, or primarily did both.
23              THE WITNESS:  Bless you.
24              MR. LARKIN:  Thank you.
25              THE WITNESS:  Then what we did is we took them

```
 1      to a secure website where we exposed them -- I don't
 2      know.  Have you done any TTAB surveys?
 3      BY MR. BRAY:
 4          Q    I think a grand total of one.
 5          A    Okay.  Well, that's better than a grand total
 6      of zero.
 7               You know, for likelihood of confusion, the
 8      TTAB, they -- and I don't know if this is going to
 9      change after the Supreme Court decision.  I -- I doubt
10      that it really is, but their preference is that the mark
11      appears on, let's say, a plain, white, three-by-five
12      card with the mark or the design mark and below that in
13      smaller letters a description of goods.  And so that's
14      what you typically expose people to in a likelihood of
15      confusion survey in a TTAB matter.
16          Q    Going back to survey tools that you use, mall
17      intercept surveys, internet -- I keep -- afraid I'm
18      going to mix those two words together.
19          A    That's okay.
20          Q    Okay.  I think I'm doing all right.
21               Mall intercept surveys, No. 1, internet
22      surveys, No. 2, combination of internet, slash,
23      telephone surveys, No. 3.  Any other survey tools that
24      you would --
25          A    Telephone.
```

```
1          Q    Telephone surveys.  Other than those four, any
2    other survey tools that you used over the last ten years
3    to help determine likelihood of confusion?
4          A    Not that I could think of.
5          Q    And the tool that was used in this case to
6    support your opinion for Jack Daniel's was an internet
7    survey; correct?
8          A    That's correct.
9          Q    I think you qualified some people, and some
10   interviewing was done by telephone, but it wasn't the
11   combination --
12         A    No.
13         Q    -- internet/telephone survey that you just
14   described at length; correct?
15         A    The telephone was only for validation purposes.
16         Q    Validation.
17         A    And we can't always do that.  Sometimes panel
18   providers won't allow us to ask for name and telephone
19   number.  Survey Sampling, who has been our major panel
20   provider for -- forever, does allow us that luxury.
21         Q    Would there be an advantage to using an
22   internet survey over a mall intercept survey where the
23   majority of the product in question, the sales, were
24   made over the internet?
25         A    Made over the internet?
```

1        Q    Yes, were online sales.

2        A    I don't think there would be an advantage or a

3    disadvantage.

4             There -- there's an advantage to some extent

5    in -- if there's some way to separate the internet from

6    mall intercepts, understanding this shrinking number of

7    mall locations, if you set that aside, the major

8    advantage for an internet is looking for -- can be

9    looking for very small populations.

10       Q    Explain that.

11       A    Well, let's suppose you wanted to do a survey

12   of cigar smokers.  You would be standing in the mall

13   forever.  And then -- God, we've done some cigarette

14   studies where the supervisors would call us and say,

15   "We're having a hard time finding qualified

16   respondents."  She says, you know --

17       Q    I know.

18       A    -- "I see them standing outside the mall,

19   smoking a cigarette.  They come in, and we try to

20   qualify them.  They say they don't smoke."

21            But sometimes that's -- I mean if it's an

22   embarrassing question or a socially-unacceptable

23   question, then you may lose respondents that way.

24       Q    And you indicated there was a declining number

25   of mall locations available.  I mean the trend obviously

Gerald L. Ford - August 19, 2015                    97

1        now is power centers or indoor/outdoor shopping or

2        combined, you know -- at least in Phoenix, you know,

3        condos around retail.

4            A    Yeah.

5            Q    Are there not survey opportunities available in

6        power centers or kind of open-air malls, for lack of a

7        better word?

8            A    Only if there's a tenant that is an

9        interviewing service --

10           Q    Okay.

11           A    -- because otherwise, you're on private

12       property and --

13           Q    Where the product -- where an extremely small

14       percentage of the product sales are generated online,

15       and the overwhelming majority of the sales are at brick

16       and mortar retail, would there be an advantage to using

17       a mall intercept survey as opposed to an internet

18       survey?

19           A    You know, there may or may not be.  It depends

20       upon how well you can reproduce the survey stimulus.

21               I'm trying to think whether we've ever had a --

22       whether we've had a situation like that, where we

23       couldn't reproduce a survey stimulus in an accurate

24       manner or photograph it in an accurate manner.  And that

25       wasn't the case here.

Gerald L. Ford - August 19, 2015                     98

1        Q    A number of the respondents for the survey
2    involving the actual Bad Spaniels product identified
3    Silly Squeakers as the source or origin of the product;
4    correct?
5        A    I -- I'd have to look, but there were a number
6    of people that did.
7        Q    Okay.  And you said before if the tactile
8    experience had anything to do with the source or origin
9    of the product, it would be valuable that a survey
10   respondent had the tactile experience with the product;
11   correct?
12       A    If the tactile experience was source
13   identifying, then it would be important.  Otherwise, it
14   would not be important.
15       Q    Sure.  And for a product where a number of
16   respondents identified the source as Silly Squeakers, it
17   would be important for survey respondents to be able to
18   squeak the toy, which you can only do with the actual
19   toy tactually; correct?
20       A    That's true.
21       Q    So that's a disadvantage of the internet survey
22   that you conducted over a potential mall intercept
23   survey, which you did not conduct in this case; correct?
24       A    Correct.
25            MR. LARKIN:  I'm sorry.  What's a disadvantage?

Gerald L. Ford - August 19, 2015                    99

```
 1              THE WITNESS:  You can't hear the squeak.
 2              MR. LARKIN:  Okay.
 3              THE WITNESS:  How do you put that on the record?
 4              THE REPORTER:  Can't.
 5      BY MR. BRAY:
 6          Q    When was the first time -- well, strike that.
 7              Circle back to something I normally do at the
 8      beginning.  You talked about reading McCarthy, the
 9      parody chapter, in preparation for today's deposition.
10      Do you remember that?
11          A    Yes, I do.
12          Q    What else did you do to prepare for today's
13      deposition?
14          A    Met with Mr. Larkin for a couple of hours.
15      Bought him lunch.
16          Q    Yesterday or --
17          A    No.  Last week.
18          Q    Did you review any other materials in addition
19      to McCarthy?
20          A    In addition to McCarthy, I reviewed everything.
21      I reviewed my declaration.  I reviewed the survey
22      reports.  I reviewed your expert's critique.  I reviewed
23      the amended complaint.  I reviewed the answer and
24      counterclaim.  That's how I remembered to ask Matt to go
25      get it for you, because --
```

Gerald L. Ford - August 19, 2015                    100

```
 1        Q     And I'm going to steal that at lunch and
 2   highlight the thing --
 3        A     Okay.
 4        Q     -- and we'll go into that after lunch.
 5              You indicated -- well, if -- even besides
 6   re-reviewing the parody -- you had read the parody
 7   chapter on McCarthy before, I presume; correct?
 8        A     You can presume that correctly.
 9        Q     Okay.
10        A     I don't think there's anything I haven't read
11   before on McCarthy.
12        Q     And prior to re-reviewing the McCarthy chapter
13   on parody, you were familiar with the Fourth Circuit
14   Chewy Vuiton decision; correct?
15        A     Oh, I was.
16        Q     With your -- it sounds like in conjunction with
17   some of the publications you talked about earlier, your
18   response --
19        A     Well, actually, I know the person who made the
20   argument, the Fourth Circuit.  David Bernstein.
21        Q     Which side did he represent?
22        A     Louis Vuitton.  He's at Debevoise & Plimpton in
23   New York.
24        Q     Were you involved in the Chewy Vuiton case at
25   all?
```

Gerald L. Ford - August 19, 2015                                    101

```
 1          A    No.

 2          Q    As a consulting expert or otherwise?

 3          A    No.  Just moral support.

 4          Q    Do you think the trial judge got the decision

 5     right in that case?

 6               MR. LARKIN:  Objection.  Calls for a legal

 7     conclusion.  That has nothing to do with his opinion

 8     here.

 9               THE WITNESS:  You know, I agree.  It has nothing

10     to do with my opinion here.

11               I'm not sure the judge got it right.  If --

12     BY MR. BRAY:

13          Q    That's fine.  You don't have to go into detail.

14          A    No, no.  But let me fill in the detail.

15          Q    Sure.

16          A    I think it's important.

17               I think that if -- if Louis Vuitton had done

18     what they should have done, and that is a likelihood of

19     confusion survey, I don't know how it would have come

20     out, because these are always questions of fact that you

21     don't know.  But if the judge had some evidence of

22     likelihood of confusion, I think that could have turned

23     the case, and I think he even mentions that.  I think it

24     was a he, not a she.

25               And the same thing is true in the --
```

Gerald L. Ford - August 19, 2015                    102

```
 1          Q     Tommy Hilfiger case?
 2          A     Tommy Hilfiger case.
 3          Q     Timmy Holedigger, Tommy Hilfiger.
 4          A     Yeah.
 5          Q     So you could have --
 6          A     But --
 7          Q     If you were retained, you could have fixed
 8     those cases from the plaintiff's perspective and
 9     narrowed the appropriate sphere for parody products?
10              MR. LARKIN:  Well, objection.  He just testified
11     he didn't know how any survey might have been done, would
12     have come out.
13              THE WITNESS:  I don't know how I would have done
14     the survey.  But do I feel I would have been competent to
15     do it?  Yes.
16     BY MR. BRAY:
17          Q     Do you think the Fourth Circuit got it right in
18     the Louis Vuitton case?
19              MR. LARKIN:  Asked and answered.
20              MR. BRAY:  No.  I asked about the trial court.
21              MR. LARKIN:  Well, I think you were referring to
22     the -- well, okay.
23     BY MR. BRAY:
24          Q     Do you think the Fourth Circuit was correct in
25     affirming the trial court's decision?
```

**Coash & Coash, Inc.**
602-258-1440        www.coashandcoash.com

Gerald L. Ford - August 19, 2015                    103

```
 1              MR. LARKIN:  Same objection.  Calls for a legal
 2    conclusion.  It had nothing to do with his opinion here.
 3              THE WITNESS:  No.  I think that that decision
 4    might have been different had they had evidence of
 5    likelihood of confusion.
 6    BY MR. BRAY:
 7         Q    The Fourth Circuit referred to the Chewy Vuiton
 8    toy as a parody product.  Do you agree with me?
 9         A    I don't remember that exact language, but --
10         Q    Do you recall the case hinging on whether -- or
11    one of the issues on appeal being whether the Chewy
12    Vuiton toy was a successful versus an unsuccessful
13    parody?
14         A    I'd have to go back and reread the case.  It's
15    been probably a week since I've read it.
16         Q    What I'm trying to do, Dr. Ford, by a circular
17    way, is try to come to an agreement regarding use of
18    terms.
19         A    Okay.
20         Q    Do you agree, Dr. Ford, that the Chewy
21    Vuiton -- using your English understanding of the word
22    parody -- that the Chewy Vuiton toy was a parody
23    product?
24              MR. LARKIN:  Objection to form.  Calls for a
25    legal conclusion even if you're asking for his -- his
```

Gerald L. Ford - August 19, 2015                    104

1      opinion, his understanding, but you can go ahead and

2      answer based on your understanding.

3            THE WITNESS:  I think -- you know, I've seen

4      pictures of it.  It looks like it simulates a Louis

5      Vuitton purse, and if you and I are guided at all by

6      McCarthy, it would suggest that if there was evidence of

7      likelihood of confusion, that the Fourth Circuit got it

8      wrong, but there was no evidence of likelihood of

9      confusion.  So it seems to me that I'm not going to

10     comment on the Fourth Circuit, because I'm liable to be

11     in front of them again.  I'm not quite through with my

12     career.

13     BY MR. BRAY:

14        Q    Okay.  I'm just going to read to you

15     paragraph 7 or Headnote 7 on the West case from the

16     Chewy Vuiton Fourth Circuit decision.  Finding that

17     Haute Diggity Dog's parody is successful, however, does

18     not end the inquiry into whether Haute Diggity Dog's

19     Chewy Vuiton products create a likelihood of confusion.

20            Does that refresh your recollection as to

21     whether the case talked about successful parodies versus

22     unsuccessful parodies?

23        A    It refers --

24            MR. LARKIN:  Well, that -- it's a headnote.  We

25     all know how dangerous those are.

```
 1              MR. BRAY:  It's not a headnote.
 2              MR. LARKIN:  I'm sorry.  I thought you read a
 3      headnote.  Didn't you just read Headnote 7?  I'm sorry.
 4              MR. BRAY:  It's actually from the case.
 5              MR. LARKIN:  Then I will withdraw the objection.
 6              Do you recall the question?
 7              THE WITNESS:  I do.
 8              MR. LARKIN:  Okay.
 9              THE WITNESS:  I'm just kind of reading from the
10      quote that you read me.  It says, indeed, if it becomes
11      apparent that an effective parody will actually diminish
12      likelihood of confusion while an ineffective parody will
13      not, and we now turn to Pizzeria Uno factors, which are
14      the -- kind of the Fourth Circuit's Polaroid or --
15      BY MR. BRAY:
16          Q    Slickcraft.
17          A    That was my first case.
18          Q    Polaroid was?
19          A    No.  Slickcraft.  I was a child.  I had no idea
20      what I was doing.
21          Q    Yes or no question.  Do you agree or disagree
22      that the Chewy Vuiton case -- or strike that.
23              Do you agree or disagree that the Chewy Vuiton
24      toy that was the subject of the Fourth Circuit opinion
25      that I just handed you was a parody dog toy?
```

Gerald L. Ford - August 19, 2015                    106

```
 1          A     I don't see that in paragraph 7.

 2          Q     No.  I'm not -- let me rephrase the question.

 3                Do you agree -- regardless of what the Fourth

 4    Circuit or the trial court said, do you agree or

 5    disagree that the Chewy Vuiton toy was a parody dog toy?

 6          A     Well, I agree it was replica of a Louis Vuitton

 7    purse.

 8          Q     You're familiar there is a chapter or a

 9    significant portion of a chapter on McCarthy discussing

10    parodies?

11          A     Yes.

12          Q     And you're familiar with the concept of parody

13    products?

14          A     Yes.

15          Q     What is your understanding of what constitutes

16    a parody product?

17          A     I'm not a lawyer, so you're asking kind of the

18    wrong person, but it is my understanding that a parody

19    product is a product that people see is a product that

20    you're poking fun at yourself with, but I also agree

21    from McCarthy, as you well know, that if the parody --

22    if the quote, unquote, parody product creates a

23    likelihood of confusion, the parody defense falls.

24          Q     So a parody product by its nature is referring

25    in some sense to another trademark product; correct?
```

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

1     A    It may or may not be, but, yes.

2     Q    For instance, Chewy Vuiton product was --

3     A    Referring to Louis Vuitton.

4     Q    Okay.  And Timmy Holedigger was referring to --

5     A    Tommy Hilfiger.

6     Q    Hilfiger.

7          And is it your understanding that the Bad

8     Spaniels toy is referring to Jack Daniel's?

9     A    That's my understanding, that the designer,

10    Ms. Phillips, used a Jack Daniel's bottle as an

11    inspiration for her design in this case.

12    Q    McCarthy said that he couldn't imagine a

13    successful parody of Time Magazine not including the Red

14    Border.  Are you familiar with that?

15    A    I do barely remember that, yeah.

16    Q    Okay.  For a parody to work -- a parody product

17    to work, isn't it true that the consumers have to make

18    the connection between what the parody product is

19    referring to?

20         MR. LARKIN:  Objection to form.  I don't

21    understand what you mean by a parody product to work.

22         Do you understand?

23    BY MR. BRAY:

24    Q    Strike that.

25         For a parody product to be a parody product, in

Gerald L. Ford - August 19, 2015                    108

1       your view, wouldn't you agree that consumers have to or

2       at least some subset of consumers have to get the

3       reference?

4           A    Well, some subset may.  It's just whether or

5       not there is non-insubstantial subset that are confused

6       as to the source, sponsorship, or affiliation of that

7       product with -- with another source.

8           Q    If nobody understood Chewy Vuiton as

9       referencing Louis Vuitton, it wouldn't be a parody

10      product; correct?

11          A    I don't know.

12              MR. LARKIN:  Objection to form.

13      BY MR. BRAY:

14          Q    The Fourth Circuit in the Louis Vuitton case

15      said, quote, for trademark purposes, a parody is defined

16      as a simple form of entertainment conveyed by

17      juxtaposing the irreverent representation of the

18      trademark with the idealized image created by the mark's

19      owner.

20              Do you agree or disagree with that definition

21      of a parody?

22              MR. LARKIN:  Objection.  Calls for a legal

23      conclusion.

24              THE WITNESS:  I mean we keep going around in

25      circles.  As long as it doesn't create a likelihood of

Gerald L. Ford - August 19, 2015                    109

1      confusion.  If it creates a likelihood of confusion, then
2      it's not a parody.
3      BY MR. BRAY:
4           Q    Well, that's not what McCarthy says, is it?
5           A    McCarthy says the parody defense falls.
6           Q    But a parody -- I think it's your opinion that
7      a parody product can be confusing; correct?
8           A    If confusing under the Lanham Act, then it's --
9      it's not a parody product.
10          Q    So it's your opinion, then, that if an
11     internet-based survey of 207 people or 412, whatever the
12     number is, 414 -- strike that.
13               We'll drill down after lunch into the details.
14     Let me just get your understanding of a parody.
15               If pursuant to your methodology some subset of
16     consumers who are surveyed answer questions regarding --
17     strike that.  I don't like that either.
18               With regard to a parody -- with regard to a
19     product that a party claims to be a parody product, if
20     your survey shows in your opinion there's a likelihood
21     of confusion, is it your testimony in your expert
22     opinion that the product is not then a parody?
23          A    It's my testimony and my understanding, based
24     upon the case law and based upon McCarthy, that if
25     consumers are confused as to source, sponsorship, or

Gerald L. Ford - August 19, 2015                    110

1    affiliation, that the parody defense falls, and

2    there's -- you can't hide behind the parody if you have

3    a non-insubstantial portion of the population being

4    confused as to the source, sponsorship, or affiliation

5    of that product --

6         Q    Okay.

7         A    -- bearing those -- bearing whatever marks that

8    product bears.

9         Q    I think I understand you.  And maybe this is

10   semantics, but with regard to a product that a party

11   claims to be a parody product, you're testifying if a

12   survey shows in your opinion there's a likelihood of

13   confusion, that likelihood of confusion goes to an

14   infringement analysis, correct, or an infringement

15   determination?

16        A    Correct.

17        Q    Does it go to the fact of whether it's a parody

18   or not in your opinion?

19        A    It goes to whether or not you can use a parody

20   as a defense.  At least according to McCarthy and

21   according to the decision in the Buttwiper case is

22   that -- that defense falls.  It fails.  It's over.

23             I mean this is not a close call.  I mean we're

24   not talking about four percent, five percent, six

25   percent.  We're talking about almost 30 percent of the

Gerald L. Ford - August 19, 2015                    111

1    population.

2         Q    Well, we'll get to that.

3         A    Okay.

4         Q    And I'll take issue as to whether it's a close

5    case or not.

6              I want to make a distinction between a parody

7    defense and the nature -- the inherent nature of the

8    product as a parody product.  Is it your contention that

9    a parody product is no longer a parody product if a

10   survey you conduct indicates in your professional

11   opinion there's a likelihood of confusion --

12             MR. LARKIN:  Objection.

13   BY MR. BRAY:

14        Q    -- or is it simply your opinion that the legal

15   defense of parody, whatever that is or isn't, falls?

16        A    That's my opinion.  That's McCarthy's opinion.

17   I think that's -- was also the opinion of the judge in

18   the Buttwiser case.

19        Q    Well, that was after a preliminary injunction

20   hearing.

21        A    Well, we'll see.

22        Q    Okay.  Is the Bad Spaniels toy in your opinion

23   a parody product?

24        A    You know, I'm not sure I have an opinion.

25             I know that -- I know the plaintiff's position

1    is that it's a parody.  I also know that we have good,

2    solid survey evidence using standard-accepted questions

3    and standard methodology that there is a

4    non-insubstantial segment of the population that -- that

5    would buy a dog toy or confuse or be deceived by the

6    source, sponsorship, or affiliation of that toy.  It's

7    just not very confusing.

8           Did I misspeak?

9     Q    Again, we'll get into the meat of your report

10    after lunch, Dr. Ford.  This is partially an attempt to

11    define terms so that you and I can talk, and we

12    understand each other, and I can avoid potential form

13    objections from your counsel.

14           Do you recall -- I mean do you agree that

15    broadly speaking, the Bad Spaniel is a similar kind of

16    product as the Chewy Vuiton toy or the Timmy Holedigger

17    dog cologne?

18           MR. LARKIN:  Objection to form as to similar

19    kind of product.

20           If you understand the question, go ahead.

21           THE WITNESS:  You know, I -- they may or may not

22    be.  I -- I'm not the fact finder here.

23           The fact finder is going to determine whether

24    or not -- I assume the fact finder is going to focus on

25    whether or not this product creates a likelihood of

```
1    confusion.
2    BY MR. BRAY:
3        Q    Is there any word you would use to characterize
4    Timmy Holedigger, Chewy Vuiton, Bad Spaniels, the type
5    of product that they are?  And I -- and despite your
6    counsel's likely --
7        A    I don't think --
8        Q    I'm not trying to trick you with this question.
9        A    No.  I didn't think you were.
10       Q    I'm going to ask you this question about your
11   background, and I'm having a hard time circling around
12   to get a defined term, because parody is such a
13   sensitive issue in this case, but --
14       A    Well, it's kind of obscure too.
15       Q    Yeah.  I mean my view -- I mean my view of the
16   parody laws, if the judge finds the joke funny, then
17   it's non infringing, but if he doesn't -- or involves
18   something he's offended by, it's not infringing, but
19   that's neither here nor there.
20       A    Right.
21            MR. LARKIN:  I agree with that statement.
22   BY MR. BRAY:
23       Q    Let me ask you this question, and then we'll
24   try to circle down more.
25            Exhibit 60 -- any of the cases in Exhibit 60
```

1    that you've given testimony on, either at trial or in

2    deposition, involve a case where one side or the other

3    raised the issue of parody?

4            MR. BRAY:  Could I see his last answer?

5    BY MR. BRAY:

6        Q    Excuse me.

7        A    You're excused.

8            Not that are a part of Exhibit 60.

9        Q    Okay.  Have you ever been retained to provide

10   an opinion in a trademark case where one party or the

11   other raised the issue of parody?

12           MR. LARKIN:  Other than this case?

13           MR. BRAY:  Other than this case.  Thank you,

14   Counsel.  Elephant in the room.

15   BY MR. BRAY:

16       Q    To the best of your recollection?

17       A    I don't have a recollection one way or the

18   other.

19       Q    In answer to one of my earlier questions, you

20   said that the parody area is quote, unquote, obscure.

21   What did you mean by that?

22       A    Well, you know, there aren't a whole lot of

23   cases.  It's a little bit like likelihood of dilution by

24   blurring is that you need a divine interrog now to

25   figure out which way the courts are really going to go,

1     how they're going to interpret the statute.  It -- I

2     found the McCarthy section helpful.  I found it helpful

3     reading the Chewy Vuiton, the Hilfiger case as well as I

4     found it helpful reading the Buttwiser case.

5            But, quite honestly, you and I don't have that

6     many cases to rely on.  So we're kind of -- all I was

7     trying to suggest is where -- with the exception of

8     something that I'm very positive about, that we're in

9     uncharted territory until you find likelihood of

10    confusion, and then the territory is not uncharted

11    anymore.

12        Q    And just to confirm, as you sit here today, you

13    can't recall providing an expert opinion in any case --

14    any trademark case involving -- where one party or the

15    other in the case had asserted parody as an issue prior

16    to this one?

17        A    I can't recall one way or the other.  We've

18    been in this business for 40 years, and --

19        Q    I understand that you can't recall one way or

20    the other.

21            To ask my same question in a different way, as

22    you sit here today, you can't think of a specific

23    example of a parody case that you've been involved in

24    prior to this one?

25        A    I'll think about it at lunch, but I -- none

1    comes to mind.

2         Q    And I think you said the survey that you did in

3    this case involved form, quote, unquote, Eveready

4    questions --

5              MR. LARKIN:  Objection.  Mischaracterizes --

6    BY MR. BRAY:

7         Q    -- or standard Eveready questions?

8         A    I might have misspoke those words.

9         Q    Okay.  You didn't do --

10        A    Standard likelihood of confusion questions.

11        Q    You didn't do anything to tailor the survey

12   differently in this case because it involved a parody

13   product; correct?

14        A    I didn't do anything different in this case

15   than I've done in any case in 40 years.

16        Q    So you gave no consideration of the fact that

17   at issue in this case is a product that one party

18   alleges is a parody of a Jack Daniel's product; correct?

19        A    Oh, yeah, I did.  I mean I gave consideration

20   of the fact that if there was no likelihood of

21   confusion, then there was no case here for Jack

22   Daniel's.

23        Q    Okay.  Let's circle back to that.  You said

24   Chewy Vuiton -- I mean you didn't have an

25   attorney/client privilege relationship with David

1    Bernstein, right, the lawyer for Chewy Vuiton in that
2    case?  Let me rephrase that.
3           When you were discussing with David Bernstein
4    issues or his experience with the Chewy Vuiton case,
5    that wasn't pursuant to any professional representation
6    that he was engaged in for you; correct?
7        A    No.  It was a personal relationship.
8        Q    Did you express your opinion to Mr. Bernstein,
9    that, "Hey, things might have been different if you used
10   me or a survey expert in the lower court"?
11       A    I'm sure I expressed that to him.
12       Q    What did he tell you?
13       A    But he didn't -- you know, he didn't try the
14   lower court case.
15       Q    He was appellate counsel?
16       A    He was just appellate counsel.
17           And I think -- I think he participated in the
18   amicus brief from the INTA, but I'm not -- I'm not
19   positive.  We'd have to go back and look.  I know he's
20   on that committee.
21       Q    You said -- I'm sorry to cut you off.
22       A    Oh, you didn't -- you weren't.
23       Q    You said that if --
24       A    I let my voice drop sometimes, and that's
25   confusing.

```
1          Q    If you had done a survey in the Chewy Vuiton

2     case, it may or may not have showed a likelihood of

3     confusion; right?

4          A    That, I admit to.

5          Q    You don't know until you conduct a survey?

6          A    That's right.

7          Q    In the last ten years, have you ever been

8     retained by the holder of a trademark to provide an

9     opinion as to likelihood of confusion where you were not

10    able to obtain or have a survey performed that would

11    allow you to make that opinion?

12              MR. LARKIN:  Objection to form.

13    BY MR. BRAY:

14         Q    I can rephrase it if you don't understand it.

15         A    I understand the question.  There have been

16    cases where we've worked on where the results would not

17    be helpful to the plaintiff or the defendant.

18         Q    Depending on which side you were on?

19         A    You know, you kind of go through the list.  I

20    mean you can see that about half of our clients are

21    plaintiffs and half are defendants, so we're not on the

22    side -- it doesn't matter what -- what position the

23    plaintiff or the defendants have.  What matters is the

24    empirical evidence.  And if the empirical evidence

25    supports, then we go forward.  If it doesn't support, I
```

Gerald L. Ford - August 19, 2015                    119

```
1      assume they find somebody else.
2           Q    Fair enough.
3           A    I'm not going to -- I'm not going to sit up
4      there and -- and make up data or come to conclusions
5      that are on behalf of a client.  That's not -- that's
6      not how we've been able to be in business for 40 years.
7           Q    Fair enough.  Do you agree with me that in the
8      abstract, not all parody products require the approval
9      or permission of the trademark holder in order to be
10     sold and not be infringed?
11          MR. LARKIN:  Objection to form.  I have no idea
12     what that question means.
13          Do you?
14     BY MR. BRAY:
15          Q    I'll circle back.  Did you understand my
16     question?
17          A    No.
18          Q    If you had conducted a survey in the Chewy
19     Vuiton case, for example, and you determined that the
20     confused cohort was low enough that it was your opinion
21     that there's not a likelihood of confusion, the
22     implication of that would be, would it not, that that
23     parody product is not infringing; right?
24          MR. LARKIN:  Objection to form.  It calls for a
25     hypothetical.  It lacks foundation.
```

```
 1              If you understand the question, go ahead.
 2              THE WITNESS:  I think I understand the question.
 3     What you're asking me is if we did a likelihood of
 4     confusion survey on Chewy Vuiton, and I'm going to make
 5     up a number, and four percent gave Louis Vuitton, would I
 6     testify that that was an actionable percentage?  The
 7     answer is no.
 8              Would I be called to testify?  Probably not,
 9     but --
10              MR. LARKIN:  Depending on what party retained
11     you.
12              THE WITNESS:  When you -- yeah.
13     BY MR. BRAY:
14        Q    And, you know, given a real world example,
15     after the Fourth Circuit decision, it's been decided
16     that the parody product Chewy Vuiton toy can be sold
17     regardless of any trademark rights asserted by Louis
18     Vuitton; correct?
19        A    That's correct.
20        Q    And the same thing -- not the Fourth Circuit,
21     but the same concept with the Timmy Holedigger perfume,
22     correct, or cologne?
23        A    That's correct.
24        Q    And so --
25        A    Although --
```

Gerald L. Ford - August 19, 2015                121

1        Q     -- in the abstract, Dr. Ford, not all parody

2     products as a matter of law require the permission of

3     the trademark holder in order to be sold; correct?

4            MR. LARKIN:  Objection to form.  I have no idea

5     what you mean by as a matter of law, and I'm a lawyer.

6            Do you understand the question?

7     BY MR. BRAY:

8        Q     Well, let me take that out.  Is it true, Mr. --

9     would you agree with me, Dr. Ford, that not all parody

10    products require the permission of the trademark holder

11    to be sold?

12           MR. LARKIN:  Objection to form.

13           MR. BRAY:  I don't know how more simply to ask

14    that question.

15           MR. LARKIN:  But require in what sense?

16    Legally?

17           MR. BRAY:  Let me strike that.

18    BY MR. BRAY:

19       Q     Would you agree that the law does not bar --

20    let me try it this way.

21           Would you agree that there's not an

22    across-the-bar law that bans the sale of parody

23    products?

24       A     I think we need to take maybe parody out of

25    your question.

**Coash & Coash, Inc.**
602-258-1440        www.coashandcoash.com

Gerald L. Ford - August 19, 2015                    122

1              What the law bans is a sale of a product that
2    is likely to cause, to deceive, or to mislead a
3    consumer --
4         Q    Sure.
5         A    -- as to the source, sponsorship, or
6    affiliation of that product with another source.  So
7    once you get there, I don't think you need the word
8    parody in your question.  I mean --
9         Q    The law doesn't bar the sale of the Chewy
10   Vuiton product; correct?
11             MR. LARKIN:  Asked and answered.
12             THE WITNESS:  The Fourth Circuit has ruled that
13   it -- it did not have evidence that would allow it to
14   overturn the district court decision.  Whether that was
15   right or wrong, I -- I have no opinion on.
16   BY MR. BRAY:
17        Q    And you agree generally that Chewy Vuiton is a
18   parody product?
19             MR. LARKIN:  That's been asked and answered too,
20   but --
21             THE WITNESS:  I don't know whether it's a parody
22   product or not.  I know it's a product that mimics Louis
23   Vuiton, and the question is does it mimic it enough to
24   create a likelihood of confusion as to source,
25   sponsorship, or affiliation.  And if it does, then --

Gerald L. Ford - August 19, 2015                    123

```
1        then the parody defense dies, and so I think parody is

2        gone.  So --

3                    MR. BRAY:  Let's go to lunch.

4                    THE WITNESS:  Okay.

5                    MR. LARKIN:  Do you want to reconvene about

6        1:30?

7                    MR. BRAY:  Yeah.  I think that's good.

8                    (Lunch recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          Huntington Beach, California; Wednesday, August 19, 2015
 2                          1:42 p.m.
 3
 4                     EXAMINATION (RESUMED)
 5     BY MR. BRAY:
 6          Q    Your counsel indicated that over the lunch hour
 7     you recalled a parody case that you had worked on in the
 8     last four years.
 9          A    A case you probably are familiar with.  The
10     North Face versus the North Butt --
11          Q    North Face --
12          A    -- or South Butt.
13               Are you familiar with the case?
14          Q    I'm not.
15          A    We -- both likelihood of confusion and
16     likelihood to dilution.  We settled with the kid and
17     paid him some money, and he turned around six months
18     later and came out with a new -- what was it -- it was
19     some sort of play on those same words.
20               MR. LARKIN:  Excuse me.
21     BY MR. BRAY:
22          Q    Did North Face sue him again?
23          A    I'm sorry?
24          Q    Did North Face sue him again?
25          A    Uh-huh.  This time we didn't pay him any money.
```

1        Q    Were you involved in the second case?

2        A    We are -- yes.

3        Q    Did you do surveys in the second case?

4        A    Yes.

5        Q    Likelihood of confusion and likelihood of

6    dilution?

7        A    Correct.

8        Q    And was the dilution likelihood of dilution by

9    blurring?

10       A    Yes.

11       Q    And when, approximately, did you work on the

12   North Face versus South Butt cases?

13       A    In 2010.

14       Q    And in what court were they in?

15       A    A court in St. Louis, federal court.

16       Q    So is that Eastern District of Missouri,

17   probably?

18       A    I think so.

19       Q    Did it get to a preliminary injunction hearing,

20   or was a preliminary injunction motion filed?

21       A    There was, and I don't know whether it issued

22   or not or the kid in the beginning folded.  The second

23   time we got an injunction.

24       Q    Did you testify at an injunction hearing?

25       A    No.

1          Q     And you didn't testify in either case at any

2     kind of hearing; correct?

3          A     That's correct.  And most courts -- you know,

4     like in New York, it's pretty typical to have live

5     testimony, either in PI cases --

6          Q     Sure.

7          A     -- like -- and I don't know what it's like in

8     Phoenix, but in the Central District of California,

9     there's actually a rule that says you can't have live

10    witnesses.

11         Q     State court in Phoenix, you get a half day

12    pretty quickly.  In federal court you get typically more

13    like a day, spread over a couple of days, and it takes

14    longer --

15         A     Okay.

16         Q     -- in my experience.

17               What was the name of the parody -- the parody

18    product was South Butt?

19         A     That's my recollection.

20         Q     And what was it?

21         A     It -- it was South Butt.

22         Q     But what was --

23               MR. LARKIN:  What was the product?

24    BY MR. BRAY:

25         Q     Was there a product associated with it?

Gerald L. Ford - August 19, 2015                    127

```
 1        A    Yes.  It was -- they were T-shirts and jackets
 2     that had a little symbol that was similar to The North
 3     Face symbol, if you know what their kind of half dome
 4     symbol looks like, and their name was -- the way they
 5     did their name, it was stacked.  So it had the same
 6     appearance.
 7        Q    And what did your likelihood of confusion
 8     survey find?
 9        A    It found likelihood of confusion.
10        Q    Do you recall the cohort of confused
11     respondents, approximately?
12        A    Not off the top of my head, but we looked at it
13     at lunch.
14        Q    And what was it?
15        A    29 percent in the test cell and one percent in
16     the control cell.
17        Q    In our case, the VIP case, the greatest
18     percentage -- there was a greater percentage of
19     respondents that indicated that the Bad Spaniels toy was
20     somehow affiliated or authorized by Jack Daniel's as
21     opposed to put out by Jack Daniel's; correct?
22        A    That's my recollection.
23        Q    In the South Butt case, was that also the case
24     in the survey?
25        A    I didn't look at the tables.
```

1      Q    In cases -- to the extent that you can
2  generalize, is it typical in cases involving non-parody
3  products that there is a higher number of respondents
4  that answer affirmatively that the infringing product is
5  actually put out by the trademark holder as opposed to
6  affiliated or sponsored by?
7      A    You know, I think it depends upon the mark and
8  the circumstances.
9           What comes to mind is we did a -- a case for
10  Conde' Nast, and they were suing a -- they were suing a
11  magazine called Channel that was in plain blue letters,
12  block letters, and it looked remarkably like Chanel.
13  And we got very little -- and because it was a fashion
14  magazine, we got very little Chanel to the source
15  question but a lot of Chanel to the authorization and
16  over the business affiliation.  So I think it depends.
17      Q    You indicate that the control group respondent
18  was one percent in the South Butt case?
19      A    That's -- that's what -- what Matt's cell phone
20  said.
21      Q    Okay.  Is it typical -- and in this case, the
22  control group response was one percent or less; correct?
23      A    I think so.
24      Q    In fact, I think it was just one respondent out
25  of 217; is that correct?

Gerald L. Ford - August 19, 2015                     129

```
 1        A    Something like that.
 2        Q    In the typical -- well, to the extent that you
 3   can generalize, is it unusual in the surveys that you
 4   have conducted to have the control come in at less than
 5   two percent?
 6        A    I don't think you could generalize.
 7        Q    Oftentimes, does the control come in higher
 8   than one percent?
 9        A    Oftentimes it does.  Oftentimes it doesn't come
10   in at all.
11        Q    You weren't asked -- you don't have any opinion
12   as to whether or not any element of Jack Daniel's trade
13   dress has acquired distinctiveness, correct, either
14   alone or in combination?
15        A    Well, I think if you look in combination, and
16   you take guidance from, let's say, the Eveready --
17   Union Carbide versus Eveready case, and you look at
18   the percentage numbers, I think you could -- you can say
19   that those would support a finding of secondary meaning
20   for the trade dress as tested.
21        Q    So it's your opinion that there might be some
22   authority in the case law, but it's not -- it's not an
23   opinion that you gave in your report; correct?
24        A    No, it is --
25        Q    It is not an opinion that you anticipate
```

Gerald L. Ford - August 19, 2015                    130

 1        testifying to at trial; correct?

 2            A    Not unless asked.

 3            Q    Okay.  And you were not asked in -- when you

 4        conducted -- when Jack Daniel's or its counsel

 5        commissioned you as an expert, they did not ask you to

 6        opine as to whether any element of the Jack Daniel's

 7        trade dress had acquired distinctiveness; correct?

 8            A    No.  We never tested any particular element.

 9        We tested the overall trade dress.

10            Q    And when you tested the overall trade dress,

11        you weren't testing it for acquired distinctiveness?

12        You were testing likelihood of confusion; correct?

13            A    Absolutely.

14            Q    Have you ever conducted a survey in order to

15        test acquired distinctiveness of one or more elements of

16        the trade dress?

17            A    Probably that would be true to all of the

18        Adidas cases.

19            Q    Okay.

20            A    There were a variety of trade dress elements

21        both in the shoe shape as well as in the stripes

22        coming -- downward stripes from the laces to the sole.

23            Q    And generally speaking, a survey that would

24        test acquired distinctiveness would ask different

25        questions than a survey you would use to test likelihood

Gerald L. Ford - August 19, 2015                 131

1        of confusion; correct?

2                MR. LARKIN:  Asked and answered.

3                THE WITNESS:  You would generally ask an

4        association question.

5        BY MR. BRAY:

6            Q    Do you acknowledge -- well, Professor McCarthy,

7        in his treatise, writes, quote, parody is a recognized

8        form of free speech protected by the First Amendment,

9        end quote.

10               Do you agree with that?

11               MR. LARKIN:  That calls for a legal conclusion.

12               THE WITNESS:  I agree he says that, but he makes

13       exceptions to that when he says it's not covered when

14       there's likelihood of confusion.

15       BY MR. BRAY:

16           Q    Do you agree with the general principle that

17       parody is a recognized form of free speech --

18               MR. LARKIN:  Same objection.

19       BY MR. BRAY:

20           Q    -- protected by the First Amendment?

21               MR. LARKIN:  Sorry.  Same objection.

22               THE WITNESS:  I have read that.  I'm not a

23       lawyer, so I -- you're asking me really legal questions

24       now.

25       BY MR. BRAY:

1        Q    Well, it's -- I know you're not a lawyer.

2        A    Okay.  I'm glad you do.

3        Q    Obviously you read a lot of the cases.

4        A    Hopefully I read a lot.

5        Q    You are as infused with knowledge of trademark

6    law, I imagine, as many lawyers out there, including

7    practitioners in trademark law, and interestingly -- I

8    mean one of the opinions that you're giving is on

9    likelihood of confusion, which is ultimately the

10   question the fact finder is going to determine.  I know

11   that likelihood of confusion goes towards the actual

12   confusion component.

13       A    Right.  And I think if you look at my

14   declaration, you'll see that my declaration says that

15   the survey results would support a finding.  So I'm not

16   making -- I'm not being the fact finder.

17       Q    Okay.

18       A    The survey results would -- we can find that in

19   the declaration, if you want, but we're pretty careful

20   in our language to say that survey results either do --

21   would support or do not support a finding of secondary

22   meaning, likelihood of confusion, genericness, whatever

23   it may be --

24       Q    Sure.

25       A    -- so that we don't sound like we're the fact

Gerald L. Ford - August 19, 2015                    133

```
 1          finders, because we're not.
 2               Q    You -- and that's true in this case, that --
 3               A    Right.  It's a multifactor test.
 4                    I assume that the judge in Phoenix is going to
 5          apply the Slickcraft/Sleekcraft factors.
 6               Q    Have you heard parodies -- well, did some of
 7          the respondents in the Bad Spaniels survey that you
 8          conducted refer to it as a spoof product?
 9               A    I wouldn't disagree.
10               Q    Is that another way of saying a parody product,
11          it spoofs a well-known brand?
12                    MR. LARKIN:  Objection.  Calls for speculation
13          about what a respondent meant by the word.
14          BY MR. BRAY:
15               Q    I'm not asking what a respondent meant.  I mean
16          for purposes of our discussion, would you agree that Bad
17          Spaniels is a spoof product?
18               A    I agree that there are some people that gave
19          that answer, but we didn't count those people as
20          confused unless they gave Jack Daniel's to one of the
21          other questions.
22               Q    Okay.  McCarthy says, quote, some parodies will
23          constitute an infringement, and some will not, end
24          quote.
25                    Do you agree with that?
```

Gerald L. Ford - August 19, 2015                    134

```
 1            MR. LARKIN:  Again, calls for a legal
 2    conclusion.
 3            If you have an understanding or opinion, go
 4    ahead.
 5            THE WITNESS:  I recall he said something like
 6    that with the caveat that -- that all hands on deck are
 7    washed away if -- if the imitation creates a likelihood
 8    of confusion as a source, sponsorship, or affiliation.
 9    BY MR. BRAY:
10        Q    Again, just so the record is clear, do you
11    agree as a general matter with Professor McCarthy that
12    some parodies will constitute an infringement and some
13    will not?
14        A    I generally agree with that, but with the
15    caveat of depending upon whether there's a likelihood of
16    confusion or not.
17        Q    Do you agree that -- well, Professor
18    McCarthy -- this was kind of the same way.  Just a
19    different way to say the same thing, but --
20        A    Do you want to show me Professor McCarthy --
21        Q    I will in a minute.  I'm happy to let you look.
22    Let me just get like two questions out.
23        A    Okay.
24        Q    Do you agree -- let me state it.  Professor
25    McCarthy states in his treatise, quote, there are
```

**Coash & Coash, Inc.**
602-258-1440        www.coashandcoash.com

Gerald L. Ford - August 19, 2015                    135

1       confusing parodies and non-confusing parodies, end
2       quote.
3              Do you agree with that?
4       A    I'm not exactly sure what he's getting at, but
5       if he's talking about parodies that are likely to cause
6       confusion as to source, sponsorship, or affiliation and
7       parodies -- and parodies or imitations that are not
8       likely to cause confusion as to source, sponsorship, or
9       affiliation, I agree that they're -- that both -- both
10      of those can exist.
11      Q    Referring to confusing and non-confusing
12      parodies, Professor McCarthy then writes, quote, all
13      they have in common is an attempt at humor through the
14      use of someone else's trademark, end quote.
15             Do you agree that both confusing and
16      non-confusing parodies have in common an attempt at
17      humor through the use of someone else's trademark?
18      A    No.
19      Q    Why not?
20      A    Because you can have a situation where you're
21      poking fun at yourself, not someone else.  So I think
22      you're reading him very narrowly.
23      Q    Can you read back his last answer, please?
24             (The record was read as follows:
25                "A    Because you can have a

Gerald L. Ford - August 19, 2015                    136

```
 1              situation where you're poking fun
 2              at yourself, not someone else.  So
 3              I think you're reading him very
 4              narrowly.")
 5   BY MR. BRAY:
 6        Q    So is what you're saying that a definition of a
 7   parody is broader than what Professor McCarthy --
 8        A    I think it can encompass poking fun at
 9   yourself, which sometimes companies do.
10        Q    Can you give me a real world example?
11        A    Not off the top of my head, no.
12        Q    Do you agree that a parody by definition must
13   take -- strike that.
14              Do you agree that a parody by definition must
15   at least take enough of the original to conjure it up?
16              MR. LARKIN:  Objection to form.  It calls for a
17   legal conclusion and --
18              THE WITNESS:  Conjure up --
19              MR. LARKIN:  -- it's asked and answered, but --
20   BY MR. BRAY:
21        Q    The trademark -- the trademark holder it's
22   referring to.
23        A    You know, I don't know an answer to that
24   question.  I know that if you take too much, it's going
25   to cause a likelihood of confusion, and then the parody
```

1    defense dies.

2        Q    The Second Circuit has written, quote, a parody

3    must contain two -- strike that.

4            The Second Circuit has held, quote, a parody

5    must convey two simultaneous and contradictory messages,

6    that it is the original, but also that it is not the

7    original and is instead a parody, end quote.

8        A    What's the case?

9        Q    Cliff's Notes, Inc., versus Bantam Doubleday

10   Publishing Group.

11       A    I remember that case.

12       Q    Do you agree that a parody has to convey two

13   simultaneous and contradictory messages?

14           MR. LARKIN:  It calls for a legal conclusion.

15           Go ahead.

16           THE WITNESS:  You know, I don't know whether it

17   has to have those two contradictory messages.

18   BY MR. BRAY:

19       Q    Would you agree with me that if the product

20   that is attempting to be a parody does not conjure up

21   the product or the mark that it's parodying, then it's

22   not a parody?

23       A    No.  I would just agree with you that it's

24   probably not likely to cause confusion as to source,

25   sponsorship, or affiliation.

Gerald L. Ford - August 19, 2015                    138

1        Q     That wasn't my question.  My question is if it

2    doesn't conjure up the product or the mark that it's

3    parroting, then, by definition, it's not a parody;

4    correct?

5             MR. LARKIN:  Well, you're asking him all these

6    legal questions.  He's not a lawyer.  I don't even think

7    they pertain to his opinions in this case.  I think it's

8    irrelevant, but you're now asking him to tell you whether

9    he agrees with what courts have said or what he thinks

10   the law is.

11            THE WITNESS:  And I don't think anywhere in my

12   declaration I use the word parody.

13   BY MR. BRAY:

14       Q     The Fifth Circuit has held that, quote, a

15   parody should be treated differently, end quote,

16   referring to the trademark context.

17            For purposes of your survey, you did not do

18   anything different in this case to account for the fact

19   that the alleged infringing product is a parody product;

20   correct?

21       A     I'd have to look at the Fifth Circuit decision.

22            MR. LARKIN:  That wasn't his question.  Just --

23            THE WITNESS:  It just seems to me it's unfair to

24   ask me about a Fifth Circuit statement and not show me

25   the decision.

```
 1              MR. LARKIN:  I don't think he was asking you
 2      about the decision, but --
 3      BY MR. BRAY:
 4          Q    The case I was quoting was Lyons Partnership
 5      versus Giannoulas.  It had to do with Barney, but that
 6      wasn't my question.  Counsel is correct.
 7          A    Okay.  I'm sorry if I wasn't listening.
 8          Q    In terms of your survey methodology and
 9      questions, you do not do anything differently in this
10      case that involves an alleged parody product than you
11      would do in any other trademark infringement likelihood
12      of confusion survey; correct?
13          A    Nor should you.
14          Q    In your expert opinion, there should be no -- a
15      parody product should not be treated any differently in
16      terms of survey questions or survey methodology than any
17      other product?
18          A    As I said before lunch, you need to take the
19      word parody out of your questioning.  It is -- what the
20      issue is is their likelihood of confusion when you're
21      exposed to the junior user's products bearing the
22      alleged infringing mark, and you are confused or
23      deceived as to the source, sponsorship, or affiliation
24      of that product.
25          Q    Sure.  And, again, getting back to my question,
```

1      you did not do anything different in conducting your

2      survey or adopting a survey methodology in this case

3      that involved a parody product than you would do in any

4      other -- in any kind of garden variety trademark

5      infringement likelihood of confusion survey that doesn't

6      involve a parody; correct?

7              MR. LARKIN:  Objection to form.

8              You can answer.

9              THE WITNESS:  This is a likelihood of confusion

10     survey, and it doesn't matter whether it's parody or not.

11     BY MR. BRAY:

12         Q    Okay.  So, again, you didn't do anything

13     different in terms of your survey methodology in this

14     case that involves a parody than you would have done for

15     a non-parody case; correct?

16         A    That's correct.

17         Q    Thank you.  So for your methodology, you don't

18     treat parodies any different than any other product;

19     correct?

20         A    It's still a question of likelihood of

21     confusion.

22         Q    So the answer is you don't treat the --

23         A    No.  It shouldn't be treated any different.

24              And I thought you were going to show me

25     McCarthy.

Gerald L. Ford - August 19, 2015                    141

```
 1              MR. LARKIN:  No.
 2     BY MR. BRAY:
 3         Q   You can look at it.  Dr. Ford, I don't have a
 4     question about McCarthy right now, but I want to be fair
 5     to you, and I know you do want to look at that.  So you
 6     can spend some time looking at it, but I don't want to
 7     waste a lot of time.
 8         A   I don't want to waste your time either.
 9         Q   So if there's something particular --
10         A   I know your wife is not well, and I know you
11     want to go home, so --
12         Q   And you're perfectly welcome to look at it at
13     the next break.  I don't want to dissuade you --
14         A   No.
15         Q   -- if you think it's relevant to any prior
16     answer.
17              MR. LARKIN:  That's fine.
18     BY MR. BRAY:
19         Q   Okay.  Explain to me as an expert -- well,
20     would you say that you're an expert in trademark
21     surveys -- or strike that.
22              Would you say you're an expert in likelihood of
23     confusion surveys used in trademark litigation?
24         A   Sounds like I'm blowing my own horn, but I
25     would say that I believe I have expertise in that area,
```

**Coash & Coash, Inc.**
602-258-1440        www.coashandcoash.com

Gerald L. Ford - August 19, 2015                    142

1    and the courts have recognized that, and they have

2    relied on my surveys in the past.

3        Q    Okay.  At a 20,000 foot level, explain to me

4    the importance of a control in a trademark -- in the

5    trademark survey likelihood of confusion context.

6        A    Okay.  Well, it's kind of a more modern

7    concept.  You know, we went for about 25 years where we

8    didn't do controls.  We relied on the why do you say

9    that question as the basis for determining why there was

10   a likelihood of confusion.  It's only maybe in the last

11   ten years that surveys have become -- and I'll use the

12   word -- more sophisticated, where they include a test

13   cell and a control cell.

14        Have we done surveys without control cells that

15   the courts have relied on in the last ten years?  The

16   one that pops to mind is the Nissan computer case in

17   front of Judge Pregerson in the Central District that

18   had no control.  He relied on the survey.

19        So are they absolutely necessary?  The answer

20   is no.

21        Q    Is state of the art today in your business to

22   have a control?

23        A    I think it is traditional.

24        Q    Okay.  What's the purpose of having a control?

25        A    The purpose of having a control is to -- much

Gerald L. Ford - August 19, 2015                    143

1       like a placebo is to eliminate the active ingredients

2       that are in the test cell so that you're controlling for

3       only the claimed elements.

4               MR. BRAY:  Can I have your copy of the answer,

5       because I wrote on mine.

6               MR. LARKIN:  Yeah.

7               MR. BRAY:  I'm going to mark this as Exhibit 63.

8               (Plaintiff's Exhibit 63 was marked

9               for identification.)

10              THE WITNESS:  Thank you.

11      BY MR. BRAY:

12          Q    Can you explain to me, before I ask you about

13      Exhibit 63 --

14          A    Sure.

15          Q    -- the concept of noise in a trademark survey?

16          A    It's kind of a term of art, but it is generally

17      mismeasurement air.  It's when you allow -- the way I

18      would explain it is when you allow the control to

19      include elements that you're testing that you

20      potentially could have noise in your control results.

21      In other words, it's not true non-confusion.  It's kind

22      of confusion created by an improper control.

23          Q    I'm going to have you look at Exhibit 62, which

24      is the --

25          A    I'm looking at it.

Gerald L. Ford - August 19, 2015                    144

```
 1          Q    No.  That's 63.

 2          A    Oh, it's 63.

 3          Q    62 is the chapter.

 4          A    Oh, I remember.  Yeah.

 5          Q    The book chapter.

 6          A    Swann and Diamond.

 7          Q    If you look on GLF 00018, it's the bottom

 8     right, or page 312, which is top left, whatever is

 9     easier.

10          A    So GLF --

11          Q    18.

12               MR. LARKIN:  018.

13               THE WITNESS:  Oh.

14               MR. LARKIN:  One more back.  Sorry.  I didn't

15     get that.

16               THE WITNESS:  Okay.

17     BY MR. BRAY:

18          Q    I'm going to ask you about some statements that

19     Swann and Diamond make in the last full paragraph on

20     page 18, GLF 18, of Exhibit 62.  You were there.

21               MR. LARKIN:  Yeah.  No.

22               THE WITNESS:  Yeah.

23               MR. LARKIN:  Yeah.

24               THE WITNESS:  Swann and Diamond didn't write

25     this.
```

Gerald L. Ford - August 19, 2015                    145

```
 1     BY MR. BRAY:
 2         Q    Oh, edited by Swann and Diamond.  I'm sorry.
 3     Thank you.  Who wrote this chapter?
 4         A    I did.
 5         Q    You wrote this chapter?
 6         A    Yes.
 7         Q    Awesome.  Oh, I see that now.  Okay.  You
 8     wrote, "One of the notable changes in the evolving
 9     nature and characteristics of the design of surveys to
10     address Lanham Act has been the use, when necessary, of
11     control cells."
12              Do you see that?
13         A    I do.  I'm sorry.  I was in the paragraph above
14     that.
15         Q    Okay.  Let me rephrase just so that --
16         A    Yeah.  I found it.
17         Q    Okay.  Do you agree with that today, sitting
18     here in this deposition?
19         A    Yeah.  I don't disagree with that.
20         Q    Okay.
21         A    I think as long as you read it as "when
22     necessary."
23         Q    Yeah.  My question is what do you mean by when
24     necessary?  When is a control not necessary?
25         A    That's a good question.  Let's suppose you did
```

Gerald L. Ford - August 19, 2015                    146

1    a likelihood of confusion survey, and you got one

2    percent likelihood of confusion.  Then I don't think the

3    control would be necessary because you're not really

4    controlling for anything at that point.

5         Q    Was a control necessary in this case, the

6    VIP/Jack Daniel's case?

7         A    Well, I suspect if you got no likelihood of

8    confusion, we probably wouldn't have executed the

9    control, so --

10        Q    So a short answer is in your expert opinion, a

11   control was necessary in this case?

12        A    In this case, I thought it was appropriate.

13        Q    All right.  In this chapter that you wrote of

14   Exhibit 62, you went on to say that the control cells

15   are designed to, quote, account for such things as

16   market share, popularity, preexisting beliefs,

17   et cetera -- factors oftentimes referred to as noise or

18   mismeasurement error.

19             Is that still your belief today?

20        A    Yes.  You read correctly.

21        Q    And is it your expert opinion, Dr. Ford, that

22   a -- some of the noise that you might get in a survey

23   can arise from preexisting beliefs?

24        A    It's probably more common in false advertising

25   cases than it is in trademark cases, but you would --

Gerald L. Ford - August 19, 2015                    147

1        you would want to eliminate from the control all the
2        elements that you're trying to test for in the test
3        cell.
4             Q    Well, the noise that you talk about eliminating
5        through a control isn't all regarding controlling for
6        the claimed elements, but in certain cases, anyway,
7        control cells could be used to account for such things
8        as market share; correct?  That's what you wrote in the
9        treatise.
10            A    Yes.
11            Q    And in certain cases, the control could be used
12       to account for preexisting beliefs; correct?
13            A    In certain cases, that's correct.
14            Q    And that's what you wrote in this treatise;
15       correct?
16            A    Yes.
17            Q    And in certain cases, the control could be used
18       to account for popularity; correct?
19            A    Which is maybe another way of saying market
20       share.
21            Q    Okay.
22            A    If I showed you a pair of athletic shoes and
23       asked you who put them out, it doesn't matter whether
24       they have a swoosh on them or not.  You're liable to get
25       some level of Nike because it's -- has such a high

Gerald L. Ford - August 19, 2015                          148

 1        market share.  It's so popular.  So you would want a

 2        control for that by showing another pair of athletic

 3        shoes that didn't have any of the claimed trademark or

 4        trade dress ingredients.

 5             Q     And you referred to the factors oftentimes

 6        referred to as noise or, quote, unquote, mismeasurement

 7        error.  Are those synonymous concepts, noise and

 8        mismeasurement?

 9             A     I think they are.  I mean I don't really know

10        what noise is.  I think we use both words because I

11        think it communicates better to a fact finder what the

12        control is intended to do.

13                  This whole concept of noise is kind of a term

14        of art -- term of survey art that I would expect most

15        federal judges wouldn't understand what the heck noise

16        is.  They think it's somebody coughing in their

17        courtroom or clearing their throat.

18             Q     Or cell phones going off, which really upsets

19        them.

20             A     Oh, it makes them cranky.

21             Q     The only people I see judges forgive are jury

22        members.

23             A     Are what?

24             Q     Jurors.

25                  MR. LARKIN:  Jurors.

Gerald L. Ford - August 19, 2015                    149

1          BY MR. BRAY:
2              Q    They get one or two free passes before they
3          really get --
4                  MR. LARKIN:  Lawyers don't.
5          BY MR. BRAY:
6              Q    Lawyers don't get a free pass.
7              A    I had that happen one time in a federal
8          district court in New Jersey.  They allow lawyers to
9          bring in cell phones, but not witnesses, but I was
10         dressed in my finest suit, and I probably looked like a
11         lawyer.  And the -- the poor guy at security, I think,
12         decided I was a lawyer.
13                 And I -- and so in my litigation bag that you
14         have, I -- I had my cell phone, and the damn thing went
15         off.  And so I just kind of pushed it away from me.  I
16         was just like, "I don't know whose bag that is," and it
17         continued to ring.
18             Q    I won't give you the analogy I'm thinking of.
19                 Okay.  You next say in the -- in the chapter
20         that you wrote in Exhibit 62, "Thus, such experimental
21         designs, i.e., with a test cell and an appropriate
22         control cell" --
23             A    I'm sorry.
24                 THE WITNESS:  Chris, thank you.
25                 MR. LARKIN:  Yeah.  He's reading from the bottom

Gerald L. Ford - August 19, 2015                      150

```
1        there.
2        BY MR. BRAY:
3            Q    -- "are likely to result in an estimate net of
4        noise."
5                 Do you see that?
6            A    Yes.
7            Q    So in this case -- well, I don't want to talk
8        about this case.
9                 The North Face case that you gave as an
10       example, there was one percent in the control and 29
11       percent or so in the test group?
12           A    That's correct.
13           Q    The net of noise was the difference -- the
14       delta between the two?
15           A    Correct.
16           Q    Okay.  The net effect of using a control cell
17       to eliminate noise typically is to reduce the percentage
18       of respondents that you would say were confused by the
19       two products?
20                MR. LARKIN:  Objection to --
21       BY MR. BRAY:
22           Q    I probably asked that --
23           A    Probably that's the wrong way to ask it, but
24       it's a way to -- it's a means upon which you can reduce
25       the percentage of people that express confusion and
```

Gerald L. Ford - August 19, 2015                    151

```
 1      remove from those -- that portion of the mark to remove
 2      that portion of the population that is confused for
 3      reasons that don't have anything to do with the
 4      trademarks at issue.
 5           Q    And, again, one of those --
 6                MR. BRAY:  Can you read back his answer, please?
 7                (The record was read as follows:
 8                    "A    Probably that's the wrong
 9                way to ask it, but it's a way to -- it's
10                a means upon which you can reduce the
11                percentage of people that express
12                confusion and remove from those -- that
13                portion of the mark to remove that
14                portion of the population that is
15                confused for reasons that don't have
16                anything to do with the trademarks at
17                issue.")
18      BY MR. BRAY:
19           Q    And the reasons that don't have anything to do
20      with the trademark at issue are what constitute the
21      noise; correct?
22           A    Right.  Market share of popularity, preexisting
23      beliefs.
24                We're keeping you up?
25           Q    It's my afternoon lull.  Big lunch.
```

Gerald L. Ford - August 19, 2015                    152

1        A    I want to see your highlighter.  It's kind of
2    buried here, so I'll --
3        Q    Because you in your -- in this case, the -- the
4    test cell had approximately a 29 percent response rate
5    that you associate with confusion, because that number
6    was in that range, it's your opinion that it would be
7    necessary to have a control cell to test for noise or
8    mismeasurement errors?
9        A    It would be our general practice, yes.
10        Q    In fact, it would be state-of-the-art best
11    practice for trademark survey experts, correct, to use a
12    control cell?
13        A    Well, I gave you an example of where it
14    wouldn't matter.
15        Q    Sure.  What I'm asking is in this case, with 29
16    percent.
17        A    In this case, with 29 percent, I guess you --
18    in fact, I shouldn't say I guess.  I know you'd want to
19    be assured that that confusion is attributable to the
20    combination of elements that are claimed to be
21    infringed.
22        Q    And you have not -- you don't have any opinion
23    in this case as to whether any of the elements of Jack
24    Daniel's trade dress at issue or claimed by Jack
25    Daniel's in this case have acquired secondary meaning;

1        correct?

2                    MR. LARKIN:  Asked and answered at least twice.

3                    Go ahead.

4                    THE WITNESS:  Maybe three times.

5                    I didn't check -- I didn't test for any

6        particular element.  I tested for a combination of

7        elements that are identified in the answer and

8        counterclaim, I think, on page 6.

9                    Bless you.

10                   MR. LARKIN:  Thank you.

11                   THE WITNESS:  Exhibit 63.

12       BY MR. BRAY:

13           Q    Okay.  Let's turn to that.  You said the

14       purpose of the control cell is to control for only the

15       claimed elements?

16           A    Correct.

17           Q    As well as to eliminate noise or mismeasurement

18       as to market share, popularity, preexisting beliefs;

19       correct?

20           A    Correct.

21           Q    And so what elements did you control for?

22           A    I direct you to page 5 of the answer and

23       counterclaims in paragraph 6.

24           Q    Okay.  So you controlled for a square bottle?

25           A    Correct.

Gerald L. Ford - August 19, 2015                    154

1        Q    Ribbed neck?

2        A    Yes.

3        Q    Black cap?

4        A    Yes.

5        Q    Black neck closure?

6        A    Oh, it says black neck wrap closure.

7        Q    I'm sorry.  Black --

8        A    That's okay.

9        Q    Black neck wrap closure with white --

10       A    Not easy to say.

11       Q    -- with white printing bearing the Old No. 7

12   mark?

13       A    Correct.

14       Q    A black front label with white printing and

15   filagreed border bearing the Jack Daniel's mark depicted

16   in arch lettering at the top of the label?

17       A    You're reading correctly.

18       Q    The Old No. 7 mark contained within a filagreed

19   oval design in the middle portion of the label beneath

20   the Jack Daniel's mark?

21       A    It's not very clear in this -- in this

22   photocopy, but, yes.

23       Q    And the words Tennessee Sour Mash Whiskey in

24   the lower portion of the label with the word "Tennessee"

25   depicted in script.

Gerald L. Ford - August 19, 2015                    155

1               Do you see that?
2        A      I do.
3        Q      Let's talk about some of these elements.  To
4    your knowledge, does Jack Daniel's have any exclusive
5    rights to the words Tennessee Sour Mash Whiskey?
6               MR. LARKIN:  Objection to form.  Calls for a
7    legal conclusion.
8               You can answer.
9               THE WITNESS:  Well, I think they have exclusive
10   rights to Jack Daniel's Tennessee whiskey --
11   BY MR. BRAY:
12       Q      Was one of the --
13       A      -- maybe not to Tennessee whiskey.
14       Q      Okay.  And does the Bad Spaniel toy use the
15   words Tennessee Sour Mash Whiskey --
16       A      Can you turn it around so I can see it?
17       Q      -- anywhere on the product?
18       A      I don't believe so.
19       Q      Does the Bad Spaniels toy use the words Old
20   No. 7 anywhere on the product?
21       A      No.  It uses Old No. 2.
22       Q      Are you aware of other -- another competing
23   whiskey and bourbon product made by George Dickel that
24   uses the words Old No. 8?
25       A      I'm not.

Gerald L. Ford - August 19, 2015                    156

1       Q    Would that influence you one way or the another
2   as to whether it was appropriate or not to take out Old
3   No. 2 as part of the control?
4       A    No.  It wouldn't one way or another, because
5   you're looking at the combination of elements.
6            What you're starting to do now is, I think, a
7   violation of -- of -- the whole concept of trademark law
8   is you can't dissect trademarks into little pieces, not
9   when the trademark is claimed as it is as a combination
10  of elements.
11      Q    Well, what Jack Daniel's is claiming is a trade
12  dress is a combination of elements; correct?
13      A    Well, the trade -- there's no -- I think, as
14  Professor McCarthy aptly states, that the concept of
15  trade dress and trademarks is probably historic and not
16  modern and that there really is no difference, because a
17  trade dress is a trademark.
18      Q    At any time in the litigation, have you
19  reviewed the report prepared by Stephen Sacra of VIP
20  where based on publicly available sources, he analyzed
21  which competing whiskey and bourbon products incorporate
22  various elements of what Jack Daniel's claims to be a
23  trade dress in this case?
24           MR. LARKIN:  Objection to the form.
25           You can answer as to whether you've seen that

1     document or not.

2              THE WITNESS:  I've seen a rough draft of his

3     declaration where I think he has a diagram of examples.

4     BY MR. BRAY:

5         Q    I'm just refreshing my recollection what

6     exhibit number it is Kristi E-mailed.

7         A    I didn't realize lawyers had to refresh their

8     recollection.

9              MR. LARKIN:  Are you going to mark his report?

10             MR. BRAY:  Yeah.

11             MR. LARKIN:  I think it's either 53 or 58.

12             MR. BRAY:  Mark this as Exhibit 53, please.

13             (Plaintiff's Exhibit 53 was marked

14             for identification.)

15             THE WITNESS:  Thank you.

16    BY MR. BRAY:

17        Q    I've handed you what's been marked as

18    Exhibit 53.  Have you reviewed this document before?

19        A    I'm not sure I've seen this document before.

20        Q    Okay.

21        A    Can we look?  You have my declaration in front

22    of you.

23        Q    You have it in front of you too.

24        A    Okay.

25        Q    It's Exhibit 61.

1        A    Oh, there.  Okay.  Got it.  So it's not listed

2    as material that's reviewed, so I have not.

3        Q    Okay.  You've read the answer and counterclaim

4    that Jack Daniel's filed in this case?

5        A    Correct.  That's what Matt made a copy for you.

6        Q    Sure.  And is it your understanding that Jack

7    Daniel's, among other things, is alleging that VIP is

8    infringing its Jack Daniel's trademark?

9        A    Well, it's a combination of elements, I think,

10   and that's why I sent you to paragraph 6 on page 5.

11       Q    Do you understand that the Jack Daniel's

12   trademark is one of the -- if you need to look at page 8

13   of the complaint --

14            MR. LARKIN:  Get to it.

15   BY MR. BRAY:

16       Q    -- that the Jack Daniel's trademark is one of

17   the trademarks that Jack Daniel's Property, Inc.,

18   alleges is infringed by VIP's Bad Spaniel toy?

19       A    I do.

20       Q    In your control group, you used Bad Spaniels on

21   the control; correct?

22       A    Correct, but not in an arched form like Jack

23   Daniel's is displayed here on page 8.

24            MR. LARKIN:  Sorry.

25

Gerald L. Ford - August 19, 2015                    159

1    BY MR. BRAY:

2        Q    Did the results of your -- in your expert

3    opinion, did the results of your control survey

4    demonstrate to you that there's no likelihood of

5    confusion between Jack Daniel's -- the Jack Daniel's

6    mark and the Bad Spaniels mark?

7            MR. LARKIN:  Objection as to form.

8            THE WITNESS:  It's my understanding that Jack

9    Daniel's is not objecting to Bad Spaniels as a mark.

10   They're objecting to the depiction of Bad Spaniels in

11   arch lettering that's reminiscent of Jack Daniel's.

12   BY MR. BRAY:

13       Q    Do you know whether or not other American

14   whiskey and bourbon products used arch lettering for

15   their products?

16       A    There may be.

17       Q    And you have no knowledge that, you know, apart

18   from the name Jack Daniel's, that Jack Daniel's has

19   exclusive rights in arch lettering for use on a label of

20   a whiskey and bourbon product for the primary purpose --

21           MR. LARKIN:  Objection to form.  Calls for a

22   legal conclusion.

23           You can answer.

24           THE WITNESS:  No.  I -- they're not claiming

25   just a single element.  They're claiming a combination of

1    elements, and one of those is Jack -- is Jack Daniel's in

2    arch lettering or Bad Spaniels in arch lettering.

3    BY MR. BRAY:

4         Q    Do the results -- the survey results of the

5    control group cause you in your expert opinion to

6    believe that in the absence of arch lettering on either,

7    that a text only Bad Spaniels mark does not infringe or

8    is not likely to cause confusion with a text only Jack

9    Daniel's mark?

10             MR. LARKIN:  Objection to form.  Incomplete

11   hypothetical.

12             Are you referring to how it appears on the

13   control --

14             MR. BRAY:  Yes.

15             MR. LARKIN:  -- cells?

16             THE WITNESS:  We were not testing for individual

17   elements.  As you know, the control did not use Bad

18   Spaniels in an arched form.

19   BY MR. BRAY:

20        Q    Do you know whether or not the majority of

21   whiskey and bourbon -- Tennessee and Kentucky whiskey

22   and bourbon products in the United States are sold in

23   square bottles?

24        A    I don't.  I also know that to the degree in

25   which they are, they haven't had an effect on the

Gerald L. Ford - August 19, 2015                161

1    marketplace, because if you look at the survey results,

2    you don't see those -- those brands in the survey

3    results.

4        Q    Would you agree with me that the -- the control

5    product looks more like a wine bottle than a whiskey

6    bottle?

7        A    You know, that's kind of an interesting

8    question.   The answer would be no.

9             I did some web searches and found a number of

10   whiskey bottles that were round and had a similar

11   appearance to the control bottle.

12       Q    Would you agree with me that that shape of a

13   control bottle is most -- the shape of a typical wine

14   bottle?

15       A    It's also --

16            MR. LARKIN:  Objection.  Wait.  Objection to

17   form as to use of the word typical.

18            If you understand the question, you can answer.

19            THE WITNESS:  It's also the shape of many

20   typical whiskey bottles.

21   BY MR. BRAY:

22       Q    If you look on page 50 of Exhibit 53, which is

23   Mr. Sacra's report --

24       A    Uh-huh.

25       Q    -- these are American whiskey bourbon products,

Gerald L. Ford - August 19, 2015                    162

1        including Jack Daniel's that are in square bottles.

2               MR. LARKIN:  The document speaks for itself.  Is

3        that a question, or is that a statement?

4        BY MR. BRAY:

5            Q    Why didn't you use a square bottle of a

6        different shape than the Jack Daniel's square bottle as

7        opposed to using a wine bottle shape?

8               MR. LARKIN:  Objection to the characterization

9        of a control stimulus as a wine bottle shape.

10              THE WITNESS:  Right.  I don't think we used a

11       wine bottle shape.  We just didn't use a square shape,

12       because a square shape would bring into the control some

13       of the elements you're testing in the test.

14       BY MR. BRAY:

15           Q    And, again, Jack Daniel's does not own

16       exclusive rights to a square-shaped bottle for American

17       whiskey and bourbon, correct?

18           A    Nor do I say that in my declaration, but,

19       again, we're starting to dissect the trademark.

20           Q    Would you agree with me that Jack Daniel's does

21       not own exclusive rights to a black cap for whiskey

22       bottles?

23              MR. LARKIN:  Objection to form.  Calls for a

24       legal conclusion.

25              Go ahead.

```
 1                THE WITNESS:  By -- unto and by itself, I would
 2       agree with you, but that's not what Jack Daniel's is
 3       claiming, as I understand it.
 4                Can we take a quick break?  I don't want to
 5       break you in the middle of --
 6                MR. BRAY:  Yeah.
 7                (Brief recess.)
 8       BY MR. BRAY:
 9           Q    Ready?
10           A    I'm ready.  Thank you for the break.
11           Q    Oh, you're welcome.  Any time.
12                Take a look at page 10 of your report --
13           A    Sure.
14           Q    -- or your declaration, which is Exhibit 61.
15           A    Got it.
16           Q    Is that a picture of the control?
17           A    It's not in color, but, yes, it's a picture of
18       the control.
19           Q    Your counsel has a copy.  It's not marked, but
20       it's color pictures.
21           A    Oh, that's --
22           Q    It might be easier.  That is a color picture of
23       the control you're looking at now?
24           A    That's correct.  It's under paragraph 21 on
25       page 10 of Exhibit 61.
```

Gerald L. Ford - August 19, 2015                    164

1        Q    I think you -- is it correct, Dr. Ford, that

2     with regard to the control group or the control cell,

3     there was only one respondent out of approximately 217

4     that indicated any affiliation with Jack Daniel's; is

5     that correct?

6        A    I believe you're correct.

7        Q    Okay.  Would that indicate to you that the

8     control sample does not include enough elements of the

9     Jack Daniel's trade dress to conjure up an association

10    in the minds of most consumers with Jack Daniel's?

11             MR. LARKIN:  Objection to form.

12             THE WITNESS:  Well, it conjured -- conjured up

13    Jack Daniel's to one respondent, but you don't want

14    anything in the control cell that's in the test cell.

15    BY MR. BRAY:

16        Q    So you don't want the control cell to --

17    well --

18        A    You don't --

19        Q    Go ahead.  You don't want to include -- is it

20    your testimony as an expert, Dr. Ford, that in this

21    case, you didn't want to include elements in the control

22    cell that might cause respondents to conjure up Jack

23    Daniel's?

24             MR. LARKIN:  Objection to form.

25             THE WITNESS:  No.  I didn't want to have any

Gerald L. Ford - August 19, 2015                    165

1      elements in the control cell which were part of the

2      claimed elements in the test cell -- square bottle, black

3      cap, black neck label.

4      BY MR. BRAY:

5           Q    Is every square bottle infringing on Jack

6      Daniel's trade dress?

7           A    No.  I didn't -- I didn't say that.  It's a

8      combination of those elements.

9           Q    If not every square bottle infringes Jack

10     Daniel's trade dress, why change that in the control?

11          A    Because you -- you're using a square bottle in

12     the test cell, and you wouldn't want to have a square

13     bottle in the control cell, because you wouldn't know

14     whether you're introducing into the control some of the

15     active ingredients that are in the test.  It's not very

16     complicated.

17          Q    And the elements that you removed were simply

18     elements that Jack Daniel's told you were elements of

19     its trade dress entitled to some --

20          A    I don't know that --

21          MR. LARKIN:  Objection to form.

22          THE WITNESS:  -- Jack Daniel's told me.  It's

23     what I read in the answer and counterclaim.

24     BY MR. BRAY:

25          Q    So --

Gerald L. Ford - August 19, 2015                    166

```
 1          A    So it wasn't like I just made this up out of

 2     whole cloth.

 3          Q    So paragraph 6 of the counterclaim on page 5,

 4     because Jack Daniel's asserted the elements identified

 5     in paragraph 6, you removed all of those elements from

 6     the trade dress?

 7          A    I believe I did.

 8          Q    Without taking into account that there are

 9     numerous other whiskey and bourbon products that are

10     sold in square bottles; right?

11               MR. LARKIN:  Objection to form.

12               THE WITNESS:  No.  You shouldn't.

13     BY MR. BRAY:

14          Q    Okay.  Without taking into account that there

15     are numerous other whiskey and bourbon products that

16     include a combination of a square bottle, black cap,

17     black label with red writing?

18               MR. LARKIN:  Objection.  No foundation for your

19     claim there are numerous ones.

20     BY MR. BRAY:

21          Q    You can answer it.

22          A    The control cell is what the control cell is.

23     It didn't include any of the active ingredients that are

24     identified in paragraph 6 on page 5 of the answer and

25     counterclaims.
```

Gerald L. Ford - August 19, 2015                    167

```
 1          Q    Does the control to you conjure up Jack
 2    Daniel's?
 3               MR. LARKIN:  Objection to form.
 4               If you understand the question, go ahead.
 5    BY MR. BRAY:
 6          Q    It's page 10 of your report.
 7               MR. LARKIN:  Maybe you want to see it in color.
 8               THE WITNESS:  No.  It's okay.
 9               MR. LARKIN:  Okay.
10               THE WITNESS:  Well, I wasn't a respondent, so it
11    didn't conjure up anything to me.
12    BY MR. BRAY:
13          Q    Okay.
14          A    It just didn't have any of the active
15    ingredients, which is exactly what a control cell should
16    have.
17          Q    You're not a respondent, but you're looking at
18    it now.  Does it conjure up Jack Daniel's to you?
19               MR. LARKIN:  Objection to form, and it's a
20    hypothetical question and doesn't have anything to do
21    with his opinion.
22               THE WITNESS:  It doesn't conjure up Jack
23    Daniel's one way or the other to me.
24    BY MR. BRAY:
25          Q    Okay.  Is the control -- in your expert
```

```
 1        opinion, is the control product a parody product?
 2             A    I'm not sure what a parody product is by
 3        definition, but it doesn't have any of the active
 4        ingredients of the Jack Daniel's trade dress.
 5             Q    Do you think the control is a spoof on any
 6        existing product in the market?
 7                  MR. LARKIN:  Objection to form.
 8                  THE WITNESS:  Well, in a manner of speaking, it
 9        says Bad Spaniel, which is a spoof.  Poo poo on your
10        carpet -- on your Tennessee carpet.
11        BY MR. BRAY:
12             Q    Does -- let me strike -- stop you there unless
13        you want --
14             A    Okay.
15             Q    -- to add more.
16             A    No.  I'm done.
17             Q    Does the control juxtapose an irreverent
18        representation of the Jack Daniel's trademark or trade
19        dress with an ideal -- idealized image created by the
20        mark's owner?
21                  MR. LARKIN:  Objection to form.
22                  THE WITNESS:  And the mark's owner in this case
23        is Jack Daniel's?
24        BY MR. BRAY:
25             Q    Yes.
```

Gerald L. Ford - August 19, 2015                    169

```
 1          A    I guess reference to Tennessee -- Tennessee and
 2    Bad Spaniels is a reference to Jack Daniel's.
 3          Q    If a trademark has to convey enough of the
 4    original so that people get the joke, would you expect
 5    that in a confusion survey -- well, let me strike that.
 6               If a trademark parody has to convey enough
 7    elements of the original in order that a viewer of it
 8    gets the reference and the joke, does the survey result
 9    for the control indicate to you in your expert opinion
10    that the respondents did not make a connection and did
11    not see it as a parody product?
12          A    They did not make a connection to the point
13    that they were confused as to the source of this
14    product, sponsorship, or affiliation.
15          Q    Take a look at page 19.
16          A    Of --
17               MR. LARKIN:  What document?
18    BY MR. BRAY:
19          Q    Oh, I'm sorry.  Your declaration.
20          A    Got it.
21          Q    All right.  Respondent No. 1001 --
22          A    Uh-huh.
23          Q    -- you categorize that respondent as somebody
24    that was confused; correct?
25          A    Correct.
```

Gerald L. Ford - August 19, 2015                    170

```
1        Q    And you'll see in answer to Question 9.2 the
2   respondent answered, "Because they are creating a spoof
3   of a real product, so I think they would need permission
4   so they don't get sued for copyrights or something like
5   that."
6             Do you see that?
7        A    Correct.
8        Q    The law is not such that universally makers of
9   spoof products need the permission of the trademark
10  holder in order to make the product; correct?
11       A    The question didn't ask people what the law
12  was.
13            MR. LARKIN:  Let me make my objection.
14            THE WITNESS:  I'm sorry.
15            MR. LARKIN:  Objection to form, and it calls for
16  a legal conclusion.
17            You can answer.
18            THE WITNESS:  Respondent was not asked what they
19  understood the law to be.
20  BY MR. BRAY:
21       Q    Didn't the response indicate to you that the
22  reason that the respondent answered as to affiliation
23  was because, quote, the respondent thinks they would
24  need permission so they don't get sued?
25       A    That's the respondent's state of mind.
```

```
 1        Q    Sure.
 2        A    It's not affiliation.  I think it's business
 3   connection or business affiliation.
 4             Do you know what 9.1 is?
 5             THE REPORTER:  I'm sorry?
 6             THE WITNESS:  Just asking a question.  Isn't
 7   that Question 9.1?
 8   BY MR. BRAY:
 9        Q    It's Question 9.2.  Why don't you go ahead and
10   look.
11        A    Question 9.2 is, "Why do you say that?"
12        Q    And what was Question 9.1?
13        A    Question 9.1 is, "What company or companies do
14   you believe gave authorization or approval" -- I stand
15   corrected -- "to make or put out this product.  Please
16   be as specific as possible."
17        Q    In your mind, is authorization a synonym for
18   permission?
19        A    Maybe to some people it is.
20             We don't ask the permission question.  We never
21   have, but that doesn't mean that people don't have
22   conceptions in their mind about what's appropriate and
23   what's inappropriate.
24        Q    Does it appear to you that Respondent No. 1001
25   had a preexisting belief that all spoof products require
```

```
 1      permission of the trademark or copyright holder?

 2          A    I don't think that's what this person says.

 3          Q    Would you agree that there is a preexisting

 4      belief that all spoof products require the permission of

 5      a trademark or copyright holder?

 6          A    Then you would get the same answers in the

 7      control.  They were asked the same questions.  They were

 8      just shown a different stimulus that no longer had the

 9      Jack Daniel's indicia.

10          Q    Well, with all due respect, the control product

11      is not a spoof product.  It's not -- you eliminated

12      every reference to Jack Daniel's, so nobody gets the

13      connection to Jack Daniel's except for one.

14               MR. LARKIN:  That doesn't make it not a spoof

15      product.

16      BY MR. BRAY:

17          Q    Okay.  Not a parody as defined by the Fourth

18      Circuit.

19               MR. LARKIN:  That doesn't make it not a parody

20      either.  It just doesn't make it a parody to --

21               THE WITNESS:  I don't think it doesn't make it a

22      parody.

23      BY MR. BRAY:

24          Q    Would you agree with me that a certain subset

25      of Americans might have a preexisting belief of American
```

Gerald L. Ford - August 19, 2015                173

1    intellectual property law that a spoof product or a

2    parody product requires the permission of the trademark

3    holder to be sold?

4              MR. LARKIN:  Objection to form.

5              THE WITNESS:  It might be the case, but if that

6    was the case, you would see it --

7    BY MR. BRAY:

8         Q    Okay.  Answer my question.

9         A    -- in the control.

10        Q    And if a -- if a certain percentage of

11   Americans have the mistaken belief that trademark law

12   requires all spoof or parody products to have the

13   permission of a trademark holder, that might skew the

14   survey results in favor of confusion; correct?

15             MR. LARKIN:  Objection to form.

16             THE WITNESS:  In favor -- it would skew them in

17   favor of confusion in the control also.

18   BY MR. BRAY:

19        Q    If the majority -- if the respondents in the

20   control group did not view the control as a spoof or a

21   parody, in other words, didn't make the connection

22   between the product and the -- and the mark that it's

23   the irreverent misrepresentation of, then their

24   misapprehension of the law would not be an issue;

25   correct?

Gerald L. Ford - August 19, 2015                           174

```
 1              MR. LARKIN:  Objection to form.
 2              Do you understand the question?
 3              THE WITNESS:  I'm not sure what their
 4   understanding of the law is is relevant to the question
 5   of likelihood of confusion as to source, sponsorship, or
 6   affiliation.
 7   BY MR. BRAY:
 8       Q    And in any event, you didn't test -- you didn't
 9   make any effort to test what consumers' or respondents'
10   understanding of the law was regarding spoof or parody
11   products; correct?
12       A    Made an attempt to understand whether there was
13   likelihood of confusion as to source, sponsorship, or
14   affiliation --
15       Q    Sure.  And if --
16       A    -- which is exactly what the test is.
17       Q    Sure.  And if --
18       A    Whether it's parody or not a parody, whether
19   it's an infringement or not an infringement, the test is
20   always the same.
21       Q    Okay.  If 20 percent of Americans believed that
22   all parody products as a matter of law require the
23   permission of the trademark holder, would that create
24   noise for your survey in this case?
25              MR. LARKIN:  Objection to form.
```

Gerald L. Ford - August 19, 2015                          175

1              THE WITNESS:  I think you would see that in the
2     control too.
3     BY MR. BRAY:
4         Q    If those same individuals did not view the
5     control as a spoof or parody product, would that
6     influence your answer at all?
7         A    No.  Because a control shouldn't have any of
8     the active ingredients that are in the control -- in the
9     test cell.
10        Q    So the control shouldn't be a parody; correct?
11        A    That's not exactly true.
12        Q    It --
13        A    It just shouldn't have any of the elements.
14        Q    It shouldn't include any elements that would
15    allow the consumer to conjure up what the joke was, what
16    trademark owner is being referenced by a product;
17    correct?
18             MR. LARKIN:  Objection to form.
19             THE WITNESS:  It simply is a question of what's
20    communicated by the test and what's communicated by the
21    control and is there a difference.
22    BY MR. BRAY:
23        Q    Okay.
24        A    And the control doesn't have any of the
25    elements that are being claimed in the test, as it

1    should not.

2         Q    You would agree with me if respondents who

3    reviewed the control didn't see it as a spoof or parody

4    product, then their misapprehension, their preexisting

5    belief regarding whether the makers of a spoof or parody

6    product require the permission of the trademark holder

7    wouldn't have been invoked; correct?

8              MR. LARKIN:  Objection to form.  Incomplete

9    hypothetical.

10             THE WITNESS:  I don't know whether it would or

11   it wouldn't.

12             I assume that if you believed it would, you

13   would have done a replication survey and showed that a

14   different control would have produced a different

15   answer, and you didn't.

16   BY MR. BRAY:

17        Q    That wasn't my question.

18        A    I know, but that's my answer.

19        Q    Okay.

20        A    And I -- I think that it's important to

21   recognize that it's becoming less and less common to do

22   critiques without having empirical evidence to stand

23   behind that critique.  So if you think there was some

24   sort of flaw in the control, then I would expect that --

25   that your client would have gone to the expense of at

```
 1          least doing a pilot to show what those flaws were, and
 2          you didn't do that either.
 3               Q    If a consumer viewing the control didn't view
 4          it as a spoof product or a parody product, then whatever
 5          their preexisting belief as to the law wouldn't come
 6          into -- wouldn't influence their result -- their answers
 7          to the survey; correct?
 8                    MR. LARKIN:  Objection as to form.  He's already
 9          testified multiple times he didn't ask them about their
10          preexisting view of the law.  He asked them if they
11          bought other products.
12          BY MR. BRAY:
13               Q    Dr. Ford, all I'm doing is trying to get a
14          clear record, and I ask yes or no questions, and I get
15          long answers.  So we can deal with form objections and
16          all this at trial, if it goes to trial.
17                    Here's my question.  Again, if --
18                    MR. LARKIN:  Why don't you let him -- can he
19          answer the last question?
20                    THE WITNESS:  Sure.  If upon exposure to the
21          control I was confused as to the source of that product
22          with Jack Daniel's or its affiliation, then you would see
23          that in the control results, and you don't.
24                    I looked at -- when I look at -- what is it --
25          Exhibit 53, if you look closely at the survey results,
```

Gerald L. Ford - August 19, 2015                    178

1       you'll find none of these brands show up in this -- in

2       the control -- in the control or the test results.

3       BY MR. BRAY:

4            Q    Isn't it possible that because Jack Daniel's is

5       the best selling whiskey in the country, if you did the

6       control just with a square bottle, you might -- which

7       Jack Daniel's, you admit, doesn't have exclusive rights

8       to, you might have gotten higher than one percent?

9            A    I would not do it that way.

10           Q    Okay.  Because --

11           A    And you wouldn't do it that way either, because

12      you're adding to the control some of the active

13      ingredients to the test cell, and so you're compounding

14      the results.

15           Q    Didn't your control eliminate the parody as

16      defined by the Fourth Circuit?

17           A    I'm not sure it did.

18           Q    Okay.  If it did eliminate the parody, that's

19      not a problem from your perspective, is it?

20           A    If it did not?

21           Q    Yeah.

22           A    No.  It's not a problem for --

23           Q    Because you treat parody products as a survey

24      expert in terms of surveys and likelihood of confusion

25      no different than any other product; correct?

```
 1          A     That's correct.
 2          Q     Even though by definition a parody product has
 3     to evoke the original trademark product; correct?
 4               MR. LARKIN:  Asked and answered at least three
 5     or four times, if not more.  Come on.
 6               THE WITNESS:  The --
 7               MR. LARKIN:  Let's move on.
 8               THE WITNESS:  The control product would have to
 9     conjure up a connection with Jack Daniel's, and you would
10     get a Jack Daniel's answer in the control, which you
11     would then subtract from the test cell.
12     BY MR. BRAY:
13          Q     Okay.  So if the Jack Daniel's -- if the
14     control conjured up Jack Daniel's, you would get more
15     than one respondent answering that; correct?
16          A     Right, but in order for it to conjure up Jack
17     Daniel's, you would have to use some of the active
18     ingredients in the test cell, which you would never do.
19          Q     In order for a parody to work, you have to use
20     some elements of the control; correct?
21          A     I don't think -- I think we need to get off
22     this word parody and go back to the Lanham Act and
23     likelihood of confusion.  It trumps parody.  Parody is
24     not an issue once there's likelihood of confusion.  It's
25     exactly what McCarthy says.
```

1          Q    Isn't it possible that all your survey

2      determined, if, in fact -- hypothetically, agree with me

3      that 99 percent of the respondents didn't view the

4      spoof -- didn't view the control product as a parody or

5      a spoof product --

6          A    But you have no evidence of that.

7          Q    If that were the hypothetical, isn't it

8      possible that all the test survey proved was that some

9      significant percentage of American consumers think that

10     all parody and spoof products require the permission of

11     a trademark holder?

12              MR. LARKIN:  Objection to form.  He's testified

13     three or four times that was not the question asked in

14     the test cell.

15              THE WITNESS:  In the test cell what it shows is

16     that people, when exposed to the Silly Squeakers toy and

17     all its labeling and its disclaimers, that they evidence

18     likelihood of confusion in a non-substantial way.

19          Q    Let's look at page 21 of your report.

20              MR. LARKIN:  Yeah.

21              THE WITNESS:  I'm there.

22     BY MR. BRAY:

23          Q    Respondent No. 1033 in --

24          A    I'm looking at it.

25          Q    -- response to 9.1 says, "My best guess is that

1       in order to use this design, you would have to have

2       permission from the Jack Daniel's brand."

3               Do you see that?

4       A     That's that person's state of mind.

5       Q     And you indicated that person as confused as to

6       the source or affiliation?

7       A     Yes.

8       Q     Okay.

9       A     Well, the first one they asked, Question 7.0

10      was, "Who or what company do you believe makes or puts

11      out this product?"  The answer is Jack Daniel's.

12      Q     And then in response to the later question,

13      they indicate that their guess is to use this design,

14      you would have to have the permission from Jack Daniel's

15      brand; right?  And you still categorize this person as

16      saying that it's put out by Jack Daniel's?

17      A     Right.  That's their answer to the first

18      question.

19      Q     You said that while the average person might

20      use the word authorization and permission as synonymous,

21      you don't?

22              MR. LARKIN:  I think that mischaracterizes his

23      testimony.

24      BY MR. BRAY:

25      Q     I think you said some individuals might view

```
 1        layman authorization and permission as synonymous.  You
 2        don't as a trademark expert; is that right?
 3             A    I said authorization or approval.  I don't
 4        think I said permission.
 5             Q    Okay.  Do you think authorization and
 6        permission are synonymous?
 7             A    I don't know.  We've never -- we've never asked
 8        that question.
 9             Q    Okay.  It's possible, anyway, that the average
10        consumer would view those two words as synonymous?
11             MR. LARKIN:  Objection.  Totally hypothetical.
12        Calls for speculation.  He just told you he's never
13        tested the issue.
14             Can you answer?
15             THE WITNESS:  I can.  There are lots of courts
16        who have accepted permission as a measure of likelihood
17        of confusion.  We just never have asked that question.
18             MR. BRAY:  Can we take like a five-minute break?
19             MR. LARKIN:  Sure.
20             (Brief recess.)
21        BY MR. BRAY:
22             Q    Welcome back, Dr. Ford.
23             A    Thank you.
24             Q    I think we're getting closer to the finish
25        line.
```

```
 1              MR. LARKIN:  We all like to hear that.
 2     BY MR. BRAY:
 3         Q    You'd agree with me that a non-confusing --
 4     non-confusing trademark use in a parody requires no
 5     permission from the trademark holder?
 6              MR. LARKIN:  Objection.  Calls for a legal
 7     conclusion.  I'll object to form too.
 8              If you understand it, go ahead.
 9              THE WITNESS:  If there's no likelihood of
10     confusion, then there's no likelihood of confusion.
11     BY MR. BRAY:
12         Q    If a significant subset of Americans have a
13     preexisting belief that, confusing or not, spoof or
14     parody products require the permission of the trademark
15     holder, could that create noise that would affect the
16     validity of your survey results?
17         A    No.  I think you would see the same thing in
18     the control.  A poo on your carpet, it's -- it clearly
19     is intending to continue the spoof.
20         Q    Of Jack Daniel's?
21         A    I'm sorry?
22         Q    Of Jack Daniel's?  Is it your testimony as an
23     expert that the control was clearly intended to continue
24     the spoof of Jack Daniel's?
25         A    It was continued -- it was intended to continue
```

Gerald L. Ford - August 19, 2015                    184

 1      to be a spoof, but not a spoof of Jack Daniel's.  If

 2      it's a spoof of Jack Daniel's, then you wouldn't have a

 3      proper control.  You just can't do it that way.

 4          Q    Let me --

 5          A    And I assume if you could, you would have.

 6          Q    Let me -- again, only because we're getting

 7      towards the end of the day, I -- I understand your

 8      bullet points.

 9          A    Okay.

10          Q    I know what you want to say, and, believe me --

11          A    I'm not --

12          Q    And you'll have the opportunity to testify at

13      trial --

14          A    Right.

15          Q    -- should we get that far, but if you could

16      just try to just answer my questions, but --

17          A    I will try.

18          Q    Okay.  You would agree with me that in certain

19      circumstances -- well, the mere fact that a -- a

20      survey -- strike that.

21               In your expert opinion, a valid trademark

22      survey can be used and offered even without a control;

23      correct?

24               MR. LARKIN:  I think that mischaracterizes his

25      prior testimony.

Gerald L. Ford - August 19, 2015                    185

```
 1     BY MR. BRAY:
 2          Q      Strike that.
 3                 Are there circumstances where a -- in your
 4     opinion, a scientifically valid trademark survey could
 5     be conducted today without a control?
 6          A      Yes.  I have given you examples of that.
 7          Q      Okay.  Assume there's no control.  Assume you
 8     do a trademark survey of a parody product along the
 9     lines -- let's take Bad Spaniels.  You do a trademark --
10     or you do a trademark survey, a likelihood of confusion
11     survey for Bad Spaniels, no control.  In the abstract,
12     could a preexisting belief amongst a subset of American
13     consumers that the law always requires permission of the
14     trademark holder for a spoof for a parody product, could
15     that be noise that would affect the survey results?
16          A      Then you would see it in the control.
17                 MR. LARKIN:  No.  No.  Asked and answered.
18     BY MR. BRAY:
19          Q      That was a yes or no question.
20                 Assume there is no control.  Assume you do a
21     non-control survey, which you've testified are still
22     valid and still are accepted, if you did a non-control
23     survey for a parody product, do you believe, Dr. Ford,
24     in your expert opinion that a preexisting belief amongst
25     a subset of American consumers that all spoof or parody
```

Gerald L. Ford - August 19, 2015                    186

1    products require permission of trademark holders would

2    constitute or could constitute noise with regard to that

3    survey?

4              MR. LARKIN:  It's an incomplete hypothetical,

5    and he testified that wasn't the question asked to the

6    respondents, but if you understand the question.

7              THE WITNESS:  I understand the question.

8              It's not -- it's not the survey design we would

9    have employed.  As you see, we employed a survey design

10   and a test cell and a control cell.

11   BY MR. BRAY:

12        Q    Do you agree hypothetically under any

13   circumstances dealing with surveys involving parody

14   products that a preexisting belief amongst a subset of

15   American consumers that all parody or spoof products

16   require permission of the trademark holders could

17   constitute noise?

18        A    I think that's where you have to take out the

19   word parody.  And your question is -- is this a proper

20   measure of likelihood of confusion in the tests?  Is it

21   a proper measure of likelihood of confusion of control?

22   The same questions were asked.  The stimuli were

23   different, as they should be, and the difference was

24   significant with the test cell coming in at, what, 29

25   percent; control cell coming in at one percent.

```
 1          Q    As an expert in trademark surveys, could you --
 2     do you believe it's possible to construct a survey that
 3     would test what percentage of American consumers
 4     believed that all parody and spoof products as a matter
 5     of law in all cases require the permission of the
 6     trademark holder?
 7               MR. LARKIN:  Objection to form.
 8               Do you understand the question?
 9               THE WITNESS:  I do.  I'm not sure what question
10     you would ask and how you can do that without leading the
11     respondent or suggesting an answer.
12               Do I think you could construct something like
13     that?  Possibly.  Do I think you could have done that?
14     Yes.
15     BY MR. BRAY:
16          Q    Okay.
17          A    And did you do it?  No.
18          Q    So you're a very experienced expert --
19          A    I wish.
20          Q    -- with a lot of history in trademark surveys.
21     It's your testimony that it is possible to test to
22     determine what percentage of American consumers believe
23     that all parody or spoof products require the permission
24     of the trademark holder?
25          A    See, I don't think it has anything to do with
```

Gerald L. Ford - August 19, 2015          188

```
 1      parody or spoof.  What it has to do with is there a
 2      likelihood of confusion as to source, sponsorship, or
 3      affiliation of the products bearing the alleged
 4      infringing marks at issue.
 5           Q    I know you keep saying that, but I want to take
 6      you down a path, and you're not following me.
 7           A    I'm sorry.  I'll follow you.
 8           Q    Sure.
 9           A    I'm not trying to be difficult either.
10           Q    I know you're not.
11                (Discussion off the record between
12                the witness and his counsel.)
13                MR. LARKIN:  Go ahead.  Sorry.
14      BY MR. BRAY:
15           Q    You agree with me that not all -- I know we've
16      covered this, but as a general principle, not all spoof
17      or parody products are infringing?
18           A    It's an empirical question.
19           Q    Okay.
20           A    So it's not a would you agree or disagree.
21      It's an empirical question.  It's just --
22           Q    I'll give you a yes or no question.  Are all
23      parody and spoof products infringing?
24           A    I can't answer it that way.  It's an empirical
25      question that you would have to test, and I don't think
```

```
1    it has anything to do with spoof.  I don't see spoof
2    anywhere in the Lanham Act.
3        Q    Well, isn't that a lot of the complication of
4    the parody law is how First Amendment principles and
5    parody gets incorporated into the Lanham Act?
6        A    Not according to McCarthy.  He says as soon as
7    you find likelihood of confusion, the whole parody
8    defense goes out the window.
9        Q    But if you test for likelihood of confusion,
10   and people indicate that the source -- that a company
11   gave authorization or sponsored a product, but they
12   internally believe that all spoof products require
13   authorization, wouldn't that affect a survey answer?
14            MR. LARKIN:  Objection.
15            Do you understand the question?
16            Are you asking him whether -- if someone says
17   it comes from Jack Daniel's, and then the reason they
18   give is --
19   BY MR. BRAY:
20       Q    Let me ask you -- let me put it this way.
21            MR. LARKIN:  It's --
22   BY MR. BRAY:
23       Q    You say it's an empirical question.  You would
24   have to test it.  The case law, which is -- you're
25   familiar with it.  I'm familiar with it.  You agree with
```

Gerald L. Ford - August 19, 2015                          190

1    me that as a matter of settled case law, there have been
2    instances in the past where spoof or parody products
3    were held to be non-infringing?
4        A    I will agree that I'm aware of two cases where
5    there was no evidence of likelihood of confusion, and
6    they were held to be non-infringing.
7        Q    Okay.  And without getting McCarthy out, would
8    you agree with me that Professor McCarthy cites other
9    parody cases where the alleged infringing parody product
10   was found not to be infringing?
11       A    And he cites cases where products were found to
12   be infringing because there was evidence of likelihood
13   of confusion.
14       Q    Okay.  Let's say -- you would agree with me
15   that it is not an accurate statement of American law
16   that all spoof or parody products by definition are
17   infringing; correct?
18       A    I'm not a lawyer, so I don't know what -- I
19   don't think that the word parody really belongs in the
20   sentence.  The question is is there likelihood of
21   confusion under the Lanham Act.
22       Q    Okay.  Thank you for that.  You've been an
23   expert in trademark law for 40 years.  You contribute to
24   publications.  You probably read more trademark cases
25   than I do.  So, again, it is not true that American law

```
 1        holds that all parody and spoof products require the
 2        permission of the trademark holder in order to not be
 3        infringing.  That's a yes or no question.
 4                 MR. LARKIN:  Objection to form.
 5                 THE WITNESS:  As I understand the jurisprudence
 6        in this area, that as a matter of law, if the alleged
 7        infringing product creates a likelihood of confusion,
 8        that the parody defense is gone, history, out the window.
 9        BY MR. BRAY:
10            Q    If it doesn't create a likelihood of confusion,
11        no infringement?
12            A    Then we probably wouldn't be here.
13            Q    Okay.  If a subset of American consumers
14        believe that regardless of the likelihood of confusion
15        test that you just articulated, regardless of that, that
16        American law as a blanket prohibition states that all
17        parody or spoof products require the permission of the
18        trademark holder, wouldn't that be noise for the type of
19        trademark surveys that would be conducted for a parody
20        product?
21            A    I --
22                 MR. LARKIN:  He's testified repeatedly that's
23        not the questions that he asked.
24                 THE WITNESS:  Yeah.  That's not the questions we
25        asked.
```

Gerald L. Ford - August 19, 2015                    192

1      BY MR. BRAY:
2           Q     And you didn't try to get at that question;
3      correct?
4           A     No.   We tried to get the standard likelihood of
5      confusion questions.
6           Q     Without any consideration of the case law
7      that's developed regarding parody products; correct?
8           A     Well, that's not entirely true.   If I recall
9      correctly, George Mantis did a survey in the Buttwiser
10     case.
11          Q     There's your talking point.
12          A     What?
13          Q     There's your talking point.
14                MR. LARKIN:   Let him answer.   Let him finish
15     his --
16     BY MR. BRAY:
17          Q     Sure.
18          A     And if I recall correctly, he used standard
19     Eveready design, standard design that would be used in
20     likelihood of confusion.
21          Q     Okay.  If one -- I know you didn't conduct a
22     survey to test -- though it's possible to test American
23     understanding of trademark law vis-a-vis spoofs or
24     parody products, if a survey were conducted and would
25     show that 25 percent of Americans think that regardless

Gerald L. Ford - August 19, 2015                    193

```
 1        of the circumstances, regardless of whether there's
 2        quote, unquote, confusion, in all cases, spoof or parody
 3        products require permission of the trademark holder,
 4        that would impact the results of the trademark survey
 5        that you did or your conclusions from the survey in the
 6        Bad Spaniels case; correct?
 7            A    I assume that if you had evidence of that, we'd
 8        see it.
 9            Q    If such evidence existed, it would be relevant
10        to you; correct?
11            A    If such evidence existed, I would like to see
12        it.
13            Q    Okay.  And, again, those preexisting beliefs,
14        as you said in your treatise, can be noise that can
15        account for mismeasurements in survey results; correct?
16            A    That's --
17                 MR. LARKIN:  Well, that --
18        BY MR. BRAY:
19            Q    Yes?
20            A    That's exactly why you do a control.
21            Q    Okay.  But, again, in answer to my question,
22        preexisting beliefs can be noise; correct?
23            A    Yes.
24            Q    And the control didn't study preexisting
25        beliefs, did it?
```

Gerald L. Ford - August 19, 2015                          194

```
1        A     It would have measured preexisting beliefs,
2    because if people think that all products that bear this
3    label or these labels or this packaging come from Jack
4    Daniel's or a whiskey company, you would have seen that.
5        Q     But you just testified ten minutes ago that the
6    control was not a parody or a spoof of Jack Daniel's?
7        A     I didn't testify to that.
8        Q     Okay.  The record is what it is.
9        A     It was not a spoof of Jack Daniel's.  It was --
10   I think that it still kept elements of its parody.
11       Q     Okay.  Fair enough.  The control group in this
12   case did not test for preexisting beliefs regarding what
13   U.S. trademark law allows or doesn't allow; correct?
14       A     You would have found those in the survey
15   results.
16       Q     Again --
17       A     Those preexisting beliefs exist.  They're
18   going -- you're going to see those in answer to the
19   survey questions.  Who do you believe made or developed
20   this product?  Why do you say that?  Do you believe the
21   product has been put out with the authorization or
22   approval of another company or companies?  Why do you
23   say that?
24       Q     But, again, if the control group that you
25   designed was not intended to be a spoof of Jack
```

1     Daniel's, would you expect --

2         A    But you wouldn't want it to be a spoof of Jack

3     Daniel's.

4         Q    -- would you expect anything other than getting

5     one percent or less for a control group?

6         A    I didn't expect anything one way or the other.

7         Q    Okay.

8         A    It wasn't intended to be a spoof of Jack

9     Daniel's.  If it was, it would have been an

10    inappropriate control.

11        Q    And, again, if you could answer this yes or no,

12    because I think it can be answered yes or no --

13        A    Okay.

14        Q    -- that the control survey that you did with

15    the control product, that was not designed to test

16    preexisting beliefs by consumers of what American

17    trademark law does or does not allow; correct?  Yes or

18    no?  That was not the intent of the control?

19        A    The intent of the control was to test for

20    likelihood of confusion, and if preexisting beliefs

21    about the law existed in the test group, it existed in

22    the control group.  So they had the same state of mind.

23        Q    Okay.  Would that answer be true if, as you

24    say, the control group was given a product that was not

25    intended to be a spoof product, why would, again, the

1     preexisting belief regarding spoof law even be

2     implicated in the control group?

3          A     Because spoof is not an issue.  The issue is

4     likelihood of confusion.  We've done this a hundred

5     times.

6          Q     Sure.  And, again, trademark law talks about

7     affiliation, sponsorship, association, whatever.  I

8     understand that.

9          A     The Lanham Act does.

10         Q     For parodies, the -- McCarthy, the Fourth

11    Circuit, the Second Circuit, the Fifth Circuit, the

12    Ninth Circuit, they all say the parody product has to

13    evoke the original; agreed?

14              MR. LARKIN:  Are you --

15    BY MR. BRAY:

16         Q     In order to be an effective parody, it has to

17    somehow evoke the original product; right?

18         A     I'm not sure McCarthy says it exactly that way.

19              What he does say is that if --

20         Q     Conjure up.

21         A     -- if it creates a likelihood of confusion,

22    that it defeats the parody defense.  So it's gone.

23         Q     Okay.  The control wasn't intended to conjure

24    up Jack Daniel's.  It was intended to be a spoof of Jack

25    Daniel's; correct?

1           A    It shouldn't have been.

2           Q    It shouldn't have been.  Okay.  So presumably

3     when people look at the control, their view of what the

4     law was regarding spoof products wouldn't even enter

5     their mind; correct?

6                MR. LARKIN:  Well, results are what they are.

7     How does he know?  He tested for the results.

8     BY MR. BRAY:

9           Q    And common sense would indicate that if it's

10    not viewed as a spoof product or a parody product, and

11    it wasn't intended to be, then a preexisting belief as

12    to the state of American law regarding spoof products

13    wouldn't have come into the mind of these respondents;

14    right?

15          A    I don't know that it would or it wouldn't.

16          Q    Okay.  And unlike with the -- the actual Bad

17    Spaniels group that mentions trademark law several

18    times, you didn't get that kind of response with regard

19    to the control group; correct?

20          A    That's correct, but they also -- there was only

21    one person who indicated confusion.  So there was little

22    chance to get that kind of answer --

23          Q    Okay.

24          A    -- to the "Why do you say that" question.

25          Q    And the one view of your report is you just

1        asked a circular question, and all you're doing is

2        testing people's understanding of American trademark

3        law?

4            A     No.  I'm asking the standard questions that

5        have been asked for almost 30 years.

6            Q     And those standard questions were all developed

7        in cases that were not in the parody context; correct?

8            A     They were all developed in cases that involved

9        the issue of likelihood of confusion, which McCarthy

10       says is a critical issue, and that once likelihood of

11       confusion is established, that the parody defense is no

12       longer applicable.

13              Maybe you should take his deposition.

14           Q     Whose?

15           A     Tom McCarthy.  Have you ever met him?

16           Q     No.

17           A     He is a nice guy.

18           Q     He's in Southern California somewhere, isn't

19       he?

20           A     No.  He's Northern California.

21              MR. LARKIN:  San Francisco.

22              THE WITNESS:  He's in San Francisco.  He's

23       with --

24              MR. LARKIN:  I can't remember anymore.

25              THE WITNESS:  I think Kenwick.

```
 1      BY MR. BRAY:
 2           Q    One trademark commentator has written that --
 3           A    Which commentator is this?
 4           Q    Steven Perez wrote in the Emory Law Journal
 5      that in certain circumstances --
 6           A    It's one of our clients.
 7           Q    Who is?
 8           A    Steven Perez.
 9           Q    The author of this article?  Who is he?
10                MR. LARKIN:  Do you know it's the same person?
11                THE WITNESS:  I don't.  Is he -- where does it
12      say he is?
13      BY MR. BRAY:
14           Q    He wrote -- Emory University School of Law.
15           A    No, it isn't.
16           Q    At least he -- let's see if it says who he is
17      at the end.
18           A    No.  He's in Miami.
19           Q    Oh, this case --
20           A    So that's --
21           Q    The case -- this article is ten years old.
22           A    Oh.
23                MR. LARKIN:  What's the citation?
24                MR. BRAY:  44 Emory Law Journal 1451.
25                MR. LARKIN:  Thank you.
```

Gerald L. Ford - August 19, 2015                    200

1        BY MR. BRAY:
2            Q    And it's a comment in confronting bias
3        treatment of trademark parody under the Lanham Act.
4            A    And what's his background?
5            Q    Do trademark surveys in the parody context run
6        the risk of testing consumers' knowledge of the law more
7        than the risk of confusion posed by the parody?
8            A    That's --
9                 MR. LARKIN:  Is that a question?
10       BY MR. BRAY:
11           Q    That's a question.
12           A    That's the author's opinion.  I don't know what
13       his background is or what his training is.  I don't know
14       what authority he has.
15                MR. LARKIN:  What did you test here?
16       BY MR. BRAY:
17           Q    Sure.  What I'm asking you is do trademark
18       surveys in the parody context run the risk of testing
19       the consumer's knowledge of law more than testing the
20       risk of confusion posed by the parody?
21           A    I don't think so.  I think same -- same
22       question.  It's the same Lanham Act question.  It's the
23       same statute.  It's the same everything.  I have no idea
24       what his credentials are or his background or --
25                THE WITNESS:  Did you get the citation?

Gerald L. Ford - August 19, 2015                    201

```
 1                MR. LARKIN:  I did.  Thank you.

 2                THE WITNESS:  Bless you.

 3                MR. BRAY:  Do you have another paper clip?

 4                MR. LARKIN:  We can get one.

 5                THE WITNESS:  Thanks, Matt.

 6                Put a clip on it, so we're okay.  I promise not

 7       to take any of your exhibits.

 8                THE REPORTER:  Thank you.

 9       BY MR. BRAY:

10          Q    I want to talk about Respondent No. 1194 on

11       page 28 of your declaration and report, which is

12       Exhibit 61.

13                MR. LARKIN:  You can use mine.  You can use

14       mine, Jerry.

15                THE WITNESS:  I'm sorry?

16                MR. LARKIN:  You can use mine.

17                THE WITNESS:  Sure.

18                MR. LARKIN:  It's got scribbles, but --

19                THE WITNESS:  1194?

20       BY MR. BRAY:

21          Q    Yeah.  On page 28.

22          A    I see it.

23          Q    Question 7, which reads, "Who or what company

24       do you believe makes or puts out this product?"

25          A    Correct.
```

Gerald L. Ford - August 19, 2015                        202

1          Q     "Please be as specific as" --

2          A     The answer is Jack Daniel's.

3          Q     And you categorize this response under the made

4     or put out by Jack Daniel's; correct?

5          A     That's correct.  And that's what I remember

6     seeing.

7          Q     And Question 9.1 asks, "What company or

8     companies do you believe gave the authorization or

9     approval to make or put out this product?"  He also

10    answers Jack Daniel's.

11                Do you see that?

12         A     Right.

13         Q     And then Question 9.2, "Why do you say that?

14    Again, be as specific as possible."

15                Answer, "The bottle is mimicked after Jack

16    Daniel's barbecue sauce.  So they would hold the patent.

17    Therefore, you would have to ask permission to use the

18    image."

19                Do you see that?

20         A     I do.

21         Q     Is it possible that this survey respondent was

22    under a misapprehension of law that --

23         A     I don't think so.

24                MR. LARKIN:  Wait.  Let him finish his question.

25

```
 1        BY MR. BRAY:
 2             Q    That --
 3                  MR. LARKIN:  Had you -- had you finished?  I'm
 4        sorry.
 5                  MR. BRAY:  No.
 6                  MR. LARKIN:  Okay.
 7                  MR. BRAY:  No problem.
 8        BY MR. BRAY:
 9             Q    Well, is it possible that this survey
10        respondent held a mistaken belief regarding American
11        trademark or patent law and that influenced his
12        decisions to your survey questions?
13             A    I don't think so.
14                  Who do you believe made out or put out this
15        product?  And the answer is Jack Daniel's.
16             Q    Okay.
17             A    I don't think there's any confusion there.  I
18        think -- well, I don't think that was --
19                  MR. LARKIN:  Yeah.  That was not the --
20                  THE WITNESS:  -- a legal answer.  I'm sorry.
21        BY MR. BRAY:
22             Q    Well, he also says it has to be Jack Daniel's
23        because Jack Daniel's must own a patent or something.
24                  Do you see that?
25             A    Sure.
```

Gerald L. Ford - August 19, 2015                    204

```
 1          Q    Is that possible, again, that this respondent
 2    answered Jack Daniel's because he was under a
 3    misapprehension of American intellectual property law?
 4          A    I don't think --
 5          Q    Is that at least possible?
 6          A    No.
 7          Q    Impossible?
 8          A    Impossible.
 9               Who do you believe made or developed this
10    product?  The response is Jack Daniel's.  It does not
11    ask anything else.  And then when asked why he's saying
12    that, it's because that's what I remember seeing on it.
13          Q    Respondent No. 001 on page 19 --
14               MR. LARKIN:  1001?
15    BY MR. BRAY:
16          Q    Yeah.  We talked about this one before.
17          A    Right.
18               (Discussion off the record between
19               The witness and his counsel.)
20    BY MR. BRAY:
21          Q    Is it possible that survey Respondent 1001
22    answered number -- Question 9 in the affirmative because
23    they were under the mistaken belief of what American
24    intellectual property law provides?  Is it possible?
25               MR. LARKIN:  Objection.
```

```
1              Is that relevant to your opinion?
2              THE WITNESS:  No.  I think what -- you have to
3      read the whole answer, "Is being made or put out the
4      authorization or approval."
5              "Why do you say that?"
6              "I believe they would have to get approval of
7      Jack Daniel's whiskey because the design and the name
8      are so closely related."
9      BY MR. BRAY:
10         Q    Okay.  And the next question, "Because they are
11     creating a spoof of a real product, so I think they
12     would need permission so they don't get sued for
13     copyrights or something like that."
14             Is it possible, at least possible, Dr. Ford,
15     that the affirmative answer to Question 9 from
16     Respondent 1001 was based on a misapprehension of
17     American trademark law?
18         A    I don't think so, especially if you look at the
19     answer to 9.1.
20         Q    Okay.  It's impossible in your expert opinion?
21         A    It's that person's state of mind, and that's
22     really what you're asking them for.  And the person is
23     clear that he believes that you would have to get
24     approval of Jack Daniel's whiskey because of the design
25     and the name is so closely related.
```

Gerald L. Ford - August 19, 2015                    206

```
1          Q     Again, if a significant subset of Americans
2     believe that, quote, a spoof of a real product, end
3     quote, quote, needs permission, end quote, of the
4     trademark holder, that wouldn't skew the results of your
5     survey?
6          A     I don't think so.  It's just -- it would
7     reflect whatever the state of mind is of that respondent
8     when they were exposed to the stimulus.
9          Q     Okay.  Take a look at page 10 of your report.
10         MR. LARKIN:  Actually, let's use your -- what's
11    the exhibit number again?  I'm sorry.
12    BY MR. BRAY:
13         Q     Page 10, Exhibit 61.  It's your report.
14         A     61; right?
15         MR. LARKIN:  Yeah.
16         THE WITNESS:  I'm there.
17    BY MR. BRAY:
18         Q     The control product doesn't have a label, per
19    se; correct?
20         A     It does not.
21         Q     Okay.  And a label, per se, in and of itself is
22    not an element of Jack Daniel's trade dress as alleged
23    in paragraph 6 of its counterclaim; correct?
24         MR. LARKIN:  Objection to form.  I don't know
25    what you mean by a label, per se.
```

Gerald L. Ford - August 19, 2015                    207

```
 1        BY MR. BRAY:
 2            Q    The existence of a label in and of itself.
 3            A    I'm in the wrong document.
 4            MR. LARKIN:  You are.
 5            THE WITNESS:  Thank you.  There we go.
 6            MR. LARKIN:  Yeah.
 7            THE WITNESS:  So it is a black front label with
 8        white printing and filagreed border.
 9        BY MR. BRAY:
10            Q    You agree with me not every black label is
11        infringing on Jack Daniel's trade dress; correct?
12            A    I would agree with that.
13            Q    Okay.
14            A    You would have to take every label and look at
15        it, but --
16            Q    And every label --
17            A    It's a combination of elements here.
18            Q    Sure.  But the label that you're referring to,
19        when you reference paragraph 6, is a black front label
20        with white writing; right?
21            A    White writing, white filagree, yes.
22            Q    In the control, you simply remove the label;
23        correct?
24            A    Right.  We print it on the bottle.
25            Q    Okay.  You didn't use a brown label or a maroon
```

Gerald L. Ford - August 19, 2015                    208

1        label or a yellow label?  You just eliminated the label;
2        correct?
3            A     That's correct.
4            Q     And a label in and of itself without black --
5        black label, white writing, and filagree was not one of
6        the things that you were controlling for; correct?
7            A     Sure, it was.  That's why the control didn't
8        have any of those things.
9            Q     Okay.  I understand that you were controlling
10       for a label with black writing -- or a black label with
11       white writing and a filagree; right?
12           A     Correct.
13           Q     Were you controlling for the existing -- of a
14       label itself of any color, in any design?
15           A     I don't believe so.
16           Q     Okay.  Yet you eliminated the label from the
17       control; correct?
18           A     We printed right on the bottle.
19           Q     Thereby eliminating the label; correct?
20           A     Sure.  Correct.
21           Q     And wouldn't it be -- would you agree it would
22       be a more effective control if it included as many
23       non-controlled-for elements from the original product
24       and the control?  If the original product has a label,
25       wouldn't it be better in the abstract that the control

Gerald L. Ford - August 19, 2015                 209

1        have a label?

2            A    It may or may not.  It depends on whether or

3        not that aspect of the trade dress is material and

4        source identifying.

5            Q    Do -- can you think of a whiskey or bourbon

6        bottle that doesn't have a label?

7            A    I -- I can't.

8                 MR. LARKIN:  Don't guess.

9        BY MR. BRAY:

10           Q    Okay.  Would you agree with me that in your

11       experience, at least the bourbon and whiskey bottles

12       that you're familiar with have labels on the front as

13       opposed to graphics being printed directly onto glass?

14                MR. LARKIN:  Do you want to look at -- there is

15       some marking on this exhibit.  I don't know whether

16       you --

17       BY MR. BRAY:

18           Q    Which one is it?

19                MR. LARKIN:  It's the Sacra report.  It's just

20       highlighting.

21                MR. BRAY:  It's fine.

22                MR. LARKIN:  You don't care about that?  Okay.

23       Just --

24       BY MR. BRAY:

25           Q    If you see massive amounts of notes, let me

Gerald L. Ford - August 19, 2015                      210

```
 1      know.
 2           A     Most of these bottles have labels on them.
 3           Q     Okay.  What page were you looking at, Doctor?
 4           A     What page?
 5                 MR. LARKIN:  Let me look.  Let me see if I can
 6      find it again.
 7      BY MR. BRAY:
 8           Q     You were looking at Exhibit 53?
 9                 MR. LARKIN:  That would have been --
10                 THE WITNESS:  Right.  I was looking at SC --
11      SAC0021.
12      BY MR. BRAY:
13           Q     Okay.  You said the control product was still a
14      spoof, but not a spoof of Jack Daniel's; right?
15           A     As it should not have been.
16           Q     Okay.  Was it intended to be a spoof of a
17      whiskey or bourbon product?
18           A     It was intended to be -- have elements of the
19      spoof.
20           Q     If -- well, yes or no.  Was it intended to be a
21      spoof of a whiskey or bourbon product?
22           A     Yes.
23           Q     Okay.
24           A     Well, it was intended to be a spoof.
25           Q     Not necessarily of a whiskey or bourbon
```

Gerald L. Ford - August 19, 2015                                    211

```
 1      product?
 2           A    Correct.
 3           Q    It could be a spoof of anything?
 4           A    Right.  Remember, these people were potential
 5      purchasers of dog toys.  So these were not -- this is
 6      not an audience of alcohol consumers.
 7           Q    So when you created the control, you weren't
 8      trying to keep elements that would allow a consumer to
 9      see that it's a whiskey or bourbon product?
10           A    Nor should you.
11           Q    Okay.  It really could be -- well, strike that.
12                Why not?
13           A    I'm sorry?
14           Q    You said, "Nor should you."  Why not?
15           A    Because I think that that would be biasing the
16      survey results.
17           Q    How so?
18           A    Would be suggesting a whiskey or -- or a
19      bourbon source.  It's not what you wanted to do.  It's a
20      dog toy.
21           Q    Why make a bottle shape at all?  Why not just
22      put it in the form of a pillow or a bone --
23           A    Well, we talked about that.
24           Q    -- the control?
25                Well, let's --
```

Gerald L. Ford - August 19, 2015                    212

1       A       We put it in a bottle -- we put it in a bottle

2       shape because your client uses a bottle shape.

3       Q       It uses a square bottle shape.

4       A       Right.  And that's one of the trade -- trade

5       dress elements of Jack Daniel's.

6       Q       You could have used a different square bottle

7       shape other than the Jack Daniel's square bottle shape.

8       A       I think you would have to be really careful

9       that you didn't get a square shape that was suggestive

10      of Jack Daniel's.

11      Q       And you looked at page Sacra or SAC0021 or --

12      A       Correct.

13      Q       I count nearly 50 whiskey and bourbon products

14      in square bottles.

15              MR. LARKIN:  On that page?

16      BY MR. BRAY:

17      Q       On that page alone.  Couldn't you have been

18      careful and had the control product -- product more

19      mimic the test product by having it in some shape a

20      square bottle?

21      A       It's not what I would do, because now you're

22      adding to the control some of the elements of the test

23      cell.  If we were doing this survey for you, we wouldn't

24      have done it that way.

25      Q       The label -- I'm sorry.  The hang tag --

Gerald L. Ford - August 19, 2015                    213

1          A     Uh-huh.

2          Q     -- on the Bad Spaniels toy, that -- Jack

3    Daniel's is not sold with a hang tag; correct?

4          A     I don't believe so.

5          Q     And a hang tag is not claimed as any part of

6    Jack Daniel's trade dress; correct?

7          A     I believe you're correct.

8          Q     Yet you changed the hang tag in the control;

9    correct?

10         A     We took the -- we took the black hang tag off

11   because black was one of the issues in this case, as I

12   understood it.

13         Q     Not in conjunction -- not identified by Jack

14   Daniel's, in conjunction with a hang tag though;

15   correct?

16         A     No, but a black color with white filagree,

17   which the hang tag has.

18         Q     Do you have an understanding of what filagree

19   is?

20              MR. LARKIN:  Do you mean what the word means --

21              MR. BRAY:  Yeah.  What the word means.

22              MR. LARKIN:  -- or what his understanding of

23   what he just mentioned -- what he meant in his last

24   answer?

25   BY MR. BRAY:

Gerald L. Ford - August 19, 2015                    214

1          Q     Well, okay.  Yeah.  Do you know what -- what is
2    your definition of filagree?
3          A     That it's some sort of design.
4          Q     Okay.
5          A     Squiggly -- kind of my definition of filagree
6    is some sort of squiggly design.
7          Q     Is the double line surrounding the dog on the
8    Bad Spaniels product, is that or is that not filagree,
9    in your opinion?
10         A     I think that's filagree.
11         Q     Okay.  And is that why you removed a double
12   line from the control?
13         A     Correct.
14         Q     If, in fact, Jack Daniel's witnesses in charge
15   of or involved in the design of the evolution bottle and
16   label testified that this double line is not a filagree,
17   would that change your opinion as to whether or not it's
18   appropriate to carry over the double line from the test
19   to the control?
20               MR. LARKIN:  Well, you're now asking him to
21   speculate about what somebody else's understanding or
22   definition of filagree was.  He just told you what his
23   definition was.
24   BY MR. BRAY:
25         Q     Well --

Gerald L. Ford - August 19, 2015                    215

```
 1          A    I would have to see their testimony.
 2          Q    Okay.  Assume for me the testimony is:
 3    Mr. Rousch, is that filagree?  Answer, no.  Assume
 4    that's the testimony.  Would that influence your opinion
 5    as to whether or not it's appropriate -- would have been
 6    appropriate to carry the double line from the Bad
 7    Spaniels product to the control product?
 8          A    I wouldn't have done that.
 9          Q    You would not have carried it over?
10          A    No.
11          Q    Why not?
12          A    Because that's part of the -- the Bad Spaniels
13    label that I think could be associated with Jack
14    Daniel's, and you can see the filagree on Jack Daniel's
15    label.
16          Q    Okay.  Even though the complaint uses the word
17    filagree, and Jack Daniel's witnesses say that's not a
18    filagree, it doesn't make a difference to you?
19                MR. LARKIN:  Both products speak for themselves
20    or appear for themselves, but you can answer.
21                THE WITNESS:  No.  It doesn't make a difference
22    what they testify to.
23    BY MR. BRAY:
24          Q    Does -- does Jack Daniel's own exclusive rights
25    to a lined border?
```

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

Gerald L. Ford - August 19, 2015                       216

```
 1          A     No.  They don't own exclusive rights to a black
 2    cap either.
 3          Q     Does Jack Daniel's even use a double line on
 4    its whiskey product?
 5          A     It's hard to tell.
 6          Q     I'll call up a picture.
 7                MR. LARKIN:  Maybe we can get one here.  Just a
 8    minute.
 9                MR. BRAY:  I think there are close-ups of one.
10                MR. LARKIN:  I'll get one.
11                THE WITNESS:  There.
12                MR. LARKIN:  No.  Mr. Ezell has pulled up a
13    label from the internet.
14                MR. BRAY:  Okay.
15                MR. LARKIN:  Do you agree that's a fair --
16                MR. BRAY:  Sure.
17                MR. LARKIN:  -- representation of the label?
18    Okay.
19    BY MR. BRAY:
20          Q     Does Jack Daniel's use a double line as part of
21    its trade dress?
22          A     I think so.
23          Q     Does Jack Daniel's own exclusive rights to
24    black hang ties?
25          A     No, but --
```

1        Q    Does Jack Daniel's own exclusive rights to a
2   black label with white writing; yes or no?
3        A    Again, what you're doing is you're dissecting
4   their mark, which is prohibited.
5        Q    If the elements of their mark don't have
6   secondary meaning and are widely used by others in the
7   whiskey and bourbon industry, is it still prohibited in
8   your expert opinion?
9        A    Yes.  It's prohibited to dissect the mark.
10   It's a combination of elements that they're claiming,
11   and it was a combination of elements that was being
12   tested.
13        Q    Okay.  And the actual Bad Spaniels product uses
14   No. 2; right?
15        A    Correct.
16        Q    And Jack Daniel's does not use No. 7;
17   correct -- does not use No. 2; correct?
18        A    It uses No. 7.
19        Q    And No. 2 is not part of the claimed trade
20   dress in paragraph 6 of the counterclaim; correct?
21        A    Old No. 7 is.
22        Q    Okay.  Yet -- so No. 2 is not part of the
23   claimed trade dress in paragraph 6 of the counterclaim;
24   correct?
25        A    The counterclaim is talking about the trade

Gerald L. Ford - August 19, 2015                    218

```
 1      dress for the Jack Daniel's -- for Jack Daniel's, not
 2      Bad Spaniels.
 3           Q    I know.  And what I'm saying is Jack Daniel's
 4      isn't claiming No. 2 as part of its trade dress in its
 5      counterclaim; correct?
 6           A    It's claiming Old No. 7.
 7           Q    And 2 is different than 7; right?
 8           A    Last time I looked.
 9           Q    Okay.  And George Dickel uses 8.  8 is
10      different than 7?
11                MR. LARKIN:  Objection.  No foundation.  I think
12      he previously testified he is not familiar with that
13      product.
14      BY MR. BRAY:
15           Q    Yet you removed No. 2 from the control even
16      though No. 2 is not claimed as part of the Jack Daniel's
17      trade dress; correct?
18           A    We removed a number from the control.
19           Q    You also removed 2; correct?
20           A    Yes.
21           Q    Okay.
22           A    That's what I said.  We removed the number from
23      the control.
24           Q    Okay.
25           A    And that happened to be the No. 2.
```

1      Q    The reason I'm confused is Old No. 2, when you
2   say remove the number, you're talking about removing
3   the -- what's the word?
4           MR. LARKIN:  Don't look at me.
5   BY MR. BRAY:
6      Q    Both the actual 2 as well as number; correct?
7      A    Correct.
8      Q    Two things are removed?
9      A    Correct.
10     Q    Okay.  You can take a look at SAC60.  Depicted
11  there is George Dickel Tennessee Sour Mash Whiskey
12  No. 8.
13     A    I don't know that I've ever seen this before.
14     Q    Okay.  You don't think Jack Daniel's has the
15  exclusive right to the words No. 8 or No. 2, do you?
16     A    No.  In combination of other elements,
17  that's -- they're claiming their trade dress includes --
18  is No. 7.
19     Q    Sure.  Does VIP have the right to use -- if, in
20  fact, many of the elements claimed by Jack Daniel's in
21  paragraph 6 of its counterclaim are, in fact, used in
22  combination together by numerous other competitors in
23  the whiskey company, bourbon sphere, does that influence
24  your expert opinion or not --
25     A    No.

```
 1          Q      -- as to whether or not --
 2               MR. LARKIN:  Let him finish his question.
 3               THE WITNESS:  I'm sorry.
 4      BY MR. BRAY:
 5          Q      -- it would be appropriate to remove all of the
 6      elements you did in the control product?
 7          A     We would remove all of the elements that Jack
 8      Daniel's or the plaintiff was claiming trademark rights
 9      in.
10          Q     Okay.  Do you see the phrase "poo poo" on the
11      control product on page 10 of Exhibit 61?
12          A     Yes.  Poo poo on your -- on your Tennessee
13      carpet.
14          Q     And with regard to the picture on page 8, which
15      is the actual Bad Spaniels toy, do you see the words
16      "poo poo" anywhere on the VIP product, the Bad Spaniels
17      product?
18          A     Yes, at the bottom of the label.
19          Q     Here.  You can have it.
20               MR. LARKIN:  Just give him -- yeah.  It's much
21      easier.
22               THE WITNESS:  Oh.  I could see it.  I could
23      actually see it now.
24      BY MR. BRAY:
25          Q     Sure.  And the bottom of the label talks about
```

Gerald L. Ford - August 19, 2015                    221

```
1      poo by volume, not poo poo; correct?
2          A     Correct.
3          Q     If the Bad Spaniel toy does not use the words
4      "poo poo," why is it appropriate to use it in the
5      control?
6          A     Because we were trying to communicate in the
7      control that it was a -- it was a spoof, poo poo on your
8      Tennessee carpet.  We could have said poo on your
9      Tennessee carpet.
10         Q     Would it have been just as appropriate in your
11     opinion to use a control, instead of the round bottle
12     shape, with a bone shape?
13         A     A bone shape?
14         Q     Sure.
15         A     I would have to see it, but I probably wouldn't
16     make that choice since the test cell was a bottle shape.
17     Because we wanted another bottle shape.  We just didn't
18     want a square bottle shape.
19         Q     And you didn't want to invoke a whiskey or
20     bourbon bottle, right, or shape?  It wasn't appropriate
21     for the spoof to invoke in the minds of consumers a
22     whiskey or bourbon product; right?
23         A     I don't think so.
24         Q     And you tried to avoid that when you created
25     the control; correct?
```

Gerald L. Ford - August 19, 2015                                222

```
 1        A    Generally that's true.  We tried to avoid that.
 2   We used the same dog.  We used the same hang tag.  We
 3   changed the color from black to yellow.
 4        Q    And on the control, you removed from the hang
 5   tag, "The product and its design belong to VIP Products.
 6   This product is not affiliated with Jack Daniel's
 7   Distillery."
 8             Do you see that?
 9        A    I do.
10             MR. LARKIN:  Wait.  Are you asking him whether
11   he agrees with what you just read off the Bad Spaniels --
12             MR. BRAY:  He answered my question.  I asked him
13   it was removed from the control; correct?
14             MR. LARKIN:  Well, you --
15             THE WITNESS:  Well, not everything is removed
16   from the control.  The reference --
17   BY MR. BRAY:
18        Q    Okay.
19        A    -- Jack Daniel's wasn't removed.
20             MR. BRAY:  Thank you.  Thank you, Counsel.  It's
21   late in the afternoon.
22             MR. LARKIN:  It is.
23   BY MR. BRAY:
24        Q    You removed from the control words that were on
25   the Bad Spaniels hang tag, "This product is not
```

Gerald L. Ford - August 19, 2015                          223

```
1    affiliated with Jack Daniel's Distillery."  Correct?
2         A    Correct.  There was no reason for that
3    disclaimer on a bottle that --
4         Q    Because, again, the --
5         A    -- didn't evoke Jack Daniel's.
6         Q    Sure.  The bottle -- the control bottle was not
7    intending to be a spoof of Jack Daniel's; right?
8         A    Correct.  It shouldn't have been --
9         Q    It wasn't even intended to be a spoof of a
10   liquor -- or a whiskey or bourbon bottle; correct?  That
11   would have been inappropriate, in your words?
12        A    Now, there are lots of bourbon bottles that
13   I've seen that are round bottles that look like this,
14   but -- so I don't think you can make -- necessarily make
15   that distinction.
16        Q    Have you ever seen a parody product that had a
17   hang tag label like this that contained instructions on
18   how to answer survey questions if you were ever surveyed
19   as a result of trademark litigation like this?
20        A    I'm not sure I understand the question.
21             MR. LARKIN:  Objection as to form.  I have no
22   idea what you're asking.
23   BY MR. BRAY:
24        Q    Sure.  If the -- if a label were marked -- if
25   you were ever asked in a survey about this product and
```

1    asked, "Who makes this product?  The answer is VIP
2    Products.  If you're ever asked, is there an
3    affiliation, sponsorship, or relationship with any other
4    product, answer none."  Have you ever seen that on a
5    label or a hang tag?
6              MR. LARKIN:  Again, I have no idea what you're
7    asking.
8              Do you understand, Dr. Ford?
9              THE WITNESS:  I understand that I've seen
10    disclaimers on hang tags.
11    BY MR. BRAY:
12       Q    No.  I'm talking -- I've seen disclaimers too.
13    I'm talking about a label or a hang tag that tells you
14    how to answer survey questions like yours.
15       A    I don't think that that label or hang tag tells
16    you how to answer the survey questions.
17       Q    Oh, I know it doesn't.  This one doesn't.  I'm
18    asking have you ever seen a case where a product
19    includes a label or a hang tag that specifically answers
20    how to ask Eveready survey -- answer Eveready survey
21    questions?
22              MR. LARKIN:  I have no idea what you're asking.
23              Do you understand?
24              THE WITNESS:  No.
25    BY MR. BRAY:

Gerald L. Ford - August 19, 2015                                225

```
 1          Q    A cut-and-paste question.  Have you ever seen a

 2     bottle that cut and paste Question 9 from your survey

 3     and put it on the label and said, "If you're ever asked

 4     in a survey this question, here's the answer"?  Ever

 5     seen that?  That's a yes or no.  That's probably an easy

 6     one.  The answer is no, isn't it?

 7          A    The answer is no.  I've never seen one.

 8          Q    If you were confronted with a product that had

 9     a hang tag with instructions on how to answer an expert

10     survey like yours, would that influence how you would

11     conduct your survey?

12          MR. LARKIN:  Objection to form.  It's an

13     incomplete hypothetical.  And, again, I'm sorry.  I have

14     no idea what you're asking.

15          Dr. Ford, do you understand what he's asking

16     you?

17          THE WITNESS:  No.

18     BY MR. BRAY:

19          Q    Okay.  The only -- this litigation has the

20     potential to go on for years.  Jack Daniel's gets an

21     injunction in theory what's enjoined is this specific

22     product.  There could be changes made to this product.

23     If one of the changes to this product were a hang tag

24     that included suggested answers to survey questions,

25     would the existence of those questions and answers on a
```

```
 1      hang tag influence how you would conduct a survey as to
 2      whether that modified product would be likely to cause
 3      confusion with Jack Daniel's?
 4                  MR. LARKIN:  It's an incomplete hypothetical.
 5      BY MR. BRAY:
 6          Q    But do you, at least, understand the question?
 7          A    I do.
 8          Q    And Steve Sacra is a very creative guy.  I'm
 9      just thinking hypothetically.  They include answers to
10      your survey.  Would that influence how you go about
11      testing the new product?
12          A    No.
13          Q    You would do the same survey?
14          A    Yes.
15          Q    And you would show them the entire product,
16      including the -- including the hang tag?
17          A    Yes.
18          Q    Okay.  And do you think a hang tag like that
19      would -- well, this is a hypothetical.  Let's say that a
20      survey is done with a modified hang tag, and the answer
21      is you get a significantly lower confusion rate or
22      alleged confusion rate than 29 percent.  In that case,
23      in your expert opinion, would the hang tag ameliorate
24      the possibility of a likelihood of confusion?
25                  MR. LARKIN:  Objection.  It's an incomplete
```

1       hypothetical.

2                   Do you understand the question?

3                   THE WITNESS:  I do.

4                   It's an empirical question.  You would have to

5       see.

6       BY MR. BRAY:

7           Q    You would have to see.  But you wouldn't do

8       anything different?

9           A    No.

10          Q    Even if the product tells you how to answer the

11      survey, you would give the same survey?

12          A    I couldn't change what people would see nor the

13      placing, and I wouldn't.  And I've seen so many cases,

14      which I think you probably have too, in which -- that's

15      a little bit like a disclaimer, and people just don't

16      understand those things.

17          Q    I know.  I don't understand that.  It's this

18      whole counterintuitive thing that people see

19      disclaimers, and they think, "Oh, my God.  There must be

20      an affiliation.  It's the opposite of what the

21      disclaimer says."  I'm aware of the cases, but it

22      doesn't make any sense to me.

23          A    And there's some pretty good scholarly research

24      that suggests that not affiliated is not really

25      understood by consumers.

Gerald L. Ford - August 19, 2015                    228

1        Q    I suppose from the trademark holder's

2    perspective, there's no language that could be

3    understood by consumers.  Everything is confusing.

4              MR. LARKIN:  It calls for -- come on.

5    Objection.

6              THE WITNESS:  I'm not sure.

7              MR. LARKIN:  Objection to form.  That's a --

8    BY MR. BRAY:

9        Q    You're not sure?

10             MR. LARKIN:  -- ridiculous question.

11             THE WITNESS:  I'm not sure that's true from a

12   trademark owner's perspective, everything is confusing.

13   BY MR. BRAY:

14       Q    Have you ever given an opinion in a trademark

15   case that a disclaimer was effective in communicating to

16   a consumer that there was no affiliation between the

17   alleged infringing product and the trademark holder's

18   product?

19             MR. LARKIN:  I'm sorry.  Was effective?  Is that

20   your question?

21             MR. BRAY:  Yeah.

22             THE WITNESS:  I --

23             MR. LARKIN:  Well, there's no foundation he's

24   testified about the effectiveness or ineffectiveness of a

25   disclaimer at all.

Gerald L. Ford - August 19, 2015                    229

```
 1                  Do you understand the question?
 2      BY MR. BRAY:
 3           Q    I think you do, and you're thinking; is that
 4      right?
 5           A    We have done cases where there were
 6      disclaimers, and the disclaimers didn't work.
 7           Q    Okay.  Have you ever provided an expert opinion
 8      that a disclaimer was effective?
 9           A    Not that I recall, but I think conventional
10      wisdom is disclaimers generally are not effective,
11      because people misunderstand them.  These are not
12      life-changing events.  You've got to read very
13      carefully.  They don't process each word.
14           Q    Do you want to take a break, or are you good?
15           A    How much time -- more time do you have?
16           Q    I've got -- I want to talk about -- there's one
17      more topic I want to cover.  I'm guessing like 40
18      minutes.
19                  MR. LARKIN:  Let's take a break.  It's 4:30.
20                  (Brief recess.)
21                  THE WITNESS:  Excuse me.
22      BY MR. BRAY:
23           Q    All right.  It is what it is.  I'm not going to
24      ask you about that.  We just saved five minutes.
25                  MR. LARKIN:  We like that.
```

Gerald L. Ford - August 19, 2015                    230

```
 1              THE WITNESS:  Matt, you want to go tell Kathy
 2        that they all can go at 5 o'clock.
 3              MR. EZELL:  I'm sure they'll agree with that.
 4              MR. BRAY:  A well-trained staff.
 5              64.  You can mark this as Exhibit 64.
 6              (Plaintiff's Exhibit 64 was marked
 7              for identification.)
 8              THE WITNESS:  Thank you.
 9              MR. LARKIN:  What's the last page?
10              MR. BRAY:  Oh, here you go.
11              MR. LARKIN:  Oh, you have it?  Thank you.
12        That's great.
13        BY MR. BRAY:
14          Q    Before I ask you about 64 or the changing
15        gears, I asked you a couple of questions about
16        particular respondents, 1001, and categorizing the
17        respondent as confused or one category and the other.
18        Do you remember that?
19          A    I remember.
20          Q    You never talked to any of the respondents,
21        right, in order to further explore their answers in the
22        survey?
23          A    No.
24          Q    Okay.
25          A    Which you never do.
```

Gerald L. Ford - August 19, 2015                    231

1        Q    And is it -- would you agree that there's --
2   that experts such as yourself can disagree as to the
3   proper coding of responses by respondents in the survey?
4        A    I've seen that before.
5        Q    Okay.  And would you agree that's not -- it's
6   more of an art than a science in determining for a
7   respondent that you've never talked to, just reading
8   bare answers, whether they were in Category A, put out
9   by the trademark holder, or, B, sponsored or affiliated?
10            MR. LARKIN:  Objection to form.
11  BY MR. BRAY:
12       Q    Strike that.
13            Would you agree that it's an art versus a
14  science in terms of how survey respondents' answers are
15  coded?
16            MR. LARKIN:  Same objections.
17            THE WITNESS:  I'm not sure I would agree with
18  that.  I mean obviously you know how it was coded because
19  we've given you all the codes.
20  BY MR. BRAY:
21       Q    Sure.
22       A    And if your expert or you're unhappy with any
23  of those codes, that's fair game for cross-examination.
24       Q    Sure.  And what I'm saying is, as you know,
25  Dr. Nowlis was unhappy or disagreed with several of

Gerald L. Ford - August 19, 2015                    232

1      your -- a number of your coding choices; correct?

2          A      Correct.

3          Q      And is that something that you see in your

4      cases, where experts disagree as to how to properly code

5      respondents' answers when there's really no opportunity

6      beyond the bare record to explore what they were

7      actually thinking or believing?

8                MR. LARKIN:  Objection.  Relevancy.  Incomplete

9      hypothetical.

10               You can answer.

11               THE WITNESS:  Sometimes that's true, and

12     sometimes it's not.

13     BY MR. BRAY:

14         Q      And you don't believe that -- do you believe

15     that Dr. Nowlis was unreasonable in any of his critiques

16     of your coding choices?

17         A      I'd have to go back and read his report again.

18         Q      Okay.  As you sit here today, is there anything

19     in Dr. Nowlis' report that struck you as completely

20     unreasonable?

21               MR. LARKIN:  Objection to form.

22               Did you mean whether he agrees with Dr. Nowlis'

23     criticisms?

24     BY MR. BRAY:

25         Q      Sure.  I mean you've been against Dr. Nowlis in

1    other cases?

2       A    No.

3       Q    You have been against other survey experts in

4    other cases; right?

5       A    Yes.

6       Q    And oftentimes -- and there have been cases

7    where, like this, the other expert is retained to rebut

8    your report; correct?

9       A    There have been cases like that, and there have

10   been other cases where there was no other expert.

11      Q    Okay.  And what I'm trying -- this is only a

12   question in order to see if there's anything else worth

13   exploring.  So I'm probably going to get a form

14   objection.

15           Was there anything in Dr. Nowlis' report that

16   you recall, and I could hand it to you, if you'd like,

17   that was completely out in left field that you think is

18   not in accordance with general -- how experts in your

19   field, of survey research in trademark area, conduct

20   themselves?

21           MR. LARKIN:  You're going to get an objection to

22   form.  It's also an incomplete hypothetical.

23           You need -- if you want to show him your

24   report, and you want to ask him to respond to specific

25   criticisms, that's fine.  I don't think it's fair to ask

Gerald L. Ford - August 19, 2015                    234

```
1      him to remember everything and whether something is, I
2      think, as you put it, completely out in left field or
3      completely unreasonable.
4      BY MR. BRAY:
5          Q    I mean experts disagree; correct?
6          A    Sometimes.
7          Q    Okay.
8          A    Sometimes they don't.
9          Q    All right.  I'm going to go ahead and just mark
10     Exhibit --
11              MR. LARKIN:  That's 65.
12              MR. BRAY:  65.
13              (Plaintiff's Exhibit 65 was marked
14              for identification.)
15     BY MR. BRAY:
16         Q    Did you review Dr. Nowlis' report to prepare
17     for today's deposition?
18         A    More than once.
19         Q    Okay.  Is there anything in Dr. -- and I
20     believe you'll say as an expert that the work that you
21     do designing and conducting surveys and analyzing
22     surveys, there is empirical research or science behind
23     them -- behind it, or not?
24         A    I would say there is empirical --
25         Q    Okay.
```

Gerald L. Ford - August 19, 2015                235

```
 1        A    -- research, especially behind the Eveready
 2   design.
 3        Q    Okay.
 4        A    I think Jerry Swann -- not in the chapter we
 5   looked at, but in his chapter on likelihood of
 6   confusion, he -- he suggests that the Eveready survey
 7   design has been used so often and for so many years,
 8   that it's -- he would consider it to be peer reviewed.
 9        Q    Are you aware of any case law reported cases
10   that have held that the Eveready survey design is an
11   appropriate design to use in a parody case?
12        A    I'm not aware of.
13        Q    Okay.
14        A    And I think that that's what -- was an
15   Eveready survey design that George Mantis used.
16        Q    I assume you disagree with the conclusions or
17   the opinions of Dr. Nowlis in his rebuttal report?
18        MR. LARKIN:  Why don't you take a minute to
19   review them briefly and --
20   BY MR. BRAY:
21        Q    I'd like to strike that question.
22        I'll go through a summary of opinions.  Do you
23   agree with Dr. Nowlis' opinion that the survey used was
24   not designed to test for fame in this case?
25        A    You've already asked me that question.
```

```
 1          Q    So the answer is, yes, you agree?
 2          A    I'm not going to testify about fame.
 3          Q    So, yes, you would agree with Dr. Nowlis'
 4     opinion regarding fame; correct?
 5               MR. LARKIN:  It was not designed to test for
 6     fame?
 7               MR. BRAY:  Yes.
 8               THE WITNESS:  He seems to rely on me.
 9     BY MR. BRAY:
10          Q    Okay.
11          A    So I'd rely on me also.
12          Q    Okay.  That's fine.  And that -- same is true
13     for acquired distinctiveness; correct?  I don't want
14     to --
15               MR. LARKIN:  Saying what?  It's clearly not
16     designed to test for acquired distinctiveness --
17               MR. BRAY:  Yeah.
18               MR. LARKIN:  -- or whether it shows it in any
19     way?
20               THE WITNESS:  I think -- I think I've already
21     testified about that whole issue.
22     BY MR. BRAY:
23          Q    Dr. Nowlis testified or provides an opinion
24     that the Ford survey does not properly test likelihood
25     of confusion.
```

Gerald L. Ford - August 19, 2015                    237

```
 1              I assume you disagree with that, or maybe you
 2       agree?
 3           A    I disagree.
 4           Q    Okay.  I don't want to go into all his
 5       critiques.  What I'm trying -- and if you can answer
 6       this -- it's late in the day.  What I'm trying to drill
 7       down into is with regard to Dr. Nowlis' rebuttal opinion
 8       regarding the Ford survey, it does not properly test
 9       likelihood of confusion, in your opinion is this a
10       reasonable disagreement amongst experts who can have
11       different views on how surveys are conducted, or is
12       Dr. Nowlis completely in left field?
13           A    I think he's completely in left field.
14           Q    What's the basis for your comment?
15           A    That, first, he seems to focus on likelihood of
16       confusion as to source.  It's almost as if he's never
17       read the Lanham Act.  He kind of ignores confusion as
18       affiliation or authorization.
19              The other is he may be under the
20       misapprehension that we made up the display that was
21       shown people to give them a reference for what they
22       could see in the store, and we did not.  It's the truth.
23       It's an actual photograph from a pet store.  The only
24       difference is in the control cell.  Matt Ezell went in
25       and photoshopped the control stimuli, so it matched the
```

Gerald L. Ford - August 19, 2015                    238

1       control stimuli used in the survey.

2           Q    Okay.  And then with regard to Dr. Nowlis'

3       opinion that -- and I understand this is a subcategory

4       of likelihood of confusion, but with regard to his

5       critiques regarding failure to properly code and analyze

6       data, in your opinion, is that a good faith disagreement

7       amongst experts, or is Dr. Nowlis completely in left

8       field with regard to his opinion there?

9               MR. LARKIN:  Objection to form.

10              Let's get to the critique.

11      BY MR. BRAY:

12          Q    It's page 12.

13          A    Page what?

14          Q    12 of Dr. Nowlis' --

15              MR. LARKIN:  Yeah.

16              THE WITNESS:  And I don't know what -- what

17      basis he has to say some of the things he says.  Jack

18      Daniel's dog toy is a parody of --

19              THE REPORTER:  Can you repeat that?

20              THE WITNESS:  Sure.  I'd be happy to.

21              The second line in paragraph 25, he says,

22      "However, Bad Spaniels dog toy is a parody of Jack

23      Daniel's bottle, and Dr. Ford's results need to be

24      analyzed with this in mind."

25              I think he's simply wrong.  I'd probably give

Gerald L. Ford - August 19, 2015                    239

1      him the chapter out of McCarthy on parody.

2      BY MR. BRAY:

3           Q    Specifically as to the coding, the

4      disagreements he has regarding your coding choices, good

5      faith disagreement amongst experts?  Completely left

6      field?

7               MR. LARKIN:  Objection to form.  That also

8      assumes that those are the only possible ways to look at

9      these opinions.

10              THE WITNESS:  Yeah.  I wouldn't agree with

11     anything he has to say about coding.

12     BY MR. BRAY:

13          Q    He's completely in left field?

14              MR. LARKIN:  Objection to form.  He just gave

15     you an answer.

16              THE WITNESS:  I wouldn't -- I probably wouldn't

17     use those words.

18     BY MR. BRAY:

19          Q    Okay.

20          A    Okay.

21          Q    This is closer to -- understanding Mr. Larkin's

22     statement that there's probably a continuum between good

23     faith disagreement amongst experts and completely in

24     left field, somewhere in the middle?

25              MR. LARKIN:  Well, he just testified he

Gerald L. Ford - August 19, 2015                    240

```
 1      disagreed with him.  You can ask him the basis for that,
 2      but I don't think there's anything further to be gained
 3      by --
 4      BY MR. BRAY:
 5          Q    Well, I don't want to get into details.  I mean
 6      you disagreed with him, but do you think it's a
 7      legitimate good faith disagreement amongst experts?
 8               MR. LARKIN:  Same --
 9               THE WITNESS:  No.
10      BY MR. BRAY:
11          Q    Why not?
12          A    Because I don't think it is.  I think the
13      results speak for themselves.
14          Q    You're right; he's wrong?
15          A    Well --
16               MR. LARKIN:  Well, he seems to think he's right,
17      and he's wrong.
18      BY MR. BRAY:
19          Q    I know.  You were going to say something.
20          A    No.  I was just going to say that all I'm
21      reporting is what -- the state of mind of the
22      respondents and how they were coded.
23          Q    If you'll turn to page 7 of your report, which
24      is Exhibit 61 --
25          A    I got it.
```

Gerald L. Ford - August 19, 2015                       241

```
1              MR. LARKIN:  I'm sorry.  Page 7?

2              MR. BRAY:  Yeah.

3              MR. LARKIN:  7.

4       BY MR. BRAY:

5           Q    Yeah.  And you may want to look at counsel's.

6       He has a colored picture.

7           A    Okay.

8           Q    What -- what brand names of products can you

9       read in this picture?

10          A    Happy Hips, Bad Spaniels, Hear Doggy, Vita

11      Help.  I see Bad Spaniels again.  Looks like there are a

12      couple of beers.

13          Q    Would you agree that the brand names are

14      somewhat difficult to read?

15              MR. LARKIN:  In the report or in the actual

16      picture?  I'm sorry.  In the picture in his declaration

17      or in the picture in the report?

18      BY MR. BRAY:

19          Q    Picture in the declaration.

20          A    I agree the picture in the declaration is not

21      easy to read, but --

22          Q    The picture in the report?

23          A    We're not looking at it on a computer monitor

24      the way the respondent was.

25          Q    Would you agree there would be --
```

Gerald L. Ford - August 19, 2015                    242

```
 1        A    They can click to enlarge.
 2        Q    Would it be easier for a consumer to read the
 3   brand names if the consumer was actually in the store as
 4   opposed to viewing something on a computer monitor?
 5        A    You know, may or may not be.  Depends upon how
 6   close they were, how interested they were in reading the
 7   brand names.  There are a number of factors there that
 8   you would have to know the answer to.
 9        Q    And you can't see the back -- any words on the
10   back of the Bad Spaniel product in the picture on page 7
11   of your report; correct?
12        A    No, and there are no words on the back.
13        Q    And -- well, there are words on the back of the
14   hang tag; correct?
15        A    But they saw the hang tag, both front and back,
16   enlarged.
17        Q    Would a consumer seeing the -- the products on
18   page 7 of a report just on a computer screen have any
19   way of knowing whether -- or how hard or soft or
20   squeezable a product is?
21             MR. LARKIN:  Objection to form.  Compound
22   question.
23             Do you understand?
24             THE WITNESS:  No.  They just knew it was a dog
25   toy.
```

Gerald L. Ford - August 19, 2015                    243

1      BY MR. BRAY:
2          Q    Okay.    Would a consumer looking at the picture
3      on Exhibit -- on page 7 of Exhibit 61 have any way of
4      knowing which products displayed squeak when squeezed?
5          A    No.
6          Q    And they'd have no way of knowing whether any
7      of the products pictured on page 7 of your report emit
8      any sound when used; correct?
9          A    That's correct.
10         Q    And a consumer looking at the products
11     displayed on page 7 of your report would not -- on a
12     computer screen would not be able to determine what any
13     of those products smelled like; correct?
14         A    Smelled like?
15         Q    Yeah.
16         A    No.
17         Q    And if a consumer actually saw the products in
18     the store, if he or she was in the store at which the
19     picture on page 7 was taken, he or she would be able to
20     answer -- determine answers to all those questions if he
21     or she was there in person; correct?
22         A    If she chose -- if he or she chose to touch the
23     products, yes.
24         Q    Look at the pictures on page 8 of your report.
25         A    I'm there.

Gerald L. Ford - August 19, 2015                          244

1        Q    Can you read the entirety of the Silly
2    Squeakers brand name on the front of the hang tag in the
3    picture on Exhibit -- page --
4        A    No.
5        Q    -- 8 of your report?
6        A    You can't.
7        Q    And Squeakers is kind of covered up?
8        A    Correct.
9        Q    If a consumer saw the product in the store and
10   moved the hang tag, would he or she be able to see the
11   entire brand name?
12            MR. LARKIN:  Calls for speculation.
13            You can answer.
14            THE WITNESS:  They may or may not.  I'm not
15   sure.
16   BY MR. BRAY:
17       Q    Is it -- if the product -- is it possible to
18   maneuver the hang tag such that you can read Silly
19   Squeakers if that product -- if you were in a store with
20   that product?
21       A    I guess it depends on whether or not you
22   thought you would get in trouble with the store owner if
23   you started messing around with the hang tags.
24       Q    At least theoretically it's possible to move it
25   around a little bit, and you can see Silly Squeakers or

Gerald L. Ford - August 19, 2015                    245

```
 1        the Squeakers part that's covered up; right?
 2             A    Correct.
 3             Q    Can -- looking at the pictures on page 8 of --
 4             A    You can read Silly Squeakers on the back of the
 5        hang tag, which --
 6             Q    But not the front?
 7             A    Because people had both the back and the front.
 8             Q    Sure.  But on the front picture, you're not
 9        able to see Squeakers; right?
10                  MR. LARKIN:  Asked and answered.
11                  THE WITNESS:  That's correct.
12        BY MR. BRAY:
13             Q    Okay.  And on the picture -- on pictures on
14        page 8 of your report, can you read any of the text on
15        the front of the hang tag?
16             A    No.
17             Q    And, again, if a consumer actually handled the
18        product at the store, would it be possible to maneuver
19        the hang tag such that he or she would be able to read
20        at least some of the text on --
21             A    I don't know about easily.  You may be able to
22        maneuver it.
23             Q    Okay.  Can you go back to Exhibit 64, which was
24        the E-Mail?  I think we marked it.  It's a stack of
25        E-Mails --
```

Gerald L. Ford - August 19, 2015                    246

```
 1              MR. LARKIN:  Here.
 2      BY MR. BRAY:
 3          Q    -- and other things.
 4              I'm sorry, Dr. Ford.  Can you go back to your
 5      report on page 9?
 6              MR. LARKIN:  The report.
 7              THE WITNESS:  Got it.
 8      BY MR. BRAY:
 9          Q    The picture depicted on page 9 was a picture
10      that you took of an actual display in a pet store or
11      somebody associated with your firm?
12          A    I did not take the picture.  It was taken by an
13      investigator.
14          Q    Okay.  And then somebody at Ford Bubala &
15      Associates --
16          A    Bubala.
17              MR. LARKIN:  Bubala.  Get that name right.
18      BY MR. BRAY:
19          Q    And how do you say Adidas?
20          A    Adidas.
21          Q    Adidas.
22              -- photoshopped in the control toy?
23          A    Yes.  Matt Ezell did.
24          Q    Okay.  And you're not able to -- with regard to
25      the control toy to the right, you're not able to see
```

Gerald L. Ford - August 19, 2015                          247

1    what the product is behind it, correct, what the brand

2    name of that product is?

3        A    I am not.

4        Q    And if a consumer were actually in the store,

5    they would be able to get closer or maneuver the control

6    toy in order to see what the product was; correct?

7        A    The product behind the control?

8        Q    Exactly.

9        A    If they wished to do that, they could, and if

10   they didn't wish to do that, they wouldn't.

11       Q    But at least if they wished to, they could at

12   the store, where they can't on a computer monitor;

13   right?

14       A    No.  That's why they were provided with these

15   pictures in large format.  You saw from the screen shots

16   that all of these screen shots -- all of the products

17   were clickable to enlarge.

18       Q    Is it your testimony if you click to enlarge

19   each photo, you could see the product behind --

20       A    No.

21       Q    Okay.  And if you look at page 66 of

22   Exhibit 64 --

23       A    Got it.

24       Q    -- was this the actual display that -- the

25   photo of the actual display that Matt worked off when he

Gerald L. Ford - August 19, 2015                    248

```
 1        photoshopped in the control toy, or does it look like it
 2        is?
 3             A    I believe it is.
 4             Q    Okay.  And I see that there's a Bad Spaniels
 5        toy in front of another toy on the right side.  Do you
 6        see that?
 7             A    That's correct.
 8             Q    Do you know whether or not the investigator
 9        placed the Bad Spaniels toy there on the right side?
10             A    I don't.
11             Q    Okay.  Would you agree with me that -- well, if
12        Mr. Sacra were to testify that in terms of displays of
13        his toys, the Silly Squeakers, they're displayed
14        together on the same metal bar, you wouldn't have any
15        reason to disagree with him; correct?
16                  MR. LARKIN:  Wait.  Are you talking about this
17        store?  In general?  He didn't testify about that.
18                  MR. BRAY:  Or in general.
19                  MR. LARKIN:  He testified he didn't know.  Are
20        you asking him a hypothetical?
21                  THE WITNESS:  I don't think that they're always
22        together.
23        BY MR. BRAY:
24             Q    Do you agree they're typically together?
25                  MR. LARKIN:  Don't guess.
```

Gerald L. Ford - August 19, 2015                              249

```
 1              THE WITNESS:  I'm not going to guess.  It's my
 2      experience that they're not typically together.
 3      BY MR. BRAY:
 4         Q    When you say they're not, are you talking about
 5      Bad Spaniels toys?
 6         A    Well, or Silly Squeakers.
 7         Q    Okay.  And what's that experience based on?
 8         A    This -- three Petcos, because originally it was
 9      my understanding that they sold the Bad Spaniels toy to
10      Petco as one of the retailers.
11         Q    And a bunch of other stores too?
12         A    Right.  So we went to three different Petcos,
13      and nobody had the Bad Spaniels toy.  So we also -- we
14      ordered it off the internet.
15         Q    If you look at -- okay.  Do you know whether or
16      not Bad Spaniels, Silly Squeakers toys are typically
17      sold in close proximity to pet treats, edibles?
18         A    I'm not sure I made a study of that when I was
19      looking for the Bad Spaniels or Silly Squeakers toys.
20         Q    Okay.  If you look at the pictures on GLF60
21      and -- well, 56 through 61.
22         A    I'm there.
23         Q    Were these pictures all taken at the Montecito
24      pet shop?  Do you know?  If you go backward, to GLF55,
25      that's where I got it from.
```

```
 1          A    Right.
 2               MR. LARKIN:  55, 56.
 3               THE WITNESS:  That's what it says.  I was not
 4     there.
 5     BY MR. BRAY:
 6          Q    Okay.  And you'd agree with me that at least
 7     with regard to the Bad Spaniels toys displayed in the
 8     pictures depicted on GLF56 through 61, these toys were
 9     not displayed in close proximity to edible pet treats?
10          A    I guess it depends upon what you mean by in
11     close proximity.  I'm looking at GLF58, and you see a --
12     a display, and right behind the display are edible pet
13     treats, it looks to be.
14          Q    Okay.  But on the display, the little tower on
15     GLF58 the Bad Spaniels toys are displayed on, there's no
16     pet treats -- pet treats -- edible pet treats on that
17     tower, correct, on that display?
18          A    Not that are visible to me.
19          Q    Okay.  If a respondent to one of your surveys
20     hypothetically only responded to the source,
21     affiliation, sponsorship question as yes or Jack
22     Daniel's because he or she had a preexisting belief that
23     trademark law requires spoof products to have the
24     permission of the trademark holder, would it be proper
25     to code that respondent as -- in the confusion cohort?
```

1        A     I think so.  They were not asked that question.

2   They were asked standard likelihood of confusion

3   questions right out of the Lanham Act.

4        Q     If somehow they were asked that question or

5   they said to you unequivocally that, "The only reason

6   I'm answering the affiliation or sponsorship question

7   Jack Daniel's is because I know trademark law requires

8   spoofs to have the permission of the trademark holder,"

9   in that instance, that hypothetical, would it be proper

10  to code that respondent in the confused cohort?

11       MR. LARKIN:  Objection to form.  It's obviously

12  a hypothetical, but if you understand the question,

13  Dr. Ford, go ahead.

14       THE WITNESS:  I generally understand what you're

15  asking.

16       I think that McCarthy said it still is

17  likelihood of confusion.

18  BY MR. BRAY:

19       Q     So --

20       A     Even if they have a misinterpretation of what

21  the law might be, it's their state of mind.  They were

22  not asked whether they had to have permission or they

23  got permission.  They were not asked either one of those

24  questions.

25       Q     Give me one minute, Dr. Ford.  Thank you for

Gerald L. Ford - August 19, 2015                    252

```
 1      your patience.
 2           A    You can have a minute or two.
 3               MR. BRAY:  No further questions.
 4               MR. LARKIN:  No questions.
 5               MR. BRAY:  Anything else, I'm sure I'd get an
 6      asked and answered.  People will be annoyed at me at ten
 7      after 5:00.
 8               MR. LARKIN:  We'll read and sign.  You can just
 9      send it to me.
10               (Ending time:  5:15 p.m.)
11
12
13
14                                    _____
15                                    GERALD L. FORD
16
17
18
19
20
21
22
23
24
25
```

```
 1                        REPORTER'S CERTIFICATE

 2

 3

 4             I, Barbara R. Swengel, CSR No. 7415, a

 5      Certified Shorthand Reporter in and for the State of

 6      California, do hereby certify:

 7             That prior to being examined, the witness

 8      named in the foregoing proceedings declared under

 9      penalty of perjury to testify to the truth, the whole

10      truth, and nothing but the truth;

11             That said proceedings were taken by me in

12      shorthand at the time and place herein named and was

13      thereafter transcribed into typewriting under my

14      direction, said transcript being a true and correct

15      transcription of my shorthand notes;

16             Pursuant to Federal Rule 30(e), transcript

17      review was requested;

18             I further certify that I have no interest in

19      the outcome of this action.

20                                    August 31, 2015

21

22

23                          _____
                            Barbara R. Swengel
24                          CSR No. 7415

25
```

Case 2:14-cv-02057-SMM     Document 233-2     Filed 10/20/17     Page 254 of 276
VIP Products vs. Jack Daniel's Properties                                    Gerald L. Ford
2:14-CV-02057-DGC                                                          August 19, 2015

## A

**Abercrombie (3)** 78:13,15;79:5

**able (14)** 47:20;86:4; 98:17;118:10;119:6; 243:12,19;244:10; 245:9,19,21;246:24, 25;247:5

**above (1)** 145:13

**absence (1)** 160:6

**Absolute (2)** 72:3,7

**absolutely (4)** 37:21; 68:1;130:13;142:19

**abstract (4)** 119:8; 121:1;185:11;208:25

**accepted (4)** 30:3; 42:22;182:16;185:22

**accordance (1)** 233:18

**according (5)** 37:13; 45:22;110:20,21; 189:6

**account (9)** 83:22; 138:18;146:15; 147:7,12,18;166:8, 14;193:15

**accurate (3)** 97:23, 24;190:15

**acknowledge (1)** 131:6

**acquired (9)** 62:12; 129:13;130:7,11,15, 24;152:25;236:13,16

**across (2)** 83:9,15

**across-the-bar (1)** 121:22

**Act (23)** 20:21;22:2; 28:11,25;29:24;34:2, 4,7;39:8;58:11,11,24; 109:8;145:10; 179:22;189:2,5; 190:21;196:9;200:3, 22;237:17;251:3

**action (3)** 40:19; 41:18,19

**actionable (1)** 120:6

**active (8)** 143:1; 165:15;166:23; 167:14;168:3;175:8; 178:12;179:17

**actual (26)** 48:7,23; 49:17;51:23;52:14; 53:5;54:18,19;55:12; 56:15;58:1,12,20,20; 98:2,18;132:11; 197:16;217:13; 219:6;220:15; 237:23;241:15; 246:10;247:24,25

**actually (7)** 7:25; 10:1;15:18;20:1,10;

27:10;62:7;79:18; 91:12;100:19;105:4, 11;126:9;128:5; 206:10;220:23; 232:7;242:3;243:17; 245:17;247:4

**add (1)** 168:15

**adding (2)** 178:12; 212:22

**addition (2)** 99:18,20

**address (2)** 18:14; 145:10

**adequately (1)** 85:19

**Adidas (14)** 80:11,12, 15,17,21,22,23,25; 81:7;89:18;130:18; 246:19,20,21

**administration (3)** 70:19,22;71:25

**admit (4)** 85:1,2; 118:4;178:7

**adopting (1)** 140:2

**advantage (13)** 84:14;85:6,10,13,15, 18;86:7,19;95:21; 96:2,4,8;97:16

**advantages (3)** 83:16;84:10,19

**Adventures (1)** 65:25

**advertising (8)** 64:22; 65:6,8,13,15,18; 84:23;146:24

**affect (4)** 57:9; 183:15;185:15; 189:13

**affiliated (17)** 37:16, 18;60:7;61:6;66:2; 72:4,14;73:3;78:14; 79:12;80:24;127:20; 128:6;222:6;223:1; 227:24;231:9

**affiliation (35)** 18:25; 34:6;38:23,24;50:6; 56:4;108:6;110:1,4; 112:6;122:6,25; 128:16;134:8;135:6, 9;137:25;139:23; 164:4;169:14; 170:22;171:2,3; 174:6,14;177:22; 181:6;188:3;196:7; 224:3;227:20; 228:16;237:18; 250:21;251:6

**affirmative (2)** 204:22; 205:15

**affirmatively (1)** 128:4

**affirming (1)** 102:25

**afraid (1)** 94:17

**afternoon (3)** 54:1; 151:25;222:21

**again (52)** 8:25; 12:12;16:6;25:3;

32:8;37:10;39:6; 41:18;45:1,4;59:10, 16;62:19;64:1;80:2; 87:12,15;88:17; 91:18;104:11;112:9; 124:22,24;134:1,10; 139:25;140:12; 151:5;162:15,19; 177:17;184:6; 190:25;193:13,21; 194:16,24;195:11,25; 196:6;202:14;204:1; 206:1,11;210:6; 217:3;223:4;224:6; 225:13;232:17; 241:11;245:17

**against (5)** 12:4; 40:12;81:4;232:25; 233:3

**aging (2)** 71:6,10

**ago (2)** 24:22;194:5

**agree (82)** 23:5,14; 47:16;48:22;54:2; 66:18;84:8;101:9; 103:8,20;105:21,23; 106:3,4,6,20;108:1, 20;112:14;113:21; 119:7;121:9,19,21; 122:17;131:10,12,16; 133:16,18,25;134:11, 14,17,24;135:3,9,15; 136:12,14;137:12,19, 23;145:17;161:4,12; 162:20;163:2;172:3, 24;176:2;180:2; 183:3;184:18; 186:12;188:15,20; 189:25;190:4,8,14; 207:10,12;208:21; 209:10;216:15; 230:3;231:1,5,13,17; 235:23;236:1,3; 237:2;239:10; 241:13,20,25;248:11, 24;250:6

**agreed (3)** 17:3; 60:15;196:13

**agreement (1)** 103:17

**agrees (3)** 138:9; 222:11;232:22

**ahead (29)** 13:7; 17:12;18:8;23:16; 29:9;30:5;33:8; 35:23;40:20;47:10; 51:3;52:20;53:18; 55:21;93:5;104:1; 112:20;120:1;134:4; 137:15;153:3; 162:25;164:19; 167:4;171:9;183:8; 188:13;234:9;251:13

**aided (2)** 21:24;93:11

**air (1)** 143:17

**Albertsons (1)** 75:4

**alcohol (1)** 211:6

**alcoholic (1)** 50:17

**alleged (23)** 11:24; 12:4,18;15:3;41:11, 15,16,20;59:20;73:6; 78:16,18;79:4;81:2; 138:19;139:10,22; 188:3;190:9;191:6; 206:22;226:22; 228:17

**alleges (2)** 116:18; 158:18

**alleging (1)** 158:7

**allow (12)** 16:5; 95:18,20;118:11; 122:13;143:17,18; 149:8;175:15; 194:13;195:17;211:8

**allows (1)** 194:13

**almost (6)** 20:24; 68:12;72:1;110:25; 198:5;237:16

**alone (2)** 129:14; 212:17

**along (4)** 13:2;59:7; 89:25;185:8

**although (5)** 22:13; 39:16;42:22;43:11; 120:25

**always (8)** 87:23; 89:6;90:18;95:17; 101:20;174:20; 185:13;248:21

**amazed (1)** 50:7

**ameliorate (1)** 226:23

**amended (2)** 83:8; 99:23

**Amendment (3)** 131:8,20;189:4

**American (22)** 159:13;161:25; 162:16;172:25; 180:9;185:12,25; 186:15;187:3,22; 190:15,25;191:13,16; 192:22;195:16; 197:12;198:2; 203:10;204:3,23; 205:17

**Americans (6)** 172:25;173:11; 174:21;183:12; 192:25;206:1

**amicus (1)** 117:18

**among (1)** 158:7

**amongst (8)** 185:12, 24;186:14;237:10; 238:7;239:5,23; 240:7

**amount (3)** 50:23; 51:19;54:13

**amounts (1)** 209:25

**analogy (1)** 149:18

**analysis (4)** 46:25; 48:11;67:20;110:14

**analyze (1)** 238:5

**analyzed (2)** 156:20; 238:24

**analyzing (1)** 234:21

**angle (2)** 85:17;86:21

**angles (1)** 85:18

**answered (19)** 33:7; 57:6,24;86:24; 102:19;122:11,19; 131:2;136:19;153:2; 170:2,22;179:4; 185:17;195:12; 204:2,22;222:12; 245:10

**anticipate (1)** 129:25

**anymore (4)** 21:19; 83:19;115:11;198:24

**apart (1)** 159:17

**apologize (3)** 56:6; 82:6,7

**apparent (1)** 105:11

**apparently (1)** 36:13

**Appeal (3)** 64:8; 72:16;103:11

**appear (2)** 171:24; 215:20

**appearance (4)** 16:2, 12;127:6;161:11

**appears (4)** 49:13; 51:16;94:11;160:12

**appellate (2)** 117:15, 16

**applicable (1)** 198:12

**application (1)** 63:20

**apply (1)** 133:5

**appreciate (7)** 8:6; 36:21;37:22;43:4; 44:5;70:2;78:7

**appropriate (13)** 102:9;146:12; 149:21;156:2; 171:22;214:18; 215:5,6;220:5;221:4, 10,20;235:11

**approval (10)** 18:24; 34:6;119:8;171:14; 182:3;194:22;202:9; 205:4,6,24

**approved (1)** 37:20

**approximately (7)** 13:14;60:16;64:11; 125:11;127:11; 152:4;164:3

**April (2)** 13:17,18

**aptly (1)** 156:14

**arch (7)** 154:16; 159:11,14,19;160:2, 2,6

**arched (3)** 19:14; 158:22;160:18

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 255 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC
Gerald L. Ford
August 19, 2015

**architect (1)** 92:10
**architects (1)** 92:18
**architectural (1)** 93:6
**area (5)** 77:8;114:20;
141:25;191:6;233:19
**areas (1)** 77:5
**argument (1)** 100:20
**arise (1)** 146:23
**around (10)** 40:22;
41:9;76:19;97:3;
108:24;113:11;
124:17;155:16;
244:23,25
**art (8)** 37:12;38:11;
142:21;143:16;
148:14,14;231:6,13
**article (5)** 31:10;
46:17;69:20;199:9,
21
**articles (2)** 80:10,10
**articulated (1)** 191:15
**aside (1)** 96:7
**aspect (3)** 50:10;
69:7;209:3
**aspects (1)** 69:4
**asserted (4)** 15:4;
115:15;120:17;166:4
**asserting (11)** 12:4;
40:12;41:21;66:5;
72:15;73:14,15;
78:17;79:14;81:1,3
**assertions (2)** 81:14,
15
**Assisted (1)** 93:11
**associate (1)** 152:5
**associated (4)** 23:18;
126:25;215:13;
246:11
**Associates (1)** 246:15
**association (6)** 46:2,
2;66:22;131:4;164:9;
196:7
**assume (19)** 65:5;
67:24;79:14;86:15;
90:17;112:24;119:1;
133:4;176:12;184:5;
185:7,7,20,20;193:7;
215:2,3;235:16;
237:1
**assumed (1)** 70:23
**assumes (1)** 239:8
**assuming (1)** 79:12
**assumption (1)** 79:13
**assured (1)** 152:19
**athletic (2)** 147:22;
148:2
**at-sale (7)** 74:1,5,7,
16;75:22,24;79:1
**attachment (4)** 52:7,
23;53:7,9
**attack (1)** 31:10
**attempt (4)** 112:10;
135:13,16;174:12

**attempting (5)** 14:1,3;
19:4;72:7;137:20
**attention (1)** 54:11
**attorney/client (1)**
116:25
**attributable (1)**
152:19
**audience (1)** 211:6
**August (2)** 5:1;124:1
**author (1)** 199:9
**authored (1)** 67:3
**authoring (1)** 32:15
**authority (2)** 129:22;
200:14
**authorization (19)**
18:24;34:5;38:22;
39:4,7;58:17;128:15;
171:14,17;181:20;
182:1,3,5;189:11,13;
194:21;202:8;205:4;
237:18
**authorized (5)** 37:20;
50:5;56:3;91:8;
127:20
**author's (1)** 200:12
**Autodesk (2)** 92:7,16
**automobiles (1)** 53:8
**available (3)** 96:25;
97:5;156:20
**average (2)** 181:19;
182:9
**avoid (4)** 27:13;
112:12;221:24;222:1
**aware (12)** 24:5,6,8;
34:2;48:7,9,10;
155:22;190:4;
227:21;235:9,12
**away (3)** 10:5;134:7;
149:15
**Awesome (1)** 145:7

**B**

**back (51)** 9:17;17:24;
20:3,4;25:21;26:16;
29:21;30:15;31:7;
32:14;42:5;49:18;
51:12,13;53:10;
54:12;56:24;57:12;
58:10,23;59:1;69:20,
23;77:7;79:2;85:23;
88:10,17;89:17;
94:16;99:7;103:14;
116:23;117:19;
119:15;135:23;
139:25;144:14;
151:6;179:22;
182:22;232:17;
242:9,10,12,13,15;
245:4,7,23;246:4
**background (6)** 32:9;
83:20;113:11;200:4,
13,24

**backward (1)** 249:24
**Bad (56)** 18:18;26:2;
37:15;43:15;49:4,21;
63:10;74:10;98:2;
107:7;111:22;
112:15;113:4;
127:19;133:7,16;
155:14,19;158:18,20;
159:6,9,10;160:2,7,
17;168:9;169:2;
185:9,11;193:6;
197:16;213:2;214:8;
215:6,12;217:13;
218:2;220:15,16;
221:3;222:11,25;
238:22;241:10,11;
242:10;248:4,9;
249:5,9,13,16,19;
250:7,15
**bag (2)** 149:13,16
**bags (1)** 83:12
**ball (2)** 38:7;65:19
**ballpark (4)** 24:21;
29:1,22;64:18
**Banana (1)** 79:7
**bans (2)** 121:22;
122:1
**Bantam (1)** 137:9
**bar (3)** 121:19;122:9;
248:14
**barbecue (1)** 202:16
**Barbie (12)** 23:13,18,
23;24:1,2,7,9,13,20,
24;25:6,7
**bare (2)** 231:8;232:6
**barely (1)** 107:15
**Barney (1)** 139:5
**based (12)** 36:17;
55:13;58:5;62:13;
70:11;79:20;104:2;
109:23,24;156:20;
205:16;249:7
**basis (5)** 57:19;
142:9;237:14;
238:17;240:1
**Bates (2)** 7:20;8:19
**batteries (1)** 35:7
**Beach (2)** 5:1;124:1
**bear (1)** 194:2
**beard (1)** 71:11
**bearing (6)** 110:7,7;
139:21;154:11,15;
188:3
**bears (1)** 110:8
**became (1)** 71:12
**become (1)** 142:11
**becomes (1)** 105:10
**becoming (1)** 176:21
**beers (1)** 241:12
**began (1)** 21:7
**beginning (6)** 36:4;
41:2;99:8;125:22
**behalf (6)** 13:21,22;

41:16;66:4;72:5;
119:5
**behind (9)** 110:2;
176:23;234:22,23;
235:1;247:1,7,19;
250:12
**belief (17)** 23:22;
146:19;171:25;
172:4,25;173:11;
176:5;177:5;183:13;
185:12,24;186:14;
196:1;197:11;
203:10;204:23;
250:22
**beliefs (13)** 146:16,
23;147:12;151:23;
153:18;193:13,22,25;
194:1,12,17;195:16,
20
**believes (1)** 205:23
**believing (1)** 232:7
**belong (1)** 222:5
**belongs (1)** 190:19
**below (1)** 94:12
**belt (1)** 35:23
**beneath (1)** 154:19
**Bernstein (4)** 100:20;
117:1,3,8
**besides (3)** 24:6;
54:11;100:5
**best (10)** 7:11;10:24;
14:12,18;60:5;78:7;
114:16;152:10;
178:5;180:25
**bet (1)** 34:10
**better (4)** 94:5;97:7;
148:11;208:25
**beverages (1)** 50:17
**beyond (1)** 232:6
**bias (1)** 200:2
**biasing (1)** 211:15
**bibliography (1)**
69:24
**big (3)** 46:4;56:9;
151:25
**bit (6)** 24:3;71:6;
91:16;114:23;
227:15;244:25
**black (28)** 19:12,12,
13;154:3,5,6,7,9,14;
162:21;165:2,3;
166:16,17;207:7,10,
19;208:4,5,10,10;
213:10,11,16;216:1,
24;217:2;222:3
**blanket (1)** 191:16
**Bless (3)** 93:23;
153:9;201:2
**blind (1)** 77:1
**block (1)** 128:12
**Bloomingdale's (1)**
83:14
**blowing (1)** 141:24

**blue (1)** 128:11
**blurring (11)** 20:25;
66:10,12,13,16,20;
67:1;69:2;71:15;
114:24;125:9
**Board (2)** 64:8;72:16
**bone (3)** 211:22;
221:12,13
**bones (1)** 34:14
**book (17)** 29:15;30:2,
13,22;31:11;32:3;
33:1,12;46:18;67:3,
11,13,13,16;69:22;
70:15;144:5
**Border (4)** 107:14;
154:15;207:8;215:25
**boroughs (1)** 83:4
**borrowing (1)** 73:18
**both (21)** 10:16;
25:20;47:24,25;53:7,
7;56:16;73:10;74:21;
75:18;93:22;124:15;
130:21;135:9,9,15;
148:10;215:19;
219:6;242:15;245:7
**bottle (45)** 19:13;
107:10;153:24;
161:5,6,11,13,14;
162:5,6,7,9,11,16;
165:2,5,9,11,13;
166:16;178:6;
202:15;207:24;
208:18;209:6;
211:21;212:1,1,2,3,6,
7,20;214:15;221:11,
16,17,18,20;223:3,6,
6,10;225:2;238:23
**bottles (11)** 160:23;
161:10,20;162:1,22;
166:10;209:11;
210:2;212:14;
223:12,13
**bottom (5)** 19:16;
144:7;149:25;
220:18,25
**bought (6)** 13:25;
14:1;92:20;93:3;
99:15;177:11
**bourbon (24)** 155:23;
156:21;159:14,20;
160:21,22;161:25;
162:17;166:9,15;
209:5,11;210:17,21,
25;211:9,19;212:13;
217:7;219:23;
221:20,22;223:10,12
**box (1)** 16:3
**Bradstreet (1)** 92:19
**brand (12)** 51:10;
52:13;133:11;181:2,
15;241:8,13;242:3,7;
244:2,11;247:1
**brands (10)** 21:8;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 256 of 276
VIP Products vs. Jack Daniel's Properties                                    Gerald L. Ford
2:14-CV-02057-DGC                                                      August 19, 2015

49:9,14;51:7,17,20,
22;53:7;161:2;178:1
**brass (1)** 45:4
**BRAY (286)** 5:9,12;
6:5,11;9:1,3;10:1,6,9,
11,14;13:8,12;14:14;
15:1,2;17:12,17,24;
18:5;19:2;20:9;
23:20;29:14;30:5,10;
32:21,24;33:11;
39:25;40:2,5,23;
41:13,25;42:5,14;
44:5,9;45:19;46:9;
47:4,15;48:2,21;
49:15;50:8;51:4,13,
18;52:8;53:3,22;
54:6,8;55:3,23;
57:14;59:4;62:16;
69:5;72:25;74:6;
77:19;82:5,14,17,19;
85:14;86:11;87:3,24;
88:6,9;90:2;94:3;
99:5;101:12;102:16,
20,23;103:6;104:13;
105:1,4,15;107:23;
108:13;109:3;
111:13;113:2,22;
114:4,5,13,15;116:6;
118:13;119:14;
120:13;121:7,13,17,
18;122:16;123:3,7;
124:5,21;126:24;
131:5,15,19,25;
133:14;134:9;136:5,
20;137:18;138:13;
139:3;140:11;141:2,
18;143:4,7,11;
144:17;145:1;149:1,
5;150:2,21;151:6,18;
153:12;155:11;
157:4,10,12,16;
158:15;159:1,12;
160:3,14,19;161:21;
162:4,14;163:6,8;
164:15;165:4,24;
166:13,20;167:5,12,
24;168:11,24;
169:18;170:20;
171:8;172:16,23;
173:7,18;174:7;
175:3,22;176:16;
177:12;178:3;
179:12;180:22;
181:24;182:18,21;
183:2,11;185:1,18;
186:11;187:15;
188:14;189:19,22;
191:9;192:1,16;
193:18;196:15;
197:8;199:1,13,24;
200:1,10,16;201:3,9,
20;203:1,5,7,8,21;
204:15,20;205:9;

206:12,17;207:1,9;
209:9,17,21,24;
210:7,12;212:16;
213:21,25;214:24;
215:23;216:9,14,16,
19;218:14;219:5;
220:4,24;222:12,17,
20,23;223:23;224:11,
25;225:18;226:5;
227:6;228:8,13,21;
229:2,22;230:4,10,
13;231:11,20;232:13,
24;234:4,12,15;
235:20;236:7,9,17,
22;238:11;239:2,12,
18;240:4,10,18;
241:2,4,18;243:1;
244:16;245:12;
246:2,8,18;248:18,
23;249:3;250:5;
251:18
**break (19)** 35:16,18,
19,22;36:24;37:10;
40:17;41:25;42:11;
84:17;88:6,13;
141:13;163:4,5,10;
182:18;229:14,19
**breaks (1)** 76:25
**brick (1)** 97:15
**Brief (6)** 42:2;88:8;
117:18;163:7;
182:20;229:20
**briefly (3)** 6:17;45:21;
235:19
**Bring (4)** 89:19,20;
149:9;162:12
**broad (2)** 47:1,3
**broader (1)** 136:7
**broadly (1)** 112:15
**brown (1)** 207:25
**Brown-Forman (3)**
48:19;50:7;91:8
**BS (3)** 86:1,13,16
**Bubala (3)** 246:14,16,
17
**bulbs (2)** 34:22;35:5
**bullet (1)** 184:8
**bumper (3)** 16:5,7,8
**bunch (1)** 249:11
**buried (1)** 152:2
**business (18)** 18:25,
25;38:23,23;50:5;
56:4,4;70:18,21;
71:24;79:6;84:3;
115:18;119:6;
128:16;142:21;
171:2,3
**businesses (1)** 24:9
**Butt (7)** 124:10,12;
125:12;126:18,21;
127:23;128:18
**Buttwiper (1)** 110:21
**Buttwiser (4)** 48:5;

111:18;115:4;192:9
**buy (4)** 29:19;76:9;
80:16;112:5

## C

**CAD (1)** 92:8
**California (5)** 5:1;
124:1;126:8;198:18,
20
**call (12)** 12:17;17:4;
23:17,21;24:1;46:18;
60:6;80:23;81:6;
96:14;110:23;216:6
**called (7)** 49:5;79:7;
80:9;93:13,14;120:8;
128:11
**calls (24)** 10:21;
23:15;47:18,21;
49:10;52:3;101:6;
103:1,24;108:22;
119:24;131:11;
133:12;134:1;
136:16;137:14;
155:6;159:21;
162:23;170:15;
182:12;183:6;228:4;
244:12
**came (4)** 37:19;50:4;
56:3;124:18
**Can (133)** 5:14,23;
10:5;11:3,13;14:12;
16:8;17:23,24;18:22;
23:16;25:3;28:14;
29:19;30:17;32:21;
35:16;38:2,5,14,21;
41:25;43:13,16;
44:17;45:16;47:5,9;
49:12;51:12,14;
53:25;54:23;55:21;
60:5;63:11,25;72:21;
77:4;78:7,11;79:10;
80:23;83:16,23;
84:10,14,25;86:20;
88:22;96:8;97:20;
98:18;100:8;104:1;
109:7;110:19;
112:11,12;118:14,20;
120:16;128:1;129:3,
18;132:18;135:10,20,
23,25;136:8,10;
140:8;141:3,6;143:4,
12;146:23;150:24;
151:6,10;155:8,16,
16;156:25;157:21;
159:23;161:18;
163:4;166:21;
170:17;177:15,18;
182:14,15,18;184:22;
187:10;193:14,14,22;
195:12;201:4,13,13,
16;209:5;210:5;
215:14,20;216:7;

219:10;220:19;
223:14;230:2,5;
231:2;232:10;237:5,
10;238:19;240:1;
241:8;242:1;244:1,
13,18,25;245:3,4,14,
23;246:4
**Canada (2)** 24:11,21
**Canadian (3)** 24:11;
25:6,11
**canvas (2)** 16:3;
83:12
**cap (7)** 19:12;86:1;
154:3;162:21;165:3;
166:16;216:2
**capability (3)** 85:1,2,4
**captions (1)** 41:5
**Carbide (5)** 34:1,17,
25;42:25;129:17
**card (1)** 94:12
**care (1)** 209:22
**career (1)** 104:12
**careful (3)** 132:19;
212:8,18
**carefully (1)** 229:13
**carpet (6)** 168:10,10;
183:18;220:13;
221:8,9
**carried (1)** 215:9
**carry (2)** 214:18;
215:6
**carry-on (1)** 83:12
**case (233)** 5:13;8:8,
23,24;10:22,24;11:1,
17,18,20;13:4,20;
15:14,15,17;16:9;
17:8;18:4;20:3,14;
21:5;22:4,5,18,21,25;
24:14,20,24,25;
25:13,18,21;26:2,4;
27:19;28:17,20;
30:24;33:6,21;34:1,
17;35:22;36:22;37:4,
5,13;38:8;39:14,18;
40:12;42:12,25;
43:13,16,25;44:10,
22;45:5,9,14;48:4,5,
8,24;53:6;55:14;
57:7;58:1,21,22;
59:12,21;60:8,13,25;
61:7,9,14;64:20,22;
65:17,23;66:3,8;
67:25;68:9;69:9,19,
20,24;70:12;71:15;
72:2,6;73:1,3,7,25,
25;74:17;75:1,21,25;
77:11,24;78:22;
80:11,22;81:9,20,23;
82:9,11,25;84:13;
85:20;86:9,12;87:1,2,
5,13,16;90:5,12,20;
91:2;95:5;97:25;
98:23;100:24;101:5,

23;102:1,2,18;
103:10,14;104:15,21;
105:4,17,22;107:11;
108:14;109:24;
110:21;111:5,18;
113:13;114:2,10,12,
13;115:3,4,13,14,15,
23;116:3,12,14,15,
17,21;117:2,4,14;
118:2;119:19;124:7,
9,13;125:1,3;126:1;
127:17,17,23,23;
128:9,18,21;129:17,
22;133:2;137:8,11;
138:7,18;139:4,10;
140:2,14,15;142:16;
146:5,6,11,12;150:7,
8,9;152:3,15,17,23,
25;156:23;158:4;
164:21;168:22;
173:5,6;174:24;
189:24;190:1;192:6,
10;193:6;194:12;
199:19,21;213:11;
224:18;226:22;
228:15;235:9,11,24
**cases (60)** 11:6,9,10,
15,16;20:10;25:24;
26:24;36:16,25;39:9,
12;43:25;46:21;
47:24,25;59:1,7;68:7,
12;69:18;78:10;
81:12;84:14;87:19;
102:8;113:25;
114:23;115:6;
118:16;125:12;
126:5;128:1,2;
130:18;132:3;
146:25,25;147:6,11,
13,17;187:5;190:4,9,
11,24;193:2;198:7,8;
227:13,21;229:5;
232:4;233:1,4,6,9,10;
235:9
**Cat (1)** 68:8
**categorize (3)**
169:23;181:15;
202:3
**categorizing (1)**
230:16
**category (3)** 54:14;
230:17;231:8
**Cat's (2)** 68:10,11
**cause (15)** 18:14,19;
19:23;27:4;53:19,20;
122:2;135:5,8;
136:25;137:24;
160:5,8;164:22;
226:2
**caused (1)** 83:14
**causes (1)** 66:22
**cautious (1)** 22:14
**caveat (2)** 134:6,15

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 257 of 276

VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

**cell (44)** 50:18,18; 127:15,16;128:19; 142:13,13;143:2; 147:3;148:18;149:9, 14,21,22;150:16; 152:4,7,12;153:14; 164:2,14,14,16,22; 165:1,2,12,13; 166:22,22;167:15; 175:9;178:13; 179:11,18;180:14,15; 186:10,10,24,25; 212:23;221:16; 237:24
**cells (5)** 142:14; 145:11;146:14; 147:7;160:15
**center (1)** 19:17
**centers (3)** 77:2;97:1, 6
**Central (2)** 126:8; 142:17
**certain (8)** 147:6,11, 13,17;172:24; 173:10;184:18;199:5
**certified (1)** 30:24
**cetera (1)** 146:17
**challenging (1)** 71:22
**chance (1)** 197:22
**Chanel (4)** 24:3; 128:12,14,15
**change (5)** 50:20; 94:9;165:10;214:17; 227:12
**changed (5)** 22:2; 33:24,25;213:8; 222:3
**changes (3)** 145:8; 225:22,23
**changing (1)** 230:14
**Channel (1)** 128:11
**chapter (32)** 30:2,12, 23;31:11;32:3,5,11, 13;33:1,12,15;47:12; 67:8,9,12,18;69:20; 70:14;99:9;100:7,12; 106:8,9;144:3,5; 145:3,5;146:13; 149:19;235:4,5; 239:1
**chapters (3)** 67:3,11; 70:13
**characteristics (1)** 145:9
**characterization (1)** 162:8
**characterize (1)** 113:3
**charge (1)** 214:14
**chat (1)** 62:4
**cheaper (2)** 89:10; 90:10
**check (2)** 39:17; 153:5

**checking (1)** 35:9
**chemistry (1)** 80:10
**chemists (1)** 80:9
**Cherokee (1)** 53:2
**chewed (1)** 55:9
**Chewy (26)** 47:23; 100:14,24;103:7,11, 20,22;104:16,19; 105:22,23;106:5; 107:2;108:8;112:16; 113:4;115:3;116:24; 117:1,4;118:1; 119:18;120:4,16; 122:9,17
**Cheyenne (1)** 72:4
**Chicago (1)** 34:18
**child (1)** 105:19
**choice (2)** 87:20; 221:16
**choices (3)** 232:1,16; 239:4
**choked (1)** 53:14
**choose (1)** 90:4
**chooses (1)** 86:21
**chose (3)** 86:5; 243:22,22
**Chris (2)** 90:18; 149:24
**Chrysler (1)** 52:25
**cigar (1)** 96:12
**cigarette (2)** 96:13,19
**Circle (4)** 99:7; 113:24;116:23; 119:15
**circles (1)** 108:25
**circling (1)** 113:11
**Circuit (29)** 34:19; 43:1;46:1;69:21; 100:13,20;102:17,24; 103:7;104:7,10,16; 105:24;106:4; 108:14;120:15,20; 122:12;137:2,4; 138:14,21,24;172:18; 178:16;196:11,11,11, 12
**Circuit's (1)** 105:14
**circular (2)** 103:16; 198:1
**circumstances (6)** 128:8;184:19;185:3; 186:13;193:1;199:5
**citation (2)** 199:23; 200:25
**cite (1)** 29:18
**cited (1)** 46:17
**cites (3)** 29:12;190:8, 11
**citing (1)** 36:16
**claim (2)** 68:15; 166:19
**claimed (17)** 19:23; 81:15;83:9;143:3;

147:6;148:3;152:20, 24;153:15;156:9; 165:2;175:25;213:5; 217:19,23;218:16; 219:20
**claiming (9)** 156:11; 159:24,25;163:3; 217:10;218:4,6; 219:17;220:8
**claims (3)** 109:19; 110:11;156:22
**classic (1)** 42:24
**Classification (1)** 92:24
**clear (8)** 13:25;15:6; 34:11;91:1;134:10; 154:21;177:14; 205:23
**clearing (1)** 148:17
**clearly (4)** 50:2; 183:18,23;236:15
**click (2)** 242:1;247:18
**clickable (1)** 247:17
**client (3)** 119:5; 176:25;212:2
**clients (5)** 89:14; 90:16;91:7;118:20; 199:6
**Cliff's (1)** 137:9
**Clinique (4)** 72:3,5,8, 9
**clip (2)** 201:3,6
**close (8)** 36:12,14; 110:23;111:4;242:6; 249:17;250:9,11
**closely (3)** 177:25; 205:8,25
**closer (6)** 23:17,21, 25;182:24;239:21; 247:5
**close-ups (1)** 216:9
**closure (3)** 154:5,6,9
**cloth (1)** 166:2
**clothing (1)** 25:8
**coast (1)** 89:25
**coat (1)** 55:7
**code (7)** 92:21,24; 93:2;232:4;238:5; 250:25;251:10
**coded (3)** 231:15,18; 240:22
**codes (4)** 92:20;93:4; 231:19,23
**coding (6)** 231:3; 232:1,16;239:3,4,11
**coexistence (4)** 50:24;51:20;52:12; 57:25
**coexisting (1)** 54:16
**coffee (1)** 91:11
**cohort (13)** 38:1,3,3, 4;39:10,14;60:17; 64:10;72:20;119:20;

127:10;250:25; 251:10
**cologne (2)** 112:17; 120:22
**color (7)** 163:17,20, 22;167:7;208:14; 213:16;222:3
**colored (1)** 241:6
**combination (21)** 45:3;92:2,6;94:22; 95:11;129:14,15; 152:20;153:6;156:5, 9,12;158:9;159:25; 165:8;166:16; 207:17;217:10,11; 219:16,22
**combined (1)** 97:2
**Comfort (1)** 7:19
**comfortable (2)** 30:1; 34:8
**coming (3)** 130:22; 186:24,25
**comment (3)** 104:10; 200:2;237:14
**commentator (2)** 199:2,3
**commission (1)** 62:21
**commissioned (2)** 27:9;130:5
**committee (1)** 117:20
**common (5)** 135:13, 16;146:24;176:21; 197:9
**communicate (1)** 221:6
**communicated (2)** 175:20,20
**communicates (1)** 148:11
**communicating (1)** 228:15
**companies (6)** 50:15; 93:3;136:9;171:13; 194:22;202:8
**company (13)** 11:5; 35:5;67:4;73:1; 75:25;171:13; 181:10;189:10; 194:4,22;201:23; 202:7;219:23
**competent (1)** 102:14
**competing (2)** 155:22;156:21
**competitors (1)** 219:22
**complaint (6)** 14:19; 48:19;83:9;99:23; 158:13;215:16
**complete (2)** 54:3; 55:17
**completely (11)** 33:19;232:19; 233:17;234:2,3;

237:12,13;238:7; 239:5,13,23
**complicated (1)** 165:16
**complication (1)** 189:3
**complied (1)** 7:7
**complying (1)** 7:2
**component (1)** 132:12
**composite (1)** 69:22
**Compound (1)** 242:21
**compounding (1)** 178:13
**comprised (1)** 92:17
**Computer (10)** 61:2, 7;62:2;93:1;142:16; 241:23;242:4,18; 243:12;247:12
**Computer-Aided (2)** 93:15,18
**concept (7)** 106:12; 120:21;142:7; 143:15;148:13; 156:7,14
**conceptions (1)** 171:22
**concepts (1)** 148:7
**conclusion (16)** 47:19,21;49:11; 101:7;103:2,25; 108:23;131:11; 134:2;136:17; 137:14;155:7; 159:22;162:24; 170:16;183:7
**conclusions (3)** 119:4;193:5;235:16
**Conde' (1)** 128:10
**conditions (1)** 57:24
**condos (1)** 97:3
**conduct (21)** 18:12, 14;22:19,23;25:17, 18;27:5;28:19;62:20, 22;71:15,18;79:22; 87:13;98:23;111:10; 118:5;192:21; 225:11;226:1;233:19
**conducted (28)** 22:4; 25:20;27:5,7,18; 43:15,18,19;48:6,24; 55:14;63:13;65:2; 73:25;75:25;78:22; 81:20,23;98:22; 119:18;129:4;130:4, 14;133:8;185:5; 191:19;192:24; 237:11
**conducting (5)** 26:25; 87:20;91:18;140:1; 234:21
**confirm (1)** 115:12

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 258 of 276
VIP Products vs. Jack Daniel's Properties                                      Gerald L. Ford
2:14-CV-02057-DGC                                                          August 19, 2015

**confronted (1)** 225:8
**confronting (1)** 200:2
**confuse (2)** 58:14;
112:5
**confused (29)** 38:4,9;
39:10,14;48:18;
53:23,24;58:1,15;
60:17;64:10;72:20;
108:5;109:25;110:4;
119:20;127:10;
133:20;139:22;
150:18;151:2,15;
169:13,24;177:21;
181:5;219:1;230:17;
251:10
**confusing (12)** 15:6;
81:18;109:7,8;112:7;
117:25;135:1,11,15;
183:13;228:3,12
**confusion (190)** 8:18;
9:5,10;11:11,19;
12:22;14:24;18:15,
19;19:4,22,23;20:17;
22:12,15;33:14,16;
34:5;37:6;38:3,19;
39:3,19;40:11,14;
42:13,16,21,23;43:3,
7,10,21;44:1,15,19,
20;47:14;48:1,7,23;
49:17,20;51:24;52:1,
14,16;53:6;54:18,20,
21;55:13,15;56:1;
57:3,4;58:5,12,13;
59:13,15;60:11,14;
61:13,21;64:5,6;
65:9;66:17;72:10,18;
73:10;78:20;80:1;
81:19,22;82:9;84:12;
88:23;91:19;94:7,15;
95:3;101:19,22;
103:5;104:7,9,19;
105:12;106:23;
109:1,1,21;110:13,
13;111:11;113:1;
115:10;116:10,21;
118:3,9;119:21;
120:4;122:24;
124:15;125:5;127:7,
9;130:12;131:1,14;
132:9,11,12,22;
134:8,16;135:6,8;
136:25;137:24;
139:12,20;140:5,9,
21;141:23;142:5,10;
143:22;146:1,2,8;
150:25;151:12;
152:5,19;159:5;
160:8;169:5;173:14,
17;174:5,13;178:24;
179:23,24;180:18;
182:17;183:10,10;
185:10;186:20,21;
188:2;189:7,9;190:5,

13,21;191:7,10,14;
192:5,20;193:2;
195:20;196:4,21;
197:21;198:9,11;
200:7,20;203:17;
226:3,21,22,24;
235:6;236:25;237:9,
16,17;238:4;250:25;
251:2,17
**congressional (1)**
70:16
**conjunction (9)** 7:19;
24:24;31:12;61:17;
63:4,13;100:16;
213:13,14
**conjure (15)** 136:15,
18;137:20;138:2;
164:9,22;167:1,11,
18,22;175:15;179:9,
16;196:20,23
**conjured (3)** 164:12,
12;179:14
**connection (11)**
18:25;38:23;50:5;
56:4;107:18;169:10,
12;171:3;172:13;
173:21;179:9
**consider (6)** 66:25;
67:2;68:2,2,24;235:8
**consideration (3)**
116:16,19;192:6
**considered (1)** 20:23
**considering (1)** 76:6
**constitute (6)** 133:23;
134:12;151:20;
186:2,2,17
**constitutes (1)** 106:15
**construct (3)** 43:8;
187:2,12
**construction (4)**
92:19;93:7,9,9
**consulting (4)** 24:25;
25:15,17;101:2
**consume (1)** 28:7
**consumer (20)** 28:5;
48:7;73:2;77:13;
86:20;122:3;175:15;
177:3;182:10;211:8;
228:16;242:2,3,17;
243:2,10,17;244:9;
245:17;247:4
**consumers (21)** 56:2;
58:1;85:25;107:17;
108:1,2;109:16,25;
164:10;180:9;
185:13,25;186:15;
187:3,22;191:13;
195:16;211:6;
221:21;227:25;228:3
**consumers' (2)** 174:9;
200:6
**consumer's (1)**
200:19

**consuming (3)** 28:2,7,
14
**contain (1)** 137:3
**contained (2)** 154:18;
223:17
**containers (1)** 21:8
**contention (1)** 111:8
**context (8)** 27:8;
46:22;54:7;138:16;
142:5;198:7;200:5,
18
**continue (3)** 183:19,
23,25
**continued (2)** 149:17;
183:25
**continues (1)** 30:21
**continuum (1)** 239:22
**contract (1)** 71:4
**contradictory (3)**
137:5,13,17
**contrary (1)** 36:9
**contribute (1)** 190:23
**control (174)** 50:18;
56:14,16,22;74:10;
75:3;76:15;127:16;
128:17,22;129:4,7;
142:4,13,14,18,22,24,
25;143:18,20,22;
145:11,24;146:3,5,9,
11,14;147:1,5,7,11,
17;148:2,12;149:22;
150:10,16;152:7,12;
153:14,14,21;156:3;
158:20,21;159:3;
160:5,13,17;161:4,
11,13;162:9,12;
163:16,18,23;164:2,
2,8,14,16,21;165:1,
10,13,14;166:22,22;
167:1,15,25;168:1,5,
17;169:9;172:7,10;
173:9,17,20,20;
175:2,5,7,8,10,21,24;
176:3,14,24;177:3,
21,23;178:2,2,6,12,
15;179:8,10,14,20;
180:4;183:18,23;
184:3,22;185:5,7,11,
16,20;186:10,21,25;
193:20,24;194:6,11,
24;195:5,10,14,15,
18,19,22,24;196:2,
23;197:3,19;206:18;
207:22;208:7,17,22,
24,25;210:13;211:7,
24;212:18,22;213:8;
214:12,19;215:7;
218:15,18,23;220:6,
11;221:5,7,11,25;
222:4,13,16,24;
223:6;237:24,25;
238:1;246:22,25;
247:5,7;248:1

**controlled (1)** 153:24
**controlling (6)** 143:2;
146:4;147:5;208:6,9,
13
**controls (2)** 56:20;
142:8
**conventional (1)**
229:9
**Converse (5)** 14:1,4;
15:18;42:12;89:18
**convey (4)** 137:5,12;
169:3,6
**conveyed (1)** 108:16
**Cool (2)** 36:23;88:14
**copies (1)** 81:7
**copy (5)** 31:17,21;
143:4;158:5;163:19
**copyright (2)** 172:1,5
**copyrights (2)** 170:4;
205:13
**corporate (1)** 63:16
**Corporation (4)** 61:3,
7;62:2;64:20
**corrected (1)** 171:15
**correctly (7)** 34:20;
38:14;100:8;146:20;
154:17;192:9,18
**cortile (2)** 21:21,23
**cost (2)** 89:12,22
**costs (2)** 90:16,17
**coughing (1)** 148:16
**counsel (28)** 6:22;
9:2;13:4;16:23;17:5,
7;18:3;22:18;26:6,
14;31:11,22;40:2,10;
41:14;43:5;63:8;
112:13;114:14;
117:15,16;124:6;
130:4;139:6;163:19;
188:12;204:19;
222:20
**counsel's (2)** 113:6;
241:5
**count (2)** 133:19;
212:13
**counter (1)** 75:15
**counterclaim (14)**
19:7,8;20:1;99:24;
153:8;158:3;165:23;
166:3;206:23;
217:20,23,25;218:5;
219:21
**counterclaims (2)**
153:23;166:25
**counterintuitive (1)**
227:18
**counties (1)** 83:5
**country (2)** 71:7;
178:5
**county (1)** 83:6
**couple (4)** 99:14;
126:13;230:15;
241:12

**controlled (1)** 153:24

**court (21)** 5:17;24:11,
12;25:6,12;30:9;
34:18;47:25;60:15;
94:9;102:20;106:4;
117:10,14;122:14;
125:14,15,15;126:11,
12;149:8
**courtroom (1)** 148:17
**courts (9)** 30:3;36:16;
42:22;114:25;126:3;
138:9;142:1,15;
182:15
**court's (1)** 102:25
**cover (3)** 10:2;74:13;
229:17
**covered (5)** 15:22;
131:13;188:16;
244:7;245:1
**cranky (1)** 148:20
**create (6)** 104:19;
108:25;122:24;
174:23;183:15;
191:10
**created (5)** 108:18;
143:22;168:19;
211:7;221:24
**creates (6)** 106:22;
109:1;112:25;134:7;
191:7;196:21
**creating (4)** 85:4;
91:18;170:2;205:11
**creative (1)** 226:8
**credentials (1)** 200:24
**critical (1)** 198:10
**criticisms (2)** 232:23;
233:25
**critique (3)** 99:22;
176:23;238:10
**critiques (4)** 176:22;
232:15;237:5;238:5
**cross-examination (1)**
231:23
**crowded (1)** 24:3
**crowds (1)** 88:15
**crux (1)** 25:5
**curiosity (1)** 28:22
**curious (1)** 28:15
**cut (2)** 117:21;225:2
**cut-and-paste (1)**
225:1
**cutoff (1)** 46:14

## D

**damn (1)** 149:14
**dangerous (1)** 104:25
**Daniel's (165)** 17:7;
18:2,12;19:1,3,14,20;
22:5,20,24;23:5,22,
24;24:5;31:3;37:16,
19,20;43:25;44:23;
48:19,25;50:6;53:12,
23,24;55:11;56:5,15;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 259 of 276
VIP Products vs. Jack Daniel's Properties                                    Gerald L. Ford
2:14-CV-02057-DGC                                                            August 19, 2015

90:17;91:2;95:6;
107:8,10;116:18,22;
127:20,21;129:12;
130:4,6;133:20;
146:6;152:24,25;
154:15,20;155:4,10;
156:11,22;158:4,7,8,
11,16,17,23;159:5,5,
9,11,18,18;160:1,9;
162:1,6,15,20;163:2;
164:4,9,10,13,23;
165:6,10,18,22;
166:4;167:2,18,23;
168:4,18,23;169:2;
172:9,12,13;177:22;
178:4,7;179:9,10,13,
14,17;181:2,11,14,
16;183:20,22,24;
184:1,2;189:17;
194:4,6,9;195:1,3,9;
196:24,25;202:2,4,
10,16;203:15,22,23;
204:2,10;205:7,24;
206:22;207:11;
210:14;212:5,7,10;
213:3,6,14;214:14;
215:14,14,17,24;
216:3,20,23;217:1,
16;218:1,1,3,16;
219:14,20;220:8;
222:6,19;223:1,5,7;
225:20;226:3;
238:18,23;250:22;
251:7

**Daniel's/Sweet (1)**
45:9
**data (2)** 119:4;238:6
**date (2)** 13:14,15
**David (4)** 5:12;
100:20;116:25;117:3
**day (4)** 126:11,13;
184:7;237:6
**days (1)** 126:13
**DC (1)** 10:25
**deal (2)** 35:24;177:15
**dealing (1)** 186:13
**Debevoise (1)** 100:22
**dec (1)** 41:18
**deceive (2)** 58:15;
122:2
**deceived (2)** 112:5;
139:23
**decide (1)** 11:15
**decided (2)** 120:15;
149:12
**decision (9)** 87:13,
16,18,21,23;89:6,13;
94:9;100:14;101:4;
102:25;103:3;
104:16;110:21;
120:15;122:14;
138:21,25;139:2
**decisions (3)** 93:17,

22;203:12
**deck (1)** 134:6
**declaration (27)** 7:18;
8:1,9,19;17:9,16,21;
18:7;19:7;20:2;22:6;
32:15;33:10;99:21;
132:14,14,19;138:12;
157:3,21;162:18;
163:14;169:19;
201:11;241:16,19,20
**declaratory (1)** 11:22
**declared (1)** 5:5
**declining (1)** 96:24
**deep-abiding (1)**
62:12
**Deers (1)** 26:13
**defeats (1)** 196:22
**defendant (17)** 12:17,
19;13:21;26:7,8;
40:12;41:20;59:14;
64:2;73:5;118:17
**defendants (7)** 17:3;
25:12,15,20;82:24;
118:21,23
**defendants' (1)** 58:14
**defense (14)** 47:13;
106:23;109:5;110:1,
20,22;111:7,15;
123:1;137:1;189:8;
191:8;196:22;198:11
**define (1)** 112:11
**defined (4)** 108:15;
113:12;172:17;
178:16
**definition (12)**
108:20;136:6,12,14;
138:3;168:3;179:2;
190:16;214:2,5,22,23
**degree (3)** 18:18;
45:23;160:24
**delta (1)** 150:14
**demonstrate (1)**
159:4
**Dental (3)** 72:3,7,9
**Department (1)** 71:5
**Depending (3)**
118:18;120:10;
134:15
**depends (11)** 52:4,5;
86:25;87:1;97:19;
128:7,16;209:2;
242:5;244:21;250:10
**depicted (5)** 154:15,
25;219:10;246:9;
250:8
**depiction (1)** 159:10
**depose (1)** 35:15
**deposed (2)** 5:18;
88:1
**deposition (15)** 9:23;
10:16;23:9;26:23;
27:14;42:3,8;54:2;
57:13;99:9,13;114:2;

145:18;198:13;
234:17
**depositions (2)** 5:22,
25
**Describe (3)** 21:3,8;
46:20
**described (2)** 56:25;
95:14
**describes (1)** 33:23
**description (2)** 19:15;
94:13
**Design (29)** 18:14;
25:18;26:25;27:4;
93:11,15,18;94:12;
107:11;145:9;
154:19;181:1,13;
186:8,9;192:19,19;
205:7,24;208:14;
214:3,6,15;222:5;
235:2,7,10,11,15
**designed (8)** 18:17;
27:9;146:15;194:25;
195:15;235:24;
236:5,16
**designer (1)** 107:9
**designing (1)** 234:21
**designs (1)** 149:21
**despite (1)** 113:5
**detail (5)** 11:15;
17:21;37:22;101:13,
14
**details (3)** 21:3;
109:13;240:5
**determination (1)**
110:15
**determine (9)** 20:25;
43:18;63:3;95:3;
112:23;132:10;
187:22;243:12,20
**determined (3)** 93:14;
119:19;180:2
**determining (6)**
51:25;55:25;68:3;
84:12;142:9;231:6
**developed (5)** 192:7;
194:19;198:6,8;
204:9
**diagram (1)** 157:3
**Diamond (4)** 144:6,
19,24;145:2
**Dickel (3)** 155:23;
218:9;219:11
**died (1)** 53:15
**dies (2)** 123:1;137:1
**differ (2)** 20:17;45:20
**difference (8)** 86:18;
150:13;156:16;
175:21;186:23;
215:18,21;237:24
**different (40)** 14:15,
16;21:6;22:10;23:2;
39:12;42:16,19;43:8;
61:25;63:22;64:2,2;

65:9;66:16;80:2,4;
103:4;115:21;
116:14;117:9;
130:24;134:19;
138:18;140:1,13,18,
23;162:6;172:8;
176:14,14;178:25;
186:23;212:6;218:7,
10;227:8;237:11;
249:12
**differently (4)** 116:12;
138:15;139:9,15
**difficult (4)** 31:4;60:3;
188:9;241:14
**Diggity (2)** 104:17,18
**Dilution (43)** 20:21,
25;22:2;28:11,25;
29:24;33:16;66:9,10,
10,12,13,15,20,25;
67:5,6,9,10,16,19,19,
21,22;68:3,8,15,25;
69:1,2,9;70:4,10,12,
15,16;71:14,19;
114:23;124:16;
125:6,8,8
**diminish (1)** 105:11
**direct (1)** 153:22
**directed (1)** 43:3
**directly (1)** 209:13
**disadvantage (3)**
96:3;98:21,25
**disagree (15)** 84:8;
105:21,23;106:5;
108:20;133:9;
145:19;188:20;
231:2;232:4;234:5;
235:16;237:1,3;
248:15
**disagreed (3)** 231:25;
240:1,6
**disagreement (5)**
237:10;238:6;239:5,
23;240:7
**disagreements (1)**
239:4
**disappointed (3)**
29:11;48:17;53:11
**disclaimer (6)** 223:3;
227:15,21;228:15,25;
229:8
**disclaimers (7)**
180:17;224:10,12;
227:19;229:6,6,10
**disclose (1)** 76:24
**discussed (1)** 46:21
**discusses (1)** 47:6
**discussing (2)** 106:9;
117:3
**Discussion (6)** 6:8;
30:3;32:23;133:16;
188:11;204:18
**display (10)** 75:8;
76:10;237:20;

246:10;247:24,25;
250:12,12,14,17
**displayed (7)** 158:23;
243:4,11;248:13;
250:7,9,15
**displays (2)** 74:8;
248:12
**dispute (1)** 25:5
**dissect (3)** 156:8;
162:19;217:9
**dissecting (1)** 217:3
**dissertation (3)** 70:23;
71:1,7
**dissuade (1)** 141:13
**Distillery (2)** 222:7;
223:1
**distinction (2)** 111:6;
223:15
**distinctiveness (7)**
129:13;130:7,11,15,
24;236:13,16
**distributed (1)** 50:16
**District (6)** 34:18;
122:14;125:16;
126:8;142:17;149:8
**divine (1)** 114:24
**DJ (3)** 40:18;59:17,
20
**Doctor (2)** 36:21;
210:3
**doctorate (2)** 70:18;
71:24
**doctorates (1)** 70:21
**document (6)** 6:15;
7:22;157:1,18,19;
162:2;169:17;207:3
**documents (5)** 6:18,
23;7:5,25;31:25
**dog (25)** 18:19;
48:16;49:5;50:2,3;
53:11,14,14;55:2,6;
56:2,3;65:22;74:9;
105:25;106:5;112:5,
17;211:5,20;214:7;
222:2;238:18,22;
242:24
**Doggy (1)** 241:10
**dogs (1)** 65:19
**Dog's (2)** 104:17,18
**doll (2)** 24:1;25:9
**dollars (1)** 83:23
**dolls (1)** 23:19
**dome (1)** 127:3
**done (44)** 5:18;10:21,
23;23:7;31:6;40:8;
61:17,23;62:23,25;
63:2,4,13;65:13,14,
15;77:11;78:10;
79:20;83:24;86:17;
90:8,19;91:1;92:5;
94:2;95:10;96:13;
101:17,18;102:11,13;
116:15;118:1;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 260 of 276
VIP Products vs. Jack Daniel's Properties                                    Gerald L. Ford
2:14-CV-02057-DGC                                                         August 19, 2015

140:14;142:14;
168:16;176:13;
187:13;196:4;
212:24;215:8;
226:20;229:5
**double (8)** 76:25;
214:7,11,16,18;
215:6;216:3,20
**double-check (1)** 6:5
**Doubleday (1)** 137:9
**doubt (1)** 94:9
**down (8)** 45:4;72:2;
81:16;82:13;109:13;
113:24;188:6;237:7
**downward (1)** 130:22
**Dr (53)** 5:10;8:23;
9:21;10:8;11:20;
17:16;19:19;20:1;
26:12;29:5;30:11;
42:6;46:12;58:3;
60:2;70:1;88:10;
103:16,20;112:10;
121:1,9;141:3;
146:21;164:1,20;
177:13;182:22;
185:23;205:14;
224:8;225:15;
231:25;232:15,19,22,
25;233:15;234:16,
19;235:17,23;236:3,
23;237:7,12;238:2,7,
14,23;246:4;251:13,
25
**draft (1)** 157:2
**draw (1)** 54:11
**dress (54)** 14:4,19,
20;15:7,10,11,12,13,
17,18,23;16:1,10;
17:4,6;19:3,20;
44:23;45:2;81:9,11,
13;19:13,20;130:7,
9,10,16,20;148:4;
152:24;156:12,15,17,
23;164:9;165:6,10,
19;166:6;168:4,19;
206:22;207:11;
209:3;212:5;213:6;
216:21;217:20,23;
218:1,4,17;219:17
**dressed (1)** 149:10
**drew (1)** 92:14
**drill (2)** 109:13;237:6
**drop (1)** 117:24
**drugs (1)** 68:20
**duces (3)** 6:13;8:7;
30:23
**due (1)** 172:10
**Dun (1)** 92:19
**duplicate (2)** 20:24,24
**durable (1)** 55:6

**E**

**earlier (10)** 31:16;
46:12;61:16,23;63:3;
78:2,4;79:21;100:17;
114:19
**easier (4)** 144:9;
163:22;220:21;242:2
**easily (3)** 22:16;90:8;
245:21
**Eastern (1)** 125:16
**easy (4)** 68:13;
154:10;225:5;241:21
**edible (3)** 250:9,12,
16
**edibles (1)** 249:17
**edited (1)** 145:2
**effect (2)** 150:16;
160:25
**effective (7)** 105:11;
196:16;208:22;
228:15,19;229:8,10
**effectiveness (1)**
228:24
**effort (1)** 174:9
**either (25)** 18:8;
19:10;37:19,24;
45:15;48:5;50:4;
56:3;75:2,13;109:17;
114:1;126:1,5;
129:13;132:20;
141:8;157:11;160:6;
172:20;177:2;
178:11;188:9;216:2;
251:23
**elected (1)** 91:4
**electronically (1)**
69:23
**element (7)** 22:19;
129:12;130:6,8;
153:6;159:25;206:22
**elements (67)** 14:20;
15:23,25;16:8,9,13,
14;17:4,6;19:3,22,24;
22:24;24:17;44:23;
45:1,3;81:11;130:15,
20;143:3,19;147:2,6;
152:20,23;153:7,15,
21;155:3;156:5,10,
12,22;158:9;160:1,
17;162:13;164:8,21;
165:1,2,8,17,18,18;
166:4,5;169:7;
175:13,14,25;179:20;
194:10;207:17;
208:23;210:18;
211:8;212:5,22;
217:5,10,11;219:16,
20;220:6,7
**Elephant (1)** 114:14
**eliminate (6)** 143:1;
147:1;150:17;
153:17;178:15,18
**eliminated (3)**
172:11;208:1,16

**eliminating (2)** 147:4;
208:19
**else (8)** 24:4;62:23;
99:12;119:1;135:21;
136:2;204:11;233:12
**else's (3)** 135:14,17;
214:21
**elsewhere (1)** 8:23
**E-Mail (1)** 245:24
**E-mailed (1)** 157:6
**E-Mails (3)** 7:3;31:16;
245:25
**embarrassing (1)**
96:22
**emit (1)** 243:7
**Emory (3)** 199:4,14,
24
**emotional (4)** 52:6,
22;53:6,8
**empirical (11)** 23:7;
118:24,24;176:22;
188:18,21,24;189:23;
227:4;234:22,24
**employed (2)** 186:9,9
**encompass (1)** 136:8
**encompassed (1)**
77:12
**encounter (2)** 77:13,
21
**end (12)** 50:13;
104:18;131:9;
133:23;135:1,14;
137:7;138:15;184:7;
199:17;206:2,3
**ended (1)** 10:23
**engaged (1)** 117:6
**engine (1)** 80:9
**engineering (1)** 93:6
**engineers (1)** 92:18
**England (1)** 67:10
**English (1)** 103:21
**enhances (1)** 63:21
**enjoined (1)** 225:21
**enlarge (3)** 242:1;
247:17,18
**enlarged (1)** 242:16
**enough (12)** 18:21;
89:4;93:11;119:2,7,
20;122:23;136:15;
164:8;169:3,6;
194:11
**enter (1)** 197:4
**Enterprises (2)** 20:15;
21:5
**Enterprises/U-Haul (1)**
27:19
**enters (1)** 42:8
**entertainment (1)**
108:16
**entire (5)** 15:7,11;
69:21;226:15;244:11
**entirely (1)** 192:8
**entirety (1)** 244:1

**entitled (1)** 165:19
**environment (1)**
77:13
**error (2)** 146:18;
148:7
**errors (1)** 152:8
**especially (3)** 26:24;
205:18;235:1
**establish (4)** 14:23;
28:25;37:12;40:24
**established (1)**
198:11
**estimate (1)** 150:3
**et (1)** 146:17
**European (1)** 67:10
**evaluated (1)** 25:19
**even (23)** 20:10;43:2;
50:6,19;59:22;64:18;
89:14,17;93:1;100:5;
101:23;103:25;
138:6;179:2;184:22;
196:1;197:4;215:16;
216:3;218:15;223:9;
227:10;251:20
**event (2)** 61:25;174:8
**events (1)** 229:12
**Eveready (18)** 33:22;
34:1,13,15,17,20;
42:25;116:3,7;
129:16,17;192:19;
224:20,20;235:1,6,
10,15
**everybody (2)** 17:6;
69:14
**everywhere (2)**
80:20;83:13
**evidence (27)** 22:16,
17;33:17;42:24;
44:16;47:14;48:1,23;
49:17;51:23;86:13;
101:21;103:4;104:6,
8;112:2;118:24,24;
122:13;176:22;
180:6,17;190:5,12;
193:7,9,11
**evoke (4)** 179:3;
196:13,17;223:5
**evolution (1)** 214:15
**evolving (1)** 145:8
**exact (3)** 13:14,15;
103:9
**exactly (8)** 135:4;
167:15;174:16;
175:11;179:25;
193:20;196:18;247:8
**EXAMINATION (2)**
5:8;124:4
**examined (1)** 5:6
**example (10)** 21:13;
23:13;42:25;89:5;
115:23;119:19;
120:14;136:10;
150:10;152:13

**examples (2)** 157:3;
185:6
**except (2)** 80:20;
172:13
**exception (2)** 54:10;
115:7
**exceptions (2)** 52:22;
131:13
**excerpts (1)** 69:18
**exciting (2)** 25:23,25
**exclusive (11)** 155:4,
9;159:19;162:16,21;
178:7;215:24;216:1,
23;217:1;219:15
**exclusively (1)** 19:20
**Excuse (7)** 18:15;
24:2;59:14;93:13;
114:6;124:20;229:21
**excused (1)** 114:7
**executed (1)** 146:8
**exhibit (70)** 6:3,9,13;
7:18;8:2,3;10:2,3,7,
10,12,15;11:10;
17:13,14;18:6;20:6,
11,22:6;23:3;30:5,6,
12;32:2,5,18,25;36:4;
59:2,10;72:2;78:9;
88:17,24;113:25,25;
114:8;143:7,8,13,23;
144:20;146:14;
149:20;153:11;
157:6,12,13,18,25;
161:22;163:14,25;
177:25;201:12;
206:11,13;209:15;
210:8;220:11;230:5,
6;234:10,13;240:24;
243:3,3;244:3;
245:23;247:22
**exhibits (3)** 6:2;
17:17;201:7
**exist (4)** 21:24;54:6;
135:10;194:17
**existed (4)** 193:9,11;
195:21,21
**existence (3)** 93:8;
207:2;225:25
**existing (4)** 63:4,13;
168:6;208:13
**expect (6)** 148:14;
169:4;176:24;195:1,
4,6
**expense (1)** 176:25
**experience (13)** 31:5;
85:8,11;91:6,9;98:8,
10,12;117:4;126:16;
209:11;249:2,7
**experienced (2)**
55:12;187:18
**experimental (1)**
149:20
**expert (51)** 8:16;
24:25;25:15,18;32:6;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 261 of 276

VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

33:2,13,18;66:25;
67:25;68:25;70:3,10;
71:17;84:6;87:10,22;
101:2;109:21;
115:13;117:10;
130:5;139:14;
141:19,20,22;146:10,
21;159:2;160:5;
164:20;167:25;
169:9;178:24;182:2;
183:23;184:21;
185:24;187:1,18;
190:23;205:20;
217:8;219:24;225:9;
226:23;229:7;
231:22;233:7,10;
234:20
**expertise (6)** 67:2;
68:3,25;69:1,2;
141:25
**experts (11)** 152:11;
231:2;232:4;233:3,
18;234:5;237:10;
238:7;239:5,23;
240:7
**expert's (1)** 99:22
**Explain (6)** 92:6;
96:10;141:19;142:3;
143:12,18
**explained (1)** 61:17
**explore (2)** 230:21;
232:6
**exploring (1)** 233:13
**expose (1)** 94:14
**exposed (5)** 50:3;
94:1;139:21;180:16;
206:8
**exposure (2)** 66:21;
177:20
**express (3)** 117:8;
150:25;151:11
**expressed (1)** 117:11
**extend (1)** 37:24
**extent (3)** 96:4;128:1;
129:2
**extremely (2)** 47:3;
97:13
**eyelets (1)** 16:4
**Ezell (8)** 42:3,8;46:8;
85:3;216:12;230:3;
237:24;246:23

## F

**Face (8)** 62:3;124:10,
11,22,24;125:12;
127:3;150:9
**Facebook (11)** 21:15;
61:2,6,8,12,17,22;
62:23;63:3,5,12
**fact (24)** 35:1;49:16;
57:19;82:24;101:20;
110:17;112:22,23,24;

116:16,20;128:24;
132:10,16,25;138:18;
148:11;152:10,18;
180:2;184:19;
214:14;219:20,21
**factors (7)** 20:22,24;
105:13;133:5;
146:17;148:5;242:7
**facts (2)** 26:2;68:16
**fails (1)** 110:22
**failure (1)** 238:5
**Fair (7)** 119:2,7;
141:4;194:11;
216:15;231:23;
233:25
**faith (4)** 238:6;239:5,
23;240:7
**falls (5)** 106:23;
109:5;110:1,22;
111:15
**false (8)** 64:22;65:6,
8,13,15,17;84:22;
146:24
**fame (40)** 20:16,17,
23;21:7,15;22:1,7,11,
17,17,19,23;27:18;
28:3,4,11,15,17,19,
25;29:24;30:4;33:16;
36:5;45:21,22;46:14;
61:3,15,20,22;62:22;
63:12,24;64:3;79:22;
235:24;236:2,4,6
**familiar (16)** 5:25;
6:15;7:22;46:19;
50:9;74:12;100:13;
106:8,12;107:14;
124:9,13;189:25,25;
209:12;218:12
**famous (12)** 23:12,
14;27:21;29:3;36:16;
49:14;51:17;61:12;
63:3;79:20;81:7;83:9
**far (1)** 184:15
**fashion (1)** 128:13
**father-in-law (1)**
92:10
**favor (4)** 25:12;
173:14,16,17
**featured (1)** 19:14
**federal (8)** 20:21;
22:2;24:11;68:14;
125:15;126:12;
148:15;149:7
**feel (4)** 7:7;29:25;
70:9;102:14
**few (3)** 30:15;68:9;
92:5
**field (12)** 22:10;24:3;
84:6;233:17,19;
234:2;237:12,13;
238:8;239:6,13,24
**Fifth (4)** 138:14,21,
24;196:11

**figure (3)** 39:12;
71:22;114:25
**figured (1)** 58:23
**filagree (16)** 19:16;
207:21;208:5,11;
213:16,18;214:2,5,8,
10,16,22;215:3,14,
16,17,18
**filagreed (3)** 154:15,
18;207:8
**file (6)** 31:17,17,21,
23;32:3;53:19
**filed (3)** 11:21;
125:20;158:4
**files (3)** 7:4;38:15;
39:17
**fill (1)** 101:14
**finally (1)** 71:12
**find (9)** 51:14;75:3;
115:9;119:1;127:8;
132:18;178:1;189:7;
210:6
**finder (6)** 112:22,23,
24;132:10,16;148:11
**finders (1)** 133:1
**finding (8)** 43:2;
72:17;73:13;96:15;
104:16;129:19;
132:15,21
**finds (1)** 113:16
**fine (11)** 12:20;27:15;
30:17;40:18;41:24;
44:4;101:13;141:17;
209:21;233:25;
236:12
**finest (1)** 149:10
**finish (9)** 15:1;54:1;
59:5;78:8,9;182:24;
192:14;202:24;220:2
**finished (1)** 203:3
**Finnegan (1)** 10:5
**firm (6)** 23:1;27:10;
76:14;93:1,1;246:11
**firms (2)** 50:15;93:14
**first (12)** 59:5;78:9,9;
85:1;99:6;105:17;
131:8,20;181:9,17;
189:4;237:15
**Fitch (3)** 78:13,15;
79:5
**five (15)** 14:22,23;
15:5;16:17,18,20;
21:20,21;24:22;32:7;
33:2;49:18;83:4;
110:24;229:24
**five-minute (1)** 182:18
**fixed (1)** 102:7
**flashlight (1)** 11:5
**flat (1)** 81:8
**flaw (1)** 176:24
**flaws (1)** 177:1
**flight (2)** 78:2,4
**focus (5)** 11:6;58:19;

67:19;112:24;237:15
**focused (1)** 67:22
**focuses (2)** 33:15;
66:21
**folded (1)** 125:22
**follow (1)** 188:7
**following (1)** 188:6
**follows (6)** 5:6;18:1;
39:8;51:15;135:24;
151:7
**Foods (2)** 64:21;
65:21
**foot (1)** 142:3
**FORD (35)** 5:4,10,15;
9:21;11:20;19:19;
29:5;30:11;42:6;
46:12;58:3;60:2;
70:1;88:10;103:16,
20;112:10;121:1,9;
141:3;146:21;164:1,
20;177:13;182:22;
185:23;205:14;
224:8;225:15;
236:24;237:8;246:4,
14;251:13,25
**F-o-r-d (1)** 5:16
**Ford's (4)** 8:23;10:8;
17:16;238:23
**forever (3)** 37:2;
95:20;96:13
**forgive (1)** 148:21
**form (77)** 13:6;27:13;
29:4;41:12;43:22;
47:2;48:13;49:10,22;
52:2,18;53:16;54:22;
55:16;74:2;77:15;
85:9;103:24;107:20;
108:12,16;112:12,18;
116:3;118:12;
119:11,24;121:4,12;
131:8,17;136:16;
140:7;155:6;156:24;
158:22;159:7,21;
160:10,18;161:17;
162:23;164:11,24;
165:21;166:11;
167:3,19;168:7,21;
170:15;173:4,15;
174:1,25;175:18;
176:8;177:8,15;
180:12;183:7;187:7;
191:4;206:24;
211:22;223:21;
225:12;228:7;
231:10;232:21;
233:13,22;238:9;
239:7,14;242:21;
251:11
**format (2)** 19:14;
247:15
**forth (1)** 17:20
**forum (1)** 64:2
**forward (2)** 41:18;

118:25
**found (14)** 24:12;
36:16;38:3;40:13;
43:1;115:2,2,4;
127:9;145:16;161:9;
190:10,11;194:14
**foundation (7)** 49:23;
52:3;53:17;119:25;
166:18;218:11;
228:23
**four (15)** 8:14;18:9:4,
9;10:23;14:21;15:9;
16:16;81:15;95:1;
110:24;120:5;124:8;
179:5;180:13
**four-stripe (1)** 81:5
**Fourth (18)** 100:13,
20;102:17,24;103:7;
104:7,10,16;105:14,
24;106:3;108:14;
120:15,20;122:12;
172:17;178:16;
196:10
**frame (1)** 8:13
**framers (1)** 28:13
**Francisco (2)** 198:21,
22
**free (4)** 131:8,17;
149:2,6
**frequently (1)** 89:9
**friend (2)** 10:24;84:9
**front (9)** 19:9;21:9;
30:20;45:12,15;
104:11;142:17;
154:14;157:21,23;
207:7,19;209:12;
242:15;244:2;245:6,
7,8,15;248:5
**full (2)** 5:14;144:19
**fully (1)** 7:7
**fun (4)** 106:20;
135:21;136:1,8
**function (1)** 52:6
**funny (1)** 113:16
**further (2)** 230:21;
240:2

## G

**gained (1)** 240:2
**Gamble (8)** 73:1,4,
14;74:16;75:1,25;
77:11;89:1
**game (1)** 231:23
**Gap (5)** 65:23,25;
66:4;67:25;79:8
**garden (1)** 140:4
**gathered (1)** 7:5
**gathering (1)** 7:2
**gave (20)** 19:24,24;
21:17;31:11;35:6;
52:17,21;71:12;
116:16,19;120:5;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 262 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC
Gerald L. Ford
August 19, 2015

129:23;133:18,20;
150:9;152:13;
171:14;189:11;
202:8;239:14
**gears (1)** 230:15
**general (21)** 19:24;
21:2;26:14;28:2,5,
14;52:25;54:9;59:6;
65:10,11;66:15;
86:10,19;131:16;
134:11;152:9;
188:16;233:18;
248:17,18
**generalize (3)** 128:2;
129:3,6
**generally (21)** 5:24,
24;13:2;14:2;20:19;
22:9,13;23:4;43:11;
66:18;81:9;87:12;
91:16;122:17;
130:23;131:3;
134:14;143:16;
222:1;229:10;251:14
**generated (1)** 97:14
**genericness (1)**
132:22
**George (5)** 155:23;
192:9;218:9;219:11;
235:15
**Georgia-Pacific (4)**
73:2,5,13,18
**GERALD (2)** 5:4,15
**Germany (1)** 80:16
**gets (5)** 85:7;169:8;
172:12;189:5;225:20
**Giannoulas (1)** 139:5
**given (12)** 10:16;
11:7,9;18:6;54:3,9;
114:1;120:14;185:6;
195:24;228:14;
231:19
**giving (1)** 132:8
**glad (1)** 132:2
**glass (1)** 209:13
**GLF (7)** 7:20;8:20;
30:21;36:4;144:7,10,
20
**GLF55 (1)** 249:24
**GLF56 (1)** 250:8
**GLF58 (2)** 250:11,15
**GLF60 (1)** 249:20
**God (2)** 96:13;227:19
**goes (6)** 69:23;
110:13,19;132:11;
177:16;189:8
**gold (1)** 33:23
**Good (16)** 5:10,11;
26:2;27:17;89:4;
91:12;92:9;112:1;
123:7;145:25;
227:23;229:14;
238:6;239:4,22;
240:7

**goods (3)** 28:7;55:6;
94:13
**Google (3)** 79:11,12,
19
**grand (2)** 94:4,5
**graphics (1)** 209:13
**great (2)** 25:4;230:12
**greater (1)** 127:18
**greatest (1)** 17:20;
127:17
**grille (2)** 53:1,2
**grocery (2)** 76:8;
77:21
**ground (2)** 26:22;
40:25
**group (17)** 128:17,22;
137:10;150:11;
158:20;160:5;164:2;
173:20;194:11,24;
195:5,21,22,24;
196:2;197:17,19
**GS (2)** 82:8,15
**guarantee (1)** 53:25
**Gubernator (4)** 79:11,
25;80:8,9
**guess (14)** 45:16;
47:9;70:14;73:8;
152:17,18;169:1;
180:25;181:13;
209:8;244:21;
248:25;249:1;250:10
**guessing (1)** 229:17
**guidance (1)** 129:16
**guided (2)** 20:20;
104:5
**guy (3)** 149:11;
198:17;226:8

**H**

**hairs (1)** 71:11
**half (5)** 34:24;118:20,
21;126:11;127:3
**hand (3)** 18:23;
92:14;233:16
**handbags (2)** 83:11,
11
**handed (8)** 6:12;
30:11;76:4,11;77:18,
24;105:25;157:17
**handing (1)** 7:17
**handle (2)** 85:16,17
**handled (1)** 245:17
**hands (1)** 134:6
**hang (34)** 90:8;
212:25;213:3,5,8,10,
14,17;216:24;222:2,
4,25;223:17;224:5,
10,13,15,19;225:9,
23;226:1,16,18,20,
23;242:14,15;244:2,
10,18,23;245:5,15,19
**happen (2)** 27:9;

149:7
**happened (1)** 218:25
**happy (3)** 134:21;
238:20;241:10
**hard (8)** 31:17;32:8;
47:23;48:14;96:15;
113:11;216:5;242:19
**harder (1)** 59:22
**Harvard (1)** 62:7
**Hat (3)** 68:9,10,11
**hatred (1)** 62:13
**Haute (2)** 104:17,18
**head (4)** 43:24;56:7;
127:12;136:11
**Headnote (5)** 104:15,
24;105:1,3,3
**hear (3)** 99:1;183:1;
241:10
**heard (4)** 5:17;27:24;
34:18;133:6
**hearing (4)** 111:20;
125:19,24;126:2
**heck (1)** 148:15
**held (8)** 6:8;32:23;
137:4;138:14;190:3,
6;203:10;235:10
**help (4)** 14:9;41:22;
95:3;241:11
**helpful (4)** 115:2,2,4;
118:17
**Henderson (1)** 10:25
**Here's (2)** 177:17;
225:4
**Hey (2)** 36:12;117:9
**hide (2)** 38:6;110:2
**high (1)** 147:25
**higher (4)** 45:24;
128:3;129:7;178:8
**highlight (1)** 100:2
**highlighted (1)** 35:12
**highlighter (1)** 152:1
**highlighting (1)**
209:20
**Hilfiger (7)** 47:24;
102:1,2,3;107:5,6;
115:3
**himself (1)** 29:12
**hinging (1)** 103:10
**Hips (1)** 241:10
**hire (1)** 71:24
**historic (1)** 156:15
**history (5)** 54:15,19;
55:24;56:24;57:25;
70:17;187:20;191:8
**hit (1)** 20:10
**Hold (2)** 6:5;202:16
**holder (28)** 59:20,24;
118:8;119:9;121:3,
10;128:5;136:21;
170:10;172:1,5;
173:3,13;174:23;
176:6;180:11;183:5,
15;185:14;187:6,24;

191:2,18;193:3;
206:4;231:9;250:24;
251:8
**holders (1)** 186:1,16
**holder's (2)** 228:1,17
**holding (1)** 12:3
**holds (1)** 191:1
**Holedigger (5)** 102:3;
107:4;112:16;113:4;
120:21
**home (1)** 141:11
**honestly (1)** 115:5
**Hopefully (4)** 27:13;
36:25;88:15;132:4
**horn (1)** 141:24
**hot (2)** 65:19,22
**hour (4)** 35:20,21;
88:7;124:6
**hours (1)** 99:14
**household (1)** 50:14
**Hummer (1)** 53:1
**humor (2)** 135:13,17
**hundred (2)** 21:20;
196:4
**hungry (1)** 88:16
**Huntington (2)** 5:1;
124:1
**hypothetical (29)**
49:23;52:3,19;
53:17;54:3,23;55:17,
18,24;56:24,25;
57:10,18;119:25;
160:11;167:20;
176:9;180:7;182:11;
186:4;225:13;226:4,
19;227:1;232:9;
233:22;248:20;
251:9,12
**hypothetically (4)**
180:2;186:12;226:9;
250:20

**I**

**idea (9)** 60:18;
105:19;119:11;
121:4;200:23;
223:22;224:6,22;
225:14
**ideal (1)** 168:19
**idealized (2)** 108:18;
168:19
**identification (8)** 6:10;
10:4;17:15;30:7;
143:9;157:14;230:7;
234:14
**identified (8)** 19:6,8;
98:2,16;153:7;166:4,
24;213:13
**identifies (1)** 18:11
**identify (3)** 11:13;
21:16;88:22
**identifying (2)** 98:13;

209:4
**ie (1)** 149:21
**ignores (1)** 237:17
**image (3)** 108:18;
168:19;202:18
**imagine (4)** 33:4;
83:23;107:12;132:6
**imitated (1)** 53:1
**imitation (1)** 134:7
**imitations (1)** 135:7
**impact (1)** 193:4
**implicated (1)** 196:2
**implication (1)** 119:22
**importance (1)** 142:4
**important (6)** 35:14;
98:13,14,17;101:16;
176:20
**imports (2)** 14:3,6
**Impossible (3)** 204:7,
8;205:20
**impractical (1)** 89:23
**improper (1)** 143:22
**inappropriate (3)**
171:23;195:10;
223:11
**Inc (7)** 27:19;61:2,6;
65:23,25;72:4;137:9;
158:17
**include (9)** 142:12;
143:19;164:8,19,21;
166:16,23;175:14;
226:9
**included (4)** 14:20;
16:13;208:22;225:24
**includes (4)** 34:5;
38:22;219:17;224:19
**including (6)** 16:3;
107:13;132:6;162:1;
226:16,16
**incomplete (11)**
52:19;53:16;54:23;
160:10;176:8;186:4;
225:13;226:4,25;
232:8;233:22
**incorporate (1)**
156:21
**incorporated (1)**
189:5
**indeed (1)** 105:10
**independent (1)**
27:10
**indicate (8)** 38:18;
128:17;164:7;169:9;
170:21;181:13;
189:10;197:9
**indicated (7)** 8:21;
69:1;96:24;100:5;
124:6;127:19;164:4;
181:5;197:21
**indicates (1)** 111:10
**indicator (5)** 85:11,
12;86:14,14,16
**indicia (1)** 172:9

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 263 of 276

VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

**individual (1)** 160:16
**individuals (2)** 175:4;
181:25
**indoor/outdoor (1)**
97:1
**Industrial (1)** 92:23
**industries (1)** 93:4
**industry (2)** 50:9;
217:7
**ineffective (1)** 105:12
**ineffectiveness (1)**
228:24
**inexpensive (1)** 48:16
**influence (13)** 49:19;
57:3,16;58:4;89:12;
156:1;175:6;177:6;
215:4;219:23;
225:10;226:1,10
**influenced (1)** 203:11
**influences (1)** 87:10
**infringe (1)** 160:7
**infringed (4)** 15:3;
119:10;152:21;
158:18
**infringement (11)**
14:19;40:12;110:14,
14;133:23;134:12;
139:11;140:5;
174:19,19;191:11
**infringer (12)** 11:25;
12:4,19;41:11,15,16,
20;59:20;73:6;78:16,
18;81:2
**infringes (1)** 165:9
**infringing (20)** 79:4;
113:17,18;119:23;
128:4;138:19;
139:22;158:8;165:5;
188:4,17,23;190:9,
10,12,17;191:3,7;
207:11;228:17
**infused (1)** 132:5
**ingredients (9)** 143:1;
148:4;165:15;
166:23;167:15;
168:4;175:8;178:13;
179:18
**inherent (1)** 111:7
**in-house (1)** 26:10
**injunction (6)** 111:19;
125:19,20,23,24;
225:21
**inquiry (2)** 28:4;
104:18
**inspiration (1)** 107:11
**instance (4)** 55:12;
88:18;107:2;251:9
**instances (4)** 52:14;
54:18;57:2;190:2
**instead (2)** 137:7;
221:11
**instructions (2)**
223:17;225:9

**Instrument (1)** 11:4
**INTA (2)** 69:23;
117:18
**intellectual (8)** 22:20,
25;79:15;81:1,3;
173:1;204:3,24
**intended (19)** 35:17;
55:9;63:16,17,19;
148:12;183:23,25;
194:25;195:8,25;
196:23,24;197:11;
210:16,18,20,24;
223:9
**intending (2)** 183:19;
223:7
**intent (2)** 195:18,19
**intercept (43)** 74:20,
21,22;75:18;76:13,
19,20;77:10;78:24;
79:3;80:5;81:20,24;
82:10,18,21;83:17,
24;84:11,15;85:6;
86:3,20;87:4,17,21;
88:24,25;89:2,7,23;
90:3,4,11,19;91:1,7,
22;94:17,21;95:22;
97:17;98:22
**intercepts (4)** 76:18;
83:21,25;96:6
**interest (1)** 53:25
**interested (1)** 242:6
**interesting (10)**
14:17;50:12;62:8;
68:5,22;73:17;76:2;
80:19;81:10;161:7
**interestingly (1)** 132:7
**internally (1)** 189:12
**International (7)**
20:15;27:19;67:5,6,
16,18;70:15
**internet (48)** 21:16;
57:5,6;58:5,8;62:3;
73:24;74:17,18;
81:25;82:4,10,22,23;
83:17,22;84:11,20;
85:5,24;86:8,23;87:6,
14,17,20;88:18;89:7,
8,10,13;90:5,9,10;
91:24;94:17,21,22;
95:6,22,24,25;96:5,8;
97:17;98:21;216:13;
249:14
**internet/telephone (1)**
95:13
**internet-based (1)**
109:11
**interpret (1)** 115:1
**interrog (1)** 114:24
**interview (2)** 77:9;
90:1
**interviewer (1)** 77:7
**interviewing (5)** 77:3,
8,8;95:10;97:9

**into (20)** 11:16;21:2;
45:2;62:19;100:4;
101:13;104:18;
109:13;112:9;156:8;
162:12;165:14;
166:8,14;177:6;
189:5;197:13;237:4,
7;240:5
**introducing (1)**
165:14
**investigate (1)** 43:6
**investigator (2)**
246:13;248:8
**invoke (2)** 221:19,21
**invoked (1)** 176:7
**involve (2)** 114:2;
140:6
**involved (16)** 11:3;
24:10;25:6;43:14,16;
48:25;68:12;87:19;
100:24;115:23;
116:3,12;125:1;
140:3;198:8;214:15
**involves (3)** 113:17;
139:10;140:14
**involving (5)** 49:20;
98:2;115:14;128:2;
186:13
**IP (1)** 63:21
**irrelevant (2)** 49:23;
138:8
**irreverent (3)** 108:17;
168:17;173:23
**issue (36)** 15:13,17;
16:9;18:15;22:20,25;
24:23;38:20;39:20;
43:6,6;46:12;47:1,7;
65:17;70:13;111:4;
113:13;114:3,11;
115:15;116:17;
139:20;151:4,17,20;
152:24;173:24;
179:24;182:13;
188:4;196:3,3;198:9,
10;236:21
**issued (1)** 125:21
**issues (3)** 103:11;
117:4;213:11
**ITC (1)** 10:20,22,24;
11:1;12:21;15:14,17;
20:14;81:23;89:18,
19
**items (1)** 31:25

**J**

**Jack (163)** 17:7;18:2,
12,25;19:3,14,20;
22:19,24;23:5,22,24;
24:4;37:16,19,20;
43:24;44:23;45:9;
48:19,24;50:6;53:12,
23,24;55:11;56:4,15;

90:17;95:6;107:8,10;
116:18,21;127:20,21;
129:12;130:4,6;
133:20;152:23,24;
154:15,20;155:4,10;
156:11,22;158:4,6,8,
11,16,17,22;159:5,5,
8,11,18,18;160:1,1,8;
162:1,6,15,20;163:2;
164:4,9,10,13,22;
165:5,9,18,22;166:4;
167:1,18,22;168:4,
18,23;169:2;172:9,
12,13;177:22;178:4,
7;179:9,10,13,14,16;
181:2,11,14,16;
183:20,22,24;184:1,
2;189:17;194:3,6,9,
25;195:2,8;196:24,
24;202:2,4,10,15;
203:15,22,23;204:2,
10;205:7,24;206:22;
207:11;210:14;
212:5,7,10;213:2,6,
13;214:14;215:13,14,
17,24;216:3,20,23;
217:1,16;218:1,1,3,
16;219:14,20;220:7;
222:6,19;223:1,5,7;
225:20;226:3;
238:17,22;250:21;
251:7
**jackets (1)** 127:1
**Japan (2)** 67:8,9
**Jeep (1)** 53:2
**Jerry (2)** 201:14;
235:4
**Jersey (4)** 83:3,6;
89:25;149:8
**job (2)** 60:5;91:17
**join (2)** 26:19,19
**joke (4)** 113:16;
169:4,8;175:15
**Journal (2)** 199:4,24
**judge (9)** 68:14;
73:12;101:4,11,21;
111:17;113:16;
133:4;142:17
**judges (3)** 68:17;
148:15,21
**junior (2)** 66:22;
139:21
**jurisprudence (1)**
191:5
**Jurors (2)** 148:24,25
**jury (2)** 40:7;148:21
**juxtapose (1)** 168:17
**juxtaposing (1)**
108:17

**K**

**Kate (8)** 59:9,15;

60:9;82:20,20;87:4;
88:18;89:22
**Kathy (2)** 91:15;230:1
**keep (5)** 72:8,9;83:7;
94:17;108:24;188:5;
211:8
**keeping (1)** 151:24
**Kentucky (1)** 160:21
**Kenwick (1)** 198:25
**kept (2)** 88:6;194:10
**key (1)** 58:16
**kick (1)** 73:15
**kid (2)** 124:16;125:22
**kidding (1)** 7:16
**Kilpatrick (1)** 26:5
**kind (56)** 8:2;28:19;
31:5;39:4,7,10;
40:16;45:1;46:13;
50:11,11;51:6;52:24,
24;54:9;58:16;63:7,
21;66:23;68:5,13,16;
70:3;78:19;79:6,17;
81:10;85:4;89:8,19;
92:2;97:6;105:9,14;
106:17;112:15,19;
113:14;115:6;
118:19;126:2;127:3;
134:18;140:4;142:6;
143:16,21;148:13;
149:15;152:1;161:7;
197:18,22;214:5;
237:17;244:7
**kitchen (1)** 75:11
**knew (2)** 92:16;
242:24
**knocked (1)** 14:4
**knowing (3)** 242:19;
243:4,6
**knowledge (6)** 7:11;
132:5;155:4;159:17;
200:6,19
**knows (1)** 29:5
**Kraft (2)** 64:21;65:21
**Kristi (1)** 157:6
**Kroger's (1)** 75:6

**L**

**label (54)** 19:14,16,
17,17;90:7;154:14,
16,19,24;159:19;
165:3;166:17;194:3;
206:18,21,25;207:2,
7,10,14,16,18,19,22,
25;208:1,1,1,4,5,10,
10,14,16,19,24;
209:1,6;212:25;
214:16;215:13,15;
216:13,17;217:2;
220:18,25;223:17,24;
224:5,13,15,19;225:3
**labeling (1)** 180:17
**labels (3)** 194:3;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 264 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

209:12;210:2
**Laboratories (1)** 72:3
**laces (1)** 130:22
**lack (2)** 54:19;97:6
**Lacks (4)** 49:22;52:2;
53:17;119:25
**language (4)** 39:8;
103:9;132:20;228:2
**Lanham (18)** 34:2,4,
7;39:8;58:11,11,24;
109:8;145:10;
179:22;189:2,5;
190:21;196:9;200:3,
22;237:17;251:3
**large (3)** 74:9;93:11;
247:15
**larger (2)** 28:5;67:20
**Larkin (269)** 7:4;8:21;
10:7,12;13:6,11;14:9,
12;15:1;17:16,18;
20:7;23:15;29:4,9;
30:8;33:7;39:24;
40:20;41:12;42:6;
43:22;44:4;45:16;
47:2,9,18,21;48:13;
49:10,22;51:2;52:2,
18;53:16;54:2,4,22;
55:16,21;57:8;59:3;
62:15;69:4;72:22;
74:2;77:15;82:1,11;
85:9;86:9,24;87:25;
88:2,5;89:16;90:18;
93:24;98:25;99:2,14;
101:6;102:10,19,21;
103:1,24;104:24;
105:2,5,8;107:20;
108:12,22;111:12;
112:18;113:21;
114:12;116:5;
118:12;119:11,24;
120:10;121:4,12,15;
122:11,19;123:5;
124:20;126:23;
131:2,11,18,21;
133:12;134:1;
136:16,19;137:14;
138:5,22;139:1;
140:7;141:1,17;
143:6;144:12,14,21,
23;148:25;149:4,25;
150:20;153:2,10;
155:6;156:24;157:9,
11;158:14,24;159:7,
21;160:10,15;
161:16;162:2,8,23;
164:11,24;165:21;
166:11,18;167:3,7,9,
19;168:7,21;169:17;
170:13,15;172:14,19;
173:4,15;174:1,25;
175:18;176:8;177:8,
18;179:4,7;180:12,
20;181:22;182:11,

19;183:1,6;184:24;
185:17;186:4;187:7;
188:13;189:14,21;
191:4,22;192:14;
193:17;196:14;
197:6;198:21,24;
199:10,23,25;200:9,
15;201:1,4,13,16,18;
202:24;203:3,6,19;
204:14,25;206:10,15,
24;207:4,6;209:8,14,
19,22;210:5,9;
212:15;213:20,22;
214:20;215:19;
216:7,10,12,15,17;
218:11;219:4;220:2,
20;222:10,14,22;
223:21;224:6,22;
225:12;226:4,25;
228:4,7,10,19,23;
229:19,25;230:9,11;
231:10,16;232:8,21;
233:21;234:11;
235:18;236:5,15,18;
238:9,15;239:7,14,
25;240:8,16;241:1,3,
15;242:21;244:12;
245:10;246:1,6,17;
248:16,19,25;250:2;
251:11
**Larkin's (1)** 239:21
**Larry (1)** 26:13
**last (24)** 6:3;8:18;9:4,
9;32:7;33:2;56:25;
80:11;84:2;88:2,5;
95:2;99:17;114:4;
118:7;124:8;135:23;
142:10,15;144:19;
177:19;213:23;
218:8;230:9
**lasted (1)** 11:5
**lasts (1)** 55:8
**late (2)** 222:21;237:6
**later (4)** 30:16;44:3;
124:18;181:12
**law (64)** 46:25;58:20,
21,22;69:16;93:1;
109:24;121:2,5,19,
22;122:1,9;129:22;
132:6,7;138:10;
156:7;170:8,11,19;
173:1,11,24;174:4,
10,22;177:5,10;
185:13;187:5;189:4,
24;190:1,15,23,25;
191:6,16;192:6,23;
194:13;195:17,21;
196:1,6;197:4,12,17;
198:3;199:4,14,24;
200:6,19;202:22;
203:11;204:3,24;
205:17;235:9;
250:23;251:7,21

**laws (1)** 113:16
**lawsuit (1)** 53:20
**lawyer (10)** 47:17;
106:17;117:1;121:5;
131:23;132:1;138:6;
149:11,12;190:18
**lawyers (7)** 26:10;
54:6;132:6;149:4,6,
8;157:7
**lay (1)** 26:22
**layman (1)** 182:1
**leading (3)** 35:1;
71:23;187:10
**leads (1)** 21:2
**least (20)** 24:17;
27:23;28:1;44:18;
97:2;108:2;110:20;
136:15;153:2;177:1;
179:4;199:16;204:5;
205:14;209:11;
226:6;244:24;
245:20;247:11;250:6
**leave (3)** 10:1;62:4;
90:12
**leaves (1)** 42:3
**Lee (3)** 64:20,24;
65:19
**left (9)** 144:8;233:17;
234:2;237:12,13;
238:7;239:5,13,24
**legal (21)** 47:18,21;
49:11;67:4;101:6;
103:1,25;108:22;
111:14;131:11,23;
134:1;136:17;
137:14;138:6;155:7;
159:22;162:24;
170:16;183:6;203:20
**Legally (1)** 121:16
**legitimate (1)** 240:7
**length (1)** 95:14
**less (10)** 21:14;
38:15,17;60:20,22;
128:22;129:4;
176:21,21;195:5
**letter (2)** 48:20;53:20
**lettering (7)** 154:16;
159:11,14,19;160:2,
2,6
**letters (3)** 94:13;
128:11,12
**level (4)** 29:23;37:22;
142:3;147:25
**levels (1)** 22:14
**Levi (3)** 78:13;79:8;
89:2
**liable (2)** 104:10;
147:24
**life (1)** 58:22
**life-changing (1)**
229:12
**light (1)** 34:17
**lightbulbs (1)** 34:21

**likelihood (160)** 8:18;
9:5,9;11:11,18;
12:22;14:24;18:15;
19:22,23;22:11,15;
33:14,15;34:4;37:6;
39:3,19;40:11,14;
42:13,16,21,23;43:3,
6,9,21;44:1,15,19,20;
47:14;48:1;49:20;
51:25;52:16;54:21;
55:14;56:1;57:4;
58:4,12,19;59:13,15;
60:14;61:13,20;64:5,
6;65:9;66:9,13,15,17,
20;68:3;72:10,17;
73:10;78:20;80:1;
81:19,22;82:8;84:12;
88:23;91:19;94:7,14;
95:3;101:18,22;
103:5;104:7,8,19;
105:12;106:23;
108:25;109:1,20;
110:12,13;111:11;
112:25;114:23;
115:9;116:10,20;
118:2,9;119:21;
120:3;122:24;
124:15,16;125:5,5,8;
127:7,9;130:12,25;
131:14;132:9,11,22;
134:7,15;136:25;
139:11,20;140:5,9,
20;141:22;142:5,10;
146:1,2,7;159:4;
174:5,13;178:24;
179:23,24;180:18;
182:16;183:9,10;
185:10;186:20,21;
188:2;189:7,9;190:5,
12,20;191:7,10,14;
192:4,20;195:20;
196:4,21;198:9,10;
226:24;235:5;
236:24;237:9,15;
238:4;251:2,17
**likely (11)** 18:19;
58:14;76:9;113:6;
122:2;135:5,8;
137:24;150:3;160:8;
226:2
**limit (1)** 91:19
**limited (2)** 24:18;
86:21
**line (16)** 49:3,5;79:6;
182:25;214:7,12,16,
18;215:6;216:3,20;
238:21
**lined (1)** 215:25
**lines (2)** 13:2;185:9
**liquor (1)** 223:10
**list (10)** 10:15;11:18;
20:1,22,24;21:13,17,
25;89:14;118:19

**listed (3)** 11:9;20:11;
158:1
**listening (1)** 139:7
**lists (1)** 20:2
**literally (2)** 87:9;
89:24
**litigation (14)** 9:5,8;
12:2;24:10;46:22;
52:25;63:5,14,15;
141:23;149:13;
156:18;223:19;
225:19
**litigations (1)** 9:19
**little (16)** 24:2;35:21;
60:6;71:6;75:14;
91:16;92:11;114:23;
127:2;128:13,14;
156:8;197:21;
227:15;244:25;
250:14
**live (2)** 126:4,9
**LLC (4)** 5:13;59:9;
82:20,21
**locations (4)** 83:24;
84:1;96:7,25
**logical (1)** 9:20
**long (10)** 12:6;38:21;
54:25;55:1,5,8;57:4;
108:25;145:21;
177:15
**longer (5)** 34:4;
111:9;126:14;172:8;
198:12
**look (53)** 6:17;9:16;
17:23;19:25;29:22;
31:7;36:8;44:7;
58:10;71:10;72:21;
76:5;79:2;89:14;
98:5;117:19;127:25;
129:15,17;132:13;
134:21;138:21;
141:3,5,12;143:23;
144:7;157:21;
158:12;161:1,22;
163:12;169:15;
171:10;177:24,25;
180:19;197:3;
205:18;206:9;
207:14;209:14;
210:5;219:4,10;
223:13;239:8;241:5;
243:24;247:21;
248:1;249:15,20
**looked (5)** 7:3,4;
31:25;50:11,22;
81:16,16,17;127:12;
128:12;149:10;
177:24;212:11;
218:8;235:5
**looking (20)** 32:14;
58:1;80:9;96:8,9;
141:6;143:25;156:5;
163:23;167:17;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 265 of 276
VIP Products vs. Jack Daniel's Properties                                 Gerald L. Ford
2:14-CV-02057-DGC                                                    August 19, 2015

180:24;210:3,8,10;
241:23;243:2,10;
245:3;249:19;250:11
**looks (6)** 7:18;104:4;
127:4;161:5;241:11;
250:13
**lose (1)** 96:23
**lost (2)** 47:24;84:2
**lot (9)** 56:2;58:22;
114:22;128:15;
132:3,4;141:7;
187:20;189:3
**lots (8)** 23:18;49:13;
51:16;65:3,4;70:22;
182:15;223:12
**Louis (13)** 5:15;
100:22;101:17;
102:18;104:4;106:6;
107:3;108:9,14;
120:5,17;122:22;
125:15
**L-o-u-i-s (1)** 5:15
**low (1)** 119:20
**lower (4)** 117:10,14;
154:24;226:21
**LP (1)** 73:2
**luck (1)** 10:22
**lull (1)** 151:25
**lunch (14)** 74:15;
88:13;99:15;100:1,4;
109:13;112:10;
115:25;123:3,8;
124:6;127:13;
139:18;151:25
**luxury (1)** 95:20
**Lyons (1)** 139:4

**M**

**Madam (1)** 30:9
**Mag (1)** 11:4
**Magazine (3)** 107:13;
128:11,14
**mail (2)** 62:3,3
**major (2)** 95:19;96:7
**majority (4)** 95:23;
97:15;160:20;173:19
**makers (2)** 170:8;
176:5
**makes (6)** 66:24;
131:12;148:20;
181:10;201:24;224:1
**making (2)** 78:2;
132:16
**malfunction (1)** 53:10
**mall (62)** 74:19,20,21,
22;75:18;76:12,14,
15,18,19,20,20;77:5,
10;78:24;79:3;80:5;
81:20,24;82:10,18,
21;83:16,21,24,25;
84:1,11,14,19;85:6;
86:3,7,19;87:4,7,14,

17,21;88:24,25;89:2,
6,10,23;90:3,4,11,19;
91:1,7,22;94:16,21;
95:22;96:6,7,12,18,
25;97:17;98:22
**malls (5)** 84:23;87:9;
89:24,25;97:6
**maneuver (4)** 244:18;
245:18,22;247:5
**Manhattan (7)** 82:25;
83:1,2,4,5;87:9;89:24
**manner (3)** 97:24,24;
168:8
**Mantis (2)** 192:9;
235:15
**manufacturer (1)**
53:10
**manufacturers (1)**
92:18
**manufacturing (1)**
93:6
**many (12)** 21:22;
36:15;56:6;70:21;
83:1;115:6;132:6;
161:19;208:22;
219:20;227:13;235:7
**marathon (1)** 35:17
**mark (43)** 6:2;7:13;
10:1;17:12;23:6,12,
14,23;24:4;29:3,23;
30:5;36:16,17;62:13;
72:8;94:10,12,12;
128:7;137:21;138:2;
139:22;143:7;151:1,
13;154:12,15,18,20;
157:9,12;159:6,6,9;
160:7,9;173:22;
217:4,5,9;230:5;
234:9
**marked (15)** 6:9,12;
10:3;17:14;22:6;
30:6,11;143:8;
157:13,17;163:19;
223:24;230:6;
234:13;245:24
**market (11)** 57:24;
58:13,14;77:13;
146:16;147:8,19;
148:1;151:22;
153:18;168:6
**Marketing (2)** 37:4;
83:23
**marketplace (3)** 48:7;
51:24;161:1
**marking (2)** 7:17;
209:15
**marks (4)** 39:20;44:8;
110:7;188:4
**mark's (3)** 108:18;
168:20,22
**maroon (1)** 207:25
**mash (5)** 19:15;
154:23;155:5,15;

219:11
**massive (1)** 209:25
**matched (1)** 237:25
**material (1)** 158:2;
209:3
**materials (2)** 31:12;
99:18
**Matt (12)** 14:8;42:11;
44:7;46:7;85:3;
99:24;158:5;201:5;
230:1;237:24;
246:23;247:25
**Mattel (1)** 24:6
**matter (27)** 10:18,19;
12:21,23;14:6;19:5;
31:2,3,17;32:15,16;
61:24;65:10,11;
66:15;94:15;118:22;
121:2,5;134:11;
140:10;147:23;
152:14;174:22;
187:4;190:1;191:6
**matters (7)** 8:17;9:6,
8;10:15;12:2;85:13;
118:23
**Matt's (1)** 128:19
**may (29)** 30:15;52:7;
59:5;71:22;84:16,16;
86:15;89:4;96:23;
97:19,19;107:1,1;
108:4;112:21,21;
118:2,2;132:23;
159:16;209:2,2;
237:19;241:5;242:5,
5;244:14,14;245:21
**maybe (22)** 9:20;
21:21;38:13;52:6;
54:4;57:1,12,23;
59:19;63:9;79:20;
110:9;121:24;
142:10;147:19;
153:4;155:13;167:7;
171:19;198:13;
216:7;237:1
**Mayer (1)** 65:21
**MBAs (1)** 70:22
**McCarthy (48)** 28:22;
29:11,13,13;36:13;
44:17,18;45:25;
46:21;47:6;83:18;
84:7;99:8,19,20;
100:7,11,12;104:6;
106:9,21;107:12;
109:4,5,24;110:20;
115:2;131:6;133:22;
134:11,18,20,25;
135:12;136:7;
140:25;141:4;
156:14;179:25;
189:6;190:7,8;
196:10,18;198:9,15;
239:1;251:16
**McCarthy's (5)** 46:13,

13,20,24;111:16
**mean (47)** 8:5;9:18;
11:4;14:15;29:6;
32:11,12;34:15;38:4;
41:8;50:1;53:5;
62:20;69:4;70:17;
74:25;83:12;86:9;
90:22;96:21,25;
107:21;108:24;
110:23,23;112:14;
113:15,15;114:21;
116:19,24;118:20;
121:5;122:8;132:8;
133:15;145:23;
148:9;171:21;
206:25;213:20;
231:18;232:22,25;
234:5;240:5;250:10
**meaning (26)** 33:16;
42:12,15,20,24;43:2,
7,18,19;44:13,16,21,
24;45:6,10,13,20,24;
46:1;63:25;82:2,3;
129:19;132:22;
152:25;217:6
**means (6)** 27:6;
119:12;150:24;
151:10;213:20,21
**meant (3)** 133:13,15;
213:23
**measure (4)** 18:18;
182:16;186:20,21
**measured (1)** 194:1
**measures (1)** 45:23
**meat (2)** 34:14;112:9
**meeting (4)** 26:16,20;
47:12;60:6
**members (1)** 148:22
**memorize (1)** 64:17
**memorized (1)** 34:7
**memory (2)** 34:19;
63:18
**mental (1)** 66:22
**mentioned (4)** 50:7;
61:15,16;213:23
**mentions (2)** 101:23;
197:17
**Mercedes (1)** 29:20
**mere (1)** 184:19
**messages (4)** 62:5;
137:5,13,17
**messing (1)** 244:23
**met (4)** 7:4;26:13;
99:14;198:15
**metal (1)** 248:14
**method (1)** 87:22
**methodology (7)**
109:15;112:3;139:8,
16;140:2,13,17
**Miami (1)** 199:18
**middle (5)** 75:16;
81:16;154:19;163:5;
239:24

**might (22)** 28:7;
53:19,20;58:22;
74:18;85:17;102:11;
103:4;116:8;117:9;
129:21;146:22;
163:22;164:22;
172:25;173:5,13;
178:6,8;181:19,25;
251:21
**million (2)** 55:10;57:1
**millions (1)** 57:19
**mimic (2)** 122:23;
212:19
**mimicked (1)** 202:15
**mimicking (1)** 51:1
**mimics (1)** 122:22
**mind (18)** 43:23;70:8;
71:16;116:1;128:9;
142:16;170:25;
171:17,22;181:4;
195:22;197:5,13;
205:21;206:7;
238:24;240:21;
251:21
**minds (2)** 164:10;
221:21
**mine (4)** 143:5;
201:13,14,16
**minions (2)** 26:14,17
**minute (5)** 37:11;
134:21;216:8;
235:18;251:25
**minutes (4)** 35:18;
194:5;229:18,24
**mirror (1)** 71:11
**misapprehension (6)**
173:24;176:4;
202:22;204:3;
205:16;237:20
**Mischaracterizes (4)**
77:16;116:5;181:22;
184:24
**misinterpretation (1)**
251:20
**mislead (2)** 8:1;122:2
**mismeasurement (6)**
143:17;146:18;
148:6,8;152:8;
153:17
**mismeasurements (1)**
193:15
**misrepresentation (1)**
173:23
**missing (5)** 10:18,19;
40:9,15,17
**Missouri (1)** 125:16
**misspeak (1)** 112:8
**misspoke (5)** 26:6,9;
87:8;88:21;116:8
**mistaken (3)** 173:11;
203:10;204:23
**misunderstand (1)**
229:11

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 266 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

**mix (1)** 94:18
**modern (2)** 142:6;
  156:16
**modified (2)** 226:2,20
**moment (2)** 10:5;
  93:19
**money (3)** 90:11;
  124:17,25
**monitor (3)** 241:23;
  242:4;247:12
**Montecito (1)** 249:23
**months (3)** 11:5;
  69:21;124:17
**moral (1)** 101:3
**more (35)** 23:22;35:1,
  22;36:22;44:23;45:1;
  46:2;49:18;66:22;
  76:17;77:12;83:21;
  88:7;89:8;113:24;
  121:13;126:12;
  130:15;142:6,12;
  144:14;146:24;
  161:5;168:15;179:5,
  14;190:24;200:6,19;
  208:22;212:18;
  229:15,17;231:6;
  234:18
**morning (3)** 5:10,11;
  61:16
**mortar (1)** 97:16
**most (12)** 11:14,17;
  25:23;35:14;51:8;
  87:19;93:9;126:3;
  148:14;161:13;
  164:10;210:2
**mostly (1)** 74:15
**mother-in-law (1)**
  62:12
**motion (1)** 125:20
**Motors (1)** 52:25
**mouth (2)** 32:19;45:2
**move (3)** 59:7;179:7;
  244:24
**moved (1)** 244:10
**movie (1)** 62:14
**movies (1)** 62:11
**much (8)** 11:15;
  17:19;63:25;78:5;
  136:24;142:25;
  220:20;229:15
**multifactor (1)** 133:3
**multiple (1)** 177:9
**must (6)** 136:12,14;
  137:3,5;203:23;
  227:19
**Myers (1)** 40:4
**myself (1)** 71:10

**N**

**name (16)** 5:12,14;
  23:6;25:7;75:11;
  95:18;126:17;127:4,

5;159:18;205:7,25;
  244:2,11;246:17;
  247:2
**names (4)** 241:8,13;
  242:3,7
**narrow (2)** 28:6;69:6
**narrowed (1)** 102:9
**narrowly (2)** 135:22;
  136:4
**Nast (1)** 128:10
**national (1)** 90:6
**nature (5)** 76:24;
  106:24;111:7,7;
  145:9
**nearly (1)** 212:13
**necessarily (3)** 32:13;
  210:25;223:14
**necessary (9)** 142:19;
  145:10,22,24,24;
  146:3,5,11;152:7
**neck (7)** 19:12,13;
  154:1,5,6,9;165:3
**need (20)** 5:21;7:13;
  13:14;21:2;36:25;
  40:21;76:24;91:10;
  114:24;121:24;
  122:7;139:18;
  158:12;170:3,9,24;
  179:21;205:12;
  233:23;238:23
**needed (2)** 89:25;
  90:23
**needs (1)** 206:3
**neighborhood (1)**
  56:23
**neither (3)** 55:11;
  62:17;113:19
**net (3)** 150:3,13,16
**Network (1)** 62:10
**networking (3)** 21:16,
  18,23
**new (11)** 20:13,21;
  29:19;83:3,6;89:25;
  100:23;124:18;
  126:4;149:8;226:11
**next (11)** 9:21;34:25;
  36:8;64:20;65:23;
  72:2;73:1;76:9;
  141:13;149:19;
  205:10
**nice (1)** 198:17
**niche (1)** 28:11
**Nike (14)** 10:20;
  11:18;12:21;13:23,
  25;14:1,2;15:4,13,14,
  17;20:14;81:23;
  147:25
**Nike's (1)** 17:5
**Nikolaus (3)** 79:11,
  25;80:8
**Ninth (2)** 46:1;196:12
**Nissan (1)** 142:16
**nobody (3)** 108:8;

172:12;249:13
**noise (24)** 143:15,20;
  146:17,22;147:4;
  148:6,7,10,13,15;
  150:4,13,17;151:21;
  152:7;153:17;
  174:24;183:15;
  185:15;186:2,17;
  191:18;193:14,22
**non (2)** 20:22;113:17
**non-confusing (5)**
  135:1,11,16;183:3,4
**non-confusion (1)**
  143:21
**non-control (2)**
  185:21,22
**non-controlled-for (1)**
  208:23
**nondescript (1)** 75:8
**None (6)** 62:9;70:7;
  71:16;115:25;178:1;
  224:4
**non-exclusive (1)**
  20:22
**non-infringing (2)**
  190:3,6
**non-insubstantial (3)**
  108:5;110:3;112:4
**non-parody (2)** 128:2;
  140:15
**non-substantial (1)**
  180:18
**nor (9)** 55:11;58:20;
  62:17;113:19;
  139:13;162:18;
  211:10,14;227:12
**Nordstrom's (1)** 83:13
**normal (1)** 21:12
**normally (2)** 35:19;
  99:7
**north (9)** 83:5;124:10,
  10,11,22,24;125:12;
  127:2;150:9
**Northern (1)** 198:20
**notable (1)** 145:8
**noted (1)** 47:25
**notes (5)** 82:9;87:7;
  88:19;137:9;209:25
**Nowlis (8)** 20:1;
  231:25;232:15,25;
  235:17;236:23;
  237:12;238:7
**Nowlis' (9)** 232:19,22;
  233:15;234:16;
  235:23;236:3;237:7;
  238:2,14
**nuances (2)** 46:4,5
**number (30)** 8:19;
  10:20;11:25;14:5;
  29:22;49:5;63:2,22;
  65:12;81:24;95:19;
  96:6,24;98:1,5,15;
  109:12;120:5;128:3;

152:5;157:6;161:9;
  204:22;206:11;
  218:18,22;219:2,6;
  232:1;242:7
**numbered (1)** 7:20
**numbers (1)** 129:18
**numerous (4)** 166:9,
  15,19;219:22
**NYC (1)** 59:25;82:25

**O**

**object (2)** 47:2;183:7
**objected (1)** 79:8
**objecting (2)** 159:9,10
**Objection (91)** 13:6;
  29:4;39:24;41:12;
  43:22;47:18;48:13;
  49:10,22;52:2,18;
  53:16;54:22;55:16;
  74:2;77:15;85:9;
  86:24;101:6;102:10;
  103:1,24;105:5;
  107:20;108:12,22;
  111:12;112:18;
  116:5;118:12;
  119:11,24;121:4,12;
  131:18,21;133:12;
  136:16;140:7;
  150:20;155:6;
  156:24;159:7,21;
  160:10;161:16,16;
  162:8,23;164:11,24;
  165:21;166:11,18;
  167:3,19;168:7,21;
  170:13,15;173:4,15;
  174:1,25;175:18;
  176:8;177:8;180:12;
  182:11;183:6;187:7;
  189:14;191:4;
  204:25;206:24;
  218:11;223:21;
  225:12;226:25;
  228:5,7;231:10;
  232:8,21;233:14,21;
  238:9;239:7,14;
  242:21;251:11
**objections (5)** 27:14;
  57:8;112:13;177:15;
  231:16
**obligations (1)** 7:8
**obscure (4)** 21:14;
  67:8;113:14;114:20
**obtain (1)** 118:10
**Obviously (7)** 13:14,
  15;76:7;96:25;132:3;
  231:18;251:11
**o'clock (1)** 230:2
**odd (1)** 77:23
**off (23)** 6:7,8;14:4;
  32:21,23;43:24;56:7,
  18;64:3;75:16;89:15;
  117:21;127:12;

136:11;148:18;
  149:15;179:21;
  188:11;204:18;
  213:10;222:11;
  247:25;249:14
**offended (1)** 113:18
**offer (1)** 85:25
**offered (5)** 22:8;
  61:23;68:7;69:25;
  184:22
**offering (3)** 28:21;
  44:22,25
**office (5)** 38:25;39:2;
  69:14;89:20;92:13
**often (1)** 235:7
**oftentimes (8)** 33:22;
  68:17;129:7,9,9;
  146:17;148:5;233:6
**Old (11)** 19:18;
  154:11,18;155:19,21,
  24;156:2;199:21;
  217:21;218:6;219:1
**O'Melveny (1)** 40:3
**once (5)** 93:19;122:7;
  179:24;198:10;
  234:18
**one (112)** 6:6;10:18;
  11:1,4;15:7,22;16:4;
  29:12;34:24,24;
  35:22;36:22;38:16,
  17;39:15;42:7;43:23,
  24;44:23,25;45:23;
  49:3,5;50:6,15,18;
  54:5;57:9;59:6;
  61:17;62:8;67:12;
  68:14;70:13;73:20;
  79:18;81:13;82:13;
  83:2;85:6,15;89:1;
  92:13;93:1;94:4;
  103:11;114:2,10,17,
  19;115:14,16,17,19,
  24;116:17;127:15;
  128:18,22,24;129:8;
  130:15;132:8;
  133:20;142:16;
  144:14;145:8;146:1;
  149:2,7;150:10;
  151:5;155:12;156:1,
  4;158:12,16;160:1;
  164:3,13;167:23;
  172:13;178:8;
  179:15;181:9;
  186:25;192:21;
  195:5,6;197:21,25;
  199:2,6;201:4;
  204:16;208:5;
  209:18;212:4;
  213:11;216:7,9,10;
  224:17;225:6,7,23;
  229:16;230:17;
  249:10;250:19;
  251:23,25
**one-man (1)** 93:10

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 267 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC
Gerald L. Ford
August 19, 2015

**ones (1)** 166:19
**online (2)** 96:1;97:14
**only (30)** 8:8;15:11;
16:14;24:25;28:14;
29:19;30:19;43:23;
61:15;65:17;81:12;
92:13;95:15;97:8;
98:18;142:10;143:3;
148:21;153:14;
160:7,8;164:3;184:6;
197:20;225:19;
233:11;237:23;
239:8;250:20;251:5
**onto (1)** 209:13
**open-air (1)** 97:6
**open-ended (2)** 21:7,
13
**operations (1)** 93:10
**opine (1)** 130:6
**opined (2)** 44:1;46:1
**opinion (123)** 11:11;
12:22;14:23;25:1;
28:17,21;29:3,23;
31:2;32:6;33:2,14;
37:4;39:18;40:11;
43:5,17;44:12,14,14,
22,25;45:5,8,13;
48:12;49:19;52:11,
15;54:21;57:3,9,16;
58:3,4;60:8,9,11,13;
61:9,11;64:5,8,14;
66:8;69:19;70:3,3,
10;71:14;72:6;73:9;
75:24;78:19;79:9,17,
19;82:9;84:4;95:6;
101:7,10;103:2;
104:1;105:24;109:6,
10,20,22;110:12,18;
111:11,14,16,16,17,
22,24;114:10;
115:13;117:8;118:9,
11;119:20;122:15;
129:11,21,23,25;
134:3;139:14;
146:10,21;152:6,22;
159:3;160:5;167:21;
168:1;169:9;184:21;
185:4,24;200:12;
205:1,20;214:9,17;
215:4;217:8;219:24;
221:11;226:23;
228:14;229:7;
235:23;236:4,23;
237:7,9;238:3,6,8
**opinions (7)** 20:3;
79:18;132:8;138:7;
235:17,22;239:9
**opportunities (1)** 97:5
**opportunity (2)**
184:12;232:5
**opposed (8)** 86:21;
90:5;97:17;127:21;
128:5;162:7;209:13;
242:4
**opposer (1)** 12:9
**opposite (1)** 227:20
**opposition (1)** 92:16
**order (14)** 28:24;
119:9;121:3;130:14;
169:7;170:10;
179:16,19;181:1;
191:2;196:16;
230:21;233:12;247:6
**ordered (1)** 249:14
**origin (4)** 38:19,22;
98:3,8
**original (14)** 14:18;
16:11;56:21;88:19;
136:15;137:6,7;
169:4,7;179:3;
196:13,17;208:23,24
**Originally (2)** 14:18;
249:8
**Oscar (1)** 65:21
**others (2)** 68:9;217:6
**otherwise (3)** 97:11;
98:13;101:2
**out (54)** 9:16;10:22;
28:22;34:22;35:4,5;
39:12;58:23;63:23;
71:11,21,22;73:15;
79:6;84:2,3;88:15;
91:15;93:8;101:20;
102:12;114:25;
121:8,24;124:18;
127:21;128:5,24;
132:6;134:22;
139:19;147:23;
156:2;164:3;166:1;
171:15;181:11,16;
186:18;189:8;190:7;
191:8;194:21;
201:24;202:4,9;
203:14,14;205:3;
231:8;233:17;234:2;
239:1;251:3
**outside (4)** 48:23;
54:20;80:14;96:18
**outstanding (2)** 36:2,
19
**oval (2)** 19:18;154:19
**over (21)** 5:19;7:6;
35:21;53:1;64:1,1,1;
83:17;84:1,11;95:2,
22,24,25;98:22;
110:22;124:6;
126:13;128:16;
214:18;215:9
**overall (3)** 16:2;
130:9,10
**overturn (1)** 122:14
**overwhelming (1)**
97:15
**own (10)** 18:9;53:7;
141:24;162:15,21;
203:23;215:24;
216:1,23;217:1
**owned (1)** 59:25
**owner (5)** 108:19;
168:20,22;175:16;
244:22
**owner's (1)** 228:12
**owns (2)** 65:19,21

**P**

**package (2)** 34:22;
76:4
**packaging (4)** 75:3;
76:5;77:22;194:3
**page (56)** 10:2;
17:21;19:8;29:16;
30:20;36:8;59:6,10;
78:9,9;88:23;144:8,
20;153:8,22;158:10,
12,23;161:22;163:12,
25;166:3,24;167:6;
169:15;180:19;
201:11,21;204:13;
206:9,13;210:3,4;
212:11,15,17;220:11,
14;230:9;238:12,13;
240:23;241:1;
242:10,18;243:3,7,
11,19,24;244:3;
245:3,14;246:5,9;
247:21
**pages (1)** 51:13
**paid (2)** 71:5;124:17
**painful (1)** 71:13
**pair (3)** 80:16;
147:22;148:2
**panel (2)** 95:17,19
**paper (8)** 73:16;75:7,
8,16;76:4,10,11;
201:3
**paragraph (19)**
17:21;18:10;36:9;
104:15;106:1;
144:19;145:13;
153:23;158:10;
163:24;166:3,5,24;
206:23;207:19;
217:20,23;219:21;
238:21
**Park (1)** 65:19
**parodies (17)** 49:9;
51:7;104:21,22;
106:10;133:6,22;
134:12;135:1,1,5,7,7,
12,16;140:18;196:10
**parody (182)** 46:20,
21,25;47:6,13;99:9;
100:6,6,13;102:9;
103:8,13,22,22;
104:17;105:11,12,25;
106:5,12,16,18,22,12,
23,24;107:13,16,16,
18,21,25,25;108:9,
15,21;109:2,5,6,7,9,
14,18,19,22;110:1,2,
11,17,19;111:6,8,9,9,
15,23;112:1;113:12,
16;114:3,11,20;
115:15,23;116:12,18;
119:8,23;120:16;
121:1,9,22,24;122:8,
18,21;123:1,1;124:7;
126:17,17;131:7,17;
133:10;136:7,12,14,
25;137:2,4,7,12,20,
22;138:3,12,15,19;
139:10,15,19;140:3,
6,10,14;168:1,2;
169:6,11;172:17,19,
20,22;173:2,12,21;
174:10,18,18,22;
175:5,10;176:3,5;
177:4;178:15,18,23;
179:2,19,22,23,23;
180:4,10;183:4,14;
185:8,14,23,25;
186:13,15,19;187:4,
23;188:1,17,23;
189:4,5,7;190:2,9,9,
16,19;191:1,8,17,19;
192:7,24;193:2;
194:6,10;196:12,16,
22;197:10;198:7,11;
200:3,5,7,18,20;
223:16;235:11;
238:18,22;239:1
**parodying (1)** 137:21
**parroting (1)** 138:3
**part (18)** 24:19;28:2;
32:9;35:15;63:16,17;
67:20;114:8;156:3;
165:1;213:5;215:12;
216:20;217:19,22;
218:4,16;245:1
**partial (1)** 16:14
**partially (2)** 33:18;
112:10
**participants (1)** 77:23
**participated (1)**
117:17
**particular (7)** 8:12;
30:22;90:15;130:8;
141:9;153:6;230:16
**Partnership (1)** 139:4
**parts (2)** 15:10,11
**party (26)** 12:3,12,13;
24:6;25:14;41:21;
60:7,8;61:6;66:2,5;
72:4,14;73:2;78:14,
16;79:12,14;80:24;
81:1;109:19;110:10;
114:10;115:14;
116:17;120:10
**pass (1)** 149:2
**passes (1)** 149:2
**past (3)** 24:17;142:2;
190:2
**paste (1)** 225:2
**patent (2)** 202:16;
203:11,23
**path (1)** 188:6
**pattern (2)** 73:16,19
**pay (2)** 89:20;124:25
**Payless (1)** 81:5
**payment (1)** 91:8
**peer (1)** 235:8
**penalty (1)** 5:5
**pending (1)** 62:15
**people (42)** 21:8,16;
24:3,9;34:20;37:19;
39:10;50:13,17;53:7;
76:4,7;77:4;90:7;
92:18;93:9,10;94:14;
95:9;98:6;106:19;
109:11;133:18,19;
148:21;150:25;
151:11;169:4;
170:11;171:19,21;
180:16;189:10;
194:2;197:3;211:4;
227:12,15,18;229:11;
237:21;245:7
**people's (1)** 198:2
**per (4)** 54:15;206:18,
21,25
**percent (43)** 28:24;
30:1;34:24;35:6;
36:18,18;37:14;
38:16,17;39:15;
46:13;50:3;57:4,5;
60:21,23;83:22;84:2;
110:24,24,25,25;
120:5;127:15,15;
128:18,22;129:5,8;
146:2;150:10,11;
152:4,16,17;174:21;
178:8;180:3;186:25,
25;192:25;195:5;
226:22
**percentage (18)** 29:1;
38:8;60:21,25;64:11,
16;97:14;120:6;
127:18,18;129:18;
150:17,25;151:11;
173:10;180:9;187:3,
22
**percentages (4)** 30:3;
33:17;36:3;39:12
**Perez (1)** 199:4,8
**perfectly (1)** 141:12
**perform (1)** 48:17
**performed (2)** 27:7;
118:10
**perfume (1)** 120:21
**period (2)** 55:8;76:9
**perjury (1)** 5:5
**permission (42)**
76:22,23,24;119:9;
121:2,10;170:3,9,24;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 268 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC
Gerald L. Ford
August 19, 2015

171:18,20;172:1,4;
173:2,13;174:23;
176:6;180:10;181:2,
14,20;182:1,4,6,16;
183:5,14;185:13;
186:1,16;187:5,23;
191:2,17;193:3;
202:17;205:12;
206:3;250:24;251:8,
22,23
person (17) 12:12,13;
50:6,18;58:15;85:2;
93:16;100:19;
106:18;172:2;181:5,
15,19;197:21;
199:10;205:22;
243:21
personal (4) 84:4,8,9;
117:7
person's (2) 181:4;
205:21
perspective (4) 102:8;
178:19;228:2,12
pertain (1) 138:7
pet (9) 237:23;
246:10;249:17,24;
250:9,12,16,16,16
Petco (1) 249:10
Petcos (2) 249:8,12
Phillips (1) 107:10
Phoenix (7) 10:25;
26:15;76:19;97:2;
126:8,11;133:4
phone (2) 128:19;
149:14
phones (2) 148:18;
149:9
photo (2) 247:19,25
photocopy (1) 154:22
photograph (2) 97:24;
237:23
photoshopped (3)
237:25;246:22;
248:1
phrase (1) 220:10
physically (1) 7:1
PI (1) 126:5
picky (3) 90:16,17,18
picture (22) 163:16,
17,22;216:6;220:14;
241:6,9,16,16,17,19,
20,22;242:10;243:2,
19;244:3;245:8,13;
246:9,9,12
pictured (1) 243:7
pictures (9) 104:4;
163:20;243:24;
245:3,13;247:15;
249:20,23;250:8
pieces (1) 156:8
pillow (1) 211:22
pilot (1) 177:1
Pizzeria (1) 105:13

place (1) 9:20
placebo (1) 143:1
placed (1) 248:9
placing (1) 227:13
plain (2) 94:11;
128:11
plaintiff (23) 5:13;
11:21;12:2,15,17;
13:21,22;25:15,16,
20;26:3;37:8;39:22;
40:1,10,11;41:22;
47:24;59:15,17;
118:17,23;220:8
plaintiffs (1) 118:21
Plaintiff's (12) 6:9;
10:3;17:14;18:18;
30:6;32:17;102:8;
111:25;143:8;
157:13;230:6;234:13
15
planned (3) 63:5,14,
15
play (1) 124:19
please (6) 21:1;
135:23;151:6;
157:12;171:15;202:1
Plimpton (1) 100:22
plow (1) 35:23
pm (1) 124:2
pocket (3) 78:21;
79:5,9
PODS (6) 20:15;21:5,
14;25:21;27:18,21
point (7) 53:25;58:2;
59:5;146:4;169:12;
192:11,13
points (1) 184:8
poking (4) 106:20;
135:21;136:1,8
Polaroid (2) 105:14,
18
pole (1) 75:14
polished (1) 16:4
poo (17) 168:9,9;
183:18;220:10,10,12,
12,16,16;221:1,1,1,4,
4,7,7,8
poor (1) 149:11
pops (1) 142:16
popular (2) 67:14;
148:1
popularity (4) 146:16;
147:18;151:22;
153:18
population (6) 93:8;
110:3;111:1;112:4;
151:2,14
populations (1) 96:9
pornography (2)
68:13,17
portfolio (1) 63:21
portion (11) 28:6;
47:6;93:5;106:9;
110:3;151:1,2,13,14;

154:19,24
portions (1) 46:19
posed (2) 200:7,20
position (4) 11:24;
12:13;111:25;118:22
positive (1) 115:8;
117:19
possibilities (1) 71:21
possibility (1) 226:24
possible (26) 52:9;
71:17;84:19;85:6,15;
171:16;178:4;180:1,
8;182:9;187:2,21;
192:22;202:14,21;
203:9;204:1,5,21,24;
205:14,14;239:8;
244:17,24;245:18
possibly (2) 57:8;
187:13
post (5) 73:11,20;
74:23;75:1,7
post-sale (1) 75:17
potential (7) 55:1;
86:7,19;98:22;
112:12;211:4;225:20
potentially (2) 52:15;
143:20
power (2) 97:1,6
practically (1) 90:23
practice (4) 21:12;
24:18;152:9,11
practitioners (1) 132:7
preexisting (26)
146:16,23;147:12;
151:22;153:18;
171:25;172:3,25;
176:4;177:5,10;
183:13;185:12,24;
186:14;193:13,22,24;
194:1,12,17;195:16,
20;196:1;197:11;
250:22
preference (1) 94:10
Pregerson (1) 142:17
preliminary (3)
111:19;125:19,20
preparation (2) 47:11;
99:9
prepare (2) 99:12;
234:16
prepared (1) 156:19
preparing (1) 31:2
presented (1) 23:3
president (2) 26:16
presumably (1) 197:2
presume (2) 100:7,8
pretty (7) 25:25;34:7;
35:12;126:4,12;
132:19;227:23
previous (1) 42:7
previously (3) 8:22;
62:25;218:12
price (3) 52:6,23;55:5

primarily (3) 93:21,21,
22
primary (2) 76:8;
159:20
principle (2) 131:16;
188:16
principles (1) 189:4
print (1) 207:24
printed (2) 208:18;
209:13
printing (3) 154:11,
14;207:8
prior (7) 26:24;36:25;
100:12;115:15,24;
141:15;184:25
private (5) 76:21;
77:8;97:11
privilege (1) 116:25
Probably (46) 5:20;
12:16;13:17;17:20;
20:19;23:10,12;
24:22;28:9;35:1,2;
37:9;39:3;40:19,21;
43:11;50:9;51:13;
60:22;69:8;74:15;
76:17;83:25;93:10;
103:15;120:8;124:9;
125:17;130:17;
137:24;146:8,24;
149:10;150:22,23;
151:8;156:15;
190:24;191:12;
221:15;225:5;
227:14;233:13;
238:25;239:16,22
problem (6) 24:19;
59:8,18;178:19,22;
203:7
procedure (1) 77:6
procedures (1) 22:1
proceeding (1) 7:19
proceedings (2) 12:9;
61:24
process (1) 229:13
Procter (8) 73:1,4,14;
74:16,25;75:25;
77:11;89:1
produce (5) 7:8;8:24;
69:13,14,15
produced (6) 8:9,22;
9:4;30:20,23;176:14
producing (2) 8:11;
31:13
product (206) 15:3;
28:7;35:1,3;37:15;
38:20;50:25,25;52:5,
12,23;54:14;58:2;
77:14,18,24;80:7;
85:8,16,17,19,20,25;
86:4,20;87:1;95:23;
97:13,14;98:2,3,9,10,
15;103:8,23;106:16,
19,19,19,22,24,25;

107:2,16,18,21,25,
25;108:7,10;109:7,9,
19,19,22;110:5,8,10,
11;111:8,8,9,9,23;
112:16,19,25;113:5;
116:13,17,18;119:23;
120:16;122:1,6,10,
18,22,22;126:18,23,
25;128:4;133:8,10,
17;137:19,21;138:2,
19,19;139:10,15,17,
24;140:3,18;155:17,
20,23;159:20;161:5;
168:1,1,2,6;169:11,
14;170:3,10;171:15;
172:10,11,15;173:1,
2,22;175:5,16;176:4,
6;177:4,4,21;178:25;
179:2,3,8;180:4,5;
181:11;185:8,14,23;
189:11;190:9;191:7,
20;194:20,21;195:15,
24,25;196:12,17;
197:10,10;201:24;
202:9;203:15;
204:10;205:11;
206:2,18;208:23,24;
210:13,17,21;211:1,
9;212:18,18,19;
214:8;215:7,7;216:4;
217:13;218:13;
220:6,11,16,17;
221:22;222:5,6,25;
223:16,25;224:1,4,
18;225:8,22,22,23;
226:2,11,15;227:10;
228:17,18;242:10,20;
244:9,17,19,20;
245:18;247:1,2,6,7,
19
Products (76) 5:13;
11:20;35:3,4;49:6,9;
51:8,21;53:13,21;
54:10,11,17;55:15;
73:2;102:9;104:19;
106:13;119:8;121:2,
10,23;128:3;139:21;
150:19;156:21;
159:14,15;160:22;
161:25;166:9,15;
170:9;171:25;172:4;
173:12;174:11,22;
177:11;178:23;
180:10;183:14;
186:1,14,15;187:4,
23;188:3,17,23;
189:12;190:2,11,16;
191:1,17;192:7,24;
193:3;194:2;197:4,
12;212:13;215:19;
222:5;224:2;241:8;
242:17;243:4,7,10,
13,17,23;247:16;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 269 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC
Gerald L. Ford
August 19, 2015

250:23
**professional (3)** 22:15;111:10;117:5
**Professor (14)** 29:10; 33:23;46:13,21;84:7; 131:6;134:11,17,20, 24;135:12;136:7; 156:14;190:8
**prohibited (3)** 217:4, 7,9
**prohibition (1)** 191:16
**promise (1)** 201:6
**pronounce (1)** 80:13
**pronounced (1)** 80:21
**proper (6)** 184:3; 186:19,21;231:3; 250:24;251:9
**properly (4)** 232:4; 236:24;237:8;238:5
**Properties (1)** 7:20
**property (11)** 22:20, 25;76:21;79:15;81:2, 3;97:12;158:17; 173:1;204:3,24
**proportion (1)** 93:7
**protected (2)** 131:8, 20
**proved (1)** 180:8
**provide (22)** 12:22, 25;13:13,20;14:15; 25:1;37:4;40:10; 43:5,17;45:8,13; 60:8;61:9;66:8;70:3, 9;73:9;78:19;79:17; 114:9;118:8
**provided (17)** 6:22, 23;8:16;9:9;11:11; 13:3;43:14;44:12,14, 16;60:9;71:14;79:19; 82:8;86:22;229:7; 247:14
**provider (1)** 95:20
**providers (1)** 95:18
**provides (3)** 22:16; 204:24;236:23
**providing (3)** 33:14; 45:5;115:13
**proximity (3)** 249:17; 250:9,11
**public (5)** 28:2,6,14; 61:24;77:5
**publication (1)** 67:15
**publications (2)** 100:17;190:24
**publicly (1)** 156:20
**published (6)** 32:13; 67:3,14;69:9,22; 70:12
**publishing (3)** 67:4,4; 137:10
**pull (2)** 71:11;75:16
**pulled (1)** 216:12
**purchasers (3)** 50:2;

55:2;211:5
**purely (1)** 55:17
**purpose (4)** 142:24, 25;153:14;159:20
**purposes (5)** 84:12; 95:15;108:15; 133:16;138:17
**purse (2)** 104:5;106:7
**pursuant (2)** 109:15; 117:5
**pushed (1)** 149:15
**put (26)** 10:5;28:13; 34:13;35:4;41:5,6; 75:14;99:3;127:21; 128:5;147:23; 171:15;181:16; 189:20;194:21; 201:6;202:4,9; 203:14;205:3; 211:22;212:1,1; 225:3;231:8;234:2
**puts (4)** 34:22;35:5; 181:10;201:24
**putting (2)** 32:19;45:1

**Q**

**QS (9)** 37:3,8;38:8; 39:14;40:4;41:10; 88:25;89:5;90:4
**qualified (5)** 67:24; 70:9;93:19;95:9; 96:15
**qualify (1)** 96:20
**quick (2)** 36:24;163:4
**quicker (1)** 41:23
**quickly (2)** 51:14; 126:12
**Quicksilver (1)** 37:9
**quite (1)** 104:11; 115:5
**quote (32)** 28:23; 34:13;51:22;52:12; 54:16;65:13;105:10; 106:22;108:15; 114:20;116:3;131:7, 9;133:22,24;134:25; 135:2,12,14;137:2,4, 7;138:14,15;146:15; 148:6;170:23;193:2; 206:2,3,3,3
**quoting (1)** 139:4

**R**

**raised (2)** 114:3,11
**random (1)** 93:3
**range (1)** 152:6
**rate (7)** 28:24;29:2,6; 37:14;152:4;226:21, 22
**rather (1)** 28:6
**reached (1)** 29:23

**read (42)** 17:22,24; 18:1;36:15;51:12,15; 69:10;70:16;79:10; 100:6,10;103:15; 104:14;105:2,3,10; 131:22;132:3,4; 135:23,24;145:21; 146:20;151:6,7; 158:3;165:23; 190:24;205:3; 222:11;229:12; 232:17;237:17; 241:9,14,21;242:2; 244:1,18;245:4,14,19
**reading (12)** 58:22; 70:12;99:8;105:9; 115:3,4;135:22; 136:3;149:25; 154:17;231:7;242:6
**reads (1)** 201:23
**ready (3)** 35:24; 163:9,10
**real (19)** 49:17; 50:24;51:19,24; 52:11,14;54:18,19; 55:12;57:2,24,24,25; 84:17;120:14; 136:10;170:3; 205:11;206:2
**realistically (1)** 77:12
**reality (1)** 55:19
**realize (1)** 157:7
**really (26)** 16:22; 22:2;33:15;46:17; 55:18;68:18;76:2; 77:2;81:7;84:22; 87:1;91:12;94:10; 114:25;131:23; 146:3;148:9,18; 149:3;156:16; 190:19;205:22; 211:11;212:8; 227:24;232:5
**realm (1)** 71:21
**reason (11)** 8:11; 16:20;28:10;61:15; 90:15;170:22; 189:17;219:1;223:2; 248:15;251:5
**reasonable (2)** 33:13; 237:10
**reasons (3)** 151:3,15, 19
**rebut (1)** 233:7
**rebuttal (2)** 235:17; 237:7
**recall (35)** 14:18; 16:1;19:11;31:14,15; 32:2,4,14,20;38:14; 47:13;49:1;51:6,10; 60:19,20,24;63:12; 64:10,13;70:5,7; 72:19;103:10;105:6;

112:14;115:13,17,19; 127:10;134:5;192:8, 18;229:9;233:16
**recalled (1)** 124:7
**received (2)** 6:25; 31:20
**recent (2)** 11:14,17
**recently (2)** 21:15; 89:9
**recess (6)** 42:2;88:8; 123:8;163:7;182:20; 229:20
**recognition (5)** 28:5; 36:17,18;45:23;46:3
**recognize (2)** 55:5; 176:21
**recognized (3)** 131:7, 17;142:1
**recollection (12)** 18:7; 39:16;51:9;80:6; 89:3;104:20;114:16, 17;126:19;127:22; 157:5,8
**recommendations (2)** 93:17,21
**recommended (1)** 91:7
**reconvene (1)** 123:5
**record (27)** 5:14;6:7, 8;12:16;13:25;17:22; 18:1;32:21,23;34:11, 14;42:5;51:15;52:11; 61:24;70:17;89:15; 90:25;99:3;134:10; 135:24;151:7; 177:14;188:11; 194:8;204:18;232:6
**records (3)** 7:2,8; 63:17
**rectangular (1)** 19:13
**Red (2)** 107:13; 166:17
**reduce (3)** 150:17,24; 151:10
**refer (10)** 12:15,19; 15:14;31:1;38:3; 39:9;41:19;50:25; 51:9;133:8
**reference (8)** 108:3; 169:1,2,8;172:12; 207:19;222:16; 237:21
**referenced (1)** 175:16
**referencing (1)** 108:9
**referred (9)** 22:5; 30:13;33:1,5,22; 103:7;146:17;148:5, 6
**referring (16)** 18:9; 26:22;51:1;59:10; 82:12;102:21; 106:24;107:3,4,8,19; 135:11;136:22;

138:16;160:12; 207:18
**refers (1)** 104:23
**reflect (1)** 206:7
**refresh (3)** 18:7; 104:20;157:7
**refreshing (1)** 157:5
**regard (14)** 8:17; 109:18;110:10; 164:2;186:2;197:18; 220:14;237:7;238:2, 4,8;246:24;250:7
**regarding (25)** 44:12, 14;45:5,9,13;46:25; 47:7;60:24;69:1; 70:4;103:17;109:16; 147:5;174:10;176:5; 192:7;194:12;196:1; 197:4,12;203:10; 236:4;237:8;238:5; 239:4
**regardless (7)** 41:18; 106:3;120:17; 191:14,15;192:25; 193:1
**register (2)** 62:3;72:8
**registration (1)** 59:25
**relate (1)** 51:10
**related (2)** 205:8,25
**relationship (3)** 116:25;117:7;224:3
**Relevancy (1)** 232:8
**relevant (11)** 28:4; 48:11;51:24;52:15; 54:20;55:25;58:3; 141:15;174:4;193:9; 205:1
**relied (7)** 32:6;72:17; 73:12;142:2,8,15,18
**rely (10)** 31:1,5; 32:17;33:13,18;36:3; 38:1;115:6;236:8,11
**remarkably (1)** 128:12
**remember (23)** 21:19; 32:14;45:11,16,18; 46:16;47:9;51:5; 63:1;64:16;72:23; 99:10;103:9;107:15; 137:11;144:4; 198:24;202:5; 204:12;211:4; 230:18,19;234:1
**remembered (1)** 99:24
**reminded (1)** 42:11
**reminds (2)** 52:24,24
**reminiscent (1)** 159:11
**remove (9)** 50:19; 151:1,1,12,13; 207:22;219:2;220:5, 7

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 270 of 276

VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

**removed (13)** 165:17; 166:5;214:11; 218:15,18,19,22; 219:8;222:4,13,15, 19,24

**removing (1)** 219:2

**render (1)** 28:17

**repeat (1)** 238:19

**repeatedly (1)** 191:22

**rephrase (4)** 106:2; 117:2;118:14;145:15

**replica (2)** 52:12; 106:6

**replicas (3)** 49:14; 51:17,22

**replicating (2)** 52:13; 54:17

**replication (2)** 86:17; 176:13

**report (49)** 8:3,12,19, 19,23;9:10,16;10:8; 12:25;13:3,13,20; 18:9;45:13;56:20; 74:13;112:9;129:23; 156:19;157:9; 161:23;163:12; 167:6;180:19; 197:25;201:11; 206:9,13;209:19; 232:17,19;233:8,15, 24;234:16;235:17; 240:23;241:15,17,22; 242:11,18;243:7,11, 24;244:5;245:14; 246:5,6

**reported (3)** 64:14; 76:8;235:9

**reporter (6)** 5:18; 30:9;99:4;171:5; 201:8;238:19

**reporting (1)** 240:21

**reports (4)** 8:17;9:5; 45:25;99:22

**represent (5)** 5:12; 8:6;12:7;39:23; 100:21

**representation (4)** 108:17;117:5; 168:18;216:17

**represented (5)** 12:1, 6;39:22;40:4;41:10

**reproduce (2)** 97:20, 23

**Republic (1)** 79:7

**requested (2)** 6:18; 7:2

**require (19)** 58:20; 119:8;121:2,10,15; 171:25;172:4; 174:22;176:6; 180:10;183:14; 186:1,16;187:5,23; 189:12;191:1,17;

193:3

**requires (7)** 57:10; 173:2,12;183:4; 185:13;250:23;251:7

**reread (1)** 103:14

**re-reviewing (2)** 100:6,12

**research (7)** 23:7; 40:8;83:23;227:23; 233:19;234:22;235:1

**respect (3)** 44:15; 93:17;172:10

**respond (1)** 233:24

**responded (2)** 38:18; 250:20

**respondent (4)** 12:10;56:9;77:7; 85:7,16;86:3;93:20; 98:10;128:17,24; 133:13,15;164:3,13; 167:10,17;169:21,23; 170:2,18,22,23; 171:24;179:15; 180:23;187:11; 201:10;202:21; 203:10;204:1,13,21; 205:16;206:7; 230:17;231:7; 241:24;250:19,25; 251:10

**respondents (36)** 10:21,23;15:10; 17:3;23:3;35:6; 38:17;50:4;57:5,6; 58:6,8,9;74:8;79:4; 96:16,23;98:1,16,17; 127:11,19;128:3; 133:7;150:18; 164:22;169:10; 173:19;176:2;180:3; 186:6;197:13; 230:16,20;231:3; 240:22

**respondents' (3)** 174:9;231:14;232:5

**respondent's (1)** 170:25

**response (18)** 8:7,22; 28:24;29:2,6;30:21, 23;31:11;37:14; 100:18;128:22; 152:4;170:21; 180:25;181:12; 197:18;202:3;204:10

**responses (2)** 42:7; 231:3

**responsible (1)** 93:16

**responsive (2)** 6:23; 32:1

**rest (2)** 27:14;54:1

**restrict (1)** 23:24

**restricted (3)** 34:4; 77:2,4

**result (5)** 27:20; 150:3;169:8;177:6; 223:19

**results (32)** 40:8; 42:23;43:1;44:2; 50:20;118:16; 132:15,18,20;143:20; 159:2,3;160:4,4; 161:1,3;173:14; 177:23,25;178:2,14; 183:16;185:15; 193:4,15;194:15; 197:6,7;206:4; 211:16;238:23; 240:13

**RESUMED (1)** 124:4

**retail (2)** 97:3,16

**retailers (1)** 249:10

**retained (17)** 24:20; 26:3;40:1,3,10; 167:1;114:43;5:59:12,19; 61:5;64:23;70:2; 102:7;114:9;118:8; 120:10;233:7

**retired (1)** 92:11

**retro (1)** 81:8

**return (1)** 48:18

**reveal (1)** 38:9

**Revenge (5)** 8:24; 43:25;44:10;45:9; 48:24

**review (5)** 47:12; 69:15;99:18;234:16; 235:19

**reviewed (11)** 99:20, 21,21,22,22,23; 156:19;157:18; 158:2;176:3;235:8

**revised (3)** 34:3; 67:12;70:14

**revision (2)** 20:21; 28:10

**Ribbed (1)** 154:1

**rid (1)** 28:11

**ridiculous (1)** 228:10

**right (107)** 5:24;6:2; 7:15,17;9:17,24,24; 13:11;14:8;15:5,15; 23:11;25:21;27:1,24; 28:9,17;32:25;35:8, 13;37:3,17,21;38:10; 43:24;46:15;50:11; 58:25;61:19,22;62:2; 63:24;65:6,7,19;67:7, 18;68:16;73:21;74:8; 78:6,8;89:4,8;92:23; 94:20;101:5,11; 102:17;113:20; 117:1;118:3,6; 119:23;122:15; 132:13;133:3;141:4; 144:8;146:13; 151:22;162:10;

166:10;169:21; 179:16;181:15,17; 182:2;184:14; 196:17;197:14; 202:12;204:17; 206:14;207:20,24; 208:11,18;210:10,14; 211:4;212:4;217:14; 218:7;219:15,19; 221:20,22;223:7; 229:4,23;230:21; 233:4;234:9;240:14, 16;245:1,9;246:17, 25;247:13;248:5,9; 249:12;250:1,12; 251:3

**rights (25)** 12:3,4; 15:4;22:20;41:21; 63:6;66:6;72:15; 73:15;78:17;79:15; 81:2,4;120:17;155:5, 10;159:19;162:16, 21;178:7;215:24; 216:1,23;217:1; 220:8

**ring (1)** 149:17

**risk (4)** 200:6,7,18,20

**room (4)** 42:4,9;85:3; 114:14

**roommate (1)** 62:7

**rough (1)** 157:2

**roughly (1)** 72:19

**round (5)** 19:18; 56:18;161:10; 221:11;223:13

**Rousch (1)** 215:3

**Ruehl (1)** 79:7

**rule (4)** 26:22;52:22; 54:10;126:9

**ruled (2)** 25:12; 122:12

**rules (2)** 5:25;40:25

**ruling (1)** 25:10

**run (2)** 200:5,18

---

**S**

**SAC0021 (2)** 210:11; 212:11

**SAC60 (1)** 219:10

**Sacra (5)** 156:19; 209:19;212:11; 226:8;248:12

**Sacra's (1)** 161:23

**Safeway (1)** 75:4

**sale (13)** 73:11,11,20, 20;74:23,23;75:1,1,2, 7;121:22;122:1,9

**sales (11)** 54:14,15; 55:19,24;57:1,1,19; 95:23;96:17;97:14,15

**same (36)** 12:18; 43:20;57:8;59:18;

101:25;103:1; 115:21;120:20,21; 124:19;127:5; 131:18,21;134:18,19; 172:6,7;174:20; 175:4;183:17; 186:22;195:22; 199:10;200:21,21,22, 23,23;222:2,2; 226:13;227:11; 231:16;236:12; 240:8;248:14

**sample (4)** 50:20; 56:10;93:3;164:8

**sampled (1)** 93:7

**Sampling (1)** 95:19

**San (2)** 198:21,22

**Sara (3)** 64:20,24; 65:19

**Sartore (1)** 26:12

**Saturdays (6)** 59:9, 14,24,25;82:21,25

**sauce (1)** 202:16

**saved (1)** 229:24

**Saving (1)** 44:5

**saw (4)** 242:15; 243:17;244:9;247:15

**saying (12)** 39:11; 60:4;84:13;133:10; 136:6;147:19; 181:16;188:5; 204:11;218:3; 231:24;236:15

**SC (1)** 210:10

**scale (1)** 74:9

**scholarly (2)** 80:10; 227:23

**School (1)** 199:14

**science (3)** 231:6,14; 234:22

**scientifically (1)** 185:4

**screen (5)** 77:5; 242:18;243:12; 247:15,16

**screening (1)** 77:6

**scribbles (1)** 201:18

**script (1)** 154:25

**se (3)** 206:19,21,25

**search (2)** 33:9;80:8

**searched (1)** 31:16

**searches (1)** 161:9

**searching (1)** 90:14

**second (12)** 6:6; 32:12;22;79:24; 82:13;125:1,3,22; 137:2,4;196:11; 238:21

**secondary (27)** 22:17;33:16;42:12, 15,20,24;43:2,7,18, 19;44:12,16,20,24; 45:6,9,13,20,24;46:1; 63:25;82:2,3;129:19;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 271 of 276
VIP Products vs. Jack Daniel's Properties                                    Gerald L. Ford
2:14-CV-02057-DGC                                                          August 19, 2015

132:21;152:25;217:6
**section (3)** 29:12;
  34:7;115:2
**secure (1)** 94:1
**security (1)** 149:11
**seeing (3)** 202:6;
  204:12;242:17
**seem (2)** 85:12;90:21
**Seems (7)** 27:22,24;
  104:9;138:23;236:8;
  237:15;240:16
**segment (1)** 112:4
**self-management (1)**
  71:2
**sell (1)** 83:1
**selling (1)** 178:5
**semantics (2)** 62:20;
  110:10
**send (3)** 36:4;53:20;
  58:23
**senior (1)** 66:23
**sense (5)** 66:24;
  106:25;121:15;
  197:9;227:22
**sensitive (1)** 113:13
**sent (1)** 158:10
**sentence (1)** 190:20
**separate (1)** 96:5
**separately (1)** 8:24
**sequentially (1)** 6:3
**served (1)** 8:7
**serves (1)** 34:20
**service (4)** 72:9;
  75:21;77:8;97:9
**services (1)** 77:3
**set (3)** 17:20;29:17;
  96:7
**sets (1)** 76:14
**settled (2)** 124:16;
  190:1
**seven (1)** 29:15
**Seventh (2)** 34:19;
  43:1
**several (2)** 197:17;
  231:25
**shape (27)** 16:2,12;
  130:21;161:12,13,19;
  162:6,7,9,11,11,12;
  211:21;212:2,2,3,7,7,
  9,19;221:12,12,13,
  16,17,18,20
**share (6)** 146:16;
  147:8,20;148:1;
  151:22;153:18
**shirt (1)** 90:7
**shoe (5)** 16:3,4,12;
  81:8;130:21
**shoes (8)** 15:20,21;
  55:7;81:4,5,6;
  147:22;148:3
**shop (3)** 82:25;83:2;
  249:24
**shoppers (1)** 76:8

**shopping (2)** 77:2;
  97:1
**short (2)** 25:4;146:10
**shorthand (11)** 12:3,
  5;15:14;27:6,17;
  38:2,5,21,24;39:1;
  41:20
**shortly (1)** 84:18
**shots (3)** 68:13;
  247:15,16
**show (11)** 85:19;
  86:17;90:7;134:20;
  138:24;140:24;
  177:1;178:1;192:25;
  226:15;233:23
**showed (4)** 44:2;
  118:2;147:22;176:13
**showing (1)** 148:2
**shown (12)** 34:20,22;
  35:5;74:8,9,10;75:2,
  7;76:10;79:4;172:8;
  237:21
**shows (4)** 109:20;
  110:12;180:15;
  236:18
**shrinking (1)** 96:6
**SIC (4)** 92:20,21;
  93:2,4
**side (11)** 12:1;16:4,4;
  19:17;65:16;100:21;
  114:2;118:18,22;
  248:5,9
**significant (7)** 22:14;
  57:1;106:9;180:9;
  183:12;186:24;206:1
**significantly (1)**
  226:21
**Silly (22)** 49:2,6,8,18;
  50:24;51:20,21;
  54:12,13,16;55:10;
  98:3,16;180:16;
  244:1,18,25;245:4;
  248:13;249:6,16,19
**similar (5)** 81:18;
  112:15,18;127:2;
  161:10
**similarly (1)** 13:3
**simple (1)** 108:16
**simpler (1)** 12:16
**simply (7)** 31:21;
  111:14;121:13;
  165:17;175:19;
  207:22;238:25
**simulated (8)** 74:4,7;
  75:22;76:1,1,3;77:11,
  18
**simulates (1)** 104:4
**simultaneous (2)**
  137:5,13
**single (2)** 55:12;
  159:25
**sit (7)** 24:8;47:5;
  64:15;115:12,22;

119:3;232:18
**site (1)** 21:24
**sites (3)** 21:17,18,20
**sits (1)** 75:15
**sitting (2)** 85:3;
  145:17
**situation (3)** 97:22;
  135:20;136:1
**six (2)** 110:24;124:17
**skew (3)** 173:13,16;
  206:4
**slap (1)** 18:22
**slash (1)** 94:22
**Slickcraft (2)** 105:16,
  19
**Slickcraft/Sleekcraft (1)**
  133:5
**slow (1)** 18:21
**small (2)** 96:9;97:13
**smaller (1)** 94:13
**smelled (2)** 243:13,14
**smoke (1)** 96:20
**smokers (1)** 96:12
**smoking (1)** 96:19
**social (4)** 21:16,18,
  23;62:10
**socially-unacceptable (1)**
  96:22
**soft (1)** 242:19
**software (3)** 93:12,15,
  18
**sold (16)** 49:6;50:16;
  54:14;55:10;83:10,
  11;119:10;120:16;
  121:3,11;160:22;
  166:10;173:3;213:3;
  249:9,17
**sole (2)** 81:8;130:22
**solid (1)** 112:2
**soliloquy (1)** 17:25
**somebody (9)** 62:10,
  11,23;119:1;148:16;
  169:23;214:21;
  246:11,14
**somehow (6)** 37:16,
  18;51:9;127:20;
  196:17;251:4
**someone (9)** 50:14,
  16;67:8,9;135:14,17,
  21;136:2;189:16
**Sometimes (12)**
  18:22;84:7,8;89:12;
  95:17;96:21;117:24;
  136:9;232:11,12;
  234:6,8
**somewhat (1)** 241:14
**somewhere (2)**
  198:18;239:24
**soon (1)** 189:6
**sophisticated (1)**
  142:12
**sorry (53)** 9:22;10:7,
  13;12:8;13:10;14:25;

16:6,18;26:6,21;
  41:14;43:7;45:4;
  49:3;59:14;73:4;
  78:5;82:11,17;87:8;
  88:21;89:18;98:25;
  105:2,3;117:21;
  124:23;131:21;
  139:7;144:14;145:2,
  13;149:23;154:7;
  158:24;169:19;
  170:14;171:5;
  183:21;188:7,13;
  201:15;203:4,20;
  206:11;211:13;
  212:25;220:3;
  225:13;228:19;
  241:1,16;246:4
**sort (5)** 53:9;124:19;
  176:24;214:3,6
**sound (4)** 25:23;
  37:16;132:25;243:8
**sounds (3)** 14:5;
  100:16;141:24
**sour (5)** 19:15;
  154:23;155:5,15;
  219:11
**source (45)** 18:20,24;
  21:9;34:5;38:19,22;
  39:4,7;48:18;58:16,
  16;85:11,12;86:14,
  14,16;98:3,8,12,16;
  108:6,7;109:25;
  110:4;112:6;122:5,6,
  24;128:14;134:8;
  135:6,8;137:24;
  139:23;169:13;
  174:5,13;177:21;
  181:6;188:2;189:10;
  209:4;211:19;
  237:16;250:20
**sources (1)** 156:20
**South (6)** 124:12;
  125:12;126:18,21;
  127:23;128:18
**Southern (2)** 7:19;
  198:18
**Spade (8)** 59:9,15;
  60:9;82:20,20;87:5;
  88:18;89:22
**Spaniel (6)** 112:15;
  155:14;158:18;
  168:9;221:3;242:10
**Spaniels (47)** 18:19;
  37:15;49:4,21;74:10;
  98:2;107:8;111:22;
  113:4;127:19;133:7,
  17;155:19;158:20;
  159:6,9,10;160:2,7,
  18;169:2;185:9,11;
  193:6;197:17;213:2;
  214:8;215:7,12;
  217:13;218:2;
  220:15,16;222:11,25;

238:22;241:10,11;
  248:4,9;249:5,9,13,
  16,19;250:7,15
**speak (6)** 14:2;16:22;
  21:1;63:7;215:19;
  240:13
**speaking (5)** 22:9;
  87:12;112:15;
  130:23;168:8
**speaks (1)** 162:2
**specific (7)** 74:25;
  115:22;171:16;
  202:1,14;225:21;
  233:24
**specifically (5)** 18:10,
  17;31:6;224:19;
  239:3
**speculate (4)** 23:9,9;
  28:14;214:21
**speculating (1)** 24:14
**speculation (4)** 23:15;
  133:12;182:12;
  244:12
**speech (3)** 35:15;
  131:8,17
**speed (3)** 36:25;
  41:17;78:11
**spend (2)** 90:11;
  141:6
**spent (3)** 11:1;20:13;
  58:21
**sphere (2)** 102:9;
  219:23
**spiel (1)** 5:22
**sponsored (3)** 128:6;
  189:11;231:9
**sponsorship (23)**
  34:6;39:4,7;58:17;
  108:6;109:25;110:4;
  112:6;122:5,25;
  134:8;135:6,8;
  137:25;139:23;
  169:14;174:5,13;
  188:2;196:7;224:3;
  250:21;251:6
**spoof (69)** 133:8,17;
  168:5,9;170:2,9;
  171:25;172:4,11,14;
  173:1,12,20;174:10;
  175:5;176:3,5;177:4;
  180:4,5,10;183:13,
  19,24;184:1,1,2;
  185:14,25;186:15;
  187:4,23;188:1,16,
  23;189:1,1,12;190:2,
  16;191:1,17;193:2;
  194:6,9,25;195:2,8,
  25;196:1,3,24;197:4,
  10,12;205:11;206:2;
  210:14,14,16,19,21,
  24;211:3;221:7,21;
  223:7,9;250:23
**spoofs (3)** 133:11;

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 272 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

192:23;251:8
**sport (1)** 55:7
**spread (1)** 126:13
**square (22)** 153:24;
160:23;162:1,5,6,11,
12;165:2,5,9,11,12;
166:10,16;178:6;
212:3,6,7,9,14,20;
221:18
**square-shaped (1)**
162:16
**squeak (3)** 98:18;
99:1;243:4
**Squeaker (2)** 49:8;
50:24
**Squeakers (23)** 49:2,
6,19;51:20,21;54:12,
13,16;55:10;98:3,16;
180:16;244:2,7,19,
25;245:1,4,9;248:13;
249:6,16,19
**squeaky (1)** 49:5
**squeezable (1)**
242:20
**squeezed (1)** 243:4
**Squiggly (2)** 214:5,6
**St (1)** 125:15
**stack (1)** 245:24
**stacked (1)** 127:5
**staff (1)** 230:4
**stand (2)** 171:14;
176:22
**standard (14)** 33:21,
24;44:18;45:24;
92:23;112:3;116:7,
10;192:4,18,19;
198:4,6;251:2
**standard-accepted (1)**
112:2
**standing (2)** 96:12,18
**stands (1)** 90:13
**start (4)** 11:14;69:6,8;
80:8
**started (2)** 10:22;
244:23
**starting (2)** 156:6;
162:19
**state (13)** 5:14;71:5;
126:11;134:24;
142:21;170:25;
181:4;195:22;
197:12;205:21;
206:7;240:21;251:21
**statement (5)** 113:21;
138:24;162:3;
190:15;239:22
**statements (1)** 144:18
**state-of-the-art (1)**
152:10
**States (12)** 23:6;
24:19;67:20,23;
80:15;83:10,13,15;
134:25;156:14;

160:22;191:16
**statute (3)** 28:13;
115:1;200:23
**steal (1)** 100:1
**stem (1)** 34:16
**Stephen (1)** 156:19
**Steve (1)** 226:8
**Steven (2)** 199:4,8
**stick (1)** 75:15
**still (12)** 36:2;55:13;
92:14;140:20;
146:19;181:15;
185:21,22;194:10;
210:13;217:7;251:16
**stimuli (3)** 186:22;
237:25;238:1
**stimulus (8)** 74:11;
75:3,17;97:20,23;
162:9;172:8;206:8
**stitching (4)** 16:3;
78:21;79:5,9
**Stop (4)** 73:22;77:4;
84:17;168:12
**storage (1)** 21:8
**store (15)** 25:8;77:22;
237:22,23;242:3;
243:18,18;244:9,19,
22;245:18;246:10;
247:4,12;248:17
**stores (2)** 79:6;
249:11
**Strauss (3)** 78:13;
79:8;89:2
**strike (27)** 43:15;
49:3;51:5;52:10;
61:3;63:9;66:14;
74:24;87:11,12,14;
99:6;105:22;107:24;
109:12,17;121:17;
136:13;137:3;
141:21;168:12;
169:5;184:20;185:2;
211:11;231:12;
235:21
**stripe (2)** 81:6,14
**stripes (6)** 81:16,17,
17,18;130:21,22
**stronger (1)** 23:22
**struck (1)** 232:19
**structure (1)** 21:3
**structured (1)** 13:2
**studies (1)** 96:14
**study (2)** 193:24;
249:18
**stumped (1)** 92:22
**style (1)** 2:6,12
**subcategory (1)** 238:3
**subject (5)** 24:10;
69:21;76:25;79:9;
105:24
**subpoena (12)** 6:13,
23;7:1,5,9;8:7,22;
30:21,23;31:12,20;

32:1
**subsequent (4)** 16:13,
16,18,20
**subsequently (1)**
14:21
**subset (11)** 108:2,4,5;
109:15;172:24;
183:12;185:12,25;
186:14;191:13;206:1
**subtract (1)** 179:11
**succeed (1)** 68:16
**successful (4)**
103:12;104:17,21;
107:13
**sue (2)** 124:22,24
**sued (3)** 170:4,24;
205:12
**suggest (2)** 104:6;
115:7
**suggested (1)** 225:24
**suggesting (2)**
187:11;211:18
**suggestive (2)** 71:23;
212:9
**suggests (2)** 227:24;
235:6
**suing (2)** 128:10,10
**suit (1)** 149:10
**summary (1)** 235:22
**Superstar (1)** 81:7
**supervise (1)** 62:21
**supervisors (1)** 96:14
**support (8)** 63:20;
95:6;101:3;118:25;
129:19;132:15,21,21
**supported (3)** 8:2,2;
43:1
**supporting (1)** 8:9
**supports (1)** 118:25
**suppose (3)** 96:11;
145:25;228:1
**supposed (1)** 23:8
**Supreme (4)** 24:12;
25:6,12;94:9
**Sure (86)** 5:15;9:20;
12:18;16:24;17:11;
19:24;20:5;21:10;
23:13;28:12;31:9;
32:10;35:24;38:15,
21;39:13,17,18;41:7;
44:8;48:18;50:21,22;
53:8;57:21;58:18;
61:25;63:21;64:15;
73:23;79:11;83:1;
84:5;98:15;101:11,
15;111:24;117:11;
122:4;126:6;132:24;
135:4;139:25;
143:14;152:15;
157:19;158:6;
163:13;168:2;171:1;
174:3,15,17;177:20;
178:17;182:19;

187:9;188:8;192:17;
196:6,18;200:17;
201:17;203:25;
207:18;208:7,20;
216:16;219:19;
220:25;221:14;
223:6,20,24;228:6,9,
11;230:3;231:17,21,
24;232:25;238:20;
244:15;245:8;249:18
**Surf (8)** 59:9,14,24,
25;82:21,25,25;83:2
**surfboards (2)** 83:1,
10
**surrounding (1)** 214:7
**survey (309)** 8:3,8,9,
12,17:9,5,10,16;15:7,
22;16:11;18:13,14,
17;20:16,17,18;21:1,
4,7,9,15;22:4,7,19,
24;23:1;25:18;26:25;
27:1,7,7,18,20;28:5,
19;33:17;34:12;
37:13;38:2,9,9,17;
40:7,13;42:16,17,20,
21,23;43:1,2,8,10,18,
19,21;44:1,19;45:20,
21;48:6,23;50:1;
54:20;55:13;57:5,6;
58:5;60:16;61:3,15,
20,21,22;62:22;
63:12;64:25;65:2,5,8,
10,14;66:9,14,16,17,
21;68:7;69:4,25;
71:15,18;72:12,17;
73:24,24;74:1,5,7,16,
17,18,19,20;75:22,
22,24;76:13,14,25;
77:10,23;78:22,24;
79:1,20,22,24;80:5;
81:19,20,22;82:2,3,4,
10,10,20,21,22,23;
83:14,17,17;84:11,
11,15,20;85:5,7,7,16,
24;86:3,8,17,23;87:4,
14,14,17,17,20,21,22;
88:19;89:7,7,13;90:4,
5,6,9,10,11,19;91:1,
7;92:15,16,17;94:15,
16,23;95:2,7,13,19,
22,22;96:11;97:5,17,
18,20,23;98:1,9,17,
21,23;99:21;101:19;
102:11,14;109:11,20;
110:12;111:10;
112:2;116:2,11;
117:10;118:1,5,10;
119:18;120:4;127:8,
24;130:14,23,25;
132:15,18,20;133:7;
138:17;139:8,12,16,
16;140:2,2,5,10,13;
142:5,18;143:15;

146:1,22;148:14;
152:11;159:3;160:4;
161:1,2;169:5,8;
173:14;174:24;
176:13;177:7,25;
178:23;180:1,8;
183:16;184:20,22;
185:4,8,10,11,15,21,
23;186:3,8,9;187:2;
189:13;192:9,22,24;
193:4,5,15;194:14,
19;195:14;202:21;
203:9,12;204:21;
206:5;211:16;
212:23;223:18,25;
224:14,16,20,20;
225:2,4,10,11,24;
226:1,10,13,20;
227:11,11;230:22;
231:3,14;233:3,19;
235:6,10,15,23;
236:24;237:8;238:1
**surveyed (3)** 85:8;
109:16;223:18
**surveys (69)** 14:16,
21,23;15:5,9;16:14,
16,21;25:19;27:5,5;
36:5;58:8;61:13;
62:1;63:25,25;65:3,4,
12,14,15,18;67:1;
71:18;73:11,20;
74:21,24;75:19;80:2;
81:24,25;83:22;
84:23;86:20;88:23,
24;91:18,19,22,24,
25;92:1;94:2,17,21,
22,23;95:1;125:3;
129:3;141:21,23;
142:2,11,14;145:9;
178:24;186:13;
187:1,20;191:19;
200:5,18;234:21,22;
237:11;250:19
**suspect (2)** 64:14;
146:7
**Swann (6)** 33:23;
144:6,19,24;145:2;
235:4
**Swann/Diamond (4)**
30:2,12;46:18,18
**Sweet (4)** 8:23;43:25;
44:10;48:24
**switch (2)** 40:21;41:9
**swoosh (1)** 147:24
**symbol (3)** 127:2,3,4
**synonym (1)** 171:17
**synonymous (5)**
148:7;181:20;182:1,
6,10
**system (2)** 62:3;71:3

**T**

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 273 of 276
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC
Gerald L. Ford
August 19, 2015

**tables (1)** 127:25
**tacks (1)** 45:4
**tactic (1)** 60:2
**tactile (5)** 85:7,11;
98:7,10,12
**tactually (1)** 98:19
**tag (31)** 90:8;212:25;
213:3,5,8,10,14,17;
222:2,5,25;223:17;
224:5,13,15,19;
225:9,23;226:1,16,
18,20,23;242:14,15;
244:2,10,18;245:5,
15,19
**tags (2)** 224:10;
244:23
**tailor (1)** 116:11
**talk (10)** 12:21;58:11;
78:6;91:16;112:11;
147:4;150:7;155:3;
201:10;229:16
**talked (8)** 54:10;99:8;
100:17;104:21;
204:16;211:23;
230:20;231:7
**talking (20)** 15:15;
24:13;28:3;34:9;
39:9;78:5,10;80:17;
83:7;110:24,25;
135:5;192:11,13;
217:25;219:2;
224:12,13;248:16;
249:4
**talks (3)** 58:12;196:6;
220:25
**tarnishment (9)**
66:11;68:4,8,15,25;
69:3;70:4,10;71:19
**TDRA (3)** 22:3;28:2;
45:22
**teaching (1)** 69:19
**technical (2)** 85:2,4
**technically (2)** 5:12;
11:21
**technology (1)** 84:21
**tecum (3)** 6:13;8:7;
30:24
**telephone (7)** 91:25;
94:23,25;95:1,10,15,
18
**telephone/internet (1)**
92:3
**tells (3)** 224:13,15;
227:10
**ten (11)** 9:18;60:20,
23;79:20;81:12;95:2;
118:7;142:11,15;
194:5;199:21
**tenant (1)** 97:8
**tenants (1)** 77:3
**tend (1)** 35:17
**ten-minute (2)** 5:22;
35:15

**Tennessee (16)**
19:15;23:25;154:23,
24;155:5,10,13,15;
160:21;168:10;
169:1,1;219:11;
220:12;221:8,9
**term (7)** 37:12;38:10,
11;113:12;143:16;
148:13,14
**terms (15)** 7:1;21:2;
26:22;28:1;29:2;
33:20;43:4;103:18;
112:11;139:8,16;
140:13;178:24;
231:14;248:12
**territory (2)** 115:9,10
**test (72)** 17:5,7;18:3;
19:4;22:10,11;50:17;
56:16;65:5,5;71:18;
74:10,23;75:1,2;
127:15;130:15,24,25;
133:3;142:12;143:2;
147:2,2;149:21;
150:11;152:4,7;
153:5;162:13;
164:14;165:2,12,15;
174:8,9,16,19;175:9,
20,25;178:2,13;
179:11,18;180:8,14,
15;186:10,24;187:3,
21;188:25;189:9,24;
191:15;192:22,22;
194:12;195:15,19,21;
200:15;212:19,22;
214:18;221:16;
235:24;236:5,16,24;
237:8
**tested (9)** 16:15;
129:20;130:8,9,10;
153:6;182:13;197:7;
217:12
**testified (22)** 5:6;
40:7;41:16;66:4;
70:16;72:5;73:12;
82:1;102:10;177:9;
180:12;185:21;
186:5;191:22;194:5;
214:16;218:12;
228:24;236:21,23;
239:25;248:19
**testify (12)** 60:22;
67:24;120:6,8;
125:24;126:1;
184:12;194:7;
215:22;236:2;
248:12,17
**testifying (2)** 110:11;
130:1
**testimony (22)** 10:16,
17;11:7,10;20:4;
32:16;40:6;73:12;
77:16;109:21,23;
114:1;126:5;164:20;

181:23;183:22;
184:25;187:21;
215:1,2,4;247:18
**testing (12)** 19:20,21;
130:11,12;143:19;
160:16;162:13;
198:2;200:6,18,19;
226:11
**tests (4)** 56:18,19,19;
186:20
**Thanks (1)** 201:5
**theoretically (1)**
244:24
**theory (1)** 225:21
**Thereby (1)** 208:19
**Therefore (1)** 202:17
**thinking (7)** 63:5;
68:8;83:7;149:18;
226:9;229:3;232:7
**thinned (1)** 88:15
**third (3)** 24:6;67:14;
83:14
**though (10)** 5:25;
36:15;43:2;80:23;
84:9;179:2;192:22;
213:14;215:16;
218:16
**thought (11)** 5:21;
14:4;37:15,19;50:4;
73:18;76:13;105:2;
140:24;146:12;
244:22
**thousand (1)** 29:16
**three (11)** 11:5;
21:22;34:3;67:3,11,
12;70:13;81:14,17,
18;93:4;153:4;179:4;
180:13;249:8,12
**three-by-five (1)**
94:11
**throat (1)** 148:17
**throughout (1)** 83:12
**Thus (1)** 149:20
**ties (1)** 216:24
**times (13)** 5:19,20;
26:23;34:3;36:15;
67:13;92:5;153:4;
177:9;179:5;180:13;
196:5;197:18
**Timmy (5)** 102:3;
107:4;112:16;113:4;
120:21
**title (1)** 36:5
**Today (14)** 35:2,2;
47:5,12;57:11;64:15;
84:25;115:12,22;
142:21;145:17;
146:19;185:5;232:18
**today's (4)** 84:21;
99:9,12;234:17
**toe (3)** 16:5,7,8
**together (7)** 8:5;
94:18;219:22;

248:14,22,24;249:2
**told (6)** 87:7;88:19;
165:18,22;182:12;
214:22
**Tom (1)** 198:15
**Tommy (5)** 47:23;
102:1,2,3;107:5
**took (7)** 21:19,20,20,
22;46:12;93:25;
213:10,10;246:10
**tool (1)** 95:5
**tools (3)** 94:16,23;
95:2
**top (12)** 21:20;36:9;
43:24;56:7;85:25;
86:4,14,16;127:12;
136:11;144:8;154:16
**topic (1)** 229:17
**total (4)** 14:22;54:15;
94:4,5
**totally (2)** 24:14;
182:11
**touch (1)** 243:22
**towards (2)** 132:11;
184:7
**towel (1)** 75:8
**towels (6)** 73:16;75:7,
16;76:5,10,11
**tower (2)** 250:14,17
**Townsend (1)** 26:5
**toy (50)** 18:19;23:19;
24:1;25:8;48:16;
49:2,4,21;50:3;53:12,
15;55:2;56:3;86:16;
98:18,19;103:8,12,
22;105:24,25;106:5,
5;107:8;111:22;
112:5,6,16;120:16;
127:19;155:14,19;
158:18;180:16;
211:20;213:2;
220:15;221:3;
238:18,22;242:25;
246:22,25;247:6;
248:1,5,5,9;249:9,13
**toys (15)** 24:7;49:5,
19;50:2;55:6;56:2;
74:9;211:5;248:13;
249:5,16,19;250:7,8,
15
**track (1)** 52:11
**trade (57)** 14:4,19,20;
15:7,10,11,12,13,17,
18,23,25;16:10;17:4,
6;19:3,20;22:24;
44:23;45:2;81:9,11,
13;129:12,20;130:7,
9,10,16,20;148:4;
152:24;156:11,13,15,
17,23;164:9;165:6,
10,19;166:6;168:4,
18;206:22;207:11;
209:3;212:4,4;213:6;

216:21;217:19,23,25;
218:4,17;219:17
**trademark (117)** 12:3;
28:7,11,25;29:24;
41:21;46:20,22;
59:19,24,25;63:20;
64:8;66:5;69:16;
71:18;72:15,16;
78:17;106:25;
108:15,18;114:10;
115:14;118:8;119:9;
120:17;121:3,10;
128:5;132:5,7;
135:14,17;136:21,21;
138:16;139:11;
140:4;141:20,23;
142:4,5;143:15;
146:25;148:3;
151:20;152:11;
156:7,9,17;158:8,12,
16;162:19;168:18;
169:3,6;170:9;172:1,
5;173:2,11,13;
174:23;175:16;
176:6;179:3;180:11;
182:2;183:4,5,14;
184:21;185:4,8,9,10,
14;186:1,16;187:1,6,
20,24;190:23,24;
191:2,18,19;192:23;
193:3,4;194:13;
195:17;196:6;
197:17;198:2;199:2;
200:3,5,17;203:11;
205:17;206:4;220:8;
223:19;228:1,12,14,
17;231:9;233:19;
250:23,24;251:7,8
**trademarks (6)** 47:7;
151:4,16;156:8,15;
158:17
**traditional (1)** 142:23
**tragic (1)** 53:9
**training (1)** 200:13
**treat (3)** 140:18,22;
178:23
**treated (3)** 138:15;
139:15;140:23
**treatise (9)** 29:16;
46:20,24;47:7;131:7;
134:25;147:9,14;
193:14
**treatment (1)** 200:3
**treats (6)** 249:17;
250:9,13,16,16,16
**trend (1)** 96:25
**trial (21)** 10:16;11:7,
10;20:4;40:6;41:8;
64:8;72:16;73:12;
81:13;89:18,18;
101:4;102:20,25;
106:4;114:1;130:1;
177:16,16;184:13

Case 2:14-cv-02057-SMM    Document 233-2    Filed 10/20/17    Page 274 of 276

VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

**trick (1)** 113:8
**tried (4)** 34:2;192:4;
221:24;222:1
**trilogy (1)** 39:5
**trouble (1)** 244:22
**true (23)** 9:7;12:8;
22:13;43:11,12;
57:18;86:6,15;98:20;
101:25;107:17;
121:8;130:17;133:2;
143:21;175:11;
190:25;192:8;
195:23;222:1;
228:11;232:11;
236:12
**trumps (1)** 179:23
**truth (2)** 5:6;237:22
**try (10)** 60:2;89:23;
96:19;103:17;
113:24;117:13;
121:20;184:16,17;
192:2
**trying (23)** 8:1;9:22;
37:22,24,25;38:6;
39:11;40:24;57:23;
60:3;62:3;97:21;
103:16;113:8;115:7;
147:2;177:13;188:9;
211:8;221:6;233:11;
237:5,6
**T-shirts (2)** 83:11;
127:1
**TTAB (8)** 7:19;12:9;
41:19;61:23;92:15;
94:2,8,15
**turn (5)** 86:4;105:13;
153:13;155:16;
240:23
**turned (4)** 7:6;63:23;
101:22;124:17
**turns (1)** 93:8
**TV (1)** 84:24
**twice (2)** 70:14;153:2
**two (30)** 7:25;9:5;
34:3;50:17;51:13;
55:15;57:25;58:8;
59:6;61:13,25;73:11,
20;79:18;81:6,17;
83:5;94:18;129:5;
134:22;137:3,5,12,
17;149:2;150:14,19;
182:10;190:4;219:8
**two-man (1)** 93:10
**two-stripe (1)** 81:5
**type (4)** 21:4;73:9;
113:4;191:18
**types (1)** 92:1
**typical (8)** 5:22;
126:4;128:2,21;
129:2;161:13,17,20
**Typically (12)** 34:16;
42:18,19;45:25;
63:24;77:4;94:14;

126:12;150:17;
248:24;249:2,16

**U**

**U-Haul (3)** 20:15;
26:6,11
**ultimately (1)** 132:9
**unaided (1)** 21:12
**uncharted (2)** 115:9,
10
**under (15)** 5:5;7:8;
28:25;29:24;35:23;
109:8;163:24;
186:12;190:21;
200:3;202:3,22;
204:2,23;237:19
**underlying (1)** 22:16
**understandable (1)**
12:5
**understood (5)** 108:8;
170:19;213:12;
227:25;228:3
**unequivocally (1)**
251:5
**unfair (2)** 32:20;
138:23
**unhappy (2)** 231:22,
25
**Union (6)** 34:1,17,24;
42:25;67:10;129:17
**United (9)** 23:6;
24:19;67:19,22;
80:15;83:10,12,15;
160:22
**units (1)** 57:2
**universally (2)** 43:12;
170:8
**universe (7)** 50:1;
52:5,23;55:1;56:9;
76:7;92:17
**University (1)** 199:14
**unless (6)** 7:13;53:9;
87:25;130:2;133:20;
168:12
**unlike (1)** 197:16
**Uno (1)** 105:13
**unquote (10)** 34:13;
51:22;52:12;54:17;
65:13;106:22;
114:20;116:3;148:6;
193:2
**unreasonable (3)**
232:15,20;234:3
**unsuccessful (2)**
103:12;104:22
**unto (1)** 163:1
**unusual (1)** 129:3
**up (39)** 10:23;21:23;
24:11;25:5;36:25;
41:17;55:9;71:12;
72:21;76:14;78:11;
119:3,4;120:5;

136:15,18;137:20;
138:2;151:24;164:9,
12,22;166:1;167:1,
11,18,22;175:15;
178:1;179:9,14,16;
196:20,24;216:6,12;
237:20;244:7;245:1
**upon (16)** 36:17;52:4,
5;70:11;79:20;87:1;
97:20;109:24,24;
128:7;134:15;
150:24;151:10;
177:20;242:5;250:10
**upper (1)** 16:3
**upsets (1)** 148:18
**use (59)** 12:2;24:4;
38:5,10,21,25;39:1;
51:22;58:14,16;72:8;
87:16,22;89:5,6,13;
93:11,18;94:16;
103:17;110:19;
113:3;130:25;
135:14,17;138:12;
142:11;145:10;
148:10;152:11;
155:14,19;159:19;
160:17;161:17;
162:5,11;179:17,19;
181:1,13,20;183:4;
201:13,13,16;202:17;
206:10;207:25;
216:3,20;217:16,17;
219:19;221:3,4,11;
235:11;239:17
**used (37)** 17:4,6;
20:25;25:7;34:12;
63:22;64:1;71:11;
84:1,22,23;89:8;
93:15;95:2,5;107:10;
117:9;141:23;147:7,
11,17;158:20;
159:14;162:10;
184:22;192:18,19;
212:6;217:6;219:21;
222:2,2;235:7,15,23;
238:1;243:8
**user (1)** 66:23
**users (2)** 66:22;93:5
**user's (1)** 139:21
**uses (10)** 23:18;24:4;
155:21,24;212:2,3;
215:16;217:13,18;
218:9
**using (13)** 15:11;
24:7,9;81:5;84:10,
14;95:21;97:16;
103:21;112:2;
150:16;162:7;165:11

**V**

**valid (3)** 184:21;
185:4,22

**validation (2)** 95:15,
16
**validity (1)** 183:16
**valuable (1)** 98:9
**variety (5)** 24:9;
50:15;81:4;130:20;
140:4
**various (2)** 12:2;
156:22
**ventilation (1)** 16:5
**vents (1)** 16:4
**version (1)** 34:23
**versus (34)** 10:20;
20:15;34:1,17;37:3;
42:25;46:3;59:9;
61:2,6;64:20;65:25;
72:3;73:1;74:23;
75:1;78:13;79:11;
82:20;87:14,17,21;
89:7,10;93:6,6;
103:12;104:21;
124:10;125:12;
129:17;137:9;139:5;
231:13
**videotape (1)** 84:24
**view (16)** 85:25;86:4,
20;108:1;113:15,15;
173:20;175:4;177:3,
10;180:3,4;181:25;
182:10;197:3,25
**viewed (1)** 197:10
**viewer (1)** 169:7
**viewing (2)** 177:3;
242:4
**views (2)** 86:22;
237:11
**violation (1)** 156:7
**VIP (22)** 5:13;8:7;
11:20;30:24;31:13;
33:21;34:12;49:6;
53:13,20;54:11;
55:10,11;73:25;
75:21;127:17;
156:19;158:7;
219:19;220:16;
222:5;224:1
**VIP/Jack (4)** 22:5;
31:3;91:2;146:6
**VIP's (2)** 31:12;
158:18
**vis-a-vis (1)** 192:23
**visible (1)** 250:18
**Vita (1)** 241:10
**voice (1)** 117:24
**volume (3)** 54:14;
57:1;221:1
**Vuiton (26)** 47:23;
100:14,24;103:7,12,
21,22;104:16,19;
105:22,23;106:5;
107:2;108:8;112:16;
113:4;115:3;116:24;
117:1,4;118:1;

119:19;120:4,16;
122:10,17
**Vuitton (11)** 100:22;
101:17;102:18;
104:5;106:6;107:3;
108:9,14;120:5,18;
122:23

**W**

**Wait (4)** 161:16;
202:24;222:10;
248:16
**wants (3)** 28:23;42:6;
88:3
**wars (1)** 65:22
**washed (1)** 134:7
**waste (2)** 141:7,8
**watching (1)** 62:13
**water (1)** 83:6
**way (44)** 29:19;31:2,
10;32:17;38:18;57:7,
9;83:20;96:5,23;
103:17;114:17,25;
115:17,19,21;121:20;
127:4;133:10;
134:18,19;143:17;
147:19;150:23,24;
151:9,9;156:1,4;
167:23;178:9,11;
180:18;184:3;
188:24;189:20;
195:6;196:18;
212:24;236:19;
241:24;242:19;
243:3,6
**ways (1)** 239:8
**web (1)** 161:9
**website (2)** 49:7;94:1
**Wednesday (1)** 124:1
**week (2)** 99:17;
103:15
**Welcome (4)** 88:10;
141:12;163:11;
182:22
**well-known (13)** 23:6,
12,14,22;27:21;28:1;
49:9;51:7,10,21;
52:13;54:17;133:11
**well-trained (1)** 230:4
**weren't (9)** 8:5;28:16,
16;36:14;76:10;
117:22;129:11;
130:11;211:7
**West (2)** 67:3;104:15
**what-comes-to-mind (1)**
66:23
**what's (21)** 6:12;
10:19;20:23;30:11;
75:11;98:25;137:8;
142:24;157:17;
171:22,23;175:19,20;
199:23;200:4;

**Case 2:14-cv-02057-SMM   Document 233-2   Filed 10/20/17   Page 275 of 276**
VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

206:10;219:3;
225:21;230:9;
237:14;249:7
**whiskey (41)** 19:15;
23:24,25;154:23;
155:5,10,13,15,23;
156:21;159:14,20;
160:21,21;161:5,10,
20,25;162:17,21;
166:9,15;178:5;
194:4;205:7,24;
209:5,11;210:17,21,
25;211:9,18;212:13;
216:4;217:7;219:11,
23;221:19,22;223:10
**white (13)** 71:11;
94:11;154:9,11,14;
207:8,20,21,21;
208:5,11;213:16;
217:2
**whole (12)** 11:1;
16:12;20:13;58:22;
114:22;148:13;
156:7;166:2;189:7;
205:3;227:18;236:21
**Wholesale (9)** 37:3,8;
38:8;39:14;40:4;
41:10;82:8;88:25;
90:4
**whose (2)** 149:16;
198:14
**wide (2)** 69:6,8
**widely (1)** 217:6
**wife (1)** 141:10
**window (2)** 189:8;
191:8
**wine (5)** 161:5,13;
162:7,9,11
**wisdom (1)** 229:10
**wish (3)** 10:22;
187:19;247:10
**wished (2)** 247:9,11
**withdraw (1)** 105:5
**within (3)** 8:14;9:4;
154:18
**Without (16)** 17:17;
21:9;52:13;54:18;
84:4,7;142:14;166:8,
14;176:22;184:22;
185:5;187:10;190:7;
192:6;208:4
**WITNESS (168)** 10:5,
10,13;14:8,11,13;
17:19;18:21;20:8;
23:17;29:8,10;30:9;
33:9;40:3,21;42:1,
10;43:23;44:7;45:18;
47:11,20,22;48:14;
49:13,25;51:16;52:4,
21;53:19;54:25;
55:20,22;57:12;
72:24;74:4;77:17;
82:3,13,18;85:10;

86:25;87:25;88:3;
89:17;93:23,25;99:1,
3;101:9;102:13;
103:3;104:3;105:7,9;
108:24;112:21;
120:2,12;122:12,21;
123:4;131:3,12,22;
134:5;136:18;
137:16;138:11,23;
140:9;143:10;
144:13,16,22,24;
149:24;153:4,11;
155:9;157:2,15;
159:8,24;160:16;
161:19;162:10;
163:1;164:12,25;
165:22;166:12;
167:8,10,22;168:8,
22;170:14,18;171:6;
172:21;173:5,16;
174:3;175:1,19;
176:10;177:20;
179:6,8;180:15,21;
182:15;183:9;186:7;
187:9;188:12;191:5,
24;198:22,25;
199:11;200:25;
201:2,5,15,17,19;
203:20;204:19;
205:2;206:16;207:5,
7;210:10;215:21;
216:11;220:3,22;
222:15;224:9,24;
225:17;227:3;228:6,
11,22;229:21;230:1,
8;231:17;232:11;
236:8,20;238:16,20;
239:10,16;240:9;
242:24;244:14;
245:11;246:7;
248:21;249:1;250:3;
251:14
**witnesses (5)** 35:15;
126:10;149:9;
214:14;215:17
**word (24)** 35:11;38:1,
5;58:16;90:13;97:7;
103:21;113:3;122:7;
133:13;138:12;
139:19;142:12;
154:24;161:17;
179:22;181:20;
186:19;190:19;
213:20,21;215:16;
219:3;229:13
**words (25)** 18:9;
32:19;45:2;51:23;
94:18;116:8;124:19;
143:21;148:10;
154:23;155:5,15,19,
24;173:21;182:10;
219:15;220:15;
221:3;222:24;

223:11;239:17;
242:9,12,13
**work (13)** 25:17;26:8,
10;32:7;33:3;71:4;
107:16,17,21;125:11;
179:19;229:6;234:20
**worked (7)** 10:25;
24:14;26:5;50:14;
118:16;124:7;247:25
**working (2)** 11:1;91:6
**works (2)** 69:14;92:6
**World (17)** 37:3;
49:17;50:24;51:20,
24;52:11,14;54:18,
19;55:12;57:2,24,25,
25;80:20;120:14;
136:10
**worldwide (1)** 67:20
**worth (1)** 233:12
**wrap (4)** 19:12,13;
154:6,9
**write (5)** 29:15;53:12,
12;70:23;144:24
**writes (2)** 131:7;
135:12
**writing (7)** 166:17;
207:20,21;208:5,10,
11;217:2
**written (4)** 31:6;67:8;
137:2;199:2
**wrong (12)** 35:8;
63:18,18;104:8;
106:18;122:15;
150:23;151:8;207:3;
238:25;240:14,17
**wrote (14)** 67:9,11,
12;71:7;143:5;145:3,
5,8;146:13;147:8,14;
149:20;199:4,14

**Y**

**year (10)** 11:1;13:17;
24:20;29:20;54:15;
55:10;57:2,2;69:15,
15
**years (35)** 8:14,18;
9:4,9,18;24:22;32:7;
33:2;49:18;55:11;
56:25;57:10,12,20;
63:2,19;70:12;71:25;
79:20;84:2,6;95:2;
115:18;116:15;
118:7;119:6;124:8;
142:7,11,15;190:23;
198:5;199:21;
225:20;235:7
**yellow (2)** 208:1;
222:3
**Yep (2)** 6:14;65:24
**Yesterday (1)** 99:16
**York (2)** 100:23;
126:4

**Yugoslavia (1)** 71:5
**Yugoslavian (1)** 71:2

**Z**

**zero (1)** 94:6
**Zuckerberg (1)** 62:13

**0**

**000160 (1)** 8:20
**00018 (1)** 144:7
**001 (1)** 204:13
**0016 (1)** 7:20
**008 (1)** 30:21
**018 (1)** 144:12

**1**

**1 (3)** 59:10;88:23;
94:21
**1:30 (1)** 123:6
**1:42 (1)** 124:2
**10 (7)** 84:2;163:12,
25;167:6;206:9,13;
220:11
**1001 (6)** 169:21;
171:24;204:14,21;
205:16;230:16
**1033 (1)** 180:23
**11:15 (1)** 78:1
**1194 (2)** 201:10,19
**12 (3)** 69:21;238:12,
14
**12:30 (1)** 88:12
**1451 (1)** 199:24
**18 (3)** 144:11,20,20
**19 (4)** 5:1;124:1;
169:15;204:13
**1978 (1)** 34:1
**1992 (1)** 10:17
**1999 (1)** 69:23

**2**

**2 (19)** 17:21,21;
18:10;94:22;155:21;
156:3;217:14,17,19,
22;218:4,7,15,16,19,
25;219:1,6,15
**20 (8)** 5:19;55:11;
56:25;57:10,12,20;
71:25;174:21
**20,000 (1)** 142:3
**200 (4)** 5:20;27:13;
56:18,19
**2002 (1)** 13:25
**2005 (1)** 13:18
**2009 (1)** 74:18
**2010 (2)** 72:3;125:13
**2013 (2)** 37:3;82:16
**2015 (2)** 5:1;124:1
**207 (9)** 56:19,19,21,

21;57:6;58:5,7,8;
109:11
**21 (2)** 163:24;180:19
**217 (2)** 128:25;164:3
**25 (3)** 142:7;192:25;
238:21
**28 (3)** 36:4;201:11,21
**29 (10)** 37:14;50:3;
57:5;127:15;150:10;
152:4,15,17;186:24;
226:22

**3**

**3 (1)** 94:23
**30 (5)** 57:4;71:25;
84:6;110:25;198:5
**31 (5)** 10:22;14:7,13,
15,16
**312 (1)** 144:8
**33 (1)** 30:22

**4**

**4:30 (1)** 229:19
**40 (7)** 36:17;72:1;
115:18;116:15;
119:6;190:23;229:17
**400 (4)** 56:11,12;
58:9;77:23
**412 (1)** 109:11
**414 (1)** 109:12
**416 (2)** 56:13,17
**44 (1)** 199:24

**5**

**5 (5)** 153:22;158:10;
166:3,24;230:2
**50 (3)** 30:1;161:22;
212:13
**53 (7)** 157:11,12,13,
18;161:22;177:25;
210:8
**545 (1)** 7:21
**55 (2)** 35:6;250:2
**56 (2)** 249:21;250:2
**57 (1)** 6:3
**58 (2)** 6:4;157:11
**59 (2)** 6:9,13

**6**

**6 (12)** 19:8;153:8,23;
158:10;166:3,5,24;
206:23;207:19;
217:20,23;219:21
**60 (20)** 10:2,3,11,12,
13,15;11:10;20:7,8,
11;36:17;59:10;72:2;
78:9;84:2;88:17,24;
113:25,25;114:8
**61 (17)** 17:13,14;

VIP Products vs. Jack Daniel's Properties
2:14-CV-02057-DGC

Gerald L. Ford
August 19, 2015

18:6;22:6;23:3;59:2;
157:25;163:14,25;
201:12;206:13,14;
220:11;240:24;
243:3;249:21;250:8
**62 (13)** 30:5,6,12;
32:2,5,18,25;36:4;
143:23;144:3,20;
146:14;149:20
**63 (6)** 143:7,8,13;
144:1,2;153:11
**64 (6)** 230:5,5,6,14;
245:23;247:22
**65 (3)** 234:11,12,13
**66 (1)** 247:21
**69 (1)** 10:10

---

### 7

**7 (26)** 19:13,18;
104:15,15;105:3;
106:1;154:11,18;
155:20;201:23;
217:16,18,21;218:6,
7,10;219:18;240:23;
241:1,3;242:10,18;
243:3,7,11,19
**7.0 (1)** 181:9
**70 (4)** 28:24;36:12,
18;83:22
**75 (3)** 35:18;36:13;
46:13

---

### 8

**8 (12)** 155:24;158:12,
23;218:9,9;219:12,
15;220:14;243:24;
244:5;245:3,14
**80 (3)** 28:24;36:12,18

---

### 9

**9 (5)** 204:22;205:15;
225:2;246:5,9
**9.1 (7)** 171:4,7,12,13;
180:25;202:7;205:19
**9.2 (4)** 170:1;171:9,
11;202:13
**9:16 (1)** 5:2
**90 (1)** 35:18
**99 (1)** 180:3