```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF ARIZONA
 3
 4    VIP PRODUCTS, LLC, an        )
      Arizona limited liability   )
 5    company,                     )
                                   )
 6          Plaintiff and          )
            Counterdefendant,      )
 7                                 )
      vs.                          )No. 14-CV-02057-PHX-SMM
 8                                 )
      JACK DANIEL'S PROPERTIES,    )
 9    INC., a Delaware             )
      corporation,                 )
10                                 )
            Defendant and          )
11          Counterclaimant.       )
12
13
14
15
16
17            DEPOSITION OF STEPHEN NOWLIS
18        TAKEN ON BEHALF OF THE DEFENDANT AND
19    COUNTERCLAIMANT JACK DANIEL'S PROPERTIES, INC.
20               AUGUST 25, 2015
21
22
23
24    PAGES: 1-235
25
```

Page 1

```
 1                    I N D E X
 2                   WITNESSES
 3   ALL WITNESSES   PAGE
 4   For Defendant/Counterclaimant
 5     Stephen Nowlis
 6         Examination by Mr. Larkin              6
 7
 8                   EXHIBITS
 9   NO.                                      PAGE
10   Exhibit 40   Bad Spaniels toy depicted
                  on VIP website               145
11
     Exhibit 53   American Whiskey/Bourbon
12                Report                        105
13   Exhibit 64   Picture of Boozin'
                  gear.com website              147
14
     Exhibit 65   Expert Rebuttal Report of
15                Stephen Nowlis                 10
16   Exhibit 66   Pages from Amazon.com        149
17   Exhibit 105  Notice of Deposition and
                  subpoena duces tecum           7
18
     Exhibit 106  Two page document
19                produced in response
                  to subpoena                     8
20
     Exhibit 107  Answer and Counterclaims
21                of Defendant and
                  Counterclaimant Jack
22                Daniel's Properties, Inc.      9
23   Exhibit 108  Declaration of Dr.
                  Stephen M. Nowlis in
24                Support of Defendant's
                  Motion for Summary
25                Judgment                       40
```

Veritext Legal Solutions
866 299-5127

1    Exhibit 109 Excerpts from 12/14/12
                 Deposition of Stephen
2                Nowlis in J.T. Colby
                 v. Apple                          44
3
     Exhibit 110 Rebuttal Expert Report of
4                Stephen M. Nowlis, Ph.D.          48
5    Exhibit 111 Expert Report of Stephen
                 M. Nowlis, Ph.D., in Bowe
6                v. Public Storage                 52
7    Exhibit 112 Supplemental Expert
                 Report of Stephen M.
8                Nowlis, Ph.D. in Bowe
                 v. Public Storage                 54
9
     Exhibit 113 Declaration and Rule 26
10               Report of Dr. Gerald L.
                 Ford                              78

11
12
13
14    (Exhibits attached to transcript; Exhibit 66
15    retained by counsel.)
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
866 299-5127

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF ARIZONA
 3
 4    VIP PRODUCTS, LLC, an        )
      Arizona limited liability   )
 5    company,                     )
                                   )
 6          Plaintiff and          )
            Counterdefendant,      )
 7                                 )
      vs.                          )No. 14-CV-02057-PHX-SMM
 8                                 )
      JACK DANIEL'S PROPERTIES,    )
 9    INC., a Delaware             )
      corporation,                 )
10                                 )
            Defendant and          )
11          Counterclaimant.       )
12
13              DEPOSITION OF WITNESS, STEPHEN
14    NOWLIS, produced, sworn and examined on the 25th
15    day of August, 2015, between the hours of eight
16    o'clock in the forenoon and six o'clock in the
17    afternoon of that day, at the offices of Midwest
18    Litigation Center, 711 North 11th Street, St.
19    Louis, Missouri, before Tara Schwake, a Certified
20    Realtime Reporter and Notary Public within and for
21    the State of Illinois, in a certain cause now
22    pending in the United States District Court,
23    District of Arizona, wherein VIP Products, LLC, is
24    Plaintiff and Counterdefendant and Jack Daniel's
25    Properties, Inc., is Defendant and Counterclaimant.
```

Page 4

```
 1    APPEARANCES

 2

 3    FOR THE PLAINTIFF/COUNTERDEFENDANT:

 4            DICKINSON WRIGHT, PLLC

 5            1850 North Central Avenue, Suite 1400

 6            Phoenix, Arizona  85004

 7            (602) 285-5000

 8            by:  Mr. Frank G. Long

 9            flong@dickinsonwright.com

10

11    FOR THE DEFENDANT/COUNTERCLAIMANT:

12            SEYFARTH SHAW, LLP

13            2029 Century Park East, Suite 3500

14            Los Angeles, California  90067-3021

15            (310) 277-7200

16            by:  Mr. Christopher C. Larkin

17            clarkin@seyfarth.com

18

19    ALSO PRESENT:

20            Ms. Tara Schwake, CRR, RPR

21

22

23

24

25

                                        Page 5
```

```
 1                 IT IS HEREBY STIPULATED AND AGREED by
 2     and between Counsel for Plaintiff/Counterdefendant
 3     and Counsel for Defendant/Counterclaimant that this
 4     deposition may be taken by Tara Schwake, Notary
 5     Public and Certified Realtime Reporter, thereafter
 6     transcribed into typewriting, with the signature of
 7     the witness being expressly reserved.
 8                         STEPHEN NOWLIS,
 9     of lawful age, having been produced, sworn, and
10     examined on the part of Defendant/Counterclaimant
11     Jack Daniel's Properties, Inc., testified as
12     follows:
13                       * * * * *
14          (Deposition commenced at 8:35 a.m.)
15                       EXAMINATION
16     QUESTIONS BY MR. LARKIN:
17          Q    Will you state your name and business
18     address for the record, please?
19          A    My name is Stephen Michael Nowlis,
20     and my business address is Washington University in
21     St. Louis, St. Louis, Missouri 63130.
22          Q    Dr. Nowlis, I have read a few of your
23     transcripts of your previous depositions, you look
24     like a fairly experienced witness.  Can I safely
25     dispense with the little speech I give at the start
```

Page 6

1    of depositions on how the process works and so on?

2         A    Yes.

3         Q    Okay.  Did you do anything to prepare

4    for your testimony today?

5         A    Yes.

6         Q    What did you do?

7         A    I reviewed my report, and I reviewed

8    the report of Dr. Ford.

9         Q    Anything else?

10        A    That's basically it.

11             MR. LARKIN:  Okay.  Let's mark as

12    Exhibit 105 a copy of the notice of Dr. Nowlis's

13    deposition and a subpoena duces tecum addressed to

14    him.

15             (Exhibit 105 marked for

16    identification by the court reporter.)

17        Q    (BY MR. LARKIN)  Dr. Nowlis, you are

18    appearing here today pursuant to the deposition

19    notice and the subpoena that we marked as Exhibit

20    105; correct?

21        A    Yes.

22        Q    Did you speak with Mr. Long or anyone

23    else from the law firm representing VIP in

24    preparation for your deposition today?

25        A    Well, I mean, when you gave me this

Page 7

```
 1    notice, there were certain documents that I was

 2    asked to produce, so I did speak with the attorneys

 3    about these documents.

 4         Q    Okay.

 5         A    Other than that, I didn't really talk

 6    much with them about preparing for my deposition.

 7              MR. LARKIN:  Okay.  Let's mark as

 8    Exhibit 106 a two page document that we received

 9    from VIP's counsel in connection with the documents

10    that Dr. Nowlis produced in response to the

11    subpoena.

12              (Exhibit 106 marked for

13    identification by the court reporter.)

14         Q    (BY MR. LARKIN)  Dr. Nowlis, have you

15    seen Exhibit 106 before today?

16         A    I don't believe I have seen it in

17    this form, no.

18         Q    Okay.  Take a moment, if you would,

19    please, to look at the two pages and -- of Exhibit

20    106 and let me know if, if Exhibit 106 describes

21    the documents that you considered in connection

22    with the preparation of your report in this case.

23              MR. LONG:  Objection, vague.

24         A    This appears to be a summary of

25    various documents but it doesn't have the documents
```

Page 8

```
 1   themselves.
 2        Q    (BY MR. LARKIN)  Understood.
 3        A    So I'm a little bit -- I'm not quite
 4   sure what each of these is referring to.  I think I
 5   do but I don't know for sure unless I have those
 6   documents in front of me.
 7             MR. LARKIN:  Fair enough.  Let's mark
 8   as Exhibit 107 a series of documents beginning with
 9   production number NOW0031 and ending with
10   production number NOW0342.
11             (Exhibit 107 marked for
12   identification by the court reporter.)
13        Q    (BY MR. LARKIN)  Dr. Nowlis, we have
14   marked as Exhibit 107 a series of documents that
15   were produced to counsel for Jack Daniel's
16   Properties by counsel for VIP, and we are going to
17   look at a number of those documents in more detail
18   today but if you could just look through those
19   quickly, or as long as you need to, and confirm
20   that those documents are the ones that are
21   referenced in Exhibit 106.
22        A    Okay.
23        Q    And to make it easier on you, the
24   last set of documents on Exhibit 106 that were
25   identified on that document as Bates numbers -- we
```

Page 9

1    know what they are but they were not produced us to

2    by VIP in connection with your subpoena.  So if

3    you're looking for them, you won't find them.

4          A    Okay.  So of the documents I see here

5    going through NOW0342, Exhibit 106 looks to be an

6    accurate summary of all the documents in Exhibit

7    107 except for there's a couple of discrepancies.

8               So those are NOW0254 through 0257.

9    Exhibit 106 says that these are all from an article

10   by Vincent Palladino, but I believe these are not

11   all from Palladino.  Some of these are from

12   different articles.

13         Q    Okay.  Do you recall reviewing those

14   different articles marked with production numbers

15   NOW254-257 in connection with your report in this

16   case?

17         A    Yes.  I could identify those if I had

18   my expert report in front of me.

19              MR. LARKIN:  Okay.  Let's mark as 108

20   a copy of Dr. Nowlis's report in this case.

21   Actually, that was previously marked in an earlier

22   deposition as Exhibit 65 so we should maintain that

23   marking.  So I'd ask the reporter to just mark this

24   again as 65.

25              (Exhibit 65 re-marked for

1    identification by the court reporter.)

2         Q    (BY MR. LARKIN)  Dr. Nowlis, is

3    Exhibit 65 a copy of your expert report in this

4    case?

5         A    Yes, it appears to be.

6         Q    Okay.  You mentioned a moment ago

7    that if you looked at your report, you could

8    identify for us the articles that were produced as

9    NOW254-257.  Please do so.

10        A    Okay.  So we have NOW0254 and

11   NOW0255.  Those refer to footnote number 10 of my

12   report, which are some pages from a chapter written

13   by Palladino.  And I notice that I cited the wrong

14   pages.  So the correct pages are in NOW0254 and

15   0255.  Those page numbers are 83 and 84 in that

16   chapter.  I had incorrectly identified those as

17   pages 322 and 323, which were the page numbers that

18   I had used for the Ford chapter that I cited

19   earlier.

20        Q    Okay.  How about 256 to 257?

21        A    So 0256 refers to footnote number 16

22   of my report, and that is a page from a chapter by

23   Shari Diamond.

24        Q    What is the title of that work?

25        A    The chapter that she wrote is called

Page 11

```
 1        "Control Foundations, Rationales and Approaches."
 2             Q     And what publication did that chapter
 3        appear in?
 4             A     It appeared in the book called
 5        Trademark and Deceptive Advertising Surveys:  Law,
 6        Science, and Design.
 7             Q     And 257, please?
 8             A     257 refers to footnote number 18 of
 9        my report, and this is a page from a chapter
10        written by Swann, and that chapter is called
11        "Likelihood of Confusion" and that chapter appears
12        in the book Trademark and Deceptive Advertising
13        Surveys:  Law, Science and Design.
14             Q     You cited the Trademark and Deceptive
15        Advertising Services:  Law, Science and Design
16        publication several places in your report.  Do you
17        consider that to be an authoritative work in the
18        field of surveys?
19                  MR. LONG:  Objection, vague.
20             A     I'm not sure I would call it
21        authoritative but my word would be it's a useful
22        reference point.
23             Q     (BY MR. LARKIN)  Have you cited that
24        work, Trademark and Deceptive Advertising Services,
25        in other reports?
```

Page 12

```
 1            A     Yes.

 2            Q     You can put Exhibit 107 aside for

 3      now.  We're going to return to that later, but

 4      let's go to your report, which has been previously

 5      marked as Exhibit 65.

 6                  Starting at page 16, numbered page

 7      16, that is from pages marked with production

 8      number NOW17 through NOW24, that's an accurate copy

 9      of your Curriculum Vitae?  You call it a vitae,

10      but...

11            A     Yes, except for I have an additional

12      deposition to report.

13            Q     Okay.

14            A     And so that would be on page 23 of my

15      vitae, which is Nowlis 0024.  So I recently did a

16      deposition, that deposition was titled BMG, and I

17      believe it was Round Hill Records v. Cox, and I was

18      deposed maybe a few weeks ago?

19            Q     Other than that, pages 17 to 24 is an

20      accurate copy of your vitae?

21            A     Yes.

22            Q     Do pages 18 through 20 list all of

23      the -- all of your publications?

24                  MR. LONG:  You sure it's not 21 also?

25                  MR. LARKIN:  I'm sorry, thank you.
```

Page 13

1          Q       (BY MR. LARKIN)   18 through 21.

2     Actually 18 --

3          A       18 to 20 is actually correct.   That

4     does list all of my publications on those three

5     pages.

6          Q       Have you ever written any articles on

7     trademark surveys?

8          A       No.

9          Q       On trademark survey design?

10         A       No.

11         Q       On the issue of likelihood of

12    confusion in trademark law?

13         A       No.

14         Q       You ever given any speeches or

15    presentations on those subjects?

16         A       No.

17         Q       Have you ever taught a course during

18    any of your academic assignments on survey design?

19         A       I have taught a Ph.D. seminar on

20    different methodologies and one of those

21    methodologies that we discussed was survey

22    research.

23         Q       During -- when was that course?

24         A       I taught that course probably 15

25    years ago, it was strictly on survey methodology.

1    I currently teach a course, though, it's a Ph.D.

2    seminar on consumer behavior, and as part of that

3    course we do cover methodological issues, including

4    survey design.

5          Q     At what university was the course on

6    such that you thought about 15 years ago?

7          A     Washington State University.

8          Q     Did you cover surveys in trademark

9    infringement cases?

10         A     No.

11         Q     Are you a member of the Council of

12   American Survey Research Organization?

13         A     No.

14         Q     Or the Council for Marketing Opinion

15   Research?

16         A     No.

17         Q     Or the Marketing Research

18   Association?

19         A     No.

20         Q     Turn if you would, please, in your

21   report, Exhibit 65, to NOW22 to 24.  With the

22   addition you noted a moment ago in your testimony,

23   do pages 22 to 24 of Exhibit 65 list all of your --

24   all of the expert witness consulting engagements in

25   which you gave deposition or trial testimony in the

                                          Page 15

1    last five years?

2          A     Well, it's actually 2009 to 2015, so

3    I suppose that's six years.

4          Q     Six years, right.

5          A     Six years, yes.

6          Q     Can you tell me which of the cases on

7    pages 22 to 24 involved issues of trademark --

8    strike that.

9                Can you tell me which of the expert

10   witness engagements identified on pages 22 to 24

11   were ones in which you gave an opinion relating to

12   trademark infringement?

13         A     So we'll start on, with the first

14   one, on my page number 21, which is Nowlis 0022, so

15   the first case Kerzner v. Monarch, that was a

16   trademark issue.  The second case --

17         Q     Maybe we can make this go faster.  In

18   the Kerzner case, did you provide -- strike that.

19               Did you provide expert testimony

20   about a survey?

21         A     Yes.

22         Q     Was it a survey that you had done or

23   one that another expert had done?

24         A     One that another expert had done.

25         Q     Was it a likelihood of confusion

                                          Page 16

1    survey?

2         A    I am not sure.  I think it was but

3    I'm not sure.

4         Q    Can you remember the trademarks at

5    issue in that case?

6         A    Not sure, so no.

7         Q    Okay.  Moving forward chronologically

8    from the Kerzner case, which of the listed cases

9    was the next one involving trademark infringement?

10        A    I believe the Brighton v. Coldwater

11   Creek case involved trademark issues.

12        Q    Did you provide expert testimony

13   about a survey in that case?

14        A    No.

15        Q    Were you a rebuttal expert in that

16   case?

17        A    I can't remember.

18        Q    Do you remember the marks?

19        A    No.

20        Q    Okay.  Which one next in

21   chronological order involved trademark issues?

22        A    The North Atlantic Operating Company

23   et al. v. DRL Enterprises, Inc.

24        Q    Did you provide expert testimony

25   about a survey?

Page 17

```
 1              A      I think I did, yes.
 2              Q      Was it a survey that you had done or
 3      one that another expert had done?
 4              A      One that another expert had done.
 5              Q      So you were a rebuttal expert in that
 6      case; correct?
 7              A      Yes.
 8              Q      Do you remember the trademarks at
 9      issue?
10              A      I do not.
11              Q      Which case next in order, please?
12              A      Youngblood Timepieces v. Fossil,
13      Inc., et al.
14              Q      Did you offer expert opinion on a
15      survey in that case?
16              A      I don't remember.
17              Q      Were you a rebuttal expert in that
18      case?
19              A      I don't recall.
20              Q      Do you recall the marks or trade
21      dress at issue in that case?
22              A      I believe the mark was Youngblood.
23              Q      Do you recall the issue on which you
24      provided expert testimony?
25              A      I'm not sure, so I don't want to say
```

Page 18

```
 1    something that I'm not sure about.  So I'll say I
 2    don't recall.
 3            Q      Fair enough.  Going back to the North
 4    Atlantic Operating Company case for a moment, do
 5    you recall the trademark issue on which you
 6    provided a rebuttal report?
 7            A      I am not sure.
 8            Q      And how about on the Brighton
 9    Collectibles case?  Do you remember what the issue
10    was there?
11            A      Again, I'm not sure.
12            Q      Okay.  And starting back at Kerzner,
13    do you remember what the issue was there?
14            A      I think that was likelihood of
15    confusion.
16            Q      I think you told me that in earlier
17    testimony.
18            A      Yeah.
19            Q      Moving forward chronologically from
20    Youngblood, what was the next case involving
21    trademark issues?
22            A      I think Sporting Supplies
23    International v. Tulammo.
24            Q      Did you provide an expert opinion
25    about a survey in that case?
```

Veritext Legal Solutions
866 299-5127

```
1          A      No.

2          Q      Were you a rebuttal expert?

3          A      Yes.

4          Q      Do you recall what the issue was?

5          A      I'm not sure.

6          Q      Do you recall what the marks were?

7          A      I'm not sure.

8          Q      Okay.  Moving forward

9   chronologically?

10         A      J.T. Colby & Company v. Apple, Inc.

11         Q      Were you a rebuttal expert in that

12  case?

13         A      I believe that was my role, was as a

14  rebuttal expert, yes.

15         Q      By which party were you retained in

16  that case?

17         A      Apple.

18         Q      Did you provide an opinion on a

19  survey?

20         A      Yes.

21         Q      Was it one that you had done?

22         A      From what I recall, there was one

23  another expert had done that I analyzed in addition

24  to my own survey.

25         Q      You did a rebuttal survey or
```

1    replication survey in that case?

2         A     I don't recall exactly what I did,

3    but I do remember I did a survey.

4         Q     Okay.  We'll come back to that one in

5    a few minutes.

6               Do you remember the mark at issue in

7    that case?

8         A     Yes.

9         Q     What was it?

10        A     iBooks, I believe was the mark.

11        Q     Okay.  Moving forward.

12        A     Meyer v. Telebrands, I believe that

13   was a secondary meaning issue.

14        Q     By which party were you retained in

15   that case?

16        A     I don't remember.

17        Q     Did you -- were you a rebuttal expert

18   in that case?

19        A     I'm not sure.

20        Q     Did that -- did your engagement in

21   that case involve a survey?

22        A     I think it did, yes.

23        Q     Was it one that you had done or one

24   that another expert had done?

25        A     I know -- I'm pretty sure that I did

                                         Page 21

1    one.  I can't recall if another expert also did one

2    that I critiqued.  I don't recall that part.

3         Q    We'll come back to that one as well.

4    How about the next one chronologically?

5         A    The next one would be His & Her Corp.

6    v. Shake-N-Go Fashion, Inc., et al.

7         Q    Just so the record is clear, going

8    back one page to 22, if you would, please, the H&R

9    Block case, the Wells case, the CERT case, the

10    Hulsey case, and the Fox Broadcasting Company

11    cases, in those cases your engagement -- strike

12    that.

13              Those cases did not involve issues of

14    trademark infringement; is that correct?

15         A    I believe that's true, to the best of

16    my memory.

17         Q    Okay.  The His & Her case, were you a

18    rebuttal expert in that case?

19         A    Yes.

20         Q    Did you offer an expert opinion about

21    a survey?

22         A    Yes.

23         Q    Was it one that you had done or one

24    that another expert had done?

25         A    One that another expert had done.

Veritext Legal Solutions
866 299-5127

1          Q      Do you recall the marks at issue in

2     that case?

3          A      No.

4          Q      Okay.  And there are two remaining

5     cases, the LOEC case and the Converse case.  Did

6     either of those involve claims of trademark

7     infringement?

8          A      They were both trademark cases, yes.

9          Q      In the LOEC case were you a rebuttal

10    expert?

11         A      Yes.

12         Q      Did you offer an opinion on a survey

13    in that case?

14         A      Yes.

15         Q      Was it one that you had done or one

16    that another expert had done?

17         A      One that another expert had done.

18         Q      What was the issue in that case that

19    -- strike that.

20                On what issue did you -- on what --

21    what issue did the other expert survey test in that

22    case?

23         A      I think it was likelihood of

24    confusion.

25         Q      And in the His & Her Corporation case

                                                Page 23

1    at the top of NOW24, what was the issue tested by

2    the expert survey in that case?

3            A       From what I recall, there were two

4    different experts that I analyzed, two different

5    surveys by two different experts, one of which was

6    likelihood of confusion, the other of which I can't

7    recall right now.  What the issue was.

8            Q       Okay.  And finally, the Converse

9    case, were you a rebuttal expert in that case?

10           A       Yes.

11           Q       Did you offer an opinion on a survey

12   in that case?

13           A       Yes.

14           Q       Was that a survey that you had done

15   or another expert had done?

16           A       That another expert had done.

17           Q       Do you recall the issue that was

18   tested in that survey?

19           A       Pretty sure likelihood of confusion.

20           Q       What were the marks at issue in the

21   His & Her Corporation case?

22           A       I don't -- I think you asked me this

23   earlier.  I don't recall.

24           Q       What were the marks at issue in the

25   LOEC case?

Veritext Legal Solutions
866 299-5127

```
 1          A      Blu, B-l-u.

 2          Q      For what product?

 3          A      Blu is a, is an electronic cigarette.

 4          Q      And what were the marks at issue in

 5     the Converse versus Fortune Dynamic case?

 6          A      A -- from what I recall, it was the

 7     Converse shoe.  The Chuck Taylor, I believe it was

 8     called.

 9          Q      The word mark Chuck Taylor, or some

10     elements of the design of the shoe?

11          A      Some elements of the design of the

12     shoe.

13          Q      Other than the cases listed on pages

14     NOW22 and -- through 24, have there been other

15     engagements in which you have prepared an expert

16     report but -- within the last five years but not

17     testified?

18          A      I'm not sure.  There may well have

19     been.

20          Q      Which of the cases involving

21     trademark infringement issues that you identified

22     involve trade dress?

23               MR. LONG:  Objection, vague.

24          A      From what I recall, the Converse v.

25     Fortune Dynamic case involved trade dress.
```

Page 25

1          Q       (BY MR. LARKIN)  Any other -- I'm

2    sorry.

3          A       Other than that, I am not sure.

4    Sitting here right now.

5          Q       Have you ever had a court accept a

6    likelihood of confusion survey that you have

7    offered as an expert?

8          A       I am not sure.

9          Q       How many likelihood of confusion

10   surveys have you offered as an expert?

11         A       What do you mean by offered?

12         Q       Used to rely on your expert opinions

13   in a case.

14         A       Are you talking about to the point

15   where I testified?

16         Q       To the point -- let's start with the

17   point where you prepared a report describing your

18   survey.

19         A       I, I'm not sure what the number is

20   for that.

21         Q       Is it more than five?

22         A       Where I've prepared a report.  Is it

23   more than five?  I'm not sure.

24         Q       Just so the record is clear, where

25   you prepared a report on a likelihood of confusion

                                        Page 26

1    survey that you have conducted.

2        A    I understand the question.  And

3    again, I'll tell you I'm not sure what that number

4    would be.

5        Q    Do you believe it's fewer than five?

6        A    I'm really not sure.

7        Q    In the expert witness engagements

8    reflected on pages NOW22 to 24, roughly what

9    percentage of those engagements involve your work

10    as a rebuttal expert?

11        A    I don't think I could give you a

12    rough estimate.  I, if you want to go case by case,

13    I could do that if you'd like.

14        Q    Okay.  Why don't you do that.  We've

15    already gone through the trademark cases so let's

16    go through the others.

17            MR. LONG:  What was the question

18    again?

19            MR. LARKIN:  How many of his

20    engagements have involved work as a rebuttal

21    expert.

22            MR. LONG:  Okay.

23        Q    (BY MR. LARKIN)  Starting with I

24    guess the LG Electronics case?

25        A    Okay.  So LG Electronics v. Whirlpool

Page 27

1    Corporation, I was a rebuttal expert in that case.

2         Q    Did that involve rebutting a survey

3    done by another expert?

4         A    Yes.

5         Q    National Products?

6         A    I was an expert but not a rebuttal

7    expert.

8         Q    Did that have anything to do with --

9    strike that.

10             Did your engagement in that case

11   involve a survey?

12        A    No.

13        Q    Miller and Tompkins versus Basic

14   Research?

15        A    That one I'm a little bit fuzzy on,

16   whether I was the rebuttal expert or not.

17        Q    Sitting here today you can't recall

18   one?

19        A    I just can't recall.

20        Q    Okay.  The next one we haven't

21   previous discussed, L'Oreal versus Bot Hair, were

22   you a rebuttal expert in that case?

23        A    I don't recall if I was a rebuttal

24   expert or not.

25        Q    Do you recall whether the Miller and

Page 28

1    Tompkins case involved -- strike that.

2            Did your engagement in the Miller and

3    Tompkins case involve a survey?

4        A    I don't think so.  Not sure.

5        Q    How about the L'Oreal case?

6        A    No.  No, sir.

7        Q    Okay.  The next one is

8    FragranceNet.com.  Were you a rebuttal expert in

9    that case?

10       A    I think I was.

11       Q    Did that involve critiquing a survey?

12       A    I remember it involved critiquing

13   something but I don't recall if that was a survey

14   or not.

15       Q    Okay.  Next page, Morgan versus Gay.

16   Were you a rebuttal expert in that case?

17       A    That one I'm just not sure of either.

18       Q    Do you recall whether whatever your

19   engagement was involved a survey?

20       A    I don't recall.

21       Q    H&R Block.  Were you a rebuttal

22   expert in that case?

23       A    Yes.

24       Q    Did you critique a survey?

25       A    Yes.

Page 29

1          Q      That was not a trademark infringement

2    survey; correct?

3          A      You are correct.

4          Q      Wells versus Abbott Laboratories,

5    were you a rebuttal expert in that case?

6          A      No.

7          Q      Did your engagement in that case

8    involve a survey?

9          A      Yes.

10          Q      Again, that was not a trademark

11    infringement case?

12          A      Correct.

13          Q      CERT versus Starbucks, were you a

14    rebuttal expert in that case?

15          A      No.

16          Q      Did that -- did your engagement in

17    that case involve a survey?

18          A      Yes.

19          Q      Hulsey versus WhiteWave Foods

20    Company, were you a rebuttal expert in that case?

21          A      No.

22          Q      Did your engagement in that case

23    involve a survey?

24          A      Yes.

25          Q      Fox Broadcasting Company versus DISH,

Veritext Legal Solutions
866 299-5127

```
 1    were you a rebuttal expert in that case?
 2          A    I am not sure.
 3          Q    Did your engagement in that case
 4    involve a survey?
 5          A    Yes.
 6          Q    Do you recall doing a survey?
 7          A    Yes.
 8          Q    On page NOW24 Bowe and Morgan versus
 9    Public Storage, were you a rebuttal expert in that
10    case?
11          A    No.
12          Q    Okay.  Did that case involve a
13    survey?
14          A    Yes.
15          Q    One that you did?
16          A    Yes.
17          Q    Was there a rebuttal expert in that
18    case who critiqued your survey?
19          A    I don't recall.
20          Q    Have all of your rebuttal critiques
21    of likelihood of confusion survey involved -- have
22    they all concluded that the survey that you
23    critiqued were so flawed as to be meaningless for
24    assessing likelihood of confusion?
25                    MR. LONG:  Objection, vague.
```

Page 31

```
 1          A     I am not sure.
 2          Q     (BY MR. LARKIN)  You need to see your
 3   report or some other reference to the case to
 4   recall for sure?
 5          A     Yes.
 6          Q     Have all of your rebuttal critiques
 7   of likelihood of confusion surveys involved a
 8   critique of the controls that were used?
 9                MR. LONG:  Objection, vague.
10          A     I'm not sure.
11          Q     (BY MR. LARKIN)  Or a critique of the
12   failure to replicate marketplace conditions?
13          A     I'm not sure.
14          Q     A critique of faulty coding or
15   interpretation of the responses?
16                MR. LONG:  Objection, vague.
17          A     I'm not sure.
18          Q     (BY MR. LARKIN)  Look back to Exhibit
19   107, please.  Top page of Exhibit 107, which is
20   marked with production number NOW0031, is an e-mail
21   from David Bray to you dated May 8, 2015.
22                Do you see that?
23          A     Yes.
24          Q     Is that the first time that you
25   corresponded with Mr. Bray about being an expert in
```

Page 32

```
 1    this case?
 2            A      I don't recall.
 3            Q      When did you first meet Mr. Bray?
 4            A      I've never met him.
 5            Q      When did you first talk to him?
 6            A      I don't have a date.
 7            Q      Was it in connection with this case?
 8            A      Yes.
 9            Q      In your vitae, in your expert report,
10    it indicates that you were a professor at Arizona
11    State University in Tempe, Arizona, from 1996 to
12    2009.
13                   Did you ever do any work for Mr.
14    Bray's law firm, Dickinson Wright, during that
15    period?
16            A      I don't think I ever did, no.
17            Q      Or any other firm that Mr. Bray was
18    at before he was at Dickinson Wright?
19            A      I don't believe I did.
20            Q      Are you aware that VIP was sued by
21    Anheuser Busch over another one of its products
22    previously?
23            A      Yes.
24            Q      When did you first learn that?
25            A      I don't remember the date.
```

Page 33

1          Q     Did you learn that sometime around

2     the time of the suit?

3          A     Yes.  I don't believe I knew that

4     prior to the suit.

5          Q     That was probably a bad question.

6     Did you learn that VIP had been sued by Anheuser

7     Busch around the time that that suit took place?

8          A     No.  I only learned about that more

9     recently during this current suit.

10         Q     Who did you learn about the previous

11    Anheuser-Busch suit from?

12         A     It would have been someone at

13    Dickinson Wright, possibly Mr. Bray, possibly Mr.

14    Long.  I don't recall who told me that.

15         Q     Did you ever look at the survey that

16    was conducted in that case?

17         A     I don't think so.

18         Q     Did you ever look at the survey

19    stimuli that were used in the survey in that case?

20         A     Well, if I don't think I saw the

21    survey, then I wouldn't have seen any detail, so

22    the answer would still be I don't think so.

23         Q     Okay.  So the record is clear, you

24    weren't -- in that case, VIP provided a critique of

25    the likelihood of confusion survey.  You weren't

Page 34

1    involved in any way in that critique; correct?

2         A     That is correct.  I was not involved.

3         Q     Did your knowledge -- strike that.

4               Did you consider, in forming your

5    opinions in this case, the knowledge that you

6    learned about that previous case?

7               MR. LONG:  Objection, form.

8         A     No.

9         Q     (BY MR. LARKIN)  Did you ever learn

10   about what the survey in that case showed?

11        A     As I said before, I don't think I

12   knew what that survey was about, I don't think I've

13   seen it, I don't recall what the issues were.

14        Q     Going back to page NOW31 in Exhibit

15   107, do you recall receiving Dr. Ford's report as

16   well as an expert report by Dr. Itamar Simonson?

17        A     Yes.

18        Q     Did Mr. Bray ask you to review both

19   of those reports?

20        A     Yes.

21        Q     Did he engage you to provide a

22   critique of both reports?

23        A     No.

24        Q     Why did you choose to critique the

25   Ford report as opposed to the Simonson report?

Page 35

```
 1              A      That was my choice.  That was what I
 2    was asked to do.
 3              Q      So Mr. Bray asked you to provide a
 4    critique of the Ford report; correct?
 5              A      Yes.
 6              Q      Did you consider the Simonson report
 7    in connection with forming your opinions in this
 8    case?
 9              A      No.
10              Q      Dr. Simonson was your Ph.D. advisor
11    at the Haas School at Berkeley?
12              A      Yes.
13              Q      Do you recognize him as a leading
14    expert in consumer behavior?
15              A      Yes.
16                     MR. LONG:  Objection, vague.
17              A      Yes.
18              Q      (BY MR. LARKIN)  Do you recognize him
19    as a leading expert in marketing?
20                     MR. LONG:  Objection, vague.
21              A      Yes.
22              Q      (BY MR. LARKIN)  Your report, which
23    we previously -- which was previously marked as
24    Exhibit 65, was executed by you on July 10th.  Is
25    that correct?
```

Page 36

1          A      Yes.

2          Q      Are you familiar with the term

3     "replication survey"?

4          A      Yes.

5          Q      What is it?

6          A      It's a survey that tends to replicate

7     the findings from a different survey.

8          Q      Have you done replication surveys in

9     your -- any of your expert witness engagements?

10         A      I don't believe I ever have.

11         Q      Is your understanding of the term

12    "replication survey" one that repeats another

13    survey with making no changes to the methodology?

14         A      Well, in my world, in my terminology,

15    a replication is a straight replication, so you

16    would literally run the exact same thing, see if

17    you got the exact same results.

18         Q      Okay.  Have you ever done a rebuttal

19    survey that uses as a starting point someone else's

20    survey but then is conducted in a manner that you

21    believe corrects flaws that you identified in the

22    original survey?

23                MR. LONG:  Would you read that

24    question back again?

25                THE REPORTER:  "Have you ever done a

Page 37

1    rebuttal survey that uses as a starting point

2    someone else's survey but then is conducted in a

3    manner that you believe corrects flaws that you

4    identified in the original survey?"

5         A    I believe I have.

6         Q    (BY MR. LARKIN)  And so I use the

7    correct terminology, that sort of survey is not a

8    replication survey as you use the term "replication

9    survey."  Correct?

10        A    That is correct.

11        Q    Replication survey literally is

12   conducted in the same way and attempts to replicate

13   what was tested in the original survey?

14        A    That's my understanding of that

15   terminology from my perspective, yes.

16        Q    Okay.  How many rebuttal surveys have

17   you done in your expert witness engagements?

18        A    I couldn't -- I don't have a number.

19        Q    Is it more than one?

20        A    I am not sure.

21        Q    I think you testified earlier that

22   you did one in the Apple iBooks litigation.  Do you

23   recall that?

24        A    Yes.

25        Q    Did you also do one in the Telebrands

                                        Page 38

1    litigation?

2          A    I did do a survey there.  I just

3    can't recall if it was a rebuttal survey or not at

4    this point.

5          Q    Can you recall if, looking at the

6    list of your prior expert witness engagements, can

7    you recall whether you did rebuttal surveys in

8    other cases?

9          A    I don't think I did from any of the

10   cases listed here, but I have been an expert

11   witness since 2001 and I could have done one

12   earlier on in my career.

13         Q    Sitting here today, you don't recall

14   doing rebuttal surveys in any cases listed in your

15   report other than the Apple case and perhaps the

16   Telebrands case; is that correct?

17         A    Yes.

18         Q    What is the purpose of doing a

19   rebuttal survey?

20         A    To look at issues that you feel you

21   need to test with the survey.

22               MR. LARKIN:  Let's mark as 108 a copy

23   of a document entitled Declaration of Dr. Stephen

24   M. Nowlis in Support of Defendant's Motion for

25   Summary Judgment in the Apple iBooks litigation.

                                          Page 39

```
 1                    (Exhibit 108 marked for
 2      identification by the court reporter.)
 3           Q      (BY MR. LARKIN)  Dr. Nowlis, do you
 4      recognize Exhibit 108 as a Declaration that you
 5      signed in the Colby versus -- J.T. Colby versus
 6      Apple, Inc., litigation?
 7           A      It appears to be that, yes.
 8           Q      In paragraph 2 of Exhibit 108 you
 9      wrote that, quote, "As explained in my expert
10      report, in my opinion, Dr. McDonald's survey
11      methodology is so flawed that the results from her
12      survey are unreliable and meaningless from a
13      consumer research perspective."
14                  Do you see that?
15           A      Yes.
16           Q      Was that your original expert
17      rebuttal opinion in that case?
18           A      I don't know what you mean by my
19      original.
20           Q      Was that your expert opinion or your
21      rebuttal expert opinion in that case?
22                  MR. LONG:  Objection, vague.
23           A      Well, I stated this, so that sentence
24      holds.
25           Q      (BY MR. LARKIN)  In paragraph 3 you
```

Page 40

1    wrote, "I also designed, directed, and supervised

2    the administration of a rebuttal likelihood of

3    reverse confusion survey."

4                    Do you see that?

5        A    Yes.

6        Q    Why did you decide to do that in that

7    case?

8        A    Because I thought it was necessary to

9    do that.

10        Q    Why did you think it was necessary?

11        A    Because I thought it would be

12    important to do it.

13        Q    Why did you believe it was important

14    in that case to do a rebuttal survey?

15        A    Because I wanted to design a survey

16    to test some of the issues that I thought were

17    important to be tested in that case.

18        Q    Do you recall the specific critiques

19    of Dr. McDonald's survey that you made in that

20    case?

21        A    No.

22        Q    In paragraph 3 of Exhibit 108 you

23    wrote, "Unlike Dr. McDonald, who used a 'conceptual

24    stimulus,' in my survey I used one of Plaintiff's

25    actual books as a stimulus."

                                    Page 41

```
 1                    Do you see that?
 2        A     Yes.
 3        Q     Do you recall that one of your
 4   critiques of Dr. McDonald's was using an
 5   inappropriate control stimulus?
 6        A     I don't recall that but sitting here
 7   now I see that I wrote this sentence, and I, I
 8   wrote it and I stand by it.
 9        Q     Okay.  In the next sentence of
10   paragraph 3 you wrote, "I also asked widely
11   accepted questions for testing confusion, which
12   were derived from the Ever-Ready" -- that's spelled
13   E-v-e-r hyphen R-e-a-d-y -- "survey, and used a
14   proper control."
15                    Do you see that?
16        A     Yes.
17        Q     What is the Ever-Ready survey
18   protocol?
19        A     It's a protocol where a respondent
20   sees one particular product and is asked a series
21   of questions about source, affiliation and
22   sponsorship, similar to what Dr. Ford did in his
23   survey.
24        Q     So in your opinion, Dr. Ford used the
25   Ever-Ready protocol in his survey; correct?
```

Page 42

```
 1          A     Yes.
 2          Q     And in your rebuttal survey in the
 3   Apple case, you used what you described in
 4   paragraph 3 as a "proper control."  Correct?
 5          A     Yes.
 6          Q     And by that you meant a control that
 7   you believe more accurately controlled for
 8   mismeasurement error than what Dr. McDonald had
 9   done?
10          A     I can't quite remember sitting here
11   today what exactly the issue I had with her control
12   at this point.
13          Q     Do you now recall that you had some
14   issue with her control?
15          A     Yes.
16          Q     Paragraph 4 of Exhibit 108 you wrote,
17   "The resulting confusion rate for my survey was
18   1.49 percent."
19                Do you see that?
20          A     Yes.
21          Q     How did you determine that?
22          A     Well, in general, the way that this
23   would be determined would be to take the results
24   from the test group and then subtract out the
25   results from the control group to get a net rate.
```

Page 43

1          Q      Had Dr. McDonald also done that in
2    her survey?
3          A      I don't remember.
4          Q      Do you remember what other errors
5    beside the control you identified in the McDonald
6    survey?
7          A      No.
8          Q      In designing your rebuttal survey in
9    the Apple case, did you correct for what you
10   believed Dr. McDonald's errors had been?  Or did
11   you do an entirely new survey?
12         A      I wish I could give you a better
13   response but this is a short summary of what I did
14   over about three years ago, and I simply just don't
15   recall exactly what I did at this point at that
16   level of detail.  So I just don't remember.
17               MR. LARKIN:  Okay.  Let's mark as
18   Exhibit 109 excerpts from your deposition in the
19   Apple case.  We'll see if that helps you remember.
20   Let's first mark as Exhibit 109 excerpts from your
21   deposition that were filed with the court in that
22   case under document 172-9.
23               (Exhibit 109 marked for
24   identification by the court reporter.)
25         Q      (BY MR. LARKIN)  Dr. Nowlis, do you

                                            Page 44

```
 1    recall having your deposition taken in the --
 2              MR. LONG:  Is this an extra copy?
 3              MR. LARKIN:  It isn't, but I will get
 4    you one.  Just a moment.  Strike the last question.
 5         Q    (BY MR. LARKIN)  Dr. Nowlis, do you
 6    recall being deposed in the Apple case?
 7         A    Yes.
 8              MR. LARKIN:  Let's take a short
 9    break, we've been going about an hour.
10              (Off the record.)
11         Q    (BY MR. LARKIN)  Dr. Nowlis, you
12    recall having your deposition taken in the Apple
13    case you mentioned earlier?
14         A    Yes.
15         Q    What we marked as Exhibit 109 are
16    some excerpts from that that were filed in that
17    case with the court.  Look at pages 52 and 53 of
18    Exhibit 109, if you would, please.
19              The bottom of page 52, the question
20    is, "Tell me, have you prepared a rebuttal report
21    in this case?"  Answer, "Yes."  Top of 53 -- I'm
22    sorry.  I misread that.  Bottom of 52, "Tell me,
23    have you prepared a rebuttal report before this
24    case?"  Answer, "Yes."
25              Top of 53, "How many times?"  Answer,
```

Page 45

1    "Boy, I'm really not sure.  I'm going to take a

2    guess, 30 times.  I really don't know."

3              Does looking at that refresh your

4    recollection as to how many times you have prepared

5    a rebuttal report?

6        A    No.  Because I said I'm guessing

7    there so I just --

8        Q    So you're just guessing there and you

9    can't do any better than that now.  Okay.  Fair

10   enough.

11             Look at numbered page 61, please, in

12   Exhibit 109.  Beginning at line 14, the question

13   is, "And, am I correct, forgive me, that you didn't

14   recall the number of those that involved a study as

15   well or was there a number?"  Answer, "You are

16   correct, you really don't recall if I've done a

17   survey as part of a rebuttal report prior to this."

18             Does looking at that help you in any

19   way to remember how many times you have done a

20   rebuttal report with a survey before this -- I

21   mean, in the past?

22        A    It doesn't help.  I still, I don't

23   know.

24        Q    Okay.  At the bottom of page 61,

25   beginning on line 22, the question is, "What about

                              Page 46

1    Dr. McDonald's report made you -- caused you to do

2    a study?"  Answer, "Because I thought that her

3    methodology was very flawed, which I pointed out in

4    my report" -- on the top of page 62 -- "and I

5    thought that I had a better way of doing it.  So I

6    wanted to do that so that we could see the accurate

7    results, rather than her results, which I don't

8    consider to be accurate but are flawed."

9                Do you see that?

10        A    Yes.

11        Q    Does that accurately describe the

12   reason that you did a rebuttal survey in the Apple

13   case?

14        A    Yes.

15        Q    Do you recall -- strike that.

16             Was the Apple case resolved before

17   trial, do you recall?

18        A    I didn't testify at trial, so I think

19   it was resolved before trial.

20        Q    Okay.  You didn't testify at trial in

21   that case; correct?

22        A    Yes, you are correct.  I did not.  I

23   did not testify at trial in that case.

24        Q    Okay.  Let's think back to the

25   Telebrands litigation that was listed in your

Veritext Legal Solutions
866 299-5127

1    report, Exhibit 16 [sic].  That's on page NOW0023

2    of your report.

3               And if I remember your earlier

4    testimony correctly, you recall doing a survey in

5    that case but you weren't sure whether it was what

6    I'll call a case in chief survey over a rebuttal

7    survey; is that an accurate summary of your

8    testimony?

9          A    Yes.

10              MR. LARKIN:  Let's mark as Exhibit

11   110 a document entitled Rebuttal Expert Report of

12   Stephen M. Nowlis, Ph.D.

13              (Exhibit 110 marked for

14   identification by the court reporter.)

15         Q    (BY MR. LARKIN)  Dr. Nowlis, do you

16   recognize Exhibit 110 to be a copy of your Rebuttal

17   Expert Report in the Telebrands litigation?

18         A    It appears to be.

19         Q    Does looking at that refresh your

20   memory as to whether you prepared a rebuttal survey

21   in that case?

22         A    Yes.

23         Q    Did you do so?

24         A    Yes.

25         Q    Looking at the Telebrands report, do

Page 48

1    you recall the issue that -- the trademark issue in

2    that case that you provided a -- an expert opinion

3    on?

4            A       Secondary meaning.

5            Q       And did you recall, from your --

6    looking at your report, what your criticisms of the

7    other expert, Hal Poret, were?

8            A       I mean, they're all contained here in

9    the report.  I don't remember every single one of

10   them but if I went through and reviewed it, I could

11   do that.

12           Q       I don't think that's necessary.  Why

13   did you decide to do a rebuttal survey in that

14   case?

15           A       Because I thought it was needed.

16           Q       Why did you think it was needed?

17           A       Because I wanted to test some of the

18   issues that I brought up in my critique of Mr.

19   Poret's survey.

20           Q       And doing a rebuttal survey was the

21   best way to do that?

22                   MR. LONG:  Objection, form.

23           A       I critiqued Mr. Poret and I also

24   thought it was important in this particular case to

25   conduct a survey.

Veritext Legal Solutions
866 299-5127

1        Q        (BY MR. LARKIN)   And again, why did
2    you feel you needed to go beyond critiquing Mr.
3    Poret's survey to conducting one of your own?
4        A        Because I wanted to test some of the
5    issues that I raised.  I thought that was important
6    to do in this case.
7        Q        And in the rebuttal survey you
8    conducted in the Telebrands case, did you design
9    the survey differently to correct for the errors in
10   Mr. Poret's survey that you identified?
11       A        I don't recall if I used those words
12   or not.  I can read through this, if you'd like me
13   to, and see if I used those words.
14       Q        The words aren't important.  You
15   didn't do replication survey?  You didn't simply
16   replicate what Mr. Poret had done; correct?
17       A        That is correct, I did not.
18       Q        You did your own survey in the manner
19   that you thought a survey on this issue should be
20   conducted; is that accurate?
21       A        Yes.
22       Q        And is that -- and in the Apple case,
23   you did your own survey in the manner in which you
24   thought a survey to test the issues in that case
25   should be conducted; correct?

Veritext Legal Solutions
866 299-5127

```
 1           A     Yes.
 2           Q     Other than the Apple case and the
 3    Telebrands case, do you recall doing rebuttal
 4    surveys?
 5           A     No.
 6           Q     What was it about those two cases
 7    that led you to conduct rebuttal surveys when you
 8    didn't do so in other engagements in which you
 9    critiqued somebody else's survey?
10           MR. LONG:  Objection to the extent
11    it's seeking any information related to this case
12    which is privileged.
13           A     Because I thought it was necessary to
14    do in these two cases but not in other cases that I
15    worked on.
16           Q     (BY MR. LARKIN)  What was it about
17    those two cases that differentiated themselves from
18    the others where you didn't do a rebuttal survey?
19           A     To give you a complete answer, I'd
20    have to go through and refresh my memory about each
21    of those particular cases in detail so I could
22    recall exactly why I did that.  Just don't remember
23    sitting here right now.
24           Q     Have you ever conducted a survey and
25    had a rebuttal expert critique your survey?
```

Page 51

```
 1          A      Yes.

 2          Q      In which cases?

 3          A      The one that I can say for certain

 4    was the CERT v. Starbucks, et al.

 5          Q      And if my notes are correct, based on

 6    your earlier testimony, that was not a trademark

 7    case?

 8          A      You are correct, that was not a

 9    trademark case.

10          Q      So in the CERT versus Starbucks case,

11    you did a survey and another expert critiqued your

12    survey; is that correct?

13          A      Yes.

14          Q      Do you remember any other cases, any

15    other engagements, expert witness engagements in

16    which you did a survey and another expert critiqued

17    it?

18          A      I have done surveys in other cases.

19    I just can't recall sitting here right now if

20    another expert critiqued them or not.  They may

21    have.  Just don't remember.

22               MR. LARKIN:  Okay.  Let's mark as 111

23    a copy of the Expert Report of Stephen M. Nowlis,

24    Ph.D., in the Bowe versus Public Storage case.

25               (Exhibit 111 marked for
```

Page 52

```
 1    identification by the court reporter.)

 2          Q      (BY MR. LARKIN)  Dr. Nowlis, do you

 3    recognize Exhibit 111?

 4          A      Yes.

 5          Q      Is that a copy of your Expert Report

 6    in the Bowe versus Public Storage litigation?

 7          A      It appears to be.

 8          Q      You did a survey in that case?

 9          A      Yes.

10          Q      Do you recall, in general, what the

11    survey tested?

12          A      I mean, I can direct you to paragraph

13    8, which I can read aloud, which is, "I was asked

14    by counsel representing Public Storage to determine

15    whether this information," which I described

16    earlier, "has a material impact on consumers' [sic]

17    likelihood of purchasing the Perfect Solution

18    insurance.  To test this, I designed a survey to

19    determine to what extent, if any, customers'

20    likelihood of purchasing the Perfect Solution

21    insurance would differ if Public Storage were to

22    disclose that they receive a portion of the

23    insurance premium."

24          Q      And you designed an online survey in

25    that case to test that issue; correct?
```

Page 53

1            A     Yes.

2            Q     Do you recall that a rebuttal expect

3    critiqued your survey in the Bowe versus Public

4    Storage case?

5            A     That may well have been the case but

6    I don't recall it.

7                  MR. LARKIN:  Let's mark as Exhibit

8    112 a document entitled Supplemental Expert Report

9    of Stephen M. Nowlis, Ph.D.

10                 (Exhibit 112 marked for

11   identification by the court reporter.)

12           Q     (BY MR. LARKIN)  Dr. Nowlis, do you

13   recognize what we've marked as Exhibit 112 as a

14   Supplemental Expert Report that you prepared in the

15   Bowe versus Public Storage case?

16           A     Yes.

17           Q     That's your signature there on page

18   10?

19           A     Yes.

20           Q     Does looking at Exhibit 112 refresh

21   your memory that a Dr. Larry D. Compeau, spelled

22   C-o-m-p-e-a-u, offered a critique of the online

23   survey in the Bowe versus Public Storage case that

24   you just described?

25           A     Yes.

Veritext Legal Solutions
866 299-5127

1          Q          In paragraph 2 of your Supplemental

2     Report you wrote that, "As a preliminary matter, I

3     note that Dr. Compeau has chosen not to conduct any

4     empirical tests nor to cite any published consumer

5     research relating to this matter."

6                    Farther down in that paragraph,

7     "Therefore, his opinions about what consumers would

8     do or might do in various hypothetical situations

9     are simply speculation on his part, as he has not

10    supported these conjectures with empirical tests or

11    research."

12                    Do you see that?

13          A          Yes.

14          Q          Was that your opinion in that case?

15          A          Yes.

16          Q          And looking at page 3 of Exhibit 112,

17    paragraph 8, you wrote, "Based on his lack of

18    relevant experience and the minimal research that

19    he conducted before offering his Expert Report, I

20    believe that Dr. Compeau's conclusions, such as

21    that materially different results would have

22    obtained with different disclosure language or a

23    stronger manipulation, or that the online

24    environment does not replicate actual context of

25    the insurance transactions, lack a sufficient

1    basis, since they are not based on any empirical

2    tests nor any cited consumer research."

3                  Do you see that?

4         A        Yes.

5         Q        Was that your opinion in that case?

6         A        Yes.

7         Q        Did you attend Dr. Compeau's

8    deposition in that case?

9         A        No.

10        Q        Did you review it?

11        A        I don't remember.

12        Q        If you look at page 4 of Exhibit 112,

13   you quote from what you say Dr. Compeau stated as

14   following in his deposition.

15                 Do you see that?

16        A        Yes.

17        Q        Do you recall reviewing his

18   deposition in that case?

19        A        I don't recall it but I must have if

20   I cited it.

21        Q        Okay.   Look at page 7 of Exhibit 112,

22   please.   Paragraph 14, about halfway down that

23   paragraph you wrote, "His assertion that I should

24   have used a different font, larger font, emphasized

25   font, different color, capital letters, or

                                            Page 56

1      otherwise draw attention to the disclosure is made

2      without any reference to specific research or

3      empirical evidence indicating that this would have

4      affected the results."

5                     Then you go on to say, "And he admits

6      he cannot say which specific language of the

7      disclosure should have been emphasized or what

8      impact it would have had, if any, on the survey

9      results."

10                    Do you see that?

11          A      Yes.

12          Q      Is that your opinion in that case?

13          A      Yes.

14          Q      Did you ever consider doing a

15      rebuttal survey in this case?

16                    MR. LONG:  Objection, calls for

17     inquiry into privileged information.

18                    MR. LARKIN:  Are you instructing him

19     not to answer?

20                    MR. LONG:  I am.

21                    MR. LARKIN:  What is the basis for

22     your assertion of privilege?

23                    MR. LONG:  It was information based

24     on conversations and discussions with counsel.

25                    MR. LARKIN:  Okay, but how does that

```
 1    -- what specific privilege?  The work product
 2    privilege?
 3              MR. LONG:  Work product and also --
 4    yeah.  Work product privilege.
 5              MR. LARKIN:  Whether or not he
 6    considered doing a rebuttal survey in this case
 7    does not seem to be covered by any privilege.
 8              MR. LONG:  I think it was a
 9    consideration that involved discussion with counsel
10    and had to do with discussion with how counsel
11    intended to prosecute this case and what evidence
12    it intended to collect in order to do that and that
13    seemed to be intimately involved and intricately
14    involved with counsel's work product and
15    impressions and plans.
16         Q    (BY MR. LARKIN)  Well, let me ask you
17    this.  And this is a yes or no answer.  Did you
18    ever discuss doing a rebuttal survey with VIP's
19    counsel?
20              MR. LONG:  That, even the fact that
21    there was a discussion calls for an inquiry into
22    that same information, so I instruct him not to
23    answer.  I mean, if you can address the fact as to
24    whether one was done or not, as to whether that's
25    important to you or not, but whether there was any
```

Page 58

 1    discussions is, is -- involves and invades that

 2    privilege.

 3            Q      (BY MR. LARKIN)  You didn't do a

 4    rebuttal survey in this case; is that correct?

 5            A      Yes.  I did not.  That is correct.

 6            Q      Why not?

 7                   MR. LONG:  No, that's -- objection,

 8    instruct him not to answer.

 9                   MR. LARKIN:  Well, he testified at

10    length in other cases about why he did one.

11                   MR. LONG:  I'm not responsible for

12    the privilege in that case.

13            Q      (BY MR. LARKIN)  Well, did you

14    consider it necessary to do a rebuttal survey in

15    this case?

16                   MR. LONG:  That's also absolutely

17    invading work product privilege.

18            Q      (BY MR. LARKIN)  Why didn't do you

19    one in this case?

20                   MR. LONG:  That is also asking for

21    information that would invade the privilege.  I

22    instruct him not to answer.

23                   MR. LARKIN:  Okay.  I don't think

24    your objections are well taken, nor do I think your

25    instructions are well taken and we may end up

                                          Page 59

1    coming back to do Dr. Nowlis again if you insist on

2    not allowing him to answer those basic questions.

3                    MR. LONG:  We can talk about that at

4    a break if you want.

5           Q       (BY MR. LARKIN)  Do you agree that

6    without doing a rebuttal survey in this case, you

7    don't know if the results had, would have been

8    different if a survey had been conducted in the

9    manner that you thought it should be conducted

10   here?

11          A       I don't know what the results would

12   have been, I'd have to speculate, but I do know

13   that these are serious flaws that, in the survey

14   design, that should not have been there.

15          Q       You don't know what the results of a

16   survey that had been conducted as you would have

17   done it, eliminating Dr. -- the errors in Dr.

18   Ford's survey that you claim, you don't know what

19   the results would have been.  Is that correct?

20          A       I couldn't -- I don't know for sure

21   what any results would be of any other survey.  You

22   never know that.

23          Q       You don't know whether those results

24   would have been any different from the results that

25   Dr. Ford obtained in his survey, do you?

                                      Page 60

1          A      Again, without doing a --

2                 MR. LONG:   Asked and answered.

3          A      -- a survey, I'd have to speculate on

4     what those results would be.   So I simply just

5     don't know.

6          Q      (BY MR. LARKIN)  Earlier in your

7     testimony you referred to a couple of citations in

8     your report from Trademark and Deceptive

9     Advertising Surveys:   Laws, Science and Design.

10                Do you recall that testimony?

11         A      Yes.

12         Q      Let me read you a statement by Jerry

13    Swann, one of the editors, on page 370 that

14    publication, and ask you if you agree with it.

15                "For purposes of excluding a survey

16    with asserted technical and methodological flaws,

17    there is rarely a substitute for countervailing

18    data."

19                MR. LONG:  Objection to the form of

20    the question.

21         Q      (BY MR. LARKIN)  Do you agree with

22    that statement, Dr. Nowlis?

23                MR. LONG:  Objection, form.

24         A      It would help me if you could show me

25    the page that it's on so I could look at that in

                                        Page 61

1    context.

2         Q      (BY MR. LARKIN)  At the break.  Do

3    you agree that the best way to test for claimed

4    flaws in a survey is to conduct your own survey

5    eliminating those flaws?

6              MR. LONG:  Objection to form.

7         A      What do you mean by "test"?

8         Q      (BY MR. LARKIN)  You, you opined in

9    your report that Dr. Ford -- Dr. Ford's survey

10   contains several serious methodological errors.

11   You just said a moment ago, if I recall your

12   testimony correctly, that you could only speculate

13   on whether running a survey with those errors

14   corrected as you would have corrected them would

15   have different results.

16             The best way to determine whether

17   you're right and those errors would have affected

18   the results of a properly conducted survey is to do

19   what you consider to be a properly conducted

20   survey; correct?

21             MR. LONG:  Same objection, form.

22        A      No.

23        Q      (BY MR. LARKIN)  Why not?

24        A      Because I think I'm right.

25        Q      But you haven't tested that

Page 62

1  proposition by doing your own survey; correct?

2       A    You are correct, I did not do a

3  survey.  But I still think I'm absolutely right.

4       Q    I understand that and I suspect we

5  wouldn't be here today if you didn't.  But did you

6  feel that you were absolutely right in the Apple

7  case?

8       A    Yes.

9       Q    In terms of your critique of Dr.

10  McDonald's survey?

11       A    Yes.

12       Q    But nevertheless, you did a survey to

13  see if the results would have been different;

14  correct?

15       A    I don't know if --

16            MR. LONG:  Objection to form.

17       A    -- that's the words I used, if that's

18  the reason for it, but did I do a survey in that

19  case because I thought it was necessary.

20       Q    (BY MR. LARKIN)  And in the

21  Telebrands case you believed you were correct in

22  your critique of Mr. Poret's survey; correct?

23       A    Yes.

24       Q    But you nevertheless did your own

25  survey to see if the results differed from what Mr.

Page 63

1    Poret got; correct?

2                MR. LONG:  Objection to form.

3    Misstates the previous testimony.

4         A    I did not -- I did not do a survey in

5    that case.  There's plenty of other cases, though,

6    where I've been a rebuttal expert where I didn't do

7    a survey.

8                MR. LARKIN:  Could I have that last

9    answer read back, please?

10               THE REPORTER:  "I did not do a survey

11   in that case.  There's plenty of other cases,

12   though, where I've been a rebuttal expert where I

13   didn't do a survey."

14        Q    (BY MR. LARKIN)  You did not do a

15   survey in the Telebrands case?

16        A    I did in the Telebrands case but

17   there's other cases that we went through in my

18   vitae where I was the rebuttal expert but I did not

19   do a rebuttal survey.

20        Q    I understand that, but focusing just

21   for the moment on the Telebrands case, you offered

22   an expert opinion critiquing Mr. Poret's survey;

23   correct?

24        A    Yes.

25        Q    And you believed that your critiques

                                        Page 64

1    had merit; correct?

2         A    Yes.

3         Q    Yet you nevertheless did a survey to

4    see if the results of a properly done survey, in

5    your view, would have differed from the results

6    that Mr. Poret got; correct?

7              MR. LONG:  Objection, misstates his

8    prior testimony as the reason for doing the survey.

9         A    I'm not sure that that was what I

10   said in that report was the reason why I did it.

11   But I did do a survey.

12        Q    (BY MR. LARKIN)  Okay.  Look back at

13   what we marked as Exhibit 107, please.  Turn to the

14   page marked NOW259, please.  Do you have that in

15   front of you?

16             MR. LONG:  I've got it.

17        Q    (BY MR. LARKIN)  Do you have that in

18   front of you, Dr. Nowlis?

19        A    Yes.

20        Q    Okay.  Page NOW259 of Exhibit 107 is

21   your statement for time spent in May of this year

22   on your expert engagement in this case; correct?

23        A    Yes.

24        Q    And each entry lists that you spoke

25   with attorneys and reviewed documents; is that

Page 65

1    correct?

2            A      Yes.

3            Q      Did you do anything else during May

4    in connection with your engagement in this case

5    other than speaking with VIP's counsel and

6    reviewing documents?

7            A      No.  Reviewing documents also means

8    working on my rebuttal report.

9            Q      Do you recall starting that work on

10   your rebuttal report in May?

11           A      I don't recall exactly when I started

12   writing it.  It may have been.

13           Q      During any of the conversations with

14   VIP's attorneys reflected on page NOW259, did they

15   ask you to make any assumptions about -- any

16   assumptions about any facts for purposes of forming

17   your opinions in this case?

18                  MR. LONG:  Objection to the extent it

19   calls for revelation of information provided by

20   attorneys.

21                  MR. LARKIN:  Well, that's a specific

22   exemption to Rule 26 for assumptions the expert was

23   asked to make.

24                  MR. LONG:  Withdraw the objection.

25           A      I don't recall.

Page 66

1          Q      (BY MR. LARKIN)  During any of the

2     conversations with VIP's attorneys reflected on

3     NOW259 of Exhibit 107, did they provide you with

4     any facts or data or information that you

5     considered in forming your opinions?

6          A      We could look at the documents and

7     see when they sent documents.  I believe some were

8     sent in May.  Would you like me to do that?

9          Q      Sure.

10         A      Okay.  So if we look at Exhibit 107,

11    this is Nowlis -- or I'm sorry, NOW0031.  I was

12    sent documents in May.  May 8.  A number of

13    documents were sent to me.  And then going forward,

14    it looks like other documents were sent to me in

15    June and July, but I believe that's the only set of

16    documents that I received in May.

17         Q      So your recollection, looking at

18    Exhibit 107, is the only documents you received

19    from VIP's counsel during May were Dr. Ford's

20    report and Dr. Simonson's report; is that correct?

21         A      It appears to be.  I don't, I don't

22    know if there's any other documents that I've

23    received that aren't listed here.  I do recall

24    seeing the Complaint.  That says I received that on

25    July 1st, though.  So maybe that's when I received

Page 67

1    it.

2          Q      Okay.

3          A      I just don't remember.

4          Q      Sitting here today, the best you

5    recall is that during May, which is the month that

6    is reflected in NOW259 of Exhibit 107, the only

7    documents you received from VIP's attorneys were

8    Dr. Ford's report and Dr. Simonson's report; is

9    that correct?

10         A      That's what I have here, so that's

11   the best I can give you.

12         Q      Okay.  And during the multiple --

13   what appear to be the multiple phone conversations

14   with VIP's attorneys in May, as reflected in NOW259

15   at 107, do you recall them providing you with any

16   other facts, data, or information that you

17   considered in forming your opinions in this case?

18         A      No, I don't recall.

19         Q      Look at page -- the page marked

20   production of NOW261, please.  Do you have that in

21   front of you, Dr. Nowlis?

22         A      Yes.

23         Q      Okay.  Is it correct that the page

24   marked in Exhibit 107, is NOW261, is a log of the

25   time that you spent on this engagement in June of

                                              Page 68

1    this year?

2            A      Yes.

3            Q      There are two references to speaking

4    with VIP's attorneys on June 18 and June 19.  Do

5    you see those?

6            A      Yes.

7            Q      Do you recall during either of those

8    conversation that is VIP's attorneys asked you to

9    make any assumptions that you considered in forming

10   your opinions in this case?

11           A      I don't recall.

12           Q      And during those conversations, did

13   VIP's attorneys provide with you any facts or data

14   or information that you considered in forming your

15   opinions in this case?

16           A      Well, as they pointed out earlier at

17   the beginning of Exhibit 107, I did receive some

18   other documents in June.

19           Q      Which ones did you receive in June?

20           A      Okay.  So on NOW0033 -- oh, sorry.

21   That's my invoice.  On NOW0034, I was sent a set of

22   documents which are listed here.  And that was June

23   16.  So I think those were the documents that I

24   received in June.

25           Q      And those are identified on 0034 as

```
 1      "Responses to First Set of non-Uniform
 2      Interrogatories, Responses" -- Jack Daniel's
 3      "Responses to First Set of Request for Production
 4      of Documents" and "Responses to First Set of
 5      Requests for Admissions."
 6                  Do you see that?
 7          A     Yes.
 8          Q     Do you recall receiving those
 9      documents?
10          A     Yes.
11          Q     Do you recall reviewing them?
12          A     I must have.
13          Q     And sitting here today you don't have
14      a specific recollection of that?
15          A     I don't recall it but I'm sure I did.
16          Q     During the month of June with the
17      entries reflected on NOW261, did you begin
18      preparing, drafting your Expert Report in this
19      case?
20          A     Again, I don't recall.  I may well --
21      I may have.  For example, like say when I say
22      "reviewing documents," that also includes working
23      on my report.  Just a general term, it's my
24      practice just to use that, but I may have started
25      working on it in June or May.  I just don't recall.
```

Page 70

1    I think I probably started working it on May.  That

2    would be my normal practice to start writing down

3    some ideas and working on it as I move forward.

4         Q    Sitting here today you don't have a

5    recollection as to when in May or June, if during

6    that time period you started drafting your report;

7    correct?

8         A    I don't recall with certainty exactly

9    when I started it.

10         Q    Look at the document marked with

11    production number NOW263, please.

12         A    Okay.

13         Q    Is that a -- that reflects the time

14    that you spent on this engagement during the month

15    of July; is that correct?

16         A    Yes.

17         Q    There are two references to phone

18    conversations with attorneys on July 1 and July 6.

19    Do you see that?

20         A    Yes.

21         Q    Do you recall whether during those

22    conversations VIP's attorneys asked you to make any

23    assumptions that you relied upon in forming your

24    opinions in this case?

25         A    No.

1          Q     Do you recall whether during those

2     conversations VIP's attorneys provided any facts or

3     data or information that you considered in forming

4     your opinions in this case?

5          A     No, but as I pointed out earlier, I

6     did receive some information in July on NOW0036.

7     It says I received some information there, and

8     0037, some other information, and 0038, some more

9     information, and 0039, some more information, and

10    0040, some more information.  That was all in July.

11         Q     Okay.  Let's look at 0036 first,

12    please.  That's an e-mail from Mr. Long to you on

13    July 1, 2015.  Correct?

14         A     Yes.

15         Q     And you submitted your Expert Report

16    -- you signed your Expert Report on July 10; is

17    that correct?

18         A     Yes.

19         Q     Is July 1 the first time that you saw

20    the Complaint, the Answer and Counterclaim, the

21    Answer to Counterclaim, the Motion to Amend, Reply

22    to Counterclaim and JDPI's Answer to Amended

23    Complaint?

24         A     Well, it's odd because I do recall

25    seeing the Complaint at least, and I believe the

Page 72

```
 1    Answer and Counterclaim earlier than July 1.  So
 2    I'm not sure why this is July 1.  Just don't know.
 3         Q    When do you recall first seeing those
 4    two pleadings?
 5         A    I thought I had received those
 6    earlier on, which were in May.  I think.
 7         Q    Okay.  Does looking at NOW0036
 8    refresh your memory that the first time you saw
 9    them was on July 1?
10         A    Again, that doesn't feel right to me.
11    I believe I saw them earlier but I see that it
12    states this.  So I'm just not sure why I have the
13    an e-mail here when I believe I saw these documents
14    earlier.
15         Q    Do you recall when -- how long after
16    your engagement in this case you first saw the two
17    pleadings you mentioned a moment ago?
18         A    I thought it was sometime in May.
19    That's my recollection.
20         Q    NOW0037, that's an e-mail from Mr.
21    Bray to you dated July 1, covering the signed Rule
22    26 report of Martin Wolinsky and Responses -- VIP's
23    Responses to JDPI's Second Set of Interrogatories.
24              Do you see that?
25         A    Yes.
```

Page 73

```
 1          Q     Do you recall receiving those

 2    referenced documents under cover of Mr. Bray's

 3    e-mail 0037?

 4          A     I believe I remember getting those,

 5    yes.

 6          Q     Is that the first time you saw Mr.

 7    Wolinsky's Expert Report?

 8          A     I think so.

 9          Q     0038 is an e-mail from Mr. Long to

10    you dated July 1 covering an online survey with

11    some production numbers.

12                Do you see that?

13          A     Yes.

14          Q     Do you recall receiving an online

15    survey conducted by ORC in this case?

16          A     Yes.

17                MR. LONG:  Objection.  I'm not sure

18    that's -- what was that question again?

19          Q     (BY MR. LARKIN)  Do you recall

20    receiving an online survey conducted by ORC in this

21    case?

22                MR. LONG:  Oh, I see.  I understand.

23    No objection.

24          Q     (BY MR. LARKIN)  Okay.  Do you recall

25    receiving that?
```

Page 74

1           A      I do.  I, I think that's what these

2     Bates numbers refer to.  I remember seeing it.

3                   MR. LONG:  That was my hesitation as

4     well.

5           A      I can't remember if I can connect it

6     to these numbers or not.

7           Q      (BY MR. LARKIN)  Yeah, if we went

8     back to Exhibit 106, which is the log of documents,

9     it's on the second page of that exhibit.  At the

10    bottom there is a Bates number description, there's

11    JDPI00355 to 396.

12                  Do you see that?

13          A      I'm sorry.  I see the first page.  I

14    need to see the second page.

15                  MR. LARKIN:  Hopefully it's attached

16    to the first page.

17                  MR. LONG:  That's why I stapled mine.

18    He can use mine.

19                  MR. LARKIN:  We need to get the

20    second page.  That's important.

21          A      Okay.  Where were we?

22          Q      (BY MR. LARKIN)  We were at the

23    second page of Exhibit 106, there are some

24    documents at the bottom, the description is "ORC

25    International's Introduction to Detailed

                                          Page 75

1    Tabulations."  Yeah.  And then it looks like

2    NOW0038 is the e-mail covering documents with those

3    production numbers.

4              Do you see that?

5        A    I do.

6        Q    Okay.  Do you recall first receiving

7    the ORC online survey on July 1 from Mr. Long?

8        A    Sounds about right.

9        Q    Then if you look at NOW39, please?

10   That's an e-mail from Mr. Long to you dated July 2

11   covering "JDPI Responses to VIP First Set of

12   Requests for Admissions."

13             Do you see that?

14       A    Yes.

15       Q    Do you recall that that's when you

16   first received JDPI's Responses to VIP's First Set

17   of Requests for Admissions?

18       A    I don't recall, but that sounds about

19   right.

20       Q    And then NOW0040 in Exhibit 107,

21   that's an e-mail from Kylie Boie to you, Dr.

22   Nowlis, dated Monday, July 6, the attachments are,

23   JDPI production number 327 to 334 and 401 to 408.

24             Do you see that?

25       A    I think you meant to 418.

Veritext Legal Solutions
866 299-5127

1          Q      To 418.  Thank you, I did mean that.

2          A      I do see that.

3          Q      And then if you look back at Exhibit

4    106, it identifies those documents as an exhibit to

5    the Sacra, that's S-a-c-r-a, deposition, and the

6    Excel file of Dog Toy Study codes.

7               Do you see that?

8          A      Yes.

9          Q      Do you recall first receiving those

10   documents on July 6 under cover of the e-mail

11   NOW40?

12         A      I don't remember, but that sounds

13   about right.

14               MR. LARKIN:  Let's take a break.

15               (Off the record.)

16         Q      (BY MR. LARKIN)  Earlier I asked you

17   some questions about fact that you didn't do a

18   rebuttal survey in this case.  I'm going to ask you

19   a couple more for purposes of making a record in

20   this case, and then we'll move on to Dr. Ford's

21   report.

22               At any point in your engagement did

23   you consider doing a rebuttal survey in this case?

24               MR. LONG:  Objection, privilege,

25   instruct the witness not to answer.

Page 77

1          Q      (BY MR. LARKIN)  You testified you

2    didn't do one.  Was that decision entirely yours?

3                    MR. LONG:  Objection, privilege,

4    instruct the witness not to answer.

5                    MR. LARKIN:  Okay.  Let's mark as 113

6    a copy of Dr. Ford's Declaration and Rule 26 Expert

7    Report.

8                    (Exhibit 113 marked for

9    identification by the court reporter.)

10          Q      (BY MR. LARKIN)  Okay, Dr. Nowlis,

11    we've marked as Exhibit 113 Dr. Ford's Declaration

12    and his entire report, including all the verbatims

13    and so on.  I note for the record that Dr.

14    Ford's --

15                    MR. LONG:  Wasn't this marked as

16    something --

17                    MR. LARKIN:  Yes.  I'm about to say

18    that.  That Dr. Ford's Declaration, without the

19    entirety of his report, was previously marked as

20    Exhibit 61, but I want to mark the entire

21    Declaration, his entire report.  It's all there.

22    okay.

23          Q      (BY MR. LARKIN)  Dr. Nowlis, one of

24    your criticisms of Dr. Ford's survey is the control

25    that he used; is that correct?

                                        Page 78

1        A      Yes.

2        Q      Have you ever created a control

3   stimulus in a trade dress case?

4        A      I'm not sure.  I may have.

5        Q      Sitting here today you can't recall?

6        A      Yes, I cannot recall.

7        Q      I hate to refer you back to the large

8   stack again but I'm going to have to.  Exhibit 107

9   for a moment, please.  One of the documents

10   contained in Exhibit 107 is a copy of JDPI's Answer

11   and Counterclaim in this case.  And that begins at

12   page NOW0047.

13        A      Okay.

14        Q      And if you look at -- strike that.

15               When you were engaged in this case,

16   what was your understanding of the trade dress that

17   JDPI claimed in this case?

18        A      I report that in my report.  You want

19   me to read that?

20        Q      Yes.  I want you to just find it in

21   your report, if you would, please.

22        A      So on my report, paragraph 15, which

23   is NOW0007, I say, "My understanding is that

24   Plaintiffs allege the 'Jack Daniel's Trade Dress'

25   supposedly consists of the combination of the

Veritext Legal Solutions
866 299-5127

1    following features," and then that lists a number

2    of features.

3        Q    Where did you get that list of

4    features from?

5        A    I have a citation, which is citation

6    14, and I say that was from the Amended Complaint,

7    pages 3 to 4.

8        Q    And sitting here today you don't

9    recall exactly when you first received the Amended

10   Complaint; is that correct?

11       A    I believe it was sometime in May.  We

12   talked about this before, but I'm not certain.  But

13   I think it was.

14       Q    When you first -- in paragraph 15 of

15   your report, you just started to read a little bit

16   of that and then we moved on.  You wrote about

17   halfway down, after your recitation of what your

18   understanding of the claim trade dress was, you

19   wrote, "However, as mentioned above, neither the

20   Ford survey, nor to my understanding any survey,

21   have shown that the combination of these particular

22   elements [sic] has acquired distinctiveness or

23   secondary meaning."

24            What is your understanding of

25   "distinctiveness or secondary meaning"?

Page 80

1           A      That there are survey methods to
2    determine that.
3           Q      Okay.  But what, what is your
4    understanding of the concept of distinctiveness or
5    the concept of secondary meaning?
6                  MR. LONG:  Objection to form.
7    Question refers to "acquired distinctiveness" in
8    your statement.
9                  MR. LARKIN:  I'm sorry, you're right,
10   "acquired distinctiveness or secondary meaning."
11          A      So it's when a feature has, as it
12   says, it's acquired distinctiveness in the minds of
13   consumers over a period of time.  In association
14   with something.
15          Q      (BY MR. LARKIN)  Is a survey the only
16   way to determine whether acquired distinctiveness
17   or secondary meaning for any claimed trade dress
18   exists?
19                 MR. LONG:  Objection, calls for
20   speculation.
21          A      I'm going to tell you I'm not a
22   lawyer right now for sure but I am aware of survey
23   methods to do this.  I'm not sure what other
24   methods the law allows.
25          Q      (BY MR. LARKIN)  In paragraph 15 of

Page 81

1    your report that we have been discussing, Exhibit

2    65 --

3                    MR. LONG:  Paragraph 13 did you say?

4                    MR. LARKIN:  15.  15.

5         Q    (BY MR. LARKIN)  As I said, you

6    wrote, "However, as mentioned above, neither the

7    Ford survey, nor to my understanding any survey,

8    have shown that the combination of these particular

9    features has acquired distinctiveness or secondary

10   meaning."

11                   Is it your understanding that in the

12   absence of such a survey, that showing acquired

13   distinctiveness or secondary meaning for the

14   claimed features, you should disregard the claimed

15   features in developing a control?

16                   MR. LONG:  Objection to form of the

17   question.  I don't understand it.

18        A    I'm going to have to say I don't

19   understand it.  I'm sorry.

20        Q    (BY MR. LARKIN)  Well, you wrote

21   farther in that paragraph, quote, "Thus, my

22   understanding is that, given there is no evidence

23   of acquired secondary meaning of the alleged Jack

24   Daniel's trade dress, it is improper to even test

25   the influences of these characteristics on

                                          Page 82

1    likelihood of confusion in the first place."

2            Do you see that?

3        A    Yes.

4        Q    Is it your opinion that unless there

5    exists a survey that shows acquired distinctiveness

6    of the Jack Daniel's trade dress, the combination

7    of elements that you describe in paragraph 15

8    should not be considered when developing a control

9    stimulus?

10            MR. LONG:  Objection to form.

11        A    I'm sorry, I didn't follow that.

12        Q    (BY MR. LARKIN)  What did you mean by

13    "it is improper to even test the influences of

14    these characteristics on likelihood of confusion in

15    the first place"?

16        A    What I meant by that was because my

17    understanding is that there is no evidence of

18    acquired secondary meaning, as I pointed out here;

19    therefore, it has not been established.  Therefore,

20    to do a survey on likelihood of confusion which

21    uses the trade dress as the subject of attention is

22    not proper.

23        Q    So do I understand it correctly that

24    it was improper for Dr. Ford even to test -- even

25    to do the test cell in this survey?

                                            Page 83

```
 1           A     I mean, he, he can do whatever he

 2    wants.  He can test whatever he wants.  But the

 3    interpretation of the results doesn't make any

 4    sense if there, if there hasn't been an

 5    established, acquired distinctiveness in the first

 6    place.  If that concept has not been shown, then

 7    his test -- the results from his test don't make

 8    any sense.  Because he's testing something that

 9    hasn't been established.

10           Q     The -- in paragraph 15 of your report

11    is in the portion of your report criticizing Dr.

12    Ford's failure to design an appropriate control

13    stimulus, do I understand your testimony correctly

14    that unless Dr. Ford had done or someone else had

15    done a survey showing acquired distinctiveness for

16    the claimed elements of the Jack Daniel's trade

17    dress, it was improper to do the survey on the Bad

18    Spaniels toy in the test cell?

19           MR. LONG:  Objection, form,

20    mischaracterizes prior testimony.

21           A     That, I didn't follow that.

22           Q     (BY MR. LARKIN)  Are you, I mean,

23    you're addressing -- in this section of your report

24    you're addressing his control; correct?

25           A     I am.  But, you know, I talk about
```

Veritext Legal Solutions
866 299-5127

```
 1    various things throughout here.  It's a point that
 2    I'm making in this section but I just explained to
 3    you what the point was that I was making there.
 4         Q     I'm just trying to understand the
 5    point because I'm having some difficulty.  Is it
 6    your opinion that, in the absence of a survey that
 7    shows acquired distinctiveness for the claimed
 8    combination, what you referred to as the alleged
 9    Jack Daniel's trade dress, none of those features
10    should be taken into account when designing the
11    control stimulus?
12              MR. LONG:  Objection, form.
13         A     Again, I'm really sorry.  I'm not
14    sure I'm following what you're asking me.
15         Q     (BY MR. LARKIN)  I'm just trying to
16    understand what you meant by "it is improper to
17    even test the influences of these characteristics
18    on likelihood of confusion in the first place."
19              Were you referring to the control
20    cell or the test cell?
21         A     I was referring to what I mentioned
22    earlier which is if secondary meaning hasn't been
23    established over trade dress, then testing with
24    likelihood of confusion issue of trade dress is
25    improper because trade dress has never been
```

Page 85

```
 1    established.
 2              So you're testing something that has
 3    never been established.  And it needs to be
 4    established in order for the test results to make
 5    any sense.
 6         Q    So is it your opinion that the
 7    results of the test cell, not the control cell, are
 8    meaningless because Dr. Ford or somebody else
 9    hasn't done a survey to establish that there is
10    secondary meaning in the combination of elements
11    alleged to be the Jack Daniel's trade dress?
12              MR. LONG:  Objection to form, asked
13    and answered.
14         A    I wouldn't focus just on the test
15    cell.  I would focus on the results of the survey
16    and interpretation of the results as a whole.
17         Q    (BY MR. LARKIN)  You testified
18    earlier that you have familiarity with the
19    Ever-Ready protocol; is that correct?
20         A    Yes.
21         Q    Do you consider that to be the case
22    that created the proper protocol for likelihood of
23    confusion surveys?
24              MR. LONG:  Objection, form.
25         A    I wouldn't, I wouldn't go that broad.
```

Page 86

1    I mean, there's different forms of likelihood of

2    confusion surveys but certainly the Ever-Ready case

3    established some important principles that have

4    gone forward.

5          Q     (BY MR. LARKIN)  Do you agree with

6    the following statement from the Ever-Ready case --

7    strike that.

8               Do you remember what the results of

9    the survey in the Ever-Ready case were?

10         A     No.

11         Q     Do you recall that they showed a

12   likelihood of confusion?

13         A     I do not recall.

14         Q     Okay.  And I assume you don't recall

15   any discussion -- have you ever read the Ever-Ready

16   case?

17         A     I am not sure.  I think I've probably

18   seen portions of it here and there over time but I

19   can't tell you with certainty that I have read it

20   word for word.  I don't think I have.

21         Q     Okay.  Do you recall the following

22   statement in the Ever-Ready case, quote, "The only

23   conclusion that can be drawn from these results of

24   the likelihood of confusion survey is that an

25   extremely significant portion of the population a

Page 87

1    associates carbides product with a single anonymous

2    source"?

3          A    I don't recall that exact sentence

4    but I believe you that it's in there.

5          Q    Do you agree that the results of a

6    likelihood of confusion survey can support a

7    finding of secondary meaning?

8                MR. LONG:  Objection, form.

9          A    My understanding is that they're

10   different.

11         Q    (BY MR. ARKIN)  Let me read you a

12   statement from a decision of the United States

13   Court of Appeals for the Third Circuit in a case

14   called Charles Jacquin versus Distileria Serralles,

15   921 F.2d 467 3rd Circuit, 1990, and ask you a

16   series of statements and ask you if you agree with

17   these.

18                "Likelihood of confusion and

19   secondary meaning are two closely related concepts

20   that collapse into one another in trade dress

21   cases."

22                Do you agree with that statement?

23                MR. LONG:  Objection to form, calls

24   for a legal conclusion.

25         A    My understanding from, as I mentioned

1    to you before, is that they are separate issues and

2    should be tested separately.

3         Q    (BY MR. LARKIN)  So you don't agree

4    or disagree, one way or the other, with that

5    statement?

6         A    I think you -- is that from a judge's

7    opinion?

8         Q    Yes.

9         A    I just, I mean, I think we're getting

10   into legal issues that I'm not sure how to answer

11   that question without being a lawyer.

12              MR. LONG:  Just what was the --

13   what's the citation?

14              MR. LARKIN:  921 F.2d 467.

15              MR. LONG:  What year was it?

16              MR. LARKIN:  1990.

17              MR. LONG:  Third Circuit you said?

18              MR. LARKIN:  Yes.

19         Q    (BY MR. LARKIN)  Let me read another

20   statement from that case.  "Necessarily a package

21   or mark must have acquired secondary meaning before

22   likelihood of confusion can result."

23              Do you agree with that statement?

24              MR. LONG:  Objection, form; object to

25   this entire line of questioning because it calls

Veritext Legal Solutions
866 299-5127

1    for opinions on quotes from a judge's legal

2    decision.

3              MR. LARKIN:  Your partner asked Dr.

4    Ford about an hour's worth of those questions and I

5    let him answer every one of them, so.

6         A    I'm sorry, now I forgot the question.

7         Q    (BY MR. LARKIN)  And I'm sorry for

8    extemporaning like that.  Do you agree with the

9    following statement from the Third Circuit's

10   decision in the Charles Jacquin case:  "Necessarily

11   a package or mark must have acquired secondary

12   meaning before likelihood of confusion can result"?

13             MR. LONG:  Objection.

14        A    It's, again, it's going to be hard

15   for me to say whether I agree or disagree with a

16   judge's opinion because that seems to me to be

17   getting into legal issues.  As I said, as a general

18   statement and I'll just kinda keep going back to

19   this, my understanding is that they are separate

20   issues and they're tested separately with different

21   surveys.  That's my understanding.

22        Q    (BY MR. LARKIN)  Are you familiar

23   with Professor McCarthy's treatise, McCarthy on

24   Trademarks and Unfair Competition?

25        A    I'm familiar with it in general.  I

Veritext Legal Solutions
866 299-5127

1    haven't read the whole thing.

2         Q    Okay.  Do you recognize that as an

3    authoritative source on trademark law?

4              MR. LONG:  Objection, foundation.

5         A    I know that people often have cited

6    McCarthy for sure, but I don't know if I'd call

7    every single word of that entire treatise

8    authoritative or not.  I just, I couldn't go there

9    on.

10         Q    (BY MR. LARKIN)  Okay.  Let me read

11    you a couple statements from Section 1511 of the

12    most recent addition of Professor McCarthy's

13    treatise at pages 15-29.

14              "If buyers are confused between two

15    sources, then this must -- this also means they

16    must have recognized plaintiff's designation as a

17    trademark and associated it only with the

18    plaintiff."

19         A    I'm sorry, I didn't follow.  Could

20    you repeat that, please?

21         Q    "If buyers are confused between two

22    source, then this also means they must have

23    recognized plaintiff's designation as a trademark

24    and associated it only with the plaintiff."

25              MR. LONG:  Objection, form, calls for

Page 91

1    a legal conclusion.

2         A     I just have to say I'm not sure.

3    That probably comes in context of all sorts of

4    other things which I'd have to read to give you a

5    better response.

6         Q     (BY MR. LARKIN)  Okay.  And one more

7    statement from Professor McCarthy, "Evidence of

8    confusion is also evidence of secondary meaning and

9    trademark significance."

10              Do you agree with that statement?

11              MR. LONG:  Objection, form.

12         A     Again, I just have to say I don't

13    know.

14         Q     (BY MR. LARKIN)  Looking back to

15    paragraph 15 of your report, please?  Is it your

16    opinion that in the absence of a survey showing

17    that the Jack Daniel's trade dress had acquired

18    distinctiveness, that you couldn't even test the

19    likelihood of confusion created by the plaintiffs

20    that are -- it would have been improper to test the

21    likelihood of confusion created by the plaintiff's

22    product in this case?

23              MR. LONG:  Objection, form.

24         A     Well, as I mentioned before, because

25    my understanding is that acquired secondary meaning

Page 92

1    has never been established and yet that supposedly

2    exists as part of the trade dress, to test

3    likelihood of confusion over trade dress which has

4    never been established is improper because an issue

5    is being tested that has never been shown to truly

6    exist.

7            Q    (BY MR. LARKIN)  You testified -- is

8    intentional copying of trade dress one way to show

9    secondary meaning?

10               MR. LONG:  Objection to form, calls

11   for a legal conclusion.

12           A    I am not sure.

13           Q    (BY MR. LARKIN)  Other than survey

14   evidence, are you aware of the other things that

15   have been used to show secondary meaning in trade

16   dress?

17           A    Not off the top of my head, no.

18           Q    Are you familiar with Jack Daniel's

19   Tennessee Whiskey?

20           A    Yes.

21           Q    Are you familiar with the packaging

22   for the product?

23               MR. LONG:  Objection, form.

24           A    Which packaging?

25           Q    (BY MR. LARKIN)  The Jack Daniel's

Page 93

1    Old No. 7 black label product.

2                    MR. LONG:  Objection, vague, form.

3        A    If you -- could you show me a bottle

4    and I could tell you?

5        Q    (BY MR. LARKIN)  Look in the Answer

6    and Counterclaim which starts at NOW47 on numbered

7    page 5.

8        A    So you're asking me if I've ever seen

9    the bottle on NOW0051 before in the actual

10   marketplace.  I believe I have.

11       Q    Have you seen Jack Daniel's

12   television and print ads for the product?

13                   MR. LONG:  Objection, vague.

14       A    I can't recall a specific one, but I

15   may well have seen their advertising over the

16   years.

17       Q    (BY MR. LARKIN)  Have you ever been a

18   consumer of the product itself?

19       A    Yes.

20       Q    Are you a regular consumer?

21       A    No.

22       Q    Do you believe that the Jack Daniel's

23   mark is a well-known brand of whiskey in the United

24   States?

25                   MR. LONG:  Objection, form, calls for

Page 94

1    a legal conclusion.

2         A    I am not sure.

3         Q    (BY MR. LARKIN)  Are you aware that

4    the product is the best selling whiskey in the

5    United States?

6              MR. LONG:  Objection, form, lack of

7    foundation.

8         A    I don't recall seeing that in any of

9    these documents but that may well be here, I just

10   don't remember.

11        Q    (BY MR. LARKIN)  In your report you

12   characterize the Bad Spaniels product in several

13   places as a "parody."  Do you recall that?

14        A    Yes.

15        Q    What is your understanding of -- how

16   did you use that word in your -- what is your

17   understanding of the meaning of "parody" as used in

18   your report?

19             MR. LONG:  Objection, again, could

20   you show what portion of the report you're

21   referring to?  Where in the report are you talking

22   about?

23        Q    (BY MR. LARKIN)  Do you understand my

24   question, Dr. Nowlis?

25        A    I think I do.

Page 95

1          Q      Could I have an answer, please?

2          A      Sure.   "Parody" would be something

3     that's making fun of something else.  Mimicking it

4     but exaggerating certain features to make fun of

5     something else.

6          Q      And your understanding is that the

7     Bad Spaniels toy, and I have one here, your

8     understanding is that's a parody of the Jack

9     Daniel's product that we just looked at in the

10    Answer and Counterclaim?

11                MR. LONG:  Objection to form.

12         A      It is a parody of the Jack Daniel's

13    whiskey, no doubt.

14         Q      (BY MR. LARKIN)  Don't most parody

15    products mimic, in your words, products that are

16    well-known?

17                MR. LONG:  Objection, form,

18    foundation.

19         A      Do most parody products mimic

20    well-known products?  Is that what you said?

21         Q      (BY MR. LARKIN)  Yes.

22         A      I am not sure.  It may be, but I just

23    don't know.

24         Q      Don't they have to mimic well-known

25    products for people to get the parody?

Veritext Legal Solutions
866 299-5127

1           MR. LONG:  Objection, form,

2     foundation.

3           A      I'm not sure.

4           Q      (BY MR. LARKIN)  Are you aware that

5     the VIP's label designer who created the front

6     display label and the neck label and the hangtag

7     had a bottle of Jack Daniel's in front of her when

8     she was doing those things?

9           MR. LONG:  Objection, foundation.

10          A      I may have seen that in some of the

11    documents that I reviewed.  Sounds familiar.

12          Q      (BY MR. LARKIN)  Are you aware that

13    VIP's principal, Stephen Sacra, sent pictures of

14    Jack Daniel's bottles to his toy manufacturer in

15    Asia to develop the product?

16          A      I don't believe I am aware of that.

17          Q      Looking at the product, either actual

18    product or you can look in Dr. Ford's report, do

19    you agree that the Bad Spaniels product mimics the

20    portion of the claimed Jack Daniel's trade dress

21    involving a square bottle with a ribbed neck?

22          MR. LONG:  Objection, form.

23          A      I'm not sure what you mean by that.

24          Q      (BY MR. LARKIN)  Do you recognize a

25    square bottle with a ribbed neck to be a feature of

Page 97

1    the Bad Spaniels toy?

2              MR. LONG:  Objection, form.

3        A    I see a square bottle top, I do, and

4    a ribbed neck, it does look like a ribbed neck,

5    yes, I see that.

6        Q    (BY MR. LARKIN)  And do you agree

7    that a black cap is a feature of the Bad Spaniels

8    toy?

9        A    There is a black cap on this toy,

10   yes.

11       Q    Do you agree there is a black neck

12   wrap closure with white printing that bears the Old

13   No. 2 mark?

14             MR. LONG:  Objection, vague.

15       A    I don't see that it encloses it, I

16   see a square black and white label on the front and

17   I see the Old No. 2 on the front.

18       Q    (BY MR. LARKIN)  Do you agree that on

19   the product there is a black front label with white

20   printing with a filigreed border?

21       A    I see a -- yes.  It does appear to be

22   the case.

23       Q    And that the -- that label bears the

24   Bad Spaniels mark in arched lettering at the top of

25   the label?

Veritext Legal Solutions
866 299-5127

```
 1                    MR. LONG:  Objection, form.
 2           A     I see arched lettering, yes, I do.
 3           Q     (BY MR. LARKIN)  Arched lettering is
 4      the Bad Spaniels mark at the top of the label;
 5      correct?
 6                    MR. LONG:  Objection to form.
 7           A     You mean the middle of the label?
 8           Q     (BY MR. LARKIN)  Yeah.
 9           A     Yeah, I see how it kind of arches, I
10      do see that.
11           Q     Do you agree that the Bad Spaniels
12      toy contains the Old No. 2 within a filigreed oval
13      in the middle portion of the label?
14                    MR. LONG:  Objection, vague.
15           A     I see the Old No. 2 in the middle and
16      I see some circles, two circles around that.
17           Q     (BY MR. LARKIN)  And you agree that
18      the words "Tennessee" -- the word "Tennessee"
19      appears at the bottom of the label in script?
20                    MR. LONG:  Objection, form.
21           A     I see that, yes.
22           Q     (BY MR. LARKIN)  Look at paragraph 16
23      of your report, please.  You can put the toy down
24      if you want for a minute.
25                    In that paragraph you discuss
```

Veritext Legal Solutions
866 299-5127

1    "competing brands of whiskey" that have various

2    features.

3                 Do you see that?

4         A     Yes.

5         Q     When did you first learn of the

6    existence of those competing brands?

7         A     I'm not sure.

8         Q     Did you first learn of them when you

9    saw Mr. Wolinsky's Expert Report in this case?

10        A     Well, let's take a look.  So I cited

11   in paragraph 16, I have footnote 15 and that

12   applies to Appendix C.  And there's a number of

13   brands in there.  I see Jim Beam, Benchmark, Ezra

14   Brooks, Evan Williams, Zackariah Harris, and I'm

15   not -- so I guess the question was, was I familiar

16   with any of these brands, when did I become

17   familiar with these brands over time?  I'm not

18   sure.

19        Q     Okay.  When did you first -- when did

20   you first become familiar with the brands that are

21   referenced in Appendix C in your report?

22        A     Okay.  For example, when did I first

23   hear of the name Jim Beam?  I don't know.  When did

24   I first hear of the name of any of these?  I really

25   honestly don't know.

Page 100

1          Q      Well, in your report in footnote 15,

2     which I think was the citation you referenced from

3     paragraph 16, you reference several sources.  The

4     Amended Complaint, the Answer of Jack Daniel's

5     Properties to Amended Complaint, and Jack Daniel's

6     Responses to VIP's First Set of Requests for

7     Admissions.

8                 Do you see those?

9          A      Yes.

10         Q      When did you first receive those

11    documents?

12         A      I believe we went over this earlier

13    in one of my exhibits which showed the date when I

14    received those documents.

15         Q      And looking at NOW36 in Exhibit 106,

16    it's the big stack, again, NOW36, do you have that

17    in front of you?

18         A      I do.

19         Q      That references several of the

20    sources cited your footnote; correct?

21         A      That references the Complaint and the

22    -- I -- yes, it does, some of them.

23         Q      Okay.  And then NOW39 references JDPI

24    Responses to VIP First Set of Request for

25    Admissions.

                                        Page 101

1              Do you see that?

2        A    Yes.

3        Q    And you received all of those

4    documents -- at least the e-mails show you received

5    those documents on July 1 and July 2; is that

6    correct?

7        A    That is correct.  As I mentioned to

8    you earlier, though, I have a recollection that I

9    received the Complaint and the Answer and

10   Counterclaim earlier on.  I believe that was in

11   May.

12       Q    Okay.  But you don't recall receiving

13   the other documents earlier than July 1 or 2;

14   correct?

15       A    That I am really not sure of, yeah, I

16   truly don't remember.

17       Q    What was the significance in your --

18            MR. LONG:  It's in the exhibits.

19   That he received them earlier, if you want to see

20   it.  If you look at NOW34.  Says he received Jack

21   Daniel's Responses of VIP's First Set for --

22            MR. LARKIN:  Yeah, but that's not

23   what he cited in this particular footnote.

24       Q    (BY MR. LARKIN)  Dr. Nowlis, for

25   purposes of your opinion, what was the significance

                                        Page 102

1    of the possible existence of these other brands

2    containing the features you described in paragraph

3    16?

4         A    To show what's happening in the

5    marketplace and to show that there are lots of

6    other brands which have very similar features to

7    what Jack Daniel's is claiming that is part of its

8    trade dress.

9         Q    If the possible existence of these

10   other brands impacted the distinctiveness of the

11   Jack Daniel's trade dress, would you have expected

12   respondents in the test cell to have identified the

13   Bad Spaniels toys as originating from these other

14   brands?

15              MR. LONG:  Objection, form.

16        A    I'm sorry, could you please repeat

17   that?

18        Q    (BY MR. LARKIN)  I'll rephrase it.

19   In the -- how many respondents in Dr. Ford's test

20   cell identified one of these other brands as the

21   company that made or put out the Bad Spaniels toy

22   or sponsored or authorized it?

23        A    I'm not sure, but I could look in his

24   report and try to find that information for you.

25        Q    Do you remember any off the top of

Page 103

```
 1    your head?
 2              A     I don't.
 3              Q     Would it surprise that you only two
 4    respondents in the test cell, respondents 1075 and
 5    1092, identified Jim Beam?
 6              A     No.
 7              Q     And that no respondents in the test
 8    cell identified any other whiskey other than Jack
 9    Daniel's?
10              A     No.  That wouldn't surprise me.
11              Q     Let's look at paragraph 17 of your
12    report.  It's numbered NOW007.  You characterize
13    Dr. Ford's control stimulus in the first
14    parenthetical as a product "that looks like a wine
15    bottle."
16                    Do you see that?
17              A     Yes.
18              Q     Are all whiskey bottles square?
19              A     I don't believe they are.
20              Q     Have you seen round whiskey bottles?
21              A     I think I have.
22              Q     Do you recall any of the brands?
23              A     No.
24              Q     Let me show you -- let's mark what
25    was previously marked as Exhibit 53 in an earlier
```

Page 104

1    deposition.  This is entitled American

2    Whiskey/Bourbon Report.

3                 (Exhibit 53 re-marked for

4    identification by the court reporter.)

5         Q     (BY MR. LARKIN)  Dr. Nowlis, have you

6    seen Exhibit 53 before today?

7         A     I'm not sure.

8         Q     Okay.  This is a, well, the name, the

9    name and the purpose are clear from the first page

10   of the exhibit, SAC0001.  This is a report that

11   VIP's principal, Mr. Sacra, prepared by looking at

12   various whiskey bottles on the internet.  And

13   Exhibit 53 -- I'm sorry.  I'll let you --

14        A     I don't see it listed in any of the

15   documents, so I don't think I've seen it.  But

16   again, I'm not sure.  There's a lot of documents

17   floating around and I'm having trouble keeping

18   track of them all.

19        Q     I understand.  That's fine.  Whether

20   or not you have seen it, as the report describes --

21   as the report describes itself, it is intended to

22   look at 114 bottles used by sellers of whiskey and

23   to break them out into various shapes.

24                 For example, if you look at SAC0010,

25   those are three bottles of what Mr. Sacra's report

                                           Page 105

1    described as a "Round Flare Bottom."

2                Do you see that?

3        A    I do see that.  Yes.  Flared at the

4    bottom and round at the top.

5        Q    SAC0011 is what Mr. Sacra describes

6    as "Bottle Shape Wine" for whiskies.

7                Do you see that?

8        A    I do, yes.

9        Q    And then SAC13 and SAC14 depict

10   various styles of whiskey bottles.  SAC15, SAC19.

11   Do you see the, just, do you see those pages I've

12   just referred to?

13       A    Yes.

14       Q    If you look at SAC0021, that page --

15   that page is captioned American Whiskey/Bourbon

16   Industry - Bottle Shape (Industry Generic Square).

17                Do you see that?

18       A    Yes.

19       Q    And according to Mr. Sacra's

20   analysis, 36 percent of the products he looked at

21   have what he called the "Industry Generic Square"

22   shape.

23                Do you see that?

24       A    Yes.

25       Q    And then if you look at SAC49.

Veritext Legal Solutions
866 299-5127

1               MR. LONG:  Page 49?

2          Q    (BY MR. LARKIN)  SAC49.  Actually,

3     coincidentally, it is page 49.  According to Mr.

4     Sacra's report, only 12.3 percent of the 114

5     bottles that he looked at contained the combination

6     of elements of the "Jack Daniel's Alleged Bottle

7     Trade Dress" that you see described at the top of

8     that page.

9               Do you see that?

10         A    I see a sentence where he says, "This

11    value Represents 12.3 percent of the 114 Bottles

12    Reviewed."

13         Q    Right.

14         A    I see that sentence.

15         Q    And at the top, the value is the

16    number of whiskey bottles that contain a

17    "Combination of all elements in Jack Daniel's

18    Alleged Bottle Trade Dress."

19               Do you see that?

20         A    Yes.

21         Q    Does it affect your opinion on

22    whether the control stimulus in Dr. Ford's test

23    looked like a wine bottle to read the Sacra report?

24         A    No.  Still looks like a wine bottle

25    to me.

Veritext Legal Solutions
866 299-5127

1          Q     On -- look back to your report,

2     please.  I know we're moving around a lot there.

3     On page NOW9, paragraph 18 you wrote, "Thus, the

4     Control toy is drastically different from the Test

5     toy.  It does not even look like a whiskey bottle

6     anymore," and then there is a footnote citation,

7     "but now looks like, in my opinion, a wine bottle."

8     The footnote citation is again to Trademark and

9     Deceptive Advertising Services [sic].

10               Do you see that?

11          A     I do.

12          Q     And you quoted from that work as

13     follows:  "A good control stimulus, if it is a

14     control for an allegedly infringing mark, should

15     appear to be a plausible member of the same product

16     category."

17               Do you see that?

18          A     Yes.

19          Q     Isn't the product category here dog

20     toys, not whiskey?

21          A     The category that would need to -- it

22     would need to be similar to would be some sort of

23     bottle that would look potentially like a whiskey

24     bottle and not something that looks like a wine

25     bottle.

Veritext Legal Solutions
866 299-5127

1      Q     But I want to get your understanding

2    of what the product category is here.  The product

3    category is a dog toy; correct?

4               MR. LONG:  Objection to form.

5      A     Well, when you say "the product

6    category," the -- at least the Bad Spaniel is a dog

7    toy.  But when I am talking about the product

8    category, I am talking about the control needs to

9    mimic the parody category, which is a whiskey

10   bottle.  Not a wine bottle.

11     Q     (BY MR. LARKIN)  So for purposes --

12   your reference to Professor Diamond's quotation

13   there that the control needs to be a plausible

14   member of the same product category, your

15   understanding is the product category is a dog toy

16   in the shape of a whiskey bottle?

17               MR. LONG:  Objection,

18   mischaracterizes prior testimony.  He's already

19   testified it's not a dog toy category.

20               MR. LARKIN:  I don't think he

21   testified that at all.

22               MR. LONG:  I think he testified that

23   for purposes of --

24     Q     (BY MR. LARKIN)  What is the product

25   category, as you understand it, for purposes of

                                      Page 109

1    your reference to Professor Diamond's quotation?

2         A    She said "category," so I, as an

3    expert, need to apply the principles that she has

4    established and that lots of other people have

5    established to determine what that means in this

6    particular circumstance.  And in this particular

7    circumstance it means the product category would be

8    the same product category as the test stimulus,

9    which is a parody of a whiskey bottle.  Not a wine

10   bottle.

11        Q    So a dog toy that -- your opinion is

12   that the category for purposes of the proper -- a

13   proper control here is a parody -- a dog toy that

14   is a parody of a whiskey bottle; is that accurate?

15        A    That would be what the control would

16   need to be a member of that category, yes.

17        Q    Just so I'm clear, in your opinion, a

18   proper control here would have been a parody

19   product containing certain elements; is that

20   correct?  Your understanding is that the Bad

21   Spaniels toy is a parody product --

22        A    Yes.

23        Q    -- because it mimics, I think was

24   your word, the Jack Daniel's product.

25        A    It mimics it in the sense that it

Page 110

1    exaggerates certain features for humorous effect,

2    such as "No. 2" and the words "Poo" and "Smelly,"

3    et cetera, things like that.

4         Q    And is it your opinion that a proper

5    control also would have mimicked another product?

6              MR. LONG:  Objection, form.

7         A    It would have been the similar --

8    again, it would have been a parody.  I already

9    talked before what a parody is.  A parody of a

10   whiskey bottle.

11        Q    Okay.  Doesn't a parody have to

12   reference a specific product to be a parody?  Like

13   Bad Spaniels references Jack Daniel's?

14             MR. LONG:  Objection.

15        A    A parody would need to have the

16   potential -- sure.  It would need to exaggerate the

17   features of a product that it's mimicking for

18   humorous effect.

19        Q    (BY MR. LARKIN)  In your opinion, a

20   proper control product here would have to be a

21   parody that mimics the features of another product;

22   is that correct?

23        A    It would have to be a parody.  My

24   understanding, when I read Dr. Ford's deposition,

25   was that he said the same thing.  The control was

                                      Page 111

```
1    meant to be a parody.  So I don't think we're on
2    opposite ground here.
3                  That's what he meant it to be.
4    That's what it should have been.  I don't think we
5    disagree on that point.  I don't think it is.  He
6    thinks it is.  But I don't -- I think both of us
7    agree that that's what it should be.
8         Q      What product would, in designing the
9    proper control, what product would you have
10   mimicked?
11        A      I don't know.  I didn't do that.  I'm
12   not sure.  All I know is that what he did was not
13   proper.
14        Q      Your last answer indicated that
15   you've reviewed the rough draft of Dr. Ford's
16   deposition.  Is that correct?
17        A      Yes.
18        Q      I assume you did that in preparation
19   for your testimony today because you didn't mention
20   that earlier?
21        A      Yes.  Thank you for mentioning that.
22   You're right.  I did forget to mention that, but I
23   did.
24        Q      Okay.  During your engagement in this
25   case, did you try to design what you believed would
```

Page 112

1    be an appropriate and proper control stimulus?

2             MR. LONG:   Objection.

3         A    No.

4         Q    (BY MR. LARKIN)  Did you try to

5    envision an appropriate and proper control stimulus

6    in your mind's eye, even if you didn't actually

7    design them?

8         A    I did not.

9         Q    Did you think about the elements of

10   the Bad Spaniels product that you believe should be

11   retained in a proper and appropriate control

12   stimulus?

13        A    I didn't go to that level of detail,

14   no.

15        Q    Okay.  Why not?

16        A    Because I didn't think it was

17   necessary.  Because in my opinion, what Dr. Ford's

18   control is flawed, as I mentioned all throughout my

19   report, and I stand by that.  So, therefore, his

20   survey results aren't accurate because he has a

21   flawed control.

22        Q    Should Dr. Ford's control have kept a

23   square bottle?

24        A    Again, I don't -- I didn't go to the

25   point of deep step by step, so I couldn't tell you

                                        Page 113

1    that, exactly what, what it would look like
2    exactly.  I don't know that.  I didn't go that far.
3              All I know is when I critiqued his
4    survey, I determined whether or not this was a
5    proper control or not.  My opinion, it's not a
6    proper control, because of all the reasons I
7    listed, that's as far as I went.
8         Q    I understand that's as far as you
9    went in your report, but since your report did talk
10   about the changes that Dr. Ford made, specifically
11   paragraph 17 beginning on page 6 where you say,
12   "Yet, Dr. Ford's Control Stimulus," and then you
13   list a number of things that he did and so on, and
14   you, you stated later in paragraph 18 on page 8
15   that, "The control cell [sic] has also removed all
16   black coloring from the bottle labels, completely
17   changed the fonts, simply removed white borders
18   without replacing them with other types of borders,
19   removed mention of 'The Old No. 2' without
20   replacing it with something comparable, and even
21   changed the design and color of the hangtag."
22             Do you see that?
23        A    Yes.
24        Q    And then in paragraph 20 on page 9,
25   you wrote about two-thirds of the way down, quote,

                                      Page 114

1    "Instead, the Control dog toy should have replaced

2    the elements of the alleged trade dress with

3    similar elements, and kept other elements that are

4    not part of the trade dress (such as, to my

5    understanding, the color black on the label or

6    hangtag)."

7              Do you see that?

8         A    Yes.

9         Q    What should Dr. Ford have done to

10   replace the elements of the alleged trade dress

11   with similar elements?

12        A    I couldn't tell you specifically what

13   he should have done.  I think we talked about this

14   earlier.  I, my analysis showed that his control is

15   defective but I didn't produce a control, which I

16   would have used instead.

17        Q    And is it correct that you didn't

18   think about what elements you would have retained

19   in order to create what you thought was a proper

20   and appropriate control in this case?

21        A    I didn't go to that point because in

22   my opinion his control was defective; therefore,

23   his survey results are not meaningful, period.

24   That's as far as I went.

25        Q    And sitting here today you don't have

                                        Page 115

1     any opinion on whether he should have kept a square

2     bottle, for example?

3           A     I don't have an opinion about that

4     specific point, no, I do not.

5           Q     Or a black cap?

6           A     I do not.

7           Q     Or a black neck wrap with white

8     lettering?

9           A     I do -- no, I do not go into that

10    detail.

11          Q     Or black front label?

12          A     Again, I don't have an opinion about

13    that one way or the other.

14          Q     Okay.  And do you have an opinion --

15    I think you testified a moment -- sorry, I'll start

16    over.

17                I think you testified a moment ago

18    that a proper and appropriate control would have

19    been a parody product.  Did you give any

20    consideration to whether creating a parody control

21    would, by the nature of a parody, conjure up some

22    other brand and skew the results?

23          A     I think, as I mentioned before, I

24    believe Dr. Ford and I both agree that the goal was

25    to make the control a parody.  So we agree on that,

Page 116

1    and that's the right approach.  Because it can pick

2    up on any noise from the test group that revolves

3    around a parody.

4            But in my opinion his product is not

5    -- his control is not a parody.  He believes it is.

6        Q    Well, I'm not sure I agree with your

7    characterization but that's for another day.  But

8    by definition, a "parody" has to evoke another

9    product; correct?  Or otherwise it's not -- at

10   least not an effective parody.  Do you agree with

11   that?

12       A    Yes.

13       Q    So to do a parody in the control cell

14   would, by definition, have to evoke another

15   product; correct?

16       A    Potentially, yes.

17       Q    Did you give any consideration to

18   what other product you would have evoked if you had

19   created what you thought was a proper control?

20       A    No.

21       Q    In paragraph 17, starting at the

22   bottom of page 6, you wrote, "Dr. Ford's Control

23   stimulus, parenthetical 1, changed the bottle from

24   a square shape with a ribbed neck to a shape with a

25   rounded top and smooth neck that looks like a wine

Page 117

1    bottle."

2                    Do you see that?

3         A     Yes.

4         Q     Would you have retained a square

5    shape with a ribbed neck?

6                    MR. LONG:  Objection, asked and

7    answered.

8         A     I don't know.

9         Q     (BY MR. LARKIN)  The next

10   parenthetical said that Dr. Ford "changed the black

11   cap with the letters BS on the top and a square

12   neck label to a gold label that wraps around the

13   neck of the bottle."

14                   Do you see that?

15        A     Yes.

16        Q     In a proper control, should he have

17   retained the black cap with the letters BS on the

18   top and a square neck label?

19                   MR. LONG:  Objection, asked and

20   answered.

21        A     I don't know.

22        Q     (BY MR. LARKIN)  Parenthetical 3 at

23   the top of page NOW8, you say that Dr. Ford

24   "replaced the words 'Old No. 2' on the neck of the

25   bottle with the words 'Poo Poo on your Tennessee

                                        Page 118

1    Carpet."

2                      Do you see that?

3          A      Yes.

4          Q      Should he have retained a number?

5          A      I'm not sure.

6                      MR. LONG:  Objection, asked and

7    answered.

8          Q      (BY MR. LARKIN)  And parenthetical 3

9    -- actually there are two parenthetical 3s, but the

10   second parenthetical 3, you said that Dr. Ford

11   "completely removed the black front labeling."

12                     Do you see that?

13         A      Yes.

14         Q      Should he have retained the black

15   front labeling?

16                     MR. LONG:  Objection, asked and

17   answered.

18         A      I'm not sure.

19         Q      (BY MR. LARKIN)  Parenthetical 4, you

20   say that Dr. Ford "replaced the words 'The Old No.

21   2' on the front the label with 'Poo Poo'."

22                     Do you see that?

23         A      Yes.

24         Q      Should he have retained some --

25   should he have retained the Old No. 2?

Veritext Legal Solutions
866 299-5127

1           A      I'm not sure.

2                  MR. LONG:  Objection, asked and

3      answered.

4           Q      (BY MR. LARKIN)  And parenthetical 5,

5      you said he "removed the white filigreed border

6      completely."

7                  Should he have retained it?

8                  MR. LONG:  Objection, asked and

9      answered.

10          A      I am not sure.

11          Q      (BY MR. LARKIN)  Parenthetical 6, you

12     say he "changed the font on the front of the label

13     and replaced curved letters with straight letters."

14                 Should he have retained the font and

15     the curved letters?

16                 MR. LONG:  Objection, asked and

17     answered.

18          A      I'm not sure.

19          Q      (BY MR. LARKIN)  And parenthetical 7,

20     you say that Dr. Ford "even changed the color of

21     the hangtag from black to yellow and removed the

22     white border around it."

23                 Should he have removed the black

24     hangtag?

25                 MR. LONG:  Objection, asked and

                                          Page 120

```
 1   answered.
 2        A    I'm not sure.
 3        Q    (BY MR. LARKIN)  At the bottom of
 4   that paragraph, at the bottom of page 7, you say
 5   that, "In addition, the words 'Limited Guarantee:
 6   For defects in workmanship.  To read the full
 7   details of our Limited Guarantee, please visit
 8   www.vipproducts.com' and 'This product is not
 9   affiliated with Jack Daniel Distillery' were also
10   removed from the Test dog toy to create the Control
11   toy."
12             Do you see that?
13        A    Yes.
14        Q    Should he have retained in his
15   control the disclaimer of affiliation with Jack
16   Daniel Distillery?
17             MR. LONG:  Objection, asked and
18   answered.
19        A    I'm not sure.
20        Q    (BY MR. LARKIN)  At the top of page
21   NOW009 you wrote, "In fact, the only direct
22   similarities between the Test and Control toys are
23   the picture of the dog itself, the design of the
24   'Silly Squeakers' brand name, and some of the words
25   on the back of the hangtag."
```

Page 121

1                    Do you see that?

2          A     Yes.

3          Q     Do you agree that in the control

4    stimulus, the Bad Spaniel mark continues to appear

5    at the top of the front label, just not an art

6    depiction?  On the product, not on the hangtag, I'm

7    sorry.  I should have been clear.

8                    Do you agree that on the stimulus

9    product, the Bad Spaniel's mark appears, just not

10   in an art depiction?

11         A     Yes.

12         Q     Do you agree that the words "on your

13   Tennessee Carpet" appear at the bottom, just not in

14   the script?

15         A     Yes.

16         Q     What was your understanding of the

17   meaning of the words "Old No. 2" on the Bad

18   Spaniels product?

19         A     My takeaway is it refers to poop.

20         Q     Okay.  And poo poo also refers to

21   poop; correct?

22         A     Yes.

23         Q     And the words "Poo Poo" appear in the

24   middle of the front of the bottle on the control

25   stimulus; correct?

                                        Page 122

1          A      Yes.

2          Q      And Dr. Ford retained the words 43

3    percent poo by volume and 100 percent smelly on the

4    control stimulus; correct?

5          A      Yes.

6          Q      Look at paragraph 19 of your report,

7    please, that begins on NOW9 and goes over to the

8    next page.  At the top of NOW0010, you wrote,

9    quote, "And yet, less than 1 percent of respondents

10   seeing the Control dog toy thought that it was put

11   out by Jack Daniel's.  This very low number

12   indicates that the design of the Control dog toy is

13   likely defective.  In particular, this very low

14   number indicates that respondents likely did not

15   even think of the Control dog toy as a whiskey

16   bottle because, if they did, more than 1 percent of

17   respondents should have mentioned Jack Daniel's,

18   since the alleged Jack Daniel's trade dress is

19   supposedly a famous trade dress of whiskey."

20               Do you see that?

21         A      Yes.

22         Q      How do you know that in a proper

23   control, more than 1 percent of the respondents

24   would have mentioned Jack Daniel's?

25         A      Because if Jack Daniel's is truly

Page 123

1    famous and well-known, as is alleged in this case,

2    and if someone were to see a whiskey bottle, then I

3    know from experience that more than 1 percent,

4    seeing a whiskey bottle, for a very famous,

5    well-known brand, should have thought that it was

6    that brand.

7        Q    Is there an expected level of noise

8    that a proper control should generate?

9        A    No.

10       Q    What was the experience that you

11   mentioned a moment ago in your answer?

12       A    So we, you said is there a certain

13   number, I said no, it depends on the situation.

14   But my experience as knowing about consumer

15   behavior, as an expert on consumer psychology, as a

16   marketing professor, that if somebody sees a member

17   of a certain product category, that if it truly is

18   part of that category, then certainly more than 1

19   percent of respondents should think, just guess,

20   that it's part of that product category.

21       Q    Is that based on any empirical

22   research you have ever done?

23       A    I can't cite a particular study but

24   that's based on my knowledge and my expertise.

25       Q    Is that based on any litigation

Veritext Legal Solutions
866 299-5127

1    surveys you have ever done?

2         A     Nothing comes to mind.

3         Q     You have -- you testified earlier

4    this morning that you have done some likelihood of

5    confusion surveys, I think we had a hard time

6    establishing exactly how many, but have you used a

7    control in each of those?

8         A     I think so.

9         Q     Do you recall the level of noise in

10   the control cell in those cases?

11        A     I do not.

12        Q     Do you agree that the best way to

13   test the proposition in paragraph 19, that more

14   than 1 percent of the respondents in a proper

15   control test should have answered Jack Daniel's

16   would be to develop a, what you consider to be a

17   proper control stimulus and test?

18             MR. LONG:  Objection, form.

19        A     No.  I think that this best way to

20   establish this is, as I already pointed out, that

21   if, logically, this brand is supposedly, as you

22   mentioned to me earlier on today, the best seller

23   in the category, very well-known, lot of marketing,

24   et cetera, et cetera, given that information, I

25   know that if somebody then saw that as a member of

Page 125

1    that product category and were to guess what, who

2    made or put that out, you would certainly get a

3    number higher than 1 percent.

4         Q    (BY MR. LARKIN)  In your opinion, how

5    much higher?

6         A    I don't know.

7         Q    You don't know whether that -- your

8    supposition is correct without actually testing it;

9    right?

10        A    No, I am confident that my

11   supposition is correct based on principles of

12   consumer psychology that I study on a regular

13   basis.

14        Q    You didn't -- did you consider trying

15   to actually create what you consider to be a proper

16   control in this case?

17             MR. LONG:  Objection.

18        A    We talked about this before.  I did

19   not.

20        Q    (BY MR. LARKIN)  What would the level

21   of Jack Daniel's noise have been in a control test

22   with a proper stimulus?

23             MR. LONG:  Objection, form of the

24   question.

25        A    I'm not sure what that number would

Page 126

1   be.

2          Q      (BY MR. LARKIN)  Can you even give me

3   a range that you believe that number would be?  I

4   assume you believe it's more than 1 percent.  How

5   much more?

6                 MR. LONG:  Objection, asked and

7   answered.

8          A      I'm not sure.

9          Q      (BY MR. LARKIN)  Is there any

10  academic literature or survey literature that

11  describes the expected level of noise in a control

12  cell that employs a proper control stimulus?

13         A      I think I said this before.  There is

14  no, quote unquote, expected level, period.  It

15  depends on the situation.  So every survey has to

16  be analyzed individually, given all of the

17  information about it, and that's what I did for

18  this particular survey.

19         Q      Do you have an opinion as to how much

20  more than 1 percent the noise in a properly

21  conducted control test would have been?

22                MR. LONG:  Objection, asked and

23  answered.  I think several times.

24         A      I do not.

25                MR. LARKIN:  Why don't we take a

                                      Page 127

1    lunch break now and we can eat.  And we'll continue

2    working away.  Thank you.

3                (Off the record.)

4          Q    (BY MR. LARKIN)  Back on the record.

5    Dr. Nowlis, in the Rebuttal Expert Reports that you

6    have previously prepared in likelihood of confusion

7    cases involving surveys, have you criticized the

8    control stimulus used by the other expert in each

9    case?

10         A    I'm not sure.

11         Q    Do you believe that it is difficult

12   to design a proper control?

13         A    No.

14         Q    Look back at your report, please, on

15   page 9, your second criticism of Dr. Ford's report

16   is entitled "Failure to replicate marketplace

17   conditions."

18                Do you see that?

19         A    Yes.

20         Q    You've done multiple online surveys

21   in your academic research; correct?

22         A    Yes.

23         Q    How many such -- how many online

24   surveys have you done for purposes of litigation?

25         A    I'm not sure what the number is.

                                          Page 128

1          Q      You agree that internet surveys are
2    now a very common form of market research?
3          A      Yes.
4          Q      Do you agree that data collected
5    using internet surveys does not differ in quality
6    from that collected using other means such as
7    through as through phone or mall intercept surveys?
8                      MR. LONG:  Objection.
9          A      If designed properly, that is true.
10         Q      (BY MR. LARKIN)  Is there research or
11   scholarship to support that proposition?
12         A      That the results from an internet
13   survey will produce similar results to surveys
14   using other methodologies, assuming that the survey
15   is designed properly, is there research?  I've
16   cited research on that before.  I believe there's a
17   paper by Hal Poret that I've cited.
18         Q      Okay.  And in the Bowe litigation
19   that we talked about a little bit earlier today,
20   you did an internet survey in that case.  Correct?
21         A      Yes.
22         Q      And your survey in the Telebrands
23   case was also an internet survey; correct?
24         A      I don't recall, but I could check it
25   out.  I'll take your word for it because you've

Page 129

1    read this more recently than I have.

2         Q    I don't want you to do that.  We

3    looked at your report in that case, why don't we

4    just quickly reference that.  That was Exhibit --

5         A    Exhibit 110.

6         Q    Exhibit 110.  Thank you.

7         A    Yes, it was an internet survey.

8         Q    And do you recall that in that case

9    the product at issue was involved in -- excuse me.

10   Strike that.

11             Do you recall that in the Telebrands

12   case the product at issue was available online

13   through an infomercial and in retail stores?

14        A    Yes.

15        Q    Do you believe that Dr. Ford should

16   have done -- strike that.

17             Do you recall that Dr. Ford's survey

18   should have been done using a means other than the

19   internet?

20        A    No, I don't have a problem with the

21   internet per se, as long as it's done properly.

22        Q    Okay.  Look back to your report,

23   please, it's Exhibit 65.  And at the bottom of your

24   section on, entitled "Failure to replicate

25   marketplace conditions" begins on the bottom of

                                        Page 130

1    page 9 and continues over to page 10 and subsequent

2    pages.  I'd like you to look at the top of page 10

3    if you would, please.  I think you're there.

4            You wrote that, "However, Dr. Ford

5    only allowed respondents to see two direct views of

6    the product:  a front view, and the back of the

7    hangtag."

8            Do you see that?

9        A    Yes.

10        Q    And then you go on to say, "Thus, the

11    respondents could not see either side of the

12    product, or the back of the product, or the top of

13    the product (with the word BS on it), or the bottom

14    of toy (which has a little round button where a

15    squeaking noise is emitted if someone squeezes the

16    toy)."

17            Do you see that?

18        A    Yes.

19        Q    What information is provided to a

20    consumer from the sides of the VIP product?

21        A    The way that it looks from the side,

22    or the way that it looks from the back or the way

23    that it looks from the bottom or the way that it

24    looks from the top.

25        Q    Does any of that provide information,

Page 131

1    in your opinion, as to the source or the

2    sponsorship of the product?

3         A    It certainly could.  I think it's a

4    very important principle to at least give the

5    respondent the opportunity to look at the entire

6    product and let the respondent determine whether

7    that has any bearing on their answers or not.  But

8    you shouldn't withhold that information so the

9    respondent cannot see it.  That's not proper.

10         Q    Why would having been able to see the

11    sides of the product affect consumer perception

12    here?

13         A    Because if the goal of the survey is

14    to replicate marketplace conditions, and I believe

15    that would be Dr. Ford's goal but I don't think he

16    accomplished that goal, because in the marketplace

17    he asked the person, I think his survey said

18    examine this product as though you were in a store.

19    Okay?  If somebody's in a store, they clearly can

20    look at the back, the sides, the top, whatever

21    angle they want to look at, and they can use that

22    information to form their judgments about the

23    product.

24              How exactly each respondent would do

25    that, I don't know, but do I know that it's

Page 132

1    important to let each respondent have that

2    information because it absolutely could affect

3    their responses.

4         Q    How would having been able to see the

5    sides of the product change the results in Dr.

6    Ford's survey?

7         A    Again, I couldn't specify for each

8    individual consumer.  He had 400 people in here in

9    his survey, how for each of those 400 it would have

10   changed, that I don't know that, but do I know that

11   if he wants his survey results to be applicable to

12   the real world, then you have to give people the

13   opportunity to see all the different sides of a

14   product just as they would in their real world so

15   that they could base their judgments on the same

16   information they would have.  But he didn't give

17   them that information.

18        Q    But you don't know that the results

19   would have been any different if consumers -- if

20   respondents, not consumers -- respondents had been

21   able to see the side of the product; correct?

22        A    I couldn't tell you exactly how it

23   would change.  All I know is that it should have

24   been offered.  That information.

25        Q    And you don't know if it would have

Page 133

1    changed the results; correct?

2         A    I'd have to speculate, I don't know.

3    But I do know that it's important to give people

4    that information.

5         Q    And is the same true about the

6    ability to see the back of the product?  You don't

7    know if the ability to see the back of the product

8    would have changed the results in the test cell;

9    correct?

10        A    Yeah, I don't know how it would have

11   affected each of the 400 people individually, I'd

12   have to guess at that.  But again, I do know that

13   it should -- all of that information should have

14   been available to the respondent.

15        Q    What information is provided on the

16   top of the product?

17        A    Well, it says the word "BS."

18        Q    What would -- why would having been

19   able to see I guess it's the letters "BS" affect

20   consumer perception?

21        A    Because it's giving them information

22   that's on the package that they should be able to

23   see.

24        Q    But again, you don't know if having

25   been able to see that information would have

                                              Page 134

1  changed the results in the test cell in any way, do

2  you?

3          A       Again, I don't know how that

4  information would affect each of the 400

5  respondents individually.  But do I know that

6  withholding it does not allow us to replicate

7  marketplace conditions.

8          Q       In your last several answers you

9  refer to each of the individuals "individually."

10  Each of the respondents "individually."  You don't

11  know in the aggregate whether being able to see the

12  sides of the product would have changed the results

13  in the test cell, do you?

14          A       Yeah, I don't, I don't know that.

15          Q       And the same is true for having been

16  able to see the back of the product in the

17  aggregate; correct?

18          A       I don't know how it would have

19  affected the results.  I just know that it should

20  have been available to them.

21          Q       And the same is true about being able

22  to see -- or not being able to see the top of the

23  product; correct?

24          A       Yes.

25          Q       And the bottom of the product;

                                                    Page 135

1    correct?

2         A    Yes.  We should point out that the

3    bottom of the product does have a little circle to

4    it that when you squeeze it, it makes a little

5    squeaking noise.  So that information was not

6    available to the respondent.

7         Q    But you don't know if having that

8    information would have changed the results of the

9    test cell in the aggregate, do you?

10        A    I couldn't -- I wouldn't be able to

11   know that.  No.

12        Q    Okay.  Farther down on -- in

13   paragraph 21 on page NOW11 of your report, you

14   wrote, "In addition, respondents could not read the

15   front of the hangtag because it was blocked by the

16   toy and respondents had no way to manipulate the

17   toy so that they could read it."

18              Do you see that?

19        A    Yes.

20        Q    What information is provided by the

21   front of the hangtag?

22        A    Well, I'm going to have to move it

23   myself here so I can see it.  Do you want me to

24   read all of it?

25        Q    No.  I just want you to tell me in

                                            Page 136

1     general what information is.

2          A     Well, first, one very important piece

3     of information is the brand name itself.  Silly

4     Squeakers is here on the front of the label.  And

5     in the picture I can't read that.  I think one of

6     the respondents mentioned that too.

7          Q     But that brand name is clearly

8     visible on the back in the same logo; correct?

9          A     It is, but you asked me what

10    information was on the front the label that they

11    cannot view in this survey that they could view in

12    the real world.  I'm giving you that answer.

13         Q     Fair enough.

14         A     So they cannot read the brand name

15    Silly Squeakers.  And then below that, they can't

16    read other information that's on the package.

17         Q     I notice in your last answer you're

18    physically manipulating the hangtag to enable you

19    to read it; correct?

20         A     Yep.

21         Q     That could only be done in a mall

22    intercept or some other survey format where the

23    respondent would be allowed to actually hold the

24    toy; correct?

25         A     No.

Page 137

1          Q      Okay.  How else could it be done?

2          A      He could have shown them a picture of

3     it or they could have read it online.

4          Q      But showing them a picture would not

5     replicate the way in which the product is actually

6     sold, would it?

7          A      It would have given them the same

8     information that someone could see in the real

9     world, and an online survey is supposed to mimic

10    that process.

11         Q      Do you agree that reading the front

12    of the label is difficult on the actual product

13    because you have to move -- you have to manipulate

14    the hangtag to read it in portions?

15              MR. LONG:  Objection, form.

16         A      I wouldn't call it difficult.  You do

17    have to move things around to read it but I

18    wouldn't call it difficult.

19         Q      (BY MR. LARKIN)  And again, you have

20    no idea whether being able to read the front of the

21    hangtag would have changed the results of the test

22    cell in the aggregate, do you?

23         A      I don't know exactly what it would

24    have done to the results.  Again, I just know that

25    it, it should have been available and even as I

                                        Page 138

1    pointed out here in my report, even respondent --

2    one of the respondents even flat out said that they

3    couldn't read it.

4         Q    If the information on the front the

5    hangtag was important to the purchase decision, why

6    do you think VIP affixed the hangtag to the bottle

7    in the way in which you see it in front of you?

8                   MR. LONG:  Objection --

9         A    I don't know why VIP did it that way.

10                  MR. LONG:  -- calls for speculation.

11        Q    (BY MR. LARKIN)  At the bottom of

12   page NOW11, the last sentence begins, "Thus,

13   respondents could not read either the details about

14   the product on the front of the hangtag, nor even

15   the brand name itself in some cases, because the

16   toy blocked the brand name, and again the

17   respondents had no way to handle the product so

18   that the front of the label could be read."

19                  Do you see that?

20        A    Yes.

21        Q    Would you look at Dr. Ford's full

22   report for a moment, please, which we marked as

23   Exhibit 113?

24        A    Okay.

25        Q    Did you review Dr. Ford's full report

Page 139

1    including all of the verbatims in the Test and

2    Control cells?

3          A     Yes.

4          Q     Do you recall seeing that a number of

5    the respondents identified the brand name of the

6    product as Silly Squeaker?

7          A     I do recall that, yes.

8          Q     Okay.  And do you recall that only

9    one of the respondents, the one you cited your

10   report, respondent 1001, mentioned that he or she

11   could not read the tag that said "Silly S"

12   something?

13         A     I believe that is true.

14         Q     If the -- if respondents could read

15   the brand name on the back of the hangtag, why

16   would being unable to read the brand name on the

17   front of the hangtag matter?

18         A     Because it's a very important

19   principle to replicate marketplace conditions and

20   to give people the same information they would have

21   in the marketplace, and if in the marketplace they

22   could see it in two different spots, they should be

23   allowed to see that.

24               Especially because on the front of

25   the label, Silly Squeakers is much larger font size

                                        Page 140

1    than on the back of the label.  So to withhold that

2    information I think is -- was a mistake.

3         Q    You agree that it was possible in the

4    survey to increase the resolution of the back of

5    the hangtag beyond what it is in the actual

6    marketplace?

7         A    Let me take a look at his survey

8    because I believe that you could click to enlarge

9    the image on the front and the back.  I know he

10   could for the front.  Just double checking on the

11   back here for a minute.

12        Q    Sure.

13        A    So, yes.  The back of the hangtag, if

14   someone clicked on it to enlarge it, it would be

15   larger than what they would see in the marketplace.

16        Q    In paragraph 21 in your report on

17   page 11, you stated that, quote, "it is even

18   difficult to read all of the words that appear on

19   the front of the toy itself, such as '43 percent

20   poo by volume' and '100 percent smelly' even if the

21   image is enlarged."

22             Do you see that?

23        A    Yes.

24        Q    What was your basis for stating that

25   "it's even difficult to read all of the words that

                                        Page 141

1    appear on the front of the toy"?

2        A    Because when I was looking through

3    the screen shots from the survey, I noticed that

4    even in the enlarged images, it was hard to read

5    that.  I'll give you an example.  If you look at

6    Exhibit 113, C 20.

7        Q    Appendix -- help me out here.

8        A    So this would be Appendix C.  It's

9    all the way at the bottom.  Just says C 20.  It's

10    towards the back of the report.

11        Q    Got it.

12        A    You'll see a picture of the bottle

13    enlarged, still smaller than the actual size in the

14    marketplace, and if you look at that, you'll see

15    that at the bottom, the "43 percent poo by volume"

16    and "100 percent smelly" are blurry and hard to

17    read.

18        Q    Okay.  Do you recall any respondent

19    answering that he or she could not read what was at

20    the bottom of the label?

21        A    I don't recall.

22        Q    And to qualify in the screener

23    questions, respondents were required to affirm that

24    they could clearly see the toy and clearly see the

25    hangtag; correct?

Page 142

1          A      Let me look for the exact language.

2    Yes, they were asking the screener if they could

3    clearly see the dog toy, and they were also asked

4    could you clearly read the hangtag.

5               So it's sort of unusual that people

6    would say yes when it's obvious you can't read the

7    front of the hangtag.  I don't think that's --

8    anybody would dispute that.  It's just a fact that

9    the -- that a big chunk of the front of the hangtag

10   is blocked.

11         Q      Well, only 14 out of 1,000

12   respondents responded that they could not clearly

13   see the dog toy; correct?

14         A      I don't know what that number is.

15   I'll take your word for it.

16         Q      You don't need to.  Dr. Ford's survey

17   excluded those respondents who answered that they

18   could not clearly see the dog toy or not clearly

19   see the hangtag; is that correct?

20         A      He did.

21         Q      Okay.  How would you have shown the

22   toy and the hangtag to respondents?

23         A      Well, I certainly would have let them

24   see all the information on the front of the

25   hangtag.  They could have had a view of that front

Page 143

1    of the hangtag that took it off the package so that

2    they could clearly read what it said.

3         Q    And with respect to the toy per se,

4    how would you have shown the toy to respondents if

5    you were doing a survey online?

6         A    I would have shown it to the

7    respondent from multiple angles so they could see

8    the side and the back and the bottom and the top.

9         Q    Did you, in the course of your

10   engagement, did you mock up, for lack of a better

11   term, the test cell stimulus that you would have

12   used?

13        A    No.

14        Q    Did you consider that in your mind's

15   eye?

16        A    I considered in my mind's eye what

17   the proper procedure would be and the proper

18   procedure would be to show the respondent all the

19   different angles and then I just naturally think in

20   my mind what those angles would look like.

21        Q    Have you see the Bad Spaniels toy

22   displayed on the internet?

23        A    I am not sure.  I think I have but

24   I'm not 100 percent on that.

25        Q    Recognizing you are a not 100

Page 144

1   percent, do you believe that you have seen it on

2   the VIP website?

3             MR. LONG:  Objection, foundation.

4        A    I may have.

5        Q    (BY MR. LARKIN)  Do you believe that

6   you've seen it on other websites?

7             MR. LONG:  Objection.

8        A    I may have seen it on others but I am

9   not sure right now.

10            MR. LARKIN:  Let's mark as 114 -- I'm

11  sorry, this has already been marked.  This has been

12  marked as Exhibit 40 at an earlier deposition, so

13  let's retain that number if we could, please.

14            (Exhibit 40 re-marked for

15  identification by the court reporter.)

16       Q    (BY MR. LARKIN)  Dr. Nowlis, we've

17  shown you what was previously marked at another

18  deposition as Exhibit 40.  This is, I'll represent

19  to you that this is, or probably more precisely was

20  the manner which the Bad Spaniels toy is depicted

21  on the VIP website.

22            Does looking at Exhibit 40 refresh

23  your memory as to whether you've seen the toy

24  exhibited on VIP's website?

25       A    I believe I have.  This does look

                                    Page 145

1    familiar.

2         Q     The -- on VIP's website you can't

3    read the front of the hangtag; correct?

4         A     Yes.   That is correct.

5         Q     And you can't read, or at least I

6    can't read the mark that appears on the front

7    hangtag against an orange background; correct?

8         A     Yes.   Just like in Dr. Ford's survey.

9         Q     Okay.   There are three -- excuse me.

10   There are four views of the product shown on

11   Exhibit 40.  Do you recall, when you visited the

12   VIP website, clicking on the various depictions of

13   the product that are shown in Exhibit 40?

14        A     I believe I do, yes.

15        Q     Okay.  Can you read the top of the --

16   what we have been I think referring to as the cap

17   on Exhibit 40?

18        A     I don't recall.

19        Q     Looking at Exhibit 40, can you read

20   the top of the cap?

21        A     I cannot.  But I believe you could

22   enlarge these lower images, which I can't do on

23   this piece of paper.

24        Q     Do you recall having done that?

25        A     I think I did.

Page 146

1              Q      Do you recall being able to see the
2      -- what was printed on the top of the cap when you
3      did so?
4              A      I don't recall.
5              Q      Do, sitting here today, do you recall
6      seeing the Bad Spaniels product displayed on other
7      websites besides VIP's?
8              A      As I mentioned earlier, I may have.
9      I don't recall which one I would have seen it on.
10             MR. LARKIN:   Okay.   Let's mark what
11     was previously marked as Exhibit 64.
12             (Exhibit 64 re-marked for
13     identification by the court reporter.)
14             Q      (BY MR. LARKIN)   Dr. Nowlis, have you
15     seen the pages from the website that we marked as
16     Exhibit 64 at an earlier deposition that we just
17     handed to you?
18             A      Let me take a look.   I don't recall
19     seeing this website before today.
20             Q      Okay.   Look at -- these are not
21     numbered, but the seventh page into Exhibit 64,
22     please?
23             A      Okay.
24             Q      And that should be a page of Beer &
25     Liquor Dog Toys?

                                    Page 147

```
1              A      I see that.
2              Q      Do you agree that the -- you cannot
3     see the top of the cap of the Bad Spaniels squeak
4     dog toy on that page?
5              A      That appears to be the case.
6              Q      And you can't see the side or the
7     back of the toy or the bottom of the toy; correct?
8              A      That appears to be the case.
9              Q      And there is no hangtag depicted
10    there?
11             A      That appears to be the case.
12             Q      And then if you go into the document
13    three more pages where there is a larger picture of
14    the Bad Spaniels squeak dog toy, do you agree that
15    you can't see the -- what's written on the top of
16    the cap on that page?
17             A      That appears to be the case.
18             Q      And you can't see the -- at least one
19    of the sides and the back or the bottom; correct?
20             A      That appears to be the case, yes.
21             Q      And there is no hangtag depicted
22    there?
23             A      That is correct.
24             MR. LARKIN:  And let's mark as
25    Exhibit 66 what was previously marked with that
```

Page 148

1    number in another deposition.

2                (Exhibit 66 re-marked for

3    identification by the court reporter.)

4        Q    (BY MR. LARKIN)  Dr. Nowlis, I show

5    you what we've marked as -- what we marked as

6    Exhibit 66 at another deposition in this case.

7    Those are pages from Amazon.com.

8                Are you familiar with Amazon.com?

9        A    Yes.

10       Q    Can you give me a one sentence

11   description of what it is?

12       A    They sell many different products

13   online.

14       Q    Do you recall seeing the Bad Spaniels

15   product on the Amazon.com website?

16       A    I believe I have before, yes.

17       Q    And on the first page of Exhibit 66,

18   there is an image of the Bad Spaniels toy at the

19   top.

20                Do you see that?

21       A    Yes.

22       Q    Do you recall seeing that on the

23   Amazon.com website?

24       A    I do, yes.

25       Q    Underneath the image are the words

                                    Page 149

1    "Roll over image to zoom in."  Did you roll over

2    the image when you visited that website?

3            A     I believe I did, yes.

4            Q     When you did that, were you able to

5    read the top of the cap?

6            A     I don't recall.

7            Q     Were you able to see the side or the

8    back or the bottom of the toy?

9            A     From this image that I am looking at

10   right here?  I think it just blew up this one front

11   image.

12           Q     Okay.  And there are two smaller I

13   guess thumbnail, for lack of a better word, images.

14   Do you see those?

15           A     Yes.

16           Q     The bottom one is turned to orient

17   the product to see some of the side.

18                 Do you see that?

19           A     Yes.

20           Q     Do you recall being able to zoom over

21   that image?

22           A     I believe so.  I believe when you

23   click on it, it enlarges it.

24           Q     Okay.  And the images of the Bad

25   Spaniels toy on Exhibit 66 do not bear a hangtag.

                                          Page 150

1    Correct?

2         A     Yes.  That is correct.

3         Q     Do you recall any other websites

4    where you saw the toy?

5         A     No.

6         Q     Going back to your report, please,

7    Exhibit 65, paragraph 22, "In addition, if a

8    consumer were shopping for the Bad Spaniels dog toy

9    in a store in the actual marketplace, the consumer

10   would be able to touch the toy.  This is important

11   because the toy emits a squeaking noise if

12   squeezed."

13             Then you went on to say, "The failure

14   to allow consumers to have this tactile or auditory

15   information is a major defect in the methodology of

16   the Ford survey."

17             Do you see that?

18        A     Yes.

19        Q     The only way to cure that alleged

20   major defect would be to allow the respondents to

21   actually touch the toy; correct?

22        A     No.

23        Q     How could you cure it?

24        A     Well, let me take a step back, too,

25   and make a comment about a lot of these things that

Page 151

1    we have been looking at today.

2              I want to remind everybody that Dr.

3    Ford said the purpose of his survey was to

4    replicate what a consumer would see in a store.

5    And if the instructions that he gave respondents

6    were please -- let me see.  He said, please look at

7    this display of products for dogs as you would if

8    you saw it in a store and were considering

9    purchasing a dog toy.

10             So all -- his survey doesn't show

11   people all of the information they would have in a

12   store.  You've shown me things that are available

13   online but that's not information that would be in

14   a store and Dr. Ford himself in his survey said the

15   purpose of his survey was to replicate a store

16   environment, and in a store environment you would

17   have a hangtag on, I assume.

18             So all of the store information is

19   not available.  If his purpose was to replicate an

20   internet site, well, that would have been a

21   completely different survey.

22             And furthermore, you mentioned, for

23   example, I'm going to go back to one of your

24   exhibits, this is Exhibit 64, and I'm going to go

25   to page 10.  This is a picture of the Bad Spaniels

Page 152

1    squeak dog toy from Boozin' gear.com.

2                Now, this is an online

3    representation, again, Dr. Ford was trying to do in

4    store, but even in the online representation you'll

5    see the description of the product.  And it says,

6    "Tall bottle of Bad Spaniels liquor, our Jack

7    Daniel's style squeaker toy.  This safe, durable

8    rubber dog toy squeaks when squeezed."

9                So he -- this website tells the

10   person two important pieces of information.  A,

11   it's rubber.  That's giving people tactile

12   information, explaining tactile information in an

13   online format; and second of all, it's telling that

14   it squeaks when you squeeze it.

15               In Dr. Ford's survey, people had no

16   way of knowing that.  So even in an online survey

17   they try to give people that information.  again,

18   Dr. Ford didn't do that anywhere.

19        Q    Would you have done that, would you

20   have -- strike that.

21               Well, I think you said earlier that

22   you didn't have any objection to Dr. Ford doing the

23   survey online per se.  If you had been doing the

24   survey online, would you have included references

25   to the fact that the toy was rubber?

                                    Page 153

1          A     I'm not sure.  But I would have tried

2     to, the best I could, if the purpose of my survey

3     was to replicate what a consumer -- the information

4     a consumer would have in the store, then would I

5     try to give as much information as I could to

6     replicate that environment.

7                If it was to do it on the internet,

8     this was not Dr. Ford's intent, then I would have

9     done it a little bit differently.

10         Q     But to answer -- well, isn't every

11    likelihood of confusion survey supposed to in some

12    manner replicate the buying conditions for a

13    particular product?

14         A     Yes.

15         Q     Okay.  If you had done this survey

16    online as opposed to mall intercept, would you have

17    included in the information provided to the

18    respondents the fact that the toy was made out of

19    rubber?

20         A     I'm not sure.  I may well have.  I'd

21    have to think about that.

22         Q     Would you have included the

23    information that the toy emits a squeaking noise if

24    squeezed?

25         A     I may well have.  I'm not sure,

                                        Page 154

1    though.  I'd have to think about that.

2         Q    What information is provided --

3    strike that.

4              How would the fact that the toy emits

5    a squeaking sound when squeezed be relevant

6    information about the source or sponsorship of the

7    toy?

8         A    Again, it's important as an important

9    principle to give the respondent all of the

10   information they would have in the marketplace to

11   see how that would affect their response.  A

12   squeaking noise, for example, reinforces the idea

13   that it's a toy.  That it's a dog toy that squeaks

14   when it's squeezed.  I think that's important

15   information for the respondent to have.

16        Q    On the back of the hangtag, the mark

17   Silly Squeakers appears; correct?

18        A    Yes.

19        Q    Doesn't that communicate that the toy

20   squeaks?

21        A    Not necessarily.  I might not -- as a

22   consumer, it doesn't necessarily mean that it

23   squeaks.  Squeaker could mean different things.

24        Q    You testified earlier that you

25   reviewed all of the verbatim responses in both the

Page 155

1    Test and Control cells.  Do you recall seeing

2    respondents who identified the toy as having a

3    squeaking sound or being a squeaking toy?

4         A    I don't remember one way or the

5    other.

6         Q    Would you look at the verbatims in

7    Dr. Ford's report, please?  That's Appendix B.

8         A    Okay.  I am at Appendix B.

9         Q    The respondents were identified by

10   number.  Correct?  So if I use a number, you will

11   understand that that's identifying a particular

12   respondent?

13        A    Yes.

14        Q    Okay.  Look at respondent 1029,

15   please, on page B-10.

16        A    Okay.

17        Q    In response to question 8.0, which is

18   what other products, I'm paraphrasing a little,

19   what other products are made or put out by the

20   company that makes or puts out this dog toy, that

21   respondent responded different designs of squeaky

22   toys.

23             Do you see that?

24        A    Yes.

25        Q    And that was a response that Dr. Ford

                                        Page 156

1    interpreted as showing likelihood of confusion;

2    correct?

3          A    Let me take a look.

4          Q    I know.  The lawyers always get in

5    the way.

6          A    Yes, 1029 is on page 20 of Exhibit

7    113, which is part of the responses to the test

8    cell that Dr. Ford included in the, quote unquote,

9    Jack Daniel's category.

10         Q    Okay.  Look at respondent 1044

11   please.  That's on B-15.  I can give you pages, I'm

12   sorry.

13         A    Okay.

14         Q    And that respondent, in response to

15   question 8.0, identified "Pet toys that squeak."

16              Do you see that?

17         A    Yes.

18         Q    Do you believe it's reasonable to

19   interpret that response as meaning that the

20   respondent understood that this was a squeaking

21   toy?

22         A    Well, let me reread what question 8.0

23   says exactly.  So question 8.0 says, quote, "What

24   other product or products, if any, do you believe

25   are made or put out by whoever makes or puts out

                                        Page 157

1    this product?  Please be as specific as possible."

2    And the person said, "Pet toys that squeak."

3              So that doesn't necessarily mean that

4    they think that this particular product that

5    they're looking at squeaks.

6         Q    Okay.  1044 was one of the

7    respondents that Dr. Ford identified as being

8    confused as to the source or sponsorship of the

9    product; correct?

10        A    Yes.

11        Q    Okay.  Have you ever done an online

12   survey where you have provided a tactile or

13   auditory -- strike that.

14             Have you ever done an online survey

15   where the test or control stimulus provided sounds

16   or the ability to actually feel the product?

17        A    I'm not sure, but the way that it

18   would be done is the way that you mentioned to me

19   earlier in Exhibit 64 where it would be described

20   verbally to the respondent.

21        Q    Would you have done that in this case

22   if you were doing the survey?

23        A    I'm not sure.

24        Q    Okay.  Look at paragraph 23 in your

25   report, please.  That's also on page 11.  You

                                          Page 158

1    wrote, quote, "Finally, Dr. Ford showed respondents

2    a picture of a display of products, and told

3    respondents to, 'Please look at this display of

4    products for dogs as you would if you saw it in a

5    store and were considering purchasing a dog toy.'"

6              Do you see that?

7         A    Yes.

8         Q    Do you agree that it's proper to

9    begin an Ever-Ready survey by asking the

10   respondents to put themselves into a buying frame

11   of mind?

12        A    Yes.  I mentioned this earlier, the

13   fact that he said, put yourself into a buying frame

14   of mind about buying something in a store.  And so

15   that's why I had a problem with him not showing all

16   the information that would be available in a store.

17   So, yes, I agree with that.

18        Q    Okay.  And farther down in paragraph

19   23 on the next page, 12, you wrote, "However, the

20   display that Dr. Ford showed to respondents

21   featured both dog toys and dog treats, when it is

22   more common for a display such as this to only

23   feature one type of product (either toys or

24   treats)."

25              Do you see that?

Veritext Legal Solutions
866 299-5127

```
 1           A      Yes.
 2           Q      Were you aware that the display
 3    photograph that Dr. Ford showed respondents in the
 4    Test and Control cell was an actual in store retail
 5    display?
 6           A      No.  I mean, obviously in the control
 7    cell it had to be modified so it wasn't completely
 8    actual but I understand your point.  I was not
 9    aware of that, no.
10           Q      Would that matter to you?
11           A      No.
12           Q      Why not?
13           A      Because I am talking about what my
14    understanding of what typically happens.  My
15    understanding of the photos that he took are
16    atypical.
17           Q      What is that understanding based on?
18           A      My knowledge of marketing professor,
19    the way that things are done in the marketplace, of
20    looking at stores in my area.
21           Q      That understanding is not based on
22    anything that Mr. Long or Mr. Bray told you?
23           A      No.
24           Q      Have you seen the Silly Squeaker Bad
25    Spaniels toy displayed at retail?
```

Page 160

1          A       No, I have not.

2          Q       Did you make any effort to try to

3     find a store that carried it?

4          A       Yes.

5          Q       I assume from those answers you did

6     not succeed in that effort?

7          A       I looked in the St. Louis area where

8     I live and I could not find any.

9          Q       Did you ask VIP's counsel to identify

10    a store in the St. Louis area that carried the Bad

11    Spaniels product?

12         A       I don't recall.

13         Q       Or not just the Bad Spaniels product

14    but any of the products in the Silly Squeaker line?

15         A       I don't recall.

16         Q       Look back to Exhibit 106, please.  On

17    the second page of Exhibit 106 at the bottom there

18    are some JDPI documents.  We've talked about a few

19    of them already.  The ones marked 327 to 334 are

20    described as "Exhibit 63 of Sacra deposition:  List

21    of Orders with Date, Company, Customer Name, Order

22    ID and Quantity."

23                 Do you see that?

24         A       Yes.

25         Q       Do you recall receiving a list of

                                          Page 161

1    orders that VIP -- for the Bad Spaniels toy that

2    VIP had filled?

3        A    I have to go back and look to see if

4    that was one of the documents that were sent to me.

5    So I'll go ahead and do that.

6        Q    I'll help you.  Look at NOW 40.  Do

7    you see that?

8        A    I do.

9        Q    That's an e-mail from Miss Boie to

10   you dated July 6 covering JDPI 327 to 334.

11                Do you see that?

12       A    Yes.

13       Q    Do you recall receiving a list of

14   VIP's customers?

15       A    I don't, but I must have received it.

16       Q    When your attempts to find the

17   product in the St. Louis area were unsuccessful,

18   did you contact VIP's counsel and ask them to give

19   you some direction as to finding a store that

20   carried the Bad Spaniels product?

21       A    I don't recall.

22       Q    Or the Silly Squeakers line if not

23   the Bad Spaniels product per se?

24       A    I don't recall.

25       Q    Did you ever go online to try to

Page 162

1    identify retail stores that carried the Bad

2    Spaniels product?

3         A    I don't remember.

4         Q    Have you ever seen pet toys displayed

5    in a retail store?

6         A    Yes.

7         Q    When?

8         A    Do you want a specific date?

9         Q    No.  Let me try -- do you own a dog?

10        A    Yes.

11        Q    Do you yourself shop for pet toys?

12        A    I have in the past, yes.

13        Q    Okay.  Do you recall any time when

14   you personally shopped for pet toys where you have

15   seen a display of either toys or treats, not both

16   together, as you described the common, the more

17   common display in paragraph 23?

18        A    When I specifically was shopping for

19   dog toys do I remember seeing that.  I don't have

20   that recollection in my head because it's probably

21   been a few years since I bought a dog toy.

22        Q    So your statement in paragraph 23

23   that "it is more common for a display such as this

24   to only feature one type of product (either toys or

25   treats)," is not based on your personal observation

Page 163

```
 1    of a display of either dog toys or dog treats;
 2    correct?
 3                  MR. LONG:  Objection to form,
 4    mischaracterizes prior testimony.
 5           A     No.
 6           Q     (BY MR. LARKIN)  It is based on your
 7    personal observation of the display of either dog
 8    toys or dog treats?
 9           A     In part it is, yes, based on stores
10    that I have visited.  I wasn't shopping for a dog
11    toy, I think that's what you said -- asked me
12    earlier.  I was just observing the marketplace.  So
13    that's what -- those were my observations.
14           Q     Okay.  How many stores did you
15    observe?
16           A     I don't recall a number.
17           Q     Do you, during -- over what period
18    did you make those observations?
19           A     Particular -- in particular for this
20    case, over the past few months?  Since I got
21    involved with this case, which would have been
22    sometime in early May.
23           Q     Let me see if I understand your last
24    answer correctly.  Have you looked at the display
25    of dog toys or dog treats other than VIP's since
```

Page 164

1    you have been involved in this case?

2         A    Yes.

3         Q    Okay.  How many stores did you visit

4    to observe the display of dog toys or dog treats?

5         A    Since I have been involved with this

6    case?

7         Q    Yes.

8         A    I would estimate five to ten.

9         Q    And you didn't see any VIP products

10   in any of those stores; correct?

11        A    That is correct.

12        Q    Do I understand it correctly that you

13   saw, in those five to ten stores, dog toys or dog

14   treats displayed separately?

15        A    Yes.

16        Q    Did you ever see them intermingled?

17        A    I don't recall.  But I don't -- I

18   remember that was not the norm that I saw.  And

19   also, my conclusion is based not only on my own

20   observations but in my understanding of the way

21   that the marketplace works.

22        Q    I understand.  I'm focusing right now

23   on your observations.

24             What stores did you visit?

25        A    I remember going to PetSmart, I

                                        Page 165

```
1    remember going to Petco, I remember going to at
2    least a couple different PetSmarts.  I'm trying to
3    remember what else I have seen.  I'm sure there
4    were more than that, but I'm blanking right now.
5    But I remember for sure PetSmart and Petco.
6           Q     Those are large chain pet retailers;
7    correct?
8           A     Yes.
9           Q     Did you visit any smaller pet product
10   specialty stores?
11          A     I can't remember.  I may have.  I
12   just don't remember.
13          Q     Okay.  Do you know if the VIP product
14   is carried in PetSmart?  Strike that.  Bad
15   question.
16                Do you know if any of the VIP dog
17   toys are carried in PetSmart?
18          A     I don't know.
19          Q     Or in Petco?
20          A     I don't know.
21          Q     How would -- looking back at your
22   report, paragraph 23, at the bottom of page 11, if
23   you were doing the survey and you wanted to ask the
24   preamble question, please look at this display of
25   products for dogs as you would if you saw it in a
```

Page 166

1    store, were considering purchasing a dog toy, what

2    picture would you have taken to do that?

3          A      If I were to use a picture, I would

4    take a picture of a type of display that's most

5    common in the marketplaces.

6          Q      And you believe that what you saw in

7    Petco and PetSmart is what's most common in the

8    marketplace?

9                MR. LONG:  Objection,

10   mischaracterizes testimony.

11         A      That, and my knowledge of the

12   marketplace.

13         Q      (BY MR. LARKIN)  Okay.  You testified

14   if you would use a photo, would you not use a

15   photo?

16         A      I wouldn't necessarily use a photo up

17   front, no.

18         Q      What would you do in lieu of a photo?

19         A      Sometimes I've done likelihood of

20   confusion surveys with no photo up front.  Just the

21   person is asked to go into a state of mind.

22         Q      Should Dr. Ford have done that here,

23   as opposed to using these photos?

24         A      I don't have a problem with it either

25   way.  I don't have a problem with him using photos.

                                        Page 167

1    My problem is more the photo that he picked.

2         Q      And it doesn't change your opinion

3    that this is an actual -- the test cell recognizing

4    the control cell was modified, the test cell was an

5    actual store display in Southern California?

6         A      It doesn't change my opinion.

7         Q      Okay.  How would have presenting a

8    different display have affected consumer

9    perceptions about the source of the sponsorship of

10   the toy?

11        A      Because this point that I am making

12   here is in the section on replicating marketplace

13   conditions, and it's an important principle of

14   survey design because if that principle is not

15   upheld throughout the whole survey, then whatever

16   results you get, you can't say would be

17   generalizable to the actual marketplace.

18              So if he picked a picture to show

19   that's not representative of the typical display,

20   it could give someone an impression about something

21   that's not typical for the marketplace as a whole.

22        Q      How would have doing it the right way

23   affected the results here?

24        A      I wouldn't know exactly how the

25   results would change.

Page 168

1    Q    You'd have to actually do it the
2    right way, in your view, to know that; correct?
3    A    Well, I think it was wrong but to
4    know how the actual numbers in the survey would
5    change, I wouldn't know that.  I'd have to
6    speculate unless the survey was done.
7    Q    Okay.  In paragraph 23 at the top of
8    page 12, in the second sentence you wrote, "In
9    addition, it is more common for products to be
10   organized by brand, whereas Dr. Ford showed the
11   Silly Squeaker products separated by other brands."
12          Do you see that?
13   A    Yes.
14   Q    Is the basis for -- is your basis for
15   that statement the same as your basis for the
16   previous statement that it's more common for a
17   display to feature only one type of product, either
18   toy or treats?
19   A    Yes.
20   Q    You didn't do any additional or
21   different investigation or you didn't rely on any
22   additional or different experience in support of
23   your statement that it's more common for the
24   products to be organized by brands?
25   A    I didn't do anything in addition to

Page 169

1    that.  For that point.

2        Q    Okay.  And on the picture that Dr.

3    Ford used, which is replicated on page 11 of your

4    report, there are other VIP products shown in

5    addition to the Bad Spaniels product; correct?

6        A    Yes.

7        Q    Okay.  Including other products in

8    the Silly Squeakers line; correct?

9        A    I can, from this page 11 of my

10   report, I can barely read that out but I believe

11   that is correct, yes.

12       Q    Okay.  How would having shown a

13   picture of the Silly Squeaker products organized

14   together by brands affected the results in this

15   survey?

16       A    I couldn't -- I don't know exactly

17   how the results would change.  I am just -- my

18   point is that it's not the right procedure.

19       Q    Farther down in paragraph 23 of your

20   report, NOW13, you wrote, "Furthermore, it is more

21   common for the same product to be on the same

22   hanger rather than separated.  And yet, there are

23   two different images of the Bad Spaniels toy

24   separated by other toys, and the Bad Spaniels toys

25   appear to be covering up other types of toys."

Page 170

1          Do you see that?

2     A     Yes.

3     Q     What is the basis for your statement

4  that "it is more common for the same product to be

5  on the same hanger rather than separated"?

6     A     The same thing I said earlier, my

7  understanding of the way the marketplace operates

8  and my observations of the marketplace.

9     Q     And forgive me if I asked you this

10  already, but you have never actually seen the Bad

11  Spaniels toy displayed in the marketplace; correct?

12     A     That is correct.

13     Q     And you've never actually seen any

14  other VIP Silly Squeaker product displayed in the

15  marketplace; correct?

16     A     That is correct.

17     Q     And you don't know if displaying the

18  products on the same hanger rather than separated

19  would have affected the results in the survey;

20  correct?

21     A     I don't know how the results would

22  have changed.

23     Q     Or if they would have changed.  You

24  don't know that either, do you?

25     A     That is true.

Page 171

1    Q    Finally, in paragraph 23 you wrote,

2    "Finally, it is not possible to read all of the

3    words on the many products shown on the display,

4    whereas in the actual marketplace, consumers would

5    be able to read these words."

6         Do you see that?

7    A    Yes.

8    Q    Why does that matter, in your

9    opinion?

10   A    Because the point of all of this is

11   supposed to be able to replicate actual marketplace

12   conditions, and in the real marketplace a consumer

13   could read all of these packages.  But they're not

14   able to do that in the survey.

15   Q    Why would that affect their beliefs

16   as to the source or sponsorship of the Bad Spaniels

17   product?

18   A    Because it's important to be able to

19   give people the same type of information that they

20   would have in the actual marketplace, to give them

21   that opportunity, to see how it would affect their

22   responses.

23   Q    And again, you don't know if being

24   able to read all the words on the other products in

25   a display would have changed the results of Dr.

Page 172

1    Ford's survey, do you?

2         A    I don't know that.  I don't know if

3    it would have changed it.  I just know it was the

4    wrong procedure.

5              MR. LARKIN:  Let's take a short

6    break.

7              (Off the record.)

8              MR. LARKIN:  Okay.  Let's go back on

9    the record.

10        Q    (BY MR. LARKIN)  Dr. Nowlis, I would

11   like now to turn to what I think is your final

12   criticism of Dr. Ford's report starting on page 12

13   entitled "Failure to properly code and analyze

14   data."

15             In paragraph 25, beginning on page

16   12, in the second sentence you wrote, "However, the

17   Bad Spaniels dog toy is a parody of a Jack Daniel's

18   bottle, and Dr. Ford's results need to be analyzed

19   with this in mind."

20             How so?

21        A    In the ways that I detail later on.

22        Q    Okay.  So do I understand it that the

23   fact that the Bad Spaniels dog toy is a parody of

24   the Jack Daniel's bottle, or at least is claimed to

25   be a parody -- or you understood it to be a parody

                                    Page 173

1    of a Jack Daniel's bottle, that goes to Dr. Ford's

2    coding and analysis of his data and not to the way

3    in which the survey was designed itself; correct?

4        A    I just want to be careful.  When we

5    say "the survey was designed," part of the design

6    is the control group.  Part of the design are

7    marketplace conditions.

8        Q    Okay.  But in terms of your specific

9    criticism that Dr. Ford's results need to be

10   analyzed with this in mind -- strike that.

11            I think you testified earlier that

12   you agreed that Dr. Ford used the Ever-Ready format

13   in his survey?

14       A    Yes.

15       Q    Do you believe that that per se was

16   improper in this case because the -- your

17   understanding was the Bad Spaniels toy is a parody

18   of a Jack Daniel's bottle?

19       A    No.  I didn't have a problem with

20   Ever-Ready per se.  I had a problem with the

21   understanding of the results from using that

22   methodology.

23       Q    Okay.  So if you -- if you had been

24   doing the survey in this case, you would also have

25   used the Ever-Ready format; correct?

                                    Page 174

```
 1                MR. LONG:  Objection.
 2         A    I'm not sure.
 3         Q    (BY MR. LARKIN)  Okay.  What other
 4    formats are available?
 5         A    Well, one that I'm aware of is the
 6    squirt methodology.
 7         Q    Have you ever done a squirt survey?
 8         A    Yes.
 9         Q    Have you ever done a survey in a case
10    involving a product that was claimed to be a
11    parody?
12         A    I don't think so.
13         Q    Have you ever studied surveys in
14    cases involving products claimed to be a parody?
15         A    I'm not sure what you mean by
16    "studied."
17         Q    That's probably a bad word for a
18    scientist.  Have you ever reviewed any, other than
19    Dr. Ford's surveys, any surveys in cases involving
20    products claimed to be parodies?
21         A    I'm not sure.
22         Q    I think I asked you earlier about
23    whether you had reviewed the survey that was
24    offered in the Anheuser-Busch case against VIP?
25         A    Okay.
```

Page 175

1          Q       Do you recall seeing that survey?

2          A       I do not.

3          Q       Do you believe that a product claimed

4    to be a parody can cause a likelihood of confusion

5    as to source or sponsorship?

6                  MR. LONG:  Objection, form.

7          A       I'm sorry, I didn't follow that.

8    Would you ask it again?

9          Q       (BY MR. LARKIN)  Sure.  Do you

10   believe that a product that is claimed to be a

11   parody can cause a likelihood of confusion as to

12   the source of sponsorship of that product?

13                 MR. LONG:  Same objection.

14         A       I think anything's possible.

15         Q       (BY MR. LARKIN)  Let me state it in

16   the negative.  Is it your opinion that because a

17   product is a parody, it can't cause a likelihood of

18   confusion as to source of sponsorship of the

19   product?

20                 MR. LONG:  Objection to form,

21   foundation.

22         A       I believe it's possible that it can.

23         Q       (BY MR. LARKIN)  In paragraph 25 of

24   your report on page 12, after the sentence I read a

25   moment ago, you wrote, "First, I found that some

                                    Page 176

1    respondents, in their explanations of their

2    answers, explicitly stated that the product was a

3    spoof while others realized that the Bad Spaniels

4    toy was put out by a different company but were

5    trying to interpret the questions in terms of

6    whether a spoof needs to get permission or approval

7    from the company it is spoofing."

8            Do you see that?

9        A    Yes.

10        Q    Is it your opinion in this case that

11    if a respondent responded in a manner that in your

12    view indicated that he or she recognized the

13    product was a spoof, that that respondent could not

14    possibly also believe that the product came from or

15    was sponsored or authorized by Jack Daniel's?

16        A    I think that that information would

17    need to be highlighted so that it was information

18    that people would have to make that determination.

19        Q    What information would need to be

20    highlighted?

21        A    The information that I described in

22    my analysis of Dr. Ford's survey where I looked at

23    how respondents responded across all the different

24    questions, and I looked at the verbatims to see

25    what they said person by person.

Page 177

1           Q      Okay.  So if a respondent gave a

2    verbatim that referenced spoof, that in your view

3    indicated that that respondent understood the

4    product to be a spoof or a parody, you would need

5    to look at the rest of that respondent's verbatim

6    responses to conclude whether it was proper to

7    characterize that respondent as confused as to

8    source of sponsorship?

9           A      I'd have to look at -- right.  I'd

10   have to look at the complete response of each

11   respondent and the verbatims of each respondent

12   individually.  I don't think Dr. Ford did that.  I

13   think he just assumed certain things.

14          Q      So that I understand your last couple

15   answers correctly, just because a respondent gave

16   an answer that suggested to you that he or she

17   thought the product was a spoof or a parody, that

18   by itself did not establish that the respondent was

19   not confused as to source of sponsorship?  You'd

20   need to look at the rest of their responses;

21   correct?

22          A      I had to look at their complete

23   response of each person, yes.  That's exactly what

24   I did do.

25          Q      Okay.  In the second part of the

                                          Page 178

```
 1    sentence I just read to you, which I'll read again,
 2    "others realized that the Bad Spaniels toy was put
 3    out by a different company but were trying to
 4    interpret the questions in terms of whether a spoof
 5    needs to get permission or approval from the
 6    company it is spoofing," is, in your opinion, is
 7    the fact that -- does the fact that someone
 8    recognized that the product was put out by VIP, Bad
 9    Spaniels, Silly Squeaker, does that fact alone mean
10    that that person could not be confused as to
11    whether that product was put out with the
12    sponsorship or authorization of Jack Daniel's?
13         A    I'd have to look at each individual
14    respondent to answer that.
15         Q    Where in Dr. Ford's questions are
16    respondents asked whether the company that makes or
17    puts out the Bad Spaniels toy needed to get
18    permission or approval from anyone to do that?
19         A    Okay.  I will look at his
20    questionnaire again.  So I am looking at Exhibit
21    113.  And I am looking at the section which has his
22    survey.  And I am looking at page 7 of that survey.
23         Q    Okay.
24         A    And question 7.0 says, "Who or what
25    company do you believe makes or puts out this
```

Page 179

1    product?  Please be as specific as possible."  Then

2    a later question asks "What other product or

3    products, if any, do you believe are made or put

4    out by whoever makes or puts out this product?

5    Please be as specific as possible."  And then later

6    on, question number 9 asks, "Do you believe this

7    product is, or is not, made or put out with the

8    authorization or approval of any other company or

9    companies?"

10            So I believe you asked me earlier

11   about these questions, so the who or what company

12   makes or puts out is 7.0, and the authorization or

13   approval question is question 9.0 which is on page

14   8, again, of Exhibit 113.

15        Q    Okay.  Are those -- those are

16   standard Ever-Ready protocol questions; correct?

17        A    Yes.

18        Q    Where in those questions are the

19   respondents asked whether the company who makes or

20   puts out the Bad Spaniels product needed to get

21   permission from anyone?

22        A    The question doesn't ask do you need

23   to get permission.  It asks about authorization or

24   approval.

25        Q    Okay.  Where does the question ask

Page 180

1    whether -- the respondents whether the company

2    making or putting out the product needed to get

3    authorization or approval?

4            MR. LONG:  I'm not -- object, I don't

5    understand the form of that question.

6        A    I'm not sure I understand it either.

7            MR. LONG:  I don't know whether he

8    ever said it needs to be done.

9            MR. LARKIN:  Okay.  that's my point.

10   Let me ask it this way.

11       Q    (BY MR. LARKIN)  Dr. Ford's questions

12   never ask the respondents whether the company who

13   made or put out the Bad Spaniels toy needed to get

14   approval from anyone to put the toy out; correct?

15       A    When you ask, I am assuming we are

16   being very specific here with the word "need." The

17   word "need" is nowhere in question 9.

18       Q    Well, I'm being specific with the

19   word "need" because in paragraph 25 of your report

20   you opined that some of the respondents were,

21   quote, "trying to interpret the question in terms

22   of whether a spoof needs to get permission or

23   approval from the company it is spoofing," and I

24   simply wanted to establish that nowhere in Dr.

25   Ford's survey are respondents asked whether the

Page 181

1    company that made or put out the toy needed to get

2    permission or approval from anyone to do so.  Is

3    that correct?

4                    MR. LONG:  I think that's a

5    mischaracterization of what the report says, if I

6    understand your question.  I'm not sure.  So just

7    maybe you better be real careful about what your

8    question is.

9         Q    (BY MR. LARKIN)  Do you understand

10   the question, Dr. Nowlis?

11        A    I'm not sure I do.  I thought I did,

12   but now maybe I don't.  Now I've forgotten what the

13   question even was.

14        Q    Well, let me try it this way.  In Dr.

15   Ford's Ever-Ready questions, he never asked the

16   respondents whether it was necessary to produce the

17   products shown in the test stimulus to get

18   authorization or approval for any company.

19   Correct?

20        A    I think I understand what you're

21   saying.  He did not use the word "need."  But my --

22   when I say that, I am referring to question number

23   9.

24        Q    Okay.

25        A    Which is essentially the same thing

                                        Page 182

```
 1    but it doesn't use the word "need."
 2         Q      Yes number 9 says -- do you have it?
 3              MR. LONG:  I'm looking at it here,
 4    yeah.
 5              MR. LARKIN:  I'll wait until you're
 6    done.
 7         Q      (BY MR. LARKIN)  Question number 9,
 8    9.0, asks, "Do you believe this product is,"
 9    underscored, "being made or put out with the
10    authorization or approval of any other company or
11    companies; is not," underscored, "being made or put
12    out with the authorization or approval of any other
13    company or companies; or don't know or have no
14    opinion."  Correct?
15         A      Correct.
16         Q      The respondents are nowhere asked
17    whether it was necessary for the company that made
18    or put out the product to get the authorization or
19    approval of any other company or companies.  Is
20    that correct?
21         A      I think we're hung up on the word
22    "necessary."  I mean, I just want to follow through
23    the whole question, too, just to make sure we're on
24    the same page, because 9.1, the follow-up question
25    says, "What company or companies do you believe
```

Page 183

1    gave the authorization or approval."

2         Q    Doesn't that ask for their state of

3    mind as to whether authorization or approval was in

4    fact given?

5         A    I'm sorry, could you please repeat

6    that?  I got lost.

7         Q    That's okay.  You just read question

8    9.1, which says, "What company or companies do you

9    believe gave the authorization or approval to make

10   or put out this product."

11              Do you see that?

12        A    Yes.

13        Q    That question asked for the state of

14   mind of the respondents as to whether authorization

15   or approval was in fact given.  Correct?

16        A    Are you asking me to interpret what

17   the word "gave" means?  Is that what you're saying?

18        Q    Well, I mean, you're the one whose --

19   your report talked about interpreting these

20   questions as whether permission was -- or

21   authorization or approval was needed.

22        A    Right.

23        Q    That's not what was asked in question

24   9.1; correct?

25        A    Yes.  I think I -- right.  I agree

                                        Page 184

1    with you.  Doesn't have the word "need."  Totally

2    agree with you.  But I think it's the same spirit

3    as gave authorization or approval.  To me that's

4    the same concept but it's not the exact same word.

5         Q    Have you ever seen surveys where the

6    word "need" was in fact used?

7         A    I am not sure.

8         Q    Have you ever done a survey where the

9    question was whether the company or companies that

10   made or put out the product needed to get

11   authorization from someone to do so?

12        A    I am not sure.

13        Q    Look back at Exhibit 109, the

14   excerpts of your deposition from the Apple case,

15   please.

16        A    Okay.

17        Q    Look at page 33 from your deposition

18   which is part of Exhibit 109, starting at line 10.

19   You were asked a question about the questions that

20   you used in your rebuttal survey in the Apple case,

21   and your answer was, "So the question has three

22   answers.  Now, with respect to the company or

23   companies that printed, released or put out this

24   book, do you think that they did receive permission

25   or approval from some other company to print,

Page 185

1    release, or put out this book, they did not receive

2    permission, or do you have no opinion?"

3            Do you see that?

4        A    Yes.

5        Q    Do you recall that that was the

6    general format of the questions that you used in

7    your rebuttal survey in Apple?

8        A    I do not remember that at this point

9    three years later.

10       Q    Okay.  Assuming that your deposition

11   testimony in that case accurately described the

12   question, do you believe that Dr. Ford's question

13   9.0, "Do you believe this product is being made or

14   put out with the authorization or approval, is not

15   being made or put out with the authorization or

16   approval, or don't know or have no opinion," is

17   essentially the same questions that you asked in

18   your Apple survey?

19       A    I'd have to go back and look at that

20   survey to make sure.  I just don't remember.

21       Q    Dr. Ford's question 9.0 asks for the

22   state of mind of the respondents as to whether the

23   Bad Spaniels toy is in fact being made or put out

24   with the authorization or approval of somebody else

25   or not; correct?

Page 186

1          A      He does ask.  For question number 9,

2      "Do you believe this product is being made or put

3      out with the authorization or approval of any other

4      company or companies."  So he is trying to get an

5      answer for that.  He also asks "is not."  I'm

6      sorry, did you ask something else?

7          Q      No.  Your answer was fine.  Thank

8      you.  Then 9.1, if the answer was is being made or

9      put out with the authorization or approval of

10     another company, they were asked what company;

11     correct?

12         A      Yes.

13         Q      Okay.  Let's go back to your report

14     in paragraph 25, please.  Where you go through a

15     number of respondents, particular verbatim

16     responses, and I'd like to take a few minutes to go

17     through those with you.

18             In paragraph 25 at the bottom of page

19     12, you wrote, "For example, respondent 1001 said,

20     'Because they are creating a spoof of a real

21     product so I think they would need permission so

22     they don't get sued for copyrights or something

23     like that."  And then that's the end of the quote

24     from the verbatim and then you put a parenthetical

25     "and this respondent realized in an earlier

Page 187

1    response that this product was put out by Silly

2    somethings."

3                    Do you see that?

4         A    Yes.

5         Q    That respondent answered that he or

6    she believed that the Bad Spaniels toy was being

7    made or put out with the authorization or approval

8    of Jack Daniel's.  Correct?

9         A    Let me take a look at this

10   respondent.  I'm going to look at the verbatim in

11   Dr. Ford's report.  So respondent 1001 is on page

12   17 of Exhibit 113.  And it gives the complete

13   responses for this particular respondent.

14        Q    Okay.  Do you agree that that

15   respondent identified Jack Daniel's as the company

16   that he or she believed gave authorization or

17   approval for the Bad Spaniels toy?

18        A    Yes.

19        Q    If the respondent believed that in

20   fact the Bad Spaniels toy was authorized or

21   approved by Jack Daniel's, why does it matter if

22   the respondent believed that such approval or

23   authorization was required?

24        A    Because as I pointed out, this survey

25   has to be considered in light that this is a parody

                                          Page 188

1    product.  And because of that, it's important to

2    really read carefully through all of the responses,

3    think about each person in particular.

4              And when I did that, I found out that

5    a number of people did say it was a spoof, and what

6    my reading of their verbatims was that they

7    realized that the product was put out by VIP or Bad

8    Spaniels or Silly Squeakers or whatever it was.

9    They knew the company that put it out.

10             But then when we get to question

11   number 9, the authorization or approval, they

12   thought that it had to be approved or authorized by

13   Jack Daniel's.  And the interpretation of that I

14   think is important because there's evidence here

15   from the verbatims that the reason why they were

16   thinking of that is because they thought it's put

17   out by VIP, it's a spoof of Jack Daniel's.

18             Now, they seem to try to be

19   interpreting what is required by VIP in terms of

20   getting authorization by -- from Jack Daniel's to

21   do a spoof.  So that's why think it's important to

22   think of it from that perspective.

23        Q    How do you know they were trying to

24   do -- interpret the questions as opposed to simply

25   answering them?

Page 189

1      A     Because every -- this is a very

2   important principle of survey research is that any

3   question, a consumer will look at and read it and

4   come up with a response.  So when I say interpret,

5   they have to have some understanding of what the

6   question is asking them in the context of the

7   particular survey.  Which, again, is why it's very

8   important to look at the verbatims, which is what I

9   did, and it's also important to look at all of

10   their responses.

11          What I think Dr. Ford did was just

12   focus -- sort of did a routine analysis where he

13   just looked at the responses to each question but

14   he didn't look at the verbatims, he didn't look at

15   the responses across the questions and I think it's

16   important to do that.

17      Q     If respondent 1001 answered as I

18   believe you agreed he or she did, that he or she

19   believed that Bad Spaniels is being made with the

20   authorization or approval of Jack Daniel's, why

21   does it matter to that consumer's belief that, as

22   you suggest in your report, the consumer believed

23   that such authorization or approval was required?

24      A     Because again, I -- that's why I said

25   it's so important for this particular matter to

Page 190

1    remember that this is a parody product.  That's

2    very important to remember because, again, my

3    interpretation of these responses is people realize

4    in many cases it was put out by VIP, but they

5    started to wonder if VIP, which they knew made it

6    out, would need to get authorization or approval

7    from Jack Daniel's if it was a parody or a spoof.

8    And I think that's important information to

9    highlight that.  I don't think Dr. Ford did that.

10         Q    Why would it matter to their belief

11   that in fact the product was being made or put out

12   with the authorization or approval of Jack

13   Daniel's, that they might have believed that that

14   was required?  Their state of mind is still that it

15   is being made with the authorization or approval of

16   Jack Daniel's; correct?

17         A    They said that but, again, it has to

18   be considered in the context of the situation.

19   It's a spoof.  We have to look at all of the

20   responses across all the different questions to

21   really get at their state of mind.

22              It's not just one answer to one

23   question.  It's a bunch of questions and there's a

24   context here and that's what I tried to think

25   about.

                                        Page 191

1          Q      Well, do you -- if the reason given

2     for the belief that the product is being made or

3     put out with Jack -- with the authorization or

4     approval of Jack Daniel's is because the respondent

5     suggested it was a spoof or that the respondent

6     suggested that that needed permission, is it your

7     opinion that those answers do not legitimately

8     reflect the view that that respondent believed that

9     the product was in fact being made or put out with

10    the authorization or approval of Jack Daniel's?

11         A      I'm sorry, I didn't follow that.

12         Q      What I'm trying to get at is why does

13    it matter if the respondent believed -- answered

14    9.0 believing that the product was -- is being made

15    or put out with the authorization or approval, why

16    does it matter that the reason for that belief was

17    some belief that it was a spoof or that such

18    authorization or approval was needed?

19         A      Because again, it's important to look

20    at the complete response.  I think when Dr. Ford

21    reported the responses in his report, he didn't

22    give us the complete responses.  So for example, he

23    did this -- let me see what he did here.

24                So starting on page 19 of Exhibit

25    113, what Dr. Ford did was he gave -- he didn't

                                          Page 192

1    give the full response to each respondent here when

2    he sort of said that these people all were in the,

3    quote unquote, Jack Daniel's category.  He focused

4    only on certain questions.

5              So I know, from my work as a

6    marketing researcher and as an expert in consumer

7    psychology, it's important to look at the complete

8    response because that can give us important

9    information which I believe it does in this case.

10   Because when I looked at the complete response and

11   I backed up and I said why do they think, for

12   example, that it needs authorization or approval

13   and I found out in an earlier response that they

14   knew that it was put out by VIP and then they were

15   starting to wonder whether it needed authorization

16   or approval because they know it's a spoof and

17   they're trying to interpret if a spoof needs to get

18   authorization or approval from Jack Daniel's.

19   Again, knowing that it's not put out by Jack

20   Daniel's.

21             So that was important to me to look

22   at the whole response in light of this being a

23   parody product.  So that's what I tried to do.

24        Q    Okay.  In your report on page 13 in

25   footnote 25, you listed "Other" -- quote, "Other

Page 193

1    examples of respondents noting the product was a

2    spoof or trying to interpret what a spoof needs to

3    do to get permission or approval from the company

4    it is spoofing," and then you list a number of

5    those respondents and I'd like to go through those

6    now if we could.

7                 Starting with respondent 1012.  Do

8    you have that respondent's verbatims?

9         A     Yes, I do.

10        Q     That respondent said that the product

11   "is being used with the authorization or approval,"

12   and then identified the company giving the

13   authorization or approval as "Jack Daniel's," and

14   then when asked why, "Bottle design and name are

15   plays on the Jack Daniel's brand."

16                Doesn't that response reflect that

17   respondent's belief that the Bad Spaniels toy is

18   being made or put out with the authorization of

19   Jack Daniel's?

20        A     They did say that in question 9, but

21   again, I didn't simply stop there.  I looked at the

22   verbatims.  I don't think Dr. Ford did that.

23   That's why we have verbatims, to take a look at

24   them, and the verbatims told me something

25   important.

                                              Page 194

1              That in my opinion, this reflects the

2     other responses that I've noted in footnote 25,

3     which are ideas that this is a parody product, and

4     therefore, their response to question 9 needs to be

5     considered in light of that to think whether

6     another company actually needs to provide -- get

7     permission or approval for a spoof.

8          Q     What else about the verbatim

9     responses of respondent 1012 suggest to you that

10    that should not be countered as somebody who

11    believes the product is being put out with the

12    authorization or approval of Jack Daniel's?

13         A     The verbatims make me apply to my

14    point in footnote 25.

15         Q     Let's focus on 1012 specifically.

16    What else in the verbatim of that respondent gives

17    you the reason to believe that that respondent

18    should not be counted as somebody who believes that

19    the product is being made or put out with the

20    approval or authorization of Jack Daniel's?

21         A     Okay.  We'll focus on respondent

22    1012.  And I'll respond exactly as I responded in

23    footnote number 25 of my report where I talked

24    about that, that part of the verbatim.  Where they

25    said "Bottle design and name are plays on the Jack

                                            Page 195

1    Daniel's brand."  That's what I was referring to.

2         Q    And you believe that that means that

3    they did not in fact believe that the Bad Spaniels

4    product is being made or put out with the

5    authorization or approval of Jack Daniel's?

6         A    No.  They said that that's what they

7    thought but the -- all of these responses are

8    consistent with the idea that people know that this

9    is a parody product and are trying to interpret

10   question 9 as to whether a parody needs

11   authorization or approval from Jack Daniel's even

12   though they realize it's made or put out by a

13   different product.

14        Q    Okay.  Let's look at the next

15   respondent in footnote 25.  That's 1015, please,

16   that's B-6 of Dr. Ford's report.

17        A    Okay.

18        Q    That respondent responded to the

19   question "Who or what company do you believe makes

20   or puts out this toy," that Jack Daniel's was the

21   source of the toy; correct?

22             MR. LONG:  Which one is that?

23             MR. LARKIN:  1015.

24             MR. LONG:  1015?

25        A    So what was the question?

Veritext Legal Solutions
866 299-5127

```
1           Q      (BY MR. LARKIN)  Respondent 1015
2    responded to the question "Who or what company do
3    you believe makes or puts out this toy with Jack
4    Daniel's?"
5                  Do you see that?
6           A      Yes.
7           Q      And then responded to the question,
8    "What other product or products, if any, do you
9    believe the company makes or puts out this toy,"
10   sells Jack Daniel's.  Correct?
11          A      Yes.
12          Q      What is it about that verbatim that
13   indicates to you that that respondent did not
14   believe that the product was made or put out by
15   Jack Daniel's?
16          A      The portion that I quoted from that
17   respondent in footnote 25, which said, quote, "It
18   mimics them," which again is consistent with the --
19   what I found about the idea that it's a parody
20   product and they're trying to determine what type
21   -- how to interpret what a parody product needs to
22   do.
23          Q      So you believe that based on the
24   answer to question 7.2, it mimics them, you believe
25   that that respondent was trying to figure out
```

Page 197

1    whether permission -- authorization or approval

2    from Jack Daniel's was required to sell the

3    product?

4         A    No --

5         Q    Even though they identified the

6    source of the product as Jack Daniel's itself?

7         A    No.  That was to my earlier point of

8    that the -- when I looked at the verbatims, I saw

9    evidence that people were trying to -- knew that

10   the product was a spoof.

11        Q    Okay.

12        A    And were trying to interpret what to

13   do in that situation.

14        Q    And the basis for your belief that

15   respondent 1015 knew the product was a spoof was

16   the answer to 7.2, "It mimics them."  Correct?

17        A    Yes.

18        Q    Let's look at the next one, please,

19   respondent 1020.  That respondent answered the

20   question "Is the product -- is the product being

21   made or put out with the authorization or approval

22   of another company with Jack Daniel distillery."

23             Do you see that?

24        A    Yes.

25        Q    And then in response to the question,

Page 198

```
 1      "Do you believe that the company that made or put

 2      out the product has a business affiliation or

 3      business connection with another company,"

 4      respondent, quote, "It looks like they did a

 5      license deal with Jack Daniel's."

 6                  Do you see that?

 7           A     Yes.

 8           Q     Isn't that exactly what you would

 9      expect from somebody who believes that the product

10      is approved or authorized by Jack Daniel's?

11           A     They are answering yes to a business

12      affiliation or business connection.  And respondent

13      1020 in an earlier response, an earlier question,

14      said that they said the product was put out by VIP.

15                  So this respondent said I know it's

16      put out by VIP but now they're trying to figure out

17      if VIP has a business affiliation or connection

18      with Jack Daniel's.  They are thinking that they

19      would -- that they would need to get licensing

20      permission from Jack Daniel's to be able to do

21      something like this.

22           Q     That's how you interpret the response

23      "It looks like they did a license deal with Jack

24      Daniel's"?

25           A     Yes.
```

Page 199

1          Q     Okay.  Isn't every product licensed

2     by Jack Daniel's produced by somebody other than

3     Jack Daniel's?

4               MR. LONG:  Objection, form,

5     foundation.

6          A     I don't know.

7          Q     (BY MR. LARKIN)  Well, isn't that the

8     nature of licensing?  You authorize somebody else

9     to use your trademarks or trade dress to produce a

10    product?

11              MR. LONG:  Objection as to who you

12    mean by Jack Daniel's.

13         A     In general, that's what a license

14    does.  In general.

15         Q     (BY MR. LARKIN)  Okay.  Let's look at

16    the next response 1022 in your footnote.

17         A     Okay.

18         Q     This respondent also answered the

19    question, "Is this product being made or put out

20    with the authorization or approval of somebody with

21    Jack Daniel's liquor company."

22               Do you see that?

23         A     Yes.

24         Q     Then they went on to explain why in

25    response to 9.2, and then in response to question

Page 200

1   10, "Does the respondent believe that the company

2   who made or put out the dog toy has a business

3   affiliation or business connection with another

4   company," and they responded "Jack Daniel's" to

5   that question.

6           Do you see that?

7       A   Yes.

8       Q   Why do you believe this should not be

9   counted as a respondent who believes that the

10  product is being made or put out with the

11  authorization or approval of Jack Daniel's?

12      A   So I am looking at the complete

13  response to this person, which is in Exhibit 113,

14  page 19, and I am looking at respondent 1022.  So

15  the first thing, when they were asked who makes or

16  put this out, they said Bad Spaniels, and they

17  asked why?  And they said because that is the name

18  that is on the dog toy and that is where most dog

19  toy brands put their name.  So they know who made

20  or put it out.

21          Then later on they were asked

22  questions about did they need to get -- did a

23  company give them authorization or approval, and

24  they said Jack Daniel's and then 9.2 is telling

25  some very important information, that they are,

1    they are interpreting this to say that they think

2    that a dog toy company that made this toy, so they

3    know a different company made this toy, had to get

4    permission and legal rights to essentially copy

5    their product.

6              So again, the reason why I'm going

7    through these verbatims like this is because it

8    is's a parody product.  That's very important.  To

9    not just look at the responses and not look at the

10   answers and not look at the verbatims because the

11   verbatims tell us something important.

12             They're telling me they know it's

13   made by Bad Spaniels, they clearly said that, and

14   then later on they even said that they think the

15   dog toy company had to get permission and legal

16   rights to do this.  So, to me, that suggests that

17   they know it's a parody, they are trying to figure

18   out if Bad Spaniels needs to get permission from

19   Jack Daniel's to do this.

20        Q    And that's the reason you don't think

21   Dr. Ford should have included respondent 1022 as to

22   oversimplify confused?

23        A    I think Dr. Ford should have

24   certainly looked at the verbatims and thought about

25   how this would affect his results and he didn't do

                                        Page 202

1    that.

2          Q      Okay.  But, but do you -- the ones we

3    have been talking about and identified in your

4    report in footnote 25 are ones that you believe

5    should not be -- should not be -- their responses

6    should not be interpreted as reflecting confusion

7    as to source or sponsorship or affiliation;

8    correct?

9                MR. LONG:  Objection,

10   mischaracterizes.

11         A      They should be used for the purpose

12   that I said that they should be used.  To think

13   about how people are interpreting, what people are

14   looking at when they see the product, and how

15   they're answering the questions.

16         Q      (BY MR. LARKIN)  But just so it's

17   clear, is it your opinion that they should not have

18   been counted by Dr. Ford, as you put it here,

19   supposedly confused?  They should have been, they

20   should have been -- their responses should have

21   been excluded from confusion as to source or

22   sponsorship or affiliation?

23         A      I didn't say that, but what it tells

24   me is that these are simply the people that said

25   it.  There are other people that may not have said

1  it point blank but who may have also interpreted

2  the survey that way.

3           It tells me that the survey as a

4  whole, and all the results in it, need to be

5  considered from the perspective that this is a

6  parody product and these verbatims are clearly

7  telling us that.  So that we -- it's not the same

8  interpretation as a typical likelihood of confusion

9  survey.  It's a parody product and these verbatims

10 are telling us that and we have to consider the

11 results in that light.

12      Q     But the bottom line, should they be

13 counted or should they not be counted as people who

14 are confused about the source or sponsorship or

15 affiliation of the product?

16      A     Again, that's ultimately the judge's

17 decision here.  I am pointing out the additional

18 analysis that Dr. Ford should have done so that we

19 have a complete understanding of what the survey

20 results really were telling us.

21      Q     Okay.  So you're not saying that

22 those respondents that we have been talking about

23 should not have been counted by Dr. Ford as being

24 confused as to the source of sponsorship or

25 approval of the product?

Page 204

1          A     I am not trying to pull them out one

2     by one.  I am not doing that.  Because again, I

3     found enough evidence here in people's verbatims

4     talking about telling me there's a theme here.  And

5     the theme needs to be considered in the

6     interpretation of the results and that wasn't done.

7          Q     What percentage -- Dr. Ford, as you

8     said in paragraph 25, "Dr. Ford believes that a

9     survey results show that approximately 29 percent

10    of respondents were confused between the Bad

11    Spaniels dog toy and Jack Daniel's."  That's your

12    first sentence of paragraph 25 in your report.

13          What percentage of the respondents do

14    you believe were confused between the Bad Spaniels

15    dog toy and Jack Daniel's?

16          A     I couldn't give you a number and the

17    reason is because the survey is so flawed that we

18    can't do that.  For example, the control is just

19    wrong.  Without a proper control, it's impossible

20    to calculate net confusion.

21          Q     I'm not talking about net confusion

22    right now.  I'm talking about your criticism of Dr.

23    Ford's interpretation of the test cell results.

24    And you said "Dr. Ford believes that his survey

25    results -- the survey results show that

Page 205

1    approximately 29 percent of respondents were

2    confused."

3              Just focusing on the test cell, what

4    is -- do you have a figure as to what respondents

5    should have been excluded from the test cell as

6    being confused?

7         A    I do not because, again, as I pointed

8    out earlier, there's, there's problems with the

9    control.  There's also problems with the test cell.

10   As I pointed out, we spent a lot of time talking

11   this, the test cell did not mimic marketplace

12   conditions.  So the test cell by itself is -- won't

13   tell us anything because it doesn't follow a very

14   important principle.

15             Going beyond that now to looking at

16   what the verbatim responses were and it's the

17   reason why I did this, to look at the verbatims,

18   and the reason why I went through and did this

19   analysis was to show, through evidence that I found

20   in the survey results, that it need -- these

21   results need to be interpreted in the light of the

22   fact that it's a parody product.

23             Dr. Ford did not do that.  He seemed

24   to interpret it as though it was any other kind of

25   product.  He hadn't -- unless I missed it, he had

Veritext Legal Solutions
866 299-5127

1    nothing in there about the fact that it was a

2    parody product.  He had nothing in there about the

3    fact that he would mention any of these things that

4    I mentioned, that they would affect the

5    interpretation of the results in any way.  And I am

6    bringing this to the attention of people who are

7    going to read this report because I think it's

8    important to consider that.

9         Q    Okay.  Let's go through the remaining

10   respondents in your footnote 25 quickly.

11             Respondent 1029.  That respondent, in

12   response to the question "Is the Bad Spaniels toy

13   being made or put out with the authorization or

14   approval of another company?"  Answer, "Jack

15   Daniel's because the label resembles and is a play

16   on their label."  And then went on further to say,

17   "It has the colors and design of the Jack Daniel's

18   label."

19             Do you see that portion of the

20   verbatim?

21        A    I do.

22        Q    Is it your opinion that that

23   respondent did not in fact believe that the product

24   was being made or put out with the authorization or

25   approval of Jack Daniel's?

Veritext Legal Solutions
866 299-5127

1          A     It's my opinion that, as I pointed

2     out here, that this is suggesting that the person

3     knew that the product was a parody, and they are

4     interpreting -- they are trying to interpret

5     whether a parody needs to get authorization or

6     approval, and respondent 1029 in their earlier

7     response said that they know it's put out by Silly

8     Squeakers.

9               So they know that.  And yet, they are

10    all of a sudden trying to think if Jack Daniel's --

11    if they would -- if Jack Daniel's would need to

12    grant authorization or approval for this.

13         Q     Okay.  Let's look at respondent 1033

14    please, that's the next in order in your footnote.

15    That respondent, do you agree that that respondent

16    said the Bad Spaniels toy is being made or put out

17    by Jack Daniel's?

18         A     They did say that.  In question one,

19    this is respondent 1033.

20         Q     And the response to the following

21    question, why do you say that?  "Because it is a

22    spoof on their logo."

23               Do you see that?

24         A     Yes.

25         Q     And is it your opinion that that

Page 208

1    respondent did not believe that the product was

2    being made or put out by Jack Daniel's?

3         A    So I'll look at the complete response

4    to 1033, and this is on page 20 of Exhibit 113, and

5    I believe they said Jack Daniel's made or put it

6    out and the question, they asked why, and they said

7    "it is a spoof on their logo."

8              And later on, when they were asked if

9    they needed -- if authorization or approval needed

10    to be granted, they said, "My best guess is that in

11    order to use this design you would have to have

12    permission from the Jack Daniel's brand."

13         Q    What question asked whether

14    authorization or approval was needed, Dr. Nowlis?

15         A    Question 9.0.

16         Q    Okay.  Could you read what that

17    question asks?

18         A    Okay.  Let me find the exact wording

19    of it.  Question 9 asks, "Do you believe this

20    product either is being made or put out with the

21    authorization or approval of any other company or

22    companies, or is not being made or put out with the

23    authorization or approval of any other company or

24    companies, or don't know or have no opinion."

25         Q    So you agree that nowhere in that

Page 209

1    question is the respondent asked whether the

2    company making or putting out the product needs to

3    get permission, authorization, or approval from

4    anyone; correct?

5          A    We talked about this before.  It does

6    not have the word, quote unquote, "need" in it, but

7    it certainly asks if permission or approval, if

8    they needed to grant it, and then question 9.1 is

9    if they gave it.

10         Q    Where does question 9.0 ask whether

11   they needed to grant it?

12         A    I think we're mincing words here in

13   my opinion.  Because it says "Do you believe this

14   product is or is not being made or put out with the

15   authorization," when it says "with the

16   authorization or approval."

17         Q    And you interpret that as -- that's a

18   standard Ever-Ready question; correct?

19         A    Yes.

20         Q    But you interpret the way in which

21   the question is asked in this case as asking the

22   respondent whether authorization or approval is

23   needed; is that correct?

24         A    We talked about this before.  The

25   words "need" are not in there.

Page 210

1          Q      Okay.

2          A      That's why I'm not saying that.  Some

3     of the respondents I believe use the word "need"

4     in their verbatims.  I think respondent 1001 did,

5     for example, but it's not in that question.

6          Q      Let's go to paragraph 26 of your

7     report, please, on page 13.  And I'm, I'm going to

8     read this.  I think it's probably the fastest way.

9     You wrote, "Also, note that, of the four questions

10    designed to test likelihood of confusion (made or

11    put out, other products made or put out,

12    authorization/approval, and affiliation/

13    connection), the largest group who were counted by

14    Dr. Ford as supposedly confused were those

15    answering the question about authorization or

16    approval."

17                Do you see that?

18         A      Yes.

19         Q      Wouldn't that make sense, given the

20    fact that Jack Daniel's makes whiskey, not dog toys

21    or other products?

22         A      I'm not sure what you mean by "makes

23    sense."  I'm just reporting a fact here.

24         Q      Okay.  But wouldn't it be -- wouldn't

25    it make sense that the largest group would believe

                                      Page 211

1    that this product was made or put out with the

2    authorization or approval of Jack Daniel's rather

3    than being made or put out by Jack Daniel's itself

4    when Jack Daniel's doesn't make this product?

5            MR. LONG:  Objection, foundation.

6        A    It's -- each survey is different and

7    I am simply making a note of what the most common

8    response was.  And then later on I am analyzing

9    that to show that the majority of people who

10   thought that they -- authorization or approval had

11   to be granted also knew that VIP made or put out

12   the product.

13           Q    (BY MR. LARKIN)  Okay.  And you went

14   on, after giving the breakdown and I'm not going to

15   read that into the record because it's there, the

16   last sentence of paragraph 26 you wrote, "In

17   particular, the largest group of respondents (12.8

18   percent) were likely trying to figure out if a

19   parody needs authorization or approval from the

20   company it is spoofing (since the greatest alleged

21   'confusion' from the four likelihood of confusion

22   questions came from the question about

23   authorization or approval)."

24           Do you see that?

25       A    Yes.

Veritext Legal Solutions
866 299-5127

1        Q      And the reason for your belief that

2    that group of respondents was, quote, "likely

3    trying to figure out if a parody needs

4    authorization or approval from the company it is

5    spoofing," is the verbatims of that group; correct?

6        A      If the verbatims and my point in the

7    next paragraph, which is the majority of that group

8    knew that the product was put out by VIP.  And then

9    only later on, when it got to this other question

10   about authorization or approval, were they trying

11   to determine whether this -- whether Jack Daniel's

12   needed to give this.

13       Q      Okay.  Let's look at those

14   respondents.  And you noted -- you footnoted those

15   respondents in paragraph 27; correct?

16       A      Yes.

17       Q      Okay.  Let's look at their responses

18   now.

19       A      Okay.

20       Q      We have already -- we have already

21   looked at respondents 1001, 1020, 1022, and 1029,

22   because you reference those in the preceding

23   footnote.  Correct?

24       A      Yes.

25       Q      So let's look at respondent 1035.

Page 213

1    That respondent said, in response to question 9.0,

2    that the Bad Spaniels toy "is being used with the

3    authorization or approval," and then in response to

4    9.1, "Jack Daniel's," and a response to 9.2, "It is

5    the same look."

6                 Do you see that?

7         A    Yes.

8         Q    That respondent made no mention of

9    this being a spoof; correct?

10        A    Correct.

11        Q    And that respondent made no mention

12   of a belief that the company that made or put out

13   the product needed to get permission; correct?

14        A    They never used word "need" anywhere.

15        Q    Let's look at respondent 1044,

16   please.  It's on B-14.  I'm sorry, B-15.  That

17   respondent said that the Bad Spaniels toy is being

18   made or put out with the authorization or approval

19   of Jack Daniel's; correct?

20        A    Yes.

21        Q    Because the Jack Daniel's name is on

22   the front of the package.  That's the reason given

23   for the authorization or approval and belief;

24   correct?

25        A    Yes.

1          Q     That respondent didn't mention a

2     spoof or didn't mention any need to get permission;

3     correct?

4          A     Correct.

5          Q     That respondent coincidentally also

6     said in response to 8.1 that it says Silly

7     Squeakers on the front of the tag.

8                Do you see that?

9          A     I do see that.  So we -- I think we

10    all agree, though, you, me, and Dr. Ford and

11    everybody, that it's unreadable.

12         Q     Apparently this respondent read it?

13         A     I don't know how that's possible.

14         Q     Let's go on to respondent 1054,

15    please.  That respondent, in response to the

16    question, "What other product or product, if any,

17    is made or put out by Silly," the company that

18    makes or puts out this product, that respondent

19    responded "Jack Daniel's whiskey."  Correct?

20         A     Yes, and this may well have been

21    somebody who couldn't read the whole Silly Squeaker

22    since we just pointed that out.  They could only

23    read the top of the front label.

24         Q     And in response to the probe

25    question, "Why do you say that," the -- that

                                        Page 215

1    respondent said "The toy looks like a Jack Daniel's

2    bottle."

3               Do you see that?

4         A    Yes.

5         Q    And then in response to the question,

6    "Is the product being made or put out with the

7    authorization or approval of any company or

8    companies," that respondent responded "Jack

9    Daniel's, Inc." Correct?

10        A    Yes.

11        Q    And is that respondent didn't mention

12   a spoof or anything about needing to get

13   permission; is that correct?

14        A    You are correct.

15        Q    Okay.  Next is 1062.  That is on page

16   B-21 in Dr. Ford's report.

17        A    I have it as B-22.

18        Q    I'm sorry.  You have a different -- I

19   have the actual, yeah, sorry.

20        A    Oh, okay.

21        Q    You are with me on respondent 1062;

22   correct?

23        A    Yes.

24        Q    That respondent, in response to the

25   question "What other products or products, if any,

Page 216

1    are made or put out by I guess Silly Squeakers,"

2    that respondent answered "Jack Daniel's" and gave

3    as the reason it has the same sort of label.

4              Do you see that?

5        A    I do, yes.

6        Q    And there is no mention there of

7    whether the product is a spoof or whether the

8    company that made or put out the product had to get

9    permission; correct?

10       A    Well, they did say it was made in

11   China.

12       Q    That's -- I think we'll all agree

13   that's different from being a spoof.  It may be

14   different things but there's no mention of "spoof"

15   in that respondent's answer; correct?

16       A    They don't specifically use the word

17   "spoof."

18       Q    Okay.  Or "parody"?

19       A    Or "parody."

20       Q    And they don't make any mention of

21   needing to get permission; correct?

22       A    They don't use the word "need

23   permission."

24       Q    In respondent 1065, that respondent

25   identified Bad Spaniels as the company that makes

1    or puts out the toy in response to 7.0; correct?

2          A     Yes.

3          Q     And farther in that answer they also

4    --7.0, they also said "It closely resembles is a

5    Jack Daniel's bottle."

6                Do you see that?

7          A     Well, if I'm just going through it,

8    they said -- let's see.  8.0 they said, "I would

9    expect balls to be made from this company as well,"

10   and then where are you on 9?

11         Q     Yeah.  Starting on 9 --

12         A     Or it says 8.1, "It's based on it

13   being a chew dog toy."

14         Q     Okay.  That respondent 1065 answered

15   the question, "Is the product being made or put out

16   with the authorization or approval of the other

17   company, Jack Daniel's."

18                Do you see that?

19         A     Yes.

20         Q     And the reasons given were that

21   that's "what the bottle resembles" and "This is

22   what a Jack Daniel's bottle looks like.  Other than

23   the name and some details, it's a mirror image."

24                Do you see that?

25         A     Yes.  They say "This is what a Jack

                                          Page 218

1    Daniel's bottle looks like.  Other than the name

2    and some details, it's a mirror image."  I do see

3    that.

4         Q    Um, that respondent did not mention

5    that he or she thought the product was a spoof or a

6    parody; correct?

7         A    They did not say "parody" or "spoof."

8         Q    And there's no mention of needing to

9    get permission from anyone; correct?

10        A    They did not used words "needing

11   permission."  That is correct.

12        Q    1095.  That respondent identified VIP

13   products as a company that made or puts out the

14   toy, and then in response to 9.0, "Is the product

15   -- is the toy being made or put out with the

16   authorization or approval of anyone," they

17   answered, "I believe that Jack Daniel distillery

18   wanted to help out."

19             Do you see that?

20        A    I do.  Yes.

21        Q    Do you believe that that indicates

22   that this respondent believed that the product was

23   being made or put out with the authorization or

24   approval of Jack Daniel's?

25             MR. LONG:  Objection, form.

Page 219

```
 1          A       Well, they answered question 9.0

 2     that, yes, they do believe that.

 3          Q       (BY MR. LARKIN)   Okay.   And there is

 4     no mention of a spoof or parody or of needing to

 5     get permission in that respondent's verbatims;

 6     correct?

 7          A       9.1 is close when they said "I

 8     believe that Jack Daniel distillery wanted to help

 9     out."  This is exactly why it's important to go

10     through these verbatim responses as you and I are

11     doing because it helps us to get a better picture

12     of what's going on here.

13          Q       Do you interpret that response to be

14     that Jack Daniel distillery licensed the product?

15          A       I don't know exactly what they meant

16     by that but I do know it fits the theme that I've

17     seen throughout the verbatims that we have talked a

18     lot about.

19          Q       But there's no mention -- you

20     interpret that answer to reflect the respondent's

21     belief that permission was needed?

22          A       They don't use the words, quote

23     unquote, "permission was needed."  But again, this

24     verbatim response gives us some interesting

25     information that I think is useful.
```

Page 220

1         Q     Okay.  1098.  That respondent

2    identified Silly Squeakers as the company that made

3    or put out the product, and in response to 9.0, "Is

4    the product being made or put out with the

5    authorization or approval of anyone," the

6    respondent answered "Jack Daniel's."  Correct?

7         A     They did.

8         Q     And the reason given is, "It's

9    similar to the bottle design for Jack Daniel's and

10   Jim Beam."

11              Do you see that?

12        A     I do.

13        Q     There's nothing in those verbatim

14   responses mentioning a spoof or the need to get

15   permission; is that correct?

16        A     They do not use those specific words

17   in this, for their responses, that is correct.

18        Q     Let's look at 1099.  "What other

19   product or product made or put out by Silly

20   Squeakers," and the respondent answered "Jack

21   Daniel's."

22              Do you see that?

23        A     To 8.0 they answered "Jack Daniel's,"

24   that is correct.

25        Q     And again there is no mention in the

Page 221

```
 1    verbatim of this being a spoof or a parody or
 2    permission being needed?
 3            A     That is correct.
 4            Q     Okay.  1106.  That respondent
 5    identified Bad Spaniels as the company that made or
 6    put out the product.  Then in response to the 9.0
 7    question identified Jack Daniel's as the company
 8    who gave or -- gave authorization or approval for
 9    the product.
10            Do you see that?
11            A     Yes.
12            Q     And the reason is -- reasons given
13    were "Because it's Jack Daniel's.  It looks like
14    Jack Daniel's."
15            Do you see that?
16            A     Yes.
17            Q     There is no mention in those verbatim
18    responses of spoof or need to get permission?
19            A     That is correct.
20            Q     Okay.  And 1132?  That respondent
21    identified Silly Squeakers as the company who made
22    or put out Bad Spaniels toy and in response to the
23    question, "Is it being made or put out with the
24    authorization or approval of another company,"
25    answered "Jack Daniel's," and gave as the reason,
```

Page 222

1    "The 'label' on the toy is the same design as the

2    label on a bottle of Jack Daniel's whiskey."

3              Do you see that?

4        A    Yes.

5        Q    And there is no mention in that

6    response of spoof or the need to get permission?

7        A    Correct.

8        Q    Okay.  1139, please.  That respondent

9    identified Silly as the company that makes or puts

10   out the Bad Spaniels toy and in response to the 9.0

11   question, "Is the product being made or put out

12   with the authorization or approval of any company,"

13   answer, "Jack Daniel's" and gave as the reasons,

14   "That label" and "That logo."

15             Do you see that?

16       A    Yes.

17       Q    And there's no mention in that

18   respondent's verbatims as a spoof or the need to

19   get permission; right?

20       A    That's correct.

21       Q    Okay.  1147.  That respondent

22   identified Bad Spaniels as the company that makes

23   or puts out the toy.  Then in response to the

24   question, "What other product or products, if any,

25   were made or put out by Bad Spaniels," respondent,

Page 223

1    "Jack Daniel's," gave as the reason, "It looks like

2    their products" and "The appearance."

3                   Do you see that?

4          A     Yes.

5          Q     And then in response to the question,

6    "Is the product being made or put out with the

7    authorization or approval," identified "Jack

8    Daniel's," gave as the reason -- reasons, "It uses

9    their brand image.  It looks like their product."

10   Correct?

11         A     Yes.

12         Q     Then in response to the question,

13   "Does the company putting out the product have a

14   business affiliation or business connection with

15   another company," gave as the response, "Jack

16   Daniel's Tennessee whiskey," and the reasons, "They

17   are using their brand image" and "It looks like

18   their product."  Correct?

19         A     Yes.

20         Q     And there's no mention in any of

21   those verbatims of this product being a spoof or

22   permission from Jack Daniel's being required?

23         A     That is correct.

24         Q     Okay.  1172, that respondent

25   identified Silly made in China as the company that

                                        Page 224

1    made or put out the product and then said that the

2    company -- that company "Has a business affiliation

3    or business connection with Jack Daniel's."

4                    Do you see that?

5        A    Yes.

6        Q    And again, there's no mention of

7    verbatim there about this being a spoof or about

8    permission being needed?

9        A    That is correct.

10       Q    Okay.  Couple more.  1176, please.

11   That respondent identified Silly Squeakers as the

12   company that made or put out product, and in

13   response to the question, "Is it being made or put

14   out with the authorization or approval of another

15   company," answer, "Jack Daniel's," and gave as the

16   reason, "It looks like a dog version of a Jack

17   Daniel's bottle."

18                   Do you see that?

19       A    Yes.

20       Q    And there's no mention in those

21   verbatim responses of this being a spoof or

22   permission from Jack Daniel's being needed.

23   Correct?

24       A    Well, I mean, when they say "It looks

25   like a dog version of the Jack Daniel's bottle,"

Page 225

1    and earlier on they said "It's a funny dog toy,"

2    it's -- certainly could be thinking that this is a

3    spoof or parody.  They don't use those exact words

4    but it's suggestive of that.

5           Q     So you interpret the entirety of

6    1176's verbatim response to indicate that the

7    respondent thought it was a spoof?

8           A     No.  I said it certainly indicates

9    that that could be what they were thinking.

10          Q     Okay.  And last two.  1179, please?

11   That respondent identified VIP as the company that

12   makes or puts out the toy, and then in response to

13   9.0, "Is it being made or put out with the

14   authorization or approval of any company or

15   companies," gave "Jack Daniel's," and as the

16   reason, "The toy looks like a Jack Daniel's

17   bottle."

18                Do you see that?

19          A     Yes.

20          Q     There's no mention in those verbatim

21   responses of this being a spoof or of the need to

22   get permission?

23          A     You are correct.

24          Q     And the last one in your footnote,

25   1210, that respondent -- do you agree that that

Page 226

1    respondent said that he or she didn't know who made

2    or put out this product?

3           A      Yes.

4           Q      Okay.  And then in response to the

5    question about whether the company -- whatever

6    company made or put out the product had a business

7    affiliation or business connection with anyone,

8    answer, "Jack Daniel's," gave as the reasons,

9    "Because of similarity of names" and "It looks like

10   a bourbon bottle."

11                Do you see that?

12          A      Yes.

13          Q      There's nothing in the verbatim

14   responses of that respondent mentioning a spoof or

15   of the need for Jack Daniel's to give the producer

16   permission?

17          A      That is correct.

18          Q      Look at paragraph 28 of your report,

19   please.  And you wrote, quote, "Thus, my analysis

20   of Dr. Ford's results shows that they need to be

21   interpreted in light of the fact that the Bad

22   Spaniels dog toy is a parody of a Jack Daniel's

23   liquor bottle.  When this is done, it is clear that

24   many respondents in fact recognized that the

25   product is being made or put out by VIP, and yet

Page 227

1    were thinking that VIP would need to get

2    authorization or approval from Jack Daniel's in

3    order to sell such a parody product."

4            Do you see that?

5        A    Yes.

6        Q    Which respondents in Dr. Ford's test

7    cell actually mentioned that, quote, "VIP would

8    need to get authorization or approval to sell the

9    product"?

10        A    Right.  So when we talked about this

11    before, when I said "need authorization or

12    approval," I was referring to question 9, which is

13    giving authorization or approval.  I used the word

14    "need" instead of "give."  But it is the same idea.

15    But I could replace that with "give."

16        Q    Okay.  Let me just make sure I

17    understand that answer.  Well, it's -- do I

18    understand it correctly that the part of paragraph

19    28 where you opined that "it is clear that many

20    respondents in fact recognize that the product is

21    being made or put out by VIP products, and yet were

22    thinking that VIP would need to get authorization

23    or approval from Jack Daniel's in order to sell

24    such a parody product," are you now saying that

25    what you meant was that -- and I'm going to

                                        Page  228

1   paraphrase what you wrote, you tell me if it's
2   accurate -- yet were thinking that Jack Daniel's
3   had given VIP permission, authorization, or
4   approval, to sell such a parody product?
5        A    Yes.  I'm linking question 7 and 9
6   together.  That's exactly what those two are
7   saying.  And that's the general point.  But even if
8   you -- even the -- another point that we talked
9   about before was that some of the verbatim
10  responses, I believe somebody even did use the
11  specific word "need."  I have to see if respondent
12  1001 said that.  They would have to get the
13  approval of Jack Daniel's.
14       So, I mean, some of them even would
15  say something like that in their verbatims, but the
16  general point here is linking question 7 and 9 and
17  looking at those two together rather than as
18  individual questions, which I think Dr. Ford did.
19  I tried to look at the total response across the
20  questions and looked at their verbatims to help me
21  analyze the results.
22       Q    Well, is it, in the Ever-Ready
23  protocol, which I think you referenced in paragraph
24  26, if you'd turn to that for a second, please.  In
25  the Ever-Ready protocol, is it correct, based on

Page 229

1  what you said in paragraph 26, that in the

2  Ever-Ready protocol you ask four questions designed

3  to test likelihood of confusion.

4           Made or put out, that's source

5  confusion; correct?

6       A    Yes.

7       Q    What other product or products, if

8  any, are made or put out by that company.  That's

9  also goes to source confusion; correct?

10      A    Yes.

11      Q    Then ask you the authorization or

12  approval question that we have been discussing.

13  That goes to sponsorship confusion; correct?

14      A    Yeah, there's sponsorship and --

15  there's authorization and sponsorship.  But, right.

16  Affiliate -- anyway, these are the base -- right.

17      Q    The first two questions go to source

18  confusion?

19      A    Yes.

20      Q    Did some company make or put out the

21  product; correct?

22      A    Yes.

23      Q    And the last two questions, which you

24  described as authorization or approval and

25  affiliation connection, that goes it sponsorship

                              Page 230

1    confusion; correct?

2            A       Yes, sponsorship and affiliation.

3            Q       Okay.

4            A       Yes.

5            Q       And it's typical to ask all four of

6    those questions in an Ever-Ready protocol; correct?

7            A       Yes.  I -- we don't have a problem

8    with that.  It's the fact that it's a parody

9    product and the fact that because it is, that's a

10   very important consideration here.  So the

11   interpretation of the results would need to be

12   considered with that in mind.  And Dr. Ford did not

13   do that and I did that.

14           Q       Okay.  Just so it's clear, you

15   wouldn't -- if you were designing a survey in a

16   parody case, you feel it's appropriate to use the

17   traditional Ever-Ready protocol in terms the

18   questions; correct?

19           A       Well, I didn't design the survey but

20   in theory, I don't have a problem with that.

21           Q       Okay.  Do you believe that a -- some

22   percentage of the dog buying public in the United

23   States believes that all spoofs require the

24   permission of the company they spoof?

25                   MR. LONG:  Objection, foundation.

Page 231

1          A       I'm sorry, could you say that again?

2          Q       (BY MR. LARKIN)  Well, you read Dr.

3    Ford's -- a rough transcript of Dr. Ford's

4    testimony; correct?

5          A       Yes, I did.

6          Q       Do you recall that he was asked on a

7    number of occasions -- he was -- he was asked to

8    assume for purposes of his questions on a number of

9    occasions that some percentage of the, I think Mr.

10   Bray used the public, holds the belief that all

11   spoofs require the permission of the company they

12   spoof.  Do you remember those questions?

13         A       I don't remember the deposition in

14   that level of detail.

15         Q       Okay.  Let me go at it this way.  Do

16   you believe that there is a certain percentage,

17   beginning with the general public, who believes

18   that all spoofs or parodies, like the one that's

19   claimed in this case, require the permission of the

20   company they spoof to be legal?

21                 MR. LONG:  Objection, foundation.

22         A       I have no idea.

23         Q       (BY MR. LARKIN)  Okay.  And I assume

24   from that answer that you've never tested that or

25   studied that issue?

                                          Page 232

```
 1            A      You are correct.
 2                   MR. LARKIN:  Let's take a very short
 3      break and I think we're almost finished.
 4                   (Off the record.)
 5            Q      (BY MR. LARKIN)  Back on the record.
 6      Just a couple of last questions and then we'll get
 7      you out of here.
 8                   Dr. Nowlis, looking again at your
 9      critique of Dr. Ford's failure to properly code and
10      analyze his data, do I understand your testimony
11      correctly that you don't have an opinion as to
12      which of the respondents who Dr. Ford characterized
13      or classified I guess as confused should be
14      excluded from that categorization?
15            A      I didn't, no, I don't pinpoint them
16      one by one.  I do not do that.
17            Q      Or how many of them should be
18      excluded?
19            A      I don't have a specific answer on
20      that.
21                   MR. LARKIN:  Okay.  Subject to any
22      possible dispute about Mr. Long's instructions to
23      Dr. Nowlis not to answer certain questions about a
24      rebuttal survey, I have no further questions.  Dr.
25      Nowlis, thank you for your time today.
```

Page 233

1           MR. LONG:  No questions for me, but

2     just want to read and sign.

3           THE REPORTER:  What format do you

4     like your transcript in?

5           MR. LONG:  Digital is fine.

6           MR. LARKIN:  That's fine for me too.

7           THE REPORTER:  Do you want the

8     exhibits attached?

9           MR. LARKIN:  Yes, please.

10          (Wherein, the taking of the instant

11     deposition ceased at 3:29 p.m.)

12          (Deposition to be read and signed by

13     the witness.)

14

15

16

17     _____          _____

18          STEPHEN NOWLIS                 DATE

19

20

21

22

23

24

25

                                        Page  234

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, TARA SCHWAKE, a Registered

 4    Professional Reporter and Notary Public within and

 5    for the State of Illinois, do hereby certify that

 6    the witness whose testimony appears in the

 7    foregoing deposition was duly sworn by me; that the

 8    testimony of said witness was taken by me to the

 9    best of my ability and thereafter reduced to

10    typewriting under my direction; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken, and further that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties thereto, nor financially or otherwise

16    interested in the outcome of the action.

17

18    DATED: September 8, 2015

19

20

21

22

23          TARA SCHWAKE

24

25
```

Veritext Legal Solutions
866 299-5127

[& - 25]

**&**

**&**   20:10 22:5,17
23:25 24:21 147:24

**0**

**0022**   16:14
**0024**   13:15
**0034**   69:25
**0036**   72:11
**0037**   72:8 74:3
**0038**   72:8 74:9
**0039**   72:9
**0040**   72:10
**02057**   1:7 4:7
**0255**   11:15
**0256**   11:21
**0257**   10:8

**1**

**1**   71:18 72:13,19
73:1,2,9,21 74:10
76:7 102:5,13
117:23 123:9,16,23
124:3,18 125:14
126:3 127:4,20
**1,000**   143:11
**1-235**   1:24
**1.49**   43:18
**10**   2:15 11:11 54:18
72:16 131:1,2
152:25 156:15
185:18 201:1
**100**   123:3 141:20
142:16 144:24,25
**1001**   140:10 187:19
188:11 190:17
211:4 213:21
229:12
**1012**   194:7 195:9,15
195:22
**1015**   196:15,23,24
197:1 198:15
**1020**   198:19 199:13
213:21

**1022**   200:16 201:14
202:21 213:21
**1029**   156:14 157:6
207:11 208:6
213:21
**1033**   208:13,19
209:4
**1035**   213:25
**1044**   157:10 158:6
214:15
**105**   2:12,17 7:12,15
7:20
**1054**   215:14
**106**   2:18 8:8,12,15
8:20,20 9:21,24
10:5,9 75:8,23 77:4
101:15 161:16,17
**1062**   216:15,21
**1065**   217:24 218:14
**107**   2:20 9:8,11,14
10:7 13:2 32:19,19
35:15 65:13,20 67:3
67:10,18 68:6,15,24
69:17 76:20 79:8,10
**1075**   104:4
**108**   2:23 10:19
39:22 40:1,4,8
41:22 43:16
**109**   3:1 44:18,20,23
45:15,18 46:12
185:13,18
**1092**   104:5
**1095**   219:12
**1098**   221:1
**1099**   221:18
**10th**   36:24
**11**   141:17 158:25
166:22 170:3,9
**110**   3:3 48:11,13,16
130:5,6
**1106**   222:4
**111**   3:5 52:22,25
53:3
**112**   3:7 54:8,10,13
54:20 55:16 56:12

56:21
**113**   3:9 78:5,8,11
139:23 142:6 157:7
179:21 180:14
188:12 192:25
201:13 209:4
**1132**   222:20
**1139**   223:8
**114**   105:22 107:4,11
145:10
**1147**   223:21
**1172**   224:24
**1176**   225:10
**1176's**   226:6
**1179**   226:10
**11th**   4:18
**12**   159:19 169:8
173:12,16 176:24
187:19
**12.3**   107:4,11
**12.8**   212:17
**12/14/12**   3:1
**1210**   226:25
**13**   82:3 193:24
211:7
**14**   1:7 4:7 46:12
56:22 80:6 143:11
214:16
**1400**   5:5
**145**   2:10
**147**   2:13
**149**   2:16
**15**   14:24 15:6 79:22
80:14 81:25 82:4,4
83:7 84:10 92:15
100:11 101:1
157:11 214:16
**15-29**   91:13
**1511**   91:11
**16**   11:21 13:6,7 48:1
69:23 99:22 100:11
101:3 103:3
**17**   13:19 104:11
114:11 117:21
188:12

**172-9**   44:22
**18**   12:8 13:22 14:1,2
14:3 69:4 108:3
114:14
**1850**   5:5
**19**   69:4 123:6
125:13 192:24
201:14
**1990**   88:15 89:16
**1996**   33:11
**1st**   67:25

**2**

**2**   40:8 55:1 76:10
98:13,17 99:12,15
102:5,13 111:2
114:19 118:24
119:21,25 122:17
**20**   13:22 14:3
114:24 142:6,9
157:6 209:4
**2001**   39:11
**2009**   16:2 33:12
**2015**   1:20 4:15 16:2
32:21 72:13 235:18
**2029**   5:13
**21**   13:24 14:1 16:14
136:13 141:16
216:16
**22**   15:23 16:7,10
22:8 46:25 151:7
216:17
**23**   13:14 158:24
159:19 163:17,22
166:22 169:7
170:19 172:1
**24**   13:19 15:21,23
16:7,10 25:14 27:8
**25**   1:20 173:15
176:23 181:19
187:14,18 193:25
195:2,14,23 196:15
197:17 203:4 205:8
205:12 207:10

Veritext Legal Solutions
866 299-5127

**[256 - addressing]**

**256**  11:20
**257**  11:20 12:7,8
**25th**  4:14
**26**  3:9 66:22 73:22
  78:6 211:6 212:16
  229:24 230:1
**27**  213:15
**277-7200**  5:15
**28**  227:18 228:19
**285-5000**  5:7
**29**  205:9 206:1

**3**

**3**  40:25 41:22 42:10
  43:4 55:16 80:7
  118:22 119:8,10
**30**  46:2
**310**  5:15
**322**  11:17
**323**  11:17
**327**  76:23 161:19
  162:10
**33**  185:17
**334**  76:23 161:19
  162:10
**3500**  5:13
**36**  106:20
**370**  61:13
**396**  75:11
**3:29**  234:11
**3rd**  88:15
**3s**  119:9

**4**

**4**  43:16 56:12 80:7
  119:19
**40**  2:10,25 145:12
  145:14,18,22
  146:11,13,17,19
  162:6
**400**  133:8,9 134:11
  135:4
**401**  76:23
**408**  76:23
**418**  76:25 77:1

**43**  123:2 141:19
  142:15
**44**  3:2
**467**  88:15 89:14
**48**  3:4
**49**  107:1,3

**5**

**5**  94:7 120:4
**52**  3:6 45:17,19,22
**53**  2:11 45:17,21,25
  104:25 105:3,6,13
**54**  3:8

**6**

**6**  2:6 71:18 76:22
  77:10 114:11
  117:22 120:11
  162:10 196:16
**602**  5:7
**61**  46:11,24 78:20
**62**  47:4
**63**  161:20
**63130**  6:21
**64**  2:13 147:11,12
  147:16,21 152:24
  158:19
**65**  2:14 10:22,24,25
  11:3 13:5 15:21,23
  36:24 82:2 130:23
  151:7
**66**  2:16 3:14 148:25
  149:2,6,17 150:25

**7**

**7**  2:17 56:21 94:1
  120:19 121:4
  179:22 229:5,16
**7.0**  179:24 180:12
  218:1,4
**7.2**  197:24 198:16
**711**  4:18
**78**  3:10

**8**

**8**  2:19 32:21 53:13
  55:17 67:12 114:14
  180:14 235:18
**8.0**  156:17 157:15
  157:22,23 218:8
  221:23
**8.1**  215:6 218:12
**83**  11:15
**84**  11:15
**85004**  5:6
**8:35**  6:14

**9**

**9**  2:22 114:24
  128:15 131:1 180:6
  181:17 182:23
  183:2,7 187:1
  189:11 194:20
  195:4 196:10
  209:19 218:10,11
  228:12 229:5,16
**9.0**  180:13 183:8
  186:13,21 192:14
  210:10 214:1
  219:14 220:1 221:3
  222:6 223:10
  226:13
**9.0.**  209:15
**9.1**  183:24 184:8,24
  187:8 210:8 214:4
  220:7
**9.2**  200:25 201:24
  214:4
**90067-3021**  5:14
**921**  88:15 89:14

**a**

**a.m.**  6:14
**abbott**  30:4
**ability**  134:6,7
  158:16 235:9
**able**  132:10 133:4
  133:21 134:19,22
  134:25 135:11,16

135:21,22 136:10
138:20 147:1 150:4
150:7,20 151:10
172:5,11,14,18,24
199:20
**absence**  82:12 85:6
  92:16
**absolutely**  59:16
  63:3,6 133:2
**academic**  14:18
  127:10 128:21
**accept**  26:5
**accepted**  42:11
**accomplished**
  132:16
**account**  85:10
**accurate**  10:6 13:8
  13:20 47:6,8 48:7
  50:20 110:14
  113:20 229:2
**accurately**  43:7
  47:11 186:11
**acquired**  80:22 81:7
  81:10,12,16 82:9,12
  82:23 83:5,18 84:5
  84:15 85:7 89:21
  90:11 92:17,25
**action**  235:12,16
**actual**  41:25 55:24
  94:9 97:17 138:12
  141:5 142:13 151:9
  160:4,8 168:3,5,17
  169:4 172:4,11,20
  216:19
**addition**  15:22
  20:23 91:12 121:5
  136:14 151:7 169:9
  169:25 170:5
**additional**  13:11
  169:20,22 204:17
**address**  6:18,20
  58:23
**addressed**  7:13
**addressing**  84:23,24

[administration - approval]

**administration** 41:2
**admissions** 70:5
76:12,17 101:7,25
**admits** 57:5
**ads** 94:12
**advertising** 12:5,12
12:15,24 61:9 94:15
108:9
**advisor** 36:10
**affect** 107:21 132:11
133:2 134:19 135:4
155:11 172:15,21
202:25 207:4
**affiliate** 230:16
**affiliated** 121:9
**affiliation** 42:21
121:15 199:2,12,17
201:3 203:7,22
204:15 211:12
224:14 225:2 227:7
230:25 231:2
**affirm** 142:23
**affixed** 139:6
**afternoon** 4:17
**age** 6:9
**aggregate** 135:11,17
136:9 138:22
**ago** 11:6 13:18
14:25 15:6,22 44:14
62:11 73:17 116:17
124:11 176:25
**agree** 60:5 61:14,21
62:3 87:5 88:5,16
88:22 89:3,23 90:8
90:15 92:10 97:19
98:6,11,18 99:11,17
112:7 116:24,25
117:6,10 122:3,8,12
125:12 129:1,4
138:11 141:3 148:2
148:14 159:8,17
184:25 185:2
188:14 208:15
209:25 215:10
217:12 226:25

**agreed** 6:1 174:12
190:18
**ahead** 162:5
**al** 17:23 18:13 22:6
52:4
**allege** 79:24
**alleged** 82:23 85:8
86:11 107:6,18
115:2,10 123:18
124:1 151:19
212:20
**allegedly** 108:14
**allow** 135:6 151:14
151:20
**allowed** 131:5
137:23 140:23
**allowing** 60:2
**allows** 81:24
**aloud** 53:13
**amazon.com** 2:16
149:8,15,23
**amazon.com.** 149:7
**amend** 72:21
**amended** 72:22 80:6
80:9 101:4,5
**american** 2:11
15:12 105:1 106:15
**analysis** 106:20
115:14 174:2
177:22 190:12
204:18 206:19
227:19
**analyze** 173:13
229:21 233:10
**analyzed** 20:23 24:4
127:16 173:18
174:10
**analyzing** 212:8
**angeles** 5:14
**angle** 132:21
**angles** 144:7,19,20
**anheuser** 33:21 34:6
34:11 175:24
**anonymous** 88:1

**answer** 2:20 34:22
45:21,24,25 46:15
47:2 51:19 57:19
58:17,23 59:8,22
60:2 64:9 72:20,21
72:22 73:1 77:25
78:4 79:10 89:10
90:5 94:5 96:1,10
101:4 102:9 112:14
124:11 137:12,17
154:10 164:24
178:16 179:14
185:21 187:5,7,8
191:22 197:24
198:16 207:14
217:15 218:3
220:20 223:13
225:15 227:8
228:17 232:24
233:19,23
**answered** 61:2
86:13 118:7,20
119:7,17 120:3,9,17
121:1,18 125:15
127:7,23 143:17
188:5 190:17
192:13 198:19
200:18 217:2
218:14 219:17
220:1 221:6,20,23
222:25
**answering** 142:19
189:25 199:11
203:15 211:15
**answers** 132:7 135:8
161:5 177:2 178:15
185:22 192:7
202:10
**anybody** 143:8
**anymore** 108:6
**anything's** 176:14
**anyway** 230:16
**apparently** 215:12
**appeals** 88:13

**appear** 12:3 68:13
98:21 108:15 122:4
122:13,23 141:18
142:1 170:25
**appearance** 224:2
**appearances** 5:1
**appeared** 12:4
**appearing** 7:18
**appears** 8:24 11:5
12:11 40:7 48:18
53:7 67:21 99:19
122:9 146:6 148:5,8
148:11,17,20
155:17 235:6
**appendix** 100:12,21
142:7,8 156:7,8
**apple** 3:2 20:10,17
38:22 39:15,25 40:6
43:3 44:9,19 45:6
45:12 47:12,16
50:22 51:2 63:6
185:14,20 186:7,18
**applicable** 133:11
**applies** 100:12
**apply** 110:3 195:13
**approach** 117:1
**approaches** 12:1
**appropriate** 84:12
113:1,5,11 115:20
116:18 231:16
**approval** 177:6
179:5,18 180:8,13
180:24 181:3,14,23
182:2,18 183:10,12
183:19 184:1,3,9,15
184:21 185:3,25
186:14,16,24 187:3
187:9 188:7,17,22
189:11 190:20,23
191:6,12,15 192:4
192:10,15,18
193:12,16,18 194:3
194:11,13 195:7,12
195:20 196:5,11
198:1,21 200:20

[approval - bad]

201:11,23 204:25
207:14,25 208:6,12
209:9,14,21,23
210:3,7,16,22
211:12,16 212:2,10
212:19,23 213:4,10
214:3,18,23 216:7
218:16 219:16,24
221:5 222:8,24
223:12 224:7
225:14 226:14
228:2,8,12,13,23
229:4,13 230:12,24
**approved**  188:21
189:12 199:10
**approximately**
205:9 206:1
**arched**  98:24 99:2,3
**arches**  99:9
**area**  160:20 161:7
161:10 162:17
**arizona**  1:2,4 4:2,4
4:23 5:6 33:10,11
**arkin**  88:11
**art**  122:5,10
**article**  10:9
**articles**  10:12,14
11:8 14:6
**asia**  97:15
**aside**  13:2
**asked**  8:2 24:22
36:2,3 42:10,20
53:13 61:2 66:23
69:8 71:22 77:16
86:12 90:3 118:6,19
119:6,16 120:2,8,16
120:25 121:17
127:6,22 132:17
137:9 143:3 164:11
167:21 171:9
175:22 179:16
180:10,19 181:25
182:15 183:16
184:13,23 185:19
186:17 187:10

**august**  1:20 4:15
**authoritative**  12:17
12:21 91:3,8
**authorization**
179:12 180:8,12,23
181:3 182:18
183:10,12,18 184:1
184:3,9,14,21 185:3
185:11 186:14,15
186:24 187:3,9
188:7,16,23 189:11
189:20 190:20,23
191:6,12,15 192:3
192:10,15,18
193:12,15,18
194:11,13,18
195:12,20 196:5,11
198:1,21 200:20
201:11,23 207:13
207:24 208:5,12
209:9,14,21,23
210:3,15,16,22
211:12,15 212:2,10
212:19,23 213:4,10
214:3,18,23 216:7
218:16 219:16,23
221:5 222:8,24
223:12 224:7
225:14 226:14
228:2,8,11,13,22
229:3 230:11,15,24
**authorize**  200:8
**authorized**  103:22
177:15 188:20
189:12 199:10
**available**  130:12
134:14 135:20
136:6 138:25
152:12,19 159:16
175:4
**avenue**  5:5
**aware**  33:20 81:22
93:14 95:3 97:4,12
97:16 160:2,9 175:5

**b**

**b**  25:1 156:7,8,15
157:11 196:16
214:16,16 216:16
216:17
**back**  19:3,12 21:4
22:3,8 32:18 35:14
37:24 47:24 60:1
64:9 65:12 75:8
77:3 79:7 90:18
92:14 108:1 121:25
128:4,14 130:22
131:6,12,22 132:20
134:6,7 135:16
137:8 140:15 141:1
141:4,9,11,13
142:10 144:8 148:7
148:19 150:8 151:6
151:24 152:23
155:16 161:16
162:3 166:21 173:8
185:13 186:19
187:13 233:5
**backed**  193:11
**background**  146:7
**bad**  2:10 34:5 84:17
95:12 96:7 97:19
98:1,7,24 99:4,11
103:13,21 109:6
110:20 111:13
113:10 122:4,9,17
144:21 145:20
147:6 148:3,14
149:14,18 150:24
151:8 152:25 153:6
160:24 161:10,13
162:1,20,23 163:1
166:14 170:5,23,24
171:10 172:16
173:17,23 174:17
175:17 177:3 179:2
179:8,17 180:20
181:13 186:23
188:6,17,20 189:7

194:14 201:15,17
201:21 209:6,8,13
210:1,21 232:6,7
**asking**  59:20 85:14
94:8 143:2 159:9
184:16 190:6
210:21
**asks**  180:2,6,23
183:8 186:21 187:5
209:17,19 210:7
**asserted**  61:16
**assertion**  56:23
57:22
**assessing**  31:24
**assignments**  14:18
**associated**  91:17,24
**associates**  88:1
**association**  15:18
81:13
**assume**  87:14
112:18 127:4
152:17 161:5 232:8
232:23
**assumed**  178:13
**assuming**  129:14
181:15 186:10
**assumptions**  66:15
66:16,22 69:9 71:23
**atlantic**  17:22 19:4
**attached**  3:14 75:15
234:8
**attachments**  76:22
**attempts**  38:12
162:16
**attend**  56:7
**attention**  57:1 83:21
207:6
**attorney**  235:14
**attorneys**  8:2 65:25
66:14,20 67:2 68:7
68:14 69:4,8,13
71:18,22 72:2
**atypical**  160:16
**auditory**  151:14
158:13

**[bad - brands]**

190:19 194:17
196:3 201:16
202:13,18 205:10
205:14 207:12
208:16 214:2,17
217:25 222:5,22
223:10,22,25
227:21
**balls** 218:9
**barely** 170:10
**base** 133:15 230:16
**based** 52:5 55:17
56:1 57:23 124:21
124:24,25 126:11
160:17,21 163:25
164:6,9 165:19
197:23 218:12
229:25
**basic** 28:13 60:2
**basically** 7:10
**basis** 56:1 57:21
126:13 141:24
169:14,14,15 171:3
198:14
**bates** 9:25 75:2,10
**beam** 100:13,23
104:5 221:10
**bear** 150:25
**bearing** 132:7
**bears** 98:12,23
**beer** 147:24
**beginning** 9:8 46:12
46:25 69:17 114:11
173:15 232:17
**begins** 79:11 123:7
130:25 139:12
**behalf** 1:18
**behavior** 15:2 36:14
124:15
**belief** 190:21 191:10
192:2,16,17 194:17
198:14 213:1
214:12,23 220:21
232:10

**beliefs** 172:15
**believe** 8:16 10:10
13:17 17:10 18:22
20:13 21:10,12
22:15 25:7 27:5
33:19 34:3 37:10,21
38:3,5 41:13 43:7
55:20 67:7,15 72:25
73:11,13 74:4 80:11
88:4 94:10,22 97:16
101:12 102:10
104:19 113:10
116:24 127:3,4
128:11 129:16
130:15 132:14
140:13 141:8 145:1
145:5,25 146:14,21
149:16 150:3,22,22
157:18,24 167:6
170:10 174:15
176:3,10,22 177:14
179:25 180:3,6,10
183:8,25 184:9
186:12,13 187:2
190:18 193:9
195:17 196:2,3,19
197:3,9,14,23,24
199:1 201:1,8 203:4
205:14 207:23
209:1,5,19 210:13
211:3,25 219:17,21
220:2,8 229:10
231:21 232:16
**believed** 44:10
63:21 64:25 112:25
188:6,16,19,22
190:19,22 191:13
192:8,13 219:22
**believes** 117:5
195:11,18 199:9
201:9 205:8,24
231:23 232:17
**believing** 192:14
**benchmark** 100:13

**berkeley** 36:11
**best** 22:15 49:21
62:3,16 68:4,11
95:4 125:12,19,22
154:2 209:10 235:9
**better** 44:12 46:9
47:5 92:5 144:10
150:13 182:7
220:11
**beyond** 50:2 141:5
206:15
**big** 101:16 143:9
**bit** 9:3 28:15 80:15
129:19 154:9
**black** 94:1 98:7,9,11
98:16,19 114:16
115:5 116:5,7,11
118:10,17 119:11
119:14 120:21,23
**blank** 204:1
**blanking** 166:4
**blew** 150:10
**block** 22:9 29:21
**blocked** 136:15
139:16 143:10
**blu** 25:1,3
**blurry** 142:16
**bmg** 13:16
**boie** 76:21 162:9
**book** 12:4,12 185:24
186:1
**books** 41:25
**boozin** 2:13 153:1
**border** 98:20 120:5
120:22
**borders** 114:17,18
**bot** 28:21
**bottle** 94:3,9 97:7,21
97:25 98:3 104:15
106:6,16 107:6,18
107:23,24 108:5,7
108:23,24,25
109:10,10,16 110:9
110:10,14 111:10
113:23 114:16

116:2 117:23 118:1
118:13,25 122:24
123:16 124:2,4
139:6 142:12 153:6
173:18,24 174:1,18
194:14 195:25
216:2 218:5,21,22
219:1 221:9 223:2
225:17,25 226:17
227:10,23
**bottles** 97:14 104:18
104:20 105:12,22
105:25 106:10
107:5,11,16
**bottom** 45:19,22
46:24 75:10,24
99:19 106:1,4
117:22 121:3,4
122:13 130:23,25
131:13,23 135:25
136:3 139:11 142:9
142:15,20 144:8
148:7,19 150:8,16
161:17 166:22
187:18 204:12
**bought** 163:21
**bourbon** 2:11 105:2
106:15 227:10
**bowe** 3:5,8 31:8
52:24 53:6 54:3,15
54:23 129:18
**boy** 46:1
**brand** 94:23 116:22
121:24 124:5,6
125:21 137:3,7,14
139:15,16 140:5,15
140:16 169:10
194:15 196:1
209:12 224:9,17
**brands** 100:1,6,13
100:16,17,20 103:1
103:6,10,14,20
104:22 169:11,24
170:14 201:19

[bray - chapter]

**bray** 32:21,25 33:3
  33:17 34:13 35:18
  36:3 73:21 160:22
  232:10
**bray's** 33:14 74:2
**break** 45:9 60:4
  62:2 77:14 105:23
  128:1 173:6 233:3
**breakdown** 212:14
**brighton** 17:10 19:8
**bringing** 207:6
**broad** 86:25
**broadcasting** 22:10
  30:25
**brooks** 100:14
**brought** 49:18
**bs** 118:11,17 131:13
  134:17,19
**bunch** 191:23
**busch** 33:21 34:7,11
  175:24
**business** 6:17,20
  199:2,3,11,12,17
  201:2,3 224:14,14
  225:2,3 227:6,7
**button** 131:14
**buyers** 91:14,21
**buying** 154:12
  159:10,13,14
  231:22

**c**

**c** 5:16 54:22 77:5
  100:12,21 142:6,8,9
**calculate** 205:20
**california** 5:14
  168:5
**call** 12:20 13:9 48:6
  91:6 138:16,18
**called** 11:25 12:4,10
  25:8 88:14 106:21
**calls** 57:16 58:21
  66:19 81:19 88:23
  89:25 91:25 93:10
  94:25 139:10

**cap** 98:7,9 116:5
  118:11,17 146:16
  146:20 147:2 148:3
  148:16 150:5
**capital** 56:25
**captioned** 106:15
**carbides** 88:1
**career** 39:12
**careful** 174:4 182:7
**carefully** 189:2
**carpet** 119:1 122:13
**carried** 161:3,10
  162:20 163:1
  166:14,17
**case** 8:22 10:16,20
  11:4 16:15,16,18
  17:5,8,11,13,16
  18:6,11,15,18,21
  19:4,9,20,25 20:12
  20:16 21:1,7,15,18
  21:21 22:9,9,9,10
  22:17,18 23:2,5,5,9
  23:13,18,22,25 24:2
  24:9,9,12,21,25
  25:5,25 26:13 27:12
  27:12,24 28:1,10,22
  29:1,3,5,9,16,22
  30:5,7,11,14,17,20
  30:22 31:1,3,10,12
  31:18 32:3 33:1,7
  34:16,19,24 35:5,6
  35:10 36:8 39:15,16
  40:17,21 41:7,14,17
  41:20 43:3 44:9,19
  44:22 45:6,13,17,21
  45:24 47:13,16,21
  47:23 48:5,6,21
  49:2,14,24 50:6,8
  50:22,24 51:2,3,11
  52:7,9,10,24 53:8
  53:25 54:4,5,15,23
  55:14 56:5,8,18
  57:12,15 58:6,11
  59:4,12,15,19 60:6
  63:7,19,21 64:5,11

  64:15,16,21 65:22
  66:4,17 68:17 69:10
  69:15 70:19 71:24
  72:4 73:16 74:15,21
  77:18,20,23 79:3,11
  79:15,17 86:21 87:2
  87:6,9,16,22 88:13
  89:20 90:10 92:22
  98:22 100:9 112:25
  115:20 124:1
  126:16 128:9
  129:20,23 130:3,8
  130:12 148:5,8,11
  148:17,20 149:6
  158:21 164:20,21
  165:1,6 174:16,24
  175:9,24 177:10
  185:14,20 186:11
  193:9 210:21
  231:16 232:19
**cases** 15:9 16:6 17:8
  22:11,11,13 23:5,8
  25:13,20 27:15 39:8
  39:10,14 51:6,14,14
  51:17,21 52:2,14,18
  59:10 64:5,11,17
  88:21 125:10 128:7
  139:15 175:14,19
  191:4
**categorization**
  233:14
**category** 108:16,19
  108:21 109:2,3,6,8
  109:9,14,15,19,25
  110:2,7,8,12,16
  124:17,18,20
  125:23 126:1 157:9
  193:3
**cause** 4:21 176:4,11
  176:17
**caused** 47:1
**ceased** 234:11
**cell** 83:25 84:18
  85:20,20 86:7,7,15
  103:12,20 104:4,8

  114:15 117:13
  125:10 127:12
  134:8 135:1,13
  136:9 138:22
  144:11 157:8 160:4
  160:7 168:3,4,4
  205:23 206:3,5,9,11
  206:12 228:7
**cells** 140:2 156:1
**center** 4:18
**central** 5:5
**century** 5:13
**cert** 22:9 30:13 52:4
  52:10
**certain** 4:21 8:1
  52:3 80:12 96:4
  110:19 111:1
  124:12,17 178:13
  193:4 232:16
  233:23
**certainly** 87:2
  124:18 126:2 132:3
  143:23 202:24
  210:7 226:2,8
**certainty** 71:8 87:19
**certificate** 235:1
**certified** 4:19 6:5
**certify** 235:5
**cetera** 111:3 125:24
  125:24
**chain** 166:6
**change** 133:5,23
  168:2,6,25 169:5
  170:17
**changed** 114:17,21
  117:23 118:10
  120:12,20 133:10
  134:1,8 135:1,12
  136:8 138:21
  171:22,23 172:25
  173:3
**changes** 37:13
  114:10
**chapter** 11:12,16,18
  11:22,25 12:2,9,10

Veritext Legal Solutions
866 299-5127

[chapter - confident]

12:11
**characteristics** 82:25 83:14 85:17
**characterization** 117:7
**characterize** 95:12 104:12 178:7
**characterized** 233:12
**charles** 88:14 90:10
**check** 129:24
**checking** 141:10
**chew** 218:13
**chief** 48:6
**china** 217:11 224:25
**choice** 36:1
**choose** 35:24
**chosen** 55:3
**christopher** 5:16
**chronological** 17:21
**chronologically** 17:7 19:19 20:9 22:4
**chuck** 25:7,9
**chunk** 143:9
**cigarette** 25:3
**circle** 136:3
**circles** 99:16,16
**circuit** 88:13,15 89:17
**circuit's** 90:9
**circumstance** 110:6 110:7
**citation** 80:5,5 89:13 101:2 108:6,8
**citations** 61:7
**cite** 55:4 124:23
**cited** 11:13,18 12:14 12:23 56:2,20 91:5 100:10 101:20 102:23 129:16,17 140:9
**claim** 60:18 80:18
**claimed** 62:3 79:17 81:17 82:14,14

84:16 85:7 97:20 173:24 175:10,14 175:20 176:3,10 232:19
**claiming** 103:7
**claims** 23:6
**clarkin** 5:17
**classified** 233:13
**clear** 22:7 26:24 34:23 105:9 110:17 122:7 203:17 227:23 228:19 231:14
**clearly** 132:19 137:7 142:24,24 143:3,4 143:12,18,18 144:2 202:13 204:6
**click** 141:8 150:23
**clicked** 141:14
**clicking** 146:12
**close** 220:7
**closely** 88:19 218:4
**closure** 98:12
**code** 173:13 233:9
**codes** 77:6
**coding** 32:14 174:2
**coincidentally** 107:3 215:5
**colby** 3:2 20:10 40:5 40:5
**coldwater** 17:10
**collapse** 88:20
**collect** 58:12
**collected** 129:4,6
**collectibles** 19:9
**color** 56:25 114:21 115:5 120:20
**coloring** 114:16
**colors** 207:17
**combination** 79:25 80:21 82:8 83:6 85:8 86:10 107:5,17
**come** 21:4 22:3 190:4

**comes** 92:3 125:2
**coming** 60:1
**commenced** 6:14
**comment** 151:25
**common** 129:2 159:22 163:16,17 163:23 167:5,7 169:9,16,23 170:21 171:4 212:7
**communicate** 155:19
**companies** 180:9 183:11,13,19,25 184:8 185:9,23 187:4 209:22,24 216:8 226:15
**company** 1:5 4:5 17:22 19:4 20:10 22:10 30:20,25 103:21 156:20 161:21 177:4,7 179:3,6,16,25 180:8 180:11,19 181:1,12 181:23 182:1,18 183:10,13,17,19,25 184:8 185:9,22,25 187:4,10,10 188:15 189:9 194:3,12 195:6 196:19 197:2 197:9 198:22 199:1 199:3 200:21 201:1 201:4,23 202:2,3,15 207:14 209:21,23 210:2 212:20 213:4 214:12 215:17 216:7 217:8,25 218:9,17 219:13 221:2 222:5,7,21,24 223:9,12,22 224:13 224:15,25 225:2,2 225:12,15 226:11 226:14 227:5,6 230:8,20 231:24 232:11,20

**comparable** 114:20
**compeau** 54:21 55:3 56:13
**compeau's** 55:20 56:7
**competing** 100:1,6
**competition** 90:24
**complaint** 67:24 72:20,23,25 80:6,10 101:4,5,21 102:9
**complete** 51:19 178:10,22 188:12 192:20,22 193:7,10 201:12 204:19 209:3
**completely** 114:16 119:11 120:6 152:21 160:7
**concept** 81:4,5 84:6 185:4
**concepts** 88:19
**conceptual** 41:23
**conclude** 178:6
**concluded** 31:22
**conclusion** 87:23 88:24 92:1 93:11 95:1 165:19
**conclusions** 55:20
**conditions** 32:12 128:17 130:25 132:14 135:7 140:19 154:12 168:13 172:12 174:7 206:12
**conduct** 49:25 51:7 55:3 62:4
**conducted** 27:1 34:16 37:20 38:2,12 50:8,20,25 51:24 55:19 60:8,9,16 62:18,19 74:15,20 127:21
**conducting** 50:3
**confident** 126:10

**confirm** 9:19
**confused** 91:14,21
  158:8 178:7,19
  179:10 202:22
  203:19 204:14,24
  205:10,14 206:2,6
  211:14 233:13
**confusion** 12:11
  14:12 16:25 19:15
  23:24 24:6,19 26:6
  26:9,25 31:21,24
  32:7 34:25 41:3
  42:11 43:17 83:1,14
  83:20 85:18,24
  86:23 87:2,12,24
  88:6,18 89:22 90:12
  92:8,19,21 93:3
  125:5 128:6 154:11
  157:1 167:20 176:4
  176:11,18 203:6,21
  204:8 205:20,21
  211:10 212:21,21
  230:3,5,9,13,18
  231:1
**conjectures** 55:10
**conjure** 116:21
**connect** 75:5
**connection** 8:9,21
  10:2,15 33:7 36:7
  66:4 199:3,12,17
  201:3 211:13
  224:14 225:3 227:7
  230:25
**consider** 12:17 35:4
  36:6 47:8 57:14
  59:14 62:19 77:23
  86:21 125:16
  126:14,15 144:14
  204:10 207:8
**consideration** 58:9
  116:20 117:17
  231:10
**considered** 8:21
  58:6 67:5 68:17
  69:9,14 72:3 83:8

144:16 188:25
191:18 195:5 204:5
205:5 231:12
**considering** 152:8
  159:5 167:1
**consistent** 196:8
  197:18
**consists** 79:25
**consulting** 15:24
**consumer** 15:2
  36:14 40:13 55:4
  56:2 94:18,20
  124:14,15 126:12
  131:20 132:11
  133:8 134:20 151:8
  151:9 152:4 154:3,4
  155:22 168:8
  172:12 190:3,22
  193:6
**consumer's** 190:21
**consumers** 53:16
  55:7 81:13 133:19
  133:20 151:14
  172:4
**contact** 162:18
**contain** 107:16
**contained** 49:8
  79:10 107:5
**containing** 103:2
  110:19
**contains** 62:10
  99:12
**context** 55:24 62:1
  92:3 190:6 191:18
  191:24
**continue** 128:1
**continues** 122:4
  131:1
**control** 12:1 42:5,14
  43:4,6,11,14,25
  44:5 78:24 79:2
  82:15 83:8 84:12,24
  85:11,19 86:7
  104:13 107:22
  108:4,13,14 109:8

109:13 110:13,15
110:18 111:5,20,25
112:9 113:1,5,11,18
113:21,22 114:5,6
114:12,15 115:1,14
115:15,20,22
116:18,20,25 117:5
117:13,19,22
118:16 121:10,15
121:22 122:3,24
123:4,10,12,15,23
124:8 125:7,10,15
125:17 126:16,21
127:11,12,21 128:8
128:12 140:2 156:1
158:15 160:4,6
168:4 174:6 205:18
205:19 206:9
**controlled** 43:7
**controls** 32:8
**conversation** 69:8
**conversations** 57:24
  66:13 67:2 68:13
  69:12 71:18,22 72:2
**converse** 23:5 24:8
  25:5,7,24
**copy** 7:12 10:20
  11:3 13:8,20 39:22
  45:2 48:16 52:23
  53:5 78:6 79:10
  202:4
**copying** 93:8
**copyrights** 187:22
**corp** 22:5
**corporation** 1:9 4:9
  23:25 24:21 28:1
**correct** 7:20 11:14
  14:3 18:6 22:14
  30:2,3,12 35:1,2
  36:4,25 38:7,9,10
  39:16 42:25 43:4
  44:9 46:13,16 47:21
  47:22 50:9,16,17,25
  52:5,8,12 53:25
  59:4,5 60:19 62:20

63:1,2,14,21,22
64:1,23 65:1,6,22
66:1 67:20 68:9,23
71:7,15 72:13,17
78:25 80:10 84:24
86:19 99:5 101:20
102:6,7,14 109:3
110:20 111:22
112:16 115:17
117:9,15 122:21,25
123:4 126:8,11
128:21 129:20,23
133:21 134:1,9
135:17,23 136:1
137:8,19,24 142:25
143:13,19 146:3,4,7
148:7,19,23 151:1,2
151:21 155:17
156:10 157:2 158:9
164:2 165:10,11
166:7 169:2 170:5,8
170:11 171:11,12
171:15,16,20 174:3
174:25 178:21
180:16 181:14
182:3,19 183:14,15
183:20 184:15,24
186:25 187:11
188:8 191:16
196:21 197:10
198:16 203:8 210:4
210:18,23 213:5,15
213:23 214:9,10,13
214:19,24 215:3,4
215:19 216:9,13,14
216:22 217:9,15,21
218:1 219:6,9,11
220:6 221:6,15,17
221:24 222:3,19
223:7,20 224:10,18
224:23 225:9,23
226:23 227:17
229:25 230:5,9,13
230:21 231:1,6,18
232:4 233:1

Veritext Legal Solutions
866 299-5127

[corrected - depictions]

**corrected** 62:14,14
**correctly** 48:4 62:12
  83:23 84:13 164:24
  165:12 178:15
  228:18 233:11
**corrects** 37:21 38:3
**corresponded** 32:25
**council** 15:11,14
**counsel** 3:15 6:2,3
  8:9 9:15,16 53:14
  57:24 58:9,10,19
  66:5 67:19 161:9
  162:18 235:11,14
**counsel's** 58:14
**counted** 195:18
  201:9 203:18
  204:13,13,23
  211:13
**counterclaim** 72:20
  72:21,22 73:1 79:11
  94:6 96:10 102:10
**counterclaimant**
  1:11,19 2:4,21 4:11
  4:25 5:11 6:3,10
**counterclaims** 2:20
**counterdefendant**
  1:6 4:6,24 5:3 6:2
**countered** 195:10
**countervailing**
  61:17
**couple** 10:7 61:7
  77:19 91:11 166:2
  178:14 225:10
  233:6
**course** 14:17,23,24
  15:1,3,5 144:9
**court** 1:1 4:1,22
  7:16 8:13 9:12 11:1
  26:5 40:2 44:21,24
  45:17 48:14 53:1
  54:11 78:9 88:13
  105:4 145:15
  147:13 149:3
**cover** 15:3,8 74:2
  77:10

**covered** 58:7
**covering** 73:21
  74:10 76:2,11
  162:10 170:25
**cox** 13:17
**create** 115:19
  121:10 126:15
**created** 79:2 86:22
  92:19,21 97:5
  117:19
**creating** 116:20
  187:20
**creek** 17:11
**criticism** 128:15
  173:12 174:9
  205:22
**criticisms** 49:6
  78:24
**criticized** 128:7
**criticizing** 84:11
**critique** 29:24 32:8
  32:11,14 34:24 35:1
  35:22,24 36:4 49:18
  51:25 54:22 63:9,22
  233:9
**critiqued** 22:2 31:18
  31:23 49:23 51:9
  52:11,16,20 54:3
  114:3
**critiques** 31:20 32:6
  41:18 42:4 64:25
**critiquing** 29:11,12
  50:2 64:22
**crr** 5:20
**cure** 151:19,23
**current** 34:9
**currently** 15:1
**curriculum** 13:9
**curved** 120:13,15
**customer** 161:21
**customers** 53:19
  162:14
**cv** 1:7 4:7

**d**

**d** 2:1 42:13 54:21
**daniel** 121:9,16
  198:22 219:17
  220:8,14
**daniel's** 1:8,19 2:22
  4:8,24 6:11 9:15
  70:2 79:24 82:24
  83:6 84:16 85:9
  86:11 92:17 93:18
  93:25 94:11,22 96:9
  96:12 97:7,14,20
  101:4,5 102:21
  103:7,11 104:9
  107:6,17 110:24
  111:13 123:11,17
  123:18,24,25
  125:15 126:21
  153:7 157:9 173:17
  173:24 174:1,18
  177:15 179:12
  188:8,15,21 189:13
  189:17,20 190:20
  191:7,13,16 192:4
  192:10 193:3,18,20
  194:13,15,19
  195:12,20 196:1,5
  196:11,20 197:4,10
  197:15 198:2,6
  199:5,10,18,20,24
  200:2,3,12,21 201:4
  201:11,24 202:19
  205:11,15 207:15
  207:17,25 208:10
  208:11,17 209:2,5
  209:12 211:20
  212:2,3,4 213:11
  214:4,19,21 215:19
  216:1,9 217:2 218:5
  218:17,22 219:1,24
  221:6,9,21,23 222:7
  222:13,14,25 223:2
  223:13 224:1,8,16
  224:22 225:3,15,17

  225:22,25 226:15
  226:16 227:8,15,22
  228:2,23 229:2,13
**data** 61:18 67:4
  68:16 69:13 72:3
  129:4 173:14 174:2
  233:10
**date** 33:6,25 101:13
  161:21 163:8
  234:18
**dated** 32:21 73:21
  74:10 76:10,22
  162:10 235:18
**david** 32:21
**day** 4:15,17 117:7
**deal** 199:5,23
**deceptive** 12:5,12,14
  12:24 61:8 108:9
**decide** 41:6 49:13
**decision** 78:2 88:12
  90:2,10 139:5
  204:17
**declaration** 2:23 3:9
  39:23 40:4 78:6,11
  78:18,21
**deep** 113:25
**defect** 151:15,20
**defective** 115:15,22
  123:13
**defects** 121:6
**defendant** 1:10,18
  2:4,21 4:10,25 5:11
  6:3,10
**defendant's** 2:24
  39:24
**definition** 117:8,14
**delaware** 1:9 4:9
**depends** 124:13
  127:15
**depict** 106:9
**depicted** 2:10
  145:20 148:9,21
**depiction** 122:6,10
**depictions** 146:12

Veritext Legal Solutions
866 299-5127

[deposed - dog]

**deposed** 13:18 45:6
**deposition** 1:17 2:17
  3:1 4:13 6:4,14 7:13
  7:18,24 8:6 10:22
  13:12,16,16 15:25
  44:18,21 45:1,12
  56:8,14,18 77:5
  105:1 111:24
  112:16 145:12,18
  147:16 149:1,6
  161:20 185:14,17
  186:10 232:13
  234:11,12 235:7,12
**depositions** 6:23 7:1
**derived** 42:12
**describe** 47:11 83:7
**described** 43:3
  53:15 54:24 103:2
  106:1 107:7 158:19
  161:20 163:16
  177:21 186:11
  230:24
**describes** 8:20
  105:20,21 106:5
  127:11
**describing** 26:17
**description** 75:10
  75:24 149:11 153:5
**design** 12:6,13,15
  14:9,18 15:4 25:10
  25:11 41:15 50:8
  60:14 61:9 84:12
  112:25 113:7
  114:21 121:23
  123:12 128:12
  168:14 174:5,6
  194:14 195:25
  207:17 209:11
  221:9 223:1 231:19
**designation** 91:16
  91:23
**designed** 41:1 53:18
  53:24 129:9,15
  174:3,5 211:10
  230:2

**designer** 97:5
**designing** 44:8
  85:10 112:8 231:15
**designs** 156:21
**detail** 9:17 34:21
  44:16 51:21 113:13
  116:10 173:21
  232:14
**detailed** 75:25
**details** 121:7 139:13
  218:23 219:2
**determination**
  177:18
**determine** 43:21
  53:14,19 62:16 81:2
  81:16 110:5 132:6
  197:20 213:11
**determined** 43:23
  114:4
**develop** 97:15
  125:16
**developing** 82:15
  83:8
**diamond** 11:23
**diamond's** 109:12
  110:1
**dickinson** 5:4 33:14
  33:18 34:13
**dickinsonwright.c...**
  5:9
**differ** 53:21 129:5
**differed** 63:25 65:5
**different** 10:12,14
  14:20 24:4,4,5 37:7
  55:21,22 56:24,25
  60:8,24 62:15 63:13
  87:1 88:10 90:20
  108:4 133:13,19
  140:22 144:19
  149:12 152:21
  155:23 156:21
  166:2 168:8 169:21
  169:22 170:23
  177:4,23 179:3
  191:20 196:13

202:3 212:6 216:18
  217:13,14
**differentiated** 51:17
**differently** 50:9
  154:9
**difficult** 128:11
  138:12,16,18
  141:18,25
**difficulty** 85:5
**digital** 234:5
**direct** 53:12 121:21
  131:5
**directed** 41:1
**direction** 162:19
  235:10
**disagree** 89:4 90:15
  112:5
**disclaimer** 121:15
**disclose** 53:22
**disclosure** 55:22
  57:1,7
**discrepancies** 10:7
**discuss** 58:18 99:25
**discussed** 14:21
  28:21
**discussing** 82:1
  230:12
**discussion** 58:9,10
  58:21 87:15
**discussions** 57:24
  59:1
**dish** 30:25
**dispense** 6:25
**display** 97:6 152:7
  159:2,3,20,22 160:2
  160:5 163:15,17,23
  164:1,7,24 165:4
  166:24 167:4 168:5
  168:8,19 169:17
  172:3,25
**displayed** 144:22
  147:6 160:25 163:4
  165:14 171:11,14
**displaying** 171:17

**dispute** 143:8
  233:22
**disregard** 82:14
**distileria** 88:14
**distillery** 121:9,16
  198:22 219:17
  220:8,14
**distinctiveness**
  80:22,25 81:4,7,10
  81:12,16 82:9,13
  83:5 84:5,15 85:7
  92:18 103:10
**district** 1:1,2 4:1,2
  4:22,23
**document** 2:18 8:8
  9:25 39:23 44:22
  48:11 54:8 71:10
  148:12
**documents** 8:1,3,9
  8:21,25,25 9:6,8,14
  9:17,20,24 10:4,6
  65:25 66:6,7 67:6,7
  67:12,13,14,16,18
  67:22 68:7 69:18,22
  69:23 70:4,9,22
  73:13 74:2 75:8,24
  76:2 77:4,10 79:9
  95:9 97:11 101:11
  101:14 102:4,5,13
  105:15,16 161:18
  162:4
**dog** 77:6 108:19
  109:3,6,15,19
  110:11,13 115:1
  121:10,23 123:10
  123:12,15 143:3,13
  143:18 147:25
  148:4,14 151:8
  152:9 153:1,8
  155:13 156:20
  159:5,21,21 163:9
  163:19,21 164:1,1,7
  164:8,10,25,25
  165:4,4,13,13
  166:16 167:1

**[dog - entirely]**

173:17,23 201:2,18
201:18 202:2,15
205:11,15 211:20
218:13 225:16,25
226:1 227:22
231:22
**dogs** 152:7 159:4
166:25
**doing** 31:6 39:14,18
47:5 48:4 49:20
51:3 57:14 58:6,18
60:6 61:1 63:1 65:8
77:23 97:8 144:5
153:22,23 158:22
166:23 168:22
174:24 205:2
220:11
**double** 141:10
**doubt** 96:13
**dr** 2:23 3:10 6:22
7:8,12,17 8:10,14
9:13 10:20 11:2
35:15,16 36:10
39:23 40:3,10 41:19
41:23 42:4,22,24
43:8 44:1,10,25
45:5,11 47:1 48:15
53:2 54:12,21 55:3
55:20 56:7,13 60:1
60:17,17,25 61:22
62:9,9 63:9 65:18
67:19,20 68:8,8,21
76:21 77:20 78:6,10
78:11,13,18,23,24
83:24 84:11,14 86:8
90:3 95:24 97:18
102:24 103:19
104:13 105:5
107:22 111:24
112:15 113:17,22
114:10,12 115:9
116:24 117:22
118:10,23 119:10
119:20 120:20
123:2 128:5,15

130:15,17 131:4
132:15 133:5
139:21,25 143:16
145:16 146:8
147:14 149:4 152:2
152:14 153:3,15,18
153:22 154:8 156:7
156:25 157:8 158:7
159:1,20 160:3
167:22 169:10
170:2 172:25
173:10,12,18 174:1
174:9,12 175:19
177:22 178:12
179:15 181:11,24
182:10,14 186:12
186:21 188:11
190:11 191:9
192:20,25 194:22
196:16 202:21,23
203:18 204:18,23
205:7,8,22,24
206:23 209:14
211:14 215:10
216:16 227:20
228:6 229:18
231:12 232:2,3
233:8,9,12,23,24
**draft** 112:15
**drafting** 70:18 71:6
**drastically** 108:4
**draw** 57:1
**drawn** 87:23
**dress** 18:21 25:22,25
79:3,16,24 80:18
81:17 82:24 83:6,21
84:17 85:9,23,24,25
86:11 88:20 92:17
93:2,3,8,16 97:20
103:8,11 107:7,18
115:2,4,10 123:18
123:19 200:9
**drl** 17:23
**duces** 2:17 7:13

**duly** 235:7
**durable** 153:7
**dynamic** 25:5,25

### e

**e** 2:1 32:20 42:13,13
42:13 54:22 72:12
73:13,20 74:3,9
76:2,10,21 77:10
102:4 162:9
**earlier** 10:21 11:19
19:16 24:23 38:21
39:12 45:13 48:3
52:6 53:16 61:6
69:16 72:5 73:1,6
73:11,14 77:16
85:22 86:18 101:12
102:8,10,13,19
104:25 112:20
115:14 125:3,22
129:19 145:12
147:8,16 153:21
155:24 158:19
159:12 164:12
171:6 174:11
175:22 180:10
187:25 193:13
198:7 199:13,13
206:8 208:6 226:1
**early** 164:22
**easier** 9:23
**east** 5:13
**eat** 128:1
**editors** 61:13
**effect** 111:1,18
**effective** 117:10
**effort** 161:2,6
**eight** 4:15
**either** 23:6 29:17
69:7 97:17 131:11
139:13 159:23
163:15,24 164:1,7
167:24 169:17
171:24 181:6
209:20

**electronic** 25:3
**electronics** 27:24,25
**elements** 25:10,11
80:22 83:7 84:16
86:10 107:6,17
110:19 113:9 115:2
115:3,3,10,11,18
**eliminating** 60:17
62:5
**else's** 37:19 38:2
51:9
**emits** 151:11 154:23
155:4
**emitted** 131:15
**emphasized** 56:24
57:7
**empirical** 55:4,10
56:1 57:3 124:21
**employed** 235:11,14
**employee** 235:14
**employs** 127:12
**enable** 137:18
**encloses** 98:15
**engage** 35:21
**engaged** 79:15
**engagement** 21:20
22:11 28:10 29:2,19
30:7,16,22 31:3
65:22 66:4 68:25
71:14 73:16 77:22
112:24 144:10
**engagements** 15:24
16:10 25:15 27:7,9
27:20 37:9 38:17
39:6 51:8 52:15,15
**enlarge** 141:8,14
146:22
**enlarged** 141:21
142:4,13
**enlarges** 150:23
**enterprises** 17:23
**entire** 78:12,20,21
89:25 91:7 132:5
**entirely** 44:11 78:2

Page 11

[entirety - facts]

**entirety** 78:19 226:5
**entitled** 39:23 48:11
  54:8 105:1 128:16
  130:24 173:13
**entries** 70:17
**entry** 65:24
**environment** 55:24
  152:16,16 154:6
**envision** 113:5
**error** 43:8
**errors** 44:4,10 50:9
  60:17 62:10,13,17
**especially** 140:24
**essentially** 182:25
  186:17 202:4
**establish** 86:9
  125:20 178:18
  181:24
**established** 83:19
  84:5,9 85:23 86:1,3
  86:4 87:3 93:1,4
  110:4,5
**establishing** 125:6
**estimate** 27:12
  165:8
**et** 17:23 18:13 22:6
  52:4 111:3 125:24
  125:24
**evan** 100:14
**everybody** 152:2
  215:11
**evidence** 57:3 58:11
  82:22 83:17 92:7,8
  93:14 189:14 198:9
  205:3 206:19
**evoke** 117:8,14
**evoked** 117:18
**exact** 37:16,17 88:3
  143:1 185:4 209:18
  226:3
**exactly** 21:2 43:11
  44:15 51:22 66:11
  71:8 80:9 114:1,2
  125:6 132:24
  133:22 138:23

157:23 168:24
  170:16 178:23
  195:22 199:8 220:9
  220:15 229:6
**exaggerate** 111:16
**exaggerates** 111:1
**exaggerating** 96:4
**examination** 2:6
  6:15
**examine** 132:18
**examined** 4:14 6:10
**example** 70:21
  100:22 105:24
  116:2 142:5 152:23
  155:12 187:19
  192:22 193:12
  205:18 211:5
**examples** 194:1
**excel** 77:6
**excerpts** 3:1 44:18
  44:20 45:16 185:14
**excluded** 143:17
  203:21 206:5
  233:14,18
**excluding** 61:15
**excuse** 130:9 146:9
**executed** 36:24
**exemption** 66:22
**exhibit** 2:10,11,13
  2:14,16,17,18,20,23
  3:1,3,5,7,9,14 7:12
  7:15,19 8:8,12,15
  8:19,20 9:8,11,14
  9:21,24 10:5,6,9,22
  10:25 11:3 13:2,5
  15:21,23 32:18,19
  35:14 36:24 40:1,4
  40:8 41:22 43:16
  44:18,20,23 45:15
  45:18 46:12 48:1,10
  48:13,16 52:25 53:3
  54:7,10,13,20 55:16
  56:12,21 65:13,20
  67:3,10,18 68:6,24
  69:17 75:8,9,23

76:20 77:3,4 78:8
  78:11,20 79:8,10
  82:1 101:15 104:25
  105:3,6,10,13 130:4
  130:5,6,23 139:23
  142:6 145:12,14,18
  145:22 146:11,13
  146:17,19 147:11
  147:12,16,21
  148:25 149:2,6,17
  150:25 151:7
  152:24 157:6
  158:19 161:16,17
  161:20 179:20
  180:14 185:13,18
  188:12 192:24
  201:13 209:4
**exhibited** 145:24
**exhibits** 2:8 3:14
  101:13 102:18
  152:24 234:8
**exist** 93:6
**existence** 100:6
  103:1,9
**exists** 81:18 83:5
  93:2
**expect** 54:2 199:9
  218:9
**expected** 103:11
  124:7 127:11,14
**experience** 55:18
  124:3,10,14 169:22
**experienced** 6:24
**expert** 2:14 3:3,5,7
  10:18 11:3 15:24
  16:9,19,23,24 17:12
  17:15,24 18:3,4,5
  18:14,17,24 19:24
  20:2,11,14,23 21:17
  21:24 22:1,18,20,24
  22:25 23:10,16,17
  23:21 24:2,9,15,16
  25:15 26:7,10,12
  27:7,10,21 28:1,3,6
  28:7,16,22,24 29:8

29:16,22 30:5,14,20
  31:1,9,17 32:25
  33:9 35:16 36:14,19
  37:9 38:17 39:6,10
  40:9,16,20,21 48:11
  48:17 49:2,7 51:25
  52:11,15,16,20,23
  53:5 54:8,14 55:19
  64:6,12,18,22 65:22
  66:22 70:18 72:15
  72:16 74:7 78:6
  100:9 110:3 124:15
  128:5,8 193:6
**expertise** 124:24
**experts** 24:4,5
**explain** 200:24
**explained** 40:9 85:2
**explaining** 153:12
**explanations** 177:1
**explicitly** 177:2
**expressly** 6:7
**extemporaning** 90:8
**extent** 51:10 53:19
  66:18
**extra** 45:2
**extremely** 87:25
**eye** 113:6 144:15,16
**ezra** 100:13

|   f   |
|---|

**f.2d** 88:15 89:14
**fact** 58:20,23 77:17
  121:21 143:8
  153:25 154:18
  155:4 159:13
  173:23 179:7,7,9
  184:4,15 185:6
  186:23 188:20
  191:11 192:9 196:3
  206:22 207:1,3,23
  211:20,23 227:21
  227:24 228:20
  231:8,9
**facts** 66:16 67:4
  68:16 69:13 72:2

[failure - format]

**failure**  32:12 84:12
128:16 130:24
151:13 173:13
233:9
**fair**  9:7 19:3 46:9
137:13
**fairly**  6:24
**familiar**  37:2 90:22
90:25 93:18,21
97:11 100:15,17,20
146:1 149:8
**familiarity**  86:18
**famous**  123:19
124:1,4
**far**  114:2,7,8 115:24
**farther**  55:6 82:21
136:12 159:18
170:19 218:3
**fashion**  22:6
**faster**  16:17
**fastest**  211:8
**faulty**  32:14
**feature**  81:11 97:25
98:7 159:23 163:24
169:17
**featured**  159:21
**features**  80:1,2,4
82:9,14,15 85:9
96:4 100:2 103:2,6
111:1,17,21
**feel**  39:20 50:2 63:6
73:10 158:16
231:16
**fewer**  27:5
**field**  12:18
**figure**  197:25
199:16 202:17
206:4 212:18 213:3
**file**  77:6
**filed**  44:21 45:16
**filigreed**  98:20
99:12 120:5
**filled**  162:2
**final**  173:11

**finally**  24:8 159:1
172:1,2
**financially**  235:15
**find**  10:3 79:20
103:24 161:3,8
162:16 209:18
**finding**  88:7 162:19
**findings**  37:7
**fine**  105:19 187:7
234:5,6
**finished**  233:3
**firm**  7:23 33:14,17
**first**  16:13,15 32:24
33:3,5,24 44:20
70:1,3,4 72:11,19
73:3,8,16 74:6
75:13,16 76:6,11,16
76:16 77:9 80:9,14
83:1,15 84:5 85:18
100:5,8,19,20,22,24
101:6,10,24 102:21
104:13 105:9 137:2
149:17 176:25
201:15 205:12
230:17
**fits**  220:16
**five**  16:1 25:16
26:21,23 27:5 165:8
165:13
**flare**  106:1
**flared**  106:3
**flat**  139:2
**flawed**  31:23 40:11
47:3,8 113:18,21
205:17
**flaws**  37:21 38:3
60:13 61:16 62:4,5
**floating**  105:17
**flong**  5:9
**focus**  86:14,15
190:12 195:15,21
**focused**  193:3
**focusing**  64:20
165:22 206:3

**follow**  83:11 84:21
91:19 176:7 183:22
183:24 192:11
206:13
**following**  56:14 80:1
85:14 87:6,21 90:9
208:20
**follows**  6:12 108:13
**font**  56:24,24,25
120:12,14 140:25
**fonts**  114:17
**foods**  30:19
**footnote**  11:11,21
12:8 100:11 101:1
101:20 102:23
108:6,8 193:25
195:2,14,23 196:15
197:17 200:16
203:4 207:10
208:14 213:23
226:24
**footnoted**  213:14
**ford**  3:10 7:8 11:18
35:25 36:4 42:22,24
60:25 62:9 80:20
82:7 83:24 84:14
86:8 90:4 114:10
115:9 116:24
118:10,23 119:10
119:20 120:20
123:2 130:15 131:4
151:16 152:3,14
153:3,18,22 156:25
157:8 158:7 159:1
159:20 160:3
167:22 169:10
170:3 174:12
178:12 190:11
191:9 192:20,25
194:22 202:21,23
203:18 204:18,23
205:7,8,24 206:23
211:14 215:10
229:18 231:12
233:12

**ford's**  35:15 60:18
62:9 67:19 68:8
77:20 78:6,11,14,18
78:24 84:12 97:18
103:19 104:13
107:22 111:24
112:15 113:17,22
114:12 117:22
128:15 130:17
132:15 133:6
139:21,25 143:16
146:8 153:15 154:8
156:7 173:1,12,18
174:1,9 175:19
177:22 179:15
181:11,25 182:15
186:12,21 188:11
196:16 205:23
216:16 227:20
228:6 232:3,3 233:9
**foregoing**  235:7
**forenoon**  4:16
**forget**  112:22
**forgive**  46:13 171:9
**forgot**  90:6
**forgotten**  182:12
**form**  8:17 35:7
49:22 61:19,23 62:6
62:21 63:16 64:2
81:6 82:16 83:10
84:19 85:12 86:12
86:24 88:8,23 89:24
91:25 92:11,23
93:10,23 94:2,25
95:6 96:11,17 97:1
97:22 98:2 99:1,6
99:20 103:15 109:4
111:6 125:18
126:23 129:2
132:22 138:15
164:3 176:6,20
181:5 200:4 219:25
**format**  137:22
153:13 174:12,25
186:6 234:3

Veritext Legal Solutions
866 299-5127

[formats - higher]

**formats** 175:4
**forming** 35:4 36:7
    66:16 67:5 68:17
    69:9,14 71:23 72:3
**forms** 87:1
**fortune** 25:5,25
**forward** 17:7 19:19
    20:8 21:11 67:13
    71:3 87:4
**fossil** 18:12
**found** 176:25 189:4
    193:13 197:19
    205:3 206:19
**foundation** 91:4
    95:7 96:18 97:2,9
    145:3 176:21 200:5
    212:5 231:25
    232:21
**foundations** 12:1
**four** 146:10 211:9
    212:21 230:2 231:5
**fox** 22:10 30:25
**fragrancenet.com.**
    29:8
**frame** 159:10,13
**frank** 5:8
**front** 9:6 10:18
    65:15,18 68:21 97:5
    97:7 98:16,17,19
    101:17 116:11
    119:11,15,21
    120:12 122:5,24
    131:6 136:15,21
    137:4,10 138:11,20
    139:4,7,14,18
    140:17,24 141:9,10
    141:19 142:1 143:7
    143:9,24,25 146:3,6
    150:10 167:17,20
    214:22 215:7,23
**full** 121:6 139:21,25
    193:1
**fun** 96:3,4
**funny** 226:1

**further** 207:16
    233:24 235:13
**furthermore** 152:22
    170:20
**fuzzy** 28:15

## g

**g** 5:8
**gay** 29:15
**gear.com** 2:13
**gear.com.** 153:1
**general** 43:22 53:10
    70:23 90:17,25
    137:1 186:6 200:13
    200:14 229:7,16
    232:17
**generalizable**
    168:17
**generate** 124:8
**generic** 106:16,21
**gerald** 3:10
**getting** 74:4 89:9
    90:17 189:20
**give** 6:25 27:11
    44:12 51:19 68:11
    92:4 116:19 117:17
    127:2 132:4 133:12
    133:16 134:3
    140:20 142:5
    149:10 153:17
    154:5 155:9 157:11
    162:18 168:20
    172:19,20 192:22
    193:1,8 201:23
    205:16 213:12
    227:15 228:14,15
**given** 14:14 82:22
    125:24 127:16
    138:7 184:4,15
    192:1 211:19
    214:22 218:20
    221:8 222:12 229:3
**gives** 188:12 195:16
    220:24

**giving** 134:21
    137:12 153:11
    194:12 212:14
    228:13
**go** 13:4 16:17 22:6
    27:12,16 50:2 51:20
    57:5 86:25 91:8
    113:13,24 114:2
    115:21 116:9
    131:10 148:12
    152:23,24 162:3,5
    162:25 167:21
    173:8 186:19
    187:13,14,16 194:5
    207:9 211:6 215:14
    220:9 230:17
    232:15
**goal** 116:24 132:13
    132:15,16
**goes** 123:7 174:1
    230:9,13,25
**going** 9:16 10:5 13:3
    19:3 22:7 35:14
    45:9 46:1 67:13
    77:18 79:8 81:21
    82:18 90:14,18
    136:22 151:6
    152:23,24 165:25
    166:1,1 188:10
    202:6 206:15 207:7
    211:7 212:14 218:7
    220:12 228:25
**gold** 118:12
**good** 108:13
**grant** 208:12 210:8
    210:11
**granted** 209:10
    212:11
**greatest** 212:20
**ground** 112:2
**group** 43:24,25
    117:2 174:6 211:13
    211:25 212:17
    213:2,5,7

**guarantee** 121:5,7
**guess** 27:24 46:2
    100:15 124:19
    126:1 134:12,19
    150:13 209:10
    217:1 233:13
**guessing** 46:6,8

## h

**h&r** 22:8 29:21
**haas** 36:11
**hair** 28:21
**hal** 49:7 129:17
**halfway** 56:22 80:17
**handed** 147:17
**handle** 139:17
**hanger** 170:22
    171:5,18
**hangtag** 97:6 114:21
    115:6 120:21,24
    121:25 122:6 131:7
    136:15,21 137:18
    138:14,21 139:5,6
    139:14 140:15,17
    141:5,13 142:25
    143:4,7,9,19,22,25
    144:1 146:3,7 148:9
    148:21 150:25
    152:17 155:16
**happening** 103:4
**happens** 160:14
**hard** 90:14 125:5
    142:4,16
**harris** 100:14
**hate** 79:7
**head** 93:17 104:1
    163:20
**hear** 100:23,24
**help** 46:18,22 61:24
    142:7 162:6 219:18
    220:8 229:20
**helps** 44:19 220:11
**hesitation** 75:3
**higher** 126:3,5

Veritext Legal Solutions
866 299-5127

[highlight - interrogatories]

**highlight** 191:9
**highlighted** 177:17
  177:20
**hill** 13:17
**hold** 137:23
**holds** 40:24 232:10
**honestly** 100:25
**hopefully** 75:15
**hour** 45:9
**hour's** 90:4
**hours** 4:15
**hulsey** 22:10 30:19
**humorous** 111:1,18
**hung** 183:21
**hyphen** 42:13
**hypothetical** 55:8

**i**

**ibooks** 21:10 38:22
  39:25
**idea** 138:20 155:12
  196:8 197:19
  228:14 232:22
**ideas** 71:3 195:3
**identification** 7:16
  8:13 9:12 11:1 40:2
  44:24 48:14 53:1
  54:11 78:9 105:4
  145:15 147:13
  149:3
**identified** 9:25
  11:16 16:10 25:21
  37:21 38:4 44:5
  50:10 69:25 103:12
  103:20 104:5,8
  140:5 156:2,9
  157:15 158:7
  188:15 194:12
  198:5 203:3 217:25
  219:12 221:2 222:5
  222:7,21 223:9,22
  224:7,25 225:11
  226:11
**identifies** 77:4

**identify** 10:17 11:8
  161:9 163:1
**identifying** 156:11
**illinois** 4:21 235:5
**image** 141:9,21
  149:18,25 150:1,2,9
  150:11,21 218:23
  219:2 224:9,17
**images** 142:4 146:22
  150:13,24 170:23
**impact** 53:16 57:8
**impacted** 103:10
**important** 41:12,13
  41:17 49:24 50:5,14
  58:25 75:20 87:3
  132:4 133:1 134:3
  137:2 139:5 140:18
  151:10 153:10
  155:8,8,14 168:13
  172:18 189:1,14,21
  190:2,8,9,16,25
  191:2,8 192:19
  193:7,8,21 194:25
  201:25 202:8,11
  206:14 207:8 220:9
  231:10
**impossible** 205:19
**impression** 168:20
**impressions** 58:15
**improper** 82:24
  83:13,24 84:17
  85:16,25 92:20 93:4
  174:16
**inappropriate** 42:5
**included** 153:24
  154:17,22 157:8
  202:21
**includes** 70:22
**including** 15:3
  78:12 140:1 170:7
**incorrectly** 11:16
**increase** 141:4
**indicate** 226:6
**indicated** 112:14
  177:12 178:3

**indicates** 33:10
  123:12,14 197:13
  219:21 226:8
**indicating** 57:3
**individual** 133:8
  179:13 229:18
**individually** 127:16
  134:11 135:5,9,10
  178:12
**individuals** 135:9
**industry** 106:16,16
  106:21
**influences** 82:25
  83:13 85:17
**infomercial** 130:13
**information** 51:11
  53:15 57:17,23
  58:22 59:21 66:19
  67:4 68:16 69:14
  72:3,6,7,8,9,9,10
  103:24 125:24
  127:17 131:19,25
  132:8,22 133:2,16
  133:17,24 134:4,13
  134:15,21,25 135:4
  136:5,8,20 137:1,3
  137:10,16 138:8
  139:4 140:20 141:2
  143:24 151:15
  152:11,13,18
  153:10,12,12,17
  154:3,5,17,23 155:2
  155:6,10,15 159:16
  172:19 177:16,17
  177:19,21 191:8
  193:9 201:25
  220:25
**infringement** 15:9
  16:12 17:9 22:14
  23:7 25:21 30:1,11
**infringing** 108:14
**inquiry** 57:17 58:21
**insist** 60:1
**instant** 234:10

**instruct** 58:22 59:8
  59:22 77:25 78:4
**instructing** 57:18
**instructions** 59:25
  152:5 233:22
**insurance** 53:18,21
  53:23 55:25
**intended** 58:11,12
  105:21
**intent** 154:8
**intentional** 93:8
**intercept** 129:7
  137:22 154:16
**interested** 235:16
**interesting** 220:24
**intermingled** 165:16
**international** 19:23
**international's**
  75:25
**internet** 105:12
  129:1,5,12,20,23
  130:7,19,21 144:22
  152:20 154:7
**interpret** 157:19
  177:5 179:4 181:21
  184:16 189:24
  190:4 193:17 194:2
  196:9 197:21
  198:12 199:22
  206:24 208:4
  210:17,20 220:13
  220:20 226:5
**interpretation** 32:15
  84:3 86:16 189:13
  191:3 204:8 205:6
  205:23 207:5
  231:11
**interpreted** 157:1
  203:6 204:1 206:21
  227:21
**interpreting** 184:19
  189:19 202:1
  203:13 208:4
**interrogatories** 70:2
  73:23

Veritext Legal Solutions
866 299-5127

[intimately - label]

**intimately**  58:13
**intricately**  58:13
**introduction**  75:25
**invade**  59:21
**invades**  59:1
**invading**  59:17
**investigation**  169:21
**invoice**  69:21
**involve**  21:21 22:13
  23:6 25:22 27:9
  28:2,11 29:3,11
  30:8,17,23 31:4,12
**involved**  16:7 17:11
  17:21 25:25 27:20
  29:1,12,19 31:21
  32:7 35:1,2 46:14
  58:9,13,14 130:9
  164:21 165:1,5
**involves**  59:1
**involving**  17:9 19:20
  25:20 97:21 128:7
  175:10,14,19
**is's**  202:8
**issue**  14:11 16:16
  17:5 18:9,21,23
  19:5,9,13 20:4 21:6
  21:13 23:1,18,20,21
  24:1,7,17,20,24
  25:4 43:11,14 49:1
  49:1 50:19 53:25
  85:24 93:4 130:9,12
  232:25
**issues**  15:3 16:7
  17:11,21 19:21
  22:13 25:21 35:13
  39:20 41:16 49:18
  50:5,24 89:1,10
  90:17,20
**itamar**  35:16

**j**

**j.t.**  3:2 20:10 40:5
**jack**  1:8,19 2:21 4:8
  4:24 6:11 9:15 70:2
  79:24 82:23 83:6

84:16 85:9 86:11
92:17 93:18,25
94:11,22 96:8,12
97:7,14,20 101:4,5
102:20 103:7,11
104:8 107:6,17
110:24 111:13
121:9,15 123:11,17
123:18,24,25
125:15 126:21
153:6 157:9 173:17
173:24 174:1,18
177:15 179:12
188:8,15,21 189:13
189:17,20 190:20
191:7,12,16 192:3,4
192:10 193:3,18,19
194:13,15,19
195:12,20,25 196:5
196:11,20 197:3,10
197:15 198:2,6,22
199:5,10,18,20,23
200:2,3,12,21 201:4
201:11,24 202:19
205:11,15 207:14
207:17,25 208:10
208:11,17 209:2,5
209:12 211:20
212:2,3,4 213:11
214:4,19,21 215:19
216:1,8 217:2 218:5
218:17,22,25
219:17,24 220:8,14
221:6,9,20,23 222:7
222:13,14,25 223:2
223:13 224:1,7,15
224:22 225:3,15,16
225:22,25 226:15
226:16 227:8,15,22
228:2,23 229:2,13
**jacquin**  88:14 90:10
**jdpi**  76:11,23 79:17
  101:23 161:18
  162:10

**jdpi's**  72:22 73:23
  76:16 79:10
**jdpi00355**  75:11
**jerry**  61:12
**jim**  100:13,23 104:5
  221:10
**judge's**  89:6 90:1,16
  204:16
**judgment**  2:25
  39:25
**judgments**  132:22
  133:15
**july**  36:24 67:15,25
  71:15,18,18 72:6,10
  72:13,16,19 73:1,2
  73:9,21 74:10 76:7
  76:10,22 77:10
  102:5,5,13 162:10
**june**  67:15 68:25
  69:4,4,18,19,22,24
  70:16,25 71:5

**k**

**keep**  90:18
**keeping**  105:17
**kept**  113:22 115:3
  116:1
**kerzner**  16:15,18
  17:8 19:12
**kind**  99:9 206:24
**kinda**  90:18
**knew**  34:3 35:12
  189:9 191:5 193:14
  198:9,15 208:3
  212:11 213:8
**know**  8:20 9:5 10:1
  21:25 40:18 46:2,23
  60:7,11,12,15,18,20
  60:22,23 61:5 63:15
  67:22 73:2 84:25
  91:5,6 92:13 96:23
  100:23,25 108:2
  112:11,12 114:2,3
  118:8,21 123:22
  124:3 125:25 126:6

126:7 132:25,25
133:10,10,18,23,25
134:2,3,7,10,12,24
135:3,5,11,14,18,19
136:7,11 138:23,24
139:9 141:9 143:14
157:4 166:13,16,18
166:20 168:24
169:2,4,5 170:16
171:17,21,24
172:23 173:2,2,3
181:7 183:13
186:16 189:23
193:5,16 196:8
199:15 200:6
201:19 202:3,12,17
208:7,9 209:24
215:13 220:15,16
227:1
**knowing**  124:14
  153:16 193:19
**knowledge**  35:3,5
  124:24 160:18
  167:11
**known**  94:23 96:16
  96:20,24 124:1,5
  125:23
**kylie**  76:21

**l**

**l**  3:10 25:1
**l'oreal**  28:21 29:5
**label**  94:1 97:5,6,6
  98:16,19,23,25 99:4
  99:7,13,19 115:5
  116:11 118:12,12
  118:18 119:21
  120:12 122:5 137:4
  137:10 138:12
  139:18 140:25
  141:1 142:20
  207:15,16,18
  215:23 217:3 223:1
  223:2,14

Veritext Legal Solutions
866 299-5127

[labeling - long]

**labeling**  119:11,15
**labels**  114:16
**laboratories**  30:4
**lack**  55:17,25 95:6
  144:10 150:13
**language**  55:22 57:6
  143:1
**large**  79:7 166:6
**larger**  56:24 140:25
  141:15 148:13
**largest**  211:13,25
  212:17
**larkin**  2:6 5:16 6:16
  7:11,17 8:7,14 9:2,7
  9:13 10:19 11:2
  12:23 13:25 14:1
  26:1 27:19,23 32:2
  32:11,18 35:9 36:18
  36:22 38:6 39:22
  40:3,25 44:17,25
  45:3,5,8,11 48:10
  48:15 50:1 51:16
  52:22 53:2 54:7,12
  57:18,21,25 58:5,16
  59:3,9,13,18,23
  60:5 61:6,21 62:2,8
  62:23 63:20 64:8,14
  65:12,17 66:21 67:1
  74:19,24 75:7,15,19
  75:22 77:14,16 78:1
  78:5,10,17,23 81:9
  81:15,25 82:4,5,20
  83:12 84:22 85:15
  86:17 87:5 89:3,14
  89:16,18,19 90:3,7
  90:22 91:10 92:6,14
  93:7,13,25 94:5,17
  95:3,11,23 96:14,21
  97:4,12,24 98:6,18
  99:3,8,17,22 102:22
  102:24 103:18
  105:5 107:2 109:11
  109:20,24 111:19
  113:4 118:9,22
  119:8,19 120:4,11

120:19 121:3,20
126:4,20 127:2,9,25
128:4 129:10
138:19 139:11
145:5,10,16 147:10
147:14 148:24
149:4 164:6 167:13
173:5,8,10 175:3
176:9,15,23 181:9
181:11 182:9 183:5
183:7 196:23 197:1
200:7,15 203:16
212:13 220:3 232:2
232:23 233:2,5,21
234:6,9
**larry**  54:21
**law**  7:23 12:5,13,15
  14:12 33:14 81:24
  91:3
**lawful**  6:9
**laws**  61:9
**lawyer**  81:22 89:11
**lawyers**  157:4
**leading**  36:13,19
**learn**  33:24 34:1,6
  34:10 35:9 100:5,8
**learned**  34:8 35:6
**led**  51:7
**legal**  88:24 89:10
  90:1,17 92:1 93:11
  95:1 202:4,15
  232:20
**legitimately**  192:7
**length**  59:10
**lettering**  98:24 99:2
  99:3 116:8
**letters**  56:25 118:11
  118:17 120:13,13
  120:15 134:19
**level**  44:16 113:13
  124:7 125:9 126:20
  127:11,14 232:14
**lg**  27:24,25
**liability**  1:4 4:4

**license**  199:5,23
  200:13
**licensed**  200:1
  220:14
**licensing**  199:19
  200:8
**lieu**  167:18
**light**  188:25 193:22
  195:5 204:11
  206:21 227:21
**likelihood**  12:11
  14:11 16:25 19:14
  23:23 24:6,19 26:6
  26:9,25 31:21,24
  32:7 34:25 41:2
  53:17,20 83:1,14,20
  85:18,24 86:22 87:1
  87:12,24 88:6,18
  89:22 90:12 92:19
  92:21 93:3 125:4
  128:6 154:11 157:1
  167:19 176:4,11,17
  204:8 211:10
  212:21 230:3
**limited**  1:4 4:4
  121:5,7
**line**  46:12,25 89:25
  161:14 162:22
  170:8 185:18
  204:12
**linking**  229:5,16
**liquor**  147:25 153:6
  200:21 227:23
**list**  13:22 14:4 15:23
  39:6 80:3 114:13
  161:20,25 162:13
  194:4
**listed**  17:8 25:13
  39:10,14 47:25
  67:23 69:22 105:14
  114:7 193:25
**lists**  65:24 80:1
**literally**  37:16 38:11
**literature**  127:10,10

**litigation**  4:18 38:22
  39:1,25 40:6 47:25
  48:17 53:6 124:25
  128:24 129:18
**little**  6:25 9:3 28:15
  80:15 129:19
  131:14 136:3,4
  154:9 156:18
**live**  161:8
**llc**  1:4 4:4,23
**llp**  5:12
**loec**  23:5,9 24:25
**log**  68:24 75:8
**logically**  125:21
**logo**  137:8 208:22
  209:7 223:14
**long**  5:8 7:22 8:23
  9:19 12:19 13:24
  25:23 27:17,22
  31:25 32:9,16 34:14
  35:7 36:16,20 37:23
  40:22 45:2 49:22
  51:10 57:16,20,23
  58:3,8,20 59:7,11
  59:16,20 60:3 61:2
  61:19,23 62:6,21
  63:16 64:2 65:7,16
  66:18,24 72:12
  73:15 74:9,17,22
  75:3,17 76:7,10
  77:24 78:3,15 81:6
  81:19 82:3,16 83:10
  84:19 85:12 86:12
  86:24 88:8,23 89:12
  89:15,17,24 90:13
  91:4,25 92:11,23
  93:10,23 94:2,13,25
  95:6,19 96:11,17
  97:1,9,22 98:2,14
  99:1,6,14,20 102:18
  103:15 107:1 109:4
  109:17,22 111:6,14
  113:2 118:6,19
  119:6,16 120:2,8,16
  120:25 121:17

**[long - mcdonald's]**

125:18 126:17,23
127:6,22 129:8
130:21 138:15
139:8,10 145:3,7
160:22 164:3 167:9
175:1 176:6,13,20
181:4,7 182:4 183:3
196:22,24 200:4,11
203:9 212:5 219:25
231:25 232:21
234:1,5
**long's** 233:22
**look** 6:23 8:19 9:17
9:18 32:18 34:15,18
39:20 45:17 46:11
56:12,21 61:25
65:12 67:6,10 68:19
71:10 72:11 76:9
77:3 79:14 94:5
97:18 98:4 99:22
100:10 102:20
103:23 104:11
105:22,24 106:14
106:25 108:1,5,23
114:1 123:6 128:14
130:22 131:2 132:5
132:20,21 139:21
141:7 142:5,14
143:1 144:20
145:25 147:18,20
152:6 156:6,14
157:3,10 158:24
159:3 161:16 162:3
162:6 166:24 178:5
178:9,10,20,22
179:13,19 185:13
185:17 186:19
188:9,10 190:3,8,9
190:14,14 191:19
192:19 193:7,21
194:23 196:14
198:18 200:15
202:9,9,10 206:17
208:13 209:3
213:13,17,25 214:5

214:15 221:18
227:18 229:19
**looked** 11:7 96:9
106:20 107:5,23
130:3 161:7 164:24
177:22,24 190:13
193:10 194:21
198:8 202:24
213:21 229:20
**looking** 10:3 39:5
46:3,18 48:19,25
49:6 54:20 55:16
67:17 73:7 92:14
97:17 101:15
105:11 142:2
145:22 146:19
150:9 152:1 158:5
160:20 166:21
179:20,21,22 183:3
201:12,14 203:14
206:15 229:17
233:8
**looks** 10:5 67:14
76:1 104:14 107:24
108:7,24 117:25
131:21,22,23,24
199:4,23 216:1
218:22 219:1
222:13 224:1,9,17
225:16,24 226:16
227:9
**los** 5:14
**lost** 184:6
**lot** 105:16 108:2
125:23 151:25
206:10 220:18
**lots** 103:5 110:4
**louis** 4:19 6:21,21
161:7,10 162:17
**low** 123:11,13
**lower** 146:22
**lunch** 128:1

**m**

**m** 2:23 3:4,5,7 39:24
48:12 52:23 54:9,22
**mail** 32:20 72:12
73:13,20 74:3,9
76:2,10,21 77:10
162:9
**mails** 102:4
**maintain** 10:22
**major** 151:15,20
**majority** 212:9
213:7
**making** 37:13 77:19
85:2,3 96:3 168:11
181:2 210:2 212:7
**mall** 129:7 137:21
154:16
**manipulate** 136:16
138:13
**manipulating**
137:18
**manipulation** 55:23
**manner** 37:20 38:3
50:18,23 60:9
145:20 154:12
177:11
**manufacturer** 97:14
**mark** 7:11 8:7 9:7
10:19,23 18:22 21:6
21:10 25:9 39:22
44:17,20 48:10
52:22 54:7 78:5,20
89:21 90:11 94:23
98:13,24 99:4
104:24 108:14
122:4,9 145:10
146:6 147:10
148:24 155:16
**marked** 7:15,19
8:12 9:11,14 10:14
10:21,25 13:5,7
32:20 36:23 40:1
44:23 45:15 48:13
52:25 54:10,13

65:13,14 68:19,24
71:10 78:8,11,15,19
104:25 105:3
139:22 145:11,12
145:14,17 147:11
147:12,15 148:25
149:2,5,5 161:19
**market** 129:2
**marketing** 15:14,17
36:19 124:16
125:23 160:18
193:6
**marketplace** 32:12
94:10 103:5 128:16
130:25 132:14,16
135:7 140:19,21,21
141:6,15 142:14
151:9 155:10
160:19 164:12
165:21 167:8,12
168:12,17,21 171:7
171:8,11,15 172:4
172:11,12,20 174:7
206:11
**marketplaces** 167:5
**marking** 10:23
**marks** 17:18 18:20
20:6 23:1 24:20,24
25:4
**martin** 73:22
**material** 53:16
**materially** 55:21
**matter** 55:2,5
140:17 160:10
172:8 188:21
190:21,25 191:10
192:13,16
**mccarthy** 90:23
91:6 92:7
**mccarthy's** 90:23
91:12
**mcdonald** 41:23
43:8 44:1,5
**mcdonald's** 40:10
41:19 42:4 44:10

Veritext Legal Solutions
866 299-5127

[mcdonald's - need]

47:1 63:10
**mean** 7:25 26:11
40:18 46:21 49:8
53:12 58:23 62:7
77:1 83:12 84:1,22
87:1 89:9 97:23
99:7 155:22,23
158:3 160:6 175:15
179:9 183:22
184:18 200:12
211:22 225:24
229:14
**meaning** 21:13 49:4
80:23,25 81:5,10,17
82:10,13,23 83:18
85:22 86:10 88:7,19
89:21 90:12 92:8,25
93:9,15 95:17
122:17 157:19
**meaningful** 115:23
**meaningless** 31:23
40:12 86:8
**means** 66:7 91:15,22
110:5,7 129:6
130:18 184:17
196:2
**meant** 43:6 76:25
83:16 85:16 112:1,3
220:15 228:25
**meet** 33:3
**member** 15:11
108:15 109:14
110:16 124:16
125:25
**memory** 22:16
48:20 51:20 54:21
73:8 145:23
**mention** 112:19,22
114:19 207:3 214:8
214:11 215:1,2
216:11 217:6,14,20
219:4,8 220:4,19
221:25 222:17
223:5,17 224:20
225:6,20 226:20

**mentioned** 11:6
45:13 73:17 80:19
82:6 85:21 88:25
92:24 102:7 113:18
116:23 123:17,24
124:11 125:22
137:6 140:10 147:8
152:22 158:18
159:12 207:4 228:7
**mentioning** 112:21
221:14 227:14
**merit** 65:1
**met** 33:4
**methodological** 15:3
61:16 62:10
**methodologies**
14:20,21 129:14
**methodology** 14:25
37:13 40:11 47:3
151:15 174:22
175:6
**methods** 81:1,23,24
**meyer** 21:12
**michael** 6:19
**middle** 99:7,13,15
122:24
**midwest** 4:17
**miller** 28:13,25 29:2
**mimic** 96:15,19,24
109:9 138:9 206:11
**mimicked** 111:5
112:10
**mimicking** 96:3
111:17
**mimics** 97:19
110:23,25 111:21
197:18,24 198:16
**mincing** 210:12
**mind** 125:2 144:20
159:11,14 167:21
173:19 174:10
184:3,14 186:22
191:14,21 231:12
**mind's** 113:6 144:14
144:16

**minds** 81:12
**mine** 75:17,18
**minimal** 55:18
**minute** 99:24
141:11
**minutes** 21:5 187:16
**mirror** 218:23 219:2
**mischaracterization**
182:5
**mischaracterizes**
84:20 109:18 164:4
167:10 203:10
**mismeasurement**
43:8
**misread** 45:22
**missed** 206:25
**missouri** 4:19 6:21
**misstates** 64:3 65:7
**mistake** 141:2
**mock** 144:10
**modified** 160:7
168:4
**moment** 8:18 11:6
15:22 19:4 45:4
62:11 64:21 73:17
79:9 116:15,17
124:11 139:22
176:25
**monarch** 16:15
**monday** 76:22
**month** 68:5 70:16
71:14
**months** 164:20
**morgan** 29:15 31:8
**morning** 125:4
**motion** 2:24 39:24
72:21
**move** 71:3 77:20
136:22 138:13,17
**moved** 80:16
**moving** 17:7 19:19
20:8 21:11 108:2
**multiple** 68:12,13
128:20 144:7

**n**

**n** 2:1 22:6
**name** 6:17,19
100:23,24 105:8,9
121:24 137:3,7,14
139:15,16 140:5,15
140:16 161:21
194:14 195:25
201:17,19 214:21
218:23 219:1
**names** 227:9
**national** 28:5
**naturally** 144:19
**nature** 116:21 200:8
**necessarily** 89:20
90:10 155:21,22
158:3 167:16
**necessary** 41:8,10
49:12 51:13 59:14
63:19 113:17
182:16 183:17,22
**neck** 97:6,21,25
98:4,4,11 116:7
117:24,25 118:5,12
118:13,18,24
**need** 9:19 32:2
39:21 75:14,19
108:21,22 110:3,16
111:15,16 143:16
173:18 174:9
177:17,19 178:4,20
180:22 181:16,17
181:19 182:21
183:1 185:1,6
187:21 191:6
199:19 201:22
204:4 206:20,21
208:11 210:6,25
211:3 214:14 215:2
217:22 221:14
222:18 223:6,18
226:21 227:15,20
228:1,8,11,14,22
229:11 231:11

[needed - observing]

| | | | |
|---|---|---|---|
| **needed** 49:15,16 | **noted** 15:22 195:2 | **now39** 76:9 101:23 | 75:6 76:3 169:4 |
| 50:2 179:17 180:20 | 213:14 | **now40** 77:11 | **o** |
| 181:2,13 182:1 | **notes** 52:5 | **now47** 94:6 | **o** 54:22 |
| 184:21 185:10 | **notice** 2:17 7:12,19 | **now8** 118:23 | **o'clock** 4:16,16 |
| 192:6,18 193:15 | 8:1 11:13 137:17 | **now9** 108:3 123:7 | **object** 89:24 181:4 |
| 209:9,9,14 210:8,11 | **noticed** 142:3 | **nowlis** 1:17 2:5,15 | **objection** 8:23 12:19 |
| 210:23 213:12 | **noting** 194:1 | 2:23 3:2,4,5,8 4:14 | 25:23 31:25 32:9,16 |
| 214:13 220:21,23 | **now0007** 79:23 | 6:8,19,22 7:17 8:10 | 35:7 36:16,20 40:22 |
| 222:2 225:8,22 | **now0010** 123:8 | 8:14 9:13 11:2 | 49:22 51:10 57:16 |
| **needing** 216:12 | **now0023** 48:1 | 13:15 16:14 39:24 | 59:7 61:19,23 62:6 |
| 217:21 219:8,10 | **now0031** 9:9 32:20 | 40:3 44:25 45:5,11 | 62:21 63:16 64:2 |
| 220:4 | 67:11 | 48:12,15 52:23 53:2 | 65:7 66:18,24 74:17 |
| **needs** 86:3 109:8,13 | **now0033** 69:20 | 54:9,12 60:1 61:22 | 74:23 77:24 78:3 |
| 177:6 179:5 181:8 | **now0034** 69:21 | 65:18 67:11 68:21 | 81:6,19 82:16 83:10 |
| 181:22 193:12,17 | **now0036** 72:6 73:7 | 76:22 78:10,23 | 84:19 85:12 86:12 |
| 194:2 195:4,6 | **now0037** 73:20 | 95:24 102:24 105:5 | 86:24 88:8,23 89:24 |
| 196:10 197:21 | **now0038** 76:2 | 128:5 145:16 | 90:13 91:4,25 92:11 |
| 202:18 205:5 208:5 | **now0040** 76:20 | 147:14 149:4 | 92:23 93:10,23 94:2 |
| 210:2 212:19 213:3 | **now0047** 79:12 | 173:10 182:10 | 94:13,25 95:6,19 |
| **negative** 176:16 | **now0051** 94:9 | 209:14 233:8,23,25 | 96:11,17 97:1,9,22 |
| **neither** 80:19 82:6 | **now007** 104:12 | 234:18 | 98:2,14 99:1,6,14 |
| 235:10 | **now009** 121:21 | **nowlis's** 7:12 10:20 | 99:20 103:15 109:4 |
| **net** 43:25 205:20,21 | **now0254** 10:8 11:10 | **number** 9:9,10,17 | 109:17 111:6,14 |
| **never** 33:4 60:22 | 11:14 | 11:11,21 12:8 13:8 | 113:2 118:6,19 |
| 85:25 86:3 93:1,4,5 | **now0255** 11:11 | 16:14 26:19 27:3 | 119:6,16 120:2,8,16 |
| 171:10,13 181:12 | **now0342** 9:10 10:5 | 32:20 38:18 46:14 | 120:25 121:17 |
| 182:15 214:14 | **now11** 136:13 | 46:15 67:12 71:11 | 125:18 126:17,23 |
| 232:24 | 139:12 | 75:10 76:23 80:1 | 127:6,22 129:8 |
| **nevertheless** 63:12 | **now13** 170:20 | 100:12 107:16 | 138:15 139:8 145:3 |
| 63:24 65:3 | **now17** 13:8 | 114:13 119:4 | 145:7 153:22 164:3 |
| **new** 44:11 | **now22** 15:21 25:14 | 123:11,14 124:13 | 167:9 175:1 176:6 |
| **noise** 117:2 124:7 | 27:8 | 126:3,25 127:3 | 176:13,20 200:4,11 |
| 125:9 126:21 | **now24** 13:8 24:1 | 128:25 140:4 | 203:9 212:5 219:25 |
| 127:11,20 131:15 | 31:8 | 143:14 145:13 | 231:25 232:21 |
| 136:5 151:11 | **now254-257** 10:15 | 149:1 156:10,10 | **objections** 59:24 |
| 154:23 155:12 | 11:9 | 164:16 180:6 | **observation** 163:25 |
| **non** 70:1 | **now259** 65:14,20 | 182:22 183:2,7 | 164:7 |
| **norm** 165:18 | 66:14 67:3 68:6,14 | 187:1,15 189:5,11 | **observations** 164:13 |
| **normal** 71:2 | **now261** 68:20,24 | 194:4 195:23 | 164:18 165:20,23 |
| **north** 4:18 5:5 17:22 | 70:17 | 205:16 232:7,8 | 171:8 |
| 19:3 | **now263** 71:11 | **numbered** 13:6 | **observe** 164:15 |
| **notary** 4:20 6:4 | **now31** 35:14 | 46:11 94:6 104:12 | 165:4 |
| 235:4 | **now34** 102:20 | 147:21 | **observing** 164:12 |
| **note** 55:3 78:13 | **now36** 101:15,16 | **numbers** 9:25 10:14 | |
| 211:9 212:7 | | 11:15,17 74:11 75:2 | |

Page 20

[obtained - page]

**obtained** 55:22
60:25
**obvious** 143:6
**obviously** 160:6
**occasions** 232:7,9
**odd** 72:24
**offer** 18:14 22:20
23:12 24:11
**offered** 26:7,10,11
54:22 64:21 133:24
175:24
**offering** 55:19
**offices** 4:17
**oh** 69:20 74:22
216:20
**okay** 7:3,11 8:4,7,18
9:22 10:4,13,19
11:6,10,20 13:13
17:7,20 19:12 20:8
21:4,11 22:17 23:4
24:8 27:14,22,25
28:20 29:7,15 31:12
34:23 37:18 38:16
42:9 44:17 46:9,24
47:20,24 52:22
56:21 57:25 59:23
65:12,20 67:10 68:2
68:12,23 69:20
71:12 72:11 73:7
74:24 75:21 76:6
78:5,10,22 79:13
81:3 87:14,21 91:2
91:10 92:6 100:19
100:22 101:23
102:12 105:8
111:11 112:24
113:15 116:14
122:20 129:18
130:22 132:19
136:12 138:1
139:24 140:8
142:18 143:21
146:9,15 147:10,20
147:23 150:12,24
154:15 156:8,14,16

157:10,13 158:6,11
158:24 159:18
163:13 164:14
165:3 166:13
167:13 168:7 169:7
170:2,7,12 173:8,22
174:8,23 175:3,25
178:1,25 179:19,23
180:15,25 181:9
182:24 184:7
185:16 186:10
187:13 188:14
193:24 195:21
196:14,17 198:11
200:1,15,17 203:2
204:21 207:9
208:13 209:16,18
211:1,24 212:13
213:13,17,19
216:15,20 217:18
218:14 220:3 221:1
222:4,20 223:8,21
224:24 225:10
226:10 227:4
228:16 231:3,14,21
232:15,23 233:21
**old** 94:1 98:12,17
99:12,15 114:19
118:24 119:20,25
122:17
**ones** 9:20 16:11
69:19 161:19 203:2
203:4
**online** 53:24 54:22
55:23 74:10,14,20
76:7 128:20,23
130:12 138:3,9
144:5 149:13
152:13 153:2,4,13
153:16,23,24
154:16 158:11,14
162:25
**operates** 171:7
**operating** 17:22
19:4

**opined** 62:8 181:20
228:19
**opinion** 15:14 16:11
18:14 19:24 20:18
22:20 23:12 24:11
40:10,17,20,21
42:24 49:2 55:14
56:5 57:12 64:22
83:4 85:6 86:6 89:7
90:16 92:16 102:25
107:21 108:7
110:11,17 111:4,19
113:17 114:5
115:22 116:1,3,12
116:14 117:4 126:4
127:19 132:1 168:2
168:6 172:9 176:16
177:10 179:6
183:14 186:2,16
192:7 195:1 203:17
207:22 208:1,25
209:24 210:13
233:11
**opinions** 26:12 35:5
36:7 55:7 66:17
67:5 68:17 69:10,15
71:24 72:4 90:1
**opportunity** 132:5
133:13 172:21
**opposed** 35:25
154:16 167:23
189:24
**opposite** 112:2
**orange** 146:7
**orc** 74:15,20 75:24
76:7
**order** 17:21 18:11
58:12 86:4 115:19
161:21 208:14
209:11 228:3,23
**orders** 161:21 162:1
**organization** 15:12
**organized** 169:10,24
170:13

**orient** 150:16
**original** 37:22 38:4
38:13 40:16,19
**originating** 103:13
**outcome** 235:16
**oval** 99:12
**oversimplify** 202:22

**p**

**p** 54:22
**p.m.** 234:11
**package** 89:20
90:11 134:22
137:16 144:1
214:22
**packages** 172:13
**packaging** 93:21,24
**page** 2:3,9,18 8:8
11:15,17,22 12:9
13:6,6,14 16:14
22:8 29:15 31:8
32:19 35:14 45:19
46:11,24 47:4 48:1
54:17 55:16 56:12
56:21 61:13,25
65:14,20 66:14
68:19,19,23 75:9,13
75:14,16,20,23
79:12 94:7 105:9
106:14,15 107:1,3,8
108:3 114:11,14,24
117:22 118:23
121:4,20 123:8
128:15 131:1,1,2
136:13 139:12
141:17 147:21,24
148:4,16 149:17
152:25 156:15
157:6 158:25
159:19 161:17
166:22 169:8 170:3
170:9 173:12,15
176:24 179:22
180:13 183:24
185:17 187:18

[page - pinpoint]

188:11 192:24
193:24 201:14
209:4 211:7 216:15
**pages** 1:24 2:16 8:19
11:12,14,14,17 13:7
13:19,22 14:5 15:23
16:7,10 25:13 27:8
45:17 80:7 91:13
106:11 131:2
147:15 148:13
149:7 157:11
**palladino** 10:10,11
11:13
**paper** 129:17
146:23
**paragraph** 40:8,25
41:22 42:10 43:4,16
53:12 55:1,6,17
56:22,23 79:22
80:14 81:25 82:3,21
83:7 84:10 92:15
99:22,25 100:11
101:3 103:2 104:11
108:3 114:11,14,24
117:21 121:4 123:6
125:13 136:13
141:16 151:7
158:24 159:18
163:17,22 166:22
169:7 170:19 172:1
173:15 176:23
181:19 187:14,18
205:8,12 211:6
212:16 213:7,15
227:18 228:18
229:23 230:1
**paraphrase** 229:1
**paraphrasing**
156:18
**parenthetical**
104:14 117:23
118:10,22 119:8,9
119:10,19 120:4,11
120:19 187:24

**park** 5:13
**parodies** 175:20
232:18
**parody** 95:13,17
96:2,8,12,14,19,25
109:9 110:9,13,14
110:18,21 111:8,9,9
111:11,12,15,21,23
112:1 116:19,20,21
116:25 117:3,5,8,10
117:13 173:17,23
173:25,25 174:17
175:11,14 176:4,11
176:17 178:4,17
188:25 191:1,7
193:23 195:3 196:9
196:10 197:19,21
202:8,17 204:6,9
206:22 207:2 208:3
208:5 212:19 213:3
217:18,19 219:6,7
220:4 222:1 226:3
227:22 228:3,24
229:4 231:8,16
**part** 6:10 15:2 22:2
46:17 55:9 93:2
103:7 115:4 124:18
124:20 157:7 164:9
174:5,6 178:25
185:18 195:24
228:18
**particular** 42:20
49:24 51:21 80:21
82:8 102:23 110:6,6
123:13 124:23
127:18 154:13
156:11 158:4
164:19,19 187:15
188:13 189:3 190:7
190:25 212:17
**parties** 235:12,15
**partner** 90:3
**party** 20:15 21:14
**pending** 4:22

**people** 91:5 96:25
110:4 133:8,12
134:3,11 140:20
143:5 152:11
153:11,15,17
172:19 177:18
189:5 191:3 193:2
196:8 198:9 203:13
203:13,24,25
204:13 207:6 212:9
**people's** 205:3
**percent** 43:18
106:20 107:4,11
123:3,3,9,16,23
124:3,19 125:14
126:3 127:4,20
141:19,20 142:15
142:16 144:24
145:1 205:9 206:1
212:18
**percentage** 27:9
205:7,13 231:22
232:9,16
**perception** 132:11
134:20
**perceptions** 168:9
**perfect** 53:17,20
**period** 33:15 71:6
81:13 115:23
127:14 164:17
**permission** 177:6
179:5,18 180:21,23
181:22 182:2
184:20 185:24
186:2 187:21 192:6
194:3 195:7 198:1
199:20 202:4,15,18
209:12 210:3,7
214:13 215:2
216:13 217:9,21,23
219:9,11 220:5,21
220:23 221:15
222:2,18 223:6,19
224:22 225:8,22
226:22 227:16

229:3 231:24
232:11,19
**person** 132:17
153:10 158:2
167:21 177:25,25
178:23 179:10
189:3 201:13 208:2
**personal** 163:25
164:7
**personally** 163:14
**perspective** 38:15
40:13 189:22 204:5
**pet** 157:15 158:2
163:4,11,14 166:6,9
**petco** 166:1,5,19
167:7
**petsmart** 165:25
166:5,14,17 167:7
**petsmarts** 166:2
**ph.d.** 3:4,5,8 14:19
15:1 36:10 48:12
52:24 54:9
**phoenix** 5:6
**phone** 68:13 71:17
129:7
**photo** 167:14,15,16
167:18,20 168:1
**photograph** 160:3
**photos** 160:15
167:23,25
**phx** 1:7 4:7
**physically** 137:18
**pick** 117:1
**picked** 168:1,18
**picture** 2:13 121:23
137:5 138:2,4
142:12 148:13
152:25 159:2 167:2
167:3,4 168:18
170:2,13 220:11
**pictures** 97:13
**piece** 137:2 146:23
**pieces** 153:10
**pinpoint** 233:15

Page 22

[place - product]

**place**  34:7 83:1,15
  84:6 85:18
**places**  12:16 95:13
**plaintiff**  1:6 4:6,24
  5:3 6:2 91:18,24
**plaintiff's**  41:24
  91:16,23 92:21
**plaintiffs**  79:24
  92:19
**plans**  58:15
**plausible**  108:15
  109:13
**play**  207:15
**plays**  194:15 195:25
**pleadings**  73:4,17
**please**  6:18 8:19
  11:9 12:7 15:20
  18:11 22:8 32:19
  45:18 46:11 56:22
  64:9 65:13,14 68:20
  71:11 72:12 76:9
  79:9,21 91:20 92:15
  96:1 99:23 103:16
  108:2 121:7 123:7
  128:14 130:23
  131:3 139:22
  145:13 147:22
  151:6 152:6,6 156:7
  156:15 157:11
  158:1,25 159:3
  161:16 166:24
  180:1,5 184:5
  185:15 187:14
  196:15 198:18
  208:14 211:7
  214:16 215:15
  223:8 225:10
  226:10 227:19
  229:24 234:9
**plenty**  64:5,11
**pllc**  5:4
**point**  12:22 26:14
  26:16,17 37:19 38:1
  39:4 43:12 44:15
  77:22 85:1,3,5

  112:5 113:25
  115:21 116:4 136:2
  160:8 168:11 170:1
  170:18 172:10
  181:9 186:8 195:14
  198:7 204:1 213:6
  229:7,8,16
**pointed**  47:3 69:16
  72:5 83:18 125:20
  139:1 188:24 206:7
  206:10 208:1
  215:22
**pointing**  204:17
**poo**  111:2 118:25,25
  119:21,21 122:20
  122:20,23,23 123:3
  141:20 142:15
**poop**  122:19,21
**population**  87:25
**poret**  49:7,23 50:16
  64:1 65:6 129:17
**poret's**  49:19 50:3
  50:10 63:22 64:22
**portion**  53:22 84:11
  87:25 95:20 97:20
  99:13 197:16
  207:19
**portions**  87:18
  138:14
**possible**  103:1,9
  141:3 158:1 172:2
  176:14,22 180:1,5
  215:13 233:22
**possibly**  34:13,13
  177:14
**potential**  111:16
**potentially**  108:23
  117:16
**practice**  70:24 71:2
**preamble**  166:24
**preceding**  213:22
**precisely**  145:19
**preliminary**  55:2
**premium**  53:23

**preparation**  7:24
  8:22 112:18
**prepare**  7:3
**prepared**  25:15
  26:17,22,25 45:20
  45:23 46:4 48:20
  54:14 105:11 128:6
**preparing**  8:6 70:18
**present**  5:19
**presentations**  14:15
**presenting**  168:7
**pretty**  21:25 24:19
**previous**  6:23 28:21
  34:10 35:6 64:3
  169:16
**previously**  10:21
  13:4 33:22 36:23,23
  78:19 104:25 128:6
  145:17 147:11
  148:25
**principal**  97:13
  105:11
**principle**  132:4
  140:19 155:9
  168:13,14 190:2
  206:14
**principles**  87:3
  110:3 126:11
**print**  94:12 185:25
**printed**  147:2
  185:23
**printing**  98:12,20
**prior**  34:4 39:6
  46:17 65:8 84:20
  109:18 164:4
**privilege**  57:22 58:1
  58:2,4,7 59:2,12,17
  59:21 77:24 78:3
**privileged**  51:12
  57:17
**probably**  14:24 34:5
  71:1 87:17 92:3
  145:19 163:20
  175:17 211:8

**probe**  215:24
**problem**  130:20
  159:15 167:24,25
  168:1 174:19,20
  231:7,20
**problems**  206:8,9
**procedure**  144:17
  144:18 170:18
  173:4
**process**  7:1 138:10
**produce**  8:2 115:15
  129:13 182:16
  200:9
**produced**  2:19 4:14
  6:9 8:10 9:15 10:1
  11:8 200:2
**producer**  227:15
**product**  25:2 42:20
  58:1,3,4,14 59:17
  88:1 92:22 93:22
  94:1,12,18 95:4,12
  96:9 97:15,17,18,19
  98:19 104:14
  108:15,19 109:2,2,5
  109:7,14,15,24
  110:7,8,19,21,24
  111:5,12,17,20,21
  112:8,9 113:10
  116:19 117:4,9,15
  117:18 121:8 122:6
  122:9,18 124:17,20
  126:1 130:9,12
  131:6,12,12,13,20
  132:2,6,11,18,23
  133:5,14,21 134:6,7
  134:16 135:12,16
  135:23,25 136:3
  138:5,12 139:14,17
  140:6 146:10,13
  147:6 149:15
  150:17 153:5
  154:13 157:24
  158:1,4,9,16 159:23
  161:11,13 162:17
  162:20,23 163:2,24

[product - question]

166:9,13 169:17
170:5,21 171:4,14
172:17 175:10
176:3,10,12,17,19
177:2,13,14 178:4
178:17 179:8,11
180:1,2,4,7,20
181:2 183:8,18
184:10 185:10
186:13 187:2,21
188:1 189:1,7 191:1
191:11 192:2,9,14
193:23 194:1,10
195:3,11,19 196:4,9
196:13 197:8,14,20
197:21 198:3,6,10
198:15,20,20 199:2
199:9,14 200:1,10
200:19 201:10
202:5,8 203:14
204:6,9,15,25
206:22,25 207:2,23
208:3 209:1,20
210:2,14 212:1,4,12
213:8 214:13
215:16,16,18 216:6
217:7,8 218:15
219:5,14,22 220:14
221:3,4,19,19 222:6
222:9 223:11,24
224:6,9,13,18,21
225:1,12 227:2,6,25
228:3,9,20,24 229:4
230:7,21 231:9
**production**  9:9,10
10:14 13:7 32:20
68:20 70:3 71:11
74:11 76:3,23
**products**  1:4 4:4,23
28:5 33:21 96:15,15
96:19,20,25 106:20
149:12 152:7
156:18,19 157:24
159:2,4 161:14
165:9 166:25 169:9

169:11,24 170:4,7
170:13 171:18
172:3,24 175:14,20
180:3 182:17 197:8
211:11,21 216:25
216:25 219:13
223:24 224:2
228:21 230:7
**professional**  235:4
**professor**  33:10
90:23 91:12 92:7
109:12 110:1
124:16 160:18
**proper**  42:14 43:4
83:22 86:22 110:12
110:13,18 111:4,20
112:9,13 113:1,5,11
114:5,6 115:19
116:18 117:19
118:16 123:22
124:8 125:14,17
126:15,22 127:12
128:12 132:9
144:17,17 159:8
178:6 205:19
**properly**  62:18,19
65:4 127:20 129:9
129:15 130:21
173:13 233:9
**properties**  1:8,19
2:22 4:8,25 6:11
9:16 101:5
**proposition**  63:1
125:13 129:11
**prosecute**  58:11
**protocol**  42:18,19
42:25 86:19,22
180:16 229:23,25
230:2 231:6,17
**provide**  16:18,19
17:12,24 19:24
20:18 35:21 36:3
67:3 69:13 131:25
195:6

**provided**  18:24 19:6
34:24 49:2 66:19
72:2 131:19 134:15
136:20 154:17
155:2 158:12,15
**providing**  68:15
**psychology**  124:15
126:12 193:7
**public**  3:6,8 4:20 6:5
31:9 52:24 53:6,14
53:21 54:3,15,23
231:22 232:10,17
235:4
**publication**  12:2,16
61:14
**publications**  13:23
14:4
**published**  55:4
**pull**  205:1
**purchase**  139:5
**purchasing**  53:17
53:20 152:9 159:5
167:1
**purpose**  39:18 105:9
152:3,15,19 154:2
203:11
**purposes**  61:15
66:16 77:19 102:25
109:11,23,25
110:12 128:24
232:8
**pursuant**  7:18
**put**  13:2 99:23
103:21 123:10
126:2 156:19
157:25 159:10,13
177:4 179:2,8,11
180:3,7 181:13,14
182:1 183:9,11,18
184:10 185:10,23
186:1,14,15,23
187:2,9,24 188:1,7
189:7,9,16 191:4,11
192:3,9,15 193:14
193:19 194:18

195:11,19 196:4,12
197:14 198:21
199:1,14,16 200:19
201:2,10,16,19,20
203:18 207:13,24
208:7,16 209:2,5,20
209:22 210:14
211:11,11 212:1,3
212:11 213:8
214:12,18 215:17
216:6 217:1,8
218:15 219:15,23
221:3,4,19 222:6,22
222:23 223:11,25
224:6 225:1,12,13
226:13 227:2,6,25
228:21 230:4,8,20
**puts**  156:20 157:25
179:17,25 180:4,12
180:20 196:20
197:3,9 215:18
218:1 219:13 223:9
223:23 226:12
**putting**  181:2 210:2
224:13

### q

**qualify**  142:22
**quality**  129:5
**quantity**  161:22
**question**  27:2,17
34:5 37:24 45:4,19
46:12,25 61:20
74:18 81:7 82:17
89:11 90:6 95:24
100:15 126:24
156:17 157:15,22
157:23 166:15,24
179:24 180:2,6,13
180:13,22,25 181:5
181:17,21 182:6,8
182:10,13,22 183:7
183:23,24 184:7,13
184:23 185:9,19,21
186:12,12,21 187:1

[question - receive]

189:10 190:3,6,13
191:23 194:20
195:4 196:10,19,25
197:2,7,24 198:20
198:25 199:13
200:19,25 201:5
207:12 208:18,21
209:6,13,15,17,19
210:1,8,10,18,21
211:5,15 212:22
213:9 214:1 215:16
215:25 216:5,25
218:15 220:1 222:7
222:23 223:11,24
224:5,12 225:13
227:5 228:12 229:5
229:16 230:12
**questioning** 89:25
**questionnaire**
179:20
**questions** 6:16
42:11,21 60:2 77:17
90:4 142:23 177:5
177:24 179:4,15
180:11,16,18
181:11 182:15
184:20 185:19
186:6,17 189:24
190:15 191:20,23
193:4 201:22
203:15 211:9
212:22 229:18,20
230:2,17,23 231:6
231:18 232:8,12
233:6,23,24 234:1
**quickly** 9:19 130:4
207:10
**quite** 9:3 43:10
**quotation** 109:12
110:1
**quote** 40:9 56:13
82:21 87:22 114:25
123:9 127:14
141:17 157:8,23
159:1 181:21

187:23 193:3,25
197:17 199:4 210:6
213:2 220:22
227:19 228:7
**quoted** 108:12
197:16
**quotes** 90:1

**r**

**r** 42:13,13 77:5
**raised** 50:5
**range** 127:3
**rarely** 61:17
**rate** 43:17,25
**rationales** 12:1
**read** 6:22 37:23
50:12 53:13 61:12
64:9 79:19 80:15
87:15,19 88:11
89:19 91:1,10 92:4
107:23 111:24
121:6 130:1 136:14
136:17,24 137:5,14
137:16,19 138:3,14
138:17,20 139:3,13
139:18 140:11,14
140:16 141:18,25
142:4,17,19 143:4,6
144:2 146:3,5,6,15
146:19 150:5
170:10 172:2,5,13
172:24 176:24
179:1,1 184:7 189:2
190:3 207:7 209:16
211:8 212:15
215:12,21,23 232:2
234:2,12
**reading** 138:11
189:6
**ready** 42:12,17,25
86:19 87:2,6,9,15
87:22 159:9 174:12
174:20,25 180:16
182:15 210:18
229:22,25 230:2

231:6,17
**real** 133:12,14
137:12 138:8
172:12 182:7
187:20
**realize** 191:3 196:12
**realized** 177:3 179:2
187:25 189:7
**really** 8:5 27:6 46:1
46:2,16 85:13
100:24 102:15
189:2 191:21
204:20
**realtime** 4:20 6:5
**reason** 47:12 63:18
65:8,10 189:15
192:1,16 195:17
202:6,20 205:17
206:17,18 213:1
214:22 217:3 221:8
222:12,25 224:1,8
225:16 226:16
**reasonable** 157:18
**reasons** 114:6
218:20 222:12
223:13 224:8,16
227:8
**rebuttal** 2:14 3:3
17:15 18:5,17 19:6
20:2,11,14,25 21:17
22:18 23:9 24:9
27:10,20 28:1,6,16
28:22,23 29:8,16,21
30:5,14,20 31:1,9
31:17,20 32:6 37:18
38:1,16 39:3,7,14
39:19 40:17,21 41:2
41:14 43:2 44:8
45:20,23 46:5,17,20
47:12 48:6,11,16,20
49:13,20 50:7 51:3
51:7,18,25 54:2
57:15 58:6,18 59:4
59:14 60:6 64:6,12
64:18,19 66:8,10

77:18,23 128:5
185:20 186:7
233:24
**rebutting** 28:2
**recall** 10:13 18:19
18:20,23 19:2,5
20:4,6,22 21:2 22:1
22:2 23:1 24:3,7,17
24:23 25:6,24 28:17
28:19,23,25 29:13
29:18,20 31:6,19
32:4 33:2 34:14
35:13,15 38:23 39:3
39:5,7,13 41:18
42:3,6 43:13 44:15
45:1,6,12 46:14,16
47:15,17 48:4 49:1
49:5 50:11 51:3,22
52:19 53:10 54:2,6
56:17,19 61:10
62:11 66:9,11,25
67:23 68:5,15,18
69:7,11 70:8,11,15
70:20,25 71:8,21
72:1,24 73:3,15
74:1,14,19,24 76:6
76:15,18 77:9 79:5
79:6 80:9 87:11,13
87:14,21 88:3 94:14
95:8,13 102:12
104:22 125:9
129:24 130:8,11,17
140:4,7,8 142:18,21
146:11,18,24 147:1
147:4,5,9,18 149:14
149:22 150:6,20
151:3 156:1 161:12
161:15,25 162:13
162:21,24 163:13
164:16 165:17
176:1 186:5 232:6
**receive** 53:22 69:17
69:19 72:6 101:10
185:24 186:1

[received - represents]

**received** 8:8 67:16
67:18,23,24,25 68:7
69:24 72:7 73:5
76:16 80:9 101:14
102:3,4,9,19,20
162:15
**receiving** 35:15 70:8
74:1,14,20,25 76:6
77:9 102:12 161:25
162:13
**recitation** 80:17
**recognize** 36:13,18
40:4 48:16 53:3
54:13 91:2 97:24
228:20
**recognized** 91:16,23
177:12 179:8
227:24
**recognizing** 144:25
168:3
**recollection** 46:4
67:17 70:14 71:5
73:19 102:8 163:20
**record** 6:18 22:7
26:24 34:23 45:10
77:15,19 78:13
128:3,4 173:7,9
212:15 233:4,5
**records** 13:17
**reduced** 235:9
**refer** 11:11 75:2
79:7 135:9
**reference** 12:22
32:3 57:2 101:3
109:12 110:1
111:12 130:4
213:22
**referenced** 9:21
74:2 100:21 101:2
178:2 229:23
**references** 69:3
71:17 101:19,21,23
111:13 153:24
**referred** 61:7 85:8
106:12

**referring** 9:4 85:19
85:21 95:21 146:16
182:22 196:1
228:12
**refers** 11:21 12:8
81:7 122:19,20
**reflect** 192:8 194:16
220:20
**reflected** 27:8 66:14
67:2 68:6,14 70:17
**reflecting** 203:6
**reflects** 71:13 195:1
**refresh** 46:3 48:19
51:20 54:20 73:8
145:22
**registered** 235:3
**regular** 94:20
126:12
**reinforces** 155:12
**related** 51:11 88:19
235:11
**relating** 16:11 55:5
**relative** 235:13
**release** 186:1
**released** 185:23
**relevant** 55:18
155:5
**relied** 71:23
**rely** 26:12 169:21
**remaining** 23:4
207:9
**remember** 17:4,17
17:18 18:8,16 19:9
19:13 21:3,6,16
29:12 33:25 43:10
44:3,4,16,19 46:19
48:3 49:9 51:22
52:14,21 56:11 68:3
74:4 75:2,5 77:12
87:8 95:10 102:16
103:25 156:4 163:3
163:19 165:18,25
166:1,1,3,5,11,12
186:8,20 191:1,2
232:12,13

**remind** 152:2
**removed** 114:15,17
114:19 119:11
120:5,21,23 121:10
**repeat** 91:20 103:16
184:5
**repeats** 37:12
**rephrase** 103:18
**replace** 115:10
228:15
**replaced** 115:1
118:24 119:20
120:13
**replacing** 114:18,20
**replicate** 32:12 37:6
38:12 50:16 55:24
128:16 130:24
132:14 135:6 138:5
140:19 152:4,15,19
154:3,6,12 172:11
**replicated** 170:3
**replicating** 168:12
**replication** 21:1
37:3,8,12,15,15
38:8,8,11 50:15
**reply** 72:21
**report** 2:12,14 3:3,5
3:7,10 7:7,8 8:22
10:15,18,20 11:3,7
11:12,22 12:9,16
13:4,12 15:21 19:6
25:16 26:17,22,25
32:3 33:9 35:15,16
35:25,25 36:4,6,22
39:15 40:10 45:20
45:23 46:5,17,20
47:1,4 48:1,2,11,17
48:25 49:6,9 52:23
53:5 54:8,14 55:2
55:19 61:8 62:9
65:10 66:8,10 67:20
67:20 68:8,8 70:18
70:23 71:6 72:15,16
73:22 74:7 77:21
78:7,12,19,21 79:18

79:18,21,22 80:15
82:1 84:10,11,23
92:15 95:11,18,20
95:21 97:18 99:23
100:9,21 101:1
103:24 104:12
105:2,10,20,21,25
107:4,23 108:1
113:19 114:9,9
123:6 128:14,15
130:3,22 136:13
139:1,22,25 140:10
141:16 142:10
151:6 156:7 158:25
166:22 170:4,10,20
173:12 176:24
181:19 182:5
184:19 187:13
188:11 190:22
192:21 193:24
195:23 196:16
203:4 205:12 207:7
211:7 216:16
227:18
**reported** 192:21
**reporter** 4:20 6:5
7:16 8:13 9:12
10:23 11:1 37:25
40:2 44:24 48:14
53:1 54:11 64:10
78:9 105:4 145:15
147:13 149:3 234:3
234:7 235:1,4
**reporting** 211:23
**reports** 12:25 35:19
35:22 128:5
**represent** 145:18
**representation**
153:3,4
**representative**
168:19
**representing** 7:23
53:14
**represents** 107:11

Veritext Legal Solutions
866 299-5127

[request - right]

**request** 70:3 101:24
**requests** 70:5 76:12
 76:17 101:6
**require** 231:23
 232:11,19
**required** 142:23
 188:23 189:19
 190:23 191:14
 198:2 224:22
**reread** 157:22
**research** 14:22
 15:12,15,17 28:14
 40:13 55:5,11,18
 56:2 57:2 124:22
 128:21 129:2,10,15
 129:16 190:2
**researcher** 193:6
**resembles** 207:15
 218:4,21
**reserved** 6:7
**resolution** 141:4
**resolved** 47:16,19
**respect** 144:3
 185:22
**respond** 195:22
**responded** 143:12
 156:21 177:11,23
 195:22 196:18
 197:2,7 201:4
 215:19 216:8
**respondent** 42:19
 132:5,6,9,24 133:1
 134:14 136:6
 137:23 139:1
 140:10 142:18
 144:7,18 155:9,15
 156:12,14,21
 157:10,14,20
 158:20 177:11,13
 178:1,3,7,11,11,15
 178:18 179:14
 187:19,25 188:5,10
 188:11,13,15,19,22
 190:17 192:4,5,8,13
 193:1 194:7,10

195:9,16,17,21
196:15,18 197:1,13
197:17,25 198:15
198:19,19 199:4,12
199:15 200:18
201:1,9,14 202:21
207:11,11,23 208:6
208:13,15,15,19
209:1 210:1,22
211:4 213:25 214:1
214:8,11,15,17
215:1,5,12,14,15,18
216:1,8,11,21,24
217:2,24,24 218:14
219:4,12,22 221:1,6
221:20 222:4,20
223:8,21,25 224:24
225:11 226:7,11,25
227:1,14 229:11
**respondent's** 178:5
194:8,17 217:15
220:5,20 223:18
**respondents** 103:12
103:19 104:4,4,7
123:9,14,17,23
124:19 125:14
131:5,11 133:20,20
135:5,10 136:14,16
137:6 139:2,13,17
140:5,9,14 142:23
143:12,17,22 144:4
151:20 152:5
154:18 156:2,9
158:7 159:1,3,10,20
160:3 177:1,23
179:16 180:19
181:1,12,20,25
182:16 183:16
184:14 186:22
187:15 194:1,5
204:22 205:10,13
206:1,4 207:10
211:3 212:17 213:2
213:14,15,21
227:24 228:6,20

233:12
**response** 2:19 8:10
44:13 92:5 155:11
156:17,25 157:14
157:19 178:10,23
188:1 190:4 192:20
193:1,8,10,13,22
194:16 195:4
198:25 199:13,22
200:16,25,25
201:13 207:12
208:7,20 209:3
212:8 214:1,3,4
215:6,15,24 216:5
216:24 218:1
219:14 220:13,24
221:3 222:6,22
223:6,10,23 224:5
224:12,15 225:13
226:6,12 227:4
229:19
**responses** 32:15
70:1,2,3,4 73:22,23
76:11,16 101:6,24
102:21 133:3
155:25 157:7
172:22 178:6,20
187:16 188:13
189:2 190:10,13,15
191:3,20 192:21,22
195:2,9 196:7 202:9
203:5,20 206:16
213:17 220:10
221:14,17 222:18
225:21 226:21
227:14 229:10
**responsible** 59:11
**rest** 178:5,20
**result** 89:22 90:12
**resulting** 43:17
**results** 37:17 40:11
43:23,25 47:7,7
55:21 57:4,9 60:7
60:11,15,19,21,23
60:24 61:4 62:15,18

63:13,25 65:4,5
84:3,7 86:4,7,15,16
87:8,23 88:5 113:20
115:23 116:22
129:12,13 133:5,11
133:18 134:1,8
135:1,12,19 136:8
138:21,24 168:16
168:23,25 170:14
170:17 171:19,21
172:25 173:18
174:9,21 202:25
204:4,11,20 205:6,9
205:23,25,25
206:20,21 207:5
227:20 229:21
231:11
**retail** 130:13 160:4
160:25 163:1,5
**retailers** 166:6
**retain** 145:13
**retained** 3:15 20:15
21:14 113:11
115:18 118:4,17
119:4,14,24,25
120:7,14 121:14
123:2
**return** 13:3
**revelation** 66:19
**reverse** 41:3
**review** 35:18 56:10
139:25
**reviewed** 7:7,7
49:10 65:25 97:11
107:12 112:15
155:25 175:18,23
**reviewing** 10:13
56:17 66:6,7 70:11
70:22
**revolves** 117:2
**ribbed** 97:21,25
98:4,4 117:24 118:5
**right** 16:4 24:7 26:4
51:23 52:19 62:17
62:24 63:3,6 73:10

[right - sentence]

76:8,19 77:13 81:9
81:22 107:13
112:22 117:1 126:9
145:9 150:10
165:22 166:4
168:22 169:2
170:18 178:9
184:22,25 205:22
223:19 228:10
230:15,16
**rights** 202:4,16
**role** 20:13
**roll** 150:1,1
**rough** 27:12 112:15
232:3
**roughly** 27:8
**round** 13:17 104:20
106:1,4 131:14
**rounded** 117:25
**routine** 190:12
**rpr** 5:20
**rubber** 153:8,11,25
154:19
**rule** 3:9 66:22 73:21
78:6
**run** 37:16
**running** 62:13

**s**

**s** 77:5 140:11
**sac0001** 105:10
**sac0010** 105:24
**sac0011** 106:5
**sac0021** 106:14
**sac13** 106:9
**sac14** 106:9
**sac15** 106:10
**sac19** 106:10
**sac49** 106:25 107:2
**sacra** 77:5 97:13
105:11 106:5
107:23 161:20
**sacra's** 105:25
106:19 107:4

**safe** 153:7
**safely** 6:24
**saw** 34:20 72:19
73:8,11,13,16 74:6
100:9 125:25 151:4
152:8 159:4 165:13
165:18 166:25
167:6 198:8
**saying** 182:21
184:17 204:21
211:2 228:24 229:7
**says** 10:9 67:24 72:7
81:12 102:20
107:10 134:17
142:9 153:5 157:23
157:23 179:24
182:5 183:2,25
184:8 210:13,15
215:6 218:12
**scholarship** 129:11
**school** 36:11
**schwake** 4:19 5:20
6:4 235:3,23
**science** 12:6,13,15
61:9
**scientist** 175:18
**screen** 142:3
**screener** 142:22
143:2
**script** 99:19 122:14
**se** 130:21 144:3
153:23 162:23
174:15,20
**second** 16:16 73:23
75:9,14,20,23
119:10 128:15
153:13 161:17
169:8 173:16
178:25 229:24
**secondary** 21:13
49:4 80:23,25 81:5
81:10,17 82:9,13,23
83:18 85:22 86:10
88:7,19 89:21 90:11
92:8,25 93:9,15

**section** 84:23 85:2
91:11 130:24
168:12 179:21
**see** 10:4 32:2,22
37:16 40:14 41:4
42:1,7,15 43:19
44:19 47:6,9 50:13
55:12 56:3,15 57:10
63:13,25 65:4 67:7
69:5 70:6 71:19
73:11,24 74:12,22
75:12,13,14 76:4,13
76:24 77:2,7 83:2
98:3,5,15,16,17,21
99:2,9,10,15,16,21
100:3,13 101:8
102:1,19 104:16
105:14 106:2,3,7,11
106:11,17,23 107:7
107:9,10,14,19
108:10,17 114:22
115:7 118:2,14
119:2,12,22 121:12
122:1 123:20 124:2
128:18 131:5,8,11
131:17 132:9,10
133:4,13,21 134:6,7
134:19,23,25
135:11,16,22,22
136:18,23 138:8
139:7,19 140:22,23
141:15,22 142:12
142:14,24,24 143:3
143:13,18,19,24
144:7,21 147:1
148:1,3,6,15,18
149:20 150:7,14,17
150:18 151:17
152:4,6 153:5
155:11 156:23
157:16 159:6,25
161:23 162:3,7,11
164:23 165:9,16
169:12 171:1 172:6
172:21 177:8,24

184:11 186:3 188:3
192:23 197:5
198:23 199:6
200:22 201:6
203:14 207:19
208:23 211:17
212:24 214:6 215:8
215:9 216:3 217:4
218:6,8,18,24 219:2
219:19 221:11,22
222:10,15 223:3,15
224:3 225:4,18
226:18 227:11
228:4 229:11
**seeing** 67:24 72:25
73:3 75:2 95:8
123:10 124:4 140:4
147:6,19 149:14,22
156:1 163:19 176:1
**seeking** 51:11
**seen** 8:15,16 34:21
35:13 87:18 94:8,11
94:15 97:10 104:20
105:6,15,20 145:1,6
145:8,23 147:9,15
160:24 163:4,15
166:3 171:10,13
185:5 220:17
**sees** 42:20 124:16
**sell** 149:12 198:2
228:3,8,23 229:4
**seller** 125:22
**sellers** 105:22
**selling** 95:4
**sells** 197:10
**seminar** 14:19 15:2
**sense** 84:4,8 86:5
110:25 211:19,23
211:25
**sent** 67:7,8,12,13,14
69:21 97:13 162:4
**sentence** 40:23 42:7
42:9 88:3 107:10,14
139:12 149:10
169:8 173:16

Veritext Legal Solutions
866 299-5127

[sentence - spaniels]

176:24 179:1
205:12 212:16
**separate** 89:1 90:19
**separated** 169:11
170:22,24 171:5,18
**separately** 89:2
90:20 165:14
**september** 235:18
**series** 9:8,14 42:20
88:16
**serious** 60:13 62:10
**serralles** 88:14
**services** 12:15,24
108:9
**set** 9:24 67:15 69:21
70:1,3,4 73:23
76:11,16 101:6,24
102:21
**seventh** 147:21
**seyfarth** 5:12
**seyfarth.com** 5:17
**shake** 22:6
**shape** 106:6,16,22
109:16 117:24,24
118:5
**shapes** 105:23
**shari** 11:23
**shaw** 5:12
**shoe** 25:7,10,12
**shop** 163:11
**shopped** 163:14
**shopping** 151:8
163:18 164:10
**short** 44:13 45:8
173:5 233:2
**shots** 142:3
**show** 61:24 93:8,15
94:3 95:20 102:4
103:4,5 104:24
144:18 149:4
152:10 168:18
205:9,25 206:19
212:9
**showed** 35:10 87:11
101:13 115:14

159:1,20 160:3
169:10
**showing** 82:12
84:15 92:16 138:4
157:1 159:15
**shown** 80:21 82:8
84:6 93:5 138:2
143:21 144:4,6
145:17 146:10,13
152:12 170:4,12
172:3 182:17
**shows** 83:5 85:7
227:20
**sic** 48:1 53:16 80:22
108:9 114:15
**side** 131:11,21
133:21 144:8 148:6
150:7,17
**sides** 131:20 132:11
132:20 133:5,13
135:12 148:19
**sign** 234:2
**signature** 6:6 54:17
**signed** 40:5 72:16
73:21 234:12
**significance** 92:9
102:17,25
**significant** 87:25
**silly** 121:24 137:3
137:15 140:6,11,25
155:17 160:24
161:14 162:22
169:11 170:8,13
171:14 179:9 188:1
189:8 208:7 215:6
215:17,21 217:1
221:2,19 222:21
223:9 224:25
225:11
**similar** 42:22 103:6
108:22 111:7 115:3
115:11 129:13
221:9
**similarities** 121:22

**similarity** 227:9
**simonson** 35:16,25
36:6,10
**simonson's** 67:20
68:8
**simply** 44:14 50:15
55:9 61:4 114:17
181:24 189:24
194:21 203:24
212:7
**single** 49:9 88:1
91:7
**sir** 29:6
**site** 152:20
**sitting** 26:4 28:17
39:13 42:6 43:10
51:23 52:19 68:4
70:13 71:4 79:5
80:8 115:25 147:5
**situation** 124:13
127:15 191:18
198:13
**situations** 55:8
**six** 4:16 16:3,4,5
**size** 140:25 142:13
**skew** 116:22
**smaller** 142:13
150:12 166:9
**smelly** 111:2 123:3
141:20 142:16
**smm** 1:7 4:7
**smooth** 117:25
**sold** 138:6
**solution** 53:17,20
**somebody** 51:9 86:8
124:16 125:25
186:24 195:10,18
199:9 200:2,8,20
215:21 229:10
**somebody's** 132:19
**somethings** 188:2
**sorry** 13:25 26:2
45:22 67:11 69:20
75:13 81:9 82:19
83:11 85:13 90:6,7

91:19 103:16
105:13 116:15
122:7 145:11
157:12 176:7 184:5
187:6 192:11
214:16 216:18,19
232:1
**sort** 38:7 108:22
143:5 190:12 193:2
217:3
**sorts** 92:3
**sound** 155:5 156:3
**sounds** 76:8,18
77:12 97:11 158:15
**source** 42:21 88:2
91:3,22 132:1 155:6
158:8 168:9 172:16
176:5,12,18 178:8
178:19 196:21
198:6 203:7,21
204:14,24 230:4,9
230:17
**sources** 91:15 101:3
101:20
**southern** 168:5
**spaniel** 109:6 122:4
**spaniel's** 122:9
**spaniels** 2:10 84:18
95:12 96:7 97:19
98:1,7,24 99:4,11
103:13,21 110:21
111:13 113:10
122:18 144:21
145:20 147:6 148:3
148:14 149:14,18
150:25 151:8
152:25 153:6
160:25 161:11,13
162:1,20,23 163:2
170:5,23,24 171:11
172:16 173:17,23
174:17 177:3 179:2
179:9,17 180:20
181:13 186:23
188:6,17,20 189:8

Veritext Legal Solutions
866 299-5127

190:19 194:17
196:3 201:16
202:13,18 205:11
205:14 207:12
208:16 214:2,17
217:25 222:5,22
223:10,22,25
227:22
**speak** 7:22 8:2
**speaking** 66:5 69:3
**specialty** 166:10
**specific** 41:18 57:2,6
58:1 66:21 70:14
94:14 111:12 116:4
158:1 163:8 174:8
180:1,5 181:16,18
221:16 229:11
233:19
**specifically** 114:10
115:12 163:18
195:15 217:16
**specify** 133:7
**speculate** 60:12 61:3
62:12 134:2 169:6
**speculation** 55:9
81:20 139:10
**speech** 6:25
**speeches** 14:14
**spelled** 42:12 54:21
**spent** 65:21 68:25
71:14 206:10
**spirit** 185:2
**spoke** 65:24
**sponsored** 103:22
177:15
**sponsorship** 42:22
132:2 155:6 158:8
168:9 172:16 176:5
176:12,18 178:8,19
179:12 203:7,22
204:14,24 230:13
230:14,15,25 231:2
**spoof** 177:3,6,13
178:2,4,17 179:4
181:22 187:20

189:5,17,21 191:7
191:19 192:5,17
193:16,17 194:2,2
195:7 198:10,15
208:22 209:7 214:9
215:2 216:12 217:7
217:13,14,17 219:5
219:7 220:4 221:14
222:1,18 223:6,18
224:21 225:7,21
226:3,7,21 227:14
231:24 232:12,20
**spoofing** 177:7
179:6 181:23 194:4
212:20 213:5
**spoofs** 231:23
232:11,18
**sporting** 19:22
**spots** 140:22
**square** 97:21,25
98:3,16 104:18
106:16,21 113:23
116:1 117:24 118:4
118:11,18
**squeak** 148:3,14
153:1 157:15 158:2
**squeaker** 140:6
153:7 155:23
160:24 161:14
169:11 170:13
171:14 179:9
215:21
**squeakers** 121:24
137:4,15 140:25
155:17 162:22
170:8 189:8 208:8
215:7 217:1 221:2
221:20 222:21
225:11
**squeaking** 131:15
136:5 151:11
154:23 155:5,12
156:3,3 157:20
**squeaks** 153:8,14
155:13,20,23 158:5

**squeaky** 156:21
**squeeze** 136:4
153:14
**squeezed** 151:12
153:8 154:24 155:5
155:14
**squeezes** 131:15
**squirt** 175:6,7
**st** 4:18 6:21,21
161:7,10 162:17
**stack** 79:8 101:16
**stand** 42:8 113:19
**standard** 180:16
210:18
**stapled** 75:17
**starbucks** 30:13
52:4,10
**start** 6:25 16:13
26:16 71:2 116:15
**started** 66:11 70:24
71:1,6,9 80:15
191:5
**starting** 13:6 19:12
27:23 37:19 38:1
66:9 117:21 173:12
185:18 192:24
193:15 194:7
218:11
**starts** 94:6
**state** 4:21 6:17 15:7
33:11 167:21
176:15 184:2,13
186:22 191:14,21
235:5
**stated** 40:23 56:13
114:14 141:17
177:2
**statement** 61:12,22
65:21 81:8 87:6,22
88:12,22 89:5,20,23
90:9,18 92:7,10
163:22 169:15,16
169:23 171:3
**statements** 88:16
91:11

**states** 1:1 4:1,22
73:12 88:12 94:24
95:5 231:23
**stating** 141:24
**step** 113:25,25
151:24
**stephen** 1:17 2:5,15
2:23 3:1,4,5,7 4:13
6:8,19 39:23 48:12
52:23 54:9 97:13
234:18
**stimuli** 34:19
**stimulus** 41:24,25
42:5 79:3 83:9
84:13 85:11 104:13
107:22 108:13
110:8 113:1,5,12
114:12 117:23
122:4,8,25 123:4
125:17 126:22
127:12 128:8
144:11 158:15
182:17
**stipulated** 6:1
**stop** 194:21
**storage** 3:6,8 31:9
52:24 53:6,14,21
54:4,15,23
**store** 132:18,19
151:9 152:4,8,12,14
152:15,16,18 153:4
154:4 159:5,14,16
160:4 161:3,10
162:19 163:5 167:1
168:5
**stores** 130:13
160:20 163:1 164:9
164:14 165:3,10,13
165:24 166:10
**straight** 37:15
120:13
**street** 4:18
**strictly** 14:25
**strike** 16:8,18 22:11
23:19 28:9 29:1

Veritext Legal Solutions
866 299-5127

[strike - take]

35:3 45:4 47:15
79:14 87:7 130:10
130:16 153:20
155:3 158:13
166:14 174:10
**stronger**  55:23
**studied**  175:13,16
232:25
**study**  46:14 47:2
77:6 124:23 126:12
**style**  153:7
**styles**  106:10
**subject**  83:21
233:21
**subjects**  14:15
**submitted**  72:15
**subpoena**  2:17,19
7:13,19 8:11 10:2
**subsequent**  131:1
**substitute**  61:17
**subtract**  43:24
**succeed**  161:6
**sudden**  208:10
**sued**  33:20 34:6
187:22
**sufficient**  55:25
**suggest**  190:22
195:9
**suggested**  178:16
192:5,6
**suggesting**  208:2
**suggestive**  226:4
**suggests**  202:16
**suit**  34:2,4,7,9,11
**suite**  5:5,13
**summary**  2:24 8:24
10:6 39:25 44:13
48:7
**supervised**  41:1
**supplemental**  3:7
54:8,14 55:1
**supplies**  19:22
**support**  2:24 39:24
88:6 129:11 169:22

**supported**  55:10
**suppose**  16:3
**supposed**  138:9
154:11 172:11
**supposedly**  79:25
93:1 123:19 125:21
203:19 211:14
**supposition**  126:8
126:11
**sure**  9:4,5 12:20
13:24 17:2,3,6
18:25 19:1,7,11
20:5,7 21:19,25
24:19 25:18 26:3,8
26:19,23 27:3,6
29:4,17 31:2 32:1,4
32:10,13,17 38:20
46:1 48:5 60:20
65:9 67:9 70:15
73:2,12 74:17 79:4
81:22,23 85:14
87:17 89:10 91:6
92:2 93:12 95:2
96:2,22 97:3,23
100:7,18 102:15
103:23 105:7,16
111:16 112:12
117:6 119:5,18
120:1,10,18 121:2
121:19 126:25
127:8 128:10,25
141:12 144:23
145:9 154:1,20,25
158:17,23 166:3,5
175:2,15,21 176:9
181:6 182:6,11
183:23 185:7,12
186:20 211:22
228:16
**surprise**  104:3,10
**survey**  14:9,18,21
14:25 15:4,12 16:20
16:22 17:1,13,25
18:2,15 19:25 20:19
20:24,25 21:1,3,21

22:21 23:12,21 24:2
24:11,14,18 26:6,18
27:1 28:2,11 29:3
29:11,13,19,24 30:2
30:8,17,23 31:4,6
31:13,18,21,22
34:15,18,19,21,25
35:10,12 37:3,6,7
37:12,13,19,20,22
38:1,2,4,7,8,9,11,13
39:2,3,19,21 40:10
40:12 41:3,14,15,19
41:24 42:13,17,23
42:25 43:2,17 44:2
44:6,8,11 46:17,20
47:12 48:4,6,7,20
49:13,19,20,25 50:3
50:7,9,10,15,18,19
50:23,24 51:9,18,24
51:25 52:11,12,16
53:8,11,18,24 54:3
54:23 57:8,15 58:6
58:18 59:4,14 60:6
60:8,13,16,18,21,25
61:3,15 62:4,4,9,13
62:18,20 63:1,3,10
63:12,18,22,25 64:4
64:7,10,13,15,19,22
65:3,4,8,11 74:10
74:15,20 76:7 77:18
77:23 78:24 80:20
80:20 81:1,15,22
82:7,7,12 83:5,20
83:25 84:15,17 85:6
86:9,15 87:9,24
88:6 92:16 93:13
113:20 114:4
115:23 127:10,15
127:18 129:13,14
129:20,22,23 130:7
130:17 132:13,17
133:6,9,11 137:11
137:22 138:9 141:4
141:7 142:3 143:16
144:5 146:8 151:16

152:3,10,14,15,21
153:15,16,23,24
154:2,11,15 158:12
158:14,22 159:9
166:23 168:14,15
169:4,6 170:15
171:19 172:14
173:1 174:3,5,13,24
175:7,9,23 176:1
177:22 179:22,22
181:25 185:8,20
186:7,18,20 188:24
190:2,7 204:2,3,9
204:19 205:9,17,24
205:25 206:20
212:6 231:15,19
233:24
**surveys**  12:5,13,18
14:7 15:8 24:5
26:10 32:7 37:8
38:16 39:7,14 51:4
51:7 52:18 61:9
86:23 87:2 90:21
125:1,5 128:7,20,24
129:1,5,7,13 167:20
175:13,19,19 185:5
**suspect**  63:4
**swann**  12:10 61:13
**sworn**  4:14 6:9
235:7

**t**

**tabulations**  76:1
**tactile**  151:14
153:11,12 158:12
**tag**  140:11 215:7
**take**  8:18 43:23 45:8
46:1 77:14 100:10
127:25 129:25
141:7 143:15
147:18 151:24
157:3 167:4 173:5
187:16 188:9
194:23 233:2

Veritext Legal Solutions
866 299-5127

[takeaway - thought]

**takeaway**  122:19
**taken**  1:18 6:4 45:1
45:12 59:24,25
85:10 167:2 235:8
235:13
**talk**  8:5 33:5 60:3
84:25 114:9
**talked**  80:12 111:9
115:13 126:18
129:19 161:18
184:19 195:23
210:5,24 220:17
228:10 229:8
**talking**  26:14 95:21
109:7,8 160:13
203:3 204:22 205:4
205:21,22 206:10
**tall**  153:6
**tara**  4:19 5:20 6:4
235:3,23
**taught**  14:17,19,24
**taylor**  25:7,9
**teach**  15:1
**technical**  61:16
**tecum**  2:17 7:13
**telebrands**  21:12
38:25 39:16 47:25
48:17,25 50:8 51:3
63:21 64:15,16,21
129:22 130:11
**television**  94:12
**tell**  16:6,9 27:3
45:20,22 81:21
87:19 94:4 113:25
115:12 133:22
136:25 202:11
206:13 229:1
**telling**  153:13
201:24 202:12
204:7,10,20 205:4
**tells**  153:9 203:23
204:3
**tempe**  33:11
**ten**  165:8,13

**tends**  37:6
**tennessee**  93:19
99:18,18 118:25
122:13 224:16
**term**  37:2,11 38:8
70:23 144:11
**terminology**  37:14
38:7,15
**terms**  63:9 174:8
177:5 179:4 181:21
189:19 231:17
**test**  23:21 39:21
41:16 43:24 49:17
50:4,24 53:18,25
62:3,7 82:24 83:13
83:24,25 84:2,7,7
84:18 85:17,20 86:4
86:7,14 92:18,20
93:2 103:12,19
104:4,7 107:22
108:4 110:8 117:2
121:10,22 125:13
125:15,17 126:21
127:21 134:8 135:1
135:13 136:9
138:21 140:1
144:11 156:1 157:7
158:15 160:4 168:3
168:4 182:17
205:23 206:3,5,9,11
206:12 211:10
228:6 230:3
**tested**  24:1,18 38:13
41:17 53:11 62:25
89:2 90:20 93:5
232:24
**testified**  6:11 25:17
26:15 38:21 59:9
78:1 86:17 93:7
109:19,21,22
116:15,17 125:3
155:24 167:13
174:11
**testify**  47:18,20,23

**testimony**  7:4 15:22
15:25 16:19 17:12
17:24 18:24 19:17
48:4,8 52:6 61:7,10
62:12 64:3 65:8
84:13,20 109:18
112:19 164:4
167:10 186:11
232:4 233:10 235:6
235:8
**testing**  42:11 84:8
85:23 86:2 126:8
**tests**  55:4,10 56:2
**thank**  13:25 77:1
112:21 128:2 130:6
187:7 233:25
**theme**  205:4,5
220:16
**theory**  231:20
**thereto**  235:15
**thing**  37:16 91:1
111:25 171:6
182:25 201:15
**things**  85:1 92:4
93:14 97:8 111:3
114:13 138:17
151:25 152:12
155:23 160:19
178:13 207:3
217:14
**think**  9:4 17:2 18:1
19:14,16,22 21:22
23:23 24:22 27:11
29:4,10 33:16 34:17
34:20,22 35:11,12
38:21 39:9 41:10
47:18,24 49:12,16
58:8 59:23,24 62:24
63:3 69:23 71:1
73:6 74:8 75:1
76:25 80:13 87:17
87:20 89:6,9 95:25
101:2 104:21
105:15 109:20,22
110:23 112:1,4,5,6

113:9,16 115:13,18
116:15,17,23
123:15 124:19
125:5,8,19 127:13
127:23 131:3 132:3
132:15,17 137:5
139:6 141:2 143:7
144:19,23 146:16
146:25 150:10
153:21 154:21
155:1,14 158:4
164:11 169:3
173:11 174:11
175:12,22 176:14
177:16 178:12,13
182:4,20 183:21
184:25 185:2,24
187:21 189:3,14,21
189:22 190:11,15
191:8,9,24 192:20
193:11 194:22
195:5 202:1,14,20
202:23 203:12
207:7 208:10
210:12 211:4,8
215:9 217:12
220:25 229:18,23
232:9 233:3
**thinking**  189:16
199:18 226:2,9
228:1,22 229:2
**thinks**  112:6
**third**  88:13 89:17
90:9
**thirds**  114:25
**thought**  15:6 41:8
41:11,16 47:2,5
49:15,24 50:5,19,24
51:13 60:9 63:19
73:5,18 115:19
117:19 123:10
124:5 178:17
182:11 189:12,16
196:7 202:24
212:10 219:5 226:7

Veritext Legal Solutions
866 299-5127

[three - underscored]

**three**  14:4 44:14
  105:25 146:9
  148:13 185:21
  186:9
**thumbnail**  150:13
**time**  32:24 34:2,7
  65:21 68:25 71:6,13
  72:19 73:8 74:6
  81:13 87:18 100:17
  125:5 163:13
  206:10 233:25
**timepieces**  18:12
**times**  45:25 46:2,4
  46:19 127:23
**title**  11:24
**titled**  13:16
**today**  7:4,18,24 8:15
  9:18 28:17 39:13
  43:11 63:5 68:4
  70:13 71:4 79:5
  80:8 105:6 112:19
  115:25 125:22
  129:19 147:5,19
  152:1 233:25
**told**  19:16 34:14
  159:2 160:22
  194:24
**tompkins**  28:13
  29:1,3
**top**  24:1 32:19 45:21
  45:25 47:4 93:17
  98:3,24 99:4 103:25
  106:4 107:7,15
  117:25 118:11,18
  118:23 121:20
  122:5 123:8 131:2
  131:12,24 132:20
  134:16 135:22
  144:8 146:15,20
  147:2 148:3,15
  149:19 150:5 169:7
  215:23
**total**  229:19
**totally**  185:1

**touch**  151:10,21
**toy**  2:10 77:6 84:18
  96:7 97:14 98:1,8,9
  99:12,23 103:21
  108:4,5 109:3,7,15
  109:19 110:11,13
  110:21 115:1
  121:10,11 123:10
  123:12,15 131:14
  131:16 136:16,17
  137:24 139:16
  141:19 142:1,24
  143:3,13,18,22
  144:3,4,21 145:20
  145:23 148:4,7,7,14
  149:18 150:8,25
  151:4,8,10,11,21
  152:9 153:1,7,8,25
  154:18,23 155:4,7
  155:13,13,19 156:2
  156:3,20 157:21
  159:5 160:25 162:1
  163:21 164:11
  167:1 168:10
  169:18 170:23
  171:11 173:17,23
  174:17 177:4 179:2
  179:17 181:13,14
  182:1 186:23 188:6
  188:17,20 194:17
  196:20,21 197:3,9
  201:2,18,19 202:2,2
  202:3,15 205:11,15
  207:12 208:16
  214:2,17 216:1
  218:1,13 219:14,15
  222:22 223:1,10,23
  226:1,12,16 227:22
**toys**  103:13 108:20
  121:22 147:25
  156:22 157:15
  158:2 159:21,23
  163:4,11,14,15,19
  163:24 164:1,8,25
  165:4,13 166:17

170:24,24,25
  211:20
**track**  105:18
**trade**  18:20 25:22
  25:25 79:3,16,24
  80:18 81:17 82:24
  83:6,21 84:16 85:9
  85:23,24,25 86:11
  88:20 92:17 93:2,3
  93:8,15 97:20 103:8
  103:11 107:7,18
  115:2,4,10 123:18
  123:19 200:9
**trademark**  12:5,12
  12:14,24 14:7,9,12
  15:8 16:7,12,16
  17:9,11,21 19:5,21
  22:14 23:6,8 25:21
  27:15 30:1,10 49:1
  52:6,9 61:8 91:3,17
  91:23 92:9 108:8
**trademarks**  17:4
  18:8 90:24 200:9
**traditional**  231:17
**transactions**  55:25
**transcribed**  6:6
**transcript**  3:14
  232:3 234:4
**transcripts**  6:23
**treatise**  90:23 91:7
  91:13
**treats**  159:21,24
  163:15,25 164:1,8
  164:25 165:4,14
  169:18
**trial**  15:25 47:17,18
  47:19,20,23
**tried**  154:1 191:24
  193:23 229:19
**trouble**  105:17
**true**  22:15 129:9
  134:5 135:15,21
  140:13 171:25
**truly**  93:5 102:16
  123:25 124:17

**try**  103:24 112:25
  113:4 153:17 154:5
  161:2 162:25 163:9
  182:14 189:18
**trying**  85:4,15
  126:14 153:3 166:2
  177:5 179:3 181:21
  187:4 189:23
  192:12 193:17
  194:2 196:9 197:20
  197:25 198:9,12
  199:16 202:17
  205:1 208:4,10
  212:18 213:3,10
**tulammo**  19:23
**turn**  15:20 65:13
  173:11 229:24
**turned**  150:16
**two**  2:18 8:8,19 23:4
  24:3,4,5 51:6,14,17
  69:3 71:17 73:4,16
  88:19 91:14,21
  99:16 104:3 114:25
  119:9 131:5 140:22
  150:12 153:10
  170:23 226:10
  229:6,17 230:17,23
**type**  159:23 163:24
  167:4 169:17
  172:19 197:20
**types**  114:18 170:25
**typewriting**  6:6
  235:10
**typical**  168:19,21
  204:8 231:5
**typically**  160:14

|  u  |
| --- |

**u**  25:1 54:22
**ultimately**  204:16
**um**  219:4
**unable**  140:16
**underneath**  149:25
**underscored**  183:9
  183:11

Veritext Legal Solutions
866 299-5127

**[understand - website]**

**understand**  27:2
  63:4 64:20 74:22
  82:17,19 83:23
  84:13 85:4,16 95:23
  105:19 109:25
  114:8 156:11 160:8
  164:23 165:12,22
  173:22 178:14
  181:5,6 182:6,9,20
  228:17,18 233:10
**understanding**
  37:11 38:14 79:16
  79:23 80:18,20,24
  81:4 82:7,11,22
  83:17 88:9,25 90:19
  90:21 92:25 95:15
  95:17 96:6,8 109:1
  109:15 110:20
  111:24 115:5
  122:16 160:14,15
  160:17,21 165:20
  171:7 174:17,21
  190:5 204:19
**understood**  9:2
  157:20 173:25
  178:3
**unfair**  90:24
**uniform**  70:1
**united**  1:1 4:1,22
  88:12 94:23 95:5
  231:22
**university**  6:20 15:5
  15:7 33:11
**unquote**  127:14
  157:8 193:3 210:6
  220:23
**unreadable**  215:11
**unreliable**  40:12
**unsuccessful**  162:17
**unusual**  143:5
**upheld**  168:15
**use**  38:6,8 70:24
  75:18 95:16 132:21
  156:10 167:3,14,14
  167:16 182:21

  183:1 200:9 209:11
  211:3 217:16,22
  220:22 221:16
  226:3 229:10
  231:16
**useful**  12:21 220:25
**uses**  37:19 38:1
  83:21 224:8

**v**

**v**  3:2,6,8 13:17
  16:15 17:10,23
  18:12 19:23 20:10
  21:12 22:6 25:24
  27:25 42:13 52:4
**vague**  8:23 12:19
  25:23 31:25 32:9,16
  36:16,20 40:22 94:2
  94:13 98:14 99:14
**value**  107:11,15
**various**  8:25 55:8
  85:1 100:1 105:12
  105:23 106:10
  146:12
**verbally**  158:20
**verbatim**  155:25
  178:2,5 187:15,24
  188:10 195:8,16,24
  197:12 206:16
  207:20 220:10,24
  221:13 222:1,17
  225:7,21 226:6,20
  227:13 229:9
**verbatims**  78:12
  140:1 156:6 177:24
  178:11 189:6,15
  190:8,14 194:8,22
  194:23,24 195:13
  198:8 202:7,10,11
  202:24 204:6,9
  205:3 206:17 211:4
  213:5,6 220:5,17
  223:18 224:21
  229:15,20

**version**  225:16,25
**versus**  25:5 28:13,21
  29:15 30:4,13,19,25
  31:8 40:5,5 52:10
  52:24 53:6 54:3,15
  54:23 88:14
**view**  65:5 131:6
  137:11,11 143:25
  169:2 177:12 178:2
  192:8
**views**  131:5 146:10
**vincent**  10:10
**vip**  1:4 2:10 4:4,23
  7:23 9:16 10:2
  33:20 34:6,24 76:11
  101:24 131:20
  139:6,9 145:2,21
  146:12 162:1,2
  165:9 166:13,16
  170:4 171:14
  175:24 179:8 189:7
  189:17,19 191:4,5
  193:14 199:14,16
  199:17 212:11
  213:8 219:12
  226:11 227:25
  228:1,7,21,22 229:3
**vip's**  8:9 58:18 66:5
  66:14 67:2,19 68:7
  68:14 69:4,8,13
  71:22 72:2 73:22
  76:16 97:5,13 101:6
  102:21 105:11
  145:24 146:2 147:7
  161:9 162:14,18
  164:25
**visible**  137:8
**visit**  121:7 165:3,24
  166:9
**visited**  146:11 150:2
  164:10
**vitae**  13:9,9,15,20
  33:9 64:18
**volume**  123:3
  141:20 142:15

**vs**  1:7 4:7

**w**

**wait**  183:5
**want**  18:25 27:12
  60:4 78:20 79:18,20
  99:24 102:19 109:1
  130:2 132:21
  136:23,25 152:2
  163:8 174:4 183:22
  234:2,7
**wanted**  41:15 47:6
  49:17 50:4 166:23
  181:24 219:18
  220:8
**wants**  84:2,2 133:11
**washington**  6:20
  15:7
**way**  35:1 38:12
  43:22 46:19 47:5
  49:21 62:3,16 81:16
  89:4 93:8 114:25
  116:13 125:12,19
  131:21,22,22,23
  135:1 136:16 138:5
  139:7,9,17 142:9
  151:19 153:16
  156:4 157:5 158:17
  158:18 160:19
  165:20 167:25
  168:22 169:2 171:7
  174:2 181:10
  182:14 204:2 207:5
  210:20 211:8
  232:15
**ways**  173:21
**we've**  27:14 45:9
  54:13 78:11 145:16
  149:5 161:18
**website**  2:10,13
  145:2,21,24 146:2
  146:12 147:15,19
  149:15,23 150:2
  153:9

Veritext Legal Solutions
866 299-5127

[websites - zoom]

**websites** 145:6
147:7 151:3
**weeks** 13:18
**wells** 22:9 30:4
**went** 49:10 64:17
75:7 101:12 114:7,9
115:24 151:13
200:24 206:18
207:16 212:13
**whirlpool** 27:25
**whiskey** 2:11 93:19
94:23 95:4 96:13
100:1 104:8,18,20
105:2,12,22 106:10
106:15 107:16
108:5,20,23 109:9
109:16 110:9,14
111:10 123:15,19
124:2,4 211:20
215:19 223:2
224:16
**whiskies** 106:6
**white** 98:12,16,19
114:17 116:7 120:5
120:22
**whitewave** 30:19
**widely** 42:10
**williams** 100:14
**wine** 104:14 106:6
107:23,24 108:7,24
109:10 110:9
117:25
**wish** 44:12
**withdraw** 66:24
**withhold** 132:8
141:1
**withholding** 135:6
**witness** 4:13 6:7,24
15:24 16:10 27:7
37:9 38:17 39:6,11
52:15 77:25 78:4
234:13 235:6,8
**witnesses** 2:2,3
**wolinsky** 73:22

**wolinsky's** 74:7
100:9
**wonder** 191:5
193:15
**word** 12:21 25:9
87:20,20 91:7 95:16
99:18 110:24
129:25 131:13
134:17 143:15
150:13 175:17
181:16,17,19
182:21 183:1,21
184:17 185:1,4,6
210:6 211:3 214:14
217:16,22 228:13
229:11
**wording** 209:18
**words** 50:11,13,14
63:17 96:15 99:18
111:2 118:24,25
119:20 121:5,24
122:12,17,23 123:2
141:18,25 149:25
172:3,5,24 210:12
210:25 219:10
220:22 221:16
226:3
**work** 11:24 12:17
12:24 27:9,20 33:13
58:1,3,4,14 59:17
66:9 108:12 193:5
**worked** 51:15
**working** 66:8 70:22
70:25 71:1,3 128:2
**workmanship** 121:6
**works** 7:1 165:21
**world** 37:14 133:12
133:14 137:12
138:9
**worth** 90:4
**wrap** 98:12 116:7
**wraps** 118:12
**wright** 5:4 33:14,18
34:13

**writing** 66:12 71:2
**written** 11:12 12:10
14:6 148:15
**wrong** 11:13 169:3
173:4 205:19
**wrote** 11:25 40:9
41:1,23 42:7,8,10
43:16 55:2,17 56:23
80:16,19 82:6,20
108:3 114:25
117:22 121:21
123:8 131:4 136:14
159:1,19 169:8
170:20 172:1
173:16 176:25
187:19 211:9
212:16 227:19
229:1
**www.vipproducts....**
121:8

| x |
|---|

**x** 2:1

| y |
|---|

**y** 42:13
**yeah** 19:18 58:4
75:7 76:1 99:8,9
102:15,22 134:10
135:14 183:4
216:19 218:11
230:14
**year** 65:21 69:1
89:15
**years** 14:25 15:6
16:1,3,4,5 25:16
44:14 94:16 163:21
186:9
**yellow** 120:21
**yep** 137:20
**youngblood** 18:12
18:22 19:20

| z |
|---|

**zackariah** 100:14

**zoom** 150:1,20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.