1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3          _____

4  VIP Products, LLC,            )
                                 )
5          Plaintiff,            )      CV-14-02057-PHX-SMM
                                 )
6          vs.                   )      Phoenix, Arizona
                                 )      October 2, 2017
7  Jack Daniel's Properties, Inc.,)          8:53 a.m.
                                 )
8          Defendants.           )
   _____)
9  And Related Counterclaims.    )
   _____)

10

11      BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             TRIAL - DAY 1

15

16

17

18

19

20

21  Official Court Reporter:
    Elva Cruz-Lauer, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc. 33
23  Phoenix, Arizona  85003-2151
    (602) 322-7261
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

1                      A P P E A R A N C E S

2    For the Plaintiff/Counterdefendant:

3            DICKINSON WRIGHT PLLC
             By:  David Geoffrey Bray, Esq.
4                 David Nunzio Ferrucci, Esq.
             1850 N. Central Ave., Ste. 1400
5            Phoenix, AZ  85004

6    For the Defendants/Counterclaimants:

7            HARVEY & COMPANY
             By: Douglas Peter Harvey, Esq.
8            4 Embarcadero Ctr. 14th Fl.
             San Francisco, CA  94111
9
             QUARLES & BRADY LLP- Phoenix, AZ
10           By: Isaac Scott Crum, Esq.
             2 N. Central Ave.
11           Phoenix, AZ  85004-2391

12   Also present:  David Gooder and Justin Welch, Senior Trademark
     Counsel.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                     INDEX

3      <u>SUMMARY OF COURT PROCEEDINGS</u>                          <u>PAGE</u>:

4      Opening Statements                                    10

5      Sidebar Conference Held                               44

6      Recess Taken                                          71

7      Recess Taken                                         125

8      Recess Taken                                         174

9      Court Adjourns                                       228

10                        <u>INDEX OF WITNESSES</u>

11     <u>WITNESSES FOR THE</u>          <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>
       <u>DEFENDANT</u>:
12
       Philip M. Epps            46       71        93
13     Tobias J. Roush         100,126    133
       Eleanor Phillips         146
14     (BY DEPOSITION)
       Itamar Simonson, Ph.D.   154       187
15

16

17

18

19

20

21

22

23

24

25

<u>UNITED STATES DISTRICT COURT</u>

1                         P R O C E E D I N G S

2              THE CLERK:  Civil case 14-2057, VIP Products, LLC

3       versus Jack Daniel's Properties Incorporated.

4              This is time set for bench trial.

5              Please announce your presence for the record.

6              MR. BRAY:  Good morning, Your Honor.  David Bray,

7       Dickenson Wright, for the plaintiff, VIP Products.  Also with

8       me at counsel table is my partner, David Ferucci, as well as

9       the president of VIP, Stephen Sacra and his wife, Wendy Sacra,

10      who is head of international sales for VIP Products.

11             THE COURT:  Thank you very much, and welcome.

12             MR. BRAY:  Thank you.

13             MR. HARVEY:  Good morning, Your Honor.  Peter Harvey

14      on behalf of Jack Daniel's Properties, and with me here is

15      co-counsel, Isaac Crum from Quarles & Brady, and we have the

16      president of Jack Daniel's Properties here, David Gooder, whom

17      you've seen before, as well as Justin Welch, a senior trademark

18      attorney for Jack Daniel's Properties.

19             THE COURT:  Thank you all very much.  Well, we're a

20      few minutes early, but as you know, I do like to start early.

21      I always thought that federal time is early time.  So the point

22      being, let's take care of some housekeeping matters that we

23      might have.

24             When we last were together, one of the issues we

25      talked about is that basically we are left with the

| | |
|---|---|
| 1 | counterclaims in many respects, which throws a different way of |
| 2 | the presentation of evidence. |
| 3 | Counsel was going to get together and I thought you |
| 4 | had a formula about how we are going to proceed here with the |
| 5 | presentation of evidence.  Would someone like to enlighten me? |
| 6 | MR. BRAY:  We do, Your Honor.  Jack Daniel's is going |
| 7 | to present as though they are the plaintiff.  So they will go |
| 8 | first, followed by us. |
| 9 | THE COURT:  Okay.  That will be fine.  And then as you |
| 10 | know, we are having some slight complications with our video. |
| 11 | We spent a fortune on the video equipment in this building, of |
| 12 | course it was -- we are now 18 years old.  It doesn't look that |
| 13 | way, but we are 18 years old in this building, and we are |
| 14 | having little glitches. |
| 15 | I know that none of you, in operating your own video |
| 16 | equipment or electronic equipment, ever have a glitch, but we |
| 17 | are having one here.  We will bear with it and we'll try and |
| 18 | get it all set up and fixed up.  If not, we'll use the wall |
| 19 | over here and it will be just like going to a drive-in movie. |
| 20 | So there you go. |
| 21 | With that in mind, if you wish, we will get started. |
| 22 | So if Jack Daniel's is going first, if you would like to make |
| 23 | your opening statement, you certainly may do that. |
| 24 | MR. HARVEY:  Thank you, Your Honor.  Before doing so, |
| 25 | we have a couple of housekeeping things to raise. |

1          THE COURT:  Oh, certainly.  I should have asked if

2     anyone has any of those.

3          MR. HARVEY:  One is just, as the Court is mentioning,

4     the logistics and the lighting and the AV, we have a nice

5     alternative, feel like you're going to the drive-in movie, but

6     it is on the wall for you to see.  And to see it best, we think

7     it might be best to lower the lights.  We tested this a bit on

8     Friday, to one notch, so it is a little clearer, with the

9     Court's permission.

10          THE COURT:  Whatever you want.  Are we going to do

11     that right away or we going to do that --

12          MR. HARVEY:  We will do it when we get to the opening

13     statement, which will be in a few minutes, yes.

14          THE COURT:  We can do that.  Sure.

15          MR. HARVEY:  Then the other issue, I know the Court

16     has observed this as we have.  We thought the issue of parody

17     and First Amendment had been put to bed in the Court's ruling a

18     year ago on summary judgment, but we see in the proposed

19     findings of fact and conclusions of law from VIP, that it's

20     still there, like whack-a-mole, it keeps coming back up, and we

21     need to talk about that.

22          Our issue is just, we want to be sure that the Court

23     is clear, in terms of your -- the Judge's position, your

24     position, on this.  And we don't want to waste a lot of time.

25     We feel like it's an issue that's been decided, and we just

1    need some feeling, if we might have it, from the Court on where

2    the Court is.

3         THE COURT:  Thank you.  Counsel, I did notice you did

4    put that in some of your findings of fact and conclusions of

5    law, although you did couch it in terms of the Court's already

6    ruled, but enlighten me.

7         MR. BRAY:  Sure.  The issue of parody goes to a couple

8    of elements that are part of this bench trial, in particular,

9    several of the Sleekcraft factors.  It goes towards the intent

10   of adopting the mark, it goes whether there's a likelihood of

11   confusion or not.

12        THE COURT:  Doesn't go to First Amendment though.

13        MR. BRAY:  That's -- we obviously disagree.

14        THE COURT:  Well, why would I have made a ruling a

15   year and a half ago where I put that to rest, why is it -- was

16   there something unclear about my ruling?

17        MR. BRAY:  No, there was nothing unclear about the

18   ruling, and counsel didn't raise the issue with me regarding

19   anything in our findings of fact or conclusions of law until

20   one minute ago when he raised it with the Court.  So I don't

21   know what paragraph he is referring to.  I don't know what he

22   is referring to.

23        Your ruling is clear.  I understand your ruling on the

24   First Amendment.  All I am saying is, the Second Circuit said,

25   a parody must convey two simultaneous and contradictory

UNITED STATES DISTRICT COURT

```
 1    messages, that it is the original but also that it is not the
 2    original and instead a parody.  That's in a trademark case.
 3    That's a trademark case involving Louis Vuitton.  And the issue
 4    of parody, while First Amendment, as you say is out of the
 5    case, it goes several of the Sleekcraft factors.  And it has
 6    nothing to do with the presentation of evidence.
 7             THE COURT:  To the extent there may be a crossover of
 8    some other element, it may have some admissibility, but
 9    certainly not as to First Amendment issues.
10             MR. HARVEY:  Thank you, Your Honor, yes.  And apropos
11    of what Mr. Bray just said, the Second Circuit may say that,
12    but in the Ninth Circuit --
13             THE COURT:  That's what I thought, the Ninth Circuit
14    is slightly different.
15             MR. HARVEY:  -- says, the cry of parody does not
16    magically fend off otherwise legitimate claims of trademark
17    infringement or dilution.  That's the Dr. Seuss case, as I know
18    the Court has already --
19             THE COURT:  Was that the one that was authored by
20    Former Chief Judge Kozinski?
21             MR. HARVEY:  I don't remember that one.  DreamWorks --
22             THE COURT:  Sounds like his phraseology.  But I know
23    the Ninth Circuit is different than Second Circuit on those
24    issues, and we are in the Ninth Circuit.  So there you go.
25             MR. BRAY:  Okay.
```

1          MR. HARVEY:  Thank you, Your Honor.

2          THE COURT:  Go ahead.

3          MR. CRUM:  Isaac Crum for defendant, just real quick.

4    One thing that the clerk had asked, maybe we read into the

5    record the stipulated exhibits, but they are the same as what

6    was filed with the Court on the 22nd.  So I don't know if you

7    want that, or we will just proceed.  Any exhibit that was not

8    objected to in our August 22nd filing, the parties have

9    stipulated to entry, is my understanding.

10          THE COURT:  Let me just give you an idea.  All these

11   books up here are stipulated exhibits and things like that.  I

12   have approximately five or six more volumes of equal width of

13   things that everybody seems to be objecting to, which I find to

14   be a little odd at this stage of the proceedings, but that's

15   okay.

16          So if it's something that's been admitted into

17   evidence by stipulation, just say, it's admitted into evidence,

18   and the clerk will catch it if someone makes a misstep, or one

19   of the parties will.  Other than that, you have to lay the

20   foundation obviously to get them into evidence, or we had just

21   a trial last week.  We had about five or six demonstrative

22   evidence exhibits only for demonstrative evidence, but they had

23   no other admissible value.

24          MR. CRUM:  That sounds great, Your Honor.

25          MR. HARVEY:  We have an agreement also with counsel,

1    Your Honor, that with respect to demonstratives, we will share

2    those in advance, just very -- so the counsel has an

3    opportunity to see them as we are beginning to present them.

4    THE COURT:  Okay.

5    MR. CRUM:  Your Honor, if you would like a hard copy

6    of the demonstratives, we can bring those up as well.

7    THE COURT:  We going to do those right now?  If you

8    are going to use them, you may.

9    MR. CRUM:  Great.

10    THE COURT:  You may proceed, Counsel.

11    MR. HARVEY:  Thank you.  Thank you, Your Honor.

12    Before doing so, I know we all share the feeling this morning

13    that here we are doing our business, but in Las Vegas there's a

14    terrible tragedy that has happened.  Our hearts go out to the

15    victims and their families.  And we also are grateful for the

16    response by law enforcement in Las Vegas last night.

17    THE COURT:  Obviously, I have missed something on the

18    morning news.  What happened?

19    MR. HARVEY:  There was a terrible shooting.  Crazy man

20    went up on the 13th floor of a hotel or something and opened

21    fire on a concert, killed 50 people, that we know of.

22    THE COURT:  Very tragic, thank you for your thoughts.

23    Just so everyone knows, now that you have raised that,

24    Marshals Service, which was developed in 1789 out of the

25    Judiciary Act are primarily responsible for security within

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | this building, as well as the outside of the building by an |
| 2 | agreement with the Federal Protective Service. |
| 3 | And then as a subset of that, that's what the fellows |
| 4 | in the blue coats are, who are all retired police officers from |
| 5 | some point, from either federal or local police department.  We |
| 6 | have had people from Phoenix Police Department, Sheriff's |
| 7 | Office, Secret Service, all sorts of people like that. |
| 8 | But maintaining the security within the courthouse |
| 9 | itself is not an easy task.  Even though we have the |
| 10 | magnetometers and things like that.  So that's why they are |
| 11 | here, and that's why you will see the presence. |
| 12 | Thank you for giving me a heads-up on that.  Now we |
| 13 | are ready to proceed. |
| 14 | MR. HARVEY:  Thank you, Your Honor. |
| 15 | We are here on behalf of Jack Daniel's Properties, and |
| 16 | the issue in the case and the Court asked us this question at |
| 17 | the first pretrial conference, which I was privileged to come |
| 18 | to, is why are we here?  Why does this matter? |
| 19 | We have an alcoholic beverage company fighting with a |
| 20 | company that makes dog toys.  Why does that matter?  And so we |
| 21 | need to address this.  And this is the summary now of what I |
| 22 | will be presenting. |
| 23 | We will talk about why the case matters.  We will give |
| 24 | the Court some sense of the history of the case, which I know |
| 25 | the Court is well familiar with.  We will touch on the legal |

1    issues that remain for trial, and we will talk about VIP's

2    defenses and how they propose to defend against the claims

3    being made and then we will conclude.

4              So let's talk first about why the case matters.

5              There are two simple issues.  One is infringement, and

6    the other is tarnishment or dilution.  Because why are we here?

7    Because the dog toy is likely to confuse consumers into

8    thinking that this product is made or put out by or endorsed or

9    licensed by Jack Daniel's.

10             We are here also because the kind of "potty" humor

11   that this toy represents is completely inconsistent with the

12   Jack Daniel's brand, brand values, and entire history of the

13   way they've marketed the product.

14             Here is a timeline of the case history, Your Honor.

15   We began back in 2014 when VIP introduced the so-called "Bad

16   Spaniels" toy.  This is part of a line, Your Honor.  It is

17   really very much the MO with VIP, at least with one line of

18   their toys, to engage in this kind of humor.

19             You will see there in the lower left corner of the

20   slide, a knock off of the Anheuser-Busch product, Budweiser

21   beer affectionately dubbed butt wiper.  This this the kind of

22   humor we are dealing with.  This case is very similar to a case

23   that occurred in St. Louis a few years ago when Anheuser-Busch

24   brought and secured an injunction against that product.

25             So here comes Bad Spaniels in July of 2014.  Within

1    three months, Jack Daniel's had sent a protest letter inviting

2    a conversation about ways to resolve the dispute.  VIP, instead

3    of responding to that invitation and engaging in a dialogue

4    about ways to phase out the toy or deal with it, turned around

5    and filed, very aggressively, a declaratory judgment action

6    within one week of receiving that letter.

7            In December, Jack Daniel's counterclaimed for

8    infringement and dilution.  In March, the Court will remember,

9    there were addition of number of new claims and defenses that

10   then occupied about a year's worth of discovery, culminating in

11   a motion brought for summary judgment, cross-motions for

12   summary judgment.

13           Now, what did that result in?  An order from the Court

14   in September, the one we just referred to, that essentially

15   took care of each one of these claims.  The fair use defense

16   that we were just talking about was rejected by the Court very

17   clearly.

18           The functionality, both utilitarian and esthetic

19   functionality defenses were dismissed, as well as the notion

20   that somehow the Jack Daniel's bottle and trade dress was not

21   distinctive, in fact was generic.  All of these were dismissed

22   in the Court's order, Document Number 171, last September.

23           So here we are.  We are back to square one.  Back to

24   the original claims, and the two issues that remain in the case

25   are infringement and dilution.

1    These are the products we will be comparing.  We will

2    be seeing those a fair amount.  Starting with infringement,

3    what do we have to prove?  What is left for Jack Daniel's to

4    prove to the Court?  We need to prove confusion.  That is to

5    say, likely confusion on one of three different levels.  Not

6    all three, one of three.

7    We have to convince you, Your Honor, that consumers

8    believe that Jack Daniel's makes or puts out the VIP toy, or

9    that Jack Daniel's authorizes or approves the toy or in some

10   way is affiliated or associated with VIP.  One of those three,

11   any of those three, constitutes a confused consumer.

12   Now, how does one prove likelihood of confusion?  I

13   know that Court is very familiar with trademark infringement.

14   I need not burden you with a further recitation of the eight

15   Sleekcraft factors, but we need to look at the ones that are

16   the most important.  We contend that all of these favor Jack

17   Daniel's, and we will talk about them very briefly here.

18   THE COURT:  Right, but that's where Judge Kozinski's

19   opinion comes in, in a recent case saying, you don't need to

20   prove all of those, you focus on the ones that -- the

21   Sleekcraft factors that really turn the case.

22   MR. HARVEY:  Exactly.  Exactly right.  In fact, the

23   key factors that we apply here, and we think are most

24   applicable, are the four that we have circled, and I will talk

25   briefly about each one of them.

1           But that is Judge Kozinski's quote, right there, and

2    the Court, may I say, you just nailed it.  The Ninth Circuit

3    says, we don't count beans.  And that is Judge Kozinski in the

4    DreamWorks case.  So we will talk about these four factors.  We

5    will briefly address the remaining factors.

6           First, the strength of the mark.  Well, what can we

7    say?  Jack Daniel's is the largest-selling American whiskey,

8    and in between 1997 and 2015, over 75 million cases were told,

9    all coming out of the water and the creek in Lynchburg at Cave

10   Spring.

11          In that period and over that same period of time,

12   revenues were generated by reason of those sales of over $10

13   billion.  Of course this is driven in part by the sales, but

14   also the extensive advertising and promotion.  And we will see

15   a few examples of print, TV, radio, social media, and the usual

16   kinds of advertising, to bring the image of the bottle, the

17   image of the trade dress into the minds of the consumers.  All

18   of this has obviously been very effective.  The U.S. public has

19   a very high awareness of the brand, and we will show that.

20          We will take a look here, Your Honor, just quickly, a

21   short commercial typical of Jack Daniel's TV ads that emphasize

22   the branding and the iconic trade dress and marks of the

23   company.

24       (Commercial played for the Court.)

25          MR. HARVEY:  This is part of the strength of the mark,

1    as the Court is observed.  All of the elements of the trade

2    dress that are in litigation right now are on that bottle and

3    were just shown on the ad.  So the strength issue is clear to

4    us.

5            The other reason is, among other things, for strength,

6    the advertising that has been engaged in consistently over the

7    years.  This is an ad from the 1950's, an ad that's somewhat

8    later than that -- as the Court will see on each of these ads,

9    what is happening is the consumer and the person reading the ad

10   is being exposed again and again, to the iconic trade dress and

11   all of the elements and marks that are part of this lawsuit.

12   This is not a new campaign.  This has been going on for a long,

13   long time.  And it leads to the conclusion that the marks have

14   been great consumer awareness and strength.

15           Another Sleekcraft factor is how similar are the

16   marks.  The evidence here, Your Honor, will show that the marks

17   are very similar as -- visually one can see that, but that's no

18   accident.  That happened quite intentionally.  There will be

19   evidence in the case that this was a copying operation.

20           The designer of the bottle, Elle Phillips, testified

21   that when she got the call from Mr. Sacra, they had kind of a

22   code they operated in.  Mr. Sacra would say a word, and she

23   would hang up the phone and go back and start sketching.

24           Now, in this case, Mr. Sacra said, Elle, Bad Spaniels,

25   got it?  She said, yes, thank you.  She hung up the phone.  And

1    what did she do?  She went back to her liquor cabinet and took

2    out a bottle of Jack Daniel's and started sketching, and that

3    will be the evidence.

4         One of the other Sleekcraft factors we will hear about

5    is whether people are confused or not and whether there's any

6    evidence of actual confusion.  Well, we have anecdotal

7    instances, indicia of confusion such as retailers describing

8    the product as a Jack Daniel's product.

9         We have consumer confusion exhibited in Amazon

10   reviews.  We have Google search results where if you go online

11   and you plug in Jack Daniel's dog toy, what comes up?  So we

12   have these instances, but what's really the solid evidence

13   supporting this anecdotal finding is a survey, which is very

14   typical, as you know, in these cases, Your Honor.

15        Here when asked in the survey, 400-plus survey

16   respondents were asked, who or what company makes or puts out

17   this product?  It was shown this photograph.  29 percent of

18   them said Jack Daniel's, in one fashion or another, whether it

19   makes or puts it out, whether it is affiliated, whether it is a

20   licensed product.

21        And then when asked, why do you say that?  The

22   follow-up question, here are some of the verbatim answers.

23   Well, duh, the logo replica.  The bottle.  The label.  The

24   print.  The font.  The bottle looks like Jack Daniel's.

25        And here is one of my personal favorites, it looks

1    like the packaging from Jack Daniel's sauces.  Well, that's no

2    accident, because there are barbecue sauces.

3         THE COURT:  I think those are licensed, aren't they?

4    Or you produce those yourselves?

5         MR. HARVEY:  Yes.

6         THE COURT:  So going over the weekend all of the

7    findings of facts and conclusions of law, that raised a whole

8    new specter of this case is some fashion, what I would call the

9    supplemental products produced by Jack Daniel's, other than

10   their liquor brands, which are not inconsequential.  I have had

11   those in other cases, which became very important, and not just

12   a sort of a brush-off element, so to speak.  And I will refer

13   to those, counsel for both sides, as supplemental products.

14   That's the only way I know how to define them.

15         MR. HARVEY:  Well, and they are supplemental, Your

16   Honor.  It's a good way to describe it.  Licensed products

17   expand the footprint of the core competency, if you will, of

18   the brand.  So here, sure, Jack Daniel's is the best-selling

19   American whiskey in the world, but because of the breadth of

20   the licensing program that we will look at, and Toby Roush will

21   be here to tell us about shortly, we have a much broader

22   footprint.

23         And consumers have learned, by reason of these

24   supplemental products, to expect to see the Jack Daniel's brand

25   on something other than just whiskey, and so it's not a

1    surprise to see it on a dog toy perhaps.

2            Now, let's talk about another Sleekcraft factor.  The

3    intent of VIP.  That's very plain, and I don't think they are

4    shying away from it.  They intended to copy this product.

5            Here is Elle Phillips sitting at her computer thinking

6    up the Jack Daniel's copy product called Bad Spaniels.  What

7    does she have in mind?  She is not just dreaming about it,

8    she's got it in front of her on the table.

9            Then when the product gets sent over in design form to

10   David Bai, who is Flying Pony and the manufacturer over in

11   China, there's a little mix-up about which bottle should be

12   used.  And Mr. Sacra goes to the Jack Daniel's website, or

13   Googles Jack Daniel's and comes up with a picture that he sends

14   over that fixes the older bottle, which changed in 2011,

15   slightly more rounded shoulders but very similar, to the

16   squared-off shoulder bottle that started in 2011.

17           So they tightened up the design to make it even more

18   like the current Jack Daniel's bottle.  And Mr. Sacra carefully

19   approved it all.  At one point, one of his emails says, the

20   bottle is perfect.

21           So we have looked at the four, I think, critical

22   Sleekcraft factors that really tip the balance strongly in our

23   favor on infringement.  The other ones though, I think also

24   favor, and the Court will conclude, do favor a finding in favor

25   of Jack Daniel's.

1          As we said, the licensing program brings the parties'

2   products much closer together.  In fact, Jack Daniel's

3   makes dog collars, licenses dog collars and other dog

4   paraphernalia.

5          The marketing channels already coincide because both

6   parties sell on the Internet.  Indeed we see some evidence of

7   confusion on the Internet.  One doesn't pay a lot of attention

8   when buying a toy for one's dog, I suspect.  The $15 price

9   point would confirm that or buttress that conclusion.  And

10  there's no need to expand product lines because we are already

11  converging.  So I think all of the Sleekcraft factors

12  ultimately favor a finding of likely confusion and therefore

13  infringement.

14         Okay.  So what's our -- what's the second string to

15  the bow?  Tarnishment.  And why does this product tarnish Jack

16  Daniel's brands?  Well, we have two things we need to prove to

17  the Court.  One, is the answer the question of fame in our

18  favor, and I don't think there's any question indeed, I believe

19  Mr. Sacra comes very close to conceding, it is a very

20  well-known mark.  Famous, this definition that we have here

21  comes straight out of the Lanham Act, section 43(c).  Famous

22  means, widely recognized by the general consuming public of the

23  United States.

24         Well, we have 150 years of sales and lots of reasons

25  why the consumer in America knows -- indeed worldwide -- knows

1    about Jack Daniel's.  Then on the question of tarnishment, it's

2    pretty simple.  We are putting together an iconic consumable, a

3    whiskey with dog poop.  That's what this product does in short.

4           And we will have testimony from Dr. Simonson, who is a

5    well-recognized expert in consumer behavior, consumer

6    psychology, how brands are perceived and stored in memory, who

7    will tell us that indeed you could have a huge world, sort of

8    ball of goodwill about a product, but you can have a tiny

9    little negative issue, and that's all it takes to tarnish the

10   brand, and one needs to take steps to address that, which is

11   why we are here.

12           Obviously we have talked about this already.  It is a

13   famous brand.  Here is some of the licensed products, including

14   dog collars and this dog house that is made out of a Jack

15   Daniel's barrel.  So we say we have fame especially in this

16   area.

17           With respect to tarnishment, we will address this, and

18   the evidence will show that and confirm that when you connect a

19   consumable like Jack Daniel's with dog feces, it can do no good

20   and in fact does harm.

21           Potty humor also is very inconsistent with the Jack

22   Daniel's brand value and the way that they have sought to

23   convince the public and generate goodwill around the product

24   they make.  It is not their humor.  They do have a sense of

25   humor, a knowing smile humor, but not potty humor.

1          Okay.  What does VIP say?  How is it going to try to

2    defend itself?  Well, with respect to trademark infringement,

3    they will say, and perhaps now this morning's reiteration of

4    the Court's ruling will take care of this, it's just a parody,

5    it's just a joke.  Well, the order addresses that.

6          The First Amendment does not shield infringement.

7    They will say, well, there's no actual consumer confusion, but

8    as we have discussed, we have a survey from a very

9    recognized -- very well-recognized expert, Dr. Gerald Ford,

10   showing that 29 percent of consumers are confused.

11         They will say, oh, well, Dr. Ford's survey was wrong.

12   They have Professor Nowlis who will say that the way the

13   control cell was designed was wrong and the coding was

14   incorrect.  Yet, even Professor Nowlis admits the Eveready

15   protocol, which Dr. Ford used, is the gold standard.  That's

16   how you measure whether there's likely confusion.

17         And here is Dr. Nowlis criticizing Dr. Ford, but he

18   can't say what a proper survey would have shown.  He admits in

19   his deposition that, he can't say that because he would be

20   speculating because he didn't do his own survey.

21         Now, what about dilution?  How do they defend on

22   dilution?  Well, we are going to have some interesting focus

23   group pictures, and the Court has already heard about these,

24   and as to whether a focus group is a recognized scientific

25   method of studying dilution or not.  And of course we contend

1     not.  There's no case that would accept focus groups that were

2     designed for the case as evidence of dilution, and they are not

3     quantitative.

4            In this case, there were 19 people from west Los

5     Angeles who were called into a room, and they sat in four

6     little focus groups and they were chatted to by a very helpful

7     moderator named Jeffrey Hirsch, who led them directly to where

8     he wanted them to go.  He opened the session saying, oh, hello

9     folks, let's -- today we are going to talk about spoof

10    products.

11           I'm sorry, Mr. Hirsch, you just ruined the whole thing

12    because you told them the end of the story.  So we will hear

13    about the focus groups.  You will see pictures of those focus

14    groups.  And it turns out that a couple of them didn't want to

15    be led where he wanted to be led, and we will hear about that,

16    too.

17           They'll say on dilution that there's no evidence of

18    impact on sales.  Well, we only need to show a likelihood of

19    tarnishment, and Dr. Simonson's report does confirm the

20    negative effect on the brand.

21           Okay.  So that's the story.  It is pretty simple.

22    Here's the line-up of witnesses that you will be hearing from.

23    At least we could certainly confirm on our side, and I think

24    Mr. Bray would confirm on the witnesses and experts for VIP.

25           Our lead-off man this morning will be Phil Epps, who

1    is the global brand director for Jack Daniel's.  Toby Roush,

2    the licensing manager I've already mentioned.  Elle Phillips

3    will appear by deposition.  She's the designer of the VIP toy.

4    We are calling her, in effect, as a hostile witness.

5           Dr. Ford's survey will come in.  We have a stipulation

6    about that.  As the Court knows, very sadly Dr. Ford died a

7    month after his deposition was taken in September of 2015.  So

8    we have a stipulation with Mr. Bray that he can come in, his

9    report can come in by stipulation, as can Dr. Nowlis' in

10   rebuttal.

11          Then Dr. Simonson is here.  He will speak to the issue

12   of tarnishment, and Dave Gooder is our clean-up man.  He will

13   talk about the brands and enforcement policies of Jack

14   Daniel's.

15          So back to the question we asked at the top, Your

16   Honor, and looking at this image.  Why does this case matter?

17   Here we have the iconic Jack Daniel's brand and images, trade

18   dress and all of the trademarks, and if the Court will observe,

19   we watch this and it morphs into something else, right in front

20   of our eyes, the Bad Spaniels product.  That's why this

21   matters.

22          People are confused, and this product tarnishes an

23   iconic brand that has carefully conveyed to consumers a very

24   different sense of humor about itself, as this closing

25   commercial depicts.

```
 1        (Commercial played for the Court.)

 2            MR. HARVEY:  Thank you, Your Honor.

 3            THE COURT:  Thank you, counsel.

 4            Mr. Bray, would you like the lights up or down?

 5            MR. BRAY:  We can leave them down.

 6            THE COURT:  Okay.

 7            MR. BRAY:  Morning, Your Honor.

 8            THE COURT:  Good morning.

 9            MR. BRAY:  My client, VIP Products, is a local

10   Scottsdale, Arizona based company.  It was founded by Stephen

11   Sacra.  Founded in 2001.  You will hear from Mr. Sacra at trial

12   that he started his business making spa sandals, and then

13   morphed into some pet products and horse equipment, and then

14   found he had a penchant for designing dog toys, and for the

15   last seven years of his business, dog toys have been the

16   primary focus, and now VIP Products is one of the largest

17   sellers of dog toys or soft durable dog toys in the country.

18            VIP has three lines of goods.  Tuffy, mighty and silly

19   squeakers.  The Tuffy and Mighty line of goods are the soft

20   durable dog toys.  They are toys that are meant to be played

21   with a dog, under supervision, and to last a while.  They're

22   tough, seven layers of nylon.  Mr. Sacra even has a patent on

23   it.

24            But what Mr. Sacra found is that it's difficult to

25   have fun with a soft durable dog toy, and he wanted to expand a
```

1  line to include vinyl dog toys.  Now, a vinyl dog toy is one

2  like Bad Spaniels.  (Squeezes toy)

3          It is a soft but it is not intended to be durable.  It

4  is a squeaky toy, and Mr. Sacra said, well, my company is known

5  for soft, durable dog toys, I want to make vinyl dog toys.  How

6  can I do this?  Mr. Sacra says, I am fun, my company is fun, I

7  am going to create a line of products, Silly Squeakers, that

8  are parodies of well-known products in the shape of beer

9  bottles, soda bottles, wine bottles, and eventually hard

10 liquor.

11         In terms of the proportion of its business, Silly

12 Squeakers is minor portion of VIP's business.  On the other

13 hand, it's a major piece of the image that VIP and Mr. Sacra

14 wants to cultivate for VIP.

15         VIP, despite its success over the last seven years, is

16 really a mom and pop business.  In this case, the mom and pop

17 are the Sacras.  In terms of executive management of the

18 company, there's two individuals.  Stephen Sacra, president,

19 and his wife, Wendy Sacra, who is head of international sales.

20         Now, Brown Forman, which is the corporate entity that

21 owns Jack Daniel's, has a market cap of about 20 billion.

22 Annual sales of approximately 700 million, and you'll see that

23 the name on the caption of this case is Jack Daniel's

24 Properties, Inc.  That's just an entity that Jack Daniel's,

25 Brown Forman has elected to keep its intellectual property in.

1          Just to give you an idea, these are pages of the

2     catalog for VIP Products for the Silly Squeakers.  When these

3     catalogs are distributed to people in the pet industry, you

4     will see that the Silly Squeaker products are shown together,

5     part of a line.  Here is a closeup, Barks, Cataroma, Brooks,

6     Heiney Sniffing, and I don't remember the first word for the

7     bite.

8          So this is how they are sold.  They are sold together

9     in stores.  They are sold as novelty, fun, squeaky, soft vinyl

10    dog toys that are not meant to be durable like the rest of

11    VIP's line.  These are some parodying wine bottles.

12    Kendall-Jackson, you can see, is one of them.

13         And then this is a page from VIP's catalog where it

14    shows them expanding into hard liquor, shows a parody squeaky

15    dog toy with Jose Cuervo, and then, of course, the Bad Spaniels

16    product in this case.  And this is, again, how it is listed on

17    the website with various views of the product.  Advertised as a

18    one-of-a-kind novelty dog toy.

19         I will leave the legal significance of the intent to

20    parody to the Court.  I would say that under, even under Ninth

21    Circuit law, it goes to intent on the Sleekcraft factor.  It is

22    a parody dog toy.  It was intended to parody the Jack Daniel's

23    Black Label Product, just like Catarona was intended to parody

24    Corona.  55,000 units have been sold since July of 2014, and

25    Mr. Sacra, you will hear testify later in the case, that he

1    makes about a buck on each one in profit.

2              THE COURT:  He made what?

3              MR. BRAY:  He makes about a buck on each Bad Spaniels

4    sold in profit.  So counsel for Jack Daniel's talked about the

5    intent and what Mr. Sacra and Ms. Phillips testified to in

6    their depositions.

7              Yes, they intended to copy certain elements of the

8    Jack Daniel's trade dress.  If you don't copy certain elements

9    of the trade dress, nobody is going to get the joke.  Nobody is

10   going to understand it is a parody.

11             But you will also hear Mr. Sacra testify that there

12   are about 18 to 20 distinctions, differences between the VIP

13   Bad Spaniels product and the Jack Daniel's Black Label whiskey,

14   and that was intentional.  He wanted to invoke just enough of

15   the Jack Daniel's trade dress in order for consumers to

16   recognize, hey, like the other Silly Squeakers products, this

17   is a parody product, and it is a parody of Jack Daniel's Black

18   Label whiskey.

19             Mr. Sacra will testify that the message he was

20   intending to send is that in a serious world, we need to be

21   able to sit back and be able to laugh at ourselves and laugh at

22   the humor of the constant bombardment of advertising and

23   marketing that's going on around us.  That it's such a

24   predominant part of our lives.

25             And I was thinking about that in relation to Jack

1    Daniel's counsel's opening.  The very last video from

2    Lynchburg, Tennessee, population 54, and how proud they are to

3    make Jack Daniel's.

4         I don't know how many times I've seen that ad watching

5    football.  Jack Daniel's, like other well-known brands that

6    advertise on national television, have become a predominant

7    part of our culture, and what Mr. Sacra wanted to do was to

8    leave himself a little opening to say, you are trying to

9    dominate the world, well, here's something that's funny.

10        Okay.  Let's talk about the Sleekcraft factors.

11   Sleekcraft factors number one, strength of the mark.  Counsel

12   for Jack Daniel's said that was one of the four of the eight

13   Sleekcraft factors that the Court should focus on, and that was

14   important.

15        The strength of the mark makes a parody more

16   effective.  It makes confusion less likely.  So while in a

17   normal non-parody trademark case, if Mr. Sacra or VIP were

18   truly trying to knock off a Jack Daniel's whiskey and pass

19   themselves off as Jack Daniel's, strength of the mark might be

20   a factor that goes in Jack Daniel's' favor.

21        In a parody case, as recognized by McCarthy on

22   Trademarks, it doesn't.  Proximity of goods.  One good is a dog

23   toy, the other is liquor.  And I want to talk about, a little

24   later, the DreamWorks case with Judge Kozinski.

25        In this case, it is a stipulated fact that Jack

1    Daniel's has no -- has not licensed its Jack Daniel's trade

2    dress or trademark for any dog toy, and it has no present

3    intention to expand to license its product on any dog toy.

4            Now, they mention dog collars and dog leashes.

5            THE COURT:  And a dog house.

6            MR. BRAY:  What's that?

7            THE COURT:  And a dog house.

8            MR. BRAY:  I don't remember.  The only place where

9    those products are sold is the Lynchburg Hardware and General

10   Store in Lynchburg, Tennessee that many people visit taking the

11   distillery tour.

12           It's not, while it's technically a license, the party

13   that owns the Lynchburg Hardware and General store is Brown

14   Forman, the owner of Jack Daniel's.  They have no present

15   intention to expand the offering of pet collars or pet leashes

16   beyond the Lynchburg Hardware and General Store.  They don't

17   offer those goods over the Internet, and like I said before,

18   they do not offer dog toys and have no plans to ever offer dog

19   toys.

20           Similarity of the marks.  Again, and this goes to the

21   control stimulus in Dr. Ford's survey, which I will talk to you

22   about in a little bit.  If the marks were not similar, neither

23   the Bad Spaniels product nor any of the Silly Squeakers line of

24   products would work as parody products.

25           Again, in order to have an effective parody, a

UNITED STATES DISTRICT COURT

1    designer like Mr. Sacra has to include enough of the elements

2    of the trade dress of the mark he is parodying so that a

3    consumer recognizes, hey, this has something to do with Jack

4    Daniel's, but not so much that they think that it is Jack

5    Daniel's.  Rather it is a message about Jack Daniel's.

6           This might be the only case that a bottle of liquor

7    will be marked as an exhibit.  You will have Exhibit 1 and 2,

8    which are the Bad Spaniels product and the Jack Daniel's

9    product.

10          Just some obvious differences.  The Jack Daniel's has

11   printing on three sides.  The filigree is different.  It is No.

12   2, not No. 7.  There's no Jack Daniel's signature on the side

13   of the bottle.  The top of the bottle is labeled BS.  Of course

14   the Bad Spaniels is sold with a hangtag.

15          Mr. Sacra will go through and identify distinctions

16   between the trade dress of the Bad Spaniels and the Jack

17   Daniel's product.

18          Evidence of actual confusion.  55,000 units have been

19   sold since July of 2014.  Jack Daniel's has had an impressive

20   legal team, internally and externally working on this case for

21   two and a half years.

22          They have certainly been looking for real world

23   evidence that an actual consumer bought a Bad Spaniels product,

24   was unhappy with the quality and tried to return it to Jack

25   Daniel's, or sent an email to Jack Daniel's saying, I am upset

1    as to the quality of the Bad Spaniels toy, or if, as Mr. Harvey

2    suggested, they're offended by the, quote, unquote "potty"

3    humor, one would presuppose that they may have emailed Jack

4    Daniel's in this age of social media, where you can communicate

5    with large international corporations easily over Twitter, over

6    Facebook, and probably other forms of social media that I am

7    not aware of, yet despite the impressive legal team, despite

8    the volume of units sold, and despite the length of time,

9    three-plus years, no evidence that a single actual real world

10    consumer has been confused and thought that anybody else

11    besides VIP Products put out the Silly Squeakers product.

12           In fact, that's a stipulated fact in our joint

13    pretrial statement, that JDPI has never received any

14    communication from any consumer expressing any confusion as to

15    whether or not JDPI or Jack Daniel's was the source of the

16    Silly Squeakers Bad Spaniels dog toy.

17           Marketing channels used.  This is important.  Jack

18    Daniel's will not market toys to dogs or children, and, again,

19    that's another reason why Jack Daniel's has no intention to

20    ever expand into the dog toy market, because "toy" is in the

21    title and they are concerned that underage users of the dog

22    toy, children, might be impacted by the -- by a Jack Daniel's

23    product.

24           In terms of marketing channels used, VIP Products does

25    very little marketing.  It doesn't advertise on television.  It

1    doesn't use -- the evidence will show that it doesn't use the

2    same marketing channels that Jack Daniel's does.

3           VIP markets and sells the Bad Spaniels toy through its

4    website on the Internet, and you can purchase the Bad Spaniels

5    toy directly from VIP or retailers like Amazon on the Internet.

6    You cannot purchase a bottle of Jack Daniel's over the

7    Internet.

8           The evidence will show that Jack Daniel's markets --

9    or the marketing channels they use is through television

10   advertising, what's called digital, which is social media

11   advertising, which is not something that my client does with

12   the Bad Spaniels toy, and that all of the marketing channels

13   used by Jack Daniel's are distinct and separate from the very

14   limited marketing channels used by VIP Products to market its

15   Bad Spaniels product.

16          The type of goods.  This is Sleekcraft factor number

17   6.  The types of goods and degree of care likely to be

18   exercised by the purchaser.  Now, this is interesting, and I

19   will address each of the goods in turn.

20          With regard to the Jack Daniel's whiskey, you will

21   hear a number of Jack Daniel's witnesses talk about the intent

22   to convey premiumness, that this is an expensive product.

23          I think we can assume, when you are talking about a

24   reasonably expensive premium bottle of hard liquor, that

25   consumers are going to use a degree of care when they're

1    spending grocery dollars to spend 40 or 50 dollars on a bottle

2    of liquor.

3         I don't think Jack Daniel's will have a witness to

4    come in and say, their devoted Jack Daniel's drinkers buy Jack

5    Daniel's on an impulse.  I think they are going to say that all

6    of the millions or tens of million or hundreds of millions of

7    dollars in advertising and promotion has had an effect.

8         Now, what about the Bad Spaniels product.  Yes, it is

9    relatively inexpensive, sold between $13 and $18 on the

10   Internet or in retail stores, but -- and maybe in the abstract

11   somebody might buy a squeaky toy (squeezes toy) without

12   devoting, let's say, the degree of care that it might exercise

13   towards purchasing a larger item, like a dog house, like you

14   said.

15        But this is a unique product.  This is a product that

16   spoofs major brands.  They are not going to buy the product

17   unless they get the joke.  They are sold amongst other Silly

18   Squeakers.  So a consumer is likely to purchase the product

19   regarding a brand where they think that's a funny joke.  They

20   have to make the connection that this is a parody.

21        And so I would say that even though it is a relatively

22   inexpensive product, given the nature of the jokes involved in

23   Silly Squeakers and Bad Spaniels, you know, they have to go

24   through an extra step.  There is a degree of care, particularly

25   when they are selecting amongst, you know, hangtags with many

1      different Silly Squeakers parody products.

2              VIP's intent in selecting the mark.  Again, even under

3      the Ninth Circuit, it's relevant that the intent is to parody,

4      it is not an intent to knock off in the traditional trademark

5      sense.

6              And how do we know this?  We know this for one reason,

7      that the VIP Bad Spaniels product includes a disclaimer on its

8      hangtag.  This product and its design belong to VIP Products.

9      This product is not affiliated with Jack Daniel's distillery.

10             If there was intent to really confuse the world and

11     think that this Bad Spaniels product was actually a Jack

12     Daniel's product, they wouldn't prominently display the Silly

13     Squeakers, and they wouldn't include the company name on the

14     back, VIP Products, and they wouldn't include the disclaimer.

15             This is Sleekcraft factor number 8.  Yes, Jack

16     Daniel's licenses its products for a number of goods.  Jack

17     Daniel's witnesses will testify that the licensed goods, in

18     order of importance, are food and culinary, that's its barbecue

19     sauces and whatnot, its relationship with Fridays, and not

20     anything to do in the pet sphere.

21             Again, the only place that Jack Daniel's sells collars

22     and leashes, and it sells miniscule amounts of them, I believe,

23     is in the company-owned store in Lynchburg, Tennessee.

24             And, again, there's two stipulated facts that are

25     relevant to this.  Stipulated fact number 9, and also important

1    is stipulated fact Number 10, which goes to the likelihood of

2    expansion.  JDPI has no plans to license any of its marks for

3    use on a pet toy.

4           These admissions, I think, are directly relevant to

5    Judge Kozinski's opinion in the DreamWorks case.  Where yes, he

6    said we didn't count beans, and certain factors of the eight

7    Sleekcraft factors can be more important than others in certain

8    cases.

9           In that case, he said, the clincher is the

10   relationship of the goods, and found there was a relationship

11   of goods and potential overlap.  There is no potential overlap

12   in this case.  JDPI -- or I am sorry, Jack Daniel's will not

13   sell a dog toy, period.

14          Moving to the tarnishment claim.  There is no evidence

15   that the sales of 55,000 Bad Spaniels squeaking dog toys has

16   harmed Jack Daniel's' reputation.  There's no real world

17   evidence of actual confusion.

18          So what evidence will Jack Daniel's present to you at

19   trial?  This is meant to invoke an ivory tower.  There are

20   going to be two experts.  Mr. Ford, unfortunately, has passed

21   away.  So the expert report of Mr. Ford, as well as the

22   rebuttal report of VIP's expert Stephen Nowlis, will be coming

23   in to you through the reports and depositions which are

24   stipulated into evidence.

25          The other ivory tower expert that Jack Daniel's is

1    bringing into court is a Stanford professor of business Itamar

2    Simonson.  I will talk more about him later.

3            Talk about the flaws in the Gerald Ford survey.  The

4    evidence will show the control stimulus was flawed in design,

5    that Dr. Ford failed to replicate real world market conditions,

6    and Dr. Ford failed to code and analyze the data correctly.

7            This perhaps is the most important flaw in Dr. Ford's

8    report.  The most common shape for the best-selling brands,

9    Evan Williams, Jim Beam, Jack Daniel's, for an American

10   Tennessee whiskey or Kentucky bourbon, is a square shape.

11           So Dr. Ford, for the control stimulus, number one, did

12   not -- this is obviously not a parody product.  There is no

13   joke.  There is nothing about this that's funny or conveys a

14   message to the consumer, number one.  And number two, it puts

15   it in a shape of more or less a wine bottle or actually more

16   like a bottle of port.

17           The control stimulus does not communicate whiskey

18   bottle to the consumer, and what Dr. Nowlis, VIP's expert,

19   says, is this is like selling a high-heel dress shoe and

20   expecting consumers to identify as a Nike just because it is a

21   shoe.  So the 29 percent is the delta between, you know, the

22   control stimulus and the actual Bad Spaniels product, and of

23   course the control stimulus is not going to have anybody

24   identifying or virtually anybody identifying as the Jack

25   Daniel's or any other whiskey, because it is not in a square

1   whiskey bottle, which is now American Tennessee whiskeys and

2   Kentucky bourbons are sold.

3           THE COURT:  Would that be true of Maker's Mark bottle?

4           MR. BRAY:  No, Maker's Mark is interesting, they have

5   their own seal, their own --

6           THE COURT:  Well, that was my question.  You have made

7   a generic statement that you would expect to be square bottles

8   and theirs is not, is it?

9           MR. BRAY:  There are other -- I will say there are

10  other non-square whiskey bottles.  I will tell you that the

11  VIP -- or I am sorry, the JDPI witnesses will testify that

12  consumers do commonly understand that American whiskeys and

13  bourbons are often frequently marketed in square bottles.

14          THE COURT:  That may be, but also, what about the

15  people who are the servers, who have to grab the bottle all the

16  time?  Isn't there a certain value in that?  I am, I am just

17  throwing out questions here that would -- as someone who just

18  sits and watches the world go by, would be curious about.

19          MR. BRAY:  Well, I think we can address those during

20  the course of the trial.

21          THE COURT:  Go ahead.

22          MR. BRAY:  The other problem with the control stimulus

23  is it doesn't include the disclaimer, which was on the VIP Bad

24  Spaniels product.  And in terms of failing to replicate market

25  conditions, unlike in the real world, people that participated

1    in the survey could not touch, feel, or hold the toy.  They

2    could not manipulate the toy to be able to read the words on a

3    hangtag.  They could not view the product from other angles,

4    such as the top where you could see the BS, which is clearly

5    not anything like a Jack Daniel's top.  They couldn't squeeze

6    the toy (squeezes toy) and see that it squeaks.

7            And this is interesting.  I think it's -- this may be

8    the subject of briefing after the trial, if the Court will

9    permit it, but Dr. Ford failed to consider respondent's

10   responses in the context of a spoof or a parody.

11           So Dr. Ford's survey fails to take in the nature of

12   the Bad Spaniels' toy and the consideration, and by doing so,

13   Dr. Ford ignores the subset of consumers who believe that all

14   spoof products must have the permission of the trademark

15   holder.

16           So there's 20-something respondents that Dr. Ford

17   indicated as confused, even though they acknowledged Jack

18   Daniel's didn't produce the toy.

19           And counsel for Jack Daniel's pointed out a couple of

20   quotes.  Well, here is quote from one respondent, because they

21   are creating a spoof of a real product, so I think they would

22   need permission so they don't get sued for copyrights or

23   something like that, after previously stating that the product

24   was put out by silly somethings.

25           So does that consumer think that Jack Daniel's

1    approved or authorized the product based on any elements of the

2    design?  Or does that consumer simply misapprehended the law

3    and believe that if you can recognize that it's a spoof

4    product, you must legally have the permission of the trademark

5    holder, which of course is not the law under any circuit.

6         Itamar Simonson.  Mr. Simonson is JDPI's expert on

7    dilution by tarnishment.  Dr. Simonson in his deposition by the

8    way testified that he had never read the Lanham Act definition

9    of delusion by tarnishment, and I put him in an ivory tower

10   because the totality of his nonacademic professional

11   advertising and marketing experience was working three years as

12   a marketing manager for a Motorola subsidiary.

13        Now, before I talk about VIP's expert Bruce Silverman,

14   what did Itamar Simonson do?  The evidence will show that in

15   other case, in ten other cases, Itamar Simonson had conducted

16   an experiment or a survey of some kind to test for dilution.

17        In this case, Dr. Simonson will testify that he

18   conducted no experiment.  He conducted no test.  All he did was

19   look at the pleadings, look at the two products, and then based

20   on his own knowledge as an ivory tower academic, state that he

21   believed that the Bad Spaniels toy would create -- was quote,

22   unquote disgusting, and would create a negative association

23   vis-a-vis Jack Daniel's.

24        VIP's expert is Bruce Silverman.  Bruce Silverman

25   worked in the real world of advertising and marketing for 50

1    years.  He was the president or vice president or head of

2    creative of some of the largest advertising companies, agencies

3    in the world.

4         You will see that he was president of Wong Doody

5    Advertising.  President and CEO of Inovative Partners.

6    President, Chief Creative Officer, Chief Operating Officer for

7    Asher/Gould Advertising, Inc.  Some of the clients included,

8    Suzuki, Pabst Blue Ribbon, Pizza Hut, a number of other

9    well-known brands.  This goes on.

10        He was the Executive Vice President, General Manager,

11   Creative Officer of BBDO West, Los Angeles, again, with very

12   large accounts.  Apple Computer, the largest company in the

13   world.

14        Before that, he was the Executive Vice President,

15   Chief Creative Officer of Bozell and Jacobs Southwest.

16   Accounts including American Airlines.  Dr. Simonson -- not

17   Dr. Simonson.  I am sorry.

18        Mr. Silverman will testify at trial that he created

19   the world's first Frequent Flyer Program for American Airlines.

20   It was his idea for the American Advantage Miles.  He was also

21   the Senior Vice President, Executive Creative Director for

22   Ogilvy and Mather.  Again, working on accounts like American

23   Express, Shell, Merrill Lynch, Mercedes-Benz, and other

24   well-known brands.

25        He's received virtually every -- the evidence will

1    show he's received virtually every significant award for

2    creativity and effectiveness offered by the advertising

3    industry.  Multiple Clios awards and the others.

4         He has extensive experiences with clients in the

5    beverage industry, including vodka, beer, sodas, Old Crow

6    Bourbon Whiskey.  Extensive experience with clients in the pet

7    product industry, including Puppy Palace, Gaines Meal, Purina

8    Dog Chow.

9         He was the creative force behind hundreds of national,

10   regional, and local television and radio commercials.  He

11   created the slogan, "Don't Leave Home Without It," for American

12   Express.  He suggested the design for the now famous Merrill

13   Lynch logo.

14        He created the advertising for Mercedes-Benz as the

15   best-engineered car in the world.  Created the advertising for

16   Pace Picante sauce that attacks salsa made in New York City,

17   which resulted in Pace Picante becoming one of American's

18   best-selling salsas.

19        He served on the Board of Directors of several major

20   advertising associations.  So, again, the theme of all of this

21   is that, unlike Itamar Simonson, for 50 years Bruce was working

22   in the trenches for the largest advertising agencies in the

23   world, with the largest clients in the world, creating some of

24   the most famous tag lines in the world.

25        And while he's not been on full-time on faculty, like

1    Itamar Simonson, he has taught classes, or guest-lectured at

2    Stanford and a number of other universities.

3            And what will Mr. Silverman say regarding Itamar's

4    report that it is likely to elicit disgust and create negative

5    association?  He is going to say that Dr. Simonson has not

6    considered the fact that people who buy toys for their dogs do

7    so because they love their dogs.  A person would not buy a toy

8    for their beloved pet they found disgusting or they had a

9    negative association with.

10            And with regard -- well, I will save that for closing.

11            Mr. Silverman will testify that based on his review of

12    the Bad Spaniels toy and its associated advertising and his

13    understanding of the facts of its sales and marketing, that it

14    was his instinct that unlike Dr. Simonson, people would find it

15    humorous, fun, not disgusting, and that it would create

16    positive associations for Jack Daniel's, not negative ones.

17            And what you are going to see in the focus groups were

18    that the real world consumers were delighted by the Bad

19    Spaniels product.

20            And with regard to focus groups, the evidence is going

21    to show that both Itamar Simonson has used them in the past and

22    Jack Daniel's uses them to gauge consumers' emotional reactions

23    to potential changes to their products.

24            So in the real world -- and Mr. Sacra will talk about

25    the real world.  He has personally seen people in the pet

| | |
|---|---|
| 1 | industry interact with the Bad Spaniels product.  Retailers at |
| 2 | trade shows, nobody elicits disgust, everybody expresses |
| 3 | delight. |
| 4 | In closing, I would ask Your Honor to keep an open |
| 5 | mind.  I would argue that of the eight Sleekcraft factors, all |
| 6 | of them, or nearly all of them, favored VIP Products, and that |
| 7 | the real world evidence that will be introduced in this case |
| 8 | does not support a finding of likelihood of confusion or |
| 9 | tarnishment. |
| 10 | THE COURT:  Thank you, counsel. |
| 11 | Counsel, may I see you at the side for a moment, |
| 12 | please? |
| 13 | (The following sidebar is held:) |
| 14 | THE COURT:  The gentlemen sitting behind you in the |
| 15 | short-sleeves over there, is he affiliated with the case? |
| 16 | MR. BRAY:  The African American? |
| 17 | THE COURT:  Yes. |
| 18 | MR. BRAY:  He is my tech guy. |
| 19 | THE COURT:  Well, you may tell him, unless he is |
| 20 | performing, he is not to be in front of the bench, he is not to |
| 21 | appear in this courtroom in front of the bench without a coat |
| 22 | on.  I don't know what gave him the great liberties that |
| 23 | allowed him to just come up there and sit there in kibitz, and |
| 24 | you should know that. |
| 25 | MR. BRAY:  I was not looking behind me. |

1           THE COURT:  Well, you can see when you turned around

2    and kept watching.  That's professionalism and your firm should

3    know that, you're a big national firm.

4           MR. BRAY:  I apologize, Your Honor.  Thank you.

5           THE COURT:  Now, for as long as we are up here, how

6    long is the first witness going to take?

7           MR. HARVEY:  35 minutes, 40 minutes.

8           THE COURT:  You want to go on with that right now, or

9    you want to take your morning recess now for about 10 or 15

10   minutes before we get started, so we don't interrupt?

11          MR. BRAY:  I would rather have him put him on direct

12   and then take the break before my cross.

13          THE COURT:  Okay.  As long as --

14          MR. HARVEY:  Direct and then cross after the break.

15          THE COURT:  Because we don't have a jury here.  Last

16   week we had to account for 12 other people.

17          MR. HARVEY:  It could be longer, could be 45 minutes.

18          THE COURT:  We will see how it goes.  If somebody

19   needs to take a recess, raise your hand, please.

20       (Sidebar conference concludes.)

21          THE COURT:  Go ahead.  We will proceed with our first

22   witness.

23          MR. HARVEY:  Thank you, Your Honor.  Jack Daniel's

24   calls Philip Epps to the stand.

25        PHILIP MICHAEL EPPS, DEFENDANT'S WITNESS, SWORN

UNITED STATES DISTRICT COURT

PHILIP MICHAEL EPPS – DIRECT EXAMINATION                    46

1          THE COURT:  You may proceed.

2          MR. HARVEY:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4     BY MR. HARVEY:

5     Q.  Good morning, Mr. Epps.  Would you please state your full

6     name for the record?

7     A.  Philip Michael Epps.

8     Q.  Where do you live, Mr. Epps?

9     A.  Louisville, Kentucky.

10    Q.  Are you employed?

11    A.  I am.

12    Q.  By whom?

13    A.  Brown Forman.

14    Q.  What is Brown Forman's relationship to Jack Daniel's

15    Properties?

16    A.  Well, Brown Forman is a publicly owned company, and Jack

17    Daniel's Property Inc. is a wholly owned subsidiary of Brown

18    Forman, and JDPI owns the Jack Daniel's trademarks.  Brown

19    Forman is the global marketing agent for Jack Daniel's under

20    license from JDPI.

21    Q.  Thank you.  When did that relationship begin, to your

22    knowledge?

23    A.  I believe that was 1998.

24    Q.  Great.  What is your current position with Brown Forman?

25    A.  Current job title is Vice President, Global Brand Director

1    for Jack Daniel's Tennessee Whiskey.

2    Q.  Can you tell the Court, please, what your responsibilities

3    are broadly, in that position, please?

4    A.  Yeah, my role involves managing the long-term strategy for

5    the brand, delivering annual and long-term results, developing

6    communications be that advertising or promotions, as well as

7    overseeing the licensing side of the brand, as well as having

8    or overseeing the home place marketing on top of that in

9    Lynchburg, Tennessee.

10   Q.  When you say "home place marketing," can you elaborate,

11   please?

12   A.  Yes.  So the Jack Daniel's Distillery in Lynchburg,

13   Tennessee is the oldest registered distillery in the U.S..  We

14   have about just under 300,000 visitors come through that

15   distillery every year.  It is a consumer experience.  So the

16   gentleman who oversees that facility, he reports to me and

17   someone else.

18   Q.  How long have you worked for Brown Forman?

19   A.  I have worked for Brown Forman for just over 12 years.

20   Q.  And can you take us through, for the benefit of the Court,

21   sort of headlines only, what your job titles and duties have

22   been, please?

23   A.  So I have been in the alcohol industry about 20 years now.

24   I joined Brown Forman just over 12 years ago in London, working

25   as initially as a brand manager for Jack Daniel's.  In my 12

1    years with the company, I have always worked on Jack Daniel's,

2    which I think has been more luck than judgment.

3            And I think during my time in the UK -- the UK is the

4    second biggest market for Jack Daniel's outside of the United

5    States.  I held various marketing positions from brand manager,

6    senior brand manager, marketing manager, and then towards the

7    end of my time in London as area brand director.  Always

8    working in the UK, but occasionally having responsibilities for

9    South Africa as well.

10           It was in June, 2011, that I moved to Louisville,

11   Kentucky, which is where Brown Forman's head office is based,

12   and assumed the role of brand director for Jack Daniel's

13   Tennessee Whiskey, and at the time our new flavored whiskey

14   called Jack Daniel's Tennessee Honey.  And I assumed the

15   position of brand director for those two products for the U.S..

16           In 2013, I assumed the role of group brand director

17   for the whole Jack Daniel's family of brands for North America,

18   and I held that role until April 2015, which was when I assumed

19   my current position now, which I have been in now for about two

20   and a half years.

21   Q.  So your duties as global brand director are worldwide in

22   scope?

23   A.  They are.  We sell Jack Daniel's in 170 countries around

24   the world.

25   Q.  What are the largest markets, just as a matter of

1    information?

2    A.  U.S. is the largest market still.  We probably sell about

3    47, 48 percent of our total global sales still go through the

4    U.S..  The UK is the second biggest market.  We then have

5    France, Germany and Australia.  They would be the five biggest

6    markets for us.

7    Q.  So let's focus on Jack Daniel's, and in particular, in the

8    U.S..  How long has Jack Daniel's been sold in the U.S.,

9    please?

10   A.  Well, the Jack Daniel's distillery was originally

11   registered in 1866, making it the oldest registered distillery

12   in the U.S..  We just celebrated our 150th anniversary of that

13   last year, and Jack Daniel's has been sold ever since then.

14   Q.  So -- well, not continuously, I assume.  There was a period

15   of time when it wasn't?

16   A.  Prohibition obviously had a say in that, but other than

17   Prohibition, yes.

18   Q.  And can you tell us the size of the brand in terms of

19   volume and scope?

20   A.  Sure.  So I think you have already mentioned it earlier,

21   but Jack Daniel's is the largest American whiskey in the world.

22   Jack Daniel's Tennessee whiskey, as we think about that

23   individual Jack Daniel's expression, is actually the largest

24   individual whiskey brand in the world.  So it's bigger than all

25   other individual expressions of Scotch whiskey, which we are

1    very proud of.

2            Between the dates of 1997 and 2015, we sold

3    approximately 75 million cases with a revenue of about $10

4    billion.

5    Q.  Does Brown Forman track consumer awareness of the brand?

6    A.  We do.  We have what we call an ongoing tracking study that

7    we work with global research partners on.  The latest data

8    we've got from that, which is from the period, I want to say,

9    May through to the end of July this year, our total brand

10    awareness is 89 percent.

11    Q.  In terms of consumer recognition and the value of the

12    brand, there's been a recent award, I believe you told me

13    yesterday, maybe you could inform the Court about?

14    A.  Yes, there's a company called Interbrand, which is a global

15    kind of marketing consultancy strategy company.  They have been

16    doing a survey since 2000 where they rank the top 100 brands in

17    the world by value.

18            They have a methodology where they track the financial

19    performance of the ability to attract consumers, and then also

20    the ability to come on to premium price.  We were just awarded

21    the -- we came 82nd in that list of the top 100 brands, making

22    us the highest-placed spirit brand, and the

23    second-highest-placed alcohol brand.

24            So the brands that you would have at the top of the

25    list would be your Apples and your Googles and Coca-Colas and

1    things, but we are very proud to be in that top 100 list.

2    Q.  So can you tell us the story of the brand, a short history

3    of the brand and about Jack Daniel's beginnings?

4    A.  Yes.  With a brand of over 150 years of history, it is

5    always difficult to do this quickly, but I will try.  As I

6    said, the -- Jack Daniel was a real person.  He was born around

7    1850.  He registered his distillery in Lynchburg, Tennessee in

8    1866.

9              THE COURT:  16 years old?

10             THE WITNESS:  Yep, and so --

11             THE COURT:  Just curious.

12             THE WITNESS:  I tell you we believe he was born in

13   1850.  His gravestone says 1850, but actually we've seen

14   documents in recent years where he was probably born in, we

15   think, 1848.  So I don't know if 18 is better than 16.

16             MR. HARVEY:  Can't quite get him to 18.

17             THE WITNESS:  So he was a real man.  He registered his

18   distillery in Lynchburg, Tennessee.  Water is a vital

19   ingredient to whiskey making, and the reason that he

20   established and had his distillery in Lynchburg was because of

21   the Cave Spring, and that's why we still make every drop of

22   Jack Daniel's there today to this day.

23             Jack Daniel's, he created the brand.  He was a whiskey

24   maker.  He was a salesperson.  He was a marketeer.  He was the

25   person who put Jack Daniel's originally in that square bottle,

1    in the black and white label.  He won his first gold medal.  It

2    was at the St. Louis World Fair in 1904, and that was the first

3    of seven gold medals that the whiskey won.  And Jack,

4    eventually he passed way in 1911, and he passed the distillery

5    on to his cousin, Lem Motlow.  And it was Lem Motlow who

6    oversaw the distillery and brand through Prohibition.

7            Lem eventually passed away and passed the distillery

8    and the brand on to his sons, and it was the Motlow brothers

9    who sold Jack Daniel's to Brown Forman in 1956.  At that time,

10   Jack Daniel's was about 200,000 cases, and today, as I said, we

11   sell a lot more than that.

12           MR. HARVEY:  Your Honor, we have couple of physical

13   exhibits, 1 and 2, with your permission, may I retrieve these

14   and hand them up to the witness?

15           THE COURT:  Certainly.

16   BY MR. HARVEY:

17   Q.  May I ask you, Mr. Epps, to take Exhibit 2, which is the

18   Jack Daniel's bottle, please.  What size bottle is that?

19   A.  This is a 750-milliliter.

20   Q.  And is all Jack Daniel's sold in a 750-milliliter bottle or

21   are there other sizes?

22   A.  There are other sizes.

23   Q.  Do most all of the others carry the same labeling?

24   A.  Yes, all of them carry the same labeling.

25   Q.  And could you describe for the Court the elements of the

1   brand that you feel would be the most significant on that

2   bottle, please?

3   A.   Yes, I will kind of start on the outside.  I mean, we talk

4   about a number of pieces of the iconography of this package.

5   It kind of starts off with a square bottle.  It is obviously a

6   core element of the brand, and as I said, one that Mr. Jack

7   started himself.

8           We then have what we call the filigree running around

9   the outside.  And it is also worth mentioning that the color

10  black with the white lettering and marks on it, we talk about

11  this being the blackest black that we can get.  And part of

12  that creates this iconic nature of the label.

13          On top of the filigree, you've then got -- I would

14  call this the eyebrow, or the arched logo at the top where it

15  says "Jack Daniel's."  Below that we have what we call the

16  cartouche, where you have old No. 7 brand, with part of that

17  kind of filigree design around the outside.

18          And then moving further down, you have Tennessee,

19  which has a very specific font, which is -- we call this --

20  excuse me -- a lock up where it says Tennessee sour mash

21  whiskey, this piece of area here.  And then of course you then

22  can see the other elements below.  So to summarize it, it would

23  be the square bottle, the black and white, the filigree, the

24  eyebrow or arched logo, the cartouche, and then this element

25  here where it says, Tennessee sour mash whiskey.

1    Q.  And I would ask you to look at Exhibit 1, which is the Bad

2    Spaniels toy.  What elements do you see or do you recognize

3    there that you feel replicate the key brand elements you have

4    just told us about on the Jack Daniel's bottle?

5    Q.  So as you kind of look at this and hold it at arm's length,

6    you have the square bottle, almost an exact replica of the

7    shape.  You have the color of the whiskey itself, which of

8    course isn't ownable to us, but it suggests that it's a

9    whiskey.

10          You then have the black and white, and it's

11   predominantly black with the white lettering, and the other

12   elements of that design.  You have the piece on the neck where

13   it says, Bad Spaniels up here, which is similar to the neck

14   wrap that we have.

15          And then of course you have the arch of the Bad

16   Spaniels, or the eyebrow, as I was calling it.  And then you

17   have the old No. 2.  We obviously say old No. 7.  And that's in

18   an oval shape, which isn't exactly the same as the cartouche,

19   but it is in the same position as our cartouche.

20          Then you have "Tennessee" written, not in the same

21   font but a similar font.  And then of course you have kind of

22   an effort at the filigree.  So it is not the exact same wavy

23   lines, but it's in a similar shape around the outside, so at

24   first glance, it's obvious that this is kind of trying to be a

25   take-off on Jack Daniel's.

PHILIP MICHAEL EPPS - DIRECT EXAMINATION

1    Q.   Thank you.  So you mentioned that you have responsibility,

2    overall global responsibility for the marketing of the Jack

3    Daniel's Tennessee Whiskey black label product?

4    A.   Yes.

5    Q.   And what is the strategy that you guide.  What is the -- in

6    your head as you direct this effort to market this product?

7    A.   Yeah, one thing that we are trying to do and that we have

8    done for many years is to really reinforce the specialness of

9    Jack Daniel's, especially as we get bigger and bigger.  You

10   know, we are unashamedly popular and big, and the downside of

11   that is that some consumers, drinkers, as you get bigger and

12   bigger, people think you are mass produced and not special.

13   And that couldn't be further from the truth from us.

14        Every single drop of Tennessee whiskey that is sold

15   anywhere in the world is still distilled, matured, and bottled

16   in Lynchburg, Tennessee, a town, which has kind of doubled in

17   size over the past 15 or 20 years and is just over 600 people.

18   So we are very proud that we still do that.

19        And so my efforts and my team's efforts is that as we

20   communicate the brand and what it stands for, we want people to

21   realize that this is a special brand that's made in a special

22   place by real people.

23   Q.   How does the packaging on the Jack Daniel's black label

24   product figure into that strategy?

25   A.   It is one of the most important elements of the brand.  I

1    think we are going to see a little bit later how this brand has

2    found its way naturally into pop culture, into movies, and has

3    been adopted by musicians.

4            That bottle and that label says something just by

5    being how it looks.  We used to have an advertising executive

6    who worked for us who said, the best advertisement that's ever

7    been created for Jack Daniel's wasn't an advertisement at all,

8    it was just the bottle.  So I don't know if he was trying to

9    talk himself out of a job, but for that reason, we use the

10   packaging in pretty much everything that we do.  And if we

11   don't show the full bottle, which we do normally, we will

12   definitely at least have that label and that distinctive iconic

13   black and white label.

14   Q.  I believe you were present in court for opening statements

15   and we have some ads, some print ads up there.  Each one of

16   them finished -- or at least certainly included a picture of

17   the bottle.  Is that an intentional strategy of the company?

18   A.  Absolutely, absolutely.

19   Q.  We sometimes hear the phrase "brand values" and that gets

20   kicked around a lot.  What does that mean to you?  And can you

21   identify the brand values that you espouse as a Jack Daniel's

22   person?

23   A.  I can.  One of the strengths of Jack Daniel's over the

24   years, and you showed it earlier with the kind of consistency

25   of messaging that we have, our brand values have been very

PHILIP MICHAEL EPPS – DIRECT EXAMINATION

1   consistent over time as well.

2        We use brand values to help with the creation of

3   advertising and communications, and it helps us stay on the

4   right track in terms of staying true to what the brand stands

5   for.

6        We have four brand values:  Authenticity,

7   independence, integrity, and loyalty.  And we stay true to

8   those in all that we do.  And we believe even, you know, the

9   packaging conveys some of those brand values as well.

10  Q.  How much does Jack Daniel's spend annually on advertising

11  for the Jack Daniel's black label brand?  Just in the U.S.?

12  A.  In the U.S.?  So in the U.S., we do what we would call

13  above-the-line advertising, which would be traditional

14  advertising.  So TV advertisements, digital and social,

15  out-of-home billboards.  In the past, we did a lot of press

16  advertising.  We would call that above-the-line.  In the U.S.

17  we spent about 15, 16, million dollars a year at the moment on

18  that.

19        And then we have below-the-line advertising, which is

20  more around promotions, at point of purchase.  So that might be

21  in grocery stores or liquor stores or in bars and restaurants,

22  where we would create promotions and what we would call

23  point-of-sale to drive awareness in purchase.

24        THE COURT:  I have a question.

25        MR. HARVEY:  Please.

UNITED STATES DISTRICT COURT

1          THE COURT:  My idle curiosity here.

2          MR. HARVEY:  Sure.

3          THE COURT:  You mention they have worked their way

4    into the movies, and a lot of times when you are watching

5    movies, as we all do, we see a bar-room scene or something like

6    that.  And how does that happen when you get your bottle right

7    up front where everyone can see it?  How does that work?

8          THE WITNESS:  So there's two ways.  One is that it

9    gets written into the script, and there's someone working on

10   that television program or the film who thinks that bottle, or

11   whatever brand it might be, is a good reflection of the

12   character that is drinking it.  So that's one way it happens,

13   kind of naturally.

14          Another way is that companies like ours would go and

15   pay to have that.  So a lot -- we have never paid for that.  We

16   have always -- we use a product placement agency in Hollywood,

17   and we would supply product, but that would be it.  We wouldn't

18   write any checks.

19          Recent example, I don't know if anyone would have seen

20   it, but there was a movie, part of the Alien series, Alien

21   Covenant, I think it was called.  They approached us saying

22   they wanted to include Jack Daniel's in the movie and would we

23   pay $250,000 to do that.  And we said, well, thank you for

24   thinking us of us, but no thank you.  And they said, well, do

25   you mind if we still feature the product anyway?  And we said,

 1    no, of course not, and we'll help you with product and what

 2    have you.  And sure enough, Jack Daniel's is consumed on

 3    several occasions by one of the characters in that movie.

 4           THE COURT:  I was just curious how that happens.

 5    Okay.

 6           MR. HARVEY:  Well, one of my sons is in the

 7    advertising business and says, Dad, don't call it product

 8    placement, call it brand integration.

 9           THE COURT:  Right.

10           MR. HARVEY:  So let's look at some ads, if we can, and

11    if we could ask the Court's permission to lower the lights.  We

12    will call up Exhibit 106, some print advertisements.

13    BY MR. HARVEY:

14    Q.  And if you could, I simply want you to take us through a

15    few of these, if you would, please, and describe the elements

16    and how they convey the brand values that you were talking

17    about?

18    A.  Sure.  So this is an ad, so everyone knows what it says, it

19    says, everything you need to know about our whiskey is here in

20    black and white.  Again, this is playing off the power of that

21    label and kind of the independence that comes through from

22    this, as well as obviously the authenticity.

23           And truly, when you read that label, there's a lot of

24    information on there, and we believe that tells people a lot

25    about the brand.  Something that's also worth mentioning is

1    just how, I think, Mr. Harvey mentioned it earlier in openings,

2    was around our tone of voice and our knowing smile.

3           You will see in some of these examples how we don't

4    pretend to be laugh-out-loud funny, but we want to be clever

5    with our words, and I think you will see some of that coming

6    through in a few of these examples.

7    Q.  If we can see the next ad, please.  This is all part of

8    Exhibit 106.

9    A.  So in this example, it says, in any bar in America, you

10   know someone by name.  So, again, you can see the prominence

11   here of the package and the label.  And then really bringing

12   that into a bar environment where obviously we do a lot of our

13   business.

14          And the idea being here that there's a real

15   familiarity about Jack, and people ask for a Jack.  There's

16   almost a personal relationship with some of our drinkers.

17   Q.  Next one, please.  I like this one, served in fine

18   establishments and questionable joints everywhere.

19          What's the message there?

20   A.  You will see here again the dominance of the package.  And

21   the idea here is that Jack Daniel's is a really unique brand

22   where it appeals to many different people.  And we quite often

23   use the phrase that it appeals from bikers to bankers, and this

24   is just a nice way to bring that to light.

25          We are proud for the fact that you can find Jack

1    Daniel's in a top end bar or restaurant, or you can find it in

2    a questionable joint.

3    Q.   And one more of the print ads, please.

4    A.   And on this one, this is an example where you can see we

5    don't have the full-bottle shot, but we do have that black and

6    white label, prominently in the bottom right-hand corner.  This

7    one says, making no place special, special since 1866.  So

8    again, authenticity, heritage, and history with the 1866 part.

9    And then really trying to dial up the premiumness of the brand,

10   no matter where it's sold.

11   Q.   And then you mentioned some point of sale or in-store ads,

12   can we move to those which I believe are 105?  And just if you

13   could explain to the Court what we are looking at here, please?

14   A.   Yeah, so just to give an idea of how we categorize

15   customers, I guess.  We talk about the off-premise and

16   on-premise.

17            The off-premise being examples of supermarkets, liquor

18   stores, mass wholesale, like Costco.  And then we have

19   on-premises.  On-premises being more bars and restaurants.

20   These are examples of off-premise displays.  I know the one on

21   the right is certainly in a grocery outlet.

22            And you can see what I mentioned earlier by point of

23   sale.  We would call this an off-shelf display, where we've got

24   prominent use of the package, and this is driving home one of

25   our key programs, which is our barbecue.

1          The display on the left is around a key drinking

2     occasion for our target audience, which is around the

3     tailgating drinking occasion, and then you can see the

4     prominent use of the package in those displays.

5     Q.  Let's take a look at one more of the point of sale, if we

6     could, please?

7     A.  So again, similar examples.  The one on the left is the

8     barbecue promotion that we would have done with -- you can see

9     the Jack Daniel's eyebrow logo prominently as well as the

10    bottle.  And then on the right is an example of where you

11    really are driving home our independence value, and you can see

12    the Jack Daniel's prominently placed there with the red, white,

13    and blue background.  This would have been a July 4th promotion

14    that we would have done.

15    Q.  Great.  Thank you.  Let's look now at some TV ads if we

16    could.  Exhibit 107.  And within there we have a couple that we

17    could take a look at.  479, JDPI 479.  This is one that we

18    looked at during the opening statement, Your Honor.

19          (Commercial played for the Court.)

20    BY MR. HARVEY:

21    Q.  So again, how are the brand values being portrayed,

22    conveyed there?

23    A.  So there's a real dominance about authenticity.  Again, you

24    know, what the label doesn't tell you, a sip will.  Somewhat of

25    integrity and independence coming through.  We like that

1    commercial for the fact that we are a premium priced brand, and

2    we think that does a really nice job of driving the premiumness

3    of the product in a tone of voice that is so on brand for us.

4    Q.  Next one, please.

5        (Commercial played for the Court.)

6    BY MR. HARVEY:

7    Q.  What's going on here in terms of conveying those brand

8    values you spoke of?

9    A.  So the idea with this commercial was around really

10   utilizing a key piece of the brand's iconography being the

11   filigree.  And so starting with the filigree, using that to

12   create this animation and tell this story and drive the

13   authenticity of the Jack Daniel's brand, and, again,

14   culminating and finishing with that unique bottle shot.

15   Q.  And that message, cold, clear, iron-free.  There really is

16   a Cave Spring, isn't there?

17   A.  There really is, yeah, there really is, and it's based in

18   Lynchburg, and it's a limestone cave spring and so it's a

19   constant 56 degrees year round.  If you are there in the heat

20   of the summer, then that's the place to be.

21   Q.  I have to tell the Court a quick story, which is that as a

22   Californian, I stood at the Cave Spring down at the distillery

23   and noticed that the water was flowing and asked my escort,

24   aren't you worried about drought?  Every drop of Jack Daniel's

25   is made out of this water.  And he says, well, sir, it has been

1    coming out of there for 160 years, we are not too worried about

2    it.

3              And is that still the case.  It is where all of the

4    water comes from, is that one spring?

5    A.  It is.  It is.  There was a drought in Tennessee four or

6    five years ago, and we are okay.

7    Q.  Which as a Californian I find it hard to understand, but

8    there it is.  Let's look at one final video, which, I believe,

9    relates to a celebrity, if we can show 4431.

10     (Commercial played for the Court.)

11   BY MR. HARVEY:

12   Q.  What was the relationship of Frank Sinatra to Jack Daniel's

13   during his life?

14   A.  So in the '60's, Frank Sinatra was a fan of Jack.  He

15   adopted the brand as his own.  It was his drink.  And this was

16   an example of where we never ever exchanged any money with

17   Frank Sinatra.  We may have supplied him with a few cases here

18   and there, but he became, you know, one of the brand's biggest

19   advocates.  And actually, as it said in the ad, he -- I think

20   he got buried with five things.  I think it was a pack of

21   cigarettes, a roll of dimes, a miniature of Jack Daniel's, and

22   a couple of other things.

23              So the idea of this commercial was to -- it was just

24   to celebrate that relationship in a way that we could.  It was

25   around -- it would have been around his hundredth birthday.

1   Q.   Okay.   Thank you.   We talked a bit earlier, Your Honor, of

2   the product placement and the exhibiting of the product in the

3   movies.   And if the witness could please identify for us the

4   next clip, which is compilation really of different movie

5   exposures for the brand.

6   A.   Yes.   This is a compilation of movie clips throughout the

7   years.   We didn't actually produce this video.   It was done by

8   someone else on YouTube.   And you will see in here just how

9   prominent Jack Daniel's and the bottle has been in movies and

10   TV over the decades.

11       (Commercial played for the Court.)

12           THE WITNESS:   Not sure this is the right video.

13           MR. HARVEY:   That's not the right one.   I've got 109

14   here.   Maybe I am wrong.   Let's just look at 109 as one

15   example.

16       (Commercial played for the Court.)

17   BY MR. HARVEY:

18   Q.   These are examples, not movies actually but TV episodes; is

19   that correct?

20   A.   That's correct.

21   Q.   And, again, how does that work?   I have the same question

22   the judge has about how that ends up happening.

23   A.   Yeah, we work with a product placement agency and their

24   role is to supply the product when the right opportunities

25   arise.   As I said, we don't pay for those, you know, those

UNITED STATES DISTRICT COURT

1    product integration fees that you mentioned.  We tend to rely

2    on the iconic nature of the brand and what it stands for.

3    Q.  And Jack Daniel's does web advertising, is that right, as a

4    website and engages in social media advertising?

5    A.  Yes, yes, we do.

6    Q.  Let's take a look at some of that.  For example, JDPI 427.

7    This is Exhibit 112, please.  What are we looking at here?

8    A.  This is the jackdaniels.com website from a couple of years

9    ago.  We have actually updated the website since, but it is not

10   similar to this.  So this would be -- we'd call this the brand

11   page for Jack Daniel's Tennessee Whiskey or Old No. 7, as we

12   call it.

13   Q.  Is this the landing page that one goes to on the site?

14   A.  It's not the home page, no.

15   Q.  But once again, the bottle is featured -- this is part of

16   your strategy as well?

17   A.  Yes, absolutely.

18   Q.  And then finally some social media examples.  Not to gild

19   the lily too much, but let's look at Exhibit 113.  What are we

20   looking at here Mr. Epps, please?

21   A.  That looks like it's a Twitter post, if I am not mistaken.

22   And this is a Valentine's Day post that we would have put out

23   on our own Twitter page or Twitter handle.

24   Q.  And, again, we see the brand, the trade dress, and the

25   elements involved here in this case?

1    A.   Correct.

2    Q.   Now, the bottle has changed, we talked about that from 2011

3    to current time.  How did it change and what were the changes?

4    And I would like to look at Exhibit 114, which will show some

5    changes to the bottle over the years.  This is really going way

6    back to 1890 and all the way carrying it to current day.  The

7    change I am talking about is the last one in 2011.  What

8    happened there?  What were the changes to the bottle?

9    A.   Yes.  I mean, I think the overall picture here is the

10   amazing consistency that we've had with the packaging over the

11   years.  Certainly since Brown Forman has owned it, since 1956.

12   And in 2011, you can see that the shoulders of the package

13   sharpened up a little bit.  They are a little bit more rounded

14   prior to that.

15        Also, on the neck, we talk about the beveling on the

16   neck.  And then when you look at the label itself, you can see

17   the structure of the label is still pretty much exactly the

18   same.  We just removed some of the words that we didn't think

19   were as important as some of the others.

20        So you can see, "Old Time" came off.  "Quality" was a

21   word that came off.  And on the package on the left there's a

22   reference to "Lem Motlow," who I referenced earlier, and that

23   came off as well.

24   Q.   Can we go back to the full shot of the two.  So really,

25   from 1955 onward, which is -- how many years is that, 70?

1            THE COURT:  Wait, wait.  When you step away and you

2     are not near the mic, it's hard to hear, and particularly for

3     the court reporter.

4            MR. HARVEY:  Sorry, Your Honor.

5     BY MR. HARVEY:

6     Q.  So from 1955 onward, it is true, I guess, looking at it,

7     that the label has been essentially the same, all the elements

8     that we are looking at.  Yes, some changes as you've

9     identified, and that's a conscious policy and intent on the

10    part of the company?

11    A.  It's absolutely intentional.  As I said, the package itself

12    is so iconic and so strong, and for a global brand to have the

13    same packaging everywhere in the world, isn't actually that

14    common.

15    Q.  Okay.  We finally located the movie clips, so if we can

16    look at that, we are pretty much close to the end of the

17    testimony, Your Honor.  What are we looking at, remind us?

18    This is a clip of different excerpts?

19    A.  This is a montage of clips of movies over the years where

20    Jack Daniel's has been featured.

21    Q.  Thank you.

22         (Commercial played for the Court.)

23    BY MR. HARVEY:

24    Q.  In addition to the kind of advertisement we have seen, does

25    Jack Daniel's engage in licensing of the brand?

1    A.  Yes, we do.

2    Q.  I think you described yourself as having supervisorial

3    responsibility over that program.  Can you tell us a little bit

4    about that scope of that?

5    A.  Yes.  Excuse me.  Yeah, with a brand like Jack Daniel's and

6    the iconography that it has, there are some people who buy into

7    what the brand stands for, but they may not be whiskey

8    drinkers.  And so there's certain categories that we enter into

9    that enables them to experience the brand, even though they

10   might not consume the actual product.

11           On top of that, we want to protect the brand outside

12   of class 33.  And then we also want to use licensing to help --

13   I mentioned earlier about reinforcing the specialness of the

14   brand, and we use licensing to do that in certain categories as

15   well.

16   Q.  You mention class 33.  Can you elaborate on what that

17   means?

18   A.  I will let Toby do a better job of that than me, but class

19   33 is where we operate, I believe, in wines and spirits, and

20   outside of class 33 is other categories.

21   Q.  Categorization of the trademark registrations?

22   A.  Right.

23   Q.  And Mr. Roush is the person who reports to you, is that

24   right, in the licensing capacity?

25   A.  That's correct.

1    Q.  Great.

2              MR. HARVEY:  That's all we have, Your Honor.  Thank

3    you.

4              THE COURT:  Thank you.  Okay.  We are going to take

5    our morning recess.  We will come back at about -- let's make

6    it 11:15.  The reason I say that is when we start up again, we

7    usually go until about 12:30 for lunch.  The reason we break at

8    12:30 is to get all of the other people downtown in and out of

9    the restaurant approximately at that time.

10             So when you leave and go to the few restaurants that

11   there are in this neck of the woods, it is just a little easier

12   and you are not caught up in crowds and things like that.

13   That's what we are going to do.  And we will stand at recess

14   until about 11:15.

15             And, again, there's only a couple of notes of caution.

16   We only have one bank of elevators that you came up on.  There

17   are other trials going on in this building, so please don't

18   discuss this case amongst yourselves outside of this courtroom,

19   and don't engage someone else in conversation.  We don't want

20   to have mistrial for some accidental reason of a comment

21   somewhere down at the kiosk downstairs, or there's vending

22   machines on the third floor -- second floor.  That sort of

23   thing.  So if you will bear that in mind, I would appreciate it

24   very, very much.  We will stand at recess until about 11:15.

25   And we'll start up with cross-examination, Mr. Bray.

```
 1              MR. HARVEY:  Thank you, Your Honor.

 2              MR. BRAY:  Thank you.

 3              THE COURT:  You may step down.

 4         (Recess taken at 10:52 a.m. until 11:15 a.m.)

 5              THE COURT:  Mr. Bray, you may engage in

 6    cross-examination now, please.

 7              MR. BRAY:  Thank you, Your Honor.

 8                    CROSS-EXAMINATION

 9    BY MR. BRAY:

10    Q.  Good afternoon, Mr. Epps.  We met back in July in 2015 in

11    Louisville, do you remember that?

12    A.  I do.

13    Q.  Nice to see you again.  I put in front of you copy of the

14    deposition that we took in July that we may need to refer to

15    during this exam.  Just wanted to let you know it was there.

16              With regard to the last clip Mr. Harvey showed with

17    the movie placements, was there any concern or trepidation with

18    Jack Daniel's Brown Forman that Jack Daniel's was featured in

19    the worst Star Trek movie, Star Trek V?

20              Not a serious question.

21              Okay.  I just want to cover a couple of topics with

22    you.  It won't take very long.  You are Global Brand Director

23    for Jack Daniel's?

24    A.  Vice president.

25    Q.  Vice president?
```

PHILIP MICHAEL EPPS – CROSS-EXAMINATION

1    A.  Vice President Global Brand Director.

2    Q.  And back in July of 2015, I think you were Global Brand

3    Director.  Did you get a promotion since then?

4    A.  No, it's the same job.

5    Q.  Same job, just a different title?  In your position as

6    global -- or sorry, Vice President of Jack Daniel's brand, you

7    are not aware of any licensing of the Jack Daniel's mark for

8    use on a pet toy, correct?

9    A.  Correct.

10   Q.  Okay.  And, in fact, in your position as vice president in

11   charge of the brand, you would not license the Jack Daniel's

12   mark for a pet toy, correct?

13   A.  Correct.

14   Q.  You testified this morning regarding certain brand values:

15   Authenticity, independence, integrity, loyalty.  And then you

16   also mentioned that -- I guess this isn't a brand value, but

17   you want Jack Daniel's to be perceived as a premium brand,

18   correct?

19   A.  Yeah, we talk about the brand specialness as being an

20   overall strategy.

21   Q.  And one of your brand values is loyalty.  I assume that

22   Jack Daniel's has loyal Jack Daniel's drinkers, like apparently

23   Frank Sinatra, right?

24   A.  We do.

25   Q.  So when they go to buy a bottle of Jack Daniel's, they are

UNITED STATES DISTRICT COURT

1   familiar with it, they know what they are buying, right?  Would

2   you assume?

3   A.  Yes.

4   Q.  Okay.  And I will just ask you, do you think purchasers of

5   premium liquor use an exercise -- or exercise a reasonable

6   degree of care before buying a $40 bottle of liquor?

7   A.  So it's not $40.  I think on average a bottle of Jack

8   Daniel's Tennessee Whiskey, 750ml would range in California

9   from about $20.  Whereas in New York it could be much closer to

10  $30.  So it is a bit lower in price than that.  But then also

11  remember that consumers do buy Jack Daniel's in bars, like a

12  drink of Jack Daniel's, you know, you could probably get it as

13  cheap as $6.

14  Q.  Okay.  But you don't disagree that people that -- either in

15  a bar or a liquor store purchase a premium brand like Jack

16  Daniel's, they are exercising at least some degree of care to

17  make sure they're getting what they want, right?

18  A.  They are.

19  Q.  And with regard to -- you testified a minute ago that Jack

20  Daniel's would not license the Jack Daniel's trade dress or

21  mark for use on a pet toy.  Is one of the reasons a concern

22  about potentially marketing to underage consumers?

23  A.  Correct.

24  Q.  You referred to or maybe it was your counsel referred to

25  the Jack Daniel's brand as "iconic"?

1   A.  Yes.

2   Q.  And the original definition of iconic has to do with

3   religious icons, did you know that?

4   A.  I did not.

5   Q.  And you believe that Jack Daniel's brand is one of the most

6   iconic in the world?

7   A.  I do.

8   Q.  And it would be fair to say that you don't like the fact

9   that there is a company in Scottsdale, Arizona creating a spoof

10  of the Jack Daniel's product?

11  A.  I think that's why we are here.

12  Q.  Okay.  Now, as global brand director for Jack Daniel's, you

13  are not asserting that Jack Daniel's has exclusive rights to

14  use a square-shape bottle for Tennessee whiskey or Kentucky

15  bourbon, are you?

16  A.  Correct.

17  Q.  And, in fact, there are some major competitors of Jack

18  Daniel's that use a square-shape bottle, right?

19  A.  There are.

20  Q.  Okay.  Was one of those Jim Evans?

21  A.  Sorry?

22  Q.  Jim Evans?

23  A.  No.

24  Q.  Jim Beam?  Sorry.  Evan Williams.

25  A.  Yes.  Jim Beam and Evan Williams are both in square

PHILIP MICHAEL EPPS – CROSS–EXAMINATION

1    bottles, but there are a lot of other major brands, whiskey

2    brands, bourbon brands, that aren't in square bottles.

3    Q.   And there are a lot that are square, right?

4    A.   There are several that are square, yeah.

5    Q.   Jim Beam is the second-biggest competitor in the market or

6    second biggest -- or perhaps third, after Jack Daniel's, right?

7    A.   Are you talking American whiskey?

8    Q.   Yes.

9    A.   Yes.  Yeah, I would say that.

10   Q.   And George Dickel is a competitor of Jack Daniel's in the

11   bourbon market, correct?

12   A.   George Dickel is actually a Tennessee whiskey as well, but

13   it is a much smaller competitor, yes.

14   Q.   That's the second time I think I conflated whiskey and

15   bourbon and I apologize for that.

16   A.   That's fine.

17   Q.   George Dickel uses the No. 8 on their label, correct?

18   A.   They do, yes.

19   Q.   That didn't raise any objections with Brown Forman, did it?

20   A.   Not that I am aware of.

21   Q.   You are not aware of any dog collars or dog leashes

22   being -- you know, that are sold as licensed goods of Jack

23   Daniel's being sold outside of Lynchburg General and Hardware

24   store in Lynchburg, correct?

25   A.   Correct.

PHILIP MICHAEL EPPS – CROSS–EXAMINATION

1    Q.  You would agree with me that pet products don't fit within

2    the premium focus of Jack Daniel's advertising and promotion

3    efforts?

4    A.  I would still agree with that.

5    Q.  Okay.  And, you know, we mentioned George Dickel No 8.

6    Brown Forman, you personally didn't have a problem with that?

7    You are not claiming, or Brown Forman, to your knowledge, is

8    not claiming exclusive rights in the ordinal numbers 1 through

9    9, other than number 7, correct?

10   A.  Correct.

11   Q.  And you looked at Exhibit 1 and 2, and you identified for

12   counsel some similarities between the Jack Daniel's black label

13   product and the Bad Spaniels toy, correct?

14   A.  I did.

15   Q.  And I don't need to go -- have you go into all of them, I

16   just want to ask you a general question.  Would you agree that

17   there are differences in the labeling and packaging of these

18   two products, correct?

19   A.  I would.

20   Q.  And I think you testified that with regard to the eyebrow

21   of the Jack Daniel's, is the fact that it is arched in the

22   lettering?

23   A.  Yes.

24   Q.  Do I have that lingo right?  It's the eyebrow?

25   A.  Yeah, I call it the eyebrow.  Some people call it the arch,

UNITED STATES DISTRICT COURT

1    but either.

2    Q.  Jim Beam uses arched letters for its whiskey, correct?

3    A.  I don't remember.

4    Q.  Well, did you remember back in July of 2015, possibly?

5    A.  I have read through this, so -- no, I don't remember

6    everything, but having read through this over the weekend --

7    Q.  Only because I don't have a Jim Beam bottle handy or an

8    exhibit, can you look at page 132 of your deposition?

9    A.  Yep.

10   Q.  I asked you at line 8:  Are there other competing whiskey

11   and bourbon brands that used arched lettering besides Jack

12   Daniel's, right?  Answer, you said:  I am sure, yeah.

13           You would agree with that, that there are other

14   whiskey and bourbons that used arched lettering, right?

15   A.  Right, yes.

16   Q.  Okay.  And then I think on line 13 and 14, you agreed that

17   Jim Beam is one?

18   A.  Yes.

19   Q.  Does that refresh your recollection?

20   A.  Yes, it does, thank you.

21   Q.  And you are not aware of Brown -- at least as of July 2014,

22   you are not aware of Brown Forman conducting any research study

23   to attempt to parse out awareness by consumers of the

24   individual components of Jack Daniel's trade dress, besides its

25   trademark, right?

PHILIP MICHAEL EPPS – CROSS-EXAMINATION

1    A.   Not at that time, no.

2    Q.   I want to talk about marketing channels that Jack Daniel's

3    uses, and to the extent that you know, the marketing channels

4    that VIP uses.  To your knowledge, as vice president in charge

5    of the black label brand, VIP has not marketed its Bad Spaniels

6    dog toy to be sold next to Jack Daniel's black label whiskey,

7    correct?

8    A.   Correct.

9    Q.   In fact, in July of 2015, we had a discussion regarding a

10   website called Boozin Gear; do you remember that?

11   A.   I do.

12   Q.   And at least as of July of 2015, it was true that there was

13   nothing else other than the Boozin Gear website regarding VIP's

14   marketing efforts for the Bad Spaniels product that caused you

15   any particular concern, correct?

16   A.   That was the main one that we took notice of, yes.

17   Q.   And you were aware of or involved with earlier trademark

18   dispute that Jack Daniel's had regarding a product called Sweet

19   Revenge?

20   A.   Yes, I think there's a level of involvement, but, yes, I

21   was aware of it and had conversations around it.

22   Q.   And in the Sweet Revenge case, Jack Daniel's had received

23   feedback from customers, actual customers who were being

24   confused as to who was the source origin affiliation of Sweet

25   Revenge and whether it was affiliated with Jack Daniel's,

1    correct?

2    A.  Correct.

3    Q.  And you are not aware of any similar examples of confusion

4    regarding the Bad Spaniels, real world examples today, correct?

5    A.  No.  The only thing I've seen is a comment on Amazon that

6    refers to the products as a Jack Daniel's squeaky dog toy.

7    Q.  Okay.  And you are not aware of whether your counsel has in

8    fact stipulated as a found fact that it had no examples of

9    consumer confusion?

10    A.  Yes.

11          MR. HARVEY:  Misstates the record, Your Honor.  That's

12    not the stipulation.

13          THE COURT:  Well --

14          MR. HARVEY:  Stipulation is that there were no reports

15    to Jack Daniel's of consumer confusion.

16          THE COURT:  Sustained.

17    BY MR. BRAY:

18    Q.  When it became -- at some point -- let me rephrase that.

19          In the past, it was illegal in the United States to

20    advertise liquor on television; is that correct?

21    A.  That's correct.

22    Q.  And at some point in the relatively recent past, the law

23    changed?

24    A.  Yes, it was before my time coming to the U.S., but I

25    believe it was, I think, in the early 2000s, I am not sure.

PHILIP MICHAEL EPPS – CROSS-EXAMINATION

1   Q.  Sorry to interrupt.

2         Was the impact of the change of law is that Jack

3   Daniel's started devoting more of its advertising dollars to

4   television?

5   A.  Can you ask that question again?

6   Q.  Was one of the impacts of the change of that law, that Jack

7   Daniel's started devoting more advertising and marketing

8   dollars to the TV channel?

9   A.  Gradually over time.  I don't think it was an immediate

10  thing, but again, this was a bit before my time in the U.S., so

11  I can't talk that eloquently about that.

12  Q.  In the deposition, we talked about 2015.  You would agree

13  that in 2015, the marketing budget for Jack Daniel's black

14  label was between 55 and 60 million dollars a year,

15  approximately?

16  A.  In the U.S. in total, yes.

17  Q.  And about 20 percent of that was spent on television

18  advertising?

19  A.  That sounds about right, yes.

20  Q.  More or less?

21        And you have never seen the VIP Bad Spaniels toy

22  advertised on television, have you?

23  A.  I have not.

24  Q.  Mr. Harvey showed a number of slides that depicted the

25  changes to the Jack Daniel's bottles over the years; do you

PHILIP MICHAEL EPPS – CROSS-EXAMINATION

1   remember that?

2   A.  I do.

3   Q.  I had a cheat sheet, but I am not going to hunt for it.

4   The 2011 bottle is called the evolution bottle?

5   A.  That's right.

6   Q.  And then there was a bottle in use between 2008 and 2011,

7   and what was the name of that?  Is that the business I will

8   bottle or something with a B?

9   A.  I don't know if we gave that a name at all.  I am not sure.

10  Sorry.

11  Q.  How about the bottle used before that bottle?  I think we

12  called that the old bottle?

13  A.  Yeah, maybe, yeah.

14  Q.  Okay.

15  A.  I'm really not sure that we gave any of them --

16  Q.  And maybe none of that is terribly relevant.  I want to

17  talk about the development of the evolution bottle in 2011.  As

18  part of the process of developing the evolution bottle, Jack

19  Daniel's employed focus groups to gauge consumers reactions to

20  the Jack Daniel's product and trade dress, correct?

21  A.  We did, yes, in all of our major markets and major cities

22  around the world.

23  Q.  In fact, as vice president in charge of the brand, it's

24  true that Brown Forman would never make a significant change to

25  its Jack Daniel's black label whiskey label or bottle without

1   conducting a consumer focus group first, correct?

2   A.   Yes.   As long as those focus groups are representative of

3   our drinkers and our potential drinkers in all of our major

4   markets.

5   Q.   Sure.   And the focus groups provide to -- or provide to

6   Jack Daniel's valuable feedback, vis-a-vis consumers emotional

7   reactions to trade dress, trademark, advertising, correct?

8   A.   They do.

9   Q.   You testified in your deposition that the second-biggest

10  component of Jack Daniel's black marketing, at least back in

11  2015, was something called digital; is that correct?

12  A.   Correct.

13  Q.   And digital included a social media component advertising

14  on Twitter, Facebook, Instagram, that sort of thing?

15  A.   That's correct.

16  Q.   And I think we saw an example of Twitter, a Valentine's Day

17  ad?

18  A.   We did.

19  Q.   Do you know if VIP advertises its Bad Spaniels product on

20  social media?

21  A.   I am not aware.

22  Q.   And you are not aware of any advertising that Brown Forman

23  has done for the Jack Daniel's black label product in any pet

24  industry trade publications, correct?

25  A.   That's correct.

PHILIP MICHAEL EPPS – CROSS-EXAMINATION

1   Q.  And to your knowledge, Brown Forman is not sending

2   representatives to participates in any pet industry trade

3   shows, correct?

4   A.  That's correct.

5   Q.  And to state the obvious, to your knowledge, Jack Daniel's

6   black label whiskey is not sold in pet specialty retailers,

7   like Petsmart, Petco and Petland, correct?

8   A.  Correct, it is not.

9   Q.  And I think -- well, is the third biggest part of Jack

10  Daniel's advertising budget fall within a category Jack

11  Daniel's calls, out of home?

12  A.  I am not sure what the rankings are now, but, yes, out of

13  home is a significant part of what we would call our marketing

14  mix.

15  Q.  And at least back when we talked in July of 2015, it was

16  the third largest component?  I understand the course -- the

17  river of time has flowed since we talked?

18  A.  Yes.

19  Q.  And part of the out-of-home component is advertising on

20  billboards?

21  A.  It is.

22  Q.  Have you ever seen -- so just to state the obvious, Jack

23  Daniel's advertises its black label product on billboards,

24  correct?

25  A.  We do.

1   Q.  Have you ever seen VIP advertise its Bad Spaniels product

2   on a billboard?

3   A.  I have not.

4   Q.  Now, getting back to the focus groups.  It's true, based on

5   your experience as a brand manager and your experience in your

6   career, that focus groups are commonly used by brand managers

7   generally, correct, for large important brands?

8   A.  They are, usually with quantitative research as well, but,

9   yes, focus groups are a prominent part of what we do.

10  Q.  And focus groups are, in fact, commonly used by brand

11  managers of Jack Daniel's, correct?

12  A.  They are, yes.  We will do them in, you know, key markets

13  across the USA.

14  Q.  Okay.  And you wouldn't do them unless they provided

15  valuable feedback to Jack Daniel's, right?

16  A.  Yes, assuming that they're facilitated in the right way.

17  Q.  And just to confirm, Jack Daniel's never conducted a focus

18  group to gauge consumer's emotional reaction to the Bad

19  Spaniels product either on its own or in relation to the Jack

20  Daniel's black label product, right?

21  A.  Not that I am aware of.

22  Q.  Fair enough.  That's all you can testify to here today,

23  what you are aware of.

24          In fact, you would agree with me, Mr. Epps, that a

25  significant number of American consumers associate a square

PHILIP MICHAEL EPPS - CROSS-EXAMINATION

1    bottle shape with any whiskey or bourbon product, correct?

2    A.  I think I said that in my deposition, yes.

3    Q.  Okay.  And you were testifying truthfully, at that time?

4    A.  I was.

5    Q.  And while I asked you about focus groups, vis-a-vis the Bad

6    Spaniels product alone or in conjunction with the Jack Daniel's

7    product, I just want to confirm, you have no real world

8    experience in terms of how a consumer actually reacts to the

9    Bad Spaniels product, correct?

10   A.  Not me personally, no.

11   Q.  And as to you personally, I am glad you said that, the Bad

12   Spaniels product does not in any way make you think that the

13   Jack Daniel's black label product contains dog excrement,

14   correct?

15   A.  It does not.

16   Q.  And as the global brand manager for Jack Daniel's black

17   label, you don't believe that a consumer, after interacting

18   with the Bad Spaniels toy would think that Jack Daniel's

19   Tennessee Whiskey actually contains dog excrement, correct?

20   A.  Correct.

21   Q.  It probably takes a Ph.D. from Stanford to make that

22   connection?

23        THE COURT:  That's an editorial comment.

24        MR. BRAY:  I withdraw the question.

25

1   BY MR. BRAY:

2   Q.   Have you looked at other products in VIP's Silly Squeaker

3   dog toy line, besides the Bad Spaniels product?

4   A.   I have seen them on their website.

5   Q.   Okay.  And you didn't find any of them funny, correct?

6   A.   I didn't.

7   Q.   Okay.  I think you said you found them silly?

8   A.   I did.

9   Q.   So I guess from your perspective, they are aptly titled?

10   A.   I think they are.

11   Q.   I think you said they thought the Bad Spaniels toy was in

12   bad taste?

13   A.   I did say that.

14   Q.   Okay.  And is one of the reasons that you might think that

15   is that you are more protective than the general consuming

16   public of the Jack Daniel's brand, correct?

17   A.   That's a tough one to answer.  We have some very loyal

18   consumers, some that will even go to the extent of tattooing

19   themselves with a Jack Daniel's label or logo.  And so even

20   though I am very protective of this brand and have been working

21   on it for 12 years, we have some pretty loyal drinkers out

22   there.

23   Q.   Okay.  Well, I don't need to read from your deposition, but

24   would you agree with me that the fact that you are the brand --

25   or the vice president in charge of the brand, that impacts your

PHILIP MICHAEL EPPS - CROSS-EXAMINATION

1   view of the Bad Spaniels product, doesn't it?

2   A.  I am very protective of the Jack Daniel's brand, yes.

3   Q.  And as vice president in charge of the Jack Daniel's black

4   label brand, you are not aware of any lost sales that Jack

5   Daniel's has experienced as a result of the Bad Spaniels

6   product, correct?

7   A.  In the short term, no.

8   Q.  And you, from time to time, Brown Forman assesses the brand

9   equity and value of the Jack Daniel's trademark, correct?

10  A.  We do.

11  Q.  And none of those internal assessments done by Brown Forman

12  has indicated there has been any diminution of value or brand

13  equity in the Jack Daniel's product as a result of the Silly

14  Squeakers Bad Spaniels toy, correct?

15  A.  Correct, we haven't seen that.

16  Q.  As global -- as the vice president in charge of the Jack

17  Daniel's black label brand product, you would never license or

18  approve the licensing of the Jack Daniel's mark for any product

19  that you found in bad taste, right?

20  A.  Correct.

21  Q.  And to your knowledge, you are not aware of any licensed

22  products ever being offered by Jack Daniel's that you would

23  consider in bad taste?

24  A.  Could you ask that question again?

25  Q.  To your knowledge, you are not aware historically of any

PHILIP MICHAEL EPPS - CROSS-EXAMINATION

1   licensed products being offered by Jack Daniel's, or with the

2   Jack Daniel's mark or trade dress, that you would consider in

3   bad taste, right?

4   A.  Correct.

5   Q.  Now, in terms of your personal belief that the Bad Spaniels

6   product diminishes the Jack Daniel's brand, you could be wrong,

7   right?

8   A.  I could.

9   Q.  Okay.  And I think you would agree that focus group would

10  be the main kind of study that could be done to get the best

11  consumer interpretation of the Bad Spaniels product, correct?

12  A.  If there was significant numbers and it was representative

13  of the -- kind of the Jack Daniel's drinking community, yes.

14  Q.  Okay.  So done a way that you would agree with, you would

15  agree that that would be the best way to get best consumer

16  interpretation of the Bad Spaniels product, correct?

17  A.  Yes.

18  Q.  And to your knowledge, Jack Daniel's has not undertaken

19  that kind of study, correct?

20  A.  We haven't.

21  Q.  And I think you testified at your deposition that a focus

22  group done along the lines of how you would prefer a focus

23  group would be done, would be one of the things that could

24  possibly change your mind as to whether the Bad Spaniels

25  product might diminish the value of the Jack Daniel's brand,

PHILIP MICHAEL EPPS - CROSS-EXAMINATION

1   right?

2   A.  I don't remember saying that.

3   Q.  Let's take a look at your deposition in front of you.  121,

4   starting at page 10.

5   A.  Sorry.  Did you say page 121?

6   Q.  Page 121, sorry, line 10.  I asked you:  Is there anything

7   that you could think of, any study that could be done, any

8   survey that could be done, anything that could be done that

9   could change your mind that the Bad Spaniels product somehow

10  diminishes the Jack Daniel's brand?  You answered:  The focus

11  groups would be the main one, where you get the best

12  interpretation of it.

13        You would agree that was your testimony?

14  A.  I do.

15  Q.  Now, briefly on sales channels, which you sat through the

16  opening, you saw that's one of the, quote, unquote, Sleekcraft

17  factors.  You already said the obvious, that Jack Daniel's

18  doesn't sell its black label liquor in pet specialty retailers,

19  right?

20  A.  Right.

21  Q.  And you are not aware of any plans by Brown Forman to sell

22  any licensed Jack Daniel's goods in a pet specialty retailer,

23  correct?

24  A.  Correct.

25  Q.  Okay.  And in the United States anyway, Brown Forman sells

PHILIP MICHAEL EPPS – CROSS-EXAMINATION

1  Jack Daniel's using a three-tiered distribution system?

2  A.  That's right.

3  Q.  So you sell -- Jack Daniel's sells to distributors, who

4  sell to retailers, who sell to consumers; is that right?

5  A.  That's right.

6  Q.  So if you live in the United States, you can't purchase

7  Jack Daniel's over the Internet, correct, like off amazon.com?

8  A.  You can.  It depends where you live.  Those laws are

9  getting a little bit more relaxed.  So in some places you can

10  buy Jack Daniel's on Amazon.  I think in California.  One is

11  called Drizly, where they will deliver alcohol to your front

12  door.

13  Q.  Why don't you take a look at your deposition, page 92, line

14  4?

15  A.  Mine is blank.

16  Q.  There's a confidential portion probably, so I think you

17  need to look at the skinny version.  Sorry about that.

18  A.  Okay.

19  Q.  At least this was your testimony when I asked you in July

20  of 2015.  Question:  No direct sales over the Internet?

21  Answer:  Correct.

22        That was your testimony in July of 2015?

23  A.  That's right.  And that was accurate then, I think, just in

24  those short two years.  Things have moved pretty quickly on

25  that front.

PHILIP MICHAEL EPPS – CROSS–EXAMINATION

1    Q.  And even today, I can't go on Brown Forman's website and

2    order Jack Daniel's liquor directly from Brown Forman, correct?

3    A.  It will redirect you to someone who can.

4    Q.  As part of the three-tiered distribution system?

5    A.  Right.

6    Q.  Your counsel -- I can't remember whether it was in the

7    opening or you said this during your direct, that Jack Daniel's

8    in its advertising sometimes uses not laugh out loud funny, but

9    clever with our words humor, does that --

10   A.  Yeah.

11   Q.  -- comport with your understanding?

12   A.  Yes, we describe it as a knowing smile, kind of a clever

13   humor or wit.  So we don't often go for laugh out loud funny,

14   but we like playing with words and having a humor that's, I

15   don't know if intellectual is right word, but more of a smart

16   humor.

17   Q.  At the 20,000-foot level speaking generally, humor can

18   create positive associations for brands like Jack Daniel's,

19   right?

20   A.  I guess it could, yeah.

21   Q.  And would you agree as the brand manager or the global vice

22   president for the Jack Daniel's brand, that humor is frequently

23   used in advertisements for beer and other alcoholic beverages?

24   A.  It is frequently used in those categories, yes.

25   Q.  Okay.  And how about Bacardi Rum with the captain, is that

UNITED STATES DISTRICT COURT

1    humorous to you?

2    A.  Well, Captain Morgan is a separate product to Bacardi.  And

3    I think that -- we talked about brand values earlier and tone

4    of voice, and I think there's great examples there of how

5    different brands and categories of different tone of voice --

6    Q.  And you have not done -- again, almost done, Mr. Epps.  You

7    have not done any study or talked to any real world consumers

8    or focus group to see if the Bad Spaniels toy was perceived as

9    humorous in a way that would create a positive association to

10   Jack Daniel's, correct?

11   A.  Not that I am aware of.

12   Q.  And similarly, you haven't done a study to see if it

13   created a negative association with Jack Daniel's, correct?

14   A.  Well, we have done a study about the potential for

15   misalignment and confusion.

16   Q.  Sure.

17   A.  We have done that one.

18   Q.  That was the late Mr. Ford --

19   A.  Right.

20   Q.  -- and that was confusion, but that was not a study to say

21   --

22   A.  Correct, correct.

23   Q.  And one last question, again, as vice president -- well, I

24   took your deposition in July of 2015.  You have been involved

25   in this matter for now a number of years, correct?

1    A.   Correct.

2    Q.   Okay.  And in all that time, to your knowledge, Jack

3    Daniel's has never received a communication from any real world

4    consumer that they thought that Jack Daniel's put out the Bad

5    Spaniels product instead of my client, right?

6    A.   Correct.

7            MR. BRAY:  No further questions, Your Honor.

8            THE COURT:  Thank you, counsel.  Redirect.

9            MR. HARVEY:  Thank you, Your Honor.  Just a couple of

10   questions.

11                    REDIRECT EXAMINATION

12   BY MR. HARVEY:

13   Q.   Mr. Epps, how many visitors are there annually at the

14   Lynchburg General Hardware store?

15   A.   I am not sure of the exact number to the hardware store,

16   but the number of visitors that we have to the Jack Daniel's

17   distillery, which is situated very close to the hardware store,

18   I think last year we had about 270,000 in one year.

19   Q.   Do you say -- I think your testimony was that the general

20   store functions as a gift shop for the distillery; is that

21   correct?

22   A.   It does, and you don't have to go to the distillery to

23   visit the hardware store, so I think the retailer sales that we

24   do is around about $6 million a year.  So for a small property,

25   it does a lot of business.

1    Q.  Switching gears a bit.  We have heard and will hear more

2    about focus groups and the use of focus groups by Jack

3    Daniel's.  Are you an expert in focus groups?

4    A.  I am not.

5    Q.  You have seen them used for certain purposes in the

6    company?

7    A.  Yes, yes.  We use them to look at new products.  Sometimes

8    new advertising.  And so, yes, we use them periodically.

9    Q.  When you answered the question in the deposition to which

10   Mr. Bray called your attention, about thinking that a study

11   could be done to change your mind regarding the reactions that

12   people would have to the Bad Spaniels product, you mentioned

13   focus groups, and that that might be the best way to get a

14   reaction.

15           What did you have in mind when you were answering that

16   question, in terms of the composition and way the focus groups

17   would be organized?

18   A.  Sure.  So if we were to do that, we would treat it as we

19   treat any other focus groups.  We would go to key markets

20   throughout the USA.  So in the past they would always include

21   Chicago, Dallas, LA, maybe New York, and then within those

22   cities, we would have a representation of our drinkers and our

23   nondrinkers.  So there would be different demographics,

24   different ages, different background.  And the number of groups

25   within each of those cities, you know, I would want to say,

PHILIP MICHAEL EPPS – REDIRECT EXAMINATION

1    probably six to eight groups per city, with at least eight to

2    12 people in each group.

3    Q.  And what purpose would you be using the focus groups for in

4    this description you are giving?

5    A.  So in the past we have done it to look -- as we are

6    thinking of launching new products and new brands, to get the

7    power focus groups, just to get that anecdotal feedback, and

8    the reason you want to make sure that you get a significant

9    number of people is so you get a good cross of that anecdotal

10   feedback and thoughts.  The fewer people, it might not be

11   representative of the true consumer base.

12   Q.  Would you ever do one in a single city, in a single

13   location?

14   A.  I have never done that.  I mean, even when I was in the UK,

15   which is actually a lot smaller place than here, we would

16   always do focus group, in London, and then make sure we did

17   focus groups in Manchester, and then in Glasgow as well.

18   Q.  Would you do any other kinds of studies apart from focus

19   group in conjunction with the focus groups in that setting and

20   then for that purpose?

21   A.  We would.  More recently we would use online surveys, and

22   that's a good way to get a good quantitive representation of

23   the population, and that's where you could get much larger

24   numbers. you won't get as much anecdotal feedback, which is why

25   it's good to balance it out with the focus groups.

PHILIP MICHAEL EPPS – REDIRECT EXAMINATION          96

1    Q.  And you use the expression "quantitative," can you

2    elaborate on what that means?

3    A.  It's making sure that you get a significant number of

4    people, and so some of the recent, we call them quant studies

5    that we have done, you get up into the, you know, the high 500s

6    and even up into the thousands of people, and this way you get

7    that representation of the consumer base and potential consumer

8    base nationally.

9    Q.  And that makes it more projectable and reliable?

10   A.  Correct.

11   Q.  Now, Mr. Bray asked you several questions about Jack

12   Daniel's not selling in pet specialty stores and not selling

13   pet toys.  And you answered that's right, the company doesn't.

14        Why not?

15   A.  Pet stores don't have a license to sell alcohol.

16   Q.  But in terms of any of your licensed products, you don't

17   have plans to license anyone to sell pet toys or toys

18   generally; is that right?

19   A.  No.

20   Q.  Why not?

21   A.  Because the word "toy" suggests it is appealing to someone

22   who is under the legal drinking age, and, you know, we are a

23   very responsible brand and a very responsible company.

24   Q.  And does the existence of a product like the VIP dog toy

25   give you any concern on that score?

1    A.   It does.   I mean, even the fact that it's considered, you

2    know, a toy, because of the humor, you could argue is childish,

3    so, yes, it does cause concern.

4    Q.   And it might be played with by children with a dog?

5    A.   Potentially.

6         MR. HARVEY:   Nothing further, Your Honor.

7         Thank you very much, Mr. Epps.

8         THE COURT:   Thank you.   May this witness step down, be

9    excused, at this time?

10        MR. BRAY:   Yes, Your Honor.

11        THE COURT:   Mr. Harvey, may this witness step down and

12   be excused at this time?

13        MR. HARVEY:   Yes, thank you.

14        THE COURT:   Well, before you do, you want to take a --

15   I am always asking witnesses off-beat questions, just my own

16   idle curiosity.   Do you have any opinions as to other unique

17   distinctive bottles on the market of -- not necessarily of

18   alcoholic beverages, beverages generally?

19        THE WITNESS:   Do you mean just the structure or the

20   whole?

21        THE COURT:   Yeah.

22        THE WITNESS:   Just the structure, including the

23   packaging and the branding?

24        THE COURT:   Right.

25        THE WITNESS:   Well, if you are including the packaging

1    and the branding, I would say one of the best I know of is the

2    contour Coke bottle.

3              THE COURT:  That's the one I was thinking of too.  I

4    was just curious if I was right -- my thinking was right.

5              THE WITNESS:  But then you got the color as well, so,

6    you know, Coke, you can argue, owns that color red.  I don't

7    know if you can ever own the color black, but I think we could

8    give it a good go.

9              THE COURT:  Do you have an opinion coming from -- have

10   you ever had Skyline Chili?

11             THE WITNESS:  I haven't.  I know what you mean though.

12             THE COURT:  You ought to go up the river and try it

13   sometime.  I would be interested, as a person from the UK, what

14   you thought of it.

15             MR. HARVEY:  What was the product?

16             THE COURT:  Skyline Chili.  I grew up in Cincinnati

17   it's right up the river from Louisville.  It's something unique

18   that most people don't like, most particularly my wife who's

19   from Texas and says, that stuff is not chili in my opinion.  I

20   love it.  So I don't know if you have traveled -- have you ever

21   had it, sir?

22             MR. SACRA:  I have not had it.

23             THE COURT:  You are missing one of the interesting

24   delicacies.  Try it sometime.  Anyway, let's step down.  Thank

25   you so much.  I appreciate it.

```
 1              Call your next witness.
 2              MR. HARVEY:  Jack Daniel's calls Toby Roush to the
 3    stand, please.
 4              THE COURT:  Come forward.  Be sworn as a witness.
 5              THE COURT:  By the way, the clerk pointed out to me
 6    that -- as you can see, we have lots of exhibits and things
 7    like that.  But some of the exhibits that have been stipulated
 8    to still have objections attached to them.  Seems a little odd
 9    if you are stipulating something into evidence but there's
10    still an objection attached.  So can we kind of work that out
11    with the clerk at some point?
12              MR. HARVEY:  Yes.  We have worked out a stipulation.
13    I believe Mr. Bray will support this.  That as to most of the
14    exhibits, there's no objection and they will come in.  We will
15    ask them to be admitted at the conclusion of the case.  The
16    ones we referred to.
17              THE COURT:  We want the record to be clear.  That's
18    what we want.
19              MR. HARVEY:  As to the ones in which objections are
20    going to be -- have been lodged and will be submitted, we will
21    argue those when those exhibits come up.  That's the plan.
22              THE COURT:  Right, but they are not the ones that are
23    stipulated already into evidence?
24              MR. HARVEY:  No.  For example, those two and the
25    various clips we looked at are all stipulated.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Thank you.  Okay.  Go ahead, Mr. Roush.

2          TOBIAS JOSEPH ROUSH, DEFENDANT'S WITNESS, SWORN

3          THE CLERK:  Thank you.  Please have a seat on the

4     witness stand.

5                    DIRECT EXAMINATION

6     BY MR. HARVEY:

7     Q.  Good morning, Mr. Roush.  Would you state your full name

8     for the record, please, sir?

9     A.  Tobias Joseph Roush.

10    Q.  Where do you live, Mr. Roush?

11    A.  In La Grange, Kentucky.

12    Q.  Where is that?

13    A.  About 25 miles north of Louisville, Kentucky.

14    Q.  Have you lived in the Louisville area since you were born?

15    A.  No, sir.

16    Q.  Where did you go to school?

17    A.  University, went to the University of Louisville.

18    Q.  And obtained a degree there?

19    A.  I did.

20    Q.  In what?

21    A.  Bachelor of Science in Sport Administration.

22    Q.  And are you currently employed?

23    A.  I am.

24    Q.  By whom, please?

25    A.  Brown Forman.

1    Q.   What's your job?

2    A.   I am a licensing manager for all brands in North and South

3    America.

4    Q.   You said licensing manager for all brands in North and

5    South America.  Tell us, what does that entail?  What is the

6    scope of your job?

7    A.   What it entails is negotiating and identifying products

8    that will extend the brands beyond our core trademark class,

9    which is trademark class 33.  And when we see a fit, we will

10   extend those brands through products that are not core to our

11   competency or capability; i.e, t-shirts, barbecue sauces, et

12   cetera.

13   Q.   The Court referred to those as supplemental products.

14   Would you agree with that as a characterization of what you are

15   doing with those?

16   A.   Yes, sir.

17   Q.   In what sense does it supplement the core brand to have

18   those products be licensed?

19   A.   Well, those products can, especially in the instance of

20   Jack Daniel's, extend the brand and the emotional feel that the

21   consumer might have for the brand and let them show their pride

22   and passion through products beyond our core product.

23        Let's say they are not a core drinker or like to

24   drink, but they love what the brand stands for, they might want

25   a Jack Daniel's black label T-shirt.

1   Q.  So let's go back to your personal history now, please.  And

2   if you could take us through the various jobs that you have

3   held since you have graduated from the University of

4   Louisville, please?

5   A.  Yes.  I started with the athletic department as associate

6   director of operations.  I then went to a license --

7   Q.  Department of where, please?

8   A.  Sorry?

9   Q.  Athletic department of?

10  A.  University of Louisville, sorry.

11  Q.  Thank you.

12  A.  Then I went to a licensing firm called IMC Licensing.  From

13  there -- and there I represented Hillerich & Bradsby, also

14  known as Louisville Slugger.

15          THE COURT:  That just got sold, didn't it?

16          THE WITNESS:  Yes, sir, to Wilson brands.  From there

17  I went to Churchhill Downs, home of the Kentucky Derby, and

18  represented the trademarks and licensing marks for the Kentucky

19  Derby in Churchhill Downs for roughly seven years.

20          At that juncture, we saw an efficiency to outsource

21  the business to an agency.  And at that time, I moved to LPI,

22  who then was acquired by IMG.  At that point, I represented

23  Richard Petty, Petty Enterprises, Churchhill Downs, the

24  Kentucky Derby, and some PGA Tour business.

25          At that juncture, I went from the agency side to the

1    licensee side and went to Zouire Marketing Group out of

2    Merriam, Kansas maintaining offices in Louisville this whole

3    time, representing the LPGA, USGA, Richard Petty, Petty

4    Motorsports, Petty Enterprises, and, again, Churchhill Downs

5    and the Kentucky Derby.

6         Then I went to Delta Apparel and handled the on-site

7    retail for Churchhill Downs and the Kentucky Derby as a

8    licensee, again, at which juncture I was approached by Brown

9    Forman to conduct licensing business for Brown Forman and its

10   brands.

11   Q.  So how long have you been at this licensing field?

12   A.  Next year will be 20 years in the industry.

13   Q.  Doesn't feel that long, does it?

14   A.  No, sir.

15   Q.  So you describe being on all points of the licensing field,

16   starting with being the licensor and representing the agencies

17   that do the licensing and also working for the licensees; is

18   that right?

19   A.  It is.  I make the analogy that it's like a triangle.  You

20   have a licensor, you have an agency if the licensor doesn't

21   have the infrastructure or competency in house to manage the

22   business, and you have the last side, which is the licensee,

23   that usually has a competency or capability to manufacture or

24   produce the product that you are licensing your brand to.

25   Q.  And you have represented some rather well-known brands

1    along the way.  What kind of items does Louisville Slugger

2    license?

3    A.  Licensing strategy for brands can be different.  For a lot

4    of brands it's revenue generation.  But in some instances, it's

5    what is an organic extension to that brand.  For Louisville

6    Slugger, being primarily baseball, it was, what could be

7    extended in an organic way?  T-shirts and caps made a lot of

8    sense.  Their core competency was making wood bats.  So at the

9    time, they were focusing on wood bats, but we licensed out the

10   ability to do T-shirts and hats.  We also at one point did

11   sunflower seeds in a baseball bat container.

12   Q.  Sunflower seeds?  Did I hear that correctly?

13   A.  Yes, sir, you did.

14   Q.  Would you describe that as an organic extension of the

15   brand?

16   A.  It is.  If you go around a Little League or baseball field,

17   rather than tobacco, which used to be predominant around Major

18   League players, sunflower seeds became an acceptable and okay

19   answer to that around Little Leagues.  So it did not do well,

20   but it made sense.

21   Q.  And what other products did Louisville Slugger, or

22   programs, I should say, license that you participated in?

23   A.  There was a personalized bat program that I managed.  We

24   tested it in northern Kentucky and Cincinnati area, where we

25   took an engraver at around the holidays in a kiosk program to

1    personalize bats.  So if you gave us your autograph, we could

2    then personalize it with this laser engraver on the bats.

3    Q.  How did that work out?

4    A.  It did not do as well as we would have liked.  People loved

5    the concept.  The engraver was not as reliable as it should

6    have been.  So we ended up taking it back to the main office

7    and running those there doing a drop ship program.

8    Q.  So if if I understood your testimony, you actually worked

9    for Hillerich & Bradsby, the owner of the Louisville Slugger

10   brand originally; is that right?

11   A.  Well, I was with the agency IMC Licensing Concepts.

12   Q.  The agency that managed the licensing program?

13   A.  Yes.

14   Q.  Okay.  And I think you mentioned a couple of times the

15   Kentucky Derby.  Tell us, if you would, just briefly the kinds

16   of responsibilities you had around that and what kind of

17   licensing the Derby does?

18   A.  I had the opportunity to start with Churchhill Downs in

19   1999.  It was an exciting time.  Thoroughbred racing was close

20   to its pinnacle with NTRA and growing, and it was an

21   opportunity.

22   Q.  Did you say TRA?

23   A.  NTRA, National Thoroughbred Racing Association.

24   Q.  Thank you.

25   A.  So with that I was asked to come in and manage the

1    licensing.  Our main staple item, if you will, is the mint

2    julep glass, and that is in excess of 500,000 glasses in a

3    year.  The majority of those are sold on site, on Oaks and

4    Derby Day, but we sell those, especially regionally and in some

5    cases nationally.  But we also developed a merchandise program

6    and license program around what we affectionately referred to

7    as "the greatest two minutes in sports."  So we extended that

8    through apparel and through numerous other items.

9    Q.  And can you compare the licensing programs of Louisville

10   Slugger with the way the Derby did it, in terms of their

11   objectives?  Was it revenue?  Was it organic extension?  The

12   values you were describing earlier.

13   A.  Certainly.  I can tell you the Kentucky Derby was very

14   revenue driven.  Although I take caution in logo slapping,

15   especially with a brand like Jack Daniel's, Kentucky Derby was,

16   how many products can we license and how much can we make off

17   of this program.  We basically -- it's a hot market deal.  So

18   starting from April until the day after the Derby, you have

19   your opportunity to sell as much merchandise as you can.

20   Q.  And you use the term "hot market," meaning within a very

21   confined space in the year, that was your time to sell?

22   A.  Yes, sir, you would also refer to your back-to-school time

23   as a hot market time as well.

24              THE COURT:  Really?

25

1    BY MR. HARVEY:

2    Q.  And I think you also mentioned Richard Petty as a client?

3    A.  Pardon me?

4    Q.  Sorry, I missed that exchange.

5    A.  He was concerned that the Derby might have a hot market

6    time for going back to school.

7            THE COURT:  I was a little puzzled by that, but I

8    guess you would say --

9    BY MR. HARVEY:

10   Q.  Richard Petty, I think you mentioned, and Petty

11   Motorsports, Petty Enterprises, what kind of licensing program

12   did you facilitate there?

13   A.  Richard Petty is an icon in NASCAR.  And it was an exciting

14   opportunity to work with such an icon and his team.  And we

15   developed licensing opportunities both for he and his family's

16   name over the course of three years.

17           One of the more notable ones was celebrating his 50th

18   anniversary in the sport of NASCAR.  In doing so, we took his

19   Petty blue color and developed a 50th anniversary logo for him

20   and actually did a special die cast that were a throw back to

21   when he was racing and built a program around that, in honor of

22   his 50th anniversary.

23   Q.  And then the final one I heard was LPGA and the PGA

24   marketing.  What kind of programs did you work on there?

25   A.  PGA Tour, I did small deals when I was with IMG, but the

1    bigger one was USG and the U.S. Open, which is always done on

2    Father's Day.  That was a program, pardon me, where we ran the

3    e-commerce site for the USGA, and then also had a presence at

4    their tent on site for the USGA and the Open.

5    Q.  And what was your role there?

6    A.  I was the vice president of programs at Zouire, so I was

7    responsible for these license programs and their e-commerce

8    sites.  So we sourced in, were licensee of these brands and

9    were responsible for running their e-commerce sites and

10   merchandise.

11   Q.  So it is fair to say that when you went to work with Jack

12   Daniel's at the end of this ten years or longer in other

13   fields, you'd actually span the spectrum of everything to be

14   done in licensing, merchandise licensing?

15   A.  I would like to think so.

16   Q.  Okay.  Why does Jack Daniel's license its trademarks?

17   A.  One, we want to give consumers and fans of the brand an

18   opportunity to associate with the iconic brand outside of the

19   drinking occasion.  We are very proud of our product; however,

20   we recognize not everybody that loves Jack Daniel's drinks.  We

21   also recognize they are not going to drink all the time.

22        So when you love a brand like that, you usually want

23   to show your pride in a way or through an association of

24   merchandise.  Our core competency is making Tennessee whiskey

25   and distilled spirits.

1          So in doing that, we recognize that our brand has a

2    lot of equity, and we don't have the capability or the

3    competency to make apparel or to make barbecue sauce or

4    ready-to-eat meats, so we look for best in class vendors that

5    can help us extend the brand out to consumers that want to

6    associate with the brand.

7    Q.   And what would you say the policy of Jack Daniel's is in

8    approaching licensing, the philosophy that it follows?

9    A.   We are a very conservative brand.  We want to make sure

10   that the products that we decide to go into, that it is on

11   brand, it fits the brand, and that we are not logo slapping, as

12   I referred to earlier.

13         Short of T-shirts and hats, we really look at our

14   products, whether it be culinary or barrel wood, and we want to

15   make sure that product is authentic.  If it is a culinary

16   product, we require the licensee to infuse in some way or form

17   the Jack Daniel's Tennessee Whiskey into that product.

18         So we really take a methodical approach, and I am

19   confident that should we want to logo slap, we could make much

20   more than we currently do, but we take a lot of pride in how we

21   approach the brand and how we approach licensed products so we

22   don't go license every category out there.

23   Q.   I heard you use the term "authentic" just a minute ago, and

24   I am sure you heard the discussion about brand values when

25   Mr. Epps was testifying.

1          What does that mean to you, "brand values"?

2    A.   Well, to me, an iconic brand like Jack Daniel's evokes

3    emotion.   And although Mr. Epps is the brand strategy and has

4    those brand values, I look at it from a personal perspective

5    and what the brand means to me as an icon.   So to me it is

6    authenticity.   It is independence and strength.

7          And every individual, every consumer is going to have

8    their own emotions, evoke their own emotions when it comes to

9    that.   You will get similar things when you come to

10   Harley-Davidson, Coca Cola or John Deere.   So when you do that,

11   you have a very special brand, and you want to make sure that

12   you nurture that and make sure the license products are

13   reminiscent or reflect those values.

14   Q.   And do you feel you have been successful in doing that?

15   A.   I do, but we challenge ourselves every day as to whether

16   the products we are doing, the products that we have licensed

17   are continuing to reflect those values.

18   Q.   Are there categories in which Jack Daniel's will not

19   license as just a policy, a flat policy we won't license there?

20   A.   Yes, sir, definitely.   Jack Daniel's takes a very hard

21   approach about targeting underage demographics.   We won't do

22   anything that we believe targets underage demographics, whether

23   that be toys, whether that be things that might be of interest

24   to kids, skateboards.   Certainly would never go into a toilet

25   paper or do anything that we believe is not on brand or

1    degrading to the brand.

2    Q.    I think at one point you told me that you have a zero

3    tolerance policy with respect to some of these categories, is

4    toys one of those?

5    A.    Yes, sir, it is.

6    Q.    What do you mean "zero tolerance"?

7    A.    I have been with Brown Forman for five and a half years,

8    and not at any moment has a toy been a consideration, and I

9    don't see that ever happening.  Again, we take responsible

10   marketing, and that extends to responsible licensing.  So toys

11   is not something that we would ever consider.  There's no

12   amount of money that is going to benefit us when it comes to

13   that.

14   Q.    Take us through the -- briefly, the history of the

15   licensing program at Jack Daniel's.  When did they start

16   offering their brand on, other than as you say, their core

17   competency of spirits?

18   A.    Sure.  The licensing program for Jack Daniel's predates my

19   time with the company, but as I understand, it started in the

20   late 1980's.  It was something where brown spirits at the time

21   were not the best selling item, and in an effort to diversify

22   the business and to get the product and brand more well known,

23   it was evaluated if -- it was at a dinner, and they saw that

24   there was Heinz ketchup on every table and they didn't see a

25   mustard.

1              So the consideration by one of the board members at

2    the time was, why don't we extend the Jack Daniel's brand into

3    a mustard, and so that's where it kind of began.  At the time

4    the board member was very excited about the Grey Poupon

5    commercials with the two Rolls-Royces right beside each other

6    asking if you had any Grey Poupon.  So in doing so, they found

7    an agency to help them extend the brand to what they felt was a

8    good partnership.

9    Q.  That was the beginning of the licensing program?

10   A.  Yes, sir, it was.

11   Q.  Is mustard still one of the licensed products?

12   A.  It is, with the same partner.

13   Q.  Take us through the additions then past mustard, if you

14   would, what year -- you said late '80's?

15   A.  Yes, sir.

16   Q.  After the late '80's?

17   A.  Over time, evolution and maturity of licensing as an

18   industry, as a brand, we identified that licensing could help

19   support our strategies and our platforms.  So tailgating and

20   grilling are one of our bigger platforms.  Music is also one of

21   the others.

22              So we thought it was an organic extension to go into

23   barbecue sauce.  We have also got grilling chips that are

24   ground-up used white oak barrels from our maturation process,

25   and those have been turned into licensed product of smoking

1    chips.  We do charcoal briquettes that also use chunks of Jack

2    Daniel's used barrels.

3         So as we grow and we see what's a fit, we also say,

4    okay, what are our strategies for the next five to 10 years?

5    And are the licensing initiatives and products supporting that?

6    Q.  Is Jack Daniel's currently selling any dog-related license

7    products or licensing others to make them, I should say?

8    A.  Yes, sir.  We have licensed our Lynchburg Hardware and

9    General Store.  We have two collars and a leash or lead,

10   depending on how you refer to it.  We also have a very unique

11   barrel dog house and what I refer to as a quarter of a barrel

12   where you could put a dog bed in it.

13   Q.  We will see some pictures of these later on.  What I would

14   like to do now is show you some examples of the category you

15   have talked about and just have you tell us a little bit more

16   about the program and how it extends in your view, extends the

17   brand values for Jack Daniel's.  And I would like to try with

18   the lights up, Your Honor, if we can.  I am just worried how

19   well we might be able to see this screen.

20        THE COURT:  I doubt that we will be able to see it.

21        MR. HARVEY:  So we might have to drop the lights just

22   for this.

23        THE COURT:  What exhibit will this be?

24        MR. HARVEY:  We will start with Exhibit 150, please.

25   How is that?  It is not the best.  Yeah, let's bring it down a

1    step and we'll go back up, yeah, that's better.  With Your

2    Honor's permission.

3    BY MR. HARVEY:

4    Q.  So tell us, Mr. Roush, what are we looking at here?

5    A.  This is one of our top licensed products.  This is our

6    ready-to-eat meats program.  This is a program that was

7    established to my prior coming on, but it continues to be a

8    very good license product of ours.  They are best in class

9    vendor for this product, and they have done a great job in

10   respecting the Jack Daniel's brand values and making sure that

11   every product that they make and we approve infuses Jack

12   Daniel's Tennessee Whiskey into the product, so again, hitting

13   on that authenticity.

14   Q.  How do they take care of the brand values, the dress and

15   ensure the brand values you are talking about here?  How does

16   that work, I mean, in your mind?

17   A.  Well, we have a Jack Daniel's direct quote that is, every

18   day we will make it the best we can.  When we immerse licensees

19   into the Jack Daniel's brand, we bring them to Lynchburg,

20   Tennessee.  We have a tour.  We take them to the gravesite.  We

21   want them to understand that Jack Daniel's himself was more

22   than just this iconic Tennessee whiskey.  He was a real person.

23   This is a real story.  It is not fabricated, and we want them

24   to understand the authenticity behind it and importance of

25   being a partner of the Jack Daniel's brand.

1           So we obviously have taken them through several times

2    the tour, continue to educate them as what we are trying to do

3    as a brand.  They respect that.  They also look as they develop

4    recipes, how they can infuse aspects of what we do in

5    distillation into the product that they make.  Again, to make

6    it a more natural and organic extension of the brand.

7    Q.  Is it important to you as the licensing manager for Jack

8    Daniel's that the elements that are depicted here be depicted

9    rather consistently across the different categories that you

10   license?

11   A.  Yes, sir.  Absolutely.  And I'll be honest.  It's not only

12   important to us as a brand, it's important to the licensees.

13   That's what they are paying us a royalty for, which is a

14   percentage of their sales.  They are not paying just for the

15   Jack Daniel's name.  They are paying for those elements that

16   make this an iconic brand and trademark.

17   Q.  And here on this package that we are looking at, what is

18   that, pulled pork?

19   A.  Yes, sir.

20   Q.  What elements are present here?

21   A.  Well, you have got the Jack Daniel's arch logo, which is a

22   direct take from our bottles.  You have the white filigree

23   across the top and the sides, which is, again, are reminiscent

24   of our black label on our bottle, and then it says Old Time

25   Quality, which is referring to Old No. 7.

1    Q.  And pulled pork isn't the only ready-to-eat meat that's

2    sold under the Jack Daniel's brand; is that right?

3    A.  No, sir.  We have a number of products under this licensee.

4    We have pulled chicken, pulled beef.  We have pork tenderloins,

5    rack of ribs, et cetera.  This is just a sampling of the

6    products that we have with them.

7    Q.  Is it a big seller?  Is it one of the larger categoriess

8    for you?

9    A.  It absolutely is.  It is one of our top licensees.

10   Q.  I think you used the term, "culinary" or we heard

11   "culinary" used by Mr. Bray.  Does that encompass other than

12   simply meats?

13   A.  No, culinary does encompass -- we have Jack Daniel's

14   Tennessee whiskey barbecue sauce.  We have the mustards.  We

15   have spice rubs.  These are all elements that, again, that we

16   believe support our brand platforms and strategies for grilling

17   and tailgating.  And so it also is reminiscent of that culinary

18   category.  Anything that is edible, I would categorize in

19   culinary.

20   Q.  And on the subject of edible, do you have any views as to

21   the impact of the product that we are in this lawsuit about

22   there on the table in front of you, the impact of that with

23   respect to the kinds of brand values that you are talking

24   about, the VIP tool?

25   A.  Yeah, it -- to me it's a negative toward our brand and an

1    icon that we all worked so hard to protect.

2    Q.  What other are the larger categories that you license aside

3    from culinary?

4    A.  The apparel category is one of our more notable ones.  The

5    Jack Daniel's black label T-shirt, which, again, refers to the

6    label that we have on all our bottles is by far our number one

7    selling T-shirt.  And it doesn't matter what country we are

8    selling that in or what year it is, that's always our number

9    one seller.

10   Q.  Is that a way to reinforce the brand across all categories,

11   including apparel?

12   A.  It is.  It is a way to reinforce it, but it is also what

13   the consumer demands and what they associate with the icon.

14   Again, they may not drink the core product, but they love what

15   the brand stands for, and so how best to associate that than to

16   wear it and say, this represents who I am.

17   Q.  Let's take a look at this, if we could, 151.

18          Is this the shirt that you are talking about?

19   A.  Yes, sir.  This is an example of that.  This is what we

20   refer to as our black label T-shirt.

21   Q.  And you are talking about the consumer demanding this and

22   wanting to wear this.  I am so old that I can remember wearing

23   a chemise Lacoste alligator on it back in the '50s and '60s and

24   thinking that was just shocking that I was simply advertising

25   somebody else's goods.  Has there been a shift over time with

1    respect to that, in terms of the consumer's attitude?

2    A.  Most definitely.  That's why licensing has become an

3    industry.  People now pay for brands to be on their product.

4    Q.  What's going on there, in your view, in terms of consumers'

5    mindset?  Why is that happening?

6    A.  Well, again, depending on the brand, there's an emotional

7    connection, and they want to associate in some way or respect

8    whether they actually partake in the core product.  They love

9    what the brand stands for.  They have an emotional connection,

10   and they want to represent that through either eating our

11   barbecue sauce or wearing our black label T-shirt.

12   Q.  And there's other apparel that's involved in the licensing

13   program other than this shirt.  What other types of apparel

14   goods are involved?

15   A.  We do hats, headwear.  We have a western category because

16   we sponsored professional bull riding, so we have western wear,

17   belt buckles, country western hats.  Again, things that, if you

18   understand are branding strategy and strategy platforms, they

19   make sense and are organic extension of what we are trying to

20   accomplish.

21   Q.  So let's take a look at the next line, if we could, 152.

22         What are we looking at here?

23   A.  So, this is our licensee in Cornell.  And this is for the

24   drinking occasion.  Obviously if you enjoy Jack Daniel's or

25   Jack Daniel's Tennessee Honey or any of our family of brands,

1    if you take a lot of pride in it, you like to associate your

2    drinking occasion with the appropriate glassware in your man

3    cave or your bar.

4         So we have come up with a licensee that again, best in

5    class vendor, certainly respects and understands the compliance

6    requirements of glass and flask, and so they do a very nice job

7    for us and consumers seem to love the opportunity to associate

8    when they are drinking to do it in branded product.

9    Q.  You mention belt buckles.  I think the next slide, which is

10   154, shows some of those and the belts?

11   A.  Yes, sir.  This is part of our program in the country

12   western.  Whenever possible, we do challenge our licensees to

13   manufacturer in the U.S..  So we take great pride as do they in

14   the products that they are able to produce in the U.S..  So

15   this is just a sampling of that.

16   Q.  Are there other pages to this, just to take a quick look?

17   A.  Again, more of the collection.

18   Q.  These are actual branded belts?

19   A.  Yes, sir.

20   Q.  And again, are we seeing some of the same elements of the

21   brand that we have been talking about, the branding elements,

22   including the arched logo and other elements that you feature

23   on an actual Jack Daniel's product; is that part of the idea?

24   A.  That is correct.  The assets that, as I refer to them for

25   licensing, we have guidelines and show the assets in which

1    licensees are able to use on their licensed product.  We still

2    have an approval process where we will look at concept of pre

3    pros or preproduction samples, approve them at each stage, and

4    then the final production before they go into actual production

5    and distribution.

6    Q.  Do you engage in any kind of quality control once somebody

7    is licensed?  Do you check in on them to make sure they're

8    keeping the standards that you insisted on?

9    A.  Yes, sir.

10   Q.  How do you do that?

11   A.  We will have summits on occasion.  We have quarterly

12   check-ins with licensees.  We talk about what their sales are.

13   We get ongoing samples of everything that they are doing so we

14   can continue to look at it, if it's the quality that's

15   reminiscent or reflective of Jack Daniel's.

16   Q.  Did you have an occasion where you had to pull a license or

17   discipline a licensee for not sustaining quality the way you

18   wanted to?

19   A.  Absolutely, yes, sir.

20   Q.  And final couple of categories here.  Look at slide 157,

21   please.  What are these?

22   A.  These are Zippo lighters.  This is one of these iconic

23   products that is made here in the USA.  It is more of a

24   collector item than it's actually used.  Although once people

25   fill it with lighter fluid, they can use it.

1           But it is a good iconic -- icon with icon connection

2    and co-brand opportunity for Jack Daniel's.  And although this

3    might not seem as an organic -- an extension for the brand as

4    some think, the made in USA and icon status of Zippo has

5    allowed us to continue this relationship as well.

6    Q.  Great.  Let's just look, finally, at the dog licensed --

7    the products that are licensed relating to dogs.

8           THE COURT:  What exhibit is this?

9           MR. HARVEY:  Sorry.  This is Exhibit 141 to 144, Your

10   Honor.  There are four --

11          THE COURT:  Thank you.

12          MR. HARVEY:  -- altogether.

13   A.  So this is the Westie collar.  This is the smaller of the

14   two collars.  They have the same design.  We do update the

15   design on occasion although we haven't done it in three or four

16   years.  So this is for the smaller dog or smaller stature.

17   Q.  And again, could you just cull out for us the elements that

18   we see that are part of the same designs and marks that come

19   from the bottle that are here on this dog collar?

20   A.  Yes, sir.  You will see the Jack Daniel's name in our Jack

21   Daniel's font.  You will see the Old No. 7 brand, which again,

22   comes directly from the bottle.  That circle is what we refer

23   to as our bug logo.  But you will see the font of Old No. 7

24   brand is consistent through all of our logos.

25   Q.  Great.  And if we go to the next slide please, 142.

1    A.  So this is an exact replica of the previous collar.  It is

2    just for larger dog, and it is referred to as the husky collar.

3    Q.  And then the next side?

4    A.  Our leash or lead.  Again, with the same design.  But

5    again, taking those brand elements and applying it to the pet

6    products.

7    Q.  Great.  And then I think one more here.  Yeah, tell us what

8    that one is, please.

9    A.  So this is an item that -- this is an older logo -- but we

10   had done in the past in our hardware store, however, it is not

11   a current item and it was for dog treats.

12            THE COURT:  For what?

13            THE WITNESS:  For dog treats.

14   BY MR. HARVEY:

15   Q.  And I don't think we have yet another picture here of the

16   dog bed unless you can -- oh, yes, we do.  Is this a currently

17   offered product?

18   A.  Yes, sir, it is.  And even though -- because of its price

19   and size, it's not a big seller.  It is a very popular item.

20   People love the concept.  This is an actual used Jack Daniel's

21   Tennessee whiskey barrel.  We have some great craftsman in

22   Lynchburg that developed this concept to keep both the dog safe

23   and give it protection.

24   Q.  I believe you said it was actually used in production, was

25   it charred inside, just like the other ones?

1  A.  Yes, sir, it absolutely is.

2  Q.  And have you had any reports about how dogs like this?

3  A.  We have yet to have a complaint.

4        THE COURT:  Do they pass a sobriety test?

5        THE WITNESS:  We don't test them.

6  BY MR. HARVEY:

7  Q.  Okay.  So thank you for giving us this overview, Mr. Roush.

8  What is the size, the overall size of the licensing program for

9  Jack Daniel's?

10  A.  In consumer retail sales, it's in excess of $100 million.

11  Q.  And I think you said it could be much bigger, but that's

12  not the point.  That you have different strategies involved

13  than simply making money on this?

14  A.  Yes, sir.  It's, one, protecting the brand and how the

15  brand is represented.  So, again, we could -- we have had

16  consumer research done where we have been told we could put the

17  brand on just about anything, but that's not how we believe it

18  is going to help us or help the brand -- to protect the brand.

19  Q.  We talked a bit about your licensee, the general store in

20  Lynchburg.  How many items are offered for sale in the store?

21  A.  We have in excess of 300 SKUs or products in the store.

22  Q.  300?

23  A.  Yes, sir.  And that's before you get into the different

24  size and different item.  So if you wanted to go into sizes,

25  you would probably have well over a thousand.

1    Q.  And then other trade channels for the sale of the licensed

2    goods, obviously your licensees control where the licensed

3    goods are sold, but let me ask you some specific questions.

4              Are licensed goods available on amazon.com, for

5    example?

6    A.  Yes, they are.

7    Q.  Jack Daniel's licensed goods?  How about walmart.com, are

8    they sold there?

9    A.  They are.

10   Q.  Any other online sources?  Does the General Store have its

11   own, or is it now a Jack Daniel's own website?

12   A.  Again, we do not -- we recognize what is not our core

13   competency and what is.  Distilled spirits are our core

14   competency, so we license out our e-commerce capability.  And

15   so although there are some items on the e-commerce store that

16   are similar to what we have at the hardware store, it is not

17   run by that team.

18   Q.  And just for the Court's information -- we are close.  I

19   would say we are 15 minutes, but if we would like to break?

20             THE COURT:  I think we ought to break now.  People

21   have been here a long time, and we've been about an hour and a

22   half to two hours.  So we will come back at 1:45.  That is

23   about an hour and ten minutes.  It gives you time to clear out

24   of the building and go where you are going to go.  And for

25   those of you not familiar with downtown Phoenix, there's a

1   place right across the way called Crazy Jim's.  There's a place

2   across the way called Sticklers.  It's salad and sandwich

3   place, and then down the way about four blocks, there's a

4   series of restaurants in town square, whatever they call that

5   these days.  I am not quite sure.

6          So there's different places to go, and they are all

7   within walking distance.  At this time of the year, due to we

8   are supposed to have triple digits again, it may be a little

9   toastier than other parts of our community here.  So we will

10  stand at recess until 1:45.  Thank you all very much.  You may

11  step down.

12      (Recess taken at 12:34 p.m until 1:48 p.m.)

13          THE COURT:  Is that about the right amount of time for

14  lunch?  Too long?  Too short?  Any thoughts?  About right?

15          MR. BRAY:  It was not too short, maybe five minutes

16  more.

17          MR. HARVEY:  I would agree, Your Honor.

18          THE COURT:  Okay.  Trying to strike the right balance

19  in the Three Bears time for -- or Goldilocks, I should say.

20          MR. BRAY:  If I could have a moment.  I think Your

21  Honor is aware of this, but I think this trial was originally

22  scheduled for something like 12 court days.  We are on track to

23  finish in four, so --

24          THE COURT:  Well, I know, but I just want to know

25  about the luncheon.  You've got the time, but I just want to

1    know because sometimes when we have trials, even an hour gets

2    to be too long because we have a jury here, and they always

3    bring their lunches, or half of them do, so they want to get

4    back to work.

5          So I just want to know, I don't want to inconvenience

6    you.  I know some places take an hour and a half for lunch.  We

7    tend to be a little smaller because there's just not that many

8    places to go.  But because a couple of places have closed down,

9    could be a little tighter on the time.  So we will give you a

10   little bit more time tomorrow.

11         Okay.  Mr. Roush, would you come back to the witness

12   stand, please?

13         And you may proceed, Mr. Harvey.

14         MR. HARVEY:  Thank you, Your Honor.

15                       DIRECT EXAMINATION

16   BY MR. HARVEY:

17   Q.  Mr. Roush, you understand you are still under oath?

18   A.  Yes, sir.

19   Q.  Thank you for giving us the overview of the licensing

20   program at Jack Daniel's.  I want to turn now specifically to

21   when you encountered the Bad Spaniels product and what happened

22   following your discovery.

23         So if we could call up as Exhibit 170, please.

24         THE COURT:  Counsel, I know when we stand there at the

25   lectern that way, that microphone doesn't always pick up as

1    well.  Maybe you could turn that one to your right over just a

2    little bit more so it might pick up a little bit.  Thank you.

3              MR. HARVEY:  We better there?

4              THE COURT:  Give it a shot.  See how we do.

5              MR. HARVEY:  Great.

6    BY MR. HARVEY:

7    Q.  So I am showing you, well, let me ask you, do you recognize

8    this?

9    A.  Yes, sir.

10   Q.  What is it, tell the Court, please?

11   A.  It is the Boozin Gear website.

12             THE COURT:  Sorry.  Could you give us an exhibit

13   number on that?

14             MR. HARVEY:  Exhibit 170.

15             THE COURT:  Thank you.

16   BY MR. HARVEY:

17   Q.  Maybe we could drop the lights just a notch.

18             Take us through this.  This is the home page?

19   A.  Yes, sir.  This is where -- when I was doing some due

20   diligence for another licensee that was interested in selling

21   or distributing through this website, I was confirming that as

22   a brand we would okay -- be okay with this manner of

23   distribution or this e-commerce site.

24   Q.  So who was that company that you were checking out?

25   A.  That was Ace Products.  They do pool tables, dartboards,

1    you know, bars for us.

2    Q.  So they are an officially licensed Jack Daniel's vendor?

3    A.  Yes, sir.

4    Q.  And they, you said what, checked in with you, called you,

5    is this okay to sell through this site?  Is that what they were

6    asking?

7    A.  They did.  And when we have that type of request, where

8    it's a retailer or an e-commerce site like this, we want to do

9    the due diligence to make sure that it is not targeted towards

10   underage demographics and appropriate for spirit product to be

11   sold on.

12   Q.  And they asked you, is Boozin Gear a place we can sell, is

13   that okay?

14   A.  Yes.

15   Q.  So what did you do?

16   A.  I went to the site.  I reviewed it, saw the Jack Daniel's

17   logo and actually put Jack Daniel's in the search line so I

18   could see what all came up under Jack Daniel's.

19   Q.  Well, before we go to the search line, what about the top

20   line?  Can you just tell us what that says.  I'm having trouble

21   reading it.

22   A.  Yes, sir.  Beer, shirts and T-shirts, officially licensed

23   beer, gear, hats, clothing and bar merchandise from beer and

24   liquor brands.

25   Q.  Okay.  And what is that line and who puts that up there?

1  A.  That would be Boozin Gear.

2  Q.  This is the way they describe themselves on meta tags to be

3  captured by a search?

4  A.  Yes, sir, and the product that's on here.

5  Q.  Okay.  So then you said you went to that open line search

6  bar?

7  A.  Yes, sir.

8  Q.  And what did you do?

9  A.  I put in Jack Daniel's and then hit the search button.

10  Q.  And what came up in response to that?

11  A.  Well, we had some officially licensed product pop up, but

12  also something that was new to me was the Bad Spaniels pet toy

13  came up.

14  Q.  So could you please move to that page and let me ask you,

15  is that -- internally searching on boozingear.com, you found,

16  in response to a search prompt of Jack Daniel's, this came up?

17  A.  Yes, sir.

18  Q.  This page?  And can you read it, at least -- well,

19  obviously the headline we can read Bad Spaniels, squeak dog

20  toy.  But there's some language over there on the right side?

21  A.  This says, tall bottle of Bad Spaniels liquor.  Our Jack

22  Daniel's style squeaker toy.  This safe, durable, rubber dog

23  toy squeaks when squeezed.  This toy measures approximately 10

24  inches tall.

25  Q.  Was there anything else on this page that gave you concern

1    with respect to what you had found?

2    A.  Well, between the fact that I searched Jack Daniel's and

3    this came up, the distributor actually having Jack Daniel's

4    name in it, and then having one of our officially licensed

5    shirts in the, you may also like category in the lower

6    right-hand corner, it looks like a Jack Daniel's licensed

7    product.

8    Q.  And is that an officially licensed Jack Daniel's shirt?

9    A.  Yes, sir, that's one of the black label T-shirts we

10   previously discussed.

11   Q.  How do you know it is officially licensed?

12   A.  Well, there's certain things that I know to look for.  One

13   of them being the neck label, which is screen printed in with

14   the Jack Daniel's name showing it's a private label.  To be 100

15   percent accurate, I would have to order the thing and look for

16   the other pieces.  But at first glance, it looks like it is.  I

17   could also confirm with the licensee.

18   Q.  What was your --

19              THE COURT:  Approximately when did this occur?

20              THE WITNESS:  This was in 2014.

21              THE COURT:  Thank you.

22              THE WITNESS:  Yes, sir.

23   BY MR. HARVEY:

24   Q.  And just, can you place it in relation to when the lawsuit

25   began?

1    A.   In 2014, I think it was in September that I identified

2    this, and I believe it was about a year later we had a

3    deposition.   As far as when the trial started, I would have to

4    defer to you all.

5    Q.   Right.   Just to capture that as the timeline showed in the

6    opening statement.   You are saying this was September that you

7    found this, September of 2014, and a letter went out shortly

8    after that, and the lawsuit started a week after the letter.

9    Okay.

10            All right.   So you know that's officially licensed

11   Jack Daniel's T-shirt there in the bottom right corner.   You

12   saw this and, again, tell us what was your reaction, finding

13   all of this?

14   A.   To me, this was an obvious counterfeiter knock-off product,

15   and my reaction, as when I see any product along those lines,

16   was to send it to our counsel, and my recommendation was a

17   cease and desist.   But I defer to them to make that ultimate

18   call.

19   Q.   That's not in your department, to make that final

20   recommendation?

21   A.   Correct.

22   Q.   Or I should say final decision.   That's your

23   recommendation.

24            So do you encounter what you call knock-off or

25   counterfeit goods in the course of your work in licensing?

1    Knock-off Jack Daniel's products?

2    A.  Quite a bit.

3    Q.  What is your practice, your general operating practice when

4    you do?

5    A.  When we find it, unless it's obvious that it isn't a

6    knock-off, we send it directly to our legal counsel and let

7    them take the appropriate action.

8    Q.  Do you know is action taken in all cases?

9    A.  In some cases it is not, but, again, that's deferred to the

10   legal counsel to make that ultimate decision.

11   Q.  Obviously, in this case, an action was taken in the form of

12   a protest letter being sent?

13   A.  Yes, sir.  It's our template cease and desist, very

14   friendly.  From my 20 years experience in licensing, that, you

15   know, willing to work with you on addressing this issue, but we

16   do see it as an issue for our trademark.

17   A.  We will have an opportunity to look at that with Mr. Gooder

18   when he testifies.  At this point, I have no further questions,

19   but stay where you are, please, for cross.

20        THE COURT:  Thank you.

21        You want the lights up or down, Mr. Bray.

22        MR. BRAY:  You can leave them down, please.

23        May I approach the witness, Your Honor?

24

25

CROSS-EXAMINATION

BY MR. BRAY:

Q.  We will start with the Boozin Gear site.  You don't have any knowledge that the Bad Spaniels product is sold on the Boozin Gear site today, do you?

A.  As of last week it was.

MR. BRAY:  Can you put up Exhibit 170?  Zoom in on the top, the date?

BY MR. BRAY:

Q.  The exhibit that you showed the Court was not from last week, correct?

A.  No, sir.

Q.  You don't have any documentary evidence here to show the Court that the Bad Spaniels product was available on the Boozin Gear site this week, do you?

A.  No, sir.

Q.  Okay.  You can take that down.

Out of -- how many websites are out there that sell Jack Daniel's authorized license gear, if you could estimate?

A.  I would say hundreds, if not thousands.

Q.  Okay.  And obviously there's probably millions of Internet e-commerce sites, correct?

A.  Yes, sir.

Q.  And out of the hundreds if not thousands of Internet sites that offered license Jack Daniel's products, the only one that

1    caused you any concern, vis-a-vis Bad Spaniels, was Boozin

2    Gear, correct?

3    A.  At the time, yes, sir.

4    Q.  Okay.  Let's talk about the Jack Daniel's General Store and

5    Hardware in Lynchburg.  That's the only place in the world that

6    somebody can buy that Jack Daniel's dog house, right?

7    A.  Yes, sir.

8    Q.  Only place you can buy the collar and the leash, correct?

9    A.  Yes, sir.

10   Q.  And the collar that was showed didn't have all of the

11   elements of the trade dress that Mr. Epps talked about,

12   vis-a-vis the black label bottle?

13   A.  Correct.

14   Q.  For example, it didn't have the arch lettering?  The

15   eyebrow?

16   A.  No, it had some of our other trademarked assets.

17   Q.  And you said you will not license anything that could

18   potentially touch the underage demographic, or words to that

19   effect?

20   A.  That's our intent.

21   Q.  Okay.  Do you do anything to ensure that an underage

22   demographic doesn't eat the mustard that's in your culinary

23   category or packaged meats?

24   A.  We hope responsible parents will handle that.

25   Q.  And in regard to the jar that was for pet toys, was one of

1    the -- you no longer sell that in the Jack Daniel's Hardware

2    and General Store in Lynchburg, Tennessee, correct?

3    A.  Correct.

4    Q.  Is that because it could be found to be -- resembled a

5    cookie jar for humans as opposed to a treat jar for dogs?

6    A.  That was discontinued before I started so I don't know.  I

7    will say it had the old logo and that was probably the primary

8    reason for it.

9    Q.  And, you know, I recall one of my earliest responsibilities

10   as a young kid was walking my dog.  Do you have any concern

11   regarding selling a leash for a dog that could be handled by an

12   underage consumer?

13   A.  No, sir, because people that are going to be purchasing

14   that are going to be of legal drinking age.

15   Q.  Well, let's talk about that.  I mean, what's the legal

16   drinking age in Tennessee?  21, isn't it?

17   A.  Yes, sir.

18   Q.  And you only have to be 18 years old to do the Jack

19   Daniel's distillery tour?

20   A.  Correct.

21   Q.  And after you go to the tour, most people go to the general

22   store, correct, or a lot of people do?

23   A.  Yes, sir.

24   Q.  So if you were 18 to 20 years old, you could go to the Jack

25   Daniel's General Store and buy any of the licensed goods,

1    right?

2    A.   Perhaps we have a process where we do card, and if they're

3    from out of the country and their legal drinking age there is

4    18, they are allowed to purchase.

5    A.   They are allowed to purchase anything in the general store?

6    A.   Jack Daniel's related products, yes, sir.

7    Q.   So -- oh, okay.  So if you are 18 years old, you are not

8    allowed to purchase anything in the general store?  You have to

9    be 21 or older to buy the dog lease?

10   A.   No, I just said, if you are from a country where the legal

11   drinking age is 18.

12   Q.   Sure.  If you are not from a country whose legal age is 18

13   but you are from the United States, you can't purchase any Jack

14   Daniel's license products in the hardware store?

15   A.   That's our intent.

16   Q.   It is your intent, is it enforced?

17   A.   I certainly hope so, but I don't oversee the hardware

18   store.

19   Q.   Do you agree with Mr. Epps that pet products don't fall

20   within the premiumness that Jack Daniel's is striving for,

21   vis-a-vis, its black label brand?

22   A.   Pet toys, yes, sir.

23   Q.   Okay.  By the way we met before?

24   A.   Absolutely.

25   Q.   Same day I met Mr. Epps, July of 2015.  And what I remember

1    from your deposition is that you corrected -- you disabused me

2    of my belief that the Kentucky Derby was in Lexington, when

3    it's in Louisville, right?

4    A.  Yes.  Much like Jack Daniel's, I took pride in working for

5    the Kentucky Derby and Churchhill Downs.

6    Q.  I associated horses with Lexington and brown spirits with

7    Louisville.  You understand what a parody product is, don't

8    you?

9    A.  I do.

10   Q.  Okay.  And I think you said that a parody is making fun of

11   a brand, right?

12   A.  Yes, sir.

13   Q.  And you believe the Bad Spaniels toy is attempting to be a

14   parody product, right?

15   A.  I only recognize it as being a knock-off or a pirated

16   product.

17   Q.  Okay.  Could you take a look at your deposition in front of

18   you?

19   A.  What page?

20   Q.  Page 28.  This goes back to our question and answer session

21   back in July of 2015.  So if you look on page 28 and page (sic)

22   10, I asked you:  I appreciate that.  Well, do you think the

23   Bad Spaniels toy is a parody product?  And your answer was:  I

24   personally believe it is attempting to be.

25            That was your testimony, correct?

1    A.  Yes, sir.

2    Q.  And then you also -- it is also your testimony that you

3    personally think that it's confusing enough that you would

4    recognize it as a parody product, correct?

5    A.  Yes, sir, that's what I testified.

6    Q.  Okay.  So you can't have an effective parody without

7    recognizing that there's a brand being parodied, correct?

8    A.  Perhaps.

9    Q.  Okay.  As licensing manager for Brown Forman, you feel

10   every parody product where you can figure out that Jack

11   Daniel's is the source of joke constitutes an infringement of

12   the Jack Daniel's trademark or trade dress?

13   A.  Will you repeat the questions.

14   Q.  Okay.  As the licensing manager for Brown Forman -- sorry,

15   Elva, I will try to speak slower -- it's your belief that every

16   parody product where you can identify or figure out that Jack

17   Daniel's is the butt of the joke, every parody product is an

18   infringement of Jack Daniel's trademarks or trade dress,

19   correct?

20   A.  If it's using our trade dress, yes, I do.

21   Q.  Isn't it impossible for the maker of a parody product to

22   make fun of a well-known brand without invoking enough of the

23   brand that a consumer would get the joke?

24   A.  Perhaps, but then you are using those trademarks as an

25   equity equation in the purchase, so shouldn't you be a

1    licensee?

2    Q.  So you think you should be a licensee in order to -- in

3    order to make a comment or poke fun at the iconic Jack Daniel's

4    brand, you need to be a licensee to do that?

5    A.  If the brand would allow you to do that.

6    Q.  Okay.  And Mr. Epps testified he's very protective of the

7    Bad Spaniels -- or of the Jack Daniel's marks.  You yourself

8    are hypersensitive to protecting Jack Daniel's trade dress and

9    trademarks, aren't you?

10   A.  Absolutely.

11   Q.  And you don't like that there is an existing product that

12   pokes fun or comments on the Jack Daniel's brand, right?

13   A.  Yes, sir.  And if you will, in my experience in licensing,

14   it wouldn't matter what brand it was, I would be very sensitive

15   to that.

16   Q.  Hypersensitive?

17   A.  I would be sensitive to it.

18   Q.  As licensing manager for the Jack Daniel's brand, you know

19   that Brown Forman would never license a dog toy for fear it

20   might be confused as a kid's toy, correct?

21   A.  Yes, sir.

22   Q.  And, in fact, the pet collar and leash and the dog house,

23   they are only sold by Brown Forman in the hardware store in

24   Lynchburg, Tennessee?

25   A.  They are exclusives to our visitor center there, yes, or

1    our hardware store there.

2    Q.  And, again, getting back to the underage thing, is there

3    any concern that small children would use the attractive Jack

4    Daniel's barrel dog house as a fort?

5    A.  It would be up to their parents to determine that.

6    Q.  In your position as licensing manager --

7          THE COURT:  Before you get to that, could we do a

8    double check on their iPhones and phones?  Makes sure they are

9    really off, not just on the silent position, if you would,

10   please?  Only because it interferes with the electronics up

11   here and things get a little askew.  If you could help us out

12   on that, I would appreciate it very much.  Sorry, Mr. Bray.

13         MR. BRAY:  I have an iPad too that I've been using for

14   work related -- is that okay or just the phone?

15         THE COURT:  I think it would be better if it was in

16   the off -- if somehow the signals coming into the phones, even

17   though they're on -- I don't know if airplane mode would effect

18   you or not but.  Airplane mode is safer, but for some reason it

19   interferes with our wifi up here as it relates to other things

20   going on.  If you can help us out, we would appreciate it.

21   Thank you.

22   BY MR. BRAY:

23   Q.  In your position as the licensing manager for Brown Forman,

24   you are not aware of any real world examples of a consumer

25   actually being confused and thinking Jack Daniel's was the

1   source of the Bad Spaniels product, correct?

2   A.  A consumer, no, sir.

3   Q.  When you saw the Bad Spaniels product on the one e-commerce

4   site Boozin Gear, where license gear was also available, you

5   knew right away that it was not a licensed product, correct?

6   A.  Correct.

7   Q.  You identified general -- with Mr. Harvey, general

8   categories of goods that Jack Daniel's licenses its marks and

9   trade dress to, and I went through some of this with Mr. Epps,

10  but the most important is culinary?

11  A.  Yes, sir -- I would say it is our largest category.

12  Q.  Your largest category?  The few pet collars and leashes and

13  the dog house sold in the general store, that's not one of your

14  larger categories, correct?

15  A.  Correct.

16  Q.  That's probably one of your smaller categories, correct?

17  A.  I would say that's fair.

18  Q.  And when I took your deposition in July of 2015, you said,

19  no, you had no idea as to the volume of sales of pet leashes

20  and pet collars at the general store; do you remember that?

21  A.  Yes, sir, and then we followed up with an exhibit, I

22  believe, with numbers.

23  Q.  And I think you said on direct there are over 3,000 items

24  bearing the Jack Daniel's trademark or trade dress sold in the

25  general store, more or less?

1   A.   In the deposition, yes, sir.

2   Q.   And not one of those is a dog toy, right?

3   A.   Not a dog toy, no, sir.

4   Q.   Jack Daniel's doesn't have any licenses with anybody to

5   produce dog toys with Jack Daniel's mark or trade dress, right?

6   A.   Correct.

7   Q.   And you are not aware of any present plans by Brown Forman

8   to expand into that area, correct?

9   A.   Correct.

10   Q.   And as the licensing manager for Brown Forman, you are not

11   aware of any intention on the part of Brown Forman to expand

12   the sale of the licensed pet collars and leashes to anybody

13   outside of the general store, correct?

14   A.   No, sir, not at this time.

15   Q.   And as the licensing manager for the Jack Daniel's brand,

16   you are not aware of any licensed Jack Daniel's product being

17   sold in any pet specialty retailer, like Petsmart, Petco,

18   Petland?

19   A.   Not to my knowledge.

20           MR. BRAY:  I have no further questions, Your Honor.

21           THE COURT:  Thank you, Mr. Bray.  Any brief redirect?

22           MR. HARVEY:  Please, Your Honor, just a couple.

23                    REDIRECT EXAMINATION

24   BY MR. HARVEY:

25   Q.   Mr. Bray asked you about the channels of trade of licensed

TOBIAS JOSEPH ROUSH - REDIRECT EXAMINATION          143

1    products, and I just want to ask you, we know the way you

2    license companies, but you don't control the channels of trade

3    that your licensees sell into, correct?

4    A.  No, sir, we approve generic distribution channels.  We do

5    not control who they ultimately sell to.

6    Q.  Are the products, once they are sold the first time, are

7    they sometimes resold?

8    A.  Absolutely.

9    Q.  And what channels of resale have you seen licensed Jack

10   Daniel's merchandise sold in?

11   A.  I have seen e-commerce.  I've seen grocery mass.  I have

12   seen boutique shops.

13   Q.  So when you say e-commerce, you mean a site like ebay might

14   have a resold licensed Jack Daniel's product?

15   A.  Yes, sir.  You have eBay.  You can see Etsy.  It's a

16   constant challenge for us to make sure we monitor those because

17   there are times where it is licensed product just being resold.

18   Q.  And some counterfeit being resold, I assume?

19   A.  Yes, sir.

20           MR. HARVEY:  That's all I have, Your Honor.  Thank

21   you.

22           THE COURT:  Thank you.  I don't want you to get off

23   too easy, you know.

24           THE WITNESS:  I appreciate that.

25           THE COURT:  Here is trivia questions.  Everybody is

1    going to get one, just so you all know it.  Couple of things

2    that relate to your prior dealings and prior employment that

3    have somewhat of an Arizona connection.  One deals with horses,

4    and two deals with golf.

5            Do you know who those three incidents would be, or

6    those three individual might be?

7            THE WITNESS:  No, sir.

8            THE COURT:  Anybody else out there?

9            MR. CRUM:  We couldn't hear the question, Your Honor.

10            THE COURT:  In his prior associations with golf and

11    with horse racing, there is three very well known people in

12    Arizona that are affiliated with all three of those.  I just

13    want to know if anybody had a clue.

14            MR. CRUM:  Your Honor, being from Tucson, which is

15    near Nogales, we would venture Bob Baffert.

16            THE COURT:  Perfect.  There you go.  You heard him.

17    Bob Baffert, the horse trainer.  Nogales, Arizona.  Do you know

18    who the other two are?  Since you are from Tucson, you should

19    know these.

20            MR. CRUM:  If Tucson is the hint, I would say Jim

21    Furyk.

22            THE COURT:  Well, now he's on the men's side.  He was

23    with LPGA.

24            MR. CRUM:  Annika Sorenstam.

25            THE COURT:  Annika Sorenstam?  And who else?  You are

1    pretty good.  It is like catching the ball at the Diamondbacks

2    game.  You caught two of them so far.  The other one is Lorena

3    Ochoa.

4              MR. CRUM:  Yes.

5              THE COURT:  But now you were with IMG, too.  Who --

6    one of the principle founders, who is now deceased, his number

7    one first client, which was his biggest client, do you know who

8    that might be?

9              THE WITNESS:  I believe it was Arnold Palmer.

10             THE COURT:  Arnold Palmer was the client and Mark

11   McCormick was the developer.  Now, that we are through with all

12   these trivial questions, has anyone, beside this gentleman

13   probably seen the making of the bats at Louisville Slugger?

14             You have seen it.  Well, if you go to Louisville, you

15   have to see this.  It is unbelievable.  And so it is worth the

16   admission.  It is a lot of fun.  They have great stories about

17   some of their icons who have been there, particularly the best

18   one is about Ted Williams.  But anyway, be that as it may, we

19   will let you off the witness stand.  Thank you very much for

20   your being here.  We will let you go.

21             THE WITNESS:  One last comment.  Sky line is the best.

22   I had it Friday.

23             THE COURT:  It was brought in by a series of Greeks

24   and Hungarians, and it's actually a sweet chile with cinnamon

25   and chocolate in it and you actually -- it can go with either

1    spaghetti or small hot dogs.  And it is a very unique taste.

2    If you grew up with it, it's good.  If you hadn't grown up with

3    it, you may not care for it as much.  Anyway, thank you very

4    much.  We will stand at recess with this witness.  And call

5    your next witness, please.

6              THE COURT:  Is this the one by deposition?

7              MR. HARVEY:  Yes, Your Honor.

8              THE COURT:  And who will be the thespian?

9              MR. HARVEY:  Well, we agreed not to have a thespian,

10   with the Court's permission.  Rather, what we did was mark the

11   deposition of Ms. Phillips and then I have prepared, and we've

12   agreed with the process, a few summary slides that direct the

13   Court's attention to specific pages and lines in that

14   deposition, just to save time, to tell the story.

15             THE COURT:  Is that your agreement, Mr. Bray?

16             MR. BRAY:  My recollection of the agreement, we were

17   just going to put the deposition into evidence and move on to

18   the next witness.

19             THE COURT:  Well, if you can think of anything, just

20   to give it a highlight, that's fine for just a few of them,

21   because we should have it in its entirety, if possible.  But if

22   you are just admitting the deposition, I take it that you have

23   highlighted those portions of the testimony that are relevant

24   and not other things?

25             MR. HARVEY:  Yes, Your Honor.

```
 1            THE COURT:  Mr. Bray, did you?

 2            MR. BRAY:  Yes.

 3            THE COURT:  Are they in different colors or just one

 4   color?

 5            MR. HARVEY:  They are yellow highlighting, Your Honor.

 6            THE COURT:  Okay.

 7            Mr. Bray, do you agree with that?

 8            MR. BRAY:  Sure.

 9            THE COURT:  Okay.  I will give you a little bit of

10   latitude.  Go ahead, since we have some time here.

11            MR. HARVEY:  Thank you, Your Honor.  And if I could

12   hand this to the clerk, the highlighted transcript, and I also

13   have the slides themselves to go with the copy.  Thank you.

14            MR. HARVEY:  So, Your Honor, it's a very quick summary

15   really.  The point being to highlight for the Court how Elle

16   Phillips, who was a long time label design and art design

17   person for Mr. Sacra, how she operated generally, and then how,

18   in the case of the Bad Spaniels product, she operated.

19            So on the slide, the first slide, Your Honor, is the

20   general design process.  And this was something that we will

21   hear from Mr. Sacra when he testifies and Ms. Phillips

22   confirmed in her deposition, in the transcript around page 47.

23            Mr. Sacra would typically call her, and there was a

24   little bit of a cat and mouse game of -- he would say a name,

25   and she would understand from the name, since this was to be in
```

1    all likelihood a spoof product, she would go off and design

2    something and send him a sketch.

3              And so here was the testimony in the general process.

4    Was there a general process, she was asked, whereby the idea

5    for one of those toys is taken by you and worked up?

6              And her answer was:  Usually I get a call from Steve

7    with a name for the next toy.  And he will say, come up with

8    something very brief.  And then I will often sketch.  If I need

9    to come up with a creative idea.  Then I will put it to the

10    computer and come up with one, two, or three or however many

11    mock-ups that need to be done until he approves it.

12              This is just the process that they generally followed.

13    That's at page 47.

14              Now, what happened in the case of Bad Spaniels?  Let's

15    look at that.  Question:  When did the process of designing Bad

16    Spaniels begin, she is asked.  Roughly two years ago.  What

17    happened?  I got a call.  I got a typical phone call from

18    Steve.  He said, 'Bad Spaniels, you figure it out.'  Question:

19    What did you do in response?  I sketched out an idea.  And

20    that's the sketch that appears in Exhibit 9.  Yes.

21              And here is Exhibit 9, which was at the drawing board,

22    the first sketch of the label for the Bad Spaniels product.

23    And you will see some elements there already that look very

24    familiar.

25              We have -- well, it's not yet arched.  It's kind of

1    tented logo of Bad Spaniels.  We have an oval cartouche like

2    oval that has replaced Old No. 7 with Old No. 2.  And then it

3    says beneath there, on your, and Tennessee is in script,

4    carpet.  And then there's some suggestions regarding the

5    percentage of poop and how smelly it is at the bottom.

6             That was the first sketch, and I believe the date on

7    that was June of 2013, if my memory serves, and that's found at

8    pages 49 to 51, and in Exhibit 9.

9             And this is actually one of my favorites because it

10   really does encapsulate exactly what was going on.  Here is a

11   bottle of Jack Daniel's on the left.

12            But here's the question.  Before you began work on the

13   sketches, had you concluded that Bad Spaniels referenced Jack

14   Daniel's?  Answer:  Yes.  Question:  Did you do anything to

15   research what the label for Jack Daniel's whiskey looked like?

16   Answer:  Yes.  What did you do?  Answer:  Pulled it out of my

17   liquor cabinet.

18            That's not the kind of research that I remember doing

19   in college.  Well, I shouldn't say that, I probably did, but

20   anyway, that's at page 52 of the transcript.  So moving on in

21   the summary here of the critical pages of this deposition.

22            Ms. Phillips is asked:  After you retrieve the Jack

23   Daniel's bottle, what did you do next?  Answer:  I looked at

24   it.  Examined it.  Question:  Why did you do that?  Answer:  To

25   get inspiration.

1              Well, I know I can't -- I don't want to argue here

2      other than to say inspiration is the last refuge of the

3      infringer in all of my trademark cases, but never mind.  This

4      is the transcript pages 54 to 55.  And then just a couple of

5      more pages to summarize this.  There were a couple of more

6      sketches that were done refining the original one.

7              Question:  You are the one who decided to do Old No.

8      2.  Answer:  Yes.  What did Old No. 2 refer to there?  Answer:

9      Going poop.  Question:  And why Old No. 2.  Answer:  I thought

10     it was a fun play on Old No. 7 from the Jack Daniel's bottle to

11     change it to Old No. 2, referring to the dog.  Question:  Why

12     did you put -- sorry -- do Old No. 2 in the sketch inside an

13     oval?  Answer:  Because I wanted it to be similar to the Jack

14     Daniel's bottle.

15             There's no doubt what's going on here.  That's at

16     pages 56, 57 and Exhibit 9.  Next one and nearly the last one.

17             Question:  The email on Exhibit 9 from you to

18     Mr. Sacra covered your sketch that's the second page of Exhibit

19     9, correct?  Answer:  Yes.

20             And there is the email up in the upper left corner,

21     Your Honor, of the slide.  Message from Mr. Sacra to

22     Ms. Phillips.  It says, looks good, mock it up.  Looks good.

23             What did you understand the term to mean?  Answer:

24     Put it into an electronic format.

25             And I should point out here for the benefit of the

1    record that Exhibit 9 that is referred to here in the

2    transcript has become trial Exhibit 35.  So just to direct the

3    Court to the correct exhibit.  That's the sketch that we're

4    looking at.

5            Now, moving to the next step in the process.  We have

6    another exhibit, Exhibit 10, which is, I believe, 36.  Trial

7    Exhibit 36, which is referenced in the transcript at pages 56

8    and 57 and 61.

9            What is Exhibit 10?  Answer:  It's an email to me --

10   from me -- sorry -- to Steve with a digital design of the Bad

11   Spaniels label.

12           And if we could enlarge maybe the -- it's hard to see

13   it.  We can't -- difficult for me to read it from here.  Excuse

14   me, Your Honor, I will step away and come back.  There we go.

15   Thank you.

16           Hey, Steve, take a look and let me know what you

17   think.  I did this label about a half inch taller than the

18   others.  We usually do, so let me know if I need to revise it

19   back for any reason.  Thanks, Elle.

20           Well, then looking back at the slide, you can see some

21   refinements here.  The Bad Spaniels label now wraps around.  It

22   doesn't say do Old No. 2 any more, it says the Old No. 2.  And

23   the printing is slightly changed.  But we are getting closer to

24   the final, and that is the next slide, which depicts Exhibit

25   12, which would be Exhibit 37 in the trial exhibit list.

1          And this is very close, as the Court can see by

2     looking at trial Exhibit 1, what we ended up with, or what I

3     should say VIP ended up with.  Notice now Bad Spaniels is in

4     the eyebrow or arched format, the Old No. 2 is inside of a

5     cartouche oval.  Tennessee is in script.  The filigree is

6     there, and it is a white on black image.

7          So there are many elements here that we will be

8     talking about later that the Court will recognize as coming

9     from the Jack Daniel's packaging.

10          And here was the dialogue -- exhibit 12 is -- we are

11     going to say that is Exhibit 37.  Is a second mock-up design of

12     the Bad Spaniels label.

13          Question:  Your email to Mr. Sacra says 'here's one

14     more version, just some different type treatment on Bad

15     Spaniels, maybe a bit closer to the Jack Daniel's label.

16     Question:  Did you go back and look at the bottle you had

17     pulled from your liquor cabinet when you created the second

18     mock up?  Answer:  I believe I referenced it now and then

19     throughout the process.  Question:  Was it important to you to

20     be close to the Jack Daniel's label?  Answer:  Yes.

21          And that really is the summary, the specific design

22     process then, as we can see here.  There's the coded, first

23     call is Mr. Sacra to Elle Phillips.  He simply says, Bad

24     Spaniels.  She goes to the liquor cabinet, draws a sketch,

25     sends it back to Mr. Sacra, and he says, mock it up.  They work

```
 1    through a couple more drafts, and we end up with the final

 2    design seen on the right.

 3              That's the heart of the Elle Phillips testimony, and

 4    it's referenced here in the transcript of her deposition.

 5              Thank you.  That's all I have.

 6              THE COURT:  Mr. Bray, is there any part of the

 7    deposition you would like to read or highlight, at this time?

 8              MR. BRAY:  I don't need to read or highlight any part

 9    of that deposition at this time.

10              THE COURT:  Pardon?

11              MR. BRAY:  Not at this time, Your Honor.

12              THE COURT:  Thank you.  Real quickly, where is

13    Ms. Phillips?  Where is she located?

14              MR. SACRA:  Idaho.

15              THE COURT:  Pardon?

16              MR. SACRA:  She's in Idaho.

17              THE COURT:  Oh, I assumed the parties thought she was

18    what we call "unavailable" within the meaning of the statute,

19    for her to be here in person.  If she was living in Arizona,

20    well then I would want to know why she wasn't here, but since

21    she's in Idaho, she's outside of our ability to get her here.

22              Thank you all very much.  Thank you, Mr. Sacra.  I

23    appreciate that.

24              Okay.  You may call your next witness.

25              MR. HARVEY:  Thank you, Your Honor.  Jack Daniel's
```

UNITED STATES DISTRICT COURT

1    calls Itamar Simonson to the stand.

2              THE COURT:  Dr. Simonson, if you would come forward

3    and be sworn as a witness, we would appreciate it.

4              THE CLERK:  Right here, please.

5         ITAMAR SIMONSON, PH.D. - DEFENDANT'S WITNESS, SWORN

6                        DIRECT EXAMINATION

7    BY MR. HARVEY:

8    Q.  Good afternoon, Dr. Simonson.  Would you state your full

9    name for the record, please, sir?

10   A.  Itamar Simonson.  Good afternoon.

11   Q.  Where do you live?

12   A.  I live in Burlingame in the bay area.  It is very close to

13   San Francisco airport.

14   Q.  And are you currently employed?

15   A.  Yes, I am a professor at Stanford University.  I am a

16   professor of marketing at the graduate school of business at

17   Stanford.

18   Q.  Can you give us -- and how long has that been true that you

19   have been at Stanford?

20   A.  Since 1993.

21   Q.  And can you please give us in headlines, your educational

22   history, please?

23   A.  I did my Ph.D. at Duke University.  That was from 1983

24   until 1987.  I got an MBA at UCLA.  That was 1976 to '78.  And

25   I did my undergraduate degree at The Hebrew University in

1   economics and political science, 1973 to 1976.

2   　　　　THE COURT:  Where is that located?

3   　　　　THE WITNESS:  That's in Jerusalem.

4   　　　　THE COURT:  Thank you.

5   BY MR. HARVEY:

6   Q.  Your current position at Stanford is a titled

7   professorship?

8   A.  I am the Sebastian S. Kresge chaired professor of marketing

9   at Stanford.

10  Q.  Is that Kresge the same Kresge we came to love as a

11  marketing company?

12  A.  You know, that's my understanding, but it was subsequently

13  turned into Kmart, but that was before my time.  I understand

14  that it was originally called Kresge.

15  Q.  The money to fund the professorship came from that family

16  or that foundation?

17  A.  Right.

18  Q.  Great.  What is your field of expertise?

19  A.  My expertise includes consumer decision-making, marketing

20  management, advertising, branding, various influences on the

21  decisions that consumers make, such as branding and adding

22  product features and a variety of other things.  I am also an

23  expert on surveys, and I have done work on trademarks from the

24  customer perspective.

25  Q.  Does buyers' purchasing behavior factor into the kind of

1    work and expertise that you have, is that a field of study?

2    A.   Yes, that's my main area.  If you look at my publications,

3    I would say most of them fall within the domain of consumer

4    decision-making or consumer purchase decisions.

5    Q.   Can you briefly take us through any of the awards that you

6    might have won in your position?

7    A.   Let me just list a few.  I received the award or the

8    scientific achievement award from the Society of Consumer

9    Psychology.  I received the award for the best book in

10   marketing from the American Marketing Association.

11            I received an honorary doctorate from the Sorbonne

12   University, which is also the University of Paris.  I received

13   the award for the best article published in the Journal of

14   Consumer Research.

15            I received twice the award for Most Influential

16   Article in the Field of Marketing that was published in the

17   Journal of marketing Research, and various other awards.

18   Q.   And you teach courses at Stanford?

19   A.   I do.

20   Q.   Give us a list of those, please?

21   A.   I teach at the MBA level and at the doctoral level.  At the

22   MBA level, I have taught for many years the marketing

23   management course.  That's a course that every MBA student has

24   to take that covers all aspects of marketing and consumer

25   behavior.

1          I have taught a course on marketing of high tech

2     products.  I currently teach.  I taught last spring, and will

3     teach again next spring, a course titled Applied Behavior

4     Economics that talks about the manner in which people,

5     consumers included, make decisions.  In other words, the

6     psychology of decisions.

7          And I have taught some other MBA classes.  At the

8     doctorate level, I taught courses about consumer psychology,

9     how to design studies, consumer decision-making in general,

10    decision-making.

11         I have taught executive classes, where I teach

12    executives about consumers and the psychology of consumers.  I

13    have often lectured to managers, but that would be separate

14    from my teaching load at Stanford.

15    Q.  So your lecturing to managers is consulting with businesses

16    and companies?

17    A.  Yes.  I often consult with companies, assisting them to

18    better understand their customers.  I think the advantage is

19    that I study general principles that apply to any product

20    category or service category.

21         So in some cases I teach specific companies.  I went

22    and lectured about consumer decision-making to Amazon, with all

23    the top management, including the founder, Mr. Bezos.  And I

24    lectured in various other companies.

25         I lecture to managers.  I lecture to marketing

1    consultants.  I lecture to advertising managers.  These are

2    people who may have work experience in a particular area, but

3    they do not understand the fundamental principles about the

4    psychology of consumers that are essential to make better

5    decisions.

6              In fact, in this course on applied behavior economics

7    that I am teaching now, I have a whole section, or a whole

8    lecture, I should say, talking about the problem with people

9    who perceive themselves to be experts based on work experience.

10             And the problem there is that, just because you have a

11   work experience in a particular area, doesn't make you an

12   expert on the fundamentals of consumer decision-making.

13             And the problem with people with work experience is

14   that not only are they as susceptible to errors as the rest of

15   us, but they are overconfident.  They think, well, I have work

16   experience, so I know it all, even though they don't.  And we

17   have conducted many studies showing how susceptible to errors

18   experts are.

19   Q.  Have you written any articles, Dr. Simonson?

20   A.  I have published numerous articles.

21   Q.  Can you give us couple of examples of articles that you

22   have written?

23   A.  It is kind of hard to choose.  Let me give you a simple --

24   quick simple examples of a study that I conducted many years

25   ago.  I asked some consumers to choose between $6 and a nice,

1    elegant Cross pen.  Then I took a separate group of consumers

2    and asked them to choose between $6, the same Cross pen, and

3    another pen that didn't look very attractive, like a cheap Bic

4    pen.

5         Well, no one chose the cheap pen, but those who saw

6    the cheap pen were significantly more likely to take the Cross

7    pen over the $6.

8         In other words, by showing them an unattractive pen,

9    which they didn't choose, they were able to make a comparison

10   and to look and say, wow, what a bargain, for $6 I can either

11   get this nice pen or the not so nice pen, I will take the nice

12   pen.

13        And that illustrates one particular principle that

14   consumers do have difficulty assessing products in absolute

15   sense.  It is very hard, if you ask me what's the value of a

16   particular pen or other products to you, it is hard to put an

17   absolute dollar value.  But people are very good at making

18   comparisons, which means that depending on which options you

19   show them, you can influence the decisions they make.  This is

20   just one unrelated example, but obviously I conduct thousands

21   of studies on many different topics.

22   Q.  You told me about one with respect to alcohol that you did

23   year to year in your class?

24   A.  Yes.  In the MBA class, I would ask my MBA students that

25   are over the drinking age, I should say, and say, who are the

1  Vodka experts here?  And I would always get many hands.  I

2  said, okay, I want to you try a port -- they didn't know which

3  is which, but I poured some into paper cups like this, I poured

4  Absolut Vodka, which is a pretty good Vodka, kind of a

5  midrange, I would say.  And I poured in the other cups a very

6  cheap Vodka, called Wolfschmidt.

7         Well, I let them taste from each one, and then I said,

8  tell me which is which and which one do you like more?  Well

9  most of them -- and that happened year after year.  Most of

10  them picked what was really Wolfschmidt, which costs about a

11  third of the Absolut, and thought that was the Absolut.

12  Q.  Does that say something about Vodka, I am not sure of the

13  point of the experiment?

14  A.  I think it tells you something about the importance of the

15  Absolut brand.  Because if you told those people that this is

16  Absolut, that would change completely how they experience the

17  product.  But in a blind taste test, when they didn't know,

18  they didn't know what brand -- they just decided based on the

19  taste.

20         So it just illustrates, and that's how I used it in

21  class, to illustrate the importance of brand name, because in

22  many case, for many companies, brand name is the most important

23  assets, which they must protect.

24  Q.  Just to finish your resumé, if we could, have you published

25  any books, Dr. Simonson?

1    A.   Yes.   I published a book about consumer decision-making in

2    today's age, Internet and so on.   In fact, that's the book that

3    I mentioned earlier, which received the award for the best book

4    in marketing.   And -- so that's the book.   It's called What

5    Really Influences Customers in the Age of Nearly Perfect

6    Information.

7    Q.   Have you been recognized as an expert by courts in other

8    matters than this?

9    A.   I have, many times.

10   Q.   And you have done work, I think you said, with respect to

11   trademark surveys and examined the question of likelihood of

12   confusion?

13   A.   Both likelihood of confusion and likelihood of dilution,

14   and in some cases, genericness or secondary meaning.   Different

15   issues.

16   Q.   And have you conducted research studies with respect to

17   proving likelihood of confusion?

18   A.   I have.

19   Q.   Are you familiar with a term called, the Eveready model or

20   methodology for such studies?

21   A.   Yeah, that's the methodology that I've used most often.

22   It's the, as they say, I believe Professor McCarthy referred to

23   it as the Gold Standard, or maybe it's the courts that used

24   that term.

25   Q.   Yeah, I think both actually.   Okay.   Thank you.   So that's

1  good background.  We may come back to the consumer survey

2  questions later, but I want to focus on your assignment in this

3  case.  What were you asked to do in this case?

4  A.  I was asked to determine whether there's a likelihood that

5  this product (squeezes toy) the Bad Spaniels Old No. 2 product

6  will dilute the Jack Daniel's Old No. 7 and other Jack Daniel's

7  product through tarnishment.

8  Q.  Have you been involved in other dilution matters than this

9  one?

10  A.  I have, a number of times.  I'm happy to give you an

11  example.

12  Q.  You mentioned dilution by tarnishment.  Is there another

13  kind of dilution?

14  A.  Yes, there's also dilution by blurring, which is that --

15  that refers not to, if you will, the reputation of the brand or

16  damaging the reputation of the brand, but instead it's

17  diminishing the distinctiveness of the brand.  I think it was

18  referred to as whittling away, kind of it's a long process that

19  blurs the distinctiveness of the mark.

20  Q.  With respect to dilution by tarnishment, what was the

21  question that you were seeking to answer here, in this case?

22  A.  The question was, or maybe I should say, in dilution

23  matters, there's two questions.  One is, will the allegedly

24  diluting product bring to mind or call to mind the allegedly

25  diluted mark?

1          That question, to my understanding, has been answered.

2     The whole point of this product is to bring Jack Daniel's Old

3     No. 7 to mind.

4     Q.   And then you said there's a second element?

5     A.   Now, the second is -- and that, I should say that part,

6     whether it calls to mind, that is something that you can use a

7     survey for and I have done that.   Because in most other

8     dilution cases, it wasn't so obvious that the allegedly

9     diluting mark calls to mind the allegedly diluted marks, and

10    that's something that I know how to conduct surveys for, and I

11    have.

12         Now, there's a second part which, okay, assuming that

13    it does call to mind, how does it affect the brand equity and

14    brand association of the likely to be diluted or tarnished

15    brand?   Here, you must rely on principles of consumer

16    psychology that have been based on a great deal of prior

17    research.

18         In other words, people have conducted numerous

19    empirical studies which led to certain conclusions that apply

20    to all products and services with respect to the impact of

21    adding a negative association on the association of the

22    existing brand.

23         That requires specific expertise, like what I have and

24    what I have learned and continue to learn and what I teach

25    managers and my MBA students.

1   Q.  Is there a model of how brands and ideas are represented in

2   memory?

3   A.  Yes, there is.  Since the early 70's, researchers, one of

4   them at Stanford, discovered the Associative Network Model.

5   Some people I saw refer to it simply as the Cognitive

6   Association Model, but I prefer the original term, Associative

7   Network Model, which indicates that when we have things in

8   mind, such as brands, it could also be people we know.

9           But in context here, we are talking about brands.

10  What comes to mind and what are the associations.  For example,

11  I think we have an example for McDonald's.

12  Q.  Right.  Why don't we call up as a demonstrative, something

13  that we have labeled McDonald's Associative Network, and ask

14  you to maybe bring the lights slightly down.

15  A.  So this is -- when you hear about McDonald's, it calls

16  certain associations to mind, right?  At first you see the

17  famous golden arches.  You think about hamburgers.  You think

18  about family.  McDonald's always was kid oriented.  There was

19  social involvement with their Ronald McDonald House.  They have

20  been offering Big Mac for a long time.  So in other words, just

21  the mention of McDonald's brings all kinds of associations in

22  mind, in our mind, based on our prior knowledge and experience.

23          That's an example of associative network.  That has

24  been supported by many studies.  In fact, more recently,

25  researchers have used actual, what's called FMMRI studies.

1    These are imaging of the brain that presented evidence that is

2    consistent with the Associative Network Model.

3              THE COURT:  Excuse me, while we have a brief pause,

4    what exhibit number is this, if it's for demonstrative?

5              MR. HARVEY:  I'm sorry, Your Honor.  This is simply a

6    demonstrative.  We have given a copy to counsel.  We would be

7    happy to hand one copy for the Court.

8              THE COURT:  I think we ought to have a number on it,

9    just in case.   It is only demonstrative purposes only, do you

10   want to start at 10,000?  I pulled that number out of thin air.

11   Any demonstrative exhibits that we will give a number to, we

12   will start this one at 10,000 and then they'll go on from

13   there.

14             THE CLERK:  Okay.  Go right ahead, please.  Thank you.

15             MR. HARVEY:  Thank you.

16   BY MR. HARVEY:

17   Q.  So looking at this slide, you are explaining to us how it

18   is that the notion if the word McDonald's is evoked, how the

19   notion of McDonald's is stored in the brain, in the memory?

20   A.  Right.  The term, not to use too much jargon but we are

21   talking about how it is represented in the brain.  What comes

22   to mind, and those circles that you see around McDonald's are

23   referred to as nodes.  So these are the different mental

24   associations.  Of course it may vary from one person to

25   another, but by and large, these are the mental associations of

1    McDonald's.

2    Q.  And where do they come from?

3    A.  Well, based on experience, based on what McDonald's has

4    been doing for many years, based on their advertising, based on

5    what they sell --

6    Q.  And people's experience with the brand themselves,

7    personally?

8    A.  Of course, yes.  And you know, obviously personal

9    experience, what they hear from friends.

10   Q.  And you are saying the Associative Network Model is

11   something that has been around since the 70's?

12   A.  Since the early 70's.  So it's been tested numerous times.

13   It's one of those things that by now are beyond dispute, and if

14   I were to conduct today another research on Associative

15   Network, well we would say, we already know that because that

16   has been established for so long.

17   Q.  How has it been tested?

18   A.  It has been tested in numerous ways very carefully.  For

19   example -- just an example of the top of my mind.  Let's say

20   that you have -- you are a company and you use the celebrity

21   endorser.  Let's say that that celebrity endorser misbehaves in

22   some way.  And as we know, unfortunately, that happens now and

23   then.

24        Now it becomes a problem, because now that negative

25   association is linked, is linked with the brand.  You may

 1    recall, Your Honor, you asked Mr. Roush I think about golf.

 2    And you will remember the great Tiger Woods, and there were

 3    some issues with him.  And I think that most of his sponsors,

 4    actually, I believe dropped him, but Nike decided to keep him,

 5    even during the toughest periods, and they recognized the risk

 6    that they are taking that will contaminate or tarnish the

 7    entire Nike brand, despite the fact that Nike generally is a

 8    very strong brand.

 9    Q.  Has McDonald's had any issues like this?

10    A.  Unfortunately, for them, they have.  Since going back to

11    the 70's, there has been a rumor, you probably can still find

12    it today on the Internet, that their hamburgers are made of

13    worms.

14          Well, initially, they tried to convince people that's

15    not true, until they discovered actually through academic

16    research and research that they did, that saying, no, that's

17    not true, actually causes more harm than good.  It is better to

18    just ignore it.

19          Having said that, it's still going on.  Just a couple

20    of years ago I read, again, there was the rumor spread that

21    McDonald's hamburgers are made of worms.  So, yeah, that's a

22    real problem that affects the entire brand and the

23    associations.  And there is research that -- where we talk

24    about interference.  Because if you add in negative things, it

25    makes it harder for consumers to remember some of the good

1    things.

2    Q.  Chipotle has had a similar issue in the last couple of

3    years, as I understand it.  Same problem, is it?

4    A.  That was, you know, the variety, I think, yeah.

5    Q.  So if something negative like, these hamburgers are made of

6    worms, is introduced, how does that show up in memory?  How is

7    that stored by the consumer?

8    A.  Well, it's another node that's linked in consumers' minds

9    with McDonald.  And it affects -- it diminishes the brand

10   equity, it tarnishes the brand, and I want to emphasize we are

11   talking here about largely an unconscious process.

12           When we think about McDonald's, all of those things

13   come to mind, but we don't make a list of those.  These are

14   things that are largely unconscious and are traumatic.  In

15   other words, we cannot control them, we cannot say, well,

16   actually, it doesn't make sense that McDonald's would use

17   worms.  In fact, it would have cost them more if they were to

18   use worms, but it just doesn't make sense that McDonald's would

19   do that.  And that has a negative affect on the entire brand

20   that you add something that is clearly negative.

21   Q.  So it would be like popping into this slide, this

22   demonstrative 10,000, another node that would say, worms in

23   hamburgers, or something like that?

24   A.  That's correct.

25   Q.  And then would the totality of the picture of the image of

ITAMAR SIMONSON PH.D. - DIRECT EXAMINATION

1   McDonald's in the brain be contaminated -- as your word was,

2   contaminated by that?

3   A.   That's exactly right.   That affects my response to the

4   brand, how I perceive the brand, even though it's largely

5   automatic.

6   Q.   So let's go back then to your assignment in this matter.   I

7   believe you told us that your assignment was to evaluate, based

8   upon principles of consumer psychology and the processing of

9   information in the brain about brands, whether the Bad Spaniels

10  Old No. 2 product had an effect and tarnished the Jack Daniel's

11  brand.   Did you apply this Associative Memory Network Model to

12  that problem, to that question?

13  A.   I did.

14  Q.   So let's take a look at demonstrative 10,001.   Is this the

15  Associative Network Model that you sketched for the Jack

16  Daniel's product before the introduction of the VIP product.

17  A.   It is.   Based on my review of all kinds of Jack Daniel's

18  commercials and advertisements over the years, what I read

19  about Jack Daniel's, that's what I came up with in terms of

20  associations of the Jack Daniel's brand.

21  Q.   So each of these nodes you've got a label on, can you tell

22  us where some of these come from, again, please?

23  A.   Well, I think we heard from Mr. Epps and Mr. Roush about, I

24  think especially Mr. Epps, about the history of the brand and

25  the key messages they were trying to communicate about what the

1    Jack Daniel's brand stands for.  And they are very -- they try

2    to be very consistent.

3          So when they talk about authenticity, integrity,

4    independence, you see that thing, these things, throughout

5    their advertisements and other means of promoting the brand.

6    So you see that these are -- that's exactly textbook example of

7    how you create a consistent brand equity and you communicate to

8    consumer what the brand means.

9    Q.  And so you applied the Associate Network Model to this

10   situation, this was the model that you came up with

11   pre-introduction of the VIP toy.  Did you have a model or a

12   schematic showing what it looked like after the introduction of

13   the dog toy?

14   A.  Yes.

15   Q.  Let's take a look at 10,002.  Is this your sketch and your

16   scheme of what it looks like?

17   A.  It is.  And this product has some specific characteristics.

18   I notice that someone referred to it as parody or spoof, which

19   I guess to some degree are legal issue, defecation, feces,

20   poop, these are terms that we are all familiar with.  These are

21   very -- I hate to say it.  We are all normal people.  But it is

22   not something that you would like to associate any -- anything

23   you eat or drink with.

24          In fact, there has been a great deal of research

25   specifically on that issue.  The disgust generated by this

1    combination of whether they say here, poo by weight, Old No. 2,

2    and things of that nature, or defecation more generally, and

3    food and beverages.

4         And this is the most extreme example of disgust being

5    created, and I should know, Judge, that this feeling of disgust

6    has a long history, turns out but none other than Charles

7    Darwin was the first one to recognize disgust as one of the

8    most fundamental emotions that people feel and it starts at a

9    relatively young age.

10        It is not clear yet if babies can experience disgust,

11   but it evokes fairly quickly.  And so this is very specific,

12   and I think that it's self exploratory.  Here we take something

13   individuals drink that has well-established associations, and

14   we add to that, Old No. 2, defecation, poo by weight.  That is

15   an extreme example of likelihood of tarnishment.  In other

16   words, consumers who are exposed to this product (squeezes

17   toy).

18        And I assume that it is specifically targeted to

19   people who are familiar with Jack Daniel's, because if you are

20   not familiar with Jack Daniel's, what's the point of this

21   product?  The whole product is designed for people who

22   recognize the resemblance.

23   Q.  So you are saying the association of a consumable, in this

24   case, the Jack Daniel's whiskey, with Old No. 2, or poo or

25   defecation, would generate in most consumers a notion of

1    disgust.

2    A.   It will generate the disgust.  And obviously, people are

3    not stupid.  Consumers are not stupid.  No one would think that

4    there's poo in the Jack Daniel's product, but you created a

5    mental association between Jack Daniels and poo, or Old No. 2,

6    and therefore, for those people exposed to this product, you

7    diluted or more specifically, tarnished the Jack Daniel's

8    whiskey.

9    Q.   What affect does that have on brand value, in this case

10   Jack Daniel's brand value?

11   A.   Well, it lowers the value.  I think Mr. Epps also

12   discussed, brand is, for many companies, especially where you

13   are dealing with products that it's hard to taste the precise

14   taste.  So brand name, so what you are drinking is really

15   important, and your mental associations are extremely

16   important.  That means if you have a strong brand, that you

17   have established over a century, that's your main asset, it

18   means -- it has implications with respect to whether consumers

19   will pay attention to your advisements.

20          How will they respond if you raise the price?  All

21   kind of things.  In other words, a strong brand that's not

22   tarnished allows you to do many things, and it's a strong

23   determinant of your performance in the market place.

24   Q.   Would you characterize McDonald's -- I'm sorry -- Jack

25   Daniel's as a strong brand?

1    A.   Without a doubt.

2    Q.   What are the factors that go into your assessment in that

3    regard?

4    A.   There have been different definition of -- people have used

5    different definitions of brand, brand equity.  I like one that

6    describes brand equity in terms of four key components.

7    Awareness, and we know in this case that there's extremely high

8    awareness of the Jack Daniel's product.

9            Second, is brand associations.  We have talked about

10   that.  The third one is customer loyalty, and my understanding,

11   Jack Daniel's has many loyal customers.  And the fourth

12   component is specifically the perception of product quality.

13   That's where all this heritage, history, authenticity and the

14   fact that the water are from Lynchburg, Tennessee, and so that

15   goes into perceptions of quality.  And that together,

16   determines the brand equity of Jack Daniel's, which is clearly

17   very strong.

18   Q.   If it's such a strong brand, Dr. Simonson, what does it

19   have to fear from this little dog toy product?

20   A.   I think it would be a very big mistake for Jack Daniel's or

21   any strong mark for that matter, to say, oh, that's not a big

22   deal, we can ignore it.  I think there is this term, death by a

23   thousand cuts.  I think that's an example.  If you allowed that

24   to be sold, sooner than later there will be other products that

25   may try to associate Jack Daniel's with defecation and

1    similarly, disgusting things.  And then the brand, as strong as

2    it is today, will become much weaker.  It is not going to

3    happen over night, but gradually, that's what will happen.

4         MR. HARVEY:  Your Honor, I am at a break point in the

5    examination.  It is about ten after -- a little after 10 after

6    3:00.  Is this a good point to take our afternoon break?

7         THE COURT:  Sure.  It will be a good point to take our

8    afternoon recess.  It is about 3:15.  We will come right back

9    at 3:30 and get started there.  We will go through the end of

10   the day, which 7:00, 8:00 o'clock tonight, if that's okay with

11   you.

12        We usually recess about 4:30 so people can clear out

13   of the downtown area a little bit before the traffic picks up,

14   particularly those people in north Scottsdale and other places

15   then.

16        MR. SACRA:  We don't live in north Scottsdale.

17        THE COURT:  Then you can skip that then.  Thank you

18   very much.

19       (Recess taken at 3:11 p.m. until 3:27 p.m.)

20        MR. BRAY:  Your Honor, I just wanted to talk about

21   scheduling.  I think we are going to attempt to get done with

22   Mr. Simonson so he does not have to return tomorrow.

23        THE COURT:  I always try to do that at the end of the

24   day, especially with out-of-town witnesses, because sometimes

25   we go faster, slower, and I know that's a problem.  So we will

1   make adjustments and I appreciate that.  Thank you for the

2   heads-up.

3   BY MR. HARVEY:

4   Q.  Dr. Simonson, you understand you are still under oath?

5   A.  Yes.

6   Q.  Good.  So just a couple of areas to cover with you.  We

7   were talking earlier about your experience doing research in

8   other dilution matters, and I believe you worked on a case

9   involving Starbucks; is that correct?

10  A.  That's correct.

11  Q.  Did you do -- what kind of research did you do there and

12  what was your conclusions?

13  A.  As I said earlier, there are two stages in determining

14  whether there's likelihood of dilution.  The first phase, which

15  often does involve a survey, is the phase in which you are

16  trying to determine whether the allegedly diluting mark calls

17  to mind the allegedly diluted mark.

18         Now, the second phase, as I explained, requires

19  specific expertise in consumer psychology, as I discussed

20  before the break.  So in the Starbucks matter, there was a

21  coffee shop in Oregon, I believe, that was called Sambucks?

22  Q.  Sambucks?

23  A.  Sambucks.  And Starbucks was concerned about it, so I

24  conducted a survey in which I showed the store front of this

25  coffee shop to consumers, and I asked them, what comes to mind?

1    Most of them said Starbucks.  Now, that was not enough.  You

2    also -- and I needed -- or I needed to include a control,

3    because it is possible that regardless of what's the specific

4    name of the coffee house, just seeing coffee house will lead

5    some people to name Starbucks because they're such a large and

6    famous chain of coffee houses.

7            Therefore, I had a control group, which was -- looked

8    the same, but it was called Sammy's Coffee House, so I could

9    compare what we call the test group with the control group, to

10   see to what extent Sambucks Coffee House is more likely to call

11   to mind Starbucks than the control, which was Sammy's Coffee

12   House.

13           In addition, I asked respondents, what makes you say

14   that?  Why do you say Starbucks?  And I found that most of

15   those naming Starbucks said, well, the name was very similar.

16   So that was the survey I used to establish that indeed Sambucks

17   Coffee House calls to mind Starbucks.

18           Now, there was a second phase.  And the Court in that

19   case relied on my opinion in determining that there was a

20   likelihood of dilution.  For the second phase, as I said, it is

21   not amenable to conducting a survey because dilution, the

22   process of dilution is a slow process.  It doesn't happen

23   overnight.  There is no survey that can establish the process

24   of confusion.  That's exactly why you need specific expertise

25   that I believe I have.

1    Q.  You said confusion just a moment ago.  I think you meant --

2    A.  I said confusion and I meant dilution.  I am talking here

3    about dilution.  So for the second phase, once I established in

4    that case that Sambucks Coffee House calls to mind Starbucks

5    Coffee House, I then relied on my expertise and my

6    understanding of brands, as I discussed here, to reach the

7    conclusion that Sambucks Coffee House was likely to dilute the

8    Starbucks brand.

9    Q.  Okay.  So now I understand, and you are contrasting the

10   work you did in the Starbucks case with what you did here.  You

11   didn't do a survey here, because I think you told us, it

12   already was established that the calls to mind element was

13   established -- in your view?

14   A.  Exactly.  As I said earlier, I understand -- there's no

15   dispute in this case that this product was designed to call to

16   mind this product.  That's the whole point of this product.

17   Why else would you design it in a manner that is so reminiscent

18   or so similar to Jack Daniel's?

19           So there's no dispute about the fact that it calls to

20   mind, and I just listened and I read previously the deposition

21   of Ms. Phillips and how she came up with the design and she

22   looked at the bottle and so on.  I don't think there's any

23   dispute that it calls to mind, so there was really no need for

24   survey, because this phase one that is suitable for survey, has

25   already been determined and is not in dispute.

1    Q.  And the dilution question, the second half, that was where

2    you brought your expertise?

3    A.  Exactly.

4    Q.  Just as you did here.  A quick note on the control stimulus

5    that you used in Starbucks.  Why does one use a control and

6    what is it supposed to do?  In the case of Starbucks and

7    Sambucks and Sammy's, why did you pick Sammy's, and what was

8    that --

9    A.  As I said, there is some danger that if you do not use a

10   control, some of what you measure, like mentions of Starbucks,

11   is due to irrelevant factors.  We can use an example from a

12   very different domain.

13            I am not sure how close the Arizona Cardinals stadium

14   is, to say, I-10.  Is it -- anyone local here would know if

15   it's close, or whether it's close to some other highway?  And

16   the question is, how does the fact that Arizona Cardinals are

17   playing affect the number of cars traveling on the 10, let's

18   call it, Highway 10?

19            Now, we can go before a game, like yesterday at around

20   noon and count the number of cars traveling on I-10.  Then you

21   can say, okay, that's because the Cardinals are playing.  But

22   that would be wrong, because even when the Cardinals are not

23   playing, there are many cars traveling on I-10.

24            Therefore, we need to go on another Sunday at the same

25   time when the Cardinals are playing out of town and count the

1    number of cars, and that will allow us to subtract the number

2    of cars when the Cardinals are not playing, from the number of

3    cars when they are playing.  That's called essentially the

4    point of a control, you have to subtract what you call the

5    noise.  The thing that are not attributed to what is at issue.

6    Q.  Sorry, you used a word I didn't hear you.  Nodes?

7    A.  Noise.  That's the term that people refer to -- in other

8    words, there's some degree -- for example, as I said, any

9    coffee house, you show someone a picture of coffee house, some

10   people will say, Starbucks.  But that doesn't mean that no one

11   can use the word "coffee house," which is presumably generic.

12   So you want to subtract that portion of mentions of Starbucks

13   that is not related to what is really being at issue.

14   Q.  You were saying some people would --

15            THE COURT:  Wait, wait.

16            MR. BRAY:  Can I interrupt interject an objection

17   here?  Mr. Simonson was not designated as an expert regarding

18   any survey.  He didn't perform a survey.  Counsel has already

19   used him to ask about the Eveready test.  That's not what

20   Mr. Simonson has provided an expert opinion on.  Dr. Ford is

21   their expert regarding confusion and trademark surveys that's

22   not the area of Mr. Simonson's opinion.

23            MR. HARVEY:  Fair enough, Your Honor.  We will move on

24   and talk further now about the criticisms of Dr. Simonson's

25   report and give him an opportunity to respond to those, and

1    then we will be done.

2    BY MR. HARVEY:

3    Q.  So let me ask you, have you read the report filed by

4    Mr. Silverman in this case?

5    A.  I did.

6    Q.  And he has a number of criticisms of your survey -- sorry,

7    of your study that was done and your report, are you aware of

8    that?

9    A.  My analysis, correct.

10    Q.  Yes.  And I want to ask you specifically about some of the

11    criticisms of your analysis and give you an opportunity to

12    respond to those.  You testified that you thought most people

13    would agree with your view that the Old No. 2 toy would evoke

14    feelings of disgust.  But as Mr. Silverman says, you never

15    tested that, did you?  Why not?  You didn't conduct a survey

16    about it, why not?

17    A.  As I indicated, it so happened there's been a great deal of

18    research, which indicates that if you associate any food or

19    beverage with defecation, you are creating disgust with respect

20    to that food or beverage that is being now associated with

21    defecation.

22         There's a great deal of research.  Many articles have

23    been written about this particular point.  There's really no

24    need to conduct another study.  And it really doesn't matter

25    whether it's on this thing that looks very much like a Jack

1    Daniel's bottle, or any other product that creates an

2    association between Jack Daniel's and defecation.

3    Q.  Mr. Silverman says, well, you didn't test it, but I did,

4    and I talked to 19 people, and all of them did not feel it was

5    disgusting, rather, they just thought it was funny.

6          Do you disagree with his methodology in testing that

7    question?  And how do you reconcile what he is saying with your

8    conclusion?

9    A.  I think that what he did -- I am trying to look for a nicer

10   word than referring to it as a joke, but it was incredibly

11   unreliable and I am surprised that Mr. Silverman, in the

12   context of litigation, was trying to use that as evidence.

13         And I think in general, I am not aware, and apparently

14   he is not either, in any -- not aware of any situation, any

15   other court case where someone conducted a focus group for the

16   purpose of the litigation.  And there is a good reason for

17   that.

18         Focus groups have their limitations.  They can also

19   sometimes give you ideas that you can pursue in more

20   quantitative studies.  However, in the context of litigation,

21   litigation, needless to say, is an adversarial process.

22         And if he is conducting the focus group, let's say he

23   has five people sitting around a table, the problem is that the

24   way this free-flying discussion is going can be biased in such

25   a way that it produces predetermined results.

1          And the focus groups, in this particular case,

2    represent, and I find astonishing example of bias where the

3    moderator of those focus groups, a gentleman by the name of

4    Mr., I think, Hirsch.  So he has five people around the table,

5    and he starts to focus the group and says, today, we are going

6    to talk about spoof products.  So he told them right away, this

7    is about spoof products.

8          MR. BRAY:  Again, Your Honor, this is outside of the

9    scope of anything that Mr. Simonson has been designated as an

10   expert on.  He has not been designated on an expert to rebut

11   our rebuttal expert.  There's no report on this.  This is all

12   new information.

13         MR. HARVEY:  These are comments that have been made

14   about this man's report by the rebuttal expert, Mr. Silverman.

15   And I think that he should have an opportunity to respond to

16   them.

17         THE COURT:  Well, it's not a truly rebuttal report,

18   but isn't it sort of under the rule of making a rebuttal -- it

19   is not a rebuttal report, it's rebuttal comments as to what he

20   was doing.

21         MR. HARVEY:  The alternative would be that we have him

22   wait and come back when Mr. Silverman testifies and then get up

23   on the stand in rebuttal of what he said, and I feel like this

24   is just more efficient.

25         THE COURT:  Mr. Bray?  I mean, in reality, it will

1    be -- he can't come back and rebut what -- comments made by

2    Mr. Silverman.

3            MR. BRAY:  If it is coming in anyway, we can get it

4    done.

5            THE COURT:  I mean, if it's going to come in anyway,

6    it's a nonjury trial.

7            MR. BRAY:  I understand.

8            THE COURT:  I think I can sift it out.  At least I

9    hope I can, between his and Mr. Silverman's.

10            Go right ahead.

11   BY MR. HARVEY:

12   Q.  So you were commenting on the methodology that Mr. Hirsch

13   asked a, I think you called it, leading question, it's a spoof

14   product?  What's wrong with that methodology?

15   A.  He started -- I mean, the question is whether this is seen

16   by consumers as just a spoof product, nothing -- okay, they

17   mention poo, they mention Old No. 2, not a big deal, it's just

18   a spoof product.

19            Well, by beginning this focus group with telling them,

20   this is a study about -- I want to talk to you about spoof

21   products, that by itself made this focus group meaningless,

22   because you told them what you want them to say.

23            It went on and this -- the moderator, who I understand

24   from Mr. Silverman's deposition, they talked about how to

25   conduct it, he said he would show the product or show the ad

1    for the product and say something like, that's funny, right?

2    Isn't that funny?

3          Again, this is an extreme example of a super leading

4    and uninformative focus group.  That is the reason why, to my

5    knowledge, no one tried to conduct a focus group specifically

6    for the purpose of litigation.  And I think what happened here

7    is an illustration of why not using it, not running focus group

8    for litigation is indeed a good idea.

9    Q.  He says that you offer no reason why you believe that the

10   Bad Spaniels toy would elicit disgust that would somehow carry

11   over to Jack Daniel's.  He says it is strictly your opinion.

12   A.  I think that he may misunderstand how knowledge is

13   acquired.  It's based -- as I said earlier, it's based on

14   dozens and dozens of studies that prove beyond a doubt, the

15   tarnishment or the negative association created by taking a

16   food product or a beverage and associating it with defecation.

17   There have been many studies on that.  It is beyond dispute.

18         Now, he may say, well, maybe that's true, but you

19   didn't show it specifically here that it tarnishes.  As I said,

20   the process of tarnishment is a long process.  There is no

21   study, nor did he propose any study, in fact I believe he said

22   he was never involved in any dilution matter before this one,

23   nor did he ever design or conduct the focus group before this

24   case.

25         But I am relying on general principles that apply to

1    any product or service or beverage or food, based on a great

2    deal of research that is not in dispute.  That's generally

3    recognized.  That's exactly why managers from a wide range of

4    companies come to me and want me to teach them how does general

5    principles apply to them.

6            They may have expertise in the specific product that

7    they are selling, but I can bring the general principles and

8    explain how that applies to them, which is why they hired my

9    services or invite me to lecture.

10           Same as here.  The combination of defecation with a

11   beverage or a drink leads to tarnishment.  That's based on a

12   great deal of research.  There's no need to conduct one more

13   study.

14           THE COURT:  Well, my question is, did you, in your

15   report list those, as you say, undisputed authorities in

16   support of your opinion?

17           THE WITNESS:  I did.

18           THE COURT:  Okay.  I'm just curious.  Go ahead.

19           MR. HARVEY:  Fair enough.  Thank you, Your Honor.

20   BY MR. HARVEY:

21   Q.  So finally, among his other collection of criticisms

22   Mr. Silverman says you didn't have any basis for your opinion.

23   You don't have the requisite expertise, he says, in

24   understanding consumers who own dogs and/or who own dogs and

25   who drink whiskey.

1          He says you don't own a dog yourself, so therefore,

2     you can't possibly understand it, and that you can't make any

3     judgments.  How do you respond to this?

4     A.  I think it, again, demonstrates his misunderstanding of

5     what it takes to be able to know or to understand what creates

6     consumer -- mental processes in consumers.  That's what I

7     teach.  That's what I have done research on, and that's why I

8     am reviewing the literature to see what other people have

9     studies.

10          Whether I have a dog or not, whether I drink this or

11     that, it makes no difference.  And work experience, let's say

12     if I worked on another case that relates to dog food, it has

13     nothing to do with it.  Here, we are dealing with general

14     principles of the association between defecation and a drink.

15     That's a general principle.  That's -- we know that.  Whether I

16     have a dog or not, or whether I worked on an advertising

17     campaign for dogs or for liquor, has nothing to do with it.

18          I was just recently involved in another matter

19     pertaining to bourbon and wine.  And in that case, I came to

20     the conclusion that there was no confusion between, in that

21     case, it was called Buffalo Trace bourbon and 1000 Stories,

22     which is some kind of zinfindel wine.  And I conducted a

23     survey, evaluated a survey and reached a conclusion, based on

24     my experience.  There was no confusion, and I was glad to see

25     that the Court accepted my opinion and relied on my opinion.

1    But, again, I had no experience.  In fact, I don't think I ever

2    tried bourbon.  I have tried zinfandel wine, not my favorite,

3    but putting that aside, I often opine on many different things.

4    The key is that I apply general principles, and I don't need to

5    own every product that I opine about, as long as I know that --

6    the general principles that have been supported in many

7    studies.

8    Q.  And that's the case here, is it not?

9    A.  Absolutely.

10   Q.  Great.

11           MR. HARVEY:  No further questions, at this time, Your

12   Honor.  Thank you.

13           THE COURT:  Thank you.  Mr. Bray, you may

14   cross-examine.

15           MR. BRAY:  Thank you, Your Honor.  Is the ELMO on?

16           Conversation between witness and Mr. Bray off the

17   record.

18                      CROSS-EXAMINATION

19   BY MR. BRAY:

20   Q.  Good afternoon, Dr. Simonson.

21   A.  Good afternoon.

22   Q.  We have actually never met before today?

23   A.  I think that's true.

24   Q.  I think my partner took your deposition in the bay area, so

25   it's nice to meet you in person.  If it's okay with you, I

1  would like to start with the last portion of Mr. Harvey's

2  examination.  And this was going towards the discussion of

3  Bruce Silverman, our expert.

4          You recall your counsel asked you this question, or in

5  a question he referred to Mr. Silverman's criticisms of the

6  study that you have done in this case.  And you answered your

7  counsel's question:  My analysis, correct.

8          Do you recall that testimony?

9  A.  Yes.

10  Q.  And there's a reason you use the word "analysis" and not

11  "study," isn't there?

12  A.  Now you are asking me about my mental processes.  I don't

13  remember why I chose each word but, as you know, I did not --

14  as I said a number of times, I did not conduct a survey in this

15  case, I conducted analysis.

16  Q.  You conducted analysis and not any sort of scientific

17  study, correct?

18  A.  No, that is absolutely not true.  I conducted a scientific

19  study based on scientific principles, but I did not conduct a

20  new survey.

21  Q.  You didn't conduct any research, correct?

22  A.  Of course I did.

23  Q.  All right.  Let's go back then.  You have published

24  research on consumer behavior, correct?

25  A.  Much of my research has to do with consumer behavior,

ITAMAR SIMONSON, PH.D. – CROSS–EXAMINATION    189

1    right.

2    Q.  And this research includes empirical research, correct?

3    A.  Correct.

4    Q.  And your research consists of experiments, correct?

5    A.  In many cases I conduct experiments.

6    Q.  Using experimental methodology, correct?

7    A.  Yes.

8    Q.  And almost all of your research is quantitative in nature,

9    correct?

10   A.  What do you mean by that?

11   Q.  Well, I will ask you.  There's a distinction between a

12   quantitative study and a qualitative study, correct?

13   A.  There is.

14   Q.  And do you have an understanding as to what a quantitative

15   study is?

16   A.  I think I understand what you are referring to now, yes.

17   Q.  Okay.  So, again, for the assistance of the Court, almost

18   all of your research that you do in your academic setting is

19   quantitative in nature, correct?

20   A.  I would say in quite a few cases I conducted analysis, as I

21   did here, but I would say in most cases, I conduct quantitative

22   research, that's correct.

23        THE COURT:  Could we stop there for just a minute.

24   Would you describe the difference for someone who is out of the

25   academic area?  What's the difference between quantitative and

1    qualitative, so I know?

2           THE WITNESS:  So qualitative includes, for example,

3    focus groups.  Focus groups are, let's say, 10 people sitting

4    around a table and having a discussion.  That will be an

5    example of a qualitative study.  So it's well recognized that

6    those discussions are not projectable.  You cannot reach any

7    general conclusion from such qualitative studies, which in some

8    cases are not focus groups, but they are just personal and

9    structured interviews.

10          So that will be qualitative research, and it's not

11   projectable, but it could, in some cases, give you ideas that

12   you may pursue later.

13          Quantitative research refers to the type of surveys

14   you often see, for example, in litigation.  Let's say when you

15   conduct the likelihood of confusion survey, that's typically a

16   quantitative study.

17          The survey that I described with respect to whether

18   Sambucks Coffee House calls to mind Starbucks, that was a

19   quantitative study where it's a large number of respondents.

20   The questions are fixed, so it's not something that discussion

21   moderator can change or improvise.  It's fixed.  There's a

22   fixed questionnaire in quantitative studies.

23          To the extent that you are testing so-called causal

24   relationships, that is whether A causes B, then you need to

25   also include a control group.  Whereas in qualitative studies,

1    there's no control group.  So that's why qualitative studies

2    have obvious limitations, but they could give you some ideas

3    that you can pursue further?

4            THE COURT:  Thank you.  Go ahead, Mr. Bray.  I'm

5    sorry.

6            MR. BRAY:  Thank you, Your Honor.

7    BY MR. BRAY:

8    Q.  Almost all of your research is quantitative in nature,

9    correct?

10   A.  Yes.

11   Q.  And as you explained to the court qualitative research is

12   associated with smaller samples?

13   A.  Yes.

14   Q.  And qualitative research, I think you will agree, can be

15   useful to companies like Jack Daniel's for making some

16   important decisions related to advertising and promotion or

17   development of their brands?

18   A.  They could provide them some ideas to pursue, assuming

19   those focus groups are properly conducted without bias, just in

20   in the course of making business decisions to learn about

21   consumers.

22   Q.  Okay.  And qualitative study using a focus group can be

23   useful to understand how consumers feel about a product in a

24   layman's term, their emotional reactions to a product, right?

25   A.  No.  I mean, you can get -- I mean, you have five people in

1   the room.  And you can find that a particular person feels --

2   says that he or she feels this way or that way, so in that

3   regard, you can get some tiny pieces of emotions or anything

4   else so it could happen, but, it doesn't allow you to reach any

5   general conclusions about the emotions triggered by say,

6   advertising.

7   Q.  So if Mr. Epps or another brand manager at Jack Daniel's

8   would testify that, or did testify that it is useful to Jack

9   Daniel's to gauge emotional reactions to the products, you

10  would say that they are just not -- they don't have the

11  scientific understanding that you have, right?

12  A.  No, I wouldn't say that.  As I said just now, focus groups

13  can give you ideas, especially if properly conducted in the

14  course of making business decisions, not for litigation.  And I

15  believe they conducted over 50 focus groups.

16  Q.  And in fact, they provided exemplars of focus group that

17  they had done, to you, correct?

18  A.  They did.

19  Q.  You didn't think Jack Daniel's was wasting its time doing

20  these focus groups, did you?

21  A.  As I said, my impression is they conducted proper focus

22  group, many of them, which is no comparison to what was done by

23  Mr. Silverman.

24  Q.  Your opinion in this case is not based on any quantitative

25  study that you have done, correct?

1   A.   There was no need -- well, I wouldn't say that.  I'd say

2   the Associative Network Model and the association between

3   defecation and food or beverage item, that's been supported by

4   any quantitative studies.

5   Q.   We'll get back to that, Dr. Simonson.  And believe me, your

6   counsel will have an opportunity to redirect after I am done

7   with my cross, so if you could do me the courtesy when you can

8   answer one of my yes-or-no questions or correct-or-incorrect

9   questions, yes or no or correct or incorrect without the

10  commentary, and allow your counsel to get that out on redirect,

11  I would appreciate it, could you do that?

12  A.   Depends.  There's some questions that I -- cannot be

13  answered with yes or no.

14  Q.   Okay.  Understood.  But if you can answer a yes or no

15  question, will you do that?

16  A.   Sure.

17  Q.   And again, only because we had the long soliloquy there, to

18  confirm, you didn't -- you personally did not perform any

19  quantitative study to reach your opinion offered as an expert

20  in this case, correct?

21  A.   That's correct.

22  Q.   And you personally have not performed any qualitative study

23  to reach your opinion that is being offered as an expert in

24  this case, correct?

25  A.   No.  As I said, there was no need to conduct any kind of

1    survey.

2    Q.  I think that is a question that you could have answered yes

3    or no, or correct or incorrect and allow your counsel to guide

4    you on redirect.  So again, we will get out of here quicker if

5    you can answer my questions yes or no, when you can, okay?

6    A.  Sure.

7    Q.  Fair?  With regard to your opinion in this case, you did

8    not perform any experimental methodology, correct?  You

9    personally?

10    A.  Of course not, for the reasons that I explained.

11    Q.  And with regard to -- if you look at the deposition

12    exhibits, Exhibit 3 is your report.  You have referenced

13    several times that there have been numerous studies that show

14    that where excrement is mentioned, then there must be

15    tarnishment if you are talking about a food or beverage

16    product; do you recall that testimony?

17    A.  I am confused now.  Did you say Exhibit 3 to my deposition?

18    Q.  I believe.  Is that not your report?

19    A.  Okay.  You are talking about the report itself.  Could you

20    repeat the question, please?

21    Q.  I was referencing your earlier testimony where you

22    indicated there are numerous studies, to the effect that if

23    excrement is involved, then there is tarnishment, negative

24    feelings, when it's associated with a food or beverage product;

25    Do you recall that testimony?

1    A.   I do.

2    Q.   None of those studies are quoted in this report, are they?

3    A.   You know, I didn't memorize the report, but let me check.

4    Q.   While you are looking through the report, would you agree

5    with me, Dr. Simonson, that referring to the No. 2, or a No. 2

6    is about the gentlest way, the gentlest euphemism you can refer

7    to, that bodily function?  It is what you use with small

8    children?

9    A.   I have no particular expertise in ranking the most gentle

10   ways.

11   Q.   Would you agree that there would be much harsher ways to

12   express the same concept?

13   A.   Well, I think defecation sounds -- feces sounds maybe

14   overly academic, but, you know, poo, I think appears here.

15   That's not particularly gentle.

16   Q.   No, no, I wasn't asking about that, sir.  I was asking

17   about the No. 2.

18   A.   But do you want me to look for --

19   Q.   Yes, please.

20   A.   -- this or answer the answer, or do you want me to answer

21   your fallout question.

22   Q.   My question is with regard to your report, that's been

23   marked as Exhibit 3, can you point out where you have quoted

24   any study for the proposition that you explained to the Court

25   that any reference to defecation leads to tarnishment in the

1  food and beverage area?

2  A.  As I said, I didn't memorize the report.  I sat here--

3          THE COURT:  Which page is that, if you could help us

4  out?

5          THE WITNESS:  Which page?

6          THE COURT:  Of your report, yes, sir.

7          THE WITNESS:  Based on page 12, paragraph 31.

8  Consumers who are exposed to VIP's product had another mental

9  association to the Jack Daniel's flagship brands and other

10  brands.  The new brand association, the dog's No. 2, is

11  negative, for many it is likely to be even disgusting.  Prior

12  research has shown that a feeling of disgust leads consumers to

13  avoid things which are associated in any way with that feeling.

14  And I cite here some articles.

15  Q.  I can stop you there, Dr. Simonson.

16  A.  In the present case, this prior research supports the

17  common sense conclusion that famous whiskey brand and dog's

18  number two, is likely, consciously or unconsciously, to

19  diminish consumers attraction to and interest in purchasing

20  Jack Daniel's brands.

21  Q.  I want to drill down on that a little more, because I asked

22  you if there's any study quoted that said, any reference, no

23  matter how gentle to excrement leads to tarnishment or negative

24  feelings regarding a brand in the food or beverage category.

25  Would you agree with me there's no quote from a study for that

1    proposition?  Yes or no?

2    A.   There's no quote to a study, but if you go to the sources

3    that I did cite, they do include studies.

4    Q.   Okay.  And in terms of what you stated there, and I saw

5    that in your report, I highlighted it.  That feelings of

6    disgust lead to consumers to avoid things that are associated

7    in any way with that feeling.  That's a much broader

8    proposition than what you articulated to Mr. Harvey, that,

9    again, any reference to excrement, no matter how gentle, leads

10   to tarnishment of a food or beverage brand?  You would agree

11   with me there, right?

12   A.   I am not sure I followed your question.

13   Q.   That was a very long question.  That sentence, the feeling

14   of disgust leads to consumers to avoid things.  Nothing in that

15   sentence refers to excrement or a euphemism, a gentle euphemism

16   for excrement, correct?

17   A.   In my sentence, maybe not.

18   Q.   And you referred to many, many, many, many studies where

19   any reference, no matter how gentle to excrement, leads to

20   tarnishment in the food or beverage category.  You would agree

21   with me that footnote 12 references two studies, right?

22   A.   Well, they reference various other studies.  So if you go

23   to those cited articles, they cite many studies and prior

24   articles that talked about the disgust creating when you

25   associate defecation with whiskey, as I said here.

ITAMAR SIMONSON, PH.D. - CROSS-EXAMINATION    198

1   Q.  They may or may not, but you didn't quote any of them or

2   bring any of them to the Court's attention, correct?

3   A.  You mean other than quoting them here as a footnote?

4   Q.  You didn't quote anything in the footnote.  You provided a

5   footnote for an unquoted statement.  In terms of whatever

6   studies are being referred to in the two reports in footnote

7   12, you don't quote those studies anywhere, do you?

8   A.  I didn't quote those studies.  I quoted articles that talk

9   about those studies.

10  Q.  Okay.  And you didn't perform any of those studies, right,

11  that you are quoting, or that you are referring to?

12  A.  Of course not, because there was no need to prove that it

13  calls to mind Jack Daniel's.

14          MR. BRAY:  Can I get Exhibit 234?

15  BY MR. BRAY:

16  Q.  Dr. Simonson, I put up demonstrative exhibit 10,000, I

17  believe, the McDonald's Associative Network.  Is this something

18  that you created for this litigation?

19  A.  No, actually it was adopted from a book by David Aaker, who

20  is a well-known branding expert, and that was based on a study,

21  I believe.

22  Q.  I would like to have you look at exhibit -- well, again,

23  with regard to your opinion in this case, you didn't perform

24  any quantitative study, correct?

25  A.  You talking about this case?

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION      199

1    Q.  On this case.

2    A.  As I said, there was no need, so I didn't.

3    Q.  And you didn't perform any qualitative study, correct?

4    A.  That's correct.

5    Q.  You didn't provide any experimental methodology, correct?

6    A.  As I said, yes, of course.

7    Q.  I think you looked at the products, some of the pleadings

8    in this case, and then based on your expertise, you said, I

9    think this Bad Spaniels product is tarnishing of the Jack

10   Daniel's black brand, that was the process, generally speaking,

11   that you went through, correct?

12           MR. HARVEY:  Objection, Your Honor.  Mischaracterizes

13   his testimony.

14           THE COURT:  You may answer the question.

15           THE WITNESS:  Completely incorrect.  Completely

16   incorrect.  That's the thing I explained, and I am happy to

17   explain it again.

18           THE COURT:  While are we looking at me?  I overruled

19   the objection.

20           MR. BRAY:  You overruled the objection?

21           THE COURT:  Yeah.  That's why I said -- he answered

22   the question, I thought.

23           MR. BRAY:  He did.

24           THE COURT:  Well then, next question.

25           MR. BRAY:  I was getting to that.  Thank you.

UNITED STATES DISTRICT COURT

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION          200

BY MR. BRAY:

Q.  So very briefly, to understand your process in this case
you looked at the two products, correct?

A.  I did, yes.

Q.  You reviewed some of the pleadings in this case, correct?

A.  That wouldn't effect my opinion, but I did review some
pleadings, yes.

Q.  And you have knowledge, based on your years of experience
as an academic, correct, that you applied?

A.  I think that mischaracterizes what I said.  I based my
opinion on specific research pertaining to the association
between feces and food or beverage products.  So that's well
established.  As I said, it goes back to the 19th century.

Q.  And that well-established research is not quoted or brought
out anywhere in particular in your report, correct?

A.  Some of that is included in the articles that I cited.

Q.  If you look at Exhibit 33, that's also in your -- sorry,
this is Exhibit 33 in your deposition.  It is Exhibit 235 or
Exhibit 234.  I don't know if it's easier to see that or --

A.  I can see.

Q.  Did that appear to you to be an advertisement for Jack
Daniel's?

A.  I think it is.

Q.  Okay.  You recall being deposed in this case, back in June
of 2015?

1    A.  I do.

2    Q.  Take a look at page 184.  My partner asked you at line 14:

3    Dr. Simonson, I am handing you a document that's been marked as

4    deposition Exhibit 33, which I will avow to the Court is trial

5    Exhibit 234.  Have you ever seen this image before?  Answer:  I

6    don't remember seeing it.  Question:  Does it appear to you to

7    be an advertisement for Jack Daniel's?  Answer:  No.  Question:

8    It does not?  Answer:  It does not.

9         Do you remember that being your testimony back in June

10   of 2015?

11   A.  Yes.

12   Q.  Then I asked you, well, a Jack Daniel's appears on the

13   advertisement, and you said it does, right?

14   A.  It does, because since then, I have learned, and I listened

15   to the testimony of Mr. Epps.  I know more about the

16   advertising approach of Jack Daniel's advertising, and my

17   understanding is that this kind of ad could very well be one of

18   the ads used by Jack Daniel's.

19   Q.  Based on your experience at Stanford and your academic

20   background, when you reviewed this advertisement for the first

21   time, you indicated that you would think this would be unlikely

22   in a Jack Daniel's advertisement, correct?

23   A.  That's what I said.

24   Q.  Because it referred to questionable joints, correct?

25   A.  Is that here?  If that's what I said, that's what I said.

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    Obviously he showed it to me, and a second later I answered, so

2    obviously I had no time to review it or to learn all of the

3    details of the strategy behind it, but I thought it wasn't, now

4    I understand it could very well be.

5    Q.  And you indicated that you thought "questionable" is a

6    negative term, that under the Associative Memory Model, you

7    wouldn't want to associate it with Jack Daniel's, at least that

8    was your initial impression, correct?

9    A.  Where are you reading from?

10   Q.  Well, don't have to go to your deposition, is that your

11   belief now, or not?

12   A.  No, actually, now I understand better their advertising

13   strategy, the fact that Jack Daniel's is for everyone.  I think

14   I have learned some things and it makes sense to me.

15   Q.  And --

16   A.  Obviously "questionable joint" is different than "poo."

17   Q.  And at least as of June of 2015, before Jack Daniel's

18   explained things to you, you believe that an advertisement like

19   this might create negative associations and dilute brand

20   equity, correct?

21   A.  Where are you reading from?

22   Q.  Do you recall testifying to that in June of 2015 or not?

23          THE COURT:  Well, why don't you give him the page and

24   the -- so they can look at it to see, because you are asking

25   him to recall two years ago what he might have testified to and

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    you've got it right there in front of you.  So if you are going

2    to impeach him with it, let him see it and read it.

3            MR. BRAY:  Fair enough.

4    BY MR. BRAY:

5    Q.  Dr. Simonson, it is page 185, Page (sic) 12.  I asked -- or

6    my partner asked you, referring to this exhibit, would this be

7    an advertisement that, in your mind, would create negative

8    associations that would dilute brand equity.  Your answer:  It

9    might.

10           Was that your testimony in June of 2013?

11   A.  That was.  I did say it might, and I went on to say, if you

12   look at the next line, I said:  You showed it to me just now.

13   Haven't seen it before.  Haven't thought about it, but as I

14   said, it might.

15   Q.  Well, that's fair enough.  You were shown it for the first

16   time at a deposition.  You know, based on your experience, you

17   looked at it.  You didn't apply an experimental methodology in

18   deciding that it might dilute Jack Daniel's brand equity,

19   right?

20   A.  You mean during my deposition, are you asking?  I am not

21   sure I follow your question.

22   Q.  When you looked at this in June of 2015 for the first time

23   and said, it might dilute Jack Daniel's brand equity.  When you

24   expressed that view, you weren't applying any experimental

25   methodology, correct?

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    A.  I was not.  I just saw it for a second.

2    Q.  Just like in this case, you didn't apply any experimental

3    methodology yourself to your opinion that Bad Spaniels is

4    tarnishing of the Jack Daniel's brand?

5    A.  No, absolutely not.  There's no comparisons.  I don't know

6    how many weeks or months I had to study this, to study what

7    other people have done with respect to the -- what happens when

8    you take defecation and you associate it with a beverage.  I

9    had a great deal of time.  I take forming opinions very

10   seriously.  Here I had a second to look and say what it is, and

11   I said, it might.  So there's really no comparison between what

12   I did here, and what -- the answer I gave to that particular

13   question in deposition.

14   Q.  I think you are trying to fight with me on things that we

15   don't need to fight about.  All I asked was, in this case, you

16   didn't apply any experimental methodology in reaching your

17   analysis, correct, or your opinion?

18   A.  Which case are you referring to?  The current case.

19   Q.  The current case that you are providing an opinion

20   A.  As I already said a number of times, there was no need to,

21   and I didn't?

22   Q.  Dr. Simonson, I want to make sure we understand the opinion

23   and how you arrived at your opinion, and your opinion is that

24   Bad Spaniels dilutes Jack Daniel's by tarnishment, correct?

25   A.  Right.

UNITED STATES DISTRICT COURT

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    Q.  And in reaching your opinion, you didn't reference the

2    definition of dilution by tarnishment in the Lanham Act,

3    correct?

4    A.  I think I didn't.

5    Q.  And so  the -- it's a two-step process, you said.  The

6    first step is, is the Bad Spaniels toy brings up associations

7    with the Jack Daniel's product, correct?

8    A.  Yes.

9    Q.  And would you expect that a product that's designed and

10   intended to be a parody would associate with whatever brand it

11   is parodying?

12   A.  I would think that's the intention, so, yes.

13   Q.  And the second step of the analysis is just how the

14   Associative Network theory that you relied on works.  That is

15   if a negative feeling is placed within brands -- a brand's

16   associated memory network, then the brand will be associated

17   with that negative feeling; is that correct?  I mean, as a

18   layman, I can't put it in scientific terms like you?

19   A.  If you would allow me to give you a somewhat long answer,

20   I'm happy to do it.  I think Mr. Harvey and I spent a number of

21   minutes on that question, so I am happy to do it again.  But as

22   I explained, you add defecation as an additional node, and you

23   color the brand image, and given this is largely an unconscious

24   process, now when you think about Jack Daniel's, you are

25   exposed, say at home or at some friend's house, to this.  Now

1    you added, your perception of Jack Daniel's is less positive.

2    Q.  And with regard that's an assumption on your part, not

3    tested by any scientific experimental methodology done by you,

4    correct?

5    A.  I think I already answered that question many times.  There

6    was no study to be conducted, nor was it needed, as I

7    explained.

8    Q.  And you understood that Mr. Sacra and Ms. Phillips believed

9    the Bad Spaniels product was to be conceived as good hearted

10   fun?

11   A.  Well, you know, if someone was calling me, Itamar The Poo

12   Simonson, I would not be happy.  Even though -- you know, I

13   don't think they would think about -- I wouldn't think about

14   that as favorable.  I think that somehow it would color my --

15   how people think about me.  So I think if it's pure fun, you

16   know, maybe they could have used something that's not related

17   to feces.

18   Q.  You don't have an opinion that Mr. Sacra and Ms. Phillips

19   didn't design it to be fun, do you?  That was their intent,

20   whether they accomplished it in your mind or not is another

21   question?

22   A.  No, it's not, but as I said, I know that defecation, when

23   it is associated with food and beverage, creates disgust and a

24   negative association with that brand.

25   Q.  No one, other than the people at Jack Daniel's and Brown

1   Forman, has communicated to you that they thought the Bad

2   Spaniels toy is disgusting; isn't that correct?

3   A.  I didn't ask them what they thought about it.  Obviously

4   they filed this lawsuit, say, apparently they felt that this

5   was outside of the bounds because of the -- I mean, I don't

6   even know what led them to file the lawsuit.  Evidently they

7   decided in this case that this was something they don't want to

8   be associated with their brand.

9   Q.  And the only information about the VIP Products that you

10  reviewed, in your analysis in reaching your opinion, was the

11  Bad Spaniels product and label, the depositions of Stephen

12  Sacra and Elle Phillips, VIP's responses to interrogatories and

13  some of the pleadings in this case, correct?  That's the only

14  information you reviewed regarding VIP?

15  A.  No, I think I read Mr. Sacra's deposition.  I believe I

16  read quite a bit about the butt wiper case.  I believe I read

17  about some other things and the other ways in which this

18  company operates.  So I know, I think, quite a bit about it.

19  Q.  You have done surveys in connection with what's called

20  trademark dilution in the past, correct?

21  A.  I did.

22  Q.  And you have done approximately 10 of those, correct?

23  A.  Something like that.  I don't remember, looks like you are

24  reading from my deposition.  I think it was up to 10.  Perhaps

25  between five and ten.

1    Q.  And is it your opinion, your testimony that the only way to

2    assess dilution by tarnishment in a case like this is to use an

3    expert like you?

4    A.  As I said, you need a survey expert to establish that one

5    product calls to mind the other.  In this case, it was not

6    needed.  For the second phase, yes, you do need an expert who

7    is knowledgeable about fundamentals of consumer psychology, and

8    how brands are represented in memory.  Whereas just general

9    work experience and advertising, that has nothing to do with

10   it.

11   Q.  Now, with regard to VIP's intent, you believe that VIP

12   should have conducted some research, some studies, about how

13   people perceive the Bad Spaniels product, and does it affect

14   the way they think about Jack Daniel's brand.  You think VIP

15   should have done that, correct?

16   A.  I think given their decision to put here Old Number 2 and

17   Poo by Weight, I think given that it should have been common

18   sense, that this is disgusting and you don't want it associated

19   with any food or beverage, yes, I thought that to the extent

20   they dispute this common sense conclusion, they perhaps could

21   have used a study.  I'm not sure exactly what study that would

22   be.  That could be very challenging, maybe not even possible.

23   Q.  In fact on page 12 of your report, you make a note that VIP

24   has conducted no studies to confirm that its use of the Old No.

25   2 and the Bad Spaniels product was just fun?  You even made a

1    note of that in your report, didn't you?

2    A.  Yes.

3    Q.  And you think it's common sense that VIP should have

4    conducted a study before they launched the product, right, to

5    see how it might impact the --

6    A.  I think you are mischaracterizing what I just said.

7    Q.  That's a yes-or-no question.  Is it common sense that VIP

8    should have conducted a study before launching --

9    A.  No, that's not what I said then.  The answer is no, I'm

10   happy to explain.

11   Q.  Okay.  And you yourself conducted no study.  Again,

12   personally, you conducted no study, correct?

13   A.  Other than reviewing other people's studies, I did not

14   conduct any study.

15              MR. HARVEY:  Asked and answered a number of times,

16   Your Honor.

17              THE COURT:  Sustained.

18   BY MR. BRAY:

19   Q.  You think VIP might have been able to find an expert to do

20   the study correctly?

21   A.  Probably not.

22   Q.  Why don't you take a look at your deposition.  Page 97,

23   line 4.  My partner asked you:  Okay.  So then, the thing you

24   believe, to fulfill his obligation, the effective thing that

25   Mr. Sacra or VIP Products should have done, prior to launching

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1  this product, was to consult an expert?

2  A.  Which line on page 94 it is?

3       THE COURT:  97, line --

4  BY MR. BRAY:

5  Q.  I am reading the wrong line.  Sorry.  I apologize, getting

6  near the end of the day.  Line 4.

7       In terms of effectiveness, he should have done it?

8  A.  Which page?

9  Q.  97.

10  A.  97.  Okay.

11  Q.  Line 4.  Are you there?

12  A.  I am here, yes.  Let's clarify that.  In terms of

13  effectiveness, he should have done it, referring to a study, he

14  should have done it to obtain some results.  Answer:  He might

15  have found an expert who could do it correctly.  You know,

16  maybe I would have criticism or maybe I would not have

17  criticism.  He didn't do anything.

18       Do you see that?  Was that your testimony back in June

19  of 2015?

20  A.  Yes.

21  Q.  And you thought maybe an expert could have done such a

22  study correctly?

23  A.  As you can see, the answer here, I was skeptical, and I am

24  skeptical now, but maybe he could.  I think it would be, like I

25  said, very challenging.

1  Q.  It's possible?  You said he might have been able to do

2  that, right?

3  A.  I don't want to prejudge, but let's see.  If he were to

4  conduct a study that goes against what we know, you know, maybe

5  he would convince me, but --

6  Q.  And you didn't try to do such a study in this case, yes or

7  no?

8  A.  No, there was no need to, as I said a number of times.

9  Q.  Okay.  In paragraph 13 of your report, you note that

10  Mr. Sacra has not tested his assumptions regarding the impact

11  of Bad Spaniels products on consumers.  So I assume that that

12  had to have some significance to you to include it in your

13  report, correct?

14  A.  I decided to include it in my report.

15  Q.  And you included manners of significance in your report and

16  not nonrelevant matters in your report, correct?

17  A.  I am not sure that I spent hours on each word to make sure

18  that it reaches the level of significance, but I tried to

19  include informative things, so, to that extent, yes.

20  Q.  Fair enough.  And you think that Mr. Sacra could have

21  tested his assumptions, that the Bad Spaniels Product would not

22  elicit disgust but would elicit joy by having consumers rate

23  the Bad Spaniels product on a funny, not funny scale,

24  disgusting, not disgusting scale, and then do the same thing

25  with the control product?

1  A.  Where are you reading from?

2  Q.  I am asking you if you think that was possible?  Is that

3  something Mr. Sacra could have done that would have been

4  useful?

5  A.  Maybe it would be, maybe it wouldn't be.  As I said, the

6  process of dilution cannot be captured in any survey.  Maybe it

7  could have provided some useful information.

8  Q.  Well, if you want to refer to your deposition, look at page

9  101 and your answer on line 19.  You thought maybe he can get

10  them to rate it on a funny, not funny scale, disgusting, not

11  disgusting scale.  Maybe he could do the same thing for other

12  products as controls.  So back when you were deposed -- that

13  was your testimony, correct?

14  A.  It was.

15  Q.  So you thought that perhaps such a study could be done,

16  correct?

17  A.  Maybe he could have done it, I didn't say --

18  Q.  You didn't perform such a study, correct?

19  A.  Of course not.  I didn't think it would provide much

20  relevant information for the reasons that I have indicated.

21  Q.  That's despite the fact that if Mr. Sacra did that

22  experimental test of his assumptions, you think it could have

23  provided useful information as to whether or not there was

24  dilution by tarnishment?

25          THE COURT:  Well, I think we are fencing over the word

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    might and possible, and a lot of things are possible, may not

2    be probable.  But you made a valiant attempt to challenge his

3    opinion on that issue, but it is being redundant now.

4            MR. BRAY:  You want me to speed it up?

5            THE COURT:  Yes, please.

6            MR. BRAY:  Okay.  Thank you.

7    BY MR. BRAY:

8    Q.  It was discussed in your deposition that there is the

9    Jacobi?  I am not sure if I am pronouncing it correctly.

10   A.  Jacobi.

11   Q.  Jacobi method, which was a survey designed to test both

12   association, which is step one in dilution by tarnishment, and

13   harm, correct?

14   A.  I believe so, yes.

15   Q.  And that's been accepted by at least one court, the

16   Anheuser-Busch, Balducci court, correct?

17   A.  Yes, if I recall correctly, on behalf of the plaintiff.

18   Q.  And you didn't attempt to perform that kind of survey in

19   this case, correct?

20   A.  No, as I explained in my deposition, even though that

21   methodology would have supported a position of Jack Daniel's,

22   without a doubt, as I explained in my deposition, I thought

23   that it had significant flaws, and I didn't think that was an

24   appropriate methodology.

25   Q.  Okay.  The Court just indicated about might and could have

UNITED STATES DISTRICT COURT

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    and being careful about those word.  You don't know what the

2    Jacobi test would have shown in this case, because you didn't

3    perform it, correct?

4    A.   No, I do know, because I have conducted thousands of

5    studies.  I have published articles on that specific questions

6    that I call, and other people like Nobel Prize Winner Daniel

7    Kahneman talk about so called focalism buyers.  I spent

8    actually quite a bit of detail in my deposition why that

9    methodology was flawed.  Even though it would have shown

10   that -- it would have supported Jack Daniel's position, based

11   on my experience and expertise, which I have published.

12   Q.   So do you have no need to do experimental methodology,

13   because you know the answer to tests before you apply them?

14   A.   Absolutely not.  In many cases I do not.  In many cases, I

15   do have, for example, as I said, in the Starbucks case, I did

16   conduct the survey and the Sazerac in the Buffalo Trace case.

17   I did conduct a survey, because I thought it was needed.

18   Q.   Let me stop you there.  Despite the fact that you believe

19   the Jacobi test would have supported your -- or Jacobi-style

20   survey would have supported your conclusion, you didn't perform

21   one, correct?  Yes or no?

22   A.   Could you repeat?  I didn't hear.

23   Q.   Despite your belief that performing a survey comparable to

24   the Jacobi method in this case, would support your analysis and

25   opinion, you didn't perform one, correct?

```
 1    A.  Of course not, I --

 2              THE COURT:  Wait.

 3              THE WITNESS:  I avoid flawed surveys.

 4              THE COURT:  You have already said that.  And he is

 5    just cementing down a position he is making.

 6              THE WITNESS:  Thank you, Your Honor.

 7    BY MR. BRAY:

 8    Q.  Exhibit -- well, let me ask you this.  You are aware that

 9    experimental investigations indicate that beliefs about

10    flagship products are less vulnerable to dilution than beliefs

11    about the parent brand name in general?

12    A.  That was confusing.  Could you read it again, please?

13    Q.  Do you agree that experimental investigations have

14    indicated that beliefs about flagship products are less

15    vulnerable to dilution than beliefs about the brand name in

16    general?

17    A.  I missed one word.  What was the first type of brands that

18    you talk about.

19    Q.  Sorry.  I'm having a little bit of a hard time hearing you

20    too?

21    A.  Okay.

22    Q.  That's better, thank you.  You would agree with me,

23    Dr. Simonson, there have been experimental investigations that

24    indicate that beliefs about flagship products are less

25    vulnerable to dilution than beliefs about the parent brand name
```

1    in general?

2    A.  No, I don't know what it was applied to in that particular

3    study that you are thinking about, but --

4    Q.  If you look at Exhibit 28, to your report, does that study

5    stand for that proposition?

6    A.  Which specific articles are you referring to?

7    Q.  Exhibit 28 to your deposition.  I apologize.

8    A.  So can I answer your question?

9    Q.  Sure.

10   A.  So this article deals with brand extensions.  For example,

11   let's say you have Heinz ketchup and now Heinz introduces Heinz

12   57 sauce.  That's a brand extension.  That's what this article

13   is about.

14   Q.  Dr. Simonson, you would agree with me that in the abstract,

15   a picture of a dog on a product can create a positive

16   association for some people?

17   A.  You mean without all of the other things here?  Yeah, a dog

18   might.

19   Q.  So you think -- it's your belief that Mr. Sacra's

20   assumption that consumers share his view, that the Bad Spaniels

21   product is fun and does not elicit disgust, is speculation

22   because he never tested his presumption that people perceived

23   it as funny, correct?

24   A.  Right.

25   Q.  And you pointed out that Mr. Sacra doesn't have expertise

ITAMAR SIMONSON, PH.D. – CROSS-EXAMINATION

1    in consumer psychology and brand associations?

2    A.   That's correct.

3    Q.   Yet you think the people, business people who run Jack

4    Daniel's, are experts in consumer psychology, correct?

5    A.   I didn't test their consumer psychology qualifications.

6    Just from having met them yesterday, they seem very intelligent

7    and know what they are doing, but I hesitate to tell you.  They

8    seem to do a good job in terms of marketing.

9    Q.   And you hadn't met Mr. Sacra before, so you don't have any

10   assessment of his intelligence or knowledge of consumer

11   behavior, correct?

12   A.   Well, I read his deposition.  I read -- so it didn't seem

13   that he is claiming to be consumer psychologist.

14   Q.   In fact, you think it is very well possible that Mr. Sacra

15   knows about -- more about dog toys and the consumers that buy

16   dog toys, than you do?

17   A.   It's possible.

18   Q.   Okay.

19            THE COURT:  Elva, you okay?

20   BY MR. BRAY:

21   Q.   And you would agree with me, Dr. Simonson, that for some

22   product categories, funny can be a positive brand content

23   association?

24   A.   Could you repeat that, please?

25   Q.   I'm sorry.  You would agree with me, Dr. Simonson, that in

1    some context, funny could be a positive brand content

2    association?

3    A.  Yes, that could be.

4    Q.  I'm thinking, for instance, The Most Interesting Man in the

5    World with Dos Equis, would you agree with me that that's

6    funny?

7    A.  Yes, I like those commercials.

8    Q.  And funny advertising is common in the beer industry?

9    A.  I think that's true.

10   Q.  And you have no professional -- well, strike that.

11        Your only professional experience, in terms of

12   consumer behavior specifically related to the purchase of pet

13   products, is that you have used pet products as examples in

14   some of your teaching at Stanford, correct?  That's a yes or no

15   question.  It is late in the day.

16   A.  No, it's -- I don't think it is a yes-or-no question.  I

17   have expertise about what drives consumer decision-making and

18   consumer attitudes.  It applies to dog toys.  It applies to cat

19   toys, and it applies to beer.  So that's why managers at

20   companies ask me to lecture to them, even though they know more

21   about their own business than I do.

22   Q.  Again, in your deposition, page 166, were you asked this

23   question -- this is at line 17.  What's been your professional

24   experience in terms of consumer behavior for purchases of pet

25   products?

1          Your answer was:  Over the years I have used pet

2    products as examples of my teaching.

3          Was that your testimony back in June of 2015?

4    A.  Yes.

5    Q.  Your opinion regarding how consumers make purchasing

6    decision, is based on your general knowledge of how consumers

7    form impressions and evaluate brands, correct?

8    A.  My understanding of consumer decision-making is based on

9    what I have learned over the past 30-something years, the

10   research I conducted, the research I read, the many seminars I

11   attended on a weekly basis.  So by teaching -- so there are

12   many things that add up to my expertise and knowledge.

13   Q.  Okay.  Again, if you look at your deposition on page 167.

14   You were asked:  What evidence or facts do you rely upon, as it

15   relates to how purchasers of alcoholic beverages make their

16   purchasing decisions in reaching your conclusions expressed in

17   deposition Exhibit 3, which is your report?

18          Your answer was:  Just my general knowledge of how

19   consumers form an impression and evaluate brands.

20          Was that your testimony back in June of 2015?

21   A.  Could be.  Yes, that apparently was my answer, I stand

22   behind it.  I mean, obviously my knowledge is based on many

23   sources.

24   Q.  So you didn't rely on any specific expertise or

25   understanding or evidence relating to purchasers of alcoholic

1    beverages, correct?

2    A.  Alcoholic beverage is something people consume.  In

3    combination with feces, that's something I have learned and I

4    rely on.

5    Q.  Dr. Simonson, I think we are going around in circles?

6            THE COURT:  I would agree with that.

7    BY MR. BRAY:

8    Q.  The point has been made, and I don't want to irritate

9    anybody, especially Your Honor.  Let me wrap it up.

10           Your opinion is that there was an unfavorable mental

11   association, consciously or unconsciously, created in this

12   case, correct?

13   A.  Yes.

14   Q.  Okay.  You have no opinion as to how much harm or alleged

15   harm the Bad Spaniels has done to the Jack Daniel's product,

16   correct?

17   A.  Correct.

18   Q.  It could be miniscule harm, correct?

19   A.  It's not something you can measure.  As I said, it's a

20   process.

21   Q.  And regarding the assessment of Bad Spaniels is likely to

22   lower the value of Jack Daniel's trade dress, you didn't

23   specifically factor in your assessment the likely intersection

24   between purchases of VIP Products and Jack Daniel's products,

25   correct?

1    A.  If I understand your question, I did.  I did.  Because this

2    product is designed for people who are familiar with Jack

3    Daniel's.  I mean, why would anyone else buy this product that

4    never heard about Jack Daniel's.  So, yes, apparently Mr. Sacra

5    believes there's an intersection, and people who buy dog toys

6    are also familiar with Jack Daniel's.

7    Q.  Okay.  People love their dogs, right?

8    A.  So I hear.

9    Q.  Okay.  You would expect that a person who loves his dog

10   would buy a product that they like for their dog, right?

11   A.  Sounds reasonable.

12   Q.  Okay.  You wouldn't -- and I think you just said that a

13   person that loves their dog that might buy a dog toy, out of

14   all of the different Silly Squeaker products, they might buy

15   the brand they have an affinity to, right?  So if they like

16   Jack Daniel's, they are likely to buy a Jack Daniel's dog toy,

17   correct?

18   A.  It's possible, obviously it doesn't tell us anything about

19   what the impact on Jack Daniel's is.

20   Q.  Sure.  I mean, if it was a member of the LDS church that

21   doesn't drink, and their product affinity is with Coke, they

22   might be more likely to buy their dog a parody Coke toy,

23   wouldn't you agree with that?

24   A.  It makes sense to me.

25   Q.  And then somebody who likes Jack Daniel's might buy their

1    dog, a beloved member of their family, a dog toy based on a

2    parody of the Jack Daniel's product, correct?

3    A.  Well, the question is, what it does to their liking and

4    perception of the Jack Daniel's after they use it, after their

5    friends happen to see it, and so on.  So that's the question.

6         I mean, they may very well like the toy forever.

7    That's not the question, how much they like or dislike the toy.

8    The question is what it does to the perception of Jack

9    Daniel's.

10   Q.  Okay.  Thank you, Dr. Simonson, and thank you for your

11   patience.

12        THE COURT:  Thank you, counsel.  I know everybody

13   wanted to try to wrap up this testimony today so that's why we

14   are here a little longer, and that's okay.

15        MR. HARVEY:  No redirect, Your Honor.

16        THE COURT:  Okay.  Are we going to allow him to be

17   excused as a witness to return to the land of the farm, is that

18   right?

19        THE WITNESS:  Could you repeat?

20        THE COURT:  We are going to let you return to the land

21   of the farm.

22        THE WITNESS:  You know, down -- I think they say, down

23   on the farm.  Actually, I am not very good at that.

24   Everyone -- people say so you are down on the farm, and I have

25   to think about it for a second.

|   |   |
|---|---|
| 1 | THE COURT:  Right.  Well, I don't want to let you off |
| 2 | the hook without some sort of trivial question here. |
| 3 | THE WITNESS:  Not about golf. |
| 4 | THE COURT:  No, no, no.  We won't talk about golf.  We |
| 5 | have a very distinguished resident in Arizona who has three |
| 6 | degrees from Stanford.  Undergraduate in electrical |
| 7 | engineering.  Masters in electrical engineering, and Ph.D in |
| 8 | electrical engineering.  Very famous president, was president |
| 9 | and CEO for a while of Intel, and was recruited by Mr. Grove |
| 10 | when they started Intel.  Any idea who that might be?  Might be |
| 11 | out of your area. |
| 12 | A.  It is out of my area, but, you know, Intel is almost next |
| 13 | door.  Now, wouldn't be Ottolini? |
| 14 | THE COURT:  No, no.  His wife is an ambassador, or had |
| 15 | been an ambassador.  It's Craig Barrett.  So a lot of people |
| 16 | know who he is, but it is not necessary that we know that.  But |
| 17 | I am just trying to throw a little Arizona history in here.  So |
| 18 | now we will excuse you. |
| 19 | THE WITNESS:  My son went to University of Arizona. |
| 20 | THE COURT:  There you go.  Bear down.  Okay.  Here we |
| 21 | go.  Anyway, thank you very much.  We will excuse you as a |
| 22 | witness.  Thank you very much for being here.  We appreciate |
| 23 | your time. |
| 24 | THE WITNESS:  Thank you, Your Honor. |
| 25 | THE COURT:  Now, we will take up some housekeeping |

1    matters.

2         MR. BRAY:  Counsel and I talked last week regarding

3    the trial schedule and scheduling our experts, and I had

4    indicated that Mr. Silverman is a very expensive expert, and we

5    wanted him here for one day.

6         THE COURT:  The whole day?

7         MR. BRAY:  What day would that be, and we agreed that

8    Thursday would be the most likely day that we would get to

9    Mr. Silverman.  At this pace, we potentially could even get to

10   Mr. Silverman tomorrow.  We have 12 trial days scheduled.  I

11   don't know --

12        THE COURT:  Just a minute.  You know, you keep saying

13   we had 12, you know, or --

14        MR. BRAY:  Or nine.

15        THE COURT:  This was going to be a month long trial

16   and when you cut that back, I gave all that time away to

17   someone else.  Now, just tell me what you need.  Do you need

18   accommodation for Thursday?  Is that what you want?

19        MR. BRAY:  I'm trying to figure out if Mr. Silverman

20   is, yeah, Mr. Silverman is not available on Wednesday.  So we

21   can do whatever order you want.  We can go until we are up to

22   Mr. Silverman and then pause until Thursday morning, or they

23   could close their case and we can do our whole case on

24   Thursday.  I don't know what counsel's preference is.

25        MR. HARVEY:  It is entirely possible at the rate we

1    are going, Your Honor, that we will, Jack Daniel's case in

2    chief will be finished tomorrow.

3             THE COURT:  That's what I thought, too.  Usually we

4    pick up the pace, but -- what's your position about the problem

5    on Thursday?  I mean, I realize experts and scheduling them is

6    not a matter of -- my normal rule is, you paid a lot for their

7    expertise and they are paid to be here when they are scheduled

8    to testify, and the case goes on, we end early, they should be

9    here.  But I realize in the real world, as you like to say

10   Mr. Bray, they don't always schedule things that way and

11   schedule their time, so they may be somewhere else testifying.

12            I want to know from Mr. Harvey, though, what his

13   circumstances are about -- if we finish early tomorrow or

14   midafternoon tomorrow, and they don't want to go to the

15   scalpers down the street for tickets for Wednesday's game of

16   the playoffs -- what about coming back on Thursday?  I mean, we

17   have a lot of high price executive talent hanging around here,

18   who I think want to get home to Louisville or other

19   destinations.

20            MR. HARVEY:  What I would like to do, Your Honor, is

21   talk with them this evening and see what the views are, and

22   come back in the morning.  I am not adverse to adjusting to try

23   to accommodate, and it is true, that we spoke about the

24   probability of Mr. Silverman coming on Thursday.

25            MR. BRAY:  This was a discussion between counsel and

1    myself and I said --

2         THE COURT:  See what you can work out, and we will --

3    I am going to try to give you some latitude.  I understand some

4    of these circumstances.  But on the other hand, I am not

5    insensitive to their situation either, anticipating that of

6    course everything about being here until Friday what's the big

7    deal, they can enjoy our Arizona sunshine before --

8         MR. BRAY:  I can tell you the substance of our

9    conversations was, he could be here -- which day should I plan

10   on Mr. Silverman so he can adjust his schedule?  Mr. Harvey

11   indicated we could plan for him on Thursday.  He would make

12   whatever accommodation that he needed so that could happen.  So

13   Mr. Silverman has then adjusted his schedule, too.

14        THE COURT:  Well, maybe you can check with him and see

15   if there's any possibility.  But if not, what I'm worried about

16   is if he comes in on Wednesday and we get to him in the middle

17   of the afternoon, he has to stay over until Thursday anyway.  I

18   take it that he will be about the same length as Dr. Simonson.

19        MR. BRAY:  Yeah, I would think he'd get probably not

20   exactly as long as Dr. Simonson.

21        THE COURT:  So that's about three or four hours.  We

22   can trim some time off of that if we don't keep going around in

23   circles a little bit, but not that much.

24        MR. BRAY:  In my defense, I don't think that was

25   totally me, but I will take some responsibility for it.

1          THE COURT:  You can't see the tongue sticking out of

2     my cheek.  Look, this is a trial.  I have seen this over and

3     over and over for 30 years of this sort of thing.  So what's

4     your position?  Can you talk a little bit about it.

5          MR. HARVEY:  If I could confer this evening and we

6     will come in in the morning with a decision.

7          THE COURT:  Talk to your --

8          MR. HARVEY:  And we will talk with counsel.

9          THE COURT:  The other thing is, in all deference to

10    their -- I don't know when they got here in town, but given the

11    three-hour time zone change, it messes you up.  I mean, I know

12    that from going back and forth.  So the question is, would you

13    like to start maybe a little bit later in the morning tomorrow,

14    to allow them to get --

15         MR. HARVEY:  That's fine, sure.

16         THE COURT:  -- make accommodation.  I am just trying

17    to help you out.

18         MR. HARVEY:  No, no, that's fine.  In fact, I wouldn't

19    mind starting a little later tomorrow.

20         THE COURT:  10:00 o'clock, how's that?

21         MR. BRAY:  I think that makes sense given that we are

22    ahead of schedule.

23         THE COURT:  Right.

24         MR. HARVEY:  Right.

25         THE COURT:  Way ahead.  We will start at 10:00

1    tomorrow, that's Arizona time.  So I understand.  I am sure

2    plaintiff over here who travels internationally all the time is

3    very familiar to how disruptive the travel schedules can be.

4            MR. HARVEY:  He is.

5            THE COURT:  And I appreciate that.  I mean, I don't

6    know how people in your line of work do that consistently.  I

7    can see every now and then, but consistently for all of what

8    you do.  That's tough on everyone.  So we will start at 10:00

9    tomorrow morning.  And we will go from there.

10           MR. HARVEY:  Thank you.

11           MR. BRAY:  Thank you.

12           THE COURT:  Thank you all.

13       (Court adjourns at 5:00 p.m.)

1                          C E R T I F I C A T E

2

3              I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 4th day of October,

12   2017.

13

14                                   s/Elva Cruz-Lauer
                                Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

                     UNITED STATES DISTRICT COURT