1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3          _____

4    VIP Products, LLC,              )
                                     )
5          Plaintiff,               )    CV-14-02057-PHX-SMM
                                     )
6          vs.                      )    Phoenix, Arizona
                                     )    October 3, 2017
7    Jack Daniel's Properties, Inc.,)        9:58 a.m.
                                     )
8          Defendants.              )
     _____)
9    And Related Counterclaims.      )
     _____)

10

11      BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                TRIAL - DAY 2

15

16

17

18

19

20

21   Official Court Reporter:
     Elva Cruz-Lauer, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 33
23   Phoenix, Arizona  85003-2151
     (602) 322-7261
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1                    <u>A P P E A R A N C E S</u>

2    For the Plaintiff/Counterdefendant:

3            DICKINSON WRIGHT PLLC
             By:  David Geoffrey Bray, Esq.
4                 David Nunzio Ferrucci, Esq.
             1850 N. Central Ave., Ste. 1400
5            Phoenix, AZ  85004

6    For the Defendants/Counterclaimants:

7            HARVEY & COMPANY
             By: Douglas Peter Harvey, Esq.
8            4 Embarcadero Ctr., 14th Fl.
             San Francisco, CA  94111
9
             QUARLES & BRADY LLP- Phoenix, AZ
10           By: Isaac Scott Crum, Esq.
             2 N. Central Ave.
11           Phoenix, AZ  85004-2391

12   Also present:  David Gooder and Justin Welch, Senior Trademark
     Counsel.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX

3    <u>SUMMARY OF COURT PROCEEDINGS</u>                      <u>PAGE</u>:

4    Court resumes                                          4

5    Court Adjourns                                         76

6

7

8                      <u>INDEX OF WITNESSES</u>

9    <u>WITNESSES FOR THE</u>      <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>
     <u>DEFENDANT</u>:

10
     Gerald L. Ford              6          16
11   (BY DEPOSITION)
     David Gooder               17          48
12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2          THE COURT:  Welcome back everyone.  We are ready to
3   proceed here starting a little bit later.  Hope everyone had a
4   nice evening last night, relaxed a little bit, and I have a new
5   set of trivia questions for later on.
6          And as I said, the reason I do that is just because
7   litigation is very stressful on the attorneys and on the
8   parties and everybody else, so you have to have a little bit of
9   laughter along the way.
10          We are ready to proceed.  You may now call your next
11   witness, please.
12          MR. HARVEY:  Thank you, Your Honor.  We should
13   probably clarify for the Court, we conferred about the trial
14   schedule.
15          THE COURT:  Okay.
16          MR. HARVEY:  And with the Court's permission, Mr. Bray
17   and I have agreed, with a rather relaxed schedule, but I think
18   it will accommodate the need to have Mr. Silverman come on
19   Thursday.
20          So the idea would be that today we will do our last
21   two witnesses, which will consistent of Dr. Ford's report, and
22   a few demonstratives about that, and then David Gooder's
23   testimony, and then we will rest.
24          Tomorrow, Mr. Sacra will -- the opening of the
25   defense -- plaintiff's case with Mr. Sacra's testimony and

1     Mr. Nowlis, or Dr. Nowlis by deposition.  And then Thursday, we

2     bring Mr. Silverman in the morning, and we close with closing

3     arguments in the afternoon.  If that suits the Court?

4               THE COURT:  Fine with me.

5               Mr. Bray, you agree with that all?

6               MR. BRAY:  That's our agreement last night, and I

7     think it works best for all involved.

8               THE COURT:  That's fine.  And then I would like to, on

9     Thursday, if we can get your witness, I would like to start

10    that in the morning about 9:00, and there's a reason, because

11    there's a matter I have to attend to over the luncheon hour,

12    and if I could expand that just a little bit, I would

13    appreciate it.  It's not necessary, because I can cut back my

14    obligation that I have, because this is the most important

15    thing that we are doing, so I can cut all of that out if I have

16    to.

17              MR. BRAY:  So Mr. Silverman, 9:00 a.m. on Thursday?

18              THE COURT:  Is that --

19              MR. BRAY:  That's fine.  And tomorrow, would there be

20    another 10:00 start?  We hadn't discussed that.

21              THE COURT:  Is that okay with everyone else?  I mean,

22    it is fine with me.

23              MR. BRAY:  It is a little easier on people who are

24    coming in from Scottsdale.

25              THE COURT:  That's fine.

1            MR. HARVEY:  Fine with us, Your Honor.

2            THE COURT:  Okay.  We will work that out.  Thank you

3    all very much.  I appreciate that.  That's been very helpful.

4            All right.  So now we are ready to proceed with

5    Mr. Ford's, I guess, testimony through -- or are we going to

6    get Mr. Gooder first?  Take your pick.

7            MR. HARVEY:  Thank you, Your Honor.  So how we agreed

8    to proceed this morning with respect to Dr. Ford is that, and

9    this is an agreement that extends also to Dr. Nowlis, when his

10   testimony becomes relevant.

11           We are submitting the reports.  We have agreed and

12   stipulated that they will come into evidence, and then counsel

13   will give very brief synopsis of the headlines of these reports

14   and why they are.

15           THE COURT:  The high points?

16           MR. HARVEY:  The high points, we hope so.  So I am

17   going do that now with Dr. Ford's report, with the Court's

18   permission.

19           THE COURT:  Go right ahead.

20           MR. HARVEY:  We do have demonstratives in hard copy

21   that we would be pleased to hand up, if we may approach?

22           THE COURT:  You may.

23           MR. HARVEY:  Thank you.  Just to set the stage, Jerry

24   Ford was a great long friend of mine, I must confess to the

25   Court, I knew him for 23 years.  He helped me through some of

1    my earliest trials, and so I want to do him the courtesy of at
2    least giving the Court an impression about this man as part of
3    my presentation this morning.

4        Jerry Ford was a partner in his own firm for many
5    years.  He had 40 years of experience in commercial marketing
6    research.  That was preceded by a long tenure on the faculty at
7    California State University at Long Beach, where he taught
8    marketing.

9        But he did many, many surveys, both in Patent and
10   Trademark Office matters, Trademark Trial and Appeal Board, and
11   Federal Court matters, and had quite a number of publications
12   referenced.

13       And we do have, on the Court's copy, and maybe I
14   should -- if I may, just retrieve from the clerk the copy that
15   I just gave you, because it has the citations I want to talk
16   about.  Forgive me, Your Honor.

17       If the Court cares to notice, that trial Exhibits
18   137 -- let me call the Court's attention to Exhibits 137
19   through 139, really have the full story here.  These are just
20   the headlights of his articles, his testimonial experience.
21   But he really was the dean of this field.  I am happy to say
22   that.

23       And let me just talk a bit about the methodology that
24   the survey applies that Dr. Ford used.  It was -- it's known
25   and I know the Court is familiar with Eveready studies, as the

1    gold standard, as we heard Dr. Simonson describe it yesterday,

2    for a number of good reasons.

3         It is done in a double-blind way, which means that not

4    only is the interviewer unaware of what the purpose of the

5    survey is, that is to say the interview house, because these

6    are done on the Internet these days.

7         The interviewing firm is unaware, and also the

8    supervisor, which instructs the interviewers, is unaware of the

9    purpose or the sponsor of the survey.  So it is quite intended

10   to be quite neutral.

11        And the respondents themselves are not told this is

12   being done for this company or that company.  They don't know.

13   They want to guess.  I will confess to the Court, of course

14   everyone is doing these surveys and taking them wants to know,

15   hey, who's behind this?  But that is not -- they are curious,

16   but that's not revealed.  And this appears in paragraph 13 of

17   Dr. Ford's report.

18        THE COURT:  You say these are random inquiries, is

19   that right?  Someone dials my number and it rings and says, we

20   are doing a survey, we would like you to answer these five

21   questions.  That's a double-blind survey?

22        MR. HARVEY:  Yeah, it is not a telephone survey.  It

23   done on the Internet, and people are members of panels.  So

24   they are qualified in advance to be -- and they must answer the

25   question, have you purchased a dog toy in the last six months,

1    or do you expect to purchase one?

2          THE COURT:  You will explain more of that.  I am glad

3    to see I have never been solicited for one of those.

4          MR. HARVEY:  So double-blind in the sense that neither

5    the interviewee, who is responding to the questions, nor the

6    firm that's putting the questions knows who is paying for it.

7          THE COURT:  Okay.  Thank you.

8          MR. HARVEY:  The respondents, the people who were

9    filling out the survey, have been qualified in advance as

10    people who are dog toy purchasers, or I should say, prospective

11    dog toy purchasers.  And this is referenced in, again,

12    paragraph 15 of Dr. Ford's report.

13          And here is what happens.  Each of them is shown a

14    picture, either of the real VIP product, the Bad Spaniels

15    product, or a fictitious version, which is the control cell.

16          And in terms of numbers, there are 418 -- in this

17    case, there are 418 completed interviews.  211 in the test

18    cell, and 207 in the control cell.

19          And you might ask, what are we doing?  What's the

20    control controlling four?  And as Dr. Ford explains, the intent

21    of the control is to take out what he like to call, the active

22    ingredient.

23          In other words, the first set of the test cell

24    interviewees are shown the real product and asked, who makes or

25    puts this out?

1          The same question is asked regarding the control, but

2     the control takes out the active ingredients, meaning all the

3     elements of the trademarks that we claim are influencing the

4     respondents to believe that this is a Jack Daniel's product.

5          So the notion is that you test -- you do the test

6     cell, you do the control, and you subtract from the results of

7     the test cell, whatever percentage of people think it is a Jack

8     Daniel's product, you subtract from that the control cell,

9     which doesn't contain any of the indicia of origin of Jack

10    Daniel's.

11         But it is intended to eliminate noise.  Some people

12    just guess.  Some people say, Jack Daniel's, because that's the

13    first whiskey that comes into their minds.  That has nothing do

14    to do with what the packaging or labeling is telling them.  So

15    that's the way it is set up.

16         The control and test cell interviewees are asked open

17    ended -- they are not led anyplace.  They are just asked, what

18    makes you say that?  Anything else that makes you say that?

19    And then the answers that are given to that question are

20    recorded verbatim.  And those are reflected in Dr. Ford's --

21    every single individual answer is in the supplement to the

22    report, the appendix to the report.  And that is trial Exhibit

23    134, the report.

24         Now, this is the so-called survey stimulus.  When I

25    said a minute ago that the interviewees are shown a test cell

1    survey stimulus, this is what I was talking about.  So they are

2    shown this picture.  It is a little hard to see, but it's the

3    same --

4            THE COURT:  Do you want the light down?

5            MR. HARVEY:  Please.  It is the same as the packaged

6    product as it appears in the store.  It is the same as the

7    package product that's sold online.  And so the interviewees

8    are asked, look at this picture as if you were considering

9    making a purchase.  Take your time.  Take whatever time you

10   want.  Read everything you want to read.  So this is the

11   picture that they are shown.

12           They are given an opportunity to read the front and

13   the back.  As you can see, this disclaimer that we heard about

14   is in the mouse print down there at the bottom.  And we will be

15   hearing about this further from Dr. Nowlis.  He has certain

16   criticisms about this control -- I'm sorry, this survey

17   stimulus, I should say the control stimulus, which is next.

18           Now, here's the control.  And when I said a minute

19   ago, it takes out all of the active ingredients.  You see --

20   now, I will go back.  There's the real thing.  It is a square

21   bottle.  It has all of the indicia and labeling that we have

22   seen already in this case.

23           This bottle, which is also called Bad Spaniels, does

24   not have any of that.  It is not -- it doesn't have a black

25   label.  It is not a square bottle.  It doesn't have a black

1    cap.  It does not have the fluted neck.  But there are

2    references to poo poo on your Tennessee carpet.  That language

3    is still there.  And then the respondent is asked, who makes or

4    puts this out?

5        So the point being if they have Jack Daniel's in their

6    mind and they are just guessing, they throw that out that will

7    be in there, but that has nothing to do with the packaging,

8    that answer, so the effort is to subtract that wild guess

9    answer from the real test results.

10       So here is the survey questions.  And I said at the

11   beginning in the opening that there were three levels of

12   confusion that the Lanham Act protects against.

13       One is source confusion, and that's this question,

14   actually the next two, who or what company do you believe makes

15   or puts out this product?  And then they record the answer.

16   What makes you say that?  What else, if anything, makes you say

17   that?  So really probing follow-up questions.

18       Another source confusion question is, what other

19   products or -- product or products, if any, do you believe are

20   made or put out by whoever makes or puts out this product?  So

21   there they might say, well, Jack Daniel's Tennessee Whiskey,

22   but this is another source confusion question.

23       Then here comes the authorization or approval

24   confusion question.  Do you believe this product is being made

25   or put out with the authorization or approval of any other

1    company or companies, is not being made or put out with the

2    authorization or approval of any other company or companies, or

3    you don't know or don't have an opinion?

4            And then if they identify, yes, is being made or put

5    out with the authorization or approval -- they check that first

6    box.  Then they are asked, what company or companies do you

7    believe gave the authorization or approval to make or put out

8    this product?  What makes you say that?  And those answers are

9    recorded verbatim.

10           And then a third level of questions on confusion, is

11   the affiliation or business connection question.  Same litany,

12   do you believe this product has a business affiliation or a

13   business connection with any other company or companies?  Does

14   not have a business affiliation or business connection with any

15   other company, or don't you know or don't you have an opinion?

16           And then if they identify, they check that first box,

17   which company?  And the answers are recorded verbatim.  That's

18   the way this survey worked.  211 interviews in the test cell,

19   and 207 in the control cell.

20           The Court had a question yesterday of Dr. Simonson

21   about quantitative versus qualitative.  This is a classic

22   example of quantitative.  Why?  Because there's a lot of

23   respondents involved, 400-plus people.

24           So -- and it's quantitative meaning it is projectable.

25   And we will hear testimony from others that confirm that

quantitative surveys are projectable, and Mr. Silverman, when

he arrives, will acknowledge that qualitative studies like

focus groups are not.  But that's for a later day.

Okay.  What did we get?  What happened when this

survey was conducted?  29 -- and this is in the test cell by

itself, not reducing it for any of the noise that the control

group would show.

29.38 percent of the people asked who makes or puts

out this product?  Or the authorization or approval questions

identified Jack Daniel's.  And here were the answers when

asked, what makes you say that?

Because the design and name is so closely related.

The design and wording style.  The bottle looks similar to

number 7.  It sound like it.  It looks like their bottle.  It

has the very same label and colors as a Jack Daniel's whiskey

bottle.  It looks like they did a license deal with Jack

Daniel's.

Now, these verbatims are found in the Ford report, and

I call your attention, Your Honor, to paragraph 28.  Also every

single one of the verbatims is in an appendix, so if you care

to get into the detail, you can examine those as well.

Now, what happened in our control cell?  Remember the

toy that doesn't look like Jack Daniel's.  Less than half of a

percent said Jack Daniel's.  It's called Bad Spaniels.  It

says, poo poo on your Tennessee carpet, but it doesn't have any

1    of the labels and packaging and overall indicia.  So only .48

2    percent.

3           Well, so how do you do the math on this?  You take the

4    29.38 confusion percentage in the test cell and you subtract

5    the control cell, the noise.  And there's the net confusion

6    rate that Dr. Ford identified.  28.9 percent.

7           And the result, he concludes, and this is in paragraph

8    32 and 33 of the Ford report.  The result is, he concludes,

9    that the survey results evidence that potential purchasers of a

10   dog toy are likely to be confused and deceived by the belief

11   that plaintiff's Bad Spaniels dog toy is made or put out by

12   Jack Daniel's, and that such confusion is due in particular to

13   plaintiff's use of Jack Daniel's indicia or trade dress on the

14   Bad Spaniels dog toy.

15          And that's it.  Those are the highlights.  This is

16   what Dr. Ford concluded.

17          We will be hearing testimony by way of deposition from

18   Stephen Nowlis, and he will have criticisms of the Ford report.

19   Dr. Ford's deposition was taken, and we will be offering

20   excerpts of his deposition by way of rebuttal to what Steven

21   Nowlis says about him.  But that will come during the

22   plaintiff's case, and that's all we have.

23          THE COURT:  Thank you.

24          MR. HARVEY:  Thank you.

25          THE COURT:  Okay.  Mr. Bray, anything that you want to

1    say with regard to that matter also, by way of

2    cross-examination?

3            MR. BRAY:  Did you want to put on the ELMO for me?

4            May I approach the bench, Your Honor?

5            THE COURT:  You may.

6            MR. BRAY:  I have handed your clerk Dr. Ford's

7    deposition that I took in this case with the relevant portions

8    that have been highlighted by me and that will be the source of

9    the cross-examination of Dr. Ford.

10            THE COURT:  Is this -- the highlighter is the

11   cross-examination?

12            MR. BRAY:  Yes.

13            THE COURT:  All right.

14            MR. BRAY:  The only other point I wanted to make was

15   with regard to the opinion of VIP's expert, Dr. Stephen Nowlis.

16   His biggest criticism of the Ford report and the Ford survey is

17   that the control, that golden wine bottle, looks nothing like

18   any American whiskey or bourbon bottle.  These are just

19   exemplars to show what Jack Daniel's claims is unique to its

20   trade dress, for example, the black and white labels, the black

21   wrapping around the cap, arched letterings.  Those are all

22   commonly used to designate American Kentucky bourbons,

23   Tennessee whiskeys.

24            THE COURT:  Sounds look a criminal law issue on

25   lineups.

DAVID SLOAN GOODER – DIRECT EXAMINATION          17

| | |
|---|---|
| 1 | MR. BRAY:  Pardon me? |
| 2 | THE COURT:  Sounds like a criminal law question on |
| 3 | lineups.  People that are being lined up that you are testing |
| 4 | against don't look anything like my client over there. |
| 5 | So I got your point. |
| 6 | MR. BRAY:  We will highlight Dr. Nowlis' report in |
| 7 | more detail tomorrow. |
| 8 | THE COURT:  Thank you.  Okay.  Is that it with regard |
| 9 | to Dr. Ford then?  Sorry he can't be with us.  Very sad, as is |
| 10 | the aftermath of the Las Vegas mess yesterday.  Very sad. |
| 11 | Okay.  Next witness then, please. |
| 12 | MR. HARVEY:  Thank you, Your Honor.  Jack Daniel's |
| 13 | calls David Gooder to the stand, please. |
| 14 | THE COURT:  Mr. Gooder, if you would come forward and |
| 15 | be sworn as a witness, we would appreciate that very much. |
| 16 | Thank you. |
| 17 | DAVID S. GOODER, DEFENDANT'S WITNESS, SWORN |
| 18 | DIRECT EXAMINATION |
| 19 | BY MR. HARVEY: |
| 20 | Q.  Good morning, Mr. Gooder. |
| 21 | A.  Good morning. |
| 22 | Q.  Would you state your full name for the record, please, sir? |
| 23 | A.  David Sloan Gooder. |
| 24 | Q.  Where were you born, sir? |
| 25 | A.  Tucson, Arizona. |

UNITED STATES DISTRICT COURT

DAVID SLOAN GOODER - DIRECT EXAMINATION                18

1   Q.  Can you give us a bit of your personal history in terms of

2   education and your early employment, please?

3   A.  Sure.  I was born in Tucson, went to the University of

4   Arizona undergrad, worked in the music business, and then went

5   back to the U of A to law school.  After graduating --

6          THE COURT:  When did you graduate?

7          THE WITNESS:  1987.

8          THE COURT:  Okay.

9          THE WITNESS:  Sorry, after that, I moved to San Diego

10  and started work for a law firm called Luce, Forward, Hamilton

11  & Scripps.  Then moved to Los Angeles to a law firm then known

12  then known as Graham and James, when I started working for

13  Brown Forman as an outside client.

14          After that I went in-house to Brown Forman to start

15  essentially an intellectual property function in a company they

16  never had one, even though they had been in business for over

17  100 years, at that point.  So moved to Louisville, Kentucky and

18  did my tour of duty there and then back to California.

19  Q.  How long were you in Louisville?

20  A.  A little over two years.

21  Q.  And then you moved to San Francisco bay area?

22  A.  Yes, San Rafael, California where we are based.  My whole

23  group is based there.

24          THE COURT:  You say your whole group is there.  Is

25  that the intellectual property group of Brown Forman?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  Yes.  Correct.  Jack Daniel's

2    Properties.

3          THE COURT:  Okay.

4    BY MR. HARVEY:

5    Q.  How does it happen that you are way over there in

6    California instead of down in Louisville?

7    A.  It is interesting.  There's a lot of reasons for it.  Brown

8    Forman had a fairly large presence in the wine industry.  We

9    still own a winery, but we sold most of those winery brands,

10   and so we had a presence out there.

11         Quite honestly in the era when it was set up, the law

12   in the Ninth Circuit was more developed with regard to

13   intellectual property, than it was in the circuit that -- where

14   Louisville resides.  It was easier to hire an intellectual

15   property -- or people with IP experience.  It was just an

16   easier place for us to operate, and there were a lot of

17   business reasons that we had seen in our industry that made

18   that make sense.

19   Q.  And what is your current title?

20   A.  I am president of Jack Daniel's Properties and Chief

21   Trademark Counsel to JDPI, and for, frankly, all of Brown

22   Forman's brands.

23   Q.  And functionally, for the last 20 years, has that been your

24   role?

25   A.  Yes.

DAVID SLOAN GOODER - DIRECT EXAMINATION

1    Q.   Okay.   Titles have changed slightly, but essentially the

2    same?

3    A.   Correct.

4    Q.   What is the scope of your current job and responsibilities?

5    A.   That's a big question.   I am -- I run the group that

6    protects all of the Jack Daniel's intellectual property

7    everywhere in the world, along with the other brands in the

8    company, but quite honestly, Jack Daniel's is the biggest part

9    of that.

10        We -- I direct all of the functions that go into that.

11   So you can kind of refer to that as protect, defend, and

12   extend.   We register the trademarks where they need to be,

13   which is in every place on the planet that you can.   And that's

14   not everywhere, but it's a good chunk of it.

15        We keep those registrations active.   We defend the

16   company's rights and the trademarks.   That includes

17   anti-counterfeiting in probably 30 countries, where we work

18   very tightly with law enforcement, because it's a -- we are

19   dealing with criminal groups.   We are dealing with triads.   We

20   are dealing with all that kind of thing.   There's a lot of

21   attractiveness in a product that has a healthy profit margin.

22        And then we also deal with parallel trade, all sorts

23   of piracy, all sorts of trademark infringement, trademark

24   oppositions, et cetera.

25        And then the third prong, sort of what we do is guide,

1   help the business people who are wanting to take the brand

2   places, help them do that so that we protect the IP, or find

3   ways to do things, coincide with how they want to develop the

4   business, et cetera.

5   Q.  Let me ask you to take a hold of Exhibit 2, which is the

6   Jack Daniel's product, please?

7   A.  Uh-huh.

8   Q.  And for the benefit of the Court, describe the elements of

9   the trade dress on the bottle that constitutes trademarks that

10  you are protecting?

11  A.  Start at the top of the bottle.  This is how we train law

12  enforcement actually to authenticate product as well.   It's

13  the same thing.

14        Start at the top.  It has a black shrink-band and cap.

15  It has the logo, Old No. 7 logo, which is on the shrink-band as

16  well.  You go down.  It has a unique square bottle.  It has a

17  specific shoulder pattern and signature.

18        And then predominantly then you have the white on

19  black label with the Jack Daniel's in sort of this, we call it

20  the swing logo or eyebrow.  There's a number of names for it.

21  The Old No. 7 in this design we call the cartouche.  And then

22  you have the frame of the filigree and the rest of the text.

23  Q.  Now, you mention that as part of your job, you register

24  marks?

25  A.  Correct.

DAVID SLOAN GOODER – DIRECT EXAMINATION

1   Q.  Why do you register trademarks?  What's the point?

2   A.  Our financial people ask me that sometimes.  The point of

3   registration, there's essentially two registration schemes in

4   the world.  One -- many countries follow the rule that, if you

5   don't register it, you have no rights.  Simple as that.

6          The U.S. is not in that group.  U.S. follows the rule

7   that you have to use the mark in order to be able to register

8   it, but registration gives you better rights.  The biggest of

9   those being presumptions of validity, ownership, right to use.

10         And then once the registration is old enough, the

11  right of incontestability.  Literally every country has

12  variations on that, but in the U.S., which is what we are

13  talking about here, those are some of the biggest reasons to do

14  it.

15         And it puts people on notice of the registration, you

16  know, responsible businesses will do a search before they adopt

17  a mark and they -- if fewer marks are on the register, they

18  will see them hopefully.

19  Q.  And contestable registration, you mentioned, gives you

20  certain presumptions?

21  A.  Yes.  Certain ones that are not rebuttable.  For instance,

22  if you have a mark that was potentially descriptive, once it

23  becomes incontestable, that attack is gone.  It is considered

24  valid.

25  Q.  So we have several registrations that Jack Daniel's is

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    enforcing in this case, and I would like to just have you take

2    the Court through the ones that we have.  And if we can show

3    Exhibit 3, first.  The specific elements of the trade dress you

4    have just described, which one is this?

5    A.  This is the 4,106,178 registration.  It covers the shape,

6    the distinction portions of the shape of the bottle.  Not a

7    square bottle per se, but the distinctive portions and it --

8    together with the -- and it also contains the signature.

9    Q.  You are saying the "distinct portions."  How would you --

10   which elements are shown here that you would categorize as

11   distinct elements?

12   A.  The fluting on the neck.  The way the shoulder is designed.

13   The combination of those factors, plus the beveled edges makes

14   for the unique portions.  In fact, probably, if I am not

15   mistaken, some of that registration may be in dotted lines,

16   which indicates we are not claiming a square bottle.

17   Q.  So if you could lift and hold on to VIP's product now,

18   that's Exhibit 1.  Does that product replicate the distinctive

19   elements that you have registered in this registration?

20   A.  Yeah, it does.  It has the fluting of the neck and the

21   shoulder design and the beveled edge on the sides and the

22   vertical part in the base.

23   Q.  Thank you.  So let's look at the next registration, please,

24   that would be 105.  If you could enlarge that, thank you?

25   A.  Yes, that's what we call the face label.  That's the

1   primary face label registration, which includes the words Jack

2   Daniel's, the Old No. 7 cartouche, and the framing of the

3   filigree and the type font of the words Tennessee and whiskey.

4   Q.  Now, we heard some discussion yesterday from Mr. Roush and

5   I think Mr. Epps as well, about class 33, and I see

6   International Class 33 listed there.  What class is that?  What

7   does that mean?

8   A.  That covers alcoholic beverages except beer.

9   Q.  So what does that mean, that you have a registration in

10  class 33?

11  A.  What it means is that you are claiming rights to those

12  particular goods, which in this registration are alcoholic

13  beverages, namely, Tennessee sour mash whiskey, in that class.

14  And the classification system doesn't in and of itself grant

15  you rights, it is the way it is organized for ease of access

16  and --

17  Q.  The way the Patent and Trademark Office sorts out the

18  registrations?

19  A.  Exactly.

20  Q.  Let's look at the next one, if we could please.  And that

21  needs enlarging for my bad eyes.

22  A.  That is what we refer to as a word mark registration.  It

23  is the broadest form of protection because you are not claiming

24  any stylization, no designs, anything.  And again, that covers

25  class 33.  I should say that that actual -- that mark, with no

UNITED STATES DISTRICT COURT

DAVID SLOAN GOODER – DIRECT EXAMINATION

1  claim, is covered everywhere in the world.

2          THE COURT:  Sorry, what exhibit is this again?

3          MR. HARVEY:  107 -- Exhibit 7.  Forgive me.  I set up

4  all these numbers, a hundred more than they are.  We are in the

5  early league here.  Exhibit 7, Your Honor, my mistake.  So 3,

6  5, 7, yes.

7          THE COURT:  Okay.

8          MR. HARVEY:  I am glad you stopped me.  I might have

9  kept going with this.  So --

10          THE COURT:  Wait, let him tell me again, because I was

11  focusing on that.  Can you tell me exactly what that is and

12  why?

13          THE WITNESS:  Yes.  That is U.S. Trademark

14  Registration for the words "Jack Daniel's," without any claim

15  to any form of stylization or design, and it is the broadest

16  way that you could register a trademark.

17          THE COURT:  Okay.  Thank you.

18          MR. HARVEY:  Thank you.

19  BY MR. HARVEY:

20  Q.  So the next one, if you would, please.  Exhibit 9.  What is

21  this, what are we looking at here?

22  A.  This is what we refer to as the -- this would be Jack

23  Daniel's and the swing design or eyebrow.  And, again, it is

24  the words "Jack Daniel's" but it also includes that form of it,

25  so that logo version.

1    Q.  Now, why would you register the word mark by itself, which

2    I think you just told us has the broadest scope of protection,

3    and also the same words in this arched design?

4    A.  They are effectively two different marks.  I mean, this

5    means the form and the words together are a trademark, and then

6    the other one, as I say, is more broad.  It doesn't matter what

7    form it is in.  It's plain.  It's a plain text kind of

8    registration, and it gives you, essentially, broader protection

9    if someone were to use a mark -- for instance, we've had an

10   infringement at one point where the mark was Jeike Dani, in

11   exactly that format.

12   Q.  What was the mark?

13   A.  J-E-I-K-E, second word D-A-N-I.  And it was a Chinese

14   entrepreneur, meaning in China.  So with registrations like

15   this, it enables you to protect against that kind of misuse.

16   Q.  Great.  Also class 33, I see?

17   A.  Right.

18   Q.  The next one would be 11.  Thank you.  Old No. 7, in this

19   format?

20   A.  In its format, correct, for whiskey in class 33.  Should

21   say -- it's international -- what we refer to as International

22   Class 33.  Some of these registrations are old.  There used to

23   be a U.S. classification system as well, all falls under

24   international now.

25   Q.  I notice the number on that registration is quite old

DAVID SLOAN GOODER - DIRECT EXAMINATION

1    42,000.  We are up to what, 5 or 6 million now, in terms of the

2    national registration system.  These registrations also depict

3    a first use date?

4    A.  Yes.

5    Q.  What is is that here?

6    A.  1875.

7    Q.  And what does that signify?

8    A.  That that is a very old trademark.

9    Q.  Okay.

10   A.  That has been kept alive for years because of active use,

11   which is how you keep trademarks active and alive and

12   protectable is by use.

13   Q.  You have a number of cases a year enforcing other number

14   marks in the whiskey category?

15   A.  Yes, yes.

16   Q.  If we could see the next one, please, 13?

17   A.  This is, again, what we refer to as the full label

18   trademark.  But in this registration, it covers class 9,

19   instead of class 33.  And what that means is it's -- goods in

20   class 9, for our purposes, are things like magnets, switch

21   plates for light switches, cell phone covers, which are a

22   hugely counterfeited item.  So that's a class 9, so we register

23   these trademarks in many, many classes.

24   Q.  You mentioned law enforcement a few times.  Does having a

25   trademark registration help you enforce the mark in other

DAVID SLOAN GOODER – DIRECT EXAMINATION

1   countries?

2   A.   And in our own.   I mean -- yes, is the answer to your

3   question.   It helps.   We record them with the Custom Service,

4   and the Custom Service will actually stop what they perceive as

5   infringing goods coming in across the border into the U.S. as

6   will Customs in Russia and anywhere else.

7          And then when you are trying to do some sort of raid,

8   if you don't have a registration, law enforcement usually will

9   not act on it.   So it is kind of a prerequisite as far as

10  they're concerned.   They want to have certainty what they are

11  going after, A, is protected, but, B, is done by the rightful

12  owner.

13  Q.   Thank you.   And this is the first of what I would guess I

14  would call the merchandise or supplemental products

15  registrations that you have?

16  A.   Right.

17  Q.   And that are involved in this case?

18  A.   I actually like that title, Judge, we may borrow that.

19  It's accurate.   I mean, it is all of these supplemental

20  products.   We have a theory about how we protect the brand, and

21  I grew up in ranch country, so I call it the ranch and the

22  corral fence theory.   My brother in Kentucky would refer to it

23  as the farm, but it's a ranch to me.

24          And that is, the ranch house is the core of what we

25  protect, that's the whiskey.   But if you can build a fence

UNITED STATES DISTRICT COURT

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    around the ranch house and keep it strong, then you are

2    protection increases, and all these supplemental products and

3    supplemental registrations are that corral fence.

4    Q.  So we will see a series of these.  We don't need to spend,

5    I think, a lot of time on them because there are four or five

6    more, I believe, of these supplemental goods registrations.

7            Let's look at the next one, if you would please,

8    number 15?

9    A.  Yeah.  Again, this is the face label, but this time for

10   goods in class 14, which are lapel pins, clocks, watches, cuff

11   links, sorts of jewelry-type things.

12   Q.  And you refer repeatedly to the face label, and that's the

13   design, the art, the marks that we see shown and depicted on a

14   black background?

15   A.  Correct, with the filigree and the cartouche, yeah.

16   Q.  And it is my understanding that in order to keep these

17   registrations, you use them on these goods?

18   A.  Yes, yes.

19   Q.  Or your licensees, I should say?

20   A.  Yeah, correct, both.

21   Q.  Okay.  Let's look at the next one, please.  17.  Thank you.

22   A.  Same label for goods in class 18, which are the very

23   popular Jack Daniel's umbrellas, luggage, backpacks, tote bags

24   that type of thing.

25   Q.  And on to the next, please.  I don't know where that one

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    came from.  That's just indicating of the filing of this

2    lawsuit.

3         MR. HARVEY:  Okay.  Is that the end of our

4    registration group?

5         Pardon me, Your Honor.  I am trying, for the benefit

6    of the Court to simply have every single registration that's

7    mentioned in our counterclaim identified, to the extent that

8    there are registrations, so we would want this to be -- yes,

9    I'm sorry, paragraph 12 of the counterclaim lists all of the,

10   call it merchandise, call it supplemental products

11   registrations.

12        And I believe we have run through all of them,

13   including floor mats, rugs, cigarette lighters, et cetera.  So

14   they are all there in paragraph 12 of the answer and

15   counterclaim, Document 12, in the case, Your Honor.

16        MR. HARVEY:  Thank you, Mr. Gooder.

17        THE COURT:  Mr. Bray, are you contesting that they

18   have valid -- I mean, are you saying that -- you are not

19   contesting their trademarks are valid, are you?

20        MR. BRAY:  No.  The trademarks that counsel referred

21   to have all been stipulated into evidence.

22        THE COURT:  I just want to be sure.  Okay.  Thank you

23   very much.  As we move along.  Thank you.

24        MR. HARVEY:  Thank you.

25

DAVID SLOAN GOODER - DIRECT EXAMINATION

1    BY MR. HARVEY:

2    Q.   How important to Jack Daniel's are the trademarks and the

3    trade dress that we just looked at?

4    A.   There's two answers to that.  If you think about the brand

5    itself, you -- in order to have a brand, you have to have the

6    trademarks that support it.  It is the crown jewels.  I mean,

7    if you look at our company as a whole, Jack Daniel's is the

8    most significant part of it.  It is immensely valuable.

9         I think you heard testimony yesterday that, according

10   to Interbrand, it's the 82nd or 83rd most valuable brand in the

11   world of any category.  I mean, that puts it in pretty

12   rarefied, and if you don't have the trademark portfolio, the

13   registrations to back that up, you will get chipped away at and

14   that valuation just drops.

15        So one of the first things I had to do when I came to

16   Brown Forman was, we had 225 registrations for the whole world,

17   and I was pretty shocked as a lawyer to see that.  But, again,

18   it was a company operating in a very comfortable industry with

19   lots of partners and friends and neighbors, and it didn't

20   really -- it hadn't been exposed to a lot of the rough and

21   tumble of a lot of the world.

22        We now have, you know, a portfolio in the thousands,

23   because you just can't have a brand that big, that valuable,

24   and not protect it.  So it is hugely important.  We have an

25   expression in the company, if Jack Daniel's sneezes, the whole

UNITED STATES DISTRICT COURT

DAVID SLOAN GOODER – DIRECT EXAMINATION

1   company gets a cold.  And that's very true from a brand

2   perspective and a trademark perspective.  That's why we're --

3   Q.  And apart from the registrations themselves, the marks have

4   huge value, I think you are saying, and why?  Why is that?

5   What is it that makes them so valuable?

6   A.  Well, they -- trademarks and the brand reflect the

7   personality and the values and the goodwill of the product or a

8   company or whatever happens to be attached to it.  It can be

9   even a person.

10          And in Jack Daniel's instance, it was a person.  And

11  so those values get reflected.  And that's what people identify

12  with.  That's what the shorthand -- you know, if you read some

13  of the literature of what is a trademark, it is that shorthand

14  way of communicating to a consumer, what does that brand mean?

15  What does it stand for?  And that's why it is so valuable.  You

16  know when you see a particular brand on a shelf whether that

17  brand is something you can trust, you like, it says something

18  about who you are, et cetera.

19  Q.  And we have heard the term "brand values" mentioned a few

20  times?

21  A.  Yes.

22  Q.  How would you describe the brand values of the Jack

23  Daniel's mark?

24  A.  To me they are authenticity, integrity, the honesty, the

25  quality of it, the consistency, the masculinity.  Even

1    though -- it's interesting, its masculinity, but in a way that

2    is appreciated and connected with women as well.  It is not

3    just guys, I think, it's both.

4    Q.  So having indicated those brand values, part of your job, I

5    think you have told us, entails having to enforce those rights,

6    correct?  Does Jack Daniel's have a trademark enforcement

7    philosophy, would you say?

8    A.  Yeah, we do.

9    Q.  What -- can you describe it, please?

10   A.  To me, the -- policy is not the right word.  The philosophy

11   that we follow is that everything you do, you ought to do in

12   the same values that the brand speaks in.  There's nothing

13   worse than -- and there's some really notable cases where the

14   brand went about its enforcement in a way that was so

15   contradictory to what the brand stood for that, I mean, even

16   judges would comment on it and, you know, Barbie swinging a

17   sledge hammer is not a good message to be sending to consumers.

18          So for me, when we look at an enforcement situation,

19   our philosophy is to really do it -- you see these T-shirts,

20   WWJD.  And our view of it is, What Would Jack Do?  And how

21   would we go about it?  We investigate it.  We want to know who

22   are these people?  What are they doing?  We don't just

23   knee-jerk send protest letters out at all.  We really, really

24   take our time, probably to a fault.

25   Q.  Are there typical steps that you tend to follow, or can you

1    generalize about that, in the trademark enforcement?

2    A.   Yeah, there are.  First of all, we look at how did we find

3    out about it?  We -- Jack is a really loved brand, and there

4    are people all over the world who feel -- which amazes me,

5    because they feel like they have been injured when Jack's been

6    injured.

7            We get these emails from people, and they are incensed

8    that somebody is doing X, whatever it happens to be, to Jack.

9    So whenever we get an infringement situation either from our

10   own sales people, from fans, from consumers, from law

11   enforcement, we stop, we look at it, and we figure out what --

12   we triage it.

13           I used to work in search and rescue and this old

14   crusty guy that I learned from said, first thing you do when

15   you get on an accident scene, what do you do?  Oh, jump in.  He

16   says, no, you sit down and have a cigarette.  In the days when

17   people smoked more.

18           And at first I said, what do you mean?  He said

19   because if you jump in and start doing things, you are going to

20   make mistakes.  If you sit down and assess the situation, you

21   will be smarter about it.  So that's kind of my philosophy, is

22   figure out who we are dealing with?  Where is it?  How did we

23   hear about it?  What do we know about it?  Start investigating.

24           Then we talk to our own people, who might be the

25   Country Manager, or the brand, as we frequently talk to

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    Mr. Epps and Mr. Roush.  What do they know about it?  And what

2    do we think about it?  It is not just a one-sided decision.  We

3    don't just decide what we want to do and go do it.  We are very

4    careful about it.

5    Q.  We sometimes hear the word "trademark bully" these days?

6    A.  Yes.

7    Q.  Does the company have a view about that and any concerns

8    about that?

9    A.  Yeah, I don't ever want to be named a trademark bully.  And

10   that's hard when you own a big brand, you are trying to protect

11   it, so it speaks to how you go about it, not that you take

12   action, but how you go about doing it.

13   Q.  And in terms of the kind of enforcement philosophy you just

14   described, has the company received recognition for not being a

15   trademark bully at any point?

16   A.  In fact there was an article this week, or that came out

17   last week that -- we had a situation where we sent a protest

18   letter a few years ago, and the guy had created a book with a

19   cover that mimicked the Jack Daniel's label and he posted the

20   letter we sent.

21        We went through our usual process, and he posted the

22   letter that we sent online, and it was picked up by a magazine

23   who had read it and pronounced it as the nicest cease and

24   desist letter in the world.

25        And then it went viral after that, and lawyers

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    aren't -- well, at least trademark lawyers, aren't used to

2    being in the bleeding edge of that kind of stuff, and this

3    thing went crazy viral around the world, and it unleashed --

4    publicity had unleashed, questions, articles, email to the

5    company from people who said, I don't usually buy your product,

6    but I will now.  So we kind of like to say that the lawyers can

7    build brands as well.

8            THE COURT:  Pretty soon you will be dragged into the

9    marketing meetings.

10            THE WITNESS:  That's right.

11    BY MR. HARVEY:

12    Q.  How many times under your time at -- in your adminision,

13    if I can call it that, or your group, has the company actually

14    had to go to court in court through a trial or proceeding and

15    enforce its trademark?

16    A.  All the way through a proceeding?  Once previously.  This

17    is the second time in 22 years that I have been with the

18    company.  And that prior one was actually in the Trademark

19    Trial and Appeal Board, which we view as a court of a

20    particular kind.

21    Q.  Have defendants or third parties or those using, or let's

22    call them infringers using your trademark use the defense of

23    parody?  Do you hear parody in your work?

24    A.  In particular categories of infringement, yes.

25    Q.  How often does that happen?

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    A.   Monthly, literally.  People -- what we refer to, Your

2    Honor, is takeoffs, and it is something that mimics the label

3    with different words, and that category that we call takeoffs,

4    and it is a common defense thrown at us in that category.

5    Q.   And do you have any general philosophy about parody?  What

6    do you consider a parody?

7    A.   To me it has to hit the three Cs, which I think is what the

8    law is, frankly, but my view is, it has to conjure up the

9    original, it has to comment on the original, there has to be

10   some comment there, and it can't confuse.  So if it fails on

11   any one of those, it is not protectable as a parody.

12   Q.   Were you involved, Mr. Gooder, in the VIP matter from the

13   very beginning?

14   A.   Almost the very beginning.

15   Q.   And I guess I should preface that by saying, how does the

16   information about infringements or possible infringements,

17   filter up to you, generally?

18   A.   It comes into us from all different angles, directions,

19   from people all over the world.  This particular case came,

20   Mr. Roush who testified yesterday, had seen this in the course

21   of his work.  He then sent it to the person on my team who

22   would start looking at it, investigating it, sort of working it

23   up to understand the potential matter, and then would bring me

24   into it.

25   Q.   And specifically here, when did you first become aware of

DAVID SLOAN GOODER - DIRECT EXAMINATION

1    the VIP toy?

2    A.   Would have been somewhere in -- well, right after Mr. Roush

3    mentioned it, so it would have been somewhere in September of

4    2014, I believe, and it was brought to my attention by my team

5    internally.

6    Q.   What was your reaction when you saw the toy?

7    A.   I had a number reactions, if you will.  First one, I was

8    concerned that people would be confused -- consumers would be

9    confused, that they would think it was us.

10        We know from having dealt with hundreds of these

11   years, at least for two decades, how consumers tend to think

12   about this stuff, because we've seen it.  And as Dr. Simonson

13   was saying, it's not just -- it is our experience, but it's

14   also been borne out by a number of surveys in other cases, et

15   cetera.  So I was worried about confusion on this one.

16        Especially because when you looked at it online, I

17   wasn't convinced that the quality was the kind of thing that --

18   et cetera.  But the second thing was I was really worried about

19   the tarnishment part of it.  You know, parody is -- or spoofs

20   or whatever, kind of part of my job is being the voice of --

21   the voice that says, yeah, I know, we just have to laugh.  You

22   just have to take a joke sometimes because that's what it is.

23        But this one had the tarnishing element, and as

24   Dr. Simonson said, the combination of dog poop, defecation,

25   feces, whatever you want to call it, and something you ingest,

DAVID SLOAN GOODER – DIRECT EXAMINATION

1   a drink or whatever, is just to me, is a much heightened -- is

2   a heightened risk of that.

3        I was worried about the issue of, does this product

4   have an appeal to people -- people under the legal drinking

5   age?  And how hard we work to not have that be something that's

6   out there.

7        In fact, one of our enforcement sort of criteria, if

8   you look at the factors that will make a case more likely that

9   we will go after it, is if it is appealing to people under

10  legal drinking age.

11       So for instance, we've gone after skateboard decks,

12  skateboard wheels, anything like that that appeals, makes, to

13  me, the infringement more problematic.

14  Q.  And does Jack Daniel's follow a policy about underage

15  drinking, warning against it, staying away from it?

16  A.  You mean generally?  Yeah, we have a code of conduct,

17  that's based on the code of conduct.  Let me back up.  The

18  spirits industry in the U.S. is represented by something called

19  the Distilled Spirits Council of the U.S. or DISCUS,

20  abbreviation.

21       DISCUS has a code of responsible marketing.  Brown

22  Forman also has its own code, but is actually more restrictive

23  than the DISCUS code is.  And so when it comes to an LDA, Legal

24  Drinking Age, an LDA issue, it's a big deal to us.  We take it

25  quite seriously.  Especially because our industry in many ways

1    is self-regulated.

2            There was some conversation yesterday about laws

3    relating to advertising.  There were never any.  There are no

4    laws per se in the U.S. that ever prohibited alcoholic

5    beverages from advertising.  It was a self-imposed regulatory

6    conduct.

7            So we never -- so when we started being able to

8    advertise on television, it was because the networks started

9    allowing it.  Because they felt we were doing it in a

10   responsible enough way and they could do it in the evenings --

11   and they frankly liked the revenue.  But it was always

12   self-regulation, and still is today.

13   Q.  There's a disclaimer that's been discussed on the VIP

14   product.  In fact, if you could take a look at the hangtag on

15   the back at the bottom and read that to the Court, the last two

16   lines, please?

17   A.  Yeah.  It says this -- the product -- excuse me.  It's

18   pretty small.

19           The product and its design belong to VIP Products.

20   And the next line down, yeah, there it is.

21           This product is not affiliated with Jack Daniel's

22   distillery.

23   Q.  So didn't that take care of the problem?  Why wasn't that

24   enough to alleviate your concerns about confusion?

25   A.  Two reasons, really.  One is they are inconsistent

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    statements.  So it says that, you know, you look at it and you

2    say, well, it is owned by VIP, okay, but then it says it is not

3    affiliated -- first of all, I don't think people -- I don't

4    think people really understand what disclaimers mean sometimes.

5    They understand the words, but I am not sure they know what it

6    means in the context.

7            And if you -- Professor McCarthy, who was the most

8    noted published author of the bible on trademark law, and a lot

9    of the cases actually say that, the higher the risk of

10   confusion, the less a disclaimer does any good and in fact it

11   may make it worse, because it draws people to thinking there's

12   a relationship.  They don't get the "not."  They miss the "not"

13   in it.  Not affiliated.  Not, you know, whatever.

14           So when I saw this, to me this just doesn't -- you

15   know, it is like the commercials you hear where the guy does

16   his thing.  He sounds like, you know, Jimmy Durano at the end

17   of his celebrity voice impersonator, can I unring the bell that

18   I just heard?  A commercial that sounded like him talking to

19   me.  To me the answer is no.

20   Q.  So in terms of the investigation, I guess I didn't ask the

21   foundational question, did you investigate VIP before you sent

22   the protest letter?

23   A.  Yes, we did.

24   Q.  What did you find out?

25   A.  Well, the product first showed up on a website being sold

DAVID SLOAN GOODER - DIRECT EXAMINATION

1    by a retailer, and when we investigated it and contacted them,

2    they pointed us to VIP.  We then investigated VIP and the

3    product, et cetera.

4         And what we learned fairly quickly was that this was

5    part of an effort, a concerted strategy, of theirs to do this

6    kind of product.  So there was a -- we saw there had been a

7    Budweiser, product called "Buttwiper," that had been a subject

8    of litigation in St. Louis by Anheuser-Busch.

9         There were other products, so -- you know our view

10   was, okay, this is a concerted effort.  This is not their first

11   rodeo.  And so we kind of realized, all right, then -- and they

12   are a very successful business.  I mean, they are a small

13   company in some ways, and very big in others.

14   Q.  So if we could look at Exhibit 170, I think, was the

15   website of Boozin' Gear that was mentioned in yesterday's

16   testimony.  You saw this before the cease and desist letter

17   went out?

18   A.  Yes, something like that.  That may have been -- I don't

19   know when that was -- there it is, it was taken in April of

20   '15, but I mean, that was -- that's the site that we saw it on,

21   and there was something called a beer -- another site.

22   Q.  Another site, Wear Your Beer?

23   A.  Yeah, exactly.

24         THE COURT:  Don't talk over each other.

25         MR. HARVEY:  Forgive me.

1          THE WITNESS:  Yeah, Wear Your Beer, I think was --

2     there it is.  That's it.  And then Boozin' Gear.  And both of

3     these sites sell authentic licensed supplemental products.

4     BY MR. HARVEY:

5     Q.  So for the benefit of the Court, we are identifying Exhibit

6     171.  And you say this was the Wear Your Beer site, at least as

7     it existed in April of 2015.  So this is actually after the

8     cease and desist letter was sent, but is it your testimony that

9     it was substantially the same?

10    A.  To my knowledge, yes.

11    Q.  So here we have Jack Daniel's official gear over here on

12    the right, and if you page or scroll down, please, to the

13    next -- well, these are the wearables that Mr. Roush told us

14    about yesterday.  There's the black Jack Daniel's T-shirt.

15    This is authorized?

16    A.  It appears to be.

17    Q.  And if you go on down and scroll on down in the site, it

18    says, Wear Your Beer site, Exhibit 171, we find the Bad

19    Spaniels squeaky liquor bottle dog toy.  And you're saying that

20    was around at the same time in September when you were

21    investigating?

22    A.  Yes.

23         THE COURT:  Excuse me.  Just to be sure, we are now

24    talking about -- you said you saw this on about April, mid

25    April tax day?

1             THE WITNESS:  No, we saw this, I think it was

2    September 2014 originally, when we investigated it.

3             THE COURT:  But when you saw this particular item?

4             THE WITNESS:  Correct, both beer and more in Boozin'

5    Gear, we found it at that time.

6             THE COURT:  Because we keep getting April the 15th,

7    and I can't recall if we talked about April of 2015, '16, or

8    this year.  It would be helpful if I could --

9             MR. HARVEY:  It is a valid point, Your Honor.  And

10   just to clarify, the last two exhibits, 170 and 171, show an

11   April -- a tax day kind of date in 2015.  And I think that's

12   because it was around the time of Mr. Sacra's deposition being

13   taken they were marked as exhibits.

14            THE COURT:  So we are not talking about being for sale

15   in 20 --

16            MR. HARVEY:  -- 14.

17            THE COURT:  -- 16 or 17 currently?

18            MR. HARVEY:  Right.

19            THE COURT:  This does not represent that; is that

20   correct.

21            MR. HARVEY:  That's correct.

22            THE COURT:  One of the issues may come up about

23   availability being sold now.

24            MR. HARVEY:  And my understanding --

25            THE COURT:  I am not sure you will get into that, but

 1    I'm a little slow with numbers, and I want to make sure I get

 2    all of these things in sequence.  That's important to me.

 3    Thank you.

 4            MR. HARVEY:  You're welcome, Your Honor.

 5    BY MR. HARVEY:

 6    Q.  Just to clarify, Mr. Gooder, the last two exhibits, 170 and

 7    171, if we could scroll back up on this one.  Shows a date in

 8    the upper left corner of April of 2015.  But in fact, your

 9    testimony is that the site was substantially the same back in

10    September of the year before; is that correct?

11    A.  Yeah, I would say we saw that product on the site in

12    September of 2014, along with our own licensed products.

13    Q.  Right.  Same with the Boozin' Gear site?

14    A.  Correct.

15    Q.  Thank you.  Okay.  So at that point, a protest letter was

16    sent; is that right?

17    A.  Yes.

18    Q.  And we have a copy of that.  Can we show Exhibit 87.  This

19    is the protest letter sent in September of 2014, Exhibit 87,

20    the trial Exhibit 87, Your Honor.

21            How would you characterize the tone of this?  I mean

22    it speaks for itself obviously, but what was the intent, I

23    suppose, of writing this kind of a letter, as opposed to any

24    other kind of a letter?

25    A.  Yeah, this is -- well, when I am talking to my crew about

1    which variation of letter we send, this one is what we would

2    call a fairly friendly protest letter.  It doesn't threaten

3    litigation.  It doesn't -- it asks for a reply.

4          It explains the concern in a friendly way.  It asks

5    for certain information, so we can kind of evaluate the

6    situation, because we don't always have all of the information.

7    There are certain parts that only the other side will have.

8          And if you look at page 2 of this, you will see that

9    it actually illustrates the product, but it basically says, you

10   know, look forward to hearing from you, would appreciate a

11   response, et cetera.  It doesn't say, pull it off the market or

12   we will see you in court.

13   Q.  Have letters of this type been used in the past by Jack

14   Daniel's in the trademark enforcement?

15   A.  Yes, frequently.

16   Q.  And have you had -- well, describe the reactions that you

17   have had to this type of letter in the past?

18   A.  Most of the time the reaction we get from people is they

19   appreciate the tone we took, in terms of trying to get

20   something sorted out, figured out, solved.  Most people don't

21   want to be infringers, and so we would rather have the first

22   approach be a friendly one and get it resolved.

23          If we can't, or if we find out that really these folks

24   aren't, sort of operating in good faith, whatever, then we may

25   have to change the tone.  But most of the time we try to start

DAVID SLOAN GOODER – DIRECT EXAMINATION

1    out in a way that's like this.

2    Q.  What was your hope in sending this kind of letter as

3    opposed to any other kind of letter that you might have chosen?

4    A.   Frankly, our hope was that we have a conversation and that

5    they would reply back and say, yeah, we may disagree with your

6    theory, but here's what we are doing and et cetera, and how do

7    we work this out.  That was the hope.  That's why we send them,

8    as opposed to having outside lawyers send them.

9    Q.  Does having outside lawyers send them send a different

10   message, in your view?

11   A.   Certainly does when I get one from an outside lawyer, as

12   opposed to the other company.  Yeah, it does.  I mean, to me

13   it's a different -- it amps up the dispute.  You know,

14   everybody's got lawyers sending letters.  I mean, I look at it

15   differently.  Now Rachel is a lawyer, but still, it is not

16   coming from a law firm.

17   Q.  So go back to the first page, please.  Just enlarge the

18   first couple of paragraphs, if you don't mind.  Thank you.

19          We certainly appreciate your apparent affection for

20   Jack Daniel's, says the third paragraph, what you may not have

21   realized is your use of the marks in this manner constitutes

22   trademark infringement and a dilution of our valuable trademark

23   rights.

24          So that's the tone you are talking about?

25   A.  Yes.

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    Q.  And did you hear back from Mr. Sacra?

2    A.  No, not from Mr. Sacra.  We heard from his lawyers.  We got

3    sued.  We got a complaint.

4    Q.  And how quickly after this letter was sent?

5    A.  Two weeks, I think, a couple of weeks.  It was mid

6    September.

7    Q.  Were you surprised at this reaction?

8    A.  I was disappointed.  I was a little surprised, but when I

9    knew that they had so many other products like this, I knew

10   they tangled with Anheuser-Busch, I figured this was -- after

11   losing to Anheuser-Busch, I figured this was just part of their

12   business strategy, which is, come out swinging hard and maybe

13   the brand owner will back down.

14          MR. HARVEY:  I have no further questions, at this

15   time.  Thank you, Your Honor.

16          THE COURT:  Thank you, counsel.

17          THE COURT:  Mr. Bray, you may cross-examine, please.

18          MR. BRAY:  Can this be set up so I could use the ELMO?

19          THE COURT:  Ms. Richter, is the ELMO set up for him?

20          Yes it is.  Thank you.

21                      CROSS-EXAMINATION

22   BY MR. BRAY:

23   Q.  Good morning, Mr. Gooder.  We've actually met a couple of

24   times before?

25   A.  Yep.

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    Q.  Once in your office in Northern California, and then at

2    least once in Phoenix before, maybe twice?

3    A.  I think the first pretrial.

4    Q.  Yeah, maybe even three or four times.  Nice to see you

5    again.

6    A.  You, too.

7    Q.  You reference the fact that VIP tangled with Anheuser-Busch

8    before, and you referred to VIP losing.  That was after a

9    preliminary injunction and not after a trial, correct?

10   A.  I don't know the procedural history of the case.

11   Q.  Okay.  And were you aware that the trial judge in that

12   case, on ruling on Anheuser-Busch's motion for preliminary

13   injunction, found that with regard to the "Buttwiper" product,

14   Anheuser-Busch did not establish a likelihood of success on the

15   dilution claim?

16           THE COURT:  But they had a different theory, didn't

17   they?

18           MR. BRAY:  Pardon me?

19           THE COURT:  They had a different theory in that case,

20   didn't they?

21           MR. BRAY:  Slightly.

22           THE COURT:  So that's different than the case here.  I

23   mean, it is legitimate cross-examination.  I want to make sure

24   we keep the different theories correct, that's all.

25           THE WITNESS:  I am not expert on the BP case versus

UNITED STATES DISTRICT COURT

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    VIP.

2    BY MR. BRAY:

3    Q.  And I think you said that sometimes consumers feel so

4    protective of the Jack Daniel's brand or identify so much with

5    it they bring -- and when the brand is hurt, they feel hurt,

6    they bring matters to Jack Daniel's attention?

7    A.  Yes.

8    Q.  Did I get that right?  And just as an aside, as somebody

9    that's involved in brands, it is ever depressing to you that

10   Americans feel the need to so -- wrap so much of their identity

11   up in a brand owned by a megalithic corporation?  Does that

12   ever --

13   A.  Does that depress me?

14   Q.  Pardon me?

15   A.  Did you ask if I was depressed?

16   Q.  Do you ever find that depressing?

17   A.  No.

18   Q.  Okay.  You think kind of the lauding of brands in our

19   culture and brands becoming iconic things is a good thing over

20   all?

21   A.  Yes.

22   Q.  Okay.

23   A.  Depending on how it's done, yeah.

24   Q.  I think you said that you were the voice of reason in your

25   company, in terms of potential infringers that might be out

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    there, right?

2    A.  Yes, I said that.

3    Q.  But before I circle back to that, with regard to the

4    Americans that so identify with the Jack Daniel's brand that

5    when it's harmed they feel harmed, they bring that to your

6    attention, that's not what happened in this case, right?

7    A.  No.

8    Q.  Okay.  In fact, to your knowledge, no consumer has

9    communicated to anybody at Jack Daniel's that they feel harmed

10   by the Bad Spaniels toy, correct?

11   A.  Let me make sure I understand your question.  No consumer

12   has -- ask your question again, please.

13   Q.  To your knowledge, no consumer has told Jack Daniel's that

14   they feel harmed by the Bad Spaniels toy?

15   A.  Who do you mean by Jack Daniel's?  Do you mean JDPI?  Do

16   you mean brown Forman?  Do you mean the distillery?  You used

17   the word "Jack Daniel's," he's dead but --

18   Q.  Well, I don't know if I need to have that level of

19   precision.

20   A.  The big sense of Jack.

21   Q.  Yeah, consumers being so protective of the brand that they

22   alert Jack to things that they think are harming the brand

23   because it harms them?

24   A.  None that I know of.

25   Q.  And that is not how this case came to Jack Daniel's

DAVID SLOAN GOODER - CROSS-EXAMINATION

1   attention?

2   A.   Correct.

3   Q.   And my next follow-up question is, in fact, no consumer has

4   communicated any such thing to your knowledge to Brown Forman,

5   Jack Daniel's?

6   A.   Not to us.

7   Q.   Okay.  And you talked about the Boozin' Gear site.  I

8   believe it was Mr. Roush yesterday testified that there were

9   thousands of e-commerce sites that offer licensed Jack Daniel's

10  products, correct?

11  A.   I believe that's what he said.

12  Q.   And you don't have any reason to disagree with him, do you?

13  A.   Nope.

14  Q.   And there are probably millions of e-commerce sites taken

15  as a whole, correct?

16  A.   I am no expert on the number of e-commerce sites out there,

17  but from what I see, that's probably not far off.

18  Q.   So out of the millions of e-commerce sites that exist over

19  all, and the thousands of e-commerce sites where Jack Daniel's

20  license products are available for sale, to your knowledge, the

21  only e-commerce sale where licensed Jack Daniel's goods are

22  sold, and also the Bad Spaniels product was sold, was the one

23  Boozin' Gear site, correct?

24  A.   No, that's not true.

25  Q.   What other sites?

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    A.   Amazon.

2    Q.   Everybody sells everything on Amazon?

3    A.   But you asked me if Boozin' Gear was the only one, and the

4    answer is, no, it is not.

5    Q.   Okay.  Fair enough.  Other than Amazon and Boozin' Gear,

6    anything else?

7    A.   Walmart.com, Wear Your Beer site.  I am sure there are

8    others.

9    Q.   You have knowledge that the Bad Spaniels product was sold

10   on walmart.com?

11   A.   I believe it was at one point.

12   Q.   Okay.  And if Mr. Sacra --

13   A.   Well, he mentioned -- somebody mentioned about the sales to

14   Walmart.

15   Q.   If Mr. Sacra were to testify that based on his own sales

16   records, there have been zero sales to Walmart, would that --

17   you wouldn't have any reason to doubt his business records,

18   would you?

19   A.   Not that I have --

20        THE COURT:  Counsel, that brings some facts not in

21   issue about how your client -- again, this is the problem of

22   reversing -- how your client sells his products.  Because a lot

23   of things advertised on these Internet sites are drop shipped.

24   The internet -- they do them through a site, but the site then

25   goes back to the person that is holding the inventory, and they

DAVID SLOAN GOODER - CROSS-EXAMINATION

```
 1    drop ship it down to the ultimate consumer.

 2            So you may have something on your website although not

 3    a product has been sold actually to them in that capacity.  So

 4    I think we need to know how all these businesses work, at some

 5    point.

 6            MR. BRAY:  Fair enough, and I can ask Mr. Sacra

 7    questions along those lines.

 8            THE COURT:  I understand, but I just want to make

 9    sure, at this juncture in the testimony, it assumes a fact not

10    necessarily in evidence.

11            THE WITNESS:  Yeah, and I would assume Mr. Sacra's

12    business is like ours, in the sense that we may sell to Company

13    A, but Company A will sell to Company B, and we don't have a

14    relationship with Company B, but that's how the wholesale

15    business works and many product categories.  I would assume in

16    his as well as ours.

17    BY MR. BRAY:

18    Q.  I think Mr. Roush talked about 3,000 separate products,

19    licensed products that Jack Daniel's sells.  You would agree

20    with me that the majority of those products are sold only in

21    the Lynchburg Hardware & General Store, right?

22    A.  No, I would agree with that.

23    Q.  A significant number of those products are only sold at the

24    Lynchburg General Store?

25    A.  No, I wouldn't agree with that.
```

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    Q.   Okay.  With regard to the -- specifically the dog leash and

2    collar, they are only available on the Lynchburg Hardware &

3    General Store?

4    A.   Correct.

5    Q.   There are other products in the Lynchburg General Hardware

6    Store that are only available there and not elsewhere, right?

7    A.   There are some.

8    Q.   And the VIP Bad Spaniels product is not available for sale

9    in the Lynchburg Hardware & General Store, correct?

10   A.   I highly doubt it.

11   Q.   And getting back to what you said earlier, in response to

12   questions by Mr. Harvey, that you are the voice of reason and

13   you have discussed the elements of a parody, you have never

14   been involved in a case in your 20-something years at Jack

15   Daniel's, or Jack Daniel's Properties, where involving a

16   product where the other side raised a parody defense and you

17   thought it was a potentially valid defense?

18   A.   You are asking -- I don't -- I am not sure if -- it is a

19   long question.

20        You are saying have I ever been -- ask me, again, if

21   you would, please.

22   Q.   In your 20-plus years at Jack Daniel's, Jack Daniel's

23   Properties, you have not been involved in a case where the

24   other side raised a parody defense where you thought it was a

25   valid defense?

DAVID SLOAN GOODER – CROSS-EXAMINATION

1    A.   That's not true.

2            MR. BRAY:  May I approach the witness, Your Honor?

3            THE COURT:  Yes.

4    BY MR. BRAY:

5    Q.   Like I said at the beginning, we have met before, and one

6    of those times was during your deposition in June of 2015,

7    correct?  You remember me deposing you in this case, correct?

8    A.   Yep.

9    Q.   Okay.  Do you recall me asking --

10           THE COURT:  What page?

11           MR. BRAY:  Page 43, line 13.

12   BY MR. BRAY:

13   Q.   In every case involving a product where the producer of the

14   the product alleged that it's a parody of a Jack Daniel's

15   product or mark, not likely to cause confusion as to the

16   source, origin, affiliation with Jack Daniel's, in every case,

17   you as president and chief counsel, trademark counsel of JDPI,

18   have disagreed and believed that the alleged parody product was

19   confusingly similar to JDPI's marks?

20           You then answered:  I cannot think of a case or a

21   matter where the opposing side raised the defense of a parody

22   that I thought it was a valid claim.

23           Was that your testimony in June of 2015?

24   A.   It was.

25   Q.   You referred to McCarthy on Trademarks as being the bible

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    for trademark law?

2    A.  Yes.

3    Q.  A leading authority?

4    A.  Yes.

5    Q.  In terms of your view of whether or not the Bad Spaniels

6    toy was infringing or not, did you review the section on

7    McCarthy dealing with parody products, specifically related to

8    pet toys?

9    A.  At that time?

10   Q.  Yes.

11   A.  No.

12   Q.  Have you subsequently?

13   A.  Yes.

14   Q.  And have you seen that McCarthy states, for example, the

15   pet owner who sees a line of products for pet toys under the

16   names that parody the brands of elegant and high fashion marks,

17   Chewnel No 5, Dog Perignonn, Sniffy and Company, and Chewy

18   Vuitton, is highly unlikely to mistakenly think that a famous

19   high fashion houses are making or authorizing the dog

20   accessories?

21          You have read that subsequent?

22   A.  If it's in McCarthy, probably read it.

23   Q.  And you talked about an analogy regarding ranch house and

24   the fences?

25   A.  Yep.

DAVID SLOAN GOODER – CROSS-EXAMINATION

1    Q.   Is it your job as the chief trademark counsel at Jack

2    Daniel's to continue to push the fence posts back further and

3    further away from the main house of Jack Daniel's, to use your

4    analogy?

5    A.   That my job to push the fence posts back?  I think it is

6    all of our job within the reason of what makes sense for the

7    brand.  For instance, we wouldn't push the fence where it

8    shouldn't go.  You know, we wouldn't push the fence over to

9    tobacco products.  We wouldn't push the fence to a lot of

10   things.

11            So, no, I guess the answer is no, it is not our job to

12   push it out as far as it will go.  In fact, it is our job to be

13   smarter about it than that.

14   Q.   Mr. Epps testified that one of the reasons he had a

15   reaction to the Bad Spaniels product is he's very protective of

16   the Jack Daniel's marks.  Are you also very protective of the

17   Jack Daniel's marks?

18   A.   I am.

19   Q.   And like the other witnesses, I assume that you don't find

20   any humor in the Bad Spaniels product?

21   A.   No, not the way it was done.

22   Q.   And I assume, you know, as a trademark counsel for Jack

23   Daniel's, you didn't find any humor in any of the other

24   products in the Silly Squeakers line?

25   A.   I don't remember all of them in the line.  I just remember

1    a couple of them.  But, no, I didn't find humor in "Buttwiper."

2    Q.  Cataroma and Heinie Sniff'n, Barks?

3    A.  We had seen the Heineken one also, and that's what led us

4    to the Budweiser one, and I didn't find that --

5    Q.  You don't believe the drawing of the cocker spaniel on the

6    Bad Spaniels bottle is disgusting, do you?

7    A.  No.

8    Q.  And you agree with me that at least as to pet owners,

9    having a depiction of a dog can create a positive association

10    with a product, or brand?

11    A.  Depending on the dog, yeah.

12    Q.  Sure.  And you are not aware of any actual instances where

13    the Bad Spaniels dog toy has actually harmed Jack Daniel's

14    reputation, correct?

15    A.  No, it's not true.

16    Q.  Okay.  Again, if you could look at the deposition, page 72,

17    Mr. Gooder, line 2.

18    A.  Sorry, line what?

19    Q.  Line 2.  You recall me asking this question?

20    A.  Sorry, you said page 72?

21    Q.  74, line 2.  I apologize.  Are you there?

22    A.  Yes.

23    Q.  Well, you recall me asking this question:  Well, the

24    complaint refers to imagery that harms the reputation.  So are

25    you aware of any harm to the reputation of JDPI, or Jack

DAVID SLOAN GOODER - CROSS-EXAMINATION          60

 1    Daniel's, by the Bad Spaniels toy?  Actual harm to the
 2    reputation?
 3            Your answer was:  If you are referring to instances of
 4    actual harm, no.
 5            That was your testimony in June of 2015, correct?
 6    A.  Correct.  I said, instances of actual harm.
 7    Q.  And you are also not aware of any evidence that Jack
 8    Daniel's has lost any sales because of the Bad Spaniels toy,
 9    correct?
10    A.  Sorry.  Ask the question again?
11    Q.  You are not aware, Mr. Gooder, of any evidence that Jack
12    Daniel's has lost any sales as a result of the Bad Spaniels
13    toy, correct?
14    A.  I am not aware of any specific instances, no.
15    Q.  Okay.  And I almost hate to revisit Dr. Simonson, but you
16    are not aware of Jack Daniel's performing any survey of actual
17    customers to determine if the Bad Spaniels product creates any
18    consumer aversion to Jack Daniel's?
19    A.  I am not aware of any, and I don't believe he would do one
20    or could do one.
21    Q.  Okay.  But --
22    A.  Is that too close to the line?
23    Q.  Do you agree with Dr. Simonson that VIP should have done
24    one before it launched the product?
25    A.  I don't have an opinion on -- I am not qualified to have

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    that -- to make that judgment.

2    Q.   JDPI has not -- you talked about the disclaimer briefly.

3    JDPI, Jack Daniel's, has not conducted any sort of research to

4    determine what consumers understand or don't understand about

5    the disclaimer on the Bad Spaniels toy, correct?

6    A.   Correct.  We have not ourselves done it.  We have watched

7    and read about other instances and other reviews and articles

8    and discussion from Professor McCarthy, et cetera, et cetera.

9    We haven't felt the need.

10   Q.   And you recall Mr. Harvey asking you questions regarding

11   parody products, and you said that you receive communications

12   regarding parody products about every month?

13   A.   Yeah.

14   Q.   Okay.  And you said there are three things that make a

15   successful parody.  They have to conjure up the original,

16   comment on the original, and they can't confuse?

17   A.   Correct.

18   Q.   You don't have any knowledge, Mr. Gooder, do you, as to

19   what percentage of Americans believe that any product, any

20   parody product that conjures up another brand, regardless of

21   the contents of the parody, regardless of the marks involved,

22   but just simply the fact that the connection one is made, that

23   there's a conjuring up, you don't have any knowledge as to what

24   percentage of Americans believe that, in all cases, the

25   permission of the trademark holder is relevant, needs to be

DAVID SLOAN GOODER – CROSS-EXAMINATION

1   had?

2   A.   I do not have any statistical information on that.

3   Q.   And had you reviewed -- have you reviewed -- we saw some

4   examples of comments with -- regarding to the Dr. Ford survey.

5   Would you agree or -- have you reviewed all of the comments?

6   A.   All of the comments, no.

7   Q.   Okay.  And if there were comments where a consumer

8   participating in the survey expressed the belief that, if you

9   conjure up a product, if you can tell what the joke is, you

10  have to have permission of the trademark holder, that doesn't

11  go to proving the third part of your parody analysis that it

12  can't confuse, does it?

13  A.   That's a pretty hypothetical question.  I --

14         THE COURT:  Well, let me evoke a rule here.  You can

15  answer what you -- if you have an opinion or understanding or

16  knowledge of.  You cannot engage in speculation, however, in

17  response to a question, and that's a thin line, but just so we

18  know what the parameters are.

19         THE WITNESS:  Would you please repeat your question,

20  and I will do my best.

21         THE COURT:  Do you want me to have it read to you?

22         THE WITNESS:  Sure.

23      (Whereupon, the Court readback the question.)

24         MR. BRAY:  Did you understand that, or do you want me

25  to make another attempt?

DAVID SLOAN GOODER – CROSS-EXAMINATION

1          THE WITNESS:  Maybe you can break it down into one

2     question.

3     BY MR. BRAY:

4     Q.  Would you agree that, with regard to -- you have been

5     involved -- or been involved in cases where there have been

6     trademark surveys performed other than this one, correct?

7     A.  Correct.

8     Q.  And you have some knowledge regarding the Dr. Ford survey

9     that he performed in this case?

10    A.  Yes.

11    Q.  Would you agree with me that when you are performing a

12    survey vis-a-vis a parody product, there's a danger that the

13    survey question will simply be testing the consumer's knowledge

14    of law or belief about what the law says regarding permission

15    of trademark holders being needed for parody products?

16    A.  I think that would call for me to speculate on it.  My

17    feeling is if it's a properly constructed survey as Dr. Ford's

18    was, it's not testing that, or if it's testing that -- it would

19    be speculating.  I am not an expert in that.

20    Q.  Okay.  Fair enough.  You would agree with me that for --

21    there are a number of American whiskey and bourbon products

22    that like Jack Daniel's use black and white on the labels of

23    their products, correct?

24    A.  There are some who do it in a different way than we do.

25    Q.  Sure.  And do you recognize these as examples of?

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    A.  Can we dim the lights, if you don't mind?

2            THE COURT:  Can we dim the lights, Lisa?

3    BY MR. BRAY:

4    Q.  Do you recognize these as American whiskey and bourbons

5    that compete with Jack Daniel's?

6    A.  Yes.  Well some don't compete with us, but they are brands

7    of whiskey or bourbon that I know.

8    Q.  Okay.  And they all, in this exemplar, in this

9    demonstrative, they all use black and white, on their labels?

10   A.  In some form, yeah.

11   Q.  Okay.  And at least with regard to early times, Ezra

12   Brooks, Jim Beam, Virgin Bourbon, they use the eyebrow, the

13   arch lettering?

14   A.  Yes.

15   Q.  And these are all examples that use square bottles?

16   A.  It appears that those are square bottles.

17   Q.  And I believe in your complaint, one of the elements of

18   your trade dress that you talk about is the black cap?

19   A.  Yes.

20   Q.  These all have black caps?

21   A.  I am color blind, so if you are telling me they are all

22   black, I will believe you.

23   Q.  Okay.  Thank you.

24           THE COURT:  What exhibit was that?

25           MR. BRAY:  It is a demonstrative.  It can be 10,004.

DAVID SLOAN GOODER - CROSS-EXAMINATION

```
 1              THE COURT:  Okay.
 2   BY MR. BRAY:
 3   Q.  Would you agree with me that there are Americans that
 4   associate a black and while label and a square bottle with
 5   whiskey?
 6   A.  Yes.
 7   Q.  Okay.
 8   A.  Not all whiskeys.
 9   Q.  A lots of whiskey though?
10   A.  Some whiskeys.  I wouldn't agree with you to say "a lot,"
11   some.
12   Q.  At least 12?
13   A.  Well, I don't know how many --
14   Q.  Or 10?
15   A.  I don't know what Americans think about any of these other
16   brands, so I can't testify to that.
17   Q.  Okay.  And you are not telling the Court that you have
18   exclusive right to use a square bottle shape for a whiskey or
19   bourbon product, right?
20   A.  I believe that's what I have testified earlier.
21              MR. HARVEY:  Your Honor, we have an objection that the
22   exhibit or demonstrative that counsel is showing includes the
23   Bad Spaniels product in it.  It is not a whiskey.  He is
24   characterizing these as all whiskeys and showing it to the
25   witness.
```

DAVID SLOAN GOODER – CROSS–EXAMINATION

1      MR. BRAY:  I misspoke, Your Honor.

2      THE COURT:  Right.  The one in there is the

3  plaintiff's, and that is not a product.  I think it's all of

4  the other products up there by analysis.  I believe that's the

5  purpose of the demonstrative evidence.  They have similar

6  markings on their bottles.

7  BY MR. BRAY:

8  Q.  And the control product that Dr. Ford uses didn't use black

9  and white on the control, correct?

10  A.  Correct.

11  Q.  Didn't use a square bottle?

12  A.  Doesn't appear to be one.

13  Q.  Didn't use a black cap, correct?

14  A.  Correct.

15  Q.  Didn't use any of the kind of "old timey" fonts that seem

16  to characterize --

17  A.  I don't know what you mean by "old timey" fonts.  You want

18  to put the control back up.

19  Q.  What's a better word I can use?  The fonts used on Jack

20  Daniel's and other whiskey products tend to be stylized in some

21  way?

22  A.  Fonts by definition are stylized.

23  Q.  Let me ask this question, Mr. Gooder.

24  A.  Okay.

25  Q.  Would you agree with me that the font used on the Bad

DAVID SLOAN GOODER - CROSS-EXAMINATION

1   Spaniels product, is not similar to any of the fonts used on

2   any real world --

3   A.  I couldn't see the font on the control.  If you want to

4   give me a close-up of it or let me see it on paper.  It's just

5   too small for me.

6   Q.  I will try zooming in.

7   A.  There we go.

8   Q.  Does that font look like any of the fonts?  Does it --

9   strike that.

10          Does it resemble any font on a real world whiskey or

11   bourbon product, to your knowledge?

12   A.  There's a lot of bourbons and whiskeys out there.  I could

13   not give you any opinion on whether it looks like any other

14   one.

15   Q.  At least -- and you're knowledgeable regarding the whiskey

16   and bourbon market, based on your position at Jack Daniel's

17   Properties, correct?

18   A.  Yes.

19   Q.  At least sitting here today, you know, drawing on your 22

20   years of experience at Brown Forman Jack Daniel's Properties,

21   Inc., you can't think of another whiskey or bourbon product

22   that uses a font comparable to Bad Spaniels on the control

23   product, correct?

24   A.  That's not true, actually.

25   Q.  Which product is that?

DAVID SLOAN GOODER - CROSS-EXAMINATION

1   A.  I would have to look at them, but I think there's a brand

2   called Woodford Reserve that has a very simple basic font used.

3   It's not elaborate, it's not -- I think you describe it as old

4   timey.  And I think -- I would assume --I think there are

5   probably others but Woodford comes to mind because it is one of

6   ours so I am more familiar with it.

7   Q.  I think you said that one of the elements that Jack

8   Daniel's is trying to protect, or one of the elements of the

9   trade dress that is at issue is this case is the arch

10  lettering, the eyebrow?

11  A.  It is part of the trade dress, yes.

12  Q.  Again, you would agree with me that there are other

13  American whiskey and bourbon brands that use the eyebrow arch

14  lettering?

15  A.  Correct.  With very different words in them.

16  Q.  And then your counsel, Mr. Harvey, showed you Exhibit 7,

17  which I will represent to you was the text only Jack Daniel's

18  trademark.  It is not your contention in this case that Bad

19  Spaniels infringes the text only Jack Daniel's trademark, is

20  it?

21  A.  No.

22  Q.  Okay.  In fact, Dr. Ford used Bad Spaniels on the control,

23  correct?

24  A.  Yes.

25  Q.  And you are not claiming that -- so the words "Bad

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    Spaniels" don't infringe Jack Daniel's trademark that's been

2    marked as Exhibit 7, correct?

3    A.  I don't believe so.

4    Q.  In fact, you are not alleging that trademark Exhibit 7 is

5    being infringed in this case, are you?

6    A.  That was not part of the complaint.  Whether it infringes

7    today as opposed to some odd years ago, I don't know.

8    Q.  And just as you're not claiming exclusive rights to a black

9    and white label, exclusive rights to a square bottle, you are

10   not claiming exclusive rights to arch lettering, the eyebrow

11   format, correct?

12   A.  Separately, no.

13   Q.  Okay.  And the non-infringing words, "Bad Spaniels," do

14   they become infringing if you put them stylized as --

15   A.  The word themselves?

16   Q.  Sure.  Do the words themselves "Bad Spaniels" become

17   infringing if VIP were to put them on the bottle in arch

18   lettering like the Jim Beam product?

19   A.  I don't know.  It's possible.

20   Q.  Going back to parody again and your testimony regarding the

21   three elements of a successful parody.  I assume it is your

22   position in this case, Mr. Gooder, that the Bad Spaniels

23   product is not a successful parody?

24   A.  You can assume that.

25   Q.  But, again, even using Dr. Ford's survey with the control

DAVID SLOAN GOODER - CROSS-EXAMINATION

1   that doesn't look like any of the real world American whiskey

2   and bourbon products, the delta between the control product and

3   the Bad Spaniels product was that something like 29 percent of

4   the survey participants believed there was some affiliation --

5   or answered the survey in a way that was significant for

6   likelihood of confusion, correct?

7   A.   I didn't follow your question.

8   Q.   Sorry.  The delta between -- what I understood from

9   Mr. Harvey going through Dr. Ford's report, was the significant

10  number is the delta between the confusion responses for the

11  actual product versus the control, right?

12  A.   It is the net confusion number.

13  Q.   Net confusion.  And so -- and, you know, obviously there

14  will be issues in the case regarding how Dr. Ford categorized

15  different responses, and we will deal with that through

16  Dr. Nowlis.

17       But you would agree with me that more than 70 percent

18  of the survey responses believe that the VIP parody Bad

19  Spaniels product was not affiliated, sponsored, sold, put out

20  by Jack Daniel's, right?

21  A.   I don't know that you can conclude that.

22  Q.   So --

23  A.   I don't think the surveys are -- well, that would be

24  speculating on my part.  That's a question you would have to

25  ask survey experts.  I don't think that's a fair conclusion,

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    but --

2    Q.  So when Dr. Ford, who was being paid by Jack Daniel's, you

3    know, determines after evaluating online consumer responses

4    that 29 percent gave some sort of indication of confusion, you

5    don't think that that would prove the opposite, that out of

6    those survey respondents, 71 percent were not confused?  Is

7    that your testimony, Mr. Gooder?

8    A.  My testimony is that I think 29 percent is a huge number

9    when it comes to the number of consumers -- you think of 29

10   percent of the people who are represented by that sample.

11   Q.  Sure.

12   A.  And if the baseline is somewhere around 15 percent, in most

13   litigation, that's double.  That's a huge number.

14   Q.  You are not answering the question I asked.

15   A.  Maybe it is because I don't understand your question.

16   Q.  My question is, could you not interpret Dr. Ford's study to

17   say that 71 percent of the surveyors, respondents were not

18   confused as to the source or affiliation of the Bad Spaniels

19   product?

20   A.  I suppose you could read it that way.  I don't know if

21   that's an accurate reading, but you could read it that way.

22   Q.  And while you just said that you think that the Bad

23   Spaniels product is not a successful parody, you don't doubt

24   that it was intended to be a successful parody, do you?

25   A.  I don't know what they intended, but from what I have heard

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    in this case, that's what they set out to do.

2    Q.  And and don't have any reason to doubt that, do you?

3    A.  Not so far.

4    Q.  So if they were truly trying to create a knockoff of a Jack

5    Daniel's, they likely wouldn't have included a disclaimer on

6    the hangtag, correct?

7    A.  I don't think you can read anything from putting a

8    disclaimer on there.

9    Q.  Okay.

10   A.  I think everybody who tries to hide behind any sort of

11   parody or anything like that puts it on there in the hope that

12   it gets them off the hook.

13   Q.  Sure -- well, let me put it -- if this was a traditional

14   infringement case, where the defendant is accused of knocking

15   off, trying to benefit from somebody else's trademark, a

16   non-parody context, would you agree with me that a knockoff

17   where 70 percent of the people think that it's put out, not by

18   the company being knocked off, is not a very successful

19   knockoff?

20           In other words, if there was any intent to knock off

21   Jack Daniel's, they didn't do a very good job of it with 70

22   percent of the survey respondents saying, no, it is VIP or it's

23   Silly Squeakers?

24   A.  I don't know.  30 percent of the market is a pretty big

25   number, they might be very happy with that.

DAVID SLOAN GOODER – CROSS-EXAMINATION

1    Q.  And if 25 percent of Americans believe that all parody

2    products -- again, regardless of content, if you get the joke,

3    if you get it is a parody, 25 percent of Americans believe that

4    that requires permission of the trademark holder, that might

5    impact the meaning of Dr. Ford's survey results, correct?

6            MR. HARVEY:  Lack of foundation, Your Honor.

7            THE COURT:  Sustained.

8    BY MR. BRAY:

9    Q.  You don't doubt it was Mr. Sacra's intention to amuse with

10   the Bad Spaniels product and not confuse with it?

11   A.  I don't know what his intention was.

12   Q.  You don't have any evidence to the contrary, do you?

13   A.  Not that I know of.

14   Q.  Okay.

15           MR. BRAY:  One moment, Your Honor.

16           THE COURT:  Yes.

17           MR. BRAY:  No further questions.

18           THE COURT:  Any brief redirect?

19           MR. HARVEY:  No redirect, Your Honor.  Thank you.

20           THE COURT:  Okay.  Thank you very much.

21           Mr. Gooder, before you return to --

22           THE WITNESS:  My trivia question.

23           THE COURT:  The trivia part.  Let me see here.

24           Actually, like we did yesterday, we will divert to the

25   cuisine part of the inquiry of the trivia.  Returning you to

DAVID SLOAN GOODER - CROSS-EXAMINATION

1    your thrilling days of yesteryear, when you were a student down

2    in Tucson, people from Phoenix refer to as south of the Gila

3    River, did you have a favorite Mexican cuisine that you

4    particularly liked?  Because they are different, you know,

5    between Phoenix, Tucson, New Mexico, all places, and people in

6    Tucson believe theirs is very distinctive.

7          THE WITNESS:  Sonoran, yes.

8          THE COURT:  Did you have a favorite?  Just out of

9    curiosity?

10         THE WITNESS:  Oh yeah.

11         THE COURT:  What was it?

12         THE WITNESS:  The actual food or the style?

13         THE COURT:  The restaurant.

14         THE WITNESS:  Oh, Lerua's --

15         THE COURT:  The where?

16         THE WITNESS:  -- Lerua's?

17         THE COURT:  I don't know if they are still in business

18   or not, but one of the iconic places, unfortunately, just went

19   out of business, Midway Molina's.  And the people that owned it

20   and ran it were all of them were 90 and above and they decided

21   the other generation didn't want to pursue it, and it has left

22   a big dent in the Tucson cuisine area.

23         But anyway, so that was it.  So now we know about

24   Lerua's, your favorite.  And I am sure we'll get some other

25   people who will travel down there and figure it out.

DAVID SLOAN GOODER – CROSS-EXAMINATION

1          Now, we are ahead of our schedule here.  Let's go back

2     over our –– Mr. Sacra, I think we are going to do your

3     testimony, is it tomorrow?  Is that correct, sir?

4          MR. SACRA:  Yes.

5          I should have asked your lawyer.

6          MR. BRAY:  That's correct, Your Honor.

7          THE COURT:  He was resting over there after that

8     cross-examination, recovering.  Is that your understanding

9     also, sir?

10         MR. HARVEY:  Yes, Your Honor.

11         THE COURT:  So we have nothing else for the rest of

12    the morning and/or this afternoon; is that correct, everyone?

13         MR. BRAY:  Correct.

14         MR. HARVEY:  Correct, Your Honor.

15         THE COURT:  All right.  Then we will stand at recess

16    until tomorrow morning, which is Wednesday.

17         Does everyone want to start at 10:00 again tomorrow

18    morning?

19         MR. BRAY:  Fine with us.

20         MR. HARVEY:  Fine with us.

21         THE COURT:  We will start at 10:00 tomorrow morning.

22    The other thing is for our guests in town should you decide to

23    take advantage of some of our nice weather and go out and about

24    the community, I would encourage you to, one, be sure and take

25    a lot of water.  It is still hot.  It is going to be pretty

DAVID SLOAN GOODER – CROSS-EXAMINATION

1    close to 100 today, and you can get dehydrated quickly.  Also,

2    lots of sun screen.

3           So with that in mind, we will stand in recess until

4    tomorrow morning at 10:00.  Thank you all very much.  And thank

5    you, sir.  We will let you return to counsel table.

6           Stand at recess then.  Thank you very much.

7       (Recess taken at 11:52 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID SLOAN GOODER – CROSS-EXAMINATION

1              C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 4th day of October,

12  2017.

13

14                               s/Elva Cruz-Lauer
                        Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT