1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3    _____

4    VIP Products, LLC,              )
                                     )
5         Plaintiff,                 )    CV-14-02057-PHX-SMM
                                     )
6         vs.                        )    Phoenix, Arizona
                                     )    October 4, 2017
7    Jack Daniel's Properties, Inc.,)         9:55 a.m.
                                     )
8         Defendants.                )
     _____      )
9    And Related Counterclaims.      )
     _____      )

10

11         BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              TRIAL – DAY 3

15                 VOLUME A

16              (Pages 1-82)

17

18

19

20

21   Official Court Reporter:
     Elva Cruz-Lauer, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 33
23   Phoenix, Arizona  85003-2151
     (602) 322-7261

24

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Plaintiff/Counterdefendant:

3              DICKINSON WRIGHT PLLC
              By:  David Geoffrey Bray, Esq.
4                   David Nunzio Ferrucci, Esq.
              1850 N. Central Ave., Ste. 1400
5              Phoenix, AZ  85004

6    For the Defendants/Counterclaimants:

7              HARVEY & COMPANY
              By: Douglas Peter Harvey, Esq.
8              4 Embarcadero Ctr., 14th Fl.
              San Francisco, CA  94111
9
              QUARLES & BRADY LLP- Phoenix, AZ
10             By: Isaac Scott Crum, Esq.
              2 N. Central Ave.
11             Phoenix, AZ  85004-2391

12   Also present:  David Gooder and Justin Welch, Senior Trademark
     Counsel.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                INDEX

3    SUMMARY OF COURT PROCEEDINGS                          PAGE:

4    Court resumes                                             4

5    Recess taken                                             81

6                          INDEX OF WITNESSES

7    WITNESSES FOR THE          Direct    Cross    Redirect
     PLAINTIFF:
8
     Stephen Nowlis              6        16
9    (BY DEPOSITION)
     Stephen M. Sacra          24
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Thank you.  Please be seated.

3          Did the music stop before I came in here?  What

4   happened here?  I see some rearrangements over there.  Okay.

5   We are ready to start now, and I believe we are at the point

6   where the defense has rested on the counterclaims, which was

7   the first part of the case, and, Mr. Bray, you have any motions

8   you want to make or you want to reserve those?

9          MR. BRAY:  If I could, I would reserve the motions,

10  Your Honor.

11         THE COURT:  You may.  And then, yes, sir.

12         MR. HARVEY:  Just one comment about the resting, Your

13  Honor.  We have rested, but we wanted to take care of a little

14  housekeeping regarding the exhibits, if we might.

15         THE COURT:  Okay.

16         MR. HARVEY:  We have conferred with Mr. Bray and

17  stipulated as to exhibits as to which no objection has been

18  entered.  So as to those, we would move their entry into

19  evidence on the basis of the stipulation.

20         I am happy to read the numbers for the benefit of the

21  clerk into the record, if the Court wishes.

22         THE COURT:  Okay.  Go ahead.

23         MR. HARVEY:  So Exhibits 1 to 90, 101 to 127, 134 to

24  169, 173 to 174 -- forgive me.  Pardon me.  205 to 217.  223 to

25  243.  247, 250, 252, 254, 256, 259, 265 to 271 and 271A, Your

1      Honor.  We would move their entry into evidence.

2              THE COURT:  Is that correct, Mr. Bray?

3              MR. BRAY:  That is, Your Honor.

4              THE COURT:  Okay.  They will be admitted.

5              (Exhibits 1-90, 101-127, 134-169, 173, 174, 205-217,

6      223-243, 247, 250, 252, 254, 256, 259, 265-271, and 271A were

7      were admitted into evidence.)

8              MR. HARVEY:  And now the defense rests, Your Honor.

9              THE COURT:  Okay.  And then the motions will be

10     reserved.  And, Mr. Bray, you may proceed with your part of the

11     case, if you wish?

12             MR. BRAY:  Thank you, Your Honor.  And good morning.

13     Pursuant to the stipulation of the parties before the trial,

14     and this was occasioned by the unfortunate passing of Dr. Ford,

15     who I agree with Mr. Harvey, I had only met him once, but the

16     times I shared with Dr. Ford during the breaks were different

17     than an average witness.  He was a very nice gentleman, and I'm

18     sorry for the loss.

19             But as a result of Dr. Ford's loss, we stipulated that

20     Dr. Ford's testimony would come in through his report with

21     cross-examination through the deposition, and also that my

22     expert, rebuttal expert for Dr. Ford, Stephen Nowlis, could

23     also come in through report with cross through deposition.

24             So at this time --

25             THE COURT:  Do I gather that your expert is not going

1    to be here Thursday morning?

2            MR. BRAY:  We have a second expert.  This is the

3    expert on confusion.  The expert on Thursday morning is Bruce

4    Silverman.  He is our expert to rebut Itamar Simonson on

5    tarnishment.

6            THE COURT:  Okay.

7            MR. BRAY:  As Mr. Harvey, I prepared a summary to walk

8    through the highlights of Dr. Nowlis' report.

9            First off, Dr. Nowlis' credentials.  He has a Ph.D..

10   in marketing from UC Berkeley, an MBA from UC Berkley,

11   undergrad from Stanford University.  He's the department chair

12   and August A. Busch Distinguished Professor of Marketing at the

13   Olin Business School.

14           As set forth in Dr. Nowlis' report, he's been accepted

15   as an expert in both state courts and federal courts on

16   numerous occasions.

17           Highlights of Dr. -- this is the top line headline of

18   Dr. Nowlis' report.  Quote, the methodological flaws are so

19   serious that they render Dr. Ford's survey's results

20   meaningless for assessing the likelihood of confusion.  That's

21   Exhibit 256, paragraph 7.  And Dr. Nowlis attributes three

22   reasons.  One, there was an improper control stimulus.  Number

23   two, Dr. Ford failed to mimic marketplace conditions, and

24   number 3, Dr. Ford improperly analyzed data.

25           Flaw number one, which, in my view, might be the most

1    significant flaw:  There was an improper control stimulus used.

2    What is the significance of the control stimulus?

3             As Mr. Harvey explained when he was summarizing

4    Dr. Ford's report, controls for noise, or those respondents who

5    would give Jack Daniel's response for other reasons like,

6    market share or popularity, you've heard from Mr. Gooder

7    yesterday, that the Jack Daniel's trademark is one of the most

8    valued trademarks in the country.

9             And I believe you have heard from Mr. Epps and

10   Mr. Roush that the Jack Daniel's Whiskey is the number one

11   selling whiskey in the United States.  So those are the sort of

12   things you need the control for.

13            So what is a proper control stimulus?  According to

14   Dr. Nowlis, the control stimulus must be as similar to the test

15   stimulus as possible and differ only in terms of the

16   characteristics whose influence is being tested.

17            And here we have a comparison of the actual Bad

18   Spaniels toy as opposed to the Bad Spaniels control stimulus.

19            Among the things that were improper, according to

20   Dr. Nowlis, was that the control stimulus did not use -- used a

21   a rounded bottle with a smooth neck, as opposed to a square

22   bottle.

23            You heard from David Gooder and the other JDPI

24   witnesses that Jack Daniel's is not claiming that a square

25   bottle is exclusive, or it owns exclusive rights to a square

1    bottle for a Tennessee whiskey or bourbon.

2              Number two, the black cap with letters BS on the top

3    and square neck.  Up here on the top of the Silly Squeakers

4    product.  That is not on the control's label.  Old No. 2 is on

5    the neck of the Bad Spaniels product.  It is not on the neck of

6    the control stimulus.

7              And, again, we saw yesterday that George Dickel, for

8    example, has a whiskey No. 8.  There are other examples of

9    whiskeys using ordinal numbers.  Mr. Epps or Mr. Roush

10   testified that Jack Daniel's is not claiming exclusive rights

11   to the ordinal numbers 1 through 10, only rights with regard to

12   No. 7.

13             The control stimulus has no front label, period.  The

14   Bad Spaniels product obviously has a front label.  Again,

15   another reference to No. 2, um, has been removed.  And, again,

16   they are not claiming any exclusive rights in the words "No.

17   2."

18             So even if they took an issue with "Old No. 2" on the

19   control stimulus, it should have said at least No. 2.  They

20   they don't claim an exclusive right to use a filigree border.

21   They removed any sort of border from the Bad Spaniels product.

22             They removed the curved font from the actual product

23   for the stimulus product.  And you saw from demonstrative

24   Exhibit 10004 yesterday, that as to the most well-known

25   American whiskeys and bourbons, they use stylized fonts, not

1    fonts like Bad Spaniels.

2            The next one, there was a black hangtag with a border.

3    Control has a yellow hangtag, and if you could sum it all up in

4    one, the Bad Spaniels toy resembles a whiskey bottle, and the

5    Bad Spaniels toy resembles a wine bottle.

6            Perhaps we could dim the lights halfway again?  So we

7    can see this a little better.

8            These are other exemplars of well-known -- with Bad

9    Spaniels included in there -- of other well-known American

10   whiskeys and bourbons, including Jim Beam, Evan Williams, Early

11   Times.

12           You can see the preponderance of the features that

13   Jack Daniel's claims has some significance, vis-a-vis the Bad

14   Spaniels product.  Black and white label.  The arched or

15   eyebrow font, like for example, on JT Brown, Early Times, Jim

16   Beam, Virgin Bourbon.

17           The black label around the cap.  Again, all of these

18   Tennessee whiskey and bourbons have the black label cap.  For

19   some reason -- well, you could probably assume why Dr. Ford

20   used a yellow cap for the control stimulus.

21           And, again, I think what is striking about this is

22   that you can see that Bad Spaniels resembles all these other,

23   or the packaging for all these other whiskeys and bourbons, and

24   the control product or stimulus doesn't resemble anything like

25   a whiskey or bourbon bottle.

1          So what did Dr. Nowlis opine to?  He opined that

2    Dr. Ford improperly removed elements not being claimed by Jack

3    Daniel's nor tested for, including the square bottle shape, the

4    label, the color black, the border on the hangtag, and the

5    disclaimer.

6          And as a result of these significant changes, the

7    control stimulus was not suggestive of whiskey product, and,

8    therefore, the control stimulus is defective and incapable of

9    removing the appropriate level of noise from the test results.

10          And, again, the fact that the confusion rate was less

11    than one-half of one percent, that would indicate that given

12    the testimony of JDPI's witnesses about Jack Daniel's dominance

13    in the market sector and the value of its trademark, that the

14    control was improperly designed, that you get a number that

15    low.  And because of this, Dr. Nowlis opines the Ford survey

16    does not accurately depict neck confusion.

17          Flaw number two, according to Dr. Nowlis, is the

18    failure to replicate marketplace conditions.  You heard during

19    Mr. Harvey's summary of Dr. Ford's report, that this was

20    Internet survey.  The respondents did not have physical access

21    to the toy.

22          So what information were the respondents deprived of?

23    They could not view the top or the side of the product.  For

24    example, they couldn't see the top with the "BS" on it.  They

25    couldn't see that (squeezes toy) it made the sound, that the

1    fact that it is a squeaky toy might --

2            THE COURT:  Just go back to, I guess, 701.  It has got

3    to be helpful.  The fact they couldn't hear the squeaky noise,

4    anybody who buys a doggie toy for a squeaking purpose, knows

5    how much the dogs love it and how irritating it is to the owner

6    and other people listening to it.  That's just the nature of

7    it.

8            I mean, do you think that's a serious criticism?

9            MR. BRAY:  That they couldn't have a tactile

10   sensation?

11           THE COURT:  With all due respect, I -- now a matter of

12   full disclosure, I am a pet owner.  I have been to a lot of pet

13   stores.  With all true respect to the client's product, I have

14   never seen it in a pet store.

15           I have seen a lot of squeaky toys there, and we have a

16   basket full of them at home, unfortunately.  So the point being

17   that when -- and that's why I come back to 701.  Is this

18   criticism between the experts helpful?  I'll have more to say

19   about that later.  It is just a rhetorical question that I

20   have.

21           But with regard to that, as long as we are on that

22   issue, the fact that they couldn't have it in their hands, but

23   they had Internet pictures of it, and people -- we all know

24   that the Internet is running the range on all of the big-box

25   stores these days.  How is that going to be overly helpful just

1    in this one instance?  And it is the same way with the other

2    one.  But go ahead.

3             MR. BRAY:  I would say that Dr. Nowlis in his report

4    has a number of criticisms regarding the information that the

5    consumers were deprived of, one of which was, they couldn't see

6    the bottom where the sound was emanating from, and they

7    couldn't actually touch, feel and squeak the toy.

8             Just like some people are visual learners and some

9    people are, you know, learn better from books, like my son, I

10   think, even though, as you can say, many people can envision

11   what a squeaky toy sounds like or does, for some people, I

12   think (squeezes toy) the actual ability to squeak the toy might

13   have them think, is this something that Jack Daniel's would

14   really put out?

15            THE COURT:  Okay.

16            MR. BRAY:  And -- but there's not only that, in terms

17   of --

18            THE COURT:  I knew you had other things.  I was just

19   kind of curious about that part.

20            MR. BRAY:  And there's not only that with regard to

21   the failure to replicate market conditions.  One respondent

22   reported the tag says, silly S dot S, but because of the toy, I

23   cannot read the bottom word.  So they were not able to -- if

24   you had the toy in front of you to be able to examine all

25   sides, you would be able to read everything on the toy.

1          And the other thing is Dr. Nowlis criticized, that the

2    photos that were used for the end toy display showed the dog

3    toys combined with dog treats, which is not how they are sold.

4    And it used photos that inhibited respondents' ability to read

5    the words on the display.

6          Again, the bigger picture is, there's one thing to see

7    a photo where it's difficult to read the writing.  It is

8    another thing to have the product in front of you and to be

9    able to handle the product, and that's the real world condition

10   that real world consumers encounter the Bad Spaniels product.

11         Flaw number three, there was a failure to properly

12   code and analyze data.  Dr. Nowlis opined that Dr. Ford failed

13   to take into account respondents' beliefs about parodies and

14   and how these beliefs were impacting their responses to the

15   survey questions.

16         And according to Dr. Nowlis, the largest group of

17   respondents in Dr. Ford's Internet survey were likely trying to

18   figure out if a parody needs authorization or approval from the

19   company it is spoofing.  So there's a real danger that a survey

20   like Dr. Ford's in a parody case, this is circular.  This is

21   testing a consumer's knowledge of the law or beliefs of the

22   law, rather than actual likelihood of confusion, as would be

23   the case in a non-parody product.

24         And here are some examples.  Well, we will get to the

25   examples in a second.

1          Respondents were counted as confused, despite

2    acknowledging that VIP Bad Spaniels, Silly Squeakers made or

3    put out the dog toy.  Again, because of a belief that parody

4    products necessarily require approval and not because they

5    believe Jack Daniel's made or put out the dog toy.

6          Here are some examples.  Respondent 1001, and this is

7    with regard to a question, why do you think this?  Because they

8    are creating a spoof of a real product, so I think they would

9    need permission, so they don't get sued for copyrights or

10   something like that.

11         Is that traditional trademark confusion, or is that

12   just a misapprehension of the state of the law under the Lanham

13   Act?  I would argue that it is the latter, and that's what

14   Dr. Nowlis opines.

15         Similarly, respondent 1033, because it is a spoof on

16   their label.  I am sorry for a typo on the last one I missed.

17   Respondent 1194, the bottle is mimicked after the Jack Daniel's

18   barbecue sauce, so they would a hold a patent, therefore, you

19   would have to use -- permission to use the image.

20         So this particular respondent, 1194, is not

21   demonstrating a misapprehension of trademark law under the

22   Lanham Act, he or she is expressing a misapprehension of patent

23   law.

24         Dr. Nowlis has two other conclusions.  I am not going

25   to focus on those.  That has to do with fame.  Obviously we

1    concede that the Jack Daniel's trademark itself, which was

2    reflected in Exhibit 7, I believe, is a famous trademark.

3            But as you heard from David Gooder yesterday, Jack

4    Daniel's is not contending in this case that the Jack Daniel's

5    trademark is being infringed.  It's just elements of the trade

6    dress that are common with various elements of other whiskey

7    and bourbon trade dresses.

8            And, again, David Gooder also testified that Bad

9    Spaniels in and of itself doesn't infringe Jack Daniel's

10   trademark.  And I believe he also stated that even if Bad

11   Spaniels had used an arched format, an eyebrow, as used on Jim

12   Beam and Evans Williams, that that wouldn't have infringed any

13   trademark of Jack Daniel's.

14           And, again, going back to the control stimulus, as

15   opinionated (sic) by Dr. Nowlis, they didn't use an arched

16   format for the control stimulus.

17           So in review, there was an improper control stimulus.

18   There was significant and unjustified changes.  There was a

19   failure to mimic market conditions, and there was improper

20   analysis of the data.

21           The largest pool of respondents were just struggling

22   to understand whether under the law, spoof products require

23   permission of the trademark holder.  So these flaws in

24   Dr. Nowlis' expert opinion render Dr. Ford's survey meaningless

25   and unilluminating as to the likelihood of confusion.

1              THE COURT:  Okay.

2              MR. HARVEY:  Thank you, Your Honor.

3              Pursuant to our understanding of how we would present

4       this evidence to the Court, I am now going to comment and give

5       highlights of the deposition of Dr. Nowlis that my predecessor,

6       lead counsel Chris Larkin, took a couple of years ago.  And I

7       think we are going to be able to pull up on the screen at least

8       some of the excerpts of the deposition.

9              But my purpose here, Your Honor, is to call the

10      Court's attention to certain pages of the deposition transcript

11      that I think will enlighten the Court on who Dr. Nowlis is and

12      and what his opinions were, and put his opinions in context.

13             MR. BRAY:  Your Honor, I thought our agreement was

14      simply that highlighted portions of Dr. -- the relevant

15      portions of Dr. Ford's comments, or I am sorry, the deposition

16      of Stephen Nowlis would be handed to the Judge rather than

17      summarized by counsel.

18             If I had been provided the highlighted portions, I

19      don't recall that.  Have you, Peter?

20             MR. HARVEY:  We do have a highlighted transcript, Your

21      Honor.  We are presenting that to the Court.  This is just an

22      opportunity, we thought, to illustrate a couple of the more

23      important reasons why the survey -- sorry, this lack of survey

24      and this evidence should be put in context.

25             THE COURT:  Well, I will give you just a little

1   latitude, because that way when we review it, it helps us to

2   focus in on your different points of view, from the plaintiff's

3   point of view, and from the defense point of view, or I should

4   say.

5          MR. BRAY:  What Mr. Harvey indicated yesterday that he

6   was more or less counter designating what I highlighted from

7   Dr. Ford's report in a different color highlighter.  I will be

8   providing you a copy of Mr. Nowlis' deposition where I would be

9   counter designating in green highlighting.

10         MR. HARVEY:  That's fine with us, Your Honor.

11         THE COURT:  I will give you a little latitude also

12  about any rebuttal, Mr. Bray, should you choose to do so.

13         Go ahead.

14         MR. HARVEY:  Thank you, Your Honor.

15         So at page 14 of Dr. Nowlis' transcript, and this is

16  going to be a bit hard to read.  We asked him:  Have you ever

17  written any articles on trademark surveys?  He says:  No.  On

18  trademark survey design?  No.  On the issue of likelihood of

19  confusion in trademark law?  No.  Have you ever given any

20  speeches?  No?

21         Then jumping over to page 25.  He was asked about

22  whether he had ever had a Court accept a survey that he offered

23  in a trademark case?  And he said:  I am not sure.

24         At page 36, and this is one of those small ironies

25  that happens in small worlds like this field.  Dr. Itamar

1    Simonson was his professor at Berkeley.  In fact, was his

2    doctoral supervisor, and he recognizes him as an expert, a

3    leading expert in consumer behavior and in marketing.

4              THE COURT:  Excuse me, what page is this, again?

5              MR. HARVEY:  This is page 36, Your Honor.

6              Here is an interesting point that I think is worth

7    noting, and it has to do with the work that Dr. Nowlis did.  He

8    essentially criticized Dr. Ford's survey.  He didn't do a

9    survey of his own.

10              He's testified in other cases where his own survey was

11   criticized by another expert.  He has been on the Dr. Ford side

12   of this argument.  And in one of those cases, Public Storage,

13   this is at page 54, he was criticized, Dr. Nowlis, by another

14   expert called Dr. Compeau severely in the Public Storage

15   matter, for not offering any empirical evidence to support his

16   conclusion.

17              And his reaction in his rebuttal report was to say

18   that Dr. Compeau's opinions about what consumers would do or

19   might do in various hypothetical situations, are simply

20   speculations on his part.

21              He has not supported these conjectures with empirical

22   tests or research.  So when the shoe is on the other foot, Your

23   Honor, he has a different view of what was required, in terms

24   of a proper critique.

25              And then on page 60, he admits that he does not know,

1    without doing a rebuttal survey himself, what the results of

2    correcting the alleged errors in Dr. Ford's methodology would

3    be.  He says:  I don't know.  I would be speculating.

4            And then in a follow-up question by Mr. Larkin, he is

5    asked, wouldn't -- this is page 62:  Wouldn't the best way to

6    have tested your criticisms of Dr. Ford's survey have been to

7    do your own rebuttal report?  And he says:  No.  And asked:

8    Why do you say that?  He says:  Because I think I am right.

9            That doesn't seem to be an empirical answer to me.

10            At pages 78 and 79, he can't recall if he ever

11    prepared a control stimulus in a trade dress case.  He's not

12    sure.  But he is criticizing Dr. Ford's control.

13            At page 113 to 115, Your Honor, Dr. Nowlis can't say

14    what elements of the control stimulus Dr. Ford should have

15    changed.  He wasn't asked to do a survey, so he didn't design a

16    control.

17            Again, at pages 126 and 127, he didn't consider trying

18    to design a proper survey control stimulus.  He has no idea

19    what level of confusion a properly designed control stimulus

20    might have generated.

21            And this is the point that Mr. Bray was just making

22    about famous products having -- normally generating a larger

23    level of confusion, just because the first name that comes into

24    somebody's mind, with respect to a category, is maybe the

25    market leader.

1           And as to this, Dr. Nowlis, at the same section, is of

2    the opinion, from the academic literature, that it would be

3    higher than one percent, but he can't say.  He can't say what

4    the range would be.  There is no expected level.

5           And then jumping to page 168, he's critical of the

6    picture of the retail display that Dr. Ford used.  But he says

7    he wouldn't know what doing it the right way would do and how

8    that would affect the results.  He would have to speculate

9    unless such a survey was done.

10          And then just a couple of more highlights.

11          At page 175, this goes to his expertise or lack

12   thereof.  He can't recall whether he did a survey in a

13   trademark case that involved a parody product.  Obviously, the

14   key criticism he is making is, you have to evaluate the survey

15   data differently in a parody case, but he has never actually

16   done that.

17          Page 205, ultimately counting someone who understands

18   that VIP makes the toy as confused because he or she thinks

19   that VIP needs to get permission or authorization, this is a

20   big point that they are critical of from Jack Daniel's, is for

21   the judge.  He can't or won't say.

22          In other words, this is a matter of law.

23          THE COURT:  What page is this again?

24          MR. HARVEY:  That was page 205.  Counting someone who

25   understands that VIP makes the toy as confused because he or

1    she thinks that VIP needs to get permission or authorization

2    from Jack Daniel's is for the judge.

3             MR. CRUM:  I apologize, Your Honor, it is 204.

4             MR. HARVEY:  My mistake.

5             Pages 229 to 231.  This goes to the Eveready protocol

6    that we have heard testimony about, Your Honor, and set of

7    questions that get asked in Eveready studies testing confusion

8    on three different levels.

9             He acknowledges that Dr. Ford used the standard

10   Eveready questions on source confusion, associational

11   confusion, or sponsorship confusion.  He says, these are all

12   fine.  He doesn't have a problem with using all four of the

13   Eveready questions, but Dr. Ford should have interpreted the

14   results in light of the parody nature of the product, and he

15   didn't.

16            But here's the key, and this is the last one, this is

17   at page 233.  He doesn't have an opinion on the coding of the

18   respondents as to which ones were confused or not confused.  He

19   doesn't have an opinion as to which respondents in the Ford

20   survey were misclassified or how they should have been properly

21   classified.  He didn't go into that level of detail.  He

22   doesn't have a specific answer on that.  That's page 233.

23            The other highlighted excerpts that we have to go

24   through, three with the Court, if we might, is what Dr. Ford

25   said when he, in his deposition, was asked about Dr. Nowlis'

1    criticisms.

2         MR. BRAY:  We now are having Dr. Ford's testimony in

3    my case in chief?

4         THE COURT:  That would have to be rebuttal, correct?

5    If you are now going back to Dr. Ford to object to Dr. Nowlis'

6    report, that's really rebuttal, and, therefore, this would go

7    outside of the testimony of Dr. Nowlis.  You would have to

8    bring that in, in a rebuttal fashion.

9         MR. HARVEY:  I should bring it in the rebuttal case?

10        THE COURT:  Yes.

11        MR. HARVEY:  That's fine.  I will do that.  Thank you

12   very much.

13        THE COURT:  All right.

14        MR. BRAY:  Briefly, only because I had a

15   misunderstanding of the agreement of counsel, and this relates

16   directly to the question that you posed shortly.

17        Yesterday we submitted the highlighted portions of

18   Dr. Ford's deposition.  We just didn't read them for the Court.

19   They are not extensive.  But I asked Dr. Ford yesterday, and

20   this will be the sole part of my rebuttal:  Would one of the --

21   is one possible advantage of a mall intercept survey, is that

22   the survey respondent gets a tactile experience with the survey

23   product?  The answer is:  I think that's an advantage if the

24   tactile experience was a source indicator.

25        That's on page 85 of Dr. Ford's deposition.

UNITED STATES DISTRICT COURT

1          THE COURT:  Can you help me out on what is a tactile

2     --

3          MR. BRAY:  I would say it is a source indicator,

4     because Jack Daniel's does not make any products that squeak,

5     whereas VIP makes a whole line of products called Silly

6     Squeakers.  So somebody that could -- and you saw on Dr. -- the

7     summary of Dr. Nowlis' there was many people that couldn't read

8     the Squeakers, so if you can't read the Squeakers and you can't

9     touch and squeak the bottle, the title of the product is Silly

10    Squeaker, so the squeak, the tactile experience is a source

11    indicator in this case.  Dr. Ford admitted that could be

12    relevant in this case.

13         THE COURT:  Thank you.

14         MR. BRAY:  With that I conclude the presentation of

15    Dr. Nowlis, and I would call Mr. Sacra next, unless you have

16    any questions.

17         THE COURT:  Thank you very much.  Mr. Sacra, if you

18    could come forward and be sworn as a witness please.  I would

19    appreciate it.

20         STEPHEN M. SACRA, PLAINTIFF'S WITNESS, SWORN

21         THE CLERK:  Do you want the lights down low or back

22    up?

23         MR. BRAY:  I would like the ELMO, instead of the

24    computer, and the lights on full would be fine.

25         THE CLERK:  Okay.  Thank you.

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION                24

```
 1                          DIRECT EXAMINATION
 2    BY MR. BRAY:
 3    Q.  Morning, Mr. Sacra.
 4    A.  Good morning.
 5    Q.  You are the owner of VIP Products, which is the plaintiff
 6    in this case?
 7    A.  Correct.
 8    Q.  Okay.  Why don't you talk a little bit about what your role
 9    is in VIP Products today?
10    A.  My role at VIP Products is as owner, product designer.  I
11    oversee all of operations, all of financing, pretty much run
12    the entire company, along with my wife.
13    Q.  I notice your wife is not here today?
14    A.  She is at a doctor's appointment today.  She might be
15    joining us a little bit later.
16    Q.  And what's Wendy's role in the company?
17    A.  Wendy's role, she is the International Sales Manager, and
18    she oversees all of our sales people and all of the people that
19    we contract to do sales for us.
20    Q.  And before we go into the history and the business of VIP
21    in more detail, I would like to go into a little bit of your
22    personal background for the Court, your education, prior job
23    experience, that sort of thing.
24              Where did you grow up, Mr. Sacra?
25    A.  I grew up in west Texas on a cattle ranch.
```

UNITED STATES DISTRICT COURT

1   Q.  I assume that the chili that you ate as a child was Texas

2   chili?

3   A.  It was my mom's chili.

4   Q.  You just said you grew up on a cattle ranch, were your

5   parents cattle ranchers?

6   A.  Yes, my parents were cattle ranchers and land management.

7   So I dug lots of fence posts holes and hung a lot of barbwire

8   fence.

9   Q.  So you kind of have a personal experience with the metaphor

10  that David Gooder was using regarding protecting trademarks?

11  A.  Correct.

12  Q.  Where did you go to college, Mr. Sacra?

13  A.  I went to school first at Auburn University for one year.

14  Then I left and went to Arizona State University, because they

15  had a better program for industrial design.

16  Q.  And did you work while you were attending college at ASU?

17  A.  Yes.  While I was attending college, I worked for

18  Anheuser-Busch.  My job was a pretty cool job.  I was in charge

19  of the on-premise accounting for the top 40 bars in Tempe and

20  Scottsdale.

21          So it was my job to go out and to, as a college rep,

22  to promote to people who basically, were coming into their

23  drinking age to convince them that they should be consuming

24  alcohol and what brand they should start becoming loyal to.

25  Q.  How about Wendy's prior work experience before VIP?

1    A.   Wendy worked for a number of years for Miller Brewing

2    Company doing promotions, and she was the manager over all of

3    the promo girls for Miller for the City of Phoenix and all

4    surrounding areas.

5         And then she left Miller and went over to go do the

6    same job for Bacardi, and after she worked for Bacardi for a

7    number of years, we finally convinced her to come over and

8    start selling dog toys.

9    Q.   What was the focus of your education at ASU?  What did you

10   major in?

11   A.   I started out in industrial design with a minor in

12   business, and then if you remember back in the '90s, that was

13   when they were launching the Apple computer that was all in one

14   piece.  It had the little floppy drive into it.  Well, that was

15   the emergence of computers in design.

16        So when it came time to go into upper division, I left

17   industrial design and went over to integrated computer graphics

18   and 3-D multimedia, which is what I received my degree in, and

19   that's in the school of engineering.

20   Q.   And the skills you learned at ASU are the skills you use on

21   the job today?

22   A.   Yes.

23   Q.   After college, did you work anywhere else before VIP?

24   A.   After I left college, I went to -- well, during my last few

25   years in college, I started a business, which was a telephone

1    switching company, which basically is -- when you, back in the

2    '90s, when you didn't have the Internet, or it wasn't as

3    prevalent, so you would pick up the phone and you dial a number

4    and it would say, press 1 for this, press 2 for that, press 3

5    for that.

6            So we actually built the system, the consolidated

7    system for the radio stations to use so if you dialed in, you

8    could be routed to different information about events and

9    things that the radio stations were doing.

10            And we also did it for the mall.  So if you called the

11    mall when you wanted to try to get to one of the stores, it

12    would telepromt you through longer teleprompts to get to a

13    different store and leave messages and give you advertisements

14    and so on.

15            Eventually, we sold that company.  We sold all of the

16    equipment off to the people that we were operating for.  And

17    then --

18    Q.  Stop you there.  What did you do after the automated

19    telephone prompting switching company?

20    A.  So my boss at Anheuser-Busch left to go to work with his

21    father to import a brand of sandals called Sensi Sandals, and

22    he also started and developed the footwear for the Tommy Bahama

23    fashion line, which I am sure a lot of people are familiar

24    with.

25            So I went over to -- he asked me to come over to work

1    for him in doing sales, and he also asked me to come over and

2    say, hey, can you help design some footwear for us to see if we

3    could, you know, create some new items?

4            So I went over to work for him.  I created -- sorry,

5    and then that was the emergence of the spa industry back in the

6    mid '90s.  And the Sensi Sandal happened to be one that was

7    being rapidly adopted by all of the hotel chains and being used

8    in the spa industry.

9            So I basically carved out a very large niche,

10   developed some relationships with some of the largest hotel

11   chains in the world, building a brand with this product.  But

12   as things might be, as I got successful with that, the industry

13   was looking at the fact that the sandal wasn't exactly what

14   they needed for the spa industry.

15           So using my design skills, I created a new design that

16   I thought was going to be the better solution for what it was I

17   was trying to sell.  I went and got a patent on it.  Then went

18   overseas, source manufacturing, and started a new company with

19   a partner and his brother.

20           So after I did that, I quickly learned why you don't

21   go into business with friends or family, and that relationship

22   fell to the side.  And then I went off and started another

23   sandal company, which then become VIP Footwear.

24   Q.   Okay.  I will stop you there.  And how did -- explain for

25   the Court how VIP footwear transitioned or morphed into VIP

1    Products and went from sandals, to products, including pet

2    toys?

3    A.   So with VIP footwear, we -- I still maintained all of my

4    contacts and all of my customers.  They literally just kind of

5    moved over with me, and they saw how I was able to take

6    something, design it, then back, reinvent, redesign, and

7    continue to make better products.  And I also had a lot of

8    manufacturing connection overseas.

9             So through those relationships, I would get phone

10   calls say, hey, do you know how to do this?  Do you know how to

11   do this?  Can you help us with this?  Can you help us with

12   that?

13            THE COURT:  Can you go just a little slower?

14            THE WITNESS:  Sorry.

15            THE COURT:  I understand.  You are excited about what

16   you do and it shows, but the court reporter, I think, could use

17   just a little slower pace if you would, please.  This happens

18   all the time, so don't worry about it.

19            THE WITNESS:  So eventually it -- they would come to

20   me and ask me, you know, can you make these different things.

21   And through that, I made relationships in the equestrian

22   industry making equestrian products.  We made fly masks, fly

23   sheets, leg wraps, anything that you would put onto a horse.

24            So the natural progression from there is a dog is

25   basically a smaller horse, and making clothes for a dog, we

1    started making -- because these people who had horses also had

2    dogs out on their ranch, and during the cold season, they would

3    want coats and wraps for them.  So we started manufacturing

4    those.

5            And eventually we thought, you know what, let's try

6    our hands at making some dog toys, and the rest has sort of

7    been history.

8    Q.  Okay.  Just so we have a little bit of a timeline, when did

9    VIP first start selling dog toys?

10   A.  We started selling dog toys in 2004.

11   Q.  And we will cover the different types of dog toys that VIP

12   sells, but just to skip ahead a little bit, when did VIP start

13   selling Silly Squeakers line of dog toys?

14   A.  So I believe Silly Squeakers came out in 2007.

15   Q.  And who designs VIP's dog toys?

16   A.  So all the dog toys are designed by myself and my wife,

17   specifically.  And more so -- she helps more so on the initial

18   concepts, and then when it is time to actually do the physical

19   design and development, that would be myself.

20   Q.  I am going to show you what's been marked and into evidence

21   as exhibit --

22           THE COURT:  You want to knock the light down?

23           MR. BRAY:  Half light would be good, thank you.

24           Sorry, Lisa.

25           THE CLERK:  It is okay.

1   BY MR. BRAY:

2   Q.   I next want to have you explain to the Court the different

3   lines -- different types of toys that VIP makes.  And I will

4   just put up  the -- zoom in.  Is Exhibit 270, or I am sorry,

5   Exhibit 31, the front page of an older VIP product catalog?

6   A.   Yes, it is an older catalog.

7   Q.   And I will just leave this up to guide your discussion, but

8   can you explain to the Court the types of dog toys that VIP

9   designs and sells?

10  A.   Yeah.  The first dog toy that we came out with is called

11  the Tuffy.  It's a product that is made with multiple levels of

12  polyester.  It is sewn together.  Then it's edged with

13  polyester again, and then sewn, with those parts sewn multiple

14  times.

15          The theory is that it's much like a jawbreaker in the

16  sense that you have multiple layers that you to have work

17  through to get to the core of the toy.  When we first started

18  making dog toys, there was nothing on the market that was

19  really designed to be a soft dog toy, but yet durable for play.

20          At that time, most people were buying dog toys for

21  7.99, 5.99 or less, and you just couldn't tap into that market.

22          And that's an example of what one of the products

23  looked like.  And it shows the multiple layers.  The squeakers

24  are actually sewn into individual pockets for safety, so that

25  in the event that a poor parent of a pet let their dog chew on

1    a toy, which you are not supposed to do, it will give them a

2    safe time to possibly remove the product before they could

3    possibly ingest part of the squeaker.

4    Q.  I just want to show you one more Tuffy picture out of the

5    catalog.  What is the --

6    A.  So that's the Mega Tuffy, and the Mega Tuffy is our most

7    durable one, and it is made with up to seven layers of

8    material.  So you have a layer of polyester, a plastic coating

9    on that layer of polyester.  Another layer of polyester, and so

10   on.  And then it is coated with fleece on the outside so it's

11   soft in the mouth, but it's durable through the different

12   layers.

13          And that one is actually -- we've tested it on tigers

14   and bears and all different types of animals, and they have

15   done extremely well.  They are used at most animal wildlife

16   sanctuaries as the product of choice that they can leave in

17   their cage for them to play with.

18   Q.  Did you used to sell Tuffy products on QVC?

19   A.  Yes, I used to sell products on QVC for way too long.

20   Q.  Did you get feedback in terms of the video with the tiger

21   testing?

22   A.  Any time -- well, when you are on QVC, you have an earpiece

23   on in your head and you're trying to sell dog toys, and you are

24   on a stage and you have dogs running around on the stage.

25          And as soon as they roll this B roll of the tigers,

1   the mathematical computer that they watch with the little line

2   goes up.  And as soon as they see it, they start talking in

3   your ear going, roll that B footage again.  And you could --

4   when that tiger footage would roll, we would sell -- they would

5   sell a 53-foot truckload in about four and a half minutes.

6   It's crazy.  And then when you are done, you just kind of like,

7   let me see the computer screen.  What happened?

8   Q.  We are going to talk about Silly Squeakers obviously later,

9   but the Court mentioned its experience with dog toys.  And

10  just, can you give the Court an idea where the Tuffy line of

11  products are sold?

12  A.  So the Tuffy line of products is sold, actually it's

13  distributed into almost 30 different countries, and it's

14  considered the leading durable soft dog toy on the market.

15          It's sold in stores like Walmart, Target, Petco,

16  PetSmart.  Almost every pet specialty retailer in the United

17  States at least carries one of them in their store, even Bed

18  Bath and Beyond.

19  Q.  And just a few pictures from the catalog.  You do the Tuffy

20  toys in a variety of shapes?

21  A.  We do the Tuffy toys in any possible shape we can conceive.

22  The difficulty with the Tuffy product is that with the black

23  edging that goes around the outside of the toy, in the

24  manufacturing process, limits us on the cuteness of the shapes

25  that we can make.

1           And it's a challenge to come up with some of the more

2    creative shapes, only because of the fact that at some point

3    the machinery can't sew through the corners or through the

4    number of layer of materials.

5    Q.  How many -- well, I will just show you one more page and

6    then we will move on from Tuffy.

7           These are additional Tuffy toys?

8    A.  Yes.

9    Q.  And do you -- you have designed all of these toys?

10   A.  Yes, sir.

11   Q.  And how many different, you know, across all lines, how

12   many different types of dog toys does VIP Products sell?

13   A.  When I last checked the other day, it was 598 SKUs.

14   Q.  And you designed all of them?

15   A.  Yes.  With the help of my wife.

16          THE COURT:  I am glad you answered that in case she

17   happens to read your transcript.

18          MR. BRAY:  She is supposed to be joining us shortly

19   after the doctor.

20          THE COURT:  He is covering his bases because she is

21   not here right now.  I understand that.

22   BY MR. BRAY:

23   Q.  All right.  We are going to do Silly Squeakers last and

24   then have you talk about the Mighty line.

25          What's the Mighty line of dog toys?

1    A.   So Mighty is another line of toys that we created from what

2    we learned from Tuffy.  Tuffy has this hard edge, sewn edge

3    that goes along the outside.  And as I spoke earlier, it is

4    difficult to produce a lot of unique shapes.

5         So we rethought how we could make a toy durable and

6    also looked at different types of materials.  So in the Mighty

7    line, we use a layer of fleece on the inside, which is a

8    nonwoven material so when a dog bites down on it, the material

9    stretches and moves with the teeth, instead of actually, like

10   in a woven, where your teeth would get between the two

11   different threads and pull it apart.

12        And then we cover that with different types of fleece

13   or, sorry, fur on the outside.  And then just like we do the

14   Tuffy, we reinforce all of the seams that we can on the inside,

15   so that it's inside of the toy itself.

16        And we actually got a patent on that to protect the

17   actual construction of how it's made.  And that's an example of

18   some of our microfiber toys that are in the Mighty line.

19   Q.   Okay.  We are going to do Silly Squeakers last.  We can

20   cover the next two probably pretty quickly.  The Rugged Tuffy

21   Rubber?

22   A.   Yeah.  So we wanted to expand into the different types of

23   toys that are on the market, and so we created rubber dog toys

24   in different shapes.  And some of the shapes that we did --

25   this is where we actually were able to look at something and

1    say, okay, how can we be a little more creative than our

2    competitor, and yet how can we bring fun into making dog toys?

3    And this was one of the areas that we had a little bit more

4    flexibility.

5            So I don't know if you have pictures of it, but one of

6    our first line was actually a little stick of dynamite, an acme

7    bomb and a little grenade that mimicked what we saw growing up

8    on the cartoons.

9    Q.  I don't have a picture handy, and I am afraid of tearing

10    apart the exhibit.  And then just lastly cover the Bentley and

11    Bunny?

12    A.  Bentley and Bunny.  That is the name of my two dogs.  They

13    are Italian greyhounds, and there was no good bedding available

14    for that size dog for the way that they like to sleep.  So we

15    created the Bunny and Bentley dog beds that are multiple

16    layers.

17            Once again, so that you could take the cover off and

18    wash it with the removal core.  Because in the pet industry,

19    you buy a dog bed, and then as soon as it gets worn out, you

20    have to throw it away.  This allowed people to buy a

21    replacement cover for the outside so that they could continue

22    to use the core, and it's less expensive.

23    Q.  And just for the purposes of completeness, I did find the

24    Rugged Tuffy Rubber.

25    A.  You found two of them.

1    Q.  All right.  Let's get organized.  And lastly, the Silly

2    Squeakers.  What is that line?

3    A.  So Silly Squeakers is a line of -- well, it's several types

4    of toys.  One of the things that, as a company making durable

5    dog toys, it is difficult to, you know -- when durable -- I

6    mean, you are controlled by the shape that you are able to

7    make.

8          And Silly Squeakers was a chance for us to say, all

9    right, we have all these funny cute ideas that we want to do,

10   and we want to do them in greater detail, and we want to be

11   able to share the humor that we have in this world with people

12   in the pet industry.

13         Because all of the toys that we make are serious, and

14   so this gives us a chance to actually show, hey, you know what,

15   we actually are fun people and we can make really cute things,

16   and it's indicative, of like our culture, kind of who we are.

17   Because we are fun people that sit around and laugh and spend

18   time with our dogs.

19         So Silly Squeakers is a -- it's -- the predominant

20   material is vinyl, and that's another segment of the pet

21   industry.  So you have injection molding.  You have different

22   types of balls and different shapes that you can make it in.

23         So our first ones that we had were eye balls, which

24   were, I don't know if you know Star Trek.  They looked like the

25   Terrible Tribbles.  They had eyes on the front of them, and

1    then we did ones with -- that look like funny feet, which have

2    been disconnected, but it made it look like your dog had a foot

3    of an animal in their mouth.  It was covered with soft fur on

4    one side, and then it had a plastic injection foot on the

5    other.  But a cartoon foot, not to look like a real one.

6    Q.  We are going to go into more detail about Silly Squeakers a

7    little further in your testimony, but is this a page from your

8    catalog?

9    A.  Yes, this is one of our pages from our catalog.

10   Q.  And I guess more pertinent, is this also a page from your

11   catalog?

12   A.  That's also a page from our catalog.

13   Q.  What are the biggest sellers VIP has of its dog toys?

14   A.  By far the biggest sellers are all of our durable products.

15   Tuffy being hands down the most sought after, number one

16   product we make, and it has been around the longest.

17            MR. HARVEY:  Forgive me, Your Honor.  Could we ask

18   counsel to identify the last photo that you showed on the ELMO?

19            THE COURT:  If you would, please.

20            MR. HARVEY:  I think it is the one with the bar.

21            MR. BRAY:  That's page 36 of the catalog.

22            MR. HARVEY:  Thank you.

23   BY MR. BRAY:

24   Q.  Biggest customers for the Tuffy line?

25   A.  Yeah, so the biggest customers for the Tuffy line are

1    Petco, PetSmart, Walmart, Target.

2    Q.  Let's talk about the growth of VIP over time.  You said you

3    started selling dog toys in 2004?

4    A.  Correct.

5    Q.  What's the growth projectory (sic) or the growth history of

6    the company since 2004?

7    A.  Interestingly enough, our growth history, as you know, in

8    2007, we went through the housing crisis.  And in the industry,

9    we took a different approach, because we realized, you know, if

10   you are going to -- if you are going to win in a market where

11   people aren't buying products, the only way you are going to be

12   able to succeed is to have more new products out on the market

13   as quickly as possible.

14           So instead of sitting back and saying, hey, let's make

15   it through all of this and just keep it what we got, we were

16   coming out with anywhere between 20 to 40 new toys a year.  Our

17   year over year growth, anywhere from 7 to 12 percent.  I think

18   we had one low year at like 5.  And this year we are on course

19   to do over 30 to 32 percent in growth.

20   Q.  Okay.  So even after Lehman Brothers, VIP was experiencing

21   double-digit growth per year on average?

22   A.  Most years

23   Q.  And give the Court an idea today about where VIP stands in

24   the overall dog toy industry?

25   A.  In the dog toy industry for soft durable plush, we are the

1    leader hands down.  We are the most recognized and the most

2    trusted brand in durable plush.

3    Q.  What do you believe has been the secret to VIP's success,

4    especially after Lehman Brothers, when the market, for most

5    things, was difficult?

6    A.  Well, I think the secret to our success is the fact that we

7    relate back to consumers, not just the human but the dog.  And

8    we think that when we design toys, we design toys with the idea

9    of what would a dog like?  How would a dog use this?  Then how

10   is that going to interact with the actual parent owner as well?

11        Because the most special relationship that a person

12   has is with their dog.  They come home every day from their job

13   and they -- first thing waiting for them at the door is their

14   dog waiting to say hello to them.

15        And there's an industry joke that is sort of funny,

16   but I am glad my wife is not here when I am going to tell it,

17   but they say, if you take your wife and you take your dog and

18   you lock them in your trunk and come back a day later, which

19   one is going to be happy to see you?

20        So they have used that sort of -- we hear that joke

21   all the time, but it's just -- the industry growth is so large

22   over the last 10 years, and people equate that to the

23   humanization of the dog.

24        Because people bring their dog from the backyard into

25   their home.  They are taking a dog that was sitting outside in

1    the cold and putting a costume on it for Halloween, giving it

2    shoes when it goes out and walks outside on hot pavement, which

3    is great for Arizona.  And they are concerned now about their

4    food.  They are concerned about everything.

5          So this humanization trend has encapsulated the pet

6    industry.  But you also have to take into effect the fact that

7    when Lehman Brothers were around, people were at home crying

8    about the fact that they were broke.

9          And what were they doing when they were at home, they

10   were either drinking alcohol or playing with their dogs.

11   Because they were at home, and that was -- so we were selling

12   more dog toys just for that simple fact, because you were stuck

13   at home having to spend more time, because you may not have

14   that disposable income that you did before, because you were

15   just trying to get through the hard times.

16   Q.  Have you reviewed the Amazon reviews of the Bad Spaniels

17   product?

18   A.  Yes, I have.

19   Q.  Okay.  And this isn't in evidence, but I just wanted to

20   show -- is this an example of somebody humanizing their dog?

21   A.  Yes, that's a beautiful example of someone humanizing their

22   dog.  Their dog is having their 21st birthday, which means it

23   is three.  And it's happy birthday, and obviously they bought

24   them a lot of dog toys, and the dog, I believe, is drinking.

25   Q.  You have experienced tremendous success with VIP,

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION

1    tremendous growth over the last 9 years, 10 years since Lehman

2    Brothers.  Can you explain the VIP corporate culture, how it

3    positions itself in the pet products world, and how you think

4    that's impacted your growth?

5    A.  Well, as a company, best way to -- I don't know.  We are

6    fun people.  You know, in our office we have no walls.  We --

7    everyone gets to pick the music they get to listen to on a

8    radio station, and then it combines all of those things

9    together so that everyone can have some sort of enjoyment.  We

10   are a small company.  In our office we only have 10 people that

11   work there.

12         And at our trade shows, our booth is one of the

13   biggest booths there, only so we can accommodate for people to

14   come and actually hang out and experience our culture.  We have

15   a DJ there.  We have a bartender.  We have couches.  We invite

16   all of these people to come and actually not just shop our

17   booth, but to actually come and sit down and be a part of who

18   we are.

19         And at most trade shows, when people show up, they

20   say, you know what, I can't go to the Tuffy booth until the end

21   of the day because I want to wait till it's the end so I can go

22   there and hang out and spend the rest of my day there.

23         If you see our booth, it is the busiest booth.  It is

24   packed, and you couldn't move in it.  But it's just people

25   hanging out socializing, having fun, spending time together.

1    And people take that experience home with them.

2            And when they think about our products, they think

3    about the times that they've had with us and the experience

4    that they had, and it creates a feeling, it creates an emotion,

5    and it creates an experience that helps sell our products, but

6    it also helps them understand how to sell our products when

7    they are talking with their customers.

8    Q.  Let's just briefly, while we are -- you know, one of the --

9    one of the factors that we are talking about in this case is

10    marketing channels.  So let's just segue into that just

11    briefly.

12    A.  Okay.

13    Q.  The two biggest trade shows for the pet industry in the

14    United States are SuperZoo and Global Pet Expo?

15    A.  That's correct.

16    Q.  And can you explain when those are held and where those are

17    held?

18    A.  SuperZoo is held in Las Vegas, Nevada.  It is held right

19    before buying season for the holidays, which was last month.

20    And then Global Pet Expo, which is actually geared more towards

21    international sales and large corporate buyers, that happens in

22    March every year.

23            So we kind of have two shows, one over here, and one

24    over here, so when you are doing concepts, it kind of gives you

25    the chance to throw out your concepts to the big kids, but then

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION

1    you have everything ready for actual distribution when it's

2    time to get to the SuperZoo show.

3    Q.  And who attends, say, the SuperZoo in Vegas?  What type of

4    people?

5    A.  SuperZoo in Vegas is every pet specialty retailer and mass

6    retailer, but they also have a dog grooming show, so they bring

7    in all of these dogs and they groom poodles that look like

8    Ninja Turtles, things that I can't even imagine or describe.

9            People come there with their pigs in strollers.  I

10    mean, it is SuperZoo.  And it's anything that you could buy for

11    a pet all in one place, and it is a culture of -- it is an

12    industry where people don't -- I mean, we all respect each

13    other in the industry, and we are all there and we -- everybody

14    works together, and it's -- because we all have the same

15    customers, and everything is all about fun and enjoyment for

16    you and your pet.

17    Q.  And to your knowledge, does Jack Daniel's have any presence

18    at either of the two leading pet industry trade shows?

19    A.  To date, I have not seen them.

20    Q.  And with regard to SuperZoo, for example, are retailer

21    there to decide what products to purchase and see what's out

22    there?

23    A.  If you are in the pet industry and you have a pet store,

24    you are at those shows.  Because that is where you see

25    everything that is new and everything that's going on.  That's

UNITED STATES DISTRICT COURT

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION

1    where everybody launches their new products.

2    Q.   All right.  Let's transition to Silly Squeakers.  What

3    types of Silly Squeakers products do or does VIP offer today?

4    A.   So today we still offer the eye balls.  We offer squeaking

5    tennis balls, and then we also offer our parody line of beer

6    bottles, wine bottles, and most recently, liquor bottles.

7    Q.   So what was the original idea behind Silly Squeakers?

8    A.   So the original idea behind Silly Squeakers really comes

9    from the fact that, as I was saying earlier, we can't make

10   shapes with our other toys with more intricate detail in the

11   durable category.

12          And so we wanted to branch off into plastic injection

13   molding because we would be able to make more creative shapes

14   with more detail and do more intricate graphics for our

15   consumers, but it would also give us a chance to convey more of

16   the humorous side of the dog industry.

17   Q.   Is that humorous side a reflection of VIP's culture?

18   A.   100 percent.

19   Q.   Can you describe for the Court how the Silly Squeakers line

20   has evolved over time?

21   A.   Well, the Silly Squeakers line, which mostly is reflected

22   by the parody products that we make, reflects back on the

23   humanization of the dog in our lives, and if we all reflect

24   back, we all remember the picture of dogs playing poker, and we

25   have -- you know -- well, people who take videos of their dogs

UNITED STATES DISTRICT COURT

1    who can actually bring them beers and have them say, hey, you

2    know, Fido, go get me a beer.  And he goes over to the

3    refrigerator and pulls it out.  People embrace that.  They

4    think it's funny.  They enjoy it, and it's part of their --

5    it's part of dog culture.

6           So with that humanization, we thought, all right, how

7    can we take this funny part of what everybody wants to do with

8    dogs playing poker and people bringing them beers and stuff

9    like that, and make that into a product?

10          So we looked back and we said, all right, plastic

11   injection.  Let's make beer bottles and see where that takes

12   us.  And so that's when we realized, all right, so if you are

13   going to take a beer bottle and make it effective and kind of

14   play on this humanization, what are you going to do?

15          So we reflected on the fact that, you know, all day,

16   every day, you wake up, you look at your toothpaste, you have a

17   brand name on it.  You turn on your TV, you are being bombarded

18   with commercials.

19          You hop in your car, you see billboards.  Your car

20   steering wheel is advertising to you.  Your watch is

21   advertising to you.  Your clothes are advertising to you.  Your

22   radio, when you turn it on, it's advertising to you.  You have

23   magazines that you read that are advertising to you.

24          You are constantly being bombarded with advertisements

25   all day, all day, all day.  With everything you do.  Your pen

1    that you write with, it's got a logo on it.  It's telling you,

2    hey, this is the brand that you need to be.  And everywhere you

3    go in the grocery store, everything is a brand.

4          So there's this gray fog out there that these

5    companies are constantly pushing into your head.  And so what

6    we do, in our concept with saying, all right, if you are

7    getting all of this imagery, and it is all getting pumped into

8    your head, let's do a parody.  Let's take those little tiny

9    bits of information, take a few of them, reorganize them in a

10   way that you haven't seen, and put them out there in a funny

11   way for you to laugh at.

12         Because as you know, every -- corporations take

13   themselves very seriously, and obviously, you can see from this

14   room that everyone here doesn't think Silly Squeakers is funny,

15   even though a lot of people do.

16         And if you read the Amazon reviews, they all start

17   with, hilarious, funniest dog toy I ever owned.

18   Q.  Okay.  Well -- we will come back to your intent, both with

19   Silly Squeakers and the Bad Spaniels toy later on.

20         I am sorry, I misplaced -- here we are.

21         This is a page from a catalog a few years ago, 14 fun

22   bottles to choose from.  How many Silly Squeakers products are

23   available today?

24   A.  Available today, there is, I believe, 20.

25   Q.  And I'm talking about the parody?

| | |
|---|---|
| 1 | A.   There are 20.  I believe there's 20 parody toys. |
| 2 | Q.   And how many do you have in development? |
| 3 | A.   I think there's six or seven new ones coming out. |
| 4 | Q.   And how many Silly Squeakers toys have been sold?  The |
| 5 | parody dog toys, not the tennis balls? |
| 6 | A.   Well, Silly Squeakers as a line has sold over a million dog |
| 7 | toys, and I would say a large percentage of that is, if it is |
| 8 | not a million, it is really close. |
| 9 | Q.   After one million sales of Silly Squeakers parody toys |
| 10 | since 2007, to your knowledge, has VIP ever received a |
| 11 | communication from a customer where they thought that the brand |
| 12 | being parodied put out or authorized the toy? |
| 13 | A.   Not once. |
| 14 | THE COURT:  Um -- never mind. |
| 15 | BY MR. BRAY: |
| 16 | Q.   How many -- let's draw that down a little more.  So |
| 17 | approximately a million Silly Squeakers parody beer, wine, |
| 18 | sold, liquor bottles, have been sold.  Not once have you |
| 19 | received a communication from a customer indicating a belief |
| 20 | that some other company authorized, approved, or put out the |
| 21 | Silly Squeaker, other than VIP? |
| 22 | A.   Not once. |
| 23 | MR. HARVEY:  Leading, Your Honor. |
| 24 | THE COURT:  Sustained.  Already been asked and |
| 25 | answered.  Let's move along. |

1  BY MR. BRAY:

2  Q.  I was just trying to transition, perhaps awkwardly, to the

3  next question.

4         How many Bad Spaniels products have you sold?

5  A.  I believe the number as of the other day was 55,000 units.

6  Q.  When was the first sale of the Bad Spaniels product?

7  A.  I believe in 2014.

8  Q.  And since -- so we have over three years of sales

9  experience.  Since 2014, has VIP received any kind of

10 communication from a customer indicating a belief that somebody

11 besides VIP put out or authorized the product?

12 A.  Zero.

13 Q.  Dr. Ford in his survey concluded that 29 percent had

14 evidenced some indicia of confusion.  Is that consistent with

15 your experience, based on real world results and real world

16 history?

17 A.  Real world results would be zero.

18 Q.  And the real world results with regard to the other parody

19 products?

20 A.  Zero.  Even David Gooder testified yesterday that it was

21 zero on their side as well.

22         MR. HARVEY:  Objection, Your Honor.  Mischaracterizes.

23         THE COURT:  You can argue on that and cross on that.

24 Overruled.

25

1   BY MR. BRAY:

2   Q.  What percentage of VIP's business is the Silly Squeakers

3   line?

4   A.  Sorry, could you repeat the question?

5   Q.  Out of all VIP's business, what percentage is the Silly

6   Squeakers?

7   A.  The Silly Squeakers line is less than 10 percent of our

8   total business.

9   Q.  What has been your experience with how most major brands

10  have dealt with the Silly Squeakers parody line?

11  A.  Are you saying how most major brands that we have been

12  parodying?

13  Q.  Exactly.  The major -- let me rephrase it.

14          What's been your experience with how the major brands

15  that have been the subject of the Silly Squeakers parody

16  products have responded?

17  A.  Most of the brands ignore our products.  Four of them --

18  let me go through this -- have sent letters to us which would

19  be Kendall-Jackson, Pabst Blue Ribbon, Heineken, and I might be

20  missing one.

21          Those examples are people who have sent us a letter,

22  who we have responded back to in form of letter.  In our return

23  letter, which we send, it states the existing case law that was

24  concluded in the Chewy Vuitton case and the Timmy Holedigger

25  case, to allow the person who is the subject of the parody to

1    look at what existing law is out there, and then let them

2    determine how they want to proceed from there.

3              And I also want to mention that because this was

4    brought up yesterday in testimony or -- and that is that we

5    learned from our Anheuser-Busch case that you -- that if a

6    large corporation is going to sue you, they are going to do it

7    in their state, and they immediately gear up.

8              And when you have to go there, you have to gear up and

9    not only have your own local counsel, but you have to have your

10   counsel there.  And then you have to try to find someone who

11   would even actually represent you in that state, with one of

12   the largest income suppliers of money for that state.

13             So it's our practice that we file a dec action in this

14   court so that we can gain jurisdiction, so that if in fact

15   somebody does want to proceed with litigation, which doesn't

16   normally happen, we are at least prepared and we can claim

17   jurisdiction, to try to help offset the enormous cost of

18   litigation, if in fact it would ever go there.  And until now,

19   that hasn't happened.

20   Q.  Were all of the declaratory judgment actions filed in

21   Arizona, other than this one, dismissed without prejudice?

22   A.  Yeah, they were dismissed without prejudice, only simply

23   because the other companies, they just -- they didn't see any

24   interest.  And a funny thing was, Heineken actually forgot that

25   they had reached out to us and then, was it like two or three

1   years later reached out to us again and said, hey, what is

2   this?  And we're like, do you remember?  We already had this

3   discussion?  And they were like, oh, okay, sorry, and they

4   stepped away.

5   Q.  Let's talk about the Buttwiper case, Dr. Simonson mentioned

6   it briefly when he was on the stand on Monday.  Were you

7   previously involved in litigation over the Buttwiper Silly

8   Squeaker toy with Anheuser-Busch in Federal District Court in

9   Missouri?

10  A.  Yes.

11  Q.  When Anheuser-Busch learned of the parody dog toy, how did

12  they respond?

13  A.  They immediately responded with a lawsuit, and I believe

14  they had already conducted a survey.  So they geared up, got

15  ready, and came after us full force.

16  Q.  And did they file what's called a motion for preliminary

17  injunction?

18  A.  They were emotional enough about it that they filed a --

19  sorry, a motion for preliminary injunction, correct.

20  Q.  And the ruling that was eventually received from the court

21  in Missouri was on the motion for preliminary injunction; is

22  that right?

23  A.  Yes.

24  Q.  And there was never a trial in that case?

25  A.  There was never a trial in that case.  Yesterday someone --

1    Mr. Gooder spoke that we lost that case, when in fact we didn't

2    lose that case.  After we received our preliminary injunction

3    ruling, we went back and Budweiser basically said, look, we

4    don't like the Buttwiper toy.  If you want to go forward, we

5    are going to bring in these other two toys that we have rights

6    over, which is -- which we think could probably infringe, which

7    would be the Cataroma and the O Drools, which, as you know,

8    parody Corona and O'Doul's.

9           And if we gave up the Buttwiper, they said, we will

10   just turn a blind eye and move on.  So even though they didn't

11   like one, we still have two in existence.

12   Q.   Okay.  And those have remained, especially the Cataroma,

13   has been consistently on sale for 10 years?

14   A.   Yeah, it is one of the first ones we came up with.

15   Q.   And how did you come up with the Buttwiper name?

16   A.   Well, first of all, I didn't come up with the name

17   Buttwiper.  If you look in the urban dictionary, that's like

18   the red headed stepchild name for Anheuser-Busch's Budweiser.

19   It is like the name they had in high school that they were kind

20   of bullied with, and I think that's why they were so emotional

21   about it.

22          But for -- you know, everybody has their favorite

23   brand in beer, just like in sports, everybody has their

24   favorite team.  Well, people who say, you know, Miller is

25   better, why would you drink that?  They use the term

1    "Buttwiper."  And it was a common knowledge word that was in

2    the culture of beer, and we -- and so we played on that

3    cultural advantage and created the Buttwiper dog toy using that

4    word.

5    Q.  And I think one of the witnesses for JPDI referenced VIP

6    losing the Anheuser-Busch case.  Do you know whether or not the

7    trial court in that case found that at least at that stage of

8    the case, Anheuser-Busch had established a likelihood of

9    success on either its dilution by tarnishment claim or its

10   dilution by blurring claim?

11        MR. HARVEY:  Your Honor, the record in that case

12   speaks for itself.  This witness's knowledge of this seems

13   irrelevant to me.

14        THE COURT:  He can tell what his understanding is, but

15   that doesn't necessarily mean that that's what the legal issues

16   were and how they were resolved.  That's a matter of record in

17   the court.

18        Certainly how he wishes to proceed and his

19   understanding of those results is fine.  Because if he starts

20   getting into this, you may very well get into the issue of

21   advice of counsel, et cetera, et cetera, et cetera, which is

22   not an issue in this case.  If we did, that would create a

23   whole new problem at this juncture, which I don't think we want

24   to get into.

25        MR. BRAY:  No, we are not getting into advice of

1    counsel.

2              THE COURT:  Well, I want to be sure we have the ground

3    rules straight, that's all.  You may move along.

4    BY MR. BRAY:

5    Q.  Okay.

6    A.  So I believe that they ruled that they did not find a

7    likelihood that that would succeed.

8    Q.  You read the decision yourself, right?

9    A.  Correct.

10   Q.  And were you satisfied with the non-trial resolution that

11   you reached with Anheuser-Busch through settlement?

12   A.  Yeah, I think so.  I think it was a great resolution, and

13   we can, you know -- obviously, we have continued to grow our

14   parody line of dog toys substantially since then, and with fair

15   success.

16   Q.  All right.  Let's move on to -- um, again, this is one of

17   the Sleekcraft factors, the intent behind your creation of the

18   Bad Spaniels product in particular.

19              Can you describe for the Court how you thought of Bad

20   Spaniels?  Where you were?  How it happened?  We heard a little

21   bit through Elle Phillips' deposition.

22   A.  Me and my wife, we go out to dinner every night, and we sit

23   at restaurants, but we normally sit at the bar.  And I am

24   sitting there staring, thinking, all right, what's -- you know,

25   what new product can we come up with?  And I'm looking around,

1    and I'm like, you know what, I think I got something.  And so I

2    pick up the phone and I call Elle in my -- which I am still

3    laughing about, my secret code.

4          Elle and I have done enough of these that it's kind of

5    fun for us to say, hey, I got one for you, and then just say

6    what it is.  Because if she gets it and understands what I am

7    saying, then I am positive that if I am going to elicit

8    different parts of a brand to someone and get them to get a

9    parody, then she is going to need to get it too.

10          And so she's like, hey, you know what, got it.  I will

11    go work on it right now, and that was the phone call.  So it

12    was a matter of 15 seconds, and then I went and finished my

13    dinner.

14    Q.  Was your intent in creating Bad Spaniels to create a parody

15    product?

16    A.  Absolutely.

17    Q.  And what is it your intent to amuse the public?

18    A.  Undoubtedly.

19    Q.  Did you have any intent to confuse the public into thinking

20    that Jack Daniel's was putting out one of your Silly Squeaker

21    toys, which is an integral part of your business?

22    A.  Absolutely not.

23    Q.  And you want, Mr. Sacra, the public to know that VIP is

24    behind the Silly Squeakers line, I assume?

25    A.  Absolutely.

1  Q.  Did you have any intent to harm Jack Daniel's by creating

2  the Bad Spaniels parody dog toy?

3  A.  We don't have the intent to harm anyone.

4  Q.  And does the Silly Squeakers -- you have exhibit -- it is

5  either Exhibit 1 or 2, I can't remember -- the Silly Squeakers

6  toy.  Does the Silly Squeakers toy include a disclaimer?

7  A.  Yes, it does.

8  Q.  And what does it disclaim?  Perhaps you could read it for

9  the Court?

10  A.  On the back of it it says:  This product and its design

11  belong to VIP Products.  This product is not affiliated with

12  Jack Daniel's distillery.

13  Q.  Why did you include a disclaimer on the product?

14  A.  A parody all in itself lets you know that it's not the

15  origin of source of who we're parodying, and it is simply just

16  another clear reminder that this product does not come from the

17  person being parodied.

18  Q.  Again, you are not -- it was never your intent to confuse

19  the public as to any of the Silly Squeakers?

20  A.  No, absolutely not.  Why would we want to confuse people.

21  We want to amuse people.

22  Q.  And in the Anheuser-Busch case, there was a survey

23  performed by Anheuser-Busch; do you remember that?

24  A.  There was a survey done by Anheuser-Busch.

25  Q.  Was there a survey performed by Anheuser-Busch in

1   conjunction with that?

2   A.  Yes, there was.

3   Q.  And was there a survey conducted by Dr. Ford in this case?

4   A.  Sorry, in this case that we are in now, is what you are

5   asking, correct?

6   Q.  Sure.

7   A.  So in this case there was one performed by Dr. Ford.

8   Q.  Again, what's been your real world experience, selling a

9   million parody dog toys?

10          MR. HARVEY:  Asked and answered, Your Honor.

11          THE COURT:  Overruled.

12  BY MR. BRAY:

13  Q.  What has been your real world experience selling a million

14  parody dog toys?  Any confusion?

15  A.  No, I haven't had any confusion.  The only confusion that

16  people can find is when they do these surveys that don't make

17  any sense.

18  Q.  Have you now adopted, for the Bad Spaniels products being

19  manufactured today, a different sort of disclaimer?

20  A.  Yes, I have.  And we actually -- you know, because with --

21  the experience that we had with Anheuser-Busch taught us a

22  lesson, and being -- going through this process has just added

23  to the -- has just added to our knowledge of like literally how

24  hard these corporations try to take the humor out of what it is

25  we are trying to do, and trying to take the humor out of the

1    world.  And so we introduced this new header artwork, which I

2    cannot read from here, so if you are going to ask me to read

3    it.....

4              MR. BRAY:  May I approach the witness, Your Honor?

5              THE COURT:  Go ahead.  You handed him an exhibit.

6    What is it?

7              MR. BRAY:  This has not been marked.

8              THE COURT:  Well then, why are you handing it to him

9    if it hasn't been marked yet?  If you are going to be

10   soliciting testimony about it, how is it going to be reflected

11   in the record?

12             MR. BRAY:  Can we mark it as 272?

13             THE COURT:  Any objection?

14             MR. CRUM:  Your Honor, yeah, we will object to that.

15   I don't beleive we have seen this before.  Was it produced

16   during discovery, Mr. Bray?

17             THE COURT:  This has not been disclosed in discovery?

18             MR. BRAY:  This was created years after, or months

19   after discovery closed.

20             THE COURT:  Well, then you are not going to use it.

21             MR. BRAY:  Okay.

22             THE COURT:  That's not the issue in this lawsuit.

23             MR. BRAY:  Okay.

24             THE COURT:  You will have to give that back.

25             MR. BRAY:  Sure.

1            THE WITNESS:  That's fine.

2            THE COURT:  Thank you.

3    BY MR. BRAY:

4    Q.  Let me ask you this question, Mr. Sacra, the Silly

5    Squeakers that's been marked as Exhibit 1, is that the version

6    that's being sold today?

7    A.  No.

8    Q.  So a version that's being manufactured today has a

9    different hangtag?

10   A.  Correct.

11   Q.  And when was that new version first manufactured?

12   A.  I believe it was in the early months of this year.

13   Q.  Okay.  After discovery closed in this case?

14   A.  After discovery closed.

15   Q.  And does the hangtag on the versions of the Bad Spaniels

16   Silly Squeaker product being manufactured today, include --

17           THE COURT:  Before you answer that, finish asking the

18   question, but I have a procedural question to ask before he

19   answers.

20           MR. BRAY:  Okay.

21   BY MR. BRAY:

22   Q.  Does the hangtag on the Silly Squeakers product that's

23   being sold today contain survey questions and answers that

24   parallel survey questions that Dr. Ford asked in this case?

25           THE COURT:  Now the question is, did you, when you

1    became aware of this in 2017, because we are now -- he said it

2    came out early.  Discovery is closed, but we are in October

3    2017.  Was any of this disclosed and/or a motion to reopen

4    discovery ever made?

5            MR. BRAY:  I first found out about it literally

6    preparing for the trial in the last two weeks.

7            THE COURT:  Well then, it is not coming into it now.

8    We are dealing with what happened then and what the marketing

9    was and that intent.

10           And I do appreciate this gentleman's situation, where

11   he's in a hot market, things are changing rapidly, he is

12   dealing with consumers all over the world, and I realize how

13   things can change.

14           We are talking about this toy at this time.  Because

15   otherwise, we may be end up having to start all over again,

16   because now it is a different product than that which was

17   marketed, which gave generation to this lawsuit.

18           MR. BRAY:  Sure.  And just by way of preview, Your

19   Honor, regardless of how the Court decides, there -- well, what

20   the Court is deciding is the -- whether the Bad Spaniels

21   product that's been marked as Exhibit 1 is infringing or

22   diluting of the mark?

23           THE COURT:  That's right, that's the issue, but when

24   we start interjecting other issues in the lawsuit, which has

25   never been teed up and disclosed and discovered by the parties,

1    at this stage it's too late.

2          MR. BRAY:  Oh, I understand that, and it's possible

3    that Mr. Sacra could make further changes to any of his

4    products after the trial is over.

5          THE COURT:  I understand that.

6    BY MR. BRAY:

7    Q.  What was -- did you have an intended message for the Bad

8    Spaniels parody toy?

9    A.  The intended message for the Bad Spaniels parody toy, as

10   the same with all of ours, is just saying, the world around you

11   is constantly advertising to you, and we are coming back and

12   saying, look, you need to -- and the world is so serious about

13   all of this marketing and advertising and getting sales and all

14   that.

15          And we are coming back and saying, look, you can't be

16   so serious in this world all the time.  You need to be able to

17   sit back and laugh at yourself.  Whether it is someone making

18   fun of me, or someone else, or another brand or whatever.  The

19   goal of that, of all of the parodies, is to convey that you

20   shouldn't take yourself so seriously, especially, I mean, with

21   the fact that that's all you do is take everything seriously.

22   Q.  Was it your intent to elicit disgust?

23   A.  No.

24   Q.  I am going to show the witness two demonstrative exhibits.

25   And let's do -- I think we had a number for you, 10003.  So

1    let's do this as 10003.  And this is 10005.

2              MR. HARVEY:  May we see a copy?

3              THE COURT:  We are now at 10003; is that right?

4              THE CLERK:  Yes.

5              MR. HARVEY:  Your Honor, we have an objection as to

6    this document, which again, we have not ever seen before.  It

7    was not produced to us.  I gather he is characterizing it as a

8    demonstrative, but it is quite detailed, and we object to its

9    use and admission.

10             THE COURT:  Let me see what it is, first.  103 and

11   105, right -- I mean 10005 and 10003.  He will be allowed to

12   testify about these for demonstrative purposes only.  They are

13   not going to be admitted into the record for proof of the words

14   or proof of this.  It only illustrates his testimony and what

15   he thinks.

16             MR. BRAY:  Thank you, Your Honor.

17             MR. CRUM:  I am sorry.  I just have one quick

18   question, Your Honor?  I may have seen this before.  David, was

19   this a part of Mr. Sacra's report?

20             MR. BRAY:  I believe it was.

21             THE WITNESS:  It is.

22             MR. CRUM:  Your Honor, at the pretrial conference, I

23   just want to be clear, we discussed Mr. Sacra's report, and the

24   Court was pretty clear that the report stays out.

25             THE COURT:  It does stay out.

1          MR. BRAY:  I am not offering the report, I am offering

2     pages, two pages that are demonstrative that have been

3     previously disclosed to counsel.

4          THE COURT:  He can testify to them as to his

5     understanding and his impression.  His reports do not come into

6     evidence, just like -- other than the fact you stipulated to

7     these other doctors' reports, the reports don't come in.  I

8     know a lot of courts use them, but they are the ultimate

9     hearsay testifiers, and that's wrong.

10         MR. BRAY:  Just to be clear, Your Honor, I am not

11    intending to offer Mr. Sacra's report.  That was the subject of

12    the motion in limine.  Mr. Harvey said that he hadn't seen

13    these two demonstrative exhibits before.  They had.  These are

14    being used purely for demonstrative purposes to show the

15    differences between the two products.

16         THE COURT:  Go ahead.

17    BY MR. BRAY:

18    Q.  When you designed the Bad Spaniels product with Elle

19    Phillips, were you intending to make an exact copy of the Jack

20    Daniel's label?

21    A.  No, there was no intent to make a copy.

22    Q.  And I have shown you -- let me get this -- can't do any

23    better than that.

24         This is demonstrative exhibit 10003.  Is this -- does

25    this help you explain to the Court some of the differences

1    between the elements of the Bad Spaniels product and the Jack

2    Daniel's black label product?

3    A.  Yes, it does.

4    Q.  And can you identify some of those differences for the

5    Court that were included as part of your design process?

6    A.  So if you -- there are red lines that go across this image,

7    just to show you where the top of the bottle of the label is,

8    the middle of the label, and the bottom of the label is.

9         So in your question of whether or not there was an

10   intent to copy, our goal is to just grab enough elements of

11   information that has been put into your mind.  I mean, you see

12   commercials all day long sitting in here, and you grab little

13   bits of information and you put them into your head.

14        And then we draw on those little bits and put just

15   enough for you to recall the brand that we're parodying, but

16   not to copy.  And as you can see, Jack Daniel's logo is in the

17   top -- upper top portion, which would be the upper quarter

18   portion of the label, whereas our arched lettered "Bad

19   Spaniels" is actually in the middle of our label.

20        At the top of our label, we have a dog.  Clearly Jack

21   Daniel's doesn't have a dog on their bottle.

22        You can see that the cartouche, that the Old No. 7, is

23   in the upper half, which is the bottom quarter of the label.

24   The No. 2 in the cartouche on the Bad Spaniels label has been

25   pushed down into the lower quadrant.

1           The word "Tennessee" on the Jack Daniel's label is in

2   the middle of the label.  On ours, it's on the bottom of the

3   label.  There are over 50 different instances of variances in

4   the Jack Daniel's bottle and the Bad Spaniels bottle design.

5           MR. BRAY:  Your Honor, may I approach the witness?

6           Just because it's difficult for him to read this.

7           THE COURT:  You may.

8           THE WITNESS:  So --

9           MR. BRAY:  Let me ask you a question, Mr. Sacra.

10  BY MR. BRAY:

11  Q.  Is demonstrative exhibit 10005, does it demonstrate more

12  than 50 differences between your product and the Jack Daniel's

13  product?

14  A.  Yes, it does demonstrate that.

15  Q.  And can you highlight -- I don't think we want to take the

16  Court's time to go through all 50 differences, but can you

17  highlight several of them?

18  A.  Well, as the ones -- beyond the ones I just mentioned,

19  obviously our product has a hangtag on it.  This product does

20  not have a hangtag on it.  You can see that the filigree we use

21  is completely different and is in a complete enclosed shape

22  versus the Jack Daniel's one.

23          The Jack Daniel's label has a three-sided label that

24  wraps around the entire bottle.  They have a black

25  shrink-wrapped enclosure over the top of their bottle with the

1    Old No. 7 on it.  Our is a black cap with an actual label on

2    the front that's square.  But probably one of the biggest

3    things that -- ours is a squeaking plastic bottle, and theirs a

4    glass bottle that's designed to hold a fluid.

5            But each of these instances on here represent things

6    that are completely different.  They have -- sorry, I have a

7    hard time reading this.  When you get in -- there's something

8    different, as far as with the header card artwork.  There's

9    something different with the fact that it's a glass bottle

10   versus a plastic bottle.  There are several differences in

11   that.

12           And then the label itself, and then the actual wording

13   itself.  And you can say, it doesn't say -- if you had an

14   intent to copy, you would put the word "Jack Daniel's" on

15   there.  There's no word "Jack Daniel's" on the bottle at all.

16   It says, Bad Spaniels.  There's no embossed "Jack Daniel's"

17   written on the bottle.

18           And there's an intricate number -- like I said,

19   there's an intricate number, 50 different differences which are

20   noted in this.  And I can read them all if you wanted to, but I

21   don't think the Judge really wants to go through all of them.

22   Q.  Thank you, Mr. Sacra.  And with regard to, I think this was

23   demonstrative exhibit 10003, would you agree that there are

24   similarities between the Bad Spaniels product and other

25   well-known whiskey and bourbon products, other than Jack

1    Daniel's?

2    A.  Yes.

3    Q.  And I am going to show you what's been marked as Exhibit 3,

4    which was discussed during Mr. Gooder's testimony.  This is the

5    trademark registration for the bottle shape.  Are you aware of

6    what International Class 33 goods are?

7    A.  I believe International Class 33 is for alcoholic

8    beverages.

9    Q.  Okay.  Does VIP sell any alcoholic beverages?

10   A.  We do not sell any alcoholic beverages.

11   Q.  And with regard to Exhibit 3, you will look -- part of the

12   element being claimed is the Jack Daniel's signature on the --

13   each of the four sides of the top of the bottle?

14   A.  Yes, I see that.

15   Q.  Does VIP include any signature of Jack Daniel's or anybody

16   else --

17   A.  No, we do not.

18   Q.  -- on the Bad Spaniels product?

19           Let's turn to one of the other factors that is

20   relevant in this case.  The sales channels of the Silly

21   Squeakers products.  Who does VIP sell the Bad Spaniels Silly

22   Squeakers parody dog toy to?

23   A.  We sell to independent special -- I am sorry -- independent

24   pet retailers.  And then we sold it into PetSmart, and then

25   Petco as well, which would be a larger box store.

```
 1   Q.  Does VIP have any liquor stores sales of the Bad Spaniels

 2   product?

 3   A.  None.

 4   Q.  Is the VIP Bad Spaniels product, to your knowledge, ever

 5   promoted or offered for sale in a physical space next to

 6   liquor?

 7   A.  None.

 8   Q.  Is the VIP Bad Spaniels product presently being sold into

 9   any big-box retailers?

10   A.  Other than Petco and PetSmart.

11   Q.  Non-pet specialty?

12   A.  Not in mass or anything like that, no.

13   Q.  To your knowledge, are the Silly Squeakers toys ever sold

14   alongside of the beer, soda, wine, and liquor products that

15   they are parodying?

16   A.  No.

17   Q.  I am going to show you just the first page of Exhibit 271A,

18   Mr. Sacra, which has been marked into evidence, Your Honor.  I

19   will represent to the Court that this is the full spreadsheet

20   of all sales of the Bad Spaniels product.

21          THE COURT:  Has this been stipulated into evidence?

22          MR. BRAY:  It has, pursuant to Mr. Harvey's and I's

23   agreement this morning.

24          MR. HARVEY:  Yes.

25
```

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION

BY MR. BRAY:

Q.  I am looking at page 2.  Are these some of the stores that represent the sales channels for VIP, and I know it is hard to read.  Doggie Style in Philadelphia.  K9 Loft --

A.  Yes.

Q.  -- in Sherman Oaks.  Noah's Ark Pet Supply.  Bon Appetite. Natural Pet Pantry.  Hunter.  Doggie Style K9 cafe.  Are these the kind of pet specialty stores that's the main target or channel for the Bad Spaniels product?

A.  Yes.

Q.  Is the VIP Bad Spaniels products being sold in Walmart?

A.  No.

Q.  What about Walmart.com?  That was mentioned by, I believe, Mr. Gooder yesterday.

A.  I went and looked yesterday and I believe there is a listing for it.  Someone -- some third party has put a listing up for it, but typically, we control all of our distribution. We have an IP policy that requires that all of our products, if you are going to display them on the Internet, you cannot sell them on third-party sites.  And so we tag our products, all of our products that go into our distribution channel, because we sell mostly direct to retail stores.

        But in a scenario where we would sell to a distributor, and let's say that distributor sold to their small retail store, or in fact were to sell directly to Amazon, or

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION

1    something like that, when we buy those products back, when we

2    see them listed, we then discontinue their right to distribute

3    our products and stop selling them.

4          And we actually have a police force company that

5    oversees that specific purpose, and they run queries every

6    single day all over the Internet to try to police what is

7    actually going on, to put controls onto the rights that we have

8    in our trademarks and copyrights.

9    Q.   Okay.  We will get back to that in a moment.  There is a

10   difference, to your knowledge, between Walmart.com and Walmart?

11   A.   Yeah, they are actually two complete separate entities

12   within inside of Walmart.  They have different purchasing

13   departments.  And the certain consolidation now is that,

14   Hayneedle, jet.com and walmart.com are all under the same roof

15   being managed by Jet.

16   Q.   So --

17   A.   And Walmart, you know, that's run out of the corporate

18   office, which is -- we just got a new buyer what?  Five days

19   ago.

20   Q.   So with regard to walmart.com, you've not authorized any

21   sale by any third-party seller of the Bad Spaniels toy?

22   A.   We have discontinued the sale of -- because of the giant

23   war that's going on between Amazon and Walmart, they actually

24   at one point were using our Tuffy product and selling it at $4

25   below what their cost was.

STEPHEN MICHAEL SACRA - DIRECT EXAMINATION

1        So both of them were using it as a loss leader, so

2   that they could attract people in to encapsulate the pet

3   industry, at which point in time we went and we shut off all

4   sales to Amazon, all sales to Walmart, all sales to Jet, and

5   made sure that they -- and went through and depleted their

6   inventory, going as far as to actually buy it back so that we

7   could control as much of our distribution channel as we could.

8        Because using our product as a loss leader, I mean, it

9   would be cheap -- I mean, it was less expensive for our retail

10  stores to go and buy it from Walmart -- not Walmart, from

11  amazon.com than to buy it from us.

12        I mean, if you are buying it -- if -- so they don't

13  carry our inventory.  And if it does show up on there, it's

14  drop shipped by us as a third-party seller.  So we have it

15  listed, but the inherent problem now is that they have a war on

16  who is going to have the most number of products.

17        So they are going out and grabbing information in

18  listings, and copying those listings and showing them on their

19  site.

20        And you will see, it says, available in 3 to 10 days.

21  Or 14 days.  And then what happens is they put up the listing.

22  You go to check out at the cart.  On jet.com it will say,

23  sorry, we don't have this item, even though we told you we did

24  and you were going to get a discount and made it all the way to

25  the cart.

1    And then Walmart -- sorry, not Walmart, Amazon, what

2    they do is they actually let you buy it, and they, say, okay,

3    it is going to deliver in this amount of time, and then they

4    keep delaying it and they keep delaying it.

5    And they have an actual vendor website that is on the

6    back end, which you don't know about, that allows people to go

7    in and they post products that they are looking for, to see if

8    they can get any of your suppliers to supply them product.

9    It's crazy the things that they are doing.  So it is

10   like the wild, wild west, and everybody is really scrambling

11   trying to get a grip on it.  And I believe in our instance, we

12   have done better than most people to try to wrangle up our

13   distribution.

14   And with the fact that we are starting to mark all of

15   our products, so that we can track the channels that they go

16   through has been a very successful attribute, so --

17   Q.  And at Amazon, you know, for the sales by third parties,

18   that's the sort of thing that you police for?

19   A.  Yeah.  So every day, we use a company called Mobius, and

20   they actually troll Amazon with their algorithms, and as soon

21   as they see a seller, they actually exercise the trademark

22   holder's rights and go through the trademark part of Amazon and

23   file a complaint.  And within not hours, but minutes, these

24   people are shut off.

25   And what's crazy about it is that when you make an

1    infringement on Amazon using someone else's trade dress or

2    copyright, without their authorization, when they shut it down,

3    the third-party seller, if it is their second offense, can no

4    longer list products on Amazon.  So you get two strikes and you

5    are out.

6            So it is a very serious offense.  And there's a lot

7    of people out there that -- who are jobbers, where they just go

8    and put up as many listings as they can for all of these

9    different products.  And then inherently, not pay attention to

10   that.  And then you send them a notice, and they will instantly

11   take it down.

12           But they have to contact you directly, and then you

13   gate whether or not it can go back on Amazon.  And if we tell

14   them, say, look, you are not allowed to sell our products, our

15   policy is this, you can't use our intellectual property without

16   our permission, we are are not going to give you permission,

17   please take the listing down.

18           And the only person that doesn't work with, is Amazon

19   itself, because Amazon refuses to take down any listing of a

20   product sold as a third party, because they want to see if they

21   can job it out on the back side, to get one of your

22   distributors to sell it so they can sell it for less, which

23   makes it impossible to keep MAP pricing, but it's the best you

24   can do.

25   Q.  We talked briefly with the Court yesterday about drop

STEPHEN MICHAEL SACRA – DIRECT EXAMINATION

1    shipping and Amazon and Walmart.  If you look at Exhibit 271A

2    it seems like, without a scientific review of it, it looks like

3    the bulk, the majority of your sales are to pet specialty

4    retailers?

5    A.  Absolutely.  I mean, Amazon and third-party seller sites,

6    it's miniscule.  You will see listings, but sales, I mean, even

7    using Boozin' Gear as an example that we keep talking about

8    over and over and over.

9         Last time they purchased from us or any of our

10   distributors was back, I believe, in 2016, like early 20 -- or

11   2015.  So they have the listing up.  I am not even sure you can

12   buy one.

13   Q.  And is Boozin' Gear one of -- is Boozin' Gear a significant

14   retail customer?

15   A.  They purchase 34 units.

16   Q.  So out of the 55,000 units sold, Boozin' Gear has purchased

17   34 Bad Spaniels units?

18   A.  Right.

19   Q.  Let's switch gears a little bit, Mr. Sacra, and talk about

20   marketing channels for Bad Spaniels.  With regards to -- well,

21   maybe I will ask these broader for VIP and then we can narrow

22   it down.

23        Does VIP do any social media advertising today?

24   A.  We discontinued our social media advertising, only because

25   when you make durable dog toys, people like to use the dog toys

UNITED STATES DISTRICT COURT

1    inappropriately.  So you would get postings of just crazy

2    stuff.  So it was so much work to try to control it, that we

3    just discontinued it all.

4    Q.  When was that?

5    A.  We discontinued probably 2014, '15, something like that.

6    It was quite a while ago.

7    Q.  And so if there were ever any social media advertising done

8    for the Bad Spaniels, it would have been at the very, very

9    beginning, or none at all?

10   A.  We don't social advertise any of our products.

11   Q.  And does VIP do any billboard marketing?

12   A.  No.

13   Q.  Does VIP advertise on television?

14   A.  No.

15   Q.  What marketing does VIP do for the Bad Spaniels product?

16   A.  The only marketing that we do is our two trade shows once a

17   year.  We have an email marketing campaign where we email

18   directly to our retailers, just basic information.  We don't

19   actually send any information about products, we just say, hey,

20   come check us out.  We have new items.  And then we send

21   catalogs twice a year to their mailing address.  So it's

22   nothing significant.

23   Q.  Other than the fact that VIP has an Internet presence and

24   Jack Daniel's has an Internet presence, is there any overlap,

25   to your knowledge, between the marketing channels that VIP uses

1    and the marketing channels that Jack Daniel's uses?

2    A.  I don't believe there are any.

3    Q.  Let's turn to the next Sleekcraft factor, proximity of

4    goods.  What types of goods is the Jack Daniel's black label?

5    A.  It is an alcoholic beverage.

6    Q.  And what type of good is the Bad Spaniels product?

7    A.  It is a squeaking dog toy.

8    Q.  Are these similar kind of goods?

9    A.  No.

10   Q.  How are they different?

11   A.  One is a dog toy that's not regulated, and the other one is

12   alcohol, which is a regulated product.

13   Q.  Is it your understanding that the sale of alcohol is

14   heavily regulated in the United States?

15   A.  Heavily regulated.

16   Q.  Is the sale of dog toys regulated in the United States?

17   A.  No, it is not.  There are no regulations for dog toys of

18   any kind.

19   Q.  So even when you think of Consumer Product Safety

20   Commission or the Food and Drug Association -- or

21   Administration, with regard to human products, no regulations?

22   A.  The Product Safety Commission, the CPSIA or -- they have

23   regulations for children, which we have adopted as our measures

24   for safety in dog toys, because we know that there's a -- dog

25   toys sit on the floor and children's toys sit on the floor.  So

STEPHEN MICHAEL SACRA - DIRECT EXAMINATION    78

 1    we want to make sure that all of our products meet or exceed

 2    those safety standards, but that is not a requirement in the

 3    industry.

 4    Q.  Do you -- Mr. Roush, I believe, testified to the

 5    three-tiered distribution system that Jack Daniel's uses.  Does

 6    VIP sell the Bad Spaniels product to any of the liquor

 7    distributors that might be part of the Jack Daniel's

 8    three-tiered distribution system?

 9    A.  Not at all.

10    Q.  Is the price point different between the Bad Spaniels

11    product and the Jack Daniel's black label?

12    A.  It is significantly different.

13    Q.  I think you testified to this before, but if I am covering

14    this again, I apologize in advance.  You have never sold -- VIP

15    has never sold a Silly Squeaker parody dog toy in a liquor

16    store?

17    A.  No, no.

18    Q.  Do you have any plans to?

19    A.  No.

20    Q.  Let's turn to the type of goods and degree of care likely

21    to be exercised by purchasers.  Have you observed consumers or

22    retailers contemplating purchases of your Bad Spaniels or your

23    Silly Squeakers parody dog toys?

24    A.  Absolutely.

25    Q.  Where have you observed this?

1    A.  First and foremost at all of our trade shows.  All of our

2    toys are available for sale to people who are attending the

3    show that are exhibitors, and we see the purchase there

4    obviously, and then also in retail stores.

5         We go through in retail stores throughout the value

6    to -- for some of our customers, but we also go through and do

7    walk-throughs our big retailers like Walmart or PetSmart or

8    whatever, and we watch consumers as they make purchases.

9    Q.  And in your persons, Mr. Sacra, do purchasers of the Silly

10   Squeaker parody dog toys take at least some care before

11   selecting the toy to purchase?

12   A.  Well, I think the most important thing to point out is that

13   most vinyl dog toys are traditionally 2.99, 3.99, 4.99.  This

14   product is anywhere from $12 to $15 retail.  So there is some

15   care exercised.  Not to mention that, as I was talking earlier,

16   about the humanization of pets, people have taken a very

17   serious stance on what they feed their pet, what type of toy

18   they give their pet.

19        And a lot of our success is based on the fact that our

20   brand is known for using all virgin materials, being of high

21   quality, and being some of the best product that you can get.

22   Q.  And do -- from your observation in the field at pet

23   specialty retailers or observing people shopping and purchasing

24   the parody dog toys at trade shows, do they typically have to

25   examine a toy or two to -- at least for a little bit to get the

1    joke?

2    A.  Most people take a look at it, they walk up and they go,

3    oh, my gosh, that's the funniest thing I've ever seen.  And in

4    our display at the show, all of the Silly Squeakers are all

5    together on a rack.  And then they just start picking them up

6    and then they start reading it and then they laugh.  Then they

7    pick up the next one, like, oh my gosh.  And then they look

8    around they go, all right, that's the one I want.

9            And it's, like I said, it's a show grabber because it

10   really is one of those funny things that when you walk through

11   the pet show, for people to sit and stop and take a laugh at.

12           MR. BRAY:  I think we are getting into the home

13   stretch, Steve.  Let's talk about future business plans.

14           THE COURT:  No, we are going to stop right there.  It

15   is the noontime hour.  We have been here for two hours without

16   a break and so we are going to take a little rest.  We will

17   come back here at -- we will come back at 1:30.  That gives

18   everyone a little bit of refresher time.

19           How much more do you have to go?

20           MR. BRAY:  I would say probably a half hour, maybe

21   slightly less.

22           THE COURT:  And will you be able to complete your

23   cross today or not, Mr. Harvey?

24           MR. HARVEY:  I am sure I will, Your Honor.

25           THE COURT:  Well, we will come back after lunch.

1    Let's take a recess.  Because if we need -- we didn't take a

2    break early this morning, although we did start an hour late,

3    people have been here a long time.

4            I think everyone needs a break, and you are about

5    ready to go into a new topic, so we will take a recess there.

6    We will stop and we'll come back at 1:30.  Thank you very much.

7        (Recess taken at 11:58 a.m.)

STEPHEN MICHAEL SACRA - DIRECT EXAMINATION

1                        C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 4th day of October,

12   2017.

13

14                                    s/Elva Cruz-Lauer
                                 Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25