## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| VIP Products, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 2:14-cv-0257-SMM |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 4, 2017 |
| Jack Daniel's Properties, | ) | |
| Inc., | ) | 1:30 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL TO THE COURT – DAY 3

VOLUME B

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      A P P E A R A N C E S

2


3    For the Plaintiff/Counterdefendant:

4              Dickinson Wright PLLC
               By: DAVID GEOFFREY BRAY, ESQ. and
5                  DAVID NUNZIO FERRUCCI, ESQ.
               1850 N. Central, Suite 1400
6              Phoenix, AZ  85004

7


8    For the Defendant/Counterclaimant:

9              Harvey & Company
               By: DOUGLAS PETER HARVEY, ESQ., ESQ.
10             4 Embarcadero Center, 14th Floor
               San Francisco, CA  94111

11


12             Quarles & Brady, LLP – Phoenix, AZ
               By: ISAAC SCOTT CRUM, ESQ.
13             2 N. Central Avenue
               Phoenix, AZ  85004

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                                    INDEX

2       SUMMARY OF COURT PROCEEDINGS                                PAGE:

3       Court resumes                                                 86

4
        Court Adjourns                                               189
5

6

7

8                            INDEX OF WITNESSES

9       WITNESSES FOR THE        Direct    Cross    Redirect   Exam by Court
        PLAINTIFF:
10

11      STEPHEN SACRA            86    93, 131      167      128, 178

12

13

14

15

16                           INDEX OF EXHIBITS

17      EXHIBIT NO.:         DESCRIPTION:                       RECEIVED:

18

19              * * * * * NO EXHIBITS RECEIVED * * * * *

20

21

22

23

24

25

                         UNITED STATES DISTRICT COURT

1                    P R O C E E D I N G S

2              (Proceedings resume at 1:30 p.m.)

3         THE COURT:  Thank you.

4         Please be seated.

5         Okay.  You may now continue -- and welcome back.

6    We're glad you're with us, Ms. Sacra.  Thank you very much.

7    We're ready to go.

8         Go right ahead.

9         MR. BRAY:  Thank you, Your Honor.

10   (STEPHEN SACRA, Plaintiff's witness, resumes the witness stand.)

11                DIRECT EXAMINATION (continued)

12   BY MR. BRAY:

13   Q.  Mr. Sacra, I told you before the lunch break we're in the

14   homestretch.

15         You -- you testified before lunch that when you

16   observed consumers at trade shows purchasing or looking to

17   purchase the Silly Squeaker products, you observed them

18   exhibiting that they thought the products were funny.

19         Do you recall that testimony?

20   A.  Yes.

21   Q.  Have you ever observed a consumer at one of the trade shows

22   or when you walked the stores exhibiting behavior that would

23   indicate to you they felt disgusted?

24   A.  I have not.

25   Q.  As the -- I understand you are a jack of all trades because

1    you are a small business, but would you say one of the things

2    that -- one of the roles you perform for VIP is to be their

3    brand manager?

4    A.  Absolutely.

5    Q.  Okay.  As brand manager, would you market a product that

6    consumers that purchase your products thought was disgusting?

7    A.  I would not.

8    Q.  Have you ever received any feedback from any consumers that

9    any of the Silly Squeaker products were disgusting?

10   A.  I have not.

11   Q.  Mr. Gooder testified yesterday morning about the initial

12   demand letter that Rachel Andrews, special counsel for Jack

13   Daniel's, sent to VIP Products.

14          Do you recall that testimony?

15   A.  I do recall.

16          MR. BRAY:  And, Your Honor, I'll state that it's

17   Exhibit 87 that's in evidence.

18          Oops.  Why did that....

19          If you could do the lights half, Lisa.

20          COURTROOM DEPUTY:  Sure.

21          Do you have the original exhibit?

22          MR. BRAY:  I got it out already before lunch.  I'm

23   sorry.

24          COURTROOM DEPUTY:  Okay.

25

1    BY MR. BRAY:

2    Q.  Do you recall Mr. Gooder testifying that the demand letter

3    was a kind demand letter?

4    A.  I do recall that, yes.

5    Q.  Could you read for the Court what Jack Daniel's, in its

6    initial communication, wanted from VIP, bullet point 1?

7    A.  Do you have a printed copy that I could read from?

8    Q.  Sure.

9            THE COURT:  Would you hand a copy of Exhibit 87?

10           MR. BRAY:  Sure.

11           May I approach, Your Honor?

12           THE COURT:  He has the original?

13           THE WITNESS:  There's three bullet points.

14           Bullet point 1:  Please stop all further production,

15   distribution and sale of the products, and remove all images of

16   these products from all applicable websites and catalogs.

17           Bullet point number 2:  Please confirm the number of

18   products sold to date, together with the number remaining in

19   inventory;

20           And, bullet point 3, please provide us with

21   information concerning the source of the supplier of the

22   products to the extent that you are not producing the items

23   yourself.

24   BY MR. BRAY:

25   Q.  Mr. Sacra, you read that demand letter when it came?

1    A.  Excuse me?

2    Q.  You read that demand letter when you received it?

3    A.  Yes, I did.

4    Q.  Did you find it to be a friendly demand letter?

5    A.  Asking me to stop all production, destroy catalogs and

6    remove all images is not kind.

7    Q.  Okay.

8    A.  That's threatening.

9    Q.  And what about the second bullet point where they're asking

10   for a sales history?

11   A.  That is also -- well, that's proprietary information, and

12   the fact that you're asking that is assuming that you have

13   intent to continue further with your actions.

14   Q.  Did you interpret that, that they might be seeking some

15   kind of damages from you?

16   A.  Yes.

17   Q.  Okay.  Now, Jack Daniel's is not seeing damages in this

18   case.

19   A.  They are not.

20   Q.  Okay.  And I think you testified earlier you sold 55,000 or

21   so Bad Spaniels products?

22   A.  That is correct.

23   Q.  And how has the sale of Bad Spaniels products contributed

24   to your bottom line?

25   A.  We get somewhere close to a dollar per unit at a

1    wholesale -- when you -- when you gross out what the -- what

2    the profit would be.

3    Q.  So --

4    A.  So at a dollar, you're talking about maybe $55,000.

5    Q.  Okay.  That would be a very, very small part of VIP's

6    revenue?

7    A.  Very, very small part.

8    Q.  So why fight this fight, Mr. Sacra?

9    A.  Well, I guess that's why we're here.  The reality is that,

10   you know, if Jack Daniel's was really mad at us because we took

11   the No. 7 and changed it to a 2, and they thought that it was

12   so disgusting and so defaming for their bottle, you would have

13   thought they would have immediately sought injunctive relief

14   against us, which they didn't.  And if it was so damaging to

15   them that it was going to damage their brand and hurt all the

16   efforts that they'd made, that they would have sought damages.

17   But that didn't occur either.

18           And, you know, when we responded to them, we met and I

19   even offered, said, hey, you can have this bottle.  I can go

20   make fun of somebody else.  But that's not what Jack Daniel's

21   wanted.  The reality is is that Jack Daniel's saw this as an

22   opportunity, an opportunity to be awarded, for lack of a better

23   word, or to use Gooder's words, to -- with the -- with the

24   white fence that he's got around his little ranch house, he

25   wants to be granted a golden lawn mower so he can go out and

1   mow down any other person who is possibly poking fun at them,

2   or broaden his fence to get more control over -- over the

3   people and how they see products and everything else.

4   Q.  Let me stop you there.

5           You talked about Jack Daniel's.  But from VIP's side,

6   is it one of the reasons you're fighting the fight is to --

7           THE COURT:  Well, excuse me.  You asked him the

8   question, and he's on direct, what were the motives and what

9   were the reasons?  Now you're trying to lead him and suggest

10  what one of his motives might be.  It's an improper question.

11          MR. BRAY:  I apologize, Your Honor.  I was just asking

12  him to transition.

13          THE COURT:  No, it wasn't transition.  It was to lead

14  him back into an answer that you wanted him to give by way of

15  leading, and you asked him the direct question to which he

16  responded to.

17          Let's move along.

18          MR. BRAY:  I am moving along.

19          Thank you, Your Honor.

20  BY MR. BRAY:

21  Q.  Did you have any motives to fight this fight?

22  A.  Well, like I said, we couldn't -- the settlement couldn't

23  be reached.  I mean, and it wasn't like there was anything

24  crazy out there.  But because of that, I really had no choice

25  but to step up and fight.  I mean, I could fold over, but the

1    reality is that if I do that, I let parody take a punch in the

2    face, I let design creativity take a punch in the face.  I let

3    the industry, the pet industry, which I'm not the only person

4    that does parodies in the pet industry.  There's a lot of

5    people that do parodies in the pet industry.  And that puts

6    everybody in our industry at a risk that they too could have

7    large corporations chomping down their bit, going, hey, look at

8    this.  I've got something that says something completely

9    contradictory to what two other cases have shown in other

10   districts.

11          So in the Ninth Circuit, I mean, this is pretty

12   important, and it's important for making humor and making

13   people have the ability to laugh at the world around them, and

14   all of this advertising and bombardment of large corporations.

15   I mean, it's the little guy.  I'll standing up for him, versus

16   this monster conglomerate.

17          I'm not a 3 billion-dollar company -- or is it

18   30 billion?  I -- either way, it's billions.  So, I mean, I

19   know I've spent at least a million.  I can only imagine what

20   they're spending.  And if they didn't want damages and they

21   don't want an injunction and they let my product sit out there

22   how many years afterwards?  It's okay to say you're damaging us

23   and this is disparaging us and all this, but yet you exist at

24   the same time while we get through this court, knowing it will

25   probably go to appeals?  And then you're still going to let it

STEPHEN SACRA – CROSS-EXAMINATION

 1    go even farther?  I don't understand the motive unless it's

 2    literally you want ruling to be in your favor so that you can

 3    use that against other people.

 4             I mean, look what they did to Cayman Jack.  I mean, if

 5    you're not familiar with that case, Cayman Jack made

 6    margaritas, and they made it in a bottle that was, like, clear

 7    and -- I mean, I don't remember the specifics exactly of it,

 8    but it didn't look anything like a Jack Daniel's bottle.  But

 9    just because it had the word "Jack" on it --

10             THE COURT:  I think there's any objection.

11             MR. HARVEY:  Cayman Jack, Your Honor, has no bearing

12    on this case.

13             MR. BRAY:  I have no further questions, Mr. Sacra.

14             Thank you.

15             THE WITNESS:  Thank you.

16             MR. BRAY:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             You may cross-examine, Mr. Harvey.

19             MR. HARVEY:  Thank you.

20

21                        CROSS-EXAMINATION

22    BY MR. HARVEY:

23    Q.  Good afternoon, Mr. Sacra.

24    A.  Good afternoon.

25    Q.  I think you told us in your direct examination that you

UNITED STATES DISTRICT COURT

STEPHEN SACRA – CROSS–EXAMINATION

1  have 10 people working for the company in the corporate offices

2  here in Phoenix; is that correct?

3  A.  That is correct.

4  Q.  And then you have three people working at a distribution

5  center in Arizona, as well; is that right?

6  A.  That is correct.

7  Q.  And two people in a distribution center for your company in

8  North Carolina; is that right?

9  A.  It's actually four now.

10  Q.  And then some folks overseas in Belgium in a distribution

11  center; is that right?

12  A.  Two.

13  Q.  And in addition to those folks, you have somewhere between

14  30 and 50 distributors of this product, or your products?

15  A.  That would be incorrect.  I believe we have -- since we've

16  met in the past and gone through my deposition, there's been a

17  consolidation in distributing in the United States for pet

18  toys.  Phillips Feed got private investor funds and went out

19  and started buying up distributors all over the United States

20  to become a single distributor for the East Coast.  And then

21  you have Central Pet, which oversees the central part of the

22  United States.  And they rotate a little bit down into Florida

23  and the Southeast.  And then on the West Coast, Animal Supply

24  Company has now taken over most of the distribution for that

25  part of the country, and a little bit in Texas.  So it's

STEPHEN SACRA - CROSS-EXAMINATION

```
 1    consolidated significantly.

 2    Q.   So you're saying that at the time your deposition was

 3    taken, there might have been 30 to 50, but now it's a smaller

 4    number of distributors?

 5    A.   Correct, correct.

 6    Q.   How many distributors do you estimate?

 7    A.   I would estimate maybe -- at tops maybe seven to maybe -- I

 8    don't know.  Probably around seven.

 9    Q.   And you have approximately 3,000 retail customers; is that

10    right, sir?

11    A.   Approximately, yes.

12    Q.   Dog toys are just one of the lines of the VIP Products,

13    correct --

14    A.   That is correct.

15    Q.   -- as you testified this morning.

16              Now, let's talk a little bit about your testimony

17    regarding what you believe you did with respect to this product

18    and what you're doing.

19              You testified that with respect to the Bad Spaniels

20    toy, you were simply taking only a few small elements of Jack

21    Daniel's trade dress; is that your -- is that your testimony?

22    A.   My testimony -- well, I said yes, I take a few small

23    elements of whatever product that we're parodying, correct,

24    enough to make the person who was looking at the parody be able

25    to recognize who was being parodied.  If it's too little and
```

1    someone doesn't recognize it, then they're not going to get the

2    comedy, and the parody is ineffective.  So you have to have the

3    right balance of elements, and that would vary based on what

4    product you were parodying.

5    Q.  So if could ask you to please pick up Exhibit 2 there in

6    front of you, Exhibit 2 being the Jack Daniel's bottle, sir.

7    A.  Oh, sorry.  Got it.

8    Q.  You didn't -- you just took a few elements, is that your

9    testimony, when you created the -- sorry -- the Bad Spaniels

10   toy?  You just took a few elements.  You actually are saying

11   that to the Court?

12   A.  I took the few elements that it took for a person to be

13   able to recognize who was being parodied.

14   Q.  How many parody toys do you make?

15   A.  Twenty, I believe, is the current number.

16   Q.  And what are some of those names of those toys?  You make

17   something called -- we know about Butt Wiper.  That's off the

18   market now; correct?

19   A.  Correct.  That is off.

20   Q.  You make something called -- sorry -- Smella R-Crotches; is

21   that correct?

22   A.  Right.

23   Q.  What is that?

24   A.  That is a parody.

25   Q.  Of?

1   A.   Stella Artois.

2   Q.   Okay.   Is it made up to look like a bottle of Stella

3   Artois?

4   A.   It is parodied in such a way that it has enough elements

5   for people to recognize that it would draw the person being

6   parodied to be -- sorry -- for the person who was looking at it

7   to be able to recognize that that was Stella Artois that we

8   were parodying.

9             MR. HARVEY:   Could we take a look, please, at

10   Exhibit 31, page 33.

11            I think we have some illustrations of these other

12   products.

13   BY MR. HARVEY:

14   Q.   You make something called Heini Sniff'n?

15   A.   That is correct.   That's one of our number one sellers.

16   Q.   And what is that a parody of?

17   A.   That's a parody of Heineken.   And then the front of it has

18   two dogs smelling each other's rear ends, just like when all

19   dogs greet each other.

20   Q.   And then I think you've mentioned something called

21   Cataroma?

22   A.   Yes, Cataroma.

23   Q.   And what is that a parody of, or what does it purport to

24   be?

25   A.   That is another one of our top sellers, which is a parody

STEPHEN SACRA - CROSS-EXAMINATION

1    of -- sorry -- Corona.

2    Q.  And then there's one here we see on this exhibit called

3    Pissness, sir?

4    A.  Correct.

5    Q.  And what is that a parody of?

6    A.  That is a play on the product Guinness, and it's a picture

7    of --

8    Q.  Guinness Stout, the alcoholic beverage?

9    A.  Yes.

10   Q.  So let me ask you.  Have you ever given any consideration

11   to the associations that might be made by urinating or

12   defecating and the brands that people recognize these products

13   to mimic?

14   A.  Actually, this is about the behaviors of dogs, and it's a

15   second layer of the parody that we're creating.  Not only are

16   we parodying the actual brand, we're also poking fun at dogs.

17   Because if you own a dog, these are the things that you

18   experience in your relationship with a dog.  When your dog

19   walks up, he meets another dog, they smell each other's rear

20   ends.  It's not something humans do, it's something dogs do.

21   So we say, okay, it's funny, and we laugh at it.  And sometimes

22   your dog, after that, comes up later and you forget about it

23   and kisses you in the face.  That's something that's part of

24   the culture of owning a dog.  A dog urinating on a fire

25   hydrant?  That happens every time you take your dog out for a

STEPHEN SACRA - CROSS-EXAMINATION

1    walk.  They urinate on something.  So -- and the same with

2    smell our crotch.  That is something a dog does all the time.

3    If you have a boy dog, you're just, like, wow.

4    Q.  I'm sorry, sir.  You're not answering my question.

5           My question was, have you given any consideration to

6    the way that people will react to these references between

7    defecation, urination, and these products; have you thought

8    about that?

9    A.  I've thought about it.

10   Q.  Okay.  And what's your thinking?  Your thinking is that

11   it's just harmless, clean fun; isn't that right?

12   A.  That is correct.

13   Q.  You don't think it's a distasteful parody, do you?

14   A.  No, I do not.

15   Q.  You don't think it's crude?

16   A.  I do not.

17   Q.  And that's true of all of your parody products.  You would

18   say none of them is crude.

19   A.  I would say none of them are crude.

20   Q.  Okay.

21          MR. HARVEY:  And if we could look at Exhibit 62, the

22   second page, please.

23   BY MR. HARVEY:

24   Q.  So it's your testimony, is it, that you don't think that

25   the product on the left, the Bad Spaniels product, mimics the

UNITED STATES DISTRICT COURT

1    Jack Daniel's whiskey label?

2    A.    It doesn't mimic the whiskey label.    It isn't a copy of the

3    Jack Daniel's whiskey label.    It is an apdated -- it is an

4    adaptation of bits and pieces of information which have been

5    fed to you by Jack Daniel's through advertising over and over

6    and over and over and over.    And we take a select group of

7    those and put them together in such a way for you to be able to

8    recognize that this parody is about Jack Daniel's.

9    Q.    And you don't think that it reflects badly -- none of your

10   parodies reflect badly on the brands being parodied?

11   A.    Absolutely not.

12   Q.    You're not reflecting on the brands, you said, in your

13   deposition.    We're employing imagery that people have in their

14   minds and we're creating a parody; correct?

15   A.    Could you repeat that, please?

16           MR. BRAY:    Do you want to read his deposition to him

17   and ask him?    That's not how you impeach with a deposition.

18   BY MR. HARVEY:

19   Q.    We can -- we can go through that.    I'll just ask it

20   directly to you.

21           You don't think that these reflect badly on any of

22   these brands?

23   A.    I do not think that these reflect badly on any of these

24   brands.

25   Q.    Okay.

STEPHEN SACRA – CROSS–EXAMINATION

1              Okay.  There was testimony about design, and you're

2       the chief designer, and you've told us you design every product

3       that VIP makes; correct?

4       A.  That is correct.

5       Q.  You have some assistance from others in that process, don't

6       you?

7       A.  Absolutely.

8       Q.  So, let's take Bad Spaniels.  What did you contribute; what

9       was your contribution to the creation of this product, sir?

10      A.  My individual contribution?  Was the --

11      Q.  Yes.

12      A.   -- approval of the graphics and the direction of Elle to

13      produce the graphics.  I gave her creative freedom in the

14      process.  When I give -- when I contact with her, the very

15      first part of that -- that process is to give her the creative

16      freedom to see what she comes up with, or someone else who

17      might be -- she has multiple people who work for her now.  So

18      they come up with a series of different ideas; and then they

19      present it, and they say what do you think about this, what do

20      you think about this, what do you think about this?  So I

21      oversee that creative process.  And then if I see something

22      that needs to be tailored or removed or added, I'll make

23      comment to that.  Specifically, in this case, there was very

24      little comment, only because of the fact that she did such a

25      good job of putting it together, and you've displayed that

1    process earlier for us to view on the monitor over there.

2    Q.  You don't have any disagreement with the recounting of the

3    process that -- that I engaged in there.  That was an accurate

4    depiction of how it was designed; correct?

5    A.  Other than the use of the word "secret code," you are

6    correct.

7    Q.  Right.  And that was meant in jest.

8         But you called her and just said the words "Bad

9    Spaniels," you figure it out, Elle; something to that effect.

10   Correct?

11   A.  Something to that effect, but not -- not that.

12   Q.  And that was your -- well, how -- how were your

13   instructions different?

14   A.  Well, I -- I call Elle, and she'll pick up the phone, and

15   she's, like, what do you got?  I'm, like, I got something for

16   you.  And she'll go okay, what is it?  And I go, Bad Spaniels.

17   And she's, like, okay, I got it.  And then I'm, all right, I'm

18   going back to dinner, talk to you later.  Click.  That's it.

19   Q.  And the next thing you saw was this sketch that she sent?

20   A.  Yeah, she gets to it in a couple days.

21   Q.  Okay.  And you made some comments about the sketch to her

22   and -- and refined it to a place that you were happy; correct?

23   A.  No.  The next step, as you pointed out on your slide, I

24   told her, mock it up.  Our conversations are pretty short.

25   She'll send something over.  If I see something that really

STEPHEN SACRA - CROSS-EXAMINATION

1    needs a revision and it's just absolutely God-awful, I'll

2    actually go and mock it up myself.  I actually do computer

3    graphics because that's what I majored in.  So I have no

4    problem in doing something and sending it back to her.  But in

5    this case, it was not necessary.

6    Q.   You got the inspiration for Bad Spaniels sitting in a bar;

7    correct?

8    A.   That's correct.

9    Q.   And so once you said mock it up, what happened?

10   A.   She puts it into a computer, and when she does her -- the

11   reason why we mock it up is because she can draw it really

12   quickly freehand.  But when she takes that -- when she takes

13   the picture of the dogs and actually puts it into the computer,

14   it's a really complicated process for her to do all the

15   colorization.  So she doesn't want to waste her time doing

16   that --

17           THE COURT:  Excuse me.  Can you just slow down just a

18   little bit, please?

19           THE WITNESS:  Oh, I'm sorry.

20           THE COURT:  Thank you.

21           THE WITNESS:  She doesn't want to waste her time doing

22   those colorizations until we have the basic information in --

23   that we kind of agree on the overall.  And then -- because we

24   can easily adjust a font, its shape, its color, because those

25   are all vectored items with -- inside of a computerized file

1    that are easily adjustable.

2    BY MR. HARVEY:

3    Q.  Okay.  And so it was mocked up.  You saw the image, and

4    then what happened?

5    A.  So if I recall correctly, she sent back one option, and

6    then sent back a second one and said, hey, what do you -- I --

7    said I did a second one for you where I did a different

8    treatment of the word "Bad Spaniels."  And I told her that I

9    liked the second one better, because the first one was not

10   balanced with the scrolly thing that was in it.

11           MR. HARVEY:  I wonder if we can ask you to pull up the

12   short slide that I did with respect to Elle Phillips, and let's

13   look at the final version, please.

14   BY MR. HARVEY:

15   Q.  There is a Mr. David Bai whose name figures in this case.

16   Who is Mr. Bai?

17   A.  His name is actually said David Bai.

18   Q.  Sorry.

19   A.  No, that's okay.

20           So David Bai is -- he -- well, he started out as a

21   quality control person in the factory, and then started doing

22   production of a factory of his own.  And so he is my factory

23   representative for having -- for me -- he's the person I relay

24   everything to to manufacture the product overseas.

25   Q.  And Mr. Bai is located overseas as an independent --

STEPHEN SACRA - CROSS-EXAMINATION

1    A.    Correct.

2    Q.    -- operator who --

3    A.    Well, he owns his own company, which is Flying Pony, and

4    then he also -- he has two companies that he works under.    One

5    is called Flying Pony and the other one is called Xiamen Ace,

6    and that's spelled X-I-A-M-E-N, space, A-C-E.

7    Q.    And for the benefit of the reporter, could you spell

8    Mr. Bai's name -- Bai's name as well?

9    A.    It's David, just like it sounds, and then Bai is B-A-I.

10   Q.    Now, did you send a bottle -- picture of a bottle to

11   Mr. Bai in this design process?

12   A.    That is correct.

13   Q.    And let's take a look at Exhibit 71, if you would, please.

14            And I don't know.    Do we have the bottle itself?

15            Well, you can tell us.    How did you find the -- there

16   it is.    Sorry.

17            Well, is that the picture?

18   A.    I don't think that's the one we sent.    Well, maybe it is.

19            Yeah, that's it.

20   Q.    So where did you find these pictures to send to Mr. Bai?

21   A.    So that picture, I just did a search for images, and I

22   found an image that would easily convey what shape of bottle

23   that I wanted.    And to understand in the manufacturing process,

24   when you look at a photo straight on, if you just -- if you

25   remove the one from the left and you remove the one from the

1    right, it might be difficult to know that that is a square

2    bottle versus a round bottle.  And therefore, to be able to

3    eliminate that confusion of what shape bottle I wanted, that's

4    the photo that I sent.

5    Q.  And you said you went and did a Google image search to find

6    these?

7    A.  Yeah.

8    Q.  What did you put in this -- into the search engine?

9    A.  I don't recall, but I'm -- would probably think I typed in

10   "Jack Daniel's."

11   Q.  And certainly this is what you were looking for; correct?

12   A.  That's what I got as a result.

13   Q.  And you sent this on over to Mr. Bai.  I think the prior

14   slide -- the prior image was the transmittal.

15   A.  Yeah.

16   Q.  If we could just blow that up a little bit, please.

17   A.  If you want to -- okay.  I was going to say, otherwise if

18   you could read it for me.

19   Q.  (Reading:) David, here is a concept for a new Bottle Shape.

20   A.  Correct.  Capital bottle, capital shape.

21   Q.  And that related to Bad Spaniels, as it says up in the

22   subject line?

23   A.  Correct.

24   Q.  And it was your intention that Mr. Bai use that bottle as

25   an exemplar of what you were creating; correct?

STEPHEN SACRA - CROSS-EXAMINATION

1   A.   Correct.

2   Q.   At some point, did -- sorry, Your Honor?

3           THE COURT:   What number is that?

4           MR. HARVEY:   That's Exhibit 71.

5           THE COURT:   Thank you.

6   BY MR. HARVEY:

7   Q.   At some point, you figured out -- maybe Mr. Bai figured

8   out -- that the bottle that was shown -- if we could go back to

9   the picture, please, was not the current iteration of the Jack

10  Daniel's bottle; right?  Is that right?

11  A.   I'm sorry.  Could you repeat the question again?

12  Q.   Yes.  This is the old Jack Daniel's bottle, the one that

13  was pre 2011.

14  A.   Pre 2011, correct.

15  Q.   At some point in the process, either Mr. Bai or you figured

16  that out.

17  A.   That it wasn't this one that -- well, in my directions, if

18  you read them, I tell him to make a bottle, and I say, hey --

19  but I directed that I need him to make a bottle, I need it to

20  be square, because it's new, we have a new project, and then I

21  tell him that he needs to make that bottle in the same size as

22  the beer bottle so that that way we're following within

23  costing, and to make something back.  I don't give him specific

24  directions that says go out and buy this bottle or find this

25  and make this exact thing.  I didn't -- that's not what

STEPHEN SACRA - CROSS-EXAMINATION

1    occurred.  I simply gave him a direction to build a square

2    bottle in something there, and then it wasn't until later that

3    we got a bottle back, which is the bottle that we have here --

4    Q.  Indicating Exhibit 1 in the case.

5    A.  -- right, indicating Exhibit Number 1, actually not aware

6    that this was the current bottle, and I just looked at it, oh,

7    good job.  So...

8    Q.  And you -- and you told Mr. Bai when you got it, that's

9    perfect.  The bottle is perfect; correct?

10   A.  Yeah.

11   Q.  So that's exactly what you were trying to do; you were

12   trying to imitate all of the elements that are shown here to

13   create a parody; correct?

14   A.  I was not trying to imitate to create a parody.

15   Q.  You weren't.  What were you doing, sir?

16   A.  What I was trying to do is get elements of -- sorry -- the

17   necessary elements to put them together so that we could create

18   an effective parody so that people would be able to recognize

19   who we were parodying.

20   Q.  So the necessary elements included the square bottle;

21   correct?

22   A.  It would include a square bottle; correct.

23   Q.  And a black label?

24   A.  It would include -- well, it -- yeah, it would include a

25   black label.

STEPHEN SACRA - CROSS-EXAMINATION

1   Q.   And white lettering on the black label?

2   A.   I would say it would include white lettering on the black

3   label, as well.

4   Q.   Maybe a filigree around the edge of the label?

5   A.   I don't necessarily know if a filigree is 100 percent

6   necessary, but some -- either -- you could use -- we used

7   stylized lines.  We didn't -- so these are two lines that are

8   parallel with each other that wrap around.  They're actually

9   not filigree because filigree, by definition -- well, it's

10  actually lines that move inconsistency with one another to

11  create more of a wavy-type pattern, and these are two straight

12  lines.  Now, if you want to call this little curlicue a

13  filigree, then maybe you might have something there.  But, I

14  mean, this one little tiny one down at the bottom, but it's not

15  the same as the filigree that you use that wraps around the

16  entire bottle on the outside.

17  Q.   And it was important to have a black cap on this bottle

18  too, was it?

19  A.   For esthetic appeal, I think so.

20  Q.   And what about Old No. 7 versus Old No. 2.  What was that

21  intended to do, calling it Old No. 2?

22  A.   Well, Elle changed it from a 7 to a 2.  Old No. 7.  Old No.

23  2.  And she changed that to be able to pull off the second

24  level of the parody that we put together to make the bottle fun

25  and effective towards animals by -- when she realized, hey,

STEPHEN SACRA - CROSS-EXAMINATION

1  I've got No. 2 on here, well, if I have Tennessee and I put the

2  word -- so, not changing anything -- putting the word "carpet"

3  underneath, you've got Tennessee Carpet, which is a whole new

4  meaning.

5  Q.  So you intended to make reference to defecation by

6  referencing Old No. 2.

7  A.  First of all, we're not referencing defecation.  We're

8  referencing the act of No. 2 -- sorry.  No. 2 is only what you

9  infer -- just kind of like we talked about how advertising gets

10  into your mind.  It's only how you perceive No. 2 that you

11  perceive it as defecation.

12  Q.  So you didn't have any intention to make a reference to

13  defecation by calling it Old No. 2?

14  A.  No, we had the intention of making a parody, making a joke

15  towards animals and dogs.

16  Q.  Animals and dogs on a product that mimics something that's

17  consumed, namely whiskey; right?

18  A.  If you're asking me if Jack Daniel's is consumed and it's a

19  whiskey, then, yes, Jack Daniel's is a whiskey and it is

20  consumed.

21  Q.  And the other elements include the word "Tennessee."  You

22  have that also on your product; correct?

23  A.  There is a word "Tennessee" on the front of the bottle,

24  correct.

25  Q.  In script.

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    A.  Yes.  It's in a script.

2    Q.  And the Bad Spaniels label is curved like the Jack Daniel's

3    arched -- I think we've heard it called the eyebrow?

4    A.  The eyebrow.

5    Q.  Correct?

6    A.  Yes.  Just like many other whiskey bottles.  The Bad

7    Spaniels is in the shape of an arch, something which Mr. Gooder

8    yesterday testified that they're making no claim to.

9    Q.  But all of these elements are combined on the Jack Daniel's

10   bottle.  You've separated out different arched letters on other

11   bottles that you're talking about.  But the point was to make

12   sure that the consumer understood that of your product, that

13   there was a reference being made to Jack Daniel's; right?

14   A.  I took the appropriate amount of items that a person would

15   recognize to be able to conclude that this parody was directed

16   towards Jack Daniel's.

17   Q.  Well, the judge will decide whether it was an appropriate

18   amount, sir, but I understand your thinking.

19          Now, you talk about a disclaimer, and you put a

20   disclaimer on the hangtag.  Well, I beg your pardon.

21   Ms. Phillips put the disclaimer on the hangtag; right?

22   A.  Correct.

23   Q.  Now, were you worried at all that consumers would be

24   confused that what they were buying was either put out by Jack

25   Daniel's or had some license with Jack Daniel's or some

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    affiliation with Jack Daniel's?

2    A.  No, I was not.

3    Q.  If you --

4    A.  Because the parody is effective, and its effectiveness

5    clearly states -- clearly makes it obvious to the person that

6    they're looking at something that's not Jack Daniel's.  And to

7    simply put a disclaimer on it just makes it even more clear to

8    them.

9    Q.  But if you weren't worried that anybody would be confused,

10   why would you bother putting a disclaimer on it?

11   A.  Let me turn the question around and ask you, how does it

12   hurt?

13            THE COURT:  Excuse me.  He's asking the questions.

14            THE WITNESS:  Okay.

15            THE COURT:  You answer the question, please.

16            MR. HARVEY:  Thank you, Your Honor.

17   BY MR. HARVEY:

18   Q.  Do you understand the pending question?

19   A.  Could you please ask it again?

20   Q.  If you were not concerned that consumers would be confused

21   on any of the levels we're talking about -- association,

22   sponsorship, or source -- you weren't worried about that, why

23   did you put a disclaimer on the product?

24   A.  I would say most likely because of the simple fact that any

25   precaution that I can do to not have a person coming and suing

UNITED STATES DISTRICT COURT

STEPHEN SACRA – CROSS-EXAMINATION

1    me -- it's more for you as Jack Daniel's, for you to say, oh,

2    okay, I'm not worried about the consumer, because the consumer

3    gets it.  But you, you're going to look at it and say, oh,

4    well, I'm confused about where this is coming from.  And when

5    you look at it and go, oh, it's not affiliated with us.

6              MR. HARVEY:  Could you read that answer back, please,

7    or could we ask the court reporter, please, Your Honor, to read

8    it back?

9              THE COURT:  Would you do that, please.

10             (Thereupon, the court reporter read back as follows:

11   "Question:  I would say most likely because of the simple fact

12   that any precaution that I can do to not have a person coming

13   and suing me -- it's more for you as Jack Daniel's, for you to

14   say, oh, okay, I'm not worried about the consumer because the

15   consumer gets it.  But you, you're going to look at it and say,

16   oh, well, I'm confused about where this is coming from.  And

17   when you look at it and go, oh, it's not affiliated with us.")

18             MR. HARVEY:  Thank you very much.

19   BY MR. HARVEY:

20   Q.  So your testimony is that you put a disclaimer on that

21   product, not to alleviate confusion in in -- in the consumer's

22   mind, but simply to make Jack Daniel's feel that this was okay;

23   is that right?

24   A.  If a consumer reads it, they can draw from it what's on

25   there.  Like I said, it's only there to make it more clear.

STEPHEN SACRA – CROSS-EXAMINATION

1   Q.  And where does that disclaimer show up on your product,

2   sir?

3   A.  It shows up in the important part of the bottom of the back

4   of the hangtag.

5   Q.  And you're a design person.  Can you give us an estimate of

6   the font size of that disclaimer, that last line?

7   A.  Well, the font size on this entire label is small because

8   we have a limited amount of space.  Typically on our hangtags,

9   they're much longer and take up -- I mean, they're the full

10  length of the bottle.  But because of the shape of the bottle,

11  having an indentation, we had to go with a smaller header card

12  because otherwise the header card was -- the first one which we

13  did, it was too long and it caused the bottle to hang out and

14  not merchandise properly.  So the direction was to reduce the

15  font size to something that would make everything fit.  And we

16  have requirements with retailers of how things are positioned

17  on a label so that it moves through the store properly.  So

18  they have requirements.  For UPCs, the fact that you have to

19  have your company listed, the fact that you have to have your

20  contact information of how someone will be able to contact you,

21  which people -- and you have to have your -- the source, which

22  is who we are, VIP Products, listed.  And then any other

23  information which needs to be added, such as a disclaimer as

24  far as safety is concerned.  If you add that, there becomes a

25  limited amount of -- sorry -- and then you include limited

STEPHEN SACRA - CROSS-EXAMINATION

1    guarantee on the back, you start to run out of space.  And so

2    the font is obviously as big as we can make it.  And it's

3    actually bigger than the description of the product and the

4    limited guarantee.  So this is actually bigger font down here

5    than up here.

6    Q.  So is it your testimony that that disclaimer on the bottom

7    line there is prominently displayed?

8    A.  Is it prominently displayed?  It's prominently displayed in

9    the correct place where you would go to look for additional

10   information about the company and about where this product come

11   from -- sorry -- where this product comes from.

12   Q.  You said in your original declaratory judgment complaint in

13   this case that the disclaimer was prominent.  You think it's

14   prominent?

15   A.  I do believe it's prominent.  And I believe it's located in

16   the correct place.

17   Q.  Okay.

18   A.  I don't believe there's any regulations that state that if

19   you have a disclaimer, that there's a specific size or specific

20   location that it should be.

21   Q.  Can you do me a favor, please, sir, and squeak that dog

22   toy?

23   A.  (Witness complies.)

24   Q.  Again and again, please.  A couple more times.

25   A.  (Witness complies.)

STEPHEN SACRA - CROSS-EXAMINATION

1    Q.  Do you have any concern in making this product that it

2    might irritate people?

3    A.  (Laughing)  We don't make toys for people, sir.  We make

4    toys for dogs.

5    Q.  Well, a dog doesn't --

6    A.  It's a noise they love.  I mean, if you've seen a dog with

7    one of these, they run around and they squeeze it and they

8    squeeze it and they squeeze it and they squeeze it, and they've

9    never been happier.  That's who I design toys for.  If it -- if

10   their human owner doesn't want to hear it, they pick you up and

11   take it away.  But they see the joy their dog has with it, and

12   they let it occur.

13   Q.  So you don't think affiliating this -- well, let's just ask

14   you.

15        It's entirely possible, isn't it, that people would

16   find this irritating?

17   A.  (Laughing.)  I guess.

18   Q.  In fact, you know that's true.

19   A.  I don't know.  Sure.  I'm sure there's someone in this

20   world that goes, man, that's irritating, but I will take the

21   joy of my dog playing with it over the irritation.  And when

22   I'm finally done with it, I'm going to put it away.

23   Q.  Well, didn't you say, if I -- and I'm paraphrasing here --

24   I'll give you opportunity to express it the way you want to --

25   dogs play a horrible keep-away game, running around the house,

STEPHEN SACRA - CROSS-EXAMINATION

```
 1    squeaking the toy incessantly, and causing the owner to go:
 2    Give me that thing, just give it to me.
 3    A.   That is -- that can be true to some owners, yes.
 4    Q.   Okay.  In other words, this can be an irritating device;
 5    correct?
 6             MR. BRAY:  Objection.  Asked and answered.
 7             THE COURT:  Sustained.
 8             THE WITNESS:  Do I need to respond?
 9             THE COURT:  No, you do not.
10             THE WITNESS:  Okay.
11    BY MR. HARVEY:
12    Q.   You said in your deposition the squeaker maybe, quote,
13    makes the dog feel like it can be more obnoxious and annoy its
14    human owner.
15             Do you remember saying that?
16    A.   Sure.
17    Q.   Okay.  So you would admit that this can be very irritating?
18             MR. BRAY:  Again, asked and answered.
19             THE COURT:  Well, let him answer this one.
20             THE WITNESS:  To some people, I'm sure.
21    BY MR. HARVEY:
22    Q.   And did you have any concern that affiliating a toy like
23    this with a recognized product could be deleterious to Jack
24    Daniel's, to the product you're making fun of?
25    A.   99 percent of all dog toys have squeakers in them.  So if
```

STEPHEN SACRA - CROSS-EXAMINATION

1  squeakers bother people in a dog toy, they probably should not
2  buy dog toys and just use a sock.
3  Q.  Let me ask you something, sir.  Your entire modus operandi,
4  your -- your whole business plan is to take the goodwill
5  associated with well-known brands and turn it into a product
6  that makes money for you; isn't that right?
7  A.  No, that is not.
8  Q.  How am I wrong; what did I get wrong there?
9  A.  Would you repeat your statement again, please?
10 Q.  Your entire business model is to take goodwill associated
11 with famous trademarks and turn it into products that make
12 money for you?
13 A.  No.  My -- my whole business model is to make toys for dogs
14 so that people can interact with their favorite animal on a
15 daily basis and have pleasure in this world with one another.
16 And whatever I can do to enhance that moment and that
17 experience for two people having that moment and be a part of
18 that, that's what our business model is.  We're caring, loving,
19 pet owners who want dogs to have fun with their owners and
20 enjoy life, and laugh and have some joy in this world.
21 Q.  And I heard that in your direct testimony, and I -- I
22 wanted to ask you a little bit about that.
23 A.  Okay.
24 Q.  I think you said -- and then this is my notes, I don't have
25 a transcript, but it's close -- you want to share -- the Silly

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    Squeakers line, you want to share the humor that we have in

2    this world.  We can make really cute things.

3              That's your testimony; right?

4    A.  We also want to make cute things, correct.

5    Q.  You think this is cute?

6    A.  Absolutely.

7    Q.  And you design toys with having in mind what the dog would

8    like.

9    A.  Correct.

10   Q.  And you think that this humor reflects the culture of your

11   company.

12   A.  It reflects the culture of being a pet owner.

13   Q.  Okay.  I think you said in your testimony:  This

14   100 percent reflects VIP's culture.

15             Do you remember saying that?  That was this morning.

16   A.  I remember making a comment of that nature.

17   Q.  Okay.  Now, at some point in your direct exam, you spoke

18   about letters that you've gotten from other companies --

19   A.  Yes.

20   Q.  -- protesting what you're doing.  And you said, I believe,

21   that you write letters back, explaining that there are two

22   cases that address the issue favorably to you, and at that

23   point people go away.

24             Is that the essence of your testimony?

25   A.  That was the essence of my testimony.

STEPHEN SACRA - CROSS-EXAMINATION

1   Q.   Those two -- do you want to remind us of the two cases?

2   A.   I think it was -- all right.  So Heini Sniff'n reached out

3   to us, and then they reached out to us a second time years

4   later.  It was, like, two years later.  Pabst Blue Ribbon

5   reached out to us, and Kendall Jackson reached out to us.  And

6   I'd have to look to see if I -- if there was another.  But I --

7   Q.   Fair enough.  That's fine.  Three is fine.

8   A.   Yeah.

9   Q.   Kendall Jackson.  What was the problem?

10  A.   They just looked at it and said, hey, this -- we think this

11  looks -- the imagery is drawing up the recognition of our

12  bottle, and we think there might be an issue there, and we'd

13  like to discuss it.

14  Q.   What bottle; is it a wine product?

15  A.   It's a -- it's a bottle that looks like a wine bottle, just

16  a generic wine bottle, and it says, Kennell-Relax'n, and it has

17  a dog sitting, I believe, on a leaf.

18  Q.   Okay.  And Heini Sniff'n, we know about.  What about about

19  Pabst Blue Ribbon; what was the product at issue there?

20  A.   It says Blue Cats Trippin, and it has two cats on the front

21  of it with, like, crazy-looking eyes, like they've been eating

22  catnip, and they're just kind of like crazy-looking.  That's

23  it.

24  Q.   Now, you said that in your response letters to them you

25  cited two cases.

STEPHEN SACRA - CROSS-EXAMINATION

1    A.   Correct.

2    Q.   One was Chewy Vuiton and the other was Timmy Holedigger;

3    correct?

4    A.   Correct.

5    Q.   Do you know where those cases are in terms of the federal

6    court system and --

7    A.   Unless I was looking at the cases, I know that it's not the

8    Ninth Circuit.   That -- that's all I can speak to.

9    Q.   So you wouldn't --

10   A.   Two or four, or something like that.

11   Q.   You wouldn't disagree -- exactly right.   You wouldn't

12   disagree if I said it was the Second Circuit and the Fourth

13   Circuit; correct?

14   A.   No.   Okay.

15   Q.   And you wouldn't disagree with me either if I represented

16   to you there was no evidence of confusion, consumer confusion

17   of any kind in either of those cases.

18   A.   Without having the case in front of me and reading it

19   directly, I -- I can't make a comment to that.

20   Q.   And do you know about the Dr. Seuss case?

21   A.   I have heard it mentioned.   I don't know a lot about it.

22   And I might have read something about it.   But limited

23   knowledge, at most.

24   Q.   And you know which circuit that case is in?

25   A.   I'm not familiar.

STEPHEN SACRA - CROSS-EXAMINATION

1    Q.  You've said, I think, in your direct that you filed other

2    declaratory judgment actions.

3    A.  Correct.

4    Q.  Other than this one.

5    A.  Correct.

6    Q.  Including one in this court, I believe; is that right?

7    A.  Procedure that we have followed -- when I -- the cost of

8    litigating Anheuser-Busch case was surmounting.  We were a

9    small company, and we couldn't -- I mean, the battle being that

10   small, we just -- there was no way we could afford it.  And the

11   only thing I learned from that was that since they filed from

12   the very get-go, they got jurisdiction.  And I learned that if

13   I just put a dec action on, that if -- once someone threatens

14   me, I can put a dec action on and then if it -- someone -- if

15   us communicating back and forth afterwards doesn't work out,

16   then we would then at some point in time, say, hey, by the way,

17   we've got a dec action; we're going to go ahead and file it and

18   proceed since we can't work anything out.  Just like in our

19   case.  But you guys actually did a search and found it prior to

20   us actually serving it to you, if I remember correctly.

21   Meaning that we just filed the judgment -- sorry -- we filed

22   the declaratory -- is that -- I think that's the correct

23   term -- a dec action.  I'm sorry.  We filed a dec action, and

24   then just waited.  Our intentions were to have discussions, but

25   obviously with your demand letter being so aggressive, I mean,

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    it definitely called for us to put that in place.

2              MR. HARVEY:  Could we see that letter again, please?

3    I think it's 45 or '6.

4              87.  I'm way off.

5              If you could -- thank you.

6    BY MR. HARVEY:

7    Q.  Well, I suppose minds can differ on whether this is an

8    aggressive letter or not.  It says:  We certainly appreciate

9    your apparent affection for Jack Daniel's.

10             It says:  What you may not have realized is that your

11   use of the marks in this manner constitutes trademark

12   infringement and dilution of our valuable trademark rights.

13             By the way, on that subject, I think you testified you

14   have at least one patent, you own one patent?

15   A.  Yes, sir.  I assigned one, and I have a current one.  So I

16   have two.

17   Q.  And do you own trademarks?

18   A.  Yes.

19   Q.  Trademark registrations?

20   A.  Correct.

21   Q.  Copyright registrations?

22   A.  I think we have some on several fleeces.

23   Q.  Some on several?

24   A.  Fleeces.  It's the --

25   Q.  Thank you --

STEPHEN SACRA - CROSS-EXAMINATION

1    A.  -- design pattern on the outside of our toys.

2    Q.  Thank you.

3         So you're an IP owner yourself, aren't you?

4    A.  Correct.

5    Q.  And you understand that one of the things you need to do as

6    an owner of intellectual property is to enforce it in order to

7    protect it; correct?

8    A.  That is correct.

9    Q.  So here, as this letter says in the next sentence:  As I'm

10   sure you can appreciate, if we were to allow this particular

11   use of our marks to continue, we would not only encourage other

12   similar products, we would risk losing our trademark rights all

13   together, something that would be highly damaging for any

14   business.

15        You wouldn't like to lose your trademark rights, would

16   you, sir?

17   A.  Would I want to lose my trademark rights?

18   Q.  Right.

19   A.  I don't think any trademark holder would want to lose their

20   trademark rights.

21   Q.  I agree.

22        And you've taken steps to enforce your own trademark

23   rights, haven't you?

24   A.  Yes, I have.

25   Q.  Including steps on Amazon, I think you were describing,

1   about takedown notices and citing to your trademarks; correct?

2   A.  That is correct.

3   Q.  So again, it's up to the Court to decide if this is an

4   aggressive letter, but you just testified, I think, that you

5   were looking for a dialogue, and yet you filed a lawsuit.

6   A.  Like I said, I put a dec action out there, and then we had

7   good faith settlement talks.  You weren't there for those, but

8   those were -- those were -- those did occur.  We did sit down

9   and we sat in a conference room in Arizona --

10  Q.  And I don't want to know about them, and I don't think it's

11  appropriate that we go into what was said there.

12  A.  We don't have to.

13  Q.  But you don't think filing a declaratory judgment action is

14  aggressive on your part?

15  A.  No, it's preserving my right to have a lawsuit here in this

16  state where I stand a chance, versus in a state where its sole

17  income comes from the largest -- one of the largest

18  distilleries for whiskey.

19  Q.  And have you heard the term "forum shopping," Mr. Sacra?

20  Do you know what that means, "forum shopping"?

21  A.  I'm not familiar with that.

22  Q.  Wanting to be in your home court.

23  A.  I believe that if you have a letter that's sent to you

24  demanding something and telling you that you are infringing

25  someone, that is a threat, and saying that I have done

1   something that is, in a court of law, illegal, and, therefore,

2   I have a right to file a dec action.  That's not forum

3   shopping.  That's gearing up, knowing that someone is about to

4   come after you.

5   Q.  And you did that within a week of getting the letter from

6   Jack Daniel's.  This letter.  You didn't pick up the phone, you

7   didn't write them back, you didn't send one of your letters

8   that talks about these cases in other jurisdictions that seem

9   to -- and you would argue -- protect your rights.  You just

10  sued.

11  A.  No.  I filed a dec action.

12          THE COURT:  That's what he means by "suing."

13          THE WITNESS:  Oh.  Okay.  I'm sorry.

14          THE COURT:  You filed a lawsuit against them.

15          THE WITNESS:  Right.  Okay.

16          THE COURT:  A declaratory judgment --

17          THE WITNESS:  Right.  I --

18          THE COURT:  -- is the type of lawsuit that was

19  brought.

20          THE WITNESS:  Right.

21          THE COURT:  But you still end up suing them.

22          THE WITNESS:  Okay.

23  BY MR. HARVEY:

24  Q.  Now, there was testimony this morning about your

25  distribution of your products.

STEPHEN SACRA - CROSS-EXAMINATION

1    A.   Uh-huh.

2    Q.   And I think you testified -- and again, confirmed to me,

3    that you have a number of distributors as well as selling

4    direct to retailer customers?

5    A.   Correct.

6    Q.   So in a sense, there's a three-tier level of distribution

7    of your product, isn't there, from you to the distributors,

8    from distributors on to retailers, and from retailers on to the

9    retail client.

10   A.   If that's the definition of a three-tier system, then yes,

11   that's correct.

12   Q.   Well, it's akin to, although not regulated the way alcohol

13   is.

14   A.   Right.  But that's not the only system that we use.  And

15   that's not the predominant system.

16   Q.   Right.  You're saying -- by three distributors isn't.

17   A.   Right.  But I was just saying that the distributor portion

18   of what we do does not -- it is not weighted in favor of

19   distributors.  It's weighted in favor of us selling direct to

20   customers.

21          THE COURT:  Well, could I ask -- could I interject a

22   couple questions here?

23          MR. HARVEY:  Please.

24          THE COURT:  Because I'm a little bit confused, and I

25   have to decide this case.

UNITED STATES DISTRICT COURT

EXAMINATION BY THE COURT

```
 1                        EXAMINATION
 2            THE COURT:  When you say "distributors," is that
 3    someone who buys and warehouses this product and sells them on
 4    your behalf?
 5            THE WITNESS:  That is correct.  They --
 6            THE COURT:  So in other words, you -- you manufactured
 7    them in wherever, you then sell them based on their orders to
 8    you, and then they warehouse them and it's up to them to sell
 9    it to the retail outlets; correct?
10            THE WITNESS:  In the distributor model.
11            THE COURT:  Right.  Now, on the direct model, though,
12    that's where you go to the shows, people come up, they place
13    their orders right at the shows?
14            THE WITNESS:  Correct.
15            THE COURT:  Or they can do it over the Internet.
16            THE WITNESS:  Correct.
17            THE COURT:  And that is the direct model; correct?
18            THE WITNESS:  Correct.
19            THE COURT:  But you don't have a bunch of
20    independent -- individual salesmen running around the country
21    doing this, do you?
22            THE WITNESS:  We have a few people that go into pet --
23    independent pet stores, but we would equate that to being the
24    same as ordering directly from us.
25            THE COURT:  Okay.  So that is -- so I understand your
```

EXAMINATION BY THE COURT

```
 1    distribution system.

 2             But somebody has to have some of these in locations

 3    that you can distribute them as the orders come in and are

 4    necessary because -- or you have to wait, accumulate the

 5    orders, go back to your manufacturing facilities, wherever

 6    you --

 7             THE WITNESS:  Right.

 8             THE COURT:   -- engaged them, and then get them to

 9    send them to you, and then try and fill the orders later;

10    correct?

11             THE WITNESS:  Right.  Correct.  And we have --

12             THE COURT:  Which one do you use?

13             THE WITNESS:  We have all of the inventories purchased

14    and brought into our warehouse, and we obviously don't ship to

15    anyone until the product is available.  And in some cases, with

16    the distributor, we actually drop ship.

17             A distributor only carries a limited number of our

18    items.  Usually the more popular ones, like the Tuffys and

19    whatnot.  And then to get a full breadth of our catalog, you

20    really have to order from us.

21             THE COURT:  But somebody is holding inventory.

22             THE WITNESS:  Correct.

23             THE COURT:  Various different people.  Primarily you.

24             THE WITNESS:  Primarily -- mostly -- mostly me.

25             THE COURT:  Now that's, if I might take just a
```

UNITED STATES DISTRICT COURT

EXAMINATION BY THE COURT

1   little -- that's a little bit different than, let's say, the

2   retail business years ago where the companies -- the

3   retailers --

4           THE WITNESS:  Right.

5           THE COURT:   -- would buy a certain amount of

6   inventory, and they would buy it, pay you off, and they would

7   stock it and sell it.

8           THE WITNESS:  Right.

9           THE COURT:  As opposed to -- or they could reorder, if

10  they wish to.

11          THE WITNESS:  Right.

12          THE COURT:  But in today's environment, as I

13  understand, it has changed quite a bit where they ask you, the

14  developer, marketer, to hold it --

15          THE WITNESS:  Correct.

16          THE COURT:  -- and so that the retailer takes less and

17  less risk --

18          THE WITNESS:  Correct.

19          THE COURT:  -- of holding inventory.  They have more

20  open-to-buy money, as they see it.

21          THE WITNESS:  Right.  It's called OTIF, which is

22  on-time inventory fulfillment, and they literally place an

23  order on a Monday and expect it to be there in a day.

24          THE COURT:  It's a creative marketing scheme, is what

25  it is.  I mean, I understand that.  But it's an evolving

STEPHEN SACRA - CROSS-EXAMINATION

1   marketing of products.  I don't know how --

2            THE WITNESS:  It puts the load of the expense onto the

3   creator.

4            THE COURT:  Correct.  And that's one of the issues.

5            So I just wanted to make sure I understood the

6   concepts, Mr. Harvey.  I didn't mean to interrupt you.

7            MR. HARVEY:  Not at all.

8            THE COURT:  But I have to understand some of the facts

9   in this case.

10            Go ahead, please.

11            MR. HARVEY:  It's helpful to us, as well.

12                    CROSS-EXAMINATION (continued)

13   BY MR. HARVEY:

14   Q.  So, again, just to recap, you sell yourself out of your own

15   distribution centers --

16   A.  Correct.

17   Q.  -- and you sell direct to the retail customer, dog owner?

18   A.  Correct.

19   Q.  You sell to distributors, a few?

20   A.  Correct.

21   Q.  Seven to 10, something of that nature?

22   A.  Yeah, somewhere around there.

23   Q.  And then you have independent sales representatives, some

24   30 of them, working across the country, selling your products,

25   as well?

STEPHEN SACRA - CROSS-EXAMINATION

1    A.   And that number is diminished as well.  We brought most of

2    our sales in-house.  And quite honestly, sort of kind of

3    stopped slowing down and our -- we experienced such crazy

4    growth that we've literally -- kind of trying not to sell too

5    much.  We're going over -- like almost 30-plus percent this

6    year.  We're, like, just sitting at the sidelines, going, this

7    is too vast.

8    Q.   So ultimately, though, the customer for these products is

9    the retail customer, the dog owner; right?

10   A.   The end consumer?

11   Q.   The end consumer.  That's a better way to say it.

12   A.   We like to say it's the dog, but -- I mean, the dog is

13   going to go get it, and go run around with it and hide and go

14   play with it and do whatnot.  I mean, the owner may see it

15   again when the dog brings it back, but most people let their

16   dogs run around.  But, yes, the person who is making the final

17   purchase would be a person that --

18   Q.   A dog owner.

19   A.   Right.  A dog owner.

20   Q.   Or a friend.

21   A.   Only a friend of the dog owner or grandma or whatever.

22   Q.   And so let's move now to the way you advertise and market

23   yourself.

24   A.   Uh-huh.

25   Q.   You have a website?

STEPHEN SACRA - CROSS-EXAMINATION

A.   Correct.

Q.   Do you sell off of that website; can retail customers buy on that website?

A.   Yes, they can.

Q.   Okay.  How else do you advertise?

A.   We do trade shows, which advertise to our retailers.  And we send out catalogs -- we -- I guess, let me clarify.  We don't really advertise to end consumers unless it's an email saying, hey, we have a coupon, come get 20 percent off today at mydogtoy.com.  Otherwise, we just send out -- I mean, we spend most of our time promoting to our retailers.  I mean, our website does exist, but the focus of our website is just to provide content to our retailers so they can go and see the products and get information.  Most people buy from their local store when they're buying their dog food.

Q.   I think you just mentioned another retail source for consumers, toy.com?

A.   Mydogtoy.com?

Q.   Mydogtoy.com.

A.   That's our website.

Q.   Okay.  Thank you.  And that's -- you'll put out coupons for discounts?

A.   If -- we have a list of customers that buy from us direct, that have purchased from us, so we'll just send an email out to them, saying mydogtoy.com, come today for 20 percent off, use

STEPHEN SACRA - CROSS-EXAMINATION

1    the coupon "birthday."

2    Q.  And there was a period of time when you did merchandising

3    or marketing on television through QVC; correct?

4    A.  Correct.

5    Q.  How long did that --

6    A.  Oh, that was 2004 to 2007, maybe '8, I think -- no, sorry.

7    I think 2005 to 2008.  Maybe three years.

8    Q.  And haven't done any since then?

9    A.  No.  They -- they -- they really stopped doing pet --

10   once -- I mean, the market really changed when the bottom fell

11   out, and they just -- consumables like that, they just didn't

12   do.  We haven't been invited back.

13   Q.  How much money would you estimate you spend per year

14   promoting and marketing your products?

15   A.  I would say when we buy catalogs, if -- if you've seen one

16   of our catalogs, they're really nice.  We print 6,000 at a

17   time, so we can do two mailings to our 3,000 customers and have

18   stuff for our trade shows.  Those might be -- let's say they're

19   two dollars apiece, so, like, $12,000.  And then for our trade

20   show, we have a substantial booth.  I can't speak to the total

21   cost of it, but we probably pay $40,000 for our booth, you

22   know.  I mean, 3,000, $4,000 per padded carpet, and then we

23   have lights, and then people that -- you know, our employees

24   that come and actually work the trade show.  So, I mean, those

25   are all relative expenses.  But so, I mean, if you want to add

STEPHEN SACRA – CROSS-EXAMINATION

```
 1    all that together, with two trade shows and catalogs, maybe,

 2    let's say, let's just go with an even number of a hundred

 3    thousand dollars.

 4    Q.  And that includes the DJ and the free alcohol at the booth?

 5    A.  Yeah.  The alcohol costs, like -- actually it's expensive.

 6    It's like nine or $10,000.

 7              THE COURT:  Do you actually serve their product at

 8    your --

 9              THE WITNESS:  We actually just serve a vodka and

10    Tequila.

11              THE COURT:  Ah, so it's a limited choice; right?

12              THE WITNESS:  A limited choice.

13              THE COURT:  Just curious.

14              MR. HARVEY:  Very limited.

15    BY MR. HARVEY:

16    Q.  So online sales.  There has been a fair amount of

17    testimony.  I just want to make sure we're clear.

18              Your product is sold or resold on amazon.com; is that

19    correct?

20    A.  It is sold on amazon.com, correct.

21    Q.  As is --

22    A.  But not by amazon.com.

23    Q.  Okay.  Understood.

24    A.  Okay.

25    Q.  It's available on amazon.com.
```

STEPHEN SACRA - CROSS-EXAMINATION

1   A.   Correct.

2   Q.   As are Jack Daniel's licensed products; correct?

3   A.   I -- if -- I would have to trust you in what you're saying

4   to be true to know for a fact.  I have not looked too far on

5   that.

6   Q.   And is it -- your products are sold on the Boozin' Gear

7   website.  We heard a little bit about that; correct?

8   A.   At some point in time -- I know they're listed.  I don't

9   know if you can actually buy one currently today.  But as of, I

10  think, yesterday, it is listed there.  Correct.

11  Q.   Okay.  As are licensed Jack Daniel's products; correct?

12  A.   As what I've seen on the big screen, yes.

13  Q.   So you're not suggesting otherwise.

14          And what about other online sales of your products,

15  sales available to consumers online, other than Amazon?  I

16  think there's been some discussion about Walmart.  And is it

17  your testimony your products are not offered on walmart.com?

18  A.   We don't ship to Walmart.  And if we find someone who is

19  shipping to Walmart, we would discontinue selling to them.  We

20  take a very hard stance on all third-party marketplace sellers.

21  Q.   Do you know if any of your customers resell on Amazon?

22  A.   We have -- as I discussed earlier, we have a company called

23  Mobius that every day goes and looks on the Internet -- I'm

24  sorry -- on amazon.com to see if there are third-party sellers.

25  And usually within hours, if they find something, will go and

STEPHEN SACRA - CROSS-EXAMINATION

1    have that person removed by using the brand registration
2    removal process on amazon.com.  It's a new thing they're
3    calling brand-gating.
4    Q.  And just to go back to a subject that I pretty much have
5    finished with, with respect to your own intellectual property,
6    trademarks, patents and copyrights, apart from the enforcement
7    steps that you described to us, takedown notices, have you ever
8    had to sue or seek any enforcement of your own trademarks?
9    A.  The answer to that would be yes.
10   Q.  Can you please describe that for us.
11   A.  This is going to be a little complex, so you're going to
12   have to bear with me for a second.
13   Q.  I'll make notes.
14   A.  In the very beginning when we started this company, one of
15   the people that we worked with thought that they owned --
16   sorry.  They went to -- we started the product Tuffie, and it
17   was being called Tuffie, T-U-F-F-I-E.  And when we -- this
18   person was supposed to be in charge of getting the registration
19   and making sure that we were making these products without any
20   issues, and they were going to hold that registration.  And I
21   would say in 2000 -- so, two years later, I think, it came to
22   our -- our knowledge that this person's registration was denied
23   because the brand registration was owned by our biggest
24   competitor.
25          Imagine waking up one day and realizing that you're

STEPHEN SACRA - CROSS-EXAMINATION

1    out there promoting a product and pushing it into the

2    marketplace, and the person who owns the name that you're using

3    is your largest competitor.  But in the pet industry, it's

4    different than other cutthroat industries.  We picked up the

5    phone and called them and said, hey, you're not currently --

6    you're not really using this registration.  Can we buy it from

7    you?  And then they turned around and said, you know what, here

8    you go.  Take it.  And they did.  And so that's when we got the

9    name T-U-F-F-Y.  And then since then, we have had some suits

10   that we had to file against a distributor because their

11   computer system was promoting other people's products using our

12   brand name in the actual -- what do you call it? -- in the --

13   in all of the descriptions of the product.  And believe it or

14   not, that's the product of our largest competitor that we

15   purchased it from.  We picked up the phone and called Kong, and

16   said, look, you're still using the name after you sold it to

17   us.  Would you please stop.  And they said, that's not our

18   problem, that's something our distributors are doing.  We're

19   not going to help you.  So then we had to sue the distributors

20   to get them to stop doing it and remove the feed.  So that's

21   the litigation that I have had.  And those usually don't go

22   very far because everybody -- we all settle out and move on.

23   Q.  You admit that it's absolutely possible that children who

24   would be exposed to the Bad Spaniels toy would play with it

25   with their pets; correct?

STEPHEN SACRA – CROSS-EXAMINATION

1    A.  I -- if this toy was in someone's household and there was a

2    family there, parent's discretion, it could possibly be played

3    with, correct.

4    Q.  And that doesn't concern you --

5    A.  That doesn't concern me.

6    Q.  -- the exposure of children to this product?

7    A.  It does not.

8    Q.  And you heard testimony from the Jack Daniel's executives

9    about their policies with respect to marketing to underage

10   children.  Do you understand their concern about this being

11   exposed to children, the toy that you've put together that --

12   A.  I understand concern, but I feel that they kind of pretend

13   to be one way, but then become off another way because a child

14   can eat Jack Daniel's family meats and sit down do great ol'

15   Jack Daniel's, you know, meat dinner, and you're not exposing

16   it?  You're asking me the same thing, but they're doing the

17   same thing.  How is that different?

18   Q.  And we've heard some testimony, Your Honor and sir, about

19   your message that this product is sending.  And I -- I'll -- at

20   least one of my notes, and in your deposition, you said that

21   the message of the Bad Spaniels toy is that the business and

22   product images of Jack Daniel's need not always be taken

23   seriously.

24            Is that the message?

25   A.  That's correct.

STEPHEN SACRA - CROSS-EXAMINATION

1   Q.  You're not commenting in any way on Jack Daniel's business

2   practices; correct?

3   A.  I'm making a comment, and that comment is that you're being

4   bombarded with advertisement all the time.  And I'm taking that

5   information and juxtaposing it away, that people can look at it

6   and laugh and say, hey, you know what, we shouldn't take

7   ourselves so seriously, especially these companies who are

8   taking themselves so seriously.

9   Q.  Well, that's a general message; right?  Is that specific to

10  Jack Daniel's, or is it a general message?

11  A.  It's specific to Jack Daniel's and all the parodies that we

12  do.

13  Q.  You think they take themselves too seriously?

14  A.  You've watched all the testimony.  I mean, everybody up

15  here is, like, I can't find anything funny about this.  And do

16  you find any of these funny?  No, I have not -- not one of the

17  Silly Squeakers is funny.  But yet contradictory to that, when

18  you look at our Amazon reviews:  Hilarious, funny, this is the

19  funniest toy we've ever had, people are putting it with the

20  dogs at their dog's 21st birthday.  I mean, I kind of disagree.

21  Q.  You say you're not commenting in any way on Jack Daniel's

22  business practices; correct?

23  A.  If business practices involves advertising and having

24  consumer influence over another person, that would be making a

25  comment about the fact that you're advertising to people and

STEPHEN SACRA – CROSS–EXAMINATION

1    taking it very seriously.  And we're putting it in such a way

2    that we want you to look at it in a humorous way and

3    juxtaposing it.

4    Q.  And you're not commenting at all on the quality of the Jack

5    Daniel's whiskey here with your product?

6    A.  The quality?

7    Q.  Correct.

8    A.  Quality is something that -- I mean -- I -- I guess I'm

9    trying to understand.  Are you -- are you asking if I'm making

10   a negative comment towards the quality?

11   Q.  Correct.

12   A.  I am not making a negative comment --

13   Q.  Any comment, negative or positive?

14   A.  But I'm making a comment about Jack Daniel's, yes.

15   Q.  But you're not commenting about the way they market their

16   products.

17   A.  I am commenting about the way they market their products.

18   Q.  Or anything else to do with their actual business?

19   A.  That is their business, is marketing products.

20          MR. HARVEY:  Could we look at page 220 from the

21   deposition of the witness, please.

22          And starting about halfway down the page.

23   BY MR. HARVEY:

24   Q.  Here is your testimony, sir.  Are you changing your

25   testimony now?

STEPHEN SACRA – CROSS-EXAMINATION

```
 1    A.  If that was my testimony, then that's my testimony.

 2              THE COURT:  You should read the question and answer

 3    and see if he agrees with that now or not.  That's the way it's

 4    done, rather than him just looking at it.

 5    BY MR. HARVEY:

 6    Q.  Do you -- my question is:  In the Bad Spaniels toy, are you

 7    commenting in any way on Jack Daniel's business practices?

 8              Answer:  No, absolutely not.

 9              Or the quality of their whiskey?

10              Absolutely not.

11              Are you changing your testimony now?

12    A.  (Reading) The business practices of advertising and

13    promoting to people?

14              THE COURT:  Well, excuse me.  That's the next

15    question.

16              MR. HARVEY:  Correct.

17              THE COURT:  Correct?

18              MR. HARVEY:  Yes.

19              THE WITNESS:  Correct.

20              THE COURT:  And that's your answer given there.

21    BY MR. HARVEY:

22    Q.  And now you're saying you are making a comment.

23    A.  I'm making a comment to Jack Daniel's about the product,

24    yes.

25    Q.  And you were asked:  Or anything else that has to do with
```

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    their actual business?

2            Answer:  Absolutely not.

3            And knew you're making a comment.  Not when your

4    deposition was taken, but now here in court, you're making a

5    comment; is that right?

6    A.  Our product as a parody is making a comment about the Jack

7    Daniel's product.  So -- I mean, those are my answers.

8    Q.  On page -- sorry.

9            If you could look at Exhibit 169.  A copy of Boozin'

10   Gear website pages.

11           We've looked at these pages earlier in the case.  I

12   know you saw them, Mr. Sacra.  I don't mean to prolong the

13   agony, but --

14   A.  That's all right.

15   Q.  The concern here is we have Jack Daniel's authorized

16   licensed merchandise.  And as you see here, we have references

17   to Jack Daniel's licensed merchandise.  If we go then to the

18   last page -- well, here we go.  We see the -- your product

19   being sold on the same page online as licensed Jack Daniel's

20   merchandise.  You're aware of that?

21   A.  I can see it in front of me.

22   Q.  And you have no concern about the nature of that being

23   misleading?

24   A.  I don't control that website, nor the practices of that

25   website.  I don't control how their search engines or

STEPHEN SACRA - CROSS-EXAMINATION

1   algorithms work.  So how that appears is not something that I

2   have control over.

3   Q.  I understand that.  I just -- my question really has to do

4   with the way the consumer encounters the products.  And you're

5   not denying that this is a retail website --

6   A.  Correct.

7   Q.  -- that a consumer could buy your product or could buy

8   licensed Jack Daniel's products in the very same location.

9   It's not just a channel of trade.  It's the very same vendor;

10  right?

11  A.  It's the same -- sorry.  It would be the same customer.

12  Q.  Well, to you a customer.  Vendor to the retailer -- retail

13  customer --

14  A.  Okay.

15  Q.  -- correct?

16  A.  Is it a concern of mine that a person can do that?

17  Q.  And might be confused.

18  A.  I don't think they would be confused because I think that

19  the parody is successful.  And they know the origin of source.

20          MR. HARVEY:  And I apologize, Your Honor.  The exhibit

21  we're looking at is Exhibit 170.  I misspoke earlier.

22  BY MR. HARVEY:

23  Q.  And then could you enlarge, please, the type in the upper

24  right corner of this page.

25          So it didn't worry you that your product was being

STEPHEN SACRA - CROSS-EXAMINATION

1   described as a Jack Daniel's-style squeaker toy.  That didn't

2   bother you?

3   A.  It says Jack Daniel's style.  It doesn't say it's a Jack

4   Daniel's.

5   Q.  Oh.  So nobody is going to be confused by that because it

6   says "style."  Is that what your testimony is?

7   A.  I think people are smart.  I think consumers take a care in

8   action when they're making a purchase and they read indepthly.

9   If they're going to take the time to read that statement, I'm

10  sure they understand it.

11  Q.  Did you take any steps to communicate with Jeff

12  Eichelberger, Mr. Boozin' Gear, about that, any concern that

13  you had about that way to describe this toy?

14  A.  Did I have a concern with that?

15  Q.  Did you take any steps to communicate with

16  Mr. Eichelberger, who owns Boozin' Gear?

17  A.  I believe that Mr. Eichelberger reached out to us because

18  of his concern that you had contacted -- that Jack Daniel's had

19  contacted him.  And as to the specifics of what occurred after

20  that would have to be a conversation that I had between myself

21  and my lawyer.  I mean...

22  Q.  What did Mr. Eichelberger tell you?

23  A.  I don't recall.  I just know the gist of what was said was

24  that we were -- Jack Daniel's has reached out to us in

25  regarding your bottle being sold on our website.  And after

STEPHEN SACRA - CROSS-EXAMINATION

1    that, I don't have a recollection of what tran -- what

2    conversations occurred or what transpired.  That was a long

3    time ago.

4    Q.  Let's look at Exhibit 171, please.

5              And this is a website of Wear Your Beer.  You sold to

6    Wear Your Beer; correct?

7    A.  If you -- I'm going to answer that if that is what was in

8    my deposition, we discussed that, then, yes.  But as of this

9    moment, I don't have exact recollection of every single person

10   I've sold to.

11   Q.  So you're not going to deny that your products and licensed

12   Jack Daniel's products were at least one time offered on the

13   wearyourbeer.com website?

14   A.  If you have that example to show, then that would verify

15   that.

16   Q.  Sure.

17            MR. HARVEY:  Let's page up here, if we could, please.

18   BY MR. HARVEY:

19   Q.  Oh, before you do page up -- sorry, Candy -- you see the

20   licensed Jack Daniel's products down in the lower tier of that

21   page, sir, do you?

22   A.  Yeah.

23   Q.  Okay.

24   A.  Correct.

25   Q.  And if we open up to the full page again, back to page 1 --

1   sorry -- you see -- sorry -- the Jack Daniel's insignia and

2   trademarks in the upper right corner of the main banner on the

3   page.

4   A.   There is a Jack Daniel's logo there.

5   Q.   And it's described as stocking and offering official gear.

6   You don't disagree with that?

7   A.   I don't disagree that that's what it says.

8   Q.   And now we can go on down to the picture of the Bad

9   Spaniels toy.  And here it is being offered, not just in the

10   same sales channel, but by the same store, the same retailer;

11   correct?

12   A.   That's what you're showing.

13   Q.   You're not disagreeing that that's what's happened here?

14   A.   That is one instance out of a hundred million websites that

15   are out there.

16   Q.   And then if you could look at 172, please.  This is

17   amazon.com, and I think the testimony has been that your

18   products are offered on amazon.com.

19   A.   Correct.

20   Q.   And again, this is another retail location for consumers to

21   acquire either licensed Jack Daniel's merchandise or your

22   merchandise.  Same retailer; correct?

23   A.   That is amazon.com.  Everything is offered on amazon.com.

24   Q.   Yours and Jack Daniel's; correct?

25   A.   I cannot verify to the fact that Jack Daniel's markets on

STEPHEN SACRA – CROSS–EXAMINATION

1    that site or sells products on that site because I have not

2    seen it.

3    Q.  And then let's take a look at 174.

4            MR. BRAY:  Counsel, what was the last exhibit?

5            MR. HARVEY:  70 –– 172.

6            MR. BRAY:  The last one was 170 and this is 174?

7            MR. HARVEY:  No, sorry.  This one is 174.  The last

8    one was 172.

9    BY MR. HARVEY:

10    Q.  And I think you did mention some customer reviews earlier.

11    If we could just look at the first review, the first sentence

12    in that review:  I love this Silly Squeakers liquor Jack

13    Daniel's bottle toy.  It is a plastic squeak toy that is ––

14    sorry –– the exact size and shape of a Jack Daniel's bottle.

15            So you didn't take this as being any indication of

16    someone having any concern or confusion about what you're

17    selling?

18    A.  First of all, the origin of that is undetermined.  Someone

19    from Jack Daniel's could have gone on there and put a comment

20    on amazon.com to their own benefit.  There's nothing there to

21    show that that's an actual consumer.

22            But I will say I do appreciate the fact that the

23    person who did make that took the time to put parentheses

24    around there to say Jack Daniel's to indicate that, first,

25    that's a Silly Squeaker liquor.  They recognize the origin of

UNITED STATES DISTRICT COURT

1    source.  They're not confused.  They clearly state in the very

2    beginning.  And then they put the parentheses, Jack Daniel's.

3    So they're not confused.

4         And if you read the top of it, if you scroll down just

5    a little bit, I believe it says, ah, hilarious.  Loves it.  And

6    then they go on to tell you that the Bad Spaniels is amazing.

7    Q.  Right.

8    A.  So, I mean, origin of source?  Did they think that it

9    was -- had -- that they were bothered by feces?  No, they

10   looked at it and thought it was a great toy.  They gave it five

11   stars.  So I think that is a great review.

12   Q.  Right.  And you didn't take any steps, did you, to try to

13   prevent your toy from being sold in the same retail locations

14   as Jack Daniel's licensed goods?

15   A.  Once again, I have not seen Jack Daniel's licensed goods on

16   amazon.com, so I can make no comment as to whether or not that

17   actually exists or has occurred.

18   Q.  But you didn't take any steps to stop that.  In fact, you

19   probably were encouraging that, weren't you?

20   A.  Encouraging what?

21   Q.  Having the two products sold on the same sites.

22   A.  I encourage the sales of my products.  I don't go around

23   looking and saying, oh, somebody sells something else, well, I

24   want to sell my stuff right next to it.  I don't do that.  I

25   sit around and design dog toys.

STEPHEN SACRA - CROSS-EXAMINATION

1   Q.  I want to go back to another channel of trade question

2   because your counsel has been at this for a bit, as well.

3            On social media.  And I think you testified this

4   morning that you used to have social media sites; correct?

5   A.  We just had a Facebook page.

6   Q.  But you discontinued the Facebook page; correct?

7   A.  Correct.

8   Q.  Why was that?  Say that again, please.

9   A.  Because we didn't have the ability to stay on top of -- I

10  mean, of the -- of what it takes to actually effectively use it

11  as a tool to our benefit.  I mean, people -- a lot of times

12  when you make durable dog toys, people sometimes use them

13  incorrectly.  And where it says, don't put this in your -- let

14  your dog chew this unsupervised, they'll leave for the day,

15  lock their dog in a box, give them a dog toy, go out to the bar

16  with their friends and come home late at night and realize the

17  dog chewed up their toy, and then say, well, you didn't make a

18  very strong toy, and they'll post a picture and say I want to

19  say something about.

20           So it's our practice, anytime that somebody has an

21  issue, to contact us directly, that we reeducate them on how to

22  use a dog toy so that they use it properly.  And then give them

23  the opportunity to say, hey, you know what, that dog toy wasn't

24  right for you.  We want to get you into a dog toy that is going

25  to be better suited for your -- for your pet.  And then say,

STEPHEN SACRA – CROSS-EXAMINATION

```
 1    you know, don't leave them unsupervised and you're going to
 2    have success with this toy.  And then we offer them the ability
 3    to buy an extra one for five dollars more if they pay for the
 4    cost of shipping.
 5    Q.  How long ago did you shut down your Facebook page?
 6    A.  I don't recall.  I just remember telling my assistant, you
 7    got to shut it down.
 8    Q.  I think in your testimony this morning you said you did in
 9    part because, quote, people do crazy stuff.
10    A.  Well --
11    Q.  What is --
12    A.  "Crazy stuff" meant they complain, and they complain
13    unintelligently.
14            THE COURT:  That's from your point of view; right?
15            THE WITNESS:  Correct.
16    BY MR. HARVEY:
17    Q.  And you've expressed some concern about using your toys
18    inappropriately, and I believe you said to -- in deposition,
19    don't call my product a dog chew toy; correct?
20    A.  Correct.
21    Q.  Why is that?
22    A.  We take dogs' safety very, very seriously because no one
23    should be in a horrible moment where their dog has ingested
24    something and -- simply based on the fact that the owner didn't
25    think, hey, my dog shouldn't chew on this.  You wouldn't let a
```

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1  small child chew any part of a toy.  And we spend a lot of

2  time -- Americans spend a lot of time educating people:  Don't

3  let your children chew on this.  It has small parts, it could

4  choke them or it could get in their stomach and hurt them.

5        Well, people somehow disconnected that with animals.

6  So we really, really spend a lot of time on consumer education

7  to make sure that people, when they get a dog, that they know

8  you've got to take care of your dog, you got to treat your dog

9  like a child, and you've got to make sure that they're not

10  unsupervised; and that when you're playing with a toy, you're

11  interacting together with them and it's not a babysitter.  And

12  it's -- I mean, that's -- you have to realize the negative

13  side.  If a dog chews a toy, some of the parts may not be

14  detectable via x-ray.  And then until they can figure out

15  what's going on, then they have to do invasive surgery to go in

16  and remove it.  And sometimes an animal may -- may die.  So if

17  we can prevent that, to help make a better role for pets,

18  that's our primary focus.

19  Q.  But all of the Silly Squeakers products are intended to be

20  chewed by dogs; right?  They're intended to be chewed by dogs.

21  A.  That's incorrect.  They're intended to be used for

22  interactive play.

23        MR. HARVEY:  Let's look at page 39 of the deposition,

24  please.

25

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1   BY MR. HARVEY:

2   Q.  Are they all intended to be chewed by dogs, you were asked

3   in your deposition?

4           Yeah, you said, absolutely.  I don't know what else a

5   dog would do with a toy.

6           MR. BRAY:  Your Honor, for completeness I think the

7   next question and answer should be answered -- read into the

8   record.

9           THE COURT:  You may, for completeness.

10  BY MR. HARVEY:

11  Q.  So -- isn't that what you said?

12  A.  Yeah.  And I also corrected him and said, we don't use the

13  word "chew toy," if you continue reading.  I specifically

14  corrected Chris Larkin and said:  I would prefer that you don't

15  use the word "chew" because we don't recommend that any dog

16  chew any part of any toy at any time because it's not safe or

17  good for them to ingest.  And chewing indicates -- and chewing

18  indicates that.  So let's call them interactive play toys.

19  Q.  Right.  I see that.

20          But you were asked:  Are they all intended to be

21  chewed by dogs?

22          And you said:  Yeah, absolutely.  I don't know what

23  else a dog would do with a toy.

24          So you know -- you're putting it on the market, you

25  know the dog is going to chew it, and yet you proclaim that

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

```
 1    you're concerned about a dog ingesting it.  Is that a little
 2    inconsistent, sir?
 3    A.  As far as being inconsistent, first of all, a dog only has
 4    a mouth.  So when they pick up a toy, it goes into their mouth.
 5    So if the comment is saying I don't know exactly -- I don't
 6    know what else they would do with it, it's not like they have
 7    hands to carry it around.  So chewing it, ingesting and
 8    chewing, I mean, inadvertently, same thing.
 9              THE COURT:  With that, we're going to stop.  Are
10    you -- do you have more to go?
11              MR. HARVEY:  I'd like to take a quick break.  I think
12    we're pretty much finished.
13              THE COURT:  Come back about 3:15, and we'll finish
14    up --
15              MR. HARVEY:  Thank you, Your Honor.
16              THE COURT:  -- and get to the end of the day here.
17              All rise for relaxation for 15 minutes.
18              MR. HARVEY:  Thank you.
19                  (Proceedings in recess at 3:01 p.m.)
20                   (Proceedings resume at 3:17 p.m.)
21              THE COURT:  Okay.  Ready to resume?
22              MR. HARVEY:  Yes, sir.
23              THE COURT:  All right.  Here we go.
24              MR. HARVEY:  And thank you for the break.
25              THE COURT:  You're welcome.
```

1          MR. HARVEY:  Sometimes when you sit down you don't

2    realize how long you've been standing up.

3          So, thank you.

4          So just a couple more questions for the witness, Your

5    Honor.

6    BY MR. HARVEY:

7    Q.  There's testimony, Mr. Sacra, about your Facebook page and

8    the fact that you discontinued your Facebook page; correct?

9    A.  Correct.

10   Q.  When I say "you," I mean VIP.

11   A.  Correct.

12   Q.  Had there been complaints about the dog toy products, and

13   specifically including Silly Squeakers, that appeared on that

14   Facebook page?

15   A.  Not that I'm aware of.

16   Q.  You're not aware of any complaints about the quality of the

17   product, the fact that the head came off in 10 minutes and

18   people spent $15 and weren't happy about it?  That didn't show

19   up on Facebook?

20   A.  I don't believe that showed up on Facebook, but I know that

21   I've had customer calls where they said, hey, I bought this toy

22   and my dog chewed the top of it off.  And we always tell people

23   with vinyl dog toys, you shouldn't let your dog chew on it.

24   But it also, I believe, somewhere on here it says you should

25   never let your dog -- designed for interactive play and not

STEPHEN SACRA – CROSS-EXAMINATION

1    meant to be chewed or ingested by any animal.  Failure to

2    follow these instructions can result in injury to your pet.

3           So if they do call, like I talked about earlier, we

4    express to them, and then we actually get them into a Tuffy

5    because our primary business is durable dog toys and Tuffy.

6    And sometimes if people don't understand a product, we make

7    sure that it's clear.  Even though we do our best to warn

8    people how to use the product properly, sometimes it does

9    occur.

10          MR. HARVEY:  Can we look back, please, at the Amazon

11   page we were looking at earlier, amazon.com.

12          I think it's 174 -- 172.  Thank you.

13   BY MR. HARVEY:

14   Q.  So what are the ratings for this toy on Amazon?

15          THE COURT:  Excuse me.  Your voice is dropping off.

16          MR. HARVEY:  I beg your pardon.

17          THE COURT:  Thank you.

18          MR. HARVEY:  I need to lean into the microphone.

19   BY MR. HARVEY:

20   Q.  What are the consumer or customer ratings for the Bad

21   Spaniels toy?

22   A.  In total, it's three-and-a-half stars.  You'll find that

23   out of all of the -- out of all of the comments, only seven of

24   them are a one-star, and all the rest are five stars.  There's

25   actually a little -- if you actually zoom in, you can see a

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    chart of the number of five stars versus the one stars, which

2    shows you that the customer level of satisfaction is -- I

3    believe it's somewhere between 50 to 60 percent at five stars.

4    If not, I have a printout of all of the comments.

5            THE COURT:  We're talking about this exhibit.

6            THE WITNESS:  Yeah, I thought that was -- I'm sorry.

7    I thought that was the main page that listed all the

8    people's -- because I know you do have that one.  You have the

9    long list version that you submitted into evidence, which shows

10   all the comments that people made?

11           MR. HARVEY:  Yes, that's what I was --

12           THE WITNESS:  Because if we look at that one, at the

13   top left right there, you see that, you'll see that there are

14   customers -- I can't read the percentages.  Is it 61 percent

15   right there?

16           MR. HARVEY:  Like 65.

17           THE WITNESS:  Yeah.  65 percent of our customers rated

18   this a five-star.  And then you'll see that seven people, which

19   I counted up to before I came into court, which equates to

20   23 percent, rated it a one-star and those seven people are

21   people who used the product incorrectly.

22   BY MR. HARVEY:

23   Q.  So -- sorry.

24   A.  They used it and their dog tore it up in two minutes, or

25   five minutes.  I mean, that magical number is always the same.

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    Q.  Like the review on the right-hand side of this very page,

2    the one-star review, if we could look at that.

3    A.  Yeah.  "Not durable enough to be considered a dog toy."

4    Q.  "Mine put a hole in it within a few days."

5    A.  Yeah.  Few days.  Normally it's two, five minutes.

6            THE COURT:  Right.  I would agree with that.

7    BY MR. HARVEY:

8    Q.  All right.  So it's -- it's not your testimony, then, that

9    you took down your Facebook page because you were getting so

10   many negative reviews that it was taking too much time to deal

11   with the comments?

12   A.  No, no, no.  We just didn't have the ability to manage it.

13   I mean, we're a small group of people and we're so focused on

14   getting sales out and getting orders out and order entry, it's

15   just -- we tried to focus on it, but then it's like the person

16   who would have the responsibility would just slack on it.  And

17   it's just, like, hey, just take it down.  If you can't manage

18   it, it does you no good to even have it.

19   Q.  Okay.  And then finally, let's look at two exhibits, one is

20   an array of bottles that Mr. Bray has been using as a

21   demonstrative.  I believe 10,004.

22           Oh.  Sorry.  That's right.  It's in --

23           THE WITNESS:  It's paper.

24           MR. HARVEY:  You don't mind if I borrow it from you.

25           Excuse me, Your Honor.  I'll put this on the ELMO, if

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1   I might.

2   BY MR. HARVEY:

3   Q.  So this is a demonstrative that we've looked at, Mr. Bray

4   has looked at quite a number of times, of different -- display

5   of some different bourbon products in square bottles; correct?

6   A.  Correct.

7   Q.  But this isn't representative of all the bourbons that are

8   out there, is it?

9   A.  Is it representative of all the bourbons?

10  Q.  Right.

11  A.  It does not represent all of the bourbons.  I actually did

12  a report that took the most predominant number.  But if you

13  look at the bourbons that are up there, I would say -- and

14  based on the report that I put together, some of the most

15  recognized and highest grossing sales volume whiskeys are up

16  there and are represented.  I mean, Jim Beam, I would

17  definitely state, would probably be your number one competitor.

18  Q.  But these aren't -- I don't mean to interrupt you.

19  A.  Well, I'm just saying, as a percentage of sales, you can

20  look at a subset of bottles and say, is this representative.

21  But you also have to look at the quantity of each bottle sold

22  in total volume of sales to actually understand what percentage

23  of the marketplace each bottle represents.  So you could say,

24  hey, here is one.  I think the judge used Maker's Mark as an

25  example.

STEPHEN SACRA - CROSS-EXAMINATION

1    Q.  Right.

2    A.  What percentage of the marketplace do they represent in the

3    total number of bottles that are out there.  They have a unique

4    bottle that's truly unique in whiskey and bourbon.

5    Q.  So only about 35 percent of bourbons, though, are sold in

6    square bottles; wasn't that your finding?

7    A.  I would have to look at that report to determine if that

8    was the number that was put on it.

9    Q.  You wouldn't disagree with that estimate, would you?

10   A.  Unless I looked at that report and actually verified the

11   number that I came up with, I could not speak to that.

12           MR. HARVEY:  Let's look at Exhibit 202, please.

13   BY MR. HARVEY:

14   Q.  So now, this is one of your clients' -- your counsel's

15   exhibits of bourbon -- other bourbon shaped --

16           THE COURT:  What exhibit is this?

17           MR. HARVEY:  Exhibit 202, Your Honor.

18           MR. BRAY:  Your Honor, this was an exhibit that there

19   was a motion in limine on and argument on.  It's not in

20   evidence.  And I understand he can impeach him on it, but I

21   don't believe he's -- he's laid the groundwork for that yet.

22           THE COURT:  Well, I think he's getting there.  That's

23   the point.  But I just wanted to know what the exhibit is.

24   It's not in evidence, and now it's being used for demonstrative

25   purposes, but he has not moved in it.  But it's fair game to

UNITED STATES DISTRICT COURT

STEPHEN SACRA - CROSS-EXAMINATION

1    ask your client about that.

2    BY MR. HARVEY:

3    Q.  Where did this exhibit come from, Mr. Sacra; do you

4    recognize it?

5    A.  I -- don't know.

6    Q.  Okay.  Well, then I will -- I will represent to you that it

7    is a collection of different brands of bourbon sold in the

8    United States.  You wouldn't disagree with that?

9    A.  The items that are -- okay.  I'm going to have to be very

10   clear in this answer in the fact that I cannot see the label of

11   each individual bottle to ascertain the origin of source of

12   each individual one to accurately answer that.

13   Q.  We can enlarge this, I think.  Why don't we do that so that

14   you can help us with that.

15          So I see Woodford Reserve on the left side.  That's

16   not a square bottle, is it?

17   A.  The one on the left, the far left?

18   Q.  Our left, yes.

19   A.  That is a square bottle.  It's actually -- I mean, is it

20   square in this dimension?  No.  Is it square in the face

21   dimension?  Yes.

22   Q.  Square as in square.

23   A.  Square as in it has tapered shoulders.

24   Q.  Flat?

25   A.  It's flat on the front.

STEPHEN SACRA - CROSS-EXAMINATION

1   Q.  But it's a flask.  It's the front and back are closer

2   together, certainly, than the sides?

3   A.  As to the technical terms that are used in the industry of

4   producing bourbon and whiskey, what you call that, I am not

5   familiar.  So if you would -- if you're calling it a flask

6   shape, that would be your opinion and your knowledge, not mine.

7   Q.  You're not disagreeing with that description?

8   A.  I'm not saying I don't know that it's a flask by

9   definition.

10  Q.  The next one, the Sazerac Rye, that's not square, is it?

11  A.  That is not square.

12  Q.  And about what about the next one; is that square?

13  A.  That one is not square.

14  Q.  Nor the next one, nor the next one; correct?

15  A.  Correct.

16  Q.  In fact, they're round.  In fact, the one next to the one

17  on the far right could be characterized as looking something

18  like a wine bottle; correct?

19  A.  The one on the far right?

20  Q.  No, the one next to the Buffalo Trace.

21  A.  Without seeing that bottle and holding it in my hands, I

22  can't speak to that because a lot of times you can't tell the

23  entire shape of a bottle, just like the Woodford Reserve.  I

24  know that bottle and know how thick it is, and know that it's

25  flattened square-type bottle.  But from here, from this

STEPHEN SACRA – CROSS-EXAMINATION

1    position, from this photo, I can't tell that without having it

2    in front of me.  That would be inaccurate -- it would be

3    inaccurate to make a statement.

4    Q.  That's fair enough.  Let's look at the next group, please.

5              And let me just ask you, are any of those, other than

6    the Jack Daniel's bottle, square?

7    A.  The Maker's Mark has an overall profile of being square.

8    Just like you taper the shoulders, they also taper the

9    shoulders, but in a slightly different manner.

10   Q.  All right.  And the next group, please.

11             And there we have Beam and we have Evan Williams,

12   which we've seen evidence about.  But other than those two,

13   would you say any of the other bottles is square?

14   A.  I would say that the other three appear to be round in

15   shape.

16   Q.  And let's -- thank you.

17             Let's go to the next row, please.

18             And here we have more square ones, the Kentucky

19   Gentleman, the Ancient Age appears square -- or at least

20   rounded square, if that's a right description.  I'm not able to

21   read the label on the one --

22   A.  The Ancient Times or something like that?  The one on the

23   far right?

24   Q.  Far right.

25   A.  Yeah, that one seems to be square, as well.

STEPHEN SACRA - CROSS-EXAMINATION

1   Q.  All right.  Great.  The next set, if you don't mind.

2   A.  I'd like to point out that many of these brands have

3   multiple versions, like they make a rye version and different

4   ones.  And sometimes you'll find that a brand will use one

5   bottle that's square, and then in the same brand use another

6   one that is round.

7   Q.  Okay.

8   A.  So in the subsets -- and so, yeah, you can take all of

9   these and put them into a subset.  And as I said, I did -- I

10  did a study that took all of the bottles and categorized them

11  in percentages.  And I think it would be a much more accurate

12  way to look at the entire industry than to just go through each

13  of these individual ones and say, is this one square or is this

14  one round.  I mean --

15  Q.  Well, the Whistle Pig obviously is not square.  In fact, I

16  would say none of these -- you'd agree, right? -- none of these

17  is square.

18  A.  Well, 1972, if you take that bottle, it's much like the

19  Woodford, if you call that a flask style.  But I can't see the

20  depth of it and I can't hold it in my hand to see how it -- the

21  rest of the bottle is formed.

22  Q.  Okay.

23          THE COURT:  Excuse me, I think you switched a number

24  around there.  I think it's 1792, not 1972.

25          Would you agree with that?

STEPHEN SACRA – CROSS-EXAMINATION

1          THE WITNESS:  I would agree with that.

2          THE COURT:  Okay.

3          MR. HARVEY:  The next group, please.

4    BY MR. HARVEY:

5    Q.  Of those -- well, the Early Times bottle is, I think,

6    square, or square-ish.  The others are not.  Is that right?

7    A.  Few is square, Knob Creek is square.  It's just not -- I

8    know Knob Creek and I know that it's a square face, but the

9    depth of is of it is not, like, perfect square from the

10   vertical profile.  Clearly the second one to the right is --

11   oh, egg-shaped.  And then the one on the left seems to be

12   square as well.

13          MR. HARVEY:  Okay.  Let's go to the next group,

14   please, Candy.

15          Closing it on it here.

16          THE COURT:  Counsel, I -- I think I get the point

17   you're trying to make, but --

18          MR. HARVEY:  Fair enough, Your Honor.  There's no need

19   to go through.  We can see what we can see.  The exhibit speaks

20   for itself.

21          I just wanted the witness to at least acknowledge that

22   quite a number of brands of bourbon sold in the United States

23   are not square, not sold in square bottles, and I think I have

24   that.

25

STEPHEN SACRA - CROSS-EXAMINATION

BY MR. HARVEY:

Q.  Is that right, sir?

A.  You would have to speak on your own behalf as to what you
have.  I cannot speak on your behalf.

Q.  All right.  So you're not going to answer that question.
You don't believe this shows that.

A.  Can you make a full question?  You don't believe this shows
that?

Q.  I'm sorry.  Let's do that.

A.  "This" is not a thing, and that, I don't know what "that"
is or "this."

Q.  That's a fair criticism at this hour of the day.

A.  Right.

Q.  You would agree with me that these -- this array display,
Exhibit 202, demonstrates that there are quite a number of
bourbon brands in the United States sold in bottles which are
not square.

A.  I would say that that represents the fact that there are
many different brands out there sold in different bottles that
have varying shapes.

Q.  I'm sorry.  I didn't hear the last part of your answer.

A.  It represents that there are many bottles of different
brands that employ different shapes to bottle their alcohol.

Q.  Thank you.

        MR. HARVEY:  That's all I have, Your Honor.

UNITED STATES DISTRICT COURT

1          THE COURT:  Thank you.

2          Any redirect?

3          MR. BRAY:  Just a few minutes, Your Honor.

4                        REDIRECT EXAMINATION

5   BY MR. BRAY:

6   Q.  In the homestretch, Mr. Sacra.

7          Just want to follow up on a few things that Mr. Harvey

8   asked you about.

9          He read a little bit of your deposition where you said

10  you prefer to refer to the toys as interactive play toys.

11  A.  Correct.

12  Q.  Why do you prefer to refer to the VIP toys as interactive

13  play toys?

14  A.  Because they're supposed to be used for interactive play to

15  avoid ingestion and for safety.  But also when you're playing

16  with a dog, you're supposed to be playing with your dog

17  interactively, as in, like -- playtime is not your dog just

18  playing by itself.  It's you playing with your dog.

19  Q.  Okay.  Briefly on this -- I don't want to over -- using the

20  wrong one -- don't want to overstay my welcome.

21          Recall Mr. Harvey asking you about similarities and

22  differences between Exhibit 1 and Exhibit 2?

23  A.  Correct.

24  Q.  You referred to Jim Beam as being another large-selling

25  whiskey product.

STEPHEN SACRA - REDIRECT EXAMINATION

1      Does the Jim Beam product have a black cap?

2   A.  Yes, it does.

3   Q.  Does the Jim Beam product use a black and white label?

4   A.  Yes, it does.

5   Q.  Does the Jim Beam product use arched letters?

6   A.  Yes, it does.

7   Q.  And does the Jim Beam bottle come in a square bottle?

8   A.  Yes, it does.

9   Q.  And to your knowledge, is Jack Daniel's claiming exclusive

10  rights in any of that?

11  A.  No, they're not.

12  Q.  You said in response to a question by Mr. Harvey --

13      MR. HARVEY:  I'm sorry.  Excuse me, Counsel, and Your

14  Honor.  Can we hear the last question and answer back?  My

15  brain was elsewhere.  Forgive me.

16      (Thereupon, the court reporter read back as follows:

17  "Question:  And to your knowledge, is Jack Daniel's claiming

18  exclusive rights in any of that?

19      Answer:  No, they're not.")

20      MR. HARVEY:  Well, Your Honor, I think it

21  mischaracterizes -- it -- maybe the witness's impressions --

22  and the claims speak for themselves as to what Jack Daniel's is

23  claiming.

24      THE COURT:  Well, the objection is overruled.  I can

25  evaluate all this testimony.

UNITED STATES DISTRICT COURT

1        MR. BRAY:  Thank you, Your Honor.

2        MR. HARVEY:  Okay.

3  BY MR. BRAY:

4  Q.  Mr. Harvey on cross asked you, are you worried about

5  consumers being confused regarding the Silly Squeakers parody

6  toys and Bad Spaniels, and you answered "no."

7        Why are you not worried about consumers being confused

8  by your Bad Spaniels and Silly Squeakers toys?

9  A.  Because -- well, first of all, because I think our

10 customers understand the parody of this product.  But I also

11 know that we've sold over -- I mean, like I said, we've sold

12 almost a million parody dog toys, and not once has one person

13 of anything we parodied come up and said, I'm confused as to

14 the source of where this came from, or that there's a problem

15 with tarnishment or anything of that matter.  All we get is

16 positive comments, or someone whose dog chewed up their toy.

17 Q.  Mr. Harvey asked you, isn't your business model built on

18 exploiting the goodwill of well-known brands.  You answered

19 "no" to that question.

20       What is your business model, Mr. Sacra?

21 A.  Well, our business model is durable dog toys.  And

22 that's -- I mean, that's our business.  Our business is making

23 high quality, the best products you can make, dog toys built

24 for dogs that are our consumers, to be purchased by their human

25 parents.  And, I mean, as regards to Silly Squeakers, it's just

STEPHEN SACRA – REDIRECT EXAMINATION

1  an insignificant portion of what we do, but it's the one thing

2  that allows us to have fun with our business.

3  Q.  Mr. Harvey asked you a number of questions about steps in

4  the past VIP has taken to protect its intellectual property.

5         Do you recall that?

6  A.  Yes.

7  Q.  Have any of those matters involved VIP attempting to

8  enforce any rights against a product that was parodying a VIP

9  product?

10  A.  No.

11  Q.  The Court asked a number of questions about the

12  distribution model, and there was discussion regarding direct

13  versus distributor.

14         Do you know the approximate percentage of VIP sales

15  that are direct versus distributor?

16  A.  Distributors equate to maybe 2 percent of our total sales.

17  Maybe a little less.  It's -- it's really insignificant in the

18  big picture because, as I said, distributors are only going to

19  carry a few of our strongest items.  They really won't carry

20  the whole line because it's 600 items.  You can't put 600 items

21  in your distribution center and make space for that.  A

22  distribution center has to sell, you know, a thousand kinds of

23  dog foods and a thousand types of different toys, and they're

24  not going to dedicate 600 of ours to their inventory.  So it's

25  a select few, you know, for people who are at a store and might

UNITED STATES DISTRICT COURT

1    buy one or two.

2    Q.   Okay.  There were -- there was a portion of your deposition

3    transcript that was displayed regarding questions about

4    commenting on Jack Daniel's.  When you were deposed, did you

5    interpret those questions as being directed, or are you

6    negatively commenting on Jack Daniel's?

7    A.   I'm sorry.  Could you repeat the question?

8    Q.   When you were deposed, did you interpret counsel's

9    questions to mean, are you negatively commenting on Jack

10   Daniel's?

11   A.   Yes.

12   Q.   And is it your intention to negatively comment on the Jack

13   Daniel's brand?

14   A.   I would not want to negatively comment on the Jack Daniel's

15   brand, or any brand, for that matter, that we parody.

16   Q.   And again, just to refresh, what comment are you trying to

17   make across the Silly Squeakers line, including Bad Spaniels?

18   A.   Our intent -- I'm sorry, could you -- repeat the question.

19   Q.   What comment are you intending to make with the entire

20   Silly Squeakers line, including the Bad Spaniels?

21   A.   That there should be fun in this world, and that we should

22   have an opportunity to laugh at ourselves and laugh at the

23   things around us.  It's just to have humor at the end of the

24   day, just like when the judge gives us trivia questions.

25   Q.   And do you also intend the message that large, well-known

```
 1    brands shouldn't take themselves so seriously?
 2    A.  Absolutely.
 3    Q.  Okay.  I'm going to put up on the screen Exhibit 174, which
 4    is in evidence.  It's actually my copy of 174.
 5            May I approach, Your Honor?
 6            THE COURT:  You may.
 7            MR. BRAY:  Thank you.
 8    BY MR. BRAY:
 9    Q.  I'm going to focus on a number of the reviews.
10            Do you recognize Exhibit 174 in evidence as reviews
11    that the Bad Spaniels toy has received on Amazon?
12    A.  Yes, I do.
13    Q.  First I'd like you to identify for the Court how the -- how
14    they, on Amazon, the bottle -- what source is listed for the
15    bottle?
16    A.  Silly Squeakers liquor bottle, Bad Spaniels by Silly
17    Squeakers.
18    Q.  Okay.  And with regard to the consumer comment that
19    Mr. Harvey pointed out, did that consumer indicate she found
20    the product hilarious?
21    A.  Absolutely.
22    Q.  And that she loves the Silly Squeakers toy?
23    A.  Yes.
24    Q.  Another comment at the bottom:  Perfect for my dog's 21st
25    birthday.
```

1  A.  Yes.

2  Q.  And then that reviewer felt so positive about the product,

3  she posted on Amazon a picture of her dog's 21st birthday party

4  with a number of dog toys, including some of yours.

5  A.  Correct.

6  Q.  Here is another consumer:  I bought this once because it is

7  hilarious.

8          Is this the type of feedback that you get from

9  consumers at trade shows and when you do -- when you walk

10  stores?

11  A.  This is how almost everyone perceives our product.

12  Q.  And -- okay.

13          Here is another review:  Drunky pants doggo.  This

14  item is absolutely hilarious.

15          Is this another review on Amazon?

16  A.  Yes.

17  Q.  You talked about kind of the second level of the parody,

18  that there's a parody as to the brand and there is a parody as

19  to dog behavior.

20          Did this person comment that she thought it was

21  amusing, that it looks like she's drinking whiskey.  I have

22  trained her to go grab it by saying, go get your booze?

23  A.  Yes.  Still absolutely comical.

24  Q.  And here's one, you know, that Mr. Harvey pointed out that

25  you do have some one star reviews.  But this one starts -- what

STEPHEN SACRA - REDIRECT EXAMINATION

1   did she say about the product?

2   A.  It -- I think I'm looking at the same one.  It says:  Cute

3   idea.  Basically considered disposable.

4   Q.  And there are a number of other pictures that consumers put

5   on the Amazon review page.

6          Is this a picture of a dog with a Bad Spaniels bottle?

7   A.  That is a picture of a very happy customer.

8   Q.  Okay.  Do you find that amusing?

9   A.  Yes.

10  Q.  Do most people that you interact with in your industry find

11  this amusing?

12  A.  This is why people do it, to share moments with their

13  animals.

14          THE COURT:  Do you have an objection?

15          MR. HARVEY:  Your Honor, I have a question as to

16  whether any of these pictures we seeing now are part of the

17  exhibits.

18          THE COURT:  Well, some of these that are on the survey

19  of Amazon was done way after discovery was closed.

20          MR. BRAY:  Pardon me?

21          THE COURT:  A lot of these survey things that you're

22  putting up here, the comments were made long after discovery

23  was closed.

24          MR. BRAY:  I can explain that, Your Honor.

25          THE COURT:  Well, no, you can't because that -- you're

STEPHEN SACRA – REDIRECT EXAMINATION

1   putting them up there as though they were current at the time

2   when all this litigation was going on, and now it's long after

3   that.  And I know these surveys go on and on and on, but

4   there's -- how were they going to be able to test that?

5           MR. BRAY:  Your Honor, this was their exhibit.

6   Mr. Crum emailed it to me the Thursday before trial.  He wanted

7   to get it into evidence and --

8           THE COURT:  Well, he didn't though.

9           MR. BRAY:  So I'm just using their exhibit that was

10  disclosed to me for the first time last Thursday, and these

11  pictures are on it.

12          THE COURT:  Would -- go ahead.

13          MR. CRUM:  Your Honor, yes.  We agreed to the

14  Exhibit 174.  Our concern is that these pictures that we've

15  never seen before, I don't believe those are a part of

16  Exhibit 174.

17          THE COURT:  If you're responding to their late

18  disclosure, I don't know why you disclosed that late anyway.

19  But that's on you.  They can get into it.  But these pictures

20  are out.

21          MR. BRAY:  These pictures are on Exhibit 174, Your

22  Honor.

23          THE COURT:  Are they?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Are they?

1          THE WITNESS:  Just the exploded version so you can see

2      it.

3          MR. CRUM:  This is the first time I've seen the

4      pictures, Your Honor.

5          MR. BRAY:  This is an exhibit that Jack Daniel's might

6      have.

7          MR. CRUM:  Oh, okay.

8          MR. BRAY:  This is an exhibit that Jack Daniel's

9      marked, brought to Court, and put into evidence, and it has the

10     pictures.  This is an exhibit that Jack Daniel's disclosed to

11     me for the first time the Thursday before trial.  I agreed that

12     it could come in.

13          THE COURT:  Is that true?

14          MR. CRUM:  Yes.  Yes, Your Honor.  We agreed.

15     Mr. Bray wanted to submit updated financial information.  We

16     agreed to that.  We wanted to submit this updated printout from

17     amazon.com, and Mr. Gray -- or Mr. Bray agreed to that.  I am

18     now seeing that what they have done is blown up half inch by

19     half inch pictures to make them look very large.  So that was

20     my concern.  I hadn't seen these pictures originally, Your

21     Honor, so --

22          THE COURT:  Well --

23          MR. CRUM:  If these are blow-ups of the exhibit, we

24     withdraw our objection.

25          THE COURT:  They were on your exhibit and you

STEPHEN SACRA – REDIRECT EXAMINATION

1   disclosed them, even though they were minute, they come in.

2   But this is the entanglement you get into when I'm asking about

3   the foundation, about should have -- or what has been disclosed

4   or what's been stipulated, and somebody makes an objection

5   along those lines.  So they're in.

6           MR. BRAY:  Thank you.

7   BY MR. HARVEY:

8   Q.  I just blew them up, Mr. Sacra, so they'd be easier for the

9   Court to see.

10          Is this another example that somebody --

11  A.  Yes.

12  Q.  -- posted on Amazon of their dog enjoying the product?

13  A.  Correct.

14  Q.  And finally, last example, is this another picture of a

15  happy VIP customer?

16  A.  Yes, it is.

17  Q.  And again, is this --

18          THE COURT:  You're not suggesting those aren't posed

19  pictures, are you; that the dog actually walked out and sat

20  down and took his --

21              (Laughter in the courtroom.)

22          THE COURT:  You're not suggesting that, are you,

23  Mr. Bray?

24          MR. BRAY:  I am not.

25          THE COURT:  Okay.

EXAMINATION BY THE COURT

1       MR. BRAY:  I was not with the customer.  I don't know.

2   All I'm saying is this exhibit is in evidence.  The customers

3   felt a desire to post a picture, a posed picture or otherwise,

4   of their dog enjoying the product.

5       THE COURT:  Wait a minute.  You use the term there,

6   saying these are satisfied customers.  The dogs don't go into a

7   store with a credit card and buy them.  Their owners do that.

8   The owners may be satisfied, but this dog is doing a pose --

9   what do you think, I just fell off the turnip truck yesterday?

10      MR. BRAY:  I absolutely do not think you fell off the

11  turnip truck.  I was making a joke, Your Honor.  Apparently it

12  was poorly received.  Of course the dog doesn't buy toys.

13  BY MR. HARVEY:

14  Q.  My only question, Mr. Sacra, is do you receive positive

15  feedback from customers every day regarding the Bad Spaniels

16  toys and the other Silly Squeakers toys?

17  A.  Yes, we do.

18  Q.  Just to sum it up, do dogs buy your toys or do people?

19  A.  People buy our toys for that dogs.

20      MR. BRAY:  That's all I have.  Thank you.

21      THE COURT:  Okay.  I have a couple clarifying

22  questions about the distribution and some other things.

23                      EXAMINATION

24      THE COURT:  But one of the things we talked about,

25  updated financial information, it was asked to you earlier what

EXAMINATION BY THE COURT

```
 1    your revenues were, and you deferred that question to this

 2    particular toy.

 3              What are your gross revenues for your entire business?

 4              THE WITNESS:  Our gross revenue for our entire

 5    business this year should approach 15 million.

 6              THE COURT:  Okay.  So 15 million, and out of that

 7    15 million, approximately $55,000 are for this toy; right?

 8              THE WITNESS:  Correct.

 9              THE COURT:  Okay.  Just so I understand.

10              And then the --

11              THE WITNESS:  That's not gross.  That would be the

12    estimated profit after --

13              THE COURT:  Oh, 15 --

14              THE WITNESS:  Right.  We would -- we would net 55,000.

15              THE COURT:  Right.

16              THE WITNESS:  So I don't have the total number sold.

17    I know that that's on that document.  But we multiply that

18    times the average cost of whatever our wholesale price is.

19              THE COURT:  It's a small amount of your business;

20    correct.

21              THE WITNESS:  It's a small amount.

22              THE COURT:  Now, what do you do -- because you're

23    involved with hundreds of products and you want to bring things

24    out new, you want to update them, you want to -- you know, so

25    when I go to my local store or I don't see the same old Tuffy
```

UNITED STATES DISTRICT COURT

EXAMINATION BY THE COURT

1    brand stuff that I've seen, you know, for six years prior to

2    that; right?

3                THE WITNESS:  Yes.

4                THE COURT:  Some of them you want, but some of them

5    you want to keep refreshing; right?

6                THE WITNESS:  Right.  Stores like to refresh

7    seasonally based on whatever holiday there is, like if there's

8    spring for barbecues, so different toys apply for different

9    seasons.  It's like fashions, almost.

10               THE COURT:  It's like shoes.

11               THE WITNESS:  Right.

12               THE COURT:  Okay.  I was in the footwear business.

13   Just like you, I understand seasons like that.

14               THE WITNESS:  Nice.

15               THE COURT:  The point being, I was in a little

16   different line than you were, but I understand that.  So you

17   have different seasons for shoes, and they update and they

18   refresh and they change their styles.

19               The point I'm trying to make is, what do you do when

20   you get a slow seller that isn't moving?  Because not all of

21   your ideas come out to be number one sellers, do they?  Do

22   they?

23               THE WITNESS:  No, that's --

24               THE COURT:  Okay.

25               THE WITNESS:  That's not the case.

UNITED STATES DISTRICT COURT

EXAMINATION BY THE COURT

1    THE COURT:  Well, that's what I was asking.

2    Now the next question is, what do you do when you get

3    into a seller that's taking up a lot of space for you, or your

4    warehouse, but it's not marketing very well.  When do you

5    decide to pull the plug on that?

6    THE WITNESS:  So when we bring a product in, the first

7    thing we do -- sorry.  When we bring a product in, we only

8    bring in about a thousand units.  So with 3,000 retail stores,

9    we --

10    THE COURT:  You know pretty much what -- you can stock

11    that.

12    THE WITNESS:  We can stock that.  And obviously from

13    the day it comes in, that is a deplenishing amount of product.

14    And to make it look like we have more products, we keep our

15    slow movers.  We'll have something that, you know, that may sit

16    and just become a mover that moves maybe, like, five toys a

17    month.  And something like that, we would say okay, when this

18    is done, we'll just make it go away.  And it will just be

19    absorbed in with our existing customers.  And sometimes we

20    might say, hey, we're having a special for 20 percent off of

21    this line of toys, if you want to buy them.

22    THE COURT:  So it's a close-out.

23    THE WITNESS:  Yeah, kind of.

24    THE COURT:  So you would not be in a situation like

25    some of your -- you're talking about the big kids on the block,

1    such as General Motors or Ford, when they pull a line.

2            THE WITNESS:  No.

3            THE COURT:  You're not that -- you don't do it that

4    dramatically.

5            THE WITNESS:  No, it's a thousand units.  I mean,

6    that's so easy to absorb.

7            THE COURT:  All right.  The next question -- I think

8    that's about it, the question that I have.  But now we're down

9    to the trivia part.

10           THE WITNESS:  I've been worried about this question --

11           THE COURT:  No, no.

12           THE WITNESS:  -- more than any question all day.

13           THE COURT:  I'm not even sure it's a question.  It's

14   just an observation.  Just shows you how small the world is.

15           You probably have learned this.  We share the same

16   first two names.

17           THE WITNESS:  Yes, we do.

18           THE COURT:  Okay.  We're not related, are we?

19           THE WITNESS:  No, we are not.

20           THE COURT:  Okay.  Just to be sure.

21           But I want to ask you a question about some -- since

22   you're an entrepreneur, novelty person, have you ever heard of

23   a fellow by the name of Don Poynter, P-O-Y-N-T-E-R?

24           THE WITNESS:  I have not.

25           THE COURT:  You haven't.  Well, would you like me to

1  read -- and of course I'm going to do it anyway, whether you

2  want me to or not -- a list of some of his inventions that he

3  did, that he made a lot of money on?  Some of these fall into

4  the things that you have talked about with the No. 2 thing up

5  there.

6          First is, it was backboard for wastebaskets.  Those

7  were a hot item at one point.

8          Second thing is, I would say, the other one was a

9  talking toilet seat.

10                 (Laughter in the courtroom.)

11          THE COURT:  The biggest one was what he stumped the

12  panel on What's My Line, where he won a whopping $25 because he

13  stumped the panel on his product that he developed, which was a

14  big seller.

15          Anybody want to take a guess on that?

16          It's sort of up the alley over here on the Jack

17  Daniel's side.

18          All right.

19          MR. BRAY:  Your Honor, I think Mrs. Sacra had a guess.

20          WENDY SACRA:  Pet rock?

21          THE COURT:  No.  Whiskey-flavored toothpaste.  And he

22  had three different flavors.

23          Also on Jack Parr's TV show, he introduced another

24  item, the Jane Mansfield Hot Water Bottle.

25          THE WITNESS:  Gee.

1          THE COURT:  But the biggest one -- the biggest one is

2     something that hit the movies just like things have -- it's The

3     Thing, the coin bank where the coin is placed in the slot and

4     the box shook and wiggled, and then a hand slowly reached out

5     and grabbed the coin.  And, of course, it was on the Munsters,

6     the Addams Family, things like that.  Plus the other thing was

7     the -- he invented the little black box, when you turn it on,

8     it vibrated, a little hand came out and took it, and everybody

9     said this would be -- it would never go anywhere.  In one

10    month, it became the hottest selling item in the United States.

11         He's still alive.  I happen to know this gentleman who

12    lived up the street from us, and he was also a drum major of

13    some note.  He would pedal the unicycle down the street,

14    twirling his batons, and he graduated to machetes, he graduated

15    to flaming batons, and things like that.  And he was quite the

16    entrepreneur.  He's still alive and he's about 85 or 86 years

17    old, and doing quite well.

18         He also invented a thing called -- it was sort of like

19    a cardboard version of Lincoln Logs that you could get for kids

20    and build things in your house, they have a little fort and

21    things like that.  So, that was the trivia question.  I just

22    wanted to see if you maybe crossed paths or knew him.

23         THE WITNESS:  It's an impressive resumé.

24         THE COURT:  Yeah.  So there you go.

25         MR. HARVEY:  Your Honor --

 1              THE COURT:  That ends the day.  You can --

 2              MR. HARVEY:  Your Honor, his name was Dan or Dan?

 3              THE COURT:  Don Poynter, D-O-N, P-O-Y-N-T-E-R.

 4         If you look him up, he's kind of a very interesting

 5    person, like most entrepreneurs.  They have a bend for these

 6    sort of things.

 7              You may step down and return to counsel table, if you

 8    wish.

 9              Thank you very much.

10              THE WITNESS:  What do you want me to do with the

11    papers?

12              THE COURT:  You can leave them there.  We'll pick them

13    up.

14         The next thing is, let's go back to where we go

15    tomorrow.  Tomorrow is nine o'clock, remember, with the

16    plaintiff's expert; correct?

17              MR. BRAY:  Correct.

18              THE COURT:  He will be here, ready to go?

19              MR. BRAY:  He will be here.  This is a live expert,

20    yes.

21              THE COURT:  Okay.  And then we'll probably -- I'd like

22    to get his testimony down approximately at 11:30-ish, somewhere

23    in there, if possible.  If not, we'll spill over into the

24    afternoon.  But my goal is if we can -- he has limited

25    information by which he can testify to because he didn't

1    testify broadly, it's a narrower realm of things.  We can get

2    that done.

3         We can probably come back about 1:30 in the afternoon

4    for closing arguments.  And I don't know how long you think

5    this is going to take, but what are your estimates; an hour;

6    fifteen minutes?

7         MR. BRAY:  I've done bench trials where the parties

8    have not done closings, so I would say it's at your discretion

9    in terms of how much you want to hear from us.  It's been

10    pretty extensively briefed, and you've read the cases.

11         THE COURT:  That's the point.  And so -- but I would

12    like your thoughts.  I'm not going to preclude you.  I would

13    like your thoughts, but I don't want to carry it on too long --

14         MR. HARVEY:  Your Honor, I think --

15         THE COURT:  -- otherwise it's repetitious.

16         MR. HARVEY:  We would estimate 45 minutes to an hour.

17         THE COURT:  I was thinking about an hour each.  About.

18    More or less.  Not too much more, and you don't have to go

19    less, whatever you want.

20         So that's what I envision for tomorrow, if we can meet

21    those time frames.

22         Do you think we can do that?

23         MR. BRAY:  Absolutely.

24         MR. HARVEY:  Yes, Your Honor.

25         THE COURT:  Okay.  All right.  Well, let's do that.

1          And I do appreciate everyone's attention to all these

2     matters today and through the course of the trial.  We'll wind

3     it up tomorrow morning, and we'll then take it under advisement

4     and we will give you something in writing.

5          Just so you know, if you've been in litigation

6     before -- I know the parties have -- in a case like this that

7     has all these overlapping considerations and complex case law

8     and things like that, the judge just doesn't ventilate off the

9     top of his head.  We will give you written findings of fact and

10     conclusions of law to the best of our ability, and try and

11     ferret out all the claims in this case.

12          And then the party that does not prevail can take it

13     to the Ninth Circuit Court of Appeals, and then they'll decide

14     what it is.  And you may make case law and, who knows, it may

15     go to the Supreme Court of the United States.  You never know.

16     They're taking a lot more patent and trademark cases these

17     days.

18          But -- and I -- it never was successful, but ever

19     since I inherited this case, I've always felt that the parties

20     could have gotten together to try and resolve their

21     differences.  It didn't work out for a lot of reasons, and

22     that's not my problem.  But I always thought that would have

23     been to the benefit of everyone's party, especially when it

24     comes to -- and I'm not saying they're not worth it -- but when

25     it comes to writing those checks for all the legal fees.  So --

1    they're worth it.  They're here to represent you.  But you're

2    also businesspeople and you're running businesses, and you've

3    got a lot of things on your plate.  I mean, we heard a lot of

4    it today, we've heard some from Jack Daniel's, and that is the

5    ever changing market conditions, the ever changing global

6    conditions, how fast things turn around these days, and all of

7    a sudden you're faced with an issue you never even thought

8    about.  It just pops up in your venue.  That's difficult.

9          And each one of you has testified that you have people

10   that go on online every day trying to preserve your marks

11   against other intruders.  And that's no small thing you have to

12   contend with.  Both of you have brought litigation to stop what

13   you believe to be an intrusion into your well-preserved marks.

14         So -- and so with that in mind, we'll stand at recess

15   until tomorrow morning where we'll wind up this case, and there

16   we go.

17         Thank you very much.  We'll stand at recess.

18         I've got some things to do up here, so go ahead,

19   please.

20         MR. BRAY:  Thank you, Your Honor.

21             (Proceedings in recess at 3:58 p.m.)

22

23

24

25

1                    <u>C E R T I F I C A T E</u>

2

3          I, CHARLOTTE A. POWERS, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 4th day of October,

13   2017.

14

15                              s/Charlotte A. Powers

16                        Charlotte A. Powers, RMR, FCRR

17

18

19

20

21

22

23

24

25


                    **UNITED STATES DISTRICT COURT**