UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| VIP Products, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CV-14-02057-PHX-SMM |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 5, 2017 |
| Jack Daniel's Properties, Inc.,) | 1:38 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | (AMENDED AS TO PAGE 113) |
| And Related Counterclaims. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL — DAY 4

VOLUME B

(Pages 101 — 162)

Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                         A P P E A R A N C E S

2    For the Plaintiff/Counterdefendant:

3              DICKINSON WRIGHT PLLC
               By:  David Geoffrey Bray, Esq.
4                   David Nunzio Ferrucci, Esq.
               1850 N. Central Ave., Ste. 1400
5              Phoenix, AZ  85004

6    For the Defendants/Counterclaimants:

7              HARVEY & COMPANY
               By: Douglas Peter Harvey, Esq.
8              4 Embarcadero Ctr., 14th Fl.
               San Francisco, CA  94111
9
               QUARLES & BRADY LLP- Phoenix, AZ
10             By: Isaac Scott Crum, Esq.
               2 N. Central Ave.
11             Phoenix, AZ  85004-2391

12   Also present:  David Gooder and Justin Welch, Senior Trademark
     Counsel.

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

INDEX

SUMMARY OF COURT PROCEEDINGS                          PAGE:

Court resumes                                         104

Closing statement by Mr. Harvey                       110

Closing statement by Mr. Bray                         125

Recess taken                                          151

Rebuttal closing statement by Mr. Harvey              151

Statement by Mr. Bray                                 155

Court adjourns                                        161

INDEX OF WITNESSES

WITNESSES FOR THE        Rebuttal
DEFENDANT:

Gerald L. Ford              4
(BY DEPOSITION)

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Okay.  I think you were going to,
 3     Mr. Harvey, have a slight rebuttal; is that correct?
 4              MR. HARVEY:  Those were my words, Your Honor.
 5              THE COURT:  Okay.  Well, let's go ahead then.
 6              MR. HARVEY:  Yes, Your Honor.  Thank you.
 7              Just very briefly would like to run through the
 8     highlights in the deposition of Dr. Ford, and this is by way of
 9     rebuttal to the testimony and the report of Dr. Nowlis.
10              What we submitted to the Court, as the Court is aware,
11     is -- the reports of both gentlemen have been stipulated into
12     evidence, and the cross-examination of them in their
13     depositions have been marked and submitted.
14              What I am doing, or hope to do in the next few
15     minutes, is simply flag for the Court, highlight for the Court,
16     if I may, those excerpts that I think are the most notable in
17     what Dr. Ford said when he was deposed.
18              The first one is at pages 18 and 19 of the transcript,
19     and we have tried to flag these for the Court.  The blue kind
20     of takes it out so it is difficult to see.
21              Can we -- there we go.  Even that is not -- that makes
22     it a little hard to read.  I was hoping to be able to read them
23     to the Court.
24              In essence, this section talks about the charge that
25     Dr. Ford was given and how he responded to it, and the only
```

| | |
|---|---|
| 1 | important thing to take away from these pages is that he was |
| 2 | asked to do a survey -- thank you.  That's much better -- |
| 3 | designed to measure the degree, if any, to which the |
| 4 | plaintiff's Bad Spaniels dog toy is likely to cause confusion. |
| 5 | And it is on three levels here, Your Honor, as the Court |
| 6 | continues. |
| 7 | Confusion as to source, authorization, or approval, |
| 8 | approval of or business affiliation or business connection with |
| 9 | Jack Daniel's.  But it is really three levels.  It is one |
| 10 | source, meaning did they make it or put it out?  Two, |
| 11 | authorization, did they have permission, VIP, to use it?  And |
| 12 | three, were they somehow affiliated with or connected with Jack |
| 13 | Daniel's? |
| 14 | Now, the reason this is important is, I believe, this |
| 15 | is my view, that there's confusion on the part of Dr. Nowlis in |
| 16 | terms of his assessment of what is -- what confusion meant |
| 17 | under the Lanham Act. |
| 18 | He is reading it as confusion as to source, but |
| 19 | leaving out the fact that some people were confused as to the |
| 20 | possibility of a license or authorization. |
| 21 | And he attacks Dr. Ford's coding of the respondents on |
| 22 | the basis that, what they were was confused about whether VIP |
| 23 | needed to get a license, and that somehow that's inadmissible |
| 24 | as confusion or not a good evidence of confusion. |
| 25 | But the language in the Lanham Act itself at Section |

1    32 and section 43(a) speaks to these three levels of confusion.

2    And that's what was Dr. Ford's charge, and that's what he

3    studied.

4         The second note on the transcript that I thought was

5    important is on page 33, where he talks about the Eveready

6    test.  And the Court has heard plenty about this, but he

7    said -- the questions that were asked in the VIP case were

8    standard, what were oftentimes referred to as Eveready

9    questions, which Professor Swan, that's Jerry Swan, describes

10   as the gold standard.  So that's the methodology.

11        Next reference at 34 and 35, he talks about -- some

12   more about the Eveready and where it came from, and it was, of

13   course, a case involving Union Carbide, where some people had

14   put out Eveready light bulbs, and those questions -- he is

15   citing from memory -- people were shown the Eveready light

16   bulbs and they were asked, who do you believe puts out these

17   light bulbs?  And it was a very small response that identified

18   Union Carbide, or the people that make the Eveready battery.

19        If we could keep paging up a bit?

20        But then the next question was, what other product or

21   products, if any, were made or put out by that company?  Now,

22   that's affiliation confusion, and that's when you got the

23   biggest percentage.  55 percent of the respondents said,

24   batteries.  So it shows that it's not just source, but

25   affiliation that's tested.  Eveready itself, which is the gold

1    standard, tested for that, and that's what we did in this --

2    that's what Jerry Ford did in this case.

3         One of the criticisms that Dr. Nowlis had at page 86

4    and page 87, that -- was that you couldn't see the -- he didn't

5    replicate -- I think the reference is replicate market

6    conditions, because the product was simply a photograph.  You

7    couldn't turn it in your hand and look at it, see that it had a

8    squeaker on it and so forth.

9         And he indicates that he didn't think this was the

10   case here -- oh, sorry, this is just the -- this is just

11   whether an Internet study was okay rather than a -- what's

12   called a mall intercept.  He didn't feel that that was

13   inappropriate.

14        And then I think we can dispense with -- there are

15   numerous references in here, and I will just try to summarize

16   it with one, and that is, this notion that the parody defense

17   shields infringement.

18        And Dr. Ford repeatedly says, and I'll just give you

19   the page numbers, but the difference in Chewy Vuiton, which

20   gets referenced here a lot, and our case, is that in Chewy

21   Vuiton there was not evidence of confusion.

22        Evidence of confusion makes the parody defense go away

23   and not be applicable.  Pages 108 to 110, and 100 to 103.  We

24   needn't call these up, I am just going to list them for the

25   Court to save a bit of time.

1          Now, at the bottom of 110, may we please see that

2    slide?  And have you enlarge the last -- please.  That's great.

3          He is asked -- again, I am having trouble.  Does it go

4    to the fact as to whether it is a parody or not?  He is asked

5    about his survey.  He said, it goes to whether or not you can

6    use parody as a defense.  At least according to McCarthy and

7    according to the decision in the "Buttwiper" case, that defense

8    fails, it's over.  I mean, he says, it's not a close call.  I

9    mean, we are not talking about four percent or five percent or

10   six percent, we are talking about almost 30 percent of the

11   population.  That's -- he is referencing the number of people

12   in his study that were confused.  It is not a close call.

13         I discovered, and this was just a piece of trivia in a

14   way, Your Honor.  I know Your Honor likes trivia, that Jerry

15   Ford's first case was Sleekcraft, and I did not know that, but

16   he makes that reference in page 105.

17         Now finally, we'll get in the last couple of

18   references here to his critique of how Stephen Nowlis

19   approached his survey, approached Dr. Ford's survey, and what

20   his critique was.

21         So page 237, please.  I am going to put my glasses

22   on.

23         All right.  So Mr. Bray asked him, I'm trying to drill

24   down into what is with regard to Dr. Nowlis' rebuttal opinion

25   regarding the Ford survey.  It does not properly test

1  likelihood of confusion.  In your opinion, is this a reasonable

2  disagreement amongst experts who can have different views on

3  how surveys are conducted, or is Dr. Nowlis completely in left

4  field?  Answer:  I think he is completely in left field.

5          What's the basis for your comment?

6          Well, that first he seems to focus on likelihood of

7  confusion as to source.

8          Now -- this is the point, again, that we were just

9  making.  It is not just source, it is affiliation, it is

10 association, it is sponsorship.  Dr. Ford goes on, it is almost

11 as if he's never read the Lanham Act.  He kind of ignores

12 confusion as to affiliation or authorization.

13         The other is that he may be under the misapprehension

14 that we made up the display that was shown people to give them

15 a reference -- if you could continue, please -- for what they

16 could see in the store.  And we did not.  It's the truth.  It's

17 an actual photograph from the pet store.

18         So that's another point about replicating market

19 conditions.  It wasn't a made-up picture, it was an actual pet

20 store.  They simply substituted the control stimulus in the

21 picture for the real thing.

22         And then finally, pages 238 and 39, we will call the

23 Judge's attention to those pages.  The second line in paragraph

24 25 he says, however, Bad Spaniels dog toy is a parody of Jack

25 Daniel's -- this is Dr. Nowlis speaking -- and Dr. Ford's

| | |
|---|---|
| 1 | results need to be analyzed with this in mind.  And Dr. Ford |
| 2 | says, I think he's simply wrong.  I'd probably give him a |
| 3 | chapter out of McCarthy on parody. |
| 4 | An that's all we have by way of rebuttal, Your Honor, |
| 5 | and thank you. |
| 6 | THE COURT:  Thank you. |
| 7 | THE COURT:  Anything else, Mr. Bray? |
| 8 | MR. BRAY:  No, Your Honor. |
| 9 | THE COURT:  Okay.  Thank you all very much.  And now |
| 10 | we will move to to final arguments if everyone is ready. |
| 11 | Are you ready? |
| 12 | MR. HARVEY:  Your Honor, would you like us to go |
| 13 | first? |
| 14 | THE COURT:  Yes, since you were leading off. |
| 15 | MR. HARVEY:  Indeed. |
| 16 | THE COURT:  Since this is baseball season, we will |
| 17 | stick with you leading off in final arguments. |
| 18 | MR. HARVEY:  Thank you.  We do have a couple of bound |
| 19 | copies of our demonstratives for this.  If we might hand them |
| 20 | up and approach, Your Honor? |
| 21 | THE COURT:  Yes, you may. |
| 22 | MR. HARVEY:  Your Honor, I would like to open this by |
| 23 | saying, we sincerely appreciate the attention and courtesies |
| 24 | that we've been given for this trial. |
| 25 | So on behalf of VIP (sic) -- sorry, Jack Daniel's |

1    Properties, may it please the Court.

2         We started out on Monday pointing out to the Court

3    that there were two very straightforward issues that remained

4    in this case, after all of the kerfuffle of cross-motions and

5    so forth for summary judgment, and they are infringement and

6    tarnishment.

7         As to infringement, and I am back to harping on these

8    three levels, our burden, as the party with the burden of

9    proof, is to establish to the Court's satisfaction that we have

10   shown likelihood of confusion on the part of consumers as to

11   whether Jack Daniel's makes or puts out the toy, authorizes or

12   approves VIP's making of the toy, or that VIP is affiliated or

13   associated with Jack Daniels.

14        Any of those constitutes confusion, and as we've seen,

15   Dr. Ford's survey shows that nearly 29 percent of the relevant

16   population is in the confused category.

17        Now, we also spoke to the Court, both sides have,

18   about the Sleekcraft factors.  And much as I like quoting Judge

19   Kozinski on bean counting, and much as I think it's very true

20   that often just a subset of the factors tips the balance in

21   favor of a finding of likely confusion, as is true in this

22   case, I'm going to count some beans with the Court, and with

23   the Court's permission now, because I think all of these, read

24   properly, support Jack Daniel's case.

25        Let's start with factor one, the strength of the mark.

1    There's really no doubt, and I don't think even VIP is going to

2    contest this.  They don't -- some of their references in their

3    own findings of fact and conclusions of law admit strength.

4         And why is that?  Well, it's the largest selling

5    American whiskey brand in the world.  Interbrand rates it at

6    value, I think, number 82 in all brands worldwide, and it is

7    certainly the most valuable spirits brand in the world.

8         Over this period of time shown on the slide, over 75

9    million cases were sold.  We heard Mr. Epps talk about that and

10    the very substantial revenues generated from those sales.  All

11    of that, and all that selling and all that consumption, brings

12    that bottle and trade dress to the attention of consumers every

13    day, and it is part of the reason this brand is so strong.

14         Looking at Document 209, which is the findings of fact

15    submitted by VIP, at paragraph 30, there's a concession

16    regarding strength.  This is buttressed by all of the print,

17    TV, radio, all of the advertising that we saw during Mr. Epps's

18    testimony.  And all this establishes that the U.S. public has a

19    very high brand awareness.

20         Moving to factor two -- so factor one, I don't think

21    there's a lot of debate, nor should there be.

22         Factor two, we've had some interesting debates during

23    the trial.  There's a lot of dissecting and deconstructing

24    that's been happening in front of Your Honor, but that's not

25    the test.

1          The test is, what is the overall impression that is

2     made by the product?  And this is very well established in the

3     law.

4          And we have a very great amount of similarity here

5     because it's -- there's no surprise, it was intentional.  We

6     heard the testimony of Elle Phillips.  Mr. Sacra confirmed it.

7     The whole idea was to make something that looked like the Jack

8     Daniel's product, trade dress and trademarks.

9          So moving away for a second to the anti-dissection

10    rule.  We are talking about the overall picture, the entirety,

11    the Gestalt, the tout ensemble, whatever you want to call it.

12    It's whole thing that really matters, because that's what the

13    consumer encounters.

14          But let's do some dissection, because they were trying

15    to do that during the trial, and you saw that one exhibit with

16    some alleged 50 differences.  There might have been tiny

17    differences that they were able to find, but when you look at

18    what the elements claimed in the trade dress claim that Jack

19    Daniel's is making, paragraph six of the counterclaim spells

20    out each one of these elements.

21          The black cap, the neck wrap closure, the ribbed neck,

22    square bottle, black front label -- all of these things,

23    filigree, Old No. 7, Tennessee Sour Mash Whiskey with the word

24    "Tennessee" depicted in script.

25          Okay.  That's the Jack Daniel's trade dress that we

1    are suing on.  What about the Jack Daniel's -- sorry, the VIP

2    product?  Well, the black cap.  We have a black neck wrap

3    closure with white printing, a square bottle that replicates

4    the ribbed neck, and the shoulders are the same.  The black

5    front label.

6            All of these elements, with the exception of the name

7    from Jack Daniel's to Bad Spaniels, from Old No. 7 to Old No.

8    2, and instead of Tennessee whiskey, we have Tennessee carpet.

9    Everything else is copied.

10           Now, I know we heard Mr. Sacra repeatedly say that

11   what he does in his business is he just takes a few elements.

12   Well, I submit that what he did here was a whole lot more than

13   a few elements, and, indeed, he took the heart and soul of this

14   product, and he did it intentionally.

15           Watching this graphic, Your Honor, we can see how, if

16   we morph from the Jack Daniel's product into the competitive --

17   sorry, the VIP product -- and if I could call the Court's

18   attention to the screen for just one second -- you can see just

19   how close this is.  Back.  Again.

20           There's no question, I think, I don't think anyone

21   truly disagrees with it, that the marks are highly similar --

22   and intentionally so.

23           Now, on proximity or relatedness of the goods.

24   There's been a lot of testimony about, well, we are a whiskey

25   company and they are a dog toy company and how could anybody

1    be -- possibly be confused between these?  Well, that's not the

2    whole story.

3            There are two elements that go to proximity.  One is

4    that the fact that we are a very well-known indeed famous mark,

5    entitles us to a broad spectrum of protection, broader than

6    most trademarks, because people will assume there's some

7    connection.

8            Why?  Because famous marks often engage in licensing,

9    and guess what, we have done that, done that since the '80s,

10   and these various supplemental products, as the Court called

11   them, now include dog-related products.  Leashes, collars, dog

12   houses, and beds.

13           There were debates here about fence posts and golden

14   lawnmowers, but we get the idea.  There's a perimeter around

15   the core brand, as David Gooder testified, that move out the

16   fence post and protect the mark.

17           Now, what about evidence of actual confusion?  Well, I

18   start with the proposition, as the Court well knows, in these

19   cases, actual confusion is not required, and often it is

20   difficult to find it.

21           Well, why?  Either because a product is very thinly

22   sold, or because, as I think maybe Oliver Wendell Holmes said

23   about conspiracies, these things don't often shout themselves

24   from the rooftops.  People are confused.  They are a little bit

25   embarrassed about admitting that, they don't go back.  And they

1    just bought a cheap dog toy, are they going to go back and

2    complain?  Not necessarily.

3          So there's a reason why the policy underlying the law

4    says, you don't have to prove actual confusion for there to be

5    likely confusion.  And that's very well established.

6    Sleekcraft itself says that.

7          Here we have some indicia, I would call them, of

8    confusion, or perhaps kinds of confusion that are contributory

9    in nature because a retailer has been given a toy that he can

10   pawn off as a Jack Daniel's style toy, or in parenthesis, a

11   consumer describes it as a Jack Daniel's dog toy.

12         Whatever.  We know what's going on, and people will

13   get perhaps the false impression that there's a connection.

14         So we have some indicia, but much more typical in

15   these cases are well-designed surveyed.  And how do you

16   establish it?  Well, that kind of evidence is surrogate

17   evidence, well accepted by the courts, has been for many years

18   of actual confusion.

19         And we have that here from a person that I would

20   characterize and did characterize as the dean of the survey

21   profession, Jerry Ford.  Carefully studied it, and we have an

22   answer to the question, who puts out the product?  Or the other

23   follow-up questions.  The kinds of answers that you get, 29

24   percent of the people said, Jack Daniel's.

25         And why do you say that?  All of these different

1    reasons point to exactly why we are bringing the lawsuit and

2    why we are suing.  Because it's the entirety of the bottle, and

3    it's all the, excuse me, elements of the trade dress, which

4    constitute the registered trademarks of Jack Daniel's that

5    people are thinking that Bad Spaniels is made or put out by or

6    in affiliation with, licensed by, Jack Daniel's.

7              Again, my favorite, "It looks like the packaging from

8    the Jack Daniel's sauces."  That nails it, because that really

9    says it looks like a licensed Jack Daniel's product.

10             Now, Dr. Nowlis comes on and criticizes Dr. Ford.  We

11   have submitted our references in the transcript and would call

12   the Court's attention to at least these of those references.

13             Dr. Nowlis did not do his own survey.  He didn't

14   change the control stimulus of which he was so critical.  What

15   would he change?  How would you make the control stimulus

16   better?  We don't know because he didn't know himself and

17   didn't tell us in the deposition.

18             What effect would those changes have?  Dr. Nowlis

19   didn't know because he said he would be speculating.  He didn't

20   recode any of the responses that he was critical of.  Remember,

21   his criticism was, well, Dr. Ford should have taken into

22   account that this was a parody product and so people who said

23   they thought there needed to be a license, those were not

24   confused people.  He would recode them.

25             But he didn't say how he would recode them, nor does

1    he count out how many he would have recoded.  So we can't tell,

2    was it only 26 percent, or 25 percent?  Whatever it was, it was

3    an enormous number of confused people on a percentages basis.

4         And the big one is he didn't do his own rebuttal

5    survey.  He could easily have done that.  He has done it in

6    other cases.  And when he was criticized himself by someone who

7    didn't do a survey, he turned the tables and said, the expert's

8    opinions about what consumers would do are simply speculation,

9    as he has not supported these conjectures with empirical tests

10   or research.

11        And so at page 55 of the transcript, he is aiming his

12   gun at another expert who didn't do a survey, when that expert

13   was being critical of him.  But that's what he's doing here.

14        And obviously he admits that a survey on the Internet

15   was proper.  I am not sure that he understands that the control

16   necessarily had to eliminate the active ingredients.  We will

17   talk a little bit about that, a little more about that.

18        Because there's so much focus, Your Honor, on the

19   control.  We have seen so many different square and round and

20   so forth liquor bottles up there.  But the issue is, when

21   designing a control, as Dr. Ford said and has said to me on

22   many occasions, you got to take out the active ingredients --

23        THE COURT:  What he said here in the courtroom, not

24   what he's told you on many occasions.

25        MR. HARVEY:  I'm sorry.  You are absolutely right, but

1    he also happens to say it in his deposition, and we flagged it

2    for the Court.

3            THE COURT:  Then refer to the deposition, not a

4    sidebar conversation.

5            MR. HARVEY:  I appreciate that.  I appreciate the

6    admonition.  You are absolutely right, Your Honor.

7            The active ingredients are what?  The active

8    ingredients that need to be eliminated are the things that the

9    trade dress consist of.  So they complain vehemently that we

10   didn't have a square bottle in the control.  Well, no, we

11   didn't.  Why?  Because the square bottle is part of our trade

12   dress, and it's claimed as such in paragraph six of our

13   counterclaim.  Square bottle.

14           And all of the other elements that we took out in the

15   control, we had to take out, otherwise you would get false

16   confusion.  You would get noise.  And that's what the control

17   is designed to eliminate.

18           And I have said before, I will say again, the coding

19   was proper because confusion as to affiliation or sponsorship

20   is actionable confusion under the Lanham Act.

21           So now, of course, intent.  They essentially concede

22   on intent.  We know what the testimony is.  We know how Bad

23   Spaniels was conceived by Mr. Sacra, sitting in a bar thinking

24   about a name, gives the name to Elle Phillips, who rushes to

25   her liquor cabinet and pulls out a bottle of Jack Daniel's and

UNITED STATES DISTRICT COURT

1  begins designing.

2          She comes up with a design that looks a whole lot like

3  a Jack Daniel's bottle, sends it off to Mr. Sacra, who sends

4  it, together with a picture of a Jack Daniel's bottle, to his

5  designer Mr. Bai, and when he gets back the finished product,

6  he says, this is perfect.  So it was intentional.  There's no

7  real debate about it, and we have intent on the part of VIP.

8          The marketing channels also converge.  There's no

9  debate or contest that the products are sold on the Internet

10  and sold through officially licensed Jack Daniel's stores, as

11  well as otherwise, including these specific trial exhibits that

12  were introduced.

13          How about consumer care?  Well, I think we do have a

14  debate here, and the Court will obviously be the judge.

15  Mr. Sacra says that his consumers read every line on the back

16  and read every disclaimer that's on the product and show a lot

17  of diligence in buying products for their dogs.

18          But in fact, the law says low prices imply

19  correspondingly low consumer care.  That's the Fifty-Six Hope

20  Road Music case cited in our findings of fact, and that's

21  logical.  We are not buying Lamborghinis here.  We are buying a

22  15 -- a 12 to 15-dollar dog toy, and while it is cute, nobody

23  pays a whole lot of attention, especially if the dog is with

24  you and wants to pull it off the rack.  It's disposable as

25  well.

1          And then factor 8, the issue of product line

2    expansion.  The testimony has shown that we don't even need to

3    ask that.  We are already in there.  We talked about the

4    complementary, the supplemental products that we are offering,

5    and we are already in dog products that are licensed by Jack

6    Daniel's.

7          A lot of testimony about, well, they're only sold in

8    the Lynchburg General Store.  Well, the testimony was that they

9    are almost 300,000 visitors to that store every year, and a lot

10   of people are exposed to that product.

11         Okay.  That's, to me, to us, takes care of

12   infringement.  We counted the beans, and we believe that all of

13   them favor a finding of likelihood of confusion and therefore

14   infringement.

15         Turning to tarnishment, Your Honor.  Here we have to

16   prove two things.  Are the Jack Daniel's brand and packaging

17   famous?  That is, again, I would submit, virtually conceded by

18   them.  It is a very well-known brand.  160 years of marketing.

19   Been around for a long time, and people do widely recognize it

20   across the consuming public, which is the Lanham Act test for

21   what is fame.

22         As to tarnishment, the question is whether the sale of

23   the dog toy and its availability on the market is likely -- in

24   any way likely to diminish Jack Daniel's reputation to tarnish

25   the reputation of a brand that has a very good reputation.  We

1      would submit that it does.

2              Our evidence is essentially that of Mr. Simonson, and

3      I will just review quickly for the Court what he concluded.

4      Obviously the bring to mind -- remember he said there are two

5      elements to show tarnishment.  One, you have to say that the

6      offending product brings to mind the other product.  Well,

7      that's conceded.  Even the testimony of Mr. Silverman confirmed

8      that it brings to mind.

9              And so you turn to the question then of whether

10     there's likelihood of tarnishment.  Here the product introduces

11     another mental association into the Jack Daniel's memory

12     network.

13             Again, that's not rocket science, but it's science,

14     and it's understandably disturbing to Jack Daniel's.  It is not

15     rocket science, but in fact it is common sense, as even

16     Mr. Silverman admits.

17             It invokes defecation, and when you put that together

18     with a consumable product, much as Mr. Silverman might protest,

19     that's pretty gross.  That's pretty disgusting.  And that's the

20     sort of thing that, with a mental association -- I think one of

21     the focus group folks said he would get a brand association

22     that would be negative.  Well, that's exactly what Dr. Simonson

23     is talking about.

24             And this is from his report, but this was his

25     testimony when he was here:  An association between a famous

1  whiskey brand and a dog's number two is likely, consciously or

2  unconsciously, to diminish consumers' attraction to and

3  interest in Jack Daniel's.

4          As Mr. Silverman said, if something is disgusting,

5  people don't want to buy it, and that is exactly our belief.

6  We agree with him.

7          Why is his rebuttal or attempted rebuttal flawed?

8  Well, there are many reasons.  I would say the main ones are

9  here.  He agrees that his views are not based on any science.

10  He bases them on his experience in advertising.

11          He didn't read any of Dr. Simonson's research-based

12  authorities.  As the Court noted, pulling out footnote number

13  12, he hadn't read those.  He didn't read any of them.  He

14  didn't have any comment on them.

15          He acknowledges that his focus groups are not

16  projectable science.  They were 19 folks out there in West LA

17  sitting in four different groups being led by Jeff Hirsch, who

18  was saying to them, this is about spoof products, this is about

19  jokes, it is just a joke.  He opens the conversation with -- to

20  encourage them to put that into one pile or another.

21          And even being carefully led like they were down the

22  joke channel, at least two of them, as we saw in one quick

23  segment said, yeah, I don't know, it's kind of in between.  It

24  might be insulting.  And that's the kind of impact that we talk

25  about with tarnishment.

1          Dilution and tarnishment have been referred to as a

2     death by 1,000 cuts.  You can't tolerate small incursions

3     because pretty soon your brand will not be as famous and as

4     well regarded.

5          And at least one of the focus group participants, I

6     think Mr. Silverman referred to him as Mr. Squeaky, as you

7     could see, was upset.  He found it very annoying.  And while

8     they tried to carefully say, well, it's just annoying by the

9     squeak, it's not defecation.  Nonetheless, annoying, one

10    doesn't buy annoying products, and indeed that particular

11    individual said he didn't even want to take a free one home

12    with him, thank you.  So that would have a negative effect in

13    his mental association.  I believe he was the fellow who said,

14    I have a brand association.  Makes he want to buy a different

15    whiskey brand.

16         And then finally Mr. Silverman admits that the model

17    on which Dr. Simonson's opinion was based the Associative

18    Network Model, is something he knows about, he's heard about,

19    that he believes it's simply common sense.  We think this case

20    is common sense, Your Honor.

21         And with that, we rest, and thank you very much.

22         THE COURT:  Thank you.  Mr. Bray, do you want to go

23    now.  Wasn't sure whether you or your co-counsel was going to

24    go.

25         MR. BRAY:  It will be me.

1          THE COURT:  Okay.  Thank you.

2          MR. BRAY:  Thank you, Your Honor.  And I too want to

3    thank the Court for its patience and time and its careful

4    consideration of the issues.

5          Some cases have to be tried.  This is one of them.

6    The parties -- maybe this is an unusual case.  Maybe this is a

7    hopeful case.  The parties have no personal animosity towards

8    each other.

9          JDPI, Jack Daniel's, has no dislike of my client that

10   I am aware of.  Mr. Sacra has no dislike with regard to Jack

11   Daniel's or any of its representatives.  And in terms of

12   counsel, Peter Harvey has been a joy to work with.

13         Trial can be stressful.  Trial prep can be stressful.

14   And when you work with professional counsel, it makes it

15   easier.  But having said that, this is a case that needs to be

16   decided.

17         I want to start with the likelihood of confusion.

18   Your Honor noted that Judge Kozinski in the DreamWorks case

19   said we don't count beans.

20         On the other hand, in the Jada Toys/Mattel case, ten

21   years later the Ninth Circuit stated that all eight Sleekcraft

22   factors should be considered, and I am not going to so arrogant

23   as to suggest to you, Your Honor, which of the eight factors

24   are more important than other eight factors in this case.

25         I am going to talk about all of them, and it's VIP's

1    contention that each of the eight factors, regardless of how

2    you weigh their relative importance in this case, favor

3    non-infringement or not likelihood of confusion.

4              I want to start off with evidence of actual confusion,

5    which is obviously an important Sleekcraft factor.

6              This is a case where VIP Products has been selling its

7    Bad Spaniels toy uninterrupted for three and a half years.

8    55,000 sales.  They are not only the sales of the VIP -- and

9    after all those sales, over three and a half years, there is no

10   evidence that no real world customer has been confused as a

11   result of the toy.

12             There's no evidence of a real world customer being

13   confused by the toy at trial, and there's a stipulated fact

14   that was entered into the part -- into the record as part of

15   the parties' joint pretrial that Jack Daniel's didn't have any

16   evidence of actual consumers being confused.

17             And one thing Mr. Gooder said, the trademark counsel,

18   when he was on the stand was, he used the analogy of the ranch

19   house and the posts and keeping it fenced.

20             I kind of had a different metaphor in mind after

21   hearing him testify, and that's kind of like a calvary fort in

22   the old west and the wooden fence around it.  And the way I

23   view it is, there's Jack Daniel's legal department in Northern

24   California, with its lawyers and the 10, 20 people that work

25   there.  And then the licensing people and the brand managers in

1    Louisville that constantly monitor for infringement.  They are

2    the soldiers manning the outside of the fort, and they are

3    looking -- for three years this case has been going on, they

4    are looking for actual evidence of confusion.  They are looking

5    to see is anybody reporting to Jack Daniel's that this toy, the

6    Bad Spaniels toy, comes from Jack Daniel's?  They don't find

7    anything.

8            But there's more to it than that.  And this relates to

9    again, Mr. Gooder's testimony.  Mr. Gooder testified that

10   people identify so strongly with the Jack Daniel's mark that

11   when they perceive the Jack Daniel's mark is being harmed, or

12   the brand, they feel like they're being harmed, and they report

13   infringers and concerned to Jack Daniel's.  And this is a

14   regular part of how Jack Daniel's legal department monitors the

15   world.  Their fans bring concerns to their attention.

16           So that brought to mind the Sheriff's posse and

17   deputies that they used to have here in Maricopa County to

18   patrol malls and that sort of thing.  So in addition to having

19   the soldiers inside of the stockade looking for evidence that

20   this toy actually causes any confusion, or has caused any

21   confusion with Jack Daniel's, they have deputized the world as

22   a result of their millions of dollars in brand awareness,

23   advertising, and promotion efforts.

24           And even after all of that, their legal department in

25   Northern California, their licensing and corporate folks in

1    Kentucky, their deputies all over the world, their millions of

2    fans who feel hurt when they perceive the Jack Daniel's brand

3    has been hurt, for three years this litigation has been going

4    on, they couldn't find a single real world consumer that

5    expressed confusion.

6         But there's one more element to that, and that is,

7    like in the Timmy Holedigger case, the Bad Spaniels toy does

8    not exist in isolation.  It exists in conjunction with 19 other

9    parody dog toys, all similarly branded Silly Squeakers.

10         Mr. Sacra testified that since 2007, VIP has sold one

11   million parody dog toys, including wine bottle, beer bottles,

12   liquor bottles, and soda bottles.  And in its experience over

13   the last 11 years selling one million parody dog toys, there's

14   not one real world customer that contacted VIP and said, I am

15   confused, I thought Corona, I thought Heineken, I thought

16   Kendall-Jackson, or I thought Jack Daniel's was putting out

17   your product.  Has not happened in 11 years, 1 million

18   products, regarding the whole line, regarding the Bad Spaniels

19   toy, three and a half years going on four, 55,000 products.

20         Why is that significant?  This is a Ninth Circuit

21   case, Brookfield Communications versus West Coast Entertainment

22   Corp., where the Ninth Circuit said, we cannot think of more

23   persuasive evidence that there's no likelihood of confusion

24   between these two marks than the fact they have been

25   simultaneously used for five years without causing any

1    consumers to be confused as to who makes what.

2          In this case, we don't have quite five years, with

3    regard to Bad Spaniels, but we have three and a half years with

4    Bad Spaniels, and we have 11 years with the entire Silly

5    Squeakers parody dog toy line.

6          This is how the Southern District of New York analyzed

7    the issue dealing with another pet toy case.  Whereas here, a

8    product has been on the market for several years.  The absence

9    of evidence on this point is considered very significant

10   deficiency.  Here it is also significant that Nature Labs now

11   parodies 13 other designer brands not one of which has

12   complained about consumer confusion.  That loud silence gives

13   rise to only one inference, consumers have not been confused.

14         So, again, in this case, we have 20 brands that have

15   been parodied, and not a single piece of real world evidence

16   that any actual consumer has been confused.

17         So, what does Jack Daniel's offer instead on this

18   factor?  And this goes back to the theme of my opening.  Ivory

19   tower versus the real world.  My mother-in-law likes to say

20   that she lives on planet reality, and when people spin

21   psychological theories or pretty much any new fangled thing,

22   she'll say, I live in the real world, and then tells you how

23   she feels.

24         In this case, with all due respect to the late

25   Dr. Ford and with Mr. Simonson, they were academics not in the

1    real world.

2           First, let's talk about Dr. Ford.  This is how Jack

3    Daniel's asserted what its protectable trade dress was.  A

4    square bottle with a ribbed neck, a black cap, a black neck

5    wrap closure with white printing bearing the Old No. 7 mark, a

6    black front label with white printing and filigree border

7    bearing the Jack Daniel's mark depicted in arched lettering at

8    the top of the label.

9           Now, Dr. Ford said that he had to remove all of those

10   elements.  This was his deposition.  So paragraph six of the

11   counterclaim, on page 5, because Jack Daniel's asserted the

12   elements identified in paragraph six, you removed all of those

13   elements from the trade dress.

14          So Dr. Ford didn't do any independent analysis as how

15   to make the control or what elements that needed to be removed.

16   He simply worked off of Jack Daniel's claim in this case.

17          But what's interesting is Jack Daniel's in its

18   counterclaim never asserted that in and of itself --

19          THE COURT:  Slow down just a little, if you would.

20          MR. BRAY:  Jack Daniel's never asserted in and of

21   itself that a black label with white lettering is part of its

22   trade dress.

23          It says, a black label with white printing and a

24   filigreed border bearing the Jack Daniel's mark and arched

25   letting at the top of the label.  There's no claim in this

1    case, and David Gooder disclaimed any proprietary rights to it,

2    a black label with white lettering.

3          So Dr. Ford took out more than he needed to for the

4    control, more than what Jack Daniel's is actually asserting it

5    has right to in this case, and used as a control basically,

6    what Jack Daniel's asserted in its pleading.

7          This was one demonstrative exhibit that we spent a

8    little bit of time on.  And there's good reason that Jack

9    Daniel's -- another instance in the counterclaim, it asserts

10   rights to a black neck wrap closure with white printing bearing

11   the Old No. 7 mark.

12         So Dr. Ford didn't just remove a black neck wrap

13   closure with white printing bearing the Old No. 7 mark.

14   Dr. Ford removed a black neck wrap closure.  He removed a black

15   cap and square bottle.  And you can see that these are all

16   well-known whiskey brands that use a black cap, a black neck

17   label, black and while printing.

18         And David Gooder asserted that, as to those elements,

19   Jack Daniel's is not asserting exclusive rights.  He also

20   asserted that they are not asserting exclusive rights to the

21   arched lettering.

22         Now, I didn't create for this closing a nice morph

23   between the Bad Spaniels product and any of these other

24   bottles.  I will tell you though, that you could almost as

25   easily morph and have the same graphical presentation of

1    putting the Bad Spaniels with the Jack Daniel's black label, as

2    you would with the Jim Beam or Ezra Brooks or Evans Williams.

3    There would be a striking degree of similarity.

4           In fact, this is an example of a morph that was done

5    of Jack Daniel's and Early Times.  And you can see, okay, it's

6    a nice trick, but if you look at all of the American whiskey

7    and bourbon brands that use the black and white -- black label,

8    white lettering, the cap, the neck enclosure, you can perform

9    the same trick.

10          So, again, Dr. Nowlis criticized Dr. Ford for -- I

11   mean, the analogy I think I used in the opening is comparing a

12   shoe with a wine bottle, or something like that, you know, just

13   having a high-heeled shoe and saying it's the same control as a

14   Nike sneaker because they are both shoes.

15          But there's another.  Besides a clearly improper

16   control, including elements that are not taken from the

17   counterclaim, because the counterclaim, you know, drafts the

18   elements in a particular way.

19          In addition to the criticism of the improper control,

20   there's the problem of how the survey was conducted.  And on

21   this point, there were direct admissions by Dr. Ford that this

22   type of survey was inferior to a mall intercept survey, given

23   the nature of the product.

24          Here's what I asked Dr. Ford in his deposition -- and

25   I covered this a little bit earlier:  Is one possible advantage

1    of the mall intercept survey, is that the survey respondent

2    gets a tactile experience with the surveyed product?

3             Answer:  I think that's an advantage, if the tactile

4    experience was a source indicator.

5             THE COURT:  What page was that?

6             MR. BRAY:  That is page, I am sorry, Your Honor, 85,

7    line 16 through 12 -- or I am sorry, line 6 through 12.

8             As soon as I said that, I knew it didn't come out

9    right.

10            But the questioning with Dr. Ford continued.  Question

11   -- and this is on page 98, starting on line 7, ending on line

12   24 -- and this is significant, especially when you consider

13   what you viewed with the focus groups about about how people

14   actually interact with the product.

15            Question:  Okay.  And you said before, if the tactile

16   experience had anything to do with the source or origin of the

17   product, it would be valuable that a survey respondent had the

18   tactile experience with the product, correct?

19            Answer:  If the tactile experience were source

20   identifying, then it would be important, otherwise, it would

21   not be important.

22            Question.  Sure.  And for a product where a number of

23   respondents identified the source as Silly Squeakers, it would

24   be important for the survey respondents to be able to squeak

25   the toy, which you can only do with the actual toy factually,

1    correct -- tactually, correct?

2            Answer from Dr. Ford:  That's true.

3            Question:  So that's a disadvantage of the Internet

4    survey that you conducted over a potential mall intercept

5    survey, which you did not conduct in this case, correct?

6            Answer:  Correct.

7            You saw the focus groups that were introduced through

8    Mr. Silverman.  Everybody squeaked the toy.  When you go to

9    make a purchasing decision of one of these toys, you squeak the

10   toy.

11           The largest -- one of the largest groups of

12   respondents, with regard to Dr. Ford's survey, were people that

13   identify the source as Silly Squeakers.  Is it an

14   identification of source?  Yes.

15           This is Exhibit 174 and, this was what we had some

16   discussion about yesterday.  If you look at the Amazon page,

17   Silly Squeakers liquor bottle, Bad Spaniels.  Who's it by?

18   Silly Squeakers.  It is an indication of source.  Everybody in

19   the focus group that was evaluating the product squeaked the

20   product.

21           This is not the type of product where a mall -- or I

22   am sorry -- where an Internet survey is effective.  And coupled

23   with that fact, the fact that the control included or took out

24   elements that Jack Daniel's is not claiming exclusive rights

25   in, either in its counterclaim or on the stand, it's

1    Dr. Nowlis' opinion, and frankly my opinion, that Dr. Ford's

2    survey is not relevant, not significant, doesn't reflect the

3    real world.

4            And not only are there problems with Dr. Ford's

5    report, real world results have indicated there is no

6    likelihood of confusion, because after a million units sold of

7    Silly Squeakers, there's been no confusion communicated to my

8    client.

9            The next Sleekcraft factor goes to the strength of the

10   mark.  And this is kind of an interesting factor.  And, again,

11   I will leave it to you to evaluate it.  I say it is an

12   interesting factor in this case because, as you heard David

13   Gooder say, Jack Daniel's in this case is not asserting any

14   infringement of its famous Jack Daniel's mark.

15           So Exhibit Number 7, which was the text only Jack

16   Daniel's mark, they are not claiming the Bad Spaniels mark

17   infringes the Jack Daniel's mark.  They are not claiming that

18   Bad Spaniels in and of itself infringes anything.

19           Mr. Gooder also said, Bad Spaniels and arched letters

20   we don't claim is infringing anything.  Yet on the control,

21   they don't use arched letters, they use straight.

22           So the strength of the mark.  In a traditional

23   counterfeiting case, Your Honor, I would concede that strength

24   of the mark would -- if you have a -- I am going to say, assume

25   that the mark is strong.  I don't know that it is because,

1    again, we are not talking about the Jack Daniel's mark.  They

2    are not saying that's been infringed.  They are talking about

3    particular elements of their trade dress, many of which appear

4    across the whiskey and bourbon line.  The black cap, the black

5    neck wrap, the white and black labels.

6         But even if we were to concede that the mark is

7    strong, what does that say in the context of a parody?  Now,

8    regardless, the Ninth Circuit has the Sleekcraft test.  Other

9    circuits have different names for basically, the same test.

10   There's the Polaroid test, Beer Nuts test.

11        In the Fourth Circuit, it's the Pizzeria Uno factors,

12   and they are all, more or less, the same as the Sleekcraft

13   Factors.

14        So this is the Chewy Vuitton case decided by the

15   Fourth Circuit.  And I won't read the whole quote for you.

16   This is briefed in the statement of facts and conclusions of

17   law.  I will just read the conclusion:  The strength of the LVN

18   mark, Louis Vuitton marks, in this case, does not help Louis

19   Vuitton establish a likelihood of confusion.

20        And then McCarthy says the same thing, the strength

21   and recognizability of the mark may make it easier for their

22   audience to realize that the use is a parody and a joke of the

23   quality is embodied in a trademark word or image.

24        So, again, I am not sure how strong the Jack Daniel's

25   trade dress is.  Again, because of the exhibit that showed all

1    of the other American whiskey and bourbon bottles that

2    incorporate elements that in the counterclaim Jack Daniel's is

3    asserting some rights in.

4            But even if it is considered a strong mark, in the

5    context of a parody, applying Sleekcraft factors, Pizzeria Uno

6    factors, Beer Nuts factors, they are all the same, it does not

7    contribute to a finding of likelihood of confusion because

8    nobody parodies -- you need the mark to be somewhat well known

9    in order for the parody to be effective.

10           Proximity of the goods.  This is one that Mr. Harvey

11   may have skipped over a little bit.  Obviously, we are dealing

12   with very different types of goods here.  We are dealing with a

13   whiskey and bourbon, and we are dealing with a pet toy.  What

14   does the law say about that?

15           This is the Tommy Hilfiger licensing case.  Even if

16   there is a connection between fragrances for pets and humans,

17   or even if a dense and humorless consumer could mistakenly

18   conclude that plaintiff itself sponsored the humorous line of

19   fragrances, plaintiff's and defendant's products are sold in

20   different kinds of stores, the former in department or designer

21   stores, the latter in pet stores or gifts shops, at markedly

22   different prices.  It is thus plain that the products do not

23   have the market proximity to one another that could create a

24   likelihood of confusion.

25           Same thing is true here.  They are very different

1    types of goods.

2          Similarity of the marks.  Again, I don't know if I

3    want to say too much more about this.  Yes, Mr. Sacra

4    incorporated enough of the Jack Daniel's trade dress in order

5    to make -- in order do the first C, as David Gooder testified

6    to.  Conjure, comment, and then confusion were the three

7    elements.

8          So they included enough to conjure it, but it was not

9    certainly a verbatim copy of their trade dress.  There's

10   significant differences, and I will allow the Court to

11   determine the significance of those differences, but I think

12   they are clear.

13         This is a quote from a Central District of California

14   case, Burnett versus 20th Century Fox Film.  If the difference

15   in wording or appearance of the designation together with the

16   context and overall setting is such to convey that the ordinary

17   viewer that this is a joke, not the real thing, then confusion

18   as to source, sponsorship, affiliation, or connection is

19   unlikely.  Quoting McCarthy.

20         Furthermore, the more distasteful and bizarre the

21   parody, the less likely the public is to mistakenly think that

22   the trademark owner has approved or sponsored it.

23         THE COURT:  Can you leave that up for just a minute,

24   please?

25         MR. BRAY:  Sure.  And I think the next part is

1  significant too.  It says, the more outrageous and offensive

2  the parody, the less likely confusion will result.  Trademark

3  owners, like public figures who seek the public spotlight, must

4  accept the concomitant risk of public ridicule in the form of

5  parody.

6         THE COURT:  Thank you.

7         MR. BRAY:  And again, it has never been VIP Products'

8  intent to ridicule or disparage Jack Daniel's.  It is making a

9  comment regarding how self-important major brands can be and

10 how advertising infuses every part of our life.  It is a very

11 gentle form of parody.

12        Marketing channel used.  Okay.  They both use the

13 Internet in some form.  Every business in the world, except

14 maybe the shoe repair place that I go to, uses the Internet.

15 That's not particularly significant for this analysis.

16        You heard about Jack Daniel's marketing channels.

17 Television, out-of-home, which is billboard, social media

18 marketing.

19        You heard of VIP's marketing channels, which is they

20 advertise in the form of printing their catalogs and send it to

21 their retail customers.  They have a basic website so that

22 customers can see what's going on or what the -- what products

23 are available.  And they go to two trade shows a year, and they

24 try to have fun at those trade shows.  They go to SuperZoo in

25 Vegas and they go to Global Pet Expo in Orlando.

1          Jack Daniel's does not go to pet specialty trade

2     shows.  VIP Products does not advertise on television.  One

3     time they advertised on QVC; since 2007 when the Silly

4     Squeakers line was introduced, they have not advertised on TV.

5     They don't do any social media.  They don't really do any

6     advertising or marketing in any traditional sense.  They go to

7     trade shows.

8          Again, with regard to marketing channels, the Tommy

9     Hilfiger case is also relevant, because it parallels the facts

10    of our case.

11         Finally, the Timmy Holedigger product is always

12    presented to the consumer along with a variety of other pet

13    colognes.  As Natural Lab argues, this context immediately

14    reinforces the message that the perfumes are a parody and that

15    they come from a single source rather than multiple sources of

16    the parodied marks.

17         That's exactly the case here.

18         VIP's Silly Squeakers -- or I am sorry.  VIP Bad

19    Spaniels product is always sold in conjunction with its other

20    Silly Squeakers parody dog products.

21         In fact, if you look at the Amazon page that's been

22    marked as Exhibit 174, and you see what customers also viewed,

23    customers also viewed these items, Silly Squeakers, Silly

24    Squeakers, Silly Squeakers.  The next page, Silly Squeakers,

25    Silly Squeakers.

1          The same thing is true with regard to the product

2     catalog that VIP uses, which Mr. Sacra testified is one of only

3     two ways that he really markets his product.

4          This is an example.  The Silly Squeakers products are

5     marketed and displayed in conjunction with other Silly

6     Squeakers products, which indicate they come from a single

7     source and not from multiple different sources of the parody

8     products.

9          Sophistication of the purchasers and amount of care.

10     Jack Daniel's has testified that one of its brand qualities or

11     one of the things that it's trying to infuse into its brand is

12     loyalty.  Presumably its loyal purchasers know what a Jack

13     Daniel's product is.  In fact, they have deputized people

14     around the world to look for infringers apparently.

15          I think the testimony was an average size bottle is

16     $20 or $30.  It is not something you buy for $3 or $4.  It's a

17     "premium product," in Jack Daniel's description.

18          Consumers of Jack Daniel's exercise some degree of

19     care, and, again, they exercise that care as a result of the

20     millions of dollars of advertising and promotion that Brown

21     Forman puts behind its product.

22          Now, what about the Bad Spaniels product.  Mr. Sacra

23     testified that most vinyl dog toy products cost $3 or $4.  If a

24     customer is going to spend $13 to $15 for a vinyl dog toy, they

25     are going to take more care, because that's not what they are

1    expecting.

2            And then also it is significant that each of these

3    products you have to look at for a minute to get the joke, and

4    I think you observed that in the focus group.  When they took

5    it out of the bag, they read it, they were getting the joke.

6    If they liked the joke, they purchased the product.  If they

7    don't like the joke, presumably they don't.

8            THE COURT:  Could you help me clarify something you

9    just said, and what you just said a little earlier, and that

10   is, the Silly Squeakers toys are sold in the grouping, and yet

11   the individual price of this product is approximately $14, $15,

12   something like that.

13           MR. BRAY:  14 to 15, I think, Mr. Sacra said.

14           THE COURT:  So are you saying you can buy them

15   individually, or do you have to buy the whole grouping of them,

16   which would probably be about $120 or $130?

17           MR. BRAY:  No, not always.  It depends on the product,

18   Mr. Sacra testified.  Certain of the products come in

19   two-packs, that are the beer bottles because it comes in a

20   humorous pack.  Other products are individually sold.  But when

21   they are -- and certainly you could buy the Bad Spaniels

22   product in and of itself.

23           But on the other hand, it is marketed, and this is the

24   significance of the language from the Timmy Holedigger case,

25   it's marketed with other parody dog toys, which would make the

1    consumer less likely to think that they are all from different

2    sources.  They are all marketed similarly using the Silly

3    Squeakers mark together.

4    And that's what the Southern District of New York

5    addressed in the Timmy Holedigger case.  And in that case, the

6    Southern District of New York said, it is also counterintuitive

7    that buyers of any sophistication will quote, unquote, impulse

8    buy a bottle of pet perfume priced at $10 a bottle.  To the

9    extent that a shopper might make a purchase, it would likely be

10    after viewing the bottle carefully, grasping the joke, and

11    seeking to share it with others.

12    And then it quotes another case.  This case is not one

13    where unsophisticated customers may fall prey to similar marks

14    of inexpensive products that are in competitive proximity to

15    each other.

16    That's how you should evaluate the sophistication of

17    the purchaser's likelihood of care.  And then that relates to

18    something from Mr. Harvey's opening.

19    At one point he was comparing Jack Daniel's to VIP's

20    competitive product, and then he removed "competitive," and

21    then he said VIP's product.  Because Jack Daniel's really has

22    not, cannot contend, that Bad Spaniels, VIP's dog toy, is in

23    any sense competitive with the Jack Daniel's product.

24    Intent in selecting the mark.  Again, whether -- when

25    you look at the various iterations of the Sleekcraft factors,

1    whether it is Pizzeria Uno, Beer Nuts, Polaroid, in all of the

2    circuits, when the product is a parody product and you are

3    attempting to make a parody product, the intent factor comes

4    out differently.  Because by its very nature, a parodist is

5    intending to, and using Mr. Gooder's words, conjure the

6    original.

7            And this is what the Tenth Circuit said about that.

8    Where a party chooses a mark as a parody of an existing mark,

9    the intent is not necessarily to confuse the public but to

10   amuse.

11           And that's exactly what Mr. Sacra's testimony was in

12   this case.  And, again, I think it's significant that it's not

13   a one-off product targeting Jack Daniel's.  This is a branded

14   line of 20, soon to be 26, products that has been continually

15   sold since 2007.

16           Tenth Circuit goes on to say, the benefit of the one

17   making the parody, however, arises from the humorous

18   association, not from public confusion as to source of the

19   marks.  A parody relies upon a difference from the original

20   mark, presumably a humorous difference, in order to produce its

21   desired effect.

22           And I think you can see by the focus group

23   participants, they did see a humorous difference between the

24   two.

25           And then there's a -- I thought that was a funny quote

1    from Will Rogers going into, humor is in the eye of the

2    beholder.  He said, funny if something that's happening to

3    somebody else, but when it happens to you, why, it loses its

4    sense of humor.

5         So after that digression, the Tenth Circuit went on,

6    our single concern here, however, is whether an intent to

7    parody an existing trademark supports an inference of a

8    likelihood of confusion under the reasoning that one who

9    chooses a mark similar to an existing mark intends to confuse

10   the public.  We hold that it does not.  An intent to parody is

11   not an intent to confuse the public.

12        We think that's the correct analysis for Your Honor to

13   apply in this case with regard to the intent mark.

14        Mr. Gooder said, under oath, he had no evidence, or he

15   didn't have any reason to believe that Mr. Sacra was not

16   intending to make a parody of the Jack Daniel's mark, or that

17   he didn't have an intent to do anything but amuse and not

18   confuse.

19        And, again, if he is trying to confuse the public, he

20   is doing a terrible job at it.  Even with Dr. Ford's survey,

21   with its unfortunate control, 70 percent of the people, the

22   majority of the people, thought that VIP or Silly Squeakers put

23   it out.

24        And, again, whether it is on the Internet, Amazon,

25   whether it's in its catalog, that's how VIP is marketing the

1    products, as a single line of parody dog toys.

2            There was some discussion about the message, and

3    Mr. Sacra testified that when he was asked questions about

4    commenting on the Jack Daniel's mark, he understood the

5    questions, are you negatively marking on Jack Daniel's?  Again,

6    Mr. Sacra's intention is not to disparage Jack Daniel's,

7    negatively comment on Jack Daniel's.  His comment is a broader

8    one, and this is how the First Circuit defined what the

9    commentary is, talking about trademark parodies.

10           The central role which trademarks occupy in public

11   discourse, a role eagerly encouraged by trademark owners, makes

12   them a natural target of parodies.  Trademark parodies, even

13   non-offensive, do convey a message.  The message may simply be

14   that business and product imagines need not always be taken too

15   seriously.  A trademark parody reminds us that we are free to

16   laugh at the images and associations linked at the mark.

17           That's exactly what Mr. Sacra testified that he's

18   trying to do across his entire line of Silly Squeakers products

19   and what he attempted to do with the Bad Spaniels product.

20           All right.  I am going to move on past likelihood of

21   confusion and talk about tarnishment briefly.  Let me just get

22   organized for a second.

23           Mr. Silverman testified with regard to Dr. Simonson.

24   Dr. Simonson's opinion is just his opinion.  There's no basis

25   for it in his report.  It is a two-part test, according to

1    Dr. Simonson.

2         You conjure up -- we don't dispute that Bad Spaniels

3    was intended to conjure up Jack Daniel's.  And number two, the

4    Bad Spaniels toy would elicit disgust and that would carry over

5    to Jack Daniel's.

6         There's nowhere in Dr. Simonson's testimony where he

7    provided any scientific support for the second part, or really

8    any support whatsoever.

9         What we have in this case, again, to use my

10   mother-in-law's phrase, the real world, is we have 55,000 sales

11   of the Bad Spaniels toy.  We have one million sales of Silly

12   Squeaker products total.  We have 19 focus group participants,

13   all of which, according to Mr. Silverman, and as you can see on

14   the examples from two of the focus groups, which were not

15   edited or parsed together, they ran continuously, that people

16   found the product humorous, not disgusting.

17        And in terms of the Simonson report, on paragraph 41

18   the footnote relates to, if something -- if a product elicits

19   disgust, it may have a negative impact under the Associative

20   Network Model.  But there's no evidence or support that the Bad

21   Spaniels dog toy elicits disgust.  And all of the real world

22   evidence indicates that it doesn't elicit disgust.

23        And how do we know that?  Again, this was Exhibit 174

24   that we spent some time with yesterday.  And presumably Jack

25   Daniel's, you know, wanted to introduce this late in the case

1    because they thought it would help their case.

2            The feedback is positive.  Hilarious.  I love it.

3    Hilarious.  I love it.  That's the kind of feedback that

4    Mr. Sacra testifies he gets all the time from customers.

5            He observes customers when he goes out to watch

6    stores.  He observes thousands of customers that come by to his

7    booth every year at two major trade shows.  They all elicit

8    delight, not disgust.

9            And we talked about this picture that's on the Amazon

10   site, and, yes, that picture is obviously posed, but what's the

11   significance of the fact that the human owner posed the picture

12   with the dog?

13           I would argue the significance that can be drawn from

14   this is that the human owner was delighted enough with this

15   product to take the time to pose a dog, which in my experience

16   is harder to pose than a baby, to take this picture and then

17   post it on the Internet.

18           So -- and I don't want to recap what Dr. Silverman

19   said.  I will leave it to you to evaluate the experts.

20   Personally, I was impressed by Bruce Silverman's 50 years of

21   history in the advertising world.

22           He seems to be kind of the modern day Don Draper, or

23   Don Draper if he lived to be 60 years old or 70 years old, if

24   you watch Mad Men.  But what was interesting, according to his

25   testimony I thought, was that, you know, there's academic

1  research on consumer behavior, marketing, consumer psychology,

2  that sort of thing.  And what I thought was interesting is that

3  all of these major firms, Ogilvy, BBDO, that he was the head or

4  creator for, they all do their own internal research, similar

5  to academics but it is all trade secret.  And that's what he is

6  basing his opinion on, that in the context of a dog toy, this

7  is likely to elicit joy and not disgust, and I thought he

8  explained that so well that I am not going to try to recap it.

9      I will just put on two more pictures.

10      And if I was more adept with technology, I would have

11  done some morphing like he did.  This was the JD Associative

12  Network, and then I think, if you look at the Amazon review,

13  which is Jack Daniel's Exhibit 174, instead of putting the

14  silly things that Dr. Simonson put on the JD Associative

15  Network, I think in the real world, where I argue Your Honor

16  should live, I think this should be added.  Dogs enjoying the

17  product.  People love their dogs.

18      If there's an association being made between the Bad

19  Spaniels product and Jack Daniel's, it's joy and love for pets.

20      Thank you very much.

21      THE COURT:  Well, I think that the dogs may be

22  enjoying the product probably for the squeak, not because they

23  are reading the labels.

24      MR. BRAY:  Of course.  Of course.  And the question

25  whether the dog is enjoying the product and whether the human

1    is enjoying the product, and we heard testimony, and, again,

2    you know, going back to Mr. Harvey's opening with regard to

3    tarnishment, he said it was only related to excrement is the

4    tarnishment, yet he brought up the squeaker.

5         What, some people people don't like the squeak.  But

6    what do people enjoy about the toy?  It's probably not the

7    squeak.  What they enjoy is seeing their dogs posed in humorous

8    situations like this, and they enjoy seeing their dogs enjoying

9    the toys.

10        So, again, if you want to add things to Jack Daniel's

11   Associative Network, I would add happy dogs and happy amused

12   owners.  Thank you.

13        THE COURT:  Thank you, counsel.

14        Anything else since you have the burden of proof?

15        MR. HARVEY:  Yes.

16        THE COURT:  Do you want to go forward now or do you

17   want to take about a five or 10-minute recess?

18        MR. HARVEY:  Great.

19        THE COURT:  I am thinking about the court reporter.

20        MR. HARVEY:  Absolutely.  We will come back.

21        THE COURT:  How about if we come back at about 3:15,

22   3:20, somewhere in there, and we will wind up this activity.

23   Okay?

24        MR. HARVEY:  Great.

25        THE COURT:  Thank you.

1          (Recess taken at 3:02 p.m. until 3:17 p.m.)

2              THE COURT:  Okay.  Mr. Harvey, any final thoughts that

3      you had?

4              MR. HARVEY:  At this time I really will be brief, Your

5      Honor.  You never heard that before, I am sure.

6              THE COURT:  This is probably the first time I have

7      heard that, yes.

8              MR. HARVEY:  So just four comments, really, on what we

9      just heard.

10             First, and this is rather crucial, I think in a way,

11     because I want to make sure the record is very clear on what

12     the claims are of Jack Daniel's by reason of its counterclaims.

13             I think we can put it on the ELMO.  You disconnected

14     it?  Well, then 103 is an exhibit.  Page 5, paragraph 6.

15             We heard some discussion from Mr. Bray about the

16     elements of the trade dress and the trademarks that Jack

17     Daniel's is suing on.  He represented to the Court that

18     Mr. Gooder had said that we are not suing on the Jack Daniel's

19     trademark.  Well, that's simply not true.

20             The next page -- first, let's stay with this.

21             This is the combination of elements that constitute

22     the trade dress that we are suing on, and it is all of these

23     elements together.  There's never been any dispute about that.

24             Then if we go on over to the claims that

25     demonstrate -- that show the registrations.  Thank you.

1          So not only the arched logo at the top, which is one

2   of the separate registrations, but the word mark itself,

3   without any stylization, is part of the claim in the case.  And

4   we are talking about counterclaim, which is document 15-1 in

5   the case, and in particular, paragraph 11, listing all of the

6   Jack Daniel's trademarks, registered trademarks, that are in

7   suit.  One of those is Jack Daniel's.

8          And there seems to be some misapprehension on the

9   other side that we are not suing on Jack Daniel's.  Doesn't

10  have to say "Jack Daniel's" to be infringing.  It could say

11  "Bad Spaniels" and be infringing, as the Court understands,

12  sight, sound, and meaning.

13         So just to clarify any misapprehension that may exist

14  on the other side, Jack Daniel's is very definitely one of the

15  elements of the trade dress that is being sued on, and there

16  was no contrary statement in Mr. Gooder's testimony.

17         Second point I want to make is that Mr. Bray has

18  roamed the world, or at least the United States, to find case

19  law relating to parody products.  He cites the Court to cases

20  from the Fourth Circuit.  That's Chewy Vuiton, and the Southern

21  District of New York, the Tommy Holedigger pet toy case.  He

22  cites the court to L.L. Bean, which is a First Circuit case.

23  These are different circuits and different law, and in

24  particular, neither Chewy Vuiton nor Tommy Holedigger was there

25  any confusion evidence, which makes it easier to come to a

1    different conclusion about infringement.

2            But we are in the Ninth Circuit and in the Ninth

3    Circuit, the law is different.  The cry of parody, said the

4    Ninth Circuit in the Dr. Seuss case, does not magically fend

5    off otherwise legitimate claims of trademark infringement nor

6    dilution.

7            We opened with this.  The Court may remember is the

8    first motion we made orally in this case on Monday.  We didn't

9    want to hear any more about parody.  The Court has ruled on

10   that issue and that is the law of the case.

11           MR. BRAY:  Your Honor, the Court has only ruled that

12   the parody is not relevant to a First Amendment defense, which

13   has been limited to the case.  The Ninth Circuit, just like

14   every other circuit that applies factors comparable to the

15   Sleekcraft, says that the fact that it is a parody product can

16   be considered in evaluating or how you evaluate various of the

17   eight Sleekcraft factors, including the Carol Burnett case

18   that's cited.

19           THE COURT:  I appreciate it.  You let Mr. Harvey

20   finish, and I appreciate your speaking objection, but I will

21   have to figure it out, and if you think I have got it wrong, go

22   see three of my friends.  You could probably round up three of

23   them right at the end of this hall over here and you could get

24   a decision real quickly.

25           Go ahead.

1           MR. HARVEY:  Thank you, Your Honor.

2           While the Court ruled in its order that a parody

3      theory affords no protection to VIP, and I'm quoting, because

4      it is using an adaptation of the Jack Daniel's trademark and

5      trade dress in part for commercial purposes, and when that is

6      happening, the First Amendment affords no protection.

7           So we are in the Ninth Circuit.  The law is clear, and

8      these other cases that Mr. Bray wants the Court to consider may

9      be considered by the Court, but certainly are not binding at

10     all on any ruling this Court should make.

11          And the stare decisis rule would say that Dr. Seuss is

12     the governing principle in this case.

13          I am developing a kind of theory as my third point,

14     that I hesitate to say it, but it seems that if we want to roam

15     the world for other opinions, at least with respect to parodies

16     that involve excrement, two other courts have looked at this

17     question and found both of them to be diluting and/or

18     infringing.

19          One, of course, is the "Buttwiper" case.  And then

20     back in the Southern District of New York, in the Gucci Shops

21     case, there was a case in the late '70s involving a diaper bag

22     called Gucci Goo, having a pattern looking much like a Gucci

23     bag.  And that was held to be infringing and diluting of the

24     Gucci mark.

25          So I just -- I am not necessarily saying we should

1    join the ranks of those cases and be held to be accounted among

2    the poo matters.

3            This case is simply one of those cases where it is

4    very plain, it is common sense, we have a tarnishing ingredient

5    or element being put together with a consumable, and that, in

6    itself, is tarnishing.  It detracts from the strength of the

7    mark and detracts from the values that the Jack Daniel's brand

8    represents, and with that, we will conclude.

9            Thank you, Your Honor.

10            THE COURT:  Thank you.

11            Yes, sir.

12            MR. BRAY:  Could I have one thing?

13            THE COURT:  Sure.  We are all here.  We have been

14    here.  We still have another day to go.

15            MR. BRAY:  Or seven more days, or whatever my math was

16    a few days ago.

17            THE COURT:  But he gets the last word, you understand,

18    because we are on the counterclaims.

19            MR. BRAY:  The quote that he made from your ruling

20    was, when that's happening, referring to it being on a

21    commercial product, the First Amendment does not provide any

22    protection.  I have never argued in the findings of fact,

23    conclusion of law, or at the hearing, that anything contrary to

24    your ruling, that the First Amendment doesn't provide a

25    protection.

1          I just wanted to point out in the Timmy Holedigger

2    case and The Chewy Vuitton case, in both those cases, the

3    Courts found the First Amendment provides no protection.  What

4    they found was that parody was relevant towards evaluating the

5    Polaroid, Pizzeria Uno factors, basically the Sleekcraft

6    factors, and that's what the Central District of California did

7    in the Carol Burnett case, which I quoted, which is in the

8    Ninth Circuit.

9          THE COURT:  Thank you.  Mr. Harvey?

10          MR. HARVEY:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Well, we will take this case under

12    advisement, and you can wait for the best seller to come out

13    down the road.  Anyway, it has been interesting.  It has been

14    fun.  It has been a pleasure being associated with all of you,

15    and I appreciate it very much.  And we will see where this

16    trail of breadcrumbs takes us.

17          MR. BRAY:  Housekeeping.

18          THE COURT:  But both -- on behalf of both the parties,

19    both of you have protectable interests that you are working

20    very hard to protect.  And the question is, despite what the

21    plaintiff, Mr. Sacra, has said in many respects, I do not

22    necessarily agree with his concept that he alluded to, that he

23    has the absolute authority on all things parody.  I think other

24    people may have a different point of view, and the example I

25    think I gave, that I talked about, if you have a painting up

1    there, it is an abtract painting, part of the room would think

2    it is great, part of the room would think it is terrible, and

3    some of them would say, who cares, you know, but that's it.

4         Both of you have protectable interests that are very

5    important to the companies and to the public.  So where this

6    case will fall at, I don't know.

7         But part of the thing I heard at lunch today was the

8    dean at the law school -- not law school.  Dean of the Eller

9    School of Business at the University of Arizona, and they do

10   work just like W.P. Carey does at Arizona State, and one of the

11   things that everybody is gravitating to, the MBA program, I

12   thought you would find this interesting, is trying to marry up

13   the, as you say, real life experience, with the academics that

14   they receive through the MBA program and their undergraduate

15   experience.  And that's one of the things we are going to be

16   dealing with, I think, as the Internet takes over so many

17   things is, how do you meet the clashing of these cultures and

18   how do you make them go?  And it is not going to be easy for

19   all of you who are in business to deal with that, particularly

20   in foreign countries and everything like that.

21        And I'm familiar with things, you know, people that

22   counterfeit things and all things like that.  I am not sure

23   they are counterfeiting Jim Beam, but they could.  I see so

24   many other counterfeit products.

25        I forgot to ask Mr. Roush this, since he was involved

1    with NASCAR.  How many of the old -- what was the old picture

2    that first got this started, where people began to associate

3    the old revenue evaders with evading that and the NASCAR --

4    which developed into the NASCAR races.

5          I mean, they were so good at racing, and that's how

6    they developed.  On the weekends they would get together and

7    race.  But they were also very -- during the week, trying to

8    out run, as they say, the revenuers.

9          Anybody want to take a guess at what the movie was and

10   the star was?  It's an old black and white that came up as

11   to -- this thing about the developing of trying to -- the

12   moonshiners were trying to outrun the -- outrun the police.  It

13   is an old movie you don't see very often.

14         Last bit of trivia then.  Thunder Road with Robert

15   Mitchum.

16         But anyway.  So as we part, you know, the only thing I

17   can assure you is that I don't think there's go to be a hung

18   verdict in this case.  I have to decide one way or the other.

19   And it is by a preponderance of the evidence, I believe, which

20   is ever more -- slightly more correct than not.

21         The only thing I can tell you is that that standard is

22   a little bit more recognizable in another body of law that we

23   deal with.  Congress decided that you prove something by

24   substantial evidence.  They went on to decide what substantial

25   evidence was, and that is, less than a preponderance, but more

1    than a scintilla.

2            Now, if you folks can figure out that one, I wish you

3    would let me know.  We have to apply that all the time.  But

4    the point is, we will do the best we can.  And I hope that

5    it -- whatever it is, it straightens out in some fashion,

6    because all of you need to do business down the road, and you

7    have got -- you have got a pretty good handle on your

8    market place and things you are trying to do, and as we all

9    know, for those of us who have animals, they love their toys.

10           Like I say, I don't think when you go to -- where you

11   are actually displayed in a pet store, the pet goes in and

12   says, let me read the label and let's pick this one.  I don't

13   think they do that.  The owners do.  They think that's -- the

14   parody.  And your belief is that it really does confuse people

15   as to the source and the tarnishment, and that's what I have to

16   figure out, based on all of this evidence up here.  So, with

17   that -- yes, sir.

18           MR. HARVEY:  We have a suggestion for the Court.  We

19   conferred about the issue --

20           THE COURT:  Can I take this all to Hawaii and read it

21   over there?

22           MR. BRAY:  Exactly what we agreed to.

23           MR. HARVEY:  Sounds like a great plan.  Helping you

24   the Court to cut down on that searching for citations issue, we

25   agreed, with the Court's permission, to submit annotated, or I

1    should say, reannotated findings of fact and conclusions of law

2    referencing the trial exhibits to those and also the citations

3    when appropriate to the record in the case.

4         THE COURT:  I think that would be very helpful, but

5    just so long as we don't take too long to do that.  And the

6    other thing is, just so you don't change your findings of fact

7    and conclusions of law, because I read them and I think they

8    are very good on both sides of what you are advocating.

9         MR. HARVEY:  We wouldn't change those, we'd simply

10   reannotate as appropriate.  We propose to do it a week from

11   Monday, which would be the 16th; is that right, if the Court

12   finds that convenient.

13        THE COURT:  Well, give yourselves a little time.  I

14   know you all have other cases and other things to do, and while

15   you have been -- having fun here, you have got other things to

16   do.  So I would be willing to give you more time than that, if

17   you think that would be helpful to you.

18        MR. BRAY:  It would be helpful from the VIP side.

19        THE COURT:  How much time do you need?  You tell me.

20        MR. BRAY:  I was thinking two weeks from Friday.

21        MR. HARVEY:  Our own view is, let's get it done

22   because everybody is waiting and it is fresh in people's minds.

23        THE COURT:  I am not going to give you six months, but

24   sometimes people -- it has been my experience when people

25   say -- they pick a date, it is always -- the date is too early.

1    It's too soon.  You walk in your office, you got a stack of

2    callbacks like that, and, you know, that sort of thing.  So you

3    have other litigation, other deadlines, so then the next thing

4    I get is a motion for an extension of the time.  So let's pick

5    a time now.

6              MR. HARVEY:  Two weeks from tomorrow.

7              MR. BRAY:  October 20th.

8              THE COURT:  Okay.  October 20th it is, and we will do

9    that, and I appreciate that.  That would be very, very helpful

10   as we work through this, because there's a lot of evidence.

11   Most of the things have been referenced either by the

12   witnesses, and things like that, but there's other things where

13   they could be distilled a little further to be helpful.

14             MR. HARVEY:  We will do it.  Thank you, Your Honor.

15             THE COURT:  Thank you all very much.  Safe travels to

16   wherever your journeys take you.  As Inspector Clouseau says,

17   we will get together again when the case is solved.

18             We will stand at recess.  Thank you very much.

19        (Proceedings conclude at 3:35 p.m.)

20

21

22

23

24

25

1                    <u>C E R T I F I C A T E</u>

2

3            I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7      a full, true, and accurate transcript of all of that portion of

8      the proceedings contained herein, had in the above-entitled

9      cause on the date specified therein, and that said transcript

10     was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 5th day of October,

12     2017.

13

14                                   <u>   s/Elva Cruz-Lauer   </u>
                                     Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25