UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| VIP Products, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 2:14-cv-2057-SMM |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 5, 2017 |
| Jack Daniel's Properties, | ) | |
| Inc., | ) | 8:58 a.m. |
| | ) | AMENDED CASE NUMBER |
| Defendant. | ) | |
|_____|)| |

BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL TO THE COURT - DAY 4

VOLUME A

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

3    For the Plaintiff/Counterdefendant:

4               Dickinson Wright PLLC
                By: DAVID GEOFFREY BRAY, ESQ. and
5                   DAVID NUNZIO FERRUCCI, ESQ.
                1850 N. Central, Suite 1400
6               Phoenix, AZ  85004

7

8    For the Defendant/Counterclaimant:

9               Harvey & Company
                By: DOUGLAS PETER HARVEY, ESQ., ESQ.
10              4 Embarcadero Center, 14th Floor
                San Francisco, CA  94111
11

12              Quarles & Brady, LLP – Phoenix, AZ
                By: ISAAC SCOTT CRUM, ESQ.
13              2 N. Central Avenue
                Phoenix, AZ  85004
14

15   Also Present:  David Gooder and Justin Welch, Senior Trademark

16   Counsel

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                          INDEX

2   SUMMARY OF COURT PROCEEDINGS                        PAGE:

3   Court resumes                                         4

4
    Court Adjourns                                        99
5

6

7

8                    INDEX OF WITNESSES

9   WITNESSES FOR THE      Direct    Cross    Redirect   Exam by Court
    PLAINTIFF:
10

11  CHRISTOPHER HUNGERFORD      5
     (via deposition)
12

13  BRUCE G. SILVERMAN          8      60                    90

14

15

16

17                    INDEX OF EXHIBITS

18  EXHIBIT NO.:        DESCRIPTION:                    RECEIVED:

19

20          * * * * * NO EXHIBITS RECEIVED * * * * *

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S

 2              (Proceedings resume at 8:58 a.m.)

 3          THE COURT:  Good morning.

 4          Please be seated.

 5          MR. HARVEY:  Good morning, Your Honor.

 6          THE COURT:  Okay.  Well, we're all back together this

 7     morning for our last witness in the case, but I will revert

 8     back to one of the trivia questions of the first day.

 9              You will recall that we mentioned something about

10     three people from southern Arizona that had an association with

11     either horses or other, you know, things like that, in light of

12     one of our -- oh, the LPGA.  That was our -- I think it was

13     Mr. Roush, I think it was, had some association with his prior

14     work.

15              Well, it came out last night that one of those people

16     has now been selected to the World Hall of -- Golf Hall of

17     Fame.  That's Lorraine Ochoa, who now lives in Mexico City, and

18     grew up in Guadalajara, Mexico, our neighbor to the south.

19              Just a bit of trivia.  So you might want to keep track

20     of all those things, in case after final arguments we have a

21     test.

22          MR. HARVEY:  Oh-oh.

23          MR. BRAY:  Oh, dear.

24          THE COURT:  All right.  Now we're ready to be serious

25     this morning, and we are ready for our final witness.
```

UNITED STATES DISTRICT COURT

1          So if you'll call your witness, please, Mr. Bray.

2          MR. BRAY:  Good morning, Your Honor.

3          Before we call Mr. Silverman, we did designate a JDPI

4    witness by designation -- or by deposition designation and

5    exchanged page and line numbers with counsel as part of the

6    pretrial order.

7          I've trimmed it down to two questions -- well, an

8    introduction as to who he is, and then two questions with two

9    answers.  And with your Court's permission, I'd just like to

10   read it into the record.

11         THE COURT:  Okay.  And this -- let me get my list

12   here.

13      (CHRISTOPHER HUNGERFORD, plaintiff's witness, called via

14                          deposition.)

15         MR. BRAY:  The witness is Christopher Hungerford,

16   H-U-N-G-E-R-F-O-R-D.

17         THE COURT:  Okay.

18         MR. BRAY:  The first reading is just an introduction

19   of who he is:

20         Question:  Now, you're here as a corporate designee of

21   Jack Daniel's Property, Inc., but you're actually employed by

22   Brown Forman Corporation; is that correct?

23         Answer:  Correct.

24         Question:  And your present position with Brown Forman

25   is director of global design?

1          Answer.  Correct.

2          Question:  And you've held that position for

3   approximately two years?

4          Answer:  It's a year-and-a-half, I think.  Two years

5   in October.

6          Now, with that introduction, the next reading is the

7   only substantive portion of Mr. Hungerford's deposition I'm

8   reading in.

9          This is on page 11, line 22.  And -- oh, I should say

10  this section is in the confidential portion of Mr. Hungerford's

11  deposition that's been designated as Attorneys' Eyes Only, but

12  I will show it to opposing counsel.  There is nothing

13  confidential in this.  I don't think they'd object.

14          THE COURT:  Well, you know, one of the problems we

15  always raise with these things, even though this is a non-jury

16  trial, it's an open proceeding, when people file these things,

17  it's great for discovery.  But when it comes to trial --

18          MR. BRAY:  Okay.

19          THE COURT:   -- the -- there's a much lesser standard

20  for closing everything off at that point.  So just so everyone

21  knows that.  But show it to counsel and we'll see where we get

22  to here.

23                  (Pause in proceedings.)

24          MR. HARVEY:  We have no objection, Your Honor.

25          THE COURT:  Okay.  Thank you.

1          MR. BRAY:  I just wanted to make sure I gave counsel

2    and the Court the courtesy of --

3          THE COURT:  And I appreciate that.  Thank you.

4          MR. BRAY:  And I will try to read slower:

5          Question:  Is one of the things that you find focus

6    groups useful at Brown Forman is to determine whether consumers

7    are likely to have a positive emotional reaction to a planned

8    product or extension as opposed to maybe some sort of negative

9    reaction?

10          Answer:  Yes.  And purchase intent.

11          Question:  Okay.  And again, that feedback that you

12   get in focus groups, positive versus negative, emotional

13   reactions to proposed products, is that, from your perspective

14   as the director of global design, useful to Brown Forman?

15          Answer:  Yes.

16          THE COURT:  Okay.

17          MR. BRAY:  That's the extent of Mr. Hungerford's

18   deposition we'll read.

19          THE COURT:  Thank you.

20          Mr. Harvey, do you have anything else to read from

21   that deposition or --

22          MR. HARVEY:  No, Your Honor.  Thank you.

23          THE COURT:  Okay.  Thank you.

24          Okay.  Bring your next witness up, please.

25          MR. FERRUCCI:  Good morning, Your Honor.

```
 1                VIP calls Bruce G. Silverman.

 2                THE COURT:  Thank you.

 3                THE WITNESS:  Bruce G. Silverman, S-I-L-V-E-R-M-A-N.

 4            (BRUCE G. SILVERMAN, plaintiff's witness, is sworn.)

 5                         DIRECT EXAMINATION

 6    BY MR. FERRUCCI:

 7    Q.  Good morning, Mr. Silverman.

 8    A.  Good morning.

 9    Q.  Can you please state your name for the Court.

10    A.  Bruce G. Silverman.

11    Q.  And Mr. Silverman, what is it that you do for a living?

12    A.  I am an advertising, marketing, and branding consultant.  I

13    work with companies in the U.S., in the UK, in China, both

14    companies that manufacture or produce goods and services, and

15    advertising and public relations agencies.

16    Q.  And where do you currently work?

17    A.  I work for a company I own called Silverman Consulting,

18    LLC.  It's in Los Angeles.

19    Q.  And how long have you been in the world of advertising?

20    A.  I have now been in the world of advertising nearly half a

21    century.

22    Q.  Fifty years?

23    A.  It's a long time.  Fifty years.

24    Q.  And Mr. Silverman, could you explain your background for

25    the Court?
```

1    A.   Sure.  I grew up in New York City.  I attended New York

2    City public school system.  I graduated from a college called

3    Adelphi University, which is in the suburbs of New York.  I

4    went to law school at Albany Law School in Albany, New York,

5    and I was only there for a year.  I -- I like to read, and I

6    used to go to used bookstores a lot, and I came across a book

7    about advertising called Confessions of an Advertising Man.

8    And I thought that would be a fun read because of the word

9    "confessions."  And it turned out to be anything but.  But for

10   me it was an epiphany.  It just hit me.  I needed to be in that

11   business, and I really wanted to work for the guy who wrote the

12   book.  His name was David Ogilvy.

13           THE COURT:  What was the name?

14           THE WITNESS:  David -- the book is Confessions of

15   Advertising Man, and the author was David Ogilvy, O-G-I-L-V-Y.

16           THE COURT:  Okay.  Thank you.

17           THE WITNESS:  And I went to work for him.

18           And so during spring break, I went to the offices of

19   what was then Ogilvy Benson & Mather -- that's M-A-T-H-E-R --

20   and I didn't have the résumé to -- because I hadn't done

21   anything.  I went to the personnel department and I spoke to

22   the receptionist, and I think she took pity on me because I

23   told her I was there because I read this book.  But she

24   actually had somebody interview me, and they offered me a job

25   for the summer as a mail boy.  And I stayed at Ogilvy & Mather

```
 1    for the next 13 years.  I did get out of the mailroom.
 2    BY MR. FERRUCCI:
 3    Q.  And where did you go next?
 4    A.  I became a junior copywriter.  Originally I think my first
 5    assignments were on the industrial parts of the Shell Oil
 6    Company account.  I wrote ads about different kinds of
 7    lubricating oils and chemicals and things like that.
 8              And I must have done okay on that because they gave me
 9    a chance to work on a consumer product, albeit a very
10    unimportant one, because that's what you do in the ad business
11    with junior people.  And the unimportant one was the American
12    Express card.  In those days, very, very few people had credit
13    cards.  And -- but the CEO of American Express had just bought
14    an IBM 360.  They were going to be able to process credit cards
15    quickly.  And he decided he wanted to do a television
16    commercial, and so I had a chance of doing a television
17    commercial.  And we came, my partner and I, the art director
18    partner and I came up with a idea, we showed it to our
19    supervisor, and went to the next supervisor, and we got to
20    present it to the client, and we got to make it.  And it won
21    every award that you could win in the advertising business that
22    year.  And that sort of set me on a good track.
23    Q.  And that was the Don't Leave Home Without It campaign?
24    A.  Actually it was the predecessor of Don't Leave Home Without
25    It.  I did that too, because I worked on American Express for
```

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    about 10 years.  Don't Leave Home Without It was an outgrowth

2    of a campaign called Do You Know Me, which featured people who

3    should be viewed as important, but maybe weren't.  The first

4    commercial featured William E. Miller, who had run as vice

5    president -- for vice president with Barry Goldwater for

6    Arizona.  Miller was from upstate New York.  And at the end of

7    the commercial, he held up the card and he said:  With this,

8    they treat me as though I'd won.  And that commercial led to

9    100 more Do You Know Me commercials that were enormously

10   successful for American Express.

11           So I worked on American Express, I created the Great

12   American Chocolate Bar campaign for Hershey's, and the

13   Hershey's jingle.  I have a musical background, so I can write

14   jingles, as well.  I created the Best Engineered Car in the

15   World campaign for America -- for Mercedes Benz, and a

16   variation of that is still running.  Their theme line now is

17   The Best Or Nothing.

18           So that led to me being promoted from junior

19   copywriter to copywriter to associate creative director.  And

20   then O&M shipped me off to London for a year, where I got

21   involved in the Shell account.  Shell is an Anglo-Dutch

22   company.  And I was appointed worldwide creative director on

23   the Shell account.  At that time, I think the world was smaller

24   than it is today.  I know we were handling the account in about

25   35 or 40 countries.  And that -- that was wonderful.  I loved

1    that.  Except then they said, well, you know, 50 percent of the

2    billing is in the U.S., so you have to come back to the U.S.,

3    specifically to our Houston office.  So that was, to me, a bad

4    joke.

5          But I then spent three years of my life in Houston,

6    which worked out very well.  And then I got transferred to Los

7    Angeles, which was O&M's second largest office in the U.S.,

8    as -- I was creative director.  I was also general manager.

9    Our largest account there was Mattel.  I continued working on

10   American Express.  I kept my hand in on Shell.  Some of the

11   other accounts we handled out there, Universal movies, things

12   like that.

13         And then they sent me back to New York, and I guess I

14   made it to the top.  I was named executive creative director of

15   O&M New York, at that time was the fifth largest agency in the

16   world.  We were probably number four or five in the U.S.  There

17   were about 800 people there, 200 of whom reported to me.  Our

18   biggest accounts were American Express, the General Foods

19   Company, Maxwell House, and products like that; Lever Brothers,

20   Dove soap, and products like that; TWA airlines; Hershey was

21   still there, Nabisco was there, Panasonic.  And I was in charge

22   of all of that.  And it was a great job, probably the best job

23   I ever had.

24   Q.  So you had -- so you had 13 years at Ogilvy & Mather?

25   A.  Correct.

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   Q.  And you went from mailroom to creative -- executive

2   creative director.

3   A.  Yeah.  And then I was also on the board of directors.  O&M

4   was a public company.

5   Q.  What did you do after that?

6   A.  I was -- an agency called Bozell & Jacobs made me an offer

7   I couldn't refuse.  That does happen, I guess, in all

8   businesses, but it's pretty common in the ad business.  And

9   they recruited me to be executive creative director.

10          It was kind of an odd agency.  They split the agency

11  north and south.  Most agencies do it east and west.  So I was

12  in charge of their offices in Dallas, Atlanta, Houston,

13  Phoenix, and Los Angeles.  And when I got there, our accounts

14  were Greyhound lines -- Greyhound was based here in Phoenix at

15  that time.  Let's see.  Minolta cameras, Zale Corporation,

16  Quaker Oats, that kind of stuff.

17          But the real reason that they wanted to get me was

18  that I had a pretty strong background in travel advertising

19  because of American -- excuse me -- because of TWA and American

20  Express, and a number of other travel accounts.  And they were

21  trying to get the American Airlines account, which had recently

22  moved to Dallas from New York.

23          And we had the opportunity to pitch American.  And I

24  met with the chairman of American, Bob Crandall, and he made me

25  a challenge -- I like challenges -- and the challenge was --

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    I'll never forget these words:  We fly the same airplanes from

2    the same airports to the same airports, we serve the same food,

3    and we show the same movies as our competitors.  Come up with a

4    way that a passenger will wait 20 or 30 minutes for our flight

5    instead of taking United or TWA or Delta or Braniff, and you'll

6    get the account.

7            And I left the room, and I knew the answer was not

8    going to be an advertising answer.  It wasn't going to be as

9    simple as a clever slogan or a clever jingle, though I wrote a

10   pretty good jingle for American ultimately.  It had to be

11   bigger than that.  My mother had collected green stamps, and I

12   said, boy, if we could do something like green stamps, it would

13   be great.  Maybe that would do it.  And it hit me that if we

14   could track American's passengers by miles and make each mile a

15   point, and that you collect enough points you get free trips,

16   that would be a big win.  Nobody had ever done that before.  It

17   probably would not have been legal during the period that

18   airlines were regulated, but this was well after deregulation.

19           And I called Crandall, and I asked if he could connect

20   me with their head of -- their computer system, Saber.  And I

21   asked him if this was possible, and he said, well, we really

22   already do it.  And the next thing I knew, I came up with a

23   name, it was called Advantage AA.  It was the first airline

24   frequent flyer program, and it led to many other loyalty

25   programs.  I -- I get points because I like a particular

UNITED STATES DISTRICT COURT

1    steakhouse today.  And that got us the American Airlines

2    account.  We subsequently won Armour, which was also owned by

3    Greyhound, we won AVIS.  I actually did a house ad that said we

4    have American, Armour, and AVIS, and now it's time to work on

5    the Bs.  And I was there for three years.

6    Q.  And what did you do after -- that was with Bozell.  What

7    did you do --

8    A.  I probably would have stayed there the rest of my career.

9    It was a good agency, and we had wonderful clients.  But my

10   wife hated Dallas, and I love my wife.  So, you know, at that

11   point, I knew a lot of people in the business.  I was on the

12   board of directors in the American Association of Advertising

13   Agencies, I was well connected, and I worked out a deal with an

14   agency called BBDO, and they just go by those letters.  And I

15   became head of their western operations.  We had offices in Los

16   Angeles and San Francisco and Denver and Honolulu, and I was in

17   charge of all of those based in Los Angeles.  We had some

18   pretty good accounts.  We had Apple Computer, I did a lot of

19   work on Pepsi, I did the campaign.  I did one of the campaigns

20   that involved Michael Jackson; unfortunately, it was the one

21   where we burned his head in a big fire.  And I was at Bozell --

22   excuse me -- BBDO for about three years.

23   Q.  Were you on the set when Michael Jackson had his hair

24   caught on fire?

25   A.  I was on the set.  I was horrified.  We had paid the

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    Jacksons $10 million, but I was also thinking, we may have just

2    destroyed the career of the most important figure in pop music.

3    But he was fine.  At the end, he was fine.  He -- there

4    happened to be very good hospitals in the L.A. area, and good

5    burn units.

6    Q.  And so what did you do after BBDO?

7    A.  I kind of caught the entrepreneurial bug.  To that point in

8    my career, I had worked for big agencies.  I had done well with

9    them.  I had senior positions and I was very well compensated.

10   But I really got the urge to try to build something, and I kind

11   of -- I knew not real well a couple of fellows who owned an

12   agency called Asher/Gould, A-S-H-E-R, G-O-U-L-D.  And they

13   offered to give me a third of the agency and make me president,

14   and make me executive -- and be creative head.  I didn't

15   realize they were also offering me the chance to make the

16   coffee every morning and lock the door every night.  But I

17   joined them, and I was there for the next 11 years.  When I

18   started, the agency was billing $12 million.  When we sold it

19   11 years later, we were doing 155 million.  Our clients

20   included Suzuki cars, Pizza Hut, Baskin-Robbins Ice Cream, the

21   California Department of Health Services' tobacco use

22   prevention campaign, which was the campaign I cared most about,

23   to be truthful.  We were very successful, and the strategies we

24   created have been successfully used all over the world and were

25   emulated.  So we had lots and lots of different kinds of

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    accounts, and we were really very successful.  And sold the

2    agency to New York Stock Exchange listed, communications

3    holding company called Interpublic.  And, you know, as is

4    typical in these kind of deals, it was an earn-out, so I had a

5    three-year contract to be committed to continue to work for

6    Interpublic.

7             They sort of surprised me.  About six months after the

8    deal, they asked me to take over a company called Western

9    International Media that they had purchased about six months

10   before they bought us.  And it was America's largest

11   advertising media planning and buying agency.  At that time, it

12   did nine or $10 billion a year in business.  Its largest client

13   was the Walt Disney Company.  It also had the Home Depot and

14   the United States Navy, and they had big accounts, small

15   accounts.  And they were just bleeding money.  They -- they

16   were not making money.  They were losing money at an -- an

17   alarming clip.  My agency had been very profitable, and Western

18   was based in Los Angeles.  So Interpublic figured maybe I could

19   figure it out.  And I went there, and I ended up staying for

20   six years, stayed well beyond my contract -- original contract

21   period.  And it was a little bit different for me because the

22   focus there was on the media planning side, the strategy side,

23   as opposed to the creative side, which actually for me I found

24   fascinating.  Was learning a lot of new things.  And I like to

25   learn things.

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    Q.  So during the course of this week, Mr. Silverman, we've

2    discussed both Southwest chili and Midwest chili.  You had an

3    opportunity to work on the Pace Picante?

4    A.  I did.  And I had the Pace account because I got it when it

5    was a tiny account.  It was a family-owned business in San

6    Antonio, and they wanted to get into supermarkets.  And to do

7    that, they needed to advertise, do consumer advertising.  And I

8    wrote this commercial for Pace that involved a group of cowboys

9    at a chuck wagon, and the cook at the chuck wagon is using --

10   he wasn't using Pace.  And the -- one of the cowboys picks up

11   the bottle and says:  This stuff is made in New York City.  And

12   all the cowboys, they're not happy.  And one cowboy says:  Get

13   a rope.  And that commercial ran, amazingly, for 15 years, the

14   same commercial.

15       I -- I actually ran into the actor that played the

16   lead cowboy at the supermarket we go to, while it was still

17   running, but probably 10 or 12 years after it was done.  And I

18   said:  I know you won't remember me, but I was the guy who

19   wrote and did this Pace commercial.  And he went, oh, man you

20   are paying for my kids' college education, because of

21   residuals.  But that -- that commercial all by itself put Pace

22   on the map, and it became by far the largest selling salsa,

23   second only to Heinz in the condiment -- Heinz Ketchup in the

24   condiment business.  And the family sold the business,

25   ironically, to the Campbell's Soup Company, which is in New

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    Jersey, or $1.1 billion.  Pretty good for them.

2    Q.  So, Mr. Silverman, I think we're up to Initiative Partners?

3    A.  Yes.

4    Q.  What did you do next?

5    A.  Well, after Initiative, I actually thought I retired.  That

6    was my plan.  We had done well on the sale, and my wife was one

7    of only two female general managers of radio stations in the

8    Los Angeles market.  There was 75 stations, so she must have

9    been pretty good at her job.  And we had done well.  And so

10   I -- I was interested in teaching.  I thought maybe I'd write a

11   book or two.  We wanted to travel a lot.

12          And in fact, we were on a flight to Seattle to visit

13   my -- my nephew, who is also my Godson, who is a Deputy

14   Attorney General up there, and I ran into an old friend named

15   Tracy Wong on the plane.  He owned an agency with the strange

16   name Wong Doody.  And it had been very successful as a creative

17   agency, but it really got mauled when the dot com bubble

18   exploded in the early 2000s.  And by the time I got off the

19   plane, I was president of Wong Doody.  And -- but my job,

20   really, was to try to fix it.  And we did that.  They already

21   had some really good accounts.  They had Alaska Airlines, they

22   had Nordstrom, they had T-Mobile.  But we went out on -- we got

23   a lot of new business, and new business in the advertising

24   business can heal a lot of things.  We picked up really

25   important assignments from Coca-Cola, from Sony, from MGM.  We

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    got the Los Angeles Dodgers baseball team.  You may have heard

2    of them.  I think they're going to play your team starting this

3    week.

4              THE COURT:  I believe so.

5              THE WITNESS:  Last night's game was amazing.

6              And so, you know, once the agency was stable, I

7    decided to go back to retirement.  And then former clients

8    started calling me and asking if I could assist them in some

9    way or other.  And I realized that I really loved the business.

10   I didn't love running a big company.  I think there's a point

11   at which you reach a point where you're not doing what you

12   love, you're doing what you have to do.  You end up dealing

13   with lawyers.  I want to deal with people who make commercials.

14   And accountants.  And all of that kind of technical stuff.

15             So I went back to doing what I think I do real well,

16   and that's branding and advertising, et cetera, providing

17   advice and counsel, and sometimes -- and I still create ads.  I

18   have -- one of my largest clients is a healthcare system in

19   Pennsylvania, and I'm their ad agency.  And they're big.  They

20   have 35,000 employees.  They operate 10 hospitals.

21   BY MR. FERRUCCI:

22   Q.  And now you deal with lawyers for a different reasons.

23   A.  Excuse me?

24   Q.  Now you deal with lawyers for a different reason.

25   A.  Now I deal with lawyers for a different reason.  I -- the

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   first time I was ever asked to be an expert witness, I didn't

2   even know what it was.  But it was explained to me, and I found

3   it interesting, so I do that from time to time, as well.

4   Q.  So Mr. Silverman, earlier you said you had an interest in

5   teaching.  Did you -- have you held any academic positions?

6   A.  Yes.  I taught for a couple of semesters, two semesters --

7   maybe three -- in the late 1970s at Pepperdine University.  I

8   taught advertising, introduction to advertising.  And I also

9   taught a number of quarters at UCLA extension, which is

10  basically an adult education program.  It's the largest one in

11  the world.  And again, I taught courses related to advertising.

12          But I've also been a guest lecturer at many

13  universities across the United States, and even outside the

14  U.S., including both Arizona State and the University of

15  Arizona, and Thunderbird here in Phoenix.  I always teach what

16  the instructor asks me to teach, so it might be an emphasis on

17  creative, it might be an emphasis on strategy, it might be an

18  emphasis on branding or media.  But the main reason I do it is

19  because I really like interacting with the students, and I also

20  think that it's very important for people studying advertising

21  to get a real world perspective, because try as they might,

22  academics are not operating in the real world.  They don't have

23  access to the kind of information that people who really do

24  advertising for a living have.

25  Q.  Well, Mr. Silverman, you've worked at both the real world

UNITED STATES DISTRICT COURT

1   of advertising for 50 years, you've held academic positions, so

2   you're familiar with both worlds. In your experience, what is

3   the difference between marketing academics and advertising

4   professionals?

5   A. Advertising academic -- academics, in my experience -- and

6   I really like teachers -- my sister teaches at the University

7   of Arizona, so I have to like teachers.

8                 (Cell phone ringing in courtroom.)

9                 THE WITNESS: Oh, I'm terribly sorry, Your Honor.

10                     (Pause in proceedings.)

11                 THE WITNESS: And that is now off.

12                 Academics deal in theory, and a theory is wonderful

13   and interesting. But advertising is a business that you really

14   learn on-the-job. This is going to sound strange, but in all

15   the years I've worked in advertising, I've never known anyone

16   who held a senior position in advertising that studied

17   advertising in any meaningful way when they were in college.

18   David Ogilvy, who is the only advertising man who ever appeared

19   on the cover of Time Magazine, was thrown out of Oxford -- he's

20   a Brit -- was thrown out of Oxford after three months.

21                 I was a history major in college. Advertising

22   requires people with well-furnished minds. And so that's --

23   doing it every day is when you really learn it. And one of the

24   things you learn from is that we have access to information

25   that no academic can get. We do -- advertising and marketing

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   people do tremendous amounts of research.  Research is very

2   important.  But the research is proprietary.  We don't share it

3   with anybody.  We don't share it with our client -- with anyone

4   other than our clients.  We most assuredly do not want to make

5   it public because that works against our clients.  So we know

6   things based on the real world, what thousands of consumers are

7   telling us in various ways, everything from individual

8   interviews to quantitative -- quantitative studies.  And so we

9   just know more.

10          I think the other difference -- the other difference

11  is a practical difference, a business difference.  If we do a

12  bad job for a client, we get fired.  And when I was handling

13  the Walt Disney account at Initiative, they were billing a

14  billion dollars a year with us.  A billion dollars.  If we

15  messed up, we lost a billion-dollar account.  And it would have

16  cost me my job.  I would have been fired in a heartbeat.

17  Advertising is What Have You Done for Me Lately business.  And

18  academia, you know, in colleges, a lot of professors have

19  tenure.  They're not under the same stress levels.  But I

20  happen to believe that stress is good.  I think you do better

21  work.  I can't say that I had 100 percent hit rate.  I don't

22  think anybody in advertising did or does.  But I have had a

23  very successful career, so I must have done a lot of things

24  right.

25

BRUCE G. SILVERMAN – DIRECT EXAMINATION

```
 1    BY MR. FERRUCCI:
 2    Q.  Mr. Silverman, have you authored any publications?
 3    A.  Well, I have authored thousands of -- I've authored
 4    hundreds and hundreds and hundreds -- maybe thousands -- of ads
 5    and commercials and television commercials, radio commercials,
 6    ads on the web, billboards.  So those are certainly
 7    publications.  I work full time in advertising.  That was my
 8    job.  I didn't have much time.  I would have taught more if I
 9    had time.  But to do a good job as a teacher, you have to
10    devote time to it, and I didn't have that time.
11              I did write a short book for the Brain Institute of
12    the University of Florida on -- the title was How to Create
13    Effective Tobacco Use Prevention Advertising.  And that was the
14    closest I've ever come to writing really anything other than
15    advertising.  Of course, inside the agency you're always
16    writing, you know, papers and opinion pieces, et cetera.  But
17    it's -- advertising is a business that, you know, you're not
18    interested in making the other people smarter than you are.
19    Q.  How about media appearances?
20    A.  Many.  I've been interviewed by every major newspaper --
21    well, certainly by The New York Times, Chicago Tribune, Los
22    Angeles Times.  I was recently interviewed by the Washington
23    Post about a false advertising issue related to a hotel in
24    Washington, D.C.  I've been on television, I've been on radio.
25    A lot of media appearances.
```

UNITED STATES DISTRICT COURT

1  Q.  And so generally, what is the nature of those media

2  appearances?

3  A.  It's always about advertising; you know, questions about --

4  everything from, what do you think -- what do you think of the

5  upcoming commercials in the Super Bowl?  I get asked that all

6  the time by radio stations, call me about that.  Because now

7  the commercials -- you can see the commercials before they run

8  in the game.  But, you know, two things related to business

9  issues involving advertising, as well.

10  Q.  Have you received any advertising awards?

11  A.  Yes.  Advertising -- the advertising business likes to pat

12  itself on the back.  I've won the Cannes -- the Cannes --

13  excuse me -- the Gold Lion Award at the Cannes International

14  Advertising Festival.  That's C-A-N-N-E-S.  That's sort of the

15  super -- the Oscar of the advertising business.  It's the

16  biggest award you can win in the world.  I've won a lot of Clio

17  awards.  I've lost track of them.  I've won all kinds of local,

18  regional advertising awards, as well.

19       The ones that actually I'm proudest of, there's an

20  award given by the American Marketing Association called the

21  Effie Award, as in effectiveness.  E-F-F-I-E.  And it's given

22  to the advertising campaign that it -- advertising campaigns

23  that are judged to be most effective at generating sales.  And

24  that's what we're supposed to do.  That's -- we're salesmen.

25  We may use art, but we're all about commerce.

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    Q.  Now, Mr. Silverman, as part of your 50 years working in the

2    real world of advertising, describe any experience you've had

3    working with pet products.

4    A.  Yes.  I -- Mars, Incorporated, the candy-maker, they also

5    own a chain of puppy stores called Puppy Palace.  It was a

6    national chain.  Purebred puppies.  And they were a client.  I

7    did -- I worked on the account, and I wrote the ads.  And to do

8    that, you know, we went and talked to people about what they

9    love about their puppies and why they buy puppies and what they

10   look for, and a lot of other factors.

11          I handled the Sears account for many years when Sears

12   was really a successful -- much more successful company than it

13   sadly is today.  They had at that time a big pet department;

14   both they sold pets, everything from iguanas to dogs and cats,

15   but also pet supplies, you know, everything, you know, from

16   collars and leashes and toys, and things like that.

17          And also I worked on dog food accounts.  The General

18   Foods Company owned Gaines, which was a big brand of dog food.

19   So, you know, we didn't talk to the dogs, we talked to the

20   people that bought food for the dogs.  And we learned about

21   them and how -- how to best communicate with them.  So, you

22   know -- yeah.  A lot of pet stuff.

23   Q.  Well, how about your experience with alcohol products?

24   A.  I've worked on -- boy, a bunch of alcohol products.  I

25   worked on Old Crow bourbon, I worked on Stolichnaya when it was

 1   first introduced into the U.S.  I've worked on a number of wine

 2   accounts.  I worked on Vincent Van Gogh vodka, more recently

 3   Van Gogh vodka.

 4        I also worked on a lot of beer brands.  One of the

 5   clients as Asher/Gould was the Pabst Brewing Company,

 6   P-A-B-S-T, which owned more than 15 brands.  Pabst Blue Ribbon

 7   was probably the best known.  But they also have Hamms and

 8   Olympia and Falstaff and Ballentine's.  They owned a bunch of

 9   malt liquor brands as well:  Old English 800, Private Stock,

10   and Country -- what was it called? -- God, it was the one in

11   Texas -- oh, Pearl beer they had.  So, yeah, a lot of alcohol

12   beverage business -- experience.

13   Q.  So, Mr. Silverman, you've had a great career, great

14   success.  What is the key to creating an effective advertising

15   strategy?

16   A.  I -- I always summarize it -- I get asked that question all

17   the time, not just by lawyers.  The answer I always give is you

18   have to find a way to walk in the consumer's shoes.

19   Advertising -- advertising only succeeds if you tell consumers

20   what they want or need to hear.  And that is not always what

21   the advertiser wants to say.  A lot of times the advertiser

22   says, well, I want to brag about my product this way.  But

23   that's not going to be -- that's not going to generate what you

24   want from the consumer, which is motivation.  So you have to --

25   you have to get into their heads:  You have to learn who they

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    are, what they think, what they know, what they feel, what they

2    need to know, and what will make them feel the way we want them

3    to feel about our product or service.

4    Q.   And how do advertisers learn how to walk in the consumer's

5    shoes, as you put it?

6    A.   Well, the broad way we do it is research, and you can get

7    research in a lot of ways:  There's secondary research,

8    secondary market research, that's available to business, if you

9    pay for it.  Various kind of studies.  But most marketers, most

10   advertisers, recognize -- especially larger ones that can

11   afford it -- recognize that you have to do original research,

12   proprietary research, because that's going to find ways to

13   differentiate your product from your competitors'.  You'll know

14   the consumer better.

15          So agencies, the agencies I worked for, and even my

16   own business now, you do a lot of research.  You pay for it.

17   But do quantitative studies, which means that we're doing

18   surveys; we do qualitative studies that include focus group

19   research and one-on-one interviews.  Ogilvy & Mather, where I,

20   you know, basically grew up in the business, they really felt

21   that the best way, particularly for creative people to really

22   get it, was to talk to consumers.  So when I first went to work

23   for the Shell account, I put in two weeks working at a Shell

24   station back when there were attendants.  And I pumped gas and

25   I washed windows and I checked oil, and I filled tires.  But

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    most importantly, I spoke to drivers.  What got them to that

2    Shell station?

3              When I had the Baskin-Robbins account at Asher/Gould,

4    when I got that account, I spent two weeks going to scoop

5    school, Baskin-Robbins' training program, so I could work

6    behind the counter and I could make sundaes, sodas, and shakes;

7    not because I wanted to make sodas, sundaes, and shakes, but I

8    wanted to talk to people who were buying them.  And I could do

9    it across the counter.  And I was just the guy who worked

10   there.  I was wearing a pink shirt and a brown hat.

11             When -- and when I worked on the American account,

12   they allowed us to push the drink cart up and down the aisle

13   and talk to passengers, both, you know, on the airplane and

14   also when we get off the plane.

15             It's amazing what you learn when you do that.  And

16   this is standard fair in the advertising and marketing

17   business.  The great thing about qualitative research, such as

18   focus groups, is that it -- it gives you insight into thoughts

19   and feelings, which qualitative research cannot do.  It's

20   really important, and it's tremendously well-respected and

21   relied upon.

22   Q.  And we'll talk a little further about qualitative and

23   quantitative research and the type of research that advertising

24   professionals use.

25             Mr. Silverman, have you testified as an expert witness

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    before?  I believe you said that.

2    A.  Yes, I have.

3    Q.  And what do you believe is the role of the expert witness?

4            THE COURT:  Counsel, I think I know that answer to

5    that one.

6            THE WITNESS:  Okay.

7            MR. FERRUCCI:  Strike that.

8            THE WITNESS:  Thank you, Your Honor.

9    BY MR. FERRUCCI:

10   Q.  And in how many cases have you served as an expert witness?

11   A.  Excuse me?

12   Q.  How many cases have you served as an expert witness?

13   A.  I thought -- gosh, I've been retained now over the course

14   of the past 11 or 12 years, boy, it's probably close to 90

15   times on all cases involving advertising, and branding, and

16   trademark issues, and publicity rights, and industry custom and

17   practice.

18   Q.  Is that both sides of the case; defendant, plaintiff?

19   A.  Yes.  Yeah.  Yeah.  I -- it's probably about 35 percent for

20   defendants and the balance for plaintiffs.

21   Q.  And what expertise do you generally offer in those cases?

22   A.  Well, I -- I'm an expert in advertising, so I certainly can

23   speak about consumer perceptions about advertising.  I work on

24   trademark cases, again, offering opinions about likelihood of

25   confusion.  I work on publicity rights cases.  In those, it's

1    mostly about incidents where someone -- usually a celebrity --

2    their name and likeness has been used without their permission,

3    and what the value of that would be had the person or the

4    business that used that, those images or names, had they

5    negotiated it effectively.  And also industry custom and

6    practice disputes between agencies and the media and clients,

7    et cetera, on what's custom and what's customarily done.

8    Q.  Were you ever involved in a case where you were offered as

9    an expert and where you were not qualified by the Court?

10   A.  No.

11   Q.  Now, Mr. Silverman, you were engaged by VIP Products in

12   this case to provide your expert opinion; correct?

13   A.  That's correct.

14   Q.  And what have you been asked to do?

15   A.  I was asked very specifically to rebut Dr. Simonson.

16   Q.  Now, what is your understanding of Dr. Simonson's opinion

17   in this case?

18   A.  Well, my understanding is that Dr. Simonson believes that

19   the Bad Spaniels dog toy would elicit feelings of disgust by

20   people that become familiar with it.  And then, he says, that

21   this would result, because it's a parody of -- of Jack

22   Daniel's, that it would elicit disgust in people about the Jack

23   Daniel's brand.

24           MR. FERRUCCI:  Can I have the ELMO turned on, please.

25           THE COURT:  Do you want the lights turned down?

BRUCE G. SILVERMAN – DIRECT EXAMINATION

 1          MR. FERRUCCI:  Yeah, I think so.  Just a little bit,
 2  please.
 3          Thank you.
 4  BY MR. FERRUCCI:
 5  Q.  So Mr. Silverman, on Monday Dr. Simonson testified
 6  regarding the associative memory network in general as he
 7  applied it to this case.  And as part of that testimony,
 8  Dr. Simonson used two exhibits, two demonstrative exhibits, to
 9  explain his theory of this case, demonstrative Exhibits 10,001
10  and 10,002.
11          I'm showing you Demonstrative Exhibit 10,001.
12          Do you see that, Mr. Silverman?  I can get you a copy
13  if you --
14  A.  I do.
15  Q.  Do you want a copy?
16  A.  I've seen a copy.
17  Q.  Okay.  Now, this is Demonstrative Exhibit 10,001 which
18  purports to show the notes that are in Jack Daniel's
19  associative network prior to the introduction of the Bad
20  Spaniels product.  The bubbles represent the notes or ideas
21  consumers have about the Jack Daniel's brand.
22          Do you see that?
23  A.  Yes.
24  Q.  And Demonstrative Exhibit 10,002 purports to be Jack
25  Daniel's associative network of notes or ideas that

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   Dr. Simonson testified are caused by the Bad Spaniels product.

2         Do you see that?

3   A.  I do.

4   Q.  Now, in your rebuttal report, you're not taking issues with

5   Dr. Simonson's use of the associative memory network; correct?

6   A.  That's correct.

7   Q.  What are you taking issue with?

8   A.  He makes an assumption.

9   Q.  What is that assumption?

10  A.  His assumption is that consumers would become disgusted if

11  they were -- if they were -- if they actually looked at one of

12  these bottles of the toy -- actually, it's a toy, I shouldn't

13  call it a bottle -- if they saw Bad Spaniels, that that Bad

14  Spaniels, the labeling on it, would elicit feelings of disgust.

15  And that leads to everything he then says about how it affects

16  Jack Daniel's.

17        The -- he's, in my opinion, he's making this

18  incredible leap that it would elicit feelings of disgust.  It's

19  just his opinion.  I -- I didn't see anything in his report

20  that demonstrated there was any empirical evidence that that

21  would happen.  That's just one man's opinion.

22  Q.  So I take it you do not agree with Dr. Simonson's opinion

23  that the Bad Spaniels product would tarnish the Jack Daniel's

24  brand?

25  A.  No, I do not believe that.

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1  Q.  And just to make this clear, Mr. Silverman, why do you not

2  agree?

3  A.  Well, I'm going to go back to my experience.  Number one, I

4  have never known consumers to buy products that disgust them.

5  They just don't do that.  I'm sure there are products out there

6  that might do that, but I have not encountered any personally.

7  I've worked on hundreds of -- hundreds and hundreds of

8  products.  In my CV, there are page after page listed of -- in

9  the accounts and brands that I've done advertising for.  I've

10 never seen it.  And I've worked on products, pet products that

11 we've discussed.  And during the course of working on these pet

12 product accounts, I interviewed -- either -- either I've looked

13 at qualitative research, quantitative research.  The thing I

14 learned most is that when it comes to dogs, people love their

15 dogs.  I've had dogs all my life, and so that's personal

16 experience.  But from a business standpoint, people love their

17 pets.  Dogs, especially.  Frequently they're treated like

18 children.  And you don't buy things for your dog that disgust

19 you.  You just don't do that.

20        So I -- I look at this, and it's -- I think it's --

21 personally, I happen to think it's funny, and -- but I don't

22 think it would elicit feelings of disgust, based on my business

23 experience, my professional experience.  I just don't believe

24 that would happen.  I don't believe people would buy that

25 product if it did.  And therefore, if it doesn't disgust

1    people, how is it going to cast a negative shadow on Jack

2    Daniel's?  I don't see how that could happen.

3    Q.  So there's been testimony in this case that 55,000 units of

4    the Bad Spaniels products has been sold.  I take it your

5    opinion would be that those 55,000 customers were not disgusted

6    by the Bad Spaniels product?

7    A.  Yes, that would be my opinion.

8    Q.  Mr. Silverman, I want to take a look at Dr. Simonson's

9    report.

10              Your Honor, may I approach?

11              THE COURT:  You may.

12   BY MR. FERRUCCI:

13   Q.  Mr. Silverman, let's turn to page 12 and look at

14   paragraph 31.

15   A.  Yes, I'm there.

16   Q.  Now, Dr. Simonson was asked on Monday to locate in his

17   report the studies he used to support his contention that the

18   Bad Spaniels toy would elicit disgust.  What is he really

19   saying in this paragraph?

20   A.  Well, as I look at this, the first sentence -- he writes --

21   we're talking paragraph 31?

22   Q.  Yes.

23   A.  (Reading)  As a result, VIP's product is likely to bring

24   Jack Daniel's to mind.

25              And I don't disagree with that.  It certainly would, I

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   think, would come to mind by people who are familiar with Jack

2   Daniel's.  And for people who aren't familiar with Jack

3   Daniel's, I don't think it would.

4   Q.  And that would be the second step in his associative memory

5   network process?

6   A.  Yeah, that's my understanding of it.

7           But then he goes on:  Furthermore, as explained above,

8   consumers who are exposed to VIP's product add another mental

9   association.  The new brand association is negative, and

10  that's -- he's speaking there of defecation.  And that leads to

11  this whole idea of disgusting.  But I don't see anything where

12  he has any support that the contention that the product elicits

13  disgust.  If a product elicits disgust, he may be right, but I

14  see where -- how he comes to say that this product elicits

15  disgust in anything other than a personal opinion.

16          THE COURT:  Just out of curiosity, he punctuates that

17  with a footnote.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  So my question is, if he drew from things

20  punctuated in that footnote, is he not supporting his opinion,

21  or did you -- did you read those articles?

22          THE WITNESS:  I didn't read the articles.  But the

23  footnote, Your Honor, is really important because what he's --

24  the footnote goes to the -- it's -- the article he's citing,

25  The Disgust Promotes Disposal Effect, which appears in feelings

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    and consumer decision-making, I think in a magazine called

2    Consumer Psychology.

3         But that doesn't speak to the product.  It doesn't

4    speak to Jack Daniel's -- to Bad Spaniels, it doesn't --

5    there's nothing -- I would presume there's nothing in that

6    article, I would presume, about a dog toy named Jack

7    Daniel's -- called Bad Spaniels -- excuse me -- that would

8    elicit disgust.  It's about the general concept that you can

9    become disgusted.

10        But you have to have -- you have to have a reason to

11   become disgusted for that to work.  So he -- there's nothing in

12   that paragraph, anywhere else in his report that I can see

13   where he's got real evidence that Bad Spaniels disgusts people.

14   I haven't seen it, I don't believe that would happen, and I, at

15   least, asked 19 people.  That certainly wasn't elicited with

16   these people.

17   BY MR. FERRUCCI:

18   Q.  Mr. Silverman, I think the judge's point was really

19   well-taken.

20        I think it's your testimony that the sentence that

21   begins with the new brand association, that's not footnoted.

22   So the sentence that begins:  The new brand association of

23   dog's No. 2 is negative.  For many, it's likely to even be

24   disgusting.

25        That's not source; correct?

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   A.   That's not source.

2   Q.   In fact, the footnotes for the next sentence, the sentence

3   that starts:  Prior research has shown that a feeling of

4   disgust leads consumers to avoid things that are associated in

5   any way with that feeling.

6        And then that's where we see the footnote; correct?

7   A.   That's correct.  And that's about that whole idea, which I

8   wouldn't necessarily disagree with, that if you're -- if

9   something disgusts you, you're not likely to want to purchase

10  it.  But there's nothing here that points to any empirical

11  evidence about this specific product.  He -- he makes an

12  assumption, and it's his opinion.  And I've studied his CV.  He

13  does not have experience, that I can see, dealing with pet

14  products, at least in any meaningful way.  So I don't see how

15  he gets there.  I read his deposition.  I don't know if he

16  likes dogs.

17       MR. FERRUCCI:  I'm finished with the ELMO.  We can

18  turn the lights back up.

19       Thank you.

20  BY MR. FERRUCCI:

21  Q.   So Mr. Silverman, in the course of this trial, we've talked

22  about the idea of projectability and consumer research studies.

23  Can you refresh our recollection of what projectability is?

24  A.   Yes.  In survey research, quantitative survey research, you

25  use the statistical -- what -- reliability is a synonym for

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    statistical significance.  If you interview enough people who

2    fit the right profiles demographically that relate to the

3    product or service that's being studied, if you get to a large

4    enough number, the statisticians will tell us that the answers

5    you get are statistically reliable, that they would be

6    replicated in the marketplace, plus or minus, say, 5 percent or

7    3 percent or 4 percent, depending on the number of people

8    studied.

9           I've been involved in a lot of quantitative studies.

10   You know, we -- every advertising agency does it to one degree

11   or another, the ones I worked for.  You know, we had gigantic

12   accounts, so we did a lot of it.  Typically those studies

13   involved about, you know, you kind of start at 1200 people,

14   getting for demographic balance and a geographic balance and

15   things like that.

16   Q.  Well, let me ask you this, Mr. Silverman.  Is

17   Dr. Simonson's opinion that the Bad Spaniels dog toy would

18   elicit disgust, is that opinion projectable?

19   A.  No, that's just his opinion.  That's the opinion of one

20   person.

21   Q.  And as you testified, you have a different opinion than

22   Dr. Simonson's.

23   A.  I do.  I just disagree.  And I disagree -- my experience

24   is -- is influenced by the work I've done in pet products and

25   other products that are not always -- that are sometimes meant

1    to be funny.  I happen to do a lot of advertising for toys.  I

2    ran the Mattel toy account for many years.  You know -- you

3    know, beauty is in the eyes of the beholder, and so is humor.

4    Q.  So Dr. Simonson's central premise, or as you call it in

5    your report, his linchpin, that the Bad Spaniels dog toy

6    elicits disgust, you don't share that opinion.  How did you

7    arrive at your opinion?

8    A.  Well, number one was my own experience.  My experience --

9    professional experience dealing with products, you know, pet

10   products, people buying pets, et cetera.  And what -- and

11   really what I -- my takeaway there is that people love their

12   pets, especially dogs.  Dogs can be very lovable.  If you think

13   about dogs, what they do all day; they eat, they sleep, they

14   poop.  Every once in a while they'll lick you on the face and

15   that makes everything else worthwhile, and that's a personal

16   experience.  But this is what people tell us over and over and

17   over.  They love their dogs.

18        When it comes to something like poop, if you're a dog

19   owner, you know, you can't be disgusted by it because you're

20   picking up after your dog all day.  One of the -- one of the

21   products that I did advertising for -- it was a very small

22   account -- they made the plastic bags that come in rolls that

23   you rip off the roll, you put it on your hand like a glove, you

24   pick up -- you pick up your dog's stuff, you unfurl it so it's

25   now in a bag, and you throw it away.  I just don't think that

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    dog owners are easily disgusted by funny references to poop.

2    Q.  And you --

3    A.  And that's based on my experience.

4         Now, the second part of it was, I just took the

5    opportunity, while working on this case, I thought it would be

6    interesting to see how consumers, just a group of consumers,

7    would feel about this issue, very specifically about this

8    product, as it related to to Jack Daniel's.  So with your

9    permission, the clients' permission, we conducted a series of

10   focus groups, four focus groups.

11   Q.  Well, let's talk about the focus groups that were conducted

12   here.

13        But before we do that, let's talk first generally

14   about the types of consumer research that advertising

15   professionals conduct in the real world of advertising.

16        So first, please explain, remind us again, what do

17   advertisers want to know about consumer behavior?  What's

18   important to them?

19   A.  Well, let's -- the number one thing you want to know is

20   what's important to them.  What are they looking for in a

21   product or service?  But you use research for a lot of

22   different purposes.  People doing creative work, and this could

23   be everything from creating advertising to creating packaging,

24   use -- they use research to see if there's any mistakes.  Are

25   you not communicating properly?  Is there confusion?  Is the

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

 1    consumer not getting what you were trying to communicate to

 2    them?  Do they find something wrong with the advertising, or

 3    with the label, or whatever?  So you do that because millions

 4    of dollars are at stake.  It's not just the money you're

 5    spending advertising.  It's the revenue that the advertising is

 6    supposed to generate.  That's what's really important.  So you

 7    got to try to get it right.

 8           In the creative process, the type of research that's

 9    used most is focus groups.  They use it throughout the creative

10    process for a given advertising campaign or commercial.  And

11    you're constantly help using it, A, in the beginning to try to

12    understand how consumers view the product or the category that

13    you're advertising, what their thought -- what you're after is

14    thoughts and feelings.  You know, Mr. Ogilvy, who was my

15    mentor, always preached, you have to sell to both the head and

16    the heart.  They're equally important.  So you can come up with

17    rational reasons to buy a product, but it won't sell.  But if

18    you come up with emotional reasons, as well, you have a pretty

19    good chance.  Sometimes emotional reasons all by themselves

20    will do the trick.  So you need to find ways of getting it

21    done.  So advertising folks like me, you use every kind of

22    research you can.

23    Q.  And what is your experience with those research methods?

24    A.  Well, I -- I've been involved in -- in this stuff for a

25    long time, you know, half a century.  I actually estimate that

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    over the years I've been directly involved in more than 5,000

2    quantitative studies.  If you do the math on that, it actually

3    isn't many in a given year, about 100 a year on average.  But,

4    you know, I worked at big agencies with lots of clients, and we

5    did lots of research.  It was very important.  Where I worked

6    on the Walt Disney account, I can't tell you how much research

7    we did on something -- on movie commercials, on ads for movies.

8    You know.  Huge amounts of money were at stake.

9            I figure that I've attended -- personally attended

10   more than 3500 individual focus group sessions.  Through most

11   of my career in the agency business, 38 years in the agency

12   business, I probably averaged two nights a week at focus

13   groups.  People have this think -- thinking that the ad

14   business is easy business, lots of fun.  I worked six days a

15   week, usually from 7:30 in the morning until 7:00 at night, or

16   later, if it was focus group night.  So I did a lot of those,

17   probably, you know, 3500.  I did focus groups two weeks ago for

18   one of my clients.  It's -- it's an important tool.

19   Q.  So what did you do with the focus group in this case?

20   A.  Well, in this case, we were -- at the end of the day, what

21   we were after was trying to determine whether or not the Bad

22   Spaniels toy, parody toy --

23            (Cell phone ringing in the courtroom.)

24            THE WITNESS:  I can't believe that's happened.  I'm

25   turning it off.

```
 1                    (Pause in proceedings.)
 2            THE COURT:  Can you silence that, please.
 3            THE WITNESS:  Yes, sir, I am.  I'm doing my best to do
 4   that.
 5            THE COURT:  Well, you hit the off button.
 6            THE WITNESS:  I thought I did.
 7            Now it's definitely off.  I'm sorry.
 8            I hate when that happens.
 9            The...
10  BY MR. FERRUCCI:
11  Q.  We were discussing what you did in this case with the focus
12  group.
13  A.  Yeah.  Okay.  Yeah.
14            What we did, we decided to conduct four groups:  And
15  one group would be women who drank Jack Daniel's –– who
16  preferred Jack Daniel's and who had dogs; a second group would
17  be men who didn't have dogs but drank Jack Daniel's; a third
18  group was going to be a group of people –– these are not
19  necessarily in the order we did them –– a group of people that
20  had drank Jack Daniel's but didn't own dogs; and there was a
21  fourth group of dog owners who also drank alcoholic beverages,
22  but where Jack Daniel's wasn't their number one brand.
23  Q.  And take us through the process of the focus group and how
24  it was conducted.
25  A.  Yes.  Well, we –– I did it the way most agencies do focus
```

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    groups:  I hired a company that specializes in doing focus

2    groups.  It's owned by a fellow named Jeff Hirsch.  He's been

3    doing focus groups his entire career.  In fact, I -- I believe

4    he actually either worked for Jack -- for Brown Forman or

5    conducted many focus groups for Brown Forman over the years.

6    Very experienced guy.

7            He, in turn, hired a company called Schlesinger

8    Research, which is a global company that fields research,

9    including focus groups.  They have a facility in Los Angeles

10   where focus groups are held, and they do the recruiting.  So

11   you give them the specs and they go out and get the people.

12           So we recruited -- what we were after were either dog

13   owners who drank Jack Daniel's, dog owners who didn't drink

14   Jack Daniel's -- we -- we wanted adults, and we very

15   specifically -- about the only limit we really put in was we

16   only -- we didn't want more than 50 percent people with Spanish

17   surnames, simply because that would be, you know, these days,

18   in the U.S., the Latino population is fairly significant.  We

19   didn't want to go overboard on that, especially in Los Angeles,

20   which has a very large Latino population.

21   Q.  So you were attempting to test this idea that the Bad

22   Spaniels dog toy would elicit disgust.  Why did you not decide

23   to do a more quantitative study?

24   A.  Well, there are two reasons.  The first, and to me the most

25   important reason, was if we could have done it, I don't think

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   we would have gotten the information we were trying to get.

2   You use -- I'm going to quote Ogilvy, if you don't mind.

3   Ogilvy said:  There are two ways to use research.  You can use

4   it the way a drunk does.  He leans on a lamp post for support;

5   a wise man uses a lamp post to illuminate things.  And I'm

6   interested in illumination.

7        And what we wanted to learn was, did Bad Spaniels

8   elicit feelings of disgust.  So that is what we wanted to do.

9   But that's a feeling.  It's an emotional reaction.  And in

10  our -- my opinion, the only way we could do that was actually

11  put the product in people's hands where they could touch it and

12  feel it and squeak it and -- it's very loud -- and look at the

13  label for as long as they wanted, within reason.  And check it

14  out.  And we were interested in their feelings.  And people are

15  going to verbalize that in different ways.  And they can elicit

16  physically in different ways.  And that's what we were

17  interested in.  You can't do that in a quantitative study.  You

18  can't get 1200 people to do that.  You can't put the toy in the

19  hands of 1200 people affordably.  I think recruiting would have

20  been a nightmare.

21       And quantitative studies are really expensive, and I

22  don't think, even if -- I mean, there was -- I don't believe it

23  would have been effective -- an effective way to learn what we

24  were trying to learn, but it also would have been prohibitively

25  expensive.

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1  Q.  And I think you agree with Dr. Simonson on that point, that

2  a quantitative study probably wouldn't have been able to get at

3  the disgust issue?

4  A.  That's correct.  Yes.  I read that in his deposition.

5  Q.  So Mr. Silverman, you know, you've been involved in more

6  than 3500 focus groups, you've observed them.  So I take it

7  that companies use these types of focus groups all the time.

8  A.  All the time.  It's -- it's been -- I've been in the

9  business for 50 years.  I probably started going to focus

10  groups 49 years ago.  When I was in the mailroom, I didn't go.

11  And they've been using them for years before that.  And I think

12  we'll be using them a few years from now.  It's -- there's no

13  better way to get into people's heads, to walk in their shoes,

14  than to see them in an environment where they feel free to talk

15  almost any which way they want to talk about what they think

16  and feel about a product.

17  Q.  And so what is your understanding of whether and how Jack

18  Daniel's and Brown Forman use focus groups?

19  A.  My understanding is they use focus groups both to help

20  develop strategy for -- to market and advertise their products,

21  and also for purposes of developing labeling, which is, in

22  essence, a creative chore.  So from that standpoint, they use

23  it the way almost every major company I've ever worked with

24  uses focus groups.  You know, some companies rely entirely on

25  their advertising agency to do it.  Some have in-house research

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1  departments that do it, as well as work with their agencies.
2  So they use it in a way that's very common, very typical.
3  Q.  So -- so starting from the beginning of the focus group to
4  the end, just walk us through the process.  What's the first
5  thing the moderator does?
6  A.  Well, I think in almost every focus group, the first thing
7  the moderator does, he asks people to go around the table and
8  what their name is, usually first name, where they live, and
9  what they do.  And it's a way just of getting conversation
10  going.  And it's good for the moderator because he can start to
11  know who these people are, and elicit response from them, which
12  is his job, and to keep them focused on the subject at hand,
13  which is why it's called a focus group.  So that was the first
14  step.
15       In our groups, the second step, the moderator did an
16  interesting thing.  He pulled together either photographs --
17  really, they were copies of parody ads or images.  And he
18  showed them to the group.  He held them up, showed them to the
19  group, and he asked whether or not they thought that these were
20  saying bad things about the products, or about whatever it was,
21  the parody, the original product was; whether it was neutral,
22  or whether it positive in some way.  It was funny.  It
23  really -- you know, theoretically, most parody products are
24  designed to be funny.  They're a joke.
25       And so the reason for doing this was to focus the

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    group.  He wanted them to -- he wanted to see whether or not

2    they clearly, A, understood what a parody product was, and they

3    all did.  There wasn't an issue.  And he wanted to see whether

4    or not how they differentiated -- how their feelings came out

5    about different images.  And they did that -- they did that in

6    all four groups.  That was the starting point.

7            One of the images he showed was a picture of the

8    Jack -- of the Bad Spaniels bottle.  And when he showed those

9    pictures, that was always -- you know, that's funny.  That

10   was -- you know, based -- you know, I'm going to just boil it

11   down to those two words.  The groups all identi -- put that

12   into the funny pile.

13   Q.  Why didn't Mr. Hirsch just show them the Bad Spaniels dog

14   toy?

15   A.  Well, focus groups have to focus.  If you don't find a way

16   to focus the group, you don't get to where you want to go.  If

17   you just took the toy out and, you know, said, here -- here is

18   a sample, to each person at the beginning of the group, he

19   would have to tell them right up front what we were trying to

20   learn because otherwise they wouldn't know.  I mean, they

21   wouldn't know why they were being given it, or anything.  I've

22   never seen a focus group that works that way.  I mean, I've

23   done focus groups for Hershey bars.  You don't just throw

24   Hershey bars out on the table.  I have done it for beer.  You

25   don't put bottles of beer out on the table.  I've done it for

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    airlines.  You don't put airline tickets on the table.

2           You start out creating a framework for the discussion.

3    It's a discussion.  And each group is going to go somewhat

4    differently because you're trying to get these people to talk,

5    sometimes to each other.  Conversations are very helpful in

6    focus groups because sometimes people, they nod, and do they

7    understand, and that's how you learn.  It's -- it's very

8    useful.  So that's what we did here.

9    Q.  Let me ask you this.  Doesn't explaining to the

10   participants what spoof products are and then characterizing

11   the Bad Spaniels toy as a spoof product influence how they're

12   going to think and feel about the product?

13   A.  The only thing they might feel is that it's a spoof.  And

14   one of the things that was interesting in the groups was that,

15   you know, they weren't able to point to many spoof products,

16   products themselves, but they certainly understood spoofs in

17   various ways.  Saturday Night Live was referenced a number of

18   times, which almost always has a fake commercial near the

19   beginning of the show, where they're spoofing a real product.

20   I've had clients who have been spoofed on television that way,

21   in various ways, sometimes just by comedians.

22          So, you know, we wanted to just create a framework to

23   talk about this product.

24   Q.  So Mr. Silverman, you've testified you've observed or

25   participated in over 3500 focus groups.  Was there anything out

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   of the ordinary about how this focus group was conducted?

2   A.   Conducted?  No.  I think the only -- as far as conducted --

3   they ended up being shorter than we anticipated.  That was a

4   little unusual.  But there was a lot of clarity.  And we

5   weren't trying to find out enormous amounts of information, you

6   know, which sometimes happens in focus groups.  This one --

7   these turned out to be simple.  We had scheduled each one for

8   an hour, knowing that they would probably only last about 50

9   minutes.  And, you know, as the evening went on, group after

10  group after group, each one got shorter because we realized we

11  didn't want to waste their time or our time.

12  Q.   So you had -- you had 19 participants.  What was their

13  reactions to the Bad Spaniels toy generally?

14  A.   Generally positive.  They -- I mean, I think if I was just

15  to use one word to describe it, they thought it was funny.

16  Q.   And what was their reaction specifically to the disgust

17  issue?

18  A.   They thought that was ludicrous.

19  Q.   Any exceptions to the group?

20  A.   No.  And that -- I have to say this.  You know, focus

21  groups are not projectable, but they're directional.  That's

22  how marketing people refer to it.  I don't think in my whole

23  career I have ever seen a series of focus groups where

24  everybody had the same opinion.  Everybody.  And it was

25  unanimous here.  It was -- nobody came away with disgust.

1    Everybody throughout it was -- everybody but one person thought

2    it was funny.  There was one fellow who just hated the squeak.

3    It's very loud.  And this guy, it really irritated him.  He was

4    in the group of non dog owners, so this guy probably will never

5    own a dog; if he does, he'll never own a squeaky toy.

6    Q.  So you know, I think you answered this.  Did anyone share

7    Dr. Simonson's opinion that the Bad Spaniels toy would elicit

8    disgust or is disgusting?

9    A.  No, sir.  Not one.

10   Q.  So you said earlier that one of the things that focus

11   groups allow is for the researcher to note the physical

12   reactions of the participants.

13           Do you remember that?

14   A.  Yes.

15   Q.  And you were behind the one-way mirror at these focus

16   groups?

17   A.  I was.

18   Q.  And you observed their physical reactions?

19   A.  I did.

20   Q.  And what were their physical reactions?

21   A.  Well, you know, there were smiles, there were nods.  You

22   know, the engagement with the toy, particularly by dog owners,

23   was marked.  I mean, they -- they got a kick -- I guess the

24   best way to describe it -- I don't think this is maybe legal

25   language, but it certainly works in my business -- they really

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1    engaged with it.  They -- they thought it was fun.  We -- I

2    don't -- maybe it's because Los Angeles is such a big city,

3    there were a number of dog owners that had Chihuahuas, and they

4    sort of complained that it was too big -- it was just too big

5    for their dogs.  And I -- I understand that.  But they thought

6    it was funny.  They -- I mean, literally, the physical looks

7    were the kind of looks that you hope for.

8           Now, I haven't worked on many products that are

9    necessarily supposed to be funny, but what it reminded me most

10   of was when I was dealing with products, such as toy products

11   made by Mattel, and sometimes candy products, and things like

12   that, which kind of elicit delight.  And that's what was

13   happening here.

14   Q.  Did you note any physical reactions when the

15   participants -- when the participants were specifically asked

16   questions about the disgust question?

17   A.  Yeah.  They were shaking their head.  I think they frankly

18   thought that -- that -- I mean, I think somebody actually used

19   the word "ludicrous."  They just shook their heads.  They just

20   said no; you know, I mean, that's silly.  You know -- I mean,

21   you know, we're grownups.

22          You know, there is such a thing as potty humor, but

23   it's not going to disgust people, especially in the context of

24   a dog toy.

25          MR. FERRUCCI:  Well, the Court wants us to be finished

1    by 11:30 this morning, so we were going to share some of these

2    focus groups, but --

3              THE COURT:  If possible.  I mean, it's -- this is --

4    we allowed two weeks for this.

5              MR. FERRUCCI:  Okay.

6              THE COURT:  But, you know, it's going to push your

7    case back, and their case.  And that's okay.  We allowed two

8    weeks for it.

9              MR. FERRUCCI:  All right.  Well, Your Honor --

10             THE COURT:  He's given his testimony, but we can move

11   along with it.  I'll tell you right now, we ought to take a

12   recess.  We've been here for almost an hour-and-a-half.

13             MR. FERRUCCI:  Okay.

14             THE COURT:  We're going to take a recess until 10:35.

15   We'll come back, and we'll get started then.

16             But we may pick up after the luncheon hour, instead of

17   closing arguments, with further cross-examination because I'm

18   not going to cut off your opponents just for this morning.

19   That's for sure.

20             We'll stand at recess until 10:35.

21             Thank you very much.

22                  (Proceedings in recess at 10:24 a.m.)

23                   (Proceedings resume at 10:35 a.m.)

24             THE COURT:  Please be seated.

25             Come on back up, sir, please.

```
 1              (BRUCE G. SILVERMAN resumes the witness stand.)

 2              THE COURT:  Okay.  All right.  We're back after a

 3   brief recess.

 4              And you may proceed, Counsel.

 5   BY MR. FERRUCCI:

 6   Q.  Mr. Silverman, you -- you remember that you're still under

 7   oath.

 8   A.  Yes, sir.

 9              THE COURT:  Did something happen over the break where

10   he wouldn't be?

11              MR. FERRUCCI:  I was just --

12              THE COURT:  I'm just curious.

13              MR. FERRUCCI:  Well, I'm just following Mr. Harvey's

14   lead.  That's kind of how I work as an attorney.  I model

15   the -- the wiser.

16              THE COURT:  I think we noticed that.

17              Okay.  Let's get started here.

18              MR. FERRUCCI:  Your Honor, what we've done, we were

19   going to show some of these focus groups to the Court.  They're

20   generally about 25 minutes long, but I've cut out about

21   six-and-a-half-minute segments to the portion of the focus

22   groups where the participants are talking just about Bad

23   Spaniels, and if Your Honor would like to see those, we'll put

24   a couple of those on.

25              THE COURT:  It's your case.
```

1          MR. FERRUCCI:  Okay.

2          THE COURT:  Do you have any objection to the focus

3     group?

4          MR. HARVEY:  We don't, Your Honor, unless it gets

5     particularly repetitive.

6          THE COURT:  Right.  That's the key.  I don't -- you

7     know.  But it's your -- it's your turn to prove your side of

8     the case.  So...

9          MR. FERRUCCI:  Thank you.  Thank you, Your Honor.

10    BY MR. FERRUCCI:

11    Q.  So Mr. Silverman, we're going to start with the 5:00 p.m.

12    group, if you just want to make some comments and introduce

13    that video.

14    A.  Yes.  The 5:00 p.m. group was all female.  It's fairly

15    common in focus groups' studies to do groups that are all male

16    or all female, and then mixed.  And one of the reasons for that

17    is that in some instances, women might not say things in front

18    of men that they might otherwise say, and vice versa.  So it's

19    just helpful to do it that way.

20          So the first group was women who own dogs and were

21    Jack Daniel's drinkers.  I don't think any of them were

22    exclusively Jack Daniel's drinkers, but they were all fans --

23    when we did -- when we recruited, they identified themselves as

24    Jack Daniel's drinkers.

25          MR. FERRUCCI:  Can we dim the lights, please.

1            (Portion of videotape played.)

2            THE WITNESS:  Oh, I should say one thing.

3            THE COURT:  Wait.

4            THE WITNESS:  Can you stop it for a moment?

5            The -- you know, we video these things, and there was

6     a person off to the right who is off camera.  Unfortunately,

7     the camera just wasn't set correctly.  And I wasn't looking at

8     the monitor, I was looking literally through the mirror, so I

9     didn't notice it until the group was over.

10            THE COURT:  Go ahead.

11            (Portion of videotape played.)

12    BY MR. FERRUCCI:

13    Q.  So Mr. Silverman, after reviewing that video again,

14    anything you want to add?

15    A.  Not really.  I think it speaks for itself.

16    Q.  Okay.

17    A.  I think what's most interesting, actually, is the reaction

18    that the participants had after the moderator, Jeff, left the

19    room because they're not being directed at that point in any

20    way.  They're just, you know, sharing their thoughts and

21    feelings.  And that's what we're after in many focus groups,

22    but specifically in this one.

23            MR. FERRUCCI:  I do agree with Mr. Harvey that these

24    are somewhat cumulative, Your Honor, so I'll just show one

25    more?

1          THE COURT:  Fine.  That's fine.  Thank you.

2    BY MR. FERRUCCI:

3    Q.  Mr. Silverman, let's look at the eight o'clock group, if

4    you want to just explain that group.

5    A.  The eight o'clock group -- the eight o'clock group were

6    people -- my recollection is a mixed group, and they were

7    people that used alcoholic beverages, but not Jack Daniel's,

8    but -- and they did own dogs.

9    Q.  Okay.  So let's --

10   A.  And -- and -- let me just explain.

11   Q.  Yes.

12   A.  The thinking here was, you know, if people drink alcoholic

13   beverages, particularly whiskey-type products or bourbon

14   products, they are possible prospects for Jack Daniel's.  We

15   wanted to see whether or not there was anything that might

16   knock them off of that, that might say I'll never touch that

17   stuff.

18   Q.  Okay.

19          (Portion of videotape played.)

20   BY MR. FERRUCCI:

21   Q.  So Mr. Silverman, anything you want to add after reviewing

22   that video?

23   A.  No.  Again, I think the video speaks for itself, as much as

24   you can hear and see it in this room.

25   Q.  Now, Mr. Silverman, you've testified that Dr. Simonson's

BRUCE G. SILVERMAN – DIRECT EXAMINATION

1   central premise, or as you call it, the linchpin of his

2   analysis, that the Bad Spaniels dog toy would elicit disgust is

3   fundamentally flawed.

4           Are there other flaws in Mr. Simonson's analysis that

5   you've seen?

6   A.  Well, yeah.  Yes, actually.  He -- in his report, he refers

7   to Bad Spaniels as the Old No. 2, and that is on its neck

8   label.  It's a parody of the Jack Daniel's packaging of the

9   label.  So Jack Daniel's is Old No. 7.

10          Now, I don't claim to be an expert in Jack Daniel's,

11  but I've never heard anyone refer to Jack Daniel's as Old No.

12  2.  They drink Jack Daniel's.  They ask for a Jack Daniel's.

13          What troubled me about that in his report was that I

14  think he was selling.  You know, doing this Old No. 2, he was

15  really trying to focus on defecation.  And I don't think that's

16  what an expert witness should do.  The name of the brand is Bad

17  Spaniels.  I mean, that's what's on the label.  And I think he

18  did that because he had this idea about this -- this

19  disgusting, which begins with defecation, and he was just --

20  wanted to hammer that.  I just don't think that's appropriate.

21  That's first.

22          Second, there's, again, no empirical evidence.

23          Third, it's all his opinion.

24          And then he uses this association model.  And I don't

25  dispute the association model, but you have to have something

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    that triggers it, and there's no trigger.

2          I think that's -- and the other thing is that he

3    doesn't have any -- the kind of experience I certainly have as

4    a marketing professional with pet products.  You know, he's --

5    this is clearly just starting with his -- his singular opinion.

6    And I don't think that's valid.  I mean, anybody can have a

7    personal opinion, but it is my understanding of the role of an

8    expert witness that you have to have an expert opinion, not to

9    state your personal opinion.

10          MR. FERRUCCI:  No further questions.

11          I tender the witness.

12          THE COURT:  Thank you, Counsel.

13          Mr. Harvey, you may begin your cross-examination.

14          MR. HARVEY:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. HARVEY:

17   Q.  I have -- good morning -- or good later morning --

18   A.  Good morning, sir.

19   Q.  -- Mr. Silverman.

20          I have a few foundational questions, and really I

21   think many of these either you've admitted to already or

22   they're in your deposition.  They won't be any surprise.  I'm

23   just looking for confirmation from you on that.

24          So you chose focus groups which you recognized are not

25   quantifiable or projectable science; correct?

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    A.   Yes.

2    Q.   You didn't address Dr. Simonson's opinion about the

3    associative network memory model, other than to say you agree

4    with it; correct?

5    A.   Correct.  The model I agree with, not his conclusion.

6    Q.   And in fact, in your deposition, you've said you always

7    thought the associative network memory model was common sense;

8    right?

9    A.   If I said that, I said it and I would agree with it, yes.

10   Q.   So the groups are not projectable to any relevant consumer

11   population, they're not intended to be projectable; correct?

12   A.   They're intended to help us learn, and they're intended, in

13   certain instances, to be directional.

14   Q.   So you went to west Los Angeles and talked to 19 people.

15   A.   That's correct.

16   Q.   Okay.  Now, at the beginning of the focus groups, you

17   indicated -- or I should say, Mr. Hirsch, your moderator,

18   indicated that they were going to be talking about spoof

19   products.

20   A.   Yes -- that's correct.

21   Q.   He used that term "spoof products."

22   A.   Yes.

23   Q.   Is that something you and he discussed in advance of the

24   focus groups?

25   A.   Yes.

1    Q.  Did you think that that might be at all leading to project

2    that, to put that onto the group right at the beginning?

3    A.  No, sir.  I do not.

4    Q.  You didn't think saying, this is about things that are

5    funny would not encourage them later to say things were funny?

6    A.  No.  When we do groups about healthcare, we start off by

7    saying we're talking about healthcare.  If we're doing groups

8    about travel, we say we're doing things about travel.  This is

9    about -- these groups were about a product -- a spoof product.

10    And although, you know, once they started dealing with the

11    actual product, I don't think they used that word after that.

12    I'm talking about the respondents, the participants.

13    Q.  And every single one of them, they were told right at the

14    beginning, this is about spoof products; right?

15    A.  In each of the groups, yes.

16    Q.  Why don't we take a look, if we can, at the beginning of

17    these focus groups on that subject, please.

18            MR. HARVEY:  If we can dim the lights.

19            Thanks.

20            (Portion of videotape played.)

21    BY MR. HARVEY:

22    Q.  So in each case, right at the beginning Mr. Hirsch was

23    going to the issue of whether something was funny, was a joke,

24    made fun of other things.  In fact, I think you said they

25    raised the idea of Saturday Night Live.  No, he did, didn't he?

BRUCE G. SILVERMAN - CROSS-EXAMINATION

```
 1   A.   I don't know if he did that in every group.  I don't
 2   recall.  But I do know that there were people that brought it
 3   up.
 4          More importantly, sir, what he was doing was saying
 5   he -- he was defining what a spoof product is, and then he gave
 6   people the opportunity to talk about what -- that some spoof
 7   products ended up negative and some were positive.  And some
 8   were, you know, some were just sort of -- didn't do anything.
 9   That is standard practice in focus groups, that you have to
10   start.  The reason for calling it a focus group is you got to
11   focus it, you've got to focus the discussion.  And I understand
12   that you're trying to say that he told them that this was
13   funny, but I don't think -- the pictures he was showing, some,
14   they said, were not funny.  Some, they thought, were mean.
15   Q.   But you'd agree, he introduced the idea of jokes or funny
16   or something that makes fun of something else right at the
17   beginning of every single group.
18   A.   Well, yeah, because we're talking about a funny product.
19   Q.   Well, as you said, that's in the mind of the beholder,
20   isn't it?
21   A.   No.  If we're talking about a travel product, we would say
22   it's about a travel product.  Travel is travel.  I -- this
23   is -- this is the way a marketing organization would do this
24   study.  In my opinion, actually, if your client had done focus
25   groups, they may very well have approached it exactly the same
```

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    way I did.

2    Q.  By the way, you work with Jeff Hirsch's company in this

3    case?

4    A.  Jeffrey Hirsch, yes.

5    Q.  Sorry.  Jeffrey Hirsch.

6            What was the name of that company?

7    A.  God, you know, I just -- I'm sorry.  It's in my report.

8    But I always think of Jeff as Jeff Hirsch's business, so...

9    Q.  Have you known Mr. Hirsch for a while?

10   A.  Known him for a while.  Not -- not very long.

11   Q.  Have you worked with him on any other occasion?

12   A.  Yes, he's worked -- he's done some focus groups for me with

13   other clients.  Not on litigation.

14   Q.  He's been a client of yours on other occasions?

15   A.  No, he's not a client.  He's a vendor.

16   Q.  I'm sorry.  A vendor to you.

17   A.  Yeah.  He's -- he's --

18   Q.  So you write checks to him; correct?

19   A.  Yeah.  Well, either I write the check or my client writes

20   the check.

21   Q.  How many other occasions?

22   A.  Two or three.  That's about it.

23   Q.  Now, I believe you testified this morning that they

24   certain -- when you're talking about the focus group

25   participants -- they certainly understood spoofs.  You used

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    those words.  Was that right; did they understand spoofs?

2    A.  I think they understood it, yeah.

3            MR. HARVEY:  Can we take a look at a clip here,

4    please.

5            (Portion of videotape played.)

6    BY MR. HARVEY:

7    Q.  So there was some misunderstanding about what a spoof

8    product even was, wasn't there?  One woman thought it was an

9    e-cigarette.

10   A.  Oh, an e-cigarette.  Well, yeah, you know, the term "spoof

11   product" is not -- is not a term that I think is commonly used

12   by consumers.  But again, in a focus group setting, we have a

13   limited amount of time.  It is incumbent on the moderator to

14   explain -- explain what we're trying to get at.  And this was a

15   way into it.  It's just pretty standard to me.

16   Q.  So Mr. Hirsch introduced the topic:  We're going to talk

17   about joke products, spoof products.  And then when the group

18   didn't understand what that was, he then gave them examples.

19   And that was to, I think you said, set the stage; correct?

20   A.  Yes.

21   Q.  Okay.  At least one of the focus group participants thought

22   and noted that a spoof product takes the goodwill of a

23   well-known brand and makes money off of it; right?

24           Do you remember that?

25   A.  I believe someone said that, yes.

1              MR. HARVEY:  Can we take a quick look at that, please.

2     This is the 5:00 p.m. group.

3              (Portion of videotape played.)

4     BY MR. HARVEY:

5     Q.  And you agree that that's really what a spoof product or a

6     parody product does; take the goodwill of the known product and

7     make money for the spoof-maker; right?

8     A.  Well, you know, goodwill is -- I believe that's a legal

9     term.  But my understanding of parody products is that for a

10    parody product to be -- to work as well as one would hope, it

11    has to play off the original product.  So to that degree, yes,

12    it's playing off an original product, and hopefully in a

13    good-natured way.  But, you know, that's -- that's what

14    parodies are.

15    Q.  I want to jump back to this notion of disgust for just a

16    minute.  And you've spent some time on the issue of disgust.

17              You're not suggesting that -- well, wait a minute.

18    You're a dog owner, so you understand these things.  You're not

19    suggesting that putting a consumable next to excrement is

20    anything other than disgusting, are you?

21    A.  I don't know if I've ever used the word "disgusting" to

22    talk about dog poop because I've had dogs all my life.  It's

23    just part of it.  But I certainly wouldn't put a consumable

24    next to excrement.  But I don't see how that relates to this.

25    Q.  And you don't -- well, you subscribe to the associative

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1  network memory model.  And in the nodes in the model, that is

2  what is happening; correct?

3  A.  Well, that's what Dr. Simonson says when he is speaking

4  specifically about Bad Spaniels, and when he's saying that Bad

5  Spaniels would elicit feelings of disgust.  That would trigger

6  the associative memory model.  But I just don't see where the

7  trigger is.  You've got to pull that trigger.  And I just fail

8  to see, and the folks in these focus groups certainly failed to

9  see, that where a feeling of disgust was in any way, shape, or

10 form being elicited.  So that just renders the model nothing

11 more than a model that doesn't apply.

12 Q.  You know, I think we may be talking at cross purposes here.

13       You testified that you read Dr. Simonson's report as

14 saying that consumers will become disgusted by the Bad Spaniels

15 label.  That was -- those were your words -- that that was his

16 assumption, and it was just an assumption and it was flat

17 wrong.

18       That's what you said; right?

19 A.  Yes.

20 Q.  But it's not an issue of becoming disgusted by the Bad

21 Spaniels label, is it?  It's really the association that

22 happens between a toy that purports to be full of fake

23 excrement and associating it with a well-known brand.  That's

24 what's disgusting; right?

25 A.  But you've seen the same videos that I attended.  People

UNITED STATES DISTRICT COURT

1    didn't react that way.  And in my experience, dog owners would

2    not react that way.  You -- you know, just exposure to this

3    does not result in feelings of disgust that would trigger it.

4    So I just -- you know, the -- the associative thing may -- you

5    know, it's a theory, so it may be right, it may not be

6    100 percent right.  It makes sense to me.  But what doesn't

7    make sense to me is that this product would do that.  And that

8    is just Dr. Simonson's assumption.  It is an absolute

9    assumption, and there's no basis for his assumption.  That's my

10   argument.

11   Q.  Well, let me ask you then a hypothetical as an expert

12   witness.

13        I think you said this morning that consumers don't buy

14   products that disgust them.  That's the fundamental concept of

15   advertising, that nobody wants to buy a product, whether it's

16   for his dog or for himself, that disgusts him; right?

17   A.  In my experience, that's true.  I -- I don't know if that

18   applies to 100 percent of the human race.  But at least in my

19   experience, people don't buy products that disgust them, either

20   for themselves or to give to other people.

21   Q.  And so if there were any aspect of Jack Daniel's that

22   people found disgusting, that would cause them not to buy it;

23   right?

24   A.  Well, I have friends and relatives who are recovering

25   alcoholics.  They might -- they might describe any alcoholic

1    beverage in negative terms because of the way it's affected

2    them.  But very specifically, I -- I don't know about people.

3    I don't think people who buy Jack Daniel's think it's

4    disgusting.

5    Q.  Now, I think you said one of your criticisms of

6    Dr. Simonson was that his evidence was not empirical, it was

7    simply just one man's opinion.

8            That was your phrase; right?

9    A.  Correct.

10   Q.  Did you read any of the literature on which Dr. Simonson

11   relied in his report?  The Court mentioned one of the

12   footnotes.  I think you said you hadn't read the references

13   there.  Did you read any of them?

14   A.  No, I did not, because the references were not to the

15   product.  They were to the associative concept.  And, you know,

16   I'm not going to argue about that concept.  The issue is, is --

17   does -- does Bad Spaniels elicit feelings of disgust that might

18   be -- that might then cast a shadow on Jack Daniel's?  I didn't

19   see it, based on my experience.  We did the focus groups.  They

20   clearly didn't come away with anything like that.  And in my

21   experience, one of the great things about focus group research

22   that makes it really useful is that you're getting to the --

23   you're getting to where people's hearts are, where their

24   feelings are, where their thinking are.  In my opinion, the

25   people that took the dog toy home -- not all of them did -- the

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1  people who took the dog toy home, they took it home and it

2  certainly didn't affect their thinking about Jack Daniel's in

3  any way.  Not likely to happen, because they saw the joke.

4  Q.  Well, that's what they said.  We saw the videos that --

5  A.  That's what they said.  And you could also see the way they

6  felt.

7  Q.  But you're not familiar with the science behind the

8  associative network model, are you?

9  A.  Well, I wouldn't say I'm not familiar with it because the

10  chart -- the first chart that he showed, the one before he

11  added the notes about what he felt was disgust, that's very

12  commonly used in my business, in the advertising business --

13  not that one, the other one -- where, you know, what you're

14  trying to do is to come up with ways -- and you do it usually

15  by asking questions of consumers, how do they think and feel

16  about a product?  Here, he didn't ask anybody.  He didn't have

17  any research at all about this product.

18  Q.  But you --

19  A.  Zero.  So everything he put on here is just his opinion on

20  how that would happen if this product elicited feelings of

21  disgust.

22  Q.  So --

23  A.  That, you know, it's -- it's a nice chart.  But in my

24  opinion, it's a chart that tells us nothing because it's not

25  based on fact.

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1  Q.  But you wouldn't question Dr. Simonson's statements and his

2  testimony here on Monday that the injection of these nodes into

3  the brain, and it's been proven in science in quantitative

4  tests, is an unconscious fact, so that those nodes reside in

5  there and people don't necessarily even know they're there.

6  You wouldn't disagree with that, would you?

7  A.  You know, there's a lot -- no.  You know what I will say?

8  Dr. Simonson teaches marketing.  His focus is research.  My

9  experience is what happens in the real world with real

10  consumers.  And I'm sure that there are certain things in

11  people's subconscious that leads them to positive or negative

12  feelings about products.  But that's a generalization.  His --

13  his study, the associative network that he speaks about, he

14  speaks about it in general, and then he makes this up based on

15  his belief, his belief that this product would cause a feeling

16  of disgust.  That's the linchpin.  And I don't think that would

17  happen, based on my experience with dog owners and with dog

18  people that buy products for dogs.  And I've been doing this a

19  long time.  And it certainly didn't manifest itself in any way

20  with the groups we did.  And in my business, we call that

21  directional.  And at least I have something directional.  He

22  has nothing but himself.  And he doesn't have my expertise in

23  pet products.

24  Q.  So you testified here on direct examination that you have

25  no question with and no dispute with the idea that the -- the

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1  Bad Spaniels product brings to mind Jack Daniel's.  You're not

2  contesting that?

3  A.  I'm not contesting.  You know, among -- I'll say this.

4  Among people who are very familiar with Jack Daniel's, I

5  don't -- I don't drink very much.  And in truth, I don't

6  drink -- I don't drink black -- brown liquor.  I occasionally

7  drink wine, maybe a little bit of vodka once in a while.  And

8  I'm not terribly familiar with Jack Daniel's, other than as an

9  advertising professional.  It's a wonderful brand.  Brown

10  Forman has done a great job with it.  So I'm not sure it would

11  have immediately generated the recognition from me because I'm

12  not a Jack Daniel's drinker, but I won't dispute that among

13  people who are more familiar with Jack Daniel's than I am.

14  Q.  I think you said you're a dog owner.  And as a dog owner,

15  you cannot be disgusted by poop.

16  A.  Well --

17  Q.  But that's simply not true, is it?  There are plenty of dog

18  owner, including myself who had a Welsh Corgi for 17 years, and

19  I never liked bending over to clean up after her.

20  A.  Yes.

21  Q.  I loved her, but I didn't like cleaning up after her.  It

22  was disgusting.

23       You can't disagree with that, can you?

24  A.  I wouldn't -- you know, does it leave you ill?  Does it

25  make you have horrible negative feelings?  I don't -- you know,

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    I don't love going out to pick up after my dogs.  You know, but

2    I -- I will tell you we have four children, and I diapered all

3    of them, and that wasn't very pleasant.  But it didn't make me

4    hate my children.  Thank God they grew up.

5    Q.  It didn't make you hate your children, but that's not the

6    point.  We're talking about putting excrement from your child,

7    from your dog, from any source, next to a consumable.  That's

8    the issue, isn't it?  That's -- I think you're missing the

9    point here?

10   A.  I don't think I'm missing the point because I don't think

11   this is going next to a -- the only -- this is not going to be

12   sold on the shelf, despite the recommendations of people in the

13   focus groups -- this is not likely going to be going on a shelf

14   and being sold next to Jack Daniel's.  That's first.

15            Second is, this is a joke.  The whole thing is a joke.

16   And potty humor happens all the time.  We see it in television

17   shows, we see it in Broadway shows, we say it in movies.  I

18   think it's sung about sometimes.  It's a joke.  They all took

19   the joke.  They weren't thinking about this in terms of

20   excrement.  They weren't thinking about it that way.  And I

21   don't believe, in my opinion -- and I not a psychologist -- but

22   I do not believe that it's going to result in thinking about

23   poop in a -- in a way that Dr. Simonson would have us believe.

24   I mean, Dr. Simonson, frankly, you know, just -- that's his

25   opinion.  But --

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    Q.  Do you -- sorry.

2    A.  And it's his personal opinion.  I don't think it's a

3    professional opinion.

4    Q.  You spent your life studying consumer reactions, sir.

5    You've testified at great length about your 40-plus years in

6    the ad business, all the focus groups you've conducted.  Would

7    you agree there's not an insubstantial number of people in the

8    United States who, if they encountered this product, would find

9    it to be in very bad taste?

10   A.  "Bad taste."

11   Q.  Yes, please.

12   A.  I can't read minds.  And I'm sure that there are some

13   people who think the product is in bad taste.  I would think

14   some.  But I think most people who encounter it are dog owners,

15   and I think that dog owners, for the most part, would either

16   think it's funny or not buy it.  And if they don't buy it, life

17   goes on.  I don't think it's -- among those people that don't

18   buy it, I would suspect that they forget about it within

19   seconds of walking away from it.

20          You know, what I heard this morning, 55,000 people in

21   America have purchased these toys.  That's a rather tiny number

22   of people.  And -- on a relative basis, that's a very tiny

23   number.  But, you know, taste is -- how -- things are in bad

24   taste.  You know, there's a lot of humor that's not in good

25   taste, but it's funny and people like it in their own way.  You

1    know, it's humor.  Humor is very difficult to define, and very

2    difficult to anticipate.

3              There is a Broadway musical called The Book of Mormon.

4    It's a very funny show.  But it's filthy.  There's a lot of

5    stuff in it that's really dirty jokes.  And in its own way, it

6    isn't -- it makes fun of the Mormon Church, the Church of

7    Latter-day Saints.  And yet the Mormon Church, the Church of

8    Latter-day Saints, runs advertising in the programs, both on

9    Broadway and on the road, of the Book of Mormon.  And the ad

10   says:  Now that you've seen the show, read the book.

11             You can say that that show is not in good taste.  But

12   it sells millions and millions of dollars' worth of tickets,

13   and the Mormon Church kind of -- gets it.  They must get the

14   joke.

15   Q.  Well, I --

16   A.  And I think that applies here.

17   Q.  I'm not going to contest that some kinds of humor, crude

18   humor, potty humor, may make money.  That's not what we're

19   about here.  We're about whether this product tarnishes our

20   client's product.

21   A.  Sir, I don't think it does.  I've testified to that.

22   Q.  I understand that.

23             I think you also said that humor is in the mind of the

24   beholder; correct?

25   A.  I -- yep.  Some people think things are funny, some people

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    don't.

2    Q.   Okay.  Let's go back to these focus groups for a few

3    minutes.

4             You and Mr. Hirsch collaborated in advance on how this

5    would be conducted.  You made an outline up, and he followed

6    the outline, for the most part; correct?

7    A.   Yes.  Typical in focus groups, based on how the

8    conversations go and you alter a little bit, because it's

9    intended to get at thoughts and feelings.  It's not like a quad

10   study where everything is the same all the time.

11   Q.   Right.

12   A.   It's, you know, why you do these studies.  But, yes, we

13   collaborated --

14   Q.   And you --

15   A.   -- on the questionnaire.

16   Q.   -- collaborated with the idea of introducing at the very

17   beginning the idea of joke products, spoof products, as we saw.

18   A.   Actually, Jeff suggested --

19             MR. FERRUCCI:  Asked and answered.

20             THE WITNESS:  Okay.

21             THE COURT:  Overruled.

22             THE WITNESS:  Jeff suggested that as a way to set the

23   stage for the -- for the discussion.  I thought it was a good

24   idea.

25

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1  BY MR. HARVEY:

2  Q.  So you agreed; yes?

3  A.  Yeah, I sure did.

4  Q.  And then you together collaborated on the idea of creating

5  these three piles where Mr. Hirsch would bring in pictures of

6  different products and show them to the participants, and then

7  ask them to put them in one of three piles.  I think you

8  testified about that; right?

9  A.  That's correct.

10  Q.  One of the piles was, it's just a joke.  It's funny.  And

11  one of the piles was -- how did you describe that?  It's

12  targeted, it has a message, it's meant to be harmful.

13       Is that right?

14  A.  That's correct.

15  Q.  And then there was this middle category for the piles where

16  it could be either one.

17  A.  Well, yeah.  It could be either one, but obviously it

18  wasn't -- you know, it wasn't definitively either one.  The

19  response -- and we didn't know what the response would be until

20  we did this.  But, you know, the response was, either -- either

21  somewhat mixed or unclear.  Some of those parody products, the

22  products shown in those -- those charts, some of the people

23  just didn't know what the original product was.

24  Q.  Right, I think, as we shall see.

25       Was this categorization that you were doing, the three

BRUCE G. SILVERMAN - CROSS-EXAMINATION          78

1    piles that Jeff had the pictures put in by the participants,

2    was that based on some scientific literature, or did you guys

3    just dream this up?

4    A.   You -- when you're doing focus groups, you have to dream a

5    lot of things up.

6    Q.   Right.

7    A.   When you do advertising, you have to dream a lot of things

8    up.  I've dreamt up a lot of things.  You have to find a way to

9    get the participants' creative framework for them -- for the

10   discussion.  Otherwise, it will just go off into crazy

11   directions.  So every focus group that I've ever been to finds

12   ways to set the stage.  This seemed the appropriate way to set

13   the stage for this.

14   Q.   But it wasn't based on any scientific methodology or any

15   recognized protocol for conducting this kind of a study; is

16   that right?

17   A.   Well, it's -- it's -- the recognized protocol for focus

18   groups is to find ways up front to set the stage for the

19   discussion.

20   Q.   Fair enough.

21          MR. HARVEY:  Let's look at one example of this

22   categorization model, if you would dim the rights for us,

23   please.

24          They are?  They're down?  Okay.  They're down.

25          It's number four.

UNITED STATES DISTRICT COURT

 1              (Portion of videotape played.)

 2   BY MR. HARVEY:

 3   Q.  And that was the categorization, the methodology that

 4   Mr. Hirsch applied in each of the groups; correct?

 5   A.  Yes.  I -- I think he may have used slightly different

 6   words each time, but, yes.

 7   Q.  And I think you testified quite vehemently that every

 8   single one of the participants thought that this product was a

 9   joke.  You had one guy that we'll see later that you worried

10   about the squeak, but everybody thought this was a joke.  You

11   said it was unanimous.  That was your word; right?

12   A.  I believe that to be correct, yes.

13   Q.  Okay.  Let's take a look at at least two of the folks in

14   one of the focus groups didn't agree with you.

15              (Portion of videotape played.)

16   BY MR. HARVEY:

17   Q.  So at least two in that group thought it was kind of in

18   between.  It could be a joke, maybe it was targeted and

19   insulting; right?

20   A.  Well, I think they were saying, by saying it was in

21   between, that they couldn't make up their mind.  I think that

22   if you roll down later in the same group when they actually had

23   the toy, got to look at it close up, they -- they were able to

24   characterize it somewhat differently.

25   Q.  Well, perhaps we'll see that on redirect.

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    So I'm curious, too, on the issue of children.  And I

2  think you've heard of the testimony here that -- and you

3  understand that Jack Daniel's' deciduously avoids marketing

4  goods to -- their products, their alcoholic products, to

5  underage audiences; correct?

6  A.  Well, I -- I didn't hear that tomorrow, but I would assume

7  that to be absolutely true.

8  Q.  Was there any evidence, any conversation in -- in these

9  focus groups about the appeal that this product might have to

10 children, or the effect that the Bad Spaniels product might

11 have on children?

12    Do you remember any of that?

13 A.  No.

14 Q.  Why don't we take a look and see at least one participant's

15 view on that.

16    (Portion of videotape played.)

17    MR. HARVEY:  I'm -- I'm looking at my watch and being

18 reminded by a colleague that it might be lunchtime.

19    THE COURT:  No, no.  Go -- I thought -- we're going to

20 go a little bit longer --

21    MR. HARVEY:  Great.

22    THE COURT:  -- but we will still come back at 1:30.

23    MR. HARVEY:  Great.

24    THE COURT:  I mean, I want to let you --

25    MR. HARVEY:  Thank you.

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1          THE COURT:  -- go for a few minutes longer.

2          MR. HARVEY:  Yeah.  Great.

3          Thank you, Your Honor.

4  BY MR. HARVEY:

5  Q.  So -- well, we've seen that.  It really does speak for

6  itself.

7          Did anybody express a view that he or she felt that

8  the Bad Spaniels product was made by or put out by or sponsored

9  by, associated with, Jack Daniel's?

10  A.  I don't recall anyone saying that it was made by Jack

11  Daniel's or that it was -- I think there may have been people,

12  some people, a person or two, that thought somehow or other it

13  was approved by Jack Daniel's.  Maybe that's just, you know --

14  you know, people that, you know, think about how products get

15  licensed.  Jack Daniel's seems to license everything.  They

16  have belt buckles and stuff like that.  But in general, I think

17  it was -- I think, you know, the groups were rather

18  overwhelming in saying no, they don't think it's from Jack

19  Daniel's.

20  Q.  Certainly there was one fellow that thought that the

21  product had to get permission from Jack Daniel's in terms of a

22  license; correct?

23  A.  Yeah.  I do remember one person, you know, sort of playing

24  lawyer in the group.

25          MR. HARVEY:  Let's take a look at that, please.

BRUCE G. SILVERMAN - CROSS-EXAMINATION

```
 1              (Portion of videotape played.)
 2   BY MR. HARVEY:
 3   Q.  And there was evidence that people were annoyed; is that
 4   right?  They were annoyed by this toy.  Found it greatly
 5   annoying; correct?
 6   A.  There was one person, who was not a dog owner, who just
 7   hated that loud squeak.  And he made -- he made a big deal
 8   about it.  It was in -- since it was in that group of non dog
 9   owners, I suspect he'll never have a dog.  But that had nothing
10   to do with defecation.  It had to do with squeaking.
11   Q.  Right.
12   A.  That's it.
13   Q.  It had to do with the product, and whether the product was
14   annoying or not.  And you don't think if something was annoying
15   that that might be tarnishing to Jack Daniel's?
16   A.  Well, I think that, as that guy said, he would hate to have
17   that around his house.  Does it affect -- I don't think -- I
18   think he -- I think that group was even asked, and he agreed
19   that it wouldn't -- that this toy would not cast a negative --
20   negative aspersions at Jack Daniel's.  So, no, I don't think
21   so.
22              And also, it was one guy who's just bugged out by the
23   squeaky sound.  He was -- you know, the irony was that, you
24   know, we gave everybody the toy to take home, and he didn't
25   want it, not surprisingly.  And one of the other respondents,
```

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    if you watch the tape, you know, grabbed it because she -- and

2    she didn't have dogs, but she wanted to bring it home to bring

3    gifts to people that have dogs.

4    Q.   Take home two.  She could have two.

5    A.   Yeah.

6    Q.   Let's take a look at the annoying testimony.

7              (Portion of videotape played.)

8    BY MR. HARVEY:

9    Q.   He said he would die if somebody were doing this, and he

10   would want to drink a different brand of alcohol.  So you don't

11   think that has a negative effect on Jack Daniel's likely sales.

12   He's not going to be a customer for Jack Daniel's; correct?

13   A.   He's not going to be a customer for Bad Spaniels.  He's not

14   going to be a customer for any dog toy.  He doesn't have a dog.

15   I mean, you know --

16   Q.   And --

17   A.   -- you're not going to get the negative connotation unless

18   you have exposure to the product, and you're not likely to have

19   exposure to the product unless you have a dog.  And even if you

20   do, you know, the dog plays with it and then the toy ends up

21   under the bed and you never see it again.  That's from my

22   personal experience, anyway.

23             MR. HARVEY:  Just to wrap this up, Your Honor, a

24   couple more clips.

25                   (Portion of videotape played.)

UNITED STATES DISTRICT COURT

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    BY MR. HARVEY:

2    Q.  Was there evidence, sir, that people form a brain

3    association -- a brain association between the annoyance with

4    the product and with Jack Daniel's?

5    A.  Boy, I don't -- I don't recall a brain association being

6    discussed.  But, show your video.

7              MR. HARVEY:  Please.

8              (Portion of videotape played.)

9    BY MR. HARVEY:

10   Q.  Does that sound familiar, sir?  Does that sound like

11   Dr. Simonson's report?  A brain --

12   A.  Dr. Simonson's report, very specifically, he didn't talk

13   about squeaks, he didn't talk about anything other than

14   defecation.  And we didn't get anybody who came out thinking

15   that there was an issue there.

16   Q.  Let's just wrap this up, if we could, with the last clip.

17             You did have evidence from these focus groups that

18   people would be influenced not to buy Jack Daniel's anymore,

19   didn't you?  I think you said there was no --

20   A.  I don't think so.

21   Q.  -- negative association, but let's look at the last clip,

22   please.

23             (Portion of videotape played.)

24             THE WITNESS:  And that's the squeak.

25             MR. HARVEY:  Well, this would be an appropriate place

1    to break, Your Honor, if --

2            THE COURT:  You have more cross-examination; is that

3    correct?

4            MR. HARVEY:  I have a tiny bit more.

5            THE COURT:  Well, okay.

6            MR. HARVEY:  I would say -- a lawyer should never say

7    that, Your Honor.

8            THE COURT:  Well, that's what I'm worried about, when

9    people say I've just got --

10           MR. HARVEY:  "Two more questions."

11           THE COURT:  -- Your Honor, I just have one extra

12   question, and five questions later we're still going at it.

13           The point is, they had this witness on the stand for a

14   long time.  He has a lot to say.

15           And Counsel, you were going to say something.  You

16   stood up to say something.

17           MR. FERRUCCI:  Yes, Your Honor.  I was just going to

18   say, if Mr. Harvey would want to wrap it up, we were not going

19   to redirect.

20           THE COURT:  How much --

21           MR. HARVEY:  Well, we can do that.  We can certainly

22   do that.

23           THE COURT:  All right.

24   BY MR. HARVEY:

25   Q.  Were you concerned at all about bias in -- in terms of the

1    moderator influencing -- Jeff Hirsch influencing the direction

2    the group was going?

3    A.  I don't -- he was -- in my opinion, he did a very good,

4    professional job of directing and keeping the group on focus,

5    dealing with the issues he wanted to deal with.  I don't think

6    he created bias.  Based on -- I mean, I've been to a lot of

7    focus groups.  Jeff does a good job as a moderator.  I didn't

8    see it.

9    Q.  You're familiar with the notion of suggestion bias as an

10   expert in these things?

11   A.  I am.

12   Q.  And order bias; correct?

13   A.  Well, order bias is a little bit different.  Order bias has

14   to do with the sequence in which you ask questions.  And in

15   quantitative research, for example, you tend to move the

16   questions -- you don't always ask the same questions in the

17   same order to every respondent, or else you might get -- you

18   know, people tend to answer the first question, particularly if

19   they're not sure, they always answer the first question, or

20   whatever.  You -- you only follow that to a degree in focus

21   groups, because these are different methodologies.  So I don't

22   think order bias played a role.

23          The one thing I know that he did do was in that first

24   section when he was trying to establish, you know, do people

25   understand what spoof products are and how they feel about

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    them, because that's where we were leading to, everything was

2    leading to how we feel, that he changed that sequence as he

3    went through it.  I'm pretty sure he did that.  Just because,

4    you know, you want to just -- you don't want to always start

5    with just the first one.

6    Q.  I think we look at the transcripts of these, and each one

7    he began the piles or orientation with it's just a joke, it's

8    somewhere in between, or it's -- it's just a joke, or it's

9    serious, or it's somewhere in between.  He always started with,

10   "it's just a joke," didn't he?  That was the first pile.

11   A.  Yeah.

12   Q.  Yeah.

13   A.  Well, yes.

14   Q.  So you take my point, that there's an order bias here that

15   he's encouraging the participants to say, oh, it's just funny,

16   it's just a joke.  You know it's true.

17   A.  I don't -- I don't -- I'm sorry.  I just disagree with you.

18   We're talking about a product that is a joke.  It's intended to

19   be a joke.

20   Q.  Well, once again, it's in the mind of the beholder, isn't

21   it?

22   A.  Well, it's certainly intended to be a joke, whether it's

23   taken that way or not.  That's why Jeff did that first

24   exercise.  And that's --

25   Q.  And you --

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    A.    -- actually the whole focus of the focus groups.

2    Q.  And you would accept, wouldn't you, that this is an example

3    of potty humor; correct?  That's the joke?

4    A.  Well, I think --

5    Q.  It's potty humor.

6    A.  I think there's some potty humor here, yeah.  I sure do.  I

7    think that it's a lot milder than a lot of stuff we see on

8    contemporary television.

9    Q.  You said that Dr. Simonson, by referring to the product as

10   Old No. 2, was selling.

11            Do you remember that?

12   A.  Yes.

13   Q.  Is your job, sir, as you -- as an expert witness, to sell

14   your theory to this Court?

15   A.  I'm not an advocate for VIP.  My job is to be an expert.

16   Now, I feel strongly -- you know, I -- I feel strongly about my

17   opinions, and I try to provide rationalization for them.  And

18   based on my expertise, I'm not a mild-mannered guy.  My

19   training is -- my training is what my training is.  But, you

20   know, I wouldn't -- I wouldn't have thought to refer to this as

21   Old No. 2, unless I was trying to really drive home his idea.

22   And I think -- I don't -- I don't think you can find an example

23   of that in my report, in my deposition testimony, and my

24   testimony today.

25   Q.  You're an expert, you're here to testify based upon

BRUCE G. SILVERMAN - CROSS-EXAMINATION

1    science, reliable methodology, experience.  You've testified
2    that dog owners don't find poo disgusting; right?
3    A.  I don't -- I think you're misconstruing what I said.  What
4    I was saying is --
5    Q.  But --
6    A.  -- that dog owners have to live with this all the time.  So
7    they view it differently.  You know what?  I mean, I think at
8    one time or another we've all stepped in it.  And that's pretty
9    disgusting, and it might even turn our stomachs.  This isn't
10   stepping into it.  This isn't turning stomachs.  Dog owners --
11   in my opinion, based on my experience, and based on what I saw
12   at least in these focus groups, people didn't come away from
13   this with anything other than a positive feeling, with the
14   exception of one guy who just hated the squeak.  And he hated
15   it.  Okay.  I mean, you know, I -- my dog now has this.  She
16   doesn't play with it all that often, but when she does, you
17   know, that squeak is pretty loud.  And if I'm watching
18   something on television and I don't want to be annoyed, I pick
19   it up and take it away.  But that doesn't disgust me, and it
20   certainly doesn't, in my opinion anyway, doesn't transfer to a
21   negative feeling about Jack Daniel's.
22              MR. HARVEY:  I have no further questions, Your Honor.
23              THE COURT:  Thank you.
24              MR. FERRUCCI:  VIP rests, Your Honor.
25              THE COURT:  Pardon?

UNITED STATES DISTRICT COURT

EXAMINATION BY THE COURT

1          MR. FERRUCCI:  VIP rests, Your Honor.

2          THE COURT:  No redirect?

3          MR. FERRUCCI:  No redirect.

4          THE COURT:  I have a couple questions to help me out.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  There's no jury.  I have to decide this.

7                              EXAMINATION

8          THE COURT:  On the focus groups up there, they lead

9    right in and they talk about this is a spoof.

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Spoof toys.

12         One of the collateral issues in this case -- so you

13   need to help me out here -- was this focus group for

14   tarnishment or for confusion in the marketplace?

15         THE WITNESS:  Tarnishment, period.

16         THE COURT:  Because if you start off with this is a

17   spoof product, it clearly indicates that this is not

18   manufactured by Jack Daniel's.

19         Could you infer that very heavily?

20         THE WITNESS:  I think that most of the people -- well,

21   as -- you know, if you watched all the groups, you would see

22   that -- I don't think anybody thought that it was made by Jack

23   Daniel's or authorized by Jack Daniel's.  But the -- the

24   purpose of the group was all about tarnishment.

25         THE COURT:  Tarnishment.  Okay.

UNITED STATES DISTRICT COURT

EXAMINATION BY THE COURT

1      Next thing is that you indicated that this was not,

2  from your perspective, in the great scheme of things, a big

3  seller.

4      Now, we've heard some testimony in this courtroom that

5  the plaintiff's company is about a 15 million-dollar a year

6  company.  It's gone up and up and up, and these toys have been

7  sold incrementally over a period of time to reach that 55,000.

8  Several years, or whatever.  And if you would divide the gross

9  sales into the amount sold, that would be a pretty small

10  percentage.  Is that right?

11      THE WITNESS:  I don't know how many years it's been

12  sold --

13      THE COURT:  Well, just --

14      THE WITNESS:  I would imagine that in any given year,

15  it's a fraction of 55,000, and that would be really small.

16      THE COURT:  Right.

17      So if you were the advertising agency who were -- who

18  were charged with developing this product and marketing it,

19  would you expect to retain your contract with those kind of

20  sales?  Now, that's just -- that has nothing to do with whether

21  it infringes or tarnishes.  I'm just asking about --

22      THE WITNESS:  I don't know VIP's business metrics, but

23  in general, I like to sell things in the millions.

24      THE COURT:  I understand that.  And I'm sure he would

25  like to sell things in the millions, too.  He does sell things

```
 1    in the millions, so he's good.  It's just like this company
 2    over here is very good.
 3              THE WITNESS:  Oh, they're very good.
 4              THE COURT:  So -- and it's percentage.  I mean, just
 5    like you want to get the right thing.  I hate to keep coming up
 6    with this example, but, you know, would you like to be the guy
 7    that did the Edsel?
 8              THE WITNESS:  I would not.  And in fact, I mean, my
 9    boss turned down the chance because he was afraid of it.
10              THE COURT:  Yeah.
11              So anyway, but -- all right.  With that in mind, we're
12    going to let you go.
13              And -- but we've had a tradition here, you probably --
14    you may be aware of this or not.  It has to do with trivia
15    questions along the way.
16              THE WITNESS:  Okay.
17              THE COURT:  Just -- this has nothing to do with the
18    price of tea in China or anything like that.  If's just for
19    fun.
20              Now, you started in the mailroom; correct?
21              THE WITNESS:  I did.
22              THE COURT:  All right.  Now, there was a Broadway play
23    about a fellow that started out in the mailroom.  What was it?
24              THE WITNESS:  How to Succeed in Business Without
25    Really Trying, written by an advertising copywriter.
```

```
 1              THE COURT:  And do you know who the star was the first
 2   sometime around?
 3              THE WITNESS:  Bobby Morse.
 4              THE COURT:  Yes.  Absolutely.
 5              Boy, I'll tell you.  This guy gets to go to round 2.
 6              THE WITNESS:  Oh, no.
 7              THE COURT:  Much better than a lot of the other people
 8   we've had.
 9              And you were affiliated with Maxwell House at one
10   point.
11              THE WITNESS:  I was.
12              THE COURT:  Okay.  There's a very distinguished
13   historical figure -- as a matter of fact, happens to be a
14   jurist, who that's their personal preference of coffee
15   beverages.
16              Any thoughts?
17              THE WITNESS:  Well, I wrote a commercial for Maxwell
18   House that featured the actress who played the Wicked Witch of
19   the West in a famous movie, and the commercial was:  I want to
20   tell you a story about -- about my president, Teddy Roosevelt.
21   He was at the Maxwell House Hotel, he had a cup of coffee, and
22   he said:  This coffee is good to the last drop.
23              THE COURT:  I understand the tag line.
24              My question was, would you like to just take a guess
25   at the figure -- the historical figure I'm speaking about who
```

UNITED STATES DISTRICT COURT

1    was a very famous jurist.

2            THE WITNESS:  Well, "jurist"?

3            THE COURT:  Yeah.

4            THE WITNESS:  Very famous jurist.  Teddy Roosevelt

5    actually coined the theme line.

6            Gosh.  Very famous jurist.

7            Oliver Wendell Holmes.

8            THE COURT:  Not quite.

9            But, the person I was thinking of is -- you're

10   actually sitting in the courthouse who it's named after.  This

11   is Justice O'Connor's favorite brand of coffee.

12           THE WITNESS:  Well, I'm glad to hear it was.

13           THE COURT:  Now, so, next time you go to a party, you

14   can use that.

15           THE WITNESS:  I probably will.  Thank you, sir.

16           THE COURT:  We're going to stand in recess.

17           Thank you very much for being here.  We'll excuse you.

18   You may return to Los Angeles, or wherever your journey takes

19   you.

20           You may step down.

21           Thank you very much.

22           Okay.  Real quickly, don't -- just a minute.  A little

23   housekeeping details.  The question is now, will there be any

24   rebuttal testimony?

25           MR. HARVEY:  I have only and few sentences to read out

1  of Dr. Ford's report.  I don't think it will take more than

2  four or five minutes.

3          THE COURT:  Okay.  Do you still want to do closings

4  this afternoon?  Do you want an afternoon to think about them?

5          MR. HARVEY:  I -- my preference is yes, let's go this

6  afternoon.

7          MR. BRAY:  Yeah.  I've made plans for tomorrow.  I'd

8  like to finish, as well.

9          THE COURT:  Well, you could unmake them, with all due

10  respect.

11          MR. BRAY:  Well, I could.

12          THE COURT:  You're the one that keeps telling me,

13  we've allowed two weeks for this case --

14          MR. BRAY:  I know.

15          THE COURT:  -- and so I'm going to hold you to that

16  one.

17          MR. BRAY:  I know.  I will withdraw my prior statement

18  and simply say, I agree with Mr. Harvey, I prefer to do it this

19  afternoon.

20          THE COURT:  Oh, good.  Okay.

21          MR. BRAY:  At the Court's discretion, of course.

22          THE COURT:  No, no, I want to do this in accordance

23  with the parties' preference.  We have the time.  But on the

24  other hand, I've done enough of these cases where sometimes you

25  get done at noon and somebody says I want to think about this,

1      I want to do whatever.  But we'll come back at 1:00 -- let's

2      make it about 20 until 2:00, just to be sure.

3              One thing I'm going to suggest, however, is that we

4      have lots of exhibits and things that have been admitted,

5      things that haven't.  And as what happens with a lot of cases,

6      you have thousands of exhibits and we end up using about less

7      than 10 percent of them.  That's just the nature of the trial

8      work.  A lot of it has to do with testimony, things like that.

9              But, I have to do findings of fact and conclusions of

10     law.  I do not subscribe, nor does the law require me, to adopt

11     the go-fish routine.  So if you make an argument, say, oh, it's

12     in there somewhere, it's one of these exhibits, it's this, that

13     or the other, you can read it, that's my job.  You've got to

14     articulate it as though I'm the jury to persuade them.  I'm not

15     going to sit here and take all this back there and read all

16     these depositions and read all this stuff.  It's your job to

17     present that testimony to me in a distilled fashion.

18             Yes, sir?

19             MR. HARVEY:  Suggestion, Your Honor, with respect to

20     that, if Counsel is willing to do it.  I thought about it.  We

21     were talking about this last night.  We have submitted proposed

22     findings fact and conclusions of law --

23             THE COURT:  What?

24             MR. HARVEY:  I'm sorry.

25             We've submitted proposed findings of fact --

UNITED STATES DISTRICT COURT

1            THE COURT:  Right.  I've got those.

2            MR. HARVEY:  -- and conclusions of law.  But they were

3    based on the record at that time.  We have now have had a

4    trial.  And so the proposal I'm making is that, for the benefit

5    of the Court, we take those proposed findings and reference

6    them either to trial exhibits, because the numbers changed from

7    the deposition exhibits that were referenced, or to the record

8    itself where -- where we have a transcript, and put those right

9    into the findings of fact for the benefit of the Court so you

10   won't have to go hunting.

11           MR. BRAY:  Yeah, that was going to be my concern as

12   well, Your Honor.  You mentioned wanting to be led to the

13   specific parts of the record, and the exhibit numbers that were

14   referred to in the prior joint -- in the prior findings of

15   fact, proposed findings of fact and conclusions of law, don't

16   line up to the trial exhibit number.  So I'm in agreement with

17   Mr. Harvey that it might be a useful exercise.

18           THE COURT:  Okay.  Well, you can -- you can do that.

19   You can refer me.  What I didn't want you to say is, you know,

20   it's in there somewhere, go find it.

21           MR. BRAY:  Okay.

22           THE COURT:  And the reason I do findings of facts and

23   conclusions of law ahead of time, because as soon as the trial

24   is over, everybody wants to order copies of the transcript.

25   And I understand why you would want that in order to do that.

1    But then the court reporter, you know, has to do that also.

2    And I'm sure -- because they make money off of it, as they

3    should -- they're not going to object.  But that delays the

4    getting out of the opinion forever.  And it's been my

5    experience when you put something on the shelf, it's hard

6    getting it back off the shelf.

7            MR. HARVEY:  Can --

8            THE COURT:  And your clients want to know what's going

9    to happen in this case.

10            The issues in this case are very distinct and very

11    defined.  And I think we can get through this, but I just -- I

12    just wanted to caution everyone about the temptation to do

13    that.  That's all.  I wouldn't expect counsel here to do that,

14    but I've had a lot of other people.

15            MR. BRAY:  I was going to suggest that maybe

16    Mr. Harvey and I meet before we come back from the lunch break

17    and see if we have an agreement amongst ourselves in terms of

18    timing, and then we could run it by you hopefully as --

19            THE COURT:  That would be fine.

20            MR. BRAY:  -- something the parties stipulate to.

21            MR. HARVEY:  With respect to the amended --

22            MR. BRAY:  Yes.

23            MR. HARVEY:  -- refreshed findings of fact?

24            MR. BRAY:  Yes.

25            MR. HARVEY:  All right.  Great.

1          THE COURT:  That would be fine.

2          MR. BRAY:  So we'll get on the same page and then see

3    if we --

4          MR. HARVEY:  Yeah.

5          MR. BRAY:  -- all three would be --

6          THE COURT:  All right.

7          Let's stand at recess until about 1:40, and then we'll

8    come back for final summations and we've talked about that

9    already, the timing on that.

10         Thank you very much.  And we'll stand at recess until

11   about 1:40.

12              (Proceedings in recess at 11:55 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

<u>**C E R T I F I C A T E**</u>

I, CHARLOTTE A. POWERS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 5th day of October, 2017.


                              s/Charlotte A. Powers
                              Charlotte A. Powers, RMR, FCRR


**UNITED STATES DISTRICT COURT**