**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, LLC, | No. CV-14-2057-PHX-SMM |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| Jack Daniel's Properties, Inc., | |
| Defendant, | |
| And Related Counterclaims. | |

In earlier proceedings, the Court resolved the parties' cross-motions for summary judgment, denying Plaintiff's motion for summary judgment, and granting Defendant's motion for partial summary judgment. (Doc. 171.) The remaining claims involve trademark and trade dress dilution under federal and state law, as well as trademark and trade dress infringement under federal and state law. (Id.)

The Court held a four-day bench trial beginning on October 2, 2017. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, having heard the evidence and determined the credibility of the witnesses, **THE COURT NOW FINDS BY A PREPONDERANCE OF THE EVIDENCE THE FOLLOWING FACTS AND STATES ITS CONCLUSIONS OF LAW.**

The Court finds in favor of Defendant and against Plaintiff on all remaining claims. Consequently, the Court will grant Defendant's requests and order permanent injunctive

relief.

## I.    PARTIES

1. Plaintiff VIP Products, LLC, ("VIP") designs, manufactures, markets, and sells chew toys for dogs. VIP sells various brands of dog chew toys, including the "Tuffy's" line (durable sewn/soft toys), the "Mighty" line (durable toys made of a different material than the Tuffy's line), and the "Silly Squeakers" line (durable rubber squeaky novelty toys). (Doc. 242 at 3.) VIP is an Arizona limited liability company with its principal place of business in Phoenix, Arizona. (Docs. 49 ¶ 1; 204-1, Ex. A.) President of VIP Steven Sacra and his wife are the principal owners of VIP. (Doc. 234 at 24.) Mr. Sacra is a talented entrepreneur who developed the line of VIP dog toys. (Id. at 30-37.) His talent and creativity often lead to "of the moment" inspiration, such as toys Mr. Sacra believes are parodies of other companies' products. (See, e.g., Doc. 237 at 102.).

2. Defendant Jack Daniel's Properties, Inc. ("Jack Daniel's") is a Delaware corporation with its principal place of business in San Rafael, California. (Docs. 1 ¶ 2, 15-1 ¶ 2.)

## II.    PRE-LITIGATION FACTUAL FINDINGS

3. Jack Daniel's owns and licenses the trademarks and trade dress used in connection with Jack Daniel's products. (Docs. 105; 204-1, Ex. A.)

4. Jack Daniel's Tennessee whiskey has been sold in the United States continuously since at least 1875, except during Prohibition. (Doc. 105; U.S. Trademark Reg. No. 42,663.)

5. Jack Daniel's Tennessee whiskey has borne the JACK DANIEL'S trademark and the OLD NO. 7 trademark since 1875. (Doc. 234 at 51-52 (discussing U.S. Trademark Reg. Nos. 42,663, 582,789, and 1,923,981).) Jack Daniel's federal registrations of its trademarks and trade dress for whiskey also includes Trademark Reg. No. 4,106,178 for the three-dimensional configuration of a square shape bottle container. (Doc. 12 at 7.) Jack Daniel's trade dress has included these trademarks for many decades. (Doc. 234 at 55-56, 68.)

6. Jack Daniel's has maintained an active brand licensing program for many years.

(Docs. 105, Ex. 1; 234 at 68-69; 111-113.)

7. Jack Daniel's trademarks and trade dress have appeared on thousands of products other than whiskey, including food, apparel, and a limited number of pet products. (Doc. 230-16 thru 231-7.) Jack Daniel's offers branded dog leashes, collars, and dog houses. (Docs. 234 at 113, 230-9 thru 230-12.) Jack Daniel's has offered these dog accessories since before the events giving rise to this case. (Doc. 241 at 7.)

8. Initially launched in approximately 2007, VIP's Silly Squeakers line of dog toys includes a variety of toys in the shapes of beer, wine, soda, and liquor bottles. (Doc. 236 at 31-38.)

9. Mr. Sacra's intent behind producing the Silly Squeakers line of toys was to develop a creative parody on existing products. (Id. at 45-47, 56.) Mr. Sacra provided examples of this line of toys, including "Smella R-Crotches" a parody of Stella Artois, "Heini Sniff'n" a parody of Heineken, and "Pissness" a parody of Guinness. (Doc. 237 at 96-98.) According to Mr. Sacra, these parodies are just harmless, clean fun, and are not distasteful or harmful. (Id. at 99.)

10. VIP created and marketed the "Bad Spaniels" silly squeaker dog toy. (Doc. 158.) The "Bad Spaniels" toy is in the shape of a liquor bottle and features a wide-eyed spaniel over the words "Bad Spaniels", "the Old No. 2, on your Tennessee Carpet." (Id.) At the bottom of the "Bad Spaniels" toy, it reads: "43% POO BY VOL." and "100% SMELLY". On the back of the Silly Squeakers label for the "Bad Spaniels" toy, it states: "This product is not affiliated with Jack Daniel Distillery." (Id.)

11. VIP's intent behind designing the "Bad Spaniels" toy was to match the bottle design for Jack Daniel's Tennessee Sour Mash Whiskey ("Old No. 7 Brand"). (Doc. 157.) These design elements include the size and shape of the product, the use of white lettering over a black background, and font styles.

12. Mr. Sacra originally coined the name "Bad Spaniels", and then requested Designer Elle Phillips to work on a proposed design. (Doc. 236 at 55-56.) Ms. Phillips understood that "Bad Spaniels" was a reference to "Jack Daniel's." (Doc. 233-1 at 47, 49-

50.) Ms. Phillips was familiar with that brand and had consumed Jack Daniel's Tennessee whiskey in bars and in her home. (Id. at 52-53.)

13. Prior to starting the design for "Bad Spaniels," Ms. Phillips recalled various Jack Daniel's packaging features from memory, including "[t]he black and white label, sort of a cursive font for Tennessee, simple type," and the square shape of the bottle, as well as the use of a number on the neck label. (Id. at 53-54.)

14. Ms. Phillips then retrieved a bottle from her liquor cabinet, examined it, and placed it on her desk while she developed a sketch. (Id. at 54-55, Docs. 104-1 at 101-02, 225-17.) She referenced the Jack Daniel's bottle "every now and then throughout the process." (Doc. 233-1 at 66-67.) Ms. Phillips wanted her sketch to be close to the same as the Jack Daniel's bottle. (Id. at 67.)

15. When finished, the "Bad Spaniels" product featured all the elements of the Jack Daniel's Trade Dress, including the bottle shape, color scheme, and trademark stylization, as well as the word "Tennessee," and the font and other graphic elements. (Doc. 158.)

16. "Bad Spaniels" was introduced in 2014 and in the VIP catalogs, the "Bad Spaniels" product appears in a bar setting alongside various hanging bottles, one of which can be recognized as a Jack Daniel's bottle. (Docs. 227-7 and 227-8.)

**III.    LITIGATION HISTORY**

17. After VIP introduced "Bad Spaniels," Jack Daniel's promptly demanded that it stop selling the new toy. (Doc. 47.) VIP responded by filing a complaint seeking a declaratory judgment that "Bad Spaniels" did not infringe or dilute any trademark or trade dress rights owned by Jack Daniel's. (Doc. 49 at 9-11.)

18. Subsequently, the parties filed dispositive motions. (Docs. 101, 110.)

19. In ruling on the motions, the Court ruled in favor of Jack Daniel's and against VIP, rejecting VIP's defenses of nominative and First Amendment fair use, and that VIP failed to rebut the validity of the Jack Daniel's bottle design registration. (Doc. 171.) In addition, the Court found as a matter of law that Jack Daniel's trade dress and bottle design are distinctive, not generic, and that they are nonfunctional. (Id.); see Kendall-Jackson Winery, Ltd. v. E.

& J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998) (stating that whether it be a trademark or a trade dress claim, a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion).

20. The Court left for trial the remaining issues of Jack Daniel's claim for dilution by tarnishment and Jack Daniel's claim for infringement–the remaining issue of likelihood of confusion. (Doc. 171.)

21. At this point in the litigation, VIP does not contest the validity of Jack Daniel's prior trademarks and trade dress registrations. (Doc. 242 at 33.)

## IV.   DILUTION BY TARNISHMENT

22. On October 6, 2006, the Trademark Dilution Revision Act of 2006 (the "TDRA"), was signed into law. See Pub.L. 109–312, 120 Stat. 1730 (Oct. 6, 2006). The TDRA defines dilution as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1) (establishing a likelihood of dilution standard).

23. The phrase "likely to cause dilution" used in the TDRA significantly changes the meaning of the law from "causes actual harm" under the preexisting law to "likely" or "likelihood" which means probably. See V Secret Catalogue, Inc. v. Moseley, 605 F.3d 382, 388 (6th Cir. 2010).

24. The TDRA further defines dilution by tarnishment, as follows: "For purposes of [15 U.S.C. § 1125(c)(1)], 'dilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C); Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 903 (9th Cir. 2002) (stating that generally dilution "refers to the whittling away of the value of a trademark when the mark is used to identify different products.") (further quotation and citation omitted).

25. To prove dilution by tarnishment under the TDRA, Jack Daniel's must prove that at least one of its asserted trademark and trade dress rights was not only valid but also famous before the accused use began, and that the accused use is likely to cause negative associations that harms the reputation of the famous mark. See 15 U.S.C. § 1125(c); A.R.S. § 44-1448.01; Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 634 (9th Cir. 2008); Moab Industries, LLC v. FCA US, LLC, No. CV 12-8247, 2016 WL 5859700, *8 (D. Ariz. 2016) (stating that the "elements necessary to prove [an Arizona] state law trademark dilution counterclaim are basically identical" to federal trademark dilution claims).

*(A) Fame*

26. A trademark or trade dress is famous if "it is widely recognized by the general consuming public of the United States as a designation of source." 15 U.S.C. § 1125(c)(2)(A). All relevant factors may be considered, including: "the duration, extent, and geographic reach of advertising and publicity of the mark"; "the amount, volume, and geographic extent of sales of goods or services offered under the mark"; "the extent of actual recognition of the mark"; "and whether the mark [has been] registered . . . on the principal register." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv); accord A.R.S. § 44-1448.01(A)(1-8).

27. Based on the relevant fame factors, 15 U.S.C. § 1125(c)(2)(A)(i)-(iv), advertising, sales, actual recognition, and prior registration, the Court finds that Jack Daniel's trademarks and trade dress are famous and were famous before VIP introduced "Bad Spaniels" in July 2014.

28. Regarding advertising, Jack Daniel's spent hundreds of millions of dollars to promote Jack Daniel's whiskey. (Docs. 234 at 55-56, 59-69, 80; see also Docs. 220, Exs. 105-24; Doc. 229-5 thru 229-9, 229-13, and 229-16.)

29. Regarding sales, Jack Daniel's is the best-selling whiskey in the United States since 1997, exceeding 75 million cases and 10 billion dollars in sales. (Doc. 234 at 48-50.)

30. Regarding actual recognition, Jack Daniel's trademarks have been used continuously for over a century, except during Prohibition. (Doc. 234 at 49-52.) Jack Daniel's trademarks and trade dress have been seen by millions of Americans in movies, and

television programs. (Doc. 234 at 62-66, 68; Doc. 220, Exs. 107, 109-11, and 146.) Jack Daniel's is prominently featured at jackdaniels.com, which was visited more than four million (4,000,000) times during 2014. (Docs. 234 at 66; Docs. 220, Ex. 112, and 229-8.) Jack Daniel's trade dress is prominently featured on social media pages for the brand. (Doc. 234 at 66, Doc. 229-9.) Based on Jack Daniel's internal records, aided consumer awareness of the Jack Daniel's brand is consistently around 98%.[1] (Doc. 234 at 50.)

31. Based on the foregoing, the Court finds that Jack Daniel's carried its burden of demonstrating that its trademarks and trade dress were famous before VIP's "Bad Spaniels" use began in July 2014. Jack Daniel's trademark and trade dress were widely recognized by the general consuming public of the United States in July 2014. Thus, Jack Daniel's established its fame under both the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8).

### (B) Similarity

32. Under the TDRA's likelihood of dilution standard, in order to establish similarity in a dilution by tarnishment case, a party must show only "similarity," not substantial similarity or nearly identical, between the famous mark and the accused mark. See Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 633 F.3d 1158, 1159 (9th Cir. 2011) (stating that "the 'identical or nearly identical' standard did not survive Congress's enactment of the TDRA.") Now a party only must show "similarity" between the famous mark and the accused mark. Id. at 1171.

33. The factors under consideration for determining similarity in a dilution by tarnishment case have not been clearly defined. See Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc., No. CV 12-1853, 2013 WL 1196948, at *11 (W.D. Wash. Mar. 25, 2013). To resolve the question of similarity, the Court considers "the factors of appearance, sound and meaning," factors that are also relevant in evaluating infringement. See Nordstrom, 2013 WL 1196948, at *11.

---

[1]Aided brand awareness measures the number of people who express knowledge of a brand or product when prompted (brand recognition).

34. Here, VIP intended and produced a dog toy that included and was similar to Jack Daniel's trademarks and trade dress. (Doc. 241 at 13-15.) VIP appropriated the Jack Daniel's trade dress in every aspect: "Jack Daniel's" became "Bad Spaniels, " "Old No. 7" became "Old No. 2," and "Tennessee whiskey" became "Tennessee carpet." Meanwhile, the square bottle shape, the nearly identical size of the two products, the ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and styles remain virtually unchanged. "With a single glance . . . one is immediately struck by their similarity." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000).

35. VIP does not contest similarity; rather, despite some minor artistic variations, VIP concedes that it used Jack Daniel's trademarks and trade dress as a model for its "Bad Spaniels" dog toy. (Doc. 242 at 31.)

36. Based on the foregoing, the Court finds that Jack Daniel's established the requisite similarity between VIP's "Bad Spaniels" and Jack Daniel's trademark and trade dress. Thus, the Court finds similarity between the two products under both the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8).

*(C) Reputational Harm*

37. Finally, under the TDRA, the last factor focuses on reputational harm, that is, whether associations from VIP's "Bad Spaniels" product "harms the reputation of the famous mark," Jack Daniel's trademarks and trade dress. See 15 U.S.C. § 1125(c) (2)(C).

38. Reputational harm "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 111 (2d Cir. 2010) (quoting Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994)). For example, there is a strong consensus among courts across jurisdictions that a famous mark is tarnished when it is semantically associated with a new mark that it is using to sell sex-related products. See V Secret, 605 F.3d at 388 (citing cases in support).

39. A trademark may also be tarnished if the mark loses its ability to serve as a "wholesome identifier" of the plaintiff's product. Starbucks Corp. v. Wolfe's Borough

Coffee, Inc., 588 F.3d 97, 110 (2d Cir. 2009) (citing Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 507 (2d Cir. 1996)). The Second Circuit found that the relevant inquiry is how the junior mark's product affects the positive impressions about the famous mark's product, and not whether a consumer simply associates a negative sounding junior mark with the famous mark. Starbucks, 588 F.3d at 110.

40. Regarding reputational harm, both parties engaged experts. The determination of an expert's credibility and the weight to be given expert testimony and evidence is a matter within the discretion of the trier of fact, which in a bench trial like the instant case, is a matter for the Court. See Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990). This Court decides how much weight to give the evidence and the testimony presented. Id.

41. Jack Daniel's engaged Dr. Itamar Simonson, a Professor of Marketing at Stanford University. (Doc. 234 at 154-62.) Dr. Simonson, relying on consumer psychology research, concluded that VIP's introduction of "Bad Spaniels" into the marketplace resulted in Jack Daniel's trademarks and trade dress being diluted by tarnishment. (Id. at 162-74.)

42. VIP engaged Mr. Bruce Silverman, an advertising, marketing, and branding consultant for the past 40-50 years, to rebut the opinion of Dr. Simonson and his findings. (Doc. 238 at 9-31.)

*Dr. Itamar Simonson, Credentials and Findings*

43. Dr. Simonson has served as an expert witness on numerous occasions, providing testimony on issues related to marketing, consumer behavior, trademark-related matters, false advertising, and branding. (Doc. 234 at 161.)

44. Dr. Simonson has conducted, supervised, or evaluated over one thousand marketing research studies. (Id. at 155-59, 61-62.) Such studies related to consumer behavior, consumer information processing, brand equity, trademarks, branding, marketing strategies, and advertising. (Id.)

45. Dr. Simonson's opinions here are supported by empirical studies in which there are two stages to establish a likelihood of dilution by tarnishment. (Id. at 162-63.) One, whether the allegedly diluting product will bring to mind or call to mind the allegedly diluted

mark, and two, assuming that the allegedly diluting product does call to mind the allegedly diluted mark, has it affected the brand equity and brand association of the allegedly diluted mark. (Id.)

46. The first stage was satisfied because the whole point of VIP's product was to bring "Jack Daniel's Old No. 7 to mind." (Id. at 163.)

47. Consumer psychology research utilized to evaluate the second stage was based on numerous empirical studies: The Court credits that the studies relied upon by Dr. Simonson support certain conclusions that apply to all products and services regarding the impact of adding a negative association onto the association of the existing brand. (Id.)

48. The Associative Network Model has been empirically tested and verified numerous times since the 1970's. (Id. at 164-66.) Regarding application of the Associative Network Model, the Court credits Dr. Simonson that when consumers are evaluating brands certain mental associations come to mind. (Id. at 164.)

49. In accordance with the Associative Network Model and based upon Dr. Simonson's review of Jack Daniel's commercials and advertisements, his understanding about the Jack Daniel's brand, and the key messages Jack Daniel's communicates regarding its brand values (namely authenticity, integrity, independence, loyalty), the Court credits Dr. Simonson's testimony of documented positive mental associations that come to mind when evaluating Jack Daniel's before VIP introduced the "Bad Spaniels" dog toy. (Doc. 234 at 169-70.)

50. Based upon the Associative Network Model, the Court credits Dr. Simonson's conclusion regarding the effects of "Bad Spaniels" and the negative mental associations that come to mind when you include defecation, feces, and poo upon consumers who are evaluating Jack Daniel's whiskey. (Id. at 170-72.)

51. Dr. Simonson relied on consumer psychology research to establish that when you associate any food or beverage with defecation, you are creating disgust in the mind of the consumer with respect to that food or beverage associated with defecation. (Id. at 172-74, 180.) Well documented empirical research supports that the negative associations of "Old

No. 2" defecation and "poo by weight" creates disgust in the mind of the consumer when the consumer is evaluating Jack Daniel's whiskey. (Id. at 171-72.)

52. Dr. Simonson relied on consumer psychology research in his evaluation of the second phase regarding likelihood of dilution by tarnishment. (Id.)

53. Based on the Associative Network Model, the Court credits Dr. Simonson that the "Bad Spaniels" product is likely to tarnish the Jack Daniel's trademarks and trade dress by creating negative associations, either consciously or unconsciously, and undermining the pre-existing positive associations with its whiskey ("Old No. 2 on your Tennessee carpet"). (Doc. 234 at 172-74, 220.)

54. The Court credits Dr. Simonson's conclusion that such negative associations are particularly harmful for a company such as Jack Daniel's because the goods it offers for sale involves human consumption and human consumption and canine excrement do not mix. (Id. at 172-74.) Further, because Jack Daniel's brand name along with its equity is a very important asset. (Id. at 160.)

*Mr. Bruce Silverman, Credentials and Findings*

55. VIP engaged its own expert, Bruce Silverman, to rebut the opinion of Dr. Simonson and his findings. (Doc. 238 at 31.) Mr. Bruce Silverman has been an advertising, marketing, and branding consultant for the past 40-50 years. (Id. at 9-31.) He has worked with companies that manufacture or produce goods and services, as well as his main work with advertising and public relations agencies. (Id.)

56. In West Los Angeles, Mr. Silverman arranged four focus groups[2] to test consumer reactions to "Bad Spaniels" which according to Mr. Silverman had an overall favorable impression of Jack Daniel's upon discussing the "Bad Spaniels" dog toy. (Id. at 44-50.)

57. Mr. Silverman's reliance on the West Los Angeles focus groups is flawed because

---

[2]Focus groups are a research method whereby consumers from a target market are led through a discussion regarding a particular topic and give insight as to why and how consumers use a product or service, what is important to them in choosing a particular brand, what they like and don't like about various products or services, and any special needs they might have that aren't being satisfied.

the groups were initially directed by the moderator that the product under evaluation, "Bad Spaniels", was a joke, a spoof product, and as a result the focus groups produced predetermined results. (Doc. 234 at 181, 183.) This tainted the group's conclusions. Moreover, Mr. Silverman did not have expertise or specialized knowledge in trademark dilution matters; rather, his experience was in advertising. (<u>Id.</u> at 208.)

58. Finally, Jack Daniel's trademarks and trade dress are tarnished by associating them with toys, particularly the kind of toys that might appeal to children. (Doc. 238 at 96-97, 110-11.) The Court finds that while an association with toys may not ordinarily cause reputational harm, Jack Daniel's is in the whiskey business, and does not market to children, does not license goods for children, and does not license goods that might appeal to children. (<u>Id.</u>)

59. Here, the Court credits and gives prevailing weight to Dr. Simonson's specialized knowledge and specific expertise in consumer psychology to evaluate and conclude a likelihood of dilution by tarnishment regarding the effect of the "Bad Spaniels" dog toy upon the Jack Daniel's trademarks and trade dress. (Doc. 234 at 172-74, 184-87; <u>see</u> <u>Eastman Kodak Co. v. Rakow</u>, 739 F. Supp. 116, 118 (W.D.N.Y. 1989) (stating that it does not matter whether this association is humorous or intended as such and enjoining use of the stage name KODAK by a stand-up comedian); <u>Grey v. Campbell Soup Co.</u>, 650 F. Supp. 1166, 1175 (C.D. Cal. 1986) (enjoining use of DOGIVA and CATIVA as harmful to Campbell's GODIVA business reputation because of the negative association the public makes between Godiva's premium quality food products and animal treats); <u>Steinway & Sons v. Robert Demars & Friends et al.</u>, 210 U.S.P.Q. 954 (C.D. Cal. 1981) (enjoining sale of clip-on beverage can handles under the name STEIN-WAY, finding that such association will inevitably tarnish Steinway's reputation and image with the public as sponsoring only products of taste, quality and distinction); <u>see generally</u> <u>Chemical Corp. of Am. v. Anheuser–Busch, Inc.</u>, 306 F.2d 433, 436–38 (5th Cir. 1962) (enjoining use of "Where there's life ... there's bugs!" slogan); <u>Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.</u>, 642 F. Supp. 1031, 1039 (N.D. Ga. 1986) (tarnishment "occurs when a defendant

uses the same or similar marks in a way that creates an undesirable, unwholesome, or unsavory mental association with the plaintiff's mark").

60. Accordingly, Dr. Simonson established that, the "Bad Spaniels" product is likely to tarnish the Jack Daniel's trademarks and trade dress by creating negative associations, either consciously or unconsciously, and undermining the pre-existing positive associations with its whiskey ("Old No. 2 on your Tennessee carpet"). (Doc. 234 at 172-74, 220.) This negative association is particularly harmful for a company such as Jack Daniel's because the goods it offers for sale involves human consumption and human consumption and canine excrement do not mix. (Id. at 172-74.)

61. The Court further finds that dilution by tarnishment will occur due to Jack Daniel's trademarks and trade dress being associated with toys, particularly the kind of toys that might appeal to children; Jack Daniel's is in the whiskey business and its reputation will be harmed due to the negative mental association of evoking whiskey with children, something Jack Daniel's has never done. (Id. at 96-97, 110-11.)

62. Thus, under the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8), Jack Daniel's has established the requisite reputational harm to its trademarks and trade dress as a result of VIP's creation and introduction of "Bad Spaniels" into the pet toy market.

### (D) Conclusion–Dilution by Tarnishment

63. The Court finds that Jack Daniel's established by a preponderance of the evidence all the requisite elements for dilution by tarnishment: fame, similarity, and reputational harm, caused by VIP's "Bad Spaniels" against Jack Daniel's trademark and trade dress under both the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8).

## V.    TRADEMARK/TRADE DRESS INFRINGEMENT

64. Whether a trademark or trade dress claim, Jack Daniel's must meet three elements in order to establish infringement: (1) distinctiveness; (2) nonfunctionality, and (3) the likelihood of confusion. See Kendall-Jackson, 150 F.3d at 1047.

65. This Court previously ruled as a matter of law that Jack Daniel's trademarks and

trade dress are distinctive and nonfunctional. The issue remaining at trial is likelihood of consumer confusion. (Doc. 171.)

66. To prevail on its trademark and trade dress infringement claims under federal and state law, Jack Daniel's must show ownership, meaning that at least one of its asserted rights was valid before VIP's alleged infringing use began, and VIP's use caused a "likelihood of confusion." <u>See</u> 15 U.S.C. §§ 1114, 1125(a); <u>Brookfield Commc'ns v. West Coast Entm't Corp.</u>, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999); <u>Kendall-Jackson</u>, 150 F.3d at 1047; <u>Angel's Gate Inc. v. All-Star Grand Canyon Tours Inc.</u>, No. CV 12-8181, 2013 WL 12114580, *2 (D. Ariz. 2013) ("Because Arizona's trademark infringement statute mirrors the Lanham Act, 15 U.S.C. § 1125(a), cases interpreting the Lanham Act guide the interpretation of A.R.S. § 44-1451.")

67. Here, the Court found that Jack Daniel's asserted rights are senior and valid because they have appeared on the Principal Register of the United States Patent and Trademark Office since before VIP's use began. (<u>See</u> Docs. 224-25); 15 U.S.C. §§ 1057(b), 1115(a); <u>see</u> <u>Brookfield</u>, 174 F.3d at 1047. Furthermore, all the asserted rights are conclusively senior and valid pursuant to the provisions of 15 U.S.C. § 1065.

68. At issue is whether VIP's "Bad Spaniels" product caused a "likelihood of confusion" about the source of the product. Pursuant to <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348 (9th Cir. 1979), in the Ninth Circuit "likelihood of confusion" is assessed by weighing the following eight non-exclusive factors, often referred to as the <u>Sleekcraft</u> factors: the strength of the plaintiff's mark; the proximity or relatedness of the goods; the similarity of the parties' marks; evidence of actual confusion; marketing channels used; the type of goods and degree of care likely to be exercised by the buyer; the defendant's intent in adopting the junior mark; and likelihood of expansion of the parties' product lines. <u>Id.</u>

69. "The <u>Sleekcraft</u> factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." <u>Network Automation, Inc. v. Advanced Sys. Concepts</u>, 638 F.3d 1137, 1145 (9th Cir. 2011). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." <u>Brookfield</u>, 174 F.3d

at 1054.

70. In some cases, a small number of the factors carry great weight in assessing the likelihood of confusion. See Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998) (stating that "[t]he [Sleekcraft] factors should not be rigidly weighed; we do not count beans."). "Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion." Id. (internal citation omitted).

71. Utilizing the Sleekcraft factors, likelihood of consumer confusion may be established by (1) forward confusion or (2) reverse confusion. See JL Beverage Co., LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1106 (9th Cir. 2016). "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." Id. (further citation omitted). Reverse confusion, on the other hand, "occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." Id.

*(A) Actual Confusion*

72. Regarding proof of actual confusion, in the Ninth Circuit, proof of "actual confusion is not necessary to a finding of likelihood of confusion." Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991); accord, Sleekcraft, 599 F.2d at 353.

73. Instances of actual confusion in the marketplace are often difficult to find, particularly where, as here, the sales volume of the accused product is small and the marketing is thin. "[D]ifficulties in gathering [such] evidence of actual confusion makes its absence generally unnoteworthy." Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1077 (9th Cir. 2006) ("In this case, which involves a national market and a low degree of consumer care, nothing suggests that the lack of evidence of confusion should be particularly noteworthy.").

74. "[T]he cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution." Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1405 (9th Cir. 1997) (further citation omitted).

75. In lieu of marketplace evidence of actual confusion, courts regularly accept the results of properly-designed consumer surveys as surrogate evidence of actual confusion. See Playboy Enter., Inc. v. Netscape Commc'n Corp., 354 F.3d 1020, 1026 n.28 (9th Cir. 2004) (stating that "[s]urveys are commonly introduced as probative evidence of actual confusion.")

76. Both parties engaged experts on the issue of likelihood of confusion and both experts testified via deposition. (Docs. 233-2 (Ford) and 233-3 (Nowlis).)

77. Jack Daniel's engaged the late Dr. Gerald Ford to conduct a likelihood of confusion survey regarding the two products, the Jack Daniel's Tennessee whiskey bottle, with its trademarks and trade dress, and VIP's "Bad Spaniels" product. (Doc. 233-2 at 18-19.)

78. VIP engaged Dr. Stephen Nowlis to rebut the likelihood of confusion survey conducted by Dr. Ford. (Doc. 233-3.)

*Dr. Gerald Ford, Credentials and Findings*

79. Until his death in 2015, Dr. Ford was engaged in commercial marketing research and consulting for 40 years. (Doc. 230-3 at 2.) Over the past 40 years, Dr. Ford has been qualified and accepted as an expert in marketing and marketing research in more than 60 trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board. (Id. at 33-35.)

80. Dr. Ford was retained by a variety of firms. (Id.) Approximately one-half of his engagements involved the design and execution of marketing research surveys. (Id.) Dr. Ford designed and executed surveys relating to intellectual property matters, including trademark, false advertising, patent, and other related matters. (Id.) Dr. Ford was familiar with accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls. (Id.)

81. In this matter, Dr. Ford designed an internet survey to measure whether the "Bad Spaniels" product is likely to confuse consumers. (Id. at 3.) Dr. Ford's internet survey

utilized the Ever-Ready[3] survey format, described as the prevailing standard when conducting a likelihood of confusion survey. (Doc. 235 at 7-8.)

82. Dr. Ford conducted a double-blind survey, meaning that not only is the interviewer unaware of the purpose of the survey, the interviewing firm is also unaware, and also the supervisor who instructs the interviewers is unaware of the purpose or the sponsor of the survey. (Id. at 8, Doc. 230-3 at 6.) In addition, the responding consumers were not informed that this was being done for this or that company. (Doc. 230-3 at 6.) Dr. Ford's designed internet survey was a neutral survey. (Id.)

83. The stimuli Dr. Ford utilized in his survey's test cell were photographs of VIP's "Bad Spaniels" dog toy. (Doc. 230-3 at 4.) The stimuli Dr. Ford utilized in his survey's control cell were photographs of a fictitious dog toy bearing the "Bad Spaniels" name, with none of the claimed Jack Daniel's indicia or trade dress. (Id.)

84. After viewing these photographs, all responding consumers were asked a series of open-ended and non-leading questions about who had made, sponsored, or approved the product pictured. (Id. at 13-18.)

85. In the results of Dr. Ford's survey, over 29% of those in the test cell—who had been shown the "Bad Spaniels" product—identified Jack Daniel's in response as to who had made, sponsored, or approved the product pictured. (Id. at 19-30.) By contrast, almost none of those in the control cell—who had been shown the fictitious dog toy—identified Jack Daniel's in response to these questions. (Id. at 31.)

86. The Court credits and gives prevailing weight to Dr. Ford's conclusion that "approximately twenty-nine percent . . . of potential purchasers . . . are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or made or put out with the authorization or approval of Jack Daniel's, or that

---

[3]See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 382 (7th Cir. 1976); J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:174 (4th ed. 2017) ("McCarthy") (stating that the Ever-Ready survey format has become a widely accepted format for likelihood of confusion surveys).

whoever makes or puts out Plaintiff's dog toy has a business affiliation or business connection with Jack Daniel's, and that such confusion is due in particular to Plaintiff's use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy." (Id. at 4, 33.)

87. The Court credits that Dr. Ford's survey establishes likelihood of confusion in this case. The survey followed the Ever-Ready format, considered the prevailing standard for trademark survey research in cases involving strong marks. See E&J Gallo v. Proximo Spirits, Inc., No. CV 10-411, 2012 WL 273076, at *5 (E.D. Cal. Jan. 30, 2012); accord McCarthy, § 32:174 (stating that the Ever-Ready survey format has become a standard and widely-accepted format).

88. Dr. Ford's survey results that 29% of potential purchasers were likely confused is nearly double the threshold to show infringement. (Doc. 230-3 at 19-30); see McCarthy, § 32:188 n.4 (collecting cases); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 594 (3d Cir. 2002) ("15% confusion is sufficient to demonstrate actual confusion"); James Burroughs Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976) (15% confusion "evidences a likelihood of confusion.").

*Dr. Stephen Nowlis, Credentials and Findings*

89. VIP hired Dr. Stephen Nowlis to prepare an expert rebuttal report regarding the likelihood of confusion survey conducted by Dr. Ford. (Doc. 128, and admitted at trial as Ex. 256, Doc. 221 at 5.) Dr. Nowlis holds a Ph.D. in Marketing and a Master's degree in Business Administration (MBA) from the University of California at Berkeley. (Doc. 128.)

90. Although Dr. Nowlis objected to Dr. Ford's control stimulus, Dr. Nowlis did not support this view by conducting a survey or by conducting independent research; he simply couched his opinion regarding lack of confusion through generalized objections to Dr. Ford's report.

91. Therefore, the Court does not credit Dr. Nowlis's generalized objections. Moreover, the Court finds that Dr. Nowlis has never written any articles on trademark surveys, or trademark survey design, or on the issue of likelihood of confusion in trademark

law which undercuts his opinions. (Doc. 233-3 at 14.)

92. The Court rejects VIP's assertion that Jack Daniel's was somehow obligated to establish actual confusion which <u>Sleekcraft</u> does not require. (Doc. 242 at 26.)

93. VIP did not commission or disclose a survey of its own.

94. Based on the foregoing, the actual confusion factor strongly favors Jack Daniel's.

**(B) *VIP's Intent***

95. It is undisputed that in designing and marketing "Bad Spaniels," VIP's intent was to copy the Jack Daniel's trademarks and trade dress for the purpose of parody. (Doc. 233-1 at 56-57, 62, 66-67; Doc. 242 at 29.)

96. VIP's intent was to capitalize on Jack Daniel's goodwill.

97. Dr. Ford's survey establishes a very high rate of consumer confusion regarding the source of the products.

98. Thus, the intent factor favors Jack Daniel's.

**(C) *Parody***

99. A defendant's claim of parody will be disregarded where the purpose of the similarity is to capitalize on a famous mark's popularity for the defendant's own commercial use. <u>See</u> <u>Grey</u>, 650 F. Supp. at 1175.

100. Here, VIP's intent was clear that it sought to capitalize on Jack Daniel's popularity and good will for its own gain, and therefore its claim of parody is disregarded.

**(D) *Similarity***

101. Regarding the factor of similarity between the two marks, "[t]he greater the similarity between the two marks . . . the greater the likelihood of confusion." <u>GoTo.com</u>, 202 F.3d at 1206. For a similarity evaluation, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is analyzed in terms of appearance, sound, and meaning; and third, the similarities between the products are weighed more heavily than differences. <u>Id.</u> (citation and quotation omitted).

102. Considering a mark in its entirety and how it appears in the marketplace requires consideration of the mark as a parody product. A junior mark must "conjure up the original

. . . for there to be a parody at all." <u>Tommy Hilfiger Licensing v. Nature Labs</u>, 221 F. Supp. 2d 410, 417 (S.D.N.Y. 2002).

103. Here, VIP intended to produce a dog toy that included and was similar to Jack Daniel's trademarks and trade dress so that its "Bad Spaniels" dog toy would call to mind Jack Daniel's Tennessee whiskey. VIP appropriated the Jack Daniel's Trade Dress in every aspect: "Jack Daniel's" became "Bad Spaniels," "Old No. 7" became "Old No. 2," "Tennessee whiskey" became "Tennessee carpet." Meanwhile, the square bottle size and shape, ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and styles remain virtually unchanged.

104. Various retailers that sell Jack Daniel's licensed merchandise also sell VIP's "Bad Spaniels" product, including Walmart, Amazon.com, and Boozingear.com. (Doc. 237 at 135-37, 231-19, 231-21.)

105. VIP cannot dispel confusion with a disclaimer, particularly a disclaimer in tiny font on the reverse side of its product packaging. <u>See</u> <u>E. & J. Gallo Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280, 1292 n.6 (9th Cir. 1992) (disclaimer had no significant impact). "Courts have been justifiably skeptical of such devises—particularly where exact copying is involved." <u>Au-Tomotive Gold</u>, 457 F.3d at 1077.

106. Based on this evidence, the Court finds that there is the requisite similarity between the two products and also how they appear in the marketplace causes a likelihood of confusion about the source of the products. Thus, the similarity factor favors Jack Daniels.

***(E) Strength***

107. Regarding the factor of the strength of the Jack Daniel's trademarks and trade dress, "[t]he stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." <u>La Quinta Worldwide LLC v. Q.R.T.M. SA de CV</u>, 762 F.3d 876, 874 (9th Cir. 2014); "The more 'famous' and 'well known' a [trade] mark, the greater the likelihood that use on noncompetitive products will cause confusion." <u>McCarthy</u>, § 24:49.

108. Here, Jack Daniel's asserted trademark and trade dress protection are extremely

strong: the Jack Daniel's trademarks have been used continuously for over a century, except during Prohibition (Doc. 234 at 49-52); Jack Daniel's Tennessee whiskey has been the best-selling whiskey in the United States since 1997 (id.); and between 1997 and April 30, 2015, Jack Daniel's whiskey sales in the United States exceeded seventy-five million (75,000,000) cases of various sizes, and resulting revenues exceeded ten billion dollars ($10,000,000,000) (id. at 50).

109. According to Jack Daniel's internal records, aided consumer awareness of the Jack Daniel's brand is consistently around 98%. (Doc. 234 at 50.)

110. Taken together, this is compelling evidence of strength. Thus, the strength factor strongly favors Jack Daniel's.

### (F) Proximity/Relatedness

111. Regarding the factor of proximity and relatedness of the goods, related goods are those "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." Sleekcraft, 599 F.2d at 348 n.10.

112. Here, the parties' goods can be said to be related. Jack Daniel's licensed its trademark and trade dress rights for use with certain dog products. (Doc. 234 at 113.) VIP's "Bad Spaniels" dog toy is a related pet product to Jack Daniel's dog leashes, dog collars, and dog houses. See International Kennel Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079, 1089 (7th Cir. 1988) (dog shows and dog toys related); (Docs. 230-9 thru 230-12.)

113. Although Jack Daniel's is primarily a producer and seller of whiskey, the consuming public observes Jack Daniel's trademarks and trade dress on a wide variety of merchandise, from prepared meats to barbeque sauces, from cigarette lighters to belt buckles and cufflinks, and from charcoal to clothing, due to an extensive and long-running licensing program. (Docs. 230-16 thru 231-7.)

114. Thus, the "relatedness of goods" factor favors Jack Daniels regarding likelihood of confusion about the source of the products.

### (G) Marketing Channels

115. Regarding marketing channels, "[m]arketing channels can converge[,] even when

different submarkets are involved[,] so long as 'the general class[es] of . . . purchasers exposed to the products overlap.'" Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1130 (9th Cir. 2014) (quoting Sleekcraft, 559 F.2d at 353).

116. "Bad Spaniels" and Jack Daniel's merchandise are not only sold to the same class of purchasers, but also in some of the same stores, such as Walmart, Amazon.com, and Boozingear.com. (Doc. 237 at 135–137, 231-19, 231-21.) Moreover, VIP has also promoted an association by featuring Jack Daniel's Tennessee whiskey in its marketing materials for the "Bad Spaniels" dog toy. (Docs. 231-19, 231-21.)

117. Thus, for these reasons, the marketing channels factor tips in favor of Jack Daniel's.

### (H) Consumer Degree of Care

118. "[L]ow prices imply correspondingly low consumer care." Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., 778 F.3d 1059, 1070-71 (9th Cir. 2015).

119. "[P]urchasers are unlikely to bother to inform the trademark owner when they are confused about [the source of] an inexpensive product." See Beer-Nuts v. Clover Club Foods Co., 805 F.2d 920, 928 (10th Cir. 1986); Au-Tomotive Gold, 457 F.3d at 1077.

120. Consumers are not likely to exercise significant care and attention when purchasing the "Bad Spaniels" product due to its retail value of approximately $15. Although the price of "Bad Spaniels" may be expensive as a dog toy, $15, because its relative price is not expensive, consumers are more likely to be confused as to the source of the product. See Playboy, 354 F.3d at 1028 (stating that the lack of significant consumer care increases the likelihood of confusion).

121. Based on this evidence, the consumer care factor also favors Jack Daniel's.

### (I) Product Line Expansion

122. Finally, regarding the likelihood of expansion of the parties' product lines, when parties in trademark cases do not offer goods or services in the same field, this factor assesses their likelihood of doing so.

123. "Inasmuch as a trademark owner is afforded greater protection against competing

goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." <u>Network Automation</u>, 638 F.3d at 1153 (further citation omitted).

### *(J) Conclusion – Likelihood of Confusion*

124. Upon applying the <u>Sleekcraft</u> factors to the facts of this matter and giving them due weight, there is a likelihood of consumer confusion and thus trademark and trade dress infringement under both federal law, 15 U.S.C. §§ 1114, 1125(a), and A.R.S. § 44-1451.

## VI.   ENTITLEMENT TO INJUNCTIVE RELIEF

125. Having prevailed on its trademark and trade dress claims, Jack Daniel's is entitled to an injunction "subject to the principles of equity." 15 U.S.C. §§ 1025(c)(1), 1116(a).

126. According to the principles of equity, a claimant must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships tips in its favor; and (4) that the public interest would not be disserved by a permanent injunction. <u>eBay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006). "Injunctive relief is the preferred remedy in trademark infringement . . . cases because there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." <u>Century 21 Real Estate Corp. v. Sandlin</u>, 846 F.2d 1175, 1180 (9th Cir. 1988).

127. Jack Daniel's merits a permanent injunction in this case. The "Bad Spaniels" product has caused a likelihood of confusion and reputational harm. Thus, permitting continued infringement and tarnishment of the Jack Daniel's trademarks and trade dress imposes a significant hardship on Jack Daniel's, but would not impose a legitimate hardship on VIP. Finally, a permanent injunction will serve the public interest by preventing continued consumer confusion.

## VII.   CONCLUSION

On the basis of the foregoing,

**IT IS HEREBY ORDERED** finding in favor of Defendant and against Plaintiff on

1  all remaining claims. Plaintiff is liable on all claims asserted by Defendant in this case.

2  **IT IS FURTHER ORDERED** that Defendant is directed to file a proposed form of

3  injunction by **Friday, February 23, 2018**.

4  **IT IS FURTHER ORDERED** denying as moot Defendant's Fourth and Fifth

5  Motions in Limine. (Docs. 194, 195.)

6  DATED this 29th day of January, 2018.

7

8

9  Stephen M. McNamee
   Senior United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28