Firm E-Mail: courtdocs@dickinsonwright.com
David G. Bray (#014346)
dbray@dickinsonwright.com
David N. Ferrucci (#027423)
dferrucci@dickinsonwright.com
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (844) 670-6009
*Attorneys for Plaintiff/Counterdefendant VIP Products, L.L.C*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| VIP Products L.L.C., an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Jack Daniel's Properties, Inc., a Delaware corporation,<br><br>Defendant.<br><br>And related counterclaims. | Case No. 2:14-cv-02057-SMM<br><br>**VIP PRODUCTS, L.L.C.'S RESPONSE TO JDPI'S MOTION FOR ATTORNEY'S FEES**<br><br>**(Oral Argument Requested)** |

VIP Products L.L.C. ("VIP") hereby responds to Jack Daniel's Properties, Inc.'s ("JDPI") Motion for Attorney's Fees (Dkt. 266, the "Motion"). JDPI's Motion should be denied because there is simply nothing exceptional about this case that warrants a deviation from the well-established rule that each party should bear its own fees.

**MEMORANDUM OF POINTS AND AUTHORITIES**

This case is an ordinary trademark dispute in every respect, laden with valid arguments on both sides which were ground in law and fact. There was nothing "exceptional" about the facts or law in this case, a fact even JDPI admits. *See* Dkt. 185 at 2:7-15, 3 1-6 (stating this case has no "peculiar or unique circumstances" and that this "is a straightforward trademark and trade dress infringement and dilution case seeking

only equitable relief."). Under the circumstances, and in light of JDPI's previous admissions,[1] JDPI has not met its burden establish otherwise. An award of fees in this ordinary trademark infringement case is nothing more than awarding fees because JDPI was the prevailing party. This is not the law and JDPI's Motion must be denied.

## I.   THIS IS NOT AN EXCEPTIONAL CASE.

Exceptional cases for the purposes of awarding fees under the Lanham Act are "rare." They are "unusual," "uncommon," and not "run-of-the-mill." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). These rare "exceptional" cases are defined by one of two features: the "substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* Neither of those features is present here.[2]

### A.   The Standard for Evaluating "Substantive Strength."

The first prong—the substantive strength of a party's litigating position—is not a test for "correctness or eventual success of that position." *GoDaddy.com LLC v. RPost Communications Ltd.*, 2016 WL 4569122, at *3 (D. Ariz. Sept. 1, 2016). A party's positions on issues of law do not need to be correct for those positions to be deemed reasonable. *Id.* Instead, whether a case is "exceptional" for purposes of the Lanham Act requires the Court to consider a "'nonexclusive' list of 'factors', including

---

[1] This would be reason to conclude that JDPI should be judicially estopped from now arguing this case is extraordinary for purposes of fees when it previously argued this case was ordinary for purposes of impaneling an advisory jury. *See New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S. Ct. 1808, 1815 (2001). JDPI has taken a "clearly inconsistent" position. It succeeded on its earlier position and it now seeks a benefit from taking the inconsistent position. This is unfair to VIP who was deprived the opportunity to have twelve jurors—representative of typical American consumers—provide insight on whether the Toy confused and disgusted them or delighted them with parodic humor.

[2] JDPI's does not argue that VIP's conduct with respect to this litigation was so unreasonable that it could independently justify an award of fees. See *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014). Thus, JDPI has waived any argument that VIP's litigation conduct could be a basis for awarding fees.

2

'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014)).

In evaluating substantive strength, the Ninth Circuit has "clarified that courts *must* weigh the factors articulated by the Supreme Court in *Octane Fitness*." *Arizona Skydiving Holdings, LLC v. Skydive Phoenix, Inc.*, 703 Fed. Appx. 579, 580 (9th Cir. 2017) (emphasis added); *Xcentric Ventures, LLC v. Mediolex Ltd.*, 2017 WL 5054586, at *2 (D. Ariz. Sept. 27, 2017) (declining to consider fee application without a discussion of the proper standard for a fee award); *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1986 (2016) (observing that "unconstrained discretion prevents individuals from predicting how fee decisions will turn out, and thus from making properly informed judgments about whether to litigate.").

**B. VIP's Asserted Positions Were Neither Frivolous or Objectively Unreasonable.**

A litigation position is only objectively unreasonable where "no party could see an opening through which the arguments could be squeezed." *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 2018 WL 317850, at *2 (S.D.N.Y. Jan. 8, 2018) (international quotations and alterations omitted). Where an argument has factual and legal support, it is neither frivolous nor objectively unreasonable, even if it is weak. *Fitbug Ltd. v. Fitbit, Inc.*, 2015 WL 3543116, at *3 n.1 (N.D. Cal. June 5, 2015).

Throughout this litigation, VIP offered numerous arguments well-rooted in fact and the law. Primarily, the overarching issue raised in this case and pressed by VIP is that the Bad Spaniels dog toy ("Toy") is a parody product which neither infringes nor dilutes JDPI's trademarks. VIP took two positions with respect to the effect of parody during the course of this litigation: first at the summary judgement stage, and second following the Court's summary judgment order.

First, in its Motion for Summary Judgment, Dkt. 110 at 2-8, VIP argued that the

3

fact that the product is a parody gives rise to a First Amendment fair use defense and a nominative fair use defense to all of JDPI's claims. Not only has JDPI not stated a basis from which to conclude VIP's arguments were unreasonable, *but other circuits have expressly adopted VIP's arguments*.

Shortly after this Court rejected VIP's fair use defense, the Second Circuit held that the fair use defense applied to commercial parody product thereby rejecting a claim of trademark infringement. *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 674 Fed. Appx. 16, 17 (2d Cir. 2016). The Second Circuit affirmed the court:

> LV argues that the district court erred in finding as a matter of law that the use of its marks on MOB's tote bags was parodic, bringing it within the "fair use" exclusion from dilution liability. . . . [T]he district court correctly awarded judgment to MOB.

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 674 Fed. Appx. 16, 18 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 221, 199 L. Ed. 2d 120 (2017).

Second, although the Court rejected the fair use defenses at the summary judgment stage, Dkt. 171, VIP argued that the fact that the Bad Spaniels' dog toy is a parody nevertheless *necessarily* alters the manner in which the *Sleekcraft* factors are to be applied.[3] *See* Dkt. 242 at 19-20, ¶¶ 21-26; *see also Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 2018 WL 317850, at *2 (S.D.N.Y. Jan. 8, 2018) (holding that, "in part, because 'normal application of the *Polaroid* [Sleekcraft-equivalent] test' to trademark infringement claims 'is at best awkward in the context of parody, which must evoke the original and constitutes artistic expression" the losing party's arguments concerning infringement were not unreasonable). The reasonableness of this argument is proven by the sheer number of courts to adopt it. *See* Dkt. 252 at 7:16-8:13 (collecting cases observing that parody necessarily alters the likelihood of confusion analysis).

Moreover, VIP presented *evidence*, not just argument, on each and every

---

[3] In response, JDPI has repeatedly advocated for a circular position: because there is a likelihood of confusion, the product's status as a parody may be disregarded. This is nonsense. That a product is a parody *must* be considered when evaluating confusion.

4

*Sleekcraft* factor from which this Court could have found in favor of VIP. *See* Dkt. 242 at pp. 20-29, ¶¶ 27-68. Given that the record contains actual evidence which supported VIP's arguments, and in light of the awkwardness of assessing the *Sleekcraft* factors in the context of a parody product, it cannot be said that VIP took unreasonable positions.

Finally, on JDPI's dilution claim, VIP presented evidence and made arguments that, even if JDPI's trademarks are famous, JDPI could not meet its burden to prove that the Toy would harm JDPI's brand. First, VIP argued that Dr. Itamar Simonson's conclusions were logically defective and therefore not reliable as evidence of tarnishment. Dkt. 242 at pp. 13-14, ¶¶ 86-89. Second, VIP offered as an expert witness, Bruce Silverman, to testify that the Toy created positive associations in consumers via focus groups. Dkt. 242 at p.14, ¶¶ 90-92. Lastly, VIP argued that, save for an extremely gentle and humorous reference to dog feces (the reason why the cartoon dog featured on the product was in fact a "Bad Spaniel"), JDPI offered *no evidence* of harm (including no evidence of reduced sales, lost customers, or negative press) and therefore there could be no tarnishment.  Dkt. 242 at p.15, ¶¶ 95-100, p. 33, ¶¶ 94-96.

### C.  **JDPI Has Not Met Its Burden to prove that VIP's Arguments Were Frivolous or Objectively Unreasonable.**

JDPI bears the burden of proof to establish that any of the arguments described above, or otherwise advanced by VIP were so meritless, that a fee award is justified. JDPI, however, has not met that burden.

#### 1.  *JDPI Has Not Proven that VIP's Arguments Concerning Parody were Unreasonable.*

As an initial point, the outcomes in the *Timmy Holedigger* and *Chewy Vuitton* cases illustrate that a product's status as a parody is a relevant and material consideration in trademark infringement cases. Thus, VIP's assertions of parody as a consideration for the Court cannot be objectively unreasonable. Nevertheless, JDPI posits that fees are warranted because the "the theory of parody"[4] was "rejected" three times: first, in the

---

[4] JDPI simplifies the arguments in this cases into oblivion with its use of such imprecise language. Fundamentally, "the theory of parody" is not a standalone legal theory which

5

Court's Order on summary judgment; second in the *Anheuser-Busch* case; and third "in general whenever confusion is likely." Motion at 7:7-24.

If there were an unreasonable argument in this case, it is JDPI's suggestion that VIP acted unreasonably by asserting fair use defenses and advocating with respect to the *Sleekcraft* analysis because, as JDPI phrases it, "the theory of parody" was rejected in the *Anheuser-Busch* case. JDPI cannot seriously believe its own argument. The two cases arises from totally separate and distinct factual circumstances, which require different factual proofs and analyses.

With respect to the summary judgment order, JDPI once again eschews precision and attempts to conflate the summary judgment ruling on First Amendment fair use with the *Sleekcraft* analysis. In its summary judgment order, the Court rejected VIP's fair use defenses, but not because the toy was not a parody. Rather, the Court concluded the product "is not an expressive work like those to which the *Rogers* test has been applied in the Ninth Circuit." This Court further explained that it found no First Amendment protection because the Toy had the "dual purpose of making an alleged expressive comment as well as the commercial selling of a non-competing product." Dkt. 171 at 10:28-11:4. JDPI does not explain in its Motion how or why it would be proper to extrapolate from this conclusion a finding that the Bad Spaniels' dog toy's quality as a parody should have been disregarded in the *Sleekcraft* analysis.

Lastly, JDPI argues that "parody" is not a defense "in general whenever confusion is likely." Motion at 7:10-11. This circular view reflects a fundamental misunderstanding of both the law as it relates to parody, and the argument VIP presented to the Court. In order to determine whether "confusion is likely," the Court must undertake the *Sleekcraft* analysis. When a product is intended as a parody, the *Sleekcraft* analysis is necessarily altered because parody products present challenges to the traditional *Sleekcraft* analysis.

---

can be "rejected." Parody, as VIP has always maintained, is a quality of the Toy which is taken into consideration in analyzing cognizable legal theories (such as the fair use defense and the likelihood of confusion analysis under *Sleekcraft*).

6

### 2. *JDPI Has Not Proven that VIP's Advanced Weak Arguments on Summary Judgment.*

JDPI's next theory depends on its cherry-picked smattering of the Court's findings in its 35-page Order, Dkt. 171, and points to them as if they prove that VIP "advanced exceptionally weak arguments on summary judgment." *See* Motion at 7-8.

None of the instances of "weak" arguments JDPI purportedly identifies actually proves that VIP advanced weak arguments. For example, in order to prove infringement, JDPI was required to show (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion. Dkt. 171 at 11:18-21. In turn, each element has sub-elements subject to legal argument. See Dkt. 171 at 11-20. JDPI's Motion does not argue, let alone prove, that VIP's arguments with respect to all three elements were so weak that a fee award is appropriate. Nor does it argue that VIP's arguments with respect to any one element were so weak a fee award is justified. Instead, JDPI cites a handful of minute sub-issues where the Court ruled in favor of JDPI. However, these instances do not negate the merits of the overall arguments VIP presented, even if, *arguendo*, an element was weak.

The absurdity of JDPI's argument is further highlighted by a review of the case to which JDPI tries to analogize: *Amusement Art*. There, the court awarded fees because the losing party engaged in *fraud* with respect to one of the trademarks at issue and had *no* evidence with respect to another. *Amusement Art, LLC v. Life is Beautiful, LLC*, 2017 WL 2259672, at *4 (C.D. Cal. May 23, 2017) ("Plaintiff's fraud qualifies this case as an exceptional case under the Lanham Act . . . ."). The court also concluded that the plaintiff offered "no response to [d]efendants' contention" that it was entitled to a fee award on that claim. *Id.* Here, it should go without saying that there has been no fraud, no allegations of fraud, and no bad faith.

### 3. *JDPI Has Not Proven that VIP Advanced an Overall Weak Case.*

Finally, relying on *Sazerac*, JDPI argues VIP "unreasonable advanced a weak case through trial." *See e.g.*, Motion at 6:19-20. JDPI offers just one fact as "proof": VIP's "fail[ure]" to rebut Dr. Ford's survey which VIP should have known was "fatal"

7

"since equivalent results had been fatal to its analogous case years earlier." Motion at 7.[5]

That aside, as for JDPI's single "fact" which purportedly proves VIP advanced n overall weak case, a review of the evidence reveals otherwise and JDPI once again failed to meet its burden. Dr. Ford's survey was not and is not dispositive on the question of likelihood of confusion. Of the *Sleekcraft* factors, Dr. Ford's survey goes only to "actual confusion"—a factor for which VIP offered reasoned arguments supported by evidence.

VIP argued that the Court should consider the lack of evidence of instances of actual confusion in the marketplace which is a "powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." Dkt. 242 at p.25, ¶ 48 (citing *Cohn v. PetSmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002)). VIP argued that "[d]espite years of concurrent sales, JDPI has presented no evidence" of instances of actual consumer confusion in the marketplace. Dkt. 242 p. 25 at ¶ 50.

JDPI's only evidence on the point of actual confusion was Dr. Ford's survey, which the Court concluded is a "surrogate" for actual confusion "[i]n lieu of marketplace evidence of actual confusion." Dkt. 245 at ¶ 75. In response to Dr. Ford's survey, VIP presented evidence that Dr. Ford's survey was improperly conducted, because, among other things, the control stimulus was improperly designed, the survey results were improperly coded, and the survey itself failed to properly replicate marketplace conditions, each of which rendered the survey results unreliable. Dkt. 242 at pp. 6-12, ¶¶ 36-74, pp. 25-26, ¶¶ 51-52. VIP also elicited testimony from Dr. Ford that his survey was lacking in the sense that participants could not physically "squeak" the toy—a fact Dr. Ford admitted would be relevant to understanding whether "Silly Squeakers" or some other outfit is the source of the product. Dkt. 233-2 at 98:7-24.

While the Court ultimately found JDPI's arguments and evidence more persuasive, that finding does not undermine the validity of VIP's proffered evidence and arguments, from which a court could have found in favor of VIP on this factor.

---

[5] JDPI also, once again and equally inexplicably, relies on the *Anheuser-Busch* case as proof rather than concerning itself with the actual standard for an award of fees—whether VIP's arguments *in this case* were objectively unreasonable.

8

Despite the existence of colorable arguments and supporting evidence, JDPI attempts to analogize this case to *Sazerac*, wherein the Court concluded "the losing party had 'failed to offer any evidence of harm, thereby dooming the only relief available to it." Motion at 6:23-25 (citing *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 2017 WL 6059271, at *7 (N.D. Cal. Dec. 7, 2017).

But JDPI misses the key nuance in *Sazerac* that renders it inapposite. After the summary judgment stage, the losing party (which was the party alleging infringement, and therefore bearing the burden of proof) failed to offer any evidence of irreparable harm which could justify an injunction. *Id.* And it was this failure that the Court determined justified fees. *Id.* Nothing analogous occurred here. And in its defense, VIP offered ample evidence and legal argument to justify each and every position it took.

**D.  VIP's Motivations in This Litigation were proper and JDPI did not Meet Its Burden to Establish Otherwise.**

When a plaintiff "can be found to have had a legitimate reason for bringing the lawsuit, it supports a finding that the case is not exceptional." *Caiz v. Roberts*, 2017 WL 830386, at *4 (C.D. Cal. Mar. 2, 2017). Here, VIP had a legitimate reason for bringing its lawsuit—it wanted a declaration that the Toy was a parody product that did not infringe JDPI's marks. JDPI has not met its burden to establish otherwise.

As this Court knows well by now, VIP is in the business of selling dog toys, including the line branded "Silly Squeakers." Dkt. 245 at ¶ 1. The Silly Squeakers line of dog toys are intended to be parodies of various beer, wine, soda, and liquor brands. Dkt. 245 at ¶¶ 8-9. For example, the line includes "Smella R-Crotches"—a parody of Stella Artois, "Heini Sniff'n"—a parody of Heineken, and "Pissness"—a parody of Guinness. Dkt. 245 at ¶ 9. Each toy is intended to be humorous, harmless, cute, and fun. Dkt. 245 at ¶ 9, Dkt. 243 at 118:24-119:6. In the context of the Toy specifically, Mr. Sacra explained his intent in producing the product: it was intended to comment on the seriousness with which brands portray themselves and to juxtapose that with levity. Dkt. 243 at 140:1-20, 171:19-172:2. In doing so, it conveys the message that it is okay to have fun and not take life too seriously. *Id.* Notably, JDPI's own David Gooder testified

9

JDPI lacked any evidence that VIP was motivated by any reason other than to amuse the public. Dkt. 235 at 73:9-13. Mr. Gooder also testified that while he believed the Toy was an unsuccessful attempt at a parody, he had no reason to doubt that VIP intended the product to be a successful parody product. Dkt. 235 at 71:22-72:3. The evidence in the record supports only one conclusion: VIP believed the Toy was entitled to protection consistent with the outcome in cases such as *Chewy Vuitton* and *Timmy Holedigger*.

VIP initiating this litigation is not suggestive of an improper motive. VIP learned from its experience with Anheuser-Busch that if it got sued by a major corporation, that corporation would sue VIP in its home jurisdiction, which could be remote and expensive for VIP. Dkt. 236 at 51:3-19. In the event of litigation, it was important to VIP to litigate the case in its home jurisdiction to offset the associated costs. *Id*.

VIP sought a declaration of non-infringement, *see* Dkt. 1 at ¶¶ 12, 14-15, because VIP sincerely believes its products to be parody products which are protected by law, *see* Dkt. 110, a belief based in part on the numerous finding that parody products do not inherently violate the Lanham Act. *See e.g.,* Dkt. 236 at 50:21-51:1 (citing the "Chewy Vuitton case and the Timmy Holedigger case" as a basis for asserting VIP's line of parody products do not violate the Lanham Act). VIP did so specifically to protect the right to parody. As Mr. Sacra testified:

> I really had no choice but to step up and fight. I mean, I could fold over, but the reality is that if I do that, I let parody take a punch in the face, I let design creativity take a punch in the face. I let the industry, the pet industry, which I'm not the only person that does parodies in the pet industry. There's a lot of people that do parodies in the pet industry. And that puts everybody in our industry at a risk that they too could have large corporations chomping down their bit. . . .   (Dkt. 243 at 91:24-92:10).

**E.   There Is No Need for "Deterrence" Under The Facts of this Case and JDPI Did Not Meet Its Burden to Establish Otherwise.**

Undeterred by the inconvenience of facts, JDPI offers the Court a fictive construct wherein JDPI suggests that VIP is nothing but a serial infringer lacking any legal basis to justify its production and sale of the Toy. As a result, JDPI posits, a fee award is appropriate to "deter" VIP. As proof, JDPI offers a misleading recitation of the

Anheuser-Busch litigation, and a PACER report reflecting the existence of other cases to which VIP was a party.[6] Motion at 8-9. JDPI's cynicism, however, is belied by reality.

Undermining JDPI's argument, VIP explained that the Silly Squeakers are not a large part of its business: in "regards to [the] Silly Squeakers [line of dog toys] it's just an insignificant portion of what we do, but it's the one thing that allows us to have fun with our business." Dkt. 243 at 169:25-170:2. In fact, the gross value of the profit VIP obtained from the Toy was approximately $55,000.00,[7] "a very, very small part of VIP's revenue." Dkt. 243 at 90:1-7. Thus, the relevant facts indicate that VIP produces the Silly Squeakers line of dog toys in order to have "fun with [the] business" not as a "lucrative enterprise" such that an award of fees is justified.

VIP's experience with other brands further undermines the notion that it is any kind of a serial infringer engaged in bad faith tactics. In fact, the only evidence in the record is that most brands have ignored the Silly Squeakers products. Dkt. 236 at 50:17. Four sent letters to VIP. VIP responded in kind and nothing further developed. Dkt. 236 at 50:17-20. In one instance, Heineken actually forgot that it had reached to VIP regarding the Silly Squeaker "Heini Sniff'n" and years later, reached out again. Dkt. 236 at 51:24-52:4. When VIP reminded Heineken that they previously discussed the product, Heineken once again stepped away. *Id.*

Only one company, Anheuser-Busch, instituted litigation. JDPI wishes this Court to believe that the litigation with Anheuser-Busch was a harbinger foreshadowing the outcome in this case. Of course, this view ignores the fact that the ruling in *Anheuser-Busch* was on a non-final, non-binding preliminary injunction that would not have bound

---

[6] The evidentiary value of the existence of case names in PACER is highly dubious. Whether such information has any role in ascertaining whether JDPI is entitled to an award of fees under the factor analysis required by *Octane Fitness* is even more questionable. The mere fact that other actions existed cannot possibly bear on the reasonableness of VIP's positions and conduct in *this* litigation and this Court should not consider it. In any event, VIP dismissed the other actions without prejudice, rendering their one-time existence totally unilluminating. Dkt. 236 at 51:20-24.

[7] Unfortunately for JDPI and the narrative it is working hard to manufacture, this is a far cry from the "lucrative enterprise" JDPI wishes it to be. *See* Motion at 2:20-21.

even that court at a trial on the merits of Anheuser-Busch' claim. It defies logic that it could somehow bind the Court in this case. Wright & Miller, *Fed. Prac. & Proc.* Civ. § 2950 (3d ed.) ("the court's findings of fact and conclusions of law with regard to the preliminary injunction are not binding at trial. Based, as they usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions should not be used outside the context in which they originally were rendered.").

Ultimately, not only is JDPI's argument patently absurd, JDPI is once again ignoring the facts that are inconvenient to the story JDPI it wants to tell. The *Anheuser-Busch* case resolved amicably with a settlement between the parties allowing VIP to continue selling two products parodying Anheuser-Busch brands (Cataroma/Corona and O'Drools/O'Douls). Dkt. 236 at 52:20-53:14. The Cataroma/Corona product has now been on the market consistently for 10 years. *Id.*

As it stands, if VIP is the serial infringer of JDPI's nightmares, then VIP is doing a terrible job of serially infringing for profit. As the evidence available to the Court in this case reflects, save for this case, VIP has settled its disputes with other brands and dismissed other actions as a result of either non-interest from the parodied brands or a tacit agreement by those brands of VIP's legal position in light of the *Chewy Vuitton* and *Timmy Holedigger* cases. If VIP's products[8] were the obvious infringements JDPI thinks they are, it defies reason that no other brand has sought legal intervention.

### F. The *Octane Fitness* Factors Weigh against an Award of Fees.

JDPI bore the burden of proving to this Court that the "substantive strength" of VIP's litigation position was so unreasonable that fees are warranted. And JDPI bore the

---

[8] It bears reiterating that *none* of VIP's other Silly Squeakers were the subject of this litigation and VIP vehemently objects to any insinuation that other products are tarnishing or infringing upon the parodied brand. Motion at 8:21-25; 2:20-3:11. Those products are not before the court, JDPI is not the proper party to assert those interests, and this Court has taken no evidence relevant to reaching legal conclusions about the status of those products. Likewise, JDPI's rank speculation about the outcomes of those cases—"Apparently, its targets acquiesced because the promise of an injunction did not justify the expense of security it."—is groundless and directly contrary to the testimony presented in this case. Dkt. 236 at 50:17-20; 51:24-52:4.

burden of proving that that various factors used to evaluate "substantive strength" justify that award. JDPI has not done so. Further, a review of VIP's arguments throughout this litigation conclusively demonstrates that VIP's litigation positions was well-taken, grounded in fact and in law. Although VIP was ultimately unsuccessful, its arguments do not comprise an "exceptional case" under the Lanham Act. Awarding fees under these circumstances is tantamount to punishing VIP for failing to win on the merits of its claims. This the Court cannot do. *See Octane Fitness*, 134 S. Ct. at 1753 ("fees awards are not to be used as a penalty for failure to win").

## II. JDPI'S REQUEST FOR FEES IS UNREASONABLE.

Although this is not an exceptional case entitling JDPI to an award of fees, in any event, JDPI's fee request should be denied, or reduced significantly, because it is unreasonable, excessive, and lacks adequate supporting documentation.

With respect to the fees requested by Harvey & Associates and Siskind Boyd, LLC ("Harvey"), the supporting documentation is inadequate because of a pervasive practice of block billing.[9] Block billing involves "'lump[ing] together multiple tasks, making it impossible to evaluate their reasonableness[.]'" *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (quoting *Role Models Am. Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004)).

The July 11, 2017 entry perfectly illustrates the problem: Mr. Harvey billed 7.8 hours for six discrete tasks ("trial preparation," "joint pretrial statement," "exhibit list," "Phillips testimony," "Epps testimony," and "motions in limine"). As another example, consider the August 7, 2017 entry wherein MEB billed for "new bottle design registration" and assisted with "preparation for status conference." The amount of time

---

[9] *See e.g.*, 3/21/2017; 3/31/2017; 4/6/2017; 6/2/2017; 6/5/2017; 6/6/2017; 6/8/2017; 6/19/2017; 6/20/2017; 6/21/2017; 7/11/2017; 7/14/2017; 7/18/2017; 7/19/2017; 7/19/2017; 7/20/2017); 7/24/2017; 7/26/2017; 8/1/2017; 8/9/2017; 8/11/2017; 8/16/2017; 8/21/2017; 8/22/2017; 8/23/2017; 8/23/2017; 8/23/2017; 8/29/2017; 8/29/2017; 8/31/2017; 9/7/2017; 9/8/2017. This list is not all-encompassing but reflects a sample of entries that are difficult for VIP to meaningfully consider. Exhibits A and B to the Harvey Decl. are laden with such entries. It is unfair to foist upon VIP the burden of wading through entries that are facially insufficient to meet JDPI's burden of proof.

13

spent on either task is not given. This is quintessentially block billing and it has thwarted VIP's ability to meaningfully review the reasonableness of Mr. Harvey's fees.[10]

Where a fee applicant engages in block billing, it is "reasonable for the district court to conclude that [Plaintiff] failed to carry [its] burden [of documenting the appropriate hours expended], because block billing makes it more difficult to determine how much time was spent on particular activities." *Welch*, 480 F.3d at 948 (citations omitted). In light of the pervasive nature of the block billing, it is proper for this Court to deny JDPI's application for Harvey's fees. In the alternative, VIP suggests a reduction in the amount of 50% of the requested fees is justified.

Harvey's bills are replete with numerous instances of multiple attorneys billing for interoffice conferences without any reduction in time. *See e.g.*,[11] 3/24/2017; 6/15/2017; 6/19/2017l 9/6/2017 (each reflecting attorneys billing for conferences with each other and no reduction in time). This too warrants a reduction in fees. *Gressett v. Cent. Arizona Water Conservation Dist.*, 2015 WL 5545054, at *3 (D. Ariz. Sept. 18, 2015) (observing that fees may be reduced because billing by multiple attorneys for participating in the same conference was not completely recoverable). Given the difficulties in isolating each instance of improper billing, this deficiency warrants a reduction in fees akin to that for Harvey's practice of block-billing.

Other flaws warrant reduction in the fee award JDPI seeks for Harvey. First, JDPI asserted that it is only seeking fees incurred after the Court's order on summary judgment (September 27, 2016). See Harvey Decl. at ¶ 15. But JDPI included an invoice dated October 25, 2016 totaling $45,346.00. See Exhibit B to Harvey Decl. A review of

---

[10] Another pervasive problem with Harvey's billing records is the lack of a dollar charge associated with any particular entry. For example, in order to determine the charge to JDPI for the 7.8 hours Mr. Harvey billed on July 11 requires VIP to locate Mr. Harvey's rate for that timeframe and calculate the charge. This is not what the local rules intended when they placed the burden on JDPI of offering a statement containing the hours, charge, and description of work performed.

[11] This is not an all-encompassing list. As stated in n.7, Harvey & Associates' billing entries suffer such dramatic fatal flaws that identifying and listing each and every one would unfairly shift the burden of proof to VIP.

that invoice shows that only $8,214.00 in fees was incurred from September 28, 2016. Fees for Harvey's time should be reduced by $37,132.00.

Second, the time billed by Mr. Harvey's firm is generally excessive as a result of unreasonable and unnecessary duplicative efforts. The Court "may not uncritically accept the number of hours claimed by the prevailing party, even if actually spent on the litigation, but must, in order to award fees based on them, find that the time actually spent was reasonably necessary." *Carson v. Billings Police Dept.*, 470 F.3d 889, 893 (9th Cir. 2006) (internal quotation marks and citations omitted).

For instance, on October 26-31, 2016, three attorneys performed research relating to the right to jury trial and associated motion to strike. DAT recorded up to 2.3 hours on it, CCC, 8.5 hours, and Mr. Harvey himself up to 7.2 hours.[12] Following those 18 hours of research—and outlining by Mr. Harvey—it took JDPI's counsel another 23.9 hours to prepare the motion in November 2016. In other words, three attorneys spent more than 40 hours drafting a motion which, ultimately, was less than six pages in length. This is unreasonable and unnecessary given the nature of the motion.

Interestingly, none of that research was apparently helpful with respect to responding to VIP's motion to impanel an advisory jury (which was one page) because that response required another 40.9 hours from three attorneys between December 5, 2016 and January 13, 2017 (17.5 of which was CCC performing "research" and preparing a "memo" although not drafting the actual response). Like the motion to strike, the response is less than six pages. Given the inordinate amount of time spent by numerous people on straightforward motions, it is appropriate to reduce the time spent from 82.8 to 20 hours, and reduce the fees by 62.8 x $435.00 = $27,318.00.

Third, the time spent reviewing and summarizing deposition transcripts is also excessive. Biller CCC alone spent a total of 78.6 hours between September 30 and October 27, 2016 on that task. On Mr. Silverman's deposition, CCC spent 14.1 hours

---

[12] This entry is block-billed so VIP cannot state with certainty exactly how much time Mr. Harvey spent on the same tasks—another example of why block-billing is insufficient for purposes of assessing reasonableness.

reading and summarizing. The value of this time is unclear as Mr. Harvey later spent 2.3 hours reading the transcript himself, and preparing the witness/cross examination outlines. *See* time entries dated June 17-18, 2017. Mr. Harvey further spent up to 7 hours (it is impossible to tell exactly how much time because this is another block-billed entry) reviewing Mr. Silverman's deposition and his cross outline on August 29, 2017. Even more tellingly, CCC herself spent another 7.4 hours to "read and consider" the Silverman deposition. *See* time entries dated June 28-29, 2017. Given that Mr. Harvey is the one who conducted the cross examination of Mr. Silverman at trial, only his review and preparation served any actual purpose. Thus, any fees awarded should be reduced by 21.5 x 295.00 = $ 6,342.50. CCC's time on like reviews, which is also excessive, should be reduced by $11,239.50 (78.6-21.5 = 57.1 x 2/3 = 38.1 x 295 =11,239.50).

Finally, Mr. Harvey seeks an award of fees for his time traveling although Local Rule 54.2(E)(2)(d) makes clear that air time should ordinarily not be charged. See time entries dated August 13, 15, and 18, 2017. Neither the motion nor Mr. Harvey's declaration justify why an award of travel time is appropriate in this case. The amount of fees should therefore be reduced by $4,680.00 (7.2 x $ 650.00 = $ 4,680.00).

With respect to the entirety of the fees requested by Quarles & Brady, Mr. Crum has failed to satisfy the requirements for an award of fees. Local Rule 54.2(e)(2) requires that the "party seeking an award of fees must adequately describe the services rendered so that the reasonableness of the charge can be evaluated." "Part of the court's task in calculating the fee award, is to ensure that the party seeking fees meets its burden of documenting the hours expended in litigation and that that party has submit[ted] evidence supporting those hours and the rates claimed." *Rudebusch v. Arizona*, No. 95–, 2007 WL 2774482, at *8 (D. Ariz. Sept. 21, 2007) (internal quotations omitted). Failing to comply with the requirements of Local 54.2, which are "not advisory, but mandatory," warrants a denial of the request for fees. *Aviva USA Corp. v. Vazirani*, 2013 WL 4430921, at *7 (D. Ariz. Aug. 16, 2013), *aff'd*, 632 Fed. Appx. 885 (9th Cir. 2015).

But Mr. Crum submitted an itemized statement wherein the description of the

services is truncated on nearly any and every task. *See* Exhibit 1 to Crum Decl. On August 25, 2017 Mr. Crum made a time entry that states "Finish preparing first draft of findings of fact and conclu-." *See* p.9 of Exhibit 1 to Crum Decl. It would be reasonable to speculate that "-sions of law" is missing, *in addition to* any number of words that are needed to make the following line comprehensible (--"regarding room reservations for trial."). This failure renders these descriptions useless for evaluating reasonableness of the charges and it effects entries totaling 224 hours. It is manifestly unfair to require VIP to pay for time which neither VIP nor the Court can adequately evaluate.[13]

Second, the hours billed by Mr. Crum for "trial preparation" (which are not affected by the truncated statements) are unreasonable. *See* Page 10 of Exhibit 1 to Crum Decl. Between Sept. 25 and Oct. 2, Mr. Crum billed 94.5 hours for "trial preparation" although Mr. Crum was local counsel and had no role during the trial itself.

For these reasons, Mr. Crum's hours should be reduced by 318.5 (94.5 + 224). Because Mr. Crum did not specify which entries were billed at what hourly rate, it is appropriate to reduce Quarles & Brady's fees by 318.5 x $ 360.00 = $114,660.00.

In sum, this is clearly not an exceptional case on which fees can be awarded under the Lanham Act. Even if, *arguendo*, this case could somehow be considered "exceptional", this Court should nonetheless decline to award any fees because the submitted documentation is insufficient for all of the reasons described above. At a minimum, any hypothetical fee award should be significantly reduced due to the pervasive failures and flaws in JDPI's substantiating documentation.

**DATED** this 8th day of June, 2018.

          **DICKINSON WRIGHT PLLC**

          By: *s/ David G. Bray*
             David G. Bray
             *Attorneys for VIP Products, L.L.C.*

---

[13] Mr. Crum also declared that he reviewed and approved the "time and charges set forth in the task-based itemized statement," Crum Decl. at ¶ 24, a fact that should have given Mr. Crum actual knowledge of the problems with the statement. Thus, it is fair to require JDPI to bear the consequences of failing to comply with the Local Rules.

17

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　*/s/ Janet Hawkins*

PHOENIX 53913-11 466588v1