# Exhibit A

**No.**

# In the Supreme Court of the United States

———————

JACK DANIEL'S PROPERTIES, INC.,
PETITIONER,

*v.*

VIP PRODUCTS LLC,
RESPONDENT.

———————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

THEODORE H. DAVIS JR.
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1100 Peachtree Street NE*
  *Suite 2800*
  *Atlanta, GA 30309*

DENNIS L. WILSON
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1801 Century Park East*
  *Suite 2300*
  *Los Angeles, CA 90067*

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
MATTHEW B. NICHOLSON
THOMAS S. CHAPMAN
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *lblatt@wc.com*

*(Additional counsel on inside cover)*

Isaac S. Crum
Rusing Lopez & Lizardi, PLLC
 *16427 North Scottsdale Road*
 *Suite 200*
 *Scottsdale, AZ 85254*

## QUESTIONS PRESENTED

Respondent VIP Products LLC's business model is based on marketing and selling dog toys that intentionally use the trademarks and trade dress of well-known companies, in a way that courts have deemed likely to confuse consumers about the source of the toys and to tarnish the reputation of such companies, including petitioner Jack Daniel's Properties, Inc. The questions presented are:

1. Whether a commercial product using humor is subject to the same likelihood-of-confusion analysis applicable to other products under the Lanham Act, or must receive heightened First Amendment protection from trademark-infringement claims, where the brand owner must prove that the defendant's use of the mark either is "not artistically relevant" or "explicitly misleads consumers."

2. Whether a commercial product's use of humor renders the product "noncommercial" under 15 U.S.C. § 1125(c)(3)(C), thus barring as a matter of law a claim of dilution by tarnishment under the Lanham Act.

(I)

II

**CORPORATE DISCLOSURE STATEMENT**

Petitioner Jack Daniel's Properties, Inc. is a wholly owned subsidiary of Brown-Forman Corporation, a publicly traded company.

III

**TABLE OF CONTENTS**

Page

OPINIONS BELOW ............................................................ 1

JURISDICTION ................................................................... 2

STATUTORY PROVISIONS INVOLVED ..................... 2

STATEMENT ....................................................................... 4

    A.    Statutory Framework ....................................... 7

    B.    Factual and Procedural Background .............. 8

REASONS FOR GRANTING THE PETITION .......... 17

I.    The Courts of Appeals Are Divided on the Questions Presented ................................................ 17

    A.    The Courts of Appeals Are Divided on the Contours of Trademark-Infringement Liability for Humorous Use of a Trademark 17

    B.    The Decision Below Creates a Conflict on Dilution-by-Tarnishment Liability for Humorous Use of Another's Trademark ....... 24

II.    The Questions Presented Are Recurring, Important, and Squarely Presented .................... 26

III.    The Decision Below Is Egregiously Wrong ........ 30

    A.    The Court of Appeals Erred with Respect to Trademark Infringement ................................. 30

    B.    The Court of Appeals Erred with Respect to Dilution by Tarnishment ................................. 34

CONCLUSION ................................................................... 37

IV

**TABLE OF AUTHORITIES**

Page

Cases:

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .................................... 7

*Anheuser-Busch, Inc. v. Balducci Publ'ns*,
  28 F.3d 769 (8th Cir. 1994) ..................................... 25

*Anheuser-Busch, Inc. v. VIP Prods., LLC*,
  666 F. Supp. 2d 974 (E.D. Mo. 2008) ............. 10, 26

*Bos. Red Sox Baseball Club Ltd. P'ship v.
  Sherman*, 88 U.S.P.Q.2d 1581
  (T.T.A.B. 2008) ....................................................... 22

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ................................................ 34

*Cards Against Humanity, LLC v. Vampire
  Squid Cards, LLC*, Opp'n No. 91225576,
  2019 WL 1491525 (T.T.A.B. Feb. 28, 2019).......... 22

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.
  Comm'n*, 447 U.S. 557 (1980) ................................ 28

*Cliffs Notes, Inc. v. Bantam Doubleday Dell
  Publ'g Grp., Inc.*,
  886 F.2d 490 (2d Cir. 1989)..............................23, 33

*Corley v. United States*, 556 U.S. 303 (2009) ............. 35

*Elvis Presley Enters., Inc. v. Capece*,
  141 F.3d 188 (5th Cir. 1998) ................................... 20

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  136 S. Ct. 1923 (2016) ............................................. 32

*Harley-Davidson, Inc. v. Grottanelli*,
  164 F.3d 806 (2d Cir. 1999)........................21, 22, 23

*Harper & Row, Publishers, Inc. v. Nation
  Enters.*, 471 U.S. 539 (1985) .................................. 34

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
  828 F.2d 1482 (10th Cir. 1987) ............................... 20

V

Page

Cases—continued:

Louis Vuitton Malletier, S.A. v. Haute
    Diggity Dog, LLC,
    507 F.3d 252 (4th Cir. 2007) ................20, 21, 25, 26

Mut. of Omaha Ins. Co. v. Novak,
    836 F.2d 397 (8th Cir. 1987) ............................19, 20

N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel,
    LLC, 293 F.3d 550 (2d Cir. 2002) ........................25

N.Y. Yankees P'ship v. IET Prods. & Servs.,
    Inc., 114 U.S.P.Q.2d 1497 (T.T.A.B. 2015) ...........26

Nike, Inc. v. "Just Did It" Enters.,
    6 F.3d 1225 (7th Cir. 1993) ....................................19

Pfizer Inc. v. Sachs,
    652 F. Supp. 2d 512 (S.D.N.Y. 2009)....................25

Radiance Found., Inc. v. NAACP,
    786 F.3d 316 (4th Cir. 2015) ............................21, 24

Rogers v. Grimaldi,
    875 F.2d 994 (2d Cir. 1989)...........................passim

Romag Fasteners, Inc. v. Fossil, Inc.,
    140 S. Ct. 1492 (2020).......................................31, 32

Scholz v. Goudreau,
    901 F.3d 37 (1st Cir. 2018)....................................20

Starbucks Corp. v. Wolfe's Borough Coffee,
    Inc., 588 F.3d 97 (2d Cir. 2009)............................25

Tommy Hilfiger Licensing, Inc. v. Nature
    Labs, LLC,
    221 F. Supp. 2d 410 (S.D.N.Y. 2002).........26, 27, 29

Two Pesos, Inc. v. Taco Cabana, Inc.,
    505 U.S. 763 (1992) ....................................................8

U.S. Pat. & Trademark Off. v. Booking.com
    B.V., 140 S. Ct. 2298 (2020) .......................28, 33, 36

V Secret Catalogue, Inc. v. Moseley,
    605 F.3d 382 (6th Cir. 2010) .................................25

VI

Page

Cases—continued:

*VIP Prods., Inc. v. Jack Daniel's Properties,*
    *Inc.*, 2016 WL 5408313
    (D. Ariz. Sept. 27, 2016) ............................................. 2
*VIP Prods., Inc. v. Jack Daniel's Properties,*
    *Inc.*, 291 F. Supp. 3d 891 (D. Ariz. 2018) ............... 1
*VIP Prods., Inc. v. Jack Daniel's Properties,*
    *Inc.*, 953 F.3d 1170 (9th Cir. 2020) ......................... 1

Constitution and statutes:

U.S. Const., amend. I ........................................... *passim*
Lanham Act, Pub. L. No. 79-489,
    60 Stat. 427 (1946) .................................................. 7
15 U.S.C.
    § 1114(1)(a) ............................................................ 30
    § 1115(b)(4) ............................................................ 31
    § 1125(a) ............................................................ 4, 13
    § 1125(a)(1) ........................................................... 2, 7
    § 1125(a)(1)(A) ...................................................... 30
    § 1125(c) ............................................................ 3, 4, 7
    § 1125(c)(1) .............................................................. 7
    § 1125(c)(2)(A) ........................................................ 8
    § 1125(c)(2)(C) ..................................................... 7, 8
    § 1125(c)(3) ............................................................ 25
    § 1125(c)(3)(A) ................................................. *passim*
    § 1125(c)(3)(A)(ii) ........................................... *passim*
    § 1125(c)(3)(C) ................................................. *passim*
    § 1127 ...................................................................... 7
28 U.S.C. § 1254(1) ................................................. 2

VII

Page

Miscellaneous:

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2020)............................................................32

Pierre N. Leval, *Trademark: Champion of Free Speech,* 27 Colum. J.L. & Arts 187 (2004)....................27, 34

# In the Supreme Court of the United States

———————

JACK DANIEL'S PROPERTIES, INC.,
PETITIONER,

*v.*

VIP PRODUCTS LLC,
RESPONDENT.

———————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

Jack Daniel's Properties, Inc. respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Ninth Circuit in this case.

## OPINIONS BELOW

The opinion of the court of appeals is reported at 953 F.3d 1170 (9th Cir. 2020). Pet. App. 2a-14a. The district court's findings of fact and conclusions of law are reported at 291 F. Supp. 3d 891 (D. Ariz. 2018). Pet. App. 25a-56a. The district court's opinion denying respondent's motion for summary judgment and granting petitioner's motion for partial summary judgment is unreported and available

2

at 2016 WL 5408313 (D. Ariz. Sept. 27, 2016).  Pet. App.
57a-104a.

### JURISDICTION

The judgment of the court of appeals was entered on
March 31, 2020.  The court of appeals denied a timely pe-
tition for panel rehearing and rehearing en banc on June
3, 2020.  This Court has jurisdiction under 28 U.S.C.
§ 1254(1).

### STATUTORY PROVISIONS INVOLVED

Section 43(a)(1) of the Lanham Act, 15 U.S.C.
§ 1125(a)(1), provides:

Any person who, on or in connection with any
goods or services, or any container for goods,
uses in commerce any word, term, name, symbol,
or device, or any combination thereof, or any false
designation of origin, false or misleading descrip-
tion of fact, or false or misleading representation
of fact, which—

(A)  is likely to cause confusion, or to cause
mistake, or to deceive as to the affiliation,
connection, or association of such person with
another person, or as to the origin, sponsor-
ship, or approval of his or her goods, services,
or commercial activities by another person,
or

(B)  in commercial advertising or promotion,
misrepresents the nature, characteristics,
qualities, or geographic origin of his or her or
another person's goods, services, or commer-
cial activities,

shall be liable in a civil action by any person who
believes that he or she is or is likely to be dam-
aged by such act.

3

Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in relevant part:

(1) INJUNCTIVE RELIEF. Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

(2) DEFINITIONS.

* * *

(C) For purposes of paragraph (1), "dilution by tarnishment" is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.

(3) EXCLUSIONS. The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

(A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with—

(i) advertising or promotion that permits consumers to compare goods or services; or

4

(ii)  identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

(B)  All forms of news reporting and news commentary.

(C)  Any noncommercial use of a mark.

\*  \*  \*

The full text of 15 U.S.C. § 1125(a) and (c) are set forth in the Appendix.  Pet. App. 111a-116a.

## STATEMENT

This case presents a frequently recurring question under the Lanham Act:  under what circumstances humorous use of another's trademark or trade dress to identify the origin of a commercial product constitutes trademark infringement or trademark dilution.  Petitioner Jack Daniel's Properties, Inc. identifies its whiskey products with near-universally recognized trademarks and trade dress.  Jack Daniel's also carefully licenses use of its trademarks and trade dress on non-whiskey products, including pet products.  Respondent VIP Products LLC pirated Jack Daniel's trademarks and trade dress to make a dog toy, "Bad Spaniels," that imitates a Jack Daniel's whiskey bottle, while adding dog poop humor.  The question the case presents is whether VIP Products' use of humor on its dog toy entitles it to special protections against liability for trademark infringement and dilution under the Lanham Act.

On the question of trademark infringement, every court of appeals confronting a similar case has exercised common sense and applied the traditional likelihood-of-confusion test under the Act, which asks whether the use

5

of the trademark or trade dress is likely to confuse consumers regarding the product's origin or sponsorship. Those courts have considered the humorous nature of the product as just one factor relevant to the likelihood of confusion. In many cases, humorous use of trademarks is not actionable under the Act because the use is so obviously parody that consumers would not be confused.

But this is one of many cases where the harm to one's brand identity is real and direct. Jack Daniel's spirits products are consumed by adults. Jack Daniel's has invested substantial resources into an image of sophistication. Accordingly, Jack Daniel's has a strong interest in protecting its trademarks and trade dress from association with juvenile bathroom humor. The district court found that VIP Products' use of Jack Daniel's trademarks and trade dress as marks and trade dress for its own goods was likely to confuse consumers and injure Jack Daniel's reputation. Following a four-day bench trial, the district court credited evidence showing that 29% of consumers believed that Jack Daniel's actually sponsored the Bad Spaniels dog toy. The court further found that VIP Products and Jack Daniel's sold related products, that consumers are unlikely to exercise caution when buying dog toys, and that VIP Products intentionally used Jack Daniel's trademark and trade dress to capitalize on Jack Daniel's popularity. The court thus found a likelihood of confusion, as well as a likelihood of dilution by tarnishment, and enjoined VIP Products from selling the toy.

On appeal, the Ninth Circuit—diverging from the Second, Fourth, Fifth, Seventh, Eighth, and Tenth Circuits, and from the Trademark Trial and Appeal Board—held that the standard likelihood-of-confusion test does not account for VIP Products' purported First Amendment interest in making jokes using Jack Daniel's trademarks

6

and trade dress. In other words, because the court of appeals thought VIP Products' notorious copying was funny, it held that the company has a First Amendment interest in confusing consumers into believing that Jack Daniel's sponsors a dog toy spotlighting poop. The Ninth Circuit reached this result by engrafting a two-part test on top of the standard Lanham Act analysis, requiring Jack Daniel's to show that VIP Products' use of Jack Daniel's trademarks and trade dress either is "not artistically relevant to the underlying work" or "explicitly misleads consumers as to the source or content of the work."

On the issue of trademark dilution, until the decision below, no court had held that humorous use of a trademark insulates an infringer from liability for trademark dilution. To the contrary, as the Second and Fourth Circuits and Trademark Trial and Appeal Board have recognized, the Lanham Act excludes parody from dilution liability, but only if the challenged use is "other than as a designation of source for the person's own goods or services." 15 U.S.C. § 1125(c)(3)(A)(ii). The district court held that VIP Products was unable to satisfy this exclusion because it used Jack Daniel's mark to designate the source of its own goods. The Ninth Circuit, however, sidestepped the district court's holding under section 1125(c)(3)(A) and held that VIP Products' poop humor— which, by design, injures Jack Daniel's brand identity— rendered its use of Jack Daniel's trademarks "noncommercial" and thus immune from dilution liability under a separate exclusion, *see id.* § 1125(c)(3)(C).

The Ninth Circuit's bungling of the questions presented, and the resulting conflicts in the application of the Lanham Act, require this Court's review. Absent review, the decision below will encourage forum shopping by infringers like VIP Products. And it will undermine the

7

Lanham Act's goals of protecting consumers from deception and protecting mark owners' investments in goodwill.

The Ninth Circuit's concern for First Amendment interests was egregiously misguided. The Act's likelihood-of-confusion test and the parody exclusion to dilution claims protect First Amendment interests arising from humorous use of trademarks and trade dress in the circumstances here. This Court should grant the petition and reverse the decision below.

### A. Statutory Framework

The Lanham Act guards against unfair competition, fraud, and deception "by making actionable the deceptive and misleading use of marks." Pub. L. No. 79-489, § 45, 60 Stat. 427, 444 (1946) (codified at 15 U.S.C. § 1127). Trademark infringement under the Act exists if the defendant's use of a mark is likely to cause confusion about the origin, sponsorship, or approval of a good. 15 U.S.C § 1125(a)(1). Courts assessing the likelihood of confusion consider a variety of nonexclusive factors, including the strength of the plaintiff's mark, the relatedness of the goods, the similarity of the parties' marks, and evidence of actual confusion. *See, e.g.*, *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979).

The Lanham Act also protects against dilution of famous marks. 15 U.S.C. § 1125(c). Under section 1125(c)(1), an owner of a "famous" mark may obtain relief against use of a mark in commerce likely to cause "dilution by blurring" or "dilution by tarnishment," whether or not the use is likely to confuse consumers regarding the product's source. Dilution by tarnishment occurs when "association arising from the similarity between a mark or trade name and a famous mark . . . harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Famous

mark are ones "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* § 1125(c)(2)(A).

The Act excludes from liability "fair use" of a famous mark, which includes "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner." *Id.* § 1125(c)(3)(A)(ii). To qualify as "fair use," however, the use must be "other than as a designation of source for the person's own goods or services." *Id.* § 1125(c)(3)(A). "[N]oncommercial use of a mark" also cannot give rise to liability for trademark dilution. 15 U.S.C. § 1125(c)(3)(C).

### B. Factual and Procedural Background

1. Petitioner, Jack Daniel's Properties, Inc., owns and licenses the trademarks and trade dress associated with JACK DANIEL'S® Tennessee whiskey. Pet. App. 27a.[1] The Jack Daniel's distillery in Lynchburg, Tennessee is the oldest registered distillery in the United States. Its Tennessee whiskey has been sold continuously for over a century, except during Prohibition. Since 1997, Jack Daniel's has been the best-selling whiskey in the United States. Pet. App. 33a. Between 1997 and April 2015, its domestic sales exceeded 75 million cases. Pet. App. 33a, 52a.

Since 1875, Jack Daniel's Tennessee whiskey has borne the registered trademarks JACK DANIEL'S and OLD NO. 7. Pet. App. 27a. Jack Daniel's also has a registered trademark for its three-dimensional configuration

---

[1] Trade dress is "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992) (citation omitted).

9

of a square-shaped bottle with the embossed signature of "Jack Daniel." Jack Daniel's trade dress has included aspects of these trademarks for many decades. *Id.*

Jack Daniel's has spent hundreds of millions of dollars promoting its whiskey. Pet. App. 32a. Its website is visited millions of times per year, and millions of Americans have seen its trademarks and trade dress in movies and television programs. Approximately 98% of consumers express awareness of the Jack Daniel's brand. Pet. App. 32a-33a.

For many years, Jack Daniel's has maintained an active brand licensing program. Its trademarks and trade dress have appeared on a wide range of products other than whiskey, including barbeque sauces, belt buckles, cufflinks, and clothing. Jack Daniel's licenses its trademarks and trade dress for certain pet products, including branded dog leashes, dog collars, and dog houses. Pet. App. 52a-53a.

2. Respondent VIP Products LLC is an Arizona company that designs, manufactures, markets, and sells chew toys for dogs. It sells various product lines, including "Silly Squeakers." Pet. App. 26a. This line consists of vinyl dog toys designed to profit off consumers' familiarity with well-known brands of liquor, beer, wine, and soda, but include sometimes dog-related and often excrement-related humor. Examples include dog toys labeled "Smella R-Crotches" (exploiting Stella Artois beer), "Heini Sniff'n" (exploiting Heineken beer), "Pissness" (exploiting Guinness beer), and "Mountain Drool," (exploiting Mountain Dew soda).[2] *See* Pet. App. 5a-6a, 28a.

---

[2] Images of these and other "Silly Squeakers" products appear in Appendix F (Pet. App. 105a-110a) and are available on VIP's website. *See* www.mydogtoy.com/silly-squeaker (last visited Sept. 14, 2020).

10

Formerly, VIP Products also sold a dog toy labeled "Buttwiper," to profit from the brand familiarity of Budweiser beer:



In 2008, a federal district court preliminarily enjoined VIP Products' sale of its Buttwiper toy, finding that Anheuser-Busch had demonstrated a substantial likelihood of success on its claim for trademark infringement. *Anheuser-Busch, Inc. v. VIP Prods., LLC*, 666 F. Supp. 2d 974, 986 (E.D. Mo. 2008).

Undeterred, VIP Products in 2014 began selling the dog toy at issue here, "Bad Spaniels." Pet. App. 29a. The toy copies the distinctive square bottle and black-and-white labelling of JACK DANIEL'S® Tennessee whiskey:

11



VIP Products' Bad Spaniels toy appropriates Jack Daniel's trade dress in virtually every respect, while adding poop-related humor. It replaces "Jack Daniel's" with "Bad Spaniels," along with the image of a spaniel. It also replaces "Old No. 7 Tennessee Sour Mash Whiskey" with "Old No. 2 on your Tennessee Carpet." And it replaces "40% ALC BY VOL (80 PROOF)" with "43% POO BY VOL" and "100% SMELLY." The remaining features—the square bottle shape, ribbed neck, arched lettering, filigreed border, color scheme, font styles, and size—are nearly identical. The back side of the Bad Spaniels label states in "tiny" font: "This product is not affiliated with Jack Daniel Distillery." Pet. App. 28a, 51a.

VIP Products' "intent behind designing the 'Bad Spaniels' toy was to match the bottle design for Jack Daniel's Tennessee Sour Mash Whiskey." Pet. App. 28a. VIP Products' president coined the name "Bad Spaniels" and

12

asked the company's designer to work on a proposed design. Pet. App. 28a. The designer understood that "Bad Spaniels" referred to "Jack Daniel's," and she was familiar with the brand. Pet. App. 28a-29a. Before sketching the design, she recalled several of Jack Daniel's features from memory, including the black-and-white label, the cursive font for Tennessee, and the square shape of the bottle. Pet. App. 29a. She then retrieved a Jack Daniel's bottle from her liquor cabinet, examined it, and placed it on her desk while developing the sketch. Pet. App. 29a.

VIP Products introduced Bad Spaniels in July 2014. VIP Products sells the product through several retailers, including Walmart and Amazon, that also sell Jack Daniel's licensed merchandise. Pet. App. 51a. VIP Products' promotional materials feature the Bad Spaniels product in a bar alongside various liquor bottles, one of which is recognizable as a real Jack Daniel's bottle. Pet. App. 29a, 110a.

3. After VIP Products introduced Bad Spaniels, Jack Daniel's promptly asked VIP to stop selling the toy. Pet. App. 6a. VIP Products responded by suing Jack Daniel's in the United States District Court for the District of Arizona, VIP Products' home forum, seeking a declaratory judgment that Bad Spaniels did not infringe or dilute any trademark rights and that Jack Daniel's trade dress and bottle design were not entitled to trademark protection. *Id.* Jack Daniel's filed federal and state-law counterclaims for infringement and dilution by tarnishment of its trademarks and trade dress. *Id.* VIP Products moved for summary judgment, and Jack Daniel's cross-moved for partial summary judgment. Pet. App. 7a.

The district court denied VIP Products' motion and granted Jack Daniel's motion. Pet. App. 57a-104a. The court ruled as a matter of law that Jack Daniel's established the first two elements of its infringement claims—

13

*i.e.*, the distinctiveness and nonfunctionality of its trademarks and trade dress. Pet. App. 71a-81a. The court further held that Jack Daniel's raised triable issues of fact as to the remaining element of its infringement claims—namely, that VIP Products' use of Jack Daniel's trademarks and trade dress created a likelihood of confusion. Pet. App. 81a-82a.

The district court rejected VIP Products' defense that its dog toy merited heightened First Amendment protection under the Second Circuit's framework in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). Pet. App. 67a-70a. In *Rogers*, the actress Ginger Rogers claimed that a movie entitled "Ginger and Fred" violated section 1125(a) of the Lanham Act by creating the false impression that she had sponsored the movie. 875 F.2d at 996-97. Concluding that "the expressive element of titles requires more protection than the labeling of ordinary commercial products," the Second Circuit construed the Lanham Act to avoid "intrud[ing] on First Amendment values" applicable to titles. *Id.* at 998. It held that, in the context of artistic titles, infringement will not lie unless "the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.* at 999.

The district court here understood the *Rogers* test as limited to the use of trademarks in the titles or contents of expressive or artistic works, such as movies, plays, books, and songs. Pet. App. 68a-69a. Here, by contrast, VIP Products infringed Jack Daniel's trademarks and trade dress, at least in part, to promote sales of a "commercial product." Pet. App. 69a-70a. The district court reasoned that trademark law "regulates misleading commercial speech where another's trademark is used for source identification" and "the First Amendment does not

14

extend to such use." *Id.*  Accordingly, the district court held that the "standard" likelihood-of-confusion analysis applicable under the Lanham Act governed Jack Daniel's claims. *Id.*

With respect to dilution by tarnishment, the district court rejected VIP Products' fair-use defense that its dog toy was a non-actionable parody. Pet. App. 84a-85a. The court observed that 15 U.S.C. § 1125(c)(3)(A) excludes from dilution liability "[a]ny fair use . . . other than as a designation of source for the person's own good or services, including use in connection with . . . (ii) parodying." Under the plain language of that provision, the court explained, the defense applies only if the parody is "not a designation of source for the person's own goods or services." Pet. App. 84a. Because VIP Products used Jack Daniel's trademarks and trade dress as source identifiers for its dog toy, the court concluded that the parody exclusion did not apply. Pet. App. 84a-85a.

The district court further held that Jack Daniel's raised triable issues of fact concerning its dilution-by-tarnishment claims. Pet. App. 85a-96a. The case thus proceeded to trial on the elements of those claims, as well as the remaining likelihood-of-confusion element of the infringement claims.

Following a four-day bench trial, the district court ruled in Jack Daniel's favor on both the infringement and dilution-by-tarnishment claims. Pet. App. 30a-55a. With respect to infringement, the court found that VIP Products' use of Jack Daniel's trademarks and trade dress was likely to cause confusion. Pet. App. 42a-55a. In particular, the court credited the opinion of Jack Daniel's survey expert that approximately 29% of potential purchasers believed Bad Spaniels was associated with Jack Daniel's. Pet. App. 47a-48a. The district court added that 29% was "nearly double" the 15% threshold typically used by

15

courts to establish likely confusion under the Lanham Act. Pet. App. 48a (citing cases).

The district court further found that Jack Daniel's trademarks and trade dress were "extremely strong," Pet. App. 52a; that VIP Products "intended to produce a dog toy that included and was similar to Jack Daniel's trademarks and trade dress," Pet. App. 50a-51a; and that VIP Products "sought to capitalize on Jack Daniel's popularity and good will for its own gain," Pet. App. 49a-50a. The court also found that Bad Spaniels and Jack Daniel's licensed pet products were related goods, Pet. App. 52a-53a; that they were sold to the same class of purchasers and through some of the same stores, Pet. App. 53a; and that consumers were unlikely to exercise significant care when purchasing Bad Spaniels because of its relatively inexpensive price, Pet. App. 54a. For all these reasons, the court concluded that Jack Daniel's had proved likely confusion and thus prevailed on its infringement claims. Pet. App. 55a.

The district court also concluded that Jack Daniel's proved its claims for dilution by tarnishment. Pet. App. 30a-42a. Specifically, the court found that Jack Daniel's trademarks and trade dress were famous before VIP Products began using them in 2014, Pet. App. 32a-33a; that the marks on Bad Spaniels were similar to Jack Daniel's trademarks and trade dress because VIP Products intentionally appropriated them in "every aspect," Pet. App. 34a-35a; and that Bad Spaniels likely tarnished the reputation of Jack Daniel's trademarks by, among other things, creating negative associations between a product for human consumption and canine excrement, Pet. App. 35a-42a.

Having ruled for Jack Daniel's on both the infringement and dilution claims, the district court permanently

16

enjoined VIP Products from sourcing, manufacturing, advertising, promoting, displaying, shipping, importing, offering for sale, selling, or distributing Bad Spaniels. Pet. App. 21a-24a. Jack Daniel's did not request damages.

4. The Ninth Circuit affirmed in part, reversed in part, vacated in part, and remanded for further proceedings. Pet. App. 5a-14a. The Ninth Circuit affirmed the district court's ruling that Jack Daniel's trade dress and bottle design are distinctive and nonfunctional and thus entitled to protection. Pet. App. 8a-9a. The Ninth Circuit also did not disturb the district court's factual finding that VIP Products' use of Jack Daniel's trademarks and trade dress created a likelihood of confusion. Nevertheless, the court of appeals vacated the judgment in favor of Jack Daniel's on the infringement claims on the ground that the Bad Spaniels dog toy merited heightened First Amendment protection. Pet. App. 13a.

While acknowledging that VIP Products' dog toy was "surely not the equivalent of the *Mona Lisa*," the Ninth Circuit held that it was an "expressive work" because it communicated a "humorous message." Pet. App. 11a (citation omitted). On that basis, the Ninth Circuit applied the Second Circuit's framework from *Rogers*, 875 F.2d at 999, discussed above. As interpreted by the Ninth Circuit, that framework requires a Lanham Act plaintiff to prove not only likely confusion, but also that the defendant's use of a mark either is "not artistically relevant to the underlying work" or "explicitly misleads consumers as to the source or content of the work." Pet. App. 10a (citation omitted). In light of that holding, the Ninth Circuit vacated the judgment and remanded for the district court to determine whether Jack Daniel's could prove "one of the two *Rogers* prongs." Pet. App. 12a-13a.

With respect to dilution by tarnishment, the Ninth Circuit reversed the district court's judgment. Pet. App.

17

13a.  The Ninth Circuit did not disturb the district court's finding that Jack Daniel's marks are famous.  Nor did it question, or even address, the district court's holding that the parody exclusion in section 1125(c)(3)(A) did not apply because VIP Products used the trademarks to designate the source of its product.  Instead, the Ninth Circuit invoked the separate exclusion in section 1125(c)(3)(C) for "noncommercial use of a mark."  Pet. App. 13a.  The court explained that, even though "VIP used [Jack Daniel's] trade dress and bottle design to sell Bad Spaniels," VIP Products' use was nonetheless "noncommercial" because it conveyed a "humorous message."  *Id.*  The Ninth Circuit thus concluded that such use was "protected by the First Amendment" and that VIP Products was entitled to judgment on the dilution claims.  *Id.*

  5.  The Ninth Circuit denied panel rehearing and rehearing en banc.  Pet. App. 1a.

### REASONS FOR GRANTING THE PETITION

  The decision below conflicts with the decisions of the courts of appeals, with respect to both trademark-infringement liability and trademark-dilution liability.  The resulting conflicts on these recurring, important questions of federal trademark law will encourage forum shopping and undermine the core protections of the Lanham Act.  This Court should grant review to correct the deeply flawed decision below.

## I.  The Courts of Appeals Are Divided on the Questions Presented

### A.  The Courts of Appeals Are Divided on the Contours of Trademark-Infringement Liability for Humorous Use of a Trademark

  The courts of appeals are divided over whether, to establish infringement under the Lanham Act, a plaintiff

18

must make an evidentiary showing above and beyond a likelihood of confusion where a defendant uses a trademark to identify the origin or sponsorship of a commercial product in a humorous way. In such circumstances, six circuits hold that a plaintiff need only satisfy the traditional likelihood-of-confusion test and that the use of humor or parody is merely a factor in that analysis that makes it less likely the plaintiff will prevail. In contrast, the Ninth Circuit applies a heightened First Amendment inquiry. Holding that VIP Products' use of humor rendered the dog toy expressive, the Ninth Circuit applied a test traditionally limited to use of marks in artistic or expressive works. Under that test, the Ninth Circuit held, a plaintiff must prove not only likelihood of confusion, but also that the defendant's humorous use of the mark is "not artistically relevant" or "explicitly misleads consumers." Pet. App. 10a. This Court should grant review to resolve this conflict.

1. Unlike the Ninth Circuit, the Second, Fourth, Fifth, Seventh, Eighth, and Tenth Circuits do not require an additional evidentiary showing to establish infringement when a defendant uses a trademark to identify the source of a commercial product in a humorous way or as a parody. Instead, these circuits apply a likelihood-of-confusion analysis in which the use of humor or parody is one factor.

The Seventh Circuit's decision in *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225 (7th Cir. 1993), is illustrative. There, the defendant sold shirts bearing the well-known Nike "swoosh," along with the name "MIKE," instead of "NIKE." *Id.* at 1226-27. The defendant claimed that its shirts were a "joke on Nike's image which has become a social phenomenon." *Id.* at 1227. On appeal, the Seventh Circuit recognized that the First Amendment generally protects "ridicule in the form of parody." *Id.* It

19

reasoned, however, that where a defendant uses a trade-mark on a commercial product, the "ultimate question" is "whether [the defendant's] goods confuse customers," holding that "[p]arodies do not enjoy a dispensation from this standard." *Id.* at 1228. As the Seventh Circuit explained, "parody is not an affirmative defense but an additional factor in the analysis." *Id.* "If the defendant employs a successful parody, the customer would not be confused, but amused." *Id.* The Seventh Circuit held that whether the defendant's use of Nike's marks was likely to confuse consumers was a question for the factfinder to decide on remand. *Id.* at 1233.

The Eighth Circuit employed a similar approach in *Mutual of Omaha Insurance Co. v. Novak*, 836 F.2d 397 (8th Cir. 1987). There, the defendant sold merchandise bearing the slogan "Mutant of Omaha," along with an "emaciated" version of insurer Mutual of Omaha's "familiar 'Indian head' logo" and the words "Nuclear Holocaust Insurance." *Id.* at 398. The district court found confusion likely and enjoined the defendant from selling its products. *Id.* The defendant argued on appeal that "Mutant of Omaha" was an "obvious parody" "protected by the First Amendment." *Id.* at 401-02. The Eighth Circuit held, however, that the "ultimate issue" was "whether [the defendant's] design so resembles Mutual's marks that it is likely to cause confusion among consumers" and that the First Amendment was not a "license to infringe the rights of Mutual." *Id* at 398, 402. The Eighth Circuit acknowledged that the outcome might have been different had the defendant produced "an editorial parody in a book, magazine, or film," but it reasoned that the First Amendment did not protect the "commercial use of Mutual's marks in a way that causes consumer confusion." *Id.* at 402-03 & n.9. Because the district court's likelihood-

20

of-confusion finding was not clearly erroneous, the Eighth Circuit affirmed. *Id.* at 403.

The Fifth and Tenth Circuits similarly hold that whether a commercial product uses a mark in a humorous way is one factor in the likelihood-of-confusion analysis. For example, in *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998), the defendants opened an Elvis-Presley-themed bar called the "Velvet Elvis," which they argued was a parody, *id.* at 191-92. The Fifth Circuit held that parody is "not a defense to trademark infringement" but rather a "relevant factor" in the likelihood-of-confusion analysis. *Id.* at 194, 198. The Fifth Circuit concluded that the bar infringed Elvis's marks by using them with intent to confuse consumers. *Id.* at 200-05. In *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987), where the defendant made jeans imitating the "Jordache" brand under the name "Lardashe," the Tenth Circuit similarly evaluated the defendant's alleged intent to parody within the likelihood-of-confusion framework. *Id.* at 1485-88.[3]

Contrary to the Ninth Circuit's view, *see* Pet. App. 12a, the Fourth Circuit's opinion in *Louis Vuitton Malletier, S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007), accords with this majority approach. There, the Fourth Circuit accepted that the defendant's "Chewy

---

[3] The First Circuit employed similar reasoning in a case involving use of trademarks in advertising, concluding that an advertising video that "served a commercial purpose" was not a parody subject to First Amendment protection. *Scholz v. Goudreau*, 901 F.3d 37, 51-52 (1st Cir. 2018). The First Circuit added that, even if the video was a parody, a "parody that engenders consumer confusion [is] entitled to less protection since it implicates the legitimate commercial and consumer protection objectives of trademark law." *Id.* at 52 (alteration in original) (internal quotation marks omitted).

21

Vuiton" dog toy parodied Louis Vuitton handbags, but it reasoned that this conclusion did "not end the inquiry." *Id.* at 261. "The finding of a successful parody," the Fourth Circuit explained, "only influences the way in which the [likelihood-of-confusion] factors are applied." *Id.* The Fourth Circuit thus applied a traditional likelihood-of-confusion test—not a heightened First Amendment inquiry like that applied by the Ninth Circuit here.[4]

Finally, even the Second Circuit, which originated the *Rogers* test, has rejected the notion that a heightened standard applies merely because a commercial product uses a trademark in a humorous way. In *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999), the defendant used a modified version of the Harley-Davidson logo for his motorcycle repair business and products, adding a "hog" with sunglasses and the words "UNAUTHORIZED DEALER," *id.* at 809. Distinguishing its prior decision in *Rogers*, the Second Circuit explained that, although it has "accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark," it has "not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing product." *Id.* at 812. It thus rejected the defendant's claim to First Amendment

---

[4] Although acknowledging that "[t]he Fourth Circuit's decision was based on likelihood of confusion, not the First Amendment," the Ninth Circuit attempted to diminish that aspect of the Fourth Circuit's reasoning by noting that the Fourth Circuit later adopted the "*Rogers* test" in *Radiance Foundation, Inc. v. NAACP*, 786 F.3d 316 (4th Cir. 2015). *See* Pet. App. 12a n.1. *Radiance Foundation*, however, is far afield, as it involved a nonprofit's use of a trademark in an article raising social and political issues. 786 F.3d at 327. It provides no support for the notion that the Fourth Circuit applies a heightened First Amendment test to the humorous use of a trademark on a commercial product.

22

protection for "a trademark parody that endeavors to promote primarily non-expressive products such as a competing motorcycle repair service." *Id.* at 813. The Second Circuit concluded that the district court had properly enjoined the defendant's use of marks that were "likely to cause confusion." *Id.* at 814.

2. The Trademark Trial and Appeal Board (TTAB) takes a similar approach in deciding whether parodic marks are entitled to registration. *See Bos. Red Sox Baseball Club Ltd. P'ship v. Sherman*, 88 U.S.P.Q.2d 1581, 1592 (T.T.A.B. 2008) (finding that consumers were unlikely to confuse "Sex Rod" with "Red Sox," but holding that "[p]arody is not a defense if the marks would otherwise be considered confusingly similar"); *Cards Against Humanity, LLC v. Vampire Squid Cards, LLC*, Opp'n No. 91225576, 2019 WL 1491525, at *11 (T.T.A.B. Feb. 28, 2019) (holding the same, and denying registration of "Crabs Adjust Humidity" card game because of likely confusion).

3. These decisions cannot be reconciled with the decision below, which requires Lanham Act plaintiffs to satisfy a rigid two-pronged test whenever a commercial product uses a trademark to communicate a "humorous message." Pet. App. 11a-12a. Under the Ninth Circuit's rule, the plaintiff in such a case must prove not only a likelihood of confusion, but also that the commercial product's "humorous" use of a mark either is "not artistically relevant to the underlying work" or "explicitly misleads consumers as to the source or content of the work." Pet. App. 10a, 12a.

The Ninth Circuit based its rule on the Second Circuit's decision in *Rogers*, which, as discussed above, involved a movie title referencing a famous performer's name. *See supra* p.13. The Second Circuit has made clear

23

that *Rogers* concerns the use of a trademark in "expressive works" and does not apply where, as here, a defendant "simply uses [a trademark] somewhat humorously to promote his own products and services." *Harley-Davidson*, 164 F.3d at 812-13. Further, even in cases where *Rogers* applies, the Second Circuit balances the defendant's interest in freedom of expression against the likelihood of consumer confusion. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989). Here, in contrast, the Ninth Circuit interpreted *Rogers* as imposing a strict requirement that a plaintiff must satisfy one of two specific prongs, in addition to the likelihood-of-confusion analysis, to prevail. Pet. App. 12a-13a.

The Ninth Circuit thus extended *Rogers*' heightened First Amendment standard beyond traditionally expressive or artistic works to any commercial product copying another's trademark to identify the source of the copier's own product in a humorous way. It did so even though the only purported "expression" here is the infringing use itself—as opposed to cases where a defendant uses a trademark as one element of an expressive work like a book, movie, or song, as in *Rogers*. And it rigidly applied *Rogers* to require a plaintiff to satisfy one of two strict prerequisites. The Ninth Circuit's decision conflicts directly with the decisions of other courts of appeals, which hold that affixing an allegedly humorous mark to a commercial product is merely a factor in the traditional likelihood-of-confusion analysis. The Court should grant review to resolve this conflict.

24

**B. The Decision Below Creates a Conflict on Dilution-by-Tarnishment Liability for Humorous Use of Another's Trademark**

The Ninth Circuit's ruling on dilution by tarnishment creates another circuit conflict, independently warranting review. The Ninth Circuit reasoned that, although VIP Products used Jack Daniel's trademarks and trade dress to sell Bad Spaniels, its use was nonetheless "noncommercial" because it conveyed a "humorous message." Pet. App. 13a. The Ninth Circuit thus held, as a matter of law, that VIP Products' use fell within the "noncommercial use" exclusion to the Lanham Act's cause of action for dilution. *See* 15 U.S.C. § 1125(c)(3)(C). Under the Ninth Circuit's standard, virtually any "humorous" use of another's trademark to sell a product is "noncommercial" and thus excluded from dilution liability.

1. No other circuit has adopted such a broad reading of the "noncommercial use" exclusion. In contrast to the Ninth Circuit's bright-line "humor" test, the Fourth Circuit applies a multifactor test to determine whether the defendant's use of the mark was noncommercial, considering such questions as "whether the speaker has an economic motivation for the speech" and "whether the listener would perceive the speech as proposing a transaction." *See, e.g.*, *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 331-32 (4th Cir. 2015). Under the Fourth Circuit's test, the presence of a single factor, such as humor, does not determine the exclusion's applicability. *See id.*

More generally, multiple other circuits have allowed dilution-by-tarnishment claims to proceed under the Lanham Act or analogous state law even when the defendant's use of a mark involves humor. Indeed, the use of famous marks to make sexual jokes is one of the most common

25

contexts in which plaintiffs successfully prove tarnishment. The Sixth Circuit recognized as much in *V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382 (6th Cir. 2010), approvingly citing a case that found dilution by tarnishment in "defendants' display at an adult entertainment exhibition of two models riding a VIAGRA-branded missile and distributing condoms," *id.* at 388 (citing *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 525 (S.D.N.Y. 2009)). The Ninth Circuit's rule renders use of trademarks to make sexual jokes immune from dilution-by-tarnishment liability, gutting the statutory protection against tarnishment.

Other circuits have allowed tarnishment claims to proceed in commercial contexts even where the defendant used the mark for humorous commentary. *See N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002) ("New York Slot Exchange," casino's humorous commentary on stock market, could constitute tarnishment); *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 774, 777-78 (8th Cir. 1994) (finding tarnishment as a matter of law under Missouri law, where defendant used parody "Michelob Oily" as comment on water pollution).

2. The Ninth Circuit's decision also diverges from other circuit authority construing the statutory exclusions from dilution liability. *See* 15 U.S.C. § 1125(c)(3). As explained above, Congress expressly excluded parodies of famous marks from dilution claims, but only when the parody is not used "as a designation of source" for the parodist's own goods. *Id.* § 1125(c)(3)(A)(ii); *see supra* p.8. The Second and Fourth Circuits, as well as the TTAB, accordingly have held the parody exclusion inapplicable where, as here, the defendant uses a parody as its own trademark. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 112 (2d Cir. 2009); *Louis Vuitton*, 507

26

F.3d at 266; *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 U.S.P.Q.2d 1497, 1508-09 (T.T.A.B. 2015).

In contrast, the Ninth Circuit held that humorous use of a trademark—even to sell a product like a dog toy—brings that use within the separate statutory exclusion for "noncommercial use." *See* Pet. App. 13a (holding it irrelevant to dilution defense that "VIP used [Jack Daniel's] trade dress and bottle design to sell Bad Spaniels"). That counterintuitive reading of the statute nullifies the limits on the parody exclusion created by Congress and applied by the Second and Fourth Circuits.

## II. The Questions Presented Are Recurring, Important, and Squarely Presented

1. As the foregoing discussion makes clear, the questions presented recur frequently. The decision below is only the latest reported opinion to consider these questions in the specific context of humorous use of trademarks on dog products—and the first to grant heightened First Amendment protections to such trademark use. *See, e.g., Louis Vuitton*, 507 F.3d at 261; *Anheuser-Busch*, 666 F. Supp. 2d at 986; *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 415-16 (S.D.N.Y. 2002). For example, in the oft-cited *Tommy Hilfiger* case, then-Judge Mukasey rejected special First Amendment protection for "Timmy Holedigger" dog perfume, holding that "because the mark is being used at least in part to promote a somewhat non-expressive, commercial product, the First Amendment does not extend to such use, or to the extent that it does, the balance tips in favor of allowing trademark recovery, if in fact consumers are likely to be confused." 221 F. Supp. 2d at 415-16 (footnote omitted). Nonetheless, conducting the same balancing test undertaken by the district court in this case, Judge Mukasey

27

found confusion unlikely on the specific facts of that case. *See id.* at 416-21.

More generally, these questions have arisen, and will continue to arise, across a broad spectrum of commercial uses of trademarks and trade dress. As Judge Leval recognized fifteen years ago, "[i]n the last quarter century, we have witnessed a new aggressiveness on the part of advertisers, social commentators and wisecrackers in the use of other people's trademarks." Pierre N. Leval, *Trademark: Champion of Free Speech*, 27 Colum. J.L. & Arts 187, 187 (2004) (citing cases). That trend has continued, as the case law discussed above makes clear.

Although the decision below stands alone on both questions presented, its impact will be felt nationally. Absent correction by this Court, the decision below will permit infringers to forum shop in attempts to protect their commercial exploitation and dilution of others' trademarks. Because a mark holder must satisfy the Ninth Circuit's two-pronged test to prove trademark infringement in cases involving humorous use of trademarks on commercial products, and because humorous use of trademarks will render such use "noncommercial," infringers will have every incentive to funnel trademark litigation into the Ninth Circuit by filing declaratory-judgment actions there.

VIP Products, for example, launched this declaratory-judgment action in the U.S. District Court for the District of Arizona after Jack Daniel's sent it a cease-and-desist demand. VIP has filed numerous similar actions in the same district seeking declarations that its products do not infringe trademarks of other well-known brands. *See* Compl., *VIP Prods., LLC v. Tequila Cuervo La Rojena, S.A. de C.V.*, No. 2:20-cv-319 (D. Ariz. Feb. 11, 2020), ECF No. 1 ("Jose Perro" product copying Jose Cuervo tequila);

28

Compl., *VIP Prods., LLC v. Pabst Brewing Co.*, No. 2:14-cv-2084 (D. Ariz. Sept. 19, 2014), ECF No. 1 ("Blue Cats Trippin'" product copying Pabst Blue Ribbon beer); Compl., *VIP Prods., LLC v. Champagne Louis Roederer S.A.*, No. 2:13-cv-2365 (D. Ariz. Nov. 18, 2013), ECF No. 1 ("Crispaw" product copying Cristal champagne); Compl., *VIP Prods., LLC v. Champagne Louis Roederer S.A.*, No. 2:13-cv-823 (D. Ariz. April 23, 2013), ECF No. 1 ("Crispaw"); Compl., *VIP Prods., LLC v. Heineken USA Inc.*, No. 2:13-cv-319 (D. Ariz. Feb. 13, 2013), ECF No. 1 ("HeinieSniff'n" product copying Heineken beer); Compl., *VIP Prods., LLC v. Coca-Cola Co.*, No. 2:09-cv-1985 (D. Ariz. Sept. 22, 2009), ECF No. 1 ("Bark's" product copying Barq's root beer); Compl., *VIP Prods., LLC v. Heineken USA Inc.*, No. 2:09-cv-842 (D. Ariz. Apr. 21, 2009), ECF No. 1 ("HeinieSniff'n"); Compl., *VIP Prods., LLC v. Jackson Family Wines, Inc.*, No. 2:09-cv-281 (D. Ariz. Feb. 12, 2009), ECF No. 1 ("Kennel Relax'n" product copying Kendall-Jackson wine).[5]  The inevitability of such forum shopping is a compelling reason for this Court to establish a uniform, national interpretation of the Lanham Act.

2.  The questions presented have significant implications for consumers and trademark owners alike.

Absent correction by this Court, the decision will subvert the Lanham Act's purpose of protecting mark owners' investment in goodwill and preventing consumer confusion, *see U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020)—the latter being an objective nobody doubts is consistent with the First Amendment, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*

---

[5] Except for the Jose Perro action, which remains pending, the court dismissed all of these actions for lack of service.

29

*Comm'n*, 447 U.S. 557, 563 (1980).  The district court here found VIP Products' use of Jack Daniel's trademark and trade dress likely to confuse consumers, Pet. App. 55a, a finding undisturbed by the Ninth Circuit on appeal.  The decision below inexplicably elevates VIP Products' interest in copying Jack Daniel's trademark and trade dress to make funny dog toys over the Lanham Act's central goal of protecting consumers.

The Act already protects the First Amendment rights of entities like VIP Products without the Ninth Circuit's extratextual test.  In other cases involving humorous, commercial use of trademarks, courts have found that consumers are unlikely to be confused on the specific facts of those cases.  *See, e.g.*, *Tommy Hilfiger*, 221 F. Supp. 2d at 416-21 (finding confusion unlikely in part because, unlike in this case, the companies did not compete in the same market, and Hilfiger offered no survey evidence of actual confusion).  The Lanham Act's likelihood-of-confusion standard thus already gives courts and juries the tools they need to determine whether a humorous product is likely to confuse consumers.  Engrafting a special test on top of that standard, as the Ninth Circuit did here, improperly undermines the consumer-protecting goal of the Lanham Act.

The decision below also undercuts mark holders' investments in the goodwill associated with their marks.  Jack Daniel's has invested hundreds of millions of dollars into advertising to promote its trademark-protected brand.  Pet. App. 32a.  The decision below allows VIP Products to capitalize on Jack Daniel's investments in its goodwill, by usurping Jack Daniel's trademark and trade dress to sell its own commercial products—all the while diluting the value of the Jack Daniel's mark by associating it with dog excrement.  And it diminishes Jack Daniel's

30

own First Amendment right to engage in commercial trademark speech free from infringement and dilution. Those results are antithetical to the policy considerations underlying the Lanham Act.

3. This case is an excellent vehicle for deciding the questions presented, both of which are outcome-determinative. The case reached the Ninth Circuit following a final judgment in Jack Daniel's favor. On the trademark-infringement claims, the district court ruled for Jack Daniel's under the traditional likelihood-of-confusion test that would have governed the analysis in other circuits. Pet. App. 55a. And on the trademark-dilution claims, the district court found that VIP Products' use of Jack Daniel's trademarks was likely to tarnish them and that the parody exclusion did not apply. Pet. App. 42a, 84a-85a. The Ninth Circuit's holdings regarding (1) application of the First Amendment to the trademark-infringement claims and (2) application of the noncommercial exclusion to the trademark-dilution claims dispose of this case.

**III. The Decision Below Is Egregiously Wrong**

    **A.  The Court of Appeals Erred with Respect to Trademark Infringement**

1. The Ninth Circuit's decision on the trademark-infringement claims finds no support in the Lanham Act's text. The Act prohibits use of a mark in a way that is

> likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A); *see also id.* § 1114(1)(a) (liability for use of registered marks in a way that is "likely to cause

31

confusion, or to cause mistake, or to deceive").  Put simply, liability follows from a likelihood of confusion.  Under the Ninth Circuit's rule, however, a defendant can escape liability even if the plaintiff proves a *certainty* of confusion, as long as the defendant's use of the mark is "artistically relevant" and the defendant does not *explicitly* mislead as to the source of its products.  Pet. App. 10a, 12a.  No language in the statute permits a court to require that showing in every case of infringement involving humor.

The Ninth Circuit's rule also clashes with the Lanham Act's structure.  Congress knows how to exclude certain uses of a mark from liability.  It did so in the context of dilution, creating an express exclusion for parody (subject to important limitations, as discussed below).  15 U.S.C. § 1125(c)(3)(A)(ii).  Similarly, in the context of registered marks that have become incontestable, Congress exempted certain categories of fair use from liability.  *Id.* § 1115(b)(4).[6]  The absence of a parody or humor exemption to the Act's infringement provisions demonstrates that Congress expected courts to handle such cases within the traditional likelihood-of-confusion framework—especially in cases of traditional infringement like this one, where the infringer uses the trademark to identify the origin of its own product.  *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) (drawing similar inference from absence of express willfulness requirement when Congress had specified mens rea requirements elsewhere in Lanham Act).

---

[6] VIP raised the defense of nominative fair use, but the Ninth Circuit affirmed the district court's rejection of that defense.  Pet. App. 9a.

32

2.  Nothing in established trademark doctrine supports the Ninth Circuit's approach to "humorous" commercial products under the Lanham Act.  The Ninth Circuit's reasoning means that virtually any humorous pirating of a trademark will be "expressive" and thus qualify for heightened First Amendment protection, requiring the mark owner to prove "no artistic relevance" or explicit deception to prevail.  Pet. App. 10a, 12a.  Overlaying that rigid standard on the Lanham Act could thus exclude "many of the most culpable offenders" from liability.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932-33 (2016) (rejecting similarly restrictive two-part test for enhanced patent infringement damages); *see also Romag*, 140 S. Ct. at 1497 (rejecting effort to transform defendant's mental state from "highly important consideration" into "inflexible precondition" to recovery of profits for trademark infringement).

Any First Amendment interest implicated by the use of a humorous mark to identify the origin of a commercial product can and should be evaluated as part of the likelihood-of-confusion test instead of a threshold barrier to relief.  *See supra* Part I.A; *accord* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:153 (5th ed. 2020).  This view recognizes that a parody still can confuse consumers and thereby run afoul of the Lanham Act.  As the Second Circuit explained,

> A parody must convey two simultaneous—and contradictory—messages:  that it is the original, but also that it is *not* the original and is instead a parody.  To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

*Cliffs Notes*, 886 F.2d at 494.  In other words, the funnier a use of a trademark, the less likely consumers are to be confused, and vice versa.

This Court recognized a similar concept just several months ago in *Booking.com*, which was decided after the Ninth Circuit denied rehearing in this case.  *Booking.com* presented the question whether a term styled "generic.com" is eligible for trademark registration.  140 S. Ct. at 2301.  The PTO urged the Court to adopt a "nearly *per se* rule" rendering such terms ineligible for registration, and expressed "concern . . . that trademark protection for a term like 'Booking.com' would hinder competitors" who used similarly descriptive marks.  *Id.* at 2305, 2307.

This Court rejected the PTO's "unyielding legal rule," which it found "incompatible" with the "bedrock principle" that "whether a term is generic depends on its meaning to consumers."  *Id.* at 2306.  Importantly, it dismissed the PTO's concern for competitors by explaining that the likelihood-of-confusion test that governs infringement claims already accounts for that concern.  *Id.* at 2307.  As the Court observed, "a competitor's use does not infringe a mark unless it is likely to confuse consumers."  *Id.*  And a mark's use of descriptive language such as "booking.com" is a relevant factor in that analysis:  the weaker a mark, the Court explained, the less likely consumers are "to think that other uses of the common element emanate from the mark's owner."  *Id.*

So too here.  The Ninth Circuit's "unyielding legal rule" makes consumer perception irrelevant to infringement claims in many cases involving humorous imitations of trademarks.  And, like the PTO in *Booking.com*, the Ninth Circuit failed to appreciate that the flexible likeli-

34

hood-of-confusion test, as applied in the majority of circuits, already accounts for the policy concerns animating the Ninth Circuit's rule. *See* Leval, *supra*, at 189. When a statutory scheme strikes an appropriate balance between free expression and intellectual property, courts should respect that balance rather than engrafting made-up constitutional rules onto the statutory scheme. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985) (so holding in copyright fair-use context).

The Court already has rejected the notion that parody is presumptively exempt from copyright-infringement claims, recognizing instead that parody *may* be protected as fair use, in light of all the circumstances. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 581 (1994). "[P]arody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Id.*

The same case-by-case approach should apply in the trademark context. Factfinders are well-equipped to weigh the various factors and determine whether a particular commercial product creates an unduly great risk of confusion in light of all the circumstances. The district court made that determination here, and that should have ended the matter.

### B. The Court of Appeals Erred with Respect to Dilution by Tarnishment

The district court found that Bad Spaniels was likely to create negative associations in the minds of would-be Jack Daniel's consumers, in part by associating Jack Daniel's whiskey with "canine excrement." Pet. App. 41a. Without overturning that factual finding, the Ninth Circuit reversed. Because Bad Spaniels conveys a "humor-

35

ous message," the court held that it was protected expression. Accordingly, it qualified, as a matter of law, for the "noncommercial use" dilution defense. Pet. App. 13a. The Ninth Circuit's interpretation renders the Lanham Act's dilution provision incoherent and should be reversed.

The Lanham Act provides that certain categories of use "shall not be actionable" as dilution. One excluded category is "[a]ny fair use . . . *other than as a designation of source* for the person's own goods or services." 15 U.S.C. § 1125(c)(3)(A) (emphasis added). The Act identifies parody as a permitted fair use, but it excludes the parodist from liability only so long as the parodist does not use a trademark as its own designation of source. *Id.* § 1125(c)(3)(A)(ii). The Ninth Circuit did not apply that exclusion here, presumably because it had no basis to reverse the district court's conclusion that VIP Products used Jack Daniel's trademarks as a designation of source. Pet. App. 84a-85a.

The Act separately excludes "[a]ny noncommercial use of a mark." 15 U.S.C. § 1125(c)(3)(C). Under the Ninth Circuit's decision, humorous use of a mark, including (but not limited to) use of a mark in a parody, qualifies as a "noncommercial use" excluded from dilution liability. *See* Pet. App. 13a. That interpretation renders superfluous section 1125(c)(3)(A)(ii)'s express parody exclusion. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)). It also nullifies Congress's decision to limit the parody exclusion to cases where the defendant has not used the plaintiff's mark as a designation of source. By shoehorning Bad Spaniels into the noncommercial use exclusion, the Ninth

36

Circuit performed an end-run around the limitations Congress imposed on the statutory parody exclusion. That decision should be reversed.

\*       \*       \*

The Ninth Circuit's decision cannot be squared with the text of the Lanham Act, with respect to both infringement and dilution. The decision represents an extreme departure from the decisions of other courts of appeals. And, with respect to trademark infringement in particular, the Ninth Circuit overlooked that the likelihood-of-confusion test already reconciles the various interests at issue in this case, as this Court recently explained in a similar context in *Booking.com*. The Court thus may wish summarily to reverse the Ninth Circuit's egregiously wrong decision or, at a minimum, grant, vacate, and remand in light of *Booking.com*. In all events, this Court should grant the petition.

37

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted,

THEODORE H. DAVIS JR.
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1100 Peachtree Street NE*
  *Suite 2800*
  *Atlanta, GA 30309*

DENNIS L. WILSON
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1801 Century Park East*
  *Suite 2300*
  *Los Angeles, CA 90067*

ISAAC S. CRUM
RUSING LOPEZ & LIZARDI,
PLLC
  *16427 N. Scottsdale Rd.*
  *Suite 200*
  *Scottsdale, AZ 85254*

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
MATTHEW B. NICHOLSON
THOMAS S. CHAPMAN
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *lblatt@wc.com*

SEPTEMBER 15, 2020

**APPENDIX**

**APPENDIX A:**    Order Denying Rehearing, United States Court of Appeals for the Ninth Circuit, No. 18-16012, June 3, 2020.............1a

**APPENDIX B:**    Opinion, United States Court of Appeals for the Ninth Circuit, No. 18-16012, Mar. 31, 2020...........2a

**APPENDIX C:**    Permanent Injunction and Final Judgment & Order, United States District Court for the District of Arizona, No. CV-14-2057, May 2, 2018.......15a

**APPENDIX D:**    Findings of Fact, Conclusions of Law, and Order, United States District Court for the District of Arizona, No. CV-14-2057, Jan. 30, 2018..................................25a

**APPENDIX E:**    Memorandum of Decision and Order, United States District Court for the District of Arizona, No. CV-14-2057, Sept. 27, 2016...57a

**APPENDIX F:**    Excerpts of Record filed in the Ninth Circuit depicting VIP Products dog toys ......................105a

**APPENDIX G:**    Statutory Provisions Involved ..111a

1a

## APPENDIX A

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIP PRODUCTS LLC, an Arizona limited liability company,<br><br>　　Plaintiff-counter-defendant-Appellant,<br><br>　v.<br><br>JACK DANIEL'S PROPERTIES, INC., a Delaware corporation,<br><br>　　Defendant-counter-plaintiff-Appellee. | No. 18-16012<br><br>D.C. No. 2:14-cv-02057-SMM<br>District of Arizona, Phoenix<br><br>ORDER |

Before:  TASHIMA, HURWITZ, and MILLER, Circuit Judges.

　　The panel has voted to deny the petition for panel rehearing.  Judges Hurwitz and Miller have voted to deny the petition for rehearing en banc, and Judge Tashima so recommends.

　　The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc.  Fed. R. App. P. 35.

　　The petition for panel rehearing and rehearing en banc, Dkt. 63, is **DENIED**.

2a

# APPENDIX B

**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIP PRODUCTS LLC, an Arizona limited liability company, *Plaintiff-Counter-Defendant-Appellant,* <br><br> v. <br><br> JACK DANIEL'S PROPERTIES, INC., a Delaware corporation, *Defendant-Counter-Plaintiff-Appellee.* | No. 18-16012 <br><br> D.C. No. 2:14-cv-02057-SMM <br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted February 7, 2020
Arizona State University, Phoenix

Filed March 31, 2020

Before: A. Wallace Tashima, Andrew D. Hurwitz, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Hurwitz

3a

# SUMMARY[*]

## Trademark

The panel affirmed in part, vacated in part, and reversed in part the district court's judgment after a bench trial and permanent injunction in favor of Jack Daniel's Properties, Inc., in a trademark suit brought by VIP Products, LLC, concerning VIP's "Bad Spaniels Silly Squeaker" dog toy, which resembled a bottle of Jack Daniel's Old No. 7 Black Label Tennessee Whiskey but had light-hearted, dog-related alterations.

The panel affirmed the district court's summary judgment in favor of Jack Daniel's on the issues of aesthetic functionality and distinctiveness. The panel held that the district court correctly found that Jack Daniel's trade dress and bottle design were distinctive and aesthetically nonfunctional, and thus entitled to trademark protection. Accordingly, the district court correctly rejected VIP's request for cancellation of Jack Daniel's registered trademark. The district court also correctly rejected VIP's nominative fair use defense because, although the Bad Spaniels toy resembled Jack Daniel's trade dress and bottle design, there were significant differences between them, most notably the image of a spaniel and the phrases on the Bad Spaniels label.

Vacating the district court's judgment on trademark infringement, the panel concluded that the Bad Spaniels dog toy was an expressive work entitled to First Amendment protection. Accordingly, the district court erred in

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4a

finding trademark infringement without first requiring Jack Daniel's to satisfy at least one of the two prongs of the *Rogers* test, which requires a plaintiff to show that the defendant's use of a mark is either (1) not artistically relevant to the underlying work or (2) explicitly misleads consumers as to the source or content of the work.

The panel reversed the district court's judgment on claims of trademark dilution by tarnishment. Although VIP used Jack Daniel's trade dress and bottle design to sell Bad Spaniels, they were also used to convey a humorous message, which was protected by the First Amendment. VIP therefore was entitled to judgment in its favor on the federal and state law dilution claims.

In summary, the panel affirmed the district court's summary judgment in favor of Jack Daniel's on the issues of aesthetic functionality and distinctiveness, affirmed the judgment as to the validity of Jack Daniel's registered mark, reversed the judgment on the issue of dilution, vacated the judgment after trial on the issue of infringement, and remanded for further proceedings. The panel also vacated the permanent injunction prohibiting VIP from manufacturing and selling the Bad Spaniels dog toy.

## COUNSEL

David G. Bray (argued), David N. Ferrucci, and Holly M. Zoe, Dickinson Wright PLLC, Phoenix, Arizona, for Plaintiff-Counter-Defendant-Appellant.

D. Peter Harvey (argued), Harvey & Company, San Francisco, California; Isaac S. Crum, Rusing Lopez & Lizardi PLLC, Tucson, Arizona; for Defendant-Counter-Plaintiff-Appellee.

5a

## OPINION

HURWITZ, Circuit Judge:

VIP Products sells the "Bad Spaniels Silly Squeaker" dog toy, which resembles a bottle of Jack Daniel's Old No. 7 Black Label Tennessee Whiskey, but has light-hearted, dog-related alterations. For example, the name "Jack Daniel's" is replaced with "Bad Spaniels," "Old No. 7" with "Old No. 2," and alcohol content descriptions with "43% POO BY VOL." and "100% SMELLY." After Jack Daniel's Properties, Inc. ("JDPI") demanded that VIP cease selling the toy, VIP filed this action, seeking a declaration that the toy did not infringe JDPI's trademark rights or, in the alternative, that Jack Daniel's trade dress and bottle design were not entitled to trademark protection. JDPI counterclaimed, asserting trademark infringement and dilution. After ruling on cross-motions for summary judgment and conducting a four-day bench trial, the district court found in favor of JDPI and issued a permanent injunction enjoining VIP from manufacturing and selling the Bad Spaniels toy.

We affirm the district court's summary judgment in favor of JDPI on the issues of aesthetic functionality and distinctiveness. However, because the Bad Spaniels dog toy is an expressive work entitled to First Amendment protection, we reverse the district court's judgment on the dilution claim, vacate the judgment on trademark infringement, and remand for further proceedings.

## I

### A. Factual Background

VIP designs, markets, and sells "Silly Squeakers," rubber dog toys that resemble the bottles of various well-

6a

known beverages, but with dog-related twists. One Silly Squeaker, for example, resembles a Mountain Dew bottle, but is labeled "Mountain Drool." VIP's purported goal in creating Silly Squeakers was to "reflect" "on the humanization of the dog in our lives," and to comment on "corporations [that] take themselves very seriously." Over a million Silly Squeakers were sold from 2007 to 2017.

In July of 2013, VIP introduced the Bad Spaniels squeaker toy. The toy is roughly in the shape of a Jack Daniel's bottle and has an image of a spaniel over the words "Bad Spaniels." The Jack Daniel's label says, "Old No. 7 Brand Tennessee Sour Mash Whiskey;" the label on the Bad Spaniels toy instead has the phrase "the Old No. 2, on your Tennessee Carpet." A tag affixed to the Bad Spaniels toy states that the "product is not affiliated with Jack Daniel Distillery."

**B. Procedural History**

In 2014, JDPI "demand[ed] that VIP cease all further sales of the Bad Spaniels toy." VIP responded by filing this action, seeking a declaration that the Bad Spaniels toy "does not infringe or dilute any claimed trademark rights" of JDPI and that Jack Daniel's trade dress and bottle design are not entitled to trademark protection. The complaint also sought cancellation of the Patent and Trademark Office registration for Jack Daniel's bottle design. JDPI counterclaimed, alleging state and federal claims for infringement of JDPI's trademarks and trade dress, *see* 15 U.S.C. §§ 1114(1), 1125(a)(1); A.R.S. §§ 44-1451, *et seq.*, and dilution by tarnishment of the trademarks and trade dress, *see* 15 U.S.C. § 1125(c); A.R.S. § 44-1448.01.

7a

VIP moved for summary judgment, and JDPI cross-moved for partial summary judgment. The district court denied VIP's motion and granted JDPI's. The district court held that VIP was not entitled to the defenses of nominative and First Amendment fair use. The district court rejected the nominative fair use defense because VIP "did not use JDPI's identical marks or trade dress in its Bad Spaniels toy." The district court rejected JDPI's First Amendment defense because the trade dress and bottle design were used "to promote a somewhat non-expressive, commercial product."

The district court also found as a matter of law that Jack Daniel's trade dress and bottle design were distinctive, non-generic, and nonfunctional, and therefore entitled to trademark protection. This left for trial only JDPI's dilution by tarnishment claims and whether JDPI could establish the likelihood of confusion for trademark infringement. *See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046-47 (9th Cir. 1998) ("To state an infringement claim . . . a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion.").

After a four-day bench trial, the district court found that JDPI had established dilution by tarnishment and infringement of JDPI's trademarks and trade dress. The court permanently enjoined VIP "from sourcing, manufacturing, advertising, promoting, displaying, shipping, importing, offering for sale, selling or distributing the Bad Spaniels dog toy."

## II

We have jurisdiction of VIP's appeal under 28 U.S.C. § 1291. We review the grant of summary judgment and

8a

the district court's conclusions of law following a bench trial de novo. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016); *Dolman v. Agee*, 157 F.3d 708, 711 (9th Cir. 1998). The "district court's findings of fact following a bench trial are reviewed for clear error." *Id.* at 711.

## A. Aesthetic Functionality and Distinctiveness

To obtain trademark protection, a product's trade dress or design must be nonfunctional and distinctive. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000); *Talking Rain Beverage Co., Inc. v. S. Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003). "[T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive." *Kendall-Jackson Winery*, 150 F.3d at 1050.

The district court correctly found Jack Daniel's trade dress and bottle design are distinctive and aesthetically nonfunctional. Although whiskey companies use many of the individual elements employed by JDPI on their bottles, the Jack Daniel's trade dress "is a combination [of] bottle and label elements," including "the Jack Daniel's and Old No. 7 word marks," and the district court correctly found that these elements *taken together* are both nonfunctional and distinctive. *See Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002) (stating that "'an assurance that a particular entity made, sponsored, or endorsed a product,' . . . if incorporated into the product's design by virtue of arbitrary embellishment" is not functional (quoting *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 774 (9th Cir. 1981))).

9a

VIP also failed to rebut the presumption of nonfunctionality and distinctiveness of the Jack Daniel's bottle design, which is covered by Trademark Registration No. 4,106,178. *See Tie Tech*, 296 F.3d at 783 ("[T]he plaintiff in an infringement action with a registered mark is given the prima facie or presumptive advantage on the issue of validity, thus shifting the burden of production to the defendant to prove otherwise."). None of the evidence cited by VIP demonstrates that, "taken together," the elements of the bottle design registration—including "an embossed signature design comprised of the word 'JACK DANIEL'"—are functional or nondistinctive. The district court therefore correctly rejected VIP's request for cancellation of the registered mark.

### B. Nominative Fair Use Defense

The district court also correctly rejected VIP's nominative fair use defense. Although the Bad Spaniels toy resembles JDPI's trade dress and bottle design, there are significant differences between them, most notably the image of a spaniel and the phrases on the Bad Spaniels label. These differences preclude a finding of nominative fair use. *See Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (finding nominative fair use defense did not apply where mark was "not identical to the plaintiff's" mark).

### C. First Amendment Defense

"In general, claims of trademark infringement under the Lanham Act are governed by a likelihood-of-confusion test," *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017), which seeks to strike the appropriate balance between the First

10a

Amendment and trademark rights, *see Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018). The likelihood-of-confusion test requires that the plaintiff have "a valid, protectable trademark" and defendant's "use of the mark is likely to cause confusion." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014) (quoting *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007)).

When "artistic expression is at issue," however, the general likelihood-of-confusion test "fails to account for the full weight of the public's interest in free expression." *Gordon*, 909 F.3d at 264 (quoting *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 900 (9th Cir. 2002)). Accordingly, we have held that the Lanham Act only applies to expressive works if the plaintiff establishes one of the two requirements in the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). *See MCA Records*, 296 F.3d at 902 (adopting *Rogers* test for use of a trademark in the title of an expressive work); *see also Gordon*, 909 F.3d at 267 (noting that after *MCA Records*, this Court "extended the *Rogers* test beyond a title"). *Rogers* requires the plaintiff to show that the defendant's use of the mark is either (1) "not artistically relevant to the underlying work" or (2) "explicitly misleads consumers as to the source or content of the work." *Gordon*, 909 F.3d at 265.

In determining whether a work is expressive, we analyze whether the work is "communicating ideas or expressing points of view." *MCA Records*, 296 F.3d at 900 (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987)). A work need not be the "expressive equal of *Anna Karenina* or *Citizen Kane*" to satisfy this requirement, *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013), and is not rendered non-

11a

expressive simply because it is sold commercially, *see MCA Records*, 296 F.3d at 906-07.

We recently had "little difficulty" concluding that greeting cards, which combined the trademarked phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a S - - -" alongside announcements of events such as Halloween and a birthday, were "expressive works" entitled to First Amendment protection. *Gordon*, 909 F.3d at 261-63, 268.  Even if the cards did not show great "creative artistry," they were protected under the First Amendment because the cards "convey[ed] a humorous message through the juxtaposition of an event of some significance—a birthday, Halloween, an election—with the honey badger's aggressive assertion of apathy." *Id.* at 268-69.

Like the greeting cards in *Gordon*, the Bad Spaniels dog toy, although surely not the equivalent of the *Mona Lisa*, is an expressive work. *See Empire Distribution*, 875 F.3d at 1196 ("We decide this legal question de novo."). The toy communicates a "humorous message," *see Gordon*, 909 at 268-69, using word play to alter the serious phrase that appears on a Jack Daniel's bottle—"Old No. 7 Brand"—with a silly message—"The Old No. 2."  The effect is "a simple" message conveyed by "juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *L.L. Bean, Inc.*, 811 F.2d at 34 (affording First Amendment protection to a message "that business and product images need not always be taken too seriously").  Unlike the book in *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997), which made "no effort to create a transformative work with 'new expression, meaning, or

12a

message,'" Bad Spaniels comments humorously on precisely those elements that Jack Daniels seeks to enforce here. *Id.* at 1401 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, 580 (1994)). The fact that VIP chose to convey this humorous message through a dog toy is irrelevant. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)("[T]he Constitution looks beyond written or spoken words as mediums of expression.").

The Fourth Circuit's decision in *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007), supports our conclusion. That opinion held that dog toys which "loosely resemble[d]" small Louis Vuitton handbags were "successful parodies of LVM handbags and the LVM marks and trade dress" and therefore did not infringe the LVM trademark.[1] *Id.* at 258, 260, 263. The Fourth Circuit reasoned that although "[t]he dog toy is shaped roughly like a handbag; its name 'Chewy Vuiton' sounds like and rhymes with LOUIS VUITTON; its monogram CV mimics LVM's LV mark; the repetitious design clearly imitates the design on the LVM handbag; and the coloring is similar," "no one can doubt . . . that the 'Chewy Vuiton' dog toy is not the 'idealized image' of the mark created by LVM." *Id.* at 260. No different conclusion is possible here.

Because Bad Spaniels is an expressive work, the district court erred in finding trademark infringement without first requiring JDPI to satisfy at least one of the two *Rogers* prongs. *See Gordon*, 909 F.3d at 265; *see also*

---

[1] The Fourth Circuit decision was based on likelihood of confusion, not the First Amendment, *see id.* at 259-60, as it had not yet adopted the *Rogers* test, *see Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 329 (4th Cir. 2015) (later applying it).

13a

*E.S.S. Entm't 2000*, 547 F.3d at 1101 (stating that "the First Amendment defense applies equally to . . . state law claims as to [a] Lanham Act claim"). We therefore vacate the district court's finding of infringement and remand for a determination by that court in the first instance of whether JDPI can satisfy a prong of the *Rogers* test.[2]

### D. Trademark Dilution by Tarnishment

When the use of a mark is "noncommercial," there can be no dilution by tarnishment. 15 U.S.C. § 1125(c)(3)(C); *see* A.R.S. § 44-1448.01(C)(2). Speech is noncommercial "if it does more than propose a commercial transaction," *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004) (quoting *MCA Records*, 296 F.3d at 906), and contains some "protected expression," *MCA Records*, 296 F.3d at 906. Thus, use of a mark may be "noncommercial" even if used to "sell" a product. *See Nissan Motor Co.*, 378 F.3d at 1017; *MCA Records*, 296 F.3d at 906.

Although VIP used JDPI's trade dress and bottle design to sell Bad Spaniels, they were also used to convey a humorous message. That message, as set forth in Part II.C above, is protected by the First Amendment. VIP therefore was entitled to judgment in its favor on the federal and state law dilution claims. *See Nissan Motor Co.*, 378 F.3d at 1017; *MCA Records*, 296 F.3d at 906.

---

[2] If the plaintiff satisfies one of the *Rogers* elements, "it still must prove that its trademark has been infringed by showing that the defendant's use of the mark is likely to cause confusion." *See Gordon*, 909 F.3d at 265; *see also Louis Vuitton Malletier*, 507 F.3d at 260 (noting that the application of likelihood-of-confusion factors "depend[s] to a great extent on whether its products and marks are successful parodies").

14a

### III

We affirm the district court's summary judgment in favor of JDPI on the issues of aesthetic functionality and distinctiveness, affirm the judgment as to the validity of JDPI's registered mark, reverse the judgment on the issue of dilution, vacate the judgment after trial on the issue of infringement, and remand for further proceedings. The permanent injunction is vacated.[3]

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED. Each party to bear its own costs.**

---

[3] Because we hold that VIP was entitled to judgment in its favor on the trademark dilution claims and that the judgment in favor of VIP on the infringement claims must be vacated, we do not address VIP's alternative challenges to these claims. And, because we vacate the permanent injunction, we do not address VIP's argument that the district court erred in not limiting the scope of the permanent injunction.

15a

**APPENDIX C**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| VIP Products, LLC, Plaintiff, | ) No. CV-14-2057-PHX-<br>) SMM<br>) |
| vs. | ) |
| | ) **PERMANENT** |
| Jack Daniel's Properties, Inc., | ) **INJUNCTION AND**<br>) **FINAL JUDGMENT &** |
| Defendant, | ) **ORDER**<br>) |
| _____ | )<br>) |
| And Related Counterclaims.) | |
| _____ | ) |

The Court held a four-day bench trial in this matter from October 2, 2017 through October 5, 2017. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court, having heard the evidence and determined the credibility of witnesses, entered its Findings of Fact, Conclusions of Law, and Order ("Order") on January 30, 2018. (Doc. 245.) The Court found in favor of Defendant Jack Daniel's Properties, Inc. ("Jack Daniel's") and against Plaintiff VIP Products, LLC ("VIP") on all remaining claims, namely, Jack Daniel's claims of trademark and trade dress infringement and dilution by tarnishment. (Id.) Based on VIP's violations, the Court further determined that Jack Daniel's was entitled to permanent injunctive relief. (Id.) Consequently, the Court ordered

16a

Jack Daniel's to submit a proposed permanent injunction, to which VIP responded, and Jack Daniel's replied in support. (Docs. 249, 251, 257.) Also pending before the Court is VIP's motion to stay permanent injunction pending appeal. (Doc. 252.) The briefing is complete. (Docs. 255, 256.)

## I. Scope of Permanent Injunction

Injunctive relief "is historically designed to deter, not punish[.]" Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 62 (1975) (further citation omitted). "[A] district court should only include injunctive terms that have a common sense relationship to the needs of the specific case, and the conduct for which a defendant has been held liable." MGM Studios, Inc. v. Grokster, Ltd., 518 F. Supp.2d 1197, 1226 (C.D. Cal. 2007) (citing NLRB v. Express Publ'g Co., 312 U.S. 426, 435 (1941)).

The Court will enjoin VIP from engaging in acts "which are the same type and class as [the] unlawful acts which the [C]ourt has found to have been committed" by VIP. Express Publ'g, 312 U.S. at 435; see Rondeau, 422 U.S. at 62 (stating that injunctive relief was designed "to permit the court to mould each decree to the necessities of the particular case") (further citation omitted). The permanent injunction entered against VIP is set forth in full at the end of this Order. In summary,

## II. Stay of Injunction Pending Appeal

Pursuant to Fed. R. Civ. P. 62(c) and Fed. R. App. P. 8(a)(C), the Court has discretion to grant a stay pending appeal of the permanent injunction. Rule 62(c) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or

17a

grant an injunction on terms for bond or other terms that secure the opposing party's rights."  Courts have cautioned that under these rules, a stay of a permanent injunction pending appeal is a remedy granted sparingly. See Adams v. Walter, 488 F.2d 1064, 1065 (7th Cir.1973); United States v. Texas, 523 F. Supp. 703, 729 (E.D. Tex. 1981) (stating that since such an action interrupts the ordinary process of judicial review and postpones relief for the prevailing party at trial, the stay of an equitable order is a remedy granted sparingly).

The Supreme Court has identified four factors that must be considered:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  Hilton v. Braunskill, 481 U.S. 770, 776 (1987).  In its evaluation of the factors required for issuance of a stay, the Ninth Circuit requires the moving party to show "*both* a probability of success on the merits and the possibility of irreparable injury."  Golden Gate Restaurant Ass'n v. City and County of San Francisco, 512 F.3d 1112, 1116 (9th Cir. 2008) (emphasis added).  The Ninth Circuit further requires that the moving party demonstrate both that serious legal questions are raised and that the balance of hardships tips sharply in its favor.  Id.

Regarding the probability of success on the merits and that serious legal questions are raised, the Court has judged the credibility of the witnesses at trial, found the facts, and has applied binding Ninth Circuit law to the issues of dilution by tarnishment, as well as trademark and trade dress infringement, and found against VIP.  See 15

18a

U.S.C. §§ 1114, 1125. "[T]he cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution." Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1405 (9th Cir. 1997) (further citation omitted). On appeal, the Court recognizes that the Ninth Circuit has the authority to reconsider its position on some or all issues.

Regarding the possibility of irreparable injury, the Court finds that VIP cannot make the required showing, and thus is not entitled to a stay of the permanent injunction. Although VIP alleges that the Court's permanent injunction will cause it irreparable injury because the Order will cause the destruction of all the Bad Spaniel's dog toys, all computer-aided design and other electronic files, and any molds from which the Bad Spaniel's product has been made, the Court's permanent injunction does not so order. The permanent injunction only requires VIP to gather up and control these items, pending appeal, not destroy them.

Further, under Ninth Circuit precedent, because Jack Daniel's established a likelihood of confusion between its trademarks/trade dress and VIP's Bad Spaniel's product, it is presumed that Jack Daniel's will suffer irreparable harm if injunctive relief is not granted. See Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n.3 (9th Cir. 1989). Here, the evidence at trial established that there was a strong likelihood of confusion among the consuming public. Reliable survey evidence proved that over 29% of consumers thought Jack Daniel's made, sponsored or approved the "Bad Spaniels" dog toy.

Moreover, not only did Jack Daniel's establish a likelihood of confusion between its trademarks/trade dress and

19a

VIP's Bad Spaniel's product, Jack Daniel's also estab-
lished that VIP's Bad Spaniel's product caused dilution by
tarnishment to Jack Daniel's trademarks and trade dress.

Thus, the Court finds that VIP has not established that
it will suffer irreparable harm from an order enjoining
VIP's sale of the "Bad Spaniels" toy, and the gather-up
process that must be undertaken, pending appeal.

Similarly, VIP has not established that the balance of
hardships tips sharply in its favor. In evaluating the bal-
ance of hardships the Court considers the impact the
permanent injunction will have on the respective enter-
prises. See International Jensen, Inc. v. Metrosound
U.S.A., Inc., 4 F.3d 819, 827 (9th Cir. 1993). VIP acknowl-
edged at trial that the Bad Spaniel's dog toy was not a big
seller. In contrast, as Dr. Itamar Simonson testified and
this Court found, by juxtaposing dog feces and defecation
against a consumable product like whiskey, the Bad Span-
iel's dog toy created negative mental associations in the
mind of consumers, thereby tarnishing the Jack Daniel's
brand. The Court finds that the balance of hardship does
not tip sharply in favor of VIP; rather, the opposite is true.
Thus, VIP has not established that the Order enjoining
VIP's sale of the "Bad Spaniels" toy, and the gathering-up
process that must be undertaken by VIP, tips the balance
of hardship sharply in its favor pending appeal.

Finally, when the Court considers the public interest,
the analysis for the issuance of an injunction requires con-
sideration whether there exists some critical public
interest that would be injured by the grant of injunctive
relief. See Independent Living Ctr. of S. Cal., Inc. v. Max-
well-Jolly, 572 F.3d 644, 659 (9th Cir. 2009), vacated and
remanded on other grounds, Douglas v. Independent Liv-
ing Ctr. of S. Cal., Inc., 565 U.S. 606 (2012). Regarding the

20a

likely public interest consequences of the injunction, "[s]uch consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139 (9th Cir. 2009).

Here, the public interest served by the permanent injunction is in the nature of preventing continued consumer confusion and deception caused by the Bad Spaniel's product.

Therefore, based on an evaluation of all the Hilton factors, VIP has failed to establish that it is entitled to a stay of the permanent injunction pending appeal. The Ninth Circuit requires the moving party to show "*both* a probability of success on the merits and the possibility of irreparable injury." Golden Gate Restaurant, 512 F.3d at 1116. There is no possibility of irreparable injury to VIP. The Court's permanent injunction will not destroy all the Bad Spaniel's dog toys, or the computer-aided design and other electronic files, or the molds from which the Bad Spaniel's product has been made; the permanent injunction enjoins the sale of the infringing/tarnishing product and only requires VIP to gather up and control the product, pending appeal, not destroy. Furthermore, VIP has failed to establish that the balance of hardship tips sharply in its favor or that the public interest favors VIP.

### III. Injunction Bond on Appeal

Rule 62(c) provides authority for issuance of an injunction bond pending appeal, "on terms that secure the opposing party's rights." Fed. R. Civ. P. 62(c). Federal case law confirms that an injunction bond requirement has several important purposes. First, an injunction bond provides a fund for the compensation of an enjoined party

21a

who may suffer from an injunction not upheld on appeal. See National Kidney Patients Assoc. v. Sullivan, 958 F.2d 1127, 1134 (D.C. Cir. 1991).  As a rule, courts presume damages against the bond if the injunction is not upheld. See Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 210 (3rd Cir. 1990).  Secondly, the bond provides the injunction holder with notice of the maximum extent of its potential liability since the amount of the bond is the limit of the damages a party can obtain for an injunction not upheld on appeal.  See Continuum Co. v. Incepts, Inc., 873 F.2d 801, 803 (5th Cir.1989) (citing Buddy Systems, Inc. v. Exer-Genie, Inc., 545 F.2d 1164, 1168 (9th Cir. 1976).

The Court's permanent injunction enjoins the sale of the infringing/tarnishing product and requires that VIP gather up all remaining Bad Spaniel's dog toys, all computer-aided design and other electronic files, and any molds from which the Bad Spaniel's product has been made.  Therefore, pursuant to Rule 62(c), the Court will require that the injunction holder, Jack Daniel's, establish an injunction bond in the amount of $50,000.

## IV. Conclusion

**IT IS HEREBY ORDERED** granting Defendant Jack Daniel's Properties Inc. a Permanent Injunction and Final Judgment against Plaintiff VIP Products LLC.

Pursuant to Fed. R. Civ. P. 52(a), the Court heard the evidence, determined the credibility of witnesses, and entered its Findings of Fact, Conclusions of Law, and Order. The Court found in favor of Defendant Jack Daniel's Properties, Inc. and against Plaintiff VIP Products, LLC on all remaining claims, namely, Jack Daniel's claims of trademark and trade dress infringement and dilution by

22a

tarnishment regarding VIP's Bad Spaniels dog toy. Pursuant to Fed. R. Civ. P. 65(d), based on VIP's violations, the Court finds that Jack Daniel's is entitled to permanent injunctive relief, as follows:

1. VIP and its agents, servants, officers, directors, owners, representatives, employees, successors, attorneys, assigns and all other persons in active concert or participation with them, or any of them, who receive actual notice of this injunction by personal service or otherwise, are hereby PERMANENTLY ENJOINED, effective as of the date of this Permanent Injunction and Final Judgment, from sourcing, manufacturing, advertising, promoting, displaying, shipping, importing, offering for sale, selling or distributing the Bad Spaniels dog toy, as depicted below:



2. By **Friday, June 22, 2018**, VIP shall remove from public viewing any and all catalogues, website pages, literature, brochures, business cards, promotional materials, advertising, T-shirts, and any other goods, products and materials depicting or bearing any other reference to VIP's Bad Spaniels product.

3. By **Friday, June 22, 2018**, VIP shall account to the Court and to Jack Daniel's as to the number of units and the location of all remaining inventory of the Bad Spaniel's toy.

23a

4. By **Friday, July 6, 2018**, VIP shall, pursuant to 15 U.S.C. § 1118 and A.R.S. § 44-1451(B)(5), gather up and control all of the remaining inventory of the Bad Spaniels toys, together with all labels, signs, prints, packages, wrappers, receptacles and advertisements bearing the trade dress of the Bad Spaniels toy, and all plates, molds, matrices and other means of making the same.

5. By **Friday, July 6, 2018**, VIP shall also gather up and control from its supplier of the Bad Spaniels product all computer-aided design and other electronic files and any molds from which such products are made.

6. By **Friday, July 20, 2018**, VIP shall file with the Court and serve on counsel for Jack Daniel's a report, in writing, under oath, setting forth in detail the manner and form in which it has complied with this injunction pursuant to 15 U.S.C. § 1116. Said report shall attest to the Court and to Jack Daniel's as to the details of the gathering up and control process of the products and materials ordered under paragraphs 4 and 5 hereof.

7. With the exception of any motion Jack Daniel's may elect to file for attorneys' fees pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117, and to any Bill of Costs to be settled by the Clerk of Court, this Permanent Injunction and Final Judgment shall finally conclude and dispose of all claims and counterclaims in this action with prejudice, and the Clerk of Court shall terminate this case.

8. The Court shall retain jurisdiction over this matter to ensure that the terms and conditions of this Permanent Injunction and Final Judgment are honored and enforced.

**IT IS FURTHER ORDERED** denying VIP Products LLC's motion to stay permanent injunction pending appeal. (Doc. 252.)

24a

**IT IS FURTHER ORDERED** setting a Fed. R. Civ. P. 62(c) Injunction Bond pending appeal in the amount of $50,000. By **Friday, May 18, 2018**, Jack Daniel's shall post the Injunction Bond with the Clerk of Court pending disposition of VIP's proposed appeal of this matter with the Ninth Circuit Court of Appeals.

**IT IS FURTHER ORDERED** denying as moot VIP Products LLC's motion for leave to reply in support of Global Objection. (Doc. 258.)

DATED this 2nd day of May, 2018.

/s/Stephen M. McNamee
Stephen M. McNamee
Senior United States District Judge

25a

## APPENDIX D

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products, LLC,<br>　　Plaintiff,<br><br>vs.<br><br>Jack Daniel's Properties,<br>Inc.,<br>　　Defendant,<br><br>_____<br><br>And Related Counterclaims.<br>_____ | ) No. CV-14-2057-PHX-<br>) SMM<br>)<br>) **FINDINGS OF FACT,**<br>) **CONCLUSIONS OF**<br>) **LAW, AND ORDER**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

In earlier proceedings, the Court resolved the parties' cross-motions for summary judgment, denying Plaintiff's motion for summary judgment, and granting Defendant's motion for partial summary judgment. (Doc. 171.) The remaining claims involve trademark and trade dress dilution under federal and state law, as well as trademark and trade dress infringement under federal and state law. (Id.)

The Court held a four-day bench trial beginning on October 2, 2017. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, having heard the evidence and determined the credibility of the witnesses, **THE COURT**

26a

**NOW FINDS BY A PREPONDERANCE OF THE EV-IDENCE THE FOLLOWING FACTS AND STATES ITS CONCLUSIONS OF LAW.**

The Court finds in favor of Defendant and against Plaintiff on all remaining claims. Consequently, the Court will grant Defendant's requests and order permanent injunctive relief.

**I.      PARTIES**

1. Plaintiff VIP Products, LLC, ("VIP") designs, manufactures, markets, and sells chew toys for dogs. VIP sells various brands of dog chew toys, including the "Tuffy's" line (durable sewn/soft toys), the "Mighty" line (durable toys made of a different material than the Tuffy's line), and the "Silly Squeakers" line (durable rubber squeaky novelty toys). (Doc. 242 at 3.) VIP is an Arizona limited liability company with its principal place of business in Phoenix, Arizona. (Docs. 49 ¶ 1; 204-1, Ex. A.) President of VIP Steven Sacra and his wife are the principal owners of VIP. (Doc. 234 at 24.) Mr. Sacra is a talented entrepreneur who developed the line of VIP dog toys. (Id. at 30-37.) His talent and creativity often lead to "of the moment" inspiration, such as toys Mr. Sacra believes are parodies of other companies' products. (See, e.g., Doc. 237 at 102.).

2. Defendant Jack Daniel's Properties, Inc. ("Jack Daniel's") is a Delaware corporation with its principal place of business in San Rafael, California. (Docs. 1 ¶ 2, 15-1 ¶ 2.)

27a

## II.    PRE-LITIGATION FACTUAL FINDINGS

3. Jack Daniel's owns and licenses the trademarks and trade dress used in connection with Jack Daniel's products. (Docs. 105; 204-1, Ex. A.)

4. Jack Daniel's Tennessee whiskey has been sold in the United States continuously since at least 1875, except during Prohibition. (Doc. 105; U.S. Trademark Reg. No. 42,663.)

5. Jack Daniel's Tennessee whiskey has borne the JACK DANIEL'S trademark and the OLD NO. 7 trademark since 1875. (Doc. 234 at 51-52 (discussing U.S. Trademark Reg. Nos. 42,663, 582,789, and 1,923,981).) Jack Daniel's federal registrations of its trademarks and trade dress for whiskey also includes Trademark Reg. No. 4,106,178 for the three-dimensional configuration of a square shape bottle container. (Doc. 12 at 7.) Jack Daniel's trade dress has included these trademarks for many decades. (Doc. 234 at 55-56, 68.)

6. Jack Daniel's has maintained an active brand licensing program for many years. (Docs. 105, Ex. 1; 234 at 68-69; 111-113.)

7. Jack Daniel's trademarks and trade dress have appeared on thousands of products other than whiskey, including food, apparel, and a limited number of pet products. (Doc. 230-16 thru 231-7.) Jack Daniel's offers branded dog leashes, collars, and dog houses. (Docs. 234 at 113, 230-9 thru 230-12.) Jack Daniel's has offered these dog accessories since before the events giving rise to this case. (Doc. 241 at 7.)

8. Initially launched in approximately 2007, VIP's Silly Squeakers line of dog toys includes a variety of toys

28a

in the shapes of beer, wine, soda, and liquor bottles. (Doc. 236 at 31-38.)

9.    Mr. Sacra's intent behind producing the Silly Squeakers line of toys was to develop a creative parody on existing products. (Id. at 45-47, 56.)  Mr. Sacra provided examples of this line of toys, including "Smella R-Crotches" a parody of Stella Artois, "Heini Sniff'n" a parody of Heineken, and "Pissness" a parody of Guinness. (Doc. 237 at 96-98.)  According to Mr. Sacra, these parodies are just harmless, clean fun, and are not distasteful or harmful. (Id. at 99.)

10.  VIP created and marketed the "Bad Spaniels" silly squeaker dog toy. (Doc. 158.)  The "Bad Spaniels" toy is in the shape of a liquor bottle and features a wide-eyed spaniel over the words "Bad Spaniels", "the Old No. 2, on your Tennessee Carpet." (Id.)  At the bottom of the "Bad Spaniels" toy, it reads:  "43% POO BY VOL." and "100% SMELLY".  On the back of the Silly Squeakers label for the "Bad Spaniels" toy, it states:  "This product is not affiliated with Jack Daniel Distillery." (Id.)

11.  VIP's intent behind designing the "Bad Spaniels" toy was to match the bottle design for Jack Daniel's Tennessee Sour Mash Whiskey ("Old No. 7 Brand"). (Doc. 157.)  These design elements include the size and shape of the product, the use of white lettering over a black background, and font styles.

12.  Mr. Sacra originally coined the name "Bad Spaniels", and then requested Designer Elle Phillips to work on the proposed design. (Doc. 236 at 55-56.)  Ms. Phillips understood that "Bad Spaniels" was a reference to "Jack Daniel's." (Doc. 233-1 at 47, 49-50.)  Ms. Phillips was familiar with that brand and had consumed Jack Daniel's

29a

Tennessee whiskey in bars and in her home. (Id. at 52-53.)

13.  Prior to starting the design for "Bad Spaniels," Ms. Phillips recalled various Jack Daniel's packaging features from memory, including "[t]he black and white label, sort of a cursive font for Tennessee, simple type," and the square shape of the bottle, as well as the use of a number on the neck label. (Id. at 53-54.)

14.  Ms. Phillips then retrieved a bottle from her liquor cabinet, examined it, and placed it on her desk while she developed a sketch. (Id. at 54-55, Docs. 104-1 at 101-02, 225-17.) She referenced the Jack Daniel's bottle "every now and then throughout the process." (Doc. 233-1 at 66-67.) Ms. Phillips wanted her sketch to be close to the same as the Jack Daniel's bottle. (Id. at 67.)

15.  When finished, the "Bad Spaniels" product featured all the elements of the Jack Daniel's Trade Dress, including the bottle shape, color scheme, and trademark stylization, as well as the word "Tennessee," and the font and other graphic elements. (Doc. 158.)

16.  "Bad Spaniels" was introduced in 2014 and in the VIP catalogs, the "Bad Spaniels" product appears in a bar setting alongside various hanging bottles, one of which can be recognized as a Jack Daniel's bottle. (Docs. 227-7 and 227-8.)

### III.    LITIGATION HISTORY

17.  After VIP introduced "Bad Spaniels," Jack Daniel's promptly demanded that it stop selling the new toy. (Doc. 47.) VIP responded by filing a complaint seeking a declaratory judgment that "Bad Spaniels" did not infringe

30a

or dilute any trademark or trade dress rights owned by Jack Daniel's. (Doc. 49 at 9-11.)

18. Subsequently, the parties filed dispositive motions. (Docs. 101, 110.)

19. In ruling on the motions, the Court ruled in favor of Jack Daniel's and against VIP, rejecting VIP's defenses of nominative and First Amendment fair use, and that VIP failed to rebut the validity of the Jack Daniel's bottle design registration. (Doc. 171.) In addition, the Court found as a matter of law that Jack Daniel's trade dress and bottle design are distinctive, not generic, and that they are nonfunctional. (Id.); see Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998) (stating that whether it be a trademark or a trade dress claim, a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion).

20. The Court left for trial the remaining issues of Jack Daniel's claim for dilution by tarnishment and Jack Daniel's claim for infringement–the remaining issue of likelihood of confusion. (Doc. 171.)

21. At this point in the litigation, VIP does not contest the validity of Jack Daniel's prior trademarks and trade dress registrations. (Doc. 242 at 33.)

## IV.    DILUTION BY TARNISHMENT

22. On October 6, 2006, the Trademark Dilution Revision Act of 2006 (the "TDRA"), was signed into law. See Pub.L. 109-312, 120 Stat. 1730 (Oct. 6, 2006). The TDRA defines dilution as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive,

31a

inherently or through acquired distinctive-
ness, shall be entitled to an injunction
against another person who, at any time af-
ter the owner's mark has become famous,
commences use of a mark or trade name in
commerce that is likely to cause dilution by
blurring or dilution by tarnishment of the
famous mark, regardless of the presence or
absence of actual or likely confusion, of com-
petition, or of actual economic injury.

15 U.S.C. § 1125(c)(1) (establishing a likelihood of dilution
standard).

23.  The phrase "likely to cause dilution" used in the
TDRA significantly changes the meaning of the law from
"causes actual harm" under the preexisting law to "likely"
or "likelihood" which means probably. See V Secret Cat-
alogue, Inc. v. Moseley, 605 F.3d 382, 388 (6th Cir. 2010).

24.  The TDRA further defines dilution by tarnish-
ment, as follows:    "For purposes of [15 U.S.C.
§ 1125(c)(1)], 'dilution by tarnishment' is association aris-
ing from the similarity between a mark or trade name and
a famous mark that harms the reputation of the famous
mark."  15 U.S.C. § 1125(c)(2)(C); Mattel, Inc. v. MCA
Records, Inc., 296 F.3d 894, 903 (9th Cir. 2002) (stating
that generally dilution "refers to the whittling away of the
value of a trademark when the mark is used to identify
different products.") (further quotation and citation omit-
ted).

25.  To prove dilution by tarnishment under the
TDRA, Jack Daniel's must prove that at least one of its
asserted trademark and trade dress rights was not only
valid but also famous before the accused use began, and

32a

that the accused use is likely to cause negative associations that harms the reputation of the famous mark.  See 15 U.S.C. § 1125(c); A.R.S. § 44-1448.01; Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 634 (9th Cir. 2008); Moab Industries, LLC v. FCA US, LLC, No. CV 12-8247, 2016 WL 5859700, *8 (D. Ariz. 2016) (stating that the "elements necessary to prove [an Arizona] state law trademark dilution counterclaim are basically identical" to federal trademark dilution claims).

### (A) Fame

26.  A trademark or trade dress is famous if "it is widely recognized by the general consuming public of the United States as a designation of source."  15 U.S.C. § 1125(c)(2)(A).  All relevant factors may be considered, including:  "the duration, extent, and geographic reach of advertising and publicity of the mark"; "the amount, volume, and geographic extent of sales of goods or services offered under the mark"; "the extent of actual recognition of the mark"; "and whether the mark [has been] registered . . . on the principal register."  15 U.S.C. § 1125(c)(2)(A)(i)-(iv); accord A.R.S. § 44-1448.01(A)(1-8).

27.  Based on the relevant fame factors, 15 U.S.C. § 1125(c)(2)(A)(i)-(iv), advertising, sales, actual recognition, and prior registration, the Court finds that Jack Daniel's trademarks and trade dress are famous and were famous before VIP introduced "Bad Spaniels" in July 2014.

28.  Regarding advertising, Jack Daniel's spent hundreds of millions of dollars to promote Jack Daniel's whiskey.  (Docs. 234 at 55-56, 59-69, 80; see also Docs. 220, Exs. 105-24; Doc. 229-5 thru 229-9, 229-13, and 229-16.)

33a

29.  Regarding sales, Jack Daniel's is the best-selling whiskey in the United States since 1997, exceeding 75 million cases and 10 billion dollars in sales.  (Doc. 234 at 48-50.)

30.  Regarding actual recognition, Jack Daniel's trademarks have been used continuously for over a century, except during Prohibition.  (Doc. 234 at 49-52.)  Jack Daniel's trademarks and trade dress have been seen by millions of Americans in movies, and television programs.  (Doc. 234 at 62-66, 68; Doc. 220, Exs. 107, 109-11, and 146.)  Jack Daniel's is prominently featured at jackdaniels.com, which was visited more than four million (4,000,000) times during 2014.  (Docs. 234 at 66; Docs. 220, Ex. 112, and 229-8.)  Jack Daniel's trade dress is prominently featured on social media pages for the brand.  (Doc. 234 at 66, Doc. 229-9.)  Based on Jack Daniel's internal records, aided consumer awareness of the Jack Daniel's brand is consistently around 98%.[1]  (Doc. 234 at 50.)

31.  Based on the foregoing, the Court finds that Jack Daniel's carried its burden of demonstrating that its trademarks and trade dress were famous before VIP's "Bad Spaniels" use began in July 2014.  Jack Daniel's trademark and trade dress were widely recognized by the general consuming public of the United States in July 2014.  Thus, Jack Daniel's established its fame under both the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8).

---

[1] Aided brand awareness measures the number of people who express knowledge of a brand or product when prompted (brand recognition).

34a

### (B) Similarity

32.  Under the TDRA's likelihood of dilution standard, in order to establish similarity in a dilution by tarnishment case, a party must show only "similarity," not substantial similarity or nearly identical, between the famous mark and the accused mark.  See Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 633 F.3d 1158, 1159 (9th Cir. 2011) (stating that "the 'identical or nearly identical' standard did not survive Congress's enactment of the TDRA.")  Now a party only must show "similarity" between the famous mark and the accused mark.  Id. at 1171.

33.  The factors under consideration for determining similarity in a dilution by tarnishment case have not been clearly defined.  See Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc., No. CV 12-1853, 2013 WL 1196948, at *11 (W.D. Wash. Mar. 25, 2013).  To resolve the question of similarity, the Court considers "the factors of appearance, sound and meaning," factors that are also relevant in evaluating infringement.  See Nordstrom, 2013 WL 1196948, at *11.

34.  Here, VIP intended and produced a dog toy that included and was similar to Jack Daniel's trademarks and trade dress.  (Doc. 241 at 13-15.)  VIP appropriated the Jack Daniel's trade dress in every aspect:  "Jack Daniel's" became "Bad Spaniels," "Old No. 7" became "Old No. 2," and "Tennessee whiskey" became "Tennessee carpet." Meanwhile, the square bottle shape, the nearly identical size of the two products, the ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and styles remain virtually unchanged.  "With a

35a

single glance . . . one is immediately struck by their similarity." <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1206 (9th Cir. 2000).

35.  VIP does not contest similarity; rather, despite some minor artistic variations, VIP concedes that it used Jack Daniel's trademarks and trade dress as a model for its "Bad Spaniels" dog toy.  (Doc. 242 at 31.)

36.  Based on the foregoing, the Court finds that Jack Daniel's established the requisite similarity between VIP's "Bad Spaniels" and Jack Daniel's trademark and trade dress.  Thus, the Court finds similarity between the two products under both the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8).

### *(C)  Reputational Harm*

37.  Finally, under the TDRA, the last factor focuses on reputational harm, that is, whether associations from VIP's "Bad Spaniels" product "harms the reputation of the famous mark," Jack Daniel's trademarks and trade dress.  <u>See</u> 15 U.S.C. § 1125(c)(2)(C).

38.  Reputational harm "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." <u>Tiffany (NJ) Inc. v. eBay, Inc.</u>, 600 F.3d 93, 111 (2d Cir. 2010) (quoting <u>Deere & Co. v. MTD Prods., Inc.</u>, 41 F.3d 39, 43 (2d Cir. 1994)).  For example, there is a strong consensus among courts across jurisdictions that a famous mark is tarnished when it is semantically associated with a new mark that it is using to sell sex-related products.  <u>See</u> <u>V Secret</u>, 605 F.3d at 388 (citing cases in support).

36a

39.  A trademark may also be tarnished if the mark loses its ability to serve as a "wholesome identifier" of the plaintiff's product.  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 110 (2d Cir. 2009) (citing Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 507 (2d Cir. 1996)).  The Second Circuit found that the relevant inquiry is how the junior mark's product affects the positive impressions about the famous mark's product, and not whether a consumer simply associates a negative sounding junior mark with the famous mark.  Starbucks, 588 F.3d at 110.

40.  Regarding reputational harm, both parties engaged experts.  The determination of an expert's credibility and the weight to be given expert testimony and evidence is a matter within the discretion of the trier of fact, which in a bench trial like the instant case, is a matter for the Court.  See Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990).  This Court decides how much weight to give the evidence and the testimony presented. Id.

41.  Jack Daniel's engaged Dr. Itamar Simonson, a Professor of Marketing at Stanford University.  (Doc. 234 at 154-62.)  Dr. Simonson, relying on consumer psychology research, concluded that VIP's introduction of "Bad Spaniels" into the marketplace resulted in Jack Daniel's trademarks and trade dress being diluted by tarnishment. (Id. at 162-74.)

42. VIP engaged Mr. Bruce Silverman, an advertising, marketing, and branding consultant for the past 40-50 years, to rebut the opinion of Dr. Simonson and his findings.  (Doc. 238 at 9-31.)

37a

*Dr. Itamar Simonson, Credentials and Findings*

43.  Dr. Simonson has served as an expert witness on numerous occasions, providing testimony on issues related to marketing, consumer behavior, trademark-related matters, false advertising, and branding.  (Doc. 234 at 161.)

44.  Dr. Simonson has conducted, supervised, or evaluated over one thousand marketing research studies.  (Id. at 155-59, 61-62.)  Such studies related to consumer behavior, consumer information processing, brand equity, trademarks, branding, marketing strategies, and advertising.  (Id.)

45.  Dr. Simonson's opinions here are supported by empirical studies in which there are two stages to establish a likelihood of dilution by tarnishment.  (Id. at 162-63.) One, whether the allegedly diluting product will bring to mind or call to mind the allegedly diluted mark, and two, assuming that the allegedly diluting product does call to mind the allegedly diluted mark, has it affected the brand equity and brand association of the allegedly diluted mark.  (Id.)

46.  The first stage was satisfied because the whole point of VIP's product was to bring "Jack Daniel's Old No. 7 to mind."  (Id. at 163.)

47.  Consumer psychology research utilized to evaluate the second stage was based on numerous empirical studies:  The Court credits that the studies relied upon by Dr. Simonson support certain conclusions that apply to all products and services regarding the impact of adding a negative association onto the association of the existing brand.  (Id.)

38a

48. The Associative Network Model has been empirically tested and verified numerous times since the 1970's. (Id. at 164-66.)  Regarding application of the Associative Network Model, the Court credits Dr. Simonson that when consumers are evaluating brands certain mental associations come to mind.  (Id. at 164.)

49.  In accordance with the Associative Network Model and based upon Dr. Simonson's review of Jack Daniel's commercials and advertisements, his understanding about the Jack Daniel's brand, and the key messages Jack Daniel's communicates regarding its brand values (namely authenticity, integrity, independence, loyalty), the Court credits Dr. Simonson's testimony of documented positive mental associations that come to mind when evaluating Jack Daniel's before VIP introduced the "Bad Spaniels" dog toy. (Doc. 234 at 169-70.)

50.  Based upon the Associative Network Model, the Court credits Dr. Simonson's conclusion regarding the effects of "Bad Spaniels" and the negative mental associations that come to mind when you include defecation, feces, and poo upon consumers who are evaluating Jack Daniel's whiskey.  (Id. at 170-72.)

51.  Dr. Simonson relied on consumer psychology research to establish that when you associate any food or beverage with defecation, you are creating disgust in the mind of the consumer with respect to that food or beverage associated with defecation.  (Id. at 172-74, 180.)  Well documented empirical research supports that the negative associations of "Old No. 2" defecation and "poo by weight" creates disgust in the mind of the consumer when the consumer is evaluating Jack Daniel's whiskey.  (Id. at 171-72.)

39a

52.  Dr. Simonson relied on consumer psychology research in his evaluation of the second phase regarding likelihood of dilution by tarnishment.  (Id.)

53.  Based on the Associative Network Model, the Court credits Dr. Simonson that the "Bad Spaniels" product is likely to tarnish the Jack Daniel's trademarks and trade dress by creating negative associations, either consciously or unconsciously, and undermining the pre-existing positive associations with its whiskey ("Old No. 2 on your Tennessee carpet").  (Doc. 234 at 172-74, 220.)

54.  The Court credits Dr. Simonson's conclusion that such negative associations are particularly harmful for a company such as Jack Daniel's because the goods it offers for sale involves human consumption and human consumption and canine excrement do not mix.  (Id. at 172-74.)  Further, because Jack Daniel's brand name along with its equity is a very important asset.  (Id. at 160.)

*Mr. Bruce Silverman, Credentials and Findings*

55.  VIP engaged its own expert, Bruce Silverman, to rebut the opinion of Dr. Simonson and his findings.  (Doc. 238 at 31.)  Mr. Bruce Silverman has been an advertising, marketing, and branding consultant for the past 40-50 years.  (Id. at 9-31.)  He has worked with companies that manufacture or produce goods and services, as well as his main work with advertising and public relations agencies.  (Id.)

56.  In West Los Angeles, Mr. Silverman arranged four focus groups[2] to test consumer reactions to "Bad

_____

[2] Focus groups are a research method whereby consumers from a target market are led through a discussion regarding a particular topic and give insight as to why and how consumers use a product or service, what is important to them in choosing a particular brand,

40a

Spaniels" which according to Mr. Silverman had an over-all favorable impression of Jack Daniel's upon discussing the "Bad Spaniels" dog toy.  (Id. at 44-50.)

57.  Mr. Silverman's reliance on the West Los Angeles focus groups is flawed because the groups were initially directed by the moderator that the product under evalua-tion, "Bad Spaniels", was a joke, a spoof product, and as a result the focus groups produced predetermined results. (Doc. 234 at 181, 183.)  This tainted the group's conclu-sions.  Moreover, Mr. Silverman did not have expertise or specialized knowledge in trademark dilution matters; ra-ther, his experience was in advertising.  (Id. at 208.)

58.  Finally, Jack Daniel's trademarks and trade dress are tarnished by associating them with toys, particularly the kind of toys that might appeal to children.  (Doc. 238 at 96-97, 110-11.)  The Court finds that while an associa-tion with toys may not ordinarily cause reputational harm, Jack Daniel's is in the whiskey business, and does not market to children, does not license goods for children, and does not license goods that might appeal to children. (Id.)

59.    Here, the Court credits and gives prevailing weight to Dr. Simonson's specialized knowledge and spe-cific expertise in consumer psychology to evaluate and conclude a likelihood of dilution by tarnishment regarding the effect of the "Bad Spaniels" dog toy upon the Jack Daniel's trademarks and trade dress.  (Doc. 234 at 172-74, 184-87; see Eastman Kodak Co. v. Rakow, 739 F. Supp. 116, 118 (W.D.N.Y. 1989) (stating that it does not matter whether this association is humorous or intended as such

what they like and don't like about various products or services, and any special needs they might have that aren't being satisfied.

41a

and enjoining use of the stage name KODAK by a stand-up comedian); Grey v. Campbell Soup Co., 650 F. Supp. 1166, 1175 (C.D. Cal. 1986) (enjoining use of DOGIVA and CATIVA as harmful to Campbell's GODIVA business reputation because of the negative association the public makes between Godiva's premium quality food products and animal treats); Steinway & Sons v. Robert Demars & Friends et al., 210 U.S.P.Q. 954 (C.D. Cal. 1981) (enjoining sale of clip-on beverage can handles under the name STEIN-WAY, finding that such association will inevitably tarnish Steinway's reputation and image with the public as sponsoring only products of taste, quality and distinction); see generally Chemical Corp. of Am. v. Anheuser–Busch, Inc., 306 F.2d 433, 436-38 (5th Cir. 1962) (enjoining use of "Where there's life ... there's bugs!" slogan); Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc., 642 F. Supp. 1031, 1039 (N.D. Ga. 1986) (tarnishment "occurs when a defendant uses the same or similar marks in a way that creates an undesirable, unwholesome, or unsavory mental association with the plaintiff's mark").

60.  Accordingly, Dr. Simonson established that, the "Bad Spaniels" product is likely to tarnish the Jack Daniel's trademarks and trade dress by creating negative associations, either consciously or unconsciously, and undermining the pre-existing positive associations with its whiskey ("Old No. 2 on your Tennessee carpet").  (Doc. 234 at 172-74, 220.)  This negative association is particularly harmful for a company such as Jack Daniel's because the goods it offers for sale involves human consumption and human consumption and canine excrement do not mix.  (Id. at 172-74.)

61.  The Court further finds that dilution by tarnishment will occur due to Jack Daniel's trademarks and trade

42a

dress being associated with toys, particularly the kind of toys that might appeal to children; Jack Daniel's is in the whiskey business and its reputation will be harmed due to the negative mental association of evoking whiskey with children, something Jack Daniel's has never done. (Id. at 96-97, 110-11.)

62.  Thus, under the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8), Jack Daniel's has established the requisite reputational harm to its trademarks and trade dress as a result of VIP's creation and introduction of "Bad Spaniels" into the pet toy market.

### (D) Conclusion–Dilution by Tarnishment

63.  The Court finds that Jack Daniel's established by a preponderance of the evidence all the requisite elements for dilution by tarnishment: fame, similarity, and reputational harm, caused by VIP's "Bad Spaniels" against Jack Daniel's trademark and trade dress under both the federal TDRA and Arizona state law, A.R.S. § 44-1448.01(A)(1-8).

## V.    TRADEMARK/TRADE DRESS INFRINGE-MENT

64.  Whether a trademark or trade dress claim, Jack Daniel's must meet three elements in order to establish infringement:  (1) distinctiveness; (2) nonfunctionality, and (3) the likeliness of confusion.  See Kendall-Jackson, 150 F.3d at 1047.

65.  This Court previously ruled as a matter of law that Jack Daniel's trademarks and trade dress are distinctive and nonfunctional.  The issue remaining at trial is likelihood of consumer confusion.  (Doc. 171.)

43a

66.  To prevail on its trademark and trade dress infringement claims under federal and state law, Jack Daniel's must show ownership, meaning that at least one of its asserted rights was valid before VIP's alleged infringing use began, and VIP's use caused a "likelihood of confusion."  See 15 U.S.C. §§ 1114, 1125(a); Brookfield Comm'ns v. West Coast Entm't Corp., 174 F.3d 1036, 1046 n.8 (9th Cir. 1999); Kendall-Jackson, 150 F.3d at 1047; Angel's Gate Inc. v. All-Star Grand Canyon Tours Inc., No. CV 12-8181, 2013 WL 12114580, *2 (D. Ariz. 2013) ("Because Arizona's trademark infringement statute mirrors the Lanham Act, 15 U.S.C. § 1125(a), cases interpreting the Lanham Act guide the interpretation of A.R.S. § 44-1451.")

67.  Here, the Court found that Jack Daniel's asserted rights are senior and valid because they have appeared on the Principal Register of the United States Patent and Trademark Office since before VIP's use began.  (See Docs. 224-25); 15 U.S.C. §§ 1057(b), 1115(a); see Brookfield, 174 F.3d at 1047.  Furthermore, all the asserted rights are conclusively senior and valid pursuant to the provisions of 15 U.S.C. § 1065.

68.  At issue is whether VIP's "Bad Spaniels" product caused a "likelihood of confusion" about the source of the product.  Pursuant to AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979), in the Ninth Circuit "likelihood of confusion" is assessed by weighing the following eight non-exclusive factors, often referred to as the Sleekcraft factors:  the strength of the plaintiff's mark; the proximity or relatedness of the goods; the similarity of the parties' marks; evidence of actual confusion; marketing channels used; the type of goods and degree of care likely to be exercised by the buyer; the defendant's intent in

44a

adopting the junior mark; and likelihood of expansion of the parties' product lines.  Id.

69.  "The Sleekcraft factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." Network Automation, Inc. v. Advanced Sys. Concepts, 638 F.3d 1137, 1145 (9th Cir. 2011).  "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." Brookfield, 174 F.3d at 1054.

70.  In some cases, a small number of the factors carry great weight in assessing the likelihood of confusion.  See Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998) (stating that "[t]he [Sleekcraft] factors should not be rigidly weighed; we do not count beans.").  "Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion." Id. (internal citation omitted).

71.  Utilizing the Sleekcraft factors, likelihood of consumer confusion may be established by (1) forward confusion or (2) reverse confusion.  See JL Beverage Co., LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1106 (9th Cir. 2016).  "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." Id. (further citation omitted).  Reverse confusion, on the other hand, "occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." Id.

### (A)  Actual Confusion

72.  Regarding proof of actual confusion, in the Ninth Circuit, proof of "actual confusion is not necessary to a finding of likelihood of confusion." Academy of Motion

45a

Picture Arts and Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991); accord, Sleekcraft, 599 F.2d at 353.

73.  Instances of actual confusion in the marketplace are often difficult to find, particularly where, as here, the sales volume of the accused product is small and the marketing is thin.  "[D]ifficulties in gathering [such] evidence of actual confusion makes its absence generally unnoteworthy."  Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1077 (9th Cir. 2006) ("In this case, which involves a national market and a low degree of consumer care, nothing suggests that the lack of evidence of confusion should be particularly noteworthy.").

74.  "[T]he cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution."  Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1405 (9th Cir. 1997) (further citation omitted).

75.  In lieu of marketplace evidence of actual confusion, courts regularly accept the results of properly-designed consumer surveys as surrogate evidence of actual confusion.  See Playboy Enter., Inc. v. Netscape Commc'n Corp., 354 F.3d 1020, 1026 n.28 (9th Cir. 2004) (stating that "[s]urveys are commonly introduced as probative evidence of actual confusion.")

76.  Both parties engaged experts on the issue of likelihood of confusion and both experts testified via deposition.  (Docs. 233-2 (Ford) and 233-3 (Nowlis).).

77.  Jack Daniel's engaged the late Dr. Gerald Ford to conduct a likelihood of confusion survey regarding the two products, the Jack Daniel's Tennessee whiskey bottle,

46a

with its trademarks and trade dress, and VIP's "Bad Spaniels" product. (Doc. 233-2 at 18-19.)

78. VIP engaged Dr. Stephen Nowlis to rebut the likelihood of confusion survey conducted by Dr. Ford. (Doc. 233-3.)

*Dr. Gerald Ford, Credentials and Findings*

79. Until his death in 2015, Dr. Ford was engaged in commercial marketing research and consulting for 40 years. (Doc. 230-3 at 2.) Over the past 40 years, Dr. Ford has been qualified and accepted as an expert in marketing and marketing research in more than 60 trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board. (Id. at 33-35.)

80. Dr. Ford was retained by a variety of firms. (Id.) Approximately one-half of his engagements involved the design and execution of marketing research surveys. (Id.) Dr. Ford designed and executed surveys relating to intellectual property matters, including trademark, false advertising, patent, and other related matters. (Id.) Dr. Ford was familiar with accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls. (Id.)

81. In this matter, Dr. Ford designed an internet survey to measure whether the "Bad Spaniels" product is likely to confuse consumers. (Id. at 3.) Dr. Ford's internet survey utilized the Ever-Ready[3] survey format, described

___

[3] See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 382 (7th Cir. 1976); J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:174 (4th ed. 2017)("McCarthy") (stating that the Ever-Ready survey format has become a widely accepted format for likelihood of confusion surveys).

47a

as the prevailing standard when conducting a likelihood of confusion survey.  (Doc. 235 at 7-8.)

82.  Dr. Ford conducted a double-blind survey, meaning that not only is the interviewer unaware of the purpose of the survey, the interviewing firm is also unaware, and also the supervisor who instructs the interviewers is unaware of the purpose or the sponsor of the survey.  (<u>Id.</u> at 8, Doc. 230-3 at 6.)  In addition, the responding consumers were not informed that this was being done for this or that company.  (Doc. 230-3 at 6.)  Dr. Ford's designed internet survey.  (<u>Id.</u>)

83.  The stimuli Dr. Ford utilized in his survey's test cell were photographs of VIP's "Bad Spaniels" dog toy.  (Doc. 230-3 at 4.)  The stimuli Dr. Ford utilized in his survey's control cell were photographs of a fictitious dog toy bearing the "Bad Spaniels" name, with none of the claimed Jack Daniel's indicia or trade dress.  (<u>Id.</u>)

84.  After viewing these photographs, all responding consumers were asked a series of open-ended and non-leading questions about who had made, sponsored, or approved the product pictured.  (<u>Id.</u> at 13-18.)

85.  In the results of Dr. Ford's survey, over 29% of those in the test cell—who had been shown the "Bad Spaniels" product—identified Jack Daniel's in response as to who had made, sponsored, or approved the product pictured.  (<u>Id.</u> at 19-30.)  By contrast, almost none of those in the control cell—who had been shown the fictitious dog toy—identified Jack Daniel's in response to these questions.  (<u>Id.</u> at 31.)

86.  The Court credits and gives prevailing weight to Dr. Ford's conclusion that "approximately twenty-nine

percent . . . of potential purchasers . . . are likely to be confused or deceived by the belief that Plaintiff's Bad Spaniels dog toy is made or put out by Jack Daniel's, or made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out Plaintiff's dog toy has a business affiliation or business connection with Jack Daniel's, and that such confusion is due in particular to Plaintiff's use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy." (Id. at 4, 33.)

87. The Court credits that Dr. Ford's survey establishes likelihood of confusion in this case. The survey followed the Ever-Ready format, considered the prevailing standard for trademark survey research in cases involving strong marks. See E&J Gallo v. Proximo Spirits, Inc., No. CV 10-411, 2012 WL 273076, at *5 (E.D. Cal. Jan. 30, 2012); accord McCarthy, § 32:174 (stating that the Ever-Ready survey format has become a standard and widely-accepted format).

88. Dr. Ford's survey results that 29% of potential purchasers were likely confused is nearly double the threshold to show infringement. (Doc. 230-3 at 19-30); see McCarthy, § 32:188 n.4 (collecting cases); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 594 (3d Cir. 2002) ("15% confusion is sufficient to demonstrate actual confusion"); James Burroughs Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976) (15% confusion "evidences a likelihood of confusion.").

*Dr. Stephen Nowlis, Credentials and Findings*

89. VIP hired Dr. Stephen Nowlis to prepare an expert rebuttal report regarding the likelihood of confusion survey conducted by Dr. Ford. (Doc. 128, and admitted at

49a

trial as Ex. 256, Doc. 221 at 5.)  Dr. Nowlis holds a Ph.D. in Marketing and a Master's degree in Business Administration (MBA) from the University of California at Berkeley.  (Doc. 128.)

90.  Although Dr. Nowlis objected to Dr. Ford's control stimulus, Dr. Nowlis did not support this view by conducting a survey or by conducting independent research; he simply couched his opinion regarding lack of confusion through generalized objections to Dr. Ford's report.

91.  Therefore, the Court does not credit Dr. Nowlis's generalized objections.  Moreover, the Court finds that Dr. Nowlis has never written any articles on trademark surveys, or trademark survey design, or on the issue of likelihood of confusion in trademark law which undercuts his opinions.  (Doc. 233-3 at 14.)

92.  The Court rejects VIP's assertion that Jack Daniel's was somehow obligated to establish actual confusion which Sleekcraft does not require.  (Doc. 242 at 26.)

93.  VIP did not commission or disclose a survey of its own.

94.  Based on the foregoing, the actual confusion factor strongly favors Jack Daniel's.

### (B)  VIP's Intent

95.  It is undisputed that in designing and marketing "Bad Spaniels," VIP's intent was to copy the Jack Daniel's trademarks and trade dress for the purpose of parody. (Doc. 233-1 at 56-57, 62, 66-67; Doc. 242 at 29.)

96.  VIP's intent was to capitalize on Jack Daniel's goodwill.

50a

97.  Dr. Ford's survey establishes a very high rate of consumer confusion regarding the source of the products.

98.  Thus, the intent factor favors Jack Daniel's.

### (C) Parody

99.  A defendant's claim of parody will be disregarded where the purpose of the similarity is to capitalize on a famous mark's popularity for the defendant's own commercial use.  See Grey, 650 F. Supp. at 1175.

100.  Here, VIP's intent was clear that it sought to capitalize on Jack Daniel's popularity and good will for its own gain, and therefore its claim of parody is disregarded.

### (D) Similarity

101.  Regarding the factor of similarity between the two marks, "[t]he greater the similarity between the two marks . . . the greater the likelihood of confusion." GoTo.com, 202 F.3d at 1206.  For a similarity evaluation, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is analyzed in terms of appearance, sound, and meaning; and third, the similarities between the products are weighed more heavily than differences.  Id. (citation and quotation omitted).

102.  Considering a mark in its entirety and how it appears in the marketplace requires consideration of the mark as a parody product.  A junior mark must "conjure up the original . . . for there to be a parody at all." Tommy Hilfiger Licensing v. Nature Labs, 221 F. Supp. 2d 410, 417 (S.D.N.Y. 2002).

103.  Here, VIP intended to produce a dog toy that included and was similar to Jack Daniel's trademarks and trade dress so that its "Bad Spaniels" dog toy would call

51a

to mind Jack Daniel's Tennessee whiskey. VIP appropriated the Jack Daniel's Trade Dress in every aspect: "Jack Daniel's" became "Bad Spaniels," "Old No. 7" became "Old No. 2," "Tennessee whiskey" became "Tennessee carpet." Meanwhile, the square bottle size and shape, ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and styles remain virtually unchanged.

104. Various retailers that sell Jack Daniel's licensed merchandise also sell VIP's "Bad Spaniels" product, including Walmart, Amazon.com, and Boozingear.com. (Doc. 237 at 135-37, 231-19, 231-21.)

105. VIP cannot dispel confusion with a disclaimer, particularly a disclaimer in tiny font on the reverse side of its product packaging. See E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 n.6 (9th Cir. 1992) (disclaimer had no significant impact). "Courts have been justifiably skeptical of such devises—particularly where exact copying is involved." Au-Tomotive Gold, 457 F.3d at 1077.

106. Based on this evidence, the Court finds that there is the requisite similarity between the two products and also how they appear in the marketplace causes a likelihood of confusion about the source of the products. Thus, the similarity factor favors Jack Daniels.

### (E) Strength

107. Regarding the factor of the strength of the Jack Daniel's trademarks and trade dress, "[t]he stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." La Quinta Worldwide LLC v. Q.R.T.M. SA de CV,

52a

762 F.3d 876, 874 (9th Cir. 2014); "The more 'famous' and 'well known' a [trade] mark, the greater the likelihood that use on noncompetitive products will cause confusion." McCarthy, § 24:49.

108.  Here, Jack Daniel's asserted trademark and trade dress protection are extremely strong:  the Jack Daniel's trademarks have been used continuously for over a century, except during Prohibition (Doc. 234 at 49-52); Jack Daniel's Tennessee whiskey has been the best-selling whiskey in the United States since 1997 (id.); and between 1997 and April 30, 2015, Jack Daniel's whiskey sales in the United States exceeded seventy-five million (75,000,000) cases of various sizes, and resulting revenues exceeded ten billion dollars ($10,000,000,000) (id. at 50).

109.  According to Jack Daniel's internal records, aided consumer awareness of the Jack Daniel's brand is consistently around 98%.  (Doc. 234 at 50.)

110.  Taken together, this is compelling evidence of strength.  Thus, the strength factor strongly favors Jack Daniel's.

### (F) Proximity/Relatedness

111.  Regarding the factor of proximity and relatedness of the goods, related goods are those "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." Sleekcraft, 599 F.2d at 348 n.10.

112.  Here, the parties' goods can be said to be related. Jack Daniel's licensed its trademark and trade dress rights for use with certain dog products.  (Doc. 234 at 113.) VIP's "Bad Spaniels" dog toy is a related pet product to Jack Daniel's dog leashes, dog collars, and dog houses.

53a

See International Kennel Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079, 1089 (7th Cir. 1988) (dog shows and dog toys related); (Docs. 230-9 thru 230-12.)

113.   Although Jack Daniel's is primarily a producer and seller of whiskey, the consuming public observes Jack Daniel's trademarks and trade dress on a wide variety of merchandise, from prepared meats to barbeque sauces, from cigarette lighters to belt buckles and cufflinks, and from charcoal to clothing, due to an extensive and long-running licensing program.  (Docs. 230-16 thru 231-7.)

114.   Thus, the "relatedness of goods" factor favors Jack Daniels regarding likelihood of confusion about the source of the products.

### (G)  Marketing Channels

115.   Regarding marketing channels, "[m]arketing channels can converge[,] even when different submarkets are involved[,] so long as 'the general class[es] of . . . purchasers exposed to the products overlap.'"  Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1130 (9th Cir. 2014) (quoting Sleekcraft, 559 F.2d at 353).

116.   "Bad Spaniels" and Jack Daniel's merchandise are not only sold to the same class of purchasers, but also in some of the same stores, such as Walmart, Amazon.com, and Boozingear.com.  (Doc. 237 at 135-137, 231-19, 231-21.)  Moreover, VIP has also promoted an association by featuring Jack Daniel's Tennessee whiskey in its marketing materials for the "Bad Spaniels" dog toy.  (Docs. 231-19, 231-21.)

117.   Thus, for these reasons, the marketing channels factor tips in favor of Jack Daniel's.

54a

### (H) Consumer Degree of Care

118.  "[L]ow prices imply correspondingly low consumer care."  Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., 778 F.3d 1059, 1070-71 (9th Cir. 2015).

119.  "[P]urchasers are unlikely to bother to inform the trademark owner when they are confused about [the source of] an inexpensive product."  See Beer-Nuts v. Clover Club Foods Co., 805 F.2d 920, 928 (10th Cir. 1986); AuTomotive Gold, 457 F.3d at 1077.

120.  Consumers are not likely to exercise significant care and attention when purchasing the "Bad Spaniels" product due to its retail value of approximately $15.  Although the price of "Bad Spaniels" may be expensive as a dog toy, $15, because its relative price is not expensive, consumers are more likely to be confused as to the source of the product.  See Playboy, 354 F.3d at 1028 (stating that the lack of significant consumer care increases the likelihood of confusion).

121. Based on this evidence, the consumer care factor also favors Jack Daniel's.

### (I) Product Line Expansion

122.  Finally, regarding the likelihood of expansion of the parties' product lines, when parties in trademark cases do not offer goods or services in the same field, this factor assesses their likelihood of doing so.

123.  "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing."  Network Automation, 638 F.3d at 1153 (further citation omitted).

55a

### *(J)  Conclusion – Likelihood of Confusion*

124.  Upon applying the <u>Sleekcraft</u> factors to the facts of this matter and giving them due weight, there is a likelihood of consumer confusion and thus trademark and trade dress infringement under both federal law, 15 U.S.C. §§ 1114, 1125(a), and A.R.S. § 44-1451.

## VI.    ENTITLEMENT TO INJUNCTIVE RELIEF

125.  Having prevailed on its trademark and trade dress claims, Jack Daniel's is entitled to an injunction "subject to the principles of equity."  15 U.S.C. §§ 1025(c)(1), 1116(a).

126.  According to the principles of equity, a claimant must demonstrate:  (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships tips in its favor; and (4) that the public interest would not be disserved by a permanent injunction.  <u>eBay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).  "Injunctive relief is the preferred remedy in trademark infringement . . . cases because there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."  <u>Century 21 Real Estate Corp. v. Sandlin</u>, 846 F.2d 1175, 1180 (9th Cir. 1988).

127.  Jack Daniel's merits a permanent injunction in this case.  The "Bad Spaniels" product has caused a likelihood of confusion and reputational harm.  Thus, permitting continued infringement and tarnishment of the Jack Daniel's trademarks and trade dress imposes a significant hardship on Jack Daniel's, but would not impose a legitimate hardship on VIP.  Finally, a permanent injunction will serve the public interest by preventing continued consumer confusion.

56a

## VII.   CONCLUSION

On the basis of the foregoing,

**IT IS HEREBY ORDRERED** finding in favor of Defendant and against Plaintiff on all remaining claims. Plaintiff is liable on all claims asserted by Defendant in this case.

**IT IS FURTHER ORDERED** that Defendant is directed to file a proposed form of injunction by **Friday, February 23, 2018.**

**IT IS FURTHER ORDERED** denying as moot Defendant's Fourth and Fifth Motions in Limine. (Docs. 194, 195.)

DATED this 29th day of January, 2018.


/s/Stephen M. McNamee
Stephen M. McNamee
Senior United States District Judge

57a

## APPENDIX E

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF ARIZONA**

| | |
|---|---|
| VIP Products, LLC,<br>        Plaintiff,<br><br>vs.<br><br>Jack Daniel's Properties,<br>Inc.,<br>        Defendant,<br><br>_____<br><br>And Related Counterclaim.<br>_____ | ) No. CV-14-2057-PHX-<br>) SMM<br>)<br>) **MEMORANDUM OF**<br>) **DECISION AND ORDER**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Pending before the Court is Plaintiff VIP Products, LLC's ("VIP") motion for summary judgment. (Doc. 110.) VIP contends that it is entitled to judgment as a matter of law on its Amended Complaint that contains three claims for declaratory relief. (Id.) VIP further contends that it is entitled to judgment as a matter of law on all of the claims that Defendant Jack Daniel's Properties Inc.'s ("JDPI") brought as Counterclaims in its Answer. (Id.) The matter is fully briefed.

Also pending is JDPI's motion for partial summary judgment. (Doc. 101.) At issue, JDPI moves for partial summary judgment regarding VIP's second and third claims. (Id.) The matter is fully briefed.

58a

Finally, there are pending motions associated with the parties' cross-motions for summary judgment, which are also fully briefed.

The Court will deny VIP's motion for summary judgment, grant JDPI's motion for partial summary judgment, and resolve all of the pending motions associated with the parties' cross-motions for summary judgment.[1] The Court will set a status hearing for the parties in order to discuss the remaining matters that must be adjudicated at trial.

## FACTUAL BACKGROUND

The Court will summarize the basic factual background here. In its discussion of the particular claims, the Court will discuss certain relevant and material facts that arise in conjunction with those particular legal claims at issue.

VIP designs, manufactures, markets, and sells chew toys for dogs. VIP sells various brands of dog chew toys, including the "Tuffy's" line (durable sewn/soft toys), the "Mighty" line (durable toys made of a different material than the Tuffy's line), and the "Silly Squeakers" line (durable rubber squeaky novelty toys). (Doc. 110 at 2.) In July of 2013, VIP introduced its latest novelty dog toy, the "Bad Spaniels" durable rubber squeaky novelty dog toy. (Doc. 158.) The Bad Spaniels toy is in the shape of a liquor bottle and features a wide-eyed spaniel over the words "Bad Spaniels, the Old No. 2, on your Tennessee Carpet."

---

[1] Both parties have requested oral argument. Based on the parties' extensive legal memoranda and submitted supporting evidence, the Court will not set oral argument on the parties' cross-motions as it would not aid the Court's decisional process. See e.g., Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

59a

(Id.)  The design for the Bad Spaniels toy has many simi-larities to the bottle design for Jack Daniel's Tennessee Sour Mash Whiskey ("Old No. 7 Brand").  (Doc. 157.) These similarities include the shape of the product, the use of white lettering over a black background, and font styles.  Nevertheless, on the back of the Silly Squeakers packaging for the Bad Spaniels toy, it states:  "This prod-uct is not affiliated with Jack Daniel's."  (Doc. 158.)

JDPI promptly demanded that VIP stop selling the new toy.  (Doc. 47.)  VIP responded by filing this suit seek-ing a declaratory judgment.  (Doc. 49.)  In Claim 1, VIP alleged that its use of the Bad Spaniels' name and trade-mark does not infringe or dilute any claimed trademark rights that JDPI may claim in its Jack Daniel's trademark for its Tennessee sour mash whiskey and/or any other product.  (Id. at 9.)  In Claim 2, VIP alleged that neither the Jack Daniel's trade dress nor the Jack Daniel's bottle design are entitled to trademark protection because they are functional; they contain merely ornamental and deco-rative features; they are generic; and they are non-distinctive.  (Id. at 9-10.)  In Claim 3, VIP alleges that Jack Daniel's bottle design is not entitled to Patent and Trade-mark Office ("PTO") registration because it is functional, generic, and non-distinctive.  (Id. at 10-11.)  The PTO reg-istration states that JDPI's trademark consists of a three-dimensional configuration of the square shaped bottle container for the goods having an embossed signature de-sign comprised of the words, "Jack Daniel."  (Doc. 49 at 5.)  VIP contends that JDPI's trademark registration should be cancelled.  (Id. at 10-11.)

In response, JDPI answered VIP's complaint and filed nine separate counterclaims:  (1) Infringement of JDPI's federally-registered trademarks and trade dress under

60a

the Lanham Act, 15 U.S.C. § 1114, 1116-18; (2) Trade dress infringement in violation of federal law, 15 U.S.C. § 1114, 1116-18 and 1125; (3) Dilution by tarnishment of the JDPI trademarks under 15 U.S.C. § 1125(c); (4) Dilution by tarnishment of the Jack Daniel's trade dress under 15 U.S.C. § 1125(c); (5) Trademark infringement in violation of Arizona law, A.R.S. §§ 44-1451 et seq.; (6) Infringement of the JDPI trademarks and unfair competition at common law; (7) Infringement of the Jack Daniel's trade dress at common law; (8) Dilution of the JDPI trademarks under A.R.S. § 44-1448.01; and (9) Dilution of the Jack Daniel's trade dress under A.R.S. § 44-1448.01. (Doc. 12.)

JDPI alleged in its Answer that it owns a trade dress consisting of a combination of square bottle with a ribbed neck, a black cap, a black neck wrap closure with white printing bearing the OLD NO. 7 mark, and a black front label with white printing and a filigreed border bearing the JACK DANIEL'S trademark depicted in arched lettering at the top of the label, the OLD NO. 7 trademark contained within a filigreed oval design in the middle portion of the label beneath the JACK DANIEL'S trademark, and the words "Tennessee Sour Mash Whiskey" in the lower portion of the label with the word "Tennessee" depicted in script. (Doc. 12 at 5 ¶ 6; see also Doc. 101 at 9.)

VIP has moved for summary judgment contending that JDPI's infringement and dilution claims be denied because the defenses of nominative and First Amendment fair use shield it from liability. (Doc. 110.) VIP further argues that even if those defenses do not apply, VIP is still entitled to summary judgment on all claims because JDPI

61a

cannot prove its dilution claims under the Trademark Dilution Revision Act ("TDRA"); as to JDPI's infringement claims, that Jack Daniel's Tennessee Whiskey ("JDTW") trademarks and bottle dress are functional and non-distinctive. (Id. at 3, 15-28.)

JDPI moves for partial summary judgment on VIP's Amended Complaint. (Doc. 101.) As to Claim 1, JDPI leaves for trial the issue of whether VIP's alleged parody infringes or dilutes the Jack Daniel's trademarks and trade dress. (Id. at 7.) As to Claims 2 and 3, JDPI acknowledges that it bears the burden of proof regarding the protectability of its Jack Daniel's trade dress. (Id.) JDPI disputes that the Jack Daniel's trade dress and the trademark shown in United States Trademark Registration No. 4,106,178 (See Doc. 12 at 7) are functional, contain merely ornamental and decorative features that do not function as trademarks, are generic, and are non-distinctive. (Doc. 101 at 6.)

## STANDARD OF REVIEW

### *Summary Judgment*

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a) A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S.

62a

242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may not rest upon the mere allegations or denials of the party's pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. Anderson, 477 U.S. at 247-48.

*General Trademark Principles*

"A trademark is a limited property right in a particular word, phrase or symbol." New Kids on the Block v. News Am. Publ'n, Inc., 971 F.2d 302, 306 (9th Cir. 1992).

63a

"Throughout the development of trademark law, the purpose of trademarks remained constant and limited: Identification of the manufacturer or sponsor of a good or the provider of a service.[]  And the wrong protected against was traditionally equally limited:  Preventing producers from free-riding on their rivals' marks."  Id. at 305.  "[T]he holder of a trademark will be denied protection if it is (or becomes) generic, i.e., if it does not relate exclusively to the trademark owner's product."  Id. at 306.

To state an infringement claim, whether it be a trademark claim or a trade dress claim, a plaintiff must meet three basic elements:  (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion.  Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998).

*General Trade Dress Principles*

"Trade dress refers generally to the total image, design, and overall appearance of a product."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 765 n.1 (1992).  It may include the packaging, the "dress" of a product or the design of a bottle.  See Fiji Water Co. v. Fiji Mineral Water U.S., LLC, 741 F. Supp. 2d 1165, 1172-74 (C.D. Cal. 2010).  A product's trade dress or packaging is protectable under trademark law so long as the trade dress is nonfunctional and distinctive.  See Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 210 (2000); Kendall-Jackson, 150 F.3d at 1047.  "[T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive."  Kendall-Jackson, 150 F.3d at 1050.

64a

The trade dress of a product is "distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992). Broadly speaking, trade dress is inherently distinctive if it is so "unique, unusual, or unexpected in this market that one can assume without proof that it will automatically be perceived by consumers as an indicator of origin[.]" Fiji Water, 741 F. Supp. 2d at 1176 (citing Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1344 (C.C.P.A. 1977)). Trade dress may also acquire distinctiveness through secondary meaning, that is, when the trade dress "'has come through use to be uniquely associated with a specific source.'" Two Pesos, 505 U.S. at 766 n.4 (quoting Restatement (Third) of Unfair Competition § 13 (1995)).

The trade dress of a product is functional if the trade dress is essential to the use or purpose of the product or affects the cost or quality of the product. See Disc Golf Ass'n v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998). The Ninth Circuit utilizes four factors to consider whether a product feature is functional: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. See Disc Golf, 158 F.3d at 1006. No one factor is dispositive; all are to be weighed collectively. See International Jensen, Inc. v. Metrosound U.S., Inc., 4 F.3d 819, 823 (9th Cir. 1993).

Alternatively, under the aesthetic functionality test, trade dress may be functional if "protection of the [trade

65a

dress] as a trademark would impose a significant non-reputation related competitive disadvantage." <u>Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.</u>, 457 F.3d 1062, 1072 (9th Cir. 2006) (citing <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 32-33 (2001)).  This means that trade dress is aesthetically functional when it "serve[s] an aesthetic purpose wholly independent of any source-identifying function, or in other words, where the consumer is driven to purchase the product based on how it looks." <u>Fiji Water</u>, 741 F. Supp. 2d at 1173 (further quotation and citation omitted).

## DISCUSSION

The Court will first discuss VIP's motion for summary judgment.  (Doc. 110.)

### I. VIP's Defenses

VIP first contends that all of JDPI's counterclaims for infringement and dilution must be denied because VIP's defenses of nominative fair use and First Amendment fair use shield it from liability.  (Doc. 110 at 3.)

#### *Nominative Fair Use*

Trademark law recognizes a defense where a registered trademark is used only "to describe the goods or services of a party, or their geographic origin.  <u>See</u> <u>New Kids</u>, 971 F.2d at 306.  "The 'fair use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." <u>Id</u>. (further citation omitted).

To establish nominative fair use, first, "the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the

66a

mark or marks may be used as is reasonably necessary to identify the product or service;[] and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." Id. at 308.

VIP argues that its product constitutes nominative fair use of the JDTW Marks and Bottle Dress because: (1) the JDTW Marks and Bottle Dress are not readily identifiable without using several of their elements. Given the medium of the parody, a three-dimensional dog toy, VIP argues that it had to utilize several key components of the JDTW Marks and Bottle Dress; (2) VIP used only so much of the JDTW Marks and Bottle Dress that were reasonably necessary to identify the bottle. VIP otherwise states that it did not specifically use any of JDPI's registered marks; and (3) VIP did nothing to suggest that JDPI had sponsored or endorsed the VIP Product. (See Doc. 110 at 4.)

JDPI contends that the nominative fair use defense does not apply because this defense only applies where a defendant uses the plaintiff's identical mark or trade dress. (Doc. 142 at 10-11.) Here, VIP did not identically use JDPI's trademarks or trade dress. (Id.) According to JDPI, the nominative fair use doctrine applies only "where a defendant has used the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal is to describe his own product," citing Cairns v. Franklin Mint Co., 292 F.3d 1139, 1151 (9th Cir. 2002) (finding that it was necessary for the defendant to use the name and likeness of Princess Diana to refer to its "Diana-related" merchandise). (Doc. 142 at 10-11.)

67a

The Court does not find that VIP is entitled to be shielded from liability based on its nominative fair defense. VIP's Bad Spaniels toy closely imitates the Jack Daniel's Trade Dress and marks, but it did not use any of JDPI's registered marks, including the Jack Daniel's name; the number 7; the embossed Jack Daniel's' signature on the bottle; the same filigree design on the label; the three-sided body label, or the identical combination of elements constituting the trade dress. Under the New Kids test, when a defendant uses a trademark nominally, the trademark will be identical to the plaintiff's mark, at least in terms of the words in question. 971 F.2d at 308. As further stated in Playboy Enter., Inc. v. Welles, 279 F.3d 796, 801 (9th Cir. 2001), it is the defendant's very use of the plaintiff's identical trademark that makes the nominative fair use analysis necessary rather than application of AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) which utilizes eight factors to focus on the similarity of the trademarks used by the plaintiff and the defendant in order to determine liability for likelihood of confusion in the marketplace. Because it is undisputed that VIP did not use JDPI's identical marks or trade dress in its Bad Spaniels toy, the nominative fair use doctrine does not apply as matter of law.

*First Amendment Fair Use*

Next, VIP argues that JDPI's infringement and dilution claims must fail because VIP's Bad Spaniels' parody use of the JDTW Marks and Bottle Dress is protected speech under the First Amendment. (Doc. 110 at 6.) VIP states that its dog toy parody qualifies as an expressive work under the First Amendment. (Id.) VIP argues that in order to qualify as "expressive use," first a defendant must have used the mark "beyond its source-identifying

68a

function" (Id. at 6 (citing Mattel Inc. v. MCA Records, Inc., 296 F.3d 894, 900 (9th Cir. 2002)), and second, its parody form of expression must not be part of a commercial transaction. (Id. at 6-7, (citing Nissan Motor Co. v. Nissan Comput. Corp., 378 F.3d 1002, 1017 (9th Cir. 2004)).)

JDPI contends that VIP's dog toy is not entitled to protection under the First Amendment. (Doc. 142 at 13.) In MCA Records, 296 F.3d at 902, JDPI states that the Ninth Circuit adopted the Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989), standard for determining the balancing of interests between trademark law and the First Amendment. According to JDPI, the Rogers standard applies to artistic or expressive works and requires courts to construe trademark law only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. Rogers, 875 F.2d at 999. Because the VIP dog toy is not an artistic or expressive work, JDPI contends that the Rogers balancing test is not applicable. (Doc. 142 at 14-15.) Rather, JDPI contends that the VIP dog toy falls into those cases construing parody products–cases which have uniformly applied the standard trademark likelihood of confusion analysis. (Id.)

The Court finds that VIP's dog toy is not entitled to protection under the First Amendment because it is not an expressive work. See Brown v. Elec. Arts, Inc., 724 F.3d 1235 (9th Cir. 2013) (stating that the Rogers test is reserved for expressive works). In Rogers, the court dealt with the intersection of trademark law and the title of a motion picture. 875 F.2d at 997. The Rogers court went on to find that movies, plays, books, and songs are works of "artistic expression" and thus subject to the balancing between trademark law and the protections of the First Amendment. Id.; see also E.S.S. Entm't 2000 Inc. v.

69a

Rock Star Videos, Inc., 547 F.3d 1095, 1099 (9th Cir. 2008) (stating that the Rogers balancing test only applies to artistic works).  Although Rogers dealt with a motion picture; the Ninth Circuit has also applied the Rogers balancing test to a song (MCA Records), photographs (Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003), and video games (E.S.S. and Brown).

In this case, the Court finds that the standard trademark likelihood of confusion analysis, not Rogers, is appropriate.  See Sleekcraft Boats, 599 F.2d at 348-49 (establishing the eight factors applicable to likelihood of confusion analysis).  Under likelihood of confusion principles, confusion exists where there is a likelihood that an appreciable number of ordinary prudent purchasers will be misled or confused as to the source of goods, or where consumers are likely to believe that the trademark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the trademark.  Id.  Based on the facts here, the First Amendment affords no protection to VIP because it is trademark law that regulates misleading commercial speech where another's trademark is used for source identification in a way likely to cause consumer confusion.  See Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 415 (S.D.N.Y. 2002) (refusing First Amendment protection to "Timmy Holedigger" an alleged parody "dog perfume" in favor of the owner of the Tommy Hilfiger trademarks for clothing).  Here, as was similarly the case in Tommy Hilfiger, VIP is using an adaptation of the Jack Daniel's trademark and trade dress for the dual purpose of making an alleged expressive comment as well as the commercial selling of a non-competing product.  See Tommy Hilfiger, 221 F. Supp. 2d at 415.  The Court agrees with the analysis in

70a

<u>Tommy Hilfiger</u> that because the adaptation of the Jack Daniel's trademark and trade dress mark are being used, at least in part, to promote a somewhat non-expressive, commercial product, the First Amendment does not extend to such use.  <u>See id.</u> at 415-16.

In conclusion, the Bad Spaniels dog toy is not an expressive work for purposes of the application of the <u>Rogers</u> test because VIP makes trademark use of its adaptations of JDPI's trademarks and the Jack Daniel's trade dress to sell a commercial product, its novelty dog toy.  The novelty dog toy is not an expressive work like those to which the <u>Rogers</u> test has been applied in the Ninth Circuit.  In this case, where the adaptation of the Jack Daniel's trademark and trade dress were engaged for the dual purpose of making an alleged expressive comment as well as the commercial selling of a non-competing product, the First Amendment does not establish protection.

## <u>II.  VIP's Motion for Summary Judgment Re: JDPI's Counterclaims for Trade Dress Infringement</u>

In JDPI's Answer to VIP's Complaint for Declaratory Judgment, JDPI asserted nine counterclaims against VIP. (Doc. 12.)  In five of those claims, JDPI asserted either trademark or trade dress infringement. (<u>Id.</u>)  In the other four claims, JDPI asserted trademark and trade dress dilution. (<u>Id.</u>)  In VIP's motion for summary judgment, it alleged entitlement to summary judgment on each of JDPI's counterclaims. (Doc. 110.)  As a threshold matter, VIP contended that it is entitled to summary judgment on all of JDPI's counterclaims because the nominative fair use defense and the First Amendment fair use defense shield it from liability. (<u>Id.</u> at 3.)

71a

The Court has found that neither nominative fair use nor First Amendment fair use provides a defense for VIP. Consequently, the Court turns to the merits of VIP's arguments that it is entitled to summary judgment.

*Infringement Claims*

To state an infringement claim, whether it be a trademark claim or a trade dress claim, a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion. See Kendall-Jackson, 150 F.3d at 1047. VIP alleges that the bottle dress of the Jack Daniel's Tennessee whiskey bottle and the "Jack Daniel" embossed signature bottle design lacks distinctiveness and is functional. (Doc. 110 at 15-28.)

*Lack of Distinctiveness*

*Generic*

VIP first argues that JDPI has not proven that the JDTW bottle dress is a source identifier for Jack Daniel's whiskey. Rather, VIP argues that the JDTW bottle dress is only a generic identifier of Kentucky Bourbon/Tennessee Whiskey, not Jack Daniel's whiskey in particular. (Doc. 110 at 18.) In order for JDPI to prove that its JDTW bottle dress is not generic, VIP argues that JDPI must show more than a subordinate meaning that applies to its trade dress. (Id.) It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. (Id.)

JDPI contends that VIP's expert, Martin Wolinsky, has already conceded that the JDTW bottle dress is not generic, but a source identifier for Jack Daniel's whiskey. (See Doc. 104-5 at 23, Deposition of Martin Wolinsky ("Q:

72a

Do you consider the Jack Daniel's packaging to be generic? . . . A: I do not consider the Jack Daniel's package to be generic.")

The Court finds that the JDTW bottle dress is a source identifier for Jack Daniel's whiskey. The JDTW bottle dress is a combination bottle and label elements. It includes the Jack Daniel's and Old No. 7 word trademarks. (See Doc. 12 at 5, ¶6.) Under Kendall-Jackson, the inquiry is not whether individual features of the trade dress are nondistinctive, but whether the whole collection of features taken together are nondistinctive. See 150 F.3d at 1050. No reasonable trier of fact could find that the JDTW Bottle Dress, as a "whole collection of features taken together," id., including the Jack Daniel's and Old No. 7 trademarks, merely serves as an identifier for any Kentucky Bourbon/Tennessee Whiskey. The Court finds that the JDTW Bottle Dress is a source identifier for Jack Daniel's whiskey; it is not generic as a matter of law.

### Inherent Distinctiveness

Next, VIP argues that JDPI's infringement counterclaims fail because it cannot prove that the JDTW bottle dress is inherently distinctive. (Doc. 110 at 18, 21-23.) JDPI acknowledges that its JDTW bottle dress is not inherently distinctive. (Doc. 142 at 30.)

### Acquired Distinctiveness-Secondary Meaning

Next, VIP argues that JDPI's infringement counterclaims fail because it cannot prove that the JDTW Bottle Dress has acquired distinctiveness through secondary meaning. (Doc. 110 at 23-28.) In support, VIP contends that JDPI has not established any direct evidence of acquired distinctiveness through secondary meaning. (Id. at 24.) Further, VIP contends that JDPI's circumstantial

73a

evidence is also lacking. (Id. at 25-28.) VIP argues that although JDPI relies on extensive sales and advertising, extensive consumer recognition, billions of dollars in revenue, and allegedly being one of the most iconic consumer products in American history, JDPI has failed to substantiate these vague claims with actual, probative evidence. (Id.) Accordingly, VIP contends that the JDTW bottle dress has not acquired distinctiveness through secondary meaning. (Id.)

In support of acquired distinctiveness through secondary meaning, JDPI contends that it has both direct and circumstantial evidence in support. Regarding direct evidence, JDPI contends that VIP intentionally copied aspects of the JDTW bottle dress. (Doc. 142 at 31-32.) JDPI also contends that Dr. Gerald Ford's likelihood of confusion survey is directly probative of secondary meaning. (Id. at 32-33.) In further support, JDPI contends that its circumstantial evidence is probative of secondary meaning. (Id. at 33-37.) JDPI cites the success of its advertising, it being the best-selling US whiskey for almost 20 years, and significant media exposure of its overall product packaging. (Id.)

*Secondary Meaning-Direct Evidence*

"[A] mark has acquired distinctiveness, . . . if it has developed secondary meaning, which occurs when 'in the minds of the public the primary significance of a [mark] is to identify the source of the product rather than the product itself." Wal-Mart, 529 U.S. at 211. "It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or

74a

package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." <u>TrafFix Devices</u>, 532 U.S. at 28.

The Court finds that JDPI has established direct evidence of secondary meaning. VIP admits that it intentionally copied the JDTW bottle dress, and that it did so precisely to enable consumers to instantly recognize Jack Daniel's whiskey as the "target" of the Bad Spaniels alleged parody. (<u>See</u> Doc. 110 at 2 (VIP stating that it designed the Bad Spaniels dog toy to be a comical parody of a Jack Daniel's whiskey bottle).) VIP's copying of the identifiable parts of the JDTW bottle dress was indisputably an attempt to capitalize and free ride upon the success of Jack Daniel's existing secondary meaning. In this case, intentional copying by VIP supports an inference of secondary meaning. <u>See</u> <u>Vision Sports v. Melville Corp.</u>, 888 F.2d 609, 615 (9th Cir. 1989) (stating that proof of copying strongly supports an inference of secondary meaning); <u>Lisa Frank, Inc. v. Impact Int'l, Inc.</u>, 799 F. Supp. 980, 989 (D. Ariz. 1992) (same). Thus, JDPI has established direct evidence of secondary meaning.

Next, the Court also finds that JDPI has established circumstantial evidence of acquired distinctiveness through secondary meaning. Between 1997 and 2015, sales of Jack Daniel's whiskey in the United States exceeded 75 million cases, and advertising expenditures were in the hundreds of millions of dollars. (Doc. 105 at 1-6.) The sales, advertising, and public exposure of JDTW is greater than the facts that established secondary meaning in <u>Fiji Water</u>. Between 1997, when FIJI water was

75a

first sold, and 2010, Fiji sold nearly 65 million cases world-wide and expended more than $65 million in advertising. 741 F. Supp. 2d at 1177. JDTW has been sold and advertised in the Jack Daniel's Trade Dress for more than 30 years longer than FIJI water. (See Doc. 106 at 1-6, Docs. 106-1 through 106-4.) Between 1997 and April 30, 2015, JDPI states that total unit sales of JDTW in the United States in various sizes exceeded 75 million units, resulting in revenues exceeding ten billion dollars. (Doc. 105 at 1-6.) JDPI further states that the vast majority of these sales were in packaging bearing the Jack Daniel's Trade Dress. (Id.)

Furthermore, VIP admits that through JDPI's advertising it has created significant customer recognition of Jack Daniel's whiskey. (See Doc. 104-2 at 34, Deposition of Stephen Sacra, Chief Executive Officer of VIP, "Q: Do you agree that the Jack Daniel's trademark is very well known in the United States? . . . A: I think that Jack Daniel's is more recognizable than other brands. But they've spent a lot of money to make that recognition.") Mr. Sacra further acknowledged that "the success of the Bad Spaniels toy "comes from the fact that people are familiar with Jack Daniel's . . . and have seen it before, and will get the parody." (Id.) Based on all of the above, the Court finds that JDPI's circumstantial evidence also demonstrates acquired distinctiveness through secondary meaning.

Thus, JDPI has established acquired distinctiveness through secondary meaning both with direct and circumstantial evidence. Therefore, VIP's motion for summary judgment regarding JDTW bottle dress's lack of distinctiveness will be denied.

76a

*Nonfunctionality*

To state an infringement claim, whether it be a trademark claim or a trade dress claim, JDPI must establish the element of nonfunctionality. VIP argues that the JDTW bottle is functional; JDPI contends otherwise.

*Utilitarian Functionality*

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 164 (1995). The Ninth Circuit asks four questions to test utilitarian functionality: (1) whether the trade dress yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. See Disc Golf, 158 F.3d at 1006. No one factor is dispositive; all are to be weighed collectively, that is, whether the whole collection of elements are functional. See International Jensen, 4 F.3d at 822-23. Given the functionality doctrine's underlying purpose, the Ninth Circuit applies it with somewhat less force in product packaging cases, as opposed to cases involving product configuration. See Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1261 (9th Cir. 2001) (stating that a wide range of available packaging and design options allows a producer to appropriate a distinctive identity without unduly hindering his competitor's ability to compete).

In support of JDTW bottle dress's utilitarian functionality, VIP makes two arguments: (1) that its features are

77a

"essential to the use or purpose of the article [or] affects [its] cost or quality" citing <u>Inwood Labs. v. Ives Labs., Inc.</u>, 456 U.S. 844, 850, n.10 (1982); and (2) based on VIP's expert John Howard's report, VIP argues that the Jack Daniel's embossed-signature bottle design is one of the several utilitarian features used in the JDTW bottle dress. (Doc. 116 at 85-95.) VIP contends that because JDPI has not offered controverting testimony, other than the opinions of interested parties (i.e., JDPI employees), this design feature is clearly functional under <u>Disc Golf</u>. (Doc. 110 at 16.)

JDPI responds that the JDTW bottle dress reflects aesthetic design choices and embodies branding features that focus on the historical identification of the product, and that such are wholly unrelated to utility. (Doc. 142 at 25 (citing Doc. 101 at 20-22 in support of lack of utilitarian functionality).) JDPI states that it only seeks to protect the square "shape of the bottle, together with aesthetic elements" of the JDTW bottle dress, nothing more. (Doc. 101 at 20.) JDPI contends that its advertising does not tout any utilitarian advantage of the JDTW bottle design, rather, its advertising focuses on the quality and history of JDTW. (<u>Id.</u>) Finally, JDPI contends that its JDTW bottle dress is not a comparatively simple or inexpensive method of manufacture, given its manufacture of a square bottle and the use of an embossed signature on all four sides of the bottle. (<u>Id.</u> at 27-28.)

Based on VIP's arguments regarding utilitarian functionality of the JDTW bottle dress, the Court finds that VIP is not entitled to summary judgment. The Court notes that based on the four factors set forth in <u>Disc Golf</u>, VIP chose not to address how each factor supports its contention that the JDTW bottle dress is functional. <u>See</u>

78a

International Jensen, 4 F.3d at 822-23 (stating that the four factor review considers whether the whole collection of product packaging are functional).

Initially, the Court finds that JDPI's advertising does not tout any utilitarian advantage of the JDTW bottle design, rather, its advertising has focused on the quality and history of JDTW. (Doc. 105 at 4, 105-2 at 1-116.) VIP's expert, John Howard, acknowledged that advertising for Jack Daniel's whiskey did not tout any utilitarian advantages of the Jack Daniel's bottle design. (Doc. 104-4 at 64-65.)

Next, the Court must look at product packaging as a whole, with a particular focus on whether JDPI's particular integration of the various elements on the packaging leaves competitors with commercially-feasible alternatives. See Clicks Billiards, 251 F.3d at 1261 (explaining that utilitarian functionality in packaging-type cases evaluates whether the "particular integration of elements leaves a multitude of alternatives to [competitors in the] industry that would not prove confusingly similar"). As shown in Doc. 104-7 at 22, 24, and admitted by VIP (See Doc. 104-7 at 5, 22, 24, and 30-31), there are many, many alternative trade dresses available for use by the competition for whiskey. VIP acknowledged that some companies use elements of the Jack Daniel's trade dress, including a square bottle, and graphic features such as filigree and arched lettering, but none combine all of these elements together with the other elements of the Jack Daniel's trade dress. (See Doc. 104-3 at 17-18.) "Since competitors routinely use alternative designs in packaging their [whiskey], protecting the particular combination

79a

of elements in the [Jack Daniel's] packaging will not hinder competition in the [spirits] industry." Fiji Water, 741 F. Supp. 2d at 1174.

Based on the foregoing, VIP has not demonstrated that it is entitled to summary judgment that the JDTW Bottle Dress has utilitarian functionality.

*Aesthetic Functionality*

"[P]urely aesthetic product features may be protected as a trademark where they are source identifying and are not functional." Au-Tomotive Gold, 457 F.3d at 1064. Under the aesthetic functionality test, trade dress may be functional if "protection of the [trade dress] as a trademark would impose a significant non-reputation-related competitive disadvantage." Id. at 1072. In practice, aesthetic functionality thus has been limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function. Id. (stating that there was no evidence that consumers buy Auto Gold's products solely because of their intrinsic aesthetic appeal; instead the alleged aesthetic function is indistinguishable from and tied to the mark's source-identifying nature–Audi and VW Logos).

VIP argues that in order to evaluate aesthetic functionality, the Court should utilize the comparable-alternatives test or the effective-competition test. (Doc. 110 at 17-18.) Regarding the comparable-alternatives test, VIP argues that the focus is on the existence of feasible alternative designs, meaning how difficult it would be for JDTW's competitors to compete in the market if they were precluded from using the JDTW's design, and were instead required to transition to a new design, citing

80a

competitive use of square bottles. (<u>Id.</u> at 17.) Next, regarding the effective-competition test, VIP argues that the focus is on whether a particular design feature is a pre-requisite for market participation. If, for whatever reason, the cost of protection renders JDTW's competitors unable to compete in the relevant market, then the feature is not protectable, citing the square bottle, black-and-white label, number designation, arched text, and filigree design. (<u>Id.</u> at 18.)

JDPI cites to <u>Au-Tomotive Gold</u> as the proper Ninth Circuit standard and its holding that aesthetic functionality inquires into whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. 457 F.3d at 1072. In response to VIP, JDPI contends that its competitor's trade dress demonstrates that multiple comparable alternatives exist and are in use, and that the use of the combination of features in the JDTW bottle dress for decades has had, and will have, no impact on the ability of competitors to use individual features, singly or in part-combination. (Doc. 142 at 27.) JDPI further contends that "[s]ince competitors routinely use alternative designs in packaging their [whiskey], protecting the particular combination of elements in the [Jack Daniel's] packaging will not hinder competition in the [spirits] industry" (<u>Id.</u> at 28 (quoting <u>Fiji Water</u>, 741 F. Supp. 2d at 1174).)

The Court agrees with JDPI; based on the submitted evidence, the Court first finds that VIP is not entitled to summary judgment based on the argument that consumers buy Jack Daniel's Tennessee Whiskey because of its intrinsic aesthetic appeal. <u>See Au-Tomotive Gold</u>, 457 F.3d at 1073. Rather, as the court stated in <u>Fiji Water</u>,

81a

"[c]onsumers do not buy [whiskey] based on how its packaging looks, but rather on how the [whiskey] tastes or how much it costs." Fiji Water, 741 F. Supp. 2d at 1174.

As to JDTW's packaging, "[s]ince competitors routinely use alternative designs in packaging their [whiskey], protecting the particular combination of elements in the [Jack Daniel's] packaging will not hinder competition in the [spirits] industry" Id. Rather, the combination of the trademarks and the aesthetic elements merely source-identify JDTW bottle dress as JDTW.

*Lack of Confusion*

The Court has found that VIP is not entitled to summary judgment regarding the first two elements of JDPI's counterclaim regarding trade dress infringement, rejecting VIP's contention that the JDTW bottle dress is functional and non-distinctive. VIP's motion for summary judgment fails to argue lack of confusion. (Doc. 110.) In its reply in support of summary judgment, VIP reiterated that it need not undertake an analysis of the Sleekcraft likelihood of confusion factors in its motion for summary judgment because VIP is not required to rebut confusion in order to receive protection under the fair use defenses. (Doc. 163 at 7.)[2]  However, in this case, the Court has rejected VIP's nominative and First Amendment fair use defenses.

---

[2] Although VIP argues the Sleekcraft factors in its Reply (Doc. 163 at 8-10), the Court will not consider arguments raised for the first time in a Reply. "It is well established that issues cannot be raised for the first time in a reply brief." Gadda v. State Bar of Cal., 511 F.3d 933, 937 n.2 (9th Cir. 2007). The Court need not belabor the point that VIP could have raised alternative arguments regarding Sleekcraft in its motion for summary judgment; it chose not to raise such arguments.

82a

Under Sleekcraft, the Court analyzes eight factors to determine likelihood of confusion:  (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) VIP's intent in selecting the mark; and (8) likelihood of expansion of the product lines.  See 599 F.2d at 348-49.

The material facts are construed in favor of the non-moving party, JDPI.  JDPI contends that there are material facts in its favor from which a reasonable trier of fact could find for JDPI on its infringement claims under Sleekcraft.  JDPI argues that it established VIP's intentional copying of various aspects of its trade dress, the close similarity between the Bad Spaniels' trademark and trade dress to the Jack Daniel's trademarks and trade dress, and the longstanding and extensive sales, advertising, and public exposure of Jack Daniel's whiskey.

In general, likelihood of confusion is often a fact-intensive inquiry, and therefore courts are reluctant to decide this issue at the summary judgment stage.  See Au-Tomotive Gold, 457 F.3d at 1075.  The Court finds that VIP is not entitled to summary judgment on the likelihood of confusion element regarding JDPI's counterclaims for trade dress infringement.

### III.  VIP's Motion for Summary Judgment RE: JDPI's Counterclaim for Trade Dress Dilution

On October 6, 2006, the Trademark Dilution Revision Act of 2006 (the "TDRA"), was signed into law.  See Pub.L. 109–312, 120 Stat. 1730 (Oct. 6, 2006).  The TDRA defines dilution as follows:

83a

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

In JDPI's Answer to VIP's Complaint, it raised four counterclaims related to dilution: dilution by tarnishment of JDPI's trademarks under federal law; dilution by tarnishment of Jack Daniel's trade dress under federal law; and trademark and trade dress dilution under Arizona law. (Doc. 12 at 3-21.)

VIP claims that it is entitled to summary judgment on Jack Daniel's trade dress dilution claim under federal law because: (1) the alleged Jack Daniel's trade dress is not "famous" under the TDRA; (2) the VIP Product is not similar enough to the Jack Daniel's trade dress to dilute; (3) the VIP Product is not likely to cause dilution by tarnishment; and (4) even if JDPI were able to meet its burden under the TDRA, VIP is not liable for dilution by tarnishment because VIP's Product is exempted by TDRA's fair-use provision. (Doc. 110 at 9.)

JDPI initially notes that VIP only challenges one of its dilution counterclaims, its Jack Daniel's trade dress dilution by tarnishment claim under federal law. (Doc. 142 at

84a

19; <u>see</u> Doc. 12 at 16-17 and at 5 ¶ 6) (picturing Jack Dan-
iel's trade dress.))  JDPI responds that VIP's challenge to
this claim is without merit.  (Doc. 142 at 9.)

### Federal Trade Dress Dilution-Tarnishment

The TDRA provides for injunctive relief for dilution
by tarnishment claims under 15 U.S.C. § 1125(c)(1).  The
TDRA further defines dilution by tarnishment, as follows:
"For purposes of [15 U.S.C. § 1125(c)(1)], 'dilution by tar-
nishment' is association arising from the similarity
between a mark or trade name and a famous mark that
harms the reputation of the famous mark."  15 U.S.C.
§ (c)(2)(C).

### VIP's Fair Use Defense

Under the TDRA, VIP claims its parody product,
which satirizes JDPI's product, is not actionable under an
anti-dilution statute because of its fair use defense.  (Doc.
110 at 15.)

JDPI claims that VIP's argument is without merit un-
der the TDRA.  (Doc. 142 at 24.)  Under the TDRA,
§ 1125(c)(3)(A) provides an exclusion for liability for
"[a]ny fair use . . . other than as a designation of source for
the person's own goods or services, including use in con-
nection with . . . (ii) parodying . . . ."  Thus, according to
JDPI, "[u]nder the statute's plain language, parodying a
famous mark is protected by the fair use defense only if
the parody is not 'a designation of source for the person's
own goods or services'."  (Doc. 142 at 24-25 (quoting <u>Louis
Vuitton Malletier S.A. v. Haute Diggity Dog LLC</u>, 507
F.3d 252, 266 (4th Cir. 2007)).)  JDPI contends that the
fair use exclusion was not available to the defendant in
<u>Louis Vuitton</u> because the defendant used its parody dog
toy, Chewy Vuitton, as a trademark to designate the

85a

source.  (Id. at 25 (citing Louis Vuitton, 507 F.3d at 267).)
In the same manner, JDPI states that the fair use defense
is not applicable here because VIP uses its Bad Spaniels
trademark and trade dress as source identifiers of its dog
toy.

The Court finds that the language of the statute and
its application in Louis Vuitton is directly applicable here
and compel the result that the fair use defense is not avail-
able to VIP and its alleged parody product.  See Louis
Vuitton, 507 F.3d at 267.  Under the facts here, VIP did
use its Bad Spaniels trademark and trade dress as source
identifiers of its dog toy, which takes its alleged parody
product outside the fair use defense under the TDRA.

*Fame of Jack Daniel's Trade Dress*

On the merits, VIP challenges Jack Daniel's trade
dress dilution by tarnishment claim under the FDRA.
VIP alleges that Jack Daniel's trade dress, separate and
apart from the possible fame of the JDTW trademarks, is
not famous, that is, not being widely recognized by the
general consuming public as a designation of the source of
the goods of the trademark's owner.  (Doc. 110 at 9-10.)
According to VIP, Jack Daniel's trade dress is not famous
enough to support its dilution claim because Jack Daniel's
trade dress is not a source identifier.  (Id. at 10 (citing the
competition's use of many of the same design elements in
their trade dresses, especially the use of square bottles).)

VIP further alleges that Jack Daniel's trade dress is
not famous due to lack of actual recognition.  According to
VIP, the only direct evidence JDPI presented to show na-
tional fame is the Ford Survey, but Dr. Gerald Ford
admitted that his survey did not test for fame.  (Id. at 11.)
Further, VIP argues that even if the Ford Survey had

86a

tested for fame, it would not be probative because the survey respondents were not representative of the general consuming public in the United States. (Id.)

With regard to the factors listed at 15 U.S.C. § 1125(c)(2)(A)(i)-(iv), VIP alleges that JDPI's advertising and promotional evidence is not probative because it is not specific to Jack Daniel's trade dress. (Id. at 12.) Regarding sales, VIP alleges that without evidence of actual consumer recognition, the evidentiary value of Jack Daniel's Tennessee whiskey's sales is non-existent. Regarding federal registration, VIP alleges that JDPI must prove that its unregistered trade dress is famous, independent of its registered trade marks. (Id.)

JDPI responds that in analyzing trade dress for all purposes, the focus is "not on the individual elements, [like square bottles,] but rather the overall visual impression that the combination and arrangement of those elements create." Clicks Billiards, 251 F.3d at 1259. JDPI argues that Jack Daniel's trade dress as a whole is widely recognized by the general consuming public as a designation of the source of the goods of the trademark's owner, that is, that it is a source identifier for Jack Daniel's Tennessee whiskey.

Regarding lack of direct evidence of fame, JDPI contends that all relevant factors should be considered including indirect evidence of fame such as advertising or sales. According to JDPI, evidence of actual recognition of fame, such as a survey, is not required. JDPI contends that based upon VIP's deliberate copying, the undisputed success of sales, advertising, and public exposure of Jack Daniel's Tennessee Whiskey, which is packaged in the

87a

Jack Daniel's trade dress, provide sufficient indirect evidence from which a reasonable trier of fact could find the fame of the Jack Daniel's trade dress.

The Court determines that a reasonable trier of fact could find that Jack Daniel's trade dress as a whole serves as a source identifier for Jack Daniel's Tennessee Whiskey. See Clicks Billiards, 251 F.3d at 1259 (stating the Clicks Billiards could claim as its mark the particular combination and arrangement of design elements that distinguish it from others using the same concept); see also Wal-Mart, 529 U.S. at 215 (stating that overall product packaging is the typical form of trade dress and it normally is taken by the customer to indicate orgin).

Next, based on consideration of the statutory factors, see 15 U.S.C. § 1125(c)(2)(A)(i)-(iv), it is undisputed that the sales, advertising, and public exposure of Jack Daniel's whiskey packaged in the Jack Daniel's trade dress provide substantial indirect evidence of fame. Between 1997 and 2015, sales of Jack Daniel's whiskey packaged in the Jack Daniel's trade dress exceeded 75 million cases in the United States, yielding revenues in excess of $10 billion dollars and advertising expenditures in the hundreds of millions of dollars (Doc. 101 at 15); cf. Mattel Inc. v. MGA Ent. Inc., 782 F. Supp. 2d 911, 942 (C.D. Cal. 2011) (finding that MGA had presented no evidence, direct or indirect, of the fame of its trade dress); Vallavista Corp. v. Amazon.com, Inc., 657 F. Supp. 2d 1132, 1138-39 (N.D. Cal. 2008) (finding that the limited evidence of use, coupled with very modest sales and advertising expenditures, was insufficient to prove fame); Clearly Food & Bev. Co. v. Top Shelf Bevs., Inc., No. CV 13-1763, 2015 WL 1926503, *17 (W.D. Wash. Apr. 28, 2015) (finding that the product bearing the allegedly famous mark had been out

88a

of production for six years, only negligible sales were still occurring, and the defendant's survey showed very low recognition of the mark). Thus, as a whole, the Court determines that a reasonable trier of fact could find that Jack Daniel's trade dress is famous. (See Doc. 12 at 5 (picturing Jack Daniel's trade dress at ¶ 6).)

### VIP's Motion to Exclude Testimony of JDPI's Expert, Dr. Itamar Simonson

Prior to the Court's resolution of the remaining elements of JDPI's dilution by tarnishment claim, VIP moves to exclude the report and the testimony of JDPI's dilution expert, Dr. Itamar Simonson. (Doc. 92.) According to VIP, JDPI's expert purports to opine on the issue of whether, and how, consumers associate VIP's product with JDPI's product and whether that association dilutes JDPI's trade dress by harming its reputation. (Id.) VIP contends that Dr. Simonson's reported opinion is lacking in both methodology and conceptual support that would permit admissibility as a scientific expert opinion. (Id. at 2.) In further support of exclusion, VIP argues that Dr. Simonson does not qualify as an "experienced-based" expert because an experience-based expert is someone with relevant real world experience, not someone who fails to follow scientific methodology. (Id. at 3.) Based on Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Fed. R. Evid. 702, VIP contends that the Court should exercise its gatekeeping function and deny admissibility to both Dr. Simonson's report and his testimony at trial. (Id.)

JDPI contends that the opinions and testimony of its dilution expert, Dr. Itamar Simonson, should be admitted. (Doc. 96.) According to JDPI, Dr. Simonson has been retained as an expert witness to testify regarding the

89a

implication(s) of the association between the Bad Spaniels toy and Jack Daniel's whiskey on JDPI's trade dress and trademarks and the meaning of the mark/brand to consumers. (<u>Id.</u> at 6.)

In summary of Dr. Simonson's expert report (Doc. 96 at 3 (citing Doc. 92-1)), JDPI states that Dr. Simonson will assist the finder of fact by discussing the following at trial:

1) The basics of consumer behavior and "how marks such as famous trade dress are represented in memory." (Doc. 92-1 at 4, 7–9);

2) The basics of the "associative network memory model" which are accepted by experts in the consumer behavior field. (<u>Id.</u> at 4–5);

3) The application of the "associative network memory model" to the instant case. (<u>Id.</u> at 10–12); and

4) The conclusion that VIP's Bad Spaniels toy causes negative implication for JDPI's trade dress and marks and thus is likely to tarnish them. (<u>Id.</u> at 10–14.)

JDPI contends that Dr. Simonson's report and testimony are admissible and will assist the trier of fact because Dr. Simonson is eminently qualified to provide his expert opinions and because his opinions are relevant and reliable based upon his specialized knowledge. (Doc. 96 at 2.) JDPI argues that its dilution expert is not required to quantify findings through prescribed "scientific" methodology, rather, his conclusions may be based on his specialized knowledge and principles that are accepted within his relevant area of expertise. (<u>Id.</u> at 2-3 (citing <u>Hangarter v. Provident Life & Acc. Ins. Co.</u>, 373 F.3d 998, 1017 (9th Cir. 2004) (stating that the <u>Daubert</u> factors (peer review, publication, error rate, etc.) are not

90a

applicable to expert testimony whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it).)

In opposition to Dr. Simonson's exclusion, JDPI further cites Visa Int'l Serv. Ass'n v. JSL Corp., No. CV 01-294, 2006 WL 3248394, at *3-4 (D. Nev. Nov. 7, 2006), in which the Nevada District Court admitted Dr. Itamar Simonson as a dilution expert and allowed his expert testimony based on his presentation of "specialized knowledge evidence" rather than scientific evidence.[3]

The Court will deny VIP's motion to exclude Dr. Simonson and allow the admissibility of Dr. Simonson's report and his expert testimony to assist the trier of fact. Rule 702 is to be applied with a liberal thrust favoring admission. See Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1196 (9th Cir. 2014).

Under Daubert, the Court is required to maintain a gatekeeping role regarding all forms of expert testimony, not just scientific testimony. See White v. Ford Motor Co., 312 F.3d 998, 1007 (9th Cir. 2002). With regard to non-scientific testimony, the Court is required to make some kind of reliability determination to fulfill its gatekeeping function. See Hangarter, 373 F.3d at 1018. Under United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000), the court admitted expert testimony on gang behavior based on the expert's extensive personal knowledge of street gangs. In exercising its gatekeeping function regarding expert specialized knowledge cases,

---

[3] The Visa court found it uncontested that no scientific method exists for determining whether actual dilution of a trademark occurred. Id. at *3.

91a

the <u>Hankey</u> court set forth six factors to evaluate in determining admissibility: (1) whether the opinion is based on scientific, technical, or other specialized knowledge; (2) whether the opinion would assist the trier of fact in understanding the evidence or determining a fact in issue; (3) whether the expert has the appropriate qualifications to render the opinion; (4) whether the testimony is relevant and reliable; (5) whether the methodology or technique used fits the conclusions; and (6) whether the opinion's probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

Dr. Simonson is a recognized expert in consumer behavior. In <u>Visa</u>, the court concluded that Dr. Simonson's opinion as an expert would not be excluded based on the following:

> Dr. Simonson, himself, is the Sebastian S. Kresge Professor of Marketing at the Stanford University Graduate School of Business and a recognized expert on consumer behavior. He has won multiple awards for his scholarship and research in the fields of marketing and consumer behavior. He relied on surveys conducted by Visa in 2000, his own validation survey, studies of on-line payments from 2000 to 2001, and his own personal expertise to reach the conclusions in his opinion. The court considers these sources and Dr. Simonson's methodology to satisfy the requirements of reliability and proper methodology for this type of evidence. In

92a

> addition, the court considers Dr. Simon-
> son's qualifications sufficient to render him
> an expert in the subject at hand. Finally,
> the court does not see any prejudice arising
> out of the use of Dr. Simonson's opinion and
> therefore finds that the probative value of
> Dr. Simonson's opinion is not substantially
> outweighed by the potential for prejudice,
> confusion of the issues or undue consump-
> tion of time.

<u>Visa</u>, 2006 WL 3248394, at *3-4.

The Court finds that Dr. Simonson's opinions regard-ing consumer behavior are not technical and therefore his report and testimony can be found reliable based on his knowledge and experience alone. The Court does not agree that post-<u>Daubert</u> expert opinion requires the per-formance of surveys, focus groups, studies or other real world tests or that <u>Daubert</u> would preclude an expert from applying his expertise to the facts of the case. Experience, training and education may provide a sufficient foundation for an expert's testimony. <u>See</u> <u>Hangarter</u>, 373 F.3d at 1018.

On the basis of the foregoing, the Court will deny VIP's motion to exclude the report and the testimony of JDPI's dilution expert, Dr. Itamar Simonson.

### *Similarity Requirement*

Next, VIP alleges that JDPI cannot show that the VIP Product is sufficiently similar to the Jack Daniel's trade dress. (Doc. 110 at 13.) According to VIP, similarity must be considered in light of how consumers will encounter the respective products in the marketplace, as opposed to a mere side-by-side comparison of the trade dress. (<u>Id.</u>) In

93a

support, VIP cites lack of similarity due to: (1) the VIP
Product uses the name "Bad Spaniels" in place of the
"Jack Daniel's" name; (2) the VIP Product uses "The Old
No. 2" in place of JDPI's "Old No. 7" slogan; (3) VIP has
added its SILLY SQUEAKERS® brand name to promi-
nent locations on the VIP Product hangtag; and (4) VIP
has added different design elements and omitted several
key components to the VIP trade dress, citing Apple, Inc.
v. Samsung Elecs. Co., 920 F. Supp. 2d 1116, 1128–29
(N.D. Cal. 2013) (holding that the parties' trade dresses
were not sufficiently similar because the phones varied in
appearance, and defendant's trade dress was missing key
features of plaintiff's trade dress—this weighed heavier
than expert testimony claiming that defendant's phone
was likely to dilute; the jury's findings on non-dilution was
not against the clear weight of the evidence). (Id.) Fi-
nally, VIP alleges a lack of similarity because VIP sells its
Product in a completely different market than Jack Dan-
iel's whiskey. (Id.)

JDPI responds that prior to the TDRA, a party had to
prove that the famous mark and the accused mark were
identical or nearly identical when bringing allegations of
dilution, (Doc. 142 at 22, (citing Welles, 279 F.3d at 806).)
Quoting Levi Strauss & Co. v. Abercrombie & Fitch Trad-
ing Co., 633 F.3d 1158, 1159 (9th Cir. 2011), "the 'identical
or nearly identical' standard did not survive Congress's
enactment of the TDRA." Now a party only must show
"similarity" between the famous mark and the accused
mark. (Id.)

According to JDPI, similarity or lack of similarity is a
highly fact-specific inquiry rarely found as a matter of
law. (Id. (citing Nordstrom, 2013 WL 1196948, at *14
(denying Nordstrom a preliminary injunction as a matter

94a

of law due to improbability of success on its dilution by tarnishment claim)); <u>Apple, Inc.</u>, 920 F. Supp. 2d at 1131 (denial of post-trial motion for judgment as a matter of law seeking to overturn jury finding of no dilution).) Thus, JDPI contends that under the TDRA it is for the fact-finder, not for the Court as a matter of law, to determine the fact-specific issue of similarity. (<u>Id.</u> at 23.)

Regarding the differences that VIP alleges between its Bad Spaniels toy and the Jack Daniel's trade dress, JDPI contends that rather than focusing on the discrete differences between the products, the focus is on how a consumer would see their trade dresses as a whole. (<u>Id.</u> at 22-23.) As a whole, JDPI argues that a reasonable trier of fact could find that the VIP product and Jack Daniel's trade dress meet the requisite similarity, an "association arising from the similarity between a mark or trade name and a famous mark. . . ." (<u>Id.</u> at 23 (quoting 15 U.S.C. § 1125(c)(2)(C)).)

Initially, the Court notes that under the TDRA, a party only must show "similarity," not substantial similarity or nearly identical, between the famous mark and the accused mark. <u>Levi Strauss</u>, 633 F.3d at 1159, 1172. However, the Ninth Circuit has not issued its guidance by providing a model jury instruction for the "similarity" standard in dilution by tarnishment claims.

At this stage, the Court will not rule as a matter of law that the products are not similar based upon the statutory dilution standards. Based on the factors stated by the parties, a reasonable trier of fact could find that the VIP product and Jack Daniel's trade dress meet the requisite similarity standard for dilution, an "association arising from the similarity between a mark or trade name and a

95a

famous mark. . . ."   (Id. at 23 (quoting 15 U.S.C.
§ 1125(c)(2)(C)).)

*Reputational Harm*

VIP alleges that dilution by tarnishment "generally
arises when the plaintiff's trademark is linked to products
of shoddy quality, or is portrayed in an unwholesome or
unsavory context likely to evoke unflattering thoughts
about the owner's product."   (Doc. 110 at 14 (quoting
Nordstrom, 2013 WL 1196948, at *11).)   In evaluating
likelihood of harm, VIP contends that "[c]onsiderations
such as complaints, reduction in sales, loss of customers,
and negative press are all relevant to the overall determi-
nation."   (Id. (quoting Nordstrom, 2013 WL 1196948, at
*13; see also Starbucks Corp. v. Wolfe's Borough Coffee,
Inc., 588 F.3d 97, 110 (2d Cir. 2009) (stating that plaintiff
failed to show likelihood of dilution by tarnishment be-
cause it did not show how "coffee named either 'Mister
Charbucks' or 'Charbucks Blend' would affect the positive
impressions about the coffee sold by Starbucks).

In support, VIP alleges that its expert, Dr. Bruce Sil-
verman, arranged several focus groups to test consumer
reactions to the VIP Product and that his study revealed
that none of the test subjects reacted negatively to the
VIP product. (Doc. 110 at 14.)   VIP further contends that
JDPI cannot rebut Dr. Silverman's study because it has
not disclosed any evidence of actual consumer reactions to
the VIP Product. (Id. at 14-15.)

In response, JDPI contends that its dilution expert,
Dr. Itamar Simonson, his expert report and testimony de-
tails how the VIP product tarnished JDPI's product.
(Doc. 142 at 24.)   JDPI further contends that such expert
evidence of alleged tarnishment is sufficient to preclude

96a

summary judgment. (Id. (citing Gucci Am., Inc. v. Guess?, Inc., 843 F. Supp. 2d 412, 439 (S.D.N.Y. 2012)).) According to JDPI, the credibility of the parties' respective positions is for the trier of fact to assess at trial. After drawing all reasonable factual inferences in favor of JDPI, JDPI contends that summary judgment cannot be granted against it on this issue. Matsushita, 475 U.S. at 587.

The Court finds that summary judgment on this issue is precluded. Both parties will present expert opinions and testimony on the issue of whether the VIP product tarnished the JDPI product. VIP will have its expert, Bruce Silverman, and JDPI will have its expert, Itamar Simonson, present their evidence. It will be up to the trier of fact to assess and resolve the facts on this issue.

## IV. JDPI's Motion for Partial Summary Judgment

As to Claim 1 of VIP's Amended Complaint, JDPI leaves for trial the ultimate finding of whether VIP's alleged parody infringes or dilutes the Jack Daniel's trademarks and trade dress. (Doc. 101 at 7.) Jack Daniel's trade dress and the trademark is shown in part by PTO Trademark Registration No. 4,106,178. (See Doc. 12 at 7 ¶ 11.) JDPI moves for summary judgment on VIP's second and third claim. (Doc. 101 at 6.) As to VIP's second claim, JDPI contests VIP's complaint that Jack Daniel's trade dress and the trademarks are not entitled to protection because they are functional and non-distinctive. (Id.) As to VIP's third claim, based on the same arguments as in Claim 2, JDPI contests VIP's cancellation argument for JDPI's PTO Trademark Registration No. 4,106,178. (Id.)

97a

JDPI alleges that its protectable trade dress consists of a combination of a square bottle with a ribbed neck, a black cap, a black neck wrap closure with white printing bearing the OLD NO. 7 mark and a black front label with white printing and a filigreed border bearing the JACK DANIEL'S mark depicted in arched lettering at the top of the label, the OLD NO. 7 mark contained within a filigreed oval design in the middle portion of the label beneath the JACK DANIEL'S mark and the words "Tennessee Sour Mash Whiskey" in the lower portion of the label with the word "Tennessee" depicted in script. (Doc. 101 at 9.) JDPI states that the Jack Daniel's Trade Dress is covered, in part, by a PTO registration (No. 4,106,178) for the three-dimensional configuration of a square shape bottle container with embossed "Jack Daniel" signature for distilled spirits. (Doc. 12 at 7 ¶ 11.)

*Distinctiveness and Functionality*

In VIP's motion for summary judgment, the Court set forth the parties' arguments as to whether the Jack Daniel's trade dress and bottle design are distinctive and whether they are non-functional. (*Supra* at 11-18.) The Court then resolved the issues finding that Jack Daniel's trade dress and bottle design have acquired distinctiveness through secondary meaning, and that Jack Daniel's trade dress and bottle design are non-functional both from a utilitarian analysis and an aesthetic analysis. (*Supra* at 11-18.) As to lack of confusion in the marketplace, VIP did not argue this element as part of its summary judgment motion and thus its resolution is left for the trier-of-fact at trial.

In JDPI's motion for partial summary judgment on these same issues, the non-movant VIP may avoid summary judgment if the pleadings and supporting

98a

documents, viewed in the light most favorable to VIP, the nonmoving party, show that there is a genuine issue as to any material fact such that JDPI would not be entitled to judgment as a matter of law.

As to VIP's Claim 2 in its Amended Complaint, the Court has reviewed VIP's response to JDPI's motion for partial summary judgment on this claim and finds that VIP has made the same legal arguments as to acquired distinctiveness, utilitarian functionality, and aesthetic functionality that the Court previously considered in VIP's motion for summary judgment. (See Doc. 147 at 7-24.) Therefore, the Court finds that VIP may not avoid summary judgment on the Court's earlier findings that Jack Daniel's trade dress and bottle design have acquired distinctiveness through secondary meaning, and that Jack Daniel's trade dress and bottle design are non-functional both from a utilitarian functional analysis and an aesthetic functional analysis.

### Cancellation of Registration

As to VIP's third claim, based on the same arguments that VIP raised in Claim 2, JDPI contests VIP's cancellation argument against JDPI's PTO Trademark Registration No. 4,106,178 (the "'178 Registration") (Doc. 101 at 25-35 (discussing the JDPI trademark shown in Doc. 12 at 5 ¶ 11).)

JDPI contends that the '178 Registration is prima facie evidence of a trademark's validity, shifting the burden from the registrant to the challenger. See 15 U.S.C. §§ 1057(b); 1115(a); see, e.g., Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1114 (9th Cir. 2010) (stating that a "federal registration provides 'prima facie evidence' of the mark's validity and entitles the plaintiff to

99a

a 'strong presumption' that the mark is a protectable mark"). According to JDPI, the PTO issued the '178 Registration without requiring JDPI to prove the distinctiveness of the mark which creates a presumption that the mark is inherently distinctive. See Zobmondo, 602 F.3d at 1114. JDPI further contends that the '178 Registration creates a presumption that the mark is non-functional. Talking Rain, 349 F.3d at 603. "[T]he presumption of validity is a strong one and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy." Zobmondo, 602 F.3d at 1115.

In support of distinctiveness, JDPI relies on the testimony of VIP's expert, John Howard, who testified that the shape of the Jack Daniel's bottle "is part of a marketing program to make the bottle distinctive from competitors," which has succeeded because the bottle was "very distinctive"; that the bottle has become a "classic design" for whiskey; and that the bottle shape is more eyecatching than the "Jack Daniel" signature and is what does the most to identify the product as coming from Jack Daniel's. (Doc. 104-4 at 8-9, 15-16, 64.) Therefore, because VIP's own expert admitted that the mark is distinctive, a reasonable trier of fact could only find that the '178 Registration is distinctive. (Doc. 101 at 26.)

In support of a lack of functionality, utilitarian and aesthetic, JDPI presents its previous arguments, and these arguments need not be restated again here. (Id. at 26-35.)

VIP contends that it has sufficient evidence to rebut the presumption of validity, citing Talking Rain, 349 F.3d at 603 (stating that once the presumption of validity afforded to a registered trademark has been rebutted, mere

100a

registration does not enable a trademark holder to survive summary judgment). (Doc. 147 at 24-25.)

In support of a lack of distinctiveness, VIP argues that the bottle design of the '178 Registration amounts to ordinary geometric shaped packaging that is widely used in the market, and therefore it is non-distinctive and protectable only upon proof of secondary meaning. (Id. at 25.)

As to distinctiveness, the Court reiterates that the presumption of validity of a trademark registration is a strong one and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy. See Zobmondo, 602 F.3d at 1115. The Court finds that VIP has failed to overcome that presumption. First, and foremost, the '178 Registration includes the embossed signature, "Jack Daniel." As the Court has already concluded, the Jack Daniel's name is decidedly famous, and produces a distinctiveness on its own. Moreover, VIP's own expert, John Howard, also conceded that the '178 Registration was distinctive. (Doc. 104-4 at 8-9, 15-16, 64.)

Next, as to functionality, both utilitarian and aesthetic, both JDPI and VIP have restated a number of the functionality arguments that the Court has already considered and need not be repeated again here. (See Doc. 101 at 26-35 and Doc. 147 at 26-27.)

The Court again finds that VIP has failed to rebut the validity of the '178 Registration as it pertains to functionality, both utilitarian and aesthetic. The Court has already found that the bottle design is not functional. (See supra at 15-18.)

In conclusion, the Court finds that VIP has failed to rebut the validity of the '178 Registration. Therefore, the

101a

Court will not invalidate the '178 Registration by directing the Commissioner of Patents and Trademarks to cancel JDPI's federal trademark registration No. 4,106,178.

### *VIP's Motion to Strike*

Pursuant to Fed. R. Civ. P. 37, VIP moves to exclude the declaration submitted by JDPI in support of its Opposition to Motion to Exclude Testimony of Defendant's Expert Itamar Simonson (Doc. 96) and certain evidence that JDPI submitted in support of its Motion for Partial Summary Judgment (Doc. 101). VIP lists the evidence as follows. The Declaration of Itamar Simonson in Support of Defendant's Opposition to Plaintiff's Motion to Exclude Testimony of Itamar Simonson ("Simonson Declaration") (Doc. 97-1) and the Declaration of Phillip Epps in Support of JDPI's Motion for Partial Summary Judgment ("Epps Declaration") (Doc. 105). VIP alleges that both contain untimely disclosures, either because they are information not previously disclosed despite interrogatories and requests for production of documents that sought disclosure during the discovery period, or because they were improperly submitted after the discovery cut-off date. (Doc. 133.)

In response, JDPI contends that VIP's motion to strike should be denied for the simple reason that it was brought in violation of the local rules. (Doc. 139.) According to JDPI, LRCiv 7.2(m)(2) is clear that a party may not file a separate motion to strike evidence supporting a written motion.

The Court finds that VIP's motion to strike does not comply with the Local Rules and will be denied. LRCiv 7.2(m)(2) provides, as follows:

102a

> Objections to Admission of Evidence on Written Motions. An objection to (and any argument regarding) the admissibility of evidence offered in support of or opposition to a motion must be presented in the objecting party's response or reply memorandum and not in a separate motion to strike or other separate filing.

LRCiv 7.2(m)(2). The purpose of the Local Rule is to require unitary briefs, including objections to evidence and to the propriety of arguments, within the page limits established by the Court. See Pruett v. Arizona, 600 F. Supp. 2d 1065, 1074 (D. Ariz. 2009). "Litigants may not divide their briefs and multiply their page limits by styling part of the argument as a separate motion to strike." Id. VIP violated and thus disregarded the purpose of LRCiv 7.2(m)(2) by filing a separate motion to strike; its motion to strike will be denied.

## CONCLUSION

Accordingly, on the basis of the foregoing,

**IT IS HEREBY ORDERED** granting Defendant's motion for partial summary judgment. (Doc. 101.)

**IT IS FURTHER ORDERED** denying Plaintiff's motion for summary judgment. (Doc. 110.)

**IT IS FURTHER ORDERED** denying Plaintiff's motion to exclude the testimony of Defendant's expert, Dr. Itamar Simonson. (Doc. 92.)

**IT IS FURTHER ORDERED** denying Plaintiff's motion to exclude Defendant's supplemental declaration of Dr. Itamar Simonson and evidence offered by Phillip Epps. (Doc. 133.)

103a

**IT IS FURTHER ORDERED** denying as moot Plaintiff's motion for clarification. (Doc. 88.) Prior to trial, at the time the parties file their respective motions in limine, they may argue the disputed admissibility of documentary evidence that each party would present at trial.

**IT IS FURTHER ORDERED** denying as moot the parties' stipulated motion to file documents under seal. (Doc. 152.) In resolving the parties' dispositive motions, the Court only utilized the redacted portions of the referenced documents; it was not necessary for the Court to review and consider the limited sealed portion of these documents that were lodged under seal. The Clerk of Court shall maintain as lodged under seal Doc. 153 and Doc. 154. At trial, the parties must keep in mind that referencing a confidential fact or a confidential document will in fact reveal it as a matter of course.

**IT IS FURTHER ORDERED** denying as moot Defendant's motion to seal. (Doc. 162.) The parties did not reference nor did the Court consider any of these documents during resolution of the dispositive motions. The Clerk of Court shall maintain as lodged under seal Doc. 119, Doc. 119-1, and Doc. 127. At trial, the parties must keep in mind that referencing a confidential fact or a confidential document will in fact reveal it as a matter of course.

**IT IS FURTHER ORDERED** setting this matter for a status hearing on **Wednesday, October 26, 2016, at 2:00 p.m.**, in Courtroom 401, 401 West Washington Street, Phoenix, AZ before Senior Judge Stephen M. McNamee.

**DATED** this 27th day of September, 2016.

104a

/s/Stephen M. McNamee
Stephen M. McNamee
Senior United States District Judge

105a

**APPENDIX F**

## Why Does This Case Matter?

 

ER 1563

106a



107a



108a



ER 2695

109a



110a



111a

# APPENDIX G

## STATUTORY PROVISIONS INVOLVED

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), entitled "Civil Action," provides:

(1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2)  As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this

112a

chapter in the same manner and to the same extent as any nongovernmental entity.

(3)  In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), entitled "Dilution by Blurring; Dilution by Tarnishment," provides:

(1)  INJUNCTIVE RELIEF.  Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

(2)  DEFINITIONS.

(A)  For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

113a

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(B) For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

114a

(v)  Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi)  Any actual association between the mark or trade name and the famous mark.

(C)  For purposes of paragraph (1), "dilution by tarnishment" is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.

(3) EXCLUSIONS.  The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

(A)  Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with—

(i)  advertising or promotion that permits consumers to compare goods or services; or

(ii)  identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

(B)  All forms of news reporting and news commentary.

(C)  Any noncommercial use of a mark.

115a

(4) BURDEN OF PROOF. In a civil action for trade dress dilution under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that—

    (A) the claimed trade dress, taken as a whole, is not functional and is famous; and

    (B) if the claimed trade dress includes any mark or marks registered on the principal register, the unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered marks.

(5) ADDITIONAL REMEDIES. In an action brought under this subsection, the owner of the famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title. The owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity if—

    (A) the mark or trade name that is likely to cause dilution by blurring or dilution by tarnishment was first used in commerce by the person against whom the injunction is sought after October 6, 2006; and

    (B) in a claim arising under this subsection—

        (i) by reason of dilution by blurring, the person against whom the injunction is sought willfully intended to trade on the recognition of the famous mark; or

        (ii) by reason of dilution by tarnishment, the person against whom the injunction is

116a

sought willfully intended to harm the reputation of the famous mark.

(6) OWNERSHIP OF VALID REGISTRATION A COMPLETE BAR TO ACTION. The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register under this chapter shall be a complete bar to an action against that person, with respect to that mark, that—

(A) is brought by another person under the common law or a statute of a State; and

(B)

(i) seeks to prevent dilution by blurring or dilution by tarnishment; or

(ii) asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark, label, or form of advertisement.

(7) SAVINGS CLAUSE. Nothing in this subsection shall be construed to impair, modify, or supersede the applicability of the patent laws of the United States.

No. 20-365

In the

# Supreme Court of the United States

JACK DANIEL'S PROPERTIES, INC.,

*Petitioner,*

*v.*

VIP PRODUCTS LLC,

*Respondent.*

On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Ninth Circuit

## BRIEF IN OPPOSITION

Bennett Evan Cooper
*Counsel of Record*
David G. Bray
David N. Ferrucci
Dickinson Wright PLLC
1850 North Central Avenue,
 Suite 1400
Phoenix, Arizona 85004
(602) 285-5000
bcooper@dickinsonwright.com

*Counsel for Respondent*

299210



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTIONS PRESENTED

1.  Does the *Rogers* test apply to an artistic parody of the famous Jack Daniels whiskey bottle to determine trademark infringement?

2.  Does the Trademark Dilution Revision Act's statutory exception for "noncommercial use" apply to an artistic parody of the famous Jack Daniels whiskey bottle?

*ii*

### CORPORATE DISCLOSURE STATEMENT

Respondent VIP Products LLC is an Arizona limited liability company, and no publicly traded company owns 10% or more of the interest in Respondent.

*iii*

## TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . .i

CORPORATE DISCLOSURE STATEMENT . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . .iii

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . .v

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

REASONS FOR DENYING THE PETITION . . . . . . .7

  I.    There Is No Conflict or Split in the Lower
       Courts on the Application of the *Rogers*
       Test to Expressive Works . . . . . . . . . . . . . . . . . . .7

        A.   The Ninth Circuit correctly held that
             the Bad Spaniels parody dog toy is
             protected expression. . . . . . . . . . . . . . . . . . . .8

        B.   Every circuit to consider the issue has
             adopted or endorsed the *Rogers* test . . . . . .9

        C.   Petitioner's cases do not represent a
             circuit split . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*iv*

*Table of Contents*

*Page*

    D. The interlocutory posture of the case weighs against granting certiorari . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    E. The Ninth Circuit correctly held that *Rogers* applies . . . . . . . . . . . . . . . . . . . . . . . .18

II. The Ninth Circuit Correctly Interpreted and Applied the TDRA as Required by the First Amendment, and Consistently with Existing Law . . . . . . . . . . . . . . . . . . . . . . . . . .21

    A. The TDRA may not regulate a work of creative expression, which is fully protected, noncommercial speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

    B. The Bad Spaniels parody dog toy is fully protected, noncommercial speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

    C. The TDRA's noncommercial-use exception is an independent statutory basis for protecting expression. . . . . . . . . . . . . . . . . . . . . . . . . .28

    D. Petitioner's cases do not represent a circuit split. . . . . . . . . . . . . . . . . . . . . . . . .29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*v*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Am. Acad. of Pain Mgmt. v. Joseph,*
  353 F.3d 1099 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . .25

*AMF Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979). . . . . . . . . . . . . . .9, 19, 20

*Bigelow v. Virginia,*
  421 U.S. 809 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983). . . . . . . . . . . . . . . . . . . 23, 24, 25, 26

*Brown v. Elec. Arts, Inc.,*
  724 F.3d 1235 (9th Cir. 2013). . . . . . . . . . . . . . . . . . .10

*Brown v. Entm't Merchs. Ass'n,*
  564 U.S. 786 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Chooseco LLC v. Netflix, Inc.,*
  439 F. Supp. 3d 308 (D. Vt. 2020) . . . . . . . . . . . . . . .24

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Cliffs Notes, Inc. v. Bantam Doubleday Dell
    Publ'g Grp., Inc.,*
  886 F.2d 490 (2d Cir. 1989) . . . . . . . . . . . . . . . . .20, 27

*vi*

*Cited Authorities*

*Page*

*Cummings v. Soul Train Holdings LLC,*
   67 F. Supp. 3d 599 (S.D.N.Y. 2014) . . . . . . . . . . . . . . .11

*Dex Media W., Inc. v. City of Seattle,*
   696 F.3d 952 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . .25

*Dr. Seuss Enters., L.P. v.*
   *Penguin Books USA, Inc.,*
   109 F.3d 1394 (9th Cir. 1997). . . . . . . . . . . . . . . .11, 27

*E.S.S. Ent'mt 2000, Inc. v.*
   *Rock Star Videos, Inc.,*
   547 F.3d 1095 (9th Cir. 2008) . . . . . . . . . . . . . . . . . .14

*Elvis Presley Enters, Inc. v. Capece,*
   141 F.3d 188 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . .16

*ETW Corp. v. Jireh Publ'g, Inc.,*
   332 F.3d 915 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . .13

*Facenda v. N.F.L. Films, Inc.,*
   542 F.3d 1007 (3d Cir. 2008) . . . . . . . . . . . . . . . . . . .12

*Fed. Election Comm'n v. Wis. Right to Life, Inc.,*
   551 U.S. 449 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Fortres Grand Corp. v.*
   *Warner Bros. Entm't Inc.,*
   947 F. Supp. 2d 922 (N.D. Ind. 2013), *aff'd*
   *on other grounds*, 763 F.3d 696 (7th Cir. 2014) . . . .14

*vii*

*Cited Authorities*

*Page*

*Gordon v. Drape Creative, Inc.,*
909 F.3d 257 (9th Cir. 2018). . . . . . . . . . . . .9, 11, 18, 20

*Harley-Davidson, Inc. v. Grottanelli,*
164 F.3d 806 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . .16

*Hidden City Phila. v. ABC, Inc.,*
Civ. No. 18-65, 2019 WL 1003637
(E.D. Pa. Mar. 1, 2019) . . . . . . . . . . . . . . . . . . . . . . . .12

*Hilton v. Hallmark Cards,*
599 F.3d 894 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . .25

*Hunt v. City of Los Angeles,*
638 F.3d 703 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . .25

*Hurley v. Irish-Am. Gay, Lesbian
& Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019). . . . . . . . . . . . . . . . . . . . . . . . .20

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.,*
828 F.2d 1482 (10th Cir. 1987). . . . . . . . . . . . . . . . . .15

*Jordan v. Jewel Food Stores, Inc.,*
743 F.3d 509 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . .23

*viii*

*Cited Authorities*

*Page*

*L.L. Bean, Inc. v. Drake Publishers, Inc.,*
    811 F.2d 26 (1st Cir. 1987) . . . . . . . . . . . . . . . . . .6, 8, 27

*Liberty Counsel, Inc. v. Guidestar USA, Inc.,*
    No. 4:17CV71, 2018 WL 1032372
    (E.D. Va. Jan. 23, 2018), *aff'd*, 737 F. App'x 171
    (4th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Louis Vuitton Malletier S.A. v.*
    *Haute Diggity Dog, LLC,*
    507 F.3d 252 (4th Cir. 2007) . . . . . . . . . . . . . . . . . .7, 14

*Louis Vuitton Malletier S.A. v.*
    *Warner Bros. Entm't Inc.,*
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) . . . . . . . . . . . . .11

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) . . . . . . . . . . . . . . . . . . . . . . . . .20

*Mattel, Inc. v. MCA Records, Inc.,*
    296 F.3d 894 (9th Cir. 2002) . . . . . . . . . . . . . . . *passim*

*Mattel, Inc. v. Walking Mountain Prods.,*
    353 F.3d 792 (9th Cir. 2003) . . . . . . . . . . . . . . . . .13, 26

*Meyer v. Holley,*
    537 U.S. 280 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Mount Soledad Mem'l Ass'n v. Trunk,*
    567 U.S. 944, 132 S. Ct. 2535 (2012) . . . . . . . . . . 17-18

*ix*

*Cited Authorities*

*Page*

*Mut. of Omaha Ins. Co. v. Novak,*
    836 F.2d 397 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . .15

*Nike, Inc. v. "Just Did It" Enters.,*
    6 F.3d 1225 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . .16

*Novalogic, Inc. v. Activision Blizzard,*
    41 F. Supp. 3d 885 (C.D. Cal. 2013) . . . . . . . . . . . . . .21

*Nw. Austin Mun. Util. Dist. No. 1 v. Holder,*
    557 U.S. 193 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Pa. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998). . . . . . . . . . . . . . . . . . . . . . . . . .17

*Parks v. LaFace Records,*
    329 F.3d 437 (6th Cir. 2003) . . . . . . . . . . . . . . . . .13, 16

*Polaroid Corp. v. Polarad Elecs. Corp.,*
    287 F.2d 492 (2d Cir. 1961) . . . . . . . . . . . . . . . .9, 19, 20

*Radiance Found., Inc. v. N.A.A.C.P.,*
    786 F.3d 316 (4th Cir. 2015). . . . . . . . . . . . . . . *passim*

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989) . . . . . . . . . . . . . . . *passim*

*Seale v. Gramercy Pictures,*
    949 F. Supp. 331 (E.D. Pa. 1996), *aff'd mem.,*
    156 F.3d 1225 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . .12

*x*

*Cited Authorities*

*Page*

*Sporting Times, LLC v. Orion Pictures Corp.,*
    291 F. Supp. 3d 817 (W.D. Ky. 2017) . . . . . . . . . . . . .23

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,*
    588 F.3d 97 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . .29

*Twentieth Century Fox Television v.*
    *Empire Distrib. Inc.,*
    875 F.3d 1192 (9th Cir. 2017) . . . . . . . . . . . . . . . . .10, 18

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.,*
    996 F.2d 1366 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . .12

*United States v. L.A. Tucker Truck Lines, Inc.,*
    344 U.S. 33 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.,*
    683 F.3d 1266 (11th Cir. 2012) . . . . . . . . . . . . . . . . . .14

*Va. Military Inst. v. United States,*
    508 U.S. 946, 113 S. Ct. 2431 (1993) . . . . . . . . . . . . .17

*VIP Prods. LLC v. Jack Daniel's Props., Inc.,*
    953 F.3d 1170 (9th Cir. 2020) . . . . . . . . . . . . . . .5, 6, 7, 8

*Webster v. Fall,*
    266 U.S. 507 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Westchester Media v. PRL USA Holdings, Inc.,*
    214 F.3d 658 (5th Cir. 2000) . . . . . . . . . . . . . . . . .12, 16

*xi*

*Cited Authorities*

*Page*

**STATUTES**

15 U.S.C. § 1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

15 U.S.C. § 1125(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . .19

15 U.S.C. § 1125(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

15 U.S.C. § 1125(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

15 U.S.C. § 1125(c)(3)(A) . . . . . . . . . . . . . . . . . . 28, 29, 30

15 U.S.C. § 1125(c)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 1125(c)(3)(C) . . . . . . . . . . . . . . . 22, 28, 29, 30

**OTHER AUTHORITIES**

U.S. Const., Amend I . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . .11

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2020). . . . . . *passim*

Lynn M. Jordan & David M. Kelly, *Another Decade of* Rogers v. Grimaldi*: Continuing to Balance the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 109 Trademark Rep. 833 (2019). . . . . . . . 11-12

1

## INTRODUCTION

Petitioner Jack Daniels Property Inc.'s ("JDPI") petition for a writ of certiorari should be denied because there are no cert-worthy conflicts for the Court to resolve, and the Ninth Circuit's unanimous opinion below was decided correctly and in a manner consistent with the approach of circuit courts that have considered trademark infringement and dilution claims where the alleged offending use was part of an expressive work. Neither the Ninth Circuit nor any other circuit has perceived any conflict among them in the small number of cases that have addressed the infrequently raised issues presented. Moreover, the Ninth Circuit's opinion did not even conclude the case, which has been remanded for a determination on the merits of the trademark infringement claim.

Petitioner's Lanham Act trademark infringement and dilution claims target protected First Amendment expression—a parody of the famous Jack Daniels whiskey bottle, Respondent VIP Products LLC's ("VIP") Bad Spaniels Silly Squeaker dog toy. There is no dispute by any party or any court in this case that the Bad Spaniels parody dog toy is an expressive work.[1] The only issues decided by the Ninth Circuit were the standards that properly govern infringement and dilution claims in the expressive context.

---

1. Petitioner concedes that Bad Spaniels constitutes a "humorous [i.e., expressive] use of another's trademark or trade dress," and "imitates a Jack Daniel's whiskey bottle, while adding … juvenile bathroom humor." Pet. at 4-5.

2

With regard to Petitioner's infringement claim, the Ninth Circuit correctly held that the *Rogers* test—the test derived from the Second Circuit's seminal decision in *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989)—applies to the facts here, and the court of appeals remanded the case to the district court for application of the *Rogers* test. With regard to Petitioner's dilution claim, the Ninth Circuit correctly held that the Bad Spaniels parody was noncommercial speech under this Court's commercial-speech doctrine and therefore was exempted from liability under the statutory "noncommercial use" exception of the Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125(c).

Petitioner asks this Court to review both of those rulings, contending that they were incorrect and in conflict with decisions of other circuits. But review is entirely unwarranted—particularly at this interlocutory stage. First, in vacating the district court's ban on protected parody, dismissing Petitioner's dilution claim as a matter of law under the TDRA's noncommercial-use exception, and reversing and remanding for application of the *Rogers* test in the first instance, the unanimous Ninth Circuit scrupulously and faithfully followed settled and uniform precedent.

Second, there are no circuit conflicts, let alone cert-worthy conflicts, on either of the questions presented. Every court of appeals to consider the issue has adopted the *Rogers* test to determine likelihood of confusion in the expressive context. No circuit has rejected it. Likewise, to determine whether the alleged dilutive use falls within the TDRA's noncommercial-use exemption, the courts, including the Ninth Circuit, uniformly apply this Court's

3

commercial-speech doctrine and generally decide this issue as a matter of law. The Ninth Circuit did not believe it was creating or perpetuating a circuit conflict, and no other court has recognized a circuit conflict.

In reality, Petitioner's (and amici curiae's) quarrel is not with the Ninth Circuit's manifestly correct rulings below, but with the balance Congress and the courts have struck between trademark rights and First Amendment rights, and with the long-recognized principle that the First Amendment does not permit "the trademark owner … to control public discourse" about its trademark. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002).

The petition for certiorari should be denied.

## STATEMENT

1. Respondent VIP designs, manufactures, markets, and sells dog toys. Pet App. 5a-6a, 26a. Among its dog toy product offerings is a parody line branded "Silly Squeakers®." *Id*. VIP's Silly Squeakers line of dog toys includes a variety of toys in the shapes of beer, wine, soda, and liquor bottles. Pet. App. 27a-28a. Among those Silly Squeakers® brand dog toys is the Bad Spaniels Silly Squeaker. Pet. App. 28a.

VIP designed the Bad Spaniels Silly Squeaker to be a comical parody of the Jack Daniel's black label whiskey. Pet. App. 49a. As the Ninth Circuit stated, "VIP's purported goal in creating Silly Squeakers was to 'reflect' 'on the humanization of the dog in our lives,' and to comment on 'corporations [that] take themselves very

4

seriously.'" Pet. App. 6a. The district court acknowledged that VIP owner Stephen Sacra's "intent behind producing the Silly Squeakers line of toys was to develop a creative parody on existing products." Pet. App. 28a.

 To accomplish the parodic effect, the Bad Spaniels Silly Squeaker invokes elements of the Jack Daniel's black label whiskey bottle and artistically transforms those elements in order to communicate the parody. "Jack Daniel's" becomes "Bad Spaniels," "Old No. 7" becomes "Old No. 2," and "Tennessee whiskey" becomes "Tennessee carpet." References to alcohol content are transformed into "43% POO BY VOL." and "100% SMELLY." Pet. App. 28a. Bad Spaniels approximates the shape and size of a Jack Daniel's black label whiskey bottle but features the picture of, in the district court's words, a "wide-eyed spaniel." Pet. App. 28a.

2. In September 2014, Petitioner JDPI "demand[ed] that VIP cease all further sales of the Bad Spaniels toy." Pet. App. 6a, 29a. Perceiving the threat implicit in JDPI's demand letter, VIP promptly filed the present action for a declaratory judgment that its parody of the Jack Daniel's whiskey bottle "d[id] not infringe or dilute any claimed trademark rights" of JDPI. Pet. App. 6a; Pet. App. 29a-30a. JDPI counterclaimed and generally asserted that the Bad Spaniels Silly Squeaker infringed and diluted JDPI's trademarks. Pet. App. 6a.

3. In September 2016, the district court denied VIP's motion for summary judgment, rejecting VIP's First Amendment defenses, including its parody,

5

noncommercial-use and fair-use defenses. Pet. App. 30a. Although the district court found that Bad Spaniels was an expressive work, the court refused to apply the *Rogers* test and the TDRA's noncommercial-use exception, leaving for trial all of JDPI's counterclaims. Pet. App. 30a.

In ruling on VIP's motion for summary judgment, the district court found that VIP "adapt[ed]" JDPI's mark for the "dual purpose" of "expressive comment[ary] [and] [to sell] a non-competing product." Pet. App. 69a. It found Bad Spaniels to be a predominantly expressive work—the court said that it was only "somewhat non-expressive," *id.*,— developed by a creative artist, Pet. App. 26a, whose intent "was to develop a creative parody," *id*. Yet the court disregarded VIP's First Amendment defenses because VIP sold the parody. Pet App. 68a.

In May 2018, following a four-day bench trial, the district court permanently banned the parody, enjoining VIP "from sourcing, manufacturing, advertising, promoting, displaying, shipping, importing, offering for sale, selling or distributing the Bad Spaniels dog toy." Pet. App. 7a; Pet. App. 22a.

4. The Ninth Circuit, in a unanimous panel decision, reversed the district court's judgment and remanded "because the Bad Spaniels dog toy is an expressive work entitled to First Amendment protection." Pet. App. 5a; *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1172 (9th Cir. 2020). The court of appeals reversed and vacated the district court's permanent injunction; held that the parody dog toy constituted a noncommercial use such that it did not dilute Petitioner's mark by tarnishment as a matter of law; held that the parody dog toy was an

6

expressive work to which the *Rogers* test applied; and remanded for application of that test in the first instance. *Id.*

In determining whether the Bad Spaniels parody was an expressive work, the Ninth Circuit analyzed "whether the work [wa]s "'communicating ideas or expressing points of view.'" Pet App. 10a; 953 F.3d at 1174-75 (citing *MCA Records*, 296 F.3d at 900 (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987))). The court noted that the "work need not be the expressive equal of *Anna Karenina* or *Citizen Kane* to satisfy this requirement, and is not rendered non-expressive simply because it is sold commercially." *Id.* (citations and quotations omitted).

Applying these settled standards, the Ninth Circuit held "the Bad Spaniels dog toy, although surely not the equivalent of the *Mona Lisa*, is an expressive work." Pet App. 11a; 953 F.3d at 1175. As the court explained, Bad Spaniels is a humorous parody of the original:

> The toy communicates a "humorous message," using word play to alter the serious phrase that appears on a Jack Daniel's bottle—"Old No. 7 Brand"—with a silly message—"The Old No. 2." The effect is "a simple" message conveyed by "juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *L.L. Bean, Inc.*, 811 F.2d at 34 (affording First Amendment protection to a message "that business and product images need not always be taken too seriously").

7

*Id.* (internal citation omitted). The court noted, "The fact that VIP chose to convey this humorous message through a dog toy is irrelevant." Pet App. 12a; 953 F.3d at 1175 (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)). The Ninth Circuit also observed that it was not the first court to find that dog toys can be "successful parodies" of well-known brands, pointing to the Fourth Circuit's conclusion that a parody dog toy did not dilute or infringe as a matter of law. *Id.* (discussing *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007) (affirming grant of summary judgment for dog toy maker)).[2]

Petitioner sought rehearing en banc. Pet. App. 1a. The Ninth Circuit denied review, with not a single judge requesting a vote. *Id.* This petition followed.

### REASONS FOR DENYING THE PETITION

### I.  There Is No Conflict or Split in the Lower Courts on the Application of the *Rogers* Test to Expressive Works.

With regard to Petitioner's infringement claim, the only issue the Ninth Circuit decided was whether the Bad Spaniels parody was an expressive work to be evaluated

---

2.  Parody products are ubiquitous in the dog product industry. For this reason, "[t]he pet owner who sees a line of products for pet dogs under names that parody [famous] brands … such as CHEWNEL #5, DOG PERIGNON, SNIFFANY & CO. and CHEWY VUITON, is not likely to mistakenly think that those [brands] are making or authorizing the dog accessories." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:154 (5th ed. 2020).

8

under the *Rogers* test. The unanimous panel answered in the affirmative and remanded the case to the district court for application of the test. Therefore, the only issue presented by the Petition is whether there is disagreement on the standard that should govern application of the Lanham Act to expressive works. There is not.

### A.  The Ninth Circuit correctly held that the Bad Spaniels parody dog toy is protected expression.

The Bad Spaniels Silly Squeaker is quintessential parody, that is, "a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *L.L. Bean*, 811 F.2d at 34. "Parody is a form of artistic expression covered by the First Amendment." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:153 (5th ed. 2020).

As the Ninth Circuit correctly held below, the fact that the parody is in the form of a dog toy that is sold to the public does not "render[] [it] non-expressive" for First Amendment purposes. Pet. App. 10a-11a; *VIP Prods.*, 953 F.3d at 1175; *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) ("[T]he basic principles of freedom of speech … do not vary when a new and different medium for communication appears." (quotation omitted)); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the … speech is sold rather than given away.").

9

### B.   Every circuit to consider the issue has adopted or endorsed the *Rogers* test.

There is no cert-worthy conflict presented here because every circuit that has addressed the issue has adopted the Second Circuit's *Rogers* test to determine infringement claims that target expressive works. For this reason, as explained below, Petitioner is compelled to manufacture a conflict by citing either cases that pre-date *Rogers*, and therefore used other doctrinal tools to evaluate the fact-specific disputes before them, or cases where the issue of the *Rogers* test's applicability was not addressed by the court.

To put this in context, the Lanham Act "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 263 (9th Cir. 2018) (quotation omitted). As to trademark infringement, in the typical, purely commercial context that does not involve an expressive use, courts traditionally weigh a nonexclusive list of several factors known as the likelihood-of-confusion test. *See, e.g.*, *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "Ordinarily, this test 'strikes a comfortable balance' between the Lanham Act and the First Amendment." *Gordon*, 909 F.3d at 264 (quoting *MCA Records*, 296 F.3d at 900).

But "where artistic expression is at issue, [courts] have expressed concern that the traditional test fails to account for the full weight of the public's interest in free expression." *Id.* (internal quotation marks omitted). In that

10

context, when a mark is used in an expressive work, courts assess likelihood-of-confusion in a different way. That is because "First Amendment concerns" must "inform [a court's] consideration of the scope of the [Lanham] Act as applied to claims involving" expressive works. *Rogers*, 875 F.2d at 998; *see also Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1242 (9th Cir. 2013) ("the likelihood of confusion test fails to account for the full weight of the public's interest in free expression when expressive works are involved" (quotation omitted)).

In the seminal 1989 *Rogers* decision, the Second Circuit articulated a two-part test for assessing whether the use of a mark in an expressive work is "likely to cause confusion" within the meaning of the Lanham Act. Such a use, even if found to be likely confusing under the traditional analysis, is not actionable unless (1) the use has "no artistic relevance to the underlying work whatsoever," or (2) the work "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. Applying the *Rogers* test is straightforward: "the only threshold requirement for the *Rogers* test is an attempt to apply the Lanham Act to First Amendment expression." *Twentieth Century Fox Television v. Empire Distrib. Inc.*, 875 F.3d 1192, 1198 (9th Cir. 2017).

*Rogers* is illustrative. That case involved a Federico Fellini film called *Ginger and Fred* about "two fictional Italian cabaret performers ... who, in their heyday, imitated" Ginger Rogers and Fred Astaire and so "became known in Italy as 'Ginger and Fred.'" *Rogers*, 875 F.2d at 996-97. Ginger Rogers sued, alleging that the film's title violated the Lanham Act "by creating the false impression that the film was about her or that

she sponsored, endorsed, or was otherwise involved in the film." *Id.* at 997. Despite survey evidence showing likely confusion and evidence of actual confusion, *id.* at 1001, the court found no infringement because the use was artistically relevant to the work, and the work did not "explicitly mislead[] as to the source or content of the work," *id.* at 999. The district courts in the Second Circuit continue to follow *Rogers*. *See, e.g., Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 177 (S.D.N.Y. 2012) (applying *Rogers* and finding no infringement); *Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 606 (S.D. N.Y. 2014) (using the *Rogers* analysis and dismissing false endorsement claim under Rule 12(b)(6)).

The *Rogers* test was a sea change in how courts treat Lanham Act infringement claims involving expressive works. Before the *Rogers* test became the governing standard in such cases, courts analyzed whether an expressive use of a trademark was infringing under the traditional likelihood-of-confusion test. *See, e.g., Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403-04 (9th Cir. 1997). The circuit courts now use the *Rogers* test "as a rule of construction to avoid conflict between the Constitution and the Lanham Act." *Gordon*, 909 F.3d at 264.

When presented with the opportunity, every circuit court has adopted or endorsed the *Rogers* test to determine infringement in cases involving expressive works. "The Second Circuit's *Rogers* balancing test is now widely used by almost all courts." 6 *McCarthy on Trademarks and Unfair Competition* § 31:144.50 (collecting cases). "No courts have rejected the *Rogers* test." Lynn M. Jordan &

12

David M. Kelly, *Another Decade of* Rogers v. Grimaldi*: Continuing to Balance the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 109 Trademark Rep. 833, 834-35 (2019).

The Fifth Circuit adopted the *Rogers* test in *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000). In evaluating a claim for infringement against the publisher of a lifestyle magazine, the Fifth Circuit agreed with the Second Circuit that there is a "tension between the protection afforded by the Lanham Act to trademark owners and the protection afforded by the First Amendment to expressive activity." *Id.* at 664. The court "adopted the Second Circuit's approach" (i.e., the *Rogers* test) for resolving that tension. *Id.* at 664-65 (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993) (quoting *Rogers*, 875 F.2d at 999)).

The *Rogers* analysis was followed in *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 339 (E.D. Pa. 1996), which the Third Circuit affirmed without opinion, 156 F.3d 1225 (3d Cir. 1998) (mem.); *see also Hidden City Philadelphia v. ABC, Inc.*, Civ. No. 18-65, 2019 WL 1003637, at *3 (E.D. Pa. Mar. 1, 2019) (applying *Rogers* to dismiss state-law claim of trademark infringement against expressive use of title of video website).[3]

---

3. In *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1018 (3d Cir. 2008), the Third Circuit decided not to apply the *Rogers* test because it held the alleged infringement was not protected expression. Nevertheless, the court ruled for the defendant, overturning summary judgment for the plaintiff on the traditional factors and remanding for trial. *Id.* at 1024-25.

13

The Ninth Circuit first adopted the *Rogers* test in 2002 in *Mattel, Inc. v. MCA Records*, which involved trademark dilution and infringement claims based on the music band Aqua's commercially successful parody song *Barbie Girl*. Applying *Rogers* to the parody song, the Ninth Circuit concluded "that MCA's use of Barbie is not an infringement of Mattel's trademark." 296 F.3d at 902. The Ninth Circuit later applied the *Rogers* test to another parodic use of Barbie in *Mattel, Inc. v. Walking Mountain Products*, 353 F.3d 792, 801 (9th Cir. 2003), which concerned postcards sold for profit that bore parodic photographs depicting the famous doll. The court affirmed summary judgment for the parodist because his use was artistically relevant to his "parodic message," and the photographs did "not explicitly mislead as to Mattel's sponsorship of the works." *Id*. at 807.

The year after the Ninth Circuit adopted the *Rogers* test, the Sixth Circuit followed suit. *Parks v. LaFace Records*, 329 F.3d 437, 450 (6th Cir. 2003) (holding that the likelihood-of-confusion and "alternative means" tests do not give sufficient weight to the public interest in freedom of expression). Then, in *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 936-37 (6th Cir. 2003), the Sixth Circuit applied the *Rogers* test to the use of a Tiger Woods' likeness in a painting of Woods at The Masters golf tournament. The court held that even though "[s]ixty-two percent" of survey respondents indicated they thought Woods was affiliated or connected with, approved, or sponsored the painting, *id*. at 937 n.19, "[t]he risk of misunderstanding, not engendered by any explicit indication on the face of the print, is so outweighed by the interest in artistic expression as to preclude application of the [Lanham] Act," *id*. at 937.

14

Although the Seventh Circuit has not expressly adopted the *Rogers* test, it affirmed a district court decision that dismissed a claim for infringement and held that even if the plaintiff could demonstrate that the use constituted "actionable trademark infringement, it is protected by the First Amendment under *Rogers*." *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 947 F. Supp. 2d 922, 931-32 (N.D. Ind. 2013) ("The [*Rogers* test] is one of the beacons used to navigate the murky boundary between trademark law and the First Amendment."), *aff'd on other grounds*, 763 F.3d 696 (7th Cir. 2014).

The Eleventh Circuit adopted the *Rogers* test in *University of Alabama Board of Trustees v. New Life Art, Inc.*, 683 F.3d 1266 (11th Cir. 2012), stating that "we have no hesitation in joining our sister circuits by holding that we should construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark." *Id.* at 1278. The court held that "[a]n artistically expressive use of a trademark will not violate the Lanham Act 'unless the use of the mark has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless it explicitly misleads as to the source or the content of the work.'" *Id.* at 1278 (quoting *E.S.S. Ent'mt 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008), and citing *Rogers*, 875 F.2d at 999).

The one-directional trend in the circuit courts in favor of *Rogers* continues. The Fourth Circuit recently endorsed *Rogers* in *Radiance Foundation, Inc. v. N.A.A.C.P.*, 786 F.3d 316 (4th Cir. 2015). As noted above, that court had previously used the traditional analysis to reject an infringement claim based on a parody dog toy. *Haute Diggity Dog*, 507 F.3d at 268-69.

15

In short, there is no disagreement on the central question at issue in this case: the standard that governs analysis of Lanham Act infringement claims involving expressive works.

## C. Petitioner's cases do not represent a circuit split.

Petitioner's claim that there is a circuit split, like its incredible suggestion that the majority of circuits continue to apply the traditional likelihood-of-confusion analysis to expressive works, is simply untrue. The framework Petitioner cites as the "majority" approach to infringement claims regarding expressive uses is the outdated approach that antedates the widespread adoption of the *Rogers* test. Indeed, it is the very approach the courts have rejected in favor of *Rogers* precisely because that approach "fails to account for the full weight of the public's interest in free expression." *MCA Records*, 296 F.3d at 900.

As evidence of a putative intercircuit conflict, Petitioner presents a grand total of five circuit cases, but either they were decided before the widespread adoption of the *Rogers* test, or the issue of its applicability was not raised by the parties or addressed by the courts.

To begin, both *Mutual of Omaha Insurance Co. v. Novak*, 836 F.2d 397 (8th Cir. 1987), and *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987), predate *Rogers*, and their use of a different analytical approach cannot reflect a circuit split. Moreover, the so-called "alternative means" test employed by *Novak* has been discredited in favor of the *Rogers* approach, and it was in fact rejected by *Rogers* itself. 875 F.2d at

16

998; *see also Parks*, 329 F.3d at 448-49, 450 (6th Cir.) ("reject[ing] the alternative avenues test" because it does not "accord[] adequate weight to the First Amendment interests"); *Westchester Media*, 214 F.3d at 672 n.18 (5th Cir.) (explicitly rejecting *Novak*'s "alternative means test").

Although both were decided after *Rogers*, neither *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225 (7th Cir. 1993), nor *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999), addressed whether the *Rogers* test should be applied. In fact, in *Nike*, the defense argued that "a totality of the circumstances test" applied. 6 F.3d at 1228 n.3. For this reason alone, those cases provide no support for Petitioner's suggested precedential circuit split. *Cf. United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (issue not "raised in briefs or argument nor discussed in the opinion of the Court" cannot be taken as "a binding precedent on th[e] point"); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not considered as having been so decided as to constitute precedents.").

Similarly, in *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998), the Fifth Circuit did not consider application of *Rogers* or the defendants' First Amendment defense at all because it was not properly raised on appeal. *Id.* at 193 n.2. At any rate, two years later the Fifth Circuit adopted the *Rogers* test in *Westchester Media.* 214 F.3d at 664-65.

17

Simply put, and as demonstrated by Petitioner's cited cases, there is no circuit split to resolve. Every circuit court to consider the issue has either adopted or endorsed *Rogers* and no circuit court has rejected it.

### D. The interlocutory posture of the case weighs against granting certiorari.

Even if there were a difference of opinion among the courts of appeals, this appeal does not present an appropriate circumstance in which to address it. The Ninth Circuit vacated the trial court's final judgment and remanded for further proceedings, specifically, to apply the *Rogers* test in the first instance. For this reason, no other aspect of the *Rogers* test, other than the threshold requirement for its application, is before this Court. It is well settled that this Court will not grant certiorari or otherwise consider issues that were not pressed before or considered by the court of appeals. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212–13 (1998) ("Where issues are neither raised before nor considered by the Court of Appeals, this Court will not ordinarily consider them." (quotation omitted)); *Meyer v. Holley*, 537 U.S. 280, 291 (2003) ("[I]n the absence of consideration of that matter by the Court of Appeals, we shall not consider it.")

Although this case does not present any question meriting this Court's review, even if it did, there are no extraordinary circumstances that warrant failing to wait for entry of a final judgment. *See Va. Military Inst. v. United States*, 508 U.S. 946, 113 S. Ct. 2431, 2432 (1993) (Scalia, J., concurring) ("We generally await final judgment in the lower courts before exercising our certiorari jurisdiction."); *Mount Soledad Mem'l Ass'n v.*

18

*Trunk*, 567 U.S. 944, 132 S. Ct. 2535, 2536 (2012) (Alito, J., concurring) ("Because no final judgment has been rendered … I agree with the Court's decision to deny the petitions for certiorari."). The petition should be denied for this reason alone.

### E.   The Ninth Circuit correctly held that *Rogers* applies.

Because there is no circuit conflict on the applicable *legal* standard, it appears that Petitioner's real complaint is that it doesn't appreciate the Ninth Circuit's applying that standard to a parodic dog toy that makes light of Petitioner's iconic brand. However, disagreeing with the application of a legal standard to particular facts does not create a conflict worthy of certiorari. And here, Petitioner does not even show a similar case in which a court of appeals refused to apply *Rogers* to a similarly parodic item. Moreover, the Ninth Circuit's ruling below is manifestly correct.

The unanimous Ninth Circuit panel scrupulously followed settled precedent in holding that the Bad Spaniels parody dog toy constitutes First Amendment expression. *See* Section I.A., *supra*. Under uniform precedent, that holding mandates that the *Rogers* test applies. *See, e.g.*, *Empire Distrib.*, 875 F.3d at 1198 (explaining that "the only threshold requirement for the *Rogers* test is an attempt to apply the Lanham Act to First Amendment expression"). The courts are virtually unanimous in holding that, in the expressive context, *Rogers* must be applied "as a rule of construction to avoid conflict between the Constitution and the Lanham Act." *Gordon*, 897 F.3d at 1190.

19

Petitioner argues the opposite, contending that the Lanham Act's statutory language mandates using the traditional likelihood-of-confusion test in every case of infringement, even those involving expressive uses. In Petitioner's view, under the statute, "liability flows from a likelihood of confusion," such language precludes the *Rogers* approach. Pet. at 31. Petitioner is incorrect.

What Petitioner fails to recognize is that the *Rogers* approach, like the traditional approach, is an interpretation of when the use of a mark in an expressive work is "likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A). The *Rogers* approach is simply a recognition that different considerations come into play when assessing likelihood of confusion in the context of an expressive work. This is also why Petitioner's characterization of the *Rogers* approach as a judicial exception that "clashes with the Lanham Act's structure" also misses the mark. Pet. at 31. Congress did not need to make an exception to trademark infringement liability under 15 U.S.C. § 1125(a) because the *Rogers* test is simply an interpretation of subsection 1125(a) in the context of expressive works.

The Lanham Act does not furnish any particular formula for evaluating whether the use of a mark is "likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A). The circuit courts have evolved various sets of factors to consider in determining whether confusion is likely in a typical case of related, purely commercial products. *Compare Sleekcraft*, 599 at 348-49 (listing Ninth Circuit factors), *with Polaroid*, 287 F.2d at 495 (listing Second Circuit factors). Even these various "catalogue[s]" of factors do "not exhaust the possibilities—the court may have to take still other variables into account." *Polaroid*, 287 F.2d at

20

495; *see Sleekcraft*, 599 F.2d at 348 n.11 ("The list is not exhaustive. Other variables may come into play depending on the particular facts presented.").

These "traditional" factors have their "origin in cases of purely commercial exploitation." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 495 n.3 (2d Cir. 1989). In the purely commercial context, there are no countervailing First Amendment interests to consider. But "when a trademark owner claims that an expressive work infringes on its trademark rights," those countervailing First Amendment interests must be taken into account. *Gordon*, 909 F.3d at 260-61. Courts "use the *Rogers* test to balance th[ose] competing interests." *Id*. And they do so because, as the courts have repeatedly explained, the traditional factors are "at best awkward in the context of parody" and "artistic expression." *Cliff Notes*, 886 F.2d at 495 n.3.

The use of the *Rogers* test "as a rule of construction to avoid conflict between the Constitution and the Lanham Act," *Gordon*, 909 F.3d at 264, is warranted by the bedrock principle that statutes should be construed, when fairly possible, to avoid constitutional difficulties. *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 205 (2009); *cf. Matal v. Tam*, 137 S. Ct. 1744 (2017) (invalidating separate provision of Lanham Act for impinging on free expression); *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) (same).

Petitioner and amici curiae disagree with the *Rogers* approach (but do not cite a single case that agrees with them) because it does not permit them to stifle criticism either outright or through expensive, speech-chilling

21

litigation. *See e.g.*, *Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 900 (C.D. Cal. 2013) ("The *Rogers* test is relatively straightforward to apply and is very protective of speech."). But that is precisely what the First Amendment requires in the context of protected expression: clear rules regarding any boundaries on protected speech, not the ad hoc, discretionary weighing of factors fostered by the traditional approach. As this Court explained in a different First Amendment context, to avoid "chilling speech through the threat of burdensome litigation," First Amendment standards "must eschew the open-ended rough-and-tumble of factors, which invites complex argument in a trial court and a virtually inevitable appeal. In short, it must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007) (citations and quotations omitted).

Congress and the courts have struck the proper balance between trademark rights and First Amendment rights. Petitioner is simply unhappy with that balance because it does not permit it "to control public discourse" about its trademark. *MCA Records*, 296 F.3d at 900.

## II. The Ninth Circuit Correctly Interpreted and Applied the TDRA as Required by the First Amendment, and Consistently with Existing Law.

Petitioner accuses the Ninth Circuit of "adopting" a "broad reading of" the TDRA's statutory "noncommercial use" exception, suggesting that no other circuit would find the Bad Spaniels expressive parody a "noncommercial use." Pet. at 24. That is at best the prediction of a *future* circuit conflict, which militates against grant of certiorari

22

at this time. In any event, Petitioner is simply incorrect. The Ninth Circuit did not "adopt" a definition of commercial use; it properly applied this Court's commercial-speech doctrine to the speech at issue and correctly held an obvious parody to be fully protected, noncommercial speech such that the TDRA's noncommercial-use exception applied.

## A. The TDRA may not regulate a work of creative expression, which is fully protected, noncommercial speech.

The TDRA "provides three broad, overlapping categories within which any use of a famous mark, even if likely to cause harm or blurring, is not actionable: fair use; news reporting and news commentary; and noncommercial use." *Radiance Found.*, 786 F.3d at 330 (citing 15 U.S.C. § 1125(c)(3) and holding that the noncommercial-use exemption precluded the NAACP's dilution-by-tarnishment claim even though it made a *prima facie* showing of dilution).[4]

To determine whether the alleged dilutive use falls within the noncommercial-use exemption, the courts, including the Ninth Circuit, uniformly apply this Court's commercial-speech doctrine. *See, e.g.*, *Radiance Found.*, 786 F.3d at 331 ("The term 'noncommercial' refers to the First Amendment commercial speech doctrine."). And contrary to Petitioner's contention, the courts decide this

---

4. The 2006 version of the TDRA defines in Lanham Act § 43(c)(3)(C) a defense exempting from liability "[a]ny noncommercial use of a mark." This exemption is identical to an exception in the 1996 Federal Trademark Dilution Act, but for the inclusion in the 2006 version of the determiner "any."

23

legal issue as a matter of law. *See, e.g., Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983) ("[W]e must first determine the proper classification of the [speech] at issue here."); *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515 (7th Cir. 2014) ("classifying [speech] as commercial or noncommercial speech for constitutional purposes … is a legal question").

In its seminal 2002 decision in *Mattel, Inc. v. MCA Records*, 296 F.3d at 903, the Ninth Circuit took a deep dive into the legislative history behind the noncommercial-use exception and found that "the exemption for noncommercial speech is used as a somewhat inexact, shorthand reference to 'speech protected by the First Amendment.'" *Sporting Times, LLC v. Orion Pictures Corp.*, 291 F. Supp. 3d 817, 826-27 (W.D. Ky. 2017) (quoting and finding "the noncommercial use exemption reasoning of *Mattel* persuasive," and dismissing the "dilution claim [as] meritless" under that rubric).

Stated somewhat differently, the "[l]egislative history indicates that Congress intended the noncommercial exemption to … incorporate the Supreme Court's concept of 'commercial speech.'" 4 *McCarthy on Trademarks and Unfair Competition* § 24:128. Accordingly, in *MCA Records*, the Ninth Circuit held that "[t]o determine whether [the speech at issue] falls within this exemption, we look to our definition of commercial speech under our First Amendment caselaw." 296 F.3d at 906.

Contrary to Petitioner's contention, this approach is not at odds with the Fourth Circuit's approach. *See Radiance Found.*, 786 F.3d at 331 ("The term 'noncommercial' refers to the First Amendment commercial speech doctrine.").

24

Indeed, courts uniformly use this Court's commercial-speech doctrine to determine whether the speech at issue falls within the TDRA's statutory noncommercial-use exemption. *See also Chooseco LLC v. Netflix, Inc.*, 439 F. Supp. 3d 308, 324 (D. Vt. 2020) ("This [i.e., the noncommercial-use] 'exemption incorporates the concept of commercial speech from the commercial speech doctrine.'") (quoting *MCA Records*); *Liberty Counsel, Inc. v. Guidestar USA, Inc.*, No. 4:17CV71, 2018 WL 10323724, at *3 (E.D. Va. Jan. 23, 2018) ("The term 'noncommercial' refers to the First Amendment commercial speech doctrine.") *(quoting Radiance Found.*, 786 F.3d at 331), *aff'd*, 737 F. App'x 171 (4th Cir. 2018).

## B.  The Bad Spaniels parody dog toy is fully protected, noncommercial speech.

There is no question that the Bad Spaniels parody dog toy constitutes noncommercial speech under this Court's commercial-speech doctrine. As this Court has held, "[p]arody is a form of noncommercial expression if it does more than propose a commercial transaction." *Bolger*, 463 U.S. at 66-67 (1983) (finding that speech does not become "commercial" simply because the author had economic motivation). Entirely consistent with this Court's definition, the Ninth Circuit held that the Bad Spaniels Silly Squeaker does more than propose a commercial transaction—it communicates a humorous parody—and therefore is not commercial speech. 953 F.3d at 1176. That holding is unassailable.

Petitioner's suggestion that Bad Spaniels would be deemed commercial speech under the Fourth Circuit's three-part *Bolger* analysis (or that the Ninth Circuit does

25

not use that analysis to aid in determining the issue) is simply incorrect. First, the Ninth Circuit does use the *Bolger* analysis in cases that present "close questions," *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012) (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011)), which this case decidedly is not.

Second, the Bad Spaniels parody dog toy does not qualify as commercial speech under the factors identified in *Bolger*. As the Ninth Circuit has applied this Court's decision, "[t]he factors identified in *Bolger* include 'three characteristics which, in combination, support[ ]' a conclusion that the document 'at issue constitute[s] commercial speech, including (i) their advertising format, (ii) their reference to a specific product, and (iii) the underlying economic motive of the speaker.'" *Dex Media*, 696 F.3d at 958 (quotation omitted).

The Bad Spaniels parody dog toy is not an advertisement; it does "not advertis[e] [another] product; it is the product." *Hilton v. Hallmark Cards*, 599 F.3d 894, 905 n.7 (9th Cir. 2010); *see also Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (first *Bolger* factor met only if "the speech is admittedly advertising"). Nor does Bad Spaniels reference a product; again, it *is* the product. *See Hilton*, 599 F.3d at 905 n.7. In short, "[e]ven the most cursory examination of [Bad Spaniels] reveals that it is not 'concededly an advertisement' and … it does not refer to a specific product." *Dex Media*, 696 F.3d at 959. VIP is not offering or selling bottles of anything, much less bottles of "Old No. 2" that contain "43% POO BY VOL."

26

That leaves the final factor, economic motivation. Respondent did want to sell Bad Spaniels (as do most, if not all, artists and parodists[5]), but "the fact that [VIP] has an economic motivation for [creating Bad Spaniels] would clearly be insufficient by itself to turn [it] into commercial speech." *Bolger*, 463 U.S. at 67 (citing *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975)).

There is simply no merit in Petitioner's contention that there is a conflict in how courts determine whether the TDRA's noncommercial-use exemption applies, or that the issue would have been decided differently under the Fourth Circuit's *Bolger* analysis. In fact, in the principal case championed by Petitioner on this issue, the Fourth Circuit not only affirmed dismissal of the dilution claim there, but recognized more broadly that "[t]rademark law in general and dilution in particular are not proper vehicles for combating speech with which one does not agree. Trademarks do not give their holders under the rubric of dilution the rights to stymie criticism." *Radiance Found.*, 786 F.3d at 332. The court continued:

> Criticism of large and powerful entities in particular is vital to the democratic function....

---

5.  Cases applying *Rogers* to parody products routinely (if not always) involve commercial products sold for a profit. *See, e.g., MCA Records*, 296 F.3d at 903 (finding "[t]hat is precisely what MCA did with the Barbie mark: It created and sold to consumers in the marketplace commercial products (the Barbie Girl single and the Aquarium album) that bear the Barbie mark."); *Walking Mountain*, 353 F.3d at 797, 803 (finding that the "'Food Chain Barbie' series earned [the parodist] income" and that the parodist "had a commercial expectation and presumably hoped to find a market for his art").

27

> The article in this case was harsh. But that did not forfeit its author's First Amendment liberties. The most scathing speech and the most disputable commentary are also the ones most likely to draw their intended targets' ire and thereby attract Lanham Act litigation. It is for this reason that law does not leave such speech without protection.

*Id.*

Petitioner attempts to distinguish *Radiance Foundation* on the basis that the speech there involved social criticism, but it fails to acknowledge that "[p]arody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment." *Dr. Seuss*, 109 F.3d at 1400 (9th Cir.); *see also Cliffs Notes*, 886 F.2d at 493 (2d Cir.) ("parody and satire are deserving of substantial freedom—both as entertainment and as a form of social and literary criticism"). "Parody is a humorous form of social commentary and literary criticism that dates back as far as Greek antiquity." *L.L. Bean*, 811 F.2d at 28 (1st Cir.). And at least since the advent of "Wacky Packages" stickers in the 1960s, parodying famous brands has been part of American culture.

Simply put, there is no reason to anticipate that any other circuit would disagree with the Ninth Circuit's conclusion here.

28

### C. The TDRA's noncommercial-use exception is an independent statutory basis for protecting expression.

Petitioner also contends that the Ninth Circuit's application of the TDRA's statutory noncommercial-use exception under 15 U.S.C. § 1125(c)(3)(C) without also requiring satisfaction of the statutory fair-use defense under 15 U.S.C. § 1125(c)(3)(A) is error and conflicts with other circuit's authority. Pet. at 25-26. That argument misstates the law. As the Ninth Circuit explained in in its detailed explanation of the TDRA's legislative history in *MCA Records*, the statute contains "three statutory exemptions [for] uses that, though potentially dilutive, are nevertheless permitted: comparative advertising; news reporting and commentary; and noncommercial use." 296 F.3d at 904. As the statute's plain language and the cases construing it make clear, these defenses can be asserted in the alternative (as Respondent did below), and the failure to satisfy the requirements of one defense does not preclude application of another. *See, e.g.*, *MCA Records*, 296 F.3d at 904 (holding "[t]he first two exemptions clearly do not apply" but the noncommercial-use exemption did).

The Ninth Circuit explained in *MCA Records* that the statutory noncommercial-use exception contained in 15 U.S.C. § 1125(c)(3)(C) allays First Amendment concerns not addressed by the statutory defenses contained in 15 U.S.C. § 1125(c)(3)(A) and (B). 296 F.3d at 906 ("the bill's sponsors relied on the 'noncommercial use' exemption to allay First Amendment concerns"). The three statutory defenses overlap to ensure robust First Amendment protection:

29

> [T]he overlap of exemptions represents a sort of overabundance of caution to statutorily provide for free speech concerns that the federal anti-dilution law would be used to silence "noncommercial" critics who use the famous marks of companies whose goods, services or policies were being criticized or mocked.

4 *McCarthy on Trademarks and Unfair Competition* § 24:128; *see also Radiance Found.*, 786 F.3d at 330 (explaining that "[t]he law provides three broad, overlapping categories within which any use of a famous mark, even if likely to cause harm or blurring, is not actionable," and holding that the exemption precluded the dilution claim despite evidence of dilution). For example, McCarthy notes that though an allegedly dilutive use does not fall within the statutory fair-use exception, "[e]ven if the accused use is a trademark use, a parody can still be immune under free speech principles from liability for dilution by tarnishment." 4 *McCarthy on Trademarks and Unfair Competition* § 24:90 (collecting cases).

### D. Petitioner's cases do not represent a circuit split.

Petitioner struggles to identify a circuit split under the TDRA, and it ultimately cites a grand total of two circuit cases that it argues reflect a conflict. But neither of those cases stand for the proposition that failure to satisfy the statutory fair-use defense under 15 U.S.C. § 1125(c)(3)(A) precludes the court from applying the noncommercial-use exception in 15 U.S.C. § 1125(c)(3)(C). In *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 113 (2d Cir. 2009), the court considered only the fair-use defense under

30

15 U.S.C. § 1125(c)(3)(A) and never addressed whether the noncommercial-use exception in 15 U.S.C. § 1125(c)(3)(C) applied in that case. The same thing happened in *Haute Diggity Dog*—the Fourth Circuit never addressed whether the noncommercial-use exception applied in that case. 507 F.3d at 266.

There is no intercircuit conflict for this Court to resolve on this or any of the issues presented for review.

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted,

BENNETT EVAN COOPER
   *Counsel of Record*
DAVID G. BRAY
DAVID N. FERRUCCI
DICKINSON WRIGHT PLLC
1850 North Central Avenue,
   Suite 1400
Phoenix, Arizona 85004
(602) 285-5000
bcooper@dickinsonwright.com

*Counsel for Respondent*

No. 20-365

# In the Supreme Court of the United States

———————

JACK DANIEL'S PROPERTIES, INC.,
PETITIONER,

*v.*

VIP PRODUCTS LLC,
RESPONDENT.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———————

## REPLY BRIEF FOR PETITIONER

———————

THEODORE H. DAVIS JR.
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1100 Peachtree Street NE*
  *Suite 2800*
  *Atlanta, GA 30309*

DENNIS L. WILSON
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1801 Century Park East*
  *Suite 2300*
  *Los Angeles, CA 90067*

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
MATTHEW B. NICHOLSON
SURAJ KUMAR
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *lblatt@wc.com*

*(Additional counsel on inside cover)*

Isaac S. Crum
Rusing Lopez & Lizardi, PLLC
*16427 North Scottsdale Road*
*Suite 200*
*Scottsdale, AZ 85254*

**TABLE OF CONTENTS**

Page

I.    The Questions Presented Now Divide the Courts of
      Appeals.............................................................................2

II.   The Questions Presented Are Recurring, Important,
      and Squarely Presented ...................................................7

III.  The Decision Below Is Egregiously Wrong .................8

CONCLUSION ..........................................................................12

(I)

II

## TABLE OF AUTHORITIES

Page

Cases:

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983) .................................................................6

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ..............................................................9

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g
   Grp., Inc.*, 886 F.2d 490 (2d Cir. 1989).............................3

*Dr. Seuss Enters., L.P. v. Comicmix LLC*,
   -- F.3d --, 2020 WL 7416324
   (9th Cir. Dec. 18, 2020)......................................................10

*Eli Lilly & Co. v. Nat. Answers, Inc.*,
   233 F.3d 456 (7th Cir. 2000) ...............................................4

*Elvis Presley Enters., Inc. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ...............................................3

*Harley-Davidson, Inc. v. Grottanelli*,
   164 F.3d 806 (2d Cir. 1999)..................................................3

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ..............................................................9

*Integrity Staffing Sols., Inc. v. Busk*,
   574 U.S. 27 (2014) .................................................................8

*Louis Vuitton Malletier, S.A. v. Haute Diggity
   Dog, LLC*, 507 F.3d 252 (4th Cir. 2007) .............3, 5, 6, 11

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) .............................................11

*Mut. of Omaha Ins. Co. v. Novak*,
   836 F.3d 397 (8th Cir. 1987) ...............................................3

*Nike, Inc. v. "Just Did It" Enters.*,
   6 F.3d 1225 (7th Cir. 1993) .............................................3, 4

*NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929 (2017) ......................6

*Parks v. LaFace Records*,
   329 F.3d 437 (6th Cir. 2003) ...............................................4

*Radiance Found., Inc. v. NAACP*,
   786 F.3d 316 (4th Cir. 2015) ....................................4, 6, 12

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989).....................................*passim*

III

Page

Cases—continued:

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009) ..............................................6, 11
*Tommy Hilfiger Licensing, Inc. v. Nature Labs,*
   *LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002) ......................5
*U.S. Pat. & Trademark Off. v. Booking.com B.V.*,
   140 S. Ct. 2298 (2020) ..........................................................9
*Westchester Media v. PRL USA Holdings, Inc.*,
   214 F.3d 658 (5th Cir. 2000) ................................................4

Constitution and statutes:

U.S. Const. amend. I..................................................2, 4, 5, 10
Lanham Act, Pub. L. No. 79-489,
   60 Stat. 427 (1946)....................................................*passim*
Trademark Dilution Revision Act of 2006,
   Pub. L. No. 109-312, § 2, 120 Stat. 1731........................11
15 U.S.C.
   § 1125(c)(3)(A)(ii) ..........................................................6, 11
   § 1125(c)(3)(C) ..............................................................6, 10

Miscellaneous:

Stacey L. Dogan & Mark A. Lemley, *Parody as*
   *Brand*, 47 U. Cal. Davis L. Rev. 473 (2013) ................6, 8
Bill Donahue, *Top 10 Trademark Rulings of 2020*,
   Law360 (Dec. 16, 2020) ......................................................8
J. Thomas McCarthy, *McCarthy on Trademarks*
   *and Unfair Competition* (5th ed. 2020)................5, 8, 11

# In the Supreme Court of the United States

———————

JACK DANIEL'S PROPERTIES, INC.,
PETITIONER,

*v.*

VIP PRODUCTS LLC,
RESPONDENT.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———————

**REPLY BRIEF FOR PETITIONER**

———————

For consumers and mark owners alike, a brand is a priceless asset; a name lies at the heart of one's identity and reputation. The decision below, however, renders one's name a free-for-all for profiteers looking to make money off a joke. The decision guts the Lanham Act by giving heightened protection from infringement liability to any commercial rip-off of a trademark as long as a court deems the rip-off funny. Worse still, under the decision below, that same commercial use of a mark becomes "non-commercial" and thus immune from dilution liability. This Court should not sit idly by while the Ninth Circuit re-writes the Lanham Act.

Respondent struggles mightily to paint the decision below as consistent with authority applying the Second

(1)

2

Circuit's test in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to infringement claims involving artistic works. But respondent identifies no other circuit that has applied *Rogers* where, as here, an infringer uses a trademark to identify the source of a commercial product. Six other circuits apply the traditional likelihood-of-confusion analysis, and three of those circuits expressly *reject* heightened protection for commercial parodies. Pet. 18-22. Even the Second Circuit rejects application of *Rogers* in this context—something respondent ignores.

Respondent's arguments with respect to dilution are equally meritless. The Ninth Circuit's construction of the "noncommercial" exclusion eliminates dilution liability in all cases of commercial-but-humorous tarnishment. It also renders the more specific exclusion for parody—applied by the Second and Fourth Circuits in similar cases—impermissibly superfluous, another point that respondent ignores.

Respondent barely contests the importance of these frequently litigated and case-dispositive questions. If allowed to stand, the Ninth Circuit's outlier decision will permit infringers to confuse customers with near impunity, impede mark holders' ability to control commercial use of their marks, and promote forum shopping. The wide range of amici that have lined up both for and against the decision below underscores the importance of the questions presented. The Court should grant the petition.

I. **The Questions Presented Now Divide the Courts of Appeals**

1. a. The circuits are divided on whether humorous use of a trademark to identify the source of a commercial product is subject to the same likelihood-of-confusion analysis applicable to other uses under the Lanham Act, or must receive heightened First Amendment protection

3

from infringement claims. Pet. 17-23; INTA Br. 15-21. Respondent does not dispute that six other circuits have applied the likelihood-of-confusion analysis in these circumstances. And the Second, Seventh, and Eighth Circuits expressly rejected the argument, adopted by the Ninth Circuit below, that commercial parody products deserve heightened protection. *See Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812-13 (2d Cir. 1999); *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228 (7th Cir. 1993); *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402 (8th Cir. 1987)); *see also Louis Vuitton Malletier, S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 261 (4th Cir. 2007) (holding that "[t]he finding of a successful parody *only* influences the way in which the [likelihood-of-confusion] factors are applied" (emphasis added)).

Respondent (at 9) argues that these cases predated or failed to consider *Rogers*. But as just discussed, numerous courts reject heightened protection for commercial parody comparable to the protection the Second Circuit conferred on artistic movie titles in *Rogers*.

Respondent's assertion is also incorrect. In *Harley-Davidson*, the Second Circuit (in an opinion by *Rogers*' author) specifically distinguished *Rogers*; it explained that while it has "accorded considerable leeway" to parodists using trademarks in "expressive works," it has "not hesitated to prevent" an infringer from "using an alleged parody of a competitor's mark to sell a competing product." 164 F.3d at 811. It thus denied heightened protection to an infringer who (like respondent here) used a mark "somewhat humorously to promote his own products and services." *Id.* at 813. Similarly, the Seventh Circuit in *Nike* and the Fifth Circuit in *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998), cited a Second Circuit case applying *Rogers*, *Cliffs Notes, Inc. v.*

4

*Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490 (2d Cir. 1989), but nonetheless analyzed commercial parodies under the likelihood-of-confusion analysis.[1]

b.   Respondent identifies no case outside the Ninth Circuit applying *Rogers* to protect an infringer's humorous use of a trademark to designate the origin of its commercial product.  To support its claims of a "uniform" rule (at 15-17, 18), respondent cites cases giving heightened First Amendment protection to magazines or music.  *E.g., Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 320 (4th Cir. 2015) (article); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000) (magazine title); *Parks v. LaFace Records*, 329 F.3d 437, 443 (6th Cir. 2003) (song title).  But again, other than the Ninth Circuit, no court has extended such protection to the humorous use of trademarks to identify the source of commercial products.

Respondent claims (at 1 & n.1) that no one disputes that Bad Spaniels is "expressive."  That is wrong:  the district court correctly held that "VIP's dog toy is not entitled to protection under the First Amendment because it is not an expressive work."  Pet. App. 68a.  To the extent Bad Spaniels communicates any message, it does so by ripping off the communicative message that Jack Daniel's has spent decades developing and using that message as its own designation of source.  *See* Campari Br. 5-11.

Respondent invokes the McCarthy trademarks treatise for the proposition that "[t]he Second Circuit's *Rogers*

---

[1]  Respondent erroneously suggests (at 14) that the Seventh Circuit agrees with the Ninth Circuit.  After *Nike*, the Seventh Circuit again rejected the argument that parody is "entitled to some heightened form of protection from trademark liability."  *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 462-63 (7th Cir. 2000).

5

balancing test is now widely used by almost all courts." Br. in Opp. 11 (quoting 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:144.50 (5th ed. 2020)). But that treatise expressly states that "[t]he *Rogers* test is not applicable if the mark is used in a 'commercial' setting." 6 McCarthy, *supra*, § 31:153. In a section addressing "Parody Used in a Commercial Setting as Defendant's Mark," the treatise identifies *no* case applying *Rogers* and instead cites cases applying the likelihood-of-confusion factors, including the Fourth Circuit's decision in *Louis Vuitton*, then-Judge Mukasey's decision in *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002), and the district court's decision below. 6 McCarthy, *supra*, § 31:154 n.23; *see* Pet. 26, 29.

c. Respondent ignores altogether the Trademark Trial and Appeal Board (TTAB) decisions applying the likelihood-of-confusion analysis to similar uses of marks. Pet. 22. The decision below clashes with those decisions in addition to the circuit decisions addressed above. *See* Pet. 22.

2. The conflict between the Ninth Circuit's approach to dilution and that of other circuits is equally stark. The Ninth Circuit did not, as respondent suggests (at 23-24), apply the Fourth Circuit's multi-factored test to determine whether respondent's use of Jack Daniel's trademark and trade dress was "noncommercial." *See* Pet. 24. The Ninth Circuit reasoned that, even though respondent used Jack Daniel's trademark and trade dress "to sell Bad Spaniels" (*i.e.*, for a commercial purpose), its use qualified as "noncommercial" because the First Amendment protected respondent's "humorous message." Pet. App. 13a. That bright-line reasoning is the antithesis of the Fourth Circuit's multi-factored approach grounded in this

6

Court's commercial-speech cases. *See Radiance Found.*, 786 F.3d at 331-32; *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-68 (1983).

The Ninth Circuit's application of the noncommercial exclusion to "humorous" dilution would render the dilution-by-tarnishment statute a dead letter in any case involving alleged humor, such as the frequently occurring situation of tarnishment by sexual innuendo. *See* Pet. 24-25; *see also* Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U. Cal. Davis L. Rev. 473, 489 n.71 (2013) (identifying examples of "arguable parodies that may tarnish because of their offensive or sexual content"). Respondent does not dispute that point, nor does it cite any other case categorically protecting humorous tarnishment. Respondent ignores cases imposing dilution liability in similar circumstances, and it offers the Court no basis to distinguish those cases from this one. Pet. 25.

Finally, respondent concedes (at 29-30) that other circuits have refused to apply the parody exclusion to humorous uses of famous marks where, as here, the infringer used the mark "as a designation of source." 15 U.S.C. § 1125(c)(3)(A)(ii); *see Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 113 (2d Cir. 2009); *Louis Vuitton Malletier*, 507 F.3d at 266. (Respondent ignores the similar decision of the TTAB. *See* Pet. 26.) Respondent dismisses those cases because they did not address the separate exclusion for noncommercial use under section 1125(c)(3)(C). But a fundamental canon of construction dictates that "the specific"—here, the parody exclusion—"governs the general"—here, the noncommercial exclusion. *NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 941 (2017); *see also* pp. 10-12, *infra*. That no other court entertained respondent's argument just highlights how egregiously the Ninth Circuit misread the statute.

7

## II. The Questions Presented Are Recurring, Important, and Squarely Presented

1. The wide array of amici supporting the petition—within and outside the alcohol beverage industry and trademark plaintiffs and defendants—confirms the importance of the questions presented. Amici explain that the decision below will hinder alcohol manufacturers' ability to control commercial use of their marks in order to ensure fair advertising and discourage underage drinking. Alcohol Beverage Indus. Ass'ns Br. 13-18; *see* Constellation Brands Br. 10 (identifying infringing products that "expressly link Corona with children"). The district court echoed that point, finding "that dilution by tarnishment will occur due to Jack Daniel's trademarks and trade dress being associated with toys, particularly the kind of toys that might appeal to children." Pet. App. 41a-42a.

The effects of the decision below will sweep far beyond the alcohol industry; the decision forces any mark holder to satisfy a heightened evidentiary burden to avoid association with potentially offensive and misleading products. Take Campbell Soup's recent effort to "halt[] a third party's sale of T-shirts depicting a red and white Campbell's soup label but adding the words 'Bat Soup' and 'Now With COVID-19.'" Campbell Soup Br. 8. Only the Ninth Circuit would accord that T-shirt heightened protection against infringement liability no matter the likelihood of consumer confusion. That outlier approach will encourage rampant forum-shopping. Pet. 27; Campbell Soup Br. 7 n.2; Constellations Brands Br. 3.

The questions presented arise frequently in trademark cases, and respondent does not demonstrate otherwise. Although it begins its brief (at 1) by referencing a "small number of cases" and "infrequently raised issues," respondent later acknowledges (at 7 n.2) that "[p]arody

8

products are ubiquitous in the dog product industry," quoting the McCarthy treatise. That the McCarthy treatise discusses trademark issues related to parody pet products should tell the Court all it needs to know about how frequently parties litigate these issues, both with respect to pet products and other parody products. Pet. 27-28; *see also* Campbell Soup Br. 10-11 (citing cases).

Commentators also have written about the trademark issues implicated by parodic commercial products. *See* Dogan & Lemley, *supra*. The decision below was recently recognized as one of the most important trademark decisions of 2020. *See* Bill Donahue, *Top 10 Trademark Rulings of 2020*, Law360 (Dec. 16, 2020). Conspicuously, prominent law professors who typically oppose the interests of mark holders filed a certiorari-stage amicus brief supporting respondent. Br. of Trademark Law Professors. Both industry and academics are closely watching this case.

2. This case could not be a better vehicle to decide both questions. Respondent does not dispute that the questions are case-dispositive. Pet. 30. And, although respondent invokes (at 17) the "interlocutory" posture as a ground to deny certiorari, that posture results entirely from the Ninth Circuit's reversal of the district court's *final judgment in favor of Jack Daniel's*. The interlocutory nature merely underscores the mischief created by the decision below. If this Court reverses, the case will be over. The case's posture is no bar to certiorari. *See, e.g.*, *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 30 (2014).

**III. The Decision Below Is Egregiously Wrong**

1. a. Respondent does not ground the Ninth Circuit's decision in the Lanham Act's text or structure. Pet. 30-

9

31.  The Ninth Circuit's rule permits an infringer to es-
cape liability even where, as here, the mark holder *satis-
fies* the statutory likelihood-of-confusion test.  Pet. App.
48a.  Nothing in the Act allows that result; when Congress
wanted to exclude certain uses of a mark from liability, it
did so expressly.  Pet. 31.

Nor does respondent attempt to reconcile the Ninth
Circuit's bright-line rule with this Court's precedent re-
jecting that blunt approach in trademark and copyright
cases.  Pet. 32-34; *see U.S. Pat. & Trademark Off. v. Book-
ing.com B.V.*, 140 S. Ct. 2298, 2306-07 (2020); *Campbell v.
Acuff-Rose Music, Inc.*, 510 U.S. 569, 581 (1994); *Harper
& Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539,
560 (1985).  Just as the flexible likelihood-of-confusion test
rendered unnecessary the PTO's "unyielding legal rule"
regarding trademark registration in *Booking.com*, 140 S.
Ct. at 2307, that test adequately protects the free-speech
considerations that motivated the Ninth Circuit to apply
*Rogers* below.  Pet. 33-34.

The Ninth Circuit's inflexible rule places a heavy
thumb on the scale in favor of the infringer's junior use of
a mark for purportedly communicative purposes, dis-
counting the mark holder's senior use of the mark, which
is every bit as communicative.  Campari Br. 11-16.  Here,
that approach privileges a crass, juvenile dog toy over an
evocative, well-known brand that conveys sophistication
and refinement.  Pet. 8-9, 11.  Respondent fails to explain
why courts should create a special rule favoring one com-
municative use of a mark over another.

b.  Respondent wrongly argues (at 19) that the *Rogers*
test merely construes the statutory phrase "likely to
cause confusion."  To the contrary, the Ninth Circuit ap-
plied *Rogers* to determine whether "[t]he Lanham Act []
applies" at all.  Pet. App. 10a.  The court reiterated that

10

point just last week: "The *Rogers* test . . . determine[s] whether the Lanham Act applies," and a trademark holder who cannot satisfy either prong "does not have an actionable Lanham Act claim," and "evidence of consumer confusion . . . does not change the result." *Dr. Seuss Enters., L.P. v. Comicmix LLC*, -- F.3d --, 2020 WL 7416324, at *12 (9th Cir. Dec. 18, 2020). That holding confirms just how far the Ninth Circuit has changed the law.

Similarly misplaced is respondent's attempt (at 20) to justify the Ninth Circuit's approach as a "rule of construction" to "avoid constitutional difficulties." As just noted, the Ninth Circuit applies *Rogers* as a threshold inquiry to determine *whether* to apply the Lanham Act. Pet. App. 10a. No one is construing ambiguous statutory language. Nor did the Ninth Circuit explain *why* the likelihood-of-confusion factors are inadequate to protect respondent's claimed interest. The Ninth Circuit just blindly applied the *Rogers* test after concluding that humor renders a dog toy "expressive." Pet. App. 12a-13a.

Respondent identifies no logical stopping point to that approach. If humor renders Bad Spaniels "expressive," then any infringer could try to obtain heightened protection from liability simply by adding a modicum of humor (or any form of communication) to its infringing use—no matter the likelihood of consumer confusion. The First Amendment does not require that wholesale revision of the Lanham Act or obliteration of Jack Daniel's own First Amendment interests.

2. The Ninth Circuit even more blatantly erred with respect to dilution. Respondent has no answer to the fatal problem with the Ninth Circuit's reasoning: by reading the noncommercial exclusion of section 1125(c)(3)(C) to permit humorous use of famous marks to sell products,

11

11

Pet. App. 13a, the Ninth Circuit rendered the more specific parody exclusion of section 1125(c)(3)(A)(ii)—which applies only when the mark is used "other than as a designation of source"—superfluous. Pet. 35.

Respondent does not address this superfluity problem. Instead, respondent offers platitudes (at 28-29) about the alternative and overlapping nature of the statutory exclusions. Oddly, respondent relies almost entirely on *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), for this proposition, but that case *predated* Congress' enactment of the parody exclusion in the Trademark Dilution Revision Act of 2006. *See* Pub. L. No. 109-312, § 2, 120 Stat. 1731. Cases predating the 2006 amendment are of limited utility to dilution claims involving parody. *Starbucks*, 588 F.3d at 112; *see also* 4 McCarthy, *supra*, § 24.126. Respondent cites no other case considering a parody claim under the noncommercial exclusion since the 2006 amendment. The only dilution cases the Ninth Circuit cited below predated the amendment as well. Pet. App. 13a.

Invoking the McCarthy treatise, respondent argues that the overlapping statutory exclusions "provide for free speech concerns that the federal anti-dilution law would be used to silence 'noncommercial' critics." Br. in Opp. 29 (citation omitted). But that treatise nowhere supports the notion that parodic use of a mark *as a designation of source* is noncommercial and thus avoids dilution liability.[2] It strains credulity to characterize respondent's poop-humored dog toy as noncommercial criticism of Jack

---

[2] McCarthy makes the commonsense point that parody bears on whether use of a famous mark causes dilution by blurring or tarnishment in the first place. 4 McCarthy, *supra*, § 24.90 (citing *Louis Vuitton Malletier*, 507 F.3d at 266-67).

12

Daniel's whiskey.  *Cf. Radiance Found.*, 786 F.3d at 330 (article using NAACP trademark to criticize NAACP's stance on abortion satisfied the noncommercial exception).  Respondent cites no case holding a product branded with a humorous-but-tarnishing version of a famous mark to be "noncommercial" and thus excluded from tarnishment liability.

### CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

<table>
<tr>
<td>

THEODORE H. DAVIS JR.
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1100 Peachtree Street NE*
  *Suite 2800*
  *Atlanta, GA 30309*

DENNIS L. WILSON
KILPATRICK TOWNSEND &
STOCKTON LLP
  *1801 Century Park East*
  *Suite 2300*
  *Los Angeles, CA 90067*

ISAAC S. CRUM
RUSING LOPEZ & LIZARDI,
PLLC
  *16427 N. Scottsdale Rd.*
  *Suite 200*
  *Scottsdale, AZ 85254*

</td>
<td>

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
MATTHEW B. NICHOLSON
SURAJ KUMAR
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *lblatt@wc.com*

</td>
</tr>
</table>

DECEMBER 23, 2020