**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| VIP Products, L.L.C., | ) | |
| | ) | No. 2:14-cv-02057-SMM |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 27, 2023 |
| Jack Daniel's Properties, | ) | 3:24 p.m. |
| Incorporated, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE STEPHEN M. MCNAMEE, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**STATUS CONFERENCE**

**APPEARANCES:**

For the Plaintiff:
   DICKINSON WRIGHT PLLC
   By:  **Mr. David G. Bray, Esq.**
        **Mr. Bennett E. Cooper, Esq.**
   1850 N Central Ave., Ste. 1400
   Phoenix, AZ 85004

For the Defendant:
   WILLIAMS & CONNOLLY LLP - Washington, DC
   By:  **Ms. Amy M. Saharia, Esq.**
   680 Maine Ave., SW
   Washington, DC 20024

   MESSNER REEVES LLP - Phoenix, AZ
   By:  **Mr. Isaac S. Crum, Esq.**
   7250 N 16th St., Ste. 410
   Phoenix, AZ 85020

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **P R O C E E D I N G S**

2          COURTROOM DEPUTY:  This is case number CV 14-2057, VIP

3    Products, L.L.C. versus Jack Daniel's Properties, Incorporated,

4    before the Court for a status conference.

5          Counsel, please announce for our record.

6          MR. COOPER:  Good afternoon, Your Honor.  Bennett

7    Cooper and David Bray for VIP Products.

8          THE COURT:  Thank you.  Good afternoon.

9          MR. BRAY:  Good afternoon.

10         MR. CRUM:  Good afternoon, Your Honor.  Isaac Crum

11   from Messner Reeves on behalf of Jack Daniel's Properties,

12   Incorporated.

13         With me today is Amy Saharia from Williams and

14   Connolly, and also a client representative, Justin Welch, who

15   is chief IP counsel and managing director of Jack Daniel's

16   Properties, Incorporated.

17         THE COURT:  Thank you and welcome.

18         MS. SAHARIA:  Good afternoon, Your Honor.

19         THE COURT:  Good afternoon.  I see we're back together

20   again after your adventures in Washington, D.C.

21         Mr. Cooper, what happened to your opponent in the

22   Supreme Court?

23         MR. COOPER:  What happened in the Supreme Court?

24         THE COURT:  No, I know what happened in the Supreme

25   Court, but I'm saying where is your opponent from the Supreme

1    Court who argued the case?

2           MR. COOPER:  Oh, Ms. Blatt?

3           MS. SAHARIA:  She sent me in her place, Your Honor.

4           THE COURT:  Oh, well, do we expect her, because it was

5    very interesting to listen to both of you.

6           Again, I'm sorry to bring everyone down here for this,

7    but I thought it would be better if we get together and find

8    out exactly where we are, where we're headed, and, you know,

9    that sort of thing.

10          I need some help here.  Who wants to go first?  We

11   ought to clean up the record, too, about if there is any

12   attorneys that are no longer in the case who have been

13   substituted in, out or -- and if there is new attorneys, would

14   you please make sure that we're -- we have all the

15   documentation of all that sort of thing.

16          Can you help me out here, Mr. Cooper, for your side?

17          MR. COOPER:  Yes, Your Honor.  David Ferrucci and

18   Jonathan Batchelor are still listed on the docket, they're not

19   -- no longer in the state.  They're no longer with our firm.

20   They're certainly no longer representing clients.  I don't know

21   what the status of the notice of withdrawal are, but they're no

22   longer with us.

23          THE COURT:  Okay.  Well, we'll excuse them from any

24   further participation in this case.

25          And, Mr. Bray, do you agree with that?  The reason is

4

1   you've been here throughout this entire process in this court

2   and you know the record just about as well as anybody here.  So

3   do you agree with that assessment?

4          MR. BRAY:  I do, Your Honor.

5          THE COURT:  Thank you very much.

6          Okay.  Counsel, go ahead, whoever wants to jump up

7   there and have at it.

8          MR. CRUM:  Thank you, Your Honor.

9          There are, I believe, three attorneys from Kilpatrick

10  Townsend who entered an appearance earlier in the case who will

11  be withdrawing.

12         THE COURT:  Okay.  Do we need to do anything formal on

13  their behalf or is your suggestion here today that they have

14  been relieved of their representation good enough?

15         MR. CRUM:  Your Honor, we will also file -- we'll file

16  something with the Court to make it clear.

17         THE COURT:  Okay.

18         MR. CRUM:  Thank you.

19         THE COURT:  These things have a way of getting tangled

20  up from time to time.

21         Okay.  Now, it seems like the Supreme Court has spoken

22  and it's back here.  It's almost like starting at square one

23  again.

24         Mr. Bray, I think you and I were a lot younger when we

25  started all this.

1          MR. BRAY:  I don't think my hair was quite this white.

2          THE COURT:  I think I may have had some hair back then

3     but not much.

4          But, anyway, tell me where we think we should go.  Do

5     we resurrect any part of the case?  Are there just certain

6     evidentiary things?  Do we pick it up on the issue of

7     tarnishment and dilution, assuming the first part of the case

8     is over on some of the things we did.  What's the effect of the

9     prior trial, if anything?

10          Help me out.  Mr. Cooper, you want to jump in here

11    first?

12          MR. COOPER:  Yes.  Should I do it from here, Your

13    Honor?

14          THE COURT:  Yeah.  It would be probably easier if you

15    remain seated.  It's easier for the microphones if you pull

16    them down, because it's easier for the court reporter and

17    everybody to hear, since there is no other people in the

18    courtroom.

19          Go ahead.

20          MR. COOPER:  Fair enough, Your Honor.  It's been a

21    while since I've been in this courthouse, as Your Honor

22    probably remembers.

23          I think it's something of a middle ground of where we

24    go from here.  I don't think, frankly, that we need to reopen

25    the evidentiary record.  The Court held a bench trial.  The

1    facts are in.  But there are legal arguments to be made on

2    those facts, and we believe that can be accomplished with what

3    -- not summary judgment or judgment as a matter of law, but a

4    set of post-trial motion practice based on the existing factual

5    record.

6            And we would recommend one motion directed to the

7    infringement claim and one motion directed to the tarnishment

8    claim and then Your Honor can rule on that.

9            THE COURT:  Okay.  Let me ask you this.  If the -- one

10   of the issues that they seem to be a little critical of, and

11   that was the lesson -- I mean, the, you know -- I'm blanking on

12   it here -- the use of the surveys.  Apparently, there was some

13   comment that they thought that by, at least in part of the

14   opinions, or it was probably dicta in the other part of the

15   case, that they said, well, we don't think you should rely too

16   heavily on those sort of things.  And in one case I think one

17   of the justices said we thought it may have been flawed, or

18   something like that.  I don't know if that's correct, if my

19   recollection is correct, but the point is what do we do about

20   that, because that's -- I don't know if they wish to still --

21   I'll ask them when it's their turn.  What's your take on that

22   one?

23           MR. COOPER:  Your Honor, Dr. Ford who conducted the

24   plaintiff's surveys -- Jack Daniel's Properties surveys, passed

25   away, as Your Honor may recall, well before the trial in this

1   case, so that record is fixed.  But we think that that can be

2   addressed in the motion practice about what weight to give the

3   surveys in light of the issues raised by Justice Sotomayor and

4   Justice Alito's concurrence.

5           THE COURT:  All right.

6           MR. COOPER:  And I think there are other weighting

7   issues about how to approach the difference Sleekcraft factors

8   raised by the majority opinion and its citation to the

9   Solicitor General's brief.  And we think that doesn't require a

10  new factual record, we think that can be done on the basis of

11  motion practice.

12          THE COURT:  Okay.  Let me hear from the other side

13  now.  Tell me what you think.

14          MS. SAHARIA:  So I think the parties are largely

15  aligned on how to proceed.  We agree that the Court does not

16  need to reopen the evidence.  The Court has already found the

17  facts based on the prior bench trial, and we think the only

18  issue remaining for the Court to decide is whether the Supreme

19  Court's decision affects its legal analysis on the infringement

20  claim, and so we agree that can be addressed through briefing.

21          I'm not sure why we need to have separate motions

22  directed to the two claims, but we would propose that the

23  parties submit what is, essentially, post-trial briefing to the

24  Court, requesting entry of judgment on both claims.

25          We think the way to do that would be for both sides to

1    file simultaneous post-trial briefs addressing the affect of

2    the Supreme Court's decision on the two claims.  We would

3    propose that we do that in 60 days from now, given the

4    intervening holidays, and then both sides simultaneous --

5    simultaneously could submit a response brief 30 days later.  So

6    two rounds of briefing, one opening brief by both sides, and

7    then a response brief by both sides.  Presumably both sides

8    will be asking the Court to enter judgment in their favor in

9    light of the Supreme Court ruling.

10            THE COURT:  With oral argument in, let's say, June,

11    July, or August?

12            I'm teasing you.

13            MS. SAHARIA:  We're anxious to resolve the case, Your

14    Honor.

15            THE COURT:  I would imagine.  Okay.  Now, so that

16    gives me some ideas.

17            Do you think, in light of the Supreme Court's ruling,

18    that the Fourth Circuit case is the one that jumps into the

19    driver seat, because the Supreme Court said the Miller case is

20    out as a functioning controlling thing that they used to

21    reverse me the first time so -- and they're saying, well,

22    that's out.

23            So my question then is is there anything in that

24    rubric or about the Fourth Circuit case that you think -- is

25    that in the driver seat now, so to speak, for want of a better

1    terminology, or is there something else out there?  Are there

2    other cases that have developed interpreting all of this

3    business of the use of someone else's mark as a, sort of a

4    springboard to get their product off the ground?

5        MS. SAHARIA:  Sure.  I think there are multiple cases

6    from other circuits that have addressed claims of parody.

7    Those cases, like the Fourth Circuit case, address parody in

8    the context of whether the parody is likely to confuse.  That

9    is the rubric the Supreme Court held is the correct rubric.  Of

10   course, that is the rubric that Your Honor acknowledged in your

11   original ruling was the correct rubric.

12       We think Your Honor's original rulings are perfectly

13   consistent with the existing case law and the Supreme Court's

14   decision, but that's the issue that we would propose to address

15   in briefing.  I think there are multiple factual distinctions

16   between the Fourth Circuit's Louis Vuitton case and this case,

17   both with respect to the products, both the infringing product

18   and the trademark at issue, but those would be issues that we

19   would address to the Court in our proposed briefing.

20       THE COURT:  I sort of, by looking at the Fourth

21   Circuit case, I kind of gleaned that there might be some

22   differentiation there between the two cases.

23       MS. SAHARIA:  Exactly.

24       THE COURT:  And the way the products were developed.

25       But, anyway, Mr. Cooper, are you pretty much in

1    agreement with that, about 60-day out cross motions, sort of

2    like that?

3         MR. COOPER:  Your Honor, people's experience may

4    differ.  I find that simultaneous briefing is often a recipe

5    for -- to mix metaphors -- ships passing in the night.  I find

6    sequential briefing hones the issues and brings them to a point

7    more effectively, because then you've got two briefs coming in

8    that may be addressed to different things, and then two reply

9    briefs that doesn't, and everyone is left being unsatisfied.

10   We would recommend more of a three brief schedule, both one on

11   infringement.  And we think there are also issues to be

12   addressed, or arguments we wish to make that we highlighted to

13   the Ninth Circuit in the briefing on remand from the Supreme

14   Court, and said we thought the Ninth Circuit could do it on, in

15   the first instance, and they gave us a general remand of all of

16   that to the district court, so we'd like an opportunity to

17   present that.

18         THE COURT:  I take it, since you're here, they didn't

19   buy your argument?

20         MR. COOPER:  No, I don't think they addressed it, but

21   they --

22         THE COURT:  Well, otherwise I wouldn't have the case.

23         MR. COOPER:  I think you'd have to ask Judge Hurwitz

24   upstairs, or downstairs, I forget which, but I think the

25   defendant -- the Jack Daniel's argument, I think that there was

1    no judgment to hear on appeal at that point on remand, so they

2    sent it back down, but it was a general remand without

3    limitations to specific issues.  So we'd like to make the

4    arguments in the first instance there and then see how it turns

5    out.  But we think it's just a separate -- these are legal

6    arguments that we'd like to make on the -- on the issue of

7    tarnishment, some legal issues based on the Brunetti case which

8    came out after this Court's ruling.

9         THE COURT:  Well, the one thing that I'm concerned

10   about is, if I adopted your theory of briefing, is that then

11   you have, hypothetic, if I say -- ask you to go first, then

12   they respond and then they cross raise issues, then you file a

13   reply to their response, and then you have to respond to them

14   and then they get a reply back.  I'm set with the same problem.

15   I mean, I've got -- see that person over there with the nice

16   glasses on, I have one clerk.  You've got banks of lawyers.

17   Now, how am I going to do that?  And we're going to have to put

18   page limitations on this.  And that's a serious problem, to be

19   quite candid with you.

20        So give me some help here about where do you think --

21   how should we do this?  I want to give each party a fair shot

22   at this, but I don't want to keep this ping pong ball going ad

23   nauseam either.

24        MR. COOPER:  I understand fully, Your Honor.  It's

25   always a problem.  Maybe the best way is to have simultaneous

1    briefs, simultaneous responses, simultaneous replies, and then

2    you're not ping ponging, but at least there is a chance for

3    everyone to respond to the other side's arguments on a

4    particular --

5            THE COURT:  Provided, if we do it that way -- if I do

6    it simultaneous, no new issues can be raised in a reply brief.

7            MR. COOPER:  Absolutely, Your Honor.

8            THE COURT:  In the past, for -- at least most of you

9    have never been here before.  In this district, we take a very

10    dim view of things being raised for the first time in reply

11    that should have been raised in your moving brief or in your --

12    or in a response.  And they usually end up in the, as the

13    English would say, in the dust bin somewhere, because that's

14    not fair.  So, I mean, you know what the issues are, you know

15    what the cases say, certainly better than I do, and you know

16    what has developed and the law has been since this case and

17    other cases out there and how this should be interpreted.

18    That's all I'm asking for is a fair shot at that.

19            Now, if we do that, because I'm pretty much persuaded

20    the simultaneous way is the way to go, and I'll give you the

21    reply, I'll do that, but there should be some sort of page

22    limitations on this so everybody gets their fair shot at it.

23    So how much -- how many computers do you want to exhaust in

24    giving me all this?  And what I don't want to do is get

25    something that looks like War and Peace up here on my desk.

1          MR. COOPER:  Your Honor, I would never do that, and I

2    promise to do it without footnotes so you won't have that

3    problem.

4          THE COURT:  I don't mind footnotes as long as you

5    don't go past the page limitation and they're all the same

6    font.

7          MR. COOPER:  I share Your Honor's concern about those

8    people who put their footnotes in even smaller font to squeeze

9    them in, never could understand that.

10          Because of the two, that we want to address both

11    claims, we think it's more than just the usual 17-page motion

12    limit, so we would ask for 30.  That's for both, altogether.

13          MS. SAHARIA:  I think 25 pages is sufficient, Your

14    Honor.  We've been at this case for ten years.  We know what

15    it's about.  I have concern that most of the arguments that VIP

16    wants to raise, based on their brief to the Ninth Circuit, are

17    arguments they should have raised ten years ago that have long

18    been waived, so giving them more pages will just encourage more

19    briefing of waived issues.

20          THE COURT:  Now, okay, let me think about that a

21    little bit.  Maybe we'll get like 27 and two-thirds pages, I

22    don't know.

23          What about law of the case?  If there is anything that

24    comes up in that argument that I should be either bound by or

25    say, well, there is changed circumstances, changed law, the

1   whole thing has gone upside down, whatever you want to call it,

2   what do we think about something like that?  Because you have

3   done things, and there has been briefing -- and along, as a

4   sidecar of that, or as a footnote, as counsel would say, where

5   somebody has made an argument in another court, not this one,

6   but it is either directly or quietly overruled or discharged,

7   or someone has made an argument in some other court that

8   becomes an admission against interest, just hypothetically, can

9   you help me out on some of those thoughts?  I don't know that

10  it's going to happen but --

11           MS. SAHARIA:  Sure.  I'm not -- I don't -- obviously,

12  I don't know what VIP is going to say in their brief, so I

13  can't predict whether there might be some judicial estoppel

14  issues that could arise that they took a position inconsistent

15  with a position they took elsewhere.  That would be something

16  that we could brief if it occurred.

17           I think what is more likely to occur is that VIP

18  intends to present a brand new argument, which is that the

19  dilution statute is facially unconstitutional under the First

20  Amendment.  This is not the First Amendment argument that was

21  addressed to Your Honor at trial and at the summary judgment

22  stage, which was an argument about parody in particular.  This

23  is a facial attack on the dilution statute that VIP told the

24  Ninth Circuit on remand they wished to present.

25           THE COURT:  My question on that one is they wish to

1  present it now, but it was never raised the first time around,

2  and it wasn't raised in the Supreme Court, and the Supreme

3  Court had a comment about it, not facially unconstitutional,

4  First Amendment prevails.  They carefully looked at that and

5  said the Lanham Act is what it is, and it doesn't automatically

6  prevail on a First Amendment issue.

7          MR. COOPER:  Your Honor, we flagged the issue before

8  the Supreme Court, because the issue had been raised and the

9  argument had become possible after the Supreme Court's 2019

10 decision in the Iancu versus Brunetti, and so we raised it in

11 the Supreme Court.  The Supreme Court did not resolve it as to

12 the dilution statute, or even flag the issue, it simply

13 resolved the issue that had been decided on the noncommercial

14 use exclusion and then remanded it.

15         We indicated before the Ninth Circuit that we wanted

16 to raise it.  And we cited the case law that would allow us to

17 raise it for the first time on appeal, because it's a pure

18 issue of law.  And it was the result of intervening Supreme

19 Court case law, and the Ninth Circuit just issued a general

20 remand without identifying it or foreclosing it.

21         So we simply -- if Jack Daniel's Properties wants to

22 say that Your Honor should not consider the argument, they can

23 do that in their response brief.

24         THE COURT:  Well, wouldn't you have to move to amend

25 your complaint?

1          MR. COOPER:  We don't think so, Your Honor.  The Ninth

2     Circuit has not required -- it's never required, our research

3     reveals, that a constitutional argument like that be raised in

4     an answer.

5          Now, if the Court wants to indulge that formalism,

6     then we would ask for leave to amend it, but it's a pure issue

7     of law that requires no factual development, and it's based on

8     intervening case law long after the answer in this case, and

9     long after, in fact, this Court resolved the First Amendment

10    issues.

11         MS. SAHARIA:  Sure.  So this argument, as VIP told the

12    Ninth Circuit, first became possible after the Supreme Court's

13    decision in a case called Matal v. Tam.  That decision was

14    decided during the proceedings in this court and before the

15    trial in this court.  VIP never raised the issue to this court.

16    It never raised the issue on appeal to the Ninth Circuit, even

17    though the Brunetti case that counsel just mentioned was

18    decided while that first appeal in the Ninth Circuit was

19    pending.  It didn't raise it to this Court.  It didn't raise it

20    to the Ninth Circuit.  It has never complied with Federal Rule

21    of Civil Procedure 5.1 which requires notice to the attorney

22    general when a party is attacking facially a statute as

23    unconstitutional.  Raising that issue now would require

24    compliance with that rule, it would require certification to

25    the attorney general, it would inject substantial delay into

1    the proceedings.

2         This is a classic example of a party losing on appeal

3    and trying to get a second bite at the apple by making brand

4    new arguments it could have made years ago.  We're happy to

5    brief this to the Court if they choose to raise this argument

6    in their brief.

7         THE COURT:  Okay.  Well, that being said now, because

8    that does raise an interesting thing, is that something that

9    should be included in the briefing on all the claims that we

10   think are still outstanding, or is that a separate issue that

11   should be briefed independently as a separate standalone issue

12   if they choose to raise it?

13        MS. SAHARIA:  I think we would -- we would simply

14   respond to that issue in our response brief.

15        THE COURT:  Briefing, okay.  Well, then, if that's the

16   case, then we'll hold to it all comes in.  That being said,

17   that may take up a slightly few extra pages.

18        MS. SAHARIA:  I agree, Your Honor.

19        THE COURT:  Okay.

20        MS. SAHARIA:  The waiver arguments will require a few

21   extra pages in response.

22        THE COURT:  So 30 would be adequate for it then?

23        MS. SAHARIA:  Yes.

24        THE COURT:  All right.  Then we'll do that.  That will

25   give you an opportunity and give them an opportunity to respond

1    to that issue within the context of the other issues.

2            Now, we're looking at 60 pages, I mean, 60 days.  And

3    I realize that counsel have other cases and other matters and

4    other deadlines in other courts, so please -- let's look at

5    that.  So 2024, approximately, it's first of December,

6    approximately, that's -- 60 days would be, basically, March the

7    1st, approximately.

8            MS. SAHARIA:  60 days, I think, is late January.

9            THE COURT:  Well, if I give you -- oh, I'm sorry, all

10   December and all January, so that would be February the 1st,

11   somewhere in there.

12           MS. SAHARIA:  Exactly.

13           THE COURT:  Now, the question is, there is a lot of

14   activity in December, I mean, a lot of activity for a lot of

15   people for a lot of reasons, including firm closeouts, this and

16   -- I mean, you know, closing out books, doing this, doing that.

17   And I believe that, from my perspective, I like to give people

18   time to spend time with their family, get other things done and

19   come in with a little extra time.  So I'm willing to give a

20   little extra on that issue, because once we set the deadlines,

21   I will be less than enthusiastic about a continuance for other

22   reasons.  So please keep that in mind.

23           So tell me what you think and I'll be willing to work

24   with you.

25           MS. SAHARIA:  Sixty days is fine with us, Your Honor.

1   We took account of the holidays in proposing 60 days.

2            THE COURT:  Mr. Cooper.

3            MR. COOPER:  I would suggest maybe splitting the

4   difference and say mid February.

5            THE COURT:  Well, I'm going to do it for a completely

6   different reason here, I'm going to do the -- I'll say Friday,

7   the 16th of February.  And then you get -- how long do you want

8   for replies?

9            MS. SAHARIA:  You mean for the initial response?

10           THE COURT:  The initial responses.

11           MS. SAHARIA:  I think 30 days would be fine with us,

12  Your Honor.

13           MR. COOPER:  That's fine, Your Honor.

14           THE COURT:  Good.  We'll do one day short of that.

15  How does the 15th of March sound?

16           MR. COOPER:  The Ides would be fine, Your Honor.

17           THE COURT:  The Ides -- I finally got someone in the

18  courtroom that understands that.  When I tell new admittees to

19  the Court, I make reference of that, I get a blank stare from

20  some of these folks out there.

21           Is that a good day or do you want an extra week in

22  there?  Now, the reason I say this, it doesn't affect me now,

23  but getting back and forth on airlines these days is not the

24  easiest thing in the world either, but this date has nothing to

25  do with airlines.  So tell me what you think.

1          MS. SAHARIA:  March 15th is great, Your Honor.

2          THE COURT:  Okay.  Fifteenth of March, with the usual

3     admonition that Caesar got.  And then we'll go to the replies,

4     if anything, that would probably be -- boy, I can't get

5     April 15th in there.  How about the 19th of April?

6          MR. COOPER:  I'm sorry, the 19th?

7          THE COURT:  The 19th of April for replies.

8          MS. SAHARIA:  Sure.

9          THE COURT:  Okay.  All right.  Let's do that.

10         MS. SAHARIA:  And, Your Honor, if it's 30 pages for

11    the opening brief and the response brief, then it would be half

12    of that for the reply brief?

13         THE COURT:  Yes, because that should be a much

14    narrower analysis.

15         Then, once we get it done, I suppose, given the nature

16    of this and all the things that have gone on, that you --

17    rather than me rule without -- rule without the necessity of

18    oral argument, I take it the parties would like to have oral

19    argument, unless I am mistaken on that?  You don't have to.

20         MS. SAHARIA:  Our view is it's in Your Honor's

21    discretion.  We think the issues to be resolved are fairly

22    narrow, but if Your Honor would like argument, of course we

23    will provide it.

24         THE COURT:  No, I'm trying to be accommodating to the

25    parties.  I can do without another oral argument, but I -- on

1   the other hand, I'm interested -- and you don't have to decide

2   this now.  Maybe you should let it develop and then keep your

3   options open, because it may or may not be helpful to the

4   parties.  I mean, sometimes these things take unusual twists

5   and turns, that's all.

6          And the reason I say that, I mean, I know Mr. Cooper

7   is right down the street here, but, on the other hand, you

8   folks are from a ways far away, but I don't want to let that be

9   the driving force of it.  I want to take it as what would the

10  parties like?  And Mr. Bray is close at hand also, just from a

11  logistics point of view.

12         MS. SAHARIA:  We're fine having oral argument and it's

13  always nice to have an excuse to come to sunny Arizona.

14         THE COURT:  Okay.  Well, that's nice.

15         All right.  Now, with that in mind, what else should

16  we -- could we take up?  Because this answers some of my

17  questions.  What questions do you have?  What things are you

18  concerned about?  What have we done that we should have

19  addressed?  Because you've been dealing with this case a long

20  time, but also the last portion of it I just get the results of

21  what someone else has done.  So tell me what else it is we

22  should be addressing or thinking about or scheduling, whatever

23  you think.

24         MR. COOPER:  I think that's all we have today, Your

25  Honor, and everything else, that we can foresee, would be

1   addressed in the briefing.

2           MS. SAHARIA:  Agreed, Your Honor.

3           THE COURT:  Okay.  And I assume -- are there -- is

4   anyone aware of any cases that are out there pending in any

5   courts of appeals, or even on their way to the Supreme Court in

6   some fashion, that may affect this case along the way?

7           MR. COOPER:  As I sit here today, no.  I don't expect

8   that the Court's ruling in the Elster case, which is -- deals

9   with another trademark registration issue, is going to affect

10  this case, but it's always possible.  That's under submission

11  in front of the Supreme Court.

12          MS. SAHARIA:  I'm not aware of any other case, Your

13  Honor.

14          THE COURT:  Okay.  All right.  Now, if there is

15  anything else we can do to help move this along, because I

16  gather, since everyone is here, there is absolutely zero chance

17  that there is any kind of a negotiated resolution of this case.

18  And that's fine.  You're entitled to your days in court.  But I

19  just always want to throw this out in the what it's worth

20  category.  It's usually not worth a lot.

21          MR. BRAY:  Mr. Crum and I have an open line of

22  communication, but I tend to doubt it will settle before

23  conclusion of --

24          MR. CRUM:  Yes, Your Honor.  I called Mr. Bray.  We've

25  discussed that.  And certainly, if that happens, we'll

1    definitely apprise the Court.

2         THE COURT:  Well, I would hope so.  Okay.  All right.

3    And I don't know, I mean, there is a lot of things that occur.

4    Your client may have new products on the line.  This may not

5    have been his number one seller.  I don't know that.  Maybe he

6    wants to get out of there.  I don't know.

7         But, on the other hand, sometimes there is a slight

8    narrow window for some sort of a resolution, whatever that

9    would be, that's up to you.  I don't get involved in that.

10   Just like we can't get involved in plea bargaining in criminal

11   cases, I don't get myself involved in settlement discussions

12   with people.

13        MR. COOPER:  Well, Your Honor, the one thing I'll

14   offer that this case won't turn into is next week I'm arguing

15   in the Ninth Circuit an appeal from Judge Bury's decision in

16   the desegregation case from Tucson that was filed in 1974.

17        THE COURT:  I'm very much aware of that.  Judge Frey

18   was the original judge in that case when it started out, and

19   it's been going on for a long time.  The only ones that might

20   exceed that are some of the Native American cases of housing

21   rights, water rights, things like that that go on for some

22   period of time, so -- but this one is short in comparison.

23        MR. COOPER:  Exactly.  We don't think you'll even make

24   two decades.

25        THE COURT:  Are you referring to my ability to stay

1  alive this long or --

2          MR. COOPER:  I'm questioning my wife's ability to let

3  me practice that long.

4          THE COURT:  I see.  Okay.  Well, it's been a pleasure

5  to see everyone.  And if there is anything I can do, please let

6  me know.  If we have to make some adjustments along the way,

7  emergencies arise, we can do that for everyone.

8          MS. SAHARIA:  Thank you, Your Honor.

9          MR. CRUM:  Thank you, Your Honor.

10          MR. COOPER:  Thank you, Your Honor.

11          THE COURT:  Thank you.  We'll stand at recess.  Thank

12  you very much.

13          (Proceedings concluded at 3:56 p.m.)

14                    *          *          *

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7              I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12             DATED at Phoenix, Arizona, this 5th day of January,

13   2024.

14

15

16                        /s/ Christine M. Coaly
17                        Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25