**DICKINSON WRIGHT PLLC**
Bennett Evan Cooper (010819)
  *bcooper@dickinsonwright.com*
David G. Bray (014346)
  *dbray@dickinsonwright.com*
Vail C. Cloar (032011)
  *vcloar@dickinsonwright.com*
Alexandra Crandall (034838)
  *acrandall@dickinsonwright.com*
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax:    (844) 670-6009

Attorneys for Plaintiff-Counterdefendant
VIP Products, L.L.C.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products L.L.C., an Arizona limited liability company, | No. 2:14-cv-02057-SMM |
| Plaintiff, | **OPENING BRIEF OF VIP PRODUCTS LLC** |
| v. | |
| Jack Daniel's Properties, Inc., a Delaware corporation, | |
| Defendant. | |
| Jack Daniel's Properties Inc., a Delaware corporation, | |
| Counterclaimant, | |
| v. | |
| VIP Products, L.L.C., an Arizona limited liability company, | |
| Counterdefendant. | |

# TABLE OF CONTENTS

*Page*

Table of Contents ...................................................................................................i

Table of Authorities..............................................................................................i

Introduction ..........................................................................................................1

Fctual Background................................................................................................2

Argument ..............................................................................................................4

I.      Bad Spaniels is a legitimate parody of a trademark. ..............................4

II.     Under the multifactor test modified for parodies, the Bad Spaniels dog
        toy is unlikely to create confusion with its parodic object, Jack
        Daniel's whiskey. ....................................................................................7

        A.      The Supreme Court and other courts have recognized the
                multifactor test must be applied differently in cases of parody. .................7

        B.      Factors that the Court previously found to favor JDPI flip in
                significance because Bad Spaniels is a parody. ...........................9

                1.      The strength of JDPI's marks reduces the likelihood of
                        confusion because is the engine of VIP's parody. .........................10

                2.      The similarity of the parties' marks is legitimate and
                        essential to the parody's success.....................................................11

                3.      VIP's intent to parody Jack Daniel's does not weigh in
                        favor of a likelihood of confusion...................................................12

        C.      Other factors must be reevaluated in the context of parody. ...................13

                1.      There is no evidence of actual confusion or, as a proxy,
                        a survey that screened out parody-induced legal
                        confusion. .........................................................................................14

                2.      The proximity of the goods and likelihood of an
                        expansion in product lines do not favor a likelihood of
                        confusion. .........................................................................................17

                3.      The parties' marketing channels do not overlap in any
                        meaningful sense...............................................................................18

                4.      The type of goods and degree of care exercised does not
                        favor a finding of likely confusion...................................................19

III.   JDPI's claim for dilution by tarnishment is meritless and should be rejected on constitutional grounds and nonconstitutional grounds. .....................20

    A.   Tarnishment amounts to unconstitutional viewpoint discrimination. ..........................................................................................20

        1.   Tarnishment cannot survive strict scrutiny. .................................21

        2.   Tarnishment also fails to pass intermediate scrutiny. ..................25

    B.   Even if the tarnishment statute were constitutional, JDPI has failed to prove tarnishment. .......................................................................26

Conclusion ................................................................................................................30

1

# TABLE OF AUTHORITIES

2

*Page(s)*

3

**Cases**

4

*Airhawk Int'l, LLC v. Ontel Prods. Corp.*,
   2020 WL 10321726 (S.D. Cal. 2020) ................................................................. 18, 19

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ...................................... 8, 10, 13, 14, 20

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011) ................................................................. 24

*Ashcroft v. ACLU*,
   535 U.S. 564 (2002) ................................................................. 22

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
   963 F.3d 859 (9th Cir. 2020) ................................................ 30

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ........................................... 8, 17

*Brown v. Elec. Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013) ............................................. 15

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ...................................... 4, 6, 7, 8, 9, 11, 12, 18, 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ................................................................. 25

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
   886 F.2d 490 (2d Cir. 1989) ........................................... 11, 15

*Coach Servs., Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012) ........................................... 29

*Cohn v. PetSmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002) ............................................... 14

*Davis v. Amazon.com, Inc.*,
   2023 WL 8113299 (C.D. Cal. Nov. 2, 2023)............................ 19

*Dille Fam. Tr. v. Nowlan Fam. Tr.*,
   276 F. Supp. 3d 412 (E.D. Pa. 2017) ...................................... 30

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
   967 F.2d 1280 (9th Cir. 1992) ........................................................ 14, 17, 20

*Elvis Presley Enters., Inc. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ........................................................ 8

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ...................................................... 14

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021) ................................................................ 7

*Great Am. Duck Races Inc. v. Kangaroo Mfg. Inc.*,
   398 F. Supp. 3d 494 (D. Ariz. 2019) ............................................ 18, 19

*Greater New Orleans Broad. Ass'n v. United States*,
   527 U.S. 173 (1999) .................................................................... 6, 25

*Hasbro, Inc. v. Asus Computer Int'l, Inc.*,
   2012 WL 13012663 (C.D. Cal. Mar. 23, 2012) ............................ 19

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
   73 F.3d 497 (2d Cir. 1996) .......................................................... 9, 10

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ................................................................ 2, 21, 23

*Indianapolis Colts, Inc. v. Metro Balt. Football Club Ltd. P'ship*,
   34 F.3d 410 (7th Cir. 1994) ........................................................ 15, 16

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
   599 U.S. 140 (2023) .......................................... 7, 8, 11, 12, 14, 15, 25

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
   828 F.2d 1482 (10th Cir. 1987) .................................................. 13

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) ................................................................ 23

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
   811 F.2d 26 (1st Cir. 1987) ........................................................ 4, 7

*Laserworks v. Pitney Bowes, Inc.*,
   105 F. App'x 657 (6th Cir. 2004) ............................................... 23

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
   507 F.3d 252 (4th Cir. 2007) .......................... 4, 8, 10, 11, 12, 13

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
   674 F. App'x 16 (2d Cir. 2016) ................................................................. 4, 7

*Lyons P'ship v. Giannoulas*,
   179 F.3d 384 (5th Cir. 1999) ................................................................. 10

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*,
   703 F. Supp. 2d 671 (W.D. Ky. 2010), *aff'd on other grounds*, 679 F.3d
   410 (6th Cir. 2012) ................................................................. 30

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ................................................................. 21, 22, 23

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) ................................................................. 9, 13

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003) ................................................................. 9

*Mintz v. Subaru of Am., Inc.*,
   716 F. App'x 618 (9th Cir. 2017) ................................................................. 28

*Moseley v. V Secret Catalogue, Inc.*,
   537 U.S. 418 (2003) ................................................................. 23, 24, 25, 28

*Multifab, Inc. v. ArlanaGreen.com*,
   122 F. Supp. 3d 1055 (E.D. Wash. 2015) ................................................................. 17

*Mut. of Omaha Ins. Co. v. Novak*,
   648 F. Supp. 905 (D. Neb. 1986), *aff'd*, 836 F.2d 397 (8th Cir. 1987) ................................................................. 9

*N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC*,
   69 F. Supp. 2d 479 (S.D.N.Y. 1999), *aff'd in part, rev'd in part*, 293
   F.3d 550 (2d Cir. 2002) ................................................................. 28

*Nabisco, Inc. v. PF Brands, Inc.*,
   191 F.3d 208 (2d Cir. 1999) ................................................................. 14

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ................................................................. 17, 18, 20

*Nissan Motor Co. v. Nissa Comput. Corp.*,
   2007 WL 9374946 (C.D. Cal. Sept. 21, 2007) ................................................................. 26, 27, 28

*Nissan Motor Co. v. Nissa Comput. Corp.*,
   378 F.3d 1002 (9th Cir. 2004) ................................................................. 29

*Panavision Int'l, L.P. v. Toeppen*,
    141 F.3d 1316 (9th Cir.1998) .................................................................. 28

*People for the Ethical Treatment of Animals v. Doughney*,
    263 F.3d 359 (4th Cir. 2001) ................................................................. 16

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    55 F. Supp. 2d 1070 (C.D. Cal.), *aff'd*, 202 F.3d 278 (9th Cir. 1999). ...................... 27

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................................ 23

*Radiance Found., Inc. v. NAACP*,
    786 F.3d 316 (4th Cir. 2015) ......................................................... 10, 11

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................ 22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................................ 22

*S&P Glob. Inc. v. S&P Data LLC*,
    619 F. Supp. 3d 445 (D. Del. 2022) ..................................................... 30

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2d Cir. 2009) ...................................................... 13, 14, 28

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ............................................................... 20

*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
    305 F.3d 894 (9th Cir. 2002) ............................................................... 29

*Theta Chi Frat., Inc. v. Leland Stanford Junior Univ.*,
    212 F. Supp. 3d 816 (N.D. Cal. 2016) .................................................. 29

*Tommy Hilfiger Licensing v. Nature Labs, LLC*,
    221 F. Supp. 2d 410 (S.D.N.Y. 2002) .................................................. 10

*TrueNorth Cos. v. TruNorth Warranty Plans of N. Am., LLC*,
    292 F. Supp. 3d 864 (N.D. Iowa 2018) ................................................ 29

*Uncommon, LLC v. Spigen Inc.*,
    926 F.3d 409 (7th Cir. 2019) ......................................................... 14, 19

*United States v. Alvarez*,
    567 U.S. 709 (2012) ...................................................................... 22, 24

*United States v. Playboy Ent. Grp.*,
   529 U.S. 803 (2000) ............................................................................. 23

*Bd. of Regents ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*,
   550 F. Supp. 2d 657 (W.D. Tex. 2008) ........................................... 30

*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*,
   527 F.3d 1045 (10th Cir. 2008) ...................................................... 8

*V Secret Catalogue, Inc. v. Moseley*,
   605 F.3d 382 (6th Cir. 2010) ................................................. 24, 28

*VIP Prods., LLC v. Jack Daniel's Props., Inc.*,
   291 F. Supp. 3d 891, 901, 909 (D. Ariz. 2018)
   .......................................... 3, 4, 10, 11, 12, 14, 17, 19, 28, 29

*VIP Prods. LLC v. Jack Daniel's Props., Inc.*,
   953 F.3d 1170, 1172 (9th Cir. 2020). ............................................ 4

*Waln v. Dysart Sch. Dist.*,
   54 F.4th 1152 (9th Cir. 2022) ....................................................... 23

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................ 22

*Water Pik, Inc. v. Med-Systems, Inc.*,
   726 F.3d 1136 (10th Cir. 2013) ..................................................... 14

**Statutes**

15 U.S.C. § 1125(c) ............................................................................. 20

15 U.S.C. § 1125(c)(1) ........................................................................ 28

15 U.S.C. § 1125(c)(2) ................................................................. 20, 29

15 U.S.C. § 1125(c)(3) ........................................................................ 27

**Other Authorities**

*American Heritage Dictionary of the English Language* (3d ed. 1992) .......................... 11

Ashutosh Bhagwat, *Truthiness: Corporate Public Figures & The Problem of Harmful Truths*, 99 Minn. L. Rev. 297 (2014) ....................................... 22

David Lenson, *Mystery Drug One*, 36 MASS. REV. No. 1, at 43-44 (2006) ..................... 6

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    (5th ed. 2023) ................................................................................. 9, 13, 28

João Carlos Pecci, *Vinicius sem ponto final* 40 (1994) ......................................... 5

John Gilbertson, *Blunt Advice: A Crash Course in Cannabis Trademarks*,
    60 IDEA: L. Rev. of Franklin Pierce Ctr. for Intell. Prop. 502 (2020) ..................... 21

Lisa P. Ramsey, *Free Speech Challenges*, 56 Hous. L. Rev. 401 (2018) ....................... 21

Phil Taylor, *No Taboo to Boo*, SPORTS ILLUSTRATED, May 16, 2004, at 17 .................... 9

Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L.
    Rev. 473 (2013) ............................................................................... 15

Theodore H. Davis, Jr., *Introduction: United States Annual Review, The
    Seventieth Year of Administration of the Lanham Act of 1946*, 108
    Trademark Rep. 1 (2018) ....................................................................... 21

## INTRODUCTION

This case is on a general remand from the Ninth Circuit. There is no extant judgment, and there is no limitation on the Court's ability to entertain arguments. By agreement of the parties, the case is proceeding on the evidentiary record created through the 2017 trial before this Court. Neither side has sought to reopen discovery or make new disclosures. Thus, ten years after VIP Products LLC introduced its "Bad Spaniels" parody dog toy and after it garnered national publicity, Jack Daniel's Properties, Inc.'s claim for trademark infringement is proceeding in a new legal landscape but with established facts. In this new environment, JDPI still invites the Court to bar VIP's parody toy without any evidence of actual confusion, and without any evidence of actual harm to reputation.

Though the facts have not changed since the Court's 2018 ruling, the law has changed considerably. The Supreme Court made clear—largely adopting the U.S. Solicitor General's position rejecting both this Court's and the Ninth Circuit's analyses— that the multifactor test for infringement must be applied in a way that takes into account the parodic nature of the purportedly infringing use. This means, for example, that some factors that favor the plaintiff in an ordinary infringement claim invert in significance and, in this context, favor the defendant. The concurring opinion by Justices Sotomayor and Alito also points out the unreliability of generic confusion surveys that, like Dr. Ford's here, fail to control for respondents' irrelevant *legal* confusion as to whether permission is required for a parody. And developing case law in this District and elsewhere now establishes that sales of both parties' products on Amazon.com and Walmart.com has no significance at all, because *everyone* sells *everything* in such general streams. Correctly applied, the multifactor test indicates that consumer confusion, which has never happened over the past decade, is unlikely to happen in the future.

The legal context of the dilution-by-tarnishment claim has changed even more radically. After briefing closed before the Ninth Circuit in the initial appeal in this case, the U.S. Supreme Court recognized in a majority opinion that the Lanham Act's bar of registration of "immoral" or "scandalous" marks—which would include marks that have

scatological meaning—constituted impermissible viewpoint discrimination in violation of the First Amendment. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2303 (2019). Dilution by tarnishment is unconstitutional because it is not grounded in likelihood of confusion and is inherently one-sided: speech that would "harm" or "tarnish" a mark's reputation is prohibited, but speech that would burnish a mark's reputation is not. If barring the registration of a trademark based on viewpoint is unconstitutional, then enjoining use of a mark based on viewpoint must surely be so because it is even clearer that "speech is being restricted." *Brunetti*, 139 S. Ct. at 2303 (Roberts, C.J., concurring).

This Court may avoid the constitutional issue by recognizing that JDPI has failed to offer competent evidence of tarnishment. While "Jack Daniel's" is a famous mark, VIP has not tarnished that particular mark. Dilution requires a specific mark-to-mark comparison, and "Bad Spaniels" itself does not say anything about dog poo. Indeed, JDPI admitted that it did not object to "Bad Spaniels" by itself. The only poo-related joke directed to a JDPI trademark is "The Old No. 2," which comments on JDPI's "Old No. 7." JDPI has produced no evidence that "Old No. 7" is, on its own, a "famous" mark that meets the very high legal standard for a dilution claim.

For these reasons, the Court should enter judgment for VIP on both the infringement and dilution claims.

## FCTUAL BACKGROUND

The basic facts of this case are familiar to the Court and are, at this point, undisputed. In 2014, VIP introduced the Bad Spaniels dog toy as part of its Silly Squeakers® line of interactive-play dog toys that parody famous brands of liquor, wine, and soda bottles. Dkt. 236 at 49. Alcohol brands were a natural target for VIP's parodies because VIP's owner, Stephen Sacra, and its Director of International Sales, Wendy Sacra, both brought to the company backgrounds in alcohol marketing. Stephen Sacra worked for Anheuser-Busch, in charge of the on-premises marketing for the top 40 bars in Tempe and Scottsdale, to encourage those who had reached the legal drinking age to choose the "brand they should start becoming loyal to." *Id.* at 25. Wendy Sacra worked

for a number of years on promotions for Miller Brewing Company, managing all of the "promo girls for Miller" for Phoenix and surrounding areas, and then did the same job for Bacardi for a number of years. *Id.* at 26.

Poking fun at the self-serious nature of alcohol marketing was the main purpose of the Silly Squeaker® line, which are made primarily of injection-molded vinyl. To accomplish the parodic effect, the Bad Spaniels toy artistically transforms elements of the Jack Daniel's bottle and label. "Jack Daniel's" becomes "Bad Spaniels"; "Old No. 7" becomes "Old No. 2"; and "Tennessee whiskey" becomes "Tennessee carpet." References to alcohol content are transformed into "43% POO BY VOL." and "100% SMELLY." Bad Spaniels also features a dominating cartoon of, in this Court's words, a "wide-eyed spaniel." *VIP Prods., LLC v. Jack Daniel's Props., Inc.*, 291 F. Supp. 3d 891, 898 (D. Ariz. 2018). The differences between VIP's soft vinyl squeak toy and a Jack Daniel's glass bottle of amber liquid are greater than their similarities, and are sufficient to alert consumers that the Silly Squeaker® toy is a parody.

The Bad Spaniels toy also is sold with a "hang tag" that prominently displays the Silly Squeakers® logo on the front and back, and includes a disclaimer stating, "The product and its design belong to VIP Products. This product is not affiliated with Jack Daniel Distillery." Dkt. 49 at 3; Dkt. 230-3 at 9. The disclaimer is in the same size font as the rest of the text, and was placed at the bottom with the copyright notice because that is where consumers expect to see legal notices. Dkt. 233-1 at 75–76; Dkt. 243 at 32–33.

Ten years after the introduction of the Bad Spaniels toy—and extensive national publicity arising from the Supreme Court's consideration of the case—there is still no evidence of any actual injury to JDPI, which continues to seek solely injunctive relief rather than damages. No one can point to evidence of either actual confusion as to source or actual harm to the reputation of JDPI's marks, e.g., any real-world "disgust" associated with Bad Spaniels, any bizarre belief that Jack Daniel's is affiliated with dog poo, or any tarnishment of Jack Daniel's public image.

**ARGUMENT**

**I.    Bad Spaniels is a legitimate parody of a trademark.**

The Bad Spaniels dog toy is a parody of Jack Daniel's, and the law applied to it should reflect that the toy would be "reasonably perceived" as a parody by an objective observer. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 n.17 (1994) (copyright parody). In 2018, this Court found that VIP owner Stephen Sacra's "intent behind producing the Silly Squeakers line of toys was to develop a creative parody on existing products." 291 F. Supp. 3d at 898. The Ninth Circuit elaborated that "VIP's purported goal in creating Silly Squeakers was to 'reflect' 'on the humanization of the dog in our lives,' and to comment on 'corporations [that] take themselves very seriously.'" *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1172 (9th Cir. 2020). The Supreme Court said nothing in its opinion that casts doubt on that conclusion.

As this Court acknowledged at the November 28, 2023, post-remand status conference, the leading case on trademark parodies, cited by the Supreme Court, is *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007), which held that the "Chewy Vuiton" chewable dog toy was a successful parody of Louis Vuitton luxury handbags. The Fourth Circuit recognized, "For trademark purposes, a 'parody' is defined as a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized imaged created by the mark's owner." *Id.* at 260 (cleaned up). Other circuits have followed the same or similar definition of a parody in trademark cases. *See, e.g.*, *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34 (1st Cir. 1987) (applying same definition); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 674 F. App'x 16, 18 (2d Cir. 2016) (quoting *L.L. Bean*).

But VIP's parody does comment on Jack Daniel's. The Bad Spaniels parody operates at two levels: skewering JDPI's sense of cultural self-importance, including the personification of "Jack" as a friend in the public imagination, and spoofing dog owners' relationship with their pets, and even the relationship between love of alcohol and brands. Dkt. 243 at 45–46, 58. The combined parodic point is best summarized in the line of

Brazilian poet, lyricist, and diplomat Vinicius de Moraes: "*O uísque é o melhor amigo do homem—é um cachorro engarrafado*—Whiskey is man's best friend, it's a dog in a bottle." João Carlos Pecci, *Vinicius sem ponto final* 40 (1994).

While Steve Sacra freely admitted that Bad Spaniels did not disparage Jack Daniel's *whiskey*—a point confirmed by the admission of JDPI's expert, Itamar Simonson, that "[n]o one would think there's poo in the Jack Daniel's product," Dkt. 234 at 172—the parody nevertheless comments on Jack Daniel's *commercial presence*, which is something that Steve and Wendy Sacra knew well from their backgrounds in marketing some of America's most popular alcohol brands. Sacra testified he was "making a comment about Jack Daniel's," "the way they market their product," and their "having consumer influence over another person" and "taking it very seriously." Dkt. 243 at 141–42. He elaborated, "The intended message for the Bad Spaniels parody toy … is just saying, the world around you is constantly advertising to you," and "[y]ou need to be able to sit back and laugh at yourself. Whether it is someone making fun of me, or someone else, or another brand or whatever." Dkt. 236 at 62–63. Sacra added, "Not only are we parodying the actual brand, we're also poking fun at dogs. Because if you own a dog, these are the things that you experience in your relationship with a dog." Dkt. 243 at 16. He testified that "the Silly Squeakers line … reflects back on the humanization of the dog in our lives," in the spirit of "the picture of the dogs playing poker" or "people who take videos of their dogs who can actually bring them beers." *Id.* at 45–46.

Indeed, JDPI confirmed through its testimony that it richly earned the parody by taking itself far too seriously. JDPI's Global Brand Director, Phillip Epps, testified that the Jack Daniel's package is "one of the most iconic in the world," Dkt. 234 at 74, and its then-President, David Gooder, made VIP's point when he claimed that "the lauding of brands in our culture and brands becoming iconic things is a good thing over all." Dkt. 235 at 50. Epps proclaimed that the Jack Daniel's "brand has found its way naturally into pop culture, into movies, and has been adopted by musicians." Dkt. 234 at 55–56. He emphasized the anthropomorphism of their whiskey that the company has long promoted

in its advertising: "there's a real familiarity about Jack, and people ask for a Jack. There's almost a personal relationship with some of our drinkers." *Id.* at 60; *see* Dkt. 229-6 at 27 (advertisement showing Jack Daniel's bottle, bar patrons, and slogan "In any bar in America, you know someone by name"). At trial, executives like Epps glowed with pride over people's love affair with "Jack," testifying that the brand's "very loyal consumers … will even go to the extent of tattooing themselves with a Jack Daniel's label or logo." Dkt. 234 at 86. Gooder echoed that "there are people all over the world who feel … like they have been injured when Jack's been injured." Dkt. 235 at 34.

As Epps suggested, the role of "Jack" in influencing "pop culture" and "musicians" shows how it positions itself as man's *new* best friend. One essayist noted that "Jack Daniels" stands among "images of patriarchal comfort," as "alcohol is often anthropomorphized, usually as a man." David Lenson, *Mystery Drug One*, 36 MASS. REV. No. 1, at 43–44 (2006). Musicians' odes to "Jack" bear this out:

- George Thorogood and the Destroyers rocked, "Yeah, the other night I laid sleeping/And I woke from a terrible dream/So I caught up my pal Jack Daniel's/And his partner Jimmy Beam." *I Drink Alone* (1985).

- David Allan Coe sang, "Jack Daniels, if you please/Knock me to my knees/You're the only friend/There's has ever been that didn't do me wrong." *Jack Daniel's, If You Please* (1978).

- Country superstar Miranda Lambert crooned, "I fell in love with Jack Daniels again/He's the best kind of lover that there is/I can have him when I please/He always satisfies my needs." *Jack Daniels* (2001).

Lambert's lyrics echo Gooder's testimony that the "brand values of the Jack Daniel's mark" include "masculinity, but in a way that is appreciated and connected with women as well." Dkt. 235 at 33.

This curated (and apparently beloved) marketing strategy made the anthropomorphic "Jack" fair game and brings VIP's Bad Spaniels toy squarely within the scope of a true parody. "Man's best friend" also deserves a constant "friend"—a joke that JDPI has invited. Bad Spaniels is an "artistic work that imitates the characteristic style of an author or a work for comic effect or to ridicule." *Campbell*, 510 U.S. at 580 (quotation omitted).

Such commentary needs leeway and "[a]n 'artistic painting' might, for example, fall within the scope of fair use even though it precisely replicates a copyrighted 'advertising logo to make a comment about consumerism.'" *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1203 (2021) (quotation omitted). The "threshold question … is whether a parodic character may reasonably be perceived. Whether, going beyond that, parody is in good taste or bad does not and should not matter …." *Campbell*, 510 U.S. at 582.

Skewering Jack Daniel's self-promotional strategy is true parody. As the First Circuit has explained, "[t]he central role which trademarks occupy in public discourse (a role eagerly encouraged by trademark owners), makes them a natural target of parodists. Trademark parodies, even when offensive, do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark." *L.L. Bean*, 811 F.2d at 34 ("Denying parodists the opportunity to poke fun at symbols and names which have become woven into the fabric of our daily life, would constitute a serious curtailment of a protected form of expression."); *see My Other Bag*, 674 F. App'x at 18 ("The fact that the joke on LV's luxury image is gentle … does not preclude it from being a parody. Indeed, a parody of LV's luxury image is the very point of MOB's plebian product." (citations omitted)). In light of that unquestionable parody, a proper analysis of infringement and tarnishment claims must accommodate the important societal benefits of commentary that Jack's meticulously crafted corporate image "need not always be taken so seriously." *L.L. Bean*, 811 F.2d at 34.

**II.   Under the multifactor test modified for parodies, the Bad Spaniels dog toy is unlikely to create confusion with its parodic object, Jack Daniel's whiskey.**

  **A.   The Supreme Court and other courts have recognized the multifactor test must be applied differently in cases of parody.**

Having set aside the *Rogers* test, the Supreme Court remanded this case for a determination "whether the Bad Spaniels marks are likely to cause confusion" under the multifactor test as reframed by that Court. *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 161 (2023). Citing the Fourth Circuit's "Chewy Vuiton" parody dog toy

case, the Supreme Court emphasized that "a trademark's expressive message—particularly a parodic one, as VIP asserts—may properly figure in assessing the likelihood of confusion." *Id.* (citing *Haute Diggity Dog*, 507 F.3d at 265). For this proposition, the Supreme Court approvingly cited not only *Haute Diggity Dog*, but also the Solicitor General's Brief for United States as *Amicus Curiae*, and specifically the passage in which the Solicitor General urged that this Court's 2018 ruling erroneously "disregarded" VIP's claim of parody in applying the multifactor test. *Id.* (citing Br. for U.S. as *Amicus Curiae* 17–22). The Solicitor General's analysis is therefore cited below. The Supreme Court concluded, "So although VIP's effort to ridicule Jack Daniel's does not justify use of the *Rogers* test, it may make a difference in the standard trademark analysis." *Id.*

In evaluating the likelihood of confusion, the Ninth Circuit relies on eight *Sleekcraft* factors: (1) the strength of the mark; (2) similarity of the marks; (3) the defendant's intent in selecting the mark; (4) evidence of actual confusion; (5) proximity or relatedness of the goods; (6) the likelihood of expansion of the product lines; (7) marketing channels used; and (8) type of goods and the degree of care likely to be exercised by the purchaser. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

Parodies must modify the multifactor test because a parody has to "conjure up" enough of the original to convey its message, but would in no sense be mistaken for the original. *Jack Daniel's*, 599 U.S. at 161 (citing *Campbell*, 510 U.S. at 588). Courts, including those cited by the Supreme Court with approval, have recognized that parody "casts several of the … factors in a different light." *Haute Diggity Dog*, 507 F.3d at 265 (parody "influences the way in which the [likelihood-of-confusion] factors are applied"); *see Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1055 (10th Cir. 2008) ("Parody … casts several of the … six factors in a different light."); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 199 (5th Cir. 1998) ("[P]arody …

can even weigh heavily enough to overcome a majority of the digits of confusion weighing in favor of a likelihood of confusion").

Indeed, "few parodies will constitute trademark infringement—most will not." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:153 (5th ed. 2023). Parody often "depends on a lack of confusion to make its point." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996); *see Mut. of Omaha Ins. Co. v. Novak*, 648 F. Supp. 905, 910 (D. Neb. 1986) ("[T]rue parody actually decreases the likelihood of confusion because the effect of the parody is to create a distinction in the viewer's mind between the actual product and the joke."), *aff'd*, 836 F.2d 397 (8th Cir. 1987). Thus, in the passage cited by the Supreme Court, the Solicitor General concluded, "In the mine run of cases, a successful trademark or trade-dress parody is unlikely to cause confusion and therefore is unlike to infringe on the mark." Br. of U.S. as *Amicus Curiae* 19 (citing *Hormel*).

## B. Factors that the Court previously found to favor JDPI flip in significance because Bad Spaniels is a parody.

The unquestionable reality is that parodists don't target unknown brands—as Reggie Jackson once quipped, "Fans don't boo nobodies"[1]—and parody must conjure up core elements of the original to convey its message. Thus, in a true parody case, certain factors that would otherwise militate in favor of a finding of infringement must flip or drop out of the analysis. Parodies and satires confound standard application of the multifactor test because they are necessarily and properly referential. *See, e.g., id.; Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803, 810 (9th Cir. 2003) ("Parody emerges from this 'joinder of reference and ridicule.'") (quoting *Campbell*, 510 U.S. at 583)); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901 (9th Cir. 2002). Because Bad Spaniels is a parody, three of the factors that this Court found in 2018 to favor JDPI invert in significance to favor VIP—without disturbing the Court's findings of fact: the strength of JDPI's marks, the similarity of the parties' marks, and VIP's intent.

---

[1] Phil Taylor, *No Taboo to Boo*, SPORTS ILLUSTRATED, May 16, 2004, at 17.

1.   **The strength of JDPI's marks reduces the likelihood of confusion because is the engine of VIP's parody.**

While the strength of the plaintiff's mark ordinary weighs in favor of the plaintiff in a *Sleekcraft* analysis, it inverts in significance in the parody context and points to the unlikelihood of confusion. This Court found in 2018 that JDPI's trademarks and trade dress were "extremely strong, i.e., that they "were widely recognized by the general consuming public of the United States in July 2014." *VIP Prods.*, 291 F. Supp. 3d at 901, 909; *see Jack Daniel's*, 599 U.S. at 149 ("Even if you didn't already know [what the Jack Daniel's bottle looks like], you'd probably not have much trouble identifying one."). That is why VIP's parody works. But when this Court declared that the "defendant's claim of parody will be disregarded" in the *Sleekcraft* analysis and that the "compelling evidence of [Jack Daniel's] strength" strongly favored JDPI, 291 F. Supp. 3d at 908, 910, it did not have the benefit of the Supreme Court's guidance. The Court now has the opportunity to review the evidence in light of the proper analytical framework.

For parodies, the great strength of the plaintiff's mark is "precisely the mechanism by which likelihood of confusion is avoided." *Haute Diggity Dog*, 507 F.3d at 261. As the Fourth Circuit noted, it is "a matter of common sense that the strength of a famous mark allows consumers immediately to perceive the target of the parody, while simultaneously allowing them to recognize the changes to the mark that make the parody funny or biting." *Id.* "[T]he strength of the mark … often work[s] in reverse for cases of parody and satire as compared to a standard infringement case." *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 324–25 (4th Cir. 2015). A stronger senior user's mark may "actually make it easier for the consumer to realize" the parody. *Lyons P'ship v. Giannoulas*, 179 F.3d 384, 389 (5th Cir. 1999). "[I]t is precisely because of the mark's fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends upon to achieve the parody." *Tommy Hilfiger Licensing v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002); *see also Hormel*, 73 F.3d at 503. Simply stated, the stronger the mark, the more likely a consumer will realize they are looking at a product poking fun at the original, not the original itself.

### 2. The similarity of the parties' marks is legitimate and essential to the parody's success.

While the similarity of the parties' marks normally weighs in favor of the plaintiff, such similarity favors a defendant parodist because a reasonable level of similarity is essential to make the parody work. In 2018, the Court found that VIP's toy was "similar to Jack Daniel's trademarks and trade dress so that its 'Bad Spaniels' dog toy would call to mind Jack Daniel's Tennessee whiskey." 291 F. Supp. 3d at 909. *That is precisely the point.* Parody is a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule." *Campbell*, 510 U.S. at 580 (quoting *The American Heritage Dictionary of the English Language* 1317 (3d ed. 1992)). The humor or satire of the parody purposefully brings to mind the parodied object, mark, or trade dress. *Id.* at 588. For a parody to be successful, it "*must* be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." *Id.* (emphasis added).

Any general inference that the similarity of nonparodic junior marks to senior marks leans toward a likelihood of confusion simply does not apply to parodies. As the Fourth Circuit explained, "parodic usage … converts what might be a problem for [the defendant] into a disfavored conclusion for [the plaintiff]." *Haute Diggity Dog*, 507 F.3d at 262; *see Radiance*, 786 F.3d at 324–25 ("[T]he similarity between the marks often work[s] in reverse for cases of parody and satire as compared to a standard infringement case."). A parody necessarily invokes the famous mark. "A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc*, 886 F.2d 490, 494 (2d Cir. 1989). As the Solicitor General pointed out, "[t]he *Louis Vuitton* court correctly explained … that such an inference [of likelihood of confusion from similarity of marks] was unlikely where the dog-toy manufacturer was invoking 'a famous mark in the consumer's mind' in order to make a joke." Br. for U.S. as *Amicus Curiae* 20 (quoting *Haute Diggity Dog*, 507 F.3d at 262).

Bad Spaniels' evocation of Jack Daniel's does not simply parrot Jack Daniel's trade dress; rather, lays the foundation for the success of its parody, calling to mind the

original while transforming it into a joke. *Jack Daniel's*, 599 U.S. at 149–50. As is necessary for parody, Bad Spaniel's similarity to the Jack Daniel's trade dress extends far enough to allow consumers to grasp the parody—but no more than that. Dkt. 234 at 74:12–75:20, 76:5–77:20, 84:24–85:4; Dkt. 236 at 64:24–68:18; Dkt. 243 at 167:24–168:11. VIP's graphics designer, Elle Phillips, testified that she included "some decent similarities" because "we wanted it to be a parody of the Jack Daniel's bottle." Dkt. 233-1 at 57. Sacra confirmed that VIP had "no intent to make a copy" of Jack Daniel's label, as "our goal is to just grab enough of the elements of information that has been put into your mind … for you … [to] recall the brand that we're parodying, but not to copy." Dkt. 236 at 64–65. As the Solicitor General correctly concluded, "a court should bear in mind that a degree of resemblance to the original mark or trade dress is essential for a parody to be recognizable as such." Br. for U.S. as *Amicus Curiae* 21 (citing *Campbell*, 510 U.S. at 588). Here, "the degree of resemblance" favors VIP.

### 3.   VIP's intent to parody Jack Daniel's does not weigh in favor of a likelihood of confusion.

VIP's parodic intent also flips the intent factor to favor the *unlikelihood* of confusion. In 2018, this Court dismissed the relevance of parody and found that VIP wrongfully intended to capitalize on Jack Daniel's good will and popularity. 291 F. Supp. 3d at 908. But the Court found that VIP's "intent was to copy the Jack Daniel's trademarks and trade *dress for the purpose of parody*." *Id.* (emphasis added). As the Supreme Court acknowledged, Bad Spaniel's trade dress … is designed to evoke a distinctive beverage bottle-with-label." 599 U.S. at 153. But, as the Supreme Court highlighted, Bad Spaniels' parody "matters in assessing confusion because consumers are not so likely to think that the maker of a mocked product is itself doing the mocking." *Id.*

As in the Fourth Circuit's decision in *Haute Diggity Dog*, VIP's actual intention is "to evoke a humorous, satirical association that *distinguishes* the products." 507 F.3d at 263. Intending to parody, satire, critique, or comment is not the same as intending to confuse potential consumers. "There is considerable difference between an intent to copy

12

and an intent to deceive." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) (quoting 4 *McCarthy*, *supra*, § 23.113); *see Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir. 1987) ("An intent to parody is not an intent to confuse the public."). Parodic intentions do "not amount to a bad faith intent to create customer confusion." *Haute Diggity Dog*, 507 F.3d at 263; *see* Br. for U.S. as *Amicus Curiae* 20–21 (urging that the Fourth Circuit "appropriately discounted the manufacturer's 'intent to profit from its use of parodies,' observing that the manufacturer lacked any intent 'to create consumer confusion' and intended just the opposite").

Nor should VIP's intent to profit from its parody dog toy be misconstrued as actionable under the Lanham Act. The Ninth Circuit has recognized that intending to profit and intending to parody are not contradictory aims; attempting to profit does not diminish the parody or the social commentary conveyed. *MCA Records*, 269 F.3d at 906; *see Haute Diggity Dog*, 507 F.3d at 263 (defendant's active marketing of parody "neutralize[s]" the intent factor). As the Solicitor General explained in this case, "A claim of parody also should not be 'disregarded' merely because the parodist is trying to profit from making fun of a well-known mark…. [M]ost commercial parodists seek to profit from the goodwill (or at least the fame or notoriety) that others have accumulated. *There is nothing illicit about that endeavor.*" Br. for U.S. as *Amicus Curiae* 22 (emphasis added). In short, "the Lanham Act's prohibitions against trademark infringement do not ban free riding per se. The district court therefore should have assessed whether the parodic character of the respondent's dog toy reduced the likelihood of consumer confusion as to its source." *Id.* On remand, this Court should do so now.

**C. Other factors must be reevaluated in the context of parody.**

Four other *Sleekcraft* factors do not invert because of the parodic nature of the Bad Spaniels toy, but they do become considerably less significant: evidence of actual confusion, the proximity of goods and likelihood of expanded products lines, the parties' marketing channels, and the type of goods and expected customer care. In light of the developing law, these factors are at worst neutral as between the parties, and they thus

exemplify circumstances where "some of the *Sleekcraft* factors will not always be helpful in assessing the likelihood of confusion." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010).

### 1. There is no evidence of actual confusion or, as a proxy, a survey that screened out parody-induced legal confusion.

The absence of any indication of actual confusion over the ten years VIP has sold the Bad Spaniels toy is telling. It is well settled that where there has been ample opportunity for confusion, the lack of evidence of actual confusion "can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Cohn v. PetSmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002) (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999)). JDPI's witnesses were not aware of any consumer confusion between Jack Daniel's and Bad Spaniels. Dkt. 234 at 79, 85, 93, 140–41. VIP has never heard from a single consumer who thought Jack Daniel's was somehow affiliated with the Bad Spaniels dog toy. Dkt. 236 at 48–49.

Survey evidence is *not* evidence of actual confusion, but rather it is a proxy—however suspect—for actual confusion. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992); *VIP Prods.*, 291 F. Supp. 3d at 906 (consumer survey is "surrogate evidence of actual confusion"). As Justice Sotomayor observed in this case, however, "Like any other evidence, surveys should be understood as merely one piece of the multifaceted likelihood of confusion analysis." *Jack Daniel's*, 599 U.S. at 163 (Sotomayor, J., concurring); *see also Uncommon, LLC v. Spigen Inc.*, 926 F.3d 409, 425 (7th Cir. 2019). In the best of circumstances, courts routinely advise caution when assessing survey evidence offered to establish a likelihood of confusion. *See Starbucks*, 588 F.3d at 117. Even then, there is an ineluctable problem of "background noise" in survey data and other methodological problems that fail to replicate how consumers actually encounter products in the marketplace. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1144–50 (10th Cir. 2013).

But whatever the utility of surveys in an ordinary case, parody exacerbates the

problems with surveys to the point of unreliability. This is particularly true where, as here, the survey was not designed to control for the parody. Justice Sotomayor advised that "[w]hen an alleged trademark infringement involves a parody, … there is a particular risk in giving uncritical or undue weight to surveys," and "courts should treat the results of surveys with particular caution." *Jack Daniel's*, 599 U.S. at 163–64.

Surveys like the one by Dr. Gerald Ford conducted for JDPI may detect *some* kind of confusion, but not the kind the Lanham Act was intended to combat, i.e., confusing the consumer about a product purchase decision. *See Cliffs Notes*, 886 F.2d at 495. "Survey answers may reflect a mistaken belief among some survey respondents that all parodies require permission from the owner of the parodied mark." *Jack Daniel's*, 599 U.S. at 164 (Sotomayor, J. concurring); *see Indianapolis Colts, Inc. v. Metro Balt. Football Club Ltd. P'ship*, 34 F.3d 410, 416 (7th Cir. 1994) (similar). As leading scholars in the field have explained, questions about sponsorship or approval may reveal confusion about a legal proposition, namely, "confusion about what trademark law actually requires—but it is not confusion that causes the sort of harm trademark law cares about and it should not be actionable." Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L. Rev. 473, 482 (2013). *See, e.g.*, *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013) (plaintiff relied on "a consumer survey demonstrating that a majority of the public believes that identifying marks cannot be included in products without permission"). This is a problem of circularity: a misunderstanding of whether a license or permission is legally required to make a parody creates "confusion" as to whether there was permission in the instant case. Thus, Justice Sotomayor warned that "[c]ourts should also be attentive to ways in which surveys may artificially prompt such confusion about the law or fail to sufficiently control for it." *Jack Daniel's*, 599 U.S. at 165.

Indeed, "[s]ome of the answers to the survey in this case illustrate this potential" source of legal confusion rather than product-purchase confusion. *Id.* at 164 (Sotomayor, J., concurring). And the circularity problem demonstrates why JDPI's reliance on the "29% confusion" result produced by the survey of its expert, Dr. Gerald Ford, is

misplaced. As VIP's expert, Dr. Stephen Nowlis, explained, Dr. Ford failed to analyze the results "in light of the fact that the Bad Spaniels dog toy is a parody of a Jack Daniel's liquor bottle." Dkt. 233-3 at 227. Dr. Nowlis's report showed that "the largest group who were counted by Dr. Ford as supposedly confused were those answering the question about authorization and approval," and they "were likely trying to figure out if a parody needs authorization or approval from the company it is spoofing." *Id.* at 211–13.

When the parodic character of Bad Spaniels was considered, "it is clear that many respondents in fact recognized that the product is made or put out by VIP Products, and yet were thinking that VIP would need to get authorization or approval from Jack Daniel's in order to sell such a parody." *Id.* at 227. In fact, the largest group of respondents believed that JDPI was required to give permission to VIP for the Bad Spaniels parody. Dkt. 118 ¶ 25 (admitted as Trial Ex. 256); Dkt. 221 at 5; Dkt 233-2 at 251:4-24. And the survey itself was not intended to evaluate actual confusion. Dkt. 234 at 140:23–141:2; Dkt. 235 at 33:25–34:12 48:9–22, 49:8–21, 58:13–17; Dkt. 232 at 148:10–149:11, 169:7–16, 172:10–174:13. Nothing in the Lanham Act gives JDPI the right to take advantage of layperson confusion over the legality of parody.

Even more fundamentally, JDPI has failed to justify why a 29% number that is meaningful in a purely commercial context should be considered equally meaningful in a parody context. Circuits have recognized that the public interest in free discourse justifies tolerating a level of confusion that might be actionable in other contexts. As the Fourth Circuit explained, "a parody necessarily must engender some initial confusion, [but] an effective parody will diminish the risk of customer confusion." *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 366 (4th Cir. 2001). And, in any event, the survey environment does not reflect what would happen when an actual consumer who is making a purchase is confronted with the parodic good and its target. "There is the more fundamental problem, one common to almost all consumer survey research, that people are more careful when they are laying out their money than when they are answering questions." *Indianapolis Colts*, 34 F.3d at 416. The survey evidence offered

by JDPI does not make up for the lack of evidence of consumer confusion among those actually buying the Bad Spaniels parody dog toy, and Supreme Court justices noticed.

### 2.   The proximity of the goods and likelihood of an expansion in product lines do not favor a likelihood of confusion.

Jack Daniel's whiskey and the Bad Spaniels dog toy that parodies it are not proximate. Goods' proximity is measured by whether the products are complementary, sold to the same class of purchasers, and similar in use and function. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). And when the products are not competitors at all, "the likelihood of confusion will probably be remote." *Multifab, Inc. v. ArlanaGreen.com*, 122 F. Supp. 3d 1055, 1063 (E.D. Wash. 2015) (quoting *Brookfield*, 174 F.3d at 1056 (cleaned up)). Whiskey and dog toys do not share complementary uses or functions and are not sold to the same class of purchasers. One is a spirituous beverage intended for adult drinkers; the other is intended for canine play and human amusement regardless of age.

The closest JDPI's goods extend to Bad Spaniels is that JDPI incidentally sells dog leashes, collars, a treat jar, and a doghouse with the Jack Daniel's mark. But even JDPI's witnesses admit that none of those items are sold outside of the Lynchburg Hardware & General Store, the distillery's brick-and-mortar "gift shop" in Lynchburg, Tennessee. Dkt. 234 at 75, 85, 113, 123, 134, 139–40, 142; Dkt. 235 at 55. Unsurprisingly, that gift shop does not sell Bad Spaniels. And because none of these Jack Daniel's accessories are advertised or sold on the internet, there is no evidence that any reasonable number of consumers would know about them, associate such dog products with Jack Daniel's, or perceive them as a basis for associating Jack Daniel's with a parodic dog toy. Indeed, JDPI believes that dog toys are such a distinct line of goods that it admitted that it would *never* expand its nonalcoholic product offerings into the dog toy market for fear (however farfetched) that it would appear to be marketing its *real* product, liquor, to those under age 21. Dkt 234 at 73:19–23; 96:16–23; 110:18–111:13, 139:18–21, 142:4–14; *see VIP Prods.*, 291 F. Supp. 3d at 910; *see also Gallo Cattle*, 967 F.2d at 1291. Further, that Bad

17

Spaniels is a parody dog toy makes any perceived sponsorship or approval even less probable given the "unlikelihood" that JDPI or similarly iconic brands would "license … lampoons of their own productions." *Campbell*, 510 U.S. at 592.

### 3. The parties' marketing channels do not overlap in any meaningful sense.

Since the Court found in 2018 that JDPI's and VIP's marketing channels overlapped, the facts have not changed, but the legal precedent has, and this factor now has no significance. To begin, VIP sells Bad Spaniels dog toys in pet stores; JDPI sells Jack Daniel's whiskey in liquor stores, not pet stores or pet specialty marketplaces. Any risk of encountering Jack Daniel's and Bad Spaniels next to each other is minimal at best, with accompanying confusion being even less likely. *See* Dkt. 234 at 75:21–76:4, 89:21–24, 96:11–18; Dkt. 236 at 69:1–16, 70:11–74:24, 75:13–75:16. In short, JDPI "presents no evidence that the parties' goods are physically sold in the same stores." *Airhawk Int'l, LLC v. Ontel Prods. Corp.*, 2020 WL 10321726, at *17 (S.D. Cal. 2020). There is thus no convergence of marketing channels that is likely to result in confusion. Dkt. 234 at 78:2–8, 82:9–84:3, 133:18–134:3; Dkt. 236 at 42:5–45:1.

In 2018, this Court found that the marketing-channels factor favored JDPI because some online retailers sell Jack Daniel's *licensed merchandise* as well as Bad Spaniels, including Amazon.com, Walmart.com, and Boozingear.com. 291 F. Supp. 3d at 909, 911.[2] But the increasing dominance of online marketing has shifted courts' evaluation of this factor. Thus, in 2019, Judge Silver recognized that, under Ninth Circuit precedent, the marketing-channels "factor is most helpful when the two entities belong a niche market and advertise in specialized outlets, such as trade shows." *Great Am. Duck Races Inc. v. Kangaroo Mfg. Inc.*, 398 F. Supp. 3d 494, 506 (D. Ariz. 2019) (citing *Network Automation*, 638 F.3d at 1151) (holding that "the shared use of a ubiquitous marketing

---

[2] While the Court's finding of facts pointed to "Walmart," the undisputed testimony was that VIP never sold the Bad Spaniels toy in Walmart stores, but some third parties put up listings through Walmart.com. Dkt. 235 at 70; Dkt. 243 at 54.

channel does not shed much light on the likelihood of consumer confusion")). Judge Silver concluded, "Given the breadth of products available on Amazon, it cannot be deemed a specialized outlet." *Id.* (finding that the factor "does not weigh strongly in either party's favor"). As the Seventh Circuit noted in 2019 in rejecting a marketing-channels argument based on "sell[ing] nationwide through online retailers," "[s]elling through Amazon and eBay is ubiquitous." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 426 (7th Cir. 2019); *see Davis v. Amazon.com, Inc.*, 2023 WL 8113299, at *8 (C.D. Cal. Nov. 2, 2023) (finding that marketing-channels factor weighed against confusion because "[t]he extent of the overlap in customer bases is confined only to the mass of humanity that shops on Amazon, which is such a broad group that it provides no useful metric to evaluate likelihood of confusion the way a comparison of specified, targeted marketing campaigns otherwise would"). The same is true of Walmart.com. *See, e.g.*, *Airhawk*, 2020 WL 10321726, at *17 (holding the fact that "both parties sell their products on Amazon.com and Walmart.com … is entitled to little weight").

That leaves Boozingear.com, yet there is no evidence that one such website is significant. There was no evidence of how much product either party ever sold over that website, or how much view traffic the site ever drew when it sold Bad Spaniels and Jack Daniel's merchandise. Nor is there evidence a consumer searching the site (or even Amazon.com or Walmart.com) would bring up the Jack Daniel's gear and Bad Spaniels in the same search, whether of names or product categories. *See Hasbro, Inc. v. Asus Computer Int'l, Inc.*, 2012 WL 13012663, at *9 (C.D. Cal. Mar. 23, 2012) (denying preliminary injunction because "the fact that both Hasbro's and Asus's products appear on the search results pages is at best equivocal"). Different searches were necessary to find Bad Spaniels and Jack Daniel's—just as they are found in different stores.

### 4. The type of goods and degree of care exercised does not favor a finding of likely confusion.

This Court's previous evaluation of the type of goods and degree of care focused almost entirely on Bad Spaniel's retail value of about $15, which led the Court to conclude

that consumers are unlikely to exercise much care. *VIP Prods.*, 291 F. Supp. 3d at 910. But that fails to account for either Jack Daniel's side of the ledger or the fact that "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce [has] become[] commonplace." *Network Automation*, 638 F.3d at 1152. Given Jack Daniel's own higher price point and premium brand image—and avid brand loyalty that JDPI cherishes—one would expect that customers would exercise greater care. *See, e.g.*, *Gallo Cattle*, 967 F.2d at 1293 ("When goods are expensive, it is assumed that buyers will exercise greater care in their purchases."). Moreover, "[t]he degree of care" hinges on "whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005) (quotation omitted).

At any price point, the parodic nature of Bad Spaniels is obvious—it is the selling point of the dog toy—the reasonably prudent customer would appreciate the "unlikelihood" that Jack Daniel's would "license … lampoons of their own productions." *Campbell*, 510 U.S. at 592. That is certainly true of a devoted pet owner who is shopping for a specialty dog toy rather than a generic supermarket rope toy or rawhide bone. Even a consumer exhibiting little to no care, therefore, would still likely be able to distinguish between a red vinyl squeaky toy and a bottle of Tennessee whiskey. Dkt. 234 at 73:4–18; Dkt. 236 at 77:3–78:12, 78:20–80:11.

In short, the *Sleekcraft* factors do not suggest a likelihood of confusion, and this Court should enter judgment for VIP on JDPI's claim for trademark infringement.

## III.   JDPI's claim for dilution by tarnishment is meritless and should be rejected on constitutional grounds and nonconstitutional grounds.

### A.   Tarnishment amounts to unconstitutional viewpoint discrimination.

The provision of the Lanham Act that proscribes "dilution by tarnishment" runs afoul of the First Amendment. "Dilution by tarnishment" is defined by the Lanham Act as "association … that *harms the reputation* of the famous mark." 15 U.S.C. § 1125(c)(2)(C) (emphasis added). The proscription in § 1125(c)(1) of tarnishment

"regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury" is facially unconstitutional. Dilution by tarnishment is a paradigm of viewpoint-based discrimination: speech that burnishes is permissible, while speech that tarnishes is subject to injunction *regardless* of any harm to the senior mark holder. Because of its sweeping breadth, disregard for actual confusion or damages, and injunctive remedy, the tarnishment cause of action cannot survive the required strict scrutiny analysis, or even a lesser intermediate scrutiny review.

In a pair of cases, the Supreme Court recognized that trademarks can be expressive and subject to First Amendment protection, and the Court struck down statutory bars to registration of types of marks because the statutes amounted to unconstitutional viewpoint discrimination. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2303 (2019) (majority opinion striking down registration bar for "scandalous" or "immoral" marks). *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (plurality opinions striking down registration bar for "derogatory" marks). If barring registration of an "disparaging," "scandalous," or "immoral" mark is unconstitutional viewpoint discrimination, *Tam*, 137 S. Ct. at 1763, then enjoining use of a disparaging mark that "harms the reputation" must be as well because it is even clearer that "speech is being restricted." *Brunetti*, 139 S. Ct. at 2303 (Roberts, C.J., concurring). "Giving offense is a viewpoint," *Tam*, 137 S. Ct. at 1763, and the tarnishment provision is, like the disparagement bar in *Tam*, a "happy-talk clause," *id.* at 1765 (op. of Alito, J.).

### 1. Tarnishment cannot survive strict scrutiny.

The unconstitutionality of the statute barring dilution by tarnishment nature is by no means a new thought; as a host of commentators have identified, dilution by tarnishment cannot survive constitutional scrutiny following the Supreme Court's decisions on registration bars. *See, e.g.*, John Gilbertson, *Blunt Advice: A Crash Course in Cannabis Trademarks*, 60 IDEA: L. Rev. of Franklin Pierce Ctr. for Intell. Prop. 502, 532 (2020) ("'tarnishment' is likely broad enough to encompass marks which 'shock the sense of decency,' placing it in *Brunetti*'s crosshairs"); Lisa P. Ramsey, *Free Speech Challenges*, 56 Hous. L. Rev. 401, 456 (2018) ("After *Tam*, dilution laws are probably

unconstitutional."); Theodore H. Davis, Jr., *Introduction: United States Annual Review, The Seventieth Year of Administration of the Lanham Act of 1946*, 108 Trademark Rep. 1, 3 n.22 (2018) (explaining that courts' application of dilution by tarnishment "appears as much a viewpoint-discriminatory measure as the statutory prohibition at issue in *Tam*"); Ashutosh Bhagwat, *Truthiness: Corporate Public Figures & The Problem of Harmful Truths*, 99 Minn. L. Rev. 297, 310 (2014) ("[T]he policies underlying the dilution-by-tarnishment claim are in direct, irreconcilable conflict with the First Amendment…. The solution is to forthrightly recognize that the claim itself is unconstitutional, no less so than the law of seditious libel and the Sedition Act of 1798.").

Because tarnishment discriminates based on viewpoint, it is necessarily subject to strict scrutiny. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The Supreme Court has long cautioned that the First Amendment leaves the government without the power to "restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). The Court has rejected as "startling and dangerous" any free-floating First Amendment test in the context of content- and viewpoint-based regulations on speech. *Id.* at 717 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)). Where the government seeks to regulate speech "because of its message," such a regulation is "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. And where the target of the regulation is certain messages, "the violation of the First Amendment is all the more blatant," because "[v]iewpoint discrimination is … an egregious form of content discrimination." *Id.* at 829.

To pass constitutional muster, a viewpoint-based regulation must advance a compelling state interest and be narrowly tailored to meet that end. *See Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (explaining that "laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message the speech conveys'" must pass strict

scrutiny) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (cleaned up)); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022); *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022). The party seeking to enforce the regulation bears the burden of showing both the substantial interest and that the means selected is the least restrictive means of achieving the governmental interest. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992).

Despite Congress's power to regulate trademarks, the Supreme Court has unwaveringly applied these ironclad principles to that field. In both *Tam* and *Brunetti*, the Court struck down both the disparagement and immoral and scandalous bars on trademark registration as impermissible viewpoint-based regulations. As the Court explained in *Brunetti*, both the Lanham Act's bar on disparaging trademarks and immoral or scandalous marks were unconstitutional for the same simple reason: they both "disfavor[ed] certain ideas." *Brunetti*, 139 S. Ct. at 2297. Indeed, the fact that either restriction could constitutionally apply in certain circumstances was of no moment because "[t]he Court's finding of viewpoint bias ended the matter." *Id.* at 2302.

It is difficult to identify precisely what Congress's legitimate goal could be for the dilution provisions as currently written. Unlike traditional infringement law, which has its origins in the common-law goal of consumer protection, dilution is a purely statutory beast that has no basis in the common law or consumer protection. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 429 (2003). Because tarnishment is not rooted in the common law, it has none of the protections that have developed for common-law causes of action, like trade defamation's requirement of falsity and scienter, that permit it to withstand scrutiny under the First Amendment. *See, e.g.*, *Laserworks v. Pitney Bowes, Inc.*, 105 F. App'x 657, 661 (6th Cir. 2004) (listing elements of trade defamation).

Because the dilution cause of action does not require confusion, damages, or injury, the only explicable governmental interest in prohibiting junior marks that tarnish is to stop speech that the government does not like, or to stop criticism of speech it does like. That is, unquestionably, insufficient to satisfy the high bar of strict scrutiny. *See*

23

*Tam*, 582 U.S. at 246 (denouncing the disparagement bar to registration as a "happy-talk clause" unsupportable under the First Amendment).

Nor does protecting a company's investment in famous marks justify stifling the speech of others. The Supreme Court has repeatedly rejected regulations that stifle the speech of one party to protect the free expression of another—the government may not "beggar they neighbor" to protect preferred viewpoints. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011). Short of proof of actual confusion, the tarnishment cause of action acts only to burden nonconfusing speech to the benefit of the senior, and ostensibly preferred, holder. Even purely and demonstrably false speech about a mark is entitled to First Amendment protection. *Alvarez*, 567 U.S. at 717–19 (striking down Stolen Valor Act even though it "targets falsity and nothing more").

The tarnishment statute as written is not narrowly tailored and, logically, cannot be the least restrictive means of accomplishing Congress's aims. Indeed, a narrower (and possibly constitutional) version of the tarnishment cause of action existed prior to the enactment of the Trademark Dilution Revision Act of 2006 ("TDRA"). In *Moseley*, the Supreme Court considered the prior version of the tarnishment statute, and held that prior version "unambiguously require[d] a showing of actual dilution, rather than a likelihood of dilution." 537 U.S. at 433. In that scenario, the statute was at least somewhat tailored to protect the usefulness of the mark, rather than its integrity or social status. As a direct result of the Supreme Court's holding in *Moseley*, however, Congress enacted the TDRA because it perceived an "undue burden" on trademark holders seeking to stop diluting uses. *V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382 (6th Cir. 2010).

Thus, even assuming that Congress has a legitimate interest in protecting the holders of famous marks from speech that tarnishes their marks by discriminating based on viewpoint, the broad sweep of the current tarnishment statute fails because it is not narrowly tailored. The pre-TDRA version of the tarnishment cause of action was a narrower means of accomplishing that claimed interest that did not burden nonconfusing speech (which, again, Congress has no interest in prohibiting in the first instance).

24

Strikingly, tarnishment is both over- and underinclusive to achieve this end. Speech that falls within the statutory exclusions can be equally damaging to brand recognition, while any speech that is source-identifying will be swept into tarnishment's ambit no matter how remote the possibility of confusion—even if there is no confusion at all because dilution, by design, has nothing to do with consumer confusion. *Moseley*, 537 U.S. at 429.

Plainly stated, the post-TDRA version of dilution by tarnishment sweeps exceptionally broadly, and "no parody, criticism, or commentary will rescue the alleged dilutor. It will be subject to liability regardless." *Jack Daniels*, 599 U.S. at 162. Such an outright ban on particular viewpoints necessarily fails under the First Amendment

### 2. Tarnishment also fails to pass intermediate scrutiny.

Even if the Court were inclined to consider dilution by tarnishment through the less-rigorous standard of intermediate scrutiny as a regulation on commercial speech, the tarnishment statute still violates the First Amendment. Under *Central Hudson*, a regulation on commercial speech can stand only if it directly advances that interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980); *see also Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183 (1999). There is no evidence, nor has there been any argument, that VIP's speech is misleading. As explained above, the government has no legitimate interest in stopping speech that criticizes, embarrasses, or mocks famous marks. But, even if it did, dilution by tarnishment does not distinguish between *actually* diluting speech and speech that merely offends or mocks. Stated differently, dilution by tarnishment sweeps far too broadly by censoring speech well outside the ambit of the government's purported interest. For this reason, it violates the First Amendment. *See Cent. Hudson*, 447 U.S. at 570 (striking down regulation that targeted all promotional advertising even if unrelated to government's substantial interest). Again, the pre-TDRA version of the tarnishment cause of action stands as proof that a narrower, less restrictive, means was available to Congress. That Congress pushed the statute even further is insufficient reason to muzzle all mark-related commentary. The current tarnishment statute does not survive constitutional scrutiny.

**B.      Even if the tarnishment statute were constitutional, JDPI has failed to prove tarnishment.**

The constitutional infirmities of dilution by tarnishment can be avoided here because JDPI failed to prove the elements of tarnishment. This is true for three reasons.

1.      There is no evidence of actual tarnishment, i.e., that Jack Daniel's reputation has been harmed in the slightest, or even a likelihood of tarnishment. No consumers ever told JDPI or VIP that they thought Bad Spaniels was disgusting or hurting Jack Daniel's brand. Dkt. 235 at 51–52; Dkt. 243 at 87. Bad Spaniels has been on the market for ten years and, even after the publicity as to the Supreme Court case, JDPI has not sought to introduce evidence of actual reputational harm to its marks.

Whatever "likely to cause … dilution by tarnishment" means for purposes of the TDRA, it cannot be sufficient as a matter of logic or constitutional law for one person's opinion to be sufficient to meet that bar. In its 2018 ruling, this Court relied entirely on the subjective impression of Dr. Itamar Simonson, a marketing professor, who opined that Bad Spaniels is tarnishing because "if you associate any food or beverage with defecation, you are creating disgust with respect to that food or beverage that is being now associated with defecation." Dkt. 234 at 171–72, 180. Claiming to speak on behalf of all "normal people," he invoked "principles of consumer psychology" to reach a "common sense conclusion" that poop "is not something that you would like to associate … anything you eat or drink with." *Id.* at 170, 175, 196.

Indeed, Dr. Simonson claimed that Bad Spaniels "will generate the disgust" even though "[c]onsumers are not stupid. No one would think there's poo in the Jack Daniel's product." *Id.* at 172. He conducted no surveys or focus groups to verify his conclusion. *Id.* at 180. Nor is there any indication that he accounted for the facts that (1) Bad Spaniels is a parody dog toy or (2) certain kinds of "poop" are considered wholesome aspects of ordinary life and routinely featured in family movies, e.g., baby poop and dog poop. In short, not all feces are created equal—or greeted by people in the same way. *See Nissan Motor Co. v. Nissa Comput. Corp.*, 2007 WL 9374946, at *18–19 (C.D. Cal. Sept. 21,

26

2007) ("[I]n the 'dilution by tarnishment' line of domain name cases, courts have typically found tarnishment only when the potentially tarnishing website leads viewers to an 'unwholesome' website."). VIP did not use JDPI's marks "in connection with sexual activity, obscenity, illegal activity or any other activity of questionable repute." *Id.* Giving offense is a viewpoint; that Dr. Simonson may be upset by dog poop doesn't foot the bill.

Dr. Simonson's testimony is particularly insufficient because his "common sense" conclusion was controverted by that of VIP's expert, Bruce Silverman, a leading advertising executive and consultant who actually conducted four focus groups that produced unanimous results: "they thought it was funny," and "they thought that [the idea the toy created disgust] was ludicrous." Dkt. 238 at 51. "Nobody was disgusted … or suggested that anyone would be disgusted by the toy or disgusted by Jack Daniel's because of the toy." Dkt. 129-1 at 17 ¶ 51 (cleaned up).

Even though Bad Spaniels cannot avail itself of the statutory dilution exclusion for "[a]ny fair use …, including … parodying" the famous mark or its owner, 15 U.S.C. § 1125(c)(3)(A), because "Bad Spaniels" has been held to be a source identifier, that does not mean that the toy's parodic nature is not relevant to whether it is likely to tarnish the reputation of the JDPI's famous marks. Yet Dr. Simonson made no allowance for humor at all. On the one hand, actual humans that Silverman spoke to thought the idea of disgust from a novelty dog toy was absurd and laughable; on the other, Dr. Simonson gave his *ipse dixit* explanation that any reference to scatological function and consumable goods tarnishes. Dr. Simonson's absurd proposition cannot survive as a matter of statutory construction or constitutional law, and it must be rejected.

2.      This case differs from other cases held to involve dilution by tarnishment because VIP's product is itself admittedly innocuous—an interactive-play dog toy—and the only allegedly tarnishing aspect is the speech component of the parody. Other cases of tarnishment involved the use of marks on *sex- or drug-related products*. "Tarnishment occurs when a famous mark is improperly associated with an inferior or offensive product or service." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070,

1089 (C.D. Cal.) (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1326 n.7 (9th Cir. 1998)), *aff'd*, 202 F.3d 278 (9th Cir. 1999). In the leading case cited by this Court, the Sixth Circuit pointed to the fact that "[t]here have been at least eight federal cases in six jurisdictions that conclude that a famous mark is tarnished when its mark is semantically associated with a new mark that is used to sell *sex-related products*." *Moseley*, 605 F.3d at 384, 388 (use of VICTOR'S LITTLE SECRET for store that sells "'sex toys' and other sexually oriented products"), *cited in VIP Prods.*, 291 F. Supp. 3d at 902; *see Nissan Motor*, 2007 WL 9374946, at *18 (rejecting tarnishment because there was "no reliable evidence that the products sold on Nissan Computer are in fact 'inferior' to those offered by Nissan Motor").

In contrast, courts have rejected tarnishment claims where there was no evidence of tarnishment by association with *underlying activity*. *See, e.g.*, *N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC*, 69 F. Supp. 2d 479, 492 (S.D.N.Y. 1999) (exchange failed to show likelihood that its marks will be tarnished by "negative associations as a result of the Casino's use" because site visitors would believe "that gambling is similar to investing in securities traded on the NYSE"), *aff'd in part, rev'd in part*, 293 F.3d 550 (2d Cir. 2002). The notion that a federal court must enjoin playful humor simply because it invokes dog poop illustrates how low and vague the tarnishment standard JDPI advocates is, how broadly it sweeps, and how much of a constitutional problem it creates.

3.     Finally, JDPI has never made the requisite showing of tarnishment of a "famous" mark by a correlative junior mark. The plain language of the tarnishment statutes requires the comparison of the "famous mark" to the "mark or trade name … that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." 15 U.S.C. § 1125(c)(1). Such similarity requires more than creating a mere mental association between the two marks. *Moseley*, 537 U.S. at 433–44; *Starbucks*, 588 F.3d at 110. The similarity of the marks must be driven *by the marks themselves*, not other sources. *See Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 621 (9th Cir. 2017); *see also* 4 *McCarthy*, *supra*, § 24:117 ("The required 'association' must be created solely by the

similarity of the conflicting marks, not from some other source.").

"Jack Daniel's" is a "famous" mark, but its correlative mark, "Bad Spaniels," does not refer to defecation—dogs can be "bad" because they bark or chew furniture—and JDPI's then-president testified that JDPI does not claim that the words "Bad Spaniels" were the problem. Dkt. 235 at 68–69. The parody's reference to "43% POO BY VOL." may mean dog poo, but it is a pretend content description, not a pretend trademark.

That leaves "The Old No. 2," with or without "on your Tennessee carpet," which allegedly tarnishes JDPI's "Old No. 7." But despite the Court's 2018 finding that JDPI's marks in generally are famous, 291 F. Supp. 3d at 900, ¶ 27, there is no evidence (or a finding by this Court) that "Old No. 7" is by itself "famous" within the meaning of the tarnishment statute. Under the 2006 revised federal statute, to be "famous," a mark must be "widely recognized by the general consuming public of the United States" as a designation indicating a single source of goods or services. 15 U.S.C. § 1125(c)(2)(A). Like other federal courts, the Ninth Circuit has recognized that being a strong mark is not enough for dilution—"the mark must be a household name," such that "a large portion of the general consuming public recognizes that mark." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) (contrasting "the general consuming public" with "bicycle enthusiasts"). "'Household name' status is difficult to achieve." *Theta Chi Frat., Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 827 (N.D. Cal. 2016). Indeed, because dilution protection is "reserved for a select class of marks," *Nissan Motor Co. v. Nissa Comput. Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004) (quotation omitted), such claims have been rejected where the plaintiff's mark "has not achieved 'household name' status similar to marks such as Coca-Cola, Apple or Budweiser," *TrueNorth Cos. v. TruNorth Warranty Plans of N. Am., LLC*, 292 F. Supp. 3d 864, 871 (N.D. Iowa 2018).

Examples of strong marks that nevertheless fell short of "famous" for dilution purposes include TREK for bicycles, *Thane Int'l*, 305 F.3d at 911, and COACH for high-end handbags and leather goods, *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372–76 (Fed. Cir. 2012) (recognizing that "the burden to show fame in the dilution

context is high—and higher than that for likelihood of confusion purposes"). Perhaps most pertinent factually, the Maker's Mark trade dress for bourbon—red dripping wax on the bottle's top—was held not to be "famous" by a *Kentucky* federal court. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 698 (W.D. Ky. 2010) ("Congress intended for dilution to apply only to a small category of extremely strong marks."), *aff'd on other grounds*, 679 F.3d 410 (6th Cir. 2012).

There is no evidence that households across America recognize "Old No. 7" as anything, much less Jack Daniel's mark. As with the Maker's Mark red dripping wax, it is not enough that perhaps some subset of whiskey drinkers might recognize "Old No. 7" from the Jack Daniel's label. The Ninth Circuit recently reiterated that "niche fame can no longer make a trademark eligible for protection against dilution." *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 870 (9th Cir. 2020) (reversing jury finding that "Eames" chair product design was "famous" and stating that "we do not interpret the TDRA of 2006 to have lowered the standard" for "fame"). Thus, even *in Texas*, the University of Texas's "longhorn" logo was not "famous" because, though widely known among college football fans, it was not "so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK" among "nearly the entire population of the United States." *Bd. of Regents ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 678 (W.D. Tex. 2008); *see S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 465–67 (D. Del. 2022) (S&P not "famous" for financial services); *Dille Fam. Tr. v. Nowlan Fam. Tr.*, 276 F. Supp. 3d 412, 437 (E.D. Pa. 2017) (BUCK ROGERS not "famous").

## CONCLUSION

For the foregoing reasons, the Court should enter judgment for VIP on JDPI's claims for trademark infringement and dilution by tarnishment.

DATED this 16th day of February, 2024.

DICKINSON WRIGHT PLLC

s/ Bennett Evan Cooper
Bennett Evan Cooper
David G. Bray
Vail C. Cloar
Alexandra Crandall
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004

Attorneys for Plaintiff-Counterdefendant
VIP Products, L.L.C.

COPY of the foregoing served by CM/ECF system
this 16th day of February, 2024, on the following:

Isaac S. Crum
MESSNER REEVES LLP
7250 North 16th Street, Suite 410
Phoenix, Arizona 85020

Lisa Blatt
Amy M. Saharia
Amy Mason Saharia
WILLIAMS & CONNOLLY LLP
680 Maine Ave., SW
Washington, D.C. 20024

s/ Bennett Evan Cooper