**DICKINSON WRIGHT PLLC**
Bennett Evan Cooper (010819)
  *bcooper@dickinsonwright.com*
David G. Bray (014346)
  *dbray@dickinsonwright.com*
Vail C. Cloar (032011)
  *vcloar@dickinsonwright.com*
Alexandra Crandall (034838)
  *acrandall@dickinsonwright.com*
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax:    (844) 670-6009

Attorneys for Plaintiff-Counterdefendant
VIP Products, L.L.C.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products L.L.C., an Arizona limited liability company, | No. 2:14-cv-02057-SMM |
| Plaintiff, | **RESPONSE BRIEF OF VIP PRODUCTS LLC** |
| v. | |
| Jack Daniel's Properties, Inc., a Delaware corporation, | |
| Defendant. | |
| Jack Daniel's Properties Inc., a Delaware corporation, | |
| Counterclaimant, | |
| v. | |
| VIP Products, L.L.C., an Arizona limited liability company, | |
| Counterdefendant. | |

# TABLE OF CONTENTS

*Page*

Table of Contents ...........................................................................................................i

Table of Authorities........................................................................................................ iii

Introduction ................................................................................................................... 1

Argument ....................................................................................................................... 2

I.    VIP is entitled to raise the issues and arguments that has raised on this general remand, because this Court has wide discretion on remand to resolve this case in the manner it so chooses. ........................................................ 2

    A.    A remand is considered to be "general" unless a court expressly states otherwise. ................................................................................. 3

    B.    Neither the Supreme Court nor the Ninth Circuit narrowed the issues this Court could consider on remand. ................................................. 5

    C.    Principles of waiver do not apply here. ........................................................ 7

        1.    None of the cases JDPI cites apply in light of the procedural posture of this case and the nature of VIP's argument. ................................................................. 7

        2.    Even if waiver applied when a judgment has been vacated, important and applicable exceptions apply here. ................................................................. 9

II.   VIP Products' parody dog toy is not likely to cause confusion with Jack Daniel's whiskey. ............................................................................... 11

    A.    It is undisputed—and indisputable—that the Bad Spaniels dog toy is a successful parody. ....................................................................... 11

    B.    Applied in light of the parodic context, the *Sleekcraft* factors do not indicate any likelihood of confusion. ................................................. 12

III.  The Court should enter judgment for VIP on JDPI's dilution-by-tarnishment claim. ...................................................................................... 19

    A.    The 2006 dilution-by-tarnishment statute is unconstitutional. ................. 19

        1.    JDPI misstates the scope of its tarnishment cause of action. ........................................................................... 20

        2.    Dilution by tarnishment is not viewpoint-neutral. ......................... 22

        3.    JDPI's marks are not similar to the "Olympic" mark. ................... 23

i

B.    JDPI has failed to establish the elements of its tarnishment claim. ..................................................................................25

1.    JDPI has not shown that VIP's toy uses a poo-related mark substantially identical to a "famous" JDPI mark. .................25

2.    There is no evidence that the Bad Spaniels toy actually tarnishes Jack Daniel's. .................................................27

Conclusion ..............................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alfwear, Inc. v. Mast-Jagermeister US, Inc.*,
   2021 WL 364109 (D. Utah 2021) ........................................................... 27

*Allstate Ins. Co. v. Kia Motors Am., Inc.*,
   784 F. App'x 507 (9th Cir. 2019) ...................................................... 13, 15

*Am. Freedom Def. Initiative v. King County*,
   904 F.3d 1126 (9th Cir. 2018) .............................................................. 23

*Apple Inc. v. Samsung Elecs. Co.*,
   2017 WL 3232424 (N.D. Cal. July 28, 2017) ...................................... 8, 9

*Bd. of Regents v. KST Elect., Ltd.*,
   550 F. Supp. 2d 657 (W.D. Tex. 2008) ................................................ 26

*In re Beverly Hills Bancorp*,
   752 F.2d 1334 (9th Cir. 1984) ................................................................ 6

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
   963 F.3d 859 (9th Cir. 2020) ................................................................ 25

*Burgess v. Pliler*,
   2007 WL 430742 (E.D. Cal. Feb. 6, 2007), *report and recommendation
   adopted*, 2007 WL 776585 (E.D. Cal. Mar. 12, 2007), *aff'd sub nom.
   Burgess v. Johnson*, 314 F. App'x 33 (9th Cir. 2008) ................................ 30

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) .............................................................................. 22

*CCA & B, LLC v. F + W Media Inc.*,
   819 F. Supp. 2d 1310 (N.D. Ga. 2011) ................................................ 21

*Chem. Corp. of Am. v. Anheuser-Busch, Inc.*,
   306 F.2d 433 (1962) .............................................................................. 20

*Christian Legal Soc'y Chapter v. Wu*,
   626 F.3d 483 (9th Cir. 2010) .................................................................. 7

*Coach Servs., Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012) ............................................................ 25

*Cohn v. Petsmart, Inc.*,
  281 F.3d 837 (9th Cir. 2002) ............................................................. 13, 15, 16

*Cummings v. Connell*,
  281 F. Supp. 2d 1187 (E.D. Cal. 2003), *rev'd on other grounds*, 402
  F.3d 936 (9th Cir. 2005) ............................................................................. 4

*Deere & Co. v. MTD Prods., Inc.*,
  41 F.3d 39 (1994) ...................................................................................... 20

*Dominguez v. Spearman*,
  2017 WL 6508981, at *7 (C.D. Cal. July 19, 2017), *report and*
  *recommendation adopted*, 2017 WL 6512214 (C.D. Cal. Dec. 18, 2017) ................ 30

*Dream Palace v. County of Maricopa*,
  384 F.3d 990 (9th Cir. 2004) ................................................................. 9, 10

*Ducks Unlimited, Inc. v. Boondux, LLC*,
  2017 WL 3579215 (W.D. Tenn. 2017) ...................................................... 26

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F. Supp. 3d 765 (N.D. Cal. 2017) ........................................................ 8

*Firth v. United States*,
  554 F.2d 990 (9th Cir. 1977) ...................................................................... 3

*Fisher v. Vassar Coll.*,
  70 F.3d 1420 (2d Cir. 1995), *on reh'g en banc on other grounds*; 114
  F.3d 1332 (2d Cir. 1997) (en banc) ......................................................... 29

*Flagship W., LLC v. Excel Realty Partners, L.P.*,
  758 F. Supp. 2d 1004 (E.D. Cal. 2010) ...................................................... 5

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
  314 F.2d 149 (9th Cir. 1963) ..................................................................... 1

*Friend v. Time Mfg. Co.*,
  422 F. Supp. 2d 1079 (D. Ariz. 2005) ...................................................... 29

*Hall v. Swift*,
  2018 WL 2317548 (C.D. Cal. Feb. 13, 2018), *rev'd on other grounds*,
  786 F. App'x 711 (9th Cir. 2019) ............................................................ 29

*Hershey Foods Corp. v. Mars, Inc.*,
  998 F. Supp. 500 (M.D. Pa. 1998) ........................................................... 25

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ................................................................ 10, 23

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
   599 U.S. 140 (2023) .......................................... 5, 6, 12, 13, 16

*Jones v. Atl. Recs.*,
   2023 WL 5577282 (S.D.N.Y. Aug. 29, 2023), *appeal filed* (2d Cir. Sept.
   28, 2023) ................................................................................ 29

*Kellogg Co. v. Toucan Golf, Inc.*,
   337 F.3d 616 (6th Cir. 2003) ...................................................... 17

*Kharoufeh v. Holder*,
   599 F. App'x 619 (9th Cir. 2015) .................................................. 5

*L.L. Bean v. Drake Publishers, Inc.*,
   811 F.2d 26 (1st Cir. 1987) ......................................................... 21

*Liberty Mut. Ins. Co. v. E.E.O.C.*,
   691 F.2d 438 (9th Cir. 1982) ..................................................... 3, 5

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
   507 F.3d 252 (4th Cir. 2007) ...................... 2, 6, 11, 12, 13, 14, 15, 17, 18, 19, 27, 28

*Luv N' Care Ltd. v. Regent Baby Prods. Corp.*,
   841 F. Supp. 2d 753 (S.D.N.Y. 2012) ....................................... 26

*Magnesystems, Inc. v. Nikken, Inc.*,
   933 F. Supp. 944 (C.D. Cal. 1996) ............................................... 8

*Mason v. Texaco, Inc.*,
   948 F.2d 1546 (10th Cir. 1991) .................................................... 3

*Matal v. Tam*,
   582 U.S. 218 (2017) .................................................................. 10, 23

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003) ...................................................... 22

*In re Mercury Interactive Corp. Secs. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ........................................................ 9

*Moore v. Robinson Oil Corp.*,
   588 F. App'x 528 (9th Cir. 2014) ................................................ 30

v

*Moseley v. V Secret Catalogue, Inc.*,
    537 U.S. 418 (2003) ............................................................................. 20

*Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*,
    642 F. Supp. 1031 (N.D. Ga. 1986) ..................................................... 21

*Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*,
    358 F.3d 694 (10th Cir. 2004) ............................................................ 3, 4

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................................. 24

*Raich v. Gonzales*,
    500 F.3d 850 (9th Cir. 2007) ............................................................. 8, 9

*S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
    483 U.S. 522 (1987) ...................................................................... 23, 24

*Sec. Inv. Prot. Corp. v. Vigman*,
    74 F.3d 932 (9th Cir. 1996) .................................................................. 8

*Street v. New York*,
    394 U.S. 576 (1969) ............................................................................. 23

*United States v. Castellanos*,
    608 F.3d 1010 (8th Cir. 2010) ..................................................... 3, 4, 26

*United States v. Caterino*,
    29 F.3d 1390 (9th Cir. 1994) ................................................................ 4

*United States v. Cornelius*,
    968 F.2d 703 (8th Cir. 1992) ................................................................ 5

*United States v. Husband*,
    312 F.3d 247 (7th Cir. 2002) ................................................................ 4

*United States v. McFalls*,
    675 F.3d 599 (6th Cir. 2012) ............................................................ 3, 5

*United States v. Olano*,
    507 U.S. 725 (1993) ............................................................................... 7

*United States v. Ruis*,
    133 F.3d 930 (9th Cir. 1998) ................................................................ 4

*United States v. Sandoval-Barajas*,
    8 F. App'x 622 (9th Cir. 2001) ............................................................. 3

*United States v. Stratos*,
   2017 WL 272213 (E.D. Cal. Jan. 20, 2017) ...................................................... 30

*United States v. Washington*,
   172 F.3d 1116 (9th Cir. 1999) ................................................................................ 3

*V Secret Catalogue, Inc. v. Moseley*,
   605 F.3d 382 (6th Cir. 2010) ................................................................................ 20

*Vans, Inc. v. MSCHF Prod. Studio, Inc.*,
   88 F.4th 125 (2d Cir. 2023) .................................................................................. 19

*VIP Prods. LLC v. Jack Daniel's Props, Inc.*,
   953 F.3d 1170 (9th Cir. 2020) ............................................. 6, 11, 12, 13, 28

*Wong Ho v. Dulles*,
   261 F.2d 456 (9th Cir. 1958) ................................................................................ 30

**Statutes and Rules**

15 U.S.C. § 1125(c)(1) ................................................................................................ 20

15 U.S.C. § 1125(c)(2) ................................................................................................ 27

36 U.S.C. § 220502 ..................................................................................................... 24

36 U.S.C. § 220507 ..................................................................................................... 24

Fed. R. Evid. 201(b) ................................................................................................... 29

**Other Authorities**

Stephen Dinan, "The brownout problem spreads: San Francisco's public
   poo problem hits record level," WASH. TIMES, Dec. 1, 2023,
   https://www.washingtontimes.com/news/2023/dec/1/brownout-spreads-
   san-franciscos-public-poo-problem/ ..................................................................... 28

Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L.
   Rev. 473 (2013) ...................................................................................................... 16

*McCarthy on Trademarks and Unfair Competition* (5th ed. 2024) ...................... 26, 27

Andrew Michaels, *Confusion in Trademarked NFTs*, 7 Stan. J. Blockchain
   L. & Pol'y 1 (2024) ................................................................................................ 13

Nathan Robinson, "Why is San Francisco ... covered in human feces?," THE
   GUARDIAN, Aug. 18, 2018,
   https://www.theguardian.com/commentisfree/2018/aug/18/san-
   francisco-poop-problem-inequality-homelessness ....................................... 28

David A. Simon, *The Confusion Trap: Rethinking Parody in Trademark
   Law*, 88 Wash L. Rev. 1021 (2013) ............................................................. 15

"Animal Poo Poo Song/Whose Poop Is It?," Animal Song for Kids,
   JunyTony, https://www.youtube.com/watch?v=mbohlAGRSqw ............................. 29

"Baby Puppy Song (Pick Up Poop Poop)," Nursey Rhymes and Kids
   Songs, https://www.youtube.com/watch?v=0pHxNCVwgmg ................................. 29

"I Stepped in Dog Poop," The Poopy Man,
   https://open.spotify.com/track/2gCPXi7Ws0cwzX1SjkzIF3 ...................................... 29

"I Stepped on Poop!," Kids Songs & Nursery Rhymes,
   https://www.youtube. com/watch?v=6bSfIQTSjjE ........................................................ 29

"Scoop a Doop Poop," https://www.songsforteaching.com/store/scoop-a-
   doop-poop-song-download-with-lyrics-pr-60302.html#google_vignette .................. 29

"Treading in Dog Poo is a Rainbow of Regret,"
   https://www.funnysongsforkids.com/funny-songs-for-kids1/treading-in-
   dog-poo-is-a-rainbow-of-regret ..................................................................... 29

# INTRODUCTION

From the title of JDPI's motion—"to reinstate prior judgment"—to its conclusion asking the Court to "re-issue" 131 of the Court's initial findings of fact and conclusions of law, to its proposed order calling for the Court to add six more conclusory bullet points, JDPI treats the Court's role on general remand from the Ninth Circuit as a ministerial exercise "in light of the Supreme Court's decision." (Doc. 338 at 1, 30; Doc. 338-1.) JDPI has missed the point. But this Court showed that it has not when it asked at the November 2023 status conference, "Now, it seems like the Supreme Court has spoken and it's back here. It's almost like starting at square one again." (Doc. 337 at 4:21–23.) Indeed, the Court asked, "What's the effect of the prior trial, if anything?" (*Id.* at 5:8–9.) While the parties agreed that there was no need to reopen the evidentiary record (*id.* at 5:24–6:5, 7:16–16), JDPI spends much of its brief asserting that VIP is somehow barred from raising any new or different issues or arguments based on that record. Yet, as explained in part I below, JDPI cannot cite even a *single* case limiting a party's ability to raise issues or arguments on a general remand to the district court.

The problem here is not the inadequacy of the evidentiary record or, for the most part, even this Court's initial finding of specific facts related to the *Sleekcraft* factors as they were understood in 2018, but instead the prior determination of the *legal consequences* of the found facts, i.e., which way a *Sleekcraft* factor points when the purportedly infringing use is a parody. As the Ninth Circuit has recognized with respect to the likelihood of confusion, "[t]he inference to be drawn from the undisputed facts here are derived from application of a legal standard," and "*this* determination of likelihood of confusion partakes more of the character of a conclusion of law than a finding of fact." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 152 (9th Cir. 1963) (quotation marks omitted) (emphasis added).

JDPI's arguments for reentering the Court's initial 2018 findings and conclusions ignore what the Ninth Circuit and the Supreme Court have said about the legal standards to be applied *and* the facts of this case. The Supreme Court guided this Court to the Fourth

Circuit's opinion in *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007), which involved a parody dog toy that the Ninth Circuit found materially indistinguishable from this case, and was the model on which the Solicitor General urged the *Sleekcraft* factors apply in a parody context. JDPI ignores the cited Solicitor General's views, ignores the portion of the Ninth Circuit's opinion as to *Louis Vuitton*'s relevance, and urges the Court to disregard the Justices Sotomayor and Alito's concurrence as to the impropriety of relying on Dr. Gerald Ford's confusion survey.

JDPI has failed to act on this Court's questions about whether, "in light of the Supreme Court's ruling, … the Fourth Circuit case is the one that jumps into the driver seat." (Doc. 337 at 8:17–25), as well as its justifiable concern about the concurrence's suggestion that "we don't think you should rely too heavily on those sorts of [surveys]" because the survey "may have been flawed" (*id.* at 6:9–18). As shown below in part II below, this case is indistinguishable from *Louis Vuitton*, and Ford's flawed survey, which made no attempt to account for the parodic context, does not compel a different result.

Finally, as to JDPI's tarnishment claim, JDPI cannot rely on any notion of wavier to avoid the constitutional infirmity of the 2006 tarnishment statute, which constitutes impermissible viewpoint discrimination based on whether the defendant's use is likely to "harm the reputation" of the trademark. And even apart from the constitutional issue, JDPI cannot establish that VIP's parody has tarnished JDPI's mark, nor can it establish that the only mark that is even the subject of a "poo" joke ("Old No. 7") is, as the tarnishment statute requires, a "household name" beyond any "niche market" of whiskey drinkers. JDPI is not entitled to an injunction based on a flimsy tarnishment claim as a poor substitute for demonstrating any likelihood of so-far-nonexistent actual confusion.

## ARGUMENT

**I.    VIP is entitled to raise the issues and arguments that has raised on this general remand, because this Court has wide discretion on remand to resolve this case in the manner it so chooses.**

JDPI acts as if this Court's role is purely ministerial, repeatedly asking for "reinstate[ment of] its original judgment." (Doc. 338 at 13.) But this request ignores what

the Supreme Court and Ninth Circuit actually did in this case. "When a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." *Firth v. United States*, 554 F.2d 990, 993 (9th Cir. 1977). Rather than reinstate the judgment in favor of JDPI, the Supreme Court—and then the Ninth Circuit— returned the parties to this Court on a general remand, and this Court thus is limited only by the language in the Supreme Court's opinion. Any other issues are fair game.

### A. A remand is considered to be "general" unless a court expressly states otherwise.

JDPI ignores the scope of the remand orders restoring jurisdiction in this Court. When an appellate court issues an order remanding to the district court for further proceedings, such a remand can be either "general" or "limited." When an appellate court's remand order merely states that further proceedings should be conducted consistent with the appellate court's ruling, that remand is *general*. *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 711 (10th Cir. 2004); *see also United States v. Sandoval-Barajas*, 8 F. App'x 622 (9th Cir. 2001) (general remand); *United States v. Washington*, 172 F.3d 1116, 1120 (9th Cir. 1999) (limited remand). "Unless otherwise specified, a remand order is presumed to be general." *United States v. McFalls*, 675 F.3d 599, 604 (6th Cir. 2012).

A general remand permits a district court to consider the case as it deems appropriate free of constraints, and in such cases district courts "are free to decide issues on remand so long as they were not decided on a prior appeal." *Liberty Mut. Ins. Co. v. E.E.O.C.*, 691 F.2d 438, 441 (9th Cir. 1982). Although a district court may be confined by holdings of an appellate court, it is otherwise permitted to "decide anything not foreclosed by the mandate." *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991). This includes new arguments in support of issues already litigated, but remanded to the district court. *United States v. Castellanos*, 608 F.3d 1010, 1017 (8th Cir. 2010) (holding that it was permissible for the government to "formulate[] a new argument in support of

3

the position maintained" before remand). The district court is free even to contradict its original findings, so long as its new findings do not conflict with holdings made by the appellate court. *Pittsburg Cnty. Rural Water Dist. No. 7*, 358 F.3d at 711; *see also Cummings v. Connell*, 281 F. Supp. 2d 1187, 1190 (E.D. Cal. 2003) (finding that because "the Ninth Circuit opinion contains no specific mandate about the remedies to be awarded on remand," the court was free to award damages under a different legal theory because such a finding was "consistent with the Ninth Circuit's determination"), *rev'd on other grounds*, 402 F.3d 936 (9th Cir. 2005).

JDPI inaccurately quoted *Castellanos* in its surresponse to VIP's Rule 5.1 notice as stating that, "'[a]lthough lower courts are free to decide new issues left open on remand,' issues that were 'not previously raised [are] deemed waived, and therefore, not within the scope of remand,'" and suggested that VIP had misrepresented the holding. (Doc. 353 at 2 (quoting *Castellanos*, 608 F.3d at 1017 (brackets by JDPI)). But JDPI cherry-picks language from the opinion and ignores what *Castellanos* actually said and stands for. What the court actually said was this: "Although lower courts are free to decide new issues left open on remand, this court must also consider *whether* an issue not previously raised is deemed waived, and therefore, not within the scope of remand. *Not every new argument, or shift in approach, constitutes the raising of a new issue*." 608 F.3d at 1017 (emphasis added) (internal citations omitted). The Eighth Circuit explicitly recognized that a party is "not required to anticipate every possible outcome on appeal and formulate a responsive argument for each alternative," and "[i]ssues that arise anew on remand are generally within the scope of the remand." *Id.* at 1019 (quoting *United States v. Husband*, 312 F.3d 247, 251 n.4 (7th Cir. 2002)). So long as a party raises an argument at "the earliest practicable time," it is not waived. *Id.* at 1020.

The presumption that a remand is general can only be rebutted by "clear evidence to the contrary." *United States v. Caterino*, 29 F.3d 1390, 1395 (9th Cir. 1994); *see United States v. Ruis*, 133 F.3d 930 (9th Cir. 1998) ("[W]e have found remands to be limited in scope only when they carefully and explicitly set forth such limitations."). Any silence

4

on the part of the appellate opinion or decision "simply leave[s] the matter … open for consideration by the district court on remand." *Liberty Mut.*, 691 F.2d at 441; *see also Flagship W., LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1042 (E.D. Cal. 2010) (finding that Ninth Circuit's general remand permitted district court to consider new legal theory). "[C]lear evidence" of a limited remand manifests as "a narrow framework within which the district court must operate." *McFalls*, 675 F.3d at 604.

Courts that refuse to consider issues left open by the appellate court on general remand may commit legal error. *Kharoufeh v. Holder*, 599 F. App'x 619, 619 (9th Cir. 2015) (holding that lower court erred by failing to address additional claim from party on a general remand); *United States v. Cornelius*, 968 F.2d 703, 705–06 (8th Cir. 1992) (affirming district court's new determination of whether defendant could be considered an "armed career criminal" on general remand as "the district court was free to consider any new arguments raised at the resentencing").

### B. Neither the Supreme Court nor the Ninth Circuit narrowed the issues this Court could consider on remand.

The procedural posture of this case is not subject to reasonable dispute. The Supreme Court vacated this Court's judgment, such that there are no findings of fact or law currently in place. The only limitation the Supreme Court placed on this Court (to the extent that it can be construed as a limitation) was the requirement that its proceedings be "consistent with [its] opinion." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 163 (2023). Upon receiving the Supreme Court mandate, the Ninth Circuit likewise remanded for "further proceedings consistent with the Supreme Court's order." (Ninth Cir. Doc. 41.) JDPI does not dispute that this was the language used by the Supreme Court. (Doc. 338 at 12 (stating that "[t]he Supreme Court vacated the judgment and remanded for further proceedings" consistent with its opinion).)

Nothing in the Supreme Court's opinion constricts the scope of VIP's argument. Having decided that the *Rogers* test did not apply to JDPI's infringement claim, the Supreme Court determined that, on the infringement issue, the remaining question "is

whether the Bad Spaniels marks are likely to cause confusion." *Jack Daniel's*, 599 U.S. at 161. The Court continued that "a trademark's expressive message—particularly a parodic one, as VIP asserts—may properly figure in assessing the likelihood of confusion" and "may make a difference in the standard trademark analysis." *Id.*

VIP's arguments as to infringement fit squarely within the Supreme Court's opinion. In contrast to JDPI's superficial analysis of the factors and insistence that this Court should reissue judgment for it, VIP showed that the Court's analysis must be modified in light of the Supreme Court's guidance and its holding that parody influences application of the likelihood-of-confusion factors. *See Louis Vuitton*, 507 F.3d at 265. Neither the Supreme Court nor the Ninth Circuit ordered entry of judgment for JDPI, nor did they opine what result the multifactor test would produce once properly applied. This Court has been left free to consider the facts presented at trial in light of the new legal landscape and any arguments raised by the parties.

On the tarnishment question, the Supreme Court determined that the Ninth Circuit's legal analysis was flawed, and that not every parody or humorous commentary could be wrapped up in the noncommercial-use exclusion. *Jack Daniel's*, 599 U.S. at 161–62. In the Court's own words, it held "only that the noncommercial exclusion does not shield parody or other commentary when its use of a mark is similarly source-identifying." *Id.* at 162. There is no language in the Supreme Court's opinion or in any remand order that limits this Court to legal arguments in any way. Given that VIP had raised its constitutional challenge in its Ninth Circuit supplemental brief on remand and had explained that it intended to raise that argument, the Ninth Circuit's general-remand language to this Court is especially significant. The Ninth Circuit did not include any language in its order that would limit this Court's ability to consider any issue whatsoever. *See In re Beverly Hills Bancorp*, 752 F.2d 1334, 1337 (9th Cir. 1984) (holding that remand precluded bankruptcy court from permitting trustee to amend pleadings where the Ninth Circuit had denied same specific request on appeal).

JDPI has recognized, both in its brief and during the November 2023 status conference, that VIP's constitutional challenge is not directly foreclosed by any order from the Supreme Court or Ninth Circuit. (Doc. 388 at 26 ("This new challenge pertains only to the dilution statute and is entirely distinct from VIP's argument (which the Supreme Court rejected) that it should receive heightened First Amendment protection from infringement liability."); Doc. 337 at 14 ("This is not the First Amendment argument that was addressed to Your Honor at trial and at the summary judgment stage, which was an argument about parody in particular.").) Thus, neither the Supreme Court nor the Ninth Circuit has foreclosed this Court's ability to consider any of the arguments asserted by JDPI. And because this case has been returned to the Court on a general remand, the Court is free to consider any and all arguments raised by VIP.

## C.    Principles of waiver do not apply here.

Faced with the reality that no appellate court meaningfully limited the scope of proceedings on remand, JDPI argues at length that VIP somehow "waived" or "forfeited" its ability to assert a facial constitutional challenge to its tarnishment claim. (Doc. 338 at 21, 26.) But none of the cases cited by JDPI support this theory. And even if waiver did apply, VIP's argument fits within well-recognized exceptions to the rule.

### 1.    None of the cases JDPI cites apply in light of the procedural posture of this case and the nature of VIP's argument.

None of the cases JDPI cites in support of its waiver argument inform the Court's analysis. Indeed, *no* cited case stands for the proposition that, on general remand, a party is barred from raising a purely legal question when the law has substantially developed after the conclusion of initial trial court proceedings.

First, many of the cases JDPI cites as support are immediately distinguishable because they involve novel arguments made on appeal, *not on remand* to the district court. For example, JDPI cites *United States v. Olano*, 507 U.S. 725 (1993), to discuss the idea of forfeiture, but this case has nothing to do with arguments at the trial level, and instead discusses only "limitation[s] on *appellate* authority." *Id.* at 733 (emphasis added.) JDPI repeatedly points to cases dealing with remand to the *Ninth Circuit*. *Christian Legal Soc'y*

7

*Chapter v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) (on remand to Ninth Circuit from Supreme Court); *Raich v. Gonzales*, 500 F.3d 850, 868-69 (9th Cir. 2007) (same). Those cases consider whether new arguments can be raised *on appeal*, and are fundamentally different from a case like this, where the judgment has been vacated and the district court is, as this Court put it, "starting at square one again." (Doc. 337 at 4:22–23.)

Equally inapplicable are cases finding waiver when the district court is operating under a *limited* remand. JDPI continues to quote *Securities Investor Protection Corp. v. Vigman*, 74 F.3d 932, 938 (9th Cir. 1996), to argue that VIP should not get "another bite at the apple" with its constitutional argument on remand. But *Vigman* unquestionably dealt with a limited remand, and the court prevented a party from raising a new argument on an issue where the Supreme Court had kept the district court's original ruling "intact." *Id*. JDPI also cites *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 776–77 (N.D. Cal. 2017), but *Facebook* is inapposite because that decision actually found that a party had waived arguments that were "inconsistent with" the Ninth Circuit's order. *Id.* That is manifestly different from the case at hand: though VIP raised the constitutional issue both before the Supreme Court and, on remand, the Ninth Circuit, *none* of the orders ultimately remanding to this Court limited the issues, and none of this Court's original judgment has remained "intact." Both the Ninth Circuit and the Supreme Court are more than capable of limiting issues when they choose to do so; their silence here is dispositive.

The third category of cases cited by JDPI are inapplicable because they deal with arguments that were available to the parties prior to the initial appeal but that were never articulated until after the case had traveled through the appellate process. In *Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 949–50 (C.D. Cal. 1996), for example, a district court only declined to consider a new argument on remand because the factual basis of the argument had existed for *fifteen years* before the waived argument was made. *Id.* at 951 ("Indeed, both patents are over 15 years old … [and] Defendants could, with due diligence, have found these patents and brought them to the attention of the Court at the time of the summary judgment motion."). Likewise, *Apple Inc. v.*

*Samsung Elecs. Co.*, 2017 WL 3232424, at *13–15 (N.D. Cal. July 28, 2017), dealt with a party's attempt to limit the issues on remand based on topics included in the joint pretrial order. But because the party did not identify that estoppel issue when the case was appealed in the first place, the district court determined that the argument had been waived. *Id.* at *15. JDPI's cases simply do not pass even modest scrutiny.

> **2.    Even if waiver applied when a judgment has been vacated, important and applicable exceptions apply here.**

As explained above, waiver is generally applied in the *appellate* context by *appellate* courts determining whether to consider a new argument raised *on appeal*, and JDPI has not cited a single case where, on general remand, a district court was precluded from considering a new argument due to waiver. But even if waiver *could* apply in the manner JDPI urges, it fails to acknowledge critical exceptions to the rule of waiver, much less establish their inapplicability here. Accordingly, while the Court need not analyze these exceptions because waiver does not apply in the first instance, even after applying rules recognized in JDPI's cited cases, VIP's new constitutional argument still deserves this Court's consideration. Even late-breaking arguments can be considered where (1) exceptional circumstances exist; (2) there has been a change in the law; or (3) the new issue "is a pure question of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *Raich*, 500 F.3d at 868.

To be sure, waiver "is a discretionary, not jurisdictional, determination." *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992–93 (9th Cir. 2010) (considering new issue on appeal because it "has been sufficiently briefed and the record has been sufficiently developed"). Given that at least two of the exceptions squarely apply here, such that even an appellate court could hear this argument for the first time on appeal, there is no reason this Court cannot consider VIP's constitutional argument now.

1.    There is "a very different legal landscape" now than in October 2017 when this Court heard this case for the first time, because two Supreme Court cases have called into question the constitutionality of Lanham Act provisions. *See Dream Palace v. County*

*of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004) (permitting new argument on appeal due to an intervening "Supreme Court decision after the proceedings in the district court were complete"). The only arguable basis for VIP's facial constitutional challenge prior to this Court entering judgment was the plurality opinion in *Matal v. Tam*, 582 U.S. 218 (2017), which was published only *after* this Court had ruled on VIP's motion for summary judgment. One first day of trial, this Court indicated it did not wish to hear any further First Amendment arguments because of its summary-judgment ruling. (Doc. 234 at 6:15–8:25 ("I … made a ruling a year and a half ago where I put that to rest.").) VIP proceeded to trial without making arguments based on the First Amendment. It was not until 2019, two years after this Court entered final judgment, that a majority opinion in *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019), held that the prohibition on registering immoral or scandalous trademarks was unconstitutional. That opinion was not handed down until after the completion of briefing before the Ninth Circuit.

2.     Moreover, resolving VIP's facial challenge to the tarnishment statute is an issue that "is purely one of law, does not affect or rely upon the factual record developed by the parties, and will not prejudice the party against whom it is raised." *Dream Palace*, 384 F.3d at 1005 (internal quotation omitted). JDPI has known that VIP intended to make this purely legal argument since VIP raised it in briefing to the Supreme Court, and again in briefing at the Ninth Circuit. Given that there are no factual issues at play, there is no prejudice to JDPI. (*See* Doc. 337 at 7:15–16 (JDPI's counsel agreeing that the Court did not need to "reopen the evidence").) There is no question that VIP will have "a full opportunity to brief its response to the new arguments" here, *see id.*, because the Court has ordered simultaneous briefing on remand that will give JDPI *three* separate opportunities to address the purely legal constitutional issue.

Accordingly, even if waiver principles apply on a general remand from appellate courts (they do not), VIP's constitutional challenge merits consideration under well-recognized exceptions to the rule.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    VIP Products' parody dog toy is not likely to cause confusion with Jack Daniel's whiskey.

### A.    It is undisputed—and indisputable—that the Bad Spaniels dog toy is a successful parody.

JDPI does not dispute that VIP's Bad Spaniels dog toy is an intended—and successful—parody of Jack Daniel's whiskey. (*See* Doc. 339 at 13–18.) The Ninth Circuit recognized that the toy "use[s] word play to alter the serious phrase that appears on a Jack Daniel's bottle," with the "effect" of "'juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.'" *VIP Prods. LLC v. Jack Daniel's Props, Inc.*, 953 F.3d 1170, 1175 (9th Cir. 2020) (quoting *Louis Vuitton*, 507 F.3d at 260). The Ninth Circuit's quotation of that language from the Fourth Circuit's opinion is significant because that is how, "[f]or trademark purposes, a parody is defined." *Louis Vuitton*, 507 F.2d at 260 (cleaned up).

JDPI's suggestion that this case "is worlds apart" from *Louis Vuitton* (Doc. 338 at 6:10) is facially groundless and contrary to the Ninth Circuit's recognition that a CHEWY VUITON chewable dog toy in the shape of a handbag is directly comparable to a BAD SPANIELS chewable dog toy in the shape of a whisky bottle. The only apparent difference is that CHEWY VUITON prevailed, but this Court initially ruled against BAD SPANIELS. The Ninth Circuit, while acknowledging that it was ruling based on the *Rogers* test rather than a parody-sensitive application of the multifactor test, *VIP Prods.*, 953 F.3d at 1175 n.1, looked to the CHEWY VUITON case, recognizing that "[t]he Fourth Circuit's decision in [*Louis Vuitton*] supports our conclusion." *Id.* at 1175. The Ninth Circuit noted that the Fourth Circuit had "held that dog toys which 'loosely resembled' small Louis Vuitton handbags were '*successful parodies* of LVM handbags and the LVM marks and trade dress,'" and the Ninth Circuit concluded that "'*[n]o different conclusion is possible here.*" *Id.* at 1175 (emphasis added) (quoting *Louis Vuitton*, 507 F.3d at 252, 258, 260, 263). The Ninth Circuit's reasoning, which quotes from the Fourth Circuit's opinion, bears this out:

- Just like the CHEWY VUITON "'dog toy is shaped roughly like a handbag,'" the Ninth Circuit recognized that the Bad Spaniels "toy is roughly in the shape of a Jack Daniel's bottle." *Id.* at 1172, 1175.

- Just like the "'name "Chewy Vuiton" sounds like and rhymes with LOUIS VUITTON,'" the Ninth Circuit found that among VIP's "light-hearted, dog-related alterations … the name 'Jack Daniel's' is replaced with 'Bad Spaniels,'" another rhyme. *Id.* at 1172, 1175.

- Just like "the monogram CV mimics LVM's LV mark; the repetitious design clearly imitates the design on the LVM handbag; and the coloring is similar,'" the Ninth Circuit found that "the Bad Spaniels toy resembles JDPI's trade dress and bottle design," though "there are significant differences between them, most notably the image of a spaniel and the phrases on the Bad Spaniels label." *Id.* at 1174–75.

- Just as "'no one can doubt that the "Chewy Vuiton" dog toy is *not* the "idealized image" of the mark created by LVM,'" the Ninth Circuit concluded that "[n]o different conclusion is possible here." *Id.* at 1175 (emphasis added).

In short, the Bad Spaniels toy is a successful parody, and neither this Court, nor the Ninth Circuit, nor the Supreme Court has suggested anything to the contrary. The rationale in *Louis Vuitton* compels the same result here.

**B.**    **Applied in light of the parodic context, the *Sleekcraft* factors do not indicate any likelihood of confusion.**

JDPI runs through this Court's prior findings and conclusions without any acknowledgment of the guidance provided by the Supreme Court *in this case* as to the proper application of the multifactor test to a parody. Leaving until later the concurring justices' concern about reliance on Ford's garden-variety confusion survey, the unanimous Court held that the likelihood-of-confusion "inquiry is not blind to the expressive aspect of the Bad Spaniels toy that the Ninth Circuit highlighted." *Jack*

*Daniel's*, 599 U.S. at 153. The Court continued, "Beyond source designation, VIP uses the marks at issue in an effort to 'parody' or 'make fun' of Jack Daniel's. And that kind of message *matters in assessing confusion* because consumers are not so likely to think that the maker of a mocked product is itself doing the mocking." *Id.* (emphasis added). Yet JDPI persists in wrongly arguing, as it did in 2017, that VIP's message *doesn't* matter.

The Ninth Circuit has since 2017 reiterated that "[t]he 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing … the mark." *Allstate Ins. Co. v. Kia Motors Am., Inc.*, 784 F. App'x 507, 508 (9th Cir. 2019) (quoting prior cases). "The question is whether confusion is 'probable, not simply a possibility.'" *Id.* (quoting *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002)). Professor Andrew Michaels, who had submitted an amicus brief to the Supreme Court, has since explained that "the Supreme Court recently provided some limited guidance on … aspects of likelihood of confusion in the *Jack Daniel's* case," in light of which "[t]he district court's finding of likelihood of confusion thus seems questionable." Andrew Michaels, *Confusion in Trademarked NFTs*, 7 Stan. J. Blockchain L. & Pol'y 1, 22 (2024). Comparison with the *Louis Vuitton* case indicates that, with the Supreme Court's guidance based on that case, this Court should not find likelihood of confusion this time based on the *Sleekcraft* factors.

1.    **Strength of JDPI's marks.** As in *Louis Vuitton*, the strength of JDPI's marks inverts in significance the strength-of-the-mark factor. The Fourth Circuit explained that "the strength of LVM's marks in this case does not help LVM establish a likelihood of confusion" because, "in cases of parody, a strong mark's fame and popularity is precisely the mechanism by which likelilhood of confusion is avoided." *Louis Vuitton*, 507 F.3d at 261 (cleaned up). Quoting *Louis Vuitton*, Professor Michaels added that "[a]lthough Jack Daniel's is a strong mark, the weight given to this factor 'should generally be diminished in a case of parody, for courts have recognized that it 'is a matter of common sense that the strength of a famous mark allows consumers

immediately to perceive the target of the parody, while simultaneously allowing them to recognize the changes to the mark that make the parody funny or biting.'" Michaels, *supra*, at 24 (quoting *Louis Vuitton*, 507 F.3d at 261). Also as matter of common sense, consumers intuit—and the law acknowledges—that a strong mark is highly unlikely to mock itself—particularly in the purportedly tarnishing and egregious manner JDPI urges occurred here. (*Compare* Doc. 338 at 12:14–17 *with id.* at 8–9.)

    **2.**    **Similarity of the parties' marks.** This case once more is like *Louis Vuitton*, where the context of a parody "again converts what might be a problem for Haute Diggity Dog into a disfavored conclusion for LVM." *Louis Vuitton*, 507 F.3d at 261. The Fourth Circuit recognized that "[t]he particular Haute Diggity Dog chew toys in question here are small *imitations* of handbags … that *mimic* … LOUIS VUITTON handbags." *Id.* at 256 (emphasis added). Indeed, the "chew toys … are plush, made of polyester, and have a shape and design that loosely imitate the signature product of the targeted brand," and the "'Chewy Vuiton' dog toys, in particular, loosely resemble miniature handbags and undisputedly evoke LVM handbags of similar shape, design, and color." *Id.* at 258. Aside from the parodied marks, "the other symbols and colors employed are imitations, but not exact ones, of those used in the LVM Multicolor and Cherry designs." *Id.* LVM argued that the dog toy had "'painstakingly copied Vuitton's Monogram design mark, right down to the exact arrangement and sequence of geometric symbols.'" *Id.* at 259 (quoting *Louis Vuitton*).

    Just as "'Chewy Vuiton' dog toy undoubtedly and deliberately conjures up the famous LVM marks and trade dress, … at the same time, it communicates that it is not the LVM product." *Id.* at 260. Instead, the toy that is "something to be *chewed by a dog*" "immediately conveys a joking and amusing parody" of a famous product that "must *not* be chewed by a dog." *Id.* at 260–61. And as with VIP's line of Silly Squeaker® dog toys, "[t]he parody is enhanced by the fact that 'Chewy Vuiton' dog toys are sold with similar parodies of other famous and expensive brands." *Id.* at 261.

The same is true here. As Professor Michaels noted, "[t]he marks are somewhat similar but not identical; VIP used the name 'Bad Spaniels' rather than 'Jack Daniel's' and embedded various jokes on the dog toy, making it fairly clear that the dog toys were parodies." Michaels, *supra*, at 2 (citing David A. Simon, *The Confusion Trap: Rethinking Parody in Trademark Law*, 88 Wash L. Rev. 1021, 1033 (2013) (explaining as to the similarity of the marks factor that "a parody can neutralize a factor that would otherwise weigh in favor of the plaintiff"). The similarity of the marks is essential to the Bad Spaniels parody, and no one would take from it that the Bad Spaniels toy is a JDPI self-parodying product. This *Sleekcraft* factor does not point in favor of a likelihood of confusion any more than it did in *Louis Vuitton*.

3.    **Defendant's intent in selecting its marks.** *Louis Vuitton* is again instructive. The Fourth Circuit found that the intent factor "does not favor LVM" because "[a]n intent to parody is not an intent to confuse the public," and "Haute Diggity Dog's obvious intent to profit from its use of parodies … does not amount to a bad faith intent to create consumer confusion." 507 F.3d at 263. As Professor Michaels added, because VIP's "intent was not to cause confusion, but rather to create a humorous parody … the district court seems to have committed legal error by finding that the factor favored Jack Daniel's." Michaels, *supra*, at 24 & n.108–10. This Court found in 2018 only that VIP intended to parody Jack Daniel's and profit from the parody—the Court has *never* found that JDPI intended "to confuse the public." This factor weighs against JDPI's claim.

4.    **Evidence of actual confusion.** As in this case, the "actual confusion" factor in *Louis Vuitton* favored the parody dog toy because "there was no evidence of actual confusion." *Louis Vuitton*, 507 F.3d at 263. Since this Court's ruling in 2018, the Ninth Circuit has reiterated that "lack of evidence about actual confusion after an ample opportunity for confusion "can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Allstate Ins.*, 784 F. App'x at 510 (finding that district court did not err in finding that factor favored defendant in light of absence of evidence of actual confusion) (quoting *Cohn*, 281 F.3d at 843) (cleaned up).

If, as JDPI incorrectly argues, the parties really have used substantially similar marks in the same geographical areas "to market closely-related goods and services … some evidence of actual confusion should have become available if [the defendant's] coexisting use had created a genuine likelihood of confusion." *Cohn*, 281 F.3d at 842–43. Given the notoriety of this case and a decade of time, *some* evidence of actual confusion should have percolated up over ten years of Bad Spaniels' existence if confusion were truly likely. JDPI offered none at trial in 2017, and none exists today.

Instead of showing actual confusion, JDPI offered as a surrogate only Gerald Ford's confusion survey. But the concurring Supreme Court justices—without disagreement from the majority—criticized reliance on that survey because it showed the wrong kind of confusion and failed to control for the parodic nature of the Bad Spaniels toy. Finding that some percentage of consumers perceived an "association" between a parody and the object of the parody proves nothing about confusion—the "association" may only be the necessary and lawful understanding of the parody itself.

JDPI's assertion that the concurring justices were not criticizing Ford's survey is untenable. (Doc. 338 at 19–21.) Justice Sotomayor specifically stated not only that that "[w]hen an alleged trademark infringement involves a parody, … there is a particular risk in giving uncritical or undue weight to surveys," but also that "[s]ome of the answers to the survey *in this case* illustrate this potential" source of legal confusion rather than product-purchase confusion. 599 U.S. at 163–64 (Sotomayor, J., concurring) (emphasis added). Prior cases and academic literature had already criticized reliance on such surveys in parody cases. (*See* Doc. 339 at 23–24 (citing, inter alia, *Indianapolis Colts, Inc. v. Metro Balt. Football Club Ltd. P'ship*, 34 F.3d 410, 416 (7th Cir. 1994); Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L. Rev. 473, 482 (2013)).) Following the Supreme Court's decision, Professor Michaels advised that in this case "the surveys were questionable," and this Court's reliance on them "should not be enough to establish a sufficiently compelling case for confusion in a case where many of the other factors should weight against confusion." Michaels, *supra*, at 24, 16. As he observed, "it

16

is questionable whether the confusion that was measured in the surveys is the type that would tend to affect consumer purchasing decisions," because "[b]uyers of dog toys … probably would not give much thought to or care whether the obviously parodic dog toy they are buying was officially endorsed by the Jack Daniel's company or not." Michaels, *supra*, at 25.

Given the lack of evidence of actual confusion, and the questionable nature of the Ford survey, this factor does not weigh in JDPI's favor.

**5.    Proximity of the goods.** JDPI's contention that the parties' goods are related cannot survive comparison to *Louis Vuitton*. The Fourth Circuit recognized that "[t]he differences are immediate, beginning with the fact that the 'Chewy Vuiton' product is a dog toy, not an expensive, luxury LOUIS VUITTON handbag." 507 F.3d at 261. Like the CHEWY VUITON "imitation handbag," the Bad Spaniels bottle-shaped toy is *not* a bottle—it "does not open and is manufactured as a dog toy." *Id.* at 262. Again, here "[t]he products are quite different—dog toys versus whiskey—so this factor should have weighed strongly against confusion." Michaels, *supra*, at 23.

This difference was critical in *Louis Vuitton* even though LVM sold some pet-related products. Much like JDPI, LVM "also markets a limited selection of luxury pet accessories—collars, leashes, and dog carriers—which bear" its marks, but it "does not make dog toys." 507 F.3d at 258. "Even LVM's most proximate products—dog collars, leashes, and pet carriers—are *fashion accessories, not dog toys*," and "LVM does not make pet chew toys and likely does not intend to do so in the future." *Id.* at 262 (emphasis added). Similarly, Professor Michaels commented that any reliance on JDPI's licensing of its marks for use on products that included "dog leashes, dog collars, and dog houses … seems highly questionable," because "the public associates Jack Daniel's with whiskey, not dog products, and other courts have appropriate held that limited licensing of this sort does not suffice to tilt the proximity of the products factor in favor of confusion when the *core product lines* are far apart." Michaels, *supra*, at 23 & n.106 (emphasis added) (citing *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 625 (6th Cir. 2003)

(recognizing that "Kellogg's presence in the golf industry was insignificant, and nothing more than a marketing tool to further boost sales of its cereal")). That JDPI slaps "Jack Daniel's" on pet "fashion accessories" does not put it in the same realm as pet toys—particularly when JDPI eschewed any idea of ever marketing a "Jack Daniel's" pet toy. This factor favors VIP.

6.    **Marketing channels.** As VIP explained in its Opening Brief, that both parties sold product through universal online marketers like Amazon.com and Walmart.com is legally immaterial. (Doc. 339 at 27–28.) That both parties also offered merchandise (nonalcoholic merchandise, in JDPI's case) at one point over "Boozingear.com" is likewise insufficient. In *Louis Vuitton*, the Fourth Circuit held that "*de minimis* overlap lends insignificant support to LV on this factor," even though "both LVM handbags and 'Chewy Vuiton' dog toys are sold at a Macy's department store in New York,'" because this amounted to "little overlap in the individual retail stores selling the brands," *Id.* at 263. The Fourth Circuit noted that the defendant's toys "are *mostly* distributed and sold through pet stores," and, "of course, as a dog toy, one must buy it with pet supplies and cannot buy it at an exclusive LVM store or boutique within a department store." *Id.* at 260. Similarly, one buys Bad Spaniels toys through pet stores or pet websites, not in liquor stores or grocery stores that sell liquor, and JDPI does not offer any products through pet channels—even its dog "fashion accessories" are available only at its Lynchburg, Tennessee, distillery gift shop. Absent any meaningful overlap in marketing channels, this factor favors VIP.

7.    **Type of goods and degree of purchaser care.** The type of goods and degree of purchaser care does not favor JDPI any more than it favored LVM. The Fourth Circuit found no likelihood of confusion even though the "dog toys are generally sold for less than $20." *Louis Vuitton*, 507 F.3d at 258. No different result should be found for VIP's similarly priced dog toys. This factor favors VIP.

* * *

This case is not just similar to *Louis Vuitton*. It *is Louis Vuitton*.[1] Two different dog-toy manufacturers chose to skewer mighty legends of commerce through light-hearted parodies. The Fourth Circuit applied the multifactor test in a way that accounted for the parody, and it found no likelihood of confusion. The Supreme Court spotlighted the Fourth Circuit's decision as the way such cases should be handled. JDPI's analysis fails to honor the Supreme Court's clear direction, and this Court should not accept that invitation to err. As shown above, the strikingly correlative facts in the two cases show that this Court should reach the same result that the Fourth Circuit did.

## III.     The Court should enter judgment for VIP on JDPI's dilution-by-tarnishment claim.

### A.      The 2006 dilution-by-tarnishment statute is unconstitutional.

JDPI's attempts to avoid the constitutional question in this case are unsurprising given the constitutional infirmity of the tarnishment claim. JDPI does not at any point attempt to defend the tarnishment claim under strict, or even intermediate, scrutiny. JDPI does not identify any legitimate interest Congress could have in prohibiting derogatory speech while permitting burnishing speech. And JDPI does not defend the breadth of the TDRA at all.

Instead, JDPI misstates the scope of the tarnishment cause of action, stretches the statute's meaning to pretend that it is viewpoint neutral, and holds to the notion that Congress could properly prohibit huge swaths of commentary. The Court should decline JDPI's invitation to err.

---

[1] By comparison, this case is not *Vans, Inc. v. MSCHF Product Studio, Inc.* 88 F.4th 125 (2d Cir. 2023). In *Vans*, there was evidence of *actual* consumer confusion, where consumers believed the parody sneaker was a collaboration between MSCHF and Vans. *Id.* at 134, 140–41. Further, the products were advertised to the same market, were both wearable shoes, and the "Wavy Baby" was not a successful parody. *Id.* at 139–42. And the Second Circuit's conclusion that the strength of the marks favored Vans was simply incorrect under a *Louis Vuitton* analysis. *Id.* at 139.

### 1.    JDPI misstates the scope of its tarnishment cause of action.

At the outset of its argument, JDPI characterizes "dilution by tarnishment" as "an association … that harms the reputation of the famous mark." (Doc. 338 at 31.) Thus, in JDPI's erroneous view, only products that are actually "incompatible" with the senior mark would be subject to the tarnishment cause of action. That is incorrect, and both over- and under-inclusive.

In many ways, the statute is far broader than JDPI urges. Subsection (c)(1) of 15 U.S.C. § 1125 provides that "tarnishment" in the manner described by JDPI is not necessary—instead, subsection (c)(1) lets a senior mark holder enjoin any use that is merely "likely to cause" dilution by tarnishment. Thus, far from the prior version of the statute that required proof of *actual* tarnishment, the post-TDRA version of subsection (c)(1) is *extraordinarily* broad. *See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003) (holding that the pre-TDRA version of the dilution by tarnishment required proof of actual tarnishment); *V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382 (6th Cir. 2010) (explaining that the TDRA was a direct result of the "undue burden" of demonstrating actual tarnishment). Stated simply, the dilution cause of action is too broad to avoid also prohibiting protected speech inherent in mocking famous marks.

JDPI simultaneously stretches the tarnishment cause of actions in an unrecognizable manner by claiming that any "incompatible" association is necessarily tarnishing, and fails to recognize that virtually all cases regarding tarnishment involve either sex or drugs—not normal canine functions or run-of-the-mill parody. As explained by the Second Circuit, even though the statute on its face precludes a broad swath of associative speech, tarnishment is usually found only "where a distinctive mark is depicted in a context of sexual activity, obscenity, or illegal activity." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 44 (1994).

The only two cases JDPI cites as finding tarnishment absent sex, drugs, or illegal conduct are of no moment to the Court's analysis. For example, *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d 433 (1962), predates even the earliest version

20

of the federal tarnishment statute by more than twenty years and never uses the word "tarnish" or any derivative anywhere in the text of the opinion. Similarly, *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031 (N.D. Ga. 1986), predates the federal tarnishment statute and is a ruling merely as to a preliminary injunction, not on the merits. Further, in the intervening thirty-plus years since the Northern District of Georgia decided that case, that court has backed away from the *ratio decendi* in *Original Appalachian*, i.e., the fact that the parody was sold for a profit. In analyzing a claimed (albeit not particularly biting) parody of *Elf on the Shelf*, the court explained that *Original Appalachian's* "analysis of the copyright and trademark infringement factors in a parody context is outdated, *if not expressly overruled*." *CCA & B, LLC v. F + W Media Inc.*, 819 F. Supp. 2d 1310, 1321 n.6 (N.D. Ga. 2011) (emphasis added). JDPI's attempt to expand the tarnishment cause of action to what the Ninth Circuit called "light-hearted" jokes relies on bad law and lacks merit.

JDPI's heavy reliance on *L.L. Bean v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir. 1987), is misplaced for all of the same reasons set forth above. Far from being the panacea for all First Amendment ailments that are inconvenient to JDPI, *L.L. Bean* recognizes that prohibiting uses that create a mere "negative" or "unwholesome" association with the senior mark cannot survive First Amendment scrutiny. *Id.* at 31. Instead, that case recognizes that Maine's state tarnishment law (again, this case predates the federal statute) is only offended if the defendant's conduct either causes consumers to associate plaintiff's goods with shoddy products or risks "public identification of plaintiff's trade name or mark with a *product or service* of a type incompatible with the quality and prestige" of the senior mark. *Id.* (emphasis added). Here, there is no evidence that anyone ever confused JDPI's mark as being associated with anything, nor is there any real "product or service" that VIP has caused association with. There is nothing but a dog toy that pretends to be a joke product (watered-down "poo") that does not actually exist.

## 2.     Dilution by tarnishment is not viewpoint-neutral.

JDPI erroneously urges that tarnishment is, despite its name, a viewpoint-neutral regulation of speech. First, it is logically impossible for something to be both "positive" while simultaneously being likely to cause harm to—or tarnish—JDPI's reputation. JDPI muses about the impossible when it suggests that a poop-themed joke that somehow bolstered its reputation would be barred as tarnishing. JDPI's argument only makes sense in the context of dilution *by blurring*, not dilution *by tarnishment*. The Court should not follow JDPI down the wrong dilution path.

Parody, by its very nature, negatively comments on the original to make a point. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994) (holding that "parody may quite legitimately aim at garotting the original, destroying it commercially as well as artistically" (quotation omitted)); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 802–03 (9th Cir. 2003) ("Parody emerges from this 'joinder of reference and ridicule.'" (quoting *Campbell*, 510 U.S. at 583)). JDPI provides no case law or examples of the bizarre proposition that a parody—much less a parody that is likely to tarnish its reputation—could be positive, because that is not parody. Reference and ridicule are the lifeblood of parody, not reverence and homage.

Second, JDPI has already established as an evidentiary matter that it believes there is no positive association to be had for its spirituous liquor with either scatological humor or a squeaky dog toy. According to the testimony of JDPI's expert, Dr. Itamar Simonson, it would be impossible to have any positive commentary involving food or drink and "poo" because it is "the most extreme example of disgust" that one could create in connection with a food or beverage, and it will "generate … disgust" at an evolutionary, Darwinian, level. (Doc. 234 at 171:4–5, 171:23–172:8.) Indeed, Simonson was unequivocal that "[t]he combination of defecation with a beverage or a drink" inexorably "leads to tarnishment." (*Id.* at 185:10–13.) JDPI cannot rely on Simonson's testimony that a poop joke is tarnishing per se—indeed, at the most primitive and evolutionary level—and simultaneously maintain its claim to viewpoint neutrality.

Finally, and most critically, it is a legal certainty that "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017); *see Am. Freedom Def. Initiative v. King County*, 904 F.3d 1126, 1131 (9th Cir. 2018) ("[O]ffensive speech is, itself, a viewpoint and that the government engages in viewpoint discrimination when it suppresses speech on the grounds that the speech offends."). JDPI all but concedes an attempt to censor what may be deemed an "incompatible"—offensive—use. That is viewpoint discrimination in its rawest form.

JDPI's attempts to distinguish the registration bars at issue in *Tam* and *Brunetti* fall short. To be sure, whatever distinction exists between barring registration of something that is "disparaging," "immoral," or "scandalous" and enjoining speech that is "tarnishing" is little more than semantics. Indeed, an injunction is far worse than a mere bar on registration—a speaker whose registration is barred is still free to speak, while an enjoined party is muted forever under the Court's contempt power. Further, the notion that the registration bars in *Tam* and *Brunetti* were not "evenhanded" is nonsense. In *Tam*, the Asian-American band sought to reclaim a slur directed at Asian Americans: "The Slants." It did not matter that "The Slants" did not seek to offend, or were not using the slur in a derogatory manner, it mattered only that the word itself was offensive. And again, offensive language is a viewpoint that the government cannot bar without satisfying the rigors of strict scrutiny. *Tam*, 582 U.S. at 244 ("We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" (quoting *Street v. New York*, 394 U.S. 576, 592 (1969))).

### 3.    JDPI's marks are not similar to the "Olympic" mark.

As it has throughout this litigation, JDPI clings to *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522 (1987), for the proposition that Congress can properly prohibit broad categories of speech related to trademarks without violating the First Amendment, even though that case has nothing to do with private trademark law. In *Olympic Committee*, the Supreme Court approved the constitutionality of a statute that

banned the use of the word "Olympic" to induce the sale of good or services or to promote the sale of tickets to an athletic event by anyone other than the United States Olympic Committee. *Id.* at 539–40. Critically, the Court specifically *did not* address the question of private trademarks because there was "no need" to decide whether Congress could grant exclusive use of a word or phrase to a private entity. *Id.* at 532–33. USOC is a federally chartered entity whose entire existence is based in federal statute to accomplish public ends. 36 U.S.C. §§ 220502, 220507. Accordingly, *Olympic Committee* provides no relevant analysis to the question of whether Congress may censor speech protecting the reputation of famous marks without running afoul of the Constitution.

Further, JDPI cannot use Congress's ability to regulate broad categories of speech like obscenity to justify its attempt to ban tarnishing marks. Congress can regulate speech that is obscene—but once it elects to do so it cannot pick and choose which viewpoints or targets are off-limits. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). To be sure, Congress cannot regulate obscenity containing only political messages, or threats that target only the President of the United States. *Id.* Thus, *R.A.V.* undermines, rather than supports, JDPI's argument. Even assuming Congress *could* limit any use of a famous mark (a dubious proposition), it certainly cannot prohibit tarnishing commentary while permitting burnishing uses. *Id.*

JDPI also incorrectly urges that there are adequate alternative means of communication for parodying speech, and therefore the First Amendment somehow simply overlooks a viewpoint-based restriction on speech. There is no alternative means of commenting on JDPI's mark with the message that VIP wishes to convey without triggering the proscriptions of the tarnishment statute, other than to make changes that would undermine the existence of the parody itself. Parody is referential by its nature. JDPI does not identify how VIP could possibly convey the message it wishes, particularly when, according to its own expert, any "poo" association is the pinnacle of tarnishment. Congress cannot stop speech to protect JDPI when that restriction is viewpoint-based, and

JDPI cannot avoid the constitutional infirmity by urging that VIP could simply say something else.

### B.    JDPI has failed to establish the elements of its tarnishment claim.

As VIP showed in its Opening Brief, JDPI has failed to show that VIP used a mark substantially identical to a "famous" JDPI mark that likely tarnished that famous JDPI mark. JDPI offers no substantive analysis showing the tarnishing effect of a corresponding mark. Rather, it merely urges the Court to reenter its prior rulings based on broad arguments that are inconsistent with the limited nature of the dilution remedy.

### 1.    JDPI has not shown that VIP's toy uses a poo-related mark substantially identical to a "famous" JDPI mark.

JDPI claims "tarnishment" based solely on the allegedly "disgust"-generating nature of any kind of "poo" jokes, but that does not satisfy the requirements of a dilution claim. By its terms, the dilution statute requires a mark-to-famous-mark comparison. But the only arguably "famous" mark is "Jack Daniel's," and Simonson never claimed that "Bad Spaniels" was a "disgusting" "poo" reference or otherwise tarnishing. (*E.g.*, Doc. 234 at 171:14–15 (referring to "Old No. 2, defecation, poo by weight"), 172:4–5 (referring to "poo, or Old No. 2").) JDPI cannot bootstrap its secondary marks to the required "fame" just because they appear on the same label as "Jack Daniel's." *See, e.g.*, *Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500, 514 (M.D. Pa. 1998) (rejecting argument that dilution analysis must "include all the elements of the trade dress," as opposed to abbreviated description that "omits the trade name, the slanted handwritten style of the trade name, the sawtoothed top of the brown bar, and the words inside the bar").

As the Federal Circuit noted in holding that COACH was not "famous" for purposes of the 2006 dilution statute, "[i]t is well-established that dilution fame is difficult to prove." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012). This has become clear in the Ninth Circuit case law since this Court initially ruled in 2017. *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 870 (9th Cir. 2020) (reversing jury finding that "Eames" chair product design was "famous" outside of

"niche market" because it was not a "household name"). The prevailing "household name" requirement codified through the elimination of niche-market fame in 2006 "is a difficult and demanding requirement." 3 *McCarthy on Trademarks and Unfair Competition* § 24:104 (5th ed. 2024). "The 2006 provision of the federal antidilution law (TDRA) is more rigorous in its test for 'fame' than was the original 1996 Act," and the legislative history shows that "the revised fame requirement … should act as a potent filter to permit only truly prominent and renowned marks to qualify." *Id.* (discussing legislative history). McCarthy cites legislative history establishing that it was Congress's intention that, by eliminating "fame for a niche market," "the dilution remedy will be used in the rare circumstance and not as alternative pleading." *Id.* (quoting legislative history). Critically, "[f]ame is a different concept for applying the dilution rule than for the likelihood of confusion rule. The standard for the kind of 'fame' needed to trigger anti-dilution protection is more rigorous and demanding that the 'fame' which is sufficient for the classic likelihood of confusion test," and a mark "is eligible only if it is clear proven to belong in the 'famous' category of truly elite marks." *Id.*

The only JDPI mark that corresponds to a "poo" joke is "Old No. 7," but there is no evidence that "Old No. 7" is itself a "household name" outside of perhaps a niche market of whiskey drinkers.[2] *Cf. Luv N' Care Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 758–59 (S.D.N.Y. 2012) (trademarks not "recognized beyond a niche market, i.e., the baby product market"); *Bd. of Regents v. KST Elect., Ltd.*, 550 F. Supp. 2d 657, 78 (W.D. Tex. 2008) (team logo not "famous" outside of niche market of "college football fans"); *Ducks Unlimited, Inc. v. Boondux, LLC*, 2017 WL 3579215, at *31, *36

---

[2] Contrary to JDPI's suggestion (Doc. 338 at 14 n.3), VIP preserved its challenge on this ground by submitting proposed findings of fact that JDPI's trademarks and trade dress were *not* "famous" under the dilution standard. (Doc. 209 at 12–13, 29–31.) Courts reject applications of waiver doctrine "that would motivate appellees to raise every possible alternative ground and to file every conceivable protective cross-appeal, thereby needlessly increasing the scope and complexity" of cases on appeal. *Castellanos*, 608 F.3d at 1019.

(W.D. Tenn. 2017) (mark not famous outside of "niche audience, people interested in hunting, fishing, and related outdoor activities"); *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, 2021 WL 364109, at *10 (D. Utah 2021) (mark not famous outside niche market for "outdoor apparel"). The testimony of Jack Daniel's executives is replete with references to "Jack Daniel's," with virtually no mention of "Old No. 7."

JDPI uses "Old. No. 7" as a secondary mark on its Jack Daniel's label. Because of the bootstrapping problem, the statutory "fame" factors that relate to the extent of "advertising and publicity" or "sales of goods" or even federal registration, 15 U.S.C. § 1125(c)(2)(i)–(ii), (iv), pale in significance because they are of Jack Daniel's whiskey, and they do not measure even indirectly whether the general population widely recognizes "Old No. 7" apart from "Jack Daniel's." The critical statutory "fame" factor is "[t]he extent of actual recognition of the mark," 15 U.S.C. § 1125(c)(2)(iii), because "[t]his factor goes directly to the heart of the matter: the knowledge and impact of the mark on the mind of the 'general consuming public of the United States.' This factor requires an evaluation or measure of exactly just how widely known and famous is the mark." 3 *McCarthy*, *supra*, § 24:106. "One way to evidence the extent of actual recognition of the mark would be through the use of a survey," but JDPI offered no such "direct, not circumstantial, evidence of the perceptions of the consuming public." *Id.* By comparison, McCarthy notes that "[o]ne cannot logically infer fame from the fact that a mark is one of the millions on the Federal Register." *Id.* There is no evidence that anyone other than avid whiskey enthusiasts—or dedicated Jack Daniel's fans—would even know that "Old No. 7" appears on a bottle, or that JDPI established or even marketed it as a "household name" before Bad Spaniels appeared in 2014.

**2.     There is no evidence that the Bad Spaniels toy actually tarnishes Jack Daniel's.**

That VIP's uses its parody as a "source identifier" does not mean that its parodic nature is irrelevant to a dilution claim. In *Louis Vuitton*, the Fourth Circuit recognized that while "parody is not automatically a complete *defense* to a claim of dilution … where

the defendant uses the parody is its own designation of source, i.e., *as a trademark*, … [t]he TDRA … does not require a court to ignore the existence of a parody that is used as a trademark," or "preclude a court from considering parody as part of the circumstances to be considered for determining whether the plaintiff has made out a claim for dilution." 507 F.3d at 266–67 (addressing claim for dilution by blurring). As to dilution by tarnishment, the Fourth Circuit, like the district court, rejected "a flimsy theory that a pet may some day choke on a Chewy Vuiton squeak toy and incite the wrath of a confused consumer against LOUIS VUITTON." 507 F.3d at 269 (cleaned up). Just as in that case, where there was no record support for the farfetched notion that the toy's choking hazards would redound to Louis Vuitton, 507 F.3d at 269, so too here. There is no evidence that any consumer has had feelings of "disgust" from the Bad Spaniels toy, much less that it redounded to JDPI. Yes, there is the absolute testimony by Itamar Simonson, but his theoretical construction as to all forms of "poo" could have been tested by surveys or focus groups, yet he conducted none. In contrast, the focus groups conducted by VIP's expert, Bruce Silverman, showed the opposite. JDPI had the burden of proving tarnishment, but Simonson's theorized universal "disgust" is far less plausible than the risk of a dog's choking on a toy.

Simonson did not account for the fact that this was, to use the Ninth Circuit's term, a "light-hearted" parody. *VIP Prods.*, 953 F.3d at 1172. Simonson did not discriminate among kinds of "poo," because, to him, poo from a beloved pet on its owner's carpet (or, by extension, cat poo in a litter box) is as universally disgusting as human feces in the streets of San Francisco, where the Ninth Circuit makes its home. *See, e.g.*, Stephen Dinan, "The brownout problem spreads: San Francisco's public poo problem hits record level," WASH. TIMES, Dec. 1, 2023, https://www.washingtontimes.com/news/2023/dec/1/brownout-spreads-san-franciscos-public-poo-problem/; Nathan Robinson, "Why is San Francisco … covered in human feces?," THE GUARDIAN, Aug. 18, 2018, https://www.theguardian.com/commentisfree/2018/aug/18/san-francisco-poop-problem-inequality-homelessness. Compare this to classic comedies featuring poopy baby

28

diapers—*Three Men and a Baby* (1987), *Baby Boom* (1987), and *Mr. Mom* (1983). Even more pertinent, compare Simonson's testimony with funny songs about "dog poo" used to *entertain and teach* young children:

- **"Treading in Dog Poo is a Rainbow of Regret,"** https://www.funnysongs forkids.com/funny-songs-for-kids1/treading-in-dog-poo-is-a-rainbow-of-regret

- **"I Stepped on Poop!,"** Kids Songs & Nursery Rhymes, https://www.youtube. com/watch?v=6bSfIQTSjjE

- **"I Stepped in Dog Poop,"** The Poopy Man, https://open.spotify.com/ track/2gCPXi7Ws0cwzX1SjkzIF3

- **"Scoop a Doop Poop,"** https://www.songsforteaching.com/store/scoop-a-doop-poop-song-download-with-lyrics-pr-60302.html#google_vignette

- **"Baby Puppy Song (Pick Up Poop Poop),"** Nursey Rhymes and Kids Songs, https://www.youtube.com/watch?v=0pHxNCVwgmg

- **"Animal Poo Poo Song/Whose Poop Is It?,"** Animal Song for Kids, JunyTony, https://www.youtube.com/watch?v=mbohlAGRSqw.[3]

VIP's reference to "Old No. 2" is no more tarnishing to a brand of whiskey than these songs are "disgusting" to the young children and parents they entertain.

This Court is not now being asked to sit as gatekeeper under *Daubert* as to the admissibility of Simonson's testimony. Rather, because JDPI did not seek damages, the Court is sitting as the trier of fact in place of even an advisory jury, and it is similarly "entitled to hear expert testimony and decide whether to accept or reject it after considering whether predicate facts on which the expert relied were accurate." *Friend v. Time Mfg. Co.*, 422 F. Supp. 2d 1079, 1081 (D. Ariz. 2005); *see Fisher v. Vassar Coll.*, 70 F.3d 1420, 1447 (2d Cir. 1995) ("As the finder of fact, the district court was under no obligation to accept the word of Dr. Simon simply because she had been qualified as an expert."), *on reh'g en banc on other grounds*; 114 F.3d 1332 (2d Cir. 1997) (en banc);

---

[3] The Court may take judicial notice of these song lyrics under Fed. R. Evid. 201(b). *Jones v. Atl. Recs.*, 2023 WL 5577282, at *5 n.5 (S.D.N.Y. Aug. 29, 2023) (taking judicial notice of song lyrics), *appeal filed* (2d Cir. Sept. 28, 2023); *Hall v. Swift*, 2018 WL 2317548, at *3 (C.D. Cal. Feb. 13, 2018) (taking judicial notice of "song titles" and "song lyrics"), *rev'd on other grounds*, 786 F. App'x 711 (9th Cir. 2019).

*Wong Ho v. Dulles*, 261 F.2d 456, 460 (9th Cir. 1958) (holding that, in a bench trial, "[t]he weight to be given his testimony— i.e., 'how expert is the expert?'—is another matter. That is purely a question of discretion for the trier of fact to determine."); *Moore v. Robinson Oil Corp.*, 588 F. App'x 528, 530 (9th Cir. 2014) (holding that, during bench trial, "[i]t was … within the district court's discretion to reject [the expert's] untested speculation" and find expert to be not credible); *Dominguez v. Spearman*, 2017 WL 6508981, at *7 (C.D. Cal. July 19, 2017) ("[E]xpert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected. Here, the Court as fact finder was not required to accept [the expert's] opinion without scrutiny."), *report and recommendation adopted*, 2017 WL 6512214 (C.D. Cal. Dec. 18, 2017).

Simonson's testimony is flatly contrary to common lived experience, and the Court need not and should not accept it as the sole ground for finding likelihood of tarnishment of marks by a parody that has not been shown to have created actual tarnishment over ten years of use. *See Burgess v. Pliler*, 2007 WL 430742, at *9 (E.D. Cal. Feb. 6, 2007) ("The court is not bound to accept an expert's opinion when it conflicts with common sense notions…."), *report and recommendation adopted*, 2007 WL 776585 (E.D. Cal. Mar. 12, 2007), *aff'd sub nom. Burgess v. Johnson*, 314 F. App'x 33 (9th Cir. 2008); *United States v. Stratos*, 2017 WL 272213, at *8 (E.D. Cal. Jan. 20, 2017) (disregarding expert testimony in part because "the argument proffered by Defendant and his expert is inconsistent with common sense"). There is no evidence that what the Ninth Circuit considered a "light-hearted" parody has or likely will tarnish Jack Daniel's marks. The Court should reject the claim on the merits and avoid the constitutional issue entirely.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment for VIP on JDPI's claims for trademark infringement and dilution by tarnishment.

1    DATED this 19th day of April, 2024.

2                                             DICKINSON WRIGHT PLLC

3                                             s/ Bennett Evan Cooper
                                              Bennett Evan Cooper
4                                             David G. Bray
                                              Vail C. Cloar
5                                             Alexandra Crandall
                                              1850 North Central Avenue, Suite 1400
6                                             Phoenix, Arizona 85004

7
                                              Attorneys for Plaintiff-Counterdefendant
8                                             VIP Products, L.L.C.

9

10   COPY of the foregoing served by CM/ECF system
     this 19th day of April, 2024, on the following:

11
     Isaac S. Crum
12   MESSNER REEVES LLP
     7250 North 16th Street, Suite 410
13   Phoenix, Arizona 85020

14   Lisa Blatt
     Amy M. Saharia
15   Matthew B. Nicholson
     WILLIAMS & CONNOLLY LLP
16   680 Maine Ave., SW
     Washington, D.C. 20024
17

18
     s/ Bennett Evan Cooper
19

20

21

22

23

24

25

26

27

28