MESSNER REEVES LLC
Isaac S. Crum
1440 E. Missouri Avenue, Suite C100
Phoenix, Arizona 85014
(602) 641-6705
icrum@messner.com

WILLIAMS & CONNOLLY LLP
Lisa S. Blatt (*pro hac vice*)
Amy Mason Saharia (*pro hac vice*)
Matthew B. Nicholson (*pro hac vice*)
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
lblatt@wc.com
asaharia@wc.com
mnicholson@wc.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products LLC, an Arizona limited liability company, | )<br>)<br>) No. CV-14-2057-PHX-SMM |
| Plaintiff, | )<br>) **JACK DANIEL'S PROPERTIES,** |
| v. | ) **INC.'S OPPOSITION TO VIP**<br>) **PRODUCTS LLC'S OPENING BRIEF** |
| Jack Daniel's Properties, Inc., a Delaware corporation, | )<br>)<br>) |
| Defendant. | )<br>) |

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.      Jack Daniel's Proved Its Infringement Claim. ...................................... 2

    A.     The Test for Infringement Is Likelihood of Confusion. ...................... 2

    B.     This Court's Findings Under the *Sleekcraft* Factors Were Correct. ................. 4

II.     Jack Daniel's Proved Dilution by Tarnishment. ................................... 14

    A.     This Court Should Re-Adopt Its Dilution Findings........................... 14

    B.     VIP's Waived Facial Constitutional Challenge Lacks Merit. ........... 18

        1.     *VIP Waived Its Facial Constitutional Challenge.* ...................... 19

        2.     *VIP's Facial Constitutional Challenge Is Meritless.* ................. 20

CONCLUSION ......................................................................................................... 30

i

# **TABLE OF AUTHORITIES**

Page

## **CASES**

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ..........................................21

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
 598 U.S. 508 (2023)..................................................................................................11

*Anheuser-Busch Inc. v. Andy's Sportswear Inc.*,
 1996 WL 657219 (N.D. Cal. Aug. 28, 1996) ............................................................16

*Arizona Free Enters. Club's Freedom Club PAC v. Bennett*,
 564 U.S. 721 (2011)..................................................................................................26

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062 (9th Cir. 2006) .......13

*Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (9th Cir. 1999) ...................................27

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036 (9th Cir. 1999) ........10

*Brown v. Electric Arts, Inc.*,724 F.3d 1235 (9th Cir. 2013) ............................................11

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...............................................4

*Central Hudson Gas & Elec. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)......................24

*Chem. Corp. of Am. v. Anheuser-Busch, Inc.*, 306 F.2d 433 (5th Cir. 1962)..............16, 28

*Cmty. Fed. Sav. & Loan Ass'n v. Orondorff*, 678 F.2d 1034 (11th Cir. 1982) ................18

*Coca-Cola v. Gemini Rising, Inc.*, 346 F. Supp. 1183 (E.D.N.Y. 1972) .........................16

*Cohn v. PetSmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) .....................................................12

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
 467 F. Supp. 366 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir. 1979) ..............................16

*Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994).........................................16

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) ........4

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .............................................................22, 27, 30

*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963) ..........7

Page

Cases—continued:

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ................................................................. 10

*Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) ............................ 23

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .......... 22

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497 (2d Cir. 1996) ............. 6, 16

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ..................................................... 20, 29

*Indianapolis Colts, Inc. v. Metro Baltimore Football Club Ltd.*,
   34 F.3d 410 (7th Cir. 1994) ..................................................................... 11

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023) ....................*passim*

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987) ................... 9

*L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir. 1987) .................. 9, 28, 30

*Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438 (9th Cir. 1982) .......................... 20

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) ................................................... 28

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
   507 F.3d 252 (4th Cir. 2007) ................................................................. 6, 8

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
   674 F. App'x 16 (2d Cir. 2016) ............................................................. 8, 9

*Lyon P'ship v. Giannoulas*, 179 F.3d 384 (5th Cir. 1999) ................................... 6

*M2 Software Inc. v. Viacom Inc.*, 223 F. App'x 653 (9th Cir. 2007) ..................... 18

*Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944 (C.D. Cal. 1996) ................ 15, 19

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................... 20, 23, 28, 29

*Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ........................... 23, 24, 25

*N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 69 F. Supp. 2d 479 (S.D.N.Y.
   1999), *aff'd in part and rev'd in part*, 293 F.3d 550 (2d Cir. 2002) ................ 17

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999) ......................... 12

Page

Cases—continued:

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ............................................................ 12

*Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*,
    642 F. Supp. 1031 (N.D. Ga. 1986) .............................................. 16, 17

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) ................................. 23

*Polo Ralph Lauren L.P. v. Schuman*, 1998 WL 110059 (S.D. Tex. Feb. 9, 1998)........... 18

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) ............................ 3, 6, 7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).......................................... 20, 29, 30

*Radiance Found., Inc. v. NAACP*, 786 F.3d 316 (4th Cir. 2015)........................................ 6

*Recot, Inc. v. Becton*, 214 F.3d 1322 (Fed. Cir. 2000) ............................................... 13, 14

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ......................... 20

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*,
    483 U.S. 522 (1987)....................................................................*passim*

*Sec. Inv. Prot. Corp. v. Vigman*, 74 F.3d 932 (9th Cir. 1996).......................................... 20

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009) ......9, 15, 21

*Steinway & Sons v. Robert Demars & Friends*,
    1981 WL 40530 (C.D. Cal. Jan. 28, 1981) ...................................... 17, 21

*TE-TA-MA Truth Found.—Fam. of URI, Inc. v. World Church of the Creator*,
    297 F.3d 662 (7th Cir. 2002) ............................................................ 23

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
    221 F. Supp. 2d 410 (S.D.N.Y. 2002).................................................... 6

*United States v. Alvarez*, 567 U.S. 709 (2012)............................................................ 27

*United States v. Castellanos*, 608 F.3d 1010 (8th Cir. 2010).................................... 19, 20

*United States v. O'Brien*, 391 U.S. 367 (1968)......................................................... 24, 26

*Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125 (2d Cir. 2023) (per curiam) ..3, 4, 5

*Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088 (9th Cir. 2010)................................ 15

iv

Page

Cases—continued:

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) .................21

*Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136 (10th Cir. 2013).............................11

*Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977) ...........................22, 23, 27

## CONSTITUTION, STATUTES, AND RULE

U.S. Const. amend. I.........................................................................................*passim*

15 U.S.C.
    § 1052(a) ...................................................................................................29
    § 1125(a) ...................................................................................................26
    § 1125(a)(1)(A) ........................................................................................10
    § 1125(c)(1)........................................................................................*passim*
    § 1125(c)(2)(C) ..................................................................................16, 28
    § 1125(c)(3)(A)(ii) ....................................................................................28
    § 1125(c)(3)(B) ........................................................................................28
    § 1125(c)(3)(C) ........................................................................................28
    § 1125(c)(4) ..............................................................................................18

Fed. R. Civ. P. 5.1.............................................................................................19

## OTHER AUTHORITIES

Ashutosh Bhagwat, *Truthiness: Corporate Public Figures & The Problem of Harmful Truths*, 99 Minn. L. Rev. 297 (2014) ...........................................20

John Gilbertson, *Blunt Advice: A Crash Course in Cannabis Trademarks*, 60 IDEA: L. Rev. of Franklin Pierce Ctr. for Intell. Prop. 502 (2020).......................29

H.R. Rep. No. 109-23 (2005) ............................................................................27

Mark Lemley & Rebecca Tushnet, *First Amendment Neglect in Supreme Court Intellectual Property Cases* (Jan. 11, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4691950 ................................11

Page

Other Authorities—continued:

3 J. McCarthy, Trademarks and Unfair Competition (5th ed. 2024)
   § 19:8 ..................................................................................................... 23
   § 23:5 ............................................................................................... 10, 14
   § 23:6 ..................................................................................................... 10
   § 23:7 ..................................................................................................... 10
   § 23:8 ..................................................................................................... 10
   § 23:97 ................................................................................................... 13
   § 23:107 ................................................................................................... 7
   § 23:110 ................................................................................................... 7
   § 24:49 ..................................................................................................... 5
   § 24:67 ................................................................................................... 24
   § 24:102 ................................................................................................. 18

5 J. McCarthy, Trademarks and Unfair Competition § 32:188 (5th ed. 2024) ................. 10

Robert C. Post & Jennifer E. Rothman, *The First Amendment and the Right(s) of Publicity*, 130 Yale L.J. 86 (2020) .......................................................................... 21, 22

Results of Seach for "Jack Daniel's Dog Toy," Amazon.com, http://tinyurl.com/AmazonBadSpaniels .......................................................... 13

## **INTRODUCTION**

VIP's brief makes clear its desire to litigate this nearly ten-year-old case from scratch and further prolong this litigation. VIP ignores this Court's extensive findings of fact and conclusions of law, instead re-asserting many of the same arguments this Court already rejected. VIP provides no persuasive argument for why this Court should make different findings now. And signaling that it knows it has lost, VIP attempts to inject new, never-before-raised arguments on both infringement and dilution without acknowledging that it waived those arguments years ago. VIP's reliance on waived arguments is rampant.

As to infringement, VIP never engages with the Supreme Court's core ruling about the degree to which parody affects the likelihood-of-confusion test. While a parody must conjure up enough of the original to make the object of its wit recognizable, the parody must also create enough *contrasts* with the original to dispel likely confusion. Here, this Court already found that VIP's purported parody failed to create such contrasts. Disregarding the Supreme Court's ruling and this Court's prior findings, VIP proposes a new threshold test. In its view, as long as a case involves a "true parody," then certain likelihood-of-confusion factors automatically "flip" in the defendant's favor or "fall out" of the analysis—resulting in a veritable presumption of no infringement. But that rigid threshold test contravenes the Supreme Court's flexible approach to parodies and would improperly revive the *Rogers* test under a different name.

As to dilution, nothing in the Supreme Court's decision affects Jack Daniel's claim of dilution by tarnishment, and this Court's finding of likely dilution by itself entitles Jack Daniel's to an injunction in its favor. While VIP rehashes its arguments about the likelihood of dilution, it provides no basis for revising this Court's prior findings. And VIP's new arguments about sex and drugs and about the fame of "Old No. 7" are long since waived and lack merit in any event. This Court already found that (1) all of Jack Daniel's trademarks, including Old No. 7, are famous, and (2) Bad Spaniels is likely to tarnish Jack Daniel's famous trade dress as well as its marks.

VIP's response also confirms that its late-breaking constitutional challenge to the

1

dilution statute is waived, a point it does not even deny.  VIP relies on case law and articles predating the trial in this case—belying its suggestion that it could not have raised its challenge before the original judgment.  The challenge also is meritless.  VIP does not even attempt to meet the rigorous standard that applies to facial challenges, which requires VIP to demonstrate that *all* applications of the dilution statute are unconstitutional.  And VIP ignores decades of precedent holding that intellectual property rights, including trademark rights, are not subject to heightened First Amendment scrutiny because they impose only incidental restrictions on expression and further countervailing First Amendment interests. This Court should not indulge VIP's waived argument or break new constitutional ground.

## ARGUMENT

**I.    Jack Daniel's Proved Its Infringement Claim.**

    **A.    The Test for Infringement Is Likelihood of Confusion.**

Eager to circumvent this Court's likelihood-of-confusion findings, VIP yet again proposes a new, threshold test for parodies.  Specifically, VIP (at 9) contends that, in any case involving a "true parody," certain likelihood-of-confusion factors automatically "flip" in the defendant's favor or "drop out" of the analysis entirely.  The Supreme Court, however, already rejected VIP's previous attempt to replace the flexible likelihood-of-confusion test with the *Rogers* rigid framework.  This Court similarly should reject VIP's latest attempt to read an inflexible parody test into the Lanham Act.

Tellingly, VIP all but ignores the Supreme Court's central holding concerning parodies.  Having rejected application of the threshold *Rogers* test, the Court explained that the "only question" as to infringement "is whether the Bad Spaniels marks are likely to cause confusion."  *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 161 (2023). The Court noted that "a trademark's expressive message—particularly a parodic one, as VIP asserts—may properly figure in assessing the likelihood of confusion."  *Id.*  The Court added that a parody must "conjure up enough of an original to make the object of its critical wit recognizable."  *Id.* (cleaned up).  But in language VIP ignores, the Court proceeded to explain that, "to succeed, the parody must also *create contrasts*, so that its message of

1   ridicule or pointed humor comes clear." *Id.* (emphasis added). VIP nowhere attempts to

2   explain how its purported parody creates sufficient contrasts to make clear that it was not

3   created, sponsored, or approved by Jack Daniel's.

4       VIP instead (at 7-9) leans into its new artificial test, under which certain *Sleekcraft*

5   factors automatically "flip" in the defendant's favor whenever an infringing use contains

6   even a modicum of parody. But VIP's mechanical test is incompatible with central prin-

7   ciples of trademark law. The *Sleekcraft* factors are a guide for assessing whether consum-

8   ers are likely to be confused; they are not a rigid formula and do not "necessarily dictate a

9   result." *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014). Under

10  VIP's proposed test (at 9), by contrast, a threshold determination that an infringing use

11  qualifies as a "true parody" would dictate that certain factors "flip" or "fall out" of the

12  analysis, with no further inquiry into the facts bearing on the likelihood of confusion. In

13  other words, VIP seeks to resurrect a *Rogers*-like test under another name.

14      VIP's test also improperly treats a finding of "parody" as an on-off switch that con-

15  trols the application of the *Sleekcraft* factors. But "parody" itself is not a one-size-fits-all

16  term, as parodies come in all varieties. As the Supreme Court recognized, some parodies

17  are more confusing than others; the ultimate question is whether the particular parody is

18  likely to confuse. *Jack Daniel's*, 599 U.S. at 161. The Court emphasized that the inquiry

19  is nuanced: while a parodist must conjure up enough of the original to make its point, it

20  must also create enough contrasts to dispel the likelihood of confusion. *See id.* The par-

21  ticular features of the parody will be relevant to that inquiry. VIP's on-off test fails to

22  account for these contextual features and is contrary to the "fluid" nature of the *Sleekcraft*

23  inquiry. *See Pom Wonderful*, 775 F.3d at 1125 (citation omitted).

24      In the only appellate decision applying the Supreme Court's ruling regarding par-

25  ody, the Second Circuit applied the ordinary likelihood-of-confusion factors and concluded

26  that a purported parody did not create sufficient contrasts to dispel the likelihood of con-

27  fusion. *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 139-42 (2d Cir. 2023) (per

28

curiam).  As the Second Circuit explained, "if a parodic use of protected marks and trade dress leaves confusion as to the source of a product, the parody has not 'succeeded' for purposes of the Lanham Act." *Id.* at 142.  That holding (which VIP does not even cite) correctly reads the Supreme Court's decision and accords with the Ninth Circuit's own prior holding that "[t]he cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997); ECF 338 at 18-21 ("Jack Daniel's Br.").

VIP (at 4-7) dedicates pages of its brief attempting to show that Bad Spaniels is a "true parody" and that Jack Daniel's "invited" VIP's commentary.  VIP's characterization is incorrect for the reasons explained below (at 7-9), but that characterization is irrelevant in any event.  Parody is not a defense in and of itself, nor does a claim of parody magically transform the *Sleekcraft* factors.  *Dr. Seuss*, 109 F.3d at 1405.  The purported parodic nature of Bad Spaniels is relevant only to the extent it dispels likely confusion under the *Sleekcraft* factors.  For the reasons this Court already identified, and as Jack Daniel's explained in its opening brief, VIP copied too much and distinguished too little.

### B.    This Court's Findings Under the *Sleekcraft* Factors Were Correct.

This Court already held that the *Sleekcraft* factors weigh in Jack Daniel's favor— confirming that VIP's purported parody did not create sufficient contrasts to dispel likely confusion.  Jack Daniel's explained in its opening brief that this Court's findings remain valid.  We will not rehash those arguments here and instead respond to VIP's arguments.

**<u>Similarity of the marks.</u>**  VIP contends that the similarity of the marks weighs in its favor because, to create its parody, it "must be able to conjure up at least enough of th[e] original to make the object of its critical wit recognizable."  ECF 339 at 11 ("VIP Br.") (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 588 (1994)).  But the problem is that VIP "conjured up" far too much without adding enough distinguishing features to dispel the likelihood of confusion.

VIP does not identify *any* features of Bad Spaniels that draw sufficient contrasts with Jack Daniel's trademarks and trade dress.  VIP (at 3) points out that it added poop

humor and a cartoon image of a spaniel.  But this Court already correctly found that the minor differences did not overcome the overwhelming similarities, noting that "the square bottle size and shape, ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and styles remain virtually unchanged."  FoF ¶¶ 101-06.

VIP (at 12) invokes the testimony of Stephen Sacra, VIP's owner, that his "goal" was to "grab enough of the elements" to create a parody, "not to copy."  But, whatever Sacra's subjective goal was, the evidence showed that VIP grabbed too many elements. VIP's designer Eleanor Phillips explained that, with painstaking attention to detail, she replicated the specific features of the Jack Daniel's trade dress.  *See* ECF 104-1 at 61-79. And Sacra himself testified that the Bad Spaniels toy replicates specific features of the current, redesigned Jack Daniel's bottle shape, which includes squarer shoulders, sharper edges, and a wider neck.  *See* ECF 243 at 107-08; *see* ECF 106 at 4-5; ECF 106-1 at 3; ECF 106-5 at 3 (describing features).

VIP also (at 3) points to the hang tag, presumably as evidence against similarity. But the Court already found that "VIP cannot dispel confusion with a disclaimer, particularly a disclaimer in tiny font on the reverse side of its product packaging."  FoF ¶ 105.

**Strength of the marks.**  VIP fares no better with respect to the next factor:  the strength of Jack Daniel's marks.  The strength of the mark ordinarily favors the markholder because "the stronger a mark … the more likely it is to be remembered and associated in the public mind with the mark's owner."  FoF ¶ 107 (cleaned up); *see* 3 J. McCarthy, Trademarks and Unfair Competition § 24:49 (5th ed. 2024).  That principle applies even in parody cases where, as here, the parodist does not create sufficient contrasts between its product and the original.  *See Vans*, 88 F.4th at 139; *see* Jack Daniel's Br. 12-13.  As explained above, VIP failed to create sufficient contrasts with the original, so this factor favors Jack Daniel's.  *Accord Jack Daniel's*, 599 U.S. at 161.

VIP (at 10) cites a handful of cases where courts have considered the strength of the mark in favor of the alleged infringer.  But those cases involved obvious parodies that

immediately signaled to consumers that the markholder was not the source of the product. For example, the parody in *Louis Vuitton* was "sufficiently blatant that a consumer encountering [the] dog toy would not mistake its source or sponsorship" because it contrasted luxury purses with a cheap, plush dog toy. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 262 (4th Cir. 2007); *see* Jack Daniel's Br. 20-21. And the parody in *Tommy Hilfiger* was similarly obvious because, unlike here, the allegedly infringing product (pet perfume) was a "novelty item" "for which there [was] no market independent of the parody." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 418 (S.D.N.Y. 2002); *see* Jack Daniel's Br. 21 n.5. VIP's other cases also involved obvious parodies that clearly communicated to consumers that the brand was not speaking. *See Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 319 (4th Cir. 2015) ("National Association for the Abortion of Colored People"); *Lyon P'ship v. Giannoulas*, 179 F.3d 384, 386 (5th Cir. 1999) (performance at evening sporting events during which a chicken mascot assaulted "look-alike" of children's "Barney" character); *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996) ("not particularly subtle" parody using "Spa'am" as the name of fictional puppet character). In contrast, Bad Spaniels "appropriated the Jack Daniel's trade dress in every aspect." *See* FoF ¶ 34; *supra* pp.4-5.

**Proximity of the goods.** As the Court already found, the "relatedness" or "proximity" of the goods favors Jack Daniel's. FoF ¶¶ 111-14. VIP simply seeks to relitigate the Court's findings. VIP (at 17) argues that, because Jack Daniel's sells dog products only from the Jack Daniel's gift shop, the buying public would not think that Bad Spaniels is associated with Jack Daniel's. But VIP ignores the broad array of licensed merchandise bearing Jack Daniel's trademarks and trade dress, including prepared meats and barbeque sauces, cigarette lighters, belt buckles, cufflinks, charcoal, and apparel. FoF ¶ 113. To establish proximity between goods, parties "need not be direct competitors." *Pom Wonderful*, 775 F.3d at 1127. Instead, "'[r]elated goods (or services) are those which would be reasonably thought by the buying public to come from the same source if sold under the

6

same mark." *Id.* (citation omitted).  Jack Daniel's wide variety of licensed goods renders it more likely that consumers would think Bad Spaniels is associated with Jack Daniel's, not a joke about the brand by an unrelated third party.

**Intent.**  VIP (at 4-7, 12-13) spends pages of its brief emphasizing its purportedly parodic intent.  But intent is "minimally important," and "evidence of the defendant's intent to confuse customers … is not required for a finding of likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1131 (citation omitted).  To the extent intent weighs in any direction, it either weighs in Jack Daniel's favor or is neutral.

Intent is relevant to infringement because, when a defendant intends to confuse, confusion is *more* likely to occur.  3 McCarthy § 23:110 & n.4 (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963)).  The converse is not necessarily true, however: an intent to parody does not necessarily mean that confusion is *less* likely to occur.  *Accord* 3 McCarthy § 23:107 ("Good faith is not a defense to trademark infringement." (citation omitted)).  The likelihood of confusion will depend on all relevant factors, including the specific features of the supposed parody.  As the Supreme Court explained, some messages, such as "ridicule," "pointed humor," and "[]mockery," may signal to consumers that the alleged infringer's product is not related to the markholder because markholders do not normally mock or ridicule themselves. *Jack Daniel's*, 599 U.S. at 161.  By contrast, other supposedly parodic messages may not have that effect if the parodist does not create sufficient "contrasts" with the original to make its message clear.  *Id.*  In such cases, consumers may be confused into thinking the markholder is engaged in a joke or "[s]elf-deprecation."  *See id.*  "[H]umor—especially self-deprecating humor—is a tried-and-true marketing strategy" that brands routinely deploy.  Br. of Campari Am. LLC as Amicus Curiae at 26, *Jack Daniel's Props., Inc. v. VIP Prods., LLC*, No. 22-148 (Jan. 18, 2023) ("Campari Br.").  As VIP points out, Jack Daniel's itself uses humor to advertise.  VIP Br. 6 ("In any bar in America, you know someone by name.").

VIP's supposed parody does not communicate to consumers that Jack Daniel's did

7

not sponsor its dog toy.  VIP does not identify any aspect of Bad Spaniels that ridicules or mocks Jack Daniel's.  VIP (at 5) claims an intent to communicate that "the world around you is constantly advertising to you" so "[y]ou need to be able to sit back and laugh at yourself."  But that banal message could apply to, and come from, any markholder.[1]  Many of VIP's supposed "messages" have nothing to do with Jack Daniel's at all.  VIP claims (at 5) that Bad Spaniels "pok[es] fun at dogs" and "reflects back on the humanization of the dog in our lives."  But VIP did not need to copy Jack Daniel's trademarks and trade dress to convey those supposed messages.  And Jack Daniel's licensed dog products argu-ably convey similar messages—confirming the potential for confusion.

VIP proffers a number of other supposed "messages," none of which it articulated at trial and none of which a reasonable consumer would understand.  No evidence shows that consumers viewing Bad Spaniels would associate it with an obscure Brazilian poem (VIP Br. 4-5), or would understand that VIP's toilet-humor dog toy was a comment about the "anthropomorphic 'Jack,'" *id.* at 6, whatever that means.  And VIP's conduct belies its after-the-fact explanation, because VIP sells Silly Squeakers ripping off myriad other brands that do not involve whiskey or Jack Daniel's, including Stella Artois ("Smella-R-Crotches"), Heineken ("Heini Sniff'n"), and Guinness ("Pissness").  *See* FoF ¶ 9.

None of VIP's cases (at 4) supports it.  Unlike here, the parody in *Louis Vuitton* was "unmistakable" because the parodist "irreverently present[ed] haute couture as an object for casual canine destruction."  507 F.3d at 261.  Similarly, the parody in *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, succeeded because it used Louis Vuitton's "image of luxury" on a "plebian product."  674 F. App'x 16, 18 (2d Cir. 2016) (cited at VIP Br. 4).[2]  Unlike those cases, Bad Spaniels communicates no similar meaning or message.  *See*

---

[1] For example, General Telephone of California ran a commercial where an executive in-troduced himself as associated with the company and was pelted with tomatoes, eggs, and cream-filled pie.  *See* Campari Br. 27; *id.* (ad making fun of poor reputation by stating: "Hyundai.  Yes, Hyundai.").

[2] The court in *My Other Bag* did not even consider parody in the likelihood-of-confusion analysis; it considered parody in the context of *dilution*.  *See id.*  The court applied the

1    Jack Daniel's Br. 19-21.

2        VIP's other citations are even further afield.  *L.L. Bean, Inc. v. Drake Publishers,*

3    *Inc.*, involved dilution, not infringement.  *See* 811 F.2d 26, 34 (1st Cir. 1987) (cited at VIP

4    Br. 4).  And that court explained that its holding would not apply to infringement because

5    "[a] parody which causes confusion in the marketplace implicates the legitimate commer-

6    cial and consumer protection objectives of trademark law."  *Id.* at 32 n.3.  Similarly, *Jor-*

7    *dache Enterprises, Inc. v. Hogg Wyld, Ltd.*, recognized that although some parodies may

8    reduce confusion, "a parody of an existing trademark can cause a likelihood of confusion,"

9    when, for example, "two marks are confusingly similar."  828 F.2d 1482, 1486 (10th Cir.

10   1987) (cited at VIP Br. 13).

11       VIP's also relies (at 13) on *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, but

12   that case cuts against VIP's claim of parody.  *See* 588 F.3d 97, 113 (2d Cir. 2009).  That

13   court rejected the defendant's proffered parody as "at most, a subtle satire" of the plaintiff's

14   mark that "fail[ed] to demonstrate such a clear parody."  *Id.*  The same is true here.

15       Finally, VIP (at 13) repeats its misguided criticism of the Court's Findings of Fact.

16   As Jack Daniel's explained in its opening brief, this Court's analysis made clear it did not

17   ignore VIP's asserted parody; it merely found that VIP failed to include enough distin-

18   guishing features to dispel confusion.  To avoid any debate on this issue, the Court should

19   adopt the further findings set out in Jack Daniel's opening brief.  Jack Daniel's Br. 16-18.

20       **Actual confusion.**  With respect to actual confusion, VIP attempts (at 15-16) to

21   relitigate the battle of the experts that it already lost.  This Court already refused to credit

22   VIP's expert's "generalized objections" to Jack Daniel's survey evidence.  FoF ¶ 91.  As

23   this Court explained, VIP's expert "did not support [his] view by conducting a survey or

24   by conducting independent research," and he had "never written any articles on trademark

25   surveys, or trademark survey design, or on the issue of likelihood of confusion in trademark

26   law."  FoF ¶¶ 90-91.  VIP ignores those findings and provides no reason to depart from

27   ────────────────

28   ordinary likelihood-of-confusion test, not the modified test VIP advocates.  *See id.* at 17-
     18.

1   them.  Jack Daniel's (at 15-16) already explained why Justice Sotomayor's noncontrolling

2   concurrence (joined by only one other Justice) does not compel a different result.

3       Citing the concurring opinion, VIP nitpicks Jack Daniel's survey, but its criticisms

4   are unpersuasive.  VIP (at 15) says that Dr. Ford's survey improperly tested for "confusion

5   about a legal proposition" rather than trademark-related confusion.  That is simply incor-

6   rect; Dr. Ford's survey properly tested for sponsorship-or-approval confusion, which is

7   squarely within the scope of the Lanham Act's protection.  *See* Jack Daniel's Br. 15-16.

8   And even discounting any responses referencing the need for intellectual property permis-

9   sions, Dr. Ford's survey still showed 25% confusion.  Jack Daniel's Br. 16.[3]

10      VIP (at 15-16) similarly is wrong to dismiss Dr. Ford's survey on the ground that it

11  could not detect confusion in "product purchase decision[s]."  In addition to point-of-sale

12  confusion (confusion that leads a consumer to purchase a good), the Lanham Act applies

13  to other forms of confusion, including initial-interest confusion and post-purchase confu-

14  sion.  *See, e.g.*, *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1062-

15  65 (9th Cir. 1999) (initial-interest confusion); *Fortune Dynamic, Inc. v. Victoria's Secret

16  Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010) (post-purchase confusion);

17  *see* 3 McCarthy §§ 23:5, 23:6, 23:7.  And although the Lanham Act proscribes confusion

18  as to source, it also expressly applies to confusion about "sponsorship[] or approval."  *See*

19  15 U.S.C. § 1125(a)(1)(A); 3 McCarthy § 23:8.  All these forms of confusion are actiona-

20  ble and can be proved by survey evidence.  Jack Daniel's Br. 15.

21      VIP concedes (at 16) that a survey result of 29% confusion is "meaningful in a

22  purely commercial context," but claims that this percentage should not suffice "in a parody

23  context."  But 29% is well above the threshold that courts traditionally consider to establish

24  likely confusion.  5 McCarthy § 32:188; *see* Jack Daniel's Br. 14.  And VIP cites no au-

25  thority holding that a higher threshold should apply in cases of supposed parodies, nor does

26

27  [3] VIP (at 16) cites its expert's suggestion that nine survey responses should be discounted
    because they "stated that the product was a spoof."  ECF 118 ¶ 25.  Even discounting those
28  nine responses, Dr. Ford's survey still demonstrated a confusion rate of 24.6%.

1  it provide any justification for that approach.  Parody or not, the likelihood of consumer

2  confusion is the ultimate question in every case.  Survey results reflecting likely confusion

3  confirm that the purported parody did not include sufficient contrasts to alert consumers

4  that it was not the original.  Further, even if there were a difference between "commercial"

5  and "parody" uses, VIP's use is commercial because it used Jack Daniel's marks and trade

6  dress as source identifiers to sell dog toys.  *See Jack Daniel's*, 599 U.S. at 160.

7      VIP's cited sources do not undermine this Court's prior findings.  VIP (at 15) relies

8  on an article by purportedly "leading scholars."  But time and again, the Supreme Court

9  has disagreed with these academics' positions, and the same scholars published an article

10  lambasting the Supreme Court's decision in this very case.[4]  They are out of sync with,

11  and expressly disagree with, the governing legal standards set forth by the Supreme Court.

12      None of VIP's cases (at 14-15) help it either.  In *Indianapolis Colts, Inc. v. Metro*

13  *Baltimore Football Club Ltd.*, the court *credited* the plaintiff's survey, even though the

14  survey had significant problems not present here, observing that "[t]rials would be very

15  short if only perfect evidence were admissible."  34 F.3d 410, 416 (7th Cir. 1994).  In

16  *Water Pik, Inc. v. Med-Systems, Inc.*, the expert's survey was improper because he used a

17  test sample and a control sample but failed to factor the control into his results.  726 F.3d

18  1136, 1149-50 (10th Cir. 2013).  The survey also used an improper side-by-side compari-

19  son that did not replicate market conditions.  *See id.* at 1147.  In contrast, Dr. Ford's survey

20  used the *Eveready* format (not a side-by-side) and appropriately adjusted for the control

21  sample, so *Water Pik* is beside the point.  Finally, *Brown v. Electric Arts, Inc.*, is even

22  further afield because the survey in that case was introduced to try to satisfy the *Rogers*

23  test, which does not apply here.  *See* 724 F.3d 1235, 1245 (9th Cir. 2013); *Jack Daniel's*,

---

24  [4] Mark Lemley & Rebecca Tushnet, *First Amendment Neglect in Supreme Court Intellec-*
25  *tual Property Cases* (Jan. 11, 2024), https://papers.ssrn.com/sol3/papers.cfm?ab-
   stract_id=4691950.  Last term, these academics filed amicus briefs in support of the losing
26  parties in this case, No. 22-148, and in *Andy Warhol Foundation for the Visual Arts, Inc.*
   *v. Goldsmith*, No. 21-869, 598 U.S. 508 (2023).  *See* Br. of Art Law Profs., No. 21-869
27  (June 16, 2022); Br. of Copyright Law Profs., No. 21-869 (June 16, 2022); Br. of First
28  Amendment Profs., No. 22-148 (Feb. 23, 2023).

599 U.S. at 145.

Finally, VIP (at 14) argues that the absence of actual-confusion evidence can be a "powerful indication" that confusion is not likely, but no authority supports this proposition. VIP selectively quotes from *Cohn v. PetSmart, Inc.*, but that case elsewhere explains that "[b]ecause evidence of actual confusion can be difficult to obtain, its absence is 'generally unnoteworthy' and is *given little probative weight.*'" 281 F.3d 837, 842 (9th Cir. 2002) (per curiam) (emphasis added) (citation omitted). *Cohn,* in turn, quotes a Second Circuit case that states in full: "If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected *either by survey or in actual reported instances of confusion*, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) (emphasis added). Jack Daniel's introduced persuasive survey evidence.

**Marketing channels.** VIP argues (at 18-19) that the overlap in marketing channels (which includes Walmart, Amazon.com, and Boozingear.com) is irrelevant because selling on Amazon.com and Walmart.com is ubiquitous. This argument is waived and meritless. VIP never previously presented this argument. In its proposed Findings of Fact and Conclusions of Law, VIP simply argued that the "majority" of Bad Spaniels toys were sold through other channels. ECF 242 at 26. Presumably to avoid this waiver, VIP (at 18) claims that the "legal precedent" in this area has "changed." That is simply not true; VIP itself cites cases going back as far as 2011. VIP Br. 18 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011)). And Amazon.com was "ubiquitous" in 2018—Sacra himself testified at trial that "[e]verything is offered on amazon.com." ECF 243 147. VIP is simply quibbling with the Court's prior finding.

VIP's argument is also meritless. As VIP (at 19) concedes, VIP sold Bad Spaniels on Boozingear.com and other specialty online stores that sell licensed alcohol products. In other words, VIP sold its goods through marketing channels of specialty merchandise,

where Bad Spaniels competes directly with Jack Daniel's licensed products.

VIP responds (at 19) that there is no "evidence a consumer searching [Booz-ingear.com] would bring up the Jack Daniel's gear and Bad Spaniels in the same search." But Jack Daniel's licensing manager Tobias Roush testified that he became aware of Bad Spaniels because he conducted a search for "Jack Daniel's" on the Boozingear.com web-site, which included Bad Spaniels in the results.  ECF 234 at 129-30.  And the same is true of large Internet retailers; searching for a "Jack Daniel's dog toy" on Amazon.com returns Bad Spaniels among the top results.  *See* http://tinyurl.com/AmazonBadSpaniels.

Finally, VIP errs in claiming that Boozingear.com was the only alcohol-specific overlapping channel.  Sacra testified that Bad Spaniels also was available on Wearyour-beer.com, another website where Jack Daniel's sold licensed products.  ECF 243 at 146-47.  Even discounting Amazon.com and Walmart.com, this factor favors Jack Daniel's.

**Degree of consumer care.**  As this Court already found, consumers cannot be ex-pected to exercise a high degree of care when purchasing a $15 dog toy, so this factor favors Jack Daniel's.  FoF ¶¶ 118-21.  VIP responds (at 20) that the Court "fail[ed] to account for … Jack Daniel's side of the ledger" because Jack Daniel's is an expensive product.  But the Court need not consider the degree of care in purchasing the *markholder's* genuine product.  *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006).  In any event, even if the degree of care in purchasing Jack Daniel's were relevant, it still favors Jack Daniel's.  The average U.S. retail price for Jack Daniel's Old No. 7 Tennessee Whiskey is under $50 a bottle; it is nowhere near the type of expen-sive good weighing against confusion.  *See* 3 McCarthy § 23:97 ("upscale homes," "ex-pensive vehicles," "race cars," and boats).

VIP also halfheartedly argues (at 20) that pet owners would exercise heightened care because Bad Spaniels is a "specialty dog toy," but it cites no evidence to support this argument.  At $15, Bad Spaniels is a "relatively low-priced" good that is "subject to im-pulse buying," which engenders a lesser standard of purchasing care.  *Recot, Inc. v. Becton*,

214 F.3d 1322, 1329 (Fed. Cir. 2000) (dog treats); *see* FoF ¶ 120.  And VIP's argument (at 20) that consumers will not confuse a dog toy with a bottle of whiskey misses the point.  The question is whether consumers are likely to be confused as to whether Jack Daniel's was the source of or sponsored or approved Bad Spaniels, not whether the Bad Spaniels dog toy *is* Jack Daniel's whiskey.  3 McCarthy § 23:5 & nn.9-12.  That consumers will exercise a low degree of care when purchasing inexpensive dog toys makes confusion likely, particularly in light of the wide variety of Jack Daniel's licensed products.  The "fact that the goods themselves are different"—dog toys vs. whiskey and licensed merchandise—does not "compel a conclusion that consumers may not confuse the origin" of the products.  *Recot*, 214 F.3d at 1329.

## II.    Jack Daniel's Proved Dilution by Tarnishment.

### A.    This Court Should Re-Adopt Its Dilution Findings.

As Jack Daniel's explained in its opening brief, this Court already has considered and ruled upon every issue relevant to Jack Daniel's dilution claim.  *See* Jack Daniel's Br. at 8-9.  In its brief, VIP rehashes arguments this Court already rejected and also attempts to inject new arguments that it waived long ago.  None of VIP's arguments has merit.

1.    First, VIP argues (at 26) there is no evidence of "actual tarnishment."  But no such evidence is required.  As VIP concedes (at 26), the statute expressly prohibits uses of marks that are "likely" to cause dilution by tarnishment.  15 U.S.C. § 1125(c)(1).

As to likely tarnishment, VIP seeks to relitigate this Court's prior findings, which credited the opinions of Jack Daniel's dilution expert, Dr. Itamar Simonson.  For example, VIP argues (at 26) that Dr. Simonson relied solely on his "subjective impression" that Bad Spaniels was likely to tarnish the reputation of Jack Daniel's marks.  But this Court already rejected that argument.  *See* ECF 242 at 13-14, 33-34.  As this Court explained, Dr. Simonson based his opinions on the "Associative Network Model," which "has been empirically tested and verified numerous times since the 1970's."  FoF ¶ 48.[5]  In applying that model,

---

[5] At trial, VIP's expert conceded he was not "taking issue[]" with the Associative Network Model in general and was challenging only the application of it.  ECF 244 at 33.

Dr. Simonson relied on "consumer psychology research to establish that when you associate any food or beverage with defecation, you are creating disgust in the mind of the consumer." FoF ¶ 51. Accordingly, "[w]ell documented empirical research" supports the conclusion that associating Jack Daniel's whiskey with dog poop "creates disgust in the mind of the consumer." *Id.* VIP provides no basis for revisiting that conclusion.

VIP also faults Dr. Simonson (at 26-27) for not conducting "surveys or focus groups" and touts the "focus groups" conducted by its expert, Bruce Silverman. But a plaintiff is not required to present survey evidence to establish likely dilution. *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1091 (9th Cir. 2010). And this Court already determined that Mr. Silverman's focus groups were "flawed" because the moderator gave the participants biased instructions that "tainted" the results. FoF ¶ 57. Here, too, VIP offers no basis for revisiting the Court's conclusion.

VIP next argues (at 26) that Dr. Simonson did not account for the "facts" that (i) Bad Spaniels is a "parody" and (ii) certain kinds of poop are "wholesome." VIP, however, waived those arguments by failing to raise them before the original judgment or on appeal. *See Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 949-50 (C.D. Cal. 1996); Jack Daniel's Br. 22 (collecting cases). VIP's new arguments are also meritless. As to the first argument, Dr. Simonson acknowledged in his report that Bad Spaniels was an "alleged 'parody'" and relied on scholarship examining tarnishment when "a name is used as a parody of the original mark." ECF 144-1 at 5-6. Further, as Jack Daniel's explained in its opening brief (at 17) and above, Bad Spaniels was at most a generic parody that would apply to any brand for taking itself "too seriously." The toy was not "such a clear parody" of Jack Daniel's that its nature should weigh against likely dilution. *See Starbucks*, 588 F.3d at 113. As to the second argument, VIP cites no evidence, expert or otherwise, that consumers consider certain kinds of poop "wholesome," much less that associating a food or beverage with those kinds of poop is unlikely to cause disgust.

      2.      Second, VIP (at 27) contends that Bad Spaniels is not diluting because the

1   product "itself" is "innocuous" and the "only allegedly tarnishing aspect is [its] speech

2   component." VIP appears to be suggesting that *products* themselves can dilute but that

3   trademark uses *on* products cannot. But VIP waived any such argument by failing to raise

4   it at any prior stage. And the argument has no basis in the statute or precedent. The dilution

5   statute prohibits the "use of a *mark or trade name* in commerce that is likely to cause

6   dilution," not the sale of a *product* that is likely to cause dilution. 15 U.S.C. § 1125(c)(1)

7   (emphasis added). Courts for decades have enjoined diluting uses of trademarks, regard-

8   less of whether the product itself was allegedly "innocuous." *See, e.g.*, *Coca-Cola v. Gem-*

9   *ini Rising, Inc.*, 346 F. Supp. 1183, 1188 (E.D.N.Y. 1972) (poster saying "Enjoy Co-

10  caine"); *Anheuser-Busch Inc. v. Andy's Sportswear Inc.*, 1996 WL 657219, at *1 (N.D.

11  Cal. Aug. 28, 1996) (t-shirts saying "Buttwiser"). Indeed, VIP's argument (at 27) that the

12  "product" itself, rather than its "speech component," must dilute makes no sense in light

13  of cases finding dilution in context of movies or commercials; in those cases, dilution oc-

14  curs precisely because of the "speech component" of the use. *See, e.g.*, *Dallas Cowboys*

15  *Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F. Supp. 366, 377 (S.D.N.Y.), *aff'd*, 604

16  F.2d 200 (2d Cir. 1979); *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 45 (2d Cir. 1994).

17       Nor is VIP correct (at 27) to suggest that tarnishment must "involve[] the use of

18  marks on *sex- or drug-related products*." While the dilution statute certainly applies in

19  cases involving sex and drugs, it is not limited to those situations. Subject to certain ex-

20  clusions, the statute broadly applies to any use of a mark in commerce that is likely to cause

21  an "association" that "harms the reputation of the famous mark." 15 U.S.C. §§ 1125(c)(1),

22  (c)(2)(C). Tarnishment of a mark's reputation can occur "through a variety of uses," not

23  just those associated with "sexual activity, obscenity, or illegal activity." *Hormel Foods*,

24  73 F.3d at 507. Courts regularly enjoin uses that create other incompatible associations,

25  similar to the association between whiskey and dog poop. *See e.g.*, *Chem. Corp. of Am. v.*

26  *Anheuser-Busch, Inc.*, 306 F.2d 433, 437-38 (5th Cir. 1962) (beer and insecticide); *Origi-*

27  *nal Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031, 1039-40

28

(N.D. Ga. 1986) (children's toys and garbage); *Steinway & Sons v. Robert Demars & Friends*, 1981 WL 40530, at *6 (C.D. Cal. Jan. 28, 1981) (high-end pianos and beverage-can handles).

There also is no merit to VIP's suggestion (at 28) that the dilution statute requires "evidence of tarnishment by association with *underlying activity*." The statute is not limited to associations with tarnishing activities (as opposed to things). And even if it were, Jack Daniel's proved that Bad Spaniels associates Jack Daniel's products with an incompatible activity (dogs pooping). VIP's designer, Eleanor Phillips, confirmed that she designed the toy to reference the activity of "[g]oing poop." ECF 234 at 150. VIP's argument also is hopelessly semantic because virtually any "thing" could be reframed as an "activity": an "Enjoy Cocaine" poster tarnishes because it associates Coca-Cola with an activity (enjoying drugs) as well as a thing (drugs).[6]

3.      Third, VIP argues (at 2, 28-30) that dilution requires a "specific mark-to-mark comparison," that only one of its marks ("the Old No. 2") is potentially tarnishing, and that Jack Daniel's failed to prove that its "correlative" mark ("Old No. 7") is sufficiently famous. That argument fails for four reasons. *First*, VIP waived any such argument by failing to raise it on appeal. VIP never previously argued that dilution requires this sort of one-to-one matchup. And in the prior proceedings, this Court found that *all* of Jack Daniel's trademarks, including Old No. 7, were famous, and VIP did not challenge those findings on appeal. *See* FoF ¶¶ 25-27; Jack Daniel's Br. 9 n.3. If anything, VIP embraced those findings on appeal by referring to Bad Spaniels as a "parody of the famous and iconic Jack Daniel's black label whiskey." Case No. 18-16012, ECF 16 at 1 (9th Cir.) (VIP's

---

[6] The only case VIP cites (at 28) for this proposition does not support it. *See N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 69 F. Supp. 2d 479 (S.D.N.Y. 1999), *aff'd in part and rev'd in part*, 293 F.3d 550 (2d Cir. 2002). There, the New York Stock Exchange sued a casino for dilution regarding the casino's "New York $lot Exchange" display and player's club. *See* 293 F.3d. at 553-54. The Second Circuit held that the casino diluted its marks by drawing an analogy between stock trading and gambling. *See id.* at 558. Nowhere does that case purport to announce a rule that, in every case, a dilution plaintiff must prove an association with an "underlying activity."

1    Opening Brief).  Having waived this new argument and any challenge to the fame of Jack

2    Daniel's trademarks (including Old No. 7) on appeal, VIP may not revive that issue on

3    remand.  *See M2 Software Inc. v. Viacom Inc.*, 223 F. App'x 653, 656 (9th Cir. 2007).

4        *Second*, on the merits, this Court also found that Bad Spaniels is likely to tarnish by

5    associating Jack Daniel's whiskey with "toys" that "might appeal to children."  FoF ¶¶ 58,

6    61.  All of VIP's similar marks and trade dress appearing on the toy create this harm.

7        *Third*, Jack Daniel's dilution claim is not limited to VIP's use of "Old No. 2."

8    Marks that are perfectly benign on their face dilute when they create harmful associations

9    with famous marks.  *See, e.g.*, *Polo Ralph Lauren L.P. v. Schuman*, 1998 WL 110059, at

10   *1-2 (S.D. Tex. Feb. 9, 1998) ("THE POLO CLUB" adult entertainment diluted Polo

11   Ralph Lauren's mark); *Cmty. Fed. Sav. & Loan Ass'n v. Orondorff*, 678 F.2d 1034, 1035-

12   36 (11th Cir. 1982) ("ANNIE'S COOKIE JAR" adult-entertainment bar diluted bank's

13   "COOKIE JAR" mark).  All of VIP's Bad Spaniels marks associate all of Jack Daniel's

14   famous marks with poop, regardless of whether the marks themselves reference poop.

15       *Fourth*, VIP ignores that the dilution statute provides a cause of action for *trade*

16   *dress* infringement as well as trademark infringement.  15 U.S.C. § 1125(c)(4) (providing

17   special rules for trade-dress dilution claims); 3 McCarthy § 24:102 ("Any doubts about

18   trade dress qualifying as a 'mark' under the [Federal Trademark Dilution Act of 1995]

19   were put to rest in the [Trademark Dilution Revision Act of 2006.]").  This Court already

20   found, correctly, that Jack Daniel's demonstrated a likelihood of dilution as to its "trade-

21   mark *and trade dress*."  *See* FoF ¶¶ 25-27, 30-31, 34-37, 41, 53, 58-63.  VIP does not (and

22   cannot credibly) dispute the fame of the Jack Daniel's trade dress.

23       The Court can, and should, reinstate its earlier dilution findings, which are sufficient

24   to support a judgment in Jack Daniel's favor.

25       **B.    VIP's Waived Facial Constitutional Challenge Lacks Merit.**

26       Because it has no remaining defense to dilution, VIP seeks to raise for the first time

27   in this litigation a facial constitutional challenge to the dilution statute.  In particular, it

28   contends (at 20-25) that the statute's prohibition on dilution by tarnishment amounts to

18

1    viewpoint discrimination.  As Jack Daniel's explained in its opening brief (at 21-25), how-

2    ever, VIP waived any such challenge by failing to raise it at any point over the past ten

3    years.  VIP's eleventh-hour challenge also is meritless:  the dilution statute does not dis-

4    criminate based on viewpoint and leaves open ample alternative avenues for expression.

### 1.  *VIP Waived Its Facial Constitutional Challenge.*

6    As an initial matter, this Court need not and should not entertain VIP's constitu-

7    tional challenge because VIP plainly waived it.  VIP failed to raise any such challenge

8    before this Court during the trial-level proceedings from 2014 to 2018, before the Ninth

9    Circuit during the first appeal in 2018, or during subsequent phases of the case from 2019

10   to 2023.  *See* Jack Daniel's Br. 23.  As VIP concedes and this Court recognized, VIP "first

11   raised its constitutional challenge before this Court in its Opening [Remand] Brief on Feb-

12   ruary 16, 2024."  ECF 347 at 2-3 (VIP's Rule 5.1 Reply); *see* ECF 354 at 2.  As Jack

13   Daniel's explained in its opening brief (at 22-23), where (as here) a party waives an issue

14   at the trial level or on appeal, a district court should decline to consider that issue for the

15   first time on remand.

16   Remarkably, VIP does not squarely address the issue of waiver in its opening brief,

17   despite waiver being a major topic at the recent status conference.  Instead, VIP merely

18   hints at two reasons the Court should entertain its untimely challenge, but neither has merit.

19   *First*, VIP (at 1) asserts that a general remand means there is "no limitation on the

20   Court's ability to entertain arguments."  That misstates the law.  "[A]n issue or factual

21   argument waived at the trial level before a particular order is appealed, or subsequently

22   waived on appeal, cannot be revived on remand."  *Magnesystems*, 933 F. Supp. at 949-50.

23   As one of VIP's own cases explains, "[a]lthough lower courts are free to decide new issues

24   left open on remand, [courts] must also consider whether an issue not previously raised is

25   deemed waived, and therefore, not within the scope of remand."  *United States v. Castel-*

26   *lanos*, 608 F.3d 1010, 1017 (8th Cir. 2010) (cited in VIP's Rule 5.1 Reply, ECF 347 at 3).[7]

---

27   [7] As Jack Daniel's explained in its Rule 5.1 surresponse, VIP's cases are distinguishable.

28   In *Castellanos*, the court found that a newly raised argument was not waived because it

A party thus may not use a remand as "another bite at the apple" to raise arguments it could have raised long ago, as VIP is attempting to do here. *Sec. Inv. Prot. Corp. v. Vigman*, 74 F.3d 932, 938 (9th Cir. 1996).

*Second*, VIP asserts (at 1-2) that the Supreme Court's decision in *Iancu v. Brunetti*, 588 U.S. 388 (2019) "changed" the "legal context." As Jack Daniel's explained in its opening brief (at 23-25), VIP is incorrect. *Brunetti* merely followed the reasoning of *Matal v. Tam*, 582 U.S. 218 (2017)—which was decided in June 2017, months *before* the trial in this case. Moreover, *Tam* itself relied on a longstanding, "bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." *Tam*, 582 U.S. at 223 (plurality op.); *accord id.* at 248 (Kennedy, J., concurring). Even now, VIP cites decades-old cases discussing that principle. *See* VIP Br. 22-23 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)). VIP also concedes that the alleged unconstitutionality of the dilution statute is "by no means a new thought" and cites academic articles dating back to *2014*. VIP Br. 22 (citing Ashutosh Bhagwat, *Truthiness: Corporate Public Figures & The Problem of Harmful Truths*, 99 Minn. L. Rev. 297, 310 (2014)). VIP thus cannot credibly contend that *Brunetti* (or *Tam*) changed the legal landscape. Like the parties in those cases, VIP could have raised a challenge years ago, but it failed to do so.

### 2. VIP's Facial Constitutional Challenge Is Meritless.

Even if this Court were to consider VIP's waived challenge, its challenge is meritless. To start, VIP does not even attempt to satisfy the stringent standard for a facial con-

---

was within the scope of a previously raised argument and related to an issue arising anew on remand. 608 F.3d at 1017-20. Neither circumstance is present here. In *Liberty Mutual Insurance Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982), a party contested in a previous appeal the district court's denial of costs, but the Ninth Circuit's decision in that appeal was silent on that issue. *Id.* In those circumstances, the Ninth Circuit held on a subsequent appeal that its prior decision was not law of the case on the denial of costs. *Id.* Here, in contrast, VIP did *not* raise any challenge to the dilution statute before the 2018 judgment or on appeal.

stitutional challenge.  "Facial challenges are disfavored" because they "often rest on speculation" about the sweep of the challenged law, run contrary to principles of judicial restraint, and "threaten to short circuit the democratic process." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008).  To prevail on a facial constitutional challenge, VIP must "establish that no set of circumstances exists under which the [dilution provision] would be valid, or show that the law lacks a plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (cleaned up).

Here, VIP claims (at 21) the tarnishment provision of the dilution statute is viewpoint discriminatory.  But VIP does not, and cannot, attempt to prove that *all* tarnishment claims constitute viewpoint discrimination.  As VIP acknowledges (at 27), tarnishment claims can arise when a defendant associates a famous mark with an "inferior" product.  *See Starbucks*, 588 F.3d at 111 ("products of shoddy quality"); *see Steinway & Sons*, 1981 WL 40530, at *6 ("inexpensive, mass-produced products").  Using a famous mark on low-quality goods is not a "viewpoint."  VIP's facial challenge fails from the outset.

As Jack Daniel's argued in its opening brief (at 25-29), VIP's argument also fails because the dilution statute validly establishes an intellectual property right, while leaving open alternative avenues of expression.  Such intellectual property rights are subject to reduced First Amendment scrutiny because they merely impose incidental restrictions on expression and create incentives to create and disseminate ideas, thereby furthering countervailing First Amendment interests.  The dilution statute easily satisfies reduced constitutional scrutiny because its incidental restrictions on expression are no greater than necessary to further these substantial governmental interests.

> a.    *Intellectual Property Laws, Including Trademark Laws, Are Subject to Diminished Constitutional Scrutiny.*

1.    The Court should reject VIP's invitation (at 21-25) to apply strict scrutiny to a statute, like the dilution statute, that protects intellectual property.  It is well established that restrictions on speech "that embod[y] intellectual property" receive only "diminished First Amendment scrutiny."  Robert C. Post & Jennifer E. Rothman, *The First Amendment*

1    *and the Right(s) of Publicity*, 130 Yale L.J. 86, 134 (2020).  For example, in *Harper &*

2    *Row Publishers, Inc. v. Nation Enterprises*, the Supreme Court held the First Amendment

3    did not insulate a magazine from copyright liability for publishing a public figure's work.

4    471 U.S. 539, 555-60 (1985).  The Court emphasized that copyrights protect only the form

5    of expression, while permitting others to convey the "ideas or the facts" contained in the

6    copyrighted work.  *Id.* at 556.  As the Court explained, copyrights serve First Amendment

7    interests because they function as an "engine of free expression."  *Id.* at 558.  "By estab-

8    lishing a marketable right to the use of one's expression, copyright supplies the economic

9    incentive to create and disseminate ideas."  *Id.*  And by granting authors the right to prohibit

10   others from using their works, copyright law vindicates authors' First Amendment rights

11   "to refrain from speaking."  *Id.* at 554 (citation omitted).  Because the Copyright Act serves

12   these "countervailing First Amendment value[s]" and contains its own "First Amendment

13   protections," the First Amendment provides no defense to infringement.  *See id.* at 560.

14        Similarly, in *Eldred v. Ashcroft*, the Supreme Court upheld the constitutionality of

15   a federal statute extending the duration of copyright protection.  537 U.S. 186, 193 (2003).

16   In so doing, the Court "reject[ed] petitioners' plea for imposition of uncommonly strict

17   scrutiny" on the copyright statute.  *Id.* at 218-19.  The Court observed that "[t]he Copyright

18   Clause and First Amendment were adopted close in time," indicating that the Framer's

19   viewed "copyright's limited monopolies" as "compatible with free speech principles."  *Id.*

20   at 219.  The Court further explained that "copyright's purpose is to *promote* the creation

21   and publication of free expression."  *Id.* at 219.  The Court added that copyright law also

22   "contains built-in First Amendment accommodations," including the distinction "between

23   ideas and expression" and the fair-use defense.  *Id.* at 219-20.

24        The Court reached a similar result in *Zacchini v. Scripps-Howard Broadcasting Co.*,

25   holding that the First Amendment did not shield a broadcaster from liability under a com-

26   mon-law right of publicity for broadcasting an individual's performance.  433 U.S. 562,

27

28

565-75 (1977).  The Court reasoned that the right of publicity created a "proprietary interest" in the performance, serving an interest "closely analogous to the goals of patent and copyright law." *Id.* at 573.  The right of publicity "provides an economic incentive … to make the investment required to produce a performance of interest to the public." *Id.* at 576.  The Court reasoned that the Constitution "no more prevents" liability for violating the right of publicity than it prevents liability for infringing copyrights. *Id.* at 575.

2.      These principles apply with full force to trademark rights.  Much like copyrights, trademarks have "ancient origins" and "were protected at common law and in equity at the time of the founding of our country." *Tam*, 582 U.S. at 224 (quoting 3 McCarthy § 19:8).  Trademarks grant owners a limited "property right" in a mark to identify their source of their goods. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916).  By granting such a property right, trademark law "secure[s] to the owner of the mark the goodwill of his business" and "protect[s] the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).

Like other intellectual property rights, trademarks advance countervailing First Amendment interests.  "[T]rademarks are often expressive, in any number of ways." *Jack Daniel's*, 599 U.S. at 158.  And "[c]ompanies spend huge amounts to create and publicize trademarks that convey a message." *Matal*, 582 U.S. at 239.  Trademarks "enabl[e] producers … to differentiate themselves" when conveying these messages. *TE-TA-MA Truth Found.—Fam. of URI, Inc. v. World Church of the Creator*, 297 F.3d 662, 667 (7th Cir. 2002).

Trademark dilution statutes build upon the historical foundations of trademark law.  Beginning in the mid-twentieth century, states began enacting statutes protecting trademarks from dilution. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 430 (2003).  Such statutes prevent uses that, while not confusing, still diminish the "selling power" of marks. *Id.* at 428-29 & n.9 (citation omitted).  In particular, such laws prohibit uses of marks that are likely to cause "injury to business reputation" (dilution by "tarnishment") or "dilution

of the distinctive quality of a trade name or trademark" (dilution by "blurring").  *Id.* at 430, 432 (citations omitted); *see* 3 McCarthy § 24:67.  In 1995, Congress adopted a federal statute providing a remedy for dilution of famous marks.  As amended, the statute prohibits persons from using "a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark."  15 U.S.C. § 1125(c)(1).

3.    Like other intellectual property rights, trademark rights are subject only to diminished constitutional scrutiny.  Indeed, in *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522 (1987) ("*SFAA*"), the Supreme Court upheld a federal trademark statute, the Amateur Sports Act, which was essentially a dilution statute.  That statute granted the U.S. Olympic Committee ("USOC") a limited property right to prevent others from using the word "Olympic" for trade purposes, "without regard to whether an unauthorized use of the word tends to cause confusion."  *Id.* at 529-30.  Notably, that statute (unlike the Copyright Act or the dilution statute here) did not contain a fair-use exclusion or other built-in First Amendment accommodations.  *Id.*

The Supreme Court had little difficulty finding that trademark statute constitutional.  The Court reasoned that, by prohibiting certain uses of "Olympic," the statute did not pro-hibit the plaintiff group from "conveying its message."  *Id.* at 536.  Instead, the statute restricted "only the manner" in which the group could do so.  *Id.*  Accordingly, the Court applied the reduced form of scrutiny applicable to time, place, and manner restrictions.  *Id.* at 536-37 (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).[8]  In particular, the "appropriate inquiry" was "whether the incidental restrictions on First Amendment free-doms are greater than necessary to further a substantial governmental interest."  *Id.*

Applying that test, the Court concluded that the statute furthered a substantial gov-ernmental interest in "ensur[ing] that the USOC receives the benefits of its … efforts" to promote the Olympics, so that it would "have an incentive to continue to produce a 'quality

---

[8] The Court noted that the same result would obtain under the test for commercial speech articulated in *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557, 566 (1980).  *See SFAA*, 483 U.S. at 537 n.16.

24

product.'"  *Id.* at 537.  The Court further concluded that the statute's restrictions on speech were no broader than necessary, even though the statute did not require proof of likely confusion.  *Id.* at 539.  The Court reasoned that "Congress reasonably could conclude that most commercial uses of the Olympic words and symbols are likely to be confusing."  *Id.* Congress "also could determine that unauthorized uses, even if not confusing, nevertheless may harm the USOC by lessening the distinctiveness and thus the commercial value of the marks"—in other words, by diluting the marks.  *Id.*

### b.    *The Dilution Statute Easily Satisfies Reduced Scrutiny.*

From the Supreme Court's holding in *SFAA*, it follows *a fortiori* that the dilution statute at issue here is constitutional.  As discussed below, the dilution statute furthers the same governmental interests as the statute in *SFAA* and is even less restrictive because it contains a number of built-in First Amendment accommodations.

1.    To begin with, the dilution statute here, like the one in *SFAA*, does not pre-vent defendants from conveying any message.  VIP, for example, is free to continue mak-ing dog-poop jokes.  And it can even sell generic whiskey bottle toys depicting dogs and saying "43% POO by VOL." or "100% SMELLY."  The dilution statute merely restricts defendants from conveying messages in a particular manner—namely, by using "a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tar-nishment of [a] famous mark."  *See* 15 U.S.C. § 1125(c)(1).  The dilution statute is there-fore subject to, at most, reduced constitutional scrutiny.  *See SFAA*, 483 U.S. at 536-37.

2.    The dilution statute furthers a substantial governmental interest.  Although VIP claims (at 23) it is "difficult to identify" Congress's goal in enacting the dilution stat-ute, the statute plainly serves the same interest as the statute in *SFAA*.  The dilution statute protects the "commercial value" of famous marks by prohibiting uses that dilute those marks.  *SFAA*, 483 U.S. at 539; *see also Moseley*, 537 U.S. at 428-29 & n.9 (dilution stat-utes protect the "selling power" of marks).  In so doing, the dilution statute ensures famous mark owners "receive[] the benefit" of the investments in their marks and thus have "an

1    incentive to continue to produce a 'quality product.'" *SFAA*, 483 U.S. at 537.

2    Ignoring *SFAA*, VIP asserts (at 24) that "protecting a company's investment in fa-

3    mous marks" cannot "justify stifling the speech of others." But the dilution statute does

4    not "stifle" VIP's purported message; as noted, it merely restricts *the manner* in which VIP

5    may convey that message. Further, VIP's reliance on *Arizona Free Enterprise Club's*

6    *Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011), is misplaced. That case involved a

7    statute regulating campaign speech, a context in which "the First Amendment has its fullest

8    and most urgent application." *Id.* at 734 (cleaned up). Specifically, the statute created a

9    campaign funding scheme whereby funds were allocated to publicly funded candidates

10   depending on the expenditures of privately funded candidates. *Id.* at 727-28. The statute

11   effectively imposed a "penalty" on privately funded candidates' speech by providing a

12   corresponding "advantage[] for [their] opponents." *Id.* at 736-37 (citation omitted). In

13   contrast, the dilution statute simply prevents VIP from using a mark in commerce in way

14   that likely dilutes Jack Daniel's famous marks. It does not regulate, much less "penal[ize],"

15   campaign speech.

16   VIP further asserts (at 23-25) that the dilution statute does not serve sufficiently

17   important interests because it does not require "proof of actual confusion." But that argu-

18   ment proves far too much, as even the Lanham Act's infringement provisions do not re-

19   quire proof of *actual* confusion. 15 U.S.C. § 1125(a). Furthermore, in *SFAA*, the Court

20   upheld a dilution statute that did not require proof of any confusion, actual or likely. 483

21   U.S. at 539. The Court reasoned that Congress "could determine that unauthorized uses,

22   even if not confusing, nevertheless may harm the [mark owner] by lessening the distinc-

23   tiveness and thus the commercial value of [its] marks." *Id.* The same applies here.

24   3.    The dilution statute's restrictions also are no "greater than necessary to fur-

25   ther" these substantial interests. *Id.* at 537 (citing *O'Brien*, 391 U.S. at 377). *First*, the

26   dilution statute is limited to "famous" marks, making it far narrower than trademark in-

27

28

fringement.  15 U.S.C. § 1125(c)(1).  As the Ninth Circuit has explained, the dilution stat-ute is "reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value."  *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999).  Congress thus "carefully limit[ed] the class of trademarks eligible for dilution protection."  *Id.*

*Second*, the statute (as amended) requires plaintiffs to prove that defendants' use of a similar mark is likely to cause dilution.  15 U.S.C. § 1125(c)(1).  Similar to the likelihood-of-confusion test for infringement, the likelihood-of-dilution test "tends to ensure that the feared harm will in fact take place."  *United States v. Alvarez*, 567 U.S. 709, 738 (2012) (Breyer, J., concurring).

VIP contends (at 24-25) that the current dilution statute is not the least restrictive means of accomplishing Congress's aims because an earlier version of the statute required *actual* dilution.  In amending the statute, however, Congress determined that the actual dilution test did not adequately protect famous markholders because "by the time measur-able, provable damage to the mark has occurred much time has passed, the damage has been done, and the remedy, which is injunctive relief, is far less effective."  H.R. Rep. No. 109-23, at 5 (2005) (cleaned up).  Further, in *SFAA*, the Supreme Court upheld a statute that did not require proof of even *likely* dilution, much less actual dilution.  483 U.S. at 539.  Thus, the dilution statute here, which requires likely dilution, is constitutional.

VIP also complains (at 23) that the dilution statute lacks "trade defamation's re-quirement of falsity and scienter."  But VIP cites no authority suggesting that an *intellec-tual property* statute must have such elements.  To the contrary, in *SFAA*, the Court upheld a trademark statute lacking such defamation elements.  483 U.S. at 530.  And in *Zacchini*, the Court rejected the defendant's attempt to extend defamation precedents to a case in-volving an intellectual property right.  433 U.S. at 574.

*Third*, the dilution statute (like the Copyright Act) contains "built-in First Amend-ment accommodations."  *Eldred*, 537 U.S. at 219.  In other words, the statute leaves open

"adequate alternative avenues of communication." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972). As explained, the statute regulates only a manner of expression (using marks in commerce in a way likely to dilute) and does not prohibit any message. Furthermore, the statute broadly excludes from dilution liability "[a]ny fair use" of a mark, including "parodying, criticizing, or commenting upon" the famous mark, as long as the person does not use the mark "as a designation of source for the person's own goods or services." 15 U.S.C. § 1125(c)(3)(A)(ii). The statute also excludes "[a]ll forms of news reporting and news commentary," as well as "[a]ny noncommercial use of a mark." *Id.* §§ 1125(c)(3)(B), (C). In contrast, the statute upheld in *SFAA* contained no similar exclusions. 483 U.S. at 530. Again, it follows *a fortiori* that the dilution statute here is constitutional.

### c.    The Dilution Statute Is Viewpoint Neutral.

Ignoring the precedents above, VIP contends (at 20-21) that the dilution statute is subject to strict scrutiny because it discriminates on the basis of viewpoint. VIP argues (at 21) that the statute's tarnishment provision is viewpoint discriminatory because "speech that burnishes is permissible, while speech that tarnishes is subject to injunction."

VIP is incorrect. Viewpoint discrimination occurs when "the government has singled out a subset of messages for disfavor *based on the views expressed*." *Tam*, 582 U.S. at 248 (Kennedy, J., concurring) (emphasis added). The dilution statute does not prohibit uses based on the views expressed. The statute defines "dilution by tarnishment" as an "*association* arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C) (emphasis added). The statute thus prohibits using a mark in a way that "conjure[s] associations that clash with the associations generated" by the famous mark. *L.L. Bean*, 811 F.2d at 31.

Whether such an incompatible association exists does not depend on the viewpoint expressed. For example, the dilution statute would prohibit associating beer with insecticide, regardless of whether the diluter takes a negative, positive, or neutral view of beer. *See Chem. Corp. of Am.*, 306 F.2d at 436. The *incompatible association itself* undermines

the reputation of the brand.  Similarly, associating a poop-themed toy with Jack Daniel's whiskey undermines the Jack Daniel's reputation, regardless of whether VIP has a positive, negative, or neutral view of Jack Daniel's.  What matters is that VIP created incompatible associations between (1) "canine excrement" and a product for "human consumption" and (2) toys that "appeal to children" and "whiskey."  FoF ¶¶ 58, 60.  The statute is indifferent to VIP's opinions or beliefs, so it does not discriminate on the basis of viewpoint.

VIP's reliance (at 21) on *Tam* and *Brunetti* is misplaced.  To begin with, neither of those cases involved a statute, like the one here, that protects one party's intellectual property against exploitation by others and thus advances countervailing First Amendment interests.  Instead, those cases involved provisions concerning whether *the government* would register certain marks—a question in which the government itself had no speech interest.  *See Tam*, 582 U.S. at 239 (rejecting argument that registration is "government speech").  Furthermore, the provisions there barred the government from registering marks that are "disparag[ing]," "immoral," or "scandalous."  15 U.S.C. § 1052(a).  Those provisions necessarily required the government to consider an applicant's viewpoint when deciding whether to grant the benefits of trademark registration.  Here, in contrast, the dilution statute protects all famous marks (regardless of the owner's viewpoint) against uses that create incompatible associations (regardless of the diluter's viewpoint).  Thus, there is no merit to VIP's claim (at 21) that the dilution statute is a "happy-talk clause."  The dilution statute evenhandedly protects famous marks, irrespective of viewpoints.[9]

The dilution statute is not viewpoint discriminatory for an additional reason.  The Supreme Court has made clear that "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists."  *R.A.V.*, 505 U.S. at 388.  "Such

---

[9] VIP scrapes the barrel to find academic support for its argument.  Its leading article authority is a law-student article providing "practical tips" for marijuana producers to steal famous brand names for marijuana products.  *See* John Gilbertson, *Blunt Advice: A Crash Course in Cannabis Trademarks*, 60 IDEA: L. Rev. of Franklin Pierce Ctr. for Intell. Prop. 502, 503 (2020).

a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class." *Id.*; *see* Jack Daniel's Br. 27.

Here, as Jack Daniel's explained in its opening brief (at 27-28), *SFAA* establishes that Congress may categorically prohibit others from making trademark use of a famous mark in order to protect the mark's goodwill. It follows that Congress may more narrowly prohibit the subclass of uses (namely, those uses that are likely to blur or tarnish) that are particularly likely to harm the famous mark's reputation. There is no impermissible viewpoint discrimination because the reason for that distinction "consists entirely of the very reason" that the "entire class" of trademark uses is "proscribable." *R.A.V.*, 505 U.S. at 388.

It therefore is no answer for VIP to complain (at 25) that the dilution statute is "underinclusive" because uses that fall within its "statutory exclusions" can be "equally damaging to brand recognition." Under *R.A.V.*, Congress may choose to prohibit certain trademark uses, while permitting others. *See id.* And the fact that the statute contains exclusions to accommodate First Amendment interests counts *in favor* of, not against, its constitutionality. *Eldred*, 537 U.S. at 219 (emphasizing "built-in First Amendment accommodations").

Finally, even if strict scrutiny applied (it does not), the dilution statute still would be constitutional. The statute furthers a compelling governmental interest by ensuring that famous mark owners "receive[] the benefit of [their] own efforts" and thus "will have an incentive to continue to produce a 'quality product,' that, in turn, benefits the public." *SFAA*, 483 U.S. at 537. And the statute is narrowly tailored to achieve that interest, as explained above (at 26-28). The dilution statute thus satisfies any level of scrutiny. As the First Circuit put it, "[t]he Constitution is not offended" where, as here, an "anti-dilution statute is applied to prevent a defendant from using a trademark without permission in order to merchandise dissimilar products or services." *L.L. Bean*, 811 F.2d at 31.

## CONCLUSION

The Court should deny VIP's motion to enter judgment for VIP. Instead, the Court should reenter judgment in Jack Daniel's favor on both infringement and dilution.

30

1

2

3    Dated:     April 19, 2024            Respectfully submitted,

4                                        */s / Lisa S. Blatt*

5

6    MESSNER REEVES LLC                    WILLIAMS & CONNOLLY LLP
     Isaac S. Crum (AZ Bar #028756)       Lisa S. Blatt (*pro hac vice*)
7    1440 E. Missouri Avenue, Suite C100  Amy Mason Saharia (*pro hac vice*)
     Phoenix, Arizona 85014               Matthew B. Nicholson (*pro hac vice*)
8    (602) 641-6705                       680 Maine Avenue, SW
     icrum@messner.com                    Washington, DC 20024
9                                         (202) 434-5000
                                          lblatt@wc.com
10                                        asaharia@wc.com
                                          mnicholson@wc.com
11

12
     *Attorneys for Defendant and Counter-Plaintiff*
13   *Jack Daniel's Properties, Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

1

## **CERTIFICATE OF SERVICE**

2

 I hereby certify that on April 19, 2024, the foregoing document was transmitted to

3

the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

4

Electronic Filing to all CM/ECF registrants.

5

6
            */s/ Lisa S. Blatt*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28