1  Rebecca Tushnet (*pro hac vice*)
   520 Hauser, Harvard Law School
2  1575 Massachusetts Avenue
   Cambridge, MA 02130
3  rtushnet@law.harvard.edu
   Telephone: 703-593-6759
4

5  Gregg P. Leslie
   First Amendment Clinic
6  Public Interest Law Firm
   Sandra Day O'Connor College of Law
7  Arizona State University
   111 E. Taylor St., Mail Code 8820
8  Phoenix, AZ 85004
   Ariz. Bar No. 035040
9  Gregg.Leslie@asu.edu
   Telephone: (804) 727-7398

10

   *Attorneys for Intellectual Property Law Professors*

11

12
   ## UNITED STATES DISTRICT COURT
   ## DISTRICT OF ARIZONA
13

14  VIP Products L.L.C., an Arizona limited     |  No. 2:14-cv-02057-SMM
    liability company
15                      Plaintiff                  **(PROPOSED) AMICUS**
                                                   **BRIEF OF**
16        v.                                       **INTELLECTUAL**
                                                   **PROPERTY LAW**
17  Jack Daniel's Properties, Inc., a             **PROFESSORS**
    Delaware corporation,
                                                   
    
                        Defendant
18  _____
    Jack Daniel's Properties, Inc., a
19  Delaware corporation,
                   Counterclaimant
20        v.

21  VIP Products L.L.C., an Arizona limited
    liability company
22
              Counterdefendant

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF INTEREST OF AMICI CURIAE ...............................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ...........................................................................................4

   I. Tarnishment Is Viewpoint-Based. ...................................................5

   II. Even if Tarnishment Weren't Viewpoint-Based, It Would Be Content-Based
      and Subject to Strict Scrutiny. ..................................................8

     A. The Government Lacks a Constitutionally Sufficient Interest in Banning
        Tarnishment. ...............................................................10

     B. Protecting Reputation Against Nondefamatory Criticism Is Not a
        Legitimate Government Interest ...........................................12

     C. Repackaging The Government's Interest Under Other Labels Fails. ......16

     D. Commercial Use Is Not Relevant to the First Amendment Inquiry ...........18

CONCLUSION .......................................................................................20

Appendix ................................................................................................22

1

# TABLE OF AUTHORITIES

2

**Cases**

3
*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ......................... 8, 11, 16
*Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021)...................15

4
*Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997) ........................................18
*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local*

5
*655*, 39 F.3d 191 (8th Cir. 1994) ........................................................................13
*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ................... passim

6
*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................7
*Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir.

7
1996) ....................................................................................................................17
*City of Austin v. Reagan National Advertising, LLC*, 596 U. S. 61 (2022)..............8

8
*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) .....................17
*Cohen v. California*, 403 U.S. 15 (1971)...........................................................4, 18

9
*Compuware Corp. v. Moody's Investors Servs.*, Inc., 499 F.3d 520 (6th Cir. 2007)

10
....................................................................................................................................13

11
*Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) ...........13
*Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.*, 952 F.2d 1059 (9th Cir. 1990).18

12
*Hurley v. Irish-American Gay, Lesbian & Bisexual Gp.*, 515 U.S. 557 (1995)......18
*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988)........................................... 13, 16

13
*Iancu v. Brunetti*, 139 S.Ct. 2294 (2019)....................................................... 4, 5, 6
*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023). 4, 16, 17

14
*Janus v. American Federation of State, County, & Mun. Employees*, 138 S.Ct.

15
2448 (2018) .........................................................................................................16
*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir.

16
2007) ......................................................................................................................5

17
*Marbury v. Madison*, 5 U.S. 137 (1803)..................................................................3
*Matal v. Tam*, 137 S. Ct. 1744 (2017) ............................................................ passim

18
*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)......................................................2
*National Press Photographers Ass'n v. McCraw*, 2022 WL 939517 (W.D. Tex.

19
Mar. 28, 2022)........................................................................................................8

20
*New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir 1992)......4
*New York Stock Exchange, Inc. v. Gahary*, 196 F.Supp.2d 401(S.D.N.Y. 2002)...13

21
*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)...............................................................3, 6
*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................... 1, 7, 8

22
*San Francisco Arts & Athletics v. U.S. Olympic Committee*, 483 U.S. 522 (1987)..8

ii

*Schoenecker v. Koopman*, 349 F. Supp. 3d 745 (E.D. Wis. 2018)..........................18

*Smith v. California*, 361 U.S. 147 (1959) ....................................................17

*Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union*, 585
    F. Supp. 2d 815 (E.D. Va. 2008) ........................................................13

*Snyder v. Phelps*, 562 U.S. 443 (2011)........................................................12

*Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97 (2d Cir. 2009).........5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ....................14

*U.S. v. United Foods, Inc.*, 533 U.S. 405 (2001)............................................17

*United States v. Alvarez*, 567 U.S. 709 (2012) ...............................................14

*United States v. Mongol Nation*, 370 F. Supp. 3d 1090 (C.D. Cal. 2019) .............14

*United States v. Stevens*, 559 U.S. 460 (2010) .............................................2, 9

*V Secret Catalogue, V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382, 389 (6th
    Cir. 2010)..................................................................................10

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2d Cir. 2018) ...........................5, 7

**Statutes**

15 U.S.C. § 1116...................................................................................10

15 U.S.C. § 1125(c)(1)............................................................................9

15 U.S.C. § 1125(c)(3)(C) ......................................................................17

15 U.S.C. §1052(a) ................................................................................3

**Other Authorities**

Laura R. Bradford, *Emotion, Dilution, and the Trademark Consumer*, 23 Berkeley
    Tech. L.J. 1227, 1237 (2008)..............................................................14

Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L. Rev. 473,
    486 (2013) .................................................................................15

Laura A. Heymann, *Metabranding and Intermediation: A Response to Professor
Fleischer*, 12 Harv. Negot. L. Rev. 201, 218–19 (2007)......................................9

https://www.dictionary.com/browse/disparage ...........................................6

https://www.dictionary.com/browse/tarnish ...............................................6

https://www.merriam-webster.com/dictionary/demeaning .................................3

Mary LaFrance, No Reason to Live: Dilution Laws as Unconstitutional
    Restrictions on Commercial Speech, 58 S.C. L. REV. 709, 719 (2007).............11

Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in
Intellectual Property Cases*, 48 Duke L.J. 147, 221 n. 325 (1998).....................11

Jake Linford, Justin Sevier, & Allyson Willis, *Trademark Tarnishmyths*, 55 Ariz.
    St. L.J. 609, 618 (2023) ..................................................................10

Mark P. McKenna, Dilution and Free Speech in the U.S., Reprise,
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3352090 (2019) ................6

Maureen Morrin & Jacob Jacoby, *Trademark Dilution: Empirical Measures for an
    Elusive Concept*, 19 J. Pub. Pol'y & Marketing 265, 274 (2000) ......................14

Lisa P. Ramsey, Free Speech Challenges to Trademark Law After Matal v. Tam,
    56 Hous. L. Rev. 401, 429 (2018) ........................................................................11

Jennifer E. Rothman, *Commercial Speech, Commercial Use, and the Intellectual
    Property Quagmire*, 101 Va. L. Rev. 1929 (2015)................................................17

Rebecca Tushnet, Gone in 60 Milliseconds: Trademark Law and Cognitive
    Science, 86 TEX. L. REV. 507, 554-58 (2008)......................................................6

Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent
    Judgment Review in Copyright Cases*, 107 Yale L.J. 2431, 2445-46 (1998) ......15

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici, listed in the Appendix, are law professors who teach and have written extensively about the First Amendment and intellectual property law. Our sole interest in this case is in the orderly development of trademark law in a way that serves the public interest.[1]

## SUMMARY OF ARGUMENT

In general, speakers do not need good reasons to be allowed to speak. In the absence of material deception, the government requires another compelling interest to stop them. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Dilution by tarnishment, defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark," 15 U.S.C. § 1125(c)(2)(C), is viewpoint- and content-based protection for famous trademarks that is unrelated to protecting against deception. It protects the powerful at the expense of the less powerful, serving no substantial government interest, unlike the interest in protecting against consumer confusion that is at the heart of trademark law.

At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Tarnishment fundamentally contradicts that

---

[1] Counsel for the parties did not author this brief in whole or in part. No persons other than Amici Curiae contributed money to fund preparation or submission of this brief. The parties have been provided with notice.

1  principle, suppressing truthful, nonmisleading speech about famous trademarks—that is,

2  only about trademarks that already have power to shape public discourse.

3  The Supreme Court has "emphatically rejected [the] 'startling and dangerous'

4  proposition" that the government "could create new categories of unprotected speech by

5  applying a 'simple balancing test' that weighs the value of a particular category of speech

6  against its social costs and then punishes that category of speech if it fails the test."

7  *Brown v. Entertainment Merchants Ass'n.*, 564 U.S. 786, 792 (2011) (quoting *Stevens*,

8  559 U.S. at 470). Tarnishment does just that: It singles out a subset of nondeceptive

9  speech and declares such speech impermissible because it might lessen the persuasive

10  value of others' speech.

11  JDI argues that tarnishment allows it to prevent consumers from forming new

12  associations with or opinions about it even in the absence of confusion.[2] But, although

13  Congress can permissibly regulate use of trademarks in other contexts, the First

14  Amendment constrains Congress's ability to restrict truthful, non-misleading speech—

15  even commercial speech—that changes or might change public opinion about another

16  entity in an unfavorable direction.

17  As the Supreme Court explained:

18  [A] State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech

19

20  [2] Like defamation, dilution is subject to the constraints of the First Amendment because Congress has authorized one party to suppress another's speech, a power it would lack without state support. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("It matters not that that law has been applied in a civil action …. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.") (citations omitted).

21

22

2

that justifies depriving it of full First Amendment protection) is in its view greater there. But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.

*R.A.V. v. St. Paul*, 505 U.S. 377, 388-89 (1992) (citations omitted).

Tarnishment claims provide exactly this sort of anti-"demeaning" protection for famous marks.[3] This is not just content-based suppression of speech, it is viewpoint-based suppression of speech—the prime evil against which the First Amendment protects.

In *Matal v. Tam*,  582 U.S. 218 (2017), the Supreme Court unanimously held that the Lanham Act's prohibition on registering disparaging trademarks, 15 U.S.C. §1052(a), constituted unconstitutional viewpoint discrimination, regardless of whether the expressive dimensions of trademarks are considered commercial or noncommercial speech. Like the provision struck down in *Tam*, tarnishment creates a viewpoint- and content-based rule that applies to truthful, non-misleading speech.  Even worse, whereas the disparagement bar insulated everyone from criticism, whether powerful or powerless, tarnishment protects only the famous, suppressing the speech of the comparatively powerless. And the tarnishment provision is a much more significant restraint of speech: the disparagement bar at issue in Tam merely denied a trademark claimant the benefits of federal registration, whereas the tarnishment provision enables a mark owner to fully enjoin speech.

---

[3] Indeed, "demeaning" means harmful to reputation. See, e.g., https://www.merriam-webster.com/dictionary/demeaning.

3

**ARGUMENT**

It has long been settled that Congress cannot pass laws that override the Constitution, *Marbury v. Madison*, 5 U.S. 137 (1803), and the Lanham Act is no exception. *Tam*, 582 U.S. at 239, 247 (noting that the expressive dimensions of trademarks warrant First Amendment protection; striking down a prohibition on registering "disparaging" marks); *Iancu v. Brunetti*, 588 U.S. 388, 398-99 (2019) (same for "scandalous" and "immoral" marks). Under the First Amendment, JDI's remedy for nondefamatory challenges to its reputation is in the marketplace of ideas, not in injunctions and damages.

Creators, parodists or otherwise, routinely make nondefamatory portrayals of beloved (or disliked) people, institutions, and other things they see in the world or find in its history. For this reason, the First Amendment protects not only speakers' choices of topics, but also their choices of how to speak about those topics. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 26 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process."); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992) ("[W]e need not belabor the point that some words, phrases or symbols better convey their intended meanings than others.").

The Supreme Court did not address the constitutionality of tarnishment in its recent opinion in this case, only a statutory interpretation issue. *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 162 (2023) (*JDI*). But the Court did focus repeatedly on the core function of trademark law: "the Lanham Act views marks as

4

source identifiers—as things that function to 'indicate the source' of goods, and so to 'distinguish' them from ones 'manufactured or sold by others.' The cardinal sin under the law … is to undermine that function." *Id.* at 156-57 (cleaned up); *see also id.* at 161 (noting that ridicule of trademark is unlikely to interfere with source identification). Tarnishment does not protect source identification, but rather brand reputation; that focus strengthens the constitutional case against it. *Cf. Tam*, 582 U.S at 247 (Alito, J., opinion of four Justices) (noting dangerous lack of connection between viewpoint-based restrictions and commercial goals of trademark law).

## I. Tarnishment Is Viewpoint-Based.

Tarnishment claims single out a subset of uses of a famous mark based on the views expressed by those uses. Use of a mark tarnishes only when it "harms the reputation of the famous mark." 15 U.S.C. 1125(c)(2)(C). Meanwhile, nonconfusing uses that *reinforce* the renown of a trademark are not subject to suppression. *See Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97, 111 (2d Cir. 2009) (rejecting tarnishment claim because reference was insufficiently negative); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 268 (4th Cir. 2007) (same). That distinction is explicitly viewpoint-based: it restricts negative, but not positive, depictions of famous marks. Like the viewpoint-discriminatory bar on registering disparaging marks, this is a "happy-talk" rule. *Tam*, 582 U.S. at 246 (Alito, J., opinion of four Justices); *see also id.* at 243 (explaining the Court's "cases use the term 'viewpoint'

discrimination in a broad sense" and that "[g]iving offense is a viewpoint");[4] *id.* at 221

(Kennedy, J., concurring) (viewpoint discriminatory to allow "a positive or benign mark

but not a derogatory one"); *see also Brunetti*, 588 U.S. at 388 (holding §2(a)'s bar on

registering "scandalous or immoral" trademarks unconstitutional because it "permits

registration of marks that champion society's sense of rectitude and morality, but not

marks that denigrate those concepts"); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32

(2d Cir. 2018) ("mandating positivity" in trademarks is viewpoint-based even outside of

registration context).

Dilution law allows the government to suppress the junior user's expression if that

message is inconsistent with the brand message conveyed by the senior user's mark—put

otherwise, it permits only viewpoints that are consistent with that message.

As Justice Kennedy wrote in *Tam*:

> A subject that is first defined by content and then regulated or censored by mandating only one sort of comment is not viewpoint neutral. . . . By mandating positivity, the law here might silence dissent and distort the marketplace of ideas. . . . The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. That danger is all the greater if the ideas or perspectives are ones a particular audience might think offensive, at least at first hearing.

*Tam*, 582 U.S. at 249 (Kennedy, J., concurring); *see also R.A.V. v. City of St. Paul*, 505

U.S. 377, 388 (1992) ("A State might choose to prohibit only that obscenity which is the

most patently offensive in its prurience …. But it may not prohibit, for example, only that

---

[4] Notably, "disparage" and "tarnish" have essentially the same meaning. *See* https://www.dictionary.com/browse/disparage ("to speak of or treat slightingly; depreciate; belittle/to bring reproach or discredit upon; lower the estimation of"); https://www.dictionary.com/browse/tarnish ("to diminish or destroy the purity of; stain; sully").

obscenity which includes offensive political messages."); Mark P. McKenna, Dilution and Free Speech in the U.S., Reprise, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3352090 (2019); Rebecca Tushnet, Gone in 60 Milliseconds: Trademark Law and Cognitive Science, 86 Tex. L. Rev. 507, 554-58 (2008).

And tarnishment claims impose greater restrictions on speech than did the disparagement bar to registration in *Tam*, since they enable owners of famous marks to completely suppress nonconfusing uses, whereas a party denied a registration can still continue to use the mark. *Cf. Brunetti*, 588 U.S. at 401 (Roberts, J., concurring) (noting that denial of registration "does not affect the extent to which their owners may use them in commerce to identify goods. No speech is being restricted; no one is being punished. The owners of such marks are merely denied certain additional benefits associated with federal trademark registration.").

The fact that §2(a) targeted uses that disparaged persons or groups was enough to make the provision viewpoint-based even though that provision was evenhanded in applying "equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue." *Tam*, 582 U.S. at 243 (Alito, J., opinion of four Justices). Tarnishment is worse: Federal law provides special extra protection for "famous" marks, targeting one set of viewpoints specifically—those that "harm[] the reputation" of a *famous* mark. 15 U.S.C. § 1125(c)(2)(C). Tarnishing a nonfamous mark is fine. To those who have, more is given, tilting the marketplace of ideas in their favor. *Cf. Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) ("[T]he concept that

1  government may restrict the speech of some elements of our society in order to enhance

2  the relative voice of others is wholly foreign to the First Amendment ….").

3      The fact that the audience's reaction determines whether a use is tarnishing does

4  not change the viewpoint-based nature of the rule.  "The Government may not insulate a

5  law from charges of viewpoint discrimination by tying censorship to the reaction of the

6  speaker's audience. . . . Indeed, a speech burden based on audience reactions is simply

7  government hostility and intervention in a different guise."  *Tam*, 582 U.S at 250 (Alito,

8  J., opinion of four Justices).

9      Viewpoint-based restrictions are anathema to the First Amendment; this is not one

10  of the rare cases where an overriding government interest justifies an exception to that

11  rule. See *Wandering Dago*, 879 F.3d at 39 (striking down viewpoint-based restriction on

12  use of trademarks). JDI is concerned that Bad Spaniels will pollute the meaning of its

13  mark. But that evaluation is for citizens in the marketplace of ideas.

14

15  **II. Even if Tarnishment Weren't Viewpoint-Based, It Would Be Content-Based and Subject to Strict Scrutiny.**

16

17      In *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Court held that "[a] law that

18  is content based on its face is subject to strict scrutiny regardless of the government's

19  benign motive, content-neutral justification, or lack of 'animus toward the ideas

20  contained' in the regulated speech." *Id.* at 165.[5]

21  _____

[5] *Reed* plainly rejected the reasoning in *San Francisco Arts & Athletics v. U.S. Olympic Committee*, 483 U.S. 522 (1987), that applied minimal scrutiny to a law directed at

22  specific trademarks because of Congress's beneficial motive in passing it. *Compare id.* at 534-35 *with Reed*, 576 U.S. at 163-64.

8

As Justice Thomas wrote, "when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial.'" *Tam*, 582 U.S at 254 (Thomas, J., concurring); see also *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (Stevens, J.) ("Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth. The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.") (cleaned up).

Tarnishment is content-based because a defendant's speech is unlawful only if (1) its similarity to a famous mark causes association with that mark—requiring an evaluation of its content—and (2) that association has the effect of harming the famous mark's reputation, which is a speech-based effect rather than an effect caused by noncommunicative elements of the accused use. *See City of Austin v. Reagan National Advertising, LLC*, 596 U. S. 61, 74 (2022) ("[A] regulation of speech cannot escape classification as facially content based simply by swapping proxy that achieves the same result."); 939517, at *10 (W.D. Tex. Mar. 28, 2022) (finding regulation content-based when enforcement requires inquiry "into the contents of the image to determine whether it is prohibited"; "it is the content of the image that determines its permissibility—the definition of a content-based restriction").

Notably, tarnishment does not require any false or misleading assertions of fact. 15 U.S.C. § 1125(c)(1) (barring tarnishment "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury"). As Laura Heymann puts it: "A dilution action essentially argues . . . '[W]e have spent a lot of money and effort on telling consumers what they should think about our brand, and the defendant's activities have caused them to think something different.' . . . The brand owner, in other words, is claiming a right to the exclusive mental association with the brand in the minds of the public." Laura A. Heymann, *Metabranding and Intermediation: A Response to Professor Fleischer*, 12 Harv. Negot. L. Rev. 201, 218–19 (2007).

Thus, tarnishment prevents certain speakers from giving with a new meaning to another's trademark by forbidding that speech, even without falsity.

## A. The Government Lacks a Constitutionally Sufficient Interest in Banning Tarnishment.

Tarnishment prohibitions were unknown to the Framers of the Constitution. They developed in the early decades of the twentieth century. Sarah L. Burstein, *Dilution by Tarnishment: The New Cause of Action*, 98 Trademark Rep. 1189, 1192 (2008). Yet the Supreme Court has repeatedly emphasized that the traditional categories of unprotected speech cannot be expanded based merely on a legislature's determination of the speech's low value. *See United States v. Stevens*, 559 U. S. 460, 468 (2010).

To justify a content-based regulation, the government "must specifically identify an actual problem in need of solving, . . . and the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799 (cleaned up). This "is a

demanding standard." *Id.* Even when speech is sold in the marketplace, content-based

restrictions must be carefully justified. *Id.* at 790. Tarnishment fails this requirement.

Liability for tarnishment does not require proof of actual harm to the trademark owner,

economic or otherwise. 15 U.S.C. § 1125(c)(1). The statute instead directs courts to

*presume* irreparable harm upon a showing of likely success on the merit. § 1116. Courts

regularly infer tarnishment based on mere conjecture. *See, e.g.*, *V Secret Catalogue, V*

*Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382, 389 (6th Cir. 2010) (noting that harm

was speculative but reasoning that statute created a presumption of tarnishment for sex-

related uses). This is inconsistent with the governing law applicable to content-based

regulations.

Even if fixing meaning to favor current owners of famous trademarks were a

legitimate interest, there is no good evidence that suppressing speech through dilution

law can accomplish this. *See, e.g.*, Jake Linford, Justin Sevier, & Allyson Willis,

*Trademark Tarnishmyths*, 55 Ariz. St. L.J. 609, 618 (2023) ("The results of these

experiments suggest that the case for tarnishment might be weak in circumstances where

courts have been most willing to presume tarnishment occurs. Indeed, much of what

courts have presumed about the tarnishing effect of sex-, drug-, and sacrilege-related uses

may be more mythic than material.").[6] The Court in *Brown* rejected as insufficient a far

more empirically developed claim about the causal relationship between violent video

---

[6] Barton Beebe et al., *Testing for Trademark Dilution in Court and in the Lab*, 86 U. Chi. L. Rev. 611 (2019) (explaining the weaknesses of empirical claims about dilution); Rebecca Tushnet, *Gone in 60 Milliseconds: Trademark Law and Cognitive Science*, 86 Tex. L. Rev. 507, 526-46 (2008) (same).

games and harm to youth. 564 U.S. at 799–800. Tarnishment is also based on

unacceptable "speculation and conjecture" that preventing nonconfusing use of

trademarks in commercial speech would preserve famous marks' distinctiveness. 517

U.S. at 507.

Trademark law is constitutional when it regulates false and misleading statements

in commercial speech.  *See* Lisa P. Ramsey, Free Speech Challenges to Trademark Law

After Matal v. Tam, 56 Hous. L. Rev. 401, 429 (2018). But this justification "offers no

support for dilution statutes," which are not limited to false or misleading speech.  Mark

A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual*

*Property Cases*, 48 Duke L.J. 147, 221 n. 325 (1998).


**B.  Protecting Reputation Against Nondefamatory Criticism Is Not a Legitimate Government Interest.**

The government's putative interest is in preventing nondefamatory harm to a famous

mark's reputation.[7] This is the opposite of a legitimate government interest.  Contesting

meaning, in the absence of deception, is at the heart of a system of free expression. There

is no compelling or substantial interest in suppressing a message out of fear that it might

lead audiences to think differently.  Mary LaFrance, *No Reason to Live: Dilution Laws as*

---

[7] To the extent that this control over meaning has economic value, tarnishment is far from
the least restrictive means of rewarding the owners of famous trademarks. Congress
could give them tax breaks or other subsidies; economic measures less restrictive than
suppressing speech can be used to promote favored entities in the product market. *See 44
Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (endorsing economic
regulation as less restrictive alternative to banning nondeceptive commercial speech).

*Unconstitutional Restrictions on Commercial Speech*, 58 S.C. L. Rev. 709, 719 (2007)

("[A]ny harm to the value of the trademarks affected by dilutive speech interferes only

with the ability of the trademark owners to psychologically manipulate consumers.

Preserving the ability of trademark owners to influence

consumers in this way does not amount to a substantial governmental interest."); Ramsey,

supra, at 443-61 (similar).

 *Tam* confirmed that the government lacks a substantial interest in suppressing a

message out of fear that it might convince audiences to disrespect a trademark, affecting

the amount of attention and goodwill the trademark can command:

> The commercial market is well stocked with merchandise that disparages prominent
> figures and groups, and the line between commercial and non-commercial speech is
> not always clear, as this case illustrates. If affixing the commercial label permits the
> suppression of any speech that may lead to political or social "volatility," free
> speech would be endangered.

*Tam,* 582 U.S at 247 (Alito, J., opinion of four Justices).

 Other areas of the law demonstrate that the government lacks a valid interest in

protecting reputations from non-factual, non-falsifiable claims. When the harm sought to

be avoided is change in third parties' opinions (as opposed to, for example, physical

violence), defamation law has provided a detailed map of what the law may not suppress.

Defamation requires a false or misleading statement of fact, even though derogatory

opinions can cause harm, including economic harm. For example, the deliberate infliction

of emotional distress on specific targets is regularly protected by the First Amendment.[8]

---

[8] *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (public speech on a matter of public
concern "cannot be restricted simply because it is upsetting or arouses contempt. 'If there

The Supreme Court has held that even definable damage to a plaintiff is not enough to justify relief when a well-known plaintiff is made the target of savage insult, but not defamed. *Hustler Magazine v. Falwell*, 485 U.S. 46, 51-53 (1988). Lower courts have recognized that attempts to protect "reputation" must follow the same constitutional rules, even if the harm is relabeled. *New York Stock Exchange, Inc. v. Gahary*, 196 F.Supp.2d 401, 412-13 & n.17 (S.D.N.Y. 2002) (applying *Hustler* to parody; trademark liability would be "at odds with the principles articulated in that case"); *Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union*, 585 F. Supp. 2d 815, 820-21 (E.D. Va. 2008) ("[I]f a plaintiff seeks damages which are 'reputational' in nature, constitutional libel standards (i.e., falsity and actual malice) apply to the plaintiff's damage claims. To allow otherwise would be to countenance 'an end-run around First Amendment strictures.' . . . [T]he label of the claim is not dispositive ...." (quoting *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999))); *see also Compuware Corp. v. Moody's Investors Servs.*, Inc., 499 F.3d 520, 530 (6th Cir. 2007) (same); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (same).

As the *Tam* Court made clear, we are more likely to get to the truth if we have a marketplace of ideas and information rather than suppression of the messages of the weak by the strong because of a concern about preserving the reputation of celebrated brands.

---

is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' ") (citations omitted).

Allowing audiences to choose from a variety of competing meanings, experiences, and opinions is generally a First Amendment value, not a harm to be avoided. As Laura Bradford has explained:

> Typically interlopers that evoke famous marks in advertising subtly reveal to consumers alternative understandings such as that some segment of the public thinks the brand is pretentious, a bad value, or simply over-exposed. Even if consumers process the new message only subconsciously, automatically, and involuntarily, as they do with much authorized brand advertising, a resulting increase in negative feelings about the dominant brand may well be welfare-enhancing and efficient.

Laura R. Bradford, *Emotion, Dilution, and the Trademark Consumer*, 23 Berkeley Tech. L.J. 1227, 1237 (2008) (footnote omitted).[9]

Finally, it is especially important that evaluation of the government's interest not be swayed by the perception that VIP's message is "low-value." The Supreme Court has rejected, outside narrow traditional limitations, arguments that perceived "low value" speech is less deserving of First Amendment considerations or that only "high value" speech should be part of the marketplace of ideas. A symbol that has developed substantial meaning—as JDI insists is true for Jack Daniel's—is a legitimate subject of public discourse.  *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969); *United States v. Mongol Nation*, 370 F. Supp. 3d 1090, 1112 (C.D. Cal.

---

[9] Again, the empirical evidence indicates that dilution protection is irrelevant to famous marks. *See, e.g.*, Maureen Morrin & Jacob Jacoby, *Trademark Dilution: Empirical Measures for an Elusive Concept*, 19 J. Pub. Pol'y & Marketing 265, 274 (2000) ("It appears that very strong brands are immune to dilution because their memory connections are so strong that it is difficult for consumers to alter them or create new ones with the same brand name."); *cf. United States v. Alvarez*, 567 U.S. 709, 726 (2012) ("The Government point[ed] to no evidence to support its claim that the public's general perception of military awards is diluted by false claims such as those made by Alvarez.").

2019) (symbols—in that case, trademarks representing association with Mongol Nation—

are First Amendment speech).

  And, in any event, audiences may well disagree about the value of commentary

like VIP's. Stacey Dogan and Mark Lemley have identified the importance of brand-

based humor as

> a valuable form of social commentary. Even more than non-commercial forms of
> parody, the subversive use of a parody as brand invites critical reflection on the role
> of brands in society and the extent to which we define ourselves by them. Brands
> that parody, in other words, offer a unique platform for expression and pose little
> threat to trademark law's core values.

Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L. Rev. 473, 486

(2013) (footnotes omitted).


### C. Repackaging The Government's Interest Under Other Labels Fails.

  Trademark law's source-identification justification does not extend to granting

trademark owners rights to control how they are spoken about. The ordinary commercial

case is one in which the trademark identifies for consumers which source they want:

"Eveready" for a battery summarizes information about battery life and reliability for

consumers. *See JDI*, 599 U.S. at 146, 157. Tarnishment, by contrast, protects nonfactual,

emotional associations, not quality guarantees—source *connotation*, not source

identification.

  Characterizing the government's interest as protecting trademark owners' property

rights rather than their reputations cannot save the statute. Trademarks are nonrivalrous—

unlike a car, more than one person can use them at once, and so one person's

nonconfusing use does not expropriate another's property right. More broadly, as

scholars have explained, any speech-suppressive interest could be reconceptualized as an

intangible "property" interest to defeat a speech claim. Eugene Volokh & Brett

McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases*,

107 Yale L.J. 2431, 2445-46 (1998). If the law could, by fiat, give claimants a property

interest that outweighs the First Amendment, legislatures could create liability for any

speech that annoys someone or disrespects them. *See Animal Legal Defense Fund v.*

*Reynolds*, 8 F.4th 781, 793 (8th Cir. 2021) (Gruender, J., concurring and dissenting in

part) (rejecting claim "that the scope of First Amendment protection contracts over time

as Congress 'elevate[s]' new harms to the status of legally cognizable harms for the

purposes of federal law. [Such reasoning] would allow Congress to bootstrap laws into

compliance with the First Amendment by elevating harms associated with the false

speech that the laws regulate to the status of legally cognizable harms.") (citations

omitted).

Nor is animosity to "free riding" sufficient justification. In the absence of

impersonation, commentary that attracts attention by referring to a well-known entity is

part of robust public discourse. *Hustler*, 485 U.S. at 51-52. The Supreme Court has

previously held that the fact that one person benefits from the existence of another's

speech without paying for it does not establish a compelling interest in making the first

person pay. *Janus v. American Federation of State, County, & Mun. Employees*, 585 U.S.

878, 896-97 (2018).

1      Ultimately, tarnishment has nothing to do with the core function of trademark:

2   allowing consumers to get the products they desire and not counterfeits. *JDI*, 599 U.S. at

3   146, 157; *Tam*, 582 U.S. at 225. In the absence of defamation, if audience members

4   merely hold negative attitudes, the solution is found in the marketplace of ideas,

5   including JDPI's own undoubted ability to advertise itself and what it wants the public to

6   believe about the brand.

7

8   **D. Commercial Use Is Not Relevant to the First Amendment Inquiry**

9      Tarnishment does not implicate the reason that commercial speech can be more

10  readily regulated than other speech: the need to protect consumers from harm. *See 44*

11  *Liquormart*, 517 U.S. at 502 ("It is the State's interest in protecting consumers from

12  commercial harms that provides the typical reason why commercial speech can be subject

13  to greater governmental regulation than noncommercial speech.") (cleaned up); *cf. Tam*,

14  582 U.S. at 251 (Kennedy, J., concurring) ("To the extent trademarks qualify as

15  commercial speech, they are an example of why that term or category does not serve as a

16  blanket exemption from the First Amendment's requirement of viewpoint neutrality.").

17     More broadly, the Supreme Court found that VIP's speech was not

18  "noncommercial *use*" for purposes of applying 15 U.S.C. § 1125(c)(3)(C)'s exclusion

19  because VIP was making a use as a mark. 599 U.S. at 162 (emphasis added). However,

20  that finding does not mean that VIP's speech was commercial *speech* for First

21  Amendment purposes. As Jennifer Rothman has explained, intellectual property

22  jurisprudence often focuses on commercial "use"—whether speech is sold in the

1  marketplace— which is a different inquiry than the First Amendment's stringent test for

2  "commercial speech." Jennifer E. Rothman, *Commercial Speech, Commercial Use, and*

3  *the Intellectual Property Quagmire*, 101 Va. L. Rev. 1929 (2015).

4      Congress cannot by statute reconfigure the boundaries of the First Amendment.

5  For First Amendment purposes, commercial speech is regularly defined as speech that

6  does no more than propose a commercial transaction. *U.S. v. United Foods, Inc.*, 533

7  U.S. 405, 409 (2001); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir.

8  2002) (same; rejecting infringement claim against song).  That is, commercial speech is

9  an offer to sell something other than the speech itself.

10     By contrast, speech that is itself the expressive product being sold is

11  noncommercial for First Amendment purposes, even when sold for profit.  *See, e.g.,*

12  *Brown*, 564 U.S. at 790 (video games); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486

13  U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not

14  diminished merely because the newspaper or speech is sold rather than given away.");

15  *Smith v. California*, 361 U.S. 147, 150 (1959) (same); *Cardtoons, L.C. v. Major League*

16  *Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) ("Cardtoons' trading cards . . .

17  are not commercial speech—they do not merely advertise another unrelated product.

18  Although the cards are sold in the marketplace, they are not transformed into commercial

19  speech merely because they are sold for profit.").

20     Thus, courts routinely apply stringent First Amendment scrutiny when articles

21  sold in the marketplace are restricted because of the message they bear. *See, e.g.,*

22  *Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.*, 952 F.2d 1059, 1063-65 (9th Cir. 1990)

19

(message-bearing items such as T-shirts and jewelry were noncommercial speech despite being sold); *Ayres v. City of Chicago*, 125 F.3d 1010, 1014 (7th Cir. 1997) ("[T]here is no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment, and they do not lose their protection by being sold rather than given away."); *cf., e.g., Cohen v. California*, 403 U.S. 15 (1971) (jacket bearing message was fully protected by First Amendment); *Schoenecker v. Koopman*, 349 F. Supp. 3d 745, 751 (E.D. Wis. 2018) ("[T]he shirts themselves are pure speech, in that they contain images and words that convey a message. The message may be ambiguous and open to interpretation, … but this does not deprive it of First Amendment protection. Rather, 'a narrow, succinctly articulable message is not a condition of constitutional protection.'") (citing *Hurley v. Irish-American Gay, Lesbian & Bisexual Gp.*, 515 U.S. 557, 569 (1995)).

Thus, even if tarnishment were subject to intermediate rather than strict scrutiny as a regulation of truthful commercial speech, the government would still lack a sufficient interest to justify the suppression of nondefamatory speech.

## CONCLUSION

Tarnishment law is the kind of paternalistic language policing that the Supreme Court has long condemned. The fear is that consumers may make "wrong" decisions because their opinion of a famous mark has changed.  But, in the absence of falsity or deception, there is no "wrong" meaning of a trademark. It is for audiences themselves to make such decisions and choose their own values and interpretations.

1        The dilution by tarnishment cause of action is unconstitutional. It cannot be the

2   basis for any liability.

3        DATED: May 24, 2024          /s/  *Rebecca Tushnet*
         Rebecca Tushnet (*pro hac vice*)
4        rtushnet@law.harvard.edu
         520 Hauser, Harvard Law School
5        1575 Massachusetts Avenue
         Cambridge, MA 02138
6        Telephone: 703-593-6759

7        Gregg P. Leslie
         First Amendment Clinic
8        Public Interest Law Firm
         Sandra Day O'Connor College of Law
9        Arizona State University
         111 E. Taylor St., Mail Code 8820
10       Phoenix, AZ 85004
         Ariz. Bar No. 035040
11       Gregg.Leslie@asu.edu
         Telephone: (804) 727-7398

12

13       Attorneys for Amici Curiae IP Law Professors

14

15

16

17

18

19

20

21

22

**Appendix\***

James Grimmelmann, Tessler Family Professor of Digital and Information Law, Cornell Tech and Cornell Law School

Mark A. Lemley, William H. Neukom Professor of Law, Stanford Law School

Jessica Litman, John F. Nickoll Professor of Law, University of Michigan Law School

Mark P. McKenna, Professor of Law, UCLA Law

Lisa P. Ramsey, Professor of Law, University of San Diego School of Law

Christopher Sprigman, Murray and Kathleen Bring Professor of Law, NYU Law

Rebecca Tushnet, Frank Stanton Professor of the First Amendment, Harvard Law School

Eugene Volokh, Gary T. Schwartz Distinguished Professor of Law, UCLA Law

---

\*Affiliations provided solely for purposes of identification.