**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIP Products LLC, | No. CV-14-02057-PHX-SMM |
| Plaintiff, | **AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| v. | |
| Jack Daniel's Properties Incorporated, | |
| Defendant. | |

This matter is before the Court on remand from the United States Circuit Court of Appeals for the Ninth Circuit for proceedings consistent with the United States Supreme Court's decision in <u>Jack Daniel's Properties, Inc. v. VIP Products LLC</u>, 599 U.S. 140 (2023). The parties have agreed that the Court may decide this matter without further fact-finding or reopening of trial. The parties agreed to instead file supplemental briefing in the form of cross-motions for judgment. (Doc. 333). The parties' motions are now fully briefed and ripe for ruling. (Docs. 338–39, 357–58, 368–69). The United States has intervened and filed a brief in support of the constitutionality of the Lanham Act's cause of action for dilution by tarnishment. (Doc. 364). The Court held oral argument in this matter on December 3, 2024. Having heard and considered the parties' arguments, the Court now issues its amended findings of fact and conclusions of law.

## BACKGROUND AND PROCEDURAL HISTORY

At the heart of this fervently contested dispute, which has now entered its second decade of litigation, lies a squeaky dog toy. This trademark infringement and dilution

1    action has yielded two appeals and now an opinion by the United States Supreme Court,

2    which vacated the Ninth Circuit's judgment and deposited this action before the Court for

3    a third time. By now the parties are more than familiar with the facts, and so the Court

4    only briefly recounts the background of this dispute.

5        VIP filed this action for declaratory judgment against Jack Daniel's on September

6    16, 2014, seeking a judgment from this Court that VIP's "Bad Spaniels" Silly Squeaker

7    chewable rubber dog toy ("Bad Spaniels"), designed to imitate a bottle of Jack Daniel's

8    Black Label Whiskey, did not infringe on nor dilute Jack Daniel's trademark rights to its

9    black label whiskey. (Docs. 1 at 3–4, 49 at 9). Jack Daniel's counterclaimed for

10   trademark infringement and trademark dilution in violation of the United States

11   Trademark Act, 15 U.S.C. § 1125 ("Lanham Act" or "TDRA") and Arizona law. (Doc.

12   12).

13       VIP moved for summary judgment and Jack Daniel's cross-moved for partial

14   summary judgment. Ruling on the parties' cross-motions, the Court rejected VIP's

15   nominative and First Amendment fair use defenses, denying VIP's motion and granting

16   Jack Daniel's. The Court found as a matter of law that Jack Daniel's trade address and

17   the design of its whiskey bottle were distinctive and nonfunctional, and therefore entitled

18   to trademark protection.

19       In 2017, this matter proceeded to a bench trial on Jack Daniel's dilution and

20   infringement claims. After the four-day bench trial, the Court found that VIP's "Bad

21   Spaniel's" trademark was likely to confuse consumers and therefore constituted

22   trademark infringement in violation of the Lanham Act. The Court also found that "Bad

23   Spaniel's" tarnished Jack Daniel's Old. No. 7 Tennessee Sour Mash Whiskey trademarks

24   and trade dress.[1] The Court entered a permanent injunction preventing VIP from

25   "sourcing, manufacturing, advertising, promoting, displaying, shipping, importing,

26   offering for sale, selling or distributing the Bad Spaniels dog toy." (Doc. 262 at 6).

27   ───────────────────────

28   [1] Jack Daniel's has several registered trademarks, including for "Jack Daniel's" itself, for "Old No. 7," for the ornamental label design, and others. For the purposes of this action, Jack Daniel's various trademarks relating to its black label whiskey are referred to collectively as "Jack Daniel's trademarks and trade dress."

VIP appealed the Court's judgment in favor of Jack Daniel's to the Ninth Circuit. The Ninth Circuit reversed the Court's judgment on the issue of dilution and vacated the Court's judgment after trial on the issue of consumer confusion, holding that VIP's use of the "Bad Spaniel's" mark was expressive in nature and thus protected First Amendment expression under Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989). See VIP Prods. LLC v Jack Daniel's Props., Inc., 953 F.3d 1170 (9th Cir. 2020). On remand from the Ninth Circuit, this Court found that Jack Daniel's could not satisfy either prong of the two-prong Rogers test and granted summary judgment to VIP on the infringement and dilution claims. (Doc. 308). Jack Daniel's appealed and the Ninth Circuit summarily affirmed.

The Supreme Court granted certiorari on the Ninth Circuit's rulings on both trademark infringement and dilution. 599 U.S. at 152. On June 8, 2023, the Supreme Court held that the heightened First Amendment protections provided by Rogers did not apply where the mark in question was used by the infringer as a mark. Id. at 153 ("Without deciding whether Rogers has merit in other contests, we hold that it does not when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods."). The Supreme Court vacated the Ninth Circuit's 2020 decision and remanded. Ibid. The Ninth Circuit in turn remanded to this Court for further proceedings. Remaining for this Court's consideration on remand are both Lanham Act claims for dilution and infringement; specifically, the Court must determine, consistent with the Supreme Court's decision in this case, (1) whether VIP's "Bad Spaniels" dog toy tarnishes Jack Daniel's trademarks, and (2) whether "Bad Spaniels" infringes on Jack Daniel's trademark rights.

The Court held a status conference in this matter on November 27, 2023, at which the parties agreed that this matter may be resolved on the record established at the 2018 bench trial of this matter and that it would be unnecessary to engage in further fact-finding. The parties agreed to file additional briefing on the remaining issues in the form of cross-motions for judgment. The parties' motions are now fully briefed. The United

1    States has filed a brief defending the constitutionality of the Lanham Act's dilution

2    provisions.

3        The Court's opinion below constitutes the Court's amended findings of fact,

4    conclusions of law, and order.

5                        **AMENDED FINDINGS OF FACT[2]**

6        Plaintiff VIP Products, LLC designs, manufactures, markets, and sells chew toys

7    for dogs. VIP sells various brands of dog chew toys, including the "Tuffy's" line (durable

8    sewn/soft toys), the "Mighty" line (durable toys made of a different material than the

9    Tuffy's line), and the "Silly Squeakers" line (durable rubber squeaker novelty toys).

10   (Doc. 242 at 3). VIP is an Arizona limited liability company with its principal place of

11   business in Phoenix, Arizona. (Docs. 49 ¶ 1; 204-1, Ex. A). President of VIP Steven

12   Sacra and his wife are the principal owners of VIP. (Doc. 234 at 24). Mr. Sacra is a

13   talented entrepreneur who developed VIP's line of dog toys. (Id. at 30–37). His talent and

14   creativity often lead to "of the moment" inspiration, such as toys Mr. Sacra creates as

15   parodies of other companies' products. (Doc. 237 at 102).

16       Defendant Jack Daniel's Properties, Inc. is a Delaware corporation with its

17   principal place of business in San Rafael, California. (Doc. 1 ¶ 2, 15-1 ¶ 2). Jack Daniel's

18   owns and licenses the trademarks and trade dress used in connection with Jack Daniel's

19   products. (Docs. 105; 204-1, Ex. A). Jack Daniel's Tennessee whiskey has been sold in

20   the United States continuously since at least 1875, except during Prohibition. (Doc. 105;

21   U.S. Trademark Reg. No. 42,663). Since 1875, Jack Daniel's Tennessee whiskey has

22   borne the "Jack Daniel's" trademark and the "Old No. 7" trademark. (Doc. 234 at 51–52)

23   (discussing U.S. Trademark Reg. Nos. 42,663, 582,789, and 1,923,981). Jack Daniel's

24   federal registration of its trademarks and trade dress for whiskey also includes Trademark

---

25   [2] As the parties agreed that no further fact-finding was necessary for the Court's decision
26   and the disposition of this action was vacated based on the Court's application of the law,
     the findings of fact recounted below are largely incorporated verbatim from those in the
27   Court's January 30, 2018 Findings of Fact, Conclusions of Law, and Order. (Doc. 245)
     ("2018 Order"). However, the Court has revised or omitted findings of fact in its prior
28   Order that recounted, depended on, or applied statements of the law which have since
     changed. Due to these alterations, the Court finds it appropriate to restate its amended
     findings of fact rather than incorporate by reference its prior findings.

Reg. No. 4,106,178 for the three-dimensional configuration of a square-shaped bottle container. (Doc. 12 at 7). Jack Daniel's trade dress has included these trademarks for many decades. (Doc. 234 at 55–56, 68).

Jack Daniel's has maintained an active brand licensing program for many years. (Docs. 105, Ex.1; 234 at 68–69; 111–13). Jack Daniel's trademarks and trade dress have appeared on thousands of products other than whiskey, including food, apparel, and a limited number of pet products. (Doc. 230-16 thru 231-7). With respect to Jack Daniel's branded pet products, Jack Daniel's offers dog leashes, collars, and dog houses. (Docs. 234 at 113, 230-9 thru 230-12). Jack Daniel's has offered these dog accessories since before the events giving rise to this case. (Doc. 241 at 7).

Initially launched in approximately 2007, VIP's Silly Squeakers line of dog toys includes a variety of toys in the shapes of beer, wine, soda, and liquor bottles. (Doc. 236 at 31–38). Mr. Sacra's intent behind producing the Silly Squeakers line of dog toys was to develop creative parodies of existing products. (Id. at 45–47, 56). Examples of this line of toys, as provided by Mr. Sacra, include "Smella R-Crotches," a parody of Stella Artois, "Heini Sniff'n," a parody of Heineken, and "Pissness," a parody of Guinness. (Doc. 237 at 96–98). Mr. Sacra maintains his opinion that these parodies are just harmless, clean fun, and are not distasteful or harmful. (Id. at 99).

VIP created and marketed the "Bad Spaniels" silly squeaker dog toy, pictured below, in 2014. (Doc. 158). The "Bad Spaniels" toy is in the shape of a liquor bottle and features a wide-eyed spaniel placed over the words "Bad Spaniels" and "the Old No. 2, on your Tennessee Carpet." (Ibid.) At the bottom of the "Bad Spaniels" toy are the words "43% POO BY VOL." and "100% SMELLY." The back of the Silly Squeakers label for the "Bad Spaniels" toy states "This product is not affiliated with Jack Daniel Distillery." (Ibid.)

///

//

///

- 5 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   ///

16        VIP's intent in designing the "Bad Spaniels" toy was to match the bottle design for

17   Jack Daniel's Tennessee Sour Mash Whiskey. (Doc. 157). The design elements

18   transposed onto the "Bad Spaniels" toy include the size and shape of the product, the use

19   of white lettering and filigree over a black background, and the font styles. Mr. Sacra

20   originally coined the name "Bad Spaniels" and then requested Designer Elle Phillips to

21   work on a proposed design. (Doc. 236 at 55–56). Ms. Phillips understood that "Bad

22   Spaniels" was a reference to "Jack Daniel's." (Doc. 233-1 at 47, 49–50). Ms. Phillips was

23   familiar with Jack Daniel's brand. (Id. at 52–53). Prior to starting the design for "Bad

24   Spaniels," Ms. Phillips recalled various Jack Daniel's packaging features from memory,

25   including "[t]he black and white label, sort of a cursive font for Tennessee, simple type,"

26   and the square shape of the bottle, as well as the use of a number on the neck label. (Id. at

27   53–54).

28

Ms. Phillips then retrieved a bottle of Jack Daniel's Tennessee Whiskey from her liquor cabinet, examined it, and placed it on her desk while she developed a sketch. (Id. at 54–55; Docs. 104-1 at 101–02, 225-17). She referenced the bottle "every now and then throughout the process." (Doc. 233-1 at 66–67). Ms. Phillips wanted her sketch to be close to the same as the Jack Daniel's bottle. (Id. at 67). When finished, the "Bad Spaniels" product featured all the elements of Jack Daniel's trade dress, including the bottle shape, color scheme, font, and stylization, as well as the word "Tennessee". (Doc. 158). VIP introduced "Bad Spaniels" in 2014. (Doc. 227-7, 227-8). In VIP's catalogues, the toy appears in a bar setting alongside various hanging bottles, one of which is recognizable as a Jack Daniel's bottle. (Ibid.)

After VIP introduced "Bad Spaniels," Jack Daniel's promptly demanded that VIP stop selling the new dog toy. (Doc. 47). VIP responded by filing a complaint in this Court seeking a declaratory judgment that "Bad Spaniels" did not infringe on or dilute any trademark or trade dress rights owned by Jack Daniel's. (Docs. 1, 49 at 9–11).

## I.     FINDINGS RELATING TO TARNISHMENT

The Trademark Dilution Revision Act (the "TDRA") was signed into law in 2006. See Pub.L. 109-312, 120 Stat. 1730 (Oct. 6, 2006). The TDRA defines trademark dilution as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). Importantly, the TDRA changed the standard for actionable dilution to include marks that are "likely to cause" harm to the reputation of the famous

mark, rather than marks causing "actual" harm. See V Secret Catalogue, Inc. v. Mosely, 605 F.3d 382, 384 n.1 (6th Cir. 2010), citing 15 U.S.C. § 1125(c)(2)(C).

The TDRA further defines dilution by tarnishment as "associating arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C); Mattel Inc. v. MCA Records, Inc., 296 F.3d 894, 903 (9th Cir. 2002) ("'Dilution' refers to the 'whittling away of the value of a trademark' when it's used to identify different products.") (quoting another source). To prove dilution by tarnishment under the TDRA, Jack Daniel's most prove that at least one of its asserted trademark and trade dress rights was not only valid but also famous before the accused use began, and that the accused use is likely to cause negative associations that harms the reputation of the famous mark. See 15 U.S.C. § 1125(c); A.R.S. 44-1448.01; Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 634 (9th Cir. 2008); Moab Indus., LLC v. FCA US, LLC, No. CV 12-8247, 2016 WL 5859700, at *8 (D. Ariz. Oct. 6, 2016) (stating that the "elements necessary to prove [an Arizona] state law trademark dilution counterclaim are basically identical" to federal trademark dilution claims).

### a. Fame

A trademark or trade dress is famous if "it is widely recognized by the general consuming public of the United States as a designation of source." 15 U.S.C. § 1125(c)(2)(A). All relevant factors may be considered, including:

(i)   The duration, extent, and geographic reach of advertising and publicity of the mark;

(ii)  The amount, volume, and geographic extent of sales of goods or services offered under the mark;

(iii) The extent of actual recognition of the mark; and

(iv)  Whether the mark [has been] registered . . . on the principal register.

See id.; accord A.R.S. § 44-1448.01(A)(1)–(8).

Regarding the first factor—advertising—Jack Daniel's has spent hundreds of millions of dollars to promote Jack Daniel's whiskey. (Doc. 234 at 55–56, 59–69, 80;

Doc. 220, Ex. 105–24; Doc. 229-5–229-9, 229-13, and 229-16). Regarding sales, Jack Daniel's has been the best-selling whiskey in the United States since 1997, exceeding 75 million cases and 10 billion dollars in sales. (Doc. 234 at 48–50). In terms of recognition, Jack Daniel's trademarks have been used continuously for over a century, except during Prohibition. (Doc. 234 at 49–52). Jack Daniel's trademarks and trade dress have been viewed by millions of Americans in movies and television programs. (Doc. 234 at 62–66, 68; Doc. 220, Exs. 107, 109–11, and 146). Jack Daniel's is prominently featured as jackdaniels.com, which was visited more than four million times in 2014. (Docs. 235 at 66, 220 Ex. 112, and 229-8). Jack Daniel's trade dress is prominently featured on social media pages for the brand. (Docs. 234 at 66, 229-9). Based on Jack Daniel's internal records, Jack Daniel's has achieved global recognition and aided consumer awareness of the Jack Daniel's brand is consistently around 98%.[3] (Doc. 234 at 50).

### b. Similarity

Under the TDRA's likelihood of dilution standard, in order to establish similarity in a dilution by tarnishment case, a party must show only "similarity," not substantial similarity or identicalness, between the famous mark and the accused mark. See Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 633 F.3d 1158, 1159 (9th Cir. 2011) (stating that "the 'identical or nearly identical' standard did not survive Congress's enactment of the TDRA."). The factors to be considered in determining similarity in a dilution by tarnishment case have not been clearly defined. See Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc., No. CV 12-1853, 2013 WL 1196948, at *11 (W.D. Wash. Mar. 25, 2013). To resolve the question of similarity, the Court considers "the factors of appearance, sound and meaning"—factors that are also relevant in evaluating infringement. See ibid.

Here, VIP intended to produce, and did produce, a dog toy that mimicked Jack Daniel's trademarks and trade dress. (Doc. 241 at 13–15). VIP appropriated Jack Daniel's trade dress in every aspect; "Jack Daniel's" became "Bad Spaniels," "Old No. 7" became

---

[3] Aided brand awareness measures the number of people who express knowledge of a brand or product when prompted.

"Old No. 2," and "Tennessee whiskey" became "Tennessee carpet." Meanwhile, the square bottle shape, the nearly identical size of the two products, the ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shapes, and styles remain virtually unchanged.

### c.  Reputational Harm

The TDRA's final factor centers on reputational harm; that is, whether associations with VIP's "Bad Spaniels" product "harms the reputation of the famous mark," which, here, is Jack Daniel's trademarks and trade dress. See 15 U.S.C. § 1125(c)(2)(C). Reputational harm "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 111 (2d Cir. 2010) (quoting Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994)). For example, there is a strong consensus among courts across jurisdictions that a famous mark is tarnished when it is semantically associated with a new mark that uses the famous mark to sell sex-related products. See V Secret, 605 F.3d at 388 (collecting cases).

A trademark may also be tarnished if the mark loses its ability to serve as a "wholesome identifier" of the plaintiff's product. Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 110 (2d Cir. 2009), citing Hormel Foods Corp. v. Jim Hensen Prods., Inc., 73 F.3d 497, 507 (2d Cir. 1996). In Starbucks, the Second Circuit found that the relevant inquiry is how the junior mark's product affects positive impressions about the famous mark's product, not whether a consumer simply associates a negative-sounding junior mark with the famous mark. 588 F.3d at 110.

Regarding reputational harm, the parties opted to present evidence in the form of expert testimony.[4] The determination of an expert's credibility and the weight to be given

---

[4] Expert testimony as to survey evidence is frequently admitted in trademark and false advertising disputes as evidence on consumer perceptions. See J. McCarthy, McCarthy on Trademarks and Unfair Competition § 32:158 (5th ed. 2024) ("Both trademark validity and infringement turn largely on factual issues of customer perception. Evidence of such perceptions …. includes the quantity and quality of sales and advertising, testimony of dealers and testimony of experts in the field.").

1    to expert testimony and evidence is a matter within the discretion of the trier of fact,

2    which in a bench trial like the instance case, is a matter for the Court. See Fox v.

3    Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990). This Court decides how much weight

4    to give the evidence and the testimony presented. Id.

5        *Findings as to Dr. Itamar Simonson*

6        Jack Daniel's engaged Dr. Itamar Simonson, a Professor of Marketing at Stanford

7    University. (Doc. 234 at 154–62). Dr. Simonson, relying on consumer psychology

8    research, concluded that VIP's introduction of "Bad Spaniels" into the marketplace

9    resulted in reputational harm to Jack Daniel's trademarks and trade dress. (Id. at 162–

10   674).  Dr. Simonson has served as an expert witness on numerous occasions, providing

11   testimony on issues related to marketing, consumer behavior, trademark-related matters,

12   false advertising, and branding. (Doc. 234 at 161). Dr. Simonson has conducted,

13   supervised, or evaluated over 1,000 marketing research studies. (Id. at 155–59, 161–62).

14   Such studies related to consumer behavior, consumer information processing, brand

15   equity, trademarks, branding, marketing strategies, and advertising. (Ibid.)

16       Dr. Simonson's opinions as to this matter are supported by empirical studies

17   evaluating two stages of establishing a likelihood of dilution by tarnishment. (Id. at 162–

18   63). First, whether the allegedly dilution product will bring or call to mind the allegedly

19   diluted mark, and second, assuming that the allegedly diluting product does call to mind

20   the allegedly diluted mark, whether it has affected the brand equity and brand association

21   of the allegedly diluted mark. (Ibid.) Dr. Simonson concluded that the first stage was

22   satisfied because the point of VIP's product was to bring Jack Daniel's whiskey to mind.

23   (Id. at 163). Consumer psychology research utilized to evaluate the second stage was

24   based on numerous empirical studies. The Court credits that the studies relied upon by

25   Dr. Simonson support certain conclusions that apply to all products and services

26   regarding the impact of adding a negative association onto the association of the existing

27   brand. (Ibid.)

28

1        The Associative Network Model ("ANM") has been empirically tested and
2  verified numerous times since the 1970's. (Id. at 164–66). Regarding application of the
3  ANM, the Court credits Dr. Simonson's conclusion that when consumers are evaluating
4  brands, certain mental associations come to mind. (Id. at 164). In accordance with the
5  ANM and based upon Dr. Simonson's review of Jack Daniel's commercials and
6  advertisements, Dr Simonson's understanding about Jack Daniel's brand, and the key
7  messages Jack Daniel's communicates regarding its brand values—namely authenticity,
8  integrity, independence, and loyalty—the Court credits Dr. Simonson's testimony of
9  documented positive mental associations that come to mind when evaluating Jack
10 Daniel's before VIP introduced the "Bad Spaniels" dog toy. (Doc. 234 at 169–70). The
11 Court credits Dr. Simonson's conclusion regarding the effects of "Bad Spaniels" and the
12 negative mental associations that arise when defecation, feces, and poo are included
13 among the associations of customers evaluating Jack Daniel's whiskey. (Id. at 170–72).

14       Dr. Simonson relied on consumer psychology research to establish that when food
15 or beverage is associated with defecation, disgust is generated in the consumer's mind
16 with respect to that food or beverage which has been associated with defecation. (Id. at
17 172–74, 180). Well-documented empirical research supports that the negative
18 associations of "Old No. 2," referring to defecation, and "poo by weight" would create
19 disgust in the mind of the consumer evaluates Jack Daniel's whiskey. (Id. at 171–72).

20       Dr. Simonson relied on consumer psychology research in his evaluation of the
21 second stage of the likelihood of dilution by tarnishment. (Ibid.) Based on the ANM, the
22 Court credits Dr. Simonson's conclusion that the "Bad Spaniels" product is likely to
23 tarnish Jack Daniel's trademarks and trade dress by creating negative associations, either
24 consciously or unconsciously, and undermining the pre-existing positive associations
25 with Jack Daniel's whiskey. (Id. at 172–74, 200). The Court credits Dr. Simonson's
26 conclusion that such negative associations are particularly harmful for a company such as
27 Jack Daniel's because the goods it offers for sale involve human consumption and human
28 consumption and canine excrement do not mix. (Id. at 172–74). Further, the Court credits

1   Dr. Simonson's conclusion that such associations are particularly harmful to Jack
2   Daniel's because Jack Daniel's brand name along with its equity is a very important
3   asset. (Id. at 160).

4   *Findings as to Mr. Bruce Silverman*

5   VIP engaged Mr. Bruce Silverman, an advertising, marketing, and branding
6   consultant for the past 40 to 50 years, to rebut the opinion and findings of Dr. Simonson.
7   (Doc. 238 at 9–31). Mr. Silverman has worked with companies that manufacture or
8   produce goods or services in addition to his primary work with advertising and public
9   relations agencies. (Ibid.) In West Los Angeles, Mr. Silverman arranged four focus
10  groups[5] to test consumer reactions to "Bad Spaniels." (Id. at 44–50). Mr. Silverman
11  concluded that the focus groups had an overall favorable impression of Jack Daniel's
12  upon discussion of VIP's "Bad Spaniels" dog toy. (Ibid.)

13  The Court finds that Mr. Silverman's reliance on the West Los Angeles focus
14  groups is flawed because the groups were initially directed by the moderator that the
15  product under evaluation, "Bad Spaniels," was a spoof product and as a result the focus
16  groups produced predetermined results. (Doc. 234 at 181–183). In other words, the
17  moderator's biased presentation of the products tainted the groups' conclusions.
18  Moreover, Mr. Silverman did not have expertise or specialized knowledge in trademark
19  dilution matters; rather, his experience was in advertising. (Id. at 208).

20  Here, the Court credits and gives prevailing weight to Dr. Simonson's specialized
21  knowledge and specific expertise in consumer psychology to evaluate and conclude that
22  there is a likelihood of a tarnishing effect of the "Bad Spaniels" dog toy upon Jack
23  Daniel's trademarks and trade dress. (Doc. 234 at 172–74, 184–87).

24  ///

25  ///

26

27  _____
    [5] Focus groups are a research method whereby consumers from a target market are led
28  through a discussion regarding a particular topic and give insight as to why and how
    consumers use a product or service, what is important to them in choosing a particular
    brand, what they like and don't like about various products or services, and any special
    needs they might have that aren't being satisfied.

1

## II.    FINDINGS RELATING TO INFRINGEMENT

Jack Daniel's must prove three elements in order to prevail on its trademark and trade dress infringement claims: (1) distinctiveness, (2) nonfunctionality, and (3) a likelihood of confusion. See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998); see also 15 U.S.C. § 1125(a)(1)–(3). The Court previously ruled as a matter of law that Jack Daniel's trademarks and trade dress are distinctive and nonfunctional. (Doc. 171). The Court's findings in this regard were affirmed on appeal by the Ninth Circuit. 953 F.3d at 1176. Thus, the only factor remaining is the likelihood of consumer confusion.

To prevail on its trademark and trade dress infringement claims under federal and state law, Jack Daniel's must also show ownership, meaning that at least one of its asserted rights was valid before VIP's alleged infringing use began, and VIP's use caused a "likelihood of confusion" as to the source of VIP's product. See 15 U.S.C. §§ 1114, 1125(a); Brookfield Commc'ns v. W. Coast Ent. Corp., 174 F.3d 1036, 1046 n.8 (9th Cir. 1999); Kendall-Jackson, 150 F.3d at 1047; Angel's Gate Inc. v. All-Star Grand Canyon Tours Inc., No. CV 12-8181, 2013 WL 12114580, *2 (D. Ariz. Sept. 30, 2013) ("Because Arizona's trademark infringement statute mirrors the Lanham Act, 15 U.S.C. § 1125(a), cases interpreting the Lanham Act guide the interpretation of A.R.S. § 44-1451."). Here, the Court found that Jack Daniel's asserted rights are senior and valid because they have appeared on the Principal Register of the United States Patent and Trademark Office since before VIP's use began. (Docs. 224, 225); 15 U.S.C. §§ 1057(b), 1115(a); see Brookfield, 174 F.3d at 1047. Furthermore, all the asserted rights are conclusively senior and valid pursuant to the provisions of 15 U.S.C. § 1065.

At issue is whether VIP's "Bad Spaniels" product caused a likelihood of confusion about the source of the product. Pursuant to the Ninth Circuit's decision in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979), likelihood of confusion is assessed by weighing the following eight non-exclusive factors, often referred to as the Sleekcraft factors: (1) the strength of the plaintiff's mark; (2) the proximity or relatedness of the

goods; (3) the similarity of the parties' marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the type of goods and degree of care likely to be exercised by the buyer; (7) the defendant's intent in adopting the junior mark; and (8) the likelihood of expansion into the parties' product lines. Ibid.

"The <u>Sleekcraft</u> factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." <u>Network Automation, Inc. v. Advanced Sys. Concepts</u>, 638 F.3d 1137, 1145 (9th Cir. 2011). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." <u>Brookfield</u>, 174 F.3d at 1054. In some cases, a small number of the factors carry great weight in assessing the likelihood of confusion. See <u>Dreamwerks Prod. Grp., Inc. v. SKG Studio</u>, 142 F.3d 1127, 1129 (9th Cir. 1998) (stating that "[t]he [Sleekcraft] factors should not be rigidly weighed; we do not count beans."). "Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion." <u>Ibid.</u> (internal citation omitted). Utilizing the <u>Sleekcraft</u> factors, likelihood of consumer confusion may be established by (1) forward confusion or (2) reverse confusion. See <u>JL Bev. Co., LLC v. Jim Beam Brands Co.</u>, 828 F.3d 1098, 1106 (9th Cir. 2016). "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." <u>Ibid.</u> (further citation omitted). Reverse confusion, on the other hand, "occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." <u>Ibid.</u>

As the Supreme Court posited in this action, the parodic use of a trademark may properly factor into the likelihood of confusion analysis. 599 U.S. at 1591. A "successful parody" of a famous mark—one which "conjures up" the original, yet "creates contrasts, so that its message of ridicule or pointed humor becomes clear"—is "not often likely to create confusion." <u>Id.</u> at 1591–92 (internal quotations omitted).

Both parties engaged experts on the issue of likelihood of confusion and both experts testified via deposition. (Docs. 233-2 and 233-3).

///

1

### a. Strength

2   "The stronger a mark-meaning the more likely it is to be remembered and

3   associated in the public mind with the mark's owner-the greater the protection it is

4   accorded by the trademark laws." La Quinta Worldwide LLC v. Q.R.T.M. SA de CV,

5   762 F.3d 876, 874 (9th Cir. 2014). "The more 'famous' and 'well known' a mark, the

6   greater the likelihood that use on noncompetitive products will cause confusion. J.

7   McCarthy, McCarthy on Trademarks and Unfair Competition § 24:49 (5th ed. 2024)

8   ("McCarthy").

9   Here, Jack Daniel's trademarks have been used continuously for over a century,

10  except during Prohibition. (Doc. 234 at 49–52); Jack Daniel's Tennessee whiskey has

11  been the best-selling whiskey in the United States since 1997, and between 1997 and

12  April 30, 2015, Jack Daniel's whiskey sales in the United States exceeded 75 million

13  cases of various sizes, and resulting revenues exceeded ten billion dollars. (Id. at 50).

14

### b. Proximity/Relatedness

15  Regarding the factor of proximity and relatedness of the goods, related goods are

16  those "products which would be reasonably thought by the buying public to come from

17  the same source if sold under the same mark." Sleekcraft, 599 F.2d at 348 n.10.

18  Here, Jack Daniel's has licensed its trademark and trade dress rights for use with

19  certain dog toy products. (Doc. 234 at 113). VIP's "Bad Spaniels" dog toy is a related pet

20  product to Jack Daniel's dog leashes, dog collars, and dog houses. See Int'l Kennel Club

21  of Chi. v. Mighty Star, 846 F.2d 1079, 1089 (7th Cir. 1988) (finding dog shows and dog

22  toys to be related); (Doc. 230 at 9–12). The Court finds that, although Jack Daniel's is

23  primarily a producer and seller of whiskey, the consuming public observes Jack Daniel's

24  trademarks and trade dress on a wide variety of merchandise, from prepared meats to

25  barbeque sauces, from cigarette lighters to belt buckles and cufflinks, and from charcoal

26  to clothing, due to an extensive and long-running licensing program. (Docs. 230-16 thru

27  231-7).

28  ///

- 16 -

### c. Similarity

Regarding the factor of similarity between two marks, "[t]he greater the similarity between the two marks…the greater the likelihood of confusion." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000). For a similarity evaluation, the marks must be considered in their entirety, and as they appear in the marketplace; second, similarity is analyzed in terms of appearance, sound, and meaning; and third, the similarities between the products are weighed more heavily than differences. Ibid.

Considering a mark in its entirety and how it appears in the marketplace requires consideration of the mark as a parodic product if it is intended as a parody. A junior mark must "conjure up the original…for there to be a parody at all." Tommy Hilfiger Licensing v. Nature Labs, 221 F. Supp. 2d 410, 417 (S.D.N.Y. 2002).

Here, VIP intended to produce a dog toy that included and was similar to Jack Daniel's trademarks and trade dress so that its "Bad Spaniels" dog toy would call to mind Jack Daniel's Tennessee Whiskey. VIP appropriated Jack Daniel's Trade Dress in every aspect: "Jack Daniel's" became "Bad Spaniels," "Old No. 7" became "Old No. 2," "Tennessee whiskey" became "Tennessee carpet." Meanwhile, the square bottle size and shape, ribbed neck, arched lettering, filigreed border, black-and-white color scheme, fonts, shales, and styles remain virtually unchanged.

### d. Actual Confusion

In the Ninth Circuit, proof of "actual confusion is not necessary to a finding of likelihood of confusion." Acad. of Motion Picture Arts & Sci. v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991); accord Sleekcraft, 599 F.2d at 353. Instances of actual confusion in the marketplace are often difficult to find, particularly where, as here, the sales volume of the accused product is small and the marketing is thin. "[D]ifficulties in gathering [such] evidence of actual confusion makes its absence generally unnoteworthy." Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1077 (9th Cir. 2006) ("In this case, which involves a national market and a low degree of consumer care, nothing suggests that the lack of evidence of

confusion should be particularly noteworthy."). In lieu of marketplace evidence of actual confusion, courts regularly accept the results of properly designed consumer surveys as surrogate evidence of actual confusion. See Playboy Enter., Inc. v. Netscape Commc'n Corp., 354 F.3d 1020, 1026 n.28 (9th Cir. 2004) (stating that "[s]urveys are commonly introduced as probative evidence of actual confusion."), citing Schering Corp. v. Pfizer Inc., 189 F.3d 218, 224–26 (2d Cir. 1999; but see 599 U.S. at 163–64 (Sotomayor, J., concurring) (cautioning against reliance on survey evidence as to consumer confusion when parody is involved because "[s]urvey answers may reflect a mistaken belief among some survey respondents that all parodies require permission from the owner of the parodied mark.").

Both parties engaged experts on the issue of consumer confusion and both experts testified via deposition. (Docs. 233-2 and 233-3).

*Findings as to Dr. Gerald Ford*

Jack Daniel's engaged the late Dr. Gerald Ford to conduct a likelihood of confusion survey regarding the two products, the Jack Daniel's Tennessee whiskey bottle, with its trademarks and trade dress, and VIP's "Bad Spaniels" product. (Doc. 233-2 at 18–19). Until his death in 2015, Dr. Ford was engaged in commercial marketing research and consulting for 40 years. (Doc. 230-3 at 2). Over his 40-year career, Dr. Ford had been qualified as an accepted as an expert in marketing and marketing research in more than 60 trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board. (Id. at 33–35). Dr. Ford was retained by a variety of firms. (Ibid.) Approximately one-half of his engagements involved the design and execution of marketing research surveys. (Ibid.) Dr. Ford designed and executed surveys relating to intellectual property matters, including trademark, false advertising, patent, and other related matters. (Ibid.) Dr. Ford was familiar with accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls. (Ibid.)

In this matter, Dr. Ford designed an internet survey to measure whether the "Bad Spaniels" product is likely to confuse customers. (Id. at 3). Dr. Ford's internet survey utilized the Ever-Ready[6] survey format, described as the prevailing standard when conducting a likelihood of confusion survey. (Doc. 235 at 7–8). Dr. Ford conducted a double-blind survey, meaning that not only is the interviewee unaware of the purpose of the survey, but the interviewing firm is also unaware, as is the supervisor instructing the interviewers. (Id. at 8, Doc. 230-3 at 6). In addition, the responding consumers were not informed as to what company sponsored the survey. (Doc. 230-3 at 6). Dr. Ford's designed internet survey was a neutral survey. (Ibid.)

The stimuli Dr. Ford utilized in his survey's test cell were photographs of VIP's "Bad Spaniels" dog toy. (Doc. 230-3 at 4). The stimuli Dr. Ford utilized in his survey's control cell were photographs of a fictitious dog toy bearing the "Bad Spaniels" name, with none of the claimed Jack Daniel's indicia or trade dress. (Ibid.) After viewing these photographs, all responding consumers were asked a series of open-ended and non-leading questions about who had made, sponsored, or approved the product pictured. (Id. at 13–18).

The results of Dr. Ford's survey showed that over 29% of those in the test cell-who had been shown the "Bad Spaniels" product-identified Jack Daniel's in response to who had made, sponsored, or approved the product pictured. (Id. at 19–30). By contrast, almost none of those in the control cell-who had been shown the fictitious dog toy-identified Jack Daniel's in response to these questions. (Id. at 31).

The Court credits and gives prevailing weight to Dr. Ford's conclusion that "approximately twenty-nine percent…of potential purchasers…are likely to be confused or deceived by the belief that [VIP's] Bad Spaniels dog toy is made or put out by Jack Daniel's, or made or put out with the authorization or approval of Jack Daniel's, or that whoever makes or puts out [VIP's] dog toy has a business affiliation or business

---

[6] See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 382 (7th Cir. 1976); McCarthy at § 32:174.

connection with Jack Daniel's, and that such confusion is due in particular to [VIP's] use of Jack Daniel's indicia or trade dress on the Bad Spaniels dog toy." (Id. at 4, 33).

The Court credits that Dr. Ford's survey establishes some consumer confusion as to the origin of the "Bad Spaniels" dog toy. The survey followed the Ever-Ready format, considered the prevailing standard for trademark survey research in cases involving strong marks. See E&J Gallo v. Proximo Spirits, Inc., No. CV 10-411, 2012 WL 273076, at *5 (E.D. Cal. Jan. 30, 2012); accord McCarthy, § 32:174 (stating that the Ever-Ready survey format has become a standard and widely accepted format). Dr. Ford's survey results that 29% of potential purchasers were likely confused is nearly double the threshold to show actual confusion. (Doc. 230-3 at 19–30); see McCarthy, § 32:188 n.4 (collecting cases); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 594 (3d Cir. 2002) ("15% of confusion is sufficient to demonstrate actual confusion"); James Burroughs Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976) (15% confusion "evidences a likelihood of confusion").

*Findings as to Dr. Stephen Nowlis*

VIP engaged Dr. Stephen Nowlis to prepare an expert rebuttal report regarding the likelihood of confusion survey conducted by Dr. Ford. (Doc. 128, admitted at trial as Ex. 256, Doc. 221 at 5). Dr. Nowlis holds a Ph.D. in Marketing and a Master's degree in Business Administration (MBA) from the University of California at Berkeley. (Doc. 128). Although Dr. Nowlis objected to Dr. Ford's control stimulus, Dr. Nowlis did not support this viewpoint by conducting a survey or by conducting independent research; he simply couched his opinion regarding lack of confusion through generalized objections to Dr. Ford's report. Therefore, the Court does not credit Dr. Nowlis's generalized objections. Moreover, the Court notes that Dr. Nowlis has never written any articles on trademark surveys, or trademark survey design, or on the issue of likelihood of confusion in trademark law, which does not lend credibility to his opinions. (Doc. 233-3 at 14).

///

1

### e. Marketing Channels

"Marketing channels can converge even when different submarkets are involved so long as 'the general class[es] of…purchasers exposed to the products overlap.'" Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1130 (9th Cir. 2014) (quoting Sleekcraft, 559 F.2d at 353).

The Court finds that "Bad Spaniels" and Jack Daniel's merchandise are not only sold to the same class of purchasers, but also in some of the same stores, such as Walmart, Amazon.com, and Boozingear.com. (Docs. 237 at 135–37, 231-19, 231-21). Moreover, VIP has also promoted an association by featuring Jack Daniel's Tennessee Whiskey in its marketing materials for the "Bad Spaniels" dog toy. (Docs. 231-19, 231-21).

### f. Consumer Degree of Care

In general, "low prices imply correspondingly low consumer care." Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., 778 F.3d 1059, 1070–71 (9th Cir. 2015). Moreover, "purchasers are unlikely to bother to inform the trademark owner when they are confused about [the source of] an inexpensive product." See Beer-Nuts v. Clover Club Foods Co., 805 F.2d 920, 928 (10th Cir. 1986); Au-Tomotive Gold, 457 F.3d at 1077.

The Court finds that consumers are not likely to exercise significant care and attention when purchasing the "Bad Spaniels" product due to its retail value of approximately $15. Although the price of "Bad Spaniels" may be considered by some to be expensive for a dog toy, because its relative price is not expensive, consumers are more likely to be confused as to the source of the product. See Playboy, 3354 F.3d at 1028 (stating that the lack of significant consumer care increases the likelihood of confusion).

### g. Intent

Intent to copy another's mark is not required to show infringement under the Lanham Act. McCarthy, § 23:107. However, when a parodic product is involved, an intent to parody may neutralize this factor, Louis Vuitton Malletier, S.A. v. Haute Diggity

_Dog_, LLC, 507 F.3d 252, 263 (4th Cir. 2007) ("As other courts have recognized, '[a]n intent to parody is not an intent to deceive the public.'") (quoting Jordache Enter., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir. 1987)).

It is undisputed that in designing and marketing "Bad Spaniels," VIP's intent was to copy Jack Daniel's trademarks and trade dress for the purpose of parodying them. (Doc. 233-1 at 56–57, 62, 66–67, Doc. 242 at 29).

### h.  Product Line Expansion

Finally, regarding the likelihood of expansion of the parties' product lines, when parties in trademark cases do not offer goods or services in the same field, this factor assesses their likelihood of doing so. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Network Automation, 638 F.3d at 1153 (further citation omitted).

## AMENDED CONCLUSIONS OF LAW

## I.    TRADEMARK DILUTION

The Ninth Circuit reversed this Court's grant of judgment to Jack Daniel's on its trademark dilution counterclaim, holding that that "[w]hen the use of a mark is 'noncommercial,' there can be no dilution by tarnishment." 953 F.3d at 1176. The Ninth Circuit therefore found that "VIP was entitled to judgment in its favor on the federal and state law dilution claims." Ibid. This holding was vacated by the Supreme Court, which found that a parody cannot be encompassed by the statute's "noncommercial use" exclusion when it is used as a source identifier. 599 U.S. at 152.

While the Supreme Court did reverse the Ninth Circuit's determination that heightened First Amendment protections applied to "Bad Spaniels," the Supreme Court did not alter the Lanham Act's trademark dilution framework that this Court applied in its 2018 Order. On tarnishment, the Supreme Court found only that this Court had correctly concluded that VIP's source-identifying use of the "Bad Spaniels" mark could not benefit from the statute's fair-use exclusion for parody. 599 U.S. at 152.

1    Now on remand, VIP raises an unequivocal First Amendment challenge to the

2    Lanham Act's prohibition on trademark dilution by tarnishment, arguing that the

3    Supreme Court's recent decisions in <u>Matal v. Tam</u>, 582 U.S. 218 (2017) and <u>Iancu v.</u>

4    <u>Brunetti</u>, 588 U.S. 388 (2019) compel the conclusion that the statute amounts to

5    unconstitutional viewpoint discrimination by enjoining the use of a mark that "harms the

6    reputation" of a famous mark. 15 U.S.C. § 1125(c)(2)(C). However, VIP did not raise this

7    cause of action before the Court prior to the Court's 2018 judgment, nor on subsequent

8    appeal to the Ninth Circuit, raising serious questions as to whether VIP has waived its

9    claim. VIP did raise the issue of constitutionality in its merits brief to the United States

10   Supreme Court in 2023, suggesting that a narrow reading of the statute's exceptions

11   would run afoul of the First Amendment but positing that "[t]he Court need not resolve"

12   the matter of whether the statute discriminates on viewpoint "because the statute provides

13   (i) an exclusion for '[a]ny noncommercial use of a mark,' and (ii) an exclusion for '[a]ny

14   fair use..., including...parodying' the famous mark or its owner[.]". VIP Br. 12, 599 U.S.

15   140 (2023) (No. 22-148) (internal citations omitted). The Supreme Court did adopt a

16   narrower interpretation of the statute's exceptions for noncommercial use, reversing the

17   Ninth Circuit, but did not address VIP's arguments as to viewpoint discrimination.

18   Jack Daniel's contends that the Court need not and should not consider VIP's First

19   Amendment challenge to the Lanham Act because VIP waived its First Amendment

20   challenge by failing to raise the claim prior to appeal or on appeal to the Ninth Circuit.

21   (Doc. 338 at 26). In Jack Daniels' view, "VIP waived or, at a minimum, forfeited that

22   challenge multiple times over by failing to raise it at *any* prior point during this nearly

23   decade-long litigation." (<u>Id.</u>) (emphasis in original) (internal citation omitted).

24   Accordingly, before the Court can substantively consider VIP's First Amendment

25   challenge to the dilution statute, the Court must first determine whether VIP's challenge

26   should be considered by the Court or whether, as Jack Daniel's argues, it has been

27   waived.

28

1

2

### a. VIP's First Amendment challenge to the Lanham Act is not properly before the Court because it is not raised in VIP's pleadings.

3    Jack Daniel's argues that VIP waived its constitutional challenge by failing to

4    raise it during the prior proceedings before this Court from 2014–18. Jack Daniel's

5    argues that "where a party waives an issue at the trial level or on appeal, courts in this

6    circuit routinely decline to consider the issue for the first time on remand." (Doc. 338 at

7    27).

8    VIP argues that it is not precluded from raising its constitutional challenge, which

9    VIP fashions as an affirmative defense to Jack Daniel's dilution counterclaim, because

10   this matter is before the Court on a general remand. VIP rejects Jack Daniel's assertion

11   that VIP's challenge is waived because VIP did not raise it prior to the appeal of this

12   action or on appeal, arguing that the cases cited by Jack Daniels are inapposite and that,

13   even if waiver rules did apply in this instance to bar VIP's new challenge, intervening

14   changes in the law—namely, the Supreme Court's decisions in Matal and Iancu—warrant

15   a departure from the mandate. (Doc. 357 at 8–9).

16   At the nexus of the parties' dispute is the question of whether the Court may, on

17   remand, hear a new affirmative defense in the form of a facial constitutional challenge to

18   a statute that has been relied on throughout this litigation. On this question, the Court

19   concludes that it may. The Court first evaluates whether VIP's First Amendment

20   challenge is precluded by either (1) the law of the case doctrine or (2) the mandate rule.

21   The law of the case doctrine provides that issues decided at earlier stages of the litigation

22   before the court, either explicitly or by necessary inference, constitute the law of the case.

23   Milgard Tempering v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir. 1990). The Court

24   will not depart from the law of the case unless there is either (1) an intervening change in

25   controlling law; (2) new evidence has surfaced; or (3) the previous disposition has

26   resulted in clear error or manifest injustice. Waggoner v. Dallaire, 767 F.2d 589, 593 (9th

27   Cir. 1985); see also 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and

28   Procedure § 4478 (3d ed. 2024) ("Wright & Miller"). "Under the doctrine, a court is

generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case." <u>Milgard Tempering</u>, 902 F.2d at 715. Application of the doctrine is discretionary, however. <u>United States v. Mills</u>, 810 F.2d 907, 909 (9th Cir. 1987).

The mandate rule, by contrast, is not discretionary and dictates that the trial court may not depart from the mandate of an appellate court. <u>Matter of Beverly Hills Bancorp.</u>, 752 F.2d 1334, 1337 (9th Cir. 1984). The trial court may, however, decide any issue not foreclosed by the appellate court's mandate. <u>Lindy Pen Co. v. Bic Pen Corp.</u>, 982 F.2d 1400, 1404 (9th Cir. 1993) ("An order issued after remand may deviate from the mandate [] if it is not counter to the spirit of the circuit court's decision.") (overruled on other grounds). Thus, issues not decided explicitly or by necessary implication on appeal may be considered by the lower court on remand. <u>Liberty Mut. Ins. Co. v. E.E.O.C.</u>, 691 F.2d 438, 441 (9th Cir. 1982); <u>see also</u> <u>Sprague v. Ticonic Nat. Bank</u>, 307 U.S. 161, 169 ("While a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues."), <u>citing</u> <u>In re Sanford Fork & Tool Co.</u>, 160 U.S. 247 (1895); <u>see also</u> Wright & Miller at § 4478.3. In sum, the lower court may permit amendment of pleadings following remand so long as such amendment is not inconsistent with the mandate of the appellate court. <u>Beverly Hills Bancorp</u>, 752 F.2d at 1337.

This action is before the Court on a general mandate "for proceedings consistent with the Supreme Court's order." (Doc. 326-1). As VIP argues, the Court is not bound to a limited mandate, as arises where a case is remanded for resentencing or another specific directive of the appeals court. Thus, issues not decided by the appeals court are not precluded from the Court's consideration by the mandate rule. The record and procedural history of this case is clear: neither the Ninth Circuit nor the Supreme Court addressed the constitutionality of the Lanham Act's cause of action for trademark dilution. The Court has little difficulty in concluding that consideration of VIP's First Amendment challenge would not be inconsistent with the Ninth Circuit's mandate.

Jack Daniel's argues that VIP waived its constitutional challenge by failing to raise it during VIP's first appeal to the Ninth Circuit in 2018. (Doc. 338 at 28). The cases cited by Jack Daniel's indisputably affirm the well-established principle that arguments not raised in opening briefs on appeal are considered to have been waived. See Cruz v. Int'l Collection Corp., 673 F.3d 991 (9th Cir. 2012) (finding issue not raised in opening brief waived on appeal); Consumer Fin. Prot. Bureau v. CashCall, Inc., 35 F.4th 734 (9th Cir. 2022) (finding argument not raised below or in opening brief waived on appeal). However, they do not support Jack Daniel's proposition that an argument waived on appeal is necessarily waived on remand to the trial court.

Nor are Jack Daniel's citations to other Ninth Circuit cases particularly instructive on this matter, for they do not address the circumstances where party a seeks to raise a facial constitutional challenge for the first time on remand to the trial court. Sec. Inv. Prot. Corp. v. Vigman, 74 F.3d 932, 938 (9th Cir. 1996) (affirming district court's determination that claim appealed on one theory cannot be relitigated upon remand on a new theory); Raich v. Gonzales, 500 F.3d 850, 868–69 (9th Cir. 2007) (reaffirming the general principle that the Ninth Circuit will not consider arguments raised for the first time on appeal); Zixiang Li v. Kerry, 710 F.3d 995, 1000 (9th Cir. 2013) (same); M2 Software Inc. v. Viacom Inc., 223 F. App'x 653, 656 (9th Cir. 2007) (affirming district court's determination on remand that party waived issue argued at summary judgment but not raised on appeal).

There is one case cited by Jack Daniel's that is germane to the procedural circumstances before the Court: a decision out of the Central District of California finding that the mandate rule precluded post-remand amendment of the pleadings to assert new counterclaims that the court determined had been waived. Magnesystems, Inc. v. Nikken, Inc., 933 F. Supp. 944, 950–51 (C. D. Cal. 1996). Jack Daniel's quotes Magnesystems for the proposition that "an issue or factual argument waived at the trial level before a particular order is appealed, or subsequently waived on appeal, cannot be revived on remand." (Doc. 338 at 27) (quoting 933 F. Supp. at 949–50). In that case, the

court's grant of summary judgment to the plaintiff on the plaintiff's claims for patent infringement had been appealed, where the Ninth Circuit affirmed the district court and remanded for further proceedings. Then, the defendant moved to amend the pleadings to assert new counterclaims on the basis that the patent was invalid. The patent in question had already been determined by the Court to be valid in its grant of summary judgment, however. The court denied the motion, finding that the defendant had waived the issue by failing to raise it in the motions for summary judgment.

Magnesystems is distinguishable from the facts now before the Court for two reasons: first, the court in Magnesystems had, on summary judgment, determined that the patent in question was valid. 933 F. Supp. at 951. Second, the court's prior finding of validity was *upheld* by the Federal Circuit on appeal, cementing the patent's validity as the law of the case on remand. For these reasons, the court determined that the defendants had waived the issue of the patent's validity by failing to raise it earlier. Id. Here, by contrast, the Court made no prior determinations as to the constitutionality of the Lanham Act. Moreover, the Court's judgment was largely vacated by the Ninth Circuit and, as a result, the Court's prior determinations are not the law of the case.

The Court thus concludes that the law of the case and mandate rule do not preclude VIP's constitutional challenge. The facts before the Court are akin to those which confronted the Ninth Circuit in Nguyen v. United States, 792 F.2d 1500 (9th Cir. 1986). In Nguyen, the Ninth Circuit found that the mandate rule did not preclude the plaintiffs from amending their complaints to raise new claims on remand, including void for vagueness challenges to the regulation at issue—even where the case was remanded for entry of summary judgment in favor of the government. Id. at 1501–02. The Ninth Circuit held that "the mandates did not preclude amendment on remand," finding that "[a]bsent a mandate explicitly or impliedly precluding amendment, the decision whether to allow leave to amend is within the trial court's discretion." Id. at 1502–03.

Following from Nguyen, the Court rejects Jack Daniel's conclusory assertion that VIP waived its First Amendment challenge by failing to raise it prior to or on appeal.

This Court has not, expressly or impliedly, decided the constitutionality of the Lanham Act, and so VIP's First Amendment challenge is not foreclosed by the law of the case or the mandate rule.

However, that the Court's consideration of VIP's constitutional challenge is not foreclosed by the mandate or the law of the case does not mean that the new claim is properly before the Court. As the Ninth Circuit in <u>Nguyen</u> held, the plaintiff may be granted *leave to amend* the complaint following a general remand. Similarly, the Ninth Circuit in <u>Beverly Hills Bancorp</u> found that "amendment of the pleadings following remand may be permitted." 752 F.2d at 1337 (emphasis added). VIP has not moved to amend its pleadings to assert its constitutional challenge to the Lanham Act.

Ordinarily, the failure to raise a claim in a complaint means that a party cannot then raise that argument on summary judgment or at later stages of the case. <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1291–92 (9th Cir. 2000); <u>Stallcop v. Kaiser Found. Hosp.</u>, 820 F.2d 1044, 1050 n.5 (9th Cir. 1987). This rule is not without exception: "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2); <u>see</u> <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 741 (2d Cir. 2010) (considering on appeal facial Fourteenth Amendment claim not raised in complaint but briefed and argued without objection at summary judgment). This is not the case here. VIP's First Amendment challenge has not been tried by the parties' express or implied consent; Jack Daniel's opposition to VIP's attempt to raise the claim now is more than adequate evidence of that.

When asked about VIP's failure to seek to amend its pleading at the oral argument, VIP argued that VIP did not need to amend its pleadings because VIP raises its First Amendment challenge as a defense to Jack Daniel's dilution claim. However, that VIP's challenge comes as a defense does not exempt VIP from the federal rules on pleadings; a facial constitutional challenge is plainly an affirmative defense and "[i]n responding to a pleading, a party must affirmatively state any…affirmative defense[.]"—

otherwise, such a defense is waived. Fed. R. Civ. P. 8(c); In re Adbox, Inc., 488 F.3d 836, 841 (9th Cir. 2007) ("Federal Rule of Civil Procedure 8(a) and (c) provide that a defendant's failure to raise an affirmative defense in his answer effects a waiver of that defense.") (internal quotation marks omitted).

In sum, VIP's First Amendment challenge has been waived—not by virtue of VIP's failure to raise it at prior stages of this litigation, but because VIP's challenge is not raised in the pleadings. The First Amendment is far from a new or unexpected factor in this litigation—in fact, VIP maintained throughout this case that "Bad Spaniels" was entitled to sweeping First Amendment protections under the Lanham Act's fair use exclusion—but never did VIP amend its pleadings to raise a First Amendment challenge to the statute. VIP could have moved to amend its pleadings once this action was remanded to this Court to assert its challenge as a claim or an affirmative defense and the Court would have been obliged to consider such a motion under Federal Rule of Civil Procedure 15. See Wright & Miller at § 1488 (discussing timeliness of motions to amend). VIP made no such motion. VIP's constitutional challenge is not properly before the Court because it is not raised in VIP's pleadings, and the Court declines to consider the merits of it at this time.

### b. Jack Daniel's has met its burden of showing that "Bad Spaniels" tarnishes its trademarks and trade dress.

VIP argues that, even presuming the constitutionality of the Lanham Act's cause of action for tarnishment, Jack Daniel's has failed to prove tarnishment for three reasons: (1) because Jack Daniel's has produced no evidence of actual reputation harm; (2) because VIP's Silly Squeaker toy, as a product, is innocuous relative other products that other courts have found to be tarnishing; and (3) because Jack Daniel's has not made a showing of tarnishment of a famous mark due to the fact that "Old No. 7" is not, by itself, famous.

Jack Daniel's counters that (1) actual tarnishment is not required under the dilution statute, which prohibits marks that are "likely" to cause dilution by tarnishment, (2) the

dilution statute prohibits marks or trade names that are likely to cause dilution, not products, and (3) VIP's mark-to-mark comparison argument is unavailing because this Court found that "Bad Spaniels" tarnished Jack Daniel's trade dress as well as Jack Daniel's trademarks. Jack Daniel's also argues that VIP has waived its latter two arguments by failing to raise them on appeal.

As a threshold matter, the Court briefly addresses Jack Daniel's contentions that VIP has waived its latter two arguments by failing to raise them on appeal. (Doc. 358 at 23, 24). While it is true that VIP only raised its argument as to actual reputational harm on appeal to the Ninth Circuit, the Ninth Circuit vacated this Court's judgment in most respects, only affirming the Court's findings as to the distinctiveness and validity of Jack Daniel's trademarks and trade dress. As a result, the Court's prior determinations as to dilution and trademark infringement do not stand as the law of the case. Accordingly, VIP is not precluded from raising new arguments as to why Bad Spaniels does not tarnish Jack Daniel's marks and trade dress. The Court therefore addresses VIP's arguments as to dilution within the three-factor dilution analysis of fame, similarity, and reputational harm.

### 1. Fame

With respect to fame, VIP argues now that Jack Daniel's "has never made the requisite showing of tarnishment of a 'famous' mark by a correlative junior mark." (Doc. 339 at 28). Specifically, VIP contends that "Old No. 7"—one of Jack Daniel's registered trademarks associated with its Tennessee Whiskey—does not possess the level of fame necessary for a dilution claim. (Id. at 29–30). VIP concedes that the "Jack Daniel's" mark is famous, but argues that its "correlative" mark on the dog toy—"Bad Spaniels"—makes no reference to dog defecation and thus does not tarnish Jack Daniel's trademarks. (Id.) Rather, because the offending text on the toy—"Old No. 2"—is instead correlative to "Old No. 7," which VIP argues is not famous, there is no tarnishment.  (Id.)

Jack Daniel's counters that even marks which are facially benign can tarnish when they create harmful association with famous marks. (Doc. 358 at 18). As Jack Daniels

argues, "[a]ll of VIP's Bad Spaniels marks associate all of Jack Daniel's famous marks with poop, regardless of whether the marks themselves reference poop." (Id.)

The Court found in its 2018 Order that "Jack Daniel's trademarks and trade dress are famous and were famous before VIP introduced 'Bad Spaniels' in July 2014." (Doc. 254). The Court noted earlier in its Order that Jack Daniel's trademarks included both "Jack Daniel's" and "Old No. 7." (Id. at 2). VIP takes issue with the fact that the Court did not later delineate between "Jack Daniel's" and "Old No. 7" when finding that Jack Daniel's trademarks are famous. However, the Court need not reach this issue because even if the Court were to conclude that "Old No. 7" is not a famous trademark for dilution purposes, the Court disagrees with VIP's argument that the Court must undertake a "correlative" analysis of the trademarks that VIP has appropriated for use on "Bad Spaniels" in order to determine whether Jack Daniel's has proved tarnishment of a famous mark. The Lanham Act's cause of action for tarnishment prohibits the "*use of a mark*" that is likely to cause dilution by tarnishment by associating a junior mark with a similar famous mark. 15 U.S.C. § 1125(c)(1) (emphasis added).

It is VIP's use of Jack Daniel's marks—on a poop-themed dog chew toy—that Jack Daniel's claims tarnish its trademarks, not "Bad Spaniels" itself when taken in isolation. That "Bad Spaniels" as a trademark does not tarnish Jack Daniel's does not also mean that "Bad Spaniels" the dog chew toy does not. VIP's interpretation would exclude numerous uses of famous trademarks from the reaches of the Lanham Act's cause of action for dilution by tarnishment. Take, for instance, the Sixth Circuit's decision in V Secret Catalogue v. Moseley, 605 F.3d 382 (6th Cir. 2010) ("Moseley II"), which VIP cites. Nothing is inherently tarnishing about the trademark "Victor's Secret" when taken in isolation; instead, it was the defendant's use of "Victor's Secret" for an adult novelty store that constituted tarnishment of the famous Victoria's Secret trademark because it associated Victoria's Secret with sex. See id. at 387–89. Under VIP's approach, there would be no tarnishment in that instance because a correlative analysis of "Victor's Secret," viewed in isolation and compared to Victoria's Secret, yields no apparent

disparagement or unsavory association. By prohibiting the tarnishing "use" of a mark, however, the Lanham Act avoids the interpretation that VIP advances.

The Court finds that Jack Daniel's has shown by a preponderance of the evidence that its trademarks and trade dress were famous prior to VIP's use of "Bad Spaniels." Jack Daniel's trademarks and trade dress, which Jack Daniel's has used almost continuously for a century and on which Jack Daniel's has spent millions of dollars on advertising, were widely recognized by the general public of the United States by July of 2014. Accordingly, Jack Daniel's has established its fame by a preponderance of the evidence for the purposes of both the Lanham Act's and Arizona's causes of action for trademark dilution. A.R.S. § 44-1448.01(A)(1)–(8).

### 2. Similarity

The similarity factor is easily disposed of. The Court has already found a high degree of similarity between the VIP's and Jack Daniel's marks and the parties raise no new arguments on this factor. As noted above, VIP does not contest the similarity of the products and intentionally designed "Bad Spaniels" to closely mimic Jack Daniel's Tennessee Whiskey. The Court finds that Jack Daniel's has established the requisite similarity between "Bad Spaniels" and Jack Daniel's trademarks and trade dress.

### 3. Reputational Harm

Finally, the Court addresses VIP's arguments as to reputational harm. The Court has, in its findings of fact, credited the testimony of Jack Daniel's expert Dr. Simonson that "Bad Spaniels" is likely to dilute Jack Daniel's trademarks and trade dress by virtue of creating unsavory associations between Jack Daniel's marks and dog feces. VIP argues on remand that there is no evidence of actual tarnishment of Jack Daniel's reputation. (Doc. 339 at 35–36). VIP argues that the opinion of one individual—namely, Dr. Itamar Simonson, Jack Daniel's expert witness—cannot suffice to show tarnishment. Dr. Simonson's conclusions that the association of dog poop with Jack Daniel's whiskey is tarnishing to Jack Daniel's should be disregarded, VIP argues, because Dr. Simonson failed to account for the fact that "Bad Spaniels" is a parody or that poop can sometimes

be "wholesome." (Doc. 339 at 35). VIP also contends that "Bad Spaniels has been on the market for ten years and . . . [Jack Daniel's] has not sought to introduce evidence of actual reputational harm to its marks." (Id. at 35).

To begin, the Court recalls that the parties agreed at the post-remand status conference that the Court need not undertake additional findings of fact in order to decide this matter and that briefing on the remaining legal issues would suffice. The parties reaffirmed this fact at the oral argument held in this matter on December 3, 2024. VIP, in arguing that no evidence of reputational harm has been found in the ten years since "Bad Spaniels" was released, apparently invites the Court to make additional findings of fact—without any evidentiary basis—as to whether reputational harm has occurred in the intervening years between the initial appeal of this case and the present day. The Court rejects VIP's attempt to backdoor in new factual determinations. Moreover, Jack Daniel's previously prevailed on its tarnishment counterclaim; that Jack Daniel's has not sought to introduce new evidence of reputational harm to bolster its claim is hardly persuasive evidence that such harm is absent.

In any event, the Court agrees with Jack Daniel's that, under the plain language of the TDRA, actual tarnishment is not required. See 15 U.S.C. § 1125(c)(1). Congress amended the TDRA in 2006 to expressly state what several courts had already concluded: that trademark dilution by tarnishment is actionable. See McCarthy, § 24:89 ("Several cases held that the 1996 FTDA did encompass dilution by tarnishment."). But Congress not only amended the statute to recognize that dilution by tarnishment was actionable; Congress also rejected the standard announced by the Supreme Court in Moseley v. V Secret Catalogue, wherein the Supreme Court concluded that "actual harm," rather than simply the "likelihood of tarnishment," was necessary. See Moseley II, 605 F.3d at 382 (quoting Moseley v. V Secret Catalogue, 537 U.S. 418, 434 (2003) ("Moseley I")). Congress amended the statute to state that a trademark holder need only show that there is a *likelihood* of dilution of the famous mark. See Moseley II, 605 F.3d at 382 ("Congress rejected the Court's view that a simple 'likelihood' of association in the

consumer's mind of the Victoria's Secret mark with the sexually-oriented videos and toys of 'Victor's Secret' is insufficient for liability."). Section § 1125(c)(1) provides that injunction may be sought against another who uses "a mark or trade name in commerce that is *likely* to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." (emphasis added).

To prove a violation of the antidilution statute, a plaintiff must show that "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." Jada Toys, 518 F.3d at 634. Mere association of a famous mark with a negative-sounding junior mark is insufficient evidence of the likelihood of reputational harm; the relevant inquiry is how the use of the junior mark affects the consumer's positive impressions of the famous mark. See Starbucks, 588 F.3d at 110.

The Court finds unpersuasive VIP's argument that Dr. Simonson's testimony is insufficient to show tarnishment because it merely amounts to Dr. Simonson's subjective impression of the tarnishing effect of "Bad Spaniels." VIP contends that Dr. Simonson's conclusions are unsupported because Dr. Simonson conducted no surveys or focus groups and failed to account for the fact that "Bad Spaniels" is a parody product. (Doc. 330 at 26). "That Dr. Simonson may be upset by dog poop doesn't foot the bill[,]" VIP argues. (Id. at 27).

VIP misconstrues and misstates the testimony provided by Dr. Simonson. In reaching his conclusions, Dr. Simonson evaluated consumer psychology research showing that the association of food of beverage with defecation generates disgust in the mind of the consumer. Based on well-documented research suggesting that such feces-related associations lead to negative consumer associations with food and drink products, Dr. Simonson concluded that "Bad Spaniels" was likely to create negative associations of Jack Daniel's whiskey with feces and thereby undermine the positive associations that

Jack Daniel's has created with respect to its whiskey. (Doc. 234 at 172–74, 200). In weighing the testimony and evidence supplied by the parties' experts, the Court has credited and given prevailing weight to Dr. Simonson's conclusion that "Bad Spaniels" is likely to tarnish Jack Daniel's trademarks by creating negative associations of Jack Daniel's products with dog feces.

The Court also rejects VIP's argument that "Bad Spaniels" does not tarnish Jack Daniel's trademarks and trade dress because poop jokes are innocuous in comparison to sex and drug associations. While it is true, as VIP argues, that courts have generally found tarnishment in such instances—the Sixth Circuit in Moseley II even recognized a presumption of tarnishment when a junior user's mark is used to sell sex-related products, see 605 F.3d at 385—the antidilution statute does not dictate that tarnishment may only occur via association with sex and drugs. "Tarnishment is not limited to seamy conduct." Hormel Foods, 73 F.3d at 507; Courts may find tarnishment if there is a likelihood that the plaintiff's mark will suffer negative associations with an inferior product. Ibid.; see also L.L. Bean, Inc. v. Drake Pub. Inc., 811 F.2d 26, 31 (1st Cir. 1987) ("[T]he threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark."). Because Jack Daniel's produces a product intended for human consumption, association of Jack Daniel's marks with something like dog feces is particularly detrimental.

While it is obviously true that "Bad Spaniels" does not actually contain dog feces and consumers would not believe that it does, the fact remains that "Bad Spaniels" creates an association between dog feces and Jack Daniel's by way of referencing dog feces in substitution for Jack Daniel's listed qualities. VIP's use of "The Old No. 2 on your Tennessee carpet" in place of "Old No. 7 Tennessee Sour Mash Whiskey," together with VIP's replacement of "40% alcohol by vol. (80 proof)" with "43% poo by vol." and "100% smelly" create unsavory associations that denigrate Jack Daniel's marks and undermine the positive associations that Jack Daniel's has taken considerable expense to

create. See Grey v. Campbell Soup Co., 650 F. Supp. 1166, 1175 (C.D. Cal. 1986) (finding that DOGIVA and CATIVA pet treats "injures Campbell's business reputation because of the association which the public makes between DOGIVA and CATIVA treats for animals and GODIVA premium quality food products which are intended for human consumption."); see also Chem. Corp. of Am. v. Anheuser-Busch, Inc., 306 F.2d 433 (5th Cir. 1962) (emphasizing "the peculiarly unwholesome association of ideas when the word 'bugs' was substituted in the slogan for the word 'Bud,' referring to a food product."); Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc., 642 F. Supp. 1031, 1040 (N.D. Ga. 1986) (enjoining use of "Garbage Pail Kids" because product's "association with Cabbage Patch Kids would disparage the wholesome image plaintiff attempts to present for its products.") (internal quotation marks omitted); Steinway & Sons v. Robert Demars & Friends et al., 2010 U.S.P.Q. 954 (C.D. Cal. 1981) (enjoining sale of clip-on beverage can handles under the name STEIN-WAY, finding that such association would inevitably tarnish Steinway's reputation and image with the public as sponsoring only products of taste, quality, and distinction).

As the Court found after the bench trial of this matter in 2018, "Bad Spaniels" creates a negative association with Jack Daniel's whiskey by associating whiskey with dog feces and is likely to tarnish Jack Daniel's trademarks. VIP's parodic intentions in creating "Bad Spaniels" do not exempt VIP from the TDRA's cause of action for dilution by tarnishment. VIP's position that excrement-focused messaging used to parody a product intended for human consumption does not amount to tarnishment is unpersuasive. The Court sees no reason to depart from its prior conclusion that Jack Daniel's has shown that its reputation is likely to be harmed by association with a dog chew toy that replaces Jack Daniel's whiskey's listed qualities with dog feces-related humor. See Anheuser-Busch, Inc. v. Balducci Publ'ns, 28 F.3d 769, 777 (8th Cir. 1994) (finding "obvious" tarnishment where ad parody suggested that Michelob beer contained oil).

1   The Court thus finds that Jack Daniel's has demonstrated by a preponderance of
2   the evidence all of the elements necessary for a claim of dilution by tarnishment: fame,
3   similarity, and reputational harm, caused by the association of VIP's use of "Bad
4   Spaniels" with Jack Daniel's trademarks and trade dress.

5   **II.    TRADEMARK INFRINGEMENT**

6   This Court concluded in its 2018 Order that "Bad Spaniels" infringed on Jack
7   Daniel's trademark and trade dress rights because there was a likelihood of consumer
8   confusion as to the source of "Bad Spaniels." (Doc. 245 at 23). As with the Court's
9   judgment on the issue of dilution, its trademark infringement finding was vacated by the
10  Ninth Circuit on the threshold basis that "Bad Spaniels" was an expressive work entitled
11  to heightened First Amendment protections under Rogers. 953 F.3d at 1175–76. In the
12  Supreme Court's subsequent vacatur of the Ninth Circuit, the Supreme Court noted that,
13  although "Bad Spaniels" was not entitled to protection under Rogers because VIP used it
14  as a source identifier, "a trademark's expressive message—particularly a parodic one, as
15  VIP asserts—may properly figure in assessing the likelihood of confusion." 599 U.S.
16  161. Accordingly, the issue that remains for the Court to consider is how the trademark
17  infringement analysis that the Court must again undertake is impacted by the fact that
18  "Bad Spaniels" was conceived as a parody.

19  **a.  Jack Daniel's has not shown by a preponderance of the evidence that "Bad**
20  **Spaniels" creates a likelihood of confusion as to its source.**

21  VIP has always maintained that "Bad Spaniels" parodies Jack Daniel's. In its
22  previous disposition of this action, this Court found that VIP's claim of parody should be
23  disregarded because VIP intended to capitalize on the success of Jack Daniel's mark.
24  (Doc. 245 at 19) ("A defendant's claim of parody will be disregarded where the purpose
25  of the similarity is to capitalize on a famous mark's popularity for the defendant's own
26  commercial use.") (citing Grey, 650 F. Supp. At 1175). The Supreme Court's decision in
27  this action, however, makes clear that VIP's parodic intentions should not be disregarded
28  so readily.

The Supreme Court, in its disposition of this action, did not expressly delineate how parody should factor into the trademark infringement analysis because the issue was not before the Court. The Supreme Court did, however, note that the alleged infringing product must be a *successful* parody in order to avoid confusion, meaning that, in addition to "conjur[ing] up" the original, it must "create contrasts, so that its message of ridicule or pointed humor becomes clear." 599 U.S. at 161. In observing this, the Supreme Court cited to the Fourth Circuit's decision in Haute Diggity Dog, 507 F.3d at 265, in which the Fourth Circuit found that Haute Diggity Dog's chew toys that parodied Luis Vuitton purses did not infringe on Louis Vuitton's trademark rights because the parodies were not likely to be confusing to consumers. See 599 U.S. at 161.

In considering how parody should impact the infringement analysis, the Court finds instructive the method of analysis adopted by the Fourth Circuit in Haute Diggity Dog. There, the Fourth Circuit considered first whether the parody succeeded before turning to the likelihood of confusion analysis. 507 F.3d at 259 ("Because Haute Diggity Dog's arguments with respect to the [likelihood of confusion] factors depend to a great extent on whether its products and marks are successful parodies, we consider first whether Haute Diggity Dog's products, marks, and trade dress are indeed successful parodies of LVM's marks and trade dress."). The Court thus undertakes a two-part analysis before proceeding to the Sleekcraft factors, considering first whether VIP's parody evokes the original, and then whether it creates contrasts through humor adequate to dispel confusion as to the source of the parody. See also Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc., 886 F.2d 490, 494 (2d Cir. 1989) ("A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody.").

For "Bad Spaniels" to prevail on the first part of this analysis, it must evoke Jack Daniel's trademarks and trade dress. While more similarities between marks typically point to a greater likelihood of confusion, in the context of parody, some similarities are essential. See McCarthy, § 31:153 ("[A] parody, by definition, must at least take enough

- 38 -

of the original to conjure it up[.]"). On this first element, the parties are in agreement: VIP's "Bad Spaniels" toy evokes Jack Daniel's trademarks and trade dress by closely copying the style of Jack Daniel's label, as well as, *inter alia*, the size and shape of the bottle. The Court already found in its trademark dilution analysis that "Bad Spaniels" bears numerous similarities to Jack Daniel's and has no trouble concluding here that "Bad Spaniels" bears the first quality of a successful parody in that it undisputedly conjures up the image of Jack Daniel's.

The parties primarily dispute the second element—whether "Bad Spaniels" creates sufficient contrasts between itself and Jack Daniel's marks by way of conveying a humorous message. Jack Daniel's argues that VIP's "Bad Spaniels" toy does not create sufficient contrasts between the toy and Jack Daniel's products because there are only minor differences between the products and because "Bad Spaniels" does not "ridicule" or otherwise comment on Jack Daniel's. (Doc. 338 at 22), <u>citing</u> 599 U.S. at 161 (describing a successful parody as one which, through contrasts, creates a "message of ridicule or pointed humor."). Jack Daniel's argues that "[e]ven if VIP had some parodic intent, it is of the most generic kind[,]" and "VIP has never suggested that its 'parody' comments on anything specific to Jack Daniel's." (Doc. 338 at 22).

By Jack Daniel's reasoning, a parody must convey some message of ridicule about the mark being parodied in order to succeed. The question that thus confronts the Court is whether, as Jack Daniel's argues, a parody must contain a message of ridicule directed at the famous mark.

The Supreme Court has previously offered a definition of parody, albeit in the copyright context, as follows: "Modern dictionaries . . . describe a parody as a 'literary or artistic work that imitates the characteristic style of an author of a work for comic effect or ridicule[.]'" <u>Campbell v. Acuff-Rose Music</u>, 510 U.S. 569 (1994) (quoting American Heritage Dictionary 1317 (3d ed. 1992)). Circuit courts which have considered the issue appear to largely agree that a parody need not contain some commentary of ridicule about the mark being parodied. The First Circuit described trademark parodies as follows:

Trademark parodies . . . do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

L.L. Bean, 811 F.2d at 34; accord Anheuser-Busch, Inc. v. L. & L. Wings, Inc., 962 F.4th 316, 321 (4th Cir. 1992).

Indeed, courts have found parodies to be successful or obvious even where there was no apparent message or commentary at all about the famous mark. See Tommy Hilfiger, 221 F. Supp. 2d at 415 (finding pet perfume coined "Timmy Holedigger" to be an obvious parody of Tommy Hilfiger even though the "product admittedly makes no comment about Hilfiger[.]"); see Lyons P'ship v. Giannoulas, 179 F.3d 384, 389–90 (5th Cir. 1999) (finding that sports mascot's satirical performance featuring a lookalike of "Barney" the purple dinosaur qualified as a non-infringing parody); Jordache, 828 F.2d at 1486 (affirming finding that "Lardashe" jeans parodied Jordache despite Lardashe creator's contention that Lardashe was not a parody at all and the marks' similarities were coincidental). Nor is a parody that does offer pointed humor directed at a famous mark *per se* absolved from a finding of confusion. See Balducci Publ'ns, 28 F.3d at 776–77 (finding likelihood of confusion as to parody fictitious product "Michelob Oily" that commented on environmental pollution in conjunction with Anheuser-Busch's brand).

The Court's review of prior cases discussing parody leads the Court to conclude that "Bad Spaniels" need not contain some message of ridicule directed at Jack Daniel's in order to succeed as a parody product. "Bad Spaniels" must instead create contrasts between it and Jack Daniel's trademarks by way of a humorous message achievable "by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." L.L. Bean, 811 F.2d at 34. Based upon these criteria, the Court must conclude that "Bad Spaniels" achieves this juxtaposition.

An evaluation of the "Bad Spaniels" alongside a bottle of Jack Daniel's whiskey, as pictured earlier in this discussion, yields numerous readily visible contrasts. The most obvious contrasts include the prominent cartoon image of a spaniel dog on the label—notably absent from Jack Daniel's label—and the replacement of "Jack Daniel's" with "Bad Spaniels." While the substitution of Jack Daniel's with "Bad Spaniels" together with the cartoon image is itself humorous, perhaps more importantly, the contrasts that communicate that "Bad Spaniels" is a parody are the substitutions of the original label's texts with references to dog feces, those being "The Old No. 2 on your Tennessee Carpet," "43% POO BY VOL.," and "100% SMELLY." It is these contrasts that transform "Bad Spaniels" into an irreverent and parodic representation of Jack Daniel's. While "Bad Spaniels" may not contain a message of ridicule about Jack Daniel's as a brand, the toy's references to the product containing dog feces in place of alcohol do convey a message of humor to some, and the Court finds that this suffices as a parody.

At the oral argument held in this matter, Jack Daniel's distinguished between prior cases finding a successful parody and the facts now before the Court by arguing that prior cases tended to involve "gag gifts," whereas this action does not. But it is difficult to cast a dog chew toy in the form of a popular liquor bottle as anything other than a gag gift, even if the dog does not appreciate the humorous nature of it. This argument does not help Jack Daniel's.

In sum, the Court finds that "Bad Spaniel" both evokes and humorously contrasts with Jack Daniel's marks such that it succeeds as a parody. As the Fourth Circuit recognized in Haute Diggity Dog, however, a finding that a product is a successful parody does not obviate the need to conduct a likelihood of confusion analysis. 507 F.3d at 261. While bearing in mind that "a [successful] parody is not often likely to create confusion[,]" 599 U.S. at 160, the Court now proceeds to the Sleekcraft factors.

### 1. Similarity of the marks

The similarity factor is largely subsumed into the preceding evaluation of whether "Bad Spaniels" is a successful parody, on which the Court has concluded that "Bad

Spaniels" is both similar to Jack Daniel's marks and also creates contrasts with and successfully parodies Jack Daniel's. See Haute Diggity Dog, 507 F.3d at 252 ("In concluding that Haute Diggity Dog has a successful parody, we have impliedly concluded that Haute Diggity Dog appropriately mimicked a part of the LVM marks, but at the same time sufficiently distinguished its own product to communicate the satire."). Whereas the Court concluded in its 2018 Order that this factor favored Jack Daniel's in the likelihood of confusion analysis, VIP argues that this factor inverts in favor of VIP when accounting for parody because the similarity between the products is essential to the parody's success. (Doc. 339 at 20). As VIP argues, "Bad Spaniel's similarity to Jack Daniel's trade dress extends far enough to allow consumers to grasp the parody—but no more than that." (Id. at 21). "Bad Spaniels" undisputedly bears similarities to Jack Daniel's whiskey, but the Court concludes that such similarities are necessary in order for "Bad Spaniels" to evoke Jack Daniel's as a parody. See Tommy Hilfiger, 221 F. Supp. 2d at 417. This factor tips in favor of VIP.

## 2. Strength of Jack Daniel's mark

As the Court has found, Jack Daniel's trademarks have been used almost continuously for more than a century and Jack Daniel's the best-selling whiskey in the United States. VIP does not contest the strength of Jack Daniel's trademarks and trade dress, and the Court sees no reason to depart from its prior conclusion that Jack Daniel's has presented compelling evidence of the strength of its marks.

The Court concluded in its 2018 Order that this factor strongly favored Jack Daniel's. See McCarthy, § 24:49 ("The more famous and well known a plaintiff's mark, the greater the likelihood that use on noncompetitive products will cause confusion.") (internal quotation marks omitted). VIP argues that the Court should reach a different result now in light of the Supreme Court's decision and points to Haute Diggity Dog, in which the Fourth Circuit, conducting a likelihood of confusion analysis as to a parody product, determined that "the strength of a famous mark allows consumers immediately to perceive the target of the parody, while simultaneously allowing them to recognize the

changes to the mark that make the parody funny or biting." 507 F.3d at 261. As a result, the Fourth Circuit concluded that although Louis Vuitton's marks were strong, the factor did not tip in Louis Vuitton's favor. Id. at 262.

When accounting for parody in the likelihood of confusion analysis, the fact that Jack Daniel's trademarks are strong does not tip the scales in Jack Daniel's favor. Courts have concluded that a successful parody is necessarily dependent on the widespread recognition of the parodied trademark in order to avoid consumer confusion. See, e.g., Tommy Hilfiger, 221 F. Supp. 2d at 416 ("[I]t is precisely because of the mark's fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends on to achieve the parody."). Thus, this factor also inverts to favor VIP. See Hormel Foods, 73 F.3d at 503 (concluding that strength of Hormel's SPAM trademark weighed against likelihood of confusion about source of parody).

### 3. Proximity or relatedness of the goods and likelihood of expansion into other markets

The Court has found that Jack Daniel's products and the "Bad Spaniels" dog toy are at least somewhat related because Jack Daniel's, though primarily a producer of whiskey, has licensed its trademark and trade dress rights for use on dog-related products, including dog leashes, dog collars, and dog houses. As VIP counters, Jack Daniel's dog-related products are only sold at Jack Daniel's distillery's gift shop in Lynchburg, Tennessee. However, the fact remains that Jack Daniel's has licensed its trademark rights to a wide variety of non-alcohol related products that the public associates with Jack Daniel's. The Court sees no reason to depart from its prior conclusion that the proximity of goods factor weighs in favor of Jack Daniel's. See Int'l Kennel Club of Chi., 846 F.2d 1079 (7th Cir. 1988).

Neither party argues in substance as to the likelihood that Jack Daniel's will expand into other markets, perhaps because Jack Daniel's already markets to dog owners, and the Court sees no cause to consider this factor separately.

///

1

### 4. VIP's intent in selecting the mark

2      It is undisputed that VIP intentionally copied Jack Daniel's marks when creating

3  "Bad Spaniels." In its 2018 Order, the Court concluded that the intent factor favored Jack

4  Daniel's because VIP intended to copy Jack Daniel's marks and capitalize on Jack

5  Daniel's good will. (Doc. 245). VIP does not dispute that VIP intended to copy Jack

6  Daniel's marks when creating "Bad Spaniels," but argues that this factor should favor

7  VIP because VIP's intent was to parody, not to deceive. (Doc. 339 at 21–22). Jack

8  Daniel's argues that the intent factor is either neutral or still favors Jack Daniel's because

9  VIP failed to create sufficient contrasts between VIP's and Jack Daniel's marks. (Doc.

10  338 at 21).

11      This Court previously determined in its 2018 Order that VIP's parody argument

12  should be disregarded because VIP intended to capitalize on Jack Daniel's fame for

13  VIP's own commercial gain. (Doc. 245 at 19). This conclusion, however, bears revisiting

14  in the wake of the Supreme Court's decision in this case because, although the Supreme

15  Court determined that products using a mark "'at least in part' for 'source

16  identification'—when the defendant may be trading on the good will of the trademark

17  owner to market its own goods" are not entitled to heightened protection under Rogers,

18  the Supreme Court also recognized that non-confusing trademark parodies may not

19  constitute actionable trademark infringement. 599 U.S. at 161. The foremost concern of

20  the intent factor, then, is not the intent to capitalize on another trademark's fame, but the

21  intent to deceive consumers in doing so. See Haute Diggity Dog, 507 F.3d at 263

22  ("Despite Haute Diggity Dog's obvious intent to profit from its use of parodies, this

23  action does not amount to a bad faith intent to create consumer confusion.").

24      Accordingly, although VIP intended to copy Jack Daniel's trademarks and trade

25  dress, this factor does not favor Jack Daniel's because VIP's purpose was not to deceive

26  consumers. Instead, VIP's intent was to create a parody product. See Jordache, 828 F.2d

27  at 1487 ("An intent to parody is not an intent to confuse the public."). The Court

28

1  concludes that this factor is neutral and does not weigh in favor of or against either party.

2  See Haute Diggity Dog, 507 F.3d at 263.

3  **5.  Evidence of actual confusion**

4  With respect to actual consumer confusion, the Court has credited Dr. Ford's

5  determination that there exists some degree of actual consumer confusion as to the origin

6  of "Bad Spaniels" because Dr. Ford's data showed that 29% of survey respondents

7  believed that it was made or approved by Jack Daniel's. Jack Daniel's argues that nothing

8  in the Supreme Court's disposition of this action upsets this Court's prior finding that the

9  actual confusion factor weighs strongly in favor of Jack Daniel's. (Doc. 338 at 20). VIP

10  argues, by contrast, that there has been no evidence of actual confusion in the ten years

11  since this litigation began, and that Justice Sotomayor's concurrence in the Supreme

12  Court's decision, in which Justice Sotomayor advised against giving undue weight to

13  survey evidence in the context of parodic products, should undercut the weight given to

14  Dr. Ford's survey. (Doc. 339 at 23–25).

15  The Court reiterates that the parties agreed that there was no need to reopen the

16  findings of fact in order to decide this matter. Yet, VIP invites the Court again to make

17  new findings of fact as to confusion that may or may not have occurred in the intervening

18  years between the Court's 2018 Order and the present day. The Court declines to do so.

19  The Court acknowledges VIP's arguments as to Justice Sotomayor's concurrence

20  in this matter. Justice Sotomayor wrote separately to advise against reliance on the results

21  of consumer surveys on confusion, noting that "there is particular risk in giving uncritical

22  or undue weight" to survey results because such results "may reflect "a mistaken belief

23  among some survey respondents that all parodies require permission from the owner of

24  the parodied mark." 599 U.S. at 164 (Sotomayor, J., concurring). Justice Sotomayor

25  quoted survey answers that evinced some belief among the survey respondents that Jack

26  Daniel's must have given permission for "Bad Spaniels" to copy Jack Daniel's products.

27  (Ibid.) However, as the trial court, this Court is tasked with weighing the evidence

28  presented by the parties, and the parties opted to present such evidence through surveys.

"Surveys are … routinely admitted in trademark and false advertising cases to show actual confusion[.]" Schering, 189 F.3d at 225; see also McCarthy, § 32:158 (discussing the need for survey evidence in trademark disputes).

Ultimately, Dr. Ford's results showed that a significant portion of the survey respondents believed that Jack Daniel's was associated with "Bad Spaniels" in some manner, and so the Court does not depart from its previous conclusion that this factor weighs in favor of Jack Daniel's. As the parties agreed, the Court is proceeding on the record as established at the 2018 bench trial of this matter and, though VIP may argue as to why Dr. Ford's survey should have been conducted differently, the Court will not speculate as to what the results of a differently conducted survey *may* have shown. Bearing in mind that Dr. Ford's survey may not have accounted for the fact that "Bad Spaniels" is a parody product, however, the Court affords limited weight to this factor.

### 6. Marketing channels

As the Court has found, VIP and Jack Daniel's products are sold through several of the same marketing channels, including Walmart, Amazon.com, and Boozingear.com. The Court has also found that VIP promoted an association between its "Bad Spaniels" toy and Jack Daniel's whiskey by including a bottle of Jack Daniel's in its marketing materials.

VIP contends that cases decided subsequent to this Court's 2018 Order have noted that this factor does not merit much consideration in the overall analysis when the marketing channels concerned are ubiquitous, such as Amazon. See, e.g., Uncommon, LLC v. Spigen, Inc., 926 F.3d 409, 426 (7th Cir. 2019) (finding marketing channels factor to "slightly" favor the plaintiff because "both parties sell nationwide through online retailers" but "selling through Amazon and eBay is ubiquitous[.]"). The Court agrees with this line of reasoning; as a result of the expansion of e-commerce, the fact that two products are available on an omnipresent platform such as Amazon does not significantly support an inference that a likelihood of confusion will be created by both products' availability on that platform. However, there is ultimately some overlap in the

marketing channels utilized by the parties, and VIP's argument against the Court's consideration of Boozingear.com is less persuasive. The Court concludes that this factor tips in Jack Daniel's favor but does not weigh heavily in the overall analysis.

### 7. Degree of care likely to be exercised by purchasers of VIP's product

The Court has found that consumers are unlikely to exercise a large degree of care and attention when purchasing "Bad Spaniels," a $15 dog toy, and sees no reason to depart from this conclusion now. VIP does raise arguments as to why the Court should weigh the evidence differently, arguing, for instance, that Jack Daniel's higher price point and degree of brand loyalty should prompt consumers to exercise a higher degree of care. (Doc. 339 at 28–29). VIP's arguments are unpersuasive. Based on the Court's findings of fact, the Court concludes that consumers purchasing a $15 dog chew toy are unlikely to exercise significant care and attention when making such a purchase, and this factor still favors Jack Daniel's in the likelihood of confusion analysis.

### b. Conclusion

Neither party seizes a runaway victory upon reconsideration of the <u>Sleekcraft</u> factors when accounting for the parodic intentions of "Bad Spaniels." However, beginning the <u>Sleekcraft</u> evaluation with the premise that a successful parody is unlikely to be confusing, the Court finds that Jack Daniel's has not shown by a preponderance of the evidence that VIP's "Bad Spaniels" toy creates a likelihood of confusion. The foremost concern of trademark infringement is consumer confusion as to source, and, when accounting for parody, the Court cannot conclude based on the <u>Sleekcraft</u> factors that consumer confusion is likely.

In reaching this conclusion, the Court bears in mind that the <u>Sleekcraft</u> factors are intended to facilitate a case-specific evaluation rather than serve as a rigid checklist of factors. <u>See</u> <u>Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.</u>, 109 F.3d 1394, 1404 (9th Cir. 1997). Adjusting the <u>Sleekcraft</u> factors to account for parody neutralizes or flips three important factors—similarity of the marks, VIP's intent, and strength of Jack Daniel's mark—in VIP's favor. <u>See</u> <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199,

1205 (9th Cir. 2000) ("The first <u>Sleekcraft</u> factor—the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis."). Without a strong showing on the remaining factors, Jack Daniel's has not shown a likelihood of confusion. As such, the Court finds by a preponderance of the evidence that VIP has not infringed on Jack Daniel's trademark rights.

## III.    CONCLUSION

The Court finds that VIP has prevailed on the issue of trademark infringement; however, the same cannot be said for trademark dilution. In fact, the qualities on which "Bad Spaniels" runs afoul of the Lanham Act's cause of action for dilution by tarnishment are the very qualities that help "Bad Spaniels" to prevail on a trademark infringement claim, as they are the qualities that create contrasts with Jack Daniel's mark by way of irreverent juxtaposition. As McCarthy observed, "[t]he irony is that the more distasteful and crude the parody, the less likely it is that the public will mistakenly think that the trademark owner has sponsored or approved it." § 31:153.

"Bad Spaniels" finds itself in the category of a non-confusing parody product that is nonetheless impermissible under the Lanham Act's cause of action for tarnishment. This divergent result arises because the considerations under the Lanham Act's cause of action for trademark infringement and trademark dilution are distinct; liability for trademark infringement "protects the prior user of a mark from the potential diversion of trade or harm to reputation that results when purchasers are confused as to the source or sponsorship of goods or services bearing the mark[,]" whereas "antidilution statutes protect against … dilution of the distinctiveness and the selling power of a mark." Restatement (Third) of Unfair Competition, § 25 (1995). As further explained in the Restatement,

> Tarnishment and dilution of distinctiveness, although conceptually distinct, both undermine the selling power of a mark, the latter by disturbing the conditioned association of the mark with the prior user and the former by displacing positive with negative associations. Thus, tarnishment and

1    dilution of distinctiveness reduce the value of the mark to the trademark

2    owner.

3    <u>Ibid.</u>  Thus, a parodic product that does not create confusion as to its source may still, by

4    way of the irreverent message qualifying it as a parody in the first instance, create

5    negative associations and reduce the value of the famous mark to its owner. Such is the

6    case here.

7    Upon review of the factual record and the parties' arguments, the Court finds that

8    Jack Daniel's has not established by a preponderance of the evidence that "Bad Spaniels"

9    infringes on Jack Daniel's trademark rights. However, Jack Daniel's has shown, by way

10   of expert testimony on well-documented consumer psychology research, that "Bad

11   Spaniels" is likely to tarnish Jack Daniel's trademarks and trade dress. As it is only

12   necessary for Jack Daniel's to prevail on one of its counterclaims in order to obtain an

13   injunction, the Court finds that a permanent injunction is appropriate here and directs

14   Jack Daniel's to file a proposed form of injunction.

15   **IT IS THEREFORE ORDERED** that Jack Daniel's Products, Inc. is entitled to

16   judgment in its favor against VIP Products, LLC on Jack Daniel's trademark and trade

17   dress dilution counterclaims pursuant to the Lanham Act, 15 U.S.C. § 1125, and

18   Arizona's antidilution statute, A.R.S. § 44-1448.01.

19   **IT IS FURTHER ORDERED** that VIP Products LLC is not liable to Jack

20   Daniel's on Jack Daniel's trademark and trade dress infringement counterclaims.

21   **IT IS FURTHER ORDERED directing** Jack Daniel's Properties, Inc. to file a

22   proposed form of injunction within thirty (30) days of this Order.

23   Dated this 21st day of January, 2025.

24

25   _____

26   Stephen M. McNamee

Senior United States District Judge

27

28