UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

VIP Products, LLC,                    )
                                      ) No. 2:14-cv-02057-SMM
                         Plaintiff,   )
                                      )
           vs.                        )
                                      ) Phoenix, Arizona
**Jack Daniel's Properties**          ) December 3, 2024
**Incorporated,**                     ) 9:54 a.m.
                                      )
                         Defendant.   )
_____

BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>ORAL ARGUMENT RE: CROSS MOTIONS FOR ENTRY OF JUDGMENT</u>

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3    For the Plaintiff:
         DICKINSON WRIGHT PLLC
         By:  **Alexandra Crandall, Esq.**
4        1850 N Central Avenue, Ste. 1400
         Phoenix, AZ 85004
5
     For the Plaintiff:
6        DICKINSON WRIGHT PLLC
         By:  **Bennett Evan Cooper, Esq.**
7        1850 N Central Avenue, Ste. 1400
         Phoenix, AZ 85004
8
     For the Plaintiff:
9        DICKINSON WRIGHT PLLC
         By:  **David Geoffrey Bray, Esq.**
10       1850 N Central Avenue, Ste. 1400
         Phoenix, AZ 85004
11
     For the Plaintiff:
12       DICKINSON WRIGHT PLLC
         By:  **Vail Choji Bryant Cloar, Esq.**
13       1850 N Central Avenue, Ste. 1400
         Phoenix, AZ 85004
14
     For the Defendant:
15       WILLIAMS & CONNOLLY LLP-WASHINGTON, DC
         By:  **Amy Mason Saharia, Esq.**
16       680 Maine Ave, SW
         Washington, DC 20024
17
     For the Defendant:
18       MESSNER REEVES LLP-PHOENIX, AZ
         By:  **Isaac Scott Crum, Esq.**
19       7250 N 16th St., Ste 410
         Phoenix, AZ 85020
20
     For the Intervenor:
21       US DEPARTMENT OF JUSTICE-CIVIL DIVISION FED PROGRAMS BRANCH
         By: **Ross Slaughter, Esq.**
22       1100 L St. NW
         Washington, DC 20530
23

24

25

1                    **P R O C E E D I N G S**

2

3            THE COURT:  Welcome.  And we'll get started in just a

4    minute.  Just a couple opening remarks.  This kicks off --

5    since we're in the sports season -- this kicks off the second

6    decade of this case.  I don't think I'll be around if we come

7    to another decennial type thing.

8            But, anyway, it's -- and I just was thinking the other

9    night, that amount of time is about the same amount of time of

10   both World War I and World War II cumulatively in this case.

11   It's just something to think about.

12           As long as we're on that, I would point out that our

13   flags in this courthouse and the courtrooms are flown over the

14   Arizona Memorial and Pearl Harbor.  Here is the certificate for

15   one of them.  We did that when we opened this building because

16   it was important.  People gave up a lot of their lives,

17   everything so we could be involved in the constitutional

18   process which is part of this case and that's important.

19           So -- and we all took an oath to support and defend

20   the constitution which we are doing now.  And in both sides, I

21   could give you team monikers but I won't.

22           But here is the constitution, pretty simple, and I

23   know a lot of people that carry this everyday and refer to it.

24   It's important what we do here so think about the bigger things

25   in life that we're doing here today.

```
1          So if I could, let me introduce -- before I ask you to
2    introduce yourselves -- let me introduce a couple people around
3    here.  We have Robert Vasquez who is our Courtroom Deputy.  He
4    keeps track all of all of the things that go on here in this
5    case and all of the other judges he's responsible for.
6          And our Court Reporter over here is Andrea Bluedorn.
7    And she is a -- what they call a realtime reporter for those of
8    you who do not appear in district courts or trial courts.  In
9    order to qualify for that, she has to be able to transcribe at
10   the rate of 285 words a minute for a sustained period of five
11   minutes.  Think about that.  Her fingers go faster than my car
12   goes.  So she's extremely talented and it prints up here on the
13   screen so that you can see.
14         And the other person who's over here, that's my law
15   clerk, Haley Stewart, who is a remarkable individual.  And for
16   those who find it hard to hire people, I will point her out as
17   an example of her sacrifice.  She drives back and forth to
18   Tucson every single day.
19         That's 120 miles down, 120 miles back.  That shows you
20   the importance that's done and the opportunities here.  She has
21   a remarkable background, and there are other people in the
22   courtroom who have equally remarkable backgrounds.
23         Now, with that, how about you all introduce
24   yourselves.  Go ahead.
25              MR. COOPER:  Good morning, Your Honor.  Ben Cooper
```

```
 1    with David Bray, Vail Cloar, and Alexandra Crandall for VIP
 2    Products.
 3              THE COURT:  Let me see.  Is -- you're Mr. Crandall; is
 4    that it?
 5              MR. CLOAR:  Ms. Crandall.
 6              THE COURT:  Okay.  Ms. Crandall.
 7              MR. CLOAR:  Mr. Cloar.
 8              THE COURT:  Okay.  I got you a little bit reversed
 9    here.  Thank you.  Thank you very much.  Please be seated.
10    Okay.
11              ISAAC CRUM:  Good morning, Your Honor.  Isaac Crum
12    from Messner Reeves on behalf of Jack Daniel's Properties.
13              THE COURT:  Thank you.
14              MS. SAHARIA:  Good morning, Your Honor.  Amy Saharia
15    from Williams and Connolly for Jack Daniel's Properties.
16              THE COURT:  Thank you.
17              MR. WELCH:  Justin Welch, the client representative,
18    in-house counsel, managing director for Jack Daniel's.
19              THE COURT:  Okay.  Can I get your name again, please.
20              MR. WELCH:  Justin Welch.
21              THE COURT:  Thank you, Mr. Welch.
22              MR. SLAUGHTER:  Hi.  I'm Ross Slaughter from the
23    United States Department of Justice.
24              THE COURT:  Can you spell your name for me, please.
25              MR. SLAUGHTER:  R-O-S-S, S-L-A-U-G-H-T-E-R.
```

1          THE COURT:  Slaughter.  Is that it?

2          MR. SLAUGHTER:  Yes.

3          THE COURT:  As in Slaughter on Tenth Avenue.  Have you

4   heard the music?

5          MR. SLAUGHTER:  I'm not familiar with it.  Off to a

6   bad start.

7          THE COURT:  Okay.  Well, we have plenty of time this

8   morning.  I wanted to give you every opportunity to express

9   your points of view.  We read the briefs, we studied the case

10  again, and so I'll have some questions maybe along the way, but

11  please feel free to give me your best thoughts since we're back

12  again.

13          And I think the lay of the land is -- as near as I can

14  tell -- the Supreme Court -- well I -- they sent it back to the

15  Ninth Circuit.  We're back here again.  We'll get started.

16          So, Mr. Cooper, since you represent the plaintiff in

17  this case, I'll let you go first.  And have at it.

18          MR. COOPER:  Thank you, Your Honor.  If I may, the

19  Court's order didn't refer to whether we could reserve time for

20  rebuttal in the format you --

21          THE COURT:  No.  If I have rebuttal, I'll ask you

22  questions about it.  But -- and it's a fairness.  If you have a

23  question or something that you think is important that you

24  haven't said before, just raise your hand, say I'd like to be

25  heard.  I usually, as you know, I try and give you that

1    opportunity.  I'm not trying to close anyone out here today.

2          I mean, if we were in the Supreme Court like you were,

3    you'd have about ten minutes here to say as fast as you can

4    what you think and that's the end of it.  So I'm trying to give

5    each side a fair opportunity to be heard.

6          MR. COOPER:  I appreciate that, Your Honor.

7          Since the 2017 trial, a lot has changed in this case

8    and in the context of this case.  And Jack Daniel's invitation

9    to Your Honor to just basically rubber stamp what Your Honor

10   did in 2018 is essentially an invitation to error.

11         Bad Spaniels is about ten --

12         THE COURT:  Well, Mr. Cooper, I'm very familiar as a

13   District Judge with error.  That's all they think about is

14   reversing District Court Judges at the Court of Appeals.

15   That's part of their job but tell me why.

16         MR. COOPER:  Okay.  Bad Spaniels is now ten years old.

17   And after ten years of being on the market, there is still no

18   evidence of consumer confusion or harm to reputation from

19   consumer disgust, even though the press coverage of this case

20   through the Supreme Court's review has made Bad Spaniels,

21   arguably, the most famous dog toy -- or at least parody dog toy

22   in the country.

23         THE COURT:  Let me ask you this, I saw in the media at

24   some point a new picture of Bad Spaniels and the shape of the

25   bottle had been changed dramatically.  Are you familiar with

1  that?  I don't know where it came up.  It was in some magazine

2  somewhere.

3          MR. COOPER:  I'm not aware -- there's been a change in

4  the hang tag.  Our client added, you know, FAQs on there to try

5  to eliminate any claim of confusion, but I'm not aware of a --

6          THE COURT:  Okay.  All right.  I saw that.  I don't

7  know how it came about.  It looked like someone left it in the

8  sun too long.  But, anyway, go ahead.

9          MR. COOPER:  Okay.  When we were last before Your

10  Honor, you asked whether we were back at square one, and the

11  parties agreed there was no need to reopen the factual record.

12  And, certainly, if there had been evidence of actual confusion

13  or consumer disgust, Jack Daniel's would have been first to

14  jump up and say, yes, we have evidence now.

15          But what we do have is guidance from the Ninth Circuit

16  and the Supreme Court.  The Ninth Circuit in its description of

17  the case, its opinion -- its first opinion -- said that what --

18          THE COURT:  That's the one that got reversed.

19          MR. COOPER:  It did.  But not in this respect.

20          THE COURT:  Oh, okay.

21          MR. COOPER:  In talking in its discussion of what the

22  facts were and what our clients product was, it referred to

23  these being lighthearted alterations and humorous.  And what

24  the Ninth Circuit also did -- like the Supreme Court -- was

25  compare this case in terms of infringement to the Louis Vuitton

1   case and an extensive discussion of the facts of Louis Vuitton

2   and why the cases were similar.

3           THE COURT:  Well, that may be but I think there may be

4   a different point of view.  Now, you're giving your point of

5   view, but those I have a little bit of -- not total agreement

6   with because I'm not going to tell you what I think -- but I

7   think you can argue that the comment of a lighthearted nature

8   has taken great exception by your opponents.

9           MR. COOPER:  I'm sure they do.  But Your Honor is the

10  finder of fact here.

11          And the Ninth Circuit, three judges of the Ninth

12  Circuit offered their opinion.  One of them in this building

13  as --

14          THE COURT:  I understand.  I know who they are.

15          MR. COOPER:  The -- the Supreme Court then referred to

16  the jokes and -- in its opening comments about the case and our

17  client's product, and also indicated that the toys and the line

18  are designed to look like and to parody popular beverage

19  brands, echoing this Court's comment about my clients intent

20  being to parody.

21          The major difference what the Supreme Court said was

22  that was this court had thought that parody was to be

23  disregarded implying the usual standards.  The Supreme Court

24  said with no uncertain terms that, no, it may significantly

25  affect the judicial multi-factor test.

1          And to borrow Your Honor's words last year, what the

2    Supreme Court did was put Louis Vuitton in the driver's seat

3    along with the Daniel's brief, which --

4          THE COURT:  Now, just a minute.  Did Louis Vuitton

5    apply the Rogers test in affirming that case or not?

6          MR. COOPER:  No.  It applied -- it went through a

7    multi-factor analysis.

8          THE COURT:  So the Sleekcraft.  Which is what --

9          MR. COOPER:  Yes.  It was the Pizzeria Uno factors,

10   which are, you know --

11         THE COURT:  Very similar.

12         MR. COOPER:  They're essentially identical.  Everyone

13   has their own lead case in their circuit.

14         And we also have, in terms of tarnishment, the further

15   development of first amendment case law in what is the first

16   majority opinion in the Brunetti case.  Now a major issue on

17   tarnishment in particular is that Jack Daniel's argues that

18   essentially VIP can't say anything new or even different even

19   though we're not on appeal now and we're before the trial

20   court, applying what is essentially a stricter standard than

21   the Ninth Circuit would apply to the argument raised for the

22   first time on appeal, not on a remand.

23         We are here.  There's no case law that supports that.

24   We are here on a general remand from the Ninth Circuit.  We

25   told the Ninth Circuit that we wanted to bring a constitutional

1     challenge.  If the Ninth Circuit wants to limit that or

2     restrict the Court's scope of inquiry, it could have issued a

3     limited remand, but that's not what the Ninth Circuit did.

4            THE COURT:  There wasn't -- the constitutional claim,

5     even though the broad interpretation you want was not in your

6     original complaint.  Correct?

7            MR. COOPER:  That's correct.

8            THE COURT:  And you have not moved nor can you move,

9     at this point, to amend your complaint?

10            MR. COOPER:  We don't need to --

11            THE COURT:  That's what your point is.  I may take

12     exception to that, but that's -- I want to get this record

13     straight on this.  That's all.

14            MR. COOPER:  That's correct, Your Honor.  We have not

15     moved to amend the complaint because what we have now is not

16     simply our original complaint for declaratory action but we

17     have affirmative claims of dilution by tarnishment.  And this

18     is our response to those affirmative claims challenging the

19     constitutionality of the statute.

20            What Jack Daniel's is arguing is, essentially, we

21     can't make new arguments.  We can't make -- spin new arguments

22     aside from new issues.  We can't introduce new authority.  We

23     can't even make colorful characterizations of the existing

24     evidence like anthropometric Jack.  But that's not really what

25     the law bears out.

1          But I want to get to the merits of the dilution claim.

2     There's very little relevant Federal case law on dilution.

3     There is no common law cause of action for tarnishment,

4     dilution, or blurring.  There is no Federal Statute clearly

5     setting out dilution by tarnishment until 2006.  You have

6     basically stray state statutes or buzzword references in the

7     cases to tarnishing, and it was rarely litigated to this day or

8     tested by the Courts because usually tarnishment is a sidekick

9     to an infringement claim as it was here.

10          We've made several arguments, one which I will just

11     mention briefly is that we think the Court should revisit its

12     finding of tarnishment of harm to reputation.

13          The Court, as finder of fact, can credit its lived

14     experience, and also the observation of the Ninth Circuit

15     Judges that this was a lighthearted alteration because that

16     backed up what our focus groups had shown that we put into

17     evidence, that no one found this disgustingly --

18          THE COURT:  I appreciate it but you're missing the

19     point here.  Because in my original order where I had people in

20     the courtroom testifying, I found that your focus groups were

21     deficient and bad.  So if you're trying to use that to try and

22     say I should get a new time, I think you're barking up the

23     wrong tree on that one.

24          MR. COOPER:  We're simply reserving the argument.

25          THE COURT:  You can reserve it.  But if the theory

1    is -- one of the great theories in the law is that findings of

2    fact by a jury or a judge acting as a jury should not be

3    disturbed absent clear error.  And when your person was found

4    and there was no challenge to it ever before that they got it

5    all wrong on their focus groups, how are you going to do that?

6            MR. COOPER:  We respect fully disagree, Your Honor.

7    We think Your Honor is free on the general remand to revisit

8    its prior statements.  But I want to focus --

9            THE COURT:  Then why don't you want me to open up

10   discovery in the entirety and take -- just send it out to the

11   forces of darkness of discovery to send out into the world.

12           MR. COOPER:  Because we don't think it's necessary.

13           THE COURT:  Well, then I can use the record before but

14   you just want me to put a new spin on it.  Right?  You're a

15   spin doctor.  Right?

16           MR. COOPER:  Your Honor, that's exactly right.

17           THE COURT:  Okay.  Just to be sure.

18           MR. COOPER:  Right.  We're not saying you need to put

19   in new evidence.  We're saying it's a different spin based on

20   the existing facts.

21           But what we really want to talk about is whether or

22   not Jack Daniel's has in a relevant, pertinent way, met the

23   burden of showing a famous mark that's been tarnished.  And we

24   preserved the fame issue before the trial in the last case.

25           THE COURT:  Are you telling me at this stage that Jack

1    Daniel's doesn't have a famous mark?

2         MR. COOPER:  It does.  But --

3         THE COURT:  Okay.  But I know what your but is but you

4    imply that, well, we want to look at that again.  You'd be hard

5    pressed to ever sell that to anybody.

6         MR. COOPER:  No.  No.  Your Honor, we agree that Jack

7    Daniel's is famous.  The name Jack Daniel's is name famous but

8    that's not our argument.

9         THE COURT:  Okay.

10         MR. COOPER:  Because to -- the standard, first of all,

11    for famous is much higher than for even strong trademark for

12    infringement.  So it has to be a household name for general

13    consuming public of the United States.  So things like Coach

14    Handbags, Buck Rogers things are not famous for purposes of

15    dilution.

16         Now the critical thing for the statute and why Jack

17    Daniel's is not enough is that the statute requires in

18    (c)(2)(c) that proof of the association arising from the

19    similarity between a mark or tradename and a famous mark that

20    harms the reputation of the famous mark.  So you have to show

21    the similarity between a mark and a famous mark.  And the

22    similarity has to be driven under the Mintz case by the marks

23    themselves.

24         Jack Daniel's may be a famous mark, but that's the

25    only famous mark.  There is no evidence, there is no testimony

1    that anything else, Old Number 7, 43 percent -- you know, the

2    reference to alcohol, that that's even a mark much less a

3    famous household name.  And this is critical because the only

4    even remotely similar mark to Jack Daniel's is Bad Spaniels.

5          But JDPI has remedially admitted, directly and

6    implicitly, that Bad Spaniels, which is the -- similar to their

7    famous mark -- is not the problem.  Their executive testified

8    on the stand that they didn't really have a problem with Jack

9    Daniel's -- with Bad Spaniels.  It was the whole thing.  And

10   they said, in fact, their expert, Dr. Ford, used Bad Spaniel's

11   and the dog as their control.

12         Okay.  And then when Dr. Simonson, who is the witness

13   Your Honor referred to before, got on the stand -- and he was

14   the expert about tarnishment.  He's the only one that said this

15   was tarnishing or created disgust.  He talked about 43 percent

16   proof by volume and Old Number 2.

17         He never mentioned Bad Spaniel's because Bad Spaniel's

18   isn't about poop.  You get Bad Spaniel's.  Bad could be for

19   anything.

20         So Bad Spaniel's itself is not the -- is not the

21   problem.  It's all the other stuff.  But there's no evidence

22   all the other stuff is a household name.  You know, I knew what

23   Old Number 7 was because I used to drink Jack Daniel's, at

24   least before this case.  My wife and other members of my family

25   didn't know what it was.  They obviously knew what Jack

1    Daniel's was but there's no evidence that that's a household

2    name.

3           And Jack Daniel's only substantive response is to say,

4    well, basically we can bootstrap.  We can say you have to look

5    at the whole thing.  But there's reasons why that doesn't work

6    as a legal matter.  Which was Congress -- in recognizing this

7    new form of protection that didn't exist at common law -- said

8    we're only going to allow this for the really narrow class of

9    truly famous marks.

10           You know, we're talking about Coke, Pepsi, Apple,

11    Chevrolet, Buick, things that everybody knows, general

12    consuming population.  Not niche -- and the Courts have said,

13    including the Ninth Circuit, it doesn't apply to niche

14    products.  And Bourbon drinkers or whiskey drinkers are a niche

15    product.

16           We have the Court in Kentucky saying that the Maker's

17    Mark red dripping wax on the top may be well known to whiskey

18    drinkers but it's not generally known across the country.  Trek

19    is not known, the Ninth Circuit said, to people outside of, you

20    know, bicycle users.  In Texas, they said the longhorn logo for

21    the University of Texas football team is not generally known

22    across the country.  It's known to football fans and maybe only

23    Texas football fans.

24           So what they're essentially saying is by taking the

25    Jack Daniel's name, somehow you can't tarnish anything

1    associated with the Jack Daniel's, even if that stuff that's

2    similar, you know, that correlates, is not itself famous.  So,

3    by that token, if we put out the same product -- oh, sorry.

4    The same product -- somewhere in my bag I have a copy of the

5    squeak toy.  And had instead of Bad Spaniel's put bad collies

6    or bad shepherds, but otherwise we had all the filigree and the

7    black label and the stuff that that would be infringement

8    because people would -- they were tarnishing the brand as a

9    whole.

10          But there's no similarity between the famous mark and

11   the mark to mark comparison that the statute requires you to

12   make.  And they -- we raised the fame and they never put in

13   evidence establishing that, in fact, anyone recognizes Old

14   Number 7 independently or as some -- other than, well, yeah,

15   it's on the Jack Daniel's label.  Jack Daniel's is famous.  Old

16   Number 7 just isn't.

17          Nor is the other element, the poo reference even -- 43

18   percent poo by volume, that's not even about a trademark.  That

19   doesn't relate to any trademark or regards an ingredient list

20   on a bottle of Jack Daniel's.  So we think they have

21   fundamentally failed to prove infringement by their own

22   admission by saying that Bad Spaniel's was their control, that

23   it wasn't infringing, that Bad Spaniel's wasn't -- no testimony

24   that Bad Spaniel's was disgusting.

25          We're at an end.  That's what distinguishes this case

1    from the other cases they use in their brief.  Like when

2    someone puts out a cookie that's got marijuana in it or

3    cannabis and that's called Stoneos and it looks like Oreos.

4    Well, Stoneos relates to Oreos and Oreos is very famous.

5    Everyone in the United States knows what Oreos are.

6          But here there's no tarnishing correlate to Jack

7    Daniel's.  There's just Bad Spaniel's and there's no testimony

8    even.  Dr. Simonson never refers to Bad Spaniel's being a

9    problem.

10          I'd like to talk now about the constitutional issue.

11          THE COURT:  Go right ahead.

12          MR. COOPER:  The fundamental -- this is a new issue

13    because remember the -- the -- as I noted before, the

14    tarnishment statute is new.  It's from 2006 and it hasn't come

15    up.  And the entire application of the First Amendment to

16    trademarks is relatively new, the Brunetti case, the Tam case

17    which was the -- the first case came out, you know, while -- a

18    couple months before the trial in this case and Brunetti came

19    out when the reply brief had already been filed in the Ninth

20    Circuit.

21          THE COURT:  Quick question.  If it just came out in

22    2006, why do you think Congress puts that in there?  Wasn't it

23    to protect people's marks and trademarks?  Yes or no.  They did

24    it for a reason because 500 people in Congress and a majority

25    of them voted to put this in.  They did it for a reason.

1              MR. COOPER:  Yes.

2              THE COURT:  Okay.  Thank you.

3              MR. COOPER:  They -- one presumes Congress has lots of

4    reasons.  The direct motivation for it was the Supreme Court in

5    the Moseley case had said that -- commented the statute didn't

6    really have an explicit tarnishment provision as opposed to --

7              THE COURT:  I agree.  And Courts say that a lot.  And

8    a lot of time Congress says that's very nice you said that but

9    we're on our way in a different fashion.  We're not going to

10   deal with that.  In this case, they responded.

11             MR. COOPER:  Yes.

12             THE COURT:  It must have been for a reason.

13             MR. COOPER:  Yes.

14             THE COURT:  To protect people even if it -- let's say

15   somebody makes a parody hypothetically of squeaker toys or

16   squeaky toys.  The plaintiff might say, wait a minute here.

17   They're taking my name and tarnishing my name and there's a

18   statute that says that, you turn around and say no, too bad, so

19   sad.  Right?

20             MR. COOPER:  Well, there are two things to note.

21   First of all, Congress put limitations on it and that's my

22   argument on the merits why they haven't met the merits -- the

23   elements of the statutory cause of action.  Secondly, Congress

24   sometimes does things that violate the constitution.

25             THE COURT:  No doubt.

1          MR. COOPER:  And our argument is this is one of them.

2          THE COURT:  Okay.

3          MR. COOPER:  Because by -- you know, this is -- the

4     tarnishment statute basically says, well, if you harm my

5     reputation -- and in this case it's by the mockery -- then it's

6     a violation.  But if you varnish the reputation instead of

7     tarnishing it, it wouldn't be a violation.

8          Well, the Supreme Court said in the Tam case that

9     giving offense -- in a trademark context -- is a viewpoint, and

10    they struck down in Tam and in Brunetti congressional

11    enactments on trademarks, statutory bars to registration on the

12    grounds they were viewpoint discriminatory because they were

13    basically -- as Judge Alito put it in his plurality opinion in

14    Tam -- happy talk clauses.  And you can't have a happy talk

15    clause.

16         So it -- Congress can try to protect all it wants to,

17    but it can only do so within the bounds of what's

18    constitutional.  And I think the Court has to understand the

19    way in which this tarnishment provision is different from the

20    analogies that Jack Daniel's has drawn.

21         For example, dilution by blurring.  Dilution by

22    blurring does not require that the product do anything bad.

23    It's simply if you have a lot of people using Cadillac or Rolls

24    Royce.  When I was a young lawyer and used to lecture on this

25    stuff, I used to say if you have Rolls Royce peanuts, after a

1    while, people say Rolls Royce and they don't know that you're

2    referring to the famous mark of the car maker.

3            So that's not happy talk or harmful to reputation or

4    anything, it's just more people using it even without

5    confusion.  So that's not based on viewpoint at all.

6            So the Vidal versus Elster case -- which was the Trump

7    Too Small case -- they put in their supplemental authority.

8    Again, you can't use somebody's name without permission.

9    That's specific to the history of protecting people's rights to

10   use of their names.  And it doesn't matter if I'm calling it

11   the -- you know, my -- using the persons name to praise them or

12   to, as in the case of Trump Too Small, to insult them.  It's

13   not about viewpoint.  It's simply about the use of the name.

14           And in the Olympic, the San Francisco Arts case,

15   Congress had reserved the exclusive right to use Olympic for

16   athletic competitions to the US Olympic Committee.  It didn't

17   matter if you were using it for -- as in that case -- the gay

18   Olympics or something else.  If it wasn't licensed, you can't

19   use it even for a noble cause because Congress has reserved it

20   regardless of your viewpoint.

21           That's not what Congress did here.  It went out on the

22   edge and it said if you use it in a way that harms the

23   reputation, that tarnishes the mark, then you can be enjoined.

24   But that's not simple use.  That's viewpoint of giving offense.

25   If you offend the mark, then it's a viewpoint discriminatory.

```
 1    And there's no showing of any interest of the Government doing

 2    that.

 3           Got along quite well without this cause of action

 4    until 2006.  And what Congress put in place just doesn't pass

 5    muster.  It's an issue of first impression before the Court.

 6           THE COURT:  Okay.  Now, question.  You indicated

 7    that -- both of you, both sides, said I can resolve this on the

 8    record before me.

 9           MR. COOPER:  We believe so.  Yes.

10           THE COURT:  Now, just a minute.  Then you say but

11    things have changed and you sort of chided Jack Daniel's for

12    not bringing forth new evidence of tarnishment.  No one here

13    has moved to reopen discovery or add additional evidence.  And

14    I believe in my mind you're estopped from making that argument

15    because you didn't -- you're very talented.

16           Mr. Bray is very talented.  Good lawyer.  But your

17    side did not move to reopen discovery and produce new evidence

18    so why can you chide them and say they should have brought

19    forth something they're not entitled to do?

20           MR. COOPER:  Because, Your Honor, for the very simple

21    reason there is no evidence in the record that any real -- any

22    consumers, any people out there in the marketplace have felt

23    any disgust as a result of our product of any actual

24    tarnishment of reputation.  That's still the case -- that was

25    the case in 2017, it's the case now.  It's not about estoppel.
```

1    We said all along there's no evidence of actual tarnishment.

2         There's no evidence anyone has complained.  And that

3    was the testimony of Jack Daniel's witnesses.  And as we sit

4    here today, because the record hasn't opened, there's still no

5    evidence.

6         THE COURT:  But how do you -- you're moving to declare

7    the whole part of that statute on unconstitutionality and I

8    think the statute says actual or likelihood.

9         MR. COOPER:  No.  It says likelihood.  But one of the

10   things --

11        THE COURT:  Well, you left that out, the modifier.

12   You said no actual.  The likelihood of actual tarnishment.

13   Answer that one.

14        MR. COOPER:  Your Honor, as -- as we -- as in the case

15   of likelihood of confusion, one of the things you look to in

16   evaluating whether to grant an injunction whether confusion is

17   likely in the future, you look to see whether confusion was --

18   existed actually in the past.  And so same thing in looking to

19   see whether or not there's likely to be harm to the reputation

20   of the mark, you look to see whether there has been any actual

21   harm to the reputation of the mark through the time of the

22   Court's findings.

23        And there is no evidence that happened.  There is no

24   evidence -- the testimony of Jack Daniel's executives and of

25   our client was no one had ever conveyed any of these sentiments

1    and that's still the record before the Court today, and so it's

2    a fair factor.  It may not be dispositive but there's still no

3    evidence.

4        And ten years on, no one has -- no one has sought to

5    change the record which is devoid.  All we have is the

6    statement of a professor who said based on his own inclinations

7    that he thinks people will find this disgusting.  And the Ninth

8    Circuit didn't find it disgusting, and the Supreme Court didn't

9    find it disgusting and it's just Professor Simonson.

10        THE COURT:  Well, you know, disgusting I'm not sure is

11    the standard.

12        MR. COOPER:  That's what his testimony was.

13        THE COURT:  Well, it may be but there are a lot of

14    things that are -- you know, take any of your late night talk

15    show people and your out there comedians and stuff.  They say a

16    lot of disgusting things but that doesn't mean it -- there's a

17    tarnishment.

18        The issue is does the product that your client

19    developed tarnish their brand in such a way.  I'll let your

20    opponent address that issue what you just said about

21    disgusting.  That's the standard.

22        MR. COOPER:  Well, Your Honor, we're trying to figure

23    out what exactly their argument is as to how their reputation

24    has been harmed -- has been tarnished by it.  Dr. Simonson said

25    if you -- if you associate references to any kind of poo, that

1    that tarnishes the brand because people get a sense of

2    revulsion.  And we think that's kind of not lived experience

3    when it comes to something like dog poo, lighthearted jokes

4    about dog poo, but that's the only evidence they have because

5    no one else has complained about that.

6              THE COURT:  Okay.  Thank you.

7              MR. COOPER:  At some point, people have a right to

8    make jokes in this country and a right to have humor.  And

9    iconic brands like Jack Daniel's should be able to accept, you

10   know, lighthearted jokes without making a Federal case, but,

11   yet, here we are and --

12             THE COURT:  Making a lighthearted case, your client is

13   the one that sued them.

14             MR. COOPER:  Well, Your Honor -- no.  We --

15             THE COURT:  They didn't sue you.  You sued them.

16             MR. COOPER:  We got a demand letter and the reason was

17   the last time they had gotten a demand letter, they let the

18   alcohol brand sue first so they got sued in St. Louis by

19   Anheuser-Busch to wait until Jack Daniel's sued us in

20   Lynchburg, Tennessee, probably without seeing the course.  But

21   they made the demand letters and threatened suit so we filed a

22   deck action.

23             THE COURT:  What would you have done if they'd made a

24   motion for change of venue on that one?  It didn't happen so

25   I'm not -- I'll let it go.

1          MR. COOPER:  We would have said -- you know, it's an

2   interesting question because, you know, the venue for the

3   University of Texas was Texas, and the Texas Court said not --

4   that University of Texas mark wasn't famous.

5          The Kentucky Court said red dripping wax wasn't famous

6   in Kentucky.  And we are in Arizona and the Old Number 7 the

7   Courts said, broadly, all the marks were famous but there was

8   no specific finding as to all these elements other than Jack

9   Daniel's and that I think is the critical thing.

10          And the Court doesn't have to reach the constitutional

11   issue.  The Court finds it's a fame element which we did argue

12   before the Court was met.  And unless the Court has further

13   questions, I'll sit down on the tarnishment issue.

14          THE COURT:  I don't think so right now.  Give your

15   opponent an opportunity to speak at this point, but thank you.

16          MR. COOPER:  Thank you, Your Honor.

17          THE COURT:  Thank you very much.  Appreciate it.

18          Okay.  Ms. Saharia, you're up.

19          MS. SAHARIA:  Thank you, Your Honor.

20          Okay.  Let me start with the fame argument that

21   counsel made and then I'll turn on VIP's new facial challenge.

22   And just to be clear about where we are with respect to the

23   three elements of the dilution claim, this Court found for Jack

24   Daniel's on all three elements.  And nothing that the Ninth

25   Circuit or the Supreme Court said has any bearing on the Court

1   s findings on those three elements.

2       The Ninth Circuit ruled only on the basis of the

3   exclusions to the dilution statue holding that those exclusions

4   applied, and then, of course, the Supreme Court reversed the

5   Ninth Circuit agreeing with Your Honor that those exclusions do

6   not apply, but nothing the Supreme Court said or the Ninth

7   Circuit said with respect to dilution.  I related to the

8   Court's findings on the three elements of dilution, and,

9   therefore, the Court should simply reenter its findings and

10  enter judgment.

11      Let me address this new fame argument that VIP is

12  making which is wrong for at least four different reasons.

13  First, VIP made a tactical choice at the time of the bench

14  trial to argue all or nothing when it came to fame.  VIP argued

15  none of the Jack Daniel's marks are famous in one fell swoop.

16  It did not distinguish between Jack Daniel's, Old Number 7, the

17  trade dress.  It just made this all or nothing argument and it

18  lost on that tactical judgment, this court finding that all of

19  Jack Daniel's trademarks and trade dress were famous.

20      Then VIP made another tactical choice.  It appealed to

21  the Ninth Circuit and it chose to concede fame in the Ninth

22  Circuit.  It did not challenge this Court's finding of fame.

23  In fact, it told the Ninth Circuit that Jack Daniel's marks

24  were famous.  So having lost on that, now VIP is trying to make

25  a new argument distinguishing between the marks and we think

1    that new argument has been waived given that it conceded fame

2    in the Ninth Circuit before.  That's reason one.

3          Now, reason two, the dilution statute applies to trade

4    dress.  We have brought a trade dress dilution claim.  This

5    court already ruled for us on that claim.  And VIP does not

6    argue nor could it argue in good faith that Jack Daniel's trade

7    dress is not famous.  The trade dress, the bottle, is iconic.

8    It is recognized all over the world.

9          And that trade dress obviously associates Jack

10   Daniel's trade dress with dog poop because it is all over VIP's

11   dog toy.  So that's reason two.  They just ignore the trade

12   dress dilution claim entirely.

13         Reason three, this court found dilution on two

14   separate grounds.  One was that VIP's dog toy associates the

15   Jack Daniel's marks and trade dress with poop, but the other

16   was that it associated them with toys that appeal to children.

17   And that is tarnishing to Jack Daniel's because Jack Daniel's

18   engages in good faith efforts to make sure it does not

19   advertise to children and VIP just completely ignores that

20   entirely separate ground for this court's dilution findings.

21         Of course VIP Bad Spaniel's mark associates the Jack

22   Daniel's mark with a toy that appeals to children because it is

23   on a toy, a dog toy, so that's reason three.

24         And then reason four is that their argument just

25   doesn't work when you look at the text of the statute.  The

1    statute asks whether the similarity -- whether the similarity

2    between the two marks creates an association and whether that

3    association then harms the reputation of the famous mark.

4            And, here, the similarity between Jack Daniel's and

5    Bad Spaniel's creates an association with dog poop because the

6    Bad Spaniel's toy is all about dog poop.  And that association

7    is what tarnishes Jack Daniel's even if you're looking just at

8    the Jack Daniel's mark.  And there's many cases that are like

9    that one.

10           So, for instance, there's a case involving a strip

11   club that named itself the Polo Club, and its mark was the

12   famous Polo horseplayer.  Of course, if you look just at the

13   mark, the Polo horseplayer, there's nothing tarnishing about

14   the mark in isolation.  But it was the fact that the defendant

15   slapped that -- excuse me -- slapped that horse on a strip club

16   that made it tarnishing.

17           And it's exactly the same here.  They've taken the

18   Jack Daniel's mark, the Bad Spaniel's version of that mark and

19   put it on a toy that both appeals to children and that

20   references excrement.  So the Court should reject that new

21   argument for those four reasons.

22           Let me turn to the new facial challenge to the

23   dilution statute -- unless the Court has any questions about

24   the elements of dilution.  And I want to be super clear about

25   what VIP is arguing.  Because VIP is not arguing that applying

1    the dilution statute on the facts of this case is

2    unconstitutional.  This is not an as-applied challenge.

3         And I heard Mr. Cooper say they have a right to make

4    jokes.  Well, in fact, the dilution statute protects their

5    right to make jokes because there is an exclusion in the

6    statute for fair use.  And that exclusion entitles defendants

7    to use marks to -- famous marks to make parodies as long as

8    they're not using them as a designation of source.  And what

9    Your Honor found and what the Supreme Court found is that that

10   exclusion does not protect VIP because it is using our marks as

11   designations of source.

12        They can make whatever jokes they want.  They can say

13   whatever they want about dog poop, they just can't use our

14   famous marks and our famous trade dress as designations of

15   source.  And the Supreme Court made crystal clear in its

16   opinion that there is no First Amendment problem with that.

17        It said -- and I quote -- when a challenged trademark

18   use functions as source identifying, trademark rights play well

19   with the First Amendment.  And that's what we have here.

20   They're using our mark as source identifying and there's just

21   no First Amendment problem with prohibiting them from doing

22   that.

23        So what they're doing is asking the Court to strike

24   down a statute, even though applied to them, there is no First

25   Amendment problem, and that's a fairly radical argument that

1    the Court should reject.

2           Now, before the Court even gets to the merits of this

3    new argument, there's two reasons the Court can easily reject

4    it; first, waiver and, second, that they haven't even addressed

5    the standard for a facial challenge.  So if I may, let me

6    address those two grounds and then I'll turn to the merits.

7           So let me start with waiver.  VIP has waived this

8    issue by failing to bring it at any point before or during the

9    first appeal in the case.  It is black letter law that when a

10   party forfeits an issue by failing to raise it before a first

11   appeal, it can't just magically make the argument on remand

12   even in cases involving a general remand.

13          As I take it, VIP's argument seems to be that when

14   there's a general remand, forfeiture principals just go out the

15   window and they have literally no case -- no authority that

16   says that.  There is ample authority that goes the other way.

17   We cited the Court to the Wright and Miller treatise

18   establishing that proposition.

19          There are District Court cases in this circuit on

20   general remands that have enforced forfeiture.  The

21   Magnesystems case and the Apple case.  The Ninth Circuit has

22   affirmed courts applying forfeiture and waiver on general

23   remands, including the Vigman case that we cite.

24          And then the Ninth Circuit itself, when it gets cases

25   on remand from the Supreme Court that are general remands, it

 1    too applies forfeiture and waiver principals.  The Raich case

 2    and Christian Legal Society case are both examples of that.  So

 3    there's just example authority that they have waived this new

 4    issue by failing to bring it in the last ten years.

 5          We have spent ten years litigating whether and how

 6    this statute applies to VIP; and if they thought the statute on

 7    its face was unconstitutional, they should have raised that

 8    issue ten years ago before we all wasted all this time and

 9    money going all the way up to the Supreme Court litigating how

10    this statute applies.

11          With respect to the issue of the complaint, I think

12    the real problem here is that VIP did not assert this in its

13    answer to our counterclaims because this is an issue on which

14    VIP bears the burden.  It is their burden on a facial challenge

15    to a statute and, therefore, this was an affirmative defense

16    and they have never pleaded this defense in their answers.

17          Let me address the two exceptions to the forfeiture

18    role that VIP has raised.  First, it says that there's been

19    some kind of change in law and that justifies the lateness of

20    this -- of them raising this issue.  I think I heard counsel

21    say just now that the idea of First Amendment challenges to

22    trademark statutes is new.  Well, that's just wrong because the

23    Olympic case which was a First Amendment challenge to a

24    trademark statute was in 1987.

25          That's the SFAA case that we cite.  VIP hangs its hat

UNITED STATES DISTRICT COURT

1    on the Matal v. Tam and Iancu v. Brunetti cases.  And the Tam

2    case is really the one that I think they would have to concede

3    is -- we don't think it's analogous but it is the one that uses

4    the word disparaging.  And they say, well, the dilution statute

5    is talking about disparaging.  And so that case is the case

6    that is the basis for their argument but that case was decided

7    in 2017 before the trial in this case.

8            And so if VIP thought that case changed the law, which

9    it didn't, but if it thought that case changed the law, that's

10   when it should have raised this issue, before we had the bench

11   trial, certainly before we went on appeal to the Ninth Circuit.

12           Now the other problem for VIP's argument about a

13   change in law is that Tam and Brunetti really didn't change the

14   law at all.  In fact, VIP conceded in its opening brief -- this

15   is Docket 339, page 21 -- its opening brief on remand -- that

16   the thought of challenging the dilution statute on First

17   Amendment grounds is by no means a new thought.  Well, if

18   that's true, they should have raised this long ago.

19           They actually cite cases going back decades.  They saw

20   law review articles going back to 2014 when this case began.

21   This is not a new issue that they just could have thought to

22   raise now.

23           The second exception they raise is what's called the

24   pure question of law exception.  That also doesn't help them

25   for two reasons.  First, they have to show that there's no

1   prejudice to Jack Daniel's.  And we're certainly prejudiced by

2   having to address and brief this new issue ten years into the

3   case after we spent all this time and money litigating the

4   applicability of the statute.  Having to bring in DOJ to defend

5   the statute has, of course, delayed these proceedings in this

6   Court, as has delayed the injunction that we're entitled to.

7        And, second, there's still a presumption against

8   hearing new arguments even under that exception.  As we point

9   out, they haven't shown any circumstances that would overcome

10  that presumption.  So that's waiver.

11       Let me briefly talk about the standard for a facial

12  challenge which are disfavored in the law.  They're greatly

13  disfavored.  The Supreme Court has articulated two different

14  standards.  I don't think the Court needs to decide which one

15  would apply because they haven't even tried to satisfy either

16  one of them.

17       First, the Supreme Court has said that in ordinary

18  facial challenges where you're seeking to strike down a whole

19  statute, you need to show that all applications of a statute

20  are unconstitutional or that the statute lacks a plainly

21  legitimate sweep.  And as the Government points out in its

22  brief, that's the standard that applies in cases of commercial

23  speech.

24       In First Amendment cases that do no involve commercial

25  speech, the Court has articulated a slightly different standard

1  which requires that the statutes unconstitutional applications

2  substantially outweigh their constitutional ones.  And the --

3  VIP hasn't tried to satisfy either one of them.  It really

4  can't given that it doesn't even argue that this application in

5  this case is unconstitutional.

6      It concedes there are many constitutional applications

7  of the statute; for instance, cases involving references to

8  drugs or elicit activity, obscene uses of marks.  They concede

9  those are all appropriate constitutional applications of the

10 statute so they just can't meet the facial standard.

11     Let me briefly conclude about on the merits.  I know

12 DOJ will discuss that as well so I'll just be very brief about

13 that.  The seminal case addressing First Amendment challenges

14 to intellectual property rights, enforcement of intellectual

15 property rights is the SFAA case involving the Olympic mark.

16 As I said, that case is from 1987.

17     That case held two things.  It said, first, Congress

18 can grant constitutionally consistent with the First Amendment,

19 a limited property right in a source identifying word that an

20 entity has distinguished through its own efforts.  And, of

21 course, famous marks by definition are marks that entities like

22 Jack Daniel's have distinguished through their own efforts.

23     The second thing it held was that Congress can

24 prohibit others from using those -- those words even without

25 requiring confusion.  And the Court articulated a test.  It is

1    not the strict scrutiny test that VIP asks for it.  It is a

2    reduced scrutiny test, and it is one that the Court applies

3    with a very healthy dose of deference to Congress.

4         The Court said that it just needs to further a

5    substantial government interest.  And that interest can be

6    promoting investments, investment in the Olympic mark, in that

7    case.  In this case, promoting investments in goodwill in

8    famous American marks.

9         And then the statute just needs to -- the restrictions

10   on speech need to be no greater than necessary to further that

11   interest.  In that case, in the Olympic case, the Court said

12   that was satisfied because the statute only required -- only --

13   excuse me.  Regulated the manner in which others could use the

14   word Olympic, and the same is true here as I already indicated.

15   VIP is free under the dilution statute to use Jack Daniel's

16   marks and parody, it just can't do so in a source identifying

17   way, as the Supreme Court held.

18        THE COURT:  Let me ask you a question.  This is a

19   rather ridiculous example but you use the phrase no

20   restrictions no greater than necessary.  That same language is

21   used in bail statutes at the Federal level when setting bail

22   for someone.  Same language used and it leaves it to the

23   judicial officer and or the jury to determine those issues.

24   Right?

25        Because if I'm the judicial officer and somebody says

1    this restriction is no greater than necessary, the other says,

2    yes, it is greater than necessary, I have to make that

3    determination and they can appeal that as to whether that is.

4          MS. SAHARIA:  Yes, Your Honor.

5          THE COURT:  Hypothetically.  Now set that aside.  That

6    is a bad example.  But those words, that phrase has been used

7    in other Federal statutes is what I'm saying.

8          Now, what happens, hypothetically -- and I know you

9    dread these questions -- and we get these cases all the time

10   where someone in a different context is -- products liability

11   case.  So a design of a car they say is wrong, completely

12   wrong, and if you operate it incorrectly, there's no liability.

13   But if I build it incorrectly, then I'm liable.

14         Now, five of these cases get filed throughout the

15   United States.  They're all turned over to a different jury,

16   different reasons.  Some of the jury said, yes, it was a

17   defective design; the other two said, no, it wasn't, with the

18   same witnesses testifying in all four or five cases.  How do

19   you reconcile that sort of thing?  Because if you leave it to

20   the least restrictive, then you just turn it out to people like

21   me all over the country.

22         How do you reconcile that?

23         MS. SAHARIA:  Well, I think the Supreme Court tried to

24   reconcile that in the Olympic Committee case by making clear

25   that the -- that Courts need to give -- as I said -- a healthy

1    dose of deference to Congress.  Because it is Congress that is

2    enacting the statute.  And, for instance, when the Supreme

3    Court analyzed this very question in the Olympic case, the

4    Court said that the statutes restrictions are not broader than

5    Congress reasonably could have determined to be necessary to

6    further its interest.

7           And so it -- it asks what could Congress reasonably

8    have thought, not -- it didn't apply its own view of what was

9    necessary but what could Congress have reasonably thought

10   necessary.  And I think that's the way at least in the context

11   of this issue the Supreme Court reconciled that in favor of the

12   property holder, the intellectual property holder.

13          Now, just to conclude by addressing the Tam and the

14   Brunetti cases.  There's -- those cases are different than this

15   case for two reasons.  First, they don't involve a competing

16   intellectual property right.  That is the situation in the --

17   in the Olympic case where the Olympic committee had a property

18   right vested by Congress in using the word Olympic as a

19   trademark.  And the Court was dealing with the intersection

20   between someone else claiming they had a First Amendment right

21   to use that mark and the Olympic Committee's right to use the

22   mark.

23          That's just not the case in those two cases which

24   involve simply whether someone can register a trademark.

25   There's no competing property interest on the part of someone

UNITED STATES DISTRICT COURT

1    like Jack Daniel's in those cases.

2          In fact, the much closer case is the most recent case

3    from the Court on a registration statute which is Vidal v.

4    Elster, which we pointed out to the Court in our supplement

5    authority.  Because there was a competing property interest.

6    There was a competing interest in someone's name.

7          And the Supreme Court made crystal clear that in cases

8    where someone has invested goodwill into their name, it is

9    perfectly permissible for Congress to prohibit others from

10   using that name.  And the Court sited the Olympic case as

11   support for that proposition, therefore, tying that case back

12   to the Olympic case.

13         The final point I'll make about those two cases is

14   that the statutes and those cases just work very differently

15   than our statute.  Those statutes on their face require the

16   person determining whether to register a mark to engage in

17   viewpoint discrimination.  They have to ask does this proposed

18   trademark disparage someone else or is this using offensive or

19   scandalous -- is this expressing an offensive or scandalous

20   viewpoint.

21         That is not how the dilution statute works.  The

22   dilution statute asks whether -- whether a use of a mark

23   creates an association and whether that association harms the

24   reputation of the mark holder.  But that association can be

25   created, whatever the viewpoint, VIP could say good things

1    about dog poop, bad things about dog poop.  It can say good

2    things about Jack Daniel's, bad things about Jack Daniel's.

3    But by associating Jack Daniel's with dog poop and with toys,

4    it has tarnished our reputation irrespective of any viewpoint.

5            So unless the Court has questions, I'll defer the rest

6    to infringement.

7            THE COURT:  You'll do what?

8            MS. SAHARIA:  I'll wait to discuss infringement after

9    the Government speaks to dilution.

10            THE COURT:  I have a question.

11            MS. SAHARIA:  Yes.

12            THE COURT:  What is your take on the question I posed

13    to Mr. Cooper and that is it came back and the parties said

14    just leave the record as it is.  Do you believe that I should

15    reopen discovery or reopen the fact findings, schedule trial

16    number two, trial number three, whatever it is, and keep going

17    through this in a serial fashion.

18            MS. SAHARIA:  No, Your Honor.  I think both --

19            THE COURT:  Tell me why.

20            MS. SAHARIA:  Because we believe that the Court's

21    prior findings based on the prior bench trial entitle us to

22    judgment in our favor both on dilution and on infringement.

23            THE COURT:  And do you -- what is your take on his

24    position that as of -- since 2017, the trial that the landscape

25    has changed so dramatically that the facts that were found back

1    in 2017 now support the law as it stands currently today.

2            MS. SAHARIA:  Sure.  So I disagree with that.

3    Focusing first on dilution.  Nothing has happened in the law

4    relevant to the Court's findings on the three elements of

5    dilution.  Those elements are fame, similarity, and likely

6    tarnishment.  And as I indicated when I started, all the Ninth

7    Circuit did with respect to tarnishment is rule incorrectly

8    that the exclusions applied and the Supreme Court reversed

9    that.

10            Neither the Ninth Circuit nor the Supreme Court said

11   anything about the three elements of dilution.  And VIP doesn't

12   cite any other law that has said anything relevant about those

13   three elements of dilution.  So there's just nothing to reopen

14   when it comes to the elements of dilution.

15            VIP separately is trying to inject this brand new

16   constitutional facial challenge to the statute, but as to the

17   three elements of dilution, really nothing has happened at all.

18   The Court should just reenter its findings.

19            Now the argument VIP is making we haven't come forward

20   with any actual concrete evidence of tarnishment is the exact

21   same argument they made at the prior bench trial.  They argue

22   that we had no evidence of actual tarnishment, but as the Court

23   pointed out, the standard in the statute is actual tarnishment.

24   It's actually quite common in tarnishment cases that there's no

25   evidence of actual tarnishment.  Courts often times are just

1    using their own common sense.

2         In this case, we have more than common sense, we have

3    expert opinions and the expert opinion of Dr. Simonson applying

4    the associative network memory mile, which this Court found to

5    be empirically based and supported by research.  In fact, VIP's

6    own expert agreed with that.  That model is accepted in the

7    literature as a model and so we have more than common sense.

8    We have common sense and the expert testimony this Court

9    already accredited.

10         THE COURT:  That being said, because I can guarantee

11    you no matter what ruling I make in this case, it's going back

12    up to the Ninth Circuit; more money, more time, whatever.  And

13    the parties have the right to do that.

14         But my question is if it goes back up, what is your

15    take on the question that I ask of Mr. Cooper on the focus

16    groups where he puts great stock in that and what they found

17    and I discredited as a matter of testimony and believability by

18    a preponderance of the evidence of that witness is not credible

19    evidence and they were flawed.

20         Now, do you think that's sort of sacrosanct or do you

21    think they have the right to go back and say, well, he got it

22    all wrong on the facts?

23         MS. SAHARIA:  They have -- I think -- as to that

24    issue, they have the right to say that because they said that

25    in the first appeal to the Ninth Circuit.  The Ninth Circuit

 1    didn't reach that question.  But I find it very difficult to

 2    imagine how the Ninth Circuit is going to reverse Your Honor on

 3    that question when the Court I think --

 4              THE COURT:  It's been known to happen.

 5              MS. SAHARIA:  -- quite correctly -- I think the Court

 6    quite correctly found those focus groups to be biased because

 7    the questioner told the focus groups in advance that they were

 8    intended to be parody jokes.  And, you know, not only is VIP

 9    going to have to overcome the normal abusive discretion

10    standard that governs admitting expert testimony, but, here,

11    because Your Honor was the fact finder, they have to overcome

12    clear error because Your Honor entered actual findings to which

13    experts you were accrediting, and I don't see how on this

14    record they could possibly overcome that standard.

15              THE COURT:  Yeah.  I'm just -- okay.  Now, just a

16    minute.

17              MS. SAHARIA:  Yeah.

18              THE COURT:  I'm trying to decide should I give Mr.

19    Cooper a chance to sort of respond since I never let -- just

20    because you have a response, I would give her a chance to

21    respond again and that's fine.  But do we let our friend over

22    here from DOJ go next.  He's been sitting there waiting, going

23    like this at the table, I want to speak.  So should we give him

24    that opportunity?

25              MS. SAHARIA:  I think that makes sense, but I defer to

 1    Your Honor, of course.

 2            THE COURT:  I often ask lawyers what they think and I

 3    go with some of that but let's do that.  Let's get Mr.

 4    Slaughter up here.

 5            MR. SLAUGHTER:  Good morning, Your Honor.  I'll try to

 6    be relatively brief but I'm happy to answer whatever questions

 7    you have.

 8            Ten years into this long running trademark dispute VIP

 9    products has raised for the first time the facial

10    constitutional challenge to the Lanham Act's cause of action

11    for dilution by tarnishment.  And as the United States, we

12    intervened in this suit to make a couple of points.

13            The first one is about constitutional avoidance.

14    Before the Court reaches the constitutional issue raised by

15    VIP, the Court should exhaust all nonconstitutional grounds for

16    decision.  And that includes addressing whether or not VIP

17    waived or forfeited this argument by failing to raise it

18    earlier.

19            You've heard the arguments from the parties on whether

20    or not there's been waiver of forfeiture.  The United States

21    doesn't take a position on it but it does believe that that

22    issue should be resolved first.  And if the issue were

23    forfeited or waived, then there's no need to reach the

24    constitutional challenge at all.

25            By the same token, if the Court were to find that Jack

1    Daniel's has failed to prove any of the elements of dilution by

2    tarnish, there would be no reason to reach the constitutional

3    issue either.  And so both of those avenues, off ramps from

4    this case, should be explored before the Court determines it's

5    necessary to reach the constitutional issue.

6        On the merits of the constitutional challenge, the

7    Court should hold that the statute does not discriminate on the

8    basis of viewpoint, that it survives the relaxed scrutiny

9    that's applicable to trademark regulations like this one, which

10   are designed to protect the goodwill and reputation of marks.

11   And that, in any event, VIP has failed to carry its burden of

12   making a facial challenge to a statute like the cause of action

13   for tarnishment.

14       Turning first to whether or not the statute is

15   viewpoint discriminatory.  I think the statute isn't focused

16   like the statute in Tam, for example, on the views that are

17   expressed by the mark itself.  Instead, it's about whether or

18   not the use of the similar mark creates discordant associations

19   and whether those associations, in turn, harm the more famous

20   mark.  And that focus on the effect of the use of the mark,

21   rather than on the viewpoint expressed means the statute is not

22   viewpoint discriminatory.

23       I think that there is a tendency advocated for by VIP

24   to associate the idea of harm to reputation with one where all

25   associations can be mark -- can be mapped onto a binary or a

spectrum of positive and negative, and, therefore, analogize this case to Tam.

But the reality is that discordant uses don't necessarily have to be about good or bad things.  Of course there are the cases we cited in our brief and that Jack Daniel's cited where the tarnishment arose from the shotty quality of the product.  And that had nothing to do with the viewpoint expressed.  But you can also imagine situations where two competing uses are just creating discordant associations without any type of positive or negative valence to that disagreement.

For example, if you imagined a company with a famous mark that they used to market their salads.  We can just -- for example, if Sweetgreen were a famous mark, and then another company tried to use that mark to market toothpaste, it could create discordant associations because a company that is trying to market something that's for consuming, that is designed to be appetizing might feel that the discordant associations created by connecting that mark to toothpaste create discordance for their brand, even if it has nothing to do with whether or not using a particular mark in connection with toothpaste is negative in some way and so there isn't viewpoint discrimination going on here.

And I think that, as Jack Daniel's pointed out, the important thing to remember is that when the plurality or when

1    the two plurality opinions in Tam said that giving offense was

2    a viewpoint that was prohibited by the bound registration.

3    That idea of giving offense was completely untethered from any

4    affect on the use of other marks or on the value of other

5    marks.  And, here, by contrast, the tarnishment statute is

6    looking at how the use of the mark affects and harms the

7    reputation of the more famous mark.  And that is not about the

8    viewpoint expressed.

9         And I think that Vidal, the recent Supreme Court case

10   about the Lanham Act, helps reinforce this idea that viewpoint

11   based regulations target not nearly the subject matter but the

12   particular views taken by a speaker on a subject and there

13   simply isn't any indication on the face of the statute or in

14   any application that's what the tarnishment statute does.

15        Now, VIP tries to distinguish a few of the examples

16   mentioned by Jack Daniel's and the United States in our briefs

17   where the tarnishment came from shotty quality of the product

18   by trying to write those off as cases that dealt specifically

19   with dilution by blurring.  But if you're to look at the

20   opinion in the Tiffany case or in the Steinway case, both

21   courts specifically hold that there's both dilution by blurring

22   and dilution by tarnishment going on in those cases.  And so

23   it's simply incorrect that those cases aren't talking about

24   dilution by tarnishment.

25        And then the other point that I would make is that the

1    regulatory scheme of the tarnishment cause of action is

2    significantly different from a registration bar.  When you have

3    a registration bar, you have a government actor saying that

4    this specific word or the contents of a mark are disparaging,

5    scandalous, they're looking at the expressive content.  Here,

6    by contrast, the Government isn't involved on the front end in

7    determining whether or not a particular use is -- expresses a

8    viewpoint that the Government disagrees with.

9         Instead, it's up to private actors, private plaintiffs

10   like Jack Daniel's, to determine that another similar mark is

11   causing harm to their mark and then to prove that in court.

12   And the different regulatory scheme lowers the likelihood that

13   the Government is attempting to remove certain ideas or

14   perspectives from a broader debate, which is what the concern

15   of viewpoint discrimination is.

16        So once we set that aside and recognize that this

17   statute isn't about viewpoint discrimination, then the Supreme

18   Court's decisions in SFAA and in Vidal make it clear that

19   Congress can clearly regulate these uses of trademarks without

20   running afoul with the First Amendment.  And that's because

21   there's a substantial Government interest in protecting the

22   value in goodwill attached to marks and that Congress can

23   lawfully pursue protecting that interest by -- by prohibiting

24   uses of marks that interfere with that.

25        Now, VIP tries to distinguish these cases,

1    specifically SFAA, by arguing, well, Congress could prohibit

2    all uses of a word by the non mark holder but it can't just

3    target the harmful uses.  I think that's really putting too

4    much weight on the idea that this is somehow different from the

5    use in SFAA.  Because the reality is that in order to prove

6    liability in Federal Court to have a cause of action, there has

7    to be some sort of harm or likelihood of harm that flows from

8    your action.  And the idea that only harmful conduct is

9    actionable isn't something that gives rise to the idea of

10   viewpoint discrimination generally.

11          Rather, the tarnishment statute is narrowly tailored

12   to the interest that it's designed to protect by limiting it to

13   cases where there is a likelihood of harm to the reputational

14   mark.  And then, as VIP points out in its briefs, the Supreme

15   Court has said that you can use the rational that allows an

16   entire category of speech to be prescribable to target a

17   specific category of speech within that larger prescribable

18   category.  That's from RAV.

19          And that's exactly what's happening here.  Congress

20   has the power to protect the goodwill and reputation associated

21   with marks and it past a statute designed to prohibit similar

22   uses that harm that goodwill and the reputation of those famous

23   marks.  And so the rational behind the regulation is the same

24   that allowed it to pass the much more sweeping restriction on

25   the use of the word Olympic that the Supreme Court upheld in

1    SFAA.  And it's the same rational that was part of the reason

2    why Supreme Court unanimously upheld the names clause in the

3    registration part of the Lanham Act because there is the

4    substantial interest in allowing the Government to regulate.

5        And that is true whether or not you examine this case

6    just by looking at SFAA and Vidal, whether you examine this

7    under the lens of a regulation on commercial speech which I

8    think is the upshot of the SFAA case.  And, importantly, it

9    also affects the analysis of the facial challenge.

10       Here, we have a situation where VIP has only raised a

11   facial challenge to the -- to the tarnishment cause of action,

12   and, yet, we know that many of the time -- many of the

13   applications of the tarnishment cause of action are to

14   completely legitimate prescribable speech.  And, as VIP said

15   here today, the reason why often this hasn't been litigated is

16   because tarnishment is often a sidekick to infringement

17   actions.  But that only proves that there's this enormous

18   category of actionable tarnishment that is clearly

19   constitutional because the Supreme Court has said that

20   trademark law plays well with the First Amendment in the

21   context of infringement and so all of those uses are a reason

22   why VIP's facial challenge can't succeed.

23       So, in summation, I think the -- the Court should

24   resolve the non constitutional issues first, only reaching the

25   constitutional issue, if necessary.  If it does reach the

 1   constitutional issue, hold that the statute is viewpoint

 2   neutral and that it survives under the relaxed scrutiny

 3   applicable under SFAA and that VIP has failed to carry its

 4   burden of mounting a facial challenge to the statute.

 5           THE COURT:  Okay.  Thank you.  I have two brief

 6   questions.  Do you subscribe or take issue with Mr. Cooper's

 7   characterization of two tiers of fame theory?  If there's fame

 8   and there's really fame -- or famous.  I mean, he kind of

 9   differentiated because there's a middle of the road fame that's

10   not really protected as much but there's high fame.

11           But to get to high fame, you really have to be up

12   there somewhere and he disagrees, from his point of view, that

13   Jack Daniel's is not really a high fame thing because it only

14   appeals to a small segment of societies, which are people that

15   imbibe.

16           MR. SLAUGHTER:  I don't think the United States is

17   taking a position on this case on how famous is famous enough.

18           THE COURT:  No.  I'm saying are you subscribing to his

19   idea there are two standards for different fame that have to be

20   proven, or is it just likelihood of tarnishment of the mark?

21           MR. SLAUGHTER:  I'm not sure I totally follow the

22   question.  I think that there is --

23           THE COURT:  That doesn't surprise me the way I phrased

24   it.

25           MR. SLAUGHTER:  I think that -- that part of the

1    plaintiffs burden in a tarnishment suit is to prove that the

2    mark is famous and the statute sets out some rules for doing

3    that in the context of trade dress.  But I think that famous is

4    famous.

5           THE COURT:  Okay.  That's my point.  There's only one

6    category of famous then.  Okay.

7           Now what about the statutory statement of the statute

8    which talks about likelihood as opposed to actual.  I think I

9    said in my earlier statements its likelihood of confusion and

10   things like that as opposed to must be actual.

11          MR. SLAUGHTER:  Absolutely.

12          THE COURT:  That could be a basis -- if it goes back

13   up, that issue, to me -- and I'm not criticizing, I'm just

14   saying it was a different standard applied in a different

15   way -- but if you go up on the multi-factor test and it goes up

16   and we talk about likelihood of confusion, which is what it was

17   to begin with that I said, and the Supreme Court seemed to

18   agree with that, that becomes the standard by which binds now

19   the Ninth Circuit is what the statute says, not by saying,

20   well, there's no evidence that someone actually denigrated

21   their mark.  It's likelihood by -- particularly on the

22   association theory.  Am I getting that right?

23          MR. SLAUGHTER:  Yeah.  I think so. Yes, Your Honor.

24          THE COURT:  Okay.  This is a tough one.  Okay.  Go

25   ahead.

1          MR. SLAUGHTER:  Well your question reminded me of one

2    other point I wanted to make.

3          THE COURT:  Go ahead.

4          MR. SLAUGHTER:  Which is you asked counsel for Jack

5    Daniel's about the no greater than necessary prong of

6    intermediate scrutiny.  And one of the points that VIP made in

7    their brief -- or one of the arguments they raised was this

8    idea that because of the previous version of the dilution

9    statute didn't reach likelihood of confusion, that somehow the

10   statute wasn't a means-ends fit for -- for what Congress was

11   trying to do.

12         And as Jack Daniel's correctly pointed out, the SFAA

13   case clearly contemplates that Congress has a lot of discretion

14   in terms of determining what -- what is the right means for

15   addressing the substantial interest that they've identified.

16   And I would only add that that is totally consistent with the

17   approach that the Supreme Court has taken in challenges to

18   commercial speech regulations, generally, and in challenges to

19   time placed in matter restrictions.

20         All of these intermediate scrutiny standards don't

21   have the same least restrictive means test that you see in

22   strict scrutiny.  They contemplate that Congress is going to

23   have discretion in terms of determining what the appropriate

24   means of addressing the substantial interest is.

25         THE COURT:  Okay.  Thank you.  Just out of curiosity,

```
 1    what section of the Department are you with?

 2              MR. SLAUGHTER:  Federal Programs Branch.

 3              THE COURT:  Okay.  I thought you might be with the

 4    SG's Office.  But just checking.  Have a seat.

 5              MR. SLAUGHTER:  Thank you, Your Honor.

 6              THE COURT:  Now before, Mr. Cooper, you wanted to

 7    raise some things and then I was giving them a chance to

 8    respond to anything you're raising now.  Just -- but if we want

 9    to -- would anybody like to take a five or ten minute recess to

10    stretch your legs and use the restroom facilities and anything

11    like that?

12              MR. COOPER:  That would be delightful, Your Honor.

13              THE COURT:  Besides, I don't want her little hands to

14    wear out.  So with that in mind, let's come back 20 to 11:00.

15    We'll go to the noon time hour or shortly thereafter depending

16    on what you have to say and we'll take a brief breather.

17              Thank you.  Stand at recess until 20 after 11:00.

18    Thank you.

19         (Proceedings reconvene at 11:20 a.m.)

20              THE COURT:  Was that a sufficient amount of time for

21    everyone to relax just a little bit?

22              MS. SAHARIA:  Yes, Your Honor.

23              THE COURT:  Okay.  Here we go.  All right.  Mr.

24    Cooper, you're back up again.  Top of the order.

25              MR. COOPER:  I'm back, Your Honor.  But hopefully for
```

1    not as much time.

2            I want to start where Your Honor ended.  First, to be

3    clear, there are different kinds of fame and that's why the

4    Federal Circuit -- in which has specific expertise in

5    trademarks -- refers to dilution fame in the Coach case where

6    it held that Coach may be a strong mark but it's not a famous

7    mark for purposes of a specific standard for fame for the

8    dilution stature, that it has to not just be in a specific

9    market.  It has to be basically a household name for the entire

10   consuming population of the United States.  That's a rare

11   class.  That's very different that what one does for an

12   infringement claim under the Lanham Act.

13           Secondly, so they're very much -- and the Thane case

14   from the Ninth Circuit which deals with the Trek for

15   bicycles -- very strong mark.  Trek is -- in our generation was

16   a Schwinn.  Now it's a Trek.  But not famous for purposes of

17   dilution.  It's a different standard under the dilution

18   statute.

19           Secondly, Ms. Saharia says you have to look at the two

20   marks and she cites the Polo Pony case, which is the Polo Ralph

21   Lauren versus Schuman.  That was a case that was decided almost

22   a decade before the 2006 statute was passed.  And that was

23   basically, if not identical, the same mark being used as the

24   Ralph Lauren mark Polo Club on adult entertainment.  That's

25   what all of these cases are, someone uses basically the

1    identical mark on shotty goods or something like that.

2              But that's not what we have here because they admitted

3    that Bad Spaniel's -- which is the only thing similar mark to

4    their famous mark -- wasn't infringing, wasn't similar.  They

5    used it on the control and no one said that that was -- that

6    Bad Spaniel's was at all tarnishing.  That wasn't the problem.

7    So this is different from those cases because the similarity of

8    the mark and their own litigation positions on why Bad

9    Spaniel's wasn't the problem.

10             Secondly, Ms. Saharia says, well, you raise the fame

11   issue -- I believe her term was -- in one fell swoop.  Its

12   their burden.  We indicated in our proposed findings of fact

13   before the trial what the legal standard was for dilution fame.

14   And we indicated their marks didn't make it.

15             And Jack Daniel's then could have put on proof but

16   there is no proof.  Because there's no -- Old Number -- again,

17   this is not about the Jack Daniel's mark.  It's about Old

18   Number 7 and Old Number 2 because that's where the alleged

19   tarnishment was, that's where the poo references are.  There's

20   no evidence that Old Number 7 is by itself a household name.

21             Which takes me to our next point.  Ms. Saharia says,

22   well, we conceded fame in the Ninth Circuit.  That's not the

23   case.  What she's referring to there are references in our

24   brief in the Ninth Circuit in the first round to the famous

25   iconic Jack Daniel's black label whiskey.  We're talking about

1    the famous Jack Daniel's whiskey.  Yes, Jack Daniel's is

2    famous.

3         The problem is there's no poo reference that's similar

4    to Jack Daniel's because it's not the same mark and it's not a

5    problematic mark according to Jack Daniel's in this case.  So

6    this is a relatively -- and you can't bring in the surrounding

7    circumstances.  That's what the Mintz versus Subaru case from

8    the Ninth Circuit says.  You have to do mark to mark

9    comparison.  That's the legal standard.

10        Ms. Saharia also says trade dress can be subject to a

11   dilution claim.  That's true but it has to be dilution famous

12   trade dress.  And maybe you could show that in a particular

13   case but there's just no evidence of it here.  All they've said

14   throughout the testimony was Jack Daniel's is famous, and I'll

15   given them that subject to -- its -- Jack Daniel's name is

16   iconic but we can't tarnish the Jack Daniel's name by using Bad

17   Spaniel's.  Their contention is you -- it's all the surrounding

18   circumstances that tarnished it but that's not enough under the

19   2006 statute.

20        And, finally, they talk about, well, it's not just

21   disgust.  You used it on a toy and that connects alcohol to

22   children.  This is a dog toy sold in pet stores, not a child's

23   toy sold in Babies "R" Us or whatever.

24        THE COURT:  I remember also that Jack Daniel's

25   produced other products like a doghouse and a lot of other

1    things.  But the point is, but -- you know, I can remember my

2    daughter being quite young and whenever we would go to the pet

3    store to get our dog a toy, she was the first one to pick up

4    three or four of them, say this is what we want.  So it may be

5    an attenuated circumstance.  But she's not going to play with

6    the dogs toy but she helps to pick it out.

7          MR. COOPER:  Well, the one thing -- first of all, we

8    don't put out a product that says Jack Daniel's but they

9    licensed a product that says Jack Daniel's and has their marks

10   on it that sold -- advertised for children which is Jack

11   Daniel's playing cards and that's in our brief.

12          So it's a little bit of a rich argument that somehow a

13   dog toy that says Bad Spaniel's that kids aren't going to

14   understand it unless they already know Bourbon -- or whiskey as

15   compared to playing cards that directly say Jack Daniel's.  So

16   it's -- you know, it's an argument that -- it's not a credible

17   argument for them to claim that they're being -- because their

18   name or something like their name or something that's somehow

19   related to their name is used for something kids might pick up

20   when they're licensing their mark for playing cards that are

21   advertised for children.

22          But the key thing is to understand that fame is not

23   fame.  Fame and dilution are something specific.  And you have

24   to show mark to mark, and they failed in their burden.  They

25   failed in their burden.

1          And, at the same time, they failed to show that Old

2    Number 7 -- which was famous -- they were contending that Bad

3    Spaniel's wasn't the problem.  Well, that takes us out of the

4    range of the Polo cases and the shotty goods cases where

5    someone is using the identical mark or basically the identical

6    mark.  Here they're saying it was in their control, okay, in

7    their survey control.

8          Bad Spaniel's was not the issue.  It's all the other

9    stuff but the other stuff doesn't relate to anything famous.

10   And that -- with that, the Court doesn't need to reach the

11   constitutional rulings at all.

12         THE COURT:  All right.  Thank you.  Now I will give

13   you the opportunity to respond before we move on to the other

14   portion of it.  Very briefly, and same with the Department of

15   Justice, if you have anything to respond to his last comments.

16         MS. SAHARIA:  I do, Your Honor.  Just very briefly.

17         THE COURT:  It's okay.  Go ahead.  I mean, we're all

18   here for reasons.

19         MS. SAHARIA:  Just to respond to these fame arguments,

20   some of which were new.

21         First of all, just to be clear, the Court in its

22   findings of fact applied the dilution fame standard.  So I

23   don't want the Court to be confused into thinking that's not

24   what the Court applied.  The Court did apply the correct

25   dilution fame standard.  This is at Findings of Fact 26 to 31

1    where the Court walked through the various factors that are

2    laid out in the dilution statute.

3        There are four factors that the statute lays out to

4    ascertain fame and the Court walked through those factors and

5    found that all of the trademarks and trade dress were famous.

6    That's at Finding of Fact 31.

7        Counsel seemed to suggest that there's not the

8    requisite degree of similarity here because the marks are not

9    identical but the Court expressly found at finding 35 that VIP

10   does not contest similarity.  That's the second element of

11   trade dilution.  And VIP expressly conceded that the similarity

12   prong was met.

13       Third, with respect to the appeal, counsel -- or VIP

14   absolutely did concede fame on appeal because it failed to

15   appeal the Court's finding of fame.  That was not an argument

16   that VIP made to the Ninth Circuit, and, therefore, they

17   conceded it.

18       With respect to the trade dress, today is the first

19   time we've been on remand that VIP is now arguing the trade

20   dress is not famous.  We've had three rounds of briefing.  They

21   didn't make that argument.  This is not the appropriate time to

22   now make a brand new argument here at oral argument.

23       But if the Court were to walk through the four factors

24   specific to trade dress, specific to Old Number 7, the Court

25   would easily find them to be famous as well.  But that didn't

1    happen because that's not how VIP chose to argue this case the

2    first go-around when, as I mentioned before, it was all in one

3    fell swoop.

4         And then, finally, with respect to the playing cards

5    that VIP referenced.  They raised those for the first time in

6    their reply brief so we have not had the chance to respond to

7    them.  And they expressly agreed, as Your Honor indicated

8    earlier, not to reopen evidence.  So VIP cannot bring new

9    evidence before the Court in the form of something in their

10   reply brief.  There has been no evidence taken with respect to

11   those playing cards on Amazon.

12        There's no evidence that Jack Daniel's authorized

13   Amazon to market those playing cards as for children.  Jack

14   Daniel's does not market its products to children.  And there's

15   a world of difference between playing cards that simply have

16   the logo of Jack Daniel's on them as opposed to a physical dog

17   toy that a child can hold, can pretend to drink from in the

18   shape of a whiskey bottle.  That is quite concerning to Jack

19   Daniel's and tarnishes its reputation.

20        So those are the points I wanted to make in response

21   to Mr. Cooper.

22        THE COURT:  Okay.  Thank you.  I've got both positions

23   on this now.  Thank you.

24        MS. SAHARIA:  Great.  Should I stay up here and turn

25   to infringement?

1          THE COURT:  Mr. Slaughter, do you have any additional
2    comments?
3          MR. SLAUGHTER:  Nothing further from me.
4          THE COURT:  Thank you.  Go ahead.  Go ahead.
5          MS. SAHARIA:  Okay.  So the Court's order indicated we
6    should go first on infringement so that's what I'll do.
7          I don't want to go factor by factor through the
8    Sleekcraft factors because we've done that in our brief
9    already.  So what I thought --
10          THE COURT:  Oh darn.  You've just taken all of the
11    excitement out of the this case.
12          MS. SAHARIA:  What I thought I would do is explain to
13    the Court why the Court's prior findings on likely confusion
14    are consistent with, first, the Supreme Court's decision and
15    then also why they are consistent with the long line of Federal
16    Court decisions assessing parody and under the likelihood of
17    confusion factor which come out both ways.
18          There are cases finding confusion.  There are cases
19    finding no confusion.  And what I want to do is tell the Court
20    why this case is more like the cases that have found confusion
21    and is unlike the cases like the Louis Vuitton case, as one
22    example, that have found no confusion.
23          So let me just start with a Supreme Court decision.
24    And what the Supreme Court did is two things.  First of all, it
25    was concretely -- of course, it reversed the Ninth Circuit's

1    erroneous holding that the Rogers test applies and of course it

2    agreed with Your Honor that the test does not apply in this

3    case.

4         The second thing it did was to reaffirm the

5    pre-existing approach that the other courts have taken to

6    assessing parody which is to assess parody in the context in

7    the likelihood of confusion factors or assessment.  And the

8    Court --

9         THE COURT:  Just one of those silly facts.  Congress

10   put the parody into the statute.  Correct?

11        MS. SAHARIA:  Into the dilution statute but not into

12   the infringement statute.

13        THE COURT:  Right.  Right.  But if you look up in

14   Webster's -- somebodies dictionary -- parody is always meant to

15   be a verbal humorous thing not related to product.  It's been

16   morphed into products now.  Go ahead.

17        MS. SAHARIA:  That's interesting, Your Honor.

18        So the key paragraph of the Supreme Court decision is

19   at the end of part two.  There's one key paragraph where the

20   Court essentially kind of reaffirms how lower courts have been

21   handling parody.  What it says is there's the question going

22   forward is whether the Bad Spaniel's dog toy is likely to cause

23   confusion.  It deferred the answer to that question to the

24   lower courts which now is Your Honor.

25        It, again, said there's no threshold test for parodies

UNITED STATES DISTRICT COURT

but that a product message may factor into the likelihood of confusion analysis. And then it gave what I think is the key sentence. It said parody, of course, must conjure up the original, but, to succeed, it must also create contrasts so that its message of ridicule or pointed humor comes clear.

And there's really two key components of that sentence. First, it made clear parodies need to -- or not to be confusing, parodies need to have enough contrast so the consumers understands what they're seeing is not coming from the original mark holder. And it made clear that in cases involving messages where the parodist is ridiculing the mark holder or directing pointed humor at the mark holder, in those cases, consumers are less likely to be confused. And that's because mark holders don't often mock themselves. They may of course engage in humor, which as the Supreme Court expressly recognized that mark holders also recognize jokes, but they don't often mark themselves.

So when a product is actually mocking a mark holder or ridiculing a mark holder, consumes are more likely not to be confused. That passage essentially kind of recognizes what courts have been doing. Some courts find confusion, some don't. And there's no magic formula. It just depends on the facts of any given case.

The only Circuit Court that has analyzed the Supreme Courts decision since then was the -- is the Second Circuit in

1    the Vans case which involved a sneaker parody.  And the Second

2    Circuit put it quite nicely when it said if a parodic use of

3    protected marks and trade dress leaves confusion as to the

4    source of the product, the parody has not succeeded for

5    purposes of the Lanham Act and the infringement is unlawful.

6            So with the guidance that we now have the Supreme

7    Court, I think there are three key features of this case that

8    should give the Court comfort that your prior findings are

9    entirely consistent with the Supreme Court's decision.

10           First, a consumer would not view the Bad Spaniel's dog

11   toy as ridiculing or mocking Jack Daniel's.  And, in fact, VIP

12   expressly conceded that at the bench trial.  And this comes

13   from the closing argument VIP's closing argument, ECF240 at

14   page 139.

15           I'd like to read this express concession from VIP.

16   Quote, it has never been VIP product's intent to ridicule or

17   disparage Jack Daniel's.  It is making a comment regarding how

18   self important major brands can be and how advertising infuses

19   every part of our life.  It is a very gentle form of parody.

20           So, I mean, just to be clear, VIP said it is not doing

21   the thing, ridiculing, that the Supreme Court said is likely

22   not to lead to confusion.  It's not ridiculing Jack Daniel's.

23   Its parody is so -- even if this is a parody, it's so generic,

24   it's so benign, it applies to every single big company in the

25   United States.  And if it was enough to just put a joke on a

1    product and say now I can engage in a successful parody making

2    fun of a company for being too serious, then it's going to be

3    open season on all mark holders in this country.

4         And that's why the Supreme Court said there needs to

5    be an actual message of ridicule, which there's just not here.

6    So that's feature number one.  Feature number two, there are

7    just simply not sufficient contrasts between the Bad Spaniel's

8    dog toy and Jack Daniel's marks' trade dress.  This Court found

9    that over and over again in your Findings of Fact.

10        At paragraph 34, the Court said that with a single

11   glance, one is immediately struck their similarity, not by the

12   contrasts.  And Finding of Fact 103, the Court said that VIP

13   appropriated the Jack Daniel's trade dress in every aspect.

14   And then the Court went on to list nine features of the trade

15   dress that remain virtually unchanged including the bottle

16   shape, the bottle size, you know, they're exactly the same size

17   of each other, and all of the various features on the labels of

18   the bottle.

19        So they're just highly similar.  And then the third

20   point that I would make with respect to the Supreme Court

21   decision is the Supreme Court said that the ultimate question

22   is whether there is confusion.  And here we have the gold

23   standard evidence of confusion which is a survey.  We have the

24   Eveready survey from Dr. Ford which the Court previously

25   credited.

1          Now, VIP makes many of the same criticisms that this

2     Court already rejected.  Let me just briefly address a few of

3     them.  VIP says this survey doesn't account for parody.  Well,

4     of course it accounts for parody because the product that they

5     claim is a parody was shown to the respondents in the survey.

6     And if the respondents understood that this was just a parody

7     making fun of Jack Daniel's and did not come from Jack

8     Daniel's, then they would have responded that it didn't come

9     from Jack Daniel's.  But, in fact, we know that 29 percent of

10    respondents thought that Jack Daniel's had approved, sponsored

11    or made the product.

12          Now VIP also says that certain respondents show legal

13    confusion.  But, as we point out, if you exclude all of those

14    respondents from the survey, there's still 25 percent

15    confusion.  VIP does not contest that.  That's still way above

16    the threshold that courts look to to find confusion.  And the

17    notion that you should draw any inference from a two justice

18    concurrence about what a majority of the Supreme Court thought

19    is wrong.  Justices are not usually shy about expressing

20    themselves and only two of them did so in this case.

21          So, for those I think three really key reasons; the

22    high degree of similarity, the lack of a message of ridicule,

23    and the evidence of confusion, this case should come out

24    exactly the same way with the Supreme Court's guidance.

25          Let me just briefly turn to other cases including the

1    Louis Vuitton case and others that have come out on both sides.

2    I don't want to go case by case, but what I want to do is

3    identify what I think are some common features in cases that

4    find confusion and then the features that are common to cases

5    that find no confusion.

6        So cases finding confusion.  I think there's four key

7    features, all of which are present here.  First, a high degree

8    of similarity between the trademark holders mark or trade dress

9    and the defendant's product.

10       And just to give a few examples, I think the best

11   example is VIP's own example of in the Budweiser case.

12   Anheuser-Busch versus VIP to a Budweiser bottle and a dog toy

13   that looked just like a Budweiser bottle.  There, the District

14   Court found likely confusion given how similar they were, given

15   the evidence of -- the survey evidence in that case.

16       And, importantly, the Court in that case discussed

17   Louis Vuitton and it discussed Tommy Hilfiger and it considered

18   VIP's claim of parody.  And the District Court in that case

19   found that those cases were different than the -- than the case

20   before it, as we think the Court should do here.

21       That's one case where you have a high degree of

22   similarity.  The Vans case from the Second Circuit involving

23   the sneakers, also a very high degree of similarity and the

24   Court found likely confusion.  That's one feature.

25       Second, these cases often -- there's no message of

UNITED STATES DISTRICT COURT

ridicule, no message directly targeting the mark holder as in

our case.  As in, for instance, the Dr. Seuss case from the

Ninth Circuit that this court cited in its finding.  That was a

case where the Ninth Circuit said there's no message of

ridicule targeting the mark holder, Dr. Seuss.  They're just

suing the famous Dr. Seuss mark to get attention for

themselves.  And in that case, they found there was still

likely to be confusion.

A third factor, commonly these cases involve products

that travel in similar marketing channels or that are sold at

similar price points.  And those are circumstances where courts

find consumers are more likely to be confused into thinking

that the mark holder sponsored this product.  The Budweiser

case is a great example of that.  Of course we have that here,

the products are sold not only on product -- on websites like

Amazon, Walmart, but also specialty websites that are devoted

to alcohol themed products, as we point out in our briefing.

And then, fourth, the cases that find confusion,

including the Budweiser case, including the Schiefflin case

which involved Dom Popingnon popcorn.  They have survey

evidence or they have other evidence of actual confusion just

like our case.  So those are cases that find confusion.

It's the Dom Popingnon case, the Budweiser case, Vans,

Dr. Seuss.  Another great one is the Mutual of Omaha case.

Those are all cases finding confusion under the likelihood of

1   confusion analysis.

2          So then the cases on the other side which include

3   Louis Vuitton, Tom Hilfiger.  Another great one is the Hormel

4   case from the Second Circuit which involves a parody by a

5   Muppets.  And in those cases, I think there are five things

6   that distinguish all of those cases from this one.  First, they

7   have a very low degree of similarity between the defendants

8   marks and trade dress and the protected ones.

9          And Louis Vuitton is just such a great example of

10  that.  In the Louis Vuitton case, the Fourth Circuit said the

11  following, it said that this Chewy Vuitton purse only loosely

12  resembles a Louis Vuitton handbag, and, at that, only a

13  miniature version of a Louis Vuitton handbag.

14         It said the differences are immediate.  The toy was

15  smaller, it was courser, and it said, quote, virtually all of

16  its designs differ.  And that's just the opposite of what this

17  court already found with respect to the designs on VIP's dog

18  toy.  So that's one feature.  Low degree of similarity.

19         Second, these cases often have very obvious indicia of

20  parody which we don't have here.  And those obvious indicia can

21  include things like the fact that it's a gag product, like pet

22  perfume.  Pet perfume is not a real thing.  It exists only as a

23  gag.  And that was the Tommy Hilfiger case and that factored

24  very heavily in the Tommy Hilfiger case.  Or in the case of the

25  Muppets, for instance.  The Muppets themselves are known are

1    for parody.

2            So when you have a product that is a parody of Spam in

3    that case and the Muppets house mark is on the product, people

4    are going to know that's a parody because the Muppets are

5    famous for parody.  We don't have anything like that here.  Dog

6    toys are not gag products.  VIP makes a whole range of dog toys

7    that have nothing to do with trademarks.

8            Third, often these cases have an obvious parodic

9    message directed at the mark holder.  In the Louis Vuitton

10   case, the Fourth Circuit said the message was obvious because

11   Louis Vuitton is known for very expensive, many thousand dollar

12   handbags, and it was obvious that this little, tiny dog toy was

13   making fun of the pretensions of people that carry Louis

14   Vuitton handbags.

15           THE COURT:  Let me ask you the question there.  Do you

16   think in this case the same argument could be made against your

17   client?  It's a dog toy.  It's not making fun of your client

18   there.  But could the same argument be made there or not?

19           MS. SAHARIA:  No.  I don't think so.

20           THE COURT:  Why?

21           MS. SAHARIA:  Well because there's a huge difference

22   between a bottle of Jack Daniel's whiskey or, even more, all of

23   the licensed products that Jack Daniel's licenses, things like

24   T-shirts, barbecue sauce, belt buckles, right, everyday kind of

25   objects that people buy, you know, on an impulse, for instance.

1    There's a world of difference between those kind of things and

2    $3,000, $4,000 Louis Vuitton handbags.  Right?

3          And what the Fourth Circuit found in that case are, I

4    think, two relevant things.  First, it was obvious that these

5    dog toys were making fun of the pretensions and the expensive

6    nature of Louis Vuitton handbags.  But, second, that you can't

7    even buy them in the same places which made it super obvious

8    these were parodies.

9          So in the Louis Vuitton case, the purses can only be

10   bought in Louis Vuitton boutiques or in a boutique of that high

11   end department store and you can't buy them in the same place.

12   That's just not the case here where Jack Daniel's licensed

13   products can be bought at the exact same place as these dog

14   toys.  And if you search -- evidence shows if you search on

15   these websites for Jack Daniel's, you get the VIP Bad Spaniel's

16   dog toy.  How is that not going to confuse consumers into

17   thinking that this is legitimate Jack Daniel's product?

18         So the fourth factor I just talked about which is

19   often these products travel in different marketing channels or

20   they're sold at very different price points, as in Louis

21   Vuitton.  And then, fifth, the cases that find no confusion

22   very often typically do not have survey evidence or other

23   evidence of confusion.  No survey in Louis Vuitton, no survey

24   in Tommy Hilfiger, just to give two examples.  So very, very

25   different than this case.

1          Let me just conclude on VIP's argument about the

2    factors automatically flipping in their favor because I think

3    that's a really serious misreading of what happened in Louis

4    Vuitton.  In Louis Vuitton, the Fourth Circuit first analyzed

5    whether the parody was a successful parody.  And it kind of

6    analyzed that question at length and concluded that, yes, this

7    is a successful parody because consumers will obviously realize

8    this is not coming from Louis Vuitton.  And only after it came

9    to that conclusion, then it walked through the factors which in

10   that case were called the Pizzeria Uno factors.

11         And it said in that case where there was a successful

12   parody that the strength of the mark weighed in favor of the

13   defendant of no confusion because it was a strength of the mark

14   that allowed consumers to understand that this was a parody.

15   But it was only after it had determined that parody was

16   successful and not likely to be confusing that the Court said

17   that.  What VIP wants the Court to do -- and no case holds

18   this -- is to say that as long as the defendant claims some

19   amount of parody, I automatically flip the Sleekcraft factors

20   in its favor before I answer the question of whether there's

21   likely to be confusion.

22         And that's just question begging because you have to

23   assume the answer to the ultimate question to flip the factors.

24   And that can't be right.  And if it were right, we would be

25   back in a Rogers-like situation where parodies are, by

1  definition, never going to be confusing.

2       The Courts recognize there's no magic formula.  You

3  just have to take each case on its facts.  And we think when

4  the Court does that, the Court should reaffirm its prior

5  findings.

6       We proposed a few additional findings that the Court

7  should enter in light of the Supreme Court decision, but we

8  think if the Court enters as prior findings that enters -- and

9  enters those new findings with the exception of the few

10 findings that we suggest the Court replace, then the Court on

11 that basis should then enter judgment for Jack Daniel's.

12      THE COURT:  Thank you very much.

13      MS. SAHARIA:  Thank you.

14      THE COURT:  Mr. Cooper.

15      MR. COOPER:  Your Honor began this morning by pointing

16 out how long this case has been pending and how many times it's

17 gone up and down.  And I agree with you.  It's a lot for a dog

18 toy.

19      THE COURT:  It's a lot for anything.

20      MR. COOPER:  It's a lot for anything.  By the way,

21 we're still waiting for our ruling in the Tucson Unified School

22 District Desegregation case.  That's been going on since '74.

23      THE COURT:  I know when that case started.  I'm

24 familiar with that case and the ups and downs very much.

25      MR. COOPER:  So this case is a youngster by

1    comparison.

2         THE COURT:  Yeah.  That -- a school district does a

3    lot of different things.  This is a product.  Go ahead.

4         MR. COOPER:  I understand.  But my point is simply

5    that with all respect, opposing counsel is inviting the Court

6    to commit reversible error and keep this court case going

7    further and further.  The idea that the Court can simply look

8    at each case on its own facts and reenter the Court's prior

9    findings is an invitation to reversal and one you don't look

10   at -- with all respect --

11        THE COURT:  Mr. Cooper, I appreciate your advocacy why

12   you think I shouldn't do what they want, but your argument

13   inviting me to commit reversible error, every counsel in this

14   courtroom for 34 years has said, Judge, if you don't go my way,

15   that's reversible error.  I've come to say I don't pay

16   attention to that argument.  I'm going to try to apply the

17   facts as best I know how so tell me about the facts, why you

18   think they don't apply.  I assume that you take that out of

19   your argument.

20        MR. COOPER:  Right.  I'll explain why because in --

21   one cannot ignore what the Supreme Court said in this case and

22   what the Ninth Circuit said in this case.  And then that

23   Supreme Court said that parody based properly figure in

24   assessing the likelihood of confusion and may make a difference

25   in the standard trademark analysis.

1          And it cited two things.  It cited Louis Vuitton and

2   the Solicitor Generals brief and that portion of the Solicitor

3   Generals brief where the Solicitor General criticized this

4   Court's rulings on several of the factors for getting it wrong

5   in the context of a parody.  That's why I'm saying you can't

6   reenter what you did before when the Supreme Court is citing

7   the Solicitor General and the Solicitor General of the United

8   States is taking the position that the Court was erroneous and

9   I'll explain why.

10         THE COURT:  I listened to the arguments in the Supreme

11  Court, and I think counsel for VIP, Ms. Blatt, took exception

12  to some of the statements that were made by the Solicitor

13  General in some respects.  So, I mean, I heard those but that's

14  not part of my record here.  But I know there was a controversy

15  but she was very pointed in her criticism of some of their

16  positions.

17         MR. COOPER:  Right.

18         THE COURT:  That's why I asked the gentlemen over here

19  which part he was from.

20         MR. COOPER:  And the Supreme Court cited the Solicitor

21  Generals brief along with Louis Vuitton so I think the

22  Solicitor Generals brief bears noting on here.

23         THE COURT:  That's fine.

24         MR. COOPER:  Let me talk about why.  If Jack Daniel's

25  is taking the position that this is not a legitimate parody,

1    then they're going to have to argue that before the Ninth

2    Circuit because we're going to be back in front of the Court.

3    Because I think if one reads the Ninth Circuit's brief, the

4    Ninth Circuit's decision, and reads its discussion of the Louis

5    Vuitton case and its comparison of Louis Vuitton to this case,

6    the contention that we're not a parody is fallacious, and it's

7    unsustainable.

8         And I'll say the problem is that you've -- Ms. Saharia

9    gets up and says the standard is did we ridicule their product

10   and she cites the Dr. Seuss case.  Well, in its opinion in this

11   case, the Ninth Circuit distinguishes the Dr. Seuss case.  And

12   the Supreme Court as Your Honor knows -- to use Your Honors

13   terms -- said Louis Vuitton is in the driver seat.  And Louis

14   Vuitton said that the standard for a parody is where you have a

15   juxtaposition of the irreverent representation of the trademark

16   with the idealized image created by the marks owner.

17        You don't need in the trademark context -- and that's

18   Louis Vuitton citing the Peta case -- and that's what the

19   Supreme Court cited.  And you don't need to ridicule the

20   product.  And what we said in our brief was in this case we

21   have never attacked the quality of Jack Daniel's whiskey.

22   Still haven't.

23        What we said in the testimony at trial on the

24   arguments of appeal have all been about we're spoofing their

25   self image, you know, and that's fair game.  And if you look at

1 the Ninth Circuit's treatment of the case, it says that we're

2 spoofing Jack Daniel's commercial image as well as spoofing the

3 relationship people have with their dogs and the self

4 seriousness of all of this stuff.  And that's legitimate

5 parody.

6   And I suggest that the Court read -- just like in

7 Louis Vuitton, they weren't scouring Louis Vuitton handbags and

8 claiming they were shotty.  They were making fun of people that

9 spent a lot of money on these luxury brands.  And Jack Daniel's

10 statement now that we're not like Louis Vuitton, we're -- I

11 don't want to -- they didn't use this term but basically

12 implied we're cheap booze is kind of crazy.  They've been very

13 proud of their image as America's whiskey.

14   And so we're entitled to spoof that even though we

15 don't make negative comments about the quality of the liquor.

16 We're entitled to attack the self seriousness of their

17 commercial image.  And that's in our brief.  It was in our

18 Supreme Court brief and we were making it all along.  And if

19 you look at the Ninth Circuit's opinion, the Ninth Circuit's

20 opinion is, well, the Court's own findings really look back at

21 what the nature of this was and the nature of parody was.

22   But it's not limited to we have to attack their

23 product.  That's not a trademark doctrine.  It's certainly not

24 a trademark doctrine after the Supreme Court decided this case

25 and cited to Louis Vuitton and Your Honor made the correct

1    observations that Louis Vuitton is now the standard for these

2    parody cases.

3         Now, I do want to make a comment about the Second

4    Circuit in the Mr. Studios case, which is the sneakers.  This

5    isn't the sneakers case.  In the sneakers case, both parties

6    put out wearable sneakers.  They were advertised to the same

7    demographic.  There was actual confusion.  It's not this case.

8         I have some doubts about whether the Second Circuits

9    analysis will stand up but it's not this case.  Not even close.

10   The idea this is not a bottle whiskey, they didn't -- this is a

11   dog toy.  They don't make dog toys.  To the extent they make

12   dog products of any kind, they're sold in one place, the gift

13   shop in Lynchburg, Tennessee; not on the web, not in your local

14   stores.  You can't go down any place in Phoenix, log onto the

15   network, and buy a Jack Daniel's dog product or -- or log onto

16   the network or go into a store and buy it.  It exists in one

17   place.  That's minimum overlap.

18        And the Louis Vuitton case says the fact you can buy

19   both products in one Macy's store in New York, that's not

20   substantial overlap so it's the same kind of thing.  The Wavy

21   Baby cases -- the Wavy sneakers is completely different.

22        Let me talk about the Sleekcraft factors, why the

23   Court has to reexamine all of those factors.  Even if the Court

24   doesn't reevaluate the strength of the marks and the Louis

25   Vuitton -- and endorsed by the Solicitor General in its brief

1   and the Supreme Court -- that slips in significance because the

2   strength of the mark is the mechanism avoiding confusion.

3   People recognize the Jack Daniel's bottle and they know this

4   isn't it.

5         The idea that there is not enough contrast between a

6   Jack Daniel's bottle and this, Bad Spaniels, the wide eyed

7   spaniel on the front, not a bottle of liquor.  And the fact

8   that they contend that Bad Spaniel's wasn't even the infringing

9   aspect of it, that Bad Spaniel's was -- this stuff was their

10  control is crazy.  You have to -- in fact, it's not the same.

11  The similarity of the marks are critical to make the parody

12  work.

13        If you put this on their control -- they had like a

14  wine bottle that said Bad Spaniel's and had a dog.  That

15  wouldn't be much of a parody because it doesn't look alike

16  enough to sell the joke.  This is enough to sell the joke but

17  not too much.

18        If we put Jack Daniel's label on a dog toy, we

19  couldn't say that's enough because we used their exact mark and

20  their stuff and we couldn't call it a parody just because we

21  put it on a dog toy but there are a lot more changes.  And if

22  the Court reads the Ninth Circuit's description of facts,

23  that's what you're going to see in the next opinion in this

24  case.

25        Third, this court found out there was -- that VIP

1    products had intent to copy, quote, for purposes of parody.

2    That's this Courts language.  We agree.  What the Court said

3    that was enough bad intent.

4         What Louis Vuitton said is, no, because it's okay to

5    free ride by putting out a parody but that's not the same as

6    intent to confuse.  And even attempting to profit does not

7    diminish the parody.  That's both the Solicitor Generals brief

8    and the MCA Records case from the Ninth Circuit.

9         So those factors which the Court found just have a

10   different legal significance when you get into the parody

11   context.  As for the other factors, of actual confusion, all

12   there is now is this survey by Dr. Ford.  I'm not sure where

13   they got a 25 percent number correcting for confusion because

14   the problem is, as Dr. Nowlis pointed out during the trial, the

15   survey designed that Dr. Ford used did not control for the

16   problem of legal confusion or the problem of parody.

17        And that's -- it's a two-part problem.  First, as the

18   odd couple as I like to call it -- Justices Sotomayor and

19   Justice Alito -- pointed out in their concurrence that one of

20   the problems is your standard, everyday, garden variety

21   trademark confusion survey doesn't adjust for the fact that

22   people may think that you need -- that these are related to

23   Jack Daniel's because to do a parody, you need permission as a

24   matter of law.  And that's what the concurrent says.  That's a

25   real problem here.

1   And there's prior case law that was cited before which
2   was from the Seventh Circuit in the Indianapolis Colts case and
3   the stuff we cited in our brief, commentary on that problem of
4   legal confusion.  Dr. Ford didn't adjust for that.  So the fact
5   that the lawyers go back and say we'll take out the respondents
6   who asked about legal permission and come up with a 25 percent
7   number, that's -- that's the tip of the iceberg problem.

8   We don't know how many people who responded to survey
9   and thought there was some relationship were going off of the
10  problematic legal confusion because there were no instructions,
11  there's no survey designed for it.  I don't know how to design
12  a survey for that but that survey didn't do it and that's why
13  Justice Sotomayor is pointing out that the survey in this case
14  was problematic.

15  And, in fact, all of the surveys are problematic as
16  the Indianapolis Colts finds -- case from the Seventh Circuit
17  pointed out.  When you have a parody, it's a two-step thing.
18  The first thing you do is you see, oh, this looks similar and
19  then you realize it's a parody.  Oh, I get the joke now.  So
20  when you're filling out a survey, you see the similarity, but
21  because you're not buying it, you don't look at it enough to
22  say it's a parody.  And that's the problem that the Seventh
23  Circuit found in these kinds of surveys.

24  Maybe you could do a survey that corrected for these
25  problems but Dr. Ford didn't do it.  There's no evidence in the

1    record that Dr. Ford made any attempt to reflect the fact that

2    this was a parody case in his survey design.  And that's why

3    this court on reflection, after the Supreme Court said parody

4    is critical to analysis of factors and also the concurrences

5    acknowledgment that surveys are a particular problem in parody

6    cases that it needs to -- the Court should come out in a

7    different way.

8        Finally, let me talk about the other factors that are

9    really diminished.  One is the proximity of goods.  Again, the

10   only -- the -- Jack Daniel's has forsworn ever putting out a

11   dog toy.  All they have are some other dog accessories that are

12   only sold in the gift shop.  That's the Louis Vuitton Macy's

13   situation.  It's not enough of an overlap.

14       They talked about Internet searches.  Well, this court

15   found -- and we're not disagreeing that both products -- that

16   you could find Jack Daniel's merchandise and our product on

17   Amazon or Walmart.com at least for some period of time, and now

18   Boozin Gear.  What's the legal significance of that?  Well

19   since this court ruled, we now have a body of precedent about

20   what does Walmart.com and Amazon.com mean in terms of trademark

21   confusion and marketing channels.

22       Judge Silver in 2019 says, well, everybody sells

23   everything on Amazon so that doesn't -- that's not really under

24   the prevailing test for some overlapping marketing channels

25   enough.  The Seventh Circuit in Uncommon said Amazon and Ebay

1    aren't enough because everything gets sold on those.  The

2    Central District of California in Davis case said Amazon.com.

3    Again, it's a universal outlet for everybody so that's really

4    not enough.

5         And the Southern District of California in Airhawk in

6    2020 said Amazon and Walmart are kind of the universal

7    ubiquitous channels for everyone to sell everyone's goods so

8    those are not enough.  So all these cases are 2019 to 2023.

9    This Court did not have the benefit of it.

10        They said, well, you cited a Ninth Circuit case from

11   2011.  All the Ninth Circuit case said in Network Automation in

12   that case -- the only thing that was available at the time

13   which was a legal precedence -- was it's not enough for the two

14   companies to be selling on the Internet because lots of things

15   get sold on the Internet.  It's the later precedent that this

16   Court did not have the benefit of that said Amazon,

17   Walmart.com, not enough because everything in the world gets

18   sold.

19        That leaves them with Boozin Gear.  Boozin Gear is, at

20   best, like Macy's in New York.  It's a site with indeterminant

21   amount of stuff.  It's one little site that no one's heard of

22   and that's not enough to say overlapping marketing channels for

23   purposes of that.

24        Then we get to the issue of the type of goods and

25   degree of care.  You don't have to be an expensive product for

1  people to care.  In this case, it's a parody item.  People and

2  the Supreme Court warned in the Campbell case -- pointed to the

3  unlikelihood that a company would license a lampoon of their

4  own productions.

5       People seeing this, aside from that legal confusion

6  problem, do not think this is a Jack Daniel's whiskey bottle or

7  Jack Daniel's product.  So it's unlikely that even -- that

8  anyone is going to think that this dog toy is actually -- aside

9  from legal confusion -- is from out of Jack Daniel's,

10 particularly because this points to the tension they have in

11 their argument.

12      On the one hand, they say this is so disgusting that

13 it's tarnishing our reputation, but, yet, people are going to

14 think it's coming from Jack Daniel's.  You can't have it both

15 ways.  The Supreme Court in the United States has said people

16 don't license lampoons of their own productions, yet they're

17 saying exactly that, that people are going to think that Jack

18 Daniel's put out a disgusting parody of its own product and

19 that's not the standard and that's not the law.

20      You know, just because, you know, if you talked about,

21 well, Jack Daniel's, a lot of their merchandise are impulse

22 buys like barbecue sauce and belt buckles.  You mean, the kind

23 of barbecue sauce that children might use.  The belt buckles

24 that children might wear.  I got my Jack Daniel's belt buckle

25 when I was under a drinking age.  And I then passed it off to

1    my son because he was in college.

2           THE COURT:  That's not evidence in this case.

3           MR. COOPER:  It's not.

4           THE COURT:  I just want to be sure.

5           MR. COOPER:  I'm offering it as a little aside.  But

6    the argument that somehow that if it's a product to be used by

7    children that somehow it tarnishes is contrary to their own

8    acknowledgement.  They license a lot of products.  But the one

9    thing they don't license is dog toys.  And they don't sell in

10   pet shops or places we have.

11          The fact there's one website somewhere that for some

12   period of time you could get their merch and our product -- and

13   I don't know how you come up with them on the same web source

14   but it doesn't matter.  It's the Macy's thing from -- from --

15   from Louis Vuitton.

16          I really recommend that the Court read the Ninth

17   Circuits treatment of Louis Vuitton, its comparison of Louis

18   Vuitton to this case, and then read the Louis Vuitton case.

19   They are so close that if you put our hypothetical in a

20   trademark class at ASU Law School, people would think it was

21   based on the Louis Vuitton case.  And the fact their luxury

22   goods cost more than a bottle of Jack Daniel's iconic whiskey

23   is not enough to distinguish the case.

24          And the idea that that -- that it's -- there's not

25   enough contrast because this is a squeaky injected vinyl dog

1    toy compared to a glass bottle and that's a fuzzy dog toy

2    compared to a luxury handbag.  That doesn't take us out.

3    Again, read the Ninth Circuit, Your Honor, read Louis Vuitton.

4         Your Honor is right when you said Louis Vuitton is

5    steering -- is steering this -- is in the driver's seat for

6    this case.

7         THE COURT:  Thank you.  Back to you.

8         MS. SAHARIA:  May I respond very briefly, Your Honor?

9         THE COURT:  Of course.

10         MS. SAHARIA:  Okay.  I'll be super brief.

11         THE COURT:  You came all the way out here, might as

12    well give it all to me.

13         MS. SAHARIA:  Thank you.  I think it's quite telling

14    that counsel is urging the Court to read the vacated Ninth

15    Circuit decision more than he is urging the Court to read the

16    Supreme Court decision.  The Ninth Circuit decision was vacated

17    by the Supreme Court, and the Ninth Circuit for that matter did

18    not decide likelihood of confusion.  If it had decided

19    likelihood of confusion and if it had decided there's no way on

20    earth that anyone could conclude likelihood of confusion on

21    these facts, then why did it remand this case to apply the

22    Rogers test.  It didn't decide likelihood of confusion and it's

23    been vacated so that's point number one.

24         The decision that is in the driver seat now is this

25    Supreme Court decision.  And this is what the Supreme Court had

to cite about Louis Vuitton.  This is everything.  A trademarks expressive message, particularly a product one as VIP asserts, may properly figure in assessing the likelihood of confusion.  CEG, Louis Vuitton.  That's it.

It didn't tell the Court this case is just like Louis Vuitton on its facts.  It didn't tell the Court the factors look out the same way in this case as Louis Vuitton.  In fact, it just said at the end of the same paragraph consistent with our ordinary practice, we remand that issue to the Courts below, to Your Honor -- for Your Honor to determine.  It didn't tell the Court that this case is Louis Vuitton.  Nor, for that matter, did the Solicitor General say that in its brief.

The Solicitor General told the Supreme Court consistent with its ordinary practice this court should vacate the judgment and remand this case to the Court of Appeals, which remanded to this court, of course, to review in the first instance, the District Courts finding of a likelihood of confusion under the correct label standard.  So it didn't say this case is just like Louis Vuitton either.  It just said this is one example for how to assess likelihood of confusion.

Two more related points and then one final point about the marketing channels.  With respect to ridicule, I think counsel said something like there's no ridicule requirement.  Well, that language is in the Supreme Court decision and it's not just that VIP said we're not attacking the quality of Jack

1   Daniel's whiskey.  They said point blank in closing argument we

2   are not ridiculing Jack Daniel's.  This is gentle parody and

3   gentle parody is more likely to be confusing.

4          Similarly, they say there's no question this is

5   legitimate parody, and I think they're basing that on the

6   Fourth Circuit decision but that's not question.  The Supreme

7   Court didn't say the question is whether something is a

8   legitimate parody.  It said the question is whether consumers

9   are likely to be confused.  That is the question before the

10  Court.  Confusion.  Not some sort of on off switch is something

11  parody or is it not.

12         Parodies come in all shapes and sizes.  Some are

13  funnier than others.  Some are more confusing than others and

14  that's what's this court has to sort out.

15         And then, six, with respect to the issue of the

16  overlap and marketing channels and the related products.  It is

17  not required that Jack Daniel's sell actual dog toys in the

18  same -- or dog products in the same marketing channels because

19  we sell related products.  Everyday products like barbecue

20  sauce, like belt buckles, like T-shirts that consumers can buy

21  in places like Amazon and Walmart.  And, yes, we also sell dog

22  products at our store in Tennessee.

23         Now, it is true that in your ordinary case the fact

24  that things are sold on Walmart or Amazon.com may not be that

25  dispositive because many things are sold there, but it is very

1    important here because it distinguishes this case from Louis

2    Vuitton.  Where in Louis Vuitton you cannot buy firsthand Louis

3    Vuitton purses on Amazon, whereas, presumably, you could buy

4    those dog toys on Amazon.

5            Although, the case was a long time ago.  I don't know

6    what was on Amazon then.  But you get my point here.  Right.

7            Here, it matters because this is not a case where you

8    cannot get the products in the same places which was the case

9    in Louis Vuitton except for one physical store.  And to say

10   that Amazon or Walmart are the same as one physical store is

11   just preposterous.  Everyone buys everything on Amazon these

12   days.

13           THE COURT:  They think they can.  There are exclusive

14   marketing agreements that are still in existence.

15           MS. SAHARIA:  But that is a feature of this case that

16   is extremely different than the Louis Vuitton case.  So unless

17   the Court has further questions, I'll stop there.

18           THE COURT:  Could you -- you sort of hit the ball back

19   to me saying you got to sort it out.  I want you to tell me

20   exactly why you think -- and maybe you have -- of likelihood of

21   confusion on -- as to your client.

22           MS. SAHARIA:  Yes, Your Honor.

23           THE COURT:  Maybe -- maybe I blinked my eyes or

24   something like that and I didn't quite hear it but can you give

25   me that because that's the thing.  I got to find certain

1    things.  But since you're advocating for your client, what you

2    think your client's position is, can you help me out to

3    understand that.  That's all.

4            MS. SAHARIA:  Yes.  Of course, Your Honor.

5            So to go back -- let me start with just very briefly.

6    I think the three features that I highlighted that we think

7    show confusion on the facts of this case when you take into

8    account the Supreme Court's guidance.  First, the high degree

9    of similarity between their products.  This is not a case where

10   the differences are obvious.

11           This is not a case like Louis Vuitton where you have a

12   miniature version of a leather purse that was made out of

13   plush.  These are -- the Court already found that these are

14   highly similar, that they copied the label exactly with the

15   same filigreed border, the same neck around the wrap, the same

16   coloring scheme, the same exact size and exact shape of the

17   bottle.  It is completely different than Louis Vuitton and the

18   Tommy Hilfiger case so that's reason one.

19           Reason two is the point that I made that this is not a

20   case where a consumer would think that Jack Daniel's is mocking

21   itself or ridiculing itself.  Even accepting the premise that

22   VIP's intent was to mock big companies for taking themselves

23   too seriously, that message is so generic that a consumer would

24   not see that dog toy and understand the message or understand

25   that this is not a product coming from Jack Daniel's because

1    it's so inconceivable that Jack Daniel's could have made that

2    dog toy.  So that's reason number two.

3              Reason number three, the survey.  We have clear

4    evidence of confusion finding 29 percent confusion.

5              And then reason number four, the products aren't

6    related to each other.  They are sold in the same marketing

7    channels which, again, would lead a consumer to be confused

8    into thinking, well, this product could come from Jack Daniel's

9    because I see T-shirts coming from Jack Daniel's.  I see

10   barbecue sauce coming from Jack Daniel's, and in some cases, I

11   see dog leashes and doghouses coming from Jack Daniel's.

12             And then I think the other relevant factor that we

13   haven't touched on today is the low degree of consumer care in

14   buying these kinds of products.  These dog toys are $15.

15   They're the kind of product that courts find everyday lead to a

16   low degree of consumer care in buying them which contributes to

17   confusion.

18             So I think those touch on the primary reasons.  I

19   think the Supreme Court decision supports all of that and these

20   are all based on the Sleekcraft factors, the similarity of the

21   mark, the confusion evidence, the parallel marketing channels,

22   and the low degree of consumer confusion.

23             THE COURT:  Okay.  Is that it?

24             MS. SAHARIA:  That's it.

25             THE COURT:  Mr. Slaughter, do you have anything to add

1    to all of this?  I don't want to miss you because you're

2    sitting to the side over there.

3                MR. SLAUGHTER:  Nothing from me.

4                THE COURT:  Mr. Cooper, anything additional that you

5    have that hasn't been addressed yet?

6                MR. COOPER:  No, Your Honor.  I think everything has

7    been addressed either today or in the briefs.

8                THE COURT:  So that means we came to the end of the

9    journey here this morning.  We've --

10               MS. SAHARIA:  Yes, Your Honor.

11               THE COURT:  We have no further arguments?  All right.

12   Then they will be deemed submitted.

13               However, I have something else.  Here it is.  Since

14   we're here at this time of the year which is a very festive

15   time of the year, I have some pop quizzes here.

16               MS. SAHARIA:  I had a bad feeling about that, Your

17   Honor.

18               MR. COOPER:  Now you've got my attention, Your Honor.

19               THE COURT:  I didn't want to distract you from your

20   presentation by this.  If you've been here -- and some of you

21   have -- when I swear people into court to practice here we have

22   lots of people and we have lots of pop quizzes.

23               One has to do with the constitutionality of our system

24   and the importance of the rule of law and the antipathy of that

25   is the old movie Judgement at Nuremberg, the trial of six

```
 1   judges at the conclusion of World War II and what happened when

 2   they failed their oath of office.  And that's why the oath of

 3   office of the Constitution that I point out earlier is very

 4   important and why we have a separation of powers.

 5           It's very important.  They don't have that in a lot of

 6   countries around the world.  I'm sure you know as an

 7   international marketer there's different standards of justice

 8   throughout the world, but be that as it may, and there's only

 9   one -- as I point out -- there's only one actor who's still

10   left from that movie that was made back then.

11           MR. COOPER:  Maximilian Schell.

12           THE COURT:  Nope.  He's gone.  Anyone want to take

13   another guess?  You see him everyday.  Hand in the back there.

14   He knows.

15           UNIDENTIFIED SPEAKER:  William Shatner.

16           THE COURT:  William Shatner.  Right.  He's the only

17   one left.  Okay.  Now you know some trivia for your tables.

18   Now couple more things because these have -- these next things

19   have to do with Arizona obviously.

20           In I think it was -- I can't remember the exact year

21   but Irving Berlin has written the famous song White Christmas.

22   It's been made into a movie, Holiday Inn, then White Christmas

23   again.  And it's very famous.  Bing Crosby recorded it.

24           It was the number one seller at one time.  I think it

25   still is.  But it sold more than anything else.
```

1          Now two hotels claim that that song was written at

2    their location.  There's no definitive proof and they're very

3    famous hotels.  One happens to be in Arizona.  And he was here

4    at that time.  There's another one over in California.  Anyone

5    want to take a swipe at that one just for the heck of it?

6          MR. COOPER:  The California one?

7          THE COURT:  Either one.

8          MR. COOPER:  I'll go for The Biltmore in Arizona.

9          THE COURT:  That's one of them.  He was here at that

10   time.  There's evidence of that that he was here.  But in his

11   opening thing about Southern California and whatever they talk

12   about in the opening thing before they get to White Christmas

13   is -- in California is the Beverly Hills Hilton and they both

14   vie to claim it was written there because they talk about

15   Beverly Hills LA in the song.

16         But that's not the real question.  There's two -- in

17   the movie White Christmas, there's two movie stars who come

18   from the same town who are very famous in the movie and they're

19   not related but they come from the same town and one of them is

20   an academy award winner.

21         That's kind of bleak.  Anyone want to take a wild

22   guess on that?  One man and one woman.

23         MR. COOPER:  I'm thinking -- it could be the wrong

24   movie.  Virginia Mayo.

25         THE COURT:  No.  All right.  I'll help you out so you

1    can laugh about all of this.  Female is Rosemary Clooney.  And

2    the actor is really a dancer, George Chakiris, who was a Tony

3    Award winner I think in -- on stage for West Side Story.  In

4    the movie, that's what he got his Academy Award for.  They're

5    both from Cincinnati, Ohio, which is where I happened to grow

6    up, thus my interest in this.

7         But the point being they were both -- which is unusual

8    being in the same movie from the same town way back when --

9    when they made that movie in the 1940s, whatever, 50s.  That's

10   just two easy ones.

11        Now there is one other one that has a better thing

12   that you'll get a kick out of, maybe, maybe not, that involves

13   one of our sister states sort of.  Texas.  In Texas,

14   particularly on the west side of Texas, in El Paso, there's a

15   very famous cantina that was made famous in a song.  Anybody

16   want to take a guess on that one?

17        MR. COOPER:  I assume you're talking about Marty

18   Robbins' song?

19        THE COURT:  That's correct.  What's the name of the

20   song though?

21        MR. COOPER:  The song is --

22        THE COURT:  El Paso.  Out in the West Texas town of El

23   Paso --

24        UNIDENTIFIED SPEAKER:  Rosa's Cantina.

25        THE COURT:  Rosa's Cantina.  Has anybody ever eaten

 1    there?  It's a real place.  If you go to El Paso, eat there.

 2    Enjoy yourself.

 3          But what's unusual about Marty Robins -- that's the

 4    connection to Arizona -- you might know this, he's from here.

 5    He grew up in Glendale, Arizona.  And he is a member of the

 6    Country Western Hall of Fame as a singer and a songwriter.

 7          So now you have lots of trivia when you get around the

 8    dinner table to have fun with.  And they'll say where did you

 9    learn those crazy facts, and you'll say this nutty judge out in

10    Arizona having a game session at the end of the hearing.

11          But I always like to try to leave -- this is a very

12    contested case, a lot of hard feelings, maybe, maybe not.  But

13    I always try and leave hearings with some sort of smile on our

14    face because if you make yourself smile, everybody is happy

15    that day.

16          MR. COOPER:  Well, Your Honor, if there is another

17    hearing before Your Honor, I can try to attend wearing a white

18    sport coat with a pink carnation.

19          THE COURT:  You might.  But you may get stopped by the

20    guard.  I don't know.  I know you wouldn't appear in front of

21    the Supreme Court like that.

22          But, anyway, I appreciate everyone being here.  It's

23    an inconvenient time of the year and everybody prepared well.

24    I know how hard it is and we'll try to get this sorted out as

25    somebody said.  So we'll go forward and hopefully we'll see

1    where our journey takes us to the end of the day.

2           Thank you all very much for being here.  It's a

3    pleasure.

4           MS. SAHARIA:  Thank you, Your Honor.

5           THE COURT:  And travel safely going home or wherever

6    you're from.

7           MS. SAHARIA:  Thank you very much.

8

9       (Proceedings conclude at 12:26 p.m.)

10                          ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    **C E R T I F I C A T E**

6

7          I, ANDREA K. BLUEDORN, do hereby certify that I am

8    duly appointed and qualified to act as Official Court Reporter

9    for the United States District Court for the District of

10   Arizona.

11         I FURTHER CERTIFY that the foregoing pages constitute

12   a full, true, and accurate transcript of all of that portion of

13   the proceedings contained herein, had in the above-entitled

14   cause on the date specified therein, and that said transcript

15   was prepared under my direction and control.

16         DATED at Phoenix, Arizona, this 24th day of

17   March,2025.

18

19

20                    /s/ Andrea Bluedorn
21                    Andrea K. Bluedorn, RMR, CRR

22

23

24

25